UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ALEXEY V. TARASOV, ESQ., Administrator of the                Case No.: 21-cv-6226 (NRB)
Estate of EVGENIY LAGODA, Deceased, and
GRIGORY TIKHOPLAV,

                                  Plaintiffs,                **DEFENDANTS' RULE 56.1
                                                            STATEMENT OF MATERIAL
        -against-                                           FACTS**

PORT AUTHORITY OF NEW YORK AND
NEW JERSEY, and PORT AUTHORITY OF NEW
YORK AND NEW JERSEY POLICE DEPARTMENT
a/k/a PORT AUTHORITY POLICE DEPARTMENT
a/k/a PAPD, PAPD OFFICER MICHAEL BUGIADA,
PAPD OFFICER ROBERT JOSEPH, PAPD OFFICER
JONATHAN PAPIA, PAPD OFFICER PAUL
MEZZACAPPA, and PAPD OFFICER JONATHAN
DURAN,

                                  Defendants.
-------------------------------------------------------------------X

Defendants, Port Authority of New York and New Jersey, (the "Port Authority")[1], Port

Authority Officer Michael Bugiada, Port Authority Officer Robert Joseph, Port Authority Officer

Jonathan Papia, Port Authority Officer Paul Mezzacappa, and Port Authority Officer Jonathan

Duran, (hereinafter referred to collectively as "Defendants"), by the undersigned attorneys for the

Port Authority Law Department, submit the following statement of material facts pursuant to Local

Rule 56.1:

## Preliminary Statement

This case arises from the unfortunate death of Evgeniy Lagoda on April 12, 2019,

following an incident aboard JetBlue Flight 659 at JFK Airport. As the undisputed material facts

establish, Lagoda experienced a seizure related to his previously undiagnosed medical condition

---

[1] The Port Authority of New York and New Jersey Police Department a/k/a Port Authority Police Department a/k/a PAPD was also named as Defendant in this matter; however, the Port Authority Police Department does not exist as a separate entity that is subject to suit.

while onboard an aircraft with approximately 200 passengers. Once the Port Authority Police was called to respond to the plane, Lagoda became violent and assaulted a flight crew member and a passenger, creating a safety risk in the confined aircraft environment. When Port Authority Officers responded to this escalating emergency, they were confronted with a combative individual who refused to comply with verbal commands, physically attacked an officer, and continued to pose a threat to the safety of others. The officers' actions were reasonable, necessary, and in accordance with their training and Port Authority protocols. Medical evidence confirms that Lagoda's death resulted from his underlying medical conditions rather than from any force used by the officers, who promptly initiated life-saving measures once they observed the first sign of medical distress. An independent investigation by the New York Attorney General's Office concluded that no wrongdoing occurred.

## The Parties

1.      The Port Authority is a body corporate and politic created by Compact between the States of New York and New Jersey with the consent of the Congress of the United States, having its principal office at 4 World Trade Center, 150 Greenwich Street, New York, New York 10007. (Exhibit ("Ex.") F of Declaration of Cheryl N. Alterman ("Alterman Dec.") at ¶ 4).

2.      At all times relevant, Port Authority Officers Michael Bugiada, Robert Joseph, Jonathan Papia, Paul Mezzacappa, and Jonathan Duran were employed by the Port Authority as police officers. (Ex. F of Alterman Dec., Defendants' Answer, at ¶¶ 6-10).

3.      Alexey V. Tarasov, Esq., is an attorney duly licensed to practice in the states of Texas, Oklahoma, and New York. On January 8, 2021, Mr. Tarasov was appointed as the Administrator of the Estate of Evgeniy Lagoda, deceased, by the Surrogate's Court of the State of

2

New York, Queens County.  (Ex. E of Alterman Dec., Plaintiffs' First Amended Complaint at ¶ 1).

4.    Gregory Tikhoplav is the father of decedent, Evgeniy Lagoda, and is a citizen of Russia, residing in the city of Krasnodar. (Ex. E of Alterman Dec., Plaintiffs' First Amended Complaint at ¶ 3).

### Initial Medical Response and Rapid Escalation to Violence

5.    The first call reporting the incident was received at 10:20 p.m. on April 12, 2019, when a female caller from JetBlue reported to the Port Authority Police that a male passenger was having seizures on JetBlue Flight 659 at Gate 20, Terminal 5. (Ex. JJ of Alterman Dec., Analysis of Radio Transmissions, PA1405).

6.    At 10:21 p.m., the initial dispatch information was transmitted via patrol radio, informing Officer Michael Bugiada and other officers that an aircraft was returning to Gate 20 with a male passenger having a seizure onboard. (Ex. JJ of Alterman Dec., Analysis of Radio Transmissions, PA1405).

7.    JetBlue Flight 659 was bound for Kingston, Jamaica with approximately 200 passengers on board. (Ex. O of Alterman Dec., Swinney Dep. at 51:6-15; Ex. R, Bengtson Dep. at 43:21-44:25).

8.    It was discovered by the flight crew, that the passenger, Evgeniy Lagoda ("Lagoda"), had experienced a seizure while seated in an aisle seat near the back of the aircraft, around Row 32 or 33. (Ex. P of Alterman Dec., Ingleton Dep. at 27:16-28:14, 81:6-13; Ex. Q, Leandro Dep. at 22:9-18; Ex. S, Wright-Reid Dep. at 16:10-17:11).

9.    Lagoda was observed to be exhibiting symptoms of a seizure, including "tremors, foaming at the mouth, and some bleeding." (Ex. T of Alterman Dec., Miller Dep. at 55:23-56:9; Ex. O, Swinney Dep. at 20:18-23; Ex. Q, Leandro Dep. at 22:9-19).

10.    Flight attendants Calvin Swinney and Kevin Ingleton responded to the medical incident by moving Lagoda to the aft galley in the rear of the aircraft where he was laid down. (Ex. O of Alterman Dec., Swinney Dep. at 21:9-22-7; Ex. P, Ingleton Dep. at 28:7-14; Ex. Q, Leandro Dep. at 23:12-18).

11.    The flight crew made an announcement requesting medical assistance, and three nurses, who were passengers on the flight, responded and came to assist with Lagoda. (Ex. P of Alterman Dec., Ingleton Dep. at 35:6-20; Ex. O, Swinney Dep. at 25:25-26:10, 29:24-30:6).

12.    After approximately 10 minutes, Lagoda suddenly became violent. (Ex. O of Alterman Dec., Swinney Dep. at 41:13-42:10; Ex. Q, Leandro Dep. at 67:13-68:1, 70:21-14; Ex. T, Miller Dep. at 56:24-57:9).

13.    After the seizure ended, Lagoda became "aggravated and belligerent" and swinging his arms "trying to fight". (Ex. S of Alterman Dec., Wright-Reid Dep. at 28:23-29:20; Ex. P, Ingleton Dep. at 66:6-23).

14.    Registered nurse Nathana Wright-Reid testified that when she tried to explain to Lagoda what had happened, he became aggressive and struck her hard in the stomach. (Ex. S of Alterman Dec., Wright-Reid Dep. at 17:19-25, 26:3-13; Ex. T, Miller Dep. at 37:19-38:12).

15.    Wright-Reid described Lagoda as "aggravated and belligerent," "just trying to fight," and "swinging his arms." (Ex. S of Alterman Dec., Wright-Reid Dep. at 28:23-29:10).

16.    After punching Wright-Reid, Lagoda repeatedly and forcefully punched flight attendant Calvin Swinney. Swinney testified that he was struck "five to six times". (Ex. O of

Alterman Dec., Swinney Dep. at 37:13-18, 43:16-44:5; Ex. P, Ingleton Dep. at 50:12-18, 119:5-24).

17.    The punches were delivered with significant force, as Swinney described Lagoda as "a strong dude" who "hit [him] pretty hard." Swinney was "in pain" from the assault. (Ex. O of Alterman Dec., Swinney Dep. at 37:19-25, 44:6-16).

18.    Lagoda's violent behavior trapped two women in the galley, one of whom was pregnant, who were "too scared to move." (Ex. O of Alterman Dec., Swinney Dep. at 42:18-43:5; Ex. J, Bugiada Dep. at 112:13-113:4; Ex. S, Wright-Reid Dep. at 31:21-32:20).

## Significant Threat to Aircraft Safety

19.    Flight attendant Calvin Swinney, who had 20 years of NYPD experience including 11 years as a detective, testified that Lagoda "posed a threat to the safety of the other passengers on board this aircraft." (Ex. O of Alterman Dec., Swinney Dep. at 13:14-15:6, 44:20-45:8).

20.    Swinney positioned himself between Lagoda and the passenger cabin to prevent Lagoda from threatening other passengers. (Ex. O of Alterman Dec., Swinney Dep. at 45:2-20).

21.    Captain Bengtson testified that assaulting crew members and passengers constitutes "serious customer misconduct" that "effects the safety of the flight." (Ex. R of Alterman Dec., Bengtson Dep. at 32:9-34:5, 75:17-76:8).

22.    Captain Bengtson further testified that when crew members are injured "they cannot perform that safety function, so the safety of that flight is compromised." (Ex. R of Alterman Dec., Bengtson Dep. at 75:24-76:8).

23.    According to the flight operations manual, Lagoda's actions constituted a "Level II customer disturbance," defined as "physically abusive behavior" that is "considered a serious violation of safety of flight resulting in the need to involve law enforcement authorities." (Ex. R

5

of Alterman Dec., Bengtson Dep. at 27:5-25, 72:4-73:12, 74:12-75:3, 115:3-18; Ex. OO, JetBlue Flight Operations Manual at Sections 1.47.22-1.47.23 at PA267-PA269).

24.     Captain Bengtson testified that in his 16.5 years of experience with JetBlue Airways, he has experienced "two or three" instances where flight attendants reported being assaulted by customers. (Ex. R of Alterman Dec., Bengtson Dep. at 111:2-18).

25.     Captain Bengtson noted that a confined aircraft environment magnifies the danger of violent behavior: "… it's a confined environment, so anything that one person does in a confined environment has a greater chance to impact more people around them …" and "… there is a chance for inadvertent people getting hurt, as well as the higher chance of someone getting hurt just due to the density of the people onboard." This was echoed by Swinney, who testified that the confined nature of an aircraft provides additional safety concerns when violence occurs on a plane, "The space is very limited. There's not much you can do, so you just try to get ahold of the suspect, or customer, as best you can before things get out of control." (Ex. R of Alterman Dec., Bengtson Dep. at 28:1-25; Ex. O, Swinney Dep. at 50:12-23).

## Officer Bugiada's Response

26.     The situation that Officer Bugiada encountered upon arrival on the aircraft had escalated from what was initially reported medical incident to an active violent disturbance threatening the safety of crew and passengers. (Ex. J of Alterman Dec., Bugiada Dep. at 55:22-56:18, 111:13-112:23; Ex. O, Swinney Dep. at 46:24-47:23).

27.     When Officer Bugiada arrived at the plane, he was directed to the rear galley where he immediately observed a chaotic scene with women trapped and screaming for help. (Ex. MM of Alterman Dec., Affidavit of Michael Bugiada ("Bugiada Aff.") at ¶¶ 7-9; Ex. J, Bugiada Dep. at 112:13-112:23; Ex. P, Ingleton Dep. at 55:17-56:11).

28.    Officer Bugiada testified that Lagoda was blocking the exit from the galley where three women were trapped. (Ex. MM of Alterman Dec., Bugiada Aff. at ¶¶ 9-10; Ex. J, Bugiada Dep. at 112:13-23).

29.    Officer Bugiada first attempted to resolve the situation by giving verbal commands and using hand gestures directing Lagoda to move aside to let the women out. (Ex. MM of Alterman Dec., Bugiada Aff. at ¶¶ 12-13; Ex. J, Bugiada Dep. at 112:24-113:23; Ex. Z, Monaghan Dep. at 295:12-24).

30.    Lagoda did not comply with Officer Bugiada's verbal commands. (Ex. MM of Alterman Dec., Bugiada Aff. at ¶ 14; Ex. J, Bugiada Dep. at 113:13-114:8).

31.    Officer Bugiada gave his verbal commands to Lagoda in English in a combination with his use of hand gestures. (Ex. MM of Alterman Dec., Bugiada Aff. at ¶¶ 12-13; Ex. J., Bugiada Dep. at 104:17-19, 112:24-113:18).

32.    Lagoda's father conceded that he "had the command of the English – technical English language … " and "He was able to communicate. He was not completely fluent in the English language, but he could understand. He could carry a conversation." (Ex. V of Alterman Dec., Tikhoplav Dep. dated July 25, 2023 at 174:3-23).

33.    Multiple witnesses testified regarding Lagoda's aggressive behavior toward Officer Bugiada and confirmed that Lagoda initiated the physical confrontation with the officer. Officer Bugiada stated that Lagoda charged at him with clenched fists. Flight attendant Kevin Ingleton stated that "The officer, to my recollection, also got attacked," "He did attack the officer," and "I saw him move toward to attack him...I saw that he lunged at him." Nurse Wright-Reid stated that when police arrived, Lagoda continued his behavior and was "throwing punches everywhere"

including at the police officer. (Ex. J of Alterman Dec., Bugiada Dep. at 113:24-114:8; Ex. P, Ingleton Dep. at 56:12-57:9, 59:18-61:12; Ex. S, Wright-Reid Dep. at 29:21-30:16).

34.    In response to Lagoda charging at him, Officer Bugiada used OC (pepper) spray on Lagoda. (Ex. MM of Alterman Dec., Bugiada Aff. at ¶ 15; Ex. J, Bugiada Dep. at 114:9-12).

35.    Officer Bugiada testified that at the time he deployed the OC spray he did so to protect himself and everyone on the aircraft by trying to gain compliance and control over Lagoda. (Ex. J of Alterman Dec., Bugiada Dep. at 114:9-115:6).

36.    The OC spray had no effect on Lagoda, who wiped it off his face and attempted to punch Officer Bugiada in the head. (Ex. MM of Alterman Dec., Bugiada Aff. at ¶ 18; Ex. J, Bugiada Dep. at 116:8-15).

37.    After avoiding Lagoda's punch, Officer Bugiada responded by striking Lagoda once in the face with his fist, after which Lagoda went to the ground. (Ex. MM of Alterman Dec., Bugiada Aff. at ¶¶ 19-20; Ex. J, Bugiada Dep. at 117:13-21).

38.    Officer Bugiada radioed a distress call stating, "I'm in a fight. Send me another one," and further reporting, "Negative, I'm in a fight. Send me another one." When asked for his location, Officer Bugiada responded, "Gate 20, on the plane!" followed by, "Still combative, speed it up." (Ex. MM of Alterman Dec., Bugiada Aff. at ¶ 21; Ex. JJ, PA1409; Ex. J, Bugiada Dep. at 117:22-118:17; Ex. NN, Affidavit of Paul Mezzacappa ("Mezzacappa Aff.") at ¶ 8).

39.    While on the ground with Officer Bugiada, Lagoda bit him, after which Officer Bugiada struck Lagoda four more times: twice when Mr. Lagoda bit him, and twice more when he was "losing control." (Ex. MM of Alterman Dec., Bugiada Aff. at ¶¶ 22-23; Ex. J, Bugiada Dep. at 62:11-64:2).

40.    Defendants' police expert, Retired New York City Police Department Captain John Monaghan, testified that his review and analysis of this matter determined Officer Bugiada's actions to be proper and reasonable under the circumstances, finding Lagoda presented as a combative man in a confined area and Officer Bugiada tried to take control of the situation without using physical force and that progressed to physical restraint in order to take Lagoda under control and place him into custody. (Ex. AA of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan; Ex. Z, Monaghan Dep. at 321:4-323:13).

**Additional Officers' Response to Emergency**

41.    Multiple officers responded to Officer Bugiada's radio call for assistance. Officer Papia testified the threat to Officer Bugiada was evident to him given that Office Bugiada "was screaming on the radio" that "he was in a fight for his life." Officer Joseph stated he could "hear a struggle on the radio." (Ex. K of Alterman Dec., Papia Dep. at 91:5-10; Ex. L, Joseph Dep. at 84:16-85:7).

42.    Officer Papia described the situation on the aircraft as "total chaos" with passengers standing in the aisle and screaming for help. Officer Joseph observed "an active fight in the rear of the plane" between Lagoda and Officer Bugiada, as well as "multiple passengers, some screaming, an environment filled with OC or pepper spray." (Ex. K of Alterman Dec., Papia Dep. at 92:19-93:5; Ex. L, Joseph Dep. at 85:8-15).

43.    Officer Joseph observed Lagoda "actively fighting with Officer Bugiada," "kicking... actively swinging at or grabbing at Officer Bugiada near and around his upper body and his waist and his gun belt." (Ex. L of Alterman Dec., Joseph Dep. at 85:16-86:4).

44.     Officer Papia testified that he observed Lagoda was "trying to gain compliance over [Bugiada]. He was actively biting him... trying to grab his testicles, his firearm, trying to bite him overall fighting and resisting compliance." (Ex. K of Alterman Dec., Papia Dep. at 93:16-94:4).

45.     Officer Papia testified as to the safety threat posed by Lagoda's actions in the following manner: "As police officers, we wear gun belts... if Officer Bugiada was overcome by the suspect, all of those articles and weapons on his gun belt could be used against him and other people." (Ex. K of Alterman Dec., Papia Dep. at 91:11-23).

46.     Upon arrival at the rear of the aircraft, the responding officers immediately engaged Lagoda, who continued to actively resist. Officer Joseph testified that during the restraint process, Lagoda was actively resisting by "pulling his hands away and kicking and attempting to push up and pull his arms away." (Ex. NN of Alterman Dec., Mezzacappa Aff. at ¶ 10; Ex. L, Joseph Dep. at 85:24-87:3).

47.     Officer Papia testified that he struck Lagoda with a closed fist twice – once in the face and once in the arm area – as he attempted to gain control over Lagoda's left arm as officer Bugiada attempted to gain control of Lagoda's right arm. (Ex. K of Alterman Dec., Papia Dep. at 53:23-54:11, 56:8-18).

48.     Officer Joseph assisted by grabbing Lagoda's left hand and bringing it to the rear of his lower back. (Ex. L of Alterman Dec., Joseph Dep. at 86:9-15).

49.     Officer Duran testified that he applied a compliance hold on Lagoda's shin using his expanded baton and hands in a controlled manner. (Ex. N of Alterman Dec., Duran Dep. at 54:13-55:23).

50.     Officer Mezzacappa held Lagoda's leg to the ground with his hands. (Ex. NN of Alterman Dec., Mezzacappa Aff. at ¶ 11; Ex. M, Mezzacappa Dep. at 46:12-17).

51.     Officer Duran testified that he did not apply his body weight to Lagoda during the restraint process and did not observe any other officers sitting on Lagoda or applying body weight to him. (Ex. N of Alterman Dec., Duran Dep. at 59:24-15, 69:12-23).

52.     Officer Joseph testified that at no point did he observe any officer on top of Lagoda during the restraining process, nor did he observe any officer apply pressure in a way that would restrict Lagoda's airway. (Ex. L of Alterman Dec., Joseph Dep. at 86:5-87:10).

53.     Officer Joseph testified that Lagoda was not entirely face down at any point. Rather, Lagoda was on his chest with his head turned to one side: "At no point did I see Mr. Lagoda on his stomach face down. It was always with his head to one side or the other, but it was never strictly prone with his nose directly on the ground. That was not the case." (Ex. L of Alterman Dec., Joseph Dep. at 55:1-9).

54.     Officer Mezzacappa testified that "Once he was handcuffed, there was no more compliance hold on his body." (Ex. M of Alterman Dec., Mezzacappa Dep. at 53:21-54:10).

55.     Even after being successfully handcuffed, Lagoda remained combative and continued to pose a threat. Officer Joseph testified he was "Still actively resisting, kicking, jerking his body around in a manner that was very distinctly to injure or harm people at his feet." (Ex. L of Alterman Dec., Joseph Dep. at 88:23-89:10).

56.     Once Lagoda was handcuffed, he was put on his side and a search of his person was conducted. Officer Papia testified that Lagoda was actively continuing to resist and bucking his body as the search was being conducted. (Ex. NN of Alterman Dec., Mezzacappa Aff. at ¶¶ 13-14; Ex. K, Papia Dep. at 57:14-58:22).

11

**Immediate Medical Response Upon Signs of Distress**

57.     Medical records confirm that Lagoda had a pre-existing medical condition called mesial temporal sclerosis (MTS), described by Plaintiff's own medical expert as "the most common of the focal epilepsies" which Lagoda "had been living with for years prior to his death." (Ex. DD of Alterman Dec., Sperry Dep. at 95:10-97:24, 100:9-21).

58.     Plaintiffs' medical expert, Dr. Sperry, testified that Lagoda's MTS was undiagnosed and untreated, and that he was taking no medication for seizures. (Ex. DD of Alterman Dec., Sperry Dep. at 98:5-99:16, 102:1-25, 193:17-194:12).

59.     Lagoda was fatigued at the time of the incident, having been traveling for approximately 24 hours. Tikhoplav testified that his son was extremely fatigued upon arrival at JFK, stating: "When they arrived in JFK, he wrote that he was extremely fatigued. He did not sleep at all during that flight." (Ex. V of Alterman Dec., Tikhoplav Dep. dated July 25, 2023 at 183:7-185:13).

60.     Sometime after Lagoda was restrained, Officer Joseph noticed Lagoda turning blue around his "neck into his cheek area." (Ex. L of Alterman Dec., Joseph Dep. at 90:18-91:9).

61.     Officer Papia testified that when the officers discovered Lagoda's neck was blue, Officer Joseph immediately checked for a pulse. (Ex. K of Alterman Dec., Papia Dep. at 60:21-61:8).

62.     Upon finding no pulse, the responding officers immediately removed handcuffs, placed Lagoda on his back, initiated CPR, and called for and used an AED. (Ex. NN of Alterman Dec., Mezzacappa Aff. at ¶¶ 15-19; Ex. K, Papia Dep. at 61:5-21; Ex. L, Joseph Dep. at 91:15-92:11).

63.     Officer Papia testified that he "instructed the group of officers to start CPR." Officer Mezzacappa participated, testifying: "I was doing the oxygen. Someone had handed us an AED. Officer Papia was doing compressions." (Ex. K of Alterman Dec., Papia Dep. at 61:5-16; Ex. M, Mezzacappa Dep. at 56:10-21).

64.     Officer Bugiada, who had started walking toward the front of the aircraft upon Lagoda being handcuffed, was speaking to a sergeant about what had just transpired, when he learned that an AED was needed. He then retrieved an AED from a flight attendant and delivered it to the officer at the rear of the aircraft with Lagoda. (Ex. J of Alterman Dec., Bugiada Dep. at 80:22-81:18).

65.     The AED was administered to Lagoda by the officers and the device recommended that no shock be administered and that the officers continue CPR compressions.  (Ex. NN of Alterman Dec., Mezzacappa Aff. at ¶¶ 19-21; Ex. M, Mezzacappa Dep. at 56:22-58:5).

66.     The officers continued to administer CPR until Emergency Medical Services personnel was on scene. (Ex. NN of Alterman Dec., Mezzacappa Aff. at ¶¶ 21-22; Ex. M, Mezzacappa Dep. at 58:2-9).

67.     The Office of Chief Medical Examiner's Investigation Report documents that Lagoda was pronounced dead at Jamaica Hospital Emergency Room on April 12, 2019 at 11:35 p.m. (Ex. HH of Alterman Dec., Notice of Death, p. 1).

68.     The Medical Examiner's report notes that "Upon arrival to the emergency room at [11:25 p.m.] the decedent was in asystole. ACLS was continued and the decedent was pronounced dead despite all efforts 23:35." (Ex. HH of Alterman Dec., Investigation Report, p. 1).

69.     The Medical Examiner's report states that "As per Dr. Turner, the decedent sustained a small laceration to his nose, a few abrasions to his back and chest." (Ex. HH of Alterman Dec., Investigation Report, p. 1).

70.     Defendants' Emergency Medical Expert, Dr. Gregory I. Mazarin, testified that Lagoda "had all superficial injuries. There were no injuries to any of his vital structures or any of his vital organs, and there's no evidence from the Medical Examiner report that any of those physical injuries led to his death." (Ex. CC of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. BB, Mazarin Dep. at 151:24-152:15).

71.     Dr. Sperry testified: "But for the grand mal seizure... If the grand mal seizure had not happened, then far more probably than not, he would have survived." (Ex. DD of Alterman Dec., Sperry Dep. at 171:19-25).

**Ambulance Response**

72.     Officer Duran was originally assigned to wait for and escort an ambulance but proceeded to the scene as instructed when Officer Bugiada called for help due to the emergent nature of the situation onboard the plane. (Ex. N of Alterman Dec., Duran Dep. at 75:12-22).

73.     Lt. Sandoz testified that the designated meeting point for EMS was located adjacent to the police command post. (Ex. W of Alterman Dec., Sandoz Dep. at 58:5-25).

74.     Lt. Sandoz testified that Port Authority Police procedures require that a scene must be secured before EMS personnel can enter to provide treatment. Lt. Sandoz stated: "Nothing really can be done to help anybody until a scene is safe." (Ex. W of Alterman Dec., Sandoz Dep. at 71:9-74:5).

75.     On April 30, 2019, Sergeant Lawanda Irving of the Port Authority Office of Inspector General, Police Integrity Unit, and Investigator Bryan Mason from the New York State Attorney General's Office interviewed Mr. Chalako Hodges, a paramedic from Jamaica Hospital,

regarding the April 12, 2019 incident aboard JetBlue flight 659. (Ex. KK of Alterman Dec., Chalako Hodges Interview Transcript, p. 1).

76.    According to Mr. Hodges, the EMS unit responded to a call at JFK Airport and waited within 10 minutes the ambulance was escorted to the aircraft, where they encountered Port Authority police officers performing CPR on a male passenger with an AED attached. (Ex. KK of Alterman Dec., Chalako Hodges Interview Transcript, p. 1-2).

77.    The ambulance transport from JFK Airport to Jamaica Hospital took approximately 10-12 minutes. (Ex. KK of Alterman Dec., Chalako Hodges Interview Transcript, p. 7, 10).

78.    A similar account was provided by Mr. Jerry Zander, another Jamaica Hospital paramedic who was also testified that the ride to JFK Airport took 10-12 minutes. (Ex. LL of Alterman Dec., Jerry Zander Interview Transcript, p. 3, 7).

79.    Lagoda was pronounced dead at Jamaica Hospital by Dr. Turner at 11:35 p.m. on April 12, 2019. (Ex. II of Alterman Dec., Certificate of Death at PA1556).

80.    Lagoda had features suggestive of mesial temporal sclerosis (CA4) and bilateral basal subarachnoid glioneuronal heterotopia, which have been associated with seizures. (Ex. II of Alterman Dec., Neuropathology Report at PA1566-1567).

**Comprehensive Port Authority Training and Policies**

81.    Port Authority Officers receive comprehensive training, including a 26-week academy training that covers behavioral sciences, police practices, laws of arrest, court procedures, defensive tactics, use of force training, first aid, medical response, mental health crisis response, and de-escalation techniques. (Ex. X of Alterman Dec., Bergery Dep. at 18:24-19:11, 19:16-22:14).

82.    After academy graduation, Port Authority Officers must complete mandatory in-service training sessions twice annually (Spring and Fall sessions), pass tests with a minimum

score of 70%, complete remedial training if standards are not met, and maintain proficiency in skills learned at the academy. (Ex. X of Alterman Dec., Bergery Dep. at 41:15-43:5, 44:23-45:22, 54:25-56:5).

83.     On the date of the incident the Port Authority's use of force policies were set forth in General Order 100-05 "Use of Non-Deadly Force" and General Order 100-04 "Use of Force." (Ex. EE of Alterman Dec., General Order 100-05; Ex. FF, General Order 100-04).

84.     Lt. Bergery testified that Port Authority Officers are trained to use force that is "objectively reasonable at the time to control the suspect" and "whatever level of force is reasonable at the time that the officer believes they are able to utilize, just to control the situation, to control the suspect." (Ex. X of Alterman Dec., Bergery Dep. at 29:24-31:11).

85.     Port Authority Officers are taught to evaluate "the totality of the circumstance" and make decisions based on "the entire scope" of a situation. This includes assessing environmental factors and space constraints, potential threats to officers and the public, and the number of people involved or at risk. (Ex. X of Alterman Dec., Bergery Dep. at 73:23-74:16, 104:25-106:13, 107:10-108:6, 109:15-110:8).

86.     Port Authority Officer training complies with guidelines from both New York and New Jersey. The department "fall[s] underneath both" state jurisdictions, ensuring adherence to proper standards. (Ex. X of Alterman Dec., Bergery Dep. at 44:7-22).

87.     Port Authority Officers receive specific training on handling subjects experiencing medical emergencies, including emergency medical response, CPR, managing subjects in altered mental states, and frequent medical refresher courses. (Ex. X of Alterman Dec., Bergery Dep. at 34:18-38:3, 55:24-58:25, 90:10-24).

88.    Lt. Sandoz testified that Port Authority Officers are trained to assess situations individually and respond appropriately based on circumstances presented. (Ex. W of Alterman Dec., Sandoz Dep. at 67:1-71:8).

89.    Port Authority Officers receive in-service training that includes responding to medical emergencies and handling persons in altered mental states. (Ex. W of Alterman Dec., Sandoz Dep. at 33:13-34:10).

90.    Lt. Sandoz testified that "make the scene safe" is a principle taught at the Academy and that officers must secure a scene before medical treatment can be rendered. (Ex. W of Alterman Dec., Sandoz Dep. at 71:9-75:4).

91.    Lt. Sandoz testified that officers are trained to evaluate and respond to the actual situation they encounter, not just what was reported, stating "Many jobs are not exactly what they start out as." (Ex. W of Alterman Dec., Sandoz Dep. at 59:25-63:4).

92.    Lt. Sandoz testified that when responding to medical emergencies involving altered mental states, officers consider whether the person is creating a danger to themselves or others. Lt. Sandoz stated: "For police, when we get to the scene, it's someone's actions that we have to deal with." (Ex. W of Alterman Dec., Sandoz Dep. at 68:17-70:13, 71:9-73:12).

**Investigation of the Incident**

93.    The New York State Office of the Attorney General ("OAG") conducted an investigation into the circumstances surrounding Lagoda's death, reviewing Port Authority paperwork, audio recordings, interviews with officers and witnesses, medical records, and the autopsy report. (Ex. GG of Alterman Dec., OAG Report, PA1803; Ex. Y, Irving Dep. at 61:7-64:8).

94.    The OAG concluded: "There can be little doubt that the officers were legally permitted to use at least some degree of physical force on Mr. Lagoda. Having been informed that

17

Mr. Lagoda had been combative toward civilians on the aircraft, and then having himself been swung on by Mr. Lagoda, Officer Bugiada was certainly reasonable in his belief that Mr. Lagoda has committed an offense, and was therefore authorized to arrest him – and likewise authorized to use 'physical force when and to the extent … he reasonably believe[d] such to be necessary to effect the arrest.'" (Ex. GG of Alterman Dec., OAG Report, PA1811-PA1812).

95.    The OAG further determined: "Because it would be impossible to prove beyond a reasonable doubt that any of the officers' conduct was unjustified, and therefore that their conduct violated New York Penal Law, the OAG has concluded that no criminal charges are warranted." (Ex. GG of Alterman Dec., OAG Report, PA1812-PA1813).

96.    The Office of Chief Medical Examiner of the City of New York performed an autopsy on Lagoda on April 13, 2019, conducted by Dr. Yvonne Milewski, M.D. (Ex. GG of Alterman Dec., OAG Report, PA1863).

97.    The Medical Examiner determined the cause of death to be "sudden death following grand mal seizure of undetermined etiology complicated by post-ictal excited delirium." (Ex. GG of Alterman Dec., OAG Report, PA1864).

98.    The autopsy revealed that Mr. Lagoda had several pre-existing medical conditions including "hypertensive cardiovascular disease: cardiac hypertrophy (455 grams) with microscopic features consistent with above" and "arteriolonephrosclerosis; kidneys." (Ex. GG of Alterman Dec., OAG Report, PA1863).

99.    The Medical Examiner identified "features suggestive of mesial temporal sclerosis (CA4) and bilateral basal subarachnoid glioneuronal heterotopia" which are associated with seizure disorders. (Ex. GG of Alterman Dec., OAG Report, PA1863).

18

100.    The OAG report noted that "a medical examiner identified as the cause of Lagoda's death: '[s]udden death following grand mal seizure of undetermined etiology complicated by post-ictal excited delirium.'" The medical examiner found blunt force injuries to Lagoda's face and body attributable to the officers but concluded these injuries were "ultimately superficial; none of them resulted in any skull or facial fractures, and they caused no injury to the brain." (Ex. GG of Alterman Dec., OAG Report, PA1809-PA1810).

101.    The OAG report further noted that these blunt force injuries "would not have been sufficient in and of themselves to cause death, or to contribute to death, in an otherwise healthy person." (Exhibit GG of Alterman Dec., OAG Report, PA1810).

102.    The OAG acknowledged that the Port Authority's "current use of force policy appropriately instructs officers using force to conduct a 'careful balancing of all human interests' and 'use only that force that is reasonably necessary to bring an incident under control, while protecting the lives of the officer or another.'" (Ex. GG of Alterman Dec., OAG Report PA1814).

103.    Lt. Irving testified that after investigation: "in this particular situation, the officers did not violate any policies that would warrant discipline; therefore, they were not disciplined in this situation." (Ex. Y of Alterman Dec., Irving Dep. at 102:21-103:9).

104.    Lt. Irving testified: "In this particular situation, the officers were presented with an individual who did not present having a seizure. He presented as a violent subject. Therefore, in this situation, the officers responded according to what they were presented at the time, which is someone who was violent." (Ex. Y of Alterman Dec., Irving Dep. at 104:17-105:7).

**Plaintiffs' Late Notice of Claim**

105.    On or about April 7, 2021, Plaintiffs served the Port Authority with a Notice of Claim seeking monetary damages related to the death of decedent, Evgeniy Lagoda, on April 12, 2019. (Ex. C of Alterman Dec., Notice of Claim at pp. 2-3).

106.    On April 9, 2021, Plaintiffs filed a Complaint in the New York Supreme Court, New York County. (Ex. D of Alterman Dec., Plaintiffs' Complaint).

107.    Plaintiffs' April 9, 2021 Complaint raises a federal law claim and two state law claims. (Ex. D of Alterman Dec., Plaintiffs Complaint).

108.    On June 9, 2021, the Port Authority filed a motion to dismiss the state law claims contained in Plaintiff's Complaint due to Plaintiffs' failure to serve a notice of claim at least 60 days before initiating suit. (Ex. G of Alterman Dec., Port Authority's Motion to Dismiss Plaintiffs' State Law Claims filed on June 9, 2021).

109.    On June 29, 2021, Plaintiffs filed their First Amended Complaint in the New York Supreme Court, New York County, which added Port Authority Officers Michael Bugiada, Robert Joseph, Jonathan Papia, Paul Mezzacappa, and Jonathan Duran as defendants. (Ex. E of Alterman Dec., Plaintiffs' First Amended Complaint filed on June 29, 2021).

110.    On July 12, 2021, Plaintiffs filed a motion seeking an order pursuant to McKinney's Unconsolidated § 7108 giving Plaintiffs leave of court satisfy jurisdictional conditions precedent pursuant to McKinney's Unconsolidated § 7107. (Ex. H of Alterman Dec., Plaintiffs' Motion to for Leave of Court to Satisfy Jurisdictional Conditions Precedent filed on July 12, 2021).

111.    On July 21, 2021, Defendants filed a notice of removal pursuant to 28 U.S.C. § 1441 removing this matter from the New York Supreme Court, New York County to this Honorable Court. (Docket No. 1, Notice of Removal).

112.    On July 22, 2021, the Hon. Barbara Jaffe, J.S.C., of the New York Supreme Court, New York County, denied the pending motions of the parties as academic, citing that the matter had been removed to federal court. (Ex. I of Alterman Dec., Decision + Order on Motions).

113.    New York Unconsolidated Laws § 7107 contains provisions regarding claims against the Port Authority. (Ex. A of Alterman Dec., McKinney's Consolidated Laws of New York, § 7107).

114.    Lagoda died on April 12, 2019. The date of February 12, 2020 was sixty days prior to April 12, 2020. (Ex. CC of Alterman Dec., Mazarin Dep. at 152:20-21).

115.    Plaintiffs served the Port Authority with a notice of claim on April 7, 2021. (Ex. C of Alterman Dec., Notice of Claim).

116.    Plaintiffs filed their Complaint in New York Supreme Court, New York County on April 9, 2021, two days after serving their notice of claim.  (Ex. D of Alterman Dec., Plaintiffs' Complaint).

Dated: New York, New York
March 28, 2025

Port Authority Law Department
Attorneys for Defendants, Port Authority of
New York and New Jersey, Port Authority
Officer Michael Bugiada, Port Authority Officer
Robert Joseph, Port Authority Officer Jonathan
Papia, Port Authority Officer Paul Mezzacappa,
and Port Authority Officer Jonathan Duran

By: _Cheryl Alt_____
Cheryl Alterman, Esq.
Matthew Malysa, Esq.
4 World Trade Center, 24th Floor
150 Greenwich Street
New York, New York 10007
Telephone: (212) 435-3431