# EXHIBIT J

**In the Matter Of:**

TARASOV V. PORT AUTHORITY OF NEW YORK

1:21-cv-06226

**MICHAEL BUGIADA**

*August 08, 2023*



800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------X

ALEXEY V. TARASOV, ESQ., Administrator of the
Estate of EVGENIY LAGODA, Deceased, and
GRIGORY TIKHOPLAV,

                    Plaintiffs,

-against-          Case No. 1:21-cv-06226
                   (NRB)

PORT AUTHORITY OF NEW YORK AND
NEW JERSEY, and PORT AUTHORITY OF NEW YORK
AND NEW JERSEY POLICE DEPARTMENT a/k/a PORT
AUTHORITY POLICE DEPARTMENT a/k/a PAPD, PAPD
OFFICER MICHAEL BUGIADA, PAPD OFFICER ROBERT
JOSEPH, PAPD OFFICER JONATHAN PAPIA, PAPD
OFFICER PAUL MEZZACAPPA, and PAPD OFFICER
JONATHAN DURAN,
                    Defendants.
-----------------------------------------------x

VIDEOTELECONFERENCED DEPOSITION OF:
          MICHAEL BUGIADA
       New York, New York
     Tuesday, August 8, 2023

Reported by:
Aydil M. Torres, CSR
JOB NO. J10007218



August 8, 2023

10:08 a.m.


VTC deposition of MICHAEL BUGIADA, held at the offices of Port Authority of New York & New Jersey, 4 World Trade Center, New York, New York, pursuant to Notice, before Aydil M. Torres, a Notary Public of the State of New York.



800.211.DEPO (3376)
EsquireSolutions.com

A  P  P  E  A  R  A  N  C  E  S:


   ASHCROFT LAW FIRM, LLC

   Attorneys for Plaintiff

        200 State Street, 7th Floor

        Boston, Massachusetts 02109

   BY:  CHRISTOPHER AMRHEIN, JR., ESQ.




   PORT AUTHORITY OF NEW YORK & NEW JERSEY

   Attorneys for Defendants

        4 World Trade Center

        150 Greenwich Street, Floor 24

        New York, New York 10007

   BY:  CHERYL N. ALTERMAN, ESQ.


ALSO PRESENT:

   Alexey Tarasov, Esq.

   Matthew Malysa, Esq.

   Grigory Tikhoplav



S T I P U L A T I O N S


IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;


IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial;


IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.



800.211.DEPO (3376)
EsquireSolutions.com

THE REPORTER:  My name is Aydil M. Torres, a New York State notary public and certified shorthand reporter.  This deposition is being held via videoconferencing equipment.  The witness and reporter are not in the same room.  The witness will be sworn in remotely pursuant to agreement of all parties.  The parties stipulate that the testimony is being given as if the witness was sworn in person.

M I C H A E L    B U G I A T A,
called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

THE REPORTER:  Please state your name for the record.

THE WITNESS:  Michael Bugiada.

THE REPORTER:  Please state your address for the record.

MS. ALTERMAN:  Business.


ESQUIRE
DEPOSITION SOLUTIONS

THE WITNESS:  269 South Service Road, Jamaica, New York 11430.

EXAMINATION BY

MR. AMRHEIN:

Q.   Good morning, Officer.  We very much appreciate you being here today and taking the time that is, you know, a busy schedule, I am sure, especially during the summer.  So we do very much appreciate it.

MR. AMRHEIN:  In terms of stipulation, Cheryl, I know we had some depositions yesterday.  Is it agreeable to proceed in the same stipulation?  I am happy to read them into the record, if so.

MS. ALTERMAN:  Yes.

MR. AMRHEIN:  We are going to be doing the usual stipulations. All objections, except as to form, are reserved until the time of trial.  All motions to strike are reserved until the time of trial. Read and sign show thirty days, or



Michael Bugiada

whatever, you know, is agreeable for you guys, whatever you need, and then, you know, we are happy to waive notary for that as well.

MS. ALTERMAN:  Okay, thank you.

BY MR. AMRHEIN:

Q.   Good morning, Officer, and forgive me, it's Officer Bugiada?

A.   Bugiada, yes.  Good morning.

Q.   Okay, okay, perfect.

I am sorry if -- I originally was going to mispronounce it, so I wanted to make sure I asked.

My name is Chris Amrhein.  I am an attorney for Ashcroft Law firm.  Our firm represents the plaintiffs in this matter and today, I will be asking you a series of questions.

Before I get started, have you been deposed before, sir?

A.   Yes.

Q.   Okay.  So this may sound familiar to you.



Michael Bugiada

Roughly, how many times do you believe you have been deposed before?

A.   Once.

Q.   Okay.  So this will be a nice refresher and I am sure it will sound familiar.  Just going to go over a few introductory matters, before we get started.

First, if you can't hear one of my questions, please let me know and I am happy to repeat it for you.  I know sometimes, especially visa Zoom, if there's a glitch or a lapse in audio, please let me know, and I am happy to repeat it for you.

If you don't understand a question, please let me know and I can either repeat it for you and try to rephrase it into something that's, you know, more understandable.

However, if you do answer a question, is it fair to say that you understood the question?

A.   Yes.

Q.   If you could please avoid all, you know, head nods and shoulder shrugs, and try to answer everything verbally.  It just makes



800.211.DEPO (3376)
EsquireSolutions.com

Michael Bugiada

the stenographer's job much easier and makes the transcript a lot cleaner.  And our goal is to make the stenographer's job as easy as we possibly can.

In that same vein, especially via Zoom, if you can wait until I finish my question before answering, that would make for a clean transcript, and, again, make the stenographer's job a lot easier, and I will do my best to allow you to fully answer everything before, you know, I ask my follow-up question -- my following question as well.

Finally, if you need a break, please let me know.  All I ask is if there's a pending question, or inquiry, that you -- the question is answered or the inquiry is closed, before we take a break.

Do you have any questions with regard to anything that I have said so far, Officer?

A.   No.

Q.   Sir, do you understand that you are giving oath -- sorry, giving testimony under



Michael Bugiada

oath and that even though we are in an office environment and you are in a conference room, that it's just as if you were testifying under oath in court?

A.   Yes.

Q.   Do you understand that your response are subject to the pains and penalty of perjury?

A.   Yes.

Q.   And, sir, we ask this of everybody. This is not personal to you.  Again, you can check all transcripts.  We ask this of all people.

Are you under the influence of anything that would impair your ability to understand my questions or impair your ability to answer my questions truthfully?

A.   No.

Q.   Again, that's not a personal question.  We ask of all deponents.  I know you already stated your full name and address for the record.

Sir, I know you previously testified that you have been deposed once



Michael Bugiada

before.  Have you testified any other times under oath?

A.  Yes.

Q.  Roughly, how many times have you done that, sir?

A.  About three times.

Q.  What setting were those testimonies under oath?  Was that in a courtroom?

A.  Yes.

Q.  And can you give me a general description of what the case involved and what was -- were you a witness, were you a party?

A.  It was in regards to an arrest that I made.  It was a criminal case.

Q.  Do you know if that document is public, sir?

A.  I am not sure.

Q.  Do you know what the result of that matter was?

A.  The individual was sentenced to, I believe, eight years.

Q.  Sir, what's your marital status?

A.  I am married.



ESQUIRE
DEPOSITION SOLUTIONS

Michael Bugiada

Q.    Do you have any children?

A.    Yes.

Q.    Can you briefly describe your educational background after high school?

A.    I have an associate's degree in criminal justice.

Q.    Roughly, what year did you receive your degree?

A.    2014.

Q.    What year did you graduate high school?

A.    2007.

Q.    Are you currently employed, sir?

A.    Yes.

Q.    Who is your employer?

A.    The Port Authority of New York and New Jersey.

Q.    What title do you have?

A.    Police officer.

Q.    And did you work for the Port Authority Police Department, in April of 2019?

A.    Yes.

Q.    Did you have the same title, then?



Michael Bugiada

A.   Yes.

Q.   Prior to joining the Port Authority Police Department, did you have any law enforcement experience?

A.   No.

Q.   In terms of work, before you started at the police academy, what did you do before you began?

A.   I did security work and I worked at a warehouse loading and unloading trucks.

Q.   When did you attend the Port Authority Police Department academy?

A.   2014.

Q.   Did you start and graduate in the calendar year 2014?

A.   Yes.

Q.   Was that, roughly, a six-month program, sir?

A.   Yes, roughly, six months.

Q.   It's an intensive training program?

A.   Yes.

Q.   I will just go over a few things that -- and ask about what you -- what may or may have not been covered at your time in the



Michael Bugiada

police academy back in 2014.

Q.    Was part of the curriculum behavioral sciences?

A.    Yes.

Q.    How about police practices and procedures?

A.    I believe so.

Q.    Did they cover laws of arrest?

A.    Yes.

Q.    Did they cover courtroom procedures?

A.    Yes.

Q.    Did they cover giving testimony under oath?

A.    I believe so.

Q.    How about rules of evidence?

A.    Yes.

Q.    Did they cover defensive tactics?

A.    Yes.

Q.    First aid?

A.    Yes.

Q.    Did you take any tests at the police academy?

A.    Yes.



                    Michael Bugiada

        Q.    Were you tested pretty often?

        A.    Yes.

        Q.    Was part of the curriculum specific
situations that you may face as an officer
for the Port Authority Police Department?

        A.    Can you repeat that?

        Q.    Sure thing.

              Was part of the curriculum at the
police academy, when you attended in 2014,
situations that you may face as an officer
for the Port Authority Police Department?

        A.    Yes.

        Q.    Now, were these tests physical
demonstrations or written tests or perhaps
both?

        A.    Both.

        Q.    Did the curriculum include
deescalation techniques?

        A.    I don't remember.

        Q.    What about defusing techniques?

        A.    I don't remember, specifically.

        Q.    Did it cover use of force, when you
are at the police academy?

        A.    Yes.



Michael Bugiada

Q.    What about use of deadly force?

A.    Yes.

Q.    Can you tell me what was covered when you were at the police academy, with respect to use of force?

MS. ALTERMAN:  Objection.

You can answer.

A.    I would have to see the policy to go into detail about the use of force.

Q.    What do you recall learning about use of force when you attended the police academy, in 2014?

A.    We had a use of force matrix which showed different levels of force that could be used at a given time.

Q.    And was use of force and use of deadly force separate topics or was that all one general use of force class or lesson?

A.    I don't remember.

Q.    Did they -- when you were at the police academy, do you recall being taught about individual use of force or use of deadly force versus group or collective use of force or use of deadly force?



Michael Bugiada

A.   No.

Q.   Is that you do not recall or you weren't taught that?

A.   I don't recall being taught that.

Q.   When you were at the police academy, did they teach about ground fighting techniques?

A.   Yes.

Q.   And defensive tactics?

A.   Yes.

Q.   As part of that lesson area, were you tested physically, as opposed to written?

A.   I don't recall.

Q.   What did you learn about defensive tactics and ground fight techniques, when you were at the police academy?

A.   They showed different types of techniques to use while fighting on the ground.

Q.   What type of techniques?

A.   Control.  How to get control from the bottom, how to maintain control on top, and things like that.

Q.   Did they also teach you --



                        Michael Bugiada

                    MR. AMRHEIN:  Excuse me, I
          will rephrase that.
     Q.    When you were at the police
academy, in 2014, did you learn about
restraining techniques?
     A.    Yes.
     Q.    What type of restraining techniques
did they teach you?
     A.    In regards to what type of
restraint?
     Q.    I am just -- generally speaking,
what do you recall that you learned at your
time at the police academy, with respect to
restraining techniques?
     A.    We learned handcuffing techniques.
     Q.    Anything else?
     A.    Not that I remember.
     Q.    Did they teach you about compliance
holds?
     A.    Yes.
     Q.    How would you define, based upon
your understanding of what you learned at the
police academy, how would you define
"compliance hold"?



                    Michael Bugiada

A.    Holding an individual in a manner to gain compliance from them.

Q.    And there are a variety of compliance holds?

A.    I am not sure.

Q.    Did they teach you initial restraints, when you were at the academy, in 2014?

A.    Not that I remember.

Q.    Did they teach about compressional asphyxiation, when you were at the police academy, in 2014?

A.    Not that I remember.

Q.    Did they teach you about dealing with medical crisis?

A.    Yes.

Q.    How about dealing with -- perhaps this is a subset, please let me know if it is, did they teach you about dealing with mental health crisis?

A.    Yes.

Q.    Was that part of medical crisis, in general?

A.    I believe so.



Michael Bugiada

Q.   Did they teach you about dealing with altered mental statuses?

A.   I don't remember, specifically.

Q.   Did they teach you about verbal strategies and active listening skills?

A.   I am not sure.

Q.   Did they teach you about duties owed by officers to civilians?

MS. ALTERMAN:  Objection.

You can answer.

A.   Yes.

Q.   When you were at the police academy, do you recall learning about duties owed by officers to civilians?

A.   Yes.

Q.   When you were at the police academy, what did they teach you about duties owed by officers to civilians?

A.   That we had a duty to act, if a civilian is in need of assistance.

Q.   Is that to protect life, at all costs?

MS. ALTERMAN:  Objection.

You can answer.



Michael Bugiada

A.    It is to protect life, yes.

Q.    When you were at the police academy, did you learn about duties to intercede?

A.    Yes.

Q.    And was part of the curriculum at the police academy, interceding or learning about interceding when you perceive another officer to be doing something improper?

A.    Yes.

Q.    And what they -- did they teach you that it was a case-by-case basis or was it something mandatory?

A.    It's a mandatory thing.

Q.    When they taught you about restraining techniques, when you were at the police academy, in 2014, did they also teach you which restraining techniques to avoid?

A.    One restraining type comes to mind, after somebody is handcuffed.

Q.    What -- can you please elaborate on that one restrain type that comes to mind?

A.    Once an individual is handcuffed, they have to be either held onto their side



Michael Bugiada

or sat up or stood up.

Q.   When you were at the police academy, in 2014, did you learn about a standard of care owed to civilians?

A.   No.

Q.   Do you recall hearing the term "standard of care" at the police academy?

A.   No.

Q.   Sir, I know I asked this of you before, but I will just refresh my own memory and ask it one quick time again:  The tests that you took at the police academy, with regard to those techniques and lessons, they were both written form and physical demonstrations?

A.   For the tests, you are referring to?

Q.   Yes, were they both -- you had written tests, as well as physical demonstrations?

A.   We did have written tests.  I am not sure if the physical demonstrations were graded or if it was just a practical type of thing.



Michael Bugiada

Q.   Got you.  Thank you for clarifying, sir.

You say you graduated in 2014, from the police academy, after your six months there.

A.   Yes.

Q.   Do you recall, roughly, when in 2014?

A.   When I graduated?

Q.   Yes, sir?

A.   August.

Q.   Sorry, did you say the month?

A.   August.

Q.   August, okay.

How soon, after you were sworn in to be a police officer for the Port Authority Police Department?

A.   We were sworn in prior to graduating.

Q.   Okay.  In terms of, "sworn in prior to graduating," is that something that happens during graduation week, or is that something that occurs at the outset and you will have to go through the six months of



Michael Bugiada

training to pass your classes, before you can begin active duty?

A.   I believe it was towards the end of the academy, prior to graduation.

Q.   As an officer for the Port Authority Police Department, is there a mandated training you must complete?

A.   During the academy?

Q.   No.

So this is in your time as an officer, after graduating from the academy, and I can ask the question again:  As an officer for the Port Authority Police Department, is there a mandated training you must complete?

A.   Yes, we complete IST.

Q.   What is that?

A.   Training -- "In-Service Training."

Q.   With respect to IST, In-Service Training, do you know who or what mandates it?

A.   No.

Q.   Do you know if it's a state mandated thing or if it's just your employer?



Michael Bugiada

A.   I don't know.

Q.   How often would you say your training occurs?

Is it something that's yearly, or once every other year?  Can you give me a ballpark?

A.   I believe it's twice a year, we go.

Q.   Same topics covered each year or are there topics that weren't covered one year and may be covered the next?

A.   I am not sure.  I would have to see the records.

Q.   Do you recall any classes being more frequent than others; say, like, a CPR first aid class?

A.   I don't recall.

Q.   In terms of IST, so In-Service Training that you received in your capacity as an officer for the Port Authority Police Department, as part of those In-Service Training classes, any training about deescalation techniques?

A.   Yes, we did have a course on that.

Q.   Roughly, how often were you taking



Michael Bugiada

a course on deescalation techniques?

Is that a yearly thing?

A.    I don't recall.

Q.    Based upon your experience with ISTs and deescalation technique classes, is the curriculum for that specific class pretty consistent, in your time as a police officer, or would you say it has evolved and changed?

A.    I am not sure.

Q.    Do you recall learning anything new about deescalation techniques in recent years, compared to what you learned back in -- starting in 2014?

A.    I am not sure.

Q.    Do you know -- can you tell me a little about what those IST classes, In-Service Training classes, on deescalation techniques, covered?

A.    I couldn't say, specifically, without seeing the documents for it.

Q.    Okay, can you generally tell me?

A.    So when it comes to deescalation, that's the first step that we would try to do, as feasible, to try to deescalate a



Michael Bugiada

situation.

Q.   You said, "as feasible."  Is it -- does that mean it's optional or is it mandatory to, at a minimum, try to deescalate, before resorting to other action?

MS. ALTERMAN:  Objection.

Excuse me, you can answer.

A.   Can you repeat the question?

Q.   Sure.

I notice that you had said, "as feasible," in your last answer, sir.  Based upon your experience with the IST classes on deescalation techniques, are deescalation techniques mandatory or are they optional?

A.   So deescalation techniques, as I said, are as feasible, if time allows. That's, like, every situation is different, so if time allows and you have that option, then that would be an option that you could take.

Q.   Okay.  If time does allow.

Are officers required to proceed with deescalation techniques, before moving forward with alternative techniques?



Michael Bugiada

A.    I am not sure if it's mandatory or not.

Q.    As part of the deescalation techniques, do they cover diffusing techniques or is that a separate IST training class?

A.    I am not sure.

Q.    In terms of deescalation techniques, did they talk to you about or teach you about, I should say, time to assess and calm a situation?

A.    I am not really sure.

Q.    How about provide reassurance that officers are there to help a person?

A.    I don't recall that.

Q.    What about moving slowly and reducing environmental distractions?

A.    In regards to what?

Q.    Deescalation techniques.

A.    I am not sure.

Q.    With respect to the In-Service Training classes you took and completed in your time as a police officer for the Port Authority Police Department, did they teach



                      Michael Bugiada

you about use of force and use of deadly

force?

        A.    Yes.

        Q.    Were the IST classes similar to the

use of force lessons you received at the

police academy?

        A.    Similar, yes.

        Q.    Were there any differences?

        A.    There were differences that

evolved, since I have been there.

        Q.    Can you tell me how it evolved?

        A.    I wouldn't be able to say,

specifically, without seeing them side by

side.

        Q.    Just, generally, based upon your

understanding of what you learned, how it has

evolved in your time since being a police

officer with the Port Authority Police

Department?

        A.    I would really need to see them

side by side to be able to pick out

differences.

        Q.    Do you know when, approximately, a

lesson began to change and become a little



Michael Bugiada

bit different; is it more recently?

A.    I don't recall.

Q.    As part of IST, training on use of force and use of deadly force, do you recall if the lesson differentiated between individual use of force and collective use of force?

A.    I don't know.

Q.    As a police officer and in the In-Service Training classes you received in your capacity as an officer for the Port Authority, did they teach you about restraining techniques?

A.    Yes.

Q.    Do you recall what they taught you in the ISTs, with regard to restraining?

A.    We just reviewed going over the handcuffing techniques.

Q.    Were those similar techniques to what you had learned at the Port Authority Police Department police academy?

A.    Yes.

Q.    Do you recall if the restraining techniques have evolved, based upon the



                        Michael Bugiada

lessons you have taken in your In-Service

Training classes?

        A.    I don't know.

        Q.    As a police officer attending the

mandatory IST on restraining techniques, did

those classes cover provisional restraint?

        A.    I am not sure.

        Q.    What about compressional

asphyxiation, was that covered in the IST on

restraining techniques?

        A.    I don't remember.

        Q.    In your capacity as officer for the

Port Authority Police Department, did you

take In-Service Training classes on dealing

with medical crisis?

        A.    Yes.

        Q.    What about dealing with mental

health crisis?

        A.    Yes.

        Q.    How about dealing with a person or

individual citizen who has an altered mental

state, was that also covered in your IST

training?

        A.    Yes.



Michael Bugiada

Q.   Do you recall what, specifically, was taught as part of the In-Service Training that you received in the class on medical crisis?

A.   I don't remember, specifically.

Q.   Do you remember, generally?

A.   No.

Q.   You don't remember anything from the ISTs on mental health crisis or medical crisis?

MS. ALTERMAN:  Objection to form.

You can answer.

A.   I don't recall, specifically, to be able to state it.

Q.   Within those classes, the IST training classes on medical crisis, did they teach you about standards of care or duty owed to civilians?

A.   I don't remember hearing "standard of care."  "Duty to act," I don't believe, fell into, specifically, to "medical crisis." It was more of an overall statement.

Q.   Perhaps this would be a part of the



Michael Bugiada

deescalation or diffusing techniques.

As part of your training in the ISTs, as an officer, did they teach you verbal strategies and active listening skills?

A.   I don't remember.

Q.   You had said that, kind of, generally, they taught you ISTs about duties. Is that a correct capturing of your testimony from a few moments ago?

A.   Duty to act, where we have to do something, in case of an emergency.

Q.   Okay.  Is that duties to act with respect to civilians or duties to intercede when you perceived another officer doing something you believe was improper?

A.   That would be both.

Q.   Tell me a little bit about duties to act you had mentioned, and what you had learned in that lesson that you received as part your IST.

MS. ALTERMAN:  Objection to form.

You can answer.



800.211.DEPO (3376)
EsquireSolutions.com

Michael Bugiada

A.   So that's just an overview of, police officer has a duty and responsibility to step in to a situation where we would be needed, whether it be criminal situation, medical situation.

Q.   Did they teach you about intervention or would they fall into a different category?

A.   I am not sure.

Q.   So the topic we just covered there, are those covered yearly?

A.   I don't know if they are covered every year.  I don't know the frequency with each topic being covered.

Q.   And as part of the ISTs, were you tested?

A.   Yes.

Q.   Were those courses, you know, several hours long or were they quick online classes?

A.   No, they were in person classes. Each module was a different length of time.

Q.   Did you receive any certificates or confirmation papers indicated that you



Michael Bugiada

completed your In-Service Training?

A.   For In-Service, I don't believe so.

Q.   Do you know if the In-Service

Training were done by the Port Authority

Police Department or was it an independent

entity that ran the ISTs?

A.   IST is run by the Port Authority

police academy.

Q.   Did you receive an employee manual,

when you became an officer for the Port

Authority Police Department?

A.   No, I don't believe so.

Q.   Do you know if one is available

online or --

A.   I don't know.

Q.   -- accessible by employees?

A.   I don't know.

Q.   Did any of your training involve

the National Safety Council?

A.   I am not sure.

Q.   Does that name ring a bell?

A.   I am not sure.

Q.   Do you know if you have ever

received any training materials from the



Michael Bugiada

National Safety Council?

A.   I don't know.

MR. AMRHEIN:  I will introduce what will, ultimately, be marked as Exhibit A.  Bear with me a second.  I will share my screen.

Q.   Let me know whenever you are able to see it.

A.   I can see it.

Q.   Okay, great.

Sir, do you see that this is a -- this page, in particular, is the first page of a set of slides -- I will scroll through for you, so you can see -- provided by the National Safety Council?

A.   Yes, I see it.

Q.   And am I correct that it says, "Altered Mental Status," on the first page?

A.   Yes, that's what it says.

MR. AMRHEIN:  And for the record, I just want to state that it's Bates-stamped PA2064, on the bottom, and the final page is PA, as in "Port Authority," 2068.



Michael Bugiada

Q.    Sir, this is a document produced by defendants in this matter as part of the discovery.  And I am going to direct you -- I will scroll through and have you read each page.

This is a short PowerPoint.  It shouldn't take very long.  If you can, just let me know as soon as you are done reading the individual page, and then I will move to the next.

A.    Okay.  You want me to read the bullet points?

MS. ALTERMAN:  To yourself.

Q.    Yeah, you don't have to read them out loud.  Read them to yourself and let me know when you are done, and then I will move to the next page.

A.    Okay.  Okay, ready for the next one.  Okay, okay.  Okay, I am done.

Q.    Great.  Thank you, Officer.

I am going to show you the second page in this PowerPoint.  It's Bates-stamped PA, Port Authority, 2065.  Under "Altered Mental Status," am I correct that the second

Michael Bugiada

bullet point says, "Patient may be confused, disoriented, combative, drowsy or partially or wholly unresponsive"?

A.   That's what it says.

Q.   Going to go to the next page, third page of this document Bates-stamped PA, Port Authority, 2066, am I correct that the title of this individual slide is "Common Causes of Altered Mental Status"?

A.   That's correct.

Q.   Am I correct that the first point in the list says, "seizures"?

A.   Yes, that's the first bullet point.

MR. AMRHEIN:  And then I will introduce what will be marked as Exhibit B.

Q.   Before I move on, sorry, sir, the document that was just on the screen, do you -- do you recognize that document?

A.   I don't recognize it, specifically. I don't recall the document itself.

Q.   Okay.  Let me know whenever this new exhibit is on your screen and available to you, sir.



800.211.DEPO (3376)
EsquireSolutions.com

Michael Bugiada

A.    I can see it.

Q.    Okay, great.

Sir, this is another set of slides in the National Safety Council.

A.    Yes, that's marked on there.

Q.    And the title page says, "Seizures"?

A.    Yes.

Q.    This is the first page.  It is Bates-stamped Port Authority, PA2082, and it goes all the way to PA2095.  Again, sir, this is a document produced by defendants, as part of the discovery.

We're going to go through this, just like we did the last one, just so you have an opportunity to review it.

And on the onset, sir, do you recognize this document?

A.    I don't recognize it, specifically, no.

Q.    Okay.  So we'll just go through, in the same fashion.  Just let me know as soon as you are done reading the page to yourself and I will move to the next.



                    Michael Bugiada

        A.   Okay.  Okay.  Okay.  Okay.  Okay.

Okay.  Okay.  Okay.  Okay.  Okay.  Okay.

Okay.  Okay.  Okay.

        Q.   And that's the final page of the

document, sir.  I am going to go to what is

the second page, in this particular exhibit,

and it's marked PA2083.

             Am I correct that the third bullet

point reads, "Results in altered mental

status/uncontrolled muscular contractions"?

        A.   Yes, that's what it says.

        Q.   Am I correct that the last bullet

point says, "Rarely life-threatening but

serious emergency;" --

        A.   Yes, that's what it says.

        Q.   -- is that correct?

             And the title of this slide is

"Seizures"?

        A.   Yes.

        Q.   I'm going to go to page

Bates-stamped PA2093.  Am I correct that the

title of this slide is "Emergency Care for

Seizures"?

        A.   Yes.



Michael Bugiada

Q.   Am I correct that the second-to-last bullet point says, "Don't restrain patient"?

A.   That's what it says.

Q.   I will go to what is marked PA2095. This is the final page of this exhibit.

Am I correct that this is also titled "Emergency Care Procedures for Seizures"?

A.   Yes, that's what it says.

Q.   Second bullet point says, "Be reassuring after seizure"?

A.   Yes, that's what it says.

Q.   The third bullet point says, "If recovering patient is agitated or angry, stay back but prevent any dangers"?

A.   Yes, that's what it says.

Q.   Sir, did you review any training material, in advance of your deposition today?

A.   No.

Q.   I will introduce to you what will be marked as Exhibit C.  This would be the operative complaint in this matter, and just



Michael Bugiada

bear with me a second, as I pull this up and share the screen.

Let me know whenever you are able to see that, sir.

A.   I see it.

Q.   Okay.  Sir, I will represent to you that this is the complaint in this matter, and I will scroll through it, just to -- so you can see it.

But as you will see at the top, it has the federal document stamp, with the case caption -- or, excuse me, the case docket number shows the docket -- specific docket number "1-1," the date of filing, as you will see, this was part of the removal filing, but it shows the summons of the officers and defendants, in general.

Scrolling down, sir, so you can see the first page.  It is a full operative complaint here, complete with three exhibits to the complaint.

Sir, do you recognize this document?

A.   Yes.



800.211.DEPO (3376)
EsquireSolutions.com

                    Michael Bugiada

        Q.    Have you reviewed it before?

        A.    When I was served it, I looked it
over.

        Q.    Did you review this document, in
preparation for your deposition today?

        A.    No.

        Q.    Did you first become aware of this
document, when you were served with it?

        A.    Yes.

        Q.    When was the last time you reviewed
this document, sir?

        A.    The day I was served with it.

        Q.    Did you ever go over this document
with an attorney?

        A.    No.

        Q.    Sir, did you speak with your
attorney, in preparation for this deposition?

        A.    Yes.

        Q.    Did you speak with anyone else, in
preparation for this deposition, other than
your attorney?

        A.    No.

        Q.    Did you speak with any of the other
defendants about their depositions last week?



Michael Bugiada

A.   No.

Q.   Did you e-mail or communicate via electronic communication, text, or Whatsapp, or any internal electronic communication that the Port Authority Police Department may have, with any officers, with respect to their depositions last week?

A.   No.

Q.   Sir, I preface this with any conversation -- you know, what was discussed with your attorney, that's for you and your attorney.  I am not asking about that.

But what did you do to prepare yourself for this deposition?

A.   I met with the attorney.

Q.   Did you review any documents, in preparation for this -- for your deposition today?

A.   I reviewed the documents that I prepared on the night of this event.

Q.   What documents, in particular, sir?

A.   My memo book, handwritten, and use of force.

Q.   Sir, do you recall the name,



                     Michael Bugiada

Anthony Lagoda?

        A.    Yes.

        Q.    Did you first learn that name on
the night of April 12th, 2019?

        A.    Yes.

        Q.    What shift were you working that
day, if you recall?

        A.    I was working 10:00 p.m. to 6:00
a.m..

        Q.    Was that your usual shift, at that
time, sir?

        A.    Yes.

        Q.    Were you planning on working any
overtime?

        A.    I don't remember.

        Q.    If you had been working overtime,
would that be after the conclusion of your
shift or would that be preceding your shift
and rolling into your normal shift at 10?

        A.    I am not sure.  It varied.

        Q.    By "varied," does it mean it could
be overtime, after your shift concludes at 6,
or it would be overtime that starts, before
your shift begins at 10?



                    Michael Bugiada

A.   Yes, it was both, usually, available.

Q.   And was that, you know, depending on when it began, either before or after your shift?

Is that, typically, a scheduling matter?

Just making sure, you know, if there are available police officers at that given time, or is that just a choice an officer is given?

MS. ALTERMAN:  Objection to form.

You can answer.

A.   If you were coming in, prior to your shift, it would, generally, be voluntarily.  If you are say staying after your shift, it could be voluntary or mandated overtime.

Q.   Mandated overtime, if -- I will rephrase that.

Tell me what "mandated overtime" is versus "voluntary overtime"?

A.   So "voluntary overtime" is when an



800.211.DEPO (3376)
EsquireSolutions.com

Michael Bugiada

officer chooses to stay to fill a position on the next tour.  "Mandated overtime" is when there's minimum staffing that needs to be met, if there's not enough people to volunteer for it, they will start mandating officers to stay for positions.

Q.   Understood.  Thank you for that distinction, sir.

Sir, are you aware of a Jetblue flight that called in a medical emergency for a male having a seizure on board?

A.   Yes.

Q.   Did you hear that call?

A.   No.

Q.   Was that -- were you, ultimately, dispatched to respond to the scene for a male having a seizure on board?

A.   So Jetblue calls into our desk and the desk relays that information to officers in the field via the radio.

Q.   Got you.

So am I correct that a message of a male having a seizure on board a Jetblue fight was relayed to you, and you were,



Michael Bugiada

ultimately, dispatched to the scene?

MS. ALTERMAN:  Objection to form.

You can answer.

A.   Yes, that's what was put over the radio.

Q.   Am I correct that you are the first officer to respond to the scene?

A.   Yes.

Q.   When you received the, you know, the radio for you to be dispatched, where were you at that time, sir?

A.   I was in front of the terminal.

Q.   How did you, ultimately, get to the scene?

A.   I walked.

Q.   Sorry, just for clarity on the record, just to make sure that we have full transparency and understanding of what my questions may be and your answer may be, is it fair to say, if I say, "scene," I am talking about the Jetblue flight that Mr. Lagoda was aboard and you responded to?

A.   Yes.



800.211.DEPO (3376)
EsquireSolutions.com

Michael Bugiada

Q.   Am I correct you reached the terminal almost immediately after the plane returned to the gate?

MS. ALTERMAN:  Objection to form.

You can answer.

A.   I was already stationed in the terminal, before the plane returned back.

Q.   Sir, when you were on duty that night, were you wearing a body cam?

A.   No, I was not.

Q.   Do you have the option to wear one?

A.   We do not have the option to wear a body cam.

Q.   Approximately, how long, from where you were stationed at the terminal, to get to the gate where the -- roughly, how long did it take you to get there, sir?

A.   I walked from the front of the terminal to the gate.  It would have been a few minutes, but I don't know the specific number.

Q.   Is there a reason you walked, instead of ran, sir?



Michael Bugiada

MS. ALTERMAN:  Objection.

You can answer.

A.   The plane was returning to the gate.  It wasn't off yet.

Q.   Have there been circumstances where you do run to the scene after being dispatched?

A.   Yes.

Q.   Have there been circumstances where you have been transported by, you know, a vehicle, a cart, in a terminal, to get to a scene faster?

A.   No, I have not.

Q.   Do any such vehicles or transportation methods exist?

A.   For our use, no, not that I am aware of.

Q.   Did you board the plane from the front, sir?

A.   Yes.

Q.   If I say, "plane," as well, is it fair to say that we're talking about the plane on the scene where Mr. Lagoda was aboard the flight and you had responded?



                    Michael Bugiada

        A.    Yes.

        Q.    You made your way to the back of
the plane, after boarding the front?

        A.    After speaking with the flight
attendant that let me onto the plane, then, I
made my way towards the back.

        Q.    Am I correct that the flight
attendant with whom you spoke, told you that
a gentleman in the back of the plane had just
suffered a seizure and was disoriented and
combative?

        A.    Yes.

        Q.    Am I correct that you previously
testified that, as part of your curriculum at
the police academy, you received training on
responding to medical emergencies?

        A.    Yes.

        Q.    Am I correct that you previously
testified that, as part of your curriculum in
the police academy, you received training on
responding to mental health crisis?

        A.    Yes.

        Q.    Am I correct that you previously
testified, as part of your training -- or



Michael Bugiada

excuse me, as part of your curriculum at the police academy, you received training on people with altered mental statuses?

A.   Yes.

Q.   Sir, am I correct that you previously testified that in your capacity as an officer for the Port Authority Police Department, you took mandatory IST training courses on responding to medical emergencies?

A.   Yes.

Q.   Am I correct that you previously testified that in your capacity as a police officer for the Port Authority Police Department, that you took mandatory IST training courses on responding to situations where a person is having a mental health crisis?

A.   Yes.

Q.   Am I correct that you previously testified, in your capacity as a police officer for the Port Authority Police Department, you took mandatory IST training courses on people with altered mental statuses?



Michael Bugiada

A.   Yes.

Q.   Sir, do you remember the materials presented a little bit earlier today that were marked Exhibits A and B, that defendants produced in discovery, with the National Safety Council PowerPoint I showed you?

A.   Yes, I remember you showing them to me.

Q.   Do you recall your testimony agreeing that a person with an altered mental status may be confused, disoriented, combative, drowsy, or partially or wholly unresponsive?

MS. ALTERMAN:  Objection.

You can answer.

A.   Yes, I remember reading that on the slide.

Q.   Do you recall your testimony agreeing that it said a common cause for altered mental status was a seizure?

MS. ALTERMAN:  Objection.

You can answer.

A.   Yes, that was on the list of the various things.

ESQUIRE
DEPOSITION SOLUTIONS

Michael Bugiada

Q.    Am I correct that you were responding to a call for a male having a seizure aboard a Jetblue flight?

A.    That is the call that I was dispatched to, but we get calls all the time where we think we are responding to one type of job and it's completely different from the initial call.

Q.    Understood.

But am I also correct that you had just previously testified that you spoke with a flight attendant when you immediately boarded the flight at the scene, and the flight attendant informed you that Mr. Lagoda, in the back of the plane, had just suffered a seizure and was disoriented and combative?

A.    So the flight attendant isn't a medical professional, you know --

Q.    I understand that, sir.

MS. ALTERMAN:  Wait, wait.

Let him finish his answer.

Q.    Sir, this is a simple yes-or-no question.



Michael Bugiada

I am asking about what you just testified to.

MS. ALTERMAN:  You can answer --

Q.   Sir, "yes" or "no," am I correct that you had previously testified that upon boarding the flight, you had spoken with a flight attendant who told you a gentleman on the back of the plane had just suffered a seizure and was disoriented and combative?

A.   The flight attendant did state that, but like I said, he is not a medical professional.  That's from his point of view. But he didn't have any experience with that.

Q.   Oh, I understand.

My question is simply:  Am I correct that you testified that the flight attendant told you that upon arriving on the scene?

A.   Yes.

Q.   Sir, after speaking with the flight attendant and being told by the flight attendant that a gentleman was in the back of the plane having just suffered a seizure and



Michael Bugiada

was disoriented and combative, did you make your way to the back of the plane?

A.   I did move towards the back of the plane, yes.

Q.   When you got to the back of the plane, did you see Mr. Lagoda?

A.   Yes.

Q.   Did you give any command to Mr. Lagoda?

A.   So when I got to the rear of the plane, very chaotic, multiple women screaming, I did issue a command to Mr. Lagoda to move out of the way, to clear the aisle and where the aisle and galley meet.  I gave him a command to move to the side to let the women out who were screaming for help, yes.

Q.   I appreciate your answer, sir.

My question was a simple one:  Did you give a command -- did you give any command to Mr. Lagoda?

A.   That was not the first -- I didn't go right to commands.  Initially, I --

Q.   I understand, sir.  I just -- I



Michael Bugiada

just mean, did you give any commands to Mr. Lagoda?

A.   I did give commands, yeah.

Q.   Did you give any warnings to Mr. Lagoda?

A.   I only issued commands to him at that time.

Q.   Were you speaking English to Mr. Lagoda?

A.   Yes.

Q.   Do you speak Russian, sir?

A.   I do not.

Q.   Are you aware that Mr. Lagoda's native language was Russian?

A.   I was not aware of that.

Q.   Am I correct that you physically engaged Mr. Lagoda, in order to restrain him?

A.   Eventually, it got to the point where I had to physically restrain him, yes.

Q.   When you were attempting to restrain Mr. Lagoda, was he flailing his arms?

A.   So before we got to that point, he attempted to assault me, which is what led to



                        Michael Bugiada

me trying to restrain him, and, yes, he was

pulling his arms, grabbing towards my gun

belt, making movements like that, yes.

        Q.    "Grabbing" towards your gun belt.

              He didn't grab your gun belt?

        A.    He did grab my gun belt on the

front of my body.

        Q.    He grabbed your belt?

        A.    Yes.

        Q.    But just your belt?

                    MS. ALTERMAN:   Objection.

                    You can answer.

        A.    That was the only thing he could

get a hold of at that time, yes.

        Q.    Okay.   Was he kicking his legs?

        A.    Yes.

        Q.    At this time, were you both

standing or were you on the ground?

        A.    By that time, after he attempted to

assault me and I got him on the ground, we

were both on the ground.

                    MR. AMRHEIN:   Strike that.

        Q.    Am I correct that you used OC

spray?



Michael Bugiada

A.   Yes.

Q.   And known as a fancy term, but is it fair to use the colloquial term "pepper spray," to describe "OC spray"?

A.   I am not sure if they are 100 percent one in the same.  We refer to it as "OC spray."

Q.   Okay, but is it intended to have a similar effect?

A.   Yes.

Q.   You had mentioned Mr. Lagoda, and you had said, you know, "attempting to assault."

How many times did you punch Mr. Lagoda?

MS. ALTERMAN:  Objection.

At what point in time?

MR. AMRHEIN:  That's a general question.  And that's -- you can object to the form of the question.  We already have stipulations on record.

A.   Are you referring to the entire incident, from start to finish?



Michael Bugiada

Q.   Let's say, before Mr. Lagoda were on the ground, and then I can ask after.

Let me rephrase the question, so I can clear for the record and make it easier for you, sir.

Before you and Mr. Lagoda were on the ground, and in your attempt to restrain Mr. Lagoda, how many times did you punch Mr. Lagoda?

A.   I struck him one time.

Q.   And where did you strike him?

A.   In the face.

Q.   Can you tell me where on the face you struck Mr. Lagoda?

A.   I don't remember, exactly, where it hit him in the face.  In that area.

Q.   Was it a cross, was it an upper cut, was it a hook; do you recall?

A.   It was with my right fist.  I don't recall, exactly, the type of punch.

Q.   Are you a righty or lefty?

A.   I am a righty.

Q.   Was boxing part of the curriculum at the Port Authority Police Department



                        Michael Bugiada

police academy?

        A.    Yes, we did box.

        Q.    And was that a part of IST, or

general training that you did as an officer

for the Port Authority?

        A.    No, it was just one of the initial

academy.

        Q.    Did you ever train in boxing or in

your personal time, outside of your capacity

as an officer?

        A.    No.

        Q.    What about MMA or any mixed martial

arts?

        A.    No.

        Q.    Now, am I correct that you

eventually took Mr. Lagoda to the ground,

when you were trying to restrain him?

        A.    Yes.

        Q.    When you had Mr. Lagoda on the

ground, was he face down, like prone to the

ground, with his chest to the ground?

        A.    Initially, when I placed him onto

the ground, his torso was on the ground, but

his face was not on the ground.



                         Michael Bugiada

Q.    You say that was "initially"?

A.    Yes.

Q.    And, eventually, did his face go onto the ground, as part of the restraining process?

A.    Not that am I aware of, but he was moving around, bucking quite violently.  So it was hard to keep track of all of his exact movements.

Q.    When Mr. Lagoda was on the ground -- when you and Mr. Lagoda were on the ground, how many times did you punch Mr. Lagoda?

A.    So during the course of being on the ground, when the individual -- when Mr. Lagoda bit me on my thigh, I struck him two times, and then in an effort to gain control, when I was losing it, shortly after that, I struck him two more times.

Q.    When you struck him the first two times, can you tell me where you landed those punches?

A.    So his face was on my thigh, just above my knee.  At that point, that would



                    Michael Bugiada

have been the right side of his face that I
struck him when he was biting me.

        Q.    With both punches?

        A.    Yes.

        Q.    And how -- can you describe to me
how you were positioned and Mr. Lagoda was
positioned at that time?  Just trying to get
a picture for it, sir.

        A.    So he would have been on his side
at that point.  I was -- had more of a side
control at that point.  I had my right leg up
on the ground, and my left leg would have
been across his waistline.

        Q.    And would it be fair to say you
were using body weight with your left leg to
try to control Mr. Lagoda?

        A.    I am not sure.

        Q.    Can you describe to me where you
landed the punches to -- the two times --
final two times you had punched Mr. Lagoda?

        A.    I don't remember, specifically, but
I believe they were in his face area.

        Q.    So, in total, would that be five
punches to Mr. Lagoda's face?



Michael Bugiada

A.    Yes.

Q.    Now, did you, eventually, get Mr. Lagoda to be facing down on the ground, as opposed to lying on his side?

A.    At a certain -- at one point, like I said, he wasn't -- he was never face down. His body was prone down, but he always had his head to one side or the other.

Q.    Did you, eventually, get his body prone down, as to opposed on the side?

A.    Yes.

Q.    At this time, were Mr. Lagoda's arms underneath his, say, stomach or chest?

A.    I don't recall, specifically, if they were under him or at his sides.

Q.    And at this time that Mr. Lagoda's body and chest are prone down onto the ground, were you positioned on top of Mr. Lagoda, in a similar way that you had described a little bit earlier, with one leg to the side and one leg over Mr. Lagoda's waistline?

A.    At that point, I was across his waistline, trying to hold down his shoulders



Michael Bugiada

with my arms, while I tried to radio for backup, at some point during that interaction.

Q.   So were you -- and, again, I am just trying to get a picture for that scenario.

Were you laying on top of Mr. Lagoda, trying to hold his shoulder down, like you said?

A.   No, I was not laying on him.

Q.   So were you on your knees?

Can you just describe to me your position, sir, at that time when you are trying to keep Mr. Lagoda's shoulder down on the ground?

A.   Sure.  I was straddled across his waistline, my knees would have been on either side of him, and holding down his shoulder with my hand.

Q.   So when you say straddling Mr. Lagoda, position wise, was -- were you above the buttocks, at the buttocks, below the buttocks?

A.   I was right around the buttocks



Michael Bugiada

area.

Q.   At any point, did your -- any part of you or your, you know, rear, make any contact with Mr. Lagoda's back or buttocks?

A.   Like I said, he was bucking quite violently, moving around, rolling around, attempting to get me off of him.  I am sure, at some point, I did, you know, move a little bit from that area, but that is where I attempted to remain.

Q.   Were you using your strength and physical body weight to be able to hold Mr. Lagoda down and make sure that he is not bucking you off of him?

A.   I just tried to maintain control of Mr. Lagoda, until I could have other officers respond.

Q.   I will ask that again.  I understand.  I do appreciate that, sir.

Were you using your body weight and strength to try and keep Mr. Lagoda from raising his shoulders and bucking you off of him?

A.   Not sure if I was -- used my body



800.211.DEPO (3376)
EsquireSolutions.com

                       Michael Bugiada

weight.  Kind of a difficult thing to answer.

          Can we take a break?

     Q.   Sure.  I know there's no pending

question right now, sir.  Is it, you know,

facility break?

          Do you need five minutes?

     A.   I just need to use the restroom.

     Q.   Sure.

               MR. AMRHEIN:  We can come

          back in five minutes, at 11:33.

               Does that work for

          everybody?

               MS. ALTERMAN:  Yes, that's

          fine.

               MR. AMRHEIN:  All right,

          great.

               (Whereupon, a recess was

          taken at this time.)

BY MR. AMRHEIN:

     Q.   Sir, before we took the requested

facilities break, we were talking about your

positioning on Mr. Lagoda and your attempts

or part of process of restraining Mr. Lagoda

at the scene aboard the Jetblue flight.



Michael Bugiada

What did they call that restraining technique when you were at the police academy?

Is that a "compliance hold," or does that go by a different name, what you were doing?

A.   I am not sure what the exact term on it would be.

Q.   Did it have a specific term, from what you learned at the IST, the In-Service Training, as part of your requirement as a police officer for the Port Authority?

A.   Not sure if they have a specific term of what it is.

Q.   Do you use -- did you use a baton at all, as a part of trying to restrain Mr. Lagoda?

A.   No, I did not.

Q.   Do you carry a baton with you?

A.   Yes.

Q.   Was it on your person at that time?

A.   Yes.

Q.   Sir, am I correct that you called for -- excuse me.



Michael Bugiada

Am I correct that you were called to the scene -- responded to the scene for a male having a seizure aboard a Jetblue flight?

MS. ALTERMAN:  Objection.

You can answer.

Q.   You testified to that earlier.

A.   That's what the radio run was, yes.

Q.   Yes.

And then when you boarded the flight, am I correct that you testified that the flight attendant had told you, at the front of the plane, that Mr. Lagoda had just suffered a seizure and was disoriented and combative?

A.   Yes, that's what he said.

Q.   And am I correct that you called requesting additional assistance by other officers?

A.   So, initially, when the females were screaming for help and I could see that Mr. Lagoda was not complying with my command, even though I was in uniform, at that point, I attempted to radio for backup assistance.



                    Michael Bugiada

        Q.    Again, Mr. Lagoda -- the commands
you gave to Mr. Lagoda were in English; am I
correct?

        A.    So it was in English, but I was in
full uniform, with an authoritative presence,
issuing commands and gesturing what I would
like him to do, to move to the side, which he
clearly was ignoring.

        Q.    I appreciate that, sir.

            Am I correct that the commands were
in English?

        A.    Yes, they were.

        Q.    And they weren't in Russian, right?

        A.    No.

        Q.    And, again, you had previously
testified that a flight attendant had told
you a male had just suffered -- Mr. Lagoda
just suffered a seizure, was disoriented and
combative.

            Am I correct that you testified to
that?

                    MS. ALTERMAN:   Objection.

                    You can answer.

        A.    Yes, that's what the flight



Michael Bugiada
attendant stated.

Q.   And am I correct that we went over materials earlier today and marked Exhibits A and B, and talked about how a patient may be confused, disoriented, combative, or partially or wholly unresponsive, when they are in an altered mental status, which a common cause is seizures?

Do you remember that, sir?

MS. ALTERMAN:  Objection to form.

You can answer.

A.   That is part of -- but there's also numerous other things that can lead to that, so with the screaming for help --

Q.   Are you a doctor?

A.   What's that?

Q.   Are you a doctor?

A.   No, I am not a doctor.

Q.   Do you recall the names of the other officers who responded to the scene?

A.   Yes.  Some of them.

Q.   Who do you remember?

And I may be able to fill in some



Michael Bugiada

blanks and jog your memory.

A.   Officer Papia, Officer Joseph, Officer Mezzacappa, Officer Duran, are the few that I remember.

Q.   That covered it, in terms of defendants in this case.

Did you, sir, witness the other officers physically engage Mr. Lagoda with you?

A.   So before we had the individual under control, another officer did respond and struck the individual two times, in an effort to finally get control of Mr. Lagoda.

Q.   What was the name of that officer?

A.   That was Officer Papia.

Q.   And would it refresh your memory that Officer Papia struck Mr. Lagoda with a punch to the face and punch to the arm?

A.   I don't know, exactly, where the punches landed.  I was focusing on trying to get Mr. Lagoda's arm under control.

Q.   But did you witness other officers attempting to help restrain Mr. Lagoda on the ground that night?



Michael Bugiada

A.   I was focused on his upper body, his arms -- getting those under control.  I don't recall what went on behind me with his lower body.

Q.   Was your back to the -- to any officers who may have been tending to Mr. Lagoda's legs?

A.   Yeah, I was facing forward, trying to get his arms.  My back would have been to them.

Q.   Do you know which arm you were trying to gain control over -- right, left?

A.   It was his right arm.

Q.   And you said Officer Papia -- was he trying to gain control of Mr. Lagoda's left arm?

A.   Yes.

Q.   And so you said your back was to, you know, the leg or lower half of Mr. Lagoda's body.

Were you, generally, aware that other officers were trying to assist you in restraining Mr. Lagoda by controlling his legs?



Michael Bugiada

A.   I was not aware of it at the time.

Q.   When did you become aware of it?

A.   Once I stood up and I left the scene, the other officers were at his lower body.  That's when I first realized that there was even other officers on scene, besides Officer Papia.

Q.   Had you worked with any of those officers, before?  Were you familiar with each other?

A.   Yes.

Q.   Were any of the officers your partner?

A.   We don't have partners.

Q.   Did you go to school with any of the officers?  By "school," I mean the police academy.

A.   I went to the academy with two of them.

Q.   Which two?

A.   Officer Papia and Officer Mezzacappa.

Q.   Do you have a friendly relationship, outside of work, with these



                        Michael Bugiada

officers?

        A.    No, it's mostly just at work.

        Q.    Do you have a cordial friendly

relationship with the officers while at work?

        A.    Yes.

        Q.    Was Officer Papia, from what you

witnessed, was he using a compliance hold on

Mr. Lagoda's arm?

        A.    I couldn't really see Mr. Lagoda's

left arm, until Officer Papia presented it

behind his back, when I was able to handcuff

him.

        Q.    Did he ever tell you that he used a

compliance hold?

        A.    No.

        Q.    During the process of restraining

Mr. Lagoda, when he was thrown on the ground

and other officers had responded to the scene

and were assisting the restraining of Mr.

Lagoda, did you hear Mr. Lagoda making any

noises or sound?

        A.    I recall him yelling.  I don't know

if he was saying anything, just that he was

yelling.



Michael Bugiada

Q.   Did you hear him breathing?

A.   It was a very hectic situation.  I don't know for sure if he was, like, breathing heavy.

I don't really remember.

Q.   You said "yelling."

Was Mr. Lagoda making -- again, that's within the compounds of the question, which was:  In the process of restraining him with the other officers when Mr. Lagoda is prone on the ground, was Mr. Lagoda making any guttural sounds, harsh, loud sounds?

A.   I am not sure what that term means.

Q.   Some would say, like, harsh, loud sounds, I suppose, yells.

A.   He was yelling.

Q.   Okay.  Sorry, I didn't mean to interrupt you there.

Am I correct that you testified that you witnessed Officer Papia punch Mr. Lagoda multiple times?

MS. ALTERMAN:  Objection to form.

You can answer.



Michael Bugiada

A.   Two times, yes.

Q.   At any point -- did you, at any point during the attempt to restrain Mr. Lagoda, did you intervene because of concerns for health and safety of Mr. Lagoda?

A.   Shortly after the two strikes from Officer Papia, we were able to handcuff the individual.  There was no need at that point. He was placed in handcuffs.  No more force, at that point, was used against Mr. Lagoda.

Q.   That's because he was, like you said, shortly thereafter, handcuffed?

A.   Yes, once we had him handcuffed, there was no further force used.

Q.   When Mr. Lagoda was handcuffed, he was prone on the ground with his hands behind his back?

A.   So, at that point, Mr. Lagoda was still attempting to grab my gun belt.  I believe he was grabbing onto my pants at that point.  I had to pull his hand off of me, and I stood up from the situation and left shortly after.

Q.   And he was doing so with handcuffs



Michael Bugiada

on his wrists, with his hands behind his back?

A.    Yes, they were centered more toward his side at that point.

Q.    But he was -- am I correct, he was still cuffed at that time?

A.    Yes.

Q.    And were you still in the same position that you described earlier in today's deposition, before the break, which was straddling Mr. Lagoda right at the buttocks area?

A.    No, once other officers got on scene, I moved to his side, control -- where I was on one side of him and Officer Papia was on the other side of him.

Q.    Okay.  This was -- was it just past the last row of seats on the plane, in the back galley, or were you -- can you describe, positionally, where on the plane you and the other officers were able to restrain Mr. Lagoda?

A.    It was in the back galley.

Q.    Would that be in between the



Michael Bugiada

bathroom on the plane, or that would be in the back, where the flight attendants would typically be during a flight?

A. I believe it's where the flight attendants would be during the flight. Where they get drinks and those items from.

Q. Do you know who rolled Mr. Lagoda onto his side, after being restrained?

A. I don't. I left shortly after he was restrained to go get witness information for the assault that occurred. He was going to be placed under arrest at that point.

Q. When you went to get witness information, was that in the front of the plane?

Am I correct that you would have left the galley?

A. Yes, I left the galley and walked toward the front.

Q. You didn't witness any officer rolling Mr. Lagoda over onto his side?

A. No.

Q. So I can have a full picture of the timing and series of events; after Mr. Lagoda



Michael Bugiada

was placed in handcuffs, can you give me an estimate as to the amount of time, from when he was cuffed, to when you got up and moved to the front of the aircraft to get witness statements?

A.    So immediately after he was cuffed and I removed his hand, which was grabbing me, at that point I stood up.  One of the other officers filled in for me at that position and I walked toward the front.  I don't know how many, you know, the exact time that elapsed, but it was very --

Q.    Would you say --

A.    -- short.  Short.

Q.    Sorry to interrupt.

A.    Short amount of time.

Q.    Would that be a matter of ten seconds, fifteen seconds, or do you think --

A.    Yeah, I don't know, specifically, but it was a short period of time.

Q.    Okay.  When you were at the -- where were you in the aircraft, at the scene, when you learned that Mr. Lagoda -- his neck was blue and he had no pulse?



Michael Bugiada

A.    So I started walking towards the front of the plane, shortly after he was handcuffed.  I was met by one of our sergeants.  I was briefly explaining the situation, you know, what had happened, the series of events, and then I started walking towards the front of the plane.  I was probably three-quarters towards the front, maybe a little more than that, when I learned that an AED was needed.

Q.    Did you get the AED or did another officer?

A.    I got it from a flight attendant in the front of the aircraft.

Q.    And did you bring it to the back galley to use for Mr. Lagoda?

A.    Yes.  I brought it to the back.

Q.    Were officers performing CPR at that time?

A.    Yes.

Q.    Do you know who discovered that Mr. Lagoda's neck was blue?

A.    I am not sure.

Q.    Do you know who checked for a pulse



                        Michael Bugiada

and began immediately performing CPR?

        A.   I am not sure.  I was in the front
of the plane.

        Q.   Did you ever learn, after the fact?

        A.   No.

        Q.   Are you aware that the -- excuse
me.

        So after receiving the AED from a
flight attendant, you, personally, brought it
back to the back galley?

        Does that capture your testimony?

        A.   Yes, I received it from the flight
attendant, and I brought it to the back
galley.

        Q.   Did you, then, pass off the AED to
other officers, or did you set up the AED for
potential use yourself?

        A.   I don't recall setting it up.  I
know I didn't put the pads on Mr. Lagoda.  I
don't remember, exactly, who set it up.

        Q.   But you particularly don't -- you,
personally, I should say, don't recall
setting up the pads for Mr. Lagoda?

        A.    No, I didn't set up the pads.



                    Michael Bugiada

            MS. ALTERMAN:  Just let him
       finish.

            THE WITNESS:  Sorry.

       Q.   It's okay.  I know you can easily
anticipate where the questions may go,
especially with colloquial terms and
everything.  It's just for the sake of the
court reporter.  We want to have segmented
questions and answers, just to make her job
easier.

       A.   Understood.

       Q.   After the pads were -- or after the
AED was hooked up to Mr. Lagoda, were you
still in the back galley?

       A.   I left, shortly after delivering
the AED to the back -- to go back to get
witness information.

       Q.   When you were on the scene there
that day, were you aware that the AED did not
trigger a shock because it detected no
heartbeat?

            MS. ALTERMAN:  Objection.
            You can answer.

       A.   I was not aware at the time, no.



Michael Bugiada

Q.   Did you become aware of it, after the fact?

A.   No, I did not know.

Q.   Roughly, from the time you were alerted that there was a need for an AED, to the time that an ambulance arrived at the scene, can you give me an estimate of that amount of time?

A.   I don't have an estimate for that time because I was not in the rear galley.  I don't remember when EMS -- I don't know how much time elapsed.

Q.   Did you call EMS or did another officer?

A.   I did not call EMS.

Q.   Did you hear any -- do you remember hearing any radio calls for EMS?

A.   I don't remember.

Q.   Do you recall hearing any radio calls from EMS responding to the initial Jetblue radio call to the, you know, police dispatch, saying that there was a male having a seizure on board?

A.   Can you just repeat that, please?



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Michael Bugiada

Q.   Sure.  I can provide a clearer question.  Sorry about that, sir.

Do you recall hearing EMS respond to the initial call from aboard the Jetblue flight, saying there was a male on board having a seizure?

A.   I don't remember EMS being called immediately after that.

Q.   But am I correct that EMS, emergency medical services, had eventually been called or had at some point been called?

A.   I am not sure.  That would have gone through the desk.  They would have been the ones calling.

Q.   An ambulance requires police escort when responding to a call at JFK International Airport?

A.   Yes.

Q.   Have you ever provided police escort for an ambulance?

A.   Yes.

Q.   Are you aware that the ambulance was significantly delayed in getting to the scene because it had no police escort?



Michael Bugiada

MS. ALTERMAN:  Objection.

You can answer.

A.   I was not aware.

Q.   Are you aware that when the other officers dispatched to the scene, that would be Officer Papia, Duran, Mezzacappa, and Joseph, that there were no more available personnel at the police command station to escort an ambulance to the scene?

MS. ALTERMAN:  Objection.

You can answer.

A.   No.  Would not be something that I would be concerned at the time, while I am basically fighting for my safety and safety of others.  It's just not something that I would be concerned with at that time.

Q.   Respectfully, sir, that wasn't my question, so I will ask it again.

Are you aware that when the other officers responded to the scene, that there were no more available personnel at police command station to escort the ambulance to the scene?

MS. ALTERMAN:  Objection.



800.211.DEPO (3376)
EsquireSolutions.com

                       Michael Bugiada

                            You can answer.

        A.    I was not aware.

        Q.    Out of the four that responded,
Officers Duran, Papia, Mezzacappa, and
Joseph, do you know which officer was
supposed to stay behind and escort the
ambulance?

        A.    I don't know.

        Q.    Sir, did the New York Attorney
General's office conduct an investigation
into Mr. Lagoda's death?

        A.    Yes.

        Q.    Do you know what the purpose of the
investigation was?

        A.    To determine if there was any
criminal wrongdoing that led to the death.

        Q.    Do you know what the conclusion of
the report was?

        A.    That we did not cause his death
that night.

        Q.    Have you ever read the report
before, sir?

        A.    I looked at the report, yes.

        Q.    You are sure the report concluded



Michael Bugiada

you did not -- the officers did not cause

Mr. Lagoda's death that night?

Are you sure that's the conclusion?

MS. ALTERMAN:  Objection.

You can answer.

A.   I would need to see the conclusion

to refresh my memory, but the way I remember,

was we did not cause his death.

Q.   That's your personal memory, right;

not the attorney general's office

investigation conclusion?

MS. ALTERMAN:  Objection.

You can answer.

A.   I would have to see the report to

refresh my memory.

Q.   I will introduce it, I assure you,

sir.

Were you interviewed, as part of

the attorney general's office investigation?

A.   Yes.

Q.   Were you provided any written

statement, as part of the investigation?

A.   I don't believe so.

Q.   Do you know how many times -- was



Michael Bugiada

your interview -- was it one-off, or were you interviewed multiple rounds?

A.    I believe it was one time.

Q.    Roughly, how long do you think the interview lasted?

A.    I don't really remember how long it was.

Q.    Do you know who interviewed you?

A.    I don't remember.

Q.    Do you know where you were interviewed?

A.    I was interviewed at building 269, in the conference room.

Q.    What is building 269?

A.    That's our police building.

Q.    Is that where you report to when you start a shift?

A.    Yes.

Q.    Do you know if that interview was recorded?

A.    I am not sure.

Q.    Do you know if there was ever a transcript made of the interview?

A.    I don't know.



Michael Bugiada

Q.    Did you take any notes during the interview?

A.    I don't believe so, no.

Q.    Were you represented by counsel during the interview?

A.    I did have an attorney present, yes.

Q.    Was that a counsel appointed by your union?

A.    Yes.

Q.    That's a separate attorney than you have right now?

A.    Yes.

Q.    Sir, you had previously stated you were aware that there was a report released by the attorney general's office, regarding his findings in the investigation?

A.    Yes.

Q.    Are you aware that the report concluded that the use of force by Port Authority Police Department personnel, likely contributed to the death of Mr. Lagoda?

                    MS. ALTERMAN:  Objection.

                    You can answer.



Michael Bugiada

A.    I would have to see the conclusion to refresh my memory on that.

Q.    Are you aware that the report recommended that the Port Authority Police Department train its officers about the unique vulnerability of individuals in the immediate wake of a seizure?

MS. ALTERMAN:  Objection.

You can answer.

A.    Again, I would have to see the document to refer to all these things that you are stating.

Q.    Based upon the questions I just asked you, sir, with respect to PAPD personnel contributing to the death of Mr. Lagoda and the need for PAPD to train the officers on the unique vulnerability of the individuals coming out of wake of a seizure, are you saying you are not aware that it was in the report, or you don't remember that it was in the report?

A.    Like I said, I reviewed that probably when it first came out, the last time I looked at it.  I would have to refresh



                    Michael Bugiada

my memory by reading it again.

        Q.   Let me know, Officer, whenever it
is on your screen and you are able to see it.

        A.   I can see it.

        Q.   Okay, great.

                    MR. AMRHEIN:  This will be
            marked as Exhibit D.  This is the
            attorney general's investigative
            report.

        Q.   Sir, for the record, can you just
state aloud, starting under the red letters
of "confidential," what the text says on the
screen?

        A.   "Office of the Attorney General."

        Q.   And then can you finish the
remainder of the text on that screen?

        A.   Sure.  "Special Investigations and
Prosecutions Unit.  Report on the
investigation into the death of Evgeniy
Lagoda."

        Q.   Thank you, sir.

             And this is a public document,
available online.  However, it's been
produced by both parties as part of discovery



Michael Bugiada here in this matter.

In particular, this is Bates-stamped Port Authority 1802, and the final page of the document, Port Authority 1864.  It's a 63-page document.

I will represent to you, this is the full report produced by defendants in this matter, and as you will see, it has an "executive summary," it goes with a "statement of facts," has a "legal analysis" as to whether or not charges will be brought, "recommendations," and then three exhibits. That's the first exhibit.  "Executive order" is the second.  "Radio and telephone transmissions," a transcript of that from Friday, April 12th, 2019, through Saturday April 13th, 2019, and the final exhibit is the "Autopsy Report."

I will direct you to -- excuse me, before I begin, sir, do you recognize this document?

A.    Yes.

Q.    Have you seen it before?

A.    Yes.



800.211.DEPO (3376)
EsquireSolutions.com

                        Michael Bugiada

Q.   Have you read this document before?

A.   Yes.

Q.   When I asked earlier about the
conclusion of this document, sir, am I
correct that you are not an attorney?

A.   No.

Q.   Did you read this document, in
preparing for your deposition here today?

A.   No.

Q.   I will turn to page two, the final
paragraph on the "executive summary."  Let me
know if that text is too big or you need me
to shrink it, sir.

A.   No, I can see it.  I can read it.

Q.   Okay.  Can you read that to
yourself and just let me know whenever you
are finished.

A.   Okay.  Okay.

Q.   Now, sir, I am going to turn to
page 12 of this document, which is
Bates-stamped PA, Port Authority 1814.  I
will ask you to read the first two
paragraphs, along with their individual
headings, but first, can you tell me what



                    Michael Bugiada

this page -- the header of this page is, sir?

        A.    It says, "Recommendations."

        Q.    Great.

              Can you please read those first,

you know, lines, large paragraph, line, large

paragraph, and let me know whenever you are

finished, and I am happy to scroll whenever

you need me to scroll.

        A.    Okay.  Okay.

                    MS. ALTERMAN:   If you can

        scroll.

        A.    If you can scroll.

        Q.    Yeah.

        A.    Okay.

        Q.    Officer, would you agree that the

report determined that the "Port Authority

Police Department failed to have personnel

available to escort an ambulance to the

scene"?

                    MS. ALTERMAN:   Objection.

              You can answer.

        A.    That's what the report states, yes.

        Q.    Officer, would you agree with me

that the report found that the "use of force



Michael Bugiada

by the Port Authority Police Department

personnel was found to have likely

contributed to Mr. Lagoda's death"?

                MS. ALTERMAN:  Objection.

           You can answer.

    A.  Can I read the document again?

    Q.  Sure.  I can point you to the

specific area --

    A.  Thank you.

    Q.  -- of the text.

      Sir, do you see where my mouse is,

where it says, "second" --

    A.  Yes, I see it.

    Q.  -- in the final paragraph?

      Am I correct that the report says,

"Second, because the force used by the Port

Authority police officer likely contributed

to Mr. Lagoda's death, the office of the

attorney general recommends that the Port

Authority Police Department provide training

to its officers about the unique

vulnerability of an individual in the

immediate wake of a seizure, such that any

officer may incorporate that information into



Michael Bugiada

their decisions as to the appropriate amount
of force used against such individuals"?

Am I correct that the report says
that?

MS. ALTERMAN:  Objection.

You can answer.

A.   That's what the report states, yes.

Q.   So, sir, would you agree with me
that the report found that the use of force
by Port Authority Police Department personnel
was found to have likely contributed to Mr.
Lagoda's death?

MS. ALTERMAN:  Objection.

You can answer.

A.   That's what the report states.

Q.   And, Officer, would you agree with
me that the report emphasizes that a person
who had just suffered a seizure is in a
uniquely vulnerable condition, immediately
following the seizure?

MS. ALTERMAN:  Objection.

You can answer.

A.   That's what the report states, yes.

Q.   Sir, I will introduce what will be



                        Michael Bugiada

marked as Exhibit E, and just let me know

whenever it's on your screen.

        A.    I can see it.

        Q.    Okay, great.

              Sir, do you recognize this

document?

        A.    Yes.

        Q.    Have you had the opportunity to

review both the top half and bottom half of

this page?

        A.    Yes, I recognize it.

        Q.    Is that your signature at the

bottom?

        A.    Yes.

        Q.    This is dated April 13th, 2019?

        A.    Yes.

        Q.    Am I correct that your shift was

from 10:00 at night, on the 12th of April,

2019, to 6:00 a.m., the morning of April

13th, 2019?

        A.    Yes.

        Q.    Did you fill out your report --

excuse me.

              Did you fill out this report that



Michael Bugiada

day or during that shift?

A.   Yes.

Q.   I can ask a cleaner question.

Did you fill out this "Use of Force" report in your shift that went from 10:00 p.m., on April 12th, 2019, to 6:00 a.m., April 13th, 2019?

A.   Yes.

Q.   Am I correct that you checked the box under "compliance hold"?

A.   Yes.

Q.   Am I correct that you checked the box for "chemical/natural agent"?

A.   Yes.

Q.   And is that, sir, the OC spray that we discussed a little bit earlier today?

A.   Yes, that would be the OC spray.

Q.   And am I correct that you checked box for "hand/fists"?

A.   Yes.

Q.   Sir, am I correct that after Mr. Lagoda was restrained by the officers at the



                    Michael Bugiada

scene that night, and you made your way,

after restraining, to the front part of the

plane, that Mr. Lagoda was discovered to have

a neck turning blue, pulse was taken, and no

pulse was found?

                    MS. ALTERMAN:  Objection.

                    You can answer.

    A.    I just remember the officers in the

back of the plane calling for an AED.  I

don't remember specifics.

    Q.    Did you since learn that they were

calling for an AED because an officer took

Mr. Lagoda's pulse and he had none?

                    MS. ALTERMAN:  Objection.

                    You can answer.

    A.    I don't know.  I was not back

there.  I just remember them calling for an

AED.

    Q.    And are you aware that no shock was

administered because of -- because no

heartbeat was detected?

                    MS. ALTERMAN:  Objection.

                    You can answer.

    A.    I was not back there while the AED



800.211.DEPO (3376)
EsquireSolutions.com

Michael Bugiada
was being used.  I handed it off.

Q.   Are you aware that CPR and potential AED use did not revive Mr. Lagoda?

MS. ALTERMAN:  Objection.

You can answer.

A.   At the time it was still actively being performed while I was there.  Like I said, I handed off the AED and left that immediate area.

Q.   Are you aware that Mr. Lagoda never woke up?

A.   I am aware that he passed away, yes.

Q.   Sir, would you agree with me that someone who has just come out of a seizure is medically vulnerable?

MS. ALTERMAN:  Objection.

You can answer.

A.   I don't know.

Q.   Based upon your training at the police academy and the ISTs, you wouldn't agree that someone who has just come out of a seizure is medically vulnerable?

MS. ALTERMAN:  Objection.



Michael Bugiada

You can answer.

A.   I am not sure.

Q.   "Not sure," as in, you didn't learn that at the police academy or in your ISTs?

A.   I don't know.

Q.   Did you learn about the unique medical vulnerability of somebody who's coming out of a seizure, when you were at the police academy?

A.   I am not sure.

Q.   What about in the IST, did you learn about the unique vulnerability of somebody coming out of a seizure?

A.   I am not sure.

Q.   Sir, wouldn't you agree that someone who has just come out of a seizure, may be disoriented?

A.   I don't know.

Q.   Do you recall seeing the National Safety Council slides earlier in today's deposition?

A.   I recall you showing them to me, yes.

Q.   Yes.



Michael Bugiada

Do you recall how it spoke about how a patient may be -- patient who suffers a seizure, which is the first bullet point under "Common Cause of Altered Mental Statuses," that a "patient may be confused, disoriented, combative, drowsy, or partially or wholly unresponsive"?

Do you recall that from earlier, sir, in the deposition?

A.   That's what the slide stated, yes.

Q.   Yes.

So wouldn't you agree that someone who has just come out of a seizure, may be disoriented?

MS. ALTERMAN:  Objection.

You can answer.

A.   I don't know.

Q.   Sir, are you aware that you, as a defendant in this case, your counsel produced this in discovery, it's part of the defendants' disclosure as a part of discovery in this matter --

A.   Yes.

Q.   -- the National Safety Council's



Michael Bugiada

slide that we went over?

And so you don't know if somebody who is coming out of a seizure may be disoriented?

A.   That's what the slide states, but I don't know.

Q.   Wouldn't you agree that someone who has just come out of a seizure, may have combative behavior?

A.   I am not sure.

Q.   Wouldn't you agree that it is more difficult to understand words, commands, and warnings, that are in a foreign language you do not speak?

A.   I don't know.

Q.   Do you speak any other languages, other than English, sir?

A.   No.

Q.   If I were to give you a command in German, or a warning in German or spoke to you in German, you are saying it wouldn't be more difficult to understand than it would to understand English words?

A.   I am not sure the context of it.



Michael Bugiada

Q.   I am speaking generally.

Sir, wouldn't you agree that it's more difficult to understand words, warnings, and commands, that are in a foreign language that you don't understand?

A.   I am not sure.

Q.   Would you agree it's more difficult to understand words, warnings, and commands, when you are disoriented?

A.   I'm not sure.

Q.   Would you agree that it's more difficult to breathe, when laying face down on your stomach, prone on your stomach, and someone is straddling your back?

A.   I am not sure.

Q.   Wouldn't you agree that a person who is placed face down, prone on the ground, with a number of people applying increasing amounts of pressure to the back, neck, and legs, may not be resisting, or rather fighting for one's life?

              MS. ALTERMAN:  Objection.

              You can answer.

A.   I am not sure.



Michael Bugiada

Q.    You are not sure that restraining may be confused with someone who's simply trying to fight for survival?

MS. ALTERMAN:  Objection.

You can answer.

A.    No, I am not sure.

Q.    Sir, wouldn't you agree that improper restraining techniques can block the flow of air into a person's lungs, contributing to a life-threatening condition known as "positional" or "restraint asphyxia"?

A.    I am not sure.

Q.    They didn't teach you that at the police academy?

A.    I don't recall.

Q.    They didn't you teach you that in the IST, the yearly training that you are required to take as a police officer at the Port Authority?

A.    I am not sure.

Q.    So you don't know if improper restraining techniques can block the flow of air into a person's lungs, and contribute to



Michael Bugiada

a life-threatening condition known as "positional" or "restraint asphyxia"?

A.   I am not sure.

Q.   Sir, would you agree that the risk of positional asphyxia is compounded when a person with predisposing factors becomes involved in a physical struggle?

A.   I am not sure.

Q.   You don't think predisposed factors, such as coming out of a seizure, can compound the risk for positional asphyxia, when somebody engages in a physical struggle with a number of officers?

MS. ALTERMAN:  Objection.

You can answer.

A.   I don't know.

Q.   Sir, if you and your fellow officers didn't use force against Mr. Lagoda that night on April 12th, 2019, do you believe he would still be alive today?

MS. ALTERMAN:  Objection.

You can answer.

A.   I am not sure.

Q.   Do you recall when we went over the



                    Michael Bugiada

National Safety Council's slides,

particularly, the set of slides in Exhibit B,

on seizures?

          Do you remember that, sir?

     A.   Yes.

     Q.   Do you recall that I read a few of

the bullet points aloud and you confirmed

that that was included correctly as part of

the documents that defendants had produced in

discovery?

     A.   Can you repeat that?

     Q.   Sure.

          Do you recall that I read aloud

portions of that PowerPoint for confirmation

that it was accurately read and that this

document had been produced by defendants as

part of discovery in this matter?

     A.   Yes.

     Q.   Do you recall confirming that I

accurately read on Port Authority 2083,

Bates-stamped, that seizures were "rarely

life-threatening but a serious emergency"?

     A.   I recall you reading that from the

slide, yes.



Michael Bugiada

Q.   So, sir, I will ask you again:  If you and your fellow officers did not use the force that was used against Mr. Lagoda that night of April 12th, 2019, do you believe he would still be alive today?

MS. ALTERMAN:  Objection.

You can answer.

A.   I don't know.

Q.   Sir, have you ever been disciplined as a police officer for the Port Authority Police Department?

A.   No.

Q.   Are you aware if any -- are you aware if Officer Papia has been disciplined as a member of the Port Authority Police Department?

A.   I don't know.

Q.   Are you aware if officer Joseph has been disciplined as a part of -- as a police officer for the Port Authority Police Department?

A.   I don't know.

Q.   How about Officer Duran?

A.   I don't know.



Michael Bugiada

Q. How about Officer Mezzacappa?

A. I don't know.

Q. If somebody has a disciplinary record, is that public, or is that information that is stored and available by police officers?

Is a disciplinary record available and, you know, logged as part of the administration of the Port Authority Police Department?

A. I am not sure.

Q. Sir, if you did know that they had a --

MR. AMRHEIN: Strike that.

Q. Would you describe the Port Authority Police Department as a "brotherhood with comradery"?

A. I don't know.

Q. Is there expected loyalty to other officers?

A. I don't know about that.

Q. If the other officers had disciplinary records and you knew about it, would you disclose them here today?



Michael Bugiada

A.    I don't know if anybody has any disciplinary records.

MR. AMRHEIN:  I have no more questions.

MS. ALTERMAN:  I have a few questions.

Do you want us to zoom out?

MR. AMRHEIN:  Yes, please.

Thanks, Cheryl.

EXAMINATION BY

MS. ALTERMAN:

Q.    Officer Bugiada, when you responded to the scene, describe for us what you first observed on board the aircraft?

A.    So when I first made contact on board the aircraft, I encountered the flight attendant, who was highly stressed out, nervous, agitated, as he was explaining to me that there was an individual in the back of the plane who had possibly had a seizure and was combative.

Q.    When he told you that the individual was "combative," did you know what he meant by that?



Michael Bugiada

MR. AMRHEIN:  Objection.

A.   Just by that term, meant that he was getting physical with people.

Q.   Did you have any understanding if the individual, Mr. Lagoda, had struck or assaulted anyone, as you were walking to the back of the aircraft?

A.   I didn't know specifically --

MR. AMRHEIN:  Objection.

A.   -- if he had struck anybody, just the fact that he was combative.

Q.   You had testified that as you made your way to the back of the aircraft, you heard women screaming.  Where were these women located, in relation to where Mr. Lagoda was standing?

A.   So Mr. Lagoda was blocking the exit from the galley to the actual aircraft.  The three women were stuck in that galley area, unable to pass him.  They were -- sounded like they were too afraid to pass him.  They were screaming for help.

Q.   When you observed this, what did you do in response?



Michael Bugiada

A.   I issued commands to Mr. Lagoda to step towards the corner of the galley to make way for the women to get past him.

Q.   Did Mr. Lagoda comply with your commands?

A.   No.

Q.   When you issued these commands, did you do so verbally, in addition to using any gestures?

A.   Yes, I did both.

MR. AMRHEIN:   Objection.

Q.   Describe for us the gestures that you made while using verbal commands.

A.   I pointed towards the corner of the galley, and I commanded Mr. Lagoda to step back, get back to the corner, while gesturing with my hand to him.

Q.   What was the distance between yourself and Mr. Lagoda at that point in time?

A.   We were probably about five or six feet apart.

Q.   And at that moment when Mr. Lagoda refused to comply with your verbal commands,



Michael Bugiada

what happened next?

A.   He began to charge towards me.

MR. AMRHEIN:  Objection.

Q.   When you say that he "began to charge towards" you, what was he doing?

A.   He had his fist clenched, tucked his chin, and he lunged in my direction.

Q.   In response to Mr. Lagoda charging at you, what did you do?

A.   I deployed the OC spray, delivered towards his face.

Q.   Why did you do that?

A.   To protect myself and everybody else on the aircraft, to try and gain compliance and control of Mr. Lagoda.

Q.   Were you concerned for your own safety at the time?

A.   Yes.

Q.   Were you --

MR. AMRHEIN:  Objection.

Q.   Were you also concerned about the safety of others on the aircraft?

A.   Yes.

MR. AMRHEIN:  Objection.



Michael Bugiada

Q.   Why?

A.   Because I had information that this individual was combative.  I was in full uniform, issuing commands to Mr. Lagoda.  He ignored those commands and lunged towards me.

Q.   In addition to the information that you had that Mr. Lagoda was combative, did you also observe, firsthand, that he was combative and violent towards you?

A.   Yes.

Q.   Did Mr. Lagoda appear to be in any type of distress, at any point in time when he was charging at you?

A.   No.

MR. AMRHEIN:  Objection.

Q.   Did Mr. Lagoda appear to be suffering from any medical crisis, at the time that he was charging towards you?

A.   No.

MR. AMRHEIN:  Objection.

Q.   Did Mr. Lagoda appear to be suffering from any type of medical emergency, at the time he was charging towards you?

A.   No.



Michael Bugiada

MR. AMRHEIN:  Objection.

Q.   Did the OC spray result in Mr. Lagoda listening to your directions and complying with your orders?

A.   No.

MR. AMRHEIN:  Objection.

Q.   After you deployed a burst of the OC spray, what happened?

A.   Mr. Lagoda wiped it off his face and then proceeded to attempt to punch me in the head.

Q.   Did he actually make contact with your head?

A.   No, he just missed.

Q.   What -- did you have to do anything, in order for him not to punch you in the head?

A.   I had to move my head back to get out of the way.

MR. AMRHEIN:  Objection.

Q.   How would you describe the action that he took, in order to punch you or attempt to punch you in the head?

MR. AMRHEIN:  Objection.



                     Michael Bugiada

     A.    It was violent and aggressive.

     Q.    Describe for us the motion that he
made with his arm in an attempt to punch.

              MR. AMRHEIN:  Objection.

     A.    He made, with his right hand, an
overhead swing, haymaker-type of lunge
towards my head.

     Q.    What is a "haymaker" punch?

     A.    Just a punch that's loaded up
pretty heavily, with a lot of force and power
behind it.

     Q.    And once you moved out of the way
to avoid being struck by Mr. Lagoda, what did
you do in response to the situation?

     A.    I struck Mr. Lagoda in the face
with my fist.

     Q.    Why did you do that?

     A.    To protect myself at that point.

     Q.    Did you feel that it was necessary?

     A.    Yes.

     Q.    At some point in time during this
struggle with Mr. Lagoda, did you call for
help or backup for assistance?

     A.    I attempted to, but I don't believe



Michael Bugiada

the radio transmission went through.

Q.    Did the radio transmission calling
for assistance ever go through, to your
knowledge?

A.    Yes.

MR. AMRHEIN:  Objection.

Q.    Do you recall what you said over
the radio when you were calling for help?

A.    I said --

Q.    In sum and substance.

A.    Basically, that I am in a fight.  I
need them to speed it up.

Q.    How did you feel, at the time that
you were making that radio transmission?

A.    I was in fear for my safety and the
safety of everybody on the aircraft.

MS. ALTERMAN:  That's all I
have.

Thank you.

MR. AMRHEIN:  Just a few
follow-up questions.

BY MR. AMRHEIN:

Q.    Sir, are you a medical doctor?

A.    No.



Michael Bugiada

Q.   Sir, did you speak with your counsel when we returned from -- when we took a break, at your own request, earlier in today's deposition?

A.   No.

Q.   Sir, did you have some regaining of memory when your attorney started to question you?  Because you were able to articulate an answer to everything she asked, but consistently said, "I don't know," to the majority of my questions at the end of my direct examination.

MS. ALTERMAN:  Objection.

You can answer.

A.   I didn't have a sudden regain of memory.  Just the questioning -- questions were different, that I was able to answer them.

Q.   So you were able to answer direct questions from your own attorney, but weren't able to answer simple yes-or-no questions from opposing counsel?

MS. ALTERMAN:  Objection.

A.   I am not sure which question you



                        Michael Bugiada

are referring to, specifically.

     Q.   I mean, I can go over them again,

sir, but I remind you that your answers were

under oath, and if you know the information

and choose to say, "I don't know," that

implicates some bad things.

          I can try to ask them again, sir.

          Sir, would you agree with me that

somebody who has just come out of a seizure

is medically vulnerable?

               MS. ALTERMAN:  Objection.

     A.   I don't know.

     Q.   So you seem to be making many

statements with medical diagnoses when

counsel representing you asked you questions,

but there you don't know?

          You are not able to make the same

conclusion?

               MS. ALTERMAN:  Objection to

     form.

               You can answer.

     A.   It's a different question.  She was

asking me questions about direct

observations.



Michael Bugiada

Q.   Yes.

And based upon your training and experience as an officer, are you telling me that you can't say whether or not a person who has just come out of a seizure is medically vulnerable?

A.   I am not sure.

Q.   Do you remember when we went over the New York attorney general's office reports a little bit earlier today?  It was marked as Exhibit D.

A.   Yes.

Q.   Don't you remember agreeing with me that the reports emphasize that a person who has come out a seizure, is in a uniquely vulnerable condition immediately following the seizure?

MS. ALTERMAN:  Objection to form.

You can answer.

A.   I remember that's what the report stated, yes.

Q.   Yes.

So you can't confidently say that



                      Michael Bugiada
-- or say at all, that a person who has just
come out a seizure is medically vulnerable,
based upon your training and experience as an
officer?
               MS. ALTERMAN:  Objection.
               You can answer.
     A.    I am not sure.
     Q.    What about somebody who comes out
of a seizure may be disoriented; wouldn't you
agree with that?
     A.    I am not sure.
     Q.    Wouldn't you agree that someone who
has come out of a seizure may have combative
behavior?
     A.    I am not sure.
     Q.    You wouldn't agree that -- wouldn't
you agree that improper restraining
techniques can block the flow of air into a
person's lungs, contributing to a
life-threatening condition known as
"positional" or "restraint asphyxia"?
     A.    I am not sure.
     Q.    Wouldn't you agree that the risk of
positional asphyxia, is compounded when a



Michael Bugiada

person with predisposing factors, such as having just suffered a lengthy seizure, is involved in a physical struggle with five police officers?

MS. ALTERMAN:  Objection.

A.    I am not sure.

MR. AMRHEIN:  I have no more questions.

MS. ALTERMAN:  You are all done.

MR. AMRHEIN:  Officer, thank you very much for your time.  We very much appreciate it.

-oOo-

(Whereupon, the examination of MICHAEL BUGIADA was adjourned at 12:43 p.m.)

MICHAEL BUGIADA

Subscribed and sworn to before me this        day of                , 2023.

NOTARY PUBLIC



---------------- I N D E X ----------------


WITNESS          EXAMINATION BY          PAGE

MICHAEL BUGIADA

                 MR. AMRHEIN             6, 118

                 MS. ALTERMAN            111


---------------- EXHIBITS ------------------

PLAINTIFF'S                              FOR ID.

EXHIBIT A     NSC PowerPoint      premarked

EXHIBIT B     Seizures Slides     premarked

EXHIBIT C     Complaint           premarked

EXHIBIT D     AG's Report         premarked

EXHIBIT E     Use of Force Report premarked


     (Exhibits retained by attorney.)

-------------------------------------------



C E R T I F I C A T E

STATE OF NEW YORK     )
                      : ss.
COUNTY OF NEW YORK    )

I, AYDIL M. TORRES, a Notary Public within and for the State of New York, do hereby certify:

That MICHAEL BUGIADA, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of August, 2023.



AYDIL M. TORRES

DEPOSITION ERRATA SHEET


Our Assignment No.  J10007218

Case Caption: ALEXEY TARASOV vs. PORT

AUTHORITY OF NEW YORK & NEW JERSEY

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury

That I have read the entire transcript of

My Deposition taken in the captioned matter

Or the same has been read to me, and

The same is true and accurate, save and

Except for changes and/or corrections, if

Any, as indicated by me on the DEPOSITION

ERRATA SHEET hereof, with the understanding

That I offer these changes as if still under

Oath.

_____

MICHAEL BUGIADA

Subscribed and sworn to on the _____ day of

_____, 20____ before me,


_____

Notary Public,

In and for the State of _____



800.211.DEPO (3376)
EsquireSolutions.com

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change

to:_____

_____

Reason for

change:_____

Page No._____Line No._____Change

to:_____

_____

Reason for

change:_____

Page No._____Line No._____Change

to:_____

_____

Reason for

change:_____

Page No._____Line No._____Change

to:_____

_____

Reason for

change:_____

SIGNATURE:_____DATE:_____

          MICHAEL BUGIADA



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change

to:_____

_____

Reason for

change:_____

Page No._____Line No._____Change

to:_____

_____

Reason for

change:_____

Page No._____Line No._____Change

to:_____

_____

Reason for

change:_____

Page No._____Line No._____Change

to:_____

_____

Reason for

change:_____

SIGNATURE:_____DATE:_____

                MICHAEL BUGIADA



**1**

**1-1**
42:15

**10**
45:20,25

**100**
59:6

**10:00**
45:9
98:19
99:7

**11:33**
67:11

**12**
94:21

**12th**
45:5
93:17
98:19
99:7
107:20
109:5

**13th**
93:18
98:16,21
99:8

**1802**
93:4

**1814**
94:22

**1864**
93:6

**2**

**2007**
12:13

**2014**

12:10
13:14,16
14:2
15:10
16:13
18:5
19:9,13
21:18
22:4
23:4,9
26:14

**2019**
12:23
45:5
93:17,18
98:16,20,
21 99:7,8
107:20
109:5

**2065**
37:24

**2066**
38:8

**2068**
36:25

**2083**
108:21

**269**
89:13,15

**6**

**6**
45:23

**63-page**
93:6

**6:00**
45:9
98:20
99:7

**A**

**a.m**
45:10

**a.m.**
98:20
99:8

**ability**
10:16,18

**aboard**
48:24
50:25
54:4
67:25
69:4 85:5

**academy**
13:8,13
14:2,24
15:10,24
16:5,13,
22 17:7,
17 18:5,
14,24
19:8,13
20:14,18
21:4,8,18
22:4,8,13
23:5
24:5,9,12
29:7
30:22
35:9
51:16,21
52:3
61:2,8
68:4
74:18,19
101:22
102:5,10
106:16

**accessible**
35:17

**accurately**
108:16,21

**act**
20:20
32:22
33:12,14,
20

**action**
27:6
116:22

**active**
20:6 24:3
33:5

**actively**
101:7

**actual**
112:19

**addition**
113:9
115:7

**additional**
69:19

**address**
10:22

**administere
d**
100:21

**administrat
ion**
110:10

**advance**
41:20

**AED**
81:11,12
82:9,16,
17 83:14,
17,20
84:6
100:10,
13,19,25
101:4,9

**afraid**
112:22

**agent**
99:15

**aggressive**
117:2

**agitated**
41:16
111:19

**agree**
95:16,24
97:9,17
101:15,23
102:16
103:13
104:8,12
105:3,8,
12,17
106:8
107:5
120:9
122:11,
13,17,18,
24

**agreeable**
6:15 7:2

**agreeing**
53:11,20
121:14

**aid**
14:21
25:16

**air**
106:10,25
122:19

**aircraft**
80:5,23
81:15
111:15,17
112:8,14,
19
114:15,23
118:17



Airport
  85:18

aisle
  56:15

alerted
  84:6

alive
  107:21
  109:6

aloud
  92:12
  108:8,14

altered
  20:3
  31:22
  36:19
  37:24
  38:10
  40:10
  52:4,24
  53:11,21
  71:8
  103:5

ALTERMAN
  6:18 7:6
  16:7
  20:10,24
  27:7
  32:12
  33:23
  37:14
  46:13
  48:3 49:5
  50:2
  53:15,22
  54:22
  55:4
  58:12
  59:17
  67:14
  69:6
  70:23
  71:11
  76:23

83:2,23
86:2,11,
25 88:5,
13 90:24
91:9
95:11,21
96:5
97:6,14,
22 100:7,
15,23
101:5,18,
25 103:16
105:23
106:5
107:15,22
109:7
111:6,12
118:18
119:14,24
120:12,20
121:19
122:6
123:6,10

alternative
  27:25

ambulance
  84:7
  85:16,21,
  23 86:10,
  23 87:8
  95:19

amount
  80:3,17
  84:9 97:2

amounts
  105:20

Amrhein
  6:12,19
  7:8,16
  18:2
  36:4,21
  38:15
  58:23
  59:19

67:10,16,
20 92:7
110:15
111:4,9
112:2,10
113:12
114:4,21,
25
115:16,21
116:2,7,
21,25
117:5
118:7,21,
23 123:8,
12

analysis
  93:11

angry
  41:16

answering
  9:8

answers
  83:10
  120:4

Anthony
  45:2

anticipate
  83:6

applying
  105:19

appointed
  90:9

approximate
ly
  29:24
  49:16

April
  12:22
  45:5
  93:17,18
  98:16,19,
  20 99:7,8

107:20
109:5

area
  17:12
  60:17
  63:23
  66:2,10
  78:13
  96:9
  101:10
  112:20

arm
  72:19,22
  73:12,14,
  17 75:9,
  11 117:4

arms
  57:23
  58:3
  64:14
  65:2
  73:3,10

arrest
  11:15
  14:9
  79:13

arrived
  84:7

arriving
  55:19

articulate
  119:9

arts
  61:14

Ashcroft
  7:17

asphyxia
  106:13
  107:3,6,
  12
  122:22,25

asphyxiatio
n
  19:12
  31:10

assault
  57:25
  58:21
  59:14
  79:12

assaulted
  112:7

assess
  28:11

assist
  73:23

assistance
  20:21
  69:19,25
  117:24
  118:4

assisting
  75:20

associate's
  12:6

assure
  88:17

attempt
  60:8 77:4
  116:11,24
  117:4

attempted
  57:25
  58:20
  66:11
  69:25
  117:25

attempting
  57:21
  59:13
  66:8
  72:24
  77:20



**attempts**
67:23

**attend**
13:12

**attendant**
51:6,9
54:13,15,
19 55:9,
12,19,23,
24 69:13
70:17
71:2
81:14
82:10,14
111:18

**attendants**
79:3,6

**attended**
15:10
16:12

**attending**
31:5

**attorney**
7:17
43:15,18,
22 44:12,
13,16
87:10
88:11,20
90:7,12,
17 92:9,
15 94:6
96:20
119:8,21
121:10

**audio**
8:13

**August**
23:12,14,
15

**authoritative**
70:6

**Authority**
12:17,22
13:3,13
15:6,12
23:17
24:7,14
25:20
28:25
29:19
30:13,21
31:14
35:5,8,12
36:25
37:24
38:8
39:11
44:6
52:8,14,
22 60:25
61:6
68:13
90:22
91:5
93:4,5
94:22
95:17
96:2,18,
21 97:11
106:21
108:21
109:11,
16,21
110:10,17

**Autopsy**
93:19

**avoid**
8:23
21:19
117:14

**aware**
43:8
47:10
50:18
57:14,16
62:7

73:22
74:2,3
82:7
83:20,25
84:2
85:23
86:4,5,20
87:3
90:16,20
91:4,20
100:20
101:3,11,
13 103:19
109:14,
15,19

---

**B**

---

**back**
14:2
26:13
41:17
49:9
51:3,7,10
54:16
55:10,24
56:3,4,6
66:5
67:11
73:6,10,
19 75:12
77:18
78:3,20,
24 79:3
81:16,18
82:11,14
83:15,17
100:10,
17,25
105:15,20
111:20
112:8,14
113:17
116:19

**background**

12:5

**backup**
65:3
69:25
117:24

**bad**
120:7

**ballpark**
25:7

**based**
18:22
26:5
27:12
29:16
30:25
91:14
101:21
121:3
122:4

**basically**
86:15
118:12

**basis**
21:13

**Bates-
stamped**
36:23
37:23
38:7
39:11
40:22
93:4
94:22
108:22

**bathroom**
79:2

**baton**
68:16,20

**bear**
36:6 42:2

**began**
13:9

29:25
46:5 82:2
114:3,5

**begin**
24:3
93:21

**begins**
45:25

**behavior**
104:10
122:15

**behavioral**
14:4

**bell**
35:22

**belt**
58:4,5,6,
7,9,11
77:20

**big**
94:13

**bit**
30:2
33:19
53:4
62:17
64:21
66:10
99:18
121:11

**biting**
63:3

**blanks**
72:2

**block**
106:9,24
122:19

**blocking**
112:18

**blue**
80:25



81:23
100:5

**board**
47:12,18,
24 50:19
84:24
85:6
111:15,17

**boarded**
54:14
69:11

**boarding**
51:4 55:8

**body**
49:11,15
58:8
63:16
64:8,10,
18 66:13,
21,25
73:2,5,21
74:6

**book**
44:23

**bottom**
17:23
36:24
98:10,14

**box**
61:3
99:11,14,
21

**boxing**
60:24
61:9

**break**
9:15,19
67:3,6,22
78:11
119:4

**breathe**
105:13

**breathing**
76:2,5

**briefly**
12:4 81:5

**bring**
81:16

**brotherhood**
110:17

**brought**
81:18
82:10,14
93:12

**bucking**
62:8
66:6,15,
23

**Bugiada**
7:1,10,11
8:1 9:1
10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1
30:1 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1

60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1 99:1
100:1
101:1
102:1
103:1
104:1
105:1
106:1
107:1
108:1
109:1
110:1
111:1,13
112:1
113:1
114:1
115:1
116:1
117:1
118:1
119:1
120:1
121:1
122:1
123:1

**building**
89:13,15,

16

**bullet**
37:13
38:2,14
40:9,13
41:3,12,
15 103:4
108:8

**burst**
116:8

**busy**
6:9

**buttocks**
65:23,24,
25 66:5
78:13

———————

**C**

———————

**calendar**
13:16

**call**
47:14
54:3,5,9
68:2
84:14,16,
22 85:5,
17 117:23

**called**
47:11
68:24
69:2,18
85:8,12

**calling**
85:15
100:10,
13,18
118:3,9

**calls**
47:19
54:6
84:18,21

**calm**
28:12

**cam**
49:11,15

**capacity**
25:19
30:12
31:13
52:7,13,
21 61:10

**caption**
42:13

**capture**
82:12

**capturing**
33:10

**care**
22:5,8
32:19,22
40:23
41:9

**carry**
68:20

**cart**
50:12

**case**
11:12,16
33:13
42:12,13
72:7
103:20

**case-by-
case**
21:13

**category**
34:9

**centered**
78:4

**certificate
s**
34:24



change
29:25

changed
26:9

chaotic
56:12

charge
114:3,6

charges
93:12

charging
114:9
115:14,
19,24

check
10:13

checked
81:25
99:10,13,
20

chemical/
natural
99:15

Cheryl
6:13
111:10

chest
61:22
64:14,18

children
12:2

chin
114:8

choice
46:11

choose
120:6

chooses
47:2

Chris
7:16

circumstanc
es
50:6,10

citizen
31:22

civilian
20:21

civilians
20:9,15,
19 22:5
32:20
33:15

clarifying
23:2

clarity
48:18

class
16:19
25:16
26:7 28:7
32:4

classes
24:2
25:14,22
26:6,17,
18 27:13
28:23
29:5
30:11
31:3,7,15
32:17,18
34:21,22

clean
9:9

cleaner
9:3 99:4

clear
56:14
60:5

clearer
85:2

clenched
114:7

closed
9:19

collective
16:24
30:7

colloquial
59:4 83:7

combative
38:3
51:12
53:13
54:18
55:11
56:2
69:16
70:20
71:6
103:7
104:10
111:22,24
112:12
115:4,8,
10 122:14

command
56:9,13,
16,21,22
69:23
86:9,23
104:20

commanded
113:16

commands
56:24
57:2,4,7
70:2,7,11
104:13
105:5,9
113:2,6,
8,14,25

115:5,6

common
38:9
53:20
71:9
103:5

communicate
44:3

communicati
on
44:4,5

compared
26:13

complaint
41:25
42:8,21,
22

complete
24:8,16,
17 42:21

completed
28:23
35:2

completely
54:8

compliance
18:19,25
19:3,5
68:5
75:8,15
99:11
114:16

comply
113:5,25

complying
69:23
116:5

compound
107:12

compounded
107:6

122:25

compounds
76:9

compression
al
19:11
31:9

comradery
110:18

concerned
86:14,17
114:17,22

concerns
77:5

concluded
87:25
90:21

concludes
45:23

conclusion
45:18
87:18
88:4,7,12
91:2 94:5
120:19

condition
97:20
106:11
107:2
121:17
122:21

conduct
87:11

conference
10:3
89:14

confidentia
l
92:13

confidently
121:25



confirmation
  34:25
  108:15

confirmed
  108:8

confirming
  108:20

confused
  38:2
  53:12
  71:6
  103:6
  106:3

consistent
  26:8

consistently
  119:11

contact
  66:5
  111:16
  116:13

context
  104:25

contractions
  40:11

contribute
  106:25

contributed
  90:23
  96:4,18
  97:12

contributing
  91:16
  106:11
  122:20

control
  17:22,23

62:18
63:12,17
66:16
72:12,14,
22 73:3,
13,16
78:15
114:16

controlling
  73:24

conversation
  44:11

cordial
  75:4

corner
  113:3,15,
  17

correct
  33:10
  36:18
  37:25
  38:8,11,
  12 40:9,
  13,17,22
  41:2,8
  47:23
  48:8 49:2
  51:8,14,
  19,24
  52:6,12,
  20 54:2,
  11 55:6,
  18 57:17
  58:24
  61:16
  68:24
  69:2,12,
  18 70:4,
  11,21
  71:3
  76:20
  78:6
  79:17

85:10
94:6
96:16
97:4
98:18
99:10,13,
20,24

correctly
  108:9

costs
  20:23

Council
  35:20
  36:2,16
  39:5 53:7
  102:21

Council's
  103:25
  108:2

counsel
  90:5,9
  103:20
  119:3,23
  120:16

courses
  34:19
  52:10,16,
  24

court
  10:5 83:9

courtroom
  11:9
  14:11

cover
  14:9,11,
  14,19
  15:23
  28:5 31:7

covered
  13:25
  16:4
  25:9,10,

11 26:19
31:10,23
34:11,12,
13,15
72:6

CPR
  25:15
  81:19
  82:2
  101:3

criminal
  11:16
  12:7 34:5
  87:17

crisis
  19:16,21,
  23 31:16,
  19 32:5,
  10,11,18,
  23 51:22
  52:18
  115:18

cross
  60:18

cuffed
  78:7
  80:4,7

curriculum
  14:3
  15:4,9,18
  21:7 26:7
  51:15,20
  52:2
  60:24

cut
  60:19

———————
      D
———————

dangers
  41:17

date

42:15

dated
  98:16

day
  43:13
  45:8
  83:20
  99:2

days
  6:25

deadly
  16:2,18,
  24,25
  29:2 30:5

dealing
  19:15,18,
  20 20:2
  31:15,18,
  21

death
  87:12,17,
  20 88:3,9
  90:23
  91:16
  92:20
  96:4,19
  97:13

decisions
  97:2

deescalate
  26:25
  27:6

deescalation
  15:19
  25:23
  26:2,6,
  12,18,23
  27:14,16,
  24 28:4,
  9,20 33:2

defendant



103:20

**defendants**
37:3
39:13
42:18
43:25
53:5 72:7
93:8
108:10,17

**defendants'**
103:22

**defensive**
14:19
17:10,15

**define**
18:22,24

**defusing**
15:21

**degree**
12:6,9

**delayed**
85:24

**delivered**
114:11

**delivering**
83:16

**demonstrati**
**ons**
15:15
22:16,21,
23

**Department**
12:22
13:4,13
15:6,12
23:18
24:7,15
25:21
28:25
29:20
30:22
31:14

35:6,12
44:6
52:9,15,
23 60:25
90:22
91:6
95:18
96:2,21
97:11
109:12,
17,22
110:11,17

**depending**
46:4

**deployed**
114:11
116:8

**deponents**
10:21

**deposed**
7:22 8:3
10:25

**deposition**
41:20
43:6,18,
21 44:15,
18 78:11
94:9
102:22
103:10
119:5

**depositions**
6:14
43:25
44:8

**describe**
12:4 59:5
63:6,19
65:13
78:20
110:16
111:14
113:13
116:22

117:3

**description**
11:12

**desk**
47:19,20
85:14

**detail**
16:10

**detected**
83:21
100:22

**determine**
87:16

**determined**
95:17

**diagnoses**
120:15

**differences**
29:9,10,
23

**differentia**
**ted**
30:6

**difficult**
67:2
104:13,23
105:4,8,
13

**diffusing**
28:5 33:2

**direct**
37:4
93:20
119:13,20
120:24

**direction**
114:8

**directions**
116:4

**disciplinar**
**y**
110:4,8,
24 111:3

**disciplined**
109:10,
15,20

**disclose**
110:25

**disclosure**
103:22

**discovered**
81:22
100:4

**discovery**
37:4
39:14
53:6
92:25
103:21,22
108:11,18

**discussed**
44:11
99:18

**disoriented**
38:3
51:11
53:12
54:17
55:11
56:2
69:15
70:19
71:6
102:18
103:7,15
104:5
105:10
122:10

**dispatch**
84:23

**dispatched**
47:17

48:2,12
50:8 54:6
86:6

**distance**
113:19

**distinction**
47:9

**distraction**
**s**
28:18

**distress**
115:13

**docket**
42:13,14

**doctor**
71:17,19,
20 118:24

**document**
11:17
37:2
38:7,19,
20,22
39:13,19
40:6
42:12,24
43:5,9,
12,14
91:12
92:23
93:5,6,22
94:2,5,8,
21 96:7
98:7
108:17

**documents**
26:21
44:17,20,
22 108:10

**drinks**
79:7

**drowsy**
38:3



53:13
103:7

**Duran**
72:4  86:7
87:5
109:24

**duties**
20:8,14,
18 21:4
33:9,14,
15,19

**duty**
20:20
24:3
32:19,22
33:12
34:3
49:10

———

**E**

**e-mail**
44:3

**earlier**
53:4
64:21
69:8  71:4
78:10
94:4
99:18
102:21
103:9
119:4
121:11

**easier**
9:2,10
60:5
83:11

**easily**
83:5

**easy**
9:4

**educational**
12:5

**effect**
59:10

**effort**
62:18
72:14

**elaborate**
21:22

**elapsed**
80:13
84:13

**electronic**
44:4,5

**emergencies**
51:17
52:10

**emergency**
33:13
40:15,23
41:9
47:11
85:11
108:23
115:23

**emphasize**
121:15

**emphasizes**
97:18

**employed**
12:14

**employee**
35:10

**employees**
35:17

**employer**
12:16
24:25

**EMS**
84:12,14,

16,18,21
85:4,8,10

**encountered**
111:17

**end**
24:4
119:12

**enforcement**
13:5

**engage**
72:9

**engaged**
57:18

**engages**
107:13

**English**
57:9
70:3,5,12
104:18,24

**entire**
59:24

**entity**
35:7

**environment**
10:3

**environment
al**
28:18

**escort**
85:16,21,
25 86:10,
23 87:7
95:19

**estimate**
80:3
84:8,10

**event**
44:21

**events**
79:25

81:7

**eventually**
57:19
61:17
62:4
64:3,10
85:11

**Evgeniy**
92:20

**evidence**
14:17

**evolved**
26:9
29:11,12,
18 30:25

**exact**
62:9 68:8
80:12

**examination**
111:11
119:13

**excuse**
18:2 27:8
42:13
52:2
68:25
82:7
93:20
98:24

**executive**
93:10,14
94:12

**exhibit**
36:6
38:17,24
40:7
41:7,24
92:8
93:14,18
98:2
108:3
121:12

**exhibits**
42:21
53:5 71:4
93:13

**exist**
50:16

**exit**
112:18

**expected**
110:20

**experience**
13:5 26:5
27:13
55:15
121:4
122:4

**explaining**
81:5
111:19

———

**F**

**face**
15:5,11
60:13,14,
17 61:21,
25 62:4,
24 63:2,
23,25
64:7
72:19
105:13,18
114:12
116:10
117:16

**facilities**
67:22

**facility**
67:6

**facing**
64:4 73:9



**fact**
82:5 84:3
112:12

**factors**
107:7,11
123:2

**facts**
93:11

**failed**
95:18

**fair**
8:20
48:22
50:23
59:4
63:15

**fall**
34:8

**familiar**
7:24 8:7
74:10

**fancy**
59:3

**fashion**
39:23

**faster**
50:13

**fear**
118:16

**feasible**
26:25
27:3,12,
17

**federal**
42:12

**feel**
117:20
118:14

**feet**
113:23

**fell**
32:23

**fellow**
107:18
109:3

**females**
69:21

**field**
47:21

**fifteen**
80:19

**fight**
17:16
47:25
106:4
118:12

**fighting**
17:7,19
86:15
105:22

**filing**
42:15,16

**fill**
47:2
71:25
98:23,25
99:5

**filled**
80:10

**final**
36:24
40:5 41:7
63:21
93:5,18
94:11
96:15

**finally**
9:15
72:14

**findings**
90:18

**fine**
67:15

**finish**
9:7 54:23
59:25
83:3
92:16

**finished**
94:18
95:8

**firm**
7:17

**firsthand**
115:9

**fist**
60:20
114:7
117:17

**flailing**
57:22

**flight**
47:11
48:23
50:25
51:5,8
54:4,13,
14,15,19
55:8,9,
12,18,22,
23 67:25
69:5,12,
13 70:17,
25 79:3,
4,5,6
81:14
82:10,13
85:6
111:17

**flow**
106:10,24
122:19

**focused**
73:2

**focusing**
72:21

**follow-up**
9:13
118:22

**force**
15:23
16:2,6,
10,12,14,
15,17,18,
19,23,24,
25 29:2,
3,6 30:5,
7,8 44:24
77:10,15
90:21
95:25
96:17
97:3,10
99:6
107:19
109:4
117:11

**foreign**
104:14
105:5

**forgive**
7:9

**form**
6:21
22:15
32:13
33:24
46:14
48:4 49:6
59:21
71:12
76:24
120:21
121:20

**forward**
27:25
73:9

**found**
95:25
96:3
97:10,12
100:6

**frequency**
34:14

**frequent**
25:15

**Friday**
93:17

**friendly**
74:24
75:4

**front**
48:14
49:20
50:20
51:4 58:8
69:14
79:15,20
80:5,11
81:3,8,9,
15 82:3
100:3

**full**
10:22
42:20
48:19
70:6
79:24
93:8
115:4

**fully**
9:11

---

G

---

**gain**
19:3
62:18
73:13,16
114:15



**galley**
56:15
78:20,24
79:18,19
81:17
82:11,15
83:15
84:11
112:19,20
113:3,16

**gate**
49:4,18,
21 50:5

**gave**
56:16
70:3

**general**
11:11
16:19
19:24
42:18
59:20
61:5
92:15
96:20

**general's**
87:11
88:11,20
90:17
92:9
121:10

**generally**
18:12
26:22
29:16
32:7 33:9
46:17
73:22
105:2

**gentleman**
51:10
55:9,24

**German**
104:21,22

**gestures**
113:10,13

**gesturing**
70:7
113:17

**give**
11:11
25:6
56:9,21
57:2,4,5
80:2 84:8
104:20

**giving**
9:25
14:14

**glitch**
8:12

**goal**
9:3

**Good**
6:7 7:9,
11

**grab**
58:6,7
77:20

**grabbed**
58:9

**grabbing**
58:3,5
77:21
80:8

**graded**
22:24

**graduate**
12:11
13:15

**graduated**
23:4,10

**graduating**
23:20,22
24:12

**graduation**
23:23
24:5

**great**
36:11
37:21
39:3
67:17
92:6 95:4
98:5

**ground**
17:7,16,
20 58:19,
21,22
60:3,8
61:17,21,
22,24,25
62:5,12,
13,16
63:13
64:4,19
65:16
72:25
75:18
76:12
77:17
105:18

**group**
16:24

**gun**
58:3,5,6,
7 77:20

**guttural**
76:13

**guys**
7:3

─────────

**H**

─────────

**half**
73:20
98:10

**hand**
65:20
77:22
80:8
113:18
117:6

**hand/fists**
99:22

**handcuff**
75:12
77:8

**handcuffed**
21:21,24
77:13,14,
16 81:4

**handcuffing**
18:16
30:19

**handcuffs**
77:10,25
80:2

**handed**
101:2,9

**hands**
77:17
78:2

**handwritten**
44:23

**happened**
81:6
114:2
116:9

**happy**
6:16 7:4
8:10,14
95:8

**hard**
62:9

**harsh**
76:13,15

**haymaker**

117:9

**haymaker-
type**
117:7

**head**
8:24 64:9
116:12,
14,18,19,
24 117:8

**header**
95:2

**headings**
94:25

**health**
19:21
31:19
32:10
51:22
52:17
77:6

**hear**
8:9 47:14
75:21
76:2
84:17

**heard**
112:15

**hearing**
22:7
32:21
84:18,20
85:4

**heartbeat**
83:22
100:22

**heavily**
117:11

**heavy**
76:5

**hectic**
76:3



**held**
21:25

**high**
12:5,11

**highly**
111:18

**hit**
60:17

**hold**
18:25
58:15
64:25
65:9
66:13
68:5
75:8,15
99:11

**holding**
19:2
65:19

**holds**
18:20
19:5

**hook**
60:19

**hooked**
83:14

**hours**
34:20

---

**I**

---

**ignoring**
70:9

**immediately**
49:3
54:13
80:7 82:2
85:9
97:20
121:17

**impair**
10:16,17

**implicates**
120:7

**improper**
21:10
33:17
106:9,23
122:18

**In-service**
24:19,20
25:18,21
26:18
28:22
30:11
31:2,15
32:3
35:2,3,4
68:11

**incident**
59:25

**include**
15:18

**included**
108:9

**incorporate**
96:25

**increasing**
105:19

**independent**
35:6

**individual**
11:22
16:23
19:2
21:24
30:7
31:22
37:10
38:9
62:16
72:11,13

77:9
94:24
96:23
111:20,24
112:6
115:4

**individuals**
91:7,19
97:3

**influence**
10:15

**information**
47:20
79:11,15
83:18
96:25
110:6
115:3,7
120:5

**informed**
54:15

**initial**
19:7 54:9
61:7
84:21
85:5

**initially**
56:24
61:23
62:2
69:21

**inquiry**
9:17,18

**intended**
59:9

**intensive**
13:21

**interaction**
65:4

**intercede**
21:5
33:15

**interceding**
21:8,9

**internal**
44:5

**International**
85:18

**interrupt**
76:19
80:16

**intervene**
77:5

**intervention**
34:8

**interview**
89:2,6,
20,24
90:3,6

**interviewed**
88:19
89:3,9,
12,13

**introduce**
36:5
38:16
41:23
88:17
97:25

**introductory**
8:8

**investigation**
87:11,15
88:12,20,
23 90:18
92:20

**Investigations**
92:18

**investigative**
92:9

**involve**
35:19

**involved**
11:12
107:8
123:4

**issue**
56:13

**issued**
57:7
113:2,8

**issuing**
70:7
115:5

**IST**
24:17,20
25:18
26:17
27:13
28:6 29:5
30:4
31:6,10,
23 32:17
33:22
35:8
52:9,15,
23 61:4
68:11
102:12
106:19

**ISTS**
26:6
30:17
32:10
33:4,9
34:16
35:7
101:22
102:5

**items**



79:7

## J

**Jersey**
12:18

**Jetblue**
47:10,19,
24 48:23
54:4
67:25
69:4
84:22
85:5

**JFK**
85:17

**job**
9:2,4,10
54:8
83:10

**jog**
72:2

**joining**
13:3

**Joseph**
72:3 86:8
87:6
109:19

**justice**
12:7

## K

**kicking**
58:16

**kind**
33:8 67:2

**knee**
62:25

**knees**

65:12,18

**knew**
110:24

**knowledge**
118:5

## L

**Lagoda**
45:2
48:24
50:24
54:16
56:7,10,
14,22
57:3,6,
10,18,22
59:12,16
60:2,7,9,
10,15
61:17,20
62:11,12,
14,17
63:7,17,
21 64:4,
20 65:9,
22 66:14,
17,22
67:23,24
68:18
69:14,23
70:2,3,18
72:9,14,
18,24
73:24
75:18,21
76:8,11,
12,22
77:5,6,
11,16,19
78:12,23
79:8,22,
25 80:24
81:17
82:20,24

83:14
90:23
91:17
92:21
99:25
100:4
101:4,11
107:19
109:4
112:6,17,
18 113:2,
5,16,20,
24 114:9,
16 115:5,
8,12,17,
22 116:4,
10
117:14,
16,23

**Lagoda's**
57:14
63:25
64:13,17,
22 65:15
66:5
72:22
73:8,16,
21 75:9,
10 81:23
87:12
88:3
96:4,19
97:13
100:14

**landed**
62:22
63:20
72:21

**language**
57:15
104:14
105:5

**languages**
104:17

**lapse**
8:13

**large**
95:6

**lasted**
89:6

**law**
7:17 13:4

**laws**
14:9

**laying**
65:8,11
105:13

**lead**
71:15

**learn**
17:15
18:5 21:4
22:4 45:4
82:5
100:12
102:4,7,
13

**learned**
18:13,16,
23 26:13
29:17
30:21
33:21
68:11
80:24
81:10

**learning**
16:11
20:14
21:8
26:11

**led**
57:25
87:17

**left**
63:13,16

73:13,17
74:4
75:11
77:23
79:10,18,
19 83:16
101:9

**lefty**
60:22

**leg**
63:12,13,
16 64:21,
22 73:20

**legal**
93:11

**legs**
58:16
73:8,25
105:21

**length**
34:23

**lengthy**
123:3

**lesson**
16:19
17:12
29:25
30:6
33:21

**lessons**
22:14
29:6 31:2

**letters**
92:12

**levels**
16:15

**life**
20:22
21:2
105:22



life-
threatening
  40:14
  106:11
  107:2
  108:23
  122:21

lines
  95:6

list
  38:13
  53:24

listening
  20:6 33:5
  116:4

loaded
  117:10

loading
  13:11

located
  112:16

logged
  110:9

long
  34:20
  37:8
  49:16,18
  89:5,7

looked
  43:3
  87:24
  91:25

losing
  62:19

lot
  9:3,10
  117:11

loud
  37:16
  76:13,15

lower

73:5,20
74:5

loyalty
  110:20

lunge
  117:7

lunged
  114:8
  115:6

lungs
  106:10,25
  122:20

lying
  64:5

———————

**M**

———————

made
  11:16
  51:3,7
  89:24
  100:2
  111:16
  112:13
  113:14
  117:4,6

maintain
  17:23
  66:16

majority
  119:12

make
  7:14 9:4,
  8,9 48:19
  56:2 60:5
  66:4,14
  83:10
  113:3
  116:13
  120:18

makes
  8:25 9:2

making
  46:9 58:4
  75:21
  76:8,12
  118:15
  120:14

male
  47:12,17,
  24 54:3
  69:4
  70:18
  84:23
  85:6

mandated
  24:8,15,
  25 46:19,
  21,23
  47:3

mandates
  24:21

mandating
  47:6

mandatory
  21:14,15
  27:5,15
  28:2 31:6
  52:9,15,
  23

manner
  19:2

manual
  35:10

marital
  11:24

marked
  36:6
  38:16
  39:6 40:8
  41:6,24
  53:5 71:4
  92:8 98:2
  121:12

married
  11:25

martial
  61:13

material
  41:20

materials
  35:25
  53:3 71:4

matrix
  16:14

matter
  7:18
  11:21
  37:3
  41:25
  42:8 46:8
  80:18
  93:2,9
  103:23
  108:18

matters
  8:8

means
  76:14

meant
  111:25
  112:3

medical
  19:16,23
  31:16
  32:4,10,
  18,23
  34:6
  47:11
  51:17
  52:10
  54:20
  55:13
  85:11
  102:8
  115:18,23
  118:24

120:15

medically
  101:17,24
  120:11
  121:7
  122:3

meet
  56:15

member
  109:16

memo
  44:23

memory
  22:11
  72:2,17
  88:8,10,
  16 91:3
  92:2
  119:8,17

mental
  19:21
  20:3
  31:18,22
  32:10
  36:19
  37:25
  38:10
  40:10
  51:22
  52:4,17,
  24 53:11,
  21 71:8
  103:5

mentioned
  33:20
  59:12

message
  47:23

met
  44:16
  47:5 81:4

methods



50:16

**Mezzacappa**
72:4
74:23
86:7 87:5
110:2

**Michael**
7:1 8:1
9:1 10:1
11:1 12:1
13:1 14:1
15:1 16:1
17:1 18:1
19:1 20:1
21:1 22:1
23:1 24:1
25:1 26:1
27:1 28:1
29:1 30:1
31:1 32:1
33:1 34:1
35:1 36:1
37:1 38:1
39:1 40:1
41:1 42:1
43:1 44:1
45:1 46:1
47:1 48:1
49:1 50:1
51:1 52:1
53:1 54:1
55:1 56:1
57:1 58:1
59:1 60:1
61:1 62:1
63:1 64:1
65:1 66:1
67:1 68:1
69:1 70:1
71:1 72:1
73:1 74:1
75:1 76:1
77:1 78:1
79:1 80:1
81:1 82:1
83:1 84:1

85:1 86:1
87:1 88:1
89:1 90:1
91:1 92:1
93:1 94:1
95:1 96:1
97:1 98:1
99:1
100:1
101:1
102:1
103:1
104:1
105:1
106:1
107:1
108:1
109:1
110:1
111:1
112:1
113:1
114:1
115:1
116:1
117:1
118:1
119:1
120:1
121:1
122:1
123:1

**mind**
21:20,23

**minimum**
27:5 47:4

**minutes**
49:22
67:7,11

**mispronounce**
7:14

**missed**
116:15

**mixed**
61:13

**MMA**
61:13

**module**
34:23

**moment**
113:24

**moments**
33:11

**month**
23:13

**months**
13:20
23:5,25

**morning**
6:7 7:9,
11 98:20

**motion**
117:3

**motions**
6:23

**mouse**
96:12

**move**
37:10,17
38:18
39:25
56:4,14,
16 66:9
70:8
116:19

**moved**
78:15
80:4
117:13

**movements**
58:4
62:10

**moving**

27:24
28:17
62:8 66:7

**multiple**
56:12
76:22
89:3

**muscular**
40:11

_____

**N**
_____

**names**
71:21

**National**
35:20
36:2,16
39:5 53:6
102:20
103:25
108:2

**native**
57:15

**neck**
80:24
81:23
100:5
105:20

**needed**
34:5
81:11

**nervous**
111:19

**nice**
8:5

**night**
44:21
45:5
49:11
72:25
87:21
88:3

98:19
100:2
107:20
109:5

**nods**
8:24

**noises**
75:22

**normal**
45:20

**notary**
7:5

**notes**
90:2

**notice**
27:11

**number**
42:14,15
49:23
105:19
107:14

**numerous**
71:15

_____

**O**
_____

**oath**
9:25
10:2,5
11:3,9
14:15
120:5

**object**
59:21

**Objection**
16:7
20:10,24
27:7
32:12
33:23
46:13



48:3 49:5 50:2 53:15,22 58:12 59:17 69:6 70:23 71:11 76:23 83:23 86:2,11, 25 88:5, 13 90:24 91:9 95:21 96:5 97:6,14, 22 100:7, 15,23 101:5,18, 25 103:16 105:23 106:5 107:15,22 109:7 112:2,10 113:12 114:4,21, 25 115:16,21 116:2,7, 21,25 117:5 118:7 119:14,24 120:12,20 121:19 122:6 123:6

**objections**
6:21

**observations**
120:25

**observe**

115:9

**observed**
111:15
112:24

**OC**
58:24
59:5,8
99:17,19
114:11
116:3,9

**occurred**
79:12

**occurs**
23:24
25:4

**office**
10:2
87:11
88:11,20
90:17
92:15
96:19
121:10

**officer**
6:7 7:9, 10 9:22
12:20
15:5,11
21:10
23:17
24:6,12, 14 25:20
26:8
28:24
29:19
30:10,12
31:5,13
33:4,16
34:3
35:11
37:21
46:12
47:2 48:9
52:8,14,

22 61:5, 11 68:13
72:3,4, 12,15,16, 18 73:15
74:8,22
75:7,11
76:21
77:8
78:16
79:21
81:13
84:15
86:7 87:6
92:3
95:16,24
96:18,25
97:17
100:13
106:20
109:11, 15,19,21, 24 110:2
111:13
121:4
122:5
123:12

**officers**
20:9,15, 19 27:23
28:15
42:17
44:7
46:10
47:7,20
66:17
69:20
71:22
72:9,23
73:7,23
74:5,7, 10,13,17
75:2,5,19
76:11
78:14,22
80:10

81:19
82:17
86:6,21
87:5 88:2
91:6,18
96:22
99:25
100:9
107:14,19
109:3
110:7,21, 23 123:5

**one's**
105:22

**one-off**
89:2

**online**
34:20
35:15
92:24

**onset**
39:18

**operative**
41:25
42:20

**opportunity**
39:17
98:9

**opposed**
17:13
64:5,11

**opposing**
119:23

**option**
27:19,20
49:13,14

**optional**
27:4,15

**order**
57:18
93:14
116:17,23

**orders**
116:5

**originally**
7:13

**outset**
23:24

**overhead**
117:7

**overtime**
45:15,17, 23,24
46:20,21, 23,24,25
47:3

**overview**
34:2

**owed**
20:9,15, 19 22:5
32:20

───────

**P**
───────

**p.m.**
45:9 99:7

**PA**
36:24
37:24
38:7
94:22

**PA2064**
36:23

**PA2082**
39:11

**PA2083**
40:8

**PA2093**
40:22

**PA2095**
39:12



41:6

**pads**
82:20,24,
25 83:13

**pains**
10:8

**pants**
77:21

**PAPD**
91:15,17

**papers**
34:25

**Papia**
72:3,16,
18 73:15
74:8,22
75:7,11
76:21
77:8
78:16
86:7 87:5
109:15

**paragraph**
94:12
95:6,7
96:15

**paragraphs**
94:24

**part**
14:3
15:4,9
17:12
19:23
21:7
25:21
28:4 30:4
32:3,25
33:3,22
34:16
37:3
39:13
42:16
51:15,20,

25 52:2
60:24
61:4 62:5
66:3
67:24
68:12,17
71:14
88:19,23
92:25
100:3
103:21,22
108:9,18
109:20
110:9

**partially**
38:3
53:13
71:7
103:7

**parties**
92:25

**partner**
74:14

**partners**
74:15

**party**
11:14

**pass**
24:2
82:16
112:21,22

**passed**
101:13

**past**
78:18
113:4

**patient**
38:2
41:4,16
71:5
103:3,6

**penalty**

10:8

**pending**
9:17 67:4

**people**
10:14
47:5
52:4,24
105:19
112:4

**pepper**
59:4

**perceive**
21:9

**perceived**
33:16

**percent**
59:7

**perfect**
7:12

**performed**
101:8

**performing**
81:19
82:2

**period**
80:21

**perjury**
10:9

**person**
28:15
31:21
34:22
52:17
53:11
68:22
97:18
105:17
107:7
121:5,15
122:2
123:2

**person's**
106:10,25
122:20

**personal**
10:12,20
61:10
88:10

**personally**
82:10,23

**personnel**
86:9,22
90:22
91:16
95:18
96:3
97:11

**physical**
15:14
22:15,20,
23 66:13
107:8,13
112:4
123:4

**physically**
17:13
57:17,20
72:9

**pick**
29:22

**picture**
63:9 65:6
79:24

**plaintiffs**
7:18

**plane**
49:3,9
50:4,19,
22,24
51:4,6,10
54:16
55:10,25
56:3,5,7,
12 69:14

78:19,21
79:2,16
81:3,8
82:4
100:4,10
111:21

**planning**
45:14

**point**
38:2,12,
14 40:10,
14 41:3,
12,15
55:14
57:19,24
59:18
62:25
63:11,12
64:6,24
65:3
66:3,9
69:24
77:3,4,9,
11,19,22
78:5
79:13
80:9
85:12
96:8
103:4
113:20
115:13
117:19,22

**pointed**
113:15

**points**
37:13
108:8

**police**
12:20,22
13:4,8,13
14:2,6,24
15:6,10,
12,24



16:5,12,
22 17:6,
17 18:4,
14,24
19:12
20:13,17
21:3,8,18
22:3,8,13
23:5,17,
18 24:7,
14 25:20
26:8
28:24,25
29:7,18,
19 30:10,
22 31:5,
14 34:3
35:6,9,12
44:6
46:10
51:16,21
52:3,8,
13,14,21,
22 60:25
61:2
68:3,13
74:17
84:22
85:16,20,
25 86:9,
22 89:16
90:22
91:5
95:18
96:2,18,
21 97:11
101:22
102:5,10
106:16,20
109:11,
12,16,20,
21 110:7,
10,17
123:5

**policy**
16:9

**Port**
12:17,21
13:3,12
15:6,12
23:17
24:6,14
25:20
28:24
29:19
30:12,21
31:14
35:5,8,11
36:25
37:24
38:7
39:11
44:6
52:8,14,
22 60:25
61:6
68:13
90:21
91:5
93:4,5
94:22
95:17
96:2,17,
20 97:11
106:21
108:21
109:11,
16,21
110:10,16

**portions**
108:15

**position**
47:2
65:14,22
78:10
80:11

**positional**
106:12
107:3,6,
12
122:22,25

**positionall
y**
78:21

**positioned**
63:7,8
64:19

**positioning**
67:23

**positions**
47:7

**possibly**
9:5
111:21

**potential**
82:18
101:4

**power**
117:11

**Powerpoint**
37:7,23
53:7
108:15

**practical**
22:24

**practices**
14:6

**preceding**
45:19

**predisposed**
107:10

**predisposin
g**
107:7
123:2

**preface**
44:10

**preparation**
43:6,18,
21 44:18

**prepare**

44:14

**prepared**
44:21

**preparing**
94:9

**presence**
70:6

**present**
90:7

**presented**
53:4
75:11

**pressure**
105:20

**pretty**
15:2 26:7
117:11

**prevent**
41:17

**previously**
10:24
51:14,19,
24 52:7,
12,20
54:12
55:7
70:16
90:15

**prior**
13:3
23:19,21
24:5
46:16

**procedures**
14:7,12
41:9

**proceed**
6:15
27:23

**proceeded**
116:11

**process**
62:6
67:24
75:17
76:10

**produced**
37:2
39:13
53:6
92:25
93:8
103:20
108:10,17

**professiona
l**
54:20
55:14

**program**
13:19,21

**prone**
61:21
64:8,11,
18 76:12
77:17
105:14,18

**Prosecution
s**
92:19

**protect**
20:22
21:2
114:14
117:19

**provide**
28:14
85:2
96:21

**provided**
36:15
85:20
88:22

**provisional**
31:7



*800.211.DEPO (3376)*
*EsquireSolutions.com*

**public**
11:18
92:23
110:5

**pull**
42:2
77:22

**pulling**
58:3

**pulse**
80:25
81:25
100:5,6,14

**punch**
59:15
60:9,21
62:13
72:19
76:21
116:11,17,23,24
117:4,9,10

**punched**
63:21

**punches**
62:23
63:4,20,25 72:21

**purpose**
87:14

**put**
48:6
82:20

——————————

**Q**

**question**
8:15,20,21 9:8,13,17,18

10:21
24:13
27:9
54:25
55:17
56:20
59:20,22
60:4 67:5
76:9 85:3
86:19
99:4
119:8,25
120:23

**questioning**
119:17

**questions**
7:20 8:10
9:20
10:17,18
48:21
83:6,10
91:14
111:5,7
118:22
119:12,17,21,22
120:16,24
123:9

**quick**
22:12
34:20

——————————

**R**

**radio**
47:21
48:7,12
65:2
69:9,25
84:18,20,22 93:15
118:2,3,9,15

**raising**

66:23

**ran**
35:7
49:25

**rarely**
40:14
108:22

**reached**
49:2

**read**
6:16,25
37:5,12,15,16
87:22
94:2,8,15,16,23
95:5 96:7
108:7,14,16,21

**reading**
37:9
39:24
53:17
92:2
108:24

**reads**
40:10

**ready**
37:19

**realized**
74:6

**rear**
56:11
66:4
84:11

**reason**
49:24

**reassurance**
28:14

**reassuring**
41:13

**recall**
16:11,22
17:3,5,14
18:13
20:14
22:7 23:8
25:14,17
26:4,11
28:16
30:3,5,16,24
32:2,15
38:22
44:25
45:8
53:10,19
60:19,21
64:15
71:21
73:4
75:23
82:19,23
84:20
85:4
102:20,23
103:2,9
106:17
107:25
108:7,14,20,24
118:8

**receive**
12:8
34:24
35:10

**received**
25:19
29:6
30:11
32:4
33:21
35:25
48:11
51:16,21
52:3
82:13

**receiving**
82:9

**recent**
26:12

**recently**
30:2

**recess**
67:18

**recognize**
38:20,21
39:19,20
42:23
93:21
98:6,12

**recommendations**
93:13
95:3

**recommended**
91:5

**recommends**
96:20

**record**
6:17
10:23
36:22
48:19
59:23
60:5
92:11
110:5,8

**recorded**
89:21

**records**
25:13
110:24
111:3

**recovering**
41:16

**red**
92:12



**reducing**
28:18

**refer**
59:7
91:12

**referring**
22:17
59:24
120:2

**refresh**
22:11
72:17
88:8,16
91:3,25

**refresher**
8:6

**refused**
113:25

**regain**
119:16

**regaining**
119:7

**regard**
9:21
22:14
30:17

**relation**
112:16

**relationshi
p**
74:25
75:5

**relayed**
47:25

**relays**
47:20

**released**
90:16

**remain**
66:11

**remainder**
92:17

**remember**
15:20,22
16:20
18:18
19:10,14
20:4
31:12
32:6,7,9,
21 33:7
45:16
53:3,8,17
60:16
63:22
71:10,24
72:5 76:6
82:21
84:12,17,
19 85:8
88:8
89:7,10
91:21
100:9,11,
18 108:5
121:9,14,
22

**remind**
120:4

**removal**
42:16

**removed**
80:8

**repeat**
8:11,14,
16 15:7
27:9
84:25
108:12

**rephrase**
8:17 18:3
46:22
60:4

**report**
87:19,22,
24,25
88:15
89:17
90:16,20
91:4,21,
22 92:10,
19 93:8,
19 95:17,
23,25
96:16
97:4,8,
10,16,18,
24 98:23,
25 99:6
121:22

**reporter**
83:9

**reports**
121:11,15

**represent**
42:7 93:7

**represented**
90:5

**representin
g**
120:16

**represents**
7:18

**request**
119:4

**requested**
67:21

**requesting**
69:19

**required**
27:23
106:20

**requirement**
68:12

**requires**
85:16

**reserved**
6:22,24

**resisting**
105:21

**resorting**
27:6

**respect**
16:6
18:14
24:20
28:22
33:15
44:7
91:15

**Respectfull
y**
86:18

**respond**
47:17
48:9
66:18
72:12
85:4

**responded**
48:24
50:25
69:3
71:22
75:19
86:21
87:4
111:13

**responding**
51:17,22
52:10,16
54:3,7
84:21
85:17

**response**
10:8
112:25

114:9
117:15

**responsibil
ity**
34:3

**restrain**
21:23
41:4
57:18,20,
22 58:2
60:8
61:18
68:17
72:24
77:4
78:22

**restrained**
79:9,11
99:25

**restraining**
18:6,8,15
21:17,19,
20 30:14,
17,24
31:6,11
62:5
67:24
68:2
73:24
75:17,20
76:10
100:3
106:2,9,
24 122:18

**restraint**
18:11
31:7
106:12
107:3
122:22

**restraints**
19:8

**restroom**
67:8



**result**
11:20
116:3

**Results**
40:10

**returned**
49:4,9
119:3

**returning**
50:4

**review**
39:17
41:19
43:5
44:17
98:10

**reviewed**
30:18
43:2,11
44:20
91:23

**revive**
101:4

**righty**
60:22,23

**ring**
35:22

**risk**
107:5,12
122:24

**rolled**
79:8

**rolling**
45:20
66:7
79:22

**room**
10:3
89:14

**roughly**
8:2 11:5

12:8
13:18,20
23:8
25:25
49:18
84:5 89:5

**rounds**
89:3

**row**
78:19

**rules**
14:17

**run**
35:8 50:7
69:9

**Russian**
57:12,15
70:14

─────────

**S**

─────────

**safety**
35:20
36:2,16
39:5 53:7
77:6
86:15
102:21
103:25
108:2
114:18,23
118:16,17

**sake**
83:8

**sat**
22:2

**Saturday**
93:17

**scenario**
65:7

**scene**

47:17
48:2,9,
16,22
50:7,13,
24 54:14
55:20
67:25
69:3
71:22
74:5,7
75:19
78:15
80:23
83:19
84:8
85:25
86:6,10,
21,24
95:20
100:2
111:14

**schedule**
6:10

**scheduling**
46:7

**school**
12:5,12
74:16,17

**sciences**
14:4

**screaming**
56:13,17
69:22
71:16
112:15,23

**screen**
36:7
38:19,24
42:3
92:4,14,
17 98:3

**scroll**
36:14
37:5 42:9

95:8,9,
12,13

**Scrolling**
42:19

**seats**
78:19

**second-to-
last**
41:3

**seconds**
80:19

**security**
13:10

**segmented**
83:9

**seizure**
41:13
47:12,18,
24 51:11
53:21
54:4,17
55:11,25
69:4,15
70:19
84:24
85:7
91:8,19
96:24
97:19,21
101:16,24
102:9,14,
17 103:4,
14 104:4,
9 107:11
111:21
120:10
121:6,16,
18 122:3,
10,14
123:3

**seizures**
38:13
39:8

40:19,24
41:10
71:9
108:4,22

**sentenced**
11:22

**separate**
16:18
28:6
90:12

**sergeants**
81:5

**series**
7:19
79:25
81:7

**served**
43:3,9,13

**services**
85:11

**set**
36:14
39:4
82:17,21,
25 108:3

**setting**
11:8
82:19,24

**share**
36:7 42:3

**shift**
45:7,11,
19,20,23,
25 46:6,
17,19
89:18
98:18
99:2,6

**shock**
83:21
100:20



**short**
37:7
80:15,17,
21

**shortly**
62:19
77:7,13,
24 79:10
81:3
83:16

**shoulder**
8:24
65:9,15,
19

**shoulders**
64:25
66:23

**show**
6:25
37:22

**showed**
16:15
17:18
53:7

**showing**
53:8
102:23

**shows**
42:14,17

**shrink**
94:14

**shrugs**
8:24

**side**
21:25
29:14,15,
22 56:16
63:2,10,
11 64:5,
9,11,22
65:19
70:8

78:5,15,
16,17
79:9,22

**sides**
64:16

**sign**
6:25

**signature**
98:13

**significant
ly**
85:24

**similar**
29:5,8
30:20
59:10
64:20

**simple**
54:24
56:20
119:22

**simply**
55:17
106:3

**sir**
7:22 9:24
10:11,24
11:6,18,
24 12:14
13:19
22:10
23:3,11
27:12
36:12
37:2
38:18,25
39:4,12,
18 40:6
41:19
42:5,7,
19,23
43:12,17
44:10,22,

25 45:12
47:9,10
48:13
49:10,19,
25 50:20
52:6 53:3
54:21,24
55:6,22
56:19,25
57:12
60:6 63:9
65:14
66:20
67:5,21
68:24
70:10
71:10
72:8 85:3
86:18
87:10,23
88:18
90:15
91:15
92:11,22
93:21
94:5,14,
20 95:2
96:12
97:9,25
98:6
99:17,24
101:15
102:16
103:10,19
104:18
105:3
106:8
107:5,18
108:5
109:2,10
110:13
118:24
119:2,7
120:4,8,9

**situation**
27:2,18

28:12
34:4,5,6
76:3
77:23
81:6
117:15

**situations**
15:5,11
52:16

**six-month**
13:18

**skills**
20:6 33:6

**slide**
38:9
40:18,23
53:18
103:11
104:2,6
108:25

**slides**
36:14
39:4
102:21
108:2,3

**slowly**
28:17

**sound**
7:24 8:6
75:22

**sounded**
112:21

**sounds**
76:13,16

**speak**
43:17,20,
24 57:12
104:15,17
119:2

**speaking**
18:12
51:5

55:22
57:9
105:2

**Special**
92:18

**specific**
15:4 26:7
42:14
49:22
68:10,14
96:9

**specificall
y**
15:22
20:4
26:20
29:14
32:2,6,
15,23
38:21
39:20
63:22
64:15
80:20
112:9
120:2

**specifics**
100:11

**speed**
118:13

**spoke**
51:9
54:12
103:2
104:21

**spoken**
55:8

**spray**
58:25
59:5,8
99:17,19
114:11
116:3,9



800.211.DEPO (3376)
EsquireSolutions.com

staffing
    47:4

stamp
    42:12

standard
    22:5,8
    32:21

standards
    32:19

standing
    58:19
    112:17

start
    13:15
    47:6
    59:25
    89:18

started
    7:21 8:8
    13:8
    81:2,7
    119:8

starting
    26:14
    92:12

starts
    45:24

state
    24:24
    31:23
    32:16
    36:22
    55:12
    92:12

stated
    10:22
    71:2
    90:15
    103:11
    121:23

statement
    32:24

88:23
93:11

statements
    80:6
    120:15

states
    95:23
    97:8,16,
    24 104:6

stating
    91:13

station
    86:9,23

stationed
    49:8,17

status
    11:24
    36:19
    37:25
    38:10
    53:12,21
    71:8

status/
uncontrolle
d
    40:11

statuses
    20:3
    52:4,25
    103:6

stay
    41:16
    47:2,7
    87:7

staying
    46:18

stenographe
r's
    9:2,4,10

step
    26:24

34:4
113:3,16

stipulation
    6:13,16

stipulation
s
    6:20
    59:23

stomach
    64:14
    105:14

stood
    22:2 74:4
    77:23
    80:9

stored
    110:6

straddled
    65:17

straddling
    65:21
    78:12
    105:15

strategies
    20:6 33:5

strength
    66:12,22

stressed
    111:18

strike
    6:23
    58:23
    60:12
    110:15

strikes
    77:7

struck
    60:11,15
    62:17,20,
    21 63:3
    72:13,18

112:6,11
117:14,16

struggle
    107:8,13
    117:23
    123:4

stuck
    112:20

subject
    10:8

subset
    19:19

substance
    118:11

sudden
    119:16

suffered
    51:11
    54:17
    55:10,25
    69:15
    70:18,19
    97:19
    123:3

suffering
    115:18,23

suffers
    103:3

sum
    118:11

summary
    93:10
    94:12

summer
    6:11

summons
    42:17

suppose
    76:16

supposed

87:7

survival
    106:4

swing
    117:7

sworn
    23:16,19,
    21

_____

        T
_____

tactics
    14:19
    17:10,16

taking
    6:9 25:25

talk
    28:10

talked
    71:5

talking
    48:23
    50:23
    67:22

taught
    16:22
    17:4,5
    21:16
    30:16
    32:3 33:9

teach
    17:7,25
    18:9,19
    19:7,11,
    15,20
    20:2,5,8,
    18 21:12,
    18 28:11,
    25 30:13
    32:19
    33:4 34:7
    106:15,18



800.211.DEPO (3376)
EsquireSolutions.com

MICHAEL BUGIADA                                      August 08, 2023
TARASOV V. PORT AUTHORITY OF NEW YORK               Index: technique..train

| | | | |
|---|---|---|---|
| **technique** | 23:21 | **thing** | 64:13,17 | 43:6 |
| 26:6 68:3 | 25:18 | 15:8 | 65:14 | 44:19 |
| | 28:9 72:6 | 21:15 | 67:19 | 53:4 71:4 |
| **techniques** | 83:7 | 22:25 | 68:22 | 94:9 |
| 15:19,21 | | 24:25 | 74:2 78:7 | 99:18 |
| 17:8,16, | **tested** | 26:3 | 80:3,12, | 107:21 |
| 19,21 | 15:2 | 58:14 | 17,21 | 109:6 |
| 18:6,8, | 17:13 | 67:2 | 81:20 | 110:25 |
| 15,16 | 34:17 | | 83:25 | 121:11 |

technique
  26:6 68:3

techniques
  15:19,21
  17:8,16,
  19,21
  18:6,8,
  15,16
  21:17,19
  22:14
  25:23
  26:2,12,
  19 27:14,
  15,16,24,
  25 28:5,
  6,10,20
  30:14,19,
  20,25
  31:6,11
  33:2
  106:9,24
  122:19

telephone
  93:15

telling
  121:4

ten
  80:18

tending
  73:7

term
  22:7
  59:3,4
  68:8,10,
  15 76:14
  112:3

terminal
  48:14
  49:3,9,
  17,21
  50:12

terms
  6:12 13:7

23:21
25:18
28:9 72:6
83:7

tested
  15:2
  17:13
  34:17

testified
  10:25
  11:2
  51:15,20,
  25 52:7,
  13,21
  54:12
  55:3,7,18
  69:8,12
  70:17,21
  76:20
  112:13

testifying
  10:4

testimonies
  11:8

testimony
  9:25
  14:14
  33:10
  53:10,19
  82:12

tests
  14:23
  15:14,15
  22:12,17,
  20,22

text
  44:4
  92:13,17
  94:13
  96:11

thigh
  62:17,24

thing
  15:8
  21:15
  22:25
  24:25
  26:3
  58:14
  67:2

things
  13:23
  17:24
  53:25
  71:15
  91:12
  120:7

thirty
  6:25

three-
quarters
  81:9

thrown
  75:18

time
  6:9,22,24
  13:25
  16:16
  18:14
  22:12
  24:11
  26:8
  27:17,19,
  22 28:11,
  24 29:18
  34:23
  43:11
  45:12
  46:11
  48:13
  54:6 57:8
  58:15,18,
  20 59:18
  60:11
  61:10
  63:8

64:13,17
65:14
67:19
68:22
74:2 78:7
80:3,12,
17,21
81:20
83:25
84:5,7,9,
11,13
86:14,17
89:4
91:25
101:7
113:21
114:18
115:13,
19,24
117:22
118:14
123:13

times
  8:2 11:2,
  5,7 59:15
  60:9
  62:13,18,
  20,22
  63:20,21
  72:13
  76:22
  77:2
  88:25

timing
  79:25

title
  12:19,25
  38:8 39:7
  40:18,23

titled
  41:9

today
  6:8 7:19
  41:21

43:6
44:19
53:4 71:4
94:9
99:18
107:21
109:6
110:25
121:11

today's
  78:11
  102:21
  119:5

told
  51:9
  55:9,19,
  23 69:13
  70:17
  111:23

top
  17:23
  42:11
  64:19
  65:8
  98:10

topic
  34:11,15

topics
  16:18
  25:9,10

torso
  61:24

total
  63:24

tour
  47:3

track
  62:9

train
  61:9
  91:6,17



**training**
  13:21
  24:2,8,
  15,19,21
  25:4,19,
  22 26:18
  28:6,23
  30:4,11
  31:3,15,
  24 32:3,
  18 33:3
  35:2,5,
  19,25
  41:19
  51:16,21,
  25 52:3,
  9,16,23
  61:5
  68:12
  96:21
  101:21
  106:19
  121:3
  122:4

**transcript**
  9:3,9
  89:24
  93:16

**transcripts**
  10:13

**transmission**
  118:2,3,
  15

**transmissions**
  93:16

**transparency**
  48:20

**transportation**
  50:16

**transported**
  50:11

**trial**
  6:23,24

**trigger**
  83:21

**trucks**
  13:11

**truthfully**
  10:18

**tucked**
  114:7

**turn**
  94:11,20

**turning**
  100:5

**type**
  17:21
  18:8,10
  21:20,23
  22:24
  54:7
  60:21
  115:13,23

**types**
  17:18

**typically**
  46:7 79:4

——————————

**U**

——————————

**ultimately**
  36:5
  47:16
  48:2,15

**unable**
  112:21

**underneath**
  64:14

**understand**

**transported**
  8:15 9:24
  10:7,17
  54:21
  55:16
  56:25
  66:20
  104:13,
  23,24
  105:4,6,9

**understandable**
  8:18

**understanding**
  18:23
  29:17
  48:20
  112:5

**understood**
  8:21 47:8
  54:10
  83:12

**uniform**
  69:24
  70:6
  115:5

**union**
  90:10

**unique**
  91:7,18
  96:22
  102:7,13

**uniquely**
  97:20
  121:16

**Unit**
  92:19

**unloading**
  13:11

**unresponsive**
  38:4

**upper**
  60:18
  73:2

**usual**
  6:20
  45:11

——————————

**V**

——————————

**varied**
  45:21,22

**variety**
  19:4

**vehicle**
  50:12

**vehicles**
  50:15

**vein**
  9:6

**verbal**
  20:5 33:5
  113:14,25

**verbally**
  8:25
  113:9

**versus**
  16:24
  46:24

**view**
  55:14

**violent**
  115:10
  117:2

**violently**
  62:8 66:7

**visa**
  8:12

**53:14**
  71:7
  103:8

**voluntarily**
  46:18

**voluntary**
  46:19,24,
  25

**volunteer**
  47:6

**vulnerability**
  91:7,18
  96:23
  102:8,13

**vulnerable**
  97:20
  101:17,24
  120:11
  121:7,17
  122:3

——————————

**W**

——————————

**waistline**
  63:14
  64:23,25
  65:18

**wait**
  9:7 54:22

**waive**
  7:5

**wake**
  91:8,19
  96:24

**walked**
  48:17
  49:20,24
  79:19
  80:11

**walking**
  81:2,7
  112:7

**wanted**



7:14

**warehouse**
13:11

**warning**
104:21

**warnings**
57:5
104:14
105:4,9

**wear**
49:13,14

**wearing**
49:11

**week**
23:23
43:25
44:8

**weight**
63:16
66:13,21
67:2

**Whatsapp**
44:4

**wholly**
38:4
53:13
71:7
103:8

**wiped**
116:10

**wise**
65:22

**witnessed**
75:8
76:21

**woke**
101:12

**women**
56:12,17
112:15,

16,20
113:4

**words**
104:13,24
105:4,9

**work**
12:21
13:7,10
67:12
74:25
75:3,5

**worked**
13:10
74:9

**working**
45:7,9,
14,17

**wrists**
78:2

**written**
15:15
17:13
22:15,20,
22 88:22

**wrongdoing**
87:17

———————

**Y**

———————

**year**
12:8,11
13:16
25:6,8,9,
11 34:14

**yearly**
25:5 26:3
34:12
106:19

**years**
11:23
26:13

**yelling**
75:23,25
76:7,17

**yells**
76:16

**yes-or-no**
54:24
119:22

**yesterday**
6:14

**York**
12:17
87:10
121:10

———————

**Z**

———————

**zoom**
8:12 9:7
111:8

