# EXHIBIT K

**In the Matter Of:**

ALEXEY V. TARASOV, ESQ. vs PORT AUTHORITY

No. 1:21-cv-06226NRB

**JONATHAN PAPIA**

*August 03, 2023*



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x

ALEXEY V. TARASOV, ESQ. Administrator

of the Estate of EVGENIY LAGODA, Deceased

and GRIGORY TIKHOPLAV,

                      Plaintiffs,    Civil Action

v.                     No. 1:21-cv-06226NRB

PORT AUTHORITY OF NEW YORK AND NEW

JERSEY and PORT AUTHORITY OF NEW YORK

AND NEW JERSEY POLICE DEPARTMENT

a/k/a PORT AUTHORITY POLICE DEPARTMENT

a/k/a PAPD, PAPD OFFICER MICHAEL BUGIADA,

PAPD OFFICER ROBERT JOSEPH, PAPD OFFICER

JONATHAN PAPIA, PAPD OFFICER PAUL MEZZACAPPA

and PAPD JONATHAN DURAN,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - x

DEPOSITION OF JONATHAN PAPIA

August 3, 2023 * 2:04 p.m.

Port Authority of New York and New Jersey PAPD

4 World Trade Center

New York, New York

Reporter:  Nancy L. LaCivita



APPEARANCES VIA ZOOM:


     ASHCROFT LAW FIRM, LLC

     By J. Christopher Amrhein, Jr., Esquire

     200 State Street

     7th Floor

     Boston, MA 02109

     (617) 573-9400

     Counsel for the Plaintiffs


     PORT AUTHORITY OF NEW YORK

     and NEW JERSEY PAPD

     By Cheryl Alterman, Esquire

     By Matthew Malysa, Esquire

     4 World Trade Center

     150 Greenwich Street

     24th Floor

     New York, New York 10007

     (212) 435-3431

     Counsel for the Defendants


ALSO PRESENT:

     Alexey Tarasov

     Grigory Tikhoplav



                    I N D E X

EXAMINATION OF:                                    PAGE

JONATHAN PAPIA


  Direct Examination by Mr. Amrhein              4

  Cross-Examination by Ms. Alterman              90

  Redirect Examination by Mr. Amrhein            97



                  E X H I B I T S

NO.                                              PAGE


Exhibit A    National Safety Council

             PowerPoint                          33

Exhibit B    National Safety Council

             PowerPoint                          34

Exhibit C    First Amended Complaint             38

Exhibit D    Attorney General's Report           69

Exhibit E    Use of Force Report                 76







*Original exhibits retained by Attorney Amrhein.



P R O C E E D I N G S

* * *

JONATHAN PAPIA, having been satisfactorily identified and duly sworn by the Notary Public, was examined and testified as follows:

* * *

DIRECT EXAMINATION

BY MR. AMRHEIN:

Q.  Good afternoon, Officer Papia.  We appreciate your time here today.

MR. AMRHEIN:  Before we get started, I know we had stipulations on the record for the prior deposition.

Would you agree to the same stipulations for this deposition here now?

MS. ALTERMAN:  Yes, we agree.

MR. AMRHEIN:  And those stipulations are all objections, except as to form of the question, are reserved until trial and all motions to strike are reserved until trial.

Read and sign, 30 days or whatever works best for your client, and we will waive notary as well.



                    MS. ALTERMAN:  Agreed.

                    MR. AMRHEIN:  For the record, I just
want to note that both plaintiffs are present
during this deposition as well.

     Q.  Officer, my name is Chris Amrhein and I
am an attorney with Ashcroft Law Firm in Boston.
Our firm represents the plaintiffs in this matter,
and today I'm going to be asking you a series of
questions.

                    Before we begin, one introductory
question.  Have you ever been deposed before?

     A.  One other time.

     Q.  Just as a refresher, I'm going to run
through a few boiler plate introductory matters
before we get started.

                    First, if you cannot hear one of my
questions, let me know.  I'm happy to repeat it.
I know sometimes with Zoom depositions, it can
have some technology errors.  If there is any
glitching and you can't hear it, let me know and
I'm happy to repeat the question.

                    Secondly, if you do not understand
one of my questions, let me know and I will
rephrase it for you, but if you answer a question,



I'm going to assume you understood my question; is that fair?

A.  Yes.

Q.  If you can please answer all questions verbally and avoid shoulder shrugs and head nods. It's just for the purpose of the stenographer to make her job as easy as possible.

In that same vein, if you could wait until I've completed my question in full before you answer, again -- before you begin your answer, again, that would make the stenographer's job much easier and that is our goal here today.

And, finally, let me know if you need a break during the course of this deposition and I will do my best to accommodate you.  I only ask if there is an open question or line of inquiry pending before you that you complete that questioning or line of inquiry before we break.

Do you have any questions with regard to anything I have said so far?

A.  No.

Q.  Sir, do you understand you're giving testimony under oath and even though you're in a conference room and we're in an office, that it's



just as if you were testifying in court?

A.  Yes.

Q.  Do you understand your responses are subject to the penalties of perjury?

A.  Yes.

Q.  I preface that we ask this of everyone. It's not personal to you.  Again, we ask this of all deponents.

Are you under the influence of anything that would impair your ability to understand or answer my questions truthfully?

A.  No.

Q.  Again, nothing personal.  We ask this of all deponents.

Can you state your full name and address for the record and work address is fine.

A.  Jonathan Papia, JFK Airport, Building 269, Queens, New York.

Q.  Thank you.  You had mentioned just a moment ago that you have testified in a deposition before.

Can you briefly describe that matter and what it entailed?

A.  It was a deposition in regards to an



arrest.

Q.   What happened with the arrest?

A.   Can you keep going with the question?

Q.   Can you elaborate on what happened with the arrest and the reason you were brought in for a deposition?

A.   I was the arresting officer and I had to be deposed for the arrest.  Nothing further came of it.

Q.   That was a civil suit filed against the Port Authority or you?

A.   I don't know if it was against me or the Port Authority.  I don't remember.

Q.   Have you ever testified in any other settings under oath?

A.   Yes.

Q.   Was that in a courtroom or another setting?

A.   Courtroom.  Yes, courtrooms.

Q.   Roughly how many times would you say you testified under oath in a courtroom?

A.   Many.

Q.   Was that in your capacity as a police officer for the Port Authority Police Department?



A.  Yes.

Q.  Sir, what's your marital status?

A.  I'm married.

Q.  Do you have any children?

A.  Yes.

Q.  Can you please briefly describe your educational background after high school?

A.  Some college.

Q.  After college, did you go directly into the Port Authority Police Department Police Academy?

A.  No.

Q.  What did you do between some of the college courses you took and before you started at the police academy?

A.  I left college and was employed by the New York City Fire Department.

Q.  When did you start at the Port Authority Police Department Police Academy?

A.  March of 2014.

Q.  How long were you a firefighter?

A.  I was the EMT for the department for roughly two years.

Q.  Sir, are you currently employed?



A.  Yes.

Q.  Who is your employer?

A.  Port Authority of New York and New Jersey.

Q.  What title do you have?

A.  Police officer.

Q.  Did you work for the Port Authority Police Department in April 2019?

A.  Yes.

Q.  Was your title police officer at that time?

A.  Yes.

Q.  Prior to becoming a police officer for the Port Authority, did you have any law enforcement experience before that?

A.  No.

Q.  You previously testified that you first started at the Port Authority Police Academy in March of 2014; is that right?

A.  Yes.

Q.  I'm just going to briefly hit on a few things that may be part of the curriculum.  Is the police academy roughly six months of schooling?

A.  Yes.



Q.   Does it cover behavioral sciences?

A.   It does.

Q.   Police practices and procedures?

A.   Yes.

Q.   Laws of arrest?

A.   Yes.

Q.   Court procedures?

A.   Yes.

Q.   What about giving testimony under oath?

A.   Yes.

Q.   Rules of evidence?

A.   Yes.

Q.   Defensive tactics?

A.   Yes.

Q.   First-Aid?

A.   Yes.

Q.   Firefighting?

A.   Yes.

Q.   I assume you were up to speed on the last two after your service as a firefighter?

A.   I was not a firefighter.

Q.   EMT for the fire department.  Is that a better classification?

A.   That was my job title.



Q.   Did they also cover police patrol?

A.   Yes.

Q.   Did they cover firearms training and defensive driving?

A.   Yes.

Q.   What about water safety and rescue?

A.   Yes.

Q.   Did you take any tests at the police academy?

A.   Yes.

Q.   How often would you say you were tested roughly?

A.   Many times.

Q.   Every other week, once a week?

A.   I couldn't give you an exact number.

Q.   Was part of the curriculum when you attended the police academy specific situations that you may face as an officer for the Port Authority?

A.   Can you say that question again?

Q.   When you attended the police academy, was part of the curriculum specific situations that you may face as an officer with the Port Authority?



A.  Yes.

Q.  I'm going to go over some specifics as to what you may or may not have been taught while attending the police academy.

So these questions are specifically for your time at the police academy.  Did they teach you about deescalation techniques?

A.  Yes.

Q.  Can you tell me about that?

A.  What would you like to know?

Q.  What did they teach you at the Port Authority Police Department Police Academy about deescalation techniques?

A.  They taught us they should be used at all possible.

Q.  Now, the deescalation techniques when taught to you at the police academy, did that include diffusing techniques or would they be separate lessons?

A.  Each one is about diffusing techniques, correct.

Q.  Would that be encompassed or grouped together with deescalation, or are they separate lessons taught at the academy?



A.  I don't recall if it was taught in the same lesson.

Q.  Do you recall any diffusing techniques they taught you at the police academy?

A.  Yes.

Q.  Can you tell me about that?

A.  Talking to people, trying to calm them down.

Q.  In terms of diffusing techniques, does that include verbal strategies and active listening skills?

A.  Yes.

Q.  I have heard the term verbal judo.  Have you heard that term before?

A.  I have.

Q.  Is that a terminology used at the police academy?

A.  Yes.

Q.  Is that within the realm of deescalation and diffusing a situation?

A.  Yes.

Q.  What does verbal judo mean to you based on what you were taught at the police academy?

A.  Using your words at all times, if



possible, to calm people down.

Q. Was that the directive of the instructors at the police academy when you attended the classes there to use your words before exhausting other efforts?

MS. ALTERMAN: Objection to form.

A. Yes.

Q. Did they also cover use of force and use of deadly force when you were at the academy?

A. Yes.

Q. I have heard multiple things with regard to the teaching of use of force whether at the academy or training after the fact.

At the academy, was it a use of force pyramid they taught? Is that an accurate description of lessons from the police academy instructors?

A. No.

Q. Can you tell me, in your own words, what they taught you about use of force and use of deadly force when you attended the police academy?

A. Use the most reasonable amount of force when effecting an arrest.

Q. Is that the same for use of deadly force,



or is this a different standard?

A.   It is the same.

Q.   What about use of force as an individual versus use of force as a collective group?  Do they differentiate that at the police academy?

A.   I don't know.

Q.   Did they teach you definitive tactics at the police academy?

A.   Yes.

Q.   Would that include ground fighting techniques?

A.   Yes.

Q.   Did they teach you about restraining techniques at the police academy?

A.   Yes.

Q.   Within that area of restraining techniques, did they tell you about positional restraint?

A.   Yes.

Q.   Did they teach you about positional restraints at the academy?

A.   Can you rephrase that?

Q.   Sure.  I initially said tell as opposed to teach.  So I am going to rephrase my question.



Did they teach you about positional restraints at the police academy?

A.  Yes, they did.

Q.  Did they teach you about compressional asphyxiation at the academy?

A.  Yes, they did.

Q.  In teaching you at the police academy about restraining techniques, was part of the lesson which techniques you should avoid?

A.  Correct, yes.

Q.  Was part of the lessons which techniques are improper?

A.  Yes.

Q.  While at the academy, did they teach you about dealing with medical crises?

A.  Yes.

Q.  Along that same vein, did they teach you about dealing with mental health crises?

A.  Yes.

Q.  Did they teach you about dealing or dealing with civilians or people with altered mental statuses when you were at the academy?

A.  Yes.

Q.  Did they teach you about duties owed to



civilians by officers while you were at the academy?

A.  Can you repeat that question?

Q.  Sure.  I can rephrase it for you and clarify.

While you were at the academy, did they teach you about duties owed by officers to civilians when responding to say a radio call?

MS. ALTERMAN:  Objection to form. You can answer.

A.  I don't really understand your question.

Q.  Did they teach you about duties of officers owed to civilians when you were at the academy?

A.  Yes.

Q.  What types of duties did they teach you when you were at the academy that officers owed to civilians?

A.  The job is to protect and serve.

Q.  Protect -- does this include protect the life of civilians?

A.  Correct.

Q.  Does that include the health and safety of civilians?



A.  Yes.

Q.  Does that include the mental well-being of civilians?

MS. ALTERMAN:  Objection.  You can answer.

A.  Yes.

Q.  Did they also teach you about duties to intercede when you were at the academy?

A.  In the form of what?

Q.  Duties to -- I will rephrase the question.  Did they, at the academy, teach you about duties to intercede when you, as an officer, perceive other officers acting improperly?

A.  Yes.

Q.  What did they teach you specifically within that lesson?

A.  That if you observe that, you are to stop it and to report it.

Q.  Is that an optional stop or mandatory stop?

A.  It's mandatory to do that.

Q.  Did they also teach you at the academy about the varying levels of standard of care?

A.  In what form?



Q.  In responding to, say, a radio call for civilians, did they teach you about the standard of care owed to civilians?

A.  I don't understand your question.

Q.  Have you heard the term standard of care before?

A.  I don't know.

Q.  You don't know or you don't recall?

A.  I don't know.

Q.  Did they ever teach you about standards of care at the police academy when you attended in 2014?

A.  I don't know.

Q.  When you were tested at the police academy, were these written tests or physical demonstrations or perhaps both?

A.  They were both depending on the subject.

Q.  When you took written tests, were those in person or on line?

A.  They were in person.

Q.  When you did physical demonstrations, were you required to do it in front of your peers, your classmates at the time in order to pass that class?



A.  You had to do it in front of an instructor.  Classmates may have been there.

Q.  You needed to satisfactorily perform that physical demonstration in order to pass a given lesson?

A.  If they are required, yes.

Q.  So you graduated from the Port Authority Police Department toward the latter end of 2014; is that right?

A.  August 2014.

Q.  As an officer for the Port Authority Police Department, is there a mandated training you must complete?

A.  Yes.

Q.  Who or what mandates the training?

A.  I don't know.  I don't know who has the standard for training.

Q.  If you were to -- based upon your understanding of the training and your job as a police officer, do you think it's state mandated training or is it mandated by your employer, the Port Authority?

MS. ALTERMAN:  Don't guess.

A.  I can't guess.  I don't know.



Q.  What kind of training have you completed as an officer for the Port Authority?

A.  A lot of training.

Q.  In terms of training that you have received or was mandated in your capacity as an officer for the Port Authority Police Department, how often would you partake in those training lessons or modules?

A.  Are you referring to refresher training since the academy?

Q.  Yes.

A.  We refresh one to two times a year.

Q.  Is that on all subjects or just specific subjects?

A.  Specific subjects.

Q.  Is there, for example, one subject that is tested more often than another?

A.  Firearms are tested more often.

Q.  So you called it -- is it a refresher? Can you let me know?  You called it a refresher class.

A.  We referred to it as in-service training.

Q.  What did you refer to it as colloquially known?



A.   Excuse me?

Q.   You mentioned refresher just a few moments ago.  What was that term?

A.   I don't know.

Q.   I'm going to go over your training as an officer in your capacity for your work with the Port Authority Police Department.

So this is as an officer.  Not the training you had when you were at the police academy.  In terms of the courses you took that were mandated as an officer, did they teach about deescalation techniques?

A.   Yes.

Q.   What about diffusing techniques?

A.   Yes.

Q.   Does that include time to assess and calm the situation?

A.   Yes.

Q.   Did it include providing assurance or reassurance officers are there to help a person?

A.   Yes.

Q.   Did it also include in moving slowly and methodically in reducing environmental distractions?



A.  Possibly.

Q.  Were the training lessons that you have taken in your capacity as an officer similar to the training you received while you were at the academy?

A.  Yes.

Q.  Are there any differences that you noticed over your nearly ten years, nine years right now of being an officer, can you tell me how the training is different from the training you received when you were at the police academy?

A.  I don't understand what you're trying to ask.

Q.  I'm curious if the training you received with respect to deescalation and diffusing is different than the training you received at the academy.

A.  Has it changed?

Q.  Yes.  Has it changed or is it the same?

A.  Same.

Q.  Are there any additions or red lines to deescalation or diffusing techniques?

A.  I don't know.

Q.  As an officer for the Port Authority



Police Department in the capacity of taking the

mandatory training classes as part of your job,

have you also taken classes on the use of force

and use of deadly force?

A.   Yes.

Q.   Were those classes -- did they largely

mirror the lessons you learned at the police

academy?

A.   Yes.

Q.   Are there any updates to the -- what is

taught to officers about use of force that you

have not learned at the police academy that is now

different?

A.   Yes.

Q.   Can you tell me what that is?

A.   That a new law came into effect with the

diaphragm.

Q.   Is that applying body pressure to the

body of a person and ultimately pressuring the

diaphragm?

A.   Yes.

Q.   Do you know when that new law came about?

A.   Post this incident.

Q.   In your training, did they teach you



about the difference, if any, about use of force as an individual versus use of force as a collective group?

A.  I don't know.

Q.  Do you ever recall whether at the academy or training sessions as an officer whether or not any of your instructors made a distinction between use of force level as an individual versus use of force level as a collective?

A.  I don't know.

Q.  As an officer in your mandatory training, did they teach you about defensive tactics?

A.  Yes.

Q.  Is there anything different you learned in defense tactic training as an officer that you had not already learned at the police academy?

A.  I don't know.

Q.  Was there any lessoning of employment of defensive tactics that you learned to -- strike that.

As an officer, did they teach and emphasize deescalation diffusing more so than defensive tactics?

A.  Can you repeat your question?



Q.   In your capacity as an officer in training you received that was mandated as part of your job, do the lessons emphasize deescalation techniques and diffusing techniques over defensive tactics?

A.   Yes.

Q.   Did it also emphasize deescalation diffusing over use of force?

A.   Yes, if possible.

Q.   As an officer for the Port Authority Police Department, did you take training on restraining techniques?

A.   Yes.

Q.   Did that training include lessons on positional restraint and compressional asphyxiation?

A.   I don't know.

Q.   Have you heard those terms before today?

A.   I don't know.

Q.   You never heard of positional restraint before today?

A.   I don't know.

Q.   What about compressional asphyxiation?

A.   I don't recall.



Q.  You testified earlier that you had taken those classes or had that training at the police academy you identified -- you said yes to those terms earlier today.

Have you had a lapse in memory in the last ten minutes?

MS. ALTERMAN:  Objection.  He previously testified about positional restraint.

MR. AMRHEIN:  I asked about both of those about the academy and they were answered in the affirmative.

Q.  I can ask you again, sir.  In training that you received as a police officer at the -- in your capacity as an officer, not at the academy, did you take classes on restraining techniques that included positional restraint and compressional asphyxiation?

A.  I don't know.

Q.  Do you recall testifying about that earlier?

A.  You're asking a lot of questions.  I can't recall.

Q.  That's the point of a deposition, sir.

A.  I can't recall the previous question.



Q.   I can ask it again if it will refresh memory.

A.   I don't remember what you asked in the past.

Q.   As an officer for the police department of the Port Authority, do you take mandatory training about dealing with medical crises?

A.   Yes.

Q.   Do you also take classes about mental health crises?

A.   Yes.

Q.   Do you have training about dealing with situations where a person has an altered mental state or mental status?

A.   Yes.

Q.   Was part of your training as an officer and the refresher courses that you indicated, did it talk about duties officers owed to civilians?

A.   Yes.

Q.   What about duties to intercede when you, as an officer, see another officer acting improperly?  Did they have refresher courses on that?

A.   Yes.



Q.   And, again, mandatory interceding when one officer perceives another officer's actions are improper?

A.   Yes.

Q.   I asked you about standard of care before.  Am I correct you have not heard the term standard of care before?

A.   I don't recall.

Q.   Roughly how many hours are these refresher courses that are mandatory?

A.   I would say an eight-hour day.

Q.   Does that cover a variety of topics the of the subjects discussed?

A.   Yes.

Q.   So just, for example, would deescalation techniques be the first hour and then the second hour may be use of force?

A.   I don't know for how long each class is. They break up into modules.

Q.   I was just curious if one specific topic is meant to be eight hours versus just a couple of hours all grouped together to make a sum total of eight hours.

A.   When we go, it's numerous subjects



involved.

Q.  Do you receive any certificates of completion after you have completed your training?

A.  I don't know.

Q.  How does the Port Authority become aware that you've completed your training?

A.  They issue tests.

Q.  And that is after you have completed your training, you have to take a test to make sure --

A.  Yes.

Q.  When you started with the Port Authority Police Department, did you receive an employee manual?

A.  Employee manual?

Q.  Correct.

A.  I don't know what you're referring to.

Q.  Did you receive an employee manual with instructions as to what to do and not to do as an employee of the Port Authority Police Department along with the rules and regulations of the company?

A.  Yes.

Q.  Were you ever tested on the manual you received?



A.   Yes.

Q.   Is that manual updated and redistributed to the employees of the Port Authority Police Department?

A.   Yes.

Q.   Do you know how often it's updated and redistributed?

A.   I do not know.

Q.   Would you say every year, or is that something that is every couple of years?

A.   I don't know.

Q.   When was the last time you received an employee manual?

A.   I don't know.

Q.   You don't know the last time you reviewed your employee manual?

A.   I don't know.

Q.   Do you know if the employee manual was produced in discovery?

A.   I don't know.

Q.   Did any of your training as a police officer for the Port Authority or at the police academy for the Port Authority involve the National Safety Council?



A.  I don't know.

Q.  Do you know who that is, National Safety Council?

A.  I have heard of it.

Q.  Do you know if the Port Authority contracts with the National Safety Council to provide training to the Port Authority police officers?

A.  I do not know.

Q.  Have you ever been provided with any training materials from the National Safety Council?

A.  I don't know.

Q.  I'm going to introduce to you what is to be marked as Exhibit A.  I'm going to pull it up on the screen.  So give me a second.  Let me know when it's on your screen.  Are you able to see it, sir?

A.  Are you asking me?

Q.  Yes.

A.  Yes, I can see it.

Q.  For the record, I represent this is a PowerPoint produced by defendants in this matter. It is a National Safety Council PowerPoint



entitled "Altered and Mental Status."  It is Bates stamped PA 2064 to PA 2068.

As you will see, it is a five-page PowerPoint.  I'm going to direct you to the second page which is Bates stamped 2065.  Can you read that second page for me and let me know when you complete?

A.  (Witness complies.)  Okay.

Q.  Am I correct that the second bullet point under Altered Mental Status on PA 2065 Bates stamped says, "Patient may be confused, disoriented, combative, drowsy or partially or wholly unresponsive?"

A.  You are correct.

Q.  I'm going to take you now to 2066, which is the third page of this PDF, PA 2066.  What is the title of this page, sir?

A.  Common Causes of Altered Mental Status.

Q.  What does the first bullet say on this page?

A.  "Seizures."

Q.  I'm going to introduce what is going to be marked as Exhibit B.  I'm actually going to reintroduce Exhibit A so you have the opportunity



to read everything.  Let me know when this is on your screen.

A.  We can see it.

Q.  You see the first page, sir?

A.  I see the first page.

Q.  We went over the second page.  You read that in full and we went over the second bullet point, correct?

A.  Yes.

Q.  This is the third page where you read the title and then the first bullet point.  I want to give you an opportunity to read the remainder of the document.

Let me know when you finish with this page and I will move to the next.

A.  Okay.  Would you like me to read this?

Q.  Let me know whenever you completed reading it.

A.  Okay.

Q.  Here is the final page, sir.

A.  Okay.

Q.  I'm going to introduce one more or another set of slides from the National Safety Council.  Is that now shared on your screen?



A.  It says, "Seizures."

Q.  And this is another document produced by defendants in this case, PA 2082 all the way to PA 2095.

It is a PowerPoint by the National Safety Counsel entitled "Seizures" and I would like you to go through and I will have you read through each page unless you have read this document before.

A.  I don't recognize it.

Q.  I'm going to go through it for you with each page.  Let me know when you have completed reading it and I will go to the next.

A.  Sure.  (Witness complies.)

Q.  So you had an opportunity to review the PowerPoint in full?

A.  No.  You skipped over the last few pages.

Q.  Did you not say that every -- that you read each page before I went to the next?

A.  Is that the last page?

Q.  Yes.

A.  Okay.  I saw a flutter of pages.  I wasn't sure which direction you were going.

Q.  I will just scroll back up.



A.  Okay.

Q.  Just for a clean transcript, am I correct you had an opportunity to read each and every page of this document?

A.  Yes.

Q.  I want to direct your attention to the second page on this document, in particular, the second and third bullet point.

Am I correct that under "Seizures," on PA 2083 Bates stamped, the third bullet point says, "Results in altered mental status, slash, uncontrolled muscular contractions?"

A.  That's what it says.

Q.  The final bullet point on this page says, "Rarely life threatening, but a serious emergency?"

A.  You are correct.

Q.  I'm going to take you to PA 2093 under emergency care for seizures, am I correct the second to last bullet point says, "Don't restrain patients?"

A.  Correct.

Q.  I'm going to take you to the final page of this PowerPoint, Bates stamped PA 2095, under



emergency care for seizures, am I correct the second bullet point says, "Be reassuring after seizure?"

A.  Yes.

Q.  Am I correct that the third bullet point says, "If recovering patient is agitated or angry, stay back but prevent any dangers?"

A.  Yes.

Q.  Did you review any training materials in advance of this deposition?

A.  No.

Q.  I'm going to introduce what is going to be marked as Exhibit C.  I represent to you this is the operative complaint in the matter, the First Amended Complaint, as you can see at the top.

It has the docket number in the federal court stamp.  It also says it is docket 1-1.  This is the full and complete First Amended Complaint that is on the docket.

Exhibit A is the actual marker after it was removed, but it shows the summons of the defendants as well as the First Amended Complaint in full including the three exhibits at the end.



Sir, this complaint, First Amended Complaint, do you recognize this document?

A. Yes. I have seen it before.

Q. Did you review this document in preparing for this deposition?

A. No, I did not review it.

Q. When did you first become aware of this document?

A. When I was served.

Q. When was the last time you reviewed this document?

A. I don't know.

Q. Did you ever go over this document with your attorney?

A. I did not.

Q. Did you speak with anyone about this complaint that is not your attorney?

A. No.

Q. Did you ever speak with any officers about this case?

A. No.

Q. Never your wife or friends?

A. No.

Q. Did you speak with your attorney in



preparing for this deposition today?

A. In regards to what?

Q. It's a yes or no question. Did you speak with your attorney in preparation for this deposition today?

A. Yes.

Q. I don't want you to go into what was discussed. That, of course, would be privileged. I'm simply asking whether or not you spoke -- and you answered in the affirmative. When did you speak with your attorney or when did that conversation occur?

A. We met over the past few weeks.

Q. Did you speak with your attorney last night about your deposition today?

A. No.

Q. Did you speak with your attorney today before your deposition started?

A. No.

Q. What did you do to prepare yourself for this deposition?

A. In regards to --

Q. Preparation for the deposition.

A. Me and my attorneys went over --



MS. ALTERMAN:  Don't say what we --

Q.  Don't tell me anything specifically you and your attorney discussed.  What did you personally, if anything, do to prepare for this deposition.

MS. ALTERMAN:  Other than meeting with counsel.

A.  Nothing.

Q.  I'm not asking what was discussed between you and your attorney.  I was asking whether or not you and your attorney spoke.  That's all.  Do you recall the name Evgeniy Lagoda?

A.  Yes.

Q.  Who is Evgeniy Lagoda?

A.  He was the subject of an arrest.

Q.  Do you recall the events that occurred on April 12, 2019?

A.  Yes.

Q.  Those events involved Mr. Lagoda?

A.  Yes.

Q.  What shift were you working that day, sir?

A.  That happened on the midnight tour.

Q.  So what is the length of that shift for



you?

A.   It's an eight-hour shift.

Q.   That begins at midnight?

A.   It begins at 10 p.m.

Q.   That's the 10 to 6 shift?

A.   Sorry.  It begins at 9:45 p.m.

Q.   So 9:45 to roughly 6 in the morning?

A.   6 a.m.

Q.   Is that your typical shift you were working at that time?

A.   At that time, yes.

Q.   Is that four days a week or five days a week?

A.   Four days on and -- yes, four days on.

Q.   Do you still work the same shift, or are you working another shift now?

A.   I do not work another shift right now.

Q.   Are you aware a Jet Blue flight called in a medical emergency for a male having a seizure on board on the night of April 12, 2019?

A.   Yes, I'm aware.

Q.   How did you become aware?  Did you hear that call?

A.   No.  I didn't hear it come over, no.



Q.   How did you become aware then?

A.   Just from understanding the totality of that night did I become aware.

Q.   Do you know who first responded to that call?

A.   Officer Bugiada.

Q.   Were you aware he was responding to a call aboard a Jet Blue flight that night?

A.   No.

Q.   When you're on duty, do you typically have your radio on at all times?

A.   Yes.

Q.   Was that mandated?

A.   It is.

Q.   Is it mandated all officers are supposed to listen to each and every call coming over the radio?

A.   If possible, yes.

Q.   Do you not remember hearing the call about a male having a seizure aboard a Jet Blue flight that required officer assistance?

A.   Those are two different.

Q.   Can you explain?  I didn't understand what you're saying in response.



A.   I responded to a call for assistance to an officer.

Q.   To your understanding, Officer Bugiada was responding to the Jet Blue flight radio call for a medical emergency for a male having a seizure on board?

A.   I didn't know he was responding to the call.

Q.   You knew he responded to it?

A.   No.  I didn't hear the call come over.

Q.   You said you learned of it from the totality of the circumstances.

Can you please specify when you learned of the reason for Officer Bugiada's response to the Jet Blue flight?

A.   Sometime that night.

Q.   At what time, sir?

A.   I don't know.

Q.   Was that before you boarded the flight?

A.   No.

Q.   Was it on the flight?

A.   No.

Q.   Was it after the flight?

A.   I was never on the flight -- what you're



JONATHAN PAPIA                                        August 03, 2023
ALEXEY V. TARASOV, ESQ. vs PORT AUTHORITY                           45

referring to as the flight.

Q.   At the scene, the Jet Blue flight that was grounded because of a medical emergency for a male having a seizure?

A.   I became aware of it after the event took place.

Q.   It's mandatory for officers to have their radio on at all times and listen to the radio calls.

Isn't it fair to say that you should have been aware of the call that Officer Bugiada ultimately responded to?

MS. ALTERMAN:   Objection.   You can answer.

A.   At times you're not able to listen to the radio.

Q.   Where were you when you ultimately responded to the call from Officer Bugiada?

A.   I was at our police precinct.

Q.   What were you doing?

A.   Preparing for my tour.

Q.   Tour of what?

A.   Preparing for the shift, the tour.

Q.   Is it your testimony here today, you were



unable to pay attention to what was going on with the emergency call for a Jet Blue flight for which your fellow officer responded?

MS. ALTERMAN:  Objection.  You can answer.

A.  It was not my radio run.  I missed the call.

Q.  So you are testifying that you missed the call even though you're mandated to have to listen to the radio call; is that right?

A.  That is correct.

Q.  You eventually received a call from Officer Bugiada requesting additional assistance for the call he responded to for a male on board having a seizure?

A.  That is not correct.

Q.  You did not go to the scene to assist Officer Bugiada who had been originally called to a Jet Blue flight for a male having a seizure on board?

A.  No.

Q.  Is it your understanding that Officer Bugiada was responding to a male having a seizure aboard a Jet Blue flight?



A.   No.

Q.   I'm asking you right now is it your understanding Officer Bugiada responded to a male having a seizure aboard in the medical emergency called in by a Jet Blue flight?

A.   At the time or now?

Q.   I'm asking right now.

A.   Right now I'm aware that at that time, he was responding to that event, correct.

Q.   And, at that time you had testified that you, although, you should have heard the call, you missed the call for a male having a seizure aboard a Jet Blue flight; is that right?

A.   Correct, because I was not dispatched to it.

Q.   So Officer Bugiada ultimately responded to a medical emergency for a male having a seizure aboard a Jet Blue flight.

He ultimately called for backup. Did you respond to that call for backup?

A.   Yes, I did.

Q.   At the time you received the call, you were preparing for your shift at the police command; is that right?



A.   Correct.

Q.   How did you get to the scene?

A.   I got to the scene in a police vehicle driven by another police officer.

Q.   Do you know which officer?

A.   Officer Riccardi.

Q.   If I refer to it as the scene, is it understood that I am talking about that Jet Blue flight that Officer Bugiada was ultimately called to?

A.   You can call it the scene.  I understand.

Q.   Okay.  Just for clarity for the record, so we have an understanding moving forward.  Were you wearing a body cam when you went to the scene?

A.   No.

Q.   Did you have the option to wear one?

A.   No.

Q.   You said one officer was in the car with you.  Did that officer also board the flight at the scene or no?

A.   I don't know.

Q.   Do you know if other officers responded to the scene?

A.   Yes.



Q.   Do you know their names?

A.   There were many officers that responded.

Q.   Did they all take their own vehicle from police command or wherever they were located to get to the scene?

A.   I can't speak for anyone else on how they got there.

Q.   Do you know if any of the responding officers that you witnessed were wearing body cam's?

A.   No.  At the time we were not issued body cam's.

Q.   So it wasn't an option at that point?

A.   We're not trained.

Q.   Is it an option now for officers to wear a body cam?

A.   The body cam program is just starting to be implemented to the job.

Q.   Approximately how long did it take you to get from police command to the scene?

A.   Minutes.

Q.   When you arrived, did you arrive at the front of the plane or the back of the plane?

A.   The front of the plane.



Q.  Did you ultimately see Officer Bugiada physically engaged with Mr. Lagoda?

A.  Not initially.

Q.  Did you eventually see Officer Bugiada physically engaged with Mr. Lagoda?

A.  Eventually, yes.

Q.  Is it fair to say when you first boarded the plane, you saw passengers moving away from the back alley?

MS. ALTERMAN:  Objection.  You can answer.

A.  I would not classify it is as that.

Q.  Once you saw Officer Bugiada, would it be fair to say your first action was to join Officer Bugiada in trying to physically restrain Mr. Lagoda?

A.  Yes, that is correct.

Q.  Did you speak with anyone before you joined Officer Bugiada in physically restraining Mr. Lagoda?

A.  Did I speak to who?  Can you clarify?

Q.  Did you speak with anyone?

A.  No.

Q.  Were you aware Mr. Lagoda's native



language was Russian?

A.    No.

Q.    When you first saw Officer Bugiada, was he sitting on Mr. Lagoda in an attempt to restrain him?

A.    No.

Q.    How was he positioned when you first saw him?

A.    Officer Bugiada was -- Mr. Lagoda was prone -- somewhat prone on the ground with his hands underneath his body and Officer Bugiada was to his right side.

Q.    Did he have his knees on Mr. Lagoda?

A.    Not that I recall.

Q.    Did he have his forearm or shoulder on Mr. Lagoda?

A.    Not that I recall.

Q.    Are you saying you don't recall, meaning, it could be a possibility that he did?

A.    I don't recall.  The suspect was actively rocking his body and moving very violently.  It would be very hard to do anything.

Q.    But it's possible?

MS. ALTERMAN:  Objection.  You can



answer.

A. I don't know.

Q. Did you physically engage Mr. Lagoda?

A. Yes, I did.

Q. You said Mr. Lagoda was prone on the ground at that time?

A. Somewhat.

Q. You said bucking. Was he kicking and flailing when he was in the prone position?

A. His body was flailing. He was continuously trying to open up his body in a physical fighting stance to Officer Bugiada.

And Mike was saying he thinks he was reaching for his gun. Officer Bugiada also said he was reaching for his testicles and trying to bite him. So it was an open stance. He was trying to open his stance many times.

Q. You're saying he was laying prone on the ground, right?

A. Not a complete prone.

Q. Doesn't stance indicate that you're on your feet?

A. No. You could be in a defensive stance on your side at times. I would not classify it as



that.

Q.   That's, as you said, defensive.  Not offensive, right?

A.   It's a fighting stance.

Q.   You just testified defensive stance; am I correct?

A.   Maybe.

Q.   Did you just say defensive stance?

A.   I don't know.  I don't remember.

Q.   Did you give Mr. Lagoda any commands?

A.   Yes.

Q.   What did you say?

A.   Stop resisting.  Stop.

Q.   Did you give Mr. Lagoda any warnings?

A.   No.

Q.   When you gave Mr. Lagoda commands, were you speaking Russian to him?

A.   No.

Q.   Do you speak Russian?

A.   No.

Q.   Were you speaking English to Mr. Lagoda?

A.   Yes.

Q.   We have your use of force report, but I will ask you first:  Did you ever hit Mr. Lagoda



with a fist?

A.   Yes.

Q.   How many times?

A.   Two.

Q.   Just two?

A.   Correct.

Q.   With a closed fist; am I right?

A.   Yes, but it was not a perfect punch.

Q.   Where did you punch him?

A.   I punched him once in the face.  I punched him once in the arm area.

Q.   You punched him once in the face and once in the arm area, but you didn't keep punching him?

A.   No.

Q.   Those must have been effective punches; do you agree?

A.   No.

Q.   Did you witness other officers physically engaged with Mr. Lagoda?

A.   In what manner?

Q.   Physically engaging Mr. Lagoda.

A.   Yes.

Q.   Which other officer hit Mr. Lagoda?

A.   I don't know.



Q.  Did you see any other officer hit Mr. Lagoda?

A.  No.

Q.  Did you witness other officers physically retraining Mr. Lagoda?

A.  Attempting to.

Q.  He was ultimately restrained; was he not?

A.  Ultimately, he was restrained.

Q.  What other officers were part of the restraining process with you?  Was it Officer Joseph attempting to restrain Mr. Lagoda with you?

A.  Yes.

Q.  What about Officer Paul Mezzacappa?

A.  I don't know his involvement.

Q.  How about Officer Duran?

A.  Yes.

Q.  Did you see the other officers when they were applying compliance holds against Mr. Lagoda?

A.  I saw Officer Bugiada attempting a compliance hold to restrain the suspect.

Q.  Was that up around his head and neck area?

A.  No.

Q.  Did you see any other officers pressing



batons against Mr. Lagoda's shins?

A.   No.

Q.   Do you know if they did?

A.   I don't.

Q.   Is that because you were facing a different direction or you didn't see it?

A.   Correct.

Q.   When you were ultimately restraining Mr. Lagoda after you used your fist to punch him in the hand --- face and arm, were you ultimately trying to restrain one of his arms as part of the process of trying to restrain Mr. Lagoda?

A.   Yes, his left arm.

Q.   Are you aware other officers were administering compliance holds on his legs and other arm?

A.   I was aware of Officer Bugiada attempting to gain control of his right arm.

Q.   On the process of hitting Mr. Lagoda and restraining Mr. Lagoda, did you hear him make any noises or sounded?

A.   I heard him screaming and yelling.

Q.   At any point during the attempt to restrain Mr. Lagoda, did you intervene because of



concern for Mr. Lagoda's health and safety?

A.   No.

Q.   At any point during the attempt to restrain Mr. Lagoda, did you intervene to prevent other officers from violating Mr. Lagoda's rights?

A.   No.  That was not necessary.

Q.   Did any other officers intervene against you from violating Mr. Lagoda's rights?

MS. ALTERMAN:  Objection.  You can answer.

A.   No.  It was not necessary to do so.

Q.   Was Mr. Lagoda ultimately restrained?  I believe you answered yes.

A.   Yes, he was.  He was placed into custody.

Q.   From the time you arrived on board at the scene, approximately how long did it take to restrain Mr. Lagoda?

A.   Ultimately minutes.  He was actively resisting and fighting and it took some time to do so.

Q.   And Mr. Lagoda you said it was -- you observed him to be prone and flailing legs and kicking, but he was prone face down on the ground?

A.   At times he was prone and at times he was



on his side.

Q.  Was Mr. Lagoda still in the compliance hold after he was handcuffed?

A.  A compliance hold?

Q.  Yes.

A.  Mr. Lagoda, after he was handcuffed, was still continually bucking his body trying to escape.  He was very aggressive after being handcuffed.

Q.  So is it fair to say other officers were still applying pressure to Mr. Lagoda after he was handcuffed?

A.  Absolutely.

Q.  Am I correct after Mr. Lagoda was restrained, officers then rolled him over on to his side?

A.  That is correct.

Q.  At that point, am I correct that you noticed Mr. Lagoda's neck was blue?

A.  That is not correct.

Q.  You didn't notice his neck was blue?

A.  That is not the correct chain of events after he was placed on his side.

Q.  After he was placed on the side, did you



check his person for any belongings or any potential weapons?

A. Yes.

Q. And you checked your surroundings as well?

A. Can I continue my answer? I was cut off.

Q. I'm going to ask the question again and give you the opportunity to answer in full.

Am I correct when Mr. Lagoda was rolled over, that you committed -- you and other officers searched Mr. Lagoda's person as well as checked the surroundings?

A. After the suspect was put on his side.

Q. It's a very simple yes or no.

A. It requires more than a yes or no, sir.

Q. I will give you the opportunity to elaborate. That is a yes or no question.

A. It is not.

Q. After Mr. Lagoda was rolled over, was a search conducted of Mr. Lagoda's person?

A. A search was conducted as he was actively continuing to resist and bucking his body, yes.

Q. After Mr. Lagoda was turned over after he was restrained, was a search conducted?



A.   I already answered the question.

Q.   Yes or no?

A.   I already answered the question.

Q.   I asked you a yes or no question and you chose to go down a separate road.  Your attorney did not object.  I would ask you to answer my simple question.

A.   A search was conducted, yes, which took some time while he was actively resisting.

Q.   Did officers also check the surroundings while Mr. Lagoda was on his side?

A.   Maybe.  I don't know.

Q.   When you were conducting a search of Mr. Lagoda, were you looking at his neck at that point?

A.   No.  I was looking to where I was searching.

Q.   Did you eventually discover Mr. Lagoda's neck was blue?

A.   Yes.

Q.   After you discovered his neck was blue, did Officer Joseph check for a pulse?

A.   An officer checked.  I did not check.

Q.   I represent to you Officer Joseph



testified that he did check for a pulse and it's also on the record no pulse was found upon the check.  Were you aware of that?

A.  Yes.

Q.  And then next it is on the record that Mr. Lagoda's handcuffed were removed.  Are you aware of that?

A.  I am aware of that.

Q.  And then Mr. Lagoda was laid on his back at that point, correct?

A.  Yes.

Q.  It's my understanding, I think, you and another officer started to perform CPR on Mr. Lagoda?

A.  I did not.  I told -- I instructed the group of officers to start CPR.

Q.  Did you also call for an AED, sir?

A.  An AED was called for.

Q.  Was that not by you?

A.  I did not call for any -- it was already taken care of by Officer Joseph.

Q.  Understood.  Were you remaining at Mr. Lagoda's side and officers' sides as CPR was performed?



A.   No.

Q.   Where were you?

A.   I had to take a step back due to the exposure of OC spray.

Q.   When you took a step back, how far back from galley were you?  How far back from Mr. Lagoda?

A.   I was in the area of the first and second to rear row.

Q.   I understand pepper spray affects the senses.  Were you still able to see what was being done to Mr. Lagoda with respect to CPR in attempts to revive him or resuscitate him?

A.   I know they were doing CPR, and there were plenty of officers there to do so, but because of the OC spray, I had to take myself out of the situation.

Q.   Was AED shock ever administered?

A.   I don't know.

Q.   Is one of the common reasons that, based upon your training and experience as an officer, that an AED shock may not be supported is because there is no detectible heart beat?

MS. ALTERMAN:  Objection.  You can



answer.

A.   They actually shock rhythms -- the AED shocks certain rhythms and they don't shock other certain rhythms.

Q.   So, if there is no detectible rhythm, then it is not going to recommend a shock?

A.   It will only recommend a shock for a certain rhythm.

Q.   So if it can't detect a rhythm, it's not going to recommend a shock?

A.   If it does not detect a rhythm, it does not produce a shock.

Q.   I will take that as a yes.  From the time Mr. Lagoda was discovered to not have a pulse, at which point CPR was administered, no shock was advise because of no heart beat, do you know how long it took an ambulance to arrive at the scene?

          MS. ALTERMAN:  Objection.  You can answer.

A.   I do not know.  I was not involved in that.

Q.   Am I correct Emergency Medical Services, EMS, and an ambulance had been called?

A.   An ambulance was called, yes.



Q.  Are you aware EMS responded to the initial radio call that led to the dispatch of Officer Bugiada?

A.  Repeat that.

Q.  Sure.  Are you aware that EMS responded to the initial radio call that led to the dispatch of Officer Bugiada?

A.  I do not know.  Is it possible to take a break?

Q.  Sure.  How long do you need?

A.  Five minutes.

(Recess taken.)

Q.  Officer, does an ambulance require a police escort when responding to a call at JFK International Airport?

A.  Yes, they do.

Q.  Have you ever provided a police escort for an ambulance at JFK?

A.  Yes.

Q.  Are you aware the ambulance was significantly delayed in arriving at the scene because it had no police escort?

MS. ALTERMAN:  Objection.  You can answer.



A.  I don't know.

Q.  Are you saying you don't know or you were not aware of that?

A.  Can you say the question again?

Q.  Are you aware the ambulance was significantly delayed in arriving to the scene because it had no police escort?

MS. ALTERMAN:  You can answer.

A.  I do not know.

Q.  I'm asking about your awareness.  Were you aware of it?  That would be a yes or no.

A.  I don't know what I was aware of at the time.

Q.  Are you aware the ambulance was significance delayed in arriving at the scene because it had no police escort?

MS. ALTERMAN:  Note my objection.

A.  I don't know what I was aware of at the time.

Q.  Are you aware of it now?

A.  No.

Q.  Are you aware that when you and the other officers responded to the scene, there were no more available personnel at police command station



to escort the ambulance to the scene?

            MS. ALTERMAN:  Objection.  You can answer.

    A.  It's typical for a call for police assistance that everyone goes.

    Q.  Are you aware no more personnel was available to escort the ambulance to the scene despite it being called?

            MS. ALTERMAN:  Objection.  You can answer.

    A.  No.  I don't specifically know that.

    Q.  Do you know which officer was to stay behind to escort the ambulance?

    A.  I don't know.

    Q.  Did the New York Attorney General's Office conduct an investigation into Mr. Lagoda's death?

    A.  Yes, they did.

    Q.  Officer, just one quick question separately from that.  Did you speak with your attorney during the break?

    A.  No.

    Q.  During the roughly 14 minutes we were out, you never once spoke with your attorney?



A.   No.

Q.   Were you coached by your attorney at all during the break?

A.   No.

Q.   Did you speak with anyone during the break?

A.   No.

Q.   Do you know what the purpose of the New York Attorney General's Office investigation was?

A.   To see if there was any wrongdoing in this case.

Q.   Were you interviewed as a part of the investigation?

A.   Yes.

Q.   Did you provide any written statements as part of the investigation?

A.   I gave a verbal statement.

Q.   Was that part of the interview?

A.   Yes.

Q.   Do you know roughly, again, estimate, how long the interview was and if it was a one or multiple thing?

A.   I was interviewed, I believe, one time from the Attorney General's Office.



Q.  Can you estimate roughly how long that interview lasted?

A.  I don't recall.

Q.  Do you know if that interview was recorded?

A.  I don't know.

Q.  Do you know if that interview was ever transcribed?

A.  I don't know.

Q.  Did you have counsel with you at the time?

A.  I had counsel that was provided from the PBA.

Q.  Union?

A.  Yes.

Q.  Do you know if there was ever a report released from the Attorney General's Office regarding its findings in the investigation?

A.  I heard there was, yes.

Q.  Were you aware the report came to numerous conclusions and recommendations based on its investigation into the death of Mr. Lagoda?

A.  I don't know.

Q.  Are you aware the report concluded that



the use of force by Port Authority Police
Department personnel likely caused the death of
Mr. Lagoda?

A.  I don't know that.

MS. ALTERMAN:  Objection.  You can
answer.

Q.  Are you aware about the unique
vulnerability of individuals in the immediate wake
of a seizure?

MS. ALTERMAN:  Objection.  You can
answer.

A.  I did not know.

Q.  Are you also aware that the report
determined that the Port Authority Police
Department failed to have personnel available to
escort an ambulance to the scene?

MS. ALTERMAN:  Objection.  You can
answer.

A.  I did not know.

Q.  I'm going to introduce Exhibit D.  It's
going to be the Attorney General's Report.  Let me
know when you have it on your screen.

A.  Okay.

Q.  Under confidential, can you tell me what



that says?

A.  New York State Office of the Attorney General.

Q.  Can you read the remaining text on the page?

A.  "Special investigations and prosecutions unit report of the investigation into the death of Evgeniy Lagoda."

Q.  Is it fair to say that is Mr. Lagoda who was the subject of the event on April 12, 2019?

A.  Yes.  He was the suspect, yes.

Q.  This is the full report available on line.  It's also been produced by defendants in this matter as well as plaintiffs and this specific copy is Bates stamped PA 1802 all the way to PA 1864.

Sir, have you ever seen this document before?

A.  No.

Q.  Is it fair to say you don't recognize this document?

A.  No.

Q.  I represent to you this is the full and complete report that was produced as part of



discovery in this matter.  This report includes an executive summary statement of facts including legal analysis, including recommendations and set of three exhibits including executive order, full transcript of the radio transmission that night.

And then the final exhibit in this report is the autopsy report of the chief medical examiner of Evgeniy Lagoda.

I direct your attention to page two of this report, and I'm going to zoom in, in particular, this last paragraph.  And if you need me to zoom in at all or zoom out, let me know or scroll.  I just ask you read this in full and let me know whenever you're finished.

A.  I think some of it is cut off.

Q.  I'm going to scroll to what is page 12 of this PDF.  I'm going to zoom out for you a little bit more, and this is a page entitled "Recommendations."

PA 1814 is the Bates stamp.  Under recommendations, the first says, "Improve PAPD emergency vehicle escort protocols."  That is the first heading.  The second is "Provide additional training to PAPD officers."  I ask you to read the



top two paragraphs to yourself and let me know when you've completed it.

A.  Okay.

Q.  Sir, based on what you just read, would you agree that the report determined that the Port Authority Police Department failed to have personnel available to escort an ambulance to the scene?

MS. ALTERMAN:  Objection.  You can answer.

A.  That is what the report states.

Q.  Previously you testified that it took just a matter of a few minutes -- couple of minutes to get from where you had been stationed to respond to Officer Lagoda's call as well as a couple of minutes to physically restrain Mr. Lagoda; is that correct?

A.  It was far away.  It was raining heavily that night.  There was a lot of aircraft movement on the taxi ways.  So it took some time to get Officer Bugiada's call for help.

Q.  That was just a few minutes; am I correct?

A.  It took a few minutes to get to Officer



Bugiada because of the weather and amount of flights traveling at the time.

Q. But it didn't take 20 minutes, did it?

A. It did not take 20 minutes to get to Officer Bugiada.

Q. Am I correct the report says the Emergency Medical Services were delayed as much as 20 minutes to get to Mr. Lagoda because no officers were around to escort it?

MS. ALTERMAN: Objection.

A. The report states 20 minutes.

Q. Would you agree with me that the report found the use of force by PAPD personnel likely contributed to Mr. Lagoda's death?

MS. ALTERMAN: Objection.

A. The report states that.

Q. Would you agree with me the report emphasizes that a person who just suffered a seizure is a uniquely and vulnerable condition immediately following the seizure?

MS. ALTERMAN: Objection. You can answer.

A. The report states that.

Q. Am I correct the report states that while



JONATHAN PAPIA                                           August 03, 2023
ALEXEY V. TARASOV, ESQ. vs PORT AUTHORITY                             74

PAPD provides training about folks who experience seizures, such training did not exist with respect to the unique vulnerability of people coming out a seizure?

          MS. ALTERMAN:  Objection.  You can answer.

     A.  That's what the report states.

     Q.  I also want to turn your attention to what is Bates stamped PA 1818.  It's the first page of Exhibit 2.

          Can you read what is on the screen there and let me know when you completed it?

     A.  Okay.

     Q.  Sir, am I correct that this is a transcript of the PAPD or Port Authority Police Department radio and telephone transmission from Friday, April 12, 2019 through Saturday, April 13, 2019.  Is that the text at the top?

     A.  That is what it says.

     Q.  It says JFK.  What time does it say next to that?

     A.  22:20:43.

     Q.  Is that 10:20 and 43 seconds at night?

     A.  That is correct.



Q.   Your shift started at 10 o'clock; am I right?

A.   9:45.

Q.   Based upon this transcript, do you agree that 10:20 p.m. on the 12th, a call came in saying that Gate 20 Delta alpha is going in and it's Jet Blue, 659, an air bus 321.  It is a male passenger having seizures right now; is that accurate?

MS. ALTERMAN:  Objection.  You can answer.

A.   That is what it appears the phone call said.

Q.   That was 35 minutes into your shift?

A.   Roughly.

Q.   37, 43, to be almost exact.  Your testimony is you missed the radio call 35 minutes into your shift?

MS. ALTERMAN:  Note my objection. This isn't a radio call.

A.   This is a telephone call.  I would never hear this.

Q.   What about the radio referring to 22:21:44.  Officer Williams, gate 25, two, dash, zero, aircraft returning to gate.  Male having a



seizure on board.  That is one minute after.  You would have heard that, correct?

A.  That was put over the radio.

Q.  That was 38 minutes into your shift; is that right?

A.  Yes.

Q.  But you missed it.  You didn't hear it?

A.  I did not hear it.

Q.  Exhibit E I will share the screen momentarily, sir.  Do you recognize this document?

A.  Yes, I do.

Q.  The bottom half of it, can you tell me what this document is?

A.  This is a Port Authority police report.

Q.  Do you fill out this document?

A.  I did.

Q.  Is that your signature at the bottom?

A.  Yes, it is.

Q.  This is dated April 13, 2019?

A.  Yes, it is.

Q.  For the record, this is a document produced by defendants in the matter, Bates stamped PA 1161.  Am I correct that you checked the box for administering a compliance



hold?

A.   You are correct.

Q.   Am I correct that you checked the box for using your hand and fist on Mr. Lagoda?

A.   Yes.

Q.   You previously testified you punched Mr. Lagoda in the face and arm?

A.   Yes.

Q.   Have you taken a pulse before?

A.   Yes.

Q.   If someone has no pulse, is that person alive?

MS. ALTERMAN:   Objection.   You can answer.

A.   A hospital dictates whether a person is alive or dead.

Q.   Have you ever taken the pulse of someone who has no pulse?

A.   Yes.

Q.   Did you presume that person to be dead or alive?

A.   In my past jobs, I have revived people with CPR that had no pulse.

Q.   But, sir, doesn't revive entail bringing



someone back to life?

MS. ALTERMAN:  Objection.

Q.  If someone has no pulse and never wakes up, wasn't that person dead?

MS. ALTERMAN:  Objection.

A.  No.

Q.  So someone without a pulse that never wakes up, that person is not dead.  That person is alive to you?

MS. ALTERMAN:  Objection.  You can answer.

A.  They would be declared dead by a medical professional that can say so.

Q.  If someone has no pulse and is unresponsive and never wakes up, you're considering that person is not dead at that time?

MS. ALTERMAN:  Objection.  You can answer.

A.  I'm not a medical professional.

Q.  Is that why you checked no for killed?

A.  I checked no for killed because I did not kill the suspect.

Q.  After engaging with the officers, Evgeniy Lagoda's neck was found to be blue and had no



pulse; is that right?

          MS. ALTERMAN:  Objection to form. You can answer.

     A.  Based on the CPR because there was no pulse found.

     Q.  Were they able to revive Mr. Lagoda?

     A.  I found later on that night, he was pronounced at the hospital by the doctors there.

     Q.  Am I correct in saying they were unsuccessful in trying to revive Mr. Lagoda?

     A.  He was not revived by CPR.

     Q.  Sir, wouldn't you agree with me that someone who has just come out of a seizure is medically vulnerable?

     A.  If they just came out of a seizure, they may be.

     Q.  Wouldn't you agree with me that someone who has just come out of a seizure may be disoriented?

     A.  I don't know.

     Q.  Do you recall the documents we went over a little earlier today that were from the National Safety Council?

     A.  I do.



Q.   Do you remember the Altered Mental Status that was Exhibit A, that PowerPoint?

A.   Yes.

Q.   Do you remember where it spoke about somebody with an altered mental status common causes, the first cause listed is seizures?

A.   Yes.

Q.   Do you recall that altered mental status says that patient may be confused, disoriented, combative, drowsy or partially or wholly unresponsive.  Do you recall that?

A.   Yes, I do.

Q.   Wouldn't you agree with me someone who has just come out of a seizure may be disoriented?

A.   I don't know.

Q.   You disagree with the evidence you produced in discovery?

             MS. ALTERMAN:  Objection.  You can answer.

A.   I don't know.

Q.   You don't know if you disagree?

A.   The answer to your question is I don't know.

Q.   I would like to remind you you're



testifying under oath, and you also testified under oath earlier that you took classes about testifying under oath.

So you should know the magnitude of it.  I'm going to ask you again.  Wouldn't you agree with me someone who has just come out of a seizure may be disoriented?

A.  Possibly.

Q.  How many years did you serve as an EMT?

A.  Three years.

Q.  And you have been a cop for the Port Authority Police Department for nine years; am I right?

A.  Correct.

Q.  And you have had training on seizures before?

A.  Yes.

Q.  And you have been presented with evidence that you produced in discovery about altered mental status and how the common cause listed at the top is seizures.

And it says, Altered mental status as a result.  "Patient may be confused, disoriented, combative, drowsy or partially or



wholly unresponsive," but you don't know whether or not someone who comes out of a seizure may be disoriented?

MS. ALTERMAN:  Objection.  Asked and answered.

MR. AMRHEIN:  That is not a proper objection.  We already had the stipulations on the record.  You can object to the form, but not asked and answered.

A.  I don't know.

Q.  Wouldn't you agree someone who has just come out of a seizure may have combative behavior?

A.  I don't know.

Q.  Sir, do you need me to put the evidence back up on the board, evidence that you produced in discovery about altered mental status, seizures and the result of someone coming out of a seizure.

Exhibit A, Port Authority, 2065 is the Bates stamped, under altered mental status, "Patient may be confused, disoriented, combative, drowsy or partially or wholly unresponsive, and the common cause listed at the top of the altered mental status on Port Authority 2066 Bates stamp is seizures.



So, again, wouldn't you agree someone who has just come out of a seizure may have combative behavior?

MS. ALTERMAN:  Objection.

A.  It's possible.

Q.  So that is a yes?

A.  It's possible.  I don't know.

Q.  Wouldn't you agree someone who has just come out of a seizure may be disoriented?

A.  I don't know.

Q.  Is that possible?

A.  I don't know.

Q.  You're not sure?

A.  I don't know.

Q.  Do you know if someone who comes out of a seizure may be medically vulnerable?

A.  I don't know.

Q.  You don't know if someone who comes out of a seizure may be based upon the evidence presented to you today and your training and experience as an officer?

A.  I don't know.  That is what it says.  I don't know.  I'm not a medical professional.

Q.  Were those materials not provided by your


DEPOSITION SOLUTIONS

counsel as part of discovery?

A.  I have never see that prior to today.  I don't know.

Q.  We went through the material, did we not?  You read them.

A.  Correct.

Q.  You disagree with the material you prevented in evidence, sir?

MS. ALTERMAN:  Objection.

A.  I don't know.  I saw that today.  I don't know.

Q.  You do realize it was discoverable material produced by you, the defendant, right?

A.  I never saw that before today.

Q.  Wouldn't you agree with me it's more difficult to understand words and verbal warnings and verbal commands that are in a foreign language you do not understand?

A.  Yes.

Q.  Wouldn't you agree with me it's more difficult to understand words, verbal warnings and commands when you are disoriented?

A.  I don't know.

Q.  You don't think it's more difficult to



understand words and verbal commands and verbal warnings when in a state of disorient?

A.  I don't know whether this suspect was disoriented.

Q.  I'm not asking you specifically about the suspect.  I am asking you in general.  Wouldn't you agree that it's more difficult to understand words, verbal commands and verbal warnings when a person is disoriented?

A.  I don't know.

Q.  Two years as an EMT and nine years on the job as a cop and you don't know?

A.  I don't know.

Q.  Wouldn't you agree that it's difficult to breathe when lying on your face or laying face down prone on your stomach when multiple people are applying pressure to your body?

A.  I don't know.

Q.  Do you think it's easier to breathe standing up than it is to do that?

A.  I don't know.  I have never been in that position.  I don't know.

Q.  Have you ever been in a pig pile growing up?



A.  No.

Q.  Never heard of that when people pile on top of each other -- I don't know if you're a baseball fan.  You see at the end of a World Series, the catcher will come out and hug the pitcher who got the final out and then all of a sudden, the whole team jumps on them.  Do you know what that is?

A.  I don't know.  I don't know if I've seen that.  If they are successfully doing it in baseball, it must be safe.  So I don't know what you're referring to.

Q.  I'm simply referring to a pig pile as an example of --

A.  I don't know what that is.  Sorry.

Q.  Do you think it's more difficult to breathe when multiple people are applying downward forces on you while you're laying down on your stomach?

A.  I don't know.

Q.  You don't know or no?

A.  I don't know.

Q.  A pig pile is when people pile on human beings making it difficult for them to breathe



because of the pressure?

A.  Is this a term you're coming up with on the fly?

Q.  This is an incredibly colloquial term, sir.

A.  I don't know where you're from.

Q.  In fact, it's so common I think judicial notice can be taken.

A.  That's good.

Q.  You're saying it's just as easy to breathe standing up or sitting up as when you're laying down with multiple people applying pressure to you face down?

A.  If they are referring to this pig pile you're talking about --

Q.  I'm not referring to --

A.  -- do it safely, then I don't know.

Q.  I'm not referring to that example.  I'm asking you a very simple question.

A.  I am confused now.

Q.  I'm asking wouldn't you agree that it is more difficult to breathe when you're laying face down prone with multiple people applying body weight and pressure to your body than it is



standing up or sitting up?

A.  I don't know.

Q.  You don't know that?

A.  It could be different to anybody.  I don't know.

Q.  May I remind you you're under oath?

A.  Thank you.

Q.  Do you understand the magnitude of that?

A.  I do.

Q.  If you know, you're supposed to answer?

A.  Correct.

Q.  If you don't know and you don't answer, that comes with penalties?

A.  Sounds good.

Q.  Wouldn't you agree a person who is face down with a number of people applying increased amounts of pressure to the back, neck and legs may not be resisting, but rather fighting for one's life?

A.  I don't know.

Q.  You don't think fighting for one's life trying to breathe trying to survive could be construed or misconstrued as an attempt to resist?

MS. ALTERMAN:  Objection.  You can



answer.

A.   I don't know.

Q.   Wouldn't you agree improper restraining techniques can block the air flow to a person's lungs contributing to life threatening conditions known as positional or restraint asphyxia?

A.   Improper what?  Repeat that.  Improper --

Q.   Wouldn't you agree improper restraining techniques can block the flow of air into a person's lungs contributing to a life threatening condition known as positional or restraint asphyxia?

A.   Yes.

Q.   Sir, wouldn't you agree that the risk of positional asphyxia is compounded when a person with predisposing factors becomes involved in a physical struggle with officers?

MS. ALTERMAN:  Objection.  You can answer.

A.   I don't know.

Q.   You would not agree that positional asphyxia is compounded when somebody has medically -- is medically compromised and then gets into a physical struggle with individuals?



MS. ALTERMAN:  Objection.  You can answer.

A.  I don't know.

Q.  If force was not used on Mr. Lagoda, do you believe he would have died on April 12, 2019?

MS. ALTERMAN:  Objection.

A.  I don't know.

Q.  It's not no?  It's I don't know?

A.  I don't know.

MR. AMRHEIN:  I have no more questions.

MS. ALTERMAN:  I have a few follow-up questions.

CROSS-EXAMINATION

BY MS. ALTERMAN:

Q.  Officer, can you describe the call that you were dispatched to respond to on April 12, 2019?

A.  Yes.  Officer Bugiada started screaming on the radio saying he was fighting and then we were told all available units to respond in which I did.

Q.  What did that signify to you that you heard that Officer Bugiada was --



MR. AMRHEIN:  Cheryl, can you zoom out the camera so I can see both you and the witness.

A.  Can you repeat?

Q.  What did that signify to you that Officer Bugiada called and requested assistance and said he was in a fight?

MR. AMRHEIN:  Objection.

A.  Officer Bugiada was in a fight for his life.  He was screaming for help.

Q.  Why would you consider it to be Officer Bugiada was in a fight for his life?

A.  As police officers, we wear gun belts. On that gun belt is a firearm, a baton, OC spray. We also -- there could be a flashlight on the belt.

All of those things can be used as a weapon against police officers or the public.  And if Officer Bugiada was overcome by the suspect, all of those articles and weapons on his gun belt could be used against him and other people.

So it is important for us to get there to help get the situation under control.

Q.  When you're responding to this call, did



you respond so in an emergency fashion?

A.  Yes.

Q.  Why was this an emergency situation?

A.  Because he was in a fight for his life and he had a weapon on his gun belt.

Q.  When you were responding in a marked police vehicle, were you doing so at a normal speed or more exodus speed?

A.  Exodus speed absolutely.

Q.  Where were you responding to?

A.  We were responding directly to, I believe, Gate 20.

Q.  Was it your understanding Officer Bugiada was on the aircraft at the time?

A.  I don't know.

Q.  When you get to the scene, gate 20, terminal five, did you go on an aircraft?

A.  Yes.

Q.  Describe for us the scene when you first got on to the plane.

A.  The plane was in total chaos.  Everyone was standing up in the aisle.  They were screaming for help.  They were in the aisle.  Officer Duran was in front of me.  When we got on the plane, we



were pushed towards the back of the plane because we kept asking where are they.  We didn't know where they were.  So we had to push our way from the front of the plane all the way directly to that back galley area.

Q.  Was the plane full of passengers at that time?

A.  Yes, many.

Q.  Were there also flight crew on the plane?

A.  Yes.

Q.  When you got to the back galley of the plane, what did you observe?

A.  I observed Officer Bugiada and the suspect on the ground actively fighting each other.

Q.  Describe to me the suspect's action at that point in time.

A.  Very confrontational, fighting, aggressive, noncompliant.

Q.  When you're using those descriptive words, Officer, tell us specifically what you observed the suspect to be doing at that time?

A.  The suspect was trying to gain compliance over Mike.  He was actively biting him.  Mike was



saying he was reaching for his -- Officer Bugiada was saying he was actively trying to grab his testicles, his firearm, trying to bite him overall fighting and resisting compliance.

Q.  For the record, when you say Mike, is that Officer Bugiada's first name?

A.  Yes.

Q.  When Officer Bugiada was telling you or describing what the suspect was doing, did the suspect appear to be in distress at any point in time?

A.  No.

MR. AMRHEIN:  Objection.

Q.  Was the suspect we now know as Mr. Lagoda actively resisting Officer Bugiada's efforts to gain control of the situation?

MR. AMRHEIN:  Objection.

A.  Yes.

Q.  Describe some of the actions Mr. Lagoda was taking while Officer Bugiada was trying to gain control over him?

A.  He was --

MR. AMRHEIN:  Objection.

A.  Officer Bugiada was actively trying to



gain control of his arms.  The suspect continually tried to take his body and take his body from prone to a side position in anticipation of getting up and biting him, reaching for his gun belt with his arm and trying to get close to Officer Bugiada's body to bite him.

His body was almost coming into a crunch position.  So he would get his head close to Officer Bugiada's body to continually bite him.

Q.  Once you were involved in attempting to restrain Mr. Lagoda, at any point during that process in order to get him handcuffed, did Mr. Lagoda exhibit any signs of distress?

A.  No.

Q.  At any point in time while you were attempting to get Mr. Lagoda handcuffed, did he appear to be suffering from any type of mental crises or emergency?

A.  No.

MR. AMRHEIN:  Objection.

Q.  While you were attempting to handcuff Mr. Lagoda, was he actively resisting your efforts?

A.  Yes, he was.



Q.   Describe for us what Mr. Lagoda was doing while you were attempting to handcuff him.

A.   He was continuously keeping his hands away from me, flailing his body away from me, bucking his body, not complying to verbal orders, refusing to give me his hand.

Q.   Once he was handcuffed, was Mr. Bugiada still actively resisting?

A.   Yes, he was.

Q.   Describe for me what he was doing.

A.   Even when he was handcuffed, he was still trying to bite.  He was screaming.  He was trying to bite us.  Even as we were able to get him on to the side to search him, he was still actively trying to get us off him, trying to get his body so we couldn't get to his waistband to see if he had weapon concealed in that position.  He was actively trying to fight us.

Q.   Before you relieved yourself because of the OC exposure, was Mr. Lagoda still moving his body at all point in time?

A.   Can you repeat that question?

Q.   Before you removed yourself from that immediate vicinity in the back alley of the plane



because of OC exposure, was Mr. Lagoda still moving his body and resisting the officers' efforts to gain control of him?

MR. AMRHEIN:  Objection.

A.  No.  They started CPR.

Q.  When the officer started CPR, Mr. Lagoda was on his back side?

A.  Yes.  He was unhandcuffed and he was on his back and the proper way to -- the proper position to start CPR.

Q.  Approximately how much time passed between the time he was placed in handcuffs and the time you first observed he was turning blue on the side of his face?

A.  It had to be a few minutes because of the search.  The search did take longer than it usually would because of his consistent resisting in an aggressive manner.

MS. ALTERMAN:  Thank you.  That's all.

REDIRECT EXAMINATION

BY MR. AMRHEIN:

Q.  You said it was your perception Officer Bugiada was in a fight for his life and



yet previously you testified that you didn't know that Mr. Lagoda's response to having five officers use physical force and place pressure to his body, that could only be construed as resisting and not also fighting for his life?

MS. ALTERMAN:  Note my objection.

A.  What is the question?

Q.  I'm saying there is inconsistent testimony with your view of Officer Bugiada fighting for his life while saying a person who is under physical duress after coming out of a seizure, mentally and physical disoriented as a result of coming out the seizure having officers piling on him.

One officer punching him twice minimally.  He is laying prone down on the ground as they try to physically restrain him and you are saying it's only reasonable from your perception that he was actively resisting.  It is not possible that he was fighting for his life that was ultimately taken that night?

MS. ALTERMAN:  Objection.

A.  I assume Officer Bugiada was fighting for his life because he had weapons on his gun belt



and if he lost, those weapons would be used against him and other people.

Q.  Is that a presumption or do you know that to be the case?

A.  That is a fact.

Q.  Were you on the scene at that time?

A.  No.

Q.  That would be a presumption?

A.  Somebody can use it against me.

Q.  You were not on the scene at the time when that happened?

A.  If I use my weapon, if someone can get to them, that means they can be used against me or any other police officer or any other person.

Q.  I'm asking were you on the scene at that time?

A.  Mike was saying he was in the fight.  He was screaming for help.

Q.  So is that a, no, you were not on the scene?

A.  I was not on the scene when he was on the radio calling for help.

Q.  Have you ever been disciplined as an officer with the Port Authority?



A.  No.

MR. AMRHEIN:  I have no further questions.

(Whereupon the deposition was concluded at 4:29 p.m.)



C E R T I F I C A T E

I, JONATHAN PAPIA, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that said transcript is a true and accurate record of said testimony (with the exception of the following corrections listed below:)

Page      Line          Correction

Signed under the pains and penalties of perjury this         day of                          , 2023.

                              JONATHAN PAPIA



COMMONWEALTH OF MASSACHUSETTS   )

                                )

SUFFOLK, SS.                    )


            I, Nancy L. LaCivita, Professional

Shorthand Reporter and Notary Public in and for

the Commonwealth of Massachusetts, do hereby

certify that JONATHAN PAPIA, the witness whose

deposition is hereinbefore set forth, was duly

sworn by me, and that such deposition is a true

record of the testimony given by such witness.

            I further certify that I am neither

related to or employed by any of the parties in or

counsel to this action, nor am I financially

interested in the outcome of this action.

            IN WITNESS WHEREOF, I have hereunto

set my hand and Notarial Seal this 2nd day of

September, 2023.



                        Nancy L. LaCivita

                        Notary Public

My Commission Expires:

January 2, 2026

---

**1**

---

**1-1**
38:19

**10**
42:4,5
75:1

**10:20**
74:23
75:5

**1161**
76:23

**12**
41:17
42:20
70:10
71:16
74:17
90:5,17

**12th**
75:5

**13**
74:17
76:19

**14**
66:23

**1802**
70:15

**1814**
71:20

**1818**
74:9

**1864**
70:16

---

**2**

---

**2**
74:10

**20**
73:3,4,8,
11 75:6
92:12,16

**2014**
9:20
10:19
20:12
21:8,10

**2019**
10:8
41:17
42:20
70:10
74:17,18
76:19
90:5,18

**2064**
34:2

**2065**
34:5,10
82:18

**2066**
34:15,16
82:23

**2068**
34:2

**2082**
36:3

**2083**
37:10

**2093**
37:18

**2095**
36:4
37:24

**22:20:43**
74:22

**22:21:44**
75:23

**25**

75:23

**269**
7:18

---

**3**

---

**30**
4:22

**321**
75:7

**35**
75:13,16

**37**
75:15

**38**
76:4

---

**4**

---

**43**
74:23
75:15

**4:29**
100:5

---

**6**

---

**6**
42:5,7,8

**659**
75:7

---

**9**

---

**9:45**
42:6,7
75:3

---

**A**

---

**a.m.**
42:8

**ability**
7:10

**aboard**
43:8,20
46:24
47:4,12,
18

**absolutely**
58:13
92:9

**academy**
9:11,15,
19 10:18,
23 12:9,
17,21
13:4,6,
12,17,24
14:4,17,
23 15:3,
9,13,14,
16,21
16:5,8,
14,21
17:2,5,7,
14,22
18:2,6,
14,17
19:8,11,
22 20:11,
15 22:10
23:10
24:5,11,
17 25:8,
12 26:5,
16 28:3,
10,14
32:23

**accommodate**
6:15

**accurate**
15:15
75:8

**acting**
19:13
29:21

**action**
50:14
93:16

**actions**
30:2
94:19

**active**
14:10

**actively**
51:20
57:18
59:21
60:9
93:14,24
94:2,15,
24 95:22
96:8,14,
18 98:19

**actual**
38:21

**additional**
46:13
71:23

**additions**
24:21

**address**
7:16

**administered**
62:18
63:15

**administering**
56:15
76:24



advance
  38:10

advise
  63:16

AED
  61:17,18
  62:18,22
  63:2

affects
  62:10

affirmative
  28:11
  40:10

afternoon
  4:10

aggressive
  58:8
  93:19
  97:18

agitated
  38:6

agree
  4:15,17
  54:16
  72:5
  73:12,17
  75:4
  79:12,17
  80:13
  81:6
  82:11
  83:1,8
  84:15,20
  85:7,14
  87:21
  88:15
  89:3,8,
  14,21

Agreed
  5:1

air
  75:7

89:4,9

aircraft
  72:19
  75:24
  92:14,17

Airport
  7:17
  64:15

aisle
  92:22,23

alive
  77:12,16,
  21 78:9

alley
  50:9
  96:24

alpha
  75:6

altered
  17:21
  29:13
  34:1,10,
  18 37:11
  80:1,5,8
  81:19,22
  82:16,19,
  22

ALTERMAN
  4:17 5:1
  15:6 18:9
  19:4
  21:23
  28:7
  41:1,6
  45:13
  46:4
  50:10
  51:24
  57:9
  62:24
  63:18
  64:23
  65:8,17

66:2,9
69:5,10,
17 72:9
73:10,15,
21 74:5
75:9,18
77:13
78:2,5,
10,17
79:2
80:18
82:4 83:4
84:9
88:24
89:18
90:1,6,
12,15
97:19
98:6,22

ambulance
  63:17,23,
  24 64:13,
  18,20
  65:5,14
  66:1,7,13
  69:16
  72:7

Amended
  38:15,20,
  23 39:1

amount
  15:22
  73:1

amounts
  88:17

Amrhein
  4:9,12,18
  5:2,5
  28:9 82:6
  90:10
  91:1,8
  94:13,17,
  23 95:20
  97:4,22

100:2

analysis
  71:3

angry
  38:6

anticipatio
n
  95:3

appears
  75:11

applying
  25:18
  55:18
  58:11
  85:17
  86:17
  87:12,23
  88:16

approximate
ly
  49:19
  57:16
  97:11

April
  10:8
  41:17
  42:20
  70:10
  74:17
  76:19
  90:5,17

area
  16:16
  54:11,13
  55:22
  62:8 93:5

arm
  54:11,13
  56:10,13,
  16,18
  77:7 95:5

arms

56:11
95:1

arrest
  8:1,2,5,8
  11:5
  15:23
  41:15

arresting
  8:7

arrive
  49:22
  63:17

arrived
  49:22
  57:15

arriving
  64:21
  65:6,15

articles
  91:20

Ashcroft
  5:6

asphyxia
  89:6,12,
  15,22

asphyxiatio
n
  17:5
  27:16,23
  28:17

assess
  23:16

assist
  46:17

assistance
  43:21
  44:1
  46:13
  66:5 91:6

assume
  6:1 11:19



98:23

**assurance**
23:19

**attempt**
51:4
56:23
57:3
88:23

**attempting**
55:6,11,
19 56:17
95:10,16,
21 96:2

**attempts**
62:12

**attended**
12:17,21
15:3,21
20:11

**attending**
13:4

**attention**
37:6 46:1
71:9 74:8

**attorney**
5:6
39:14,17,
24 40:4,
11,14,17
41:3,10,
11 60:5
66:15,21,
24 67:2,
9,24
68:17
69:21
70:2

**attorneys**
40:24

**August**
21:10

**Authority**
8:11,13,
24 9:10,
18 10:3,
7,14,18
12:19,24
13:12
21:7,11,
22 22:2,6
23:7
24:24
27:10
29:6
31:5,11,
19 32:3,
22,23
33:5,7
69:1,14
72:6
74:15
76:14
81:12
82:18,23
99:24

**autopsy**
71:7

**avoid**
6:5 17:9

**aware**
31:5 39:7
42:18,21,
22 43:1,
3,7 45:5,
11 47:8
50:24
56:14,17
61:3,7,8
64:1,5,20
65:3,5,
11,12,14,
18,20,22
66:6
68:20,24
69:7,13

**awareness**
65:10

———————

**B**

———————

**back**
36:24
38:7
49:23
50:9 61:9
62:3,5,6
78:1
82:15
88:17
93:1,5,11
96:24
97:7,9

**background**
9:7

**backup**
47:19,20

**baseball**
86:4,11

**based**
14:22
21:18
62:20
68:21
72:4 75:4
79:4
83:19

**Bates**
34:2,5,10
37:10,24
70:15
71:20
74:9
76:23
82:19,23

**baton**
91:14

**batons**
56:1

**beat**
62:23
63:16

**begin**
5:10 6:10

**begins**
42:3,4,6

**behavior**
82:12
83:3

**behavioral**
11:1

**beings**
86:24

**belongings**
59:1

**belt**
91:14,16,
20 92:5
95:5
98:24

**belts**
91:13

**bit**
71:18

**bite**
52:16
94:3
95:6,9
96:12,13

**biting**
93:24
95:4

**block**
89:4,9

**blue**
42:18
43:8,20
44:4,15
45:2
46:2,19,

24 47:5,
13,18
48:8
58:19,21
60:19,21
75:7
78:24
97:13

**board**
42:20
44:6
46:14,20
48:19
57:15
76:1
82:15

**boarded**
44:19
50:7

**body**
25:18,19
48:14
49:9,11,
16,17
51:11,21
52:10,11
58:7
59:22
85:17
87:23,24
95:2,6,7,
9 96:4,5,
15,21
97:2 98:3

**boiler**
5:14

**Boston**
5:6

**bottom**
76:12,17

**box**
76:24
77:3



**break**
  6:14,18
  30:19
  64:9
  66:21
  67:3,6

**breathe**
  85:15,19
  86:17,24
  87:11,22
  88:22

**briefly**
  7:22 9:6
  10:21

**bringing**
  77:24

**brought**
  8:5

**bucking**
  52:8 58:7
  59:22
  96:5

**Bugiada**
  43:6 44:3
  45:11,18
  46:13,18,
  23 47:3,
  16 48:9
  50:1,4,
  13,15,19
  51:3,9,11
  52:12,14
  55:19
  56:17
  64:3,7
  73:1,5
  90:19,24
  91:6,9,
  12,19
  92:13
  93:13
  94:1,8,
  20,24
  96:7

  97:24
  98:9,23

**Bugiada's**
  44:14
  72:21
  94:6,15
  95:6,9

**Building**
  7:17

**bullet**
  34:9,19
  35:7,11
  37:8,10,
  14,20
  38:2,5

**bus**
  75:7

————————

         **C**

————————

**call**
  18:8 20:1
  42:23
  43:5,8,
  16,19
  44:1,4,8,
  10 45:11,
  18 46:2,
  7,9,10,
  12,14
  47:11,12,
  20,22
  48:11
  61:17,20
  64:2,6,14
  66:4
  72:15,21
  75:5,11,
  16,19,20
  90:16
  91:24

**called**
  22:19,20
  42:18

  46:18
  47:5,19
  48:9
  61:18
  63:23,24
  66:8 91:6

**calling**
  99:22

**calls**
  45:9

**calm**
  14:7 15:1
  23:16

**cam**
  48:14
  49:16,17

**cam's**
  49:10,12

**camera**
  91:2

**capacity**
  8:23 22:5
  23:6 24:3
  25:1 27:1
  28:14

**car**
  48:18

**care**
  19:23
  20:3,5,11
  30:5,7
  37:19
  38:1
  61:21

**case**
  36:3
  39:20
  67:11
  99:4

**catcher**
  86:5

**caused**
  69:2

**certificate
s**
  31:2

**chain**
  58:22

**changed**
  24:18,19

**chaos**
  92:21

**check**
  59:1
  60:10,22,
  23 61:1,3

**checked**
  59:4,12
  60:23
  76:24
  77:3
  78:20,21

**Cheryl**
  91:1

**chief**
  71:7

**children**
  9:4

**chose**
  60:5

**Chris**
  5:5

**circumstanc
es**
  44:12

**City**
  9:17

**civil**
  8:10

**civilians**
  17:21

  18:1,8,
  13,18,21,
  24 19:3
  20:2,3
  29:18

**clarify**
  18:5
  50:21

**clarity**
  48:12

**class**
  20:24
  22:21
  30:18

**classes**
  15:4
  25:2,3,6
  28:2,15
  29:9 81:2

**classificat
ion**
  11:23

**classify**
  50:12
  52:24

**classmates**
  20:23
  21:2

**clean**
  37:2

**client**
  4:23

**close**
  95:5,8

**closed**
  54:7

**coached**
  67:2

**collective**
  16:4
  26:3,9



**college**
9:8,9,14, 16

**colloquial**
87:4

**colloquially**
22:23

**combative**
34:12
80:10
81:24
82:12,20
83:3

**command**
47:24
49:4,20
65:24

**commands**
53:10,16
84:17,22
85:1,8

**committed**
59:10

**common**
34:18
62:20
80:5
81:20
82:22
87:7

**company**
31:21

**complaint**
38:14,15, 20,23
39:1,2,17

**complete**
6:17
21:13
34:7
38:19

52:20
70:24

**completed**
6:9 22:1
31:3,6,8
35:17
36:12
72:2
74:12

**completion**
31:3

**compliance**
55:18,20
56:15
58:2,4
76:24
93:23
94:4

**complies**
34:8
36:14

**complying**
96:5

**compounded**
89:15,22

**compressional**
17:4
27:15,23
28:17

**compromised**
89:23

**concealed**
96:17

**concern**
57:1

**concluded**
68:24
100:5

**conclusions**
68:21

**condition**
73:19
89:11

**conditions**
89:5

**conduct**
66:16

**conducted**
59:20,21, 24 60:8

**conducting**
60:13

**conference**
6:24

**confidential**
69:24

**confrontational**
93:18

**confused**
34:11
80:9
81:23
82:20
87:20

**consistent**
97:17

**construed**
88:23
98:4

**continually**
58:7
95:1,9

**continue**
59:6

**continuing**
59:22

**continuously**

52:11
96:3

**contractions**
37:12

**contracts**
33:6

**contributed**
73:14

**contributing**
89:5,10

**control**
56:18
91:23
94:16,21
95:1 97:3

**conversation**
40:12

**cop**
81:11
85:12

**copy**
70:15

**correct**
13:21
17:10
18:22
30:6
31:15
34:9,14
35:8
37:2,9, 17,19,22
38:1,5
46:11,16
47:9,14
48:1
50:17
53:6 54:6
56:7
58:14,17,

18,20,22
59:9
61:10
63:22
72:17,23
73:6,24
74:14,24
76:2,23
77:2,3
79:9
81:14
84:6
88:11

**Council**
32:24
33:3,6, 12,24
35:24
79:23

**counsel**
36:6 41:7
68:10,12
84:1

**couple**
30:21
32:10
72:13,16

**courses**
9:14
23:10
29:17,22
30:10

**court**
7:1 11:7
38:18

**courtroom**
8:17,19, 21

**courtrooms**
8:19

**cover**
11:1
12:1,3



15:8
30:12

CPR
61:13,16,
23 62:12,
14 63:15
77:23
79:4,11
97:5,6,10

crew
93:9

crises
17:15,18
29:7,10
95:18

CROSS-
EXAMINATION
90:14

crunch
95:8

curious
24:14
30:20

curriculum
10:22
12:16,22

custody
57:14

cut
59:6
71:15

———————

D

dangers
38:7

dash
75:23

dated
76:19

day
30:11
41:21

days
4:22
42:12,14

dead
77:16,20
78:4,8,
12,16

deadly
15:9,21,
24 25:4

dealing
17:15,18,
20,21
29:7,12

death
66:17
68:22
69:2 70:7
73:14

declared
78:12

deescalatio
n
13:7,13,
16,23
14:19
23:12
24:15,22
26:22
27:3,7
30:15

defendant
84:13

defendants
33:23
36:3
38:23
70:13
76:22

defense
26:15

defensive
11:13
12:4
26:12,19,
23 27:4
52:23
53:2,5,8

definitive
16:7

delayed
64:21
65:6,15
73:7

Delta
75:6

demonstrati
on
21:4

demonstrati
ons
20:16,21

department
8:24
9:10,17,
19,22
10:8
11:22
13:12
21:8,12
22:6 23:7
25:1
27:11
29:5
31:12,19
32:4
69:2,15
72:6
74:16
81:12

depending
20:17

deponents
7:8,14

deposed
5:11 8:8

deposition
4:14,16
5:4 6:14
7:20,24
8:6 28:23
38:10
39:5
40:1,5,
15,18,21,
23 41:5
100:4

depositions
5:18

describe
7:22 9:6
90:16
92:19
93:16
94:19
96:1,10

describing
94:9

description
15:16

descriptive
93:20

detect
63:9,11

detectible
62:23
63:5

determined
69:14
72:5

diaphragm
25:17,20

dictates

77:15

died
90:5

difference
26:1

differences
24:7

differentia
te
16:5

difficult
84:16,21,
24 85:7,
14 86:16,
24 87:22

diffusing
13:18,20
14:3,9,20
23:14
24:15,22
26:22
27:4,8

direct
4:8 34:4
37:6 71:9

direction
36:23
56:6

directive
15:2

directly
9:9 92:11
93:4

disagree
80:16,21
84:7

disciplined
99:23

discover
60:18



discoverable
  84:12

discovered
  60:21
  63:14

discovery
  32:19
  71:1
  80:17
  81:19
  82:16
  84:1

discussed
  30:13
  40:8
  41:3,9

disorient
  85:2

disoriented
  34:12
  79:19
  80:9,14
  81:7,24
  82:3,20
  83:9
  84:22
  85:4,9
  98:12

dispatch
  64:2,6

dispatched
  47:14
  90:17

distinction
  26:7

distractions
  23:24

distress
  94:10
  95:13

docket
  38:17,19,
  20

doctors
  79:8

document
  35:13
  36:2,9
  37:4,7
  39:2,4,8,
  11,13
  70:18,21
  76:10,13,
  15,21

documents
  79:21

downward
  86:17

driven
  48:4

driving
  12:4

drowsy
  34:12
  80:10
  81:24
  82:21

due
  62:3

duly
  4:4

Duran
  55:15
  92:23

duress
  98:11

duties
  17:24
  18:7,12,
  16 19:7,
  10,12

29:18,20

duty
  43:10

---

**E**

---

earlier
  28:1,4,20
  79:22
  81:2

easier
  6:12
  85:19

easy
  6:7 87:10

educational
  9:7

effect
  25:16

effecting
  15:23

effective
  54:15

efforts
  15:5
  94:15
  95:23
  97:3

eight-hour
  30:11
  42:2

elaborate
  8:4 59:17

emergency
  37:16,19
  38:1
  42:19
  44:5 45:3
  46:2
  47:4,17
  63:22

71:22
73:7
92:1,3
95:18

emphasize
  26:22
  27:3,7

emphasizes
  73:18

employed
  9:16,24

employee
  31:12,14,
  17,19
  32:13,16,
  18

employees
  32:3

employer
  10:2
  21:21

employment
  26:18

EMS
  63:23
  64:1,5

EMT
  9:22
  11:22
  81:9
  85:11

encompassed
  13:22

end
  21:8
  38:24
  86:4

enforcement
  10:15

engage
  52:3

engaged
  50:2,5
  54:19

engaging
  54:21
  78:23

English
  53:21

entail
  77:24

entailed
  7:23

entitled
  34:1 36:6
  71:18

environmental
  23:23

errors
  5:19

escape
  58:8

escort
  64:14,17,
  22 65:7,
  16 66:1,
  7,13
  69:16
  71:22
  72:7 73:9

estimate
  67:20
  68:1

event
  45:5 47:9
  70:10

events
  41:16,19
  58:22

eventually
  46:12



50:4,6
60:18

**Evgeniy**
41:12,14
70:8 71:8
78:23

**evidence**
11:11
80:16
81:18
82:14,15
83:19
84:8

**exact**
12:15
75:15

**EXAMINATION**
4:8 97:21

**examined**
4:5

**examiner**
71:8

**Excuse**
23:1

**executive**
71:2,4

**exhausting**
15:4

**exhibit**
33:15
34:23,24
38:13,21
69:20
71:6
74:10
76:9 80:2
82:18
95:13

**exhibits**
38:24
71:4

**exist**
74:2

**exodus**
92:8,9

**experience**
10:15
62:21
74:1
83:21

**explain**
43:23

**exposure**
62:4
96:20
97:1

___

**F**

___

**face**
12:18,23
54:10,12
56:10
57:23
77:7
85:15
87:13,22
88:15
97:14

**facing**
56:5

**fact**
15:13
87:7 99:5

**factors**
89:16

**facts**
71:2

**failed**
69:15
72:6

**fair**

6:2 45:10
50:7,14
58:10
70:9,20

**fan**
86:4

**fashion**
92:1

**federal**
38:18

**feet**
52:22

**fellow**
46:3

**fight**
91:7,9,12
92:4
96:18
97:24
99:17

**fighting**
16:10
52:12
53:4
57:19
88:18,21
90:20
93:14,18
94:4
98:5,10,
20,23

**filed**
8:10

**fill**
76:15

**final**
35:20
37:14,23
71:6 86:6

**finally**
6:13

**findings**
68:18

**fine**
7:16

**finish**
35:14

**finished**
71:14

**fire**
9:17
11:22

**firearm**
91:14
94:3

**firearms**
12:3
22:18

**firefighter**
9:21
11:20,21

**Firefightin
g**
11:17

**firm**
5:6,7

**First-aid**
11:15

**fist**
54:1,7
56:9 77:4

**five-page**
34:3

**flailing**
52:9,10
57:22
96:4

**flashlight**
91:15

**flight**
42:18

43:8,21
44:4,15,
19,21,23,
24 45:1,2
46:2,19,
24 47:5,
13,18
48:9,19
93:9

**flights**
73:2

**flow**
89:4,9

**flutter**
36:22

**fly**
87:3

**folks**
74:1

**follow-up**
90:13

**force**
15:8,9,
12,15,20,
21,22,24
16:3,4
25:3,4,11
26:1,2,8,
9 27:8
30:17
53:23
69:1
73:13
90:4 98:3

**forces**
86:18

**forearm**
51:15

**foreign**
84:17

**form**
4:19 15:6



18:9
19:9,24
79:2 82:8

**forward**
48:13

**found**
61:2
73:13
78:24
79:5,7

**Friday**
74:17

**friends**
39:22

**front**
20:22
21:1
49:23,24
92:24
93:4

**full**
6:9 7:15
35:7
36:16
38:19,24
59:8
70:12,23
71:4,13
93:6

_____

**G**
_____

**gain**
56:18
93:23
94:16,21
95:1 97:3

**galley**
62:6
93:5,11

**gate**
75:6,23,

24 92:12,
16

**gave**
53:16
67:17

**general**
70:3 85:6

**General's**
66:15
67:9,24
68:17
69:21

**give**
12:15
33:16
35:12
53:10,14
59:8,16
96:6

**giving**
6:22 11:9

**glitching**
5:20

**goal**
6:12

**good**
4:10 87:9
88:14

**grab**
94:2

**graduated**
21:7

**ground**
16:10
51:10
52:6,19
57:23
93:14
98:16

**grounded**
45:3

**group**
16:4 26:3
61:16

**grouped**
13:22
30:22

**growing**
85:23

**guess**
21:23,24

**gun**
52:14
91:13,14,
20 92:5
95:4
98:24

_____

**H**
_____

**half**
76:12

**hand**
56:10
77:4 96:6

**handcuff**
95:21
96:2

**handcuffed**
58:3,6,9,
12 61:6
95:12,16
96:7,11

**handcuffs**
97:12

**hands**
51:11
96:3

**happened**
8:2,4
41:23
99:11

**happy**
5:17,21

**hard**
51:22

**head**
6:5 55:21
95:8

**heading**
71:23

**health**
17:18
18:23
29:10
57:1

**hear**
5:16,20
42:22,24
44:10
56:20
75:21
76:7,8

**heard**
14:13,14
15:11
20:5
27:18,20
30:6 33:4
47:11
56:22
68:19
76:2 86:2
90:24

**hearing**
43:19

**heart**
62:23
63:16

**heavily**
72:18

**high**
9:7

**hit**
10:21
53:24
54:23
55:1

**hitting**
56:19

**hold**
55:20
58:3,4
77:1

**holds**
55:18
56:15

**hospital**
77:15
79:8

**hour**
30:16,17

**hours**
30:9,21,
22,23

**hug**
86:5

**human**
86:23

_____

**I**
_____

**identified**
4:4 28:3

**immediately**
73:20

**impair**
7:10

**implemented**
49:18

**important**
91:22

**improper**



17:12
30:3
89:3,7,8

**improperly**
19:13
29:22

**Improve**
71:21

**in-service**
22:22

**incident**
25:23

**include**
13:18
14:10
16:10
18:20,23
19:2
23:16,19,
22 27:14

**included**
28:16

**includes**
71:1

**including**
38:24
71:2,3,4

**inconsistent**
98:8

**increased**
88:16

**incredibly**
87:4

**individual**
16:3
26:2,8

**individuals**
69:8
89:24

**influence**
7:9

**initial**
64:2,6

**initially**
16:23
50:3

**inquiry**
6:17,18

**instructed**
61:15

**instructions**
31:18

**instructor**
21:2

**instructors**
15:2,17
26:7

**intercede**
19:8,12
29:20

**interceding**
30:1

**International**
64:15

**intervene**
56:24
57:4,7

**interview**
67:18,21
68:2,4,7

**interviewed**
67:12,23

**introduce**
33:14
34:22
35:22
38:12

69:20

**introductory**
5:10,14

**investigation**
66:16
67:9,13,
16 68:18,
22 70:7

**investigations**
70:6

**involve**
32:23

**involved**
31:1
41:19
63:20
89:16
95:10

**involvement**
55:14

**issue**
31:7

**issued**
49:11

———————

**J**

———————

**Jersey**
10:4

**Jet**
42:18
43:8,20
44:4,15
45:2
46:2,19,
24 47:5,
13,18
48:8 75:6

**JFK**
7:17
64:15,18
74:20

**job**
6:7,11
11:24
18:19
21:19
25:2 27:3
49:18
85:12

**jobs**
77:22

**join**
50:14

**joined**
50:19

**Jonathan**
4:3 7:17

**Joseph**
55:11
60:22,24
61:21

**judicial**
87:7

**judo**
14:13,22

**jumps**
86:7

———————

**K**

———————

**keeping**
96:3

**kicking**
52:8
57:23

**kill**
78:22

**killed**
78:20,21

**kind**
22:1

**knees**
51:13

**knew**
44:9

———————

**L**

———————

**Lagoda**
41:12,14,
19 50:2,
5,16,20
51:4,9,
13,16
52:3,5
53:10,14,
16,21,24
54:19,21,
23 55:2,
5,11,18
56:9,12,
19,20,24
57:4,12,
17,21
58:2,6,
11,14
59:9,19,
23 60:11,
14 61:9,
14 62:7,
12 63:14
68:22
69:3
70:8,9
71:8
72:17
73:8
77:4,7
79:6,10
90:4
94:14,19



95:11,13,
16,22
96:1,20
97:1,6

**Lagoda's**
50:24
56:1
57:1,5,8
58:19
59:11,20
60:18
61:6,23
66:16
72:15
73:14
78:24
98:2

**laid**
61:9

**language**
51:1
84:17

**lapse**
28:5

**largely**
25:6

**lasted**
68:2

**law**
5:6 10:14
25:16,22

**Laws**
11:5

**laying**
52:18
85:15
86:18
87:12,22
98:16

**learned**
25:7,12
26:14,16,

19 44:11,
14

**led**
64:2,6

**left**
9:16
56:13

**legal**
71:3

**legs**
56:15
57:22
88:17

**length**
41:24

**lesson**
14:2 17:9
19:16
21:5

**lessoning**
26:18

**lessons**
13:19,24
15:16
17:11
22:8 24:2
25:7
27:3,14

**level**
26:8,9

**levels**
19:23

**life**
18:21
37:15
78:1
88:19,21
89:5,10
91:10,12
92:4
97:24
98:5,10,

20,24

**lines**
24:21

**listed**
80:6
81:20
82:22

**listen**
43:16
45:8,15
46:9

**listening**
14:11

**located**
49:4

**long**
9:21
30:18
49:19
57:16
63:17
64:10
67:21
68:1

**longer**
97:16

**lost**
99:1

**lot**
22:3
28:21
72:19

**lungs**
89:5,10

**lying**
85:15

——————————

**M**

——————————

**made**
26:7

**magnitude**
81:4 88:8

**make**
6:7,11
30:22
31:9
56:20

**making**
86:24

**male**
42:19
43:20
44:5 45:4
46:14,19,
23 47:3,
12,17
75:7,24

**mandated**
21:12,20,
21 22:5
23:11
27:2
43:13,15
46:9

**mandates**
21:15

**mandatory**
19:19,21
25:2
26:11
29:6
30:1,10
45:7

**manner**
54:20
97:18

**manual**
31:13,14,
17,23
32:2,13,
16,18

**March**
9:20

**magnitude**
10:19

**marital**
9:2

**marked**
33:15
34:23
38:13
92:6

**marker**
38:21

**married**
9:3

**material**
84:4,7,13

**materials**
33:11
38:9
83:24

**matter**
5:7 7:22
33:23
38:14
70:14
71:1
72:13
76:22

**matters**
5:14

**meaning**
51:18

**means**
99:13

**meant**
30:21

**medical**
17:15
29:7
42:19
44:5 45:3
47:4,17
63:22



800.211.DEPO (3376)
EsquireSolutions.com

71:7 73:7 78:12,19 83:23

**medically**
79:14
83:16
89:22,23

**meeting**
41:6

**memory**
28:5 29:2

**mental**
17:18,22
19:2
29:9,13,
14 34:1,
10,18
37:11
80:1,5,8
81:20,22
82:16,19,
23 95:17

**mentally**
98:12

**mentioned**
7:19 23:2

**met**
40:13

**methodically**
23:23

**Mezzacappa**
55:13

**midnight**
41:23
42:3

**Mike**
52:13
93:24
94:5
99:17

**minimally**
98:16

**minute**
76:1

**minutes**
28:6
49:21
57:18
64:11
66:23
72:13,14,
16,22,24
73:3,4,8,
11 75:13,
16 76:4
97:15

**mirror**
25:7

**misconstrued**
88:23

**missed**
46:6,8
47:12
75:16
76:7

**modules**
22:8
30:19

**moment**
7:20

**momentarily**
76:10

**moments**
23:3

**months**
10:23

**morning**
42:7

**motions**
4:20

**move**
35:15

**movement**
72:19

**moving**
23:22
48:13
50:8
51:21
96:20
97:2

**multiple**
15:11
67:22
85:16
86:17
87:12,23

**muscular**
37:12

———————

**N**

———————

**names**
49:1

**National**
32:24
33:2,6,
11,24
35:23
36:5
79:22

**native**
50:24

**neck**
55:21
58:19,21
60:14,19,
21 78:24
88:17

**needed**
21:3

**night**
40:15
42:20
43:3,8
44:16
71:5
72:19
74:23
79:7
98:21

**nods**
6:5

**noises**
56:21

**noncompliant**
93:19

**normal**
92:7

**notary**
4:5,24

**note**
5:3 65:17
75:18
98:6

**notice**
58:21
87:8

**noticed**
24:8
58:19

**number**
12:15
38:17
88:16

**numerous**
30:24
68:21

———————

**O**

———————

**oath**

6:23
8:15,21
11:9
81:1,2,3
88:6

**object**
60:6 82:8

**objection**
15:6 18:9
19:4 28:7
45:13
46:4
50:10
51:24
57:9
62:24
63:18
64:23
65:17
66:2,9
69:5,10,
17 72:9
73:10,15,
21 74:5
75:9,18
77:13
78:2,5,
10,17
79:2
80:18
82:4,7
83:4 84:9
88:24
89:18
90:1,6
91:8
94:13,17,
23 95:20
97:4
98:6,22

**objections**
4:19

**observe**
19:17
93:12



ESQUIRE
DEPOSITION SOLUTIONS

observed
57:22
93:13,22
97:13

OC
62:4,16
91:14
96:20
97:1

occur
40:12

occurred
41:16

offensive
53:3

office
6:24
66:16
67:9,24
68:17
70:2

officer
4:10 5:5
8:7,24
10:6,10,
13 12:18,
23 19:12
21:11,20
22:2,6
23:6,8,11
24:3,9,24
26:6,11,
15,21
27:1,10
28:13,14
29:5,16,
21 30:2
32:22
43:6,21
44:2,3,14
45:11,18
46:3,13,
18,22
47:3,16

48:4,5,6,
9,18,19
50:1,4,
13,14,19
51:3,9,11
52:12,14
54:23
55:1,10,
13,15,19
56:17
60:22,23,
24 61:13,
21 62:21
64:3,7,13
66:12,19
72:15,21,
24 73:5
75:23
83:21
90:16,19,
24 91:6,
9,12,19
92:13,23
93:13,21
94:1,6,8,
15,20,24
95:6,9
97:6,24
98:9,15,
23 99:14,
24

officer's
30:2

officers
18:1,7,
13,17
19:13
23:20
25:11
29:18
33:8
39:19
43:15
45:7
48:22
49:2,9,15

54:18
55:4,9,
17,24
56:14
57:5,7
58:10,15
59:11
60:10
61:16
62:15
65:23
71:24
73:9
78:23
89:17
91:13,18
98:2,13

officers'
61:23
97:2

one's
88:18,21

open
6:16
52:11,16,
17

operative
38:14

opportunity
34:24
35:12
36:15
37:3
59:8,16

opposed
16:23

option
48:16
49:13,15

optional
19:19

order
20:23

21:4 71:4
95:12

orders
96:5

originally
46:18

overcome
91:19

owed
17:24
18:7,13,
17 20:3
29:18

_____

**P**

_____

p.m.
42:4,6
75:5
100:5

PA
34:2,10,
16 36:3,4
37:10,18,
24 70:15,
16 71:20
74:9
76:23

pages
36:17,22

PAPD
71:21,24
73:13
74:1,15

Papia
4:3,10
7:17

paragraph
71:11

paragraphs
72:1

part
10:22
12:16,22
17:8,11
25:2 27:2
29:16
55:9
56:11
67:12,16,
18 70:24
84:1

partake
22:7

partially
34:12
80:10
81:24
82:21

pass
20:23
21:4

passed
97:11

passenger
75:7

passengers
50:8 93:6

past
29:4
40:13
77:22

patient
34:11
38:6 80:9
81:23
82:20

patients
37:21

patrol
12:1

Paul
55:13


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

**pay**
46:1

**PBA**
68:13

**PDF**
34:16
71:17

**peers**
20:22

**penalties**
7:4 88:13

**pending**
6:17

**people**
14:7 15:1
17:21
74:3
77:22
85:16
86:2,17,
23 87:12,
23 88:16
91:21
99:2

**pepper**
62:10

**perceive**
19:13

**perceives**
30:2

**perception**
97:23
98:18

**perfect**
54:8

**perform**
21:3
61:13

**performed**
61:24

**perjury**
7:4

**person**
20:19,20
23:20
25:19
29:13
59:1,11,
20 73:18
77:11,15,
20 78:4,
8,16 85:9
88:15
89:15
98:10
99:14

**person's**
89:4,10

**personal**
7:7,13

**personally**
41:4

**personnel**
65:24
66:6
69:2,15
72:7
73:13

**phone**
75:11

**physical**
20:15,21
21:4
52:12
89:17,24
98:3,11,
12

**physically**
50:2,5,
15,19
52:3
54:18,21
55:4

**72:16**
98:17

**pig**
85:23
86:13,23
87:14

**pile**
85:23
86:2,13,
23 87:14

**piling**
98:14

**pitcher**
86:6

**place**
45:6 98:3

**plaintiffs**
5:3,7
70:14

**plane**
49:23,24
50:8
92:20,21,
24 93:1,
4,6,9,12
96:24

**plate**
5:14

**plenty**
62:15

**point**
28:23
34:9
35:8,11
37:8,10,
14,20
38:2,5
49:13
56:23
57:3
58:18
60:15

**61:10**
63:15
93:17
94:10
95:11,15
96:21

**police**
8:23,24
9:10,15,
19 10:6,
8,10,13,
18,23
11:3
12:1,8,
17,21
13:4,6,
12,17
14:4,16,
23 15:3,
16,21
16:5,8,14
17:2,7
20:11,14
21:8,12,
20 22:6
23:7,9
24:11
25:1,7,12
26:16
27:11
28:2,13
29:5
31:12,19
32:3,21,
22 33:7
45:19
47:23
48:3,4
49:4,20
64:14,17,
22 65:7,
16,24
66:4
69:1,14
72:6
74:15

**76:14**
81:12
91:13,18
92:7
99:14

**Port**
8:11,13,
24 9:10,
18 10:3,
7,14,18
12:18,23
13:11
21:7,11,
22 22:2,6
23:7
24:24
27:10
29:6
31:5,11,
19 32:3,
22,23
33:5,7
69:1,14
72:5
74:15
76:14
81:11
82:18,23
99:24

**position**
52:9
85:22
95:3,8
96:17
97:10

**positional**
16:17,20
17:1
27:15,20
28:8,16
89:6,11,
15,21

**positioned**
51:7



possibility
51:19

Possibly
24:1 81:8

Post
25:23

potential
59:2

Powerpoint
33:23,24
34:4
36:5,16
37:24
80:2

practices
11:3

precinct
45:19

predisposing
89:16

preface
7:6

preparation
40:4,23

prepare
40:20
41:4

preparing
39:4 40:1
45:21,23
47:23

present
5:3

presented
81:18
83:20

pressing
55:24

pressure

25:18
58:11
85:17
87:1,12,
24 88:17
98:3

pressuring
25:19

presume
77:20

presumption
99:3,8

prevent
38:7 57:4

prevented
84:8

previous
28:24

previously
10:17
28:8
72:12
77:6 98:1

prior
4:14
10:13
84:2

privileged
40:8

procedures
11:3,7

process
55:10
56:12,19
95:12

produce
63:12

produced
32:19
33:23
36:2

70:13,24
76:22
80:17
81:19
82:15
84:13

professional
78:13,19
83:23

program
49:17

prone
51:10
52:5,9,
18,20
57:22,23,
24 85:16
87:23
95:3
98:16

pronounced
79:8

proper
82:6 97:9

prosecutions
70:6

protect
18:19,20

protocols
71:22

provide
33:7
67:15
71:23

provided
33:10
64:17
68:12
83:24

providing
23:19

public
4:5 91:18

pull
33:15

pulse
60:22
61:1,2
63:14
77:9,11,
17,18,23
78:3,7,14
79:1,5

punch
54:8,9
56:9

punched
54:10,11,
12 77:6

punches
54:15

punching
54:13
98:15

purpose
6:6 67:8

push
93:3

pushed
93:1

put
59:13
76:3
82:14

pyramid
15:15

**Q**

Queens

7:18

question
4:20
5:11,21,
24 6:1,9,
16 8:3
12:20
16:24
18:3,11
19:11
20:4
26:24
28:24
40:3
59:7,17
60:1,3,4,
7 65:4
66:19
80:22
87:19
96:22
98:7

questioning
6:18

questions
5:9,17,23
6:4,19
7:11 13:5
28:21
90:11,13
100:3

quick
66:19

**R**

radio
18:8 20:1
43:11,17
44:4
45:8,16
46:6,10
64:2,6
71:5



74:16
75:16,19,
22 76:3
90:20
99:22

**raining**
72:18

**Rarely**
37:15

**reaching**
52:14,15
94:1 95:4

**read**
4:22 34:5
35:1,6,
10,12,16
36:7,8,19
37:3 70:4
71:13,24
72:4
74:11
84:5

**reading**
35:18
36:13

**realize**
84:12

**realm**
14:19

**rear**
62:9

**reason**
8:5 44:14

**reasonable**
15:22
98:18

**reasons**
62:20

**reassurance**
23:20

**reassuring**

38:2

**recall**
14:1,3
20:8 26:5
27:24
28:19,22,
24 30:8
41:12,16
51:14,17,
18,20
68:3
79:21
80:8,11

**receive**
31:2,12,
17

**received**
22:5
24:4,11,
14,16
27:2
28:13
31:24
32:12
46:12
47:22

**recess**
64:12

**recognize**
36:10
39:2
70:20
76:10

**recommend**
63:6,7,10

**recommendations**
68:21
71:3,19,
21

**record**
4:13 5:2
7:16

33:22
48:12
61:2,5
76:21
82:8 94:5

**recorded**
68:5

**recovering**
38:6

**red**
24:21

**REDIRECT**
97:21

**redistributed**
32:2,7

**reducing**
23:23

**refer**
22:23
48:7

**referred**
22:22

**referring**
22:9
31:16
45:1
75:22
86:12,13
87:14,16,
18

**refresh**
22:12
29:1

**refresher**
5:13
22:9,19,
20 23:2
29:17,22
30:10

**refusing**

96:6

**regard**
6:20
15:11

**regulations**
31:20

**reintroduce**
34:24

**released**
68:17

**relieved**
96:19

**remainder**
35:12

**remaining**
61:22
70:4

**remember**
8:13 29:3
43:19
53:9
80:1,4

**remind**
80:24
88:6

**removed**
38:22
61:6
96:23

**repeat**
5:17,21
18:3
26:24
64:4 89:7
91:4
96:22

**rephrase**
5:24
16:22,24
18:4
19:10

**report**
19:18
53:23
68:16,20,
24 69:13,
21 70:7,
12,24
71:1,7,10
72:5,11
73:6,11,
12,16,17,
23,24
74:7
76:14

**represent**
33:22
38:13
60:24
70:23

**represents**
5:7

**requested**
91:6

**requesting**
46:13

**require**
64:13

**required**
20:22
21:6
43:21

**requires**
59:15

**rescue**
12:6

**reserved**
4:20,21

**resist**
59:22
88:23

**resisting**
53:13



ESQUIRE
DEPOSITION SOLUTIONS

57:19
60:9
88:18
94:4,15
95:22
96:8
97:2,17
98:4,19

**respect**
24:15
62:12
74:2

**respond**
47:20
72:15
90:17,21
92:1

**responded**
43:4
44:1,9
45:12,18
46:3,14
47:3,16
48:22
49:2
64:1,5
65:23

**responding**
18:8 20:1
43:7
44:4,7
46:23
47:9 49:8
64:14
91:24
92:6,10,
11

**response**
43:24
44:15
98:2

**responses**
7:3

**restrain**
37:20
50:15
51:4
55:11,20
56:11,12,
24 57:4,
17 72:16
95:11
98:17

**restrained**
55:7,8
57:12
58:15
59:24

**restraining**
16:13,16
17:8
27:12
28:15
50:19
55:10
56:8,20
89:3,8

**restraint**
16:18
27:15,20
28:8,16
89:6,11

**restraints**
16:21
17:1

**result**
81:23
82:17
98:13

**Results**
37:11

**resuscitate**
62:13

**retraining**
55:5

**returning**
75:24

**review**
36:15
38:9
39:4,6

**reviewed**
32:15
39:10

**revive**
62:13
77:24
79:6,10

**revived**
77:22
79:11

**rhythm**
63:5,8,9,
11

**rhythms**
63:2,3,4

**Riccardi**
48:6

**rights**
57:5,8

**risk**
89:14

**road**
60:5

**rocking**
51:21

**rolled**
58:15
59:10,19

**room**
6:24

**roughly**
8:20 9:23
10:23
12:12

30:9 42:7
66:23
67:20
68:1
75:14

**row**
62:9

**rules**
11:11
31:20

**run**
5:13 46:6

**Russian**
51:1
53:17,19

————————————

**S**

————————————

**safe**
86:11

**safely**
87:17

**safety**
12:6
18:23
32:24
33:2,6,
11,24
35:23
36:6 57:1
79:23

**satisfactor
ily**
4:4 21:3

**Saturday**
74:17

**scene**
45:2
46:17
48:2,3,7,
11,14,20,
23 49:5,

20 57:16
63:17
64:21
65:6,15,
23 66:1,7
69:16
72:8
92:16,19
99:6,10,
15,20,21

**school**
9:7

**schooling**
10:23

**sciences**
11:1

**screaming**
56:22
90:19
91:10
92:22
96:12
99:18

**screen**
33:16,17
35:2,24
69:22
74:11
76:9

**scroll**
36:24
71:13,16

**search**
59:20,21,
24 60:8,
13 96:14
97:16

**searched**
59:11

**searching**
60:17

**seconds**



74:23

**seizure**
38:3
42:19
43:20
44:6 45:4
46:15,19,
23 47:4,
12,17
69:9
73:19,20
74:4 76:1
79:13,15,
18 80:14
81:7
82:2,12,
17 83:2,
9,16,19
98:12,13

**seizures**
34:21
36:1,6
37:9,19
38:1 74:2
75:8 80:6
81:15,21
82:16,24

**senses**
62:11

**separate**
13:19,23
60:5

**separately**
66:20

**series**
5:8 86:5

**serve**
18:19
81:9

**served**
39:9

**service**
11:20

**Services**
63:22
73:7

**sessions**
26:6

**set**
35:23
71:3

**setting**
8:18

**settings**
8:15

**share**
76:9

**shared**
35:24

**shift**
41:21,24
42:2,5,9,
15,16,17
45:23
47:23
75:1,13,
17 76:4

**shins**
56:1

**shock**
62:18,22
63:2,3,6,
7,10,12,
15

**shocks**
63:3

**shoulder**
6:5 51:15

**shows**
38:22

**shrugs**
6:5

**side**

51:12
52:24
58:1,16,
23,24
59:13
60:11
61:23
95:3
96:14
97:7,14

**sides**
61:23

**sign**
4:22

**signature**
76:17

**significance**
65:15

**significantly**
64:21
65:6

**signify**
90:23
91:5

**signs**
95:13

**similar**
24:3

**simple**
59:14
60:7
87:19

**simply**
40:9
86:13

**sir**
6:22 9:2,
24 28:12,
23 33:18
34:17

35:4,20
39:1
41:22
44:17
59:15
61:17
70:17
72:4
74:14
76:10
77:24
79:12
82:14
84:8 87:5
89:14

**sitting**
51:4
87:11
88:1

**situation**
14:20
23:17
62:17
91:23
92:3
94:16

**situations**
12:17,22
29:13

**skills**
14:11

**skipped**
36:17

**slash**
37:11

**slides**
35:23

**slowly**
23:22

**sounded**
56:21

**Sounds**

88:14

**speak**
39:16,19,
24 40:3,
11,14,17
49:6
50:18,21,
22 53:19
66:20
67:5

**speaking**
53:17,21

**Special**
70:6

**specific**
12:17,22
22:13,15
30:20
70:15

**specifically**
13:5
19:15
41:2
66:11
85:5
93:21

**specifics**
13:2

**speed**
11:19
92:8,9

**spoke**
40:9
41:11
66:24
80:4

**spray**
62:4,10,
16 91:14

**stamp**
38:18



800.211.DEPO (3376)
EsquireSolutions.com

71:20
82:23

**stamped**
34:2,5,11
37:10,24
70:15
74:9
76:23
82:19

**stance**
52:12,16,
17,21,23
53:4,5,8

**standard**
16:1
19:23
20:2,5
21:17
30:5,7

**standards**
20:10

**standing**
85:20
87:11
88:1
92:22

**start**
9:18
61:16
97:10

**started**
4:12 5:15
9:14
10:18
31:11
40:18
61:13
75:1
90:19
97:5,6

**starting**
49:17

**state**
7:15
21:20
29:14
70:2 85:2

**statement**
67:17
71:2

**statements**
67:15

**states**
72:11
73:11,16,
23,24
74:7

**station**
65:24

**stationed**
72:14

**status**
9:2 29:14
34:1,10,
18 37:11
80:1,5,8
81:20,22
82:16,19,
23

**statuses**
17:22

**stay**
38:7
66:12

**stenographer**
6:6

**stenographer's**
6:11

**step**
62:3,5

**stipulations**
4:13,16,
18 82:7

**stomach**
85:16
86:19

**stop**
19:17,19,
20 53:13

**strategies**
14:10

**strike**
4:21
26:19

**struggle**
89:17,24

**subject**
7:4 20:17
22:16
41:15
70:10

**subjects**
22:13,14,
15 30:13,
24

**successfully**
86:10

**sudden**
86:7

**suffered**
73:18

**suffering**
95:17

**suit**
8:10

**sum**
30:22

**summary**

71:2

**summons**
38:22

**supported**
62:22

**supposed**
43:15
88:10

**surroundings**
59:4,12
60:10

**survive**
88:22

**suspect**
51:20
55:20
59:13
70:11
78:22
85:3,6
91:19
93:14,22,
23 94:9,
10,14
95:1

**suspect's**
93:16

**sworn**
4:4

───────────

**T**

───────────

**tactic**
26:15

**tactics**
11:13
16:7
26:12,19,
23 27:5

**taking**

25:1
94:20

**talk**
29:18

**talking**
14:7 48:8
87:15

**taught**
13:3,14,
17,24
14:1,4,23
15:15,20
25:11

**taxi**
72:20

**teach**
13:7,11
16:7,13,
20,24
17:1,4,
14,17,20,
24 18:7,
12,16
19:7,11,
15,22
20:2,10
23:11
25:24
26:12,21

**teaching**
15:12
17:7

**team**
86:7

**techniques**
13:7,13,
16,18,20
14:3,9
16:11,14,
17 17:8,
9,11
23:12,14
24:22



800.211.DEPO (3376)
EsquireSolutions.com

27:4,12
28:15
30:16
89:4,9

**technology**
5:19

**telephone**
74:16
75:20

**telling**
94:8

**ten**
24:8 28:6

**term**
14:13,14
20:5 23:3
30:6
87:2,4

**terminal**
92:17

**terminology**
14:16

**terms**
14:9 22:4
23:10
27:18
28:4

**test**
31:9

**tested**
12:11
20:14
22:17,18
31:23

**testicles**
52:15
94:3

**testified**
4:5 7:20
8:14,21
10:17

28:1,8
47:10
53:5 61:1
72:12
77:6 81:1
98:1

**testifying**
7:1 28:19
46:8
81:1,3

**testimony**
6:23 11:9
45:24
75:16
98:9

**tests**
12:8
20:15,18
31:7

**text**
70:4
74:18

**thing**
67:22

**things**
10:22
15:11
91:17

**thinks**
52:13

**threatening**
37:15
89:5,10

**time**
4:11 5:12
10:11
13:6
20:23
23:16
32:12,15
39:10
42:10,11
44:17

47:6,8,
10,22
49:11
52:6
57:15,19
60:9
63:13
65:13,19
67:23
68:11
72:20
73:2
74:20
78:16
92:14
93:7,17,
22 94:11
95:15
96:21
97:11,12,
13 99:6,
10,16

**times**
8:20
12:13
14:24
22:12
43:11
45:8,15
52:17,24
54:3
57:24

**title**
10:5,10
11:24
34:17
35:11

**today**
4:11 5:8
6:12
27:18,21
28:4
40:1,5,
15,17
45:24

79:22
83:20
84:2,10,
14

**told**
61:15
90:21

**top**
38:16
72:1
74:18
81:21
82:22
86:3

**topic**
30:20

**topics**
30:12

**total**
30:22
92:21

**totality**
43:2
44:12

**tour**
41:23
45:21,22,
23

**trained**
49:14

**training**
12:3
15:13
21:12,15,
17,19,21
22:1,3,4,
7,9,22
23:5,9
24:2,4,
10,14,16
25:2,24
26:6,11,
15 27:2,

11,14
28:2,12
29:7,12,
16 31:3,
6,9 32:21
33:7,11
38:9
62:21
71:24
74:1,2
81:15
83:20

**transcribed**
68:8

**transcript**
37:2 71:5
74:15
75:4

**transmissio**
**n**
71:5
74:16

**traveling**
73:2

**trial**
4:20,21

**truthfully**
7:11

**turn**
74:8

**turned**
59:23

**turning**
97:13

**type**
95:17

**types**
18:16

**typical**
42:9 66:4

**typically**



43:10

**U**

**ultimately**
25:19
45:12,17
47:16,19
48:9 50:1
55:7,8
56:8,10
57:12,18
98:21

**unable**
46:1

**uncontrolled**
37:12

**underneath**
51:11

**understand**
5:22 6:22
7:3,11
18:11
20:4
24:12
43:23
48:11
62:10
84:16,18,
21 85:1,7
88:8

**understanding**
21:19
43:2 44:3
46:22
47:3
48:13
61:12
92:13

**understood**
6:1 48:8

61:22

**unhandcuffed**
97:8

**Union**
68:14

**unique**
69:7 74:3

**uniquely**
73:19

**unit**
70:7

**units**
90:21

**unresponsive**
34:13
78:15
80:11
82:1,21

**unsuccessful**
79:10

**updated**
32:2,6

**updates**
25:10

**V**

**variety**
30:12

**varying**
19:23

**vehicle**
48:3 49:3
71:22
92:7

**vein**
6:8 17:17

**verbal**
14:10,13,
22 67:17
84:16,17,
21 85:1,8
96:5

**verbally**
6:5

**versus**
16:4
26:2,8
30:21

**vicinity**
96:24

**view**
98:9

**violating**
57:5,8

**violently**
51:21

**vulnerability**
69:8 74:3

**vulnerable**
73:19
79:14
83:16

**W**

**waistband**
96:16

**wait**
6:8

**waive**
4:23

**wake**
69:8

**wakes**
78:3,8,15

**warnings**
53:14
84:16,21
85:2,8

**water**
12:6

**ways**
72:20

**weapon**
91:18
92:5
96:17
99:12

**weapons**
59:2
91:20
98:24
99:1

**wear**
48:16
49:15
91:13

**wearing**
48:14
49:9

**weather**
73:1

**week**
12:14
42:12,13

**weeks**
40:13

**weight**
87:24

**well-being**
19:2

**wholly**
34:13
80:10
82:1,21

**wife**

39:22

**Williams**
75:23

**witnessed**
49:9

**words**
14:24
15:4,19
84:16,21
85:1,8
93:21

**work**
7:16 10:7
23:6
42:15,17

**working**
41:21
42:10,16

**works**
4:23

**World**
86:4

**written**
20:15,18
67:15

**wrongdoing**
67:10

**Y**

**year**
22:12
32:9

**years**
9:23 24:8
32:10
81:9,10,
12 85:11

**yelling**
56:22



**York**
  7:18  9:17
  10:3
  66:15
  67:9  70:2

---

**Z**

---

**zoom**
  5:18
  71:10,12,
  17  91:1

