# EXHIBIT L

# In the Matter Of:

## TARASOV, ESQ. vs PORT AUTHORITY OF NY

No. 1:21-cv-06226NRB

# ROBERT MEZZACAPPA

*August 02, 2023*



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

ALEXEY V. TARASOV, ESQ. Administrator

of the Estate of EVGENIY LAGODA, Deceased

and GRIGORY TIKHOPLAV,

                   Plaintiffs,    Civil Action

v.                          No. 1:21-cv-06226NRB

PORT AUTHORITY OF NEW YORK AND NEW

JERSEY and PORT AUTHORITY OF NEW YORK

AND NEW JERSEY POLICE DEPARTMENT

a/k/a PORT AUTHORITY POLICE DEPARTMENT

a/k/a PAPD, PAPD OFFICER MICHAEL BUGIADA,

PAPD OFFICER ROBERT JOSEPH, PAPD OFFICER

JONATHAN PAPIA, PAPD OFFICER PAUL MEZZACAPPA

and PAPD JONATHAN DURAN,

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEPOSITION OF ROBERT JOSEPH

August 2, 2023 * 10:13 a.m.

Port Authority of New York and New Jersey PAPD

4 World Trade Center

New York, New York

Reporter:  Nancy L. LaCivita



800.211.DEPO (3376)
EsquireSolutions.com

APPEARANCES VIA ZOOM:


     ASHCROFT LAW FIRM, LLC

     By J. Christopher Amrhein, Jr., Esquire

     200 State Street

     7th Floor

     Boston, MA 02109

     (617) 573-9400

     Counsel for the Plaintiffs


     PORT AUTHORITY OF NEW YORK

     and NEW JERSEY PAPD

     By Cheryl Alterman, Esquire

     By Matthew Malysa, Esquire

     4 World Trade Center

     150 Greenwich Street

     24th Floor

     New York, New York 10007

     (212) 435-3431

     Counsel for the Defendants


ALSO PRESENT:

     Alexey Tarasov




                          I N D E X

EXAMINATION OF:                                    PAGE

ROBERT JOSEPH


  Direct Examination by Mr. Amrhein              5

  Cross-Examination by Ms. Alterman             83

  Redirect Examination by Mr. Amrhein           91



                    E X H I B I T S

NO.                                               PAGE


Exhibit A     National Safety Council

              Powerpoint                          29

Exhibit B     National Safety Council

              Powerpoint                          29

Exhibit C     First Amended Complaint             32

Exhibit D     Attorney General Report             69

Exhibit E     Use of Force Report                 73








*Original exhibits retained by Attorney Amrhein.



800.211.DEPO (3376)
EsquireSolutions.com

P R O C E E D I N G S

* * *

ROBERT JOSEPH, having been satisfactorily identified and duly sworn by the Notary Public, was examined and testified as follows:

* * *

MR. AMRHEIN:  Cheryl, do you want to put the stipulations on the record in terms of objections?  Typically here in Massachusetts, all objections as to form are reserved until the time of trial and all motions to strike are reserved until the time of trial.

If you're agreeable to those stipulations, I'm happy to read them officially into the record.

MS. ALTERMAN:  That is fine.

MR. AMRHEIN:  Stipulations are agreed to by the parties.  All objections, except as to form, are reserved until the time of trial and all motions to strike are reserved until the time of trial.

In terms of read and sign, Cheryl, 30 days or whatever works best for Officer Joseph



and your schedule is fine by us and we are happy to waive any notary requirement.

MS. ALTERMAN:  30 days is fine.

* * *

DIRECT EXAMINATION

BY MR. AMRHEIN:

Q.  Officer Joseph, thank you for taking the time out of your very busy schedule especially during the summer to come in here today for your deposition.

My name is Attorney Chris Amrhein. I am an attorney with Ashcroft Law Firm here in Boston and our office represents the plaintiffs in this matter.  And today I'm going to be asking you a series of questions.

First, at the outset, have you ever been deposed before?

A.  Yes.

Q.  So a lot of this is going to sound pretty repetitive, but in case it's providing some type of refresher, I'm just going to quickly go through these things.

So in terms of introductory matters, first if you can't hear my question, please let me



know and I'm more than happy to repeat it for you.
If you don't understand a question I ask, let me
know and I will rephrase it or repeat it.  If you
answer a question, is it agreeable that means you
understood the question?

A.  Yes.

Q.  If you can please answer all questions
verbally and avoid shoulder shrugs or head nods,
it makes the court reporter's job a little easier.
And whatever we can do to make her job easy is
best to do and it makes the transcript a little
bit cleaner.

If you can wait until I finish
asking my question before you begin answering,
that would be great.  Again, that is for the
transcript and for the court reporter to make a
clean transcript and her job as easy as possible.

If you need a break, let me know.
All I ask is if there is an outstanding question,
if you can finish answering the question before we
then take a break.  Any questions on anything I
said so far?

A.  No.

Q.  Officer, do you understand you're giving



testimony under oath here today and that even though you're in a conference room or an office, it's just as if you were testifying under oath in court?

A.  Yes.

Q.  Do you understand your responses are subject to the pains and penalties of perjury?

A.  Yes.

Q.  This is a question we ask everyone.  So it's not personal to you.  It's something we ask everyone.  Are you under the influence of anything that would impair your ability to understand my questions or impair your ability to answer my questions truthfully?

A.  No.

Q.  Again, it's not personal to you, but it's at the outset of every deposition.  Can you state your full name and address?

A.  Robert Joseph, Building 269, JFK Airport, Jamaica, New York 11430.

Q.  You previously testified that you have been deposed before?

A.  Yes.

Q.  Have you testified under oath in court



before?

A. Yes.

Q. Just as an approximation, how many times have you testified under oath?

A. Four or five.

Q. Were those in depositions or court?

A. Both.

Q. Without going too deep into the weeds, just from a high level, what did those matters involve?

A. Previous arrests and depositions for previous arrests at work.

Q. Understood. Thank you. What is your marital status?

A. Engaged.

Q. Congratulations.

A. Thank you.

Q. Do you have any children?

A. Yes.

Q. Congratulations as well. Can you briefly describe your educational background after high school?

A. After high school, I attended Stony Brook University. I made it to my junior year and then



was called to the police department.

Q.   After your junior year at Stony Brook, is that when you began at the police academy?

A.   There was a delay.  There was a process of getting into the police academy and then the police academy in March of 2008.

Q.   Can you just briefly describe that process between after leaving Stony Brook to when you began with the police academy?

A.   They begin an investigation process.  You have to fill out paperwork.  They ask a lot of background information.  Any discrepancies they have, you will have to provide documentation for. You have to meet with an investigator multiple times.  At least you had to meet with an investigator in person multiple times, obtain more paperwork, get that filled out, notarized and return it.

Q.   You are currently employed; am I correct?

A.   Yes.

Q.   Is the Port Authority Police Department your employer?

A.   Yes.

Q.   What title do you have currently?



A.   Police officer.

Q.   Did you work for the Port Authority Police Department in April of 2019?

A.   Yes.

Q.   What was your title in April of 2019?

A.   Police officer.

Q.   Did you have any law enforcement experience before you began with the Port Authority Police Department?

A.   No.

Q.   Can you give me just, again, brief and high level, what are your duties and responsibilities as a police officer?

A.   You are assigned patrol functions that can range from calls for assistance, emergencies, medical aids to just general routine patrol.

Q.   So was it 2008 you said you first started at the Port Authority Police Department Police Academy?

A.   Yes.

Q.   Can you briefly describe the curriculum provided by the Port Authority Police Department Police Academy?

A.   There is multiple physical requirements



that are daily.  There is testing involving the law, procedural law for New York and New Jersey. There is a range of procedures they teach you as far as job procedures as well as some medical training.

Q.  Is it a 25-week course?  Do you recall it being that length in time?

A.  Give or take.  It's six months so --

Q.  As a part of the curriculum, do they provide teaching and courses on behavioral sciences?

A.  On behavioral sciences, I'm not sure.

Q.  How about police practices and procedures?

A.  Yes.

Q.  Laws of arrests?

A.  Yes.

Q.  Court procedures?

A.  Not really court procedures, no.  More like court -- that your paperwork could end up in court, but not procedures on criminal trial or deposition.

Q.  How about providing testimony?

A.  No.  I don't believe we had training



regarding testimony.

Q.  Do they cover the rules of evidence?

A.  Yes.

Q.  Do they cover definitive tactics?

A.  Yes.

Q.  First-Aid?

A.  Yes.

Q.  Fire fighting?

A.  Yes.

Q.  Police patrol?

A.  Yes.

Q.  Traffic duty?

A.  What duty?

Q.  Traffic duty.

A.  Yes.

Q.  And I know -- I think there are a few more, defensive driving and water safety and rescue.  Do they cover those as well?

A.  Yes.

Q.  Did you take any tests at the police academy?

A.  Yes.

Q.  Were you tested often?

A.  Yes.



Q.   How did you do on those tests?

A.   I did well.  I passed all of them.

Q.   What do the tests typically involve?
Were the tests on line?  Were they in person?
Were the tests physical tests?  Can you describe
what the testing process was like?

A.   They were in person in a classroom or
physical in nature.  So it depends.  Defense
tactics would be a physical exam.

Q.   Was part of the curriculum specific
situations that you may face as an officer of the
Port Authority Police Department?

          MS. ALTERMAN:  Objection.  You can
answer.

A.   Can you repeat it?

Q.   Was part of the curriculum specific
situations that you may encounter as an officer
for the Port Authority Police Department?

          MS. ALTERMAN:  Objection to form.
You can answer.

A.   They provided hypothetical situations,
but I can't remember specific ones, but I know
they provided hypotheticals.

Q.   Did the curriculum involve deescalation



techniques?

A.  Yes.

Q.  Did it include diffusing techniques?

A.  I believe it would be deescalation and any subcategory of that, I would not recall.

Q.  In terms of deescalation and diffusing, would that encompass an officer taking time to assess and calm a situation?

A.  Yes.

Q.  How about providing reassurance that officers are there to help a person?

A.  Yes.  If the situation provides for that, then yes.

Q.  Does it also cover moving slowly as an officer and reducing environmental distractions?

MS. ALTERMAN:  Objection.

A.  Yes, if it provides it.

Q.  Do they teach you restraining techniques?

A.  Yes.

Q.  Roughly how many restraining techniques do they teach?  Just an estimate is fine.

A.  There is certain levels of it.  There is compliance hold and handcuffing, things of that nature.



Q.  Is part of the curriculum use of force?

A.  Yes.

Q.  Is part of the curriculum use of deadly force?

A.  Yes.

Q.  Do they teach ground fighting techniques?

A.  They give an overview of definitive tactics, some of which is on the ground, but not actually any sort of mixed martial arts or anything like that, no.

Q.  Do they teach you general defensive tactics whether that be on the ground, on your feet or otherwise?

A.  Yes.

Q.  Do they teach you about positional restraints?

A.  Did you say positional?

Q.  Positional restraints.

A.  Yes.  Briefly, yes, but nothing in depth.

Q.  Do they teach you about compressional asphyxiation?

A.  No.

Q.  Is part of the curriculum teaching about dealing with a medical crises?



A.  Yes.

Q.  How about dealing with a mental health crises?

A.  Yes.

Q.  What about dealing with someone who is in altered mental states?

A.  Yes.

Q.  Did they teach you about verbal strategies while engaging a person?

A.  Yes.

Q.  Did they teach you about active listening skills?

A.  Yes.

Q.  Did they teach you about duties of the civilians?

A.  Can you repeat that?  Sorry.

Q.  Do they teach you about duties to civilians?

A.  Can you explain what you're saying there?

Q.  Sure.  If you were to engage a person in your capacity as an officer, do they teach you about the duties of the person you're engaging?

            MS. ALTERMAN:  Objection.

A.  Yes.



Q.  Did they teach you about the duties to intercede?

A.  Yes.

Q.  How about the standard of care?

A.  Yes.

Q.  Were these actually -- strike that.  I got ahead of myself.

Some of the tests were both written as well as physical demonstration?

A.  Yes.

Q.  What year did you graduate from the Port Authority Police Department Police Academy?

A.  2008.

Q.  As an officer for the Port Authority Police Department, is there mandated training that you must complete?

A.  Yes.

Q.  This is after you already graduated from the police academy and in your capacity as the officer for the Port Authority Police Department?

A.  Yes.

Q.  Who or what mandates the training?

A.  The police academy mandates the training that we would get yearly or biyearly.

Q.   Is that through the Port Authority Police Department, or is that through the state or perhaps both?

A.   Yes.  It would be both.

Q.   I know we've covered a number of things in terms of what the curriculum encompasses at the police academy.

Is it fair to say that what we discussed previously and what you testified to is also covered in your yearly training requirement as a police officer?

A.   It does not have to be.  It would be specific to whatever curriculum or criteria they need to meet.  Your training would not be a complete overview of your police academy training every year or biyearly.

Q.   I apologize.  I'm going to go through another list.  I don't mean to bore you with this, but for the purposes of this deposition and that answer, I'm going to go through a list one more time.

In your capacity as an officer for the Port Authority Police Department since becoming an officer after graduating the academy,

have you taken training classes on deescalation techniques?

    A.  Yes.

    Q.  Have you taken training classes on diffusing techniques?

    A.  Yes.

    Q.  Have you taken classes on restraining techniques?

    A.  Yes.

    Q.  Have you taken classes on the use of force?

    A.  Yes.

    Q.  Have you taken classes on the use of deadly force?

    A.  Yes.

    Q.  Have you taken classes on ground fighting techniques and general defense tactics?

    A.  Yes.

    Q.  Have you taken classes on positional restraint?

    A.  Yes.

    Q.  Have you taken classes on compressional asphyxiation?

    A.  Classes, no, but there has been a memo.



Q.  Who provided that memo or who wrote it and distributed it?

A.  The Port Authority.

MR. AMRHEIN:  In the event that memo has not been provided, I want to state on the record we would be requesting that memorandum.

MS. ALTERMAN:  I will take your request under advisement.  If you could please put all demands in writing after the deposition.

MR. AMRHEIN:  Sure.

Q.  Is compressional asphyxiation covered in the training either modules or classes you take about positional restraints?

A.  It's mentioned in the memo or the policy or procedure, but that is it.

Q.  In your -- just to continue with a list of training that you have done, that you have completed or participated in in your capacity as an officer after graduating from the police academy, do any of those training classes cover dealing with medical crises?

A.  Yes.

Q.  Do they cover dealing with mental health crises?



A.   Yes.

Q.   Do they cover dealing with persons who are in altered mental states?

A.   Yes.

Q.   Do they cover verbal strategies when approaching a person in your capacity as an officer?

A.   Yes.

Q.   Do they deal with active listening skills?

A.   Yes.

Q.   Did you take classes or training classes or modules in your capacity as an officer that cover duties owed to civilians as well as duties to intercede?

A.   Yes.

Q.   Do any of the classes teach intervention strategies?

A.   Yes, they do.

Q.   Do the classes and training cover the standards of care?

A.   Yes.

Q.   In those classes, do they cover the different levels of standard of care depending on



a given situation?

A.  Yes.

Q.  How often were you required -- I know you mentioned either yearly or twice a year -- how often since 2008 roughly were you required to take those courses?

A.  Typically it was twice a year.  And since about 2020 with COVID, they made it once a year.  And I believe we just started back up twice a year.

Q.  These are hours long training sessions?

A.  Yes.  It will -- earlier it was for a whole week and then they condensed it and it's been a range from a couple of days to the entire week.

Q.  Are these training modules or classes provided for by the Port Authority Police Department or are they out of pocket?

A.  They are provided by the Port Authority Police.

Q.  The topics we just covered for training that you have received in your capacity as an officer after graduating from the police academy, are those topics each covered every single year or



are certain topics covered every other year or every third year?

A.  I can't speak to how often they are covered, but all of those topics are not covered every single year.

Q.  Are there any topics that are covered each year?

A.  I believe CPR is covered every year. Possibly domestic violence.

MS. ALTERMAN:  Don't guess.

A.  But that is it.

Q.  How often do they require training on say active listening skills?

A.  I could not say.

Q.  How often, in your estimation, do they require training in restraining techniques?

A.  Again, I couldn't say.

Q.  Do you know the last time you took a training class on restraining techniques such as positional restraints and other restraining techniques you learned throughout your career?

A.  Within three years probably.

Q.  I don't mean you to hold you to a specific date.  I'm just trying to gather a range.



I appreciate that.  Do you receive certificates each time you complete a training course?

A.  Some training goes into your personnel file, some certificates, but not for every in-service training that you complete, no.

Q.  Do you receive an employee manual when you become an officer for the Port Authority Police Department?

A.  When I graduated, we did not, but now they have one you can access.

Q.  When did that come about?  When was the first manual distributed?

A.  I could not tell you.

Q.  Has that manual been updated since it was first distributed?

A.  Yes.

Q.  In your best estimation, when was the last time you received it?  Was it this year?  Was it last year?

MS. ALTERMAN:  Objection to form. You can answer.

A.  It's not receiving it.  It's on line. You can access it through your phone or computer.

Q.  Did any of your training involve the



National Safety Council?

A.  I could not tell you if it did.

Q.  You don't recognize the name National Safety Council at all?

A.  I don't, no.

Q.  I'm going to introduce a document that has been produced by defendants in this matter. It is some PowerPoint training documents from the National Safety Council.

Just bear with me.  I'm going to try to share my screen.  Is everyone able to see the shared screen?

MS. ALTERMAN:  Yes, we can see it.

MR. AMRHEIN:  Great.

Q.  Officer Joseph, do you recognize this document?

A.  I do not.

Q.  Have you ever seen it before?

MS. ALTERMAN:  Are you just showing him the first page, or do you want him to review the document?

MR. AMRHEIN:  I'm going to scroll through it, but I want to see if he recognizes the cover page from the National Safety Council.



A.   No.   I don't recognize it at this time.

Q.   I'm going to scroll through it for you. If you would like me to go back through it, let me know.

A.   No, that's fine.

Q.   So this is, again, a document provided in discovery by counsel by defendants in this matter. The first page, it is a PowerPoint from National Safety Council.  Specifically this is about altered mental status.

The page tag is Port Authority PA 2064.  I'm going to direct your attention to 2065 which is the second page of this.  I point your direction to the second bullet.  Can you read that for the record?

A.   "Patient may be confused, disoriented, combative, drowsy, partially or wholly unresponsive."

Q.   This is, again, with regards to altered mental status; am I correct?

A.   Yes.

Q.   I'm going to scroll to the next page.  Am I correct the title is "Common Causes of Altered Mental Status?"



A.   Yes.

Q.   Do you see the first bullet point under that list of Common Causes of Altered Mental Status?

A.   Yes.

Q.   Does that first bullet point say "Seizures?"

A.   Yes.

MR. AMRHEIN:   Can we mark this as Plaintiff's Exhibit 1, please.

Q.   I'm going to pull up another PowerPoint from the National Safety Council which, again, was produced by defendants in this matter.   Are you able to see this?

A.   Yes.

Q.   The cover page, is this another National Safety Council PowerPoint?

A.   Yes.

Q.   Is it on seizures?

A.   Yes.

Q.   For the record, the first page is Port Authority PA 2082 for the Bates stamp and I'm going to scroll through it for you and let me know if you need me to hold on the page longer.



A.   (Witness reads.)

Q.   Were you able to read through the PowerPoint?

A.   Yes.

Q.   I'm just going to scroll back up to the top.  I'm going to go to the second page Bates stamp 2083.

Can you read -- am I correct in reading the third bullet in saying "Results in altered mental status, slash, uncontrolled muscular contractions;" is that correct?

A.   Yes.

Q.   Does the last bullet on this page say "Rarely life threatening but a serious emergency?"

A.   Yes.

Q.   I'm going to scroll to Bates stamp PA 2093.  When somebody is having a seizure -- the second to last bullet point in terms of emergency care provided, does the second to last bullet point say "Don't restrain patient?"

MS. ALTERMAN:  Objection.  You can answer.

A.   Yes.

Q.   I'm going to go to the final page in the



emergency care for seizures.  It's Port Authority
2095 is the Bates stamp.  Does the second bullet
say "Be reassuring after seizure?"

A.  Yes.

Q.  Does the third bullet point say "If
recovering patient is agitated or angry, stay back
but prevent any dangers?"

A.  Yes.

MR. AMRHEIN:  I would like to mark
this as Plaintiff's Exhibit 2.  Is there any
specific denomination you like.  Is 1 or A or 2 or
B easier?

MS. ALTERMAN:  It does not matter.

MR. AMRHEIN:  Why don't we mark it A
and B.

Q.  Officer, did you review any training
materials in advance of this deposition?

A.  No.  Just reports that I prepared.
Nothing else.

Q.  What reports did you review in
anticipation of this deposition?

A.  Just my memo book and 360.  I believe my
360.

Q.  Can you elaborate as to what a 360 is?



A.   It's the title we used for reports whenever you have any injury or think you might be injured within an incident.

MR. AMRHEIN:  Cheryl, I believe those are in the record, but in the event they are not, I will go back through and put that in writing in a follow-up.

MS. ALTERMAN:  Those are been produced.

MR. AMRHEIN:  That's my understanding.

Q.   I'm going to share my screen briefly one more time.  Bear with me, please.  Let me know whenever it comes up on your screen.

MS. ALTERMAN:  We're able to see it.

MR. AMRHEIN:  Great.

Q.   This is actually the -- it's the operative complaint in the matter, Officer Joseph. It is docket number one, dash, one as the first amended complaint.  I'm going to scroll through this for you and see if I can -- if it's zoomed in too much, let me know.  Otherwise, I will just scroll through it.

MS. ALTERMAN:  Are you just



scrolling through so he can see the document

because I don't know if he can read this fast.

MR. AMRHEIN:  If you want me to go through it again and have him read the entire complaint, but the purpose of scrolling through it is to make sure you see it's a complete copy and ask him about recognizing the document.

MS. ALTERMAN:  Sure, that is fine. I think if you are going to ask him specific questions about the allegations, then you will have to direct him to those portions and it will give him a chance to read it.

MR. AMRHEIN:  Sure thing.  It's going to be more general questions about the amended complaint, nothing in particular specific as of now.

I just want to scroll through so you can see it's a complete copy of the amended complaint with the docket stamps upon filing.

Q.  Officer, do you recognize this document?

A.  Yes.

Q.  Have you reviewed it before?

A.  I believe so, yes.

MR. AMRHEIN:  We're going to mark



this as Plaintiff's Exhibit C.  It's the First Amended Complaint in this matter.

Q.  Did you review this document in preparation for this deposition?

A.  No.  I believe I received this around the time my indemnification papers came.

Q.  Is that how you first became aware of this document in this lawsuit?

A.  Yes.

Q.  Roughly at what time was that?  Just a rough estimation in terms of the date.

A.  I could not even guess.  I'm sorry.

Q.  Was that the last time you reviewed this document?

A.  Yes.

Q.  When you reviewed it, did you go over it with your attorney?

A.  I don't believe so.

Q.  Did you go over it with anyone?

A.  No.

Q.  Did you speak with anybody about the First Amended Complaint that is not your counsel?

A.  No.

Q.  Did you speak with your attorney in



preparation for this deposition?

A.  Yes.

Q.  Did you speak with anyone else in preparation for your deposition today?

A.  No.

Q.  I know you said you reviewed some materials besides the memo book and 360 report.

What did you do to prepare yourself for this deposition other than speak with counsel other than what you have already testified to?

A.  That's it.

Q.  I'm going to stop sharing my screen here. Do you recall the name Evgeniy Lagoda?

A.  Yes.

Q.  Who is Evgeniy Lagoda?

A.  He was the individual involved in the arrest and incident in April 2019.

Q.  Am I correct you recall the events that occurred on that day April 12, 2019?

A.  Yes.

Q.  What shift were you working that day?

A.  I was working 2 to 10 p.m. and then after 10 until 6 a.m.

Q.  Is the shift from after 10 until 6 a.m.,



is that overtime?

A.   Yes.

Q.   How often do you get to work overtime say on a weekly basis?

A.   It can vary from 0 to 40.  There is no way to pinpoint how much.

Q.   How many shifts do you have per week?

A.   Five.

Q.   Do you believe you had five shifts the week of April 12, 2019?

A.   I would have to reference my schedule to know.  There could be reasons you could be off.  I don't know if I took one or not.

Q.   Has that been your average schedule five days a week 2 to 10?

A.   Yes.

Q.   Are you aware a Jet Blue flight called in a medical emergency for a male having a seizure on board that day April 12, 2019?

A.   Yes.

Q.   Did you hear that call?

A.   Yes.

Q.   Do you know who first responded to that call?



A.   No.

Q.   Did you eventually receive a call requesting additional assistance?

A.   Yes.

Q.   Do you know who made that request?

A.   Yes.

Q.   Who was that?

A.   Officer Bugiada.

Q.   Is it Bugiada?

A.   Yes.

Q.   I have seen it written a million times. I just want to make sure I appropriately pronounce it.  So thank you for clarifying that.

Would it be fair to say Officer Bugiada was the first to respond to the call?

MS. ALTERMAN:  Objection to form. You can answer.

A.   Was he the first to respond?  Was that the question?

Q.   I can read that for you.  Would it refresh your memory if I were to -- would it refresh your memory Officer Bugiada was the first to the respond to the call on April 12, 2019?

A.   Yes.


ESQUIRE
DEPOSITION SOLUTIONS

Q.   At the time you received the call from Officer Bugiada, were you at the Port Authority Police Department police command station?

MS. ALTERMAN:  Objection to form. You can answer.

A.   I don't know exactly where I was.  I was still on patrol, but it was near the end of tour. It's possible, but I can't say exactly where I was at the exact time of the call for help.

Q.   You testified you heard the initial call from over the radio from a Jet Blue flight saying a male was having a seizure on board?

A.   Yes.

Q.   After you received the call from Officer Bugiada requesting additional assistance, how did you get to the scene?

A.   With my patrol car.

Q.   Just for clarification, when I say the scene, I mean the Jet Blue flight on board which the male was having a seizure.  Just moving forward, if I do say scene, would you agree that is what I'm referring to?

A.   Yes.

Q.   And by vehicle, did you take your own



vehicle?

    A.   My personal vehicle or the vehicle the department gives us?

    Q.   The latter.  The vehicle the department assigns to you?

    A.   Yes.  I took a marked patrol car that was assigned to me that day.

    Q.   Were you traveling alone, or were you traveling with someone?

    A.   I'm not sure if someone was in the car or not.

    Q.   Were you wearing a body cam?

    A.   No.

    Q.   Did you have the option to wear a body cam?

    A.   No.

    Q.   Is that because -- do you know why you were not given the option to wear a body cam?

    A.   Our department didn't have them.

    Q.   Does your department have body cam's now?

    A.   They should have them within a few weeks or so.  But as of today, no.

    Q.   Do you know if other officers responded to the scene with you?



A.   In my car, I don't know, but at the same time, yes.

Q.   Do you know if other officers responded to the scene?

A.   Yes.

Q.   Do you know how they got to the scene?

A.   Most would have gotten there via marked patrol cars unless you were assigned that building, you would have gone on foot.

Q.   I think I may know the answer to this one.  Do you know if the other officers were wearing body cam's?

A.   Nobody had body cam's.

Q.   And they didn't have the option to wear body cam's either?

A.   No.

Q.   Approximately how long did it take you to get from Port Authority Police Department command which is, I believe, in the record to the Jet Blue flight to the scene?

A.   I don't know.

Q.   When you arrived, did you see Officer Bugiada physically engaged with Mr. Lagoda?

A.   Yes.



Q.   Would it be fair to say that your first action was to join Officer Bugiada in trying to physical restrain Mr. Lagoda?

MS. ALTERMAN:   Objection to form. You can answer.

A.   Yes.

Q.   Did you speak to anyone before you tried to restrain Mr. Lagoda?

A.   No.

Q.   Again, you were aware based on your earlier testimony, Mr. Lagoda had just suffered a seizure; am I correct?

MS. ALTERMAN:   Objection.  You can answer.

A.   No.  We were not aware of that.  That's just what the call came over as.  There was no way to prove that as fact at that time.

Q.   Did you not trust that the call was accurate?

MS. ALTERMAN:   Objection.  You can answer.

A.   I don't know who made the call.

Q.   Do you believe if somebody is making a call for assistance and gives a specific reason



why, that person is being honest with their description for the reason?

MS. ALTERMAN:  Objection.  You can answer.

A.  It could be, but they also could be wrong.  I don't know what they do for a living.  I don't know how they assess the situation.  We see discrepancies in calls very regularly.  The call received to the radio call to the responding officer can be quite varied.

Q.  Understood, but you did hear the -- am I correct you did hear the call from over the radio from a Jet Blue flight saying a male was having a seizure on board as in a medical emergency?

A.  Yes.

Q.  Were you aware Mr. Lagoda's native language was Russian?

A.  No.

Q.  When you first saw Officer Bugiada, how was he positioned?

A.  I believe he was in the galley of the plane, and I don't know if he was on the ground at this point or still standing, but clearly involved in an altercation.



Q.  At some point, did you see Officer Bugiada sitting on top of Mr. Lagoda?

A.  No.

Q.  At some point or at any point, did you see any officer sitting on top of Mr. Lagoda while restraining him?

A.  No.

Q.  At any point, did you see any officers with any body parts on top of Mr. Lagoda in the midst of restraining him?

A.  While in the galley, we could have had arms and legs, but not sitting on top of him. Just restraining him.

Q.  Okay.  And, in doing so, when using legs, are officers applying their body weight in an attempt to restrain the person?

A.  Can you repeat that?

Q.  When using knees and arms in an attempt to restrain an individual, are officers using their body weight as a force to be able to restrain an individual?

A.  I would not say they are using their body weight as much as they are using any leverage they can get to restrain the arm or leg.



Q.   Would you classify any leverage using your own weight to try and physically restrain somebody to gain leverage?

A.   In this specific instance or in general?

Q.   In general.

A.   Then, yes.

Q.   Did you physically engage Mr. Lagoda?

A.   Yes.

Q.   When you physically engaged Mr. Lagoda, was he lying face down on his stomach?

A.   He was face down on his stomach more towards his left side a little bit.

Q.   I don't mean to have to ask you again, but the connection on your end was a little glitched.

(Record read.)

Q.   Officer, would you mind if I just ask the question again because I couldn't hear the beginning of your answer.

When you engaged Mr. Lagoda, was he lying face down on his stomach?

A.   Yes.  He was face down on his left side in the galley of the plane.

Q.   It sounds like you said he was face down



on his left side in the galley of the plane?

A.   That is correct.

Q.   What was Mr. Lagoda doing at the time you engaged him?  Was he kicking?  Was he flailing?

A.   He was actively resisting arrest.  He was attempting to pin his hands near his chest or upper body.  As far as what was going on behind me, I don't know.

Q.   Did you give Mr. Lagoda any warnings?

A.   We were asking him to put his hands behind his back and stop resisting.

Q.   Did you give him any commands -- let me rephrase that.

Would it be fair to say that you gave Mr. Lagoda a command to put his hands behind his back?

A.   Yes.

Q.   Did you give him any warnings?

A.   No, just verbal commands to put his hands behind his back.

Q.   Were you speaking in Russian when you gave these commands?

A.   No.

Q.   Do you speak Russian?



A.  No.

Q.  Did you give these commands in English?

A.  Yes.

Q.  When you engaged Mr. Lagoda with other officers, can you describe for me what you did?

A.  I grabbed his left hand and brought it behind his back towards his lower back to be handcuffed.

Q.  Did you use any restraining techniques that you learned either in the police academy or your training as a police officer required as a part of your job?

A.  It could be considered a compliance hold.

Q.  Can you generally describe what a compliance hold is?

A.  It is just a way to be in compliance from anyone combative or unwilling to be arrested or comply.

Q.  Did you ever use your fists or feet or knees to hit Mr. Lagoda?

A.  No.

Q.  I think we had a lag in the connection, but I heard your answer.  Did you witness other officers physically engage Mr. Lagoda?



A.  Yes.

MR. AMRHEIN:  I think we're having some trouble with the internet connection from you guys.  I think there is some delay.  I heard yes, but there is some significant delay and glitching.

MS. ALTERMAN:  We don't see it on our end.

(Recess taken.)

Q.  Do you recall the names of the officers who engaged Mr. Lagoda?

A.  I remember myself, Officer Bugiada, Officer Papia, Officer Duran, and Officer Mezzacappa.  I think I said Officer Mezzacappa. Sorry.

Q.  Did you witness any of the officers you named hitting Mr. Lagoda?

A.  No.

Q.  Any of them use their fists as part of the restraining process against Mr. Lagoda?

A.  No.  I didn't witness any of that.

Q.  Do you know if they did finding out after the fact?

A.  After the fact, yes, but during the incident, no, I didn't witness it.

Q.  Do you know which officers -- based on the information you learned after the fact, do you know which officers did use either their fists or their feet as a process of trying to restrain Mr. Lagoda?

A.  I have to reference the documents or the report to know specifically who did what.

Q.  You described the restraining technique that you had used as part of the process of restraining Mr. Lagoda.

Based upon what you witnessed that day at the scene, what restraining techniques did other officers use?

A.  What restraining techniques did other officers use?

Q.  Based on what you witnessed, what did you witness in terms of restraining techniques that other officers used?

A.  I'm not able to speak to what other officers did based on the scene was not ideal to be seeing anything else that was going on around me especially behind me in such a confined space and with Mr. Lagoda resisting in the way he was.

I was not able to take in what was



going on behind me or outside of the galley or the rear of the galley.

Q.   In the process of restraining Mr. Lagoda, did you hear him making any noises or sounds?

A.   I heard noises and sounds, but I don't know if they were coming from Mr. Lagoda, myself or even any of the other five or so people that were in such a confined space.

Q.   Did you hear Mr. Lagoda breathing?

A.   There was a full-blown altercation at that time.  So the only thing you could really hear were the noises associated with the altercation, gun belts, handcuffs, keys.  We are in the galley of the plane.  So a specific person breathing, no.

Q.   While trying to restrain Mr. Lagoda, did you check to see if he was breathing?

A.   Not while attempting to restrain him, no.

Q.   While attempting to restrain him, did you witness any other officers check to see if Mr. Lagoda was breathing?

A.   No.  We would not have checked to see if a resisting individual is breathing because they are actively resisting.  So they are going to be



breathing.

Q.  For the record, just to keep a clean transcript, did you witness any officers while trying to restrain him, did you witness any officers check and see if Mr. Lagoda was breathing?

MS. ALTERMAN:  Objection.  You can answer.

A.  No.

Q.  Did you hear any guttural sounds, loud sounds, harsh sounds from Mr. Lagoda during the restraining process?

A.  I would not be able to say if they were coming from Mr. Lagoda or any officers involved in what was going on at that time.  I would not be able to pinpoint who was making what noise.

Q.  At any point during the attempt to restrain Mr. Lagoda, did you intervene because of concern for the health and safety of Mr. Lagoda?

MS. ALTERMAN:  Objection.

A.  Can you repeat it?  You broke up.

Q.  Sure.  If at any time there are connection errors and you would like me to repeat a question, I'm more than happy to do that.



At any point during the attempt to restrain Mr. Lagoda, did you intervene because of concerns for the health and safety of Mr. Lagoda?

MS. ALTERMAN:  Objection.  You can answer.

A.  During the attempt, no.

Q.  At any point during the attempt to restrain Mr. Lagoda, did you witness any other officers attempt to intervene due to concerns for the health and safety of Mr. Lagoda?

MS. ALTERMAN:  Objection.  You can answer.

A.  Again, during the attempts, no, but once restrained, yes.

Q.  Just, again, for the sake of a clean record, at any point during the attempt to restrain Mr. Lagoda, did you witness any officers intervene because of concerns for the health and safety of Mr. Lagoda?

A.  No.

Q.  Was Mr. Lagoda ultimately restrained?

A.  Yes.

Q.  From the time you arrived on board the flight at the scene, approximately how long did it



take to restrain Mr. Lagoda?

A.  I'm not sure.  I would have to reference the report.

Q.  I don't want you to completely guess, but if you have an estimation whether it was five, ten minutes, less than that?

A.  I really would not know.  You're in an environment with OC spray, a fight and multiple cops, a lot going on.  I really can't pinpoint even like a general time frame.

Q.  I understand.  Again, we don't want you to guess here.  Just one more question about the restraint process.

When you testified that you gave commands, were you already engaged with Mr. Lagoda in trying to restrain him and then you gave the commands?

A.  The very end of the question broke up.

Q.  I can rephrase that to make it clearer. When you were engaged in trying to restrain Mr. Lagoda, you previously testified about giving commands.

Did you give those commands after you were already actively engaged in trying to



restrain Mr. Lagoda?

A.  It would be prior to and during the restraint the process that we would be telling him to stop resisting or place his hands behind his back.

Q.  When you gave those commands, when you were in the process of trying to restrain Mr. Lagoda, was he located face down with his face and chest on the ground?

A.  He was -- his chest was down on the ground, but his head was to each side.

Q.  Okay.  After he was restrained -- strike that.

Was Mr. Lagoda face down the entire time after he had been restrained?

A.  No.

Q.  After you restrained him, what -- after Mr. Lagoda was restrained, can you tell me what happened?

A.  Sure.  Once he is restrained, you have to assess the entire situation as far as who is there, is everyone okay, what is the scene like, is it safe for us, is it safe for Mr. Lagoda, for the passengers on the plane and does everyone have



everything, is the desk and supervision aware of the situation.

And once you start getting that stuff in order, then you can attempt to safely egress which is a problem while in the galley in the plane still with OC spray.

Q.  Is that the first order of procedure conducted and is that done before checking on the health and safety of the restrained person?

A.  You broke up again.  I apologize.  It's scattered.  I couldn't pull it.

Q.  Is that process that you testified to, is that done before checking on the health and safety of the restrained person?

A.  I would have to reference the policy, but most things are done completely simultaneously. And there was enough police officers there to get any and all bullet points done at the same time.

Q.  In terms of what you did on that individual day, did you go through those procedures before checking on the health and safety of Mr. Lagoda?

A.  No.  I would have been taking in what was being done to know not to be repetitive.  If



800.211.DEPO (3376)
EsquireSolutions.com

either officer had handled anything, then I would go to the next thing I would have to get done.

Q.  In terms of the steps that needed to get done, did you get other steps done before checking on the health and safety of Mr. Lagoda?

A.  Me personally, no.

Q.  Your first priority after restraining Mr. Lagoda was his health and safety?

A.  It would have been the responding officers' health and safety and then I would have checked on Mr. Lagoda.

Q.  After Mr. Lagoda was restrained, did you observe -- strike that.

After Mr. Lagoda was restrained, did you ever sit on Mr. Lagoda?

A.  No.

Q.  After Mr. Lagoda was restrained, did you observe any officers sitting on Mr. Lagoda?

A.  No.

Q.  After Mr. Lagoda was restrained, did you have any hands, knees, forearms or anything on Mr. Lagoda?

A.  I would have had my hands on his arm in order to remove him from the galley.



Q.   Did you witness any officers having any knees or forearms or shoulders on Mr. Lagoda as he was restrained?

A.   No.

Q.   That whole time that he was restrained and in the process of leading to the restraints, Mr. Lagoda was on his stomach with his head turned to one side or the other; am I correct?

A.   Yes.

Q.   How long would you estimate he was on his stomach with his head turned to one side or the other?

A.   I really don't know.

Q.   Do you know if any officers tried to -- strike that.

Did you try to change Mr. Lagoda's position while trying to restrain him so that he wasn't on his stomach with his head turned to the side?

A.   While trying to restrain him, no.

Q.   Do you know if any other officer tried to change the position of Mr. Lagoda while trying to restrain him?

A.   No.



Q.   After Mr. Lagoda was restrained and is lying on his stomach face down, do you recall if he was still -- if any officers were administering a compliance hold?

A.   No.  At no point did I see Mr. Lagoda on his stomach face down.  It was always with his head to one side or the other, but it was never strictly prone with his nose directly on the ground.  That was not the case.

Q.   I can rephrase the question for you. After Mr. Lagoda was restrained and he was face down and as you testified with head one side or turned one side or the other, did you witness any officers sustaining a compliance hold against Mr. Lagoda?

A.   I didn't witness anyone else, no.

Q.   In that scenario, were you maintaining your compliance hold against Mr. Lagoda?

A.   Yes.

Q.   Can you describe what happened next after Mr. Lagoda was restrained and you went through the procedure checks you testified to today?

A.   Once that was done, we attempted to remove Mr. Lagoda towards the middle of the galley



as he was across it.  So we wanted to move him towards the middle.  And once we began to move him, we noticed that he was unresponsive.  And, at that point, I unhandcuffed him.

Q.  When you attempted to move him, how was the attempt made?

A.  It would be just by securing an arm or the waist band of their pants and sliding them safely to an area where there would be more room to sit them up.

Q.  He was face down as you testified with his head turned to one side or the other.  When you said slide him safely, do you still slide him face down?

MS. ALTERMAN:  Objection.  You can answer.

A.  No, because he was not face down.  It was -- he was on his chest with his head to one side and then it was rolled to a hip.  And then you would slide them towards wherever you had more room.  And that would be right at the opening of the entrance to the galley.

Q.  Okay.  So he was -- from his position of chest down on the ground with his head turned to



one side or the other, was he rolled on to his side as a part of trying to move him from one area of the plane to another?

A. Yes.

Q. At some point, did the responding officers notice that Mr. Lagoda was no longer -- was not breathing?

A. Yes.

Q. Did you notice -- did you make that discovery or did another officer?

A. Yes. I made that discovery.

Q. What did you do next?

A. I immediately unhandcuffed Mr. Lagoda and checked for a pulse.

Q. When you unhandcuffed him and checked for a pulse, was he still laying on his side or did you roll him over so he was on his back?

A. It would have been simultaneously from his side to back. He would have been on his side to be unhandcuffed and rolled to his back. There would not have been room to have him on his back with five or so adult males in that galley. So you would have to create space. He would be on his side once we got to the middle of the galley.



Then he would have been laid on his back unhandcuffed.

Q.  Am I correct when you checked for a pulse, he had none?

A.  That is correct.

Q.  Did you or any other officer trying to perform CPR?

A.  Yes.

Q.  Can you describe what you specifically did in that scenario?

A.  I verbally requested an AED from officers or supervisors towards the middle of the plane, so behind us.  And, at that point, I actually left the scene because the OC spray just becomes too much to operate in.  So we -- I just had to leave the scene for a few minutes.

Q.  Just for the record, OC spray, is that pepper spray?

A.  Yes.

Q.  Did you witness other officers administering CPR to Mr. Lagoda after you discovered he had no pulse?

A.  Briefly because that is when I exited.

Q.  Where did you exit to?



A.   From the rear of the plane in the galley towards the front of the plane.

Q.   Was that because of the pepper spray?

A.   Yes.

Q.   Did you witness officers attempt to use the AED on Mr. Lagoda?

A.   I did witness the AED come back from the plane into the galley and the AED pads get put on Mr. Lagoda's body.

Q.   Are you aware that it did not trigger a shock because it did not detect a heart beat?

        MS. ALTERMAN:  Objection.  You can answer.

A.   No.

Q.   I can rephrase that.  Do you know if a shock was triggered?

A.   I don't because, at that point, I would have exited.

Q.   If a shock is not triggered, is that because there is no heart beat detected?

        MS. ALTERMAN:  Objection.  You can answer.

A.   It could be that.  Sometimes that can be the case.  It could be a multitude of things, I



imagine.  They make them pretty standard to just shock advise or no shock advise.  If there is no shock, you just continue CPR.

Q.  Based on your training and years of experience as an officer --

MS. ALTERMAN:  You froze for a second.

Q.  Are we back?

A.  Yes.

Q.  Officer Joseph, based on your training and years of experience as an officer for the Port Authority Police Department, have you ever had -- if a shock -- let me rephrase.

Officer Joseph, based on your years of experience and training as a police officer, if there is no heart beat detected, is that typically the reason why no shock is triggered?

MS. ALTERMAN:  Objection.  You can answer.

A.  I really don't know if they would advise a shock or not advise a shock based on a heart beat.  We don't get that far into it.

We stay regimen.  If there is a shock advise, then you will stand back, let it



shock and also continue CPR.  And it will also tell that you via prompts at least the ones we're trained on.

Q.  So based upon your years of training and experience, is one the common reasons why a shock is not advised is there is no detectible heart beat?

MS. ALTERMAN:  Objection.  You can answer.

A.  That would be one reason, yes.

Q.  Am I correct in saying that you checked Mr. Lagoda's pulse before calling for the AED and you found no pulse?

A.  That is correct.

Q.  How many times, rough estimation, in your many years as an officer and years of training as an officer have you checked someone's pulse?

A.  A decent amount of times.

Q.  When you say decent, is that over a hundred?  Is that 50?  Is that 500?  What would you estimate?

A.  I would say not 500, but 50 would not be unreasonable.

Q.  Is checking for a pulse a part of your



training that or I should say the education you received at the police academy as well as training that you have as regard to the amount served the Port Authority Police Department?

A.  Yes.

Q.  From the time Mr. Lagoda was discovered to not have a pulse, do you know how long it took for an ambulance to arrive at the scene?

A.  I don't.  I would have to reference a report or document.  Off the top of my head, I do not know.

Q.  Am I correct emergency medical services or EMS and an ambulance had been called to the scene?

A.  Yes.

Q.  Are you aware that EMS responded to the initial radio call that led to the dispatch of Officer Bugiada?

A.  The initial call being the call for seizure or the call for ambulance after?  I'm not sure.

Q.  Sorry.  I can clarify.  Are you aware EMS responded to the initial radio call from the Jet Blue plane says there was a male aboard suffering



from a seizure?

A.  Yes.

Q.  Was there a subsequent call from the officers on board the plane after Mr. Lagoda was restrained requesting an ambulance and EMS to come to the scene?

A.  Yes.

Q.  Did you make that call or did another officer make that call?

A.  I would have to reference some transcript or document to actually see who made the call.

Q.  Ambulance and EMS, do they require a police escort when responding to a call at JFK International Airport?

A.  Yes.

Q.  Have you personally ever provided police escort for an ambulance in that scenario?

A.  Yes.

Q.  Are you aware that the ambulance was significantly delayed in arriving to the scene because it had no police escort?

MS. ALTERMAN:  Objection.  You can answer.

A.  I wasn't really aware of the timeline



because I was directly involved in the incident and then left that incident.  I didn't really know how much time had passed.  It could have been delayed.  I just would not know it was until subsequently.

Q.  Are you aware that when you and the other officers that you had mentioned, Duran, Mezzacappa, Papia responded to the scene that there were no more available personnel at the Port Authority personnel command station to escort an ambulance to the scene?

MS. ALTERMAN:  Objection.  You can answer.

A.  No.

MS. ALTERMAN:  No, you're not aware?

THE WITNESS:  No, I'm not aware.

Q.  If there is no additional personnel available at police command center, is one officer responsible for staying behind in case an ambulance needs a police escort?

MS. ALTERMAN:  Objection.  You can answer.

A.  They would be assigned the desk or the supervisor would assign someone to break away from



the scene, find someone available or EMS would have the ability to call using our radio or walk into the building to say there is no one standing by and then even a supervisor could escort them.

Q.  Do you know if the New York Attorney General's Office conducted an investigation into Mr. Lagoda's death?

A.  Yes, they did.

Q.  Do you know what the purpose of the investigation was?

A.  Are you asking if I knew what the purpose was?

Q.  Do you know what the purpose of the investigation was?

A.  I believe it was to --

MS. ALTERMAN:  Based on what you know.

A.  No.  I don't know what the purpose was.

Q.  Did you provide any statements as part of the investigation?

A.  Yes, I was interviewed.

Q.  Do you know if there were any -- strike that.

Who interviewed you?



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.  I don't remember their name.  I would have to look at the report.

Q.  How many times were you interviewed?

A.  Once.

Q.  Do you know roughly how long the interview lasted?

A.  A couple of hours.

Q.  Do you know if the interview was recorded?

A.  I don't believe it was, no.

Q.  Were you represented by counsel at the interview?

A.  Yes, I was.

Q.  Do you know if there is a copy of the transcript of that interview?

A.  I believe there is a summation of their findings.

Q.  Do you believe there is a copy of the transcript of the interview?

A.  I don't know.

MR. AMRHEIN:  In the event there is a transcript of that interview and to the extent it has not been produced, I will put on the record that we ask for it be produced.  I will continue



to check the file.

MS. ALTERMAN:  We confirmed with the Attorney General's Office there are no recordings or transcripts from any of the interviews conducted.

Q.  Besides your testimony for a couple of hours in that one instance, you didn't provide any written statements to the Office of the Attorney General?

A.  No.

Q.  Is there a report released by the Attorney General's Office regarding its findings in the investigation?

A.  Yes.

Q.  Do you read that report?

A.  Yes.

Q.  Do you know what the conclusion of the report was?

A.  I would have to reference it, but it's been a while since I read it.

Q.  Are you aware the report concluded -- and perhaps this will jog your memory -- are you aware the report concluded that the use of force by PAPD personnel, Port Authority Police Department



personnel, likely contributed to the death of Mr. Lagoda?

MS. ALTERMAN:  Objection.  You can answer.

A.  Yes.

Q.  Are you aware that the report recommended that the Port Authority Police Department train its officers about the unique vulnerability of individuals in the immediate wake of the seizure?

MS. ALTERMAN:  Objection.  You can answer.

A.  Yes.

Q.  I'm going to share my screen briefly. Let me know whenever that is on your screen.  Do you recognize this document?

A.  Not yet.

Q.  I can scroll through.  It's a relatively lengthy document.  I represent for the record, it's 63 pages in length, and I believe there are three exhibits at the end.  There is an executive summary.  There is a statement of facts.

I will go through this slowly in a second.  There is the statement of facts.  It continues.  This is legal analysis,



recommendations.  And then there are three exhibits.

Exhibit 2 is the radio transmission and Exhibit 3 is the report of autopsy.  Officer Joseph, do you recognize this document?

A.  Yes.

Q.  Have you read this document before?

A.  Yes.

MR. AMRHEIN:  I would like to mark this as Plaintiff's Exhibit D, please.  It is just identified as Bates stamped Port Authority 1802 to 1864.

Turning to the second page of the executive summary which is, as you can see on the page, I am going to go to the final paragraph, Bates stamped PA 1804.

Can you read to yourself the paragraph that begin "Nevertheless.)

A.  (Witness complies.)  I'm finished.

Q.  I'm going to scroll to page 12 of the report.  It is marked Bates stamped PA 1814.  It says, "Recommendations."

Can you read the first two large paragraphs of recommendations to yourself and let

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

me know when you're complete.

A.   Can you scroll a little bit?

Q.   Sure.   Is that better?

A.   Yes.

MR. AMRHEIN:  Just for the record, I noticed one of the plaintiffs in this matter, Alexey Tarasov, as an administrator of the estate of the deceased, Evgeniy Lagoda, has joined.  So I want to make sure the record notes his presence.

MS. ALTERMAN:  Thank you.

Q.   Officer Joseph, please take your time and whenever you're finished reading, please let me know.

A.   (Witness reads.)  I'm finished.

Q.   Would you agree the report determined the Port Authority Police Department failed to have personnel available to escort an ambulance to the scene?

MS. ALTERMAN:  Objection.  You can answer.

A.   I would disagree.  I would say that they didn't fail to have them standing by.  The ambulance could have picked up the radio and let us know they were standing by.  And there could



have been another step.  It may have been delayed still, but I would not say they failed.  They just abandoned the ability to have someone stand by.

Q.  Do you know if the EMS and the medical service folks called over the radio and said they were waiting for a police escort?

A.  I don't believe they called over saying they were awaiting escort or standing by.

Q.  When you say over, is that to you, the officers aboard the flight or where the police station was?

A.  It was generally over the radio to anyone that has the ability to listen.  It's directed to the police desk, but anyone can hear it.

Q.  Is that typically for all communications over the radio?

A.  Yes.

Q.  Is it fair to say they would all be on the same channel?

A.  Correct.

Q.  So, do you disagree that the reports by the Office of the Attorney General determined that the Port Authority Police Department failed to have personnel available to escort an ambulance to



the scene?

MS. ALTERMAN:  Objection.  You can answer.

A.  Well, the report says that.  Sorry.  Go ahead.

Q.  I was going to say my question is limited to the report.

A.  So, yes, the report does that say that.

Q.  So I'm going to restate it for a clean transcript.

Would you agree that the report determined the Port Authority Police Department failed to have personnel available to escort an ambulance to the scene?

MS. ALTERMAN:  Objection.  You can answer.

A.  Yes.

Q.  Would you agree with me the report found the use of force by the Port Authority Police Department personnel was found to have likely contributed to the death of Mr. Lagoda?

MS. ALTERMAN:  Objection.  You can answer.

A.  I'm just rereading the second paragraph.



Q.  I can provide a little more content for you, Officer, as to where that would be.

A.  Yes, please.

Q.  If I can direct you to -- see where the mouse is that starts with the word "Second."  Did you have a chance to read that?

A.  Yes.  Can you ask the question again?

Q.  Sure.  Would you agree with me the report found the use of force by Port Authority Police Department personnel was found to have likely contributed to Mr. Lagoda's death?

MS. ALTERMAN:  Objection.  You can answer.

A.  Yes.  That is what the report says.

Q.  Would you agree with me that the report emphasizes a person who has just suffered a seizure is in a uniquely vulnerable position immediately following a seizure?

A.  Yes.  That is what it says.

MR. AMRHEIN:  I want to introduce a document.  I'm going to mark it as Exhibit E.

Q.  I'm going to share my screen right now. Let me know when you are able to review it.

A.  I can see it.



Q.  Let me know whenever you would like me to scroll down so you can see the bottom half of it.

A.  You can go.

Q.  Let me know when you have been able to read through it?

A.  All good.

Q.  Officer Joseph, do you recognize this document?

A.  Yes.

Q.  And you have seen it before?

A.  Yes.

Q.  Did you read this document in preparation for this deposition?

A.  Can you repeat that?

Q.  Sure thing.  Did you read this document in preparation for this deposition?

A.  I have seen this, yes.

Q.  Did you fill out this report on August 13, 2019?

MS. ALTERMAN:  Just for the record, April 13th.

MR. AMRHEIN:  Sorry about that.

Q.  For the record, did you fill out this report on April 13, 2019?

A.   Yes.

Q.   Was that the day after when you were called to the Jet Blue flight regarding Mr. Lagoda that night April 12, 2019?

A.   Just technically because it would be after midnight.  So we would be using the next date.  If the incident was around 10ish o'clock, if it was after midnight when I pulled it out, it would be 4:13.  So not necessarily 24 hours later, but the next day.

Q.   If I recall -- and correct me -- I know you said you worked from, I believe, 2 to 10 is your standard shift and 10 to 6 a.m. the next morning?

A.   Yes.

Q.   So you could have filled out this report between the hours of 12 and 6 a.m. that morning on April 1st?

A.   Correct.

Q.   That would have been just a few hours maybe after your engagement with Mr. Lagoda?

A.   Yes.

Q.   When you filled out that report at that time, were you aware Mr. Lagoda was deceased?



A.  You would have to let me know what time that report was actually filled out.  Can you scroll up?

Q.  Sure.

A.  So then -- no.  That form was likely filled out once I was back at command or in the car or in the a folder or anything like that.

Q.  Officer Joseph, based on your training and professional experience, how would you classify a person that does not have a heart beat?

A.  I would say they are not alive at the moment.

Q.  Is it fair to say if someone is not alive, they are dead?

A.  I think that is fair.

Q.  Is that fair based on your years of professional experience and training?

A.  Yes.

Q.  Why did you mark "no" for Evgeniy Lagoda killed on your use of force report?

A.  Because killed -- just because you are dead does not mean you were killed.  There is definitely subsets for dead and he was not killed. So no is the appropriate answer there.



Q.   You say subsets of killed.  Can you please describe that based upon your years of training and experience?

MS. ALTERMAN:  Note my objection. He testified subsections to dead.  Not killed.

MR. AMRHEIN:  Thank you for the clarification.

Q.   You described subsections of being dead. Can you describe those based on your years of training and professional experience?

A.   Sure.  You could die from natural causes. You could die from an incident such as a car accident, heart attack, all sorts of medical emergencies.  And then you could be the victim of a crime and be killed.  Those are just a few I can think of right now.

Q.   April 12, 2019, am I correct that you and four other officers physically engaged Mr. Lagoda aboard a Jet Blue flight at JFK International Airport?

A.   Yes.

Q.   Am I correct the Attorney General's Office of New York conducted an investigation into the events of that day, April 12, 2019?



A.  Yes.

Q.  Am I correct that you testified in the affirmative that the report stated that -- or report found that the use of force by PAPD personnel was found to have likely contributed to the death of Mr. Lagoda?

MS. ALTERMAN:  Objection.  You can answer.

A.  Yes.

Q.  Knowing all those factors, would you like to change your no to a yes if you were given the opportunity?

A.  No.  Absolutely not.  Likely contributed to is not a sole cause.  It's their -- that is their summary, but there was also no wrongdoing found.

Q.  I don't have much more.  I appreciate your time.  I just have a final question to ask you.

A.  Sure.

Q.  Now, wouldn't you agree that someone who has just come out of a seizure is medically vulnerable?

A.  Yes, I would agree.



Q.  Wouldn't you agree that someone who has just come out of a seizure may be disoriented?

A.  Yes.

Q.  Wouldn't you agree with me someone who has just come out of a seizure may have combative behavior?

A.  Yes.

Q.  Wouldn't you agree it is more difficult to understand words, warnings and commands that are in a foreign language that you do not speak?

MS. ALTERMAN:  Objection.  You can answer.

A.  Yes, it would be.

Q.  Do you think it's more difficult to understand words, warnings and commands in a foreign language that you don't speak, Officer Joseph?

A.  Yes.

Q.  Wouldn't you agree it's more difficult to understand words, warnings and commands when you're disoriented?

A.  Yes.

Q.  Wouldn't you agree it's more difficult to breathe lying face down on your stomach than it is



sitting up or standing up?

MS. ALTERMAN:  Objection.  You can answer.

A.  If we're referencing a specific instance, I don't think he was face down, chest down prone. His head was to the side.  So I don't think any breathing was obstructed.

Q.  Wouldn't you agree it's more difficult to breathe when you're lying down on your stomach than it is sitting or standing up?

MS. ALTERMAN:  Objection.  You can answer.

A.  No.  I think you can breathe equally lying on your stomach or lying on your back.  I think it is the same.

Q.  You think it's just as easy standing up and breathing as it is lying down on your stomach with officers trying to restain you breathing?

MS. ALTERMAN:  Objection.  You can answer.

A.  Yes, I do.  I think it's relatively equal.

Q.  Did you ever try and sit up Mr. Lagoda or stand him up in the restraining process?



A.  We didn't get to that point.  We were rendering aid prior to standing him up.

Q.  Do you agree it's even more difficult to breathe when lying on your stomach with a head turned to the side or another when human beings are applying physical force to you with arms, fists, hands and knees and legs?

MS. ALTERMAN:  Objection.  You can answer.

A.  It might be.

MS. ALTERMAN:  Don't guess.

A.  Yes.

Q.  Wouldn't you agree that a person who is placed face down with a number of people applying increasing amounts of pressure to the back, neck and legs may not be resisting but rather fighting for one's life?

MS. ALTERMAN:  Objection.  You can answer.

A.  I don't think that was the scenario we're talking about here.  So no.

Q.  If you're laying down on your back -- excuse me -- if a person is laying down with their chest on the ground and officers are applying



increasing amounts of pressure to a person's back, neck and legs, is it fair to say that the person may be fighting for his or her life in that scenario and it should be perceived as resisting?

MS. ALTERMAN: Objection. You can answer.

A. No. The perception of resisting was the reality of the situation. He was doing everything that I have seen in my career of what a person resisting does.

Q. Have you ever been in a pig pile as a kid when you're at the bottom and people pile on top of you?

A. Yes.

Q. Have you ever ran into the scenario where you're gasping for air, you're telling everyone to get off and they say, you're fine, we can hear you talk. That means you can breathe?

A. Yes.

Q. Are you aware that is not actually the case, the person is still struggling to breathe. Just because they are breathing and talking, their life is not in danger?

A. Yes, I am aware.



Q.  Wouldn't you agree that improper restraining techniques can block a flow of air into a person's lungs contributing to a life threatening condition known as positional or restraint asphyxia?

A.  Generally speaking or in this case?

Q.  Generally speaking.

A.  General speaking, yes.

Q.  Wouldn't you agree the risk of positional asphyxia is compounded when a person with predisposing factors become involved in a physical struggle with an officer or officers?

MS. ALTERMAN:  Objection.  You can answer.

A.  Yes.

Q.  If force was not used against Mr. Lagoda, do you believe he would have died that night April 12, 2019?

MS. ALTERMAN:  Objection.  You can answer.

A.  I would have no way of knowing that.  I don't know.

Q.  You don't know if he would have died as a result?



A.  I have no idea what would have happened or would not have happened to him, no.

MR. AMRHEIN:  If we can go off the record for five minutes.

(Recess taken.)

MR. AMRHEIN:  Officer Joseph, thank you for your time.  I have no further questions. I very much appreciate you taking the time out of your day especially during summertime with vacations to be here today.

(Recess taken.)

MS. ALTERMAN:  I have a few questions.

CROSS-EXAMINATION

BY MS. ALTERMAN:

Q.  Officer Joseph, what type of call did you respond to when you responded to Gate 20, Terminal 5 on April 12, 2019?

A.  I responded to an officer needing assistance call.

Q.  What type of call did that mean to you? What did that signify to you that you were responding to an officer needing assistance?

MR. AMRHEIN:  Objection.



A.   That the officer was in significant need of help.

Q.   How did you know that Officer Bugiada was in significant need of help?

A.   Based on the fact that they put that over the radio and you can hear a struggle on the radio.

Q.   When you responded to the scene of the aircraft and you actually got on board of the plane, tell us what you observed.

A.   It was chaotic on board.  There was an active fight in the rear of the plane with Mr. Lagoda and Officer Bugiada as well as multiple passengers, some screaming, an environment filled with OC or pepper spray.

Q.   When you got to the back of the aircraft towards the galley area, what did you see?

A.   I saw Officer Bugiada actively engaging with Mr. Lagoda attempting to restrain him.

Q.   How would you describe Mr. Lagoda's behavior at that point in time?

A.   It would be very chaotic.  He was actively fighting with Officer Bugiada.

Q.   What do you recall Mr. Lagoda doing at



that time?

A.  He was kicking.  He was actively swinging at or grabbing at Officer Bugiada near and around his upper body and his waist and his gun belt.

Q.  Was Mr. Lagoda exhibiting any signs of distress at that point in time?

A.  No.

MR. AMRHEIN:  Objection.

Q.  When you observed this behavior by Mr. Lagoda, what did you do in response?

A.  I began to assist Officer Bugiada in restraining Mr. Lagoda.

Q.  How did you do so?

A.  I grabbed his left hand and began to bring it to the rear of his lower back.

Q.  When you grabbed Mr. Lagoda's left hand in an attempt to restrain him in handcuffs, was he resisting?

MR. AMRHEIN:  Objection.

A.  Yes.

Q.  How would you describe how Mr. Lagoda was resisting at that time?

A.  He was still --

MR. AMRHEIN:  Objection.



A.   He was still pulling his hands away and kicking and attempting to push up and pull his arms away.

Q.   At any point in time, did you observe any officer on top of Mr. Lagoda during the restraining process?

A.   No.

Q.   At any point in time, did you observe any police officer on scene asphyxiating Mr. Lagoda?

A.   No.

MR. AMRHEIN:   Objection.

Q.   At any point in time, did you observe any police officer on scene attempting to cut off an airway of Mr. Lagoda during the restraining?

MR. AMRHEIN:   Objection.

A.   No.

Q.   Once Mr. Lagoda was restrained, what was the very next thing that occurred?

A.   He was -- well, once restrained, we checked on one another and then checked on Mr. Lagoda.

Q.   How did you check on Mr. Lagoda?

A.   He was turned around on to his back and we noticed he was blue.



Q.   You testified previously that after Mr. Lagoda was restrained, you attempted to move his body from one portion of the galley to another.  Do you recall that testimony?

A.   Yes.

Q.   Why did you do that?

A.   The scenario dictated that he was in the back of the galley, and we would not be able to get him out.  We would have to move him to where there was more space.

Q.   How did you go about moving him from one portion of the galley to the other?

A.   We rolled him.

Q.   When you say "we," who is we?

A.   It would be myself, Officer Papia and whoever was behind me.

Q.   Another police officer?

A.   Yes.

Q.   How did you go about rolling Mr. Lagoda's position from the position he was in to being rolled to one side?

A.   Well, on to his hip and on to his back.

Q.   While you were attempting to move Mr. Lagoda's body to the other part of the galley



and rolling his body to one side, what was Mr. Lagoda doing at that time?

A.   Still actively resisting, kicking, jerking his body around in a manner that was very distinctly to injure or harm people at his feet.

Q.   When you say people at his feet, do you mean other police officers?

A.   Yes.

Q.   Did Mr. Lagoda have a pulse at that time?

A.   Yes, he did.  He was actively fighting.

Q.   At the point in time when you were able to roll Mr. Lagoda on to one side, how much time had passed from the moment he was handcuffed until he was rolled to one side, if you know?

A.   From the moment he was handcuffed to when he was put on to one side and rolled on to his back?

Q.   Yes.

A.   It was a couple of minutes.

Q.   During that couple of minute period, was he actively resisting at that time?

A.   Yes.

MR. AMRHEIN:  Objection.

Q.   At any point in time during that period



of time from when he was handcuffed to when he was rolled to one side, did he exhibit any signs of distress?

A.  No.

MR. AMRHEIN:  Objection.

A.  He was just actively resisting at that time.

Q.  At any point in time between the time when he was handcuffed and the time he was rolled to one side, did he call out for help?

A.  No.

Q.  At any point in time when he was cuffed from the time he was rolled on to one side, did you, yourself, observe any signs of breathing difficulty or distress that he was experiencing?

MR. AMRHEIN:  Objection.

A.  No.

Q.  Once he was rolled to one side, what did you do at that point in time?

A.  Then he was moved towards the middle of the galley, and he was still actively resisting. He was then repositioned to attempt to be taken out of the galley.  And that is when I noticed he was blue and he was unhandcuffed.



Q.  Where did you observe he was turning blue?

A.  Around his neck -- towards like his neck to his chin maybe into his cheeks.

Q.  You are using your hand.  Just for the record, if you could describe using your words where did you observe that Mr. Lagoda was turning blue?

A.  Around his neck into his cheek area.

Q.  Do you recall if it was the left side of his face, the right side of the face, the center or any other portion?

MR. AMRHEIN:  Objection.

A.  I don't.

Q.  Once you observed that he was turning blue, what did you do next in response?

A.  Immediately unhandcuffed him.

Q.  Once he was unhandcuffed, what was the very next thing that was done?

A.  Check for a pulse.

Q.  Once you checked for a pulse, what was the next step?

A.  Then I was leaving the area, requested an AED on the plane.



Q.  Before you left the area after requesting an AED machine to be brought to the back galley of the plane, did you observe any police officer starting chest compressions?

A.  Yes.

Q.  Do you recall which officer started chest compressions?

A.  I don't.

Q.  Do you know how many compressions were done before you left the scene?

A.  I don't know.

Q.  Did you later come back to the scene?

A.  No.

MS. ALTERMAN:  That's all I have. Thank you.

MR. AMRHEIN:  Just two or three follow-up questions and then we will be done for the day.

REDIRECT EXAMINATION

BY MR. AMRHEIN:

Q.  Officer Joseph, during that break, were you -- coming back, there seems to be some inconsistent testimony with respect to a memory of time and events aboard the plane.



Were you coached during the break to offer different answers based upon testimony you previously gave?

A.  No.

Q.  Did you speak with your attorney during the break?

A.  No, just where to go to the bathroom.

Q.  You didn't speak with your attorney other than the bathroom.  Did you speak with anyone during the break outside of asking where the bathroom was?

A.  Not asking.  We just discussed if there is going to be more questions, if she's going to have follow-up questions.

MS. ALTERMAN:  Just don't talk about what we discussed.

Q.  I'm only asking if you had a discussion with your attorney during the break.  Not the content of your discussion.

A.  Yes.

Q.  One final question.  Am I correct that asphyxiation caused by positional restraints -- sorry -- that asphyxiation to a person does not have to be on purpose.  It can happen naturally?



A.  Can you repeat it one more time?

Q.  Am I correct that asphyxiation does not have to be purposeful.  It can happen by chance or just by the occurrence of the event?

A.  That is correct.

Q.  So it does not have to be on purpose?

A.  No.  It does not have to be on purpose.

MR. AMRHEIN:  I have no more questions.

MS. ALTERMAN:  I don't have any further questions.

(Whereupon the deposition was concluded at 12:43 p.m.)



                        C E R T I F I C A T E

                I, ROBERT JOSEPH, do hereby certify

that I have read the foregoing transcript of my

testimony, and further certify that said

transcript is a true and accurate record of said

testimony (with the exception of the following

corrections listed below:)

Page     Line          Correction

Signed under the pains and penalties of perjury

this          day of                    , 2023.

                              ROBERT JOSEPH



COMMONWEALTH OF MASSACHUSETTS   )

                                )

SUFFOLK, SS.                    )


           I, Nancy L. LaCivita, Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that ROBERT JOSEPH, the witness whose deposition is hereinbefore set forth, was duly sworn by me, and that such deposition is a true record of the testimony given by such witness.

           I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

           IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal this 28th day of August, 2023.


                         Nancy L. LaCivita
                         Notary Public

My Commission Expires:

January 2, 2026



**0**

**0**
34:5

**1**

**1**
27:10
29:11

**10**
33:22,23,
24 34:15
75:12,13

**10ish**
75:7

**11430**
7:20

**12**
33:19
34:10,19
35:23
69:20
75:4,17
77:17,24
83:18
84:18

**13**
74:19,24

**13th**
74:21

**1802**
69:11

**1804**
69:16

**1814**
69:21

**1864**
69:12

**1st**
75:18

**2**

**2**
29:10,11
33:22
34:15
69:3
75:12

**20**
84:17

**2008**
9:6 10:17
17:13
22:5

**2019**
10:3,5
33:17,19
34:10,19
35:23
74:19,24
75:4
77:17,24
83:18
84:18

**2020**
22:8

**2064**
26:12

**2065**
26:12

**2082**
27:22

**2083**
28:7

**2093**
28:17

**2095**
29:2

**24**
75:9

**25-week**
11:6

**269**
7:19

**3**

**3**
69:4

**360**
29:22,23,
24 33:7

**4**

**40**
34:5

**4:13**
75:9

**5**

**5**
84:18

**50**
61:20,22

**500**
61:20,22

**6**

**6**
33:23,24
75:13,17

**63**
68:19

**A**

**a.m.**
33:23,24
75:13,17

**abandoned**
71:3

**ability**
7:12,13
65:2
71:3,13

**aboard**
62:24
71:10
77:19
92:24

**Absolutely**
78:13

**academy**
9:3,5,6,9
10:19,23
12:21
17:12,19,
23 18:7,
15,24
20:20
22:23
44:10
62:2

**access**
24:10,23

**accident**
77:13

**accurate**
39:19

**action**
39:2

**active**
16:11
21:9
23:13

85:12

**actively**
43:5
47:24
50:24
85:18,23
86:2
89:3,10,
21 90:6,
21

**additional**
35:3
36:15
64:17

**address**
7:18

**administeri
ng**
55:3
58:21

**administrat
or**
70:7

**adult**
57:22

**advance**
29:17

**advise**
60:2,20,
21,24

**advised**
61:6

**advisement**
20:8

**AED**
58:11
59:6,7,8
61:12
91:24
92:2

**affirmative**



800.211.DEPO (3376)
EsquireSolutions.com

78:3

**agitated**
29:6

**agree**
36:21
70:15
72:11,18
73:8,15
78:21,24
79:1,4,8,
19,23
80:8
81:3,13
83:1,9

**agreeable**
6:4

**ahead**
17:7 72:5

**aid**
81:2

**aids**
10:16

**air**
82:16
83:2

**aircraft**
85:9,16

**Airport**
7:19
63:14
77:20

**airway**
87:14

**Alexey**
70:7

**alive**
76:11,14

**allegations**
31:10

**altercation**

40:24
47:10,13

**altered**
16:6 21:3
26:10,19,
23 27:3
28:10

**ALTERMAN**
13:13,19
14:16
16:23
20:7
23:10
24:20
25:13,19
28:21
29:13
30:8,15,
24 31:8
35:16
36:4
39:4,13,
20 40:3
45:6
48:7,20
49:4,11
56:15
59:12,21
60:6,18
61:8
63:22
64:12,15,
21 65:16
67:2
68:3,10
70:10,19
72:2,15,
22 73:12
74:20
77:4 78:7
79:11
80:2,11,
19 81:8,
11,18
82:5
83:13,19

84:12,15
92:14
93:15
94:10

**ambulance**
62:8,13,
20 63:5,
12,17,19
64:11,20
70:17,23
71:24
72:14

**amended**
30:20
31:15,18
32:2,22

**amount**
61:18
62:3

**amounts**
81:15
82:1

**Amrhein**
5:11
20:4,10
25:14,22
27:9
29:9,14
30:4,10,
16 31:3,
13,24
45:2
66:21
69:9 70:5
73:20
74:22
77:6
84:3,6,24
86:8,19,
24 87:11,
15 89:23
90:5,16
91:13
92:16,20

94:8

**analysis**
68:24

**angry**
29:6

**answering**
6:14,20

**answers**
93:2

**anticipatio
n**
29:21

**apologize**
18:17
52:10

**applying**
41:15
81:6,14,
24

**approaching**
21:6

**appropriate
ly**
35:12

**approximate
ly**
38:17
49:24

**approximati
on**
8:3

**April**
10:3,5
33:17,19
34:10,19
35:23
74:21,24
75:4,18
77:17,24
83:18
84:18

**area**
56:9 57:2
85:17
91:9,23
92:1

**arm**
41:24
53:23
56:7

**arms**
41:12,18
81:6 87:3

**arrest**
33:17
43:5

**arrested**
44:17

**arrests**
8:11,12
11:16

**arrive**
62:8

**arrived**
38:22
49:23

**arriving**
63:20

**arts**
15:9

**Ashcroft**
5:12

**asphyxia**
83:5,10

**asphyxiatin
g**
87:9

**asphyxiatio
n**
15:21
19:23
20:11



93:22,23
94:2

**assess**
14:8 40:7
51:21

**assign**
64:24

**assigned**
10:14
37:7 38:8
64:23

**assigns**
37:5

**assist**
86:11

**assistance**
10:15
35:3
36:15
39:24
84:20,23

**attack**
77:13

**attempt**
41:16,18
48:17
49:1,6,7,
9,16 52:4
56:6 59:5
86:17
90:22

**attempted**
55:23
56:5 88:2

**attempting**
43:6
47:18,19
85:19
87:2,13
88:23

**attempts**
49:13

**attended**
8:23

**attention**
26:12

**attorney**
5:11,12
32:17,24
65:5
67:3,8,12
71:22
77:22
93:5,8,18

**August**
74:19

**Authority**
9:21
10:2,9,
18,22
13:12,18
17:12,14,
20 18:1,
23 20:3
22:17,19
24:7
26:11
27:22
29:1 36:2
38:18
60:12
62:4
64:10
67:24
68:7
69:11
70:16
71:23
72:12,19
73:9

**autopsy**
69:4

**average**
34:14

**avoid**
6:8

**awaiting**
71:8

**aware**
32:7
34:17
39:10,15
40:16
52:1
59:10
62:16,22
63:19,24
64:6,15,
16 67:21,
22 68:6
75:24
82:20,24

——————————

**B**

——————————

**back**
22:9 26:3
28:5 29:6
30:6
43:11,16,
20 44:7
51:5
57:17,19,
20,21
58:1 59:7
60:8,24
76:6
80:14
81:15,22
82:1
85:16
86:15
87:23
88:8,22
89:17
92:2,12,
22

**background**
8:21 9:12

**band**

56:8

**based**
39:10
46:1,11,
16,20
60:4,10,
14,21
61:4
65:16
76:8,16
77:2,9
85:5 93:2

**basis**
34:4

**Bates**
27:22
28:6,16
29:2
69:11,16,
21

**bathroom**
93:7,9,11

**bear**
25:10
30:13

**beat**
59:11,20
60:16,22
61:7
76:10

**began**
9:3,9
10:8 56:2
86:11,14

**begin**
6:14 9:10
69:18

**beginning**
42:19

**behavior**
79:6
85:21

86:9

**behavioral**
11:10,12

**beings**
81:5

**belt**
86:4

**belts**
47:13

**bit**
6:12
42:12
70:2

**biyearly**
17:24
18:16

**block**
83:2

**blue**
34:17
36:11,19
38:19
40:13
62:24
75:3
77:19
87:24
90:24
91:2,8,16

**board**
34:19
36:12,19
40:14
49:23
63:4
85:9,11

**body**
37:12,14,
18,20
38:12,13,
15 41:9,
15,20,22



43:7 59:9
86:4
88:3,24
89:1,4

**book**
29:22
33:7

**bore**
18:18

**Boston**
5:13

**bottom**
74:2
82:12

**break**
6:18,21
64:24
92:21
93:1,6,
10,18

**breathe**
79:24
80:9,13
81:4
82:18,21

**breathing**
47:9,15,
17,21,23
48:1,6
57:7
80:7,17,
18 82:22
90:14

**briefly**
8:20 9:7
10:21
15:19
30:12
58:23
68:13

**bring**
86:15

**broke**
48:21
50:18
52:10

**Brook**
8:23 9:2,
8

**brought**
44:6 92:2

**Bugiada**
35:8,9,
15,22
36:2,15
38:23
39:2
40:19
41:2
45:11
62:18
85:3,13,
18,23
86:3,11

**building**
7:19 38:9
65:3

**bullet**
26:14
27:2,6
28:9,13,
18,19
29:2,5
52:18

**busy**
5:8

———————

**C**

———————

**call**
34:21,24
35:2,15,
23 36:1,
9,10,14
39:16,18,

22,24
40:8,9,12
62:17,19,
20,23
63:3,8,9,
11,13
65:2
84:16,20,
21 90:10

**called**
9:1 34:17
62:13
71:5,7
75:3

**calling**
61:12

**calls**
10:15
40:8

**calm**
14:8

**cam**
37:12,15,
18

**cam's**
37:20
38:12,13,
15

**capacity**
16:21
17:19
18:22
20:18
21:6,13
22:22

**car**
36:17
37:6,10
38:1 76:7
77:12

**care**
17:4
21:21,24

28:19
29:1

**career**
23:21
82:9

**cars**
38:8

**case**
5:20 55:9
59:24
64:19
82:21
83:6

**caused**
93:22

**center**
64:18
91:11

**certificate
s**
24:1,4

**chance**
31:12
73:6 94:3

**change**
54:16,22
78:11

**channel**
71:19

**chaotic**
85:11,22

**check**
47:17,20
48:5 67:1
87:22
91:20

**checked**
47:22
53:11
57:14,15
58:3

61:11,17
87:20
91:21

**checking**
52:8,13,
21 53:4
61:24

**checks**
55:22

**cheek**
91:9

**cheeks**
91:4

**Cheryl**
30:4

**chest**
43:6
51:9,10
56:18,24
80:5
81:24
92:4,6

**children**
8:18

**chin**
91:4

**Chris**
5:11

**civilians**
16:15,18
21:14

**clarificati
on**
36:18
77:7

**clarify**
62:22

**clarifying**
35:13

**class**



23:19

**classes**
19:1,4,7,
10,13,16,
19,22,24
20:12,20
21:12,17,
20,23
22:16

**classify**
42:1
76:10

**classroom**
13:7

**clean**
6:17 48:2
49:15
72:9

**cleaner**
6:12

**clearer**
50:19

**coached**
93:1

**combative**
26:17
44:17
79:5

**command**
36:3
38:18
43:15
64:10,18
76:6

**commands**
43:12,19,
22 44:2
50:15,17,
22,23
51:6
79:9,15,
20

**common**
26:23
27:3 61:5

**communicati
ons**
71:15

**complaint**
30:18,20
31:5,15,
19 32:2,
22

**complete**
17:16
18:15
24:2,5
31:6,18
70:1

**completed**
20:18

**completely**
50:4
52:16

**compliance**
14:23
44:13,15,
16 55:4,
14,18

**complies**
69:19

**comply**
44:18

**compounded**
83:10

**compression
al**
15:20
19:22
20:11

**compression
s**
92:4,7,9

**computer**
24:23

**concern**
48:19

**concerns**
49:3,9,18

**concluded**
67:21,23

**conclusion**
67:17

**condensed**
22:13

**condition**
83:4

**conducted**
52:8 65:6
67:5
77:23

**conference**
7:2

**confined**
46:22
47:8

**confirmed**
67:2

**confused**
26:16

**Congratulat
ions**
8:16,20

**connection**
42:14
44:22
45:3
48:23

**considered**
44:13

**content**
73:1
93:19

**continue**
20:16
60:3 61:1
66:24

**continues**
68:24

**contraction
s**
28:11

**contributed**
68:1
72:21
73:11
78:5,13

**contributin
g**
83:3

**cops**
50:9

**copy**
31:6,18
66:14,18

**correct**
9:19
26:20,23
28:8,11
33:18
39:12
40:12
43:2 54:8
58:3,5
61:11,14
62:12
71:20
75:11,19
77:17,22
78:2
93:21
94:2,5

**Council**
25:1,4,9,
24 26:9
27:12,17

**counsel**
26:7
32:22
33:9
66:11

**couple**
22:14
66:7 67:6
89:19,20

**courses**
11:10
22:6

**court**
6:9,16
7:4,24
8:6
11:18,19,
20,21

**cover**
12:2,4,18
14:14
20:20,23
21:2,5,
14,20,23
25:24
27:16

**covered**
18:5,10
20:11
22:21,24
23:1,4,6,
8

**COVID**
22:8

**CPR**
23:8
58:7,21
60:3 61:1

**create**
57:23

**crime**
77:15



**criminal**
11:21

**crises**
15:24
16:3
20:21,24

**criteria**
18:13

**CROSS-EXAMINATION**
84:14

**cuffed**
90:12

**curriculum**
10:21
11:9
13:10,16,
24 15:1,
3,23
18:6,13

**cut**
87:13

———————

D

———————

**daily**
11:1

**danger**
82:23

**dangers**
29:7

**dash**
30:19

**date**
23:24
32:11
75:7

**day**
33:19,21
34:19
37:7

46:12
52:20
75:2,10
77:24
84:9
92:18

**days**
22:14
34:15

**dead**
76:14,22,
23 77:5,8

**deadly**
15:3
19:14

**deal**
21:9

**dealing**
15:24
16:2,5
20:21,23
21:2

**death**
65:7 68:1
72:21
73:11
78:6

**deceased**
70:8
75:24

**decent**
61:18,19

**deep**
8:8

**deescalation**
13:24
14:4,6
19:1

**defendants**
25:7 26:7
27:13

**defense**
13:8
19:17

**defensive**
12:17
15:11

**definitive**
12:4 15:7

**delay**
9:4 45:4,
5

**delayed**
63:20
64:4 71:1

**demands**
20:9

**demonstration**
17:9

**denomination**
29:11

**department**
9:1,21
10:3,9,
18,22
13:12,18
17:12,15,
20 18:2,
23 22:18
24:8 36:3
37:3,4,
19,20
38:18
60:12
62:4
67:24
68:7
70:16
71:23
72:12,20
73:10

**depending**
21:24

**depends**
13:8

**deposed**
5:17 7:22

**deposition**
5:10 7:17
11:22
18:19
20:9
29:17,21
32:4
33:1,4,9
74:13,16

**depositions**
8:6,11

**depth**
15:19

**describe**
8:21 9:7
10:21
13:5
44:5,14
55:20
58:9
77:2,9
85:20
86:21
91:6

**description**
40:2

**desk**
52:1
64:23
71:14

**detect**
59:11

**detected**
59:20
60:16

**detectible**
61:6

**determined**
70:15
71:22
72:12

**dictated**
88:7

**die**
77:11,12

**died**
83:17,23

**difficult**
79:8,14,
19,23
80:8 81:3

**difficulty**
90:15

**diffusing**
14:3,6
19:5

**direct**
26:12
31:11
73:4

**directed**
71:13

**direction**
26:14

**directly**
55:8 64:1

**disagree**
70:21
71:21

**discovered**
58:22
62:6

**discovery**
26:7
57:10,11



**discrepancies**
9:12 40:8

**discussed**
18:9
93:12,16

**discussion**
93:17,19

**disoriented**
26:16
79:2,21

**dispatch**
62:17

**distinctly**
89:5

**distractions**
14:15

**distress**
86:6
90:3,15

**distributed**
20:2
24:12,15

**docket**
30:19
31:19

**document**
25:6,16,
21 26:6
31:1,7,20
32:3,8,14
62:10
63:11
68:15,18
69:5,7
73:21
74:8,12,
15

**documentation**
9:13

**documents**
25:8 46:6

**domestic**
23:9

**driving**
12:17

**drowsy**
26:17

**due**
49:9

**Duran**
45:12
64:7

**duties**
10:12
16:14,17,
22 17:1
21:14

**duty**
12:12,13,
14

––––––––––

**E**

––––––––––

**earlier**
22:12
39:11

**easier**
6:9 29:12

**easy**
6:10,17
80:16

**education**
62:1

**educational**
8:21

**egress**
52:5

**elaborate**
29:24

**emergencies**
10:15
77:14

**emergency**
28:14,18
29:1
34:18
40:14
62:12

**emphasizes**
73:16

**employed**
9:19

**employee**
24:6

**employer**
9:22

**EMS**
62:13,16,
22 63:5,
12 65:1
71:4

**encompass**
14:7

**encompasses**
18:6

**encounter**
13:17

**end**
11:20
36:7
42:14
45:7
50:18
68:20

**enforcement**
10:7

**engage**
16:20
42:7
44:24

**engaged**
8:15
38:23
42:9,20
43:4 44:4
45:10
50:15,20,
24 77:18

**engagement**
75:21

**engaging**
16:9,22
85:18

**English**
44:2

**entire**
22:14
31:4
51:14,21

**entrance**
56:22

**environment**
50:8
85:14

**environmental**
14:15

**equal**
80:22

**equally**
80:13

**errors**
48:23

**escort**
63:13,17,
21 64:10,
20 65:4
70:17
71:6,8,24
72:13

**estate**

70:7

**estimate**
14:21
54:10
61:21

**estimation**
23:15
24:17
32:11
50:5
61:15

**event**
20:4 30:5
66:21
94:4

**events**
33:18
77:24
92:24

**eventually**
35:2

**Evgeniy**
33:13,15
70:8
76:19

**evidence**
12:2

**exact**
36:9

**exam**
13:9

**EXAMINATION**
92:19

**excuse**
81:23

**executive**
68:20
69:14

**exhibit**
27:10
29:10



32:1
69:3,4,10
73:21
90:2

**exhibiting**
86:5

**exhibits**
68:20
69:2

**exit**
58:24

**exited**
58:23
59:18

**experience**
10:8
60:5,11,
15 61:5
76:9,17
77:3,10

**experiencin
g**
90:15

**explain**
16:19

**extent**
66:22

———————

F
———————

**face**
13:11
42:10,11,
21,22,24
51:8,14
55:2,6,11
56:11,14,
17 79:24
80:5
81:14
91:11

**fact**
39:17
45:22,23
46:2 85:5

**factors**
78:10
83:11

**facts**
68:21,23

**fail**
70:22

**failed**
70:16
71:2,23
72:13

**fair**
18:8
35:14
39:1
43:14
71:18
76:13,15,
16 82:2

**fast**
31:2

**feet**
15:13
44:19
46:4
89:5,6

**fight**
50:8
85:12

**fighting**
12:8 15:6
19:16
81:16
82:3
85:23
89:10

**file**
24:4 67:1

**filing**
31:19

**fill**
9:11
74:18,23

**filled**
9:17
75:16,23
76:2,6
85:14

**final**
28:24
69:15
78:18
93:21

**find**
65:1

**finding**
45:21

**findings**
66:17
67:12

**fine**
14:21
26:5 31:8
82:17

**finish**
6:13,20

**finished**
69:19
70:12,14

**Fire**
12:8

**Firm**
5:12

**First-aid**
12:6

**fists**
44:19
45:18
46:3 81:7

**flailing**
43:4

**flight**
34:17
36:11,19
38:20
40:13
49:24
71:10
75:3
77:19

**flow**
83:2

**folder**
76:7

**folks**
71:5

**follow-up**
30:7
92:17
93:14

**foot**
38:9

**force**
15:1,4
19:11,14
41:20
67:23
72:19
73:9
76:20
78:4 81:6
83:16

**forearms**
53:21
54:2

**foreign**
79:10,16

**form**
13:19
24:20
35:16

36:4 39:4
76:5

**forward**
36:21

**found**
61:13
72:18,20
73:9,10
78:4,5,16

**frame**
50:10

**front**
59:2

**froze**
60:6

**full**
7:18

**full-blown**
47:10

**functions**
10:14

———————

G
———————

**gain**
42:3

**galley**
40:21
41:11
42:23
43:1
47:1,2,14
52:5
53:24
55:24
56:22
57:22,24
59:1,8
85:17
88:3,8,
12,24
90:21,23



92:2

**gasping**
82:16

**Gate**
84:17

**gather**
23:24

**gave**
43:15,22
50:14,16
51:6 93:3

**general**
10:16
15:11
19:17
31:14
42:4,5
50:10
67:9
71:22
83:8

**General's**
65:6
67:3,12
77:22

**generally**
44:14
71:12
83:6,7

**give**
10:11
11:8 15:7
31:12
43:9,12,
18 44:2
50:23

**giving**
6:24
50:21

**glitched**
42:15

**glitching**
45:5

**good**
74:6

**grabbed**
44:6
86:14,16

**grabbing**
86:3

**graduate**
17:11

**graduated**
17:18
24:9

**graduating**
18:24
20:19
22:23

**great**
6:15
25:14
30:16

**ground**
15:6,8,12
19:16
40:22
51:9,11
55:9
56:24
81:24

**guess**
23:10
32:12
50:4,12
81:11

**gun**
47:13
86:4

**guttural**
48:10

**guys**

45:4

———————

**H**

———————

**half**
74:2

**hand**
44:6
86:14,16
91:5

**handcuffed**
44:8
89:13,15
90:1,9

**handcuffing**
14:23

**handcuffs**
47:13
86:17

**handled**
53:1

**hands**
43:6,10,
15,19
51:4
53:21,23
81:7 87:1

**happen**
93:24
94:3

**happened**
51:19
55:20
84:1,2

**happy**
6:1 48:24

**harm**
89:5

**harsh**
48:11

**head**
6:8 51:11
54:7,11,
18 55:7,
12 56:12,
18,24
62:10
80:6 81:4

**health**
16:2
20:23
48:19
49:3,10,
18 52:9,
13,21
53:5,8,10

**hear**
5:24
34:21
40:11,12
42:18
47:4,9,12
48:10
71:14
82:17
85:6

**heard**
36:10
44:23
45:4 47:5

**heart**
59:11,20
60:16,21
61:6
76:10
77:13

**high**
8:9,21,23
10:12

**hip**
56:19
88:22

**hit**
44:20

**hitting**
45:16

**hold**
14:23
23:23
27:24
44:13,15
55:4,14,
18

**honest**
40:1

**hours**
22:11
66:7 67:7
75:9,17,
20

**human**
81:5

**hundred**
61:20

**hypothetica
l**
13:21

**hypothetica
ls**
13:23

———————

**I**

———————

**idea**
84:1

**ideal**
46:20

**identified**
69:11

**imagine**
60:1

**immediately**
57:13
73:18
91:17



**impair**
    7:12,13

**improper**
    83:1

**in-service**
    24:5

**incident**
    30:3
    33:17
    45:24
    64:1,2
    75:7
    77:12

**include**
    14:3

**inconsistent**
    92:23

**increasing**
    81:15
    82:1

**indemnification**
    32:6

**individual**
    33:16
    41:19,21
    47:23
    52:20

**individuals**
    68:9

**influence**
    7:11

**information**
    9:12 46:2

**initial**
    36:10
    62:17,19,
    23

**injure**
    89:5

**injured**
    30:3

**injury**
    30:2

**instance**
    42:4 67:7
    80:4

**intercede**
    17:2
    21:15

**International**
    63:14
    77:19

**internet**
    45:3

**intervene**
    48:18
    49:2,9,18

**intervention**
    21:17

**interview**
    66:6,8,
    12,15,19,
    22

**interviewed**
    65:21,24
    66:3

**interviews**
    67:4

**introduce**
    25:6
    73:20

**introductory**
    5:23

**investigation**
    9:10
    65:6,10,

    14,20
    67:13
    77:23

**investigator**
    9:14,16

**involve**
    8:10
    13:3,24
    24:24

**involved**
    33:16
    40:23
    48:14
    64:1
    83:11

**involving**
    11:1

—————————

    **J**
—————————

**Jamaica**
    7:20

**jerking**
    89:4

**Jersey**
    11:2

**Jet**
    34:17
    36:11,19
    38:19
    40:13
    62:23
    75:3
    77:19

**JFK**
    7:19
    63:13
    77:19

**job**
    6:9,10,17
    11:4

    44:12

**jog**
    67:22

**join**
    39:2

**joined**
    70:8

**Joseph**
    5:7 7:19
    25:15
    30:18
    60:10,14
    69:5
    70:11
    74:7 76:8
    79:17
    84:6,16
    92:21

**junior**
    8:24 9:2

—————————

    **K**
—————————

**keys**
    47:13

**kicking**
    43:4 86:2
    87:2 89:3

**kid**
    82:11

**killed**
    76:20,21,
    22,23
    77:1,5,15

**knees**
    41:18
    44:20
    53:21
    54:2 81:7

**knew**
    65:11

    **knowing**
    78:10
    83:21

—————————

    **L**
—————————

**lag**
    44:22

**Lagoda**
    33:13,15
    38:23
    39:3,8,11
    41:2,5,9
    42:7,9,20
    43:3,9,15
    44:4,20,
    24 45:10,
    16,19
    46:5,10,
    23 47:3,
    6,9,16,21
    48:5,11,
    14,18,19
    49:2,3,8,
    10,17,19,
    21 50:1,
    15,21
    51:1,8,
    14,18,23
    52:22
    53:5,8,
    11,12,14,
    15,17,18,
    20,22
    54:2,7,22
    55:1,5,
    11,15,18,
    21,24
    57:6,13
    58:21
    59:6 62:6
    63:4 68:2
    70:8
    72:21
    75:3,21,



76:19
77:18
78:6
80:23
83:16
85:13,19,
24 86:5,
10,12,21
87:5,9,
14,17,21,
22 88:2
89:2,9,12
91:7

**Lagoda's**
40:16
54:16
59:9
61:12
65:7
73:11
85:20
86:16
88:19,24

**laid**
58:1

**language**
40:17
79:10,16

**large**
69:23

**lasted**
66:6

**law**
5:12 10:7
11:2

**Laws**
11:16

**lawsuit**
32:8

**laying**
57:16
81:22,23

**leading**
54:6

**learned**
23:21
44:10
46:2

**leave**
58:15

**leaving**
9:8 91:23

**led**
62:17

**left**
42:12,22
43:1 44:6
58:13
64:2
86:14,16
91:10
92:1,10

**leg**
41:24

**legal**
68:24

**legs**
41:12,14
81:7,16
82:2

**length**
11:7
68:19

**lengthy**
68:18

**level**
8:9 10:12

**levels**
14:22
21:24

**leverage**
41:23
42:1,3

**life**
28:14
81:17
82:3,23
83:3

**limited**
72:6

**list**
18:18,20
20:16
27:3

**listen**
71:13

**listening**
16:11
21:9
23:13

**living**
40:6

**located**
51:8

**long**
22:11
38:17
49:24
54:10
62:7 66:5

**longer**
27:24
57:6

**lot**
5:19 9:11
50:9

**loud**
48:10

**lower**
44:7
86:15

**lungs**
83:3

**lying**

42:10,21
55:2
79:24
80:9,14,
17 81:4

---

**M**

**machine**
92:2

**made**
8:24 22:8
35:5
39:22
56:6
57:11
63:11

**maintaining**
55:17

**make**
6:10,16
31:6
35:12
50:19
57:9 60:1
63:8,9
70:9

**makes**
6:9,11

**making**
39:23
47:4
48:16

**male**
34:18
36:12,20
40:13
62:24

**males**
57:22

**mandated**
17:15

**mandates**
17:22,23

**manner**
89:4

**manual**
24:6,12,
14

**March**
9:6

**marital**
8:14

**mark**
27:9
29:9,14
31:24
69:9
73:21
76:19

**marked**
37:6 38:7
69:21

**martial**
15:9

**materials**
29:17
33:7

**matter**
5:14 25:7
26:7
27:13
29:13
30:18
32:2 70:6

**matters**
5:23 8:9

**means**
6:4 82:18

**medical**
10:16
11:4
15:24



20:21
34:18
40:14
62:12
71:4
77:13

**medically**
78:22

**meet**
9:14,15
18:14

**memo**
19:24
20:1,4,14
29:22
33:7

**memorandum**
20:6

**memory**
35:21,22
67:22
92:23

**mental**
16:2,6
20:23
21:3
26:10,20,
24 27:3
28:10

**mentioned**
20:14
22:4 64:7

**Mezzacappa**
45:13
64:8

**middle**
55:24
56:2
57:24
58:12
90:20

**midnight**

75:6,8

**midst**
41:10

**million**
35:11

**mind**
42:17

**minute**
89:20

**minutes**
50:6
58:16
84:4
89:19

**mixed**
15:9

**modules**
20:12
21:13
22:16

**moment**
76:12
89:13,15

**months**
11:8

**morning**
75:14,17

**mouse**
73:5

**move**
56:1,2,5
57:2
88:2,9,23

**moved**
90:20

**moving**
14:14
36:20
88:11

**multiple**

9:14,16
10:24
50:8
85:13

**multitude**
59:24

**muscular**
28:11

---

**N**

---

**named**
45:16

**names**
45:9

**National**
25:1,3,9,
24 26:8
27:12,16

**native**
40:16

**natural**
77:11

**naturally**
93:24

**nature**
13:8
14:24

**necessarily**
75:9

**neck**
81:15
82:2
91:3,9

**needed**
53:3

**needing**
84:19,23

**night**
75:4

83:17

**nods**
6:8

**noise**
48:16

**noises**
47:4,5,12

**nose**
55:8

**notarized**
9:17

**Note**
77:4

**notes**
70:9

**notice**
57:6,9

**noticed**
56:3 70:6
87:24
90:23

**number**
18:5
30:19
81:14

---

**O**

---

**oath**
7:1,3,24
8:4

**objection**
13:13,19
14:16
16:23
24:20
28:21
35:16
36:4
39:4,13,
20 40:3

48:7,20
49:4,11
56:15
59:12,21
60:18
61:8
63:22
64:12,21
68:3,10
70:19
72:2,15,
22 73:12
77:4 78:7
79:11
80:2,11,
19 81:8,
18 82:5
83:13,19
84:24
86:8,19,
24 87:11,
15 89:23
90:5,16
91:13

**observe**
53:13,18
87:4,8,12
90:14
91:1,7
92:3

**observed**
85:10
86:9
91:15

**obstructed**
80:7

**obtain**
9:16

**OC**
50:8 52:6
58:14,17
85:15

**occurred**
33:19



87:18

**occurrence**
94:4

**offer**
93:2

**office**
5:13  7:2
65:6
67:3,8,12
71:22
77:23

**officer**
5:7  6:24
10:1,6,13
13:11,17
14:7,15
16:21
17:14,20
18:11,22,
24  20:19
21:7,13
22:23
24:7
25:15
29:16
30:18
31:20
35:8,14,
22  36:2,
14  38:22
39:2
40:10,19
41:1,5
42:17
44:11
45:11,12,
13  53:1
54:21
57:10
58:6
60:5,10,
11,14,15
61:16,17
62:18
63:9

64:18
69:4
70:11
73:2  74:7
76:8
79:16
83:12
84:6,16,
19,23
85:1,3,
13,18,23
86:3,11
87:5,9,13
88:15,17
92:3,6,21

**officers**
14:11
37:23
38:3,11
41:8,15,
19  44:5,
24  45:9,
15  46:1,
3,13,15,
18,20
47:20
48:3,5,14
49:9,17
52:17
53:18
54:1,14
55:3,14
57:6
58:11,20
59:5  63:4
64:7  68:8
71:10
77:18
80:18
81:24
83:12
89:7

**officers'**
53:10

**one's**

81:17

**opening**
56:21

**operate**
58:15

**operative**
30:18

**opportunity**
78:12

**option**
37:14,18
38:14

**order**
52:4,7
53:24

**outset**
5:16  7:17

**outstanding**
6:19

**overtime**
34:1,3

**overview**
15:7
18:15

**owed**
21:14

―――――――――

**P**

―――――――――

**p.m.**
33:22

**PA**
26:11
27:22
28:16
69:16,21

**pads**
59:8

**pages**
68:19

**pains**
7:7

**pants**
56:8

**PAPD**
67:23
78:4

**papers**
32:6

**paperwork**
9:11,17
11:20

**Papia**
45:12
64:8
88:15

**paragraph**
69:15,18
72:24

**paragraphs**
69:24

**part**
11:9
13:10,16
15:1,3,23
44:12
45:18
46:9  57:2
61:24
65:19
88:24

**partially**
26:17

**participate
d**
20:18

**parts**
41:9

**passed**
13:2  64:3
89:13

**passengers**
51:24
85:14

**patient**
26:16
28:20
29:6

**patrol**
10:14,16
12:10
36:7,17
37:6  38:8

**penalties**
7:7

**people**
47:7
81:14
82:12
89:5,6

**pepper**
58:18
59:3
85:15

**perceived**
82:4

**perception**
82:7

**perform**
58:7

**period**
89:20,24

**perjury**
7:7

**person**
9:16
13:4,7
14:11
16:9,20,
22  21:6
40:1
41:16
47:14



52:9,14
73:16
76:10
81:13,23
82:2,9,21
83:10
93:23

**person's**
82:1 83:3

**personal**
7:10,16
37:2

**personally**
53:6
63:16

**personnel**
24:3
64:9,10,
17 67:24
68:1
70:17
71:24
72:13,20
73:10
78:5

**persons**
21:2

**phone**
24:23

**physical**
10:24
13:5,8,9
17:9 39:3
81:6
83:11

**physically**
38:23
42:2,7,9
44:24
77:18

**picked**
70:23

**pig**
82:11

**pile**
82:11,12

**pin**
43:6

**pinpoint**
34:6
48:16
50:9

**place**
51:4

**Plaintiff's**
27:10
29:10
32:1
69:10

**plaintiffs**
5:13 70:6

**plane**
40:22
42:23
43:1
47:14
51:24
52:6 57:3
58:12
59:1,2,8
62:24
63:4
85:10,12
91:24
92:3,24

**pocket**
22:18

**point**
26:13
27:2,6
28:18,20
29:5
40:23
41:1,4,8
48:17

49:1,7,16
55:5 56:4
57:5
58:13
59:17
81:1
85:21
86:6
87:4,8,12
89:11,24
90:8,12,
19

**points**
52:18

**police**
9:1,3,5,
6,9,21
10:1,3,6,
9,13,18,
22,23
11:13
12:10,20
13:12,18
17:12,15,
19,20,23
18:1,7,
11,15,23
20:19
22:17,20,
23 24:8
36:3
38:18
44:10,11
52:17
60:12,15
62:2,4
63:13,16,
21 64:18,
20 67:24
68:7
70:16
71:6,10,
14,23
72:12,19
73:9
87:9,13

88:17
89:7 92:3

**policy**
20:14
52:15

**Port**
9:21
10:2,8,
18,22
13:12,18
17:11,14,
20 18:1,
23 20:3
22:17,19
24:7
26:11
27:21
29:1 36:2
38:18
60:11
62:4 64:9
67:24
68:7
69:11
70:16
71:23
72:12,19
73:9

**portion**
88:3,12
91:12

**portions**
31:11

**position**
54:17,22
56:23
73:17
88:20

**positional**
15:15,17,
18 19:19
20:13
23:20
83:4,9

93:22

**positioned**
40:20

**Possibly**
23:9

**Powerpoint**
25:8 26:8
27:11,17
28:3

**practices**
11:13

**predisposin
g**
83:11

**preparation**
32:4
33:1,4
74:12,16

**prepare**
33:8

**prepared**
29:18

**presence**
70:9

**pressure**
81:15
82:1

**pretty**
5:19 60:1

**prevent**
29:7

**previous**
8:11,12

**previously**
7:21 18:9
50:21
88:1 93:3

**prior**
51:2 81:2



priority
    53:7

problem
    52:5

procedural
    11:2

procedure
    20:15
    52:7
    55:22

procedures
    11:3,4,
    14,18,19,
    21 52:21

process
    9:4,8,10
    13:6
    45:19
    46:4,9
    47:3
    48:12
    50:13
    51:3,7
    52:12
    54:6
    80:24
    87:6

produced
    25:7
    27:13
    30:9
    66:23,24

professiona
l
    76:9,17
    77:10

prompts
    61:2

prone
    55:8 80:5

pronounce
    35:12

prove
    39:17

provide
    9:13
    11:10
    65:19
    67:7 73:1

provided
    10:22
    13:21,23
    20:1,5
    22:17,19
    26:6
    28:19
    63:16

providing
    5:20
    11:23
    14:10

pull
    27:11
    52:11
    87:2

pulled
    75:8

pulling
    87:1

pulse
    57:14,16
    58:4,22
    61:12,13,
    17,24
    62:7 89:9
    91:20,21

purpose
    31:5
    65:9,11,
    13,18
    93:24
    94:6,7

purposeful
    94:3

purposes
    18:19

push
    87:2

put
    20:8 30:6
    43:10,15,
    19 59:8
    66:23
    85:5
    89:16

—————————

Q
—————————

question
    5:24 6:2,
    4,5,14,
    19,20 7:9
    35:19
    42:18
    48:24
    50:12,18
    55:10
    72:6 73:7
    78:18
    93:21

questions
    5:15 6:7,
    21 7:13,
    14 31:10,
    14 84:7,
    13 92:17
    93:13,14
    94:9,11

quickly
    5:21

—————————

R
—————————

radio
    36:11
    40:9,12
    62:17,23

65:2 69:3
70:23
71:5,12,
16 85:6,7

ran
    82:15

range
    10:15
    11:3
    22:14
    23:24

Rarely
    28:14

read
    26:14
    28:2,8
    31:2,4,12
    35:20
    42:16
    67:15,20
    69:7,17,
    23 73:6
    74:5,12,
    15

reading
    28:9
    70:12

reads
    28:1
    70:14

reality
    82:8

rear
    47:2 59:1
    85:12
    86:15

reason
    39:24
    40:2
    60:17
    61:10

reasons

34:12
61:5

reassurance
    14:10

reassuring
    29:3

recall
    11:6 14:5
    33:13,18
    45:9 55:2
    75:11
    85:24
    88:4
    91:10
    92:6

receive
    24:1,6
    35:2

received
    22:22
    24:18
    32:5
    36:1,14
    40:9 62:2

receiving
    24:22

recess
    45:8
    84:5,11

recognize
    25:3,15
    26:1
    31:20
    68:15
    69:5 74:7

recognizes
    25:23

recognizing
    31:7

recommendat
ions
    69:1,22,



24

**recommended**
68:6

**record**
20:6
26:15
27:21
30:5
38:19
42:16
48:2
49:16
58:17
66:23
68:18
70:5,9
74:20,23
84:4 91:6

**recorded**
66:9

**recordings**
67:3

**recovering**
29:6

**REDIRECT**
92:19

**reducing**
14:15

**reference**
34:11
46:6 50:2
52:15
62:9
63:10
67:19

**referencing**
80:4

**referring**
36:22

**refresh**
35:21,22

**refresher**
5:21

**regard**
62:3

**regimen**
60:23

**regularly**
40:8

**released**
67:11

**remember**
13:22
45:11
66:1

**remove**
53:24
55:24

**rendering**
81:2

**repeat**
6:1,3
13:15
16:16
41:17
48:21,23
74:14
94:1

**repetitive**
5:20
52:24

**rephrase**
6:3 43:13
50:19
55:10
59:15
60:13

**report**
33:7 46:7
50:3
62:10
66:2
67:11,15,

18,21,23
68:6
69:4,21
70:15
72:4,7,8,
11,18
73:8,14,
15 74:18,
24 75:16,
23 76:2,
20 78:3,4

**reporter**
6:16

**reporter's**
6:9

**reports**
29:18,20
30:1
71:21

**repositione
d**
90:22

**represent**
68:18

**represented**
66:11

**represents**
5:13

**request**
20:8 35:5

**requested**
58:11
91:23

**requesting**
20:6 35:3
36:15
63:5 92:1

**require**
23:12,16
63:12

**required**

22:3,5
44:11

**requirement**
18:10

**requirement
s**
10:24

**rereading**
72:24

**rescue**
12:18

**resisting**
43:5,11
46:23
47:23,24
51:4
81:16
82:4,7,10
86:18,22
89:3,21
90:6,21

**respect**
92:23

**respond**
35:15,18,
23 84:17

**responded**
34:23
37:23
38:3
62:16,23
64:8
84:17,19
85:8

**responding**
40:9 53:9
57:5
63:13
84:23

**response**
86:10
91:16

**responses**
7:6

**responsibil
ities**
10:13

**responsible**
64:19

**restain**
80:18

**restate**
72:9

**restrain**
28:20
39:3,8
41:16,19,
21,24
42:2 46:4
47:16,18,
19 48:4,
18 49:2,
8,17
50:1,16,
20 51:1,7
54:17,20,
23 85:19
86:17

**restrained**
49:14,21
51:12,15,
17,18,20
52:9,14
53:12,14,
17,20
54:3,5
55:1,11,
21 63:5
87:17,19
88:2

**restraining**
14:18,20
19:7
23:16,19,
20 41:6,
10,13



44:9
45:19
46:8,10,
12,14,17
47:3
48:12
53:7
80:24
83:2
86:12
87:6,14

**restraint**
19:20
50:13
51:3 83:5

**restraints**
15:16,18
20:13
23:20
54:6
93:22

**result**
83:24

**Results**
28:9

**return**
9:18

**review**
25:20
29:16,20
32:3
73:23

**reviewed**
31:22
32:13,16
33:6

**risk**
83:9

**Robert**
7:19

**roll**
57:17

89:12

**rolled**
56:19
57:1,20
88:13,21
89:14,16
90:2,9,
13,18

**rolling**
88:19
89:1

**room**
7:2 56:9,
21 57:21

**rough**
32:11
61:15

**roughly**
14:20
22:5
32:10
66:5

**routine**
10:16

**rules**
12:2

**Russian**
40:17
43:21,24

——————

S

——————

**safe**
51:23

**safely**
52:4
56:9,13

**safety**
12:17
25:1,4,9,
24 26:9

27:12,17
48:19
49:3,10,
19 52:9,
13,22
53:5,8,10

**sake**
49:15

**scattered**
52:11

**scenario**
55:17
58:10
63:17
81:20
82:4,15
88:7

**scene**
36:16,19,
21 37:24
38:4,6,20
46:12,20
49:24
51:22
58:14,16
62:8,14
63:6,20
64:8,11
65:1
70:18
72:1,14
85:8
87:9,13
92:10,12

**schedule**
5:8
34:11,14

**school**
8:22,23

**sciences**
11:11,12

**screaming**
85:14

**screen**
25:11,12
30:12,14
33:12
68:13,14
73:22

**scroll**
25:22
26:2,22
27:23
28:5,16
30:20,23
31:17
68:17
69:20
70:2 74:2
76:3

**scrolling**
31:1,5

**securing**
56:7

**seizure**
28:17
29:3
34:18
36:12,20
39:12
40:14
62:20
63:1 68:9
73:17,18
78:22
79:2,5

**seizures**
27:7,19
29:1

**series**
5:15

**served**
62:3

**service**
71:5

**services**
62:12

**sessions**
22:11

**share**
25:11
30:12
68:13
73:22

**shared**
25:12

**sharing**
33:12

**shift**
33:21,24
75:13

**shifts**
34:7,9

**shock**
59:11,16,
19 60:2,
3,13,17,
21,24
61:1,5

**shoulder**
6:8

**shoulders**
54:2

**showing**
25:19

**shrugs**
6:8

**side**
42:12,22
43:1
51:11
54:8,11,
19 55:7,
12,13
56:12,18
57:1,2,



16,19,24
80:6 81:5
88:21
89:1,12,
14,16
90:2,10,
13,18
91:10,11

**significant**
45:5
85:1,4

**significant ly**
63:20

**signify**
84:22

**signs**
86:5
90:2,14

**simultaneou sly**
52:16
57:18

**single**
22:24
23:5

**sit**
53:15
56:10
80:23

**sitting**
41:2,5,12
53:18
80:1,10

**situation**
14:8,12
22:1 40:7
51:21
52:2 82:8

**situations**
13:11,17,
21

**skills**
16:12
21:10
23:13

**slash**
28:10

**slide**
56:13,20

**sliding**
56:8

**slowly**
14:14
68:22

**sole**
78:14

**someone's**
61:17

**sort**
15:9

**sorts**
77:13

**sound**
5:19

**sounds**
42:24
47:4,5
48:10,11

**space**
46:22
47:8
57:23
88:10

**speak**
23:3
32:21,24
33:3,9
39:7
43:24
46:19
79:10,16
93:5,8,9

**speaking**
43:21
83:6,7,8

**specific**
13:10,16,
22 18:13
23:24
29:11
31:9,15
39:24
42:4
47:14
80:4

**specifically**
26:9 46:7
58:9

**spray**
50:8 52:6
58:14,17,
18 59:3
85:15

**stamp**
27:22
28:7,16
29:2

**stamped**
69:11,16,
21

**stamps**
31:19

**stand**
60:24
71:3
80:24

**standard**
17:4
21:24
60:1
75:13

**standards**
21:21

**standing**
40:23
65:3
70:22,24
71:8
80:1,10,
16 81:2

**start**
52:3

**started**
10:17
22:9 92:6

**starting**
92:4

**starts**
73:5

**state**
7:17 18:2
20:5

**stated**
78:3

**statement**
68:21,23

**statements**
65:19
67:8

**states**
16:6 21:3

**station**
36:3
64:10
71:11

**status**
8:14
26:10,20,
24 27:4
28:10

**stay**
29:6
60:23

**staying**

64:19

**step**
71:1
91:22

**steps**
53:3,4

**stomach**
42:10,11,
21 54:7,
11,18
55:2,6
79:24
80:9,14,
17 81:4

**Stony**
8:23 9:2,
8

**stop**
33:12
43:11
51:4

**strategies**
16:9
21:5,18

**strictly**
55:8

**strike**
17:6
51:12
53:13
54:15
65:22

**struggle**
83:12
85:6

**struggling**
82:21

**stuff**
52:4

**subcategory**
14:5


ESQUIRE
DEPOSITION SOLUTIONS

subject
   7:7

subsections
   77:5,8

subsequent
   63:3

subsequently
   64:5

subsets
   76:23
   77:1

suffered
   39:11
   73:16

suffering
   62:24

summary
   68:21
   69:14
   78:15

summation
   66:16

summer
   5:9

summertime
   84:9

supervision
   52:1

supervisor
   64:24
   65:4

supervisors
   58:12

sustaining
   55:14

swinging
   86:2

——————————
       T
——————————

tactics
   12:4 13:9
   15:8,12
   19:17

tag
   26:11

taking
   5:7 14:7
   52:23
   84:8

talk
   82:18
   93:15

talking
   81:21
   82:22

Tarasov
   70:7

teach
   11:3
   14:18,21
   15:6,11,
   15,20
   16:8,11,
   14,17,21
   17:1
   21:17

teaching
   11:10
   15:23

technically
   75:5

technique
   46:8

techniques
   14:1,3,
   18,20
   15:6
   19:2,5,8,

17 23:16,
19,21
44:9
46:12,14,
17 83:2

telling
   51:3
   82:16

ten
   50:5

Terminal
   84:17

terms
   5:23 14:6
   18:6
   28:18
   32:11
   46:17
   52:19
   53:3

tested
   12:23

testified
   7:21,24
   8:4 18:9
   33:10
   36:10
   50:14,21
   52:12
   55:12,22
   56:11
   77:5 78:2
   88:1

testifying
   7:3

testimony
   7:1 11:23
   12:1
   39:11
   67:6 88:4
   92:23
   93:2

testing
   11:1 13:6

tests
   12:20
   13:1,3,4,
   5 17:8

thing
   31:13
   47:11
   53:2
   74:15
   87:18
   91:19

things
   5:22
   14:23
   18:5
   52:16
   59:24

threatening
   28:14
   83:4

time
   5:8 11:7
   14:7
   18:21
   23:18
   24:2,18
   26:1
   30:13
   32:6,10,
   13 36:1,9
   38:2
   39:17
   43:3
   47:11
   48:15,22
   49:23
   50:10
   51:15
   52:18
   54:5 62:6
   64:3
   70:11

75:24
76:1
78:18
84:7,8
85:21
86:1,6,22
87:4,8,12
89:2,9,
11,12,21,
24 90:1,
7,8,9,12,
13,19
92:24
94:1

timeline
   63:24

times
   8:3 9:15,
   16 35:11
   61:15,18
   66:3

title
   9:24 10:5
   26:23
   30:1

today
   5:9,14
   7:1 33:4
   37:22
   55:22
   84:10

top
   28:6
   41:2,5,9,
   12 62:10
   82:12
   87:5

topics
   22:21,24
   23:1,4,6

tour
   36:7

Traffic



12:12,14

**train**
68:7

**trained**
61:3

**training**
11:5,24
17:15,22,
23 18:10,
14,15
19:1,4
20:12,17,
20 21:12,
20 22:11,
16,21
23:12,16,
19 24:2,
3,5,24
25:8
29:16
44:11
60:4,10,
15 61:4,
16 62:1,2
76:8,17
77:3,10

**transcript**
6:11,16,
17 48:3
63:10
66:15,19,
22 72:10

**transcripts**
67:4

**transmission**
69:3

**traveling**
37:8,9

**trial**
11:21

**trigger**
59:10

**triggered**
59:16,19
60:17

**trouble**
45:3

**trust**
39:18

**truthfully**
7:14

**turned**
54:7,11,
18 55:13
56:12,24
81:5
87:23

**turning**
69:13
91:1,7,15

**type**
5:20
84:16,21

**typically**
13:3 22:7
60:16
71:15

———————

**U**

———————

**ultimately**
49:21

**uncontrolled**
28:10

**understand**
6:2,24
7:6,12
50:11
79:9,15,
20

**understanding**

**understood**
6:5 8:13
40:11

**unhandcuffed**
56:4
57:13,15,
20 58:2
90:24
91:17,18

**unique**
68:8

**uniquely**
73:17

**University**
8:24

**unreasonable**
61:23

**unresponsive**
26:18
56:3

**unwilling**
44:17

**updated**
24:14

**upper**
43:7 86:4

———————

**V**

———————

**vacations**
84:10

**varied**
40:10

**vary**
34:5

**vehicle**

30:11

**understood**
6:5 8:13
40:11

36:24
37:1,2,4

**verbal**
16:8 21:5
43:19

**verbally**
6:8 58:11

**victim**
77:14

**violence**
23:9

**vulnerability**
68:8

**vulnerable**
73:17
78:23

———————

**W**

———————

**waist**
56:8 86:4

**wait**
6:13

**waiting**
71:6

**wake**
68:9

**walk**
65:2

**wanted**
56:1

**warnings**
43:9,18
79:9,15,
20

**water**
12:17

**wear**
37:14,18

38:14

**wearing**
37:12
38:12

**weeds**
8:8

**week**
22:13,15
34:7,10,
15

**weekly**
34:4

**weeks**
37:21

**weight**
41:15,20,
23 42:2

**wholly**
26:17

**witnessed**
46:11,16

**word**
73:5

**words**
79:9,15,
20 91:6

**work**
8:12 10:2
34:3

**worked**
75:12

**working**
33:21,22

**writing**
20:9 30:7

**written**
17:8
35:11
67:8



**wrong**
  40:6

**wrongdoing**
  78:15

**wrote**
  20:1

---

**Y**

---

**year**
  8:24 9:2
  17:11
  18:16
  22:4,7,8,
  10,24
  23:1,2,5,
  7,8
  24:18,19

**yearly**
  17:24
  18:10
  22:4

**years**
  23:22
  60:4,11,
  14 61:4,
  16 76:16
  77:2,9

**York**
  7:20 11:2
  65:5
  77:23

---

**Z**

---

**zoomed**
  30:21

