# EXHIBIT M

**In the Matter Of:**

TARASOV, ESQ. vs PORT AUTHORITY OF NY

No. 1:21-cv-06226NRB

**PAUL MEZZACAPPA**

*August 02, 2023*



800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

ALEXEY V. TARASOV, ESQ. Administrator

of the Estate of EVGENIY LAGODA, Deceased

and GRIGORY TIKHOPLAV,

                    Plaintiffs,     Civil Action

v.                        No. 1:21-cv-06226NRB

PORT AUTHORITY OF NEW YORK AND NEW

JERSEY and PORT AUTHORITY OF NEW YORK

AND NEW JERSEY POLICE DEPARTMENT

a/k/a PORT AUTHORITY POLICE DEPARTMENT

a/k/a PAPD, PAPD OFFICER MICHAEL BUGIADA,

PAPD OFFICER ROBERT JOSEPH, PAPD OFFICER

JONATHAN PAPIA, PAPD OFFICER PAUL MEZZACAPPA

and PAPD JONATHAN DURAN,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEPOSITION OF PAUL MEZZACAPPA

August 2, 2023 * 2:02 p.m.

Port Authority of New York and New Jersey PAPD

4 World Trade Center

New York, New York

Reporter:  Nancy L. LaCivita



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

APPEARANCES VIA ZOOM:


     ASHCROFT LAW FIRM, LLC

     By J. Christopher Amrhein, Jr., Esquire

     200 State Street

     7th Floor

     Boston, MA 02109

     (617) 573-9400

     Counsel for the Plaintiffs


     PORT AUTHORITY OF NEW YORK and

     NEW JERSEY PAPD

     By Cheryl Alterman, Esquire

     By Matthew Malysa, Esquire

     4 World Trade Center

     150 Greenwich Street

     24th Floor

     New York, New York 10007

     (212) 435-3431

     Counsel for the Defendants


ALSO PRESENT:

     Alexey Tarasov




                        I N D E X

EXAMINATION OF:                                    PAGE

PAUL MEZZACAPPA


  Direct Examination by Mr. Amrhein          4




                    E X H I B I T S

NO.                                               PAGE

Exhibit A     National Safety Council
              PowerPoint                          32
Exhibit B     National Safety Council
              PowerPoint                          34
Exhibit C     First Amended Complaint            37
Exhibit D     Attorney General's Report          63
Exhibit E     Use of Force Report                71

*Original exhibits retained by Attorney Amrhein.



P R O C E E D I N G S

* * *

PAUL MEZZACAPPA, having been satisfactorily identified and duly sworn by the Notary Public, was examined and testified as follows:

* * *

DIRECT EXAMINATION

BY MR. AMRHEIN:

Q.  Good afternoon.

MR. AMRHEIN:  Just like this morning's deposition, I was hoping to put on the record some stipulations.  Would the stipulations from earlier this morning be agreeable and I'm happy to put them on the record?

MS. ALTERMAN:  That's fine.

MR. AMRHEIN:  So the stipulations will be all objections, except as to form, will be reserved until the time of trial and all motions to strike are reserved until the time of trial.

And, Cheryl, 30 days, read and sign, however many days your client needs and we're happy to waive the notary requirement.

MS. ALTERMAN:  Okay.



Q.  Good afternoon, Mr. Mezzacappa.  Am I pronouncing that correctly?

A.  Yes.

Q.  Great.  My name is Attorney Chris Amrhein.  I'm an attorney with Ashcroft Law Firm here in Boston.  Our firm represents the plaintiffs in this matter, and today I'm going to be asking you a series of questions.

Have you ever been deposed before?

A.  No.

Q.  I'm going to go over a few introductory matters to lay out a few things at the outset.

First, if you cannot hear one of my questions, let me know, and I'm happy to repeat it for you.

And, second, if you don't understand one of my questions, let me know and I will rephrase it for you or I'm happy to repeat it for you.  If you do answer a question, is it fair to assume you understood the question?

A.  Yes.

Q.  Please answer all questions verbally and avoid any physical responses like shaking your head or shrugging your shoulders.  And that is so



the stenographer can record your answer and make the stenographer's life as easy as possible.  And in that same vein, if you can wait until I finish asking a question before you begin your answer.

I know it's easy to anticipate where questions may go especially in colloquially conversation or even in questions.  But it makes the stenographer's job easier and the transcript cleaner if we just have a question/answer period.

Finally, if you need to take a break, let me know.  All I ask is if there is an outstanding question before you, answer the question in full and then we can hop off the record and take break.

Are there any questions you have about what I said so far?

A.  No.

Q.  Do you understand you're giving testimony under oath even though you're in an office or conference room, it's just as if you were testifying in court?

A.  Yes.

Q.  Do you understand your responses are subject to the penalties of perjury?



A.  Yes.

Q.  This is not a personal question.  We ask it of every deponent.  So it's not anything personal to you.

Are you under the influence of anything that would impair your ability to understand my questions or impair your ability to answer my questions truthfully?

A.  No.

Q.  Again, it's nothing personal.  Can you state your full name and address?

MS. ALTERMAN:  Objection to form.

A.  Officer Paul John Mezzacappa, JFK Building 269, Jamaica, New York.

Q.  And even though you testified earlier that you have not been deposed before, have you testified under oath before?

A.  No.

Q.  What's your marital status?

A.  Married.

Q.  Do you have children?

A.  Yes.

Q.  Can you briefly describe your educational background after high school?



A.  I went to St. John's for four years for a degree in Homeland Security.  Then I attended the police academy for six months when I was hired.

Q.  What year did you graduate from St. John's?

A.  2013.

Q.  Did you immediately go into the police academy after graduation?

A.  About a year later, 2014.

Q.  So police academy was in 2014; fair to say?

A.  Correct.

Q.  Officer, are you presently employed?

A.  Yes.

Q.  Who is your employer?

A.  Port Authority of New York New Jersey.

Q.  What title do you have currently?

A.  Police officer.

Q.  Did you work for the Port Authority Police Department in 2019?

A.  Yes.

Q.  Was your title police officer in April of 2019 as well?

A.  Yes.



Q.  Did you have any law enforcement experience before you started with Port Authority Police Department other than your education from St. John's in Homeland Security?

A.  No.

Q.  You stated that you attended the Port Authority Police Academy in 2014.  Did you graduate in 2014 as well?

A.  Yes.

Q.  Can you give me a brief rundown of the curriculum from start to finish.  You said it was about six months.  I guess I can ask you specific questions to make it easier for you.

In terms of curriculum, did the police academy cover behavioral sciences?

A.  Yes.  In terms of behavioral sciences, if that falls under First-Aid, we received that.

Q.  How about police practices and procedures?

A.  Yes.

Q.  Laws of arrest?

A.  Yes.

Q.  Court procedures?

A.  Yes.



Q.   How about offering testimony under oath?

A.   Yes.

Q.   Rules of evidence?

A.   Yes.

Q.   Defensive tactics?

A.   Yes.

Q.   I know you said First-Aid.  Did it cover police patrol and traffic duty?

A.   Yes.

Q.   Did you take any tests at the police academy?

A.   Can you repeat that?

Q.   Did you take any tests at the police academy?

A.   Yes.

Q.   How often were you tested?

A.   Several times a week for different subjects.

Q.   Was part of the curriculum specific situations that you may face as an officer at the Port Authority Police Department?

A.   Yes.

Q.   I'm going to touch on a few things and quickly go through them.  In terms of what the



curriculum may have covered beyond just the general topics we discussed just a few moments ago, did the curriculum when you were at the police academy cover deescalation techniques?

A.   Yes.

Q.   Can you briefly describe what deescalation techniques it covered?

A.   Deescalation could involve giving verbal commands, your command presence, distance and space, tone, the subject's behavior and judging the way to react to different behaviors displayed by the individual based on their aggression level and the totality of the circumstance.

Q.   Did diffusing techniques fall under the category of deescalation techniques, or was that a separate part of the curriculum?

A.   It sounds like the same thing.

MS. ALTERMAN:   Don't guess.

Q.   Typically did the academy teach you diffusing techniques?

A.   I don't recall.

Q.   Did they teach you restraining techniques?

A.   Yes.



Q.   What are a few restraining techniques that the police academy taught you?

A.   We are taught to restrain an individual with handcuffs behind their back.

Q.   Did they teach you about compliance holds?

A.   Yes.

Q.   What do the compliance holds involve?

A.   Compliance holds can be used on the subject's arms and legs in order to gain compliance.  It could be holding an arm or leg in a certain position to stop the individual from moving, fighting in order to gain compliance whether that is from immobilizing them or changing the subject's mind into complying.

Q.   As a part of teaching you about restraining techniques, did they also teach you about improper restraining techniques?

A.   Yes.

Q.   Can you briefly elaborate as to what improper techniques they alerted you to at the police academy?

A.   An improper technique would be involving a neck or head.  You're not supposed to touch any



PAUL MEZZACAPPA                                          August 02, 2023
TARASOV, ESQ. vs PORT AUTHORITY OF NY                    13

of that due to the safety of the subject.

Q.  Did they teach you about use of force?

A.  Yes.

Q.  Did they also teach you about use of deadly force?

A.  Yes.

Q.  Can you tell me what they taught you about use of force and use of deadly force at the police academy?

MS. ALTERMAN:  Objection to form. You can answer.

A.  In the academy, it was the use of force pyramid, transition to the use of force continuum. In the use of force pyramid, it was escalating scale based off of man presence and giving verbal commands.  And then it was escalation to physical force.

From there, it could be mechanical force such as baton and pepper spray and deadly force would be the highest.  It was taught you're only to use the minimum amount of force to gain compliance.  And this was determined by the subject's aggression level, violence, their demeanor.



800.211.DEPO (3376)
EsquireSolutions.com

Q.   Did they teach you about defensive tactics including ground fighting techniques?

A.   Yes.

Q.   How about positional restraints and compressional asphyxiation?

A.   In the academy, we were taught to place an individual in cuffs.  And then once they are in cuffs, you are to roll them on to their side or sit them up as soon as possible in terms of their position.

Q.   Did the academy teach you about dealing with medical crises?

A.   Yes.

Q.   In particular, did they teach you about dealing with mental health crises or folks with altered mental states?

A.   Yes.

Q.   Specifically in the category of dealing with people in the mental health crises or altered mental states, was part of the curriculum to proceed with caution and diffuse the situation at the outset?

A.   Can you repeat the question?

(Record read.)



A.   If an individual is in an altered mental state, the caution would be based off their actions.  So everything is always based on totality if the individual is able to be convinced through deescalation tactics to -- if the individual is convinced through deescalation tactics to comply, then, yes, we are to use minimal amount of force.

Q.   Did they teach you about verbal strategies and active listening skills at the academy?

A.   Yes.

Q.   Did they go over duties officers owe to the civilians and the people they respond to?

A.   Yes.   Our job is to protect life and the patrons of our facility is our main goal.

Q.   Did they teach you about duties as an officer to intercede when an officer perceives another officer is acting improperly?

A.   Yes.

Q.   What specifically do you recall about your time at the police academy did they teach you about duties to intercede?

A.    If an officer uses excessive force, we



would report it to the supervisor immediately if that occurred.

Q. Did they teach you about interceding as the -- in your example, excessive force is being used as opposed to waiting until after the excessive force was used?

A. Yes. If you're on a scene and an officer is using excessive force, we would intercede if that occurred and then afterwards report to the supervisor.

Q. Thank you for the clarification. Did they teach you about standard of care and the varying levels depending on the situation and totality of the circumstances you described?

A. Yes.

Q. What are the various levels of standard of care, in your opinion, based on what you learned in the police academy? What are the categories for those levels?

A. I'm not sure I understand.

Q. I can try and rephrase that for you to make it a little bit clearer. Did they teach you about standard of care in the police academy?

A. I don't recall if it was phrased that



way.  I'm not really sure.

Q.  Are there certain duties of care owed to a person based upon a mental health crises versus a person who is not?

MS. ALTERMAN:  Do you understand the question?

A.  I don't understand the question.

Q.  I can rephrase it to clarify it.  Is there a specific standard of care that you are to apply generally in an average typical situation?

A.  Our job is to respond to a medical and to respond, talk to the individual, get their medical condition, issue care if it's something severe or if it's something minor, call for EMS, if the individual requires a medical bag, it is nearby and bring them to the hospital or apply First-Aid as required.  Is that what you're asking me?

Q.  Are there situations where there is a heightened standard of care based on what you learned at the police academy?

A.  I still don't understand.

Q.  Are there situations that there is a heightened standard of care owed by a police officer to an individual citizen that requires a



higher standard of care?

A.   If an individual has a more severe condition such as a heart attack, the severity of the job would obviously increase and you would use CPR, for example, on oxygen, if they require that until EMS arrives and are able to offer additional care.

Q.   You mentioned heart attack.  What about if somebody is attempting suicide.  Would that be a standard -- higher standard of care?

A.   Sure.

Q.   What about someone suffering a seizure, would that be a heightened standard of care?

A.   It would be more serious than something simple as not feeling well or something.

Q.   When you took tests at the police academy, were those tests written or physical demonstrations or perhaps both?

A.   Both.

Q.   There were times where you were required to physically demonstrate in the presence of an instructor what was being taught to you in order to, say, pass a test?

A.   Yes.



PAUL MEZZACAPPA                                    August 02, 2023
TARASOV, ESQ. vs PORT AUTHORITY OF NY                        19

Q.   What year did you graduate from the police academy?

A.   2014.

Q.   I realize I asked you that before.  I should have skipped over that one.

As an officer for the PAPD postgraduation and in your capacity as a police officer for the Port Authority Police Department, is there a mandated training you must complete?

A.   We have annual in-service that we attend.

Q.   Who or what mandates those annual training requirements?

A.   Different training points are mandated through the state.  Some of it is through job.

Q.   Are those training courses done on line, done in person?

A.   It was mostly on line.  Ever since COVID, there has been on-line training.

Q.   As far as the training, do you have to take tests in order to pass the training?

A.   Yes.

Q.   Do they update based on your understanding and experience?  Do they recycle the old training or do they provide new updated



formats and tests?

A.   New updated material.

Q.   Do they provide a certificate every time they require training?

A.   I have never seen a certificate except for CPR where we receive a certificate.

Q.   Is it fair to say it would be most important to have confirmation that you completed the training so that your employer would be aware you checked the required box?

MS. ALTERMAN:   Objection to form. You can answer.

A.   I don't understand what you mean, but the training received is updated and some of it exceeded the state and local requirements.

Q.   In terms of training that you participated in in your capacity as an officer with the Port Authority Police Department, I'm going to go over a few things, a very similar list, with respect to what it covered after you graduated from the police academy and now that you're an officer.  These training modules, do they cover deescalation techniques?

A.   Yes.



Q. Do they cover diffusing techniques?

A. Yes.

Q. Are those similar principles and lessons in terms as to what you learned in the police academy?

A. There is new material every time we go.

Q. What, for example, has been new material you have not learned at the police academy about deescalation?

A. Usually different scenarios. A lot of it are body cam's. We see a lot of recent events that are included in the training. That's how it is different.

Q. How about diffusing techniques?

A. Same.

Q. How about restraining techniques?

A. That has changed with the laws that have been passed.

Q. Can you describe those changes, please?

A. The New York City laws requiring officers to -- not allow officers to compress on an individual's diaphragm. We received updates on that.

Q. Approximately when did that update come



out?

A.   2020.

Q.   You said compress an individual's diaphragm?

A.   Correct.

Q.   How would one do that?

A.   If an individual was sitting on a subject's chest.

Q.   If somebody were to apply force with forearms or shoulders on someone's back, could that too apply pressure to a person's diagram?

MS. ALTERMAN:  Objection.  You can answer.

A.   Well, in regards to what happened on April 12, 2019, the incident that I responded to, there was --

Q.   My question is just limited -- it is specifically limited to what I asked about your training.

(Record read.)

MR. AMRHEIN:  I note that Cheryl objected to that question.  So please renew that objection.

Q.   Sir, can you answer the question?



A.  As far as my understanding is, the law is restricted to sitting and placing your body weight on the person.  I can't say specifically if it applies to simply touching their back.  If that is what you're alluding to, I can't say.

Q.  But applying body weight, does fall into the category of restricted behavior?

A.  Yes.

Q.  Did the training module say -- that you went through as a police officer -- did it cover the use of force and deadly force?

A.  Yes.

Q.  Was it pretty consistent with what you learned at the police academy and what you testified to today or have there been updates?

A.  There were updates.  When I was in the academy, I learned use of force pyramid and it switched to use of force continuum.

Q.  Can you describe that?

A.  Use of force continuum, instead of it being a pyramid where it looks like a linear path for escalating force, it is more of a -- the diagram is more of a web where you have your different options required where it does not



restrict it to a linear chart.

So it's more frequent flowing and it goes with the idea that things are always changing and to go with the totality where you don't necessarily need to follow a linear path and to use the tools at your disposal and use minimal amount of force to get someone to comply.

Q. Based upon your understanding of this continuum update, does that narrow or expand an officer's ability to use force or deadly force compared to the original linear teaching's you had received at the police academy.

A. The tools at your disposal, your options are still the same. It's just a different way of processing the use of force.

Q. During the training you have received in your capacity as a police officer for the Port Authority Police Department, did it discuss positional restraint and compressional asphyxiation?

A. In terms of positional restraints, we were taught after you restrain an individual, if they are restrained on the ground and they're rear cuffed, you have to roll them over as soon as



possible.

MS. ALTERMAN:  Can we take a two-minute break?

(Recess taken.)

Q.  Did you have any discussions during the break with your counsel?

A.  No.

Q.  Did you have any discussions with anyone in the approximately three-minute break that was requested by your counsel?

A.  No.

Q.  Sir, you do understand that here today you're testifying under oath?

A.  Yes.

Q.  Is that a yes?

A.  Yes.

Q.  In your capacity as a police officer for the Port Authority Police Department and the training you received as required by both the state and your employer, did they teach you about duties to intercede as well as other duties owed by an officer?

A.  Yes.

Q.  Are these duties consistent with what you



described the police academy taught you based on their curriculum or have there been updates and new things learned based on the training you received in your capacity as an officer?

A.  I don't recall the changes or updates specifically.

Q.  Do those training modules and texts cover intervention strategies?

A.  Can you elaborate further?

Q.  Let's say do they cover intervention strategies when dealing with someone with a mental health crises or an altered mental state?

A.  Yes.

Q.  Can you tell me about what those intervention strategies would be specifically in a situation of a person with a mental health crises or dealing with an altered mental state?

A.  Strategies for dealing with an emotionally disturbed person or dealing with somebody with an altered state, meaning, verbal commands, trying to speak to them on their level, if possible, verbal commands.

When possible, try not to incite the individual up further by police sirens and lights.



If the individual is not a threat to themselves or others, you can judge based on how much time you have.  Try to call more support, other officers on the scene, if you have the time, in order to keep the situation controlled.

Q.  I just want to make sure you have the opportunity to finish.

A.  I'm done.

Q.  Do you take training classes in your capacity as a police officer for the Port Authority Police Department on the varying standards of care?

A.  I still don't understand particularly the standards of care, the way it is phrased.  You might phrase it a little differently.

Q.  How would you phrase the term standards of care in the language of police training?

A.  I don't -- I can't define something I don't understand the meaning.

Q.  You don't understand what the words standard of care means?

A.  I'm not sure exactly what you're -- you mentioned it before -- in terms of if you're referring to how we handle First-Aid and



responding to a medical emergency.

Q.  Would perhaps a more applicable term or a more understandable term for you to be duties of care or duties owed to a person?

A.  I don't know.  I'm not really familiar with this term.  I understand how we would respond to medical.  I'm not really familiar with the way it's phrased or it's not really coming to me.

Q.  I just want to make sure this is as clear as possible for the record.  So I'm going to rephrase or repeat my question.

In your capacity as a police officer for the Port Authority Police Department, did you take any training classes on the standard of care that the police officer owes to individual civilians?

A.  We received First-Aid and medical emergency training.

Q.  What about duties owed to civilians?

A.  Our job is to protect life and property. So our duty is to protect life.

Q.  How often -- you said roughly once a year or maybe even more often.  Is that how often typically you would have to take those training



courses?

A.  I don't recall how long we take the different refreshers for responding to medical emergencies and blood borne pathogens.  I don't remember off the top of my head if CPR is -- I believe it's once a year.

Q.  Would it be fair to say some training courses or refreshers like CPR may be once a year and others may be once every two years or every three years?

A.  It's generally once a year, but I can't recall specifics.

Q.  That's fine.  It's okay.  I'm just generally gauging how often they require this training from you.  If you don't remember the exact specifics, we can move on.

In terms of those courses that provide training, were they eight-hour sessions for each individual topic, or was it an eight-hour class that covered a laundry list of things such as restraining techniques, use of force or defensive tactics or mental health crises?

A.  It varied.  Most courses would be two hours long, two, three hours.



Q.  Would it be narrowly focused on a particular subject?

A.  It would be an eight-hour day and it would be different subjects.

Q.  Did you receive an employee manual when you became a police officer for the Port Authority Police Department?

A.  Yes.

Q.  Generally speaking, what does that manual cover?

A.  Different police orders ranging all different topics of policing.

Q.  How often do you receive an employee manual?  Is it something given out to each individual officer once a year?

MS. ALTERMAN:  Objection to form.

A.  You receive a big manual when you're in the academy, and we receive different orders and updates throughout the year digitally now.

Q.  When was the last time you received an employee manual?

A.  We don't have paper manuals anymore.  I don't recall the last time I received a paper manual.



Q.   When was the last time you reviewed your employee manual?

A.   I received an update for use of force last month.

Q.   Did you review it?

A.   Yes.

Q.   Roughly speaking, when was the last time before use of force update to the manual?

A.   I don't recall.  Probably a few months ago.

Q.   I didn't catch that.

A.   A few months ago.

Q.   In your capacity as an officer for the Port Authority Police Department, are you tested based upon your knowledge of the employee manual?

A.   As part of in-service, they will include the orders detailed in the training that would apply to the subjects we learned.  And then there will often be a question or two in the following test about that.

Q.   Do you know if that employee manual in past iterations has been produced in discovery?

A.   I don't.

MR. AMRHEIN:  Cheryl, I will put on



the record we will formally request any copies of employee manuals within the limitation of years, of course, but I will put that in writing.

Q.  Officer, did any of your training involve the National Safety Council?

A.  I don't recall.

Q.  Have you heard of the National Safety Council before?

A.  I believe it has to do with First-Aid.

Q.  Do you know if Port Authority contracts with the National Safety Council to provide training to Port Authority Police Department officers?

A.  I don't recall.

Q.  Have you ever seen any of the National Safety Council materials?

A.  I don't know what the First-Aid and CPR, what the source was.

Q.  I'm going to put up on the screen a PowerPoint from the National Safety Council and we will mark it as Plaintiff's Exhibit A.

I will share my screen.  So bear with me a second.  Just let me know whenever it appears on your screen.



MS. ALTERMAN:  We see it.

Q.  Officer, have you ever seen this document?  I will scroll through it.  Do you recognize this document?

A.  I don't know if this is what we received in-service or the Port Authority instructors put it on our own PowerPoint.

Q.  I will note this is a document produced by defendants in this matter, in particular, Bates stamped PA 2064 through 2068.

This is a cover page entitled "Altered Mental Status."  And, again, this is from the National Safety Council and produced by the defendants.

I will give you the opportunity to read through this right now and tell me when you're done with each page, please.

A.  Okay.

Q.  That is the document in its entirety.  I just want to direct your attention to Bates stamp PA 2065 which is the second page of this PDF.

And this is under "Altered Mental Status."  Am I correct that the second bullet point says, "Patient may be confused, disoriented,



combative, drowsy or partially or wholly unresponsive."

A. That's what it says.

Q. I'm going to take you to the third page of this document which is PA 2066. The title of this page is "Common Causes of Altered Mental Status." Can you tell me what the first bullet point says?

A. "Seizures."

Q. I'm going to introduce another National Safety Council PowerPoint that, again, has been produced by defendants in this matter and I will share my screen and have you read through the document in its entirety. Let me know whether you're able to see it.

A. Okay. It's on the screen.

Q. So this is a National --

MR. AMRHEIN: This is going to be marked as Exhibit B. This is another National Safety Council PowerPoint produced by defendants in this matter specifically entitled "Seizures." It is PA 2029 for the Bates stamp through 2095.

I want to give you an opportunity to read through this and alert me to when you're



finished reading an individual page, please.

A.   Okay.

Q.   That's the last page.  I'm just going to direct you to Bates stamped PA 2083 which is the second page in this PowerPoint from the National Safety Council.

Am I correct that the third bullet point on this page which is entitled "Seizures" says "Result in altered mental status, slash, uncontrolled muscular contractions?"

A.   Yes.

Q.   Am I correct the last bullet point says, "Rarely life threatening, but a serious emergency?"

A.   Yes.

Q.   Going to bring you down to PA 2095 -- sorry -- 2093.  This is with regard to Emergency Care Procedures.  Is that the title of this page, sir?

A.   Yes.

Q.   Does the last bullet point say "Don't restrain patient?"

MS. ALTERMAN:  Just for the record, it's the second to last bullet point.

Q.   Does the second to last bullet point say "Don't restrain patient?"

A.   Yes.

Q.   Next page, PA 2095.  Does the second bullet point say "Be reassuring after a seizure?"

A.   Yes.

Q.   Third bullet says, "If recovering patient is agitated or angry, stay back but prevent any dangers."  Is that what the third bullet point says?

A.   Is that your question?

Q.   My question is, does the third bullet say "If recovering patient is agitated or angry, stay back but prevent any dangers."  Is that what it says?

A.   Yes.  It says, "Prevent any dangers."

Q.   Did you review any training materials in advance of this deposition?

A.   No.

Q.   What materials did you review in advance of this deposition?

A.   A handwritten memorandum form, my memo book, my use of force report and my personal injury 360 form.



MR. AMRHEIN:  I'm going to introduce what is going to be marked as Exhibit C.  It's going to be the First Amended Complaint.

And, Cheryl, I will go through it quickly as I did earlier so just --

MS. ALTERMAN:  That's fine.  Are we remarking these or using the initial deposition exhibits as exhibits for both?

MR. AMRHEIN:  I think we can probably keep them separate just to make it as easy as possible because there will be different documents used.

If, at the end, we realize it may be best to go with the uniform method, that is fine, but for now, I think we can individually mark them.

Q.  Let me know when that is on your screen.

A.  It's on the screen.

Q.  So this is -- it shows Exhibit A at the top.  You will see it shows the case number, the docket number 1-1.

And I will represent to you it shows the summons to the officers and the defendants in general.  And then it shows -- then it is the



First Amended Complaint and it's full length including attorney verification, Exhibit A and Exhibit B and Exhibit C?

Sir, do you recognize this document, the First Amended Complaint?

A.   I remember receiving this in the mail.

Q.   When you received it, roughly when was that?

A.   I don't recall.  A few years ago.

Q.   Have you reviewed it in full?

A.   I read it at the time of receiving it.

Q.   Roughly when was the last time you read this complaint?

A.   When I received it.

Q.   Did you ever go over this document with your attorney?

A.   No.

Q.   Did you ever go over this document with anybody else?

A.   No.

Q.   Did you speak with your attorney in preparing for this deposition?

A.   Yes.

Q.   Did you speak with anyone else in



preparation for this deposition?

A.  No.

Q.  I'm not asking what was discussed, but when did you speak with your attorney in preparation for this deposition?

A.  July.

Q.  Can you give a rough date?

A.  Middle of July.

Q.  Did you speak with your attorney today about the deposition?

A.  No.

Q.  You didn't speak with your counsel at all before your deposition today?

A.  No.

        MS. ALTERMAN:  Just a yes or no.

Q.  The topic of conversation or what was discussed is between you and counsel.  I'm simply inquiring whether you spoke with counsel today before your deposition.

A.  We spoke when I got here.

Q.  Sir, do you recall the name Evgeniy Lagoda?

A.  Yes.

Q.  Who is Evgeniy Lagoda?



A.   The individual who suffered a seizure in April 2019 that I responded to.

Q.   Just, general speaking, do you recall the event that occurred on April 12, 2019?

A.   Yes.

Q.   What shift were you working that day?

A.   I started working the 2 to 10 afternoon shift, and then I was staying for overtime, the 10 to 6 shift.

Q.   How many days a week were you working at that time?  Was it five days a week?

A.   Four on, four off.

Q.   Are those your typical shifts, 2 to 10 four days a week with a potential for overtime?

A.   Yes.

Q.   How often do you work overtime?  Just a general estimate is fine.

A.   I remember at the time, I think it was 10 to 15 hours a week overtime.

Q.   Are you aware that a Jet Blue flight at JFK International Airport called in a medical emergency for a male having a seizure on board?

A.   Yes.

Q.   Did you hear that call?



PAUL MEZZACAPPA                                              August 02, 2023
TARASOV, ESQ. vs PORT AUTHORITY OF NY                                    41

A.  I heard it over the radio.

Q.  Do you know who first responded to that call?

A.  Officer Bugiada.

Q.  Is that Officer Michael Bugiada?

A.  Yes.

Q.  Did you eventually receive a call from Officer Bugiada requesting additional assistance in attending to the male having a seizure on board?

A.  I heard Officer Bugiada dispatched to the call briefly later.  He was screaming over the radio that he needed help, that he was in a fight over the radio.

Q.  So am I correct you understood Officer Bugiada was the officer dispatched to the flight with a male having a seizure on board?

A.  Yes.

Q.  And then you heard over the radio that Officer Bugiada was requesting for additional assistance?

A.  Yes.

Q.  How did you get to the scene?

A.  I ran into a RMP and someone drove us.


ESQUIRE
DEPOSITION SOLUTIONS

Q.  You ran into a what?

A.  A marked police vehicle.

Q.  Was that a vehicle assigned to you, or are they generally available for Port Authority officers?

A.  I had a partner.  We were at different posts.  He had the keys to the car.  When the call for help went over, I ran briefly to the back of the vehicle and just jumped in the first available vehicle.

Q.  Was your partner -- you said assigned to a different post -- so he was not one of the officers who responded to this call?

A.  We were at building 269, our police command, on break for that time.  I don't know where he was.  We were both in the break room.  I just ran straight to the back building and jumped in the back of the first car that I saw people in the driver's seat.

Q.  What is name of your partner?  What was the name of your partner at that time?

A.  Matthew Gilhooley.

Q.  Were you wearing a body cam when you responded to the scene?



A.   No.

Q.   Do you have the option to wear one?

A.   No.

Q.   Did other officers respond to Officer Bugiada's call for additional assistance to attending to the male at the scene?

A.   Yes.

Q.   Do you know the name of the officer who responded with you?

A.   I don't remember who within my vehicle, but I remember the people around me who were on scene.

Q.   Do you know if the other officers who responded to the scene -- and, for the record, when I say scene, is it understood that I'm talking about that Jet Blue flight where Evgeniy Lagoda suffered a seizure and Officer Bugiada responded to the scene and additional officers were called.

         Is it fair to categorize it as the scene?

A.   Can you repeat that?

Q.   Just for the purpose of this deposition, if I say the scene, is it fair that you understand



that to mean the Jet Blue flight where Evgeniy Lagoda suffered a seizure an officers responded; is that fair?

A.  Yes.

Q.  Sorry if I already asked this before, do you know if other officers wore body cam's to the scene?

A.  None of us had body cam's.

Q.  Is that because you didn't have the option.  They were not available to you?

A.  That is correct.

Q.  Just approximately, how long did it take you to get from the police command to the Jet Blue flight?

A.  I don't recall the exact specifics, but it was a few minutes.

Q.  When you arrived at the scene, did you board the front or the back of the plane?

A.  Front.

Q.  When you arrived, did you see Officer Bugiada physically engaged with Mr. Lagoda?

A.  When I arrived on the scene, I was behind the other officer.  We ran straight back down the aisle of the plane.  It was chaotic.  People were



screaming and yelling.  I followed everyone straight to the back.

When I got there, Officer Bugiada, Officer Papia, Officer Joseph were on the sides of Mr. Lagoda's arms trying to place his arms in cuffs.

Q.  Was Mr. Lagoda standing or prone on the ground face down at that time?

A.  He was already laying on the ground.

Q.  And that is on his stomach face down?

A.  Yes.

Q.  Would it be fair to say your first action upon boarding the flight was to join Officer Bugiada in trying to physically restrain Mr. Lagoda?

A.  Yes.

Q.  Did you speak with anyone on board the flight before you tried to restrain Mr. Lagoda?

A.  No.

Q.  Were you aware Mr. Lagoda's native language was Russian?

A.  No.

Q.  When you first saw Officer Bugiada, how was he positioned?



A.   He was to the side by -- on the ground crouched trying to grab his arms, place them in cuffs.

Q.   Was this in the galley or the aisle?

A.   This was the back galley.

Q.   Was Officer Bugiada ever sitting on Mr. Lagoda?

A.   No.

Q.   Was Officer Bugiada ever placing forearms or shoulders on the back of Mr. Lagoda?

A.   No.

Q.   Did you physically engage Mr. Lagoda?

A.   I held his legs down with my hands.

Q.   With your hands?

A.   With my hands.

Q.   You didn't use a baton to hold his legs?

A.   No.

Q.   When were you holding Mr. Lagoda, as you said, he was laying face down on his stomach; am I correct?

A.   Yes.

Q.   Do you recall -- and if you don't, it's okay.  Do you recall which leg you were restraining?



A.   I recall holding down his right leg.

Q.   Were you putting Mr. Lagoda in what could be called a compliance hold?

A.   Yes.

Q.   Were his legs, say the shin of his leg, being pushed back towards the buttocks so the heel was connecting to the buttocks?

A.   No.

Q.   Can you describe it for me?

A.   I was holding his leg on the ground with my hands.

Q.   Was his leg bent at all, or was it just up against the ground?

A.   His leg was touching down along the ground.

Q.   Officer Mezzacappa, when you were administering a compliance hold on Mr. Lagoda, his legs were straight and parallel with the ground; is that correct?

A.   That is correct.

Q.   Was Mr. Lagoda attempting to kick and flail his limbs when being restrained?

A.   Yes.

Q.   Did you give any warnings to Mr. Lagoda?



A.  I did not give any warnings, but other officers that were on the scene were yelling to give his hands -- give us your hands, relax.

Q.  Did you give any commands to Mr. Lagoda?

A.  I did not.

Q.  Am I correct your testimony is you heard other officers giving commands to Mr. Lagoda?

A.  Yes.

Q.  Did you hear any officers give Mr. Lagoda any warnings?

A.  What type of warnings?

Q.  Any warning.

A.  No, not at the time.  There were no warnings there.

Q.  Were the officers speaking Russian when they gave commands to Mr. Lagoda?

A.  No.

Q.  Do you speak Russian?

A.  No.

Q.  Were the commands given in English?

A.  Yes.

Q.  Did you ever hit Mr. Lagoda?

A.  No.

Q.  Did you witness other officers physically



engage Mr. Lagoda?

A.   No.   Other than placing his hands in cuffs and Officer Duran had his other leg in a compliance hold.

Q.   Would you describe that as physically engaging a person?

A.   Yes.

Q.   I will repeat the question.  Did you witness other officers physically engage Mr. Lagoda?

A.   Yes.

Q.   Do you recall which officers hit Mr. Lagoda?

A.   I didn't witness anyone hit Mr. Lagoda.

Q.   It's your testimony here today no officer punched Mr. Lagoda?

MS. ALTERMAN:  Objection.

A.   I did not see anyone punch Mr. Lagoda when I was on scene.

Q.   Did you ever learn after the fact any officers punched Mr. Lagoda?

A.   All I knew was Bugiada was in a fight.

Q.   Are punches typically used in fights?

MS. ALTERMAN:  Objection.  You can



answer.

A.   It's part of the use of force, it can, or it could be hustling, grappling, shoving.

Q.   Besides the compliance hold you referenced in, I believe -- was it Duran or Papia who was assigned to the other leg?

A.   Officer Duran was on the other leg.

Q.   And you mentioned he was also doing a compliance hold; am I correct?

A.   Yes.

Q.   Besides those two restraining techniques, what other restraining techniques did you witness the other officers employ?

A.   Joseph and Papia were grabbing his arms and trying to place them behind his back so they could place him in handcuffs.

Q.   In the process of restraining Mr. Lagoda, did you hear him make any noises or sounds?

A.   I heard him yelling loudly.

Q.   Would you classify that as guttural sounds, harsh low sounds, wails even?

A.   No.  He was screaming.

Q.   Were officers using their body weight in the process of trying to restrain Mr. Lagoda?



A.  No.

Q.  At no point, no officers used any body weight to restrain Mr. Lagoda?

A.  No, just in terms of getting his arms behind his back, not leaning on him or applying their weight down on to him.

Q.  Is it possible to do a compliance hold without using any of your body weight?

A.  What I saw was the officer use their arms to place his arms behind his back.  They were forcing his arms using the weight of their body to push him other than just using their arms to put his hands together to cuff.

Q.  I appreciate your answer, but it was not what I was asking.

Is it possible to do a compliance hold without using any body weight?

A.  I don't know.

Q.  You don't know?

A.  I don't understand the question.

Q.  I will repeat it.  Is it possible to put someone in a compliance hold without using any body weight?

A.  For me, I was holding his arms and leg



down with my arms.  So that includes body weight behind my arms.  Is that what you're referring to?

Q.  My question is a simple yes or no question.  And I do remind you that you're testifying here under oath today.

Is it possible to do a compliance hold without using body weight -- any body weight at all?

A.  I guess not.  Your arms are connected to your body, generate force.

Q.  At any point during the attempt to restrain Mr. Lagoda, did you intervene because of concerns for the health and safety of Mr. Lagoda?

A.  I didn't witness any excessive force or any unsafe conditions while we were using reasonable force as anyone that was resisting actively in order to gain control of the situation.

Q.  You're saying at no point you intervened for any concern of Mr. Lagoda's health and safety?

A.  Yes.

Q.  Am I correct Mr. Lagoda was ultimately restrained?

A.  Yes.



Q.   Roughly speaking from the time you arrived on board the flight at the scene, approximately how long did it take to restrain Mr. Lagoda?

A.   I don't remember the exact amount of time, but it felt very quick.  From the time that I arrived heading to the back of the plane, it felt quick that he was put in cuffs.

Q.   If Mr. Lagoda was face down on his stomach that whole time in the process of restraining and then once he was physically restrained, he was still face down on his stomach?

A.   At the time that he was being restrained, he was face down and then he rolled over to his side.

Q.   So when he rolled over -- did he voluntarily roll over or did you roll him over or officers roll him over?

A.   I remember officers rolling him over to his side.

Q.   After Mr. Lagoda was restrained, but before he was rolled over by the officers, was he still in a compliance hold?

A.   No.



Q.  Your testimony here today is you were not still holding Mr. Lagoda's legs after he had already been handcuffed.  Is it your testimony here today that you were not holding Mr. Lagoda's legs down after he had been handcuffed but before he was rolled over by officers?

A.  Once he was handcuffed, there was no more compliance hold on his body.

Q.  By you or other officers?

A.  By me or other officers.

Q.  Did you ever sit on Mr. Lagoda while he was being restrained?

A.  No.

Q.  Did you and the other officers ever sit on Mr. Lagoda after he was being restrained?

A.  No.

Q.  Did you ever sit on Mr. Lagoda after he was restrained?

A.  No.

Q.  Did you witness any other officers sitting on Mr. Lagoda after he was restrained?

A.  No.

Q.  Which officer rolled Mr. Lagoda on to his side?



A.  I don't recall specifically.  I remember hearing Officer Joseph saying let's roll him over to the side.  And, at that time, I remember Papia was in the back cabin with us.

Q.  Am I correct that once Mr. Lagoda was rolled over to the side, that is when it was noticed Mr. Lagoda's neck was blue?

A.  We rolled him over to his side.  I believe he was searched and Officer Papia noticed his face was turning blue.

Q.  Am I correct that Officer -- based upon your recollection, did you see Officer Joseph then check for a pulse?

A.  Yes.

Q.  Am I correct that Officer Joseph found no pulse?

A.  Yes.

Q.  In your experience, was Officer Joseph an experienced police officer?

A.  Yes.

Q.  Did he go to the academy with you or did he graduate before you?

A.  He graduated before me.

Q.  So he had approximately ten years



experience on the job, correct?

A.  Correct.

Q.  Does he have roughly 15 years experience on the job, Officer Joseph?

A.  Yes.

Q.  Do you trust Officer Joseph's checking of the pulse and finding none was correct?  Am I right on that?

A.  Yes.

Q.  Did you or any other officers, upon finding out that Mr. Lagoda had no pulse, try and perform CPR?

A.  Yes.

Q.  Was that you or was that other officers you witnessed?

A.  Myself, Officer Papia.  I don't remember exactly who else, what order.  I remember I was doing the oxygen.  Someone had handed us an AED. Officer Papia was doing compressions.  Officer Guidice also did compressions.  I don't remember who else.

Q.  Were you a part of the -- were you one of the officers trying to use the AED for Mr. Lagoda?

A.  Yes.



Q.  Did you hook up the pads in advance of potentially using the paddles for a shock?

A.  Yes.  We passed the paddle.

Q.  Am I correct no shock was recommended?

A.  Yes.

Q.  Is that because there was no detectible heart beat?

MS. ALTERMAN:  Objection.  You can answer.

A.  The AED does not say.  We do the compressions and oxygen.  It tells us to step back and it says reading for tests, scans and then says no shock advised and continue compressions.

Q.  Based on your approximate ten years of policing and training as well as the additional six months at the academy, is a typical cause for no recommendation shock, no heart beat?

MS. ALTERMAN:  Objection.  You can answer.

A.  That is one of the reasons why you could say no shock advised.  It also could mean that the heart does not need one to keep pumping.  Either way, you're trained to keep doing compressions until EMS and a higher level of medical response



can come to the scene.

Q.  After no shock was advised and that was after Officer Joseph found no pulse on Mr. Lagoda, did you continue CPR on Mr. Lagoda?

A.  Yes.

Q.  From the time Mr. Lagoda was discovered to not have a pulse, do you know roughly how long it took for an ambulance to arrive at the scene?

A.  I don't recall how long.

Q.  Am I correct that Emergency Medical Services or EMS and an ambulance had been called?

A.  Yes.

Q.  Are you aware EMS responded to the initial radio call that led to the dispatch of Officer Bugiada in responding to a male having a seizure aboard a Jet Blue flight?

MS. ALTERMAN:  Objection to form. You can answer.

A.  I was aware that the call came over the air.  I am not sure where they were in their response.

Q.  Does an ambulance require a police escort when responding to a call at JFK?

A.  Yes.



Q.   Have you ever provided a police escort for an ambulance?

A.   Yes.

Q.   Were you aware if the ambulance was significantly delayed in arriving at the scene because it had no police escort?

MS. ALTERMAN:  Objection.  You can answer.

A.   No.

Q.   You were not aware of that?

A.   I wasn't aware of a significant delay.

Q.   Were you aware when you and the other officers responded to the scene there were no more available personnel at police command to escort the ambulance to the scene?

MS. ALTERMAN:  Objection.  You can answer.

A.   I wasn't aware.

Q.   Do you know which officer was supposed to stay behind to escort the ambulance?

A.   No.

Q.   Did the New York Attorney General's Office conduct an investigation into Mr. Lagoda's death?



A.  Yes.

Q.  Do you know what the purpose of that investigation was?

A.  The New York Attorney General's Office is supposed to investigate independently any death in police custody.

Q.  Is it to determine whether or not there is going to be criminal liability for a situation?

A.  Yes.

Q.  Did they offer recommendations and comments on the situation in a report form?

A.  I'm not sure.

Q.  Were you interviewed as part of the investigation?

A.  Yes.

Q.  Who interviewed you?

A.  I don't recall the investigator's name.

Q.  Was it multiple rounds of interviews or was it one?

A.  It was one, two investigators.

Q.  Do you know roughly how long that interview was?

A.  Half hour to an hour.

Q.  Was that in person on phone via Zoom?



A.  It was in person.

Q.  Were you represented by counsel during this interview?

A.  Yes.

Q.  Is it your current counsel now?

A.  No.

Q.  Was it a private attorney or an attorney appointed by the police department?

A.  It was an attorney appointed by our union.

Q.  Do you know if that conversation was recorded?

A.  I don't recall.

Q.  Did you take any notes during that interview?

A.  No.

Q.  You didn't provide any written statements as part of that investigation?

A.  I didn't provide any written statements.

Q.  Are you aware a report was released by the Attorney General's Office?

A.  Yes.

Q.  Do you ultimately know what the conclusion of the report was?



A.    That we were cleared of any wrongdoing.

Q.    You mean cleared of potential criminal charges?

A.    Yes.

Q.    So would it be fair to categorize the conclusion of your report, from your understanding, that the Attorney General's Office said it wasn't going to bring charges?

A.    We were cleared of any criminal charges.

Q.    Do you know why, in your words, you were cleared of criminal charges?

A.    Because we didn't do anything wrong.  We used the reasonable force required to restrain the individual and rendered the aid to the best of your ability.  We were not charged with anything involving excessive force.

Q.    And that is just your understanding as -- are you an attorney?

A.    No.

Q.    Are you aware the report concluded that the use of force by Port Authority Police Department personnel likely contributed to the death of Mr. Lagoda?

A.    Can I see it?



Q.   Are you aware of that?

A.   I'm not aware.  Can I see it?

Q.   Are you aware that the report recommended that the Port Authority Police Department train its officers about the unique vulnerability of individuals in the immediate wake of a seizure?

A.   Can you repeat that?

Q.   Are you aware the report recommended -- are you aware the report recommended that the Port Authority Police Department train its officers about the unique vulnerability of individuals in the immediate wake of a seizure?

A.   I wasn't aware of the report's findings.

Q.   I'm going to introduce Exhibit D.  It's going to be the Office of the Attorney General's report.  Let me know when that is on your screen.

A.   It's on the screen.

Q.   This is the full Office of the Attorney General Special Investigation's Unit and Prosecution Unit report into the investigation on the death of Evgeniy Lagoda.

It is 63 pages in length.  It is publically available as well as produced by



defendants in this matter.  It is Bates stamped PA 1802 and it finishes with PA 1864.  It is a lengthy document, of course.

And I'm only going to focus on a few small areas, but based on this cover letter and scrolling through on this document, do you recognize this report?

A.  No.

Q.  Have you seen this report before?

A.  No.

Q.  Generally speaking, I'm just going to scroll through this so you have an idea what is in this report.  There is an executive summary that summarizes at the outset what the Attorney General found, the statement of fact.

It goes through the events that led to the law enforcement response -- the law enforcement response, the medical assessment and treatment section and the medical examiner's report.  And there is a legal analysis conducted by the Attorney General's Office, and there is a recommendations section.

And there is a series of exhibits.  There are three in total.  First, there is an



executive order.  The second is the transcript from the radio calls that night.  That takes up the majority of this document that you will see scrolling through.

The final exhibit is the Office of the Chief Medical Examiner's report on autopsy of decedent, Evgeniy Lagoda.  I'm going to direct your attention to page two of this report specifically asks you to read the final paragraph.

I can zoom in for you starting with "Nevertheless."  Can you read this to yourself and let me know when you have finished.

A.   (Witness reads.)  Okay.

Q.   After reading this paragraph, which is the final paragraph of the executive summary of the Attorney General's report which is marked as Exhibit D, would you agree that the report determined that -- excuse me.

Would you agree that the report found that the use of force by PAPD personnel was found to have likely contributed to Mr. Lagoda's death?

MS. ALTERMAN:  Objection.  You can answer.



A.  I disagree with the findings, but that is what it says.

Q.  That is not my question.  Do you agree that the report found that the use of force by PAPD personnel was likely to have contributed to Mr. Lagoda's death.  Is that what it says in the report?

A.  That is what it says.

Q.  Do you agree with me the report emphasizes that a person who has just suffered a seizure is in a uniquely vulnerable condition immediately following procedure?

MS. ALTERMAN:  Objection.  You can answer.

A.  That is what the report says.

Q.  I'm going to scroll down to page 12 of the report.  This is Bates stamped PA 1814 entitled "Recommendations."

Can you read the first two paragraphs, two large paragraphs under recollection and I'm happy to zoom in to make it easier for you.

A.  That's fine.

Q.  Tell me when to scroll down.  Let me know



if you need me to scroll and when you're finished with the first two paragraphs.

A.   (Witness complies.)  Okay.

Q.   Would you agree the report determined that the Port Authority Police Department did not have personnel available to escort an ambulance to the scene?

MS. ALTERMAN:  Objection.  You can answer.

A.   Can you repeat the question?

Q.   Sure.  Would you agree the report determined that the Port Authority Police Department failed to have personnel available to escort an ambulance to the scene?

A.   That is what the report says.

Q.   At that time in 2019, based upon your training, had -- at that time, had you been trained to understand that individuals are uniquely vulnerable in the immediate wake of a seizure?

A.   Yes.

Q.   Do you disagree with the report's contention that there should have been more emphasis on the training of the PAPD officers as



to how to deal with an individual when handling a seizure?

A.  I disagree with the report's findings that we were not trained.

Q.  But do you understand the report is saying there needs to be a heightened level of training for officers in dealing with individuals who are coming out of a seizure?

MS. ALTERMAN:  Objection to form.

A.  I understand that is what the report says.

Q.  Thank you.  Did you provide an explanation of the training you and Port Authority Police Department officers have received regarding collective or group use of force?

A.  We received training for multi-officer takedown's and multi-officer arrests to put an individual in cuffs.

Q.  Is that a division of the use of force training session or part of the use of force curriculum?

A.  I don't recall if it's part of use of force or defensive tactics or which specific training.



Q.  Can you describe the difference in protocols and guidelines between individual use of force and collective use of force?

A.  If there is more than one officer on scene, it's easier to control the situation where one officer is getting overpowered.  For example, several officers makes it easier to control the situation.

Q.  Are you done with your answer?

A.  Yes.

Q.  Specifically what I'm asking is can you tell me what protocols or guidelines based on your training you received both at the police academy and during the training lessons and modules you had completed in your capacity as a police officer?

What do those protocols and guidelines say about the difference between the use of force of an individual versus collective use of force?

A.  I don't know.  I don't understand the question.

Q.  Do you understand the difference between individual and collective?



A.  Yes.

Q.  Now I will apply it to use of force. What do the protocols say that you learned based upon your training or individual use of force versus collective use of force?

A.  Use of force would be the same regarding what you're allowed to do to use reasonable force --

(Reporter asks for clarification.)

A.  When using reasonable force, if there is more than one officer on scene, in order to gain compliance, it's all dictated by the subject's actions and demeanors.

So whatever is reasonable to gain compliance.  If there is a collective group of officers, it's a large number, it's easier to put the individual in cuffs based on strength and numbers if that is what you're asking.

Q.  I appreciate your answer.  What I'm really just trying to get at is are there any specific protocols or teaching lessons and trainings you received in your career as a police officer or at the police academy that provided for the difference between individual use of force or



collective use of force?

A.  I don't recall specifically.

Q.  Would it be fair to say there was just one use of force policy?

A.  I don't recall.

MR. AMRHEIN:  I want to introduce what will be marked as Exhibit E.

Q.  Let me know when it is available to you and let me know if you need to zoom out at all.

MS. ALTERMAN:  It's on your screen.

Q.  Do you recognize this document?

A.  Yes.

Q.  This is a use of force report that was produced by defendants.  It is Bates stamped PA 1159.  It is a one-page document.

Sir, is that your signature and is that your name?

A.  Yes.

Q.  Did you fill this out on -- I think it says 4/3, but do you mean to say 4/13?

A.  Yes.

Q.  I know you said you worked from that overtime shift from 10 until 6 a.m. on the 13th. Was this filled out in the early hours of the



13th?

A.   Yes.   It was filled out that same tour. So past midnight.

Q.   And you said this would have occurred shortly after your response aboard the Jet Blue flight?

A.   Yes.

Q.   Based upon your training and professional experience, if a person does not have a heart beat, would you consider that person to be alive?

MS. ALTERMAN:   Objection.   You can answer.

A.   If a person does not have a heart beat, they can still be alive or revived.

Q.   Is that person alive if they don't have a heart beat?

MS. ALTERMAN:   Objection.   You can answer.

A.   A person isn't dead until they are pronounced dead based on my training and experience.

Q.   Have you ever pronounced someone to be dead?

A.   No.



Q.  Have you ever taken someone's pulse?

A.  Yes.

Q.  Have you ever taken someone's pulse and that person had no heartbeat?

A.  Yes.

Q.  Was it your understanding that person was dead?

A.  No.

Q.  So the person with no heart beat when you took their pulse was alive?

A.  We did CPR and they were resuscitated.

Q.  At that time with no pulse, they were alive?

A.  I don't know.

Q.  You're unclear if a person with no heart beat is alive?

MS. ALTERMAN:  Objection.  You can answer.

A.  I don't know.

Q.  Sir, I will remind you you're testifying under oath here today as if you were in a courtroom.

After Officer Joseph, based on your testimony, took the pulse of Mr. Lagoda and found



no pulse -- and this is after he was restrained, then turned over and it was found his neck was blue -- how long before the ambulance came; do you recall?

A.  Well, one, can we take a bathroom break after this question?  And, two, I don't recall how long the ambulance took to respond.  I know that the AED went on for a few cycles.

Q.  Can you define cycles?

A.  The round of compressions and breaths will go on for a few minutes.  And then the AED will analyze and shock or advise no shock and then continue more breaths and compressions.

Q.  One question before we break.  Am I correct in my capturing of your testimony from earlier today that Mr. Lagoda was restrained after he -- after checking the surroundings, Mr. Lagoda was rolled on to the side by the officers at which point it was discovered his neck was blue.

And Officer Joseph then took the pulse of Mr. Lagoda at which point he found no heartbeat; is that correct?

MS. ALTERMAN:  Objection.  You can answer.



A.   We responded.  Mr. Lagoda was placed in cuffs.  After he was placed in cuffs, we stood up, rolled him over -- shifted him forward.  So there was room to roll him over to his side, roll him to his side.  He was searched and --

Q.   Is that when Officer Papia discovered his neck was blue?

A.   His neck was blue and Officer Joseph took Mr. Lagoda's pulse and determined he had none, yes.

(Recess taken.)

Q.   Officer Mezzacappa, I only have a few last questions.  One more exhibit to the exhibit that was just on the screen before the break.

Did you prepare your use of force report in the presence of anyone?

A.   There were other officers in the arrest room when I prepared it.

Q.   There were other officers you said?

A.   Yes.

Q.   Were those other officers officers who responded to the scene that night?

A.   I believe they may -- I remember Office Guidice was there with me.  He did CPR.



Q.  Did you or any of the officers coordinate how you would fill out reports based on what happened that night?

A.  I filled out my own use of force with my own words.

Q.  During the ten-minute break, were you coached at all by your attorney?

A.  No.

Q.  Did you have any conversations with your attorney?

A.  No.

Q.  Sir, I, again, remind you you're under oath just as if you were testifying in court.

During that ten-minute break, you had no conversations with your attorney?

A.  Yes, just in the bathroom.

Q.  So you're amending your answer that you did have a conversation with your attorney?

A.  I did not have a conversation, if that is what you're asking.

Q.  You're saying you saw your attorney, but there was no conversation?

A.  I walked straight to the bathroom.  I saw my attorney because they are in the same room with



me.  We did not have a conversation.

Q.  Would you agree with me that someone who has just come out of a seizure is medically vulnerable?

A.  Yes.

Q.  Wouldn't you agree that someone who has just come out of a seizure may be disoriented?

A.  Yes.

Q.  Wouldn't you agree with me someone who had just come out of a seizure may have combative behavior?

A.  Yes.

Q.  Wouldn't you agree it's more difficult to understand words and warnings and commands that are in a foreign language that you do not speak?

MS. ALTERMAN:  Objection.  You can answer.

A.  Yes.

Q.  Wouldn't you agree it's more difficult to understand words, warnings and commands when you are disoriented?

A.  Yes.

Q.  Wouldn't you agree with me it is more difficult to understand words, warnings and



commands when you are in an altered mental state?

A.  Yes.

Q.  Wouldn't you agree it is more difficult to breathe lying face down on your stomach than it is sitting up or standing up?

MS. ALTERMAN:  Objection.  You can answer.

A.  Like laying down on your stomach while you're sleeping?

Q.  I'm saying in general.  Face down on your stomach versus breathing and standing up.

MS. ALTERMAN:  Are you able to answer the question?

THE WITNESS:  No.

Q.  Are you saying you're unable to answer the question, or you are answering no to the question?

A.  There is not enough information people can sleep on their stomachs all night.

Q.  Would you agree -- wouldn't you agree with me -- strike that.

Wouldn't you agree that a person who is placed face down with a number of people applying increased amounts of pressure makes it



more difficult to breathe in that scenario than it is without pressure?

A. Pressure where?

Q. On the person's legs, back, neck.

MS. ALTERMAN: Objection. You can answer.

A. There was no pressure on Mr. Lagoda's neck.

Q. That's not what I'm asking. I'm asking is it more difficult to breathe laying face down with pressure on legs, back and neck?

MS. ALTERMAN: Objection. You can answer.

A. I don't see how putting pressure on someone's leg would.

Q. I'm saying pressure on the legs, back and neck, pressure on the body. Do you believe that makes it more difficult for a person to breathe when they are laying face down?

A. I can't answer. There is not enough information.

Q. What is the basis for saying there is not enough information?

A. If there is pressure on someone's legs,



then it does not impede their lungs.

Q.  I can ask the question again.  I specifically said pressure on the legs, back and neck.

A.  If it incorporates all three in this answer, I don't believe putting pressure on someone's legs can impede their breathing.

Q.  What about putting pressure on someone's back, does that make it more difficult for someone to breathe when they are laying on their stomach?

MS. ALTERMAN:  Objection.

A.  If there was pressure on someone's back, it can be different.

Q.  Is that a yes?

A.  Yes.

Q.  What about pressure on someone's neck in that scenario, would that make it more difficult to breathe?

A.  In a hypothetical scenario putting pressure on someone's neck, that would, indeed, cause difficulty breathing.

Q.  Thank you.  Would it be more difficult for a person to breathe when they are laying face down if someone were sitting on their back?



A.  Yes.

Q.  Wouldn't you agree that a person who is placed face down with a number of people applying amounts of pressure to the back, neck and legs may not be resisting but rather fighting for one's life?

MS. ALTERMAN:  Objection.  You can answer.

A.  You can say the question again.

Q.  Sure.  Wouldn't you agree a person who is placed face down with a number of people applying increasing amounts of pressure to the back, neck and legs may not be resisting, but rather fighting for one's life?

MS. ALTERMAN:  Note my objection. You can answer.

A.  Anything is possible.  That is not what happened but --

Q.  I'm simply asking the question.  You said anything is possible.  Does that mean yes?

A.  Yes.

Q.  Wouldn't you agree the improper -- wouldn't you agree improper restraining techniques can block the flow of air into a person's lungs



contributing to a life threatening condition known as potential or restraint asphyxia?

A.  Yes.

Q.  Wouldn't you agree the risk of positional asphyxia is compounded with a person with predisposing factors becomes involved in a physical struggle with an officer or officers?

A.  Yes.

MS. ALTERMAN:  Objection.

Q.  If force was not used that night against Mr. Lagoda, do you believe he would have died?

MS. ALTERMAN:  Objection.

A.  There is no way of knowing.  I can't answer that.

Q.  Do you remember reviewing the PowerPoint from the National Safety Council earlier in this deposition regarding seizures?

A.  Say that again.

Q.  Do you remember reviewing the PowerPoint earlier in your deposition today's, Officer, and that PowerPoint was from the National Safety Council and it was involving seizures?

A.  Yes.

Q.  Do you recall the bullet point that I



read out loud and you confirmed that it was correctly read that seizures were, quote, rarely life threatening, but a serious emergency?

A.  Yes.  I recall you reading that.

Q.  So if force was not used against Mr. Lagoda that night, April 12, 2019, do you believe he would still be alive today?

MS. ALTERMAN:  Objection.

A.  I don't know.

MR. AMRHEIN:  I have no more questions.

MS. ALTERMAN:  I don't have any questions.

MR. AMRHEIN:  I want to thank the officer for his time.  I appreciate you coming in. I know it's difficult in the summer to be able to do so with the schedules you have.  So I want to thank you for coming in and taking the time to be deposed here today.

(Whereupon the deposition was concluded at 4:29 p.m.)



C E R T I F I C A T E

I, PAUL MEZZACAPPA, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that said transcript is a true and accurate record of said testimony (with the exception of the following corrections listed below:)

Page     Line          Correction

Signed under the pains and penalties of perjury this          day of                              , 2023.

PAUL MEZZACAPPA



COMMONWEALTH OF MASSACHUSETTS   )

                                )

SUFFOLK, SS.                    )


              I, Nancy L. LaCivita, Professional

Shorthand Reporter and Notary Public in and for

the Commonwealth of Massachusetts, do hereby

certify that PAUL MEZZACAPPA, the witness whose

deposition is hereinbefore set forth, was duly

sworn by me, and that such deposition is a true

record of the testimony given by such witness.

              I further certify that I am neither

related to or employed by any of the parties in or

counsel to this action, nor am I financially

interested in the outcome of this action.

              IN WITNESS WHEREOF, I have hereunto

set my hand and Notarial Seal this 28th day of

August, 2023.


                                _Nancy L. LaCivita_

                                Nancy L. LaCivita

                                Notary Public

My Commission Expires:

January 2, 2026



### 1

**1-1**
37:21

**10**
40:7,8,
13,18
71:23

**1159**
71:15

**12**
22:15
40:4
66:16
83:6

**13th**
71:23
72:1

**15**
40:19
56:3

**1802**
64:2

**1814**
66:17

**1864**
64:2

### 2

**2**
40:7,13

**2013**
8:6

**2014**
8:9,10
9:7,8
19:3

**2019**

8:20,23
22:15
40:2,4
67:16
83:6

**2020**
22:2

**2029**
34:22

**2064**
33:10

**2065**
33:21

**2066**
34:5

**2068**
33:10

**2083**
35:4

**2093**
35:17

**2095**
34:22
35:16
36:4

**269**
7:14
42:14

### 3

**30**
4:21

**360**
36:24

### 4

**4/13**
71:20

**4/3**
71:20

### 6

**6**
40:9
71:23

**63**
63:23

### A

**a.m.**
71:23

**ability**
7:6,7
24:10
62:15

**aboard**
58:16
72:5

**academy**
8:3,8,10
9:7,15
10:11,14
11:4,19
12:2,22
13:9,12
14:6,11
15:11,22
16:18,23
17:20
18:17
19:2
20:21
21:5,8
23:14,17
24:12
26:1
30:18
55:21
57:16

69:13
70:23

**acting**
15:19

**action**
45:12

**actions**
15:3
70:13

**active**
15:10

**actively**
52:17

**additional**
18:6
41:8,20
43:5,18
57:15

**address**
7:11

**administering**
47:17

**advance**
36:18,20
57:1

**advise**
74:12

**advised**
57:13,21
58:2

**AED**
56:18,23
57:10
74:8,11

**afternoon**
4:10 5:1
40:7

**aggression**
11:12

13:23

**agitated**
36:8,13

**agree**
65:17,19
66:3,9
67:4,11
77:2,6,9,
13,19,23
78:3,20,
22 81:2,
10,22,23
82:4

**agreeable**
4:14

**aid**
62:14

**air**
58:20
81:24

**Airport**
40:21

**aisle**
44:24
46:4

**alert**
34:24

**alerted**
12:21

**alive**
72:10,14,
15 73:10,
13,16
83:7

**allowed**
70:7

**alluding**
23:5

**altered**
14:16,19
15:1



800.211.DEPO (3376)
EsquireSolutions.com

26:12,17,
20 33:12,
22 34:6
35:9 78:1

**ALTERMAN**
4:16,24
7:12
11:18
13:10
17:5
20:11
22:12
25:2
30:16
33:1
35:23
37:6
39:15
49:17,24
57:8,18
58:17
59:7,16
65:23
66:13
67:8 68:9
71:10
72:11,17
73:17
74:23
77:16
78:6,12
79:5,12
80:11
81:7,15
82:9,12
83:8,12

**ambulance**
58:8,11,
22 59:2,
4,15,20
67:6,14
74:3,7

**Amended**
37:3
38:1,5

**amending**
76:17

**amount**
13:21
15:8 24:7
53:5

**amounts**
78:24
81:4,12

**Amrhein**
4:11,17
5:5 22:21
31:24
34:18
37:1,9
71:6
83:10,14

**analysis**
64:20

**analyze**
74:12

**angry**
36:8,13

**annual**
19:10,11

**answering**
78:16

**anticipate**
6:5

**anymore**
30:22

**appears**
32:24

**applicable**
28:2

**applies**
23:4

**apply**
17:10,16
22:9,11

31:18
70:2

**applying**
23:6 51:5
78:24
81:3,11

**appointed**
61:8,9

**approximate**
57:14

**approximately**
21:24
25:9
44:12
53:3
55:24

**April**
8:22
22:15
40:2,4
83:6

**areas**
64:5

**arm**
12:11

**arms**
12:10
45:5 46:2
50:14
51:4,9,
10,11,12,
24 52:1,
2,9

**arrest**
9:21
75:17

**arrests**
68:17

**arrive**
58:8

**arrived**
44:17,20,
22 53:2,7

**arrives**
18:6

**arriving**
59:5

**Ashcroft**
5:5

**asks**
65:9 70:9

**asphyxia**
82:2,5

**asphyxiation**
14:5
24:20

**assessment**
64:18

**assigned**
42:3,11
50:6

**assistance**
41:8,21
43:5

**assume**
5:20

**attack**
18:3,8

**attempt**
52:11

**attempting**
18:9
47:21

**attend**
19:10

**attended**
8:2 9:6

**attending**
41:9 43:6

**attention**
33:20
65:8

**attorney**
5:4,5
38:2,16,
21 39:4,9
59:22
60:4
61:7,9,21
62:7,18
63:16,19
64:14,21
65:16
76:7,10,
15,18,21,
24

**Authority**
8:16,19
9:2,7
10:21
19:8
20:18
24:18
25:18
27:11
28:13
30:6
31:14
32:10,12
33:6 42:4
62:21
63:4,10
67:5,12
68:13

**autopsy**
65:6

**average**
17:10

**avoid**
5:23

**aware**
20:9
40:20



45:20
58:13,19
59:4,10,
11,12,18
61:20
62:20
63:1,2,3,
8,9,14

---

**B**

**back**
12:4
22:10
23:4
36:8,14
42:8,17,
18 44:18,
23 45:2
46:5,10
47:6
50:15
51:5,10
53:7 55:4
57:11
79:4,11,
16 80:3,
9,12,24
81:4,12

**background**
7:24

**bag**
17:15

**based**
11:12
13:15
15:2,3
16:17
17:3,19
19:22
24:8
26:1,3
27:2
31:15

55:11
57:14
64:5
67:16
69:12
70:3,17
72:8,20
73:23
76:2

**basis**
79:22

**Bates**
33:9,20
34:22
35:4 64:1
66:17
71:14

**bathroom**
74:5
76:16,23

**baton**
13:19
46:16

**bear**
32:22

**beat**
57:7,17
72:10,13,
16 73:9,
16

**begin**
6:4

**behavior**
11:10
23:7
77:11

**behavioral**
9:15,16

**behaviors**
11:11

**bent**
47:12

**big**
30:17

**bit**
16:22

**block**
81:24

**blood**
29:4

**blue**
40:20
43:16
44:1,13
55:7,10
58:16
72:5
74:3,19
75:7,8

**board**
40:22
41:10,17
44:18
45:17
53:2

**boarding**
45:13

**body**
21:11
23:2,6
42:23
44:6,8
50:23
51:2,8,
11,17,23
52:1,7,10
54:8
79:17

**book**
36:23

**borne**
29:4

**Boston**
5:6

**box**
20:10

**break**
6:11,14
25:3,6,9
42:15,16
74:5,14
75:14
76:6,14

**breathe**
78:4
79:1,10,
18 80:10,
18,23

**breathing**
78:11
80:7,21

**breaths**
74:10,13

**briefly**
7:23 11:6
12:20
41:12
42:8

**bring**
17:16
35:16
62:8

**Bugiada**
41:4,5,8,
11,16,20
43:17
44:21
45:3,14,
23 46:6,9
49:22
58:15

**Bugiada's**
43:5

**building**
7:14
42:14,17

**bullet**
33:23
34:7
35:7,12,
21,24
36:1,5,7,
9,12
82:24

**buttocks**
47:6,7

---

**C**

**cabin**
55:4

**call**
17:14
27:3
40:24
41:3,7,12
42:7,13
43:5
58:14,19,
23

**called**
40:21
43:19
47:3
58:11

**calls**
65:2

**cam**
42:23

**cam's**
21:11
44:6,8

**capacity**
19:7
20:17
24:17
25:17
26:4
27:10



28:12
31:13
69:15

**capturing**
74:15

**car**
42:7,18

**care**
16:12,17,
23 17:2,
9,13,19,
23 18:1,
7,10,13
27:12,14,
17,21
28:4,14
35:18

**career**
70:22

**case**
37:20

**catch**
31:11

**categories**
16:19

**categorize**
43:20
62:5

**category**
11:15
14:18
23:7

**caution**
14:21
15:2

**certificate**
20:3,5,6

**changed**
21:17

**changing**
12:14

24:3

**chaotic**
44:24

**charged**
62:15

**charges**
62:3,8,9,
11

**chart**
24:1

**check**
55:13

**checked**
20:10

**checking**
56:6
74:17

**Cheryl**
4:21
22:21
31:24
37:4

**chest**
22:8

**Chief**
65:6

**children**
7:21

**Chris**
5:4

**circumstanc
e**
11:13

**circumstanc
es**
16:14

**citizen**
17:24

**City**
21:20

**civilians**
15:14
28:16,19

**clarificati
on**
16:11
70:9

**clarify**
17:8

**class**
29:20

**classes**
27:9
28:14

**classify**
50:20

**cleaner**
6:9

**clear**
28:9

**cleared**
62:1,2,9,
11

**clearer**
16:22

**client**
4:22

**coached**
76:7

**collective**
68:15
69:3,19,
24 70:5,
15 71:1

**colloquiall
y**
6:6

**combative**
34:1
77:10

**command**
11:9
42:15
44:13
59:14

**commands**
11:9
13:16
26:21,22
48:4,7,
16,20
77:14,20
78:1

**comments**
60:11

**Common**
34:6

**compared**
24:11

**complaint**
37:3
38:1,5,13

**complete**
19:9

**completed**
20:8
69:15

**compliance**
12:5,8,9,
11,13
13:22
47:3,17
49:4
50:4,9
51:7,16,
22 52:6
53:23
54:8
70:12,15

**complies**
67:3

**comply**

15:7 24:7

**complying**
12:15

**compounded**
82:5

**compress**
21:21
22:3

**compression
al**
14:5
24:19

**compression
s**
56:19,20
57:11,13,
23 74:10,
13

**concern**
52:20

**concerns**
52:13

**concluded**
62:20

**conclusion**
61:24
62:6

**condition**
17:13
18:3
66:11
82:1

**conditions**
52:15

**conduct**
59:23

**conducted**
64:20

**conference**
6:20



confirmation
20:8

confirmed
83:1

confused
33:24

connected
52:9

connecting
47:7

consistent
23:13
25:24

contention
67:23

continue
57:13
58:4
74:13

continuum
13:13
23:18,20
24:9

contractions
35:10

contracts
32:10

contributed
62:22
65:21
66:5

contributing
82:1

control
52:17
69:5,7

controlled

27:5

conversation
6:7 39:16
61:11
76:18,19,
22 77:1

conversations
76:9,15

convinced
15:4,6

coordinate
76:1

copies
32:1

correct
8:12 22:5
33:23
35:7,12
41:15
44:11
46:20
47:19,20
48:6 50:9
52:22
55:5,11,
15 56:1,
2,7 57:4
58:10
74:15,22

correctly
5:2 83:2

Council
32:5,8,
11,16,20
33:13
34:11,20
35:6
82:16,22

counsel
25:6,10
39:12,17,

18 61:2,5

courses
19:15
29:1,8,
17,23

court
6:21 9:23
76:13

courtroom
73:22

cover
9:15 10:7
11:4
20:23
21:1
23:10
26:7,10
30:10
33:11
64:5

covered
11:1,7
20:20
29:20

COVID
19:17

CPR
18:5 20:6
29:5,8
32:17
56:12
58:4
73:11
75:24

criminal
60:8
62:2,9,11

crises
14:12,15,
19 17:3
26:12,16
29:22

crouched
46:2

cuff
51:13

cuffed
24:24

cuffs
14:7,8
45:6 46:3
49:3 53:8
68:18
70:17
75:2

current
61:5

curriculum
9:11,14
10:19
11:1,3,16
14:20
26:2
68:21

custody
60:6

cycles
74:8,9

―――――――――

D

―――――――――

dangers
36:9,14,
16

date
39:7

day
30:3 40:6

days
4:21,22
40:10,11,
14

dead
72:19,20,
23 73:7

deadly
13:5,8,19
23:11
24:10

deal
68:1

dealing
14:11,15,
18 26:11,
17,18,19
68:7

death
59:24
60:5
62:23
63:22
65:22
66:6

decedent
65:7

deescalation
11:4,7,8,
15 15:5,6
20:23
21:9

defendants
33:9,14
34:12,20
37:23
64:1
71:14

defensive
10:5 14:1
29:22
68:23

define
27:18
74:9


ESQUIRE
DEPOSITION SOLUTIONS

degree
  8:2

delay
  59:11

delayed
  59:5

demeanor
  13:24

demeanors
  70:13

demonstrate
  18:21

demonstrations
  18:18

department
  8:20 9:3
  10:21
  19:8
  20:18
  24:18
  25:18
  27:11
  28:13
  30:7
  31:14
  32:12
  61:8
  62:22
  63:4,11
  67:5,13
  68:14

depending
  16:13

deponent
  7:3

deposed
  5:9 7:16
  83:19

deposition
  4:12
  36:18,21

37:7
38:22
39:1,5,
10,13,19
43:23
82:17,20

describe
  7:23 11:6
  21:19
  23:19
  47:9 49:5
  69:1

detailed
  31:17

detectible
  57:6

determine
  60:7

determined
  13:22
  65:18
  67:4,12
  75:9

diagram
  22:11
  23:23

diaphragm
  21:22
  22:4

dictated
  70:12

died
  82:11

difference
  69:1,18,
  23 70:24

differently
  27:15

difficult
  77:13,19,
  24 78:3

79:1,10,
18 80:9,
17,22
83:16

difficulty
  80:21

diffuse
  14:21

diffusing
  11:14,20
  21:1,14

digitally
  30:19

direct
  33:20
  35:4 65:7

disagree
  66:1
  67:22
  68:3

discovered
  58:6
  74:19
  75:6

discovery
  31:22

discuss
  24:18

discussed
  11:2
  39:3,17

discussions
  25:5,8

disoriented
  33:24
  77:7,21

dispatch
  58:14

dispatched
  41:11,16

displayed
  11:11

disposal
  24:6,13

distance
  11:9

disturbed
  26:19

division
  68:19

docket
  37:21

document
  33:3,4,8,
  19 34:5,
  14 38:4,
  15,18
  64:3,6
  65:3
  71:11,15

documents
  37:12

driver's
  42:19

drove
  41:24

drowsy
  34:1

due
  13:1

Duran
  49:3
  50:5,7

duties
  15:13,17,
  23 17:2
  25:21,24
  28:3,4,19

duty
  10:8

28:21

───────────

E

───────────

earlier
  4:14 7:15
  37:5
  74:16
  82:16,20

early
  71:24

easier
  6:8 9:13
  66:22
  69:5,7
  70:16

easy
  6:2,5
  37:11

education
  9:3

educational
  7:23

eight-hour
  29:18,19
  30:3

elaborate
  12:20
  26:9

emergencies
  29:4

emergency
  28:1,18
  35:14,17
  40:22
  58:10
  83:3

emotionally
  26:19

emphasis
  67:24



emphasizes
66:10

employ
50:13

employed
8:13

employee
30:5,13,
21 31:2,
15,21
32:2

employer
8:15 20:9
25:20

EMS
17:14
18:6
57:24
58:11,13

end
37:13

enforcement
9:1
64:17,18

engage
46:12
49:1,9

engaged
44:21

engaging
49:6

English
48:20

entirety
33:19
34:14

entitled
33:11
34:21
35:8
66:18

escalating
13:14
23:22

escalation
13:16

escort
58:22
59:1,6,
14,20
67:6,14

estimate
40:17

event
40:4

events
21:11
64:16

eventually
41:7

Evgeniy
39:21,24
43:16
44:1
63:22
65:7

evidence
10:3

exact
29:16
44:15
53:5

examiner's
64:19
65:6

exceeded
20:15

excessive
15:24
16:4,6,8
52:14
62:16

excuse
65:18

executive
64:13
65:1,15

exhibit
32:21
34:19
37:2,19
38:2,3
63:15
65:5,17
71:7
75:13

exhibits
37:8
64:23

expand
24:9

experience
9:2 19:23
55:18
56:1,3
72:9,21

experienced
55:19

explanation
68:13

———————

F

face
10:20
45:8,10
46:19
53:9,12,
14 55:10
78:4,10,
23 79:10,
19 80:23
81:3,11

facility

15:16

fact
49:20
64:15

factors
82:6

failed
67:13

fair
5:19 8:10
20:7 29:7
43:20,24
44:3
45:12
62:5 71:3

fall
11:14
23:6

falls
9:17

familiar
28:5,7

feeling
18:15

felt
53:6,8

fight
41:13
49:22

fighting
12:13
14:2
81:5,13

fights
49:23

fill
71:19
76:2

filled
71:24

72:2 76:4

final
65:5,9,15

Finally
6:10

finding
56:7,11

findings
63:14
66:1 68:3

fine
4:16
29:13
37:6,14
40:17
66:23

finish
6:3 9:11
27:7

finished
35:1
65:12
67:1

finishes
64:2

firm
5:5,6

First-aid
9:17 10:7
17:16
27:24
28:17
32:9,17

flail
47:22

flight
40:20
41:16
43:16
44:1,14
45:13,18



53:2
58:16
72:6

**flow**
81:24

**flowing**
24:2

**focus**
64:4

**focused**
30:1

**folks**
14:15

**follow**
24:5

**force**
13:2,5,8,
12,13,14,
17,19,20,
21 15:8,
24 16:4,
6,8 22:9
23:11,17,
18,20,22
24:7,10,
15 29:21
31:3,8
36:23
50:2
52:10,14,
16 62:13,
16,21
65:20
66:4
68:15,19,
20,23
69:3,19,
20 70:2,
4,5,6,7,
10,24
71:1,4,13
75:15
76:4
82:10

83:5

**forcing**
51:11

**forearms**
22:10
46:9

**foreign**
77:15

**form**
4:18 7:12
13:10
20:11
30:16
36:22,24
58:17
60:11
68:9

**formally**
32:1

**formats**
20:1

**forward**
75:3

**found**
55:15
58:3
64:15
65:20,21
66:4
73:24
74:2,21

**frequent**
24:2

**front**
44:18,19

**full**
6:13 7:11
38:1,10
63:19

---
**G**
---

**gain**
12:10,13
13:21
52:17
70:11,14

**galley**
46:4,5

**gauging**
29:14

**gave**
48:16

**general**
11:2
37:24
40:3,17
63:20
64:14
78:10

**General's**
59:22
60:4
61:21
62:7
63:16
64:21
65:16

**generally**
17:10
29:11,14
30:9 42:4
64:11

**generate**
52:10

**Gilhooley**
42:22

**give**
9:10
33:15
34:23

39:7
47:24
48:1,3,4,
9

**giving**
6:18 11:8
13:15
48:7

**goal**
15:16

**Good**
4:10 5:1

**grab**
46:2

**grabbing**
50:14

**graduate**
8:4 9:8
19:1
55:22

**graduated**
20:21
55:23

**graduation**
8:8

**grappling**
50:3

**Great**
5:4

**ground**
14:2
24:23
45:8,9
46:1
47:10,13,
15,18

**group**
68:15
70:15

**guess**
9:12

11:18
52:9

**guidelines**
69:2,12,
18

**Guidice**
56:20
75:24

**guttural**
50:20

---
**H**
---

**Half**
60:23

**handcuffed**
54:3,5,7

**handcuffs**
12:4
50:16

**handed**
56:18

**handle**
27:24

**handling**
68:1

**hands**
46:13,14,
15 47:11
48:3 49:2
51:13

**handwritten**
36:22

**happened**
22:14
76:3
81:18

**happy**
4:15,23
5:14,18



66:21

**harsh**
50:21

**head**
5:24
12:24
29:5

**heading**
53:7

**health**
14:15,19
17:3
26:12,16
29:22
52:13,20

**hear**
5:13
40:24
48:9
50:18

**heard**
32:7
41:1,11,
19 48:6
50:19

**hearing**
55:2

**heart**
18:3,8
57:7,17,
22 72:9,
13,16
73:9,15

**heartbeat**
73:4
74:22

**heel**
47:6

**heightened**
17:19,23
18:13
68:6

**held**
46:13

**high**
7:24

**higher**
18:1,10
57:24

**highest**
13:20

**hired**
8:3

**hit**
48:22
49:12,14

**hold**
46:16
47:3,17
49:4
50:4,9
51:7,17,
22 52:7
53:23
54:8

**holding**
12:11
46:18
47:1,10
51:24
54:2,4

**holds**
12:6,8,9

**Homeland**
8:2 9:4

**hook**
57:1

**hop**
6:13

**hoping**
4:12

**hospital**
17:16

**hour**
60:23

**hours**
29:24
40:19
71:24

**hustling**
50:3

**hypothetica
l**
80:19

—————————

I

—————————

**idea**
24:3
64:12

**immediately**
8:7 16:1
66:12

**immobilizin
g**
12:14

**impair**
7:6,7

**impede**
80:1,7

**important**
20:8

**improper**
12:18,21,
23 81:22,
23

**improperly**
15:19

**in-service**
19:10
31:16
33:6

**incident**

22:15

**incite**
26:23

**include**
31:16

**included**
21:12

**includes**
52:1

**including**
14:2 38:2

**incorporate
s**
80:5

**increase**
18:4

**increased**
78:24

**increasing**
81:12

**independent
ly**
60:5

**individual**
11:12
12:3,12
14:7
15:1,4,6
17:12,15,
24 18:2
22:7
24:22
26:24
27:1
28:15
29:19
30:15
35:1 40:1
62:14
68:1,18
69:2,19,
24 70:4,

17,24

**individual'
s**
21:22
22:3

**individuall
y**
37:15

**individuals**
63:6,12
67:18
68:7

**influence**
7:5

**information**
78:18
79:21,23

**initial**
37:7
58:14

**injury**
36:24

**inquiring**
39:18

**instructor**
18:22

**instructors**
33:6

**intercede**
15:18,23
16:8
25:21

**interceding**
16:3

**Internation
al**
40:21

**intervene**
52:12

**intervened**



800.211.DEPO (3376)
EsquireSolutions.com

52:19

**intervention**
26:8,10,
15

**interview**
60:22
61:3,15

**interviewed**
60:13,16

**interviews**
60:18

**introduce**
34:10
37:1
63:15
71:6

**introductory**
5:11

**investigate**
60:5

**investigation**
59:23
60:3,14
61:18
63:21

**Investigation's**
63:20

**investigator's**
60:17

**investigators**
60:20

**involve**
11:8 12:8
32:4

**involved**

82:6

**involving**
12:23
62:16
82:22

**issue**
17:13

**iterations**
31:22

———————

**J**
———————

**Jamaica**
7:14

**Jersey**
8:16

**Jet**
40:20
43:16
44:1,13
58:16
72:5

**JFK**
7:13
40:21
58:23

**job**
6:8 15:15
17:11
18:4
19:14
28:20
56:1,4

**John**
7:13

**John's**
8:1,5 9:4

**join**
45:13

**Joseph**
45:4

50:14
55:2,12,
15,18
56:4 58:3
73:23
74:20
75:8

**Joseph's**
56:6

**judge**
27:2

**judging**
11:10

**July**
39:6,8

**jumped**
42:9,17

———————

**K**
———————

**keys**
42:7

**kick**
47:21

**knew**
49:22

**knowing**
82:13

**knowledge**
31:15

———————

**L**
———————

**Lagoda**
39:22,24
43:17
44:2,21
45:7,15,
18 46:7,
10,12,18
47:2,17,

21,24
48:4,7,9,
16,22
49:1,10,
13,14,16,
18,21
50:17,24
51:3
52:12,13,
22 53:4,
9,21
54:11,15,
17,21,23
55:5
56:11,23
58:3,4,6
62:23
63:22
65:7
73:24
74:16,17,
21 75:1
82:11
83:6

**Lagoda's**
45:5,20
52:20
54:2,4
55:7
59:23
65:21
66:6 75:9
79:7

**language**
27:17
45:21
77:15

**large**
66:20
70:16

**laundry**
29:20

**law**
5:5 9:1

23:1
64:17

**laws**
9:21
21:17,20

**lay**
5:12

**laying**
45:9
46:19
78:8
79:10,19
80:10,23

**leaning**
51:5

**learn**
49:20

**learned**
16:18
17:20
21:4,8
23:14,17
26:3
31:18
70:3

**led**
58:14
64:16

**leg**
12:11
46:23
47:1,5,
10,12,14
49:3
50:6,7
51:24
79:15

**legal**
64:20

**legs**
12:10
46:13,16



47:5,18
54:2,5
79:4,11,
16,24
80:3,7
81:4,13

**length**
38:1
63:23

**lengthy**
64:3

**lessons**
21:3
69:14
70:21

**letter**
64:5

**level**
11:12
13:23
26:21
57:24
68:6

**levels**
16:13,16,
19

**liability**
60:8

**life**
6:2 15:15
28:20,21
35:13
81:6,14
82:1 83:3

**lights**
26:24

**limbs**
47:22

**limitation**
32:2

**limited**

22:17,18

**linear**
23:21
24:1,5,11

**list**
20:20
29:20

**listening**
15:10

**local**
20:15

**long**
29:2,24
44:12
53:3
58:7,9
60:21
74:3,7

**lot**
21:10,11

**loud**
83:1

**loudly**
50:19

**low**
50:21

**lungs**
80:1
81:24

**lying**
78:4

───────────

**M**

───────────

**mail**
38:6

**main**
15:16

**majority**
65:3

**make**
6:1 9:13
16:22
27:6 28:9
37:10
50:18
66:21
80:9,17

**makes**
6:7 69:7
78:24
79:18

**male**
40:22
41:9,17
43:6
58:15

**man**
13:15

**mandated**
19:9,13

**mandates**
19:11

**manual**
30:5,9,
14,17,21,
24 31:2,
8,15,21

**manuals**
30:22
32:2

**marital**
7:19

**mark**
32:21
37:15

**marked**
34:19
37:2 42:2
65:16
71:7

**Married**
7:20

**material**
20:2
21:6,7

**materials**
32:16
36:17,20

**matter**
5:7 33:9
34:12,21
64:1

**matters**
5:12

**Matthew**
42:22

**meaning**
26:20
27:19

**means**
27:21

**mechanical**
13:18

**medical**
14:12
17:11,12,
15 28:1,
7,17 29:3
40:21
57:24
58:10
64:18,19
65:6

**medically**
77:3

**memo**
36:22

**memorandum**
36:22

**mental**
14:15,16,

19,20
15:1 17:3
26:11,12,
16,17
29:22
33:12,22
34:6 35:9
78:1

**mentioned**
18:8
27:23
50:8

**method**
37:14

**Mezzacappa**
5:1 7:13
47:16
75:12

**Michael**
41:5

**Middle**
39:8

**midnight**
72:3

**mind**
12:15

**minimal**
15:8 24:6

**minimum**
13:21

**minor**
17:14

**minutes**
44:16
74:11

**module**
23:9

**modules**
20:22
26:7
69:14



moments
  11:2

month
  31:4

months
  8:3 9:12
  31:9,12
  57:16

morning
  4:14

morning's
  4:12

motions
  4:19

move
  29:16

moving
  12:13

multi-
officer
  68:16,17

multiple
  60:18

muscular
  35:10

N

narrow
  24:9

narrowly
  30:1

National
  32:5,7,
  11,15,20
  33:13
  34:10,17,
  19 35:5
  82:16,21

native

45:20

nearby
  17:15

necessarily
  24:5

neck
  12:24
  55:7
  74:2,19
  75:7,8
  79:4,8,
  11,17
  80:4,16,
  20 81:4,
  12

needed
  41:13

night
  65:2
  75:22
  76:3
  78:19
  82:10
  83:6

noises
  50:18

notary
  4:23

note
  22:21
  33:8
  81:15

notes
  61:14

noticed
  55:7,9

number
  37:20,21
  70:16
  78:23
  81:3,11

numbers
  70:18

O

oath
  6:19 7:17
  10:1
  25:13
  52:5
  73:21
  76:13

objected
  22:22

objection
  7:12
  13:10
  20:11
  22:12,23
  30:16
  49:17,24
  57:8,18
  58:17
  59:7,16
  65:23
  66:13
  67:8 68:9
  72:11,17
  73:17
  74:23
  77:16
  78:6
  79:5,12
  80:11
  81:7,15
  82:9,12
  83:8

objections
  4:18

occurred
  16:2,9
  40:4 72:4

offer
  18:6

60:10

offering
  10:1

office
  6:19
  59:23
  60:4
  61:21
  62:7
  63:16,19
  64:21
  65:5
  75:23

officer
  7:13
  8:13,18,
  22 10:20
  15:18,19,
  24 16:7
  17:24
  19:6,8
  20:17,22
  23:10
  24:17
  25:17,22
  26:4
  27:10
  28:12,15
  30:6,15
  31:13
  32:4 33:2
  41:4,5,8,
  11,15,16,
  20 43:4,
  8,17
  44:20,23
  45:3,4,
  13,23
  46:6,9
  47:16
  49:3,15
  50:7 51:9
  54:23
  55:2,9,
  11,12,15,

18,19
  56:4,6,
  16,19
  58:3,15
  59:19
  69:4,6,16
  70:11,23
  73:23
  74:20
  75:6,8,12
  82:7,20
  83:15

officer's
  24:10

officers
  15:13
  21:20,21
  27:3
  32:13
  37:23
  42:5,13
  43:4,13,
  18 44:2,6
  48:2,7,9,
  15,24
  49:9,12,
  21 50:13,
  23 51:2
  53:18,19,
  22 54:6,
  9,10,14,
  20 56:10,
  14,23
  59:13
  63:5,11
  67:24
  68:7,14
  69:7
  70:16
  74:18
  75:17,19,
  21 76:1
  82:7

on-line
  19:18



one's
  81:5,14

one-page
  71:15

opinion
  16:17

opportunity
  27:7
  33:15
  34:23

opposed
  16:5

option
  43:2
  44:10

options
  23:24
  24:13

order
  12:10,13
  18:22
  19:20
  27:4
  52:17
  56:17
  65:1
  70:11

orders
  30:11,18
  31:17

original
  24:11

outset
  5:12
  14:22
  64:14

outstanding
  6:12

overpowered
  69:6

overtime
  40:8,14,
  16,19
  71:23

owe
  15:13

owed
  17:2,23
  25:21
  28:4,19

owes
  28:15

oxygen
  18:5
  56:18
  57:11

─────────

P

PA
  33:10,21
  34:5,22
  35:4,16
  36:4
  64:1,2
  66:17
  71:14

paddle
  57:3

paddles
  57:2

pads
  57:1

pages
  63:23

PAPD
  19:6
  65:20
  66:5
  67:24

paper
  30:22,23

Papia
  45:4
  50:5,14
  55:3,9
  56:16,19
  75:6

paragraph
  65:9,14,
  15

paragraphs
  66:20
  67:2

parallel
  47:18

part
  10:19
  11:16
  12:16
  14:20
  31:16
  50:2
  56:22
  60:13
  61:18
  68:20,22

partially
  34:1

participate
d
  20:17

partner
  42:6,11,
  20,21

pass
  18:23
  19:20

passed
  21:18
  57:3

past
  31:22
  72:3

path
  23:21
  24:5

pathogens
  29:4

patient
  33:24
  35:22
  36:2,7,13

patrol
  10:8

patrons
  15:16

Paul
  7:13

PDF
  33:21

penalties
  6:24

people
  14:19
  15:14
  42:18
  43:11
  44:24
  78:18,23
  81:3,11

pepper
  13:19

perceives
  15:18

perform
  56:12

period
  6:9

perjury
  6:24

person
  17:3,4
  19:16

23:3
  26:16,19
  28:4 49:6
  60:24
  61:1
  66:10
  72:9,10,
  13,15,19
  73:4,6,9,
  15 78:22
  79:18
  80:23
  81:2,10
  82:5

person's
  22:11
  79:4
  81:24

personal
  7:2,4,10
  36:23

personnel
  59:14
  62:22
  65:20
  66:5
  67:6,13

phone
  60:24

phrase
  27:15,16

phrased
  16:24
  27:14
  28:8

physical
  5:23
  13:16
  18:17
  82:7

physically
  18:21
  44:21



45:14
46:12
48:24
49:5,9
53:11

**place**
14:6 45:5
46:2
50:15,16
51:10

**placing**
23:2 46:9
49:2

**Plaintiff's**
32:21

**plaintiffs**
5:7

**plane**
44:18,24
53:7

**point**
33:24
34:8
35:8,12,
21,24
36:1,5,9
51:2
52:11,19
74:19,21
82:24

**points**
19:13

**police**
8:3,7,10,
18,20,22
9:3,7,15,
18 10:8,
10,13,21
11:4
12:2,22
13:9
15:22
16:18,23

17:20,23
18:16
19:2,7,8
20:18,21
21:4,8
23:10,14
24:12,17,
18 25:17,
18 26:1,
24 27:10,
11,17
28:12,13,
15 30:6,
7,11
31:14
32:12
42:2,14
44:13
55:19
58:22
59:1,6,14
60:6 61:8
62:21
63:4,10
67:5,12
68:14
69:13,15
70:22,23

**policing**
30:12
57:15

**policy**
71:4

**Port**
8:16,19
9:2,6
10:21
19:8
20:18
24:17
25:18
27:10
28:13
30:6
31:14

32:10,12
33:6 42:4
62:21
63:4,10
67:5,12
68:13

**position**
12:12
14:10

**positional**
14:4
24:19,21
82:4

**positioned**
45:24

**post**
42:12

**postgraduat
ion**
19:7

**posts**
42:7

**potential**
40:14
62:2 82:2

**potentially**
57:2

**Powerpoint**
32:20
33:7
34:11,20
35:5
82:15,19,
21

**practices**
9:18

**predisposin
g**
82:6

**preparation**
39:1,5

**prepare**
75:15

**prepared**
75:18

**preparing**
38:22

**presence**
11:9
13:15
18:21
75:16

**presently**
8:13

**pressure**
22:11
78:24
79:2,3,7,
11,14,16,
17,24
80:3,6,8,
12,16,20
81:4,12

**pretty**
23:13

**prevent**
36:8,14,
16

**principles**
21:3

**private**
61:7

**procedure**
66:12

**procedures**
9:19,23
35:18

**proceed**
14:21

**process**
50:17,24
53:10

**prepare**
75:15

**processing**
24:15

**produced**
31:22
33:8,13
34:12,20
63:24
71:14

**professiona
l**
72:8

**prone**
45:7

**pronounced**
72:20,22

**pronouncing**
5:2

**property**
28:20

**Prosecution**
63:21

**protect**
15:15
28:20,21

**protocols**
69:2,12,
17 70:3,
21

**provide**
19:24
20:3
29:18
32:11
61:17,19
68:12

**provided**
59:1
70:23

**publically**
63:24

**pulse**



55:13,16
56:7,11
58:3,7
73:1,3,
10,12,24
74:1,21
75:9

**pumping**
57:22

**punch**
49:18

**punched**
49:16,21

**punches**
49:23

**purpose**
43:23
60:2

**push**
51:12

**pushed**
47:6

**put**
4:12,15
31:24
32:3,19
33:6
51:12,21
53:8
68:17
70:16

**putting**
47:2
79:14
80:6,8,19

**pyramid**
13:13,14
23:17,21

─────────

**Q**

─────────

**question**

5:19,20
6:4,12,13
7:2 14:23
17:6,7
22:17,22,
24 28:11
31:19
36:11,12
49:8
51:20
52:3,4
66:3
67:10
69:22
74:6,14
78:13,16,
17 80:2
81:9,19

**question/
answer**
6:9

**questions**
5:8,14,
17,22
6:6,7,15
7:7,8
9:13
75:13
83:11,13

**quick**
53:6,8

**quickly**
10:24
37:5

**quote**
83:2

─────────

**R**

─────────

**radio**
41:1,13,
14,19
58:14
65:2

**ran**
41:24
42:1,8,17
44:23

**ranging**
30:11

**rarely**
35:13
83:2

**react**
11:11

**read**
4:21
14:24
22:20
33:16
34:13,24
38:11,12
65:9,11
66:19
83:1,2

**reading**
35:1
57:12
65:14
83:4

**reads**
65:13

**realize**
19:4
37:13

**rear**
24:23

**reasonable**
52:16
62:13
70:7,10,
14

**reasons**
57:20

**reassuring**
36:5

**recall**
11:21
15:21
16:24
26:5
29:2,12
30:23
31:9
32:6,14
38:9
39:21
40:3
44:15
46:22,23
47:1
49:12
55:1 58:9
60:17
61:13
68:22
71:2,5
74:4,6
82:24
83:4

**receive**
20:6
30:5,13,
17,18
41:7

**received**
9:17
20:14
21:22
24:12,16
25:19
26:4
28:17
30:20,23
31:3 33:5
38:7,14
68:14,16
69:13
70:22

**receiving**
38:6,11

**recent**
21:11

**recess**
25:4
75:11

**recognize**
33:4 38:4
64:7
71:11

**recollectio
n**
55:12
66:21

**recommendat
ion**
57:17

**recommendat
ions**
60:10
64:22
66:18

**recommended**
57:4
63:3,9,10

**record**
4:13,15
6:1,14
14:24
22:20
28:10
32:1
35:23
43:14

**recorded**
61:12

**recovering**
36:7,13

**recycle**
19:23

**referenced**
50:5



**referring**
27:24
52:2

**refreshers**
29:3,8

**regard**
35:17

**relax**
48:3

**released**
61:20

**remarking**
37:7

**remember**
29:5,15
38:6
40:18
43:10,11
53:5,19
55:1,3
56:16,17,
20  75:23
82:15,19

**remind**
52:4
73:20
76:12

**rendered**
62:14

**renew**
22:22

**repeat**
5:14,18
10:12
14:23
28:11
43:22
49:8
51:21
63:7
67:10

**rephrase**
5:18
16:21
17:8
28:11

**report**
16:1,9
36:23
60:11
61:20,24
62:6,20
63:3,8,9,
17,21
64:7,9,
13,20
65:6,8,
16,17,19
66:4,7,9,
15,17
67:4,11,
15  68:5,
10  71:13
75:16

**report's**
63:14
67:22
68:3

**reporter**
70:9

**reports**
76:2

**represent**
37:22

**represented**
61:2

**represents**
5:6

**request**
32:1

**requested**
25:10

**requesting**

41:8,20

**require**
18:5 20:4
29:14
58:22

**required**
17:17
18:20
20:10
23:24
25:19
62:13

**requirement**
4:23

**requirements**
19:12
20:15

**requires**
17:15,24

**requiring**
21:20

**reserved**
4:19,20

**resisting**
52:16
81:5,13

**respect**
20:20

**respond**
15:14
17:11,12
28:6 43:4
74:7

**responded**
22:15
40:2 41:2
42:13,24
43:9,14,
18  44:2
58:13
59:13

75:1,22

**responding**
28:1 29:3
58:15,23

**response**
57:24
58:21
64:17,18
72:5

**responses**
5:23 6:23

**restrain**
12:3
24:22
35:22
36:2
45:14,18
50:24
51:3
52:12
53:3
62:13

**restrained**
24:23
47:22
52:23
53:12,13,
21 54:12,
15,18,21
74:1,16

**restraining**
11:22
12:1,17,
18 21:16
29:21
46:24
50:11,12,
17 53:11
81:23

**restraint**
24:19
82:2

**restraints**

14:4
24:21

**restrict**
24:1

**restricted**
23:2,7

**Result**
35:9

**resuscitated**
73:11

**review**
31:5
36:17,20

**reviewed**
31:1
38:10

**reviewing**
82:15,19

**revived**
72:14

**risk**
82:4

**RMP**
41:24

**roll**
14:8
24:24
53:17,18
55:2 75:4

**rolled**
53:14,16,
22 54:6,
23 55:6,8
74:18
75:3

**rolling**
53:19

**room**
6:20



42:16
75:4,18
76:24

rough
39:7

roughly
28:22
31:7
38:7,12
53:1 56:3
58:7
60:21

round
74:10

rounds
60:18

Rules
10:3

rundown
9:10

Russian
45:21
48:15,18

――――――――

S

safety
13:1
32:5,7,
11,16,20
33:13
34:11,20
35:6
52:13,20
82:16,21

scale
13:15

scans
57:12

scenario
79:1

80:17,19

scenarios
21:10

scene
16:7 27:4
41:23
42:24
43:6,12,
14,15,18,
21,24
44:7,17,
22 48:2
49:19
53:2
58:1,8
59:5,13,
15 67:7,
14 69:5
70:11
75:22

schedules
83:17

school
7:24

sciences
9:15,16

screaming
41:12
45:1
50:22

screen
32:19,22,
24 34:13,
16 37:17,
18 63:17,
18 71:10
75:14

scroll
33:3
64:12
66:16,24
67:1

scrolling
64:6 65:4

searched
55:9 75:5

seat
42:19

section
64:19,22

Security
8:2 9:4

seizure
18:12
36:5
40:1,22
41:9,17
43:17
44:2
58:16
63:6,13
66:11
67:20
68:2,8
77:3,7,10

seizures
34:9,21
35:8
82:17,22
83:2

separate
11:16
37:10

series
5:8 64:23

Services
58:11

session
68:20

sessions
29:18

severe
17:13

18:2

severity
18:3

shaking
5:23

share
32:22
34:13

shift
40:6,8,9
71:23

shifted
75:3

shifts
40:13

shin
47:5

shock
57:2,4,
13,17,21
58:2
74:12

shortly
72:5

shoulders
5:24
22:10
46:10

shoving
50:3

shows
37:19,20,
22,24

shrugging
5:24

side
14:8 46:1
53:15,20
54:24
55:3,6,8

74:18
75:4,5

sides
45:4

sign
4:21

signature
71:16

significant
59:11

significant
ly
59:5

similar
20:19
21:3

simple
18:15
52:3

simply
23:4
39:17
81:19

sir
22:24
25:12
35:19
38:4
39:21
71:16
73:20
76:12

sirens
26:24

sit
14:9
54:11,14,
17

sitting
22:7 23:2
46:6


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

54:21
78:5
80:24

**situation**
14:21
16:13
17:10
26:16
27:5
52:18
60:8,11
69:5,8

**situations**
10:20
17:18,22

**skills**
15:10

**skipped**
19:5

**slash**
35:9

**sleep**
78:19

**sleeping**
78:9

**small**
64:5

**someone's**
22:10
73:1,3
79:15,24
80:7,8,
12,16,20

**sounds**
11:17
50:18,21

**source**
32:18

**space**
11:10

**speak**

26:21
38:21,24
39:4,9,12
45:17
48:18
77:15

**speaking**
30:9 31:7
40:3
48:15
53:1
64:11

**Special**
63:20

**specific**
9:12
10:19
17:9
68:23
70:21

**specifically**
14:18
15:21
22:18
23:3
26:6,15
34:21
55:1 65:9
69:11
71:2 80:3

**specifics**
29:12,16
44:15

**spoke**
39:18,20

**spray**
13:19

**St**
8:1,4 9:4

**stamp**
33:20
34:22

**stamped**
33:10
35:4 64:1
66:17
71:14

**standard**
16:12,16,
23 17:9,
19,23
18:1,10,
13 27:21
28:14

**standards**
27:12,14,
16

**standing**
45:7
78:5,11

**start**
9:11

**started**
9:2 40:7

**starting**
65:10

**state**
7:11 15:2
19:14
20:15
25:20
26:12,17,
20 78:1

**stated**
9:6

**statement**
64:15

**statements**
61:17,19

**states**
14:16,20

**status**
7:19

33:12,23
34:7 35:9

**stay**
36:8,13
59:20

**staying**
40:8

**stenographe**
**r**
6:1

**stenographe**
**r's**
6:2,8

**step**
57:11

**stipulation**
**s**
4:13,17

**stomach**
45:10
46:19
53:10,12
78:4,8,11
80:10

**stomachs**
78:19

**stood**
75:2

**stop**
12:12

**straight**
42:17
44:23
45:2
47:18
76:23

**strategies**
15:10
26:8,11,
15,18

**strength**

70:17

**strike**
4:20
78:21

**struggle**
82:7

**subject**
6:24 13:1
30:2

**subject's**
11:10
12:10,15
13:23
22:8
70:12

**subjects**
10:18
30:4
31:18

**suffered**
40:1
43:17
44:2
66:10

**suffering**
18:12

**suicide**
18:9

**summarizes**
64:14

**summary**
64:13
65:15

**summer**
83:16

**summons**
37:23

**supervisor**
16:1,10

**support**



27:3

**supposed**
12:24
59:19
60:5

**surroundings**
74:17

**switched**
23:18

---

**T**

**tactics**
10:5 14:2
15:5,7
29:22
68:23

**takedown's**
68:17

**takes**
65:2

**taking**
83:18

**talk**
17:12

**talking**
43:16

**taught**
12:2,3
13:7,20
14:6
18:22
24:22
26:1

**teach**
11:19,22
12:5,17
13:2,4
14:1,11,
14 15:9,

17,22
16:3,12,
22 25:20

**teaching**
12:16
70:21

**teaching's**
24:11

**technique**
12:23

**techniques**
11:4,7,
14,15,20,
23 12:1,
17,18,21
14:2
20:23
21:1,14,
16 29:21
50:11,12
81:23

**tells**
57:11

**ten**
55:24
57:14

**ten-minute**
76:6,14

**term**
27:16
28:2,3,6

**terms**
9:14,16
10:24
14:9
20:16
21:4
24:21
27:23
29:17
51:4

**test**

18:23
31:20

**tested**
10:16
31:14

**testified**
7:15,17
23:15

**testifying**
6:21
25:13
52:5
73:20
76:13

**testimony**
6:18 10:1
48:6
49:15
54:1,3
73:24
74:15

**tests**
10:10,13
18:16,17
19:20
20:1
57:12

**texts**
26:7

**thing**
11:17

**things**
5:12
10:23
20:19
24:3 26:3
29:20

**threat**
27:1

**threatening**
35:13
82:1 83:3

**three-
minute**
25:9

**time**
4:19,20
15:22
20:3 21:6
27:2,4
30:20,23
31:1,7
38:11,12
40:11,18
42:15,21
45:8
48:13
53:1,6,
10,13
55:3 58:6
67:16,17
73:12
83:15,18

**times**
10:17
18:20

**title**
8:17,22
34:5
35:18

**today**
5:7 23:15
25:12
39:9,13,
18 49:15
52:5
54:1,4
73:21
74:16
83:7,19

**today's**
82:20

**tone**
11:10

**tools**
24:6,13

**top**
29:5
37:20

**topic**
29:19
39:16

**topics**
11:2
30:12

**total**
64:24

**totality**
11:13
15:4
16:14
24:4

**touch**
10:23
12:24

**touching**
23:4
47:14

**tour**
72:2

**traffic**
10:8

**train**
63:4,11

**trained**
57:23
67:18
68:4

**training**
19:9,12,
13,15,18,
19,20,24
20:4,9,
14,16,22
21:12
22:19
23:9
24:16



25:19
26:3,7
27:9,17
28:14,18,
24 29:7,
15,18
31:17
32:4,12
36:17
57:15
67:17,24
68:7,13,
16,20,24
69:13,14
70:4
72:8,20

**trainings**
70:22

**transcript**
6:8 65:1

**transition**
13:13

**treatment**
64:19

**trial**
4:19,20

**trust**
56:6

**truthfully**
7:8

**turned**
74:2

**turning**
55:10

**two-minute**
25:3

**type**
48:11

**typical**
17:10
40:13

57:16

**typically**
11:19
28:24
49:23

———————

**U**

———————

**ultimately**
52:22
61:23

**unable**
78:15

**unclear**
73:15

**uncontrolle
d**
35:10

**understand**
5:16
6:18,23
7:7 16:20
17:5,7,21
20:13
25:12
27:13,19,
20 28:6
43:24
51:20
67:18
68:5,10
69:21,23
77:14,20,
24

**understanda
ble**
28:3

**understandi
ng**
19:23
23:1 24:8
62:7,17
73:6

**understood**
5:20
41:15
43:15

**uniform**
37:14

**union**
61:10

**unique**
63:5,11

**uniquely**
66:11
67:19

**Unit**
63:20,21

**unresponsiv
e**
34:2

**unsafe**
52:15

**update**
19:22
21:24
24:9
31:3,8

**updated**
19:24
20:2,14

**updates**
21:22
23:15,16
26:2,5
30:19

———————

**V**

———————

**varied**
29:23

**varying**
16:13
27:11

**vehicle**
42:2,3,9,
10 43:10

**vein**
6:3

**verbal**
11:8
13:15
15:9
26:20,22

**verbally**
5:22

**verificatio
n**
38:2

**versus**
17:3
69:19
70:5
78:11

**violence**
13:23

**voluntarily**
53:17

**vulnerabili
ty**
63:5,12

**vulnerable**
66:11
67:19
77:4

———————

**W**

———————

**wails**
50:21

**wait**
6:3

**waiting**
16:5

**waive**
4:23

**wake**
63:6,12
67:19

**walked**
76:23

**warning**
48:12

**warnings**
47:24
48:1,10,
11,14
77:14,20,
24

**wear**
43:2

**wearing**
42:23

**web**
23:23

**week**
10:17
40:10,11,
14,19

**weight**
23:2,6
50:23
51:3,6,8,
11,17,23
52:1,7

**wholly**
34:1

**witnessed**
56:15

**words**
27:20
62:10
76:5
77:14,20,
24



800.211.DEPO (3376)
EsquireSolutions.com

**wore**
  44:6

**work**
  8:19
  40:16

**worked**
  71:22

**working**
  40:6,7,10

**writing**
  32:3

**written**
  18:17
  61:17,19

**wrong**
  62:12

**wrongdoing**
  62:1

---

**Y**

---

**year**
  8:4,9
  19:1
  28:22
  29:6,8,11
  30:15,19

**years**
  8:1 29:9,
  10 32:2
  38:9
  55:24
  56:3
  57:14

**yelling**
  45:1 48:2
  50:19

**York**
  7:14 8:16
  21:20
  59:22

60:4

---

**Z**

---

**zoom**
  60:24
  65:10
  66:21
  71:9

