# EXHIBIT N

**In the Matter Of:**

ALEXEY V. TARASOV, ESQ. vs PORT AUTHORITY

No. 1:21-cv-06226NRB

**JONATHAN DURAN**

*August 03, 2023*



800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - x

ALEXEY V. TARASOV, ESQ. Administrator

of the Estate of EVGENIY LAGODA, Deceased

and GRIGORY TIKHOPLAV,

                     Plaintiffs,    Civil Action

v.                     No. 1:21-cv-06226NRB

PORT AUTHORITY OF NEW YORK AND NEW

JERSEY and PORT AUTHORITY OF NEW YORK

AND NEW JERSEY POLICE DEPARTMENT

a/k/a PORT AUTHORITY POLICE DEPARTMENT

a/k/a PAPD, PAPD OFFICER MICHAEL BUGIADA,

PAPD OFFICER ROBERT JOSEPH, PAPD OFFICER

JONATHAN PAPIA, PAPD OFFICER PAUL MEZZACAPPA

and PAPD JONATHAN DURAN,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - x

DEPOSITION OF JONATHAN DURAN

August 3, 2023 * 10:04 a.m.

Port Authority of New York and New Jersey PAPD

4 World Trade Center

New York, New York

Reporter:  Nancy L. LaCivita


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

APPEARANCES VIA ZOOM:


    ASHCROFT LAW FIRM, LLC

    By J. Christopher Amrhein, Jr., Esquire

    200 State Street

    7th Floor

    Boston, MA 02109

    (617) 573-9400

    Counsel for the Plaintiffs


    PORT AUTHORITY OF NEW YORK

    and NEW JERSEY PAPD

    By Cheryl Alterman, Esquire

    By Matthew Malysa, Esquire

    4 World Trade Center

    150 Greenwich Street

    24th Floor

    New York, New York 10007

    (212) 435-3431

    Counsel for the Defendants


ALSO PRESENT:

    Alexey Tarasov

    Grigory Tikhoplav



                         I N D E X

EXAMINATION OF:                                  PAGE

JONATHAN DURAN


  Direct Examination by Mr. Amrhein              4


                    E X H I B I T S

NO.                                             PAGE

Exhibit A      National Safety Council            34

Exhibit B      National Safety Council            36

Exhibit C      First Amended Complaint            39

Exhibit D      Attorney General Report            78

Exhibit E      Use of Force Report                85

*Original exhibits retained by Attorney Amrhein.



P R O C E E D I N G S

* * *

JONATHAN DURAN, having been satisfactorily identified and duly sworn by the Notary Public, was examined and testified as follows:

* * *

DIRECT EXAMINATION

BY MR. AMRHEIN:

Q.  Good morning, Officer Duran.  Thank you for taking time out of your day to be here.  We appreciate it.

Before we get started, Cheryl, I know we had a couple of depositions yesterday where we put stipulations on the record.  Would you agree to the same stipulations?

MS. ALTERMAN:  Yes.

MR. AMRHEIN:  For the record, those stipulations are all objections, except as to form, are reserved until the time of trial and all motions to strike reserved until the time of trial.  30 days, whatever is best for Officer Duran and we will waive notary.

MS. ALTERMAN:  Yes.  We will also



note the plaintiff's presence on the record.

MR. AMRHEIN:  Yes, my apologies. Also present here with us today are the plaintiffs in the matter, in particular, Grigory Tikhoplav and Alexey Tarasov who is the administrator of the estate of Evgeniy Lagoda.

MS. ALTERMAN:  Thank you.

Q.  Officer Duran, have you ever been deposed before?

A.  No.

Q.  So I'm going to go over a few introductory matters.  My name is Chris Amrhein. I'm an attorney with Ashcroft Law Firm.  We represent the plaintiffs in this matter.

I'm going to be asking you a series of questions here today.  Just in terms of a few introductory matters as to what to expect from today's deposition.

First, if you can't hear one of my questions, please tell me and I'm happy to repeat it.  If you do not understand one of my questions, please let me know and I will rephrase it for you. And if you do answer a question, my understanding is that you understood the question.  Is that fair



to say?

A.  Yes, sir.

Q.  Please answer all questions verbally and try to avoid physical responses like shakes of the head or shrugs of the shoulder.  And that is for the purpose of the stenographer.

In colloquial conversation, it's easier to communicate that way, but for the purpose of the stenographer, oral answers make her job as easy as possible.  In that same vein, if you can wait until I complete my question before you answer.  It's easy to anticipate where things may go, but, again, for the stenographer's job here today, it is best for the transcript to have a clean, clear question and answer.

Finally, if you need a break, let me know.  If there is a question pending, all I ask is you finish your answer to the question and then we can take the requested break.  Do you have any questions about anything I have said so far?

A.  No.

Q.  Officer Duran, do you understand you're giving testimony under oath and even though you're in a conference room and office, it's just as



though you were testifying in court?

A. Yes.

Q. Do you understand your responses are subject to the penalties of perjury?

A. I do.

Q. And I promise we ask this of every deponent. This is not a personal question. We, again, ask this of everyone.

Are you under the influence of anything that would impair your ability to understand my questions or impair your ability to answer my questions truthfully?

A. No.

Q. Again, that is not a personal question. We ask that of every deponent. Can you please state your work address?

A. Jonathan Duran. Work address is LaGuardia, Building 137, Queens, New York. I'm not too sure about the zip code.

Q. Have you ever testified under oath before?

A. Yes.

Q. Can you briefly describe when that was?

A. When, time frame?



Q.  Roughly.

A.  Maybe four years ago.  Four or five years ago.

Q.  Was that part of a trial?

A.  No.

Q.  Can you tell me a little bit about what you testified under oath?

A.  It was during an arrest that I had and the person's attorney, we went to court and she was cross-examining the case.

Q.  What was the setting?

A.  It was in a court setting.

Q.  What was the result of that?  Was it questioning the arrest you had made?  Was there any disciplinary action taken?

MS. ALTERMAN:  Objection to form. You can answer.

A.  There was no disciplinary action.  The person in question had multiple arrests and he ended up receiving -- I think it was three years in jail for his actions.

Q.  Officer, what is your marital status?

A.  I'm married.

Q.  Do you have any children?



A.  I do.

Q.  Can you please briefly describe your educational background after high school?

A.  College.

Q.  What year did you graduate college?

A.  I didn't receive a bachelor's.  I did about four years of college.

Q.  Did you receive any degree from your schooling after high school?

A.  Yes.  Well, after high school, no.

Q.  What years did you take those roughly four years of post high school educational courses?

A.  That was 2000 to 2004, 5.

Q.  Officer Duran, are you currently employed?

A.  Yes.

Q.  Who is your employer?

A.  Port Authority of New York and New Jersey.

Q.  What title do you have?

A.  I'm a police officer.

Q.  Did you work for the Port Authority Police Department in April 2019?



A.   Yes.

Q.   Was your title police officer at that time?

A.   Yes.

Q.   I know you mentioned your present address is the LaGuardia Airport.  At one point, was your work address JFK International Airport?

A.   That is correct.

Q.   When did you make the change from JFK to LaGuardia?

A.   That was roughly three years ago.

Q.   Why did you make that change?

A.   Because I got into the emergency service unit.

Q.   Was that a promotion or was that -- did you receive a change in title or anything like that?

A.   Specialized training.

Q.   Sir, when did you attend the Port Authority Police Department Police Academy?

A.   Can you repeat your question?

Q.   Sure thing.  When did you attend the Port Authority Police Department Police Academy?

A.   It was August 16, 2013.



Q.   What did you do for employment wise before you began with the Port Authority or before you started at the police academy for the Port Authority?

A.   I was a retail store manager.

Q.   Before starting at the police academy for the Port Authority, you did not have any law enforcement experience?

A.   No.

Q.   I'm just going to run through a few things with respect to the curriculum at the Port Authority Police Academy.  Did they cover behavioral sciences?

A.   Yes.

Q.   Police practices and procedures?

A.   Yes.

Q.   Laws of arrest?

A.   Yes.

Q.   Court procedures?

A.   Yes.

Q.   How about testifying under oath?

A.   Yes.

Q.   Was part of the curriculum rules of evidence?



A.   Can you repeat the question?

Q.   Sure thing.  Was part of the curriculum rules of evidence?

A.   Rules of evidence, I don't recall.

Q.   Was part of the curriculum defense tactics?

A.   Yes.

Q.   I think I probably know the answer to this one, was First-Aid part of the curriculum?

A.   First-Aid?

Q.   Yes.

A.   I don't recall the order of curriculum.

Q.   I mean, First Aid as administering First Aid to a person.

A.   Yes, that is correct.

Q.   Did you take any tests at the police academy?

A.   Yes, sir.

Q.   How often were you tested?

A.   Every week.

Q.   Was that every week for about six months?

A.   That is correct.

Q.   Was part of the curriculum specific situations that you may face as an officer for the



Port Authority?

A.  Yes.

Q.  As part of your teaching and training at the police academy, did they teach you about deescalation techniques?

A.  Yes.

Q.  What did they teach you?

A.  Different techniques to use during an encounter with said individuals whether it was verbal judo.

Q.  Did you say verbal judo?

A.  Yes.  Verbal judo, police presence and restraining an individual.

Q.  Can you describe what verbal judo is?

A.  Can you ask the question again?

Q.  Sure.  Can you please describe what verbal judo is?

A.  You got cut off.

Q.  Can you please describe what verbal judo is?

A.  Sure.  It's like utilizing your words to try to get an individual to comply to what you want him to do at a time.

Q.  Is this a type of thing, verbal judo,



that the academy teaches you to do before engaging physically?

MS. ALTERMAN:  Objection.  You can answer.

A.  Yes.

Q.  Is verbal judo also a type of diffusing technique?

A.  Yes.

Q.  Based on your experience at the police academy and the teachings they offered, do you understand deescalation and diffusing techniques to be almost one in the same or fall in the same bucket?

A.  Yes.

Q.  In your time at the police academy, did they teach you about restraining techniques?

A.  Yes.

Q.  Can you tell me what techniques they taught you?

A.  Sure.  Arm locks, wrist holds, handcuffing.  There are others, but I can't recall the particular name.

Q.  Did they teach you about compliance holds?



A.  Yes.

Q.  Was part of the training within the curriculum at the police academy that you experienced when you were there which restraining techniques you should not use as an officer?

A.  That I shouldn't use?

Q.  I can rephrase.  In your time at the police academy, did they also teach you about restraining techniques that you should not use?

A.  Yes.

Q.  What restraining techniques were they referencing there?

A.  Choking someone.

Q.  Any other examples?

A.  I don't recall any others.

Q.  Did they teach you about use of force and use of deadly force at the police academy?

A.  Yes.

Q.  Now, did they use the use of force pyramid, or did they use a flow chart web about use of force?

A.  It was more of the use of force what we had available as a tool.

Q.  Did they teach you about individual use



of force versus group use of force?

A.  I don't know.  I don't recall.

Q.  Did they teach you about ground fighting techniques when you were at the police academy?

A.  Yes.

Q.  What type of techniques did they teach you?

A.  Breaking a fall.  If a suspect comes from behind you and tries to get you to the ground and the person tries to get on top of you and reaches for your service weapon, how to try to get that individual off your body so you can regain control.

Q.  Did they teach you about positional restraints and compressional asphyxiation when you were at the police academy?

A.  Can you repeat that?

Q.  Sure.  When you were at the police academy, did they teach you about positional restraints and compressional asphyxiation?

A.  Yes.

Q.  What, in particular, did they teach you about with respect to positional restraints and compressional asphyxiation when you were at the



police academy?

A.   They taught us how to restrain someone, putting their hands behind the back and to effect the restraint in an ordinarily fashion without putting any pressure on their neck.

Q.   What about pressure on the back?

A.   No.

Q.   Did they teach you not to sit on anyone?

A.   Yes.  We never did that during the academy.

Q.   What about applying pressure with your body weight on someone's back and neck?

MS. ALTERMAN:  Objection to form. You can answer.

A.   Yes.  They told us that is not something that we practice.

Q.   Did they teach you about dealing with medical crises when you were at the police academy?

A.   Yes.

Q.   I guess a subcategory of that may be the following:  Did they teach you about mental health crises when you were at the police academy?

A.   Yes.



Q.   And as an officer in the capacity as a police officer for the Port Authority Police Department how to handle and deal with a civilian who is having a mental health crises?

A.   Yes.

Q.   Did they teach you about dealing with someone, a civilian, who has an altered mental state?

A.   Yes.

Q.   You learned all this when you were at the police academy; am I correct?

A.   Yes.

Q.   What, in particular, did they teach you with respect to dealing with a civilian who is having a mental health crisis and has an altered mental state?

A.   To be mindful that person may not be in their right state of mind at the moment.

Q.   Did they teach you to proceed with caution in dealing with a person who has an altered mental state?

A.   Yes.

Q.   Did they teach you to try to diffuse or deescalate the situation when dealing with a



person with an altered mental state?

A.  Yes.

Q.  Did they teach you to try to deescalate or diffuse a situation with respect to a person with an altered mental state before engaging that person physically?

MS. ALTERMAN:  Objection.  You can answer.

A.  Yes.

Q.  Did they teach you about active listening skills?

A.  Yes.

Q.  When teaching you about mental health or dealing with people with mental health crises and altered mental state while you were at the academy, did they teach you that you owe those civilians a higher level of duty and care?

MS. ALTERMAN:  Objection.  You can answer.

A.  Yes.

Q.  Did they teach you about the duty to intercede when seeing an officer doing something you may perceive as improper?

A.  Yes.



Q.  While you were at the academy, did they teach you about the different level of the standard of care owed to civilians?

A.  Yes.

Q.  When you took these tests at the academy, were they written tests or physical demonstrations or perhaps both?

A.  Both.

Q.  Were the written tests in person or were they on line?

A.  In person.

Q.  As part of your testing at the police academy, you also had to show your physical ability within the confines of the lesson in order to pass that given class or training; am I correct?

          MS. ALTERMAN:  Objection to form. You can answer.

A.  Yes.

Q.  I can rephrase that.  It was a poorly worded question.

          Officer, as part of your training at the police academy, you also have to pass tests that were physical in nature?



A.   Yes.

Q.   What year did you graduate from the Port Authority Police Department academy?

A.   It was January 2014.

Q.   You're coming up on ten years; am I correct?

A.   That is correct.

Q.   Congratulations, sir.

A.   Thank you.

Q.   As an officer for the Port Authority Police Department, so after graduation, is there mandated training you must complete?

A.   Yes.

Q.   Who or what mandates the training requirements?

A.   The agency, Port Authority.

Q.   Does the state mandate the training as well?

            MS. ALTERMAN:  If you know.

A.   I don't know.

Q.   How often do you have to take training courses in your capacity as a police officer for the Port Authority Police Department starting back in 2014?



A.  Twice a year.

Q.  Are there some classes that occur more frequently than others?

A.  Yes.

Q.  Would a class that occurs more frequently be something like CPR?

A.  Yes.

Q.  Do other classes occur less frequently, say, every other year or every third year?

MS. ALTERMAN:  Objection.  You can answer.

A.  I'm not sure how frequent they occur.

Q.  Would you agree with me some classes are not as frequent as, say, your CPR testing?

A.  Yes.

Q.  Again, I'm going to go over a few things with respect to your training you received in your capacity as an officer.  So, again, this is after you attended the police academy.

Have you taken training on deescalation and diffusing techniques?

A.  Yes.

Q.  Are those largely the same as to what you testified to earlier in your days at the police



academy and, if not, what has changed?

A.   They are more in depth than the previous training because of the unit I'm in currently.

Q.   Let's say prior to 2019, were they as in depth as they are now?

A.   Are you referring to the training I'm receiving now of the unit I'm involved or the training that a patrol officer receives after 2019?

Q.   After 2019, so the latter.  I can rephrase that for you to make it easier and clear for the record.

Dating back to prior to 2019, did you take classes on deescalation and diffusing techniques?

A.   Yes.

Q.   How did those classes compare to your classes at the police academy on the same subjects?

A.   Can you repeat that question, the last portion of it?

Q.   Sure.  How did those classes compare to the classes you took at the police academy on the same subject?



A.    The same.

Q.    Was there any updating on strategy and techniques in order to deescalate and diffuse the situation that developed after you were out of the police academy?

A.    There has been updates, yes.

Q.    Do you recall what the updates were?

A.    No, I don't.

Q.    In terms of diffusing techniques that you were trained in as an officer for the Port Authority, so after you graduated from the police department academy, did they teach you about taking time to assess and calm the situation?

A.    Yes.

Q.    How about providing assurance that officers are there to help a person?

A.    Yes.

Q.    What about moving slowly and reducing environmental distractions?

A.    Yes.

Q.    In your capacity as an officer for the Port Authority Police Department and the training you were required to take, did they teach you about restraining techniques?



A.  Yes.

Q.  Do those techniques differ at all from what you learned at the Port Authority Police Department Academy?

A.  No.

Q.  Did they make any additions to the training or updates to the training with respect to restraining techniques?

A.  I don't recall if there was modifications.

Q.  Did they give you material as part of the classes you took?

A.  I don't recall.

Q.  Were these tests on line or were they physical demonstrations?

A.  After the academy?

Q.  Correct.

A.  I believe it was both.

Q.  So in terms of restraining techniques training that you received as a police officer for the Port Authority Police Department, you did both written and physical demonstrations for the tests, correct?

A.  Yes.



Q.   When do the physical demonstrations occur when you were tested in your capacity as an officer for the Port Authority Police Department?

A.   They were in-service training.

Q.   Was that in-house at the police department?

A.   At the academy.

Q.   As an officer, did they also require you to take training classes on use of force and use of deadly force?

A.   Yes.

Q.   What, if anything, differed between the training you received as an officer in the use of deadly force or use of force versus training you received on the same subject at the police academy?

A.   What was the difference?

Q.   What, if any, difference, yes?

A.   I don't recall any differences after becoming a police officer.

            MS. ALTERMAN:  Don't guess.  If you know.

A.   I don't know.  I don't recall.

Q.   As an officer for the Port Authority



Police Department, did they require you to take classes and training about the difference between individual use of force versus collective or group use of force?

A.  I don't recall.

Q.  You don't recall if the classes existed, or do you just not think they have two separate classes?

MS. ALTERMAN:  Objection to form. You can answer.

A.  I don't recall if they had different classes for both scenarios.

Q.  To the best of your knowledge, do you believe there was one single class on use of force and use of deadly force?

A.  Can you repeat that question again?

Q.  Sure.  To the best of your knowledge, do you think it's just one single class on use of force and use of deadly force?

A.  No.

Q.  By that, I don't mean one single class you took in your career.  I mean, one class on use of deadly force versus a separate class on deadly force or use of force as a collective group?



A.  I don't recall.  I don't recall being -- I don't really understand the question how you phrased it.

Q.  Let me see if I can clarify for you, Officer.  Did they ever teach you in your capacity as a police officer for the Port Authority Police Department in your training classes required about the difference between use of force and use of deadly force as an individual versus use of force and use of deadly force as a group or collective?

A.  No.

Q.  As an officer in the training classes required, did they teach you about defense tactics?

A.  Yes.

Q.  Does that include ground fighting techniques?

A.  Yes.

Q.  As an officer for the Port Authority Police Department, did you take required classes and training about compressional asphyxiation and positional restraints?

A.  Yes.

Q.  Was that similar to the classes that you



took at the Port Authority Police Academy?

A.  Yes.

Q.  Do you recall any updates or changes in strategy that you learned in your capacity as an officer that changed from what you learned at the police academy?

A.  I don't recall any updates.

Q.  Do you recall any updated training manuals in your capacity as an officer that discussed the use of body weight when trying to physically restrain a civilian?

A.  I don't recall.

Q.  As part of your training as a police officer, were you required to take classes on dealing with mental health crises?

A.  Yes.

Q.  Did that training include dealing with people with altered mental states?

A.  Yes.

Q.  Was that training very similar or the same as the training you received at the police academy?

A.  Yes.

Q.  You also take training classes as a



police officer on dealing with mental crises?

A. Yes.

Q. Was that training similar to the training -- let me rephrase that. Strike that.

Was that similar or the same as the training you received at the police academy?

A. Yes.

Q. As far as your training as a police officer, did they train you on verbal strategies and active listening skills?

A. Yes.

Q. Is that the same as deescalation techniques and diffusing techniques or is that different?

A. Yes.

Q. So it's the same?

A. It's the same as diffusing techniques, deescalate.

Q. I know you testified they taught you this at the academy. So I'm going to ask about your time as a police officer.

In your capacity as a police officer for the Port Authority Police Department and training you received as required, did they teach



you about duties to intercede when an officer is doing something you perceive to be improper?

     A.  Yes.

     Q.  If you perceive something to be improper, are you mandated or required to intercede?

     A.  Yes.

     Q.  As an officer for the Port Authority Police Department, did you receive training on the different standards of care owed to civilians?

     A.  Yes.

     Q.  Were those similar standards of care you were trained in at the police academy?

          MS. ALTERMAN:  Objection.  You can answer.

     A.  Yes.

     Q.  Roughly how often -- I know we touched on this earlier.  How often were you required to take these courses when you were an officer for the Port Authority Police Department?

     A.  It would be twice a year.

     Q.  And some of these may be more often than others.  Is that fair to say?

     A.  Yes.

     Q.  Were those courses typically a block of



time several hours, can you describe to me how long the courses were?

    A.  I'm not sure on the length of the courses.

    Q.  Was it more than an hour?

    A.  Yes.

    Q.  Would they cover multiple subjects in a given training session?

    A.  Yes.

    Q.  Did you receive any certificates that indicated you completed the training courses?

    A.  During or after the academy?

        MS. ALTERMAN:  Listen to his question.  His question is while you're a police officer.

    Q.  I can be more specific.  And if you're unclear about a question, let me know and I'm happy to repeat it or provide some clarification. Again, these lines of questions are about your time after the academy.  So in your capacity as a police officer.  Did you receive any certificates upon completion of the training courses that indicated you did, in fact, complete the training courses?



A.  Yes.

Q.  Is that with each course, or is it for only specific courses?

A.  I'm not sure on the -- which courses give out the certification or not.  I'm not sure.

Q.  Is it safe to say not all courses do give out certificates upon completion?

A.  Yes.

Q.  When you started with the Port Authority Police Department in January 2014, did you receive an employee manual when you became an officer?

A.  I don't recall.

Q.  Have you ever received an employee manual as a police officer at the Port Authority Police Department?

A.  I don't recall.

Q.  Did you ever receive a hard copy manual from anyone at the police department?

MS. ALTERMAN:  Objection.  You can answer.

A.  I don't recall.

Q.  What about an electronic copy, is there a manual accessible on line for employees at the Port Authority Police Department?



A.  Not that I'm aware of.

Q.  Is it fair to say you would not have had to take any tests on the information contained within an employee manual as part of your job as a police officer for the Port Authority Police Department?

MS. ALTERMAN:  Objection.  You can answer.

A.  I don't recall taking any tests.

Q.  I know we went over a number of things that require training in subjects about the training for you in your capacity as an officer for the Port Authority police departments.

Again, that is after you graduated from the academy.  Does any of your training involve the National Safety Council?

A.  I don't recall.

Q.  Do you recognize the name National Safety Council at all?

A.  I have heard of it, but I don't --

MR. AMRHEIN:  I'm going to introduce what is going to be Exhibit A.  Just bear with me.

Q.  I'm going to share my screen as soon as this PDF loads.  Let me know whenever you're able



to see it on your end, Officer.

A.  It's up.

Q.  Have you ever seen this document before?

A.  I don't recall.

Q.  This is a document that was produced by defendants in this matter -- the defendants in this case.  This is a document produced by defendants as part of discovery.  It is Bates stamped PA 2064 through PA 2068.

It is a PowerPoint from the National Safety Council entitled "Altered Mental Status." I'm going to take you through it.  It's a short PowerPoint.

Can you let me know as soon as you're finished reading each page, and I will move on the next and I will ask you a few things about it.

A.  (Witness complies.)  Okay.

Q.  This is the short balance on the PowerPoint Altered Mental Status.  I'm going to turn your attention to PA 2065 which is the same page on this exhibit.

Am I correct the second bullet point says under "Altered mental status.  Patient may be



confused, disoriented, combative, drowsy or partially or wholly unresponsive?"

A.  Yes.

Q.  If you can turn to the next page entitled "Common Causes of Altered Mental Status."  Can you tell me what the first bullet point says there?

A.  "Seizures."

MR. AMRHEIN:  I'm going to introduce what is going to be marked as Exhibit B and we're going to go through this.  This is like the last document.  Let me know whenever it is on your screen.

A.  For the record, this is another PowerPoint from the National Safety Council entitled "Seizures."  This is a document produced by defendants in the matter as part of discovery.

It is Bates stamped PA 2029 all the way through PA 2095, and I'm going to take you through it and let me know when you have completed reading each page.

MS. ALTERMAN:  For the record, the first Bates stamp is 2082.

MR. AMRHEIN:  Was that a mistake in what I said?



MS. ALTERMAN:  Yes.  I'm not sure what you said, but --

MR. AMRHEIN:  It is PA 2082 through PA 2095.  Thank you for cleaning that up for me. I appreciate it.

Q.  I'm going to bring you to the second page.  The first page is, again, just a cover page for the National Safety Council PowerPoint on seizures.

A.  (Witness complies.)

Q.  Officer, again, this is a National Safety Council PowerPoint on seizure.  This was produced by defendants in this matter.

I'm just going to direct your attention to Bates stamped PA 2083, the second page of this PowerPoint.

Am I correct the third bullet point on this page under seizures says, "Results in altered mental status, slash, uncontrolled muscular contractions?"

A.  Yes.

Q.  Am I correct the final and fourth bullet point on this page says, "Rarely life threatening but a serious emergency?"



800.211.DEPO (3376)
EsquireSolutions.com

A.  Yes.

Q.  I'm going to take you through 2093 as the Bates stamp is the second to last bullet point. Does that say "Don't restrain patient?"

A.  Yes.

Q.  I'm going to take you to 2095.  Am I correct the second bullet point says "Be reassuring after seizure?"

A.  Yes.

Q.  Does the third bullet point down say "If recovering patient is agitated or angry, stay back but prevent any dangers?"

A.  Yes.

Q.  Did you review any training materials in advance of this deposition?

A.  Yes.

Q.  Which training materials did you review?

A.  The reports that were created by me.

Q.  Are those the same as training materials or just documents you created by yourself in your capacity as an officer within the duties of your job?

A.  Materials I created.

Q.  So I can repeat it.  There may have been



some confusion.  Did you review any training

materials in advance of this deposition?

    A.  No.

        MR. AMRHEIN:  I'm going to introduce

what is going to be marked as Exhibit C.  It is

the First Amended Complaint in this matter.

    Q.  Let me pull it up.  Let me know when that

is on your screen.

    A.  It is up.

    Q.  I represent to you this is the entire

First Amended Complaint, and, in particular, is

the Bates stamp by the court docket number 1,

dash, 1 after this matter was removed from state

court.

        It shows the summons of defendants

and it includes right after that the complaint in

this matter all the way through the complaint to

the first exhibit, the second and the third?

        Have you reviewed this document

before?

    A.  Yes.

    Q.  So I assume you recognize this document,

the First Amended Complaint?

    A.  Yes.



Q.  Did you review this document in preparation for this deposition?

A.  No.

Q.  When did you first become aware of this document?

A.  I don't recall the exact date, but it was mailed to my home address.

Q.  Do you know who mailed it to you?

A.  No, sir.

Q.  When was the last time you reviewed this document?

A.  I don't recall.

Q.  Did you ever go over this document with your attorney?

A.  No.

Q.  Did you speak with anyone about this document?

A.  No.

Q.  You didn't speak with any other officers about this document?

A.  No.

Q.  Did you speak with your attorney in preparation for today's deposition?

A.  Did I speak to her in the past?



Q.  Have you spoken with your attorney --
excuse me.  I will rephrase it for you.

Did you speak with your attorney in
preparation for your deposition today?

A.  Yes.

Q.  Again, I don't want you to divulge the
context of what was actually discussed.  I'm
simply asking when did you speak with your
attorney when you were preparing for this
deposition?

A.  When?  Last week.

Q.  Did you speak with your attorney last
night before your deposition today?

A.  No.

Q.  Sorry.  I think that got cut off.

A.  I did not speak to my attorney last
night.

Q.  Did you speak with your attorney this
morning in advance of this deposition?

A.  No.

Q.  Not once you spoke with your attorney in
response of this deposition?

MS. ALTERMAN:  Objection.  You can
answer.



A.  No.

Q.  Did you speak with anyone else in preparation for this deposition?

A.  No.

Q.  I think you touched on it earlier, but I asked you about training materials, if you reviewed any.  So I will just ask this again just to get a clear question.  What did you do to prepare yourself for this deposition?

MS. ALTERMAN:  Objection.  You can answer.

A.  I met with my attorneys twice.

Q.  When did you meet?

A.  Once last week and I think maybe the week prior.

Q.  Did you review any materials on your own in anticipation of this deposition?

A.  No.

Q.  You didn't review any reports or anything in preparation for the deposition?

MS. ALTERMAN:  Objection.  You can answer.

Q.  I can rephrase that for you.  Did you review any reports or documents in preparation for



your deposition today?

MS. ALTERMAN: Objection. Asked and answered. You can answer.

A. I reviewed the reports created by me for the events that night.

Q. Can you specify what reports you reviewed?

A. A copy of my memo book, a copy of the use of force. That's all I can recall at this time.

Q. Okay. Thank you, sir. Do you recall the name Evgeniy Lagoda?

A. Yes.

Q. Who is Evgeniy Lagoda?

A. He was a passenger on a Jet Blue flight.

Q. Do you recall the events that occurred on April 12, 2019?

A. Yes.

Q. Sir, what shifts were you working that day?

A. I was working the 10 to 6.

Q. Is that your typical shift?

A. Yes.

Q. How long had you been working that 10 to 6 shift roughly in April 2019?



A.  Probably four years.

Q.  Did you ever work any overtime?

A.  Yes.

Q.  Would that overtime shift be in the 2 to 10 range or come after your 10 to 6 concluded and start from 6 to 2?

A.  It would be prior 10 to 6 or after 10 to 6.

Q.  It would depend on what was needed that day?

A.  Correct.

Q.  Officer, are you aware that a Jet Blue flight called in a medical emergency for a male having a seizure on board?

A.  Yes.

Q.  Did you hear that call yourself?

A.  Yes.

Q.  Can you tell me who first responded to that call?

A.  Yes.  It was --

Q.  Do you know the name of the officer?

A.  Officer Bugiada.

Q.  You were aware that night Officer Bugiada was responding to a medical emergency for a male



having a seizure on board?

A.  Yes.

Q.  You eventually received a call from Officer Bugiada requesting additional assistance for the matter he was attending to that night?

A.  He didn't call me specifically.  He put a broadcast over the radio that he needed assistance.

Q.  Do you recall -- not you personally, I suppose.  Do you recall hearing a call from Officer Bugiada requesting additional assistance for the matter he was attending to that night?

A.  Yes.

Q.  Did you respond to that call?

A.  Yes.

Q.  How did you get to the scene?

A.  Patrol car.

Q.  Sir, just for clarity of the record, and for your understanding and my understanding and collective understanding here, is it okay for me to use the word scene?

A.  Yes.

Q.  You said you got to the scene via patrol vehicle?



A.  Yes.

Q.  Is that your personal patrol vehicle that was assigned to you, or did you arrive with another officer?

A.  Assigned to me.

Q.  Were you driving alone?

A.  Yes.

Q.  Were you wear a body cam?

A.  No.

Q.  Do you have the option to wear one?

A.  No.

Q.  Did other officers respond to the scene as well?

A.  Can you repeat that question?

Q.  Sure thing.  Did other officers respond to the scene as well?

A.  Yes.

Q.  Do you know if they took their own vehicles?

A.  I'm unaware.

Q.  Besides vehicles, what other potential options for going to the scene are there available to a police officer at the Port Authority Police Department?



A. Options available?

Q. Yes.

A. You can get there by the train.

Q. Am I correct you were coming from the Port Authority Police Department command station?

A. The staging area.

Q. Is that the best way to describe it, the station area?

A. Yes.

MS. ALTERMAN: Wait. He said staging area. Not station area.

Q. Can you tell us what that?

A. The staging area is located right next to the police building 269 in front of the ramp side gate. And that is standard procedure for all outside agencies meet up location.

Q. So is a staging area different from police command?

A. Yes.

Q. Is it next door?

A. Right adjacent to it, yes.

Q. Thank you for clarifying that, sir. I appreciate it.

Do you know if other officers were



wearing body cam's when they responded to the scene?

A. No.

Q. Did they have an option to wear body cam?

A. No.

Q. Approximately how long did it take you to get from the staging area next to the police command to the scene?

A. It depends.

Q. Do you recall how long it took you that night April 12, 2019 responding to the scene?

A. I don't recall the time frame, but I got there fairly quick.

Q. As a rough estimate, would you say a matter of minutes, less than five minutes, more than five minutes?

A. Less than five minutes.

Q. When you arrived at the scene, did you board the front of the plane or the back of the plane?

A. The front of the plane.

Q. When you arrived, did you see Officer Bugiada physically engaging with Mr. Lagoda?

A. No.



Q.  You did not see Officer Bugiada physically engaging Mr. Lagoda when you first arrived?

A.  We're talking when I arrived to the front of the plane?  No.  Officer Bugiada was not in front of the plane.  So I did not see him engage him until I walked to the back of the plane and was told that is where the officer was at that time.

Q.  Would it be fair to say as you made your way back to where Officer Bugiada was located, once you saw Officer Bugiada, your first action was to assist and join Officer Bugiada in trying to physically restrain Mr. Lagoda?

MS. ALTERMAN:  Objection.  You can answer.

A.  Yes.

Q.  Did you speak with anyone before you tried to restrain Mr. Lagoda?

A.  Yes.

Q.  Who did you speak to or with?

A.  I don't recall who they were at that moment.  I remember asking where is he, where is he.  And they pointed out he is in the back.  He



is in the back.

Q.  Is it fair to say the purpose of your communication was to figure out where the officer was?

A.  Correct.

Q.  When you first saw Officer Bugiada, how was he positioned?

A.  Officer Bugiada was positioned on his side.

Q.  Was Mr. Lagoda face down with his chest on the ground?

A.  I would not say face down.  When I arrived, I could see a side profile of his face.

Q.  Was he facing the ground -- regardless of where his head was positioned, was his head, chest and body face down on the ground?

MS. ALTERMAN:  Objection.  You can answer.

A.  His chest was on the ground.

Q.  Was he laying prone?

A.  Yes.

Q.  Was Officer Bugiada sitting on top of Mr. Lagoda?

A.  No.



Q.  Did you physically engage Mr. Lagoda?

A.  Can you repeat your question?

Q.  Sure.  Did you physically engage Mr. Lagoda?

A.  Yes.

Q.  Did you observe Mr. Lagoda kicking and flailing his limbs?

A.  Yes.

Q.  Did you give Mr. Lagoda any warnings?

A.  Yes.

Q.  Can you tell me what warnings you gave Mr. Lagoda?

A.  I said stop resisting, give us your hands.

Q.  Would you consider that to be a command versus a warning?

A.  Can I get a break, please?

Q.  There is an outstanding question and then we can discuss a break.

A.  Can you repeat the question?

Q.  I can repeat the question for you.  You just testified what you said to Mr. Lagoda and my question and response was would you consider that a command, not a warning?



800.211.DEPO (3376)
EsquireSolutions.com

A.  I don't see it as a command.

Q.  Is it fair to say the difference between a command and warning is a warning says if you don't do this, then something will happen?

A.  I answered your question already, and I asked you for a break after I answered the last question.

Q.  I understand.  I'm still on the same line of questioning.  We're trying to get clarification on your answer.

A.  Can you repeat the question?

Q.  Sure thing.  I'm just trying to differentiate between what a command is and what a warning is.  Is it fair to say that typically commands is a statement commanding somebody to do something whereas a warning is usually -- has a cause and effect.  If you don't do this, then this may happen?

A.  Yes.

Q.  Would it be fair to classify what you testified you said to Mr. Lagoda as a command?

A.  Can you repeat your question?

Q.  Sure.  Would it be fair to classify what you testified here today that you said to Mr.



Lagoda as a command?

A.  Yes.

MR. AMRHEIN:  Do you need five minutes for a rest room break?

MS. ALTERMAN:  Make it seven.

MR. AMRHEIN:  Sure.  We can make it ten.

MS. ALTERMAN:  Sure.

MR. AMRHEIN:  We can resume at 11:35.

(Recess taken.)

Q.  Officer, so we just a question and answer with regard to the difference between command and warning.  Do you recall that?

A.  Yes.

Q.  Based upon the questions and answers, I will follow up with one more regarding that topic. Did you give Mr. Lagoda any warnings?

A.  I don't recall.

Q.  Officer Duran, did you speak with your attorney during the break?

A.  No, I didn't.

Q.  Officer, when you gave your commands to Mr. Lagoda, were you speaking Russian?



A.  No.

Q.  Do you speak Russian?

A.  No.

Q.  Were you speaking in English to Mr. Lagoda?

A.  Yes.

Q.  Were you aware Mr. Lagoda's native language was Russian?

A.  No.

Q.  So, when you physically engaged Mr. Lagoda, can you describe to me what you did?

A.  Can you repeat your question?

Q.  Sure.  When you physically engaged Mr. Lagoda, can you describe for me what you did?

A.  Sure.  When I responded, I made my way to the back of the plane.  My heart was racing because I know Officer Bugiada was in a fight with Mr. Lagoda which meant there was a firearm already involved.

So that was putting the life of Officer Bugiada on the line as well as all passengers.  So my main concern was those two main factors.  My main objective was to make sure we got this individual under compliance as soon as



possible so we could get the situation under control.

So when I engaged the suspect, I was able to apply a compliance hold on the shin.  I feel it's very effective.

Q.  Do you recall which leg?

A.  No, I don't recall.

Q.  Regardless of right or left, you said you applied the compliance hold on Mr. Lagoda's shin, correct?

A.  Yes.

Q.  Was that using your hand or was that using something else?

A.  It was using my hands controlled by the expanded baton better known as the Monadnock.

Q.  Am I correct you used your hands -- just to make the record as clear as possible, am I correct you used your hands and a button in applying a compliance hold on Mr. Lagoda?

A.  Yes.

Q.  You said you were doing that compliance hold to Mr. Lagoda's shin; is that right?

A.  Yes.

Q.  You previously testified Mr. Lagoda was



prone laying chest down on the ground at that time, correct?

A.   Yes.

Q.   So when applying the compliance hold with your hands and baton to Mr. Lagoda's shin, am I correct that you would have to bend one of his legs with his heel towards his buttocks in order to apply that restraint?

MS. ALTERMAN:   Objection.   You can answer.

A.   No.   That is not accurate.

Q.   You didn't bend the leg at all in order to apply pressure to Mr. Lagoda's shin?

MS. ALTERMAN:   Objection.   You can answer.

A.   No.

Q.   How did you access the shin if the shin was on the front of the leg and the body was prone to the ground?

A.   By sliding the baton under his shin and placing my hand holding the shin as an X and to apply reasonable force.

Q.   Was the baton in contact with Mr. Lagoda's shin after you slid it under his leg?



A.  Yes.

Q.  Were you lifting it to apply pressure to Mr. Lagoda's shin?

A.  No.

Q.  I'm confused as to the compliance hold you're describing.  So I'm going to continue to ask questions to provide clarity.  Am I correct that Mr. Lagoda was lying prone on the ground?

A.  Yes.

Q.  And he was being physically engaged by officers in an attempt to restrain him?

A.  Yes.

Q.  Regardless of right or left, you were administering a compliance hold to one of Mr. Lagoda's legs by applying pressure with your hands and a baton to Mr. Lagoda's shin; is that correct?

A.  Yes.

Q.  And you did so without ever bending his legs upward?

A.  That is correct.

Q.  Did you witness any other officers apply a compliance hold to Mr. Lagoda?

A.  I don't recall.

Q.  You don't recall any officers to your



right or left applying a compliance hold to Mr. Lagoda's either leg?

A. No.

Q. No as in you don't recall that?

A. I don't recall, no. I don't recall.

Q. Did you witness any other officers physically restraining Mr. Lagoda's upper limbs?

A. I know Officer Bugiada and there was another -- Officer Joseph that were in the vicinity, but my back was turned to them. So I'm unsure what sort of activity they were doing.

Q. Was your back perpendicular to Mr. Lagoda's body laying on the ground?

A. I'm not understanding your question.

Q. So you say you -- am I correct that you did not see what Officer Joseph and Officer Bugiada were doing to Mr. Lagoda's upper limbs because you were faced in completely the opposite direction?

A. That is correct.

Q. If you were faced completely in the opposite direction to Mr. Lagoda laying on the ground, could you have done so without placing knees on Mr. Lagoda's back?



MS. ALTERMAN:  Objection.  You can answer.

A.  Absolutely.  I was in the vicinity of his legs.

Q.  You testified you were faced completely the opposite direction.  Not the side; am I correct?

A.  Again, I was -- my back was toward the officers, and I was in the vicinity of the leg. So there is no way I could be on top of the suspect's body.

Q.  Were you straddling Mr. Lagoda's legs?

A.  Can you rephrase that?

Q.  Were you straddling Mr. Lagoda's legs?

A.  What do you mean by straddling?

Q.  Were your legs straddling Mr. Lagoda's legs?  Were your legs outside straddling Mr. Lagoda's legs inside?

A.  My body was positioned over the top over his legs.

Q.  Were you applying physical force to Mr. Lagoda's legs?

A.  Yes.

Q.  Were you using your body weight to apply



that force?

A.  No.

Q.  You never once used your body weight to apply the force?

A.  My body weight?  Not my body weight.

Q.  Never once?  You just laid there passively trying to restrain him.  You didn't use any of your weight to try and restrain Mr. Bugiada?

MS. ALTERMAN:  Objection.  You can answer.

Q.  I would like to remind you you're testifying under oath here today just as if you're in a courtroom.

A.  I'm fully aware and the answer is no.

Q.  Did you ever hit Mr. Lagoda?

A.  No.

Q.  Did you ever witness other -- what other officers physically engaged Mr. Lagoda?  You mentioned Officers Bugiada and Joseph.  Did you witness any other officers engage Mr. Lagoda?

A.  No.

Q.  Were other officers engaging Mr. Lagoda's legs other than you?



A.  Not that I recall.

Q.  Do you know Officer Mezzacappa?

A.  Yes.

Q.  Do you know Officer Papia?

A.  Papia.

Q.  P-A-P-I-A?

A.  Officer Papia, yes.

Q.  Would it refresh your memory they were there on the scene with you applying physical restraint to Mr. Lagoda?

A.  Can you repeat the question?

Q.  Sure.  Would it refresh your memory Officer Papia and Officer Mezzacappa were joining with you, Officers Joseph and Bugiada in applying physical force to Mr. Lagoda?

A.  They were on the scene, but I don't recall me seeing them on scene.

Q.  Are you aware that all the officers mentioned including Officer Bugiada and Officers Joseph, Papia and Mezzacappa, along with yourself, all submitted use of force reports regarding the events that occurred on April 12, 2019 involving Mr. Lagoda?

A.  Yes.



Q.  And you didn't witness Officer Papia or Mezzacappa doing anything right next to you that night?

A.  That night was extremely hectic.  I responded to a call of an officer in distress walking into a plane of screaming passengers saying this individual was kicking and punching people.

So it was very chaotic.  So it is possible.  I don't recall having seen those officers on scene.  Everything happened so quick.

Q.  Are you done?

A.  Yes.

Q.  That wasn't my question.  Are you saying you didn't witness Officer Papia and Officer Mezzacappa applying compliance holds or physically engaging Mr. Lagoda?

A.  No.

Q.  Would you describe the Port Authority Police Department as a brotherhood?

MS. ALTERMAN:  Objection.  You can answer.

A.  What do you mean by a brotherhood?

Q.  Is it a close-knit environment where



other officers look out for the well-being of other officers?

    A.  Yes.

    Q.  Would you say it's frowned upon to testify about another officer in acts that may not look well for that officer?

          MS. ALTERMAN:  Objection.  You can answer.

    A.  No.  It's not frowned upon.  You have to answer for your actions.  If the actions are not valid, that officer has to answer for his actions so --

    Q.  So the close-knit tight environment of the Port Authority Police Department would not prevent you from testifying here today that Mr. Bugiada was physically punching Mr. Lagoda, that Officer Papia used the same to punch Mr. Lagoda?

          MS. ALTERMAN:  Objection.  You can answer.

    A.  I missed the first part of your question.

    Q.  The relationship you have with your other fellow officers and expectations of other officers and how they should act, that would not prevent you from testifying here today as to Officer



Bugiada and Officer Papia physically punching Mr. Lagoda, correct?

MS. ALTERMAN:  Objection.

A.  Absolutely not.

Q.  Are you aware Officer Bugiada was punching Mr. Lagoda?

MS. ALTERMAN:  Objection.  You can answer.

A.  Again, I was unaware because my back was towards the officers.  I was not aware of what was going on.

Q.  How about Officer Papia, are you aware in his use of force report that he used his hands and fists on Mr. Lagoda?

A.  I was not aware.

Q.  Had you been aware, would you have interceded?

A.  (Pause.)

Q.  Had you been aware they were improperly punching a civilian, would you have interceded?

MS. ALTERMAN:  Objection.  You can answer.

A.  If I'm going to intervene on that scene or --



Q.  No.  I can restate the question.

Had you been aware an officer was punching and improperly doing so in an attempt to restrain an individual, would you have interceded in a situation like that?

A.  If the situation is labeled as improper, yes.  If the situation is --

Q.  My question is limited to what I asked and thank you.

While in the process of restraining Mr. Lagoda, did you hear him making any noises or sounds?

A.  Yes.

Q.  Was he making guttural sounds like wails or grunting as he was being restrained?

A.  I don't recall.

Q.  What noises do you recall?

A.  Like the Incredible Hulk trying to resist.

Q.  So that would be a guttural sound; am I right?

MS. ALTERMAN:  Objection.  You can answer.

A.  I don't need to -- my definition of the



guttural sound is someone that is probably sucking in water.  The sound I provided, someone that is angry trying to get up from the situation, trying to fight the restraint.

Q.  There are multiple definitions of guttural, sir, I represent to you.  One could be a hissing of a snake or sucking water from a water fountain.  Other sounds are harsh sounds that may sound monster like.  You said the Incredible Hulk. Is it fair to say those are guttural sounds?

MS. ALTERMAN:  Objection.  You can answer.

A.  I guess.

MS. ALTERMAN:  Don't guess.

Q.  In your use of force, if you recall -- you said you reviewed your notes and use of force report -- did you mention he was making sounds like the Incredible Hulk in that report at all?

A.  No.

Q.  Do you recall when you filled out that use of force report, was it shortly after the event occurred on scene?

A.  Shortly after the incident.

Q.  At any point during the attempt to



800.211.DEPO (3376)
EsquireSolutions.com

restrain Mr. Lagoda, did you intervene because of cause for health and safety concerns of Mr. Lagoda?

A.  Did I intervene?  No.  Once he was in handcuffs, I felt it was under control.

Q.  My question is, as part of the restraining process, did you ever intervene an officer action out of concern for Mr. Lagoda's health and safety?

A.  I didn't intervene because he was resisting our commands.

Q.  Did you ever listen to see if Mr. Lagoda was breathing when you were trying to physically restrain him?

A.  I could not hear he was breathing because I was towards his legs.  There was no way I could hear if he was breathing or not.

Q.  Was Mr. Lagoda ultimately restrained?

A.  Yes.

Q.  From the time you arrived on board the flight at the scene, can you give me a rough approximation as to how long it took to restrain Mr. Lagoda?  Would you say less than three minutes, less than two minutes, less then five?



A.  It happened so fast, I'm unable to give you a specific time frame.

Q.  But, as you said, it happened so fast. Is that fair to say?

A.  Yes.

Q.  Am I correct that you previously testified that Mr. Lagoda was laying prone on the ground when he was in the process of being physically restrained?

A.  Yes.

Q.  After he was handcuffed, after he was restrained, was he still initially laying prone on the ground in that same position?

A.  I'm unaware of his position because as soon as I heard the officer saying he is cuffed, I let go of the compliance hold and I turned my attention to the flight attendants who were not physically hurt.  I wanted to get to their side of the story as to the chief complaints they had.

Q.  Did you witness just after he was cuffed, meaning, Mr. Lagoda, that when rolled on the side, an officer observed Mr. Lagoda's neck was blue. His pulse was taken and there was no pulse?

MS. ALTERMAN:  Objection.  You can



answer.

A.  I didn't witness that because I wasn't there when he was turned around.  My attention at that point was getting the witnesses to tell me their side of the story and this occurred at the front of the plane, the jet bridge.

Q.  So you can't speak to the series of events with respect to Mr. Lagoda's neck being blue and not being able to find a pulse.  You didn't witness that at all?

A.  No.

Q.  At any point during the restraining process, did you witness any officers sitting on Mr. Lagoda?

A.  No.

Q.  At any point during the restraining process, did you witness any officers putting a knee on Mr. Lagoda, any part of his body?

A.  No.

Q.  At any point during the restraining process, did you witness any officers applying body weight to Mr. Lagoda?

A.  No.

Q.  Is it your testimony here today that no



officer that you saw was applying any body weight to Mr. Lagoda?

          MS. ALTERMAN:  Objection to form. You can answer.

     A.  Not that I saw, no.  My focus was on the compliance hold.

     Q.  You said not that you saw.  Is it possible other officers were doing it, but you did not see it?

     A.  I'm not sure.

     Q.  Is it possible other officers sat on Mr. Lagoda, but you didn't see it?

     A.  Again, I'm not sure.  My back was towards the officers.

     Q.  I'm simply asking is it possible.  Could it have happened, but you didn't see it?

          MS. ALTERMAN:  Objection.  You can answer.

     A.  Anything is possible.

     Q.  So you're saying, yes, it is possible?

     A.  Anything is possible.

     Q.  I will take that as a yes.  At what point do you learn -- after Officer Joseph took the pulse of Mr. Lagoda, at what point did you learn



Mr. Lagoda had no pulse?

A.  Again, I was not on the scene.  I was not sure what was going on.  I just heard the communication on the radio of the AED and started CPR.

Q.  When you were engaging Mr. Lagoda to physically restrain him and you were applying the compliance hold to Mr. Lagoda's shin, was this in the galley in the back of the plane?

A.  It was way in the back of the plane.

Q.  After you released the compliance hold from Mr. Lagoda, did you then move towards the front of the plane?

A.  That is correct.  The flight attendants, like I said, were -- I made contact with them to get the witness statements from them.

Q.  When you were at the front of the plane, is that when you heard the radio call for CPR and AED?

A.  I'm not sure if it was when I was in the front or on my way to the door, but it was not at the scene when I got off from the suspect's leg.

Q.  Understood.  I should be clear with my question.  Thank you for pointing that out.  When



you learned of the fact that Mr. Lagoda needed CPR and a potential AED, you had already been either walking away from the back galley towards the front or you were already in the front?

A.  Again, no.  This came over a radio transmission.  I'm not sure -- I was not on the scene when this occurred.  So I would not be able to give you a time frame as to how far from when I got off the suspect's leg to the time I got to the jet bridge when this occurred.

Q.  Understood.  And I can just clarify with a question because I think we are going at the same thing.

When you heard the radio call, you weren't standing next to Mr. Lagoda; am I correct?

A.  That is correct.  I was not standing next to him.

Q.  When you heard the radio call, what did you do next?

A.  When I heard the radio call that they were doing CPR?

Q.  Yes.

A.  I proceeded to get those passengers -- those passengers off the plane.



There were already multiple officers in the back galley.

Q. Would it be fair to say after you were engaged physically with Mr. Lagoda in an attempt to restrain him and after restraint occurred, your duty and responsibility was away from that medical emergency and it was instead dealing with the flight attendants and passengers of the other end of the plane?

MS. ALTERMAN: Objection. You can answer.

A. There were other injuries that occurred to those witnesses I was talking to. So my duty, as a police officer, is to render aid to those passengers. There were other officers already taking care of the suspect. So I could not do anything --

Q. Just for the sake of the record, while other officers were -- this is not anything towards you. I am just trying to establish where officers were at a given time. That's all.

So while other officers were in the back galley attending to Mr. Lagoda, you were attending to other civilians aboard the plane as



well as some of the flight attendants?

A.   Trying to determine what happened and get the chief complaints from them that they were claiming.

Q.   From the time you heard the radio call about Mr. Lagoda needing CPR, AED and medical assistance to the time the ambulance arrived at the scene, can you provide an estimate of about how long that was?

A.   I would not be able to tell you the time frame.

Q.   Am I correct that Emergency Medical Services or EMS an ambulance had been called to the scene?

A.   Yes.

Q.   Are you aware EMS and an ambulance responded to the initial radio call which led to the dispatch of Officer Bugiada?

A.   I can tell you that they were not there because I was waiting for the escort.  So when the call over, they didn't arrive.

Q.   Did the ambulance require a police escort while responding to a call at JFK International Airport?



A.  Yes.

Q.  Had you ever provided a police escort for an ambulance?

A.  Yes.

Q.  Are you aware when you or the other officers responded to the scene there were no other personnel at police command or the location next door to escort the ambulance to the scene?

MS. ALTERMAN:  Objection.  You can answer.

A.  No.  I was not aware.

Q.  Were you supposed to stay behind and escort the ambulance to the scene?

A.  I was supposed to stay behind and wait for the escort until the officer required assistance on board a plane full of passengers with an officer that had a handgun and was in a fight.

So, yes, I was supposed to wait for the ambulance and at that given time, all the units were available.  So that is why I decided to proceed to and assist Officer Bugiada.

Q.  My question is when you initially dispatched for the scene, you were supposed to



stay behind for an ambulance to escort?

A. I was assigned to the ambulance.

Q. You were assigned to the ambulance when you were initially dispatched?

A. Yes.

Q. Did the Attorney General's Office conduct an investigation into Mr. Lagoda's death?

A. Yes.

Q. Do you know what the purpose of the investigation was?

A. I am unclear.

Q. Were you interviewed as part of the investigation?

A. Yes.

Q. Do you know who interviewed you?

A. I don't know the titles or the names.

Q. Were you interviewed multiple times, or was it a one-time thing?

A. I don't recall.

Q. Do you recall what the interview process was for you?

A. I would not be able to tell you the time frame for it. It felt long.

Q. Long like a couple of hours if you had to



estimate?

A.   Unfortunately, I cannot give you a time frame.

Q.   Besides the interview, did you provide any written statements to New York Attorney General's Office as part of their investigation?

A.   Besides the documents they acquired from the Port Authority, I don't remember handing them any additional documents.

Q.   Do you know if a report was ever released by the Attorney General's Office in regard to the death of Mr. Lagoda?

A.   If there was a report?

Q.   Yes.

A.   I'm not sure.

Q.   If I represent to you there was a report released and it's public information, are you aware the report concluded the use of force by Port Authority Police Department personnel likely contributed to the death of Mr. Lagoda?

MS. ALTERMAN:  Objection.  You can answer.

A.   Not that I'm aware.

Q.   Are you aware that the report recommended



that Port Authority Police Department train its officers about the unique vulnerability of individuals in the immediate wake of a seizure?

MS. ALTERMAN:  Objection.  You can answer.

A.  I'm not aware.

Q.  Are you aware that the New York Attorney General's Office report also determined the Port Authority Police Department failed to have personnel available to escort the ambulance to the scene?

MS. ALTERMAN:  Objection.  You can answer.

A.  Not that I'm aware.

MR. AMRHEIN:  I'm going to introduce what is going to be marked as Exhibit D.  It's going to be the Office of the Attorney General's report based upon their investigation into the death of Evgeniy Lagoda.

Q.  At the top where it says, "Confidential," can you tell me what that says?

A.  "New York State Office of the Attorney General."

Q.  Can you read the text on the middle of



the page?

A.   "Special investigation and prosecution unit."

Q.   What does it say under that?

A.   "Report on the investigation into the death of Mr. Lagoda."

Q.   Correct.  And that is Evgeniy Lagoda.  I represent to you, sir, this is, while publically available, it's also been produced as part of defendant's discovery production.  This is Bates stamped PA 1802 and goes all the way to PA 1864.  This is the complete investigative report by the New York State Office of the Attorney General plus the accompanying exhibits to this report.  Do you recognize this document?

A.   No.

Q.   Have you ever seen this document before?

A.   No.

Q.   Is it fair to say you haven't read this document before?

A.   Yes.

Q.   I'm going to turn to the last paragraph in the executive summary and let me know if this is zoomed in enough or not zoomed out enough?




A.  It is good.

Q.  Can you read that to yourself and let me know when you're finished?

A.  (Witness complies.)

Q.  I'm going to scroll what is page 12 of this report.  This is under recommendations and this is Bates stamped PA 1814.

Sir, I ask you to read the first two large paragraphs under recommendations.  Let me know when you're finished and I will scroll down to whatever you need.

MS. ALTERMAN:  Can you scroll up to the second part of that, please?

Q.  Is that good right there?

A.  Yes.

Q.  Let me know if you need me to zoom in.

A.  All right.

Q.  After reading the several paragraphs that I asked you to read, sir, on both page two and page 12 of this report, I'm going to ask you a few questions.

Would you agree that the report determined that the Port Authority Police Department failed to add personnel available to



escort an ambulance to the scene?

            MS. ALTERMAN:  Objection.  You can answer.

    A.  I don't agree because there are other members in the unit -- supervisors that could have --

    Q.  That's not what I'm asking, sir.  I'm asking do you agree the reports determined that the Port Authority Police Department failed to have personnel available to escort an ambulance to the scene?

            MS. ALTERMAN:  Objection.  You can answer.

    A.  I don't agree.

    Q.  You don't agree the report determined that?

    A.  The report -- that's a report stating that.  You asked me --

    Q.  Sir, that's my question.  I will repeat my question again.

            Do you agree that the report determines that the Port Authority Police Department failed to have personnel available to escort an ambulance to the scene?

MS. ALTERMAN: Note my objection. You can answer.

A. Yes.

Q. Would you agree with me the report found the use of force by Port Authority Police Department personnel was found to have likely contributed to Mr. Lagoda's death?

MS. ALTERMAN: Objection. You can answer.

A. I don't agree, but that is what the report states.

Q. Just for the sake of a clean transcript, I'm going to ask that again and ask you to answer the question I ask.

Would you agree with me the report found the use of force by Port Authority Police Department personnel was found to have likely contributed to Mr. Lagoda's death?

MS. ALTERMAN: Objection. You can answer.

A. I don't agree.

Q. I will keep repeating the question. This is not based on your personal feelings about the report. This is simply asking you what does the



report say.

I will ask again.  Would you agree with me the report states that the use of force by Port Authority Police Department personnel was found to have likely contributed to Mr. Lagoda's death?

MS. ALTERMAN:  Objection.  You can answer.

A.  Yes.

Q.  Would you agree with me that the report emphasizes a person who has just suffered a seizure is in a uniquely vulnerable condition immediately following a seizure?

MS. ALTERMAN:  Objection.  You can answer.

A.  Yes.

Q.  Was that language about covering the uniquely vulnerable condition of individuals who have just experienced a seizure, is that under the section of recommendations particularly where the report says, "Provide additional training to Port Authority Police Department officers?"

A.  I don't understand your question.

Q.  Do you see on the page where it says,



"Recommendations?"

A.  Yes.

Q.  And this is Bates stamped Port Authority 1814; is that correct?

A.  Yes.

Q.  Under recommendations, do you see a header for a second paragraph?

MS. ALTERMAN:  Note my objection. You can answer.

A.  Yes.

Q.  Does it say "Provide additional training to Port Authority Police Department officers?"

A.  Yes.

Q.  Does it say "cover the uniquely vulnerable condition of such individuals in the period immediately after the resolution of a seizure?"

MS. ALTERMAN:  Objection to form. You can answer.

A.  Yes.

Q.  I'm going to share my screen one more time.  Bear with me just a second.  Let me know when you're able to see that, sir.

A.  Yes.



Q.  Do you recognize this document?

A.  Yes.

Q.  Is that your signature down at the bottom?

A.  Yes.

Q.  And that was dated April 13, 2019?

A.  Yes.

Q.  You had been working a shift April 12, 2019 starting at 10 a.m. into the morning of April 13, 2019 at 6 a.m.; am I correct?

A.  Yes.

MS. ALTERMAN:  You said 10 a.m.  Did you mean 10 p.m.?

MR. AMRHEIN:  Yes, 10 p.m.

A.  10 p.m. to 6 a.m., that is correct.

Q.  Yes.  10 p.m. on the 12th to 6 a.m. on the 13th, correct?

A.  Correct.

Q.  I'm going to mark this as Exhibit E. This is Officer Duran's use of force report and it's Bates stamped PA 1160.  This is a document produced by defendants as part of discovery.  Am I correct you checked the box for compliance hold?

A.  Yes.



Q.  I see you checked the box that the subject was injured; am I correct?

A.  Yes.

Q.  Are you aware, sir, that officers, upon rolling over Mr. Lagoda after he was restrained, found Mr. Lagoda's neck was blue.  He took a pulse and he had none?

MS. ALTERMAN:  Objection.  You can answer.

A.  I was not aware of it until they asked to start CPR.

Q.  But you became aware of it when they requested medical intervention, CPR and AED; is that correct?

MS. ALTERMAN:  Objection to form. You can answer.

A.  I was not aware of the details.  I just know they were doing CPR and they requested AED at the scene.

Q.  Sir, based upon your training and experience approaching ten years experience as an officer for the Port Authority Police Department, have you taken someone's pulse before?

A.  Yes.



JONATHAN DURAN                                           August 03, 2023
ALEXEY V. TARASOV, ESQ. vs PORT AUTHORITY                              87

Q.   Have you ever taken someone's pulse and found they have none?

A.   Yes.

Q.   When you did so, did you understand that person to not be alive?

MS. ALTERMAN:  Objection.  You can answer.

A.   I disagree.

Q.   You disagree that a person without a heart beat is not alive?

MS. ALTERMAN:  Objection.  You can answer.

A.   I believe a person without a pulse is not alive.

Q.   Are you doubting your skills in detecting a pulse or are you saying -- please expand on what you're trying to say here?

A.   What I'm trying to say is a person without a pulse can be brought back.

Q.   Brought back indicates the person is brought back to life; is it not?

MS. ALTERMAN:  Objection.  You can answer.

Q.   The very nature of resuscitation is



taking someone who was dead and bringing them back to life; am I right?

A.  A person that is -- does not have a pulse is someone that probably stops breathing and can be brought back by CPR and interventions.

Q.  You said brought back.  You mean brought back to life?

A.  Brought back to get a rhythm is what I mean.

Q.  Sir, can someone be alive if they don't have a heart beat?

A.  If they don't have a heart beat, all that says is the heart is not pumping blood to the rest of the body.  It doesn't necessarily mean they stop living.

Q.  You indicated you would make attempts to resuscitate or bring back someone.  Would that indicate you're trying to bring them back to life?

MS. ALTERMAN:  Objection.  You can answer.

A.  Trying to do the best I can to get that person to continue living.

Q.  And part of that process is to try and resuscitate them and revive them?



A.  Part of that process is just keeping them alive.

Q.  When did you check Mr. Lagoda was not killed on the use of force report, when he was found with no heartbeat and never woke up?

A.  Because he was not killed.  We didn't kill him.

Q.  Was he not physically restrained by five officers at which point once they restrained him, they rolled him over and his neck was blue and he had no heart beat anymore?

MS. ALTERMAN:  Objection.  You can answer.

A.  He was restrained.

Q.  He rolled over.  His neck was blue.  He was not breathing and he had no heart beat and he never woke up?

MS. ALTERMAN:  Objection.  You can answer.

A.  Listen, I'm not a medical doctor.  So I would not be able to tell you if those signs meant he was dead.

Q.  Did you receive -- I think you testified earlier today you received training both at the



police academy and almost yearly training on CPR and other medical emergencies in your capacity as a police officer?

A.  Yes.

Q.  Sir, am I correct in that report we have just seen, there was no notation about making Incredible Hulk sounds or super human strength?

A.  No.

Q.  I'm not correct or there was no notation in there?

A.  There was no notation.

Q.  Wouldn't you agree someone who has just come out of a seizure is medically vulnerable?

MS. ALTERMAN:  Objection.  You can answer.

A.  Are you asking me can they be vulnerable? I'm not too sure.

Q.  You don't agree someone who has just come out of a seizure is medically vulnerable?

A.  It depends.

Q.  On what?

A.  It depends on the circumstances.  There have been situations where the person coming out of the seizure can be very passive, does not know



where they are or, in this case, could be very aggressive.

Q.  Do you agree someone could be disoriented and combative after coming out of a seizure; am I right?

A.  Yes.

Q.  And that is based on your training and experience you received at the police academy and as an officer at the Port Authority Police Department?

A.  Yes.

Q.  Is that also based on the National Safety Counsel document I put in front of you this morning marked Exhibits A and B that spoke to altered mental status including seizures and how to respond to and treat someone who is coming out of a seizure?

MS. ALTERMAN:  Objection to form.

A.  The only difference is this individual was striking people and hurting others and potentially could have gotten a firearm from a police officer.

Q.  Did you not just testify that someone who had just come out of a seizure is medically



vulnerable, may be disoriented and combative based upon your training and experience as a police officer?

A.  And all those things I mentioned with a person that comes out of a seizure that can possibly take a police officer's firearm and use it.  Is that okay?

Q.  Sir, I'm deposing you.  I'm simply asking you to -- did you not just testify based on your training and experience as an officer and training that you received at the Port Authority Police Department Police Academy that an individual who comes out of a seizure may be medically vulnerable, may be passive or may be combative and is disoriented?

A.  Yes.

Q.  Sir, would you agree it's more difficult to understand words, warnings and commands that are in a foreign language you do not speak?

MS. ALTERMAN:  Objection.  You can answer.

A.  Can you repeat the question?

Q.  Sure.  I can go one by one.  Do you agree -- do you think it's more difficult to



understand words spoken to you that are in a
language you do not understand?

A.  Words, yes.

Q.  Is it more difficult, in your opinion, to
understand warnings that are given or spoken to
you in a foreign language you don't understand?

A.  Using words only?  Is that your question
or using physical actions?

Q.  Words, warnings, verbal warnings?

A.  Yes.

Q.  What about verbal commands given to you
in a foreign language?  Do you think those are
also more difficult to understand when given in a
foreign language?

A.  Yes.

Q.  What about words and verbal warnings and
verbal commands that are given to an individual
when that individual is in an altered mental state
and disoriented.  Do you think it's more difficult
to understand then?

MS. ALTERMAN:  Objection.  You can
answer.

A.  Yes.

Q.  Wouldn't you agree it's more difficult to



breathe lying face down on your stomach than it is sitting up or standing up when someone is applying pressure to your body?

MS. ALTERMAN: Objection. You can answer.

A. Personally, it depends on your fitness level.

Q. You're saying that somebody with -- somebody with a group of people applying substantial amounts of pressure to their body while they're laying prone on the ground would not have a difficult time breathing when compared to their normal breathing standing up or sitting up?

MS. ALTERMAN: Objection. You can answer.

A. I do not have difficulty. I'm not sure about that. Is it easier to breathe standing up? Yes.

Q. Wouldn't you agree a person placed prone face down with a number of people applying increased amounts of pressure to the back, neck and legs may not be resisting, but rather fighting for one's life?

MS. ALTERMAN: Objection. You can



answer.

A.  No, I don't agree.

Q.  You don't agree someone may be fighting for one's life if they are dying?

MS. ALTERMAN:  Objection.  You can answer.

A.  I don't agree because, as humans, you would know what is going on, why did this happen to me and resisting is a universal language.  If someone -- it doesn't matter the language you speak.

You can just, by physical commands, you can get that person to understand what it is you want them to comply.  It's a universal language.

Q.  Didn't you say you're supposed to evaluate situations based on the total amount of the circumstance?

A.  Yes.

Q.  And you testified here today that somebody who comes out of a seizure is likely disoriented and medically vulnerable as well as may have combative behavior?

MS. ALTERMAN:  Objection.  You can



answer.

A.  Yes.  And it's your job to --

Q.  It's a yes or no question.  Was that a yes?

A.  Yes.

Q.  Based on the totality of the circumstance and that testimony, I just remind you I'm going to ask you the question again.

Wouldn't you agree a person placed face down with a number of people applying increased amounts of pressure to the back, neck and legs may not be resisting, but rather fighting for one's life?

MS. ALTERMAN:  Objection.  You can answer.

A.  I don't agree.

Q.  Sir, wouldn't you agree the improper restraining techniques -- I will rephrase.

Sir, wouldn't you agree improper restraining techniques can block the flow of air into a person's lung contributing to a life threatening condition known as positional or restraint asphyxia?

MS. ALTERMAN:  Objection.  You can



answer.

A.   What do you mean by improper techniques? What are you referring to?

Q.   I think it's pretty self-explanatory, sir.  I can offer you an alternative way of expressing it.

Can an improper restraining technique block the flow of air into a person's lungs and contribute to a life threatening condition known as positional or restraint asphyxiation?

MS. ALTERMAN:  Objection.  You can answer, if you can.

A.   Yes.

Q.   Sir, wouldn't you agree that the risk of positional asphyxia is compounded when a person with predisposing factors becomes involved in a physical struggle with an officer or officers?

MS. ALTERMAN:  Objection.

A.   I don't know.  I'm not understanding the question.

Q.   I can repeat it for you.  Wouldn't you agree the risk of positional asphyxiation is compounded when a person with predisposing factors



becomes involved in a physical struggle with

officers?

            MS. ALTERMAN:  Objection.  If you

know.

    A.  I don't know.

    Q.  You have almost ten years of experience

on the force; do you not?

    A.  I do.

    Q.  And you have six months of training at

the police academy; am I right?

    A.  Correct.

    Q.  And you previously just testified and

understood the term positional or restraint

asphyxia; did you not?

    A.  Yes.

    Q.  Do you understand what the term

compounded means?

    A.  Yes.

    Q.  Do you know what the term predisposing

factors means?

    A.  I'm aware of the term.

    Q.  Perhaps that is the area of confusion.  I

can ask the question in a different way.

        Sir, wouldn't you agree that the

risk of positional asphyxia is compounded when a person with a medical condition becomes involved in a physical struggle with an officer or officers?

MS. ALTERMAN:  Objection.  You can answer.  Do you know?

THE WITNESS:  I don't know.

Q.  Again, you have almost ten years of experience.  You understand the words I am asking here.  You spent six months at the police academy. You already testified to the terms used within that question, but you don't know?

A.  Yes.  That's my honest answer.  I don't know.  There is nothing wrong with that.

Q.  Is it because your attorney asked you do you know?

A.  No.

Q.  Officer Duran, if force was not used against Mr. Lagoda on April 12, 2019, do you believe he would not have died that night?

A.  Can you repeat the question?

Q.  If force was not used against Mr. Lagoda on April 12, 2019, do you believe he would have died that night?



A.  I wouldn't be able to know the answer to the question.

Q.  Do you remember when I introduced the National Safety Council PowerPoint that was Exhibit A.  It was on Altered Mental Status.  We went over some causes of seizures and we went to the next PowerPoint from the same National Council Safety which was Exhibit B.  And that specifically was on seizures.

Can I confirm with you after reading the testimony specifically under the section seizure, it says, "Rarely life threatening, but a serious emergency."

So knowing that you confirmed that testimony was in there -- this is a document, again, produced by your counsel -- I'm going to ask the final question.  If force was not used against Mr. Lagoda that night, April 12, 2019, do you believe he would have died?

MS. ALTERMAN:  Objection.  You can answer.

A.  I'm not a doctor.  I will not be able to know the answer to the question.

MR. AMRHEIN:  I have no further



JONATHAN DURAN                                    August 03, 2023
ALEXEY V. TARASOV, ESQ. vs PORT AUTHORITY                    101

questions.

MS. ALTERMAN:  I don't have any questions.

MR. AMRHEIN:  Thank you, Officer, for taking the time out of your day.  I know the summer is incredibly busy and we do very much appreciate your time.

(Whereupon the deposition was concluded at 12:48 p.m.)



JONATHAN DURAN                                                August 03, 2023
ALEXEY V. TARASOV, ESQ. vs PORT AUTHORITY                             102

C E R T I F I C A T E

I, JONATHAN DURAN, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that said transcript is a true and accurate record of said testimony (with the exception of the following corrections listed below:)

Page    Line            Correction

Signed under the pains and penalties of perjury this        day of                        , 2023.

JONATHAN DURAN



COMMONWEALTH OF MASSACHUSETTS   )

                                )

SUFFOLK, SS.                    )


          I, Nancy L. LaCivita, Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that JONATHAN DURAN, the witness whose deposition is hereinbefore set forth, was duly sworn by me, and that such deposition is a true record of the testimony given by such witness.

          I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

          IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal this 2nd day of September, 2023.

                         Nancy L. LaCivita

                         Nancy L. LaCivita

                         Notary Public

My Commission Expires:

January 2, 2026



**1**

**1**
39:12,13

**10**
43:20,23
44:5,7
85:9,12,
13,14,15,
16

**1160**
85:21

**11:35**
53:10

**12**
43:16
48:11
61:22
80:5,20
85:8
99:19,23
100:18

**12:48**
101:9

**12th**
85:16

**13**
85:6,10

**137**
7:18

**13th**
85:17

**16**
10:24

**1802**
79:11

**1814**
80:7 84:4

**1864**

79:12

**2**

**2**
44:4,6

**2000**
9:14

**2004**
9:14

**2013**
10:24

**2014**
21:4,24
33:10

**2019**
9:24
23:4,9,
10,13
43:16,24
48:11
61:22
85:6,9,10
99:19,23
100:18

**2029**
36:17

**2064**
35:9

**2065**
35:21

**2068**
35:9

**2082**
36:22
37:3

**2083**
37:15

**2093**
38:2

**2095**
36:18
37:4 38:6

**269**
47:14

**3**

**30**
4:22

**5**

**5**
9:14

**6**

**6**
43:20,24
44:5,6,7,
8 85:10,
15,16

**A**

**a.m.**
85:9,10,
12,15,16

**ability**
7:10,11
20:14

**aboard**
73:24

**Absolutely**
59:3 64:4

**academy**
10:20,23
11:3,6,12
12:17
13:4

14:1,10,
15 15:3,
8,17
16:4,16,
19 17:1,
10,19,23
18:11
19:16
20:1,5,
13,23
21:3
22:19
23:1,18,
23 24:5,
12 25:4,
16 26:7,
16 29:1,
6,22
30:6,20
31:12
32:12,20
34:15
90:1 91:8
92:12
98:10
99:10

**access**
56:17

**accessible**
33:23

**accompanying**
79:14

**accurate**
56:11

**acquired**
77:7

**act**
63:23

**action**
8:15,18
49:12
67:8

**actions**
8:21
63:10,11
93:8

**active**
19:10
30:10

**activity**
58:11

**acts**
63:5

**add**
80:24

**additional**
45:4,11
77:9
83:21
84:11

**additions**
25:6

**address**
7:16,17
10:5,7
40:7

**adjacent**
47:21

**administering**
12:13
57:14

**administrator**
5:5

**advance**
38:15
39:2
41:19

**AED**
71:4,19
72:2 74:6
86:13,18



**agencies**
47:16

**agency**
21:16

**aggressive**
91:2

**agitated**
38:11

**agree**
4:16
22:13
80:22
81:4,8,
14,15,21
82:4,10,
15,21
83:2,10
90:12,18
91:3
92:17,24
93:24
94:19
95:2,3,7
96:9,16,
17,19
97:15,23
98:24

**aid**
12:13,14
73:14

**air**
96:20
97:8

**Airport**
10:6,7
74:24

**Alexey**
5:5

**alive**
87:5,10,
14 88:10
89:2

**altered**
18:7,15,
21 19:1,
5,15
29:18
35:11,20,
24 36:5
37:19
91:15
93:18
100:5

**ALTERMAN**
4:17,24
5:7 8:16
14:3
17:13
19:7,18
20:17
21:19
22:10
26:21
27:9
31:13
32:13
33:19
34:7
36:21
37:1
41:23
42:10,21
43:2
47:10
49:15
50:17
53:5,8
56:9,14
59:1
60:10
62:21
63:7,18
64:3,7,21
65:22
66:11,14
68:24
70:3,17
73:10

75:9
77:21
78:4,12
80:12
81:2,12
82:1,8,19
83:7,14
84:8,18
85:12
86:8,15
87:6,11,
22 88:19
89:12,18
90:14
91:18
92:20
93:21
94:4,14,
24 95:5,
24 96:14,
24 97:12,
19 98:3
99:5
100:20
101:2

**alternative**
97:5

**ambulance**
74:7,13,
16,22
75:3,8,
13,20
76:1,2,3
78:10
81:1,10,
24

**Amended**
39:6,11,
23

**amount**
95:17

**amounts**
94:10,21
96:11

**Amrhein**
4:9,18
5:2,12
34:21
36:8,23
37:3 39:4
53:3,6,9
78:15
85:14
100:24
101:4

**angry**
38:11
66:3

**answers**
6:9 53:16

**anticipate**
6:12

**anticipation**
42:17

**anymore**
89:11

**apologies**
5:2

**applied**
55:9

**apply**
55:4
56:8,13,
22 57:2,
21 59:24
60:4

**applying**
17:11
55:19
56:4
57:15
58:1
59:21
61:9,14
62:16
69:21

70:1 71:7
94:2,9,20
96:10

**approaching**
86:21

**Approximately**
48:6

**approximation**
67:22

**April**
9:24
43:16,24
48:11
61:22
85:6,8,10
99:19,23
100:18

**area**
47:6,8,
11,13,17
48:7
98:22

**Arm**
14:20

**arrest**
8:8,14
11:17

**arrests**
8:19

**arrive**
46:3
74:21

**arrived**
48:18,22
49:3,4
50:13
67:20
74:7

**Ashcroft**
5:13



**asphyxia**
96:23
97:16
98:14
99:1

**asphyxiation**
16:15,20,
24 28:21
97:11,23

**assess**
24:13

**assigned**
46:3,5
76:2,3

**assist**
49:13
75:22

**assistance**
45:4,8,11
74:7
75:16

**assume**
39:22

**assurance**
24:15

**attempt**
57:11
65:3
66:24
73:4

**attempts**
88:16

**attend**
10:19,22

**attendants**
68:17
71:14
73:8 74:1

**attended**
22:19

**attending**
45:5,12
73:23,24

**attention**
35:21
37:15
68:17
69:3

**attorney**
5:13 8:9
40:14,22
41:1,3,9,
12,16,18,
21 53:21
76:6
77:5,11
78:7,17,
22 79:13
99:15

**attorneys**
42:12

**August**
10:24

**Authority**
9:19,23
10:20,23
11:2,4,7,
12 13:1
18:2
21:3,10,
16,23
24:11,22
25:3,21
26:3,24
28:6,19
29:1
30:23
31:7,19
33:9,14,
24 34:5,
13 46:23
47:5
62:19
63:14

77:8,19
78:1,9
80:23
81:9,22
82:5,16
83:4,22
84:3,12
86:22
91:9
92:11

**avoid**
6:4

**aware**
34:1 40:4
44:12,23
54:7
60:15
61:18
64:5,10,
12,15,16,
19 65:2
74:16
75:5,11
77:18,23,
24 78:6,
7,14
86:4,10,
12,17
98:21

―――――――

**B**

―――――――

**bachelor's**
9:6

**back**
17:3,6,12
21:23
23:13
38:11
48:19
49:7,11,
24 50:1
54:16
58:10,12,

24 59:8
64:9
70:13
71:9,10
72:3
73:1,23
87:19,20,
21 88:1,
5,6,7,8,
17,18
94:21
96:11

**background**
9:3

**balance**
35:19

**based**
14:9
53:16
78:18
82:23
86:20
91:7,12
92:1,9
95:17
96:6

**Bates**
35:8
36:17,22
37:15
38:3
39:12
79:11
80:7 84:3
85:21

**baton**
55:15
56:5,20,
23 57:16

**bear**
34:22
84:22

**beat**
87:10

88:11,12
89:11,16

**began**
11:2

**behavior**
95:23

**behavioral**
11:13

**bend**
56:6,12

**bending**
57:18

**bit**
8:6

**block**
31:24
96:20
97:8

**blood**
88:13

**blue**
43:14
44:12
68:22
69:9 86:6
89:10,15

**board**
44:14
45:1
48:19
67:20
75:16

**body**
16:12
17:12
29:10
46:8
48:1,4
50:16
56:18
58:13
59:11,19,



24 60:3,5
69:18,22
70:1
88:14
94:3,10

**book**
43:8

**bottom**
85:4

**box**
85:23
86:1

**break**
6:16,19
51:17,19
52:6
53:4,21

**Breaking**
16:8

**breathe**
94:1,17

**breathing**
67:13,15,
17 88:4
89:16
94:12,13

**bridge**
69:6
72:10

**briefly**
7:23 9:2

**bring**
37:6
88:17,18

**bringing**
88:1

**broadcast**
45:7

**brotherhood**
62:20,23

**brought**
87:19,20,
21 88:5,
6,8

**bucket**
14:13

**Bugiada**
44:22,23
45:4,11
48:23
49:1,5,
11,12,13
50:6,8,22
54:17,21
58:8,17
60:9,20
61:14,19
63:16
64:1,5
74:18
75:22

**building**
7:18
47:14

**bullet**
35:23
36:6
37:17,22
38:3,7,10

**busy**
101:6

**buttocks**
56:7

**button**
55:18

———————

C

———————

**call**
44:16,19
45:3,6,
10,14
62:5

71:18
72:14,18,
20 74:5,
17,21,23

**called**
44:13
74:13

**calm**
24:13

**cam**
46:8 48:4

**cam's**
48:1

**capacity**
18:1
21:22
22:18
24:21
26:2 28:5
29:4,9
30:22
32:20
34:12
38:21
90:2

**car**
45:17

**care**
19:17
20:3
31:9,11
73:16

**career**
27:22

**case**
8:10 35:7
91:1

**caution**
18:20

**certificate
s**
32:10,21

33:7

**certificati
on**
33:5

**change**
10:9,12,
16

**changed**
23:1 29:5

**chaotic**
62:9

**chart**
15:20

**check**
89:3

**checked**
85:23
86:1

**Cheryl**
4:13

**chest**
50:10,15,
19 56:1

**chief**
68:19
74:3

**children**
8:24

**Choking**
15:13

**Chris**
5:12

**circumstanc
e**
95:18
96:6

**circumstanc
es**
90:22

**civilian**
18:3,7,14
29:11
64:20

**civilians**
19:17
20:3 31:9
73:24

**claiming**
74:4

**clarificati
on**
32:18
52:9

**clarify**
28:4
72:11

**clarifying**
47:22

**clarity**
45:18
57:7

**class**
20:15
22:5
27:14,18,
21,22,23

**classes**
22:2,8,13
23:14,17,
18,22,23
25:12
26:9
27:2,6,8,
12 28:7,
12,20,24
29:14,24

**classify**
52:20,23

**clean**
6:15
82:12



cleaning
    37:4

clear
    6:15
    23:11
    42:8
    55:17
    71:23

close-knit
    62:24
    63:13

code
    7:19

collective
    27:3,24
    28:10
    45:20

college
    9:4,5,7

colloquial
    6:7

combative
    36:1 91:4
    92:1,14
    95:23

command
    47:5,18
    48:8
    51:15,24
    52:1,3,
    13,21
    53:1,13
    75:7

commanding
    52:15

commands
    52:15
    53:23
    67:11
    92:18
    93:11,17
    95:12

Common
    36:5

communicate
    6:8

communication
    50:3 71:4

compare
    23:17,22

compared
    94:12

complaint
    39:6,11,
    16,17,23

complaints
    68:19
    74:3

complete
    6:11
    21:12
    32:23
    79:12

completed
    32:11
    36:19

completely
    58:18,21
    59:5

completion
    32:22
    33:7

compliance
    14:23
    54:24
    55:4,9,
    19,21
    56:4
    57:5,14,
    22 58:1
    62:16
    68:16
    70:6

71:8,11
    85:23

complies
    35:18
    37:10
    80:4

comply
    13:22
    95:14

compounded
    97:16,24
    98:17
    99:1

compressional
    16:15,20,
    24 28:21

concern
    54:22
    67:8

concerns
    67:2

concluded
    44:5
    77:18
    101:9

condition
    83:12,18
    84:15
    96:22
    97:10
    99:2

conduct
    76:6

conference
    6:24

Confidential
    78:20

confines
    20:14

confirm
    100:10

confirmed
    100:14

confused
    36:1 57:5

confusion
    39:1
    98:22

Congratulations
    21:8

contact
    56:23
    71:15

contained
    34:3

context
    41:7

continue
    57:6
    88:22

contractions
    37:20

contribute
    97:9

contributed
    77:20
    82:7,18
    83:5

contributing
    96:21

control
    16:13
    55:2 67:5

controlled
    55:14

conversation
    6:7

copy
    33:17,22
    43:8

correct
    10:8
    12:15,22
    18:11
    20:16
    21:6,7
    25:17,23
    35:23
    37:17,22
    38:7
    44:11
    47:4 50:5
    55:10,16,
    18 56:2,6
    57:7,16,
    20 58:15,
    20 59:7
    64:2 68:6
    71:14
    72:15,16
    74:12
    79:7 84:4
    85:10,15,
    17,18,23
    86:2,14
    90:5,9
    98:11

Council
    34:16,19
    35:11
    36:14
    37:8,12
    100:4,7

counsel
    91:13
    100:16

couple
    4:14



76:24

**courses**
9:13
21:22
31:18,24
32:2,4,
11,22,24
33:3,4,6

**court**
7:1 8:9,
12 11:19
39:12,14

**courtroom**
60:14

**cover**
11:12
32:7 37:7
84:14

**covering**
83:17

**CPR**
22:6,14
71:5,18
72:1,21
74:6
86:11,13,
18 88:5
90:1

**created**
38:18,20,
23 43:4

**crises**
17:18,23
18:4
19:14
29:15
30:1

**crisis**
18:15

**cross-
examining**
8:10

**cuffed**
68:15,20

**curriculum**
11:11,23
12:2,5,9,
12,23
15:3

**cut**
13:18
41:15

_____

**D**
_____

**dangers**
38:12

**dash**
39:13

**date**
40:6

**dated**
85:6

**Dating**
23:13

**day**
4:11
43:19
44:10
101:5

**days**
4:22
22:24

**dead**
88:1
89:22

**deadly**
15:17
26:10,14
27:15,19,
23 28:9,
10

**deal**
18:3

**dealing**
17:17
18:6,14,
20,24
19:14
29:15,17
30:1 73:7

**death**
76:7
77:12,20
78:19
79:6
82:7,18
83:6

**decided**
75:21

**deescalate**
18:24
19:3 24:3
30:18

**deescalatio
n**
13:5
14:11
22:21
23:14
30:12

**defendant's**
79:10

**defendants**
35:6,8
36:16
37:13
39:15
85:22

**defense**
12:5
28:13

**definition**
65:24

**definitions**
66:5

**degree**
9:8

**demonstrati
ons**
20:6
25:15,22
26:1

**department**
9:24
10:20,23
18:3
21:3,11,
23 24:12,
22 25:4,
21 26:3,6
27:1
28:7,20
30:23
31:8,19
33:10,15,
18,24
34:6
46:24
47:5
62:20
63:14
77:19
78:1,9
80:24
81:9,23
82:6,17
83:4,22
84:12
86:22
91:10
92:12

**departments**
34:13

**depend**
44:9

**depends**
48:9

90:20,22
94:6

**deponent**
7:7,15

**deposed**
5:8

**deposing**
92:8

**deposition**
5:18
38:15
39:2
40:2,23
41:4,10,
13,19,22
42:3,9,
17,20
43:1
101:8

**depositions**
4:14

**depth**
23:2,5

**describe**
7:23 9:2
13:14,16,
19 32:1
47:7
54:11,14
62:19

**describing**
57:6

**details**
86:17

**detecting**
87:15

**determine**
74:2

**determined**
78:8
80:23



81:8,15

**determines**
81:22

**developed**
24:4

**died**
99:20,24
100:19

**differ**
25:2

**differed**
26:12

**difference**
26:17,18
27:2 28:8
52:2
53:13
91:19

**differences**
26:19

**differentiate**
52:13

**difficult**
92:17,24
93:4,13,
19,24
94:12

**difficultys**
94:16

**diffuse**
18:23
19:4 24:3

**diffusing**
14:6,11
22:21
23:14
24:9
30:13,17

**direct**
4:8 37:14

**direction**
58:19,22
59:6

**disagree**
87:8,9

**disciplinary**
8:15,18

**discovery**
35:8
36:16
79:10
85:22

**discuss**
51:19

**discussed**
29:10
41:7

**disoriented**
36:1 91:3
92:1,15
93:19
95:22

**dispatch**
74:18

**dispatched**
75:24
76:4

**distractions**
24:19

**distress**
62:5

**divulge**
41:6

**docket**
39:12

**doctor**
89:20
100:22

**document**
35:3,5,7
36:11,15
39:19,22
40:1,5,
11,13,17,
20 79:15,
17,20
85:1,21
91:13
100:15

**documents**
38:20
42:24
77:7,9

**door**
47:20
71:21
75:8

**doubting**
87:15

**driving**
46:6

**drowsy**
36:1

**duly**
4:4

**Duran**
4:3,10,23
5:8 6:22
7:17 9:15
53:20
99:18

**Duran's**
85:20

**duties**
31:1
38:21

**duty**
19:17,21
73:6,13

**dying**
95:4

—————

E

—————

**earlier**
22:24
31:17
42:5
89:24

**easier**
6:8 23:11
94:17

**easy**
6:10,12

**educational**
9:3,12

**effect**
17:3
52:17

**effective**
55:5

**electronic**
33:22

**emergencies**
90:2

**emergency**
10:13
37:24
44:13,24
73:7
74:12
100:13

**emphasizes**
83:11

**employed**
9:16

**employee**
33:11,13
34:4

**employees**
33:23

**employer**
9:18

**employment**
11:1

**EMS**
74:13,16

**encounter**
13:9

**end**
35:1 73:8

**ended**
8:20

**enforcement**
11:8

**engage**
49:6
51:1,3
60:21

**engaged**
54:10,13
55:3
57:10
60:19
73:4

**engaging**
14:1 19:5
48:23
49:2
60:23
62:17
71:6

**English**
54:4

**entire**
39:10

**entitled**
35:11
36:4,15



**environment**
62:24
63:13

**environmental**
24:19

**escort**
74:20,22
75:2,8,
13,15
76:1
78:10
81:1,10,
24

**establish**
73:20

**estate**
5:6

**estimate**
48:14
74:8  77:1

**evaluate**
95:17

**event**
66:22

**events**
43:5,15
61:22
69:8

**eventually**
45:3

**Evgeniy**
5:6
43:11,13
78:19
79:7

**evidence**
11:24
12:3,4

**exact**
40:6

**EXAMINATION**
4:8

**examined**
4:5

**examples**
15:14

**excuse**
41:2

**executive**
79:23

**exhibit**
34:22
35:22
36:9
39:5,18
78:16
85:19
100:5,8

**exhibits**
79:14
91:14

**existed**
27:6

**expand**
87:16

**expanded**
55:15

**expect**
5:17

**expectations**
63:22

**experience**
11:8  14:9
86:21
91:8
92:2,10
98:6  99:9

**experienced**
15:4
83:19

**expressing**
97:6

**extremely**
62:4

———————

**F**

———————

**face**
12:24
50:10,12,
13,16
94:1,20
96:10

**faced**
58:18,21
59:5

**facing**
50:14

**fact**
32:23
72:1

**factors**
54:23
97:17,24
98:20

**failed**
78:9
80:24
81:9,23

**fair**
5:24
31:22
34:2
49:10
50:2
52:2,14,
20,23
66:10
68:4  73:3
79:19

**fairly**
48:13

**fall**
14:12
16:8

**fashion**
17:4

**fast**
68:1,3

**feel**
55:5

**feelings**
82:23

**fellow**
63:22

**felt**
67:5
76:23

**fight**
54:17
66:4
75:18

**fighting**
16:3
28:16
94:22
95:3
96:12

**figure**
50:3

**filled**
66:20

**final**
37:22
100:17

**Finally**
6:16

**find**
69:9

**finish**
6:18

**finished**

35:15
80:3,10

**firearm**
54:18
91:21
92:6

**Firm**
5:13

**First-aid**
12:9,10

**fists**
64:14

**fitness**
94:6

**flailing**
51:7

**flight**
43:14
44:13
67:21
68:17
71:14
73:8  74:1

**flow**
15:20
96:20
97:8

**focus**
70:5

**follow**
53:17

**force**
15:16,17,
19,21,22
16:1
26:9,10,
14  27:3,
4,14,15,
19,23,24
28:8,9,10
43:9
56:22



59:21
60:1,4
61:15,21
64:13
66:15,16,
21 77:18
82:5,16
83:3
85:20
89:4 98:7
99:18,22
100:17

**foreign**
92:19
93:6,12,
14

**form**
4:20 8:16
17:13
20:17
27:9 70:3
84:18
86:15
91:18

**found**
82:4,6,
16,17
83:5 86:6
87:2 89:5

**fountain**
66:8

**fourth**
37:22

**frame**
7:24
48:12
68:2 72:8
74:11
76:23
77:3

**frequent**
22:12,14

**frequently**
22:3,5,8

**front**
47:14
48:19,21
49:4,6
56:18
69:6
71:13,17,
21 72:4
91:13

**frowned**
63:4,9

**full**
75:16

**fully**
60:15

———————

**G**

———————

**galley**
71:9 72:3
73:2,23

**gate**
47:15

**gave**
51:11
53:23

**General**
78:23
79:14

**General's**
76:6
77:6,11
78:8,17

**give**
25:11
33:4,6
51:9,13
53:18
67:21
68:1 72:8
77:2

**giving**
6:23

**good**
4:10
80:1,14

**graduate**
9:5 21:2

**graduated**
24:11
34:14

**graduation**
21:11

**Grigory**
5:4

**ground**
16:3,9
28:16
50:11,14,
16,19
56:1,19
57:8
58:13,23
68:8,13
94:11

**group**
16:1
27:3,24
28:10
94:9

**grunting**
65:15

**guess**
17:21
26:21
66:13,14

**guttural**
65:14,20
66:1,6,10

———————

**H**

———————

**hand**

55:12
56:21

**handcuffed**
68:11

**handcuffing**
14:21

**handcuffs**
67:5

**handgun**
75:17

**handing**
77:8

**handle**
18:3

**hands**
17:3
51:14
55:14,16,
18 56:5
57:15
64:13

**happen**
52:4,18
95:8

**happened**
62:11
68:1,3
70:16
74:2

**happy**
5:20
32:18

**hard**
33:17

**harsh**
66:8

**head**
6:5 50:15

**header**
84:7

**health**
17:22
18:4,15
19:13,14
29:15
67:2,9

**hear**
5:19
44:16
65:11
67:15,17

**heard**
34:20
68:15
71:3,18
72:14,18,
20 74:5

**hearing**
45:10

**heart**
54:16
87:10
88:11,12,
13 89:11,
16

**heartbeat**
89:5

**hectic**
62:4

**heel**
56:7

**high**
9:3,9,10,
12

**higher**
19:17

**hissing**
66:7

**hit**
60:16

**hold**



55:4,9,
19,22
56:4
57:5,14,
22 58:1
68:16
70:6
71:8,11
85:23

**holding**
56:21

**holds**
14:20,24
62:16

**home**
40:7

**honest**
99:13

**hour**
32:5

**hours**
32:1
76:24

**Hulk**
65:18
66:9,18
90:7

**human**
90:7

**humans**
95:7

**hurt**
68:18

**hurting**
91:20

————

I

————

**identified**
4:4

**immediately**
83:13
84:16

**impair**
7:10,11

**improper**
19:23
31:2,4
65:6
96:17,19
97:2,7

**improperly**
64:19
65:3

**in-house**
26:5

**in-service**
26:4

**incident**
66:23

**include**
28:16
29:17

**includes**
39:16

**including**
61:19
91:15

**increased**
94:21
96:11

**Incredible**
65:18
66:9,18
90:7

**incredibly**
101:6

**individual**
13:13,22
15:24
16:12

27:3 28:9
54:24
62:7 65:4
91:19
92:12
93:17,18

**individuals**
13:9 78:3
83:18
84:15

**influence**
7:9

**information**
34:3
77:17

**initial**
74:17

**initially**
68:12
75:23
76:4

**injured**
86:2

**injuries**
73:12

**inside**
59:18

**intercede**
19:22
31:1,5

**interceded**
64:17,20
65:4

**International**
10:7
74:23

**intervene**
64:23
67:1,4,7,
10

**intervention**
86:13

**interventions**
88:5

**interview**
76:20
77:4

**interviewed**
76:12,15,
17

**introduce**
34:21
36:8 39:4
78:15

**introduced**
100:3

**introductory**
5:12,17

**investigation**
76:7,10,
13 77:6
78:18
79:2,5

**investigative**
79:12

**involve**
34:16

**involved**
23:7
54:19
97:17
98:1 99:2

**involving**
61:22

————

J

————

**jail**
8:21

**January**
21:4
33:10

**Jersey**
9:20

**jet**
43:14
44:12
69:6
72:10

**JFK**
10:7,9
74:23

**job**
6:10,13
34:4
38:22
96:2

**join**
49:13

**joining**
61:13

**Jonathan**
4:3 7:17

**Joseph**
58:9,16
60:20
61:14,20
70:23

**judo**
13:10,11,
12,14,17,
19,24
14:6



**K**

keeping
89:1

kicking
51:6 62:7

kill
89:7

killed
89:4,6

knee
69:18

knees
58:24

knowing
100:14

knowledge
27:13,17

**L**

labeled
65:6

Lagoda
5:6
43:11,13
48:23
49:2,14,
19 50:10,
23 51:1,
4,6,9,12,
22 52:21
53:1,18,
24 54:5,
11,14,18
55:19,24
57:8,22
58:22
60:16,19,
21 61:10,
15,23

62:17
63:16,17
64:2,6,14
65:11
67:1,3,
12,18,23
68:7,21
69:14,18,
22 70:2,
12,24
71:1,6,12
72:1,15
73:4,23
74:6
77:12,20
78:19
79:6,7
86:5 89:3
99:19,22
100:18

Lagoda's
54:7
55:9,22
56:5,13,
24 57:3,
15,16
58:2,7,
13,17,24
59:12,14,
16,18,22
60:23
67:8
68:22
69:8 71:8
76:7
82:7,18
83:5 86:6

Laguardia
7:18
10:6,10

laid
60:6

language
54:8
83:17

92:19
93:2,6,
12,14
95:9,10,
15

large
80:9

largely
22:23

law
5:13 11:7

Laws
11:17

laying
50:20
56:1
58:13,22
68:7,12
94:11

learn
70:23,24

learned
18:10
25:3
29:4,5
72:1

led
74:17

left
55:8
57:13
58:1

leg
55:6
56:12,18,
24 58:2
59:9
71:22
72:9

legs
56:7
57:15,19

59:4,12,
14,16,17,
18,20,22
60:24
67:16
94:22
96:12

length
32:3

lesson
20:14

level
19:17
20:2 94:7

life
37:23
54:20
87:21
88:2,7,18
94:23
95:4
96:13,21
97:9
100:12

lifting
57:2

limbs
51:7
58:7,17

limited
65:8

lines
32:19

listen
32:13
67:12
89:20

listening
19:10
30:10

living
88:15,22

loads
34:24

located
47:13
49:11

location
47:16
75:7

locks
14:20

long
32:2
43:23
48:6,10
67:22
74:9
76:23,24

lung
96:21

lungs
97:9

lying
57:8 94:1

**M**

made
8:14
49:10
54:15
71:15

mailed
40:7,8

main
54:22,23

make
6:9 10:9,
12 23:11
25:6
53:5,6
54:23



800.211.DEPO (3376)
EsquireSolutions.com

**making**
65:11,14
66:17
90:6

**male**
44:13,24

**manager**
11:5

**mandate**
21:17

**mandated**
21:12
31:5

**mandates**
21:14

**manual**
33:11,13,
17,23
34:4

**manuals**
29:9

**marital**
8:22

**mark**
85:19

**marked**
36:9 39:5
78:16
91:14

**married**
8:23

**material**
25:11

**materials**
38:14,17,
19,23
39:2
42:6,16

55:17
88:16

**matter**
5:4,14
35:6
36:16
37:13
39:6,13,
17 45:5,
12 48:15
95:10

**matters**
5:12,17

**meaning**
68:21

**means**
98:17,20

**meant**
54:18
89:21

**medical**
17:18
44:13,24
73:6
74:6,12
86:13
89:20
90:2 99:2

**medically**
90:13,19
91:24
92:13
95:22

**meet**
42:13
47:16

**members**
81:5

**memo**
43:8

**memory**
61:8,12

**mental**
17:22

18:4,7,
15,16,21
19:1,5,
13,14,15
29:15,18
30:1
35:11,20,
24 36:5
37:19
91:15
93:18
100:5

**mention**
66:17

**mentioned**
10:5
60:20
61:19
92:4

**met**
42:12

**Mezzacappa**
61:2,13,
20 62:2,
16

**middle**
78:24

**mind**
18:18

**mindful**
18:17

**minutes**
48:15,16,
17 53:4
67:24

**missed**
63:20

**mistake**
36:23

**modifications**
25:10

**moment**
18:18
49:23

**Monadnock**
55:15

**monster**
66:9

**months**
12:21
98:9
99:10

**morning**
4:10
41:19
85:9
91:14

**motions**
4:21

**move**
35:15
71:12

**moving**
24:18

**multiple**
8:19 32:7
66:5 73:1
76:17

**muscular**
37:20

———— **N** ————

**names**
76:16

**National**
34:16,18
35:10
36:14
37:8,11
91:12
100:4,7

**native**
54:7

**nature**
20:24
87:24

**necessarily**
88:14

**neck**
17:5,12
68:22
69:8 86:6
89:10,15
94:21
96:11

**needed**
44:9 45:7
72:1

**needing**
74:6

**night**
41:13,17
43:5
44:23
45:5,12
48:11
62:3,4
99:20,24
100:18

**noises**
65:11,17

**normal**
94:13

**notary**
4:5,23

**notation**
90:6,9,11

**note**
5:1 82:1
84:8

**notes**
66:16



**number**
  34:10
  39:12
  94:20
  96:10

_____

**O**

_____

**oath**
  6:23 7:20
  8:7 11:21
  60:13

**objection**
  8:16 14:3
  17:13
  19:7,18
  20:17
  22:10
  27:9
  31:13
  33:19
  34:7
  41:23
  42:10,21
  43:2
  49:15
  50:17
  56:9,14
  59:1
  60:10
  62:21
  63:7,18
  64:3,7,21
  65:22
  66:11
  68:24
  70:3,17
  73:10
  75:9
  77:21
  78:4,12
  81:2,12
  82:1,8,19
  83:7,14
  84:8,18

  86:8,15
  87:6,11,
  22 88:19
  89:12,18
  90:14
  91:18
  92:20
  93:21
  94:4,14,
  24 95:5,
  24 96:14,
  24 97:12,
  19 98:3
  99:5
  100:20

**objections**
  4:19

**objective**
  54:23

**observe**
  51:6

**observed**
  68:22

**occur**
  22:2,8,12
  26:1

**occurred**
  43:15
  61:22
  66:22
  69:5
  72:7,10
  73:5,12

**occurs**
  22:5

**offer**
  97:5

**offered**
  14:10

**office**
  6:24 76:6
  77:6,11

  78:8,17,
  22 79:13

**officer**
  4:10,22
  5:8 6:22
  8:22
  9:15,22
  10:2
  12:24
  15:5
  18:1,2
  19:22
  20:22
  21:10,22
  22:18
  23:8
  24:10,21
  25:20
  26:3,8,
  13,20,24
  28:5,6,
  12,19
  29:5,9,14
  30:1,9,
  21,22
  31:1,7,18
  32:15,21
  33:11,14
  34:5,12
  35:1
  37:11
  38:21
  44:12,21,
  22,23
  45:4,11
  46:4,23
  48:22
  49:1,5,8,
  11,12,13
  50:3,6,8,
  22 53:12,
  20,23
  54:17,21
  58:8,9,16
  61:2,4,7,
  13,19

  62:1,5,15
  63:5,6,
  11,17,24
  64:1,5,12
  65:2 67:8
  68:15,22
  70:1,23
  73:14
  74:18
  75:15,17,
  22 85:20
  86:22
  90:3
  91:9,22
  92:3,10
  97:18
  99:3,18
  101:4

**officer's**
  92:6

**officers**
  24:16
  40:19
  46:12,15
  47:24
  57:11,21,
  24 58:6
  59:9
  60:19,20,
  21,23
  61:14,18,
  19 62:11
  63:1,2,22
  64:10
  69:13,17,
  21 70:8,
  11,14
  73:1,15,
  19,21,22
  75:6 78:2
  83:22
  84:12
  86:4 89:9
  97:18
  98:2 99:4

**one's**
  94:23
  95:4
  96:13

**one-time**
  76:18

**opinion**
  93:4

**opposite**
  58:18,22
  59:6

**option**
  46:10
  48:4

**options**
  46:22
  47:1

**oral**
  6:9

**order**
  12:12
  20:14
  24:3
  56:7,12

**ordinarily**
  17:4

**outstanding**
  51:18

**overtime**
  44:2,4

**owe**
  19:16

**owed**
  20:3 31:9

_____

**P**

_____

**P-A-P-I-A**
  61:6

**p.m.**



800.211.DEPO (3376)
EsquireSolutions.com

85:13,14, 15,16 101:9

**PA**
35:9,21 36:17,18 37:3,4,15 79:11 80:7 85:21

**Papia**
61:4,5,7, 13,20 62:1,15 63:17 64:1,12

**paragraph**
79:22 84:7

**paragraphs**
80:9,18

**part**
8:4 11:23 12:2,5,9, 23 13:3 15:2 20:12,22 25:11 29:13 34:4 35:8 36:16 63:20 67:6 69:18 76:12 77:6 79:9 80:13 85:22 88:23 89:1

**partially**
36:2

**pass**
20:15,23

**passenger**
43:14

**passengers**
54:22 62:6 72:24 73:8,15 75:16

**passive**
90:24 92:14

**passively**
60:7

**past**
40:24

**patient**
35:24 38:4,11

**patrol**
23:8 45:17,23 46:2

**Pause**
64:18

**PDF**
34:24

**penalties**
7:4

**pending**
6:17

**people**
19:14 29:18 62:8 91:20 94:9,20 96:10

**perceive**
19:23 31:2,4

**period**

84:16

**perjury**
7:4

**perpendicular**
58:12

**person**
8:19 12:14 16:10 18:17,20 19:1,4,6 20:9,11 24:16 83:11 87:5,9, 13,18,20 88:3,22 90:23 92:5 94:19 95:13 96:9 97:16,24 99:2

**person's**
8:9 96:21 97:8

**personal**
7:7,14 46:2 82:23

**personally**
45:9 94:6

**personnel**
75:7 77:19 78:10 80:24 81:10,23 82:6,17 83:4

**phrased**

28:3

**physical**
6:4 20:6, 13,24 25:15,22 26:1 59:21 61:9,15 93:8 95:12 97:18 98:1 99:3

**physically**
14:2 19:6 29:11 48:23 49:2,14 51:1,3 54:10,13 57:10 58:7 60:19 62:16 63:16 64:1 67:13 68:9,18 71:7 73:4 89:8

**placing**
56:21 58:23

**plaintiff's**
5:1

**plaintiffs**
5:3,14

**plane**
48:19,20, 21 49:5, 6,7 54:16 62:6 69:6 71:9,10, 13,17 72:24

73:9,24 75:16

**point**
10:6 35:23 36:6 37:17,23 38:3,7,10 66:24 69:4,12, 16,20 70:22,24 89:9

**pointed**
49:24

**pointing**
71:24

**police**
9:22,24 10:2,20, 23 11:3, 6,12,15 12:16 13:4,12 14:9,15 15:3,8,17 16:4,16, 18 17:1, 18,23 18:2,11 20:12,23 21:3,11, 22,23 22:19,24 23:18,23 24:5,11, 22 25:3, 20,21 26:3,5, 15,20 27:1 28:6,20 29:1,6, 13,21 30:1,6,8,



21,22,23
31:8,12,
19 32:14,
21 33:10,
14,18,24
34:5,13
46:23
47:5,14,
18 48:7
62:20
63:14
73:14
74:22
75:2,7
77:19
78:1,9
80:23
81:9,22
82:5,16
83:4,22
84:12
86:22
90:1,3
91:8,9,22
92:2,6,
11,12
98:10
99:10

**poorly**
20:20

**Port**
9:19,23
10:19,22
11:2,3,7,
11 13:1
18:2
21:2,10,
16,23
24:10,22
25:3,21
26:3,24
28:6,19
29:1
30:23
31:7,19
33:9,14,

24 34:5,
13 46:23
47:5
62:19
63:14
77:8,19
78:1,8
80:23
81:9,22
82:5,16
83:4,21
84:3,12
86:22
91:9
92:11

**portion**
23:21

**position**
68:13,14

**positional**
16:14,19,
23 28:22
96:22
97:10,16,
23 98:13
99:1

**positioned**
50:7,8,15
59:19

**possibly**
92:6

**post**
9:12

**potential**
46:21
72:2

**potentially**
91:21

**Powerpoint**
35:10,13,
20 36:14
37:8,12,
16 100:4,

7

**practice**
17:16

**practices**
11:15

**predisposing**
97:17,24
98:19

**preparation**
40:2,23
41:4
42:3,20,
24

**prepare**
42:9

**preparing**
41:9

**presence**
5:1 13:12

**present**
5:3 10:5

**pressure**
17:5,6,11
56:13
57:2,15
94:3,10,
21 96:11

**pretty**
97:4

**prevent**
38:12
63:15,23

**previous**
23:2

**previously**
55:24
68:6
98:12

**prior**

23:4,13
42:15
44:7

**procedure**
47:15

**procedures**
11:15,19

**proceed**
18:19
75:22

**proceeded**
72:23

**process**
65:10
67:7 68:8
69:13,17,
21 76:20
88:23
89:1

**produced**
35:5,7
36:15
37:12
79:9
85:22
100:16

**production**
79:10

**profile**
50:13

**promise**
7:6

**promotion**
10:15

**prone**
50:20
56:1,18
57:8
68:7,12
94:11,19

**prosecution**

79:2

**provide**
32:18
57:7 74:8
77:4
83:21
84:11

**provided**
66:2 75:2

**providing**
24:15

**public**
4:5 77:17

**publically**
79:8

**pull**
39:7

**pulse**
68:23
69:9
70:24
71:1
86:6,23
87:1,13,
16,19
88:3

**pumping**
88:13

**punch**
63:17

**punching**
62:7
63:16
64:1,6,20
65:3

**purpose**
6:6,9
50:2 76:9

**put**
4:15 45:6
91:13



**putting**
   17:3,5
   54:20
   69:17

**pyramid**
   15:20

_____

**Q**
_____

**Queens**
   7:18

**question**
   5:23,24
   6:11,15,
   17,18
   7:7,14
   8:19
   10:21
   12:1
   13:15
   20:21
   23:20
   27:16
   28:2
   32:14,17
   42:8
   46:14
   51:2,18,
   20,21,23
   52:5,7,
   11,22
   53:12
   54:12
   58:14
   61:11
   62:14
   63:20
   65:1,8
   67:6
   71:24
   72:12
   75:23
   81:19,20
   82:14,22
   83:23

   92:22
   93:7
   96:3,8
   97:21
   98:23
   99:12,21
   100:2,17,
   23

**questioning**
   8:14 52:9

**questions**
   5:16,20,
   21 6:3,20
   7:11,12
   32:19
   53:16
   57:7
   80:21
   101:1,3

**quick**
   48:13
   62:11

_____

**R**
_____

**racing**
   54:16

**radio**
   45:7
   71:4,18
   72:5,14,
   18,20
   74:5,17

**ramp**
   47:14

**range**
   44:5

**Rarely**
   37:23
   100:12

**reaches**
   16:10

**read**
   78:24
   79:19
   80:2,8,19

**reading**
   35:15
   36:20
   80:18
   100:10

**reasonable**
   56:22

**reassuring**
   38:8

**recall**
   12:4,12
   14:21
   15:15
   16:2 24:7
   25:9,13
   26:19,23
   27:5,6,11
   28:1
   29:3,7,8,
   12 33:12,
   16,21
   34:9,17
   35:4
   40:6,12
   43:9,10,
   15 45:9,
   10 48:10,
   12 49:22
   53:14,19
   55:6,7
   57:23,24
   58:4,5
   61:1,17
   62:10
   65:16,17
   66:15,20
   76:19,20

**receive**
   9:6,8
   10:16

   31:8
   32:10,21
   33:10,17
   89:23

**received**
   22:17
   25:20
   26:13,15
   29:21
   30:6,24
   33:13
   45:3
   89:24
   91:8
   92:11

**receives**
   23:8

**receiving**
   8:20 23:7

**recess**
   53:11

**recognize**
   34:18
   39:22
   79:15
   85:1

**recommendat
ions**
   80:6,9
   83:20
   84:1,6

**recommended**
   77:24

**record**
   4:15,18
   5:1 23:12
   36:13,21
   45:18
   55:17
   73:18

**recovering**
   38:11

**reducing**
   24:18

**referencing**
   15:12

**referring**
   23:6 97:3

**refresh**
   61:8,12

**regain**
   16:12

**regard**
   53:13
   77:11

**relationshi
p**
   63:21

**released**
   71:11
   77:10,17

**remember**
   49:23
   77:8
   100:3

**remind**
   60:12
   96:7

**removed**
   39:13

**render**
   73:14

**repeat**
   5:20
   10:21
   12:1
   16:17
   23:20
   27:16
   32:18
   38:24
   46:14
   51:2,20,



800.211.DEPO (3376)
EsquireSolutions.com

52:11, 54:12
61:11
81:19
92:22
97:22
99:21

**repeating**
82:22

**rephrase**
5:22 15:7
20:20
23:11
30:4 41:2
42:23
59:13
96:18

**report**
64:13
66:17,18, 77:10, 13,16,18, 24 78:8, 18 79:5, 12,15
80:6,20, 22 81:15, 17,21
82:4,11, 15,24
83:1,3, 10,21
85:20
89:4 90:5

**reports**
38:18
42:19,24
43:4,6
61:21
81:8

**represent**
5:14
39:10
66:6

77:16
79:8

**requested**
6:19
86:13,18

**requesting**
45:4,11

**require**
26:8 27:1
34:11
74:22

**required**
24:23
28:7,13, 20 29:14
30:24
31:5,17
75:15

**requirements**
21:15

**reserved**
4:20,21

**resist**
65:19

**resisting**
51:13
67:11
94:22
95:9
96:12

**resolution**
84:16

**respect**
11:11
16:23
18:14
19:4
22:17
25:7 69:8

**respond**
45:14

46:12,15
91:16

**responded**
44:18
48:1
54:15
62:5
74:17
75:6

**responding**
44:24
48:11
74:23

**response**
41:22
51:23

**responses**
6:4 7:3

**responsibility**
73:6

**rest**
53:4
88:13

**restate**
65:1

**restrain**
17:2
29:11
38:4
49:14,19
57:11
60:7,8
65:4
67:1,14, 22 71:7
73:5

**restrained**
65:15
67:18
68:9,12
86:5
89:8,9,14

**restraining**
13:13
14:16
15:4,9,11
24:24
25:8,19
58:7
65:10
67:7
69:12,16, 20 96:18, 20 97:7

**restraint**
17:4 56:8
61:10
66:4 73:5
96:23
97:10
98:13

**restraints**
16:15,20, 23 28:22

**result**
8:13

**Results**
37:18

**resume**
53:9

**resuscitate**
88:17,24

**resuscitation**
87:24

**retail**
11:5

**review**
38:14,17
39:1 40:1
42:16,19, 24

**reviewed**
39:19

40:10
42:7
43:4,7
66:16

**revive**
88:24

**rhythm**
88:8

**risk**
97:15,23
99:1

**rolled**
68:21
89:10,15

**rolling**
86:5

**room**
6:24 53:4

**rough**
48:14
67:21

**roughly**
8:1 9:11
10:11
31:16
43:24

**rules**
11:23
12:3,4

**run**
11:10

**Russian**
53:24
54:2,8

─────────

**S**

─────────

**safe**
33:6

**safety**



34:16,18
35:11
36:14
37:8,11
67:2,9
91:12
100:4,8

**sake**
73:18
82:12

**sat**
70:11

**satisfactorily**
4:4

**scenarios**
27:12

**scene**
45:16,21,
23 46:12,
16,22
48:2,8,
11,18
61:9,16,
17 62:11
64:23
66:22
67:21
71:2,22
72:7
74:8,14
75:6,8,
13,24
78:11
81:1,11,
24 86:19

**school**
9:3,9,10,
12

**schooling**
9:9

**sciences**
11:13

**screaming**
62:6

**screen**
34:23
36:12
39:8
84:21

**scroll**
80:5,10,
12

**section**
83:20
100:11

**seizure**
37:12
38:8
44:14
45:1 78:3
83:12,13,
19 84:17
90:13,19,
24 91:4,
17,24
92:5,13
95:21
100:12

**seizures**
36:7,15
37:9,18
91:15
100:6,9

**self-
explanatory**
97:4

**separate**
27:7,23

**series**
5:15 69:7

**service**
10:13
16:11

**Services**

74:13

**session**
32:8

**setting**
8:11,12

**shakes**
6:4

**share**
34:23
84:21

**shift**
43:21,24
44:4 85:8

**shifts**
43:18

**shin**
55:4,9,22
56:5,13,
17,20,21,
24 57:3,
16 71:8

**short**
35:12,19

**shortly**
66:21,23

**shoulder**
6:5

**show**
20:13

**shows**
39:15

**shrugs**
6:5

**side**
47:14
50:9,13
59:6
68:18,21
69:5

**signature**

85:3

**signs**
89:21

**similar**
28:24
29:20
30:3,5
31:11

**simply**
41:8
70:15
82:24
92:8

**single**
27:14,18,
21

**sir**
6:2 10:19
12:18
21:8 40:9
43:10,18
45:18
47:22
66:6 79:8
80:8,19
81:7,19
84:23
86:4,20
88:10
90:5
92:8,17
96:17,19
97:5,15
98:24

**sit**
17:8

**sitting**
50:22
69:13
94:2,13

**situation**
18:24
19:4

24:4,13
55:1
65:5,6,7
66:3

**situations**
12:24
90:23
95:17

**skills**
19:11
30:10
87:15

**slash**
37:19

**slid**
56:24

**sliding**
56:20

**slowly**
24:18

**snake**
66:7

**someone's**
17:12
86:23
87:1

**sort**
58:11

**sound**
65:20
66:1,2,9

**sounds**
65:12,14
66:8,10,
17 90:7

**speak**
40:16,19,
22,24
41:3,8,
12,16,18
42:2



49:18,21
53:20
54:2 69:7
92:19
95:11

**speaking**
53:24
54:4

**Special**
79:2

**Specialized**
10:18

**specific**
12:23
32:16
33:3 68:2

**specifically**
45:6
100:8,11

**spent**
99:10

**spoke**
41:21
91:14

**spoken**
41:1
93:1,5

**staging**
47:6,11,
13,17
48:7

**stamp**
36:22
38:3
39:12

**stamped**
35:9
36:17
37:15
79:11
80:7 84:3

85:21

**standard**
20:3
47:15

**standards**
31:9,11

**standing**
72:15,16
94:2,13,
17

**start**
44:6
86:11

**started**
4:13 11:3
33:9 71:4

**starting**
11:6
21:23
85:9

**state**
7:16
18:8,16,
18,21
19:1,5,15
21:17
39:13
78:22
79:13
93:18

**statement**
52:15

**statements**
71:16
77:5

**states**
29:18
82:11
83:3

**stating**
81:17

**station**
47:5,8,11

**status**
8:22
35:11,20,
24 36:5
37:19
91:15
100:5

**stay**
38:11
75:12,14
76:1

**stenographer**
6:6,9

**stenographer's**
6:13

**stipulations**
4:15,16,
19

**stomach**
94:1

**stop**
51:13
88:15

**stops**
88:4

**store**
11:5

**story**
68:19
69:5

**straddling**
59:12,14,
15,16,17

**strategies**
30:9

**strategy**

24:2 29:4

**strength**
90:7

**strike**
4:21 30:4

**striking**
91:20

**struggle**
97:18
98:1 99:3

**subcategory**
17:21

**subject**
7:4 23:24
26:15
86:2

**subjects**
23:19
32:7
34:11

**submitted**
61:21

**substantial**
94:10

**sucking**
66:1,7

**suffered**
83:11

**summary**
79:23

**summer**
101:6

**summons**
39:15

**super**
90:7

**supervisors**
81:5

**suppose**

45:10

**supposed**
75:12,14,
19,24
95:16

**suspect**
16:8 55:3
73:16

**suspect's**
59:11
71:22
72:9

**sworn**
4:4

---

**T**

---

**tactics**
12:6
28:14

**taking**
4:11
24:13
34:9
73:16
88:1
101:5

**talking**
49:4
73:13

**Tarasov**
5:5

**taught**
14:19
17:2
30:19

**teach**
13:4,7
14:16,23
15:8,16,
24 16:3,
6,14,19,



22 17:8,
17,22
18:6,13,
19,23
19:3,10,
16,21
20:2
24:12,23
28:5,13
30:24

**teaches**
14:1

**teaching**
13:3
19:13

**teachings**
14:10

**technique**
14:7 97:8

**techniques**
13:5,8
14:11,16,
18 15:5,
9,11
16:4,6
22:21
23:15
24:3,9,24
25:2,8,19
28:17
30:13,17
96:18,20
97:2

**ten**
21:5 53:7
86:21
98:6 99:8

**term**
98:13,16,
19,21

**terms**
5:16 24:9
25:19

99:11

**tested**
12:19
26:2

**testified**
4:5 7:20
8:7 22:24
30:19
51:22
52:21,24
55:24
59:5 68:7
89:23
95:20
98:12
99:11

**testify**
63:5
91:23
92:9

**testifying**
7:1 11:21
60:13
63:15,24

**testimony**
6:23
69:24
96:7
100:11,15

**testing**
20:12
22:14

**tests**
12:16
20:5,6,9,
23 25:14,
22 34:3,9

**text**
78:24

**thing**
10:22
12:2
13:24

46:15
52:12
72:13
76:18

**things**
6:12
11:11
22:16
34:10
35:16
92:4

**threatening**
37:23
96:22
97:9
100:12

**tight**
63:13

**Tikhoplav**
5:4

**time**
4:11,20,
21 7:24
10:3
13:23
14:15
15:7
24:13
30:21
32:1,20
40:10
43:9
48:12
49:9 56:2
67:20
68:2
72:8,9
73:21
74:5,7,10
75:20
76:22
77:2
84:22
94:12

101:5,7

**times**
76:17

**title**
9:21
10:2,16

**titles**
76:16

**today**
5:3,16
6:14
41:4,13
43:1
52:24
60:13
63:15,24
69:24
89:24
95:20

**today's**
5:18
40:23

**told**
17:15
49:8

**tool**
15:23

**top**
16:10
50:22
59:10,19
78:20

**topic**
53:17

**total**
95:17

**totality**
96:6

**touched**
31:16
42:5

**train**
30:9 47:3
78:1

**trained**
24:10
31:12

**training**
10:18
13:3 15:2
20:15,22
21:12,14,
17,21
22:17,20
23:3,6,8
24:22
25:7,20
26:4,9,
13,14
27:2
28:7,12,
21 29:8,
13,17,20,
21,24
30:3,6,8,
24 31:8
32:8,11,
22,23
34:11,12,
15 38:14,
17,19
39:1 42:6
83:21
84:11
86:20
89:24
90:1 91:7
92:2,10
98:9

**transcript**
6:14
82:12

**transmissio
n**
72:6



treat
91:16

trial
4:20,22
8:4

truthfully
7:12

turn
35:21
36:4
79:22

turned
58:10
68:16
69:3

type
13:24
14:6 16:6

typical
43:21

typically
31:24
52:14

U

ultimately
67:18

unable
68:1

unaware
46:20
64:9
68:14

unclear
32:17
76:11

uncontrolled
37:19

understand
5:21 6:22
7:3,11
14:11
28:2 52:8
83:23
87:4
92:18
93:1,2,5,
6,13,20
95:13
98:16
99:9

understanding
5:23
45:19,20
58:14
97:20

understood
5:24
71:23
72:11
98:13

unique
78:2

uniquely
83:12,18
84:14

unit
10:14
23:3,7
79:3 81:5

units
75:21

universal
95:9,14

unresponsive
36:2

unsure
58:11

updated
29:8

updates
24:6,7
25:7
29:3,7

updating
24:2

upper
58:7,17

upward
57:19

utilizing
13:21

V

valid
63:11

vehicle
45:24
46:2

vehicles
46:19,21

vein
6:10

verbal
13:10,11,
12,14,17,
19,24
14:6 30:9
93:9,11,
16,17

verbally
6:3

versus
16:1
26:14
27:3,23
28:9
51:16

vicinity
58:10
59:3,9

vulnerability
78:2

vulnerable
83:12,18
84:15
90:13,16,
19 92:1,
14 95:22

W

wails
65:14

wait
6:11
47:10
75:14,19

waiting
74:20

waive
4:23

wake
78:3

walked
49:7

walking
62:6 72:3

wanted
68:18

warning
51:16,24
52:3,14,
16 53:14

warnings
51:9,11
53:18
92:18

93:5,9,16

water
66:2,7

weapon
16:11

wear
46:8,10
48:4

wearing
48:1

web
15:20

week
12:20,21
41:11
42:14

weight
17:12
29:10
59:24
60:3,5,8
69:22
70:1

well-being
63:1

wholly
36:2

wise
11:1

witnesses
69:4
73:13

woke
89:5,17

word
45:21

worded
20:21

words
13:21



**work**
7:16,17
9:23 10:7
44:2

**working**
43:18,20,
23 85:8

**wrist**
14:20

**written**
20:6,9
25:22
77:5

**wrong**
99:14

---

**Y**

---

**year**
9:5 21:2
22:1,9
31:20

**yearly**
90:1

**years**
8:2,20
9:7,11,12
10:11
21:5 44:1
86:21
98:6 99:8

**yesterday**
4:14

**York**
7:18 9:19
77:5
78:7,22
79:13

---

**Z**

---

**zip**
7:19

**zoom**
80:16

**zoomed**
79:24

