# EXHIBIT O

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
ALEXEY V. TARASOV, ESQ., Administrator of
the Estate of EVGENIY LAGODA, Deceased, and
GRIGORY TIKHOPLAV,

                    Plaintiffs,

    -V-                   Case No.:
                          21-cv-6226 (NRB)
PORT AUTHORITY OF NEW YORK AND
NEW JERSEY, and PORT AUTHORITY OF NEW
YORK AND NEW JERSEY POLICE DEPARTMENT
A/k/a PORT AUTHORITY POLICE DEPARTMENT
A/k/a PAPD, PAPD OFFICER MICHAEL BUGIADA,
PAPD OFFICER ROBERT JOSEPH, PAPD OFFICER
JONATHAN PAPIA, PAPD OFFICER PAUL
MEZZACAPPA, and PAPD OFFICER JONATHAN
DURAN,
                    Defendants.
-----------------------------------------X

               DATE: August 21, 2023
               TIME:  12:00 P.M.


          VIDEOTAPED VIRTUAL EXAMINATION
BEFORE TRIAL of Calvin Swinney, taken by
Ms. Alterman, pursuant to Order and to the
Federal Rules of Civil Procedure, before
Hindy Freilich, a Notary Public of the
State of New York.



A  P  P  E  A  R  A  N  C  E  S:

(All parties appearing electronically)

ASHCROFT LAW FIRM
   Attorneys for the Plaintiff
   200 State Street - 7th Floor
   Boston, MA 02109
   BY: CHRISTOPHER AMRHEIN, JR., ESQ.
Camrhein@ashcroftlawfirm.com

THE PORT AUTHORITY OF NY & NJ
LAW DEPARTMENT
   Attorneys for the Defendants
   4 World Trade Center
   150 Greenwich Street, 24th Floor
   New York, NY 10007
   BY: CHERYL ALTERMAN, ESQ.

ALSO PRESENT:
   Alexey Tarasov



MAGNA
LEGAL SERVICES

F E D E R A L   S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

                *    *    *    *



Page 4

CALVIN SWINNEY, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

COURT REPORTER: Please state your name for the record.

THE WITNESS: Calvin Swinney.

COURT REPORTER: What is your address?

THE WITNESS: 812 East 40th Street, Brooklyn, New York 11210.

MS. ALTERMAN: Just for the record, before we begin, Chris, do you want to note the plaintiff's on the --

MR. AMRHEIN: Sure. For the record, present here today for the video deposition of Mr. Calvin Swinney is the administrator of the estate of Evgeniy Lagoda. His name is Alexey Tarasov. He is a plaintiff in this matter represented by counsel. And I just wanted to note that for the record.



Page 5

Thank you, Cheryl.

MS. ALTERMAN:  Thank you.

EXAMINATION BY

MS. ALTERMAN:

Q.    Good afternoon, Mr. Swinney.
My name is Cheryl Alterman and I'm
representing the defendants in this action,
the Port Authority of New York and New
Jersey, as well as the police officers who
are being sued by the plaintiffs,
Mr. Tarasov and the decedent's father in
this lawsuit that's been filed in the
Southern District of New York.

I'm going to be asking you a
series of questions today regarding an
incident that occurred back on April 12,
2019.

Sir, have you ever been deposed
before?

A.    I have.

Q.    I'm just going to review some
of the rules and guidelines before we begin
today's deposition.  I'm going to be asking
you questions today, and while I ask the



Page 6

questions, I'll ask you to give me an
opportunity to fully ask my question before
you answer the same, so that the court
reporter can take down a complete record.
Okay?

A.    Yes, ma'am.

Q.    I'll also ask that all of your
responses be verbal, because, again, the
court reporter cannot take down any hand
gestures or nods of the head, okay?

A.    Yes, ma'am.

Q.    If at any time you don't
understand the questions that I ask you,
please let me know and I'll be happy to
rephrase them.  If you do, in fact, answer
a question, I'm going to assume you
understood the question as it was posed to
you.  Okay?

A.    Yes, ma'am.

Q.    Is there anything that's
preventing you from testifying truthfully
and completely today?

A.    No, ma'am.

Q.    Sir, would you please give us



Page 7

the benefit of your educational background?
What is your highest level of education?

A.   Two years of college.

Q.   When did you attend those two years of college?

A.   The last year was in 2001.

Q.   Have you received any degrees from your college experience?

A.   No, not yet, ma'am.

Q.   And, sir, what is your age?

A.   Fifty-seven.

Q.   Are you currently employed?

A.   I am.

Q.   By whom?

A.   JetBlue Airways.

Q.   How long have you been employed by JetBlue Airways?

A.   I've been with JetBlue since 2012, so that makes 11 years.

Q.   In what capacity are you employed by JetBlue Airways?

A.   I'm a flight attendant.

Q.   Sir, what type of training did you receive in order to become a flight



Page 8

attendant for JetBlue Airways?

    A.    Four weeks of training at JetBlue training facility in Orlando, Florida, which includes emergency procedures, as far as evacuations, medical procedures, medical aid, fire, decompressions and learn of the different aircraft that we operate.

    Q.    In terms of training that you received to respond to medical emergencies, would you be able to describe for me that training?

    A.    Yes.  We go over CPR, first aid, learning symptoms of certain conditions, such as maybe a heart attack, people passing out.  That's about it.

    Q.    As part of your duties and responsibilities as a flight attendant for JetBlue Airways, are you required to abide by a flight operations manual?

    A.    Yes, ma'am.

    Q.    What is that called?

    A.    We call it flight attendant -- we call it -- it stands for -- we call it



the FAM, I forgot what it stands for.  I know the flight attendant manual that we carry with us every day.

Q.    Is that flight attendant manual contained in an iPad that you carry?

A.    Yes, ma'am.

Q.    Were you acquired to abide by the flight attendant manual back in April 2019?

A.    Yes.

Q.    Does the flight attendant manual describe certain responsibilities when you're dealing with customer misconduct?

A.    I believe so, yes.

Q.    Does the flight attendant manual also describe your duties and responsibilities when a medical emergency is identified to you as a flight attendant?

A.    Yes, ma'am.

Q.    Now, are there different types of flight attendants for JetBlue Airways? For example, lead flight attendant versus other flight attendants on board?



Page 10

A.    No, not necessarily, unless you're in the special program, such as an on board lead that runs the mint section of the mint plane, which is our first class section.

Q.    Have you ever been an on board lead for JetBlue?

A.    No, ma'am.

Q.    Is there any distinction between, for example, flight attendant 1, flight attendant 2, flight attendant 3 and a flight attendant 4?

A.    No, ma'am.

Q.    Are you familiar with the Airbus 320 and the Airbus 321?

A.    Yes.

Q.    Are you trained to work on those specific planes?

A.    I am.

Q.    Were you trained to work on those specific planes back in April 2019?

A.    Yes, ma'am, I was.

Q.    If you could describe for me, what type of plane is an Airbus 320 or 321?



Page 11

A.    What do you mean?

Q.    If you could, for us, describe the configuration of that aircraft?

A.    There's three seats on each side of the aircraft.  On A320, we have a total of 162 seats.  On an A321, same thing, three seating on each side.  And on an A321, there's 220 seats.

Q.    And in the A321, is there one aisle?

A.    Yes.  They both have one aisle.

Q.    Now, with respect to your duties and responsibilities as a flight attendant for JetBlue Airways, describe for me the safety duties of the flight attendant?

A.    Can you repeat that.

Q.    Sure.

      What are your duties and responsibilities with respect to safety on the aircraft?

A.    Just make sure that they follow all the safety procedures and make sure that anything -- hold on -- to make sure



Page 12

that if anything does occur on an aircraft, that we're equipped to handle the situation that arises.

Q.   Would you agree with me that safety is paramount as one of your duties as a flight attendant on JetBlue Airways?

A.   Yes, that's the most important thing on the aircraft.

Q.   Sir, when dealing with situations involving customer misconduct, what are you required to do as a flight attendant?

A.   It all depends on what kind of misconduct that we're talking about.  But for the most part, we're required to refer to one another, to let each flight attendant know what's going on, then pass information on to the captain.  And then, for the most part, we'll be advised of what the captain tells us.

Q.   Now, would you agree with me, sir, that any type of customer misconduct would interfere with a flight attendant's duties on the aircraft?



A.    Yes.

MR. AMRHEIN:  Objection.

Q.    And, sir, if a customer commits any type of actions that would be detrimental to the safety of the flight and the other passengers on the aircraft, what are you required to do?

A.    Again, we're required to confer with one another and pass information on to the captain, since he's in charge of the flight.  So we're going to be directed by whatever he says.

Q.    Sir, prior to joining JetBlue Airways, did you have any law enforcement experience?

A.    Yes, ma'am.

Q.    What type of experience did you have?

A.    I was a New York City police officer.

Q.    For how long, sir?

A.    Twenty years.

Q.    Congratulations.  I'm assuming you retired from the force?



Page 14

A.    Yes, ma'am.

Q.    After retiring from the force, is that when you joined JetBlue Airways?

A.    Yes, that is correct.

Q.    What was the highest rank that you held with the NYPD?

A.    I was a detective.

Q.    How long did you hold the rank of detective for NYPD?

A.    I believe 11 years.

Q.    And prior to attaining the rank of detective, were you a police officer?

A.    Yes, ma'am.

Q.    What precinct were you assigned to?

A.    Initially, I was assigned to the 70th precinct in Brooklyn, and the AA precinct, also in Brooklyn.

Q.    As a detective, sir, where were you assigned?

A.    As a detective, I was assigned Brooklyn North narcotics, robbery squad, 77 detective squad, and Brooklyn special victims.



Q.    In your capacity as a detective, sir, and prior to that, as a police officer, had you had experience with individuals who had seizures?

A.    Yes.

Q.    And did you ever have experience with individuals who had seizures and then were combative or violent?

A.    Not that I can recall.

Q.    What about as a flight attendant prior to this incident on April 12, 2019, did you ever observe any passengers having a seizure on board an aircraft?

A.    Not that I can recall.

Q.    Sir, did you retire from the force in good standing?

A.    What was that?

Q.    Did you retire from NYPD in good standing?

A.    Absolutely.

Q.    Now, as your duties and responsibilities as a JetBlue flight



Page 16

attendant, do you wear a uniform?

A.    I do, ma'am.

Q.    Can you describe the uniform that you were wearing back in April 2019?

A.    My blazer, my JetBlue issued blazer, slacks, JetBlue shirt and tie, with my name attached to my blazer or shirt.

Q.    Sir, do you recall working a flight on April 12, 2019 that was scheduled to depart from JFK Airport to Kingston, Jamaica?

A.    I do.

Q.    Now, do you recall what time flight 659 was scheduled to depart JFK to Jamaica?

A.    I don't remember the exact time.  But if I had to take a guess, it was probably like 9:59 or 10:59, whatever, at night.

Q.    Had you ever worked that specific flight prior to this date?

A.    Yes, ma'am.

Q.    How many times?

A.    Quite often.



Q.    Do you recall on the night of April 12, 2019, whether or not that flight was on time or delayed?

A.    I don't remember.

Q.    Do you recall any of the other crew members assigned to that flight?

A.    I do.

Q.    Please tell me who they were?

A.    Kevin Ingleton and Frank, and the other one, he's fairly new, I think his name was Kareem, he's on reserve.  I think they just called him up for that date to work that flight.  Kevin and Frank I worked with often, and then Kareem is the first time working with him.

Q.    Do you know Frank's last name?

A.    Leonard, or something like that.

Q.    Do you know Kareem's last name?

A.    I don't.

Q.    What position on the aircraft did Kevin Ingleton work for that flight?

A.    Kevin is the number 1.

Q.    What position did Frank work?



Page 18

A. He had to be number 3.

Q. Do you recall your position on the flight?

A. I believe I was a number 2.

Q. And Kareem's position?

A. He was the number 4.

Q. Do you recall who was the pilot and first officer on the flight?

A. I do not, ma'am.

Q. Was there a number 4 flight attendant?

A. A number 4?

Q. Yes.

A. Yeah. That was Kareem. He's the number 4.

Q. Now, once the flight was pushed back from the gate, do you recall at some point before the flight actually took off that you were notified about a passenger issue on board the flight?

A. I do.

Q. Please tell me what you recall.

A. He was alert and I said there was a passenger, I believe he's sitting in



row 33, 33 C, if I can remember correctly, that said they believed he was having a seizure.

Q.    Who told you that, sir?

A.    Some customers.

Q.    How did they convey that information to you?

A.    That he was just -- they believed he was having a seizure.

Q.    Did they tell you in person that he was having a seizure --

A.    Yes.

Q.    Okay.  Do you recall where those passengers were seated who alerted you to the fact that a passenger in row 33 C was having a seizure?

A.    All I can remember, they were in the back of the aircraft, as well, towards the back.

Q.    Where were you at the time when you were first notified of this issue?

A.    At this time, as a number 2, I would be in the forward galley, the forward part of the aircraft.



Page 20

Q.   What were you doing, in terms of your responsibilities, at this point when you were notified of the passenger issue?

A.   What was I doing prior to that?

Q.   Yes.

A.   If we're pushing back from the gate, normally we would just be starting the safety demo.  So either we were doing a safety demo or we just ended the safety demo.

Q.   Now, sir, after you were made aware of this issue with the passenger in seat 33 C, what did you do?

A.   If I remember, me and Kevin, we went back there to 33 C.

Q.   What did you observe when you went back to seat 33 C?

A.   So we saw the customer sit in his seat.  It seemed like he was foaming from the mouth, and like his eyes were rolled in the back of his head.

Q.   Was there a passenger seated directly next to him?



Page 21

A.    I believe so, yes.

Q.    What, if anything, did that passenger say to you?

A.    I don't --

MR. AMRHEIN:  Objection.

A.    -- remember him saying anything to me.

Q.    When you observed the passenger in the seat who you said was foaming from the mouth, what did you do in response?

A.    Me and Kevin was trying to get him to lay flat.  So we unbuckled his seat belt and we lifted him to the back galley, which was right there.

Q.    How many rows behind row 33 are there in that aircraft?

A.    Just one more row.

Q.    Was this a 321 Airbus, sir?

A.    Yes, ma'am.

Q.    So between yourself and Kevin, you were able to unbuckle the passenger from his seat belt and move him one row to the back galley of the aircraft, is that correct?



Page 22

A.   That is correct.

Q.   How did you move him from the seated position to the back galley of the aircraft?

A.   I lifted his legs, I believe, and Kevin lifted his upper body.

Q.   How much would you say this passenger weighed?

A.   If I had to take a guess, anywhere between 185 pounds to 200 pounds.

Q.   Would you be able to approximate his height?

A.   He's about 6'1", 6'2" maybe.

Q.   How tall are you, sir?

A.   I'm six feet.

Q.   And how tall is Kevin Ingleton?

A.   If I had to take a guess, Kevin's probably 5'9", 5'10".

Q.   Did you have any difficulty moving him from his seat to the back galley?

A.   No, ma'am.

Q.   What was he doing at the time you were lifting him up out of his seat and



Page 23

moving him to the back galley?  Was he moving his body in any way?  Describe for us what he was doing at that time.

A.    He wasn't doing anything.  He was just foaming at the mouth.

Q.    Was he saying anything?

A.    No, ma'am.

Q.    When you brought him to the back galley, did you lay him down?

A.    Yes, ma'am.

Q.    And did you -- in what position was he laid down?

A.    He was laid on his back.

Q.    What was his body doing at the time once he was laid down in the back galley?

A.    His body was convulsing or he was shaking.

Q.    What did you do at that point?

A.    At that point, we were trying to assess what was going on with him.  And as we are trained, we asked if there's any medical personnel on board the aircraft, if they can come and assist us in aiding the



Page 24

passenger.

Q.    How did you make that announcement, sir?

A.    We made that announcement over the PA system.

Q.    Did anyone respond to that announcement?

A.    Yes.

Q.    How many individuals responded?

A.    I believe three or four.

Q.    Would you be able to describe the individuals who responded to your request for medical assistance?

A.    All I recall, they were all African American females.

Q.    Did yourself or Kevin Ingleton do anything for the passenger prior to the three women coming back to provide assistance?

A.    Not that I recall.

Q.    Did you touch him in any way while you were waiting for the medical professionals to assist you?

A.    No, I don't believe so.


MAGNA
LEGAL SERVICES

Page 25

Q. Did either of you put on any type of gloves or protective gear?

A. At this point, I can't recall. I don't think so, because it happened so quickly, so I don't think so.

Q. How long would you say it took for the first medical professional to get to the back galley from when you made the announcement?

A. Thirty seconds to a minute, maybe.

Q. And, sir, at this point in time, do you know where the plane was? Was it still taxiing to take off? Where was the plane at this point in time?

A. I believe we were taxiing out to the runway.

Q. Had any notifications been made at this point in time to the captain to alert him of the medical issue on board the aircraft?

A. I don't believe at this time, no.

Q. Once the first medical



Page 26

professional came back to assist you, what happened at that point in time?

A.    One of the women came back there, they were like, oh, she recognized he was having a seizure.  She was like, I believe he's having a seizure.  Just let him come out of it naturally.  Just make sure he doesn't swallow his tongue, and that was it.

Q.    Did she do anything, touch the passenger in any way, in order to assist him?

MR. AMRHEIN:  Objection.

Q.    You can answer.

A.    I don't believe so.

Q.    At what point in time was a notification made to the captain to alert him of a medical issue on board the aircraft?

A.    I don't recall.  We have different roles at the time as flight attendants, when a situation like that happens.  So me and Kevin is back there with the customer that needed aided.  Then


MAGNA
LEGAL SERVICES

Page 27

the other two were making notifications to the captain in regards to what's going on.

Q.   When were the other two flight attendants made aware of this medical issue?

MR. AMRHEIN:  Objection.

A.   I don't remember.  I don't recall.

Q.   Do you know who notified the other two flight attendants of the medical issue?

MR. AMRHEIN:  Objection.

A.   I don't know.

Q.   Do you recall if it was yourself or someone else?

A.   Again, I don't remember.  But if they're working in the that section of the aircraft, then they should have been aware of what's going on.  Me and Kevin came from the front.  Again, he was the number 1; I was the number 2.

Q.   Okay.  Do you know where the other two flight attendants were at the time when you moved the passenger from his



Page 28

seat to the back galley?

A.   I don't remember.

Q.   Do you remember seeing them in the back galley area at that point in time?

A.   Maybe the number 4, because that's where he had been stationed at.

Q.   Okay.  At what point in time was the captain notified of the medical issue on board the aircraft?

A.   Again, me and Kevin back there with the customer, then the other two probably had to make that notification.  I don't know who alerted the cockpit to what was going on.

Q.   From when you were first notified of the medical issue on board the aircraft, approximately how much time passed from that moment until when the captain was made aware of this issue?

MR. AMRHEIN:  Objection.

A.   I don't recall.  I don't remember.  But he's been -- he would have been alerted right away to what's going on.

Q.   Do you know how he was alerted?



Page 29

Was that over the intercom?  Was it some other means?

A.    Yeah.  It had to be over the intercom because the aircraft was in movement, so the cockpit door was closed. So it would be over the PA system, or the intercom, rather.

Q.    Is there also an emergency button that could be used to contact the cockpit?

A.    There is.

Q.    Do you know if that emergency button was initiated to alert the captain or the first officer about this issue?

A.    No.  That's not procedure to use an emergency button for that situation.

Q.    Okay.  So after the first medical professional came, you had testified that at least two other individuals responded, as well, is that correct?

A.    That is correct.

Q.    What did you observe any of the medical professionals doing to assist the


MAGNA
LEGAL SERVICES

passenger who appeared to be having a

seizure?

A.    Again, they all said the same

thing, just let him come out of the seizure

naturally.

Q.    Do you remember anyone placing

blankets or pillows under his head?

A.    I don't recall.

Q.    Sir, do you recall preparing a

statement known as an E report in

connection with your duties and

responsibilities as a flight attendant for

JetBlue Airways?

A.    Yes.

Q.    I'm going to show you this

report, and you'll let me know if it helps

refresh your recollection as to some of the

events that took place.  I'm going to share

my screen with you.  And we'll mark this

report as 21 for identification.

Just let me know when that's up

on your screen, sir.

A.    Okay.  I can hardly see it, but

it's on the screen.



Page 31

Q.    All right.  So for the record, it's a three-page document.  I'm going to direct your attention to the bottom of page 1, where your name appears.  And then the statement, itself, is contained on page 2 of the document, which is Bates stamped PA 1276.

And, sir, if you could just read that statement to yourself, and then let me know when you've had an opportunity to do so.

A.    Hold on.  Let me fix my screen, because it's so small, I can't read it.

Q.    Do you want me to adjust it on my end?  Would that be helpful?

A.    No, I opened it up.

So my statement, you said, is above where it says Kareem's statement?

Q.    Correct.  So on the bottom of page 1, your name is typed there, and it says E report-IME 686-19, and then your statement appears on page 2 of the document.

A.    Okay.  So what you want me to



Page 32

read?

Q.    So if you can just read the statement to yourself, and let me know when you've had a chance to do so.

A.    Okay.  No problem.

Okay.

Q.    Sir, does reading this statement refresh your recollection that pillows and blankets were placed under his head to keep the passenger's head elevated?

A.    Yes.

MR. AMRHEIN:  Objection.

Q.    You can answer.

A.    Yes.

Q.    Do you recall the passenger being kept on his side and his head up for approximately ten minutes?

A.    Yes.

MR. AMRHEIN:  Objection.

(Whereupon, a short break was taken at this time.)

Q.    Sir, at the time when the passenger was on his side for that ten-minute period, do you know where the



Page 33

plane was at that point in time?

A.    The plane?

Q.    Yes.

A.    I believe we were still taxiing.  I don't think we were returned to the gate at that time.

Q.    Do you know at what point in time the plane started returning back to the gate?

MR. AMRHEIN:  Objection.

A.    I believe when the customers start to assault people.

Q.    And were you part of that decision, or made aware of the decision for the plane to return back to the gate?

A.    No.  That's all the captain's decision now.

Q.    At the point in time when the captain made the decision to return the flight back to the gate, were the flight attendants made aware of that decision?

A.    I believe so, yes.

Q.    How was that communicated to the flight attendants?



Page 34

MR. AMRHEIN:  Objection.

A.    Whoever was in communication with the captain, they would inform the rest of the flight attendants that the captain had made the decision to return to the gate.

Q.    At the point in time when the plane was returning back to the gate, do you know what the passenger who had the seizure was doing at that point in time?

A.    At this point in time, he had came out the seizure and he was standing up in the aft galley being very combative.

Q.    And when you say he was being "very combative," would you describe for us what he was doing?

A.    So we were trying to tell him, like, he had a seizure, but maybe he was just slightly disoriented at the time.  So we told him he had a seizure, calm down. He was just swinging and hitting everybody that was in the aft galley.

Q.    Sir, did you observe him punch one of the medical professionals who



Page 35

responded back to the galley to assist him?

A.    I didn't see him punch one of
them.  But at this time, I had been to the
front to get some paperwork.  When I came
back, I heard he was punching people.

Q.    Sir, how did you learn that he
had punched one of the medical
professionals in the stomach?

A.    Everybody, at this point, was
-- in the back of the aircraft was
screaming that he's punching people.
That's when I ran back there.

Q.    When you ran back to the aft
galley, what did you see?

A.    He was standing up in the
middle of the galley.  He was foaming at
the mouth.  He was making these growling
sounds, and he was just swinging.  I was
just trying to get him to calm down,
because one of the ladies that was still in
the back in the galley was with him.

Q.    I'm sorry.  I lost the end of
that.  Was what?  What was she doing?

A.    There was one lady, she was



Page 36

still in the galley with him.  She was scared to move.

Q.    How do you know she was scared to move?

A.    Because she was screaming, saying she's pregnant, that she's scared.

Q.    When he was in the back galley, was he facing towards the front of the aircraft or the back of the aircraft?  What was his position at that point in time when you ran there?

A.    He was in the middle of the galley, facing the front.

Q.    How would you describe the position of his body at that point in time?

A.    He was just standing straight up.

Q.    Did he appear to be in like a threatening position, where he would punch people?

MR. AMRHEIN:  Objection.

A.    Yes.

Q.    Okay.  Did you see his fists?

A.    Yes.



MR. AMRHEIN:  Objection.

Q.    Were his fists clenched?

A.    Yes.

MR. AMRHEIN:  Objection.

Q.    Did you actually see him moving his arms in a way to strike individuals?

MR. AMRHEIN:  Objection.

A.    Yes.

Q.    Did he, in fact, strike you, sir?

A.    Yes.

Q.    How many times did he strike you?

A.    I would say about five or six.

Q.    Okay.  Where did he hit you, sir?

A.    In my torso.

Q.    Describe the force for us in which this passenger struck you in the torso.

A.    Again, he's a pretty big sized dude, so he was striking me pretty hard.

Q.    Were you in pain?

A.    Yes.



Q.    Did you feel threatened, sir?

MR. AMRHEIN:  Objection.

A.    Not at the time, because I was trying to get the other lady from out of the corner.

Q.    Did you feel that this passenger's behavior was a serious misconduct at this point in time?

MR. AMRHEIN:  Objection.

A.    Absolutely.

Q.    Why?

MR. AMRHEIN:  Objection.

A.    Again, he came out of the seizure acting erratic, so we didn't know what he was capable of doing.  Again, he was just hitting everybody that he saw.

Q.    Now, sir, you said that one of the medical professionals was in the back of the aircraft behind this passenger and she was screaming in fear, is that correct?

A.    She was.

MR. AMRHEIN:  Objection.

Q.    Was she saying that she was pregnant?



MR. AMRHEIN:  Objection.

A.    Yes.

Q.    What did you do, if anything, in order to help her?

A.    Well, again, I was engaged with the customer, he was still striking me.  So I was trying to get his attention so she can come out of the galley, but she wouldn't move.

Q.    Okay.  When he was striking you, what, if anything, did you do in response?

A.    I didn't do anything.  I was just trying to tell him to calm down.  He had his seizure, everything is going to be okay.

Q.    Was he responding to your efforts to calm him down?

A.    Not at all.

Q.    Did he keep striking you?

A.    He did.

Q.    Now, sir, do you recall being interviewed by the Port Authority's inspector general's office after this



Page 40

incident occurred?

    A.   I do.

        (Whereupon, an off-the-record discussion was held.)

    Q.   I'll reask my question.

        Do you recall being interviewed by the Port Authority inspector general's office regarding this incident?

    A.   Yes.

    Q.   And do you recall that interview taking place on May 13, 2019?

    A.   I don't remember the exact date, ma'am.

    Q.   But it was sometime shortly after this incident occurred?

    A.   Yeah, you can say that.

    Q.   When you gave the statements to the sergeant who interviewed you on that date, did you give truthful testimony, sir?

    A.   I did.

    Q.   I'm going to pull up that interview transcript for you, and we'll mark this as 22 for identification.

        Just let me know when that's on



your screen.

A.    Okay.  It's on my screen.

Q.    Thank you.

I'll direct you to page 2 of the transcript, which is Bates stamped PA 1787.

In your response, sir, which continues from page 1, you indicate that, "and then he punched one of the nurses." Do you see that, sir?

A.    Say that again.

Q.    In this transcript, you had told Sergeant Lawanda Irving, upon her questioning, "can you tell us the circumstances of the incident," as part of your response, you indicated, "and then he punched one of the nurses."

Do you see that, sir?

A.    I don't see that over here.

Q.    I'll tell you where I'm reading here.  On page 2 of the transcript, it says here -- we'll just start from the sentence that begins with "and."

"And they said just let him



Page 42

come out of the seizure and he will be

okay.  Well, this lasted about, say, 10

minutes, and then he just stood up, and he

stood up and his mouth was bleeding.  He

stood up and he was just really aggressive.

He made a grunt sound -- and then he

punched one of the nurses."

          Do you see that, sir?

     A.    Yes.  I see it.

     Q.    Okay.  Does that refresh your

recollection that you observed this

passenger punching one of the nurses?

          MR. AMRHEIN:  Objection.

     A.    I can't be for certain I

actually saw him punch the nurse.  I can't

remember.

     Q.    Okay.  And then as you

testified, sir, that there was -- your

memory was one of the medical professionals

was still in the aft galley.  This

interview statement indicates that two

ladies are still in the aft galley.  Do you

see that?

     A.    Yes.



Page 43

Q.    And you indicated that they were too scared to move.  Do you see that, as well?

A.    Yes.

Q.    And then, sir, you had given a statement that "he swung at me, he hit me." Do you see that, sir?

A.    Yes.

Q.    And even though you told him to calm down, every time you told him to calm down, he would hit you again.  Is that true?

A.    Yes.

MR. AMRHEIN:  Objection.

Q.    And, sir, I will direct you to page 6 of the transcript, which is Bates stamped PA 1791, for the record.

And you were asked, sir, by Nicholas Viorst, who was an investigator with the attorney general's office, "how many times did you -- did he hit you?"

Your response, "I would take a guess, five to six times."

Do you see that, sir?



A.    Yes.

Q.    Do you recall the passenger hitting you at least five to six times?

A.    Yes, ma'am.

Q.    And then you were then asked by Mr. Nicholas Viorst, "how would you gauge the forcefulness of those punches?"  And you said, "sure, I mean, he was -- he was strong.  He was a strong dude."

Do you see that?

A.    Yes, ma'am.

Q.    And you also indicated as part of this interview that he hit you pretty hard, is that correct?

A.    Yes, ma'am.

Q.    And you never retaliated and hit him back, correct?

A.    Correct.

Q.    At this point in time, when he was hitting you at least five to six times, sir, you knew that he was a threat to other passengers on board this aircraft, correct?

MR. AMRHEIN:  Objection.

A.    That's correct.



Page 45

Q.    And because you knew that this passenger posed a threat to the safety of the other passengers on board this aircraft, you prevented him from going into the cabin area, correct?

MR. AMRHEIN:  Objection.

A.    That's correct.

Q.    And, sir, you had told the Internal Affairs investigators this as part of your interview on page 3 of the transcript, that you were trying to prevent him from going outside into the cabin area. Do you see that, sir?

A.    Yes.

Q.    So you stood in front of him, in between the cabin and the galley, to prevent him from hurting anyone else, correct, sir?

A.    That's correct.

MR. AMRHEIN:  Objection.

Q.    Now, how long was he attacking you and punching you?

MR. AMRHEIN:  Objection.

A.    If I were to take a guess, I



Page 46

would say three or four minutes.

Q.    During this three to four-minute period, what were the other flight attendants doing?

MR. AMRHEIN:  Objection.

A.    I don't recall.  I know -- I believe Kareem, he was trying to chill the lady that was still in the galley.  The other two, I don't recall.

Q.    At some point in time, did you observe police officers board the aircraft?

A.    I did.

Q.    Was that after the three to four-minute period?

A.    Yes.

Q.    Would you be able to describe the officers who first boarded the aircraft?

A.    So when the aircraft returned back to the gates and the doors opened, by this time I'm sure Port Authority was alerted.  There's only one cop came on.

Q.    When that first cop came on, did you say anything to him?



Page 47

A. He asked me what was going on. I told him the customer had a seizure, then he just stood up, and then started punching people.

Q. Did you tell him that he punched you?

A. I don't recall I told him that.

Q. Do you know if you told him that he punched one of the other nurses at that point in time?

A. I don't remember, ma'am, to be honest.

Q. When the cop came on the aircraft and after you told him what had occurred, what, if anything, did that passenger attempt to do to the cop?

MR. AMRHEIN: Objection.

A. So the cop told him to calm down, he had a seizure, as well. And then he took a swing at the cop.

Q. Did you see that, sir?

A. I did.

Q. Where did he take a swing at the cop?



Page 48

A.    The cop was standing next to me on the carpet area, right behind row 34. So he just took a swung at him, no particular place.

Q.    At what portion of his body did he swing at the cop?

A.    Torso.

Q.    Did he swing at the cop with a closed fist?

A.    I believe so, yes.

Q.    Did the cop do anything that you observed to provoke the passenger to swing at the cop?

MR. AMRHEIN:  Objection.

A.    No, ma'am.

Q.    When he took a swing at the cop, what, if anything, did the cop do in response?

MR. AMRHEIN:  Objection.

A.    The cop deployed his mace.

Q.    Where were you standing at the point in time when the cop deployed his mace?

A.    I was still standing right next


MAGNA
LEGAL SERVICES

Page 49

to the cop.

Q.   Did the mace appear to have any affect on this passenger?

MR. AMRHEIN:  Objection.

A.   I don't remember.

Q.   After it was -- after the mace was deployed, what did you do next?

A.   At this time, it got really chaotic, so we were just trying to get out of the way, because at this time, there was more police officers coming inside the aircraft.

Q.   Approximately how many other police officers came onto the aircraft at this point in time?

A.   I would say at least 10 to 15.

Q.   Sir, with your prior law enforcement experience working for NYPD for 20 years, if someone takes a swing at you, as a uniformed police officer, what were you required to do?

MR. AMRHEIN:  Objection.

A.   Yeah, you could use your mace, you could use your baton, you can use your



Page 50

mace to defend yourself.

Q.    If an individual takes a swing at a uniformed police officer, are they required to restrain that individual?

MR. AMRHEIN:  Objection.

A.    Absolutely.

Q.    Why?

MR. AMRHEIN:  Objection.

A.    So he won't pose another threat.

Q.    When you're in a confined space, such as a cabin of an aircraft, does that also pose additional safety concerns?

MR. AMRHEIN:  Objection.

A.    Yes.

Q.    Why is that, sir?

MR. AMRHEIN:  Objection.

A.    The space is very limited. There's not much you can do, so you just try to get ahold of the suspect, or customer, as best as you can before things get out of control.

Q.    At the point in time when this passenger was swinging at you and hitting



you at least five to six times, were all the passengers still on board this flight?

MR. AMRHEIN:  Objection.

A.    Yes.

Q.    How many customers, approximately, were on board that flight, if it was a full flight?

A.    It was a full -- if it was a full flight, 200.

Q.    So there were 200 passengers, if it was a full flight, in addition to crew members on board that aircraft, correct, sir?

A.    That's correct.

(Whereupon, a short break was taken at this time.)

Q.    Mr. Swinney, when you observed this passenger attempt to punch the officer, did you previously also tell the investigators that this occurred?

MR. AMRHEIN:  Objection.

A.    Yes.

Q.    You can answer.

A.    Yes.



Page 52

Q.    And I'm going to share my screen again and show you what we marked as Swinney 2 for identification.

So you previously testified, sir, you had told the officers who were questioning you that the passengers took a swing at the officer.  Do you see that on page 4 of the transcript?

A.    Page 6, you said?

Q.    Page 4.

A.    Page 4, yes.

Q.    And before he took a swing at the officer, the officer did not do anything to provoke this passenger to swing at him, is that correct?

A.    That is correct.

MR. AMRHEIN:  Objection.

Q.    The fact that this passenger punched you at least five to six times, another nurse, and now took a swing at the officer, would you say that this is a very high level of customer misconduct?

MR. AMRHEIN:  Objection.

A.    Yes, ma'am.



Page 53

Q.   Do you know if the FAM, the flight attendant's manual, defines the various levels of customer misconduct?

A.   There's different levels of threats to the aircraft, yes.

Q.   Are you familiar with the different levels of threats as they're defined in the FAM?

A.   Not without looking at it specifically.

Q.   Would you be able to say what level of threat this would arise to?

MR. AMRHEIN:  Objection.

A.   Probably a level three out of four.

Q.   Why do you say that, sir?

A.   Three would be because he was so combative.  Four would be if the aircraft was under attack to the cockpit or something, so that's the highest level of threat.  Level 3 would fit this incident.

Q.   When you say "level 3 would fit this incident," how would you describe the level of misconduct that you observed on



the aircraft?

MR. AMRHEIN:  Objection.

A.    In terms of what, ma'am?

Q.    In terms of the seriousness of the level of threats, as they're defined in the flight attendant's manual, or the FAM.

MR. AMRHEIN:  Objection.

A.    He could have posed a lot of threat to the aircraft in hurting passengers.

Q.    Thank you, sir.

Now, after he attempted to punch the officer, you testified that the officer deployed his mace spray, is that correct?

A.    Yes.

Q.    And is that when you left the area, after that mace spray was deployed?

A.    Yes, ma'am.

Q.    Why did you leave the area at that point in time, sir?

A.    Again, at this time, there are more police officers coming on board the aircraft.  So we were just trying to get



Page 55

out of their way.  And plus, Kevin had
grabbed the number 4, Kareem, who had got a
hit of the pepper spray.  We had to get him
out of the aircraft, as well.

Q.    Did you assist in helping
Kareem to the front of the aircraft?

A.    I know Kevin did.  Kevin
grabbed him and took him to the front.

Q.    Okay.  When you said that you
left the area, where did you go to at that
point in time?

A.    We were in the front of the
aircraft.

Q.    When you got to the front of
the aircraft, did you speak with any of the
police officers or any other crew members
about what had occurred?

A.    Not that I can recall.

Q.    When you were in the front of
the aircraft, did -- at some point in time,
did anyone request any medical equipment
from either yourself or any of the other
crew members?

A.    One of the police officers.



MR. AMRHEIN:  Objection.

Q.    About how much time passed from when you left the back galley of the aircraft, up until the point when medical equipment was requested by one of the police officers?

MR. AMRHEIN:  Objection.

A.    I would say a good 20 to 25 minutes maybe.

Q.    Were you able to see from where you were positioned, towards the front of the aircraft, anything that was happening in the back galley with that passenger once the police officers came on board?

A.    No, ma'am.

Q.    Now, sir, do you also recall preparing a statement on a Port Authority witness statement form after this incident occurred?

A.    I believe so, yes.

Q.    I'm going to show you a copy of that statement, as well.  It should be on your screen now.  Just let me know when you're able to see it.



Page 57

A.    Okay.

Q.    So for the record, we're going to mark this two-page document, which is Bates stamped PA 1082 to 1083 as Swinney 3 for identification.

And, sir, I'll just give you a moment to review the document, and I can scroll when you're ready.  Just let me know.

A.    Okay.

Q.    Scroll to the next page.

A.    Okay.

Q.    Sir, in this statement, do you see how you indicate towards the bottom of page 1 that "he started hitting anyone in the galley.  He hit me about eight to ten times at this time.  We were at the gate and the doors opened."

Do you see that, sir?

A.    Yes, ma'am.

Q.    Do you recall being struck approximately eight to ten times by this passenger?

MR. AMRHEIN:  Objection.



A.    Yes.  Again, he was swinging.

Q.    When you made this statement, sir, and prepared this on April 12, 2019, was it truthful and accurate?

A.    Yes, ma'am.

Q.    And you prepared this statement, the time is indicated under the detailed description of incident.  The time of the event was 2200 hours.  Do you see that, sir?

A.    Yes.

Q.    And your signature appears on the bottom of page 1 of the document?

A.    Yes.

Q.    And you signed under the statement, "I have read this statement," and then it says "consisting of," there's a blank there, "pages, and I affirm to the truth and accuracy of the facts contained herein."  Do you see that?

A.    Yes, ma'am.

Q.    And does your name appear on the page 2 of 2 of the statement?

A.    Yes.



Page 59

Q.    And is this two-page document, under detailed description of incident, was this completed in your own handwriting, sir?

A.    Yes.

Q.    Do you recall where you prepared this statement?

A.    On the aircraft, I believe.

Q.    Now, going back to -- just to bring up the first document we looked at -- going back to the typewritten document, which we marked as 21 for identification, the E report.  Do you know where you prepared this typewritten accounting of the incident?

A.    In my house.

Q.    And how soon after the incident did you prepare this document, sir, if you recall?

A.    The next day -- sometime the next day.

Q.    Are you required to prepare this statement for JetBlue?

A.    Yes.



Page 60

Q.    Did you have any conversations with any of the flight crew at the time when you prepared this E report?

A.    No, ma'am.

Q.    Was the information contained in this E report also truthful and accurate as it was prepared?

A.    Yes, ma'am.

Q.    Now, once the officer requested the medical equipment, do you know what type of equipment he requested?

MR. AMRHEIN:  Objection.

A.    An AED.

Q.    Do you know who provided him with that medical equipment?

MR. AMRHEIN:  Objection.

A.    I don't recall.

Q.    Did you ask any questions as to why that piece of medical equipment was being requested?

A.    No, ma'am.

Q.    Did you know at that time why that medical equipment, why the AED machine was being requested?



Page 61

A.    No, ma'am.

Q.    At some point in time, were the passengers allowed to deplane?

A.    Yes, ma'am.

Q.    Was the passenger still in the aft galley at that point in time?

A.    I believe so.

MR. AMRHEIN:  Objection.

Q.    Do you recall at what time the passengers were allowed to deplane?

A.    I don't recall.

Q.    After the passengers were permitted to deplane, did you give any statements, other than what we marked as Swinney 3 for identification, the two-page report, did you give any other written statements to any Port Authority police officers who responded?

A.    Not that I can remember, no.

Q.    Did any of the Port Authority police officers ask you if you needed medical attention as a result of being struck so many times by this passenger?

MR. AMRHEIN:  Objection.



Page 62

A.   I can't recall.

Q.   I would like to show you what we'll mark as Swinney 4 for identification, which is titled an aided report, and it's Bates stamped PA 1216.

Sir, this document indicates that at the time, place and occurrence, the aided, and you're listed as the aided -- do you see your name at the top of the document?

A.   Are you asking me a question?

Q.   Yes.  Do you see that your name appears on this document?

A.   Yes.  I see that.

Q.   It reads, "at the time, place of occurrence, aided stated he attempted to calm down the irate passenger when he was suddenly attacked by receiving several punches from the passenger.  EMS was ordered as a precaution," and then it says EMS, and it indicates the number, "RMA aided," refused medical attention.

Do you recall the EMS being ordered and you refusing medical attention



Page 63

by the Port Authority police officers?

A.   Yes, ma'am.

Q.   Were you still on board the aircraft at the point in time when the passenger in the back galley was ultimately removed from the plane?

A.   I don't know.  I don't recall.

Q.   Do you know how he was removed from the airplane?

A.   I don't know.

Q.   Did you have any other discussions with any of the Port Authority police officers who responded on scene to learn what happened in the back galley?

MR. AMRHEIN:  Objection.

A.   I can't remember.

MS. ALTERMAN:  Thank you, sir.
That's all the questions I have for
now.  I may have some follow-up
questions after plaintiff's counsel
questions you.

EXAMINATION BY

MR. AMRHEIN:

Q.   First of all, thank you,



Page 64

Mr. Swinney, for being with us here today. We very much appreciate your time. If you bear with me just a moment, so I can just get some of the tech side of it set up for me. Sorry. Just a moment.

Sir, I'm just going to start out going back to your just kind of employment history. I know you said you were a cop for 20 years with the New York Police Department and detective for the last 11 years and, you know, honorably retired and moved on to your career with JetBlue, is that correct?

A.    That's correct.

Q.    Prior to the -- to your time with the NYPD, did you go through any schooling to be a medical professional?

A.    No, sir.

Q.    After your time with the New York Police Department and before starting with JetBlue, did you take any classes or have any schooling or earn any degrees to be a medical professional?

A.    No, sir.



Q.    You did have experience in the past, am I correct, with respect to individuals having a seizure?

A.    I've come across people having seizures before, yes.

Q.    Is that in your capacity as an officer for the NYPD?

A.    Yes, sir.

Q.    Would it refresh your memory that you were F1 that night on April 12, 2019?

A.    If I could refresh my memory? I would have to look at the pairing to see. Most of the time, again, Kevin and I worked these flights all the time.  99 percent of the time, Kevin is DF 1.

Q.    I'm going to briefly introduce one document, sir, which is -- just bear with me from a tech perspective.

Before I do so, do you know who was the pilot of the flight that night?

A.    I can't recall his name, no.

Q.    Do you know an individual named Curt Bengston?



Page 66

A.    Never heard of the name.

Q.    Typically, as a flight attendant for JetBlue, are you made aware of the pilot's name for each flight or no?

A.    Yes, we are.

Q.    So do you just not recall that Mr. Bengston was the pilot for that flight that night?

A.    Yeah, I don't recall.

Q.    Sir, I represent to you that it is -- Mr. Bengston, Curt Bengston was the pilot that night aboard flight 659 on April 12, 2019.

I'm going to introduce to you what was marked as Exhibit 2 in Mr. Bengston's deposition.  And it is a -- it's called SCIR report, and I'm going to share.

Sir, let me know whenever this is on your screen.

A.    Yeah.  It's on my screen.

Q.    So this is a document which is -- I'll scroll through it so you can see.  It's a two-page document that was marked as



Exhibit 2 in Mr. Bengston's deposition in this matter.  It is Bates stamped PA 1362 through PA 1363.  This is not the marked exhibit, I don't believe we have that yet.  But I represent to you that this is the document that was used as -- marked as Bengston 2.

Sir, do you see on the left-hand side of this document that there is a number of handwritten notations?

A.    I see that, yes.

Q.    Okay.  And is your name second on the list right there?

A.    Yes.

Q.    Okay.  I'll represent to you, sir, that the drafter or the pilot of that plane drafted this document, and testified that he handwrote those notes on the side of this document in order of personnel that night.  So Mr. Fluory was the first officer.  You, listed first as F1.  Frank Leandro, who I know you said you have great familiarity with earlier today, he was F2. Kevin Ingleton, F3.  And you had already



Page 68

testified earlier today that Kareem Arondol was F4.  Does that refresh your memory?

A.   Could be, yes.  Yeah.

Q.   Okay.  And then if you -- if I can point to -- just one second.

Can you see the paragraph where -- actually, directly next to your name, it starts at "at this time"?

A.   Yes.

Q.   Am I correct that it says, "at this time, we were told a customer had become violent and assaulted, F1 Swinney and F4 Arondol"?

A.   I see that.

Q.   Sir, you had previously testified that there were two different methods for contacting the cockpit in event of something happening on board the flight. Is that correct?

A.   Yes.

Q.   And one would be over the PA system, is that right?

A.   Correct.

Q.   And the second one would be the



Page 69

emergency line directly to the cockpit?

A. Correct.

Q. Did you, personally, make the call to the cockpit alerting the pilots of the medical emergency happening on board the flight?

A. I don't think I did, no. It wasn't me.

Q. Do you know who did?

A. I don't recall.

Q. Okay. So you don't know whether or not it was the -- it was initiated over the PA system or via the emergency line?

A. Definitely be over the PA system.

Q. Did you hear it?

A. What was that?

Q. Did you hear it over the PA system?

A. It would be an intercom, so it would go directly into the cockpit. It wouldn't come over the PA system.

Q. Sir, would a -- would -- if I



Page 70

were to bring to your attention that the testimony on the record from Mr. Bengston is that the emergency line was used, would that refresh your memory?

A.    Again, I didn't deal with the communication with the captain, so I can't testify which radio method was used to notify him.

Q.    All right.  And just for the sake of a clean transcript, you don't know whether or not the PA normal method versus the abnormal emergency method was used to contact and alert the captain of the medical emergency?

MS. ALTERMAN:  Objection to form.

A.    If we're following procedure, generally we use the intercom.

Q.    But you had testified that there are two methods for contacting the cockpit, am I right?

A.    Yes.

Q.    And you don't know which one was used?



Page 71

A.   Again, I don't know, I didn't do the communication.  But if I had to take a guess, I would say over the intercom. That's how we normally notify captains of medical situations.

Q.   And so if it were an abnormal situation, would the emergency line be used?

A.   Emergency line would only be used in case of emergency evacuations and we would notify the captain and they would come out of the plane.

Q.   So again, you didn't witness or make this call at all, so you don't know if it was the regular PA line or the emergency line, right?

A.   Right.

Q.   Sir, under recommendation, just because part of -- something that I want to get a better picture of is, I think, the timing of what occurred on that flight.  I think there's a lot of inconsistency in your statements and your testimony here today with respect to the passage of time



Page 72

between the given events.

So sir, I just want to direct your attention to the first line under recommendation.  Am I correct that it says "from initial call to arrival at the gate was within five minutes"?

MS. ALTERMAN:  Objection.

Q.    Do you see that?

A.    Yes, I see that.

Q.    Okay.  Do you trust -- as a flight attendant, do you trust the word of a captain?

MS. ALTERMAN:  Objection.

A.    Absolutely.

Q.    So do you trust the captain's specific recollection of from the initial call of the medical emergency to the return of the gate was within five minutes?  Do you trust that that was an accurate statement?

MS. ALTERMAN:  Objection.

A.    Again, I don't know -- you're asking me the communication with the captain, I have no idea who was talking to



Page 73

the captain at the time.  So I have no idea.  I stayed with the customer pretty much the whole event, I was in aft galley.

Q.   And sir, you had said, I think it was approximately 10 minutes from when you had responded to when the police officers arrived, is that correct?

A.   I don't recall.  In terms of what?

Q.   In terms of when you had responded to the aft galley for the medical emergency of a man having a seizure, to when the police arrived at the scene, is that right?

A.   First officer came on board to the aircraft?

Q.   Yeah.

A.   Give or take, yes.  I mean, we're not counting the minutes at this time, when something like this happens.

Q.   So is it fair to say you don't know if it was 10 minutes?

A.   It could have been 10, 15 minutes.  It could have been.  The specific



time exactly, I can't testify and say it was 10 minutes, 9 minutes, 11 minutes.

Q.    What about less than five?

A.    My recollection, definitely not less than five.

Q.    But you don't know?  Am I right?  You're just guessing?

MS. ALTERMAN:  Objection.

A.    You're asking me when the cop came one.  Remember, we're taxiing out, and we had to taxi back to the gate.  So definitely five minutes -- more than five minutes.

Q.    So more than five?

A.    Absolutely.

Q.    Do you see that from when the initial call, according to the captain of this flight, am I correct that it says from initial call to arrival of the gate was within five minutes?

A.    For initial call, doesn't necessarily indicate the time the event started.  It could have been the time the flight attendant notified the captain.  So



Page 75

again, you're asking about the communication with the captain.  I have no idea how long.  What he recollected, I don't know.

Q.    Would it refresh your memory that Frank Leandro had responded to the initial call, as well, put gloves on, made the emergency call to the pilots, at which point the flight turned around and returned to the gate?  Would that refresh your memory?

A.    That could have happened, yes.

Q.    So from the initial call, do you agree with me that the pilot said returned to the gate within five minutes?

MS. ALTERMAN:  Objection.

A.    Again, you're asking me the same question.  I don't know what you're trying to refer to, sir.

Q.    I'm simply trying to gather the major discrepancy between your perception of time and everybody else's perception of time as to this chain of events.

MS. ALTERMAN:  Objection to



Page 76

form.

Q.    I'll ask just again, one follow-up question about this specific document.

Am I correct that it says "from initial call to arrival at the gate was within five minutes"?

MS. ALTERMAN:  Objection.

A.    I don't know what the initial call was to return -- call to return to the gate, or the call to let the captain know that we had a medical incident on board. So it could have been two different calls.

Q.    Sir, I'm representing to you that initial call was the call alerting the cockpit of the medical emergency.  I can ask this again, it's a very simple yes-or-no question.

Does this say, "from initial call to arrival at the gate was within five minutes"?

MS. ALTERMAN:  Objection.

A.    It can't be -- it can't be five minutes.  The time we requested medical



Page 77

personnel, the time we that lifted him up out of his seat, it couldn't be five minutes.  The time he took his first swing at me, it had to be more than five minutes.

Q.    But you don't know?  That's just your estimation?

A.    It's definitely more than five minutes.  Again, it could be -- Frank could have called and said we need to return back to the gate.  Not all medical events require us to return back to the gate.  So Frank could have called them and said we got to go back to the gate.

Q.    Sir, my question was very simple.  I do appreciate that you're trying to expand on your answer.  But my question was very simple.

Does this say "from initial call to arrival at the gate was within five minutes"?

MS. ALTERMAN:  Note my objection.

A.    I just answered the question like three times already.



Page 78

Q.    With respect, sir, you didn't
answer the question.  I simply asked does
that document say right here, "from initial
call to arrival of the gate was within five
minutes"?

        MS. ALTERMAN:  Note my
    objection.  That's not the complete
    sentence.

Q.    I'll read the whole thing right
here.  "From initial call to the arrival at
the gate was within five minutes, as we
recall.  Our rapid gate assignment and jet
bridge operator made quick response.
Communication with F1 Swinney was quick and
all relevant information was passed that he
had available."

        Did I read that correctly?

A.    Again, sir, that could be a
request to return to the gate.  Not alert
him of a medical procedure.  Not all
medical procedures require returning to the
gate.

Q.    I asked you a very simple
question.



Page 79

A.    And I'm giving the answer to the best of my ability.

Q.    I simply said did I read that correctly?

A.    Yes, you read that statement correctly.

Q.    Okay.  So for the purpose of this deposition, just so we have a clean transcript, I'm going to read it again and then we can move on.

A.    Okay.

Q.    "From initial call to arrival at the gate was within five minutes, as we recall.  Our rapid gate assignments and jet bridge operator made response quick. Communication with F1 Swinney was quick and all relevant information was passed that he had available."

        Did I read that correctly?

A.    Yes.

Q.    Sir, you were stationed in the front of the galley as F1, is that correct?

A.    Correct.

Q.    And as you had just began to



Page 80

taxi, you heard some yells and screams from passengers regarding a medical emergency of a man having a seizure in the back of the plane?

A.    Correct.

Q.    And you had said, I believe, that this medical emergency for a man having a seizure was happening in row 33?

A.    Row 33, yes.

Q.    And when you arrived at the scene, am I correct that you said you observed Mr. Lagoda, the passenger, having a seizure, foaming at the mouth, slumping towards the middle of the seat?

A.    He was leaning towards the inside of the seat, yes.

Q.    And he was -- was he located in the aisle seat?

A.    He was sitting in the aisle seat.  That's correct.

Q.    And if he was in 33 C, sir, based upon your knowledge of the 321 Airbus, if you're walking from the front to the back, which side would C be on?



Page 81

A.    If you're walking from the front of the aircraft to the back, C would be on the right-hand side.

Q.    So would it be fair to say that Mr. Lagoda, when he was seizing, was, as you observed, leaning to his left, towards the middle seat?

A.    That is correct.

Q.    Am I correct that when you arrived, you tried to position Mr. Lagoda towards the aisle because you observed him foaming at the mouth and things coming out of his mouth?

A.    That's correct.

Q.    Is it fair to say that was for the purpose of not having him do that on the passenger sitting next to him?

A.    I would say, yeah.

Q.    As well as as a part of your treatment of a man having a serious medical situation aboard the flight?

MS. ALTERMAN:  Objection.

A.    Yes.

Q.    And you say he was foaming from



Page 82

the mouth.  Was he also tremoring and convulsing?

A.    Yes, sir.

Q.    And you said you, along with Kevin, you unbuckled him and lifted him out of the seat, into the back galley, where you laid him on his back?  Is that a correct and accurate representation of your testimony?

A.    Yes, sir.

Q.    And when you responded, had you seen the F2 at that point, or F3?  I believe F2, Frank Leandro, responding back there, as well?

A.    I don't recall.

Q.    Am I correct that you had testified earlier today that nurses who had responded for the -- to the PA call which requested help in medical assistance, given the ongoing medical emergency, am I correct that the nurses instructed that Mr. Lagoda, the passenger, be laid on his side?

A.    Yes.

Q.    And did they instruct the



Page 83

flight attendants to let the seizure run its course and not to restrain Mr. Lagoda?

A.    That's correct.

Q.    Did you trust that they were handling this based upon their medical training and experience?

A.    Yes.

Q.    In your experience as a flight attendant for JetBlue, have you worked with nurses before in response to medical emergencies?

A.    Doctors and nurses, yes.

Q.    Is it fair to say that as flight attendants, during a medical emergency, when doctors and nurses are aboard, that you put your faith in them to instruct you as to how to handle a situation based upon their schooling, teaching and experience in their medical field?

A.    And among other things.

Q.    At some point, Mr. Lagoda went from lying on the side on the ground to standing up, is that correct?



Page 84

A.    That's correct.

Q.    And just for the record, just for clarity sake, if I am referring to Mr. Lagoda, I know you had referred to him and been referred to as the passenger in the back of the plane.  Is that your understanding -- if I say Mr. Lagoda, is it fair you understand that to be the same person, the passenger?

A.    Yes, sir.

Q.    Am I correct that you had mentioned the word "disoriented" earlier in today's deposition?

A.    Correct.

Q.    Do you recall saying in your witness interview less than a month after this event occurred on April 12, 2019 -- excuse me.  Perhaps just over a month, so about 32 days, give or take, that you had said Mr. Lagoda was confused, as well as disoriented, definitely out of it and wasn't in his right mind at that point?

MS. ALTERMAN:  Objection to form.



A.    Yes.

Q.    I'm sorry.  I didn't hear that just over the objection.  But did you say yes, sir?

A.    Yes.

Q.    Okay.  You had previously testified that you had made several attempts to calm Mr. Lagoda down, telling him that he had a seizure and that he would be okay, am I correct?

A.    Correct.

Q.    And at that time, is it fair to say that Mr. Lagoda was, as you testified, disoriented and confused and definitely out of it?

A.    Yes.

Q.    Do you recall testifying earlier that as -- when Mr. Lagoda was standing, he was still foaming at the mouth?

A.    Yes.

Q.    And Mr. Lagoda struck you several times in both the chest and torso, am I correct?



Page 86

A.    That's correct.

Q.    And again, that was at the time where, as you testified, Mr. Lagoda was confused, disoriented and definitely out of it and foaming at the mouth?

A.    That was my opinion, yes.

Q.    When you tried to calm Mr. Lagoda down, did you do so in English or Russian?

A.    English.

Q.    Did you ever try to communicate with him in Russian?

A.    I don't speak Russian.

Q.    Did you hear any of the nurses, based upon your memory and recollection of the events, speaking Russian to Mr. Lagoda?

A.    Not that I recall.

Q.    Do you recall hearing any nurses speak anything in English to Mr. Lagoda, similarly, as you did, with respect to trying to alert him that he had a seizure and calm him down?

A.    No.

Q.    While you were doing this, am I



Page 87

correct that you were aware that the plane was already on its way back to the gate?

A.    While I was doing what?

Q.    When you were trying to communicate with Mr. Lagoda, telling him that he had a seizure, at which point Mr. Lagoda had been disoriented and confused and definitely out of it, based upon your testimony here today, were you aware that the plane was already on the way back to the gate?

A.    At this time, he was assaulting me, so yes, we were going back to the gate, yes.

Q.    And again, you testified that at that time, Mr. Lagoda was confused, disoriented, definitely out of it, and wasn't in his right mind at that point, isn't that right?

A.    I said that's my opinion, yes.

Q.    Okay.  And positionally, am I correct that you were standing, I think you said on the carpet.  Is that in between the two lavatories in the rear, with your back



Page 88

facing the cabin and then your front facing the aft galley?

A.    That's correct.

Q.    Do you have -- with your back facing the galley -- facing the cabin, excuse me, sir, sorry.  I think there may have been testimony about turning around or -- did you observe the exact moment when the Port Authority police department first officer responded to the scene?

A.    Observe him come onto the aircraft?

Q.    Yes.

A.    I can't remember.

Q.    Did you eventually see him making his way down the aisle?

A.    I could say that, yes.

Q.    If you don't know, you don't know.  I understand it's been many, many years since this time, sir.  So I do know it's a test of the memory.

But -- so am I correct that you didn't see, as you were facing Mr. Lagoda directly in front of you with your back to



Page 89

the cabin, am I correct that you didn't see when the first officer responded and --

A.    I did see him come down the aisle.

Q.    But not when he first boarded the plane, am I right?

A.    No.

Q.    When the officer -- strike that.

When you eventually saw the officer making his way down the cabin aisle towards the back galley, were you still positioned in the same place on the carpet, say, between the lavatories, facing the back galley?

A.    I was.

Q.    Am I correct that you informed the officer upon the officer's arrival at the back galley -- or excuse me, next to you, that there was a medical emergency of a man having a seizure, and that man was both disoriented and combative?

MS. ALTERMAN:  Objection.

A.    Yes.



Page 90

Q.    Am I correct that you testified during your May 14, 2019 interview that Mr. Lagoda struck the Port Authority police officer just one time in the arm?

A.    Yes.

Q.    Am I correct that you observed how the officer responded being hit in the arm just one time?

A.    Can you repeat that question.

Q.    Sure.  Did you observe how that officer responded to being hit in the arm? Did he use pepper spray?

A.    He did.

Q.    Do you recall testifying during your May 14, 2019 interview that the cop was a "no nonsense" cop in responding to that medical emergency for a man having a seizure on board?

A.    You're saying did I say that?

Q.    Yes.  Do you recall saying that?

A.    I don't recall.

MR. AMRHEIN:  Cheryl, in terms of housing of the documents, I'm



Page 91

happy to pull up the same documents or, how would you best like to proceed? Just because I want to introduce, I think it's Exhibit 2.

MS. ALTERMAN: That's fine. You can pull it up and we'll refer to it the same way, as Swinney 2.

Q. My apologies, sir.

Do you recall being asked whether or not the officer was responding in a no nonsense way?

A. I don't recall.

Q. I'm just going to pull up -- let me know whenever this is on your screen, sir.

A. It's on my scree.

Q. This is -- for the record, this is Swinney 2, which was introduced at the outset by counsel for defendants. In particular, right now, this is Bates stamped PA 1793. It's the eighth page of this 14-page document.

Sir, am I correct that Mr. Nicholas Viorst asked, "and then you



Page 92

said you saw him strike the officer?" To which you responded "yes"?

A. Yes.

Q. And then did Mr. Viorst say, "where did he hit the officer?" Did you say, "in the arm?" Or did you say "in the arm, you thought," and you responded, "yeah, I think it was like in the arm." And then he followed up saying, "just one time?" And you said, "yeah"?

A. Yes.

Q. And then did Mr. Viorst say, "and then the cop was just no nonsense, he went right with the" -- and you interjected and said, "right with the spray," is that correct?

A. That's correct.

Q. And am I correct that as the officer arrived at the scene, you have testified here today that you, as well as in your interview, that you immediately told the officer that the man had suffered a seizure and was disoriented?

MS. ALTERMAN: Objection.



Q.   And combative?

A.   Yes.

Q.   Am I correct that you testified that after the pepper spray was deployed, you left the back galley and returned to the front of the plane?

A.   That's correct.

Q.   So you didn't witness any further interaction between the first responding officer and Mr. Lagoda?

A.   I did not.

Q.   And am I correct that you didn't witness any other interaction between any Port Authority officers and Mr. Lagoda?

A.   I did not.

Q.   Am I correct that you had testified in your interview about how, based upon your estimation, it was approximately, I think, two minutes, less than three minutes from when the first officer arrived and responded to the male having a seizure on board to when the group of officers rushed onto the plane?



A.   Around that time, yes.

Q.   Sir, do you recall testifying in today's deposition earlier, when questioned by counsel for defendants, that you had been struck by Mr. Lagoda in the chest and torso and I think you called him a pretty big sized dude who struck you pretty hard?

A.   Yes, sir.

Q.   And you said you were in a little bit of pain?

A.   Yes, sir.

Q.   Do you recall saying that you didn't feel threatened?

A.   No.

Q.   You don't recall saying that earlier?

A.   I didn't feel threatened.

Q.   Okay.  Is that --

A.   But just me.

Q.   Understood.

Is that because you were aware, like you had said and testified here today, that the gentleman had just suffered a



Page 95

seizure and was confused, disoriented and wasn't in his right mind?

MS. ALTERMAN:  Objection.

A.    That could have been part of it, yes.  But I remember there was a customer that was in the back galley with him, so I was trying to make sure her safety was more paramount than mine.

Q.    Understood.  I think that's a great mentality that you have today, and I very much appreciate that, sir.

Sir, given the ongoing medical emergency of a male having a seizure, and from your perspective and testimony, coming out of the seizure being confused, disoriented, not in his right mind, combative, do you feel that given -- and standing up and foaming from the mouth, do you feel that it was imperative for you to keep the situation isolated so that the medical situation could be resolved and not involve passengers?

A.    Absolutely.

Q.    And again, you said you,


MAGNA
LEGAL SERVICES

Page 96

personally, didn't feel threatened,
although you were struck several times by,
again, a big sized dude who had hit you in
the torso and chest?

A.    Correct.

Q.    Sir, do you remember being
questioned briefly about the, I think it's
called the FAM, flight attendant manual?

A.    Yes.

Q.    And you said you carry it on
you, on your person as a part of your
duties and responsibilities as a JetBlue
flight attendant?

A.    As a required item, yes.

Q.    And that's on an iPad?

A.    Yes.

Q.    Do you remember being asked
about the different levels of threats that
fall within the FAM?

A.    Yes.

Q.    Do you recall testifying that
you don't remember, specifically, what the
different levels of threats are?

A.    I said without referring to the


MAGNA
LEGAL SERVICES

FAM directly.

Q.   Yes.  So you don't recall, specifically, what the different levels of threats are right now, as you sit here today?

A.   Yes.  There's four levels.

Q.   Beyond that --

A.   I know it's four levels and I know there are certain incidents that escalate each threat.  So this particular medical procedure and turning into a violent assault, that's what I was referring to.

Q.   Understood.  But am I correct that sitting here today, you don't remember the specifics of each individual level of the four levels you described?

A.   I was referring to this particular incident.

Q.   I just mean in general, sir. Based upon the four levels of differing threats from the FAM, sitting here today, am I correct that you don't remember the specifics that go into each one without



having to refer to your iPad?

A.    Again, different incidents escalate different levels of threats.  So you just can't say there's levels of threats that's for one particular thing.

Q.    No, I understand.  I just mean the individual requirements or events and specific language that is a subcategory of each level of threat, am I correct that you don't recall --

A.    I do.  I know them.  But again, placing the incidents into particular levels of threat s, I would have to refer to the FAM to see which level this arises up to.

Q.    Okay.  I don't mean to put you on the spot.  I just --

A.    No, no.

Q.    -- there were some questions earlier today.

Sir, I know you were asked towards the end of questioning from counsel for defendants that you don't -- whether or not you knew when or why Mr. Lagoda was



removed from the plane.  Do you recall that?

A.    Why he was -- I don't know.  I don't recall.  I don't know why he was removed.

Q.    Did you ever learn after the fact what happened to Mr. Lagoda?

A.    No, I did not.

Q.    Did you ever read about or hear about the investigation by the office of the attorney general's office into the conduct of the officers who responded to the flight that day?

A.    No, sir.  Not at all.

Q.    I know we had touched on it just a few minutes ago about, I believe, it was roughly two or -- two to three minutes, under three minutes, I believe.  I think it was on PA 1794 of that interview document, that the second wave of officers responded to Mr. Lagoda.  Is that a correct encapsulation of your testimony?

A.    Yes, sir.

Q.    And then you didn't witness



Page 100

anything after the fact, after that --
after you left the back galley, is that
right?

A.    That's correct.

Q.    I'm just going to bring up a
document.  It's going to be the same
document, Exhibit 2.  Just let me know when
that's on your screen, sir.

A.    It's on the screen, sir.

Q.    Okay.  Do you see here, sir, on
page 1787, the document produced by the
Port Authority, which is a transcript of
your interview marked as Exhibit 2, this
line where you said, "I told him," meaning
the officer, Port Authority officer who
responded, "I said, listen, you know, the
male had a seizure, he's a little
disoriented, but he's also combative."

Do you recall stating that?

A.    Yes, sir.

Q.    I'm going to go down to the
following page, PA 1788, it's the third
page in this same document, Exhibit 2.

Sergeant Lawanda Irving asked,



"okay, did you notice anything about his face?"  His, meaning Mr. Lagoda.  "Did he appear to be cognizant of what was going on?  Did he appear confused?"

Your response, am I correct that you said, "definitely not.  Definitely confused and disoriented.  And like I said, his mouth was bleeding.  Definitely out of it."

Did I read that correctly?

A.    Yes, sir.

Q.    And then I'm going to bring your attention down to the bottom of what is PA 1791.

Am I correct that you said, "sure, he was a strong dude," and then Mr. Viorst said, "so it wasn't like he came across sort of weakened as a result of his seizure.  He actually hit you pretty hard?"  You responded, "yeah."  Mr. Viorst said, "okay.  Did you hit him back?"  To which you said "no."  Mr. Viorst said, "and what did you -- did you -- what were you doing when he was" -- and you responded, "I -- I



know he was disoriented and I kept saying, calm down, sir.  You had a seizure.  But every time he would hit me, I was like calm down, you had a seizure.  And then I figured he wasn't in the right mind at that point."

Q.    Did I read that correctly?

A.    Yes, sir.

Q.    Sir, I know there was a brief line of questioning at the beginning by counsel, or I should say towards the end of defense counsel's questioning of you with regard to the AED requested by officers.

Was that request made directly to you or was that -- or was that request not made directly to you?

A.    It wasn't made directly to me.

Q.    The mace spray or pepper spray, did that come into contact with you at all or was that because you were -- or if no, was that because you were standing next to the officer?

A.    Yes, I was standing right next to the officer.



Page 103

MR. AMRHEIN:  Sir, for now, I have no more questions.

MS. ALTERMAN:  Sir, I just have a few follow-up questions.

EXAMINATION BY

MS. ALTERMAN:

Q.    You previously testified that you're about six feet tall, is that right?

A.    That's correct.

Q.    And approximately how much do you weigh, sir?

A.    285 pounds.

Q.    Is that approximately the same weight or the -- did you weigh approximately the same in April 2019 as you do today?

A.    Yes, ma'am.

Q.    Sir, you testified upon questioning that you didn't feel threatened by the passenger.  Is that because you worked as an NYPD officer for 20 years?

A.    That's part of it, yes.

Q.    And would you say, sir, that you didn't feel threatened by him because



you know how to defend yourself?

A.    That's correct.

MR. AMRHEIN:  Objection.

Q.    Would you also agree with me that you didn't feel threatened by the passenger because as working for the NYPD for 20 years, you've gone through numerous training and police tactical courses?

A.    That's correct.

MR. AMRHEIN:  Objection.

Q.    Would you also agree with me, sir, that many people on that flight did feel threatened by the passenger?

MR. AMRHEIN:  Objection.

A.    That is correct, as well.

Q.    And in fact, you testified, sir, that the nurses were screaming in fear based on the passenger's conduct and violent acts, correct?

MR. AMRHEIN:  Objection.

A.    Right.

Q.    That's correct, sir?

A.    Yes, ma'am.

Q.    And would you also agree with



me, sir, that you were blocking the cabin, as you testified, and gave an interview statement back in May 2019, because you were preventing the passenger from going out into the cabin, because you didn't know what his state of mind was, is that correct, sir?

A.    That is correct.

Q.    And, sir, would you agree with me, when you don't know a person's state of mind and they're punching multiple people on an aircraft, that that individual poses a serious safety threat to everyone on board that airplane?

MR. AMRHEIN:  Objection.

A.    That is correct.

Q.    And would you agree with me, sir, that based upon your prior law enforcement experience and your training as a JetBlue flight attendant, that that person who's punching people and assaulting people on an aircraft, that escalated the situation from a medical emergency to one of an act of violence, is that correct,



sir?

MR. AMRHEIN:  Objection.

A.    You can say that, yes.

Q.    And you would agree with me, sir, that based on the different levels of threats that are contained in the FAM, that this was no longer a medical emergency, but this was now escalated to a level threat that involved violence and assault, correct, sir?

MR. AMRHEIN:  Objection.

A.    That's correct.

Q.    And you testified, sir, in your own words that this passenger was assaulting you, is that correct?

A.    Yes, ma'am.

MR. AMRHEIN:  Objection.

Q.    When you testified that he was assaulting you, what did you mean by that?

MR. AMRHEIN:  Objection.

A.    He was hitting me.  Physically hitting me.

Q.    And he was hitting you multiple times, sir, right?



MAGNA

LEGAL SERVICES

A.    That's correct.

Q.    And he was hitting you multiple times and striking you in your torso in a violent manner, correct, sir?

MR. AMRHEIN:  Objection.

A.    Correct.

MS. ALTERMAN:  That's all I have.  Thank you.

EXAMINATION BY

MR. AMRHEIN:

Q.    Just a few follow-up questions, sir, and I -- hopefully we'll be able to wrap up.  And we do, again, appreciate your time very much.

Sir, do your duties, responsibilities, and rules, requirements that you were obliged to or required to abide by as a New York police officer, do they have any bearing on the duties and responsibilities that you're required to abide by as a JetBlue employee who has a set of rules and manuals that you must adhere to?

A.    I don't understand the



Page 108

question.

Q.    Am I correct that as a flight attendant and employee of JetBlue, you're required to abide by the rules of JetBlue, correct?

A.    Yes.

Q.    You're not required to abide by the rules and/or make analysis about situations based upon the rules that you were required to abide by as a police officer for the NYPD, correct?

A.    Correct.

Q.    And again, am I correct that you had testified here today that you saw Mr. Lagoda in his seat foaming at the mouth, convulsing, tremoring, at which point you brought him back to the back galley as a man having a seizure, is that right?

A.    That's correct.

Q.    At which point he continued to foam from the mouth and was convulsing and vigorously moving as the seizure continued?

A.    That's correct.



Q. And you were advised by medical professionals who responded to the scene to let the seizure run its course, am I correct?

A. That's correct, sir.

Q. And then at some point, Mr. Lagoda stood up and, as you testified, both here today, as well as your interview a month after the event occurred back in 2019, that Mr. Lagoda was, based upon your perception of these entire events, that he was noticeably disoriented, confused, did not appear in his right state of mind, as well as combative?

MS. ALTERMAN: Objection.

A. In my opinion, yes.

Q. And when he was standing, again, you said you saw him still foaming at the mouth?

A. Yes.

Q. And your duties and responsibilities and rules by which you must abide as a flight attendant for JetBlue have no bearing on the duties and



Page 110

responsibilities or rules by which Port

Authority police department officers must

abide, isn't that right?

    A.    That's not -- you can say that.

            MR. AMRHEIN:  I have no more

        questions.

            MS. ALTERMAN:  Sir, I don't

        have any further questions.  Thank

        you very much for your time today.

            (Whereupon, at 2:07 P.M., the

        examination of this witness was

        concluded.)


            °         °         °         °



D E C L A R A T I O N

I hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore.

_____
Calvin Swinney

Subscribed and sworn to before me this _____ day of _____ 2023.

_____
NOTARY PUBLIC



Page 112

                    I N D E X
EXAMINATION BY                          PAGE
Ms. Alterman                            5, 103
Mr. Amrhein                             63, 107


                  E X H I B I T S

   NO.        DESCRIPTION                PAGE

   Swinney 1 through 4


   INFORMATION/ DOCUMENTS REQUESTED    PAGE

   (None)

        QUESTIONS MARKED FOR RULINGS
   PAGE LINE QUESTION

   (None)



Page 113

C E R T I F I C A T E

STATE OF NEW YORK        )
                         :   SS.:
COUNTY OF NEW YORK       )

I, HINDY FREILICH, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 21st day of August 2023.

_____
HINDY FREILICH



Page 114

ERRATA SHEET

PAGE/LINE   CORRECTION

_____   _____
_____   _____
_____   _____
_____   _____
_____   _____
_____   _____
_____   _____
_____   _____
_____   _____
_____   _____
_____   _____
_____   _____
_____   _____
_____   _____
_____   _____
_____   _____
_____   _____
_____   _____
_____   _____
_____   _____
_____   _____
_____   _____



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



| A |
|---|

**AA**
14:18
**abide**
8:20 9:8 107:19,22
108:5,8,11 109:24
110:4
**ability**
79:3
**able**
8:12 21:22 22:12
24:12 46:17 53:12
56:11,25 107:13
**abnormal**
70:13 71:7
**aboard**
66:13 81:22 83:17
**Absolutely**
15:23 38:11 50:7
72:15 74:16 95:24
**accounting**
59:15
**accuracy**
58:20
**accurate**
58:5 60:7 72:20 82:9
**acquired**
9:8
**act**
105:25
**acting**
38:15
**action**
5:8 113:15
**actions**
13:5
**acts**
104:20
**addition**
51:12
**additional**
50:14
**address**
4:10
**adhere**

107:24
**adjust**
31:15
**administer**
3:6
**administrator**
1:3 4:20
**advised**
12:20 109:2
**AED**
60:14,24 102:14
**Affairs**
45:10
**affect**
49:4
**affirm**
58:19
**African**
24:16
**aft**
34:14,23 35:14 42:21
42:23 61:7 73:4,12
88:3
**afternoon**
5:6
**age**
7:11
**aggressive**
42:6
**ago**
99:17
**agree**
12:5,22 75:15 104:5
104:12,25 105:10
105:18 106:5
**AGREED**
3:3,11
**ahold**
50:21
**aid**
8:7,15
**aided**
26:25 62:5,9,9,17,23
**aiding**
23:25
**Airbus**

10:16,16,25 21:19
80:24
**aircraft**
8:9 11:4,6,22 12:2,9
12:25 13:7 15:16
17:22 19:19,25
21:17,24 22:5 23:24
25:22 26:20 27:19
28:10,18 29:5 35:11
36:10,10 38:20
44:23 45:5 46:12,19
46:20 47:15 49:13
49:15 50:13 51:13
53:6,20 54:2,10,25
55:5,7,14,16,21
56:5,13 59:9 63:5
73:17 81:3 88:13
105:13,23
**airplane**
63:10 105:15
**Airport**
16:11
**Airways**
7:16,18,22 8:2,20
9:23 11:15 12:7
13:15 14:4 30:14
**aisle**
11:11,12 80:19,20
81:12 88:17 89:5,12
**alert**
18:24 25:21 26:18
29:14 70:14 78:20
86:22
**alerted**
19:15 28:14,24,25
46:23
**alerting**
69:5 76:16
**Alexey**
1:3 2:15 4:22
**allowed**
61:4,11
**Alterman**
1:21 2:13 4:13 5:3,5
5:7 63:18 70:16
72:8,14,22 74:9

75:17,25 76:9,23
77:22 78:7 81:23
84:24 89:24 91:6
92:25 95:4 103:4,7
107:8 109:16 110:8
112:4
**American**
24:16
**Amrhein**
2:8 4:17 13:3 21:6
26:14 27:7,13 28:21
32:13,20 33:11 34:2
36:22 37:2,5,8 38:3
38:10,13,23 39:2
42:14 43:15 44:24
45:7,21,24 46:6
47:18 48:15,20 49:5
49:23 50:6,9,15,18
51:4,22 52:18,24
53:14 54:3,8 56:2,8
57:25 60:13,17 61:9
61:25 63:16,24
90:24 103:2 104:4
104:11,15,21
105:16 106:3,12,18
106:21 107:6,11
110:6 112:5
**analysis**
108:9
**and/or**
108:9
**announcement**
24:4,5,8 25:10
**answer**
6:4,16 26:15 32:14
51:24 77:17 78:3
79:2
**answered**
77:24
**apologies**
91:9
**appear**
36:19 49:3 58:23
101:4,5 109:14
**appeared**
30:2



**appearing**
2:4
**appears**
31:5,23 58:13 62:14
**appreciate**
64:3 77:16 95:12
107:14
**approximate**
22:13
**approximately**
28:18 32:18 49:14
51:7 57:23 73:6
93:21 103:11,14,16
**April**
5:17 9:9 10:22 15:13
16:5,10 17:3 58:4
65:11 66:13 84:18
103:16
**area**
28:5 45:6,13 48:3
54:19,21 55:11
**arises**
12:4 98:15
**arm**
90:5,9,12 92:7,8,9
**arms**
37:7
**Arondol**
68:2,14
**arrival**
72:6 74:20 76:7,21
77:20 78:5,11 79:13
89:19
**arrived**
73:8,14 80:11 81:11
92:20 93:23
**ASHCROFT**
2:6
**asked**
23:23 43:19 44:6
47:2 78:3,24 91:10
91:25 96:18 98:22
100:25
**asking**
5:15,24 62:12 72:24
74:10 75:2,18

**assault**
33:13 97:13 106:10
**assaulted**
68:13
**assaulting**
87:13 105:22 106:16
106:20
**assess**
23:22
**assigned**
14:15,17,21,22 17:7
**assignment**
78:13
**assignments**
79:15
**assist**
23:25 24:24 26:2,12
29:25 35:2 55:6
**assistance**
24:14,20 82:20
**assume**
6:17
**assuming**
13:24
**attached**
16:8
**attack**
8:16 53:20
**attacked**
62:19
**attacking**
45:22
**attaining**
14:12
**attempt**
47:17 51:19
**attempted**
54:13 62:17
**attempts**
85:9
**attend**
7:5
**attendant**
7:23 8:2,19,24 9:3,5
9:9,12,17,20,24
10:11,12,12,13

11:15,17 12:7,13,18
15:13 16:2 18:12
30:13 66:4 72:12
74:25 83:10 96:9,14
105:21 108:4
109:24
**attendants**
9:23,25 26:23 27:5
27:11,24 33:22,25
34:5 46:5 83:2,15
**attendant's**
12:24 53:3 54:7
**attention**
31:4 39:8 61:23
62:23,25 70:2 72:4
101:14
**attorney**
43:21 99:12
**Attorneys**
2:6,11
**August**
1:15 113:19
**Authority**
1:8,8,9 2:10 5:9 40:8
46:22 56:18 61:18
61:21 63:2,13 88:10
90:4 93:15 100:13
100:16 110:3
**Authority's**
39:24
**authorized**
3:6
**available**
78:17 79:19
**aware**
20:14 27:5,20 28:20
33:15,22 66:4 87:2
87:11 94:23
**A/k/a**
1:9,10
**A320**
11:6
**A321**
11:7,9,10

_____
**B**
_____

**B**
112:8
**back**
5:17 9:9 10:22 16:5
18:18 19:19,20 20:8
20:17,19,23 21:14
21:24 22:4,21 23:2
23:10,14,16 24:19
25:9 26:2,4,24 28:2
28:5,11 33:9,16,21
34:9 35:2,6,11,13
35:14,22 36:8,10
38:19 44:18 46:21
56:4,14 59:10,12
63:6,15 64:8 74:12
77:10,12,14 80:4,25
81:3 82:7,8,14 84:7
87:3,12,14,25 88:5
88:25 89:13,16,20
93:6 95:7 100:3
101:22 105:4
108:18,18 109:10
**background**
7:2
**based**
80:23 83:6,19 86:16
87:9 93:20 97:22
104:19 105:19
106:6 108:10
109:11
**Bates**
31:7 41:6 43:17 57:5
62:6 67:3 91:21
**baton**
49:25
**bear**
64:4 65:19
**bearing**
107:20 109:25
**began**
79:25
**beginning**
102:11
**begins**
41:24
**behavior**


MAGNA
LEGAL SERVICES

38:8
**believe**
9:16 14:11 18:5,25
21:2 22:6 24:11,25
25:17,23 26:7,16
33:5,12,23 46:8
48:11 56:21 59:9
61:8 67:5 80:7
82:14 99:17,19
**believed**
19:3,10
**belt**
21:14,23
**benefit**
7:2
**Bengston**
65:25 66:8,12,12
67:8 70:3
**Bengston's**
66:17 67:2
**best**
50:22 79:3 91:3
**better**
71:21
**Beyond**
97:8
**big**
37:22 94:8 96:4
**bit**
94:12
**blank**
58:19
**blankets**
30:8 32:10
**blazer**
16:6,7,8
**bleeding**
42:5 101:9
**blocking**
105:2
**blood**
113:15
**board**
9:25 10:4,7 15:15
18:21 23:24 25:21
26:19 28:10,17

44:23 45:4 46:12
51:3,7,13 54:24
56:15 63:4 68:19
69:6 73:16 76:13
90:19 93:24 105:15
**boarded**
46:18 89:6
**body**
22:7 23:3,15,18
36:16 48:6
**Boston**
2:7
**bottom**
31:4,20 57:15 58:14
101:14
**break**
32:21 51:16
**bridge**
78:14 79:16
**brief**
102:10
**briefly**
65:18 96:8
**bring**
59:11 70:2 100:6
101:13
**Brooklyn**
4:12 14:18,19,23,24
**brought**
23:9 108:18
**BUGIADA**
1:10
**button**
29:10,14,17

--- C ---

**C**
2:2 4:2 19:2,17 20:15
20:17,19 80:22,25
81:3 111:2 113:2,2
**cabin**
45:6,13,17 50:13
88:2,6 89:2,12
105:2,6
**call**
8:24,25,25 69:5

71:15 72:6,18 74:18
74:20,22 75:8,9,14
76:7,11,11,12,16,16
76:21 77:20 78:5,11
79:13 82:19
**called**
4:2 8:23 17:13 66:18
77:10,13 94:7 96:9
**calls**
76:14
**calm**
34:21 35:20 39:15,19
43:11,11 47:19
62:18 85:9 86:8,23
102:3,4
**Calvin**
1:20 4:8,19 111:15
**Camrhein@ashcro...**
2:8
**capable**
38:16
**capacity**
7:21 15:2 65:7
**captain**
12:19,21 13:11 25:20
26:18 27:3 28:9,20
29:14 33:20 34:4,6
70:7,14 71:12 72:13
72:25 73:2 74:18,25
75:3 76:12
**captains**
71:5
**captain's**
33:17 72:16
**career**
64:13
**carpet**
48:3 87:24 89:14
**carry**
9:4,6 96:11
**case**
1:6 71:11
**Center**
2:11
**certain**
8:15 9:13 42:15

97:10
**certification**
3:5
**certify**
111:4,8 113:8,13
**chain**
75:24
**chance**
32:5
**chaotic**
49:10
**charge**
13:11
**Cheryl**
2:13 5:2,7 90:24
**chest**
85:24 94:7 96:5
**chill**
46:8
**Chris**
4:14
**CHRISTOPHER**
2:8
**circumstances**
41:16
**City**
13:20
**Civil**
1:22
**clarity**
84:4
**class**
10:5
**classes**
64:22
**clean**
70:11 79:9
**clenched**
37:3
**closed**
29:6 48:10
**cockpit**
28:14 29:6,11 53:20
68:18 69:2,5,23
70:22 76:17
**cognizant**



101:4
**college**
7:4,6,9
**combative**
15:9 34:14,16 53:19
89:23 93:2 95:18
100:19 109:15
**come**
23:25 26:8 30:5 39:9
42:2 65:5 69:24
71:13 88:12 89:4
102:20
**coming**
24:19 49:12 54:24
81:13 95:15
**commits**
13:4
**communicate**
86:12 87:6
**communicated**
33:24
**communication**
34:3 70:7 71:3 72:24
75:3 78:15 79:17
**complete**
6:5 78:8
**completed**
59:4
**completely**
6:23
**concerns**
50:14
**concluded**
110:13
**conditions**
8:16
**conduct**
99:13 104:19
**confer**
13:9
**configuration**
11:4
**confined**
50:12
**confused**
84:21 85:15 86:5

87:9,17 95:2,16
101:5,8 109:13
**Congratulations**
13:24
**connection**
30:12
**consisting**
58:18
**contact**
29:10 70:14 102:20
**contacting**
68:18 70:21
**contained**
9:6 31:6 58:20 60:6
106:7
**continued**
108:22,24
**continues**
41:9
**control**
50:23
**conversations**
60:2
**convey**
19:7
**convulsing**
23:18 82:3 108:17,23
**cop**
46:23,24 47:14,17,19
47:21,25 48:2,7,9
48:12,14,18,18,21
48:23 49:2 64:10
74:10 90:16,17
92:14
**copy**
3:8,9 56:22
**corner**
38:6
**correct**
14:5 21:25 22:2
29:22,23 31:20
38:21 44:15,18,19
44:23,25 45:6,8,19
45:20 51:14,15
52:16,17 54:16
64:14,15 65:3 68:11

68:20,24 69:3 72:5
73:8 74:19 76:6
79:23,24 80:6,12,21
81:9,10,15 82:9,17
82:21 83:4,25 84:2
84:12,15 85:11,12
85:25 86:2 87:2,23
88:4,23 89:2,18
90:2,7 91:24 92:17
92:18,19 93:4,8,13
93:18 96:6 97:15,24
98:10 99:22 100:5
101:6,16 103:10
104:3,10,16,20,23
105:8,9,17,25
106:11,13,16 107:2
107:5,7 108:3,6,12
108:13,14,21,25
109:5,6 111:9
**CORRECTION**
114:3
**correctly**
19:2 78:18 79:5,7,20
101:11 102:8
**counsel**
3:4,9 4:24 63:21
91:20 94:5 98:23
102:12
**counsel's**
102:13
**counting**
73:20
**COUNTY**
113:4
**course**
83:3 109:4
**courses**
104:9
**court**
1:2 3:7 4:6,9 6:4,10
**CPR**
8:14
**crew**
17:7 51:13 55:17,24
60:3
**currently**

7:13
**Curt**
65:25 66:12
**customer**
9:14 12:11,23 13:4
20:20 26:25 28:12
39:7 47:3 50:22
52:23 53:4 68:12
73:3 95:7
**customers**
19:6 33:12 51:6

---

**D**

**D**
3:2 111:2 112:2
**date**
1:15 16:22 17:13
40:14,20
**day**
9:4 59:21,22 99:14
111:19 113:19
**days**
3:9 84:20
**deal**
70:6
**dealing**
9:14 12:10
**Deceased**
1:4
**decedent's**
5:12
**decision**
33:15,15,18,20,22
34:6
**decompressions**
8:8
**defend**
50:2 104:2
**defendants**
1:13 2:11 5:8 91:20
94:5 98:24
**defense**
102:13
**defined**
53:9 54:6
**defines**



53:3
**definitely**
69:16 74:5,13 77:8
84:22 85:15 86:5
87:9,18 101:7,7,9
**degrees**
7:8 64:23
**delayed**
17:4
**demo**
20:10,11,12
**depart**
16:11,15
**department**
1:9,9 2:10 64:11,21
88:10 110:3
**depends**
12:14
**deplane**
61:4,11,14
**deployed**
48:21,23 49:8 54:15
54:19 93:5
**deposed**
5:19
**deposition**
3:5,5,8 4:19 5:24
66:17 67:2 79:9
84:14 94:4
**describe**
8:12 9:13,18 10:24
11:3,15 16:4 23:3
24:12 34:16 36:15
37:19 46:17 53:24
**described**
97:18
**description**
58:9 59:3 112:9
**detailed**
58:9 59:3
**detective**
14:8,10,13,20,22,24
15:3 64:11
**detrimental**
13:6
**DF**

65:17
**different**
8:8 9:22 26:22 53:5,8
68:17 76:14 96:19
96:24 97:4 98:3,4
106:6
**differing**
97:22
**difficulty**
22:20
**direct**
31:4 41:5 43:16 72:3
**directed**
13:12
**directly**
20:25 68:8 69:2,23
88:25 97:2 102:15
102:17,18
**discrepancy**
75:22
**discussion**
40:5
**discussions**
63:13
**disoriented**
34:20 84:13,22 85:15
86:5 87:8,18 89:23
92:24 95:2,17
100:19 101:8 102:2
109:13
**distinction**
10:10
**District**
1:2,2 5:14
**doctors**
83:13,16
**document**
31:3,7,24 57:4,8
58:14 59:2,11,12,19
62:7,11,14 65:19
66:23,25 67:7,10,18
67:20 76:5 78:4
91:23 99:20 100:7,8
100:12,24
**documents**
90:25 91:2 112:12

**doing**
20:2,6,10 22:24 23:4
23:5,15 29:25 34:11
34:17 35:24 38:16
46:5 86:25 87:4
101:24
**door**
29:6
**doors**
46:21 57:19
**drafted**
67:18
**drafter**
67:17
**dude**
37:23 44:10 94:8
96:4 101:17
**duly**
4:3 111:5 113:10
**DURAN**
1:12
**duties**
8:18 9:18 11:14,16
11:20 12:6,25 15:24
30:12 96:13 107:16
107:20 109:22,25

---
**E**
---

**E**
2:2,2 3:2,2 4:2 30:11
31:22 59:14 60:4,7
111:2 112:2,8 113:2
113:2
**earlier**
67:24 68:2 82:18
84:13 85:19 94:4,18
98:21
**earn**
64:23
**East**
4:11
**education**
7:3
**educational**
7:2
**effect**

3:7,8
**efforts**
39:19
**eight**
57:17,23
**eighth**
91:22
**either**
20:10 25:2 55:23
**electronically**
2:4
**elevated**
32:11
**else's**
75:23
**emergencies**
8:11 83:12
**emergency**
8:5 9:19 29:9,13,17
69:2,6,15 70:4,13
70:15 71:8,10,11,16
72:18 73:13 75:9
76:17 80:3,8 82:21
83:16 89:21 90:18
95:14 105:24 106:8
**employed**
7:13,17,22
**employee**
107:22 108:4
**employment**
64:9
**EMS**
62:20,22,24
**encapsulation**
99:23
**ended**
20:11
**enforcement**
13:15 49:19 105:20
**engaged**
39:6
**English**
86:9,11,20
**entire**
109:12
**equipment**



55:22 56:6 60:11,12 60:16,20,24
**equipped** 12:3
**ERRATA** 114:2
**erratic** 38:15
**escalate** 97:11 98:4
**escalated** 105:23 106:9
**ESQ** 1:3 2:8,13
**estate** 1:4 4:21
**estimation** 77:7 93:20
**evacuations** 8:6 71:11
**event** 58:10 68:18 73:4 74:23 84:18 109:10
**events** 30:19 72:2 75:24 77:11 86:17 98:8 109:12
**eventually** 88:16 89:11
**everybody** 34:22 35:10 38:17 75:23
**Evgeniy** 1:4 4:21
**exact** 16:17 40:13 88:9
**exactly** 74:2
**examination** 1:19 5:4 63:23 103:6 107:10 110:12 112:3 113:9,11
**examined** 4:5
**example** 9:24 10:11

**excuse** 84:19 88:7 89:20
**exhibit** 66:16 67:2,5 91:5 100:8,14,24
**expand** 77:17
**experience** 7:9 13:16,18 15:4,8 49:19 65:2 83:7,9 83:20 105:20
**eyes** 20:22

_____
**F**

**F** 3:2 113:2
**face** 101:3
**facility** 8:4
**facing** 36:9,14 88:2,2,6,6,24 89:15
**fact** 6:16 19:16 37:10 52:19 99:8 100:2 104:17
**facts** 58:20
**fair** 73:22 81:5,16 83:14 84:9 85:13
**fairly** 17:11
**faith** 83:17
**fall** 96:20
**FAM** 9:2 53:2,9 54:7 96:9 96:20 97:2,23 98:15 106:7
**familiar** 10:15 53:7
**familiarity**

**67:24**
**far** 8:6
**father** 5:12
**fear** 38:21 104:18
**Federal** 1:22
**feel** 38:2,7 94:15,19 95:18,20 96:2 103:20,25 104:6,14
**feet** 22:16 103:9
**females** 24:16
**field** 83:21
**Fifty-seven** 7:12
**figured** 102:6
**filed** 5:13
**filing** 3:4
**fine** 91:6
**fire** 8:7
**FIRM** 2:6
**first** 4:3 8:14 10:5 17:15 18:9 19:22 25:8,25 28:16 29:15,18 46:18,24 59:11 63:25 67:21,22 72:4 73:16 77:4 88:10 89:3,6 93:10,22 111:5
**fist** 48:10
**fists** 36:24 37:3

**fit** 53:22,23
**five** 37:15 43:24 44:4,21 51:2 52:20 72:7,19 74:4,6,13,13,15,21 75:16 76:8,21,24 77:3,5,8,20 78:5,12 79:14
**fix** 31:13
**flat** 21:13
**flight** 7:23,25 8:19,21,24 9:3,5,9,12,17,20,23 9:24,25 10:11,12,12 10:13 11:14,16 12:7 12:12,17,24 13:6,12 15:12,25 16:10,15 16:22 17:3,7,14,23 18:4,9,11,17,19,21 26:22 27:4,11,24 30:13 33:21,21,25 34:5 46:5 51:3,7,8 51:10,12 53:3 54:7 60:3 65:22 66:3,5,8 66:13 68:19 69:7 71:22 72:12 74:19 74:25 75:10 81:22 83:2,9,15 96:9,14 99:14 104:13 105:21 108:3 109:24
**flights** 65:16
**Floor** 2:7,12
**Florida** 8:5
**Fluory** 67:21
**foam** 108:23
**foaming** 20:21 21:10 23:6



35:17 80:14 81:13
81:25 85:20 86:6
95:19 108:16
109:19
**follow**
11:23
**followed**
92:10
**following**
70:18 100:23
**follows**
4:5
**follow-up**
63:20 76:4 103:5
107:12
**force**
3:8 13:25 14:3 15:19
37:19
**forcefulness**
44:8
**foregoing**
111:8
**forgot**
9:2
**form**
3:11 56:19 70:17
76:2 84:25
**forth**
113:10
**forward**
19:24,24
**four**
8:3 24:11 46:2 53:16
53:19 97:7,9,18,22
**four-minute**
46:4,15
**Frank**
17:10,14,25 67:22
75:7 77:9,13 82:14
**Frank's**
17:17
**Freilich**
1:23 113:6,23
**front**
27:21 35:5 36:9,14
45:16 55:7,9,13,15

55:20 56:12 79:23
80:24 81:3 88:2,25
93:7
**full**
51:8,9,10,12
**fully**
6:3
**further**
3:11 93:10 110:9
111:8 113:13
**F1**
65:11 67:22 68:13
78:15 79:17,23
**F2**
67:24 82:13,14
**F3**
67:25 82:13
**F4**
68:3,14

----

**G**

**galley**
19:24 21:14,24 22:4
22:22 23:2,10,17
25:9 28:2,5 34:14
34:23 35:2,15,17,22
36:2,8,14 39:9
42:21,23 45:17 46:9
56:4,14 57:17 61:7
63:6,15 73:4,12
79:23 82:7 88:3,6
89:13,16,20 93:6
95:7 100:3 108:19
**gate**
18:18 20:9 33:7,10
33:16,21 34:7,9
57:18 72:6,19 74:12
74:20 75:11,16 76:7
76:12,21 77:11,12
77:14,20 78:5,12,13
78:20,23 79:14,15
87:3,12,14
**gates**
46:21
**gather**
75:21

**gauge**
44:7
**gear**
25:3
**general**
97:21
**generally**
70:19
**general's**
39:25 40:8 43:21
99:12
**gentleman**
94:25
**gestures**
6:11
**give**
6:2,25 40:20 57:7
61:14,17 73:19
84:20
**given**
43:6 72:2 82:20
95:13,18 111:10
113:12
**giving**
79:2
**gloves**
25:3 75:8
**go**
8:14 55:11 64:17
69:23 77:14 97:25
100:22
**going**
5:15,22,24 6:17
12:18 13:12 23:22
27:3,20 28:15,24
30:16,19 31:3 39:16
40:22 45:5,13 47:2
52:2 56:22 57:3
59:10,12 64:7,8
65:18 66:15,18
79:10 87:14 91:14
100:6,7,22 101:4,13
105:5
**good**
5:6 15:19,22 56:9
**grabbed**

55:3,9
**great**
67:23 95:11
**Greenwich**
2:12
**GRIGORY**
1:4
**ground**
83:24
**group**
93:24
**growling**
35:18
**grunt**
42:7
**guess**
16:18 22:10,18 43:24
45:25 71:4
**guessing**
74:8
**guidelines**
5:23

----

**H**

**H**
112:8
**hand**
6:10 113:19
**handle**
12:3 83:18
**handling**
83:6
**handwriting**
59:4
**handwritten**
67:11
**handwrote**
67:19
**happened**
25:5 26:3 63:15
75:13 99:8
**happening**
56:13 68:19 69:6
80:9
**happens**
26:24 73:21


MAGNA
LEGAL SERVICES

**happy**
6:15 91:2
**hard**
37:23 44:15 94:9
101:20
**head**
6:11 20:23 30:8
32:11,11,17
**hear**
69:18,20 85:3 86:15
99:10
**heard**
35:6 66:2 80:2
**hearing**
86:19
**heart**
8:16
**height**
22:13
**held**
14:7 40:5
**help**
39:5 82:20
**helpful**
31:16
**helping**
55:6
**helps**
30:17
**hereinbefore**
111:11 113:10
**hereunto**
113:18
**high**
52:23
**highest**
7:3 14:6 53:21
**Hindy**
1:23 113:6,23
**history**
64:9
**hit**
37:16 43:7,12,22
44:14,18 55:4 57:17
90:8,12 92:6 96:4
101:20,22 102:4

**hitting**
34:22 38:17 44:4,21
50:25 57:16 106:22
106:23,24 107:3
**hold**
11:25 14:9 31:13
**honest**
47:13
**honorably**
64:12
**hopefully**
107:13
**hours**
58:10
**house**
59:17
**housing**
90:25
**hurting**
45:18 54:10

---
**I**

**idea**
72:25 73:3 75:4
**identification**
30:21 40:24 52:4
57:6 59:13 61:16
62:4
**identified**
9:20
**immediately**
92:22
**imperative**
95:20
**important**
12:8
**incident**
5:17 15:13 40:2,9,16
41:16 53:22,24
56:19 58:9 59:3,16
59:18 76:13 97:20
**incidents**
97:10 98:3,13
**includes**
8:5
**inconsistency**

71:23
**indicate**
41:9 57:15 74:23
**indicated**
41:17 43:2 44:13
58:8
**indicates**
42:22 62:7,22
**individual**
50:3,5 65:24 97:17
98:8 105:13
**individuals**
15:5,8 24:10,13
29:21 37:7 65:4
**inform**
34:4
**information**
12:19 13:10 19:8
60:6 78:16 79:18
112:12
**informed**
89:18
**Ingleton**
17:10,23 22:17 24:17
67:25
**initial**
72:6,17 74:18,20,22
75:8,14 76:7,10,16
76:20 77:19 78:4,11
79:13
**Initially**
14:17
**initiated**
29:14 69:14
**inside**
49:12 80:17
**inspector**
39:25 40:8
**instruct**
82:25 83:18
**instructed**
82:22
**interaction**
93:10,14
**intercom**
29:2,5,8 69:22 70:19

71:4
**interested**
113:16
**interfere**
12:24
**interjected**
92:15
**Internal**
45:10
**interview**
40:12,23 42:22 44:14
45:11 84:17 90:3,16
92:22 93:19 99:20
100:14 105:3 109:9
**interviewed**
39:24 40:7,19
**introduce**
65:18 66:15 91:5
**introduced**
91:19
**investigation**
99:11
**investigator**
43:20
**investigators**
45:10 51:21
**involve**
95:23
**involved**
106:10
**involving**
12:11
**iPad**
9:6 96:16 98:2
**irate**
62:18
**Irving**
41:14 100:25
**isolated**
95:21
**issue**
18:21 19:22 20:5,14
25:21 26:19 27:6,12
28:10,17,20 29:15
**issued**
16:6


**MAGNA**
LEGAL SERVICES

**item**
96:15

---
**J**
---

**Jamaica**
16:12,16
**Jersey**
1:8,9 5:10
**jet**
78:13 79:15
**JetBlue**
7:16,18,19,22 8:2,4
8:20 9:23 10:8
11:15 12:7 13:14
14:4 15:25 16:6,7
30:14 59:24 64:14
64:22 66:4 83:10
96:13 105:21
107:22 108:4,5
109:25
**JFK**
16:11,15
**joined**
14:4
**joining**
13:14
**JONATHAN**
1:11,11
**JOSEPH**
1:10
**JR**
2:8
**Judge**
3:7

---
**K**
---

**Kareem**
17:12,15 18:15 46:8
55:3,7 68:2
**Kareem's**
17:20 18:6 31:19
**keep**
32:11 39:21 95:21
**kept**
32:17 102:2
**Kevin**

17:10,14,23,24 20:16
21:12,21 22:7,17
24:17 26:24 27:20
28:11 55:2,8,8
65:15,17 67:25 82:6
**Kevin's**
22:19
**kind**
12:14 64:8
**Kingston**
16:11
**knew**
44:22 45:2 98:25
**know**
6:15 9:3 12:18 17:17
17:20 25:14 27:10
27:14,23 28:14,25
29:13 30:17,22
31:11 32:4,25 33:8
34:10 36:4 38:15
40:25 46:7 47:9
53:2 55:8 56:24
57:10 59:14 60:11
60:15,23 63:8,9,11
64:9,12 65:21,24
66:20 67:23 69:10
69:12 70:11,24 71:2
71:15 72:23 73:23
74:7 75:5,19 76:10
76:12 77:6 84:5
88:19,20,21 91:15
97:9,10 98:12,22
99:4,5,16 100:8,17
102:2,10 104:2
105:6,11
**knowledge**
80:23
**known**
30:11

---
**L**
---

**L**
3:2,2 4:2 111:2
**ladies**
35:21 42:23
**lady**

35:25 38:5 46:9
**Lagoda**
1:4 4:21 80:13 81:6
81:11 82:22 83:3,23
84:5,8,21 85:9,14
85:19,23 86:4,9,17
86:21 87:6,8,17
88:24 90:4 93:11,16
94:6 98:25 99:8,22
101:3 108:16 109:8
109:11
**laid**
23:13,14,16 82:8,23
**language**
98:9
**lasted**
42:3
**lavatories**
87:25 89:15
**law**
2:6,10 13:15 49:18
105:19
**Lawanda**
41:14 100:25
**lawsuit**
5:13
**lay**
21:13 23:10
**lead**
9:24 10:4,8
**Leandro**
67:23 75:7 82:14
**leaning**
80:16 81:7
**learn**
8:8 35:7 63:15 99:7
**learning**
8:15
**leave**
54:21
**left**
54:18 55:11 56:4
81:7 93:6 100:3
**left-hand**
67:10
**legs**

22:6
**Leonard**
17:18
**level**
7:3 52:23 53:13,15
53:21,22,23,25 54:6
97:17 98:10,15
106:9
**levels**
53:4,5,8 96:19,24
97:4,7,9,18,22 98:4
98:5,14 106:6
**lifted**
21:14 22:6,7 77:2
82:6
**lifting**
22:25
**limited**
50:19
**line**
69:2,15 70:4 71:8,10
71:16,17 72:4
100:15 102:11
112:15
**list**
67:14
**listed**
62:9 67:22
**listen**
100:17
**little**
94:12 100:18
**located**
80:18
**long**
7:17 13:22 14:9 25:7
45:22 75:4
**longer**
106:8
**look**
65:14
**looked**
59:11
**looking**
53:10
**lost**



35:23
**lot**
54:9 71:23
**lying**
83:24

**M**

**MA**
2:7
**mace**
48:21,24 49:3,7,24
50:2 54:15,19
102:19
**machine**
60:24
**major**
75:22
**making**
27:2 35:18 88:17
89:12
**male**
93:23 95:14 100:18
**man**
73:13 80:4,8 81:21
89:22,22 90:18
92:23 108:19
**manner**
107:5
**manual**
8:21 9:3,5,9,13,18
53:3 54:7 96:9
**manuals**
107:23
**mark**
30:20 40:24 57:4
62:4
**marked**
52:3 59:13 61:15
66:16,25 67:4,7
100:14 112:15
**marriage**
113:15
**matter**
4:23 67:3 113:17
**ma'am**
6:7,12,20,24 7:10

8:22 9:7,21 10:9,14
10:23 13:17 14:2,14
16:3,23 18:10 21:20
22:23 23:8,11 40:14
44:5,12,16 47:12
48:16 52:25 54:4,20
56:16 57:21 58:6,22
60:5,9,22 61:2,5
63:3 103:18 104:24
106:17
**mean**
11:2 44:9 73:19
97:21 98:7,17
106:20
**meaning**
100:15 101:3
**means**
29:3
**medical**
8:6,7,11 9:19 23:24
24:14,23 25:8,21,25
26:19 27:5,11 28:9
28:17 29:19,25
34:25 35:8 38:19
42:20 55:22 56:5
60:11,16,20,24
61:23 62:23,25
64:18,24 69:6 70:15
71:6 72:18 73:12
76:13,17,25 77:11
78:21,22 80:3,8
81:21 82:20,21 83:6
83:11,15,20 89:21
90:18 95:13,22
97:12 105:24 106:8
109:2
**members**
17:7 51:13 55:17,24
**memory**
42:20 65:10,13 68:3
70:5 75:6,12 86:16
88:22
**mentality**
95:11
**mentioned**
84:13

**method**
70:8,12,13
**methods**
68:18 70:21
**MEZZACAPPA**
1:11
**MICHAEL**
1:10
**middle**
35:17 36:13 80:15
81:8
**mind**
84:23 87:19 95:3,17
102:6 105:7,12
109:14
**mine**
95:9
**mint**
10:4,5
**minute**
25:11
**minutes**
32:18 42:4 46:2
56:10 72:7,19 73:6
73:20,23,25 74:3,3
74:3,13,14,21 75:16
76:8,22,25 77:4,5,9
77:21 78:6,12 79:14
93:21,22 99:17,18
99:19
**misconduct**
9:15 12:11,15,23
38:9 52:23 53:4,25
**moment**
28:19 57:8 64:4,6
88:9
**month**
84:17,19 109:10
**mouth**
20:22 21:11 23:6
35:18 42:5 80:14
81:13,14 82:2 85:21
86:6 95:19 101:9
108:17,23 109:20
**move**
21:23 22:3 36:3,5

39:10 43:3 79:11
**moved**
27:25 64:13
**movement**
29:6
**moving**
22:21 23:2,3 37:6
108:24
**multiple**
105:12 106:24 107:3

**N**

**N**
2:2 3:2 4:2,2,2 111:2
112:2
**name**
4:7,21 5:7 16:8 17:12
17:17,20 31:5,21
58:23 62:10,13
65:23 66:2,5 67:13
68:8
**named**
65:24
**narcotics**
14:23
**naturally**
26:8 30:6
**necessarily**
10:2 74:23
**need**
77:10
**needed**
26:25 61:22
**never**
44:17 66:2
**new**
1:2,8,8,8,9,24 2:12
4:4,12 5:9,9,14
13:20 17:11 64:10
64:20 107:19 113:3
113:4,7
**Nicholas**
43:20 44:7 91:25
**night**
16:20 17:2 65:11,22
66:9,13 67:21



**NJ**
2:10
**nods**
6:11
**nonsense**
90:17 91:12 92:14
**normal**
70:12
**normally**
20:9 71:5
**North**
14:23
**Notary**
1:23 4:4 111:22
113:6
**notations**
67:11
**note**
4:15,24 77:22 78:7
**notes**
67:19
**notice**
101:2
**noticeably**
109:13
**notification**
26:18 28:13
**notifications**
25:19 27:2
**notified**
18:20 19:22 20:4
27:10 28:9,17 74:25
**notify**
70:9 71:5,12
**NRB**
1:7
**number**
17:24 18:2,5,7,11,13
18:16 19:23 27:22
27:22 28:6 55:3
62:22 67:11
**numerous**
104:8
**nurse**
42:16 52:21
**nurses**

41:10,18 42:8,13
47:10 82:18,22
83:11,13,16 86:15
86:20 104:18
**NY**
2:10,12
**NYPD**
14:7,10 15:21 49:19
64:17 65:8 103:22
104:7 108:12

---
**O**
---
**O**
3:2 111:2
**oath**
3:7
**objection**
13:3 21:6 26:14 27:7
27:13 28:21 32:13
32:20 33:11 34:2
36:22 37:2,5,8 38:3
38:10,13,23 39:2
42:14 43:15 44:24
45:7,21,24 46:6
47:18 48:15,20 49:5
49:23 50:6,9,15,18
51:4,22 52:18,24
53:14 54:3,8 56:2,8
57:25 60:13,17 61:9
61:25 63:16 70:16
72:8,14,22 74:9
75:17,25 76:9,23
77:23 78:8 81:23
84:24 85:4 89:24
92:25 95:4 104:4,11
104:15,21 105:16
106:3,12,18,21
107:6 109:16
**objections**
3:11
**obliged**
107:18
**observe**
15:14 20:18 29:24
34:24 46:12 88:9,12
90:11

**observed**
21:9 42:12 48:13
51:18 53:25 80:13
81:7,12 90:7
**occur**
12:2
**occurred**
5:17 40:2,16 47:16
51:21 55:18 56:20
71:22 84:18 109:10
**occurrence**
62:8,17
**office**
39:25 40:9 43:21
99:11,12
**officer**
1:10,10,10,11,11
13:21 14:13 15:4
18:9 29:15 49:21
50:4 51:20 52:8,14
52:14,22 54:14,15
60:10 65:8 67:22
73:16 88:11 89:3,9
89:12,19 90:5,8,12
91:11 92:2,6,20,23
93:11,23 100:16,16
102:23,25 103:22
107:19 108:12
**officers**
5:10 46:12,18 49:12
49:15 52:6 54:24
55:17,25 56:7,15
61:19,22 63:2,14
73:8 93:15,25 99:13
99:21 102:14 110:3
**officer's**
89:19
**off-the-record**
40:4
**oh**
26:5
**okay**
6:6,11,19 19:14
27:23 28:8 29:18
30:24 31:25 32:6,7
36:24 37:16 39:11

39:17 41:3 42:3,11
42:18 55:10 57:2,11
57:13 67:13,16 68:5
69:12 72:11 79:8,12
85:7,11 87:22 94:20
98:17 100:11 101:2
101:22
**once**
18:17 23:16 25:25
56:14 60:10
**ongoing**
82:21 95:13
**opened**
31:17 46:21 57:19
**operate**
8:9
**operations**
8:21
**operator**
78:14 79:16
**opinion**
86:7 87:21 109:17
**opportunity**
6:3 31:11
**order**
1:21 7:25 26:12 39:5
67:20
**ordered**
62:21,25
**original**
3:5,9
**Orlando**
8:4
**outcome**
113:16
**outset**
91:20
**outside**
45:13

---
**P**
---
**P**
2:2,2 3:2
**PA**
24:6 29:7 31:8 41:7
43:18 57:5 62:6


MAGNA
LEGAL SERVICES

67:3,4 68:22 69:14
69:16,20,24 70:12
71:16 82:19 91:22
99:20 100:23
101:15
**page**
31:4,6,21,23 41:5,9
41:22 43:17 45:11
52:9,10,11,12 57:12
57:16 58:14,24
91:22 100:12,23,24
112:3,9,12,15
**pages**
58:19
**PAGE/LINE**
114:3
**pain**
37:24 94:12
**pairing**
65:14
**PAPD**
1:10,10,10,10,11,11
**paperwork**
35:5
**PAPIA**
1:11
**paragraph**
68:7
**paramount**
12:6 95:9
**part**
8:18 12:16,20 19:25
33:14 41:16 44:13
45:10 71:20 81:20
95:5 96:12 103:23
**particular**
48:5 91:21 97:11,20
98:6,13
**parties**
2:4 3:4 113:14
**pass**
12:18 13:10
**passage**
71:25
**passed**
28:19 56:3 78:16

79:18
**passenger**
18:20,25 19:16 20:4
20:14,24 21:4,9,22
22:9 24:2,18 26:12
27:25 30:2 32:16,24
34:10 37:20 38:20
42:13 44:3 45:3
47:17 48:13 49:4
50:25 51:19 52:15
52:19 56:14 57:24
61:6,24 62:18,20
63:6 80:13 81:18
82:23 84:6,10
103:21 104:7,14
105:5 106:15
**passengers**
13:7 15:15 19:15
44:23 45:4 51:3,11
52:7 54:11 61:4,11
61:13 80:3 95:23
**passenger's**
32:11 38:8 104:19
**passing**
8:17
**PAUL**
1:11
**people**
8:17 33:13 35:6,12
36:21 47:5 65:5
104:13 105:12,22
105:23
**pepper**
55:4 90:13 93:5
102:19
**percent**
65:16
**perception**
75:22,23 109:12
**period**
32:25 46:4,15
**permitted**
61:14
**person**
19:11 84:10 96:12
105:22

**personally**
69:4 96:2
**personnel**
23:24 67:20 77:2
**person's**
105:11
**perspective**
65:20 95:15
**Physically**
106:22
**picture**
71:21
**piece**
60:20
**pillows**
30:8 32:10
**pilot**
18:8 65:22 66:8,13
67:17 75:15
**pilots**
69:5 75:9
**pilot's**
66:5
**place**
30:19 40:12 48:5
62:8,16 89:14
111:11
**placed**
32:10
**placing**
30:7 98:13
**plaintiff**
2:6 4:22
**plaintiffs**
1:5 5:11
**plaintiff's**
4:15 63:21
**plane**
10:5,25 25:14,16
33:2,3,9,16 34:9
63:7 67:18 71:13
80:5 84:7 87:2,11
89:7 93:7,25 99:2
**planes**
10:19,22
**please**

4:6 6:15,25 17:9
18:23
**plus**
55:2
**point**
18:19 20:3 23:20,21
25:4,13,16,20 26:3
26:17 28:5,8 33:2,8
33:19 34:8,11,12
35:10 36:11,16 38:9
44:20 46:11 47:11
48:23 49:16 50:24
54:22 55:12,21 56:5
61:3,7 63:5 68:6
75:10 82:13 83:23
84:23 87:7,19 102:7
108:18,22 109:7
**police**
1:9,9 5:10 13:20
14:13 15:4 46:12
49:12,15,21 50:4
54:24 55:17,25 56:7
56:15 61:18,22 63:2
63:14 64:11,21 73:7
73:14 88:10 90:4
104:9 107:19
108:11 110:3
**Port**
1:8,8,9 2:10 5:9
39:24 40:8 46:22
56:18 61:18,21 63:2
63:13 88:10 90:4
93:15 100:13,16
110:2
**portion**
48:6
**pose**
50:10,14
**posed**
6:18 45:3 54:9
**poses**
105:13
**position**
17:22,25 18:3,6 22:4
23:12 36:11,16,20
81:11



**positionally**
87:22
**positioned**
56:12 89:14
**pounds**
22:11,11 103:13
**precaution**
62:21
**precinct**
14:15,18,19
**pregnant**
36:7 38:25
**prepare**
59:19,23
**prepared**
58:4,7 59:8,15 60:4,8
**preparing**
30:10 56:18
**present**
2:15 4:18
**pretty**
37:22,23 44:14 73:3
94:8,9 101:20
**prevent**
45:12,18
**prevented**
45:5
**preventing**
6:22 105:5
**previously**
51:20 52:5 68:16
85:7 103:8
**prior**
13:14 14:12 15:3,13
16:22 20:6 24:18
49:18 64:16 105:19
**probably**
16:19 22:19 28:13
53:15
**problem**
32:6
**procedure**
1:22 29:16 70:18
78:21 97:12
**procedures**
8:6,7 11:24 78:22

**proceed**
91:4
**produced**
100:12
**professional**
25:8 26:2 29:19
64:18,24
**professionals**
24:24 29:25 34:25
35:9 38:19 42:20
109:3
**program**
10:3
**protective**
25:3
**provide**
24:19
**provided**
60:15
**provoke**
48:13 52:15
**Public**
1:23 4:4 111:22
113:6
**pull**
40:22 91:2,7,14
**punch**
34:24 35:3 36:20
42:16 51:19 54:14
**punched**
35:8 41:10,18 42:8
47:7,10 52:20
**punches**
44:8 62:20
**punching**
35:6,12 42:13 45:23
47:4 105:12,22
**purpose**
79:8 81:17
**pursuant**
1:21
**pushed**
18:17
**pushing**
20:8
**put**

25:2 75:8 83:17
98:17
**P.M**
1:16 110:11

---
### Q

**question**
6:3,17,18 40:6 62:12
75:19 76:4,19 77:15
77:17,24 78:3,25
90:10 108:2 112:15
**questioned**
94:5 96:8
**questioning**
41:15 52:7 98:23
102:11,13 103:20
**questions**
5:16,25 6:2,14 60:19
63:19,21,22 98:20
103:3,5 107:12
110:7,9 112:15
**quick**
78:14,15 79:16,17
**quickly**
25:6
**Quite**
16:25

---
### R

**R**
2:2 3:2 111:2 113:2
**radio**
70:8
**ran**
35:13,14 36:12
**rank**
14:6,9,12
**rapid**
78:13 79:15
**read**
31:10,14 32:2,3
58:17 78:10,18 79:4
79:6,10,20 99:10
101:11 102:8
**reading**
32:8 41:21

**reads**
62:16
**ready**
57:9
**really**
42:6 49:9
**rear**
87:25
**reask**
40:6
**recall**
15:11,17 16:9,14
17:2,6 18:3,8,18,23
19:14 24:15,21 25:4
26:21 27:9,15 28:22
30:9,10 32:16 39:23
40:7,11 44:3 46:7
46:10 47:8 55:19
56:17 57:22 59:7,20
60:18 61:10,12 62:2
62:24 63:8 65:23
66:7,10 69:11 73:9
78:13 79:15 82:16
84:16 85:18 86:18
86:19 90:15,21,23
91:10,13 94:3,14,17
96:22 97:3 98:11
99:2,5 100:20
**receive**
7:25
**received**
7:8 8:11
**receiving**
62:19
**recognized**
26:5
**recollected**
75:4
**recollection**
30:18 32:9 42:12
72:17 74:5 86:16
**recommendation**
71:19 72:5
**record**
4:7,14,18,25 6:5 31:2
43:18 57:3 70:3


MAGNA
LEGAL SERVICES

84:3 91:18 113:11
**refer**
12:16 75:20 91:7
98:2,14
**referred**
84:5,6
**referring**
84:4 96:25 97:14,19
**refresh**
30:18 32:9 42:11
65:10,13 68:3 70:5
75:6,11
**refused**
62:23
**refusing**
62:25
**regard**
102:14
**regarding**
5:16 40:9 80:3
**regards**
27:3
**regular**
71:16
**related**
113:14
**relevant**
78:16 79:18
**remember**
16:17 17:5 19:2,18
20:16 21:7 27:8,17
28:3,4,23 30:7
40:13 42:17 47:12
49:6 61:20 63:17
74:11 88:15 95:6
96:7,18,23 97:16,24
**removed**
63:7,9 99:2,6
**repeat**
11:18 90:10
**rephrase**
6:16
**report**
30:11,17,21 59:14
60:4,7 61:17 62:5
66:18

**reporter**
4:6,9 6:5,10
**report-IME**
31:22
**represent**
66:11 67:6,16
**representation**
82:9
**represented**
4:23
**representing**
5:8 76:15
**request**
24:14 55:22 78:20
102:15,16
**requested**
56:6 60:10,12,21,25
76:25 82:20 102:14
112:12
**require**
77:12 78:22
**required**
8:20 12:12,16 13:8,9
49:22 50:5 59:23
96:15 107:18,21
108:5,8,11
**requirements**
98:8 107:17
**reserve**
17:12
**reserved**
3:12
**resolved**
95:22
**respect**
11:13,21 65:3 71:25
78:2 86:22
**respective**
3:4
**respond**
8:11 24:7
**responded**
24:10,13 29:21 35:2
61:19 63:14 73:7,12
75:7 82:12,19 88:11
89:3 90:8,12 92:3,8

93:23 99:13,21
100:17 101:21,25
109:3
**responding**
39:18 82:14 90:17
91:11 93:11
**response**
21:11 39:13 41:8,17
43:23 48:19 78:14
79:16 83:11 101:6
**responses**
6:9
**responsibilities**
8:19 9:13,19 11:14
11:21 15:25 20:3
30:13 96:13 107:17
107:21 109:23
110:2
**rest**
34:5
**restrain**
50:5 83:3
**result**
61:23 101:19
**retaliated**
44:17
**retire**
15:18,21
**retired**
13:25 64:13
**retiring**
14:3
**return**
33:16,20 34:6 72:18
76:11,11 77:10,12
78:20
**returned**
33:6 46:20 75:10,16
93:6
**returning**
33:9 34:9 78:22
**review**
5:22 57:8
**right**
21:15 28:24 31:2
48:3,25 67:14 68:23

70:10,22 71:17,18
73:15 74:8 78:4,10
84:23 87:19,20 89:7
91:21 92:15,16 95:3
95:17 97:5 100:4
102:6,24 103:9
104:22 106:25
108:20 109:14
110:4
**right-hand**
81:4
**RMA**
62:22
**robbery**
14:23
**ROBERT**
1:10
**roles**
26:22
**rolled**
20:23
**roughly**
99:18
**row**
19:2,16 21:16,18,23
48:3 80:9,10
**rows**
21:16
**rules**
1:22 5:23 107:17,23
108:5,9,10 109:23
110:2
**RULINGS**
112:15
**run**
83:2 109:4
**runs**
10:4
**runway**
25:18
**rushed**
93:25
**Russian**
86:10,13,14,17

———— **S** ————



**s**
2:2 3:2,2 4:2 98:14
  112:8
**safety**
11:16,21,24 12:6
  13:6 20:10,11,11
  45:3 50:14 95:9
  105:14
**sake**
70:11 84:4
**saw**
20:20 38:17 42:16
  89:11 92:2 108:15
  109:19
**saying**
21:7 23:7 36:7 38:24
  84:16 90:20,21
  92:10 94:14,17
  102:2
**says**
13:13 31:19,22 41:22
  58:18 62:21 68:11
  72:5 74:19 76:6
**scared**
36:3,4,7 43:3
**scene**
63:14 73:14 80:12
  88:11 92:20 109:3
**scheduled**
16:10,15
**schooling**
64:18,23 83:19
**SCIR**
66:18
**screaming**
35:12 36:6 38:21
  104:18
**screams**
80:2
**scree**
91:17
**screen**
30:20,23,25 31:13
  41:2,3 52:3 56:24
  66:21,22 91:16
  100:9,10

**scroll**
57:9,12 66:24
**sealing**
3:4
**seat**
20:15,19,21 21:10,13
  21:23 22:21,25 28:2
  77:3 80:15,17,19,21
  81:8 82:7 108:16
**seated**
19:15 20:24 22:4
**seating**
11:8
**seats**
11:5,7,9
**second**
67:13 68:6,25 99:21
**seconds**
25:11
**section**
10:4,6 27:18
**see**
30:24 35:3,15 36:24
  37:6 41:11,19,20
  42:9,10,24 43:3,8
  43:25 44:11 45:14
  47:22 52:8 56:11,25
  57:15,20 58:10,21
  62:10,13,15 65:14
  66:24 67:9,12 68:7
  68:15 72:9,10 74:17
  88:16,24 89:2,4
  98:15 100:11
**seeing**
28:4
**seen**
82:13
**seizing**
81:6
**seizure**
15:15 19:4,10,12,17
  26:6,7 30:3,5 34:11
  34:13,19,21 38:15
  39:16 42:2 47:3,20
  65:4 73:13 80:4,9
  80:14 83:2 85:10

86:23 87:7 89:22
  90:19 92:24 93:24
  95:2,14,16 100:18
  101:20 102:3,5
  108:19,24 109:4
**seizures**
15:5,9 65:6
**sentence**
41:23 78:9
**sergeant**
40:19 41:14 100:25
**series**
5:16
**serious**
38:8 81:21 105:14
**seriousness**
54:5
**service**
3:9
**set**
64:5 107:23 113:10
  113:19
**shaking**
23:19
**share**
30:19 52:2 66:19
**SHEET**
114:2
**shirt**
16:7,8
**short**
32:21 51:16
**shortly**
40:15
**show**
30:16 52:3 56:22
  62:3
**side**
11:6,8 32:17,24 64:5
  67:10,19 80:25 81:4
  82:23 83:24
**signature**
58:13
**signed**
3:6,7,8 58:16
**similarly**

86:21
**simple**
76:18 77:16,18 78:24
**simply**
75:21 78:3 79:4
**sir**
5:19 6:25 7:11,24
  12:10,23 13:4,14,22
  14:20 15:3,18 16:9
  19:5 20:13 21:19
  22:15 24:4 25:13
  30:10,23 31:9 32:8
  32:23 34:24 35:7
  37:11,17 38:2,18
  39:23 40:20 41:8,11
  41:19 42:9,19 43:6
  43:8,16,19,25 44:22
  45:9,14,19 47:22
  49:18 50:17 51:14
  52:6 53:17 54:12,22
  56:17 57:7,14,20
  58:4,11 59:5,19
  62:7 63:18 64:7,19
  64:25 65:9,19 66:11
  66:20 67:9,17 68:16
  69:25 71:19 72:3
  73:5 75:20 76:15
  77:15 78:2,19 79:22
  80:22 82:4,11 84:11
  85:5 88:7,21 91:9
  91:16,24 94:3,10,13
  95:12,13 96:7 97:21
  98:22 99:15,24
  100:9,10,11,21
  101:12 102:3,9,10
  103:2,4,12,19,24
  104:13,18,23 105:2
  105:8,10,19 106:2,6
  106:11,14,25 107:5
  107:13,16 109:6
  110:8
**sit**
20:20 97:5
**sitting**
18:25 80:20 81:18
  97:16,23



**situation**
12:3 26:23 29:17
71:8 81:22 83:19
95:21,22 105:24
**situations**
12:11 71:6 108:10
**six**
22:16 37:15 43:24
44:4,21 51:2 52:20
103:9
**sized**
37:22 94:8 96:4
**slacks**
16:7
**slightly**
34:20
**slumping**
80:14
**small**
31:14
**soon**
59:18
**sorry**
35:23 64:6 85:3 88:7
**sort**
101:19
**sound**
42:7
**sounds**
35:19
**Southern**
1:2 5:14
**space**
50:13,19
**speak**
55:16 86:14,20
**speaking**
86:17
**special**
10:3 14:24
**specific**
10:19,22 16:22 72:17
73:25 76:4 98:9
**specifically**
53:11 96:23 97:4
**specifics**

97:17,25
**specified**
111:11
**spot**
98:18
**spray**
54:15,19 55:4 90:13
92:16 93:5 102:19
102:19
**squad**
14:23,24
**SS**
113:4
**stamped**
31:7 41:6 43:18 57:5
62:6 67:3 91:22
**standing**
15:19,22 34:13 35:16
36:17 48:2,22,25
83:25 85:20 87:23
95:19 102:22,24
109:18
**stands**
8:25 9:2
**start**
33:13 41:23 64:7
**started**
33:9 47:4 57:16
74:24
**starting**
20:9 64:21
**starts**
68:9
**state**
1:24 2:7 4:4,6 105:7
105:11 109:14
113:3,7
**stated**
62:17
**statement**
30:11 31:6,10,18,19
31:23 32:4,9 42:22
43:7 56:18,19,23
57:14 58:3,8,17,17
58:24 59:8,24 72:21
79:6 105:4

**statements**
40:18 61:15,18 71:24
**STATES**
1:2
**stating**
100:20
**stationed**
28:7 79:22
**stayed**
73:3
**STIPULATED**
3:3,11
**stomach**
35:9
**stood**
42:4,5,6 45:16 47:4
109:8
**straight**
36:17
**Street**
2:7,12 4:12
**strike**
37:7,10,13 89:9 92:2
**striking**
37:23 39:7,11,21
107:4
**strong**
44:10,10 101:17
**struck**
37:20 57:22 61:24
85:23 90:4 94:6,8
96:3
**subcategory**
98:9
**Subscribed**
111:18
**suddenly**
62:19
**sued**
5:11
**suffered**
92:23 94:25
**sure**
4:17 11:19,23,24,25
26:9 44:9 46:22
90:11 95:8 101:17

**suspect**
50:21
**swallow**
26:9
**swing**
47:21,24 48:7,9,14
48:17 49:20 50:3
52:8,13,15,21 77:4
**swinging**
34:22 35:19 50:25
58:2
**Swinney**
1:20 4:8,20 5:6 51:18
52:4 57:5 61:16
62:4 64:2 68:13
78:15 79:17 91:8,19
111:15 112:10
**sworn**
3:6 4:3 111:5,18
113:10
**swung**
43:7 48:4
**symptoms**
8:15
**system**
24:6 29:7 68:23
69:14,17,21,24

---
**T**

**T**
3:2,2 111:2 112:8
113:2,2
**tactical**
104:9
**take**
6:5,10 16:18 22:10
22:18 25:15 43:23
45:25 47:24 64:22
71:3 73:19 84:20
**taken**
1:20 32:22 51:17
**takes**
49:20 50:3
**talking**
12:15 72:25
**tall**



MAGNA
LEGAL SERVICES

22:15,17 103:9
**Tarasov**
 1:3 2:15 4:22 5:12
**taxi**
 74:12 80:2
**taxiing**
 25:15,17 33:6 74:11
**teaching**
 83:20
**tech**
 64:5 65:20
**tell**
 17:9 18:23 19:11
   34:18 39:15 41:15
   41:21 47:6 51:20
**telling**
 85:9 87:6
**tells**
 12:21
**ten**
 32:18 57:17,23
**ten-minute**
 32:25
**terms**
 8:10 20:2 54:4,5 73:9
   73:11 90:24
**test**
 88:22
**testified**
 4:5 29:20 42:19 52:5
   54:14 67:18 68:2,17
   70:20 82:18 85:8,14
   86:4 87:16 90:2
   92:21 93:4,19 94:24
   103:8,19 104:17
   105:3 106:14,19
   108:15 109:8
**testify**
 70:8 74:2 111:5
**testifying**
 6:22 85:18 90:15
   94:3 96:22
**testimony**
 40:20 70:3 71:24
   82:10 87:10 88:8
   95:15 99:23 111:6

111:10 113:12
**thank**
 5:2,3 41:4 54:12
   63:18,25 107:9
   110:9
**thing**
 11:8 12:9 30:5 78:10
   98:6
**things**
 50:22 81:13 83:22
**think**
 17:11,12 25:5,6 33:6
   69:8 71:21,23 73:5
   87:23 88:7 91:5
   92:9 93:21 94:7
   95:10 96:8 99:19
**third**
 100:23
**Thirty**
 25:11
**thought**
 92:8
**threat**
 44:22 45:3 50:11
   53:13,22 54:10
   97:11 98:10,14
   105:14 106:9
**threatened**
 38:2 94:15,19 96:2
   103:20,25 104:6,14
**threatening**
 36:20
**threats**
 53:6,8 54:6 96:19,24
   97:5,23 98:4,6
   106:7
**three**
 11:5,8 24:11,19 46:2
   46:3,14 53:15,18
   77:25 93:22 99:18
   99:19
**three-page**
 31:3
**tie**
 16:7
**TIKHOPLAV**

1:4
**time**
 1:16 3:12 6:13 16:14
   16:18 17:4,16 19:21
   19:23 22:24 23:4,16
   25:14,16,20,23 26:3
   26:17,22 27:25 28:5
   28:8,18 32:22,23
   33:2,7,9,19 34:8,11
   34:12,20 35:4 36:11
   36:16 38:4,9 43:11
   44:20 46:11,22
   47:11 48:23 49:9,11
   49:16 50:24 51:17
   54:22,23 55:12,21
   56:3 57:18 58:8,9
   60:3,23 61:3,7,10
   62:8,16 63:5 64:3
   64:16,20 65:15,16
   65:17 68:9,12 71:25
   73:2,21 74:2,23,24
   75:23,24 76:25 77:2
   77:4 85:13 86:3
   87:13,17 88:21 90:5
   90:9 92:11 94:2
   102:4 107:15
   110:10 111:10
**times**
 16:24 37:13 43:22,24
   44:4,21 51:2 52:20
   57:18,23 61:24
   77:25 85:24 96:3
   106:25 107:4
**timing**
 71:22
**titled**
 62:5
**today**
 4:18 5:16,25 6:23
   64:2 67:24 68:2
   71:25 82:18 87:10
   92:21 94:24 95:11
   97:6,16,23 98:21
   103:17 108:15
   109:9 110:10
**today's**

5:24 84:14 94:4
**told**
 19:5 34:21 41:14
   43:10,11 45:9 47:3
   47:8,9,15,19 52:6
   68:12 92:23 100:15
**tongue**
 26:9
**top**
 62:10
**torso**
 37:18,21 48:8 85:24
   94:7 96:5 107:4
**total**
 11:7
**touch**
 24:22 26:11
**touched**
 99:16
**Trade**
 2:11
**trained**
 10:18,21 23:23
**training**
 7:24 8:3,4,10,13 83:7
   104:9 105:20
**transcript**
 40:23 41:6,13,22
   43:17 45:12 52:9
   70:11 79:10 100:13
   111:9,9
**treatment**
 81:21
**tremoring**
 82:2 108:17
**trial**
 1:20 3:12
**tried**
 81:11 86:8
**true**
 43:13 111:9 113:11
**trust**
 72:11,12,16,20 83:5
**truth**
 58:20 111:5
**truthful**



40:20 58:5 60:7
**truthfully**
 6:22
**try**
 50:21 86:12
**trying**
 21:12 23:21 34:18
   35:20 38:5 39:8,15
   45:12 46:8 49:10
   54:25 75:20,21
   77:16 86:22 87:5
   95:8
**turned**
 75:10
**turning**
 88:8 97:12
**Twenty**
 13:23
**two**
 7:4,5 27:2,4,11,24
   28:12 29:20 42:22
   46:10 68:17 70:21
   76:14 87:25 93:21
   99:18,18
**two-page**
 57:4 59:2 61:16
   66:25
**type**
 7:24 10:25 12:23
   13:5,18 25:3 60:12
**typed**
 31:21
**types**
 9:22
**typewritten**
 59:12,15
**Typically**
 66:3

_____
        **U**
**U**
 3:2
**ultimately**
 63:6
**unbuckle**
 21:22

**unbuckled**
 21:13 82:6
**understand**
 6:14 84:9 88:20 98:7
   107:25
**understanding**
 84:8
**understood**
 6:18 94:22 95:10
   97:15
**uniform**
 16:2,4
**uniformed**
 49:21 50:4
**UNITED**
 1:2
**unsigned**
 3:8
**upper**
 22:7
**use**
 29:17 49:24,25,25
   70:19 90:13

_____
        **V**
**V**
 1:3,6 4:2
**various**
 53:4
**verbal**
 6:9
**versus**
 9:24 70:12
**victims**
 14:25
**video**
 4:19
**VIDEOTAPED**
 1:19
**vigorously**
 108:24
**violence**
 105:25 106:10
**violent**
 15:10 68:13 97:13
   104:20 107:5

**Viorst**
 43:20 44:7 91:25
   92:5,13 101:18,21
   101:23
**VIRTUAL**
 1:19

_____
        **W**
**W**
 4:2
**waiting**
 24:23
**waived**
 3:5
**walking**
 80:24 81:2
**want**
 4:15 31:15,25 71:20
   72:3 91:4
**wanted**
 4:24
**wasn't**
 23:5 69:9 84:23
   87:19 95:3 101:18
   102:6,18
**wave**
 99:21
**way**
 23:3 24:22 26:12
   37:7 49:11 55:2
   87:3,11 88:17 89:12
   91:8,12 113:16
**weakened**
 101:19
**wear**
 16:2
**wearing**
 16:5
**weeks**
 8:3
**weigh**
 103:12,15
**weighed**
 22:9
**weight**
 103:15

**went**
 20:17,19 83:23 92:15
**we'll**
 12:20 30:20 40:23
   41:23 62:4 91:7
   107:13
**we're**
 12:3,15,16 13:9,12
   20:8 57:3 70:18
   73:20 74:11
**WHEREOF**
 113:18
**witness**
 3:6,9,10 4:3,8,11
   56:19 71:14 84:17
   93:9,14 99:25
   110:12 113:9,12,18
**women**
 24:19 26:4
**word**
 72:12 84:13
**words**
 106:15
**work**
 10:18,21 17:14,23,25
**worked**
 16:21 17:14 65:15
   83:10 103:22
**working**
 16:9 17:16 27:18
   49:19 104:7
**World**
 2:11
**wouldn't**
 39:10 69:24
**wrap**
 107:14
**written**
 61:17

_____
        **X**
**X**
 1:3,13 112:2,8

_____
        **Y**
**Y**



**4:2**
**yeah**
18:15 29:4 40:17
49:24 66:10,22 68:4
73:18 81:19 92:9,11
101:21
**year**
7:7
**years**
7:4,6,20 13:23 14:11
49:20 64:10,12
88:21 103:22 104:8
**yells**
80:2
**yes-or-no**
76:19
**York**
1:2,8,9,24 2:12 4:4
4:12 5:9,14 13:20
64:10,21 107:19
113:3,4,7

--- **0** ---

**02109**
2:7

--- **1** ---

**1**
3:9 10:11 17:24
27:22 31:5,21 41:9
57:16 58:14 65:17
112:10
**10**
42:3 49:17 73:6,23
73:24 74:3
**10:59**
16:19
**10007**
2:12
**103**
112:4
**107**
112:5
**1082**
57:5
**1083**

**57:5**
**11**
7:20 14:11 64:12
74:3
**11210**
4:12
**12**
5:17 15:14 16:10
17:3 58:4 65:11
66:14 84:18
**12:00**
1:16
**1216**
62:6
**1276**
31:8
**13**
40:12
**1362**
67:3
**1363**
67:4
**14**
90:3,16
**14-page**
91:23
**15**
49:17 73:24
**150**
2:12
**162**
11:7
**1787**
41:7 100:12
**1788**
100:23
**1791**
43:18 101:15
**1793**
91:22
**1794**
99:20
**185**
22:11

--- **2** ---

**2**
10:12 18:5 19:23
27:22 31:6,23 41:5
41:22 52:4 58:24,24
66:16 67:2,8 91:5,8
91:19 100:8,14,24
**2:07**
110:11
**20**
49:20 56:9 64:10
103:22 104:8
**200**
2:7 22:11 51:10,11
**2001**
7:7
**2012**
7:20
**2019**
5:18 9:10 10:22
15:14 16:5,10 17:3
40:12 58:4 65:12
66:14 84:18 90:3,16
103:16 105:4
109:11
**2023**
1:15 111:19 113:19
**21**
1:15 30:21 59:13
**21st**
113:19
**21-cv-6226**
1:7
**22**
40:24
**220**
11:9
**2200**
58:10
**24th**
2:12
**25**
56:9
**285**
103:13

--- **3** ---

**3**
10:12 18:2 45:11
53:22,23 57:5 61:16
**30**
3:9
**32**
84:20
**320**
10:16,25
**321**
10:16,25 21:19 80:23
**33**
19:2,2,17 20:15,17
20:19 21:16 80:9,10
80:22
**34**
48:3

--- **4** ---

**4**
2:11 10:13 18:7,11
18:13,16 28:6 52:9
52:11,12 55:3 62:4
112:10
**40th**
4:11

--- **5** ---

**5**
112:4
**5'10**
22:19
**5'9**
22:19

--- **6** ---

**6**
43:17 52:10
**6'1**
22:14
**6'2**
22:14
**63**
112:5
**659**
16:15 66:13


MAGNA
LEGAL SERVICES

**686-19**
31:22

**7**

**7th**
2:7
**70th**
14:18
**77**
14:23

**8**

**812**
4:11

**9**

**9**
74:3
**9:59**
16:19
**99**
65:16

