# EXHIBIT R

**ORIGINAL**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - -

ALEXEY V. TARASOV, ESQ.,

Administrator of the Estate

of EVGENIY LAGODA, Deceased,

and GRIGORY TIKHOPLAV,        Case #21-cv-6226 (NRB)

   Plaintiffs,

-against-

PORT AUTHORITY OF NEW YORK

AND NEW JERSEY, and PORT

AUTHORITY OF NEW YORK AND NEW

JERSEY POLICE DEPARTMENT a/k/a

PORT AUTHORITY POLICE DEPARTMENT

a/k/a PAPD, PAPD OFFICER MICHAEL

BUGIADA, PAPD OFFICER ROBERT JOSEPH,

PAPD OFFICER JONATHAN PAPIA, PAPD

OFFICER PAUL MEZZACAPPA, and PAPD

OFFICER JONATHAN DURAN,

   Defendants.

- - - - - - - - - - - - - - - - - - - - - - -

Virtual Deposition of

KURT BENGTSON

August 15, 2023

10:00 a.m. EST

Taken

Virtually via Zoom

Eileen J. Bell, CCR #833




PA LAW DEPARTMENT
572516

APPEARANCES:

On behalf of the Plaintiffs:

ASHCROFT LAW FIRM, by

CHRISTOPHER AMRHEIN, ESQ.

200 State Street, 7th Floor

Boston, MA  02109

617-573-9400

Camhein@ashcroftlawfirm.com

On behalf of the Defendants THE PORT
AUTHORITY OF NEW YORK, THE PORT AUTHORITY
OF NY & NJ LAW DEPARTMENT, by

CHERYL ALTERMAN, ESQ.

4 World Trade Center

150 Greenwich

24th Floor

New York, NY  10007

212-435-3517

ALSO PRESENT:

Matthew Malysa, ESQ.



TRANSCRIPT INDEX

APPEARANCES............................    2

APPEARANCES............................    2



Page 4

INDEX OF EXHIBITS...................... 3

EXAMINATION OF KURT BENGTSON

BY MS. ALTERMAN...................... 4

CROSS-EXAMINATION BY MR. AMRHEIN..... 87

REDIRECT EXAMINATION BY MS. ALTERMAN. 110

RECROSS-EXAMINATION BY MR. AMRHEIN... 113

REDIRECT BY MS.ALTERMAN.............. 115

RECROSS-EXAMINATION BY MR. AMRHEIN... 116

REPORTER'S CERTIFICATE............... 119

DEPOSITION EXHIBIT NO. 1.............20

DEPOSITION EXHIBIT NO. 2.............39



MAGNA
LEGAL SERVICES

Page 4

KURT BENGTSON, of lawful age, called for examination, as provided by the New York and New Jersey Rules of Civil Procedure, being by me first duly sworn, as hereinafter certified, deposed and said as follows:

EXAMINATION OF KURT BENGTSON BY MS. ALTERMAN:

Q. Morning, Mr. Bengtson, my name is Cheryl Alterman, and I'm representing the defendants in this case, the Port Authority of York and New Jersey, as well as the individually named police officers who are receiving action brought by administrators, Mr. Tarasov, and the decedent's father, Mr. Tikhoplar, in an action that's commenced here in New York in the Southern District of New York in Federal Court.

I'm going to be asking you a series of questions today regarding an incident that occurred onboard a flight back on April 12th, 2019.

Sir, have you ever been deposed before?



Page 5

A. Yes.

Q. What was the context of that deposition?

A. It was involving this case here. It was with post -- there was, I guess, an investigation internally. And it was providing details with that.

Q. Okay. Are you referring to the interviewing with the Port Authority's Inspector General's Office?

A. Yes.

Q. Okay. So this is a little bit of a proceeding. This is called a deposition. Your testimony here today is under oath. You took an oath to tell the truth.

And this testimony can be used at trial, as well. Do you understand this is sworn testimony that you're giving today?

A. Yes.

Q. Now, besides for that interview that you had with the Port Authority Inspector General's Office, have you ever been deposed for a civil lawsuit?

A. I have not, no.

Q. So I'm going to give you some



instructions before we begin just so that we are on the same page with respect to how this proceeding is going to happen today.

So with respect to the deposition, I'll be asking you questions about an incident, and you'll answer those questions.

If at any time you don't understand the question that I'm asking you, please let me know, and I'll be happy to rephrase the question; okay?

A. Yeah.

Q. If you do answer a question I'm going to assume that you understood the question as it was posed to you; okay?

A. Okay.

Q. I would also request that you give me an opportunity to finish my question before you answer the same because the court reporter can only take down one of us speaking at once.

A. Okay.

Q. Also, for the court reporter's sake she cannot take down any hand gestures or



Page 7

nods of the head; so I ask that all of the response be verbal; okay?

A. Okay.

Q. Is there anything that's preventing you from testifying truthfully and completely today?

A. No.  There is not.

Q. Sir, what is your current address?

A. 468 Fox Trail Drive, in Lake St. Louis, Missouri, 63367.

Q. Thank you.  And what is your age?

A. Forty-seven.

Q. And what is your highest level of education?

A. Bachelor's.

Q. Where did you obtain the Bachelor's Degree?

A. Purdue University.

Q. Do you recall the year?

A. 1999.

Q. And what was that a bachelor's in?

A. Bachelor of Science, Aviation Technology.

Q. Are you currently employed?

A. I am.


MAGNA
LEGAL SERVICES

Q. By whom?

A. Jet Blue Airways.

Q. How long have you been working for Jet Blue Airways?

A. About almost 17 years, 16 and a half years, plus.

Q. What is your current position with Jet Blue Airways?

A. I'm a New York based Airbus 320, 321 Captain.

Q. When you are referring to an Airbus 320, 328 can you tell us what you mean by that?

A. That's designated for that model aircraft. It's 320 and 321. It's the same model of aircraft. One's with a higher seating capacity than the other.

Q. How long have you held the position of Captain for Jet Blue Airways?

A. About ten years.

Q. Prior to that did you hold any other positions for Jet Blue Airways?

A. I was a first officer for Jet Blue Airways.

Q. How long were you a first officer?



A. About six years.

Q. Did you hold any other positions for Jet Blue Airways?

A. No.

Q. Please tell me your duties and responsibilities as a Captain for Jet Blue Airways.

A. As a Captain for Jet Blue Airways I am considered the pilot in command. So my job just is the general safety and operation of the aircraft; so I am what is considered the final authority for the operation of the aircraft.

Everything requires verification as far as all the safety of the pre-checks, the operation of the flight, the post flight, and then the managing of the crew onboard are in my control.

Q. You mentioned safety of the aircraft, if you could, sir, tell me about your responsibilities specifically with respect to the safety of the aircraft and the passengers onboard.

A. The safety starts pre-flight. That involves documentation. Making sure the


MAGNA
LEGAL SERVICES

crew has appropriate documentation, check the maintenance log books. We check the flight dispatch release. Make sure it complies with all the federal aviation regulations.

Then we're in charge of the safe operation of the aircraft. That involves everything from when we arrive to the aircraft, the pre-flight inspection, all the way to a post-flight inspection. Everything in between.

And then also I am in charge of the crew onboard and the passengers onboard. So the safe operation from our inflight crew members, making sure everyone is performing their duties safely.

And then overall responsibility for the safety of the passengers onboard when the aircraft is off the gate.

Q. Are you the ultimate authority on the aircraft once the flight, or once the aircraft is off the gate?

A. Yes. And that's a federal regulation.

Q. When you refer to the term "off the



gate", what do you mean by that?

A. When the aircraft is at the gate with the door open that's considered at the gate.  And once that main cabin door is complete and all of the doors, and service doors are closed and the bridge has been removed, the aircraft is considered "off the gate".

And at that time the responsibility of the flight transitions from a consortium of our ground team to being under my control.

Q. Now, in addition to the federal regulations, are you aware, are you required to abide by a flight operations manual?

A. Yes.  All our pilots are issued. We have to maintain current, and be able to access the information and pull it out. It's on a company-issued iPad.  And it updates regularly.

Q. What licenses do you hold as a captain?

A. Specifically for me I hold what's called Air Transport Pilot's License.



That's the designation once you reach a certain designation to operate as a captain.

And you have to get certified on each particular aircraft you get. It's called a type rated. I'm type rated in this particular case on the Airbus 320.

Q. When did you become typed rated for that airbus?

A. I became type rated, you initially get a second in command license when you are checked out and tested for your initial as a first officer.

But you're given type rating once you pass your pilot in command check ride. So when I updated to Captain on the 320, which would have been about four years ago.

Q. Prior to that did you hold any certifications or licenses?

A. Yeah. So the same certifications as far as airline transport pilot. And I was also certified as Captain of the Amber 190, which is an another fleet for Jet Blue.


MAGNA
LEGAL SERVICES

And then previously had certification for that on my previous airline. And then also I have a flight engineer rating on the Boeing 727.

Q. You mentioned a previous airline. Where did you work prior to Jet Blue?

A. Prior to Jet Blue I worked for, the company has gone through several names. When I was hired it was called Chautauqua Airlines.

It was based in Indianapolis and finished up. Now it's operating under the Republic Airways Flight name. For them I flew as a first officer and a captain as well.

And I finished up as a Embrair 170, which is a common type to the 190 that I flew for Jet Blue. I finished as a check airman. I was a line check airman, which is like an instructor pilot.

And I was also a simulator, evaluator for them as well.

Q. How long did you work for that prior airway?

A. Seven years.



MAGNA
LEGAL SERVICES

Q. And prior to that did you fly for any other companies?

A. I flew for a company called Ryan International Airlines. I don't believe they are in business any more. They may have just recently tried to come back as a flight engineer on the Boeing 727.

Q. How long have you held your pilots license in total?

A. My initial pilot's license I got in 1995.

Q. How many years in total do you have flying aircrafts?

A. Well, since '95 is when I started my training, so you can consider that to be the start of things, and their operating aircraft. Just single engine aircraft, just building my training and flight time.

And that's what I did at Purdue as well for both single and multi-engine.

Q. Now, taking you back to your duties as a captain for Jet Blue, how do those duties, if at all, vary from your prior position as a first officer?



A. The first officer, the designation is just to operate and support of the captain. So really the way the airlines function is you kind of have a, a pilot command is the final authority. And then the duties are also separated between pilot flying and pilot not flying.

Those separate into what things we do as far as the pre-flight goes, who sets up our flight navigation data. Who goes around and does the pre-flight safety inspection on the aircraft. The walk-around on the exterior of the aircraft.

And then who's going to be operating the flight controls inflight. And then who's going to be running primarily the radios and the checklist inflight. So the duties are split in multiple ways, but the goal is to share the flying time so everyone maintains currency.

And we develop together as pilots, because there is an opportunity for each pilot to fly and make decisions, but the



final authority always does rest with the captain.

Q. Now, are all the flight crew members onboard an aircraft required to abide by the flight operations manual that is issued by Jet Blue?

A. Pilots are. We have the operations manual, and the flight attendants have a, it's called a FAM, an F-A-M. I'm not sure what the middle initial is.

Maybe it's -- the flight attendant manual is maybe what it's called; but they operate with the FAM. And that's where they have their instructions.

Q. Understood. So they kept on the aircraft, in addition to the first officer, are required to abide by the flight operations manual, also known as the F-O-M?

A. Correct.

Q. And you testified that this flight operations manual is on an iPad that you have issued to you by Jet Blue Airways. And it constantly updates with any changes; is that correct?



A. Yes.

Q. Do you have access to that flight operations manual inflight?

A. Yes.

Q. And do you refer to it inflight as-needed?

A. Yes.

Q. What are some of the circumstances where you've had to refer to the operations manual inflight?

A. There is a lot of regulations that we have to comply with. And some of them only apply in certain situations. So there can be regulations involving some of our customers, which are rare.

Sometimes, like in this instance, medical disturbances. And then there is some, they are regulations that are not really applied that often. They may have to do with weather.

They may have to do with the operation of the aircraft. They may have to do with unusual atmospheric conditions. If you don't see them often, the goal is not to have everything memorized.



But instead to be able to navigate through the FOM effectively, and find those chapters and that information and apply it.

Q. Are the flight attendants also concerned with safety of the aircraft?

A. That's the primary.  Yep.  That is their primary job.

Q. Why is that?

A. That's their job.  I mean, that's what they're there to do.  They're there for the safety of the passengers onboard, number one.

They do provide service onboard, but their primary duty is to maintain the safety of the cabin.

Q. If the safety of the cabin is compromised what, if anything, are the flight attendants required to do once the flight is inflight?

MR. AMRHEIN:  Objection.  Go ahead.

A. Once it is inflight it's very specific; so if you can let me reference my FOM here.  Their procedures are very, it's very detailed.  Everything is, the



goal is for everything to be as detailed as possible.

They just -- I'm sorry, they just did an update here.  They just did an update on me and some of the stuff I do; but if they have a flight disturbance it starts off, depending on the level of the disturbance, an initial disturbance, they just try and talk to them, and try to correct the behavior.

Try to make sure that everyone is not being disruptive for everyone else's comfort and safety.  And then it escalates from there.  And it just varies on the behavior of the passenger onboard what the flight attendants will do.

But everything is detailed and written down as far as how they should approach it.

Q. (By Ms. Alterman)  I will show you the flight operations manual for your convenience.  I'm going to share my screen with you.

A. I have it here.

Q. And you should be able to see it on



my screen just so you can look at it.  Are you able to see the flight operations manual?

A. Yes.

Q. Section 1.13.1 on the screen, do you see that, sir?

A. Yes.

Q. And for the record we'll identify the flight operations manual.  This is 1043 PH document.  Right now I'm showing the Captain Page 96 PDF of that document.

And we'll mark this as Bengtson 1 for identification.

(Thereupon, Deposition Exhibit Bengtson No. 1 was marked for identification.)

Q. (By Ms. Alterman)  So, sir, I would like you to take a look at the Responsibility Section 1.13.  And specifically 1.13.1, the Responsibilities and Authority of Flight Crew/Dispatcher and Captain/Pilot in Command (PIC).

A. Uh-huh.

Q. Does this section of the flight operations manual detail your responsibilities as the captain of the



aircraft?

A. Correct.

Q. And, sir, this section, specifically the second paragraph of this section, states that the captain has authority over assigned flight crew members (both flight deck and inflight) from the time they report for duty until the termination of the flight. Is that your understanding, sir?

A. Yes.

Q. And the first bullet point of this Section 1.13.1 states that the captain shall be the final and complete authority in regard to matters concerning aircraft operation, safety and security of customers and fellow crew members; is that correct, sir?

A. Correct.

Q. And next I would like to show you Section 1.7 of the flight operations manual. I'm going to pull that up as well for you. Are you able to see that on yours?

A. Yes.



Q. So I'm showing Section 1.7, titled Emergency Authority of the Flight Operations Manual.  It start at Page 91 of the PDF.

MS. ALTERMAN:  And this is Bengtson 1 for identification.

Q. (By Ms. Alterman)  What is your understanding of this section of the flight operations manual, sir?

A. The captain's authority is:  When an abnormal situation occurs and what may be a controlling limit in either the FOM or the, we call it the FCOM, flight crew operating manual, which is just a manual on the operation of the aircraft individually with restrictions.

So you have weight limits or performance limits.  And this details also any federal aviation regulations.  What this says is basically that there is -- I decide that there is an emergency.

I do not have to comply with the instructions from the air traffic control or ground crew or other certain limitations that may exist under the



normal operation of the airplane.

I can deviate from those regulations for those rules to ensure a safe, final outcome of a flight.

So in a situation where you may have a pressurization issue and there is air speed limitations, you can deviate from those to descend faster to get down at a safe operating altitude.

If there's a problem with the aircraft, and you're required to do a certain procedure, fly a certain speed or fly a certain direction, I'm able to do that as long as I feel like it justifies the safety of the flight.

And then the emergency room authority talks about it's a joint authority with both the captain and the dispatcher.  And that more details with an issue that occurs with the aircraft and/or a customer onboard, as far as a medical issue, where it allows us to deviate from where we're going or what we're doing.

So if we need to land overweight, if there is a best interest of somebody to


MAGNA
LEGAL SERVICES

get on the ground as fast as possible, we'll land the aircraft over a certified weight.  It just requires some additional inspections, but that's to be done for the health and safety of an individual or the aircraft overall.

Q. Thank you.  Now, with respect to a flight that has pushed off the gate but is not in the air, would you consider that flight to be inflight?

A. Yeah.  I mean, it would be defined under that would be where my PIC authority or the inflight security coordinator will go into effect once the aircraft is closed, or the aircraft doors are closed and the jet bridge has been removed that aircraft is considered inflight.

In a sense that's where the transition of authority has occurred.

Q. Now, you mentioned that under Section 1.7, the emergency authority in the FOM, that you have the authority to determine what is necessary to protect the safety of the flight including for medical emergencies; is that correct?



A. Correct.

Q. Now, sir, I would also like to direct your attention to the part of the FOM that deals with inflight disturbances. And I'm going to pull that up for you. Can you see that, sir?

A. Okay.  Yep.  I see it.

Q. So for the record I'm showing you Page 252 in the PDF of the flight operations manual, Section 1.47.22, entitled inflight services.

You testified previously that when there are disturbances onboard an aircraft that you are required to take certain actions.  What are the different types of inflight disturbances?

A. For us we review it, each level of disturbance, at a difference level.  Those are levels 1 through 4.  And we react or we try and handle those in different and kind of escalating immediacy of responses.

So a Level I disturbance, and it should be, it's detailed in the FOM as well, is disruptive behavior or suspicious or threatening.  That would be something



that a passenger, who, say, last week we just had was vaping in one of the bathrooms.

That sets off an alarm in our cockpit. It senses smoke as a possible fire. And then it is responded in that way. And how they respond to that varies. So initially they try to get some compliance from the customer, talk with them.

And then can just issue them a card that says, hey, you're in violation of federal aviation regulations. And then it escalates from there. It goes disruptive to physically abusive.

And that could be any sort of contact with the customer or with inflight crew members or with other passengers onboard or the aircraft, itself, it could be damaging.

And Level 3 would be a life threatening situation where there is a possible display of a weapon. And then it would be Level 4, which, you know, post 911 our approach is much different than it



used to be.

That's considered the highest.  And that's an attempt or a threat to try and breach the cockpit.

Q. I want to direct your attention now to a Level II threat, which is described on Page 253 of the PDF.  It's titled Level II, physically abusive behavior.

Sir, would you consider assaulting other passengers and other crew members to be a Level II threat?

A. Yes.

MR. AMRHEIN:  Objection.

Q. (By Ms. Alterman)  Why is that? You can answer.

A. Okay.  It's detailed very clearly what a Level II is.  An example, it says in the FOM:  Pushing, grabbing, slapping, hitting or kicking any other person, or a deliberate attempt to damage another person's property or the aircraft.

And then unauthorized weapons or contraband, which doesn't apply there, or aggressiveness.  It could be related to drugs or alcohol.



MAGNA
LEGAL SERVICES

Q. Sir, in your experience as a captain for Jet Blue Airways for the past ten years and working for the company 16 and a half years, how serious is a Level II threat when someone is assaulting passengers and crew members onboard a flight?

A. It could be very serious.  The biggest, it's a confined environment, so anything that one person does in a confined environment has a greater chance to impact more people around them because of the density and everybody sitting next to each other.

So there is a chance.  And then also there are, the aircraft is not designed -- there are a lot of sharp edges, a lot of metal sharp edges as you go through the cabin just the way it's designed.

So there is a chance for inadvertent people getting hurt, as well as the higher chance of someone getting hurt just due to the density of the people onboard.


MAGNA
LEGAL SERVICES

Q. If a passenger onboard a flight is assaulting crew members would you consider that to be a significant interference with their duties.

MR. AMRHEIN:  Objection.

A. Yes.

Q. (By Ms. Alterman)  I just want to make sure we have your answer for the record.  I think there was an objection.  So I'll just ask the question again.  When a passenger onboard an aircraft is assaulting crew members, would you consider that to be an interference with their duties as flight attendants?

A. Yes.

MR. AMRHEIN:  I'm going to renew my objection.  Please note it for the record.  Thank you.

Q. (By Ms. Alterman)  You can answer.

A. Yes.

Q. Describe for us why that would be a significant interference to the flight attendant's duty if a passenger is assaulting crew members and other passengers onboard an aircraft.



Page 30

MR. AMRHEIN:  Objection.

A. The first part there may not be any.  Depending on the level of injury, we don't have a great way to treat it onboard.

Actually, there is no immediate medical attention.  We do have a type of emergency treatment that could be applied onboard, but you would have to have a medical professional onboard to help apply that.

And the time it takes to descend an aircraft and land and receive, have medical treatment onboard can be lengthy, depending on where you're at; but the biggest part is everybody onboard that aircraft has a safety role.

They're located around the aircraft in certain positions to allow for an emergency response to an abnormal condition.

If something, a crew member is injured they can no longer perform that safety role.  And that compromises the safety of everybody onboard.  They are


MAGNA
LEGAL SERVICES

stationed at certain places throughout the aircraft to allow for evacuation, relay the safety information.

It also compromises our ability for communication as we try and communicate from both the flight deck through the cockpit door, to the rest of the cabin where the flight attendants and other customers are seated.

Q. Now, besides for the Level IV threat, which is the breach of the cockpit, in terms of the seriousness of any type of physical abuse that occurs on an aircraft, do you consider that to be a serious threat to the safety of everyone onboard that aircraft?

MR. AMRHEIN:  Objection.

Q. (By Ms. Alterman)  Go ahead.

A. We're advised to consider that, yes.  To be -- any disturbance that's brought onboard our training is to -- as a past security event that has happened.

We're to consider anything that happens onboard.  We are to take it seriously because it could be part of



something bigger. You don't know. So they advise us when an incident does occur to treat every incident seriously. And give it something -- if the onboard flight crew cannot deescalate that situation, then we have to consider everything to be, possibly have a serious impact on the safe outcome of that flight.

Q. Sir, would you agree with me that assaulting passengers and crew members would constitute serious customer misconduct?

MR. AMRHEIN: Objection.

A. Yes.

Q. (By Ms. Alterman) Now, are you familiar with the sections of the FOM that deals with customer misconduct?

A. Yes.

Q. I will direct you to those. It's Section 1.47.25, starting at Page 255 of the PDF, also marked as Bengtson 1 for identification.

So I'll just give you a chance to review this section.

A. Okay.



Page 33

Q. Now, this Section 1.47.25, titled Customer Misconduct, would you agree with me that if a customer is committing or threatens to commit any act which would be detrimental to the safety of the flight and/or our customers it is the duty and responsibility of Jet Blue and its crew members to use whatever means are reasonable, including restraint, if necessary, to ensure the safety of the flight and its customers?

A. Yes.

Q. Would you agree with me that that's still your obligation and duty to use whatever means is necessary if misconduct started with a medical emergency, and then escalated to misconduct, such as assault?

MR. AMRHEIN: Objection.

A. Yeah. The response is meant to be a dynamic. And that's part of the problem with being on an aircraft because it's an unusual condition.

So many people together, you know, at that altitude, it is -- everything in here is meant to be dynamic so we are able



to move from the application of one situation to another.

And just respond in whatever, whatever reaction from us is required for the safe outcome of the flight.

Q. (By Ms. Alterman)  I'm going to show you the next section in the flight operations manual, Section 1.47.26, entitled Misconduct Not Initially Involving Safety of Flight or Customers. Do you see that, sir?

A. Yes.

Q. I'll give you a moment to review this.  Just let me know when you're ready.

A. Okay.

Q. Scroll down to the next part of this section.

A. Okay.

Q. Would you agree with me, sir, that based on this Section 1.47.26 in the flight operations manual that even if misconduct doesn't initially involve safety of the flight, but then it escalates to a Level II threat, for example, that all crew members are



required to take whatever means necessary for the safety of the flight?

MR. AMRHEIN:  Objection.

A. Yes.  That's what's detailed in Exhibit 1.

Q. (By Ms. Alterman)  Were you trained and required to abide by the flight operations manual in April of 2019?

A. Yes.

Q. And was the flight operations manual that we've been reviewing, was that in effect on April 12th, 2019?

A. Yes.

Q. Sir, do you recall working on April 12, 2019 a flight from JFK airport?

A. Yes.

Q. What type of airbus were you scheduled to operate that day?

A. It was an Airbus 321.

Q. And can you describe for us for that Airbus 321, the layout of that aircraft?

Is there one aisle leading to the back galley?  How many seats are on either side of the back ally?  Describe for us



the layout of that airbus.

A. Yeah.  It's a single aisle, narrow body aircraft.  We have it configured with three on each side of the aisle.  And it holds 200 customers.

Q. How many flight crew are required to operate that specific airbus?

A. Four.

Q. Can you detail those positions for me?

A. For us they're just, they're flight attendant 1, flight attendant 2, flight attendant 3, and flight attendant 4, or they shorthand them into F1, F2, F3, F4. They're just locations on the aircraft.

And then what they do as far as safety and service change is based on where they are.

Q. And how many, besides for yourself as the captain of the aircraft, how many other pilots are onboard?

A. One.  It's a certified multi-crew, so it's a two-pilot aircraft.

Q. Is the other pilot onboard the aircraft known as the first officer?



Page 37

A. Correct.

Q. The flight attendant 1, is that the lead flight attendant onboard the aircraft?

A. Yeah.  They're designated as the lead one, so they'll be responsible for documentation, for verification of their fellow flight attendants, so they have to verify passports and currency for their manuals.

They go through and they have a little process that they do amongst themselves.

It's not -- all flight attendants are trained for all positions except for, unless we have a special cabin with a first class, then not everyone is trained for that first class; but, otherwise, they are all trained in all positions.

And then they can bid to operate in those positions.  And then they can switch it if they show up and someone wants to switch and be the number one.  They can do that as well.

Q. Do you know how many rows were on



Page 38

that specific airbus that you were operating on April 12th, 2019?

A. I can't recall off the top of my head.

Q. Would there be any documents that would help refresh your recollection as to the specific configuration of that airbus?

A. I'm not sure if we have it listed or not.

Q. Do you recall who the crew members were onboard that flight, the names of the individuals?

A. I have it written down, yes.

Q. Are you referring to the report there?

A. Pardon?

MR. AMRHEIN: I'm sorry, Cheryl, can you repeat that?

Q. (By Ms. Alterman) Are you referring to or are you looking at the report that you prepared?

A. I am, yes. It's called the Flight Crew Irregularity Report or JR.

Q. Why don't I bring that up on the screen? Is that up on your screen?



A. Yes.

MS. ALTERMAN:  We will mark this document as Bengtson 2 for identification.

(Thereupon, Deposition Exhibit Bengtson No. 2 for identification.)

Q. (By Ms. Alterman) It is a two-page document.  And I'll put it up so you can see more of the document.  The report is entitled E Report, PSR 1206-19.  Is this the report that you were referring to, sir?

A. Yes, it is.

Q. Just for the record, what is this report?

A. It's called the Flight Crew Irregularity Report.  It is a required report.  Any time -- there's a long list of incidents that can require an FCIR. Both operationally.

It could be in performance of the flight crew.  It could be customer related.  It could be operationally related.  It could also be things outside of the aircraft that we encounter, such as air traffic control, an irregular event.



This is kind of a global document. We fill it out, submit it, and it gets automatically disseminated to a large number of people within Jet Blue. And allows different departments to review that.

And then they will all review it. The goal is for, if there is a safety event, to see if there is anything that needs to be learned from it or any policy change because of it.

Q. Sir, were you required to prepare this report in the ordinary course of your duties as a captain for Jet Blue Airways?

A. Yes.

Q. Did you do so at or about the time after you competed the flight on April 12th, 2019?

A. Yes.

Q. And as you testified, you submitted this report for Jet Blue Airways as part of your duties and responsibilities as a captain of Jet Blue Airways; correct?

A. Correct.

Q. Is this the only report that you



prepared in connection with the incident that occurred on April 12th, 2019?

A. I also filled out a fatigue report. And that was because we elected as a crew not to continue to operate the flight after the delay. We had concerns about, the fight was going to be late.

It was going to be a late arrival. And we had concerns with kind of the unusual circumstances, and kind of the heightened -- we were a little concerned that we would have a bit of a letdown mid-flight towards the end of the flight, so we elected to call fatigue and call for some replacement pilots to come in and operate that flight.

Any time that occurs we're required to fill out a fatigue report. And I also filled out and submitted that.

Q. Understood. Okay. Directing your attention to the first page, you called this an irregularity report; is that correct, sir?

A. Yeah. FCIR is the official name.

Q. What does that stand for?



Page 42

A. Flight Crew Irregularity Report.

Q. Okay. So on the first page of the FCIR there is some handwritten names. And it looks like identification numbers. Do you see that?

A. Yeah. That was the crew that was onboard and their employee numbers.

Q. Is that in your handwriting, sir?

A. It is.

Q. So we'll just go down the list that's on this first page. The first name is listed as William Florey. And the number appears to be 05223. Who is that individual?

A. That was the First Officer, William Florey.

Q. So he was the other pilot onboard the aircraft?

A. He was, yes.

Q. The next name that appears is Calvin Swinny, S-w-i-n-n-y. The identification number is 68435. Who is that individual?

A. That was F1 Swinny.

Q. Okay. So a flight attendant?



A. Yes.

Q. The next name that appears is Frank Leandro, L-e-a-n-d-r-o. Identification number 79313. Who is that individual?

A. That was another flight attendant.

Q. The next name is Kevin Ingleton, I-n-g-l-e-t-o-n. Identification number 71973. Who is that individual?

A. Flight attendance No. 3.

Q. The last name that's handwritten on this FCIR is Kareem, K-a-r-e-e-m, Aarndel, A-a-r-n-d-e-l. Identification No. 41583. Who is that individual?

A. That was our F4 for that flight.

Q. Thank you. So this handwritten list on the side of the FCIR comprises of the entire flight crew on this flight scheduled to leave from JFK on April 12th, 2019; is that correct?

A. Correct.

Q. And based on your testimony, I understand that this flight never flew to Kingston, Jamaica; is that correct?

A. It was considered left. We did -- the aircraft was boarded. And we were



taxying out to the runway when we were notified of a medical event onboard.

Q. So once you started taxying out onto the runaway was that flight considered to be inflight, sir?

MR. AMRHEIN:   Objection.

A. Inflight would be in the air, but, yeah, it's shorthand.  We would call it inflight or out, we call it out of locks, which just means it's made the transition from being at the gate to, it's considered that transition of authority has occurred.

Q. (By Ms. Alterman)  Sir, based on that transition of authority, is it your understanding that the sections in the flight operations manual that pertain to inflight would apply once the plane pushed back from the gate?

MR. AMRHEIN:   Objection.

A. Yes.

Q. (By Ms. Alterman)  Thank you.  Do you recall the flight number of the flight that was scheduled to depart from JFK?

A. Let's see, it was flight number 659.



Page 45

Q. Do you recall if that flight was on time or was it delayed at the outset?

A. It was delayed.

Q. Do you recall what time you initially pulled off from the gate or pushed back from the gate?

A. I have down here as 2155, which is 9:55 local.

Q. And you're reading on the first page of the FCIR; is that fair?

A. Yes, correct.

Q. So under the narrative section we have: Event/concern description. There is a typed written body of this section. Who typed this?

A. I did.

Q. Do you recall approximately when this narrative report was prepared?

A. It would have been an initial draft I completed the night of the incident. And then it was revised and reviewed.

I got together with the first officer to make sure that the details I was writing were accurate, and what he recalled as well.


MAGNA
LEGAL SERVICES

So any amendments we wanted to put in there or change of language, we did that.  And then that would have been submitted after that the following day.

Q. Do you recall the sum and substance of that conversation that you had with First Officer Florey, whether or not he made any changes or additions to the narrative report that you prepared?

MR. AMRHEIN:  Objection.

A. I don't recall anything specific as far as timeline.  It was just more of a verification of what we had, because we did discuss it the night prior.

And I made notes as we were talking about, after the event happened and as the event was going on we tried to just jot down a few things, knowing that a report was going to have to be generated.

Q. (By Ms. Alterman)  And I'll just give you a moment to read through yourself this narrative summary that's listed on the first page.

A. All right.

Q. Just let me know when you have had



an opportunity to do so.

A. Okay.

Q. Now, sir, in the narrative section of the FCIR Report, which is marked for identification as Bengtson 2, the second sentence says:  That we pushed and began our taxi to Runaway 22R via A, to hold short of V.  What does that mean?

A. That means that we pushed off the gate, started our engines.  And through our coordination with ground control we were cleared to taxi to Runway 22R.

And we were going to do that initially by taxiway Alpha to hold short of taxiway Victor.

Q. And at some point during your taxying and preparing for takeoff did you become made aware of a passenger issue onboard the flight?

A. Yes.

Q. How did you first learn there was a passenger issue onboard your aircraft?

A. We received a call from the cabin. Once the aircraft is pushed off the gate it's considered a sterile cockpit



environment, which occurs during taxi, takeoff, and up to 10,000 feet, and on descent below 10,000 feet all the way to the gate.

And that's considered sterile, which means the only communication that comes from the aft of the cabin behind the cockpit door will be some, an unusual event.

So it would be a big issue.  So when we receive that call that's a very unusual call.  It doesn't happen very often.

And we have to respond to that initially, knowing that there is probably going to be an issue involved; otherwise the inflight crew members are instructed not to call up to the flight deck.

Q. When you received that call, do you know which flight attendant made that call?

A. It was flight attendant 1.

Q. So that's flight attendant Swinny?

A. Swinny, yes.

Q. Did he call you directly; or did he



call First Officer Florey?

A. It's a total call on both of us. Both the captain and the first officer have our own independent radio control modules onboard. And we are able to talk on different frequencies and through different channels.

We get an alert in the cockpit. It's an alert and a light. The light aluminates. We get a buzz. We respond to that. And either pilot can respond. Typically it varies on who does the response.

Normally on the ground the captain will be taxying and the first officer will be responsible for the radios; but in an unusual situation where we get these calls the way I handle it is I ask the first officer to respond to the call from the cabin.

And that allows me to make sure that I'm in communication with ground control in case the aircraft is moving as I'm taxying it.

So it was a universal call, and I



MAGNA
LEGAL SERVICES

asked First Officer Florey to respond.

But I did turn my speaker on from the primary the headset, so I turned the speaker on in the cockpit so I could have it on just a little bit in the background, so that would allow me to maybe start shifting gears or changing my mental framework of what we need to do a little bit faster.

Q. What was the issue that was reported at the time by the Flight Attendant Swinny to First officer Florey and yourself as the captain of the aircraft?

A. He said that we were having a medical issue. There was a customer onboard that was having a seizure in the aft part of the aircraft by the galley.

Q. When you are referring to the aft part of the aircraft by the galley, just for the record can you tell us what you mean by that?

A. The aft galley is -- at the end of the passenger seating the aft galley is the flight kind of attendant work area.



That's where we have our service items onboard, as well as some safety items.

There is also the laboratories back there. And then the aft, the cabin access doors are back there as well.

Q. Do you know where this passenger was seated on the aircraft who was apparently experiencing a seizer?

MR. AMRHEIN: Objection.

A. I do not recall which seat exactly it was. Just that it was towards the back of the aircraft, the last few rows.

Q. (By Ms. Alterman) In response to receiving this information what, if anything, did you do?

A. At that point I slowed the aircraft down. The initial thing we needed to figure out is what's needed, what they need from us. We try and gather as much information as we can.

Do we need to go immediately back to the gate? Is it something that someone we respond to; or do we need to stop and allow them to deal with the situation?

In this case with a seizure, and



they said that they would like to return back to the gate immediately, we started the process of trying to contact, who we need to contact to get the aircraft turned around and headed back towards the gate.

Q. Besides for the fact it was reported that this individual was having a seizure onboard the aircraft, did you receive any further information at that point in time about his condition?

A. No.

MR. AMRHEIN: Objection.

A. No.

Q. (By Ms. Alterman) When you made the decision to return back to the gate did you have to notify air traffic controllers about that decision?

A. Yeah. At that point there is going to be multiple steps that we need. The first step is advising air traffic control that we have a medical emergency onboard.

That's going to allow primary priority handling for the rest of the way, which means that they can just stop everybody else and position the aircraft



Page 53

in a best attempt to get us back to the gate as soon as possible.

So we did that. The second step is to notify our company that we need to return back. That we have a medical issue onboard. That will allow them to source a gate for us.

And also to start the process of responding to it. Who needs to be there? Who from Jet Blue can get down there as soon as possible to make sure that we have what we need to get a jet bridge up to the aircraft to allow treatment?

And then on the taxi back also contact our ramp control, which controls the aircraft inside of the act of taxiways.

Ground control handles that, but once you get close to the gate we have our ramp control, which controls access to those gates.

Q. In some point in time did you also request for local law enforce to respond to the aircraft?

A. No. We just requested we have a



medical emergency onboard, we're turning back to the gate. And at that point whoever responds, typically responds.

We don't -- the only time we would request a law enforcement response is if we knew there was a previous response onboard.

If we had something happening that we felt that was the primary one; but in this situation all we knew was it was a medical emergency and we requested whatever assistance could be provided as soon as it could.

Q. How often have you flown out of JFK Airport prior to April 12th, 2019?

A. Frequently. It's where I have a base for the majority of my time with Jet Blue up there. And even when I wasn't based there, it's our largest operation, so I have flown out of there since I've been hired.

Q. Have you experienced other medical emergencies onboard their aircraft prior to April 12th, 2019?

A. I have, yes.



MAGNA
LEGAL SERVICES

Page 55

Q. In your experience working mostly out of JFK airport for the 16 and a half years working for Jet Blue Airways, is it your understanding that the port authority police responds to both medical emergencies and customer disturbances onboard aircrafts?

A. Yes.  That I can recall, they typically do respond, as well.

Q. Now, how long did it take you from the time that it was first reported to you that this passenger was experiencing a seizure onboard the aircraft to return back to the gate, if you know?

A. So according to the notes I reviewed, we said it took about five minutes.

Q. And are you referring to, there is a section entitled the Recommendation at the bottom of the first page of the FCIR. Is that where you're gathering that information from?

A. Yes.

Q. And the first sentence of that recommendation section says:  From initial



call to arrival at the gate was within five minutes, as we recall.

Do you know if that information was actually documented or recorded in any sort of flight database?

A. Yeah. So it will show our, like the out and the in times, which is, the out is when the parking brake is released, and the aircraft is considered off the gate. And kind of inflight, on our way.

And the in time is when the aircraft has been parked with the parking brake set and the first door opened.

Q. Where are those specific out and in times documented?

A. It's an automatic, it's an automatic process through an internal communication device called our A cars, which is air crew automated recording system.

It just allows communication for all sorts of things, but also documents those times.

So it's an automatic process. When the parking brake is released with all the


MAGNA
LEGAL SERVICES

doors closed the time is generated.  It's automatically sent to the company.

And then when we take off it's sent out as well.  When we land they send another one.  And then once we get back to the gate the end time is sent automatically as well.

Q. Is there any document that you're aware of that has the actual out and in times for this particular flight, Flight 659?

A. Yeah.  The company will have it.

Q. But that information is not documented on your SAR; correct?

A. I put that we were in, let's see, my notes that I have, I should have said that, we were in I believe 2224, is what I have.  That's just down in my own personal notes.

Q. Are those personal notes contained in the FCIR or is that something that you --

A. No.  It's not in there.  It's just in the side notes that I took on my own, like just a piece of paper that when it



MAGNA⊙
LEGAL SERVICES

occurred.  You know, like I said, I knew we were going to have to report stuff, so I just took it down, just for my own reference.

Q. So if you could since I don't have access to that document, tell me, again, the out or in times that you have documented on that piece of paper?

A. So it was 2155.  And then I have down the in was 2224.

Q. And the in time would be when the flight returned back to the gate; correct?

A. Back to the gate with the main cabin door opened, yep.

Q. Do you have any other notes documented on that piece of paper that would help refresh your recollection as to any of these events from this particular flight?

A. Those are just kind of times is all I had down.  I had, we estimated a time when we were contacted about 2220, so that was, you know, four minutes, but about five minutes prior to our gate return. And that's, as far as the reference for



time, that's all I have.

Q. And just so the record is clear, the 2220 time that you have documented on the piece of paper that you prepared, that's the time that you were contacted by Flight Attendant Swinny about the medical issue onboard; correct?

A. Yes. That was the estimate that we, both myself and William Florey, that's the time we estimated we got the call.

Q. Understood. Thank you. So once you returned back to the gates at approximately 2224, what was the next step that you took?

A. When we got back to the gate the first thing we needed to do was shut down the aircraft, and go through that process.

And I wanted to make sure we did it solely and reviewed the checklist an additional time. Pilots are creatures of habit, so we typically do things in a certain flow, process.

So when you have an unusual situation like this where you've deviated from the normal flow of a fight, it's


MAGNA
LEGAL SERVICES

possible you could miss things because you didn't do the proceeding trigger for you to do it.

So we were just trying to make sure we had everything secured the correct way. The aircraft was configured safely to be sitting there at the gate.  And all of the switches were in the correct position.

So we reviewed that.  And then I instructed the first officer to pull out and start reviewing.  They call it a MedLink check form.  MedLink is a company that provides medical advice.

We have a MedLink checklist form that we carry with us.  And when we are in contact -- especially inflight, it provides information or suggests to a medical event inflight.

So you reference that to get information, such as, you know, patients' name, age, sex.  Any medications.  And then you just go through and get information.  And we relay that.  And that allows us to make the best decision inflight.



So we were trying to pull that information, get ready to ask the right questions when we open the door, so we could relay that over the radio to our operations.

So as we were doing that, verified everything. And then we transition from opening the door to dealing with the situation in the back.

Q. What time did you open the cockpit door to communicate with the inflight crew?

A. I don't know. I don't have an exact time; but I estimated, you know, no more than two or three minutes before we had everything filled out and reviewed to open that door.

Q. When you were taking the time to review the MedLink checklist was that on your iPad where the FOM was located or was that information from somebody else?

A. Yes. So I carry a paper copy of it; but also it is on the iPad. And I was asking him to pull out the iPad. I was working with our logbook.



Page 62

Anytime we have -- as a medical emergency I thought there was a possibility of some of our medical equipment being used onboard, so if that's the case you do have to document that into our maintenance logbook stating that it was used so it can be reviewed and restocked according to Federal regulations.

So I was pulling that out and making sure I had everything ready to write down anything that was being used or anything that would be abnormal on my side.

And then I asked him to pull out the MedLink checklist.  The initial goal was just to have him relay it over the radio while I was talking to the flight crew and trying to assist in the back.

Q. Once you open the cockpit door who was the first member of the inflight crew --

MR. AMRHEIN:  Can you repeat that, Cheryl, I think it faded off a little bit at the end.



Page 63

MS. ALTERMAN: No problem.

Q. (Ms. Alterman) Once you open the cockpit door, who was the first member of the inflight crew who you communicated with?

A. I don't remember exactly. I believe it was F1 Swinny.

Q. What, if anything, do you recall about that conversation?

MR. AMRHEIN: Objection. Go head.

A. At that point there was, I don't recall where the initial conversation, where it was heading because there were already some Jet Blue, ground personnel were already responding.

They were already there. They were already talking. There were multiple people from Jet Blue there. And I'm not sure who the initial person I started talking with was.

Q. (By Ms. Alterman) Do you recall who the Jet Blue personnel was that boarded the plane?

A. I do not, no.

Q. Do you know their titles?



Page 64

A. I don't know exactly what their titles were, no.

Q. Were they members of Jet Blue security; or did they hold other functions of the airways, if you know?

MR. AMRHEIN: Objection.

A. I don't recall what they were. I know that there was someone from our, like there was an inflight liaison, I believe, that was there. And also someone who deals with our systems operational control.

They would have access to just overall who, all the phone numbers that needs to be dealt with.

So they would know our ramp tower, our headquarters in Long Island City where they could provide more support, if needed, for the flight.

Q. (By Ms. Alterman) When you opened up the cockpit door were all the passengers still onboard the aircraft?

A. They were. We had asked everyone to please remain seated so that would allow the responders to get onboard as



Page 65

quickly and as unobstructed as possible. If everyone just remained in their seat and allow them to start treatment.

Q. Was it your understanding at that point that the port authority police officers were responding to the scene to provide and assess the medical situation?

A. When I opened the door I had no idea who was there. I opened the door, and we were waiting.

We did not see a, like, right away as we pulled up because it was so quick, we did not see any, like, an ambulance or anything hadn't pulled up yet. Sometimes they come down through the jet bridge.

Sometimes they respond through the ambulance as far as the medical teams go.

Q. When did you first see or learn that there was a port authority police officer onboard the aircraft?

A. There was, that's when the situation had kind of changed a little bit. Everyone was seated. And you could see that there was a bit of a commotion in the back. And the atmosphere had changed



a little bit.  People were starting to be a bit more agitated and looking around.

And they were escorting up one of the inflight crew members to the front. And that's the first time I learned that someone had boarded the aircraft to the back there to respond even before we had the cockpit door opened.

Q.  So is it fair to say then that when you opened the cockpit door there was already a port authority police officer on the aircraft.  You just didn't know it at that time.

MR. AMRHEIN:  Objection.

A.  Yes.

Q.  (By Ms. Alterman)  Approximately what time was it when you said that you noticed the situation had changed and there was now commotion coming from the back of the aircraft?

A.  I can't estimate.

Q.  Do you know if it was more than five minutes after you opened the cockpit door?  Was it less than five minutes?

MR. AMRHEIN:  Objection.



Page 67

A. Again, I don't know the exact timeframe. I would say it was fairly quickly. So I would say probably within five minutes, but I don't know exactly.

Q. (By Ms. Alterman) And you mentioned that one of the flight attendants was being escorted up to the front of the aircraft. Who was the flight attendant being escorted by, if you know?

A. That was, when the inflights -- F4, Aarndel.

Q. So the Flight Attendant Aarndel as the FCIR Report indicates in the narrative section, was observed being assisted forward with the three volunteered medical professionals. Do you see that, sir?

A. Yes. They had made a call if there was any doctors or nurses onboard. And three nurses responded.

Q. And how soon after the three nurses responded, to your knowledge, was F4 Aarndel being escorted forward to the front of the plane with those three medical professionals?

MR. AMRHEIN: Objection.



Page 68

A. I do not know.

Q. (By Ms. Alterman)  When he was escorted to the front of the plane what, if anything, did you learn at that time about the situation in the aft galley?

A. As they were coming up he said, he said they needed to get him to the laboratory for whatever reason.  I didn't know if -- I wasn't sure of the reason why.

The laboratory door opens from the cabin to the cockpit.  So when the laboratory door is open it blocks my visual access to the cabin.

So that door, in order for him to get to the laboratory I stepped back into the cockpit because the forward entrance in the galley and the jet bridge was already full.  You know, had in flight crew members and then there was responding Jet Blue personnel as well.

So there was no room for me to move forward, so I stepped back.  And that's when they started splashing.  And then I heard someone say that he had pepper spray



in his eyes.

Q. Did you smell or feel any pepper spray in the air in the front of the plane at that point in time?

A. I did not, no.

Q. At any point in time while you were on that plane did you feel any effects of the pepper spray?

A. I did not, no.

Q. Did you also learn at that time that the passenger who was reported to having a seizure had become violent and assaulted a flight attendant -- flight attendants, multiple, as well as one of the medical professionals onboard?

MR. AMRHEIN: Objection.

A. Yes.

Q. (By Ms. Alterman) How did you learn this information?

A. That was passed along by the F1 upfront who advised me as they were talking, just saying that it had occurred. And that's why I didn't get the details of what was happening. That was why the F4 needed to wash his eyes out, just out of



MAGNA
LEGAL SERVICES

response from that.

And the passenger, as they were from the F1's narratives, they said the passenger was disruptive in the back as they were kind of coming out of the seizure.

Q. Sir, would you agree with me that the flight attendants onboard relayed to you in accordance with their duties and responsibilities that this passenger who had experienced the seizure had now become violent and assaulted Flight Attendant Swinny, as well as Flight Attendant Aarndel and assisting medical professionals?

MR. AMRHEIN:  Objection.

A. Yes.

Q. (By Ms. Alterman)  Did you rely on the accuracy of the information of your flight crew when they were relaying information?

MR. AMRHEIN:  Objection.  Go ahead.

A. Yes.  We have to.  The communication that we have with the cockpit door closed we are not able to



access or see what's occurring in the cabin.

So the communication between the inflight crew members, the flight attendants and the pilots is critical. That's the only way we can get an accurate understanding of what's occurring in the cabin.

Q. (By Ms. Alterman)  Once this information was relayed to you that this passenger had become violent and was assaulting crew members in addition to medical professionals, did this escalate the situation for you as the captain?

MR. AMRHEIN:  Objection.

A. For me I viewed it as, at that point some more port authority police officers were responding, so at that point I considered my role to be a support role at that point.

I am no longer making the call. Once we're there at the gate our ground security coordinator is in charge of the aircraft.  And my job is just to provide the best support I can for what's needed.



MAGNA
LEGAL SERVICES

So I just felt like, okay, the shift from when, can we get medical personnel, on to what's needed for me now?

Q. You would agree with me, sir, that in your experience of 16 and a half years as a captain for Jet Blue Airways that now the situation was not a medical situation, but, in fact, had escalated to a Level II, threatening customer misconduct situation; correct?

MR. AMRHEIN:  Objection.

A. I would say that I didn't have enough information at that time.  I could not see what was happening.  Everything I was hearing was thirdhand.  I would say that we had a medical situation.

And there was now a Level II disturbance onboard.  Whether the medical situation resolved itself or was not ongoing or how it was related, I couldn't accurately say.

Q. (By Ms. Alterman)  But you can accurately say and report that that was what was relayed to you by your inflight crew was that this passenger was



Page 73

assaulting crew members and other passengers onboard the aircraft; correct?

MR. AMRHEIN: Objection.

A. That was what was relayed to me.

Q. (By Ms. Alterman) And you relied on that information to be truthful and accurate; correct?

MR. AMRHEIN: Objection.

A. I did, but it was no longer the decision, at that point, when we had responding authority onboard, our role becomes more secondary and in support of.

Q. (By Ms. Alterman) Understood about your role, sir, but I'm just asking you about the accuracy and truthfulness of the information. What was -- just for the record, let me finish my question, please.

What was reported to you, sir, was from your inflight crew that two of your flight attendants were assaulted by this individual onboard the aircraft; is that correct?

MR. AMRHEIN: Objection.

A. Correct.

Q. (By Ms. Alterman) And you had no



reason to doubt the accuracy of that information; correct?

MR. AMRHEIN:  Objection.

A.  Correct.

Q.  (By Ms. Alterman)  And, in fact, you relied on that information to be truthful.  And you reported that information to have occurred in your FCIR report; correct?

MR. AMRHEIN:  Objection.

A.  Correct.

Q.  (By Ms. Alterman)  You also indicated in your FCIR report that this was a medical escalating to Level II customer disturbance.  Do you see that under title of report?

A.  Yes.

Q.  And you would agree with me, sir, that as per the flight operations manual, and we can go back to that.  I'll just go back to the section dealing with inflight disturbances, which is 1.47.22:  A Level II disturbance is considered a serious violation of safety of flight resulting in the need to involve law enforcement



authorities; is that correct?

MR. AMRHEIN: Objection.

A. Correct.

Q. (By Ms. Alterman) You would also agree with me, sir, that Level II threats, which is what you identified this as on your FCIR, is physically abusive behavior that has escalated to the point it requires the presence of law enforcement officials at the arrival city; correct?

MR. AMRHEIN: Objection.

A. Correct.

Q. (By Ms. Alterman) I'll take you back to your FCIR report, share my screen. Let me know when that's on your screen.

A. It's up.

Q. Now, sir, as a captain of Jet Blue Airways for the past 16 and a half years, would you consider assaulting a flight attendant to be a serious level of misconduct?

MR. AMRHEIN: Objection.

A. Yes.

Q. (By Ms. Alterman) Why is that, sir?


MAGNA
LEGAL SERVICES

A. It effects the safety of the flight. Again, as I said earlier, everyone has a role, a safety role in a job. They're all important.

And if a crew member becomes injured they cannot perform that safety function, so the safety of that flight is compromised.

Q. Now, did you have conversations with either of the flight attendants who were assault by this customer, who we now know is Mr. Lagoda, got onboard the aircraft?

MR. AMRHEIN: Objection.

A. Yes.

Q. (By Ms. Alterman) What did they tell you about the assault?

MR. AMRHEIN: Objection.

A. Mainly it was sudden. It happened fast. It was unexpected from their side of things; so they didn't get into too much detail with us.

The focus for us at the time was to just try to get information and deal with the customer; so there wasn't a lot of



communication about the exact details of the incident. Only that the situation changed. From then they were trying to provide medical assistance to, they were, felt like they were getting assaulted or hit.

So it just happened quickly. That was the main part of their communication.

Q. (By Ms. Alterman) Did they appear to be injured?

MR. AMRHEIN: Objection.

A. The F4 was, obviously, he was affected by the pepper spray. He was very upset. And the other inflight crew member, he, I believe, was only struck once.

And he moved into a position. One of the responding nurses was pregnant, and she was one of the ones who was pushed or I'm not sure what happened, but he placed himself in between her and the passenger. So that was the extent as far as I know.

There was no -- I didn't see any physical indications of an injury or anything, like no blood or anything, but



MAGNA
LEGAL SERVICES

Page 78

it was more just the response of it.

Q. (By Ms. Alterman)  Okay.  So is it your understanding that this flight attendant was struck by Mr. Lagoda in this case by protecting one of the pregnant nurses who was responding to the medical emergency originally?

MR. AMRHEIN:  Objection.

A. That was my understanding.

Q. (By Ms. Alterman)  Did you interview any of the medical professionals or nurses who responded to the medical emergency initially?

A. No.  They were kind of separated. And once it happened there were still other things going on.  So all I did was thank them for responding.  I appreciated it.  And then the Jet Blue personnel took over.

Q. Did you interact with any of the police officers who responded to the plane?

A. Only briefly.

Q. Do you recall which ones you interacted with?



A. I do not, no.  They were kind of coming and going.

Q. Would you be able to describe what, if any, information you relayed to them or they relayed to you?

A. They just requested what was my understanding of what was happening.  And I just told them we had a medical emergency, and it just seemed to change to a disturbance in the back, like a Level II physical disturbance.

And then from there that's it. They did not relay any information to me.

Q. Once the situation escalated to a Level II customer disturbance were all the passengers still onboard the aircraft?

MR. AMRHEIN:  Objection.

A. At first, yes.

Q. (By Ms. Alterman)  And were the instructions at that time for all the passengers to be seated and remain seated onboard the aircraft?

A. Yes.

MR. AMRHEIN:  Objection.

A. That's standard to allow for



medical response, access to the alley to get up and down to the customers.

Q. (By Ms. Alterman)  At some point was an AED requested by one of the officers?

A. Yes.

Q. Would you be able to describe which officer requested that AED?

A. No.  They requested AED and the portable oxygen bottle.

Q. And who did they request those pieces of equipment from?

A. They just kind of came up and said, hey, do you guys have an AED and a portable oxygen bottle onboard?  And an inflight crew member responded by retrieving those items.

Q. Which inflight crew member retrieved those items?

A. I don't know.

Q. Where are those items kept on the plane?

A. They were kept in multiple locations, but the ones that were retrieved were from the forward galley



storage.

Q. At what time, if you know, was that medical equipment requested?

A. I couldn't accurately say.

Q. Would you be able to estimate about how many minutes after you opened the cockpit door to when that medical equipment was first requested?

A. No.

Q. Did you ever see the passenger who was engaging in this Level II customer threat?

MR. AMRHEIN: Objection.

A. I did not, no.

Q. (By Ms. Alterman) Did you ever have any interactions with this customer?

A. I did not, no.

Q. Once the passengers started deplaning was it your understanding that the officers were still in the aft galley with this passenger?

MR. AMRHEIN: Objection.

A. That was my understanding.

Q. (By Ms. Alterman) Did you see the passenger at that point in time once the



passengers started deplaning?

MR. AMRHEIN: Objection.

A. I did not, no.

Q. (By Ms. Alterman) Did you learn how the passenger was removed from the aircraft?

MR. AMRHEIN: Objection.

A. Yes. They requested aft air stairs to be brought to the aircraft to allow access from the ramp to up to the aircraft. Just direct access to the aft galley.

Q. (By Ms. Alterman) Who requested the stairs?

A. I'm not sure.

Q. Who actually attaches the stair to the aft galley, if you know?

A. That would be our ground crew.

Q. Is that Jet Blue employees?

A. That would be Jet Blue, yes.

Q. How long did it take for the stairs to be connected to the plane?

A. I had no visual sight picture. They -- we made the call to get air stairs in, but I don't know when the air stairs


MAGNA
LEGAL SERVICES

arrived or anything. We can't see outside -- we can't see it from inside the airplane. Where I was standing I couldn't visually see the stairs.

Q. Is the call that's made -- strike that. Who made the call for the air stairs?

A. I don't know what other people made the call, but I know First Officer Florey made the call to our operations requesting air stairs.

Q. When First Officer Florey made the call requesting the air stairs to be attached to the plane, is that something that would be recorded as well on the flight database?

MR. AMRHEIN objection.

A. It would not be recorded, no.

Q. (By Ms. Alterman)  And what about when the air stairs are actually attached to the aircraft, is that information that would be recorded by any type of flight data recorder?

MR. AMRHEIN:  Objection.

A. Maybe it would be recorded.  I'm



not entirely sure if that's one of the parameters on the ground with the engines off, if that's recorded or not. I imagine it is. But I'm not sure if it's kept.

Q. (By Ms. Alterman) Is that information recorded in any written document regarding this incident prepared by Jet Blue Airways employee?

A. Not that I'm aware of.

Q. Did you have any discussions with any of the port authority police officers onboard the plane regarding the passenger's behavior in the aft galley once they responded?

MR. AMRHEIN: Objection.

A. I did not, no.

Q. (By Ms. Alterman) Have you ever seen any video of the interactions between the port authority police and the passenger in the back of the aircraft?

A. I did not, no.

Q. Now, at some point after this incident you were interviewed by the port authority office of inspector general; correct?



A. Correct.

Q. Do you recall that interview taking place on April 29, 2019?

A. Yes.

Q. And when you gave a statement did you give a truthful and accurate statement of your recollection of this incident?

A. Yes.

Q. Is it your understanding that that interview that you provided with port authority officer inspector general on April 12, 2019 is truthful and accurate of your recollection of this event?

MR. AMRHEIN: Objection.

A. Yes.

Q. (By Ms. Alterman) Since that interview, sir, have you had any other interviews or discussions regarding the events that took place on the aircraft on April 12th, 2019?

A. I have not, no.

Q. To your knowledge, were any of the customers onboard the aircraft detained?

MR. AMRHEIN: Objection.

A. Not to my knowledge.



Page 86

Q. (By Ms. Alterman)  If any of the customers onboard the aircraft were detained would that be recorded by Jet Blue Airways?

MR. AMRHEIN:  Objection.

A. I would imagine so, yes, but I'm not 100 percent sure.

Q. (By Ms. Alterman)  And if any of the customers were refused boarding for a later flight would that also be recorded by Jet Blue Airways?

A. Yes.

MS. ALTERMAN:  All right.  Thank you, sir.  That's all I have for now. Plaintiff's counsel may have some questions as well.  And then depending on those questions, I may have a few follow-ups.  Thank you.

MR. AMRHEIN:  Cheryl, is it okay if we take maybe a two-minute break? Technicalogically I have to get set up just for a brief moment.

I don't expect to have too many questions for you, sir.

THE WITNESS:  Okay.



Page 87

MR. AMRHEIN: Maybe if you'll just bear with me here.

CROSS-EXAMINATION

QUESTIONS BY MR. AMRHEIN:

Q. Sir, when did you become aware of this lawsuit?

A. This lawsuit here for the deposition? Just last week when I received an email requesting my testimony.

Q. Did you ever review the complaints in this matter?

A. I haven't heard anything. I have received no information since the event happened, I haven't received any information about what happened or any follow-up behind it.

Q. I know you said you haven't received any video with respect to the events that occurred on April 12th, 2019. Have you read any press articles about the events?

A. I have not, no. In fact, I tried to look when I received this last week, and I didn't find anything then either.

Q. Are you aware that the office of


MAGNA
LEGAL SERVICES

Page 88

the attorney general in New York conducted an investigation into this matter and released a public report?

A. I was not aware that that occurred, no.

Q. In preparing for this deposition can you just, I know you had previously stated you had reviewed some information.

Can you just lay out all documents or statements or, you know, written instruments that you reviewed in anticipation of this deposition today?

A. I pulled up my FCIR and the Fatigue Report, which had the information on it. And then I had like a scrape piece of paper that I just kind of wrote notes down that I've saved, which I do any time I fill out a report.

Whatever those little scraps of information I think I may need in the future. And then reviewed the policies and procedures that I thought may apply to what happened.

And then I reviewed the previous testimony I had in the previous interview.



Page 89

Q. Did you alert your employer that you were being deposed in this matter?

A. They were the ones who contacted me first.

Q. Did you have any discussions with any attorneys with respect to giving testimony here today?

A. Just the Jet Blue legal representative who sent me the email. I just asked --

Q. You don't need to disclose anything that was actually, you know, discussed. Simply whether or not you did speak with any attorneys in preparation for today's hearing.

A. An email back and forth, if that's discussion; but no discussion, only an email.

Q. Understood. I just don't want you to inadvertently reveal anything that may be privileged. That's why I just wanted to see whether or not you discussed something as opposed to what was discussed.

A. Okay.



Q. Sir, I know we went over in detail, or you were questioned in detail with regard to many policies and practices and procedures from Jet Blue, as well as the events that occurred on April 12th, 2019.

Do you recall being asked about the difference between inflight versus, I think you used a specific term? It was like onboard.

Does that refresh your memory about your testimony a little bit earlier today?

A. Yeah. Whether we are out of block or in, as far as the times go, when we made it back to the gate. When we blocked in, is what the industry term is.

Q. Blocked in. And then when you are actually taking off in the air that's when you consider to be inflight, sir?

A. Yeah. So it's, one, we use the term broadly inflight, so it's pushing off the -- once we're blocked off the gate it's considered we're no longer -- we're on the ground still, but the aircraft is considered kind of like inflight. Like it's on its way to its intended



destination.  And then when we block in, that means we terminated at that destination.  And then more specifically, obviously, inflight is when the aircraft is off the ground and in the air.

But as far as the transition of duties, it occurs at blocked out.  So they can also refer to that as inflight.

Q. Understood.  Thank you for the clarification.  Am I correct that you previously testified that there are three automated instances where information is recorded by Jet Blue when the doors are closed and the parking brake is released?  And then when the flight actually is in air.  And then when the flight lands.

A. And then also when the aircraft is at the gate.  The criteria is at the gate, parking brakes set, and the main cabin door is open, the passenger door there in front.

Q. So the first instance of automated information being relayed or transmitted would be when you release the parking brake and you pull back from the gate?



A. Yeah.  Once you release the parking brake and the door is closed that generates our "out time".

Q. Okay.  And than at that point that is when you described as "out of the block"?

A. Yes.

Q. Okay.  And then the next points after being out of the block is when you literally take off into the air?

A. Yep.  That's off time, off the ground.

Q. And off time, that is the next moment of automated recording of information?

A. Yes.

Q. Okay.  Sir, am I correct, you didn't witness anything occurring in the back of the aircraft?

A. I did not, no.

Q. Am I correct that while you were taxying on the tarmac and that off the block moment before inflight that's -- you received what you described I believe as an abnormal situational call from the



medical emergency from the flight crew members.

A. I did. There is two contact methods that our inflight crew members can use. The first is a regular cockpit call. And they process it. And it just says oral time.

And the other one is an emergency call. And the emergency call is used when there is an abnormal situation. So they are in contact with the emergency call.

Q. Okay. So just for the record of two potential options to contact the pilots in the cockpit, they used the method for emergency call?

A. Yes. That's what I recall.

Q. And do you recall that they, as a part of their emergency call, it was reporting that a male was having a seizure onboard the flight?

MS. ALTERMAN: Objection.

A. Yes.

Q. (By Mr. Amrhein) Sir, do you remember what was relayed into the cockpit with respect to the emergency call that



Page 94

day, April 12th, 2019?

A. There was just a customer onboard that was experiencing a seizure. And that was the first call, the first piece of information.

And they were passing along more information as they received it communicating from the aft part of the cabin where the event was occurring and the forward cabin.

Q. And I think you previously testified, and please correct me if I'm getting the numbers wrong. I know they're in military time, but I believe you had testified that you received a call at, I think, it was 22 -- you got back to the gate at 2224; is that correct?

A. Yes.

Q. Amount I correct that there was also a notation or there was testimony that you had received the emergency call at 2220, just four minutes beforehand?

A. That was our best estimate, yes.

Q. And am I correct that you had commended the crew members and all parties



involved for the quick response of getting the medical situation back to the gate for --

A. Yeah. It often can be a difficult process when you're out of sequence. All the other aircraft are stacked up together taxying out. You're considered gone, so Jet Blue allocates that gate to somebody else.

And it can be hard to get access back to the gate in a situation like that. But it all happened very quickly. And, yeah, I did commend everyone involved in that. It did happen very quickly.

Q. Sir, am I correct that you testified that when you first learned that the police had responded to the flight was when a flight attendant, I believe, F4, had then approached the front of the cabin.

A. Yeah. Up until that point I wasn't sure who was onboard when I opened the door. There was a lot of people there. You know, just trying to gather information.


MAGNA
LEGAL SERVICES

I didn't know exactly who was onboard. I was talking to some of the Jet Blue representatives, just trying to get a feel for who was there and where everybody was located. And what steps we need to take next.

When the F4 was coming up that was the first time that I had heard that someone had made it onboard to respond.

Q. And it was at that point that you had understood that pepper spray had been used in the back portion of the aircraft.

A. That's what had been told to me.

Q. Sir, was it after that point that you had learned that there was a commotion going on for a potentially combative man in the back of the aircraft?

MS. ALTERMAN: Objection.

A. Yeah. I didn't know if it was combative or not. I just knew that there was a disturbance in the back that was different than the medical response where I would have thought someone would have had a seizure and been more unresponsive.

That was the time when I learned



there was a commotion back there.  What was happening I did not know.

Q. (By Mr. Amrhein)  And you're not a medical professional, sir; right?

A. I am not, no.

Q. So from the time you got to the gate to the time that you went through your checks you said it was approximately two minutes or so?

A. Yeah.  Two, maybe three minutes before we opened the door to start trying to gather the information.  At that point we were taking care of what we needed take care of first before we shifted --

Q. And when you say, sorry, I didn't mean to cut you off there.  I was going to let you finish.  When you say "open the door" are you talking about the cockpit door or the door to the airplane?

A. The cockpit door.  Once we pull in and set the parking brake we normally turn off the seat belt sign, is our typical procedure.

And that alerts the flight attendants that they need to disarm their



doors so the safety slides don't deploy.

And then the main cabin doors are opened by the gate agent. So in this case we wanted everyone to remain in their seats, so we left on the seat belt sign.

I believe we just cycled the seat belt sign just to say we were here. Go head and disarm your door. And when that occurs they have their procedures for that.

Q. Okay. So your procedures for being able to go through your checks and open the cockpit door is separate from the procedures of the checks to be able to open, say, the front ingress and egress point at the plane.

A. It's sequential. They're all tied together. So the trigger to open the door is the seat belt sign is off. Once we turn the seat belt sign off that's their trigger to disarm the doors.

Once the main cabin door is open, that's our trigger that we are allowed to open the cockpit door.

Q. From the time that you had opened


MAGNA
LEGAL SERVICES

the cockpit door from the time that you -- that F4 came to the front of the plane, at which point you had learned that an officer had already been aboard, can you give me an approximate estimation as to that time-period?

A. I really can't. I felt like the information was changing a lot. I don't have an exact timeline because I was just trying to take in as much information as I can.

And there was a lot of people there trying to do the same as far as Jet Blue representatives. Just trying to get a timeline, and figure out where we needed to put our focus at.

Q. Understood. And your understanding of returning to the gate was for a medical emergency for a man having a seizure onboard your flight; am I correct?

A. That's correct.

Q. And your understanding that any response by, whether it be port authority personnel or Jet Blue personnel, any response to that would be for the medical



emergency that was onboard.

A. Yes.

Q. Again, sir, I think you may have said that some visibility to anything that was happening in the back of the plane was limited after F4 had come up because he was using the laboratory; is that correct?

A. Yeah.  That door opens up, and there is a small hallway in between the cabin and the cockpit.  And when that door is open it's block.  And I can only see a few rows back at the most.

He did go in there and they did close it, so I was able to see it.  He didn't leave it open for any extended period of time; but, yes, those moments I did not have any visibility to the back of the aircraft.

Q. At some point I think you previously testified, am I correct, that you never saw Mr. Lagoda.

A. I never did, no.

Q. Have you ever been on a flight where an ambulance was ordered?

A. Yes.


MAGNA
LEGAL SERVICES

Q. Roughly, how many times has that happened in your nearly 17 years at JFK?

A. With Jet Blue it's been multiple different stations.  Maybe five or six times.

Q. Are you aware that a police escort is required for the ambulance required by federal law?

MS. ALTERMAN:  Objection.

A. I'm not familiar with what requirements they have as far as response or anything.

Q. (By Mr. Amrhein)  Do you know if there was a significant delay for the ambulance to arrive aboard the flight from the time that you pulled to the gate?

A. I'm not sure.

Q. I can give you a better question, sir.  I know that was a little convoluted. Sir, roughly, do you know how long it took from the time that you received information about the medical emergency onboard your flight to the time the ambulance arrived at the scene?

MS. ALTERMAN:  Objection.



MAGNA
LEGAL SERVICES

A. I do not recall.

Q. (By Mr. Amrhein) Sir, after you called fatigue where did you go next? Is there a locker room that you typically put on a uniform; or did you go home? Did you go to a hotel? Can you tell me what you did next?

A. We have a crew room where Jet Blue employees have kind of a ready room. Employee groups have access to it. I went down there, myself and the first officer went down there.

And then at that point with the fatigue call they were going to assign us a hotel. So we went down there to wait for that; but initially we went to the other, we were going to swap airplanes and go -- initially we were intending on going.

It was only after discussing it between the two of us, how we were feeling where we made the decision not to continue. And then we went down to the crew room.

Q. Was that just with your first

MAGNA
LEGAL SERVICES


officer or with the flight attendants as well?

A. We had a short get-together in the jet bridge with the flight attendants on the aircraft. We talked to them and they had an inflight representative there who was talking with them.

I had told them because of the situation I didn't think any of them should continue on. And I would prefer to have a fresh crew.

And I said that -- I did contact Jet Blue and say I prefer if they were -- I did not want them on my flight again. Replace them with a fresh crew.

And they went their way to go deal with that. I'm not sure where they went. I'm going to assume they went where they were dealing with their inflight supervisor.

Q. And when that meeting occurred, do you know approximately how long do you think that was?

A. How long was the meeting; or how long until after the incident?



Q. No. How long was that meeting?

A. It was short. Yeah. It was short. I was just checking in to see how everyone was doing. If there was anything I could do to help them along.

I wanted them to make sure that they were comfortable with the decision not to continue. And that if they weren't I was going to make the call for them.

Q. Just in terms of timeline of what you witnessed yourself, I just want to clarify a few things, if I may. And I know that may sound a little bit repetitive.

I do apologize, but roughly based upon your memory and notes at 2220, you received the emergency line call from a male having a seizure on your flight. Am I correct?

A. Correct.

Q. And that was when you had left the gate; however, you weren't in the air inflight.

A. Correct. We were on the taxiway. There was some storms in the area, so



Page 105

there was a long line for takeoff.  So we were joining the line to make our way towards the runaway.

Q. And when you say a long line, do you have an estimate as to how long that line may have been that night?

A. Yeah.  At the time I was estimating it was going to be an hour before we got up in the air.  It was going to be a long taxi.

Q. And then based upon your notes and reports, I believe were introduced as, I think, Exhibit No. 2 here today, am I correct that you returned to the gate at 2224?

A. Correct.

Q. At which point you went forward with your methodical and purposeful checks.

A. Right.  We did finish the shutdown and make sure that we accomplished, again, out of sequence things, so after landing checklist, as well as the shutdown list.

Q. And your communications from onboard to airport personnel or over the



MAGNA ▸
LEGAL SERVICES

radio, that was relaying the emergency medical situation for a male having a seizure onboard.

A. Yes.

Q. And you first became aware that an officer was onboard after a flight attendant, who was in the back galley, then came all the way to the front galley?

A. Yes.

Q. Sir, did any of your -- or did any of the flight crew members that day tell you about how the male who had suffered a seizure onboard was physically restrained by the police officers at the port authority?

A. No.  No one detailed what happened. The conversation was only about the physicality of it, but I didn't even get, they didn't even give too much detail about what happened, just that it turned physical.

Q. And these flight attendants, they're not medical professionals either; correct?

A. They are not, no.



Page 107

Q. Did any of them mention how after the seizure Mr. Lagoda was disoriented?

A. I don't recall, but it's possible. They may have mentioned that, too. Yeah. That's very possible.

Q. Do you believe that if they had mentioned that someone was disoriented they would have put it in any formal reports that they filed?

MS. ALTERMAN:  Objection.

A. That's the information that they see and pass along as require. Again, it's different than what mine is. I mean, we're just required to put in the facts as we went through from our perspective.

And then the different employee groups have their different requirements.

Q. (By Mr. Amrhein)  Do you know if any of the crew members aboard that flight spoke Russian?

A. I am not aware.

Q. Are you aware that Mr. Lagoda was a -- Russian was his native language?

A. I had heard this afterwards, but I did not know at the time. It was never



brought up.

Q. Do you know when you heard that afterwards?

A. I don't remember. I think it was maybe just a follow-up with my report; or I may have asked like the chief pilots or something, saying, did you get my report? Is everything in there; or do you need additional information? That kind of thing. Just following up to make sure I had everything in there.

But there was no detailed information about the passenger at all.

Q. In any of the conversations you had with either flight attendants who were part of your crew that day -- or that night, excuse me, did any of them tell you about how police officers from the port authority police department had punched Mr. Lagoda?

A. They just said that there was a scuffle going on in the back. And that was it. That was the only information that they said. There was no detail.

I had no real understanding of any



Page 109

level of an altercation that was occurring back there until afterwards where someone said it was more heightened than just kind of pushing around.

And that's all anyone said that it had escalated.

Q. And you eventually learned that it escalated, but your initial response and to go back to the gate was because of a emergency medical situation for a male having a seizure onboard.

A. Yes.

Q. And you had, again, am I correct that you previously testified that it was going to be approximately an hour wait due to delays in taking off?

A. It could have been, yeah. You're never entirely sure. I'm sure you travel. You're never entirely sure of how long it's going to take.

The exact sequence air traffic control is going to use, but at that time there were thunderstorms in the area. And it had backed up the taxiways.

And based on where they were



taxying and where we were going, there was a line, a significant line. And based on my experience from operating out of JFK, I put that initial guess of about 60 minutes.

Q. And that's based on your 16 and a half years of experience, sir?

A. Yeah.

Q. Did any of the flight attendants tell you that they saw Mr. Lagoda face down on the ground with officers on his back?

A. They did not, no. Although, once the disturbance occurred the inflight crew members, they all moved to the front galley to give -- to just get out of the way.

At that point there was not a whole lot they can do, or should do per our regulations. They just got out of the way and the response occurred. I don't think they saw it. I have no knowledge of it.

MR. AMRHEIN: I have no further questions.

REDIRECT EXAMINATION



Page 111

QUESTIONS BY MS. ALTERMAN:

Q. All right.  I just have a few more.
How many times in your 16 and a half years
of working for Jet Blue Airways have
flight attendants reported to you that
they have been assaulted by customers
onboard the aircraft?

MR. AMRHEIN:  Objection.

A. Maybe two or three.

Q. (By Ms. Alterman)  Would that
include this incident on April 12, 2019?

MR. AMRHEIN:  Objection.

A. Yeah.  That would include that.

Q. (By Ms. Alterman)  So you would
agree with me that this is a very unusual
circumstance that occurred; correct?

MR. AMRHEIN:  Objection.

A. Based on my experience, yes.

Q. (By Ms. Alterman)  Would you also
agree with me that it's unusual for not
only flight attendants to be assaulted
onboard an aircraft, but in this case
there were flight attendants who reported
to be assaulted and customers; is that
correct?  That was what was reported to



you?

MR. AMRHEIN:  Objection.

A. It was the responding medical personnel and the flight attendants.  I'm not sure if any other customers were impacted by those responding.  Although they were customers, but it was the responding medical professionals.

Q. (By Ms. Alterman)  That was going to be my follow-up question, sir.  The responding medical professionals were passengers onboard your aircraft; correct?

A. Yes.

Q. So in addition to passengers onboard your aircraft being assaulted by Mr. Lagoda, he also assaulted two flight attendants onboard your aircraft; correct?

MR. AMRHEIN:  Objection.

A. That's what was relayed to me, yes.

Q. (By Ms. Alterman)  And you believed that information to be true; correct, sir?

MR. AMRHEIN:  Objection.

A. I did, yes.

Q. (By Ms. Alterman)  And when anyone is assaulted onboard an aircraft, that's



Page 113

considered a Level II customer disturbance requiring law enforcement; correct?

MR. AMRHEIN: Objection.

A. Yes.

MS. ALTERMAN: Thank you. That's all I have.

RECROSS-EXAMINATION

QUESTIONS BY MR. AMRHEIN:

Q. Just a few follow-ups. As you see, counsel was using the word "assaulted" with respect to the alleged occurrence in the back of the aircraft. Sir, are you a barred attorney?

A. No.

Q. Do you know if the flight attendants in the back of the -- or the crew that day are attorneys with the knowledge of, you know, legal definitions or implications?

A. Not to my knowledge.

Q. Do you know if the alleged medical professionals were?

A. Not to my knowledge.

Q. So you don't know whether or not anybody was assaulted; you simply heard that there was a medical response



emergency that you needed to respond to.

A. They said that the -- one of the inflight crew members who was, not Swinny, but he was in a position where someone, the customer, was -- arms were going out, and had impacted one of the responding nurses. And that he had moved in between to try and absorb whatever was coming out.

But I don't know the mechanics of that or what was happening. I just know that that's what they said. They said that they were hit. And he stepped in the way to prevent that with the responding nurse.

And that was it, but I don't know the details or the mechanics of it, no.

Q. So at that point, that emergency and the response -- or that emergency that ultimately led to the call in the cockpit relaying any of this information was based upon a male having a seizure onboard the flight.

A. The initial call was, yes.

MR. AMRHEIN: I have no further questions.



MAGNA
LEGAL SERVICES

REDIRECT EXAMINATION

QUESTIONS BY MS. ALTERMAN:

Q. Sir, were any subsequent calls made to alert port authority that this medical emergency was now escalated to a Level II customer disturbance?

A. No.  The Level II customer disturbance was a description by me.  The port authority police were already responding.  And once they were there -- I mean, they were who I would contact.  And also the Jet Blue supervisors were there.

Again, that's who I would have contacted, so from us there was no communication as far as an escalation of the event.

The event was escalated and everyone was there responding already.

Q. And in addition to you classifying this as a Level II customer disturbance, you also indicated in your FCIR report that we looked at, that what was reported to you was that the customer had become violent and had assaulted F1 Swinny and F4 Aarndel.  And assisting medical



Page 116

professionals, as well as the PAPD officer who responded with pepper spray; is that correct?

A. Yes.  That was my understanding is that they were hit.  And that's how they, that's the verbiage that they used.

MS. ALTERMAN:  Thank you, sir.

RECROSS-EXAMINATION

QUESTIONS BY MR. AMRHEIN:

Q. Just one question in response. Sir, that was your understanding based upon information that was ultimately told by you to other parties.

A. Correct.

Q. You didn't witness any of this?

A. I did not, no.

Q. So the information that is contained within the FCIR is second or thirdhand information?

A. That piece of the FCIR is, yes.

Q. And you had mentioned that there were initial drafts that you had done. And you ultimately updated the drafts as more information came in after the fact; is that right?



A. Not as more information came after the fact, but we -- I just wrote it down initially. And as practice that we do, this is submitted by the captain of the flight.

The first officer can submit it as well, but you can do what's called a joint filing. And the best practice is to get together as a crew and review the information to make sure the information was correct as we both understood it, because, you know.

We both have our own perspective on it. So if we can come to an agreement on what happened it would be more accurate.

Q. And, again, the information contained in this report was information that was ultimately told by you by other parties, not witnessed by you.

A. Some of it, yes.

MR. AMRHEIN: I have no more questions.

MS. ALTERMAN: I don't have anything further. Thank you so much for your time today.



Page 118

MR. AMRHEIN:  Thank you so much. We very much appreciate you taking the time out of your day.  Thank you.

THE WITNESS:  Thank you guys.

MS. ALTERMAN:  Electronic is fine.

MR. AMRHEIN:  Yeah.  Electronic would be great as well with the large and the mini.  That would be perfect.

MR. MALYSA:  I am together with Ms. Alterman.

MS. ALTERMAN:  If you want to put your email in the chat we can send you the exhibits.

MR. AMRHEIN:  I know in past depositions we have done 30 days read and sign, waive notary.  That's agreeable by us.

MS. ALTERMAN:  That's fine.  That's agreeable by us as well.

(SIGNATURE NOT WAIVED.)



Page 119

REPORTER'S CERTIFICATE

State of Missouri)

SS:)

County of St. Louis)

I, EILEEN J. BELL, a Certified Court Reporter within and for the State of Missouri, duly commissioned and qualified, do hereby certify that the within named witness, KURT BENGTSON, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by the above-referenced witness was by me reduced to stenotype in the presence of said witness; afterwards transcribed, and that the foregoing is a true and correct transcription of the testimony so given by the above-referenced witness.

I do further certify that this deposition was taken at the time and place in the foregoing caption specified and was completed without adjournment.

*Eileen J. Bell*
_____
EILEEN J. BELL, CCR #833



Page 120

Eileen J. Bell, CCR #833

August 31, 2023

Chris Amrhein, Esq.

20 Downer Ave, Ste. 4

Hingham, Massachusetts   02043

In Re:  Tarasov, et al. vs. Port Authority of NY and NJ, et al.

Dear Mr. Amrhein:

Please find enclosed your copy of the deposition of KURT BENGTSON taken on August 15, 2023, in the above-referenced case.  Also enclosed is the original signature page and errata sheets.

Please have Mr. Bengtson read your copy of the transcript, indicate any changes and/or corrections desired on the errata sheets, and sign the signature page before a notary public.

Please return the errata sheets and notarized signature page to Ms. Alterman for filing prior to trial date.

Thank you for your attention to this matter.

Sincerely,

*Eileen J. Bell*

Eileen J. Bell, CCR #833

Enclosures



STATE OF_____)

COUNTY OF                 )

I, KURT BENGTSON, do hereby certify:

That I have read the foregoing deposition;

That I have made such changes in form and/or substance to the within deposition as might be necessary to render the same true and correct;

That having made such changes thereon, I hereby subscribe my name to the deposition.

I declare under penalty of perjury that the foregoing is true and correct.

                              KURT BENGTSON


        Executed this        day of 2023, at


Notary Public:

My Commission Expires:



MAGNA
LEGAL SERVICES

Page 122

WITNESS ERRATA SHEET

Witness Name:  KURT BENGTSON

Case Name:  Tarasov, et al. vs. Port Authority of NY and NJ, et al.

Date Taken:  August 15, 2023

Page #_____    Line #_____

Should Read:

_____

Reason for Change:

_____

Page #_____    Line #_____

Should Read:

_____

Reason for Change:

_____

Page #_____    Line #_____

Should Read:

_____

Reason for Change:

_____

Page #_____    Line #_____

Should Read:

_____

Reason for Change:

_____



Page 123

Page #_____    Line #_____

Should Read:

_____

Reason for Change:

_____


Witness Signature:

_____





## Schedule a Deposition:
Scheduling@MagnaLS.com | 866-624-6221

## Order a Transcript:
CustomerService@MagnaLS.com | 866-624-6221

## General Billing Inquiries:
ARTeam@MagnaLS.com | 866-624-6221

## Scheduling Operations Manager:
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

## Customer Care:
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

## Director of Production Services:
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

## National Director of Discovery Support Services:
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

## Billing Manager:
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

## Director of Sales Operations:
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



WORD INDEX

## A

**Aarndel**
43:11 67:11,12,22
70:14 115:25
**abide**
11:15 16:5,17 35:7
**ability**
31:4
**able**
11:18 18:1 19:25
20:2 21:23 23:13
33:25 49:5 70:25
79:3 80:7 81:5
98:12,14 100:14
**abnormal**
22:11 30:20 62:13
92:25 93:10
**aboard**
99:4 101:15 107:19
**above-referenced**
119:14,19 120:12
**absorb**
114:8
**abuse**
31:13
**abusive**
26:15 27:8 75:7
**access**
11:19 17:2 51:4
53:20 58:6 64:13
68:14 71:1 80:1
82:10,11 95:10
102:10
**accomplished**
105:21
**accuracy**
70:19 73:15 74:1
**accurate**
45:24 71:6 73:7 85:6
85:12 117:15
**accurately**
72:21,23 81:4
**act**
33:4 53:16
**action**

4:14,17
**actions**
25:15
**actual**
57:9
**addition**
11:13 16:16 71:12
112:14 115:19
**additional**
24:3 59:20 108:9
**additions**
46:8
**address**
7:8
**adjournment**
119:23
**Administrator**
1:3
**administrators**
4:15
**advice**
60:13
**advise**
32:2
**advised**
31:19 69:21
**advising**
52:20
**AED**
80:4,8,9,14
**aforesaid**
119:13
**aft**
48:7 50:18,19,23,24
51:4 68:5 81:20
82:8,11,17 84:13
94:8
**age**
4:1 7:11 60:21
**agent**
98:3
**aggressiveness**
27:24
**agitated**
66:2
**ago**

12:18
**agree**
32:9 33:2,13 34:19
70:7 72:4 74:18
75:5 111:15,20
**agreeable**
118:14,15
**agreement**
117:14
**ahead**
18:21 31:18 70:22
**air**
11:25 22:23 23:7
24:9 39:25 44:7
52:16,20 56:19 69:3
82:8,24,25 83:6,11
83:13,20 90:17 91:5
91:16 92:10 104:22
105:9 109:21
**airbus**
8:9,11 12:7,9 35:17
35:19,21 36:1,7
38:1,7
**aircraft**
8:15,16 9:11,13,20
9:22 10:7,9,19,21
10:22 11:2,7 12:5
14:17,18 15:12,14
16:4,16 17:22 18:6
21:1,15 22:15 23:11
23:20 24:2,6,14,15
24:17 25:13 26:19
27:21 28:16 29:11
29:25 30:13,17,18
31:2,14,16 33:21
35:22 36:3,15,20,23
36:25 37:4 39:24
42:18 43:25 47:22
47:24 49:23 50:14
50:18,20 51:7,12,16
52:4,8,25 53:13,16
53:24 54:23 55:13
56:9,12 59:17 60:6
64:22 65:20 66:6,12
66:20 67:8 71:24
73:2,21 76:13 79:16

79:22 82:6,9,11
83:21 84:20 85:19
85:23 86:2 90:23
91:4,17 92:19 95:6
96:12,17 100:18
103:5 111:7,22
112:12,15,17,25
113:11
**aircrafts**
14:13 55:7
**airline**
12:22 13:3,5
**airlines**
13:10 14:4 15:3
**airman**
13:19,19
**airplane**
23:1 83:3 97:19
**airplanes**
102:17
**airport**
35:15 54:15 55:2
105:25
**airway**
13:24
**airways**
8:2,4,8,19,22,24 9:3
9:7,8 13:13 16:23
28:2 40:14,21,23
55:3 64:5 72:6
75:18 84:8 86:4,11
111:4
**aisle**
35:23 36:2,4
**al**
120:7,8 122:3,3
**alarm**
26:4
**alcohol**
27:25
**alert**
49:8,9 89:1 115:4
**alerts**
97:24
**ALEXEY**
1:2



alleged
113:10,20
alley
80:1
allocates
95:8
allow
30:19 31:2 50:6
51:24 52:22 53:6,13
64:25 65:3 79:25
82:9
allowed
98:23
allows
23:22 40:5 49:21
56:21 60:24
ally
35:25
Alpha
47:14
altercation
109:1
Alterman
2:17 4:5,7 4:8,10
19:20 20:16 22:5,7
27:14 29:7,19 31:18
32:15 34:6 35:6
38:19 39:2,6 44:13
44:21 46:20 51:13
52:14 63:1,2,21
64:20 66:16 67:5
68:2 69:18 70:18
71:9 72:22 73:5,13
73:25 74:5,12 75:4
75:13,24 76:16 77:9
78:2,10 79:19 80:3
81:15,24 82:4,13
83:19 84:5,17 85:16
86:1,8,13 93:21
96:18 101:9,25
107:10 111:1,10,14
111:19 112:9,20,24
113:5 115:2 116:7
117:23 118:5,9,10
118:15 120:19
altitude

23:9 33:24
aluminates
49:10
Amber
12:23
ambulance
65:13,17 100:24
101:7,15,24
amendments
46:1
Amount
94:19
Amrhein
2:5 4:6,8,10 18:21
27:13 29:5,16 30:1
31:17 32:13 33:18
35:3 38:17 44:6,19
46:10 51:9 52:12
62:23 63:10 64:6
66:14,25 67:25
69:16 70:16,22
71:15 72:11 73:3,8
73:23 74:3,10 75:2
75:11,22 76:14,18
77:11 78:8 79:17,24
81:13,22 82:2,7
83:17,24 84:15
85:14,24 86:5,19
87:1,4 93:23 97:3
101:13 102:2
107:18 110:23
111:8,12,17 112:2
112:18,22 113:3,7
114:24 116:9
117:21 118:1,6,12
120:4,9
and/or
23:20 33:6 120:15
121:9
answer
6:7,14,20 27:15 29:8
29:19
anticipation
88:12
anybody
113:24

Anytime
62:1
apologize
104:15
apparently
51:8
appear
77:9
APPEARANCES
2:1 3:2,2
appears
42:13,20 43:2
application
34:1
applied
17:19 30:8
apply
17:13 18:4 27:23
30:10 44:17 88:22
appreciate
118:2
appreciated
78:17
approach
19:19 26:25
approached
95:19
appropriate
10:1
approximate
99:5
approximately
45:17 59:13 66:16
97:8 103:22 109:15
April
4:23 35:8,12,14 38:2
40:17 41:2 43:18
54:15,24 85:3,12,20
87:19 90:5 94:1
111:11
area
50:25 104:25 109:23
arms
114:5
arrival
41:8 56:1 75:10

arrive
10:8 101:15
arrived
83:1 101:24
articles
87:20
ASHCROFT
2:4
asked
50:1 62:15 64:23
89:10 90:6 108:6
asking
4:20 6:6,10 61:24
73:14
assault
33:17 76:11,17
assaulted
69:13 70:12 73:20
77:5 111:6,21,24
112:15,16,25 113:9
113:24 115:24
assaulting
27:9 28:5 29:2,12,24
32:10 71:12 73:1
75:19
assess
65:7
assign
102:14
assigned
21:6
assist
62:19
assistance
54:12 77:4
assisted
67:14
assisting
70:14 115:25
assume
6:15 103:18
as-needed
17:6
atmosphere
65:25
atmospheric



MAGNA
LEGAL SERVICES

17:23
**attached**
83:14,20
**attaches**
82:16
**attempt**
27:3,20 53:1
**attendance**
43:9
**attendant**
16:11 36:12,12,13,13
37:2,3 42:25 43:5
48:20,22,23 50:12
50:25 59:6 67:9,12
69:13 70:12,13
75:20 78:4 95:18
106:7
**attendants**
16:8 18:5,19 19:16
29:14 31:8 37:8,14
67:7 69:14 70:8
71:5 73:20 76:10
97:25 103:1,4
106:22 108:15
110:9 111:5,21,23
112:4,17 113:15
**attendant's**
29:23
**attention**
25:3 27:5 30:7 41:21
120:21
**attorney**
88:1 113:12
**attorneys**
89:6,14 113:16
**August**
1:21 120:3,11 122:4
**authorities**
75:1
**authority**
1:7,9,11 2:15,15 4:12
5:21 9:12 10:20
15:5 16:1 20:20
21:6,14 22:2,10
23:17,18 24:12,19
24:21,22 44:12,14

55:4 65:5,19 66:11
71:17 73:11 84:11
84:19,24 85:11
99:23 106:15
108:19 115:4,9
120:7 122:3
**Authority's**
5:9
**automated**
56:19 91:12,22 92:14
**automatic**
56:16,17,24
**automatically**
40:3 57:2,7
**Ave**
120:5
**aviation**
7:22 10:4 22:19
26:13
**aware**
11:14 47:18 57:9
84:9 87:5,25 88:4
101:6 106:5 107:21
107:22
**A-a-r-n-d-e-l**
43:12
**a.m**
1:22
**a/k/a**
1:10,12

---
**B**
---

**Bachelor**
7:22
**bachelor's**
7:15,16,21
**back**
4:22 14:6,22 35:24
35:25 44:18 45:6
51:3,5,11,21 52:2,5
52:15 53:1,5,14
54:2 55:14 57:5
58:12,13 59:12,15
61:9 62:19 65:25
66:7,20 68:16,23
70:4 74:20,21 75:14

79:10 84:20 89:16
90:14 91:25 92:19
94:16 95:2,11 96:12
96:17,21 97:1 100:5
100:12,17 106:7
108:22 109:2,9
110:12 113:11,15
**backed**
109:24
**background**
50:5
**barred**
113:12
**base**
54:17
**based**
8:9 13:11 34:20
36:17 43:21 44:13
54:19 104:15
105:11 109:25
110:2,6 111:18
114:20 116:11
**basically**
22:20
**bathrooms**
26:3
**bear**
87:1
**began**
47:6
**behalf**
2:3,14
**behavior**
19:10,15 25:24 27:8
75:7 84:13
**believe**
14:4 57:17 63:7 64:9
77:15 92:24 94:14
95:18 98:6 105:12
107:6
**believed**
112:20
**Bell**
1:25 119:6,25 120:1
120:24
**belt**

97:22 98:5,7,19,20
**Bengtson**
1:20 4:4 4:1,7,9
20:12,14 22:5 32:21
39:3,4 47:5 119:10
120:11,14 121:5,19
122:2
**best**
23:25 53:1 60:24
71:25 94:23 117:8
**better**
101:18
**bid**
37:20
**big**
48:10
**bigger**
32:1
**biggest**
28:9 30:16
**bit**
5:12 41:12 50:5,9
62:24 65:23,24 66:1
66:2 90:11 104:13
**block**
90:12 91:1 92:6,9,23
100:11
**blocked**
90:14,16,21 91:7
**blocks**
68:13
**blood**
77:25
**Blue**
8:2,4,8,19,22,23 9:3
9:6,8 12:25 13:6,7
13:18 14:23 16:6,23
28:2 33:7 40:4,14
40:21,23 53:10
54:18 55:3 63:14,18
63:22 64:3 68:21
72:6 75:17 78:18
82:19,20 84:8 86:4
86:11 89:8 90:4
91:13 95:8 96:3
99:13,24 101:3



102:8 103:13 111:4 115:12
**boarded** 43:25 63:23 66:6
**boarding** 86:9
**body** 36:3 45:14
**Boeing** 13:4 14:7
**books** 10:2
**Boston** 2:7
**bottle** 80:10,15
**bottom** 55:20
**brake** 56:8,13,25 91:14,25 92:2 97:21
**brakes** 91:19
**breach** 27:4 31:11
**break** 86:20
**bridge** 11:6 24:16 53:12 65:15 68:18 103:4
**brief** 86:22
**briefly** 78:23
**bring** 38:24
**broadly** 90:20
**brought** 4:14 31:21 82:9 108:1
**BUGIADA** 1:13
**building** 14:18
**bullet**

21:12
**business** 14:5
**buzz** 49:10

—————— **C** ——————

**cabin** 11:4 18:16,17 28:19 31:7 37:16 47:23 48:7 49:20 51:4 58:14 68:12,14 71:2 71:8 91:19 94:9,10 95:20 98:2,22 100:10
**call** 22:13 41:14,14 44:8 44:9 47:23 48:11,12 48:18,19,21,25 49:1 49:2,19,25 56:1 59:10 60:11 67:17 71:21 82:24 83:5,6 83:9,10,13 92:25 93:5,9,9,11,15,18 93:25 94:4,15,21 102:14 104:9,17 114:19,23
**called** 4:1 5:13 11:25 12:6 13:9 14:3 16:9,12 38:22 39:15 41:21 56:18 102:3 117:7
**calls** 49:17 115:3
**Calvin** 42:21
**Camhein@ashcrof...** 2:9
**capacity** 8:17
**captain** 8:10,19 9:6,8 11:23 12:3,16,23 13:14 14:23 15:3 16:2 20:11,25 21:5,13 23:18 28:2 36:20

40:14,23 49:3,14 50:13 71:14 72:6 75:17 117:4
**captain's** 22:10
**Captain/Pilot** 20:21
**caption** 119:22
**card** 26:11
**care** 97:13,14
**carry** 60:15 61:22
**cars** 56:18
**case** 1:4 4:11 5:4 12:7 49:23 51:25 62:5 78:5 98:3 111:22 120:12 122:3
**cause** 119:13
**CCR** 1:25 119:25 120:1,24
**Center** 2:18
**certain** 12:2 17:13 22:24 23:12,12,13 25:14 30:19 31:1 59:22
**CERTIFICATE** 4:11 119:1
**certification** 13:2
**certifications** 12:20,21
**certified** 4:5 12:4,23 24:2 36:22 119:6
**certify** 119:9,20 121:5
**chance** 28:11,15,21,23 32:23
**change**

36:17 40:11 46:2 79:9 122:8,13,18,22 123:4
**changed** 65:22,25 66:18 77:3
**changes** 16:25 46:8 120:15 121:8,12
**changing** 50:7 99:8
**channels** 49:7
**chapters** 18:3
**charge** 10:6,12 71:23
**chat** 118:11
**Chautauqua** 13:9
**check** 10:1,2 12:15 13:18 13:19 60:12
**checked** 12:12
**checking** 104:3
**checklist** 15:18 59:19 60:14 61:19 62:16 105:23
**checks** 97:8 98:12,14 105:19
**Cheryl** 2:17 4:10 38:17 62:24 86:19
**chief** 108:6
**Chris** 120:4
**CHRISTOPHER** 2:5
**circumstance** 111:16
**circumstances** 17:8 41:10
**city**



**MAGNA**
**LEGAL SERVICES**

64:17 75:10
civil
4:3 5:23
clarification
91:10
clarify
104:12
class
37:17,18
classifying
115:19
clear
59:2
cleared
47:12
clearly
27:16
close
53:19 100:14
closed
11:6 24:15,15 57:1
70:25 91:14 92:2
cockpit
26:5 27:4 31:7,12
47:25 48:8 49:8
50:4 61:10 62:20
63:3 64:21 66:8,10
66:23 68:12,17
70:25 81:7 93:5,14
93:24 97:18,20
98:13,24 99:1
100:10 114:19
combative
96:16,20
come
14:6 41:15 65:15
100:6 117:14
comes
48:7
comfort
19:13
comfortable
104:7
coming
66:19 68:6 70:5 79:2
96:7 114:8

command
9:9 12:11,15 15:5
20:21
commenced
4:17
commend
95:13
commended
94:25
Commission
121:25
commissioned
119:8
commit
33:4
committing
33:3
common
13:17
commotion
65:24 66:19 96:15
97:1
communicate
31:5 61:11
communicated
63:4
communicating
94:8
communication
31:5 48:6 49:22
56:18,21 70:24 71:3
77:1,8 115:15
communications
105:24
companies
14:2
company
13:8 14:3 28:3 53:4
57:2,12 60:12
company-issued
11:20
competed
40:17
complaints
87:10
complete

11:5 21:14
completed
45:20 119:23
completely
7:6
compliance
26:9
complies
10:4
comply
17:12 22:22
comprises
43:16
compromised
18:18 76:8
compromises
30:24 31:4
concerned
18:6 41:11
concerning
21:15
concerns
41:6,9
condition
30:21 33:22 52:10
conditions
17:23
conducted
88:1
configuration
38:7
configured
36:3 60:6
confined
28:9,11
connected
82:22
connection
41:1
consider
14:15 24:9 27:9 29:2
29:13 31:14,19,23
32:6 75:19 90:18
considered
9:9,12 11:3,8 24:17
27:2 43:24 44:5,11

47:25 48:5 56:9
71:19 74:23 90:22
90:24 95:7 113:1
consortium
11:11
constantly
16:24
constitute
32:11
contact
26:17 52:3,4 53:15
60:16 93:3,11,13
103:12 115:11
contacted
58:22 59:5 89:3
115:14
contained
57:20 116:18 117:17
context
5:2
continue
41:5 102:23 103:10
104:8
contraband
27:23
control
9:18 11:12 22:23
39:25 47:11 49:4,23
52:20 53:15,18,20
64:12 109:22
controllers
52:17
controlling
22:12
controls
15:16 53:15,20
convenience
19:22
conversation
46:6 63:9,12 106:17
conversations
76:9 108:14
convoluted
101:19
coordination
47:11


MAGNA
LEGAL SERVICES

coordinator
24:13 71:23
copy
61:22 120:10,14
correct
16:20,25 19:10 21:2
21:18,19 24:25 25:1
37:1 40:23,24 41:23
43:19,20,23 45:11
57:14 58:12 59:7
60:5,8 72:10 73:2,7
73:22,24 74:2,4,9
74:11 75:1,3,10,12
84:25 85:1 91:10
92:17,21 94:12,17
94:19,24 95:15
99:20,21 100:7,20
104:19,20,24
105:14,16 106:24
109:13 111:16,25
112:12,17,21 113:2
116:3,14 117:11
119:18 121:11,16
corrections
120:15
counsel
86:15 113:9
County
119:4 121:2
course
40:13
court
1:1 4:19 6:21,24
119:7
creatures
59:20
crew
9:17 10:1,13,15 16:3
21:6,17 22:13,24
26:18 27:10 28:6
29:2,12,24 30:22
32:5,10 33:7 34:25
36:6 38:10,23 39:15
39:21 41:4 42:1,6
43:17 48:17 56:19
61:12 62:19,21 63:4

66:4 68:20 70:20
71:4,12 72:25 73:1
73:19 76:5 77:14
80:16,18 82:18 93:1
93:4 94:25 102:8,24
103:11,15 106:11
107:19 108:16
110:14 113:16
114:3 117:9
Crew/Dispatcher
20:20
criteria
91:18
critical
71:5
CROSS-EXAMIN...
4:6 87:3
currency
15:22 37:9
current
7:8 8:7 11:18
currently
7:24
customer
23:21 26:9,17 32:11
32:17 33:2,3 39:21
50:16 55:6 72:9
74:15 76:11,25
79:15 81:11,16 94:2
113:1 114:5 115:6,7
115:20,23
customers
17:15 21:17 31:9
33:6,11 34:10 36:5
80:2 85:23 86:2,9
111:6,24 112:5,7
cut
97:16
cycled
98:6

_____ D _____

damage
27:20
damaging
26:20

data
15:10 83:23
database
56:5 83:16
date
120:20 122:4
day
35:18 46:4 94:1
106:11 108:16
113:16 118:3
121:21
days
118:13
deal
51:24 76:24 103:16
dealing
61:8 74:21 103:19
deals
25:4 32:17 64:11
dealt
64:15
Dear
120:9
Deceased
1:3
decedent's
4:16
decide
22:21
decision
52:15,17 60:24 73:10
102:22 104:7
decisions
15:25
deck
21:7 31:6 48:18
declare
121:15
deescalate
32:5
defendants
1:17 2:14 4:11
defined
24:11
definitions
113:17

Degree
7:17
delay
41:6 101:14
delayed
45:2,3
delays
109:16
deliberate
27:20
density
28:13,24
depart
44:23
department
1:10,11 2:16 108:19
departments
40:5
depending
19:7 30:3,15 86:16
deplaning
81:19 82:1
deploy
98:1
deposed
4:5,24 5:23 89:2
deposition
1:19 4:13,14 5:3,13
6:5 20:14 39:4 87:8
88:6,12 119:21
120:10 121:7,9,14
depositions
118:12
descend
23:8 30:12
descent
48:3
describe
29:21 35:20,25 79:3
80:7
described
27:6 92:5,24
description
45:13 115:8
designated
8:14 37:5



MAGNA
LEGAL SERVICES

designation
12:1,2 15:1
designed
28:17,20
desired
120:16
destination
91:1,3
detail
20:24 36:9 76:22
90:1,2 106:19
108:24
detailed
18:25 19:1,17 25:23
27:16 35:4 106:16
108:12
details
5:7 22:18 23:19
45:23 69:23 77:1
114:16
detained
85:23 86:3
determine
24:23
detrimental
33:5
develop
15:23
deviate
23:2,7,22
deviated
59:24
device
56:18
difference
25:18 90:7
different
25:15,20 26:25 40:5
49:6,7 96:22 101:4
107:13,16,17
difficult
95:4
direct
25:3 27:5 32:19
82:11
Directing

41:20
direction
23:13
directly
48:25
disarm
97:25 98:8,21
disclose
89:11
discuss
46:14
discussed
89:12,22,24
discussing
102:20
discussion
89:17,17
discussions
84:10 85:18 89:5
disoriented
107:2,7
dispatch
10:3
dispatcher
23:19
display
26:23
disruptive
19:12 25:24 26:14
70:4
disseminated
40:3
District
1:1,1 4:18
disturbance
19:6,8,8 25:18,22
31:20 72:18 74:15
74:23 79:10,11,15
96:21 110:14 113:1
115:6,8,20
disturbances
17:17 25:4,13,16
55:6 74:22
doctors
67:18
document

20:10,11 39:3,7,8
40:1 57:8 58:6 62:5
84:7
documentation
9:25 10:1 37:7
documented
56:4,15 57:14 58:8
58:16 59:3
documents
38:5 56:22 88:9
doing
23:23 61:6 104:4
door
11:3,4 31:7 48:8
56:13 58:14 61:3,8
61:11,17 62:20 63:3
64:21 65:8,9 66:8
66:10,24 68:11,13
68:15 70:25 81:7
91:20,20 92:2 95:23
97:11,18,19,19,20
98:8,13,18,22,24
99:1 100:8,10
doors
11:5,6 24:15 51:5
57:1 91:13 98:1,2
98:21
doubt
74:1
Downer
120:5
draft
45:19
drafts
116:22,23
Drive
7:9
drugs
27:25
due
28:24 109:15
duly
4:4 119:8,11
DURAN
1:16
duties

9:5 10:16 14:22,24
15:6,19 29:4,14
40:14,22 70:9 91:7
duty
18:15 21:8 29:23
33:6,14
dynamic
33:20,25

— E —

E
39:9
earlier
76:2 90:11
edges
28:18,18
education
7:14
effect
24:14 35:12
effectively
18:2
effects
69:7 76:1
egress
98:15
Eileen
1:25 119:6,25 120:1
120:24
either
22:12 35:24 49:11
76:10 87:24 106:23
108:15
elected
41:4,14
Electronic
118:5,6
else's
19:12
email
87:9 89:9,16,18
118:10
Embrair
13:16
emergencies
24:25 54:23 55:6


M GNA
LEGAL SERVICES

emergency
22:2,21 23:16 24:21
  30:8,20 33:16 52:21
  54:1,11 62:2 78:7
  78:13 79:9 93:1,8,9
  93:11,15,18,25
  94:21 99:19 100:1
  101:22 104:17
  106:1 109:10 114:1
  114:17,18 115:5
employed
7:24
employee
42:7 84:8 102:10
  107:16
employees
82:19 102:9
employer
89:1
enclosed
120:10,12
Enclosures
120:25
encounter
39:24
enforce
53:23
enforcement
54:5 74:25 75:9
  113:2
engaging
81:11
engine
14:17
engineer
13:4 14:7
engines
47:10 84:2
ensure
23:3 33:10
entire
43:17
entirely
84:1 109:18,19
entitled
25:11 34:9 39:9

55:19
entrance
68:17
environment
28:9,11 48:1
equipment
62:4 80:12 81:3,8
errata
120:13,16,18 122:1
escalate
71:13
escalated
33:17 72:8 75:8
  79:14 109:6,8 115:5
  115:17
escalates
19:13 26:14 34:24
escalating
25:21 74:14
escalation
115:15
escort
101:6
escorted
67:7,9,22 68:3
escorting
66:3
especially
60:16
Esq
1:2 2:5,17,25 120:4
EST
1:22
Estate
1:3
estimate
59:8 66:21 81:5
  94:23 105:5
estimated
58:21 59:10 61:14
estimating
105:7
estimation
99:5
et
120:7,8 122:3,3

evacuation
31:2
evaluator
13:22
event
31:22 39:25 40:9
  44:2 46:16,17 48:9
  60:18 85:13 87:13
  94:9 115:16,17
events
58:18 85:19 87:19,21
  90:5
eventually
109:7
Event/concern
45:13
everybody
28:13 30:16,25 52:25
  96:4
EVGENIY
1:3
exact
61:14 67:1 77:1 99:9
  109:21
exactly
51:10 63:6 64:1 67:4
  96:1
examination
4:4,7 4:2,7 110:25
  115:1
example
27:17 34:25
excuse
108:17
Executed
121:21
Exhibit
4:13,14 20:14 35:5
  39:4 105:13
exhibits
4:2 118:11
exist
22:25
expect
86:23
experience

28:1 55:1 72:5 110:3
  110:7 111:18
experienced
54:22 70:11
experiencing
51:8 55:12 94:3
Expires
121:25
extended
100:15
extent
77:22
exterior
15:13
eyes
69:1,25

## F

face
110:10
fact
52:6 72:8 74:5 87:22
  116:24 117:2
facts
107:14
faded
62:24
fair
45:10 66:9
fairly
67:2
FAM
16:9,13
familiar
32:16 101:10
far
9:15 12:22 15:9
  19:18 23:21 36:16
  46:12 58:25 65:17
  77:22 90:13 91:6
  99:13 101:11
  115:15
fast
24:1 76:20
faster
23:8 50:9


MAGNA
LEGAL SERVICES

father
4:16
fatigue
41:3,14,18 88:13
102:3,14
FCIR
39:18 41:24 42:3
43:11,16 45:10 47:4
55:20 57:21 67:13
74:8,13 75:7,14
88:13 115:21
116:18,20
FCOM
22:13
federal
4:19 10:4,23 11:13
22:19 26:13 62:8
101:8
feel
23:14 69:2,7 96:4
feeling
102:21
feet
48:2,3
fellow
21:17 37:8
felt
54:9 72:1 77:5 99:7
fight
41:7 59:25
figure
51:18 99:15
filed
107:9
filing
117:8 120:19
fill
40:2 41:18 88:18
filled
41:3,19 61:16
final
9:12 15:5 16:1 21:14
23:4
find
18:2 87:24 120:10
fine

118:5,15
finish
6:19 73:17 97:17
105:20
finished
13:12,16,18
fire
26:6
FIRM
2:4
first
4:4 8:23,25 12:13
13:14 14:25 15:1
16:16 21:12 30:2
36:25 37:17,18
41:21 42:2,11,11,15
45:9,22 46:7,23
47:21 49:1,3,15,18
50:1,12 52:20 55:11
55:20,24 56:13
59:16 60:10 62:21
63:3 65:18 66:5
79:18 81:8 83:9,12
89:4 91:22 93:5
94:4,4 95:16 96:8
97:14 102:11,25
106:5 117:6 119:10
five
55:16 56:2 58:24
66:23,24 67:4 101:4
fleet
12:24
flew
13:14,18 14:3 43:22
flight
4:22 9:16,17 10:3,21
11:10,15 13:3,13
14:7,19 15:10,16
16:3,5,8,11,18,21
17:2 18:5,19,20
19:6,16,21 20:2,9
20:20,23 21:6,7,9
21:21 22:2,9,13
23:4,15 24:8,10,24
25:9 28:7 29:1,14
29:22 31:6,8 32:4,8

33:5,11 34:5,7,10
34:21,23 35:2,7,10
35:15 36:6,11,12,12
36:13 37:2,3,8,14
38:11,22 39:15,21
40:17 41:5,13,16
42:1,25 43:5,9,14
43:17,17,22 44:4,16
44:22,22,24 45:1
47:19 48:18,20,22
48:23 50:11,25 56:5
57:10,10 58:12,19
59:6 62:18 64:19
67:6,8,12 68:19
69:13,13 70:8,12,13
70:20 71:4 73:20
74:19,24 75:19 76:2
76:7,10 78:3 83:16
83:22 86:10 91:15
91:16 93:1,20 95:17
95:18 97:24 99:20
100:23 101:15,23
103:1,4,14 104:18
106:6,11,22 107:19
108:15 110:9 111:5
111:21,23 112:4,16
113:14 114:22
117:5
Floor
2:6,20
Florey
42:12,16 46:7 49:1
50:1,12 59:9 83:9
83:12
flow
59:22,25
flown
54:14,20
fly
14:1 15:25 23:12,13
flying
14:13 15:7,7,21
focus
76:23 99:16
following
46:4 108:10

follows
4:6
follow-up
87:16 108:5 112:10
follow-ups
86:18 113:8
FOM
18:2,24 22:12 24:22
25:4,23 27:18 32:16
61:20
foregoing
119:17,22 121:6,16
form
60:12,14 121:8
formal
107:8
forth
89:16
Forty-seven
7:12
forward
67:15,22 68:17,23
80:25 94:10 105:17
four
12:17 36:8 58:23
94:22
Fox
7:9
framework
50:8
Frank
43:2
frequencies
49:6
Frequently
54:16
fresh
103:11,15
front
66:4 67:8,23 68:3
69:3 91:21 95:19
98:15 99:2 106:8
110:15
full
68:19
function



15:4 76:7
**functions**
64:4
**further**
52:9 110:23 114:24
117:24 119:20
**future**
88:21
**F-A-M**
16:9
**F-O-M**
16:19
**F1**
36:14 42:24 63:7
69:20 115:24
**F1's**
70:3
**F2**
36:14
**F3**
36:14
**F4**
36:14 43:14 67:10,21
69:24 77:12 95:18
96:7 99:2 100:6
115:24

___ G ___

**galley**
35:24 50:18,20,23,24
68:5,18 80:25 81:20
82:12,17 84:13
106:7,8 110:16
**gate**
10:19,22 11:1,2,4,8
24:8 44:11,18 45:5
45:6 47:10,24 48:4
51:22 52:2,5,15
53:2,7,19 54:2
55:14 56:1,10 57:6
58:12,13,24 59:15
60:7 71:22 90:14,21
91:18,18,25 94:17
95:2,8,11 97:7 98:3
99:18 101:16
104:22 105:14

109:9
**gates**
53:21 59:12
**gather**
51:19 95:24 97:12
**gathering**
55:21
**gears**
50:7
**general**
9:10 84:24 85:11
88:1
**General's**
5:10,22
**generated**
46:19 57:1
**generates**
92:3
**gestures**
6:25
**getting**
28:22,23 77:5 94:13
95:1
**get-together**
103:3
**give**
5:25 6:18 32:4,23
34:13 46:21 85:6
99:5 101:18 106:19
110:16
**given**
12:14 119:14,19
**giving**
5:18 89:6
**global**
40:1
**go**
18:21 24:14 28:19
31:18 37:11 42:10
51:21 59:17 60:22
63:10 65:17 70:22
74:20,20 90:13 98:7
98:12 100:13 102:3
102:5,6,18 103:16
109:9
**goal**

15:20 17:24 19:1
40:8 62:16
**goes**
15:9,10 26:14
**going**
4:20 5:25 6:3,15
15:15,17 19:22
21:22 23:23 25:5
29:16 34:6 41:7,8
46:17,19 47:13
48:16 52:18,22 58:2
78:16 79:2 96:16
97:16 102:14,17,19
103:18 104:9 105:8
105:9 108:22
109:15,20,22 110:1
112:9 114:5
**grabbing**
27:18
**great**
30:4 118:6
**greater**
28:11
**Greenwich**
2:19
**GRIGORY**
1:4
**ground**
11:11 22:24 24:1
47:11 49:14,22
53:18 63:14 71:22
82:18 84:2 90:23
91:5 92:12 110:11
**groups**
102:10 107:17
**guess**
5:5 110:4
**guys**
80:14 118:4

___ H ___

**habit**
59:21
**half**
8:6 28:4 55:2 72:5
75:18 110:7 111:3

**hallway**
100:9
**hand**
6:25
**handle**
25:20 49:18
**handles**
53:18
**handling**
52:23
**handwriting**
42:8
**handwritten**
42:3 43:10,15
**happen**
6:3 48:12 95:14
**happened**
31:22 46:16 76:19
77:7,20 78:15 87:14
87:15 88:23 95:12
101:2 106:16,20
117:15
**happening**
54:8 69:24 72:14
79:7 97:2 100:5
114:10
**happens**
31:24
**happy**
6:11
**hard**
95:10
**head**
7:1 38:4 63:10 98:8
**headed**
52:5
**heading**
63:13
**headquarters**
64:17
**headset**
50:3
**health**
24:5
**heard**
68:25 87:12 96:8



MAGNA
LEGAL SERVICES

107:24 108:2
113:24
**hearing**
72:15 89:15
**heightened**
41:11 109:3
**held**
8:18 14:8
**help**
30:10 38:6 58:17
104:5
**hereinafter**
4:5
**hey**
26:12 80:14
**higher**
8:17 28:23
**highest**
7:13 27:2
**Hingham**
120:6
**hired**
13:9 54:21
**hit**
77:6 114:12 116:5
**hitting**
27:19
**hold**
8:21 9:2 11:22,24
12:19 47:7,14 64:4
**holds**
36:5
**home**
102:5
**hotel**
102:6,15
**hour**
105:8 109:15
**hurt**
28:22,24

_____
**I**
_____
**idea**
65:9
**identification**
20:13,15 22:6 32:22

39:3,5 42:4,22 43:3
43:7,12 47:5
**identified**
75:6
**identify**
20:8
**II**
27:6,8,11,17 28:5
34:24 72:8,17 74:14
74:23 75:5 79:10,15
81:11 113:1 115:5,7
115:20
**imagine**
84:3 86:6
**immediacy**
25:21
**immediate**
30:6
**immediately**
51:21 52:2
**impact**
28:12 32:7
**impacted**
112:6 114:6
**implications**
113:18
**important**
76:4
**inadvertent**
28:22
**inadvertently**
89:20
**incident**
4:21 6:7 32:2,3 41:1
45:20 77:2 84:7,23
85:7 103:25 111:11
**incidents**
39:18
**include**
111:11,13
**including**
24:24 33:9
**independent**
49:4
**INDEX**
3:1 4:2

**Indianapolis**
13:11
**indicate**
120:15
**indicated**
74:13 115:21
**indicates**
67:13
**indications**
77:24
**individual**
24:5 42:14,23 43:4,8
43:13 52:7 73:21
**individually**
4:13 22:16
**individuals**
38:12
**industry**
90:15
**inflight**
10:14 15:16,19 17:3
17:5,10 18:20,22
21:7 24:10,13,17
25:4,11,16 26:17
44:5,7,9,17 48:17
56:10 60:16,18,25
61:11 62:21 63:4
64:9 66:4 71:4
72:24 73:19 74:21
77:14 80:16,18 90:7
90:18,20,24 91:4,8
92:23 93:4 103:6,19
104:23 110:14
114:3
**inflights**
67:10
**information**
11:19 18:3 31:3
51:14,20 52:9 55:22
56:3 57:13 60:17,20
60:23 61:2,21 69:19
70:19,21 71:10
72:13 73:6,16 74:2
74:6,8 76:24 79:4
79:13 83:21 84:6
87:13,15 88:8,14,20

91:12,23 92:15 94:5
94:7 95:25 97:12
99:8,10 101:22
107:11 108:9,13,23
112:21 114:20
116:12,17,19,24
117:1,10,10,16,17
**Ingleton**
43:6
**ingress**
98:15
**initial**
12:13 14:10 16:10
19:8 45:19 51:17
55:25 62:16 63:12
63:19 109:8 110:4
114:23 116:22
**initially**
12:10 26:8 34:9,22
45:5 47:14 48:15
78:13 102:16,18
117:3
**injured**
30:23 76:6 77:10
**injury**
30:3 77:24
**inside**
53:16 83:2
**inspection**
10:9,10 15:12
**inspections**
24:4
**inspector**
5:10,22 84:24 85:11
**instance**
17:16 91:22
**instances**
91:12
**instructed**
48:17 60:10
**instructions**
6:1 16:14 22:23
79:20
**instructor**
13:20
**instruments**


**MAGNA**
**LEGAL SERVICES**

88:11
intended
90:25
intending
102:18
interact
78:20
interacted
78:25
interactions
81:16 84:18
interest
23:25
interference
29:3,13,22
internal
56:17
internally
5:6
International
14:4
interview
5:20 78:11 85:2,10
  85:17 88:25
interviewed
84:23
interviewing
5:9
interviews
85:18
introduced
105:12
investigation
5:6 88:2
involve
34:22 74:25
involved
48:16 95:1,13
involves
9:25 10:7
involving
5:4 17:14 34:10
iPad
11:20 16:22 61:20,23
  61:24
irregular

39:25
irregularity
38:23 39:16 41:22
  42:1
Island
64:17
issue
23:6,20,22 26:11
  47:18,22 48:10,16
  50:10,16 53:5 59:7
issued
11:17 16:6,23
items
51:1,2 80:17,19,21
IV
31:10
I-n-g-l-e-t-o-n
43:7

**J**

J
1:25 119:6,25 120:1
  120:24
Jamaica
43:23
Jersey
1:8,10 4:3,12
jet
8:2,4,8,19,22,23 9:3
  9:6,8 12:24 13:6,7
  13:18 14:23 16:6,23
  24:16 28:2 33:7
  40:4,14,21,23 53:10
  53:12 54:17 55:3
  63:14,18,22 64:3
  65:15 68:18,21 72:6
  75:17 78:18 82:19
  82:20 84:8 86:3,11
  89:8 90:4 91:13
  95:8 96:2 99:13,24
  101:3 102:8 103:4
  103:13 111:4
  115:12
JFK
35:15 43:18 44:23
  54:14 55:2 101:2

110:3
job
9:10 18:8,10 71:24
  76:4
joining
105:2
joint
23:17 117:7
JONATHAN
1:14,16
JOSEPH
1:13
jot
46:17
JR
38:23
justifies
23:14

**K**

Kareem
43:11
kept
16:15 80:21,23 84:4
Kevin
43:6
kicking
27:19
kind
15:4 25:21 40:1 41:9
  41:10 50:25 56:10
  58:20 65:22 70:5
  78:14 79:1 80:13
  88:16 90:24 102:9
  108:9 109:3
Kingston
43:23
knew
54:6,10 58:1 96:20
know
6:11 26:24 32:1
  33:23 34:14 37:25
  46:25 48:20 51:6
  55:14 56:3 58:1,23
  60:20 61:13,14
  63:25 64:1,5,8,16

66:12,22 67:1,4,9
68:1,9,19 75:15
76:12 77:22 80:20
81:2 82:17,25 83:8
83:9 87:17 88:7,10
89:12 90:1 94:13
95:24 96:1,19 97:2
101:13,19,20
103:22 104:13
107:18,25 108:2
113:14,17,20,23
114:9,10,15 117:12
118:12
knowing
46:18 48:15
knowledge
67:21 85:22,25
110:22 113:17,19
113:22
known
16:18 36:25
KURT
1:20 4:4 4:1,7 119:10
120:11 121:5,19
122:2
K-a-r-e-e-m
43:11

**L**

laboratories
51:3
laboratory
68:8,11,13,16 100:7
Lagoda
1:3 76:12 78:4
100:21 107:2,22
108:20 110:10
112:16
Lake
7:9
land
23:24 24:2 30:13
57:4
landing
105:22
lands



MAGNA
LEGAL SERVICES

91:16
language
46:2 107:23
large
40:3 118:7
largest
54:19
late
41:7,8
law
2:4,16 53:23 54:5
74:25 75:9 101:8
113:2
lawful
4:1
lawsuit
5:23 87:6,7
lay
88:9
layout
35:21 36:1
lead
37:3,6
leading
35:23
Leandro
43:3
learn
47:21 65:18 68:4
69:10,19 82:4
learned
40:10 66:5 95:16
96:15,25 99:3 109:7
leave
43:18 100:15
led
114:19
left
43:24 98:5 104:21
legal
89:8 113:17
lengthy
30:14
letdown
41:12
let's

44:24 57:15
level
7:13 19:7 25:17,18
25:22 26:21,24 27:6
27:7,11,17 28:4
30:3 31:10 34:24
72:8,17 74:14,22
75:5,20 79:10,15
81:11 109:1 113:1
115:5,7,20
levels
25:19
liaison
64:9
license
11:25 12:11 14:9,10
licenses
11:22 12:20
life
26:21
light
49:9,9
limit
22:12
limitations
22:25 23:7
limited
100:6
limits
22:17,18
line
13:19 104:17 105:1,2
105:4,6 110:2,2
122:6,10,15,20
123:1
list
39:17 42:10 43:16
105:23
listed
38:8 42:12 46:22
literally
92:10
little
5:12 37:12 41:11
50:5,8 62:24 65:22
66:1 88:19 90:11

101:19 104:13
local
45:8 53:23
located
30:18 61:20 96:5
locations
36:15 80:24
locker
102:4
locks
44:9
log
10:2
logbook
61:25 62:6
long
8:3,18,25 13:23 14:8
23:14 39:17 55:10
64:17 82:21 101:20
103:22,24,25 104:1
105:1,4,5,9 109:19
longer
30:23 71:21 73:9
90:22
look
20:1,17 87:23
looked
115:22
looking
38:20 66:2
looks
42:4
lot
17:11 28:17,18 76:25
95:23 99:8,12
110:19
Louis
7:10 119:4
L-e-a-n-d-r-o
43:3

_____
M
_____

MA
2:7
main
11:4 58:13 77:8

91:19 98:2,22
maintain
11:18 18:15
maintains
15:21
maintenance
10:2 62:6
majority
54:17
making
9:25 10:15 62:11
71:21
male
93:19 104:18 106:2
106:12 109:10
114:21
Malysa
2:25 118:9
man
96:16 99:19
managing
9:17
manual
11:16 16:5,8,12,18
16:22 17:3,10 19:21
20:3,9,24 21:22
22:3,9,14,14 25:10
34:8,21 35:8,11
44:16 74:19
manuals
37:10
mark
20:12 39:2
marked
20:15 32:21 47:4
Massachusetts
120:6
matter
87:11 88:2 89:2
120:21
matters
21:15
Matthew
2:25
mean
8:12 11:1 18:10



MAGNA
LEGAL SERVICES

**means**
33:8,15 35:1 44:10
47:9 48:6 52:24
91:2

**meant**
33:19,25

**mechanics**
114:9,16

**medical**
17:17 23:21 24:24
30:7,10,14 33:16
44:2 50:16 52:21
53:5 54:1,11,22
55:5 59:6 60:13,18
62:1,3 65:7,17
67:15,24 69:15
70:14 71:13 72:2,7
72:16,18 74:14 77:4
78:6,11,12 79:8
80:1 81:3,7 93:1
95:2 96:22 97:4
99:18,25 101:22
106:2,23 109:10
112:3,8,11 113:20
113:25 115:4,25

**medications**
60:21

**MedLink**
60:12,12,14 61:19
62:16

**meeting**
103:21,24 104:1

**member**
30:22 62:21 63:3
76:5 77:15 80:16,18

**members**
10:15 16:4 21:7,17
26:18 27:10 28:6
29:2,12,24 32:10
33:8 34:25 38:10
48:17 64:3 66:4
68:20 71:4,12 73:1
93:2,4 94:25 106:11

24:11 47:8 50:22
97:16 107:13
115:11

107:19 110:15
114:3

**memorized**
17:25

**memory**
90:10 104:16

**mental**
50:7

**mention**
107:1

**mentioned**
9:19 13:5 24:20 67:6
107:4,7 116:21

**metal**
28:18

**method**
93:15

**methodical**
105:18

**methods**
93:4

**MEZZACAPPA**
1:15

**MICHAEL**
1:12

**middle**
16:10

**mid-flight**
41:13

**military**
94:14

**mine**
107:13

**mini**
118:7

**minutes**
55:17 56:2 58:23,24
61:15 66:23,24 67:4
81:6 94:22 97:9,10
110:5

**misconduct**
32:12,17 33:2,15,17
34:9,22 72:9 75:21

**Missouri**
7:10 119:2,8

**model**

8:14,16

**modules**
49:5

**moment**
34:13 46:21 86:22
92:14,23

**moments**
100:16

**Morning**
4:9

**move**
34:1 68:22

**moved**
77:17 110:15 114:7

**moving**
49:23

**MS.ALTERMAN**
4:9

**multiple**
15:20 52:19 63:17
69:14 80:23 101:3

**multi-crew**
36:22

**multi-engine**
14:21

---

**N**

---

**name**
4:9 13:13 41:24
42:11,20 43:2,6,10
60:21 121:13 122:2
122:3

**named**
4:13 119:9

**names**
13:8 38:11 42:3

**narrative**
45:12,18 46:9,22
47:3 67:13

**narratives**
70:3

**narrow**
36:2

**native**
107:23

**navigate**

18:1

**navigation**
15:10

**nearly**
101:2

**necessary**
24:23 33:10,15 35:1
121:10

**need**
23:24 50:8 51:19,21
51:23 52:4,19 53:4
53:12 74:25 88:20
89:11 96:5 97:25
108:8

**needed**
51:17,18 59:16 64:19
68:7 69:25 71:25
72:3 97:13 99:15
114:1

**needs**
40:10 53:9 64:15

**never**
43:22 100:21,22
107:25 109:18,19

**New**
1:1,7,8,9,9 2:15,21
4:2,3,12,17,18 8:9
88:1

**night**
45:20 46:14 105:6
108:17

**NJ**
2:16 120:7 122:3

**nods**
7:1

**normal**
23:1 59:25

**normally**
49:14 97:21

**notarized**
120:18

**notary**
118:13 120:17
121:24

**notation**
94:20



note
29:17
notes
46:15 55:15 57:16,19
57:20,24 58:15
88:16 104:16
105:11
noticed
66:18
notified
44:2
notify
52:16 53:4
NRB
1:4
number
18:13 37:23 40:4
42:13,22 43:4,7
44:22,24
numbers
42:4,7 64:14 94:13
nurse
114:14
nurses
67:18,19,20 77:18
78:6,12 114:7
NY
2:16,21 120:7 122:3

**O**

oath
5:14,15
objection
18:21 27:13 29:5,9
29:17 30:1 31:17
32:13 33:18 35:3
44:6,19 46:10 51:9
52:12 63:10 64:6
66:14,25 67:25
69:16 70:16,22
71:15 72:11 73:3,8
73:23 74:3,10 75:2
75:11,22 76:14,18
77:11 78:8 79:17,24
81:13,22 82:2,7
83:17,24 84:15

85:14,24 86:5 93:21
96:18 101:9,25
107:10 111:8,12,17
112:2,18,22 113:3
obligation
33:14
observed
67:14
obtain
7:16
obviously
77:12 91:4
occur
32:2
occurred
4:22 24:19 41:2
44:12 58:1 69:22
74:8 87:19 88:4
90:5 103:21 110:14
110:21 111:16
occurrence
113:10
occurring
71:1,7 92:18 94:9
109:1
occurs
22:11 23:20 31:13
41:17 48:1 91:7
98:9
office
5:10,22 84:24 87:25
officer
1:12,13,14,15,16
8:23,25 12:13 13:14
14:25 15:1 16:17
36:25 42:15 45:23
46:7 49:1,3,15,19
50:1,12 60:10 65:20
66:11 80:8 83:9,12
85:11 99:4 102:11
103:1 106:6 116:1
117:6
officers
4:13 65:6 71:18
78:21 80:5 81:20
84:11 106:14

108:18 110:11
official
41:24
officials
75:10
okay
5:8,12 6:12,16,17,23
7:2,3 25:7 27:16
32:25 34:15,18
41:20 42:2,25 47:2
72:1 78:2 86:19,25
89:25 92:4,8,17
93:12 98:11
onboard
4:22 9:18,23 10:13
10:13,18 16:4 18:12
18:14 19:15 23:21
25:13 26:19 28:6,25
29:1,11,25 30:5,9
30:10,14,16,25
31:16,21,24 32:4
36:21,24 37:3 38:11
42:7,17 44:2 47:19
47:22 49:5 50:17
51:2 52:8,21 53:6
54:1,7,23 55:7,13
59:7 62:4 64:22,25
65:20 67:18 69:15
70:8 72:18 73:2,11
73:21 76:12 79:16
79:22 80:15 84:12
85:23 86:2 90:9
93:20 94:2 95:22
96:2,9 99:20 100:1
101:23 105:25
106:3,6,13 109:11
111:7,22 112:12,15
112:17,25 114:21
once
6:22 10:21,21 11:4
12:1,14 18:19,22
24:14 44:3,17 47:24
53:19 57:5 59:11
62:20 63:2 71:9,22
77:16 78:15 79:14
81:18,25 84:14

90:21 92:1 97:20
98:19,22 110:13
115:10
ones
77:19 78:24 80:24
89:3
One's
8:16
ongoing
72:20
open
11:3 61:3,10,17
62:20 63:2 68:13
91:20 97:17 98:12
98:15,18,22,24
100:11,15
opened
56:13 58:14 64:20
65:8,9 66:8,10,23
81:6 95:22 97:11
98:3,25
opening
61:8
opens
68:11 100:8
operate
12:2 15:2 16:13
35:18 36:7 37:20
41:5,16
operating
13:12 14:17 15:16
22:14 23:9 38:2
110:3
operation
9:11,13,16 10:7,14
17:22 21:16 22:15
23:1 54:19
operational
64:11
operationally
39:19,22
operations
11:15 16:5,7,18,22
17:3,10 19:21 20:2
20:9,24 21:21 22:3
22:9 25:10 34:8,21



MAGNA
LEGAL SERVICES

35:8,10 44:16 61:5 74:19 83:10
opportunity
6:19 15:24 47:1
opposed
89:23
options
93:13
oral
93:7
order
68:15
ordered
100:24
ordinary
40:13
original
120:12
originally
78:7
outcome
23:4 32:8 34:5
outset
45:2
outside
39:23 83:1
overall
10:17 24:6 64:14
overweight
23:24
oxygen
80:10,15

— P —

page
6:2 20:11 22:3 25:9
27:7 32:20 41:21
42:2,11 45:10 46:23
55:20 120:13,17,19
122:6,10,15,20
123:1
PAPD
1:12,12,13,14,14,15
116:1
paper
57:25 58:8,16 59:4

61:22 88:16
PAPIA
1:14
paragraph
21:4
parameters
84:2
Pardon
38:16
parked
56:12
parking
56:8,12,25 91:14,19
91:24 92:1 97:21
part
25:3 30:2,16 31:25
33:20 34:16 40:21
50:18,20 77:8 93:18
94:8 108:16
particular
12:5,7 57:10 58:18
parties
94:25 116:13 117:19
pass
12:15 107:12
passed
69:20
passenger
19:15 26:1 29:1,11
29:23 47:18,22
50:24 51:6 55:12
69:11 70:2,4,10
71:11 72:25 77:21
81:10,21,25 82:5
84:20 91:20 108:13
passengers
9:23 10:13,18 18:12
26:18 27:10 28:6
29:25 32:10 64:22
73:2 79:16,21 81:18
82:1 112:12,14
passenger's
84:13
passing
94:6
passports

37:9
patients
60:20
PAUL
1:15
PDF
20:11 22:4 25:9 27:7
32:21
penalty
121:15
people
28:12,22,24 33:23
40:4 63:18 66:1
83:8 95:23 99:12
pepper
68:25 69:2,8 77:13
96:11 116:2
percent
86:7
perfect
118:8
perform
30:23 76:6
performance
22:18 39:20
performing
10:16
period
100:16
perjury
121:15
person
27:19 28:10 63:19
personal
57:18,20
personnel
63:14,22 68:21 72:3
78:18 99:24,24
105:25 112:4
person's
27:21
perspective
107:15 117:13
pertain
44:16
PH

20:10
phone
64:14
physical
31:13 77:24 79:11
106:21
physicality
106:18
physically
26:15 27:8 75:7
106:13
PIC
20:21 24:12
picture
82:23
piece
57:25 58:8,16 59:4
88:15 94:4 116:20
pieces
80:12
pilot
9:9 12:15,22 13:20
15:4,7,7,25 36:24
42:17 49:11
pilots
11:17 14:8 15:23
16:7 36:21 41:15
59:20 71:5 93:14
108:6
pilot's
11:25 14:10
place
85:3,19 119:21
placed
77:20
places
31:1
Plaintiffs
1:5 2:3
Plaintiff's
86:15
plane
44:17 63:23 67:23
68:3 69:3,7 78:22
80:22 82:22 83:14
84:12 98:16 99:2


MAGNA
LEGAL SERVICES

100:5
please
6:10 9:5 29:17 64:24
  73:17 94:12 120:10
  120:14,18
plus
8:6
point
21:12 47:16 51:16
  52:10,18 53:22 54:2
  63:11 65:5 69:4,6
  71:17,18,20 73:10
  75:8 80:3 81:25
  84:22 92:4 95:21
  96:10,14 97:12
  98:16 99:3 100:19
  102:13 105:17
  110:18 114:17
points
92:8
police
1:10,11 4:13 55:5
  65:5,19 66:11 71:17
  78:21 84:11,19
  95:17 101:6 106:14
  108:18,19 115:9
policies
88:21 90:3
policy
40:10
port
1:7,8,11 2:14,15 4:11
  5:9,21 55:4 65:5,19
  66:11 71:17 84:11
  84:19,23 85:10
  99:23 106:14
  108:18 115:4,9
  120:7 122:3
portable
80:10,15
portion
96:12
posed
6:16
position
8:7,18 14:25 52:25

60:8 77:17 114:4
positions
8:22 9:2 30:19 36:9
  37:15,19,21
possibility
62:3
possible
19:2 24:1 26:5,23
  53:2,11 60:1 65:1
  107:3,5
possibly
32:7
post
5:5 9:16 26:24
post-flight
10:10
potential
93:13
potentially
96:16
practice
117:3,8
practices
90:3
prefer
103:10,13
pregnant
77:18 78:5
preparation
89:14
prepare
40:12
prepared
38:21 41:1 45:18
  46:9 59:4 84:7
preparing
47:17 88:6
presence
75:9 119:15
PRESENT
2:24
press
87:20
pressurization
23:6
prevent

114:13
preventing
7:4
previous
13:2,5 54:6 88:24,25
previously
13:1 25:12 88:7
  91:11 94:11 100:20
  109:14
pre-checks
9:15
pre-flight
9:24 10:9 15:9,11
primarily
15:18
primary
18:7,8,15 50:3 52:22
  54:9
prior
8:21 12:19 13:6,7,24
  14:1,24 46:14 54:15
  54:23 58:24 120:19
priority
52:23
privileged
89:21
probably
48:15 67:3
problem
23:10 33:20 63:1
procedure
4:4 23:12 97:23
procedures
18:24 88:22 90:4
  98:9,11,14
proceeding
5:13 6:3 60:2
process
37:12 52:3 53:8
  56:17,24 59:17,22
  93:6 95:5
professional
30:10 97:4
professionals
67:16,24 69:15 70:15
  71:13 78:11 106:23

112:8,11 113:21
116:1
property
27:21
protect
24:23
protecting
78:5
provide
18:14 64:18 65:7
  71:24 77:4
provided
4:2 54:12 85:10
provides
60:13,17
providing
5:7
PSR
39:9
public
88:3 120:17 121:24
pull
11:19 21:22 25:5
  60:10 61:1,24 62:15
  91:25 97:20
pulled
45:5 65:12,14 88:13
  101:16
pulling
62:10
punched
108:19
Purdue
7:18 14:20
purposeful
105:18
pushed
24:8 44:17 45:6 47:6
  47:9,24 77:19
pushing
27:18 90:20 109:4
put
39:7 46:1 57:15
  99:16 102:4 107:8
  107:14 110:4
  118:10


MAGNA
LEGAL SERVICES

**Q**

qualified
119:8
question
6:10,12,14,16,19
29:10 73:17 101:18
112:10 116:10
questioned
90:2
questions
4:21 6:6,8 61:3 86:16
86:17,24 87:4
110:24 111:1 113:7
114:25 115:2 116:9
117:22
quick
65:12 95:1
quickly
65:1 67:3 77:7 95:12
95:14

**R**

radio
49:4 61:4 62:18
106:1
radios
15:18 49:16
ramp
53:15,20 64:16 82:10
rare
17:15
rated
12:6,6,8,10
rating
12:14 13:4
reach
12:1
react
25:19
reaction
34:4
read
46:21 87:20 118:13
120:14 121:6 122:7
122:11,16,21 123:2

reading
45:9
ready
34:14 61:2 62:11
102:9
real
108:25
really
15:3 17:19 99:7
reason
68:8,9 74:1 122:8,13
122:18,22 123:4
reasonable
33:9
recall
7:19 35:14 38:3,10
44:22 45:1,4,17
46:5,11 51:10 55:8
56:2 63:8,12,21
64:7 78:24 85:2
90:6 93:16,17 102:1
107:3
recalled
45:25
receive
30:13 48:11 52:9
received
47:23 48:19 87:9,13
87:14,18,23 92:24
94:7,15,21 101:21
104:17
receiving
4:14 51:14
recollection
38:6 58:17 85:7,13
recommendation
55:19,25
record
20:8 25:8 29:9,17
39:13 50:21 59:2
73:17 93:12
recorded
56:4 83:15,18,22,25
84:3,6 86:3,10
91:13
recorder

83:23
recording
56:19 92:14
RECROSS-EXAM...
4:8,10 113:6 116:8
REDIRECT
4:7,9 110:25 115:1
reduced
119:15
refer
10:25 17:5,9 91:8
reference
18:23 58:4,25 60:19
referring
5:8 8:11 38:14,19
39:10 50:19 55:18
refresh
38:6 58:17 90:10
refused
86:9
regard
21:15 90:3
regarding
4:21 84:7,12 85:18
regular
93:5
regularly
11:21
regulation
10:24
regulations
10:5 11:14 17:11,14
17:18 22:19 23:3
26:13 62:9 110:20
related
27:24 39:22,23 72:20
relay
31:2 60:23 61:4
62:17 79:13
relayed
70:8 71:10 72:24
73:4 79:4,5 91:23
93:24 112:19
relaying
70:20 106:1 114:20
release

10:3 91:24 92:1
released
56:8,25 88:3 91:14
relied
73:5 74:6
rely
70:18
remain
64:24 79:21 98:4
remained
65:2
remember
63:6 93:24 108:4
removed
11:7 24:16 82:5
render
121:10
renew
29:16
repeat
38:18 62:23
repetitive
104:14
rephrase
6:11
Replace
103:15
replacement
41:15
report
21:8 38:14,20,23
39:8,9,10,14,16,17
40:13,21,25 41:3,18
41:22 42:1 45:18
46:9,18 47:4 58:2
67:13 72:23 74:9,13
74:16 75:14 88:3,14
88:18 108:5,7
115:21 117:17
reported
50:11 52:7 55:11
69:11 73:18 74:7
111:5,23,25 115:22
reporter
6:21 119:7
reporter's


MAGNA
LEGAL SERVICES

4:11 6:24 119:1
reporting
93:19
reports
105:12 107:9
representative
89:9 103:6
representatives
96:3 99:14
representing
4:10
**Republic**
13:13
request
6:18 53:23 54:5
  80:11
requested
53:25 54:11 79:6
  80:4,8,9 81:3,8 82:8
  82:13
requesting
83:10,13 87:9
require
39:18 107:12
required
11:15 16:4,17 18:19
  23:11 25:14 34:4
  35:1,7 36:6 39:16
  40:12 41:17 101:7,7
  107:14
requirements
101:11 107:17
requires
9:14 24:3 75:9
requiring
113:2
resolved
72:19
respect
6:2,5 9:22 24:7 87:18
  89:6 93:25 113:10
respond
26:7 34:3 48:14
  49:10,11,19 50:1
  51:23 53:23 55:9
  65:16 66:7 96:9

114:1
responded
26:6 67:19,21 78:12
  78:21 80:16 84:14
  95:17 116:2
responders
64:25
responding
53:9 63:15 65:6
  68:20 71:18 73:11
  77:18 78:6,17 112:3
  112:6,8,11 114:6,13
  115:10,18
responds
54:3,3 55:5
response
7:2 30:20 33:19
  49:13 51:13 54:5,6
  70:1 78:1 80:1 95:1
  96:22 99:23,25
  101:11 109:8
  110:21 113:25
  114:18 116:10
responses
25:21
responsibilities
9:6,21 20:19,25
  40:22 70:10
responsibility
10:17 11:9 20:18
  33:7
responsible
37:6 49:16
rest
16:1 31:7 52:23
restocked
62:8
restrained
106:13
restraint
33:9
restrictions
22:16
resulting
74:24
retrieved

80:19,25
retrieving
80:17
return
52:1,15 53:5 55:13
  58:24 120:18
returned
58:12 59:12 105:14
returning
99:18
reveal
89:20
review
25:17 32:24 34:13
  40:5,7 61:19 87:10
  117:9
reviewed
45:21 55:16 59:19
  60:9 61:16 62:7
  88:8,11,21,24
reviewing
35:11 60:11
revised
45:21
ride
12:15
right
20:10 46:24 61:2
  65:11 86:13 97:4
  105:20 111:2
  116:25
**ROBERT**
1:13
role
30:17,24 71:19,19
  73:11,14 76:3,3
room
23:16 68:22 102:4,8
  102:9,24
roughly
101:1,20 104:15
rows
37:25 51:12 100:12
rules
4:3 23:3
runaway

44:4 47:7 105:3
running
15:17
runway
44:1 47:12
**Russian**
107:20,23
**Ryan**
14:3

_____
S

safe
10:6,14 23:4,9 32:7
  34:5
safely
10:16 60:6
safety
9:10,15,19,22,24
  10:18 15:11 18:6,12
  18:16,17 19:13
  21:16 23:15 24:5,24
  30:17,24,25 31:3,15
  33:5,10 34:10,23
  35:2 36:17 40:8
  51:2 74:24 76:1,3,6
  76:7 98:1
sake
6:24
**SAR**
57:14
saved
88:17
saw
100:21 110:10,22
saying
69:22 108:7
says
22:20 26:12 27:17
  47:6 55:25 93:6
scene
65:6 101:24
scheduled
35:18 43:18 44:23
**Science**
7:22
scrape



MAGNA
LEGAL SERVICES

88:15
scraps
88:19
screen
19:22 20:1,5 38:25
38:25 75:14,15
Scroll
34:16
scuffle
108:22
seat
51:10 65:2 97:22
98:5,6,19,20
seated
31:9 51:7 64:24
65:23 79:21,21
seating
8:17 50:24
seats
35:24 98:5
second
12:11 21:4 47:5 53:3
116:18
secondary
73:12
section
20:5,18,23 21:3,5,13
21:21 22:1,8 24:21
25:10 32:20,24 33:1
34:7,8,17,20 45:12
45:14 47:3 55:19,25
67:14 74:21
sections
32:16 44:15
secured
60:5
security
21:16 24:13 31:22
64:4 71:23
see
17:24 19:25 20:2,6
21:23 25:6,7 34:11
39:8 40:9 42:5
44:24 57:15 65:11
65:13,18,24 67:16
71:1 72:14 74:15

77:23 81:10,24 83:1
83:2,4 89:22 100:11
100:14 104:3
107:12 113:8
seen
84:18
seizer
51:8
seizure
50:17 51:25 52:8
55:13 69:12 70:6,11
93:19 94:3 96:24
99:19 104:18 106:3
106:13 107:2
109:11 114:21
send
57:4 118:11
sense
24:18
senses
26:5
sent
57:2,3,6 89:9
sentence
47:6 55:24
separate
15:8 98:13
separated
15:6 78:14
sequence
95:5 105:22 109:21
sequential
98:17
series
4:20
serious
28:4,8 31:15 32:7,11
74:23 75:20
seriously
31:25 32:3
seriousness
31:12
service
11:6 18:14 36:17
51:1
services

25:11
set
56:13 86:21 91:19
97:21
sets
15:9 26:4
Seven
13:25
sex
60:21
share
15:20 19:22 75:14
sharp
28:17,18
SHEET
122:1
sheets
120:13,16,18
shift
72:2
shifted
97:14
shifting
50:7
short
47:8,14 103:3 104:2
104:2
shorthand
36:14 44:8
show
19:20 21:20 34:7
37:22 56:6
showing
20:10 22:1 25:8
shut
59:16
shutdown
105:20,23
side
35:25 36:4 43:16
57:24 62:14 76:20
sight
82:23
sign
97:22 98:5,7,19,20
118:13 120:16

signature
118:17 120:13,16,19
123:7
significant
29:3,22 101:14 110:2
simply
89:13 113:24
simulator
13:21
Sincerely
120:22
single
14:17,21 36:2
sir
4:24 7:8 9:20 20:6,16
21:3,10,18 22:9
25:2,6 27:9 28:1
32:9 34:11,19 35:14
39:11 40:12 41:23
42:8 44:5,13 47:3
67:16 70:7 72:4
73:14,18 74:18 75:5
75:17,25 85:17
86:14,24 87:5 90:1
90:18 92:17 93:23
95:15 96:14 97:4
100:3 101:19,20
102:2 106:10 110:7
112:10,21 113:11
115:3 116:7,11
sitting
28:13 60:7
situation
22:11 23:5 26:22
32:5 34:2 49:17
51:24 54:10 59:24
61:9 65:7,22 66:18
68:5 71:14 72:7,7,9
72:16,19 77:2 79:14
93:10 95:2,11 103:9
106:2 109:10
situational
92:25
situations
17:13
six


MAGNA
LEGAL SERVICES

9:1 101:4
slapping
27:18
slides
98:1
slowed
51:16
small
100:9
smell
69:2
smoke
26:5
solely
59:19
somebody
23:25 61:21 95:8
soon
53:2,11 54:13 67:20
sorry
19:3 38:17 97:15
sort
26:16 56:5
sorts
56:22
sound
104:13
source
53:6
Southern
1:1 4:18
speak
89:13
speaker
50:2,4
speaking
6:22
special
37:16
specific
18:23 36:7 38:1,7
46:11 56:14 90:8
specifically
9:21 11:24 20:19
21:4 91:3
specified

119:22
speed
23:7,12
splashing
68:24
split
15:19
spoke
107:20
spray
68:25 69:3,8 77:13
96:11 116:2
SS
119:3
St
7:10 119:4
stacked
95:6
stair
82:16
stairs
82:8,14,21,24,25
83:4,7,11,13,20
stand
41:25
standard
79:25
standing
83:3
start
14:16 22:3 50:6 53:8
60:11 65:3 97:11
started
14:14 33:16 44:3
47:10 52:2 63:19
68:24 81:18 82:1
starting
32:20 66:1
starts
9:24 19:7
State
2:6 119:2,7 121:1
stated
88:8
statement
85:5,6

statements
88:10
states
1:1 21:5,13
stating
62:6
stationed
31:1
stations
101:4
Ste
120:5
stenotype
119:15
step
52:20 53:3 59:13
stepped
68:16,23 114:12
steps
52:19 96:5
sterile
47:25 48:5
stop
51:23 52:24
storage
81:1
storms
104:25
Street
2:6
strike
83:5
struck
77:15 78:4
stuff
19:5 58:2
submit
40:2 117:6
submitted
40:20 41:19 46:4
117:4
subscribe
121:13
subsequent
115:3
substance

46:5 121:9
sudden
76:19
suffered
106:12
suggests
60:17
sum
46:5
summary
46:22
supervisor
103:20
supervisors
115:12
support
15:2 64:18 71:19,25
73:12
sure
9:25 10:3,15 16:9
19:11 29:8 38:8
45:23 49:21 53:11
59:18 60:4 62:11
63:19 68:9 77:20
82:15 84:1,4 86:7
95:22 101:17
103:17 104:6
105:21 108:10
109:18,18,19 112:5
117:10
suspicious
25:24
swap
102:17
Swinny
42:21,24 48:23,24
50:12 59:6 63:7
70:13 114:3 115:24
switch
37:21,23
switches
60:8
sworn
4:4 5:18 119:11
system
56:20



systems
64:11
S-w-i-n-n-y
42:21

_____ T _____

take
6:21,25 20:17 25:14
31:24 35:1 55:10
57:3 75:13 82:21
86:20 92:10 96:6
97:13 99:10 109:20
taken
1:23 119:21 120:11
122:4
takeoff
47:17 48:2 105:1
takes
30:12
talk
19:9 26:9 49:5
talked
103:5
talking
46:15 62:18 63:17,20
69:22 96:2 97:18
103:7
talks
23:17
Tarasov
1:2 4:15 120:7 122:3
tarmac
92:22
taxi
47:7,12 48:1 53:14
105:10
taxiway
47:14,15 104:24
taxiways
53:17 109:24
taxying
44:1,3 47:17 49:15
49:24 92:22 95:7
110:1
team
11:11

teams
65:17
Technicalogically
86:21
Technology
7:23
tell
5:15 8:12 9:5,20
50:21 58:6 76:17
102:6 106:11
108:17 110:10
ten
8:20 28:3
term
10:25 90:8,15,20
terminated
91:2
termination
21:9
terms
31:12 104:10
tested
12:12
testified
16:21 25:12 40:20
91:11 94:12,15
95:16 100:20
109:14
testify
119:11
testifying
7:5
testimony
5:14,16,18 43:21
87:9 88:25 89:7
90:11 94:20 119:13
119:18
thank
7:11 24:7 29:18
43:15 44:21 59:11
78:17 86:13,18 91:9
113:5 116:7 117:24
118:1,3,4 120:21
thereon
121:12
thing

51:17 59:16 108:10
things
14:16 15:8 39:23
46:18 56:22 59:21
60:1 76:21 78:16
104:12 105:22
think
29:9 62:24 88:20
90:8 94:11,16 100:3
100:19 103:9,23
105:13 108:4
110:21
thirdhand
72:15 116:19
thought
62:2 88:22 96:23
threat
27:3,6,11 28:5 31:11
31:15 34:24 81:12
threatening
25:25 26:22 72:9
threatens
33:4
threats
75:5
three
36:4 61:15 67:15,19
67:20,23 91:11
97:10 111:9
thunderstorms
109:23
tied
98:17
Tikhoplar
4:16
TIKHOPLAV
1:4
time
6:9 11:9 14:19 15:21
21:8 30:12 39:17
40:16 41:17 45:2,4
50:11 52:10 53:22
54:4,17 55:11 56:11
57:1,6 58:11,21
59:1,3,5,10,20
61:10,14,18 66:5,13

66:17 68:4 69:4,6
69:10 72:13 76:23
79:20 81:2,25 88:17
92:3,11,13 93:7
94:14 96:8,25 97:6
97:7 98:25 99:1
100:16 101:16,21
101:23 105:7
107:25 109:22
117:25 118:3
119:21
timeframe
67:2
timeline
46:12 99:9,15 104:10
times
56:7,15,23 57:10
58:7,20 90:13 101:1
101:5 111:3
time-period
99:6
title
74:16
titled
22:1 27:7 33:1
titles
63:25 64:2
today
4:21 5:14,18 6:4 7:6
88:12 89:7 90:11
105:13 117:25
today's
89:14
told
79:8 96:13 103:8
116:12 117:18
top
38:3
total
14:9,12 49:2
tower
64:16
Trade
2:18
traffic
22:23 39:25 52:16,20



| | | | V |
|---|---|---|---|
| 109:21 | 19:9,9,11 25:20 26:8 | 27:22 | **V** |
| **Trail** | 27:3 31:5 51:19 | **understand** | 1:2 47:8 |
| 7:9 | 76:24 114:8 | 5:17 6:9 43:22 | **vaping** |
| **trained** | **trying** | **understanding** | 26:2 |
| 35:6 37:15,17,19 | 52:3 60:4 61:1 62:19 | 21:10 22:8 44:15 | **varies** |
| **training** | 77:3 95:24 96:3 | 55:4 65:4 71:7 78:3 | 19:14 26:7 49:12 |
| 14:15,18 31:21 | 97:11 99:10,13,14 | 78:9 79:7 81:19,23 | **vary** |
| **transcribed** | **turn** | 85:9 99:17,22 | 14:24 |
| 119:16 | 50:2 97:21 98:20 | 108:25 116:4,11 | **verbal** |
| **transcript** | **turned** | **understood** | 7:2 |
| 3:1 120:15 | 50:3 52:4 106:20 | 6:15 16:15 41:20 | **verbiage** |
| **transcription** | **turning** | 59:11 73:13 89:19 | 116:6 |
| 119:18 | 54:1 | 91:9 96:11 99:17 | **verification** |
| **transition** | **two** | 117:11 | 9:14 37:7 46:13 |
| 24:19 44:10,12,14 | 61:15 73:19 93:3,13 | **unexpected** | **verified** |
| 61:7 91:6 | 97:9,10 102:21 | 76:20 | 61:6 |
| **transitions** | 111:9 112:16 | **uniform** | **verify** |
| 11:10 | **two-minute** | 102:5 | 37:9 |
| **transmitted** | 86:20 | **UNITED** | **versus** |
| 91:23 | **two-page** | 1:1 | 90:7 |
| **transport** | 39:6 | **universal** | **Victor** |
| 11:25 12:22 | **two-pilot** | 49:25 | 47:15 |
| **travel** | 36:23 | **University** | **video** |
| 109:18 | **type** | 7:18 | 84:18 87:18 |
| **treat** | 12:6,6,10,14 13:17 | **unobstructed** | **viewed** |
| 30:4 32:3 | 30:7 31:13 35:17 | 65:1 | 71:16 |
| **treatment** | 83:22 | **unresponsive** | **violation** |
| 30:8,14 53:13 65:3 | **typed** | 96:24 | 26:12 74:24 |
| **trial** | 12:8 45:14,15 | **unusual** | **violent** |
| 5:17 120:19 | **types** | 17:23 33:22 41:10 | 69:12 70:12 71:11 |
| **tried** | 25:15 | 48:8,12 49:17 59:23 | 115:24 |
| 14:6 46:17 87:22 | **typical** | 111:15,20 | **Virtual** |
| **trigger** | 97:22 | **update** | 1:19 |
| 60:2 98:18,21,23 | **typically** | 19:4,5 | **Virtually** |
| **true** | 49:12 54:3 55:9 | **updated** | 1:24 |
| 112:21 119:17 | 59:21 102:4 | 12:16 116:23 | **visibility** |
| 121:11,16 | | **updates** | 100:4,17 |
| **truth** | U | 11:21 16:24 | **visual** |
| 5:15 119:11,12,12 | **Uh-huh** | **upfront** | 68:14 82:23 |
| **truthful** | 20:22 | 69:21 | **visually** |
| 73:6 74:7 85:6,12 | **ultimate** | **upset** | 83:4 |
| **truthfully** | 10:20 | 77:14 | **volunteered** |
| 7:5 | **ultimately** | **use** | 67:15 |
| **truthfulness** | 114:19 116:12,23 | 33:8,14 90:19 93:5 | **vs** |
| 73:15 | 117:18 | 109:22 | |
| **try** | **unauthorized** | | |



MAGNA
LEGAL SERVICES

120:7 122:3

**W**

**wait**
102:15 109:15
**waiting**
65:10
**waive**
118:13
**WAIVED**
118:17
**walk-around**
15:13
**want**
27:5 29:7 89:19
103:14 104:11
118:10
**wanted**
46:1 59:18 89:21
98:4 104:6
**wants**
37:22
**wash**
69:25
**wasn't**
54:18 68:9 76:25
95:21
**way**
10:10 15:3 26:7
28:19 30:4 48:3
49:18 52:23 56:10
60:5 71:6 90:25
103:16 105:2 106:8
110:17,20 114:13
**ways**
15:20
**weapon**
26:23
**weapons**
27:22
**weather**
17:20
**week**
26:1 87:8,23
**weight**
22:17 24:3

**went**
90:1 97:7 102:10,12
102:15,16,23
103:16,17,18
105:17 107:15
**weren't**
104:8,22
**we'll**
20:8,12 24:2 42:10
**we're**
10:6 23:23,23 31:19
31:23 41:17 54:1
71:22 90:21,22,22
107:14
**we've**
35:11
**William**
42:12,15 59:9
**witness**
86:25 92:18 116:15
118:4 119:10,14,16
119:19 122:1,2
123:7
**witnessed**
104:11 117:19
**word**
113:9
**work**
13:6,23 50:25
**worked**
13:7
**working**
8:3 28:3 35:14 55:1,3
61:25 111:4
**World**
2:18
**write**
62:12
**writing**
45:24
**written**
19:18 38:13 45:14
84:6 88:10
**wrong**
94:13
**wrote**

88:16 117:2

**Y**

**yeah**
6:13 12:21 24:11
33:19 36:2 37:5
41:24 42:6 44:8
52:18 56:6 57:12
90:12,19 92:1 95:4
95:13,21 96:19
97:10 100:8 104:2
105:7 107:4 109:17
110:8 111:13 118:6
**year**
7:19
**years**
8:5,6,20 9:1 12:17
13:25 14:12 28:3,4
55:3 72:5 75:18
101:2 110:7 111:3
**yep**
18:7 25:7 58:14
92:11
**York**
1:1,7,9 2:15,21 4:3
4:12,17,18 8:9 88:1

**Z**

**Zoom**
1:24

**#**

**#21-cv-6226**
1:4
**#833**
1:25 119:25 120:1,24

**0**

**02043**
120:6
**02109**
2:7
**05223**
42:13

**1**

**1**
4:13 20:12,14 22:5
25:19 32:21 35:5
36:12 37:2 48:22
**1.13**
20:18
**1.13.1**
20:5,19 21:13
**1.47.22**
25:10 74:22
**1.47.25**
32:20 33:1
**1.47.26**
34:8,20
**1.7**
21:21 22:1 24:21
**10,000**
48:2,3
**10:00**
1:22
**100**
86:7
**10007**
2:21
**1043**
20:10
**110**
4:7
**113**
4:8
**115**
4:9
**116**
4:10
**119**
4:11
**12**
35:15 85:12 111:11
**12th**
4:23 35:12 38:2
40:18 41:2 43:18
54:15,24 85:20
87:19 90:5 94:1
**1206-19**
39:9
**15**



MAGNA
LEGAL SERVICES

1:21 4:12 120:11
122:4
**150**
2:19
**16**
4:13 8:5 28:3 55:2
72:5 75:18 110:6
111:3
**17**
4:14 8:5 101:2
**170**
13:16
**18**
4:15
**19**
4:16
**190**
12:24 13:17
**1995**
14:11
**1999**
7:20

___ **2** ___

**2**
3:2,2 4:14 36:12 39:3
39:4 47:5 105:13
**20**
4:13,17 120:5
**200**
2:6 36:5
**2019**
4:23 35:8,12,15 38:2
40:18 41:2 43:19
54:15,24 85:3,12,20
87:19 90:5 94:1
111:11
**2023**
1:21 120:3,11 121:22
122:4
**21**
4:18
**212-435-3517**
2:22
**2155**
45:7 58:9

**22**
4:19 94:16
**22R**
47:7,12
**2220**
58:22 59:3 94:22
104:16
**2224**
57:17 58:10 59:13
94:17 105:15
**23**
4:20
**24**
4:21
**24th**
2:20
**25**
4:22
**252**
25:9
**253**
27:7
**255**
32:20
**29**
85:3

___ **3** ___

**3**
4:2 26:21 36:13 43:9
**30**
118:13
**31**
120:3
**320**
8:9,12,15 12:7,16
**321**
8:10,15 35:19,21
**328**
8:12
**39**
4:14

___ **4** ___

**4**
2:18 4:5 25:19 26:24

36:13 120:5
**41583**
43:12
**468**
7:9

___ **6** ___

**6**
4:3
**60**
110:4
**617-573-9400**
2:8
**63367**
7:10
**659**
44:25 57:11
**68435**
42:22

___ **7** ___

**7th**
2:6
**71973**
43:8
**727**
13:4 14:7
**79313**
43:4

___ **8** ___

**87**
4:6

___ **9** ___

**9:55**
45:8
**91**
22:3
**911**
26:25
**95**
14:14
**96**
20:11

