# EXHIBIT S

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
ALEXEY V. TARASOV, ESQ., Administrator of
the Estate of EVGENIY LAGODA, Deceased, and
GRIGORY TIKHOPLAV,

                          Plaintiffs,

     -V-                       Case No.:
                               21-cv-6226 (NRB)
PORT AUTHORITY OF NEW YORK AND
NEW JERSEY, and PORT AUTHORITY OF NEW
YORK AND NEW JERSEY POLICE DEPARTMENT
A/k/a PORT AUTHORITY POLICE DEPARTMENT
A/k/a PAPD, PAPD OFFICER MICHAEL BUGIADA,
PAPD OFFICER ROBERT JOSEPH, PAPD OFFICER
JONATHAN PAPIA, PAPD OFFICER PAUL
MEZZACAPPA, and PAPD OFFICER JONATHAN
DURAN,
                          Defendants.
------------------------------------------X
               DATE: August 21, 2023
               TIME: 9:00 A.M.


          VIDEOTAPED VIRTUAL EXAMINATION
BEFORE TRIAL of Nathana Wright-Reid, taken
by Ms. Alterman, pursuant to Subpoena and
to the Federal Rules of Civil Procedure,
before Hindy Freilich, a Notary Public of
the State of New York.



Page 2

APPEARANCES:

(All parties appearing electronically)

ASHCROFT LAW FIRM
   Attorneys for the Plaintiff
   200 State Street - 7th Floor
   Boston, MA 02109
   BY: CHRISTOPHER AMRHEIN, JR., ESQ.
Camrhein@ashcroftlawfirm.com

THE PORT AUTHORITY OF NY & NJ
LAW DEPARTMENT
   Attorneys for the Defendants
   4 World Trade Center
   150 Greenwich Street, 24th Floor
   New York, NY 10007
   BY: CHERYL ALTERMAN, ESQ.

ALSO PRESENT:
   Alexey Tarasov



Page 3

F E D E R A L   S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

        *      *      *      *



Page 4

N A T H A N A   W R I G H T-R E I D, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

COURT REPORTER:  Please state your name for the record.

THE WITNESS:  Nathana Wright-Reid.

COURT REPORTER:  What is your address?

THE WITNESS:  171 Greenvale Avenue, Yonkers, New York 10713.

EXAMINATION BY

MS. ALTERMAN:

Q.    Good morning, again, Ms. Reid.

A.    Good morning.

Q.    My name is Cheryl Alterman and I'm representing the defendants in this case, the Port Authority of New York and New Jersey, in addition to the individually named police officers who are being sued by the plaintiffs in a legal action that's brought in the United States District Court



in the Southern District of New York.

I'm going to be asking you a series of questions today regarding an incident that occurred back on April 12, 2019.

Ms. Reid, have you ever been deposed before?

A.    If I've ever been to what?

Q.    Have you ever been questioned in this manner, where an attorney is asking you questions about a case that's been filed in court?

A.    In regards to this case -- I've never been to court before, no.  This is my first time in court.

Q.    All right.  So I'm just going to give you some instructions before we begin today to help ease you through the process.  Okay?

A.    Okay.

Q.    So how this procedure works is I'm going to be asking you questions and you'll then answer those questions.  If at any time you don't understand the question



that I ask you, please let me know and I'll be happy to rephrase the question. Okay?

A.    Okay.

Q.    The court reporter can only take down one of us speaking, so just please give me the opportunity to finish my question before you answer the question, and I'll do the same for you, okay?

A.    Okay.

Q.    The court reporter also can only take down verbal responses, so she can't take down any type of hand gestures or nods of the head, so I'll just ask that all of your responses be verbal. Okay?

A.    Okay.

Q.    Is there anything that's preventing you from testifying truthfully and completely today?

A.    No.

Q.    Ms. Reid, what is your date of birth?

A.    August 14, 1975.

Q.    And what is your highest level of education?



Page 7

A.    A Bachelor's degree.

Q.    When did you receive that Bachelor's degree?

A.    I think it was 2012.

Q.    What was the concentration of the degree?

A.    Nursing.

Q.    What school did you receive that degree from?

A.    Lehman College.

Q.    Are you a registered nurse?

A.    Yes.

Q.    When did you become a registered nurse?

A.    2010.

Q.    Do you hold any other degrees or licenses besides for your Bachelor's degree and your nursing degree?

A.    No.

Q.    Are you currently employed?

A.    Yes.

Q.    Who is your employer?

A.    New York Presbyterian and also St. John's Riverside Hospital.


MAGNA
LEGAL SERVICES

Page 8

Q.    How long have you been working for New York Presbyterian Hospital?

A.    A year.

Q.    And how long have you been working for St. John's Riverside?

A.    About a year and six months.

Q.    How do you split your time between the two hospitals?

A.    So I'm full-time at New York Presbyterian, where I do three 12-hour shifts, that's overnight.  And then I'm part-time at St. John's, where I work one day -- one eight-hour shift -- no, two eight-hour shifts during the day, and then every other weekend.

Q.    In what capacity do you work for New York Presbyterian Hospital?

A.    I work as a psychiatric nurse.

Q.    Did you receive any additional training in order to become a psychiatric nurse?

A.    I'm actually in the process of doing that.  But no, not now.

Q.    What type of training are you


MAGNA
LEGAL SERVICES

Page 9

in the process of completing?

A.    I'm going to be certified.  I'm coming up to be certified as a psychiatric nurse.

Q.    In what capacity do you work for St. John's Hospital?

A.    So I work in the detox and rehabilitation for substance abuse.

Q.    Prior to working at these two hospitals, did you ever work at any other hospital?

A.    Yes.  I worked at Montefiore Medical Center for eight and a half years.

Q.    In what capacity did you work for Montefiore Medical Center?

A.    As a home care nurse.

Q.    When you held the title as home care nurse, were you working as a registered nurse for Montefiore --

A.    Yes.

Q.    What were your duties and responsibilities, generally, as a home care nurse at Montefiore?

A.    This is like an extension of



Page 10

the hospital, so once the patients are discharged from the hospital, we go in the home and take whatever needs that they have, like medical needs.

Q.    So is it my understanding that once patients were discharged from the hospital, you would provide in-home care for those --

A.    Yes.  For a short period, yes.

Q.    You said that you held that role as a home care nurse for Montefiore for eight years.  Do you recall which years you worked for Montefiore?

A.    I think it was from 2010 until 2021.  No, not -- because I started there -- I'm trying to remember.  I think it was 2010 until 2019, somewhere around there, 2020.  No, 2021.  Actually more than eight and a half years.  I went in first through an agency from 2010 until 2011, and then I was hired directly by Montefiore in 2012.

Q.    Just so the record is clear, you worked for Montefiore as a full-time employee from 2012 to 2021, is that


MAGNA
LEGAL SERVICES

Page 11

correct?

A.    Yeah.

Q.    When you worked as a home care nurse for Montefiore Medical Center, were you responsible to be familiar with any procedures when patients would become violent or aggressive?

MR. AMRHEIN:  Objection.

A.    Not necessarily.  Home care is a stable place.  So you rarely had violent or aggressive patients in home care.

Q.    Do you have any experience with that currently in your roles either at New York Presbyterian or at St. John's Riverside?

A.    Absolutely.

Q.    Please tell me what the hospitals' procedures are when a patient becomes violent?

A.    So if a patient becomes violent, we have -- you always try to do, like, nonpharmacological interventions first, where we would either take them to a quiet room where they could stay there and



Page 12

calm down, try to do it on their own.  But if it gets to a point where they're still being aggressive, then they usually have to get like a pharmacological intervention, which is like an injection of some sort.

Q.    And that injection is to sedate them?

A.    To sedate them, yes.

Q.    Are there times when this occurs when a patient becomes violent that you're required to contact hospital security?

A.    Yes.  Always.

Q.    So is that the first step, that you're required to contact hospital security?

A.    First step, once the patient becomes violent, yeah, we're pressing that button.  Security, we're calling everyone in on the floor, all the help we can get from other floors, yes.

Q.    Why are you required to do that, to call hospital security when a patient becomes violent?



Page 13

A.    Because it could get out of hand really quick and you can get hurt.

Q.    Have you had experience with that, where patients of yours become violent and you get hurt?

A.    I have never gotten hurt, no. But I've had experience where a patient has become violent.  And I've seen where other nurses have gotten hurt, yes.

Q.    And you would agree with me that's a serious situation when a patient becomes violent and when he's a threat or he or she is a threat to other hospital employees, correct?

MR. AMRHEIN:  Objection.

A.    Absolutely, yes.

Q.    Now, Ms. Reid, I would like to direct your attention to April 12, 2019. Do you recall being scheduled to take a flight to Jamaica from John F Kennedy International Airport that day?

A.    Yes.

Q.    Do you recall what time the flight was originally scheduled to depart



from JFK Airport?

A.    Honestly, I'm not -- I think it was either 9:00 or 10:00.  I'm not sure.

Q.    Is that 9:00 or 10:00 at night?

A.    P.m., yes.

Q.    Were you scheduled to travel with anyone that day?

A.    Yes.  I had my son.

Q.    How old was your son with you?

A.    What year was this again?

Q.    2019.

A.    So he was 10.

Q.    And were you traveling to Jamaica for vacation?  Business?  Some other reason?

A.    For vacation.

Q.    Now, do you recall whether or not the flight that day was on time or was it delayed?

A.    It was delayed.  I think it was delayed.

Q.    Do you recall whether or not that was a full flight?

A.    There was a lot of people on



the plane.  I'm not sure if every seat was taken.  But there was a lot of people on the plane, yes.

Q.   Do you recall which seats you were traveling in?

A.   No.

Q.   I know it's been a long time.

Do you recall if you were in the front of the plane?  The middle of the plane?  The back of the plane?

A.   I was in the front, closer to the front.

Q.   Before the plane took off that day, at some point did you become notified of a passenger medical issue on board the flight?

A.   Yes.

Q.   How did you first become aware that there was a medical issue on board the flight?

A.   There was an announcement over the intercom.  I don't know what it's called.  I don't quite remember what it said, but there was an announcement that


MAGNA
LEGAL SERVICES

Page 16

they needed help, medical help in the back
of the plane, yes.

Q.    Once you heard that
announcement, that they needed medical help
in the back of the plane, what, if
anything, did you do in response?

A.    I got up and went.  I'm a
registered nurse.  That's what I do.

Q.    When you went to the back of
the plane, what did you observe?

A.    So when I went to the back of
the plane, in the back of the plane, there
was a guy, he was a white guy.  I -- I
think he was like -- honestly, I don't
remember.  It was so long ago.  I'm not
sure if he was already on the floor or if
he was standing.  I don't remember.

But I knew at one point he was
on the floor, and it appeared like he was
having a seizure.  It appeared, that's the
way he was, he was shaking.  It appeared
like he was having a seizure.  So I went --
it was me and two other nurses that were
there, and I think there were two flight


MAGNA
LEGAL SERVICES

Page 17

attendants there by the time we got there.

So we put him on the floor, we turned him on his side, because I'm thinking if he's having a seizure, he needs to be on his side, we need to protect his head, we need to make sure he's not hitting anywhere.  And that's what we did.  He was there for a while, just going -- we just allowed him, don't touch him, let him do what needs to be done.

If he's going through a seizure, just let it pass.  If it's a seizure, it will be over.  And yeah.  Eventually, he got up out of the seizure.  He appeared, like, confused when he stood up.  So he appeared like he was confused.  And he was like looking around.

So I went directly in front of him trying to explain like, you know, this is what happened, I'm a nurse, I think you had a seizure.  And then he just became, like, aggravated.  He just started swinging his arms and that's when he swung his arm and he hit me in my stomach.



Page 18

At that point, I think the police came onto the plane and then I just left and I went back to my seat.

Q.   Thank you.  I'm just going to ask you some specific questions about those observations now.

So when you went to the back of the aircraft, were there other nurses or flight attendants already tending to this passenger who you said was having a seizure?

A.   When I went to the back, if I remember, there were just the flight attendants.  Because I think all three nurses got there around the same time.  I'm not sure if -- the nurses were -- no, I think one nurse was there already.  I'm sorry.  One nurse was there already when I got there.

Q.   Do you recall what that nurse looked like?

A.   Light skin.  She's African American, but her complexion is much lighter than mine.  Yeah.



Q.    And the flight attendants who you observed in the back, would you be able to describe them?

A.    I knew a male was there and a female.  This is so long ago, like no.  And at that point, I'm not even looking at who is there to see.  I just know a body is there and we were all there.  So, like, no.  But I knew there was a male and a female.

Q.    Now, when you first got to the back of the plane, did you observe that passenger who was having a seizure bleeding from any part of his body?

A.    No.  No bleeding.

Q.    When you got to the back of the plane, do you recall if he was sitting down in his seat?  Was he already on the floor of the plane?

A.    That's where I'm struggling.  I can't recall if he was -- he wasn't in his seat.  He was definitely in the back of the plane already when I got there.  But I can't recall if he was standing or if he was sitting.  I can't recall.  I wrote a


MAGNA
LEGAL SERVICES

Page 20

statement, and I should have reviewed it. But I can't recall, honestly. It's been so long ago.

Q.   I'm going to show you -- do you recall, Ms. Reid, being interviewed by the Port Authority's inspector general's office at your home back on May 6, 2019?

A.   Yes.

Q.   I'm going to show you a transcript of that --

A.   Okay.

Q.   I'm going to pull that up on the screen. We'll mark it for identification as Wright-Reid-1.

A.   Okay.

Q.   Ms. Reid, are you able to see that on your screen?

A.   Yeah.

Q.   So I will direct you to page 2 of the transcript.

MS. ALTERMAN:   And just for the record, it's a 20-page transcript that we're marking as Wright-Reid-1 for identification.



Page 21

Q.    And you were asked by Sergeant Lawanda Irving when you went to the rear of the plane, what did you see.  Just please take a moment to -- and it goes on to page 3 of the transcript -- read your response to yourself and then I'm going to ask you if that refreshes your recollection.

A.    Okay.  See, I don't remember.

Q.    That's okay.  Just take your time and read that to yourself, please.

        Whenever you finish reading it, just --

A.    Uh-huh.

Q.    Are you ready?

A.    I'm almost done.  Yeah.

        Okay.  I'm finished reading.

Q.    Thank you.

        Did you have an opportunity to read your response to the interview questions on page 2?

A.    Yeah.  Like I said, I don't remember everything.  So if that's what I said, then I guess that's what happened. This was five years ago.



Page 22

Q. And just, if you could, just let me finish my question, just so that we have a complete transcript.

A. Sure.

Q. So you had an opportunity to read your response on pages 2, and it goes on to page 3 of the transcript. Does that refresh your recollection as to what occurred when you went to the rear of the aircraft in response to hearing the call for a medical emergency?

A. So honestly, if this is what I said, then maybe that's what happened. I don't remember. I cannot say I remember, but if this is what I said in my response, then that's what happened. But I don't remember five years later.

Q. Understood.

Ms. Reid, would you agree with me that when you were questioned back on May 6, 2019, you gave truthful and honest responses to the questions that were asked of you?

A. Yes.



Page 23

Q.    Now, Ms. Reid, when you went to the back of the plane, you indicated that you saw this passenger having a seizure. Do you recall about how long it took for him to come out of the seizure?

MR. AMRHEIN:  Objection.

A.    No, I don't recall.

Q.    Would it refresh your recollection to read this response that you had previously indicated that it took about two to three minutes for the passenger to come out of the seizure?

MR. AMRHEIN:  Objection.

Go ahead.

A.    Are you asking a question?  I'm not sure.

Q.    Yes.

A.    Can you rephrase the question?

Q.    Certainly.

Would it refresh your recollection, based on reading your response to the interview questions, that it took the passenger approximately two to three minutes to come out of the seizure?


MAGNA
LEGAL SERVICES

Page 24

MR. AMRHEIN:  Objection.

You can answer.

A.    You're asking me -- can you ask the question again?

Q.    Sure.

You had indicated when you were interviewed back in 2019 that it took the passenger approximately two to three minutes to come out of the seizure. Reading your response in Wright-Reid-1, your interview transcript, does this refresh your recollection as to how long it took the passenger to come out of the seizure?

A.    No, it does not.

MR. AMRHEIN:  Objection.

Q.    Now, do you recall at some point the passenger came out of the seizure?

A.    Yes.

Q.    When he came out of the seizure, you had previously testified that he became violent and started punching.  Do you recall that?



Page 25

MR. AMRHEIN:  Objection.

A.      When he came out, I said he looked confused.  And then I went to explain.  And that's when he started flaring his arms, yes.

Q.      And when you went to explain to him, is that something that you did as part of your training as a registered nurse, that you tried to explain to him that he had just come out of a seizure?

A.      Yes.

Q.      Did you hear the passenger say anything to you in response to you saying to him he had just come out of a seizure?

A.      No.

Q.      When you were trying to explain to him that he had just come out of the seizure, were you trying to calm him down?

A.      Because he looked so confused, I was just trying to reorient him, like to say it looks like this is what happened, yeah.  At that point, I was just trying to reorient him.  He was looking confused.  So I was trying to reorient him, it looks like



Page 26

you had a seizure, but you're okay now.

Q.     And in response to that, he struck you in the abdomen, right?

A.     Yeah.  During -- when that was happening, he just started lashing out at that point, and his arms were just flaring all over and he just, boom, struck me right in my abdomen, yes.

Q.     Was it a hard strike?

A.     Yes, it was.

Q.     Did you experience pain?

A.     Yeah, I had some pain.

Q.     After he did that, did anyone try to come in between you or to come assist you?

A.     I remember the male flight attendant, yes.

Q.     What did he do?  What do you recall?

A.     Like I think he stepped in front of me.  He stepped in front of me. At this point, I was directly in front of the gentleman.

Q.     Was the flight attendant trying



to protect you by stepping in front of you?

MR. AMRHEIN:  Objection.

A.  I can't speak for him, but I think that's what he was doing.

Q.  Was that your understanding of what he was doing by stepping in front of you?

MR. AMRHEIN:  Objection.

A.  Yes.

Q.  When the flight -- when the male flight attendant stepped in front of you to protect you, what, if anything, did that passenger who had just come out of the seizure do to him?

MR. AMRHEIN:  Objection.

A.  I don't remember.

Q.  Do you remember, Ms. Reid, that he also punched that flight attendant?

MR. AMRHEIN:  Objection.

A.  I don't remember, no.

Q.  I would like you to take a look at your interview statement again.

A.  Mm-hmm.

Q.  We're going to go on to page 3



Page 28

of the transcript, and it's Bates stamped
PA 1688.

    A.   Mm-hmm.

    Q.   I'm just going to scroll up a
little bit.  At the bottom of page 2,
PA 1687, I'll just ask you to read that
response to yourself, and it goes on to
page 3, about your observations between
that passenger and the flight attendant,
and just let me know when you've had a
chance to read that.

    A.   You said page 2?

    Q.   The bottom of page 2, where it
starts with, "so at that point, one of the
flight attendants, he came between both of
us, and then he was trying to like --
because he was confused."  Please start
reading from that point.

    A.   Okay.

    Q.   Thank you.

    A.   Okay.

    Q.   Do you recall that passenger
who had come out of the seizure attempting
to punch the flight attendant who was



Page 29

attempting to protect you after he punched you?

A.    At that point, like I said in my statement, he was just trying -- he was just trying to fight.  He was just so aggravated and belligerent, just swinging his arms, trying to fight, yes.  I don't know if he punched him, but he was just trying to fight, yes.

Q.    And Ms. Reid, do you recall how you felt at the time that he punched you?

A.    First I felt pain and then I felt scared.

Q.    Now, you also had previously given a statement and testified that this individual who had come out of the seizure then tried to fight one of the police officers.  Do you recall that?

A.    Yes.

Q.    Where were you at the moment when the police officers started boarding the airplane?

A.    So I was still in the back of the plane.  I think when the first cop came



Page 30

onto the plane, I was still in the back of the plane.  And when that cop came on, the gentleman was still going on.  He wanted to fight everybody.  So of course, he was trying to -- he was lashing out at the cop also.

Q.    Did you see that passenger actually try to throw a punch at the police officer?

A.    He was throwing punches everywhere.

Q.    Would you say that he was acting very violent at that time?

MR. AMRHEIN:  Objection.

A.    At that point, yes.

Q.    Did you feel threatened and scared by this passenger's behavior?

A.    Yes, I did.  That's why I left and went back to the front of the plane.

Q.    When you went back to the front of the plane, how many police officers had boarded the airplane at that time?

A.    I'm not sure.

Q.    Now, you were asked by the



Page 31

investigator also how you felt when you were punched, and you gave the statement that you felt like your wind got knocked out of you. Do you recall that?

A. No.

Q. I'm going to show you page 13 of the transcript. And I'll just have you read this to yourself, and it's Bates stamped PA 1698, for the record?

A. Yeah.

Q. Do you recall being in so much pain and that you had the wind knocked out of you?

A. Yeah, I was in pain. Yeah. It was a hard hit.

Q. Did you mention this to any of the police officers when they first got on the airplane?

A. I don't remember.

Q. Do you remember that one of the other nurses who came to assist this passenger mentioned that she was pregnant and fearful based on this passenger's actions?



Page 32

MR. AMRHEIN:  Objection.

A.    Yes.  I remember her saying that, yes.

Q.    Do you recall what that nurse looked like?

A.    She was also African American. She was a little heavyset.  That's all I remember.

Q.    What else do you recall about what that nurse was saying, besides that she was pregnant.  Was she crying?  Was she screaming?  What was happening at that time?

MR. AMRHEIN:  Objection.

A.    She was saying, I'm pregnant, I'm pregnant, I'm pregnant.  I don't remember what else she was saying.  But I remember specifically she was saying that she's pregnant.

Q.    Were people generally threatened and scared about what this passenger was doing in the back of the aircraft?

MR. AMRHEIN:  Objection.


MAGNA
LEGAL SERVICES

Page 33

A.    I can't speak for people.

Q.    But you, yourself, were, correct?

A.    Yes.  But I was, yes.

Q.    Now at this point, Ms. Reid, had you ever treated someone who had come out of a seizure before?

A.    Yes, I've treated people who have came out of seizures before.

Q.    But at this point, back in April of 2019, you were asked some questions about whether or not you had treated someone who has come out of a seizure before, and you had said in a statement, and I'll direct you to page 7, it's Bates stamped PA 1692, that you've never experienced people having seizures before, but you do work with that population.  But no, I've never really experienced it.

Do you see that response?

A.    Okay.  So like I said, this is how many years ago, and I've treated people with seizures since then, so yes.



Page 34

Q.    But at the point in time, back in April 2019, you had never really experienced someone coming out of a seizure and acting like this, correct?

A.    Yes.

Q.    Now, Ms. Reid, if you saw a patient of yours today exhibiting these violent tendencies, like this passenger was back on April 12, 2019, is this the type of situation that you would contact security?

MR. AMRHEIN:  Objection.

THE WITNESS:  Should I answer the question?  You said objection.

MR. AMRHEIN:  If I object, go ahead and answer.

A.    Yes.

Q.    Why would you do so, Ms. Reid?

MR. AMRHEIN:  Objection.

A.    Because if a patient is violent, I can't take on a patient who is violent.  That's what we have security for.

Q.    Ms. Reid, after you went back to the front of the plane, at some point in time did you -- were all the passengers



Page 35

asked to get off the airplane?

A.    Yes.

Q.    Were you then redirected to board another aircraft in order to continue your trip to Jamaica?

A.    Yes.

Q.    Once you got off the airplane, did you speak with any Port Authority police officers about what had occurred in the back galley of the aircraft?

A.    I don't recall.

Q.    I'm going to show you now, Ms. Reid, a witness statement that was prepared.  We'll mark that for identification as Wright-Reid-2.

Just let me know when it's up on your screen.

A.    Okay.

Q.    Ms. Reid, I'm going to show you, it's a two-page document.  It's titled the Port Authority Police of New York and New Jersey statement, and it's Bates Stamped PA 1088 to PA 1089.  And I'll give you a chance to review both pages, if you



Page 36

could just read them to yourself. And once you complete the first page, I'll scroll to the second page for you.

A.    I'm finished with the first page.

Q.    I'll scroll to the second page.

A.    Okay. Yeah, I'm done.

Q.    Ms. Reid, is this two-page document filled out, the narrative portion, the detailed description of incident, is this in your handwriting?

A.    Yes.

Q.    Did you prepare this statement somewhere in JFK Airport after the incident occurred?

A.    Yes, I did. Uh-huh.

Q.    Do you recall writing the statement down and handing it to a Port Authority police officer at approximately 11:40 p.m., as indicated on the bottom of page 1 of your statement?

A.    Yes.

Q.    Is this your signature that appears on this statement on the bottom of



page 1?

A.    Yes.

Q.    Did you understand that when you made this statement back on April 12, 2019, that it was truthful and accurate as to the information that was recorded in it?

A.    Yes.

Q.    I just want to ask you a few questions about what's written in this statement.

You indicated that at approximately -- after three minutes, the individual appeared to come out of the seizure.  Do you see that?

A.    Yes.

Q.    And then after that, what is the next word there?

A.    I'm sorry.  "Appeared to come out of the seizure," I think he motioned. I think it's "motioned to take his jacket off."  I remember now he was trying to get out of his jacket, like he was hot.

Q.    Did anyone assist him to take his jacket off at that point in time?



Page 38

A.    Yeah, I think me and the other nurses, yeah, we did.

Q.    Do you recall, Ms. Reid, when he was having the seizure, did he strike any part of his body on other parts of the cabin?

A.    No, I don't recall him. Because we made sure.  We were trying to make sure he didn't hit -- I don't recall him striking any part of his body, no.

Q.    And then the statement goes on to state, "I was standing directly in front of individual explaining what just happened, when suddenly he became erratic, punched me in my stomach.  Flight attendant stepped in, at which point he tried to fight him also."

Do you see that?

A.    Yes.  Mm-hmm.

Q.    Do you recall this to be true and accurate?

A.    Yes, it's true.  Yes.  Uh-huh.

Q.    And then it goes on to state, "soon after cops arrived, individual tried



Page 39

to fight them also."  Do you see that,
Ms. Reid?

A.    Yes.

Q.    "At this point, I was
experiencing pain and SOB and made my way
back to the front of the plane."

What does SOB mean?

A.    Like shortness of breath,
because it was so much pain.  Yes, I
remember now.  Yes.

Q.    And then it goes on to say,
"soon after requested medical evaluation
due to pain."

A.    Yes.

Q.    Who did you request the medical
evaluation due to the pain you experienced
from this passenger punching you in the
stomach?

A.    I think they asked me if I
wanted them to call EMS, and I was like
sure.  I'm not sure if the EMS was on site,
if I wanted to see the EMS.  I remember --
specifically remember them asking me if I
wanted to go to the hospital.  And I was



Page 40

like no, I'm going on vacation, I'll bear the pain, yes.

Q. Did you receive any medical treatment in response to being punched in the stomach and experiencing pain and shortness of breath?

A. No. They came and I don't remember what was done, but nothing major.

Q. Okay. I'm going to -- before I move on from this statement, everything that's contained in this two-page statement, that we've marked as Wright-Reid-2 for identification, is truthful and accurate, correct?

A. Yes.

Q. I'm going to now show you an aided report, which we'll mark as Wright-Reid 3 for identification. And it's Bates stamped PA 1218.

Are you able to see this document?

A. Yes.

Q. Ms. Reid, is any part of this document, an aided report, in your



Page 41

handwriting?

A.    In my handwriting?  No.  Let me check.  Hold on.

Q.    Sure.  Take your time.

A.    No.

Q.    This report, Ms. Reid, states that at TPO, and I'll just indicate for the record that stands for time/place of occurrence, aided stated she was punched in her stomach by passenger, Evgeniy Lagoda. Aided assisted passenger and he was unresponsive on board the plane.  Upon regaining conscious, passenger acted irate and punched aided in the stomach, causing severe pain.  EMS was ordered and responded.  And then it says RMA aided, which I'll represent to you stands for refused medical attention.

A.    Right.

Q.    Do you recall refusing medical attention after EMS being called to respond?

A.    Yes.

Q.    Did you, in fact, go on to your



Page 42

trip to Jamaica that same night?

A.    Absolutely.

Q.    I hope you enjoyed yourself.

A.    I sure did.

Q.    Did you give any other statements, Ms. Reid, to anyone else, besides for the Port Authority police officers and the sergeants who came to your home back in May 2019?

A.    No.

Q.    Have you ever spoken with anyone else about this incident that happened on board the aircraft?

A.    I mean, I've spoken to the nurse that was there, but no one else.  And like family, you tell them, oh, this happened on the airplane, if that's what you mean.  But, yeah.

Q.    The nurse, Ms. Reid, do you recall the name of that nurse who you spoke with?

A.    I think Chantel.

Q.    Chantel Miller?

A.    Yes.



Q.    Do you recall the last time you spoke with Ms. Miller about this incident?

A.    I remember calling her when I was served.  And I just told her I was served.  Yeah, that's it.  But I didn't go into details, because yeah, I was just letting her know, did you get served?  Because this is five years later and I got served for something, yeah.

Q.    Okay.  Before recently speaking to Ms. Miller about being served with a Subpoena to testify for your deposition today, did you have any other conversations with Ms. Miller between April 12, 2019, and up until recently?

A.    We've had conversations here and there, but nothing about this.  Yeah. I haven't spoken to her in a long time, since I called her the other day.  Because when this just happened, we -- I would call her, how are you doing, because we met on the plane, yeah.

Q.    So that was going to be my next question, Ms. Reid.  Did you first meet



Page 44

Ms. Miller on the plane that day, on April 12, 2019?

A.    Yes.

Q.    Did you know each other beforehand?

A.    No.

Q.    And how often do you keep in touch with Ms. Miller?

A.    Like I said, initially, we were talking more, you know, but I haven't spoken to her, I think, since Covid.  Like it's been a long time since I've spoken to her.  Until recently, when I got served, I called her.

Q.    Did you witness the passenger who came out of having the seizure commit any acts of violence against Ms. Miller on the plane?

MR. AMRHEIN:  Objection.

A.    No.

Q.    Have you spoken with any of the JetBlue flight attendants since this incident?

A.    No.



Page 45

Q.    Do you know approximately what time the flight later left to Jamaica, the new flight?

A.    I am not sure.  I know we were delayed for a while, because we had to -- yeah.  But no.  Honestly, no.

Q.    Do you recall any other passengers attempting to speak with that passenger who had punched you in the stomach when you are treating him?

MR. AMRHEIN:  Objection.

A.    Now that I read the statement, I remember there was this other guy, and they said something.  Yeah.  We asked did anybody know him, because obviously he didn't speak English.  I know he didn't look like he speak English because we were talking, he wasn't responding.  Does anybody know him?  Some guy said something. I don't know what he said.  But no.

Q.    Did you have any substantive conversations with that individual who appeared to know that passenger who punched you in the stomach?



Page 46

A.    No.  No.

Q.    And when you first were trying to explain to that passenger, Ms. Reid, that he had just had a seizure, that you wanted to -- you were explaining what happened, did you know at that point that he didn't speak English?

A.    No.

Q.    So it was later on that you learned he didn't speak English?

A.    I'm not sure if he spoke English.  I don't know.  I don't know what he speaks.  I can't say, honestly.

Q.    Okay.  So you didn't know one way or another what language he spoke, is that fair to say?

A.    Yes.

Q.    Would you agree with me, Ms. Reid, that when he started punching yourself and the other flight attendants and the police officer who boarded the airplane, that this was a very serious situation?

            MR. AMRHEIN:  Objection.



Page 47

A.    Yes.

Q.    And would you agree with me that as a registered nurse and working in hospitals since 2010, that when a passenger exhibits this type of violent behavior, that actions need to be taken to either sedate or restrain the patient from hurting himself --

MR. AMRHEIN:  Objection.

A.    Yes.

MS. ALTERMAN:  Thank you, Ms. Reid.  That's all the questions I have for now.  I may have additional follow-up questions after plaintiff's counsel.

MR. AMRHEIN:  Just bear with me.  Technologically, I don't have my extra screen right now.  So just one minute, please.

EXAMINATION BY:

MR. AMRHEIN:

Q.    Ms. Reid, again, hopefully this is not going to take up too much more of your time.  We very much appreciate it.  I



Page 48

just have a few --

A.    Hold on.

Q.    No problem.

A.    Okay.

Q.    Can you hear me now?

A.    Yes.

Q.    Okay.  Excellent.  Thank you again for your time here today.  We greatly appreciate it, and hopefully we're not going to keep you for too much longer.  I just have a few questions for you on behalf of our client.

I know you had previously testified about your training and experience as a registered nurse.  So I'm just going to start there and ask you a couple of questions about the training you have and education you have received as a registered nurse.

When you achieved your degree in nursing and any certifications that you received, do you recall having any lessons about treating somebody while they are having a seizure?


MAGNA
LEGAL SERVICES

A.    In school, yes.

Q.    Can you briefly tell me some of the directives that you learned based upon the education you received about treating somebody who is having a seizure?

A.    So when a person is having a seizure, you want to make sure you're not restricting them.  You want to make sure they're on their side.  You want to make sure you're timing the seizure to see how long it lasts.  You want to make sure, like, nothing is in their mouth.  Yeah.

Q.    And do they teach you about the signs to identify what a -- identify when a person is having a seizure?

A.    Yeah.

Q.    And can you tell me about some of the signs that you learned as part of your training and education to become a registered nurse in identifying when a person is having a seizure?

A.    There's a platitude of different seizures.  Like you could be -- you could have like a silent seizure, where



Page 50

you're just staring out in space, and that also can be considered a seizure. And you have some where you're just on the floor, you're flaring, you're moving around, you're convulsing, yes.

Q. Would that include foaming at the mouth?

A. Yes.

Q. And you said convulsing and tremoring?

A. Shaking, yes.

Q. What about bleeding from the mouth, is that potentially a sign of seizure?

A. Usually not. Sometimes no.

Q. Could it occur as a result of potentially biting either a tongue or portions of the inside of your mouth while having a seizure?

A. Absolutely, yes.

Q. And you had testified, at least in Exhibit 1, that interview transcript that counsel had showed you from back when you were interviewed as a part of this



Page 51

investigation in May 2019, you had said you, at that point, hadn't treated anybody who was having a seizure, is that right?

A.    Yes.

Q.    But am I correct that prior to that point, you had received training and education as a part of your becoming a registered nurse about how to treat someone who is having a seizure?

A.    Yes.

Q.    And you also had the training and education as to how to identify somebody who is having a seizure?

A.    Yes.

Q.    As a part of that training, did they teach you that somebody who has just had a seizure may be disoriented or confused after coming out of a seizure?

A.    Yes.

Q.    And am I correct that you testified earlier today that that's what you witnessed personally after Mr. Lagoda came out of the seizure and stood up?

A.    Yes.


MAGNA
LEGAL SERVICES

Q. You said you were sitting at the front of the plane when you heard a call over the intercom asking for any medical professional on board who could assist with a medical emergency, is that right?

A. Yes.

Q. And so based upon that understanding of we have a medical emergency, we need assistance, is it your understanding that the medical emergency had already begun?

A. Yes.

MS. ALTERMAN: Objection.

Q. So you were responding to an ongoing medical emergency, am I right?

A. Yes.

Q. When you went to the back of the plane, based upon your initial evaluation of the medical emergency, and based upon your education and experience as a registered nurse, am I correct that you made the determination that a man was having a seizure?



Page 53

A. It appeared -- when I -- in my statement, now that I saw the statement, because remember, this is five years ago, I didn't remember. But now that I saw the statement, I see where I say he was in his seat. I don't know what was happening in his seat, why they called for that medical emergency. But by the time I got there, they were trying to take him out of the seat, they put him in the back of the plane. And that's when, like I said in the statement, it appeared that he started having the seizure.

Q. Correct. And that determination and evaluation would be based upon your education and experience as a registered nurse?

A. Yes.

Q. Am I frozen here?

A. No, I'm here. I answered. I said yes.

MR. AMRHEIN: Can you read back the last question and answer.

(Whereupon, a portion of the



Page 54

testimony was read back.)

Q.    So when you arrived at the back of the plane, were you aware that the plane was -- that the crew had notified the pilot of the medical emergency, and that the plane was turning around to head back to the gate?

A.    No.

Q.    Are you aware that it only took a few minutes to get the plane back to the gate from when the medical emergency was identified by the flight crew?

MS. ALTERMAN:  Objection.

A.    No.

Q.    And in the back galley, am I correct that you were standing kind of in front of Mr. Lagoda -- sorry, the patient -- if I identify the patient as Mr. Lagoda, do you understand that to be the man who was, as you testified, was having a seizure on board that flight that night?

A.    Okay.

Q.    So in the back galley, am I



Page 55

correct that you were standing kind of in front of and towards the head of Mr. Lagoda as he laid down on the ground on his side?

A.    Yeah.  I was -- he was on his side, I was -- I'm not exactly sure.  But yeah, I was standing there.

Q.    And am I correct that you had previously testified that when he was seizing on the ground, laying on his side, that he wasn't flailing his arms or body at that point, meaning he wasn't hitting his head or body against anything?

A.    No.  He wasn't hitting his head or body against anything, no.

Q.    So other than the signs of seizure that you testified here to today, including convulsing and foaming at the mouth and other signs that you identified as a man having a seizure, you didn't witness any other physical injuries to Mr. Lagoda?

A.    No.

Q.    And understanding the magnitude of the situation and how time can move



differently in emergency medical situations, can you tell me roughly, from the time you got there, how long, in your opinion, it took for the seizure to, you know, subside?

A. I don't remember, honestly. I think in my statement I said between two to three minutes. Probably that was like way longer than what it was. I don't remember, honestly.

Q. I appreciate that. And if you don't remember, we don't want you to guess. We understand it's many years later.

And then after, as you had testified -- or Mr. Lagoda, at some point, stood up?

A. Yes.

Q. And am I correct that you said Mr. Lagoda appeared confused and disoriented as you observed him when he stood up?

A. Yes.

Q. And based upon your training and experience as a registered nurse,


MAGNA
LEGAL SERVICES

Page 57

confusion and disorientation, that would be

something that's common for somebody coming

out of a seizure, am I right?

A.    Yes.

MS. ALTERMAN:  Objection.

Q.    I can ask that question a

different way.

Ms. Wright-Reid, based upon

your education and experience as a

registered nurse, is it common for somebody

to be confused when coming out of a

seizure?

MS. ALTERMAN:  Objection.

A.    Yes.  They can be confused.

Yes.

Q.    Is it, based upon your

education and experience as a registered

nurse, common for somebody to --

A.    Based on my experience too,

yes.

Q.    I can ask a slightly different

question.

So based upon your education

and experience as a registered nurse, is it



common when somebody comes out of a seizure for them to be disoriented?

A.    Yes, I've seen it.  Yes.

Q.    At what point -- at that point, after Mr. Lagoda stood up and you identified him to be confused and disoriented, as you just testified to today, you tried to explain to Mr. Lagoda what happened, is that right?

A.    Yes.

Q.    And I know we had testified -- we had discussed or there was some discussion on the record a little bit earlier today about English speaking versus somebody who didn't speak the language. Did you give that explanation to Mr. Lagoda in English?

A.    In English, yes.  I only speak English.

Q.    I very much appreciate that.

At which point he began swinging his arms and struck both you and a flight attendant, is that right?

A.    He swung his arms, he struck me



Page 59

initially.

Q.    He struck you in the stomach?

A.    Yes.

Q.    And when you were struck in the stomach, after Mr. Lagoda had come out of the seizure and you had identified him to be disoriented and confused, were you positioned in the aisle between the bathrooms?

A.    No.  I think we were -- you know the area in the back of the plane, I don't know if it was in the aisle.  There was an area in the back of the plane where I think they have like --

Q.    The back galley?

A.    The back galley in the back of the plane.  I think that's where it was. Yeah.  But it's close to the aisle, though. It's right there.  And then the bathroom is to your right, and then there's a little area in the back, yes.

Q.    Sorry.  Just bear with me a second.

        Am I correct that while you had



Page 60

been one of the nurses responding to that medical emergency in the back of the plane, that you eventually witnessed a Port Authority police officer coming to the back galley of the plane?

A.   Yes.

Q.   So in a matter of minutes, am I correct that the plane had returned to the gate and a Port Authority officer had boarded the plane?

A.   Yes.

MS. ALTERMAN:  Objection.

Q.   And that was based upon your understanding?

A.   Well, it's not hours, so it's definitely minutes.  It didn't take long. I don't know how many minutes it was.  It definitely wasn't an hour.  From everything going on, no.  But I'm not sure how long it took.

MR. AMRHEIN:  Cheryl, for the record, Alexey Tarasov, who is plaintiff in this matter, who is the administrator of the estate of


MAGNA
LEGAL SERVICES

Page 61

Mr. Lagoda, has just joined, and I just wanted to let everybody be aware, as well as put it on the record.

Q.   So is it your understanding that the police officer who had boarded the plane and immediately responded to the emergency that you had initially responded to, was there to help treat and handle the situation for the man having a seizure?

A.   For me, I was thinking because of his behavior, like him being so erratic and violent, that's why the cops were called.  So, yeah.

Q.   Would you be aware that there was a medical emergency call for a male having a seizure on board and that sparked the initial police response for the plane, would you be aware of that?

MS. ALTERMAN:  Objection.

A.   You have to rephrase the question.  I don't understand the question.

Q.   Sure thing.

Would you -- were you aware



Page 62

that the initial call was made over the radio for a male having a seizure on board a flight and that sparked the initial response by the Port Authority police department officer?

MS. ALTERMAN:  Objection.

A.    I'm not aware of how the process works, so I don't know.

Q.    But you had responded to the initial call, which was a person having a medical emergency in the back of the plane, and that it was, based upon your observations, per your training and education as a nurse, that a male was having a seizure in the back of the plane, is that right?

A.    Yes.  It appeared he was having a seizure, yes.

Q.    And when the Port Authority police officer arrived, was your back initially to him?

A.    To the police officer?

Q.    Yeah.  When the first officer arrived, so the back galley, were you



Page 63

facing down the aisle or was your back to
the aisle, do you recall?

A.    No.  I do not recall.

Q.    Okay.  At some point did the
officer go around you or any of the nurses
in the back galley to see the person who
was having a seizure at that point?

A.    Yes.

Q.    And at that point, in terms of
what you did next, did you turn around and
leave the back galley and head towards the
front of the plane?

A.    Yes.

Q.    Am I correct that you didn't
witness any pepper spray being sprayed at
the --

A.    No pepper spray.  I didn't
witness that, no.

Q.    I know this was already
introduced as an exhibit in today's
deposition.  It was Exhibit 1, which was a
transcript of your interview from the
beginning of May 2019.

Do you believe that your



Page 64

testimony during that -- your responses and testimony during that interview, do you believe that they were accurate and fresh in mind, given that it was just less than a month after the event occurred?

A.    Absolutely.  Just now that I'm reading it, some of the stuff -- yeah, so that's accurate.  Yes, it is.

Q.    Do you recall stating during that interview that even though you got hit in the stomach, and even though you had realized that you could have left the area, that you still wanted to stay there to help the person experiencing a medical emergency?

MS. ALTERMAN:  Objection.

A.    If I said it, then that's what I said.  I don't recall saying it.  But if it's there, then I probably did.  That's just who I am as a nurse.

Q.    That was going to be my follow-up question.

And that's because, as a nurse, and as the person that you are, in your



Page 65

professional capacity, that you felt you were treating somebody in the ongoing process of having a medical emergency, is that right?

A.    Yes.

Q.    I'm just going to clarify one thing that I know was addressed a little bit earlier today.  I think you had been previously asked by counsel for defendants if you had witnessed any bleeding from any part of Mr. Lagoda's body and I think you had responded no.

And then you were given the opportunity to read pages 2 and 3, a long response in the interview transcript.  Did you see a notation in there or a writing in there of your testimony that said you had seen blood coming from Mr. Lagoda's mouth as part of this seizure?

A.    Yes.

Q.    But upon some of the questions from me during this examination, am I correct that you had previously testified that you didn't witness any other physical



Page 66

injuries to Mr. Lagoda's body, other than the symptoms of the seizure that you identified, is that right?

A.    Yes.  That I can recall, yes.

Q.    Are you aware that when a person comes out of a seizure, they may become combative or aggravated as a result of coming out of that medical emergency?

MS. ALTERMAN:  Objection.

A.    Sometimes they can be. Sometimes they come out, they're like so sedated.  It's different.  I mean, it's different for everyone.

Q.    But you are aware, based upon your experience and training as a registered nurse, that a person who comes out of a seizure may be combative and aggressive?

MS. ALTERMAN:  Objection.

A.    Can be.

Q.    So yes?

A.    Yes.

Q.    That's as well as being confused and disoriented after coming out



of a seizure?

A.    Yes, confused.  Just being confused, disoriented, not sure.  Yes.

MR. AMRHEIN:  Okay.  I have no more questions for now.

MS. ALTERMAN:  I don't have any further questions, Ms. Reid.  Thank you for your time today.

(Whereupon, at 10:14 A.M., the examination of this witness was concluded.)

            °          °          °          °



Page 68

                    D E C L A R A T I O N


        I hereby certify that having been
first duly sworn to testify to the truth, I
gave the above testimony.


        I FURTHER CERTIFY that the foregoing
transcript is a true and correct transcript
of the testimony given by me at the time
and place specified hereinbefore.




                    _____
                    Nathana Wright-Reid



Subscribed and sworn to before me
this _____ day of _____ 2023.



_____
     NOTARY PUBLIC






Page 69

                    I N D E X
EXAMINATION BY                              PAGE
Ms. Alterman                               4
Mr. Amrhein                                47


                  E X H I B I T S

NO.        DESCRIPTION                      PAGE

Wright-Reid 1 through 3


INFORMATION/ DOCUMENTS REQUESTED    PAGE

(None)

      QUESTIONS MARKED FOR RULINGS
PAGE LINE QUESTION

(None)



Page 70

C E R T I F I C A T E

STATE OF NEW YORK          )

                           :    SS.:

COUNTY OF NEW YORK         )

I, HINDY FREILICH, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 21st day of August 2023.

_____
         HINDY FREILICH



Page 71

ERRATA SHEET

PAGE/LINE CORRECTION

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



| A | | | |
|---|---|---|---|

**abdomen**
26:4,9
**able**
19:3 20:17 40:21
**Absolutely**
11:17 13:17 42:3
50:21 64:7
**abuse**
9:9
**accurate**
37:6 38:22 40:15
64:4,9
**achieved**
48:21
**acted**
41:14
**acting**
30:14 34:5
**action**
4:24 70:15
**actions**
31:25 47:7
**acts**
44:18
**addition**
4:22
**additional**
8:20 47:14
**address**
4:12
**addressed**
65:8
**administer**
3:6
**administrator**
1:3 60:25
**African**
18:23 32:7
**agency**
10:21
**aggravated**
17:23 29:7 66:8
**aggressive**
11:8,12 12:4 66:19

**ago**
16:16 19:6 20:4
21:25 33:24 53:4
**agree**
13:11 22:20 46:19
47:3
**AGREED**
3:3,11
**ahead**
23:15 34:16
**aided**
40:18,25 41:10,12,15
41:17
**aircraft**
18:9 22:11 32:24
35:5,11 42:14
**airplane**
29:23 30:23 31:19
35:2,8 42:18 46:23
**Airport**
13:22 14:2 36:15
**aisle**
59:9,13,19 63:2,3
**Alexey**
1:3 2:15 60:23
**allowed**
17:10
**Alterman**
1:19 2:13 4:16,19
20:22 47:12 52:15
54:14 57:6,14 60:13
61:21 62:7 64:17
66:10,20 67:7 69:4
**American**
18:24 32:7
**Amrhein**
2:8 11:9 13:16 23:7
23:14 24:2,17 25:2
27:3,9,16,20 30:15
32:2,15,25 34:12,15
34:19 44:20 45:12
46:25 47:10,17,22
53:23 60:22 67:5
69:5
**announcement**
15:22,25 16:5

**answer**
5:24 6:8 24:3 34:13
34:16 53:24
**answered**
53:21
**anybody**
45:16,20 51:3
**appeared**
16:20,21,22 17:16,17
37:14,19 45:24 53:2
53:13 56:20 62:18
**appearing**
2:4
**appears**
36:25
**appreciate**
47:25 48:10 56:12
58:21
**approximately**
23:24 24:9 36:20
37:13 45:2
**April**
5:5 13:19 33:12 34:3
34:10 37:5 43:15
44:2
**area**
59:12,14,22 64:13
**arm**
17:24
**arms**
17:24 25:6 26:7 29:8
55:11 58:23,25
**arrived**
38:25 54:3 62:21,25
**ASHCROFT**
2:6
**asked**
21:2 22:23 30:25
33:12 35:2 39:20
45:15 65:10
**asking**
5:3,11,23 23:16 24:4
39:24 52:4
**assist**
26:16 31:22 37:24
52:6

**assistance**
52:11
**assisted**
41:12
**attempting**
28:24 29:2 45:9
**attendant**
26:18,25 27:12,19
28:10,25 38:16
58:24
**attendants**
17:2 18:10,15 19:2
28:16 44:23 46:21
**attention**
13:19 41:19,22
**attorney**
5:11
**Attorneys**
2:6,11
**August**
1:14 6:23 70:19
**Authority**
1:8,8,9 2:10 4:21
35:9,22 36:20 42:8
60:5,10 62:5,20
**Authority's**
20:7
**authorized**
3:6
**Avenue**
4:14
**aware**
15:19 54:4,10 61:4
61:16,20,25 62:8
66:6,15
**A.M**
1:15 67:10
**A/k/a**
1:9,10

| B | | | |
|---|---|---|---|

**B**
69:8
**Bachelor's**
7:2,4,18
**back**



MAGNA
LEGAL SERVICES

5:5 15:11 16:2,6,10
16:12,13 18:4,8,13
19:3,12,16,22 20:8
22:21 23:3 24:8
29:24 30:2,20,21
32:23 33:11 34:2,10
34:23 35:11 37:5
39:7 42:10 50:24
52:19 53:11,23 54:2
54:3,7,11,16,25
59:12,14,16,17,17
59:22 60:3,5 62:12
62:16,21,25 63:2,7
63:12
**based**
23:22 31:24 49:4
52:9,20,22 53:16
56:24 57:9,17,20,24
60:14 62:13 66:15
**Bates**
28:2 31:9 33:17
35:23 40:20
**bathroom**
59:20
**bathrooms**
59:10
**bear**
40:2 47:17 59:23
**becoming**
51:8
**began**
58:22
**beginning**
63:24
**begun**
52:13
**behalf**
48:12
**behavior**
30:18 47:6 61:13
**believe**
63:25 64:4
**belligerent**
29:7
**birth**
6:22

**bit**
28:6 58:14 65:9
**biting**
50:18
**bleeding**
19:13,15 50:13 65:11
**blood**
65:19 70:15
**board**
15:16,20 35:5 41:13
42:14 52:5 54:22
61:18 62:3
**boarded**
30:23 46:22 60:11
61:7
**boarding**
29:22
**body**
19:8,14 38:6,11
55:11,13,15 65:12
66:2
**boom**
26:8
**Boston**
2:7
**bottom**
28:6,14 36:21,25
**breath**
39:9 40:7
**briefly**
49:3
**brought**
4:25
**BUGIADA**
1:10
**Business**
14:15
**button**
12:20

_____ C _____

**C**
2:2 68:2 70:2,2
**cabin**
38:7
**call**

12:24 22:11 39:21
43:21 52:4 61:17
62:2,11
**called**
4:2 15:24 41:22
43:20 44:15 53:8
61:15
**calling**
12:20 43:4
**calm**
12:2 25:19
**Camrhein@ashcro...**
2:8
**capacity**
8:17 9:6,15 65:2
**care**
9:17,19,23 10:8,12
11:4,10,12
**case**
1:6 4:21 5:12,14
**causing**
41:15
**Center**
2:11 9:14,16 11:5
**Certainly**
23:20
**certification**
3:5
**certifications**
48:22
**certified**
9:3,4
**certify**
68:4,8 70:8,13
**chance**
28:12 35:25
**Chantel**
42:23,24
**check**
41:4
**Cheryl**
2:13 4:19 60:22
**CHRISTOPHER**
2:8
**Civil**
1:20

**clarify**
65:7
**clear**
10:23
**client**
48:13
**close**
59:19
**closer**
15:12
**College**
7:11
**combative**
66:8,18
**come**
23:6,13,25 24:10,14
25:11,15,18 26:15
26:15 27:14 28:24
29:17 33:7,14 37:14
37:19 59:6 66:12
**comes**
58:2 66:7,17
**coming**
9:4 34:4 51:19 57:3
57:12 60:5 65:19
66:9,25
**commit**
44:17
**common**
57:3,11,19 58:2
**complete**
22:4 36:3
**completely**
6:19
**completing**
9:2
**complexion**
18:24
**concentration**
7:6
**concluded**
67:12
**confused**
17:16,17 25:4,20,24
28:18 51:19 56:20
57:12,15 58:7 59:8



66:25 67:3,4
**confusion**
57:2
**conscious**
41:14
**considered**
50:3
**contact**
12:12,16 34:11
**contained**
40:12
**continue**
35:5
**conversations**
43:14,17 45:23
**convulsing**
50:6,10 55:18
**cop**
29:25 30:3,6
**cops**
38:25 61:14
**copy**
3:8,9
**correct**
11:2 13:15 33:4 34:5
40:15 51:6,21 52:23
53:15 54:17 55:2,8
56:19 59:25 60:9
63:15 65:24 68:9
**CORRECTION**
71:3
**counsel**
3:4,9 47:16 50:24
65:10
**COUNTY**
70:4
**couple**
48:18
**course**
30:5
**court**
1:2 3:7 4:7,11,25
5:13,15,16 6:5,11
**Covid**
44:12
**crew**

54:5,13
**crying**
32:12
**currently**
7:21 11:14

---
**D**
---

**D**
3:2 4:2 68:2 69:2
**date**
1:14 6:21
**day**
8:14,15 13:22 14:8
14:19 15:15 43:20
44:2 68:19 70:19
**days**
3:9
**Deceased**
1:4
**defendants**
1:13 2:11 4:20 65:10
**definitely**
19:22 60:17,19
**degree**
7:2,4,7,10,19,19
48:21
**degrees**
7:17
**delayed**
14:20,21,22 45:6
**depart**
13:25
**department**
1:9,9 2:10 62:6
**deposed**
5:8
**deposition**
3:5,5,8 43:13 63:22
**describe**
19:4
**description**
36:11 69:9
**detailed**
36:11
**details**
43:7

**determination**
52:24 53:16
**detox**
9:8
**different**
49:24 57:8,22 66:13
66:14
**differently**
56:2
**direct**
13:19 20:20 33:16
**directives**
49:4
**directly**
10:22 17:19 26:23
38:13
**discharged**
10:3,7
**discussed**
58:13
**discussion**
58:14
**disorientation**
57:2
**disoriented**
51:18 56:21 58:3,8
59:8 66:25 67:4
**District**
1:2,2 4:25 5:2
**document**
35:21 36:10 40:22,25
**DOCUMENTS**
69:12
**doing**
8:24 27:5,7 32:23
43:22
**due**
39:14,17
**duly**
4:3 68:5 70:10
**DURAN**
1:12
**duties**
9:22

---
**E**
---

**E**
2:2,2 3:2,2 4:2 68:2
69:2,8 70:2,2
**earlier**
51:22 58:15 65:9
**ease**
5:19
**education**
6:25 48:19 49:5,20
51:8,13 52:22 53:17
57:10,18,24 62:15
**effect**
3:7,8
**eight**
9:14 10:13,19
**eight-hour**
8:14,15
**either**
11:14,24 14:4 47:7
50:18
**electronically**
2:4
**emergency**
22:12 52:6,11,12,17
52:21 53:9 54:6,12
56:2 60:3 61:9,17
62:12 64:16 65:4
66:9
**employed**
7:21
**employee**
10:25
**employees**
13:15
**employer**
7:23
**EMS**
39:21,22,23 41:16,22
**English**
45:17,18 46:8,11,13
58:15,18,19,20
**enjoyed**
42:4
**ERRATA**
71:2
**erratic**



38:15 61:13
**ESQ**
1:3 2:8,13
**estate**
1:4 60:25
**evaluation**
39:13,17 52:21 53:16
**event**
64:6
**eventually**
17:15 60:4
**everybody**
30:5 61:3
**Evgeniy**
1:4 41:11
**exactly**
55:6
**examination**
1:17 4:15 47:21
65:23 67:11 69:3
70:9,11
**examined**
4:5
**Excellent**
48:8
**exhibit**
50:23 63:21,22
**exhibiting**
34:8
**exhibits**
47:6
**experience**
11:13 13:4,8 26:12
48:16 52:22 53:17
56:25 57:10,18,20
57:25 66:16
**experienced**
33:18,21 34:4 39:17
**experiencing**
39:6 40:6 64:15
**explain**
17:20 25:5,7,10,17
46:4 58:9
**explaining**
38:14 46:6
**explanation**

58:17
**extension**
9:25
**extra**
47:19

— **F** —

**F**
3:2 13:21 70:2
**facing**
63:2
**fact**
41:25
**fair**
46:17
**familiar**
11:6
**family**
42:17
**fearful**
31:24
**Federal**
1:20
**feel**
30:17
**felt**
29:12,13,14 31:2,4
65:2
**female**
19:6,10
**fight**
29:6,8,10,18 30:5
38:18 39:2
**filed**
5:13
**filing**
3:4
**filled**
36:10
**finish**
6:7 21:12 22:3
**finished**
21:17 36:5
**FIRM**
2:6
**first**

4:3 5:16 10:20 11:24
12:15,18 15:19
19:11 29:13,25
31:18 36:3,5 43:25
46:3 62:24 68:5
**five**
21:25 22:18 43:9
53:4
**flailing**
55:11
**flaring**
25:6 26:7 50:5
**flight**
13:21,25 14:19,24
15:17,21 16:25
18:10,14 19:2 26:17
26:25 27:11,12,19
28:10,16,25 38:16
44:23 45:3,4 46:21
54:13,22 58:24 62:4
**floor**
2:7,12 12:21 16:17
16:20 17:3 19:18
50:4
**floors**
12:22
**foaming**
50:7 55:18
**follows**
4:6
**follow-up**
47:15 64:23
**force**
3:8
**foregoing**
68:8
**form**
3:11
**forth**
70:10
**Freilich**
1:21 70:6,23
**fresh**
64:4
**front**
15:10,12,13 17:19

26:22,22,23 27:2,7
27:12 30:20,21
34:24 38:13 39:7
52:3 54:18 55:3
63:13
**frozen**
53:20
**full**
14:24
**full-time**
8:10 10:24
**further**
3:11 67:8 68:8 70:13

— **G** —

**G**
4:2
**galley**
35:11 54:16,25 59:16
59:17 60:6 62:25
63:7,12
**gate**
54:8,12 60:10
**generally**
9:23 32:21
**general's**
20:7
**gentleman**
26:24 30:4
**gestures**
6:13
**give**
5:18 6:7 35:24 42:6
58:17
**given**
29:16 64:5 65:14
68:10 70:12
**go**
10:3 23:15 27:25
34:15 39:25 41:25
43:6 63:6
**goes**
21:5 22:7 28:8 38:12
38:24 39:12
**going**
5:3,17,23 9:3 17:9,12



18:5 20:5,10,13
21:7 27:25 28:5
30:4 31:7 35:13,20
40:2,10,17 43:24
47:24 48:11,17
60:20 64:22 65:7
**Good**
4:17,18
**gotten**
13:7,10
**greatly**
48:9
**Greenvale**
4:13
**Greenwich**
2:12
**GRIGORY**
1:4
**ground**
55:4,10
**guess**
21:24 56:13
**guy**
16:14,14 45:14,20

**H**

**H**
4:2,2 69:8
**half**
9:14 10:20
**hand**
6:13 13:3 70:19
**handing**
36:19
**handle**
61:10
**handwriting**
36:12 41:2,3
**happened**
17:21 21:24 22:14,17
25:22 38:15 42:14
42:18 43:21 46:7
58:10
**happening**
26:6 32:13 53:7
**happy**

6:3
**hard**
26:10 31:16
**head**
6:14 17:7 54:7 55:3
55:13,14 63:12
**hear**
25:13 48:6
**heard**
16:4 52:3
**hearing**
22:11
**heavyset**
32:8
**held**
9:18 10:11
**help**
5:19 12:21 16:2,2,5
61:10 64:14
**hereinbefore**
68:11 70:10
**hereunto**
70:18
**highest**
6:24
**Hindy**
1:21 70:6,23
**hired**
10:22
**hit**
17:25 31:16 38:10
64:11
**hitting**
17:7 55:12,14
**hold**
7:17 41:4 48:3
**home**
9:17,18,23 10:4,12
11:4,10,12 20:8
42:10
**honest**
22:22
**honestly**
14:3 16:15 20:3
22:13 45:7 46:14
56:7,11

**hope**
42:4
**hopefully**
47:23 48:10
**hospital**
7:25 8:3,18 9:7,12
10:2,3,8 12:12,16
12:24 13:14 39:25
**hospitals**
8:9 9:11 11:19 47:5
**hot**
37:23
**hour**
60:19
**hours**
60:16
**hurt**
13:3,6,7,10
**hurting**
47:8

**I**

**identification**
20:15,25 35:16 40:14
40:19
**identified**
54:13 55:19 58:7
59:7 66:4
**identify**
49:15,15 51:13 54:19
**identifying**
49:21
**immediately**
61:8
**incident**
5:5 36:11,15 42:13
43:3 44:24
**include**
50:7
**including**
55:18
**indicate**
41:8
**indicated**
23:3,11 24:7 36:21
37:12

**individual**
29:17 37:14 38:14,25
45:23
**individually**
4:22
**information**
37:7 69:12
**initial**
52:20 61:19 62:2,4
62:11
**initially**
44:10 59:2 61:9
62:22
**injection**
12:6,7
**injuries**
55:21 66:2
**inside**
50:19
**inspector**
20:7
**instructions**
5:18
**intercom**
15:23 52:4
**interested**
70:16
**International**
13:22
**intervention**
12:5
**interventions**
11:23
**interview**
21:20 23:23 24:12
27:23 50:23 63:23
64:3,11 65:16
**interviewed**
20:6 24:8 50:25
**introduced**
63:21
**investigation**
51:2
**investigator**
31:2
**in-home**



10:8
**irate**
41:14
**Irving**
21:3
**issue**
15:16,20

**J**

**jacket**
37:21,23,25
**Jamaica**
13:21 14:15 35:6
42:2 45:3
**Jersey**
1:8,9 4:22 35:23
**JetBlue**
44:23
**JFK**
14:2 36:15
**John**
13:21
**John's**
7:25 8:6,13 9:7 11:15
**joined**
61:2
**JONATHAN**
1:11,11
**JOSEPH**
1:10
**JR**
2:8
**Judge**
3:7

**K**

**keep**
44:8 48:11
**Kennedy**
13:21
**kind**
54:17 55:2
**knew**
16:19 19:5,10
**knocked**
31:4,13

**know**
6:2 15:8,23 17:20
19:8 28:11 29:9
35:17 43:8 44:5,11
45:2,5,16,17,20,21
45:24 46:7,13,13,15
48:14 53:7 56:6
58:12 59:12,13
60:18 62:9 63:20
65:8

**L**

**L**
3:2,2 68:2
**Lagoda**
1:4 41:11 51:23
54:18,20 55:3,22
56:16,20 58:6,9,17
59:6 61:2
**Lagoda's**
65:12,19 66:2
**laid**
55:4
**language**
46:16 58:16
**lashing**
26:6 30:6
**lasts**
49:12
**LAW**
2:6,10
**Lawanda**
21:3
**laying**
55:10
**learned**
46:11 49:4,19
**leave**
63:12
**left**
18:4 30:19 45:3
64:13
**legal**
4:24
**Lehman**
7:11

**lessons**
48:23
**letting**
43:8
**level**
6:24
**licenses**
7:18
**Light**
18:23
**lighter**
18:25
**LINE**
69:15
**little**
28:6 32:8 58:14
59:21 65:8
**long**
8:2,5 15:8 16:16 19:6
20:4 23:5 24:13
43:19 44:13 49:12
56:4 60:17,20 65:15
**longer**
48:11 56:10
**look**
27:22 45:18
**looked**
18:22 25:4,20 32:6
**looking**
17:18 19:7 25:24
**looks**
25:22,25
**lot**
14:25 15:3

**M**

**MA**
2:7
**magnitude**
55:24
**major**
40:9
**male**
19:5,10 26:17 27:12
61:17 62:3,15
**man**

52:24 54:21 55:20
61:11
**manner**
5:11
**mark**
20:14 35:15 40:18
**marked**
40:13 69:15
**marking**
20:24
**marriage**
70:15
**matter**
60:8,24 70:17
**mean**
39:8 42:15,19 66:13
**meaning**
55:12
**medical**
9:14,16 10:5 11:5
15:16,20 16:2,5
22:12 39:13,16 40:4
41:19,21 52:5,6,10
52:12,17,21 53:8
54:6,12 56:2 60:3
61:17 62:12 64:15
65:4 66:9
**meet**
43:25
**mention**
31:17
**mentioned**
31:23
**met**
43:22
**MEZZACAPPA**
1:11
**MICHAEL**
1:10
**middle**
15:10
**Miller**
42:24 43:3,12,15
44:2,9,18
**mind**
64:5


MAGNA
LEGAL SERVICES

mine
18:25
minute
47:20
minutes
23:12,25 24:10 37:13
  54:11 56:9 60:8,17
  60:18
Mm-hmm
27:24 28:4 38:20
moment
21:5 29:21
Montefiore
9:13,16,20,24 10:12
  10:14,22,24 11:5
month
64:6
months
8:7
morning
4:17,18
motioned
37:20,21
mouth
49:13 50:8,14,19
  55:19 65:19
move
40:11 55:25
moving
50:5

—————— N ——————

N
2:2 3:2 4:2,2 68:2
  69:2
name
4:8,19 42:21
named
4:23
narrative
36:10
Nathana
1:18 4:9 68:15
necessarily
11:10
need

17:6,7 47:7 52:11
needed
16:2,5
needs
10:4,5 17:5,11
never
5:15 13:7 33:18,20
  34:3
new
1:2,8,8,8,9,22 2:12
  4:4,14,21,22 5:2
  7:24 8:3,10,18
  11:14 35:22,23 45:4
  70:3,4,7
night
14:5 42:2 54:23
NJ
2:10
nods
6:14
nonpharmacological
11:23
Notary
1:21 4:4 68:22 70:6
notation
65:17
notified
15:15 54:5
NRB
1:7
nurse
7:12,15 8:19,22 9:5
  9:17,19,20,24 10:12
  11:5 16:9 17:21
  18:18,19,21 25:9
  32:5,11 42:16,20,21
  47:4 48:16,20 49:21
  51:9 52:23 53:18
  56:25 57:11,19,25
  62:15 64:21,24
  66:17
nurses
13:10 16:24 18:9,16
  18:17 31:22 38:3
  60:2 63:6
nursing

7:8,19 48:22
NY
2:10,12

—————— O ——————

O
3:2 68:2
oath
3:7
object
34:15
objection
11:9 13:16 23:7,14
  24:2,17 25:2 27:3,9
  27:16,20 30:15 32:2
  32:15,25 34:12,14
  34:19 44:20 45:12
  46:25 47:10 52:15
  54:14 57:6,14 60:13
  61:21 62:7 64:17
  66:10,20
objections
3:11
observations
18:7 28:9 62:14
observe
16:11 19:12
observed
19:3 56:21
obviously
45:16
occur
50:17
occurred
5:5 22:10 35:10
  36:16 64:6
occurrence
41:10
occurs
12:11
office
20:7
officer
1:10,10,10,11,11
  30:10 36:20 46:22
  60:5,10 61:7 62:6

62:21,23,24 63:6
officers
4:23 29:19,22 30:22
  31:18 35:10 42:9
oh
42:17
okay
5:20,21 6:3,4,9,10,15
  6:16 20:12,16 21:9
  21:10,17 26:2 28:20
  28:22 33:23 35:19
  36:8 40:10 43:11
  46:15 48:5,8 54:24
  63:5 67:5
old
14:10
once
10:2,7 12:18 16:4
  35:8 36:2
ongoing
52:17 65:3
opinion
56:5
opportunity
6:7 21:19 22:6 65:15
order
8:21 35:5
ordered
41:16
original
3:5,9
originally
13:25
outcome
70:16
overnight
8:12

—————— P ——————

P
2:2,2 3:2
PA
28:3,7 31:10 33:17
  35:24,24 40:20
page
20:20 21:5,21 22:8


MAGNA
LEGAL SERVICES

27:25 28:6,9,13,14
31:7 33:16 36:3,4,6
36:7,22 37:2 69:3,9
69:12,15
**pages**
22:7 35:25 65:15
**PAGE/LINE**
71:3
**pain**
26:12,13 29:13 31:13
31:15 39:6,10,14,17
40:3,6 41:16
**PAPD**
1:10,10,10,10,11,11
**PAPIA**
1:11
**part**
19:14 25:8 38:6,11
40:24 49:19 50:25
51:8,16 65:12,20
**parties**
2:4 3:4 70:14
**parts**
38:6
**part-time**
8:13
**pass**
17:13
**passenger**
15:16 18:11 19:13
23:4,12,24 24:9,14
24:19 25:13 27:14
28:10,23 30:8 31:23
32:23 34:9 39:18
41:11,12,14 44:16
45:10,24 46:4 47:5
**passengers**
34:25 45:9
**passenger's**
30:18 31:24
**patient**
11:19,21 12:11,18,25
13:8,12 34:8,20,21
47:8 54:19,19
**patients**
10:2,7 11:7,12 13:5

**PAUL**
1:11
**people**
14:25 15:3 32:21
33:2,9,18,24
**pepper**
63:16,18
**period**
10:10
**person**
49:7,16,22 62:11
63:7 64:15,25 66:7
66:17
**personally**
51:23
**pharmacological**
12:5
**physical**
55:21 65:25
**pilot**
54:5
**place**
11:11 68:11
**plaintiff**
2:6 60:24
**plaintiffs**
1:5 4:24
**plaintiff's**
47:15
**plane**
15:2,4,10,11,11,14
16:3,6,11,13,13
18:3 19:12,17,19,23
21:4 23:3 29:25
30:2,3,20,22 34:24
39:7 41:13 43:23
44:2,19 52:3,20
53:12 54:4,4,7,11
59:12,14,18 60:3,6
60:9,11 61:8,19
62:12,16 63:13
**platitude**
49:23
**please**
4:7 6:2,7 11:18 21:4
21:11 28:18 47:20

**point**
12:3 15:15 16:19
18:2 19:7 24:19
25:23 26:7,23 28:15
28:19 29:4 30:16
33:6,11 34:2,24
37:25 38:17 39:5
46:7 51:3,7 55:12
56:16 58:5,5,22
63:5,8,10
**police**
1:9,9 4:23 18:3 29:18
29:22 30:9,22 31:18
35:10,22 36:20 42:8
46:22 60:5 61:7,19
62:5,21,23
**population**
33:20
**Port**
1:8,8,9 2:10 4:21
20:7 35:9,22 36:19
42:8 60:4,10 62:5
62:20
**portion**
36:10 53:25
**portions**
50:19
**positioned**
59:9
**potentially**
50:14,18
**pregnant**
31:23 32:12,16,17,17
32:20
**prepare**
36:14
**prepared**
35:15
**Presbyterian**
7:24 8:3,11,18 11:15
**PRESENT**
2:15
**pressing**
12:19
**preventing**
6:18

**previously**
23:11 24:23 29:15
48:14 55:9 65:10,24
**prior**
9:10 51:6
**probably**
56:9 64:20
**problem**
48:4
**procedure**
1:20 5:22
**procedures**
11:7,19
**process**
5:20 8:23 9:2 62:9
65:4
**professional**
52:5 65:2
**protect**
17:6 27:2,13 29:2
**provide**
10:8
**psychiatric**
8:19,21 9:4
**Public**
1:21 4:4 68:22 70:6
**pull**
20:13
**punch**
28:25 30:9
**punched**
27:19 29:2,9,12 31:3
38:16 40:5 41:10,15
45:10,24
**punches**
30:11
**punching**
24:24 39:18 46:20
**pursuant**
1:19
**put**
17:3 53:11 61:4
**p.m**
14:6 36:21

**Q**



**question**
 5:25 6:3,8,8 22:3
   23:16,19 24:5 34:14
   43:25 53:24 57:7,23
   61:23,23 64:23
   69:15
**questioned**
 5:10 22:21
**questions**
 5:4,12,23,24 18:6
   21:21 22:23 23:23
   33:13 37:10 47:13
   47:15 48:12,18
   65:22 67:6,8 69:15
**quick**
 13:3
**quiet**
 11:25
**quite**
 15:24

————————— R —————————

**R**
 2:2 3:2 4:2 68:2 70:2
**radio**
 62:3
**rarely**
 11:11
**read**
 21:6,11,20 22:7
   23:10 28:7,12 31:9
   36:2 45:13 53:23
   54:2 65:15
**reading**
 21:12,17 23:22 24:11
   28:19 64:8
**ready**
 21:15
**realized**
 64:13
**really**
 13:3 33:20 34:3
**rear**
 21:3 22:10
**reason**
 14:16

**recall**
 10:13 13:20,24 14:18
   14:23 15:5,9 18:21
   19:17,21,24,25 20:3
   20:6 23:5,8 24:18
   24:25 26:20 28:23
   29:11,19 31:5,12
   32:5,10 35:12 36:18
   38:4,8,10,21 41:21
   42:21 43:2 45:8
   48:23 63:3,4 64:10
   64:19 66:5
**receive**
 7:3,9 8:20 40:4
**received**
 48:19,23 49:5 51:7
**recollection**
 21:8 22:9 23:10,22
   24:13
**record**
 4:8 10:23 20:23
   31:10 41:9 58:14
   60:23 61:5 70:11
**recorded**
 37:7
**redirected**
 35:4
**refresh**
 22:9 23:9,21 24:13
**refreshes**
 21:8
**refused**
 41:19
**refusing**
 41:21
**regaining**
 41:14
**regarding**
 5:4
**regards**
 5:14
**registered**
 7:12,15 9:20 16:9
   25:9 47:4 48:16,20
   49:21 51:9 52:23
   53:18 56:25 57:11

   57:18,25 66:17
**rehabilitation**
 9:9
**Reid**
 4:17 5:7 6:21 13:18
   20:6,17 22:20 23:2
   27:18 29:11 33:6
   34:7,18,23 35:14,20
   36:9 38:4 39:3
   40:24 41:7 42:7,20
   43:25 46:4,20 47:13
   47:23 67:8
**related**
 70:14
**remember**
 10:17 15:24 16:16,18
   18:14 21:9,23 22:15
   22:15,18 26:17
   27:17,18,21 31:20
   31:21 32:3,9,18,19
   37:22 39:11,23,24
   40:9 43:4 45:14
   53:4,5 56:7,10,13
**reorient**
 25:21,24,25
**rephrase**
 6:3 23:19 61:22
**report**
 40:18,25 41:7
**reporter**
 4:7,11 6:5,11
**represent**
 41:18
**representing**
 4:20
**request**
 39:16
**requested**
 39:13 69:12
**required**
 12:12,16,23
**reserved**
 3:12
**respective**
 3:4
**respond**

 41:23
**responded**
 41:17 61:8,9 62:10
   65:13
**responding**
 45:19 52:16 60:2
**response**
 16:7 21:6,20 22:7,11
   22:16 23:10,23
   24:11 25:14 26:3
   28:8 33:22 40:5
   61:19 62:5 65:16
**responses**
 6:12,15 22:23 64:2
**responsibilities**
 9:23
**responsible**
 11:6
**restrain**
 47:8
**restricting**
 49:9
**result**
 50:17 66:8
**returned**
 60:9
**review**
 35:25
**reviewed**
 20:2
**right**
 5:17 26:4,8 41:20
   47:19 51:4 52:7,17
   57:4 58:10,24 59:20
   59:21 62:17 65:5
   66:4
**Riverside**
 7:25 8:6 11:16
**RMA**
 41:17
**ROBERT**
 1:10
**role**
 10:12
**roles**
 11:14



| | | | |
|---|---|---|---|
| **room** 11:25 | 66:13 | **severe** 41:16 | 57:22 |
| **roughly** 56:3 | **see** 19:8 20:17 21:4,9 30:8 33:22 37:15 38:19 39:2,23 40:21 49:11 53:6 63:7 65:17 | **shaking** 16:22 50:12 | **SOB** 39:6,8 |
| **Rules** 1:20 | | **SHEET** 71:2 | **somebody** 48:24 49:6 51:14,17 57:3,11,19 58:2,16 65:3 |
| **RULINGS** 69:15 | | **shift** 8:14 | |
| | **seen** 13:9 58:4 65:19 | **shifts** 8:12,15 | **son** 14:9,10 |
| **S** | **seizing** 55:10 | **short** 10:10 | **soon** 38:25 39:13 |
| **S** 2:2 3:2,2 69:8 | **seizure** 16:21,23 17:5,13,14 17:15,22 18:12 19:13 23:4,6,13,25 24:10,15,20,23 25:11,15,19 26:2 27:15 28:24 29:17 33:8,15 34:4 37:15 37:20 38:5 44:17 46:5 48:25 49:6,8 49:11,16,22,25 50:3 50:15,20 51:4,10,14 51:18,19,24 52:25 53:14 54:22 55:17 55:20 56:5 57:4,13 58:2 59:7 61:11,18 62:3,16,19 63:8 65:20 66:3,7,18 67:2 | **shortness** 39:9 40:7 | **sorry** 18:19 37:19 54:18 59:23 |
| **saw** 23:4 34:7 53:3,5 | | **show** 20:5,10 31:7 35:13 35:20 40:17 | **sort** 12:6 |
| **saying** 25:14 32:3,11,16,18 32:19 64:19 | | **showed** 50:24 | **Southern** 1:2 5:2 |
| **says** 41:17 | | **side** 17:4,6 49:10 55:4,6 55:10 | **space** 50:2 |
| **scared** 29:14 30:18 32:22 | | **sign** 50:14 | **sparked** 61:18 62:4 |
| **scheduled** 13:20,25 14:7 | | **signature** 36:24 | **speak** 27:4 33:2 35:9 45:9 45:17,18 46:8,11 58:16,19 |
| **school** 7:9 49:2 | | **signed** 3:6,7,8 | |
| **screaming** 32:13 | | **signs** 49:15,19 55:16,19 | **speaking** 6:6 43:11 58:15 |
| **screen** 20:14,18 35:18 47:19 | | **silent** 49:25 | **speaks** 46:14 |
| **scroll** 28:5 36:3,7 | **seizures** 33:10,18,25 49:24 | **site** 39:22 | **specific** 18:6 |
| **sealing** 3:4 | **Sergeant** 21:2 | **sitting** 19:17,25 52:2 | **specifically** 32:19 39:24 |
| **seat** 15:2 18:4 19:18,22 53:7,8,11 | **sergeants** 42:9 | **situation** 13:12 34:11 46:24 55:25 61:11 | **specified** 68:11 |
| **seats** 15:5 | **series** 5:4 | **situations** 56:3 | **split** 8:8 |
| **second** 36:4,7 59:24 | **serious** 13:12 46:23 | **six** 8:7 | **spoke** 42:21 43:3 46:12,16 |
| **security** 12:13,17,20,24 34:11 34:22 | **served** 43:5,6,8,10,12 44:14 | **skin** 18:23 | **spoken** 42:12,15 43:19 44:12 44:13,22 |
| **sedate** 12:7,9 47:8 | **service** 3:9 | **slightly** | **spray** 63:16,18 |
| **sedated** | **set** 70:10,19 | | **sprayed** |


MAGNA
LEGAL SERVICES

63:16
**SS**
 70:4
**St**
 7:25 8:6,13 9:7 11:15
**stable**
 11:11
**stamped**
 28:2 31:10 33:17
    35:24 40:20
**standing**
 16:18 19:24 38:13
    54:17 55:2,7
**stands**
 41:9,18
**staring**
 50:2
**start**
 28:18 48:17
**started**
 10:16 17:23 24:24
    25:5 26:6 29:22
    46:20 53:13
**starts**
 28:15
**state**
 1:22 2:7 4:4,7 38:13
    38:24 70:3,7
**stated**
 41:10
**statement**
 20:2 27:23 29:5,16
    31:3 33:16 35:14,23
    36:14,19,22,25 37:5
    37:11 38:12 40:11
    40:13 45:13 53:3,3
    53:6,13 56:8
**statements**
 42:7
**states**
 1:2 4:25 41:7
**stating**
 64:10
**stay**
 11:25 64:14
**step**

12:15,18
**stepped**
 26:21,22 27:12 38:17
**stepping**
 27:2,7
**STIPULATED**
 3:3,11
**stomach**
 17:25 38:16 39:19
    40:6 41:11,15 45:11
    45:25 59:3,6 64:12
**stood**
 17:16 51:24 56:17,22
    58:6
**Street**
 2:7,12
**strike**
 26:10 38:5
**striking**
 38:11
**struck**
 26:4,8 58:23,25 59:3
    59:5
**struggling**
 19:20
**stuff**
 64:8
**Subpoena**
 1:19 43:13
**Subscribed**
 68:18
**subside**
 56:6
**substance**
 9:9
**substantive**
 45:22
**suddenly**
 38:15
**sued**
 4:23
**sure**
 14:4 15:2 16:17 17:7
    18:17 22:5 23:17
    24:6 30:24 38:9,10
    39:22,22 41:5 42:5

45:5 46:12 49:8,9
 49:11,12 55:6 60:20
 61:24 67:4
**swinging**
 17:23 29:7 58:23
**sworn**
 3:6 4:3 68:5,18 70:10
**swung**
 17:24 58:25
**symptoms**
 66:3

---

**T**

**T**
 3:2,2 4:2 68:2 69:8
    70:2,2
**take**
 6:6,12,13 10:4 11:24
    13:20 21:5,10 27:22
    34:21 37:21,24 41:5
    47:24 53:10 60:17
**taken**
 1:18 15:3 47:7
**talking**
 44:11 45:19
**Tarasov**
 1:3 2:15 60:23
**teach**
 49:14 51:17
**Technologically**
 47:18
**tell**
 11:18 42:17 49:3,18
    56:3
**tendencies**
 34:9
**tending**
 18:10
**terms**
 63:10
**testified**
 4:5 24:23 29:16
    48:15 50:22 51:22
    54:21 55:9,17 56:16
    58:8,12 65:24
**testify**

43:13 68:5
**testifying**
 6:18
**testimony**
 54:2 64:2,3 65:18
    68:6,10 70:12
**Thank**
 18:5 21:18 28:21
    47:12 48:8 67:8
**thing**
 61:24 65:8
**think**
 7:5 10:15,17 14:3,21
    16:15,25 17:21 18:2
    18:15,18 26:21 27:5
    29:25 37:20,21 38:2
    39:20 42:23 44:12
    56:8 59:11,15,18
    65:9,12
**thinking**
 17:5 61:12
**threat**
 13:13,14
**threatened**
 30:17 32:22
**three**
 8:11 18:15 23:12,25
    24:9 37:13 56:9
**throw**
 30:9
**throwing**
 30:11
**TIKHOPLAV**
 1:4
**time**
 1:15 3:12 5:16,25 8:8
    13:24 14:19 15:8
    17:2 18:16 21:11
    29:12 30:14,23
    32:14 34:2,25 37:25
    41:5 43:2,19 44:13
    45:3 47:25 48:9
    53:9 55:25 56:4
    67:9 68:10
**times**
 12:10


MAGNA
LEGAL SERVICES

**time/place**
41:9
**timing**
49:11
**title**
9:18
**titled**
35:21
**today**
5:4,19 6:19 34:8
43:14 48:9 51:22
55:17 58:9,15 65:9
67:9
**today's**
63:21
**told**
43:5
**tongue**
50:18
**touch**
17:10 44:9
**TPO**
41:8
**Trade**
2:11
**training**
8:21,25 25:9 48:15
48:18 49:20 51:7,12
51:16 56:24 62:14
66:16
**transcript**
20:11,21,23 21:6
22:4,8 24:12 28:2
31:8 50:23 63:23
65:16 68:9,9
**travel**
14:7
**traveling**
14:14 15:6
**treat**
51:9 61:10
**treated**
33:7,9,14,24 51:3
**treating**
45:11 48:24 49:5
65:3

**treatment**
40:5
**tremoring**
50:11
**trial**
1:18 3:12
**tried**
25:10 29:18 38:17,25
58:9
**trip**
35:6 42:2
**true**
38:21,23 68:9 70:11
**truth**
68:5
**truthful**
22:22 37:6 40:15
**truthfully**
6:18
**try**
11:22 12:2 26:15
30:9
**trying**
10:17 17:20 25:17,19
25:21,23,25 26:25
28:17 29:5,6,8,10
30:6 37:22 38:9
46:3 53:10
**turn**
63:11
**turned**
17:4
**turning**
54:7
**two**
8:9,14 9:10 16:24,25
23:12,24 24:9 56:8
**two-page**
35:21 36:9 40:12
**type**
6:13 8:25 34:10 47:6
**T-R**
4:2

—————— U ——————

**U**

**3:2**
**Uh-huh**
21:14 36:17 38:23
**understand**
5:25 37:4 54:20
56:14 61:23
**understanding**
10:6 27:6 52:10,12
55:24 60:15 61:6
**Understood**
22:19
**United**
1:2 4:25
**unresponsive**
41:13
**unsigned**
3:8
**usually**
12:4 50:16

—————— V ——————

**V**
1:3,6
**vacation**
14:15,17 40:2
**verbal**
6:12,15
**versus**
58:15
**VIDEOTAPED**
1:17
**violence**
44:18
**violent**
11:8,11,20,22 12:11
12:19,25 13:6,9,13
24:24 30:14 34:9,21
34:22 47:6 61:14
**VIRTUAL**
1:17

—————— W ——————

**W**
4:2
**waived**
3:5

**want**
37:9 49:8,9,10,12
56:13
**wanted**
30:4 39:21,23,25
46:6 61:3 64:14
**wasn't**
19:21 45:19 55:11,12
55:14 60:19
**way**
16:22 39:6 46:16
56:9 57:8 70:16
**weekend**
8:16
**went**
10:20 16:8,10,12,23
17:19 18:4,8,13
21:3 22:10 23:2
25:4,7 30:20,21
34:23 52:19
**we'll**
20:14 35:15 40:18
**we're**
12:19,20 20:24 27:25
48:10
**we've**
40:13 43:17
**WHEREOF**
70:18
**white**
16:14
**wind**
31:4,13
**witness**
3:6,9,10 4:3,9,13
34:13 35:14 44:16
55:21 63:16,19
65:25 67:11 70:9,12
70:18
**witnessed**
51:23 60:4 65:11
**word**
37:18
**work**
8:13,17,19 9:6,8,11
9:15 33:19


MAGNA
LEGAL SERVICES

**worked**
9:13 10:14,24 11:4
**working**
8:2,6 9:10,19 47:4
**works**
5:22 62:9
**World**
2:11
**Wright-Reid**
1:18 4:10 40:19 57:9
68:15 69:10
**Wright-Reid-1**
20:15,24 24:11
**Wright-Reid-2**
35:16 40:14
**writing**
36:18 65:17
**written**
37:10
**wrote**
19:25

**X**

**X**
1:3,13 69:2,8

**Y**

**yeah**
11:3 12:19 17:14
18:25 20:19 21:16
21:22 25:23 26:5,13
31:11,15,15 36:8
38:2,3 42:19 43:6,7
43:10,18,23 45:7,15
49:13,17 55:5,7
59:19 61:15 62:24
64:8
**year**
8:4,7 14:11
**years**
9:14 10:13,13,20
21:25 22:18 33:24
43:9 53:4 56:14
**Yonkers**
4:14
**York**

1:2,8,9,22 2:12 4:5
4:14,21 5:2 7:24 8:3
8:10,18 11:15 35:22
70:3,4,7

**0**

**02109**
2:7

**1**

**1**
3:9 36:22 37:2 50:23
63:22 69:10
**10**
14:13
**10:00**
14:4,5
**10:14**
67:10
**10007**
2:12
**10713**
4:14
**1088**
35:24
**1089**
35:24
**11:40**
36:21
**12**
5:5 13:19 34:10 37:5
43:15 44:3
**12-hour**
8:11
**1218**
40:20
**13**
31:7
**14**
6:23
**150**
2:12
**1687**
28:7
**1688**
28:3

**1692**
33:17
**1698**
31:10
**171**
4:13
**1975**
6:23

**2**

**2**
20:20 21:21 22:7
28:6,13,14 65:15
**20-page**
20:23
**200**
2:7
**2010**
7:16 10:15,18,21
47:5
**2011**
10:21
**2012**
7:5 10:22,25
**2019**
5:6 10:18 13:19
14:12 20:8 22:22
24:8 33:12 34:3,10
37:6 42:10 43:15
44:3 51:2 63:24
**2020**
10:19
**2021**
10:16,19,25
**2023**
1:14 68:19 70:19
**21**
1:14
**21st**
70:19
**21-cv-6226**
1:7
**24th**
2:12

**3**

**3**
21:6 22:8 27:25 28:9
40:19 65:15 69:10
**30**
3:9

**4**

**4**
2:11 69:4
**47**
69:5

**6**

**6**
20:8 22:22

**7**

**7**
33:16
**7th**
2:7

**9**

**9:00**
1:15 14:4,5


MAGNA
LEGAL SERVICES