# EXHIBIT T

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
ALEXEY V. TARASOV, ESQ., Administrator
of the Estate of EVGENIY LAGODA,
Deceased, and GRIGORY TIKHOPLAV,

                Plaintiffs,

                -against-        Case No:
                                21-cv-6226(NRB)


PORT AUTHORITY OF NEW YORK AND NEW JERSEY,
and PORT AUTHORITY OF NEW YORK AND NEW
JERSEY POLICE DEPARTMENT a/k/a PORT
AUTHORITY POLICE DEPARTMENT a/k/a PAPD,
PAPD OFFICER MICHAEL BUGIADA, PAPD OFFICER
ROBERT JOSEPH, PAPD OFFICER JONATHAN PAPIA,
PAPD OFFICER PAUL MEZZACAPPA, and PAPD
OFFICER JONATHAN DURAN,

                Defendants.
------------------------------------------x
        DEPOSITION of the Non-Party Witness,
SHANTELL MILLER, taken by the respective
parties, pursuant to Subpoena, held via
Zoom, on August 18, 2023, at 10:03 a.m.,
before a Notary Public of the State of New
York.


                Magna Legal Services
                   866-624-6221
                  www.MagnaLS.com



Page 2

A P P E A R A N C E S:

ASHCROFT LAW FIRM
        Attorney for Plaintiffs
        200 State Street, 7th Floor
        Boston, Massachusetts 02109
BY:     CHRISTOPHER AMRHEIN, ESQ.


PORT AUTHORITY OF NEW YORK AND NEW JERSEY
LAW DEPARTMENT
        Attorneys for Defendants
        4 World Trade Center
        150 Greenwich Street, 24th Floor
        New York, New York 10007
BY:     MATTHEW MALYSA, ESQ.
        CHERYL ALTERMAN, ESQ.

ALSO PRESENT:

    Alexey Tarasov- Plaintiff



S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between (among) counsel for the respective parties herein, that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

IT IS HEREBY STIPULATED AND AGREED by and between counsel for all parties present that Pursuant to CPLR section 3113(d) this deposition is being conducted by video conference, that the court reporter, all counsel, and the witness are all in separate remote locations and participating via Videoconference (LegalView/Zoom) meeting under the control of Magna Legal Services,



that the officer administering the oath to the witness need not be in the place of the deposition and the witness shall be sworn in remotely by the court reporter after confirming the witnesses identity, that this video conference will not be recorded in any manner and that any recording without the express written consent of all parties shall be considered unauthorized, in violation of law, and shall not be used for any purpose in this litigation or otherwise.

IT IS FURTHER STIPULATED that exhibits may be marked by the attorney presenting the exhibit to the witness, and that a copy of any exhibit presented to a witness shall be emailed to or otherwise in possession of all counsel prior to any questioning of a witness regarding the exhibit in question. All parties shall bear their own costs in the conduct of this deposition by video conference.



Page 5

S H A N T E L L   M I L L E R,

The witness herein, having first been duly sworn by Stella Vaks, a Notary Public in and for the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. MALYSA:

Q. Please state your name for the record.

A. Shantell Miller.

Q. Where do you reside?

A. 6941 Bayfield Avenue, Arverne, New York 11692.

Q. Ms. Miller, my name is Matthew Malysa.  I represent the Port Authority of New York and New Jersey and five individually named Port Authority police officers in a lawsuit that is currently pending in the United States District Court for the Southern District of New York.

Today we are here to take your deposition.  Before we begin, I would



like to go over some instructions.  I
am going to be asking you a series of
questions that are currently all
recorded by the court reporter.  The
court reporter will be taking down
everything that is said today so that
we have a written transcript of the
deposition.

          Even though we are communicating
virtually, you are still testifying
under oath just the same as you would
be in court and this has the same
effect as testifying in court before a
judge and a jury.

          Do you understand?

     A. I do.

     Q. That was exactly my next
directive.  The court reporter cannot
record head nods or hand gestures.

     A. Okay.

     Q. What we are going to discuss
today might be conversational.  In the
course of conversation, people often
times respond with a head nod or a hand



gesture but the court reporter cannot record this, so it is very important that you verbalize your responses.

Do you understand?

A. Yes.

Q. Another way that we can ensure that we have a nice clean transcript is to please let me finish asking you the question before you give your answer. Though you might anticipate what I am going to ask you, in order for the court reporter to take down both the question and the answer, it is very important that you please let me finish asking the question before you respond. I will in turn allow you to finish giving your answer before I ask the next case question.

Do you understand?

A. Understand.

Q. If you do not hear or understand a question, please just ask me to repeat or clarify.  If you answer, I will assume that you heard and



Page 8

understood the question.

     Do you understand?

   A. Understand.

   Q. I am going to be asking you about things that happened years ago, so it is fine if you do not remember something.  I do not want you to guess at your answer.  But if you are able to give me an estimate or an approximation, such as with regards to time or distance, please just let me know and we will clarify that for the record.

     Do you understand?

   A. Yes.

   Q. Ms. Miller, what is your date of birth?

   A. XXXXXXXX XX, 1990.

   Q. Where were you born?

   A. St. James, Jamaica, West Indies.

   Q. What is your highest level of education?

   A. I have a Bachelor's degree from Jamaica.



Page 9

Q. What year did you obtain your Bachelor's degree?

A. In 2013.

Q. Was there a specific course of study for your Bachelor's degree?

A. Primary education.

Q. Are you currently employed?

A. Yes.

Q. Who is your current employer?

A. Memorial Sloan Kettering Cancer Center.

Q. What position do you currently hold at Memorial Sloan Kettering Cancer Center?

A. Medical assistant.

Q. How long have you been employed by Memorial Sloan Kettering Cancer Center?

A. A little over six years, six years going on seven.

Q. Where did you work prior to joining Memorial Sloan Kettering Cancer Center?

A. I worked at this multi-specialty



Page 10

clinic.  It's called Primary Care Medical, PC.

Q. What position did you hold there?

A. Medical assistant.

Q. Do you hold any certifications with regard to your role as a medical assistant?

A. I have a phlebotomy certificate, basic life support, CPR.  That's pretty much it.

Q. Am I correct that you were a passenger on board a JetBlue flight traveling from New York to Jamaica in April, 2019 at John F. Kennedy International Airport?

A. Yes.

Q. Do you recall that flight taking place on April 12, 2019?

A. Yes.

Q. Do you have an independent recollection of an incident that occurred on board that JetBlue flight at JFK?



A. Yes.

Q. Did that incident involve a passenger who woke from a seizure and punched a passenger and a crew member?

MR. AMRHEIN:  Objection.

Go ahead.

Q. Ms. Miller, you can answer the question.

A. I thought someone said0 objection.

Q. You did hear objection but you are still able to answer the question.

A. Yes, I remember the incident. What was the question?

Q. Let me restate.  Did that incident abroad the JetBlue flight on April 12, 2019, involve a passenger who awoke from a seizure who punched a passenger and a crew member?

MR. AMRHEIN:  Objection.

A. Yes.

Q. Do you recall what time that JetBlue flight was scheduled to take off that night?



Page 12

A. I don't remember the exact time, but it was nighttime.  It was p.m.

Q. Do you recall whether or not that flight was delayed in any way?

A. Yes, it was delayed.

Q. Do you recall the duration of the delay?

A. I don't recall the approximate time, but I think I have correspondence from JetBlue; so I'm pretty sure the time would be in those emails.  But right now offhand, no, I don't remember the approximate length.

Q. At the time you were abroad the JetBlue flight on April 12, 2019, were you traveling alone or were you traveling with someone else?

A. I was traveling alone.

Q. At some point, as the plane was taxiing to the runway, did you become aware of a passenger in need of medical assistance?

A. Yes.

Q. How did you become aware?



Page 13

A. I noticed the gentleman -- I'm just going to describe what I saw -- he fell out of his seat to the ground and then started to have tremors like a seizure, so...

Q. Were you seated near or around where that passenger was seated on the plane?

A. Yeah.

Q. Was your seat closer to the front of the plane than his seat?

A. I think so.

Q. Can you estimate how many rows between where you were seated and where the passenger was seated who fell down to the ground?

A. I don't remember, but it was close enough so I could see and hear when I turned around.

Q. What did you see and hear when you turned around?

A. The passengers on the plane were freaked out, like scared and they announced that if anyone had any



Page 14

medical experience with what's happening.

So myself and I think it was two other nurses, I -- we went around the back; we turned him to his side. And yeah.

Q. Initially, when the passenger had fallen from his seat and you observed that, how did he make his way from that area to the rear?

MR. AMRHEIN: Objection.

A. How did he make himself from the seat to the rear?

Q. Yes. Did someone assist him, was he carried?

A. You mean after the seizure or --

Q. What did you observe? If you did not see how he made it back there, you can just let me know that. But I --

A. I don't --

MR. AMRHEIN: Objection.

A. I don't know that.

Q. At some point, as you just



testified, there was an announcement asking for medical professionals on board; is that correct?

A. Yes.

Q. Did that announcement come over the intercom or the speaker system inside the plane?

A. I think so; think so.

Q. When you responded to the announcement, did you have any initial conversation with a flight crew member or flight attendant?

A. I think they asked what your qualification was and I told them.

Q. Did you overhear any of the other two medical professionals who responded what their qualifications were?

MR. AMRHEIN:  Objection.

A. I think -- I think someone said they were a nurse.  Think so.

Q. Do you recall whether the flight attendant spoke with you, gave you any instructions when you responded?



MR. AMRHEIN: Objection.

A. If the flight attendant gave us any instructions like -- like what to do with the patient -- with the passenger?

Q. What was your conversation with the flight attendant prior to --

A. I think -- I think he was on his back and he was, like, biting at his tongue, so I told them, like, let's try to put him on his side. And I'm not sure how many of us started to but I can't recall but we put him to his side and I think he calmed down.
(Indicating)

Q. Do you recall what symptoms the passenger was exhibiting when you first entered the rear galley?

MR. AMRHEIN: Objection.

A. When we noticed -- let me see -- what symptoms were he experiencing? To me, symptoms of a seizure. I don't know. As I said, like, he had tremors; he was basically shaking with his



tongue coming from his mouth; a little
foam from his mouth, so I would think
that was a seizure.

Q. Do you recall what the passenger
was wearing at the time you first saw
him after responding to the
announcement?

A. I can't recall.

Q. Do you recall whether the
passenger was wearing a jacket?

A. I don't remember.

Q. Did you discuss what actions
should be taken with either a flight
crew member or one of the nurses who
responded to the announcement?

MR. AMRHEIN:  Objection.

A. I -- I -- I think we all agreed
to put him on his side 'cause he was,
like, stretched out more, like, on his
back.  He was hitting everywhere, so he
was basically hurting himself.  So we
tried to put him to the side to kind
of...

Q. When you say he was hurting



Page 18

himself, can you describe his movements?

MR. AMRHEIN:  Objection.

A. Like tremors, fluttering like -- it's hard to describe other than that. (Indicating)

Q. When you say he was hurting himself, was it that his body movements were abnormal or was it that he was hitting any part of the inside of the cabin?

MR. AMRHEIN:  Objection.

A. Yes, like, his body was hitting objects in the cabin.

Q. Do you recall a specific object or parts of the cabin that his body came into contact with?

MR. AMRHEIN:  Objection.

A. I think the seat; can't remember.

Q. Can you describe how he was turned to his side from his back while lying down on the ground?

A. We turned him.  Myself along



with, I think it was one of the other nurses and a crew member, I think.

Q. Do you recall specifically what part of his body you held on to, to turn him over to the side?

A. No.

Q. Do you recall what would anyone else, what would the other individuals who were assisting him turning to the side, where they were --

MR. AMRHEIN:  Objection.

A. No, not right now.  I -- everything happened so -- I -- I -- I don't remember what I held onto or what part.

Q. Did you at any point observe anyone administer any sort of medication to the passenger?

MR. AMRHEIN:  Objection.

A. No, I didn't see anything, like...

Q. Can you please explain how the passenger was positioned in the rear galley and where you were in relation?



Page 20

A. Where he was seated before?

Q. No, no.  Once he was laid down in the rear galley.

A. I think we -- we put him, like -- what's the -- like, in the -- in the walkway of the aircraft.

Q. I know a little bit about the layout there.  I know there is an aisle that leads from the front of the plane all the way to that rear galley area.

I guess the point of orientation would be if you are looking down the aisle towards the rear of the plane, how would the passenger be lying on the ground; would his feet be closest to you, if you were looking down the aisle or to the side view?

Can you describe it.

MR. AMRHEIN:  Objection.

A. I think his feet was -- I think his head was towards me and his feet were pointed to the rear, I think; I think.

Q. How long was the passenger in



that position on his side on the ground in the rear galley?

A. Not long; just until his symptoms subsided, the tremors.

Q. Was it a matter of minutes?

A. Probably minutes, yeah; not hours.

Q. Less than five minutes?

A. I don't think so.  I think more than that minute.

Q. Less than ten minutes?

A. I -- I don't know.  I don't remember.  I don't -- I don't remember. I don't wanna say yes.  I don't remember, honestly.

Q. That is fine.

What happened next?  At some point, did he change positions from lying on the side on the floor of the rear galley?

MR. AMRHEIN:  Objection.

A. He -- his symptoms stopped and he -- what happened after that?  They -- they came and took him off the



aircraft.  Yeah, after his symptom had stopped, they took him off the aircraft.

Q. Once his symptoms stopped and he was lying on his side, did there come a moment that he sat up?

MR. AMRHEIN:  Objection.

A. I think they -- I think they took him.  I think so, but I remember at that time he was standing.  I don't remember if it was before or after, but he was standing up at one point, but, yeah.

Q. Do you recall any actions that he took once he stood up?

A. He was -- he was kind of violent, but I don't know if it was before the seizure or after the seizure.  But he swung at one of the crew members.  So I remember that, but I don't recall if it was before or after.

MR. MALYSA:  Mark this, please.



Page 23

For purposes of the record, it is Bates stamped PA1086.

(Whereupon, The Port Authority Police of NY & NJ Statement was marked as Miller Exhibit 1 for identification, as of this date.)

Q. Ms. Miller, I am going to share a document with you.  We are going to refer to this for the purposes of this deposition as Miller 1.  I represent to you that this is a one-page document.

A. I was looking for this document.

Q. Ms. Miller, I am happy to zoom out or zoom in to any portion of this. I just briefly would like to ask you if this is in fact your handwriting?

A. Yes.

Q. At the top of the document here, it states, "Port Authority Police of New York and New Jersey Statement." And below that is a field, Name.  You have handwritten there Shantell Miller; is that correct?



Page 24

A.  Yes.  Okay, see patient; okay, so I guess this is -- this was after -- after.

Q.  Ms. Miller, the bottom of the document where it says, Signature of Person Making Statement, is that your signature at the bottom of the document?

A.  Yes, that's my signature.

Q.  Above your signature -- if you read this -- it is written into the form, "All statements herein are punishable as a Class A misdemeanor pursuant to Section 210.45 of the New York State Penal Law."

Was it your understanding at the time you completed this statement that this was to be a truthful and accurate statement?

MR. AMRHEIN:  Objection.

A.  Yeah.

Q.  Here on under the heading, Detailed Description of the Incident, am I correct that the document states,



"I, Shantell Miller, was a witness to, or involved in, an incident or crime that occurred on Saturday."

A. Yes.

Q. It says there 12/4/2019, but I think that is meant to be April 12, 2019; is that correct?

A. Yes.

Q. Does it state the time as 22:30?

A. Yes.

Q. The location is written to be JFK, T5.

A. Yes.

Q. Is that meant to designate Terminal 5?

A. Terminal 5, yes.

Q. The statement states as follows, "PT was having a seizure.  We turned him to his side.  He bit his tongue. After PT was awake, he became very violent, punched a passenger assisting in her stomach, punched a crew member and continued.  Shortly after, the Port Authority came and calm the situation."



Page 26

A. Yes.

Q. Did I read the statement accurately?

A. Yes.

Q. Does that refresh your recollection as to the sequence of events aboard the JetBlue flight on April 12, 2019?

MR. AMRHEIN: Objection.

A. Yes.

Q. Once the passenger came out of the seizure and changed positions from lying on his side in the rear galley, do you recall what happened?

MR. AMRHEIN: Objection.

A. Yeah. He became violent afterwards, after the seizure.

Q. As the statement says here, did you in fact witness the passenger punching one of the nurses who was attempting to assist him?

MR. AMRHEIN: Objection.

A. Yes.

Q. From where you were standing,



Page 27

were you able to see him punch her in
her stomach, as you stated here on
Miller 1?

            MR. AMRHEIN:  Objection.

    A. Yes.

    Q. Can you describe what happened
when the passenger punched the nurse in
the stomach.

            MR. AMRHEIN:  Objection.

    A. He was just throwing jabs,
throwing fists, like...

    Q. How did the nurse react to being
punched in the stomach?

            MR. AMRHEIN:  Objection.

    A. What did she do?  She didn't
really retaliate.  I think she was
more, like, protecting herself from
getting hit.

    Q. Do you recall if she screamed
out or if anyone else had begun
yelling?

            MR. AMRHEIN:  Objection.

    A. The crew members are basically
telling him, sir, calm down, like, you



Page 28

know, you can't do that, yeah.

Q. Your statement also states that the passenger punched a crew member and continued. Do you recall what you meant by that?

A. There was other -- I think two other crew members behind and he punched at one of them.

Q. Do you recall whether the passenger was saying anything as he was taking the actions against the nurse and flight attendant?

MR. AMRHEIN:  Objection.

A. If -- if he was even saying anything, I couldn't make much out of it.  If he was even saying anything, I couldn't understand really.

Q. When you observed the passenger punching the nurse and the flight attendant, did you fear that he would attack you as well?

MR. AMRHEIN:  Objection.

A. At that time, I was farther away from him, so I wasn't that close for



Page 29

him to attack me.

Q. Can you describe how the passenger punched the nurse?

MR. AMRHEIN:  Objection.

A. I think -- I think she was -- she was still back there with the crew and -- and the passenger.  I think she was standing closer to him, I think, yeah.

Q. Was there any warning, anything that indicated that the passenger would attempt to make such action?

MR. AMRHEIN:  Objection.

A. No.

Q. Did it appear to you that the passenger was taking a boxing stance when he was throwing these punches?

MR. AMRHEIN:  Objection.

A. A -- a what?

Q. A boxing stance, something that -- a position like a boxer.

MR. AMRHEIN:  Objection.

A. I don't -- I don't -- I don't know.



Q. Did you or anyone else in the rear galley attempt to talk to the passenger once he became violent?

MR. AMRHEIN:  Objection.

A. The crew members were trying to calm him down.

Q. Do you recall if the crew members had requested the assistance of another passenger who was traveling with the person who became violent and asked for assistance from that person in calming him down?

MR. AMRHEIN:  Objection.

A. I think so -- I think so -- I -- I think so or I could be wrong, but I -- I think so.

Q. I am going to share another document with you.  One moment to put it up.  Ms. Miller, do you see a document on your screen?

A. Yes.

MR. MALYSA:  Mark this, please.

Just noting for the record



that this starts at Bates stamp PA1709 and goes through Bates stamp PA1731.

(Whereupon, a transcript of interview was marked as Miller Exhibit 2 for identification, as of this date.)

Q. I will represent to you that this is a twenty-three-page document, for the purposes of the record, and refer to this as Miller 2 today.

Ms. Miller, were you interviewed by a Port Authority police detective and two investigators from the New York State Attorney General's Office following this incident on April 12, 2019?

A. Yeah. Someone came to my house. That's what you're talking about, right?

Q. Were there three individuals that came to your home to speak to you about the incident on April 12, 2019?

A. Yes.



Page 32

Q. Do you recall whether any of those individuals had recorded your conversation that day?

A. I think they told me they were recording it for a record.

Q. I will represent to you that this document I am showing you, Miller 2, is a transcript of that interview. If you read at the top of the document there, the interview with the State taking place on May 7, 2019. And the participants are stated to be yourself, Sergeant Lawanda Irving, Investigator Bryan Mason and Mr. Nicholas Viorst.

Does that refresh your recollection as to the happening of that interview?

A. Yes.

Q. I will direct your attention here to the bottom portion of page 1. There is a question posed by Sergeant Lawanda Irving where you are asked if you remember a specific



incident that may have occurred on board that plane.  And I will represent to you that it is referring to the plane you were abroad April 12, 2019.

Can you please take a moment to review your response to that question.

A. Okay.

Q. In this statement, it mentions here that you had just finished praying; is that correct?

A. Yes.

Q. Is that something that you do regularly before taking off on a --

A. Yes, before and after.

Q. I would like to direct your attention to this portion of the interview on page 2 of the document. Can you please take a moment to review the question and responses here on the screen.

A. Yes.

Q. The statement towards the top of the screen here that is attributed to you makes mention that you had assisted



Page 34

the passenger with removing his jacket as he was on the ground and it makes mention that he was positioned on his knees.

Does that refresh your recollection as to his position in the rear galley prior to coming by?

MR. AMRHEIN:  Objection.

A. Yes, I remember.  I'm starting to remember, yeah.

Q. When you say that he was positioned on his knees, was he kneeling on his knees or --

MR. AMRHEIN:  Objection.

A. Let me try to remember.  Yeah, I -- I think -- I think so.

Q. Ms. Miller, take a moment and review the questions and answers on the bottom half of page 2 of Miller 2 and let me know when you are done.

A. Okay.

Q. Does reviewing your response here on page 2 of Miller 2, refresh your recollection as to there being



another passenger who attempted to speak to the passenger who became violent at some point during the --

A. Yeah.

Q. Here it states that, that person was someone who was traveling with the passenger. Do you recall anything about the interaction between those two?

A. At -- at the time, that's what it seemed like to me. There's no way I can be sure. I was just assuming based on the interaction, but yeah.

Q. Do you recall if you saw that passenger try to speak to the agitated passenger in a --

MR. AMRHEIN: Objection.

A. Yeah, they -- he spoke to him.

Q. What, if any, effect did that conversation have on the actions of the passenger who was behaving violently?

MR. AMRHEIN: Objection.

A. I don't even -- I don't understand what they said, to be



Page 36

honest.  I don't -- I think he was trying to calm him down or ask him like, what's happening.  I don't know. They -- they -- they don't -- they didn't speak English, I don't think. So...

Q. Let me direct your --

A. Let me see what it says.  Hold on.

Yeah, the guy was trying to calm him down.

Q. Referring to your statement that you just read.  After the passenger attempted to calm down the passenger who was behaving violently, did that passenger remain angry, as you stated there; is that correct?

MR. AMRHEIN:  Objection.

A. Yeah.

Q. On the bottom of page 2, Sergeant Irving asks you:  "So the other passenger who spoke the same language as the sick passenger came to the back, said something in their



Page 37

native language and the sick passenger
continued.  Did he seem to comprehend
what the --" cut off there.

Your response is:  "Yeah, he was
saying something, like, the guy's
strong, something like that."

Do you recall who said that the
guy is strong?

MR. AMRHEIN:  Objection.

A.  I -- I think it was a passenger
saying to the other guy that I think he
was saying that the -- the flight
attendant is strong.

Q.  Ms. Miller, can you take a
moment and review the top portion of
page 8 of Miller 2.

A.  Okay.

Q.  Directing your attention to the
upper portion of page 8 of Miller 2.
Did you state, "He got up and he
punched the other nurse in the stomach
'cause he got out of it.  He was so
strong.  He actually gave her a hard
hit."



Page 38

Does that refresh your recollection as to the manner in which he struck the nurse after getting up off the ground?

MR. AMRHEIN:  Objection.

A. Yeah.

Q. Is that an accurate statement that he gave her a hard hit?

MR. AMRHEIN:  Objection.

A. Yeah, I think so.  Yeah, I would say so.

Q. Do you recall whether or not the nurse gasped or screamed out in pain when she was struck by that blow?

MR. AMRHEIN:  Objection.

A. I don't remember what she did, honestly; right now I don't.  Maybe if I see in the statement, I'll remember. But right now I don't remember what she did.  Okay.

Q. Ms. Miller, you just reviewed a portion of page 9 of Miller 2.  I would like to direct your attention to the bottom portion where your statement



starts, "So he hit the nurse and the flight attendant like stepped in like to protect her and make sure, you know, he didn't swing at her again."

Having reviewed that statement, does that refresh your recollection as to the flight attendant stepping in front of the nurse and absorbing punches from the passenger who had become violent?

MR. AMRHEIN:  Objection.

A. Yes.  Yes.

Q. Do you recall how many times the passenger struck the flight attendant?

MR. AMRHEIN:  Objection.

A. No.  How many times he punched, that's what you're asking, right?

Q. Yes.

A. Right now, no.  Sorry.  I don't remember.

Q. Do you believe that he punched the flight attendant with the same force that he used against the nurse?

MR. AMRHEIN:  Objection.



Page 40

A. I don't know.  I don't know.  I don't remember.

Q. Ms. Miller, what prompted you to leave the rear galley?

A. Huh?

Q. What prompted you to eventually leave the rear galley?

A. So he -- he came out of what seemed to be a seizure.  So I made my way back to my seat and he was getting violent, so you know, I didn't want be there.

Q. Were you at any point instructed to leave the rear galley by anyone?

MR. AMRHEIN:  Objection.

A. I don't remember.  I don't remember.

Q. Did there come a point that you saw a police officer enter the rear galley?

A. I don't -- I don't think it was one officer but they were, yeah.

Q. Do you recall receiving any instructions from a police officer



Page 41

while you were still in the rear
galley?

          MR. AMRHEIN:  Objection.

     A. I don't remember.  Can we go
through the thing to see?

     Q. Ms. Miller, I just put up the
document that you are referring to as
Miller 2 back up on the screen.  I am
going to direct your attention -- I am
just going to go to the top.  Take a
moment and review this midportion of
the page 3 that is on your screen.

     A. Okay.  Okay.

     Q. Ms. Miller, can you please
review the bottom of page 11 to the top
of page 12.

     A. My statement or from Nicholas?

     Q. You can read primarily your
statement, but if you would like to see
the context of the question, that is
fine.

     A. Okay.

     Q. First, I just want to backtrack
for a moment.  Ms. Miller, on the



Page 42

bottom of page 11, your statement states that you believe one of the nurses to be pregnant.

Does that refresh your recollection as to one of the nurses who responded to the medical event there in the rear galley appearing to you that she was pregnant?

MR. AMRHEIN:  Objection.

A. Yes.

Q. Do you know whether or not it was the nurse who was punched by the passenger who had become violent or if it was another nurse's assistant?

MR. AMRHEIN:  Objection.

A. I -- I think so.  I think he -- he punched the pregnant one.  I think so.  "I -- I think there was this pregnant one...

Q. Ms. Miller, at the time that you gave this interview in May of 2019 to the Port Authority police detective and the individuals from the New York Attorney General's Office, did you



Page 43

intend to provide truthful and accurate
responses to their questions?

A. Yes.

Q. Would it be fair to say that
your recollection of the events of the
incident on April 12, 2019, was -- your
recollection was -- strike that.

Is it fair to say that your
recollection of the events on board the
JetBlue airplane was better in May of
2019 when you provided those responses
to the questions posed by the
investigators?

MR. AMRHEIN:  Objection.

A. Are you asking if I remember
more then as opposed to today?

Q. Precisely.

A. Yes, I -- I would remember more
then.  It -- it would be more recent,
fresher in my mind.  I was expecting
even today to come where I would be
doing this, but I had totally forgot
about that, put that behind me, so --
but as I'm going through -- as I'm



MAGNA
LEGAL SERVICES

Page 44

going through the statement, you know, it's coming back to me little by little.

Q. I think the fairest way to go about this may be to just allow you a bit of time to go through this statement before I continue with any questions.  The only down side is, I kind of retained the scrolling.

While it might be a bit time consuming, I would like you to just take a look at the statement in its entirety before we take -- so I am going to put it back up on the screen.

MR. AMRHEIN:  I am just going to object to this procedure.  Counsel can ask specific questions as to the document.  It is already been produced in discovery and the parties have the transcript.

You can ask questions about refreshing memory and bringing specific things up, but I think



Page 45

it is just unnecessary to go through a time consuming thing like this.  Proceed as you will.

MR. MALYSA:  I understand your objection.

Q. Ms. Miller, just let me know when you would like me to scroll down.

A. Can you ask me the questions and what I don't remember, can you just make a reference, like go to the -- go to this or you can't?

Q. No, we could try to go about it that way as well.

What I would like to ask you next is specific to what you observed with regard to the situation in the rear galley after the gentleman became violent.

Earlier I asked you about whether you were fearful for your safety when he began striking the nurse and the flight attendant, but I just want to direct your attention to the portion of your testimony.



Page 46

MR. AMRHEIN:  I am going to object to that recap right there prior to the question.

A. Okay.

Q. Ms. Miller, do you recall whether you were still in the rear galley at the time that the Port Authority police officers -- strike that.

Were you still in the rear galley at the time the Port Authority police officer arrived in the rear galley of the plane?

MR. AMRHEIN:  Objection.

A. I think when the -- when the officers came, we went to the front of the plane.

Q. Do you recall if you observed any interactions between any Port Authority police officer and the passenger who had become violent?

MR. AMRHEIN:  Objection.

A. I -- I don't understand what you're asking.  Repeat the question.



MAGNA
LEGAL SERVICES

Q. Did you witness any interactions, and that being verbal, physical, between a Port Authority police officer and the passenger who had become violent?

MR. AMRHEIN: Objection.

A. They were taking him off the plane, so -- they were taking him off the plane, so yeah, there -- there were actions, communication.

Q. After you left the rear galley, were you able to still see what was going on in the rear galley?

A. I don't think so.

MR. AMRHEIN: Objection.

A. I -- I don't think so because I think the cops -- I think the -- what you call them? Oh, God. The Port Authority, I think they came and it was a lot going on around there, I think.

Sorry about the yawning. I -- I -- I left work at seven this morning, so I did a twelve-hour shift, so I am like not at my peak right now.



Page 48

MR. MALYSA:  We very much appreciate you taking the time to speak to us.  For now, that is all the questions that I have.  I may have follow-up questions if other counsel chooses to ask questions.  Thank you very much.

EXAMINATION BY

MR. AMRHEIN:

Q. Ms. Miller, thank you for your time.  We very much appreciate it and we will try and get this resolved as quickly as we can for you.

MR. AMRHEIN:  Matt, I may ask, just for housing purposes of depositions, if I do refer to a document that is already introduced, would it be possible for you to put it on the screen?

MR. MALYSA:  Not a problem whatsoever, sir.

MR. AMRHEIN:  Excellent.

Q. Ms. Miller, just at the outset, I just want to clarify a few things.  I



know at the beginning of the deposition you were asked about your education and I believe you had said that the highest level of education you received was your Bachelor's degree in 2013 from a school in Jamaica; is that correct?

A. Yes.

Q. That was in primary education?

A. Yes.

Q. You said that your title is medical assistant at Sloan Kettering Cancer Center; is that right?

A. Correct.

Q. Is that the same as a registered nurse or is a medical assistant something different?

A. Is it -- say that again.

Q. Is medical assistant the same as registered nurse?

A. No.

Q. Can you tell me what the difference is?

A. A registered nurse, you go to -- you attend a four-year college, you get



Page 50

your Bachelor's and you have a license.

Q. You did not do that; am I right?

A. No.

Q. You said you are primarily a medical assistant. You have a phlebotomy certificate, basic life support and CPR; is that right?

A. Yes.

Q. Is it fair to say that your primary duties and responsibilities in your job as medical assistant at Sloan Kettering is taking and storing blood?

A. Yes, monitoring vital signs.

Q. Understood. Thank you.

MR. AMRHEIN: Matt, could you put up Exhibit 1 please. Thank you.

Q. Ms. Miller, do you recall seeing this document earlier in today's deposition?

A. Yes.

Q. You stated that this was indeed your handwriting. You filled out that form regarding the events on the 12th



of April, 2019?

A. Yes.

Q. Did you write RN at the top or did somebody else?

A. I don't think so 'cause I'm not a RN, so I wouldn't write that.

Q. So you did not tell anybody that you were a registered nurse that night?

A. No.

Q. Do you recall testifying earlier about having conversations as you responded to the back galley with somebody about your qualifications?

A. Yeah.

Q. Did you tell them that you were a medical professional or did you tell them that you are a registered nurse or a doctor?

A. Oh, no.  I'm medical profession. I'm not a doctor or a nurse, no.  They asked anyone in the medical profession, so, yeah.  So I don't know if -- probably they made a mistake and put the RN on here 'cause there was another



Page 52

lady there as an RN.  I don't know.
And I don't think that RN is my
handwriting.  I don't know.  Okay.

Q. Do you recall -- I know you had
testified a little bit earlier as to
where you were seated in the plane.
Would it refresh your memory if there
was information on the record that you
had actually been assigned to a seat
closer to the front of the plane?

A. Sure.

Q. Would you remember sitting in
seat 5B, as in bravo?

A. That was my seat.

Q. Do you recall if you were seated
in seat 5B, as in bravo?

A. I -- I don't -- I don't remember
if I was in 5B, but I think I was in
the front of the plane, so...

Q. Am I correct that you did not
witness the initial events of Mr.
Lagoda's seizure in row 33, in the back
of the plane?

MR. MALYSA:  Objection.



Page 53

A. You're saying I didn't witness it?

Q. Yes.  The initial events of Mr. Lagoda's seizure when it occurred in seat 33, in the back of the plane.

A. I -- I -- I -- I saw that -- I saw that he was having -- well, it looked like he was having a seizure, so yes, I did.

Q. I understand that.  Perhaps I can provide some clarity.  I am speaking just initially about, before the call for are there any medical professionals who are willing to help.

A. Oh, oh.

Q. You were seated in the front of the plane, correct?

A. Yes.

Q. Then at some point you received or you heard, I should say, a PA announcement requesting assistance from medical personnel for a male having a medical emergency in the back of the plane?



Page 54

A. Yes.

Q. At that point, was it your understanding that a medical emergency had already occurred and began in the back of the plane?

A. Yes.

Q. You did not witness what happened initially; am I correct?

A. Yes.

Q. Then you eventually responded to that call for a medical professional, if they are abroad; am I right?

A. Yes.

Q. You got up from your seat and went towards the back area of the plane; am I right?

A. Yes.

Q. That was while you guys had -- excuse me, I will rephrase that.

That call over the PA system for assistance for medical professionals, when you heard that, had the plane just begun taxiing?

A. I think so.



Q. When you got back to the area of the plane where the gentleman was having a seizure, were you aware that the plane was turning around to the gate?

A. If I was aware that the plane was turning around to the gate?  Repeat the question.

Q. When you ultimately arrived at the back of the plane to attend to a medical emergency, which you heard over the PA announcement from the flight attendants seeking medical assistance from medical professionals on board, were you, at that time, when you arrived at the back aware that the plane had already begun going back to the gate?

MR. MALYSA:  Objection.

A. I don't -- I don't -- I don't remember.

Q. When you arrived in the back, am I correct that you saw a man that you had previously described here today



Page 56

having a seizure?

A. Yes.

Q. You said he was foaming at the mouth?

MR. MALYSA:  Objection.

A. Yes.

Q. Did you see some blood as well?

A. Yeah.

Q. Did you physically see him bite his tongue or did you think he may have bit his tongue?

A. I think he may have.

Q. You did not physically witness that; am I correct?

A. Yeah, I think he may have.

Q. I appreciate that.

Just looking at the exhibit that is currently on the screen.

MR. AMRHEIN:  Matt, if you can just scroll down a fraction that would be much appreciated. Thank you.

Q. Can you see where it says, after PT.  Is that patient?



Page 57

A. Yes.

Q. After PT, after patient, does that say K-L-A-S? I know it was initially said was awake. Is that an acronym or is that a -- it looks like K-L-A-S.

A. After patient was awake, he became very violent.

Q. Was awake.

At that point and I know you had mentioned earlier in today's deposition that there were certain symptoms that you observed.

At that point, am I correct that you were not sure whether or not the seizure had subsided? You just knew that he had gotten up?

MR. MALYSA: Objection.

A. The seizure -- yeah, he had -- by the time he was up, he had stopped experiencing the symptoms of the seizure, I think.

Q. Was that based upon your education and training that you



Page 58

received in the medical field or was that just your own perception?

A. 'Cause if you -- if he was -- if he was still experiencing the seizure, they couldn't have had him stand up.

Q. What is the foundation of that? Is that your own personal belief or is that something you learned in the medical field?

A. No, I'm telling you what happened.  Like they -- they -- he stood up after the seizure stopped 'cause when he --

Q. I appreciate that.  Is that based upon your perception that the seizure stopped?

I am trying to gather whether or not that is just your personal belief or is that something that you based upon what you learned as a medical professional.

MR. MALYSA:  Objection.

A. Oh, I get what you're saying. It's based on my perception.  I -- I --



Page 59

I -- I'm assuming that it had stopped because the tremors, he had stopped shaking.  He wasn't experiencing the symptoms that he was before, so my perception is it has -- it calmed down. It had stopped.

Q. Do you recall earlier testifying that the patient, so Mr. Lagoda, was combative and he was swinging at folks, but you could not remember if it was before or after the seizure?

A. Yes, and then I read the -- yes.

Q. You do recall testifying that?

A. Yes.

Q. Are you aware that it is common for somebody who has experienced a seizure to have an altered mental status?

MR. MALYSA:  Objection.

A. Yes.

Q. Do you know that somebody with an altered mental status may become combative, may become drowsy or partially or wholly unresponsive,



Page 60

confused or disoriented?

A. Yes.

Q. At any point, do you recall that when Mr. Lagoda was standing that he was confused and trying to determine where he was?

A. No, I don't remember writing that down, but it's not impossible.

MR. AMRHEIN:  Matt, feel free to take that exhibit off the screen.

Q. I do not mean in that specific document.  I just mean in general, based upon your recollection of the events on April 12, 2019, in the back galley of flight 659 that night, do you recall observing Mr. Lagoda when he got on his feet looking disoriented and confused as to where he was after you had said he came out of his seizure?

A. Probably.

Q. Is that probably yes?

A. Probably a yes.

MR. AMRHEIN:  Matt, would



you mind bringing up Exhibit 2,
please.
          If possible, could you
scroll to what is the -- I
believe it is the thirteenth, the
bottom of the thirteenth page of
this document.  It is Bates
stamped PA1721.  Perfect.  Thank
you.  Just a little bit lower
spilling onto the next page would
be great.  Thank you?

Q. Ms. Miller, do you see the text
that is on the screen in front of you?

A. Yeah.

Q. Am I correct that the fourth to
last line on page 13, you said, "I --
I -- I didn't see anything with -- once
the cops came"?

A. Yeah.

Q. Did you then testify:  "We -- we
all left.  I don't know if anyone else
saw, but I didn't see anything."

          And then a follow up question
was:  "So you didn't see any



MAGNA
LEGAL SERVICES

Page 62

interaction between the cop and the passenger who was sick?"

         And you answered, "No."  On the top of the following page.

         A.  Mm-hmm.

         Q.  Did I read that correctly?

         A.  Yeah.

         Q.  Does that refresh your recollection of the events that occurred that night?

         A.  Yeah.

              MR. AMRHEIN:  Matt, I think you can take that down.  Thank you.

         Q.  Ms. Miller, are you aware that from the time that the emergency was noted and noticed and relayed to both the cockpit and over the PA, looking for medical assistance from medical personnel, that it took just a few minutes to get back to the gate?

              MR. MALYSA:  Objection.

         A.  The plane?

         Q.  Yes.



Page 63

A. Okay.  You're asking me if I noticed that it took a few minutes?

Q. Yes, to get back to the gate after the medical emergency began.

A. I don't know.

Q. Mr. Lagoda did not strike you; am I correct?

A. No.

Q. No, meaning he did not?

A. No, he didn't.

Q. After you left the back galley and that was after Mr. Lagoda had gotten on his feet and based upon events that you had testified to a little bit earlier, that you, along with other nurses, had exited the back galley.

Am I correct that on your way back to your seat in the front of the plane, stepped out of the aisle and into a row so as to let a responding Port Authority police officer past you?

A. I think so.

Q. Are you aware that the police



Page 64

officer had boarded the plane and that he was not actually a passenger on the plane?

A. I -- I think so, yeah.

Q. That would of course mean that the plane had been turned around and arrived back at the gate, correct?

A. Yeah.

Q. You did not witness any of the interaction with Port Authority Police Department officers and Mr. Lagoda, the man suffering from a seizure; am I correct?

A. No.  Like, when -- when the -- when the officers came, we went to the front.  They told us to go and then it was -- you couldn't even see anything back there because after a minute, it was too much to see.

Q. Too many bodies and --

A. Yeah.

Q. -- people preventing you from -- obstructing your view of the back?

A. Yeah.


MAGNA
LEGAL SERVICES

Page 65

MR. MALYSA:  Objection.

Q. I can rephrase that in a better way.  Was your view obstructed of the back when you had made your way back to your seat?

A. I wouldn't say obstructed.  They told us to go back to our seats, so I wasn't even trying to get involved anymore, you know.

Q. Understood.

Once you were told to get back to your seat, would it be fair to say that you returned to your seat and sat down facing forward?

A. I think I was at the -- I think so.  I think I was at the top -- the front of the plane, yeah.

I'm sorry.  When the -- when the planes are passing, it's kind of hard to hear, so I have to, like, put the phone closer to my ear.

MR. AMRHEIN:  I understand. Ms. Miller, we very much appreciate your time especially



Page 66

considering you had just worked an incredibly long shift, so I do not think I am going to have much more.  I am just going over my notes, so just bear with me a second.

I am just going to introduce one document that has been produced by Defendants, the Port Authority, in this matter.  I am just going to share my screen.  Just bear with me a second.

Q. Once you have this in front of you, can you just let me know.

A. Yes.

Q. Ms. Miller, do you know what the National Safety Council is?

A. No.

Q. Have you ever heard of it before?

A. I think so.

Q. Ms. Miller, this is a five-page slide deck.  It is a range of Bates stamped Port Authority 2064 to 2068.



Page 67

It is a document produced by Defendants
in this matter.

     Am I correct that the title of
this document is Altered Mental Status?

    A. (No audible response.)

    Q. I am going to the second page,
the Altered Mental Status.  Is that the
title of this second page?

    A. (The witness nodded.)

    Q. Am I correct that it says -- as
the second bullet point, "Patient may
be confused, disoriented, combative,
drowsy, partially or wholly
unresponsive."  Am I correct?  Did I
read that right?

    A. Yes.

    Q. Then on the third page, which is
Bates stamped PA2066, am I correct that
the title of this page is, Common
Causes of Altered Mental Status?

    A. Yes.

    Q. Is the top bullet point
seizures?

    A. Yes.



Page 68

MR. AMRHEIN:  I am going to mark that as Exhibit No. 3.

(Whereupon, a National Safety Council document was marked as Miller Exhibit 3 for identification, as of this date.)

Q. Am I correct that you testified earlier today that you had seen Mr. Lagoda in the back of the plane twitching and tremoring?

A. Yes.

Q. That you had seen Mr. Lagoda foaming from the mouth and bleeding?

A. Yes.

Q. Then you had testified that at some point based upon your individual perception that Mr. Lagoda came out of the seizure?

A. (The witness nodded.)

Q. That is when Mr. Lagoda became combative?

A. Yes.

Q. When Mr. Lagoda, in your words became combative, did you quickly exit



Page 69

the back galley?

A. Yes.

Q. At which point, on your way back from the back galley to your seat at the front of the plane, a Port Authority Police Department officer was going towards the back galley and you stepped aside into a row to let him by?

A. Yes.

Q. After that, you made your way to your seat and you did not witness any interaction between the Port Authority police officer and Mr. Lagoda?

A. Yes.

MR. AMRHEIN:  I have no more questions for now.

EXAMINATION BY

MR. MALYSA:

Q. Ms. Miller, based on your recollection, as it is today, do you specifically recall whether or not you were in the rear galley at the time a Port Authority police officer entered the rear galley?



Page 70

MR. AMRHEIN:  Objection.

A. Repeat the question for me, please.

Q. Based on your recollection, as it is today, do you specifically remember whether or not you were in the rear galley at the time a Port Authority police officer entered the rear galley of the plane?

MR. AMRHEIN:  Objection.

A. I think I was behind -- I think I was in the rear making my way up, I think.

Q. Earlier you testified that while you were in the rear galley, that the passenger who had initially had experienced a medical event had stood up and had punched a nurse who was attempting to assist him and then repeatedly punched a flight attendant, who was also in the rear galley; do you recall that?

MR. AMRHEIN:  Objection.

A. Yes.



Page 71

Q. During that interaction between the passenger and the nurse and flight attendant, you were still in the rear galley; is that correct?

A. Yes.

Q. Was your path obstructed in any way, such that you would need to ask a passenger or anyone else to move in order to exit from the rear galley?

A. I don't remember.

Q. At the time you were in the rear galley attempting to assist the passenger who had been experiencing seizure symptoms, is it fair to say that your goal was to make him as comfortable as possible while he was experiencing the seizure?

MR. AMRHEIN:  Objection.

A. Yes.

Q. Then once that individual got to his feet and began acting violently, is it fair to say his behavior had surprised you?

MR. AMRHEIN:  Objection.



Page 72

Q. I'm sorry, did you hear my question?

A. Okay, go ahead now.

Q. Once that passenger, who you were attempting to assist, got to his feet and began acting violently, is it fair to say that, that behavior surprised you?

MR. AMRHEIN:  Objection.

A. Yes.

Q. Is it fair to say that you were not expecting someone to get to their feet and start assaulting people who were attempting to help him?

MR. AMRHEIN:  Objection.

A. No, I wouldn't expect that.

Q. While you were in the rear galley with that passenger who had begun striking other individuals in the rear galley, did you feel threatened?

MR. AMRHEIN:  Objection.

A. Threatened.  You're asking if I felt like he was going to punch me?

Q. Yes.



Page 73

MR. AMRHEIN:  Objection.

A. Not really.  No, not really.

Q. Is that because of where you were standing in relation to him?

A. I don't know.  I just didn't felt that way.  Right now, I don't know why I felt that way, but I -- I didn't felt like...

MR. MALYSA:  I have no further questions.

MR. AMRHEIN:  I have no more questions.

MR. MALYSA:  Ms. Miller, thank you very much for your time.  Can you just bear with us a moment in case the court reporter has any questions about spellings or something that you mentioned.

THE WITNESS:  Yes.

MR. AMRHEIN:  I echo counsel's sentiment.  Thank you so much, Ms. Miller, for being here with us today.  We very much



appreciate your time.

          THE WITNESS:  Okay.

          THE REPORTER:  Mr. Amrhein,
will you be needing to purchase a
copy of the transcript?

          MR. AMRHEIN:  Please just
electronic is perfectly fine in
lieu of hard copy in the normal
size as well as the mini would be
great.

          (Whereupon, the within
examination was concluded.  Time
noted, 11:44 a.m.)



Page 75

A C K N O W L E D G M E N T

STATE OF NEW YORK        )

                        SS:

COUNTY OF               )

I, SHANTELL MILLER, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of August 18, 2023; that the transcript is a true, complete and correct record of what was asked, answered and said during this deposition, and that the answers on the record as given by me are true and correct.

_____
        SHANTELL MILLER

Subscribed and sworn to before me this _____ day of _____, 2023
_____
        Notary Public



Page 76

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Ms. Miller | Mr. Malysa | 5-47 |
| | | 69-73 |
| | Mr. Amrhein | 48-69 |

EXHIBITS

| MILLER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | The Port Authority Police of NY & NJ Statement | 23 |
| 2 | Transcript of interview | 31 |
| 3 | National Safety Council document | 68 |

REQUESTS FOR PRODUCTION

| DESCRIPTION | PAGE |
|---|---|
| (None) | |

INSERTS

| DESCRIPTION | PAGE |
|---|---|
| (None) | |

RULINGS

| PAGE | LINE | QUESTIONING ATTORNEY |
|---|---|---|
| | | (None) |



Page 77

C E R T I F I C A T E

I, STELLA VAKS, hereby certify that
the Deposition of SHANTELL MILLER was held
before me on the 18th day of August, 2023;
that said witness was duly sworn before the
commencement of her testimony; that the
testimony was taken stenographically by
myself and then transcribed by myself; that
the party was represented by counsel as
appears herein;

That the within transcript is a true
record of the Deposition of said witness;

That I am not connected by blood or
marriage with any of the parties; that I am
not interested directly or indirectly in the
outcome of this matter; that I am not in the
employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto
set my hand this 8th day of September, 2023.


STELLA VAKS

*Stella Vaks*


MAGNA
LEGAL SERVICES

Page 78

ERRATA SHEET

PAGE    LINE (S)         CHANGE              REASON
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____

SHANTELL MILLER

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF _____, 20__.


_____    _____
(NOTARY PUBLIC)        MY COMMISSION EXPIRES:



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



**A**

**a.m**
1:18 74:14
**a/k/a**
1:10,10
**able**
8:9 11:13 27:2 47:13
**abnormal**
18:10
**aboard**
26:8
**abroad**
11:17 12:15 33:5
54:13
**absorbing**
39:9
**accurate**
24:19 38:8 43:2
**accurately**
26:4
**acronym**
57:6
**acting**
71:22 72:7
**action**
29:13
**actions**
17:13 22:15 28:12
35:21 47:11
**administer**
3:14 19:18
**administering**
4:2
**Administrator**
1:3
**against-**
1:7
**agitated**
35:16
**ago**
8:6
**agreed**
3:3,7,11,17 17:18
**ahead**
11:7 72:4

**aircraft**
20:7 22:2,4
**airplane**
43:11
**Airport**
10:17
**aisle**
20:9,14,17 63:21
**Alexey**
1:3 2:18
**allow**
7:17 44:6
**altered**
59:18,23 67:5,8,21
**ALTERMAN**
2:12
**Amrhein**
2:6 11:6,21 14:12,23
15:20 16:2,20 17:17
18:4,13,19 19:12,20
20:20 21:22 22:8
24:21 26:10,16,23
27:5,10,15,23 28:14
28:23 29:5,14,19,23
30:5,14 34:9,15
35:18,23 36:19
37:10 38:6,10,16
39:12,16,25 40:16
41:4 42:10,16 43:15
44:16 46:2,15,23
47:7,16 48:10,15,23
50:16 56:20 60:10
60:25 62:13 65:23
68:2 69:16 70:2,11
70:24 71:19,25
72:10,16,22 73:2,12
73:22 74:4,7 76:6
**angry**
36:17
**announced**
13:25
**announcement**
15:2,6,11 17:8,16
53:22 55:13
**answer**
7:10,14,18,24 8:9

11:8,13
**answered**
62:4 75:13
**answers**
34:19 75:14
**anticipate**
7:11
**anybody**
51:8
**anymore**
65:10
**appear**
29:16
**appearing**
42:8
**appears**
77:12
**appreciate**
48:3,12 56:17 58:15
65:25 74:2
**appreciated**
56:22
**approximate**
12:9,14
**approximation**
8:11
**April**
10:16,20 11:18 12:16
25:7 26:9 31:17,24
33:5 43:7 51:2
60:16
**area**
14:11 20:11 54:16
55:2
**arrived**
46:13 55:10,17,23
64:8
**Arverne**
5:14
**ASHCROFT**
2:3
**aside**
69:9
**asked**
15:14 30:12 32:25
45:20 49:3 51:22

75:13
**asking**
6:3 7:9,16 8:5 15:3
39:18 43:16 46:25
63:2 72:23
**asks**
36:22
**assaulting**
72:14
**assigned**
52:10
**assist**
14:15 26:22 70:20
71:13 72:6
**assistance**
12:23 30:9,12 53:22
54:22 55:14 62:20
**assistant**
9:16 10:6,9 42:15
49:12,16,19 50:6,12
**assisted**
33:25
**assisting**
19:10 25:22
**assume**
7:25
**assuming**
35:13 59:2
**attack**
28:22 29:2
**attempt**
29:13 30:3
**attempted**
35:2 36:15
**attempting**
26:22 70:20 71:13
72:6,15
**attend**
49:25 55:11
**attendant**
15:13,24 16:3,8
28:13,21 37:14 39:3
39:8,15,23 45:23
70:21 71:4
**attendants**
55:14


MAGNA
LEGAL SERVICES

**attention**
32:21 33:17 37:19
38:24 41:10 45:24
**attorney**
2:4 4:14 31:16 42:25
76:24
**Attorneys**
2:9
**attributed**
33:24
**audible**
67:6
**August**
1:18 75:11 77:6
**Authority**
1:9,9,10 2:8 5:17,19
23:5,21 25:25 31:14
42:23 46:9,12,21
47:4,20 63:23 64:11
66:11,25 69:7,13,24
70:9 76:10
**authorized**
3:13
**Avenue**
5:14
**awake**
25:21 57:5,8,10
**aware**
12:22,25 55:4,7,17
59:16 62:16 63:25
**awoke**
11:19

———————
**B**
———————
**Bachelor's**
8:24 9:3,6 49:6 50:2
**back**
14:6,19 16:10 17:21
18:23 29:7 36:25
40:11 41:9 44:3,15
51:13 52:23 53:6,24
54:6,16 55:2,11,17
55:18,23 60:16
62:22 63:4,12,17,20
64:8,19,24 65:5,5,8
65:12 68:10 69:2,4

69:5,8
**backtrack**
41:24
**based**
35:13 57:24 58:16,20
58:25 60:15 63:14
68:17 69:20 70:5
**basic**
10:11 50:7
**basically**
16:25 17:22 27:24
**Bates**
23:3 31:2,3 61:8
66:24 67:19
**Bayfield**
5:14
**bear**
4:20 66:6,13 73:16
**began**
45:22 54:5 63:5
71:22 72:7
**beginning**
49:2
**begun**
27:21 54:24 55:18
72:20
**behaving**
35:22 36:16
**behavior**
71:23 72:8
**belief**
58:8,19
**believe**
39:22 42:3 49:4 61:6
**better**
43:11 65:3
**birth**
8:18
**bit**
20:8 25:20 44:7,11
52:6 56:12 61:10
63:16
**bite**
56:10
**biting**
16:10

**bleeding**
68:14
**blood**
50:13 56:8 77:15
**blow**
38:15
**board**
10:14,24 15:4 33:3
43:10 55:15
**boarded**
64:2
**bodies**
64:21
**body**
18:9,14,17 19:5
**born**
8:20
**Boston**
2:5
**bottom**
24:5,8 32:22 34:20
36:21 38:25 41:16
42:2 61:7
**boxer**
29:22
**boxing**
29:17,21
**bravo**
52:14,17
**briefly**
23:17
**bringing**
44:24 61:2
**Bryan**
32:15
**BUGIADA**
1:11
**bullet**
67:12,23

———————
**C**
———————
**C**
2:2 75:2 77:2,2
**cabin**
18:12,15,17
**call**

47:19 53:14 54:12,21
**called**
10:2
**calm**
25:25 27:25 30:7
36:3,11,15
**calmed**
16:15 59:6
**calming**
30:13
**Cancer**
9:11,14,18,23 49:13
**Care**
10:2
**carried**
14:16
**case**
1:7 7:19 73:17
**cause**
17:19 37:23 51:6,25
58:4,14
**Causes**
67:21
**Center**
2:10 9:12,15,19,24
49:13
**certain**
57:13
**certificate**
10:10 50:7
**certifications**
10:7
**certify**
75:8 77:4
**change**
21:19 78:3
**changed**
26:13
**CHERYL**
2:12
**chooses**
48:7
**CHRISTOPHER**
2:6
**clarify**
7:24 8:13 48:25



clarity
53:12
**Class**
24:14
clean
7:8
clinic
10:2
close
13:19 28:25
closer
13:11 29:9 52:11
  65:22
closest
20:16
cockpit
62:19
college
49:25
combative
59:10,24 67:13 68:22
  68:25
come
15:6 22:6 40:19
  43:22
comfortable
71:17
coming
17:2 34:8 44:3
commencement
77:8
**COMMISSION**
78:21
common
59:16 67:20
communicating
6:10
communication
47:11
complete
75:12
completed
24:18
comprehend
37:3
concluded

74:13
conduct
4:21
conducted
3:20
conference
3:21 4:7,22
confirming
4:6
confused
60:2,6,20 67:13
connected
77:15
consent
4:9
considered
4:10
considering
66:2
consuming
44:12 45:3
contact
18:18
context
41:21
continue
44:8
continued
25:24 28:5 37:3
control
3:25
conversation
6:24 15:12 16:7 32:4
  35:21
conversational
6:23
conversations
51:12
cop
62:2
cops
47:18 61:19
copy
4:15 74:6,9
correct
10:13 15:4 23:25

24:25 25:8 33:11
36:18 49:7,14 52:21
53:18 54:9 55:24
56:15 57:15 61:16
63:8,19 64:8,14
67:4,11,15,19 68:8
71:5 75:12,15
correctly
62:7
correspondence
12:10
costs
4:20
**Council**
66:18 68:5 76:13
counsel
3:4,18,22 4:18 44:18
  48:7 77:11,19
counsel's
73:23
**COUNTY**
75:6
course
6:24 9:5 64:6
court
1:2 3:16,21 4:5 5:22
  6:5,6,13,14,19 7:2
  7:13 73:17
**CPLR**
3:19
**CPR**
10:11 50:8
crew
11:5,20 15:12 17:15
  19:3 22:21 25:23
  27:24 28:4,8 29:7
  30:6,8
crime
25:3
current
9:10
currently
5:21 6:4 9:8,13 56:19
cut
37:4

| | D |
|---|---|

**D**
75:2 76:2
date
8:17 23:8 31:8 68:7
day
32:4 75:21 77:6,21
  78:18
**Deceased**
1:4
deck
66:24
**Defendants**
1:13 2:9 66:10 67:2
degree
8:24 9:3,6 49:6
delay
12:8
delayed
12:5,6
**Department**
1:10,10 2:9 64:12
  69:7
deposition
1:15 3:12,20 4:4,21
  5:25 6:9 23:12 49:2
  50:21 57:12 75:10
  75:14 77:5,14
depositions
48:17
describe
13:3 18:2,6,22 20:19
  27:7 29:3
described
55:25
**Description**
24:24 76:9,16,20
designate
25:15
**Detailed**
24:24
detective
31:14 42:23
determine
60:6



difference
49:23
different
49:17
direct
32:21 33:16 36:8
38:24 41:10 45:24
Directing
37:19
directive
6:19
directly
77:17
discovery
44:21
discuss
6:22 17:13
disoriented
60:2,19 67:13
distance
8:12
District
1:2,2 5:22,23
doctor
51:19,21
document
23:10,13,14,20 24:6
24:9,25 30:19,21
31:10 32:8,10 33:18
41:8 44:20 48:18
50:20 60:14 61:8
66:9 67:2,5 68:5
76:13
doing
43:23
drowsy
59:24 67:14
duly
5:4 77:7
DURAN
1:12
duration
12:7
duties
50:11

**E**

E
2:2,2 5:2,2 75:2,2
76:2 77:2,2
ear
65:22
earlier
45:20 50:20 51:11
52:6 57:12 59:8
63:16 68:9 70:15
echo
73:22
education
8:23 9:7 49:3,5,9
57:25
effect
3:15 6:14 35:20
either
17:14
electronic
74:8
emailed
4:17
emails
12:12
emergency
53:24 54:4 55:12
62:17 63:5
employ
77:19
employed
9:8,17
employer
9:10
English
36:6
ensure
7:7
enter
40:20
entered
16:19 69:24 70:9
entirety
44:14
ERRATA

78:2
especially
65:25
ESQ
1:3 2:6,12,12
Estate
1:4
estimate
8:10 13:14
event
42:7 70:18
events
26:8 43:6,10 50:25
52:22 53:4 60:16
62:10 63:15
eventually
40:7 54:11
EVGENIY
1:4
exact
12:2
exactly
6:18
examination
5:8 48:9 69:18 74:13
76:4
examined
5:6
Excellent
48:23
excuse
54:20
exhibit
4:15,16,19 23:7 31:7
50:17 56:18 60:11
61:2 68:3,6
exhibiting
16:18
exhibits
4:13 76:8
exit
68:25 71:10
exited
63:17
expect
72:17

expecting
43:21 72:13
experience
14:2
experienced
59:17 70:18
experiencing
16:22 57:22 58:5
59:4 71:14,18
EXPIRES
78:21
explain
19:23
express
4:9

**F**

F
10:16 77:2
facing
65:15
fact
23:18 26:20
fair
43:5,9 50:10 65:13
71:15,23 72:8,12
fairest
44:5
fallen
14:9
farther
28:24
fear
28:21
fearful
45:21
feel
60:10 72:21
feet
20:16,21,22 60:19
63:14 71:22 72:7,14
fell
13:4,16
felt
72:24 73:7,8,9
field


MAGNA
LEGAL SERVICES

23:23 58:2,10
**filing**
3:5
**filled**
50:24
**fine**
8:7 21:17 41:22 74:8
**finish**
7:9,15,17
**finished**
33:10
**FIRM**
2:3
**first**
5:3 16:18 17:6 41:24
**fists**
27:12
**five**
5:18 21:9
**five-page**
66:23
**flight**
10:14,19,24 11:17,24
12:5,16 15:12,13,23
16:3,8 17:14 26:8
28:13,20 37:13 39:3
39:8,15,23 45:23
55:13 60:17 70:21
71:3
**floor**
2:4,10 21:20
**fluttering**
18:5
**foam**
17:3
**foaming**
56:4 68:14
**folks**
59:10
**follow**
61:24
**follow-up**
48:6
**following**
31:17 62:5
**follows**

5:7 25:18
**force**
3:14 39:24
**forgot**
43:23
**form**
3:8 24:13 50:25
**forward**
65:15
**foundation**
58:7
**four-year**
49:25
**fourth**
61:16
**fraction**
56:21
**freaked**
13:24
**free**
60:11
**fresher**
43:21
**front**
13:12 20:10 39:9
46:17 52:11,20
53:17 61:14 63:20
64:17 65:18 66:14
69:6
**further**
3:7,11 4:13 73:11

---

**G**

**G**
75:2
**galley**
16:19 19:25 20:4,11
21:3,21 26:14 30:3
34:8 40:5,8,15,21
41:3 42:8 45:18
46:8,12,14 47:12,14
51:13 60:17 63:12
63:18 69:2,5,8,23
69:25 70:8,10,16,22
71:5,10,13 72:19,21
**gasped**

38:14
**gate**
55:6,8,19 62:22 63:4
64:8
**gather**
58:18
**general**
60:14
**General's**
31:16 42:25
**gentleman**
13:2 45:18 55:3
**gesture**
7:2
**gestures**
6:20
**getting**
27:19 38:4 40:11
**give**
7:10 8:10
**given**
75:15
**giving**
7:18
**go**
6:2 11:7 41:5,11 44:5
44:7 45:2,11,11,13
49:24 64:17 65:8
72:4
**goal**
71:16
**God**
47:19
**goes**
31:3
**going**
6:3,22 7:12 8:5 9:21
13:3 23:9,10 30:18
41:10,11 43:25 44:2
44:15,17 46:2 47:14
47:21 55:18 66:4,5
66:8,12 67:7 68:2
69:8 72:24
**gotten**
57:18 63:14
**great**

61:12 74:11
**Greenwich**
2:10
**GRIGORY**
1:4
**ground**
13:4,17 18:24 20:16
21:2 34:3 38:5
**guess**
8:8 20:12 24:3
**guy**
36:11 37:9,12
**guy's**
37:6
**guys**
54:19

---

**H**

**H**
5:2
**half**
34:20
**hand**
6:20,25 77:21
**handwriting**
23:18 50:24 52:4
**handwritten**
23:24
**happened**
8:6 19:14 21:18,24
26:15 27:7 54:9
58:12
**happening**
14:3 32:18 36:4
**happy**
23:15
**hard**
18:6 37:24 38:9
65:20 74:9
**head**
6:20,25 20:22
**heading**
24:23
**hear**
7:22 11:12 13:19,21
65:21 72:2



**heard**
7:25 53:21 54:23
  55:12 66:20
**held**
1:17 19:5,15 77:5
**help**
53:15 72:15
**hereunto**
77:20
**highest**
8:22 49:4
**hit**
27:19 37:25 38:9
  39:2
**hitting**
17:21 18:11,14
**hold**
9:14 10:4,7 36:9
**home**
31:23
**honest**
36:2
**honestly**
21:16 38:18
**hours**
21:8
**house**
31:19
**housing**
48:16
**Huh**
40:6
**hurting**
17:22,25 18:8

**I**

**identification**
23:7 31:7 68:7
**identity**
4:6
**important**
7:3,15
**impossible**
60:9
**incident**
10:23 11:3,14,17

24:24 25:3 31:17,24
  33:2 43:7
**incredibly**
66:3
**independent**
10:22
**indicated**
29:12
**Indicating**
16:16 18:7
**Indies**
8:21
**indirectly**
77:17
**individual**
68:17 71:21
**individually**
5:19
**individuals**
19:9 31:22 32:3
  42:24 72:20
**information**
52:9
**initial**
15:11 52:22 53:4
**initially**
14:8 53:13 54:9 57:5
  70:17
**INSERTS**
76:19
**inside**
15:8 18:11
**instructed**
40:14
**instructions**
6:2 15:25 16:4 40:25
**intend**
43:2
**interaction**
35:9,14 62:2 64:11
  69:13 71:2
**interactions**
46:20 47:3
**intercom**
15:7
**interested**

77:17
**International**
10:17
**interview**
31:6 32:9,11,19
  33:18 42:22 76:12
**interviewed**
31:13
**introduce**
66:8
**introduced**
48:19
**Investigator**
32:15
**investigators**
31:15 43:14
**involve**
11:3,18
**involved**
25:3 65:9
**Irving**
32:14,24 36:22

**J**

**jabs**
27:11
**jacket**
17:11 34:2
**Jamaica**
8:21,25 10:15 49:7
**James**
8:21
**Jersey**
1:9,10 2:8 5:18 23:22
**JetBlue**
10:14,24 11:17,24
  12:11,16 26:8 43:11
**JFK**
10:25 25:13
**job**
50:12
**John**
10:16
**joining**
9:23
**JONATHAN**

1:11,12
**JOSEPH**
1:11
**judge**
6:15
**jury**
6:15

**K**

**K**
75:2
**K-L-A-S**
57:4,7
**Kennedy**
10:16
**Kettering**
9:11,14,18,23 49:12
  50:13
**kind**
17:23 22:17 44:10
  65:20
**kneeling**
34:14
**knees**
34:5,13,14
**knew**
57:17
**know**
8:13 14:20,24 16:24
  20:8,9 21:13 22:18
  28:2 29:25 34:21
  36:4 39:4 40:2,2,12
  42:12 44:2 45:7
  49:2 51:23 52:2,4,5
  57:4,11 59:22 61:22
  63:6 65:10 66:15,17
  73:6,7

**L**

**L**
3:2 5:2,2,2,2 75:2
**lady**
52:2
**Lagoda**
1:4 59:9 60:5,18 63:7
  63:13 64:12 68:10


MAGNA
LEGAL SERVICES

68:13,18,21,24 69:14

**Lagoda's**
52:23 53:5

**laid**
20:3

**language**
36:24 37:2

**law**
2:3,9 4:11 24:16

**Lawanda**
32:14,24

**lawsuit**
5:20

**layout**
20:9

**leads**
20:10

**learned**
58:9,21

**leave**
40:5,8,15

**left**
47:12,23 61:22 63:12

**Legal**
1:23 3:25

**LegalView/Zoom**
3:24

**length**
12:14

**let's**
16:11

**level**
8:22 49:5

**license**
50:2

**lieu**
74:9

**life**
10:11 50:7

**line**
61:17 76:24 78:3

**litigation**
4:12

**little**
9:20 17:2 20:8 44:3,4

52:6 61:10 63:16

**location**
25:12

**locations**
3:23

**long**
9:17 20:25 21:4 66:3

**look**
44:13

**looked**
53:9

**looking**
20:13,17 23:14 56:18 60:19 62:19

**looks**
57:6

**lot**
47:21

**lower**
61:10

**lying**
18:24 20:15 21:20 22:6 26:14

---

**M**

**M**
5:2 75:2

**Magna**
1:23 3:25

**making**
24:7 70:13

**male**
53:23

**Malysa**
2:12 5:9,17 22:24 30:23 45:5 48:2,21 52:25 55:20 56:6 57:19 58:23 59:20 62:23 65:2 69:19 73:10,14 76:5

**man**
55:24 64:13

**manner**
4:8 38:3

**mark**
22:24 30:23 68:3

**marked**
4:14 23:6 31:6 68:5

**marriage**
77:16

**Mason**
32:15

**Massachusetts**
2:5

**Matt**
48:15 50:16 56:20 60:10,25 62:13

**matter**
21:6 66:11 67:3 77:18

**Matthew**
2:12 5:16

**mean**
14:17 60:13,14 64:6

**meaning**
63:10

**meant**
25:7,15 28:6

**medical**
9:16 10:3,6,8 12:22 14:2 15:3,17 42:7 49:12,16,19 50:6,12 51:17,20,22 53:14 53:23,24 54:4,12,22 55:12,14,15 58:2,10 58:21 62:20,20 63:5 70:18

**medication**
19:19

**meeting**
3:24

**member**
11:5,20 15:12 17:15 19:3 25:23 28:4

**members**
22:21 27:24 28:8 30:6,9

**Memorial**
9:11,14,18,23

**memory**
44:24 52:8

**mental**

59:18,23 67:5,8,21

**mention**
33:25 34:4

**mentioned**
57:12 73:20

**mentions**
33:9

**MEZZACAPPA**
1:12

**MICHAEL**
1:11

**midportion**
41:12

**Miller**
1:16 5:12,16 8:17 11:8 23:6,9,12,15 23:24 24:5 25:2 27:4 30:20 31:6,12 31:13 32:8 34:18,20 34:24 37:15,17,20 38:22,23 40:4 41:7 41:9,15,25 42:21 45:7 46:6 48:11,24 50:19 61:13 62:16 65:24 66:17,23 68:6 69:20 73:14,24 75:8 75:18 76:5,9 77:5 78:16

**mind**
43:21 61:2

**mini**
74:10

**minute**
21:11 64:19

**minutes**
21:6,7,9,12 62:22 63:3

**misdemeanor**
24:14

**mistake**
51:24

**Mm-hmm**
62:6

**moment**
22:7 30:19 33:6,19 34:18 37:16 41:12



41:25 73:17
**monitoring**
50:14
**morning**
47:23
**mouth**
17:2,3 56:5 68:14
**move**
71:9
**movements**
18:3,9
**multi-specialty**
9:25

_____ N _____

**N**
2:2 3:2 5:2 75:2,2
76:2
**name**
5:10,16 23:23
**named**
5:19
**National**
66:18 68:4 76:13
**native**
37:2
**near**
13:7
**need**
4:3 12:22 71:8
**needing**
74:5
**New**
1:2,9,9,9,9,19 2:8,8
2:11,11 5:5,15,18
5:18,23 10:15 23:22
23:22 24:15 31:15
42:24 75:4
**nice**
7:8
**Nicholas**
32:16 41:18
**night**
11:25 51:9 60:17
62:11
**nighttime**

12:3
**NJ**
23:5 76:10
**nod**
6:25
**nodded**
67:10 68:20
**nods**
6:20
**Non-Party**
1:15
**normal**
74:9
**Notary**
1:19 5:4 75:24 78:21
**noted**
62:18 74:14
**notes**
66:6
**noticed**
13:2 16:21 62:18
63:3
**noting**
30:25
**nurse**
15:22 27:8,13 28:12
28:20 29:4 37:22
38:4,14 39:2,9,24
42:13 45:22 49:16
49:20,24 51:9,18,21
70:19 71:3
**nurse's**
42:15
**nurses**
14:5 17:15 19:3
26:21 42:4,6 63:17
**NY**
23:5 76:10

_____ O _____

**O**
3:2 75:2
**oath**
3:14 4:2 6:12 75:10
**object**
18:16 44:17 46:3

**objection**
11:6,11,12,21 14:12
14:23 15:20 16:2,20
17:17 18:4,13,19
19:12,20 20:20
21:22 22:8 24:21
26:10,16,23 27:5,10
27:15,23 28:14,23
29:5,14,19,23 30:5
30:14 34:9,15 35:18
35:23 36:19 37:10
38:6,10,16 39:12,16
39:25 40:16 41:4
42:10,16 43:15 45:6
46:15,23 47:7,16
52:25 55:20 56:6
57:19 58:23 59:20
62:23 65:2 70:2,11
70:24 71:19,25
72:10,16,22 73:2
**objections**
3:8
**objects**
18:15
**observe**
14:18 19:17
**observed**
14:10 28:19 45:16
46:19 57:14
**observing**
60:18
**obstructed**
65:4,7 71:7
**obstructing**
64:24
**obtain**
9:2
**occurred**
10:24 25:4 33:2 53:5
54:5 62:11
**offhand**
12:13
**Office**
31:16 42:25
**officer**
1:11,11,11,12,12

3:13 4:2 40:20,23
40:25 46:13,21 47:5
63:23 64:2 69:7,14
69:24 70:9
**officers**
5:20 46:9,17 64:12
64:16
**oh**
47:19 51:20 53:16,16
58:24
**okay**
6:21 24:2,2 33:8
34:22 37:18 38:21
41:14,14,23 46:5
52:4 63:2 72:4 74:3
**once**
20:3 22:5,16 26:12
30:4 61:18 65:12
66:14 71:21 72:5
**one-page**
23:13
**opposed**
43:17
**order**
7:12 71:10
**orientation**
20:12
**outcome**
77:18
**outset**
48:24
**overhear**
15:16

_____ P _____

**P**
2:2,2 3:2
**p.m**
12:3
**PA**
53:21 54:21 55:13
62:19
**PA1086**
23:3
**PA1709**
31:3



PA1721
61:9
PA1731
31:4
PA2066
67:19
page
32:22 33:18 34:20,24
36:21 37:17,20
38:23 41:13,16,17
42:2 61:7,11,17
62:5 67:7,9,18,20
76:4,9,16,20,24
78:3
pain
38:14
PAPD
1:10,11,11,11,12,12
PAPIA
1:11
part
18:11 19:5,16
partially
59:25 67:14
participants
32:13
participating
3:23
parties
1:17 3:5,18 4:9,20
44:22 77:16
parts
18:17
party
77:11
passenger
10:14 11:4,5,18,20
12:22 13:8,16 14:8
16:6,18 17:5,11
19:19,24 20:15,25
25:22 26:12,20 27:8
28:4,11,19 29:4,8
29:12,17 30:4,10
34:2 35:2,3,8,16,17
35:22 36:14,15,17
36:23,24 37:2,11

39:10,15 42:14
46:22 47:5 62:3
64:3 70:17 71:3,9
71:14 72:5,19
passengers
13:23
passing
65:20
path
71:7
patient
16:5 24:2 56:25 57:3
57:8 59:9 67:12
PAUL
1:12
PC
10:3
peak
47:25
Penal
24:16
pending
5:21
people
6:24 64:23 72:14
perception
58:3,16,25 59:6
68:18
Perfect
61:9
perfectly
74:8
person
24:7 30:11,12 35:6
personal
58:8,19
personnel
53:23 62:21
phlebotomy
10:10 50:7
phone
65:22
physical
47:4
physically
56:10,14

place
4:3 10:20 32:12
Plaintiff
2:18
Plaintiffs
1:5 2:4
plane
12:20 13:9,12,23
15:8 20:10,14 33:3
33:5 46:14,18 47:9
47:10 52:7,11,20,24
53:6,18,25 54:6,17
54:23 55:3,5,7,11
55:18 62:24 63:21
64:2,4,7 65:18
68:10 69:6 70:10
planes
65:20
please
5:10 7:9,15,23 8:12
19:23 22:25 30:24
33:6,19 41:15 50:17
61:3 70:4 74:7
point
12:20 14:25 19:17
20:12 21:19 22:13
35:4 40:14,19 53:20
54:3 57:11,15 60:4
67:12,23 68:17 69:4
pointed
20:23
police
1:10,10 5:20 23:5,21
31:14 40:20,25
42:23 46:9,13,21
47:5 63:23,25 64:11
69:7,14,24 70:9
76:10
Port
1:9,9,10 2:8 5:17,19
23:4,21 25:24 31:14
42:23 46:8,12,20
47:4,19 63:23 64:11
66:10,25 69:6,13,24
70:8 76:10
portion

23:16 32:22 33:17
37:16,20 38:23,25
45:25
posed
32:23 43:13
position
9:13 10:4 21:2 29:22
34:7
positioned
19:24 34:4,13
positions
21:19 26:13
possession
4:17
possible
48:19 61:4 71:17
praying
33:11
Precisely
43:18
pregnant
42:4,9,18,20
present
2:17 3:18
presented
4:16
presenting
4:14
pretty
10:11 12:11
preventing
64:23
previously
55:25
primarily
41:19 50:5
primary
9:7 10:2 49:9 50:11
prior
4:18 9:22 16:8 34:8
46:4
probably
21:7 51:24 60:22,23
60:24
problem
48:21



**procedure**
44:18
**Proceed**
45:4
**produced**
44:21 66:10 67:2
**PRODUCTION**
76:15
**profession**
51:20,22
**professional**
51:17 54:12 58:22
**professionals**
15:3,17 53:15 54:22
55:15
**prompted**
40:4,7
**protect**
39:4
**protecting**
27:18
**provide**
43:2 53:12
**provided**
43:12
**PT**
25:19,21 56:25 57:3
**Public**
1:19 5:5 75:24 78:21
**punch**
27:2 72:24
**punched**
11:5,19 25:22,23
27:8,14 28:4,9 29:4
37:22 39:17,22
42:13,18 70:19,21
**punches**
29:18 39:10
**punching**
26:21 28:20
**punishable**
24:14
**purchase**
74:5
**purpose**
4:11

**purposes**
23:2,11 31:11 48:16
**pursuant**
1:17 3:19 24:15
**put**
16:12,14 17:19,23
20:5 30:19 41:7
43:24 44:15 48:20
50:17 51:24 65:21

**Q**

**qualification**
15:15
**qualifications**
15:18 51:14
**question**
3:9 4:19 7:10,14,16
7:19,23 8:2 11:9,13
11:15 32:23 33:7,20
41:21 46:4,25 55:9
61:24 70:3 72:3
**questioning**
4:18 76:24
**questions**
6:4 34:19 43:3,13
44:9,19,23 45:9
48:5,6,8 69:17
73:11,13,18
**quickly**
48:14 68:25

**R**

**R**
2:2 5:2 77:2
**range**
66:24
**react**
27:13
**read**
24:12 26:3 32:10
36:14 41:19 59:13
62:7 67:16 75:9
**really**
27:17 28:18 73:3,3
**rear**
14:11,14 16:19 19:24

20:4,11,14,23 21:3
21:21 26:14 30:3
34:8 40:5,8,15,20
41:2 42:8 45:18
46:7,11,13 47:12,14
69:23,25 70:8,10,13
70:16,22 71:4,10,12
72:18,21
**REASON**
78:3
**recall**
10:19 11:23 12:4,7,9
15:23 16:14,17 17:5
17:9,10 18:16 19:4
19:8 22:15,22 26:15
27:20 28:5,10 30:8
32:2 35:8,15 37:8
38:13 39:14 40:24
46:6,19 50:19 51:11
52:5,16 59:8,14
60:4,18 69:22 70:23
**recap**
46:3
**received**
49:5 53:20 58:2
**receiving**
40:24
**recollection**
10:23 26:7 32:18
34:7,25 38:3 39:7
42:6 43:6,8,10
60:15 62:10 69:21
70:5
**record**
5:11 6:20 7:3 8:14
23:2 30:25 31:11
32:6 52:9 75:12,15
77:14
**recorded**
4:7 6:5 32:3
**recording**
4:8 32:6
**refer**
23:11 31:12 48:17
**reference**
45:11

**referring**
33:4 36:13 41:8
**refresh**
26:6 32:17 34:6,24
38:2 39:7 42:5 52:8
62:9
**refreshing**
44:24
**regard**
10:8 45:17
**regarding**
4:19 50:25
**regards**
8:11
**registered**
49:15,20,24 51:9,18
**regularly**
33:14
**relation**
19:25 73:5
**relayed**
62:18
**remain**
36:17
**remember**
8:7 11:14 12:2,13
13:18 17:12 18:21
19:15 21:14,14,16
22:10,12,21 32:25
34:10,11,16 38:17
38:19,20 39:21 40:3
40:17,18 41:5 43:16
43:19 45:10 52:13
52:18 55:22 59:11
60:8 70:7 71:11
**remote**
3:23
**remotely**
4:5
**removing**
34:2
**repeat**
7:24 46:25 55:8 70:3
**repeatedly**
70:21
**rephrase**



54:20 65:3
**reporter**
 3:21 4:5 6:5,6,19 7:2
  7:13 73:18 74:4
**represent**
 5:17 23:12 31:9 32:7
  33:3
**represented**
 77:11
**requested**
 30:9
**requesting**
 53:22
**REQUESTS**
 76:15
**reserved**
 3:9
**reside**
 5:13
**resolved**
 48:13
**respective**
 1:16 3:5
**respond**
 6:25 7:16
**responded**
 15:10,18,25 17:16
  42:7 51:13 54:11
**responding**
 17:7 63:22
**response**
 33:7 34:23 37:5 67:6
**responses**
 7:4 33:20 43:3,12
**responsibilities**
 50:11
**restate**
 11:16
**retained**
 44:10
**retaliate**
 27:17
**returned**
 65:14
**review**
 33:7,19 34:19 37:16

 41:12,16
**reviewed**
 38:22 39:6
**reviewing**
 34:23
**right**
 12:13 19:13 31:21
  38:18,20 39:18,20
  46:3 47:25 49:13
  50:3,8 54:13,17
  67:16 73:7
**RN**
 51:4,7,25 52:2,3
**ROBERT**
 1:11
**role**
 10:8
**row**
 52:23 63:22 69:9
**rows**
 13:14
**RULINGS**
 76:23
**runway**
 12:21

————————
**S**
————————
**S**
 2:2 3:2,2 5:2 78:3
**safety**
 45:22 66:18 68:4
  76:13
**said0**
 11:10
**sat**
 22:7 65:14
**Saturday**
 25:4
**saw**
 13:3 17:6 35:15
  40:20 53:7,8 55:24
  61:23
**saying**
 28:11,15,17 37:6,12
  37:13 53:2 58:24
**says**

 24:6 25:6 26:19 36:9
  56:24 67:11
**scared**
 13:24
**scheduled**
 11:24
**school**
 49:7
**screamed**
 27:20 38:14
**screen**
 30:21 33:21,24 41:9
  41:13 44:15 48:20
  56:19 60:12 61:14
  66:12
**scroll**
 45:8 56:21 61:5
**scrolling**
 44:10
**sealing**
 3:6
**seat**
 13:4,11,12 14:9,14
  18:20 40:11 52:10
  52:14,15,17 53:6
  54:15 63:20 65:6,13
  65:14 69:5,12
**seated**
 13:7,8,15,16 20:2
  52:7,16 53:17
**seats**
 65:8
**second**
 66:7,13 67:7,9,12
**section**
 3:19 24:15
**see**
 13:19,21 14:19 16:21
  19:21 24:2 27:2
  30:20 36:9 38:19
  41:6,20 47:13 56:8
  56:10,24 61:13,18
  61:23,25 64:18,20
**seeing**
 50:19
**seeking**

 55:14
**seen**
 68:9,13
**seizure**
 11:4,19 13:6 14:17
  16:23 17:4 22:19,20
  25:19 26:13,18
  40:10 52:23 53:5,9
  55:4 56:2 57:17,20
  57:23 58:5,13,17
  59:12,18 60:21
  64:13 68:19 71:15
  71:18
**seizures**
 67:24
**sentiment**
 73:23
**separate**
 3:22
**September**
 77:21
**sequence**
 26:7
**Sergeant**
 32:14,24 36:22
**series**
 6:3
**Services**
 1:23 3:25
**set**
 77:21
**seven**
 9:21 47:23
**shaking**
 16:25 59:4
**Shantell**
 1:16 5:12 23:24 25:2
  75:8,18 77:5 78:16
**share**
 23:9 30:18 66:12
**SHEET**
 78:2
**shift**
 47:24 66:3
**Shortly**
 25:24


MAGNA
LEGAL SERVICES

showing
32:8
sick
36:24 37:2 62:3
side
14:6 16:12,14 17:19
17:23 18:23 19:6,11
20:18 21:2,20 22:6
25:20 26:14 44:9
signature
24:6,8,10,11
signed
3:13,15
signs
50:14
sir
27:25 48:22
sitting
52:13
situation
25:25 45:17
six
9:20,20
size
74:10
slide
66:24
Sloan
9:11,14,18,23 49:12
50:12
somebody
51:5,14 59:17,22
sorry
39:20 47:22 65:19
72:2
sort
19:18
Southern
1:2 5:22
speak
31:23 35:3,16 36:6
48:4
speaker
15:7
speaking
53:13

specific
9:5 18:16 32:25
44:19,25 45:16
60:13
specifically
19:4 69:22 70:6
spellings
73:19
spilling
61:11
spoke
15:24 35:19 36:23
SS
75:5
St
8:21
stamp
31:2,4
stamped
23:3 61:9 66:25
67:19
stance
29:17,21
stand
58:6
standing
22:11,13 26:25 29:9
60:5 73:5
start
72:14
started
13:5 16:13
starting
34:10
starts
31:2 39:2
state
1:19 2:4 5:5,10 24:16
25:10 31:16 32:11
37:21 75:4
stated
27:3 32:13 36:17
50:23
statement
23:6,22 24:7,18,20
25:18 26:3,19 28:3

33:9,23 36:13 38:8
38:19,25 39:6 41:18
41:20 42:2 44:2,8
44:13 76:11
statements
24:13
states
1:2 5:21 23:21 24:25
25:18 28:3 35:6
42:3
status
59:19,23 67:5,8,21
Stella
5:4 77:4,24
stenographically
77:9
stepped
39:3 63:21 69:9
stepping
39:8
STIPULATED
3:3,7,11,17 4:13
stomach
25:23 27:3,9,14
37:22
stood
22:16 58:13 70:18
stopped
21:23 22:3,5 57:21
58:13,17 59:2,3,7
storing
50:13
Street
2:4,10
stretched
17:20
strike
43:8 46:9 63:7
striking
45:22 72:20
strong
37:7,9,14,24
struck
38:4,15 39:15
study
9:6

Subpoena
1:17
Subscribed
75:20 78:18
subsided
21:5 57:17
suffering
64:13
support
10:11 50:8
sure
12:11 16:13 35:13
39:4 52:12 57:16
surprised
71:24 72:9
swing
39:5
swinging
59:10
sworn
3:12,15 4:4 5:4 75:20
77:7 78:18
swung
22:20
symptom
22:2
symptoms
16:17,22,23 21:5,23
22:5 57:13,22 59:5
71:15
system
15:7 54:21

_____
T

T
3:2,2 5:2 75:2 77:2,2
T5
25:13
take
5:24 7:13 11:24 33:6
33:19 34:18 37:15
41:11 44:13,14
60:11 62:14
taken
1:16 17:14 75:10
77:9



**talk**
30:3
**talking**
31:20
**Tarasov-**
2:18
**TARASOV**
1:3
**taxiing**
12:21 54:24
**tell**
49:22 51:8,16,17
**telling**
27:25 58:11
**ten**
21:12
**Terminal**
25:16,17
**testified**
5:6 15:2 52:6 63:15
68:8,16 70:15
**testify**
61:21
**testifying**
6:11,14 51:11 59:8
59:14
**testimony**
45:25 75:10 77:8,9
**text**
61:13
**thank**
48:8,11 50:15,18
56:23 61:9,12 62:14
73:15,23
**thing**
41:6 45:3
**things**
8:6 44:25 48:25
**think**
12:10 13:13 14:4
15:9,9,14,21,21,22
16:9,9,15 17:3,18
18:20 19:2,3 20:5
20:21,21,23,24
21:10,10 22:9,9,10
25:7 27:17 28:7

29:6,6,8,9 30:15,15
30:16,17 32:5 34:17
34:17 36:2,6 37:11
37:12 38:11 40:22
42:17,17,18,19 44:5
44:25 46:16 47:15
47:17,18,18,20,21
51:6 52:3,19 54:25
56:11,13,16 57:23
62:13 63:24 64:5
65:16,16,17 66:4,22
70:12,12,14
**third**
67:18
**thirteenth**
61:6,7
**thought**
11:10
**threatened**
72:21,23
**three**
31:22
**throwing**
27:11,12 29:18
**TIKHOPLAV**
1:4
**time**
3:10 8:12 11:23 12:2
12:10,12,15 17:6
22:11 24:18 25:10
28:24 35:11 42:21
44:7,11 45:3 46:8
46:12 48:3,12 55:16
57:21 62:17 65:25
69:23 70:8 71:12
73:16 74:2,13
**times**
6:25 39:14,17
**title**
49:11 67:4,9,20
**today**
5:24 6:7,23 31:12
43:17,22 55:25 68:9
69:21 70:6 73:25
**today's**
50:20 57:12

**told**
15:15 16:11 32:5
64:17 65:8,12
**tongue**
16:11 17:2 25:20
56:11,12
**top**
23:20 32:10 33:23
37:16 41:11,16 51:4
62:5 65:17 67:23
**totally**
43:23
**Trade**
2:10
**training**
57:25
**transcribed**
77:10
**transcript**
6:8 7:8 31:5 32:9
44:22 74:6 75:9,11
76:12 77:13
**traveling**
10:15 12:17,18,19
30:10 35:7
**tremoring**
68:11
**tremors**
13:5 16:24 18:5 21:5
59:3
**trial**
3:10
**tried**
17:23
**true**
75:12,15 77:13
**truthful**
24:19 43:2
**try**
16:11 34:16 35:16
45:13 48:13
**trying**
30:6 36:3,11 58:18
60:6 65:9
**turn**
7:17 19:6

**turned**
13:20,22 14:6 18:23
18:25 25:19 64:7
**turning**
19:10 55:5,8
**twelve-hour**
47:24
**twenty-three-page**
31:10
**twitching**
68:11
**two**
14:4 15:17 28:7
31:15 35:10

---
**U**
---

**U**
3:2
**ultimately**
55:10
**unauthorized**
4:10
**understand**
6:16 7:5,20,21,22 8:3
8:4,15 28:18 35:25
45:5 46:24 53:11
65:23
**understanding**
24:17 54:4
**understood**
8:2 50:15 65:11
**United**
1:2 5:21
**unnecessary**
45:2
**unresponsive**
59:25 67:15
**upper**
37:20

---
**V**
---

**V**
1:3
**Vaks**
5:4 77:4,24
**verbal**



47:3
**verbalize**
7:4
**video**
3:20 4:7,21
**Videoconference**
3:24
**view**
20:18 64:24 65:4
**violation**
4:10
**violent**
22:18 25:22 26:17
30:4,11 35:4 39:11
40:12 42:14 45:19
46:22 47:6 57:9
**violently**
35:22 36:16 71:22
72:7
**Viorst**
32:16
**virtually**
6:11
**vital**
50:14

--- **W** ---

**W**
75:2
**waived**
3:6
**walkway**
20:7
**wanna**
21:15
**want**
8:8 40:12 41:24
45:24 48:25
**warning**
29:11
**wasn't**
28:25 59:4 65:9
**way**
7:7 12:5 14:10 20:11
35:12 40:11 44:5
45:14 63:19 65:4,5

69:4,11 70:13 71:8
73:7,8
**wearing**
17:6,11
**went**
14:5 46:17 54:16
64:16
**West**
8:21
**whatsoever**
48:22
**WHEREOF**
77:20
**wholly**
59:25 67:14
**willing**
53:15
**witness**
1:15 3:22 4:3,4,15,16
4:19 5:3 25:2 26:20
47:2 52:22 53:2
54:8 56:14 64:10
67:10 68:20 69:12
73:21 74:3 76:4
77:7,14,20
**witnesses**
4:6
**woke**
11:4
**words**
68:24
**work**
9:22 47:23
**worked**
9:25 66:2
**World**
2:10
**wouldn't**
51:7 65:7 72:17
**write**
51:4,7
**writing**
60:8
**written**
4:9 6:8 24:12 25:12
**wrong**

30:16
**www.MagnaLS.com**
1:24

--- **X** ---

**x**
1:3,14 76:2
**XX**
8:19
**XXXXXXXX**
8:19

--- **Y** ---

**yawning**
47:22
**yeah**
13:10 14:7 21:7 22:2
22:14 24:22 26:17
28:2 29:10 31:19
34:11,16 35:5,14,19
36:11,20 37:5 38:7
38:11,11 40:23
47:10 51:15,23 56:9
56:16 57:20 61:15
61:20 62:8,12 64:5
64:9,22,25 65:18
**year**
9:2
**years**
8:6 9:20,21
**yelling**
27:22
**York**
1:2,9,9,20 2:8,11,11
5:6,15,18,23 10:15
23:22 24:16 31:15
42:24 75:4

--- **Z** ---

**zoom**
1:18 23:15,16

--- **0** ---

**02109**
2:5

--- **1** ---

**1**
23:7,12 27:4 32:22
50:17 76:10
**10:03**
1:18
**10007**
2:11
**11**
41:16 42:2
**11:44**
74:14
**11692**
5:15
**12**
10:20 11:18 12:16
25:7 26:9 31:17,24
33:5 41:17 43:7
60:16
**12/4/2019**
25:6
**12th**
50:25
**13**
61:17
**150**
2:10
**18**
1:18 75:11
**18th**
77:6
**1990**
8:19

--- **2** ---

**2**
31:7,12 32:9 33:18
34:20,20,24,24
36:21 37:17,20
38:23 41:9 61:2
76:12
**20**
78:18
**200**
2:4



**2013**
9:4 49:6
**2019**
10:16,20 11:18 12:16
25:8 26:9 31:18,24
32:12 33:5 42:22
43:7,12 51:2 60:16
**2023**
1:18 75:11,22 77:6
77:21
**2064**
66:25
**2068**
66:25
**21-cv-6226(NRB)**
1:7
**210.45**
24:15
**22:30**
25:10
**23**
76:10
**24th**
2:10

---
**3**

**3**
41:13 68:3,6 76:13
**31**
76:12
**3113(d)**
3:19
**33**
52:23 53:6

---
**4**

**4**
2:10
**48-69**
76:6

---
**5**

**5**
25:16,17
**5-47**
76:5

**5B**
52:14,17,19

---
**6**

**659**
60:17
**68**
76:13
**69-73**
76:5
**6941**
5:14

---
**7**

**7**
32:12
**7th**
2:4

---
**8**

**8**
37:17,20
**866-624-6221**
1:23
**8th**
77:21

---
**9**

**9**
38:23


MAGNA
LEGAL SERVICES