# EXHIBIT W

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------x
ALEXEY V. TARASOV, ESQ., Administrator of the
Estate of EVGENIY LAGODA, Deceased, and GRIGORY
TIKHOPLAV,

                    Plaintiffs,

        -against-                    Case No.:
                                     1:21-cv-06226(NRB)
PORT AUTHORITY OF NEW YORK AND NEW JERSEY and
PORT AUTHORITY OF NEW YORK AND NEW JERSEY POLICE
DEPARTMENT a/k/a PORT AUTHORITY POLICE DEPARTMENT
a/k/a PAPD, PAPD OFFICER MICHAEL BUGIADA, PAPD
OFFICER ROBERT JOSEPH, PAPD OFFICER JONATHAN
PAPIA, PAPD OFFICER PAUL MEZZACAPPA, and PAPD
OFFICER JONATHAN DURAN,

                    Defendants.
----------------------------------------------------x

            REMOTE VIDEOCONFERENCE DEPOSITION OF

LIEUTENANT JAMIE SANDOZ, a 30(b)(6) witness on

behalf of the Port Authority of New York and New

Jersey, one of the Defendants herein, located in

New York, New York 10007, taken by the Plaintiffs,

pursuant to Notice, held on Tuesday, February 13,

2024, at 1:03 o'clock p.m., before Deborah

Moschitto, a Shorthand Reporter and Notary Public

of the State of New York.



                                     800.211.DEPO (3376)
                                     EsquireSolutions.com

A P P E A R A N C E S:


    ASHCROFT LAW FIRM, LLC
            Attorneys for Plaintiffs
            200 State Street - 7th Floor
            Boston, Massachusetts 02109

    BY:    J. CHRISTOPHER AMRHEIN, JR., ESQ.


    PORT AUTHORITY OF NEW YORK AND NEW JERSEY
            Attorneys for Defendants
            4 World Trade Center
            150 Greenwich Street - 24th Floor
            New York, New York 10007

    BY:    CHERYL ALTERMAN, ESQ.


                        -

                    *  *  *



800.211.DEPO (3376)
EsquireSolutions.com

LT. JAMIE SANDOZ  30B6                                February 13, 2024
TARASOV ESQ. -V- PANYNJ                                              3

S T I P U L A T I O N S


IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties hereto, that the filing, sealing and certification of the within deposition be waived; that such deposition may be signed and sworn to before any officer authorized to administer an oath; that all objections, except as to the form, are reserved to the time of the trial.

\* \* \*



J. Sandoz

THE COURT REPORTER:  Hello.  My name is Deborah Moschitto.  I'm a Shorthand Reporter and Notary Public of the State of New York.

This deposition is being held via videoconferencing equipment.  The witness and reporter are not in the same room.  The witness will be sworn in remotely pursuant to agreement of all parties.  The parties stipulate that the testimony is being given as if the witness was sworn in person.

Do counsel so stipulate?

MS. ALTERMAN:  Yes.

MR. AMRHEIN:  Yes     .

J A M I E    S A N D O Z, the witness herein, having been duly sworn by Deborah Moschitto, a Notary Public in and for the State of New York, was examined and testified as follows:

MR. AMRHEIN:  Thank you, Deborah.

EXAMINATION BY

MR. AMRHEIN:

Q.    Good afternoon, Lieutenant. Again, thank you for taking the time out of



                           J. Sandoz

your day to be here with us.  We greatly appreciate it.

            MR. AMRHEIN:  But before we get started with some introductory matters, Cheryl, I know in our previous depositions, we had the usual stipulations.  Are those agreeable for this afternoon?

            MS. ALTERMAN:  Yes.

            MR. AMRHEIN:  Okay.  And I'll put them on the record.  So all objections, except as to form, are reserved until the time of trial, and all motions to strike are reserved until the time of trial.  Read and sign, 30 days, or if you need more, Cheryl, please let us know.  I don't know if that's agreeable.

            MS. ALTERMAN:  Yes.

            MR. AMRHEIN:  And then we're happy to waive notary requirement as well.

      Q.      Again, thank you again, sir, for being here with us today.

            If you have been deposed, which I'll get to in a little bit, this may sound very familiar, but I'm going to go over some



J. Sandoz

background information or introductory information for you to outline what's going to be happening here today.

First and foremost, my name is Chris Amrhein, Jr.  I'm an associate with Ashcroft Law Firm.  Our firm represents the Plaintiffs in this matter today.  I'm going to be asking you a series of questions.

Before we begin, I have introductory matters that I was referring to.

First, if you can't hear one of my questions, please let me know and I'm happy to rephrase it -- excuse me, repeat it. If you don't understand one of my questions, please let me know, I'm happy to repeat it or rephrase it, if necessary, but if you do answer one of my questions, I'm going to operate under the assumption that you did hear and understand my question.

If you could, please answer all questions verbally and try to avoid head nods and should shrugs.  That would be much appreciated.  Just because, for the stenographer's sake, we are going to try to



800.211.DEPO (3376)
EsquireSolutions.com

J. Sandoz

keep this as clean a transcript as possible. So if you could try to make all answers verbal, that would be greatly appreciated.

And in that same vein, if you would wait until I finish my question before answering the question, that's going to make for a much cleaner transcript, as well, make the stenographer's job much easier.  And I'm going to do my best to allow you to fully answer a question before asking you the next question.

I know, in colloquial conversation, you can anticipate where a question may be going and a head nod may suffice, but just for the sake of the transcript and for the stenographer, I ask that you answer verbally and wait for a question to be asked.

Do you understand everything so far, sir?

A.    I do.

Q.    And then, finally, if you need a break, just please let me know.  I don't imagine this is going to be too, too long,



J. Sandoz

but if you do need a break, all I ask is that you answer any pending question before you and then we can discuss taking a break after that.

So that's really wraps up the introductory matters.  Do you have any questions about what I've said so far?

A.     No.

Q.     Sir, do you understand that you're giving testimony under oath and that even though you're in an office, it's just as if you're giving testimony in a courtroom?

A.     Yes.

Q.     Do you understand that your responses are subject to the pains and penalties of perjury?

A.     Yes.

Q.     Sir, I promise this is not a question particular to you or unique to you, I ask this of all deponents, but are you under the influence of anything that would impair your ability to understand my questions or impair your ability to answer my questions truthfully here today?



J. Sandoz

A.    No.

Q.    Okay.  Again, that's not a personal question, it's something that we ask of all deponents.

Sir, could you please state your full name and address, and you can use your work address?

A.    My name is Jamie Sandoz.  I work out of JFK Airport, Building 269.  That's the Port Authority Police station.

Q.    Have you testified under oath before, sir?

A.    Yes.

Q.    Can you just briefly tell me about the number of times and when that was?

A.    I remember the last time.  I testified when I was a police officer in a drug trial.  That was probably around in the early 2000s.

What was the last deposition?  I had a deposition -- also, actually, when I was a police officer with the NYPD, I was deposed in regard to some type of lawsuit.  I don't recall what it was.  But on this job,

 ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

                    J. Sandoz

I've been a cop for a long time, so I can't
remember last time.

          I would guess when I was a police
officer at LaGuardia, so you're talking about
maybe 13, 14 years ago.  It was a trial
for -- I believe a weapon trial so it's been
some time.

     Q.     Okay, I appreciate the recap.  I
don't mean to hold you to any of that.  I'm
only trying to get some background
information on whether or not you've
testified and your familiarity with
proceedings like this.  So I appreciate that,
sir.

          MR. AMRHEIN:  I'm going to
introduce what's going to be marked as
Exhibit 1.  It's going to be the Re-Notice of
the 30(b)(6) Deposition.  You may have heard
that referenced a little bit before.  Give me
a second.  I'm going to pull this up.

          (Re-Deposition Notice marked
     Sandoz Exhibit 1 for identification.)

     Q.     Let me know whatever it's on your
screen, sir?



J. Sandoz

A.    It's on the screen now.

Q.    Okay, great.

Again, this is a document that's going to be marked as Exhibit 1.  Sir, do you recognize this document?

A.    I've never read this document.  I recognize the names there, not the document so much.

Q.    Okay.  I'll represent to you that this is a Notice of Deposition pursuant to Rule 30(b)(6), which is identifying a list, as I scroll here, you'll see 30(b)(6) topics, and it lists a number of topics requested to be -- that the defense or defendant company identifies a designee to be able to testify to certain topics.

You had just testified that you haven't reviewed this document before; is that right?

A.    I have not reviewed the document, no.

Q.    Okay.  Have you reviewed similar documents in the past?  Are you familiar with this type of document?



J. Sandoz

A.    I'm not very familiar with it, but I have read this document in the past.

Q.    Okay.  Sir, I know you weren't aware of this document.  When did you first become aware of this deposition, sir?

A.    When I was asked to testify in relation to it.

Q.    Do you recall when, approximately, that was?

A.    Sometime -- sometime late last year.  It was -- I was asked by somebody on my job if I would be available to testify.

Q.    And was that an attorney or was that somebody who was just at your job?

A.    That was another police officer.  I believe it was someone -- it might have been Mark Bergery who I spoke with, who said that -- who was asking me if I would be available.

Q.    Do you recall the contents of that conversation beyond availability?  Did you discuss what was going to be testified to -- what you were expected to testify about or what testimony you would offer?



J. Sandoz

A.    Not in detail, just something about the patrol procedures regarding an ambulance response at JFK.

Q.    And was there any additional conversation with Lieutenant Bergery beyond what you just testified to?

A.    I mean, what it was in regard to.

Q.    What did he say?

A.    That it was from an incident that had occurred at Kennedy a couple of years ago where a subject had died in custody.

Q.    Okay.  Did he say anything beyond that?

A.    I don't recall anything else he said.

Q.    Do you recall what you said in response to Lieutenant Bergery?

A.    I advised him that I would be available, to let me know the dates.

Q.    Did you have any additional communication, whether verbal or written, not with an attorney, with regard to this deposition?

A.    No.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

J. Sandoz

Q.    Did you speak with an attorney, in preparation for this deposition?

A.    Yes.

Q.    When did you speak with your attorney?  You don't need to get into what was discussed, of course, but do you recall when you spoke with an attorney to prepare for this deposition?

A.    About three weeks ago.

Q.    Okay.  Did you speak with anybody else in preparation for this deposition, that's not an attorney?

A.    No.

Q.    How did you -- beyond what was discussed in privileged conversation with your attorney, what did you do to prepare yourself for this deposition; did you review any materials, any paperwork, any policies, any procedures?

A.    I actually just made sure -- I believe I spoke with somebody to make sure that we were still doing the same procedure that we've always done, you know, as far as -- because I'm not on patrol every day



J. Sandoz

now, so just to make sure that we have the same ambulance procedures that we've had since the time of this incident.

Q.    Do you recall with whom you spoke?  And if you don't, I don't want you to guess, but if you recall.

A.    I don't recall.  We have several desk officers.  I don't really recall which one it was.

Q.    Okay.  Now I believe I asked this already, so I apologize, but did you review any specific materials in preparation for this deposition?  Now that may be a Complaint or anything that's involved in the case.  You don't need to delve into any specific conversations about the materials you may have had with your attorney, but did you review any specific materials in preparation, beyond some of the policies?

A.    No, I don't recall reviewing any other type of material.

Q.    Okay.  And, Lieutenant, I'm just going to scroll down to -- this is still on your screen; correct?



                          J. Sandoz

     A.     Yes.

     Q.     Okay.  If you need me to zoom in
or anything, please let me know, but I'm
going to scroll down, you'll see hopefully in
the middle of page, numbers 8 and 9.  Do you
see that there?

     A.     Yes.

     Q.     I'm just going to read 8 and 9
for the record.

            8:   The Port Authority's
procedures and protocols for PAPD, so Port
Authority Police Department officers
responding to a medical emergency or to
persons having medical crises.  Did I read
that correctly?

     A.     Yes.

     Q.     9:  For the record, the Port
Authority's procedures and protocols for
PAPD, so, again, Port Authority Police
Department, officers being dispatched in
response to a radio call or transmission at
JFK International Airport.  Did I read that
correctly, sir?

     A.     Yes.



J. Sandoz

Q.    Lieutenant, are you aware that -- I imagine counsel will bring up their response and objection as well as anything else counsel has to bring up, but, Lieutenant, are you aware that you are expected to testify regarding topics 8 and 9 that I just listed right there?

MS. ALTERMAN:  We're just going to note our objection.  Again, this re-notice deposition was dated August 18th, I believe, 2023.  Since that date, the Port Authority responded with objections and narrowed down the scope of the topics by a letter dated September 8, 2023, and, with Counsel, we've had several meetings and confers since that date, which we agreed on the scope of the topics Lieutenant Sandoz will testify in accordance with our objections and narrowing down of topics 8 and 9.

Q.    Sir, subject to that objection, in follow-up I should say I'm just going to ask the question again just to make sure you're familiar with the general topics that I'll be asking you questions about today.



J. Sandoz

.  Are you aware that you're going to be expected to testify regarding generally topics 8 and 9 that I just read on the record?

A.    Yes.

MR. AMRHEIN:  Okay.  I'm just going to stop sharing here, sir.

Okay, sir, could you please briefly describe your educational background after high school?

A.    I attended undergraduate at City College of New York.  I received a Bachelor's Degree in Theater, and that would be the extent of my education.

Q.    What year did you receive your Bachelor's Degree?

A.    1995.

Q.    And I know the answer to this question, but are you currently employed, sir?

A.    Yes.

Q.    Who is your employer?

A.    The Port Authority of New York and New Jersey.



J. Sandoz

Q.      Am I correct that you're currently a lieutenant with the Port Authority Police Department?

A.      Yes.

Q.      How long have you held that title, sir?

A.      Next month it will be ten years.

Q.      That's great.  Congratulations, sir.

Can you please describe your duties and responsibilities as a lieutenant with the Port Authority Police Department?

A.      As a lieutenant, I oversee a tour of officers and sergeants.  Essentially what the lieutenant does is enforce the policies that the commanding officer and the executive officer have put forth, the policies of the Port Authority that they have put forth through the superintendent.  So we ensure that people are compliance with those policies throughout the day.

Q.      And have you served, or prior to being a lieutenant did you hold a different title?



                    J. Sandoz

     A.     Yes.

     Q.     So what was that title?

     A.     Just prior to being a lieutenant I was a sergeant.

     Q.     And when or how long were you a sergeant with the PAPD?

     A.     I was a sergeant for about two years and eight months.

     Q.     So roughly three years as a sergeant.  And prior to that, were you a police officer?

     A.     Yes.

     Q.     And how long did you serve as a police officer, before becoming sergeant?

     A.     For the Port Authority, I was a police officer for nine years.

     Q.     So along the lines of some of the questions I've just asked a few minutes ago, can you tell me about what your duties and responsibilities were as a sergeant for the Port Authority Police Department?

     A.     As a sergeant I would oversee the activities of the police officers, ensure that they were on post, ensure that they were



J. Sandoz

properly uniformed, verify arrests, do evaluations, you know, from what I know about them in the field, and generally be on patrol.  But my patrols would be focused on monitoring the police officers and ensuring that, again, they're in compliance with the Port Authority Police Rules and Regulations.

Q.    Now, were those duties and responsibilities specific to you as a sergeant or was that a general description of what sergeants do at the PAPD?

A.    It's a general description of what sergeants do.

Q.    Okay.  Now, can you tell me about your duties and responsibilities as a police officer?

A.    As a police officer, I go out on a post or whatever assignment I'm given for that day, to go on patrol, to observe, you know, what's going on on that post, to make arrests, to respond to aideds, meaning people that are sick or injured people, to control traffic sometimes and essentially to take direction from those superior officers who



J. Sandoz

are above me.

Q.    Sir, when did you start with the Port Authority Police Department?  I know you said you had prior law enforcement experience, but can you tell me when you started with the PAPD?

A.    July of 2002.

Q.    And were you required to go to the Police Academy for the PAPD or did your prior experience essentially serve as a pre-req for the PAPD?

A.    I did go to a Port Authority Police Academy.

Q.    Can you tell me the dates, roughly?  I know it's about a 25 or 26 week extensive period, but do you recall?

A.    It was about ten weeks, because I came from a law enforcement job.

Q.    Okay.  And what were those ten weeks, just roughly?

A.    I would say about July 15th to about the beginning of September.

Q.    And that was of 2002?

A.    Yes.



J. Sandoz

Q.      Okay.  So prior to -- prior to July of 2002, what was your previous job leading up to that?

A.      I was a police officer with the New York City Police Department.

Q.      How long were you an officer with the NYPD?

A.      For about two years.

Q.      So roughly 2000 to 2002?

A.      Yes.

Q.      Do you have law enforcement experience before that?

A.      No.

Q.      So I'm guessing you went to the Police Academy for the NYPD?

A.      Yes.

Q.      How long was the academy for the NYPD, just roughly?

A.      Approximately only six months.

Q.      Now, when you went to the academy for the Port Authority Police Department, did you go through kind of an abridged version of what would normally be taught for first-time law enforcement recruits, or can you describe



J. Sandoz

your understanding of how your PAPD Police Academy experience differed from a first-time recruit's experience?

A.    Yeah, I wouldn't call it an abridged version.  I would call it an accelerated version.  We all had experience already.  We went over, I would say, all the same type of things, same topics, just at a much faster pace because we weren't coming from nothing.  We were all current police officers who had just left to come to the Port Authority.

Q.    Understood.  Thank you for that clarification.

So do you take the same tests, do you learn the same lessons as somebody coming in with no experience and wanting to join the PAPD, you just went through it at a more accelerated pace?

A.    That's how I would probably characterize it, yes.

Q.    Okay.  And did you find that the lessons significantly overlapped with the teachings and lessons that you learned at the



J. Sandoz

academy for the NYPD?

Q. A. They were similar, but we also had to learn things about New Jersey Law, so there were additional things with it. There was a whole additional set of laws.

Q. So between 1995, when you got your degree, and 2000 when you started with the -- your track with the NYPD, what did you do professionally?

A. I worked at a number of jobs. I worked as a waiter, as a bartender. I worked in a law firm as a paralegal.

Q. Thank you. I'm not going to ask specific questions about that.

What was your title with the -- I believe I know the answer to this already, but I can confirm -- so you were a lieutenant with the PAPD as of April 2019; is that correct?

A. As of -- no. A lieutenant with the Port Authority, I have been a lieutenant with the Port Authority since March 4th of 2014.

Q. Yes, so I think we may have some



J. Sandoz

wires crossed and I apologize if I said NYPD versus PAPD, but I mean in April of 2019, at that time, you were, in fact, a lieutenant with the PAPD; correct?

A.     Oh, yes.

Q.     Okay.

A.     Yes.

Q.     Lieutenant, I'm just going to try and briefly go through some background questions about your training and certification.

I know I covered a couple of things already, but I'm just going to go through a little bit more specific just to get some background information on you for this deposition.  These are questions about your specific training and certification and any policies and procedures, as opposed to questions that I will ask about general PAPD policies and procedures, you know limited, of course, in the scope of today's deposition.

But I already know when you attended the Police Academy and when you graduated.  I asked this a little bit ago,



J. Sandoz

but am I correct that you took the requisite tests when you attended the Port Authority Police Department Police Academy back in 2002?

A.    Yes.

Q.    Do you recall -- I know it was an accelerated track.  Do you recall how often, roughly, you were tested when you went there in 2002?

A.    I have no recollection how often I was tested.

Q.    I get it.  It's 22 years ago at this point.  If you don't remember, I don't want you to guess, but if you do remember specifics or things in general, I just ask that you answer those.  But don't feel the need to guess.

In terms of types of tests that you may recall taking, do you recall that they were written or oral or physical demonstrations?

A.    I recall that we had written tests and physical would be firearms, but I can't recall any other things.



J. Sandoz

Q.    Part of the curriculum, when you were at the PAPD Police Academy, again I know it was accelerated given your prior law enforcement experience, but did you learn then about the kind of policies and procedures and teachings regarding officers being dispatched to a medical emergency?

A.    I can't recall a specific lesson on it.  I mean, it was a long time ago, so I really can't say.

Q.    But do you believe that was covered in your training at the Port Authority Police Department Police Academy?

A.    It may have been.  The response, I don't remember -- specifically -- I mean, it likely was.  I couldn't imagine a police department not teaching you how to respond to jobs, but I don't remember specifically how it was taught or anything like that.

Q.    Okay.  So I can kind of fly through these, I understand it was quite some time ago.

Do you recall, though, any of the lessons that you learned from the Police



J. Sandoz

Academy for the Port Authority, about how officers are supposed to approach responding to a medical emergency where a person is having a medical crisis?

A.    You mean in a tactical sense?

Q.    Yes, sir.

A.    I mean, it would depend which medical crisis we're talking about, so I'm not sure.  I mean, there are so many different types of medical crisis somebody could be having.  There are injuries, there are sicknesses.

I mean, are you talking about using what we were taught, the appropriate protective equipment?  You know if somebody is expelling fluid, things like that.  So, yeah, I mean, but those type of tactics, certainly, yeah, how to protect yourself when responding, sure, I can imagine that we definitely had had those type of lessons.

Q.    At that time were there any lessons about somebody who was having a medical crises where the subject would be in an altered mental state or having a mental



J. Sandoz

health crises?

A.    I think there are a lot of ways. If you're talking about someone exhibiting just -- you know, we get a lot of dementia but there is also people who have that who are violent, so in that case, you know, it's all going to depend on what specific mental crisis we're talking about:  Somebody having a breakdown, someone assaulting people, someone who is just wandering around and doesn't know where they are.  They would all be handled very differently.

So I couldn't -- I don't know specifically which one we're referring to.

Q.    Okay.  Do you recall having lessons back then when you were at the Port Authority Police Academy about -- and this is within the scope of responding to a medical crisis or an altered mental state, subject with an altered mental state -- were you taught at the academy about verbal strategies, de-escalation solutions and techniques?  Do you recall that at all, sir?

A.    I remember, you know, terms such



J. Sandoz

as verbal Judo, instances where there was violence present and things like that where you can -- someone appears to be getting worked up, you know, things that you could say to them, yeah, sure.

Q.      Did they ever go over anything to be able to specifically determine or a strategy to communicate with somebody who does not speak English, in terms of de-escalation techniques or verbal strategies when there is a language barrier?

A.      I mean, all I can recall, we, you know -- I don't know that they specifically made a point that we work at facilities with people from all over the world, but one of the big strategies have always been, you try to find somebody and try to speak their language, communicate with them and they might be more comfortable with, usually someone they know.  All of that would have to do with if there is no physical danger present.

Otherwise, you know, that's kind of off the table.  We would never put



J. Sandoz

somebody else into a dangerous position.

Q.     Thank you, sir.  I know that your days in the academy were some time ago, given your lengthy experience with the Port Authority Police Department, so you may have some more recent knowledge in terms of specifics and/or general information with regard to the in-service training.

So I'm just going to start going over that in terms of the in-service training that you've received, and we can start from when you became a lieutenant in 2014 and break this off at April of 2019, so that time period.  That's part of the upkeep, for lack of a better phrase, of an officer's training, whether it's an officer, lieutenant or sergeant or commanding officer, that there are in-service training kind of modules or dates, lessons that are required of each person who is an employee of the Port Authority?

A.     What's the question?

Q.     That was a long-winded question. I'm happy to rephrase that for you.



J. Sandoz

As part of the upkeep in training and lessons, you know, that had been learned at the academy and other ISTs, am I correct that there are mandated yearly training, whether it's in the classroom or at the range, that each employee of the PAPD is required to complete?

A.    Yes.

Q.    And am I correct that IST is the common abbreviation for in-service training?

A.    Yes.

Q.    As part of ISTs, and this is between 2014 when you became a lieutenant and April of 2019, as a part of the ISTs, were you taught about responding to and handling situations where a person was having a medical crisis?

A.    Yes.

Q.    And as part of ISTs, again in the same time period, were you taught about responding and handling situations where a person was having a mental health crisis where they're in an altered mental state?

MS. ALTERMAN:  Objection.  You



J. Sandoz

can answer.

A.      Yes.

Q.      Were those -- do you recall if those were done annually, were they done every other year, to the best of your recollection?

A.      I would call them probably at least once a year, I recall them like that, yeah.

Q.      Now, as a part of the ISTs, again in the same time period, were you taught about the procedures and protocols for the transmission of radio calls to officers?

A.      I'm not sure exactly what you mean.

Q.      So as a part of the ISTs, was a part of that upkeep of training and lessons, did it include going over the procedures and the protocols for PAPD officers, in terms of how they're dispatched to certain calls that come over the radio?

A.      I'm not sure.  So for IST, you're asking if they would tell us like how to put something over the air, how to transmit a



                        J. Sandoz

call?

     Q.     Yeah.  So is that covered at all
in IST or is it strictly training and --

     A.     Yeah, I don't really recall -- I
don't think there is an IST of how to -- you
know, we don't -- you know, after the
academy, I'm not exactly what they teach in
the academy right now, but in IST, we really
don't go over how to transmit on the radio.
We don't have anything specific to that.

     Q.     Is that something that's
typically learned on the job, through
experience, or is that something that is
spelled out in written form and given to each
employee?

     A.     It's probably taught somewhere in
the academy, but that's something you really
learn out in the field.

     Q.     So if you're an employee of the
PAPD working specifically at JFK Airport, are
the ISTs at all focused on the procedures and
protocols within JFK itself?

     A.     No.  IST is going to be a
job-wide thing, so that's for the entire job.



J. Sandoz

So it would be more general than that IST. It's not tailored to one specific facility.

Q.    Understood.  Thank you for the clarification, sir.

Is there anything akin to an IST that's specific to JFK International?

A.    I mean, we don't have -- no, all of the training would come from the academy. So we do have specific training, but this wouldn't be for everyone.

We have what they call a detail. So somebody who works in the desk, a detail would receive, they don't get yearly training but they would receive a training that comes from the academy, but they also get sort of like an on-the-job version at JFK.  I don't believe they repeat that or have recurrent training in that, but they would receive an initial training in that.

We have a boat, so, again, that training is produced by the academy, but then, of course, they would have to learn the waterways around JFK.  Again, I don't believe that they have a recurrent training, you



J. Sandoz

know, which would be similar to IST.  They would get an initial training and that would probably be it.

And we have several other details that are similar, which, again, are produced by the academy, but then, of course, there would be an on-the-job portion or module of that training that would be specific to JFK.

Q.    Okay.  Sir, are you familiar with the National Safety Council?

A.    I'm not.

MR. AMRHEIN:  I'm going to introduce a document that is going to be marked as Exhibit 2, if I'm not mistaken.

MS. ALTERMAN:  Yes.

(Document marked Sandoz Exhibit 2 for identification.)

Q.    Let me know whenever this is on your screen, sir.

A.    It's there.

Q.    Okay.  So I'm going to scroll down to page 12 of 32, but above, as I'm showing you, is just a number of summons for the defendants in this matter.  But I'm just



J. Sandoz

going to focus your attention to this page 12.

Am I correct that this says First Amended Complaint?

A.    I see it, yes.

Q.    Do you recognize this document, sir?

A.    I've seen it before.

Q.    Do you recall reviewing it before, reading through it?

A.    I don't recall reading through it.

Q.    Do you recall when you saw this document before?

A.    Maybe when I came to speak with the attorneys.  Yeah, I think that's the time I saw it.  I did not read through it, though. I did see that, I do recall that cover page.

Q.    Sir, I just want to point your direction to -- I'll highlight this portion, it's just the listed defendants here right in the middle of the page of the First Amended Complaint.

Are you familiar with any of the



J. Sandoz

individual defendant officers who are listed

in this complaint?

    A.    Yes.

    Q.    Can you tell me who you are

familiar with?

    A.    Michael Bugiada, Robert Joseph,

Jonathan Papia, Paul Mezzacappa, Jonathan

Duran.

    Q.    So all of the officers?

    A.    Yes.

    Q.    Can you describe your

relationship with Officer Bugiada?

    A.    He is one of the police officers.

He's on a desk.  He's a desk officer.  I

mean, I don't have a relationship, other

than -- I don't know him socially or anything

like that, I just know him as one of my cops.

He's a good cop.

    Q.    Can you describe your

relationship with Officer Robert Joseph?

    A.    The same.  I mean, I know him.  I

know him for many years, but I don't know him

personally, but he, again, does good work.

    Q.    And how about Officer Mezzacappa?



J. Sandoz

A.    Officer Mezzacappa, again, not personally, but as a boss to a worker, he's a good worker.

Q.    And is that -- I'll try and fast forward through this, do you have a personal relationship with any of the named defendants, or are they all on a boss-to-cop relationship?

A.    They're all boss-to-cop relationship.  I don't know any of them personally.

Q.    Have you ever socialized with any of them?

A.    No.

Q.    Did you speak with any of them about this deposition?

A.    I did not.

Q.    Have you ever spoken with any of them about this lawsuit?

A.    I have not.

Q.    Have you ever spoken with any of them about the events that occurred on April 12, 2019?

A.    No, I have not.



J. Sandoz

Q.    Did you ever review any reports of theirs filed in connection with this lawsuit, as their boss, you know, use of force reports, any interviews that they gave? Do you recall, did you review any of those?

A.    I have not reviewed any of those.

Q.    Is that just in anticipation of this, you didn't review it in anticipation of this deposition or you didn't review any of those in 2019 when they were filled out and filed?

A.    No, I didn't review them then and I didn't review them now.

Q.    Okay.  Sir, I'm going to ask you a number of questions about the policies and procedures for officers being dispatched at JFK, as well as the procedures and protocols for responding to a medical emergency by PAPD officers.

MR. AMRHEIN:  So I'm going to remove this from the screen.

Q.    Where are PAPD officers located if they are located on duty but they are not responding to a call or on-site executing a



J. Sandoz

specific duty or responsibility?

    A.      If they're not on a call or they're not on post you're asking, if they're on a break?  Is that what we're getting at or --

    Q.      So I guess what would the definition of "on post" be, in terms of your understanding?

    A.      So the officers get two mealtimes throughout their tour of duty, and so whenever they're not on those meal times, they are expected to be on their post, meaning if you're a sector, say driving a car, you have a certain area of the airport, you should be there on patrol.  If you're assigned to an air terminal, when you're not on those breaks or if you haven't called for a break or a bathroom break, 20 minutes or whatever it is that they requested, and we don't have a staffing issue, but any other times, they should be on the post that they're assigned to, meaning their air terminal, their train terminal, in their car doing what they're supposed to do.



LT. JAMIE SANDOZ  30B6
TARASOV ESQ. -V- PANYNJ

February 13, 2024
43

J. Sandoz

Q.    And I know you had mentioned that Officer Bugiada is a desk officer and I know you had familiarity with the remaining defendants in this matter, individual defendants in a boss-to-cop relationship.  Do you recall where their posts would have been in 2019?

A.    I would not recall specific posts, but I don't believe Bugiada was a desk officer at the time.  He would have been on a post somewhere in the field.

Q.    Okay.  And I'm trying to put this as delicately as possible:  Is going from the field to the desk, is that a promotion or a demotion?

A.    No, that's a detail.  So when an officer gets a certain amount of seniority, they have the option to apply to go into a detail, whether the desk or we have another stationhouse officer position which helps out the cops doing arrests, we have cargo positions, which are driving around on the ramp and guarding cases with millions of dollars in them.



800.211.DEPO (3376)
EsquireSolutions.com

J. Sandoz

So it's really -- once an officer gets to a certain level, I wouldn't call it a promotion, but they don't have to do that. An officer can, if they want, which it rarely happens, just stay on regular patrol their whole career.

But generally, as they get more senior, they will put into a -- put in to get into a detail and that will bring them out of the normal patrol into something a little more -- I don't know if you want to say a little bit more not elite, but it's a better gig maybe rather than just being, you know, faced with the public all the time, they get to do something else.

Q.    Understood.  Thank you for that explanation, sir.  That provides a lot of clarity.

Just to kind of try to capture it, to see if I understand it, through experience on the job, an officer is afforded the opportunity to apply for a different post should he or she want that type of post or change from their typical patrol duties?



J. Sandoz

A.    Yes.

Q.    Does it really come down to officer preference or is there a type of post or I should say is there a type of -- yeah, is there a type of post that is better suited for somebody who has been on patrol in a certain area or in a certain role when they were on patrol?

A.    Probably not.  I mean, it's just the preference of what they would rather do. Not everybody likes being cooped up inside. Guys want to be outside doing other things. They want to be in the cargo detail because they get to learn how to drive a boat.

It depends on what they want to do.  Some guys are scared of the water so they don't ever take the cargo detail.  And they can't force you into it.  I think it would have to be their preference and they would have to do the requisite training.

Q.    Understood.  Thank you, sir.

Is each individual officer equipped with a radio?

A.    Yes.



J. Sandoz

Q.    Is that the radio that you have attached to your person right now?

A.    Yes, exactly.

Q.    So other than situations like we're in now, are officers required to have the volume of the radio on at a minimum to be able to hear transmissions and calls?

A.    When they're out on post, yes.

Q.    And post would include not only say a desk job or in a certain department but also posts could be as a patrol officer?

A.    Yeah.  So when they're not on a break, when they're out in the field, they are expected to answer their radio.

Q.    Okay.  And is requiring -- is carrying a radio on your person, is that a requirement, you know, as a part of uniform, is it a mandate as part of a general order? Can you tell me about that?

A.    I think there is actually an order.  The idea of not carrying a radio as a cop is crazy, so that's your safety.  So, yes, you would be out in the field, you wouldn't really leave the police command


DEPOSITION SOLUTIONS

J. Sandoz

without your radio, and you are required to carry it when you are on patrol.

Q.    So if an officer is not carrying his or her radio on their person, would that be a violation of PAPD policy and procedure or general order?

A.    If they go out to post without their radio, yes, absolutely.

Q.    Would it also be a violation of PAPD policy and procedure or general order if the officer is out on patrol or out at their post and the officer doesn't have the volume turned on for the radio?

A.    Unless there was a good reason for it.  But, yeah.  You're supposed to be -- that's part of your job, is to be listening to your radio when you're on post.

Q.    So is it also if your post is at a desk at a police station, say, or if the officer is at a place where they're clocking in and they're putting on your uniform and strapping in their radio and everything, is there an intercom system that normally relays what you would be hearing over the radio?



J. Sandoz

A.     We have an intercom but it does not relay the radio.  The intercom is for, say somebody is on a break and say something important comes over the radio, the desk can separately put something over the intercom, but the intercom is not broadcasting what's going on on the radio.

Q.     Okay.  So in order to receive radio transmission, they're pretty much exclusively relying upon the personal radio as they have as part of their uniform?

A.     I mean, if they're in their vehicle, they would have a radio also in the vehicle.  So if they're in the car, they will have two radios.  One has to get turned down or else it's difficult to transmit.  If you're on a foot post, yeah, it's just a radio that you have on your person.

Q.     Okay.  So when a radio call comes in, where specifically does it come from?

A.     I'm not sure.  A radio call to?

Q.     To -- say a radio call for a medical emergency at JFK, where would that dispatcher be located or where would the call



J. Sandoz

come from?

        A.      So you're asking the person who's
communicating that job out to the field to
the post officer?

        Q.      Yes, sir.

        A.      So Building 269, which is what we
call the police desk, will receive calls via
the telephone, and then those calls will be
entered into a computer, and then we have a
person who we call the "communicater" and
that communicater will wave that unit or they
will call that unit's post designation and
then they will tell them what the condition
is and where it is and that officer is
expected to respond to that condition.

        Q.      Okay.  So in terms of -- it seems
like a chain of communication to ultimately
get the call broadcast over the radio to
officers to be able to respond.  Is that a
fair --

        A.      Yes.

        Q.      Okay.  And does the initial call
come from -- does it always come from a
police officer who is responding, does it



J. Sandoz

come from sometimes a pilot on board a flight?  Does it vary where the call originates?

A.    Sure, yeah.  I mean, it could come from -- many of our calls come from terminals, so even within a terminal, somebody may have a job, there may be a job at a gate, one of our air terminal gates. Often what happens is it's already gone through a couple of other people, so they may have called their -- what they call their "tower."  They tell them:  We have some rowdy people here.

And then that tower calls the police desk and says:  Oh, there are some rowdy people over at gate 15, and then that officer taking that call, puts it in the computer, the communicater sees that coming up and they would put it over the air to one of the posts:  Post 5, be advised there are some rowdy people at gate 15, step over there, and the officer would go.

Q.    Is it your understanding that all of the radio transmissions and calls are not



J. Sandoz

only entered but they're recorded?

A.    Yes.

Q.    Is this broadcast over a specific channel or can you tell me a little bit about that?

A.    Yeah.  So each different command has their own patrol channel.  As long as there is no issues with the system, you know, nine out of ten days, probably more than that, we are on what we call JFK patrol and that's -- unless there is a deviation from that, that's what we are listening to.

Q.    If there is a deviation, is that something that's relayed to commanding officers at the beginning of the day for them to pass on to the other officers?

A.    Yeah.  So a lot of times those deviations would come from the radio shop, because there is an issue.  JFK patrol channel is the standard, and then when there are any issues or they have to do maintenance on it, they would broadcast that to the desk or call the desk by phone and we would go to what we call the "backup channel" and we



J. Sandoz

would operate on that until our radio frequency is back in service.

Q.    Okay.  So how often are specific police codes or Port Authority codes used over the radio versus general descriptions of what's happening and what's needed?

A.    I mean, the codes are used fairly often.  There is many standard codes.

Q.    So in the event of somebody who is saying at gate 15 getting rowdy, would that be normally relayed via a code or would that be somebody saying:  Hey, somebody is getting rowdy at gate 15, we need someone on patrol in the area to go and check it out?

A.    Someone would call and say: People are getting rowdy.  The desk officer, the communicater who is putting that out would say:  We have an 810 at gate 15.

Q.    Understood.  Okay.

If there is a specific medical emergency, am I correct that that specific medical emergency is going to be relayed beyond just a code?

A.    Normally, yes, if we have the



J. Sandoz

information, they will generally say what the condition is.  If we already know the condition, that will often be broadcast.

Q.    Is that done for the purpose of informing the officers of the situation at hand and, therefore, how to proceed, based upon their training from the academy and the ISTs?

A.    Yes.

Q.    In terms of how to proceed at a given time, to a call to a medical emergency, where the medical emergency is specifically specified, am I correct that responding officers can only operate on the training and ISTs and lessons that they've learned up to that given date; correct?

A.    Unless they have, you know, additional medical training, I suppose.

Q.    In terms of, let's say, tactically how to respond or what a general order requires, in terms of action, officers responding to a medical emergency for a specific, you know specific relayed event can only work with what they've been taught at



J. Sandoz

that time and up to that date; am I correct?

A.    That's all they've got.

Q.    So after a call comes in, what is the procedure regarding officer response?  So what is the first event that happens after a call comes in from the -- after it's relayed, whether it's with a code or with a specific description?

A.    The officer will start heading to the location that was given.

Q.    And any officer kind of patrol in that area has the opportunity to acknowledge and accept the call for a response?

A.    Well, the job will be given to the officer who has that post.  If for some reason someone else is close by, they may volunteer to take the job, and it's up to the desk or supervisor to say:  Okay, that's fine.

You know, everyone's hearing it, so they are able to either go directly there or if somebody comes up on the air and says, you know:  I'm right here, I'm going to respond, then they may be allowed to respond.



J. Sandoz

Q.     Got you.  So there is an understanding of where individual officers on patrol are located, and so calls are specifically relayed knowing that that officer is in that location?

A.     Right.  So that would be their area of responsibility.

Q.     Okay.

A.     So they would be responsible for those jobs.

Q.     Understood.  Thank you, sir.

So after an officer responds to a call and say there is a request for backup, what is the procedure for who responds, how many respond, can you tell me about that, sir?

A.     A lot of that, so the request for back up is very broad.  It could be, you know, someone just asking for, you know, one additional person to help them out administratively, one person might go.  If you're talking about an officer, violent situation, you're going to get a much bigger response.  You're talking about a really, a



J. Sandoz

serious condition.

For an officer to be either getting assaulted or, you know, an extremely violent person, every officer comes there with a firearm.  It's one of the main focuses when we do a job.  Every job is a gun run because we have a gun.  So in a job like that, it would be anybody in the vicinity is going to have to go.

For more minor things, someone needing assistance with equipment or something like that, someone may volunteer and they'll bring the equipment.  But you have to really figure out what is the request for.

Q.    Are officers supposed to be aware of other calls that have been dispatched over the radio that may have led to responses or requests for additional help?

A.    Certain officers in the vicinity would probably be listening.  You know, all officers, when they're on their post, you should be listening to the radio.

Q.    So the origin of the call should



J. Sandoz

be in mind for the officers responding to help; am I correct?

A.    Again, we are talking about what is the -- what is the call -- you know, what is that request for assistance from that officer.  You know, other officers, you have to remember, could be on other jobs.  I may be -- you know if I'm doing CPR on somebody and somebody expects that I'm listening to an officer asking for help to write a summons, that's not going to happen.

So, you know, a lot of these things are really going to be dependent on what the situation of the other officer is, what the request for assistance entails.  So I mean I don't know that you could really blanket say that.

If an officer is just standing there on his post doing nothing, he should be listening to the radio because the desk may be calling them.  So I mean in that case, they probably would hear.  But if they're involved in doing something else, you know, we wouldn't expect that they -- they didn't



J. Sandoz

know what's going on in the entire airport. That's unreasonable, and our radio never stops.  It's a constant barrage.

Q.    Understood.  If there are medical emergencies happening and the officer is responding to the medical emergency and there is a request for backup to the scene by those originally called for an medical emergency, is there a policy and procedure in place for officers who are responding to that request to come for additional help, where officers, at least at a minimum one officer, is supposed to stay behind to be able to escort EMS or EMTs to the scene for that medical emergency?

MS. ALTERMAN:  Objection.  You can answer.

A.    So when a medical is called and we're calling for an ambulance, you know the way things work at the airport is that any ambulance will stay in the vicinity of our Building 269 and a mobile officer, an officer with a car, will go to the location to escort them to the location of the medical.



J. Sandoz

Q.    In an event where officers are responding to a medical emergency, an original call for a medical emergency, what is the protocol where no officers are around to escort an EMS or EMT to the scene?  Can you tell me what happens in that situation?

A.    Well, I mean, EMS -- you know, if someone is going to have to be freed up at some point, you know, EMS, luckily we have our own Jamaica Hospital EMS who actually have our radio.  So, you know, I don't know you'd say there is a policy in place, but certainly, if something was say at terminal 5, you know, EMS could hear where it is, they would be at least able to get to the terminal and would certainly be able to communicate for someone to break away, at least get them through the screening point.

Or, if not, I suppose they would reach out to TSA and tell them let them through the screening point.  You have to be a little creative with that, if that were to happen.

Q.    So in the beginning of 2019, do



J. Sandoz

you recall if there was a policy in place where an officer was specifically supposed to stay behind in a call that's originally for a medical emergency, to be able to escort the EMT and EMS to the scene so as to avoid significant delay in a medical response?

MS. ALTERMAN:  Objection.  Wait. Objection.  You can answer.

A.      You're saying originally.  So we're saying that that changed?  If we're saying it changed -- so if we have a medical and, you know, say somebody is having a heart attack, yeah, somebody's going to wait there. But if you're saying that that call changed to something else, you know, again, we're going to have to look at what did that change to.  Did it change to something that's up here now?

You know, the thing with calls, you're out in the field and you're hearing calls and many of the calls that come into the desk, you know, an officer in the field gets an 810, an 820, this or that, many times those aren't exactly what the jobs are.  So



J. Sandoz

just because someone either calls in a job or a job is communicated out to the field, you know, in many cases, it's not the same when you get to the scene, you know.

We get a lot of assaults, you know, that turn out to be two people arguing. We get a lot of cardiacs, that is when you get there, the guy says:  No, I just ate something bad and they're not a cardiac.

So everything is not what it initially -- in fact, I would say many jobs are not exactly what they start out as.  So, you know, to say something originally, yeah, but things change.  You know, one thing could start as one thing and it could be something completely different, slightly different.

You know, when you're dealing with patrol -- I've been on patrol my whole career -- you never know what you're walking into.  So you -- you know, you're always having it in my mind as you are responding there, you know, that it could be something else, you know.  You never take it at a hundred percent face value.  That really is



800.211.DEPO (3376)
EsquireSolutions.com

J. Sandoz

not -- is something that's not going to work

for you well.

Q.    Understood.  But am I correct

that the responding officer to the call, say

for a medical emergency, that officer is

proceeding to that call with the assumption

that the medical emergency is happening, the

information relayed is accurate and they

therefore need to approach tactically and

mentally in accordance with what they were

taught at the Port Authority Police Academy,

as well as the ISTs up until that date; am I

correct.

A.    So they would use the information

that they have.  Like I mentioned, a cardiac,

so somebody who gets a job that's a cardiac

will probably take their ADD from their car

with them.  They are going to go there using

the tools that they have, you know, and with

sort of an assumption that this is what I'm

going to, but always with the expectation

that things could change.  Sometimes you go

there and it's not a cardiac, it's something

else.



J. Sandoz

But, yes, you're going to go there as well prepared as you can be for whatever the situation came over as.

Q.    That puts a lot of stress on the training and lessons that are taught, both at the academy as well as the ISTs up to the date of a given event; is that right?

MS. ALTERMAN:  Objection.  You can answer.

A.    It puts a lot of stress, in terms of, you're saying --

Q.    Puts a lot of stress and emphasis on the lessons and the training that an officer has received to be able to be well equipped to handle a situation at that given time; is that right?  Because that's all they have to rely upon in terms of approaching a situation, adapting to a situation, but the requisite knowledge is learned from the training and the lessons that they learned through the Police Academy and the ISTs, is that right?

MS. ALTERMAN:  Objection.  You can answer.



J. Sandoz

A.     So the training provides that guidance and the guidelines.  You know, but, again, you never know what you're actually going to walk into.

Q.     Are certain officers dispatched to certain types of emergencies?  I know we talked about location, but, you know, are certain officers better equipped for handling situation X versus certain officers have a reputation or experience handling situation Y and they are called to that situation?  Is there ever any preference based like that or can you tell me a little bit about that?

A.     So like I had mentioned before, about someone's post, if that's that officer's area of responsibility, they're expected to be the primary officer.  We wouldn't pull somebody from another post because we think that guy could do this.  If it's your post for the day, you got it.

Q.     So officers are trained to respond to a variety of different situations in accordance with their lessons and trainings that they received at the academy



J. Sandoz

as well as ISTs?

A.      Yes.

Q.      And that equips them with what they need on that given day?

A.      That's the expectation of the training.

Q.      And that's why the training and the ISTs are so comprehensive, it's to prepare the officers for a situation at hand; is that right?

A.      I'm not a trainer, but I would expect that's what they are hoping to do.

Q.      Are there policies and procedures in place where officers are dispatched to a medical emergency?

A.      In terms of how it comes in again?

Q.      How it comes in, tactically, how they're supposed to approach it, methods for handling a medical emergency.

        MS. ALTERMAN:  Wait.  Do you want to break it down so that way he's answering the question?

        MR. AMRHEIN:  Sure.



800.211.DEPO (3376)
EsquireSolutions.com

J. Sandoz

Q.      Could you please tell me about the policies and procedures in place where officers are dispatched to a medical emergency, with respect to the first step, the actual dispatch?

A.      Okay.  So from the dispatch, so the officer's already -- the call center's already taken the call, they've entered it into the computer, it goes to the communicater, the communicater puts it over the air to the post officers who respond, the communicater will contact Jamaica EMS, they would give them the location and tell them. You know, if we have a condition information, we will give them whatever we have.

They will then contact the unit to stand by and wait for Jamaica EMS, and then the officer will get to the scene, give the desk an update.  EMS will be brought out to the job and then EMS -- barring any changes in the job, we are talking about the perfect condition where everything was relayed properly and accurately, that EMS will then treat the injured party.



J. Sandoz

Q.    From a tactical standpoint, how is an officer who is dispatched to a scene for a medical emergency, how is that officer supposed to approach that medical emergency tactically speaking?

A.    Tactically speaking, you know, similar to dealing with people on a regular basis.  You know, they would -- I would expect the same way they were taught in the academy.  So as far as if they received information that there is any type of bodily fluids or anything, they would hopefully put on their PPE.

They would -- you know, it depends, again, what the medical emergency is, because, like I said, tactically, if somebody -- you know if we are hearing that it's a cardiac, they're going to grab whatever equipment they might have.  So if it's an officer in a car, that car is going to have an AED in it.  So they will bring that in with them, if they're going into a building.  But they always have that with them.



J. Sandoz

They would probably approach the person, speak with the person and if the person's able to talk, they would get a sense of what the job is.  Like I said, many of these turn out to be not exactly what they were.  So they would certainly interview the person.  If there is not something readily -- if somebody is bleeding from their head, they're going to attempt to administer first aid.  If they're on an aircraft, aircraft has first aid kits, they may attempt to help that person out.  If it's a cardiac and they attach an AED but if the person can speak and tell them what the problem is, they would just relay that update over to the desk.

Q.    If an officer is responding to a call where the subject has a medical emergency that places them in an altered mental state, could you tell me how an officer is supposed to approach that type of medical emergency versus someone who is, you know, a call for somebody who has stolen something or an assailant who is arguing with another passenger over the last ticket for



J. Sandoz

the flight?

A.    Again, by "altered mental state,"
there is different altered mental state.
Someone with dementia, we see an elderly
person wandering around, we are going to
speak to them calmly.  We are going to make
sure they understand what we are saying.

To somebody who is, say, violent,
you would have to get them under control
first, whatever that meant, you know, or if
someone is doing things that might be harmful
to themselves, you would have to initially
make that scene safe.

So if someone is attempting to
hurt themselves, someone is -- you know
you're on a departure level of an air
terminal and they're near the edge and you
think they might try to go over, depending on
what they're saying or doing, you would
either verbally or physically get that person
to a safe location.  If the altered mental
state person is a threat to other people,
again, you would do your best to protect
those other people.  You would do your best



J. Sandoz

to secure that person, so that some type of medical aid could be actually rendered.

It's very difficult to render medical aid with someone who is either very uncooperative or violent or trying to hurt themselves.  So you would really have to secure that person, prior to doing that.

So you would try to collect as much information as possible when you got there and find out what that person is doing, what that person was saying if it's not readily apparent.

Q.    If you're equipped with the requisite information going into a scene to be able to handle somebody who is in a disoriented state and you learned that lesson at the academy or via IST, that type of reaction and approach, tactically speaking, would be employed by an officer, would it not?

MS. ALTERMAN:  Objection.

A.    Could you say that question again?

MR. AMRHEIN:  Deborah, would you



J. Sandoz

mind reading it back.

(Record read.)

MS. ALTERMAN:  And just note my objection, please.

A.     Yes.  Again, that would depend on the circumstances of what exactly is going on.

Q.     Yeah, so in that circumstance where a person is disoriented, an officer is called to respond to that medical emergency, if equipped with the requisite knowledge, based upon lessons at the academy, teachings at the academy and ISTs, is it fair to say that an officer would take those teachings, take that information and use it tactically on that given day?

A.     I mean, you're saying disoriented, but disoriented, you're not so much looking at the disorientation, it's the person's actions.

So if someone is committing a violent action, you know, it's still going to be different.  Someone disoriented wandering around is a little bit different, actually a



J. Sandoz

lot different than someone disoriented, you know, who is flailing their arms, who is walking on the edge of a building, you know.

These are -- these are -- you know, disoriented can be very general.  I could be disoriented in doing a lot of things.  For police, when we get to the scene, it's someone's actions that we have to deal with, you know.

Again, if I got to the scene and someone is -- someone tells me that person is disoriented, you know, it doesn't really matter.  I have to see what is that person doing.  Are they an immediate imminent threat to themselves, to somebody else, or are they, you know, simply wandering around and they don't know where they are.  In that case, I'm going to sit them down, I'm going to try to get them calm.

If someone's disoriented and engaging in any type of violence, then I would have to secure them first in order to, you know, render -- I would have to be a little more physical.  I might have to



J. Sandoz

handcuff them.  I might have to, you know, use an arm bar, do some type of compliance hold, you know, just to settle them and then secure them in order to -- because you got to remember, these are medical jobs, so it's going beyond the police.

So we have to make the scene safe for the responding EMS.  We cannot bring EMS to the scene of violence.  When EMS comes, that person has to be secured so that one can treat them and so that they're not injured.

Q.      Is that information you just gave based upon your experience, 22 years with the PAPD, or is that specifically something that's in the curriculum of the Police Academy trainings as well as the ISTs?

A.      I would say it's Police Academy training.  I mean one thing that is brought up to us is make the scene safe.  I would say that would apply, a blanket, to any scene, whether it's medical or anything else.  So, yeah, I would say that has to be -- that's part of the curriculum.

I mean, it may seem common sense,



J. Sandoz

but, you know, that's something that's also been drilled into me on day one, that nothing really can be done to help anybody until a scene is safe.

Q. And is making a scene safe for a medical emergency, does that include potentially use of force that ultimately causes the loss of the life of somebody?

MS. ALTERMAN: Objection. You can answer.

A. It may include the use of force. You know, whether or not somebody loses their life, we are responding to something, to any job we are always hoping to avoid a loss of life. But, again, you know, making a scene safe means making it safe. It means not -- you know -- nobody at that scene being subject to injury or violence from any other person.

So, I mean, we would have to do what we would have to do using the reasonable amount of force. You're never going to go crazy. You are going to try to get a scene under control. That's what we are certainly



J. Sandoz

taught in the academy, that you would use reasonable amount of force to make a scene safe.

Q. But more specifically, at the academy are you aware of any of the teachings -- before 2019, are you aware of any teachings about the uniquely vulnerable state of somebody coming out of a seizure and the impact of, you know, that medical event may have or likely will have on that subject and how officers should approach that given situation?

MS. ALTERMAN: Objection. You can answer.

A. You're asking about somebody who is not exhibiting violence or someone who is exhibiting violence?

Q. No, I'm talking about somebody who is in a uniquely vulnerable state as a result of a medical event that would lead to a call for officer response. I'm happen to pull up materials that testimony has shown that has been distributed to officers, that show that coming out of a seizure may likely



800.211.DEPO (3376)
EsquireSolutions.com

J. Sandoz

put somebody in an altered mental state where they may become, likely to become disoriented, may become combative as a result of their mental compromise.

Now, in a situation like that, how is an officer supposed to respond to a situation that I just described if they aren't equipped with that knowledge at the academy?  How does an officer responding to a medical emergency handle that situation?

MS. ALTERMAN:  Objection.  You could answer.

A.    Again, they would have to do what is presented to them.  So whether or not -- you know, someone's actions are a result of a seizure or, you know, giving somebody Narcan or something like that, the officer still has to secure that scene.

Now, I mean --

Q.    What duties does an officer owe to the subject?  Can you describe the duties owed by an officer to a subject?

MS. ALTERMAN:  Objection.  You could answer.



J. Sandoz

A.      We don't --

Q.      What is the standard of care for a subject who is experiencing a medical emergency and an officer is called to respond, what is the standard of care for that responding officer owed to that subject?

A.      Actually, I don't know if you know, you're talking about a legal sense of standard of care?  We don't -- we, as police, we -- we serve society.  We don't necessarily, you know, owe a certain duty to specific people.  So for a specific person, you know, we don't really have that -- you know, we -- I wouldn't say we don't -- we're not going to provide care.

So we are always going to get to the scene and give whatever basic first aid.  So if someone's bleeding, you know, an officer is not going to stand there watching somebody bleed if they have the means of assisting that person.

So I don't know that if you say -- I don't know about that term "owed a standard of care."  We are certainly there.



J. Sandoz

We will provide, to the best of our training, care.  So, again, we would -- we would attach an AED if we believe it's a cardiac.  We would bandage somebody up if they have any bleeding.  I mean, I had two of my officer's save someone's life by putting a tourniquet on them.  So we are going to use the training and the equipment that we have.  So, you know, whether you would legally say that's owed...

I mean, that's part of our training is to provide whatever care we can at the scene, you know, prior to EMS getting there.  And then once they come, since they are of a higher level, they will certainly, I'm sure, provide better care than us, but we will do our best to stabilize somebody.

Q.     Sir, I appreciate your answer, sir.  I'm not concerned about -- and I don't mean this in an offensive way by any stretch, I'm just trying to narrow this down for you. I'm not concerned about your interpretation potentially of a legal issue.  I'm more concerned about what the policies and



                        J. Sandoz

procedures are in place for an officer

responding to a medical emergency.

          So based upon the training that

officers received leading up to April of 2019

and the ISTs as well, in terms of responding

to a medical emergency, is there -- does the

Port Authority have in place standards of

care owed to subjects who are going through

medical crises versus those who are not?  Is

there a heightened standard of care, is there

a blanket standard of care owed to every

person?  Could you just describe that to me?

          I'm trying to pin down what the

duty officer's owe to subjects when

responding to them.

     A.     Yes.  You know, without policies,

you know, the police service that we provide

is not -- is not necessarily directed to one

specific person and it wouldn't change.  I

mean, you know, when we get on a scene, again

we evaluate a scene and we provide, you know,

whatever assistance we can, whether it's

medical or otherwise.

          But I'm not sure exactly what you



J. Sandoz

mean by -- I'm not sure exactly where we're going with a standard.  It's not like levels of we would give one person better care than another person or provide better service to someone else.

I mean, we get to a scene, we evaluate what's going on and we would provide whatever lifesaving, you know, action that we could.  But there isn't really -- I wouldn't say there is a varying.  It doesn't vary person to person.

Q.    Tactical approach does vary say for somebody who's clearly exhibiting a mental health crisis versus the run-of-the-mil theft or somebody who's -- you know, who's mentally there.  So am I correct that one approach would tactically, you know, require active listening skills, verbal jesting or I forgot the specific term that you said earlier --

A.    Verbal Judo.

Q.    Verbal Judo.  There you go.

Am I correct that approaching somebody with the theft wouldn't typically



J. Sandoz

require the officer to go through that verbal Judo, the active listening, the verbal strategy as opposed to somebody who is going through a mental health crisis or a mental crisis.  Am I correct that there would be a difference in approaching the two?

A.     Not necessarily.  I mean, I'm 5'6".  If I encounter somebody who is 6'6", gigantic, and I have no backup on me, I'm probably going to use some verbal Judo before I take that person into custody.

It is a very similar thing. Again, we get to a scene, we size that scene up.  Again, sometimes we have a frail person, you know, who is -- who has dementia.  Do I necessarily want to grab that person even though they may be doing some things that I might not want to hurt that person?  I might use that verbal Judo and maybe it's better to get my hands on that person.  I'm looking at that person, I'm saying this person could be hurt in other ways, is maybe not as much of a threat to me as somebody who is 6'8" and just stole something and wants to get away.



800.211.DEPO (3376)
EsquireSolutions.com

J. Sandoz

Q.   So it's individualized, it's particularized?

A.   Yeah.  I mean, it could be similar, it could not.  Again, that scene is sized up.  When you get there -- you have to size that scene up when you get there, for yourself.  Again, that's something you're going to learn through experience, but I would say they give you that kind of guidance in the academy, that's what you're doing, you know.

Q.   How often are planes turned around from taxing for a medical emergency for a person having a seizure on board?

A.   I mean, I couldn't give you a number.

Q.   In your experience, how often does that happen?

A.   It does happen.  I'm sure it's happened in other cases, but it's not -- I don't know.  I would say for medical planes are turned around, it's fairly often.

Q.   For medicals or for specifically for somebody having a seizure on board on a



J. Sandoz

taxiing flight that gets turned around?

A.    Yeah, yeah.  A number of flights get turned around for medicals, for people who are intoxicated, for people who are disorderly.  I couldn't give you a number for that.  I couldn't give you a number.

Q.    What policies and procedures were in place in 2019, as well as lessons and teachings that you had understood had been relayed or given to you and other officers, what was in place to equip officers who are dispatched to respond to a person having a seizure on board a plain, what policies were in place?

A.    I mean, it would have just been our normal, you know, medical policies.

Q.    So there wasn't any particularized policy or procedure alerting the officers responding to a scene about the unique vulnerability of an individual suffering coming out of a seizure in 2019; is that right?

A.    I don't recall that policy and specifically on a plane, you know, that I



J. Sandoz

have not seen.

Q.    So is it fair to say there was no policy in 2019?

A.    Particular to that specific, I can't recall that there was.

Q.    Okay.

THE WITNESS:  Could I just get --

MR. AMRHEIN:  Do you need water?

THE WITNESS:  Do you mind if I just take a quick bathroom break?

MR. AMRHEIN:  Sure.  How long do you need, two minutes?

THE WITNESS:  It's down the hall. Give me five.  Could you spare five?  Three?

MR. AMRHEIN:  I don't think I have that much longer, so it's going to be relatively quick, but, yeah, if you want to run, we can stay on the record and then we can come back.

THE WITNESS:  Okay.  Just give me a second.

MR. AMRHEIN:  Go ahead.

We are still on so I'm just going to continue.



J. Sandoz

Q.    Sir, based upon the PAPD policy and protocol in place in 2019 and leading up to April of 2019, an emergency radio call for a person having a seizure on board a flight that's returning to its gate would be considered a medical emergency; correct?

A.    That call would be considered a medical emergency.

Q.    At that time, there was no designated officer assigned to a post for purposes of escorting EMTs to a scene; is that right?

A.    You're saying at the time of?

Q.    Leading up to April of 2019.

A.    There was no specific post designated for that, no.

Q.    So am I correct that by law, the EMS, EMTs are required to be escorted by police to a scene when called; correct?

A.    I wouldn't say by law.  It's not a law.  It's just that there are some areas of the airport, you know, that they wouldn't be able to access necessarily, so it's by our orders that that's how we do it.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

J. Sandoz

Q.    So there is no federal regulation that requires, at federal airports, for EMS or medical services to be escorted by police?

A.    No.

Q.    That's just your understanding, there may be but you don't know?

A.    There's no federal law that says that.

Q.    That you're aware of; right?

A.    Yes.

Q.    You did testify that you believe there is a policy in place, at a minimum, that escort is required?

A.    Yes.

Q.    So if there was no policy in place where escort is required in 2019, why was there significant delay in EMS arriving at a scene where Mr. Lagoda had suffered a seizure because no officers were left to escort the EMS to the scene?

            MS. ALTERMAN:  Objection.

Q.    How do you weigh the requirement, based upon what you said, policy, procedure, and nobody there to escort, how do you



J. Sandoz

reconcile those two?

MS. ALTERMAN:  Objection.  You can answer.

A.    Well, I mean in that case, so if an officer, if they are sent to do a job, whether it's a medical or otherwise, that's where they go.  If things change, as often these jobs do change, and that job becomes at least on its face not what it initially appeared to be and, in fact, becomes a very high priority job that would require an immediate response, then that officer is going to have to go to that job, that new job, or it's not a new job, but it's a job that possibly was mis-communicated, it's at the same scene, they would have to still go there and they would have to perform the duties of that higher level priority.

Q.    So there was no policy in place to protect the rights and interests and health and safety of an individual suffering from a medical crisis, you know, in place to have EMS, Emergency Medical Services, arrive swiftly and promptly?  There was no policy in



J. Sandoz

place for that in 2019?

A.    Well, there was a policy to have the officer stand by, but when the conditions change, you know, those conditions have to be adapted to.  So, you know, the fact that something came over as one thing and an officer responds to perform a job that they think that they have to go to and then at that same location it seems like that's not the condition, the condition is actually that, you know, an officer is being assaulted who has a gun on him and who also is on a plane full of people, that would take priority at that moment because that's going to be the immediacy.  That has to be dealt with immediately.

Q.    Are you just using a general example of an officer being assaulted?

A.    It could be any officer being assaulted anywhere is going to -- you know --

Q.    You had mentioned assault.  That wasn't the topic of conversation in this line of questioning.  I'm just curious as to were you using that as a general example?  Just as



800.211.DEPO (3376)
EsquireSolutions.com

J. Sandoz

I used theft compared to medical emergency, are you just using assault in general?

A.    Yeah, I'm saying -- in terms of assault, no, I'm saying the officer has a gun to protect.  You know, if that's the case, then that officer would have to leave.

So you said that specifically is there something that -- if there is something that would take precedence, I think something to that effect you said, that would -- you know, somebody would somehow be denied medical aid, that's absolutely not the case.

The case is that, you know, if something immediate, like an immediacy comes, and there is lives possibly in danger, that officer has to -- has to respond to that.

Q.    So that's a long way of saying that there was no policy in place for an officer to be at a post ready and willing to escort Emergency Medical Services to a medical emergency; correct?  And that was in 2019, the beginning?

MS. ALTERMAN:  Objection.

A.    I mean, just based upon my



J. Sandoz

knowledge of the incident --

Q.    I'm not asking about the incident.  I asked a very simple yes or no question, sir.  I feel as though these answers are going beyond the simple questions that I'm asking.  So I'm going to ask you to focus on what I'm asking and just answer the question that I'm asking you.

In 2019, at the beginning, before April, was there any policy in place for an officer to be posted ready to escort medical services to a scene of medical emergency when medical services were ready to go and provide care for a subject?

A.    Yes, they would be assigned to escort that ambulance.

Q.    I didn't ask that question.  I said is there a post specifically assigned to be there at the ready for -- exclusively for escort services for EMS?

A.    Oh, no, no.  Again --

Q.    So if no officer was around and Emergency Medical Services needed to provide care for an individual suffering from a



J. Sandoz

medical event and they weren't able to get escorted, is that a violation of officer protocol or policy or is it non-existent because the policy itself at that time was non-existent?

MS. ALTERMAN:  Just note my objection.  He testified there is a policy. I think that there is a confusion.

MR. AMRHEIN:  He said there is a policy in place for escorting EMS to a scene. I'm trying to get at you clearly testifying or dancing around the fact that there was no policy in place at the time of April 12, 2019 requiring an officer to stay behind to escort EMS services when a person was suffering from a medical emergency and needed medical help.

MS. ALTERMAN:  No, I don't believe that's the testimony.  I object as it's a mischaracterize.  I think he said there is a priority call.  So if there is a call for help on board a plane, the officer is going to go to that priority call instead of waiting for an ambulance.

MR. AMRHEIN:  And I object to the



J. Sandoz

accusation of a mischaracterization.  That is right there itself addressing something different.  I understand his testimony about priority calls.  I'm simply saying was there a policy in place requiring an individual to be exclusively posted at the ready to escort medical services to a medical -- to a scene that required medical response in April 2019.

A.    So there would be -- I'm not exactly sure.  Are you saying that there is a post that their only job is to do that or that someone gets assigned that job when --

Q.    Is there a post exclusively for a person to escort medical services in April of 2019?

A.    No.  It would be one of the units that was out in the field who would then be called back to do that.

Q.    So given that lack of procedure in place at that time, am I correct that if officers responded to the scene and there was nobody there to escort, that could cause significant delay in EMS being able to arrive at a scene and render a potentially



J. Sandoz

lifesaving help; am I correct?

MS. ALTERMAN:  Objection.

A.      I mean --

Q.      It's a simple yes or no question.

A.      They have access to our radio so they do know the location.  So if there is a change in condition, they could get there. So that's sort of the contingency that they can hear what's going on.  So they're not in the dark.

Q.      So previously you testified that there is, either by federal law which you may not know or by at least policy and procedure, that escort is required for EMS to get to the scene at JFK.  But now you're saying that the buck no longer stops with PAPD and instead is shifting the responsibility to the EMS services for being delayed in getting to Mr. Lagoda's aid?  I'm very confused, sir.

MS. ALTERMAN:  Wait.  Objection. Now we are asking specific questions about Mr. Lagoda whereas before it was generalized. Are we asking about this incident or generalized?



800.211.DEPO (3376)
EsquireSolutions.com

J. Sandoz

MR. AMRHEIN: These are generalized questions, but pointed specifically to try and involve the situation. I feel like some of these answers to yes or no questions are being particularly evasive. I'm just trying to narrow this down with very simple questions, yes or no questions, that are getting long-winded answers. I'm going to ask again.

Q.   In April of 2019, was there a policy in place for somebody to stay behind and escort Emergency Medical Services and that was their exclusive post?

A.   No.

Q.   And am I correct that if medical -- as you had testified previously, where escort is part of the policy and procedure of the Port Authority or part of federal law, am I correct that if there is no police officer to be able to escort EMS services to a scene for a medical emergency, that that can cause significant delay in EMS's ability to render care to that person who is suffering from a medical emergency?



J. Sandoz

MS. ALTERMAN:  I'm going to object.  This calls for a legal conclusion. This is clearly an issue for the jury to decide.  This goes beyond the scope of the topics that he's asked to testify about today, and his testimony will not be binding on the Port Authority.

Over my objection, you can answer.

MR. AMRHEIN:  For the record, this topic -- this is talking about the Port Authority's procedures and protocols for PAPD officers being dispatched to a radio call transmission at JFK International, and that that encompasses a radio call for a medical emergency, which, as has been testified, that there is a policy in place that somebody's supposed to stay behind or somebody has to -- excuse me -- escort EMS to the scene.

Now I'm simply asking a question that derives from that, which is -- falls within the scope of that topic for this 30(b)(6) deposition, and this is the designee for the Port Authority here designed to



800.211.DEPO (3376)
EsquireSolutions.com

J. Sandoz

answer these type of questions.

MS. ALTERMAN:  No, that's not what your question is.  Your question is taking the conclusions from the Attorney General's report and trying to mold them into these topics to get him to agree or disagree with the findings of the Attorney General's Office.  So that's the focus.

MR. AMRHEIN:  I'm saying that they're inappropriate.  I take great offense to that, great offense to that, Cheryl.  I'm simply asking was there a policy in place for somebody to stay behind, that was an exclusive post and the answer was no.

Now my follow-up is because there was no policy in place, if officers are responding to a scene, leaving nobody to escort, is that logically possible to cause significant delay in somebody obtaining medical care because nobody could escort the EMS in time.

MS. ALTERMAN:  You're asking him a hypothetical question on facts that are not even tied to this incident.  You're asking



J. Sandoz

generalized questions and calling for a hypothetical response.

MR. AMRHEIN: That is directly in relation to the topics for this 30(b)(6) deposition.

MS. ALTERMAN: So you can answer this hypothetical question as best you can.

A. It's possible.

Q. It's possible that that can cause significant delay because there was nobody to escort EMS medical services to a potentially life-threatening medical emergency?

MS. ALTERMAN: Objection. You can answer.

A. It's a possibility.

Q. What happens in an instance of policy and procedure breach when an officer breaches any of the policies and procedures in place for responding to a medical emergency?

A. If somebody breaches any policy or procedure of the Port Authority, they could be either counseled verbally, they could be counseled in writing or they could


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

J. Sandoz

be written up with a derogatory incident report.

Q.    As a lieutenant, is that something that you investigate or is that something that a commanding officer would investigate?  Can you tell me a little bit about that process, please?

A.    I mean, the officers are directly supervised in the field by sergeants, so that sergeant would be responsible.

Q.    Okay.  And when you were a sergeant, is that something that, you know, was a part of your duties and responsibilities and something that you experienced?

A.    In terms of having to counsel people, yes.

Q.    Ever take disciplinary action -- I'm just trying to figure out what the steps would be and if you had firsthand knowledge of those policies and procedures as opposed to generalized, but when you were a sergeant, and I know you had said that you were a sergeant for a couple of years before 2014,


DEPOSITION SOLUTIONS

J. Sandoz

what were the steps for disciplining and investigate -- investigating and discipline somebody who may have stepped beyond the policies and procedures and orders in place for a PAPD officer; is that consistent with what it is -- what it was in 2019?  Is it different?

Could you just tell me a little bit about that.

A.    It's the same.  But we don't actually discipline people.  We document anything that we perceive as a violation and then that goes through other channels all the way up until it gets up to headquarters and then they make the determination whether or not discipline applies.

So we just document what we perceive as that violation.

Q.    And in terms of -- I know -- I suppose it's similar to the channeled communication like we spoke about earlier for radio calls coming in at JFK.

For an event that may require potential disciplinary action, or referral


DEPOSITION SOLUTIONS

J. Sandoz

for potential disciplinary action, is that something that a sergeant would fill out, it's given to a lieutenant, it's given to a commanding officer from there or is it sent directly to the top?

A.    No, it goes through each rank.

Q.    And does each rank, in that situation, is there mandatory follow through, so if a sergeant reports something, is the lieutenant therefore required to report it to the CO and is the CO required to report it up the chain of command, or is there a discretion on the part of the superiors to say:  We are not going to move forward with this?

A.    There is discretion.  Each level will evaluate what's been written, what's the violation, I guess.  So, yeah, at each level, there is discretion.

Q.    And is there anything about this written opinion the policies and procedures of officer responses and dispatching, does it not only describe the procedures and protocols for being dispatched and responding



J. Sandoz

to a medical emergency, does it also discuss the implications of any failure to abide by the rules and the orders in place?

A.    I mean, all of that would be contained in the rules and regs, the MOA, so these -- you know, in terms of like what you're saying, are there -- is there a written response policy.  People are supposed to comply with whatever written response policies there are.

`So that's what we would base any violation of the policy on.  It would have to be a specific -- it would have to be a specific violation of a specific portion.

Q.    Are you aware that the New York Attorney General's Office conducted an investigation involving the response to this medical emergency at the heart of this lawsuit?

A.    I am aware of that.

Q.    Were you interviewed as a part of that investigation, just to provide statements or background or anything?

A.    No.



J. Sandoz

Q.    Are you aware, generally, of what the conclusion of the report was?  Have you ever read the report?

A.    I have not read the report.  I was aware that there were no criminal charges brought.

Q.    In terms of response to a medical emergency, I'm going to ask you a question about your awareness about the OAG's report. I know you have some familiarity about it.

Are you aware that the report recommended that the Port Authority Police Department train its officers about the unique vulnerability of individuals in the immediate wake of a seizure?

A.    I'm not aware that the -- you're saying that's what the report said?

Q.    Yes.

A.    I'm not aware of that.

Q.    Are you aware that the report determined that the PAPD failed to have personnel available to escort an ambulance to the scene?

A.    I'm not -- I didn't read that in



J. Sandoz

the report.  I didn't read the report.

Q.    So you're not aware of that being in the report?

A.    No.

MR. AMRHEIN:  Sir, I know your attorney may have some questions for you, but for now I don't have any more questions and I very much appreciate your time.

MS. ALTERMAN:  I don't have any questions.  Thank you.  We will order a copy of both transcripts, as well.

(Time noted:  3:06 o'clock p.m.)

                              JAMIE SANDOZ

SUBSCRIBED AND SWORN TO
BEFORE ME THIS        DAY
OF              , 2024.

     NOTARY PUBLIC

                    * * *



                        I N D E X

WITNESS                 EXAMINED BY             PAGE

JAMIE SANDOZ            Mr.  Amrhein            4-103



                        *  *  *



                    E X H I B I T S

SANDOZ                  DESCRIPTION             PAGE

Exhibit 1    Re-Deposition Notice               10

Exhibit 2    Document                           37


(Sandoz Exhibits 1 and 2 attached to transcript.)


                        *  *  *



C E R T I F I C A T E

STATE OF NEW YORK     )
                      )          ss:
COUNTY OF QUEENS      )

I, DEBORAH MOSCHITTO a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That the within is a true and accurate transcript of the testimony taken on the 13th of February, 2024.

I further certify that I am not related to any of the parties to the proceeding by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of February, 2024.



DEBORAH MOSCHITTO

DEPOSITION ERRATA SHEET

Our Assignment No.:  J10897177

Case Caption:  TARASOV V. PANYNJ

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

_____

                    JAMIE SANDOZ

Subscribed and sworn to on the _____ day of

_____, 20 ____ before me.

_____

Notary Public,

in and for the State of

_____.



LT. JAMIE SANDOZ  30B6
TARASOV ESQ. -V- PANYNJ

February 13, 2024
107

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

Reason for change:_____



SIGNATURE:_____DATE:_____

          JAMIE SANDOZ



LT. JAMIE SANDOZ  30B6                            February 13, 2024
TARASOV ESQ. -V- PANYNJ                                        108

         DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

           JAMIE SANDOZ



| Exhibits | | | |
|---|---|---|---|
| **Exhibits** | **2** | **22** | **6** |
| 10897177 Lt .. Jamie Sando z 30b6. EXHIBIT1 | 2 | 27:13 | 6'6" |
| 10:18,23 | 37:15,17 | 73:14 | 81:9 |

absolutely
47:9
89:13

academy
22:10,14
23:16,18,
21 24:3
25:2
26:24
27:4
28:3,14
29:2
30:18,22
32:4 33:4
35:8,9,18
36:9,16,
22 37:7
53:8
62:12
63:7,22
64:25
67:11
70:18
71:13,14
73:17,18
75:2,6
76:10
82:11

**Exhibits**

**10897177 Lt ..**
**Jamie Sando z 30b6.**
**EXHIBIT1**
10:18,23
11:5
104:10

**10897177 Lt ..**
**Jamie Sando z 30b6.**
**EXHIBIT2**
37:15,17
104:11

**1**
10:18,23
11:5

**12**
37:23
38:3
40:24
91:14

**13**
10:6

**14**
10:6

**15**
50:17,22
52:11,14,
19

**15th**
22:22

**18th**
17:11

**1995**
18:18
25:7

**2**
2
37:15,17

**20**
42:19

**2000**
23:10
25:8

**2000s**
9:20

**2002**
22:8,24
23:3,10
27:5,10

**2014**
25:24
32:13
33:14
98:25

**2019**
25:19
26:3
32:14
33:15
40:24
41:11
43:8
59:25
75:7 79:5
83:9,22
84:4
85:3,4,15
86:17
88:2
89:23
90:10
91:14
92:9,16
94:11
99:7

**2023**

17:12,15

**22**
27:13
73:14

**25**
22:16

**26**
22:16

**269**
9:10 49:7
58:23

LT. JAMIE SANDOZ  30B6
TARASOV ESQ. -V- PANYNJ

**3**

**30**
5:15

**30(b)(6)**
10:19
11:12,13
95:24
97:5

**32**
37:23

**3:06**
103:13

**4**

**4th**
25:23

**5**

**5**
50:21
59:15

**5'6"**
81:9

**6**

**6'6"**
81:9

**6'8"**
81:24

**8**

8
16:6,9,11
17:7,15,
20 18:4

**810**
52:19
60:24

**820**
60:24

**9**

9
16:6,9,18
17:7,20
18:4

**A**


800.21...
EsquireSolutions.com

**abbreviatio n**
33:11

**abide**
101:3

**ability**
8:23,24
94:24

**abridged**
23:23
24:6

February 13, 2024

**accelerated**
24:7,20
27:8 28:4

**accept**
54:14

**access**
85:24
93:6

**accordance**
17:19
62:11
64:24

**accurate**
62:9

**accurately**
66:24

accusation
92:2

acknowledge
54:13

action
53:22
71:23
80:9
98:19
99:25
100:2

actions
71:21
72:9
76:16

active
80:19
81:3

activities
20:24

actual
66:6

adapted
88:6

adapting
63:19

ADD
62:18

additional
13:5,21
25:5,6
53:19
55:21
56:20
58:12

address
9:7,8

addressing
92:3

administer
68:10

administrat
ively
55:22

advised
13:19
50:21

AED
67:22
68:14
78:4

afforded
44:22

afternoon
4:24 5:8

agree
96:7

agreeable
5:8,17

agreed
17:17

agreement
4:10

ahead
84:23

aid
68:11,12
70:3,5
77:18
89:13
93:20

aideds
21:22

air
34:25
42:17,23
50:9,20
54:23
66:12
69:17

aircraft
68:11

airport
9:10
16:23
35:21
42:15
58:2,21
85:23

airports
86:3

akin
36:6

alerting
83:19

allowed
54:25

altered
29:25
30:20,21
33:24
68:19
69:3,4,22
76:2

ALTERMAN
4:14 5:9,
18 17:9
33:25
37:16
58:17
60:8
63:9,24
65:22
70:22
71:4
74:10
75:14
76:12,24
86:22
87:3
89:24
91:7,18
93:3,21
95:2
96:3,23
97:7,14

103:10

ambulance
13:4 15:3
58:20,22
90:17
91:24
102:23

Amended
38:5,23

amount
43:18
74:23
75:3

Amrhein
4:15,21,
23 5:4,
10,19 6:6
10:16
18:7
37:13
41:21
65:25
70:25
84:9,12,
16,23
91:10,25
94:2
95:11
96:10
97:4
103:6

and/or
32:8

annually
34:5

answering
7:7 65:23

answers
7:3 90:6
94:5,10

anticipate
7:14

anticipatio
n
41:8,9

apologize
15:12
26:2

apparent
70:13

appeared
87:11

appears
31:4

applies
99:17

apply
43:19
44:23
73:21

appreciated
6:24 7:4

approach
29:3
62:10
65:20
67:5
68:2,21
70:19
75:12
80:13,18

approaching
63:18
80:24
81:7

approximate
ly
12:10
23:20

April
25:19
26:3
32:14
33:15



40:24
79:5
85:4,15
90:11
91:14
92:9,15
94:11

**area**
42:15
45:8
52:15
54:13
55:8
64:17

**areas**
85:22

**arguing**
61:7
68:24

**arm**
73:3

**arms**
72:3

**arrests**
21:2,22
43:22

**arrive**
87:24
92:24

**arriving**
86:18

**Ashcroft**
6:7

**assailant**
68:24

**assault**
88:22
89:3,5

**assaulted**
56:4
88:12,19,

21

**assaulting**
30:10

**assaults**
61:6

**assigned**
42:17,23
85:11
90:16,19
92:13

**assignment**
21:19

**assistance**
56:12
57:6,16
79:23

**assisting**
77:22

**associate**
6:6

**assumption**
6:19
62:7,21

**ate**
61:9

**attach**
68:14
78:3

**attached**
46:3

**attack**
60:14

**attempt**
68:10,12

**attempting**
69:15

**attended**
18:12
26:24
27:3

**attention**
38:2

**attorney**
12:14
13:23
14:2,6,8,
13,17
15:18
96:5,8
101:17
103:7

**attorneys**
38:17

**August**
17:11

**Authority**
9:11
16:13,20
17:12
18:24
19:4,13,
19 20:16,
22 21:8
22:4,13
23:22
24:13
25:22,23
27:3
28:14
29:2
30:18
32:6,22
52:5
62:12
79:8
94:19
95:8,25
97:23
102:13

**Authority's**
16:11,19
95:13

**availabilit
y**

12:22

**avoid**
6:22  60:6
74:15

**aware**
12:5,6
17:2,6
18:2
56:17
75:6,7
86:10
101:16,21
102:2,6,
12,17,20,
21  103:3

**awareness**
102:10

---

**B**

---

**Bachelor's**
18:13,17

**back**
27:4
30:17
52:3
55:19
71:2
84:20
92:19

**background**
6:2  10:11
18:10
26:10,16
101:24

**backup**
51:25
55:14
58:8
81:10

**bad**
61:10

**bandage**
78:5

**bar**
73:3

**barrage**
58:4

**barrier**
31:12

**barring**
66:21

**bartender**
25:12

**base**
101:12

**based**
53:7
64:13
71:13
73:14
79:4  85:2
86:24
89:25

**basic**
77:18

**basis**
67:9

**bathroom**
42:19
84:11

**begin**
6:10

**beginning**
22:23
51:16
59:25
89:23
90:10

**Bergery**
12:18
13:6,18



**big**
31:17

**bigger**
55:24

**binding**
95:7

**bit**
5:24
10:20
26:15,25
44:13
51:5
64:14
71:25
98:7
99:10

**blanket**
57:18
73:21
79:12

**bleed**
77:21

**bleeding**
68:9
77:19
78:6

**board**
50:2
82:15,25
83:14
85:5
91:22

**boat**
36:21
45:15

**bodily**
67:12

**boss**
40:3 41:4

**boss-to-cop**
40:8,10
43:6

**breach**
97:18

**breaches**
97:19,22

**break**
7:24 8:2,
4 32:14
42:5,19
46:14
48:4
59:18
65:23
84:11

**breakdown**
30:10

**breaks**
42:18

**briefly**
9:15
18:10
26:10

**bring**
17:3,5
44:10
56:14
67:22
73:9

**broad**
55:19

**broadcast**
49:19
51:4,23
53:4

**broadcasting**
48:7

**brought**
66:20
73:19
102:7

**buck**
93:17

**Bugiada**
39:7,13
43:3,10

**building**
9:10 49:7
58:23
67:24
72:4

————————

**C**

————————

**call**
16:22
24:5,6
34:8 35:2
36:12
41:25
42:3 44:3
48:20,22,
23,25
49:8,11,
13,19,23
50:3,12,
18 51:11,
24,25
52:16
53:12
54:4,7,14
55:14
56:25
57:5 59:4
60:4,15
62:5,7
66:8,9
68:18,23
75:22
85:4,8
91:21,22,
23 95:14,
16

**called**
42:18
50:12
58:9,19
64:12

71:11
77:5
85:20
92:19

**calling**
57:22
58:20
97:2

**calls**
34:14,21
46:8
49:8,9
50:6,15,
25 55:4
56:18
60:20,22
61:2 92:5
95:3
99:23

**calm**
72:20

**calmly**
69:7

**capture**
44:20

**car**
42:15,24
48:15
58:24
62:18
67:21

**cardiac**
61:10
62:16,17,
24 67:19
68:13
78:4

**cardiacs**
61:8

**care**
77:3,6,
10,16,25
78:3,13,

17 79:9,
11,12
80:4
90:15,25
94:24
96:21

**career**
44:7
61:20

**cargo**
43:22
45:14,18

**carry**
47:3

**carrying**
46:17,22
47:4

**case**
15:15
30:7
57:22
72:18
87:5
89:6,13,
14

**cases**
43:24
61:4
82:21

**center's**
66:8

**certification**
26:12,18

**chain**
49:18
100:13

**change**
44:25
60:17,18
61:15
62:23



79:20
87:8,9
88:5 93:8

**changed**
60:11,12,
15

**channel**
51:5,8,
21,25

**channeled**
99:21

**channels**
99:14

**characterize**
24:22

**charges**
102:6

**check**
52:15

**Cheryl**
5:6,15
96:12

**Chris**
6:6

**circumstance**
71:9

**circumstances**
71:7

**City**
18:12
23:6

**clarification**
24:15
36:5

**clarity**
44:19

**classroom**
33:6

**clean**
7:2

**cleaner**
7:8

**clocking**
47:21

**close**
54:17

**code**
52:5
54:8

**codes**
52:5,8,9

**collect**
70:9

**College**
18:13

**colloquial**
7:13

**combative**
76:4

**comfortable**
31:20

**command**
46:25
51:7
100:13

**commanding**
19:17
32:18
51:15
98:6
100:5

**committing**
71:22

**common**
33:11
73:25

**communicate**
31:9,19
59:17

**communicated**
61:3

**communicater**
49:11,12
50:19
52:18
66:11,13

**communicating**
49:4

**communication**
13:22
49:18
99:22

**company**
11:15

**compared**
89:2

**complaint**
15:14
38:5,24
39:3

**complete**
33:8

**completely**
61:17

**compliance**
19:21
21:7 73:3

**comply**
101:10

**comprehensive**
65:9

**compromise**

76:5

**computer**
49:10
50:19
66:10

**concerned**
78:20,23,
25

**conclusion**
95:3
102:3

**conclusions**
96:5

**condition**
49:14,16
53:3,4
56:2
66:15,23
88:11
93:8

**conditions**
88:4,5

**conducted**
101:17

**confers**
17:16

**confirm**
25:18

**confused**
93:20

**confusion**
91:9

**Congratulations**
19:9

**connection**
41:3

**considered**
85:7,8

**consistent**

99:6

**constant**
58:4

**contact**
66:13,17

**contained**
101:6

**contents**
12:21

**contingency**
93:9

**continue**
84:25

**control**
21:23
69:10
74:25

**conversation**
7:14
12:22
13:6
14:16
88:23

**conversations**
15:17

**cooped**
45:12

**cop**
10:2
39:19
46:23

**cops**
39:18
43:22

**copy**
103:11

**correct**
15:25



19:2
25:20
26:5 27:2
33:4,10
38:4
52:22
53:14,17
54:2 57:3
62:4,14
80:17,24
81:6
85:7,18,
20 89:22
92:21
93:2
94:16,20

**correctly**
16:16,24

**Council**
37:11

**counsel**
4:13
17:3,5,15
98:17

**counseled**
97:24,25

**couple**
13:11
26:13
50:11
98:25

**COURT**
4:2

**courtroom**
8:13

**cover**
38:19

**covered**
26:13
28:13
35:3

**CPR**

57:9

**crazy**
46:23
74:24

**creative**
59:23

**criminal**
102:6

**crises**
16:15
29:24
30:2
79:10

**crisis**
29:5,9,11
30:9,20
33:18,23
80:15
81:5,6
87:23

**crossed**
26:2

**curious**
88:24

**current**
24:11

**curriculum**
28:2
73:16,24

**custody**
13:12
81:12

―――――――
D
―――――――

**dancing**
91:13

**danger**
31:22
89:16

**dangerous**
32:2

**dark**
93:11

**date**
17:12,17
53:17
54:2
62:13
63:8

**dated**
17:11,14

**dates**
13:20
22:15
32:20

**day**
5:2 14:25
19:22
21:20
51:16
64:21
65:5
71:17
74:3

**days**
5:15 32:4
51:10

**de-escalation**
30:23
31:11

**deal**
72:10

**dealing**
61:18
67:8

**dealt**
88:16

**Deborah**
4:3,17,21
70:25

**decide**
95:5

**defendant**
11:15
39:2

**defendants**
37:25
38:22
40:8
43:5,6

**defense**
11:15

**definition**
42:8

**degree**
18:14,17
25:8

**delay**
60:7
86:18
92:24
94:23
96:20
97:11

**delayed**
93:19

**delicately**
43:14

**delve**
15:16

**dementia**
30:5 69:5
81:16

**demonstrations**
27:22

**demotion**
43:16

**denied**
89:12

**department**
16:13,21
19:4,13
20:22
22:4
23:6,22
27:4
28:14,18
32:6
46:11
102:14

**departure**
69:17

**depend**
29:8 30:8
71:6

**dependent**
57:14

**depending**
69:19

**depends**
45:16
67:16

**deponents**
8:21 9:5

**deposed**
5:23 9:24

**deposition**
4:6 9:21,
22 10:19
11:11
12:6
13:24
14:3,9,
12,18
15:14
17:11
26:17,22
40:17
41:10
95:24
97:6

800.211.DEPO (3376)
EsquireSolutions.com



depositions
5:6

derives
95:22

derogatory
98:2

describe
18:10
19:11
23:25
39:12,20
76:22
79:13
100:24

description
21:11,13
54:9

descriptions
52:6

designated
85:11,17

designation
49:13

designed
95:25

designee
11:16
95:24

desk
15:9
36:13
39:15
43:3,10,
15,20
46:11
47:20
48:5 49:8
50:16
51:23,24
52:17
54:19

57:21
60:23
66:20
68:16

detail
13:2
36:12,13
43:17,20
44:10
45:14,18

details
37:5

determination
on
99:16

determine
31:8

determined
102:22

deviation
51:12,14

deviations
51:19

died
13:12

differed
24:3

difference
81:7

differently
30:13

difficult
48:17
70:4

directed
79:19

direction
21:25
38:21

directly

54:22
97:4 98:9
100:6

disagree
96:7

disciplinary
98:19
99:25
100:2

discipline
99:3,12,
17

disciplining
99:2

discretion
100:14,
17,20

discuss
8:4 12:23
101:2

discussed
14:7,16

disorderly
83:6

disorientation
71:20

disoriented
70:17
71:10,19,
24 72:2,
6,7,13,21
76:4

dispatch
66:6,7

dispatched
16:21
28:8
34:21

41:17
56:18
64:6
65:15
66:4 67:3
83:13
95:14
100:25

dispatcher
48:25

dispatching
100:23

distributed
75:24

document
11:4,6,7,
8,19,21,
25 12:3,5
37:14,17
38:7,15
99:12,18

documents
11:24

dollars
43:25

drilled
74:3

drive
45:15

driving
39:14
43:23

drug
9:19

duly
4:17

Duran
39:9

duties
19:12
20:20

21:9,16
44:25
76:21,22
87:19
98:14

duty
41:24
42:2,11
77:12
79:15

E

earlier
80:21
99:22

early
9:20

easier
7:9

edge
69:18
72:4

education
18:15

educational
18:10

effect
89:11

elderly
69:5

elite
44:13

emergencies
58:6 64:7

emergency
16:14
28:8 29:4
41:19
48:24
52:22,23



53:12,13,
23 58:7,
9,16
59:3,4
60:5
62:6,8
65:16,21
66:5
67:4,5,16
68:19,22
71:11
74:7
76:11
77:5
79:3,7
82:14
85:4,7,9
87:24
89:2,21,
22 90:13,
24 91:17
94:13,22,
25 95:17
97:13,21
101:2,19
102:9

**emphasis**
63:13

**employed**
18:20
70:20

**employee**
32:21
33:7
35:16,20

**employer**
18:23

**EMS**
58:15
59:6,8,
10,11,15
60:6
66:13,18,
20,21,24

73:9,10
78:14
85:19
86:3,18,
21 87:24
90:21
91:11,16
92:24
93:15,18
94:21
95:20
96:22
97:12

EMS ' s
94:24

**EMT**
59:6 60:6

**EMTS**
58:15
85:12,19

**encompasses**
95:16

**encounter**
81:9

**enforce**
19:16

**enforcement**
22:5,19
23:12,25
28:5

**engaging**
72:22

**English**
31:10

**ensure**
19:20
20:24,25

**ensuring**
21:6

**entails**
57:16

**entered**
49:10
51:2 66:9

**entire**
35:25
58:2

**equip**
83:12

**equipment**
4:7 29:16
56:12,14
67:20
78:9

**equipped**
45:24
63:16
64:9
70:14
71:12
76:9

**equips**
65:4

**escort**
58:14,24
59:6 60:5
86:14,17,
21,25
89:21
90:12,17,
21 91:15
92:7,15,
23 93:15
94:13,18,
21 95:20
96:19,21
97:12
102:23

**escorted**
85:19
86:4 91:3

**escorting**
85:12
91:11

**essentially**
19:15
21:24
22:11

**evaluate**
79:22
80:8
100:18

**evaluations**
21:3

**evasive**
94:7

**event**
52:10
53:24
54:6 59:2
63:8
75:10,21
91:2
99:24

**events**
40:23

**everyone's**
54:21

**EXAMINATION**
4:22

**examined**
4:19

**exclusive**
94:14

**exclusively**
48:11
90:20
92:7,14

**excuse**
6:14
95:20

**executing**
41:25

**executive**

19:17

**Exhibit**
10:18,23
11:5
37:15,17

**exhibiting**
30:4
75:17,18
80:14

**expect**
57:25
65:13
67:10

**expectation**
62:22
65:6

**expected**
12:24
17:7 18:3
42:13
46:15
49:16
64:18

**expects**
57:10

**expelling**
29:17

**experience**
22:6,11
23:13
24:3,4,7,
18 28:5
32:5
35:14
44:22
64:11
73:14
82:9,18

**experienced**
98:16

**experiencin
g**

800.211.DEPO (3376)
EsquireSolutions.com



explanation
44:18

extensive
22:17

extent
18:15

extremely
56:4

**F**

face
61:25
87:10

faced
44:15

facilities
31:15

facility
36:3

fact
26:4
61:12
87:11
88:6
91:13

facts
96:24

failed
102:22

failure
101:3

fair
49:21
71:14
84:3

fairly
52:8
82:23

falls
95:22

familiar
5:25
11:24
12:2
17:24
37:10
38:25
39:6

familiarity
10:13
43:4
102:11

fast
40:5

faster
24:10

federal
86:2,3,8
93:13
94:20

feel
27:17
90:5 94:5

field
21:4
35:19
43:12,15
46:14,24
49:4
60:21,23
61:3
92:18
98:10

figure
56:15
98:20

filed
41:3,12

fill
100:3

filled
41:11

finally
7:23

find
24:23
31:18
70:11

findings
96:8

fine
54:20

finish
7:6

firearm
56:6

firearms
27:24

firm
6:7 25:13

first-time
23:24
24:3

firsthand
98:21

flailing
72:3

flight
50:3 69:2
83:2 85:5

flights
83:3

fluid
29:17

fluids
67:13

fly
28:21

focus

focused
21:5
35:22

focuses
56:6

follow
100:9

follow-up
17:22
96:16

foot
48:18

force
41:5
45:19
74:8,12,
23 75:3

foremost
6:5

forgot
80:20

form
5:12
35:15

forward
40:6
100:15
81:15

freed
59:9

frequency
52:3

full
9:7 88:14

fully
7:10

38:2 90:8
96:9

**G**

gate
50:9,17,
22 52:11,
14,19
85:6

gates
50:9

gave
41:5
73:13

general
17:24
21:11,13
26:20
27:16
32:8 36:2
46:19
47:7,11
52:6
53:21
72:6
88:18,25
89:3

General's
96:6,8
101:17

generalized
93:23,25
94:3 97:2
98:23

generally
18:4 21:4
44:8 53:2
102:2

gig
44:14

gigantic
81:10

give



10:20
66:14,16,
19 77:18
80:4
82:10,16
83:6,7
84:15,21

**giving**
8:11,13
76:17

**good**
4:24
39:19,24
40:4
47:15

**grab**
67:19
81:17

**graduated**
26:25

**great**
11:3 19:9
96:11,12

**greatly**
5:2 7:4

**guarding**
43:24

**guess**
10:4 15:7
27:15,18
42:7
100:19

**guessing**
23:15

**guidance**
64:3
82:10

**guidelines**
64:3

**gun**
56:7,8

88:13
89:5

**guy**
61:9
64:20

**guys**
45:13,17

───────

**H**
───────

**hall**
84:14

**hand**
53:7
65:10

**handcuff**
73:2

**handle**
63:16
70:16
76:11

**handled**
30:13

**handling**
33:16,22
64:9,11
65:21

**hands**
81:21

**happen**
57:12
59:24
75:22
82:19,20

**happened**
82:21

**happening**
6:4 52:7
58:6 62:8

**happy**

5:20
6:14,16
32:25

**harmful**
69:12

**head**
6:22 7:15
68:9

**heading**
54:10

**headquarter
s**
99:15

**health**
30:2
33:23
80:15
81:5
87:22

**hear**
6:12,20
46:8
57:23
59:15
93:10

**heard**
10:19

**hearing**
47:25
54:21
60:21
67:18

**heart**
60:13
101:19

**heightened**
79:11

**held**
4:6 19:6

**helps**
43:21

**Hey**
52:13

**high**
18:11
87:12

**higher**
78:16
87:19

**highlight**
38:21

**hold**
10:10
19:24
73:4

**hoping**
65:13
74:15

**Hospital**
59:11

**hundred**
61:25

**hurt**
69:16
70:6
81:19,23

**hypothetica
l**
96:24
97:3,8

───────

**I**
───────

**idea**
46:22

**identificat
ion**
10:23
37:18

**identifies**
11:16

**identifying**
11:12

**imagine**
7:25 17:3
28:17
29:20

**immediacy**
88:16
89:15

**immediately**
88:17

**imminent**
72:15

**impact**
75:10

**impair**
8:23,24

**implication
s**
101:3

**important**
48:5

**in-service**
32:9,11,
19 33:11

**inappropria
te**
96:11

**incident**
13:10
15:4
90:2,4
93:24
96:25
98:2

**include**
34:19
46:10
74:7,12

**individual**
39:2 43:5



45:23
55:3
83:21
87:22
90:25
92:6

**individualized**
82:2

**individuals**
102:15

**influence**
8:22

**information**
6:2,3
10:12
26:16
32:8 53:2
62:9,15
66:15
67:12
70:10,15
71:16
73:13

**informing**
53:6

**initial**
36:20
37:3
49:23

**initially**
61:12
69:13
87:10

**injured**
21:23
66:25
73:12

**injuries**
29:12

**injury**
74:19

**inside**
45:12

**instance**
97:17

**instances**
31:2

**intercom**
47:24
48:2,3,6,7

**interests**
87:21

**International**
16:23
36:7
95:15

**interpretation**
78:23

**interview**
68:7

**interviewed**
101:22

**interviews**
41:5

**intoxicated**
83:5

**introduce**
10:17
37:14

**introductory**
5:5 6:2,11 8:7

**investigate**
98:5,7
99:3

**investigating**

99:3

**investigation**
101:18,23

**involve**
94:4

**involved**
15:15
57:24

**involving**
101:18

**issue**
42:21
51:20
78:24
95:4

**issues**
51:9,22

**IST**
33:10
34:23
35:4,6,9,24 36:2,6
37:2
70:18

**ISTS**
33:4,13,15,20
34:11,17
35:22
53:9,16
62:13
63:7,22
65:2,9
71:14
73:17
79:6

───────

**J**

───────

**Jamaica**
59:11

66:13,18

**Jamie**
9:9

**Jersey**
18:25
25:4

**jesting**
80:20

**JFK**
9:10 13:4
16:23
35:21,23
36:7,17,24 37:9
41:18
48:24
51:11,20
93:16
95:15
99:23

**job**
7:9 9:25
12:13,15
22:19
23:3
35:13,25
44:22
46:11
47:17
49:4 50:8
54:15,18
56:7,8
61:2,3
62:17
66:21,22
68:5
74:15
87:6,9,12,14,15
88:8
92:12,13

**job-wide**
35:25

**jobs**
25:11
28:19
55:11
57:8
60:25
61:12
73:6 87:9

**join**
24:18

**Jonathan**
39:8

**Joseph**
39:7,21

**Jr**
6:6

**Judo**
31:2
80:22,23
81:3,11,20

**July**
22:8,22
23:3

**jury**
95:4

───────

**K**

───────

**Kennedy**
13:11

**kind**
23:23
28:6,21
31:24
32:19
44:20
54:12
82:10

**kits**
68:12



knowing
55:5

knowledge
32:7
63:20
71:12
76:9 90:2
98:21

**L**

lack
32:15
92:20

Lagoda
86:19
93:23

Lagoda's
93:20

Laguardia
10:5

language
31:12,19

late
12:11

law
6:7 22:5,
19 23:12,
25 25:4,
13 28:4
85:18,21,
22 86:8
93:13
94:20

laws
25:6

lawsuit
9:24
40:20
41:4
101:20

lead
75:21

leading
23:4 79:5
85:3,15

learn
24:17
25:4 28:5
35:19
36:23
45:15
82:9

learned
24:25
28:25
33:3
35:13
53:16
63:20,21
70:17

leave
46:25
89:7

leaving
96:18

led
56:19

left
24:12
86:20

legal
77:9
78:24
95:3

legally
78:10

lengthy
32:5

lesson
28:9
70:17

lessons
24:17,24,
25 28:25
29:21,23
30:17
32:20
33:3
34:18
53:16
63:6,14,
21 64:24
71:13
83:9

letter
17:14

level
44:3
69:17
78:16
87:19
100:17,19

levels
80:3

lieutenant
4:24
13:6,18
15:23
17:2,6,18
19:3,12,
14,16,24
20:4
25:18,21,
22 26:4,9
32:13,17
33:14
98:4
100:4,11

life
74:9,14,
16 78:7

life-
threatening
97:13

lifesaving
80:9 93:2

likes
45:12

limited
26:21

lines
20:18

list
11:12

listed
39:2

listening
47:17
51:13
56:22,24
57:10,21
80:19
81:3

lists
11:14

lives
89:16

located
41:23,24
48:25
55:4

location
54:11
55:6
58:24,25
64:8
66:14
69:22
88:10
93:7

logically
96:19

long

7:25 10:2
19:6
20:6,14
23:7,18
28:10
51:8
84:12
89:18

long-winded
32:24
94:9

longer
84:17
93:17

loses
74:13

loss
74:9,15

lot
30:3,5
44:18
51:18
55:18
57:13
61:6,8
63:5,11,
13 72:2,7

luckily
59:10

**M**

made
14:21
31:15

main
56:6

maintenance
51:22

make
7:3,7,8
14:22



**making** 15:2 17:23 21:21 69:7,14 73:8,20 75:3 99:16

**making** 74:6,16, 17

**mandate** 46:19

**mandated** 33:5

**mandatory** 100:9

**March** 25:23

**Mark** 12:18

**marked** 10:17,22 11:5 37:15,17

**material** 15:22

**materials** 14:19 15:13,17, 19 75:23

**matter** 6:8 37:25 43:5 72:14

**matters** 5:5 6:11 8:7

**meal** 42:12

**mealtimes** 42:10

**meaning** 21:22 42:14,23

**means** 74:17 77:21

**meant** 69:11

**medical** 16:14,15 28:8 29:4,5,9, 11, 30:19 33:18 41:19 48:24 52:21,23 53:12,13, 19,23 58:5,7,9, 15,19,25 59:3,4 60:5,7,12 62:6,8 65:16,21 66:4 67:4,5,16 68:18,22 70:3,5 71:11 73:6,22 74:7 75:10,21 76:11 77:4 79:3,7, 10,24 82:14,22 83:17 85:7,9 86:4 87:7,23, 24 89:2, 13,21,22

**medicals** 82:24 83:4

**meetings** 17:16

**mental** 29:25 30:8,20, 21 33:23, 24 68:20 69:3,4,22 76:2,5 80:15 81:5

**mentally** 62:11 80:17

**mentioned** 43:2 62:16 64:15 88:22

**methods** 65:20

**Mezzacappa** 39:8,25 40:2

**Michael** 39:7

**middle** 16:6 38:23

**millions** 43:24

**mind** 57:2 61:22 71:2 84:10

**minimum** 46:7 58:13 86:13

**minor** 36:11

**minutes** 20:19 42:19 84:13

**mis-communicated** 87:16

**mischaracterization** 92:2

**mischaracterize** 91:20

**mistaken** 37:15

**MOA** 90:6

**mobile** 58:23

**module** 37:8

**modules** 32:19

**mold** 96:6

**moment**

**millions** 90:12,13, 14,24 91:2,17 92:8,9,15 94:13,17, 22,25 95:16 96:21 97:12,13, 20 101:2, 19 102:8

**88:15**

**monitoring** 21:6

**month** 19:8

**months** 20:9 23:20

**Moschitto** 4:3,18

**motions** 5:13

**move** 100:15

## N

**named** 40:7

**names** 11:8

**Narcan** 76:17

**narrow** 78:22 94:7

**narrowed** 17:13

**narrowing** 17:19

**National** 37:11

**necessarily** 77:12 79:19 81:8,17 85:24

**needed** 52:7 90:24



needing
  56:12

nod
  7:15

nods
  6:22

non-existent
  91:4,6

normal
  44:11
  83:17

notary
  4:4,18
  5:20

note
  17:10
  71:4 91:7

noted
  103:13

Notice
  10:22
  11:11

number
  9:16
  11:14
  25:11
  37:24
  41:16
  82:17
  83:3,6,7

numbers
  16:6

NYPD
  9:23
  23:8,16,
  19 25:2,9
  26:2

—————— O ——————

OAG's
  102:10

oath
  8:11 9:12

object
  91:19,25
  95:3

objection
  17:4,10
  21 33:25
  58:17
  60:8,9
  63:9,24
  70:22
  71:5
  74:10
  75:14
  76:12,24
  86:22
  87:3
  89:24
  91:8
  93:3,21
  95:9
  97:14

objections
  5:11
  17:13,19

observe
  21:20

obtaining
  96:20

occurred
  13:11
  40:23

offense
  96:11,12

offensive
  78:21

offer
  12:25

office
  8:12 96:9
  101:17

officer
  9:18,23
  10:5
  12:16
  19:17,18
  20:12,15,
  17 21:17,
  18 23:5,7
  32:17,18
  39:13,15,
  21,25
  40:2
  43:3,11,
  18,21
  44:2,5,22
  45:4,23
  46:12
  47:4,12,
  13,21
  49:5,15,
  25 50:18,
  23 52:17
  54:5,10,
  12,16
  55:6,13,
  23 56:3,5
  57:7,11,
  15,19
  58:6,13,
  23 60:3,
  23 62:5,6
  63:15
  64:18
  66:19
  67:3,4,21
  68:17,21
  70:20
  71:10,15
  75:22
  76:7,10,
  18,21,23

77:5,7,20
79:2 81:2
85:11
87:6,13
88:4,8,
12,19,20
89:5,7,
17,20
90:12,23
91:3,15,
22 94:21
97:18
98:6 99:6
100:5,23
102:14

officer's
  32:16
  64:17
  66:8 78:6
  79:15

officers
  15:9
  16:13,21
  19:15
  20:24
  21:6,25
  24:12
  28:7 29:3
  34:14,20
  39:2,10,
  14 41:17,
  20,23
  42:10
  46:6
  50:6,20
  51:16,17
  53:6,15,
  22 55:3
  56:17,21,
  23 57:2,7
  58:11,12
  59:2,5
  64:6,9,
  10,22
  65:10,15
  66:4,12
  75:12,24

79:5
83:11,12,
20 86:20
92:22
95:14
96:17
98:9
102:14

on-site
  41:25

on-the-job
  36:17
  37:8

operate
  6:19 52:2
  53:15

opinion
  100:22

opportunity
  44:23
  54:13

opposed
  26:19
  81:4
  98:22

option
  43:19

oral
  27:21

order
  46:19,22
  47:7,11
  48:9
  53:22
  72:23
  73:5
  103:11

orders
  85:25
  99:5
  101:4



origin
  56:25
original
  59:4
originally
  58:9
  60:4,10
  61:14
originates
  50:4
outline
  6:3
overlapped
  24:24
oversee
  19:14
  20:23
owe
  76:21
  77:12
  79:15
owed
  76:23
  77:7,24
  78:11
  79:9,12

─────────

P

─────────

p.m.
  103:13
pace
  24:10,20
pains
  8:16
PAPD
  16:12,20
  20:7
  21:12
  22:7,10,
  12 24:2,

19 25:19
26:3,5,20
28:3 33:7
34:20
35:21
41:19,23
47:6,11
73:15
85:2
93:17
95:13
99:6
102:22
paperwork
  14:19
Papia
  39:8
paralegal
  25:13
part
  28:2
  32:15
  33:2,13,
  15,20
  34:11,17,
  18 46:18,
  19 47:17
  48:12
  73:24
  78:12
  94:18,19
  98:14
  100:14
  101:22
particulari
zed
  82:3
  83:19
parties
  4:10
party
  66:25
pass

51:17

passenger
  68:25
past
  11:24
  12:3
patrol
  13:3
  14:25
  21:5,20
  42:16
  44:6,11,
  25 45:7,9
  46:12
  47:3,12
  51:8,11,
  20 52:15
  54:12
  55:4
  61:19
patrols
  21:5
Paul
  39:8
penalties
  8:17
pending
  8:3
people
  19:21
  21:22,23
  30:6,10
  31:16
  50:11,14,
  17,22
  52:17
  61:7 67:8
  69:23,25
  77:13
  83:4,5
  88:14
  98:18
  99:12

101:9

perceive
  99:13,19
percent
  61:25
perfect
  66:23
perform
  87:18
  88:8
period
  22:4,17
  32:15
  33:21
  34:12
perjury
  8:17
person
  4:12 29:4
  32:21
  33:17,23
  46:3,17
  47:5
  48:19
  49:3,11
  55:21,22
  56:5
  68:3,8,
  13,14
  69:6,21,
  23 70:2,
  8,11,12
  71:10
  72:12,14
  73:11
  74:20
  77:13,22
  79:13,20
  80:4,5,12
  81:12,15,
  17,19,21,
  22 82:15
  83:13
  85:5

91:16
92:15
94:24
person's
  68:4
  71:21
personal
  9:4 40:6
  48:11
personally
  39:24
  40:3,12
personnel
  102:23
persons
  16:15
phone
  51:24
phrase
  32:16
physical
  27:21,24
  31:22
  72:25
physically
  69:21
pilot
  50:2
pin
  79:14
place
  47:21
  58:10
  59:13
  60:2
  65:15
  66:3
  79:2,8
  83:9,12,
  15 85:3
  86:13,17



87:20,23
88:2
89:19
90:11
91:11,14
92:6,21
94:12
95:18
96:13,17
97:20
99:5
101:4

**places**
68:19

**plain**
83:14

**Plaintiffs**
6:8

**plane**
83:25
88:14
91:22

**planes**
82:13,22

**point**
27:14
31:15
38:20
59:10,19,
22

**pointed**
94:3

**police**
9:11,18,
23 10:4
12:16
16:13,20
19:4,13
20:12,15,
17,22,24
21:6,8,
16,18
22:4,10,

14 23:5,
6,16,22
24:2,11
26:24
27:4
28:3,14,
17,25
30:18
32:6
39:14
46:25
47:20
49:8,25
50:16
52:5
62:12
63:22
72:8
73:7,16,
18 77:10
79:18
85:20
86:4
94:21
102:13

**policies**
14:19
15:20
19:16,18,
22 26:19,
21 28:6
41:16
65:14
66:3
78:25
79:17
83:8,14,
17 97:19
98:22
99:5
100:22
101:11

**policy**
47:6,11
58:10
59:13

60:2
83:19,24
84:4 85:2
86:13,16,
24 87:20,
25 88:3
89:19
90:11
91:4,5,8,
11,14
92:6
93:14
94:12,18
95:18
96:13,17
97:18,22
101:9,13

**Port**
9:11
16:11,12,
18,20
17:12
18:24
19:3,13,
19 20:16,
22 21:8
22:4,13
23:22
24:13
25:22,23
27:3
28:13
29:2
30:17
32:5,21
52:5
62:12
79:8
94:19
95:8,12,
25 97:23
102:13

**portion**
37:8
38:21
101:15

**position**
32:2
43:21

**positions**
43:23

**possibility**
97:16

**possibly**
87:16
89:16

**post**
20:25
21:19,21
42:4,8,
13,22
43:12
44:23,24
45:4,6
46:9,10
47:8,13,
18,19
48:18
49:5,13
50:21
54:16
56:23
57:20
64:16,19,
21 66:12
85:11,16
89:20
90:19
91:12,14
94:14
96:15

**posted**
90:12
92:7

**posts**
43:7,10
46:12
50:21

**potential**
99:25

100:2

**potentially**
74:8
78:24
92:25
97:12

**PPE**
67:14

**pre-req**
22:12

**precedence**
89:10

**preference**
45:4,11,
20 64:13

**preparation**
14:3,12
15:13,19

**prepare**
14:8,17
65:10

**prepared**
63:3

**present**
31:3,23

**presented**
76:15

**pretty**
48:10

**previous**
5:6 23:3

**previously**
93:12
94:17

**primary**
64:18

**prior**
19:23
20:4,11
22:5,11


LT. JAMIE SANDOZ  30B6
TARASOV ESQ. -V- PANYNJ
February 13, 2024
800.211.DEPO (3376)
EsquireSolutions.com

23:2 28:4
70:8
78:14

**priority**
87:12,19
88:15
91:21,23
92:5

**privileged**
14:16

**problem**
68:15

**procedure**
14:23
47:6,11
54:5
55:15
58:10
83:19
86:24
92:20
93:14
94:19
97:18,23

**procedures**
13:3
14:20
15:3
16:12,19
26:19,21
28:7
34:13,19
35:22
41:17,18
65:14
66:3 79:2
83:8
95:13
97:19
98:22
99:5
100:22,24

**proceed**
53:7,11

**proceeding**
62:7

**proceedings**
10:14

**process**
98:8

**produced**
36:22
37:6

**professiona
lly**
25:10

**promise**
8:19

**promotion**
43:15
44:4

**promptly**
87:25

**properly**
21:2
66:24

**protect**
29:19
69:24
87:21
89:6

**protective**
29:16

**protocol**
59:5 85:3
91:4

**protocols**
16:12,19
34:13,20
35:23
41:18
95:13
100:25

**provide**
77:16

78:2,13,
17 79:18,
22 80:5,8
90:14,24
101:23

**public**
4:4,18
44:15

**pull**
10:21
64:19
75:23

**purpose**
53:5

**purposes**
85:12

**pursuant**
4:9 11:11

**put**
5:10
19:18,19
31:25
34:24
43:13
44:9 48:6
50:20
67:13
76:2

**puts**
50:18
63:5,11,
13 66:11

**putting**
47:22
52:18
78:7

---

**Q**

---

**question**
6:20 7:6,
7,11,12,

15,19
8:3,20
9:4 17:23
18:20
32:23,24
65:24
70:23
90:5,9,18
93:5
95:21
96:4,24
97:8
102:9

**questioning**
88:24

**questions**
6:9,13,
15,18,22
8:8,24,25
17:25
20:19
25:15
26:11,17,
20 41:16
90:6
93:22
94:3,6,8,
9 96:2
97:2
103:7,8,
11

**quick**
84:11,18

---

**R**

---

**radio**
16:22
34:14,22
35:10
45:24
46:2,7,
15,17,22
47:2,5,9,

14,18,23,
25 48:3,
5,8,10,
11,14,19,
20,22,23
49:19
50:25
51:19
52:2,6
56:19,24
57:21
58:3
59:12
85:4 93:6
95:14,16
99:23

**radios**
48:16

**ramp**
43:24

**range**
33:7

**rank**
100:7,8

**rarely**
44:5

**re-
deposition**
10:22

**re-notice**
10:18
17:10

**reach**
59:21

**reaction**
70:19

**read**
5:14 11:7
12:3
16:9,15,
23 18:4
38:18

LT. JAMIE SANDOZ  30B6
TARASOV ESQ. -V- PANYNJ

February 13, 2024

800.211.DEPO (3376)
EsquireSolutions.com



71:3
102:4,5,
25 103:2

**readily**
68:8
70:13

**reading**
38:11,12
71:2

**ready**
89:20
90:12,14,
20 92:7

**reason**
47:15
54:17

**reasonable**
74:22
75:3

**recall**
9:25
12:9,21
13:15,17
14:7
15:5,7,8,
9,21
22:17
27:7,8,
20,23,25
28:9,24
30:16,24
31:13
34:4,9
35:5
38:10,12,
14,19
41:6
43:7,9
60:2
83:24
84:6

**recap**
10:9

**receive**
18:16
36:14,15,
19 48:9
49:8

**received**
18:13
32:12
63:15
64:25
67:11
79:5

**recent**
32:7

**recognize**
11:6,8
38:7

**recollectio
n**
27:11
34:7

**recommended**
102:13

**reconcile**
87:2

**record**
5:11
16:10,18
18:5 71:3
84:19
95:11

**recorded**
51:2

**recruit's**
24:4

**recruits**
23:25

**recurrent**
36:18,25

**referenced**
10:20

**referral**
99:25

**referring**
6:11
30:15

**regard**
9:24
13:8,23
32:9

**regs**
101:6

**regular**
44:6 67:8

**regulation**
86:2

**Regulations**
21:8

**relation**
12:8 97:5

**relationshi
p**
39:13,16,
21 40:7,
9,11 43:6

**relay**
48:3
68:16

**relayed**
51:15
52:12,23
53:24
54:7 55:5
62:9
66:24
83:11

**relays**
47:24

**rely**
63:18

**relying**
48:11

**remaining**
43:4

**remember**
9:17 10:3
27:14,15
28:16,19
30:25
57:8 73:6

**remotely**
4:9

**remove**
41:22

**render**
70:4
72:24
92:25
94:24

**rendered**
70:3

**repeat**
6:14,16
36:18

**rephrase**
6:14,17
32:25

**report**
96:6 98:3
100:11,12
102:3,4,
5,10,12,
103:2,4

**reporter**
4:2,4,8

**reports**
41:2,5
100:10

**represent**
11:10

**represents**
6:7

**reputation**
64:11

**request**
55:14,18
56:15
57:6,16
58:8,11

**requested**
11:14
42:20

**requests**
56:20

**require**
80:19
81:2
87:12
99:24

**required**
22:9
32:20
33:8  46:6
47:2
85:19
86:14,17
92:9
93:15
100:11,12

**requirement**
5:20
46:18
86:23

**requires**
53:22
86:3

**requiring**
46:16
91:15
92:6

**requisite**
27:2
45:21
63:20
70:15



71:12

**reserved**
5:12,14

**respect**
66:5

**respond**
21:22
28:18
49:16,20
53:21
54:25
55:16
64:23
66:12
71:11
76:7  77:6
83:13
89:17

**responded**
17:13
92:22

**responding**
16:14
29:3,20
30:19
33:16,22
41:19,25
49:25
53:14,23
57:2
58:7,11
59:3
61:22
62:5
68:17
73:9
74:14
76:10
77:7
79:3,6,16
83:20
96:18
97:20
100:25

**responds**
55:13,15
88:8

**response**
13:4,18
16:22
17:4
28:15
54:5,14
55:25
60:7
75:22
87:13
92:19
101:9,10,
18  102:8

**responses**
8:16
56:19
100:23

**responsibil
ities**
19:12
20:21
21:10,16
98:15

**responsibil
ity**
42:2  55:8
64:17
93:18

**responsible**
55:10
98:11

**result**
75:21
76:4,16

**returning**
85:6

**review**
14:18
15:12,19
41:2,6,9,

10,13,14

**reviewed**
11:19,21,
23  41:7

**reviewing**
15:21
38:10

**rights**
87:21

**Robert**
39:7,21

**role**
45:8

**room**
4:8

**roughly**
20:10
22:16,21
23:10,19
27:9

**rowdy**
50:13,17,
22  52:11,
14,17

**Rule**
11:12

**rules**
21:8
101:4,6

**run**
56:7
84:19

**run-of-the-
mil**
80:16

───────────

S

───────────

**safe**
69:14,22

73:8,20
74:5,6,17
75:4

**safety**
37:11
46:23
87:22

**sake**
6:25  7:16

**Sandoz**
4:1  5:1
6:1  7:1
8:1  9:1,9
10:1,23
11:1  12:1
13:1  14:1
15:1  16:1
17:1,18
18:1  19:1
20:1  21:1
22:1  23:1
24:1  25:1
26:1  27:1
28:1  29:1
30:1  31:1
32:1  33:1
34:1  35:1
36:1
37:1,17
38:1  39:1
40:1  41:1
42:1  43:1
44:1  45:1
46:1  47:1
48:1  49:1
50:1  51:1
52:1  53:1
54:1  55:1
56:1  57:1
58:1  59:1
60:1  61:1
62:1  63:1
64:1  65:1
66:1  67:1
68:1  69:1

70:1  71:1
72:1  73:1
74:1  75:1
76:1  77:1
78:1  79:1
80:1  81:1
82:1  83:1
84:1  85:1
86:1  87:1
88:1  89:1
90:1  91:1
92:1  93:1
94:1  95:1
96:1  97:1
98:1  99:1
100:1
101:1
102:1
103:1

**save**
78:7

**scared**
45:17

**scene**
58:8,15
59:6  60:6
61:5
66:19
67:3
69:14
70:15
72:9,11
73:8,10,
20,21
74:5,6,
16,18,24
75:3
76:19
77:18
78:14
79:21,22
80:7
81:14
82:5,7
83:20



800.211.DEPO (3376)
EsquireSolutions.com

85:12,20
86:19,21
87:17
90:13
91:11
92:8,22,
25 93:16
94:22
95:20
96:18
102:24

**school**
18:11

**scope**
17:14,17
26:22
30:19
95:5,23

**screen**
10:25
11:2
15:25
37:20
41:22

**screening**
59:19,22

**scroll**
11:13
15:24
16:5
37:22

**sector**
42:14

**secure**
70:2,8
72:23
73:5
76:19

**secured**
73:11

**sees**
50:19

**seizure**
75:9,25
76:17
82:15,25
83:14,22
85:5
86:20
102:16

**senior**
44:9

**seniority**
43:18

**sense**
29:6 68:4
73:25
77:9

**separately**
48:6

**September**
17:15
22:23

**sergeant**
20:5,7,8,
11,15,21,
23 21:11
32:18
98:11,13,
23,25
100:3,10

**sergeants**
19:15
21:12,14
98:10

**series**
6:9

**serve**
20:14
22:11
77:11

**served**
19:23

**service**
52:3
79:18
80:5

**services**
86:4
87:24
89:21
90:13,14,
21,24
91:16
92:8,15
93:19
94:13,22
97:12

**set**
25:6

**settle**
73:4

**sharing**
18:8

**shifting**
93:18

**shop**
51:19

**Shorthand**
4:3

**show**
75:25

**showing**
37:24

**shown**
75:23

**shrugs**
6:23

**sick**
21:23

**sicknesses**
29:13

**sign**

5:15

**significant**
60:7
86:18
92:24
94:23
96:20
97:11

**significant
ly**
24:24

**similar**
11:23
25:3
37:2,6
67:8
81:13
82:5
99:21

**simple**
90:4,6
93:5 94:8

**simply**
72:17
92:5
95:21
96:13

**sir**
5:21 7:21
8:10,19
9:6,13
10:15,25
11:5
12:4,6
16:24
17:21
18:8,9,21
19:7,10
22:3 29:7
30:24
32:3 36:5
37:10,20
38:8,20
41:15

44:18
45:22
49:6
55:12,17
78:19,20
85:2 90:5
93:20
103:6

**sit**
72:19

**situation**
53:6
55:24
57:15
59:7
63:4,16,
19 64:10,
11,12
65:10
75:13
76:6,8,11
94:5
100:9

**situations**
33:17,22
46:5
64:23

**size**
81:14
82:7

**sized**
82:6

**skills**
80:19

**slightly**
61:17

**socialized**
40:13

**socially**
39:17

**society**
77:11



solutions
30:23

somebody's
60:14
95:18

someone's
64:16
72:9,21
76:16
77:19
78:7

sort
36:16
62:21
93:9

sound
5:24

spare
84:15

speak
14:2,5,11
31:10,18
38:16
40:16
68:3,14
69:7

speaking
67:6,7
70:19

specific
15:13,16,
19 21:10
25:15
26:15,18
28:9 30:8
35:11
36:3,7,10
37:9 42:2
43:9 51:4
52:4,21,
22 53:24
54:8
77:13

79:20
80:20
84:5
85:16
93:22
101:14,15

specificall
y
28:16,19
30:15
31:8,14
35:21
48:21
53:16
55:5 60:3
73:15
75:5
82:24
83:25
89:8
90:19
94:4

specifics
27:16
32:8

spelled
35:15

spoke
12:18
14:8,22
15:6
99:22

spoken
40:19,22

stabilize
78:18

staffing
42:21

stand
66:18
77:20
88:4

standard
51:21
52:9
77:3,6,
10,25
79:11,12
80:3

standards
79:8

standing
57:19

standpoint
67:2

start
22:3
32:10,12
54:10
61:13,16

started
5:5 22:7
25:8

state
4:4,19
9:6 29:25
30:20,21
33:24
68:20
69:3,4,23
70:17
75:9,20
76:2

statements
101:24

station
9:11
47:20

stationhous
e
43:21

stay
44:6
58:14,22

60:4
84:19
91:15
94:12
95:19
96:14

stenographe
r
7:17

stenographe
r's
6:25 7:9

step
50:22
66:5

stepped
99:4

steps
98:20
99:2

stipulate
4:11,13

stipulation
s
5:7

stole
81:25

stolen
68:23

stop
18:8

stops
58:4
93:17

strapping
47:23

strategies
30:23
31:11,17

strategy

31:9 81:4

stress
63:5,11,
13

stretch
78:21

strictly
35:4

strike
5:13

subject
8:16
13:12
17:21
29:24
30:20
68:18
74:19
75:11
76:22,23
77:4,7
90:15

subjects
79:9,15

suffered
86:19

suffering
83:22
87:22
90:25
91:16
94:25

suffice
7:16

suited
45:6

summons
37:24
57:11

superintend
ent



superior
21:25

superiors
100:14

supervised
98:10

supervisor
54:19

suppose
53:19
59:20
99:21

supposed
29:3
42:25
47:16
56:17
58:14
60:3
65:20
67:5
68:21
76:7
95:19
101:9

swiftly
87:25

sworn
4:9,12,17

system
47:24
51:9

T

table
31:25

tactical
29:6 67:2
80:13

tactically
53:21
62:10
65:19
67:6,7,17
70:19
71:16
80:18

tactics
29:18

tailored
36:3

taking
4:25 8:4
27:20
50:18
96:5

talk
68:4

talked
64:8

talking
10:5
29:9,14
30:4,9
55:23,25
57:4
66:22
75:19
77:9
95:12

taught
23:24
28:20
29:15
30:22
33:16,21
34:12
35:17
53:25
62:12
63:6
67:10
75:2

taxiing
83:2

taxing
82:14

teach
35:8

teaching
28:18

teachings
24:25
28:7
71:13,15
75:7,8
83:10

techniques
30:24
31:11

telephone
49:9

tells
72:12

ten
19:8
22:18,20
51:10

term
77:24
80:20

terminal
42:17,24
50:7,9
59:14,16
69:18

terminals
50:7

terms
27:19
30:25
31:10
32:7,11
34:20

42:8
49:17
53:11,20,
22 63:11,
18 65:17
79:6 89:4
98:17
99:20
101:7
102:8

tested
27:9,12

testified
4:20
9:12,18
10:13
11:18
12:23
13:7 91:8
93:12
94:17
95:17

testify
11:16
12:7,13,
24 17:7,
18 18:3
86:12
95:6

testifying
91:12

testimony
4:11
8:11,13
12:25
75:23
91:19
92:4 95:7

tests
24:16
27:3,19,
24

Theater
18:14

theft
80:16,25
89:2

thing
35:25
60:20
61:15,16
73:19
81:13
88:7

things
24:9
25:4,5
26:14
27:16,25
29:17
31:3,5
45:13
56:11
57:14
58:21
61:15
62:23
69:12
72:8
81:18
87:8

threat
69:23
72:15
81:24

ticket
68:25

tied
96:25

time
4:25
5:13,14
9:17
10:2,3,8
15:4 26:4
28:10,23
29:22
32:4,14



33:21
34:12
38:17
43:11
44:15
53:12
54:2
63:17
85:10,14
91:5,14
92:21
96:22
103:9,13

**times**
9:16
42:12,22
51:18
60:24

**title**
19:7,25
20:3
25:16

**today**
5:22 6:4,
8 8:25
17:25
95:7

**today's**
26:22

**tools**
62:20

**top**
100:6

**topic**
88:23
95:12,23

**topics**
11:13,14,
17 17:7,
14,18,20,
24 18:4
24:9 95:6
96:7 97:5

**tour**
19:14
42:11

**tourniquet**
78:7

**tower**
50:13,15

**track**
25:9 27:8

**traffic**
21:24

**train**
42:24
102:14

**trained**
64:22

**trainer**
65:12

**training**
26:11,18
28:13
32:9,11,
16,19
33:2,5,11
34:18
35:4
36:9,10,
14,15,19,
20,22,25
37:3,9
45:21
53:8,15,
19 63:6,
14,21
64:2
65:7,8
73:19
78:2,8,13
79:4

**trainings**
64:25
73:17

**transcript**
7:2,8,17

**transcripts**
103:12

**transmission**
16:22
34:14
48:10
95:15

**transmissions**
46:8
50:25

**transmit**
34:25
35:10
48:17

**treat**
66:25
73:12

**trial**
5:13,14
9:19
10:6,7

**truthfully**
8:25

**TSA**
59:21

**turn**
61:7 68:6

**turned**
47:14
48:16
82:13,23
83:2,4

**type**
9:24
11:25
15:22
24:9
29:18,21

44:24
45:4,5,6
67:12
68:21
70:2,18
72:22
73:3 96:2

**types**
27:19
29:11
64:7

**typical**
44:25

**typically**
35:13
80:25

—————

U

—————

**ultimately**
49:18
74:8

**uncooperative**
70:6

**undergraduate**
18:12

**understand**
6:15,20
7:20
8:10,15,
23 28:22
44:21
69:8 92:4

**understanding**
24:2 42:9
50:24
55:3 86:6

**understood**
24:14

36:4
44:17
45:22
52:20
55:12
58:5 62:4
83:10

**uniform**
46:18
47:22
48:12

**uniformed**
21:2

**unique**
8:20
83:21
102:15

**uniquely**
75:8,20

**unit**
49:12
66:17

**unit's**
49:13

**units**
92:17

**unreasonable**
58:3

**update**
66:20
68:16

**upkeep**
32:15
33:2
34:18

**usual**
5:7



**V**

variety
64:23

vary
50:3
80:11,13

varying
80:11

vehicle
48:14,15

vein
7:5

verbal
7:4 13:22
30:22
31:2,11
80:19,22,
23 81:2,
3,11,20

verbally
6:22 7:18
69:21
97:24

verify
21:2

version
23:23
24:6,7
36:17

versus
26:3 52:6
64:10
68:22
79:10
80:15

vicinity
56:9,21
58:22

videoconfer
encing
4:7

violation
47:6,10
91:3
99:13,19
100:19
101:13,15

violence
31:3
72:22
73:10
74:19
75:17,18

violent
30:7
55:23
56:5 69:9
70:6
71:23

volume
46:7
47:13

volunteer
54:18
56:13

vulnerabili
ty
83:21
102:15

vulnerable
75:8,20

**W**

wait
7:6,18
60:8,14
65:22
66:18
93:21

waiter
25:12

waiting
91:24

waive
5:20

wake
102:16

walk
64:5

walking
61:20
72:4

wandering
30:11
69:6
71:24
72:17

wanting
24:18

watching
77:20

water
45:17
84:9

waterways
36:24

wave
49:12

ways
30:3
81:23

weapon
10:7

week
22:16

weeks
14:10
22:18,21

weigh
86:23

wires
26:2

work
9:8,9
31:15
39:24
53:25
58:21
62:2

worked
23:11,12
31:5

worker
40:3,4

working
35:21

works
36:13

world
31:16

wraps
8:6

write
57:11

writing
97:25

written
25:22
27:21,23
35:15
98:2
100:18,22
101:9,10

**Y**

year
12:12
18:16

34:6,9

yearly
33:5
36:14

years
10:6
13:11
19:8
20:9,10,
17 23:9
27:13
39:23
73:14
98:25

York
4:5,19
18:13,24
23:6
101:16

**Z**

zoom
16:3

