# EXHIBIT X

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------x
ALEXEY V. TARASOV, ESQ., Administrator of the
Estate of EVGENIY LAGODA, Deceased, and GRIGORY
TIKHOPLAV,

                    Plaintiffs,

     -against-          Case No.:
                         1:21-cv-06226(NRB)
PORT AUTHORITY OF NEW YORK AND NEW JERSEY and
PORT AUTHORITY OF NEW YORK AND NEW JERSEY POLICE
DEPARTMENT a/k/a PORT AUTHORITY POLICE DEPARTMENT
a/k/a PAPD, PAPD OFFICER MICHAEL BUGIADA, PAPD
OFFICER ROBERT JOSEPH, PAPD OFFICER JONATHAN
PAPIA, PAPD OFFICER PAUL MEZZACAPPA, and PAPD
OFFICER JONATHAN DURAN,

                    Defendants.
-------------------------------------------------x

           REMOTE VIDEOCONFERENCE DEPOSITION OF

LIEUTENANT MARK BERGERY, a 30(b)(6) witness on

behalf of The Port Authority of New York and New

Jersey, one of the Defendants herein, located in

New York, New York 10007, taken by the Plaintiffs,

pursuant to Notice, held on Tuesday, February 13,

2024, at 10:01 o'clock a.m., before Deborah

Moschitto, a Shorthand Reporter and Notary Public

of the State of New York.



A P P E A R A N C E S:


        ASHCROFT LAW FIRM, LLC
                Attorneys for Plaintiffs
                200 State Street - 7th Floor
                Boston, Massachusetts 02109

        BY:     J. CHRISTOPHER AMRHEIN, JR., ESQ.


        PORT AUTHORITY OF NEW YORK AND NEW JERSEY
                Attorneys for Defendants
                4 World Trade Center
                150 Greenwich Street - 24th Floor
                New York, New York 10007

        BY:     CHERYL ALTERMAN, ESQ.


ALSO PRESENT:

        ALEXEY TARASOV, ESQ., Plaintiff
        (Partial session)


                        *  *  *



S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties hereto, that the filing, sealing and certification of the within deposition be waived; that such deposition may be signed and sworn to before any officer authorized to administer an oath; that all objections, except as to the form, are reserved to the time of the trial.

\* \* \*


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

M. Bergery

THE COURT REPORTER:  Hello.  My name is Deborah Moschitto.  I'm a Shorthand Reporter and Notary Public of the State of New York.

This deposition is being held via videoconferencing equipment.  The witness and reporter are not in the same room.  The witness will be sworn in remotely pursuant to agreement of all parties.  The parties stipulate that the testimony is being given as if the witness was sworn in person.

Do counsel so stipulate?

MR. AMRHEIN:  Yes.

MS. ALTERMAN:  Yes.

M A R K    B E R G E R Y, the witness herein, having been duly sworn by Deborah Moschitto, a Notary Public in and for the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. AMRHEIN:

Q.    Good morning, lieutenant.  I'm just going to go over a few introductory things before we get started and if you have



M. Bergery

been deposed before it may sound familiar. Otherwise I'll be happy to walk you through to get you prepared for what is to come here today.

MR. AMRHEIN:  Before I start, Cheryl, in terms of stipulations on the record, you know, could we -- would you agree to usual stipulations?

MS. ALTERMAN:  Yes.

MR. AMRHEIN:  Okay, and for the record that's all objections, except as to form, are going to be reserved until the time of trial, and all motions to strike are reserved until the time of trial.

Cheryl, I know typically it's 30 days, in terms of read and sign.  I'm happy waive Notary.  If you guys need more time, I'm happy to do that as well.

MS. ALTERMAN:  Okay.  Thank you.

Q.      Lieutenant, my name is Chris Amrhein, Jr.  I'm an attorney with Ashcroft Law Firm, and our firm represents the plaintiffs in this matter.  Today I'm going to be asking you a series of questions.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

M. Bergery

Before we begin, I'm going to go over, as I said, a set of introductory things just to lay kind of the ground rules, so to speak, for today's deposition.

First, if you can't hear one of my questions, please let me know and I'm happy to repeat it.

If you don't understand one of my questions, again, let me know and I'm happy to either repeat it or rephrase it. But if you do answer a question, I'm going to operate under the assumption that you did understand my question. Is that fair?

A.     Yes, sir.

Q.     If you could, please answer all questions verbally and avoid either shoulder shrugs or head nods or things that wouldn't be understood, colloquial conversation. It's just for the sake of the stenographer, so we can have a clean transcript. So if you can answer all questions verbally, we would greatly appreciate that.

In that same vein, if you could wait until my question is finished before



M. Bergery

answering the question, colloquial conversation, it's easy to anticipate where a question may be going and kind of talking over each other is fine, you know, when it's just outside of the deposition standpoint. But here, just for the sake of the transcript and to make the stenographer's job as easy as possible, if you could, just wait till I finish asking a question to answer it, and I'll do my best to let you finish answering the question before I start with my next question.  Do you understand that, sir?

A.     Yes, sir.

Q.     Finally, if you need a break, please let me know.  All that I ask is that if there is a pending question, I ask that you answer that before we discuss taking a break.

A.     Okay.  Yes, sir.

Q.     Do you have any questions about anything I've said so far?

A.     No, sir.

Q.     Do you understand that you're giving testimony under oath and that even



M. Bergery

though you're in an office, it's just as if you were testifying under oath in court?

A.    Yes, sir.

Q.    Do you understand that your responses are subject to the pains and penalty of perjury?

A.    Yes, sir.

Q.    And we ask this of everybody, I promise you this is not something unique to you or directed at you, we ask this of everybody:  Are you under the influence of anything that would impair your ability to understand my questions and answer my questions truthfully today?

A.    No, sir.

Q.    Could you please state your full name and address, and feel free to use your work address?

A.    Work address?  Okay.

Mark Bergery.  My work address is 241 Erie Street in Jersey City, New Jersey 07310.

Q.    Lieutenant, have you testified under oath before?



800.211.DEPO (3376)
EsquireSolutions.com

M. Bergery

A.      No, sir.

MR. AMRHEIN:  Just to start, I'm going to introduce what can be marked as Exhibit 1.  It's going to be the Re-Deposition Notice.  Just bear with me a second.  I'm going to bring it up.

(Re-Deposition Notice marked Bergery Exhibit 1 for identification.)

Q.      Sir, are you able to see that document on your screen?

A.      Yes, sir.

Q.      I'll of course scroll through this, but do you recognize this document?  At the top you'll see it says Re-Notice of Deposition.  It goes through definitions and then includes 30(b)(6) topics.

Sir, do you recognize this document?

(Scrolling.)

A.      Yes, sir.

Q.      Have you reviewed it before?

A.      Briefly.

Q.      Did you review this document in preparation for your deposition today?



M. Bergery

A.    Yes, sir.

Q.    How did you first become aware of this document?

A.    I became aware of this document when the lawyers for the Port Authority reached out for a representative from the Police Academy.

Q.    And when was the last time you reviewed this document?

A.    Last week.

Q.    Did you go over this document with your attorney?

A.    Yes, sir.

Q.    And when did you go over this document with your attorney?

A.    I'd say about two weeks ago.

Q.    Outside of that, did you speak with your attorney in preparation for this deposition?  I only need a yes or no there. Don't -- that would be privileged information, the topics about which you spoke, but did you speak with your attorney in preparation for this deposition?

A.    What exactly do you mean?



M. Bergery

Q.      I don't want you to say specifically, if anything, that you spoke about with your attorney.  I'm simply asking did you speak with your attorney in preparation for this deposition, outside of reviewing this 30(b)(6) Notice?

A.      Outside of it?

Q.      Yes, meaning additionally, set aside the 30(b)(6) Deposition Notice that's on the screen right now, did you speak with your attorney to prepare for this deposition?

A.      No.

Q.      Did you speak with anybody else, in preparation for this deposition?

A.      No, sir.

Q.      Did you let anybody know that you were being deposed today?

A.      No, sir.

Q.      What did you do to prepare yourself for today's deposition?

A.      Just looked up Police Academy training, policy and procedures in the past.

Q.      Lieutenant, are you aware that you are expected to testify regarding topics



M. Bergery

5, 6 and 12 today?  And 5 would be on the screen:  "The curriculum, training and tests at the Police Academy for the PAPD," which is the Port Authority Police Department, "including the contents of the same."

No. 6:  "The courses and training that PAPD officers are required to take by mandate of the Port Authority, the State of New York, and/or the Federal Government, including contents of the same."

And, 12:  "PAPD officer training manuals and employee handbooks."

MS. ALTERMAN:  Just note my objection.  We also lodged objections and limited the topics after this Re-Deposition Notice was issued, which is dated August 18, 2023.  We've had multiple correspondence and conversations since the date of this document.

So with that, I'll allow him to answer.

A.    Could you repeat your question?

Q.    Sure.  Cheryl's correct, numerous correspondences to meet and confer to narrow



M. Bergery

the specifics of the topics.  But are you aware that you're expected to testify regarding topics 5, 6 and 12 here today?

A.    Yes, sir.

Q.    Can you briefly describe your educational background after high school?

A.    After high school I went to college, received my Bachelor's and I got hired from the Port Authority.  I went back for my Master's, completed my Master's two years ago.

Q.    And where did you get your Bachelor's Degree in college?

A.    Albright College in Redding, Pennsylvania.

Q.    And did you also did you obtain your Master's from Albright, as well?

A.    No, my Master's is from Fairleigh Dickinson University.

Q.    Am I correct that you played football at Albright?

A.    Yes.

Q.    Sir, I already know the answer to this, but are you currently employed?


DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

M. Bergery

A.    I am.

Q.    And who is your employer?

A.    Port Authority of New York and New Jersey.

Q.    Am I correct that you're currently a lieutenant with the Port Authority Police Department?

A.    That is correct.

Q.    How long have you held that title, sir?

A.    I was promoted to lieutenant in June.

Q.    Congratulations, sir.

A.    Thank you.

Q.    Can you please describe your duties and responsibilities as a lieutenant with the Port Authority Police Department?

A.    Yes, sir.  As a lieutenant, we pretty much review the curriculum and we make sure all the necessary training is getting completed throughout, you know, anything that the Port Authority does, Police Academy training-wise, so fire, the range, the local training at Jersey City.  You know, obviously


DEPOSITION SOLUTIONS

M. Bergery

make sure we have the necessary manpower day in and day out.

And the main focus is to recruit curriculum and recruit training.  We deal with the recruit classes coming into the Police Academy in Jersey City, and then we mandate, everything gets done properly and within standards and guidelines.

Q.    Thank you, sir.

Prior to being -- to becoming a lieutenant, can you tell me what your title was?

A.    Police sergeant.

Q.    And how long were you a sergeant, sir?

A.    Two and a half years.

Q.    Similar question for your capacity as a police sergeant, could you tell me what your duties and responsibilities were as a sergeant?

A.    Yes.  Duties and responsibilities as a sergeant was, on the patrol level, supervising the police officers and the cops, doing roll calls, doing any type of



M. Bergery

administrative duties, make sure posting assignments, show what's completed, documenting roll call, billing out roll call posts, objectives.

And on the administrative side of things, we would also -- when I got transferred back to the Police Academy, we would make sure all the proper training was in compliance and our group curriculum was up-to-date.

Q.     Thank you, sir.

So I know you said approximately two and a half years, and I'm just trying to establish a timeline with respect to when you were a sergeant and I know you were recently promoted to being a lieutenant.

When did you become a sergeant? Do you recall the date, roughly?

A.     March 2021.

Q.     So prior to March 2021, sir, what was your title with the Port Authority Police Department?

A.     Police officer.

Q.     And did you have any titles



M. Bergery

before that?

A.     No, just a police officer.

Q.     Okay.  Can you tell me about your duties and responsibilities as a police officer with the Port Authority Police Department?

A.     My time was split between Newark Airport and the Police Academy.  On the patrol side of things, I was a police officer at Newark Airport.  Duties and responsibilities would be to everyday duties to the public, community service, any types of calls of service that come over at Newark Airport.

And in 2018, I got transferred to the Police Academy as a Police Academy instructor.  And at that time, as a Police Academy instructor in 2018, that's when I received training opportunities at the Police Academy.  So my duties and responsibilities was firsthand as a Police Academy instructor teaching the content and material to recruit training and in-service training.

Q.     Thank you, sir.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

M. Bergery

So between the years of 2018 and 2020, you were primarily located and working at the Police Academy as an instructor?

A.    Yes, sir.

Q.    So in terms of timeline, what year did you get your degree from Albright College?

A.    Albright was 2012.

Q.    You said you went directly to being employed by the Port Authority starting in -- after you graduated; is that correct?

A.    Two years.  I was hired by the Port Authority in 2014.

Q.    Okay.  So between graduation in 2012 and when you began with the Port Authority in 2014, can you just briefly tell me what you did in that two-year period?

A.    From 2012 to 2014, I was a high school football coach, substitute taught, personal trainer, a few other odd jobs while I was trying to get hired as a police officer.

Q.    Understood.  Thank you, sir.

So, Lieutenant, I'm going to ask



800.211.DEPO (3376)
EsquireSolutions.com

M. Bergery

you a series of questions about your training and experience, just to get some further background on you.

So when did you -- 2014, is that when you attended the Police Academy?

A.      The Port Authority Police Academy, yes, sir.

Q.      Okay.  Am I correct that's about 25 weeks of training?

A.      Yeah, 26 or so.

Q.      Do you recall the months that you were there in 2014?

A.      Yeah.  2014, I was there from March to August.

Q.      Generally, part of the curriculum, am I correct that it covers behavioral sciences, police practices and procedures, laws of arrest, court procedures, testimony, Rules of Evidence, kind of defensive tactics?

A.      Yes, sir.

Q.      Does it also cover internal investigations?

A.      You're saying recruit curriculum?



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

M. Bergery

Q.    Yeah.  So, for instance, if a lieutenant with the Port Authority is in charge of an internal investigation after a matter, is that something that has been taught to them at the academy, through a simulated investigation, or is that really a culmination of the knowledge they obtained at the academy and other mandated training to be able to investigate something?

MS. ALTERMAN:  Objection.  You can answer.  Are you asking about his training that he went through the academy, or just generally?

MR. AMRHEIN:  I can specify that question, Cheryl.  I'm happy to strike it and provide some more clarity to it.

Q.    When you were attending the academy, in your training, sir, did they teach about how to conduct internal investigations with the Port Authority?

A.    From what I remember, I don't think it was specific to the point.  I think it would pretty much be like an overview, but nothing specific during recruit curriculum



M. Bergery

training.

Q.    Okay.  Beyond that, am I correct that they taught first aid and police patrol and firearms training as well?

A.    Yes, sir.

Q.    I think you've answered this, but did you take any tests when you entered the Police Academy?

A.    Yes, sir.

Q.    Both written and physical demonstrations?

A.    Yes, sir.

Q.    Roughly, how often were you tested when you were at the academy in 2014?

A.    Weekly.

Q.    I'm going to go over some points of the curriculum to ask you about in terms of your training when you were at the academy.

When you were at the academy, did the curriculum include de-escalation techniques?

A.    Yes, sir.

Q.    What about diffusing techniques?



M. Bergery

A.    Yes, sir.

Q.    Restraining techniques?

A.    Yes, sir.

Q.    Use of force?

A.    Yes, sir.

Q.    Use of deadly force?

A.    Yes, sir.

Q.    Did they teach you about ground fighting techniques?

A.    Yes, sir.

Q.    Did they teach you about defensive tactics?

A.    Yes, sir.

Q.    I imagine that some of these overlap into general lesson plans, but do they teach you about positional restraints?

A.    During recruit training or you're still on recruit training right now?

Q.    Yes, sir.

A.    Yes, sir.

Q.    Just for the sake of a clear record, I'll just ask that one again:  When you were at the Police Academy, did they teach you about positional restraint?



M. Bergery

A.    When I was at the Police Academy, can you explain a little bit?  What exactly do you mean?

Q.    Sure.  When you attended the Police Academy, I'm trying to gather some background about the training that you received.  So when you were at the Police Academy in 2014, was a part of the curriculum, when you were there, about positional restraint involving subjects?

A.    Positional restraint, that was just imbedded in 2020, so when I was there as a recruit, that would not be the case for recruit training in 2014, the positional restraint that you just stated.

Q.    Okay.  Along those same lines, when you were there, was it part of the curriculum -- when you were at the Police Academy, was it part of the curriculum under which you learned and were trained, compressional asphyxiation?

A.    No, sir.

Q.    Do you know when that was -- was that also imbedded in 2020?



M. Bergery

A.    2020, yes, sir.

Q.    When you were at the Police Academy in 2014, did they teach you about dealing with subjects who were undergoing medical crises.

A.    Can you explain?

Q.    If you are an -- when you were at the Police Academy in 2014, was a part of the curriculum how to handle situations as an officer when a subject is dealing with a medical situation?

A.    Yes, sir.

Q.    Along those same lines, when you were at the Police Academy, was it part of the curriculum teaching prospective officers how to handle situations where a subject is going through a mental health crisis?

A.    Yes, sir.

Q.    Did they teach you about verbal strategies when engaging with subjects, when you were at the Police Academy in 2014?

A.    Yes, sir.

Q.    As a part of all those strategies, perhaps a separate lesson plan,



M. Bergery

did they teach you about active listening skills?

A.      Active listening in 2014?

Q.      Yes.

A.      Yes, sir.

Q.      Did they teach you about duties owed to civilians when you were at the academy?

A.      Duties?  Can you explain that a little bit?

Q.      Sure.  Officer duties when responding to a call, when you were at the academy, did they teach you about duties owed to civilians, in addition to, you know, subjects?

A.      Yes, sir.

Q.      Did they teach you, in the academy, about duties to intercede?

A.      Duties to intercede was integrated also during that 2020 period.

Q.      Okay.  When you were at the academy, sir, in 2014, did they teach you about the varying standards of care owed to a subject by an officer?



M. Bergery

MS. ALTERMAN:  Objection.  You can answer.

A.    What exactly do you mean by that? Would you be able to just explain?

Q.    Yeah, I'm happy to expand on that in a little bit.

I'm just curious, and I can ask a more specific question:  When you were at the academy in 2014, was part of the curriculum teaching you about the standard of care that officers must abide by?

MS. ALTERMAN:  Objection.  You can answer.

A.    What exactly do you mean by "the standard of care"?  For civilians you're saying?

Q.    The standard of care owed to subjects.

A.    Subjects, witnesses, everyone's treated completely equal, so the standard of care for a police officer is to make sure that everyone is treated completely equal.

Q.    Okay.  I'm going to kind of specifically ask about some of the things



M. Bergery

that we just covered, in terms of your time when you were at the Police Academy.

So when -- can you please tell me about what you were taught about diffusing techniques when you attended the Police Academy, sir?

A.     When I attended the Police Academy as a recruit or when I instructed?

Q.     When you were there in 2014, between March and August, as a recruit.

A.     You're asking for details in 2014 of what I was taught?

Q.     Yes, sir.  I understand that's some time ago, but if you can speak generally to it, I would appreciate that.

A.     I honestly do not think I remember everything word-for-word from 2014, the six months that I was at the Police Academy.

Q.     I don't want you to guess, but I don't want to hold you to verbatim what you were taught in terms of a lesson plan, but I'm just trying to get a general idea of what you were taught when you were at the academy



M. Bergery

with respect to diffusing techniques.

A.    I think basic communication and listening skills.

Q.    Could you tell me about -- again around the same time, between March and August of 2014, when you were attending the academy as a recruit, can you tell me about what you learned about restraining techniques?

And, again, I understand that this is some time ago, but can you just generally tell me about that?

A.    Restraining, you mean -- are you referring back to the positional restraints or are you saying restraining like basic handcuffing procedures?

Q.    I would say both, both basic handcuffing procedures as well as physically restraining an individual.

A.    At the recruit level, it was the basic handcuffing procedures that I would be able to remember at this time from 2014.

Q.    Okay.  In general, can you give me a brief overview of what those handcuffing



M. Bergery

procedures would be that you learned at the academy?

A.    Compliant handcuffing. Noncompliant handcuffing.  Pointing an individual out high threat.  Just different levels of handcuffing as a recruit.

Q.    Did they give you guidelines as to which level, where the threshold was to go from one level to the next?

A.    You're referring back to handcuffing?

Q.    Yes, sir.

A.    Yeah.  Yes, sir.

Q.    Do you recall at that time what they had taught you about, you know, basic handcuffing and then the jump to noncompliant handcuffing and a jump from noncompliant to, you know, I think you said prone handcuffing or other methods of restraining?

MS. ALTERMAN:  Objection to form. You can answer.

A.    What's the question on that?

Q.    Do you recall what they told you about how a situation, you know, what is the



M. Bergery

threshold, what is the escalation point between, say, a basic compliant arrest versus a noncompliant arrest where things require, you know, anything that you were taught at the academy.

A.    Whatever was objectively reasonable at the time to control the suspect.

Q.    In terms of "objectively reasonable," is that -- what was taught to you in terms of the level objectivity when you were at the academy?

A.    In what situation?

Q.    The situation in which you were restraining an individual.

MS. ALTERMAN:  Is this for a compliant or noncompliant individual?

Q.    I guess we can address compliant first, as well as noncompliant second.

A.    Yeah, whatever is objectively reasonable at the time.  If it's noncompliant, every situation is different, when you're there.  Somebody is not compliant, there are times when individuals



M. Bergery

turn around and you can easily place them in handcuffs.  If it transitions to noncompliant, then there is different situations.  Are you standing, are you kneeling, are you on the floor?

There is different levels. Whatever is reasonable at the time that the officer believes they are able to utilize, just to control the situation, to control the suspect.

Q.    Okay, thank you, sir.

In your time at the academy, when you were training as a recruit, can you generally tell me about what you were taught about use of force?

A.    Yes.  Use of force at the time, there was a continuum.  There are different levels of use of force.  So whatever is objectively reasonable with whatever situation the officer is in, they may use whatever level of force is reasonable at the time to control the situation and obviously to prevent any kind of harm to themselves or others.



M. Bergery

Q.    And in that same vein, can you tell me what you were taught about use of deadly force when you were a recruit at the academy?

A.    Use of deadly force during the academy stages back in 2014, that would just be strictly for, obviously, you know, deadly force would be using a firearm.  The range handled a lot of training on that throughout the six months.

Q.    When you were at the academy, was use of deadly force exclusively limited to use of a firearm or was there other methods of use of deadly force?

A.    Recruit training, I would say the use of the firearm was what was led to deadly force.

Q.    But nothing else?

A.    Not that I could recall at this time.

Q.    Okay.  I'm going to group a couple of these together.  I know we discussed ground fighting techniques as well as defense tactics.  Can you just tell me a



M. Bergery

little bit about what you learned when you were at the academy as a recruit with respect to defensive tactics?  Ground fighting techniques fall within those.

A.    At the recruit level, back in 2014, ground fighting techniques were very limited.  That was just pretty much certain restraints and ways to comply to get an individual from grabbing their hands.  The transition from ground fighting, which is what you just brought up now, is in the recent years, not in 2014.

Q.    Do you recall when -- I know I'll get to this a little bit later, but do you recall when those changes in defensive tactics or ground fighting techniques were implemented?  Is that something around 2020, like you had mentioned before?

A.    No.  I think, if I can recall properly, a few ground fighting techniques were implemented in 2018.

Q.    Could you tell me what you were taught about -- again, this is when you were at the academy as a recruit in 2014, could



M. Bergery

you tell me what you were taught about compression asphyxiation, any positional restraint?

A.      Well, I would refer back to that was in 2020.

Q.      Okay.

A.      And it was about training laws.

Q.      Could you tell me, again when you were at the academy in 2014, can you tell me what you were taught about handling situations where a person is having a medical event and you, as an officer, would be responding to that event?

A.      You're asking the same question, what we were taught in 2014 to any type of medical event?

Q.      Yes, sir.  If you recall any -- I'm not going to hold you to anything verbatim of course.  I understand that that was nearly ten years ago at this point, sir, but if you generally recall what lessons you learned when you were at the academy with respect to handling a situation where a subject is having a medical event.



M. Bergery

A.    Back in 2014, the recruit curriculum, when I was a recruit, that would be emergency medical response and CPR.

Q.    Okay.  As a part of the handling that type of situation, a person having a medical crisis, did they, when you were at the academy, teach you about active listening skills, diffusing a situation where a person may be in a medically vulnerable state?

A.    I would say recruit curriculum, it's very intertwined, so active listening I think, you know, is mixed in with a lot of different curriculums.

Q.    Okay.  Now, along the same lines of handling a situation where a person is having a medical crisis, did they also teach you, when you were at the academy, about -- as a recruit -- about handling situations where a subject is having a mental health crisis?

A.    Yes, sir.

Q.    And were there lessons, like you said, kind of intertwined with I think you had mentioned EMS and medical responses, as



M. Bergery

well as active listening and verbal strategies?

A.     Recruit curriculum back in 2014, I remember multiple classes specifically on mental health.

Q.     Do you recall how they taught you to approach a subject who was known to be having a mental health crisis?

A.     Tactically-wise?

Q.     Yes, sir.

A.     Yes, sir.

Q.     Can you tell me a little bit about that from the best of your recollection?

A.     Thinking back ten years ago, I would probably say it's probably pretty similar to what we teach right now:  Slow approach, communicate, listen, look for verbal cues, keep your distance, slow calming voice, you know, try to slow everything down and have a conversation.

Q.     Is that similar for somebody who may be going through a similar type of medical crisis?


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

                         M. Bergery

               MS. ALTERMAN:  Objection.

     Q.        Involving being in a mental --
mentally altered state?

               MS. ALTERMAN:  Objection.  You
can answer.

     A.        Can you just repeat?  I'm sorry.

     Q.        Sure.  Given your answer with
respect to how to approach a subject who is
having a mental health crisis, does that
involve -- do officers -- excuse me, are
officers taught at the academy, when you were
there, a similar approach to somebody who is
suffering a medical event where they are in
an altered mental state?

     A.        Yes, sir.

     Q.        Am I correct that you said when
you were at the academy, that the standards
of care were the same -- the officers'
standards of care owed were the same for
subjects, you know, witnesses and all people,
it's the same standard of care?

               MS. ALTERMAN:  Objection.  You
can answer.

     A.        Yes.  I would say that the level



M. Bergery

of care that is taught is to treat everyone equally.

Q.    Okay.  Sir, when you graduated from the Port Authority Police Department Police Academy in 2014, did you immediately begin working as an officer there or are there additional steps or set of steps that a graduate must take before beginning their office as an officer?

A.    Yes, sir.  Back in 2014, there was a two-week period of facility training.

Q.    Could you just briefly tell me what facility training is?

A.    At that time, I was at Newark Airport, so you get pretty much a tour around the facility, you know, where certain equipment is located, where the terminals are located, the parking spots; kind of like a brief overview of the stuff that you're going to be working at and responding at.

Q.    It's kind of an on-boarding procedure as to where you're going to be working and how things typically proceed there?



M. Bergery

A.      Yes, sir.

Q.      Do they still have that kind of facilities period, on-boarding period today or no?

A.      Yes, sir.

Q.      After that two weeks, is that when you begin, you know, at your post as a police officer with the Port Authority Police Department?

A.      In 2014, it would be.

Q.      How is that different say in 2019?

A.      2019 would be similar as well.

Q.      And what changed after that? What's the difference between how things are today versus the years of 2014 through 2019?

A.      Currently, today, there is a field training officer program.

Q.      How long is that, sir?

A.      Four weeks.

Q.      Is that right after graduation?

A.      Yes, sir.

Q.      Could you just briefly describe what that program's like?



M. Bergery

A.     So the first week or two weeks, depending on what facility you're at, whether you're at a ground transportation facility or an airport facility, it's similar to the two weeks that I received back in 2014.  So if you're at an airport, you get two weeks of facility training.  If you're at ground transportation, you get one week facility training and then you transition of getting observed for the additional two weeks or three weeks, depending on what facility you're at.  In total, it's four weeks.

Q.     Understood.  Thank you, sir.

Is that kind of a trial period?  Is that -- let me rephrase that.

I know you had mentioned kind of an observing period outside of the initial on-boarding kind of period, whether that's one week or two weeks, and then the complimentary two weeks or three weeks, depending on where you are, is that kind of a trial run period?  Is that another box you have to check in order to begin as a Port Authority Police Department officer now, or



M. Bergery

is graduation kind of the final checkpoint before you begin employment?

MS. ALTERMAN:  Objection.  You can answer.

A.    Graduation is the final check. There is no on-boarding period.  You know, you're holding a post as a police officer.

Q.    Okay.

A.    It's just an observational period.

Q.    Understood.  Thank you for the clarification.

A.    Yes, sir.

Q.    Upon graduation, am I correct that Port Authority Police Department officers are expected to retain the teachings and training lessons that they learned and were tested on at the academy?

A.    Yes, sir.

Q.    Upon graduation, am I correct that Port Authority Police Department officers are expected to be able to discuss and recite, not verbatim, but discuss the lessons and training they received at the



M. Bergery

academy?

A.    Yes, sir.

Q.    And that's like diffusing techniques and retraining techniques?

A.    So a yearly training that comes up, Police Academy-wise, there is a spring session and a fall session, so depending on what is coming up in the curriculum, depending on the topic, is decided on our general order.  And then also current trends that are happening nationally.

So the specific label of each curriculum comes up in the spring and fall and that's how it's decided upon.

Q.    Okay.  But, generally speaking, in terms of upon graduation, it's expected that officers are going to be able to recite, discuss, you know, the lessons that they had learned and were trained in when they attended the academy; correct?

A.    Yes, sir.

Q.    As a part of the -- for lack of a better phrase, "upkeep of the training and lessons learned at the Police Academy," do



                        M. Bergery
officers go through mandatory in-service
training?

     A.     Yes, sir.  That's what I was
referring to, in-service training.

     Q.     I had figured that, sir.  And
that was perfect timing because it was coming
up.

            But is it -- I heard it referred
to as ISTs.  Are you familiar with that term?

     A.     Yes, sir, in-service training.

     Q.     If I refer to ISTs moving
forward, we have an agreement that's
referring to mandatory in-service training?

     A.     Yes, sir.

     Q.     So prior to being promoted as
lieutenant, I know you were sergeant and
before that you were a police officer, let's
say starting as a police officer, did you
complete mandatory ISTs?

     A.     Yes, sir.

     Q.     When you were sergeant, were you
also required to complete the ISTs?

     A.     Yes, sir, all members of the
force.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

                              M. Bergery

Q.     How about -- I think that answers my next question:  In your capacity as a lieutenant, you're also required to complete the ISTs?

A.     Yes, sir.

Q.     Do you know who or what -- whether it's the Port Authority Police Department or local government or Federal Government, do you know who or what mandates the ISTs?

A.     I would refer to it as our general orders, so the way it works is the Port Authority would look at the guidelines from the State of New Jersey and the State of New York.  They look at the two guidelines.

However, we fall underneath both, so it's pertaining to our general order of how frequent the in-service training IST will come up, whether that's yearly, whether that's twice a year, one time a year, every three years, the general order recites that.

Q.     So I know that kind of covered it, but, generally speaking, could you just kind of touch on how often the ISTs are


ESQUIRE
DEPOSITION SOLUTIONS

                        M. Bergery

required to be completed?

           I know you said the general

orders can go over in a three-year period

cycle, but in terms of tests, how often are

police officers -- strike that.

           I know all officers, lieutenants,

sergeants, are all treated the same as far as

ISTs.  How often are Port Authority Police

Department employees tested with ISTs?

     A.     So there's a spring semester and

there's a fall semester.  So for the spring,

you get one range day and then you get one

classroom day.  Same thing with the fall, one

range day, one classroom day.  So,

technically, four times a year.

     Q.     Okay.  And roughly, how often

would a range day be?

     A.     Eight hours.

     Q.     Is it eight hours for a classroom

day as well?

     A.     Yes, sir.

     Q.     And when you're on the range,

does that cover anything beyond shooting?  Is

it tactical formations, communication,



M. Bergery

general response, or can you tell me a little bit about the range sessions, over the course of those general eight hours?

A.     Absolutely.  So pertaining back to the general orders, which I said depending on what the general orders state how often it comes up, we will look at there is two 8-hour days, there is a classroom day and then there is the range day.

Depending on the availability and what courses are coming up for that spring or fall semester, that's when we decide what classes are going to be taught with the range day and then also with the classroom day.

Q.     Okay.  In terms of the general orders from which you decide what is going to be taught, with respect to the general orders are they typically reactive to what's going on around the country, what's going on recently within the Port Authority Police Department?

A.     When referring to the general orders, that's whatever's mandated by the two states, but that doesn't change.  So, for



M. Bergery

instance, so use of force, use of force is taught twice a year.  So depending on the time that we have in that 8-hour block, we decide whether the use of force is going to be taught at the range day or the class.

Q.    And so any policies that would be put into the general orders are policies put in place by the other states, whether that's New York or New Jersey?

A.    So we teach through our general orders.  So that wouldn't be on my side, on the Police Academy side.  That would be on the headquarters decision.  But we teach through our general orders, so whatever the general orders state, that's what we abide by.

Q.    Okay.

MR. TARASOV:  I apologize, this is Alexey Tarasov speaking.  I will disconnect at this point.

MR. AMRHEIN:  Alright, Alexey, thank you for letting us know.

And for the record, plaintiff Alexey Tarasov is going to be hopping off the



M. Bergery

call, so if you had need a facilities break or anything at this point, this would be, of course, a good time.  But otherwise I'm happy to continue.

MR. TARASOV:  Thank you.

(Mr. Tarasov leaves the Zoom meeting.)

MS. ALTERMAN:  We are okay to continue, Chris.

MR. AMRHEIN:  Sorry, I didn't hear that over the sound of Alexey jumping off.

Q.    Sir, we went over a number of topics with respect to the training that you received when you were at the Port Authority Police Academy in 2014 as a recruit.  Were those topics generally covered in ISTs?

A.    The recruit curriculum, are they covered in IST?  Is that your question?

Q.    Yes, sir.  And I'm happy to go through each individually if you'd like.

A.    I wouldn't know them exactly. However, most of the topics are covered that are mandated.

 ESQUIRE
DEPOSITION SOLUTIONS

M. Bergery

Q.    So say in the years leading up to 2019, do you recall having ISTs with regard to -- that covered de-escalation techniques and diffusing techniques?

A.    Yes, sir.

Q.    And as a part of those ISTs, did it cover a time to assess and calm the situation and provide reassurances that officers are there to help a subject?

A.    In what curriculum are you referring to?

Q.    The ISTs in the years leading up to 2019.

A.    Yes, sir.

Q.    Did it also talk about moving slowly and reducing environmental distractions?

A.    Can you explain?

Q.    As a part of the ISTs, in the years leading up to 2019, do you recall having lessons within the ISTs about de-escalation, diffusing techniques that included directions to move slowly and reduce environmental distractions?



M. Bergery

A.      Yes, sir.

Q.      In the years leading up to 2019, do you recall having ISTs involving restraining techniques?

A.      Restraining techniques specifically?  Can you explain?

Q.      Sure.  I know we broke it up into parts a little bit before.  So do you recall having ISTs in the years leading up to 2019 with regard to, let's say, compliance arrests, in terms of restraining techniques?

A.      That's a little specific.  In that time period, during IST, I do recall we had a baton refresher, you have use of force refreshers.  So that could have been intertwined.

Q.      Okay.  Did they also have use of deadly force refreshers?

A.      Yeah, at the time, deadly force and non deadly force twice a year.

Q.      And do you recall anything, you know, in the years leading up to 2019, when you were at your post as an officer, do you recall any of the teachings about use of



M. Bergery

force during ISTs differing from what you learned at the academy?

A.    From 2014 to 2019?

Q.    Yes, sir.

A.    No, sir.

Q.    Between, in the years leading up to 2019, did they teach you about -- during ISTs, did they teach you about defensive tactics and ground fighting techniques?

A.    During IST?

Q.    Yes, sir.

A.    It was strictly the use of force.

Q.    Okay.  During ISTs, did they have any classroom sessions about positional restraint or compressional asphyxiation, in the years leading up to 2019?

A.    At that time, no.

Q.    Did they teach you, during the ISTs, in the years leading up to 2019, about hindering and approaching subjects who have been experiencing medical crises and mental health crises?

A.    Yes, sir.

Q.    And I think we already covered



M. Bergery

this a little bit before, and they may be intertwined, like you had said I think on several occasions here today, but specifically with the ISTs, in the years leading up to 2019, was a part of that curriculum there about verbal strategies and active listening skills?

A.     I would have to look at it specifically, but we do -- we always had some type of verbal encounters.

Q.     And that would be at the -- is that something that you believe would be tested once a year, twice a year, once every three years, to the best of your recollection?

A.     For?

Q.     For verbal strategies, active listening skills, these type of techniques.

A.     Mental health is yearly.

Q.     Okay.  And in the ISTs, do they teach you about -- in the years leading up to 2019, did they teach you about intervention strategies, duties to intercede?

A.     At what timeframe was that?



M. Bergery

Q.      In the years leading up to 2019.

A.      Could you explain the question one more time?

Q.      Sure.  In the years leading up to 2019, did the ISTs cover duties to intercede and intervene?

A.      When you say "intervene" and "intercede," it was implemented in 2020.

Q.      Did they teach you in the ISTs, in the years leading up to 2019, about the standard of care?  I know you had said previously that the standard is consistent across individuals, witnesses and subjects. Did they teach you that during ISTs as well as the academy?

A.      Would you be able to explain what type of instruction or curriculum would standard of care come up in?

Q.      Sure.  Generally, in responding to an individual, whether it's -- if it's an individual subject is having a mental health crisis or an individual subject is simply resisting arrest or, you know, I think, and please correct me if I'm wrong, but I believe



M. Bergery

you had testified that the standard of care owed to an individual is consistent regardless of the situation?

A.    Depending on what the situation is, yes; correct.

MS. ALTERMAN:  I just want to make sure the record's clear:  You're saying correct to his question, not that you were specifically trained on it in IST?

THE WITNESS:  Yes.

MR. AMRHEIN:  Okay.

Q.    So upon completion of a given IST, Lieutenant, did you receive a certificate to indicate you completed the course?  Could you just tell me a little bit about, you know, what is the process of verifying that an officer or a sergeant or lieutenant or any rank actually completed the mandatory ISTs?

A.    Yes.  It would be an attendance tracker and then each block of instruction that we're talking about for IST, it includes any tests.

Q.    So is that test -- is there a



M. Bergery

requisite score that's required to -- that a person's required to achieve in order to pass that given IST?

A.    Yes.  70 percent or higher.

Q.    Is an officer or sergeant or any rank, is the person allowed to take that test as many times before achieving that 70 percent or better score?

A.    They take it the day of and it's a one-time test.

Q.    What is the consequence if somebody does not achieve a 70 percent score?

A.    Remedial training.

Q.    What is remedial training, just briefly?

A.    Remedial training is any time in a recruit curriculum or a police officer setting, there's additional training needed remedially.

Q.    Are there tests at the end of remedial training?

A.    Yes, sir.

Q.    Is your understanding that that's ultimately the goal of remedial training, is



M. Bergery

to give the person the requisite knowledge that they would have learned in the IST?

A.    I think the individual receives the knowledge in the IST to pass the course.

Q.    As a part of your training when you were at the academy, when you were a recruit or as an officer taking the ISTs, did any of your training involve materials from the National Safety Council?

A.    National Safety Council, yes, sir.

Q.    Could you tell me what that is?

A.    The National Safety Council is the curriculum that was in place for the emergency medical response.  So this training is given to physical trainers, any civilians, some teachers, paramedics, EMTs, firefighters, police officers.

The National Safety Council is something that is directed throughout the entire country, and it's really driven towards any type of basic first responder. It could be given to teachers, physical therapists, physical trainers, firefighters,



M. Bergery

police officers, so it's a national policy and procedure.

Q.    Okay.  So were officers of the Port Authority Police Department, say in the years leading up to 2019, given materials from the National Safety Council?

A.    Yes, sir.

Q.    And could you just tell me about the distribution?  Is that something that's given out yearly, is that something that's covered and given out at ISTs?  Can you describe how those materials are distributed?

A.    Yes, sir.  So there is levels to basically emergency response training.  So blood one pathogens is yearly.  CPR is every two years.  And then there is other things that are incorporated which would be review of the medical bag and whatnot.  So it could be yearly.  It could be multiple times a year.

That information is disseminated through in-service training so the documentation is distributed at the Police Academy, whenever that in-service training



                              M. Bergery

comes up.

     Q.      Okay.  And so do you recall if it
was like a Microsoft Word document or a set
of PowerPoint slides; do you recall what
those materials were like, sir?

     A.      From the National Safety Council?

     Q.      Yes, sir.

     A.      It's a very thick binder.

     Q.      So it was a lot?

     A.      Yeah.  I specifically remember
that. . Every medical response person at the
Police Academy at that time enjoyed printing
out the entire very thick binder and giving
it to us.

     Q.      And as a part of your duties and
responsibilities, as a part of an officer's
duties and responsibilities with the Port
Authority Police Department, were they
responsible for understanding the materials
within the National Safety Council documents
that were distributed on a yearly basis?

          MS. ALTERMAN:  Objection.  You
can answer.

     A.      Yes, sir.



800.211.DEPO (3376)
EsquireSolutions.com

                        M. Bergery

            MR. AMRHEIN:  I'm going to
introduce two documents, just very briefly,
sir, so just bear with me a moment while I
bring these up.  Let me know whenever that's
on your screen, sir.

            THE WITNESS:  It's up.

            MR. AMRHEIN:  Okay.

    Q.      Is this type of document familiar
to you, sir?

    A.      Yes.  That is the National Safety
Council.

            MR. AMRHEIN:  I'm going to mark
this as Exhibit 2.

            (Altered Mental Status slides
        marked Bergery Exhibit 2 for
        identification.)

            MS. ALTERMAN:  Could you identify
the Bates numbers for this document.

            MR. AMRHEIN:  Yes.  So this is
Bates stamped PA, as in Port Authority,
PA-2064 through 2068.  And this is a National
Safety Council PowerPoint slide, and it's a
set of slides.  The title of this set is
"Altered Mental Status."



M. Bergery

Q.    Sir, am I reading that correctly?

A.    Yes, sir.

Q.    So I'm just going to bring your attention to the bottom of PA-2064.  Am I correct that this says, "Copyright 2016, National Safety Council"?

A.    Yes, sir.

Q.    And would that be materials that had been distributed in 2016 or at some point before 2019?

A.    Yes, sir.

Q.    I'm going to direct your attention to PA-2065, sir, "Altered Mental Status," am I correct that that's the heading on this particular slide?

A.    Yes, sir.

Q.    And am I correct that the second bullet point says, "Patient may be confused, disoriented, combative, drowsy or partially or wholly unresponsive;" did I read that correctly?

A.    Yes, sir.

Q.    I'm going to go to PA-2066.  Am I correct that the title of this particular



                          M. Bergery

slide is, "Common Causes of Altered Mental

Status"?

         A.      Yes, sir.

         Q.      Is the first bullet point under,

"Common Causes of Altered Mental Status" on

this document, PA-2066, "Seizures"?  Did I

read that correctly?

         A.      Yes, sir.

                 MR. AMRHEIN:  I'm going to

introduce another document, sir, so, again,

just bear with me for a second.  Let me know

whenever that's on your screen, sir.

                 THE WITNESS:  That's up.  That's

the National Safety Council again.

         Q.      Am I correct that this set of

slides, which is PA, as in Port Authority,

2086 through 2095, and this set of slides is

entitled, "Seizures"?

         A.      Yes, sir.

         Q.      And like the previous set of

PowerPoint slides on altered mental status

that I had just introduced as Exhibit No. 2,

I'm going to mark this as Exhibit No. 3.

                 (Altered Mental Status slides



800.211.DEPO (3376)
EsquireSolutions.com

M. Bergery

marked Bergery Exhibit 3 for identification.)

Q.     And like that Exhibit No. 2, am I correct that in the bottom left-hand corner, the first page of this set says, "Copyright, 2016, National Safety Council"?

A.     Yes, sir.

Q.     And as I had asked about the first set of slides, which was Exhibit No. 2, for this Exhibit No. 3, given that it's copyright 2016, is this a set of slides that would have been distributed in 2016 or in the subsequent years after that, before 2019?

A.     Yes, sir.

Q.     Sir, I'm going to direct your attention to PA-2083, which is the second page.  Am I correct that this document -- this second page is titled, "Seizures," as well?

A.     Yes, sir.

Q.     Am I correct that the third bullet point on this page says, "Results in altered mental status/uncontrolled muscular contractions"?



800.211.DEPO (3376)
EsquireSolutions.com

M. Bergery

A.     Yes.  So same as the previous PowerPoint that you just showed.  The National Safety Council is utilized for police officers.  It's just an aid to identify any type of illnesses that may be going on so you can refer the information back to the desk and have an idea of exactly what medical condition is in place of the situation that's in front of them.

Like I said before, the National Safety Council is taught to multiple civilians, and if you look through a lot of these slides, it documents and it refers back to if you need any additional assistance, to call law enforcement.  So you can definitely tell that the National Safety Council is geared towards any civilians ranging from EMTs, paramedics, teachers, physical therapists, police officers, firefighters.

Q.     Understood.  And I appreciate that, sir.

Just in particular, I just -- am I correct that these materials were distributed -- that you testified that these



M. Bergery

materials were distributed to Port Authority Police Department officers on a yearly basis?

A.    Correct.  To be utilized as a training aid to identify any type of illnesses, if they have any types of services that may be pertaining to these symptoms.

Q.    Thank you, sir.

So am I correct that the third bullet point here says, "Results in an altered mental status/uncontrolled muscular contractions;" did I read that correctly?

A.    Yes, you read that correctly.

Q.    And the fourth PowerPoint, am I correct that it says, "Rarely life-threatening, but a serious emergency; did I read that correctly?

A.    Yes.

Q.    And for the record, this is PA-2083, materials that were distributed in 2016, and this particular slide is entitled, "Seizures."

I'm going to direct your attention to PA-2093, sir.

MS. ALTERMAN:  Just note my



M. Bergery

objection to the colloquy.

Q.    Sir, am I correct that this says, at the top of the page it's entitled, "Emergency care for seizures;" did I read that correctly?

A.    Yes, sir.

Q.    I'm just going to read the second to last bullet point.  Am I correct that it says, "Don't restrain patient."  Did I read that correctly?

A.    Yes, sir.

Q.    Okay.  Sir, when you were an officer -- I should say when you started out with the Port Authority Police Department as an officer in 2014, did you receive an employee manual from the PAPD?

A.    No.

Q.    Have you ever received an employee manual from the Port Authority Police Department?

A.    A manual?

Q.    Yes, sir, an employee handbook, employee manual.

A.    No, sir.



M. Bergery

MR. AMRHEIN:  I'm going to introduce what's going to be marked as Exhibit No. 4.

(Document marked Bergery Exhibit 4 for identification.)

Q.    Let me know whenever that's on your screen, sir.

A.    It's up.

Q.    Okay.  So at the top, you'll see it says the case number, the docket number, it says document number, date of filing and the page number.  First is Exhibit A, but I represent to you, sir, that after the initial Summons here, that once you get to what is page 12 of 32, that it says, the beginning of the First Amended Complaint?  Did I read that correctly; sir?

A.    Yes, sir.

Q.    Do you recognize this document?

A.    Not at this time.

Q.    Are you familiar with what a Complaint is, sir, just generally?

A.    Yes, sir.

Q.    Do you recall reviewing a



M. Bergery

Complaint that was filed in this lawsuit?

A.    Yes, sir.

Q.    Do you know when you reviewed the Complaint from this lawsuit?

A.    Like I stated before, when I was contacted, when our lawyers were looking for a Police Academy representative.

Q.    Okay.  And did you review this document, this Complaint, the First Amended Complaint, did you review this document in preparing for today's deposition?

A.    Yes, sir.

Q.    Did you go over this document with your attorney?

A.    Yes, sir.

Q.    Do you recall when you went over this document with your attorney?

A.    About two weeks ago.

Q.    Sir, are you familiar with any of the individuals who are named as defendants in this matter?  I'll direct your attention to this portion which identifies the defendants listed.

A.    Yeah, there is 2200 officers in



M. Bergery

our department.  The names are always familiar because of my time at the Police Academy.  But specifically, just familiar with the names.

Q.    So do you have a personal relationship with any of the individuals who are named in this complaint?

A.    No, sir.

Q.    So besides potentially encountering some of these officers in your capacity as somebody who worked at the Police Academy, you don't have a working relationship, like a partner or working a case with any of these named defendants?

A.    No, sir.  Two different facilities.

Q.    Understood.  Thank you, sir.

Lieutenant, I'm going to ask you a series --

MR. AMRHEIN:  I'll stop sharing my screen here.

That will be, I believe said marked as Exhibit No. 4; is that correct, Deborah?



M. Bergery

THE COURT REPORTER:  Yes.

MR. AMRHEIN:  Thank you.

Q.    Sir, I'm going to ask you a series of questions about the PAPD Police Academy training curriculum.  I know before I went over some things and it's going to sound familiar, but that was specific to your training that you experienced when you were there as a recruit in 2014.  I'm going to ask you general questions about the curriculum.  Is that okay?

A.    Yes, sir.

Q.    So at the outset I'm going to ask questions about prior to April 12, 2019, so any of these questions that are coming are for prior to April 2019.  So the window of time would be 2014 through 2019.  Do you understand that, sir?

A.    Yes, sir.

Q.    So prior to 2019, did the Police Academy curriculum include diffusing techniques?

A.    Prior to 2019, "diffusing," are you referring to de-escalation?



M. Bergery

Q.      Yes, sir.

A.      Yes, sir.

Q.      And it includes a variety of restraining techniques, including arresting, as well as handling situations where a person may be noncompliant as well as the physical act of restraining; am I correct that the curriculum between 2014 and 2019 included those materials?

A.      Yes, sir.

Q.      It included use of force; correct?

A.      Yes, sir.

Q.      As well as use of deadly force?

A.      Yes, sir.  At that time, the general order was still split.

Q.      It included handling situations where a subject is having a medical crisis or a mental health crisis; is that correct?

A.      Yes, sir.

Q.      And I'm sure this may have some overlap with de-escalation or diffusing techniques, but did that curriculum at that time include verbal strategies and listening



M. Bergery

skills?

A.    Yes, sir.

Q.    It included the standard of care that we had discussed earlier today, sir?

A.    Specifically what exactly are you -- are you referring back to the standard of care that we spoke about before?

Q.    Yes, in terms of the standard of care that you testified to earlier, which is, if my understanding is correct from your testimony, that the standard of care by officers to individuals, whether it's witnesses, subjects, is consistent, was that standard of care part of the curriculum between 2014 and 2019?

MS. ALTERMAN:  Objection.  You can answer.

A.    Like I said before, I don't think it was specific to standard of care, but it was intertwined with multiple curriculums.

Q.    Okay.  And just you don't have to get into specifics if you don't recall, but in the years prior to 2019, in terms of teaching lessons at the academy, the



M. Bergery

curriculum, what would the standard of care be intertwined with?

A.      There is a lot of different curriculum that would pretty much come out. Like I said, there were two classes each spring and then fall.  So there was verbal encounters, mental illness encounters, de-escalation training.  There is a lot of different things that come -- you know, that come every fall or spring, whether it's ethics and stuff like that, so that would be intertwined with those topics.

Q.      Okay, thank you, sir.

Can you please tell me about what was taught about diffusing techniques at the Police Academy prior to April 12, 2019?

A.      Are you referring to de-escalation again?

Q.      Yeah, diffusing, de-escalation, my apologies.

A.      So de-escalation should be utilized, that's the number one point of de-escalation, is it should always be utilized when there is not an immediate



M. Bergery

threat to the public or the officer.  So as long as the situation is controlled and there's no threat to anyone who's in the vicinity, then you should slow everything down, de-escalation wise, keep your distance, which would be anywhere from 3 to 6 feet, try to have some distance away from that individual and slow everything down, nice calming tone, have a conversation, see if there is any type of resources that you can call to get dispatched to that scene.

Q.    Thank you, sir.

Would you agree with me that it's a point of emphasis to use diffusing techniques when a subject is having a medical crisis or a mental health crisis?

MS. ALTERMAN:  Objection to form. You can answer.

A.    Can you just explain that one more time?  I apologize.

Q.    Sure.  I can recite that again.

Sir, would you agree with me that it is a point of emphasis, as a part of the curriculum at that time, to use diffusing



M. Bergery

techniques, de-escalation techniques, when a subject is having a medical crisis or a mental health crisis?

MS. ALTERMAN:  Objection.  You can answer.

A.    I would say what's the severity of the circumstance?  What's the of the circumstance is what we teach, and what we were taught from 2014 up to 2019, take the totality of the circumstance in front of you and see if you can resort to de-escalation. Like if an individual is combative and everything may change.  A de-escalation is taught in that matter depending on what the situation gives you.

Q.    Okay.  As a part of, as you say what you were taught, so what you were taught, would that be a culmination of a number of things, including -- I should say what an officer is taught, would that be a culmination of things, including what was taught at the academy, what's taught in ISTs, as well as materials distributed from, say, the National Safety Council?



M. Bergery

A.    Yes, sir.

Q.    Could you please tell me about what was taught about restraining techniques in the various levels of restraining at the Police Academy, prior to April 12, 2019?

A.    Prior to April 12, 2019, so I would refer back to what I spoke about before, specifically restraining would be different levels of handcuffing.  I know we had a baton refresher in there.  There are certain restraints that you can utilize at the time, which is pressure points and stuff like that.

But there is different levels of restraints throughout the curriculum in training for in-service.

Q.    In addition to teaching about lawful restraining techniques at that time, during that time period, are unlawful restraining techniques taught as well?

A.    Unlawful?

Q.    Yes, sir.

A.    No, sir.

Q.    So they only teach you a certain


ESQUIRE
DEPOSITION SOLUTIONS

M. Bergery

set of restraining techniques, so you exclusively -- is an officer exclusively required to use only those that are taught and, therefore, extrapolate that anything outside those teachings are not appropriate?

A.      So for the Port Authority Police Department, we teach to the general order. So as long as the officer is abiding by the general order, it's objectively legal for that officer at that time, that's what they are allowed to use, whether you're restraining or any type of tactics that you're using.

Q.      And if you're using a tactic outside of what's in the general order, is that a violation of the code and the teachings of the general order in the Port Authority Police Department?

MS. ALTERMAN:  Note my objection. You could answer.

A.      So the general order documents, the level of force amongst the matrix where, back in the day, it was a continuum, when I was a police officer from 2014 to 2019, now


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

M. Bergery

it transitioned to a matrix, but as long as
you're staying within the appropriate levels
of force, the general order will cover you.

Q.    And the general order does not
cover those who exceed what is covered in the
general order; is that correct?

A.    Could you explain that?  I'm
sorry.

Q.    Sure.  If the general order sets
boundaries for officer action, if those
boundaries are exceeded by an officer, is
that therefore the officer would be violating
the general orders in that given situation?

A.    In that situation, yes.  During
the curriculum training for in-service, there
would be current trends where we would
hire -- you know, there are jobs across the
country to become officers and also their
job, you know, just referencing back to it.

Q.    Okay.  Thank you, sir.

In terms of restraining
techniques, between 2014 and 2019, are these
techniques delivered physically are they
verbally relayed orally or in written form?



M. Bergery

A.      In that timeframe, from 2014 to 2019, I do remember that we had a baton refresher.

Q.      That would be something that would be physical?

A.      That was physical; correct.

Q.      And other restraining techniques would either be verbally relayed or in written form?

A.      Only if it was covered in the use of force for verbal encounters or whatever that specific instruction that was given for spring or fall.

Q.      Okay.  So if something had not been covered by the ISTs or as a part of the curriculum at the Port Authority Police Department in that timeframe, 2014 to 2019, officers wouldn't be expected to know something that's outside of the curriculum; correct?

A.      Correct.

Q.      So if it's not covered, they're not expected to know it?

A.      Correct.  You would revert back



M. Bergery

to your recruit training.

Q.    And if it's not in the recruit training, what happens then?

A.    If it's not in the recruit training, then it's not mandated.

Q.    Okay.  Could you please tell me what was taught about -- just generally, about use of force at the Police Academy, between 2014 and before April 12th of 2019?

A.    What was specifically taught?

Q.    If you don't remember specifics, you can generally give me what was taught about any escalation factors or duties and responsibilities of an officer in terms of using force.

A.    So at that time the use of force, non deadly force was split, it was 100-4 and 100-5.  Currently now the general order is combined, but the documentation would be similar, which it would obviously list the levels that the officer could utilize and what the officers could use and what the officers could not use.

Q.    Am I correct that the -- before I



M. Bergery

start with that question, do you recall when the segmenting of use of force and use of deadly force was removed and the two were combined in the general order?

A.    I'm sorry, can you repeat?

Q.    Sure, I can rephrase that.

Do you recall when the use of force and use of deadly force was combined in the general order?

A.    When 100-4 and 100-5 was combined into one order?

Q.    Yes, sir.

A.    Not specifically.  I think it was 2020 or 2021.

Q.    Okay.  Now in terms of use of force, and this is again in your time -- in the time PAPD at the academy prior to April 12, 2019, am I correct that the use of force is different when a subject is having a medical crisis or a mental health crisis?

A.    Use the force is different?

Q.    Yeah, would the steps be -- am I correct that the steps, in terms of using force as an officer, would be different in



M. Bergery

the scenario where a subject is having a mental health crisis or a medical health crisis?

A.     No, sir, it's not different.

Q.     Does the PAPD teach its officers to use the least amount of force necessary to bring a situation under control?

A.     The least amount of force? Whatever level of force is reasonable at the time to control the situation.  That's how the Port Authority teaches it.

Q.     So between 2014 and April 12, 2019, the PAPD didn't teach its officers to use the least amount of force necessary to bring a situation under control?

A.     So you would want to -- so at that time, there was a continuum and then it transitioned into a matrix.  So the continuum kind of had you use the least amount of force that's necessary to control the situation where it was a step-by-step process.  Then it transitions into a matrix, which a matrix, you stand in the middle and whatever level of force is objectively reasonable which would



800.211.DEPO (3376)
EsquireSolutions.com

M. Bergery

control the situation, that's what the officer is allowed to use.

So it's a combination of the two.

Q.    Okay.  Sorry, I didn't mean to interrupt you.  Do you recall the date of the transition to the matrix?

A.    That would -- I think that was right around 2019.

Q.    Okay.  Do you recall when in 2019?

A.    Not specifically.

Q.    Could you please tell me what was taught about compressional asphyxiation at the Police Academy prior to 2019?

MS. ALTERMAN:  Just note my objection.  He's testified already that there was no training or ISTs on compressional asphyxiation until 2020, 2021.

Q.    Okay, sir; is that correct?

A.    That is correct.

Q.    Sir, between 2014 and 2019, before April 12, 2019, am I correct that the Port Authority Police Department officers were prohibited from sitting, kneeling or



M. Bergery

standing on a subject's torso?

A.    That was put in the same timeframe, 2020.

Q.    So 2020?  Okay.

I just have a few questions in terms of de-escalation or diffusing or verbal strategies in that timeframe, between 2014, when you were an officer or at the academy, I should say, to April 12, 2019.

Can you please tell me what strategies were taught with regard to determining that a subject doesn't speak English and what strategies were taught in order to communicate and effectively handle a subject who doesn't speak English?

A.    Specifically from 2014 to 2019, we had hotlines, communication hotlines, via the Port Authority, so you have those contact numbers you could reach out if you need to translate, refer back to the desk and try to get someone on the phone to communicate. That was typically the go to resource from 2014 to 2019.

Q.    Okay.  And -- but in terms of



M. Bergery

identifying whether or not a person does speak English, can you tell me about the PAPD or IST lesson plan in place between 2014 and 2019, in terms of strategy or identifying whether a subject is understanding any orders because the subject doesn't speak English?

A.    Yeah.  The interactions are, you know, they remain the same, whether it's recruit training or in-service training.

First you get on scene, you call for service, you announce yourself, state your name, Port Authority Police, Lieutenant Mark Bergery.  You state your name and use some type of verbal Judo and have a conversation with that person, and that pretty much stays across the board.

And then you would go into realizing that, obviously, that person is not able to communicate back and forth with you so there is a language barrier.

Q.    Sir, I'm going to ask you a couple of questions about after 4/12/2919.  I know that series of questions was between 2014 and April 12th of 2019.  So now just a



M. Bergery

couple of questions after.

I know, of course, a couple of things that changed that you had already testified to, but did the academy, or any of the ISTs, begin teaching about the uniquely vulnerable state of subjects suffering from mental -- medical crisis or mental health crises after April 12, 2019?

MS. ALTERMAN:  Just note my objection.  This witness' testimony was specific to the date of the incident and prior to the date of the incident.  So any testimony concerning training after April 12, 2019 we will object to that as part of the 30(b)(6) deposition.  It will be our position that it wouldn't bind the Port Authority. Lieutenant Bergery's responses with respect to that time period.

But over my objection, you can answer.

MR. AMRHEIN:  And in response to the objection, this is well within the scope of the 30(b)(6) deposition and the topics Lieutenant Bergery is expected to testify to.



M. Bergery

This is directly relating to all of the training and materials and teachings and curriculum officers of the Port Authority Police Department are expected to know and, therefore, what change is wholly relevant to this matter.

So I'm going to ask the question again and, please, Deborah, note Cheryl's objection for the record because I'm just going to repeat the same question.

Q. Did the academy start teaching about the uniquely vulnerable state of subjects suffering from medical crises after 4/12/2919?

A. The Police Academy, I wouldn't say started. We have always taught mental illness. Mental illness was taught in recruit training, and then also it was taught yearly through the Police Academy.

So I wouldn't say it's anything we started new after 2019, it's something that I would say continued.

Q. Was there an increased emphasis on the uniquely vulnerable state of



800.211.DEPO (3376)
EsquireSolutions.com

M. Bergery

individuals, say specifically for somebody who came out of a seizure, is that something that was emphasized beyond what had been potentially taught at the academy or in ISTs?

And this is after April 12, 2019.

MS. ALTERMAN:  And, again, just note my objection.  You can answer.

MR. AMRHEIN:  Please note my rebuttal to that as well.

A.    That would be the same thing that I referenced before.  Always evaluate the current trends through the nation and pretty much come up with what we are seeing.  If we are seeing more mental health and we see we need more ethics or de-escalation, motor vehicle stops or emerging trends, that would be something that we would implement into the IST program.

Q.    Do you recall any specific trends that happened in the early 2020s that had an impact in the teachings at the Port Authority Police Department?

A.    Yes.  Yes, sir.

Q.    Can you just briefly touch upon



M. Bergery

any of the trends that caused the Port Authority Police Department to reemphasize or de-emphasize or change its curriculum in teachings to the officers?

A.     Yes.  We added de-escalation. There was more de-escalation training.  We added a block of instruction on excited delirium, mental illness and then also in emerging trends.

Q.     Sir, I'm going to go over some of the ISTs for a similar set of questions.  For those I can try to go through them with you as best I can.  And, again, sir, I very much appreciate your time here today, taking the time away from your work.

So, again, this is -- I know I asked you about ISTs for you individually that you had done, but this is ISTs generally for Port Authority Police Department officers.  And I'm going to start from prior to April 12, 2019 for these questions.  Okay?

A.     Uh-hum.

Q.     So did the ISTs, during that time period, include restraining techniques and



M. Bergery

the varying levels of restraining techniques?

A.    That would be back to the same thing I referenced before.  Those certain techniques were in, let's say, something called like a baton refresher, then, yes, it would be covered.

Q.    Okay.  And I know you had testified to much of this before about what would have been covered with respect to the use of force and use of deadly force, I think 100-4 versus 100-5.  Those were also covered on a yearly basis at a minimum for ISTs; is that correct?

A.    Yes, sir.

Q.    And, in fact, I think you may have said that they were taught more frequently.  Was that every fall and every spring for use of force and use of deadly force?

A.    Yes, use of force and use of deadly force; correct.

Q.    Okay.  And during those ISTs prior to April 12, 2019, did they also teach -- was it part of that curriculum about



M. Bergery

defensive tactics and ground fighting techniques?

A.    The defensive techniques and ground fighting techniques, we didn't have any hands-on training in our curriculum.

Q.    So would that be --

A.    It was specifically towards the general order.

Q.    Thank you for that clarification, sir.

Am I correct that you had testified previously that in the years of 2014 up until April 12, 2019, that window of time, that on a yearly basis ISTs covered medical crises and mental health crises?

A.    Mental health is yearly; correct.

Q.    Medical is not?

A.    No.  Medical, blood work pathogens, which is also part of medical, that's yearly.  CPR is every two years.  We have medical bag refreshers.  We have Narcan refreshers.  So medical is very, very frequent.

Q.    Okay.  Thank you for that



M. Bergery

clarification, sir.

Do you recall some of the differences between the ISTs' curriculum and teachings in that time, 2014 to April 12, 2019, that differed from what you have learned at the academy on those topics that we had discussed, which is de-escalation, restraining, use of force, use of deadly force, defensive techniques, verbal strategies, standards of care?  Do you recall anything that differed in the ISTs in that time period from what you had learned at the academy?

A.    You're talking about the transition period, 2020 and 2021?

Q.    No, before that, so from 2014 to April 12th of 2019.  I'm just looking for if any differences, what were they between the IST teachings and what you learned at the academy?

A.    No.  From 2014 to 2019, there was no major curriculum changes.

Q.    Do you remember if there were any minor curriculum changes?



M. Bergery

A.      I would have to look into something specifically pertaining to each general order.  I assume multiple general orders were updated through those five years, but anything specifically I wouldn't know.

Q.      So any of those changes would really be as a result of any changes to the general order; is that right?

A.      Yes.  So the changes would be through the general order and then it gets pushed into the operations orders.

Q.      Thank you for that clarification.

And I know you talked about the curriculum at the Police Academy and some of the changes that happened after April 12, 2019.  Were similar changes made to ISTs during that time?

A.      Similar changes in what?

Q.      To the curriculum of ISTs.  I know you had testified that some changes were made after, in the 2020 area range to the curriculum for the Police Academy as well as the ISTs that had been in place in that period of time between 2014 and April 12,



M. Bergery

2019.

Q.    Did similar changes to the ISTs occur after, you know in that 2020 period, just like they did at the Police Academy?

A.    Yes.

Q.    And were they -- were the lessons essentially mere order, the Police Academy trainings as well as the IST, in that time, from 2020 on?

A.    Yes, any type of transitioning and recruit training that we had after 2020, that would be similar.

Q.    Okay.  Sir, do you know that the New York Attorney General's Office conducted an investigation into the death that occurred that's at the heart of this case?

A.    Yes, sir.

Q.    Do you know -- I should say do you know what the purpose of that investigation was?

A.    Specifically?  Can you explain? I'm sorry.

Q.    Yeah, do you know what the purpose of the Attorney General's Office



M. Bergery

investigation was in looking into the matter?

A.      Not the specifics, no, sir.

Q.      Do you know in general?

A.      What the investigation, like what was it looking into?

Q.      Yes, sir.

A.      No specifics, no.

Q.      Do you generally know what it was looking into?  I know you may not know the specifics of it, but do you have a general idea?

A.      Generally, yes, sir.

Q.      What was that general idea?

A.      That something happened aboard an aircraft and the Attorney General is looking into the, I guess the cause of death.

Q.      Okay.  Were you interviewed as a part of the investigation?

A.      Myself, no.  No, sir.

Q.      Obviously I know that you weren't an officer involved in this, I just know that they had a pretty extensive interview process.

I don't mean to offend you or



M. Bergery

anything by that question, I'm going to guess, based upon that answer, you didn't provide any statements or anything, in relation to that investigation?

A.    No, sir.

Q.    Did you ever learn about the conclusion of the investigation?

A.    No, sir.

Q.    So am I correct that you wouldn't be aware that the investigation included that the use of force by PAPD personnel likely contributed to the death of Mr. Lagoda?

MS. ALTERMAN:  Just note my objection.  You can answer.

A.    What was that?  I'm sorry, could you explain?

Q.    Yeah.  So based upon your answer that you didn't learn the conclusion of the investigation, so you wouldn't be aware that the investigation concluded that the use of force by Port Authority Police Department personnel likely contributed to the death of Mr. Lagoda, the man that's the subject of this lawsuit?



M. Bergery

MS. ALTERMAN:  Objection.  You can answer.

A.    No, sir.

Q.    Were you aware that, as a part of the report by the Attorney General's Office, that the PAPD was recommended to train its officers about the unique vulnerability of individuals in the immediate wake of a seizure?

A.    I did not know that at that time.

Q.    But those trainings were implemented after the fact; is that right?

A.    Yeah.  The trainings increased. I mean, we had ethics training, we had excited delirium, we had a lot of things that were implemented, suicide awareness.  Like I said, whatever the trends were across the country, they kind of added them.  And I know after the -- well, from the 2020 area and on, they've added a lot of training into the curriculum.

Q.    Thank you, sir.

So I'm just going to ask you a couple of questions about training, general



M. Bergery

training outside the capacity of a Port Authority employee, and the potential for that.

So am I correct that you may not be a white belt anymore, but am I correct that you participate in Brazilian Jiu Jitsu at Shore Academy and train in Brazilian Jiu Jitsu outside of your capacity as an officer?

A.    Yes, I used to.

Q.    Are you still a white belt?

A.    I do not live in that area anymore.

Q.    Do you still participate in similar type of training?

A.    I do, yes.

Q.    You don't need to go into specifics, but is it mixed martial arts, is it limited specifically to Jiu Jitsu?

A.    No, I have a background in mixed martial arts.  That's how I got it from the Police Academy; correct.

Q.    Was it something that you personally did on your own time or is it something that was sponsored, suggested or



M. Bergery

governed by the Port Authority Police Department?

A.     No, that was on my own time.

Q.     So you didn't receive like a credit or a stipend or anything to be a member of the gym?

A.     No, sir.

Q.     Okay.  Is this something that you and you alone do that's unique to you or is it common to PAPD officers, whether it's officers or sergeants or lieutenants or any rank, to do outside of their employment as a Port Authority Police Officer?

MS. ALTERMAN:  Objection.  You can answer.

A.     Yeah, I would say it's more of a hobby.  You know, it's more of something that we promote the young recruits who come in and we tell a lot of people to have some type of mixed martial arts background, try to stay active, whether it be physical training or anything, it's just a hobby, nothing to do with the department itself.

Q.     I understand that, and I



M. Bergery

appreciate that, sir.  I just wanted to ask about whether or not that was something that may have been reimbursed by -- I know some officers were reimbursed for a gym membership or encourage others to do this activity or that activity that may not be sponsored, but I just wanted some clarification on that.

So are you aware of any other police officers who participate in activities like that outside of their capacity as an officer, whether that's at an MMA gym, a boxing, a Jiu Jitsu gym or any other type of mixed martial art?

A.    Are you saying Port Authority officers or are you saying --

Q.    Yes, Port Authority officers.

A.    Yeah, I know multiple officers who partake in a hobby outside of the police department.

Q.    When you were -- I know you say you're no longer located in the area, but when you were at your gym, I think it was Shore Academy, did you train with other fellow officers of the Port Authority at that



M. Bergery

gym or was it just you kind of there?

A.    Very limited.  That gym is located 60, about 65 miles away from where we work.  So I think it's probably maybe two or three or officers out of 2200 that were going to that gym.

Q.    Okay.  Generally speaking, in terms of the training that you received there, I'm just curious about, am I correct that they teach grappling, ground fighting and submission holds?

A.    At the gym; yes, correct.

Q.    Do they also teach about breathing techniques?  I think mixed martial arts stresses that pretty heavily; is that right?

A.    Yes.

Q.    Is that because it becomes pretty difficult to breathe when you're placed under the stress of a tangle and with all the body weight there?

MS. ALTERMAN:  Objection.  You can answer.

A.    Specifically, you're saying when



M. Bergery

I'm in the gym?

Q.    When you're in the gym, is that a part of some of the things that you learned in your training in Brazilian Jiu Jitsu about the importance of breathing techniques when you're engaged physically like that?

A.    Yes, sir.

Q.    And I imagine it's pretty difficult to breathe when you're physically engaged like that?

A.    Yes, sir.

Q.    Any lessons that you have learned in your capacity as an officer, did you learn some things at the Jiu Jitsu gym that expanded on what you had been taught at the academy or during ISTs?

A.    Are you referring now back to 2014 or 2019 or are you referring --

Q.    Yes.  Yes, 2014 to 2019.

A.    2014 to 2019?

Q.    Yes.

A.    At that time, I was not going to that gym.

Q.    So, in general, when you're going



800.211.DEPO (3376)
EsquireSolutions.com

M. Bergery

to the Jiu Jitsu gym, are there some techniques and some things that you had learned that expanded your physical capabilities that you hadn't been taught at the academy or through ISTs?

A.    The Port Authority has a strict policy, which obviously whatever is governed and you're taught in our recruit curriculum and training, that's what you're allowed to stay with, you know, the training and experience.

My Police Academy training specifically, that's why I was asking the timeframe, I got transferred to the Police Academy in 2018, so that's when I started my defensive tactics training.  So anything that was taught at Shore Academy, no, I did not utilize anything for the Port Authority.

Q.    Thank you for that clarification.

Since you started at Shore Academy, and have been participating in that outside of work hobby, have you made any suggestions about any things that you've learned in terms of things that you think



M. Bergery

should be implemented into some of the training to help some of the officers physically be prepared for duty?

A.    Yes.  So through my training and experience at the Port Authority Police Academy in 2018, I became a general topics instructor which that's why it got me up to the Police Academy.  So I have multiple levels of defensive tactics training, so via defensive tactics training, survival tactics, defensive tactics trainings, flexion, controlled tactics training so there is multiple levels of training.

So via those trainings through the Port Authority, I've made suggestions, yes.

Q.    Thank you.

Sir, this is not a question directed at you, this is a question directed in general, so by no means am I trying to offend you here, sir.

If others -- if officers were to have this -- a hobby of MMA or boxing or something outside of work and they were to



M. Bergery

use some strategies employed that were against the general orders, that, of course, would be in violation of PAPD policy; correct?

A.    Correct.  We make that very, very clear throughout our recruit training and throughout our in-service training, anything that is taught through our policy that's approved through our general orders, that's what you're allowed to utilize.  So, no matter, whoever has this hobby outside, you can't utilize anything on the job that's outside of the general order.

Q.    Got you.  In your time at the academy, or as an officer, were you ever made aware of somebody who had violated code or policy by using or implementing certain strategies that went beyond the scope of what was allowable by a general order?

MS. ALTERMAN:  Objection.  You can answer if you know.

A.    Not that I can recall, to be honest with you.

Q.    Okay.  Sir, again thank you so


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

M. Bergery

much for your time.  I just have a few finishing questions and I know Cheryl may have some questions as well, but, again, we greatly appreciate your time.

So based upon your training and knowledge of the training given to PAPD officers at the Police Academy and their ISTs, wouldn't you agree with me that a subject who has just come out of a seizure is to be considered medically vulnerable?

MS. ALTERMAN:  Objection.  You can answer.

A.    So what's the scope of the situation?  What's the totality of the circumstance?  That's what I would ask.

Every time we teach recruit training at all levels, police officers, sergeant or lieutenant, we would have them obviously look at the entire scope, look at the entire picture.

What the situation is that individual in?  Yes they're coming out of a medical episode but who is around them. You're allowed to use de-escalation, but if



M. Bergery

they're an immediate threat to the public who is around them and the officers, then the situation changes.

So situations are always evolving, and as police officers we have to adapt to whatever the situation is.  If an individual is coming out of a medical crisis or a situation and they're combative, they're not just a patient, that was stated on the National Safety Council.  The National Safety Council refers to them as patients, not noncompliant suspects.

Q.    I understand that, sir, and I appreciate your answer.  I just mean based upon the information and teachings in the materials that officers are provided with and based upon your knowledge of all that, you wouldn't agree with me that a subject who is coming out of a seizure is not to be considered -- excuse me, is not to be considered as medically vulnerable?  You don't believe that?

A.    I wouldn't -- I would have to do my evaluation to figure out what the


ESQUIRE
DEPOSITION SOLUTIONS

M. Bergery

situation is.  I don't know.  They're coming out of a seizure but what's the situation?  How are they acting?  How are they responding?  That information that we have is a training aid to use, and use as a resource to communicate back to whatever we have.  I don't know what's happening after they're coming out of that state.

Q.    Understood.  And do you recall seeing -- I know the National Safety Council slides, do you recall going over some of the mental -- altered mental status as well as the seizures slides?

A.    I do.

Q.    Do you recall agreeing with me that I read it correctly where somebody who is coming out of a seizure would be in an altered mental state and may be disoriented and combative upon coming out of it?

A.    Yes, sir, absolutely.

Q.    And you had testified beforehand that those materials had been distributed to PAPD officers as early as 2016; correct?

A.    Yes, sir, because it referred



M. Bergery

back them as being a patient, so noncombative, everything is under control, there is not 200 people around, it's not a confined space, obviously all of those things play a part in different situations.

Q.    Based upon your training and knowledge of the training given to PAPD officers at the academy and through ISTs, wouldn't you agree with me that improper restraining techniques can block the flow of air into a subject's lungs, contributing to life-threatening condition known as positional or restraint asphyxia?

MS. ALTERMAN:  Objection.  You can answer.

A.    I'm sorry, just repeat that.

Q.    Sure.  Based upon your training and knowledge of the training given to PAPD officers both at the academy and through ISTs, wouldn't you agree with me that improper restraining techniques can block the flow of air into a subject's lungs contributing to a life-threatening condition known as positional or restraint asphyxia?



M. Bergery

A.    Yes.  Based on positional, yes.

Q.    And based upon your training and knowledge of the training given to PAPD officers at the Police Academy and through ISTs, wouldn't you agree with me that the risk of potential asphyxia is compounded when a subject is medically vulnerable and becomes involved in a physical struggle with officers?

MS. ALTERMAN:  Objection.  You can answer.

A.    I'm sorry, just repeat that question.

Q.    Sure.  Based upon your training and knowledge of the training given to PAPD officers at the Police Academy and through ISTs, wouldn't you agree with me that the risk of potential asphyxia is compounded when a subject is medically vulnerable and becomes involved in a physical struggle with officers?

A.    I think it depends on the situation.  I don't know what the scope of the situation is, you know, what's the



M. Bergery

environment, what's the position.

You're talking about position asphyxia, so what is the position?  What is the situation around them?  How much space do they have?  Is it a confined space?  Do they have an open space to work.  It really depends.

Q.    So it's one of those factors for analysis of a given situation, the medically vulnerable state of an individual and the medical condition of an individual?

A.    Would you be able to explain the medically vulnerable?  What exactly do you mean by that?

Q.    You just listed a number of factors to be able to diagnose whether or not there was a significant risk to a subject and you were talking about the surrounding area, space, people, all that.  Is one of the factors that needs to be evaluated in that given circumstance whether or not a person is in a medically vulnerable state, for instance coming out of a seizure, just as described in some of the National Safety Council slides



                          M. Bergery

that we showed you today?

        A.      Yes.

                MR. AMRHEIN:  So I don't have any

more questions for now.  I know, I'm happy to

follow up if needed, but I'm done with

questions for now.

                MS. ALTERMAN:  We don't have any

questions.

                MR. AMRHEIN:  Okay.  Deborah,

thank you so much.  And, Lieutenant, thank

you so much, I greatly appreciate it.  I know

this is never fun and not easy, but we

appreciate your time.

                THE WITNESS:  Thank you for doing

your research.

                (Time noted:  11:59 o'clock a.m.)

                                MARK BERGERY

SUBSCRIBED AND SWORN TO
BEFORE ME THIS      DAY
OF              , 2024.


    NOTARY PUBLIC


                    *  *  *



800.211.DEPO (3376)
EsquireSolutions.com

I N D E X

WITNESS              EXAMINED BY              PAGE

MARK BERGERY         Mr. Amrhein              4-112


                        *  *  *



                    E X H I B I T S

BERGERY                 DESCRIPTION              PAGE

Exhibit 1    Re-Deposition Notice                9

Exhibit 2    Altered Mental Status slides       59

Exhibit 3    Altered Mental Status slides       61

Exhibit 4    Document                           66


(Bergery Exhibits 1-4 attached to transcript.)



                        *  *  *



C E R T I F I C A T E

STATE OF NEW YORK      )
                       )        ss:
COUNTY OF QUEENS       )

I, DEBORAH MOSCHITTO a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That the within is a true and accurate transcript of the testimony taken on the 13th of February, 2024.

I further certify that I am not related to any of the parties to the proceeding by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th ay of February, 2024.



DEBORAH MOSCHITTO



Case 1:21-cv-06226-NRB   Document 75-24   Filed 03/28/25   Page 115 of 143

LT. MARK BERGERY  30B6                    February 13, 2024
TARASOV ESQ. -V- PANYNJ                                   114

DEPOSITION ERRATA SHEET

Our Assignment No.:  J10897177

Case Caption:  TARASOV V. PANYNJ

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

_____

MARK BERGERY

Subscribed and sworn to on the _____ day of _____, 20 _____ before me.

_____

Notary Public,

in and for the State of

_____.



800.211.DEPO (3376)
EsquireSolutions.com

LT. MARK BERGERY  30B6                          February 13, 2024
TARASOV ESQ. -V- PANYNJ                                      115

DEPOSITION ERRATA SHEET

Page No.____Line No.____Change to:_____

_____

Reason for change:_____

Page No.____Line No.____Change to:_____

_____

Reason for change:_____

Page No.____Line No.____Change to:_____

_____

Reason for change:_____

Page No.____Line No.____Change to:_____

_____

Reason for change:_____

Page No.____Line No.____Change to:_____

_____

Reason for change:_____

Page No.____Line No.____Change to:_____

_____

Reason for change:_____

Page No.____Line No.____Change to:_____

Reason for change:_____


SIGNATURE:_____DATE:_____

                MARK BERGERY



800.211.DEPO (3376)
EsquireSolutions.com

LT. MARK BERGERY  30B6                        February 13, 2024
TARASOV ESQ. -V- PANYNJ                                   116

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

          MARK BERGERY



---

**Exhibits**

---

**10897177 Lt**
**..**
**Mark Berger**
**y 30b6.**
**EXHIBIT1**
  9:5,9
  112:10

**10897177 Lt**
**..**
**Mark Berger**
**y 30b6.**
**EXHIBIT2**
  59:14,16
  61:23
  62:4,10
  112:11

**10897177 Lt**
**..**
**Mark Berger**
**y 30b6.**
**EXHIBIT3**
  61:24
  62:2,11
  112:12

**10897177 Lt**
**..**
**Mark Berger**
**y 30b6.**
**EXHIBIT4**
  66:4,5
  68:24
  112:13

---

**0**

---

**07310**
  8:23

---

**1**

---

1

  9:5,9

**100-4**
  79:18
  80:11
  89:12

**100-5**
  79:19
  80:11
  89:12

**11:59**
  111:17

**12**
  12:2,12
  13:4
  66:16
  69:15
  72:17
  75:6,7
  80:19
  81:13
  82:23
  83:10
  85:9,14
  87:6
  88:22
  89:24
  90:14
  91:5
  92:16,25

**12th**
  79:10
  84:25
  91:18

**18**
  12:17

---

**2**

---

**2**
  59:14,16
  61:23
  62:4,10

**200**
  108:4

**2012**
  18:9,16,
  19

**2014**
  18:14,17,
  19 19:5,
  13,14
  21:15
  23:9,15
  24:4,9,22
  25:4,23
  26:10
  27:10,12,
  18 28:7,
  23 32:7
  33:7,13,
  25 34:10,
  16 35:2
  36:4
  38:6,11
  39:11,17
  40:6
  48:17
  51:4
  65:16
  69:10,18
  70:9
  71:16
  74:10
  76:25
  77:23
  78:2,18
  79:10
  81:13
  82:22
  83:8,17,
  24 84:4,
  25 90:14
  91:5,17,
  22 92:25
  101:19,
  20,21

**2016**

  60:6,10
  62:7,12,
  13 64:21
  107:24

**2018**
  17:16,19
  18:2
  33:22
  102:16
  103:7

**2019**
  39:13,14,
  17 49:3,
  24,21
  50:3,10,
  23 51:4,
  8,17,20
  52:6,23
  53:2,6,11
  57:6
  60:11
  62:14
  69:15,17,
  18,21,24
  70:9
  71:16,24
  72:17
  74:10
  75:6,7
  76:25
  77:23
  78:3,18
  79:10
  80:19
  81:14
  82:9,11,
  15,22,23
  83:10,17,
  24 84:5,
  25 85:9,
  15 86:22
  87:6
  88:22
  89:24
  90:14
  91:6,18,

  22 92:17
  93:2
  101:19,
  20,21

**2020**
  18:3
  23:13,25
  24:2
  25:21
  33:18
  34:6 53:9
  80:15
  82:19
  83:4,5
  91:16
  92:22
  93:4,10,
  12 96:20

**2020s**
  87:21

**2021**
  16:20,21
  80:15
  82:19
  91:16

**2023**
  12:18

**2068**
  59:22

**2086**
  61:18

**2095**
  61:18

**2200**
  67:25
  100:6

**241**
  8:22

**25**
  19:10

**26**
  19:11



**3**

**3**
61:24
62:2,11
73:7

**30**
5:17

**30(b)(6)**
9:17
11:7,10
85:16,24

**32**
66:16

**4**

**4**
66:4,5
68:24

**4/12/2919**
84:23
86:15

**5**

**5**
12:2 13:4

**6**

**6**
12:2,7
13:4 73:7

**60**
100:4

**65**
100:4

**7**

**70**
55:5,9,13

**8**

**8-hour**
46:8 47:4

**A**

a.m.
111:17

abide
26:12
47:16

abiding
76:9

ability
8:13

aboard
94:15

absolutely
46:5
107:21

academy
10:8
11:22
12:4
14:23
15:7 16:8
17:9,17,
19,21,22
18:4
19:6,8
20:6,9,
13,19
21:9,15,
20,21
22:24

23:2,6,9,
20 24:4,
9,15,22
25:9,14,
19,23
26:10
27:3,7,9,
20,25
28:8 29:3
30:6,13
31:13
32:5,7,12
33:3,25
34:10,23
35:8,18
37:12,18
38:6
41:19
42:2,21,
25 47:13
48:17
51:3
53:16
56:7
57:25
58:13
67:8
68:4,13
69:6,22
71:25
72:17
74:23
75:6 79:9
80:18
82:15
83:9 85:5
86:12,16,
20 87:5
91:7,14,
21 92:15,
23 93:5,8
97:8,22
99:24
101:17
102:6,13,
16,18,22
103:7,9

104:16
105:8
108:9,20
109:5,17

Academy-
wise
42:7

achieve
55:3,13

achieving
55:8

act
70:8

acting
107:4

action
77:11

active
25:2,4
35:8,12
36:2
52:8,18
98:22

activities
99:10

activity
99:6,7

adapt
106:7

added
88:6,8
96:19,21

addition
25:15
75:18

additional
38:8
40:11
55:19
63:15

additionall
y
11:9

address
8:18,19,
20,21
30:19

administrat
ive
16:2,6

agree
5:8
73:14,23
105:9
106:19
108:10,21
109:6,18

agreeing
107:16

agreement
4:10
43:13

aid
21:4 63:5
64:5
107:6

air
108:12,23

aircraft
94:16

airport
17:9,11,
15 38:16
40:5,7

Albright
13:15,18,
22 18:7,9

Alexey
47:20,22,
25 48:12

allowable


800.211.DEPO (3376)
EsquireSolutions.com

104:20

**allowed**
55:7
76:12
82:3
102:10
104:11
105:25

**Alright**
47:22

**altered**
37:4,15
59:15,25
60:14
61:2,6,
22,25
62:24
64:11
107:13,19

**ALTERMAN**
4:15
5:10,20
12:14
20:11
26:2,13
29:21
30:17
37:2,5,23
41:4 48:9
54:7
58:23
59:18
64:25
71:17
73:18
74:5
76:20
82:16
85:10
87:7
95:14
96:2
98:15
100:23
104:21

105:12
108:15
109:11
111:8

**Amended**
66:17
67:10

**amount**
81:7,9,
15,20

**Amrhein**
4:14,22
5:6,11,22
9:3
47:22
48:11
54:12
59:2,8,
13,20
61:10
66:2
68:21
69:3
85:22
87:9
111:4,10

**analysis**
110:10

**and/or**
12:10

**announce**
84:12

**answering**
7:2,11

**answers**
44:2

**anticipate**
7:3

**anymore**
97:6,13

**apologies**
72:21

**apologize**
47:19
73:21

**approach**
36:8,19
37:9,13

**approaching**
51:21

**approved**
104:10

**approximately**
16:13

**April**
69:15,17
72:17
75:6,7
79:10
80:19
81:13
82:23
83:10
84:25
85:9,14
87:6
88:22
89:24
90:14
91:5,18
92:16,25

**area**
92:22
96:20
97:12
99:22
110:19

**arrest**
19:19
30:3,4
53:24

**arresting**
70:5

**arrests**
50:12

**art**
99:14

**arts**
97:18,21
98:21
100:16

**Ashcroft**
5:22

**asphyxia**
108:14,25
109:7,19
110:4

**asphyxiation**
23:22
34:3
51:16
82:14,19

**assess**
49:8

**assignments**
16:3

**assistance**
63:15

**assume**
92:4

**assumption**
6:13

**attendance**
54:21

**attended**
19:6 23:5
27:6,8
42:21

**attending**
20:18
28:7

**attention**

60:5,14
62:17
64:24
67:22

**attorney**
5:22
10:13,16,
19,23
11:4,5,12
67:15,18
93:15,25
94:16
96:6

**August**
12:17
19:15
27:11
28:7

**Authority**
10:6
12:5,9
13:10
14:4,8,
18,23
16:22
17:6
18:11,14,
17 19:7
20:3,21
38:5 39:9
40:25
41:16,22
44:8,14
45:9
46:21
48:16
57:5
58:19
59:21
61:17
64:2
65:15,20
76:7,19
78:17
81:12



82:24
83:19
84:13
85:17
86:4
87:22
88:3,20
95:22
97:3
98:2,14
99:15,17,
25 102:7,
19 103:6,
16

**availability**
46:11

**avoid**
6:17

**aware**
10:3,5
11:24
13:3
95:11,20
96:5 99:9
104:17

**awareness**
96:17

---

**B**

---

**Bachelor's**
13:9,14

**back**
13:10
16:8
28:15
29:11
32:7 33:6
34:5 35:2
36:4,16
38:11
40:6 46:5
63:8,14

71:7 75:8
76:24
77:20
78:25
83:21
84:20
89:3
101:18
107:7
108:2

**background**
13:7 19:4
23:7
97:20
98:21

**bag**
57:19
90:22

**barrier**
84:21

**based**
95:3,18
105:6
106:15,18
108:7,18
109:2,3,
15

**basic**
28:3,16,
18,22
29:16
30:3
56:23

**basically**
57:15

**basis**
58:22
64:3
89:13
90:15

**Bates**
59:19,21

**baton**
50:15
75:11
78:3 89:6

**bear**
9:6 59:4
61:12

**began**
18:16

**begin**
6:2 38:7
39:8
40:24
41:3 85:6

**beginning**
38:9
66:16

**behavioral**
19:18

**believes**
31:9

**belt**
97:6,11

**Bergery**
4:1 5:1
6:1 7:1
8:1,21
9:1,9
10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1
30:1 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1

40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1
59:1,16
60:1 61:1
62:1,2
63:1 64:1
65:1
66:1,5
67:1 68:1
69:1 70:1
71:1 72:1
73:1 74:1
75:1 76:1
77:1 78:1
79:1 80:1
81:1 82:1
83:1
84:1,14
85:1,25
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1 99:1
100:1
101:1
102:1
103:1
104:1
105:1
106:1
107:1
108:1
109:1
110:1
111:1

**Bergery's**
85:18

**billing**
16:4

**bind**
85:17

**binder**
58:9,14

**bit**
23:3
25:11
26:7
33:2,15
36:13
46:3 50:9
52:2
54:16

**block**
47:4
54:22
88:8
108:11,22

**blood**
57:16
90:19

**board**
84:17

**body**
100:21

**bottom**
60:5 62:5

**boundaries**
77:11,12

**box**
40:23

**boxing**
99:13
103:24

**Brazilian**
97:7,8
101:5



break
7:15,19
48:2

breathe
100:20
101:10

breathing
100:15
101:6

briefly
9:23 13:6
18:17
38:13
39:24
55:16
59:3
87:25

bring
9:7 59:5
60:4
81:8,16

broke
50:8

brought
33:12

bullet
60:19
61:5
62:23
64:10
65:9

—————————

C

—————————

call
16:4
25:13
48:2
63:16
73:12
84:11

called

89:6

calls
15:25
17:14

calm
49:8

calming
36:20
73:10

capabilitie
s
102:5

capacity
15:19
44:3
68:12
97:2,9
99:11
101:14

care
25:24
26:11,16,
18,22
37:19,20,
22 38:2
53:12,19
54:2 65:5
71:4,8,
10,12,15,
20 72:2
91:11

case
23:14
66:11
68:15
93:17

caused
88:2

certificate
54:15

change
46:25

74:14
86:6 88:4

changed
39:15
85:4

charge
20:4

check
40:24
41:6

checkpoint
41:2

Cheryl
5:7,16
20:16
105:3

Cheryl's
12:24
86:9

Chris
5:21
48:10

circumstanc
e
74:8,9,11
105:16
110:22

City
8:22
14:25
15:7

civilians
25:8,15
26:16
56:17
63:13,18

clarificati
on
41:13
90:10
91:2
92:13

99:8
102:20

clarity
20:17

class
47:6

classes
15:6 36:5
46:14
72:6

classroom
45:14,15,
20 46:9,
15 51:15

clean
6:21

clear
22:22
54:8
104:7

coach
18:20

code
76:17
104:17

college
13:9,14,
15 18:8

colloquial
6:19 7:2

colloquy
65:2

combative
60:20
74:13
106:9
107:20

combination
82:4

combined

79:20
80:5,9,11

common
61:2,6
98:11

communicate
36:19
83:15,22
84:20
107:7

communicati
on
28:3
45:25
83:18

community
17:13

complaint
66:17,23
67:2,5,
10,11
68:8

complete
43:20,23
44:4

completed
13:11
14:22
16:3 45:2
54:15,19

completely
26:21,23

completion
54:13

compliance
16:10
50:11

compliant
29:4
30:3,18,
19,25



complimenta
ry
  40:21

comply
  33:9

compounded
  109:7,19

compression
  34:3

compression
al
  23:22
  51:16
  82:14,18

concluded
  95:21

conclusion
  95:8,19

condition
  63:9
  108:13,24
  110:12

conduct
  20:20

conducted
  93:15

confer
  12:25

confined
  108:5
  110:6

confused
  60:19

Congratulat
ions
  14:14

consequence
  55:12

considered
  105:11

106:21,22

consistent
  53:13
  54:3
  71:14

contact
  83:19

contacted
  67:7

content
  17:23

contents
  12:6

continue
  48:5,10

continued
  86:23

continuum
  31:18
  76:24
  81:18,19

contraction
s
  62:25
  64:12

contributed
  95:13,23

contributin
g
  108:12,24

control
  30:8
  31:10,23
  81:8,11,
  16,21
  82:2
  108:3

controlled
  73:3
  103:13

conversatio
n
  6:19 7:3
  36:22
  73:10
  84:16

conversatio
ns
  12:19

cops
  15:24

copyright
  60:6
  62:6,12

corner
  62:5

correct
  12:24
  13:21
  14:6,9
  18:12
  19:9,17
  21:3
  37:17
  41:15,21
  42:21
  53:25
  54:6,9
  60:6,15,
  18,25
  61:16
  62:5,18,
  22 63:24
  64:4,9,15
  65:3,9
  68:24
  70:8,13,
  20 71:11
  77:7
  78:7,21,
  22,25
  79:25
  80:19,24
  82:20,21,

23 89:14,
22 90:12,
17 95:10
97:5,6,22
100:10,13
104:5,6
107:24

correctly
  60:2,22
  61:8
  64:12,13,
  17 65:6,
  11 66:18
  107:17

corresponde
nce
  12:18

corresponde
nces
  12:25

Council
  56:10,11,
  14,20
  57:7
  58:7,21
  59:12,23
  60:7
  61:15
  62:7
  63:4,12,
  17 74:25
  106:11,12
  107:11
  110:25

counsel
  4:13

country
  46:20
  56:22
  77:19
  96:19

couple
  32:23
  84:23

85:2,3
96:25

courses
  12:7
  46:12

court
  4:2 8:3
  19:19
  69:2

cover
  19:23
  45:24
  49:8 53:6
  77:4,6

covered
  27:2
  44:23
  48:18,20,
  24 49:4
  51:25
  57:12
  77:6
  78:11,16,
  23 89:7,
  10,12
  90:15

covers
  19:17

CPR
  35:4
  57:16
  90:21

credit
  98:6

crises
  24:6
  51:22,23
  85:9
  86:14
  90:16

crisis
  24:18
  35:7,17,



36:9,
37:10
53:23
70:19,20
73:17
74:3,4
80:21
81:3,4
85:8
106:8

**cues**
36:20

**culmination**
20:8
74:19,22

**curious**
26:8
100:10

**current**
42:11
77:17
87:13

**curriculum**
12:3
14:20
15:5
16:10
19:17,25
20:25
21:18,22
23:10,19,
20 24:10,
16 26:10
35:3,11
36:4
42:9,14
48:19
49:11
52:7
53:18
55:18
56:15
69:6,11,
22 70:9,

71:15
72:2,5
73:25
75:16
77:16
78:17,20
86:4 88:4
89:25
90:6
91:4,23,
25 92:15,
20,23
96:22
102:9

**curriculums**
35:14
71:21

**cycle**
45:5

────────────

**D**
────────────

**date**
12:19
16:19
66:12
82:6
85:12,13

**dated**
12:17

**day**
15:2,3
45:13,14,
15,18,21
46:9,10,
15 47:6
55:10
76:24

**days**
5:17 46:9

**de-emphasize**
88:4

**de-escalation**
21:22
49:4,23
69:25
70:23
72:9,19,
20,22,24
73:6
74:2,12,
14 83:7
87:16
88:6,7
91:8
105:25

**deadly**
22:7
32:4,6,8,
13,15,17
50:19,20,
21 70:15
79:18
80:4,9
89:11,19,
22 91:9

**deal**
15:5

**dealing**
24:5,11

**death**
93:16
94:17
95:13,23

**Deborah**
4:3,17
68:25
86:9
111:10

**decide**
46:13,17
47:5

**decided**
42:10,15

**decision**
47:14

**defendants**
67:21,24
68:15

**defense**
32:25

**defensive**
19:21
22:13
33:4,16
51:9
90:2,4
91:10
102:17
103:10,
11,12

**definitions**
9:16

**degree**
13:14
18:7

**delirium**
88:9
96:16

**delivered**
77:24

**demonstrations**
21:12

**department**
12:5
14:8,18
16:23
17:7 38:5
39:10
40:25
41:16,22
44:9
45:10
46:22
57:5
58:19

64:3
65:15,21
68:2
76:8,19
78:18
82:24
86:5
87:23
88:3,20
95:22
98:3,24
99:20

**depending**
40:3,12,
22 42:8,
10 46:6,
11 47:3
54:5
74:15

**depends**
109:23
110:8

**deposed**
5:2 11:18

**deposition**
4:6 6:5
7:6 9:16,
25 10:20,
24 11:6,
10,12,15,
21 67:12
85:16,24

**describe**
13:6
14:16
39:24
57:13

**desk**
63:8
83:21

**details**
27:12

**determining**



83:13

**diagnose**
110:17

**Dickinson**
13:20

**differed**
91:6,12

**difference**
39:16

**differences**
91:4,19

**differing**
51:2

**difficult**
100:20
101:10

**diffusing**
21:25
27:5 28:2
35:9 42:4
49:5,23
69:22,24
70:23
72:16,20
73:15,25
83:7

**direct**
60:13
62:16
64:23
67:22

**directed**
8:11
56:21
103:20

**directions**
49:24

**directly**
18:10
86:2

**disconnect**

47:21

**discuss**
7:18
41:23,24
42:19

**discussed**
32:24
71:5 91:8

**disoriented**
60:20
107:19

**dispatched**
73:12

**disseminated**
57:22

**distance**
36:20
73:6,8

**distractions**
49:18,25

**distributed**
57:13,24
58:22
60:10
62:13
63:25
64:2,20
74:24
107:23

**distribution**
57:10

**docket**
66:11

**document**
9:11,14,
19,24
10:4,5,
10,12,16
12:20

58:4
59:9,19
61:7,11
62:18
66:5,12,
20 67:10,
11,14,18

**documentation**
57:24
79:20

**documenting**
16:4

**documents**
58:21
59:3
63:14
76:22

**driven**
56:22

**drowsy**
60:20

**duly**
4:17

**duties**
14:17
15:20,22
16:2
17:5,11,
12,21
25:7,10,
12,14,19,
20 52:24
53:6
58:16,18
79:14

**duty**
103:4

———————

**E**

———————

**earlier**

71:5,10

**early**
87:21
107:24

**easily**
31:2

**easy**
7:3,8
111:13

**educational**
13:7

**effectively**
83:15

**emergency**
35:4
56:16
57:15
64:16
65:5

**emerging**
87:17
88:10

**emphasis**
73:15,24
86:24

**emphasized**
87:4

**employed**
13:25
18:11
104:2

**employee**
12:13
65:17,20,
23,24
97:3

**employees**
45:10

**employer**
14:3

**employment**
41:3
98:13

**EMS**
35:25

**EMTS**
56:18
63:19

**encountering**
68:11

**encounters**
52:11
72:8
78:12

**encourage**
99:6

**end**
55:21

**enforcement**
63:16

**engaged**
101:7,11

**engaging**
24:21

**English**
83:14,16
84:3,7

**enjoyed**
58:13

**entered**
21:8

**entire**
56:22
58:14
105:20,21

**entitled**
61:19
64:21
65:4



environment
110:2

environmental
49:17,25

episode
105:24

equal
26:21,23

equally
38:3

equipment
4:7  38:18

Erie
8:22

escalation
30:2
79:14

essentially
93:8

establish
16:15

ethics
72:12
87:16
96:15

evaluate
87:12

evaluated
110:21

evaluation
106:25

event
34:13,14,
17,25
37:14

everyday
17:12

everyone's
26:20

Evidence
19:20

evolving
106:6

EXAMINATION
4:21

examined
4:19

exceed
77:6

exceeded
77:12

excited
88:8
96:16

exclusively
32:13
76:3

excuse
37:11
106:21

Exhibit
9:5,9
59:14,16
61:23,24
62:2,4,
10,11
66:4,5,13
68:24

expand
26:6

expanded
101:16
102:4

expected
11:25
13:3
41:17,23
42:17
78:19,24
85:25

86:5

experience
19:3
102:12
103:6

experienced
69:9

experiencing
51:22

explain
23:3  24:7
25:10
26:5
49:19
50:7
53:3,17
73:20
77:8
93:22
95:17
110:13

extensive
94:23

extrapolate
76:5

_____

F
_____

facilities
39:4  48:2
68:17

facility
38:12,14,
17  40:3,
4,5,8,9,
12

fact
89:16
96:13

factors
79:14

110:9,17,
21

fair
6:14

Fairleigh
13:19

fall
33:5
42:8,14
44:17
45:12,14
46:13
72:7,11
78:14
89:18

familiar
5:2  43:10
59:9
66:22
67:20
68:3,4
69:8

Federal
12:10
44:9

feel
8:18

feet
73:7

fellow
99:25

field
39:19

fighting
22:10
32:24
33:4,7,
11,17,21
51:10
90:2,5
100:11

figure
106:25

figured
43:6

filed
67:2

filing
66:12

final
41:2,6

Finally
7:15

fine
7:5

finish
7:10,11

finished
6:25

finishing
105:3

fire
14:24

firearm
32:9,14,
17

firearms
21:5

firefighters
56:19,25
63:20

firm
5:23

firsthand
17:22

flexion
103:12

floor
31:6

LT. MARK BERGERY  30B6
TARASOV ESQ. -V- PANYNJ
February 13, 2024



**flow**
108:11,23

**focus**
15:4

**follow**
111:6

**football**
13:22
18:20

**force**
22:5,7
31:16,17,
19,22
32:4,6,9,
13,15,18
43:25
47:2,5
50:15,19,
20,21
51:2,13
70:12,15
76:23
77:4
78:12
79:9,16,
17,18
80:3,4,9,
17,20,22,
25 81:7,
9,10,15,
20,25
89:11,19,
20,21,22
91:9,10
95:12,22

**form**
5:13
29:21
73:18
77:25
78:10

**formations**
45:25

**forward**
43:13

**fourth**
64:14

**free**
8:18

**frequent**
44:19
90:24

**frequently**
89:18

**front**
63:17
74:11

**full**
8:17

**fun**
111:13

---

**G**

**gather**
23:6

**geared**
63:18

**general**
22:16
27:24
28:24
42:11
44:13,18,
22 45:3
46:2,4,6,
7,16,18,
23 47:8,
11,15,16
69:11
70:17
76:8,10,
16,18,22
77:4,5,7,
10,14

79:19
80:5,10
90:9
92:4,9,11
94:4,11,
14,16
96:25
101:25
103:7,21
104:3,10,
14,20

**General's**
93:15,25
96:6

**generally**
19:16
20:14
27:15
28:13
31:15
34:22
42:16
44:24
48:18
53:20
66:23
79:8,13
88:19
94:9,13
100:8

**give**
28:24
29:8  56:2
79:13

**giving**
7:25
58:14

**goal**
55:25

**good**
4:23  48:4

**governed**
98:2
102:8

**government**
12:10
44:9,10

**grabbing**
33:10

**graduate**
38:9

**graduated**
18:12
38:4

**graduation**
18:15
39:22
41:2,6,
15,21
42:17

**grappling**
100:11

**greatly**
6:23
105:5
111:12

**ground**
6:4  22:9
32:24
33:4,7,
11,17,21
40:4,8
51:10
90:2,5
100:11

**group**
16:10
32:22

**guess**
27:21
30:19
94:17
95:3

**guidelines**
15:9  29:8
44:14,16

**guys**
5:18

**gym**
98:7
99:5,12,
13,23
100:2,3,
7,13
101:2,3,
15,24
102:2

---

**H**

**half**
15:17
16:14

**handbook**
65:23

**handbooks**
12:13

**handcuffing**
28:17,19,
22,25
29:4,5,7,
12,17,18,
19 75:10

**handcuffs**
31:3

**handle**
24:10,17
83:15

**handled**
32:10

**handling**
34:11,24
35:5,16,
19 70:6,
18

**hands**
33:10



hands-on
90:6

happened
87:21
92:16
94:15

happening
42:12
107:8

happy
5:3,18,19
6:8,10
20:16
26:6
48:4,21
111:5

harm
31:24

head
6:18

heading
60:15

headquarters
47:14

health
24:18
35:20
36:6,9
37:10
51:23
52:20
53:22
70:20
73:17
74:4
80:21
81:3 85:8
87:15
90:16,17

hear
6:6 48:12

heard
43:9

heart
93:17

heavily
100:16

held
4:6 14:10

high
13:7,8
18:19
29:6

higher
55:5

hindering
51:21

hire
77:18

hired
13:10
18:13,22

hobby
98:18,23
99:19
102:23
103:24
104:12

hold
27:22
34:19

holding
41:8

holds
100:12

honest
104:24

honestly
27:17

hopping
47:25

hotlines
83:18

hours
45:19,20
46:4

———————

I

———————

idea
27:24
63:8
94:12,14

identificat
ion
9:9 59:17
62:3 66:6

identifies
67:23

identify
59:18
63:6 64:5

identifying
84:2,5

illness
72:8
86:18
88:9

illnesses
63:6 64:6

imagine
22:15
101:9

imbedded
23:13,25

immediately
38:6

impact
87:22

impair
8:13

implement
87:18

implemented
33:18,22
53:9
96:13,17
103:2

implementin
g
104:18

importance
101:6

improper
108:10,22

in-service
17:24
43:2,5,
11,14
44:19
57:23,25
75:17
77:16
84:10
104:8

incident
85:12,13

include
21:22
69:22
70:25
:25

included
49:24
70:9,12,
18 71:4
95:11

includes
9:17
54:23
70:4

including
12:6,11

70:5
74:20,22

incorporate
d
57:18

increased
86:24
96:14

individual
28:20
29:6
30:16,18
33:10
53:21,22,
23 54:3
56:4 73:9
74:13
105:23
106:8
110:11,12

individuall
y
48:22
88:18

individuals
30:25
53:14
67:21
68:7
71:13
87:2 96:9

influence
8:12

information
10:22
57:22
63:7
106:16
107:5

initial
40:18
66:14



instance
  20:2 47:2
  110:23
instructed
  27:9
instruction
  53:18
  54:22
  78:13
  88:8
instructor
  17:18,19,
  22 18:4
  103:8
integrated
  25:21
interactions
  84:8
intercede
  25:19,20
  52:24
  53:6,9
internal
  19:23
  20:4,20
interrupt
  82:6
intertwined
  35:12,24
  50:17
  52:3
  71:21
  72:3,13
intervene
  53:7,8
intervention
  52:23
interview
  94:23

interviewed
  94:18
introduce
  9:4 59:3
  61:11
  66:3
introduced
  61:23
introductory
  4:24 6:3
investigate
  20:10
investigation
  20:4,7
  93:16,21
  94:2,5,19
  95:5,8,
  11,20,21
investigations
  19:24
  20:21
involve
  37:11
  56:9
involved
  94:22
  109:9,21
involving
  23:11
  37:3 50:4
issued
  12:17
IST
  44:19
  48:20
  50:14
  51:11
  54:10,14,
  23 55:4

56:3,5
  84:4
  87:19
  91:20
  93:9
ISTS
  43:10,12,
  20,23
  44:5,11,
  25 45:9,
  10 48:18
  49:3,7,
  13,20,22
  50:4,10
  51:2,9,
  14,20
  52:5,21
  53:6,10,
  15 54:20
  56:8
  57:12
  74:23
  78:16
  82:18
  85:6 87:5
  88:12,18,
  19,24
  89:13,23
  90:15
  91:12
  92:17,20,
  24 93:3
  101:17
  102:6
  105:9
  108:9,21
  109:6,18
ISTS'
  91:4

J

Jersey
  8:22
  14:5,25

15:7
  44:15
  47:10
Jitsu
  97:7,9,19
  99:13
  101:5,15
  102:2
Jiu
  97:7,8,19
  99:13
  101:5,15
  102:2
job
  7:8 77:20
  104:13
jobs
  18:21
  77:18
Jr
  5:22
Judo
  84:15
jump
  29:17,18
jumping
  48:12
June
  14:13

K

kind
  6:4 7:4
  19:20
  26:24
  31:24
  35:24
  38:19,22
  39:3
  40:15,17,
  19,22

41:2
  44:23,25
  81:20
  96:19
  100:2
kneeling
  31:6
  82:25
knowledge
  20:8
  56:2,5
  105:7
  106:18
  108:8,19
  109:4,16

L

label
  42:13
lack
  42:23
Lagoda
  95:13,24
language
  84:21
law
  5:23
  63:16
lawful
  75:19
laws
  19:19
  34:8
lawsuit
  67:2,5
  95:25
lawyers
  10:6 67:7
lay
  6:4



leading
49:2,13,
21 50:3,
10,23
51:7,17,
20 52:6,
22 53:2,
5,11 57:6

learn
95:7,19
101:14

learned
23:21
28:9 29:2
33:2
34:23
41:18
42:20,25
51:3 56:3
91:7,13,
20 101:4,
13 102:4,
25

leaves
48:7

led
32:17

left-hand
62:5

legal
76:10

lesson
22:16
24:25
27:23
84:4

lessons
34:22
35:23
41:18,25
42:19,25
49:22
71:25

93:7
101:13

letting
47:23

level
15:23
28:21
29:9,10
30:12
31:22
33:6
37:25
76:23
81:10,24

levels
29:7
31:7,19
57:14
75:5,10,
15 77:3
79:22
89:2
103:10,14
105:18

lieutenant
4:23 5:21
8:24
11:24
14:7,12,
17,19
15:12
16:17
18:25
20:3
43:17
44:4
54:14,19
68:19
84:13
85:18,25
105:19
111:11

lieutenants
45:7

98:12

life-
threatening
64:16
108:13,24

limited
12:16
32:13
33:8
97:19
100:3

lines
23:17
24:14
35:15

list
79:21

listed
67:24
110:16

listen
36:19

listening
25:2,4
28:4
35:8,12
36:2
52:8,19
70:25

live
97:12

local
14:24
44:9

located
18:3
38:18,19
99:22
100:4

lodged
12:15

long
14:10
15:15
39:20
73:3 76:9
77:2

longer
99:22

looked
11:22

lot
32:10
35:13
58:10
63:13
72:4,9
96:16,21
98:20

lungs
108:12,23

———————

M

made
92:17,22
102:23
103:16
104:16

main
15:4

major
91:23

make
7:8 14:20
15:2
16:2,9
26:22
54:8
104:6

man
95:24

mandate
12:9 15:8

mandated
20:9
46:24
48:25
79:6

mandates
44:10

mandatory
43:2,14,
20 54:20

manpower
15:2

manual
65:17,20,
22,24

manuals
12:13

March
16:20,21
19:15
27:11
28:6

mark
8:21
59:13
61:24
84:14

marked
9:4,8
59:16
62:2
66:3,5
68:24

martial
97:18,21
98:21
99:14
100:15

Master's
13:11,18,



19

material
  17:23
materials
  56:9
  57:6,13
  58:6,20
  60:9
  63:24
  64:2,20
  70:10
  74:24
  86:3
  106:17
  107:23
matrix
  76:23
  77:2
  81:19,23
  82:7
matter
  5:24 20:5
  67:22
  74:15
  86:7 94:2
  104:12
meaning
  11:9
means
  103:21
medical
  24:6,12
  34:12,17,
  25 35:4,
  7,17,25
  36:25
  37:14
  51:22
  56:16
  57:19
  58:12
  63:9
  70:19
  73:16

74:3
80:21
81:3 85:8
86:14
90:16,18,
19,20,22,
23 105:24
106:8
110:12

medically
  35:10
  105:11
  106:22
  109:8,20
  110:10,
  14,23
meet
  12:25
meeting
  48:8
member
  98:7
members
  43:24
membership
  99:5
mental
  24:18
  35:20
  36:6,9
  37:3,10,
  15 51:22
  52:20
  53:22
  59:15,25
  60:14
  61:2,6,
  22,25
  62:24
  64:11
  70:20
  72:8
  73:17
  74:4

80:21
81:3 85:8
86:17,18
87:15
88:9
90:16,17
107:13,19

mentally
  37:4
mentioned
  33:19
  35:25
  40:17
mere
  93:8
methods
  29:20
  32:14
Microsoft
  58:4
middle
  81:24
miles
  100:4
minimum
  89:13
minor
  91:25
mixed
  35:13
  97:18,20
  98:21
  99:14
  100:15
MMA
  99:12
  103:24
moment
  59:4
months
  19:12

27:19
32:11

morning
  4:23
Moschitto
  4:3,18
motions
  5:14
motor
  87:16
move
  49:24
moving
  43:12
  49:16
multiple
  12:18
  36:5
  57:20
  63:12
  71:21
  92:4
  99:18
  103:9,14
muscular
  62:24
  64:11

N

named
  67:21
  68:8,15
names
  68:2,5
Narcan
  90:22
narrow
  12:25
nation

87:13

national
  56:10,11,
  14,20
  57:2,7
  58:7,21
  59:11,22
  60:7
  61:15
  62:7
  63:4,11,
  17 74:25
  106:11
  107:11
  110:25
nationally
  42:12
needed
  55:19
  111:6
Newark
  17:8,11,
  14 38:15
nice
  73:9
nods
  6:18
noncombativ
e
  108:3
noncomplian
t
  29:5,17,
  18 30:4,
  18,20,23
  31:4 70:7
  106:13
Notary
  4:4,18
  5:18
note
  12:14

800.211.DEPO (3376)
EsquireSolutions.com



64:25
76:20
82:16
85:10
86:9
87:8,9
95:14

**noted**
111:17

**Notice**
9:6,8
11:7,10
12:17

**number**
48:14
66:11,12,
13 72:23
74:20
110:16

**numbers**
59:19
83:20

**numerous**
12:24

─────────

O
─────────

**oath**
7:25 8:3,
25

**object**
85:15

**objection**
12:15
20:11
26:2,13
29:21
37:2,5,23
41:4
58:23
65:2
71:17
73:18

74:5
76:20
82:17
85:11,20,
23 86:10
87:8
95:15
96:2
98:15
100:23
104:21
105:12
108:15
109:11

**objections**
5:12
12:15

**objectively**
30:7,10,
21 31:20
76:10
81:25

**objectives**
16:5

**objectivity**
30:12

**observation
al**
41:10

**observed**
40:11

**observing**
40:18

**obtain**
13:17

**obtained**
20:8

**occasions**
52:4

**occur**
93:4

**occurred**
93:16

**odd**
18:21

**offend**
94:25
103:22

**office**
8:2 38:10
93:15,25
96:6

**officer**
12:12
16:24
17:3,6,10
18:23
24:11
25:12,25
26:22
31:9,21
34:13
38:7,10
39:9,19
40:25
41:8
43:18,19
50:24
54:18
55:6,18
56:8
65:14,16
73:2
74:21
76:3,9,
11,25
77:11,12,
13 79:15,
22 80:25
82:3 83:9
94:22
97:9
98:14
99:12
101:14
104:16

**officer's**
58:17

**officers**
12:8
15:24
24:16
26:12
37:11,12
41:17,23
42:18
43:2
45:6,7
49:10
56:19
57:2,4
63:5,20
64:3
67:25
68:11
71:13
77:19
78:19
79:23,24
81:6,14
82:24
86:4
88:5,21
96:8
98:11,12
99:5,10,
16,17,18,
25 100:6
103:3,23
105:8,18
106:3,6,
17 107:24
108:9,20
109:5,10,
17,22

**officers'**
37:19

**on-boarding**
38:22
39:4
40:19

41:7

**one-time**
55:11

**open**
110:7

**operate**
6:13

**operations**
92:12

**opportuniti
es**
17:20

**orally**
77:25

**order**
40:24
42:11
44:18,22
55:3
70:17
76:8,10,
16,18,22
77:4,5,7,
10 79:19
80:5,10,
12 83:15
90:9
92:4,9,11
93:8
104:14,20

**orders**
44:13
45:4
46:6,7,
17,18,24
47:8,12,
15,16
77:14
84:6
92:5,12
104:3,10

**outset**
69:14



overlap
  22:16
  70:23
overview
  20:24
  28:25
  38:20
owed
  25:8,14,
  24 26:18
  37:20
  54:3

---

P

---

PA
  59:21
  61:17
PA-2064
  59:22
  60:5
PA-2065
  60:14
PA-2066
  60:24
  61:7
PA-2083
  62:17
  64:20
PA-2093
  64:24
pains
  8:6
PAPD
  12:4,8,12
  65:17
  69:5
  80:18
  81:6,14
  84:3
  95:12
  96:7

98:11
104:4
105:7
107:24
108:8,19
109:4,16
paramedics
  56:18
  63:19
parking
  38:19
part
  19:16
  23:9,16
  20 24:9,
  15,24
  26:10
  35:5
  42:23
  49:7,20
  52:6 56:6
  58:16,17
  71:15
  73:24
  74:17
  78:16
  85:15
  89:25
  90:20
  94:19
  96:5
  101:4
  108:6
partake
  99:19
partially
  60:20
participate
  97:7,14
  99:10
participati
ng
  102:22

parties
  4:10
partner
  68:14
parts
  50:9
pass
  55:3 56:5
past
  11:23
pathogens
  57:16
  90:20
patient
  60:19
  65:10
  106:10
  108:2
patients
  106:12
patrol
  15:23
  17:10
  21:4
penalty
  8:7
pending
  7:17
Pennsylvani
a
  13:16
people
  37:21
  98:20
  108:4
  110:20
percent
  55:5,9,13
perfect
  43:7

period
  18:18
  25:21
  38:12
  39:4
  40:15,18,
  19,23
  41:7,11
  45:4
  50:14
  75:20
  85:19
  88:25
  91:13,16
  92:25
  93:4
perjury
  8:7
person
  4:12
  34:12
  35:6,9,16
  55:7 56:2
  58:12
  70:6
  84:2,16,
  19 110:22
person's
  55:3
personal
  18:21
  68:6
personally
  97:24
personnel
  95:12,23
pertaining
  44:18
  46:5 64:7
  92:3
phone
  83:22

phrase
  42:24
physical
  21:11
  56:17,24,
  25 63:19
  70:7
  78:6,7
  98:22
  102:4
  109:9,21
physically
  28:19
  77:24
  101:7,10
  103:4
picture
  105:21
place
  31:2 47:9
  56:15
  63:9 84:4
  92:24
plaintiff
  47:24
plaintiffs
  5:24
plan
  24:25
  27:23
  84:4
plans
  22:16
play
  108:6
played
  13:21
point
  20:23
  30:2
  34:21
  47:21



48:3
60:10,19
61:5
62:23
64:10
65:9
72:23
73:15,24

**Pointing**
29:5

**points**
21:17
75:13

**police**
10:8
11:22
12:4,5
14:8,18,
23 15:7,
14,19,24
16:8,22,
24 17:3,
5,6,9,10,
17,18,20,
22 18:4,
22 19:6,
7,18
21:4,9
22:24
23:2,6,8,
19 24:3,
9,15,22
26:22
27:3,6,8,
19 38:5,6
39:9
40:25
41:8,16,
22 42:7,
25 43:18,
19 44:8
45:6,9
46:21
47:13
48:17

55:18
56:19
57:2,5,24
58:13,19
63:5,20
64:3
65:15,21
67:8
68:3,12
69:5,21
72:17
75:6
76:7,19,
25 78:17
79:9
82:15,24
84:13
86:5,16,
20 87:23
88:3,20
92:15,23
93:5,8
95:22
97:22
98:2,14
99:10,19
102:13,15
103:6,9
105:8,18
106:6
109:5,17

**policies**
47:7,8

**policy**
11:23
57:2
102:8
104:4,9,
18

**Port**
10:6
12:5,9
13:10
14:4,7,
18,23

16:22
17:6
18:11,14,
16 19:7
20:3,21
38:5 39:9
40:24
41:16,22
44:8,14
45:9
46:21
48:16
57:5
58:18
59:21
61:17
64:2
65:15,20
76:7,18
78:17
81:12
82:24
83:19
84:13
85:17
86:4
87:22
88:2,20
95:22
97:2
98:2,14
99:15,17,
25 102:7,
19 103:6,
16

**portion**
67:23

**position**
85:16
110:2,3,4

**positional**
22:17,25
23:11,12,
15 28:15
34:3

51:15
108:14,25
109:2

**post**
39:8 41:8
50:24

**posting**
16:2

**posts**
16:5

**potential**
97:3
109:7,19

**potentially**
68:10
87:5

**Powerpoint**
58:5
59:23
61:22
63:3
64:14

**practices**
19:18

**preparation**
9:25
10:19,24
11:6,15

**prepare**
11:12,20

**prepared**
5:4 103:4

**preparing**
67:12

**pressure**
75:13

**pretty**
14:20
20:24
33:8
36:17

38:16
72:5
84:17
87:13
94:23
100:16,19
101:9

**prevent**
31:24

**previous**
61:21
63:2

**previously**
53:13
90:13

**primarily**
18:3

**printing**
58:13

**prior**
15:11
16:21
43:16
69:15,17,
21,24
71:24
72:17
75:6,7
80:18
82:15
85:13
88:21
89:24

**privileged**
10:21

**procedure**
38:23
57:3

**procedures**
11:23
19:19
28:17,19,
22 29:2



| | | | | |
|---|---|---|---|---|
| **proceed** | **purpose** | | **realizing** | 65:19 |
| 38:24 | 93:20,25 | **R** | 84:19 | 100:9 |
| **process** | **pursuant** | | **reasonable** | **receives** |
| 54:17 | 4:9 | **range** | 30:8,11, | 56:4 |
| 81:22 | **pushed** | 14:24 | 22 31:8, | **recent** |
| 94:24 | 92:12 | 32:9 | 20,22 | 33:13 |
| **program** | **put** | 45:13,15, | 81:10,25 | **recently** |
| 39:19 | 47:8 83:3 | 18,23 | **reassurances** | 16:16 |
| 87:19 | | 46:3,10, | 49:9 | 46:21 |
| **program's** | **Q** | 14 47:6 | **rebuttal** | **recite** |
| 39:25 | | 92:22 | 87:10 | 41:24 |
| **prohibited** | **question** | **ranging** | **recall** | 42:18 |
| 82:25 | 6:12 | 63:18 | 16:19 | 73:22 |
| **promise** | 25 7:2,4, | **rank** | 19:12 | **recites** |
| 8:10 | 10,12,13, | 54:19 | 29:15,24 | 44:22 |
| **promote** | 17 12:23 | 55:7 | 32:20 | **recognize** |
| 98:19 | 15:18 | 98:13 | 33:14,16, | 9:14,18 |
| **promoted** | 20:16 | **Rarely** | 20 34:18, | 66:20 |
| 14:12 | 26:9 | 64:15 | 22 36:7 | **recollection** |
| 16:17 | 29:23 | **re-deposition** | 49:3,21 | 36:15 |
| 43:16 | 34:15 | 9:6,8 | 50:4,9, | 52:16 |
| **prone** | 44:3 | 12:16 | 14,22,25 | **recommended** |
| 29:19 | 48:20 | **Re-notice** | 58:3,5 | 96:7 |
| **proper** | 53:3 54:9 | 9:15 | 66:25 | **record** |
| 16:9 | 80:2 | **reach** | 67:17 | 5:8,12 |
| **properly** | 86:8,11 | 83:20 | 71:23 | 22:23 |
| 15:8 | 95:2 | **reached** | 80:2,8 | 47:24 |
| 33:21 | 103:19,20 | 10:7 | 82:6,10 | 64:19 |
| **prospective** | 109:14 | **reactive** | 87:20 | 86:10 |
| 24:16 | **questions** | 46:19 | 91:3,11 | **record's** |
| **provide** | 5:25 6:7, | **read** | 104:23 | 54:8 |
| 20:17 | 10,17,22 | 5:17 | 107:10, | **recruit** |
| 49:9 95:4 | 7:21 | 60:21 | 12,16 | 15:4,5,6 |
| **provided** | 8:14,15 | 61:8 | **receive** | 17:23 |
| 106:17 | 19:2 | 64:12,13, | 54:14 | 19:25 |
| **public** | 69:5,11, | 17 65:5, | 65:16 | 20:25 |
| 4:4,18 | 15,16 | 8,10 | 98:5 | 22:18,19 |
| 17:13 | 83:6 | 66:17 | **received** | 23:14,15 |
| 73:2 | 84:23,24 | 107:17 | 13:9 | 27:9,11 |
| 106:2 | 85:2 | **reading** | 17:20 | 28:8,21 |
| | 88:12,22 | 60:2 | 23:8 40:6 | 29:7 |
| | 96:25 | | 41:25 | |
| | 105:3,4 | | 48:16 | |
| | 111:5,7,9 | | | |



31:14
32:4,16
33:3,6,25
35:2,3,
11,19
36:4
48:17,19
55:18
56:8
69:10
79:2,3,5
84:10
86:19
93:12
102:9
104:7
105:17

**recruits**
98:19

**Redding**
13:15

**reduce**
49:24

**reducing**
49:17

**reemphasize**
88:3

**refer**
34:5
43:12
44:12
63:7 75:8
83:21

**referenced**
87:12
89:4

**referencing**
77:20

**referred**
43:9
107:25

**referring**

28:15
29:11
43:5,14
46:23
49:12
69:25
71:7
72:18
101:18,19

**refers**
63:14
106:12

**refresher**
50:15
75:11
78:4 89:6

**refreshers**
50:16,19
90:22,23

**regard**
49:3
50:11
83:12

**reimbursed**
99:4,5

**relating**
86:2

**relation**
95:5

**relationshi
p**
68:7,14

**relayed**
77:25
78:9

**relevant**
86:6

**remain**
84:9

**remedial**
55:14,15,

17,22,25

**remedially**
55:20

**remember**
20:22
27:18
28:23
36:5
58:11
78:3
79:12
91:24

**remotely**
4:9

**removed**
80:4

**repeat**
6:8,11
12:23
37:7 80:6
86:11
108:17
109:13

**rephrase**
6:11
40:16
80:7

**report**
96:6

**reporter**
4:2,4,8
69:2

**represent**
66:14

**representat
ive**
10:7 67:8

**represents**
5:23

**require**
30:4

**required**
12:8
43:23
44:4 45:2
55:2,3
76:4

**requisite**
55:2 56:2

**research**
111:16

**reserved**
5:13,15

**resisting**
53:24

**resort**
74:12

**resource**
83:23
107:6

**resources**
73:11

**respect**
16:15
28:2 33:3
34:24
37:9
46:18
48:15
85:18
89:10

**responder**
56:23

**responding**
25:13
34:14
38:21
53:20
107:5

**response**
35:4 46:2
56:16
57:15

58:12
85:22

**responses**
8:6 35:25
85:18

**responsibil
ities**
14:17
15:20,22
17:5,12,
21 58:17,
18 79:15

**responsible**
58:20

**restrain**
65:10

**restraining**
22:3
28:9,14,
16,20
29:20
30:16
50:5,6,12
70:5,8
75:4,5,9,
19,21
76:2,13
77:22
78:8
88:25
89:2 91:9
108:11,22

**restraint**
22:25
23:11,12,
16 34:4
51:16
108:14,25

**restraints**
22:17
28:15
33:9
75:12,16



result
92:8

Results
62:23
64:10

retain
41:17

retraining
42:5

revert
78:25

review
9:24
14:20
57:18
67:9,11

reviewed
9:22
10:10
67:4

reviewing
11:7
66:25

risk
109:7,19
110:18

roll
15:25
16:4

room
4:8

roughly
16:19
21:14
45:17

rules
6:4 19:20

run
40:23

—————————

**S**

—————————

Safety
56:10,11,
14,20
57:7
58:7,21
59:11,23
60:7
61:15
62:7
63:4,12,
17 74:25
106:11
107:11
110:25

sake
6:20 7:7
22:22

scenario
81:2

scene
73:12
84:11

school
13:7,8
18:20

sciences
19:18

scope
85:23
104:19
105:14,20
109:24

score
55:2,9,13

screen
9:11
11:11
12:3 59:6
61:13
66:8

68:22

scroll
9:13

Scrolling
9:20

segmenting
80:3

seizure
87:3
96:10
105:10
106:20
107:3,18
110:24

seizures
61:7,19
62:19
64:22
65:5
107:14

semester
45:11,12
46:13

separate
24:25

sergeant
15:14,15,
19,21,23
16:16,18
43:17,22
54:18
55:6
105:19

sergeants
45:8
98:12

series
5:25 19:2
68:20
69:5
84:24

service
17:13,14
84:12

services
64:6

session
42:8

sessions
46:3
51:15

set
6:3 11:9
38:8 58:4
59:24
61:16,18,
21 62:6,
10,12
76:2
88:12

sets
77:10

setting
55:19

severity
74:7

sharing
68:21

shooting
45:24

Shore
97:8
99:24
102:18,21

Shorthand
4:3

shoulder
6:17

show
16:3

showed

63:3
111:2

shrugs
6:18

side
16:6
17:10
47:12,13

sign
5:17

significant
110:18

similar
15:18
36:18,23,
24 37:13
39:14
40:5
79:21
88:12
92:17,19
93:3,13
97:15

simply
11:4
53:23

simulated
20:7

sir
6:15
7:13,14,
20,23
8:4,8,16
9:2,10,
12,18,21
10:2,14
11:16,19
13:5,24
14:11,14,
19 15:10,
16 16:12,
21 17:25
18:5,24



19:8,22
20:19
21:6,10,
13,24
22:2,4,6,
8,11,14,
20,21
23:23
24:2,13,
19,23
25:6,17,
23 27:7,
14 29:13,
14 31:12
34:18,21
35:22
36:11,12
37:16
38:4,11
39:2,6,
20,23
40:14
41:14,20
42:3,22
43:4,6,
11,15,21,
24 44:6
45:22
48:14,21
49:6,15
50:2
51:5,6,
12,24
55:23
56:12
57:8,14
58:6,8,25
59:4,6,10
60:2,3,8,
12,14,17,
23 61:4,
9,11,13,
20 62:8,
15,16,21
63:22
64:8,24
65:3,7,

12,13,23,
25 66:8,
14,18,19,
23,24
67:3,13,
16,20
68:9,16,
18 69:4,
13,19,20
70:2,3,
11,14,16,
21 71:3,5
72:14
73:13,23
75:2
24 77:21
80:13
81:5
82:20,22
84:22
87:24
88:11,14
89:15
90:11
91:2
93:14,18
94:3,7,
13,20
95:6,9
96:4,23
98:8 99:2
101:8,12
103:19,22
104:25
106:14
107:21,25

**sitting**
82:25

**situation**
24:12
29:25
30:14,15,
23 31:10,
21,23
34:24
35:6,9,16

49:9
54:4,5
63:10
73:3
74:16
77:14,15
81:8,11,
16,21
82:2
105:15,22
106:4,7,9
107:2,3
109:24,25
110:5,10

**situations**
24:10,17
31:5
34:12
35:19
70:6,18
106:5
108:6

**skills**
25:3 28:4
35:9
52:8,19
71:2

**slide**
59:23
60:16
61:2
64:21

**slides**
58:5
59:15,24
61:17,18,
22,25
62:10,12
63:14
107:12,14
110:25

**slow**
36:18,20,
21 73:5,9

**slowly**
49:17,24

**sound**
5:2 48:12
69:7

**space**
108:5
110:5,6,
7,20

**speak**
6:4
10:18,23
11:5,11,
14 27:15
83:13,16
84:3,7

**speaking**
42:16
44:24
47:20
100:8

**specific**
20:23,25
26:9
42:13
50:13
69:8
71:20
78:13
85:12
87:20

**specifically**
11:3
26:25
36:5 50:7
52:5,10
54:10
58:11
68:4 71:6
75:9
79:11
80:14
82:12

83:17
87:2 90:8
92:3,6
93:22
97:19
100:25
102:14

**specifics**
13:2
71:23
79:12
94:3,8,11
97:18

**split**
17:8
70:17
79:18

**spoke**
10:23
11:3 71:8
75:8

**sponsored**
97:25
99:7

**spots**
38:19

**spring**
42:7,14
45:11,12
46:12
72:7,11
78:14
89:19

**stages**
32:7

**stamped**
59:21

**stand**
81:24

**standard**
26:11,16,
18,21



37:22
53:12,13,
19 54:2
71:4,7,9,
12,15,20
72:2

**standards**
15:9
25:24
37:18,20
91:11

**standing**
31:5 83:2

**standpoint**
7:6

**start**
5:6 7:12
9:3 80:2
86:12
88:21

**started**
4:25
65:14
86:17,22
102:16,21

**starting**
18:11
43:19

**state**
4:4,19
8:17 12:9
35:10
37:4,15
44:15
46:7
47:16
84:12,14
85:7
86:13,25
107:9,19
110:11,23

**stated**
23:16

67:6
106:10

**statements**
95:4

**states**
46:25
47:9

**status**
59:15,25
60:15
61:3,6,
22,25
107:13

**status/
uncontrolle
d**
62:24
64:11

**stay**
98:21
102:11

**staying**
77:3

**stays**
84:17

**stenographe
r**
6:20

**stenographe
r's**
7:8

**step-by-
step**
81:22

**steps**
38:8
80:23,24

**stipend**
98:6

**stipulate**
4:11,13

**stipulation
s**
5:7,9

**stop**
68:21

**stops**
87:17

**strategies**
24:21,25
36:3
52:7,18,
24 70:25
83:8,12,
14 91:11
104:2,19

**strategy**
84:5

**Street**
8:22

**stress**
100:21

**stresses**
100:16

**strict**
102:7

**strictly**
32:8
51:13

**strike**
5:14
20:16
45:6

**struggle**
109:9,21

**stuff**
38:20
72:12
75:13

**subject**
8:6
24:11,17

25:25
34:25
35:20
36:8 37:9
49:10
53:22,23
70:19
73:16
74:3
80:20
81:2
83:13,16
84:6,7
95:24
105:10
106:19
109:8,20
110:18

**subject's**
83:2
108:12,23

**subjects**
23:11
24:5,21
25:16
26:19,20
37:21
51:21
53:14
71:14
85:7
86:14

**submission**
100:12

**subsequent**
62:14

**substitute**
18:20

**suffering**
37:14
85:7
86:14

**suggested**
97:25

**suggestions**
102:24
103:16

**suicide**
96:17

**Summons**
66:15

**supervising**
15:24

**surrounding**
110:19

**survival**
103:11

**suspect**
30:9
31:11

**suspects**
106:13

**sworn**
4:9,12,17

**symptoms**
64:7

---

**T**

**tactic**
76:15

**tactical**
45:25

**Tactically-
wise**
36:10

**tactics**
19:21
22:13
32:25
33:4,17
51:10
76:13
90:2

LT. MARK BERGERY  30B6
TARASOV ESQ. -V- PANYNJ

February 13, 2024

800.211.DEPO (3376)
EsquireSolutions.com



102:17
103:10,
11,12,13

**taking**
7:18 56:8
88:15

**talk**
49:16

**talked**
92:14

**talking**
7:4 54:23
91:15
110:3,19

**tangle**
100:21

**Tarasov**
47:19,20,
25 48:6,7

**taught**
18:20
20:6 21:4
27:5,13,
23,25
29:16
30:5,11
31:15
32:3
33:24
34:2,11,
16 36:7
37:12
38:2
46:14,18
47:3,6
63:12
72:16
74:10,15,
18,19,21,
23 75:4,
21 76:4
79:8,11,
13 82:14
83:12,14

86:17,18,
19 87:5
89:17
101:16
102:5,9,
18 104:9

**teach**
20:20
22:9,12,
17,25
24:4,20
25:2,7,
14,18,23
35:8,17
36:18
47:11,14
51:8,9,19
52:22,23
53:10,15
74:9
75:25
76:8
81:6,14
89:25
100:11,14
105:17

**teachers**
56:18,24
63:19

**teaches**
81:12

**teaching**
17:23
24:16
26:11
71:25
75:18
85:6
86:12

**teachings**
41:17
50:25
76:6,18
86:3

87:22
88:5
91:5,20
106:16

**technically**
45:16

**techniques**
21:23,25
22:3,10
27:6
28:2,10
32:24
33:5,7,
17,21
42:5
49:4,5,23
50:5,6,12
51:10
52:19
69:23
70:5,24
72:16
73:16
74:2
75:4,19,
21 76:2
77:23,24
78:8
88:25
89:2,5
90:3,4,5
91:10
100:15
101:6
102:3
108:11,22

**ten**
34:21
36:16

**term**
43:10

**terminals**
38:18

**terms**

5:7,17
18:6
21:18
27:2,23
30:10,12
42:17
45:5
46:16
50:12
71:9,24
77:22
79:15
80:16,24
83:7,25
84:5
100:9
102:25

**test**
54:25
55:7,11

**tested**
21:15
41:19
45:10
52:14

**testified**
4:20 8:24
54:2
63:25
71:10
82:17
85:5 89:9
90:13
92:21
107:22

**testify**
11:25
13:3
85:25

**testifying**
8:3

**testimony**
4:11 7:25
19:20

71:12
85:11,14

**tests**
12:3 21:8
45:5
54:24
55:21

**therapists**
56:25
63:20

**thick**
58:9,14

**thing**
45:14
87:11
89:4

**things**
4:25 6:3,
18 16:7
17:10
26:25
30:4
38:24
39:16
57:17
69:7
72:10
74:20,22
85:4
96:16
101:4,15
102:3,24,
25 108:5

**Thinking**
36:16

**threat**
29:6
73:2,4
106:2

**three-year**
45:4

**threshold**
29:9 30:2



**till**
7:9

**time**
5:13,15,
19 10:9
17:8,18
27:2,15
28:6,12,
23 29:15
30:8,22
31:8,13,
17,23
32:21
38:15
44:21
47:4 48:4
49:8
50:14,20
51:18
53:4
55:17
58:13
66:21
68:3
69:18
70:16,25
73:21,25
75:13,19,
20 76:11
79:17
80:17,18
81:11,18
85:19
88:15,16,
24 90:15
91:5,13
92:18,25
93:9
96:11
97:24
98:4
101:23
104:15
105:2,5,
17
111:14,17

**timeframe**
52:25
78:2,18
83:4,8
102:15

**timeline**
16:15
18:6

**times**
30:25
45:16
55:8
57:20

**timing**
43:7

**title**
14:11
15:12
16:22
59:24
60:25

**titled**
62:19

**titles**
16:25

**today**
5:5,24
8:15 9:25
11:18
12:2 13:4
39:4,17,
18 52:4
71:5
88:15
111:2

**today's**
6:5 11:21
67:12

**told**
29:24

**tone**
73:10

**top**
9:15 65:4
66:10

**topic**
42:10

**topics**
9:17
10:22
11:25
12:16
13:2,4
48:15,18,
24 72:13
85:24
91:7
103:7

**torso**
83:2

**total**
40:13

**totality**
74:11
105:15

**touch**
44:25
87:25

**tour**
38:16

**tracker**
54:22

**train**
96:7 97:8
99:24

**trained**
23:21
42:20
54:10

**trainer**
18:21

**trainers**
56:17,25

**training**
11:23
12:3,7,12
14:21,25
15:5 16:9
17:20,24
19:2,10
20:9,13,
19 21:2,
5,19
22:18,19
23:7,15
31:14
32:10,16
34:8
38:12,14
39:19
40:8,10
41:18,25
42:6,24
43:3,5,
11,14
44:19
48:15
55:14,15,
17,19,22,
25 56:6,
9,16
57:15,23,
25 64:5
69:6,9
72:9
75:17
76:16
79:2,4,6
82:18
84:10
85:14
86:3,19
88:7 90:6
93:12
96:15,21,
25 97:2,
15 98:22
100:9
101:5
102:10,

11,13,17
103:3,5,
10,11,13,
14 104:7,
8 105:6,
7,18
107:6
108:7,8,
18,19
109:3,4,
15,16

**training-
wise**
14:24

**trainings**
93:9
96:12,14
103:12,15

**transcript**
6:21 7:7

**transferred**
16:8
17:16
102:15

**transition**
33:11
40:10
82:7
91:16

**transitione
d**
77:2
81:19

**transitioni
ng**
93:11

**transitions**
31:3
81:23

**translate**
83:21



transportation
  40:4,9

treat
  38:2

treated
  26:21,23
  45:8

trends
  42:11
  77:17
  87:13,17,
  20 88:2,
  10 96:18

trial
  5:14,15
  40:15,23

truthfully
  8:15

turn
  31:2

two-week
  38:12

two-year
  18:18

type
  15:25
  34:16
  35:6
  36:24
  52:11,19
  53:18
  56:23
  59:9 63:6
  64:5
  73:11
  76:13
  84:15
  93:11
  97:15
  98:20
  99:13

types
  17:13
  64:6

typically
  5:16
  38:24
  46:19
  83:23

———————————

U
———————————

Uh-hum
  88:23

ultimately
  55:25

undergoing
  24:5

underneath
  44:17

understand
  6:9,14
  7:13,24
  8:5,14
  27:14
  28:11
  34:20
  69:19
  98:25
  106:14

understanding
  55:24
  58:20
  71:11
  84:6

understood
  6:19
  18:24
  40:14
  41:12
  63:21
  68:18
  107:10

unique
  8:10  96:8
  98:10

uniquely
  85:6
  86:13,25

University
  13:20

unlawful
  75:20,22

unresponsive
  60:21

up-to-date
  16:11

updated
  92:5

upkeep
  42:24

usual
  5:9

utilize
  31:9
  75:12
  79:22
  102:19
  104:11,13

utilized
  63:4 64:4
  72:23,25

———————————

V
———————————

variety
  70:4

varying
  25:24
  89:2

vehicle
  87:17

vein
  6:24 32:2

verbal
  24:20
  36:2,20
  52:7,11,
  18 70:25
  72:7
  78:12
  83:7
  84:15
  91:10

verbally
  6:17,22
  77:25
  78:9

verbatim
  27:22
  34:20
  41:24

verifying
  54:18

versus
  30:3
  39:17
  89:12

vicinity
  73:5

videoconferencing
  7

violated
  104:17

violating
  77:13

violation
  76:17
  104:4

voice
  36:21

vulnerability
  96:8

vulnerable
  35:10
  85:7
  86:13,25
  105:11
  106:22
  109:8,20
  110:11,
  14,23

———————————

W
———————————

wait
  6:25 7:9

waive
  5:18

wake
  96:9

walk
  5:3

wanted
  99:2,8

ways
  33:9

week
  10:11
  40:2,9,20

Weekly
  21:16

weeks
  10:17
  19:10
  39:7,21
  40:2,6,7,
  11,12,13,
  20,21
  67:19

weight



100:22

**whatever's**
46:24

**whatnot**
57:19

**white**
97:6,11

**wholly**
60:21
86:6

**window**
69:17
90:14

**wise**
73:6

**witness'**
85:11

**witnesses**
26:20
37:21
53:14
71:14

**Word**
58:4

**word-for-word**
27:18

**work**
8:19,20,
21 88:16
90:19
100:5
102:23
103:25
110:7

**worked**
68:12

**working**
18:3
38:7,21,
24 68:13,

14

**works**
44:13

**written**
21:11
77:25
78:10

**wrong**
53:25

---

**Y**

**year**
18:7
44:21
45:16
47:3
50:21
52:14
57:21

**yearly**
42:6
44:20
52:20
57:11,16,
20 58:22
64:3
86:20
89:13
90:15,17,
21

**years**
13:12
15:17
16:14
18:2,13
33:13
34:21
36:16
39:17
44:22
49:2,13,
21 50:3,
10,23

51:7,17,
20 52:5,
15,22
53:2,5,11
57:6,17
62:14
71:24
90:13,21
92:5

**York**
4:5,19
12:10
14:4
44:16
47:10
93:15

**young**
98:19

---

**Z**

**Zoom**
48:7

LT. MARK BERGERY  30B6
TARASOV ESQ. -V- PANYNJ

February 13, 2024

800.211.DEPO (3376)
EsquireSolutions.com

