# EXHIBIT Y

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------x
ALEXEY V. TARASOV, ESQ., Administrator of the
Estate of EVGENIY LAGODA, Deceased, and GRIGORY
TIKHOPLAV,

                    Plaintiffs,

          -against-              Case No.:
                                1:21-cv-06226(NRB)
PORT AUTHORITY OF NEW YORK AND NEW JERSEY and
PORT AUTHORITY OF NEW YORK AND NEW JERSEY POLICE
DEPARTMENT a/k/a PORT AUTHORITY POLICE DEPARTMENT
a/k/a PAPD, PAPD OFFICER MICHAEL BUGIADA, PAPD
OFFICER ROBERT JOSEPH, PAPD OFFICER JONATHAN
PAPIA, PAPD OFFICER PAUL MEZZACAPPA, and PAPD
OFFICER JONATHAN DURAN,

                    Defendants.
-------------------------------------------------x



          REMOTE VIDEOCONFERENCE DEPOSITION OF

LIEUTENANT LAWANDA IRVING, a 30(b)(6) witness on

behalf of The Port Authority of New York and New

Jersey, one of the Defendants herein, located in

New York, New York 10007, taken by the Plaintiffs,

pursuant to Notice, held on Wednesday, February

14, 2024, at 10:12 o'clock a.m., before Deborah

Moschitto, a Shorthand Reporter and Notary Public

of the State of New York.



A P P E A R A N C E S:


        ASHCROFT LAW FIRM, LLC
                Attorneys for Plaintiffs
                200 State Street - 7th Floor
                Boston, Massachusetts 02109

        BY:     J. CHRISTOPHER AMRHEIN, JR., ESQ.



        PORT AUTHORITY OF NEW YORK AND NEW JERSEY
                Attorneys for Defendants
                4 World Trade Center
                150 Greenwich Street - 24th Floor
                New York, New York 10007

        BY:     CHERYL ALTERMAN, ESQ.



ALSO PRESENT:

        ALEXEY TARASOV, ESQ., Plaintiff
        (Partial session)



                        *  *  *



S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties hereto, that the filing, sealing and certification of the within deposition be waived; that such deposition may be signed and sworn to before any officer authorized to administer an oath; that all objections, except as to the form, are reserved to the time of the trial.

* * *

L. Irving

THE COURT REPORTER:  Hello.  My name is Deborah Moschitto.  I'm a Shorthand Reporter and Notary Public of the State of New York.

This deposition is being held via videoconferencing equipment.  The witness and reporter are not in the same room.  The witness will be sworn in remotely pursuant to agreement of all parties.  The parties stipulate that the testimony is being given as if the witness was sworn in person.

Do counsel so stipulate?

MR. AMRHEIN:  Yes.

MS. ALTERMAN:  Yes.

L A W A N D A    I R V I N G, the witness herein, having been duly sworn by Deborah Moschitto, a Notary Public in and for the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. AMRHEIN:

Q.    Good morning, Lieutenant.  First of all, thank you for being here.  We greatly appreciate it.



L. Irving

MR. AMRHEIN:  Before we get started, Cheryl, I know we had depos yesterday and we proceeded with the usual stipulations.  Is that agreeable for today?

MS. ALTERMAN:  Yes.

MR. AMRHEIN:  Okay.  Just to put them on the record, all objections, except as to form, are reserved until the time of trial and all motions to strike are reserved until the time of trial, receipt and sign 30 days, or if you need more, Cheryl, that's fine, and then we will waive notary.  That's fine with us.

MS. ALTERMAN:  Okay, thank you.

MR. AMRHEIN:  For the record, Plaintiff Alexey Tarasov is present in today's deposition, as well.

Q.    My name is Chris Amrhein, Jr. I'm an attorney with Ashcroft Law Firm and our firm represents the plaintiffs in this matter.

Today I'm going to be asking you a series of questions, but before we get started, I'm going to go over a few



L. Irving

introductory matters. If you have been deposed before, they may sound pretty familiar, but, nevertheless, a refresher is always nice.

So, first, if you can't hear one of my questions, please let me know and I'm happy to repeat it. If you don't understand one of my questions, again, let me know, I'm happy to repeat it or rephrase the question, but if you do answer one of my questions, I'm going to operate under the assumption that you did hear and understand my question. Is that fair?

A. Yes.

Q. If you could please try and have all answers be verbal that would be greatly appreciated, really just for the stenographer's sake. Shoulder shrugs and head nods are fine in colloquial conversation but it's more difficult for the stenographer to be able to track in the transcript.

And kind of in that same vein, just for the stenographer's sake, if you could, wait until my question is done before



800.211.DEPO (3376)
EsquireSolutions.com

L. Irving

answering and I will do my best to wait until your answer has concluded before I begin with another question, just so we can have a clean transcript.

Finally, if you need a break, just let me know and we can discuss.  I'll ask if there is a pending question, that you answer that pending question.

Do you understand everything that I've said so far?

A.      I understand.

Q.      Do you understand that while we are in an office, that you're giving testimony under oath just as if you were court?

A.      Yes.

Q.      Do you understand that your responses are subject to the pains and penalties of perjury?

A.      Yes.

Q.      I promise you, we ask this of everybody, this is not personal to you:  Are you under the influence of anything that would impair your ability to understand my


ESQUIRE
DEPOSITION SOLUTIONS

L. Irving

questions and impair your ability to answer my questions truthfully?

A.      No.

Q.      Okay.  Again, that's not anything personal to you.  It's something we ask of all deponents.

Could you please state your full name and address for the record, and your address can be your work address.

A.      Lawanda Irving; 241 Erie Street, suite 320, Jersey City, New Jersey.

Q.      It's Lieutenant Irving; correct?

A.      Correct, Lieutenant.

Q.      Lieutenant, have you ever testified under oath before?

A.      Yes.

Q.      Can you give me a brief overview of when you testified under oath?

A.      I was deposed once for a medical injury case and I have testified in court for criminal cases on three separate occasions.

Q.      When was the deposition, just roughly, if you remember?

A.      Probably close to ten years ago.



L. Irving

Q.     Okay.  Was that in your capacity as a Port Authority employee or was that something in your personal capacity?

A.     Capacity as a Port Authority Police Officer.

Q.     Do you recall the result of that?

A.     I do not.  It didn't go to trial. It was just a deposition.

Q.     Were you a witness, were you an arresting officer at that time?

A.     I was responding to the scene.

Q.     So were you a named defendant?

A.     No.

Q.     And, just briefly, I know you said you testified, I believe, three times in court, can you give me a brief overview of those, when that happened and what it involved?

A.     I was the arresting officer in two of the cases and so I was testifying on behalf of the steps that I took as far as the arrest.  And the other one, I was in front of the Grand Jury for a case that I was involved in, in my capacity as working in Internal



L. Irving

Affairs.

Q.    Approximately when were those three cases?  If you don't remember, you don't remember, but, generally, do you recall when those cases were?

A.    The two criminal cases were at least -- were over ten years ago, and the Grand Jury was within the last three years.

Q.    Do you recall the outcome of the two criminal cases?

A.    The defendant was found guilty in one and the other was, I believe, acquitted.

MR. AMRHEIN:  I'm going to introduce a document.  We will mark it as Exhibit 1.  It's going to be the Re-Notice of the 30(b)(6) deposition.  I'm just going to ask you a couple of questions about that.

(Re-Deposition Notice marked Irving Exhibit 1 for identification.)

Q.    Let me know whenever it's on your screen.

A.    I can see it.

Q.    Okay.  Lieutenant, do you recognize this document?  And I'm happy to



L. Irving

scroll through it for you.

A.     I am not familiar with the document.

Q.     Okay.

(Scrolling.)

Q.     I'll represent to you that this is a Re-Notice of Deposition.  I'll scroll through.  It includes a list of Rule 30(b)(6) topics.  So have you ever seen this document before?

A.     I have not.

Q.     Do you know what type of document this is?

A.     I am not familiar.

Q.     Lieutenant, did you speak with your attorney in preparation for this deposition?

A.     Yes.

Q.     Now I don't want you to get into the contents of what you spoke about, but when did you speak with your attorney about -- in preparation for this deposition?

A.     Over the course of the last three months.



DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

L. Irving

Q.    Do you recall how many times?

A.    Approximately three times.

Q.    Was it in person, by phone, via e-mail or all of the above?

A.    All of the above.

Q.    Do you know how frequent those e-mails and phone calls were?

A.    We met approximately three times. I couldn't say how many telephone calls or e-mails.

Q.    Did you speak with anybody else, not your attorney, in preparation for this deposition?

A.    No.

Q.    Does anybody else who is not your attorney know that you're being deposed today?

A.    No.

Q.    What did you do to prepare yourself for today's deposition?

A.    I reviewed the case file.

Q.    Anything else?

A.    No.

Q.    Can you describe to me what was



L. Irving

in the -- what "the case file" means?

A.      They were the documents that I compiled, both that I compiled on my own, documents that I typed up, as well as documents received from the New York Attorney General's Office that were maintained in the Police Integrity Unit, related to this case.

Q.      Roughly, how big is that case file?

A.      Over a hundred pages.  There are over a hundred documents in there.

Q.      Does that include personal notes, whether it's handwritten or typed?

A.      All the documents were in this case.

Q.      And were they your personal notes or anything that you had jotted down throughout your investigation in the matter?

A.      Anything related to this case was included in that documentation.

Q.      Okay.  I'm just going to scroll down to the topics section.

At the top of your screen, you'll see numbers 3 and 4, and towards the bottom,



L. Irving

you'll see number 7.  Are you able to see that, Lieutenant?

A.     Yes.

Q.     Okay.  I'm just going to read these for the record, and I understand that there may be an objection given the responses of the 30(b)(6) Notice as well as the subsequent meet and confer that counsel have had, but for the record I'm going to read topics 3, 4 and 7.

No. 3 is:  The investigation into the death of Evgeniy Lagoda conducted by the Port and/or Port Authority Police Department which we may call PAPD today, but not limited to interviews of officers and witnesses, evidence reviewed, and communication and coordination with the Office of the Attorney General for the State of New York.  Did I read that correctly?

A.     Yes.

Q.     No. 4:  The Port Authority's relationship, correspondence, and communications with New York Medical Examiners concerning the investigation and



                            L. Irving

autopsy of Evgeniy Lagoda.  Did I read that

correctly?

        A.      Yes.

        Q.      And No. 7:  All matters

concerning, referring and/or relating to PAPD

officers and their involvement with the death

of Evgeniy Lagoda, including but not limited

to any disciplinary documents, hearings

and/or punishments relating to the death of

Evgeniy Lagoda.  Did I read that correctly?

        A.      Yes.

        Q.      Is it your understanding that

those are the topics about which you would be

testifying here today?

                MS. ALTERMAN:  We are going to

note our objection.  Again, same objection

that we lodged yesterday.

                This Re-Deposition Notice is

dated August 18, 2023.  Subsequent to the

issuing of this notice, we responded in

writing, by letter dated September 8, 2023,

lodging our objections and narrowing the

scope of the topics and based upon our meet

and confers after that September 8, 2023



L. Irving

letter, Lieutenant Irving will be testifying in accordance with the agreements in place between counsel and, generally, with respect to topics 3, 4 and 7, as defined by our objections and the narrow scope that we agreed to.

Q.    Lieutenant, is that your understanding that, generally speaking, limited to any objections that that Counsel for the parties have communicated, that, generally speaking, topics 3, 4 and 7 cover what you are expected to testify about today?

A.    Yes.

Q.    Lieutenant, can you briefly describe your educational background after high school?

A.    After high school I attended Seton Hall University where I received a Bachelor's of Science in Business Management, and then a Master's of Arts Degree in Organizational Communications, Fairleigh Dickinson University.

Q.    Is that the highest level of education you've received?



L. Irving

A.     Yes.

Q.     In terms of years, when did you get the B.S. from Seton Hall?

A.     I graduated in 1996 -- '92, I apologize -- no, 1996, I apologize.

Q.     It's okay if you don't remember. I'm just looking generally speaking, because my next set of questions are going to be about professional experience, so I'm just trying to get a timeline.

In terms of your Master's from Fairleigh Dickinson, do you recall when you achieved that degree?

A.     2001.

Q.     I'm going to guess I know the answer to this question.

MR. AMRHEIN:  Before I do so and ask you, I'm going to stop sharing the screen for Exhibit 1.

Q.     But are you currently employed?

A.     Yes.

Q.     And is your employer the Port Authority?

A.     Yes.



L. Irving

Q.      And specifically, do you work as a lieutenant for the Port Authority Police Department?

A.      Yes.

Q.      How long have you held that title, lieutenant?

A.      Since September of 2000.

Q.      Prior to September of 2000, what was your title?

A.      Police sergeant.

Q.      And how long were you a police sergeant?

A.      I was a sergeant since -- I apologize, can I correct.  2020 is when I became lieutenant, September 2020.

Q.      No problem.  Thank you for the correction.

So prior to 2020, am I correct that you were a police sergeant?

A.      Correct.

Q.      And then when were you made police sergeant?

A.      In January 2016.

Q.      And prior to January 2016, were



                         L. Irving

you a police officer with the Port Authority

Police Department?

        A.      Correct.

        Q.      Okay.  I'm just going to ask you

a few questions about duties and

responsibilities for each role.

                So we'll start with police

officer, so when you first began with the

force, what were your duties and

responsibilities then?

        A.      To respond to calls for service,

to ensure safety and security at Port

Authority facilities and other duties as

assigned by police superiors.

        Q.      And approximately how long have

you served as a police officer with the Port

Authority Police Department?

        A.      I started with the department in

March of 2008.

        Q.      So roughly eight years or just

over eight years that you served as a police

officer?

        A.      Correct.

        Q.      And can you tell me what your



L. Irving

duties and responsibilities were as a

sergeant with the Port Authority Police

Department?

A.    To supervise police officers, to

ensure that they were enforcing the laws of

the States of New York and New Jersey,

responding to appropriate jobs and to respond

to the scene as requested.

Q.    Prior to becoming a lieutenant,

so in your capacity as a sergeant, was part

of your duties and responsibilities

conducting investigations?

A.    Yes.

Q.    Could you tell me about your

duties and responsibilities as a lieutenant?

A.    Lieutenants are overall incident

commanders for scenes as they occur within

the Port Authority facilities, so we

supervise the operations and activities of

police officers and police sergeants and

ensuring the safety of all patrons and

employees of the agency.

Q.    Now, in terms of the difference

between sergeant and lieutenant, I'm going to



L. Irving

use very colloquial phrasing here, so please correct my language with some more appropriate language here, but is a sergeant's role more hands-on and on-site, compared to a lieutenant's role?  Is a lieutenant's role more overseeing from afar?

Can you describe the difference between a sergeant's role and a lieutenant's role?

A.    Sure.  Sergeants typically will respond to a scene as the first line supervisor, and so they are much more hands-on and showing up at the scene while things are often unfolding, where a lieutenant is definitely much more of a broader view, looking at not only the minutia of what's happening at a scene, but also the larger issues that may be implicated in whatever that scene is.

Q.    Thank you for the clarification.

Are lieutenants ever dispatched to a scene?

A.    There are times when a lieutenant will come to a scene, yes.



L. Irving

Q.    Can you tell me, is there a threshold, a magnitude, is there a level of event that would require such substantial response to bring in a lieutenant?  Could you tell me a little bit about that?

MS. ALTERMAN:  Objection to form. You can answer.

A.    It depends on the situation. Every situation is different.  We check and take care of facilities that are worldwide targets and are very high value entities within the country.  So if an aircraft emergency with hundreds of people happened, a lieutenant will certainly go to that scene, as an example.

Q.    Okay.  I'm going to ask you some questions about your professional career before you began with the Port Authority.

So I know you had testified that around March 2008 is when you began as a police officer.  Is that when you began at the Police Academy or did you -- is that when you graduated from the Police Academy and began your active duty with the Port



L. Irving

Authority Police Department?

A.      That was my first day at the academy, in March.

Q.      So can you tell me about what you did between 1992 and 2008?

A.      So when I graduated undergrad, I worked in higher education, so I worked at Fairleigh Dickinson University full-time as a college administrator.  And once I completed my Master's Degree, I then worked at Rutgers University as a college administrator as well.

Q.      And did that cover, that span of years, from 1992 to 2008?

A.      '96 I graduated undergrad.

Q.      '96, my apologies.

Okay, so roughly 12 years you were in college administration as well as seeking your higher degree from Fairleigh Dickinson?

A.      Yes.

Q.      So prior to 2008, you hadn't had any law enforcement experience or had you had any other law enforcement experience leading



L. Irving

up to 2008?

A.      No, I had none.

Q.      In April 2019, am I correct that you were a sergeant with the Port Authority Police Department?

A.      I apologize, can you ask that question again?

Q.      Sure thing.  In April of 2019, am I correct that you were a sergeant with the Port Authority Police Department?

A.      Correct.

Q.      And your duties and responsibilities in 2019, April of 2019, were consistent with the duties and responsibilities that you had laid out just a few minutes ago?

A.      They were similar, but I was assigned specifically to the Police Integrity Unit, which was an investigative unit.

Q.      Could you tell me about the Police Integrity Unit?  And if I do refer to it as the PIU, is that understood that that would be an abbreviation for it?

A.      Yes.



L. Irving

Q.    Okay.  Could you tell me a little bit about the PIU?

A.    So it was the unit that was responsible for investigating allegations of serious police misconduct, criminality, thefts and custody, serious physical injuries to officers, and we would respond and investigate the incident on behalf of the department and the agency.

Q.    How many officers were assigned to the PIU?  And I use "officer" as a broad term, as opposed to police officer versus sergeant versus lieutenant?

A.    When I was assigned there, there were two lieutenants, approximately four sergeants and three detectives.

Q.    What is a detective's role in duties and responsibilities?

MS. ALTERMAN:  In PIU or in the department?

MR. AMRHEIN:  In PIU.

A.    In PIU, they were also assigned to investigate similar allegations that the police sergeants would investigate.



L. Irving

Q.     How does a detective's role in the PIU differ from a sergeant's role in the PIU?

A.     It was very similar.  There was no delineation at the time.

Q.     Now, while you were a member of the PIU, is that something that you were doing exclusively, was that your post, or were you also working as a sergeant, you know, responding to calls or, you know, seeing to other matters in addition to your responsibilities as a member of the PIU?

A.     I was exclusively assigned to that unit.

Q.     How long were you a member of the PIU?

A.     Just over three years.

Q.     Is that something that you had been assigned to after applying or is that something that was a promotion or given to you without asking?

A.     We had to apply.

Q.     And is there a requisite number of years that an officer must serve on duty



L. Irving

before being able to apply to the PIU?

    A.    I believe -- I cannot say with 100 percent certainty, but you had to have been at least in your rank for a year.

    Q.    Is there a certain -- is there a test or curriculum that needs to be passed or taken in order to be able to apply to the PIU and be accepted?

    A.    It's an interview process.  No test is required.

    Q.    Could you tell me a little bit about the interview process, please?

    A.    I get interviewed with the lieutenants that were assigned to the unit at the time, and I also had to submit a resume and a cover letter indicating my interest in the position.

    Q.    Do you know how many interviews, roughly?

    A.    I had two separate interviews.

    Q.    And approximately what year was that?

    A.    2016.

    Q.    So 2019 was your final year with



L. Irving

the PIU?

A.      When I was promoted to lieutenant in September 2020, that was when I left PIU.

Q.      Okay, thank you for that clarification.

Do you still have any involvement with the PIU as a lieutenant?

A.      Only when I have to speak for cases such as this one.

Q.      Is the PIU consistently the size of I think you said two lieutenants, four sergeants, three detectives, is that a consistent size for that unit?

A.      On average, yes.

Q.      Do you recall that being the size of the PIU in April of 2019?

A.      I believe it was, yes.

Q.      Upon promotion to lieutenant, did you have an option to stay with PIU or did you choose to go elsewhere with your promotion?

A.      There was no option at the time, so I was assigned to a different unit.

Q.      What unit were you assigned to?



L. Irving

A.       I worked in the Civilian Complaint Investigations Unit.

Q.       Now, Lieutenant, I'm just going to ask you a series of questions about your training and certification to get some additional background on you.

So you had -- I know the answer to this already, when you attended the Police Academy, you began in March of 2008; is that correct?

A.       Correct.

Q.       That's a 25 or 26-week program; is that right?

A.       Correct.

Q.       Did you go through a two-week transition period after graduation but before you began your post?

A.       We had an on-the-job training, it's called or OJT, and that lasted about five days.

Q.       Now, where was your post immediately coming out of the academy?

A.       Can you clarify your question?

Q.       Sure.  Where were you assigned



L. Irving

when you immediately graduated from the academy?

A.      I was assigned to Newark Airport.

Q.      Do you have a specific designation or assignment within Newark Airport when you first began?

A.      The officers assigned to general patrol are assigned to traffic details or to respond to medical calls inside of the facility or to enforce the laws of the state, State of New Jersey.  Those are the main responsibilities.

Q.      At some point, did you transition from Newark Airport to JFK International?

A.      No.

Q.      Have you ever worked as a police officer at JFK International Airport?

A.      No.

Q.      Can you tell me about the difference between procedures and protocols at JFK versus Newark International, in terms of your investigative work?

A.      I'm sorry, can you repeat that question or can you clarify that question?



L. Irving

Q.    Sure.  In terms of your investigative work, are there different procedures and protocols at Newark Airport that would be applicable versus JFK International Airport?

A.    Generally, the aviation branch of PAPD is very similar.  The biggest difference would be enforcement of the laws and the nuance of what the different laws are between the states, New York and New Jersey.

Q.    So as a member of the PIU, that's not assigned to one specific airport, is that just a general unit within the Port Authority?

A.    Correct.

Q.    Okay.  So you wouldn't be limited to investigating something at Newark Airport versus JFK International, as a member of the PIU?

A.    Correct.

Q.    In terms of the curriculum that you were taught and exposed to when you were at the Port Authority Police Department Police Academy in 2008, do you recall if they



L. Irving

went over police practices and procedures, generally speaking?

A.    Yes.

Q.    What about laws of arrest?

A.    Yes.

Q.    Did they go over court procedures?

A.    Yes.

Q.    Did they go over providing testimony?

A.    Yes.

Q.    Did they go over the Rules of Evidence?

A.    Yes.

Q.    Did they go over internal investigations?

A.    Yes.

Q.    How about questioning witnesses?

A.    Yes.

Q.    And typing up reports and memorandums?

A.    Yes.

Q.    Did the curriculum include -- more specifically speaking, did the



L. Irving

curriculum include de-escalation techniques that officers are required to employ on the job?

            MS. ALTERMAN:  Objection.  You can answer.

      A.    Yes.

      Q.    As a part of that, does it include verbal strategies and active listening skills?

      A.    Yes.

      Q.    Did the curriculum include the use of force?

      A.    Yes.

      Q.    How about the use of deadly force, did the curriculum include that?

      A.    Yes.

      Q.    Did the curriculum include defensive tactics and ground fighting?

      A.    Yes.

      Q.    Did it also include how to handle situations where a subject is having a medical crisis?

      A.    Yes.

      Q.    As well as if a subject's having



L. Irving

a mental health crisis?

        A.      Yes.

        Q.      Did it cover the standards of
care owed to subjects and civilians and the
varying standards of care owed by officers?

        A.      Can you explain what you mean by
"standards of care"?

        Q.      Sure.  A standard of care an
officer owes a subject versus that he or she
is responding to versus a civilian or witness
or an assailant?

        A.      We were trained, as a general
rule, to respond to all situations equally
and provide the level of care required for
that person.  So if that person was in
medical distress, we would provide with the
assistance we were trained to provide.

        Q.      What did the Police Academy do to
prepare you to conduct investigations?

        A.      So we were -- the Police
Academy -- can you clarify what you mean,
conduct investigations in my role as PIU
supervisor or as a police officer?

        Q.      I would say as a sergeant, and



                         L. Irving

mainly as a member of the PIU.  Yes, PIU.

        A.      So I did not receive any training

while I was in the Police Academy to be a PIU

investigator.

        Q.      So what training did you receive,

in terms of investigations, at the Police

Academy?  Was that focused on your work as a

police officer versus an investigator with

the PIU?

        A.      Yes.

        Q.      Can you tell me just briefly what

was covered in the curriculum about

investigating as a police officer?

        A.      So you were trained to very

basically take in the scene, assess the

scene, find witnesses, get them to stand by,

get their information and pass it along to

detectives who were the investigators out in

the field on patrol.

        Q.      Were there any simulated

investigations that were conducted when you

were at the Police Academy?

        A.      No, not to my knowledge.

        Q.      Were you tested on the



L. Irving

information that was taught at the Police Academy, concerning investigations?

A.      Not to my recollection.

Q.      Did it cover joint investigations as part of the curriculum?

A.      Can you clarify what you mean by "joint investigations"?

Q.      Sure.  Working with other agencies or other departments towards the same goal of investigating a single event.

A.      Not specifically as a police officer, no.

Q.      Did the Police Academy, as part of its curriculum, teach you, while you were there, about interviewing fellow officers who are under investigation?

A.      No.

Q.      Did the Police Academy teach you, when you were there, about interviewing witnesses to an event?

A.      Yes, on a very basic level.

Q.      From a high level perspective, what was that basic teaching that they gave at the academy when you attended?



L. Irving

A.      Police officers are expected to ask basic questions:  What happened, who was there, what did you see?  Collect the person's basic information, to provide that for detectives who were then trained to come in and ask more specific questions.

Q.      Was there any teaching at the Police Academy about the veracity of witness' statements and whether to, say, you know, completely believe it or take it with a grain of salt?  Was there any commentary as a part of the curriculum with regard to the veracity of witness statements?

A.      I do not recall that level of detail, receiving as a police officer in the Police Academy.

Q.      So you don't recall?  There could have been but you just don't recall at the moment?

A.      I don't recall receiving that level of detail.

Q.      Did the Police Academy, as a part of its curriculum, teach you about disciplining or initiating disciplinary



L. Irving

procedures against fellow officers?

A.     No.

Q.     Can you please tell me what you were taught about reviewing case evidence when you attended the Police Academy?

A.     So you are expected, as a police officer at the scene, to collect whatever immediate evidence is available and, again, retain it for detectives who would come and do a follow-up investigation.  So they're just taught basic scene safety and management, preserving life and property in the immediate moment.

Q.     Those teachings at the academy were specifically directed towards police officers as opposed to members of the PIU?

A.     Correct.

Q.     At the academy, was it part of the curriculum about how to correspond with Medical Examiners?

A.     No.

Q.     As a part of the upkeep of training and lessons from the academy, am I correct that there were mandatory and service



L. Irving

trainings that must be completed by Port

Authority Police Department personnel?

        A.      Yes.

        Q.      And that's not unique for

officers, it's common to all Port Authority

Police personnel?

        A.      Correct.

        Q.      And is it okay if I refer to them

as ISTs?

        A.      Sure.

        Q.      So in your capacity as officer,

sergeant, you know, leading up to April of

2019, did you complete any ISTs on conducting

internal investigations?

        A.      No.

        Q.      What about joint investigations?

        A.      No.

        Q.      Did they have any ISTs at that

time about interviewing officers?

        A.      No.

        Q.      Did they have any ISTs about

disciplining officers?

        A.      No.

        Q.      Did they have any ISTs about the



L. Irving

Rules of Evidence?

A.    No.

Q.    Did they have any ISTs about communicating with Medical Examiners?

A.    No.

Q.    Did they have any ISTs about interviewing witnesses and extracting witness testimony?

A.    No.

Q.    Did you ever receive an employee manual when you became an officer for the PAPD?

A.    We received general orders, police division instructions, command orders, that guided the rules and responsibilities of police officers.

Q.    So there wasn't a typical employee handbook or manual given out to officers?

A.    There was a document.  It was printed.  It was probably a thousand pages.

Q.    And that would contain the general orders, as you had said; is that right?



L. Irving

A.      Correct.

Q.      Okay.  As a part of the thousand pages that you received general orders and whatnot, was there a portion of it that provided for how a person, how an officer or a member of the PIU is to conduct an internal investigation?

A.      No.

Q.      What about conducting a joint investigation?

A.      No.

Q.      Was there anything in there about how to question officers who are under investigation?

A.      No.

Q.      Was there anything in there about how to question witnesses to an event?

A.      No.

Q.      Was there anything in there about how to review evidence?

A.      No.

Q.      Was there anything in there about how to communicate with Medical Examiners?

A.      No.



L. Irving

MR. AMRHEIN:  I'm going to introduce what's going to be marked as Exhibit No. 2.  So just bear with me a second while I grab this.  It's going to be the First Amended Complaint.

(First Amended Complaint marked Irving Exhibit 2 for identification.)

Q.    I'm just going to share this. Let me know whenever it's on your screen.

A.    I can see it.

Q.    Okay.  I'll represent to you that this is the start of what is the First Amended Complaint.  It is, as you'll see at the top, the UCS Bates stamp of it, page 12 of 32; however, the first 11 pages are summonses for the defendants.  So I'm just going to start at page 12.

Lieutenant, do you recognize this document?

A.    I am not familiar with this document.

Q.    So you've never seen this document before?

A.    No, I have not.



L. Irving

Q.    You didn't review this document, in preparation for today's deposition?

A.    I did not.

Q.    And you didn't review this document with your attorney?

A.    I did not.

Q.    You didn't review this document with anybody at all?

A.    I did not.

Q.    So I'm going to highlight a certain portion.  It's the caption, which is right in the middle of your screen, hopefully, as you'll see.

Do you see what I highlighted there, Lieutenant?

A.    Yes.

Q.    It is just highlighting the listed defendants in this matter.  Can you just read, silently read through the list of defendants and I'm just going to ask you a couple of questions.

(Pause.)

A.    Okay.

Q.    Are you familiar with any of the



L. Irving

individual defendants in this matter?

A.    What do you mean by "familiar"?

Q.    Are you aware of who these individuals are?

A.    They're police officers with the police department, yes.

Q.    Do you have any relationship with any of these, working relationship with any of these police officers?

A.    Yes.

Q.    Can you tell me who?

A.    Robert Joseph and I went to the Police Academy at the same time.

Q.    Anybody else?

A.    No.

Q.    Outside of attending the Police Academy with Officer Joseph, do you have a personal relationship with Officer Joseph?

A.    I do not.

Q.    You both graduated the Police Academy at the same time?

A.    Yes.

Q.    Do you recall when the last time you spoke with Officer Joseph is?



800.211.DEPO (3376)
EsquireSolutions.com

L. Irving

A.    I don't.

Q.    Would it be within the last year, would it be five years ago, ten years ago?

A.    Maybe five.

Q.    So it's been some time?

A.    Yes.

Q.    That's both in your professional and personal capacity; right?

A.    Correct.

Q.    Lieutenant, I'm going to ask you a series of questions about the investigation that you conducted as a member of the PIU concerning what is the subject of the Complaint that was Exhibit 2, which is the death of Evgeniy Lagoda, which occurred on April 12th of 2019.

Do you recall that name and that date?

A.    Yes, I do.

Q.    Is it your understanding that those events are at the foundation of why you're here to provide testimony here today?

A.    Yes.

Q.    Were you working on the night of



L. Irving

April 12, 2019?

A.    Yes.

Q.    Do you recall what shift you were working?

A.    I was working in an on-call capacity, so as an incident arose, they would notify my office who would then notify me.

Q.    Okay.  So where were you stationed, in terms of where you were working in your on-call capacity?

A.    My office at the time was in Hoboken, New Jersey, 5 Marine View Plaza, Hoboken, New Jersey.

Q.    And is that the PIU's office?

A.    Correct.

Q.    Is that still the PIU's office?

A.    Correct.

Q.    Roughly, how far is that office to JFK International?

A.    Are you talking in terms of miles?

Q.    I suppose we can do that and general commute as well.  I'm not going to hold you to specifics, but maybe just



L. Irving

generally let me know.

A.      Depending upon traffic, it could take you an hour.  It could take you two hours.  It depends upon the traffic, time of day, et cetera.

Q.      In terms of hours, do you recall what hours you were working that night?

A.      Like I said, I was on an on-call capacity, so I was on call 24/7 that weekend.

Q.      Okay.  In an on-call capacity, is that something that's via radio, were you given a work-issued phone specifically for 24-hour emergencies?

A.      A work-issued telephone.

Q.      Does that phone produce call logs that are ultimately saved and filed as a part of investigations?

A.      Typically, no.

Q.      Is that a policy and procedure that it is not or --

A.      It is not a policy or procedure.

Q.      When you receive a call -- when you're on that 24-hour duty, when you receive a call, are you required, as a member of the



L. Irving

PIU, to take notes and file a memorandum into the file on a given emergency?

MS. ALTERMAN:  Regarding the call?

MR. AMRHEIN:  Regarding a call that comes in.

A.    It is standard procedure to document telephone calls as they come in, yes.

Q.    Do you recall receiving a call about the issue that had occurred on April 2019 involving Evgeniy Lagoda at JFK International Airport?

A.    I do.

Q.    Can you tell me what happened on that call that you received?

A.    I received -- I spoke with the lieutenant who was the tour commander at JFK, Ramon Hernandez, who indicated that there was an individual on a flight who had a seizure and subsequently an officer responded to provide aid and was -- the individual assaulted a number of staff that were on the flight, as well as other passengers and the



L. Irving

officer.  The officer deployed OC spray.  The individual then went into what they believed was cardiac arrest.  They attempted to provide first aid.  He was then transported to the hospital where he was pronounced deceased.

Q.    Is that based upon your recollection of the night itself or is that based upon your review of the case file in preparation for today's hearing?

A.    I recall the incident itself.  I remember the basic information that I received, but I also reviewed the case file in preparation for today's deposition.

Q.    Okay.  Are you aware that night that an officer had been dispatched to a scene for a male having a seizure on board a Jet Blue flight; correct?

A.    Correct.

Q.    Were you aware that EMS had been notified of a male having a seizure on board a Jet Blue flight that night?

MS. ALTERMAN:  Objection.  You can answer.



L. Irving

A.    Yes.

Q.    And that officer, were you aware that night that that officer requested backup to his call; correct?

A.    On the initial telephone call, are you referring to that, or are you referring to once I received more information?

Q.    I can clarify that.  Thank you for letting me know that.

Did you ultimately learn that night, did you receive an additional call that the officer had requested additional backup?

A.    Yes.

Q.    So after the first call, can you tell me about what happened next?  Can you give me a timeline of what happened next?

A.    The call came in about 11:30 at night and so I was responding from home.  So I called my supervisor to notify her of what happened and that I was responding out to JFK Airport.  And she then called other members of my unit to also respond to the scene to



L. Irving

assist with the securing of information.

Q.    So between the first call and the call to your supervisor, roughly how long would that have been?

A.    As soon as I hung up the phone with Lieutenant Hernandez was when I called her.

Q.    Okay.  Do you recall roughly how long your call was with Lieutenant Hernandez?

A.    I don't recall the exact duration.  Maybe five minutes.

Q.    Okay.  Is that a typical length of an emergency call or does that really vary, depending on scenario?

A.    That totally varies.

Q.    Okay.  So after you got off the phone with your supervisor, I just want to make sure I'm capturing your testimony appropriately here, am I correct that you said you dispatched to JFK International?

A.    I went to JFK, yes, directly.

Q.    Okay.  Now, were you in uniform at that point?

A.    PIU is a plainclothes unit, so I



                          L. Irving

was in plainclothes.

          Q.      Okay.  Did you have any

communications on your way to the airport

about the events that occurred that night,

April 12, 2019?

          A.      Describe what you mean by

"communication," and with whom.

          Q.      I assume were you yourself

driving to JFK International?

          A.      Yes.

          Q.      Did you have any phone calls on

the way?

          A.      It's possible.

          Q.      Do you have a radio in your car?

          A.      I did have a radio.  I did not

utilize the radio that night.

          Q.      So you wouldn't have heard any

radio communications or chatter on your way

there?

          A.      No.

          Q.      Do you recall having any

interaction with anybody involving that, the

events that occurred that night April 12th of

2019 on your drive to JFK International?



L. Irving

A.    If I did have any calls, it would have been with other members of my unit so we can coordinate exactly where we would meet or follow up with one another.

Q.    Do you recall roughly what time you arrived at JFK International Airport that night?

A.    Probably took me -- it was a rainy night, so it probably took me an hour and 15 minutes, maybe.

Q.    So given the time of the first call, you likely arrived in the early morning of April 13, 2019?

A.    Correct.

Q.    Okay.  So upon arrival, did you speak with any officers?

A.    "Any officers," can you clarify what you mean?

Q.    Any officers who had responded to the scene -- and when I say "the scene," I mean that Jet Blue flight when the man was having a seizure on the board, that man being Evgeniy Lagoda?

A.    When I got to JFK, I went to the



L. Irving

police building and I did not speak with any of the officers, I spoke with responding detectives and supervisors.

Q.    At any point that early morning, after April 12, 2019, did you speak with any of the responding officers?

A.    Later on I did go to the hospital and I spoke with Officer Bugiada.

Q.    Did you conduct an interview with Officer Bugiada there?

A.    I did not.

Q.    Was that an off-the-record conversation?

A.    It was not.  His union representative was present and all I did was take a photograph of his injuries and we collected his firearm.

Q.    Is that standard protocol for a PIU member to do in response to an event like this?

A.    Correct.  He reported an injury to his hand after a serious incident and so we collected his firearm as a standard procedure.



L. Irving

Q.      So other than your interaction with Officer Bugiada, you had no interaction with any of the individual defendants named in this matter that night, be it officers who had responded to the scene?

A.      I did not.

Q.      You had said you had been a -- forgive me -- the police station, police headquarters, correct me there, but I know you had said you had spoken with some individuals who were a member of the PAPD. Could you tell me who you spoke with?

A.      I believe I spoke with detectives, so there would be an on-call detective sergeant who would have been working that evening.  I do not recall exactly the name.  I definitely spoke with the Office of Inspector General.  There was a supervisor there from my office as well and I spoke with him.

Q.      And do you recall any of the conversations, generally speaking, whether about a tactical response, PR press?  Can you tell me a little bit about, generally, what



L. Irving

the conversations were with those individuals?

A.    At that point in the investigation, it was a matter of compiling evidence and information related to what happened at the actual incident.  So gathering the -- finding out who had the OC spray that Officer Bugiada utilized, where the automatic -- the AED machine was going to be housed temporarily, getting the paperwork related to the arrest, obtaining the video, any video that was readily available, if there were also any radio recordings, obtaining that information, all of the investigative details and how we would obtain them.

Q.    Is that standard protocol and procedure for a member of the PIU?

A.    Yes.

Q.    So after you went through the steps of communicating with those detectives and other officers at the police station and going through the steps of evidence gathering and preservation, did you return home to



L. Irving

continue your service as the 24-hour on-call PIU member or did you remain at JFK International?

A.     I went back to my office in Hoboken briefly, to begin to leave whatever files I had obtained in the office.

Q.     And what happens to those files after you leave them in the office?  Could you tell me what happens then?

A.     They're secured in a case folder.

Q.     After they're secured in a case folder, in terms of hard copy, is there a process for digitizing those documents?

A.     At the end of the case, we then will scan all the documents, at the end.

Q.     So at that point, in 2019, everything was hard copy?

A.     Correct.

Q.     Is there a logbook that the PIU has where anybody who signs out the hard copy documents, signs his or her name and time of signing it out?

A.     Assigned a case file?

Q.     Yes.



L. Irving

A.    Case files are typically not signed out.  They are requested by our law department.  That's generally where they go, or if we have an outside prosecutor that we work with.  I am not aware of a specific logbook where it's documented that the files had been requested.

Q.    In terms of evidence that may have been obtained from the scene, is there a logbook for signing out that evidence?

A.    Yes.

Q.    So in terms of case file versus evidence, for a matter like this, from an investigative perspective, can you tell me the difference between the two?

A.    So the case file documents would remain in the folder with the investigator until the completion of the case, whereas something like the AED, which I ultimately took possession of for a time would be logged in our property logger, which is in a locked closet and locked in the vault.

Q.    Do you recall what evidence you had obtained and put in the locked property



L. Irving

area at the PIU?  Do you recall what evidence you had obtained beyond the AED?

A.    That night I did not take possession of any physical items that would have been logged in the book.  It was more paperwork, copies of arrest paperwork, things that had been completed to that point.  So it was more paperwork.

Q.    Okay.  And did that paperwork include use of force reports?

A.    I don't believe that they were completed at that point.  They were completed, I believe, the next morning or later on that morning.  So I wasn't at JFK that long.

I went to the hospital shortly thereafter, so I was at the hospital maybe 1:00 a.m., and I believe the use of force reports were completed later on in the morning, so I likely got them when I got back to the office on Monday.

Q.    Okay.  So can you tell me about how the investigation into the events of April 12, 2019 involving Mr. Lagoda, the male



L. Irving

who had suffered a seizure on board that Jet Blue JFK flight?  Could you tell me how that investigation began?  What was really the first step?

A.     So are you talking post dropping the items in my office or my receiving the telephone call?  Give me the point of reference you're talking about.

Q.     Sure.  I guess what is PIU's policy in terms of opening the investigation; is it from the emergency call on the 24-hour line?  What is the point of origin?  What is the kick start, in terms of PIU policy and procedure?

A.     Procedure is once you receive notification of an incident, you would begin to document the interaction, so the initial -- how you first found out about the incident.  And then you would work to obtain any details or information related to what the incident was.

PIU handles a number of different types of incidents so there is no specific rule book as to what you obtain.  There is



L. Irving

just general procedures or expectations on information you would attempt to obtain upon a given situation.

Are you asking in this particular incident, what I did?

Q.    Yeah, in this particular incident, if you recall, yes.

A.    Okay.  So once I went to the office, dropped off documents, I then went home and at some point that night, I also -- that morning, early morning, I spoke with the DA's Office, the homicide unit, and they told me that they were going to be in charge of the investigation.

So at that point, I put on pause my responsibilities, because that's our general procedure, once an outside entity indicates that they are taking a lead on the investigation we pause and give them whatever information they request.  So that was my initial response.

But later on, the next day, on the 13th, I got a phone call from the New York Attorney General's Office stating that



ESQUIRE
DEPOSITION SOLUTIONS

L. Irving

they were taking the case over from the Queens DA.

Q.      And I know this is -- may not be the proper word, but it's often used in culture, so did the DA's Office initially determine that it had jurisdiction over the matter and then jurisdiction was taken over by the New York Attorney General's Office from the DA's Office; is that your understanding of the procedure?

A.      Correct.

Q.      Okay.  And at some point was there a discussion between PIU, the OAG's office and perhaps the DA's Office with regard to conducting a joint investigation into the events of April 12, 2019 involving Evgeniy Lagoda, the man who had suffered a seizure on board that flight at JFK?

A.      So during my phone call with the investigator from the AG's Office on the 13th, he said they would like to have a meeting with us to determine the next course of action.

So we all met on Monday.  It was



800.211.DEPO (3376)
EsquireSolutions.com

L. Irving

at the New York Attorney General's Office and the representative from the Office of the Inspector General and PAPD Criminal Investigations Bureau.

Q.    Can you tell me a little bit about that meeting on that Monday?

A.    Can you clarify what it is you'd like to know?

Q.    Everything.

A.    Okay.  So there were three representatives from the New York AG's Office present and there were four representatives from the Office of Inspector General, three from PAPD's Criminal Investigations Bureau. And so we discussed what the Attorney General's Office would like to -- how they would like to proceed in the course of the investigation and how we can help support them.

It was determined that CIB, which again is the general investigative bureau for criminal acts that happen at PAPD, would not have any responsibility any further in the case and they will turn over all their case



L. Irving

files to PIU who will then share them with the AG's Office, and that the AG's Office would take the lead on the investigation because that was the purpose of the unit, that they were responding from, and that we would support whatever they needed in that investigation.

Q.    Do you know why -- you said GI something, something with a G, the unit that was ultimately charged with turning over some of the documents in the investigation.  What was the name of that again?

A.    It's the Criminal Investigations Bureau, CIB.

Q.    CIB.  Sorry about that.

Do you know why the CIB at that time was responsible for turning over, no longer being a part of the investigation?

A.    Well, they do not investigate allegations of police misconduct.  That was the responsibility of PIU, but because of the nature of the incident on the night of the 12th, police detectives went to the scene initially and so whatever responsibilities



L. Irving

they had thereafter, they turned them over to the AG's Office via PIU.

Q. Understood. Thank you.

MS. ALTERMAN: One second, Chris. Is the glare bothering you?

THE WITNESS: Yes.

MS. ALTERMAN: Do you mind? I have to close the shade. There is a big glare.

MR. AMRHEIN: No problem. We could be off the record while they handle this.

(Off the record.)

MR. AMRHEIN: We can go back on the record, Deborah.

Q. So in terms of a joint investigation where the PIU was working with the OAG's office and the Inspector General, is this something that is an agreement that's in writing, is this something that is just verbally discussed and then you proceed? Can you tell me about how the joint venture comes to fruition?

A. It was verbal. That was the



L. Irving

point of the meeting on Monday, that Monday, I believe it was the 15th, to determine how they wanted to proceed.  The AG's Office took the responsibility for determining who they wanted to interview, how we were going to move forward.  It was determined that I would assist them in whatever capacity they asked.

Q.     And is there a -- when you were asked to assist with whatever the OAG's office needed as part of the investigation, were there written directions given to you with specifics of what they needed from you?

A.     No.

Q.     Were there instructions given to you verbally, you know, on a phone call or in an in-person meeting?

A.     There was a meeting.  It was explained that Nick and Bryan Mason, who were the lead investigators on behalf of the AG's Office, would notify me as to what information and documents and interviews they wanted to conduct.

Q.     Is that Nicholas, is that Viorst?

A.     Yes.



L. Irving

MS. ALTERMAN:  And Bryan is B-R-Y-A-N?

THE WITNESS:  Correct.

MR. AMRHEIN:  Mason, M-A-S-O-N?

THE WITNESS:  Correct.

Q.    Have you worked with Nicholas Viorst and Bryan Mason before?

A.    No.

Q.    Were you aware of who they were?

A.    That day, well, yeah, they introduced themselves and gave me a business card.

Q.    So I can specify that answer -- I'm sorry -- question.  Were you aware, prior to meeting them that day, Monday, who Nicholas Viorst and Bryan Mason were?

A.    Bryan called me on the 13th.  He was the one that notified me that the AG's Office was going to take the lead on the investigation.  So I put the face with the telephone call, but that was the extent of my knowledge of each of them.

Q.    So at that point, between April 12, 2019 and the following Monday, so



800.211.DEPO (3376)
EsquireSolutions.com

L. Irving

just a couple of days later, am I correct that you personally hadn't conducted any investigative interviews?

A.    No.

MS. ALTERMAN:  No, he's not correct or he is correct?

THE WITNESS:  I did not conduct any investigative interviews, no.

Q.    Are you aware if any other members the -- I'll call it the joint task force, the joint investigative unit, had conducted any interviews between April 12th and the following Monday?

A.    No.

Q.    Whether that's off the record interviews, informal interviews or formal, you don't know?

A.    Not to my knowledge.

Q.    So the purpose of this joint investigation with the OAG's office, while you were a sergeant with the PAPD PIU, was to investigate the events surrounding the death of Mr. Lagoda; is that right?

A.    Correct.



L. Irving

Q.     Do you recall how long that investigation took?

A.     It commenced -- it ended with the issuance of the Attorney General's final report and approximately just under a year later, so April of 2020.

Q.     So in that yearlong period, could you estimate for me how often you would correspond with the Attorney General's Office?

A.     That was my main case at the time.  You said during the course of the year?

Q.     During the course of that year that you had described, so from the beginning of the investigation to the release of the OAG's report, how often would you correspond with the Attorney General's Office concerning that matter?

A.     In the beginning, it was almost daily.

Q.     What was your primary method of communication?

A.     It varied between e-mails,



L. Irving

telephone calls, in-person meetings.

Q.     Were those telephone calls
recorded as a part of policy and procedure or
are they not?

A.     No.

Q.     Do you recall having to take a
log or submit timesheets with regard to phone
calls that you had had concerning that
matter?

A.     No.

Q.     You say you e-mailed with the
OAG's office more often than you had
telephone calls?

A.     I would say it varied.  I
couldn't say which I did more of.

Q.     But e-mail was one of the primary
forms of communication during that yearlong
investigation?

A.     Correct.

Q.     Do you know if all those
communications were produced in this matter?

A.     I do not know.

MR. AMRHEIN:  Cheryl, those
e-mails have not been produced.  We request



L. Irving

that those be produced to plaintiffs.

(Document request)

Q.    Do you recall how many interviews were conducted as a part of the investigation?

A.    We began by interviewing the flight crew.  That includes the four flight attendants, the two pilots.  We then interviewed the three medical professionals who responded to the scene, civilian interviews.  We also interviewed the two EMTs that responded to the scene, and those interviews were done in concert.  I was present for all of those interviews.

And then separately, the AG's Office interviewed the police officers that filled out use of force reports and the two supervisors, the two sergeants that were present.

Q.    So you weren't present when the officers were interviewed as a part of this investigation?

A.    I was not.

Q.    Were you one of the primary



L. Irving

interviewers of the witnesses to the events that night of April 12, 2019, as a part of the investigation?

          MS. ALTERMAN:  The non-police witnesses?

          MR. AMRHEIN:  Yes.

     A.     I was the -- because our interviews were recorded, I would oftentimes open up the interview, but I wasn't necessarily the primary interviewer.

     Q.     Did you have a significant role in the process of interviewing the non-police witnesses during the investigation?

     A.     When you say "the process," you mean the actual interview itself?

     Q.     We can start before the interview, but I primarily mean during the interview itself.

     A.     During the interview itself, I would ask questions.  So would Bryan and Nick.  We would all ask questions of the individuals.

     Q.     Did you ever personally conduct any of the interviews?



L. Irving

A.    I had telephone calls with several of the passengers on the flight later on that year, closer to December and January, and those were all recorded.

Q.    Can you tell me about how you prepared for the interviews?

A.    What do you mean, exactly?

Q.    Did you prepare a list of questions to have ready in advance of the interview?

A.    The questions would vary based upon the person's level of involvement.  So we would always start off with:  Generally, what do you recall about the incident itself, basic interviewing techniques, and allow the person to just tell us from their perspective.  Generally, we would ask them follow-up questions based upon what they told us and what they recall.

Q.    So I want to follow-up on two things that you said there.  One is you said general interviewing techniques.  Two is you didn't come with a set of questions or topics that you wanted to address with a given



L. Irving

interviewee?

    A.    Not a written set of questions, no.

    Q.    How about typed?

    A.    It would not be written questions.  They were general questions that we had in our heads, based upon the person's level of involvement in the incident.  So the questions that we would ask the EMTs would differ from the questions that we would ask the flight crew.

    Q.    So what materials did you review in order to prepare those questions in your head?

    A.    The case file.  So whatever arrest documentation I had received already, I would have reviewed that, and the knowledge that I had of the case itself, in preparation for the interview.

    Q.    Did you have any meetings with Nicholas or Bryan, in advance of the non-police witnesses that you interviewed, to discuss what you wanted to ask and any testimony that you wanted to extract?



L. Irving

A.    Yes.

Q.    Can you tell me about those meetings, prior to the interviews?

A.    We would have a discussion, again based upon the person's level of involvement, as to the types of information we would ask them for.  So, again, the EMTs would be asked a different set of questions than a flight attendant or the pilot.

Q.    And do you recall taking any notes during those prep sessions with Nick and Bryan?

A.    I rely very heavily on the recordings, so the recordings would document all of the interviews themselves.

Q.    I mean in the prep sessions with Nicholas and Bryan, before the actual hearings that would have been recorded, did you take any notes during the prep sessions?

A.    No.

Q.    Do you recall if Nick or Bryan would take any notes as to what they would want to ask and how they would want to ask, in advance of the interview?



L. Irving

A.    I do not believe so.

Q.    So before you had talked about general interviewing questions and tactics. I just want to ask some questions on that.

Is there a handbook or a set of materials that you have or had been provided by the Port Authority Police Department or the PIU within the PAPD, that provides those guidelines as to what types of questions to ask?

A.    There is no handbook, no.

Q.    So is this something that is a member of the PIUs exclusively for learning just on the job and through experience?

A.    Mainly through on the job and experience, but we are also sent to a number of training classes that assist us in developing interviewing techniques.

Q.    Could you tell me about those training classes?

A.    Sure.  I attended at least three separate training classes that, again, would prepare you for types of questions to ask, depending upon the person that you are

ESQUIRE
DEPOSITION SOLUTIONS

                    L. Irving

speaking with, probative questions, how to be

open, how to allow the person to provide you

with information, how to ask follow-up

questions.

        Q.      When did you take these classes?

        A.      Shortly after I came to PIU in

2017, I took two classes.  And during my time

here, I took another.

        Q.      So were these classes mandated or

sponsored by the Port Authority Police

Department?

        A.      They were not mandated, no.

        Q.      But were they given by the Port

Authority Police Department?

        A.      They were outside trainers.

        Q.      So that was in your personal

capacity that you took those classes?

        A.      Well the classes themselves were

paid for by -- if there was a cost

associated, it was paid for by the Police

Department, but it was provided by an outside

entity, it was not provided by the Police

Academy.

        Q.      But it was reimbursed by the Port



L. Irving

Authority Police Department, if you took them?

A.    Yes.

Q.    Do you recall being reimbursed by the Port Authority for those classes that you took?

A.    They would pay the vendor direct.

Q.    Do you recall they paid the vendor direct?

A.    As far as I know, yes.

Q.    Do you recall who the vendor was for those classes?

A.    One course was the Reid School of Interview Techniques.

Q.    How do you spell that?

A.    R-E-I-D.

Q.    You said the Reid, R-E-I-D, School of Interview Techniques?

A.    Yes.

Q.    Do you know where they're located out of?

A.    I do not.

Q.    Was this an online class or was it something in person?



L. Irving

A.     It was in person.

Q.     Where did it occur, the class?

A.     The class, I believe was in Jersey City.

Q.     And was this in 2016 when you took the classes with Reid?

A.     2017.

Q.     Were you the only PAPD officer there or were there other PAPD officers there?

A.     There were others.

Q.     Do you recall roughly how many?

A.     There were probably 20 of us.

Q.     That's a substantial number.  Did it make up the majority of the class?

A.     Yes.

Q.     How did you hear about such a class; was this something that was recommended to you by other officers or by the Port Authority itself?

A.     I believe my supervisors at the time notified me that the class was being held and that I should participate.

Q.     Are you aware if the Reid School



L. Irving

has a relationship with the Port Authority

Police Department?

        A.      I am unaware of any specific

relationship.

        Q.      When you took the classes -- did

you say two classes with Reid?  And I know

you said you had a third that was another

time.  Were there two classes with Reid?

        A.      Yes.

        Q.      When you took the classes with

Reid, was there a test at the end, after the

classes concluded?

        A.      Not that I recall, no.

        Q.      Roughly, how long was the first

class?

        A.      Both classes were, I want to say,

two to three days.

        Q.      So was that something where you

were required to take PTO in order to take

this class?

        A.      No, it was during working hours.

        Q.      Is that the same for the other

officers who had been present, who attended

the class?



L. Irving

A.      Yes.

Q.      Were you given materials by the Reid School during these classes?

A.      Yes.

Q.      Do you still have those materials?

A.      I don't believe so.

Q.      Can you access those materials?

A.      I disposed of whatever books once I left PIU.

MR. AMRHEIN:  Okay, we're going to request for the record to obtain the records of any materials that were distributed as a part of the Reid School of Interviewing Techniques given to Lieutenant Irving or Sergeant at that time.

MS. ALTERMAN:  We just ask that any requests be in writing at the end of the deposition.

(Document request)

Q.      So in terms of the interviews, itself, I should say just to go back to the Reid School, as a part of the interviews that you conducted in this investigation, did you



                            L. Irving

employ some of the lessons that you had

learned from this outside entity, Reid School

of Interviewing Techniques?

    A.    I would say specifically, I did

not.  A lot of what they taught us was about

criminal investigations, and in this case I

was not interviewing anyone accused of

criminality.  Everyone that I participated in

interviews with was a witness and so that I

would say that most of what I learned in Reid

was not applicable this situation.

    Q.    But it was a criminal

investigation in its totality, was it not?

    A.    It was not -- the interviews that

I participated in were of witnesses.  So Reid

focused on actually interviewing someone

physically accused of committing that crime.

I did not participate in any interviews of

that nature.

    Q.    Understood.

          But the interviews, I know it's

semantical here, but the interviews that you

had been conducting of the witnesses, the

ultimate investigation was a criminal



L. Irving

investigation, was it not?

A.    Correct.

Q.    I understand the distinction that you're making were the Reid School teachings were more directed towards interviewing somebody being charged criminally; is that the distinction you were making?

A.    Correct.

Q.    Okay.  I just want to be fair to you on that.

So when interviewing the non-officer witnesses, you know, as a part of this criminal investigation concerning the death of Evgeniy Lagoda, am I correct that those interviews were recorded?

A.    Correct.

Q.    Were all of the interviews recorded?

A.    All of the interviews that I participated in were recorded.

Q.    Was your interview with the New York Medical Examiner's Office recorded?

A.    I did not have an interview of the Medical Examiner.



L. Irving

Q.      Did you have an interview with any of the members of the Medical Examiner's Office?

A.      I did not interview the staff, no.

Q.      Did you produce a report about an interview with the Medical Examiner's Office?

A.      We had a meeting where the Medical Examiner explained her finding and the process for her making that determination, but we did not interview her.

Q.      So that wouldn't have been a formal interview.  That was just an -- more off-the-record discussion?

A.      It was, yes, it was a meeting to discuss her findings and her process.

Q.      Do you know why that wasn't recorded?

A.      We generally don't interview -- record meetings.  Again, we only record interviews.

Q.      And did you take -- I know there is a memorandum from that describing that conversation or that interview with the



L. Irving

Medical Examiner.  But did you take any notes contemporaneous with the discussion, from which you used to create a report?

MS. ALTERMAN:  Objection to the characterization.  You can answer.

A.    Any information that I would have obtained during that meeting was notated in any actual reports that I completed related to the investigation.

Q.    So I can rephrase to try and further clarify what I'm trying to ask.

In terms of the meeting you had with the New York Medical Examiner involving this matter, when you prepared a report subsequent to that meeting, was that from memory or was that from handwritten notes or typed notes that either you had taken or somebody else had taken?

A.    I generally would compile the information based upon memory, and if I did write any notes, everything that I wrote on the notes in a handwritten note would have been included in my actual report.

Q.    And do you preserve those notes,





L. Irving

should you have any notes from that meeting?
Do you recall preserving them?

A.    No.  All information that would have been obtained in any handwritten notes taken during that meeting would have been included in the actual report and they would have been destroyed.

Q.    How would the notes have been destroyed?

A.    Likely shredded.

Q.    So you don't recall whether or not you did take any notes during that meeting?

A.    I don't recall.

Q.    So is it fair to say you could have been typing the post meeting memorandum from memory?

A.    There are portions of it that could have been from memory, yes, but I generally -- something important -- will type it fairly soon after so it will be fresh in my memory.

Q.    So given that some of the report, memorandum, after the meeting would have been



800.211.DEPO (3376)
EsquireSolutions.com

L. Irving

typed from memory, is it possible that not all that was discussed in the meeting was captured in the memorandum?

MS. ALTERMAN:  Objection.  You can answer.

A.      The actual reports are overall characterizations.  They don't necessarily contain every single fact.  The reliance is on the actual report that came from the Medical Examiner.  The actual report is just a summary document.

Q.      Okay.  And you're not a medical professional; correct?

A.      Correct.

Q.      Nor is Mr. Viorst nor Mr. Mason?

A.      Correct.

Q.      Do you recall during that meeting if there was any other personnel present, whether from the PAPD or the OAG's office or any other office as part of the investigation?

A.      Any personnel present would have been noted in the actual report.

Q.      Okay.  Part of the overall



L. Irving

investigation, I know you said you were personally part of the interviews of only non-officer witnesses, but as part of the overall investigation that you were involved in concerning Evgeniy Lagoda's death, am I correct that officers, witnesses and EMS personnel were interviewed?

A.    Can you ask me that question one more time?

Q.    Sure.  So I know that you have testified that you were only a part -- personally a part of interviewing non-officer witnesses as relates to the criminal investigation regarding the death of Evgeniy Lagoda.  Am I correct that as a part of the investigation, itself, that officers, as well as witnesses and EMS personnel, were interviewed as a part of it?

A.    They were interviewed.  However, I was not present for any officer or supervisor interview.

Q.    Okay.  Were you present for EMS personnel interviews?

A.    Yes.



L. Irving

Q.    Do you recall that?

A.    Yes.

Q.    And those would have been recorded as well, as policy and procedure?

A.    Yes.

Q.    And similar to the meeting that you had with the New York Medical Examiner, after which a memorandum was written to capture, in general, what had been discussed, after interviews, did you conduct -- go through a similar process of drafting a memorandum for the file about the interview?

A.    Generally, interviews that are recorded, I will create an actual report. Sometimes they happen a time later again because I rely very heavily on all the recordings.

Q.    So when you say a time later, when you say they occur a time later, are you referring to the action reports, like a memo to the file or are you talking about the transcript from the recording?

A.    The actual report.  My documentation of the interview in the actual



L. Irving

report doesn't necessarily happen immediately.  There can be a time lapse again because I rely heavily on the report.

Q.    Okay.  In terms of time lapse, if you don't have a meeting recorded, how quickly do you prepare an action report?

A.    It can vary, but I try to get them done fairly soon after, within a week, but it varies.

Q.    Is it fair to say that the longer you go, in terms of days from the actual meeting, the more difficult it is to fully capture what occurred in the meeting?

MS. ALTERMAN:  Objection.  You can answer.

A.    Yes, that is fair.

THE WITNESS:  I'd like to take a break.

MR. AMRHEIN:  Sure.  Is five minutes for a restroom break okay?

THE WITNESS:  Sure.

MR. AMRHEIN:  All righty.  Deborah, take it away.

(Mr. Tarasov leaves the Zoom



L. Irving

meeting.)

(Recess taken.  Time noted:
11:45 o'clock a.m.)

(Parties returned at 11:54 o'clock
a.m.)

MR. AMRHEIN:  We're back on the
record.

Q.    Lieutenant, did you speak with
your attorney at all during the break that we
just had?

A.    No.

Q.    Lieutenant, given that you were
responding to the scene that night at JFK,
that night, April 12, 2019, which is the
night of the death of Mr. Lagoda, were you
ever interviewed as a part of the
investigation?

A.    Interviewed by whom?

Q.    The Attorney General's Office or
other members of the PIU, as part of the
investigation into Mr. Lagoda's death.

A.    No.

Q.    Did you provide any statements as
a part of the investigation?



L. Irving

A.      No.

Q.      And by no means am I suggesting interview from the criminal probe, I'm simply asking from a witness standpoint, so that's not a personal question about you, I promise.

Lieutenant, did you make any recommendations to the Attorney General's Office regarding the findings of the investigation?

A.      No.

Q.      Did you have any communication with the Attorney General's Office leading up to the release of the report that the Attorney General's Office produced, regarding the conclusions and findings?

A.      No.

Q.      No e-mails or phone calls?

A.      Can you clarify what you mean by communication?

Q.      Communicating anything.  It could be a phone call, it could be an e-mail, just with the Attorney General's Office in the weeks or month leading up to the release of the report.



L. Irving

A.    Well, we were in constant contact related to any information that we had obtained relating to the case, so if I talked to them prior to the release of the report, probably, related to the investigative files and other documents that we had obtained.

Q.    Did you draft any portion of the OAG's report?

A.    The OAG report, yes.

Q.    The OAG report, the Attorney General's Office report.

A.    Did I draft?  No.

Q.    Was there an OIG report?

A.    That was my case file.  Most of those reports were compiled by myself.

Q.    So when you say the OIG report, you mean the case file itself that was used as a foundation for what was ultimately released as a report to the Attorney General's Office, that foundation was the case filed you built?

MS. ALTERMAN:  Objection.  You can answer.

A.    There is a closing memorandum



L. Irving

that I compiled, four or five pages, that was

a part of the overall case file.  That's

initially what I was referring to.

Q.    Okay, thank you for clarifying.

Do you know what the

conclusion -- have you reviewed the OAG's

report before?

A.    Yes.

Q.    Do you recall what the conclusion

of the report was?

A.    We found no basis to pursue

criminal charges against the officers.

Q.    Do you know if they found

anything else, made any recommendations?

A.    They made recommendations, yes.

Q.    Do you recall what the

recommendations were.

(Mr. Tarasov joins Zoom.)

A.    They recommended body cameras.

They recommended additional training on

dealing with individuals coming out of a

seizure, and they recommended paying closer

attention to the timeliness of the ambulance

response.



L. Irving

Q.      So given the overall report and your involvement in the lengthy investigation, about approximately a year, based upon your understanding and your involvement, is that a conclusion that you had supported?

MS. ALTERMAN:  Objection.  You can answer.

A.      I don't make recommendations as the investigator.  It was just my job to compile the facts.  So my office was not engaged in making recommendations.

Q.      Given your knowledge of the report, and obviously the investigation, you're aware that the reports concluded that use of force by PAPD personnel likely contributed to the death of Mr. Lagoda; correct?

A.      I am aware of that, yes.

Q.      And given your knowledge of the report and the investigation, you're aware that the report recommended that PAPD personnel needed to be trained about the unique vulnerability of individuals in the



L. Irving

immediate wake of a seizure; correct?

A.      I'm aware it said that, yes.

Q.      And given your knowledge of the
report and of the investigation, you're aware
that the report determined that the Port
Authority Police Department failed to have
personnel available to escort an ambulance to
the scene in a timely fashion; is that
correct?

A.      That is what the report states.

Q.      Can you describe to me how big
the case file was?  I know you said it was
hard copy before the file is closed and
digitized, but can you describe to me how big
the case file was; was it boxes, was it just
a stack of papers in a binder?  Can you give
me some description?

A.      The case file, from my
perspective, was documents.  We put stickers
on the bottom of each of the documents so
there were over a hundred for sure, maybe
120.  And it also included CDs, recordings of
the interviews of all of the witnesses that I
participated in.



L. Irving

Q.      Are those stickers yellow?

A.      Yes.

Q.      Do you have a specific filing system for e-mail communications involving a given matter; are they automatically filed into a file in your computer for that specific investigation?

A.      E-mails that I view pertinent to the actual investigation are included, so some of the e-mails are included, yes. Others may not be.

Q.      So what is the determination of pertinent versus non pertinent, who makes that determination?

A.      Usually the case investigator and the supervisor, if need be, would also advise.

Q.      Is that if they're cc'd or included on the e-mail?  What if they're not included on an e-mail, what happens there?

A.      It's incumbent upon the investigator to do their due diligence.

Q.      And if during that due diligence process the investigator makes the



L. Irving

determination that the e-mail is, in fact,
pertinent, that investigator -- it's
incumbent upon that investigator to save that
particular communication in the electronic
file for that investigation?

A.      Correct.

Q.      Do you recall how big that file
is in terms of pertinent communications,
electronic communications, for Mr. Lagoda?

A.      All pertinent information was
obtained and -- retained, rather, in the case
folder that I just talked about.

Q.      So all the e-mails, pertinent
e-mails, would have been printed from the
file and then added to the hard copy file?

A.      Correct.

Q.      So what about the -- well, what
if e-mails were determined to be
non pertinent, are they purged, are they
preserved, could you tell me about those?

A.      I'm not privy to the Port
Authority's archival of e-mails but they are
not saved and included in the case file.

Q.      As a part of your investigation,



L. Irving

I know there is the OAG's conclusion, but as part of your investigation, are you aware if any of the officers involved had been disciplined, as a result of the events that happened on April 12, 2019?

A.    To my knowledge, they have not.

Q.    Do you know who made the determination to -- within the PAPD to not discipline the officers, based upon the investigation?

A.    The investigation -- the files are sent to the upper administration within the Office of the Inspector General.  They are then forwarded on to Labor Relations.  If it is deemed that discipline is required, it is determined through Labor Relations and the Superintendent of Police.

Q.    Are you aware, in your capacity as a member of the investigative team, if those, the members of the Labor Relations Department, as well as kind of the police head there, who would be responsible for potentially disciplining officers, are you aware if they were in communication with the



L. Irving

Attorney General's Office?

A. They typically are not. It's the responsibility of PIU to serve as the conduit with outside prosecutors so all information is obtained in the case folder.

Q. Were there any recommendations -- sorry, go ahead.

A. In this particular case, because the Attorney General's Office determined there was no criminality, there was no discipline on the officers.

Q. Is that procedure in protocol based upon your understanding of how investigations work within the PAPD, or is that just common practice?

A. That is the common practice and the protocol. So if there was no criminality or wrongdoing documented for the officers that are involved, there would be no discipline.

Q. So based upon an investigation, it's your understanding, as a member of the investigative team back in 2019, that without formal charges being brought, the Port



L. Irving

Authority would not independently discipline its officers for its actions?

A.     In this particular case, there was no wrongdoing that was uncovered and so, therefore, there was no discipline.

Q.     But, generally speaking, from your investigative perspective and role as investigator with the Port Authority Police Department, is it a mandate that with no criminal charges, no discipline action can be taken, or can the Port Authority Police Department independently take steps to discipline its officers outside of any criminal probe?

A.     If it is determined the officers engaged in wrongdoing or did not follow Port Authority procedure, then, yes, there would be discipline.  But in this case, there was no discipline recommended because they were not found to be in violation of any Port Authority policies or procedures.

Q.     Can you violate a policy or procedure -- from your determination as an investigator, could you violate a policy or



                        L. Irving

procedure if there is no policy or procedure

in place yet?

            MS. ALTERMAN:  Just note my

objection.  You can answer.

      A.      If there is no policy to -- can

you ask the question again?

      Q.      Sure.  If there is no policy to

violate, can you possibly violate a policy

that doesn't exist?

      A.      Obviously not.

      Q.      So should a policy come into

place -- scratch that.     .

            Based upon your experience with

the PIU, were officers who use force against

a subject that leads to the death of a

subject, does that typically go unpunished?

            MS. ALTERMAN:  Objection.  You

can answer.

      A.      Can you ask the question again?

      Q.      Sure.  As a member of the PIU,

where officers who use force against a

subject and that leads to the death of the

subject, does that typically go unpunished by

the Port Authority?



LT. LAWANDA IRVING  30(b)(6)                          February 14, 2024
Tarasov v PA of NY & NJ                                            103

L. Irving

MS. ALTERMAN:  Objection.  You can answer.

A.    If there is wrongdoing that is detected, then the officers will be disciplined.  In this particular case, there was no wrongdoing that was uncovered in the course of the investigation, therefore, they were not disciplined.

Q.    So am I correct that where the OAG's office concluded, based upon a yearlong investigation with the Port Authority, that the officers' use of force contributed to the death of Mr. Lagoda, am I correct that the officers went unpunished as a result of the events that happened?

MS. ALTERMAN:  Objection.  You can answer.

A.    It was determined that in this particular situation, the officers did not violate any policies that would warrant discipline; therefore, they were not disciplined in this situation.

Q.    Based upon your investigation and knowledge of all the events as a member of



L. Irving

the PIU, the events being April 12, 2019 and Mr. Lagoda's death, wouldn't you agree with me that the PAPD had not properly trained its officers regarding the uniquely vulnerable condition immediately following a seizure of a subject?

MS. ALTERMAN:  Objection.  You can answer.

A.     Are you asking my personal opinion?

Q.     I'm asking your opinion as somebody who investigated the matter for a year.

A.     Okay, can you ask the question again?

Q.     Sure.  Based upon your investigation of the death of Mr. Lagoda, wouldn't you agree with me that the PAPD had not properly trained its officers regarding the uniquely vulnerable condition of a subject who had just suffered a seizure?

MS. ALTERMAN:  Objection.  You can answer.

A.     In this particular situation, the



                          L. Irving

officers were presented with an individual

who did not present having a seizure.  He

presented as a violent subject.  Therefore,

in this situation, the officers responded

according to what they were presented at the

time, which is someone who was violent.

        Q.      Am I correct that you received a

call that late night, April 12, 2019,

informing you of an officer -- excuse me of a

male who had a seizure on board a JFK flight?

        A.      The phone call that I received or

the call the officers received?

        Q.      Well, we have the radio call, so

we can -- we know that that is the case, a

male having a seizure onboard.  But am I

correct that it was -- was it Ramirez, I know

it was an R, the officer who called you that

night, am I correct that that information was

relayed that a male was having a seizure on

board and ultimately events followed that

were -- backup was requested and other

officers responded?

                Am I correct that it was relayed

to you that a man was having a seizure on



L. Irving

board and that was what led to the initial response by Officer Bugiada?

A.     Yes.  As I noted before, I was informed that there was a medical incident on board the flight.

Q.     Of a male having a seizure on board; right?

A.     Yes.

Q.     So based upon your investigation --

A.     I'm sorry, I didn't finish.

Q.     I had ask asked a very specific question and that's all.

So based upon your investigation, and then the conclusion of the OAG's report as a culmination of the investigation, you agreed before that you were aware that the determination of the investigation was that PAPD had not adequately trained its officers regarding the uniquely vulnerable condition of a person in the immediate wake of a seizure; right, you were aware of that?

MS. ALTERMAN:  Objection.  She never testified that she agreed with that



L. Irving

finding.

MR. AMRHEIN:  I said awareness.

MS. ALTERMAN:  You said agreed.

MR. AMRHEIN:  I said agreed that she was aware.

MS. ALTERMAN:  Okay.

A.     Can you ask the question again?

Q.     Sure.  Am I correct that you previously testified that you were aware -- that you agreed that you were aware of the OAG's determination at the end of this yearlong investigation, of which you were a part, that the PAPD had not properly trained its officers regarding the uniquely vulnerable state and condition of a subject in the immediate wake of a seizure?  You said you were aware of that; right?

MS. ALTERMAN:  Objection.  You can answer.

A.     I am aware of the OAG's recommendations, yes.

Q.     And based upon your investigation and understanding of the OAG's report, wouldn't you agree with me that the PAPD



L. Irving

personnel should have been available to escort the ambulance to the scene in a timely fashion and without delay of approximately 20 minutes?

MS. ALTERMAN: Objection. You can answer.

A.     In this particular situation, the officers that were responding to the situation called for help, and it is general protocol when an officer calls for help, because there are a lot of firearms involved and there are a lot of people involved, everyone that's available will respond. Therefore, that was the initial incident that they were having to deal with first, and then, unfortunately, the priority -- the secondary priority becomes the EMS response.

But the primary becomes generally the officer that is in distress because of the nature of the incident.

Q.     And the nature of the incident was originally because a male was having a seizure on board that left him in a uniquely vulnerable condition immediately following



L. Irving

the seizure, as the OAG report concluded; is that right?

MS. ALTERMAN:  Objection.  You can answer.

Q.    To the best of your understanding of the OAG's report.

A.    Based upon my experience as an officer, calls often come in one way and turn out another.

Q.    I understand.  I'm asking about your understanding about what the conclusion of this investigation was.  It was a call for a male having a seizure on board which left the male in a uniquely vulnerable condition and that led to the recommendation that the PAPD had not properly trained its officers to respond to such a situation and there was recommendation to implement teachings about the uniquely vulnerable state of an individual following a seizure.  Is that your understanding of what the report concluded?

MS. ALTERMAN:  Objection.  You can answer.

A.    The recommendation as listed on



800.211.DEPO (3376)
EsquireSolutions.com

L. Irving

the report is -- it's directly from the AG'S office.  I did not make the recommendation so I can't speak to --

Q.     But you were a part of the investigation and the interviews; correct, for a year?

A.     I was a part of the interviews, but I was not a part of the drafting of that document.

Q.     You said you were in communication almost every day, and it was a primary case for a year.  So you had a substantial hand in the general investigation; is that correct?

A.     I was involved in the investigation, itself, yes.  But, again, I do not make recommendations, that's the responsibility of the AG's Office.

Q.     Am I correct that you testified earlier that the foundation of the report was the case file that you built?

MS. ALTERMAN:  Objection.  I believe that mischaracterizes the testimony.

MR. AMRHEIN:  That didn't



L. Irving

mischaracterize it at all, and I don't appreciate the suggestion.

MS. ALTERMAN:  The phrase that you used was your question, not her response

MR. AMRHEIN:  Her response was confirming what I had asked, which was she had said the case file was the foundation of the ultimate investigation and report.

Q.     It was the backbone, was it not?

MS. ALTERMAN:  Wait.  I don't believe that was the testimony.  The record will speak for itself.  Over objection, you can answer.

A.     The case file, my final report, was the four-page report that I actually authored.  I did not author that final report, that came from the AG's Office.

Q.     And what file did the AG's Office have to work from?  Was it a different from what you had?

A.     You would have to have that discussion with the AG's Office.

Q.     But weren't you in constant communication talking about pertinent



L. Irving

information and everything that was necessary to build the investigation?  It was a joint investigation, was it not?

A.    I was not privy to their individual file, nor their case folder.  I don't have a copy of their case folder.  All I have is a copy of my case folder.  We did the interviews --

Q.    So your investigative folder could have been different from what they had?  They could have had information different from you?

A.    I was not present for a number of interviews they conducted, so they may have files that I was not privy to.

Q.    But if you had files of interviews from officers that were marked with yellow stamps and numbered, that would have been a part of your case file, would it not, regardless of whether or not you were present for an interview?

A.    All I could put in my case folder is what was given to me.  So anything that was given to me by their office was indeed



L. Irving

put in my case folder.

Q.    Do you believe they withheld information from you as part of the investigation?

A.    I could not speak to any other documents that they may have had in their file.

Q.    So you don't know whether or not they withheld documents from you?

A.    I cannot speak to any other information that they may have had in their file.

Q.    Do you believe that they would have shared everything that they had with you, since you were a part of the investigation with them?

A.    I believe that they would have, but I cannot comment on what they may or may not have had, other than what I received.

Q.    In your experience as a member of the PIU, and generally as a Port Authority Police Officer, police department employee, would you agree with me that the PAPD is a pretty tight-knit loyal group?



L. Irving

MS. ALTERMAN:  Objection.  You can answer.

A.      What do you mean by that?  In regards to what?

Q.      I mean in general.  Would you describe it as a tight-knit loyal group?

MS. ALTERMAN:  Objection, you can answer.

Q.      Would you describe it as a tight-knit group, the PAPD?

A.      It's a department of 2100 officers who are professional and work to maintain the security and safety of the patrons and employees of the Port Authority facilities that we are a part of.

Q.      So would you -- that doesn't address my question.  It's a simple yes or no question:  Is the Port Authority a tight-knit loyal group?

MS. ALTERMAN:  Objection.  You can answer.

A.      We are employees of an agency so I can't speak to 2100 people in their personal feelings of loyalty or being



                         L. Irving

tight-knit.

        Q.    I'm not speaking about
individuals and their feelings.  I know there
is a sense of pride, as there should be, for
law enforcement.  I'm just trying to gather
whether or not the PAPD members have a
feeling and sense of loyalty towards one
another.  Is that your understanding of the
group as a whole?

        A.    I couldn't speak to the group as
a whole.  I can only provide you with my
personal opinion.  I take great pride in the
work that I do.

        Q.    Would you generally say that PAPD
officers look out for each other?

        A.    We are -- we make sure that
everyone is safe and secure and that we do
our best to make sure that everybody goes
home at the end of their tour, yes, in that
way.

        Q.    So they have each other's back in
all situations?

             MS. ALTERMAN:  Objection.  You
can answer.



800.211.DEPO (3376)
EsquireSolutions.com

L. Irving

A.    We make sure that everyone goes home safely and that is the goal of what officers should be doing.  Again, I can't speak day-to-day the way officers individually feel.

Q.    Would you say they would do whatever it takes to make sure officers go home safely?

MS. ALTERMAN:  Objection.  You can answer.

A.    What do you mean by "whatever it takes"?

Q.    I think that's pretty self-explanatory.  It's a common phrase.

A.    Could you clarify what you mean by "whatever it takes"?

Q.    In protecting the rights and making sure, as you said, that every officer goes home safely every night, is it fair to say that officers are willing to do whatever it takes to make sure that other officers are protected?

MS. ALTERMAN:  Objection.  You can answer.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

L. Irving

A.    Again, the 2100 members of our department work professionally to maintain not only the safety of employees of the agency but also the patrons and other people that traverse our facilities daily.  So safety and security of all involved is our number one concern.

Q.    I know you're saying 2100 employees all work professionally.  Are you aware of any of the 2100 employees who have done unprofessional things?  Is that a possibility?

MS. ALTERMAN:  Objection.

A.    Sure.

MR. AMRHEIN:  So now you're either speaking for them or you're not speaking for them.  I'm just confused as to -- from your perspective, but for now I don't have any more questions.  I'm going to leave this deposition open to the extent of obtaining additional e-mails that go to the heart of the investigation, potentially year's worth of e-mails between the Port Authority and the OAG's office, and we will,



L. Irving

of course, follow up in writing with a request, and, you know, should we need to re-examine the witness.

But for now, I don't have any more questions for now, but I'm going to leave this open.

MS. ALTERMAN: I just have one or two follow-up questions.

EXAMINATION BY

MS. ALTERMAN:

Q. Lieutenant, is it your understanding that all e-mails that were related to the case file, with respect to interviews or meetings that were held, were, in fact, contained within the case file that you reviewed in preparation for your deposition today?

A. Absolutely.

Q. And is that case file, is that a true and complete copy of the case file that was prepared with respect to the incident involving Mr. Lagoda that occurred on April 12, 2019?

A. Yes, that is correct.



L. Irving

Q.    Are you aware of any missing documents or documents that were not included in that case file, after your review of the case file, in preparation for your testimony today?

A.    No.

MS. ALTERMAN:  That's all I have.

MR. AMRHEIN:  Just a few more follow-up questions and I promise we'll get you out of here, again, leaving this deposition open at the conclusion.

FURTHER EXAMINATION

BY MR. AMRHEIN:

Q.    But I believe you testified earlier that e-mails that were put in the file were what were determined as pertinent pieces of correspondence; isn't that correct?

A.    Correct.

Q.    So that doesn't mean that all the e-mails were in the file, only pertinent e-mails were in the file, based upon a determination of an individual officer; is isn't that right?

A.    E-mails that contain facts of the



LT. LAWANDA IRVING  30(b)(6)                       February 14, 2024
Tarasov v PA of NY & NJ                                        120

L. Irving

case were contained in the file, so

everything that was factual was contained in

the file.

Q.    Determined to be pertinent, I

believe is what you had testified to earlier;

correct?

A.    Factual and pertinent.

Q.    So that doesn't include all the

correspondence; isn't that right?

A.    So it did not include every piece

of e-mail.  Things that would not be included

would be setting up meeting times, sending

addresses, that sort of information.  But a

lot of the communication that I had with the

AG's Office and the investigation was done

via telephone.

MR. AMRHEIN:  Well, understanding

that any pertinent e-mails are in the file,

it's ultimately up to our determination

whether or not we find it pertinent.  So

we're going to be requesting all e-mails, not

just what the PAPD determined to be

pertinent, so we are going to be leaving this

deposition open.  Other than that, I don't



L. Irving

have any more questions.

MS. ALTERMAN:  No further questions.

MR. AMRHEIN:  Lieutenant, thank you so much for your time.  We greatly appreciate it.  We know this can be kind of contentious and whatnot.  It's a part of the job.  We greatly appreciate your time and thank you for being here.

And thank you, Deborah and Cheryl.

THE COURT REPORTER:  You're welcome.

MS. ALTERMAN:  Thank you.

THE COURT REPORTER:  Ms. Alterman, are you ordering a copy of this transcript, also?

MS. ALTERMAN:  Yes.

(Time noted:  12:24 o'clock p.m.)


                          LAWANDA IRVING

SUBSCRIBED AND SWORN TO
BEFORE ME THIS       DAY
OF              , 2024.


     NOTARY PUBLIC



I N D E X

| WITNESS | EXAMINED BY | PAGE |
|---|---|---|
| LAWANDA IRVING | Mr. Amrhein | 4-118 |
| | Ms. Alterman | 118-119 |
| | Mr. Amrhein | 119-121 |

* * *

E X H I B I T S

| IRVING | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Re-Deposition Notice | 10 |
| Exhibit 2 | First Amended Complaint | 42 |

(Irving Exhibits 1 and 2 attached to transcript.)

* * *

INFORMATION TO BE SUPPLIED

| DESCRIPTION | PAGE |
|---|---|
| Copies of the e-mails with the Attorney General's Office concerning this matter | 71 |
| Copies of any records or materials the witness received from the Reid School of Interviewing Techniques | 81 |

* * *



C E R T I F I C A T E

STATE OF NEW YORK    )
                     )          ss:
COUNTY OF QUEENS     )

          I, DEBORAH MOSCHITTO a Shorthand

Reporter and Notary Public within and for the

State of New York, do hereby certify:

          That the within is a true and

accurate transcript of the testimony taken on the

14th of February, 2024.

          I further certify that I am not

related to any of the parties to the proceeding by

blood or marriage, and that I am in no way

interested in the outcome of this matter.

          IN WITNESS WHEREOF, I have hereunto

set my hand this 26th day of February, 2024.



          DEBORAH MOSCHITTO

DEPOSITION ERRATA SHEET

Our Assignment No.:  J10897173

Case Caption:  TARASOV V. PANYNJ


DECLARATION UNDER PENALTY OF PERJURY


         I declare under penalty of perjury
that I have read the entire transcript of my
Deposition taken in the captioned matter or
the same has been read to me, and the same
is true and accurate, save and except for
changes and/or corrections, if any, as
indicated by me on the DEPOSITION ERRATA
SHEET hereof, with the understanding that I
offer these changes as if still under oath.

                    _____

                         LAWANDA IRVING

Subscribed and sworn to on the ____ day of

_____, 20 ____ before me.

_____

Notary Public,

in and for the State of

_____.



LT. LAWANDA IRVING  30(b)(6)                     February 14, 2024
Tarasov v PA of NY & NJ                                        125

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

Reason for change:_____

SIGNATURE:_____DATE:_____

LAWANDA IRVING



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

        LAWANDA IRVING



118:24

**Exhibits**

**10897173 La
wanda.
Irving.
EXHIBIT1**
10:16,20
17:20
122:12

**10897173 La
wanda.
Irving.
EXHIBIT2**
42:4,8
45:15
122:13

**1**
10:16,20
17:20

**100**
27:4

**11**
42:16

**11:30**
50:20

**11:45**
91:4

**11:54**
91:5

**12**
23:18
42:15,18
46:2 52:6
54:6
59:25
62:17
67:25
72:3
91:15
99:6
104:2
105:9

**120**
96:23

**12th**
45:17
52:24
64:24
68:13

**13**
53:14

**13th**
61:24
62:22
67:18

**15**
53:11

**15th**
66:3

**18**
15:20

**1992**
23:6,15

**1996**
17:5,6

**1:00**
59:19

**2**

**2**
42:4,8
45:15

**20**
79:14
108:5

**2000**
18:8,9

**2001**
17:15

**2008**
19:20
22:21
23:6,15,
23 24:2
29:10
31:25

**2016**
18:24,25
27:24
79:6

**2017**
77:8 79:8

**2019**
24:4,9,14
27:25
28:17
39:14
45:17
46:2
48:13
52:6,25
53:14
54:6
57:17
59:25
62:17
67:25
72:3
91:15
99:6
100:24
104:2
105:9
118:24

**2020**
18:15,16,
19 28:4
69:7

**2023**
15:20,22,
25

**2100**
114:12,24

117:2,9,
11

**24-hour**
47:14,24
57:2
60:12

**24/7**
47:10

**241**
8:11

**25**
29:13

**26-week**
29:13

**3**

**3**
13:25
14:11,12
16:5,12

**30**
5:11

**30(b)(6)**
10:17
11:9 14:8

**32**
42:16

**320**
8:12

**4**

**4**
13:25
14:11,22
16:5,12

**5**

**5**
46:13

**7**

**7**
14:2,11
15:5
16:5,12

**8**

**8**
15:22,25

**9**

**92**
17:5

**96**
23:16,17

**A**

**a.m.**
59:19
91:4,6

**abbreviatio
n**
24:24

**ability**
7:25 8:2

**Absolutely**
118:19

**academy**
22:23,24
23:4



29:10,23
30:3
31:25
34:19,22
35:4,8,23
36:3,14,
19,25
37:9,17,
23 38:6,
15,19,24
44:14,18,
22 77:24

**accepted**
27:9

**access**
81:9

**accordance**
16:3

**accused**
82:8,18

**achieved**
17:14

**acquitted**
10:13

**action**
62:24
89:21
90:7
101:11

**actions**
101:3

**active**
22:25
33:9

**activities**
20:20

**acts**
63:23

**actual**
56:7
72:16

75:18
85:9,24
86:7
87:7,10,
11,24
89:15,24,
25 90:12
97:10

**added**
98:16

**addition**
26:12

**additional**
29:7
50:13,14
94:21
117:22

**address**
8:9,10
73:25
114:18

**addresses**
120:14

**adequately**
106:20

**administration**
23:19
99:13

**administrator**
23:10,12

**advance**
73:10
74:22
75:25

**advise**
97:18

**AED**
56:10
58:20
59:3

**afar**
21:7

**Affairs**
10:2

**AG's**
62:21
63:12
64:3 65:3
66:4,20
67:19
71:16
110:2,19
111:18,
19,23
120:16

**agencies**
36:10

**agency**
20:23
25:10
114:23
117:5

**agree**
104:3,19
107:25
113:24

**agreeable**
5:5

**agreed**
16:7
106:18,25
107:4,5,
11

**agreement**
4:10
65:20

**agreements**
16:3

**ahead**
100:8

**aid**
48:23

49:5

**aircraft**
22:13

**airport**
30:4,7,
15,18
31:4,6,
13,18
48:14
50:24
52:4 53:7

**Alexey**
5:17

**allegations**
25:5,24
64:21

**Alterman**
4:15 5:6,
15 15:16
22:7
25:20
33:5 48:4
49:24
65:5,8
67:2 68:6
72:5
81:18
85:5 87:5
90:15
93:23
95:8
102:4,18
103:2,17
104:8,23
106:24
107:4,7,
19 108:6
109:4,23
110:23
111:4,11
114:2,8,
21 115:24
116:10,24
117:14

118:8,11
119:8
121:3,15,
17,19

**ambulance**
94:24
96:8
108:3

**Amended**
42:6,7,14

**Amrhein**
4:14,22
5:2,7,16,
19 10:14
17:18
25:22
42:2 48:6
65:11,15
67:5
70:24
72:7
81:12
90:20,23
91:7
107:3,5
110:25
111:6
117:16
119:9,14
120:18
121:5

**and/or**
14:14
15:6,10

**answering**
7:2

**answers**
6:17

**apologies**
23:17

**apologize**
17:6
18:15



24:7

**applicable**
31:5
82:12

**apply**
26:23
27:2,8

**applying**
26:20

**appreciated**
6:18

**appropriate
ly**
51:20

**approximate
ly**
10:3
12:3,9
19:16
25:16
27:22
69:6 95:4
108:4

**April**
24:4,9,14
28:17
39:13
45:17
46:2
48:12
52:6,24
53:14
54:6
59:25
62:17
67:25
68:13
69:7 72:3
91:15
99:6
104:2
105:9
118:24

**archival**
98:23

**area**
59:2

**arose**
46:7

**arrest**
9:23 32:5
49:4
56:12
59:7
74:17

**arresting**
9:11,

**arrival**
53:16

**arrived**
53:7,13

**Arts**
16:21

**Ashcroft**
5:20

**assailant**
34:12

**assaulted**
48:24

**assess**
35:16

**assigned**
19:15
24:19
25:11,15,
23 26:14,
20 27:15
28:24,25
29:25
30:4,8,9
31:13
57:24

**assignment**
30:6

**assist**
51:2
66:8,10
76:18

**assistance**
34:18

**assume**
52:9

**assumption**
6:12

**attempt**
61:3

**attempted**
49:4

**attendant**
75:10

**attendants**
71:9

**attended**
16:18
29:9
36:25
38:6
76:22
80:24

**attending**
44:17

**attention**
94:24

**attorney**
5:20
11:17,22
12:13,17
13:6
14:18
43:6
61:25
62:9
63:2,16
69:5,10,
19 91:10,
20 92:8,

13,15,23
93:11,20
100:2,10

**August**
15:20

**author**
111:17

**authored**
111:17

**Authority**
9:3,5
14:14
17:24
18:3
19:2,14,
18 20:3,
19 22:19
23:2
24:5,11
31:15,24
39:3,6
76:8
77:11,15
78:2,6
79:21
80:2 96:7
101:2,9,
12,18,22
102:25
103:12
113:22
114:15,19
117:25

**Authority's**
14:22
98:23

**automatic**
56:10

**automatical
ly**
97:6

**autopsy**
15:2

**average**
28:15

**aviation**
31:7

**aware**
44:4
49:16,21
50:3 58:6
67:10,15
68:10
79:25
95:16,20,
22 96:3,5
99:3,19,
25
106:18,23
107:6,10,
11,18,21
117:11
119:2

**awareness**
107:3

---

**B**

**B-R-Y-A-N**
67:3

**B.S.**
17:4

**Bachelor's**
16:20

**back**
57:5
59:21
65:15
81:23
91:7
100:24
115:22

**backbone**
111:10

**background**

LT. LAWANDA IRVING 30(b)(6)
Tarasov v PA of NY & NJ

February 14, 2024

800.211.DEPO (3376)
EsquireSolutions.com



16:16
29:7

**backup**
50:4,15
105:22

**based**
15:24
49:8,10
73:12,19
74:8 75:6
85:21
95:5
99:10
100:14,22
102:14
103:11,24
104:17
106:10,15
107:23
109:8
119:22

**basic**
36:22,24
37:3,5
38:12
49:13
73:16

**basically**
35:16

**basis**
94:12

**Bates**
42:15

**bear**
42:4

**began**
19:9
22:19,21,
22,25
29:10,18
30:7 60:4
71:7

**begin**
7:3 57:6
60:17

**beginning**
69:16,21

**behalf**
9:22 25:9
66:20

**believed**
49:3

**big**
13:9 65:9
96:12,15
98:8

**biggest**
31:8

**binder**
96:17

**bit**
22:6 25:3
27:12
55:25
63:6

**Blue**
49:19,23
53:22
60:3

**board**
49:18,22
53:23
60:2
62:19
105:11,21
106:2,6,8
108:24
109:14

**body**
94:20

**book**
59:6
60:25

**books**
81:10

**bothering**
65:6

**bottom**
13:25
96:21

**boxes**
96:16

**branch**
31:7

**break**
7:6
90:19,21
91:10

**briefly**
9:15
16:15
35:12
57:6

**bring**
22:5

**broad**
25:12

**broader**
21:17

**brought**
100:25

**Bryan**
66:19
67:2,8,
17,18
72:21
74:22
75:13,18,
22

**Bugiada**
54:9,11
55:3 56:9
106:3

**build**

112:3

**building**
54:2

**built**
93:22
110:22

**bureau**
63:5,15,
22 64:15

**business**
16:20
67:12

---

**C**

---

**call**
14:15
47:10,16,
23,25
48:5,6,
11,17
50:5,6,
13,17,20
51:3,4,
10,14
53:13
60:8,12
61:24
62:20
66:16
67:22
68:11
92:22
105:9,12,
13,14
109:13

**called**
29:20
50:22,24
51:7
67:18
105:18
108:10

**calls**
12:8,10
19:12
26:11
30:10
48:9
52:12
53:2
70:2,3,9,
14 73:2
92:18
108:11
109:9

**cameras**
94:20

**capacity**
9:2,4,5,
25 20:11
39:12
45:9
46:7,11
47:10,11
66:8
77:18
99:19

**caption**
43:12

**capture**
89:10
90:14

**captured**
87:4

**capturing**
51:19

**car**
52:15

**card**
67:13

**cardiac**
49:4

**care**
22:11



34:5,6,8,
9,15

**career**
22:18

**case**
8:21 9:24
12:22
13:2,8,9,
16,20
38:5
49:10,14
57:11,12,
15,24
58:2,13,
17,19
62:2
63:25
69:12
74:16,19
82:7
93:4,15,
18,22
94:3
96:13,16,
19 97:16
98:12,24
100:6,9
101:4,19
103:6
105:15
110:13,22
111:8,15
112:6,7,
8,20,23
113:2
118:14,
16,20,21
119:4,5
120:2

**cases**
8:22 9:21
10:4,6,7,
11 28:10

**cc'd**
97:19

**CDS**
96:23

**certainty**
27:4

**certificati
on**
29:6

**cetera**
47:6

**characteriz
ation**
85:6

**characteriz
ations**
87:8

**charge**
61:14

**charged**
64:11
83:7

**charges**
94:13
100:25
101:11

**chatter**
52:19

**check**
22:10

**Cheryl**
5:3,12
70:24
121:12

**choose**
28:21

**Chris**
5:19 65:5

**CIB**
63:21
64:15,16,
17

**City**
8:12 79:5

**civilian**
29:2
34:11
71:11

**civilians**
34:5

**clarificati
on**
21:21
28:6

**clarify**
29:24
30:25
34:22
36:7
50:10
53:18
63:8
85:12
92:19
116:16

**clarifying**
94:5

**class**
78:24
79:3,4,
16,19,23
80:16,21,
25

**classes**
76:18,21,
23 77:6,
8,10,18,
19 78:6,
13 79:7
80:6,7,9,
11,13,17
81:4

**clean**
7:4

**close**
8:25 65:9

**closed**
96:14

**closer**
73:4
94:23

**closet**
58:23

**closing**
93:25

**collect**
37:4 38:8

**collected**
54:18,24

**college**
23:10,12,
19

**colloquial**
6:20 21:2

**command**
40:15

**commander**
48:19

**commanders**
20:18

**commenced**
9:4

**comment**
113:19

**commentary**
37:12

**committing**
82:18

**common**
39:6
100:16,17
116:15

**communicate**

41:24

**communicate
d**
16:11

**communicati
ng**
40:5
56:22
92:21

**communicati
on**
14:17
52:8
69:24
70:18
92:12,20
98:5
99:25
110:12
111:25
120:15

**communicati
ons**
14:24
16:22
52:4,19
70:22
97:5
98:9,10

**commute**
46:24

**compared**
21:6

**compile**
85:20
95:12

**compiled**
13:4
93:16
94:2

**compiling**
56:5



**Complaint**
29:3
42:6,7,14
45:15

**complete**
39:14
118:21

**completed**
23:10
39:2
59:8,13,
14,20
85:9

**completely**
37:11

**completion**
58:19

**computer**
97:7

**concern**
117:8

**concert**
71:14

**concluded**
7:3 80:13
95:16
103:11
109:2,22

**conclusion**
94:7,10
95:6 99:2
106:16
109:12
119:12

**conclusions**
92:16

**condition**
104:6,21
106:21
107:16
108:25
109:15

**conduct**
34:20,23
41:7
54:10
66:23
68:8
72:24
89:11

**conducted**
14:13
35:22
45:13
68:3,13
71:5
81:25
112:15

**conducting**
20:13
39:14
41:10
62:16
82:24

**conduit**
100:4

**confer**
14:9

**confers**
15:25

**confirming**
111:7

**confused**
117:18

**consistent**
24:15
28:14

**consistently**
28:11

**constant**
93:2
111:24

**contact**
93:2

**contained**
118:16
120:2,3

**contemporaneous**
85:3

**contentious**
121:8

**contents**
11:21

**continue**
57:2

**contributed**
95:18
103:13

**conversation**
6:20
54:14
84:25

**conversations**
55:23
56:2

**coordinate**
53:4

**coordination**
14:18

**copies**
59:7

**copy**
57:13,18,
21 96:14
98:16
112:7,8
118:21
121:17

**correct**

8:13,14
18:15,19,
21 19:4,
24 21:3
24:4,10,
12 29:11,
12,15
31:16,21
38:18,25
39:8 41:2
45:10
46:16,18
49:19,20
50:5
51:20
53:15
54:22
55:10
57:19
62:12
67:4,6
68:2,7,25
70:20
83:3,9,
15,17
87:14,15,
17 88:7,
16 95:19
96:2,10
98:7,17
103:10,14
105:8,17,
19,24
107:9
110:6,15,
20 118:25
119:18,19
120:7

**correction**
18:18

**correctly**
14:20
15:3,11

**correspond**
38:20

69:10,18

**correspondence**
14:23
119:18
120:10

**cost**
77:20

**counsel**
4:13 14:9
16:4,10

**country**
22:13

**couple**
10:18
43:22
68:2

**court**
4:2 7:16
8:21 9:17
32:7
121:13,16

**cover**
16:12
23:14
27:17
34:4 36:5

**covered**
35:13

**create**
85:4
89:15

**crew**
71:8
74:12

**crime**
82:18

**criminal**
8:22
10:7,11
63:4,15,



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

64:14
82:7,13,
25 83:14
88:14
92:4
94:13
101:11,15

**criminality**
25:6 82:9
100:11,18

**criminally**
83:7

**crisis**
33:23
34:2

**culmination**
106:17

**culture**
62:6

**curriculum**
27:7
31:22
32:24
33:2,12,
16,18
35:13
36:6,15
37:13,24
38:20

**custody**
25:7

—————

**D**

—————

**DA**
62:3

**DA's**
61:13
62:6,10,
15

**daily**
69:22

117:6

**date**
45:19

**dated**
15:20,22

**day**
23:3 47:6
61:23
67:11,16
110:12

**day-to-day**
116:5

**days**
5:11
29:21
68:2
80:18
90:12

**de-escalation**
33:2

**deadly**
33:15

**deal**
108:16

**dealing**
94:22

**death**
14:13
15:7,10
45:16
68:23
83:15
88:6,15
91:16,22
95:18
102:16,23
103:14
104:3,18

**Deborah**
4:3,17
65:16

90:24
121:11

**deceased**
49:7

**December**
73:4

**deemed**
99:16

**defendant**
9:13
10:12

**defendants**
42:17
43:19,21
44:2 55:4

**defensive**
33:19

**defined**
16:5

**degree**
16:21
17:14
23:11,20

**delay**
108:4

**delineation**
26:6

**department**
14:14
18:4
19:3,18,
19 20:4
23:2
24:6,11
25:10,21
31:24
39:3 44:7
58:4 76:8
77:12,15,
22 78:2
80:3 96:7
99:22

101:10,13
113:23
114:12
117:3

**departments**
36:10

**depending**
47:3
51:15
76:25

**depends**
22:9 47:5

**deployed**
49:2

**deponents**
8:7

**depos**
5:3

**deposed**
6:3 8:20
12:17

**deposition**
4:6 5:18
8:23 9:9
10:17
11:8,18,
23 12:14,
21 43:3
49:15
81:20
117:21
118:18
119:12
120:25

**describe**
12:25
16:16
21:8 52:7
96:12,15
114:7,10

**describing**
84:24

**description**
96:18

**designation**
30:6

**destroyed**
86:8,10

**detail**
37:16,22

**details**
30:9
56:16
60:21

**detected**
103:5

**detective**
55:16

**detective's**
25:18
26:2

**detectives**
25:17
28:13
35:19
37:6
38:10
54:4
55:15
56:22
64:24

**determination**
84:12
97:13,15
98:2 99:9
101:24
106:19
107:12
119:23
120:20

**determine**
62:7,23
66:3

800.211.DEPO (3376)
EsquireSolutions.com



LT. LAWANDA IRVING  30(b)(6)
Tarasov v PA of NY & NJ
February 14, 2024
Index: determined..employed

**determined**
63:21
66:7 96:6
98:19
99:17
100:10
101:16
103:19
119:17
120:5,23

**determining**
66:5

**developing**
76:19

**Dickinson**
16:23
17:13
23:9,21

**differ**
26:3
74:11

**difference**
20:24
21:8
30:21
31:8
58:16

**difficult**
6:21
90:13

**digitized**
96:15

**digitizing**
57:14

**diligence**
97:23,24

**direct**
78:8,10

**directed**
38:16
83:6

**directions**
66:12

**directly**
51:22
110:2

**disciplinary**
15:9
37:25

**discipline**
99:10,16
100:12,21
101:2,6,
11,14,19
20 103:22

**disciplined**
99:5
103:6,9,
23

**disciplining**
37:25
39:23
99:24

**discuss**
7:7 74:24
84:17

**discussed**
63:16
65:22
87:3
89:10

**discussion**
62:14
75:5
84:15
85:3
111:23

**dispatched**
21:22
49:17
51:21

**disposed**
81:10

**distinction**
83:4,8

**distress**
34:17
108:20

**distributed**
81:15

**division**
40:15

**document**
10:15,25
11:4,10,
13 40:21
42:20,22,
24 43:2,
6,8 48:9
60:18
71:3
75:15
81:21
87:12
110:10

**documentation**
13:21
74:17
89:25

**documented**
58:7
100:19

**documents**
13:3,5,6,
12,15
15:9
57:14,16,
22 58:17
61:10
64:12
66:22
93:7
96:20,21

113:7,10
119:3

**draft**
93:8,13

**drafting**
89:12
110:9

**drive**
52:25

**driving**
52:10

**dropped**
61:10

**dropping**
60:6

**due**
97:23,24

**duly**
4:17

**duration**
51:12

**duties**
19:6,10,
14 20:2,
12,16
24:13,15
25:19

**duty**
22:25
26:25
47:24

—————

**E**

—————

**e-mail**
12:5
70:17
92:22
97:5,20,
21 98:2
120:12

**e-mailed**
70:12

**e-mails**
12:8,11
69:25
70:25
92:18
97:9,11
98:14,15,
19,23
117:22,24
118:13
119:16,
21,22,25
120:19,22

**earlier**
110:21
119:16
120:6

**early**
53:13
54:5
61:12

**education**
16:25
23:8

**educational**
16:16

**electronic**
98:5,10

**emergencies**
47:14

**emergency**
22:14
48:3
51:14
60:12

**employ**
33:3 82:2

**employed**
17:21



employee
9:3
40:11,19
113:23

employees
20:23
114:15,23
117:4,10,
11

employer
17:23

EMS
49:21
88:7,18,
23  108:18

EMTS
71:12
74:10
75:8

end
57:15,16
80:12
81:19
107:12
115:20

ended
69:4

enforce
30:11

enforcement
23:24,25
31:9
115:6

enforcing
20:6

engaged
95:13
101:17

ensure
19:13
20:6

ensuring
20:22

entities
22:12

entity
61:18
77:23
82:3

equally
34:14

equipment
4:7

Erie
8:11

escort
96:8
108:3

estimate
69:9

evening
55:17

event
22:4
36:11,21
41:18
54:20

events
45:22
52:5,24
59:24
62:17
68:23
72:2  99:5
103:16,25
104:2
105:21

Evgeniy
14:13
15:2,8,11
45:16
48:13
53:24

62:18
83:15
88:6,15

evidence
14:17
32:14
38:5,9
40:2
41:21
56:6,24
58:9,11,
14,24
59:2

exact
51:11

EXAMINATION
4:21
118:10
119:13

examined
4:19

Examiner
83:25
84:10
85:2,14
87:11
89:8

Examiner's
83:23
84:3,8

Examiners
14:25
38:21
40:5
41:24

exclusively
26:9,14
76:14

excuse
105:10

Exhibit
10:16,20

17:20
42:4,8
45:15

exist
102:10

expectation
s
61:2

expected
16:13
37:2  38:7

experience
17:10
23:24,25
76:15,17
102:14
109:8
113:21

explain
34:7

explained
66:19
84:10

exposed
31:23

extent
67:22
117:21

extract
74:25

extracting
40:8

_____

F
_____

face
67:21

facilities
19:14
20:19
22:11

114:16
117:6

facility
30:11

fact
87:9  98:2
118:16

facts
95:12
119:25

factual
120:3,8

failed
96:7

fair
6:14
83:10
86:16
90:11,17
116:20

Fairleigh
16:22
17:13
23:9,20

fairly
86:22
90:9

familiar
6:4  11:3,
15  42:21
43:25
44:3

fashion
96:9
108:4

feel
116:6

feeling
115:8

feelings
114:25



LT. LAWANDA IRVING  30(b)(6)
Tarasov v PA of NY & NJ
February 14, 2024
Index: fellow..generally

115:4

**fellow**
36:16
38:2

**field**
35:20

**fighting**
33:19

**file**
12:22
13:2,10
48:2,3
49:10,14
57:24
58:13,17
74:16
89:13,22
93:15,18
94:3
96:13,14,
16,19
97:7
98:6,8,
16,24
110:22
111:8,15,
19 112:6,
20 113:8,
13
118:14,
16,20,21
119:4,5,
17,21,22
120:2,4,
19

**filed**
47:17
93:22
97:6

**files**
57:7,8
58:2,7
64:2 93:6
99:12

112:16,17

**filing**
97:4

**filled**
71:18

**final**
27:25
69:5
111:15,17

**Finally**
7:6

**find**
35:17
120:21

**finding**
56:8
84:10
107:2

**findings**
84:17
92:9,16

**fine**
5:12,13
6:20

**finish**
106:12

**firearm**
54:18,24

**firearms**
108:12

**firm**
5:20,21

**flight**
48:21,25
49:19,23
53:22
60:3
62:19
71:8 73:3
74:12
75:9

105:11
106:6

**focused**
35:8
82:17

**folder**
57:11,13
58:18
98:13
100:6
112:6,7,
8,10,23
113:2

**follow**
53:5
101:17
118:2

**follow-up**
38:11
73:19,21
77:4
118:9
119:10

**force**
19:10
33:13,16
59:11,19
68:12
71:18
95:17
102:15,22
103:13

**forgive**
55:9

**form**
5:9 22:7

**formal**
68:17
84:14
100:25

**forms**
70:18

**forward**
66:7

**forwarded**
99:15

**found**
10:12
60:19
94:12,14
101:21

**foundation**
45:22
93:19,21
110:21
111:8

**four-page**
111:16

**frequent**
12:7

**fresh**
86:22

**front**
9:23

**fruition**
65:24

**full**
8:8

**full-time**
23:9

**fully**
90:13

_____

_____

G

_____

**gather**
115:6

**gathering**
56:8,24

**gave**
36:24
67:12

**general**
14:19
30:8
31:14
34:13
40:14,24
41:4
46:24
55:19
61:2,18
63:4,14,
22 65:19
73:23
74:7 76:4
89:10
99:14
108:10
110:14
114:6

**General's**
13:7
61:25
62:9
63:2,17
69:5,10,
19 91:20
92:8,13,
15,23
93:12,21
100:2,10

**generally**
10:5
16:4,9,12
17:8 31:7
32:3 47:2
55:23,25
58:4
73:14,18
84:20
85:20
86:21
89:14
101:7
108:19
113:22
115:15



GI
64:9

give
8:18 9:17
50:19
60:8
61:20
96:17

giving
7:14

glare
65:6,10

goal
36:11
116:3

Good
4:23

grab
42:5

graduated
17:5
22:24
23:7,16
30:2
44:21

graduation
29:17

grain
37:11

Grand
9:24 10:9

great
115:13

greatly
4:24 6:17
121:6,9

ground
33:19

group
113:25

114:7,11,
20
115:10,11

guess
17:16
60:10

guided
40:16

guidelines
76:10

guilty
10:12

—————————

**H**

—————————

Hall
16:19
17:4

hand
54:23
110:14

handbook
40:19
76:6,12

handle
33:21
65:12

handles
60:23

hands-on
21:5,14

handwritten
13:14
85:17,23
86:5

happen
63:23
89:16
90:2

happened

9:18
22:14
37:3
48:16
50:18,19,
23 56:7
99:6
103:16

happening
21:18

happy
6:8,10
10:25

hard
57:13,18,
21 96:14
98:16

head
6:20
74:15
99:23

headquarter
s
55:10

heads
74:8

health
34:2

hear
6:6,13
79:18

heard
52:18

hearing
49:11

hearings
15:9
75:19

heart
117:23

heavily

75:14
89:17
90:4

held
4:6 18:6
79:24
118:15

Hernandez
48:20
51:7,10

high
16:17,18
22:12
36:23

higher
23:8,20

highest
16:24

highlight
43:11

highlighted
43:15

highlightin
g
43:18

Hoboken
46:13,14
57:6

hold
46:25

home
50:21
56:25
61:11
115:20
116:3,9,
20

homicide
61:13

hospital
49:6 54:8

59:17,18

hour
47:4
53:10

hours
47:5,7,8
80:22

housed
56:11

hundred
13:11,12
96:22

hundreds
22:14

hung
51:6

—————————

**I**

—————————

identificat
ion
10:20
42:8

immediately
29:23
30:2 90:3
104:6
108:25

impair
7:25 8:2

implement
109:19

implicated
21:19

important
86:21

in-person
66:17
70:2

incident



20:17
25:9 46:7
49:12
54:23
56:7
60:17,20,
22 61:6,8
64:23
73:15
74:9
106:5
108:15,
21,22
118:22

incidents
60:24

include
13:13
32:24
33:2,9,
12,16,18,
21 59:11
120:9,11

included
13:21
85:24
86:7
96:23
97:10,11,
20,21
98:24
119:3
120:12

includes
11:9 71:8

including
15:8

incumbent
97:22
98:4

independent
ly
101:2,13

indicating
27:17

individual
44:2
48:21,23
49:3 55:4
105:2
109:21
112:6
119:23

individuall
y
116:6

individuals
44:5
55:12
56:3
72:23
94:22
95:25
115:4

influence
7:24

informal
68:17

information
35:18
36:2 37:5
49:13
50:9 51:2
56:6,15
60:21
61:3,21
66:22
75:7 77:4
85:7,21
86:4 93:3
98:11
100:5
105:19
112:2,12
113:4,12
120:14

informed
106:5

informing
105:10

initial
50:6
60:19
61:22
106:2
108:15

initially
62:6
64:25
94:4

initiating
37:25

injuries
25:7
54:17

injury
8:21
54:22

inside
30:10

Inspector
55:19
63:4,14
65:19
99:14

instruction
s
40:15
66:15

Integrity
13:8
24:19,22

interaction
52:23
55:2,3
60:18

interest

27:17

internal
9:25
32:16
39:15
41:7

Internation
al
30:15,18,
22 31:6,
19 46:20
48:14
51:21
52:10,25
53:7 57:4

interview
27:10,13
54:10
66:6
72:10,16,
18,19,20
73:11
74:20
75:25
78:15,19
83:22,24
84:2,5,8,
12,14,20,
25 88:22
89:13,25
92:4
112:22

interviewed
27:14
71:10,12,
17,22
74:23
88:8,19,
20 91:17,
19

interviewee
74:2

interviewer
72:11

interviewer
s
72:2

interviewin
g
36:16,20
39:20
40:8 71:7
72:13
73:16,23
76:4,19
81:16
82:4,8,17
83:6,12
88:13

interviews
14:16
27:19,21
66:22
68:4,9,
13,17
71:4,12,
14,15
72:9,25
73:7
75:4,16
81:22,24
82:10,15,
19,22,23
83:16,18,
20 84:22
88:3,24
89:11,14
96:24
110:6,8
112:9,15,
18 118:15

introduce
10:15
42:3

introduced
67:12

introductor
y



800.211.DEPO (3376)
EsquireSolutions.com

6:2

**investigate**
25:9,24,
25 64:20
68:23

**investigated**
104:13

**investigating**
25:5
31:18
35:14
36:11

**investigation**
13:19
14:12,25
36:17
38:11
41:8,11,
15 45:12
56:5
59:24
60:4,11
61:15,20
62:16
63:19
64:4,8,
12,19
65:18
66:11
67:21
68:21
69:3,17
70:19
71:6,23
72:4,14
81:25
82:14,25
83:2,14
85:10
87:22
88:2,5,
15,17

91:18,22,
25 92:10
95:4,15,
22 96:5
97:8,10
98:6,25
99:3,11,
12 100:22
103:8,12,
24 104:18
106:11,
15,17,19
107:13,23
109:13
110:6,15,
17 11LT. LAWANDA IRVING 30(b)(6)
Tarasov v PA of NY & NJ
112:3,4
113:5,17
117:23
120:16

**investigations**
20:13
29:3
32:17
34:20,23
35:7,22
36:3,5,8
39:15,17
47:18
63:5,15
64:14
82:7
100:15

**investigative**
24:20
30:23
31:3
56:16
58:15
63:22
68:4,9,12
93:6
99:20
100:24

101:8
112:10

**investigator**
35:5,9
58:18
62:21
95:11
97:16,23,
25 98:3,4
101:9,25

**investigators**
35:19
66:20

**involved**
9:19,24
88:5 99:4
100:20
108:12,13
110:16
117:7

**involvement**
15:7 28:7
73:13
74:9 75:6
95:3,6

**involving**
48:13
52:23
59:25
62:17
85:14
97:5
118:23

**Irving**
5:1 6:1
7:1 8:1,
11,13 9:1
10:1,20
11:1 12:1
13:1 14:1
15:1
16:1,2

17:1 18:1
19:1 20:1
21:1 22:1
23:1 24:1
25:1 26:1
27:1 28:1
29:1 30:1
31:1 32:1
33:1 34:1
35:1 36:1
37:1 38:1
39:1 40:1
41:1
42:1,8
43:1 44:1
45:1 46:1
47:1 48:1
49:1 50:1
51:1 52:1
53:1 54:1
55:1 56:1
57:1 58:1
59:1 60:1
61:1 62:1
63:1 64:1
65:1 66:1
67:1 68:1
69:1 70:1
71:1 72:1
73:1 74:1
75:1 76:1
77:1 78:1
79:1 80:1
81:1,17
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1 99:1
100:1
101:1
102:1
103:1

104:1
105:1
106:1
107:1
108:1
109:1
110:1
111:1
112:1
113:1
114:1
115:1
116:1
117:1
118:1
119:1
120:1
121:1

**issuance**
69:5

**issue**
48:12

**issues**
21:19

**issuing**
15:21

**ISTS**
39:10,14,
19,22,25
40:4,7

**items**
59:5 60:7

_____

**J**
_____

**January**
18:24,25
73:4

**Jersey**
8:12 20:7
30:12
31:11
46:13,14

February 14, 2024

800.211.DEPO (3376)
EsquireSolutions.com



79:5

**Jet**
49:19,23
53:22
60:2

**JFK**
30:15,18,
22 31:5,
19 46:20
48:13,19
50:23
51:21,22
52:10,25
53:7,25
57:3
59:15
60:3
62:19
91:14
105:11

**job**
33:4
76:15,16
95:11
121:9

**jobs**
20:8

**joins**
94:19

**joint**
36:5,8
39:17
41:10
62:16
65:17,23
68:11,12,
20 112:3

**Joseph**
44:13,18,
19,25

**jotted**
13:18

**Jr**
5:19

**jurisdictio
n**
62:7,8

**Jury**
9:24 10:9

———————

**K**

———————

**kick**
60:14

**kind**
6:23
99:22
121:7

**knowledge**
35:24
67:23
68:19
74:18
95:14,21
96:4 99:7
103:25

———————

**L**

———————

**Labor**
99:15,17,
21

**Lagoda**
14:13
15:2,8,11
45:16
48:13
53:24
59:25
62:18
68:24
83:15
88:16
91:16
95:18

98:10
103:14
104:18
118:23

**Lagoda's**
88:6
91:22
104:3

**laid**
24:16

**language**
21:3,4

**lapse**
90:3,5

**larger**
21:19

**lasted**
29:20

**late**
105:9

**law**
5:20
23:24,25
58:3
115:6

**Lawanda**
8:11

**laws**
20:6
30:11
31:9,10
32:5

**lead**
61:19
64:4
66:20
67:20

**leading**
23:25
39:13
92:13,24

**leads**
102:16,23

**learn**
50:12

**learned**
82:3,11

**learning**
76:14

**leave**
57:6,9
117:21
118:7

**leaves**
90:25

**leaving**
119:11
120:24

**led**
106:2
109:16

**left**
28:4
81:11
108:24
109:14

**length**
51:13

**lengthy**
5:3

**lessons**
38:24
82:2

**letter**
15:22
16:2
27:17

**letting**
50:11

**level**
16:24

22:3
34:15
36:22,23
37:15,22
73:13
74:9 75:6

**lieutenant**
4:23
8:13,14,
15 10:24
11:16
14:3
16:2,8,15
18:3,7,16
20:10,16,
25 21:16,
24 22:5,
15 25:14
28:3,8,19
29:4
42:19
43:16
45:11
48:19
51:7,10
81:16
91:9,13
92:7
118:12
121:5

**lieutenant'
s**
21:6,7,9

**lieutenants**
20:17
21:22
25:16
27:15
28:12

**life**
38:13

**limited**
14:15
15:8

LT. LAWANDA IRVING  30(b)(6)
Tarasov v PA of NY & NJ

February 14, 2024

800.211.DEPO (3376)
EsquireSolutions.com



list
11:9
43:20
73:9

listed
43:19
109:25

listening
33:10

located
78:21

locked
58:22,23,
25

lodged
15:18

lodging
15:23

log
70:8

logbook
57:20
58:7,11

logged
58:21
59:6

logger
58:22

logs
47:16

long
18:6,12
19:16
26:16
51:4,10
59:16
69:2
80:15

longer
64:19
90:11

lot
82:6
108:12,13
120:15

loyal
113:25
114:7,20

loyalty
114:25
115:8

## M

M-A-S-O-N
67:5

machine
56:10

made
18:22
94:15,16
99:8

magnitude
22:3

main
30:12
69:12

maintain
114:14
117:3

maintained
13:7

majority
79:16

make
51:19
79:16
92:7
95:10

110:3,18
115:17,19
116:2,8,
22

makes
97:14,25

making
83:5,8
84:11
95:13
116:19

male
49:18,22
59:25
105:11,
16,20
106:7
108:23
109:14,15

man
53:22,23
62:18
105:25

management
16:20
38:13

mandate
101:10

mandated
77:10,13

mandatory
38:25

manual
40:12,19

March
19:20
22:21
23:4
29:10

Marine
46:13

mark
10:15

marked
10:19
42:3,7
112:18

Mason
66:19
67:5,8,17
87:16

Master's
16:21
17:12
23:11

materials
74:13
76:7
81:3,7,9,
14

matter
5:22
13:19
43:19
44:2 55:5
56:5
58:14
62:8
69:20
70:10,22
85:15
97:6
104:13

matters
6:2 15:5
26:12

means
13:2 92:3

medical
8:20
14:24
30:10
33:23
34:17

38:21
40:5
41:24
71:10
83:23,25
84:3,8,10
85:2,14
87:11,13
89:8
106:5

meet
14:9
15:24
53:4

meeting
62:23
63:7
66:2,17,
18 67:16
84:9,16
85:8,13,
16 86:2,
6,14,17,
25 87:3,
18 89:7
90:6,13,
14 91:2
120:13

meetings
70:2
74:21
75:4
84:21
118:15

member
26:7,13,
16 31:12,
19 35:2
41:7
45:13
47:25
54:20
55:12
56:19
57:3



800.211.DEPO (3376)
EsquireSolutions.com

76:14
99:20
100:23
102:21
103:25
113:21

members
38:17
50:24
53:3
68:11
84:3
91:21
99:21
115:7
117:2

memo
89:21

memorandum
48:2
84:24
86:17,25
87:4
89:9,13
93:25

memorandums
32:22

memory
85:17,21
86:18,20,
23 87:2

mental
34:2

met
12:9
62:25

method
69:23

middle
43:13

miles
46:22

mind
65:8

minutes
24:17
51:12
53:11
90:21
108:5

minutia
21:17

mischaracte
rize
111:2

mischaracte
rizes
110:24

misconduct
25:6
64:21

missing
119:2

moment
37:20
38:14

Monday
59:22
62:25
63:7 66:2
67:16,25
68:14

month
92:24

months
11:25

morning
4:23
53:13
54:5
59:14,15,
21 61:12

Moschitto

4:3,18

motions
5:10

move
66:7

─────────────

N

─────────────

named
9:13 55:4

narrow
16:6

narrowing
15:23

nature
64:23
82:20
108:21,22

necessarily
72:11
87:8 90:2

needed
64:7
66:11,13
95:24

Newark
30:4,6,
15,22
31:4,18

nice
6:5

Nicholas
66:24
67:7,17
74:22
75:18

Nick
66:19
72:22
75:12,22

night
45:25
47:8
49:9,16,
23 50:4,
13,21
52:5,17,
24 53:8,
10 55:5
59:4
61:11
64:23
72:3
91:14,15,
16 105:9,
19 116:20

nods
6:20

non-officer
83:13
88:4,13

non-police
72:5,13
74:23

notary
4:4,18
5:13

notated
85:8

note
15:17
85:23
102:4

noted
87:24
91:3
106:4

notes
13:13,17
48:2
75:12,20,
23 85:2,
17,18,22,

23,25
86:2,5,9,
13

notice
10:19
14:8
15:19,21

notificatio
n
60:17

notified
49:22
67:19
79:23

notify
46:8
50:22
66:21

nuance
31:10

number
14:2
26:24
48:24
60:23
76:17
79:15
112:14
117:8

numbered
112:19

numbers
13:25

─────────────

O

─────────────

OAG
93:10,11
109:2

OAG's
62:14
65:19



66:10
68:21
69:18
70:13
87:20
93:9 94:7
99:2
103:11
106:16
107:12,
21,24
109:7
117:25

**oath**
7:15
8:16,19

**objection**
14:7
15:17
22:7 33:5
49:24
85:5 87:5
90:15
93:23
95:8
102:5,18
103:2,17
104:8,23
106:24
107:19
108:6
109:4,23
110:23
111:13
114:2,8,
21 115:24
116:10,24
117:14

**objections**
5:8 15:23
16:6,10

**obtain**
56:16
60:20,25
61:3

81:13

**obtained**
57:7
58:10,25
59:3 85:8
86:5
93:4,7
98:12
100:6

**obtaining**
56:12,15
117:22

**OC**
49:2 56:8

**occasions**
8:22

**occur**
20:18
79:3
89:20

**occurred**
45:16
48:12
52:5,24
90:14
118:23

**off-the-
record**
54:13
84:15

**office**
7:14 13:7
14:18
46:8,12,
15,17,19
55:19,20
57:5,7,9
59:22
60:7
61:10,13,
25 62:6,
9,10,15,
21 63:2,

3,12,14,
17 64:3
65:3,19
66:4,11,
21 67:20
68:21
69:11,19
70:13
71:17
83:23
84:4,8
87:20,21
91:20
92:9,13,
15,23
93:12,21
95:12
99:14
100:2,10
103:11
110:3,19
111:18,
19,23
112:25
117:25
120:16

**officer**
9:6,11,20
19:2,9,
17,23
22:22
25:12,13
26:25
30:18
34:10,24
35:9,14
36:13
37:16
38:8
39:12
40:12
41:6
44:18,19,
25 48:22
49:2,17
50:3,4,14

54:9,11
55:3 56:9
79:9
88:21
105:10,18
106:3
108:11,20
109:9
113:23
116:19
119:23

**officers**
14:16
15:7
20:5,21
25:8,11
30:8 33:3
34:6
36:16
37:2
38:2,17
39:6,20,
23 40:17,
20 41:14
44:6,10
53:17,18,
20 54:3,7
55:5
56:23
71:17,22
79:10,20
80:24
88:7,17
94:13
99:4,10,
24
100:12,19
101:3,14,
16
102:15,22
103:5,15,
20 104:5,
20 105:2,
5,13,23
106:20
107:15

108:9
109:17
112:18
114:13
115:16
116:4,5,
8,21,22

**officers'**
103:13

**oftentimes**
72:9

**OIG**
93:14,17

**OJT**
29:20

**on-call**
46:6,11
47:9,11
55:15
57:2

**on-site**
21:5

**on-the-job**
29:19

**onboard**
105:16

**online**
78:24

**open**
72:10
77:3
117:21
118:7
119:12
120:25

**opening**
60:11

**operate**
6:12

**operations**
20:20



opinion
104:11,12
115:13

opposed
25:13
38:17

option
28:20,23

order
27:8
74:14
80:20

ordering
121:17

orders
40:14,15,
24 41:4

Organizatio
nal
16:22

origin
60:13

originally
108:23

other's
115:22

outcome
10:10

overseeing
21:7

overview
8:18 9:17

owed
34:5,6

owes
34:10

_____

P
_____

pages

13:11
40:22
41:4
42:16
94:2

paid
77:20,21
78:9

pains
7:19

PAPD
14:15
15:6 31:8
40:13
55:12
63:4,23
68:22
76:9
79:9,10
87:20
95:17,23
99:9
100:15
104:4,19
106:20
107:14,25
109:17
113:24
114:11
115:7,15
120:23

PAPD's
63:15

papers
96:17

paperwork
56:11
59:7,9,10

part
20:11
33:8
36:6,14
37:12,23
38:19,23

41:3
47:17
64:19
66:11
70:4
71:5,22
72:3
81:15,24
83:13
87:21,25
88:3,4,
12,13,16,
19 91:17,
21,25
94:3
98:25
99:3
107:14
110:5,8,9
112:20
113:4,16
114:16
121:8

participate
79:24
82:19

participate
d
82:9,16
83:21
96:25

parties
4:10
16:11
91:5

pass
35:18

passed
27:7

passengers
48:25
73:3

patrol
30:9

35:20

patrons
20:22
114:15
117:5

pause
43:23
61:16,20

pay
78:8

paying
94:23

penalties
7:20

pending
7:8,9

people
22:14
108:13
114:24
117:5

percent
27:4

period
29:17
69:8

perjury
7:20

person
4:12 12:4
34:16
41:6
73:17
76:25
77:3
78:25
79:2
106:22

person's
37:5
73:13

74:8 75:6

personal
7:23 8:6
9:4
13:13,17
44:19
45:9
77:17
92:6
104:10
114:25
115:13

personally
68:3
72:24
88:3,13

personnel
39:3,7
87:19,23
88:8,18,
24 95:17,
24 96:8
108:2

perspective
36:23
58:15
73:18
96:20
101:8
117:19

pertinent
97:9,14
98:3,9,
11,14,20
111:25
119:17,21
120:5,8,
19,21,24

phone
12:4,8
47:13,16
51:6,18
52:12
61:24



LT. LAWANDA IRVING  30(b)(6)
Tarasov v PA of NY & NJ
February 14, 2024
Index: photograph..present

62:20
66:16
70:8
92:18,22
105:12

**photograph**
54:17

**phrase**
111:4
116:15

**phrasing**
21:2

**physical**
25:7 59:5

**physically**
82:18

**piece**
120:11

**pieces**
119:18

**pilot**
75:10

**pilots**
71:9

**PIU**
24:23
25:3,12,
20,22,23
26:3,4,8,
13,17
27:2,8
28:2,4,8,
11,17,20
31:12,20
34:23
35:2,4,10
38:17
41:7
45:13
48:2
51:25
54:20

56:19
57:3,20
59:2
60:14,23
62:14
64:2,22
65:3,18
68:22
76:9 77:7
81:11
91:21
100:4
102:15,21
104:2
113:22

**PIU's**
46:15,17
60:10

**PIUS**
76:14

**place**
16:3
102:3,13

**plainclothes**
51:25
52:2

**Plaintiff**
5:17

**plaintiffs**
5:21 71:2

**Plaza**
46:13

**point**
30:14
51:24
54:5 56:4
57:17
59:8,13
60:8,13
61:11,16
62:13
66:2

67:24

**police**
9:6 13:8
14:14
18:3,11,
12,20,23
19:2,3,8,
15,17,18,
22 20:3,
5,21
22:22,23,
24 23:2
24:6,11,
19,22
25:6,13,
25 29:9
30:17
31:24,25
32:2
34:19,21,
24 35:4,
7,9,14,23
36:2,12,
14,19
37:2,9,
16,17,23
38:6,7,16
39:3,7
40:15,17
44:6,7,
10,14,17,
21 54:2
55:9
56:23
64:21,24
71:17
76:8
77:11,15,
21,23
78:2 80:3
96:7
99:18,22
101:9,12
113:23

**policies**
101:22

103:21

**policy**
47:20,22
60:11,14
70:4 89:5
101:23,25
102:2,6,
8,9,12

**Port**
9:3,5
14:14,22
17:23
18:3
19:2,13,
17 20:3,
19 22:19,
25 24:5,
11 31:14,
24 39:2,6
76:8
77:11,14,
25 78:6
79:21
80:2 96:6
98:22
100:25
101:9,12,
17,21
102:25
103:12
113:22
114:15,19
117:24

**portion**
41:5
43:12
93:8

**portions**
86:19

**position**
27:18

**possession**
58:21
59:5

**possibility**
117:13

**possibly**
102:9

**post**
26:9
29:18,22
60:6
86:17

**potentially**
99:24
117:23

**PR**
55:24

**practice**
100:16,17

**practices**
32:2

**prep**
75:12,17,
20

**preparation**
11:17,23
12:13
43:3
49:11,15
74:19
118:17
119:5

**prepare**
12:20
34:20
73:9
74:14
76:24
90:7

**prepared**
73:7
85:15
118:22

**present**
5:17

LT. LAWANDA IRVING  30(b)(6)
Tarasov v PA of NY & NJ
February 14, 2024

800.211.DEPO (3376)
EsquireSolutions.com



54:16
63:13
71:15,20,
21 80:24
87:19,23
88:21,23
105:3
112:14,22

**presented**
105:2,4,6

**preservatio
n**
56:25

**preserve**
85:25

**preserved**
98:21

**preserving**
38:13
86:3

**press**
55:24

**pretty**
6:3
113:25
116:14

**previously**
107:10

**pride**
115:5,13

**primarily**
72:18

**primary**
69:23
70:17
71:25
72:11
108:19
110:13

**printed**
40:22

98:15

**prior**
18:9,19,
25 20:10
23:23
67:15
75:4 93:5

**priority**
108:17,18

**privy**
98:22
112:5,16

**probative**
77:2

**probe**
92:4
101:15

**problem**
18:17
65:11

**procedure**
47:20,22
48:8
54:25
56:19
60:15,16
61:18
62:11
70:4 89:5
100:13
101:18,24
102:2

**procedures**
30:21
31:4
32:2,8
38:2 61:2
101:22

**proceed**
63:18
65:22
66:4

**proceeded**
5:4

**process**
27:10,13
57:14
72:13,15
84:11,17
89:12
97:25

**produce**
47:16
84:7

**produced**
70:22,25
71:2
92:15

**professiona
l**
17:10
22:18
45:8
87:14
114:13

**professiona
lly**
117:3,10

**professiona
ls**
71:10

**program**
29:13

**promise**
7:22 92:6
119:10

**promoted**
28:3

**promotion**
26:21
28:19,22

**pronounced**
49:6

**proper**
62:5

**properly**
104:4,20
107:14
109:17

**property**
38:13
58:22,25

**prosecutor**
58:5

**prosecutors**
100:5

**protected**
116:23

**protecting**
116:18

**protocol**
54:19
56:18
100:13,18
108:11

**protocols**
30:21
31:4

**provide**
34:15,17,
18 37:5
45:23
48:23
49:5 77:3
91:24
115:12

**provided**
41:6 76:7
77:22,23

**providing**
32:10

**PTO**
80:20

**Public**

4:4,18

**punishments**
15:10

**purged**
98:20

**purpose**
64:5
68:20

**pursuant**
4:9

**pursue**
94:12

**put**
5:7 58:25
61:16
67:21
96:20
112:23
113:2
119:16

---

**Q**

---

**Queens**
62:3

**question**
6:10,13,
25 7:4,8,
9 17:17
24:8
29:24
30:25
41:14,18
67:15
88:9 92:6
102:7,20
104:15
106:14
107:8
111:5
114:18,19

**questioning**



32:19

**questions**
5:24 6:7,
9,11 8:2,
3 10:18
17:9 19:6
22:18
29:5
37:3,7
43:22
45:12
72:21,22
73:10,12,
19,24
74:3,7,
10,11,14
75:9
76:4,5,
10,24
77:2,5
117:20
118:6,9
119:10
121:2,4

**quickly**
90:7

_____

**R**

_____

**R-E-I-D**
78:17,18

**radio**
47:12
52:15,16,
17,19
56:14
105:14

**rainy**
53:10

**Ramirez**
105:17

**Ramon**
48:20

**rank**
27:5

**re-deposition**
10:19
15:19

**re-examine**
118:4

**Re-notice**
10:16
11:8

**read**
14:5,10,
20 15:5,
11 43:20

**readily**
56:13

**ready**
73:10

**recall**
9:7 10:5,
10 12:2
17:13
28:16
31:25
37:15,18,
19,21
44:24
45:18
46:4 47:7
48:11
49:12
51:9,11
52:22
53:6
55:17,22
58:24
59:2 61:8
69:2 70:7
71:4
73:15,20
75:11,22
78:5,9,12
79:13

80:14
86:3,12,
15 87:18
89:2
94:10,17
98:8

**receipt**
5:11

**receive**
35:3,6
40:11
47:23,24
50:13
60:16

**received**
13:6
16:19,25
40:14
41:4
48:17,18
49:14
50:8
74:17
105:8,12,
13 113:20

**receiving**
37:16,21
48:11
60:7

**recess**
91:3

**recognize**
10:25
42:19

**recollection**
36:4 49:9

**recommendation**
109:16,
19,25
110:3

**recommendations**
92:8
94:15,16,
18 95:10,
13 100:7
107:22
110:18

**recommended**
79:20
94:20,21,
23 95:23
101:20

**record**
5:8,16
8:9 14:6,
10 65:12,
14,16
68:16
81:13
84:21
91:8
111:12

**recorded**
70:4 72:9
73:5
75:19
83:16,19,
21,23
84:19
89:5,15
90:6

**recording**
89:23

**recordings**
56:14
75:15
89:18
96:23

**records**
81:14

**refer**
24:22
39:9

**reference**
60:9

**referring**
15:6
50:7,8
89:21
94:4

**refresher**
6:4

**regard**
37:13
62:16
70:8

**Reid**
78:14,18
79:7,25
80:7,9,12
81:4,15,
24 82:3,
11,16
83:5

**reimbursed**
77:25
78:5

**related**
13:8,20
56:6,12
60:21
85:9
93:3,6
118:14

**relates**
88:14

**relating**
15:6,10
93:4

**Relations**
99:15,17,
21

**relationship**
14:23

LT. LAWANDA IRVING  30(b)(6)
Tarasov v PA of NY & NJ
February 14, 2024



44:8,9,19
80:2,5

**relayed**
105:20,24

**release**
69:17
92:14,24
93:5

**released**
93:20

**reliance**
87:9

**rely**
75:14
89:17
90:4

**remain**
57:3
58:18

**remember**
8:24
10:4,5
17:7
49:13

**remotely**
4:9

**repeat**
6:8,10
30:24

**rephrase**
6:10
85:11

**report**
69:6,18
84:7
85:4,15,
24 86:7,
24 87:10,
11,24
89:15,24
90:2,4,7
92:14,25

93:5,9,
10,11,12,
14,17,20
94:8,11
95:2,15,
22,23
96:5,6,11
106:16
107:24
109:2,7,
22 110:2,
21 111:9,
15,16,18

**reported**
54:22

**reporter**
4:2,4,8
121:13,16

**reports**
32:21
59:11,20
71:18
85:9 87:7
89:21
93:16
95:16

**represent**
11:7
42:12

**representative**
54:16
63:3

**representatives**
63:12,13

**represents**
5:21

**request**
61:21
70:25
71:3
81:13,21

118:3

**requested**
20:9
50:4,14
58:3,8
105:22

**requesting**
120:22

**requests**
81:19

**require**
22:4

**required**
27:11
33:3
34:15
47:25
80:20
99:16

**requisite**
26:24

**reserved**
5:9,10

**respect**
16:4
118:14,22

**respond**
19:12
20:8
21:12
25:8
30:10
34:14
50:25
108:14
109:18

**responded**
15:21
48:22
53:20
55:6
71:11,13

105:5,23

**responding**
9:12 20:8
26:11
34:11
50:21,23
54:3,7
64:6
91:14
108:9

**response**
22:5
54:20
55:24
61:22
94:25
106:3
108:18
111:5,6

**responses**
7:19 14:7

**responsibilities**
19:7,11
20:2,12,
16 24:14,
16 25:19
26:13
30:13
40:16
61:17
64:25

**responsibility**
63:24
64:22
66:5
100:4
110:19

**responsible**
25:5
64:18
99:23

**restroom**
90:21

**result**
9:7 99:5
103:15

**resume**
27:16

**retain**
38:10

**retained**
98:12

**return**
56:25

**returned**
91:5

**review**
41:21
43:2,5,8
49:10
74:13
119:4

**reviewed**
12:22
14:17
49:14
74:18
94:7
118:17

**reviewing**
38:5

**rights**
116:18

**righty**
90:23

**Robert**
44:13

**role**
19:7
21:5,6,7,
9,10
25:18



26:2,3
34:23
72:12
101:8

**room**
4:8

**roughly**
8:24 13:9
19:21
23:18
27:20
46:19
51:4,9
53:6
79:13
80:15

**rule**
11:9
34:14
60:25

**rules**
32:13
40:2,16

**Rutgers**
23:11

**S**

**safe**
115:18

**safely**
116:3,9,
20

**safety**
19:13
20:22
38:12
114:14
117:4,7

**sake**
6:19,24

**salt**
37:12

**save**
98:4

**saved**
47:17
98:24

**scan**
57:16

**scenario**
51:15

**scene**
9:12 20:9
21:12,14,
18,20,23,
25 22:15
35:16,17
38:8,12
49:18
50:25
53:21
55:6
58:10
64:24
71:11,13
91:14
96:9
108:3

**scenes**
20:18

**school**
16:17,18
78:14,19
79:25
81:4,15,
24 82:3
83:5

**Science**
16:20

**scope**
15:24
16:6

**scratch**
102:13

**screen**
10:22
13:24
17:19
42:10
43:13

**scroll**
11:2,8
13:22

**Scrolling**
11:6

**secondary**
108:18

**section**
13:23

**secure**
115:18

**secured**
57:11,12

**securing**
51:2

**security**
19:13
114:14
117:7

**seeking**
23:20

**seizure**
48:21
49:18,22
53:23
60:2
62:19
94:23
96:2
104:6,22
105:3,11,
16,20,25
106:7,23
107:17

108:24
109:2,14,
21

**self-
explanatory**
116:15

**semantical**
82:23

**sending**
120:13

**sense**
115:5,8

**separate**
8:22
27:21
76:23

**separately**
71:16

**September**
15:22,25
18:8,9,16
28:4

**sergeant**
18:11,13,
14,20,23
20:3,11,
25 24:5,
10 25:14
26:10
34:25
39:13
55:16
68:22
81:17

**sergeant's**
21:5,9
26:3

**sergeants**
20:21
21:11
25:17,25
28:13

71:19

**series**
5:24 29:5
45:12

**serve**
26:25
100:4

**served**
19:17,22

**service**
19:12
38:25
57:2

**sessions**
75:12,17,
20

**set**
17:9
73:24
74:3 75:9
76:6

**Seton**
16:19
17:4

**setting**
120:13

**shade**
65:9

**share**
42:9 64:2

**shared**
113:15

**sharing**
17:19

**shift**
46:4

**Shorthand**
4:3

**shortly**
59:17

800.211.DEPO (3376)
EsquireSolutions.com



77:7

**Shoulder**
6:19

**showing**
21:14

**shredded**
86:11

**shrugs**
6:19

**sign**
5:11

**signed**
58:3

**significant**
72:12

**signing**
57:23
58:11

**signs**
57:21,22

**silently**
43:20

**similar**
24:18
25:24
26:5 31:8
89:7,12

**simple**
114:18

**simply**
92:4

**simulated**
35:21

**single**
36:11
87:9

**situation**
22:9,10
61:4
82:12

103:20,23
104:25
105:5
108:8,10
109:18

**situations**
33:22
34:14
115:23

**size**
28:11,14,
16

**skills**
33:10

**sort**
120:14

**sound**
6:3

**span**
23:14

**speak**
11:16,22
12:12
28:9
53:17
54:2,6
91:9
110:4
111:13
113:6,11
114:24
115:11
116:5

**speaking**
16:9,12
17:8
32:3,25
55:23
77:2
101:7
115:3
117:17,18

**specific**
30:5
31:13
37:7 58:6
60:24
80:4
97:4,8
106:13

**specificall
y**
18:2
24:19
32:25
36:12
38:16
47:13
82:5

**specifics**
46:25
66:13

**spell**
78:16

**spoke**
11:21
44:25
48:18
54:3,9
55:13,14,
18,21
61:12

**spoken**
55:11

**sponsored**
77:11

**spray**
49:2 56:9

**stack**
96:17

**staff**
48:24
84:5

**stamp**

42:15

**stamps**
112:19

**stand**
35:17

**standard**
34:9 48:8
54:19,24
56:18

**standards**
34:4,6,8

**standpoint**
92:5

**start**
19:8
42:13,18
60:14
72:17
73:14

**started**
5:3,25
19:19

**state**
4:4,19
8:8 14:19
30:11,12
107:16
109:20

**statements**
37:10,14
91:24

**states**
20:7
31:11
96:11

**stating**
61:25

**station**
55:9
56:23

**stationed**

46:10

**stay**
28:20

**stenographe
r**
6:21

**stenographe
r's**
6:19,24

**step**
60:5

**steps**
9:22
56:22,24
101:13

**stickers**
96:20
97:2

**stipulate**
4:11,13

**stipulation
s**
5:5

**stop**
17:19

**strategies**
33:9

**Street**
8:11

**strike**
5:10

**subject**
7:19
33:22
34:10
45:14
102:16,
17,23,24
104:7,22
105:4
107:16



**subject's**
33:25

**subjects**
34:5

**submit**
27:16
70:8

**subsequent**
14:9
15:20
85:16

**subsequentl
y**
48:22

**substantial**
22:4
79:15
110:14

**suffered**
60:2
62:18
104:22

**suggesting**
92:3

**suggestion**
111:3

**suite**
8:12

**summary**
87:12

**summonses**
42:17

**Superintend
ent**
99:18

**superiors**
19:15

**supervise**
20:5,20

**supervisor**

21:13
34:24
50:22
51:4,18
55:20
88:22
97:17

**supervisors**
54:4
71:19
79:22

**support**
63:19
64:7

**supported**
95:7

**suppose**
46:23

**surrounding**
68:23

**sworn**
4:9,12,17

**system**
97:5

────────

**T**
────────

**tactical**
55:24

**tactics**
33:19
76:4

**takes**
116:8,13,
17,22

**taking**
61:19
62:2
75:11

**talked**
76:3  93:4

98:13

**talking**
46:21
60:6,9
89:22
111:25

**Tarasov**
5:17
90:25
94:19

**targets**
22:12

**task**
68:11

**taught**
31:23
36:2
38:5,12
82:6

**teach**
36:15,19
37:24

**teaching**
36:24
37:8

**teachings**
38:15
83:5
109:19

**team**
99:20
100:24

**techniques**
33:2
73:16,23
76:19
78:15,19
81:16
82:4

**telephone**
12:10
47:15

48:9 50:6
60:8
67:22
70:2,3,14
73:2
120:17

**temporarily**
56:11

**ten**
8:25 10:8
45:4

**term**
25:13

**terms**
17:3,12
20:24
30:22
31:2,22
35:7
46:10,21
47:7
57:13
58:9,13
60:11,14
65:17
81:22
85:13
90:5,12
98:9

**test**
7:7,11
80:12

**tested**
35:25

**testified**
4:20
8:16,19,
21 9:16
22:20
88:12
106:25
107:10
110:20
119:15

120:6

**testify**
16:13

**testifying**
9:21
15:15
16:2

**testimony**
4:11 7:15
32:11
40:9
45:23
51:19
74:25
110:24
111:12
119:5

**thefts**
25:7

**thing**
24:9

**things**
21:15
59:7
73:22
117:12
120:12

**thousand**
40:22
41:3

**threshold**
22:3

**tight-knit**
113:25
114:7,11,
19 115:2

**time**
5:9,11
9:11 26:6
27:16
28:23
39:20



44:14,22, 24 45:6 46:12 47:5 53:6,12 57:22 58:21 64:18 69:13 77:8 79:23 80:9 81:17 88:10 89:16,19, 20 90:3,5 91:3 105:7 121:6,9

**timeline**
17:11
50:19

**timeliness**
94:24

**timely**
96:9
108:3

**times**
9:16
12:2,3,9
21:24
120:13

**timesheets**
70:8

**title**
18:7,10

**today**
5:5,23
12:18
14:15
15:15
16:13
45:23
118:18

119:6

**today's**
5:18
12:21
43:3
49:11,15

**told**
61:13
73:19

**top**
13:24
42:15

**topics**
11:10
13:23
14:11
15:14,24
16:5,12
73:24

**totality**
82:14

**totally**
51:16

**tour**
48:19
115:20

**track**
6:22

**traffic**
30:9
47:3,5

**trained**
34:13,18
35:15
37:6
95:24
104:4,20
106:20
107:14
109:17

**trainers**
77:16

**training**
29:6,19
35:3,6
38:24
76:18,21, 23 94:21

**trainings**
39:2

**transcript**
6:22 7:5
89:23
121:18

**transition**
29:17
30:14

**transported**
49:5

**traverse**
117:6

**trial**
5:9,11
9:8

**true**
118:21

**truthfully**
8:3

**turn**
63:25
109:9

**turned**
65:2

**turning**
64:11,18

**two-week**
29:16

**type**
11:13
86:21

**typed**
13:5,14

74:5
85:18
87:2

**types**
60:24
75:7
76:10,24

**typical**
40:18
51:13

**typically**
21:11
47:19
58:2
100:3
102:17,24

**typing**
32:21
86:17

———————

**U**

———————

**UCS**
42:15

**ultimate**
82:25
111:9

**ultimately**
47:17
50:12
58:20
64:11
93:19
105:21
120:20

**unaware**
80:4

**uncovered**
101:5
103:7

**undergrad**
23:7,16

**understand**
6:8,13
7:10,12, 13,18,25
14:6 83:4
109:11

**understandi
ng**
15:13
16:9
45:21
62:11
95:5
100:14,23
107:24
109:6,12, 22 115:9
118:13
120:18

**understood**
24:23
65:4
82:21

**unfolding**
21:15

**uniform**
51:23

**union**
54:15

**unique**
39:5
95:25

**uniquely**
104:5,21
106:21
107:15
108:24
109:15,20

**unit**
13:8
24:20,22
25:4
26:15



27:15
28:14,24,
25 29:3
31:14
50:25
51:25
53:3
61:13
64:5,10
68:12

**University**
16:19,23
23:9,12

**unprofessional**
117:12

**unpunished**
102:17,24
103:15

**upkeep**
38:23

**upper**
99:13

**usual**
5:4

**utilize**
52:17

**utilized**
56:9

———————

**V**

———————

**varied**
69:25
70:15

**varies**
51:16
90:10

**vary**
51:15
73:12

90:8

**varying**
34:6

**vault**
58:23

**vein**
6:23

**vendor**
78:8,10,
12

**venture**
65:23

**veracity**
37:9,13

**verbal**
6:17 33:9
65:25

**verbally**
65:22
66:16

**versus**
25:13,14
30:22
31:5,19
34:10,11
35:9
58:13
97:14

**video**
56:12,13

**videoconferencing**
4:7

**view**
21:17
46:13
97:9

**violate**
101:23,25
102:9
103:21

**violation**
101:21

**violent**
105:4,7

**Viorst**
66:24
67:8,17
87:16

**vulnerability**
95:25

**vulnerable**
104:5,21
106:21
107:16
108:25
109:15,20

———————

**W**

———————

**wait**
6:25 7:2
111:11

**waive**
5:13

**wake**
96:2
106:22
107:17

**wanted**
66:4,6,23
73:25
74:24,25

**warrant**
103:21

**week**
90:9

**weekend**
47:10

**weeks**
92:24

**whatnot**
41:5
121:8

**withheld**
113:3,10

**witness'**
37:9

**witnesses**
14:16
32:19
35:17
36:21
40:8
41:18
72:2,6,14
74:23
82:16,24
83:13
88:4,7,
14,18
96:24

**word**
62:5

**work**
8:10 18:2
30:23
31:3 35:8
58:6
60:20
100:15
111:20
114:13
115:14
117:3,10

**work-issued**
47:13,15

**worked**
23:8,11
29:2
30:17
67:7

**working**
9:25

26:10
36:9 44:9
45:25
46:5,6,10
47:8
55:17
65:18
80:22

**worldwide**
22:11

**worth**
117:24

**write**
85:22

**writing**
15:22
65:21
81:19
118:2

**written**
66:12
74:3,6
89:9

**wrongdoing**
100:19
101:5,17
103:4,7

**wrote**
85:22

———————

**Y**

———————

**year**
27:5,22,
25 45:3
69:6,14,
15 73:4
95:4
104:14
110:7,13

**year's**
117:24



**yearlong**
  69:8
  70:18
  103:11
  107:13

**years**
  8:25
  10:8,9
  17:3
  19:21,22
  23:15,18
  26:18,25
  45:4

**yellow**
  97:2
  112:19

**yesterday**
  5:4 15:18

**York**
  4:5,19
  13:6
  14:19,24
  20:7
  31:11
  61:25
  62:9
  63:2,12
  83:23
  85:14
  89:8

---
**Z**
---

**Zoom**
  90:25
  94:19

LT. LAWANDA IRVING  30(b)(6)
Tarasov v PA of NY & NJ

February 14, 2024

