# EXHIBIT Z

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------X

ALEXEY V. TARASOV, ESQ, ADMINISTRATOR OF THE

ESTATE OF EVGENIY LAGODA, DECEASED, AND

GRIGORY TIKHOPLAV,

                    PLAINTIFFS,

        vs                          INDEX NO:

                                    21-cv-6226

                                       (NRB)

PORT AUTHORITY OF NEW YORK AND

NEW JERSEY, et al.,

                    DEFENDANTS.

-------------------------------------------------X

                REMOTE DEPOSITION

                       of

                  JOHN MONAGHAN

                New York, New York

             Monday, September 16, 2024

Reported by:

Mary Agnes Drury, RPR, NYACR, CLR

JOB NO. J11741687



September 16, 2024

10:03 a.m.


    REMOTE DEPOSITION of JOHN MONAGHAN, held via Esquire Deposition Solutions Zoom Videoconferencing Platform, before Mary Agnes Drury, RPR, NYACR, CLR, a Notary Public of the State of New York.



A P P E A R A N C E S: (All via Zoom)


    ASHCROFT LAW FIRM, LLC

    Attorneys for Plaintiffs

        200 State Street, 7th Floor

        Boston, Massachusetts 02109

        (617) 573-9400

    BY:   JOSEPH CHRISTOPHER AMRHEIN, JR, ESQ.

        camrhein@ashcroftlawfirm.com


    THE PORT AUTHORITY OF NY & NJ

    Attorneys for Defendants

        4 World Trade

        150 Greenwich Street - 24th Floor

        New York, New York 10007

        (212) 435-3431

    BY:   CHERYL NANCY ALTERMAN, ESQ.

        MATTHEW MALYSA, ESQ.

        calterman@panynj.gov

        Mmalysa@panynj.gov


ALSO PRESENT:

    Alexey V. Tarasov, Esq.

                - o0o -



IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be waived and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

- oOo -



P R O C E E D I N G S

New York, New York, Monday, September 19, 2024; the proceedings commenced as follows:

- o0o -

J O H N   M O N A G H A N,

    called as a witness, having been duly sworn or affirmed by a Notary Public, was examined and testified as follows:

       (Whereupon, court reporter asked Attorney Alterman to verify the identity of the witness in lieu of displaying witness' identification.)

       MS. ALTERMAN:  We verify the witness' identity as John Monaghan.

       MR. AMRHEIN:  And that verification is acceptable.

       Good morning, Mr. Monaghan, my name is Chris Amrhein Junior, and I'm an attorney with Ashcroft Law Firm, and our law firm represents the Plaintiffs in this matter.

       I'm going to be asking you a series of questions, and I'll get into some introductory matters that I'm sure you're familiar with.  And before we do, I just

10:05
10:05
10:05
10:05
10:05
10:05
10:05
10:05
10:05
10:05
10:05
10:05
10:05
10:05



JOHN MONAGHAN

want to discuss stipulations with counsel    10:05

for Defendants.    10:05

Cheryl, I know in the past    10:05

depositions, as well as the most recent    10:05

depositions of the plaintiff's experts that    10:05

we've agreed to the usual stipulations.    10:05

Is that something that will be    10:05

agreeable with you today?    10:05

MS. ALTERMAN:  Yes.    10:05

MR. AMRHEIN:  And the usual    10:05

stipulations, I'll read them into the    10:05

record.  All objections, except as to the    10:06

form of the question are reserved until the    10:06

time of trial, and all motions to strike    10:06

are reserved until the time of trial.    10:06

And in terms of read and sign,    10:06

30 days, if that's acceptable, and we're    10:06

happy to waive the notary part, Cheryl.    10:06

MS. ALTERMAN:  That's fine.    10:06

EXAMINATION BY    10:06

MR. AMRHEIN:    10:06

Q.    Mr. Monaghan, I know I mentioned    10:06

before that I'm going to go over a number of    10:06

introductory matters.    10:06



JOHN MONAGHAN

So first, if you can't hear one of my questions, just please let me know and I'm happy to repeat it.

Secondly, if you don't understand one of my questions, please let me know and I'm either happy to repeat it or rephrase it.  If you do answer a question, is it fair to say that you understood the question that I posed to you?

A.    Yes.

Q.    If you could please answer all of my questions verbally and avoid physical responses like head nods and shoulder shrugs; that's only for the purpose of stenographer, it just makes the transcript a little cleaner.

I know in colloquial conversation we can understand each other in that method, but today, if you could just respond verbally, that would be much appreciated for court reporter's sake.

A.    Okay.

Q.    And again, for the court reporter's sake, if you can please wait until I conclude my question before answering.  I know, again,



JOHN MONAGHAN

in colloquial conversation, it's easy to

anticipate where someone is going.  For the

sake of the transcript and just streamlining of

today's procedure, if you can just wait until I

finish my question before answering that, would

be much appreciated.

And I will do my best to wait for

you to conclude finishing your answer before I

ask my follow-up question.

Is that understandable, sir?

A.    Yes.

Q.    Finally, if you do need a break,

facility break, I'm going to do my best to

accommodate you.  All I ask is if there is a

pending question or line a questions that need

to be finished, that we conclude with those

questions and your answers to the same before

we take that break.

Is that fair?

A.    Yes.

Q.    Do you have any questions regarding

anything that I've said so far today, sir?

A.    No.

Q.    Sir, do you understand that you're



800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

giving testimony under oath and that even                    10:08

though we're in an office setting that it's                  10:08

just as if you are testifying in court?                      10:08

A.   Yes.                                                    10:08

Q.   Do you understand the responses are                     10:08

subject to the same penalties of perjury?                    10:08

A.   Yes.                                                    10:08

Q.   Sir, we ask this of everybody, so                       10:08

this is not particularized to you, I promise                 10:08

you:  Are you under the influence of anything                10:08

that would impair your ability to understand my              10:08

questions or impair your ability to answer any               10:08

of my questions truthfully?                                  10:08

A.   No.                                                     10:08

Q.   And that would include drugs and                        10:08

alcohol, correct?                                            10:08

A.   Correct.                                                10:08

Q.   And again, that's not anything                          10:08

particularized to you, that's something we ask               10:08

of all deponents.                                            10:08

Sir, can you please state your full                          10:08

name for the record?                                         10:08

A.   John Monaghan.                                          10:08

Q.   Can you state your address for the                      10:09



JOHN MONAGHAN

record, please?

A.    PO Box 39 Blauvelt, B-l-a-u-v-e-l-t, New York, 10913.

Q.    Can you tell me what that address is; is that your home address or is that your work address?

A.    Work address.

Q.    Are you also a resident of Blauvelt, I apologize for the pronunciation, are you also a resident of that New York town?

A.    I am a resident of Blauvelt, yes.

Q.    Sir, did you speak with anybody in preparation of this deposition?

A.    Yes, I did.

Q.    Can you tell me who?

A.    Ms. Alterman and Mr. Malysa.

Q.    When did you speak with Attorney Alterman and Attorney Malysa in advance of this deposition?

A.    Thursday?  Thursday.  This past Thursday.

Q.    I don't want to go into the context of that, I'm just asking generalized questions about it.



JOHN MONAGHAN

Q.    How long did you speak with Ms. Alterman and Mr. Malysa in preparation of this deposition?

A.    An hour-and-a-half.

Q.    Outside of your discussion with counsel for defendants last Thursday for an hour-and-a-half, what did you do to prepare yourself for this deposition?

A.    I reviewed my report.

Q.    Did you review any other documents?

A.    I did.  I looked over, saw all the documents, I can't tell you specifically which, but I looked over some other documents that were referenced in my report.

Q.    Is it fair to say you didn't review all of the documents referenced in your report?

A.    That's fair.

Q.    Did you review any deposition testimony, deposition transcripts in advance of this deposition?

A.    I did.

Q.    Whose depositions?

A.    Mr. DeFoe.

Q.    Is that the only deposition



JOHN MONAGHAN

transcript that you reviewed?                    10:11

A.    Again, I may have -- I didn't study    10:11
entire transcripts, but I may have read a few    10:11
that were referenced in my report.               10:11

Q.    Why in particular did you review       10:11
Mr. DeFoe's transcript in advance of today's     10:11
deposition?                                      10:11

A.    Made sense, see what he had to say.    10:11

Q.    Can you expand on that?                 10:11

A.    No.                                     10:11

Q.    Is there a reason why?                  10:11

A.    Why I can't expand?                     10:11

Q.    Correct.                                10:11

A.    As a general principle, I answered     10:11
it.                                              10:11

Q.    General principle as -- I'm sorry?     10:11

A.    To see what he had to say.             10:11

Q.    Say regarding what?                     10:11

A.    This case.                              10:11

Q.    When did you first get contacted by    10:11
counsel for defendants involving this matter?    10:11

A.    That's hard to say.  I'm sure I had    10:11
it written down somewhere, maybe a couple of     10:12
years ago, year-and-a-half ago.  I forget       10:12


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

exactly.  I don't remember.

Q.    I don't want to hold you to a specific date, I'm just looking for a general timeframe.

Do you think it's closer to two years ago, it's closer to a year ago?

A.    I'd say it was closer to a year ago.

Q.    And how soon after were you engaged?

A.    How soon after they contacted me?

Q.    Yes, sir.

A.    Well, I think it was right away.

Q.    From the moment you were contacted until the time you were engaged, what did you do with regard to evaluating this matter?

A.    Took whatever documents they sent me initially, I don't remember exactly what they sent me initially.  I think maybe the Attorney General's report was the first thing I looked at.

When you say "engaged" I don't know if there is a bright line there.  They contacted me, I said I'd take the case, and I started to review documents.

Q.    Understood.  And I know a formal



JOHN MONAGHAN

engagement would be the execution of a written                10:13

agreement.  However, perhaps I can clarify.                   10:13

You know, between the time you were                            10:13

first contacted to the time you agreed to take                10:13

the case as an expert, what did you do?                       10:13

A.    There is a document, you're right.                      10:13

I read the Attorney General's                                 10:13

report; I don't remember exactly what else.                   10:13

Q.    Do you recall if there were anything                    10:13

else -- any other documents you reviewed other                10:13

than the Attorney General's report?                           10:13

A.    Maybe the Amended Complaint, the                        10:13

First Amended Complaint; I don't have specific                10:13

knowledge beyond that.                                        10:13

Q.    Now, I'll get into this a little bit                    10:13

later in today's deposition, but what is your                 10:13

typical review process or rundown, screen down                10:13

process for taking on cases as an expert                      10:14

witness; do you typically review just a couple                10:14

of documents before you agree to take on a                    10:14

case?                                                         10:14

A.    No, I make a decision in the initial                    10:14

phone call.                                                   10:14

Q.    At the outset, I'm just going to,                       10:14



JOHN MONAGHAN

just for clarity sake, I'm just going to                 10:14

introduce a document, and you'll recognize               10:14

this, sir, and you've already mentioned it, but          10:14

it's going to be Defendant's Rule 26 Expert              10:14

Disclosure of you, sir, Mr. Monaghan.                    10:14

Just give me a second and I'll show          10:14

this on the screen.                                      10:14

While I'm doing this, do you have           10:14

your Rule 26 report in front of you, sir?                10:14

A.    Yes.                                          10:14

(Whereupon, Monaghan Exhibit 1, John          10:15

Monaghan Rule 26(a)(2) Expert Disclosure             10:15

Report Dated 6/7/24, 40-Pages was marked             10:15

for identification.)                                 10:15

BY MR. AMRHEIN:                                           10:15

Q.    Sir, is the document -- the Rule 26          10:15

Expert Disclosure, is that on the screen in              10:15

front of you right now?                                  10:15

A.    Yes.                                          10:15

Q.    And I'll scroll through this, you'll          10:15

see at the top that this is an approximately             10:15

40-page document, which includes the notice by          10:15

defendants.                                              10:15

Do you recognize this first page of         10:15



JOHN MONAGHAN

your report, sir?

A.    Yes.

Q.    And I will just scroll down.

(Scrolling)

Is that your signature at the bottom of page 30?

A.    Yes.

Q.    And then is this an appendix of the list of documents that you reviewed in preparation of this Rule 26 report?

A.    Yes.

Q.    The appendix goes on from page 31 to page 38; is that correct?

A.    Yes.

Q.    I'm going to bring that up a little bit later, sir, but I'll ask you background questions before that occurs.

What year did you graduate from John Jay College of Criminal Justice?

A.    1989.

Q.    Do you typically include this on your CV?

A.    I -- yes, I believe so.

Q.    Is there a reason it wasn't included



JOHN MONAGHAN

on your expert report as a part of your

background?

    A.   No.  You mean the fact that I

graduated or the year?

    Q.   No, just the -- where you went to

college and the year, just generally speaking?

    A.   Doesn't it say "John Jay" on my CV?

    Q.   No.  On this expert disclosure

report I don't believe it does --

    A.   Oh, oh, oh, well...

    Q.   -- which includes your background.

        In your Rule 26 report, it appears

that your received your Master's of Public

Administration from the Kennedy School of

Government in 2001.

        Have you earned any other degrees

besides the two?

    A.   Besides the -- repeat that?

    Q.   Besides the two that I just

mentioned?

    A.   Oh, no.  No.

    Q.   I want to walk you through your

employment history beginning from the first

employment to after you earned your



JOHN MONAGHAN

undergraduate degree.

Who was your first employer out of college?

A.   I don't recall specifically.  I joined the police department in 1984.

Q.   So we'll start there with joining the police department.  You joined, am I correct, the NYPD when you first started?

A.   Correct.

Q.   You said that was 1984?

A.   Correct.

Q.   So 1984, when did you attend the NYPD Police Academy?

A.   1984.

Q.   Do you know what months, approximately?

A.   January to June.

Q.   Okay.  So is that a common -- is it typically a six-month set of schooling; and then after you're tested and pass, you graduate and join the force?

A.   Correct.

Q.   What was your first title with the NYPD?



JOHN MONAGHAN

A.    Police officer.

Q.    Did you ever hold the title of patrolman?

A.    That is a term that hasn't been used for many decades.

Q.    Okay.  Is "police officer" the title that every NYPD officer begins with upon starting with the force?

A.    Right.

Q.    Is there a probationary period beginning of every officer's start with the NYPD?

A.    There is.

Q.    Approximately how long is that, sir?

A.    It can range from a year-and-a-half to two years.

Q.    Safe to say given your number of years with service with the NYPD, you have obviously went beyond the probationary period to a full-time officer with the NYPD, correct?

A.    Correct.

Q.    About how many years did you serve with the title of police officer for the NYPD?

A.    Five years.



JOHN MONAGHAN

Q.    So that brings you to approximately 1989; is that right?                              10:20

A.    Correct.                                           10:20

Q.    In 1989, what was your change in title and how did that come about?                    10:20

A.    Sergeant, as a result of a civil service exam.                                      10:20

Q.    How often was that civil service examination test offered?                          10:20

A.    Back then, it could be between four and eight years.  It wasn't often.                10:20

Q.    How long did you hold the title of sergeant, sir?                                   10:20

A.    Eight-and-a-half years.                            10:20

Q.    When you were -- I guess it's at a time were you a police officer, were you attending John Jay College School of Criminal -- or College of Criminal Justice, I apologize, was that nights or were you, off-days, going to school there?    10:21

A.    Both.  John Jay had rotating schedules that synced with patrols' rotating schedule, so I went day and night for a number of years.    10:21



JOHN MONAGHAN

Q.    Got it.  Do you recall when you first enrolled in John Jay College?     10:21

A.    Before I joined the police department; the year, I couldn't tell you exactly.     10:21

Q.    When you were a police officer, so from 1984 to 1989, did you ever hold any posts at any New York airports?     10:21

A.    A steady post, no.     10:22

Q.    When you were a sergeant from approximately 1989 to 1996 or '97, that range, did you ever hold a post at a New York airport?     10:22

A.    No.     10:22

Q.    When you were a sergeant, can you please describe the duties and responsibilities as they differ from the duties and responsibilities for a police officer with the NYPD?     10:22

A.    Supervising and managing the police officers on patrol.     10:22

Q.    And what were your duties and responsibilities, generally speaking, with the NYPD as a police officer?     10:22

A.    Patrol, respond to 911.     10:22



JOHN MONAGHAN

Q.    Anything else?                                          10:22

A.    Well, that counts as a lot, yeah.                      10:22

Q.    As a sergeant, were you typically on                   10:22
the road or in a patrol car, or were you                     10:23
typically located in a station and managing a                10:23
number of officers who were police officers at               10:23
the time?                                                    10:23

A.    On the road, mostly.                                   10:23

Q.    Am I correct that you were, at some                    10:23
point, promoted to captain?                                  10:23

A.    At some point, yes.                                    10:23

Q.    Do you recall what year, roughly,                      10:23
that you were promoted to captain?                           10:23

A.    '99, 1999.                                             10:23

Q.    Do you know what role -- or what                       10:23
your title was between when you were a sergeant              10:23
until 1997, roughly, until -- or 1996, roughly,              10:23
until you were promoted to captain in 1999?                  10:23

A.    Lieutenant.                                            10:23

Q.    And how did your promotion from                        10:23
sergeant to lieutenant come about?                           10:23

A.    Civil service exam.                                    10:23

Q.    Is that a similar timeframe or --                      10:24
strike that.                                                 10:24



JOHN MONAGHAN

Is that test offered only once every couple of years, similar to the captain's exam?    10:24

A.    Correct.    10:24

Q.    Did you also take a test -- so strike that.    10:24

To elevate from police officer to sergeant, and sergeant to lieutenant, and lieutenant to captain, at each step are you required to take a civil service exam?    10:24

A.    Yes.    10:24

Q.    Were those exams held in the same type of years or were they offset, do you recall?    10:24

A.    There is no fixed pattern there.    10:24

Q.    Has that changed?  Is -- today is there a fixed pattern or is it still at the behest of whatever the NYPD wants to do?    10:24

A.    It's at the behest of the needs, yeah.    10:25

Q.    Can you please describe your duties and responsibilities as lieutenant with the NYPD?    10:25

A.    I was on a patrol with a precinct, a patrol precinct.  I was the integrity patrol    10:25



JOHN MONAGHAN

officer then.

Q.    What did the integrity patrol officer -- what did those duties and responsibilities entail?

A.    Ensure proper discipline was in place among the patrol force.

Q.    And do you hold any similar -- when I say "similar," I mean specific subtitles when you were a sergeant?

A.    Patrol supervisor, anticrime supervisor.

Q.    And when you were elevated from lieutenant to captain, and I know when you were captain, and we'll discuss this, you held a couple different titles, and a number of different paths as a captain.

In that first year as a captain, did you -- were you assigned to any specific area or were you just -- did you continue on patrol with overseeing a number of police officers, lieutenants, and sergeants; just in that first year as a captain?

A.    I was on patrol.

Q.    Okay.  And am I correct after the



JOHN MONAGHAN

first year as a member of the NYPD, you left                        10:26

and obtained your Master's, and after that, you                    10:26

returned to work for the NYPD's Office of                          10:26

Management Analysis and Planning?                                  10:26

    A.    Correct.                                          10:26

    Q.    And at that point you were still the               10:26

rank of captain, correct, or was that                              10:26

assignment a promotion within the rank of                          10:27

captain?                                                           10:27

    A.    No, it was not a promotion.                        10:27

    Q.    What other positions did you -- or                 10:27

what positions did you hold within the Office                      10:27

of Management Analysis and Planning?                               10:27

    A.    I was supervising analysts.  At one                10:27

point I became a commanding office of a                            10:27

subunit, Office of Management Analysis and                         10:27

Planning, called OMAP, and within that a                           10:27

subunit called MODS, Management Orders and                         10:27

Directives Section and I became their

commanding officer.

       (Whereupon, a discussion was held

    off the record.)

BY MR. AMRHEIN:

    Q.    I suppose, because we can hear you                 10:28



800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

there, Cheryl, if you can do your best to try
and speak up or elevate your voice a little bit
for the court reporter's sake, that will be
great, that will make her job easier.

Am I correct that you retired from
the NYPD in January of -- or, sorry, in 2004?

A.    Yes.

Q.    How many years had you worked at
that point, is that 20 years?

A.    Yes.

Q.    Why did you retire from the force?

A.    I had 20 years in.  You are eligible
at 20 years.

Q.    That was going to be my next
question; did you render a pension at that
point?

A.    Yes.

Q.    To this day do you receive monthly
pension checks from the NYPD?

A.    Yes.

Q.    I want to ask you some questions
about some of the training and whatnot that you
received when you were joining the NYPD and
when you were on the force with the NYPD.



JOHN MONAGHAN

Can you please describe your background, education, and training on lethal and less-than-lethal use of force or in the NYPD's sake in deadly or less-than-deadly force?

MS. ALTERMAN:  Objection to form. You can answer.

THE WITNESS:  Okay.  Well, in the academy there were a couple of different main sections of law.  First line of the law, police science, social science.

There was the law and then the physical application of it, the personal application of it.  The laws of the state, the rules of the department, and then the reality of people.

BY MR. AMRHEIN:

Q.    Did you ever have any training of the subject may respond -- strike that.

As a part of that, did you have any training with regard to a subject and how a subject may or may not respond if he or she is either having a seizure or coming out of a seizure?



JOHN MONAGHAN

MS. ALTERMAN:  Objection.  You can answer.    10:30

THE WITNESS:  First aid was part of our training.    10:30

Q.    And did that cover what I just asked?    10:30

A.    It did.    10:30

Q.    And again this was with the NYPD, not the Port Authority Police Department, correct?    10:30

A.    Correct.    10:30

Q.    Can you please describe what the NYPD as a part of what you call first aid, what they taught you and trained you with regard to a situation where a person is having a seizure or had come out of a seizure?    10:31

A.    I don't know if they covered come out of a seizure.  If someone needs medical attention, we call an ambulance.  If there is a bleeding wound, try to maybe stop the bleeding.  Beyond that, you know, we learned basic CPR, that's about it, you call for an ambulance.    10:31

Q.    Was some of the training that you received as a member of the NYPD, a compilation    10:31



JOHN MONAGHAN

of policy and scenario-based training?    10:31

A.    Yes.    10:31

Q.    Can you tell me when the training    10:31
was?  I know, of course, you attended the NYPD    10:32
Police Academy, but in addition to that, can    10:32
you tell me about whether or not there was    10:32
in-service training modules you had to    10:32
complete.  Can you tell me your training over    10:32
the breadth of your career with the NYPD?    10:32

A.    In-service training was mandatory    10:32
twice a year, every year.  Firearms training    10:32
was mandatory twice a year, every year.    10:32

Q.    Were those written exams or were    10:32
those physical demonstrations, you know, as    10:32
tested?    10:32

A.    It was a mix of both.    10:32

Q.    Do you recall what exams were    10:32
physical versus what exams were written?    10:32

A.    Well, obviously firearms training is    10:32
physical, you have to obtain certain score.    10:32
No, I couldn't make a distinction    10:32
beyond that.    10:32

Q.    So who provided that training to you    10:32
when you were a member on the force of the    10:33



JOHN MONAGHAN

NYPD?                                                              10:33

A.    The NYPD's Training Bureau.                           10:33

Q.    So is that an entity of the NYPD or              10:33
is that an outside entity or law enforcement?                     10:33

A.    Not an outside entity, the entity of            10:33
itself.                                                           10:33

Q.    Can you just say that name one more             10:33
time for me?                                                      10:33

A.    The Training Bureau?                             10:33

Q.    Yes, sir.                                        10:33

A.    That's it, the Training Bureau.                  10:33

Q.    Okay.  Now, the Training Bureau, is             10:33
that made up of NYPD officers or is that a                        10:33
specific group of individuals whose sole                          10:33
responsibility is the training of officers, is                    10:33
it a rotational thing?                                            10:33

A.    It could be rotational, but they're             10:33
all police officers of various ranks.                             10:33

Q.    Did you ever serve on that committee            10:34
or in that department?                                            10:34

A.    No.                                              10:34

Q.    Were you ever a trainer at the NYPD             10:34
Police Academy when you were an officer?                          10:34

A.    No.                                              10:34



JOHN MONAGHAN

Q.    Sir, are you familiar with the Objective Reasonableness Standard?    10:34    10:34

A.    It sounds objectively reasonable, yes.    10:34    10:34

Q.    I'm going to ask that question again.    10:34    10:34

Are you familiar with the Objective Reasonableness Standard?    10:34    10:34

A.    Yes.    10:34

Q.    Can you please tell me what your understanding of the Objective Reasonableness Standard is?    10:34    10:34    10:34

A.    Standard is something is reasonable, based on the perception of the average person, objectively reasonable.    10:34    10:34    10:34

Q.    Are you familiar with the 1989 United States Supreme Court Case Graham versus Connor?    10:34    10:35    10:35

A.    I've heard of it.    10:35

Q.    What do you know about that case?    10:35

A.    Off the top of my head, I can't give you specifics.    10:35    10:35

Q.    Do you recall learning that as a member of the NYPD, Graham versus Connor?    10:35    10:35



JOHN MONAGHAN

A.    It sounds familiar.    10:35

Q.    You don't recall the specifics of it?    10:35

A.    We can stop and do the research.  I mean, it sounds familiar.  It's a case I've heard of, but...    10:35

Q.    No, that's fine, I'm just asking for your recollection of any specifics that you remember at this moment.    10:35

Am I correct that you don't remember any specifics right now as we sit here today?    10:35

A.    Correct.    10:35

Q.    Can you tell me what the term "force options" means?    10:35

A.    Yes.  Options available to a member of service whose included position must use force; there are options.    10:35

Q.    What options are taught as a part of a lesson plan as it concerns force options?    10:36

MS. ALTERMAN:  Are you talking about his time at the NYPD or the Port Authority?    10:36

MR. AMRHEIN:  No.  No.  This is his time at the NYPD.    10:36

MS. ALTERMAN:  Okay.    10:36



JOHN MONAGHAN

THE WITNESS:  Sole purpose, your 10:36
command presence.  We're talking about 10:36
force options, so you're in a position 10:36
where force becomes necessary.  You try to 10:36
gain compliance, is that where we are, 10:36
force options. 10:36

These are options available to 10:36
accomplish a mission of restraining or 10:36
taking into custody, a person. 10:36

BY MR. AMRHEIN: 10:36

Q.    And the specific options were taught 10:36
to you by the NYPD in terms of force options, 10:36
correct? 10:37

A.    Yes. 10:37

Q.    And what specifically did they teach 10:37
you about force options when you were on the 10:37
force with the NYPD? 10:37

A.    The primary idea is to use the 10:37
minimum amount of force necessary.  So if you 10:37
can verbally convince someone to allow 10:37
themselves to be taken into custody, that's the 10:37
best way to do it. 10:37

If you can't, you have to use your 10:37
hands. 10:37



JOHN MONAGHAN

When I was first trained, there was OC spray, there wasn't tasers yet.  There were batons.

And, you know, these are options, you want to use the minimum amount of force necessary to accomplish that mission.

So, again, you try verbal, use your hands, use your pepper spray if you have to, use your baton if you have to.

Q.   Have you ever heard of the phrase "effective communication" as the basic element of the use of force?

A.   Specifically those words in that order, no.

Q.   But --

A.   It may come up.

Q.   How about generally?

A.   Well, the concept is a good one, but specifically, no.

Q.   So would you agree with that concept, sir?

A.   Sure.

Q.   Can you define for me, deadly force, as you know it, based upon your training with



JOHN MONAGHAN

the -- training and work as an officer with the NYPD?

A.    Yes.  Primarily means use of a firearm.

Q.    You say primarily.  What other options or other components of deadly force are there?

A.    Well, again, the firearm is -- when you think deadly force, that's exactly what you think of is the use of the firearm.

Q.    And I understand that, but are there other components of deadly force beyond use of a firearm that you learned when you were with the NYPD?

A.    No.  If you're authorized to use deadly force, you're in a situation where -- you're put in a situation where deadly force is authorized, that speaks to the use of a firearm.

Now, if the baton is used in a particular way, it could be considered a deadly force if it's used as a striking implement and you hit them in the head.  That has the potential for deadly force, but it's not --



JOHN MONAGHAN

Deadly force, the phrase, particularly as we look at the law and justification, we're speaking to a firearm, the use of a firearm.

Q.    And that last portion right there, you're talking about that's what you learned when you were the at NYPD, correct?

A.    Yes.

Q.    Okay.  Now, again, this is within your time with the NYPD and what you learned in your professional capacity with the NYPD, can you define for me, less-than-deadly force?

A.    Well, those are the force options we just discussed.

Q.    Can you -- just in response to this question in particular, do your best to define for me what you learned as a member of the NYPD, what specifically is less-than-deadly force?

A.    Well, we didn't use that phrase, "less-than-deadly force."

Q.    What phrase did you use?

A.    "Use of physical force."

Q.    Do you understand them to be



JOHN MONAGHAN

synonymous, those two phrases?

A.    Well, insofar as there is use of physical force, and separate from that is deadly use of force.  Physical force is less-than-deadly, sure.

Q.    So it would be less-than-deadly force that you're describing, but physical force.  Can you tell me what you -- or how the NYPD defined it when you were an NYPD officer?

A.    That's the force options that we discussed.

Q.    Again, can you refresh the record as to what those force options are?

A.    Verbal, hands, other tools like pepper spray, or taser, or baton.

Q.    Now, we already discussed this a little bit, but based upon your training and professional experience with the NYPD, when can an officer use deadly force?

I know you discussed the use of a firearm, but in particular, what is that threshold that is taught by the NYPD when you were an officer, as to when deadly force is allowable or justifiable?



JOHN MONAGHAN

A.    In the face of imminent threat of death or serious injury to yourself or another.

Q.    Have you heard of the term "imminent danger" as related to your professional experience with the NYPD?

A.    Well, the word "imminent," I just used it, it is part of the of the deadly force justification.

Q.    What does the term or phrase "reverence for human life" mean to you?

A.    It is to respect human life.

Q.    Anything beyond the respect of human life?

A.    There's not much beyond that; that's a stark statement.

Q.    What does respect for human life mean to you?

A.    Same as reverence for human life, to preserve life.

Q.    As a member of the NYPD, did you ever receive any training in any form of self-defense or martial arts?

A.    Not martial arts.  Self-defense. Methods of gaining custody or control of the



JOHN MONAGHAN

person resisting.

Q.    And was that a part of your training at the academy or ISTs, in-service trainings or both?

A.    The academy, mostly.

Q.    When you say "mostly" do you recall if it was tested again?

A.    I don't specifically recall.

Q.    In the academy, was that a written exam, a physical exam, or perhaps both, a hybrid?

A.    Both.

Q.    Outside of your capacity as an officer with the NYPD, did you ever take any martial arts or self-defense classes?

A.    No.

Q.    At any time in your life did you ever take martial arts or self-defense classes in your individual capacity?

A.    No.

Q.    Based upon your training with the NYPD, can you describe to me what a "team takedown" is?

A.    It's not a phrase we use.



JOHN MONAGHAN

Q.    Is there a similar phrase you would use that would capture the same meaning?

A.    Not in patrol training, no.  Maybe in slot or merchant service training, but, no, not in patrol.

Q.    If multiple officers took down an assailant or a person when you were a police officer with the NYPD, was there a specific terminology or set of rules that would cover that specific action?

A.    Not really, no.  You use minimum amount of force to gain control and/or custody of a person.

Q.    When you were with the NYPD, I understand that you didn't use the term team takedown, but when you were with the NYPD, did they ever teach you, whether at the academy or in-service training, how to accomplish a team-oriented takedown?

A.    Again, you are using the phrase "team," I'll have to say no.

The issue of -- if you are using force on someone who is resistant, the goal is handcuffs.



JOHN MONAGHAN

So if there are two of us; I'll get one arm, you get the other, that's common sense, I wouldn't call it being a part of a team effort.

But if there is more than two of us, maybe each would grab a limb.  Again, common sense, the goal is to get them in handcuffs and to stop the force, stop the resistance.

And if there is more than two of you, we didn't use the word team, but we would practice getting them into handcuffs as quickly as you can.

Q.    I appreciate the distinction, sir. I can rephrase it.

Did the NYPD, either in the academy or ISTs when you were an officer, teach you about multi-officer engagements of an individual and the steps and procedures for doing that?

A.    Not a specific part of a lesson, no. It's part of the main lesson of the use of force.

Q.    And believe me, I understand your distinction about the common test perspective.



800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

I'm simply asking you about the NYPD policy that you were trained on and learned.

You don't recall anything in particular about instructions and policy based upon your training with the NYPD that discusses that multi-officer take -- multi-officer engagement and restraint and takedown?

A.   Not specifically.

Q.   What does the term "ground control" mean to you?

A.   Well, it's easier to get someone in handcuffs if you can get them thrown on the ground.  They have less leverage when they're not on their feet.

Q.   Is that something that you learned from personal experience or was it taught to you as a part of the NYPD curriculum, whether that's in ISTs or at the academy or both, on the job and training?

A.   Both.

Q.   Roughly how many times in your -- and it may be countless that you don't know a specific number, but can you estimate for me how many times you were engaged with an



800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

individual as a police officer, would it be --          10:47

or as an officer, excuse me, with the NYPD,            10:48

that you engaged an individual on the ground           10:48

trying to restrain said individual?                    10:48

        A.    Many.  Maybe hundreds.  When you say     10:48

"on the ground," maybe a hundred, but hundreds         10:48

of times.                                              10:48

        Q.    In terms of restraining, so              10:48

arresting an individual, I'm sure the NYPD had         10:48

quotas, and just like other police departments         10:48

do, that officers are expected to meet, can you        10:48

roughly estimate on a yearly basis how many            10:48

arrests you would make, starting from your time        10:48

as a police officer to the time you were               10:48

elevated to sergeant, and lieutenant, and              10:48

captain; just a rough estimate?                        10:48

        A.    All total?                               10:48

        Q.    Yeah.  Say how many per year arrests     10:48

you believe you made?                                  10:48

        A.    Oh, a couple hundred.                    10:48

        Q.    An estimate?                             10:48

        A.    A couple hundred.  At least a            10:48

hundred a year, yeah.                                  10:49

        Q.    And so over the span of 20 years, is     10:49



800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

that consistent over the span of 20 years with the NYPD?

A.    No.  As a captain, not as often; and as a lieutenant, even less often.

Q.    But on average, you would think about 100 per year?

A.    Even less as a police officer, because as a police officer, then you have to go through all the paperwork.  But as a sergeant, I could be involved two or three times a night, so it would vary.  I couldn't give a specific average.

Q.    But roughly would you think that you made about 2,000 arrests over the course of your 20-year career with NYPD?  Is that a fair estimate?

A.    That's fair.

Q.    You said of those arrests, only about a hundred you believe were -- involved ground control and ground restraint?

A.    No.  It's hard to say, because you can't class everything through strictly ground, strictly not ground.  I mean, people end up on the ground or they don't, I couldn't tell you



JOHN MONAGHAN

exactly.

Force is used; whether they're on the ground or not, I can't make a distinction on that exactly.

Q.    Of those roughly 2,000 arrests that you've made, how many times did you use physical force, and I'll leave it physical force, against an individual?

A.    That's hard to say.  It is less than half.  Most people don't fight.  Maybe 500.  I couldn't tell you really; a few hundred at least.

Q.    And of those 2,000 arrests that you had made, how many instances of deadly force did you use?

A.    I never shot anybody.

Q.    Did you use any other forms of deadly force?  I know you mentioned a baton could be wielded in a certain way, and other weapons could be used in certain ways, not just firearms?

A.    I have forcibly removed firearms in the hands of violent felons maybe 15 to 20 times, but I've never had to shoot anybody.



JOHN MONAGHAN

The amount of force necessary to
remove the gun; was it deadly, again, I didn't
shoot them, so I would say it was not.

Q.   Do you recall what type of force you
used to be able to execute such a maneuver at
that time?

A.   Physical force.  Hands-on force.
Punches.  Night stick.

Q.   Do you recall where you punched and
how many times, roughly, I'm not holding you to
a specific?

A.   That's very specific.  Usually in
the head, not always, depending on the
physicality of the altercation.  It's hard to
say.

Q.   I know you testified that you've
never taken self-defense training or martial
arts training outside of your -- in your
individual capacity.

Did you ever take any boxing classes
outside of your work as an officer with the
NYPD?

A.   No.

Q.   Was boxing a part of the curriculum



JOHN MONAGHAN

at the academy or a part of ISTs with the NYPD?

A.    Part of the academy, not ISTs.

Q.    Do you recall what they taught you at the academy with respect to punching or boxing or planting blows it an individual?

A.    The main thing I can recall is to keep your focus and keep your cool as you get hit.  That was really the main thing.

Q.    I know we discussed this briefly already, so there will be some overlap, but can you please describe to me the term for reverence for human life or as you said it, respect for human life as it relates to the use of deadly force?

MS. ALTERMAN:  Objection.  You can answer.

THE WITNESS:  Deadly force is known as a last resort; life is a priority.

Q.    Is that your personal opinion or is that what you learned based upon your training and service with the NYPD?

A.    Both, but those phrases come from our proceedings.

Q.    Is that something that is taught to



JOHN MONAGHAN

all officers with the NYPD?    10:53

A.    Yes.    10:53

Q.    Is that something you understand is    10:53
taught to most officers, generally speaking --    10:53

MS. ALTERMAN:  Objection.    10:53

Q.    -- regardless of police departments?    10:53

MS. ALTERMAN:  Objection.    10:53

THE WITNESS:  Yes.    10:53

Q.    As a member of the NYPD, did you    10:54
ever come across the phrase or term the "direst    10:54
of circumstances" when it relates to the use of    10:54
deadly force?    10:54

A.    No.    10:54

Q.    Outside of your work with the NYPD,    10:54
have you ever come across the term or phrase    10:54
direst of circumstances as it relates to deadly    10:54
force?    10:54

A.    "Direst," doesn't sound familiar.    10:54

Q.    Can you describe this term for me,    10:54
the "immediate defense of life," as it relates    10:54
to use of deadly force?    10:54

A.    I don't know specifically.  The    10:54
immediate --- say it again?    10:55

Q.    The immediate defense of life?    10:55



JOHN MONAGHAN                          September 16, 2024
TARASOV vs PORT AUTHORITY OF NEW YORK              49

JOHN MONAGHAN

A.    No.                                        10:55

Q.    Based upon your training and              10:55
experience with the NYPD, do you have any        10:55
familiarity with that term or phrase?            10:55

A.    No.                                        10:55

THE WITNESS:  Can I take a break                 10:55
real quick?                                       10:55

MR. AMRHEIN:  Sure.  It's 10:55.                 10:55
Would you like a five-minute facility break       10:55
and then we can resume at 11?                     10:55

THE WITNESS:  Okay.  Thanks.                     10:55

MS. ALTERMAN:  Thank you.                        10:55

(Whereupon, proceedings recessed for              10:55
a short break and once again resumed.)            10:55

BY MR. AMRHEIN:                                  11:05

Q.    Sir, before we took a break at your        11:05
request, we were discussing a number of things    11:05
with regard to certain phrases and training as    11:05
it relates to your training and professional      11:05
experience with the NYPD.                         11:05

Do you recall that?                               11:06

A.    Yes.                                        11:06

Q.    Okay.  Now, during the break did you       11:06
speak with your attorney?                         11:06



JOHN MONAGHAN

A.    Briefly.

Q.    Did you discuss the contents of your answers to these questions so far?

A.    No.

Q.    Now, do you recall I asked you a couple of questions about whether or not you, in your personal capacity, had ever received any or taken any classes in self-defense or martial arts or boxing.

Do you recall that, sir?

A.    I do.

Q.    Now, in your 20 years at -- you're with the NYPD, were you aware of any officers who, outside of their employment with the NYPD, participated in any training or any -- joined any gyms that offered self-defense classes, martial arts classes, or boxing?

A.    No.  I don't specifically remember anyone, no.

Q.    Would it surprise you if people did participate in boxing classes or take boxing classes or martial arts lessons or self-defense lessons outside of and in their individual capacity outside of their scope with the NYPD?



JOHN MONAGHAN

A.    I would not be surprised, no.

Q.    Sir, in your training and experience with the NYPD, when confronting -- when an officer is confronting a potential individual or suspect, how many officers, when multiple officers are responding, how many officers are expected to give verbal commands?

A.    I don't know that there is a specific expectation there.  There is no number trained on that.

Q.    So it could be one, it could be multiple?

A.    Too many is too many, but there is no specific number in training, no.

Q.    Based upon your training and experience as a member of the NYPD, when an individual is on the ground in a confined area, do you believe that punches and strikes to a subject's head, torso, and legs detracts from the handcuffing process?

A.    Detracts, no.  Whether they're on the ground or they're not, if there is justification for those actions, they need to take place if necessary, whether they're on the



JOHN MONAGHAN

ground or not on the ground.     11:08

Q.   I can ask the question a different     11:08
way.     11:08

When an individual is on the ground     11:08
in a confined area and officers are engaged in     11:09
punching and striking an individual's body, do     11:09
you think those strikes make it more difficult     11:09
for the officers to restrain and handcuff that     11:09
individual or less difficult?     11:09

A.   Every situation would be different;     11:09
you'd have to be more specific.  If they're     11:09
necessary as part of the handcuffing process,     11:09
then they're necessary.  If they're not     11:09
necessary, then they shouldn't happen.     11:09

Q.   So regardless of whether or not     11:09
they're necessary or should happen, if they do     11:09
happen in the scenario in this question, do you     11:09
believe that strikes to the body by the     11:09
officers makes it more difficult to restrain an     11:09
individual or less difficult and easier to     11:09
restrain an individual?     11:09

MS. ALTERMAN:  Objection.  You can     11:09
answer.     11:09

THE WITNESS:  Neither.  If they are     11:09



800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

necessary, then they help the process along.  If they are not necessary, they don't, so...

BY MR. AMRHEIN:

Q.    If something is necessary, does it always help in your experience as an officer?

A.    You wouldn't do it otherwise, yes, of course.

Q.    That's not an answer to my question.

A.    You are asking me if necessary action had been effective to the end result, that's a case-by-case.

Q.    So the answer would be it depends as to whether or not something that you deem is necessary is useful?

A.    It would depend.

Q.    Have you heard of the phrase "distraction strike"?

A.    No.

Q.    So you never received any training as a member of the NYPD on distraction strikes?

A.    No.

Q.    As a member of the NYPD, did you receive any training or education on handling



JOHN MONAGHAN

situations where people have certain                11:11
disabilities?                                        11:11

A.    Disabilities.  Can you expand on            11:11
that one, I'm not sure.                              11:11

Q.    I will specify in follow-up                 11:11
questions, but did you receive any general          11:11
training on individuals with disabilities when      11:11
you were a member of the NYPD?                       11:11

A.    Beyond basic first aid, I can't say         11:11
so.  I don't recall exactly, so no.                  11:11

Q.    When you were a member of the NYPD          11:11
did you receive any training or education on        11:11
dealing with people who have mental illnesses?       11:11

A.    Yes.                                        11:11

Q.    What in particular were you trained         11:11
in?                                                  11:11

A.    How to get medical and psychiatric          11:11
aid to a person who is in need of it.                11:11

Q.    And what particular -- what                 11:11
specifically were you taught with how to get        11:12
the aid to an individual who is having a, you       11:12
know, mental crisis?                                 11:12

A.    Well, if they request it, we refer          11:12
them to the proper facility or organization         11:12



JOHN MONAGHAN

that can help them.

Q.    How about when you're engaging in an individual who is in the midst of a mental crisis, what did the NYPD teach you with respect to that as an officer?

A.    Right.  There were -- if they request such assistance, we'll refer them to the organization or agency that can help them.

If they're unwilling or are a danger to themselves or others, then we'll take them to custody and bring them to that facility with an ambulance -- in an ambulance.

Q.    And was this taught at the academy, in-service training, or something on-the-job or something else?

A.    Both at the academy and in-service training.

Q.    As a member of the NYPD, did you ever encounter individuals with mental illnesses or experiencing mental crises in situations that warranted the NYPD procedures and protocols?

A.    Yes.

Q.    Do you recall how many times,



JOHN MONAGHAN

roughly?

A.    A few hundred maybe.

Q.    Of those few hundred times, were those individuals restrained each and every time?

A.    No.

Q.    Why is that?

A.    Sometimes as I said, if they are requesting assistance, we don't have to even escort them, we can direct them.

When you say restraint, if someone is willing and they turnaround and/or put the handcuffs on them, that does happen, so that is technically restraint, but there was no force; that does happen.

Q.    Based upon your training and experience with the NYPD, what type of behavioral indicators may be generally associated with people experiencing a mental crises?

A.    Well, speech, actions, incoherence. It's usually the description of the person who called us being a family member or a close friend, cohort of some sort, co-worker who has



JOHN MONAGHAN

informed us that this person is, in fact, mentally ill and they are having an episode, they need your assistant taking them into custody and they are dangerous.

Usually we won't come upon a situation like that until someone calls us, warns us this is a person who is a danger to themselves.

Q.    Now, I know you said usually that is the case.

What are the atypical cases that you experience, if any, with respect to dealing with individuals in a mental -- experiencing mental crises?

A.    It could come as a result of a pickup, as we say.  In other words, you're on patrol and you see someone acting erratically and dangerously with no particular goal in mind or reason for it, you might consider them mentally ill and then take action.

Q.    You say you might consider them mentally ill.  They didn't, at the NYPD, train you or teach you to identify specific indicators, behavioral or otherwise, to



JOHN MONAGHAN

identify that an individual is experiencing a mental crises?

A.    They did.  They did.

Q.    Do you know what in particular they taught you when you were a member of the NYPD?

A.    If they're incoherently speaking, speaking to imaginary enemies in the area when there aren't any, violence, things of that nature.

Q.    Were those people -- as a part of NYPD policy and training, do you understand those people may be confused, and disoriented, and agitated, and perhaps aggressive?

A.    Correct.

Q.    Do you believe a law enforcement officer's standard of care should be greater if they are interacting or detaining an individual suffering a mental crisis?

MS. ALTERMAN:  Objection.

THE WITNESS:  Your use of the word standard kind of negates the very idea of standard.  No.  The answer is, no, it is the same for all people taken into custody with use of force, the standard of care is



JOHN MONAGHAN

the same.

BY MR. AMRHEIN:

Q.    So as you're -- part of your training and experience with the NYPD, are you testifying here today that there is not a varying standard of care depending on a given situation?

A.    That's right, standard of care is the same.  When you are using force, the standard of care is the same, regardless of the reason why.

Q.    Outside the use of force, and I know you are specifying there the use of force, outside of the use of force in general, with respect to the standard of care, are there varying degrees across other instances, you know, separate instances outside the use of force or is the standard of care, as you say, still remains the same?

MS. ALTERMAN:  Objection.

THE WITNESS:  Again, your use of the word standard means that there is still variation.  That is the definition of that word.



JOHN MONAGHAN

Are there other tactics that you would use with a person who force is not necessary and you realized they're mentally ill versus a violent felon, then there are different verbal things you might say verbally, but a standard is a standard.

BY MR. AMRHEIN:

Q.    Based upon your training and experience with the NYPD, what is the best way to speak to a person who is suffering a mental crisis?

A.    Directly, succinctly.

Q.    Based upon your training and experience, when dealing with an individual whose experiencing a mental crises, how do you and should you determine if an individual has been taken medication or is in need of medication?

A.    How do you ascertain that?

Q.    Correct.

A.    Again, you we're usually called to the scene by someone related to the subject; hopefully, they would inform us, but you could ask the subject.



JOHN MONAGHAN

Q.    So in a situation like that, you are relying upon the call to the scene of the information provided to you when you arrive?

A.    Well, you're not relying on it, but that's one source you can get information from.

Q.    And you said in so many words when you're speaking to an individual and providing, you know verbal instructions to an individual who is experiencing a mental crisis, then you keep sentences simple and short, correct?

A.    Direct and succinct, yes.

Q.    Can you tell me based upon your training and experience with the NYPD what diffusing techniques you learned?

A.    Again, it goes back to the force option that we discussed earlier, the presence of a uniformed officer, hopefully verbal persuasion, you try to talk to people.

Q.    What, you know, delving a little deeper, what specific types of verbal persuasion or verbal techniques were taught when you were a member of the NYPD?

A.    Are we talking about when taking someone into custody with minimal use of force?



JOHN MONAGHAN

Q.    I'm talking about at any time.    11:20

A.    Well, with courtesy,    11:20
professionalism, and respect.  That's talking    11:20
-- just generally how to talk to people with    11:20
courtesy, and professionalism.    11:20

Q.    And then expanding upon that when    11:20
you're encountering an individual?    11:20

A.    Encountering?    11:20

Q.    Yeah, an individual who may be    11:20
considered a suspect or an assailant?    11:20

A.    Okay.  Again, directly and    11:20
succinctly.    11:20

Q.    And, directly and succinctly, that    11:20
describes the manner in which you communicate;    11:20
I'm more concerned about the content of your    11:20
communication.    11:20

What specifically were you taught as    11:20
a member of the NYPD with respect to diffusing    11:20
techniques, what were you taught to say when    11:21
encountering an individual?    11:21

A.    Specific phrases I don't believe    11:21
were in the training.  I mean, the phrase    11:21
"please don't move," is written into the patrol    11:21
guide.    11:21



JOHN MONAGHAN

But de-escalation, you say diffuse, we call it de-escalation, the same thing; here is the goal, and it is to take custody of the person.

The first to do is to clearly state your goal, I need to take you into custody, please turn around.  You know, be courteous, be professional.  Don't use vulgarity.

Q.    And while this is all happening, am I correct that the over-arching principle of reverence or human life and respect for human life still remains in place?

A.    Yes.

Q.    As a matter of fact, of the diffusing are de-escalation techniques when you were at the academy with the NYPD and during your time with the NYPD as an officer, were you train on active listening skills?

A.    That's part of it.  That sounds right.

Q.    Do you recall what in particular was taught to you in your time with the NYPD with respect to active listening?

A.    It's all part of being observant,



JOHN MONAGHAN

being aware; listening is part of that.                        11:22

Q.   Was it a part of police policy or                         11:22
just simply what you were taught at the academy                11:22
as well as in-service training?                                11:22

A.   Right, that's a training matter.                          11:22

Q.   And those de-escalation techniques                        11:22
that you referred to, those were training                      11:22
matters as well, not policy matters?                           11:22

A.   They have been codified recently.                         11:22

Q.   But when you were with the NYPD for                       11:22
20 years?                                                      11:23

A.   It was a part of our training                             11:23
without that nomenclature.  You see, any good                  11:23
policy is the result of good practices being                   11:23
codified.                                                      11:23

So what we call today as                                       11:23
"de-escalation" it's always been taught, just                  11:23
not using that phrase.                                         11:23

The goal is not to use force, talk                             11:23
to them, tell them what you have to do, and                    11:23
explain to them why.  You get them to come                     11:23
along with you; that's what is taught in the                   11:23
academy.                                                       11:23

Today it's called de-escalation.  It                           11:23



JOHN MONAGHAN

was codified and iterated more specifically, but it's been in use for decades.

Q.    And that's with the NYPD, correct?

A.    Correct, yes, and with policing in general.

Q.    In your experience with the NYPD, based upon your training and professional experience, sir, if someone is unresponsive when on the ground, what are you taught to do as an officer of the NYPD?

A.    Render aid.

Q.    What specifically do you do when you render aid, what were you taught?

A.    First thing is call an ambulance.

Q.    Sorry, I couldn't make that out. Could you say that again, sir?

A.    First thing is to call an ambulance.

Q.    What do you do after that?

A.    Whatever you can; if CPR is necessary, maybe mouth-to-mouth even if it's necessary.  But, you know, try and await the ambulance, really.

Q.    Now, sir, you mentioned CPR.  How often are you, as an officer with the NYPD, was



JOHN MONAGHAN

that taught at the academy and did you become    11:24

certified or were you required to become    11:24

independently certified, can you tell me a    11:24

little bit about the CPR process and    11:25

maintaining your certification in CPR as a    11:25

member of the NYPD?    11:25

    A.    It was taught at the academy and it    11:25

was also taught now and again in in-service    11:25

training.  I don't know if there was a certain    11:25

occasion associated with it, but it was taught.    11:25

    Q.    So you needed upkeep on CPR and    11:25

knowledge and ability of CPR of the NYPD    11:25

officers, that was done through the academy, as    11:25

well as the regimented, kind of yearly    11:25

in-service training; is that fair to say?    11:25

    A.    Yes.    11:25

    Q.    Did you individually ever do CPR on    11:25

an individual when you were an officer with the    11:25

NYPD?    11:25

    A.    I have, yes.    11:25

    Q.    Can you describe that instance for    11:25

me, or perhaps instances?    11:25

    A.    I can't remember specifics.    11:25

    Q.    Was it just one time?    11:26



JOHN MONAGHAN

A.    It might have been just one.  It might have been one.  At least once, maybe just once.

Q.    Now, do you think -- and I understand this is testing your memory, do you think that was when you were an officer, when you were a sergeant, lieutenant, or captain?

A.    Not as a captain; I couldn't tell you.  I don't know.

Q.    When you were a captain, I know you were stationed in a certain building, was it -- were you primarily behind a desk or were you out in the car on patrol?

A.    Primarily behind a desk, out on patrol once a month.

Q.    And you were typically out on patrol when you were in your previous three ranks, so sergeant, lieutenant, police officer, correct?

A.    Correct.

Q.    When you were an officer with the Port Authority -- excuse me, with the New York Police Department, the NYPD, based upon your training and experience with the NYPD, were you aware of -- aware and taught how a body of an



JOHN MONAGHAN

officer should be positioned on an individual in order to reduce the risk of sudden death?

A.   No.

Q.   Based upon your training and experience with the NYPD, can you tell me how the NYPD defined when you were an officer, "positional asphyxia"?

A.   That phrase has been codified recently.  We were always taught to promote free breathing and to avoid compressing torso.

Q.   And just the torso?

A.   It would have to be -- well, to promote free breathing and blood flow, that is another thing, circulation is the word.  But positional asphyxiation, that's a fairly new term in the industry.

Q.   But as you said before in that -- although it may be codified in a new way, there were certain principles that were really the bedrock of that codification that you had learned when in the academy or in-service training; is that correct?

A.   Yes.

Q.   Now, based upon your training and



JOHN MONAGHAN

experience with the NYPD in a similar fashion, 11:28

can you tell me what compressional asphyxia is 11:28

based upon your training and experience with 11:28

the NYPD? 11:28

A.    No, but I can tell what the phrase 11:28

means now.  In my training with the NYPD 11:28

20 years ago, no. 11:28

Q.    Okay.  That's fine. 11:29

Based upon your training and 11:29

experience with the NYPD, what should an 11:29

officer do to prevent positional asphyxiation 11:29

and compressional asphyxiation? 11:29

A.    Again, those phrases weren't in use 11:29

when I was training.  But the idea was at the 11:29

time, promote free breathing, keep an airway 11:29

open, don't inhibit circulation or free 11:29

breathing. 11:29

Q.    So specifically is what I'm looking 11:29

for.  What was taught by the NYPD when you were 11:29

an officer to prevent compressional 11:29

asphyxiation, positional asphyxiation, and as 11:29

you said preserve free breathing, what 11:29

specifically was taught to you? 11:29

A.    Again, to keep the airway opened, 11:29



JOHN MONAGHAN

don't inhibit circulation.                                    11:29

Q.    But how?                                                11:29

A.    How specifically, I don't know.                         11:29

If you are doing CPR, it has to be                            11:29

on their back.  And if they are choking, it                   11:30

would have to be on their side, so I can't tell               11:30

you more specific than that.                                  11:30

Q.    You had said a few minutes ago,                         11:30

apply pressure to an individual's torso, and                  11:30

then you also expanded that to include blood                  11:30

flow; is that correct?  Do you recall that?                   11:30

A.    Yes.                                                    11:30

Q.    Do you agree with me that based                         11:30

upon, you know -- and again, this is based upon               11:30

your training with the NYPD training and                      11:30

experience, do you agree with me that a person                11:30

can experience breathing problems if they're                  11:30

position on their stomach with weight being                   11:30

applied to their back and body?                               11:30

MS. ALTERMAN:  Objection.  You can                            11:30

answer.                                                       11:30

THE WITNESS:  People can experience                           11:30

breathing problems in any position.                           11:30

Q.    Sir, you said 20 years again on the                     11:30



JOHN MONAGHAN

force; is that correct?

A.   Say it again?

Q.   You said 20 years, you were on the force for 20 years; is that right?

A.   Yes.

Q.   Sir, I think you may have briefly touched on this before.  Based upon your training and experience with the NYPD, are head strikes considered a deadly force, even if not used with a baton or with a gun?

A.   No.

Q.   Are you aware of any changes to the NYPD policies and procedures after you finish your time with the force with regard to its policy on head strikes and whether or not that's considered deadly force?

A.   Any changes to the policies at the NYPD since I left, I codified every single one of them over the last 20 years.

Specifically regarding head strikes; I don't know specifically.

Q.   Based upon your training and experience with the NYPD, if an individual is in a prone position and placed in handcuffs,



JOHN MONAGHAN

what should the officers do after the person is restrained?    11:33

A.    Get them on their feet and get them to the police facility.    11:33

Q.    When you say get them on their feet, is that the policy and procedures as a part of training for the NYPD that you have learned during your time?    11:33

A.    I don't know if you specifically have to train people to, once you have someone in custody, to get them on their feet, put them in the car and take them to the stationhouse.    11:33

I don't think it was that specific. It was understood that you would understand that.    11:33

Q.    I'm sorry, can you say that again, that last portion?    11:33

A.    It is understood.  The subject would also understand once they're in custody, take them into custody, would entail bringing them to their feet, putting them into the car, and driving the car to the stationhouse.    11:33

Q.    I'm more specifically concerned with the health of the individual who is being    11:33



JOHN MONAGHAN

restrained, as opposed to the individual simply being taken into custody.  Perhaps that's the distinction I can help provide for you to, you know, provide some clarity here.

What is the first move with regard to the, you know, reverence of an individual's life and health, what is the first move an officer is -- according to your NYPD training and your experience, what is the first move an officer is supposed to do when the individual is restrained, but still in the prone position?

A.    You still haven't given any, what's called, symptoms.  If they're restrained and in a prone position, you simply bring them out, move them to your car and bring them into the stationhouse.

You're still not being specific.

Q.    You don't roll them to the side or sit them up, you just lift them to their feet or --

A.    As in a practical, every interaction matter, absent any other factors which were not added, no, you've got to place someone in handcuffs when they're prone, that's all you



JOHN MONAGHAN

said so far.                                                      11:35

You take them into custody.  You put            11:35
them in your car, and you take them to the                       11:35
stationhouse.                                                    11:35

Q.    In an instance where an individual        11:35
is experiencing positional or compressional                      11:35
asphyxia in handcuffs and in a prone position,                   11:35
what is an officer, based upon your training                     11:35
and experience with the NYPD, what was an                        11:35
officer taught to do based upon your training                    11:35
and experience?                                                 11:35

A.    I am not clear on the use of the          11:35
phrase.  We have someone in handcuffs, prone,                    11:35
and if they're experiencing difficulty                          11:35
breathing.  I mean, you use the phrase                          11:35
positional asphyxia, I'm not sure what you are                   11:35
describing.                                                     11:35

If someone is having difficulty               11:35
breathing, obviously, as I said, call an                        11:36
ambulance and do the best you can.  Maybe sit                    11:36
them up, stand them up, do what you can to,                      11:36
again, promote free breathing, whatever that                     11:36
takes.                                                          11:36

Q.    As an officer with the NYPD, were        11:36



JOHN MONAGHAN

you trained to recognize breathing difficulties    11:36
in the process of restraining an individual?    11:36

A.    That's part of everyday life, that    11:36
everyone would recognize, so yes.    11:36

Q.    I'm not asking what in everyday life    11:36
what would recognize, I'm asking what the NYPD    11:36
taught you?    11:36

A.    No.  If someone is not breathing or    11:36
having difficulty breathing, you should    11:36
recognize that and take action.    11:36

Q.    Throughout a number of occasions you    11:37
talked about common sense and every day in life    11:37
understanding.    11:37

How much of policing in your    11:37
perspective is a common sense, you know,    11:37
underwritten understanding of how to operate    11:37
the situation?    11:37

A.    A lot of it.  I wouldn't say it's    11:37
unwritten.  We do try to codify action that has    11:37
worked.  A lot of procedures are to mandate not    11:37
doing things that didn't work.    11:37

I mean, it's all a reflection of,    11:37
again, common sense and every day events.    11:37

Q.    Could you put a percentage on it?    11:37



JOHN MONAGHAN

Do you think it's 40 percent common sense, 60 percent policy and procedure; perhaps flipped, 50/50?  Can you put a percentage on that?

A.    I don't know that there is a distinction between policy and procedure and common sense.

One is based on the other.  They're inherent to each other.  The answer is, no, I can't give you a number.

Q.    Based upon your training and experience with the NYPD, can you tell me what agonal breathing is?

A.    No.

Q.    Based upon your training and experience with the NYPD, when does an officer need to intervene or intercede if they observe an inappropriate or unreasonable force used by another officer?

A.    The answer is contained within your question.  When force becomes unreasonable or unnecessary, you have a duty.

Q.    And was that codified back in the time that you served as an officer for the NYPD



JOHN MONAGHAN

or is that something recently codified?                11:38

A.    No, that was always in place.                11:38

Q.    So in the event that an officer                11:38
observes inappropriate or unreasonable force,          11:39
you know, based upon your training and                 11:39
experience, what types of intervention methods         11:39
were you taught?                                        11:39

A.    You can physically stop them.  And          11:39
then there is a reporting procedure as well.           11:39

Q.    So what were you taught to do                11:39
physically to stop it?                                 11:39

A.    Whatever it takes.  Physical                 11:39
intervention.                                          11:39

Q.    And then the written report side of          11:39
it, can you tell me, is that something that if         11:39
you observe it occur and then it concludes, is         11:39
that something that you would fill out and             11:39
submit as a -- to a member of higher rank in          11:39
the department?                                        11:39

A.    It could be a verbal notification           11:39
initially.                                             11:39

Q.    And does that typically -- if you do         11:39
have a verbal notification, is that to the             11:39
individual that an officer observes in their          11:40



JOHN MONAGHAN

opinion acting unreasonably or unjustifiable, is that to the individual that committed the act or is that to a superior?

A.    What I said, I meant to a superior. To do it to the subject would be an informal way of adjudicating it correctly.

Q.    If there is an informal communication to the individual who is perceived to have committed an unreasonable or unjustifiable act while on the force or while on duty, is there a -- when you were a member of the NYPD, was there a duty of the officer to go beyond the informal and relay that to the superior and make a more formal notification?

A.    Yes.

Q.    Was that taught at the academy, in in-service training, or both?

A.    Both.

Q.    Do you personally ever witness an individual officer on duty acting inappropriately or using inappropriate or unreasonable amounts of force?

A.    No.  May have prevented it once or twice if I saw it possibly coming, but no.



JOHN MONAGHAN

Q.    You said you saw it possibly coming. That means it never actually happened, correct?

A.    That's correct.

Q.    It was coming but it never did happen, correct?

A.    Correct.

Q.    Did you ever submit any reports, written reports or tell a superior that you observed any officer engaging in inappropriate or unreasonable force?

A.    No.

Q.    Now, in the scenario where a member of the NYPD engages in an appropriate use of force or unreasonable use of force and the duty to intercede, does it matter if the individual is a superior or ranked higher or has tenure within the office?

A.    No.

Q.    Sir, am I correct that you're currently self-employed?

A.    Yes.

Q.    Your self-employment is as an expert witness; is that right?

A.    That's part of it.



800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN
TARASOV vs PORT AUTHORITY OF NEW YORK

September 16, 2024
80

JOHN MONAGHAN

Q.   Can you just briefly tell me what the other part of your self-employment is? Does that involve The Key?

A.   Yes, it does.

Q.   There are any other partial forms of employment that you have other than your expert witness duties, as well as your duties with respect to The Key?

A.   That's it.

Q.   I'm going to ask you a number of questions regarding your expert witness business.  I'll ask you in a few minute.  But first I just want to ask you a couple of initial questions about it.

When did you first start serving as an expert witness?

A.   Shortly after I retired in 2004.

Q.   How did you go about building your practice as an expert witness, did you start shortly after retirement in 2004?

A.   I didn't take steps to build it.  I got a call from a friend who asked me if I would consider it and took on a case, testified at trial, and the calls kept coming in.



800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

Q.    And so you -- is it fair to say that    11:44
you served as an expert witness for roughly --    11:44
it's 2024 at this point, so roughly 20 years?    11:44

A.    Yes.    11:44

Q.    Can you tell me approximately how    11:44
many cases you've worked on?    11:44

A.    About a hundred.    11:44

Q.    As an expert witness?    11:44

A.    Right.  About a hundred.    11:44

Q.    How many times have you been deposed    11:45
-- strike that.  I'll reserve some of these    11:45
questions a little later.    11:45

I know you briefly mentioned how you    11:45
got into the business.  To this day, how do you    11:45
get business; is it word of mouth, do you    11:45
advertise, can you tell me how you bring your    11:45
business to your expert witness business?    11:45

A.    Word of mouth.  I don't advertise.    11:45

Q.    In your expert witness business, is    11:45
this something that is a registered business;    11:45
whether it's a corporation, an LLC, or some    11:45
other legal form of business or is it simply    11:45
you serve as an expert should the call come?    11:45

A.    Simply serve as an expert should the    11:45



JOHN MONAGHAN

call come, no organization.

Q.    Do you know if you file any particular tax returns for a business as an expert witness?

A.    No.

Q.    How much do you charge for your services as an expert witness?

A.    $300 an hour.

Q.    Do you require an initial retainer or no?

A.    No.

Q.    How much do you charge for providing deposition testimony?

A.    $3,500.

Q.    How much do you charge for trial testimony that you provide?

A.    Same as deposition testimony, $3,500.

Q.    You charge for travel and other expenses in addition to, you know, your under oath testimony?

A.    No.

Q.    Have you ever discounted your rate on any of the matters that you've taken over



JOHN MONAGHAN

the last 20 years?

A.    No.

Q.    Can you tell me how your rate has changed over the last 20 years, your rates?

A.    It's risen slowly.

Q.    Can you tell me the specifics of it, please?

A.    Oh, I don't remember.  It was less than 300 up until a few years ago.  It was less than that, I don't recall that.

Q.    Do you recall roughly where you started out in terms of an hour charge as well as a charge for, you know, testimony given whether at a deposition or in court?

A.    Might have been $150 an hour 20 years ago.  You want the daily rate?  I've got it off of the...

Q.    Do you think your figure of $3,500 for -- yeah, correct, $3,500 per day for trial testimony or deposition testimony, do you think that's remained relatively consistent throughout your 20 years as serving as an expert witness or is that something that has also steadily risen?



JOHN MONAGHAN

A.    It has also steadily risen.                    11:48

Q.    What prompted you to raise your              11:48
rates?                                              11:48

A.    Nothing in specific.                          11:48

Q.    Then why did you do it?                       11:48

A.    Seemed appropriate.                           11:48

Q.    In what way did you feel it was              11:48
appropriate?                                        11:48

A.    With more experience I gained.               11:48

Q.    And by more experience, you mean            11:48
providing expert reports and Rule 26 reports or     11:48
whatever the rule is for an individual's states     11:48
or, you know, deposition testimony or trial         11:48
testimony; is that right?                           11:48

A.    Right.                                        11:48

Q.    So I know we touched on this just a         11:48
few moments ago, but The Key; am I correct that     11:49
The Keys, the address listed on The Key's           11:49
website is the same as your PO Box for your         11:49
expert business?                                     11:49

A.    Yes.                                          11:49

Q.    Is that on purpose?                           11:49

A.    Yes.                                          11:49

Q.    Why is that?                                  11:49



JOHN MONAGHAN

A.    It's a business address.    11:49

Q.    I thought your said your expert witness practice is not a specific business, it is a referral service that you do individual work?    11:49

A.    Well, it's not personal.    11:49

Q.    When you say "it" there, are you talking about The Key or are you talking about your expert witness practice?    11:49

A.    Both.    11:49

Q.    So the PO box is used for both your business with The Key, as well as your individual practice as an expert witness.  I just want to make sure that is correct, right?    11:49 11:50 11:50

A.    Yes.    11:50

Q.    And The Key, is that a registered business?    11:50

A.    Yes.    11:50

Q.    Can tell me the state of incorporation; some of the background to its legal registration?    11:50

A.    It's an LLC in New York State.    11:50

Q.    How many members?    11:50

A.    I have two partners.    11:50



JOHN MONAGHAN

Q.    You considered -- you used the phrase "partner."  That includes you.  Who are the other two individuals who partners with you, legally partners with you in The Key?

A.    Fellow retired NYPD.

Q.    And what are their names?

A.    Do I have to?  They wouldn't appreciate it.

MS. ALTERMAN:  Is there a reason that we need the name?

MR. AMRHEIN:  Yes.

THE WITNESS:  Okay.  Chief Kevin Ward, Inspector Paul McCormack.

BY MR. AMRHEIN:

Q.    And for the record, sir, I would assume these corporate filings are public record anyway, so this is accessible for anybody, this is not divulging materially private information.

Do you know who or when The Key became a legal corporation, an LLC?  I know it was founded in 1998, approximately, but when did it become a legal entity?

A.    Well, right away I filed as a sole



JOHN MONAGHAN

proprietorship and filled out a d/b/a with the    11:51

Blauvelt town clerk in '98.                       11:51

        When it became an LLC, I couldn't         11:51

even guess, it was some years ago.  I don't       11:51

remember.                                         11:51

    Q.    So was it a d/b/a, The Key was the      11:51

official name of the company?                     11:52

    A.    No, I was a sole proprietor at          11:52

first.                                            11:52

    Q.    No, I understand.  But you had          11:52

mentioned -- oh, so you're saying it was just     11:52

John Monaghan something something, d/b/a, The     11:52

Keys?                                             11:52

    A.    In 1998, correct.  And then I had       11:52

got partners subsequent to that and became an     11:52

LLC.  I don't remember what years we made it      11:52

LLC.                                              11:52

    Q.    Do you recall when you took on          11:52

partners?                                         11:52

    A.    Again, no, not -- maybe 1999 or         11:52

2000.                                             11:52

    Q.    So it would have been before you        11:52

retired with the NYPD, correct?                   11:52

    A.    Yes.                                     11:52



JOHN MONAGHAN

Q.    How did you recruit your partners when you were still working as an officer with the NYPD?    11:52

A.    It wasn't a matter of recruit.  We just met and they had an interest in the material the way I did.  There was no recruiting.    11:52

Q.    At that time were your partners also members of the NYPD?    11:52

A.    Yes.    11:53

Q.    And I know you retired in 2004.  You mentioned the two other partners.  Did they retire around the same time?  Did they continue service beyond your date of retirement?  Can you give me an idea of when your partners may have retired and thus may have moved on to another employment with The Key?    11:53

A.    No.  They retired subsequent to me; I don't know exactly what year though.    11:53

Q.    Can you give me their -- do you recall what rank they were when you first met them in and partnered with them in The Key?    11:53

A.    We were all captains.    11:53

Q.    Did your work in the same    11:53



JOHN MONAGHAN

department?                                                        11:53

A.    No.  We met in captain's training                           11:53
school.                                                            11:53

Q.    Can you describe to me what                                 11:53
captain's training school is?  Is that                            11:53
something that -- I know The Key is obviously                     11:53
not an NYPD business, it's your own business.                     11:54
Is the training school an NYPD business, is it                    11:54
under the hood or umbrella of the New York                        11:54
Police Department?                                                11:54

A.    My business is not related to the                           11:54
NYPD.                                                             11:54

Q.    Not your business, the captain's                            11:54
school that you went to?                                          11:54

A.    Oh, no, that's NYPD training.                               11:54

Q.    So that's just a part of -- okay.  I                        11:54
understand the distinction.  Thank you.                           11:54

A.    It's the same thing.                                        11:54

Q.    So you said you initially filed --                          11:54
or as, you know, John Monaghan, d/b/a, so on                      11:54
and so forth, you were the one that initially                     11:54
filled out the corporate paperwork and filed it                   11:54
out, correct?                                                     11:54

A.    Correct.                                                    11:54



JOHN MONAGHAN

Q.    At some point did you engage an attorney to file the corporate paperwork on your behalf?

A.    No.

Q.    So have you always been the individual responsible for filing the corporate paperwork for The Key?

A.    I don't remember.

Q.    Do you recall if each year the state requires a corporate filing to remain in compliance and in good standing?

A.    I'm not sure.  We file taxes, is that what you mean?

Q.    No.  Individual corporate filings on behalf of the company in order to remain in good standing with the state.  It's typical practice.

Do you recall if New York State requires that for your business?

A.    I don't know.

Q.    Do you know who would know?

A.    I don't know.

Q.    Has The Key ever been found to be not in good standing with the State of New



JOHN MONAGHAN                                    September 16, 2024
TARASOV vs PORT AUTHORITY OF NEW YORK                            91

JOHN MONAGHAN

York?                                                        11:56

A.    No.                                                    11:56

Q.    And you said The Key doesn't have                      11:56
any affiliation with the New York Police                     11:56
Department, correct, outside of the preparatory              11:56
material?                                                    11:56

A.    Right.                                                 11:56

Q.    So dating back to 1998, I just want                    11:56
to walk through some things with The Key.                    11:56

Can you tell me what titles you have                         11:56
held with that company?                                      11:56

A.    Well, I was the owner initially,                       11:56
sole proprietor.                                             11:56

Q.    And then after that?                                   11:56

A.    Well, we call each other partners.                     11:56
I don't know if the corporate filing has titles              11:56
that had to be filled out, so we each picked a               11:56
title; I don't know, to tell you the truth.                  11:56

Q.    So at the start, dating roughly                        11:56
1998, what were your duties and                              11:57
responsibilities with The Key?                               11:57

A.    I wrote lesson plans based on the                      11:57
NYPD procedures, summarized them, teaching them              11:57
with classes and conducted the classes.                      11:57



JOHN MONAGHAN

Q.    And this is outside of the scope of your work with the NYPD itself, because you stated that you had retired from the force in 2004, correct, so about six years later?

A.    Correct.

Q.    Did you recruit people to The Key when you were on the job?

A.    No.

Q.    How did you recruit people to The Key?

A.    I didn't have to recruit anybody.

Q.    How did you get customers?

A.    Customers.  Well, I advertised.  I talked to every precinct in the city and ended up finding them.

Q.    This is back in 1998, correct?

A.    Yes.

Q.    At that time, were there any other competing preparatory schools for the New York Police Department?

A.    Yes.

Q.    How many employees does The Key have at this time?

A.    Four or five, they're all part-time.


DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

Q.    Does that include you and your partners?

A.    No, beyond us three.  I mean, they're all consultants, there may be four or five of them.

Q.    So in total it's a shop of about eight?

A.    Right.  There is no one full-time other than me.

Q.    Is The Key your primary source of income?

A.    It is.

Q.    So right now what are your duties and responsibilities as -- or what is your title right now with The Key?

A.    Title; partner, owners.

Q.    As partner and owner, what are your duties and responsibilities with The Key now?

A.    To take the updates to the NYPD rules and procedures on a daily basis, summarize them and update all the material.

Q.    How did you do that, do you do that by video, do you do that by text, you know, written text or both?



JOHN MONAGHAN

A.    No.  It's -- I read a document, I study it, I reduce it to bullet points, and then I go to my lesson plan document and implement.

Q.    Understood.  And how often are the lessons given to customers of The Key?

A.    Whenever there is an exam, it could be three years, it could be six years.

Q.    So there would be some years where not a lot of business is coming in, and then other years where a lot of business is coming in; is that fair to say?

A.    That is exactly right.

Q.    When there is no exam scheduled for a given year, what does The Key do?

A.    The Key does hardly anything.  I am engaged every day in the processes I just described to you.  The material is being updated every day.  So there is a lot of effort required of me, even during the downtime when there is no exam scheduled.

Q.    So can you tell me about the updating of material that you described on the daily basis as part of your responsibilities?



JOHN MONAGHAN

Can you tell me how you're able to view those updates and review those updates?

A.    NYC.GOV/NYPD, you pull it up, it's all there.

Q.    Understood.  Thank you.

Can you tell me about the general duties and responsibilities of your two partners?

A.    They teach, they review my work.

Q.    Is that it?

A.    That's pretty much it.

Q.    When you took on the partners, did they infuse capital into The Key?

A.    No.

Q.    When they joined as partners, did they take on a percentage of ownership of The Key?

A.    Eventually, yes.

Q.    Do you recall when eventually they obtained that ownership percentage?

A.    What year, no.

Q.    Roughly?

A.    I don't know.

Q.    Did they join The Key or become



JOHN MONAGHAN

affiliated with The Key before they became                  12:02

partners?                                                   12:02

A.    Yes.                                                  12:02

Q.    What, if anything, did they do                        12:02

before they became partners as it relates to               12:02

their work in The Key?                                       12:02

A.    They were instructors.                                12:02

Q.    And you paid them for their time as                   12:02

instructors?                                                12:02

A.    Right.                                                12:02

Q.    Do you recall if your two partners                    12:02

were, am I correct that they were still on the             12:03

force with the NYPD when they joined as                     12:03

instructors and then partners with The Key?                12:03

A.    You asking were they still members                    12:03

of the department?                                          12:03

Q.    I'm sorry I can rephrase that                         12:03

question.  I apologize.  I had a little tickle             12:03

in my throat, so I got distracted.                         12:03

When your partners joined The Key                           12:03

first as instructors and became partners, were             12:03

they still members, active members of the NYPD             12:03

at that time?                                               12:03

A.    At that time, yes.                                    12:03



JOHN MONAGHAN

Q.    Did you or any members, you know, any partners at The Key have to disclose for conflicts purposes, your involvement with The Key to the NYPD?

A.    There was a request for off-duty employment application that had to be approved, that was on file; but beyond that, I don't remember.

Q.    How often did people's off-duty -- as a member of the NYPD, how often did off-duty work coincide directly with your work as a member of the NYPD?

MS. ALTERMAN:  Objection.  You may answer.

THE WITNESS:  When you say coincide, it had to be done outside the department hours.

Q.    I understand that it would have to be done outside of the department hours.

How many times did or how often would work of an individual member of the NYPD without work have any relation to the work that the individual does outside in their individual capacity?



JOHN MONAGHAN

MS. ALTERMAN:  Objection.  You can answer.

THE WITNESS:  I don't know how to answer.  You mean every person that filed off-duty employment applications, did the work that they did off-duty relate to the work that they did in the police department?

BY MR. AMRHEIN:

Q.   Generally speaking in your experience with the NYPD?

A.   I couldn't tell you.  I mean, there is nurses, there is artists, I have no idea.  It is a very broad -- if I'm understanding your question, it's a very, very broad question.

Q.   It is a broad question, and I may proceed with specifying it.  But for now, I just wanted a broad sense of whether you're understanding that officers who apply for off-duty work, whether or not that off-duty work had a direct relation to, you know, the duties and responsibilities that they were able to do and the training that they had with the NYPD?



JOHN MONAGHAN

MS. ALTERMAN:  Objection to form.          12:05

You can answer.          12:05

THE WITNESS:  I'd say that most of          12:05

it is securing work, so maybe is that --          12:05

MS. ALTERMAN:  Just don't guess.  We          12:05

don't want you to guess.          12:05

THE WITNESS:  Okay.  I don't know.          12:05

I really don't know.          12:05

Q.    Did you apply for -- I believe that          12:06

you had mentioned essentially a permit or          12:06

permission to go to work outside of your          12:06

capacity as a Port Authority -- excuse my, NYPD          12:06

officer when working for The Key?          12:06

A.    Yes.          12:06

Q.    Do you recall when you applied?          12:06

A.    '98.          12:06

Q.    Do you recall when your partners          12:06

applied?          12:06

A.    Oh, I couldn't tell you that.  I          12:06

don't know.          12:06

Q.    If active NYPD officers have          12:06

financial relationships with The Key and The          12:06

Key is a preparatory company suggested by NYPD          12:06

officers when they're on duty, is that          12:06



JOHN MONAGHAN

financial relationship required to be disclosed          12:06

to the NYPD?                                             12:06

    A.   I'm not clear at all on what you      12:06

just said.                                               12:06

        MR. AMRHEIN:  Can you read that    12:06

   back, please.                               12:07

       (Whereupon, partial of the last      12:07

   question was read back.)                    12:07

    Q.   Is the financial relationship      12:07

required to be disclosed by the NYPD?                    12:07

    A.   Okay.  Yes.  Today, within recent   12:07

years, active members can't work for me.  That           12:07

rule was put into effect maybe three to                  12:07

five years ago, but that was not the case in             12:07

'98 leading up to -- maybe it was in 2015 that           12:07

rule was enacted.                                        12:07

    Q.   Do you know what that rule was      12:07

enacted?                                                 12:07

    A.   No, I don't.  I could tell you, the 12:07

chief of the department ran a school.  The               12:07

police commissioner worked for me as an                  12:07

instructor.                                              12:07

       So that rule is relatively recent.   12:08

       It was not in place when I started   12:08



JOHN MONAGHAN

The Key most of the years that I ran it.                    12:08

Q.    How much income does The Key bring               12:08
in on a yearly basis?  And I know that                     12:08
obviously as we discussed several minutes ago              12:08
that the tests aren't offered every single                 12:08
year, so in certain years there may be a                   12:08
difference.                                                12:08

Is there a relatively consistent               12:08
amount of income that The Key brings in on a               12:08
year-to-year basis as a primary form of income?            12:08

A.    Well, again, year-to-year, maybe            12:08
three to $400,000 average.                                 12:08

Q.    And I'm -- I know we covered this,          12:08
but you take a salary from The Key, correct,               12:08
and that's your primary form of income?                    12:08

A.    That's my primary form.                     12:08

Q.    And would you consider the -- your          12:08
work as an expert witness, is that considered              12:08
by you to be your secondary form of income or              12:08
another primary form of income?                            12:09

A.    Secondary.                                  12:09

Q.    Have you ever been an employee of           12:09
the Port Authority of New York and New Jersey?             12:09

A.    No.                                         12:09



JOHN MONAGHAN

Q.    Have ever been an officer for the Port Authority Police Department?

A.    No.

Q.    Have you ever attended the Port Authority Police Department Police Academy?

A.    No.

Q.    Have you ever taken any in-service training for the Port Authority Police Department?

A.    Say that again?  I'm sorry, I interrupted you.  Yes, I taught at their class one day, but, no, I was never a student there.

Q.    Can you tell what class that was?

A.    Yeah, arrest process.

Q.    And do you recall when that was, roughly, sir?

A.    Maybe ten years ago or so.

Q.    It was just a one class, one day instance?

A.    Yeah.

Q.    You said arrest process?

A.    Correct.

Q.    Do you recall what you taught?

A.    Yeah.  They were switching over to



JOHN MONAGHAN

the computer system that was in place in New                    12:10

York City, so they were unfamiliar with it, so                 12:10

I gave them a quick run through it.                             12:10

Q.    Is it fair to say that your                              12:10

expertise in that sense was from a technical                   12:10

standpoint?                                                     12:10

A.    Yes.                                                     12:10

Q.    Have you ever taken any Port                            12:10

Authority Police Department in-service                         12:10

trainings?                                                     12:10

A.    No.                                                      12:10

Q.    Are you a member of any clubs or                        12:10

societies?                                                     12:10

A.    Yes.                                                     12:10

Q.    Can you tell me what clubs or                           12:10

societies?                                                     12:10

A.    International Association of the                         12:10

Chiefs of Police.  I'm a member of Mensa.                      12:10

Q.    Just those two?                                         12:11

A.    Yes.                                                     12:11

Q.    All right.  We'll start with the                        12:11

first.  Can you tell me what that is?                          12:11

A.    For the Association of the Chiefs of                    12:11

Police, your membership requirement is to have                 12:11



JOHN MONAGHAN

been an executive in a police organization.                12:11

And it's a think tank and a clearinghouse for             12:11

policy ideas, to model policies and such.                 12:11

Q.    Is this a New York-based association           12:11

or is this a nationwide association?                      12:11

A.    It's international.                             12:11

Q.    International.  Sorry.  Thank you               12:11

for the clarification.                                    12:11

Do you recall -- or, sorry, how long                 12:11

have you been a member of this association?               12:11

A.    Maybe ten years.                               12:11

Q.    Do you know how long this                      12:11

association has been around?                              12:11

A.    Much longer than ten years.  I don't           12:11

know.  I don't know.                                      12:11

Q.    How did you hear about it?                      12:11

A.    Just in general in the business of             12:11

my career.  It's been around as long as I've             12:11

been a professional in this field.                        12:11

Q.    Is it relatively common for                    12:12

officers, whether it's in the NYPD or other              12:12

departments across the country to be aware of            12:12

that association?                                         12:12

A.    Well, it's an executive level                  12:12



JOHN MONAGHAN

association, so maybe not in the ran and file. But people working policy or at the executive level would be more prone to it.

Q.   Understood.  Is there a membership fee for such an association?

A.   Yes.

Q.   What proof do you have to provide in order to become a member of that association, is it a CV or an attestation that you were, in fact, a member of high ranking within a police department?

A.   You have to be sponsored by a current member.

Q.   Do you recall who sponsored you?

A.   You want his name?  No, I'm not -- no, I don't remember.

Q.   You're saying that because you don't want to give the name or because you don't remember?

A.   I don't remember.

Q.   You mentioned Mensa.  Can you tell me what that is?

A.   It's a genius society.

Q.   Is that your interpretation of what



JOHN MONAGHAN

the society is or is that the society's slogan     12:13

and catch phrase?     12:13

A.     That's what they call themselves.     12:13

Q.     How did you become a member?     12:13

A.     I applied, submitted test scores.     12:13

Q.     Did you seek -- so you sought this     12:13

out on your own, they didn't solicit you?     12:13

A.     I may have gotten mail from them.     12:13

Q.     Do you know how you would have     12:13

gotten mail from them?     12:13

A.     United States Postal Service.     12:13

Q.     Do you know how the United States     12:13

Postal Service would have been delivering that     12:14

mail to you, how Mensa got ahold of your     12:14

contact information?     12:14

A.     You'd have to ask Mensa that, I     12:14

don't remember specifically.     12:14

Q.     Did you have to pay to take the test     12:14

for Mensa?     12:14

A.     No.     12:14

Q.     Did you have to pay a membership fee     12:14

for Mensa?     12:14

A.     Yes.     12:14

Q.     Is that a yearly set of dues?     12:14



JOHN MONAGHAN

A.    Yes.                                                   12:14

Q.    What are the perks of being a member             12:14
of Mensa?                                                    12:14

A.    They have social gatherings.  I get              12:14
a newsletter and a magazine periodically                    12:14
delivered.                                                  12:14

Q.    Are you aware of any other NYPD                  12:14
officers, former or otherwise, who are also                12:14
members?                                                    12:14

A.    No, I don't know.                                12:14

Q.    Do you recall what score you                     12:15
received?                                                   12:15

A.    No, I don't.                                     12:15

Q.    Do you hold any professional                     12:15
certifications?                                             12:15

A.    No.                                              12:15

Q.    There are no professional                        12:15
certifications required for being a teacher or             12:15
instructor as a part of The Key?                           12:15

A.    No, independent.  Entirely                       12:15
independent.                                                12:15

Q.    Can you tell me how The Key                      12:15
advertises?                                                 12:15

A.    We have a website, a Twitter                     12:15



JOHN MONAGHAN

account.  We send flier out to precincts, a lot of word-of-mouth.

Q.    Do you get a lot of business referred to you by NYPD officers?

A.    Most of it comes from students who were successful and got promoted.

Q.    And so the promotion process, I know obviously you went through four different ranks within the NYPD, right?

A.    Right.

Q.    So you're saying the students.  So a test comes around, NYPD officers, they may be police officers in title, they are looking to take a sergeant's exam.  They go to The Key to become adequately prepped to be able to take and pass that exam, is that the gist of it?

A.    That's exactly it.

Q.    And these police officers, they hear about it from other members of the NYPD or through fliers or through social media posts; is that fair to say?

A.    Yes.

Q.    How much is a class for an individual, say, sergeant examine level?



JOHN MONAGHAN

A.    It could vary.  Somewhere in the neighborhood of $700.

Q.    How many classes does that cover?

A.    Usually six months, about 24 to 26 classes.

Q.    Is that the same thing, regardless of the exam, so the rank exam, whether it's a sergeant's exam or captain's exam or otherwise?

A.    Yes.

Q.    Typically, when an exam comes around for The Key, how many would -- how many customers do you have seeking out, you know, prep help for the exam?

A.    It would depend on the exam.  For the captain's exam, just a couple of hundred. For the lieutenant's exam, it may be a thousand.  For the sergeant's exam, maybe 2,000.

Q.    Is that because fewer and fewer people ascend to higher ranks?

A.    Right.  The ranks are smaller, less people.

Q.    Are you an owner of any website domains?



JOHN MONAGHAN

A.    Well, The Key has one.  I have one for John Monaghan, yeah.

Q.    So what is your personal website?

A.    It's my name, JohnMonaghan.com.

Q.    Have you ever appeared on television, whether it's a television show or a news interview?

A.    I have.

Q.    Can you tell me about the appearances you've had, is that a television show, is that a news program, can you tell me about them?

A.    News program.

Q.    Which news programs?

A.    National Report, I believe.

Q.    It's just that one news program?

A.    I was only on maybe a few times, three or four times, and it was on Newsmax each time.  Was it National Report each time, I think so, I don't remember that.

Q.    Do you know what type of audience Newsmax attracts?

A.    What type of audience?  Cable viewers.



JOHN MONAGHAN

Q.    Is that a basic cable plan or a premium cable plan, what type of network is it?    12:19

A.    I don't know.  I think it's basic. I'm not certain.    12:19

Q.    If Fox is considered to be one way and CNN is considered to be the other, where does Newsmax fall on that spectrum?    12:19

A.    You'd have decide yourself, I have no idea.    12:19

Q.    When did you first appear on Newsmax?    12:19

A.    When?    12:20

Q.    Correct.    12:20

A.    It was recent, maybe within the last two years.    12:20

Cops were killed and I was asked to comment on that.  The nature of being a cop in New York City and the basis of the cops being murdered.  I think it was about two years ago.    12:20

Q.    Do you know roughly how many times you appeared on Newsmax, I think you may have said just a couple?    12:20

A.    Three or four.    12:20

Q.    And when was the last time you    12:20



JOHN MONAGHAN

appeared on Newsmax?                                          12:20

     A.     Less than a year ago.                             12:20

     Q.     Were you compensated for your                     12:20
appearances?                                                  12:20

     A.     No.                                               12:20

     Q.     Have you ever been compensated for                12:20
any of your appearances?                                      12:20

     A.     No.                                               12:20

     Q.     And I know you kind of mentioned                  12:20
this, but what is the typical subject matter on               12:20
which you provide commentary?                                 12:20

     A.     Policing.                                         12:20

     Q.     Anything else?                                    12:20

     A.     No.                                               12:21

     Q.     I know you said you had two sources               12:21
of income and that would be your work with The                12:21
Key as a primary source, and your expert                      12:21
witness work was your secondary income.                       12:21

            Do you also have another stream of                12:21
income through any books or anything?                         12:21

     A.     Through books on the online website,              12:21
no, there is no income there.  I thought maybe,               12:21
but it turns out it's a hobby.                                12:21

     Q.     So how many books have you authored?              12:21



JOHN MONAGHAN

A.    Two.

Q.    Can you tell me the title?

A.    Head On, and the other is The Guns of Antwerp.

Q.    Do they have any, you know, subtitles or anything after the, you know, whether it's after a colon like some books do?

A.    Yes.  Head on:  NYPD Dies Hard.

The Guns of Antwerp:  NYPD takes Boston.

They're great.

Q.    I think I'll be partial to the second one, since I'm a Boston guy.

A.    Uh-huh.

Q.    Die Hard, I understand that is a -- it probably had about four at this point, or five at this point.

Is the theme of the book simpatico with the themes the Die Hard movie?

A.    To an extent.

Q.    Can you briefly describe the first book for me, and I know we don't want to give away all the secrets.

A.    You want me to give you a synopsis



JOHN MONAGHAN

of my novel?                                                    12:22

Q.    Yeah, just a brief synopsis.                        12:22

A.    Okay.  Bad guys try to take over a               12:22
luxury cruise ship, and the good guys take it                   12:22
back.                                                           12:22

Q.    The good guys are the cops?                        12:22

A.    Yes.                                                12:22

Q.    Is that the same theme for the                     12:22
second book, just not a luxury cruise ship?                     12:22

A.    Yes.                                                12:23

Q.    Do your books sensationalize police                12:23
work?                                                           12:23

A.    No.                                                 12:23

Q.    I'm going to ask you a number of                   12:23
questions about your previous testimony as an                   12:23
expert witness.                                                 12:23

I know as a part of your Rule 26                          12:23
report you provided a list of cases that I                      12:23
believe are from the past five years that you                   12:23
served as an expert witness and you provided                    12:23
either deposition or trial testimony.                           12:23

Before I get there, am I correct                          12:23
that you were called to testify under oath in                   12:23
your career as a member of the NYPD?                             12:23



JOHN MONAGHAN

A.    Yes.                                                    12:23

Q.    How many times were you called to              12:23
testify in court as a member of the NYPD?            12:23

A.    Oh, it could be a hundred.                     12:23

Q.    And with that many, can you                    12:23
generally provide the insight as to the type of      12:23
cases that you were brought in to testify?           12:23

A.    Violent felony criminal activities.            12:23

Q.    Were you typically the arresting               12:24
officer?                                             12:24

A.    Well, as a police officer, yes.  But           12:24
as a supervisor, my driver or my partner would       12:24
be the arresting officer.                            12:24

Q.    And if somebody else was the                   12:24
arresting officer and you were the supervisor,       12:24
what type of testimony would you brought in to       12:24
give, what type of questions did you feel as a       12:24
supervisor, what was your role expected to be        12:24
for providing testimony to the court?                12:24

A.    Grand jury testimony, usually;                 12:24
sometimes trial.                                     12:24

Q.    And would a supervisor speak to the            12:24
investigation itself or the conduct of the           12:24
officers?  Can you tell me what a supervisor         12:24



800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

would be brought in -- not the arresting officer, but what would the supervisor be expected to testify in those instances?

A.    Right.  So the title supervisor is accurate, but as a patrol sergeant, you're brought in to testify not in your supervisory capacity, but as a participant in the actual criminal apprehension.

Q.    Understood.  So if you -- I'm just trying to narrow it down.  I know I had said the arresting officer.

Are you saying the distinction is you didn't slap the cuffs on the individual; however, you were there and present?  I'm trying to understand the distinction between as a supervisor just reviewing things from a far about the actions over here, or is the supervisor like you're saying regardless of the title involved?

A.    Right, regardless of title involved. Like, there is grades of supervisors.  Front line would be the supervisor; middle management would be a lieutenant; executive would be a captain.



JOHN MONAGHAN

As the frontline supervisor, often when it comes to -- let's say this, the apprehending officer, I often was.  But technical term, arresting officer is actually a technical term, whose name is going on the arrest report, who is going to go and do the pre-arraignment with the assistant district attorney, that has to be a police officer, that wouldn't be a sergeant.

Q.    Understood.  Thank you for that clarification, sir.  Do you recall, were you deposed as a member of the NYPD?

A.    In a deposition, no.

Q.    All right.  Of all those matters you described where you provided court testimony as an NYPD officer, those are all criminal matters, is that right, or were there civil matters?

A.    Criminal.

Q.    Were you -- when you were a member of the NYPD, were you ever called to testify under oath in any civil matter?

A.    No.

Q.    So you never had to provide any



JOHN MONAGHAN

testimony, say, as a responding officer in a                12:26

plaintiff's personal injury case?                           12:26

        A.    No.                                           12:26

        Q.    Do you recall our discussion earlier          12:26

regarding your current self-employment as an                12:27

expert witness?                                             12:27

        A.    Yes.                                          12:27

        Q.    How many times have you been called           12:27

to testify in court as an expert witness?  And              12:27

I know you've said you've been doing it for                 12:27

20 years.                                                   12:27

        A.    At trial?  So about 17 times to               12:27

trial.                                                      12:27

        Q.    How many times have you been deposed          12:27

as an expert witness in your 20 years as an                 12:27

expert witness?                                             12:27

        A.    11.                                           12:27

        Q.    You said 11?                                  12:27

        A.    11.                                           12:27

        Q.    So of the 17 matters where you were           12:27

called to testify in court, did those include              12:27

the 11 that you were deposed?                               12:27

        A.    No.                                           12:27

        Q.    So for the matters you were                   12:27



JOHN MONAGHAN

testifying in court, you weren't deposed?    12:27

A.    I believe so.  They're listed    12:28
separate, so there is no crossover, they're all    12:28
separately listed.    12:28

Was I deposed in a case that I    12:28
listed having testified at trial?  That may be    12:28
the case, but I didn't list it.  I'm not    12:28
counting that here.    12:28

Here, the distinction is easy to    12:28
see.  All 11 depositions were in federal court,    12:28
and only two of the 17 trials were in federal    12:28
court, 15 were in the state, so there is very    12:28
little crossover.    12:28

Q.    I just want to try to get some    12:28
clarification here.    12:28

You've been deposed 11 times in    12:28
matters where you served as an expert witness,    12:28
correct?    12:28

A.    Yes.    12:29

Q.    Of those 11 times you were deposed,    12:29
how many of those cases went to trial and you    12:29
served as an expert witness at trial?    12:29

A.    I don't think any of them.    12:29

Q.    Do you recall the result of those    12:29



JOHN MONAGHAN

11 cases?

A.    No.

Q.    Of the 17 cases where you testified in court and there seems to be a lack of a memory as to whether or not you were deposed in of these matters in addition to your trial testimony, you said 15 were in state, two were federal, correct?

A.    Correct.

Q.    Do you recall the result of those trials?

A.    Some of them, no.  Many were a verdict defense, but I don't track that, so I don't know.

Q.    So in total, you have 28 under oath forms of testimony in your career as an expert witness, according to you today, correct?

A.    Well, it's actually 29; I testified in front of the US Congress once.

Q.    Understood.  Thank you for that inclusion, I forgotten about that.  I have it in my notes, but...

Other than that one instance focused exclusively on those 28, can you give me a


800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

breakdown of civil versus criminal?                          12:30

A.    As an expert, they're all civil.                       12:30

Q.    All civil, okay.                                       12:30

Now, further, can you give me a                              12:30
breakdown if you served as an expert for the                 12:30
plaintiffs or for the defendants?                            12:30

A.    Of those listed 28?                                    12:30

Q.    Yes.                                                   12:30

A.    Defendant.                                             12:30

Q.    So you've never served as an expert                    12:30
witness for plaintiffs, correct?                             12:30

A.    Testified, correct.  Served, a few                     12:31
cases, but never testified.                                  12:31

Q.    Can you tell me about the few cases                    12:31
where you were hired by plaintiffs but you                   12:31
never provided testimony?                                    12:31

A.    I did some work for one of the                         12:31
police unions.  I did some work for -- on a                  12:31
couple of different cases for NYPD.                          12:31

Q.    So is that more of a union matter?                     12:31
Was that in a New York State Court forum or a                12:31
federal court forum, or was that operated under             12:31
the rules and the regulations of the union's                12:31
collective bargaining agreement?                             12:31



JOHN MONAGHAN

A.    No.  One was in federal court, it was a fair labor standards lawsuit, and they asked me to help with that.  So that was it.

Q.    Is that the only one that you recall that you served as an expert for the plaintiff's side?

A.    Yes.  Well, no, there was actually, after the compression law that was recently passed I served -- it was a group of unions and a few municipalities had joined together, and they were the plaintiff against New York City Council.

Q.    Can you me about that matter, please?

A.    I filled out an affidavit saying that the law was poorly written and unwieldily and unenforceable, and the courts agreed and struck it down.

Q.    When was that struck down?

A.    2020.

Q.    Was the language amended as a result and then codified?

A.    I know it was passed on appeal and implemented since; I don't know if they changed



JOHN MONAGHAN

their wording or not.

Q.    Am I correct that when you served as the -- you know, the plaintiff side of it in those two instances, those matters involved representing police?

A.    Yes.

Q.    Have you ever been engaged as an expert by the Port Authority of New York or New Jersey?

A.    Yes.

Q.    Can you tell me when?

A.    Two or three years ago I had a case here.

Q.    Can you describe the case for me?

A.    I think it was -- the plaintiff was alleging unlawful arrest.

Q.    Now, is this listed in your report, do you recall?

A.    It is.  I don't think I testified. Do you want me to look?  I don't think I testified.  If I didn't testify, it's not listed.

Q.    Okay.  Can you tell me how you were engaged by the Port Authority in that matter?



JOHN MONAGHAN

A.    Similar to the way I am now, as an expert witness in police science.

Q.    And more specifically, how were you contacted, what was the actual mechanics of getting you to join in as being an expert in the matter?

A.    I guess a phone call, I don't remember.  I didn't document that.  I may have, but the usual way, I guess.

Q.    You said it was a just a couple of years ago, two or three?

A.    I think so.

Q.    Did you work with the Port Authority attorneys on this case in that matter?

A.    The attorneys on this case, no.

Q.    In that matter, so separate Port Authority attorneys?

A.    Yes.

Q.    Do you recall what the result of that case was?

A.    You know what, I did testify.  Let me see, it was --

Q.    I can bring the Rule 26 report up on the screen, sir, so that we can --



JOHN MONAGHAN

A.    Okay.                                               12:35

Q.    I'm going to go through it.                         12:35

A.    Yeah.  There it is, page 4.                         12:35

Q.    Yeah, sir.  Do you see that?                        12:35

A.    The fourth -- or the third bullet up                12:35
from the bottom, the Port Authority, yeah.                12:35

Q.    I'm going to start, and I'll go                     12:35
through each individual case.                             12:36

      The top bullet point, do you see                    12:36
that?                                                     12:36

A.    Yes.                                                12:36

Q.    Can you describe to me your service                 12:36
as an expert in this matter?                              12:36

A.    Testified at a deposition.                          12:36

Q.    When you were engaged in that                       12:36
matter, how were you engaged, sir?                        12:36

A.    I don't track such things.  It was                  12:36
probably a phone call initially, maybe a year             12:36
or two before deposition, typically.                      12:36

Q.    Do you recall the results of that                   12:36
case?                                                     12:36

A.    No.                                                 12:36

Q.    Do you know if it ever went to                      12:36
trial?                                                    12:36



JOHN MONAGHAN

A.    I don't know.

Q.    Is that a case still on-going from your understanding?

A.    I don't know.  I don't track these things.

Q.    You don't track the cases for which you provide expert testimony?

A.    No, I don't.

Q.    The second case, Nassau County, United States Eastern District of New York, testified at a deposition in the case of Jackson, index number.

Can you tell me how you were engaged in that matter?

A.    I can tell you typically it begins as a phone call.  I take the case.  And I think usually it's a year or two years before I end up in a deposition.

Q.    And do you know the results of -- I know you may have answered this question already, but -- the general answer a few moments ago, but do you recall the results of this specific case for bullet point number two?

A.    I don't.  I don't even remember that



JOHN MONAGHAN

case.

Q.    What about bullet point number three, were you engaged in the same form or fashion that you described for the other two cases as well as, you know, previous instances?

A.    As far as I remember, yes, that's going to be true of all of these.

Q.    And to save some time, can you just take a look at all of these bullet points and just tell me when you've concluded reading through all of the bullet points?

A.    Okay.  (Witness complies._.

       Done.

Q.    The manner in which you were engaged, is that consistent throughout all the bullet points of these cases here?

A.    As far as I remember, yes.

Q.    And as you described it, you received a phone call.  On the call you agreed to take the case.  And then a couple of years later, you were called to testify as a result of the report that you produced?

A.    Typically, that's -- yes.

Q.    Looking at the list that you just

12:38
12:38
12:38
12:38
12:38
12:38
12:38
12:38
12:38
12:38
12:38
12:38
12:38
12:38
12:38
12:38
12:38
12:38
12:38
12:38
12:38
12:38
12:38
12:39



JOHN MONAGHAN

reviewed, do you recall the results of any of these cases?

A.   I honestly don't track them.  No, I don't.

Q.   What did the first case -- starting with the first bullet point, what did that first case involve?

A.   Galloway.  I think he -- I think it was a homicide case where he got I think the charges overturned.  It might have been that one.  Or that might have been Jackson.

To tell you the truth, I do not remember.

Q.   Are you saying the actions of another contributed to the death of an individual?

MS. ALTERMAN:  Chris, could you just re-ask the question, your connection broke up.

MR. AMRHEIN:  Sorry, I think I may have gotten an e-mail notification.  I apologize.

I'll ask that again, so you can have clarity, Mr. Monaghan.



JOHN MONAGHAN

(Whereupon, a discussion was held off the record.)

BY MR. AMRHEIN:

Q.   Mr. Monaghan, I know we had audio issues a moment ago, so I do apologize.

I did ask you a question about the first bullet point in the matter of Galloway, and you had said that you believed it was a based upon your memory that it was involving a homicide; is that correct?

A.   I said that, and I'm not sure if it was Galloway or Jackson, the second bullet point.  I honestly don't remember the details of cases.

Q.   Okay.  So homicide, as you know it for those cases, would that be considered the actions of another involved led to the death of an individual?

A.   You are talking about intentional killing.  That's what we're talking about when I say homicide.

Q.   Homicide.  Okay.  Is that of your understanding as a police expert or your understanding from a legal perspective as a



JOHN MONAGHAN
TARASOV vs PORT AUTHORITY OF NEW YORK

September 16, 2024
130

JOHN MONAGHAN

legal professional?                                    12:41

A.    You want to consider me a legal             12:41
professional, okay.                                    12:41

Q.    No, I'm asking -- I am asking               12:41
whether or not you are a legal professional.           12:41
I'm just asking whether or not you are.                12:42

A.    Okay.  As a police expert, the term         12:42
"homicide" means an intentional murder;                12:42
manslaughter, negligent homicide.  We're               12:42
talking about intentional murder.                      12:42

Q.    And outside the element of intent           12:42
from your understanding, homicide, is that the         12:42
action of another person contributed or caused         12:42
the death of another?                                  12:42

A.    No, that's not at all how I                 12:42
understand it.  No, that's not -- contributed,         12:42
no, that's not part of it.                             12:42

Q.    Contributed is a cause?                      12:42

A.    The Penal Law, let's look at Penal          12:42
Law.  There is a specific definition of                12:42
homicide in Penal Law.  It's the killing of            12:42
another person, murder.  There are some other          12:42
things like manslaughter, but, no, homicide is         12:42
murder.                                                12:42



JOHN MONAGHAN

Q.    So you're saying that homicide --
are you saying that homicide and murder are
one-in-the-same?

A.    The way I use it in answer to your
question earlier by the bullet points on my
resume, yes, I use them interchangeably.

Q.    But your understanding is that
murder and homicide is two distinct things,
correct?

A.    Depends on the document you are
studying.

Q.    In New York State are homicide and
murder two different things?  Is every homicide
a murder?  Is every murder a homicide?

A.    No.  No.

Q.    So the -- I know you said the first
two bullet points Galloway and Jackson, and
I'll share my screen again and hopefully we
don't have technical problems.

Is that on your screen again, sir?

A.    Yep.

Q.    I know you said you didn't know for
Galloway and you may not know for other matters
here.



JOHN MONAGHAN

I'm just going to ask you for each bullet point.

Did you know if the Jackson matter has been resolved, or is that still on-going?

A.   I don't know.

Q.   Now on to the third bullet point -- or, excuse me, before I move on to the third bullet point.  In the first two cases that you listed here, bullet point one and two, Galloway and Jackson that you provided deposition testimony in the Eastern District of New York, are you aware if any of your testimony was used in court, your deposition testimony, whether that was used in court?

A.   I'm not aware.

Q.   Do you know if your deposition testimony was ever excluded from being used in court?

A.   I'm not aware.

Q.   You just don't -- do you just not remember at this time or you're not aware that it was ever excluded?

A.   Not aware.

Q.   You understand the distinction of

12:44



JOHN MONAGHAN

the question I'm asking?  Are you not aware    12:44
that it was ever excluded or do you just not    12:45
know or recall at this time?    12:45

A.    No, it was not excluded; that, I    12:45
would have been notified of.  No.    12:45

Q.    On the third bullet point for the    12:45
City of Mount Vernon and this is 8/15/2022    12:45
matter that you testified at deposition.    12:45

Can you tell me about that matter,    12:45
please?    12:45

A.    Yeah.  They alleged wrongful arrest.    12:45

Q.    Do you know what the result of that    12:45
case was?    12:45

A.    I don't.    12:45

Q.    Do you know if that is still in    12:45
suit?    12:45

A.    I don't.    12:45

Q.    Have you been compensated for the    12:45
first three matters for your expert report and    12:45
testimony?    12:45

A.    Yes.    12:46

Q.    For the fourth bullet point it says,    12:46
testified at trial in the case of Lugo,    12:46
3/15/2022.  Can you tell me about that case,    12:46



JOHN MONAGHAN

please?

A.    I can't.  I don't remember.

Q.    You don't recall the contents of your trial testimony two years ago?

A.    I don't.

Q.    Do you recall the result of that trial?

A.    No.

Q.    Were you compensated for your services as an expert witness in that matter?

A.    Yes.

Q.    Now the next bullet point for the Port Authority of New York and New Jersey, do you see that?

A.    I do.

Q.    You're aware that the Port Authority of New York and New Jersey is a defendant in this matter, correct?

A.    Yes.

Q.    You were testifying at a deposition in the case of Suriel 2/16/2022, Eastern District of New York case, can you please tell me what that matter involved?

A.    The wrongful arrest of the plaintiff



JOHN MONAGHAN

alleged.    12:47

Q.    And you've heard this question about the other matters, but what was the result of this Port Authority matter that you served as an expert?    12:47

A.    I don't know.    12:47

Q.    Do you recall the opinion that you provided in that matter?    12:47

A.    No.    12:47

Q.    Do you recall the contents of the opinion and conclusion that you reached in that matter?    12:47

A.    No.    12:47

Q.    Was it deemed by you to be a wrongful arrest or was it in compliance with policy and procedure as you expertly opined in that matter?    12:47/12:48

A.    I don't -- I'd have to do some research before I could answer that question for you.    12:48

Q.    What about the Gallow case, the first bullet point, do you recall your expert opinion in that matter?    12:48

A.    Galloway case.    12:48



JOHN MONAGHAN

Q.    Galloway, sorry.                              12:48

A.    Yeah, I'd have to do the research            12:48
and review the documents on each of these cases    12:48
to answer the questions.                           12:48

Q.    You said in advance of this                  12:48
deposition you reviewed your Rule 26 report,       12:48
correct?                                           12:48

A.    Correct.                                      12:48

Q.    These cases are a part of your               12:48
Rule 26 report, correct, sir?                      12:48

A.    Oh, they are, but I didn't research          12:48
it to refresh my memory on each and every          12:48
individual case listed there.                      12:48

Q.    There are only one, two, three,              12:48
four, five, six, seven, eight, nine; only nine     12:48
cases, sir.  You didn't refresh your               12:48
recollection on the contents of the cases          12:48
listed in your Rule 26 report in advance of        12:48
today's deposition?                                12:49

A.    No.                                          12:49

Q.    So this is the second time you               12:49
served as a defense expert for the Port            12:49
Authority, correct?                                12:49

A.    Correct.                                      12:49



JOHN MONAGHAN

Q.    Were you paid in full by the Port Authority the first time you served as their defense expert?

A.    Yes.

Q.    So the next matter is for Ulster County Sheriff, and you testified at deposition in the case of Cruz, and that was 9/7/2021.

Can you tell me what that matter involved?

A.    I can't.

Q.    Do you recall your deposition testimony, what testimony you provide?

A.    No.

Q.    Do you recall your expert report in that matter?

A.    No.

Q.    Do you recall the contents of your findings in that matter?

A.    Nope.

Q.    Is that consistent for the first one, two, three, four, five -- the preceding five cases that we just went over that you don't recall the contents of your expert report offered in the defense of that master -- or in



JOHN MONAGHAN

those matters?

A.    Yes.

Q.    Now, the next bullet point is the City of White Plains.  You testified at the deposition in the case of Chamberlain, 5/25/2021.

Do you recall what that matter involved, sir?

A.    No.

Q.    Do you recall the contents of your expert opinion?

A.    No.

Q.    Do you recall whether or not that case is still in suit?

A.    No.

Q.    Were you, again, testifying on behalf of the defendants in that matter?

A.    Yes.

Q.    Every case on this list here that you list on page 4 and into page 5, you served as the expert for the defendant, correct?

A.    Correct.

Q.    And again, the first bullet point on the top of page 5, you testified at trial in



JOHN MONAGHAN

the case of McNeil on 2/4/2020.

     Do you recall that matter, sir?

A.   No.

Q.   Do you recall the contents of your expert report in that matter, sir?

A.   No.

Q.   Do you recall the contents of your trial testimony in that matter?

A.   No.

Q.   Do you recall the resolution of that matter at trial?

A.   No.

Q.   In the final bullet point listed for NYC Law Department -- is NYC Law Department different from the Attorney General's Office?

A.   Yes.

Q.   Can you describe for me the difference?

A.   One is the city and one is the state.

Q.   So the NYC is the city law department and the Attorney General's Office is for New York State, correct?

A.   Correct.



JOHN MONAGHAN

Q.    Have you ever been engaged in any capacity by the Attorney General's Office?

A.    No.

Q.    In this matter you were called to testify at the trial in the case of Kennedy and you list two dates.  Did you testify for two days in 2019 for that trial, sir?

A.    Yes.

Q.    Do you recall the contents of your testimony?

A.    No.

Q.    Do you recall what that case involved?

A.    No.

Q.    Do you recall the outcome of that case?

A.    No.

Q.    Do you know if that matter is still in suit?

A.    Don't know.

MS. ALTERMAN:  Can we take a few minute break?

MR. AMRHEIN:  Sure.  Do you want to come back at 1:00 and resume?



JOHN MONAGHAN

MS. ALTERMAN:  That's fine.  Thank you.    12:53

(Whereupon, proceedings recessed for a short break and once again resumed.)    12:53

BY MR. AMRHEIN:    01:09

Q.    Sir, before we took the break, we were going through your Rule 26 report, and at the top of page 5 in regard to the cases you testified in as an expert in the last four years, and that's inclusive of deposition testimony, do you recall that?  And trial testimony, do you recall that?

A.    Yes.

Q.    Sir, given that The Key and your expert report or expert witness business share the same address, I just want to ask you a couple of questions.

Do you ever discuss your expert witness matters with other partners or employees of The Key?

A.    No.

Q.    Have you ever done so?

A.    No.

Q.    Have you ever mentioned to anybody



JOHN MONAGHAN

at The Key that you do work as an expert
witness?

A.    Well, they're aware.

Q.    And so it's never come up, the cases
that you've worked on and the type of cases
that you work on?

A.    No.

Q.    How did the other members of The Key
or partners of The Key, how did they become
aware that you serve as an expert witness?

A.    Casual conversation.

Q.    So fair to say you have discussed
with them your work as an expert witness?

A.    No.

Q.    Why not?

A.    Well, I would describe it as casual
conversation, personal level, watched a ball
game, working on a case.  That's not a
professional discussion, it's more casual.

Q.    Well, regardless if it's
professional or casual, it's still a
conversation nonetheless, correct?

A.    Correct.

Q.    Do you know if the other instructors



JOHN MONAGHAN

or partners at The Key, do they work as expert    01:11

witnesses even in the past or today?    01:11

    A.    They may.  I'm not aware.  I don't    01:11

know.    01:11

    Q.    Sir, were you ever disciplined as a    01:11

member of the NYPD?    01:11

    A.    No.    01:11

    Q.    Were you ever suspended as a member    01:11

of the NYPD?    01:11

    A.    No.    01:11

    Q.    And were you ever sued in your    01:11

capacity as an officer of the NYPD?    01:11

    A.    No.    01:11

    Q.    Were you ever investigated    01:11

internally or otherwise when you were a member    01:11

of the NYPD, regardless of whether it resulted    01:11

in discipline or suspension?    01:12

    A.    Not to my knowledge.    01:12

    Q.    Have you ever been arrested?    01:12

    A.    No.    01:12

    Q.    Have you ever been sued in your    01:12

individual capacity?    01:12

    A.    No.    01:12

    Q.    Has The Key ever been sued?    01:12



JOHN MONAGHAN

A.    No.                                                  01:12

Q.    Have you, in your individual                        01:12
capacity, ever filed a lawsuit against an                 01:12
individual entity or otherwise?                           01:12

A.    No.                                                  01:12

Q.    Has The Key ever filed a lawsuit                    01:12
against an individual entity or otherwise?                01:12

A.    No.                                                  01:12

Q.    Sir, let me know when you see the                   01:12
report on the screen?                                     01:13

A.    I see it.                                            01:13

Q.    Starting at the top of what is on                   01:13
your screen, am I correct that it says                    01:13
"Methodology"?                                            01:13

A.    Yes.                                                 01:13

Q.    I'll scroll up to before this                       01:13
Methodology section.                                      01:13

At the top of the page does it start                      01:13
with a general introduction of what you expect            01:13
to read in your report?                                   01:13

A.    Yes.                                                 01:13

Q.    Is there anything in the                            01:13
introduction that is only included in the                 01:13
introduction and not included or touched upon             01:13



JOHN MONAGHAN

in your expert report?

A.    I don't know.

Q.    On page 2, does your expert report go into your background and qualifications?

A.    Yes.

Q.    Am I correct that that concludes at the top of page 4?

A.    Yes.

Q.    And we've already discussed your background and qualifications as well as your training and professional experience today, correct?

A.    Correct.

Q.    Sir, I return to the section entitled "Methodology" at the top of page 4. It states that you reviewed and analyzed documents in preparing your report.

Do you see that in the first sentence?

A.    Yes.

Q.    Are all the documents you reviewed in preparing your Rule 26 report included in the appendix to the report?

A.    I believe so.



JOHN MONAGHAN

Q.    Do you recall discussing the documents you reviewed in preparation for today's deposition?

A.    Do I recall reading them; is that what you said?

Q.    No.  I can state the question again for you, sir.

At the beginning of the deposition we had this discussion.  Do you recall discussing the documents that you reviewed in preparation for today's deposition?

A.    Oh, yes.

Q.    And do you recall -- strike that.

Are all the documents that you reviewed in anticipation of today's deposition, are they listed in your report's appendix?

A.    Other than the ones that came to my possession after the report was written, yes.

Q.    Okay.  And what were those documents that came into your possession after your report was written?

A.    Okay.  DeFoe's transcript.

Q.    Is that the only document that you're referring to?



JOHN MONAGHAN

A.    It's the only one that comes to mind.

Q.    Now, in the second-to-last or penultimate sentence of this paragraph, do you see the cursor where it's highlighting the start of the sentence, "As a law enforcement trainer," do you see that sentence?

A.    Yes.

Q.    Am I correct that the sentence says, "As a law enforcement trainer, I teach to these laws, rulings, and concepts, and have done so for many years."

Did I read that correctly?

A.    You did.

Q.    And I know we briefly touched upon it before, but you said you -- actually in a one-off, had served as kind of a technological expert for a class for the Port Authority Police Department about ten years ago.

Do you recall testifying to that?

A.    Yes.

Q.    Other than that one-off situation, is your role as a law enforcement trainer, is that strictly for the New York Police



JOHN MONAGHAN

Department?

A.    Yes.

Q.    I want to direct your attention to page 5 of your report.

Am I correct that the top of the page is a heading entitled, "Synopsis of the incident"?

A.    Yes.

Q.    And you start out with a discussion of the April 12, 2019 Jet Blue flight on board in which Mr. Lagoda suffered a seizure.

Do you see that?

A.    Yes.

Q.    Can you provide a synopsis with respect to some timing, and you offer your expert opinion on the timing of the events that you call "the incident."

And, sir, for the record, when I say in questions -- if I talk about "the event" or "the flight" or "the incident," is it fair to say that you understand that I am talking about the April 12th, 2019 Jet Blue Flight 659 at JFK International where Mr. Lagoda suffered a seizure?



JOHN MONAGHAN                                    September 16, 2024
TARASOV vs PORT AUTHORITY OF NEW YORK                         149

JOHN MONAGHAN

A.    Yes.                                                    01:17

Q.    Sir, as a part of your Rule 26                         01:17
report, am I correct that you reviewed the FCIR              01:17
completed by Captain Kurt Bengston?                          01:18

A.    I believe I did.                                       01:18

Q.    Yes.  And you're aware that your                       01:18
appendix indicates that you reviewed this                    01:18
document, correct?                                           01:18

A.    Yes.                                                   01:18

Q.    And as such, as a part of reviewing                    01:18
that, you must be aware that Captain Bengston                01:18
wrote that "from an initial call," and this is              01:18
concerning Mr. Lagoda's seizure, "to the                     01:18
arrival at the gates was five minutes."                      01:18

Do you recall that?                                          01:18

A.    I recall him saying that.                              01:18

Q.    Now, the second -- or, sorry, the                      01:18
third full sentence in the first full paragraph             01:18
states that "Emergency medical protocols were               01:18
put into effect, and 29 minutes after leaving               01:18
the gate at 10:24 p.m., Flight 659 returned to              01:18
a different terminal" -- "to a different gate                01:18
at Terminal 5, Gate 20."                                     01:19

Do you see that?                                             01:19



800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

A.    Yes.

Q.    So you're aware approximately five minutes before the arrival at the gate at 10:24 p.m., that that is when Mr. Lagoda had been suffering a seizure and the captain was alerted, at which point he turned around and proceeded to Terminal 5, Gate 20?

A.    Yeah.  I don't think that's accurate.  That was a guess by the captain.  If you want to bring up the FCIR, he was estimating that.

The brakes and listen to specifics and facts in the record show it was 29 minutes later.  He was guessing.  He said it was a guess.

Q.    Sir, do you recall that his -- that he did not say it was a guess, in fact, he referred to his notes for the specific timing? And secondly, do you recall that this report was prepared the day after this event occurred? Do you recall reading that?

MS. ALTERMAN:  Objection.  You can answer.

THE WITNESS:  I don't recall



JOHN MONAGHAN

specifically.  It was prepared prior to mine.

Q.    Yeah.  So it was prepared on the 13th of April, 2019, sir, the day after the event occurred when his memory was fresh and he referred to his notes.

In particular, do you recall that he said he received a notification about Mr. Lagoda's seizure at 10:20 or 2200 hours?

Do you recall that?

A.    What I do recall when I wrote that that, the captain was estimating and he was not certain.  And there is testimony from many, many other people on board the flight that tell us it couldn't have been five minutes.

Q.    So are you calling the captain a liar, sir?

A.    That's a tough word.  If you want to read back my answer, you can read it back.  I wouldn't call it a liar.

Q.    So the captain's notes, as he stated in his FCIR stated 10:20 or 2200 hours.

And your paragraph here states at 10:24 the flight returned to the gate at



JOHN MONAGHAN

Terminal 5, Gate 20, correct?

A.    Correct.

Q.    So do you disagree that it took him more than five minutes to get back to the gate after Mr. Lagoda suffered a seizures?

A.    Yes.

Q.    What was the basis of your disagreements in specific?

A.    The details of that paragraph before us.

Q.    And in that paragraph you cite the Attorney General's report and Captain Bengston's interview by the NYS AG, pages PA 1475 and PA 1461; is that correct?

A.    Yes.

Q.    Those are the only two pieces of material that you cite for your contentions in the first paragraph, isn't that right?

A.    No.

Q.    So did you omit citations to the materials that you allege to support your contentions here?

A.    I'm sorry, what did you ask me?

MR. AMRHEIN:  Mary Agnes, can you



JOHN MONAGHAN

read that back?

            (Whereupon, the last question was
read back.)

            THE WITNESS:  Wow, okay.  Three and
four are the two footnotes from that
paragraph.  You mentioned only four.

BY MR.  AMRHEIN:

Q.    No, I mentioned three.  In fact, I
said three and four.  Three, the New York
Attorney General's -- the AOG's investigative
reports, as well as Kurt Bengston's interview,
and I actually read the pages specifically, I
read it onto the record.

A.    Okay.  When you read the pages, I
thought you were referring only to that one
footnote.  All right.

Q.    Are you aware that having reviewed
the document, which is included in your
appendix as FCIR report that Captain Bengston's
-- that he stated that it was a five-minute
process, not a 30-minute process from the
beginning of Mr. Lagoda's seizure to when the
plane arrived at the gate?

A.    I remember reading that.  I remember



JOHN MONAGHAN

realizing it was an estimation on his part, and he wasn't entirely accurate.

Q.   Are you aware that there is other testimony on the record from flight attendants and witnesses that state as soon as Mr. Lagoda suffered a seizure, a call was placed to the front of the plane with immediate expectancy in order to inform the captain of the medical event that was occurring on the plane?

Do you recall reading that as part of the deposition transcript, sir?

A.   Yes.

Q.   And so from Captain Bengston's notes to which you refer, the day after the events, he said that upon receiving the call regarding Mr. Lagoda's procedure, it took five minutes to get back to the gate.

You're disagreeing with that?

A.   I am.

Q.   You then state that the Port Authority Police Department was called for assistance with the ongoing medical emergency concerning Mr. Lagoda's seizure, correct?

A.   I'm sorry, are you reading my



JOHN MONAGHAN

report?  Which paragraph?                                01:24

Q.   "As a part or the emergency medical        01:24
protocols, a call was made to the Port                   01:24
Authority Police Department for assistance."             01:24

Did I read it correctly?                      01:24

A.   That time you did; not the first           01:24
time.                                                    01:24

Q.   Well, I wasn't specifically quoting        01:24
your report beforehand.  I'll tell you if it             01:24
was a quote.  I was simply providing a summary,          01:24
just as you are here, a summary of what your             01:24
report stated.                                           01:24

So you stated that the Port                   01:24
Authority Police Department was called for               01:24
assistance with the on-going medical emergency           01:24
which concerned Mr. Lagoda's seizure, correct?           01:24

MS. ALTERMAN:  Objection to form.             01:24
You can answer it.                                    01:24

THE WITNESS:  I'm looking for               01:24
"on-going" and I'm not seeing it.  I don't            01:24
know what you're asking me.                            01:25

Q.   Did Mr. Lagoda suffer a seizures on        01:25
board that flight, sir?                                  01:25

A.   Yes.                                        01:25



JOHN MONAGHAN

Q.    And was the Port Authority Police Department called as a result of that medical emergency involving Mr. Lagoda's seizure?                    01:25

A.    Yes.                    01:25

Q.    And starting with the fourth paragraph you state, at the start that "The PAPD immediately dispatched Police Officer Bugiada to respond to Gate 20 to board the aircraft when it arrived at the gate to assist the man having the seizure."                    01:25

Do you see that?                    01:25

A.    I do.                    01:25

Q.    And then your report then states that Officer Duran was assigned to wait for EMS escort.                    01:25

Do you see that?                    01:25

A.    Yes.                    01:25

Q.    And directing your attention to the last paragraph on the page --                    01:25

A.    I'm sorry can I correct one thing.                    01:25

Q.    No.  I'm asking the questions here, sir.                    01:26

A.    Oh, okay.                    01:26

Q.    Directing your attention to the last                    01:26


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

paragraph on this page, sir, you state that "A flight attendant, who had been punched a number of times by Mr. Lagoda, informed the officer that the subject, Mr. Lagoda, had a seizure but had come out of the seizure and was now punching people."

Did I read that correctly, sir?

A.    Yes.

Q.    And am I correct that you cite via footnote seven to EBT Swinney; is that correct?

A.    Yes.

Q.    And "EBT" can you explain for me what that acronym is?

A.    Yes.  Electronic -- it's a deposition transcript.

Q.    Okay.  But EBT, I just didn't see any particular reference as to what it was.

I, of course, gathered that you were referring to deposition transcript.  But if it does come back to you in terms of memory as to what EBT specifically stands for, just please let me know.

But when you are referring to EBT here --



JOHN MONAGHAN

MS. ALTERMAN: Counsel, I can -- in New York, we refer to depositions as "EBTs" or Examinations Before Trial.

MR. AMRHEIN: Understood. Thank you for the clarification, Cheryl.

MS. ALTERMAN: Sure.

BY MR. AMRHEIN:

Q. So whenever you see EBT on here, Mr. Monaghan, is it fair to say you are referring to deposition testimony?

A. Yes.

Q. The citing of footnote seven you say EBT Swinney, pages 47 lines 2 to 5, correct?

A. Correct.

Q. And you're referring to, of course, Mr. Swinney's deposition transcript, correct?

A. Yes.

Q. Sir, are you aware that Mr. Swinney's deposition testimony you cite does not say that he told Officer Bugiada that Mr. Lagoda had come out of the seizure?

A. No.

Q. Are you aware that Mr. Swinney testified that he tried to calm down



800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

Mr. Lagoda, but Mr. Lagoda was disoriented, confused, and definitely out of it?

A.    I'm not aware of that specifically as I sit here, no.

Q.    Are you aware that Mr. Swinney testified that he told responding officer, Officer Bugiada that there was a medical emergency of a man having a seizure, and that that man was disoriented and combative?

A.    Yeah.

Q.    You recall that from reading the testimony?

A.    Yes.

Q.    And you reviewed all of that in preparation of your Rule 26 report, correct?

A.    Correct.

Q.    Is there a reason why you didn't cite that in this report here?

A.    No.

Q.    No reason?

A.    No.

Q.    Doesn't that provide more context as to the information Officer Bugiada knew when encountering Mr. Lagoda?

01:28



JOHN MONAGHAN

MS. ALTERMAN:  Objection.  You can answer.

THE WITNESS:  Well, you have to be selective with the entire transcript, it could be untenable.

BY MR. AMRHEIN:

Q.   Sir, you chose a one-off quote from an individual and you're asking me to not bring up three different forms of testimony in the same deposition transcript.

How do you reconcile that?

A.   I'm not asking you to do anything.

Q.   I'm simply asking you:  Why didn't you include that portion of Mr. Swinney's testimony here to provide more context as to the information Mr. Bugiada knew when encountering Mr. Lagoda on the plane?

A.   I chose not to.

Q.   Moving on to page 6, that paragraph continues on to page 6, on the bottom of page 5.

Here, you cite again the deposition of Mr. Swinney and that Mr. Swinney heard the officer telling Mr. Lagoda to calm down, that



JOHN MONAGHAN

he had a seizure, correct?

A.    Yes.  Yes.

Q.    And you cite EBT, so the deposition transcript of Swinney, the same page, 47, lines 19 through 20.

Are you aware that Mr. Swinney testified in his deposition confirming his statement back in 2019, May of 2019, that he observed Mr. Lagoda strike Officer Bugiada just one time and in the arm?

A.    Specifically, no.

Q.    And again, you're aware, we just had the discussion a few moments ago that Mr. Swinney had observed, upon trying to calm down Mr. Lagoda after the seizure, observed Mr. Lagoda being disoriented, confused, and definitely being out of it, and told Officer Bugiada, when Officer Bugiada boarded the plane, that there was a medical emergency of a man having a seizure and that that man was disoriented and combative.

You recall hearing that, correct?

A.    Yes.

Q.    And you reviewed this deposition



JOHN MONAGHAN

testimony of Mr. Swinney in preparing your
Rule 26 report, am I right?

A.    Yes.

Q.    The first full paragraph page 6
starts with the word "Such."

Do you see that?

A.    I do.

Q.    Can you give that paragraph a read
and just let me know when you've concluded?

A.    You want me to read it out loud?

Q.    No, just read it to yourself.

A.    Oh.

(Witness complies.)

Yes, I am done.

Q.    Okay.  Sir, other than the last
sentence of that paragraph which reads, "In
fact, the PAPD dispatcher's response to PO
Bugiada's call for help was to direct all units
to respond."

Other than that specific instance
which is contained within the heading "Synopsis
of the incident," isn't that paragraph, other
than the last sentence, a set of generalized
statements in opinion form by you?



JOHN MONAGHAN

A.    They're not generalized, no.  In fact, they're very specific.

Q.    Let me rephrase that for you, sir.

Is there any reference to anything on the record here, evidence on the record, or is this just your specific expert opinion offered in the synopsis section?

A.    It's both.  It was testimony from one of the lieutenants and the other.

I didn't cite the testimony in that paragraph, but there is testimony in the record saying exactly that.

Q.    So what testimony, sir?

A.    One of the lieutenants said exactly that.  And I forget who the other one was; I could research it.

Q.    Is there a reason why you didn't cite it?

A.    I didn't think it was necessary.

Q.    You didn't feel it necessary to cite the evidentiary record in your report?

A.    That's right, in that paragraph I didn't feel it was necessary.

Q.    Why don't you take a look at the



JOHN MONAGHAN

last paragraph on this page and, again, this is page 6 of your Rule 26 report.

The second sentence you write a few minutes -- you write, "A few minutes after handcuffing Mr. Lagoda, one of the officers recognized that Mr. Lagoda was in distress and turning blue and did not appear to be breathing."

Did I read that correctly?

A.   Yes.

Q.   Sir, are you aware that your own court report contradicts this narrative of a few minutes after handcuffing, the officers noticed Mr. Lagoda was turning blue and did not appear to be breathing?

A.   No.

Q.   So you're not aware that your own report is inconsistent on that matter?

A.   I don't believe it is.

Q.   Now, do you see in footnote ten at the bottom of the report at the bottom of this page 6 of your Rule 26 report?

A.   Yes.

Q.   And you cite to the First Amended



JOHN MONAGHAN

Complaint?

A.    Yes.

Q.    Are you citing that as evidentiary support of your contention here in the first line of the bottom paragraph?

A.    Yes.

Q.    You're citing the allegations contained in the Complaint as evidentiary support?

A.    Paragraph 52.

Q.    Right.  So you're citing the allegations in the Complaint, not the evidentiary record, you're citing the initial document that launched this case?

A.    That's -- so that's not part of evidentiary record you're saying?

Q.    No.  I'm simply saying you're citing this and not other evidence produced in discovery.  You're citing the initial Complaint in your refer of number ten?

A.    I know they make --

Q.    It's a very simple question, sir.

Are you citing the First Amended Complaint in footnote ten in support of your



JOHN MONAGHAN

contention to start paragraph -- or the bottom paragraph on page 6 of your Rule 26 report?

A.    Yes.

Q.    Now, moving on to page 7, at the top of page 7 do you see the sentence that reads, "The officers at the scene made two radio calls for EMS to come 'forthwith' and to 'make good time'"?

A.    Oh, yes.  Yes.  I'm sorry, yes.

Q.    I can re-read that again.

A.    I saw it.

Q.    Okay.  Did I read that correctly?

A.    Yes.

Q.    Take a look at the first full paragraph on that page.  So right below, about three lines down it says that, "This request for an ambulance was one-and-the-same as the original call for an ambulance for a man with seizures."

Did I read that correctly?

A.    Yes.

Q.    And then in the second full paragraph it states that Officer Duran "had responded to PO Bugiada's emergency call for



JOHN MONAGHAN

help," correct?                                                01:36

A.    Right.                                                   01:36

Q.    Your report states that Officer                         01:36
Duran had been assigned to escort EMS, but left               01:36
the post to respond to Officer Bugiada's call                 01:37
for backup, correct?                                          01:37

MS. ALTERMAN:  Objection to form.                             01:37

You can answer.                                               01:37

THE WITNESS:  Correct.                                        01:37

Q.    Does your report state who took the                     01:37
place of Officer Duran when he left his EMS                   01:37
escort position when he responded to the call                 01:37
for backup?                                                   01:37

A.    No.                                                     01:37

Q.    In fact, there is no reference in                       01:37
your report or on the evidentiary record of                   01:37
anybody taking the place of Mr. Duran at his                  01:37
post for EMS escort, correct?                                 01:37

A.    Correct.                                                01:37

Q.    Now, at a later point am I correct                      01:37
that Officer Duran offered to go back to serve                01:37
as an escort for EMS?                                         01:37

A.    Correct.                                                01:37

Q.    And to be fair, another officer did                     01:37



JOHN MONAGHAN

as well, and that's reflected in your report.

          Do you recall that?

    A.    Yes.

    Q.    Now, this was after the officers had already engaged Mr. Lagoda and as a result of Mr. Lagoda turning blue and needing CPR and emergency medical services, correct?

    A.    Yes.

    Q.    Am I correct that any mention of the word "bus" over a police radio or on a call for police, that's referring to an ambulance, correct?

    A.    Yes.

    Q.    Now, is that a common term across not only the Port Authority, but the New York Police Department?

    A.    Yes.

    Q.    The appendix to your report as well as your report itself acknowledges that you reviewed the Office of the Attorney General's investigative report.

          Do you recall that?

    A.    Yes.

    Q.    Do you recall reviewing that



JOHN MONAGHAN

document to prepare your Rule 26 report?

A. Yes.

Q. So in preparing the Rule 26 report, you became that the OAG report found that the ambulance, which was supposed to be providing medical help for Mr. Lagoda was delayed by as much as 20 minutes getting to Mr. Lagoda because no officer stay behind for EMS escort, isn't that right?

A. Well, I read the 20-minute delay. The second half; did they say he caused the officer because EMS didn't show up, it was seven minutes that Duran waited.

Q. That's not what the OAG report said, so I'm just going to repeat my question.

A. I'm answering.

Q. So in preparing your Rule 26 report, you became aware that the Office of the Attorney General report found out that the ambulance was delayed by as much as 20 minutes in getting to Mr. Lagoda?

A. Yes.

Q. So this brings us to page 8 of your report, sir. Anytime I say "your report" or



JOHN MONAGHAN

"you wrote," I'm referring to your Rule 26                    01:40

report produced in this matter.                              01:40

          Is that fair, sir?                                 01:40

     A.    Yes.                                              01:40

     Q.    Am I correct that your report                     01:40

accuses the OAG's record of being "inaccurate"?              01:40

     A.    Yes.                                              01:40

     Q.    Sir, am I correct that you                        01:40

acknowledged that just a few minutes ago, that               01:40

nobody replaced Officer Duran for escort of the              01:40

bus, as you said, the ambulance?                             01:40

     A.    Correct.                                          01:40

     Q.    Am I correct that the evidentiary                 01:40

record shows that the EMS dispatchers said, we               01:40

need a bus ASAP; and in particular, to go and                01:41

provide medical care to Mr. Lagoda, thus                     01:41

prompting Officer Duran and another officer to               01:41

say that they would be willing to go back and                01:41

provide escort for the ambulance, correct?                   01:41

     A.    No.  You said the EMS dispatcher; I               01:41

believe it was a police dispatcher.                          01:41

     Q.    Oh, pardon me.  The police                        01:41

dispatcher.                                                  01:41

          That prompted Officer Duran and                    01:41



JOHN MONAGHAN

another officer to -- offer to go back to

provide escort to the ambulance, correct?

A.    Correct.

Q.    That means that nobody was there to

provide escort to the ambulance, correct?

A.    Correct.  Outside of the report, I

know that --

Q.    I understand, sir.

If you can just limit your questions

to -- your answers to my very simple questions;

we'll have a smooth time getting out of this

deposition.

Sir, are you aware of how many PAPD

officers were on duty at night on April 12,

2019?

A.    In total, no.

Q.    Were you aware that Officer Duran

testified that he was supposed to wait for the

ambulance but decided to proceed to assist

Officer Bugiada's calls for backup, because he

believed that all units were available at the

time?

A.    He was in front of police

headquarters.  He made a reasonable assumption



JOHN MONAGHAN

that there would be other officers inside that            01:42

could do the escort.                                      01:42

    Q.    And there were none, correct?              01:42

    A.    Oh, I don't know who was inside that         01:42

at that moment.                                           01:42

    Q.    No, there was nobody there stationed         01:42

for the escort, correct, you just testified to           01:42

it?                                                       01:42

    A.    No.  No.  I'm talking about who is          01:42

inside the building, the police headquarters.            01:42

    Q.    Oh, this is a separate discussion,          01:42

sir.                                                      01:42

    And I'm simply saying:  Did you not          01:42

just testify that after -- or previously                 01:42

testify that after Officer Duran left his post,          01:42

that nobody had replaced Officer Duran that was          01:42

supposed to escort the ambulance, correct?               01:42

    A.    Separate point; yes, correct.               01:43

    Q.    Are you aware that Officer Duran            01:43

also testified that he was not aware that no             01:43

PAPD personnel was at the EMS post and                   01:43

available to escort EMS to the scene after he            01:43

left his post; are you aware of that testimony?          01:43

    A.    That he did not know, yes.                  01:43



JOHN MONAGHAN

Q.    Your report states that the OAGs report fails to acknowledge the efforts made by PAPD to get EMS to the plane.

Do you recall generally saying that in your report?

A.    Yes.

Q.    And just so we're clear here, you're talking about the efforts made by the PAPD made after Mr. Lagoda was physically restrained, turned blue, and was no longer actively breathing, correct?

A.    Correct.

Q.    Your report then states that "there were no miscues on the part of the PAPD" as it relates to the delayed EMS response.

Do you see that?

A.    Can you tell me where it is?

Q.    Do you see where I've highlighted, sir, on page 8?

A.    Oh, okay.  I got it.

Q.    Am I correct that your report says there were no miscues on the part of the PAPD?

A.    Yes.

Q.    Your report, in the final paragraph



JOHN MONAGHAN

of your report on page 8, it concludes on this   01:45

page with the phrase that "only a close   01:45

analysis of this documentation."   01:45

        Do you see?   01:45

    A.    Yes.   01:45

    Q.    Sir, are you insinuating that the   01:45

Attorney General's Office did not do a close   01:45

analysis in the documentation of the   01:45

investigation?   01:45

    A.    They missed something.   01:45

    Q.    Sir, the top of page 10 of your   01:45

report you state that "PO Williams was able to   01:45

coordinate these two essential resources   01:46

simultaneously to bring about the best possible   01:46

outcome to get an escort for EMS to come to the   01:46

building 269, and to bring EMS to the airplane   01:46

as soon as possible."   01:46

        Did I red that correctly?   01:46

    A.    Yes.   01:46

    Q.    Now, you've already been asked and   01:46

testified regarding Officer Duran's admission   01:46

that he left his post as EMS escort, and that   01:46

no officers were at the post to escort EMS as a   01:46

result, now leaving Officer Duran and another   01:46



JOHN MONAGHAN

officer to return to the post after Mr. Lagoda
was already not breathing.

Do you recall that discussion a few
minutes ago?

MS. ALTERMAN:  Objection.  Asked and
answered.  You can answer again.

MR. AMRHEIN:  That's not a proper
objection in today's deposition.  You
agreed to the stipulations that all
objections except as to form are reserved
until the time of trial.

Asked and answered is an improper
objection based upon our agreement.

BY MR. AMRHEIN:

Q.    So I'm going to ask it again:
You've already been asked and testified
regarding Officer Duran's admission that he
left his post as EMS escort, and that no
officers were at the post to escort EMS as a
result, leaving Officer Duran and another
officer to return to the post after Mr. Lagoda
was already not breathing.

Do you recall that discussion, sir?

A.    You are calling it now an admission,



JOHN MONAGHAN

it was not an admission, it was a statement of fact.

Yes, I do recall.

Q.    So it was Officer Duran's statement of fact that he left his post?

A.    Yes.

Q.    How do you reconcile this statement that you make in your expert report:  "The best possible outcome," and "EMS to the airplane as soon as possible," with the testimony of Officer Duran in the OAG's report that found that the EMS was waiting for police escort, and couldn't get to the scene until it was able to get escort after Mr. Lagoda had already turned blue and was not breathing; how do you reconcile that?

MS. ALTERMAN:  Objection.  You can answer.

THE WITNESS:  So I reconcile that statement as being in the wake of Duran having to respond to Lagoda's life and call for help, now the best possible outcome under those conditions.

BY MR. AMRHEIN:



JOHN MONAGHAN

Q.    That's not in your report though, correct, sir?

A.    No, that's my testimony today.

Q.    Sir, are you aware that the OAG's report says that, "Meanwhile, an ambulance, which had responded to the PAPD police command building on the original report of a passenger having a seizure was still waiting for a police escort to the aircraft.

Open parenthesis, apparently even before the ambulance had shown up, all the officers assigned to the headquarters had already rushed to the aircraft to assist Officer Bugiada, leaving them behind to serve as escort for the ambulance."

Are you aware that that the OAGs report wrote that?

A.    It sounds like -- is that an exact quote you're making, can I see the document?

Q.    I'm simply asking for your awareness, sir.

I got this document in anticipation of this, of your Rule 26 report.

Sir, wouldn't it be the best



JOHN MONAGHAN

possible outcome if EMS was given escort as          01:49

soon as possible, when it was available and          01:49

arrived at police command building as opposed        01:49

to having to wait for police escort to then          01:50

come back and give an escort to provide care to      01:50

Mr. Lagoda, wouldn't that be the best possible       01:50

outcome?                                             01:50

        A.    No.  The best possible outcome would   01:50

be for the seven minutes Duran stood there           01:50

waiting for EMS to show up so that he could          01:50

escort them, without eventually EMS to respond,      01:50

you don't know if it's a dire health emergency       01:50

that they are responding to.  It wasn't a call       01:50

for cardiac arrest; the man had a seizure.           01:50

        If they had arrived within that              01:50

seven minutes we would have the best possible        01:50

outcome.                                             01:50

        Q.    So you agree the best possible         01:50

outcome -- there is a caveat to your statement       01:50

in your expert report that that was the best         01:50

possible outcome.                                    01:50

        There were better potential outcomes         01:50

that the ambulance would have arrived sooner,        01:50

correct?                                             01:50



JOHN MONAGHAN

A.    Yes.

Q.    And that includes had police -- had Officer Duran or another officer had been at the post to escort the EMS services when it had arrived so it was ready to go and provide medical care, correct?

A.    Yes.

Q.    Am I correct that based upon your review of the OAG's report that that report stated that EMS was delayed by as much as 20 minutes.

Do you recall that the OAG's report found that?

MS. ALTERMAN:  Objection.  Asked and answered.

THE WITNESS:  I saw that number in their report.

Q.    Now, moving to the bottom of page 10, do you see the new title for a -- just underneath the screenshots, do you see that, sir, where it says, "Rebuttal of the DeFoe Report"?

A.    Yes.

Q.    Sir, does that bring your section



JOHN MONAGHAN

regarding the synopsis of the incident, does

that bring that section to a close?

A.    Yes.

Q.    In the second paragraph at the

bottom of page 10 that begins

"Notwithstanding," can you just direct your

attention to that paragraph.

Do you see that see that, sir?

A.    I see it.

Q.    In here you say that there is

nothing that -- in Mr. DeFoe's report that

shows the policies and training of the Port

Authority Police Department are substandard,

nor refutes other refuses what the New York

State Attorney General served about the

policies in the 'training recommendations,'

section of the AOG report."

Do you see that?

A.    Yes.

Q.    You already testified that you read

the OAG's report preparing for your Rule 26

report, correct?

A.    Yes.

Q.    You also read Mr. DeFoe's expert



JOHN MONAGHAN

report preparing for your Rule 26 report, correct?

    A.    Yes.

    Q.    Given that, how do you reconcile what we just read in that bottom paragraph with Mr. DeFoe's report and the findings of the AOG report, as both Mr. DeFoe's report and the OAG's investigative report states that the Port Authority Police Department training at the time of Mr. Lagoda's death did not "cover the uniquely vulnerable condition of individuals in the period immediately after the resolution of the seizure and recommend that such information be incorporated into PAPD training," how do you reconcile those two things, sir?

        MS. ALTERMAN:  Objection.  You can answer.

        THE WITNESS:  That doesn't show it to be substandard.  Making a recommendation doesn't show the existing training to be substandard.

BY MR. AMRHEIN:

    Q.    But it shows that the there was no existing training in place as to how an officer



JOHN MONAGHAN

of the Port Authority Police Department is

supposed to handle an individual who is in a

uniquely vulnerable condition in the immediate

wake of a seizure, isn't that right?

    MS. ALTERMAN:  Objection.

    THE WITNESS:  Those are still up to

 standard.

  Q. If something is not included but

should be included, it's still up to standard?

  A. Yes.

  Q. Sir, you're aware that the PAPD

policy and training as it relates to

use-of-force is after April 2019?

  A. Yes.

  Q. On page 11 of your report you state

that the changes in the PAPD policy and

procedure was "relatively nominal," you see

just above my cursor?

  A. Yes.

  Q. Did I read that correctly?

  A. Yes.

  Q. Sir, the appendix to your report

states that you read the deposition of the Port

Authority corporate designee in this matter for



800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

-- the 30(b)(6) designee for all things, police policy and training, Lieutenant Mark Bergery, correct?

A.   Okay.  Yes.

Q.   So in preparing your Rule 26 report and in advance of your deposition here today, are you aware that Mr. -- or, sorry, Lieutenant Bergery's sworn testimony was that positional restraint and compressional asphyxiation were not a part of PAPD training until 2020?

A.   No.

Q.   You weren't aware of that?

A.   No.

Q.   Are you aware that the officer duties to intercede were not a part of PAPD training until 2020 as well, according to testimony of Mark Bergery?

A.   According to his testimony, no.

Q.   You're aware of what a 30(b)(6) corporate designee is, correct?

A.   Yeah.

Q.   On page 13, excuse me, at the bottom of page 12 and onto page 13, you have a section entitled, "NSC Lesson Plans."



JOHN MONAGHAN

Q.    Do you see that, sir?

A.    Yes.

Q.    And NSC, as you'll see in the second line on the last paragraph it stands for National Safety Council; is that correct?

A.    Correct.

Q.    Again, sir, the appendix of your report states that you reviewed the deposition of the Port Authority's corporate designee Lieutenant Mark Bergery in advance of preparing the Rule 26 report, isn't that right?

A.    Right.

Q.    So in preparing your Rule 26 report and in advance of your deposition here today, you were aware that Lieutenant Bergery testified under penalty of perjury that the National Safety Council documents were a part of PAPD officer training, and it was a part of PAPD officer's duties and responsibilities to know and understand the information in those documents?

A.    You're asking the question?

Q.    Yes.  You're aware of that, correct?

A.    Yes.



JOHN MONAGHAN

Q.    How do you reconcile that with your -- how do you reconcile Lieutenant Bergery's testimony that PAPD officers are expected to know the information in the National Safety Council documents, and that knowledge as a part of an officer's duties and responsibilities, how do you reconcile that with your contention at the bottom of page 12 and the top of page 13 that these are documents merely for OSHA purposes?

A.    They're not directives.

Nothing in the lieutenant's testimony makes them directives.  They're not directives, they're mandates to be complied with.

I have to say this about them:  Your earlier question in the AG statement about not being trained on recognizing a seizure is kind of silly when you look at these NSC documents, they're all about recognizing a "seizure," but they're not directives.

So the lieutenant's testimony doesn't make them directives.

Q.    You realize that the lieutenant is



JOHN MONAGHAN

the corporate designee for the Port Authority     01:59

Police Department and testified under penalty     01:59

of perjury that it was a part of the officer's    01:59

duties and responsibilities to know the           01:59

contents of that information?                     01:59

A.    It doesn't make it a directive.             01:59

Q.    That's not my question.                     01:59

Are you aware that that testimony                 01:59

was given by Lieutenant Bergery?                  01:59

A.    Yes.                                        01:59

Q.    And, sir, you used the word "silly"         01:59

regarding a seizure?                              01:59

A.    No.  No.  That's inaccurate.                01:59

Q.    I want to give you the opportunity          01:59

to correct that, sir.                             01:59

This is a matter far from silly;                  01:59

would you agree?                                  02:00

A.    Could we read back my use of the            02:00

word?                                             02:00

Q.    No.  We're going to move on.                02:00

A.    All right.                                  02:00

Q.    Am I correct that in the bottom of          02:00

page 13 and continue to moving forward, you       02:00

have a new heading directive entitled, "Use of    02:00



                          JOHN MONAGHAN

Force."

          Do you see that?

     A.    I do.

     Q.    At the top of page 14 you define
deadly physical force as physical force which,
under the circumstances in which it is used, is
readily capable of causing death or other
serious physical injury.

          Did I read that correctly?

     A.    Yes.  You said -- you started your
question that I defined?

     Q.    Yes.  Your report defines this,
correct?

     A.    Well, I'm just reiterating New York
Penal Law's definition.

     Q.    Understood.  And thank you for the
clarification.

          But am I correct that your report
specifically writes what I just stated; and I
can read it again for confirmation?

     A.    No, that's fine.  Yes, it does.

     Q.    Sir, you would agree with me that
physical force used by officers that compresses
an individual's diaphragm and inhibits an

02:00
02:00
02:00
02:00
02:00
02:00
02:00
02:01
02:01
02:01
02:01
02:01
02:01
02:01
02:01
02:01
02:01
02:01
02:01
02:01
02:01
02:01
02:01
02:01



JOHN MONAGHAN

individual's inability to breathe can cause death, correct?

A.    Many things can.  Yes, it can.

Q.    So I'm going to ask you again just for that very particular question.

You would agree with me that the physical force used by officers that can compress diaphragm and restrict the airways of an individual can cause death, correct?

A.    I'm going to answer by saying that this is completely irrelevant to this case, that this man did not die of asphyxiation, and none of the discussion regarding asphyxiation is relative to this case at all.

There is a thousand ways for people to die, and what you described is one of them.

Q.    Are you finished with your commentary, sir?

A.    That's my answer.

Q.    I'm going to ask you again, a very simple answer for a very simple question.  And this is a broad, unpointed question, sir. Would you agree with me that physical force used by police officers that compresses the



JOHN MONAGHAN

diaphragm of an individual and restricts the    02:02

airways of that individual, that force can      02:02

cause death?                                     02:02

MS. ALTERMAN:  Objection.                        02:02

THE WITNESS:  It can.                            02:02

Q.    So compressional asphyxiation in a         02:03

man in the immediate wake of a seizure, are you  02:03

stating that that is not readily capable of      02:03

causing death in your expert opinion?            02:03

MS. ALTERMAN:  Objection.                        02:03

THE WITNESS:  I'm saying it's                    02:03

entirely irrelevant to this case.  I don't       02:03

know why we're discussing it.  It has            02:03

nothing to do with this case.  The man did       02:03

not die of asphyxiation.                         02:03

BY MR. AMRHEIN:                                  02:03

Q.    Sir, are a medical professional?           02:03

A.    No, but I know what he died from and       02:03

it was not asphyxiation.                         02:03

Q.    In fact, what did he die from, sir?        02:03

A.    It's in the report; the ME gave a          02:03

conclusion.                                      02:03

Q.    What is your recollection of that          02:03

conclusion?                                      02:03



JOHN MONAGHAN

A.    I'm sorry?

Q.    What is your recollection of that conclusion, sir?

A.    Okay.  Hold on.  I'll look it up. It's in my report.

Q.    I'm aware, but as you sit here today, what is your recollection?

A.    Well, my recollection is specifically that he did not asphyxiate. That's the extent of my recollection.

That this whole discussion regarding positional asphyxiation is irrelevant to this case.

Q.    And again, you're not a medical professional, correct, or not?

A.    I'm a police professional and compression of the diaphragm is irrelevant to this case entirely.  I don't know why --

Q.    You're talking about force -- so force used by officers from an individual in a prone position, compressional asphyxiation has no relevance to that, sir?

A.    No relevance to this case whatsoever.



JOHN MONAGHAN

Q.    What evidence do you cite, sir, that there is no relevance of compressional asphyxiation?

A.    The autopsy.  The ME's statement.  "ME" meaning medical examiner.

Q.    I understand, sir.  Thank you for clarifying for the record.

A.    You're welcome.

Q.    Again, sir, you're aware that the cause of death was considered to be a sudden death?

MS. ALTERMAN:  Objection.

Q.    And as a contributing factor, it talks about the physical struggle with officers?  Are you aware of that, sir?

A.    I'm aware that asphyxiation was not listed.  And compressional and positional asphyxiation has nothing to do with this case, 100 percent.

Q.    Sir, you previously testified that you're aware that Lieutenant Mark Bergery testified in his deposition, which you read in preparation for your report, that compressional asphyxiation and positional restraint weren't



JOHN MONAGHAN

part of PAPD training when this event occurred                02:05
in April of 2019, isn't that right?                          02:05

A.    I didn't agree with that.  No.  No.            02:05

Q.    You didn't testify to -- that that            02:05
was included in the testimony that you reviewed              02:05
in preparing this Rule 26 report?                            02:05

A.    There was a number of testimonies of          02:05
his you brought up, and I said yes to.  But one              02:06
of the first ones, I don't believe I did,                    02:06
because it's not accurate.                                   02:06

Q.    Sir, I'll represent to you that you           02:06
did confirm that he did testify to that?                     02:06

A.    I don't want to argue back.                   02:06

Q.    In the middle of page 14, do you see          02:06
that it starts out saying, "It should be noted               02:06
here that after their extensive and                          02:06
professional investigation," and you're                      02:06
referring to the OAG's report, do you see that?              02:06

A.    I see that.                                    02:06

Q.    So based upon your compliments of             02:06
your report for their extensive and                          02:07
professional investigation, do you agree with                02:07
the OAG's report, which concluded that the PAPD              02:07
officers' use of force likely contributed to                 02:07



                        JOHN MONAGHAN

the death of Mr. Lagoda?                                    02:07

        A.    I take exception to one word,                02:07

"like."  The AOG put that in there, the ME did             02:07

not say that.  So, no, I can't completely agree           02:07

with that.                                                 02:07

        Q.    So do you agree that it contributed          02:07

to the death of Mr. Lagoda?                                02:07

        A.    Yes.                                         02:07

        Q.    So I'll -- just for the clarity of           02:07

the transcript, I'll just ask a clean question            02:07

again.                                                     02:07

              Do you agree that the OAG's -- do            02:07

you agree with the OAG's report -- pardon me.              02:07

Strike that.                                               02:07

              Sir, do you agree that the use of            02:07

force by the PAPD officers contributed to the              02:07

death of Mr. Lagoda?                                       02:07

        A.    To some extent, yes.                         02:08

        Q.    And your report notes that the OAG's         02:08

report was extensive and -- an extensive and              02:08

professional investigation, correct?                      02:08

        A.    Correct.                                     02:08

        Q.    Next to my cursor here on the                02:08

screen, sir, the latter third of page 14 of               02:08



JOHN MONAGHAN

your report states that "it is highly unlikely    02:08

that the law would regard the officer's use of    02:08

force to be 'readily capable of causing death    02:08

or serious physical injury.'"    02:08

Do you see that, sir?    02:08

A.    Yes.    02:08

Q.    And that's a quote from the Attorney    02:08

General's report; is that right?    02:08

A.    Yes.    02:09

Q.    At the bottom of the page you    02:09

continue quoting the AG's report stating, "It    02:09

would be difficult to conclude and even more    02:09

difficult to prove that the use of force was    02:09

unjustified."    02:09

Did I read that correctly?"    02:09

A.    Yes.    02:09

Q.    Sir, are you an attorney?    02:09

A.    No.    02:09

Q.    Have you ever worked as an attorney    02:09

for the New York Attorney General's Office?    02:09

A.    No.    02:09

Q.    Are you aware that the material you    02:09

are citing here is a technical, legal    02:09

determination made by attorneys regarding a    02:09



JOHN MONAGHAN

criminal investigation?                                         02:09

A.    It's the AG's report on this                              02:09

incident.                                                       02:09

Q.    And so you're aware that the                              02:09

material you're citing there is a legal                         02:09

determination made by attorneys in a criminal                  02:09

investigation?                                                  02:09

A.    As it regards to police science,                         02:09

yes.                                                            02:10

Q.    Sir, how many times in your law                          02:10

enforcement career have you witnessed an                       02:10

officer admit that his or her use of force was                 02:10

not justified and not in compliance with police                02:10

policy and procedure?                                           02:10

A.    It's happened a few times.  Not                          02:10

often, but it has.                                              02:10

Q.    Count it on one hand?                                     02:10

A.    I couldn't give you a number, I                          02:10

don't know.                                                     02:10

Q.    And how often would you say use of                       02:10

-- in your 20 years experience, how often would               02:10

you say that officers use force when on duty                   02:10

every day?                                                      02:10

A.    For each individual officer or as a                      02:10



JOHN MONAGHAN

department as a whole?                                    02:10

Q.    As a department as a whole?                         02:10

A.    Oh, yeah, many times a day.                         02:10

Q.    Well, just count on one hand the                    02:10
amount of times that an officer admits that his           02:10
or her use of force was not justified and not             02:10
in compliance, is that your testimony?                    02:11

A.    Yes, that's correct.                                02:11

Q.    Sir, am I correct that at the top of                02:11
page 15 that it says -- there is a new heading,           02:11
"Force used was not the cause of death."                  02:11

      Did I read that correctly?                          02:11

A.    Yes.                                                02:11

Q.    I know we discussed this a little                   02:11
bit before; sir, you're not a doctor, correct?           02:11

A.    No.                                                 02:11

Q.    You've never gone to medical cool?                  02:11

A.    No.                                                 02:11

Q.    You never graduated from medical                    02:11
school?                                                   02:11

A.    No.                                                 02:11

Q.    You've never done a medical                         02:11
residency, right?                                         02:11

A.    That's correct.                                     02:11



JOHN MONAGHAN

Q.    Have you ever served as a medical examiner?

A.    No.

Q.    Are you board certified in anatomical pathology?

A.    No.

Q.    How about clinical pathology?

A.    No.

Q.    About forensic pathology?

A.    No.

Q.    Given that you have no medical background, what is the basis for your medical opinion for the cause of Mr. Lagoda's death?

MS. ALTERMAN:  Objection.  You can answer.

THE WITNESS:  My study of the evidence in this case.

Q.    And again, you're not a medical professional, correct?

A.    No.

Q.    Your report comments extensively on Dr. Yvonne Milewski, who is the NY medical examiner who provided the autopsy report in this matter.



JOHN MONAGHAN

Do you recall that, sir?    02:12

A.    Yes.    02:12

Q.    And starting in the first paragraph of the report it states, "Notwithstanding the AG's assertion that the force used likely contributed to Mr. Lagoda's death, the medical examiner Dr. Yvonne Milewski did not make that statement."    02:12

Did I read that correctly?    02:12

A.    Yes.    02:12

Q.    Are you aware that just a few lines later in your report you acknowledge that Dr. Milewski's report under "Opinion" identifies the other significant conditions relating to Mr. Lagoda's death, including physical struggle/altercation with blunt impacts, and identifies the manner of death as homicide?    02:12 02:13

A.    Are you pointing to a specific place in my report?    02:13

Q.    I'm saying, sir, you acknowledge here that physical struggle and altercation with blunt impact was cited as a contributing factor by Dr. Milewski?    02:13



JOHN MONAGHAN

A.    Yes.

Q.    Am I correct based upon your review of the Dr. Milewski's autopsy report that she classified the manner of death as homicide?

A.    Yes.

Q.    Sir, at the bottom of page 15 you cite footnote 18.

Did you see that?

A.    I do.

Q.    It is the PIU investigative action report.

And in the second full paragraph, that's where you first cite it, I'm talking about Dr. Milewski's meeting with investigators to discuss the preliminary findings of the autopsy of Mr. Lagoda.

Do you see that?

A.    I do.

Q.    Sir, you are aware that this is a set of notes about an investigator's conversation with Dr. Milewski, it's not a transcript, correct?

A.    Okay.  Yes.

Q.    So anywhere where you state

02:13
02:13
02:13
02:13
02:13
02:13
02:14
02:14
02:14
02:14
02:14
02:14
02:14
02:14
02:14
02:14
02:14
02:14
02:14
02:14
02:14
02:14
02:14



JOHN MONAGHAN

"Dr. Milewski went on to clarify" or                          02:14

"Dr. Milewski explained," you're simply                      02:14

referring to some of these notes of what was                 02:14

alledgedly said by Dr. Milewski, isn't that                  02:14

right?                                                       02:15

       MS. ALTERMAN:  Objection.  You can     02:15

   answer.                                         02:15

       THE WITNESS:  They're reflected in      02:15

   her autopsy.  They don't stand alone.          02:15

   Q.   Sir, you've cited for this purpose          02:15

only, Dr. Milewski's investigative report                    02:15

regarding Dr. Milewski, and you've pulled                    02:15

directly from that report, isn't that right?                 02:15

   A.   That's correct.                            02:15

   Q.   And so you're aware that that report        02:15

is not a transcript, nor is it direct quotes                 02:15

from Dr. Milewski, it is somebody's notes about              02:15

what was alledgedly said during that                         02:15

investigation -- investigative interview,                    02:15

correct?                                                     02:15

       MS. ALTERMAN:  Objection.  You can     02:15

   answer.                                         02:15

       THE WITNESS:  That is the nature of    02:15

   document PA1683, correct.                       02:15



JOHN MONAGHAN

Q.    In the last sentence of the second paragraph on this page you say "The doctor went on to explain that the force applied by Lagoda by -- applied to Lagoda by the PAPD police officers at the scene, would not have been enough to kill an otherwise healthy person."

Do you see that?

A.    I do.

Q.    And that was right after you cited footnote 18, correct?

A.    Correct.

Q.    So the basis of that statement is not a transcript of anything that Dr. Milewski said, it was, instead, somebody's notes on what Dr. Milewski may or may not have said, isn't that right?

MS. ALTERMAN:  Objection.  You can answer.

THE WITNESS:  That describes it, yes.

Q.    So you're not certain that Dr. Milewski went on to explain that, right?

MS. ALTERMAN:  Objection.  You can answer.



JOHN MONAGHAN

THE WITNESS:  Yes, I am certain.    02:16

Because they're not in a transcript    02:16
doesn't make the notes invalid, not worthy    02:16
of being cited in my report.    02:16

BY MR. AMRHEIN:    02:16

Q.    I'm not stating that.  But that's    02:16
not direct quote; saying "she went on to    02:17
explain," that's not a direct quote, correct?    02:17

A.    There is no quotation marks on that    02:17
sentence.  I don't understand your point.    02:17

Q.    You're citing the documents PA1683,    02:17
in the PIU investigative action report, which    02:17
is Dr. Milewski's meeting with investigators.    02:17
You are saying, "Dr. Milewski went on to    02:17
explain."    02:17

There are no quotes in that document    02:17
you're referencing from Dr. Milewski explaining    02:17
that the force applied to Lagoda by the PAPD    02:17
police officers at the scene would not have    02:17
been enough to kill an otherwise healthy    02:17
person, correct?  There is no quote from    02:17
Dr. Milewski saying that, right?    02:17

A.    There is no quotes in this part of    02:17
the report.  I don't understand your point.    02:17



JOHN MONAGHAN

Q.    I'm simply saying that the document you're using as the foundation of that statement there is not based upon a quote from Dr. Milewski, it is based upon notes taken from a conversation with Dr. Milewski, notes taken by somebody not made by Dr. Milewski, isn't that right?

A.    That is an accurate description of document PA1683, yes.

Q.    So you realize on the night of April 12, 2019, Mr. Lagoda had suffered a seizure, and that was the basis of Officer Bugiada's response, correct?

A.    Initially, yes.

Q.    I said Officer Bugiada's response, isn't that right?

A.    Yes.

Q.    You would agree with me that physical force used by officers that compresses an individual's diaphragm can cause death, right?  You agreed to that earlier?

A.    I said that not to this case. Anything can cause -- a lot of things can cause death, and you keep mentioning something that's

02:17
02:17
02:17
02:17
02:17
02:17
02:18
02:18
02:18
02:18
02:18
02:18
02:18
02:18
02:18
02:18
02:18
02:18
02:18
02:18
02:18
02:18
02:18
02:18
02:18



JOHN MONAGHAN

entirely irrelevant to this case.    02:18

Q.   Sir, I'm asking you a very simple question:  Can compression of a diaphragm preventing an individual from being able to breathe, can that cause death?

MS. ALTERMAN:  Objection.  You can answer.

THE WITNESS:  Not relevant to this case, but along with many, many other things, yes, it can.

Q.   So your answer is yes, it can?

A.   Read back my answer; don't reclassify.

Do you want me to give you the same answer again?  It's irrelevant to this case, and I don't know why you are bringing it up.

So a lot of these things can cause death.  So, yes, it's possible.

Q.   So is compressional asphyxiation of a man in the immediate wake of a seizure, is that readily capable of causing death in your expert opinion?

A.   Yes.

MS. ALTERMAN:  Objection.



JOHN MONAGHAN

THE WITNESS:  Yes.  Well, no, not readily --                                                                    02:19

Q.   So the second full paragraph of page 15.  Here again, it discusses Dr. Milewski's meeting with the OAG's report or the OAG's investigators.                                                                    02:19

You then go on at the -- in the third line stating that "Mr. Lagoda did not suffer any broken bones."                                                                    02:19

Did I read that correctly?                                                                    02:19

A.   Yes.                                                                    02:20

Q.   You're aware that there was a second autopsy conducted that found that Mr. Lagoda had actually fractured ribs?                                                                    02:20

A.   No, I didn't know that.                                                                    02:20

Q.   And your report states that Dr. Milewski went on to explain that the force applied -- strike that.                                                                    02:20

Again, you're aware that Mr. Lagoda had suffered a seizure on board the flight that night, which the OAG's report concluded that Mr. Lagoda was in a medically vulnerable state as a result of that seizure, correct?                                                                    02:20

A.   I know he had a seizure.  Did the                                                                    02:20



JOHN MONAGHAN

OAG use that phrase, medically vulnerable?  I don't -- can you give more specifics with that one, I don't recall that.

Q.    I believe it was uniquely vulnerable condition in the immediate wake of a seizure is the specific.

Do you recall reading that, sir, in the OAG's report?

A.    No, I don't.  I know he had a seizure on board the plane.

Q.    In the first paragraph, sir, you say Dr. Milewski went on to clarify and Dr. Milewski went on to explain.

Do you see that portion of the paragraph?

A.    Yes.

Q.    You're aware that the investigator's notes, a portion of it was omitted from this portion; in particular, the notes say -- regarding homicide, that the meeting -- that the meaning of it, in terms of Dr. Milewski, was that the actions of a person contributed to the death of another; and that as determined by Dr. Milewski, that differs from the typical



JOHN MONAGHAN

definition of homicide, because it just simply does not take into account the actions of individuals who may have contributed to the death.

Do you recall that, reading that in the investigator's notes?

A.    Not word-for-word, no, I don't.

Q.    But are you aware of Dr. Milewski's distinction that her designation of homicide is consistent with that analysis -- others have contributed to the death of -- others contributed to the death of Mr. Lagoda, her report simply does not opine on the intentions of the individuals?

MS. ALTERMAN:  Objection.  You can answer.

THE WITNESS:  Yes.

Q.    Am I correct that Dr. Milewski's determination of homicide is simply focused on whether a death occurred on its own, versus the actions of another contributing to it?

A.    Right, it's other than natural.

Q.    In the next paragraph you say that, "It is implausible to consider that the force



JOHN MONAGHAN

used by the officers contributed to    02:23

Mr. Lagoda's death when taking into account    02:23

Mr. Lagoda's erratic, medical, and physical    02:23

conditions prior to his interactions with    02:23

police."    02:23

Q.    Did I read that correctly?    02:23

A.    You did.    02:23

Q.    And again, sir, you're not a medical    02:23

professional, correct?    02:23

A.    No.    02:23

Q.    You are aware that the Attorney    02:23

General's Office, as well as evidence on the    02:23

record has found -- has determined that    02:23

Mr. Lagoda was in a medically vulnerable and    02:23

compromised state when the Port Authority    02:23

police officers physically engaged him,    02:23

correct?    02:23

MS. ALTERMAN:  Objection.  You can    02:23

answer.    02:23

THE WITNESS:  Again, I'm not sure    02:23

that phrase that you're coming up with -- I    02:23

don't -- no, I don't know where that came    02:23

from.    02:23

Q.    So you're not aware of that evidence    02:24



JOHN MONAGHAN

even though you reviewed the documents in

preparation for your Rule 26 report?

    A.    That's correct.

    Q.    Directing your focus to the top of

page 16 of your report, sir, do you see where

it says Attendant Kareem Aarndel?

    A.    Yes.

    Q.    You're aware that Mr. Aarndel is a

flight attendant, correct?

    A.    Yes.

    Q.    You're aware that there is nothing

in the record that shows Mr. Aarndel is a

medical professional, correct?

    A.    Correct.

    Q.    You then include a quote just

shortly after that from one of the nurses who

was a passenger on the flight and who had

attempted to aid Mr. Lagoda.  The name is

Nathana Wright-Reid.

    Do you see that sir?

    A.    Yes.

    Q.    Included in your excerpt quote it

says, "like he was fine.  That is why I was

explaining to him that you good.  You had a



JOHN MONAGHAN

seizure, but it looks like you're okay."

Did I read that?

A.    Yes.

Q.    And she said, "By the time I could finish he hit me and then it was just all hell broke loose."

Did I conclude that quote?

A.    Yes.

Q.    Given that you've cited Ms. Nathana Wright-Reid's deposition testimony in your report, I would assume that it's safe to say that you reviewed her deposition testimony in deposition transcript form prior to preparing your Rule 26 report?

A.    Yes.

Q.    Are you aware that Ms. Wright-Reid testified under oath that she had never treated anybody for a seizure at that point in her career as a nurse?

A.    No, I didn't know that.

Q.    Were you aware that she did testify that as a part of her training as a nurse and as a nurse that she did know that someone who has just suffered a seizure may be confused and



JOHN MONAGHAN

disoriented?

Do you recall that testimony, sir?

A.    It sounds familiar.

Q.    Are you aware that she also testified that she observed Mr. Lagoda to be being disoriented and confused when he stood up, and that this is a common response after a seizure, based on what she had learned on becoming a nurse; do you recall that testimony?

A.    No, I don't recall her saying that.

Q.    Do you recall that she also testified that even after Mr. Lagoda struck her, she stayed to help Mr. Lagoda, because it was an on-going medical event; do you recall that testimony?

A.    No.

Q.    Sir, are you aware that she testified under oath that day, that you cited her deposition transcript she testified that she was oath, correct?

A.    Correct.

Q.    Was there any reason that you didn't include that testimony that I just provided to you, is there any reason you did not include



JOHN MONAGHAN                                    September 16, 2024
TARASOV vs PORT AUTHORITY OF NEW YORK                      212

JOHN MONAGHAN

that as well?                                              02:27

A.    Again, the report would go on            02:27
forever if I just include everybody's           02:27
testimony, all of their testimony.               02:27

Q.    But wouldn't you agree that that          02:27
provides substantial context to the quote that   02:27
you're saying that you've provided here; that    02:27
he was fine, he hit her and all hell broke       02:27
loose; she clarified that he was disoriented,    02:27
confused, and that's a common response after     02:27
coming out of a seizure; that even after being   02:27
hit she stayed and helped him because it was an  02:28
ongoing medical event?                           02:28

You don't think that that provides     02:28
substantial background as to Ms. Nathana         02:28
Wright-Reid's testimony, as well as the context  02:28
of the events that night?                        02:28

MS. ALTERMAN:  Objection.  You can      02:28
answer.                                          02:28

THE WITNESS:  No, it would not have.    02:28

Q.    The bottom of page 16 and now at the      02:28
top of page 17, your report makes a note         02:28
starting with, "Once the officers had            02:28
handcuffed Mr. Lagoda," correct?                 02:28



JOHN MONAGHAN

A.    Yes.                                                02:28

Q.    Did I read that correctly?  Sorry.           02:28

A.    Yes.                                                02:28

Q.    We had discussed this awhile back, sir, but are you aware that the report -- that your own report states that within a minute of handcuffing, that the PAPD officers noticed Mr. Lagoda was turning blue and did not appear to be breathing, within a minute of handcuffing?                                            02:28 02:29

A.    Yes.                                                02:29

Q.    Are you aware that this is consistent with the OAG's report that less than a minute of handcuffing -- or, sorry, less than a minute of handcuffing, Mr. Lagoda was blue and was not breathing; are you aware of that?    02:29

A.    You're referencing my report or the AG's report?                                          02:29

Q.    Are you aware that your report, which later states that within a minute of handcuffing, the PAPD officers noticed Mr. Lagoda was turning blue and did not appear to be breathing.                                       02:29

You stated that you are aware that           02:29



JOHN MONAGHAN

your report states that.                                    02:29

I said, are you aware that that                             02:29
portion of your report is consistent with the              02:29
OAG's report that states that less than a                  02:29
minute of handcuffing -- or less than a minute             02:29
after handcuffing Mr. Lagoda was turning blue              02:30
and was not breathing.                                      02:30

Are you aware of that consistency                          02:30
with the OAG's report?                                      02:30

A.    Okay.  It says "a few minutes" in a                  02:30
couple of different places.  Your expert says              02:30
"a few minutes."  I think I said "a few                     02:30
minutes," at one point.                                     02:30

Here, it says, "Once the officers                          02:30
had handcuffed," I don't see a timeframe.                   02:30

You are on the bottom of page 16,                          02:30
right.                                                      02:30

Q.    The bottom of page 16.                               02:30

I'm simply saying once the officers                        02:30
handcuffed Mr. Lagoda my initial question was              02:30
how we covered it beforehand.  You had said a              02:30
few minutes beforehand, you said once the                  02:30
officers had handcuffs.                                     02:30

You're aware that your own report,                         02:30



JOHN MONAGHAN

later in the report is inconsistent with this

portion of your report?

A.   I'm not.

Q.   The previous portion of the report?

A.   I'm not.

Q.   I'm going to get to that point, sir.

Are you aware --

A.   Well, I can't answer your question.

Q.   This is a deposition, sir, it starts and stops with me.

The direction of your deposition starts and stops with me; this is not your deposition, sir, respectfully.

So I will cover that eventually.

But for now, I'm simply asking:  Are you aware that your report later contradicts these statements regarding the timing of the handcuffing and when the officers noticed that Mr. Lagoda was blue and not breathing?

MS. ALTERMAN:  Objection.  You can answer.

THE WITNESS:  I know that the timeframe is described by a number of different people in the case, all within



JOHN MONAGHAN

the frame of minute, a few minutes, less    02:31

than a minute, about a minute.    02:31

Specifically, I can't answer.    02:31

BY MR. AMRHEIN:    02:31

Q.    Do you see the top bullet point on    02:31
page 17, sir, the one that starts, "In his    02:31
statement"?    02:31

A.    Yes.    02:31

Q.    Your report notes that this is    02:31
information taken from a statement made by    02:31
Sergeant Vaughn, correct?    02:31

A.    Yes.    02:32

Q.    Are you aware this actually isn't a    02:32
statement by Sergeant Vaughn prepared by    02:32
Sergeant Vaughn, it's actually notes made by an    02:32
interview after speaking with someone?    02:32

A.    It's exactly what it says on that    02:32
page, "in his statement to the investigators."    02:32

Q.    I understand, sir.    02:32

Are you aware that this is not a    02:32
transcript or a set of direct quotes from    02:32
Mr. -- or, excuse me, Sergeant Vaughn, it is    02:32
instead, an investigator's set of notes after    02:32
speaking with Sergeant Vaughn?    02:32



JOHN MONAGHAN

A.    I'm confused by your question.                                  02:32

Exactly what it says on the page, "A                                  02:32
statement to investigators."  It doesn't say it                      02:32
was a transcript.  It doesn't say testimony.                         02:32

I'm confused by your question.                                       02:32

Q.    I'm specifically getting at this,                              02:32
sir, you're aware this is not a transcript from                      02:32
Mr. Vaughn, this is simply a set of notes taken                      02:32
by investigators after speaking with Sergeant                        02:33
Vaughn, you're aware of that, correct?                               02:33

A.    I'm sorry, we can just let it speak                            02:33
for itself.  It's a statement to investigators.                      02:33
That agrees with your description, yes?                              02:33

Q.    This is not your deposition, again,                            02:33
sir, you're not in a position to be asking                           02:33
questions.                                                           02:33

A.    Okay.  It's not a transcript.  I                              02:33
didn't claim it was a transcript.                                    02:33

Q.    I'm -- just for clarity sake, I'm                             02:33
going to ask it again.  It's a very simple                           02:33
question, sir.                                                        02:33

Are you aware that the statement                                     02:33
you're referring to here was not prepared by                         02:33
Sergeant Vaughn?                                                     02:33



JOHN MONAGHAN

A.    It was made by Sergeant Vaughn and documented by an investigator, correct.

Q.    It was not prepared by Sergeant Vaughn, correct?

A.    It was stated by Sergeant Vaughn and documented by an investigator.

Q.    So the Sergeant Vaughn did not document this -- the information contained in that statement, correct?

A.    Right.

Q.    It was captured and written by somebody other than Sergeant Vaughn, correct?

A.    By an investigator, yes.

Q.    And Sergeant Vaughn was not the one who documented that statement, correct, he did not prepare it himself?

A.    He's the one that made the statement.

Q.    Again, he did not -- sir, you're being invasive.

A.    No, I'm not.

MS. ALTERMAN:  Wait.  Wait.

Q.    So I'm going to ask again this again.



JOHN MONAGHAN

Sir, You're preparing -- you're asking about a PAPD --                                    02:34

MS. ALTERMAN:  If you have a question -- wait.  Wait.                                    02:34

I want to put my objection on the record before you continue and re-ask the same question.                                    02:34

He's answering your questions. We're not going to be argumentative.                                    02:34

If you don't like the answer, then you don't like the answer, but he is answering your question.                                    02:34

MR. AMRHEIN:  Cheryl, respectfully, if he were answering my question, I would have already moved on.  He's not.                                    02:34

MS. ALTERMAN:  I believe he did answer your question, but you can re-ask your question again, but we're not going to get into an argument about whether or not his answer, in your opinion, is evasive. He has answered your question.                                    02:35

MR. AMRHEIN:  And that's your opinion, and you're getting into -- you're starting an argument about whether or not                                    02:35



JOHN MONAGHAN

he did answer the question properly, while

insinuating that I'm starting it.

So I object to your objection and

I'm going to ask it again.

BY MR. AMRHEIN:

Q.    Sir, am I correct that the document

you refer to here talking about Sergeant

Vaughn's statements to the AG and PAPD

investigators -- Sergeant Vaughn did not put

pen to paper, correct?

A.    Correct.

Q.    The contents of that, as you call it

"statement," it was not actually written by

Sergeant Vaughn, correct?

A.    Correct.

Q.    Now, the interviewer's notes of

Sergeant Vaughn's statements state that -- as

you say here, "That Mr. Lagoda was lying on the

floor with the head to the right and feet to

the left, and the face was red, (flushed) from

his nose down around his mouth, he did not know

if he was cuffed or not."

Did I read that correctly?

A.    You did.



JOHN MONAGHAN

Q.    Are you aware that the "statements"    02:36

as you refer to it, sir, also included, by the    02:36

end of your notes, that Sergeant Vaughn had    02:36

arrived at CRP on Mr. Lagoda had already begun;    02:36

meaning, that after he Mr. Lagoda had already    02:36

turned blue and he was not breathing.    02:36

Are you aware of that?    02:36

MS. ALTERMAN:  Objection.  You can    02:36

answer.    02:36

THE WITNESS:  I'm not aware of that.    02:36

Q.    But you read his statement prepared    02:36

by the PAPD investigators before preparing this    02:37

report, correct?    02:37

A.    Yes.    02:37

Q.    Is there a reason why you didn't    02:37

include that specific timeframe for Sergeant    02:37

Vaughn's arrival in this section?    02:37

A.    I don't recall that being in there.    02:37

Q.    In the second bullet point, your    02:37

report notes that this information is taken    02:37

from a statement made by Sergeant Mitchell,    02:37

correct?    02:37

A.    Correct.    02:37

Q.    And again, this was not Sergeant    02:37



JOHN MONAGHAN

Mitchell putting pen to paper, correct?                02:37

A.    Correct.                                          02:37

Q.    This was Sergeant Mitchell gave a                 02:37
statement to PAPD investigators, and the               02:37
investigators prepared the documents -- or             02:37
wrote the document that you're referencing,            02:37
correct?                                               02:37

A.    Correct.                                          02:37

Q.    You said that "Sergeant Mitchell                  02:37
stated that he entered the plane after Sergeant        02:37
Vaughn who informed Sergeant Mitchell that the         02:37
situation was under control and that the person        02:37
(Mr. Lagoda) had been maced and to send EMS to         02:38
the base, they would bring the prisoner there."        02:38

Did I read that correctly?                             02:38

A.    You did.                                          02:38

Q.    Are you aware that Sergeant                       02:38
Mitchell's statement or the information                02:38
contained within the statement about Sergeant          02:38
Mitchell stated that he never put eyes on the          02:38
aid of Mr. Lagoda, he never saw him?                   02:38

A.    It doesn't state that he did.                     02:38

That claim is not made in that                         02:38
bullet point.                                          02:38



JOHN MONAGHAN

Q.    I'm simply saying:  Are you aware of    02:38

that, sir?                                        02:38

A.    Very much, yes.                         02:38

Q.    How do you reconcile that with the      02:38

sentence I'm highlighting here, sir, "Not only    02:39

did Mr. Lagoda continue fighting with the          02:39

officers, but both patrol supervisors; meaning,    02:39

Sergeant Vaughn and Sergeant Mitchell, had         02:39

boarded the plane, stepped aside to allow a        02:39

number of involved officers to leave the back      02:39

of the plane, and then made observations of the    02:39

restrained Mr. Lagoda, who did not evince any      02:39

signs of another medical episode."                 02:39

Am I correct that you just testified    02:39

that you're aware that Sergeant Mitchell is --      02:39

the statement states that he never laid eyes on    02:39

the aided Mr. Lagoda?                              02:39

MS. ALTERMAN:  Objection.                02:39

THE WITNESS:  No, it's a good point.     02:39

Vaughn made a direct observation.        02:39

Mitchell's observation was of the        02:39

information given to him by Vaughn.       02:39

That sentence, the one you just         02:39

read, "and then made observations," the    02:39



JOHN MONAGHAN                                    September 16, 2024
TARASOV vs PORT AUTHORITY OF NEW YORK                         224

                        JOHN MONAGHAN

     second half of, "of the restrained                       02:39

     Mr. Lagoda, that does really go to                       02:40

     Mitchell, you're right -- to Vaughn,                     02:40

     rather, not to Mitchell."                                02:40

BY MR. AMRHEIN:                                               02:40

     Q.    No, I appreciate your clarification,               02:40

sir.  Thank you.                                              02:40

          I want to focus on the portion of                  02:40

that last sentence where it states that --                   02:40

strike that.                                                 02:40

          Sorry.  Starting at the beginning of               02:40

that paragraph where you say, "It is apparent                02:40

that Mr. Lagoda was handcuffed" or, excuse me,               02:40

"It is apparent that after Mr. Lagoda was                    02:40

handcuffed, he did not evince any signs of                   02:40

another medical episode."                                    02:40

          Did I read that correctly?                         02:40

     A.    Yes.                                               02:40

     Q.    Again, sir, as we've covered, you're              02:40

not a trained medical professional, correct?                 02:40

     A.    Correct.                                           02:40

     Q.    So what is the basis of your medical              02:40

conclusion that Mr. Lagoda did not evince any                02:40

signs of another medical episode?                            02:41



JOHN MONAGHAN

A.    That's not a medical conclusion to say that he did evince any signs, that's not a medical one, that's a police observation.

But normally, first after --

Q.    You are saying "evince any signs of another medical episode"?

A.    Right.

Q.    So you're saying that the officers weren't able to make a determination whether or not Mr. Lagoda was suffering a medical episode at that point?

I'm trying to get your clarification here.

MS. ALTERMAN:  Objection.

THE WITNESS:  There was no evidence, so...

Q.    And again, you're stating that as somebody who doesn't have a background in medical, in the medical profession, correct?

A.    My background is in noticing these signs though.  Yes, you're right, not a medical background.

Q.    And in there, as we covered in this sentence -- or excuse me, as we covered



JOHN MONAGHAN

previously, Sergeant Vaughn is a part of what

was included in that statement, but he had

arrived after CPR had already begun on

Mr. Lagoda, correct?

A.    I didn't see that in his statement.
You had mentioned it, but I said I didn't
recall seeing that.

Q.    Sir, would you agree with me that
the record shows that CPR was performed by the
officers because Mr. Lagoda had already turned
blue and was not breathing, and the officers
took the steps to try to provide medical care
to Mr. Lagoda as a result?

A.    That was after.

Q.    Correct.  After he had already been
determined to be blue and was not breathing,
correct?

MS. ALTERMAN:  Objection.  You can
answer.

THE WITNESS:  That happened sometime
after he was handcuffed.

There was a window of time, which is
described here, that Sergeant Vaughn does
and that I described in the report, where



JOHN MONAGHAN

he was handcuffed and was not turning blue.

Q. Sir, respectfully Sergeant Vaughn, as I stated beforehand, the report prepared by the PAPD investigators with respect to Sergeant Vaughn's statements, includes a reference that Sergeant Vaughn arrived after CPR had already begun.

A. No, I didn't say that.

Q. No. Meaning, that Mr. Lagoda had already turned blue and had already been determined to not have been breathing.

So at the time of Sergeant Vaughn's arrival, Mr. Lagoda had already gone through neck turning blue, not being able to breathe, CPR; are you aware of that timeframe of Mr. Vaughn, Sergeant Vaughn?

A. I'm not aware of that.

Q. Knowing that now, how does that change your testimony, your expert report with respect to the first bullet point and the timeframe of Sergeant Vaughn's arrival?

MS. ALTERMAN: Objection.

THE WITNESS: My report doesn't change in that the handcuffing occurred,



JOHN MONAGHAN

the man struggles continued, he did not turn blue immediately.

There was a window of time.

Now, Sergeant Vaughn's observations, I believe they were made during that segment of time.

If I'm wrong, I'm wrong.  I didn't read the report thoroughly.

But Sergeant Vaughn's observations are to illustrate that there was a window of time there; it wasn't Mr. Lagoda became handcuffed and immediately turned blue, that is not in the facts.

BY MR. AMRHEIN:

Q.    Respectfully, sir, it is in the facts, and even reflected -- it's even reflected in your report later on that "less than a minute after the handcuffs were applied to Mr. Lagoda" --

A.    That's not --

MS. ALTERMAN:  Wait.  Wait.

Q.    Less than a minute after Mr. Lagoda was handcuffed, they noticed that his neck was turning blue, rolled him over, unhandcuffed him



JOHN MONAGHAN

and proceeded with CPR.                                          02:45

Now, you're aware that after the                       02:45
officers noticed that Mr. Lagoda had turned            02:45
blue and started providing CPR, you're aware           02:45
that CPR was provided to Mr. Lagoda, correct?          02:45

A.    Correct.                                    02:45

Q.    And so Sergeant Vaughn's statements,        02:45
the statement that captures -- or excuse me,           02:45
the document that captures Sergeant Vaughn's           02:45
statements where it states that Sergeant Vaughn        02:45
had arrived after CPR had already begun, that          02:45
would indicate, sir, that Sergeant Vaughn had          02:45
already arrived after restraint had occurred,          02:45
the officers had observed that the neck was            02:45
blue, and then Mr. Lagoda had stopped                  02:45
breathing, correct?                                    02:45

MS. ALTERMAN:  Objection.  You can       02:45
answer.                                            02:45

THE WITNESS:  If that's the case,        02:45
yes.                                               02:45

Q.    Sir, in the next full paragraph on         02:45
page 17 you opine that "further evidence of the        02:46
physical force used by the PAPD officers not           02:46
being directly related to the final seizure            02:46



JOHN MONAGHAN

suffered by Mr. Lagoda, is found in the

timeline provided by the transcript of radio

transmissions documented in the Attorney

General's report."

Did I read that correctly?

A.    I'm sorry, can you just direct to me

where you are exactly?

Q.    Sure.  Do you see my cursor on the

screen?

A.    Next to "Officer Williams"?

Q.    Next to that paragraph, sir.

A.    Oh, the paragraph that starts

"timeline," okay.

Q.    The paragraph that starts with the

word of "further."

A.    Okay.

Q.    I can read it again, sir.

In the next full paragraph you opine

that "further evidence of the physical force

used by the PAPD officers not being directly

related to the final seizure suffered by

Mr. Lagoda is found in the timeline provided by

the transcripts of radio transitions documented

in the Attorney General's report."



JOHN MONAGHAN

Did I read that correctly?    02:47

A.    You did.    02:47

Q.    Sir, are you saying that Mr. Lagoda suffered a separate and final seizure?    02:47

A.    It appears that way, yes.    02:47

Q.    Can you point to evidence to suggest that Mr. Lagoda suffered two separate seizures, sir?    02:47

A.    You just read it.    02:47

Q.    So your word is the evidence?    02:47

A.    No.  The timeline in the Attorney General's report.  And if you're asking for more evidence, Ms. Wright-Reid's statement that he stood up and he looked fine to her, kind of corroborates that.    02:47 02:48

But what you're reading there is that -- there was a five-minute period of time between the time that they had him in handcuffs and the time that they both --    02:48

Q.    Sir, I think there is a bit of conclusion here.    02:48

I'm trying to get to this point.    02:48

Are you saying that Mr. Lagoda suffered two separate seizures that night,    02:48



JOHN MONAGHAN

April 12, 2019?                                          02:48

A.    I don't know how many he had, but          02:48
this was separate from the initial event,                02:48
right.                                                   02:48

Q.    So you're saying the final seizure         02:48
was separate from his initial seizure?                   02:48

A.    It appears that way, yes.                   02:48

Q.    Appears that way based upon what in         02:48
particular?  I know you're saying Attorney               02:48
General's report and dispatcher transmissions.           02:48

What specifically are you citing as           02:48
evidence, because there is no citations in               02:48
here?                                                    02:48

A.    Okay.  The nurse that we talked            02:48
about earlier, Ms. Wright-Reid.                          02:48

Q.    Correct.                                    02:49

A.    I cited it earlier.  I think on            02:49
page 1 even that he had recovered -- and it was          02:49
-- I think it's the very first cite, the very            02:49
first cite on page 1.                                    02:49

The second paragraph, second                   02:49
sentence, "After several minutes, the seizure            02:49
began to subside," and the cite there is the             02:49
Attorney General's report, page 3, paragraph 3.          02:49



JOHN MONAGHAN

So --                                                       02:49

Q.    But I'm not --                                        02:49

A.    So he had a seizure -- I'm not                        02:49
finished.                                                   02:49

He had a seizure and he recovered by                        02:49
that seizure.  And that's noted by the nurse.               02:49
It's noted by the AG's investigative report.               02:49
It's noted by the timeline on a dispatch.                  02:49

And so --                                                   02:49

Q.    Sir, I'm not contesting whether or                    02:49
not he had a seizure at that point.                         02:49

What I'm getting to is you're saying                        02:49
that separate from that seizure, which was the              02:49
cause of the plane turning around to get into               02:49
the gate, and was the basis of Officer                      02:49
Bugiada's initial response --                               02:49

A.    No.                                                   02:49

Q.    -- discussing that seizure.                           02:49

I'm saying, your contention here                            02:49
regarding the "final seizure."                              02:49

I'm saying, you're contention here                          02:49
regarding the quote "final seizure," are you                02:49
saying that Mr. Lagoda suffered a separate,                 02:50
completely distinct seizure in addition to that            02:50



JOHN MONAGHAN

first seizure that you're referencing?                02:50

A.    That's correct.  Everything I just                02:50
cited points to his recovery from the first                02:50
seizure.                02:50

Q.    What are you citing that Mr. Lagoda                02:50
suffered a completely second seizure; that's                02:50
what I'm asking?                02:50

A.    Okay.  What I'm pointing out is that                02:50
that is -- saying it's a separate and second                02:50
seizure, that's a logical conclusion from what                02:50
I am pointing out; that he fully recovered from                02:50
the first one.                02:50

And the cites are page 1, cite 1.                02:50
Nurse Wright-Reid's statement, this timeline,                02:50
other observations, and testimony.                02:50

Q.    So you're saying you're drawing your                02:50
conclusion that he suffered a final seizure                02:50
from the evidence you gathered and take as a                02:50
whole?                02:50

A.    It was separate from the first one.                02:50

He recovered from the first one,                02:50
yes.                02:50

Q.    And, sir, we went over this, but                02:50
you're not a medical professional, correct?                02:51



JOHN MONAGHAN

A.    No.  But when a man stands up and                02:51
starts throwing punches, he has clearly                02:51
recovered from the seizure.                            02:51

Q.    Sir, you're aware of -- you cited in             02:51
Ms. Wright-Reid's -- or testimony, correct?            02:51
You recall that, right?                                02:51

A.    Yes.                                             02:51

Q.    You recall that she is a nurse,                  02:51
correct?                                               02:51

A.    Correct.                                         02:51

Q.    And you recall hearing about her                 02:51
sworn testimony that, for starters, she had            02:51
never treated anybody for a seizure at that            02:51
point in her career as a nurse, correct?               02:51

A.    Correct.                                         02:51

Q.    And you reviewed her deposition                  02:51
transcript prior to preparing your Rule 26             02:51
report, correct?                                       02:51

A.    Yes.                                             02:51

Q.    And she did -- do you also recall                02:51
that she testified as part of her training as a        02:51
nurse, she knew that someone who has just              02:51
suffered a seizure may be confused and                 02:52
disoriented?                                           02:52



JOHN MONAGHAN

A.    You read that, yes.    02:52

Q.    And that she also testified that she observed Mr. Lagoda to be disoriented and confused when he stood up, as you referenced, when he stood up, and that that was a common response after a seizure, based upon what she learned becoming a nurse?    02:52

A.    Based upon what she learned.    02:52

I don't recall her describing him as disoriented and confused.    02:52

Her description was --    02:52

Q.    However, do you recall --    02:52

A.    Hold on.  Hold on.    02:52

Q.    Excuse me, sir.  Sir.  This is my deposition, sir.    02:52

A.    On my end --    02:52

Q.    Do you recall Calvin Swinney's deposition testimony that we covered earlier today, that he stated -- sorry.  Just a second.    02:52

That Calvin Swinney stated that he observed Mr. Lagoda to be confused, disoriented, definitely out of it, and told Officer Bugiada, upon Officer Bugiada's response to the plane that Mr. Lagoda was    02:53



JOHN MONAGHAN

confused and combative?                                    02:53

       Do you recall that testimony, sir?                  02:53

A.     Yes.                                                 02:53

       MS. ALTERMAN:  And also, finish your                02:53

response prior.                                            02:53

       THE WITNESS:  Okay.  Also, that                     02:53

Nurse Wright-Reid --                                       02:53

       MR. AMRHEIN:  No, sir, there was no                 02:53

pending question.                                          02:53

       MS. ALTERMAN:  No.  He didn't get a                 02:53

chance to finish his response, and you                     02:53

asked him --                                               02:53

       MR. AMRHEIN:  Cheryl, you have an                   02:53

opportunity to question Mr. Monaghan                       02:53

afterwards and feel free to make a note                    02:53

about whatever the expected answer is, but                 02:53

at this point, there is not a pending                      02:53

question.                                                 02:53

       MS. ALTERMAN:  No, there was a                      02:53

pending -- there was a response that he                    02:54

wasn't allowed to finish, so he is going to                02:54

give his complete response now.                            02:54

       MR. AMRHEIN:  No, he's not.  This is                02:54

my deposition at this point, and I'm going                 02:54


800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

to pose a separate question to you, sir.    02:54

MS. ALTERMAN:  You can post a    02:54
question, but first, he's going to answer    02:54
the question, because he wasn't allowed to    02:54
finish his response.    02:54

And just like your witnesses were    02:54
given the opportunity to finish their    02:54
responses to questions, he's going to be    02:54
given the same opportunity.    02:54

MR. AMRHEIN:  Cheryl, that's not --    02:54
there was a moment of conflict in    02:54
Mr. DeFoe's deposition, for example, where    02:54
you cut off Mr. DeFoe.    02:54

You proceeded with asking your own    02:54
question.    02:54

Mr. DeFoe then had the opportunity    02:54
to then expand on that question, should he    02:54
need to, but you proceeded with asking your    02:54
own question to start with.    02:54

I'm going to proceed in kind and ask    02:54
my own questions to start the next line of    02:54
questioning, just as you do did.    02:54

MS. ALTERMAN:  I didn't cut    02:54
Dr. DeFoe off.  He finished his response,    02:54



JOHN MONAGHAN

and I asked him another question.

MR. AMRHEIN:  Just as I was --
that's -- I don't believe that is an
accurate capturing of what happened in --

THE WITNESS:  Well, my answer --

MR. AMRHEIN:  Mr. Monaghan, there is
no pending question in front of you.

THE WITNESS:  If you are not going
to talk over me; I'd like to finish it.

Ms. Wright-Reid said that there was
nothing wrong with him, he was fine.  He
stood up.  He had had a seizure, but it
looked like he was okay.

That was the rest of the statement.

BY MR. AMRHEIN:

Q.    And, sir, I clarified that
Ms. Wright-Reid had stated that she -- you said
that he was okay.

Ms. Wright-Reid testified that
Mr. Lagoda was confused and disoriented, isn't
that right?

A.    No.  I think she said that is what
her training told her; people coming out of
seizure might do.



800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

Q.    That is not an accurate recapturing    02:55
of what Ms. Wright's deposition testimony was.    02:55

Her deposition testimony stated that    02:55
she observed Mr. Lagoda to be that way, and    02:55
that she knew it was an on-going medical event,    02:55
and that is why even after being struck by    02:55
Mr. Lagoda, she still stayed to help him    02:56
because that was her duty as a nurse.    02:56

Knowing that testimony, sir, does    02:56
that change your perspective of how you    02:56
reconcile certain portions of your report    02:56
there?    02:56

A.    It actually corroborates what I say    02:56
in my report, because it shows a man who is no    02:56
longer in seizure, that he punched her.    02:56

Q.    Sir, you're aware that the residual    02:56
effects of a seizure puts an individual in a    02:56
medically vulnerable condition; are you aware    02:56
of that?    02:56

MS. ALTERMAN:  Objection.    02:56

THE WITNESS:  No.    02:56

Q.    And you read the Attorney General's    02:56
report, correct?    02:56

A.    I did.    02:56



JOHN MONAGHAN

Q.    So you're aware that the Attorney General's report specifically spoke about the how the Port Authority Police Department officers were not trained and should be trained on the unique vulnerability of an individual who is in a medically compromised state as a result of coming out of a seizure?

Are you aware of that?

A.    I've read it.  It doesn't make sense.

Q.    Are you aware that the AOG report, as well as a number of professionals, including Ms. Wright-Reid, have provided testimony in this matter that after an individual suffers a seizure, typical signs of post-seizure states is confusion, disorientation, agitation, and potential combativeness?

A.    That's the symptoms that may have existed, but they're not what he exhibited when Bugiada approached him.

Q.    Again, sir, you're aware that Calvin Swinney testified that he observed Mr. Lagoda to be confused, disoriented, definitely not with it, and that he told Officer Bugiada that



JOHN MONAGHAN

Mr. Lagoda was confused and combative; are you aware of that testimony?

A.    Yes.

Q.    You would agree that Mr. Lagoda was exhibiting signs of being combative in the back of the plane, isn't that right?

A.    Right.

Q.    Looking at the bottom of page and --

MR. AMRHEIN:  I think I -- before I start with this question, Cheryl, I know you had mentioned 3:00.  It's 2:59, I wanted to have an off-the-record discussion.

(Whereupon, proceedings recessed for 14 minutes at the court reporter's request and once again resumed.)

BY MR. AMRHEIN:

Q.    Just let me know when that's on the screen for you, sir?

A.    I see it.

Q.    So before we took the requested break, we were just discussing the bottom of page 17.

Do you recall that, sir?



JOHN MONAGHAN

A.    Yes.

Q.    Do you see the highlighted portion of the bottom of page 17, the start of the final paragraph there that says, "By observing the erratic nature of the manifestation of Mr. Lagoda's physical and medical condition"?

A.    Yes.

Q.    Do you see that, sir?  Did I read that correctly?

A.    Yes.

Q.    And again, sir, you're aware that there is testimony on the record from professionals, as well as information contained within the Office of the Attorney General's investigative report which confirms that an individual who has suffered a seizure, after coming out of the seizure, may show typical signs which include, confusion, disorientation, aggravation, combativeness?  You're aware of that, sir?

A.    Yes.

Q.    And you include the quote in the final line of this paragraph, "looking like he was fine."



JOHN MONAGHAN

Did I read that correctly, sir?        03:22

A.    Yes.        03:22

Q.    And that's taken from Ms. Nathana        03:22
Wright-Reid's deposition transcript?        03:22

A.    The medical profession, yes.        03:22

Q.    Yes.  She was a nurse on board the        03:22
plane, correct, sir?        03:22

A.    Was that a question?        03:22

Q.    Yes.  I said, "She was a nurse on        03:22
board the plane, correct"?        03:22

A.    Correct.        03:22

Q.    And she responded to Mr. Lagoda's        03:22
seizure, correct?        03:22

A.    Yes.        03:22

Q.    And we had already discussed that        03:22
Ms. Wright-Reid had testified as part of the        03:22
same deposition transcript, that she had never        03:22
treated anybody for a seizure at that point in        03:22
her medical career.        03:22

However, she did testify that as a        03:22
nurse, she was aware that someone who had just        03:22
suffered a seizure may be combative -- excuse        03:23
me, confused and disoriented.        03:23

You're aware of that testimony,        03:23



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

correct?                                                           03:23

A.    Correct.                                                     03:23

Q.    You're aware that she also testified                        03:23
that she observed Mr. Lagoda to be disoriented                    03:23
and confused when he stood up, and that was a                     03:23
common response after a seizure, based upon                       03:23
what she learned.                                                 03:23

You recall that testimony, correct?                        03:23

A.    That standing up?  No, I didn't read                        03:23
that.                                                              03:23

Q.    No, that Mr. Lagoda was observed to                         03:23
be confused and disoriented by Ms. Nathana                        03:23
Wright-Reid?                                                       03:23

A.    Yes.                                                         03:23

Q.    And to Ms. Nathana Wright-Reid's                            03:23
credit, she testified that even after                             03:23
Mr. Lagoda -- in his disoriented and confused                    03:23
state, as she testified, even after Mr. Lagoda                   03:23
struck her, she stayed with Mr. Lagoda because                   03:24
she knew it was an on-going medical event.                        03:24

You recall that testimony, correct?                        03:24

A.    Yes.                                                         03:24

Q.    I'm going to highlight a portion of                         03:24
the top of the page here.                                         03:24



JOHN MONAGHAN

Actually, for some reason this page is not technologically available to do so, so I'll put my cursor next to where I'm starting.

It's the top line where it says, "Sometime after being handcuffed, again, entering into another medical episode and turning blue, it is obvious that his sudden death was to what ME Dr. Milewski documented as 'sudden death following grand mal seizure of undetermined etiology, complicated by post-ictal excited delirium, and not the physical force used by the members of the PAPD.'"

Did I read that correctly?

A.    You did.

Q.    Again, sir, I know you already testified that you're not a doctor, correct?

A.    Correct.

Q.    You testified that you've never gone to medical school or graduated from med school, you've never done a medical residency, nor served as a medical examiner, correct?

A.    Correct.

Q.    And you also testified that you're



JOHN MONAGHAN

not board certified in anatomical pathology, clinical pathology, or forensic pathology, correct?

A.    Correct.

Q.    Given you have no medical professional background, what is the basis of your medical opinion that Mr. Lagoda entered into another medical episode?

A.    Well, he stood up.  And, you know, being disoriented in the wake of a seizure does not describe a man throwing punches and punching people committing a violent assault. That's not really the same thing at all.

Q.    Sir, you're aware that Calvin Swinney, who observed Mr. Lagoda's seizure, spoke with Officer Bugiada when Officer Bugiada boarded the plane, and instructed Officer Bugiada that Mr. Lagoda was confused and combative, correct?

A.    Right.

Q.    And you already testified that you were aware that based upon the medical evidence in this matter, that somebody who suffered a seizure -- the typical signs of an individual



JOHN MONAGHAN

in the immediate wake of the seizure is    03:26
confusion, disorientation, agitation, and    03:26
combativeness.    03:26

    Isn't that right?    03:26

    A.    Combativeness?    03:26

    Q.    Correct.  Confusion, disorientation,    03:26
agitation, and combativeness?    03:26

    A.    Whose testimony was that?    03:26

    Q.    Sir, that's a -- the testimony of    03:26
the medical documents, as well as the medical    03:26
experts in this matter, as well as documents    03:27
produced by the defendants; that the individual    03:27
in the immediate wake of a seizure may    03:27
experience confusion, disorientation, as well    03:27
as aggression or combativeness; and this was    03:27
relayed by Mr. Swinney who observed    03:27
Mr. Lagoda's seizure, relayed it to Officer    03:27
Bugiada when he initially responded to the    03:27
call.    03:27

    Do you recall that, sir?    03:27

    A.    Yes.    03:27

    MS. ALTERMAN:  Objection.    03:27

    THE WITNESS:  Yes.    03:27

    MS. ALTERMAN:  Wait.  Wait.    03:27



JOHN MONAGHAN

Q.    Given that you have no medical professional background, what is the basis for your expert medical opinion that "it is obvious that Mr. Lagoda's sudden death was due to," and then you include the quote from Dr. Milewski's autopsy report?

A.    It's -- your question gives its own answer.  It's relying on that quotation from that medical profession.

Q.    So you're saying it is obvious that his sudden death was due to, and then you are making a determination that the sudden death was due to or related to what the medical examiner stated; is that what you're saying?

A.    That's part of what I'm saying.

The last sentence that said that the physical force used by the members of the police department did not.  The force that they used was necessary and appropriate to the situation they were in.

The outcome, the exact condition of the subject; it's a standard use of force, it was proper, it was necessary.

You had a combative subject who was



JOHN MONAGHAN

not able -- even if the EMS was there with them

and responded with Bugiada, they would not have

been able to treat him if he was throwing

punches.

So it's a comment on the physical

force used by the members of the PAPD.

It was not at the level to enforce

death.  The ME said that.  The AG said that.

And EMS could not treat someone who

is throwing punches.

Part of our job is to bring

situations under control so that they can be

treated.

Q.    Sir, my question was regarding your

opinion and the medical nature of it where you

simply say, "It is obvious that his sudden

death was due to," are you aware that you're

making a medical conclusion here, sir?

MS. ALTERMAN:  Objection.  You can

answer.

THE WITNESS:  Okay.  The next three

words point to the medical professional

that I'm relying on, the ME.

Q.    Correct.  You're making a medical



JOHN MONAGHAN

conclusion and using Dr. Milewski's medical

documentation in support of your medical

conclusion; specifically, you say that it's

obvious that his sudden death is due to what

Dr. Milewski included in her autopsy report.

    A.    Right.  It's an observation.

    Q.    And again, you're not a medical

professional, correct?

    A.    It's an observations of what's

obvious, based on the medical professional's

statement.

    Q.    So you say that obvious, but you're

offering a medical opinion with no medical

professional background.

        Do you understand that?

    A.    Well, it's --

        MS. ALTERMAN:  Objection.

        THE WITNESS:  I'm not offering a

    medical opinion.  I'm offering up a medical

    opinion made by a medical professional.

        And you're --

BY MR. AMRHEIN:

    Q.    You're saying, "It is obvious that

the sudden death was due to"?



JOHN MONAGHAN

A.    Correct.

Q.    I can break it down word-by-word.

You're saying Mr. Lagoda's death was "due to," that's without citation or anything at that point.

And then you referred to --

A.    Of course not.

Q.    -- and then you refer to -- "that it was due to," and you include a point of reference that Dr. Milewski, in her interpretation of the death in her autopsy report, you're making a medical conclusion based upon a medical document, isn't that right?

A.    No, it's not right.  I'm not making a medical conclusion.

Q.    So how can --

A.    Hold on.  My answer --

Q.    How do you reconcile that you say, "It is obvious that his sudden death was due to," exactly what this Dr. Milewski said.

That's not a medical opinion?

A.    It's pointing to a medical opinion.

Q.    And again, you're not a medical



JOHN MONAGHAN

professional, correct?                                      03:31

A.    That's why I pointed to the medical              03:31
professional.                                              03:31

Q.    The point is, you're not a medical               03:31
professional pointing to the cause of a sudden            03:31
death, claiming that his sudden death was                 03:31
obvious for the certain reasons.                          03:31

Those certain reasons and the               03:31
foundation for your statement that it's                   03:31
"obvious that a sudden death occurred in a                03:31
certain way," how do you reconcile that with              03:31
the fact that you have no background as a                 03:31
medical professional, you're not a doctor,                03:31
you've not to med school, you've never done a             03:31
medical residency, you've never served as a               03:31
medical examiner, you're not board certified in           03:31
any of the pathologies, how do you reconcile              03:31
that?                                                     03:31

A.    By pointing to the one who is               03:31
certified.                                                03:31

Q.    So you're simply relying upon               03:31
Dr. Milewski's autopsy reports in which -- for            03:32
instance, Dr. Milewski stated that other                  03:32
significant factors contributing to the death             03:32



JOHN MONAGHAN

of Mr. Lagoda," which she labeled as a

homicide, "was the physical forced used by the

officers."

        Do you recall seeing that, sir?

        MS. ALTERMAN:  Objection.

        THE WITNESS:  That's -- it's

    inaccurate what you just said.

        Plus, you're departing from the text

    of what we're looking at right now on the

    screen.

        I say it's obvious, I point to the

    medical professional statement, and then I

    point to the use of force.

        It was not at the level of readily

    causing -- readily capable of causing

    death, it was proper and appropriate.

        And if EMS was standing right next

    to them and had responded along with

    Bugiada, they would not have been able to

    treat him.

BY MR. AMRHEIN:

    Q.    How do you say that, sir, without

knowing or being on foot there or the fact that

the EMS wasn't even on scene because nobody was



JOHN MONAGHAN

able to escort EMS to the scene; how can you    03:33

confidently say that, sir, that EMS wouldn't be    03:33

able to treat Mr. Lagoda in that instance?    03:33

    A.    From all my experience in this    03:33

industry for 40 years.    03:33

        There is a reason when 911 is called    03:33

and an ambulance is dispatched, that the police    03:33

are also dispatched.    03:33

        We get there first, for a number of    03:33

reasons.  One of those reasons is to secure the    03:33

scene.  And if there is a combative person in    03:33

need of medical attention, they have to be    03:33

brought to a place where EMS can treat them.    03:33

        A combative person throwing punches;    03:33

you can't send EMS in there to treat them and    03:33

get punched.    03:33

        We have to get the situation under    03:33

control in order for them to do their jobs.    03:33

        So if EMS was right next to Bugiada    03:33

at the initial call, they would not have been    03:33

able to treat him as he stands there throwing    03:33

punches.    03:33

        The police first have to bring him    03:33

under control through the necessary and proper    03:33



JOHN MONAGHAN

uses.

            That's why the police are

dispatched.

     Q.    Sir, you're aware of the conclusion

in the medical report that a contributing

factor that Mr. Lagoda's death was the physical

force used upon him prior to his death?

     A.    No.  You say "the."  No.  There was

a number of them; two or three of them, and

force was listed last.

     Q.    I can rephrase that.

     A.    The ME said -- the ME said it was

not possible to tease out what weight or in

what order these contributing factors

contributed.

     Q.    And again, you're evaluating the

medical ME's report as a medical professional

or as a police professional?

     A.    The ME is a medical professional.

     Q.    No.  I'm saying your evaluation of

the ME's report --

     A.    Yes.

     Q.    -- is that as a medical professional

or a police professional?



JOHN MONAGHAN

A.     A police professional.

Q.     And so, again, sir, you're aware that the ME's report stated in particular that the cause of death, sudden death following grand mal seizure of undetermined etiology, and then the contributing factors to the death included -- included -- not just, but included the physical struggle and altercation of the -- that the officers engaged in with Mr. Lagoda?

You're aware that that is included in the -- just under the cause of death, correct?

A.     Correct.

Q.     And then she listed it as a homicide, correct?

A.     Correct.

Q.     And you're aware, as discussed on a number of occasions beforehand with respect to Dr. Milewski, that her determination of a homicide was simply focused on the actions of a person or persons contributing to the death of another person; it wasn't focused on what you may view as the legal definition of homicide, which factors in the intentions of the



JOHN MONAGHAN

individual.

Do you recall that, sir?

A.   I do.  Homicide in police work is very different from the medical determination of homicide.

Q.   Incorrect.  She doesn't factor in the intentions of the individual; she simply factored in that outside factors, which she noted, the physical altercation and struggle that Mr. Lagoda suffered, was a contributing and another significant factor contributing to the death of Mr. Lagoda.

Amongst other things, do you agree that that was in the report?

A.   That was in the report.

She's not entirely accurate when she uses the word "intent."  It is very clear that a medical determination of homicide, is hardly related to a legal determination of homicide.

Q.   And again, sir, she didn't use the word "intent."

The report that you cited in your Rule 26 report was actually an investigative report, it's set of notes by an interviewer



JOHN MONAGHAN

after speaking with Dr. Milewski, it was not an    03:36

actual transcript or statement, direct    03:36

statements, quoted statements from    03:36

Dr. Milewski.    03:36

Again, sir, you're not a medical    03:37

professional, and the basis of your contention    03:37

at the top of page 18 is based upon your    03:37

logical gathering as a police expert; is that    03:37

fair to say?    03:37

A.    Yes.    03:37

Q.    And so that final portion after you    03:37

quote the -- just the cause of death, not the    03:37

labeling of a homicide or the contributing    03:37

factors to the death as identified by    03:37

Dr. Milewski.    03:37

After this quote you say, "And not    03:37

the physical force used by the members of the    03:37

PAPD."    03:38

Now, you had said or cited that    03:38

you're making a focused evaluation of whether    03:38

or not the use of force was in compliance with    03:38

PAPD policy and procedure.    03:38

Is that the basis of your statement    03:38

right there?    03:38



JOHN MONAGHAN

A.    That statement didn't speak to    03:38
policy.  That statement spoke to cause of    03:38
death.    03:38

And the physical force applied by    03:38
the police in this instance was necessary and    03:38
proper and did not rise to the level of readily    03:38
capable of causing death.    03:38

Q.    And so you're saying it speaks to    03:38
the cause of death.    03:38

I just want to reiterate for the    03:38
record:  You're not a medical professional,    03:38
correct?    03:38

A.    I am a police professional who    03:38
opined on the level of force used here, that it    03:38
was necessary and proper; it's not excessive.    03:38

Q.    And you're aware that the medical    03:38
professional who did the autopsy report, as    03:38
well as other medical professionals on record    03:38
in this matter have stated that the physical    03:38
force used by the members of the PAPD against    03:39
Mr. Lagoda was a contributing factor to his    03:39
death?    03:39

Are you aware of that, sir?    03:39

A.    It was one of some contributing    03:39



JOHN MONAGHAN

factors, yes, I'm aware of that.  And it was    03:39
also --    03:39

Q.    So you do agree it was a    03:39
contributing factor?  You said "one of," but    03:39
you do agree it was a contributing factor?    03:39

A.    I agree.    03:39

Q.    Your report transitions into a    03:39
section that surmises portions of Mr. DeFoe's    03:39
expert report, and you respond with what you    03:39
contend is "actual evidence."    03:39

Do you see that?    03:39

A.    Yes.    03:39

Q.    In your experience as an officer --    03:40
I'm anticipating that you've probably gathered    03:40
a number of witness statements, correct?    03:40

A.    Yes.    03:40

Q.    You've conducted investigations; is    03:40
that right?    03:40

A.    Yes.    03:40

Q.    So based upon your professional    03:40
experience, would you agree with me that a    03:40
person's recollection of events is more    03:40
accurate when given closer to the date of the    03:40
events, as opposed to if it's given by memory    03:40



JOHN MONAGHAN

years after an event?                                          03:40

A.    So that distinction between notes                        03:40
made by investigators interviewing someone and                 03:40
a transcript that is made years later; yes,                    03:40
you're right, I give weight to the                             03:40
interviewer's notes.                                           03:40

Q.    And so --                                                03:40

A.    You asked me earlier.                                    03:40

Q.    Yeah, sir, I'm trying to just get a                      03:40
clean transcript here, because it seems like                   03:41
we're in an agreement here, but so I'll just                   03:41
ask again, and if I can clarify the question                   03:41
more, I'll try.                                                03:41

So based upon your professional                                03:41
experience, would you agree with me that a                     03:41
person's recollection of events is more                        03:41
accurate when given closer to the date of an                   03:41
event, as opposed to if it's given by memory                   03:41
years afterwards.                                              03:41

Would you agree with that?                                     03:41

A.    It can be.                                               03:41

Q.    It's only natural, right?  I know                        03:41
you've spoken about common sense and thinking                  03:41
your way through things logically and with                     03:41



JOHN MONAGHAN

common sense; it's only nature that a person's

recollection would be better the more closer

they are to the events, as opposed to years

after.

Isn't that only natural, sir?

A.    It can be.  Depending if it's a

traumatic event, sometimes they don't remember

things right away, it takes time, so it can.

Q.    But typically you would say

someone's memory of an event, all things

considered, is typically far more accurate when

given or if given, you know, near or at the

time of the event versus several years down the

line that; you would agree with that, right?

A.    We like to get a timely record.

Q.    And that's for the purpose of making

sure that everything is as accurate as

possible, right?

A.    Right.

Q.    Sir, a chest down position, that's

also known as a prone position, right?

A.    Well, yes.  Prone could be either

chest down or up.

Q.    Typically, prone chest down;



JOHN MONAGHAN

meaning, chest facing the ground, right, back facing the sky, that would be chest down prone, right?  Is that fair to say?

A.   Yes.

Q.   Sir, I'm going to direct your attention to this.

I can't highlight this portion of your report.  However, I want to focus on the last sentence of this answer from Police Officer Joseph.

Do you see this, sir, where my cursor is?

A.   Yes.

Q.   I guess the question is -- I'll read it in full.

"QUESTION:  He was rolled to one side."

"He" meaning Mr. Lagoda; is that fair?

A.   Yes.

"QUESTION:  Once he was rolled to one side, what did you do at that point in time?

ANSWER:  Then he was moved towards



JOHN MONAGHAN

the middle of the galley, and he was still                    03:44
actively resisting.                                           03:44

He was then repositioned to attempt                           03:44
to be taken out of the galley, and that is                    03:44
when I noticed he was blue and he was                         03:44
handcuffed.                                                   03:44

QUESTION:  Once you observed that he                          03:44
was turning blue, what did you do next in                     03:44
response?                                                     03:44

ANSWER:  Immediately unhandcuffed                             03:44
him."                                                         03:44

Do you see that?                                              03:44

A.    I do.                                                   03:44

Q.    So how does that -- how do you                          03:44
reconcile that testimony given years after --                03:44
again, years after the events, to reconcile                  03:44
with your report that, as well as the Attorney               03:44
General's report, that states "within a minute               03:44
after handcuffing," so "less than a minute                   03:44
after handcuffing," Mr. Lagoda was turning                   03:44
blue, was observed to be turning blue and did                03:44
not appear breathing?                                         03:44

A.    You're asking me about the timeframe                    03:44
of a few minutes and less a minute?                          03:44



800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

Q.    Less than a minute; yes, sir.    03:44

A.    Well, those are generally -- you know, they describe -- those phrases, and he writes in his report as well, "few minutes," the verbiage describes a very short period of time; about a minute, a few minutes, less than a minute.

It's a period of time.

Q.    So is it fair to say that in a very short period of time, Mr. Lagoda was discovered to -- officers noticed that Mr. Lagoda's neck was blue and that he wasn't breathing, after which point they performed CPR?

A.    Well, you say short.  I mean, that's everybody's -- what's our interpretation?

Is it a minute?  A few minutes? It's somewhere between less than a minute, a minute, and a few minutes.

Q.    Well, sir, your report states varying degrees of the timeframe.

Would you agree with that?

A.    The body of work describes varying degrees; the AG, your expert, they say a few minutes, and then in other places it says,



JOHN MONAGHAN

about a minute.

          These are generally --

     Q.    I'm simply saying your report --
your report in several instances refers to this
handcuffing and restraining process.  In one
instance you talk about a few minutes, in
another instance you refer to less than a
minute.

          Do you understand the confusion
there, sir, inconsistency?

     A.    Confusion, no.  I don't find them
inconsistent.  I find them descriptive of a
similar timeframe.

          It's just verbiage describing a
short period of time.

          The bottom line was that there was a
period of time between him being handcuffed and
him turning blue.

          Was it a few minutes, less than a
minute, a minute; all of those phrases describe
a period of time.

          I don't see confusion there.

     Q.    Sir, very respectfully, those are
very different amounts of time, wouldn't you



JOHN MONAGHAN

agree?

A.   No, I don't.

Q.   You don't think less than a minute versus a few minutes is a different amount of time --

A.   When --

Q.   -- when dealing with somebody experiencing a medical event?

MS. ALTERMAN:  Objection.  You can answer.

THE WITNESS:  You know, no one had a stop watch, and these are just phrases that are all alike.

Q.   So is it fair to say you don't know, you can't pin down a specific amount of time?

A.   No one knows the exact length.

Q.   Sir, I'm going to ask you general questions.

Generally speaking, if someone states or says "That's when I noticed," so "that's when I noticed something," that simply means that's when the first -- that's when the person first observed something; is that fair?

A.   Yes.



JOHN MONAGHAN

Q.    And that would be the very nature of noticing something, right?    03:47 03:47

A.    Right.    03:47

Q.    That doesn't mean that something wasn't already happening, isn't that right?    03:47 03:47

A.    It doesn't specifically have to mean that, no.    03:47 03:48

Q.    That's because it could have already that happened, just took some time for somebody to notice that it happened, isn't that right?    03:48 03:48 03:48

A.    That's possible.    03:48

Q.    One page 21 of your expert report, do you see the first full paragraph that starts with "Contrary to the opinions"?    03:48 03:48 03:48

A.    Yes.    03:48

Q.    You see that paragraph, okay.    03:48

Sir, you note that PAPD General Order 100-5 states that officers should make every reasonable effort to avoid compressing and restricting a suspect's airway"?    03:48 03:48 03:48 03:48

A.    Yes.    03:48

Q.    And this would include any force used by officers anywhere on the body that could restrict a person's airway, correct?    03:48 03:48 03:49



JOHN MONAGHAN

A.     Well, it speaks to the suspect's
neck and chest area when applying.                            03:49

Q.     But that particularly right there,
this quote, officers should make every
reasonable effort to avoid compressing and
restricting a suspect's airway."                              03:49

Every reasonable effort encaptures
or encapsulates anything that would restrict a
suspect's airway, correct?                                    03:49

A.     Yeah, can you just show me where you
are quoting me from?                                          03:49

Q.     No, sir.  I'm just asking for your
recollection on the record.                                   03:49

A.     Oh.                                                    03:49

Q.     Again, officers should be -- this is
not directly quoted in your report, I'm simply
asking about a document that you reviewed
that's in your appendix.                                      03:49

General Order 100-5, "Officers
should make every reasonable effort to avoid
compressing and restricting a suspect's
airway."                                                      03:49

So this would include any force used
by officers anywhere on the body that could, in              03:50



JOHN MONAGHAN

theory, restrict a person's airways, correct?          03:50

MS. ALTERMAN:  Objection.  You can          03:50

answer.          03:50

THE WITNESS:  Yeah, it's a very          03:50

general statement, and that's an incomplete          03:50

statement.  It says "suspect's airway or          03:50

compressing the suspect's neck and chest          03:50

area."  Again --          03:50

Q.    Correct.          03:50

A.    And again --          03:50

Q.    Correct.  Separated by a comma,          03:50

correct, sir?          03:50

A.    Correct.          03:50

Q.    And therefore, they are two distinct          03:50

portions of a sentence.          03:50

So taken on its own and taken on its          03:50

face, you would agree with me that that          03:50

sentence, "officers should make every          03:50

reasonable effort to avoid compressing and          03:50

restricting a suspect's airway," that this          03:50

would include any force that could possibly          03:50

restrict a person's airway, correct?          03:50

A.    As it was done in this case.          03:50

The paragraph we're speaking on, on          03:50



JOHN MONAGHAN

page 21 says that they were in compliance with this order, and they were in complete compliance with this order.

This man, Mr. Lagoda, his airway was not restricted.  His breathing was not a factor.  He did not pass of asphyxiation.

The blockage of his airway has never been a point in this case; it's just not in evidence.

These officers followed that directive that you just read:  Don't block the airway, followed it exactly.

Q.    Sir, you're aware that actually it is evidence in this matter in the form of testimony from a medical professional?

A.    What is?

Q.    The exact opposite of what you just said:  That the compression of being --

A.    You'll have to point it out.

Q.    -- that the compression of the airway of Mr. Lagoda happened as a result of the officers?

A.    They did -- no, that's not here. This positional asphyxiation and asphyxiation



JOHN MONAGHAN

are completely irrelevant to this case.

These office did not block his airway.  That is not even listed as a contributing factor in his death.

I don't know why this is such an issue in this case.

Q.    Are you aware, sir --

A.    And I'm not finished.

The blockage of his airway have nothing to do with this case.

There isn't any person on this neck, there is not one mention of putting pressure on his neck.  Zero.

And his airway was never blocked by the use of force of these officers, and that asphyxiation is not even listed as a contributing factor, let alone the cause of death.

Q.    You're aware that the cause of death was listed as sudden death following grand mal seizure, correct?

A.    It has nothing to do with his airway being blocked by the use of force of these officers, it has nothing to do with compression



JOHN MONAGHAN

asphyxiation.                                                    03:52

Q.    And you're offering that opinion as     03:52
a medical expert, correct?                                      03:52

A.    A police expert.                        03:52

Q.    So not as a medical expert, right?      03:52

A.    As a police expert.                      03:52

I can tell you the use of force by     03:52
these officers was appropriate, and they                        03:52
followed this 100-5 directive exactly.                          03:52

They did not block his airway.  They     03:52
did not compress his body in a way to restrict                  03:52
his breathing.                                                  03:52

Q.    Sir, should the testimony of a         03:52
medical professional directly conflict your                     03:52
opinion that you just stated, would you defer                   03:53
to that medical professional?                                   03:53

A.    You'd have to show me that, because     03:53
I've not seen that in this case.                                03:53

Asphyxiation was not listed as a     03:53
contributing factor in this case and his death,                 03:53
it is irrelevant.                                               03:53

Q.    And you state that as a non-medical     03:53
professional, correct?                                          03:53

A.    I'm stating that as a police          03:53



JOHN MONAGHAN

professional who trains and teaches people not    03:53

to block the airway.    03:53

Q.    Sir, you're aware that Lieutenant    03:53

Bergery stated under oath that the Port    03:53

Authority Police Department did not teach about    03:53

positional restraints and compressional    03:53

asphyxiation until after Mr. Lagoda's death;    03:53

you're aware of that, right?    03:53

A.    No.    03:53

Q.    You're aware of that?    03:53

A.    Not, I'm not.  I'm answering.    03:53

Q.    That's my question, sir.  Are you    03:53

aware of that testimony?  That's a yes-or-no    03:53

question, sir.    03:53

A.    Lieutenant Bergery's testimony    03:53

reflects the fact that what was practiced in    03:53

reality was codified into procedure after 2020.    03:53

That's all it is.    03:54

And the wording you just read, the    03:54

wording from the 2014 directive that was in    03:54

force and effect in 2019, which says to avoid    03:54

compression and to maintain an open airway,    03:54

that's always been the procedure.    03:54

And it was followed here, too.    03:54



JOHN MONAGHAN

His airway was never compressed. His airway was never blocked.  The use of force was proper; it was minimal.

Q.    I'm sorry, I understand you are offering an opinion on use of force as a police expert.

Stating that his airway was never blocked, "he" being Mr. Lagoda, is that to a reasonable degree of medical certainty based on your medical background?

A.    It's to a degree of police science.

Q.    So not a medical --

A.    That's correct.  They don't block his airway.

You don't need to be a doctor to say that they put pressure on his neck.

Did they compress his neck?  They did not.

You don't have to be a medical professional to state that.

Q.    Sir, you're speaking to a contributing factor in the death of Mr. Lagoda; that is for a medical professional to opine on.

I understand you're a police expert,



JOHN MONAGHAN

not offering an opinion as to whether or not

the use of force was reasonable as policy or

procedure; those are go distinct things

reserved for distinct experts of distinct

fields, respectfully.

Sir, would you agree with me that

applying pressure to an individual's legs in

pressing a person down to the ground will apply

pressure to a person's airway, you can cause

compressional asphyxiation?

MS. ALTERMAN:  Objection.

THE WITNESS:  No.

MS. ALTERMAN:  Are you asking him a

medical question now?

MR. AMRHEIN:  No.  I'm talking about

what you learned as a police expert when

you were at the academy or based upon your

study of the police policies here.

THE WITNESS:  No.

BY MR. AMRHEIN:

Q.    No, that applying pressure, based on

your police training, that applying pressure as

an officer, you were not taught that that could

potentially compress the airway of an



JOHN MONAGHAN

individual?

A.    I've never heard that.

In fact, when the compression law was passed, the department tried to come up with training documents to show how not to compress the diaphragm, which failed, because it's almost impossible to dictate that to a police officer; but pressure on the legs was never mentioned.

Q.    You had also testified earlier that in addition to not compressing the diaphragm or compressing the airway of an individual, it was important to recognize the potential for cutting off the circulation for an individual.

Do you recall that?

A.    I don't recall that.  The mention of circulation from today?

Q.    Yes.

A.    No.  Remind me.

Q.    You don't recall speaking about -- learning about the -- not only the compression of -- the potential compression and airway, not blocking a suspect's airway, as well as making sure not to block the -- or restrict the blood



JOHN MONAGHAN

flow of an individual?                                          03:57

A.    Well, that speaks to a chokehold of          03:57
the neck; we didn't use the word "circulation."    03:57

Q.    So you're aware that there are other         03:57
ways to, based upon your experience and            03:57
training, you're aware that there are certain      03:57
ways to apply pressure to an individual and        03:57
there are certain ways to not do it?               03:57

A.    Yes.                                          03:57

Q.    And certain ways are taught to not           03:57
do it, and that is for the safety of the           03:57
individual being restrained, isn't that right?     03:57

A.    Correct.                                      03:57

Q.    And you're taught as a police               03:57
professional to not restrict a suspect's airway    03:58
or to prevent the flow of blood throughout the     03:58
body of an individual; is that right?              03:58

A.    Where was that from?                          03:58

Q.    Based on your experience, based upon         03:58
your experience and professional experience as     03:58
a medical -- excuse me, as a police expert.        03:58

A.    No.  We speak to keeping the airway          03:58
open and don't compress to the point where you     03:58
are inhibiting their free breathing.               03:58



JOHN MONAGHAN

Q.    And based upon your training as to    03:58
not inhibit free breathing and to ensure that    03:58
the blood flow to an individual is not    03:58
restricted, you wouldn't agree with me that    03:58
applying substantial pressure to an    03:58
individual's legs and pressing down on that    03:58
individual on the ground can apply substantial    03:58
amounts of pressure to an individual's airways    03:58
and can cause asphyxiation?    03:59

A.    No.  I've never heard that.    03:59

Q.    Are you saying it's not possible or    03:59
you've just never heard of it?    03:59

MS. ALTERMAN:  Objection.  Are you    03:59
asking based on his training whether he was    03:59
taught that or are you asking now for a    03:59
medical opinion?    03:59

MR. AMRHEIN:  I prefaced these    03:59
questions, Cheryl, with "based upon your    03:59
training."    03:59

MS. ALTERMAN:  But now you're asking    03:59
him if it's possible.    03:59

MR. AMRHEIN:  No.    03:59

MS. ALTERMAN:  So it's not based    03:59
upon his training.    03:59



JOHN MONAGHAN

MR. AMRHEIN:  This is, again, a                    03:59
question based on his training.                    03:59

BY MR. AMRHEIN:                                     03:59

Q.    Are you aware that it is possible,           03:59
based on your training, whether or not pressing    03:59
on the legs of an individual, driving an           03:59
individual to the ground can compress the          03:59
airways or restrict the flow of blood in an        03:59
individual's body?                                 03:59

A.    No.                                          03:59

Q.    Sir, starting here on page 21, these         03:59
opinions are re-enforced by the findings of the    04:00
NYS AG PIU on page 10 of their report, and you     04:00
conclude in block "quote."                         04:00

Is that from the Attorney General's                04:00
investigative report?                              04:00

A.    Yes.                                          04:00

Q.    Do you realize that this excerpt is          04:00
from the AOG's legal analysis section of the       04:00
report?                                            04:00

A.    It's also hypothetical.  It shows            04:00
what excessive force may look like.                04:00

And it re-enforced the fact that                   04:00
force was reasonable in this case.                 04:00



JOHN MONAGHAN

Q.    You're aware that the material you cited as a legal determination -- again, a legal determination made by attorneys in a criminal investigation, correct, that specific quote is included in the legal analysis made by attorneys, right?

A.    The line between police executives observing the behaviors of their subordinates and a legal analysis by attorneys is not quite as bright as you are making.

That statement speaks to the reasonable force that was used in this case. And illustrates that the force was not excessive.

That is something that a police executive is going opine on, yes.

Q.    So here, you're agreeing with the legal conclusion made by the New York State Attorney General's Office, is that simply what you are saying?

A.    I'm agreeing with this, yes.

Q.    Again, for the record, that was included in the OAG's report's legal analysis section.



JOHN MONAGHAN

I'm moving on to page 22.                                   04:01

There again, you are aware that a                           04:02
person who has just suffered a seizure is in a              04:02
uniquely vulnerable -- based on the record that             04:02
you reviewed, are you aware that a person who               04:02
has just suffered a seizure is in a uniquely                04:02
vulnerable condition in the immediate wake of               04:02
that procedure?                                             04:02

MS. ALTERMAN:  Objection.                                   04:02

THE WITNESS:  No.  I'm not sure, no.                        04:02
You know in --                                              04:02

Q.    And in addition, sir, based upon                      04:02
your review of the evidence in this matter, are             04:02
you aware that a typical response after                     04:02
suffering a seizure is confusion,                           04:02
disorientation, agitation and aggression; also             04:02
known as combativeness, are aware of that,                  04:02
based upon your review of the record?                       04:02

MS. ALTERMAN:  Objection.                                   04:02

THE WITNESS:  I've seen that.  I                            04:02
know what that looks like.  It is not -- it                 04:02
usually does not rise to the level of                       04:02
assault.  In other words, throwing punches.                 04:02
It's just not to be equated.                                04:02



JOHN MONAGHAN

BY MR. AMRHEIN:

Q.    I'm just asking, sir, are you aware that based upon your review of the record, that the typical response after an individual suffers a seizure, that that individual may be confused, disoriented, agitated, and combative.

MS. ALTERMAN:  Objection.  You can answer.

THE WITNESS:  That was in some obscure, irrelevant training materials I believe I read that.

Disorientation, I understand.

Combativeness is something different.

When a subject is standing before an officer and they're committing assault, their mental and emotional state is not as relevant to the amount of force that has to be applied to take control of the situation.

So whether they're coming out of a seizure and exhibiting all the things that you just described, which are not absolutes, of course, for every seizure, it



JOHN MONAGHAN

is hardly relevant to a police officer trying to take control of a situation, to prevent anybody from getting hurt and to allow for treatment by EMS.

BY MR. AMRHEIN:

Q.    Again, you stated that you reviewed Lieutenant Bergery's deposition transcript prior to producing your Rule 26 report, correct?

A.    Yes.

Q.    Did you review plaintiff's medical expert report in preparation of your Rule 26 report?

A.    I read it.

Q.    Did you review defendant's medical expert report in anticipation of preparing your Rule 26 report?

A.    I read it.

Q.    Sir, I know you stated earlier that you didn't recall what EBT was, and your counsel had explained what EBT was.

Did you have prior knowledge of what EBT was or were you informed by counsel that that is how to cite a transcript in a report?



JOHN MONAGHAN

A.    No, I'm aware; I've been using that for 20 years.

Q.    Your report speaks to the actions by Officer Bugiada in response to the call on board the flights for a male having a seizure.

And you're aware that Calvin Swinney informed Officer Bugiada regarding the condition of Mr. Lagoda when Officer Bugiada arrives on the plane, you're aware of that, right?

A.    Yes.

Q.    And you're aware that Calvin Swinney testified that the Mr. Lagoda was confused and definitely out of it, and then told Officer Bugiada that he, meaning Mr. Lagoda, was confused and combative?

A.    Yes.

Q.    Do you --

A.    Well, he said he was combative.

Q.    He said he was confused and combative, sir?

A.    Okay.

Q.    Sir, in your experience as a police officer, do you believe that someone who is



JOHN MONAGHAN

confused and disoriented, "definitely out of it," that they may have difficulty understanding verbal commands and physical cues compared to somebody who is not in a confused and disoriented state?

MS. ALTERMAN:  Objection.  You can answer.

THE WITNESS:  Could be.

Q.    On page 22, sir, you cite just a couple of studies, including the 1967 Mehrabian -- forgive me if I mispronounce that, sir, as well as the International Association of Chief of Police training key, do you see those in the middle of the page, sir?

A.    Yes.

Q.    Did any of these studies test and discuss how to approach and handle a medical event when the person in the immediate wake of a seizure?

A.    No.

Q.    Did any of these studies test and discuss how to approach and handle a medical event where a person is confused, disoriented, and not able to comprehend verbal and physical



JOHN MONAGHAN

cues?

A.    It speaks to people not being able to understand verbal cues, yes.

Q.    People not being able to understand verbal cues because of confusion, disorientation in the immediate wake of a seizure?

A.    It doesn't matter the reason, really.  They're not able to understand, they're not able to understand.

They have confusion because of a seizure or language barrier; it's just like the use of forces that I explained earlier.

The condition of the subject is not at issue.  There is a standard, and the application of the use of force; it needs to be reasonable, regardless of the emotions of a mental person, a coming out of a seizure or a violent felon, it doesn't really make a difference, the application is a standard.

So the same with the language.  If they're not understanding because of a language barrier or they're not understanding us because of a post seizure, it hardly matters, it's



JOHN MONAGHAN

talking from matters of communication.                    04:09

Q.    And am I correct, sir, that you      04:09
testified earlier today that there is no    04:09
varying standard or heightened standard to an    04:09
individual who is experiencing a medical    04:09
emergency, as opposed to an individual who is    04:09
not experiencing a medical emergency, am I    04:09
correct that you said that the standard is the    04:09
standard?                                    04:09

A.    In the application of the use of    04:09
force, that is correct.                      04:09

Q.    Sir, you reviewed the OAG's report    04:09
in advance of preparing this PAPD -- excuse me,    04:09
this Rule 26 report.                          04:09

I know you've testified to that    04:09
earlier on several occasions.                  04:09

Are you aware that the report stated    04:09
that the Port Authority Police Department    04:09
training in place in 2019 had not covered the    04:10
uniquely vulnerable condition of an individual    04:10
who is in the immediate wake of a seizure, and    04:10
as such, recommended that that be covered by    04:10
the Port Authority Police moving forward?    04:10

MS. ALTERMAN:  Objection.  You can    04:10



JOHN MONAGHAN

answer.                                                    04:10

THE WITNESS:  You asked me if I              04:10
recognized that it was a recommendation in        04:10
the Attorney General's report?                    04:10

Q.    Yes, sir.                                   04:10

A.    It's -- I won't say silly this time,        04:10
but the NSC documents are included in the PAPD    04:10
training documents, and they speak specifically   04:10
to that, so I don't understand the nature of      04:10
that recommendation.                              04:10

Q.    You are aware that that                     04:10
recommendation is in the AOG's report, correct?   04:10

A.    Correct.                                     04:10

Q.    Is it fair to say, sir, that, you           04:10
know, as logic suggests, that the PAPD officers   04:10
in 2019 were not trained to have a heightened     04:10
awareness regarding the uniquely vulnerable       04:11
condition of an individual who in the immediate   04:11
wake of a seizure, isn't that right?              04:11

MS. ALTERMAN:  Objection.  You can                04:11
answer.                                           04:11

THE WITNESS:  No, I can't agree with              04:11
that at all.  They were trained.  They            04:11
responded properly, too.                          04:11



JOHN MONAGHAN

Q.    You're saying that the OAG's report    04:11
was incorrect there, is that your testimony?    04:11

A.    When you say "there," can you just    04:11
reiterate.    04:11

Q.    In their identification that the    04:11
Port Authority Police Department had not    04:11
trained their officers about the heightened --    04:11
to have a heightened awareness regarding the    04:11
uniquely vulnerable condition of an individual    04:11
who is in the immediate wake of a seizure, and    04:11
as a result of that lack of training or that    04:11
specific area, that they recommended that PAPD    04:11
implement that training; you're aware that    04:11
that's in the report, correct?    04:11

A.    Are you asking if that's in there or    04:11
do I disagree with it?    04:11

Q.    Yeah.  You are aware that that's in    04:12
the report, correct?    04:12

A.    It is in the report and I do    04:12
disagree with it.    04:12

Q.    Okay.  Thank you.  That was going to    04:12
be my follow-up question, sir.  Thank you.  You    04:12
anticipated it.    04:12

          Moving on to page 23, sir, am I    04:12



JOHN MONAGHAN

correct that this report discussing what is
called the "Force Continuum," do you see that
heading?

A.    Yes.

Q.    You include some commentary as well
as a chart entitled, "DOJ Force Continuum/PAPD
Use of Force Matrix," right?

A.    Correct.

Q.    Is that correct?

A.    Correct.

Q.    According to the second paragraph,
the last sentence, did I read that correctly,
let me know, "When a police officer need to
gain physical compliance from a subject, the
best method is not physical force."

Did I read that correctly?

A.    It sounds right, but where are you
again?

Q.    Do you see my cursor on the screen,
sir?

A.    Okay.  Second paragraph.  Okay.

Q.    Second paragraph, second sentence.

Am I correct, did I read this
correctly, sir, "When a police officer" --



JOHN MONAGHAN

A.    Yes, you did.    04:13

Q.    -- "needs to gain physical compliance from a subject, the best method is not physical force," is that correct, did I read that correctly?    04:13

A.    Yes.  Yes.    04:13

Q.    Okay.  Moving on to the bottom of the page, can you show me on the Force Continuum chart where it discusses medical emergencies?    04:13

A.    Again, the condition of the individual and the reason why they have put us in the position to have to use force is not material to the application of the force; it's a standard.  Medical, mental, emotional, it's not an issue.  Force has to be applied as a standard, as it was in this case.    04:13

Q.    Sir, I'm aware of that, but I'm just asking a very simple question.    04:13

Is there anywhere on that chart, a reference to medical emergencies?    04:13

A.    Again, it's not relevant, so it's not --    04:14

Q.    My question is not whether it is    04:14



JOHN MONAGHAN

relevant, my question is:  Is there anywhere on                04:14

that chart, any reference to medical                          04:14

emergencies?                                                  04:14

    A.    No.        04:14

    Q.    Sir, on page 24 of your report you        04:14

include commentary that Officer Bugiada was in                04:14

uniform, issued a command and gestured, and                  04:14

then you included excerpts of Officer Bugiada's              04:14

deposition.                                                  04:14

    Do you see that?                      04:14

    A.    Yes.      04:14

    Q.    You are aware or have been made          04:14

aware today as well as we're aware, given your                04:14

review of Mr. Swinney's deposition in advance                04:14

of your Rule 26 report, that Mr. Swinney had                  04:14

testified that he observed Mr. Lagoda be                      04:15

confused, disoriented, and definitely out of                  04:15

it.                                                           04:15

    And when Officer Bugiada boarded the   04:15

plane short thereafter, he informed Officer                   04:15

Bugiada that Mr. Lagoda was confused and                      04:15

combative; you're aware of that testimony on                  04:15

the record, correct?                                          04:15

    A.    Yes.      04:15



JOHN MONAGHAN

Q.    Do you agree with me that that testimony would provide much needed context to Officer Bugiada's testimony in this section on page 24?

MS. ALTERMAN:  Objection.

Q.    Is there a reason why you didn't include it?

A.    It provided Bugiada with information he acted upon, his actions are illustrated on this page.  I mean, they're inherent.

Q.    Right.  So it provided him with information that the individual who he responded to was a male having a seizure on board was observed to be confused and combative as the flight attendant had told him when he boarded -- "he" meaning Officer Bugiada when he boarded the plane, isn't that right?

A.    Yes.  That's -- I believe that's why he didn't go and use force immediately.

He responded to a man coming out of a seizure by gesturing to him and trying to calm him down by using verbal persuasion and officer presence.

Q.    And I believe you testified a little



JOHN MONAGHAN

bit earlier today that it's possible that an

individual who is in a confused, disoriented

state and definitely out of it may have some

difficulty as compared to a normal, healthy

person may have difficulty understanding verbal

command and cues; you recall that, right?

A.    Well, cues, gestures as we're

discussing here on page 24, they're easily

understood, even if you are confused,

especially when they're coming from a uniformed

police officer.

Q.    Is that based upon a medical degree

certainty, or is that based upon your

understanding and work as a police officer; I'm

just trying to pin down the root cause or the

support of your contention that an individual

in the immediate wake of seizure can easily

understand verbal cues and physical cues from

an officer?

A.    My experience, which is if there is

a language spoken in this world, it's spoken in

New York City.

Q.    Sir, in your experience, how many

times have you responded to a call for an



800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

individual having a seizure or the immediate                    04:18
wake of a seizure?                                              04:18

    A.    Oh, I couldn't give you a number.  I             04:18
couldn't give you a number, but I have.                         04:18

    Q.    Sorry.  My computer is freezing a                 04:18
little.                                                          04:18

        Sorry.  I'm going to re-share this                  04:18
document.                                                        04:18

        Sir, are you able to see that now?                  04:18

    A.    Yes.  Yes.                                        04:18

    Q.    Okay.                                              04:18

        (Whereupon, proceedings paused for a               04:19
    technical issue off the record and once                 04:19
    again resumed.)                                          04:19

BY MR. AMRHEIN:                                                 04:20

    Q.    So you have the Rule 26 report in                 04:20
front of you, correct, you're Rule 26 report?                  04:20

    A.    Correct.                                          04:20

    Q.    Okay.  And due to some technical                  04:20
difficulties where I can no longer broadcast                   04:20
this on the screen, you're aware that when I'm                 04:20
referring to your Rule 26 report, which I have                 04:20
in front of me, is matching the same Rule 26                   04:20
report that you have in front of you; is that                  04:20



JOHN MONAGHAN

fair?

A.    Yes.

Q.    Okay.  I apologize for the technical error.  On page 25, sir, have you -- I just want to direct your attention to the second full paragraph and the last sentence in that paragraph, and I'm just going to read it to make sure you're aware of exactly what I'm referring to.

The aggressive and violent actions of Mr. Lagoda in the face of the officers' de-escalation efforts called for the other tactics available on the force continuum/matrix, and the officer properly engaged in those steps and did eventually bring the situation under control.

Do you see that sentence?

A.    Yes.

Q.    Did I read that correctly?

A.    Yes.

Q.    Sir, am I correct that you testified that there is no heightened standard owed to an individual suffering from a medical event, correct?



JOHN MONAGHAN

A.    Regarding the application of the use    04:22
of force, yes, that is correct.    04:22

Q.    And though you may disagree, you are    04:22
-- you testified that you are aware that the    04:23
OAG's report concluded that the PAPD, because    04:23
it did not, should train their PAPD officers to    04:23
cover the uniquely vulnerable condition of an    04:23
individual who is in the immediate wake of a    04:23
seizure, is that right?  You're aware that that    04:23
is in the 2019 -- sorry, the OAG's report,    04:23
correct?    04:23

A.    I disagree that he was in such a    04:23
state when he was throwing punches, yes.    04:23

Q.    And we discussed a short while ago    04:23
about the force of use continuum chart.    04:23

Do you recall that, sir?    04:23

A.    Yes.    04:23

Q.    And you feel that the questions    04:23
regarding the -- whether or not the force    04:23
continuum chart had any references to any    04:23
medical language or medical emergency, correct,    04:23
do you recall being asked questions about that?    04:24

A.    Yes.    04:24

Q.    Sir, pointing you to the bottom of    04:24



JOHN MONAGHAN

page 26, am I correct that it reads, "Officer

Bugiada however did initially respond along to

a medical emergency onboard flight 569.

          Once onboard, PO Bugiada was

informed by flight attendant Swinney that the

subject of the call, Mr. Lagoda, had a seizure

but had come out of the seizure and was now

punching people, do you see that?

     A.    Yes.

     Q.    And again, we've discussed Calvin

Swinney's deposition testimony, which you

reviewed in anticipation of your -- or in

preparation of your Rule 26 report.

          Do you recall that?

     A.    Yes.

     Q.    And do you recall that Mr. Swinney

testified that he observed Mr. Lagoda to be

confused, disoriented, and definitely out of

it, and then upon the arrival of Officer

Bugiada moments later, Calvin Swinney testified

that he told Officer Bugiada that Mr. Lagoda

was disoriented and combative, do you recall

that?

     A.    Yes.



JOHN MONAGHAN

Q.    In the middle of page 27, second bullet point, EBT Lt Bergery, Page 106, do you see that, sir?

A.    Yes.

Q.    Is there an ellipsis at the end of that quote from Officer Bergery?

A.    There is, yes.

Q.    So you would agree with me that that's an incomplete quote, and it's an excerpt of a 110-page deposition transcript?

A.    Yes.

Q.    Do you so the next bullet point, "EBT Lt Irving, page 105," do you see that?

A.    Yes.

Q.    And the second line, am I correct in reading, "not present having a seizure, he presented as a violent subject."

Do you see that sir?

A.    Yes.

Q.    And I know we discussed Calvin Swinney's deposition testimony that he told Mr. -- excuse me, Officer Bugiada that Mr. Lagoda was confused and combative after suffering a seizure.



JOHN MONAGHAN

Do you recall that?

A.    Yes.

Q.    Are you aware as the Attorney General's Office investigation states, as well as medical testimony on the record states that Mr. Lagoda remained in the wake of a seizure or remained confused and disoriented, agitated, aggressive, and combative in the immediate wake of the seizure; and as such, he was exhibiting typical post-seizure responses?

Are aware of that, sir?

A.    Where was that written?

Q.    I can rephrase the question.

Sir, so again, Lieutenant Irving stating, "not present, having a seizure, he presented as a violent subject."

Did I read that correctly?

A.    Yes, you did.

Q.    So given the testimony on the record by a medical professional, as well as the Nathana Wright-Reid and other documents produced in discovery, you're aware, as well as the OAG's report, you're aware, sir, that Mr. Lagoda had remained in the immediate wake



JOHN MONAGHAN

of the seizure in a medically vulnerable state     04:29

and exhibited typical post-seizure responses of    04:29

confusion, disorientation, agitation,              04:29

aggressiveness, combativeness; you're aware of      04:29

that?                                               04:29

    A.    No.  You're complying a lot of words     04:29

that I don't think are strung together in the       04:29

case here.                                          04:29

        Disoriented is one thing.               04:29

Post-seizure disorientation; the nurses and         04:30

everyone treating him accordingly, but that was     04:30

not the case when cops walked on board.             04:30

        Again, someone said an emotionally      04:30

disturbed person.  Their condition hardly           04:30

matters when they're throwing punches and we        04:30

have to take control of the situation.              04:30

        Your medical history, if you will,      04:30

even if they are mentally ill that needs our        04:30

assistance or a violent felon that needs to be      04:30

put in jail, the approach has to be the same:       04:30

When you go into applied force and take control     04:30

of their body, that's just the standard.            04:30

        So either post-seizure or mentally      04:30

ill or anything else, once they present as          04:30



JOHN MONAGHAN

violence, now the job has to be a standard of                    04:30

reasonable force, which is what happened in                      04:30

this case.                                                       04:30

Q.    Sir, I'm simply saying, are you                            04:30

aware that the record states that Mr. Lagoda                     04:30

was in the immediate wake of a seizure and he                    04:30

was in a medically vulnerable condition and                      04:31

experiencing the typical post-seizure responses                 04:31

of confusion, disorientation, and                                04:31

combativeness?                                                   04:31

MS. ALTERMAN:  Objection.                                        04:31

THE WITNESS:  He was not exhibiting                              04:31

vulnerable medical post.  No.  He was                            04:31

exhibiting violence and danger and was a                         04:31

threat; that's what he was exhibiting the                        04:31

moment the cops applied use of force.                            04:31

BY MR. AMRHEIN:                                                  04:31

Q.    And again, you're aware of the                             04:31

testimony from not only Calvin Swinney, but                      04:31

Nathana Wright-Reid that they observed                           04:31

Mr. Lagoda, as he was having the seizure and                     04:31

coming out of the seizure, that once he came                     04:31

out the seizure, he was confused and                             04:31

disoriented, definitely out of it, and                           04:31



JOHN MONAGHAN

combative?

You recall their testimony, correct?

A.   I do recall their testimony.  And now realize these cops are not doctors, and when the moment a man puts his hands up and starts throwing punches, it's not time to consider well, is this a post-seizure combativeness or is he mentally ill or is he a violent felon trying to get to the cockpit of this plane; it doesn't make a difference at this point, you have to use a reasonable amount of force to take control of the situation.

Q.   And, sir, you're aware that the OAG's report made a determination that Mr. Lagoda was in a uniquely vulnerable condition, uniquely vulnerable state after he suffered a seizure, and recommended that the Port Authority Police Department train its officers moving forward about that uniquely vulnerable situation of a person immediately after a proceed, correct?

A.   Say that again?

Q.   You're aware that the OAG report states that, correct?



JOHN MONAGHAN

A.     The OAG's report -- this is funny,   04:32

because you went through my lack of medical   04:32

training.   04:32

There were no medical professionals   04:32

compiling that report, am I right?  For them to   04:33

use that phrase, vulnerable, or whatever it   04:33

was, it is not descriptive of what Bugiada was   04:33

faced with, it's simply not.   04:33

And the training was there.  He was   04:33

medically vulnerable when he was laying on the   04:33

concrete floors and the nurses were tending to   04:33

him.   04:33

When he stood up and started   04:33

punching him, he lost that status.  Now he's a   04:33

violent combatant that has to be taken into   04:33

control.   04:33

Q.     Based upon your experience as a   04:33

police officer, in your training that you   04:33

received with the NYPD, were you not trained   04:33

that individuals in the immediate wake of a   04:33

seizure may be confused, disoriented, and   04:33

combative?   04:33

A.     Confused, disoriented and combative   04:33

do not describe the behavior of Mr. Lagoda when   04:34



JOHN MONAGHAN

Officer Bugiada was on site.

Q.   You're aware that the on-site witnesses who were present when Mr. Lagoda suffered the seizure and came out of the seizure, they testified to the fact that Mr. Lagoda was confused, disoriented, definitely out of it and combative, one of which was a nurse who said that based upon her training, that that was a typical response for an individual immediately in the wake of a seizure; you're aware of that, correct?

MS. ALTERMAN:   Objection.

THE WITNESS:   I'm aware that they were describing his behavior prior to his interaction with Bugiada.

Q.   You're aware that moments after Mr. Lagoda came out of a seizure and Calvin Swinney then made his way to the front of the plane to meet with Officer Bugiada, that he informed Officer Bugiada that Mr. Lagoda was confused and combative; that's what he told him, that's your sworn testimony; you're aware of that, correct?

A.   The key word "was" correct.



JOHN MONAGHAN

Q.    I direct your attention to page 28.    04:35

You see at the top there is a block    04:35
quote from a deposition transcript of    04:35
Lieutenant Sandoz.    04:35

I want to focus your attention on    04:35
the second -- or the first full paragraph on    04:35
this page.  It states, "Once Mr. Lagoda was    04:35
restrained and searched, all five officers were    04:35
then faced with a medical emergency."    04:35

Sir, is it your opinion that the    04:35
medical emergency had come to a stop as if a    04:35
pause button was hit, and then a medical    04:36
emergency happened once more; therefore, the    04:36
resume button was hit, is that what you mean by    04:36
the first sentence there?    04:36

A.    The facts are the man was laying on    04:36
the floor of the plane, he was medically    04:36
vulnerable at that time and the nurses tended    04:36
to him.    04:36

He recovered from that.  He became    04:36
violent and started throwing punches at people,    04:36
and they had to control it.    04:36

Once they did, they didn't intend to    04:36
-- yes, he had a seizure.  Was it all one    04:36



JOHN MONAGHAN

seizure that manifested in varying ways?  As I spoke earlier, he was in the airport for a few hours; he's okay one minute, and then he's not, and then he is okay again, and now he's not.

It was all one continuous event.

But it manifested in violence, and then it didn't.

It manifested in him falling out of his seat, and then it didn't.

So it was all erratic.

Q.    Do you see the next sentence there, "Within a minute of handcuffing Mr. Lagoda, the officers noticed that Mr. Lagoda was turning blue."

Do you see that?

A.    Yes.

Q.    You are aware that that is consistent with the Office of the Attorney General's report, correct?

A.    Yes.

Q.    And then you go on to say, "Contrary to the above" -- sorry.  Strike that.

"Contrary to the opinion in the DeFoe report, the officers quickly recognized



JOHN MONAGHAN

that Mr. Lagoda was in medical distress and    04:37

took immediate and appropriate action.    04:37

The officers immediately took the    04:37

following actions; and then you list a number    04:37

of things, including checking for a pulse,    04:37

removed handcuffs, laid Mr. Lagoda on his back,    04:37

and called for an AED, began CPR, administered    04:37

oxygen to Mr. Lagoda.    04:38

Did I read that correctly, sir?    04:38

A.    Yes.    04:38

Q.    Are you aware if the officers who    04:38

performed CPR were able to resuscitate    04:38

Mr. Lagoda?    04:38

A.    I don't think they did.  I don't --    04:38

Q.    Are you aware if the AED shock was    04:38

ever advised?    04:38

A.    Right, it was not advised.    04:38

Q.    Sir, am I correct that the report,    04:39

pages 29 and 30, that you include your    04:39

concluding professional opinions?    04:39

A.    Yes.    04:39

Q.    As stated on a prior page, page 28,    04:40

"Within a minute of handcuffing Mr. Lagoda, the    04:40

officers noticed that Mr. Lagoda was turning    04:40



JOHN MONAGHAN

blue," correct?                                              04:40

A.    Correct.                                              04:40

Q.    As we discussed before, the term                     04:40
"noticing something" doesn't mean something had            04:40
just occurred; but rather, someone just noticed            04:40
that it occurred; you remember that                        04:40
distinction, correct, sir?                                 04:40

A.    I remember you making that                           04:40
distinction.                                               04:40

Q.    Sir, you state the overall regiments                 04:40
and content of the Port Authority Police                   04:40
Department training are vibrant, professional,             04:40
and up to date.                                            04:40

Do you see that?                                           04:40

A.    What page are we on?                                 04:41

Q.    That's on page 30, the first                         04:41
sentence, the first paragraph.                             04:41

A.    Oh, okay.  Yes.                                      04:41

Q.    Did I read that correctly?                           04:41

A.    You did.                                             04:41

Q.    I want you to flip back to page 29                   04:41
for a second.                                              04:41

The second full paragraph under the                       04:41
term -- or excuse me, under the heading,                   04:41



JOHN MONAGHAN

"Conclusion," let me know if I read this                   04:41

correctly.                                                 04:41

In keeping with the findings of New                        04:41

York State Attorney General's investigation and            04:41

contrary to the opinions offered by the DeFoe              04:41

report, I find that the use of force by PAPD               04:41

officers was -- officers involved was                      04:41

appropriateness, necessary, and reasonable.                04:41

Did I read that correctly?                                 04:41

A.    You did.                                              04:41

Q.    Are you aware that the New York                      04:41

State Attorney General's Office made the                   04:42

determination that they would not bring charges            04:42

against the officer for use of force used in               04:42

this incident?                                             04:42

A.    Yes.                                                 04:42

Q.    Sir, on the third paragraph there                    04:42

you state "The death of Mr. Lagoda is not a                04:42

factor to be weighed in observing the propriety            04:42

of the actions of the officers as they                     04:42

interacted with Mr. Lagoda."                               04:42

Did I read that correctly?                                 04:42

A.    You did.                                              04:42

Q.    Sir, is that based upon your                         04:42



JOHN MONAGHAN

contention that compressional asphyxial did not occur in this matter?

A.   No.  It's based on the standards of reasonableness of the use-of-force.  The outcome is not always under our control.

Q.   Well, if a person dies as a result of the contributing actions of police officers and the Port Authority Police Department; that has no -- the outcome there has no effect on the evaluation of the use of force there?

I'm just -- for clarity sake, I want to ask that.

A.   Yes, you're correct.  The use of force has to be judged if it's reasonable, it can't be judged on the outcome.

Q.   If the evidence were to show that the use of force compressed the lungs of an individual; based on PAPD policy, would that be a factor weighing on the determination whether or not force was reasonable in a hypothetical situation?

A.   It's possible.  Hypothetically, you've got to fill it with a lot more details than that.



JOHN MONAGHAN

Listen, it's inadvert, it's part of a process, it's not a tactic, it wasn't purposeful.  It's possible.

Q.    So you're saying in some instances a resulting death would be weighed as to whether force is appropriate --

A.    No.

Q.    -- whereas, other circumstances the death is not always weighed?

A.    No.  No.  That's not at all what I said.

There is a standard.

It's reasonableness.  The outcome does not effect our assessment of was the force reasonable under the circumstances.

Q.    Is it a determinate factor or a factor for evaluation of whether or not the type of force used was appropriately used and in accordance of police policy?

A.    I'm not sure.  You've made a distinction between the type of force and the reasonableness of it?

Q.    Correct.  For example, if it instructs, don't punch somebody in the gut, but



JOHN MONAGHAN

somebody is punched in the gut, and as a result, a death occurs.

In evaluation of the person's actions based upon the type of force that they would use in that situation, they would be -- the officers or the superiors would make a determination as to whether or not the type of force used was appropriate, given the policies and procedures, correct?

A.   So if they misuse a tactic or violated a standard; yes, of course.

Q.   Okay.  So that is a factor to be determined as to whether or not use of force was appropriate?

A.   If they use a bad tactic or...

Q.   Correct, yes.

A.   Or over -- yes.

Q.   And would that be especially pertinent if that resulted in a death?

A.   Again, it's a standard.  I mean, now, it's a PANY standard.

Q.   Bringing you back to the following page, page 30, sir.  I know you confirmed that I read it correctly, but I'll direct your



JOHN MONAGHAN

attention again to the first sentence on the -- 04:46

of the first full paragraph. 04:46

"The overall regimens and content of 04:46

PAPD training are professional, vibrant, and 04:46

up-to-date." 04:46

Do you agree with that, sir? 04:46

A.   Yes. 04:46

Q.   How do you reconcile that with the 04:46

OAG's findings that the PAPD officers were not 04:46

trained on the vulnerability of someone coming 04:46

out of a seizure? 04:46

A.   Again, I disagree with the OAG's 04:46

word on that. 04:46

Q.   And the AOG report, based upon your 04:46

review, recommended that such practices and 04:47

training should be implemented moving forward 04:47

after this event, correct? 04:47

A.   Another that made no sense, because 04:47

it was 50 to 100 or hundreds of pages of 04:47

training material regarding that. 04:47

Q.   You'd agree with me that the OAG's 04:47

report concluded it, correct? 04:47

A.   They concluded it, yes. 04:47

Q.   When you say "up-to-date," are you 04:47



JOHN MONAGHAN

talking about up-to-date right now or were up-to-date in 2019?

    A.    Up-to-date describes the process. Like, they keep themselves up-to-date.

        If you want to go to the date of my report, I wasn't being specific.

        Up-to-date means that they keep their materials in line with current standards.

    Q.    I see what you're saying.

        So it's an evolving process whether they add additional standards in the language and codify a few things as time goes on; is that fair to say?

    A.    Yes.

    Q.    Now, sir, but for the officers' physical engagement with Mr. Lagoda, do you think he would still be alive today?

        MS. ALTERMAN:  Objection.

        THE WITNESS:  I don't know how to answer that.  I have no idea.

        Now, I'm a doctor?

        I have no idea how to answer that.

        It was -- I mean, the ME spoke to a lot of things, so I couldn't tell you that,



JOHN MONAGHAN

I have no idea.                                            04:48

BY MR. AMRHEIN:                                            04:48

Q.   So you're not sure if Mr. Lagoda            04:48
would be alive today if he was not physically    04:48
engaged with the officers from the Port          04:48
Authority?                                        04:49

A.   No idea.  I can't answer that.  I           04:49
have no idea.  Now you want me to be a doctor.   04:49
Wasn't there underlying conditions               04:49
mentioned in the autopsy?                         04:49

Q.   Now you want to be a doctor?                04:49

A.   No.  I'm asking you.  I'm sorry,            04:49
it's your deposition.                             04:49
There were underlying conditions                 04:49
that would lead me to think maybe he wouldn't;   04:49
I don't know.                                     04:49

Q.   I'm confused, sir.  Sometimes you           04:49
don't want to be a doctor, and sometimes you do  04:49
want to be a doctor, so I'm not sure.            04:49

A.   I read the doctor's report though.          04:49

Q.   I know, sir.                                04:49

MR. AMRHEIN:  For now, I will --                 04:49
that's -- I'm set for now in terms of            04:49
questions.                                        04:49



JOHN MONAGHAN

Cheryl, I understand may have some questions as well for you, sir, and then any questions that I feel need to be followed up, I will follow-up with.

But for now, I am going to pass this to Cheryl.

MS. ALTERMAN:  Okay.  Off the record.  I want to take a few minutes and just look at my notes.

MR. AMRHEIN:  Sounds good, Cheryl.

(Whereupon, proceedings recessed for a short break and once again resumed.)

EXAMINATION BY
MS. ALTERMAN:

Q.    Mr. Monaghan, you were asked questions by plaintiff's counsel about whether or not you agreed that the physical altercation with the Port Authority police officers was a contributing factor to Mr. Lagoda's death.

Do you recall those questions?

A.    I do.

Q.    When you were asked the questions about whether or not the Port Authority police officers' physical altercation was a



JOHN MONAGHAN

contributing factor, what did you mean by that?    05:03

MR. AMRHEIN:  Objection.    05:03

THE WITNESS:  I agreed that it was    05:03
written in that report.    05:03

Q.    When you say "that report," what    05:03
report are you referring to?    05:03

A.    The Attorney General's report.    05:03

Q.    The Attorney General's report when    05:03
it's referencing other significant conditions,    05:03
what other reports, the Attorney General's    05:03
report is relying on, in order to come it its    05:04
conclusion?    05:04

MR. AMRHEIN:  Objection to form.    05:04

THE WITNESS:  The ME report.    05:04

Q.    Does the ME report based upon your    05:04
review of that report that was prepared by    05:04
Dr. Milewski in the City of New York, does that    05:04
report also list other significant conditions    05:04
in the ME's report besides the physical    05:04
altercation?    05:04

A.    Yes.    05:04

Q.    Do you recall that hypertensive    05:04
cardiovascular disease is also one of the    05:04
significant conditions leading to Mr. Lagoda's    05:04



JOHN MONAGHAN

death?

    A.    Yes.

    Q.    Based upon your education, training, and experience and review of this case file, what is your opinion with respect to the use of force that was utilized by the Port Authority police officers that day?

    A.    It's proper and reasonable.  They were faced with a combative man in a confined area, and it was an airplane with 200 people, and he had assaulted a number of them at that point.

          It's not reasonable to allow that assault to continue.

          They are the police.  It's their job to stop that.  They had no choice, but to control this man.

          And they tried to do it without using physical force and they were unable to, based on the man's responses.  And they had to use a reasonable amount of force as necessary to subdue him.

          He had assaulted a number of people, there is another 200 potential victims here,



JOHN MONAGHAN

that is their job, put end to that and use a                05:05

reasonable amount of force to take them under               05:05

control and custody.                                        05:05

    Q.    When Officer Bugiada was confronted             05:05

by Mr. Lagoda who was lunging at him and                    05:05

attempting to strike him, do you consider that              05:05

to be an mercy situation for the officer?                   05:05

    A.    Yes.                                           05:05

    MR. AMRHEIN:  Objection.                                05:05

    Q.    Why is that, sir?                              05:05

    A.    He's in danger.                                05:05

    First of all, you are bringing a                        05:05

firearm onto an airplane, which is a very                   05:05

dangerous situation, it's a very confined area.             05:05

    Mr. Lagoda was actually a large man.                    05:05

Bugiada is alone initially.  You can hear it in             05:05

his voice, if you play the radio tapes, he was              05:05

in danger, and he knew he was, and he needed                05:06

help, and he did everything he could to help                05:06

this man, because he was told.  He tried                    05:06

verbally, he tried pepper spray, and he finally             05:06

had to resort to physical force.  And he was                05:06

calling for help through the whole process.                 05:06

    It was a very dangerous situation.                      05:06



JOHN MONAGHAN

He was alone.  He has a gun.  This man is                    05:06
violent and throwing punches; he was in a bad               05:06
spot.                                                        05:06

Q.    Did you believe that the force used              05:06
initially by Officer Bugiada was reasonable                 05:06
under the circumstances?                                    05:06

A.    Yes.  Yes.  And the circumstances,               05:06
were that, again, he's in a confined area with              05:06
a large crowd of people.  There is a lot of                 05:06
people whose safety is at stake here, including             05:06
Mr. Lagoda's safety, and it was reasonable,                 05:06
yes.                                                        05:06

Q.    Did you also -- do you also believe             05:06
based upon your education and training and                  05:06
experience and your review of this file, that               05:06
the force used by all of the Port Authority                 05:06
officers once they responded to the emergency               05:06
situation and responded to the call for help                05:06
that Officer Bugiada was reasonable and                     05:07
necessary under the circumstances?                          05:07

MR. AMRHEIN:  Objection.                   05:07
THE WITNESS:  Yes.  And not just                05:07
reasonable, it was restraining.                         05:07

Q.    When you said that EMS would not be             05:07



JOHN MONAGHAN

able to treat Mr. Lagoda initially if they had     05:07

responded with Officer Bugiada when he first     05:07

arrived on the aircraft, what did you mean by     05:07

that?     05:07

    A.    He was out of control.  He needed to     05:07

be taken under control.  He was assaulting     05:07

people.     05:07

        For Bugiada to think, except for the     05:07

size, yeah, okay, let's treat this man.     05:07

        It's not reasonable; he would have     05:07

punched them, too.     05:07

        First, the police have to do their     05:07

job, in order to enable the EMS to do their's.     05:07

    Q.    Did you believe that the police     05:07

officers tended to Mr. Lagoda's medical     05:07

emergency once it was observed that he was     05:07

turning blue on the side of his face in a     05:07

reasonable fashion?     05:07

    A.    I thought, yes.  It was immediate.     05:07

Once they recognized the man was in distress,     05:08

immediately, they responded to that.     05:08

    Q.    Do you recall being asked questions     05:08

about the timing as to when Sergeant Vaughn     05:08

responded to the aircraft?     05:08



JOHN MONAGHAN

A.    Yes.                                                      05:08

Q.    Did you review the JFK radio calls             05:08
and transmissions as part of your preparation        05:08
for preparing your Rule 26 expert disclosure?        05:08

A.    Yes.                                           05:08

Q.    And in reviewing those radio                   05:08
transmissions, did you observe as to when            05:08
Sergeant Vaughn responded to the aircraft by         05:08
calling off that he was there, present, on           05:08
scene?                                               05:08

A.    Yes.                                           05:08

Q.    Was Sergeant Vaughn present on scene           05:08
on the aircraft prior to any radio calls for an      05:08
AED machine?                                         05:08

A.    Yes, he was.                                   05:08

Q.    So when you were asked questions by            05:08
plaintiff's counsel as to the fact that              05:08
Sergeant Vaughn responded after Mr. Lagoda was       05:08
turning blue and stopped breathing, do you           05:08
believe that that was an accurate summary of         05:09
the sequence of events when Sergeant Vaughn was      05:09
on scene?                                            05:09

A.    No.                                            05:09

MR. AMRHEIN:  Objection.                  05:09



800.211.DEPO (3376)
EsquireSolutions.com

JOHN MONAGHAN

Q.    Is it your understanding that                         05:09
Sergeant Vaughn was already on scene when --               05:09
before there were any calls for an AED machine?            05:09

A.    That's correct.                                      05:09

MR. AMRHEIN:  Objection.                        05:09

MS. ALTERMAN:  That's all I have.               05:09
Thank you.                                                 05:09

MR. AMRHEIN:  I just have a few                  05:09
follow-up questions, sir.  And again, thank           05:09
you for your time.  We very much appreciate           05:09
it.  We know it is a lengthy process, but             05:09
we do appreciate your time being here                 05:09
today.                                                05:09

EXAMINATION BY                                              05:09
MR. AMRHEIN:                                                05:09

Q.    Sir, did you speak with anybody                     05:09
during the break that we had before defense               05:09
counsel questions?                                        05:09

A.    Just general small talk, no.                        05:09

Q.    During your deposition and any                      05:09
questions asked by me, plaintiff's counsel, you           05:09
were asked a clear question about whether you             05:09
believed the officers' actions contributed to            05:10
the death of Mr. Lagoda?                                  05:10



JOHN MONAGHAN

There was no separate context to that question.  Do you remember that isolated question asked of you, to which you answered that you agreed?

A.    I don't, no.

Q.    You don't recall that, correct?

A.    Well, if that's how it was asked; I thought you were asking about, do I agree that that's written in that report.

Q.    Sir, were you coached to change your answer by the attorney during the break?

MS. ALTERMAN:  Objection.

THE WITNESS:  No.  No.

Q.    You were not; is that your answer?

A.    That's my answer, yes.

Q.    Do you recall the instructions that I gave you at the beginning of the deposition; if you answer my questions, you agree that you understood my questions; otherwise, you would ask me to rephrase, should you not understand?

A.    Yes, I do.  I should have asked you to rephrase it; I didn't understand it.

Q.    So your position is now, after the break, after having general discussion with



JOHN MONAGHAN

your attorney, that you misunderstood the

context of my question and therefore you needed

to change it after the break; is that your

contention?

    A.   My contention throughout the

deposition and throughout this whole case is

that the cops did not contribute to this man's

death.

        So when you asked the question, I

thought you meant I have to agree it's written

in the report, but it's a report.

        And then you asked:  Do I agree with

this statement, no.

    Q.   So you were also asked about

Sergeant Vaughn by defendant's counsel.

        Do you recall that just a few

moments ago?

    A.   Yes.

    Q.   And you were asked about his arrival

when the AED machine was called, correct?

    A.   Right.

    Q.   You were aware that the report that

the investigative -- excuse me.

        The statement taken by the



JOHN MONAGHAN

investigators and written by the investigators,   05:11

that you cited in your report regarding   05:11

Sergeant Vaughn, that Sergeant Vaughn arrived   05:11

after the CPR was already under way for   05:11

Mr. Lagoda, but before the AED machine was   05:11

asked for, are you aware that the report states   05:11

that?   05:11

    A.   No, I am not.  I did not see that in   05:11

the report.   05:12

    Q.   Sir, as I stated beforehand,   05:12

Sergeant Vaughn -- the statement given by   05:12

Sergeant Vaughn and taken by the investigators   05:12

state that he arrived after CPR had already   05:12

commenced.   05:12

      And you're aware that CPR was   05:12

commenced because Mr. Lagoda had suffered a   05:12

seizure had -- strike that.   05:12

      Mr. Lagoda's neck had turned blue,   05:12

the officers identified that he wasn't   05:12

breathing, proceeded to uncuff and provide   05:12

medical treatment to Mr. Lagoda, including CPR,   05:12

correct?   05:12

    A.   No, I did not see that statement in   05:12

Sergeant Vaughn's recorded statement to the   05:12



JOHN MONAGHAN

investigators.  I did not see that in there.

Can you bring that up?  I mean, I didn't see it.

Q.   No, that's fine.  I'm simply asking if are you aware, sir.

A.   I mean, if that's a statement that was in that document?

MR. AMRHEIN:  Respectfully, sir, you know, I'm the one asking questions, I mean that with all due respect, and I understand it's been a long day.

But for now, I have no further questions.

Cheryl may follow-up with more, to which I may follow-up.

MS. ALTERMAN:  I don't have any further questions.  Thank you.

MR. AMRHEIN:  All right.  Great.

Mr. Monaghan, thank you very much for your time.  We very much appreciate it. I know it's been a long day.

Thank you for your time.  We appreciate it, sir.

COURT REPORTER:  Ms. Alterman, will

05:12
05:12
05:12
05:12
05:12
05:12
05:12
05:12
05:12
05:12
05:12
05:12
05:13
05:13
05:13
05:13
05:13
05:13
05:13
05:13
05:13
05:13
05:13
05:13



you be ordering a copy of the transcript?                    05:13

     MS. ALTERMAN:  Yes.                    05:13

     COURT REPORTER:  It is on for a                    05:13

five-day turnaround, is that okay for the                    05:13

copy as well?                    05:13

     MS. ALTERMAN:  Yes.                    05:13

     MR. AMRHEIN:  That's what we                    05:13

originally ordered that both sides would be                    05:13

interest in.  Thank you.

     - o0o -

     (Time Noted:  5:13 p.m.)

     ---------------------

     JOHN  MONAGHAN

Subscribed and sworn to before me

this_____day of _____2024.

-------------------------------------------



C E R T I F I C A T E

STATE OF NEW YORK    )

                     ) ss.:

COUNTY OF ONONDAGA   )

I, Mary Agnes Drury, a Notary Public within and for the State of New York, do hereby certify:

That JOHN MONAGHAN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 23rd day of September, 2024.

_____
Mary Agnes Drury



                                INDEX

WITNESS/EXAMINATIONS                                   PAGE

JOHN MONAGHAN

EXAMINATION BY MR. AMRHEIN                                 6

EXAMINATION BY MS. ALTERMAN                              319

EXAMINATION BY MR. AMRHEIN                              326


                        AMRHEIN EXHIBITS

NUMBER            DESCRIPTION                          PAGE

Exhibit 1    John Monaghan Rule 26(a)(2)                15

             Expert Disclosure Report

             Dated 6/7/24, 40-Pages



                       - o0o -



ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:        Tarasov vs PANYNJ
Dep. Date:        September 16, 2024
Deponent:         JOHN MONAGHAN

CORRECTIONS:

Pg. Ln.   Now Reads        Should Read       Reason

___ ___  _____  _____  _____

___ ___  _____  _____  _____

___ ___  _____  _____  _____

___ ___  _____  _____  _____

___ ___  _____  _____  _____

___ ___  _____  _____  _____

___ ___  _____  _____  _____

___ ___  _____  _____  _____

___ ___  _____  _____  _____

___ ___  _____  _____  _____

___ ___  _____  _____  _____


                         _____

                              JOHN MONAGHAN

SUBSCRIBED AND SWORN BEFORE ME

THIS_____DAY OF_____ 2024.


_____

(Notary Public)  MY COMMISSION EXPIRES:_____

