# EXHIBIT AA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

ALEXEY V. TARASOV, ESQ., Administrator of the
Estate of EVGENIY LAGODA, Deceased, and
GRIGORY TIKHOPLAV,

                      Plaintiffs,

    -against-

PORT AUTHORITY OF NEW YORK AND
NEW JERSEY, and PORT AUTHORITY OF NEW
YORK AND NEW JERSEY POLICE DEPARTMENT
a/k/a PORT AUTHORITY POLICE DEPARTMENT
a/k/a PAPD, PAPD OFFICER MICHAEL BUGIADA,
PAPD OFFICER ROBERT JOSEPH, PAPD OFFICER
JONATHAN PAPIA, PAPD OFFICER PAUL
MEZZACAPPA, and PAPD OFFICER JONATHAN
DURAN,

                      Defendants.

-------------------------------------------------------------------X

Case No.: 21-cv-6226 (NRB)

**DEFENDANTS' FED. R. CIV. P.
26(a)(2) EXPERT DISCLOSURE OF
JOHN MONAGHAN**

      Defendants, Port Authority of New York and New Jersey, (the "Port Authority")[1] , PAPD

Police Officers Michael Bugiada, PAPD Officer Robert Joseph, PAPD Officer Jonathan Papia,

PAPD Officer Paul Mezzacappa, and PAPD Officer Jonathan Duran, (hereinafter referred to

collectively as "Defendants"), make the following expert disclosures pursuant to Rule 26(a)(2):

      **PLEASE TAKE NOTICE**, that annexed hereto is a copy of a report by John Monaghan

dated June 7, 2024.

      **PLEASE TAKE FURTHER NOTICE**, that Mr. Monaghan's qualifications are

contained within his June 7, 2024 report at pgs. 2-4.

      **PLEASE TAKE FURTHER NOTICE**, that Defendants reserve the right to call Mr.

Monaghan as an expert witness at the trial of this action.

---

[1] The Port Authority of New York and New Jersey Police Department a/k/a Port Authority Police Department a/k/a
PAPD was also named as Defendant in this matter; however, the Port Authority Police Department does not exist as
a separate entity that is subject to suit.

**PLEASE TAKE FURTHER NOTICE**, that a list of Mr. Monaghan's prior testimony is contained within his June 7, 2024 report at pgs. 4-5.

**PLEASE TAKE FURTHER NOTICE**, that a statement of the compensation for Mr. Monaghan's study and testimony in the case is contained within his June 7, 2024 report at pg. 30.

**PLEASE TAKE FURTHER NOTICE**, that the following material was made available to this expert: (1) All Pleadings; (2) All Discovery Exchanged by the Parties, including all of Plaintiffs' Document Productions, and Defendants' Bates Stamped Documents from PA1 to PA2673; (3) All Deposition Transcripts; and (4) Plaintiffs' Rule 26 Expert Disclosures.

**PLEASE TAKE FURTHER NOTICE**, that the grounds for Mr. Monaghan's opinions include his education, training, experience, and his examination of the records referenced in the June 7, 2024 report.

**PLEASE TAKE FURTHER NOTICE**, that Defendants reserve the right to amend/supplement this expert disclosure.

Dated:   New York, New York
         June 7, 2024

PORT AUTHORITY LAW DEPARTMENT
*Attorneys for Defendants, Port Authority of New York and New Jersey, PAPD Police Officers Michael Bugiada, PAPD Officer Robert Joseph, PAPD Officer Jonathan Papia, PAPD Officer Paul Mezzacappa, and PAPD Officer Jonathan Duran*

By: */s/ Cheryl Alterman*
    Cheryl Alterman, Esq.
    4 World Trade Center
    150 Greenwich Street, 24th Floor
    New York, New York 10007
    Telephone: (212) 435-3431

2

John Monaghan                    P.O. Box 39                    Blauvelt, NY 10913

June 7, 2024

Cheryl Alterman, Esq.
The Port Authority of NY & NJ
4 World Trade Center
150 Greenwich Street, 24th Floor
New York, NY 10007

Expert Report in the case of Tarasov v. The Port Authority of NY & NJ et al., 21 cv 6226 (NRB)

Introduction

On the evening of April 12, 2019, Mr. Evgeniy Lagoda suffered a seizure onboard a departing aircraft at JFK International Airport. The plane returned to the gate and the Port Authority Police Department (PAPD) was called for assistance along with emergency medical services.

As the plane taxied back to the gate, crew members and medically qualified passengers assisted Mr. Lagoda through the seizure by removing him from his seat and laying him down in the aft galley. After several minutes, the seizure began to subside[1] and Mr. Lagoda stood up and became combative, assaulting the people who had assisted him.

PAPD officer, P.O. Bugiada, responded to the scene and attempted to verbally persuade Mr. Lagoda to calm down, informing him that he had just suffered a seizure, but Mr. Lagoda remained combative and became violent, punching the first arriving PAPD officer. P.O. Bugiada, in lieu of using impact weapons or hands-on force, sprayed Mr. Lagoda with pepper spray. The pepper spray had no effect on Mr. Lagoda's combativeness. Mr. Lagoda continued throwing punches at the officer who then responded with hands-on physical force, still refraining from using an impact weapon though he was armed with a baton.[2] Other PAPD officers arrived, and Mr. Lagoda was eventually placed in handcuffs through the use of non-lethal, hands-on physical force.

---

[1] NYS AG report, "A. Events Leading to Law Enforcement Response," page 3, paragraph 3.
[2] EBT Bugiada, page 68

Upon restraining Mr. Lagoda and rolling him onto his side, the PAPD officers observed Mr. Lagoda turning blue and so checked for a pulse. Finding no pulse, the officers quickly removed the handcuffs and administered emergency medical assistance. EMS arrived and continued to administer emergency medical aid and removed Mr. Lagoda from the airplane on a stretcher. Mr. Lagoda was transported by ambulance to nearby Jamaica Hospital where he was pronounced dead.

The estate of Mr. Lagoda has commenced a civil action claiming that members of the Port Authority Police Department (PAPD) caused the wrongful death of Mr. Lagoda. Attorneys for the defense have retained my services as an expert in police policy and procedure. Following my background and qualifications listed below, I will give a synopsis of the incident which includes a response to the report prepared by The Office of the New York State Attorney General's Special Investigations and Prosecutions Unit (PIU), followed by a rebuttal to the report submitted by plaintiff's police expert, Scott DeFoe.

Background and qualifications

In my twenty-year career with the New York City Police Department, I was decorated 28 times for the intelligent performance of duty, often in the face of grave personal danger. These actions included forcefully removing firearms from the hands of violent felons, handcuffing violently resisting offenders, vehicle and foot pursuits, short-term investigations, transporting, interrogating and processing prisoners and emotionally disturbed persons. As a member of the NYPD, I testified numerous times in grand jury proceedings, pre-trial suppression hearings and criminal trials, appearing as both the complaining witness for the People of the State of New York in self-initiated gun arrests and as a witness for victims of violent crimes such as robberies, assaults, and attempted murders.

After fifteen years on patrol as a police officer, sergeant and lieutenant in both uniform and plainclothes, I earned a promotion to captain. After less than a year in the executive rank, the NYPD sent me to live in Cambridge, Massachusetts to attend Harvard University's Kennedy School of Government where I earned a Master's Degree in Public Administration. Upon being accepted to Harvard, I was awarded the John B. Pickett Fellowship by The National Institute of Justice for study in Criminal Justice Policy and Management. While at Harvard, my course work included Leadership and the Structure of Organizations, a Globalization Seminar at the Harvard

Law School, and Management Control for Public and Nonprofit Organizations. Also while at Harvard, on my own time, outside of a structured class, I conducted a Forum at the Kennedy School on Racial Profiling and Community Policing. I also authored two articles for The Citizen, the Kennedy School newspaper.

Upon graduating from Harvard in June of 2001, I returned to the NYPD to work at One Police Plaza in what is known as the Department's 'think tank' –the Office of Management, Analysis and Planning. After less than a year, I became the Commanding Officer of the Management, Orders and Directives Section (MODS). I remained in that position until I retired in January of 2004.  As the C.O. of MODS, I briefed the Police Commissioner, Deputy Commissioners and Bureau Chiefs on their proposed policies. I conducted investigation and analysis of all proposed policies and was the final reviewer, writer and publisher of every NYPD policy directive.

Having been among the top scorers in the city on every open-competitive promotion exam I took in my career and having achieved the highest grade of all competitors on the 1997 Captain's exam, I started a test-preparation school in 1998. That business, The Key (www.nypdthekey.com), has thrived and is today the top promotion school serving members of the NYPD. Over the last eighteen years, I have taught over 25,000 members of the NYPD who were preparing for their promotion exams. As part of that effort, I have created and currently maintain an exhaustive body of work that transforms the voluminous policies and procedures of the NYPD's Patrol Guide into easily understood lesson plans. When a promotion exam is announced, depending on the rank for which the test is being given (Sergeant, Lieutenant or Captain), The Key conducts ten classes a week during the six-month period preceding the exam across the New York City area and the adjoining counties. During that six-month period, thousands of police students attend class each week on their own time and pay with their private funds to receive the material I have written. Today, many "Key" employees and students are now in the upper management ranks of the NYPD (Deputy Commissioner, Chief, etc.).

Upon retiring in 2004, I began a career as an expert in police policy and procedure. In April of 2007, I testified before the U.S. Congress as a police policy expert (U.S. House of Representatives, Judiciary Committee, Subcommittee on Crime, Terrorism, and Homeland Security). Over the last ten years, I have provided assistance through research, writing and testimony to various organizations both public and private, such as the New York City Law

Department, numerous private law firms and police unions (benevolent associations). I have testified as an expert witness in police procedure cases numerous times in NYS Supreme Court – Civil Branch and in the US District Court, Southern District of NY.

Methodology

I have reviewed and analyzed the documents and materials listed in the Appendix and have prepared this report based on that effort. The opinions expressed in this report are held to a reasonable degree of professional certainty. In this report and subsequent testimony related hereto, I may cite or refer to court rulings, legal principles, or legal concepts. I cite these rulings and refer to these concepts strictly as a law enforcement professional. As a law enforcement officer, I am expected to have a working knowledge of clearly established laws and court rulings related to the profession's core tasks. As a law enforcement trainer, I teach to these laws, rulings, and concepts and have done for many years. As a law enforcement use of force subject matter expert, I have applied these laws, rulings, and concepts in my evaluation of policies, procedures, training materials, and individual officer performance.

Cases in which I have testified as an Expert in the last four years;

- For Nassau County, US District Court, Eastern District of NY, testify at deposition in case of Galloway, 8/19/2022 (Index 19-CV-5026)
- For Nassau County, US District Court, Eastern District of NY, testify at deposition in case of Jackson, 8/17/2022 (Index 18-CV-3007)
- For City of Mount Vernon, US District Court, Southern District of NY, testify at deposition in case of Rutherford/Gallman, 8/15/2022 (Index 18-CV-10706)
- For NYC Department of Homeless Services Police, NYS Supreme Court, New York County, testify at trial, case of Lugo, 3/15/2022 (Index 154302/15)
- For Port Authority of NY & NJ, US District Court, Eastern District of NY, testify at deposition in case of Suriel, 2/16/2022 (Index 19-CV-3864)
- For Ulster County Sheriff, US District Court, Northern District of NY, testify at deposition in case of Cruz, 9/07/2021 (Index 19-CV-0377)
- For City of White Plains, US District Court, Southern District of NY, testify at deposition in case of Chamberlain, 5/25/2021 (Index 12-cv-5142)

4

- For City of White Plains, US District Court, Southern District of NY, testify at trial in case of McNeil, 2/4/2020 (Index 17-cv-3199)

- For NYC Law Department, NYS Supreme Court, New York County, testify at trial, case of Kennedy, 3-27 & 3-29/2019 (Index 150284/2015)

Synopsis of the incident

On April 12, 2019, at 9:55 pm, JetBlue Flight 659 left Gate 18, at JFK International Airport's Terminal 5. About five minutes later[3], a passenger onboard, Mr. Evgeniy Lagoda, had a seizure. Emergency medical protocols were put into effect and 29 minutes after leaving Gate 18, at 10:24 pm[4], Flight 659 returned to a different gate at Terminal 5, Gate 20.

During that approximately half hour process, and as part of the emergency medical protocols, a call was made to the Port Authority Police Department (PAPD) for assistance.

Because an ambulance responding to such an assignment has to drive on the runway side of the terminals, PAPD Command Order 113 calls for EMS to stage at a designated location for a police escort. That designated location in this case was the PAPD office located at 269 South Service Road, referred to as "2-6-9."

The PAPD immediately dispatched Police Officer Bugiada to respond to Gate 20 to board the aircraft when it arrived at the gate to assist the man having the seizure. The PAPD also immediately assigned Police Officer Duran to respond to 2-6-9 to escort EMS to the plane once they arrived at building 2-6-9.[5]

Almost immediately[6] after Flight 659 reached Gate 20 at 10:24 pm, Officer Bugiada boarded the plane. P.O. Duran, having received the EMS escort assignment at 10:22 pm, arrived at 2-6-9 and waited for over seven minutes for EMS to arrive, which they did not.

Upon boarding the front of the airplane, P.O. Bugiada heard cries for help from the rear galley. A flight attendant, who had been punched a number of times by Mr. Lagoda, informed the officer that the subject, Mr. Lagoda, had a seizure but had come out of the seizure and was now punching people.[7] Upon arriving at the rear galley, P.O. Bugiada was met by a combative subject, Mr. Evgeniy Lagoda, with clenched fists. Officer Bugiada attempted to verbally

---

[3] NYS AG report, page 3
[4] Bengston interview by NYS AG, pages PA1457 and PA1461
[5] NYS AG report, exhibit 2, page 1 (JFKIA Patrol Radio (22:22:10 hours))
[6] NYS AG Report, page 4.
[7] EBT Swinney, page 47, lines 2-5

5

deescalate the situation by asking Mr. Lagoda to calm down and informing Mr. Lagoda that he had suffered a seizure,[8] but Mr. Lagoda lunged and struck at the officer. P.O. Bugiada deployed his pepper spray on Mr. Lagoda with no effect. P.O. Bugiada called for help on his radio three times, informing the responding police officers that he was "in a fight" and subsequently, at 10:30 pm, Officer Bugiada radioed that the subject, Mr. Lagoda, was "still combative, speed it up."

Such a call from a uniformed police officer, especially one who is alone at the moment, and who is in a fight and is asking for his fellow officers to respond immediately, is of the highest priority. The severity of such a situation, especially in the mind of a responding police officer, cannot be overstated. On every tour a police officer understands that they may be killed that day. When a fellow officer, who is armed with a gun that could be used against them if they are overpowered in a fight, is a potentially fatal situation. If an officer is within a reasonable distance and is not engaged in an <u>immediate physical act</u> that can't be stopped, e.g.: handcuffing a violator, performing CPR, etc., that officer will and should respond immediately. In fact, the PAPD dispatcher's response to P.O. Bugiada's call for help was to direct <u>all</u>[9] units to respond.

After waiting for more than seven minutes for EMS to arrive at 2-6-9, Officer Duran properly responded to Officer Bugiada's emergency call for help.

Mr. Lagoda continued throwing punches at P.O. Bugiada. The officer punched Mr. Lagoda once and Mr. Lagoda fell to the ground. P.O. Bugiada then attempted to handcuff the subject. Mr. Lagoda struggled against the officer's efforts, biting P.O. Bugiada and pulling on the officer's gunbelt. P.O. Bugiada continued to engage in verbal persuasion throughout the struggle with no effect. Back-up officers arrived within minutes and by 10:35, were able to get Mr. Lagoda into handcuffs.

Upon handcuffing Mr. Lagoda, although he was still kicking, biting and screaming, the officers rolled him onto his side[10] which promotes free breathing. A few minutes after handcuffing Mr. Lagoda, one of the officers recognized that Mr. Lagoda was in distress and turning blue and did not appear to be breathing. The handcuffs were quickly removed, and the officers immediately engaged in life-saving measures. An AED was used, CPR was performed,

---

[8] EBT Swinney, page 47, lines 19-20
[9] JFKIA Patrol Radio (22:29:41) PA1409
[10] First Amended Complaint, paragraph 52.

and oxygen was provided. The officers at the scene made two radio calls for EMS to come "forthwith" and to "make good time."[11]

Within seconds of those radio requests, the PAPD police dispatcher contacted the EMS dispatcher via telephone. During that telephone conversation, some clarification was needed for both parties to understand that this request for an ambulance was one-and-the-same as the original call for an ambulance for a man with seizures. That phone call lasted two minutes. During that two-minute phone call, the EMS dispatcher struggled with her electronic equipment and struggled to gain a response from EMS units in the field via the radio.[12]

As the EMS dispatcher struggled to communicate with EMS units in the field while still on the phone with the police dispatcher, the police dispatcher did not wait for confirmation that an EMS unit was responding to 2-6-9, and since P.O. Duran had responded to P.O. Bugiada's emergency call for help, the dispatcher put a separate call out over the police radio for another police unit to respond "ASAP" to 2-6-9 to escort EMS to the plane at 22:40:59 hours.

Within ten seconds of that radio call, at 22:41:08 hours, P.O. Riccardi of PAPD Response 2 took the assignment, informing the police dispatcher, "I have a car, I'll go back." Officer Duran then also radioed the dispatcher offering to go back to 2-6-9 for the EMS escort duty. The dispatcher, expressing the need to get EMS to the plane quickly, had both P.O. Riccardi and P.O. Duran respond stating, "Whoever gets there first, we need that bus[13] ASAP"

Less than four minutes after accepting the assignment, at 22:45:00 hours, P.O. Riccardi informed that he had EMS and was en-route to the plane and at 22:47:46 hours, P.O. Riccardi updated that he was near Terminal 8 and would be at the plane in a couple of minutes.

Mr. Lagoda had been seated in one of the last rows at the back of the plane and this incident occurred in the aft cabin at the very rear of the plane. A stair truck had been set up at the back of the plane, allowing the responding EMS team to enter directly into the rear galley and make contact with Mr. Lagoda. The EMTs found PAPD officers performing CPR on a non-responsive Mr. Lagoda and took over care of Mr. Lagoda. The EMTs then moved

---

[11] NYS AG report, exhibit 2, page 8 (JFKIA Patrol Radio (22:39:42 hours))
[12] NYS AG report, exhibit 2, page 9 (JFKIA Telephone -Comm. Desk (22:40:05))
[13] "Bus" is police jargon for an ambulance.

Mr. Lagoda on to a stretcher and carried him down to their ambulance. About fifteen minutes later, the ambulance arrived at Jamaica Hospital and about ten minutes after arrival, Mr. Lagoda was pronounced dead.

NYS Attorney General's report

The Office of the New York State Attorney General's Special Investigations and Prosecutions Unit (AG) conducted an investigation into this incident. In its report on that investigation, in the Executive Summary on page 2, the AG mistakenly states that the PAPD failed to have personnel available to escort an ambulance to the plane:

> "Most notably, the investigation revealed that emergency medical services were significantly delayed in responding to the scene due to PAPD's failure to have personnel available to escort an ambulance there. Although there is no evidence that, in this particular instance, a more prompt response would have saved Mr. Lagoda's life, PAPD should revise its practices to make sure such a miscue does not occur in the future."

The AG report's assertion that the PAPD failed to have personnel available to escort an ambulance is inaccurate. The report fails to acknowledge that P.O. Duran was on post, waiting for EMS prior to P.O. Bugiada's call for help.

P.O. Duran was notified and on post awaiting EMS at the designated staging area[14] fully seven minutes[15] before responding to the life-and-death call for assistance from P.O. Bugiada.

The AG's report further fails to acknowledge the efforts made by the PAPD to get EMS onto the plane to treat Mr. Lagoda after P.O. Duran left building 2-6-9.

Where the AG report calls what happened in this incident a "miscue" it does not take into account the great lengths the members of the PAPD went to in order to get an ambulance escorted to the airplane as quickly as possible. There were no miscues on the part of the PAPD.

It is important to understand the exact steps taken by the members of the PAPD to get an ambulance to the plane as quickly as they did. Only a close analysis of the documentation of these steps shows that the PAPD dispatcher went above and beyond basic procedure to accomplish this mission.

---

[14] EBT Duran, page 74
[15] NYS AG, exhibit 2, page 1, JFKIA Patrol Radio (22:22:10 hours)

In its "Exhibit 2," the AG's report presents a transcript of the radio and telephone communications originally compiled by Sergeant Lawanda Irving of the PAPD's Police Integrity Unit. An analysis of the structure of this transcript shows the text of <u>telephone</u> conversations listed intermittently with the text of <u>radio</u> transmissions.

There are separate headings for each segment throughout the transcript, listing the time that the conversation began and whether it took place over the "<u>Telephone</u>," or the "<u>Radio</u>." This distinction between <u>telephone</u> conversations and <u>radio</u> transmissions is important. There is one specific place where these lines are blurred. This occurs at a pivotal point.

The headings in the report are listed chronologically, giving the time that the conversations began. However, the length of time each of these conversations lasted is not listed.

On page 8 of exhibit 2 in the AG report, midway down the page appears the heading, **JFKIA Telephone – Comm. Desk 1 (22:40:05 hours)**. The text under this heading mostly reflects a conversation between the PAPD Dispatcher and the EMS dispatcher. Unlike most of the other segments in the transcript, the text in this segment goes on for two pages rather than just a few lines. There is a reason for this anomaly. This "telephone" heading and its 43 lines of text across pages 8, 9, and 10 includes conversations that took place over the radio, simultaneously during the phone call. This "telephone" heading is then followed, midway down page 10, by two short "radio" headings titled **JFKIA Patrol <u>Radio</u> (22:40:59 hours)** and **JFKIA Patrol <u>Radio</u> (22:41:08 hours)**, respectively.

Since all the entries in this document are listed consecutively on a timeline, these radio transmissions appear to have occurred *after* the long telephone conversation that precedes them. They did not. These two separate listings of radio transmissions are duplicates of lines of text included in the long telephone conversation that precedes them. They took place simultaneously.

## P.O. Williams worked the radio while on the phone

A closer analysis of these three headings as a group makes it clear that the telephone transcription includes statements ***overheard*** through the phone as PAPD Dispatcher Williams also directed his police field units over the radio while on the phone with the EMS dispatcher.

Officer Williams did not tell the units in the field to 'standby' while he conversed with the EMS Dispatcher over the phone, nor did he tell the EMS Dispatcher to 'hold on' while he

9

conversed with the police units in the field over the radio, instead he engaged in these two specific, vital, and complicated tasks at once.

P.O. Williams was able to coordinate these two essential resources simultaneously to bring about the best possible outcome and get an escort for EMS to come to building 269 and to bring EMS to the airplane as soon as possible. These are the lengths the PAPD went to in order to get an ambulance to the airplane as quickly as they could.



### Rebuttal of the DeFoe report

I have reviewed the report of plaintiff's police expert, Scott DeFoe, regarding this incident. Nothing in the DeFoe report documents any members of the PAPD as deviating from accepted practices or being reckless. Rather, the DeFoe report reinforces the fact that police officers often must take actions in heated situations to protect themselves and others.

Notwithstanding the irrelevant policy and training materials cited by the DeFoe report, there is nothing in the report that shows the policies and training of the PAPD as substandard nor refutes what the NYS Attorney General observed about those policies in the 'training recommendations' section on page 12 of the PIU's report: "PAPD's current use of force policy appropriately instructs officers using force to conduct a careful balancing of all human interests

and use only that force that is reasonably necessary to bring an incident under control, while protecting the lives of the officer or another."

Though there were changes made to the policies and training of the PAPD regarding the use of force after this incident took place, those changes were also made by the NYPD and other police departments having jurisdiction in New York City in response to the New York City Council's enactment of Section 10-181 of the NYC Administrative Code, passed on June 18, 2020, known as the Diaphragm Law. Those changes do not reflect any shortcomings in existing policies or procedures and were relatively nominal, essentially made to include the word, 'diaphragm.'

| PAPD G.O. 100-05, Use of Non-Deadly Force, revised 07/09/2015 | PAPD G.O. 100-05, Use of Non-Deadly Force, revised 08/06/2020 |
|---|---|
| Officers should make every reasonable effort to avoid compressing and restricting the suspect's airway, or compressing the suspect's neck and chest area when applying physical force. | Members of the Force are prohibited from sitting, kneeling, or standing on the subject's torso (chest, back, or abdomen) in a manner that compresses the diaphragm. |

Despite the claims made throughout the DeFoe report, these changes to the PAPD policies were properly disseminated and effective training was conducted, resulting in widespread knowledge and understanding of the new law throughout the PAPD workforce:

P.O. Mezzacappa, EBT page 21:

Q. How about restraining techniques?

A. That has changed with the laws that have been passed.

Q. Can you describe those changes, please?

A. The New York City laws requiring officers to -- not allow officers to compress on an individual's diaphragm. We received updates on that.

P.O. Papia, EBT page 25:

Q. Are there any updates to the -- what is taught to officers about use of force that you have not learned at the police academy that is now different?

A. Yes.

Q. Can you tell me what that is?

11

A. That a new law came into effect with the diaphragm.

Q· Is that applying body pressure to the body of a person and ultimately pressuring the diaphragm?

A. Yes.


P.O. Duran, EBT pages 16-17:

Q. When you were at the police academy, did they teach you about positional restraints and compressional asphyxiation?

A. Yes.

Q. What, in particular, did they teach you about with respect to positional restraints and compressional asphyxiation when you were at the police academy?

A. They taught us how to restrain someone, putting their hands behind the back and to effect the restraint in an ordinarily fashion without putting any pressure on their neck.


P.O. Joesph, EBT, page 20:

Q. Is compressional asphyxiation covered in the training either modules or classes you take about positional restraints?

A. It's mentioned in the memo or the policy or procedure, but that is it.


P.O. Bugiada, EBT page 29:

Q. Were the IST (In-Service Training) classes similar to the use of force lessons you received at the police academy?

A. Similar, yes.

Q. Were there any differences?

A. There were differences that evolved since I have been there.


**NSC Lesson Plans**

Further regarding irrelevant policy and training materials, the DeFoe report claims that the PAPD does not "comply" with National Safety Council (NSC) lessons. The NSC materials are not police policy nor policing directives.

The NSC is allied with OSHA (Occupational Safety and Health Administration) to improve workplace health and safety. OSHA and NSC promote understanding of the rights of workers and the responsibilities of employers under the Occupational Safety and Health Act to prevent unintentional workplace injuries and are partnered with other OSHA Alliance participants to address construction and general industry safety issues.[16] This is not police procedural material. The NSC lessons are not designed for police officers to comply with. Materials such as the NSC lessons are sometimes included in police training to give police officers insight into how other professionals are trained in safety matters.

NSC training materials are not the standard by which police officers should be questioned or judged regarding their response to an emergency situation.

The DeFoe report offers eight opinion-based arguments. A number of these opinions overlap and repeat themselves, while rearranging the same language. For example, in its numbered opinion 3, the DeFoe report claims that the force used by the officers in this case was unreasonable, unnecessary and inappropriate **lethal** force. Then in its numbered opinions 4 and 8, the report claims that the force used was inappropriate, unnecessary and unreasonable. Also in its opinion 1 and then again in its opinion 2, the report mentions the language barrier present because Mr. Lagoda did not speak English.

The eight separate, numbered opinions in the DeFoe report appear to break down into a few recognizable categories: The use of force, de-escalation and the language barrier, and recognizing a medical emergency.

Nevertheless, this rebuttal will cover the points made in the DeFoe report but in a more cohesive manner, beginning with the opinions regarding the use of force.

**Use of Force**

First, the use of the term, '**Lethal** Force' in this case is, itself, inappropriate. Lethal force was not used. The New York State Department of Criminal Justice Services, in giving its definition of 'Deadly Physical Force'[17] (which is the term used in NYS, rather than 'Lethal'), borrows from the definitions found in Article 10, "Definitions" in the NYS Penal Law:

---

[16] NSC.ORG
[17] Criminaljustice.ny.gov, Use of Force, Model Policy, Municipal Police Training Council

Deadly Physical Force - Physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury.

The force used by the officers in this case was not deadly force. Open hand strikes and unarmed grappling and the use of pepper spray are not considered by anyone in police science to be 'readily capable of causing death.' That term is generally used to describe the use of a firearm. This can be seen in the PAPD definition found in General Order 100-04, Use of Deadly Force which expands on the NYS PL definition:

Deadly Force -Physical force, which, under the circumstances in which it is used, is readily capable of causing death or serious physical injury. The use of a firearm constitutes deadly physical force.

It should be noted here that, after their extensive and professional investigation, the New York State Attorney General's Special Investigations and Prosecutions Unit found that, although the use of force by the PAPD officers in this case likely contributed to Mr. Lagoda's death, the level of force used was not deadly as the AG report states:

"the resulting injuries were ugly, they were ultimately superficial, and – though painful – would have caused no meaningful or lasting damage to an otherwise healthy person."

The AG's report, in a foot note on page 10, specifically advises that:
"it is highly unlikely that the law would regard the officers' use of force to be "readily capable of causing death or serious physical injury."

The AG's report goes on to conclude that the force used by these officers was legally permitted and justified as the report states in its Legal Analysis:
"There can be little doubt that the officers were legally permitted to use at least some degree of physical force on Mr. Lagoda."
"It would be difficult to conclude, and even more difficult to prove, that the use of force was unjustified."

14

**Force Used Was Not the Cause of Death**

It is my opinion that the force used by the PAPD officers did not contribute to the death of Mr. Lagoda. Notwithstanding the AG's assertion that the force used *likely* contributed to Mr. Lagoda's death, the Medical Examiner, Dr. Yvonne Milewski did not make that statement. The doctor recorded the primary cause of death as: sudden death following grand mal seizure of undetermined etiology and listed other significant conditions as contributing factors which included hypertensive cardiovascular disease and physical struggle/altercation with blunt impacts. Doctor Milewski did not say that either of those conditions likely contributed to Mr. Lagoda's death. Even the AG's report itself, as cited directly above, stated that the force used was not capable of causing death.

Dr. Milewski, in a meeting with investigators to discuss preliminary findings from the autopsy of Mr. Lagoda[18], stated that the bruising and cuts on Mr. Lagoda's face and torso, although dramatic in appearance, were superficial and that Mr. Lagoda did not suffer any broken bones. The Doctor went on to explain that the force applied to Lagoda by the P APD Police Officers at the scene would not have been enough to kill an otherwise healthy person.

And even though the force used by the PAPD officers in this case does not fit the legal definition of Homicide in the New York State Penal law: "Conduct which **causes** the death of a person," Dr. Milewski went on to clarify the difference between that legal definition of Homicide and the medical definition. Dr. Milewski explained that a "Homicide" determination made by her office merely accounts for the fact that the death was not caused by "natural" circumstances. (The OCME identifies a cause of death as "natural" only if the death is due *exclusively* to natural causes).

Further, it is implausible to consider that the force used by the officers contributed to Mr. Lagoda's death when taking into account Mr. Lagoda's erratic medical and physical conditions prior to his interactions with the police.

There is video surveillance of Mr. Lagoda's activities as he moved throughout the terminal at JFK in an apparently normal manner. Mr. Lagoda then boarded the plane and was seated with no apparent issues. Then Mr. Lagoda suddenly went into a seizure to the point of having to be carried out of his seat and laid on the floor in a semi-conscious state. But shortly thereafter, Mr. Lagoda was on his feet again, throwing punches at people to the extent that Flight

---

[18] PA1683 PIU Investigative Action Report

15

Attendant Kareem Aarndel described it as, "I've never, I've dealt with passengers that had seizures before. I've never seen them come out with that, that kind of strength and anger in my life. It was something different about that." And one of the nurse passengers that attempted to aid Mr. Lagoda, Nathana Wright-Reid, described Mr. Lagoda's post-seizure behavior as, "When he stood up, there was nothing wrong with him. Like he was fine, and that's why I was explaining to him that, you, good. You had a seizure but it looks like you're okay, but by the time I could finish, he hit me and then it was just all hell broke loose."  And then, once the officers had subdued Mr. Lagoda and he was again on the floor, this time in handcuffs, he continued fighting with the officers.

> <u>P.O. Papi, EBT, page 96</u>:
> - Even when he was handcuffed, he was still trying to bite. He was screaming. He was trying to bite us. Even as we were able to get him on to the side to search him, he was still actively trying to get us off him, trying to get his body so we couldn't get to his waistband to see if he had weapon concealed in that position. He was actively trying to fight us.

> P.O. Bugiada, EBT pages 77-78
> - Q. When Mr. Lagoda was handcuffed, he was prone on the ground with his hands behind his back?
> - A. So, at that point, Mr. Lagoda was still attempting to grab my gun belt. I believe he was grabbing onto my pants at that point. I had to pull his hand off of me, and I stood up from the situation and left shortly after.
> - Q.  And he was doing so with handcuffs on his wrists, with his hands behind his back?
> - A. Yes, they were centered more toward his side at that point.
> - Q.  But he was -- am I correct, he was still cuffed at that time?
> - A. Yes.

Once the officers had handcuffed Mr. Lagoda, searched him for any possible weapons, had checked on themselves and each other, and had rolled Mr. Lagoda onto his side after completing their search, two PAPD Supervisors, Sergeant Vaughn, the Patrol Supervisor

16

covering outside the terminals, and Sergeant Mitchell, the Patrol Supervisor covering the terminals, entered the plane and made the following observations.[19]

- In his statement to the AG and PAPD investigators, Sgt Vaughn stated that he entered the plane and stepped to the side to allow a number of Officers to exit the plane. He then made his way to the back of the plane and observed Mr. Lagoda laying on the floor with his head to his right and feet to the left and his face was red (flushed) from his nose down around his mouth, he did not know if he was cuffed or not. The scene did not look unusual to him and his officers seemed to have it under control and assumed the passenger was a collar and he would be treated at the base.

- In his statement to the AG and PAPD investigators, Sgt Mitchell stated that he entered the plane after Sergeant Vaughn who informed Sergeant Mitchell that the situation was under control and that the person (Mr. Lagoda) had been maced and to send EMS to the base, they would bring the prisoner there.

It is apparent that after Mr. Lagoda was handcuffed, he did not evince any signs of another medical episode. Not only did Mr. Lagoda continue fighting with the officers, but both patrol supervisors had boarded the plane, stepped aside to allow a number of the involved officers to leave the back of the plane, and then made observations of the restrained Mr. Lagoda who did not evince any signs of another medical episode.

Further evidence of the physical force used by the PAPD officers not being directly related to the final seizure suffered by Mr. Lagoda is found in the timeline provided by the transcript of radio transmissions documented in the Attorney General's report. The dispatcher, Officer Williams, declared the situation as being under control at 10:34 and an unknown officer transmitted that Mr. Lagoda was handcuffed, also at 10:34.

The call for an AED came over the radio at least five minutes later at 10:39.

By observing the erratic nature of the manifestation of Mr. Lagoda's physical and medical condition; from his sitting in his seat on the airplane in an apparently normal condition to being suddenly slumped over in his seat and having to be carried out into the aisle and laid on the floor, to his standing up and "looking like he was fine," to being handcuffed but still kicking, biting

---

[19] PA1554 NYS AG's PIU Investigative Report

17

and screaming and then, sometime after being handcuffed, again entering into another medical episode and turning blue, it is obvious that his sudden death was due to, what the M.E., Dr. Milewski, documented as "sudden death following grand mal seizure of undetermined etiology complicated by post-ictal excited delirium" and not the physical force used by the members of the PAPD.

Opinion # 3 of the DeFoe report expands its opinion regarding the use of force by stating that the officers failed to immediately take the pressure and weight off Mr. Lagoda's back once he was on the ground and in a prone position. Opinion 3 goes on to say that the officers should have rolled Mr. Lagoda onto his side and, as soon as he was handcuffed, gotten him off his stomach. This portion of the report also states that the officers used unreasonable, unnecessary and inappropriate lethal force and did not comply their department's General Order governing the use of non-deadly force (G.O. 100-5).

To support these erroneous opinions, the report cites testimony in the case, most of which is incomplete and misleading:

The DeFoe report:

- Quotes P.O. Bugiada, during his interview with AG investigators as saying, "he just put his body on top of the male because he was attempting to get up, (like doing a pushup)."

The actual evidence:

- The above statement was taken from the notes made by Investigator Bryan Mason of the AG's office during an interview with P.O. Bugiada. Those notes manifested in the AG's official report as:

  o "In any event, according to Officer Bugiada, although he was immediately able to take hold of one of Mr. Lagoda's arms, he could not bring it behind Mr. Lagoda's back, and in the struggle ended up on top of Mr. Lagoda, with Mr. Lagoda lying on his back and Officer Bugiada straddling Mr. Lagoda's midsection. (One passenger's account described Officer Bugiada as "straddling" a face-up Mr. Lagoda "across his legs.")

- During his EBT, P.O. Bugiada described that specific interaction by testifying:

  Q. Were you laying on top of Mr. Lagoda, trying to hold his shoulder down…?

  A. No, I was not laying on him.

18

Q. So were you on your knees? Can you just describe to me your position, sir, at that time when you are trying to keep Mr. Lagoda's shoulder down on the ground?

A. Sure. I was straddled across his waistline, my knees would have been on either side of him, and holding down his shoulder with my hand.

The DeFoe report:

- Quotes P.O. Duran, in his EBT (page 50), as saying that, when he first saw Mr. Lagoda, he was chest down.

The actual evidence:

- P.O. Duran, EBT, page 50:

    Q. When you first saw Officer Bugiada, how was he positioned?

    A. Officer Bugiada was positioned on his side.

    Q. Was Mr. Lagoda face down with his chest on the ground?

    A. I would not say face down. When I arrived, I could see a side profile of his face.

    Q. Was he facing the ground -- regardless of where his head was positioned, was his head, chest and body face down on the ground?

    A. His chest was on the ground.

    Q. Was he laying prone?

    A. Yes.

    Q. Was Officer Bugiada sitting on top of Mr. Lagoda?

    A. No.

The DeFoe report states:

- "it is safe to say that other P.O.s were still applying pressure to Mr. Lagoda after he was handcuffed." and attributes this notion to testimony by P.O. Papia, in his EBT (page 58)

The actual evidence:

- According to P.O. Papia's EBT testimony, the above statement leaves out the fact that Mr. Lagoda was still violent after being handcuffed and any pressure applied at that time was as Mr. Lagoda was on his side.

- EBT Papia, page 58:

    A.  Mr. Lagoda, after he was handcuffed, was still continually bucking his body trying

19

to escape. He was very aggressive after being handcuffed.

Q. So is it fair to say other officers were still applying pressure to Mr. Lagoda after he was handcuffed?

A. Absolutely.

Q. Am I correct after Mr. Lagoda was restrained, officers then rolled him over on to his side?

A. That is correct.

The DeFoe report states:

- According to P.O. Papia, it was a few minutes from the time Mr. Lagoda was placed in handcuffs until it was first observed that Mr. Lagoda was turning blue.

The actual evidence:

- This fails to note that Mr. Lagoda was not in distress nor turning blue immediately upon being handcuffed.

- EBT of P.O. Joseph, page 90:

    Q. Once he was rolled to one side, what did you do at that point in time?

    A. Then he was moved towards the middle of the galley, and he was still actively resisting. He was then repositioned to attempt to be taken out of the galley. And that is when I noticed he was blue and he was unhandcuffed.

    ---

    Q. Once you observed that he was turning blue, what did you do next in response?

    A. Immediately unhandcuffed him.

The DeFoe report cites:

- According to P.O. Joseph in his EBT (page 42), Mr. Lagoda was face down on his stomach when he (P.O. Joseph) engaged him.

The actual evidence:

- This statement is incomplete and leaves off the fact that Mr. Lagoda was still fighting while face down;

    Q. When you physically engaged Mr. Lagoda, was he lying face down on his stomach?

    A. He was face down on his stomach more towards his left side a little bit.

20

----

Q. It sounds like you said he was face down on his left side in the galley of the plane?

A. That is correct.

Q. What was Mr. Lagoda doing at the time you engaged him? Was he kicking? Was he flailing?

A. He was actively resisting arrest.

Contrary to the opinions offered by the DeFoe report regarding the use of force by the PAPD officers in this case, the force used was reasonable and appropriate. The actions of these officers were entirely within the guidelines of PAPD General Order 100-5, "Use of Non-Deadly Force." The officers did in fact roll Mr. Lagoda onto his side as soon as he was handcuffed. Deadly force was not used, no dangerous instruments were used to force compliance from the resisting Mr. Lagoda, and the least amount of force necessary to bring the situation safely under control was used.

These opinions are reinforced by the finding of the NYS AG's PIU where they write in page 10 of their report:

> "Had the officers struck Mr. Lagoda with some kind of dangerous instrument, such as a baton, or kicked or stomped him to induce compliance, the reasonableness of their conduct could have been more readily called into question. Similarly, if the officers had continued to strike Mr. Lagoda even after he had been restrained, their conduct might well have been unjustified, and the analysis would be quite different."

**Language Barrier and De-escalation**

The DeFoe report claims that the officers failed to ascertain that Mr. Lagoda did not speak English and could not understand their commands. The report also falsely claims that the officers failed to use de-escalation techniques.

It is a faulty assumption that because Mr. Lagoda did not speak English, he could not understand the commands of the police officers who were trying to assist him. Also, it is widely understood in police training that non-verbal communication such as 'officer presence' is an essential part of de-escalation techniques and that verbal persuasion does not entirely rely on the

21

subject's understanding of the actual words being spoken as much as they do rely on the body language of the officers issuing them. Officer presence/Command presence is an important component of The Force Continuum which will be discussed in further detail below.

When communicating with a person, a uniformed police officer is taught to understand that only a small percentage of what they verbalize will be understood and that much more is communicated during the interaction in a non-verbal manner. The 1967 Mehrabian study, widely known as the "7%-38%-55% Rule," highlights the varying impact of words, tone of voice, and body language in communications.

The relevance of this study is illustrated by The International Association of Chief of Police (IACP) Training Key #630 titled, Effective Police Communication:

> In any face-to-face verbal communication, the total impact of the verbal transaction can be divided as follows: content, or the message that one is trying to impart amounts to roughly 7 to 10 percent; one's voice inflection and other characteristics of delivery is between 33 and 40 percent of the transaction; and non-verbal actions, such as body language and facial expressions make up the remaining 50 to 60 percent of the verbal interchange. Therefore, it is truly not what you say, but how you say it.

The application of this concept in PAPD training is documented in the training records of a number of PAPD officers involved in this incident showing how the concept was taught and tested.[20]

The manifestation of this training in seen in the testimony of Officer Bugiada in his EBT on pages 69-70:

> A. So, initially, when the females were screaming for help and I could see that Mr. Lagoda was not complying with my command, even though I was in uniform, at that point, I attempted to radio for backup assistance.
>
> Q. Again, Mr. Lagoda -- the commands you gave to Mr. Lagoda were in English; am I correct?
>
> A. So it was in English, but I was in full uniform, with an authoritative presence,

---

[20] PA2171-2259, PA2268-2339, PA2346-2434, PA2441-2531, PA2539-2587

issuing commands and gesturing what I would like him to do, to move to the side, which he clearly was ignoring.

De-escalation is a part of the first stages of what is known by varying titles, industry wide, as the Force Continuum.

**The Force Continuum**

The U.S. Department of Justice (DOJ)'s National Institute of Justice (NIJ) developed a tool referred to as the Force Continuum[21] which manifests in some training materials as a Force Options Wheel or a Matrix or any similar working title, depending on the police department. The essential elements are the same.

The Force Continuum is a compilation of best practices and lessons learned throughout policing and is informed by the Justification Statues of the law. When a police officer needs to gain physical compliance from a subject, the best method is non-physical force.

The continuum is a guide, not a rigid requirement to proceed in a predetermined way. The level of force used needs to be consistent with the level of threat presented. It is not reasonable to engage in the lower levels of physical force on the continuum if the threat presented is more serious.

The continuum begins with officer presence and/or verbal commands and continues along intervals of greater force as dictated by the response of the subject.

| DOJ Force Continuum/PAPD Use of Force Matrix |
|---|
| Professional Presence (implied authority of the uniform) |
| Verbal Persuasion (attempt to achieve control before resorting to physical force) |
| Hand Techniques (Unarmed physical force used to overcome resistance through physical strength and skill, e.g. Punches, Grips, Compliance Holds, etc.) |
| Less-Lethal Weapons<br><br>• Pepper Spray, Taser, etc. |
| Impact Weapons<br><br>• PR24 (side handle) Baton, Collapsible Baton. |
| Deadly Physical Force |

---

[21] National Institute of Justice, Office of Justice Programs, Training Topics (NIJ.GOV)

As illustrated on the previous page of this report in P.O. Bugiada's EBT, pages 69-70, P.O. Bugiada, the first officer to approach Mr. Lagoda, acted in accordance with the continuum. Officer Bugiada was <u>in uniform</u> and issued commands <u>and gestured</u>, in the officer's words, 'with an authoritative presence.'

The NYS AG's report describes witnesses as recalling, "Officer Bugiada stated to Mr. Lagoda that he had just had a seizure and instructed him to "calm down."

Officer Bugiada testified at his deposition:

> A. I issued commands to Mr. Lagoda to step towards the corner of the galley to make way for the women to get past him.
>
> Q. Did Mr. Lagoda comply with your commands?
>
> A. No.
>
> Q. When you issued these commands, did you do so verbally, in addition to using any gestures?
>
> A. Yes, I did both.
>
> Q. Describe for us the gestures that you made while using verbal commands.
>
> A. I pointed towards the corner of the galley, and I commanded Mr. Lagoda to step back, get back to the corner, while gesturing with my hand to him.

Officer Bugiada's professional presence and the implied authority of his uniform coupled with verbal persuasion failed to gain compliance from Mr. Lagoda who then lunged at the officer with clenched fists. The officer then deployed his OC/Pepper Spray at the charging Mr. Lagoda.

The governing PAPD procedure, G.O. 500-12, "OC/Pepper Spray" states, in part, in its "Procedure" statement:

> "O.C. spray may be used when a member reasonably believes it is necessary to effect an arrest of a resisting suspect, for self-defense or defense of another from unlawful force."

The PAPD Police Academy OC Spray Lesson Plan trains officers to tactically utilize OC spray prior to physical contact:

24

XIII. Deployment Tactics,

    B. Tactics

        1. Use OC Spray early utilizing the element of surprise.

        2. Prior to the escalation of physical contact.

According to P.O. Bugiada, the OC Spray had no effect on Mr. Lagoda who simply wiped his face and threw a punch at Officer Bugiada's head. At this point in the Force Continuum, P.O. Bugiada would have been authorized to draw his baton and strike Mr. Lagoda with it. In a show of restraint, the officer chose not to use his baton and instead ducked Mr. Lagoda's punch and used his unarmed hands to try and stop Mr. Lagoda from assaulting him. As Mr. Lagoda charged at Officer Bugiada, the officer punched Mr. Lagoda once in the face and Mr. Lagoda fell to the ground. As illustrated previously in this report, the use of force was entirely within accepted police practices and the procedural guidelines of the PAPD and the law.

The language barrier was not a factor as Officer Bugiada engaged in proper tactics in keeping with the Force Continuum and PAPD's procedures by presenting a professional and commanding presence in uniform and communicating with Mr. Lagoda with appropriate physical gestures. P.O. Bugiada engaged in proper de-escalation efforts by first attempting to calm Mr. Lagoda and bring the situation under control without the use of force. The aggressive and violent actions of Mr. Lagoda in the face of the officer's de-escalation efforts called for the other tactics available on the Force Continuum/Matrix and the officer properly engaged in those steps and did eventually bring the situation under control.

**Recognizing a medical emergency**

In opinions 1 and 6, the DeFoe report claims that, "P.O.s Bugiada, Duran, Joseph, Mezzacappa, and Papia failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act reasonably and appropriately." And that, "P.O. s Bugiada, Duran, Joseph, Mezzacappa, and Papia failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having a difficulty breathing and take appropriate action."

Of the 5 police officers named in these opinions only 1 was initially called to respond to a medical emergency. The first call to the JFKIA Police Desk about Mr. Lagoda came from ground control which had learned about the medical emergency directly from the aircraft's pilots.

25

P.O. Bugiada was dispatched by the PAPD dispatcher via radio to respond to Gate 20 for a "male having a seizure." P.O. Duran was assigned to respond to building 269 to escort EMS to the plane once they arrived at building 269.

With P.O. Duran on standby at building 269, awaiting the arrival of EMS, P.O. Bugiada boarded the plane, responding to a medical emergency. The remaining 3 police officers named herein were entirely uninvolved at this stage. Those three officers, Joseph, Mezzacappa, and Papia responded to P.O. Bugiada's call for help which was documented as follows:

At 29 minutes and 22 seconds after 10 p.m., P.O. Bugiada first attempted to call for help:

- Unknown (P.O. Bugiada, "8-9-3"): *inaudible*
- Officer Williams (Dispatcher): "Last unit, you're not coming over. Last unit go again."

Nineteen seconds later, P.O. Bugiada was able to send a second call for help:

- Officer Bugiada: "Kennedy, 93, speed it up."
- Officer Williams: "Roger 8-9-3, uh, male having a seizure?"
- Officer Bugiada: "Negative, I'm in a fight. Send me another one."
- Unknown: "Where is he?"
- Officer Williams: "Roger, what's your location?"
- Unknown: *inaudible*
- Officer Williams: "8-9-3, what is your location?"
- Officer Bugiada: "Gate 20, on the plane!"
- Officer Williams: "Roger, Gate 20, Terminal 5. All units Gate 20, Terminal 5."
- Officer Bugiada: "Still combative, speed it up."

It was after this exchange wherein the PAPD dispatcher, Williams, ordered all units to respond, that the remaining three officers, Joseph, Mezzacappa, and Papia began to respond to this incident. Clearly, these officers were not responding to a medical emergency but rather to a potential life or death police emergency.

Officer Bugiada, however, did initially respond alone to a medical emergency onboard Flight 659. Once onboard, P.O. Bugiada was informed by flight attendant Swinney that the subject of the call, Mr. Lagoda, had a seizure but had come out of the seizure and was now punching people. Although at that moment, the call reverted from a medical emergency to a

26

police emergency involving an assault, P.O. Bugiada did not draw a weapon and approached the subject, Mr. Lagoda, to render aid and try to calm him down. Once Mr. Lagoda responded to the officer's uniform presence and de-escalation efforts with violence by throwing a punch at the officer, the police emergency took precedence over the past, underlying medical call.

It is widely understood throughout policing and indeed common sense that any call for assistance may be, or become, an incident entirely different than what the call was originally stated to be. This is apparent in much of the testimony in this case, not just from P.O. Bugiada, but also from the front-line supervisors and middle managers (Sergeants and Lieutenants) deposed in this case:

- EBT Bugiada, page 54:

    Q. Am I correct that you were responding to a call for a male having a seizure aboard a Jetblue flight?

    A. That is the call that I was dispatched to, but we get calls all the time where we think we are responding to one type of job and it's completely different from the initial call.

- EBT Lt Bergery, page 106:

    Situations are always evolving, and as police officers we have to adapt to whatever the situation is. If an individual is coming out of a medical crisis or a situation and they're combative, they're not just a patient…

- EBT Lt Irving, page 105:

    In this particular situation, the officers were presented with an individual who did not present having a seizure. He presented as a violent subject. Therefore, in this situation, the officers responded according to what they were presented at the time, which is someone who was violent.

- EBT Lt Irving, page 109:

    Based on my experience as an officer, calls often come in one way and turn out another.

27

- EBT Lt Sandoz, pages 60-61

> You know, the thing with calls, you' re out in the field and you're hearing calls and many of the calls that come into the desk, you know, an officer in the field gets an 810, an 820 , this or that, many times those aren't exactly what the jobs are. So just because someone either calls in a job or a job is communicated out to the field, you know, in many cases, it's not the same when you get to the scene, you know. We get a lot of assaults, you know, that turn out to be two people arguing. We get a lot of cardiacs, that is when you get there, the guy says: No, I just ate something bad and they're not a cardiac. So everything is not what it initially -- in fact, I would say many jobs are not exactly what they start out as. So, you know, to say something originally, yeah, but things change. You know, one thing could start as one thing and it could be something completely different, slightly different. You know, when you're dealing with patrol -- I've been on patrol my whole career you never know what you're walking into. So you -- you know, you're always having it in my mind as you are responding there, you know, that it could be something else, you know.

Once Mr. Lagoda was restrained and searched, all five officers were then faced with a medical emergency. Within a minute of handcuffing Mr. Lagoda, the officers noticed that Mr. Lagoda was turning blue. The incident then reverted back, from a police emergency involving an assault and an arrest, to a medical emergency.

Contrary to the above opinion in the DeFoe report, the officers quickly recognized that Mr. Lagoda was in medical distress and took immediate and appropriate action. The officers immediately took the following actions:[22]

- Checked for a pulse,
- Removed the handcuffs,
- Laid Mr. Lagoda on his back,
- Called for an AED (Automatic External Defibrillator),
- Began CPR,
- Administered Oxygen to Mr. Lagoda.

---

[22] NYS AG Report, "C. Medical Assessment and Treatment,"

28

These efforts continued until EMS arrived and took over care of Mr. Lagoda.

It is my professional opinion that Officer Bugiada's initial approach to Mr. Lagoda was appropriate and proper and within the guidelines of the PAPD General Orders and all industry standards. Although the officer was on the airplane in response to a call for a man having seizures, that is not what the officer was faced with upon engaging with the subject. Even though the officer was faced with a combative subject who was throwing punches, the officer did try to calm the subject down and render aid through the use of his uniformed command presence and direct, and obvious hand gestures.

It is clear from the above facts that Officer Bugiada and the four other officers initially present did, once the assignment reverted from a police emergency to a medical emergency, immediately recognize that Mr. Lagoda was in medical distress and took appropriate action.

**Conclusion**

After a thorough review and analysis of the facts and materials presented to me in this case, I have compared the actions of the officers involved to the pertinent rules, procedures and industry standards. Based specifically on the PAPD's Use of Force procedures and industry standards regarding the use of force, it is my opinion that the members of the PAPD acted appropriately and entirely within all pertinent rules, procedures and standards.

In keeping with the findings of the NYS AG's investigation and contrary to the opinions offered by the DeFoe report, I find the use of force by the PAPD officers involved was appropriate, necessary and reasonable. More specifically, I find the initial approach and disinclination to use force, coupled with the de-escalation efforts made and the eventual reluctance to use a higher level of force by P.O. Bugiada to be a professional and responsible illustration of restraint.

Although Mr. Lagoda died in the immediate aftermath of his interaction with the officers of the PAPD, flight crew, and nurses onboard the plane, the Medical Examiner identified the cause of Mr. Lagoda's death to be "sudden death following grand mal seizure of undetermined etiology complicated by post-ictal excited delirium." The death of Mr. Lagoda is not a factor to be weighed in observing the propriety of the actions of the officers as they interacted with Mr. Lagoda. From the initial approach by P.O. Bugiada, throughout the use of physical force to

29

restrain Mr. Lagoda, to the immediate medical attention administered to Mr. Lagoda by these officers, no officer in this case violated any protocols, rules or laws.

The overall regimens and content of PAPD training are vibrant, professional, and up to date. Uniformed members of the PAPD are trained four times a year, the material is updated as needed -particularly in the wake of the passing of NYC AC 10-1081, and proper training records are maintained. The collection of General Orders that make up the patrol guide for the PAPD is functional and complete and updated as needed.

The PAPD protocols regarding bringing an ambulance across a tarmac are necessarily influenced by guidelines and regulations of the Federal Aviation Administration and Transportation Security Administration and are functional and efficient.

Overall, the actions of the members of the PAPD involved in this incident illustrate a motivated and responsive workforce and a productive well-managed, professionally administered police department. Nothing in the DeFoe report documents any members of the PAPD as deviating from accepted police practices or being reckless. Notwithstanding the opinions offered by the DeFoe report, there is nothing in the facts of this case that shows the actions of the PAPD members as being outside of accepted police practices, PAPD department rules or the law.

John Monaghan

My rate of compensation is three hundred dollars an hour for reading and research and three thousand five hundred dollars per day for trial testimony.

30

**Appendix**

List of Documents Reviewed

I.   Pleadings
  i.  Plaintiffs' First Amended Complaint
  ii.  Defendants' Answer


II.  Orders
  i.  So Ordered Protective Order


III. Initial Disclosures
  i.  Plaintiffs' Initial Disclosures
  ii.  Defendants' Rule 26 Initial Disclosures


IV.  Defendants' Discovery Demands
  i.  Defendants' First Set of Interrogatories to Alexey V. Tarasov
  ii.  Defendants' First Set of Interrogatories to Grigory Tikhoplav
  iii.  Defendants' First Set of Requests for Production to Alexey V. Tarasov
  iv.  Defendants' First Set of Requests for Production to Grigory Tikhoplav


V.   Plaintiff's Discovery Reponses
  i.  Alexey V. Tarasov's Answers to Defendants' Interrogatories
  ii.  Grigory Tikhoplav's Answers to Defendants' Interrogatories
  iii.  Alexey V. Tarasov's Responses to Defendants' Requests for Production
  iv.  Grigory Tikhoplav's Responses to Defendants' Requests for Production
  v.  Plaintiff's Responses to Defendants' Discovery Deficiency Letter
  vi.  Plaintiffs' Re-Notice of 30(b)(6) Deposition for Port Authority
  vii.  Plaintiffs' First Request for Admissions to Port Authority


VI.  Plaintiffs' Bates No. Documents
  i.  Plaintiffs' Document Production dated 2/2/22
  ii.  Plaintiffs' Document Production 2.0 dated 5/9/22
  iii.  Plaintiffs' Document Production 3.0 dated 6/7/22
  iv.  Plaintiffs' Document Production dated 4/26/23
  v.  Plaintiffs' Document Production 4.0 dated 2024


VII. Defendants' Discovery Responses
  i.  Jonathan Duran's Answers to Plaintiffs' Interrogatories


31

ii.  Jonathan Papia' Answers to Plaintiffs' Interrogatories
iii.  Michael Bugiada's Answers to Plaintiffs' Interrogatories
iv.  Paul Mezzacappa's Answers to Plaintiffs' Interrogatories
v.  Robert Joseph's Answers to Plaintiffs' Interrogatories
vi.  Port Authority of New York and New Jersey's Answers to Plaintiffs' Interrogatories
vii.  Jonathan Duran's Responses to Plaintiffs' Requests for Production
viii.  Jonathan Papia's Responses to Plaintiffs' Requests for Production
ix.  Michael Bugiada's Responses to Plaintiffs' Requests for Production
x.  Paul Mezzacappa's Responses to Plaintiffs' Requests for Production
xi.  Robert Joseph's 's Responses to Plaintiffs' Requests for Production
xii.  The Port Authority of New York and New Jersey's Responses to Plaintiffs' Requests for Production
xiii.  Defendants' Responses to Plaintiffs' 30(b)(6) Notices
xiv.  Defendants'' Responses to Plaintiffs' 30(b)(6) Re-Notice
xv.  Port Authority of New York and New Jersey's Response to Plaintiffs' Request for Admissions

VIII.  Defendants' Bates No. Documents
i.  PA1-PA1058 - JetBlue Airways' Response to Defendants' Subpoena
ii.  PA1059-PA1060 - Email notification of subject incident from Inspector Charles O'Connor
iii.  PA1061-PA1062 - JFKIA Roll Call – Tour 1 – 4/13/19
iv.  PA1063-PA1068 - JFK CAD Event Report Event ID# 2019-0975352 Report# 19-004953
v.  PA1069 - Flight Boarding Pass for Evgeniy Lagoda – Jet Blue Fl# 659, Seat 33C
vi.  PA1070-PA1072 - Photos of Passport & Luggage Tag for Evgeniy Lagoda
vii.  PA1073-PA1078 - Flight manifest – Jet Blue Flight# 659 – 4-12-2019
viii.  PA1079-PA1081 - List of Contact information for Flight Crew & Incident Witnesses on Jet Blue Flight# 659
ix.  PA1082-PA1083 - Witness Statement – Calvin Swinney (Flight Attendant)
x.  PA1084 - Witness Statement – Kevin Ingleton (Flight Attendant)
xi.  PA1085 - Witness Statement – Kareem Aarndel (Flight Attendant)
xii.  PA1086 - Witness Statement – Shantell Miller (Nurse)
xiii.  PA1087 - Witness Statement – Zoe Bignall (Nurse)
xiv.  PA1088-PA1089 - Witness Statement – Nathana Wright-Reid (Nurse)
xv.  PA1090-PA1097 - 8 Crime Scene Photos – Jet Blue Flight# 659 – Seats and Aisle
xvi.  PA1098-PA1102 - 5 Crime Scene Photos – Jet Blue Flight# 659 – Rear Galley
xvii.  PA1103-PA1105 - 3 Photos of hands of PO Michael Bugiada
xviii.  PA1106 - NYC Property Clerk Invoice # S069250 – OC Spray used during subject incident

xix.    PA1107-PA1110 - Office of NYC Medical Examiner Notice of Death and Investigation Report #Q-19-009214

xx.    PA1111-PA1113 - Fax Sheet – Consular Notification sent to Russian Consulate, New York, NY

xxi.    PA1114 - JFK Tour Commander's Log – dated 4/13/19

xxii.    PA1115-PA1118 - 2 Photos of medication found in luggage of Evgeniy Lagoda

xxiii.    PA1119-PA1130 - Copies of medical documents found in luggage of Evgeniy Lagoda

xxiv.    PA1131 - Handwritten Memorandum – PO Kumil Jozwiak dated 4/13/19

xxv.    PA1132-PA1134 - Memo Book #93044 – PO Kumil Jozwiak – pages 8-9

xxvi.    PA1135 - Handwritten Memorandum – PO Jonathan Papia dated 4/13/19

xxvii.    PA1136-PA1138 - Memo Book #90620 – PO Jonathan Papia – pages 15-16

xxviii.    PA1139 - Handwritten Memorandum – PO Jonathan Duran dated 4/13/19

xxix.    PA1140-PA1142 - Memo Book #93073 – PO Jonathan Duran – pages 10-11

xxx.    PA1143 - Handwritten Memorandum – PO Paul Mezzacappa dated 4/13/19

xxxi.    PA1144-PA1147 - Memo Book #91497 – PO Paul Mezzacappa – pages 23-25

xxxii.    PA1148 - Handwritten Memorandum – PO Robert Joseph dated 4/13/19

xxxiii.    PA1149-PA1151 - Memo Book #93003 – PO Robert Joseph – pages 5-6

xxxiv.    PA1152 - Handwritten Memorandum – PO Michael Bugiada dated 4/13/19

xxxv.    PA1153-PA1156 - Memo Book #90628 – PO Michael Bugiada – pages 17-18

xxxvi.    PA1157-PA1161 - Use of Force Reports PO Bugiada, PO Joseph, PO Mezzacappa, PO Duran, PO Papia

xxxvii.    PA1162-PA1163 - Copy of documents issued by employer of Lagoda obtained from Gateway Shipping

xxxviii.    PA1164-PA1165 - Photo of Russian passport and US Visa for Sergey Chistyakov

xxxix.    PA1166-PA1186 - JFKIA Incident Report – Case# 19-004953

xl.    PA1187-PA1191 - PAPD CPD Message Register (4/12/2019)

xli.    PA1192-PA1194 - PAPD CPD Message Register (4/13/2019)

xlii.    PA1195-PA1204 - PO Bugiada Form 360, Supervisor's Cover Sheet, and Hospital Discharge Documents

xliii.    PA1205 - ACU – Individual Sick or IOD Report for Bugiada

xliv.    PA1206-PA1213 - 8 Still photos of Lagoda from US Customs, JFK Terminal 1

xlv.    PA1214 - Copy eJustice NCIC Response for Lagoda

xlvi.    PA1215-PA1218 - PA Aided Reports for Lagoda, Swinney, Aarndel & Wright-Reid

xlvii.    PA1219-PA1232 - Lagoda Luggage Property Vouchers #S069239-S069245

xlviii.    PA1233-PA1235 - 3 photos of OC Spray utilized by PO Bugiada

xlix.    PA1236 - ACU Record of Bugiada Firearms & Weapons Restriction

l.    PA1237-PA1246 - PA Form 360 for POs J Duran, K Jozwiak, P Mezzacappa, R Joseph, R Guidice

li.    PA1247 - Request for OMS evaluation and clearance of PO Bugiada

lii.    PA1248-PA1250 - Request for AED access and surveillance video to JetBlue Airways

33

liii.      PA1251 - Confirmation of Death Notification to Lagoda family

liv.      PA1252-PA1253 - Notification by ACU of Bugiada Firearm Delivery to FTU

lv.       PA1254-PA1258 - Receipt for Delivery of items from Voucher #S069244 to NYC
          Medical Examiner

lvi.      PA1259-PA1265 - Photographs of Lagoda's credit cards

lvii.     PA1266-PA1268 - Lagoda Flight Itinerary Information (4/12/19)

lviii.    PA1269-PA1270 - Request for Incident Reports and Reservation Records to JetBlue
          Airways

lix.      PA1271-PA1274 - PA OMS Fitness for Duty – PO Bugiada (dated 4/16/19)

lx.       PA1275-PA1277 - Written statements from JetBlue Flight Attendants

lxi.      PA1275-PA1277 - Written statements from JetBlue Flight Attendants

lxii.     PA1278-PA1281 - Credit Card Purchase History Search by OTG-Terminal 5 food
          vendor

lxiii.    PA1282 - Re-vouchering (Invoice #S069239) of Lagoda's property (Removal of
          Russian Passport)

lxiv.     PA1283-PA1285 - PIU voucher and transfer of custody of OC Spray

lxv.      PA1286 - Transfer of Lagoda Russian Passport to Paccione Funeral Home

lxvi.     PA1287-PA1290 - Photos of AED used during subject incident

lxvii.    PA1291-PA1292 - Receipt for Digital Media Release from JFK Terminal One

lxviii.   PA1293-PA1319 - PAPD Incident Report #19-004953 with Supplemental Incident
          Report

lxix.     PA1320-PA1351 - Absence Status Determination – PO Bugiada

lxx.      PA1352-PA1361 - Medical Documents and Correspondence from Lagoda Family

lxxi.     PA1362-PA1363 - JetBlue Pilots and Co-pilot's Narratives

lxxii.    PA1364 - Request to JetBlue for interview of Kevin Ingleton

lxxiii.   PA1365-PA1368 - Action Report 1 – Initial Report

lxxiv.    PA1369 - Action Report 2 – Meeting with NY Attorney General's Office

lxxv.     PA1370-PA1371 - Action Report 3 - Follow up & Documents Received

lxxvi.    PA1372 - Action Report 4 – Lagoda Medication to Medical Examiner

lxxvii.   PA1373 - Documentation from GE Pickering regarding AED Reading

lxxviii.  PA1374-PA1393 - Jamaica Hospital – Lagoda Medical Records

lxxix.    PA1394-PA1398 - Jamaica Hospital – Lagoda Pre-Hospital Records Summary

lxxx.     PA1399-PA1400 - Notice to Appear for Interview with NYAG (Sergeants)

lxxxi.    PA1401-PA1403 - Notice to Appear for Interview with NYAG (Police Officers)

lxxxii.   PA1404-PA1456 - Action Report #5 – Analysis of JFK Telephones and Radio
          Transmissions

lxxxiii.  PA1457-PA1474 - Interview Transcript – Captain Kurt Bengston – 4/29/19

lxxxiv.   PA1475-PA1476 - Action Report #6 – Analysis of Interview of Captain Kurt
          Bengston

lxxxv.    PA1477-PA1486 - Interview Transcript – First Officer William Flory – 4-29-2019

34

lxxxvi.    PA1487-PA1488 - Action Report #7 – Analysis of Interview of William Flory

lxxxvii.    PA1489-PA1504 - Interview Transcript – Deborah Royal – 4/30/19

lxxxviii.    PA1505-PA1506 - Action Report #8 – Analysis of Interview of Deborah Royal

lxxxix.    PA1507-P1518 - Interview Transcript – EMT Chalako Hodges – 4/30/19

xc.    PA1519-PA1520 - Action Report #9 – Analysis of Interview of Chalako Hodges

xci.    PA1521-PA1528 - Interview Transcript – EMT Jerry Zander – 4/30/19

xcii.    PA1529-PA1532 - Notice to Appear for Interview with NYAG - PO Robert Joseph

xciii.    PA1533-PA1535 - Twitter Comments referencing subject incident

xciv.    PA1536-PA1538 - PA Medical Report & photo of bite mark on leg of PO Bugiada provided to NYAG

xcv.    PA1539-PA1554 - NYAG Report of PAPD Officer and Sergeant Interviews

xcvi.    PA1555-PA1620 - NYC Autopsy Report #Q19-09214 & Lagoda Death Certificate

xcvii.    PA1621-PA1622 - Evidence Receipt for transfer of Lagoda property from Medical Examiner to NYAG

xcviii.    PA1623-PA1624 - Action Report #10 – Analysis of Interview of Jerry Zander

xcix.    PA1625-PA1626 - Action Report #11 – Property Transfer and Funeral Home Contact

c.    PA1627-PA1641 - Property shipment documents between NYAG and Lagoda Family

ci.    PA1642-PA1648 - NYAG Subpoena to JetBlue Airways for Partial Passenger Manifest

cii.    PA1649-PA1650 - JetBlue Airways Subpoena Response for Partial Passenger Manifest

ciii.    PA1651-PA1659 - Interview Transcript – Flight Passenger Deverol Brissett – 01-02-2020

civ.    PA1660-PA1669 - Interview Transcript – Flight Passenger Moses Poyser – 01-02-2020

cv.    PA1670-PA1678 - Interview Transcript – Flight Passengers Cassandra Morrison and Nneka Morrison – 01-03-2020

cvi.    PA1679-PA1682 - Action Report #12 – Additional Passenger Interviews

cvii.    PA1683-PA1684 - Action Report #13 – NYC Medical Examiner Meetings

cviii.    PA1685 - Action Report #14 – Analysis of Automated External Defibrillator

cix.    PA1686-PA1705 - Interview Transcript – Flight Passenger Nathana Wright-Reid – 05-06-2019

cx.    PA1706 - Aircraft Galley Sketch by Nathana Wright-Reid

cxi.    PA1707-PA1708 - Action Report #15 – Analysis of Interview of Nathana Wright-Reid

cxii.    PA1709-PA1731 - Interview Transcript – Flight Passenger Shantell Miller – 05-07-2019

cxiii.    PA1732 - Aircraft Galley Sketch by Shantell Miller

cxiv.    PA1733-PA1734 - Action Report #16 – Analysis of Interview of Shantell Miller\

cxv.    PA1735-PA1764 - Interview Transcript – Flight Passenger Zoe Bignall – 05-09-2019

35

| | |
|---|---|
| cxvi. | PA1765 - Aircraft Galley Sketch by Zoe Bignall |
| cxvii. | PA1766-PA1767 - Action Report #17 – Analysis of Interview of Zoe Bignall |
| cxviii. | PA1768-PA1783 - Interview Transcript – Flight Attendant Frank Leandro – 05-02-2019 |
| cxix. | PA1784-PA1785 - Action Report #18 - Analysis of Interview of Frank Leandro |
| cxx. | PA1786-PA1799 - Interview Transcript – Flight Attendant Calvin Swinney – 5-13-2019 |
| cxxi. | PA1800-PA1801 - Action Report #19 – Analysis of Interview of Calvin Swinney |
| cxxii. | PA1802-PA1864 - NYAG Special Investigations & Prosecutions Unit – Final Report on Death of Evgeniy Lagoda |
| cxxiii. | PA1865-PA1877 - Interview Transcript – Kareem Aarndel – 5/18/19 |
| cxxiv. | PA1878-PA1879 - Action Report #20 – Analysis of Interview of Kareem Aarndel |
| cxxv. | PA1880-PA1905 - Interview Transcript – Kevin Ingleton – 6/5/19 |
| cxxvi. | PA1906 - Aircraft Galley Sketch by Kevin Ingleton |
| cxxvii. | PA1907-PA1908 - Action Report #21 – Analysis of Interview of Kevin Ingleton |
| cxxviii. | PA1909-PA1910 - Action Report #22 – Analysis of Surveillance Video from JFKIA Terminals 1 & 5 |
| cxxix. | PA1911-PA1912 - Action Report #23 – NYAG Interviews of PAPD Police Officers and Sergeants |
| cxxx. | PA1913-PA1914 - Action Report #24 – Analysis of NYAG Final Report on Death of Evgeniy Lagoda |
| cxxxi. | PA1915-PA1918 - Closing Memorandum |
| cxxxii. | PA1919 - AED Return Receipt to JetBlue Airways |
| cxxxiii. | PA1920 - Confidential Subject to Confidentiality Order - CD1 - Witness Intvs - Photos and Videos |
| cxxxiv. | PA1921 - Confidential Subject to Confidentiality Order - CD2 - Lagoda Medical Examiner Photos |
| cxxxv. | PA1922 - Confidential Subject to Confidentiality Order - CD3 - JFKIA Radio Transmissions |
| cxxxvi. | PA1923 - Confidential Subject to Confidentiality Order - CD4 - CCTV Terminal One |
| cxxxvii. | PA1924 - Confidential Subject to Confidentiality Order - CD5 - IG Video for T1 |
| cxxxviii. | PA1925 - Confidential Subject to Confidentiality Order - CD6 - Subject on Jet Bridge |
| cxxxix. | PA1926 - Confidential Subject to Confidentiality Order - CD7 - Subject Removed from Aircraft CPR in Progress |
| cxl. | PA1927 - Confidential Subject to Confidentiality Order - CD8 - Subject at Bar |
| cxli. | PA1928-PA1934 - Policy - 600-01 Processing and Temporary Detention of Prisoners |
| cxlii. | PA1935-PA1939 - Policy - 600-05 Safeguarding and Transportation of Prisoners |
| cxliii. | PA1940-PA1942 - Policy - 600-06 Hospitalized Prisoners |
| cxliv. | PA1943-PA1977 - Training Materials - 1-Special Needs LP |
| cxlv. | PA1978-PA1993 - Training Materials – DrugPlansLP |

36

cxlvi.     PA1994-PA2024 - Training Materials - EMR Behavioral Emergencies

cxlvii.     PA2025-PA2127 - Training Materials - EMR Medical Emergencies

cxlviii.     PA2128-PA2170 - Training Materials - EMR Poisoning

cxlix.     PA2171-PA2259 - Training File - Duran, Jonathan_47359

cl.     PA2260-PA2262 - Duran 47359 ELM Transcript

cli.     PA2263-PA2267 - Duran 47359 REC Trancipt

clii.     PA2268-PA2339 - Training File - Papia, Jonathan_47887

cliii.     PA2340-PA2341 - Papia 47887 ELM Transcript

cliv.     PA2342-PA2345 - Papia 47887 REC Transcript

clv.     PA2346-PA2434 - Training File - Bugiada, Michael_47814

clvi.     PA2435-PA2436 - Bugiada 47814 ELM Transcript

clvii.     PA2437-PA2440 - Bugiada 47814 REC Transcript

clviii.     PA2441-PA2531 - Training File - Mezzacappa, Paul_47742

clix.     PA2532-PA2534 - Mezzacappa 47742 ELM Transcript

clx.     PA2535-PA2538 - Mezzacappa 47742 REC Transcript

clxi.     PA2539-PA2587 - Training File - Joseph, Robert_45010

clxii.     PA2588-PA2589 - Joseph 45010 ELM Transcript

clxiii.     PA2590-PA2593 - Joseph 45010 REC Transcript

clxiv.     PA2594-PA2667 - Use of Force General Orders

clxv.     PA2668-PA2673 - General Orders

IX.    Deposition Transcripts of Fact Witnesses

     i.     Deposition Transcript of Plaintiff Grigory Tikhoplav dated 9/1/22

     ii.     Deposition Transcript of Plaintiff Grigory Tikhoplav dated 7/25/23

     iii.     Deposition Transcript of Plaintiff Alexey V. Tarasov dated 7/27/23

     iv.     Deposition Transcript of Defendant Paul Mezzacappa dated 8/2/23

     v.     Deposition Transcript of Defendant Robert Joseph dated 8/2/23

     vi.     Deposition Transcript of Defendant Jonathan Duran dated 8/3/23

     vii.     Deposition Transcript of Defendant Jonathan Papia dated 8/3/23

     viii.     Deposition Transcript of Defendant Michael Bugiada dated 8/8/23

     ix.     Deposition Transcript of Non-Party Witness Kurt Bengtson dated 8/15/23

     x.     Deposition Transcript of Non-Party Witness Frank Leandro dated 8/17/23

     xi.     Deposition Transcript of Kevin Ingleton dated 8/22/23

     xii.     Deposition Transcript of Non-Party Witness Nathana Wright-Reid dated 8/21/23

     xiii.     Deposition Transcript of Non-Party Witness Calvin Swinney dated 8/21/23

X.    Deposition Transcripts of Rule 30(b)(6) Witnesses

     i.     Deposition Transcript of Lt. Jamie Sandoz dated 2/13/24

     ii.     Deposition Transcript of M. Bergery dated 2/13/24

     iii.     Deposition Transcript of Lt. Lawanda Irving dated 2/14/24

XI.    Plaintiff's Rule 26 Expert Disclosures
      i.    Plaintiffs' Rule 26 Disclosure concerning Scott A. DeFoe
     ii.    Plaintiffs' Rule 26 Disclosures concerning Kris Sperry, M.D.