# EXHIBIT BB

**In the Matter Of:**

TARASOV, ESQ. V. PORT AUTHORITY OF NY AND NJ

1:21-cv-06226(NRB)

**GREGORY MAZARIN, M.D.**

*September 17, 2024*



800.211.DEPO (3376)
*EsquireSolutions.com*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
ALEXEY V. TARASOV, ESQ., Administrator of the
Estate of EVGENIY LAGODA, Deceased, and GRIGORY
TIKHOPLAV,

                    Plaintiffs,

          -against-                Case No.:
                                   1:21-cv-06226(NRB)
PORT AUTHORITY OF NEW YORK AND NEW JERSEY and
PORT AUTHORITY OF NEW YORK AND NEW JERSEY POLICE
DEPARTMENT a/k/a PORT AUTHORITY POLICE DEPARTMENT
a/k/a PAPD, PAPD OFFICER MICHAEL BUGIADA, PAPD
OFFICER ROBERT JOSEPH, PAPD OFFICER JONATHAN
PAPIA, PAPD OFFICER PAUL MEZZACAPPA, and PAPD
OFFICER JONATHAN DURAN,

                    Defendants.
------------------------------------------------------x


          REMOTE VIDEOCONFERENCE DEPOSITION OF

GREGORY MAZARIN, M.D., a non-party witness herein,

located in Roslyn, New York 11576, taken by the

Plaintiffs, pursuant to Notice, held on Tuesday,

September 17, 2024, at 11:08 o'clock a.m., before

Deborah Moschitto, a Shorthand Reporter and Notary

Public of the State of New York.



A P P E A R A N C E S:


        ASHCROFT LAW FIRM, LLC
                Attorneys for Plaintiffs
                200 State Street - 7th Floor
                Boston, Massachusetts 02109

        BY:     J. CHRISTOPHER AMRHEIN, JR., ESQ.


        PORT AUTHORITY OF NEW YORK AND NEW JERSEY
                Attorneys for Defendants
                4 World Trade Center
                150 Greenwich Street - 24th Floor
                New York, New York 10007

        BY:     CHERYL ALTERMAN, ESQ.
                MATTHEW MALYSA, ESQ.


ALSO PRESENT:

        ALEXEY TARASOV, Plaintiff


                        * * *



S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties hereto, that the filing, sealing and certification of the within deposition be waived; that such deposition may be signed and sworn to before any officer authorized to administer an oath; that all objections, except as to the form, are reserved to the time of the trial.

* * *



T. Mazarin

THE COURT REPORTER:  Hello.  My name is Deborah Moschitto.  I'm a Shorthand Reporter and Notary Public of the State of New York.

This deposition is being held via videoconferencing equipment.  The witness and reporter are not in the same room.  The witness will be sworn in remotely pursuant to agreement of all parties.  The parties stipulate that the testimony is being given as if the witness was sworn in person.

Do counsel so stipulate.

MR. AMRHEIN:  Yes.

MS. ALTERMAN:  Yes, agreed.

G R E G O R Y    M A Z A R I N, M.D., the witness herein, having been duly sworn by Deborah Moschitto, a Notary Public in and for the State of New York, was examined and testified as follows:

EXAMINATION BY MR. AMRHEIN:

Q.    Dr. Mazarin, is that the correct pronunciation?  I just want to make sure I'm right on that.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

T. Mazarin

A.    Yes.

Q.    Okay, great.  Forgive me, I was thinking it could be one way or another.

Dr. Mazarin, my name is attorney Chris Amrhein, Jr., and I'm an associate with Ashcroft Law Firm.  Our firm represents the plaintiffs in this matter.  Today, I'm going to be asking you a series of questions.

Before we get started, and before I get started with some instructions that you may be familiar with --

MR. AMRHEIN:  Cheryl, I would like to put the stipulations on the record, and I know in the past depositions we've agreed to the usual stipulations.  Are those stipulations agreeable to you today?

MS. ALTERMAN:  Yes.

MR. AMRHEIN:  Usual stipulations, I'll read them onto the record:

All objections except as to the form of the question are reserved until the time of trial and all motions to strike are reserved until the time of trial.

MS. ALTERMAN:  Yes, agreed.



T. Mazarin

Q.    Doctor, these may again sound familiar to you, you may recognize these instructions, but I'm going to go over them preliminarily.

First, if you can't hear one of my questions, please let me know and I'm happy to repeat it for you.  If you don't understand one of my questions, please let me know and I'm happy to rephrase it.

If you do answer a question, however, is it fair to say that I'll make the assumption that you understood my question?

A.    Yes.

Q.    If you could, please answer all my questions verbally and avoid head nods and should shrugs.  It's just for the purpose of a clean record and for the stenographer's sake.  We understand in colloquial conversation what head nods and shoulder shrugs mean, but given that there's a transcript here, we would like to reduce all answers to be verbal answers.

Do you understand that?

A.    Yes.



T. Mazarin

Q.     Again, for the sake of the stenographer, if you can, please wait until I've completed my question before you answer, it will just make for a clean transcript. I'll do my best to wait until you finish one of your answers before I begin with my next question.  Fair?

A.     Fair.

Q.     Finally, if you do need to take a break, again, let me know, but if there is a pending line of questions or an open question before you, I simply ask that those come to a conclusion before we take that break.  Is that fair, sir?

A.     Yes.

Q.     Do you have any questions with regard to what I have said so far?

A.     No.

Q.     Okay.  Doctor, do you understand that you're giving testimony under oath and that even though the attorneys are in an office and you're located in your home, that it's just as if you were testifying under oath in court?



T. Mazarin

A.    Yes.

Q.    Doctor, do you understand that your responses here today are subject to the pains and penalties of perjury?

A.    Yes.

Q.    Doctor, we ask this of everybody so it's not particular to you, I promise: Doctor, are you under the influence of anything that would impair your ability to understand my questions or impair your ability to answer my questions truthfully?

A.    No.

Q.    Doctor, I know before we got started, on the record, you had mentioned that you were located in Roslyn, New York. Just for the sake of the record, could you please state your full name and address?

A.    Yeah, my name is Gregory Mazarin. I'd rather not give my home address.  If I can give --

MS. ALTERMAN:  You can give a business address.

Q.    That's fine.

THE WITNESS:  A work address?



T. Mazarin

MS. ALTERMAN: Yes, work address.

Q. Sure.

A. Montefiore Medical Center, 1825 Eastchester Road, Bronx, New York.

Q. Thank you, sir.

And you've testified -- we're not going to give a specific address, but you've previously testified that you're testifying today from Roslyn, New York; is that right?

A. That is correct.

Q. Okay. Thank you, Doctor.

Did you speak with anybody in preparation for today's deposition?

A. I spoke with the attorneys.

Q. When did you speak with your attorneys in preparation for today's deposition?

A. I spoke with them -- I spoke with them this morning before the deposition, and I also spoke with them the other day.

Q. And, sir, I don't need you to divulge any of the contents of your privileged discussions with your attorneys, but I just want to generally ask: Were those



T. Mazarin

conversations with your attorneys for the purpose of preparing for today's deposition?

A.     Yes, they were.

Q.     In addition to your conversation with defense counsel, what did you, yourself, do to prepare for your deposition today?

A.     I reread my report as well as kind of going over some of the key documents in the case.

Q.     What documents in particular? You said "key documents."  What documents in particular did you review in addition to your report, in preparation for today's deposition?

A.     I went over the Attorney General report and the autopsy report, as well as the hospital and EMS report.

Q.     Did you review any deposition testimony, any deposition transcripts, in advance of today's deposition?

A.     Yes.  Recently, I reviewed the deposition transcripts of your police expert, as well as the pathologist.  I guess that was just conducted recently.  In the past, I had



T. Mazarin

reviewed the deposition of the father.

Q.    Okay.  I'll ask you later on, I assure you I'll ask you later on about documents that you reviewed in preparation of your Rule 26 report, but for now I'm focused on documents that you reviewed in preparation for today's deposition.  So I just want to go over it again.

I know you said you reviewed your own report, your own Rule 26 report; correct?

A.    Correct.

Q.    You also reviewed the office of the Attorney General's investigative report; correct?

A.    Correct.

Q.    You said you reviewed the deposition transcripts of Scott DeFoe as well as the deposition transcripts of Dr. Chris Sperry; correct?

A.    Correct.

Q.    And you said that you've reviewed a couple of other documents.  Could you restate those for me?  I'm sorry, that escapes my memory.



T. Mazarin

A.      I believe they were the EMS report from the date of the incident, the hospital report from the day of the incident. I'm not sure if you mentioned, but I mentioned the autopsy report as well, from the Medical Examiner.

Q.      And was that prepared by Dr. Milewski?

A.      Yes.

Q.      Thank you for that clarification, sir.

Do you recall when you reviewed the deposition transcript of Dr. Chris Sperry?

A.      Yes, I do.  It was about an hour ago.

Q.      Is that because that came in this morning?

A.      That is correct.

Q.      And were you furnished with that by your attorneys or was it produced to you by the court reporter?

A.      Through my attorney.

Q.      Were you able to do a complete



T. Mazarin

review of the entire deposition transcript in that one hour leading to your deposition?

A.    No.  I went through it pretty quickly.

Q.    Just to get this out of the way at the beginning, sir, I'm going to introduce a document that will be very familiar to you. It's actually your Rule 26 report in disclosure made by Defendants.  I'm going to share it on my screen, but before I do, do you happen to have that disclosure in front of you, sir?

A.    I do not.

Q.    Okay.  So we'll continue to reference everything on the screen when we go through it.

A.    Okay.

Q.    Just bear with me a second.

(Pause.)

Q.    Sir, let me know whenever that's on your screen, please.

A.    It is on my screen.

Q.    Okay, great.

Do you see my cursor on the



T. Mazarin

document?

A.    I do.

Q.    Okay, great.

Occasionally, if I can't highlight your document, I'll just have my cursor next to the area in which I'm referencing, but at the start, I just want to see if you recognize this document to confirm that it is your Rule 26 report disclosure.

At the beginning, at the outset, there was an introductory of the case caption, as well as several notices submitted by defense counsel.  On page 2 -- excuse me, this is actually page 3 of a 10-page document, do you recognize where it says: June 7, 2024, that's your name, Assistant Professor, Department of Emergency Medicine, Montefiore Medical Center, Albert Einstein College of Medicine.  Is that your -- was that drafted by you, sir, is this the beginning of your draft?

A.    Yes, it is.

Q.    Okay, great.

So I'm just going to briefly



T. Mazarin

scroll through this to confirm that this is the correct document that you produced as part of your Rule 26 report as an expert:

This is the final page of your report, sir.  Is that your signature?

A.    It is.

Q.    And do you recognize that to be a complete copy of your Rule 26 report in this matter?

A.    It is.

Q.    And as a part of disclosure, accompanying your reports were a number of exhibits.  The first, as you'll see here on the screen, this is Exhibit A, your CV. We'll just scroll through this to confirm that this is the copy of the CV, your CV that was produced as a part of your Rule 26 disclosure.

(Scrolling.)

Q.    Sir, was that a complete copy of Exhibit A, which is your CV?

A.    Yes.

Q.    Okay.  And then Exhibit B here to your report, is expert testimony since 2020.



800.211.DEPO (3376)
EsquireSolutions.com

T. Mazarin

Do you recognize this page as well, sir?

A.      Yes.

Q.      And then Exhibit C is your fee schedule; is that correct?

A.      That's correct.

Q.      Alright.  And that rounds up the 10-page document, and you're confirming that you recognize that document as your Rule 26 disclosure; correct?

A.      Yes.

Q.      Alright, great.

MR. AMRHEIN:  We're going to move forward with marking that as Dr. Mazarin Exhibit 1.

(Rule 26 report and attachments and attachments marked Dr. Mazarin Exhibit 1 for identification.)

Q.      I'm just going to keep it on the screen for now, sir, and I'm going to ask you a series of background questions.

MR. AMRHEIN:  For the record, on the screen is Dr. Mazarin's curriculum vitae, his CV, which I'm going to walk him through.

Q.      So, Doctor, you received your



T. Mazarin

undergraduate degree from Brown in 1992; is that correct?

A.    Yes.

Q.    And what, specifically, was -- excuse me, your undergraduate degree was a Bachelor of Arts; correct?

A.    Correct.

Q.    And it says "Economics."  Was that a focus of yours as a part of your Bachelor's?

A.    Yes.

Q.    Then you went on to receive your M.D. from Albert Einstein College of Medicine; is that correct?

A.    Yes.

Q.    Have you earned any other degrees, besides the two that I've already mentioned here?

A.    No.

Q.    Sir, I want to discuss your postgraduate training, and we can go in chronological order.

As you'll see on the screen on your CV, heading postgraduate training,



T. Mazarin

starting with St. Vincent's Medical Center, it states that you have a transitional internship from July 1996 to June 1997; is that correct?

A.    Yes.

Q.    Can you describe what a "transitional internship" is for me, Doctor?

A.    Yes.  So for many specialties, including emergency room, you have to do one year of general medicine first.  So this was my year of general medicine.  It was rotating through medicine, but a few other specialties as well.

Q.    What specialties, sir?

A.    I spent at least a month in surgery and a month doing a few other subspecialties.  It was a long time ago.  I don't remember exactly what they were.

Q.    So you kind of beat me to a couple of my questions.  So as a part of this transitional internship, did you have a particular focus in a specific area of medicine?  I know you said it was kind of a generalized thing, but did you have a



T. Mazarin

particular focus at that time?

A.    No.

Q.    You said you rotated between several areas of medicine; is that correct?

A.    Correct.

Q.    And in terms of your duties and responsibilities in this transitional internship, were they consistent throughout the different areas of medicine that you were in or did it vary from area to area?

A.    It varied.

Q.    Okay.  So is it fair to say when you were serving either in support of or as a surgeon, when you were in the surgery area of medicine, whereas other areas you may not have had those same duties and responsibilities?

A.    Correct.

Q.    And you concluded in June of 1997.  How did that come about?

A.    It was a one--year position prior to my residency.

Q.    Now, did you receive anything, a Certificate of Completion, graduation?  Did



                        T. Mazarin

you receive anything to mark your completion

of the transitional internship?

        A.      It's an interesting question.  I

think I did get some kind of diploma, but I

don't really remember.

        Q.      That's fine.  I'm not going to

hold you to that at this point.  I'm just

trying to gather some background information.

                Now, after St. Vincent's Medical

Center where you had a transitional

internship, am I correct that you went to

Lincoln Medical Center and Mental Health

Center where you served as a resident in the

emergency medicine department from July 1997

to December 1997?

        A.      That's correct -- wait, sorry,

did we get the dates right?  I wasn't

listening to the dates, from July to December

1997?

        Q.      Yes from July '97 to

December '97.

        A.      Yes; correct.

        Q.      In terms of -- obviously I

noticed a difference between the yearlong



T. Mazarin

transitional internship and approximately the six-month stent at Lincoln Medical here.  Can you tell me why was it this amount of time?  Was this an expected six-month employment?

A.     So when I originally -- in medical school, when I originally matched for my positions, I actually was originally going to be an eye doctor, and so whether I did the ER or an eye doctor, I still needed the one-year internship.  And then during my internship, I changed my mind after working in the ER and I decided that was a better career path for me.  So I was able to actually find a residency in ER at Lincoln, and that's why I was there.

And just to kind to save you from having to ask me what happened, after I was there for a few months, that a friend of mine had decided to give up his position at LIJ, which was a better position, and so that is why I transitioned from -- after being six months at Lincoln, I went over to LIJ where I completed my residency the next two and a half years.



800.211.DEPO (3376)
EsquireSolutions.com

T. Mazarin

Q.    I very much appreciate that, sir. Thank you for that clarification.  You beat me to a couple of my questions, so...

But going back to Lincoln Medical where you were there for a six-month position, before you transitioned to LIJ, so Long Island Jewish Medical Center, you list that your residency was in emergency medicine.  So that was your particular focus when you were there for that six-month period?

A.    Yes.

Q.    Can you describe -- strike that.

At Lincoln medical, at this point did you rotate between any other areas of medicine?

A.    It was primarily -- my six months at Lincoln were pretty much all in the ER, if I remember correctly.

Q.    Okay.  So what were your duties and responsibilities in your six months at Lincoln when you were in the ER?

A.    Well, I worked as a resident, seeing patients and being supervised by



T. Mazarin

attending physicians.

Q.    Did you receive training while you were going -- while you were serving as a resident for those six months?

A.    Yes.

Q.    What type of training did you receive?

A.    I don't know what you mean by that.

Q.    What type of training did you receive; was it a structured set of course modules and testing, was it just on--the-job tips and pointers that you received as a part of just general work life?  Can you tell me was there a curriculum or anything that you had to complete in those six months that you served?

A.    I mean, it's a combination of both.  Like mostly on-the-job training, but there is a curriculum.

Q.    Can you just briefly describe the curriculum as you recall it?

A.    There were weekly lectures. Yeah, I describe it that way.



T. Mazarin

Q.    Were the lectures focused on your particular area of medicine?

A.    Yeah, they were focused on emergency medicine.

Q.    Okay.  So it wasn't like you were going into being a completely -- you weren't taking a surgical or -- strike that.  I'll just move on.

So you already said that after a friend of yours, or a colleague of yours, had dropped out of the residency at LIJ, so Long Island Jewish Medical Center, am I correct that at the beginning of January, you were able to move on from Lincoln Medical to then become a resident in emergency medicine at Long Island Jewish Medical Center in January of 1998?

A.    Correct.

Q.    Again, was your focus here at Long Island Jewish Medical Center again was just in emergency medicine; correct?

A.    Correct.

Q.    Was it similar to your residency at Lincoln Medical where you were in a



T. Mazarin

rotating position between a field of medicine?

A.    It was primarily in the emergency room.  But then there were also rotations on fields that are associated with emergency medicine, such as OB, ophthalmology, orthopedics, areas that we deal with in the ER.  But during these rotations, we also spend time with these other subspecialties.

Q.    Thank you very much for that, sir.  I very much appreciate the specification.

So your duties and responsibilities, were they primarily focused on your work as an emergency -- emergency medicine residency between January 1998 and June 1999?

A.    Yeah.  I would just correct that a little bit and say that the residency really went up until July of 2000.  So for the purposes of the resume, it's separated. I was chief resident during that last year, but I was still a resident in my residency responsibilities continued for that two and a



T. Mazarin

half year time period.

Q.    Thank you for that, sir.

My next question was going to be: You were -- your resume says you were chief resident of emergency medicine from July 1999 to July 2000; is that right?

A.    That's correct.

Q.    So how did that come about?  Did you have to apply for it, did you have to take a test or was it a simple promotion? Can you tell me how it came about?

A.    Yeah.  It's an honor bestowed upon me by my attendings and co-residents to be chief resident, in which case you kind of help administrative, in addition to the normal residency requirements, it's a position where you help run the residency.

Q.    So that would be the way that your duties and responsibilities differed between when you were made chief resident versus when you were just a resident in the emergency medical department?

A.    Yes.

Q.    Now, does each department or area



T. Mazarin

of medicine, does each have their own chief resident?

A.    Yes.

Q.    And that's all within LIJ, Long Island Jewish Medical Center?

A.    I'm not sure what you mean.

Q.    So there were a number of residents -- excuse me, a number of chief residents, one per area of medicine, all within Long Island Jewish Medical Center?

A.    No.  Different specialties do have a different number of chief residents, and it works a little differently depending on which specialty you're talking about.

Q.    Okay.  But for emergency medicine, you were the sole chief resident at that point?

A.    No, there was one other.

Q.    Okay.  Now I'm going to walk you through your employment history.  So that was your postgraduate training that we just discussed.  Let me go into your professional employment.

      Starting with full-time, we're



T. Mazarin

going to go again in chronological order, so am I correct that between July 2000 and June 2013, as a full-time attending physician, you were in the Department of Emergency Medicine at Montefiore Medical Center?

A.    Yes.

Q.    Can you please describe your duties and responsibilities as attending physician in the Department of Emergency Medicine at Montefiore Medical Center between July 2000 and June 2013?

A.    Yeah.  So my responsibility was to see patients both on my own but primarily with residents, internal residents but primarily emergency room residents, and to teach as well as to have some teaching responsibilities within the residency itself.

Q.    So can you describe to me the teaching responsibilities, the teaching side of it?  Are there classrooms located within the medical center itself or are you a lecturer?  Can you describe to me what that teaching responsibility is, sir?

A.    Yeah, primarily the teaching is



T. Mazarin

kind of on the job, kind of like an apprenticeship program, but there are some lectures given.  The residency is actually based out of Jacobi so there are actual didactic classroom sessions that are held at Jacobi.

Q.    And when you were teaching, say in the classroom setting as opposed to in the apprentice -- you know, in the grand scheme of an apprenticeship of that like, in the classroom setting, were your lessons focused on the Department of Emergency Medicine work or the area of medicine which is emergency medicine?  Was that the focus of your classroom teachings?

A.    Yes.

Q.    Okay.  Now, after June 2013, so beginning in July 2013, and it states to the present, am I correct that you started and you are still an attending physician in the Department of Emergency Medicine at Jack D. Weiler-Albert Einstein Hospital?

A.    Yes.  So in 2013, the Jack Weiler Hospital is still part of the Montefiore



T. Mazarin

system and part of the same ER department, so I just -- they were expanding the residency over to Jack Weiler Hospital, so me, as well as several of my colleagues, moved over to this sister hospital to begin the residency over there.

Q.     So you said that they're in the same kind of network; is that fair?

A.     Yes.

Q.     Okay.  And were your duties and responsibilities at Jack D. Weiler, were they similar to your duties and responsibilities at Montefiore or another way of asking it is what way did they differ, if they are different?

A.     They're pretty much the same, but then I also started teaching first year medical students after I transitioned to Jack Weiler Hospital.

Q.     And was that in the hospital setting or was that in more of a classroom setting at a university?

A.     It's actually in the hospital setting.



T. Mazarin

Q.    How many of those lessons that you taught are kind of on your feet in a hospital apprenticeship-type lessons versus lecture settings?

A.    Well, with those medical students, that was all -- it wasn't really apprenticeship because they're just beginning medical students, so it's kind of a little bit more of a mix.  But they're not -- as opposed to the residents, they're not seeing patients primarily.

Q.    You have some -- you have listed professional employment part-time.  I just want to walk through that a little bit and get some clarification there, sir.  We will try to go in chronological order.

It says from July 2000 to July 2003, you worked part-time as an attending physician in the Department of Emergency Medicine at Cabrini Medical Center; is that correct?

A.    Correct.

Q.    It says you were a per diem employee, per diem attending physician.



T. Mazarin

Could you tell me how you came about getting this position and what your duties and responsibilities were here in this role?

A.    Yeah.  I worked some extra shifts to make extra money, and I lived in the City so this was convenient.

Q.    Is this common for young physicians to do at the beginning of a physician's practice?

A.    Yeah, it's very common.

Q.    And per diem, were you compensated for the work that you just performed on a day-by-day basis?

A.    Exactly.

Q.    So is it fair to say that your duties and responsibilities as an attending physician in the Department of Emergency Medicine at Cabrini Medical Center, a per diem attending physician, that they were similar to your duties and responsibilities at Montefiore Medical Center at the same time?

A.    They were roughly similar, but if I remember correctly, there were no real --



T. Mazarin

it was not a significant resident presence at Cabrini, so I think there I was mostly seeing patients on my own.

Q.    Okay.  Thank you for that clarification, sir.

Again, that was still in the Department of Emergency Medicine; correct?

A.    Yes.

Q.    Now, Doctor, from July 2000 to January 2007, again, there is a similar overlap with some other locations of work that we've already discussed.  You served as a per diem attending physician in the Department of Emergency Medicine at St. Clare's Hospital; is that correct?

A.    Yes.

Q.    Again, was that a similar setup in terms of per diem pay and you were just simply taking on extra shifts?

A.    Correct.  So it just depended on who had availability when I was available.

Q.    Now, in terms of these part-time per diem roles -- and I know we'll get to another one at the end -- in terms of the



T. Mazarin

part-time per diem roles, how were you able to obtain such a role; did you have to apply for it, did you fill out a job application through a referral service? Could you tell me how you achieved it?

A. Yeah, I had to apply for it and then submit my credentials.

Q. Did you have to interview -- was there an interview process in order to receive an offer to serve as an attending physician on a per diem basis?

A. It was a long time ago. Yes, I interviewed, but I don't think this was an interview process in the way you think of like somebody applying for some high level job or something like that.

Q. Okay. Can you just generally, from a high level, describe what an interview process is like for that?

A. I mean, I don't remember exactly, but I do remember meeting with the directors of each of these institutions and expressing my interest in wanting to work there.

Q. Got it. Now, what were your



T. Mazarin

duties and responsibilities like at

St. Clare's Hospital as a per diem attending

physician in the Department of Emergency

Medicine?

A.      They were the same as Cabrini.

Q.      Okay.  So you were more on your

own as opposed to what you were doing at

Montefiore Medical Center, and is that

because there was a more limited residency

program at St. Clare's?

A.      Yeah, they didn't have -- they

didn't have any ER residents at all.

Q.      Okay.  And you served as a

per diem attending physician at St. Clare's

from July 2000 to January 2007; right?

A.      Yes.

Q.      From January 2008 to July 2013,

am I correct that you served as an

attending -- per diem attending physician in

the Department of Emergency Medicine at Jack

D. Weiler-Albert Einstein Hospital?

A.      Yes.

Q.      And then in 2013, we've already

discussed, you began as a full-time attending



T. Mazarin

physician in the Department of Emergency Medicine of Jack D. Weiler; correct?

A.    Yes.

Q.    And when you were a per diem attending physician at Jack D. Weiler, what were your duties and responsibilities and how did they compare to your per diem work at Cabrini and St. Clare's?

A.    So, again, from up until 2013, when the residency started at the ER at Weiler, my duties were similar to Cabrini and St. Clare's, in that I was seeing patients primarily myself, although there were residents for all the other services in the hospital.  But there were no ER residents up until 2013, when the residency was expanded to include Einstein as well.

Q.    And we'll get to your academic work, I know it's just below here on the screen, but I just wanted to get some clarification, sir.

So from roughly 1997, your career in medicine has been focused on emergency medicine; is that correct?



T. Mazarin

A.    Yes.

Q.    And your focus or your intended focus when you were in medical school and after graduation, am I correct that you said you thought you were going to go into ophthalmology?

A.    That is correct.

Q.    Sir, when you were in medical school, at what point does a med student identify what he or she would like to do, in terms of a specialty?

A.    Well, people can realize it at any point, but it's not until their last year that they can actually have any real say in their coursework and what they're actually studying.

Q.    Understood.  So in medical school, the first couple of years it's a regimented, structured curriculum, in terms of classes you are required to take versus the last year where you're allowed to take electives, which are in the areas of medicine that an individual intends to practice?

A.    Yeah.  So the only caveat, that



T. Mazarin

being the fourth year, there are still some requirements.  But, yes, there are some elective opportunities in your fourth year.

Q.    Got it.  Thank you for that clarification.

Now, sir, your CV lists some academic appointments beginning in the year 2000, July 2000; to be particular, in the list to the present.  I know we've discussed some of your teaching responsibilities in the apprentice forum, in the student forum, as well as in the lecture forum.

Am I correct that you were an Assistant Professor of Emergency Medicine from July 2000 to the present?

A.    Yes.

Q.    Now, is that common for attending residents or attending residents or physicians to be professors of a given area of medicine within a specific hospital or is that uncommon?

A.    It's very common in an academic institution, but I would say uncommon in a Community Hospital.



T. Mazarin

Q.    And so from 2000 to the present, am I correct that your academic career as a professor was focused on emergency medicine; correct?

A.    Yes.

Q.    And then it says you were co-director of emergency medicine selective for a third year medical students; is that right?

A.    Yes.

Q.    That's at Albert Einstein College of Medicine?

A.    Well, you know, it's affiliated with the medical school, but it's basically for third year students who are considering a career in the ER, they would come spend two weeks with us.

Q.    Got you, thank you.

When they would come and spend a couple of weeks with you, they would spend weeks with you in the emergency medicine department; correct?

A.    Yes.

Q.    And then, finally, it lists



T. Mazarin

clinical instructor introduction to clinical medicine; correct?

A.    Yes.  I was a first year medical student.  That's what I was talking about before.

Q.    Sir, how would you describe the difference between clinical medicine and emergency medicine?

A.    I don't know what that means.

Q.    Is there any difference between emergency medicine and clinical medicine?

A.    I still don't know what that means.

Q.    Well, sir, you list here clinical instructor, introduction to clinical medicine.  Your specialty is in emergency medicine; correct?

A.    Correct.

Q.    Can you tell me the difference between emergency medicine and what you list here as clinical medicine, if there is any?

A.    I mean, I think there's a big overlap.  I guess the difference being for a first year student, they're trying to get



                            T. Mazarin

exposure to medicine in general.

Q.    Got you.

So is introduction to clinical medicine, is that med school's version of a 101 class in college?

A.    Well, I have four students, but students don't just -- some students go to the ER, some students go to various different services and specialties throughout the medical school.  So that's why the -- I guess the course is named such, because it's not just ER.

Q.    Got you.

Were your lesson plans as clinical instructor primarily focused on ER medicine, though?

A.    Yes.

Q.    Sir, I believe that wraps up your professional employment, your postgraduate training and your education; is that correct?

A.    Seems so to me.

Q.    And when I say professional employment, that includes your academic employment; correct?



800.211.DEPO (3376)
EsquireSolutions.com

                        T. Mazarin

        A.      Yes.

        Q.      Have you ever been an employee of
the Port Authority of New York and New
Jersey?

        A.      No.

        Q.      Have you ever been an officer for
the Port Authority Police Department?

        A.      No.

        Q.      Did you ever attend the Port
Authority Police Department Police Academy?

        A.      No.

        Q.      Did you ever graduate from the
Port Authority Police Department Police
Academy?

        A.      No.

        Q.      Have you ever taken any -- taken
or completed Port Authority Police Department
in-service training classes?

        A.      No.

        Q.      Have you ever taken or completed
Port Authority Police Department in-service
tests?

        A.      No.

        Q.      Have you ever been a law



T. Mazarin

enforcement officer?

A.    No.

Q.    Have you ever been responsible for drafting Port Authority Police Department policies and procedures?

A.    No.

Q.    At any point in your professional career, did you serve as an instructor for the Port Authority Police Department?

A.    No.

Q.    And that includes the Port Authority Police Academy, as well as the in-service training that Port Authority Police Officers are required to take?

A.    Correct.

Q.    Sir, I just want to go over some certifications.  Are you -- before I begin there, are you a member of any clubs or societies, sir?

A.    No.

Q.    And I know the answer to this but do you hold any professional certifications?

A.    Yes.

Q.    Am I correct that you're board



T. Mazarin

certified in emergency medicine?

A.    Yes.

Q.    So what does that certification entail?

A.    Well, initially I had to complete my residency, I had to take a written exam, as well as an oral exam, and then I've had to recertify.  So originally, that entailed taking a written exam every ten years.  Now it's changed.  I take a written exam every five years.

In addition, I've had to -- there's yearly kind of reading requirement that I've had to maintain throughout this entire time.

Q.    And you answered a number of my follow-up questions, so I do appreciate that, sir.

This certification is still active; correct?

A.    Yes.  I believe that I am credentialed through 2031, I believe.

Q.    So let's say between now and 2031, how often are the tests or reading



T. Mazarin

materials distributed and required?

A.     Well, everything has just changed.  So now the tests are every five years and there were yearly reading requirements.  It's just changing, so I'm not sure whether it's still applicable or not.

Q.     And when did you first become board certified, sir, in emergency medicine?

A.     In 2001.

Q.     So between 2001 and today, how many times have you been tested in order to maintain board certification in emergency medicine?

A.     I think I've taken three tests.

Q.     Could you describe those tests for me?  Are they, you know, like an auditorium, everybody is at a table, no materials, just a pencil, or is it at home or online, open book?  Can you describe those tests for me?

A.     Sure.  Well, you know, life's changed a little bit in the last 30 years, so originally they were old school in an auditorium with a million people.  And then



T. Mazarin

by the time the re-credentialing tests came around, they were, I think, in like one of these testing facilities on the computer and now they're actually online at home.

Q.    Are these tests open book or do you have to study and prepare and go in without any helpful materials?

A.    All the original tests were old school.  You had to -- you couldn't bring anything in with you.  The tests now are open book with a time limit.

Q.    Your board certification, is that a requirement for your medical practice in emergency medicine?

A.    I don't believe it is.

Q.    Is it required by the hospital that employs you currently?

A.    You know what, I'm not sure.  I think it's a little bit of a gray area.

Q.    Are most physicians in emergency medicine at your hospital board certified in emergency medicine?

A.    I believe so.

Q.    Based on your experience, would



T. Mazarin

you say that most physicians, regardless of area of medicine, are typically board certified in their specialized area of medicine?

A.    You know, I don't really know for sure.  I'd say most probably are, but there are definitely some who are not.

Q.    And did you say is there a fee that you have to pay, either to take the test or to maintain your active status as a board certified emergency medical professional?

A.    Of course, there's always fees for everything.

Q.    Sir, I see that your CV says that you're also credentialed for pelvic and limited abdominal ultrasound.  Do you see that?

A.    Yes.

Q.    What does this entail?  How did you obtain such a credential?

A.    Well, I did a certain number of studies, I believe there are 25 studies that were on my own, that were then checked by somebody who has expertise in ultrasound.  At



T. Mazarin

that point, I was certified to be competent in ultrasound.

Q.    Was this a test given within the hospital at which you worked?

A.    Yes.

Q.    Is this a credential that is specifically offered to emergency medicine either residents or physicians, or is this offered to residents or physicians in other areas of medicine?

A.    I'm not sure.  I believe that various specialties that use ultrasound have similar credentialing for applications that are appropriate for them.

Q.    So is it fair to say that in Ob/Gyn, a specialist may also hold this credential?

A.    I would expect that they might have expertise in pelvic ultrasound but probably not abdominal ultrasound.

Q.    And is this credential still active?

A.    Honestly, I'm not sure.

Q.    Do you recall if you maintain it,



T. Mazarin

if you do, how so, do you take tests, are there fees?

A.    No.  As I said, it's something from within the hospital.  Whether or not this still -- the criteria keeps changing, whether or not this still meets the criteria or not, I'm not clear about.

Q.    Okay.  Do you recall when you were credentialed with this for pelvic and limited abdominal ultrasound, just roughly?

A.    It was a long time ago.  It was prior to my time at Einstein.

Q.    Got it.  And I know you had testified a few minutes ago regarding the steps that you have to take, tests and materials review, in order to maintain your certification as a board certified -- as being board certified in emergency medicine. For this credential for pelvic and limited abdominal ultrasound, is there a same requirement where you're tested or provided materials on a yearly basis or no?

A.    No.

Q.    I'm guessing I know the answer to



T. Mazarin

this already, but is this credential required by your employer?

A.    No.

Q.    And does this credential have any impact on your board certification in emergency medicine?

A.    No.

Q.    Sir, you also list that you have your medical acupuncture license; is that correct?

A.    Yes.

Q.    Just generally, can you tell me about that license, how you obtained it, do you have to maintain it?  Can you give me some background on that, sir?

A.    Yeah.  This was approximately 15 years or so ago that I got this certification.  I took about a 300-hour course, both like learning at home as well as like on-site, and I practiced acupuncture like one day a week for like two years and then decided that I no longer found it interesting enough to pursue and so it's been -- it's been more than 10 years since



T. Mazarin

I've practiced.

Q.     So is this license still active or no?

A.     Yes.

Q.     And how often are you required to either be tested or pay fees to maintain such a license?

A.     It's like -- the best way I can describe it, it's like an addendum onto my medical license, so whenever I renew my medical license, I believe that it automatically gets renewed as well.

Q.     As part of that automatic renewal process, are you tested at all on acupuncture?

A.     No.  As I said, it's part of my New York State license renewal, which is just a fee.

Q.     Okay.  Thank you for that clarification.

So moving on to your New York State medical license, I'm guessing you probably obtained that close to the time that you either were a resident or after you



T. Mazarin

completed your residency?  Could you give some background on how you obtained your New York State medical license?

A.    Yeah.  I believe that you're eligible for your medical license after you complete your internship, and there's three board exams which are taken at various times. So I believe that the combination of passing the three board exams, as well as completing my transitional internship made me eligible for my license, at which point then I decided to apply and pay the fee.

Q.    And so that was probably around 1997, roughly; is that fair?

A.    Yeah.

Q.    Are you required to have a medical license, whether in New York State or another state, in order to become board certified, like you are in emergency medicine?

A.    I'm not sure.  I know that for my board certification, I have to enter in my New York State license number, so I'm assuming that maybe, yes, but I don't know



T. Mazarin

for sure.

Q.    In terms of maintaining your New York State medical license, is this simply renewing the fee on a yearly basis or are you tested periodically?

A.    Just a fee.  I believe it's a -- it's every three years.

Q.    Is this license required for your medical practice in emergency medicine?

A.    Well, it's required in order for me to practice medicine in New York State.

Q.    So this license, fair to say that this license is required by your employer?

A.    Yes.

Q.    And, sir, you have a couple of acronyms:  ACLS, ATLS, PALS after that, and I'll try to apply to you those.

Am I correct that ACLS is advanced cardiovascular life support?

A.    Yes.

Q.    So what does this certification entail and how did you get it?

A.    It just entails -- you have to take a course in doing CPR and other kind of



                              T. Mazarin

more advanced measures in a resuscitation effort.

Q.    That's the focus of this certification, it's for the purpose of lifesaving efforts, CPR and resuscitation?

A.    Correct.

Q.    Is this still active, this certification?

A.    I think this one may have expired because as an ER doctor, we have no requirement to be active and to maintain an active ACLS certificate.

Q.    If you maintained it, at all, between getting the certification and its expiration, was that another simple fee structure or were you tested on it?

A.    No, you had to take the class again.

Q.    Do you recall roughly how often?

A.    I believe that lasts for either -- I think two years, but it might be three.  I'm not sure.

Q.    Do you know how long you held that ACLS certification, between when you



                        T. Mazarin

first earned it and when it lapsed?

        A.    No.  I'm not sure because I've
kind of had it on and off and it's not a
requirement for employment for me.  So --
and, honestly, this is kind of what I do
every day so it's -- there's no -- I don't
really -- I'm not really sure.

        Q.    Got it.

              Now ATLS, is that advanced trauma
life support?

        A.    Correct.

        Q.    How does ATLS differ from ACLS?

        A.    Well, it's a perspective on
trauma.

        Q.    Can you expound on that, please?

        A.    Yeah.  It's basically how to --
gives kind of general guidelines how to treat
somebody who comes to you with an acute
traumatic injury.

        Q.    So what would an example be of an
acute traumatic injury, based upon the
classes that you took, to achieve your ATLS
certification?

        A.    If somebody came in and had a



T. Mazarin

cervical spine injury, that might be an example.  Someone who got into a bad car accident.

Q.    Did you obtain this through the hospital you had worked at -- a hospital you had worked at in the past or is this a separate certification you achieved through a private entity?

A.    No, I obtained this through the hospital.

Q.    Do you know if it's still active, do you still maintain it?

A.    It is not still active and I do not maintain it.

Q.    Okay.  Do you know roughly how long you were certified ATLS, before it became inactive; roughly?

A.    Yeah, I obtained my certification while I was at Lincoln.  Once it lapsed, I did not renew it.

Q.    Got it.  Thank you for that clarification, sir.

And finally, PALS, is that pediatric life support?



T. Mazarin

A.      Correct.

Q.      Does this share similarities to what you learned, in terms of being a certified ACLS and ATLS, it's just focused on pediatrics?

A.      Correct.

Q.      Are you still -- is this still an active certification or no?

A.      This is still active, yes.

Q.      How long has it been active, roughly?

A.      I think it's been active for the last five or six years, I think.

Q.      So is that -- did it lapse at any point?  Do you know when you were first PALS certified?

A.      Yeah.  I was first PALS certified back during residency, and then it lapsed and then -- and then it's been again, I think approximately the last five or six years it's been back.

Q.      Did you have to take any tests in order to get it back?

A.      You have to take the class and



T. Mazarin

associated with that class is kind of like a test at the end.

Q.    Okay.  Safe to say you passed the test at the end and that's why you were able to be recertified; is that correct?

A.    Yes.  I'm very proud.

Q.    Now ACLS, ATLS and PALS, those are certifications, those are not required for your employment as an emergency medical attending physician at Weiler; correct?

A.    Well, PALS is now required, which is the reason why I have been certified for the last several years.

Q.    Okay.  Thank you, sir.

And when it became required, is that fair to say that's when you took the class, passed the test and became certified?

A.    I think I had taken it once before, just for my own knowledge, but it wasn't that much after that it became a requirement.

Q.    Okay.  Sir, are you board certified in clinical pathology?

A.    No.



T. Mazarin

Q.    Are you board certified in anatomical pathology?

A.    Nope.

Q.    Are you board certified in forensic pathology?

A.    No.

Q.    Are you a neurologist?

A.    No.

Q.    Are you board certified in neurology?

A.    No.

Q.    Are you a cardiologist?

A.    No.

Q.    Are you board certified in cardiology?

A.    No.

Q.    Sir, have you ever been disciplined as a medical professional?

A.    No.

Q.    Have you ever been sued in your capacity as a medical professional?

A.    Yes.

Q.    Can you tell me about that?

A.    What do you want to know?



T. Mazarin

Q.    Everything.

MS. ALTERMAN:  Just note my objection to form.  Do you want to ask a specific question about the case name.

Q.    How many times have you been sued in your capacity as a medical professional? Let's start there.

A.    I believe I've been sued three or four times.

Q.    When were you sued?

A.    I don't know exactly when.  This is going over 25 years.

Q.    How recently were you sued? What's the most recent case?

A.    I think about five years ago.

Q.    So let's start with that one.

What was the basis of that lawsuit?  What were the allegations?

A.    It was a wrongful death.

Q.    What were the specific allegations made by the moving party as to the basis of that wrongful death claim?  What happened, based upon their allegations?

A.    I never saw the Bill of



T. Mazarin

Particulars so I don't know specifically what their allegations were.

Q.   Were you -- were you the only medical professional sued or were there other medical professionals sued as a part of that lawsuit?

A.   I believe there were other medical professionals sued as well.

Q.   Has that case since resolved?

A.   Yes.

Q.   Can you tell me what the resolution of that case was?

A.   There was a broad settlement.

Q.   Okay.  And was there a nondisclosure agreement signed as a part of that settlement or no?

A.   I don't know.

Q.   Are you aware, was this a monetary settlement with the complaining party?

A.   Sorry, I didn't hear that last part.  With the?

Q.   With the complaining party.

A.   Yeah.  There was a monetary



                          T. Mazarin

settlement.

Q.      And were you individually
responsible for contributing to the monetary
settlement or was this something covered by
insurance or by your hospital?

A.      Wait, I didn't -- I missed part
of that.

Q.      Sure.  I can repeat that for you
again, sir.

        Were you individually responsible
for contributing to that monetary settlement
or was any portion of the monetary portion
for settlement, was that paid on behalf of
either your insurance or by your hospital?

        MS. ALTERMAN:  Objection to form.
You can answer.

A.      I didn't pay anything
individually.  The hospital covered the broad
settlement.

Q.      So that would be one of either
three cases or one of either four.  So there
are either two or three cases remaining that
you said that you were sued in your capacity
as a medical professional.  Could you just --



T. Mazarin

you don't need to specify the specific year of the other two or three lawsuits against you.

Can you tell me what the other lawsuits involved?  You said the one from five years ago approximately, involved wrongful death.  What did the other two or three cases involve?

A.    Well, one case involved an infected knee and that case was ultimately dropped by the plaintiff.  One case involved a pulmonary embolism, and that case went to trial and I got a defense verdict.

And then the only reason I say that it might be one or two more cases is because I think that maybe I was named on a case but they never -- they were never against me really and I might have been deposed once, but it never went any further and they were a long time ago.  So I don't know what ever happened with those cases.

There was one, maybe there was another, but those are really, although I was named, I was not a part of the case.

T. Mazarin

Q.    Sir, the one where you said infected knee and that was dropped, was that voluntarily dismissed as a result of a settlement, if you recall?

A.    No, it was just the plaintiff decided to voluntarily discontinue the case. There was no -- there was no settlement.

Q.    Were you the only doctor named or were there other medical professionals named in that lawsuit, to the best of your memory?

A.    I don't remember.

Q.    In terms of the pulmonary embolism -- is that the correct phrase?  I know you had mentioned that.

A.    Yeah.  It's pulmonary embolism.

Q.    Embolism.  So in terms of the pulmonary embolism, thank you for correcting me there, sir, you said it was a defense verdict at trial.  Roughly speaking, do you recall how long ago that was?

A.    I know it was before I moved over to Einstein, so more than like 12 years ago.

Q.    Okay.  Were you called to testify at trial in that matter?



                          T. Mazarin

A.      I was.

Q.      And were you deposed in that matter as well?

A.      I don't think we do -- you know what, I'm not sure.

Q.      Were you the only defendant, medical professional, named in that matter?

A.      Yes, I think.

Q.      Was the hospital a co-defendant or were you the sole defendant?

A.      Oh, no, I think it was me and the hospital.  But, again, it was a long time ago and I'm not entirely sure.

Q.      Doctor, have you ever been the subject of an investigation in your career as a medical professional?

A.      No.

Q.      And that would include outside the hospital or inside the hospital; correct?

A.      Correct.

Q.      Have you ever been arrested?

A.      No.

Q.      Have you ever been sued in your individual capacity?



T. Mazarin

A.    No.

Q.    Have you, as an individual, ever filed a lawsuit against an individual entity or otherwise?

A.    No.

Q.    Now, Doctor, I'm going to ask you about your work as an expert; okay?

A.    Sure.

Q.    When did you first start serving as an expert witness?

A.    I first started approximately 18 years ago, I guess, although most of my expert work involves cases.

Q.    So could you just tell me how that came about?  Did you simply decide, similar to the acupuncture venture:  Hey, I want to do this, or did somebody approach you?  Could you tell me about the origin of your expert witness professional career?

A.    I'm not really clear.  I think I had a friend who did like, as an attorney did medical legal work and asked if I could review a case.  I think it kind of went on from there.



T. Mazarin

Q.    Understood.  So from there, how did your -- you said it kind of built from there.  How did it develop?  You said you had been doing it for about 18 years.  Did you start advertising?  Was it through word of mouth?  Were you strictly doing work for that attorney's office?

Could you tell me about how it developed, once you began doing work as an expert witness?

A.    Yeah.  I think it was really word of mouth.  I never advertised, so I think it's word of mouth.  It's many years later.

Q.    Do you own any websites or anything, sir?

A.    No.

Q.    So you said the cases that you were working on as an expert witness involved medical issues; is that fair to say?

A.    The vast, vast majority, yes.

Q.    And so let's say for the sake of argument, you served as an expert witness on a hundred matters.  What is the vast, vast majority of that 100?



T. Mazarin

A.      I'm not sure I understand the question.

Q.      So you say the vast, vast majority of the matters you served as an expert witness, were medical issues; correct?

A.      Correct.

Q.      I'm trying to get a rough percentage of what the vast, vast majority actually means.  So to be as round as possible, let's say for the sake of argument, you worked on a hundred cases as an expert witness, what percentage is this vast, vast majority, as you say, of medical cases that you've worked on?  Is it 90 percent of the cases, is it 95 percent?  Is there a small fraction, it's 98 percent of medical cases?  Can you give me an idea?

MS. ALTERMAN:  Objection to form. You can answer.

A.      Yeah, I would say like 98 or 99 percent.

Q.      What is the one or two percent that you say did not include medical matters?

A.      I have done a couple of cases



T. Mazarin

with the Attorney General looking at possible excessive force with the police, and then I also get some strange cases sometimes from pieces where there is real liability, where they're wondering about a medical aspect, such as a person who tripped on the sidewalk and then fell and then kind of trying to ascertain their injuries.

Q.    You said the Attorney General's Office.  Is that the New York Attorney General's Office or is that another state's Attorney General's Office?

A.    The New York.

Q.    Is your expert witness work, would you classify it as a business, is it a registered legal entity or is it just something that you just do?

A.    It is nothing official.  It is just something that I do.

Q.    So when you started approximately 18 years ago doing expert witness work, do you recall how much you charged for your services back then?

A.    I think I was getting like $250



T. Mazarin

an hour for reviewing cases.

Q.    How about for sworn testimony, either at deposition or at trial?

A.    I think at that point it was approximately $2500 per day for trial, and I think, you know, it was -- you know, I was not doing depositions, because in New York, medical malpractice cases, they don't depose the experts, so I hadn't done that any time during my early career.

Q.    Am I correct that your rates have risen over the course of your 18 years serving as an expert witness?

A.    Yes.

Q.    Can you tell me about how, over the course of your 18 years, how do you go about taking on a matter?  Are you called? Are you given an e-mail?  Do you discuss the matter?  Could you tell me about how you agree to take on a matter?

A.    Well, usually I'm either e-mailed or called and I -- you know, as long as there is no conflicts, I usually agree to assess the matter for, you know, the person who's



T. Mazarin

calling me.

Q.    When you say "agree to assess the matter," is that you're agreeing to serve as an expert witness?

A.    Well, I guess it depends on how you view it.  There are many cases that are not defendable, so I'm only agreeing to render an opinion one way or another.

Q.    Have there been cases in the past where you have rendered an opinion and you have not been designated as an expert as a result?

A.    I don't understand what that means.

Q.    Well, sir, you said some cases are un-defendable; am I correct?

A.    Correct.

Q.    So when you said you provide an assessment as to the case and some of the cases are un-defendable, if you're engaged as an expert and in your opinion you feel the case is un-defendable, do you still provide the expert opinion; and then, if so, are you aware if that expert opinion was ever



T. Mazarin

produced and you were disclosed as an expert in that matter?

MS. ALTERMAN:  Objection to form. You can answer.

A.    Well, I believe in most of those cases where I've rendered an opinion that said the case was indefensible, I believe the attorney and the carrier tried to settle the case or, you know -- you know, I don't think those cases ever went to trial, and if they did, they certainly weren't with me.

Q.    Understood.  So is it fair to say that from when you were initially contacted and asked to provide your opinion on a matter, you engage and take on that matter and then you ultimately provide a report based upon your view of the facts and the evidence?

A.    Well, I think you're making a generalization because most of the cases that I do are medical legal and they're in New York and we don't serve expert reports.

Q.    So of the -- so medical legal, you said that's about 98 percent, 99 percent;



T. Mazarin

is that roughly a percentage breakdown of the expert work that you've done over the last 18 years?

A.     Yeah, I think that's, you know, without going over the number, I think that's a fair representation.

Q.     Yeah, I'm not going to pin you down to an exact percentage or number, believe me, sir.  I just want a general idea of your casework and what type of cases you work on.

So of the cases that you've served as an expert witness, have you ever served as an expert witness for matters outside of New York State?

A.     Yes.

Q.     Roughly, how many?

A.     I don't know an exact number, but most of my cases are in New York State, but I do do some cases in Jersey and a couple in Connecticut.

Q.     So given that the Port Authority here is the Port Authority of New York and New Jersey, do you view this, in your



T. Mazarin

opinion, as a New York-based case or a New Jersey-based case or both?

MS. ALTERMAN:  Objection.  You can answer.

A.    Well, I don't really view it as either because to me, this is not a medical/legal case so this is not -- you know, I don't think of it in the same way.

Q.    Okay.  So roughly, how many cases have you worked on in the State of New York in your 18 years of expert witness service?

A.    I'm not really sure what the total number is.

Q.    Can you just estimate?

A.    Again, I really don't know.  It started off very, very slow and now I'm busier so I don't really know an exact number.

Q.    Do you have an idea of how many cases that you served as an expert witness per year?  Let's say in the last five years, roughly how many cases have you served as an expert witness?

A.    I would say now I'm probably



T. Mazarin

doing about 25 or so cases per year.

Q.     And the predominant amounts of those cases, those would be, as you say, medical matters?

A.     Correct.

Q.     And those are in New York State; correct?

A.     Most of them are in New York, but, as I said, there is definitely some in Jersey and occasionally, like a different state, but the predominance is in New York.

Q.     You said in New York State, in these medical matters, you say experts are not deposed or experts do not produce medical records -- sorry -- medical expert reports?

A.     They don't do either.

Q.     What about Connecticut?

A.     In Connecticut, it seems everywhere but New York.

Q.     And in those matters, if you're doing 25 a year, say for the last five years, in those matters, how many of those have gone to trial and required your testimony?

A.     I guess the best way I can answer



T. Mazarin

is that in my career, I have gone to trial 11 times.

Q.    Okay.  And in your career, roughly how many times have you been deposed?

A.    I think I've been deposed approximately 20 times.

Q.    Have you ever discounted your rates for any party?

A.    No.

Q.    As an expert, have you ever been simply hired for the purpose of being a consultant on a matter or providing the valuation of a case?

A.    Yes.

Q.    Do you charge the same fees?

A.    Earlier in my career, I was hired by an insurance carrier to just give an opinion on the case, but with no active involvement as an ongoing expert.

Q.    Have you ever been retained by the Port Authority of New York and New Jersey as an expert before this matter?

A.    I don't think so.

Q.    You say you don't think so.  Is



T. Mazarin

it that you don't recall at this moment or is that a no?

A.    I'm pretty sure they have never retained me.  I just hesitate to think -- I'm trying to answer as truthfully as possible. I hate to think there was somehow some side way I got involved in something.  But I'm pretty confident I've never been retained by them before.

Q.    I appreciate that, sir.  Thank you.

Regarding this matter, sir, who contacted you?

A.    I'm not sure.

Q.    Were you contacted by phone or e-mail?

A.    I'm not sure about that either.

Q.    When were you contacted?

A.    I believe this case was from earlier in the year.

Q.    Sir, were you contacted in 2024?

A.    I believe so.  I mean, it could have been the end of 2023, but I believe it was this year.



T. Mazarin

Q.    Do you know how many times you spoke with the Port Authority before agreeing to serve as their expert?

A.    No, I don't.  I don't remember.

MS. ALTERMAN:  Off the record.

(Discussion held off the record.)

MR. AMRHEIN:  Back on the record.

A.    Can I say one thing in regards to the last answer?

Q.    Sure.  We are on the record.

MR. AMRHEIN:  Deborah, could you read back the last question and answer, please.

(Record read.)

Q.    Doctor, you asked to expand on your answer after we went back on the record, which for the record we went off just to make sure everybody's audio was fine.

Sir, you asked to expand on your answer so I want to give you the opportunity to do so.

A.    Yeah, I just want to say that I agreed to -- I think it's a technicality, but I just agreed to review the case.  I didn't



800.211.DEPO (3376)
EsquireSolutions.com

T. Mazarin

agree to be an expert for the Port Authority,
just agreed to review the file and to give my
impression.

Q.    Is your review of the file and
your impression captured in your Rule 26
report here, sir?

A.    I'm not sure what that means.

Q.    Well, you just said you were
asked to review the file and provide your
impressions.  Is this Rule 26 report a
combination of your review of the file and
your impressions or is this something
different?

A.    No, this is it.

Q.    Sir, are you stating that this is
not an expert report prepared by you as a
medical professional?

MS. ALTERMAN:  Objection.

A.    I never said that.

Q.    No, I'm asking you.

A.    I wrote this report myself.

Q.    I'm aware of that, sir.  I'm
asking you, is this a report prepared by you
as a medical professional providing your



T. Mazarin

medical professional expert review of the matter?

A.    Yes.

Q.    Am I correct that based upon your Rule 26 report, you were, quote, "Asked to make a determination regarding whether there was use of excessive force with Evgeniy Lagoda during the events of April 12, 2019," as you state in your Rule 26 report?

A.    Yes.

Q.    And who asked you to do this?

A.    I believe you asked me that already.  I'm not sure who asked me.

Q.    I'm aware that I asked you before who asked you to potentially join as an expert in this matter.  I'm asking you who asked you to do that in particular, that being make a determination regarding whether there was use of excessive force with Evgeniy Lagoda during the events of April 12, 2019?

A.    Well, this was my impression of why I was being consulted.

Q.    So your impression as a medical professional is that you were asked to make a



T. Mazarin

determination regarding whether there was use of excessive force with Evgeniy Lagoda during the events of April 2019, April 12th of 2019; is that right?

A.    From a medical perspective.

Q.    Sir, how much are you charging defendants for your service in this matter? Did you require a retainer?

A.    No.

Q.    Am I correct that you're charging $450 per hour?

A.    Per review, yes.

Q.    Am I correct that your rate in this matter for providing deposition testimony is $3,500?

A.    Correct.

Q.    Am I correct that you are charging $4,500 to defendants for trial testimony; correct?

A.    Yes.

Q.    Do you know what your bill is so far?  How many hours have you spent on this matter?

A.    I'm not sure.



800.211.DEPO (3376)
EsquireSolutions.com

T. Mazarin

Q.    Do you keep a detailed recording or accounting of the work you do for each individual expert witness matter?

A.    I'm not sure what you mean, but certainly when a certain amount of time has gone by, I'll send out a bill.

Q.    How do you keep track of your time?

A.    With a watch.

Q.    How do you keep track of your time when you do expert professional work for defendants; do you do it by a tenth of an hour basis, do you do it by an hourly basis?

A.    I do it by a quarter of an hour.

Q.    And do you send that accounting via invoice on a monthly basis, bimonthly basis?  How often do you send your invoice?

A.    I send my invoice when I realize that we've reached a certain -- I don't want to call it milestone, but a certain point in the case where it seems like my active work is finished for that aspect of the case.

Q.    So is it fair to say that at a logical break in the development of a case,



T. Mazarin

or the lifespan of the case, you send your expert invoice after you've completed what you feel is your work in the matter?

A.    Yes.  I think you phrased that far better than I did.

Q.    Roughly, sir, do you know what your bill is so far in this matter, roughly?

A.    No, I'm not sure.

Q.    Have you ever been paid for your deposition appearance today?

A.    No.  I think you're the one paying me.

Q.    Sir, in your work as an expert witness, how many times have you been called to testify in court as an expert witness, in your career?

A.    Oh, I think that's what I was referring to earlier.

Q.    Correct.  So I could ask you again, I know you had mentioned it in passing, but I just want to be fair to you and ask you again so I can get a clean answer there:  How many times have you been called to testify in court as an expert witness in



T. Mazarin

your career as an expert witness?

A.    I believe it's approximately 11 times.

Q.    And how many times -- and I know you mentioned this roughly before -- how many times have you been deposed as an expert witness in your career as an expert witness?

A.    I believe I answered that as well.  I think it's somewhere around 18.

Q.    Of these 29 matters where you've provided sworn testimony as an expert witness over the 18-year span of your professional expert witness career, how many of those 29 matters were criminal matters?

A.    Well, can you define "criminal"?

Q.    Well, this is a civil matter here today, sir.  So a criminal matter would be either you would be an expert witness for the defense or you would be an expert witness for the prosecution.

A.    Meaning with regards to -- so this is a non-civil matter, something like someone potentially going to jail, is that what you're referring to?



T. Mazarin

Q.    Sure.

A.    Yeah, they're all civil matters.

Q.    All civil?  Okay.

Of those 29 civil matters which is a combination of your in-court testimony as well as deposition testimony, of those 29 civil matters, how many did you serve as an expert witness for the plaintiff?

A.    They were all for the defense.

Q.    All for the defense.

Now, you stated that these 29 cases don't capture the amount of work that you've done over the 18 years that you worked as an expert witness.  Is it fair to say that you've worked on hundreds of cases as an expert witness regardless of whether you provided in-court or deposition testimony?

A.    Yeah, I think that's fair.

Q.    Of those hundreds of cases that you've worked on, are the majority of those cases civil or criminal matters?

A.    They're all civil.

Q.    And of those hundreds of cases



T. Mazarin

you've worked on over the past 18 years, how many times have you worked for the plaintiff's side?

A.    The vast majority of my cases are for the defense, although I have done some plaintiff's cases.

Q.    Do you recall how many of the hundreds you worked on for the plaintiffs? Is it single digits?

A.    It's a small number.

Q.    And how small, sir?

A.    I don't have an exact number.

Q.    Is it less than five?

A.    No.  It's probably around five.

Q.    You don't know exactly; correct?

A.    Correct.

Q.    So that leaves hundreds, say for five matters, that you've worked for the defense in civil matters; is that correct?

A.    Oh, I thought you were talking about percentage.

Q.    No.  I was asking how many cases.

A.    Oh.

Q.    Of the hundreds you have worked



T. Mazarin

on, how many cases have you served, roughly how many cases have you served as plaintiff's expert?

MS. ALTERMAN:  Just note my objection.  You can answer.

A.    Yeah, I meant like 5 percent of the cases, not five cases.

Q.    Okay.  Sir, you list some cases here in Exhibit B of Exhibit 1, do you see that on your screen?

A.    Yes.

Q.    So we'll start at the top.

You provided trial testimony in number 1.  It's dated 12/16/21.  Who engaged you as an expert here, sir, which side?

A.    Well, as I stated, all my trial cases are for the defense.

Q.    Okay.  So we can shorten this up a little bit.

The numbers 1 through 5, your trial testimony since 2020, were for the defense; correct?

A.    Correct.

Q.    And how were you -- was this



T. Mazarin

through word of mouth that you became an expert in those five matters?

A.    Yes.

Q.    And you had testified earlier about the process by which you are contacted and take on a case; correct?

A.    Yes.

Q.    And was that what you had testified to earlier, is that similar to how you went about being engaged as an expert in the five cases listed on the screen now on Exhibit B?

A.    Well, I don't remember each of these cases, but I presume that that's the way that I was contacted.

Q.    The first case, for instance, what did that involve?

A.    I don't remember any of these cases specifically.

Q.    You don't remember any details of any of these five cases?

A.    If I were to see a couple of sentences, I'd be able to remember all the details, but just from the name, I can't



                        T. Mazarin

recall what happened.

        Q.      So even for number 5, Olson v.

Brown, which was less than a year ago, you

don't remember any details about that matter?

        A.      Nope.   As I said, if you were to

give me one or two sentences, I would be able

to tell you everything, but only from the

name, I don't remember.

        Q.      And am I correct that all five of

those cases listed there are medical cases?

        A.      I think that case Constant versus

New York State, I think that is -- I think

that's a case with the District Attorney.

That was not a medical case.

        Q.      Okay.  Was any of your testimony

limited or excluded in any of those five

matters listed there?

        A.      No.

        Q.      Do you know if any of those

matters are still active in any post trial

capacity?

        A.      I don't believe so.

        Q.      Do you know what the result was

of those five cases?



T. Mazarin

A.      Yes.

Q.      Starting with 1, do you recall the result?

A.      Well, I can kind of do it a little differently.  I think -- I think Lyulina -- wait one moment.  One of them, you can see there were three clumped around the same time.  I think one of them, maybe Russo, had settled outright before the jury came back with their verdict, but I think the rest of them were all a defense verdict.

Q.      Do you recall the content of your expert testimony in those matters?

A.      I don't remember the cases, so, no.

Q.      Do you recall if it was in support of the medical action or in defense of the medical action at issue in those matters, outside of number 2, the New York State matter?

A.      So could you repeat your question?

Q.      Yes.  So 1, 3, 4 and 5, you said were medical matters; correct?



                          T. Mazarin

A.     Correct.

Q.     So your testimony in those matters was in defense of the medical professionals named as defendants; is that right?

A.     Correct.

Q.     Do you recall -- you said it was a Constant V New York State, you said it was a District Attorney matter.  Having jogged your memory on that, do you recall any additional details on that matter, in particular?  I know you said that wasn't one of the medical matters.  Do you recall what it was about?

A.     Yeah.  I believe that was an accusation of excessive force with correctional officers.

Q.     And you provided a medical opinion in that matter?

A.     Correct.

Q.     So moving on to B, again listed 1 through 5, so there is a total of ten sworn testimony as an expert since 2020.  B is deposition testimony.



T. Mazarin

Just going through these matters, number 1, Jodi D'Augustine V Meika Close, M.D., were you for the plaintiff or the defense here?

A.    I think I stated before that for the depositions and the trials, they were all defense.

Q.    So depositions and trials here are all listed as defense as well.  Thank you.

Were any of these five cases here listed under B, did any of them reach trial, from your memory?

A.    I don't think so.  Otherwise, if there was a deposition, they would have appeared on my trial list.

Q.    Well, there is no guarantee that you would be called at trial, sir, and as you know settlement can occur at any time during trial.  So there is a possibility that it did reach trial.  However, you weren't called to testify so, therefor, it wouldn't be included under heading B, so that's why I asked the question.



T. Mazarin

So, again, did any of those cases under heading B, deposition testimony, did any of them reach trial or no?

A.    I mean, with that -- you bring up an interesting point, but not that I'm aware of.

Q.    I'm not trying to hold you to it, I'm trying to gather some of the work that you have done in the past five years, sir.

So on the first matter, do you know what that involves?

A.    The same would be true for the trials.  I don't remember the specifics of any of the cases unless I were to see a quick summary.

Q.    So going through all these, including trial testimony and deposition testimony, were these all New York State cases or were any of these federal matters?

A.    So as far as the deposition testimony goes, none of those are New York State because New York State doesn't have depositions for experts, with the exception being the Lee versus the United States



T. Mazarin

because that was a federal matter.

Q.    What did Lee versus the United States, what were the facts in that matter, as you understand them to be?

A.    I believe this was a gentleman who experienced a deep vein thrombosis and the suit, I believe, was against the VA, and because it was the VA, therefore it fell under the jurisdiction of the United States. That's my non-legal understanding of the situation.

Q.    And I believe you testified earlier you believe all five of those cases you have listed there have resolved before trial, or are any of them active and ongoing?

A.    It's possible some of them are still ongoing.  I don't know.  A lot of times I'm not notified when a case has been resolved, so I have -- I'm pretty sure that I remember the Lee case has resolved.  As far as the other ones, I'm not sure.

Q.    Do you know what the resolution was in the Lee case?

A.    Yeah.  There was -- there was a



T. Mazarin

settlement.

Q.   Okay.  And for all of these depositions in which you provided expert testimony, it was for the defense; correct?

A.   Correct.

Q.   Sir, I want to scroll up to the top of your Rule 26 reports.  Do you see the first page that I'm on there, sir?

A.   Yes.

Q.   And you address it to counsel for defendants; is that right?

A.   Correct.

Q.   And this is with regard to Tarasov V Port Authority, but it's your understanding the case caption is a little bit longer than that; right?

A.   I'm assuming so.

Q.   I just want to make sure that we are talking about the right matter, just for the record.  But under that, you're aware that you list items reviewed; correct?

A.   Correct.

Q.   You list Jamaica Hospital.  Are those Jamaica Hospital medical records, could



T. Mazarin

you tell me what you reviewed and what Jamaica Hospital means?

A.    I reviewed -- well, they sent as the ER chart from the day of the incident.

Q.    And that's ER chart from Jamaica Hospital?

A.    Correct.

Q.    Okay.  And Jamaica EMS, could you tell me what those documents are, what did you review there?

A.    That was the EMS report from that day.

Q.    And then the Attorney General's report, I think we may have discussed this a little bit before, am I correct that that is the Attorney General's report or OAG, Office of the Attorney General report, into the death of Mr. Lagoda?

A.    Yes.

Q.    And am I correct that you stated that you reviewed that document in anticipation of your deposition today?

A.    Yes.

Q.    Did you review the Jamaica



T. Mazarin

Hospital records that you referred to just a moment ago in preparation for your deposition?

A.    I looked over them very quickly.

Q.    And what about the Jamaica EMS documents you referred to, did you look at those before today's deposition?

A.    Again, I had reviewed both the EMS record and the hospital record in more detail before, prior to writing my report. But in preparation for today, I just looked over them very briefly.

Q.    Okay.  The fourth line that you list there, autopsy, you wrote that in singular form.  Did you only review the New York Medical Examiner's autopsy in preparing your Rule 26 report?

A.    You know, honestly, I don't remember.  I know I have read the -- I have read the second autopsy that was done in Russia.  I'm not sure whether I read that before or after this report.  I believe I was aware of it beforehand but I'm not a hundred percent sure.



T. Mazarin

Q.    Here, am I correct that you simply list autopsy; right, just singular autopsy?

A.    That is correct.

Q.    So is it fair to say when you say autopsy, you're referring to the New York Medical Examiner's autopsy here as you list it?

MS. ALTERMAN:  Objection.  You can answer.

A.    Correct.

Q.    Underneath that, you say paramedic Hodges interview.  Was that one of the interview documents produced during discovery, sir?

A.    I just know it was like a four or five-page printout I think of an interview with the EMS worker.

Q.    Is that the same for paramedic Zender?

A.    Correct.

Q.    And that's what you list back-to-back, paramedic Hodges and paramedic Zender interview; is that correct?



T. Mazarin

A.    Correct.

Q.    Did you review those documents in preparing for your deposition today?

A.    No.

Q.    You then list "PIU reports."  In your own words, what are PIU reports, sir?

A.    I just -- I just read that document and that was the best way I could describe the document.  I don't know exactly what a PIU report is.

Q.    Do you recall what those documents were, as you sit here today?

A.    Yes.

Q.    Could you tell me what they are?

A.    I'm going to say --

Q.    I'm just asking about your memory, sir.  You could leave the documents off to the side.

A.    It's some kind of investigative report.  I'm not sure exactly who issued it or...

Q.    And do you recall, by memory, what PIU reports you had reviewed for any particular individuals; do you recall?



T. Mazarin

A.    Actually, I think I just have one PIU report.

Q.    Do you recall what the name -- who was the subject of that PIU report, sir?

A.    Would you like me to look at the document?

Q.    If it's just the one next to you, and then we can move on, yes.

A.    I'm not sure exactly how to identify it.  I could show it to you on the screen if that helps you.

Q.    Could you just tell me the Bates stamp number at the bottom, sir?

A.    It's PA-1683.

Q.    Just give me a moment.

Sir, am I correct that it's a PIU report that you're referring to, you just reviewed one PIU report?

A.    I believe it's just one.  I think I maybe mislabeled it as PIU reports, but I believe it's just one.  I'd have to go through my records again to be sure, but...

Q.    Can you tell me what the last page Bates stamp is, please?



T. Mazarin

A.    It is PA-1910.  So it seems like it skips around because I've got four -- I have two reports stapled together.  So I have PA-1683, PA-1684, PA-1909 and PA-1910.

Q.    Sorry, can you repeat that for me?

A.    1683, 684, 1909 and 1910.

Q.    So it's just that?  Okay.  Just give me one second, sir.

(Pause.)

Q.    Sir, am I correct that PIU investigative action report, Bates stamped PA-1683 to 1684, does that have a marker at the bottom of PA-1683 right above it that says 105?

A.    It does.

Q.    And for the record, this is interview notes after -- made by -- in the form of a PIU investigative action after a meeting with Dr. Milewski, the Dr. Yvonne Milewski who is the City of New York, Office of the Chief Medical Examiner, who conducted the autopsy report.

Sir, is that fair, do you see



                          T. Mazarin

that in the top paragraph of page 1683?

        A.      Can you repeat that?

        Q.      Do you see in the top of page 1683, the first paragraph, a couple of lines down, it mentions that's with Dr. Yvonne Milewski of the City of New York Office of Chief Medical Examiner?

        A.      Yes.

        Q.      "The purpose of this meeting was to discuss preliminary findings from the autopsy of Evgeniy Lagoda," is the final sentence in the top paragraph.  Do you agree with that, sir?

        A.      Yes.

        Q.      You said 1909?

        A.      Correct.

        Q.      So 1910; correct?

        A.      Correct.

        Q.      So this is a review and analysis of the footage that was obtained as a part of the investigation.

                It says, "On April 15, 2019, Port Authority Police Department Sergeant Lawanda Irving of the police integrity unit received



T. Mazarin

surveillance video recording in the United States Customs and Border Patrol located at John F. Kennedy International Airport, Terminal 1."

It says, "The footage was recorded by 37 separate cameras affixed throughout CBT.  The videos were recorded on April 12, 2019, and captured the initial arrival of Mr. Lagoda."  They provide his date of birth and then go on to say, "Review of analysis of the footage revealed the following."  That's the other document, PIU investigative action report that you reviewed, sir, in preparing your Rule 26 report?

A.    Correct.

Q.    Okay.  And so it was just those two PIU reports; correct?

A.    I believe so, yes.

Q.    Under PIU reports, I'll bring this back up so you can see the screen, sir, let me know when that's on your screen.

A.    Yup.

Q.    Under PIU reports, you then state



T. Mazarin

"images."  Could you just tell me what images you reviewed?

A.    Yeah, they were the autopsy images.

Q.    Okay.  Underneath that you say Grigory Tikhoplav's deposition.  Is that Mr. Tikhoplav's deposition transcript?

A.    Yes.

Q.    And did you review that -- I think you may have reviewed that in anticipation of today's deposition; is that fair?

A.    No, I've reviewed that in the past.  I didn't re-review that.

Q.    Okay.  Here, you say underneath Grigory Tikhoplav's deposition, you say "Summons and Complaint;" is that correct?

A.    Yes.

Q.    Was that the original Complaint or was that the Amended Complaint, sir?

A.    I'm not sure.

Q.    Under that, you say, "Dr. Sperry, expert report."  Is that the Rule 26 expert report produced by plaintiff's expert --



T. Mazarin

produced by plaintiffs in this matter?

A.      Yes.

Q.      And you say, "On scene consulting expert reports."  Could you tell me what your understanding of that is?

A.      This was the police expert that the plaintiff hired.  I looked at that but very briefly.

Q.      And when you say "looked at that but very briefly," was that in preparing your Rule 26 report or is that in preparing for today's deposition?

A.      I didn't look at it for today's deposition at all.  I did look at it in preparation of my report but focused on the major conclusions.

Q.      Okay.  As for the one listed right above, so Dr. Sperry expert report, you reviewed that in anticipation and in preparation of your Rule 26 report; correct?

A.      Yes.

Q.      And did you review that expert report in preparation for today's deposition?

A.      I went back through the final


ESQUIRE
DEPOSITION SOLUTIONS

T. Mazarin

conclusions.  I did not reread the entire report.

Q.    Sir, are there any other documents that are not captured here, that you reviewed in anticipation or in preparation of your Rule 26 report?

A.    No.

Q.    So in preparing your Rule 26 report, you didn't review any deposition testimony, other than Mr. Tikhoplav's; correct?

A.    That's correct.

Q.    And you didn't review any Port Authority Police Department policies and procedures; correct?

A.    Definitely not.

Q.    Sir, we discussed this a little bit earlier, but directing your attention to -- I can't highlight this, but directing your attention to next to where my cursor is on the screen, the last sentence of the first paragraph, do you recall being asked when you were first contacted about serving as an expert in this matter and your agreement to



T. Mazarin

serve as defense expert, do you recall a discussion about that, sir?

A.    Yes.  But as I stated, my only agreement was to review the file, not to serve as an expert.

Q.    You realize that your work was submitted as a part of expert Rule 26 disclosures; correct?

A.    Well, after reviewing the file, I determined that there were grounds for an expert report and, therefore, after that, I issued my report.  But my original agreement was just to review the file.

Q.    And I appreciate that distinction, but is it fair to say that you agreed to serve as an expert for plaintiffs -- strike that -- for defendants in this matter, sir?

A.    Yes, after reviewing the materials, I did agree to serve as an expert.

Q.    And you then produced this expert report; correct, which was ultimately disclosed as a part of discovery?

A.    Yes.



T. Mazarin

Q.    And did I read this --

MS. ALTERMAN:  Sorry.

MR. AMRHEIN:  Go ahead, Cheryl.

MS. ALTERMAN:  Before we get into the substance of the report, I was going to request a five-minute break.

MR. AMRHEIN:  Sure.  Yeah, that's fine.  It's 10:07.  Do you want to come back at -- it's 10:07, geez.  It's 1:07.  Is 1:15 okay?

MS. ALTERMAN:  That's fine. Thank you.

(Recess taken from 1:07 to 1:24 p.m.)

MR. AMRHEIN:  Let's go back on the record.

Q.    Doctor, I just have a couple of more questions before we get into your report.

When you agreed to serve as an expert for defendants, I know you had discussed your initial review of the matter, but when you agreed to serve as an expert for defendants in this matter, did you sign an



T. Mazarin

engagement letter?

A.      No.

Q.      Did you sign anything that outlined the scope of your engagements?

A.      No.

Q.      And, additionally, you had said that roughly 5 percent of your cases that you've worked on, of the hundreds of cases that you've worked on as an expert, 5 percent of those cases were plaintiffs' cases; is that correct?

A.      Yes.

Q.      Of those plaintiffs' cases, of that 5 percent, what percentage were those medical matters?

A.      All of them.

I would also like to -- just to clarify for the record -- some of the cases where I'm hired by a defense firm, they are looking at a critical nature of a doctor.

Q.      I'm going to share my screen with you, sir --

A.      Almost as if I'm a plaintiff's expert for the defense.



T. Mazarin

Q.     So you're saying you were hired as a consultant basis to provide an expert report to help prepare defendants; is that what you're saying?

A.     The best way I could explain it, to give you an example, say sometimes maybe there is a case against a radiologist and the -- I'm hired by the radiologist to see if there is fault with the ER doctor.

Q.     Understood.  Sir, directing you to your report, in particular the bottom of page one of your report, which is on your screen, do you see that?

A.     Yes.

Q.     Am I correct that your report states, right next to my cursor, "With regards to the above referenced case, I was asked to make a determination whether there was use of excessive force of Evgeniy Lagoda during the events of April 12, 2019."  Do you recall that, sir -- sorry, did I read that correctly?

A.     Yes.

Q.     Do you recall discussing that a



T. Mazarin

little bit earlier?

A.     Yes.

Q.     So based upon what you say in your report right here, and what we've just read and you confirmed was in your report, do you agree with me that that's the purpose of your expert report?

MS. ALTERMAN:  Objection.

A.     That was my understanding of my purpose, yes.

Q.     Okay.  Doctor, your report twice includes a reference to -- bear with me here -- mesial temporal lobe sclerosis and bilateral basil subarachnoid bio neuronal heterotopia; do you recall that?

MS. ALTERMAN:  Can you move down to that part of the report?

MR. AMRHEIN:  I'm just asking him if he recalls it to begin with.

A.     What are you asking me if I recall, what about that?

Q.     Do you recall that your report includes references twice to mesial temporal lobe sclerosis and bilateral basil



T. Mazarin

subarachnoid bio neuronal heterotopia?

A.    Yes.

Q.    Okay.  And I may not have pronounced those the best possible ways, but are you aware of what I'm referring to when I say those terms, sir?

A.    Yes.

Q.    Earlier today we discussed that you reviewed Dr. Sperry's expert report in preparation for your Rule 26 report; correct?

A.    Yes.

Q.    And I believe you said you reviewed the conclusion portion of Dr. Sperry's expert report, in preparation for your deposition today; is that right?

A.    Correct.

Q.    Sir, do you recall that Dr. Sperry's report stated, "The overall appearance of the microscopic brain finding is suggestive of mesial temporal sclerosis, MTS, also known as temporal lobe epilepsy, TLE, which is the most common of the focal epilepsies.  Up until the events that occurred on the night of April 12, 2019 where



800.211.DEPO (3376)
EsquireSolutions.com

T. Mazarin

Mr. Lagoda had experienced what was correctly interpreted as a generalized seizure, he had no known history of epilepsy or seizures of any type in his medical records from Russia, contained no documentation that he had ever experienced a seizure of any kind."

Do you recall that in Dr. Sperry's report, sir?

A.    Not specifically, no.

Q.    Generally, do you recall that?

A.    Generally, yes.

Q.    And then Dr. Sperry's report continues saying, "It is known and recognized that MTS may first be manifested by an externally observable seizure at any age, and the apparent fact that this seizure was the initial presentation of Mr. Lagoda's MTS induced generalized seizure is not in and of itself unusual."

Do you recall that in Dr. Sperry's report, sir?

MS. ALTERMAN:    Objection.    You can answer.

A.    Again, not specifically, but, you



T. Mazarin

know --

Q.    Generally?

A.    This was generally consistent with the findings of the Medical Examiner.

Q.    And then finally Dr. Sperry, in his report, stated, "I agree with the opinion held by the NYCOCME that the presence of anatomically proven mesial temporal sclerosis is, to a degree of medical certainty, the anatomic cause of the seizure he experienced in the airplane at JFKIA."

Do you recall that in Dr. Sperry's report?

A.    Again, not specifically but generally, yes.

Q.    What I just read to you, sir, do you agree with the opinion that I just read?

MS. ALTERMAN:  Objection.  You can answer.

A.    I'm not a pathologist, but it seems that the pathologic findings by both Dr. Sperry and the Medical Examiner, finding of predisposition for seizures, was consistent with the clinical findings in this



T. Mazarin

case.

Q.      So in your report where you state -- when you twice discuss the mesial temporal lobe sclerosis and bilateral basal subarachnoid bio neuronal heterotopia, are you simply referencing from that from the report or are you offering that as based upon -- or is that an opinion of yours based upon the review of the evidence?

A.      I'm referencing -- for the most part, I'm referencing the reports.

Q.      When you say "for the most part," that doesn't include at all -- that wouldn't be a hundred percent of all the other parts. What are the other parts of how you're referencing those medical terms?

A.      Well, I have -- since I'm not a pathologist, I am not familiar with how to diagnose his condition and, therefore, I am relying upon these -- the expert of the Medical Examiner to make this diagnosis and establish this diagnosis, and I am just interpreting the pathologic findings in the clinical context.



T. Mazarin

Q.    Now, sir, moving on to the next paragraph, you begin saying, "Evgeniy Lagoda was a 39-year old Russian male."  Do you see that?

A.    Yes.

Q.    And you say, "With no significant past medical history;" correct?

A.    Correct.

Q.    Now, sir, that paragraph to which I'm referring, I'm just going to ask you a couple of questions.

The top of page 2 of your report, you state -- and when I say your report, sir, I'm referring to this Exhibit 1, your Rule 26 Report.  Is that fair?

A.    Yes.

Q.    Okay.  And on the top of page 2 of your report, you state that, "Five minutes after leaving the gate" -- and then after at approximately 10:00 p.m. you say, "Mr. Lagoda experienced a seizure as described by the flight attendants and several witnesses on the flight, including three nurses who assisted moving him to the floor at the rear



T. Mazarin

galley to prevent injury."

Did I read that correctly, sir?

A.    Yes.

Q.    And then shortly thereafter, your report states, as you'll see kind of in the middle of that paragraph, "Once the pilot returned to the gate at 10:24 p.m., Officer Bugiada (190 pounds) was able to enter the aircraft."  Do you see that, sir?

A.    Yes.

Q.    Sir, we went over the documents that you reviewed in preparation of your Rule 26 report; correct?  Do you recall that?

A.    Yes.

Q.    And you did not include -- you did not include the FCIRR report prepared bay the captain of that Jet Blue flight, Captain Kurt Bengtson; correct?

A.    Correct.

Q.    So in preparing this report, you were not aware that Captain Bengtson wrote that from the initial call regarding Mr. Lagoda's seizure, to the arrival at the gates was within five minutes, you weren't



T. Mazarin

aware of that, were you, in preparing this report, sir?

          MS. ALTERMAN:  Objection, you can answer.

     A.     I did not see a report from the pilot.

     Q.     You were not aware that he received a notification from the rear of the plane almost immediately at 10:20, or as he said "2200 hours, and then they returned to the gate at 2224, approximately five minutes later"?  You weren't aware of that in preparing your Rule 26 report; correct?

     A.     First of all, you said 2200 and then you said --

     Q.     2224.

     A.     And then you said 2220.  You said 2220, so those are two separate times.

     Q.     Sorry, sorry, that was my mistake.  22 -- that was my typo.

          2220 versus 2224, are you aware of that, you didn't review that document in preparing your Rule 26 report; correct?

          MS. ALTERMAN:  Objection.  You



T. Mazarin

can answer.

A.      As I said, I did not review the pilot's testimony.

Q.      Are you aware that Captain Bengtson had prepared that report just a day after this event had occurred?

MS. ALTERMAN:  Objection.  You can answer.

A.      As I said, I did not review the report.

Q.      And since you didn't review the report, you weren't aware, in preparing your Rule 26 report, that Captain Bengtson had commended the swift and quick action by the flight crew in identifying the medical event and the quick turn around to be able to return the flight, as he said, within five minutes at that time?  You're not aware of that; correct?

MS. ALTERMAN:  Objection.  You can answer.

A.      I wasn't aware -- I was not privy to the report of the pilot.

Q.      And so, Doctor, given that you



T. Mazarin

did not review Captain Bengtson's FCIRR, nor did you review his deposition transcript in preparing your Rule 26 report, am I correct that this is more like a 5-minute process, not a 30-minute process as you're discussing in your report here?

MS. ALTERMAN:  Objection, you can answer.

A.    Well, since I did not review the report, I can't make any comment on your question.

Q.    But you weren't aware of those documents, correct, you didn't review them in preparation for your Rule 26 report; isn't that right?

A.    I think I've said that several times, that I did not review the pilot's report.

Q.    And you didn't review his deposition transcript; right?

A.    That is correct.

Q.    You discuss generally the events on the plane and you go on to say, starting with the sentence next to my cursor which



T. Mazarin

begins, "However," you say, "However, within a minute or two later one of the officers noticed Mr. Lagoda had become cyanotic and they were unable to palpate a pulse."  Did I read that correctly?

A.     Yes.

Q.     To begin, Doctor, when you say "cyanotic," do you mean PAPD officers noticed bluish or purplish discoloring of Mr. Lagoda's neck and face due to insufficient oxygenation of the blood?

A.     Yes.

Q.     Sir, you stated that, in preparation of your Rule 26 report, that you had reviewed the Office of the Attorney General's investigative report; correct?

A.     Correct.

Q.     Would it refresh your recollection that the OAG's investigative report found that the officers found Mr. Lagoda's neck was blue within a minute of handcuffing?

MS. ALTERMAN:  Objection.  You can answer.



T. Mazarin

A.   I'm kind of confused by the question.  Is there a question about the OAG report?

Q.   No.  I said, sir, would it refresh your recollection that the OAG's investigative report found that the officers noticed Mr. Lagoda's neck was blue within a minute of handcuffing him?  Does that refresh your recollection of the events?

MS. ALTERMAN:  Objection.

A.   Yeah, I believe that's where I got my information from.

Q.   Generally speaking, Doctor, someone states:  This is when I noticed something, that simply means that's when a person first observed something; isn't that correct?

A.   Yes.

Q.   So that doesn't mean that something wasn't already occurring; correct?

MS. ALTERMAN:  Objection.  You can answer.

A.   Not necessarily.  Could you repeat the question?



T. Mazarin

Q.    I said that doesn't mean that something wasn't already occurring; correct?

A.    Correct.

Q.    And that something may have already been occurring, it could just take some time for a person to notice it; correct? That's the very nature of noticing something; right?

A.    Yes.

Q.    Sir, I know again we went over a number of documents that you reviewed in preparation of your Rule 26 reports and that you stated you only reviewed one deposition transcript, so I'm just going to raise a few things to you on the record regarding some testimony that you hadn't reviewed, in particular one of the flight attendants as well as one of the responding nurses.

One of the responding nurses, in particular Nathana Wright-Reid, are you aware that she testified in her deposition that she had never treated anyone for a seizure at that point in her career as a nurse?

A.    I didn't read her report.



T. Mazarin

Q.    So you're not aware?

A.    Not aware.

Q.    In preparing your Rule 26 report, were you aware that Nathana Wright-Reid testified that while she hadn't at that point in her career treated anybody for a seizure, that she was, as a part of her training, aware that someone who had just suffered a seizure may be confused and disoriented.  Are you aware of that testimony, sir?

MS. ALTERMAN:  Objection.  You could answer.

A.    I'm not aware.

Q.    And in preparing your Rule 26 report, sir, were you aware of her testimony that she observed Mr. Lagoda to be disoriented and confused when he stood up, and this is when a common -- excuse me, this was a common response after a seizure, based upon what she had learned in becoming a nurse?  Were you aware of that testimony in preparing your Rule 26 report?

A.    I'm not aware.

Q.    And in preparing your Rule 26



T. Mazarin

report, were you aware that Ms. Nathana Wright-Reid had testified that even after Mr. Lagoda struck her, and this is when she had already testified he was in a confused and disoriented state, that even after Mr. Lagoda had struck her, she stayed to help Mr. Lagoda because it was an ongoing medical event?

Were you aware of that testimony in preparing your Rule 26 report, sir?

MS. ALTERMAN:  Objection.  You can answer.

A.    Not aware.

Q.    I'm going to ask you about some testimony, deposition testimony given by the flight attendant who responded to Mr. Lagoda's seizure, Calvin Swinney.  I believe I know the answer to this already, but you didn't review Calvin Sweeney's deposition transcripts in preparation of your Rule 26 report; correct, sir?

A.    That is correct.

Q.    So as such, in preparing your Rule 26 report, you weren't aware that



T. Mazarin

Mr. Swinney testified that he tried to calm down Mr. Lagoda, but Mr. Lagoda was disoriented, confused and definitely out of it?  You weren't aware of that testimony in preparation of your Rule 26 report; correct?

MS. ALTERMAN:  Objection.  You can answer.

A.    Correct.

Q.    And, as such, sir, you were not aware that Mr. Swinney testified that he told the first responding officer, Officer Bugiada, that there was a medical emergency of a man having a seizure and that man was disoriented and combative, you weren't aware of that in preparing your Rule 26 report; correct, sir?

MS. ALTERMAN:  Objection.  You can answer.

A.    I'm not aware.

Q.    Now, Doctor, these observations, regarding Mr. Lagoda's disorientation, disorientation, confusion and combativeness in the immediate wake of his seizure, these are consistent with the typical symptoms an



800.211.DEPO (3376)
EsquireSolutions.com

T. Mazarin

individual may respond to or respond with in the immediate wake of a seizure; correct?

A.    Well, I would disagree.  I would say that it's not typical, but it can happen.  But I would not describe it as typical.

Q.    So if you don't describe it as typical, do you understand that those responses may happen as a result of a seizure; correct?

A.    Those responses can happen.  They're in a minority of cases and they're usually very short-lived, and not as severe, even when they do happen.

Q.    Sir, you recall a timeline that we went over a little bit earlier, how from the time that Mr. Lagoda was seizing to the time the plane returned to the gate and Officer Bugiada boarded the plane was approximately five minutes?  Do you recall learning about that testimony?

MS. ALTERMAN:  Objection to form.  I don't believe that was the testimony.  You can answer.

A.    That was not something I'm aware



T. Mazarin

of.

Q.      Does your report state that,
"Based on the description of events,
Mr. Lagoda apparently experienced a prolonged
period of postictal confusion following his
seizure.  This is a common occurrence
frequently experienced in the emergency room,
although not usually of such a violent nature
or so prolonged."  Do you recall writing
that, sir?

A.      Yes.

Q.      And you recall the testimony that
I have just brought to your attention from
one of the responding nurses, as well as the
responding flight attendant, about
Mr. Lagoda's confusion, disorientation and
combativeness; correct?

A.      I recall you reading those
passages, yes.

Q.      And making you aware of the
deposition testimony that you have not been
provided or read prior to preparing your
Rule 26 report; isn't that right?

MS. ALTERMAN:  Objection.  You



T. Mazarin

can answer.

A.    Yes, I have not seen that deposition testimony.

Q.    Sir, what I just read to you, you said this is a common occurrence frequently experienced in the medical room -- sorry, in the emergency room.  And then you added the caveat not usually of such violent nature or so prolonged.  You are agreeing that postictal confusion is a very common experience in the emergency room; correct?

A.    That is correct, but it usually lasts for just a few seconds.

Q.    You say "usually," but that doesn't capture every event; correct?

A.    I think the word usually kind of defines that.

Q.    Kind of defines that it usually happens but that's not always the case; is that what you're stating?

A.    Correct.  I think that's what the word usually means.

Q.    I'm just asking for some clarification and some expansion on your use



T. Mazarin

of the word usually, sir, that's all.

A.      Yeah, so usually, not every case.

Q.      But some cases; correct?

A.      There are some cases that have postictal confusion.  It's -- but it usually doesn't last more than a few seconds.

Q.      And you said usually not of such a violent nature.  That suggests that an individual may be combative or aggressive or agitated after suffering from a seizure and being in a postictal state; correct?

MS. ALTERMAN:  Objection.  You can answer.

A.      That is correct.

Q.      Am I correct that your report states that there is a -- "There is a wide variation," as it concerns an individual response in a postictal state following a seizure?

A.      That is what I wrote, yes.

Q.      Sir, do you recall our earlier discussion regarding your review of the New York City Medical Examiner's autopsy report prepared by Dr. Milewski?



T. Mazarin

A.    Yes.

Q.    And you agree with me and you said it was fair to say that when you referred to autopsy, singular, as the document you reviewed in preparation of your Rule 26 report, you were discussing the NYC Medical Examiner's autopsy; correct?

MS. ALTERMAN:  Objection.

A.    Correct.

Q.    And you weren't sure when you reviewed, if you reviewed the Russian autopsy report; is that right?

A.    I believe I had reviewed it before writing this report, but I'm not a hundred percent sure.

Q.    Sir, before preparing your Rule 26 report, were you aware that the second autopsy found fractures to Mr. Lagoda's ribs and that those fractures weren't included in Dr. Milewski's report?

A.    Yes, I'm certainly aware of it and I believe I was aware of it when I wrote the report.

Q.    Is there a reason why you said



T. Mazarin

there were no fractures sustained in your report, sir, if you did have the knowledge that there were fractures to Mr. Lagoda's ribs?

A.    Well, first of all, I had far more reliability in the report from the Medical Examiner that said that there were no ribs, rather than an autopsy conducted several months later in Russia whose expertise in performing an autopsy is very questionable, especially in this case where I believe several of the organs were already removed and not even available.  And so I found that the autopsy report from the Medical Examiner was far more reliable.

Q.    And do you know the doctor's reputation, the Russian doctors who performed the autopsy?

A.    I do not.  But I have trained with several people who come from Russia with medical degrees and I can guarantee you, you wouldn't want them taking care of you.

Q.    Regardless of what I want, sir, or what you want, I'm simply asking are you



T. Mazarin

aware of who the doctors are who performed the autopsy in Russia?  Are you aware?

A.    No, I'm not familiar with them.

Q.    Are you aware of their qualifications or education?

A.    No.

Q.    And just because you know a couple of Russian doctors in the United States, does that have any bearing on the qualifications which you do not know, of a Russian doctor that you do not know?

MS. ALTERMAN:  Objection.  You can answer.

A.    No.  I do find it less reliable, especially considering this was several months later.  Who knows what the travel conditions of the deceased was, and I don't think this was a very significant difference in findings between the two autopsies.

Q.    Sir, you said there were no fractures and one of the autopsies found that there were fractures.  You would say that that's a significant difference as a medical professional; correct?



T. Mazarin

A.    I actually would not. Considering this gentleman received prolonged CPR, I'm actually surprised there were not more rib fractures.

Q.    And are you saying to a degree of medical certainty that the fractures were due to CPR?

A.    I'm not a pathologist.

Q.    So your opinion that you offer on the veracity and accuracy of the Russian autopsy, are you giving that as somebody who is not a pathologist?

A.    Correct, I'm not a pathologist.

Q.    So what is the basis of your opinion, to a medical degree of certainty, as to why you're not giving any credence in speaking about the veracity of an autopsy report when you have no specialty in pathology?

A.    Well, I think it comes down to common medical sense that you have a report that specifies there's no rib fractures and then several months later, in Russia, where I do not believe their medicine is even close



T. Mazarin

to the state of the art, there's a slightly different finding.

So I think any, any professional would question whether those findings are accurate, whether they know or do not know the exact people who are performing the autopsy.

Q.     Have you ever practiced medicine in Russia, sir?

A.     I have not.  But I have, as I said, practiced with some people -- several people who have come from Russia.

Q.     And so your opinion here is entirely based upon a couple of people here in the United States that you personally know, as to the veracity and accuracy of a completely separate doctor's autopsy?

A.     I think people who have any general knowledge do not think that medicine in Russia is practiced with the same high technology that we practice it here.

Q.     And that's simply your opinion or is that your opinion to a medical degree of certainty, sir?



T. Mazarin

A.    I think that's a common accepted medical opinion.

Q.    But, again, you don't know the doctor, you don't know the doctor's background, qualifications, and you've never practiced medicine in Russia; isn't that right?

A.    That is correct.

Q.    Sir, given your alleged contention with the second autopsy, why didn't you include that in your report?

A.    Because I don't think it significantly differed from the findings of the first autopsy report.  It pretty much just, as far as I could tell, just confirmed it.

Q.    Doctor, bringing your attention to the final paragraph of your roughly two-page report, you see that final paragraph, it's a longer paragraph that starts with the word "based"?

A.    Yes.

Q.    In the final paragraph of your report, sir, you discuss hospital protocol,



T. Mazarin

hospital staff and hospital activity.  Do you see that?

        A.    Yes.

        Q.    When you're discussing hospital protocol, hospital staff and hospital activity, you're not specifically discussing and evaluating Port Authority Police Department policy and procedure; correct?

        A.    That is correct.

        Q.    And that's because you're not a law enforcement professional; right?

        A.    Correct.

        Q.    And you have no experience or training as a law enforcement and professional; correct?

        A.    Correct.

        Q.    Sir, is it fair to say that your inclusion of the "these are all superficial injuries with no fractures," that that was solely based upon the findings in the first autopsy?

        A.    Correct.

        Q.    Doctor, in the second to last sentence, on page 2 you state that there was



T. Mazarin

no direct connection between the physical injuries described and his demise, "his" meaning Mr. Lagoda.  Did I read that correctly, sir?

A.      Correct.

Q.      Doctor, is direct a medical term?

A.      Not that I know of.

Q.      So you wouldn't know how -- if direct is defined in a medical sense?

A.      I think direct is a common English word that people understand the meaning to.  I don't think it has a separate meaning in a medical context.

Q.      So here you're using it as a common English word colloquially speaking and not using it as a medical term as an opinion to medical degree of certainty; right?

MS. ALTERMAN:  Objection.

A.      I'm not really sure what you just said but I don't think -- I'm not sure exactly what you just said.  It was a big statement and it had a lot of twists and turns in it so I'm not sure I follow.

MR. AMRHEIN:  Can you read that



T. Mazarin

back, Deborah, please.

(Record read.)

MS. ALTERMAN:  Note my objection.

A.    I heard the question.  I didn't understand it.

Q.    Sir, are you using the term "direct" as a medical term in support of an opinion given to a medical degree of certainty or are you using the word direct as you stated in a common English way?

MS. ALTERMAN:  Objection.  You can answer.

A.    I still don't really understand the distinction.

Q.    Doctor, you opine that there is no direct connection between the physical injuries described and his demise, as we just stated.  So, therefore, you're saying that there was a connection, it just wasn't a direct connection; isn't that right?

A.    No, I'm not saying that.

Q.    My common English understanding of the word direct suggests that you are saying that there was a connection, it just



T. Mazarin

wasn't a direct connection.  Isn't that right, sir?

A.    That is not what I mean by that statement.

Q.    So what do you mean by the statement, "direct connection"?

A.    I think you can take the word direct out and I would still agree with that statement.

Q.    Sir, you're not a pathologist; correct?

A.    No.

Q.    So you're not tasked -- and you never served as a Medical Examiner; correct?

A.    Nope.

Q.    Doctor, to a reasonable degree of medical certainty, you cannot say that there was no connection; isn't that right?

MS. ALTERMAN:  Objection.  You can answer.

A.    No.  I believe I can, based on the information available.

Q.    Do you believe that the information available in Dr. Milewski's



T. Mazarin

opinion is incorrect?

A.    No, I believe it's correct.

Q.    So you would therefore agree that her opinion that other significant factors, which included -- other significant factors as concerning Mr. Lagoda's death included physical struggle and altercation with blunt impacts which he had sustained as a result of the physical altercation with the PAPD, so you would agree with that finding by Dr. Milewski; correct, in which she had labeled as a homicide?

MS. ALTERMAN:  Objection.  You can answer.

A.    I think that's a very twisted question with three separate things in there so I cannot agree with that statement as you read it.

Q.    Sir, you're aware that Dr. Milewski, in her opinion and finding, stated that in support of the cause of death, other significant factors contributing to Mr. Lagoda's death, physical struggle/altercation with blunt impacts and



T. Mazarin

that physical struggle was with the, of course, the physical altercation with the Port Authority Police Department officers, you're aware that she included that in her report; correct?

MS. ALTERMAN:  Objection.  You can answer.

A.    Yes, I am aware that she included that in her report.

Q.    And you just stated that you agreed with Dr. Milewski's findings, didn't you?

A.    Agreed with which findings?

Q.    You said you agree with Dr. Milewski's findings in her autopsy report; isn't that right?  You just testified to that, sir.

A.    Well, I'm not a pathologist so I cannot agree or disagree with her findings. All I can do is read her findings and interpret them in a clinical context.

Q.    So as somebody who is not a pathologist, to what degree of medical certainty are you placing on your statement



T. Mazarin

that the actions of the officers did not contribute to the death of Mr. Lagoda, as to somebody who is not a pathologist?

A.    Well, as someone who is not a pathologist, that there was no evidence found of injury to Mr. Lagoda that would cause him to die.

Q.    Sir, how do you feel about a pathologist who conducted the autopsy from the New York City Office of the Medical Examiner, who found that a significant factor contributing to the death of Mr. Lagoda was the physical struggle/altercation with blunt impacts that he had suffered at the hands of the Port Authority Police Department, how do you feel about -- what is your opinion on the Medical Examiner doctor, Dr. Milewski's finding and including that in her report and finding that the death was a homicide?

MS. ALTERMAN:  Objection.  You can answer.

A.    I think you are misconstruing what her report says and putting it in your own words.  But that's not what the report



T. Mazarin

says.

Q.    So her report, under "Other significant factors, "does not say, "Physical struggle/altercation with blunt impacts;" does it not say that?

A.    It does say that.  It doesn't say that's what caused his death.

Q.    It says other significant factors as to factoring into the cause of death section, you're aware of that; correct, sir?

A.    All it says is other significant factors.

Q.    In her opinion on the cause of death, and then she labeled it as a homicide; correct?

A.    She did label it as a homicide; correct.

Q.    And you're aware that the homicide that she labeled is because it was not a death that occurred on its own; correct?  It was not a natural death, there were other factors at play; correct?

A.    That is my understanding of the, I guess, the definition of homicide as far as



T. Mazarin

it concerns a Medical Examiner.

Q.    Correct, and the distinction between a legal definition and a Medical Examiner's definition of homicide is that a Medical Examiner is not taking intent -- is not factoring in intent in the determination as to the cause of death; isn't that right?

A.    I'm certainly not an expert in the distinction between a legal definition of homicide and a definition of homicide from a Medical Examiner.

Q.    Sir, are you an expert in clinical pathology?

A.    No.

Q.    Are you an expert in anatomical pathology?

A.    No.

Q.    Are you an expert in forensic pathology?

A.    I think you've asked me all these questions before.

Q.    I didn't actually.  I asked you whether you were board certified.  So I'm going to ask you again:  Are you an expert in



T. Mazarin

forensic pathology?

A.    No.

Q.    The final sentence of your report goes from page 2 to 3, sir, and I'll quote that for you.  It says, "There is no question there was a physical struggle between Officer Bugiada, the other officers and Mr. Lagoda during the time they were trying to place him in handcuffs, but there is absolutely no evidence from any of the information provided that excessive force was involved."  Did I read that correctly?

A.    Correct.

Q.    This is the second time you've used the phrase "excessive force" in your report; is that correct, sir?

A.    Yes.

Q.    Again, sir, am I correct that you're not a law enforcement professional?

A.    Correct.

Q.    And you have no experience or training in law enforcement; correct?

A.    Correct.

Q.    And even if you did, you stated



T. Mazarin

in your deposition testimony that you didn't review any of the Port Authority Police policies and procedures, in preparing your Rule 26 report; correct?

A.    Correct.

Q.    So you, as a medical expert, a medical professional, are opining on a police standard; correct?

MS. ALTERMAN:  Objection.  You can answer.

A.    No.  I'm responding as a medical standard as it pertains to Mr. Lagoda.

Q.    Is use of force a medical standard, sir?

A.    Use of force, there are certain medical aspects that can be reviewed and the case can look -- also be looked at through the prism of a medical basis.

Q.    The use of excessive force, sir, are you saying that that is a medical phrase, not a police standard?

MS. ALTERMAN:  Objection.

A.    I'm saying that I can look at this case from a medical perspective to



T. Mazarin

evaluate whether there is medical evidence of excessive force.

Q.    And when you reviewed the medical evidence, sir, you didn't find it necessary to put in that there were fractured ribs by the second autopsy?

A.    No.  I don't find that very relevant.

Q.    Again, you're not a pathologist; correct?

A.    Correct.

Q.    Doctor, based upon your medical background and training, when an individual is in a postictal state after suffering a seizure, medical professionals are still monitoring the individual's oxygen saturation; correct?

A.    Yes.  We try to do that at the first available opportunity.

Q.    That's because in the postictal state, after somebody has suffered a seizure, an individual's brain is still recovering from a seizure; correct?

A.    That is correct.



T. Mazarin

Q.    Doctor, am I correct that based upon your review of the evidence, there is no evidence on the record that suggests that Mr. Lagoda had suffered two distinct separate seizures on the night of April 12th; correct?

A.    It's a little unclear.  There is certainly no convincing evidence, but it's -- it's possible, especially if this was a temporal lobe seizure.

Q.    You can't say to a degree of medical certainty that that happened, based upon the evidence in this matter; isn't that right?

A.    It seems that it's by far most likely that he experienced one individual seizure.

Q.    Doctor, you can't say to a reasonable degree of medical certainty, based upon your training and professional experience, what the cause of death was; correct?

MS. ALTERMAN:  Objection.

A.    I'm not a pathologist.

Q.    So you can't say it, therefore;



                        T. Mazarin

correct?

        A.      I relied upon the Medical
Examiner to determine the cause of death.

        Q.      And because you're not a
pathologist, that's why you didn't include it
in your expert report, the cause of death;
correct?

        A.      I only referred to issues that
I'm an expert in.

        Q.      And you're not an expert in, nor
are you trained -- strike that.

                You're not an expert in
neurology; isn't that right?

        A.      In neurology?

        Q.      Yeah, you're not a neurologist;
isn't that right?

        A.      That is correct.

        Q.      You're not a cardiologist?

        A.      No.

        Q.      You're not a clinical
pathologist?

        A.      No.

        Q.      You're not an anatomical
pathologist?



T. Mazarin

A.    I'm not even sure what that is.

Q.    Do you have any certification, board certification or otherwise, in anatomical pathology, sir?

A.    No.

Q.    Are you a forensic pathologist, sir?  Are you an expert in that field?

A.    I think you've asked me these same questions like five times.

Q.    And that's fine.  I'm going to ask it again to get your honest answer.  You are under oath here, sir.

Are you a forensic pathologist?

MS. ALTERMAN:  Just note my objection to the characterization.  You can answer.

A.    No.

MR. AMRHEIN:  For now, I'm going to rest and pass this to Cheryl, but I may have some questions in response.

EXAMINATION BY

MS. ALTERMAN:

Q.    Dr. Mazarin, what is your opinion, to a reasonable degree of medical



T. Mazarin

certainty, with respect to the physical injuries that were described in the ME's report, relating to Mr. Lagoda?

MR. AMRHEIN:  Objection.

A.     Mr. Lagoda had all superficial injuries.  There were no injuries to any of his vital structures or any of his vital organs, and there's no evidence from the Medical Examiner report that any of those physical injuries led to his death.

Q.     How do you know that, Doctor?

A.     Because I have general medical knowledge and that is consistent with the report.

Q.     And what does the report indicate was the primary cause of death for Mr. Lagoda on April 12, 2019?

MR. AMRHEIN:  Objection.

A.     It says, "Sudden death was related to a grand mal seizure."

Q.     Is there any evidence in this case that the suffering of a grand mal seizure was caused by the Port Authority Police Officer?



T. Mazarin

MR. AMRHEIN:  Objection.

A.    No.

MS. ALTERMAN:  That's all I have, thank you.

FURTHER EXAMINATION

BY MR. AMRHEIN:

Q.    Sir, just a few questions in response.

You were just asked a question about the inclusion of the cause of death in your report.  There is no inclusion of the cause of death in your report; isn't that right?

A.    Let me just double-check.

(Pause.)

A.    I don't believe so.

Q.    Do you want to correct your answer to counsel's previous question from about 30 seconds ago?

A.    I answered the question.

Q.    Sir, would you agree with me that there is no cause of death listed in your report?

A.    That is correct, it's not in my



T. Mazarin

report.

Q.    Yes.  Again, sir, you are stating your evaluation of the -- what the Medical Examiner had determined in her opinion about the death of Mr. Lagoda.  You said you reviewed the OCME's report; correct?

A.    Correct.

Q.    And you just testified that your expert opinion is based upon general medical knowledge; correct?

A.    With regards to what?

Q.    I'm simply saying you just testified that your expert opinion, with regard to the cause of death of Mr. Lagoda, is based upon general medical knowledge; isn't that right?

MS. ALTERMAN:  Objection.

A.    And my expertise in emergency medicine.

Q.    Again, sir, you're not a neurologist, cardiologist or pathologist; correct?

A.    Correct.

MR. AMRHEIN:  I don't have any



T. Mazarin

more questions as of now.  Cheryl may have

some in response, then I may respond.

MS. ALTERMAN:  That's all I have.

Thank you for your time, Doctor.

MR. AMRHEIN:  Thank you

Dr. Mazarin, we very much appreciate it, and

thank you again for coming in.  We really do

appreciate it.

And thank you, Deborah.

(Time noted:  2:20 o'clock p.m.)


GREGORY MAZARIN, M.D.

SUBSCRIBED AND SWORN TO
BEFORE ME THIS     DAY
OF             , 2024.


NOTARY PUBLIC


* * *



GREGORY MAZARIN, M.D.                                    September 17, 2024
TARASOV, ESQ. V. PORT AUTHORITY OF NY AND NJ                          156

I N D E X

| WITNESS | EXAMINED BY | PAGE |
|---|---|---|
| GREGORY MAZARIN | Mr. Amrhein | 4-151 |
| | Ms. Alterman | 151-153 |
| | Mr. Amrhein | 153-155 |

*  *  *

E X H I B I T S

| DR. MAZARIN | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Rule 26 report and attachments | 16 |

(Dr. Mazarin Exhibit 1 attached to transcript.)

*  *  *

 ESQUIRE
DEPOSITION SOLUTIONS

C E R T I F I C A T E

STATE OF NEW YORK    )
                     )        ss:
COUNTY OF QUEENS     )

I, DEBORAH MOSCHITTO a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That the within is a true and accurate transcript of the testimony taken on the 17th of September, 2024.

I further certify that I am not related to any of the parties to the proceeding by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 19th day of September, 2024.

DEBORAH MOSCHITTO



DEPOSITION ERRATA SHEET


Our Assignment No.:  J11741688

Case Caption:  TARASOV V. PORT AUTHORITY


DECLARATION UNDER PENALTY OF PERJURY


        I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

                        _____
                        GREGORY MAZARIN, M.D.

Subscribed and sworn to on the ____ day of _____, 20 ____ before me.

_____

Notary Public,

in and for the State of

_____.



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

Reason for change:_____




SIGNATURE:_____DATE:_____

          GREGORY MAZARIN, M.D.



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

                GREGORY MAZARIN, M.D.



**Exhibits**

11741688 Gr
egory.
Mazarin, M.
D..EXHIBIT1
  16:15,18
  87:10,15
  92:3
  116:15
  156:9

**$**

$250
  69:25

$2500
  70:6

$3,500
  81:16

$4,500
  81:19

$450
  81:12

**1**

1
  16:15,18
  87:10,15,
  21 90:3,
  24 91:22
  92:3
  103:5
  116:15

10
  50:25

10-page
  14:15
  16:8

100
  67:25

101
  41:6

105
  101:16

10:00
  116:21

10:07
  108:9,10

10:20
  118:10

10:24
  117:8

11
  76:3 84:4

12
  64:23
  80:9,21
  103:9
  110:21
  112:25
  152:18

12/16/21
  87:15

12th
  81:4
  149:6

15
  50:17
  102:23

1683
  101:8
  102:2,5

1684
  101:14

18
  66:13
  67:5
  69:22

70:13,17
73:4
74:12
84:10
85:14
86:2

18-year
  84:13

1825
  9:4

190
  117:9

1909
  101:8
  102:16

1910
  101:8
  102:18

1992
  17:2

1996
  18:4

1997
  18:4
  19:21
  20:15,16,
  20 36:23
  52:15

1998
  24:18
  25:17

1999
  25:18
  26:6

1:07
  108:10,14

1:15
  108:10

1:24
  108:15

**2**

2
  14:14
  90:20
  116:13,18
  137:25
  146:5

20
  76:7

2000
  25:21
  26:7
  28:3,12
  31:18
  33:10
  35:16
  38:9,16
  39:2

2001
  45:10,11

2003
  31:19

2007
  33:11
  35:16

2008
  35:18

2013
  28:4,12
  29:18,19,
  24 35:18,
  24 36:10,
  17

2019
  80:9,21
  81:4
  102:23
  103:9
  110:21
  112:25
  152:18

2020
  15:25
  87:22
  91:24

2023
  77:24

2024
  14:17
  77:22

2031
  44:23,25

22
  118:21

2200
  118:11,15

2220
  118:18,
  19,22

2224
  118:12,
  17,22

25
  47:23
  60:13
  75:2,22

26
  11:6,11
  13:9
  14:10
  15:4,9,18
  16:9,16
  79:6,11
  80:6,10
  95:8
  97:18
  103:15
  104:24
  105:12,21
  106:7,9
  107:8
  112:11
  116:15
  117:14



118:14,24
119:14
120:4,15
121:15
123:13
124:4,15,
23,25
125:11,
22,25
126:6,16
128:24
131:7,18
147:5

**29**
84:11,15
85:5,8,13

---

**3**

**3**
14:15
90:24
146:5

**30**
45:23
153:20

**30-minute**
120:6

**300-hour**
50:19

**37**
103:7

**39-year**
116:4

---

**4**

**4**
90:24

---

**5**

**5**
87:7,21
89:3
90:24
91:23
109:8,10,
15

**5-minute**
120:5

---

**6**

**684**
101:8

---

**7**

**7**
14:17

---

**9**

**90**
68:15

**95**
68:16

**97**
20:21,22

**98**
68:17,21
72:25

**99**
68:22
72:25

---

**A**

**abdominal**

47:17
48:21
49:11,21

**ability**
8:10,12

**absolutely**
146:10

**academic**
36:19
38:8,23
39:3
41:24

**Academy**
42:11,15
43:13

**accepted**
136:2

**accident**
56:4

**accompanying**
15:13

**accounting**
82:3,16

**accuracy**
134:11
135:17

**accurate**
135:6

**accusation**
91:17

**achieve**
55:23

**achieved**
34:6 56:8

**ACLS**
53:17,19
54:13,25
55:13
57:5 58:8

**acronyms**
53:17

**action**
90:18,19
101:13,20
103:14
119:15

**actions**
143:2

**active**
44:21
47:11
48:23
51:3
54:8,12,
13 56:12,
14 57:9,
10,11,13
76:19
82:22
89:21
94:16

**activity**
137:2,7

**actual**
29:5

**acupuncture**
50:10,21
51:16
66:17

**acute**
55:19,22

**added**
129:8

**addendum**
51:10

**addition**
10:5,13
26:16
44:13

**additional**
91:12

**additionally**
109:7

**address**
8:18,20,
23,25
9:2,8
95:11

**administrative**
26:16

**advance**
10:21

**advanced**
53:20
54:2
55:10

**advertised**
67:13

**advertising**
67:6

**affiliated**
39:14

**affixed**
103:7

**age**
113:16

**aggressive**
130:10

**agitated**
130:11

**agree**
70:21,24
71:3 79:2
102:13
107:21
111:7
114:7,18
131:3
140:9
141:4,11,



800.211.DEPO (3376)
EsquireSolutions.com

**18**
142:15,20
153:22

**agreeable**
5:17

**agreed**
4:15
5:16,25
78:24,25
79:3
107:17
108:21,24
142:12,14

**agreeing**
71:4,8
78:3
129:10

**agreement**
4:10
61:16
106:25
107:5,13

**ahead**
108:4

**aircraft**
117:10

**airplane**
114:12

**Airport**
103:4

**Albert**
14:19
17:14
39:12

**allegations**
60:19,22,
24 61:3

**alleged**
136:10

**allowed**
37:22

**Alright**
16:7,12

**altercation**
141:8,10
142:3

**ALTERMAN**
4:15
5:18,25
8:22 9:2
60:3
62:16
68:19
72:4 74:4
78:6
79:19
87:5
98:10
108:3,5,
12 111:9,
17 113:23
114:19
118:4,25
119:8,21
120:8
121:24
122:11,22
124:12
125:12
126:7,18
127:22
128:25
130:13
131:9
133:13
138:19
139:4,12
140:20
141:14
142:7
143:21
147:10,23
149:23
151:15,23
153:4
154:18
155:4

**Amended**
104:21

**amount**
21:4 82:6
85:13

**amounts**
75:3

**Amrhein**
4:14,22
5:6,13,19
16:13,22
78:8,12
108:4,8,
16 111:19
138:25
151:19
152:5,19
153:2,7
154:25
155:6

**analysis**
102:20
103:12

**anatomic**
114:11

**anatomical**
59:3
145:16
150:24
151:5

**anatomically**
114:9

**answers**
6:23 7:7

**anticipation**
96:23
104:12
105:20
106:6

**apparent**

113:17

**apparently**
128:5

**appearance**
83:11
112:20

**appeared**
92:17

**applicable**
45:7

**application**
34:4

**applications**
48:14

**apply**
26:10
34:3,7
52:13
53:18

**applying**
34:16

**appointments**
38:8

**apprentice**
29:10
38:12

**apprenticeship**
29:3,11
31:8

**apprenticeship-type**
31:4

**approach**
66:18

**approximately**
21:2

50:17
57:21
63:7
66:12
69:21
70:6 76:7
84:3
116:21
118:12
127:20

**April**
80:9,21
81:4
102:23
103:9
110:21
112:25
149:6
152:18

**area**
14:7
18:23
19:11,15
24:3
26:25
27:10
29:14
38:20
46:20
47:3,4

**areas**
19:5,10,
16 22:16
25:8
37:23
48:11

**argument**
67:23
68:11

**arrested**
65:22

**arrival**
103:10
117:24



*800.211.DEPO (3376)*
*EsquireSolutions.com*

art
135:2

Arts
17:7

ascertain
69:9

Ashcroft
5:7

aspect
69:6
82:23

aspects
147:17

assess
70:24
71:3

assessment
71:20

Assistant
14:17
38:15

assisted
116:25

associate
5:6

assuming
52:25
95:18

assumption
6:13

assure
11:4

ATLS
53:17
55:10,13,
23 56:17
57:5 58:8

attachments
16:16,17

attend
42:10

attendant
125:17
128:16

attendants
116:23
123:18

attending
23:2
28:4,9
29:21
31:19,25
32:17,20
33:14
34:11
35:3,15,
20,25
36:6
38:18,19
58:11

attendings
26:14

attention
106:19,21
128:14
136:18

attorney
5:5 10:16
11:14
12:24
66:22
69:2,10,
11,13
72:9
89:14
91:10
96:14,17,
18 121:16

attorney's
67:8

attorneys
7:22

9:15,17,
24 10:2
12:22

audio
78:19

auditorium
45:18,25

Authority
42:4,8,
11,14,18,
22 43:5,
10,13,14
73:23,24
76:22
78:3 79:2
95:15
102:24
106:15
137:8
142:4
143:16
147:3
152:24

automatic
51:14

automatical
ly
51:13

autopsies
133:20,22

autopsy
10:17
12:6
97:15,17,
21 98:3,
4,7,8
101:24
102:12
104:4
130:24
131:5,8,
12,19
132:9,11,
15,19

133:3
134:12,18
135:8,18
136:11,15
137:22
142:16
143:10
148:7

availabilit
y
33:22

avoid
6:16

aware
61:19
71:25
79:23
80:15
93:6
95:21
97:24
112:6
117:22
118:2,8,
13,22
119:5,13,
19,23
120:13
123:21
124:2,3,
5,9,11,
14,16,22,
24 125:2,
10,14,25
126:5,11,
15,20
127:25
128:21
131:18,
22,23
133:2,3,5
141:20
142:5,9
144:11,19

───────────

B

───────────

Bachelor
17:7

Bachelor's
17:11

back
22:5
57:19,22,
24 69:24
78:8,13,
17 90:11
103:22
105:25
108:9,16
139:2

back-to-
back
98:24

background
16:21
20:9
50:16
52:3
136:6
148:14

bad
56:3

basal
115:5

based
29:5
46:25
55:22
60:24
72:18
80:5
111:4
115:8,9
124:20
128:4
135:15



basically
39:15
55:17

basil
111:15,25

basis
32:14
34:12
49:23
53:5
60:18,23
82:14,17,
18 110:3
134:15
147:19

Bates
100:13,25
101:13

bay
117:17

bear
13:19
111:13

bearing
133:10

beat
18:20
22:3

began
35:25
67:10

begin
7:7 30:6
43:18
111:20

beginning
13:7
14:11,22
24:14
29:19
31:8 32:9
38:8

begins
121:2

behalf
62:14

Bengtson
117:19,22
119:6,14

Bengtson's
120:2

bestowed
26:13

big
40:23
138:22

bilateral
111:15,25
115:5

bill
60:25
81:22
82:7 83:8

bimonthly
82:17

bio
111:15
112:2
115:6

birth
103:11

bit
25:20
31:10,15

blood
121:12

blue
117:18
121:22
122:8

bluish
121:10

blunt
141:8,25
143:14
144:5

board
43:25
45:9,13
46:13,22
47:3,11
49:18,19
50:6
52:8,10,
19,23
58:23
59:2,5,
10,15
145:24
151:4

boarded
127:19

book
45:20
46:6,12

Border
103:3

bottom
100:14

brain
112:20
148:23

break
7:11,14
82:25
108:7

breakdown
73:2

briefly
14:25
23:22
97:13
105:9,11

bring
46:10
93:5
103:21

bringing
136:18

broad
61:14
62:19

Bronx
9:5

brought
128:14

Brown
17:2 89:4

Bugiada
117:9
126:13
127:19
146:8

built
67:3

busier
74:18

business
8:23
69:16

—————————

C

—————————

Cabrini
31:21
32:19
33:3 35:6
36:9,12

call
82:21
117:23

called
64:24
70:18,23
83:15,24
92:19,22

calling
71:2

calm
126:2

Calvin
125:18,20

cameras
103:7

capacity
59:22
60:7
62:24
65:25
89:22

captain
117:18,22
119:5,14
120:2

caption
14:13
95:16

capture



85:13
129:16

captured
79:6
103:9
106:5

car
56:3

cardiologist
59:13
150:19
154:22

cardiology
59:16

cardiovascular
53:20

care
132:23

career
21:14
36:23
39:3,17
43:9
65:16
66:20
70:11
76:2,4,17
83:17
84:2,8,14
123:24
124:7

carrier
72:9
76:18

case
10:10
14:12
26:15
60:5,15
61:10,13
63:10,11,

12,13,18,
25 64:7
66:24
71:20,23
72:8,10
74:2,3,8
76:14,19
77:20
78:25
82:22,23,
25 83:2
88:7,17
89:12,14,
15 94:19,
21,24
95:16
110:8,18
115:2
129:20
130:3
132:12
147:18,25
152:23

cases
62:22,23
63:9,16,
22 66:14
67:18
68:12,14,
16,17,25
69:4
70:2,9
71:7,10,
16,21
72:7,11,
21 73:11,
13,20,21
74:10,21,
23 75:2,4
85:13,16,
21,23,25
86:5,7,23
87:2,3,8,
9,18
88:12,15,
20,22

89:11,25
90:15
92:12
93:2,15,
20 94:14
109:8,9,
11,14,19
127:12
130:4,5

casework
73:11

caused
144:8
152:24

caveat
37:25
129:9

CBT
103:8

center
9:4 14:19
18:2
20:11,13,
14 22:8
24:13,17,
21 27:6,
11 28:6,
11,22
31:21
32:19,22
35:9

certainty
114:10
134:7,16
135:25
138:18
139:10
140:18
142:25
149:12,19
152:2

certificate
19:25
54:13

certification
44:4,20
45:13
46:13
49:18
50:6,19
52:23
53:22
54:5,9,
15,25
55:24
56:8,19
57:9
151:3,4

certifications
43:18,23
58:9

certified
44:2 45:9
46:22
47:4,12
48:2
49:18,19
52:20
56:17
57:5,17,
18 58:13,
18,24
59:2,5,
10,15
145:24

cervical
56:2

changed
21:12
44:11
45:4,23

changing
45:6 49:6

characterization
151:16

charge
76:16

charged
69:23

charging
81:7,11,
19

chart
96:5,6

checked
47:24

Cheryl
5:13
108:4
151:20
155:2

chief
25:23
26:5,15,
21 27:2,
9,13,17
101:23
102:8

Chris
5:6 11:19
12:14

chronological
17:23
28:2
31:17

City
32:6
101:22
102:7
130:24
143:11

civil
84:17
85:3,4,5,
8,23,24
86:20



claim
  60:23

Clare's
  33:16
  35:3,11,
  15 36:9,
  13

clarificati
on
  12:11
  22:3
  31:16
  33:6
  36:22
  38:6
  51:21
  56:23
  129:25

clarify
  109:19

class
  41:6
  54:18
  57:25
  58:2,18

classes
  37:21
  42:19
  55:23

classify
  69:16

classroom
  29:6,9,
  12,16
  30:22

classrooms
  28:21

clean
  6:18 7:5
  83:23

clear
  49:8

  66:21

clinical
  40:2,8,
  12,15,16,
  22 41:4,
  16 58:24
  114:25
  115:25
  142:22
  145:14
  150:21

close
  51:24
  92:3
  134:25

clubs
  43:19

clumped
  90:8

co-
defendant
  65:10

co-director
  39:8

co-
residents
  26:14

colleague
  24:11

colleagues
  30:5

college
  14:20
  17:14
  39:12
  41:6

colloquial
  6:19

colloquiall
y
  138:16

combative
  126:15
  130:10

combativene
ss
  126:23
  128:18

combination
  23:19
  52:9
  79:12
  85:6

commended
  119:15

comment
  120:11

common
  32:8,11
  38:18,23
  112:23
  124:19,20
  128:7
  129:6,11
  134:22
  136:2
  138:11,16
  139:11,23

Community
  38:25

compare
  36:8

compensated
  32:13

competent
  48:2

complaining
  61:20,24

Complaint
  104:18,
  20,21

complete

  12:25
  15:9,21
  23:17
  44:6 52:7

completed
  7:4 21:24
  42:18,21
  52:2 83:3

completely
  24:7
  135:18

completing
  52:10

completion
  19:25
  20:2

computer
  46:4

concerns
  130:18
  145:2

concluded
  19:20

conclusion
  7:14
  112:14

conclusions
  105:17
  106:2

condition
  115:20

conditions
  133:18

conducted
  10:25
  101:23
  132:9
  143:10

confident
  77:9

confirm
  14:9
  15:2,16

confirmed
  111:6
  136:16

confirming
  16:8

conflicts
  70:24

confused
  122:2
  124:10,18
  125:5
  126:4

confusion
  126:23
  128:6,17
  129:11
  130:6

Connecticut
  73:22
  75:18,19

connection
  138:2
  139:17,
  20,21,25
  140:2,7,
  19

consistent
  19:9
  114:4,25
  126:25
  152:14

Constant
  89:12
  91:9

consultant
  76:13
  110:3

consulted
  80:23



consulting
105:4

contacted
72:14
77:14,16,
19,22
88:6,16
106:24

contained
113:6

content
90:13

contention
136:11

contents
9:23

context
115:25
138:14
142:22

continue
13:15

continued
25:25

continues
113:14

contribute
143:3

contributing
62:4,12
141:23
143:13

convenient
32:7

conversation
6:20 10:5

conversations

10:2

convincing
149:8

copy
15:9,17,
21

correct
4:23 9:11
11:11,12,
15,16,20,
21 12:20
15:3
16:5,6,10
17:3,7,8,
15 18:5
19:5,6,19
20:12,17,
23 24:13,
19,22,23
25:19
26:8 28:3
29:20
31:22,23
33:8,16,
21 35:19
36:3,25
37:5,8
38:14
39:3,5,23
40:3,18,
19 41:21,
25 43:16,
25 44:21
50:11
53:19
54:7
55:12
57:2,7
58:6,11
64:14
65:20,21
68:6,7
70:12
71:17,18
75:6,8

80:5
81:11,14,
17,18,20
83:20
86:16,17,
20 87:23,
24 88:7
89:10
90:25
91:2,7,21
95:5,6,
13,22,23
96:8,16,
21 98:2,
5,12,22,
25 99:2
100:17
101:12
102:17,
18,19
103:17,19
104:18
105:21
106:12,
13,16
107:9,23
109:12
110:16
112:11,17
116:8,9
117:14,
19,20
118:14,24
119:20
120:4,14,
22
121:17,18
122:18,21
123:3,4,7
125:22,23
126:6,9,
17 127:3,
10 128:18
129:12,
13,16,22
130:4,12,
15,16

131:8,10
133:25
134:14
136:9
137:9,10,
13,16,17,
23 138:6
140:12,15
141:3,12
142:6
144:11,
16,18,22,
23 145:3
146:14,
17,19,21,
23,24
147:5,6,9
148:11,
12,18,24,
25 149:2,
6,22
150:2,8,
18
153:18,25
154:7,8,
11,23,24

correcting
64:18

correctional
91:18

correctly
22:20
32:25
110:23
113:2
117:3
121:6
138:5
146:13

counsel
4:13 10:6
14:14
95:11

counsel's
153:19

couple
11:23
18:21
22:4
37:19
39:21
53:16
68:25
73:21
88:23
102:5
108:18
116:12
133:9
135:15

coursework
37:16

court
4:2 7:25
12:23
83:16,25

covered
62:5,19

CPR
53:25
54:6
134:4,8

credence
134:17

credential
47:21
48:7,18,
22 49:20
50:2,5

credentialed
44:23
47:16
49:10



credentialing
   48:14

credentials
   34:8

crew
   119:16

criminal
   84:15,16,
   18 85:23

criteria
   49:6,7

critical
   109:21

curriculum
   16:23
   23:16,21,
   23 37:20

cursor
   13:25
   14:7
   106:21
   110:17
   120:25

Customs
   103:3

CV
   15:15,17,
   22 16:24
   17:25
   38:7
   47:15

cyanotic
   121:4,9

—— D ——

D'AUGUSTINE
   92:3

date
   12:3

103:11

dated
   87:15

dates
   20:18,19

day
   9:21 12:4
   50:22
   55:7 70:6
   96:5,13
   119:6

day-by-day
   32:14

deal
   25:8

death
   60:20,23
   63:8
   96:19
   141:7,22,
   24 143:3,
   13,20
   144:8,10,
   15,21,22
   145:8
   149:21
   150:4,7
   152:11,
   17,20
   153:11,
   13,23
   154:6,15

Deborah
   4:3,18
   78:12
   139:2
   155:10

deceased
   133:18

December
   20:16,19,
   22

decide
   66:16

decided
   21:13,20
   50:23
   52:12
   64:7

deep
   94:7

defendable
   71:8

defendant
   65:7,11

defendants
   13:10
   81:8,19
   82:13
   91:5
   95:12
   107:18
   108:22,25
   110:4

defense
   10:6
   14:14
   63:14
   64:19
   84:20
   85:10,11
   86:6,20
   87:18,23
   90:12,18
   91:4
   92:5,8,10
   95:5
   107:2
   109:20,25

define
   84:16

defined
   138:10

defines
   129:18,19

definition
   144:25
   145:4,5,
   10,11

Defoe
   11:18

degree
   17:2,6
   114:10
   134:6,16
   135:24
   138:18
   139:9
   140:17
   142:24
   149:11,19
   151:25

degrees
   17:18
   132:22

demise
   138:3
   139:18

department
   14:18
   20:15
   26:23,25
   28:5,10
   29:13,22
   30:2
   31:20
   32:18
   33:8,15
   35:4,21
   36:2
   39:23
   42:8,11,
   14,18,22
   43:5,10
   102:24
   106:15
   137:9
   142:4
   143:16

depended
   33:21

depending
   27:14

depends
   71:6

depose
   70:9

deposed
   63:20
   65:3
   75:15
   76:5,6
   84:7

deposition
   4:6 9:14,
   18,20
   10:3,7,
   15,19,20,
   21,23
   11:2,8,
   18,19
   12:14
   13:2,3
   70:4
   81:15
   83:11
   85:7,18
   91:25
   92:16
   93:3,18,
   21 96:23
   97:4,8
   99:4
   104:7,8,
   12,17
   105:13,
   15,24
   106:10
   112:16
   120:3,21
   123:14,22
   125:16,21
   128:22



129:4
147:2

**depositions**
5:15 70:8
92:7,9
93:24
95:4

**describe**
18:7
22:14
23:22,25
28:8,19,
23 34:19
40:7
45:16,20
51:10
99:10
127:6,7

**description**
128:4

**designated**
71:12

**detail**
97:11

**detailed**
82:2

**details**
88:21,25
89:5
91:12

**determination**
80:7,19
81:2
110:19
145:7

**determine**
150:4

**determined**
107:11
154:5

**develop**
67:4

**developed**
67:10

**development**
82:25

**diagnose**
115:20

**diagnosis**
115:22,23

**didactic**
29:6

**die**
143:8

**diem**
31:24,25
32:12,20
33:14,19,
24 34:2,
12 35:3,
15,20
36:5,8

**differ**
30:15
55:13

**differed**
26:20
136:14

**difference**
20:25
40:8,11,
20,24
133:19,24

**differently**
27:14
90:6

**digits**
86:10

**diploma**
20:5

**direct**
138:2,7,
10,11
139:8,10,
17,21,24
140:2,7,9

**directing**
106:19,20
110:11

**directors**
34:22

**disagree**
127:4
142:20

**disciplined**
59:19

**disclosed**
72:2
107:24

**disclosure**
13:10,12
14:10
15:12,19
16:10

**disclosures**
107:9

**discoloring**
121:10

**discontinue**
64:7

**discounted**
76:8

**discovery**
98:16
107:24

**discuss**
17:21
70:19
102:11
115:4
120:23

136:25

**discussed**
27:23
33:13
35:25
38:10
96:15
106:18
108:23
112:9

**discussing**
110:25
120:6
131:7
137:5,7

**discussion**
78:7
107:3
130:23

**discussions**
9:24

**dismissed**
64:4

**disorientation**
126:22,23
128:17

**disoriented**
124:10,18
125:6
126:4,15

**distinct**
149:5

**distinction**
107:16
139:15
145:3,10

**distributed**
45:2

**District**
89:14
91:10

**divulge**
9:23

**doctor**
6:2 7:20
8:3,7,9,
14 9:12
16:25
18:8
21:9,10
33:10
54:11
64:9
65:15
66:7
78:16
108:18
109:21
110:10
111:12
119:25
121:8
122:14
126:21
133:12
136:5,18
137:24
138:7
139:16
140:17
143:18
148:13
149:2,18
152:12
155:5

**doctor's**
132:17
135:18
136:5

**doctors**
132:18
133:2,9

**document**
13:8
14:2,6,9,
16 15:3



16:8,9
96:22
99:9,10
100:7
103:13
118:23
131:6

**documentation**
113:6

**documents**
10:9,11,
12 11:5,
7,23
96:10
97:7
98:15
99:3,13,
18 106:5
117:12
120:14
123:12

**double-check**
153:15

**draft**
14:22

**drafted**
14:21

**drafting**
43:5

**dropped**
24:12
63:12
64:3

**due**
121:11
134:7

**duly**
4:17

**duties**
19:7,17

22:21
25:14
26:20
28:9
30:11,13
32:3,17,
21 35:2
36:7,12

— — —

**E**

— — —

**e-mail**
70:19
77:17

**e-mailed**
70:22

**earlier**
76:17
77:21
83:19
88:5,10
94:14
106:19
111:2
112:9
127:16
130:22

**early**
70:11

**earned**
17:17
55:2

**Eastchester**
9:5

**Economics**
17:9

**education**
41:21
133:6

**effort**
54:3

**efforts**
54:6

**Einstein**
14:19
17:14
29:23
35:22
36:18
39:12
49:13
64:23

**elective**
38:4

**electives**
37:23

**eligible**
52:6,11

**embolism**
63:13
64:14,16,
17,18

**emergency**
14:18
18:10
20:15
22:9
24:5,16,
22 25:4,
6,16
26:6,23
27:16
28:5,10,
16 29:13,
14,22
31:20
32:18
33:8,15
35:4,21
36:2,24
38:15
39:4,8,22
40:9,12,
17,21
44:2

45:9,13
46:15,21,
23 47:12
48:8
49:19
50:7
52:20
53:10
58:10
126:13
128:8
129:8,12
154:19

**employee**
31:25
42:3

**employer**
50:3
53:14

**employment**
21:5
27:21,24
31:14
41:20,24,
25 55:5
58:10

**employs**
46:18

**EMS**
10:18
12:2
96:9,12
97:6,10
98:19

**end**
33:25
58:3,5
77:24

**enforcement**
43:2
137:12,15
146:20,23

**engage**

72:16

**engaged**
71:21
87:15
88:11

**engagement**
109:2

**engagements**
109:5

**English**
138:12,16
139:11,23

**entail**
44:5
47:20
53:23

**entailed**
44:9

**entails**
53:24

**enter**
52:23
117:9

**entire**
13:2
44:16
106:2

**entity**
56:9 66:4
69:17

**epilepsies**
112:24

**epilepsy**
112:22
113:4

**equipment**
4:7

**ER**
21:10,13,
15 22:19,



23 25:9
30:2
35:13
36:11,16
39:17
41:9,13,
16 54:11
96:5,6
110:10

**escapes**
11:25

**establish**
115:23

**estimate**
74:15

**evaluate**
148:2

**evaluating**
137:8

**evaluation**
154:4

**event**
119:7,16
125:9
129:16

**events**
80:9,21
81:4
110:21
112:24
120:23
122:10
128:4

**everybody's**
78:19

**Evgeniy**
80:8,20
81:3
102:12
110:20
116:3

**evidence**
72:19
115:10
143:6
146:11
148:2,5
149:3,4,
8,13
152:9,22

**exact**
73:9,19
74:18
86:13
135:7

**exam**
44:7,8,
10,11

**EXAMINATION**
4:21
151:22
153:6

**examined**
4:19

**Examiner**
12:7
101:23
102:8
114:5,23
115:22
132:8,16
140:15
143:12,18
145:2,6,
12 150:4
152:10
154:5

**Examiner's**
97:17
98:8
130:24
131:8
145:5

**exams**
52:8,10

**exception**
93:24

**excessive**
69:3
80:8,20
81:3
91:17
110:20
146:12,16
147:20
148:3

**excluded**
89:17

**excuse**
14:14
17:6 27:9
124:19

**Exhibit**
15:15,22,
24 16:4,
15,18
87:10
88:13
116:15

**exhibits**
15:14

**expand**
78:16,20

**expanded**
36:17

**expanding**
30:3

**expansion**
129:25

**expect**
48:19

**expected**
21:5

**experience**
46:25
129:12

137:14
146:22
149:21

**experienced**
94:7
113:2,7
114:11
116:22
128:5,8
129:7
149:16

**expert**
10:23
15:4,25
66:8,11,
14,20
67:11,19,
23 68:6,
12 69:15,
22 70:14
71:5,12,
22,24,25
72:2,23
73:3,14,
15 74:12,
21,24
75:16
76:11,20,
23 78:4
79:2,17
80:2,17
82:4,12
83:3,14,
16,25
84:2,7,8,
12,14,19,
20 85:9,
15,17
87:4,16
88:3,11
90:14
91:24
95:4
104:24,25
105:5,7,
19,23

106:25
107:2,6,
8,12,17,
21,22
108:22,24
109:10,25
110:3
111:8
112:10,15
115:21
145:9,13,
16,19,25
147:7
150:7,10,
11,13
151:8
154:10,14

**expertise**
47:25
48:20
132:11
154:19

**experts**
70:10
75:14,15
93:24

**expiration**
54:16

**expired**
54:10

**explain**
110:6

**exposure**
41:2

**expound**
55:16

**expressing**
34:23

**externally**
113:16

**extra**
32:5,6



33:20

eye
21:9,10

_____

**F**
_____

face
121:11

facilities
46:4

fact
113:17

factor
143:12

factoring
144:10
145:7

factors
141:5,6,
23 144:4,
9,13,23

facts
72:18
94:4

fair
6:12 7:8,
9,15
19:13
30:9
32:16
48:16
52:15
53:13
58:17
67:20
72:13
73:7
82:24
83:22
85:15,20
98:6
101:25

104:13
107:16
116:16
131:4
137:18

familiar
5:12 6:3
13:8
115:19
133:4

father
11:2

fault
110:10

FCIRR
117:17
120:2

federal
93:20
94:2

fee
16:4 47:9
51:19
52:13
53:5,7
54:16

feel
71:22
83:4
143:9,17

fees
47:13
49:3 51:7
76:16

feet
31:3

fell
69:8 94:9

field
25:2
151:8

fields
25:6

file
79:3,5,
10,12
107:5,10,
14

filed
66:4

fill
34:4

final
15:5
102:12
105:25
136:19,
20,24
146:4

finally
7:10
39:25
56:24
114:6

find
21:15
133:15
148:5,8

finding
112:20
114:23
135:3
141:11,21
143:19,20

findings
102:11
114:5,22,
25 115:24
133:20
135:5
136:14
137:21
142:12,
14,16,20,

21

fine
8:24 20:7
78:19
108:9,12
151:11

finish
7:6

finished
82:23

firm
5:7
109:20

five-minute
108:7

five-page
98:18

flight
116:23,24
117:18
119:16,18
123:18
125:17
128:16

floor
116:25

focal
112:23

focus
17:10
18:23
19:2
22:10
24:20
29:15
37:3,4
54:4

focused
11:6
24:2,4
25:15
29:12

36:24
39:4
41:16
57:5
105:16

follow
138:24

follow-up
44:18

footage
102:21
103:6,12

force
69:3
80:8,20
81:3
91:17
110:20
146:12,16
147:14,
16,20
148:3

forensic
59:6
145:19
146:2
151:7,14

Forgive
5:3

form
5:22 60:4
62:16
68:19
72:4
97:16
101:20
127:22

forum
38:12,13

forward
16:14

found



50:23
121:21
122:7
131:19
132:15
133:22
143:6,12

**fourth**
38:2,4
97:14

**fraction**
68:17

**fractured**
148:6

**fractures**
131:19,20
132:2,4
133:22,23
134:5,7,
23 137:20

**frequently**
128:8
129:6

**friend**
21:19
24:11
66:22

**front**
13:12

**full**
8:18

**full-time**
27:25
28:4
35:25

**furnished**
12:21

─────────

**G**

─────────

**galley**

117:2

**gate**
116:20
117:8
118:12
127:18

**gates**
117:25

**gather**
20:9 93:9

**geez**
108:10

**general**
10:16
18:11,12
23:15
41:2
55:18
69:2
73:10
96:18
135:20
152:13
154:10,16

**General's**
11:14
69:10,12,
13 96:14,
17 121:17

**generalizat**
**ion**
72:21

**generalized**
18:25
113:3,19

**generally**
9:25
34:18
50:13
113:11,12
114:3,4,
16 120:23
122:14

**gentleman**
94:6
134:3

**give**
8:20,21,
22 9:8
21:20
50:15
52:2
68:18
76:18
78:21
79:3 89:7
100:16
101:10
110:7

**giving**
7:21
134:12,17

**graduate**
42:13

**graduation**
19:25
37:5

**grand**
29:10
152:21,23

**gray**
46:20

**great**
5:3 13:24
14:4,24
16:12

**Gregory**
8:19

**Grigory**
104:7,17

**grounds**
107:11

**guarantee**
92:18
132:22

**guess**
10:24
40:24
41:11
66:13
71:6
75:25
144:25

**guessing**
49:25
51:23

**guidelines**
55:18

─────────

**H**

─────────

**half**
21:25
26:2

**handcuffing**
121:23
122:9

**handcuffs**
146:10

**hands**
143:15

**happen**
13:12
127:5,9,
11,14

**happened**
21:18
60:24
63:22
89:2
149:12

**happy**
6:8,10

**hate**
77:7

**head**

6:16,20

**heading**
17:25
92:24
93:3

**Health**
20:13

**hear**
6:6 61:22

**heard**
139:5

**held**
4:6 29:6
54:24
78:7
114:8

**helpful**
46:8

**helps**
100:12

**hesitate**
77:5

**heterotopia**
111:16
112:2
115:6

**Hey**
66:17

**high**
34:16,19
135:21

**highlight**
14:6
106:20

**hired**
76:12,17
105:8
109:20
110:2,9

**history**



**Hodges**
98:14,24

**hold**
20:8
43:23
48:17
93:8

**home**
7:23 8:20
45:19
46:5
50:20

**homicide**
141:13
143:20
144:15,
17,20,25
145:5,11

**honest**
151:12

**honestly**
48:24
55:6
97:19

**honor**
26:13

**hospital**
10:18
12:4
29:23,25
30:4,6,
20,21,24
31:4
33:16
35:3,22
36:16
38:21,25
46:17,22
48:5 49:5
56:6,11

62:6,15,
19 65:10,
13,20
95:24,25
96:3,7
97:2,10
136:25
137:2,5,6

**hour**
12:16
13:3 70:2
81:12
82:14,15

**hourly**
82:14

**hours**
81:23
118:11

**hundred**
67:24
68:12
97:24
115:15
131:16

**hundreds**
85:16,21,
25 86:9,
18,25
109:9

───────────

**I**

───────────

**idea**
68:18
73:10
74:20

**identificat
ion**
16:18

**identify**
37:11
100:11

**identifying**
119:16

**images**
104:2,5

**immediately**
118:10

**impact**
50:6

**impacts**
141:9,25
143:15
144:5

**impair**
8:10,11

**impression**
79:4,6
80:22,24

**impressions**
79:11,13

**in-court**
85:6,18

**in-service**
42:19,22
43:14

**inactive**
56:18

**incident**
12:3,4
96:5

**include**
36:18
65:19
68:24
115:14
117:16,17
136:12
150:6

**included**
92:23
131:21
141:6,7

142:5,9

**includes**
41:24
43:12
111:13,24

**including**
18:10
93:18
116:24
143:19

**inclusion**
137:19
153:11,12

**incorrect**
141:2

**indefensibl
e**
72:8

**individual**
37:24
65:25
66:3,4
82:4
127:2
130:10,18
148:14
149:16

**individual'
s**
148:17,23

**individuall
y**
62:3,11,
19

**individuals**
99:25

**induced**
113:19

**infected**
63:11
64:3

**influence**
8:9

**information**
20:9
122:13
140:23,25
146:11

**initial**
103:9
108:23
113:18
117:23

**initially**
44:6
72:14

**injuries**
69:9
137:20
138:3
139:18
152:3,7,
11

**injury**
55:20,22
56:2
117:2
143:7

**inside**
65:20

**instance**
88:17

**institution**
38:24

**institution
s**
34:23

**instruction
s**
5:11 6:4

**instructor**
40:2,16
41:16



43:9

**insufficient**
121:12

**insurance**
62:6,15
76:18

**integrity**
102:25

**intended**
37:3

**intends**
37:24

**intent**
145:6,7

**interest**
34:24

**interesting**
20:4
50:24
93:6

**internal**
28:15

**International**
103:4

**internship**
18:4,8,22
19:9
20:3,12
21:2,11,
12 52:7,
11

**interpret**
142:22

**interpreted**
113:3

**interpreting**
115:24

**interview**
34:9,10,
15,19
98:14,15,
18,25
101:19

**interviewed**
34:14

**introduce**
13:7

**introduction**
40:2,16
41:4

**introductory**
14:12

**investigation**
65:16
102:22

**investigative**
11:14
99:20
101:13,20
103:14
121:17,20
122:7

**invoice**
82:17,18,
19 83:3

**involve**
63:9
88:18

**involved**
63:6,7,
10,12
67:19
77:8
146:12

**involvement**

76:20

**involves**
66:14
93:12

**Irving**
102:25

**Island**
22:8
24:13,17,
21 27:6,
11

**issue**
90:19

**issued**
99:21
107:13

**issues**
67:20
68:6
150:9

**items**
95:22

―――――――――

**J**

―――――――――

**Jack**
29:22,24
30:4,12,
19 35:21
36:3,6

**Jacobi**
29:5,7

**jail**
84:24

**Jamaica**
95:24,25
96:3,6,9,
25 97:6

**January**
24:14,17
25:17

33:11
35:16,18

**Jersey**
42:5
73:21,25
75:11
76:22

**Jersey-based**
74:3

**Jet**
117:18

**Jewish**
22:8
24:13,17,
21 27:6,
11

**JFKIA**
114:12

**job**
29:2
34:4,17

**Jodi**
92:3

**jogged**
91:10

**John**
103:4

**join**
80:16

**Jr**
5:6

**July**
18:4
20:15,19,
21 25:21
26:6,7
28:3,12
29:19
31:18
33:10

35:16,18
38:9,16

**June**
14:17
18:4
19:20
25:18
28:3,12
29:18

**jurisdiction**
94:10

**jury**
90:10

―――――――――

**K**

―――――――――

**Kennedy**
103:4

**key**
10:9,12

**kind**
10:9
18:20,24
20:5
21:17
26:15
29:2 30:9
31:3,9
44:14
53:25
55:4,6,18
58:2
66:24
67:3 69:8
90:5
99:20
113:7
117:6
122:2
129:17,19

**knee**
63:11



800.211.DEPO (3376)
EsquireSolutions.com

64:3

**knowledge**
58:20
132:3
135:20
152:14
154:11,16

**Kurt**
117:19

---

**L**

---

**label**
144:17

**labeled**
141:13
144:15,20

**Lagoda**
80:9,21
81:3
96:19
102:12
103:10
110:20
113:2
116:3,21
121:4
124:17
125:4,7,8
126:3
127:17
128:5
138:4
143:3,7,
13 146:8
147:13
149:5
152:4,6,
17 154:6,
15

**Lagoda's**
113:18
117:24
121:11,22

122:8
125:18
126:22
128:17
131:20
132:4
141:7,24

**lapse**
57:15

**lapsed**
55:2
56:20
57:19

**lasts**
54:21
129:14

**law**
5:7 42:25
137:12,15
146:20,23

**Lawanda**
102:24

**lawsuit**
60:19
61:7
64:11
66:4

**lawsuits**
63:3,6

**leading**
13:3

**learned**
57:4
124:21

**learning**
50:20
127:21

**leave**
99:18

**leaves**
86:18

**leaving**
116:20

**lecture**
31:5
38:13

**lecturer**
28:23

**lectures**
23:24
24:2 29:4

**led**
152:11

**Lee**
93:25
94:3,21,
24

**legal**
66:23
69:17
72:22,24
145:4,10

**lesson**
41:15

**lessons**
29:12
31:2,4

**letter**
109:2

**level**
34:16,19

**liability**
69:5

**license**
50:10,14
51:3,8,
11,12,18,
23 52:4,
6,12,18,
24 53:4,
9,13,14

**life**

23:15
53:20
55:11
56:25

**life's**
45:22

**lifesaving**
54:6

**lifespan**
83:2

**LIJ**
21:20,23
22:7
24:12
27:5

**limit**
46:12

**limited**
35:10
47:17
49:11,20
89:17

**Lincoln**
20:13
21:3,15,
23 22:5,
15,19,23
24:15,25
56:20

**lines**
102:5

**list**
22:8
38:10
40:15,21
50:9 87:9
92:17
95:22,24
97:15
98:3,8,23
99:6

**listed**

31:13
88:12
89:11,18
91:22
92:10,13
94:15
105:18
153:23

**listening**
20:19

**lists**
38:7
39:25

**lived**
32:6

**lobe**
111:14,25
112:22
115:5
149:10

**located**
7:23 8:16
28:21
103:3

**locations**
33:12

**logical**
82:25

**long**
18:18
22:8
24:12,17,
21 27:5,
11 34:13
49:12
54:24
56:17
57:11
63:21
64:21
65:13
70:23



**longer**
50:23
95:17
136:21

**looked**
97:5,12
105:8,10
147:18

**lot**
94:18
138:23

**Lyulina**
90:7

---

**M**

---

**M.D.**
4:16
17:14
92:4

**made**
13:10
26:21
52:11
60:22
101:19

**maintain**
44:15
45:13
47:11
48:25
49:17
50:15
51:7
54:12
56:13,15

**maintained**
54:14

**maintaining**
53:3

**major**
105:17

**majority**
67:21,25
68:5,9,14
85:22
86:5

**make**
4:24 6:12
7:5 32:6
78:18
80:7,19,
25 95:19
110:19
115:22
120:11

**making**
72:20
128:21

**mal**
152:21,23

**male**
116:4

**malpractice**
70:9

**man**
126:14

**manifested**
113:15

**mark**
20:2

**marked**
16:17

**marker**
101:14

**marking**
16:14

**matched**
21:7

**materials**
45:2,19
46:8
49:17,23

107:21

**matter**
5:8 15:10
64:25
65:4,8
70:18,20,
21,25
71:4
72:3,16
76:13,23
77:13
80:3,17
81:8,15,
24 82:4
83:4,8
84:17,18,
23 89:5
90:21
91:10,12,
20 93:11
94:2,4
95:20
105:2
106:25
107:19
108:23,25
149:13

**matters**
67:24
68:5,24
73:15
75:5,14,
21,23
84:11,15
85:3,5,8,
23 86:19,
20 88:3
89:18,21
90:14,20,
25 91:4,
14 92:2
93:20
109:16

**Mazarin**
4:23 5:1,

5 6:1 7:1
8:1,19
9:1 10:1
11:1 12:1
13:1 14:1
15:1
16:1,14,
17 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1
30:1 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1
60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1

96:1 97:1
98:1 99:1
100:1
101:1
102:1
103:1
104:1
105:1
106:1
107:1
108:1
109:1
110:1
111:1
112:1
113:1
114:1
115:1
116:1
117:1
118:1
119:1
120:1
121:1
122:1
123:1
124:1
125:1
126:1
127:1
128:1
129:1
130:1
131:1
132:1
133:1
134:1
135:1
136:1
137:1
138:1
139:1
140:1
141:1
142:1
143:1
144:1


ESQUIRE
DEPOSITION SOLUTIONS

145:1
146:1
147:1
148:1
149:1
150:1
151:1,24
152:1
153:1
154:1
155:1,7

**Mazarin's**
16:23

**ME's**
152:3

**meaning**
84:22
138:4,13,
14

**means**
40:10,14
68:10
71:15
79:8 96:3
122:16
129:23

**meant**
87:7

**measures**
54:2

**med**
37:10
41:5

**medical**
9:4 12:7
14:19
18:2
20:10,13
21:3,7
22:5,8,15
24:13,15,
17,21,25
26:23

27:6,11
28:6,11,
22 30:19
31:6,9,21
32:19,22
35:9
37:4,9,18
39:9,15
40:4
41:11
46:14
47:12
50:10
51:11,12,
23 52:4,
6,18
53:4,10
58:10
59:19,22
60:7
61:5,6,9
62:25
64:10
65:8,17
66:23
67:20
68:6,14,
17,24
69:6 70:9
72:22,24
75:5,14,
15,16
79:18,25
80:2,24
81:6
89:11,15
90:18,19,
25 91:4,
14,19
95:25
97:17
98:8
101:23
102:8
109:16
113:5
114:5,10,

23
115:17,22
116:8
119:16
125:8
126:13
129:7
130:24
131:8
132:8,16,
22 133:24
134:7,16,
22 135:24
136:3
138:7,10,
14,17,18
139:8,9
140:15,18
142:24
143:11,18
145:2,4,
6,12
147:7,8,
12,14,17,
19,21,25
148:2,4,
13,16
149:12,19
150:3
151:25
152:10,13
154:4,10,
16

**medical/
legal**
74:8

**medicine**
14:18,20
17:15
18:11,12,
13,24
19:5,10,
16 20:15
22:10,17
24:3,5,
16,22

25:3,7,17
26:6
27:2,10,
17 28:5,
11 29:13,
14,15,22
31:21
32:19
33:8,15
35:5,21
36:3,24,
25 37:23
38:15,21
39:4,8,
13,22
40:3,8,9,
12,17,18,
21,22
41:2,5,17
44:2
45:9,14
46:15,22,
23 47:3,5
48:8,11
49:19
50:7
52:21
53:10,12
134:25
135:9,20
136:7
154:20

**meeting**
34:22
101:21
102:10

**meets**
49:7

**Meika**
92:3

**member**
43:19

**memory**
11:25

64:11
91:11
92:14
99:18,23

**Mental**
20:13

**mentioned**
8:15
12:5,6
17:19
64:15
83:21
84:6

**mentions**
102:6

**mesial**
111:14,24
112:21
114:9
115:4

**microscopic**
112:20

**middle**
117:7

**milestone**
82:21

**Milewski**
12:9
101:21,22
102:7
130:25
141:12,21

**Milewski's**
131:21
140:25
142:12,16
143:18

**million**
45:25

**mind**
21:12



**mine**
21:19

**minority**
127:12

**minute**
121:3,22
122:9

**minutes**
49:15
116:19
117:25
118:12
119:19
127:20

**misconstruing**
143:23

**mislabeled**
100:21

**missed**
62:7

**mistake**
118:21

**mix**
31:10

**modules**
23:13

**moment**
77:2 90:7
97:3
100:16

**monetary**
61:20,25
62:4,12,
13

**money**
32:6

**monitoring**
148:17

**Montefiore**

9:4 14:19
28:6,11
29:25
30:14
32:22
35:9

**month**
18:16,17

**monthly**
82:17

**months**
21:19,23
22:18,22
23:5,17
132:10
133:17
134:24

**morning**
9:20
12:19

**Moschitto**
4:3,18

**motions**
5:23

**mouth**
67:7,13,
14 88:2

**move**
16:13
24:9,15
100:9
111:17

**moved**
30:5
64:22

**moving**
51:22
60:22
91:22
116:2,25

**MTS**
112:22

113:15,18

——————————

**N**

——————————

**named**
41:12
63:17,25
64:9,10
65:8 91:5

**Nathana**
123:21
124:5
125:2

**natural**
144:22

**nature**
109:21
123:8
128:9
129:9
130:9

**necessarily**
122:24

**neck**
121:11,22
122:8

**needed**
21:10

**network**
30:9

**neurologist**
59:8
150:16
154:22

**neurology**
59:11
150:14,15

**neuronal**
111:15
112:2
115:6

**night**
112:25
149:6

**nods**
6:16,20

**non-civil**
84:23

**non-legal**
94:11

**nondisclosure**
61:16

**normal**
26:17

**Notary**
4:4,18

**note**
60:3 87:5
139:4
151:15

**notes**
101:19

**notice**
123:7

**noticed**
20:25
121:4,9
122:8,15

**notices**
14:13

**noticing**
123:8

**notification**
118:9

**notified**
94:19

**number**
15:13
27:8,9,13

44:17
47:22
52:24
73:6,9,19
74:14,19
86:11,13
87:15
89:3
90:20
92:3
100:14
123:12

**numbers**
87:21

**nurse**
123:24
124:22

**nurses**
116:24
123:19,20
128:15

**NYC**
131:7

**NYCOCME**
114:8

——————————

**O**

——————————

**OAG**
96:17
122:3

**OAG's**
121:20
122:6

**oath**
7:21,25
151:13

**OB**
25:7

**Ob/gyn**
48:17



objection
60:4
62:16
68:19
72:4  74:4
79:19
87:6
98:10
111:9
113:23
114:19
118:4,25
119:8,21
120:8
121:24
122:11,22
124:12
125:12
126:7,18
127:22
128:25
130:13
131:9
133:13
138:19
139:4,12
140:20
141:14
142:7
143:21
147:10,23
149:23
151:16
152:5,19
153:2
154:18

objections
5:21

observable
113:16

observations
126:21

observed
122:17

124:17

obtain
34:3
47:21
56:5

obtained
50:14
51:24
52:3
56:10,19
102:21

occasionally
14:5
75:11

occur
92:20

occurred
112:25
119:7
144:21

occurrence
128:7
129:6

occurring
122:21
123:3,6

OCME's
154:7

offer
34:11
134:10

offered
48:8,10

offering
115:8

office
7:23
11:13
67:8
69:11,12,

13  96:17
101:22
102:7
121:16
143:11

officer
42:7  43:2
117:8
126:12
127:19
146:7
152:25

officers
43:15
91:18
121:3,9,
21  122:7
142:4
143:2
146:8

official
69:19

Olson
89:3

on--the-job
23:13

on-site
50:21

on-the-job
23:20

one--year
19:22

one-year
21:11

ongoing
76:20
94:16,18
125:8

online
45:20
46:5

open
7:12
45:20
46:6,11

ophthalmolo
gy
25:7  37:7

opine
139:16

opining
147:8

opinion
71:9,11,
22,24,25
72:7,15
74:2
76:19
91:20
114:7,18
115:9
134:10,16
135:14,
23,24
136:3
138:17
139:9
141:2,5,
21  143:17
144:14
151:25
154:5,10,
14

opportuniti
es
38:4

opportunity
78:21
148:20

opposed
29:9
31:11
35:8

oral

44:8

order
17:23
28:2
31:17
34:10
45:12
49:17
52:19
53:11
57:24

organs
132:13
152:9

origin
66:19

original
46:9
104:20
107:13

originally
21:6,7,8
44:9
45:24

orthopedics
25:8

outlined
109:5

outright
90:10

outset
14:11

overlap
33:12
40:24

oxygen
148:17

oxygenation
121:12


DEPOSITION SOLUTIONS

**P**

**p.m.**
108:15
116:21
117:8

**PA-1683**
100:15
101:5,14,
15

**PA-1684**
101:5

**PA-1909**
101:5

**PA-1910**
101:2,5

**paid**
62:14
83:10

**pains**
8:5

**palpate**
121:5

**PALS**
53:17
56:24
57:16,18
58:8,12

**PAPD**
121:9
141:10

**paragraph**
102:2,5,
13 106:23
116:3,10
117:7
136:19,
21,24

**paramedic**
98:14,20,

24

**part**
15:4,12,
18 17:10
18:21
23:14
29:25
30:2
51:14,17
61:6,16,
23 62:7
63:25
102:21
107:8,24
111:18
115:12,13
124:8

**part-time**
31:14,19
33:23
34:2

**Particulars**
61:2

**parties**
4:10

**parts**
115:15,16

**party**
60:22
61:21,24
76:9

**pass**
151:20

**passages**
128:20

**passed**
58:4,18

**passing**
52:9
83:22

**past**
5:15

10:25
56:7
71:10
86:2
93:10
104:15
116:8

**path**
21:14

**pathologic**
114:22
115:24

**pathologist**
10:24
114:21
115:19
134:9,13,
14 140:11
142:19,24
143:4,6,
10 148:10
149:24
150:6,22,
25 151:7,
14 154:22

**pathology**
58:24
59:3,6
134:20
145:14,
17,20
146:2
151:5

**patients**
22:25
28:14
31:12
33:4
36:13

**Patrol**
103:3

**Pause**
13:20
101:11

153:16

**pay**
33:19
47:10
51:7
52:13
62:18

**paying**
83:13

**pediatric**
56:25

**pediatrics**
57:6

**pelvic**
47:16
48:20
49:10,20

**penalties**
8:5

**pencil**
45:19

**pending**
7:12

**people**
37:13
45:25
132:21
135:7,12,
13,15,19
138:12

**percent**
68:15,16,
17,22,23
72:25
87:7
97:25
109:8,10,
15 115:15
131:16

**percentage**
68:9,13
73:2,9

86:22
109:15

**performed**
32:14
132:18
133:2

**performing**
132:11
135:7

**period**
22:12
26:2
128:6

**periodicall
y**
53:6

**perjury**
8:5

**person**
4:12 69:7
70:25
122:17
123:7

**personally**
135:16

**perspective**
55:14
81:6
147:25

**pertains**
147:13

**phone**
77:16

**phrase**
64:14
146:16
147:21

**phrased**
83:5

**physical**
138:2



139:17
141:8,10,
24 142:2,
3 143:14
144:4
146:7
152:2,11

**physician**
28:4,10
29:21
31:20,25
32:18,20
33:14
34:12
35:4,15,
20 36:2,6
58:11

**physician's**
32:10

**physicians**
23:2 32:9
38:20
46:21
47:2
48:9,10

**pieces**
69:5

**pilot**
117:7
118:7
119:24

**pilot's**
119:4
120:18

**pin**
73:8

**PIU**
99:6,7,
11,24
100:3,5,
17,19,21
101:12,20
103:13,

19,21,25

**place**
146:9

**placing**
142:25

**plaintiff**
63:12
64:6 85:9
92:4
105:8

**plaintiff's**
86:4,7
87:3
104:25
109:24

**plaintiffs**
5:8 86:9
105:2
107:18

**plaintiffs'**
109:11,14

**plane**
118:10
120:24
127:18,19

**plans**
41:15

**play**
144:23

**point**
20:8
22:15
27:18
37:10,14
43:8 48:2
52:12
57:16
70:5
82:21
93:6
123:24
124:6

**pointers**
23:14

**police**
10:23
42:8,11,
14,18,22
43:5,10,
13,15
69:3
102:24,25
105:7
106:15
137:8
142:4
143:16
147:3,8,
22 152:25

**policies**
43:6
106:15
147:4

**policy**
137:9

**Port**
42:4,8,
10,14,18,
22 43:5,
10,12,14
73:23,24
76:22
78:3 79:2
95:15
102:23
106:14
137:8
142:4
143:16
147:3
152:24

**portion**
62:13
112:14

**position**
19:22

21:20,21
22:7 25:2
26:18
32:3

**positions**
21:8

**possibility**
92:21

**post**
89:21

**postgraduat
e**
17:22,25
27:22
41:20

**postictal**
128:6
129:11
130:6,12,
19
148:15,21

**potentially**
80:16
84:24

**pounds**
117:9

**practice**
32:10
37:24
46:14
53:10,12
135:22

**practiced**
50:21
51:2
135:9,12,
21 136:7

**predisposit
ion**
114:24

**predominanc
e**

75:12

**predominant**
75:3

**preliminari
ly**
6:5

**preliminary**
102:11

**preparation**
9:14,17
10:14
11:5,7
97:3,12
105:16,
21,24
106:7
112:11,15
117:13
120:15
121:15
123:13
125:21
126:6
131:6

**prepare**
10:7 46:7
110:4

**prepared**
12:8
79:17,24
117:17
119:6
130:25

**preparing**
10:3
97:17
99:4
103:15
105:11,12
106:9
117:21
118:2,14,
24 119:13
120:4



124:4,15, 23,25
125:11,24
126:16
128:23
131:17
147:4

**presence**
33:2
114:8

**present**
29:20
38:10,16
39:2

**presentation**
113:18

**presume**
88:15

**pretty**
13:4
22:19
30:17
77:4,9
94:20
136:15

**prevent**
117:2

**previous**
153:19

**previously**
9:9

**primarily**
22:18
25:4,15
28:14,16, 25 31:12
36:14
41:16

**primary**
152:17

**printout**
98:18

**prior**
19:22
49:13
97:11
128:23

**prism**
147:19

**private**
56:9

**privileged**
9:24

**privy**
119:23

**procedure**
137:9

**procedures**
43:6
106:16
147:4

**process**
34:10,15, 20 51:15
88:6
120:5,6

**produce**
75:15

**produced**
12:22
15:3,18
72:2
98:15
104:25
105:2
107:22

**professional**
27:23
31:14
41:20,23
43:8,23

47:12
59:19,22
60:7 61:5
62:25
65:8,17
66:20
79:18,25
80:2,25
82:12
84:13
133:25
135:4
137:12,16
146:20
147:8
149:20

**professionals**
61:6,9
64:10
91:5
148:16

**professor**
14:18
38:15
39:4

**professors**
38:20

**program**
29:3
35:11

**prolonged**
128:5,10
129:10
134:3

**promise**
8:8

**promotion**
26:11

**pronounced**
112:5

**pronunciation**
4:24

**prosecution**
84:21

**protocol**
136:25
137:6

**proud**
58:7

**proven**
114:9

**provide**
71:19,23
72:15,17
79:10
103:10
110:3

**provided**
49:22
84:12
85:18
87:14
91:19
95:4
128:23
146:11

**providing**
76:13
79:25
81:15

**Public**
4:4,18

**pulmonary**
63:13
64:13,16, 18

**pulse**
121:5

**purplish**
121:10

**purpose**
6:17 10:3
54:5
76:12
102:10
111:7,11

**purposes**
25:22

**pursuant**
4:9

**pursue**
50:24

**put**
5:14
148:6

**putting**
143:24

——————————

Q

——————————

**qualifications**
133:6,11
136:6

**quarter**
82:15

**question**
5:22
6:11,13
7:4,8,12
20:4 26:4
60:5 68:3
78:13
90:23
92:25
120:12
122:3,25
135:5
139:5
141:17
146:6
153:10, 19,21



questionable
  132:12

questions
  5:9 6:7,
  9,16
  7:12,17
  8:11,12
  16:21
  18:21
  22:4
  44:18
  108:19
  116:12
  145:22
  151:10,21
  153:8
  155:2

quick
  93:15
  119:15,17

quickly
  13:5 97:5

quote
  80:6
  146:5

——————

R

——————

radiologist
  110:8,9

raise
  123:15

rate
  81:14

rates
  70:12
  76:9

re-
credentiali
ng
  46:2

re-review
  104:15

reach
  92:13,22
  93:4

reached
  82:20

read
  5:20
  78:13,15
  97:20,21,
  22 99:8
  108:2
  110:22
  111:6
  114:17,18
  117:3
  121:6
  123:25
  128:23
  129:5
  138:4,25
  139:3
  141:19
  142:21
  146:13

reading
  44:14,25
  45:5
  128:19

real
  32:25
  37:15
  69:5

realize
  37:13
  82:19
  107:7

rear
  116:25
  118:9

reason
  58:13

63:15
131:25

reasonable
  140:17
  149:19
  151:25

recall
  12:13
  23:23
  48:25
  49:9
  54:20
  64:5,21
  69:23
  77:2 86:8
  89:2
  90:3,13,
  17 91:8,
  11,14
  99:12,23,
  25 100:4
  106:23
  107:2
  110:22,25
  111:16,
  22,23
  112:18
  113:8,11,
  21 114:13
  117:14
  127:15,20
  128:10,
  13,19
  130:22

recalls
  111:20

receive
  17:13
  19:24
  20:2
  23:3,8,12
  34:11

received
  16:25

23:14
102:25
118:9
134:3

recent
  60:15

recently
  10:22,25
  60:14

recertified
  58:6

recertify
  44:9

recess
  108:14

recognize
  6:3 14:9,
  16 15:8
  16:2,9

recognized
  113:14

recollectio
n
  121:20
  122:6,10

record
  5:14,20
  6:18
  8:15,17
  16:22
  78:6,7,8,
  11,15,17,
  18 95:21
  97:10
  101:18
  108:17
  109:19
  123:16
  139:3
  149:4

recorded
  103:7,8

recording
  82:2
  103:2

records
  75:16
  95:25
  97:2
  100:23
  113:5

recovering
  148:23

reduce
  6:22

reference
  13:16
  111:13

referenced
  110:18

references
  111:24

referencing
  14:8
  115:7,11,
  12,17

referral
  34:5

referred
  97:2,7
  131:5
  150:9

referring
  83:19
  84:25
  98:7
  100:18
  112:6
  116:11,15

refresh
  121:19
  122:6,9

regard



7:18
95:14
154:15

**regimented**
37:20

**registered**
69:17

**related**
152:21

**relating**
152:4

**relevant**
148:9

**reliability**
132:7

**reliable**
132:16
133:15

**relied**
150:3

**relying**
115:21

**remaining**
62:23

**remember**
18:19
20:6
22:20
32:25
34:21,22
64:12
78:5
88:14,19,
21,24
89:5,9
90:15
93:14
94:21
97:20

**remotely**
4:9

**removed**
132:14

**render**
71:9

**rendered**
71:11
72:7

**renew**
51:11
56:21

**renewal**
51:14,18

**renewed**
51:13

**renewing**
53:5

**repeat**
6:8 62:9
90:22
101:6
102:3
122:25

**rephrase**
6:10

**report**
10:8,14,
17,18
11:6,11,
14 12:3,
4,6 13:9
14:10
15:4,6,9,
25 16:16
72:17
79:7,11,
17,22,24
80:6,10
96:12,15,
17,18
97:11,18,
23 99:11,
21 100:3,
5,18,19

101:13,24
103:14,16
104:24,25
105:12,
16,19,21,
24 106:3,
7,10
107:12,
13,23
108:6,20
110:4,12,
13,16
111:5,6,
8,12,18,
23
112:10,
11,15,19
113:9,13,
22 114:7,
14 115:3,
8 116:13,
14,16,19
117:6,14,
17,21
118:3,6,
14,24
119:6,11,
13,14,24
120:4,7,
11,15,19
121:15,
17,21
122:4,7
123:25
124:4,16,
23 125:2,
11,22,25
126:6,16
128:3,24
130:16,24
131:7,13,
15,18,21,
24 132:3,
7,15
134:19,22
136:12,
15,20,25

142:6,10,
17
143:19,
24,25
144:3
146:4,17
147:5
150:7
152:4,10,
15,16
153:12,
13,24
154:2,7

**reporter**
4:2,4,8
12:23

**reports**
15:13
72:23
75:16
95:8
99:6,7,24
100:21
101:4
103:19,
21,25
105:5
115:12
123:13

**representat
ion**
73:7

**represents**
5:7

**reputation**
132:18

**request**
108:7

**require**
81:9

**required**
37:21
43:15

45:2
46:17
50:2 51:6
52:17
53:9,11,
14 58:9,
12,16
75:24

**requirement**
44:14
46:14
49:22
54:12
55:5
58:22

**requirement
s**
26:17
38:3 45:6

**reread**
10:8
106:2

**reserved**
5:22,24

**residency**
19:23
21:15,24
22:9
24:12,24
25:17,20,
24 26:17,
18 28:18
29:4
30:3,6
35:10
36:11,17
44:7 52:2
57:19

**resident**
20:14
22:24
23:5
24:16
25:23,24



26:6,15,
21,22
27:3,17
33:2
51:25

**residents**
27:9,10,
13 28:15,
16 31:11
35:13
36:15,16
38:19
48:9,10

**resolution**
61:13
94:23

**resolved**
61:10
94:15,20,
21

**respect**
152:2

**respond**
127:2
155:3

**responded**
125:17

**responding**
123:19,20
126:12
128:15,16
147:12

**response**
124:20
130:19
151:21
153:9
155:3

**responses**
8:4
127:9,11

**responsibil
ities**
19:8,18
22:22
25:15,25
26:20
28:9,18,
20 30:12,
13 32:4,
17,21
35:2 36:7
38:11

**responsibil
ity**
28:13,24

**responsible**
43:4
62:4,11

**rest**
90:11
151:20

**restate**
11:24

**result**
64:4
71:13
89:24
90:4
127:9
141:9

**resume**
25:22
26:5

**resuscitati
on**
54:2,6

**retained**
76:21
77:5,9

**retainer**
81:9

**return**

119:18

**returned**
117:8
118:11
127:18

**revealed**
103:12

**review**
10:13,19
13:2
49:17
66:24
78:25
79:3,5,
10,12
80:2
81:13
96:11,25
97:16
99:3
102:20
103:11
104:10
105:23
106:10,14
107:5,14
108:23
115:10
118:23
119:3,10,
12 120:2,
3,10,14,
18,20
125:20
130:23
147:3
149:3

**reviewed**
10:22
11:2,5,7,
10,13,17,
22 12:13
95:22
96:2,4,22
97:9

99:24
100:19
103:15
104:3,11,
14 105:20
106:6
112:10,14
117:13
121:16
123:12,
14,17
131:6,12,
14 147:17
148:4
154:7

**reviewing**
70:2
107:10,20

**rib**
134:5,23

**ribs**
131:20
132:5,9
148:6

**risen**
70:13

**Road**
9:5

**role**
32:4 34:3

**roles**
33:24
34:2

**room**
4:8 18:10
25:5
28:16
128:8
129:7,8,
12

**Roslyn**
8:16 9:10

**rotate**
22:16

**rotated**
19:4

**rotating**
18:12
25:2

**rotations**
25:5,9

**rough**
68:8

**roughly**
32:24
36:23
49:11
52:15
54:20
56:16,18
57:12
64:20
73:2,18
74:10,23
76:5
83:7,8
84:6 87:2
109:8
136:19

**round**
68:10

**rounds**
16:7

**rule**
11:6,11
13:9
14:10
15:4,9,18
16:9,16
79:6,11
80:6,10
95:8
97:18
103:15
104:24



105:12,21
106:7,9
107:8
112:11
116:15
117:14
118:14,24
119:14
120:4,15
121:15
123:13
124:4,15,
23,25
125:11,
22,25
126:6,16
128:24
131:7,18
147:5

**run**
26:18

**Russia**
97:22
113:5
132:10,21
133:3
134:24
135:10,
13,21
136:7

**Russian**
116:4
131:12
132:18
133:9,12
134:11

**Russo**
90:9

_____

**S**

_____

**Safe**
58:4

**sake**
6:19  7:2
8:17
67:22
68:11

**saturation**
148:18

**save**
21:17

**scene**
105:4

**schedule**
16:5

**scheme**
29:10

**school**
21:7
37:4,10,
19  39:15
41:11
45:24
46:10

**school's**
41:5

**sclerosis**
111:14,25
112:21
114:9
115:5

**scope**
109:5

**Scott**
11:18

**screen**
13:11,16,
22,23
15:15
16:20,23
17:24
36:21
87:11
88:12

100:12
103:22,23
106:22
109:22
110:14

**scroll**
15:2,16
95:7

**Scrolling**
15:20

**seconds**
129:14
130:7
153:20

**section**
144:11

**seizing**
127:17

**seizure**
113:3,7,
16,17,19
114:11
116:22
117:24
123:23
124:7,10,
20  125:18
126:14,24
127:3,10
128:7
130:11,20
148:16,
22,24
149:10,17
152:21,24

**seizures**
113:4
114:24
149:6

**selective**
39:8

**send**
82:7,16,

18,19
83:2

**sense**
134:22
138:10

**sentence**
102:13
106:22
120:25
137:25
146:4

**sentences**
88:24
89:7

**separate**
56:8
103:7
118:19
135:18
138:13
141:17
149:5

**separated**
25:22

**Sergeant**
102:24

**series**
5:9  16:21

**serve**
34:11
43:9  71:4
72:23
78:4  85:8
107:2,6,
17,21
108:21,24

**served**
20:14
23:18
33:13
35:14,19
67:23
68:5

73:14,15
74:21,23
87:2,3
140:15

**service**
34:5
74:12
81:8

**services**
36:15
41:10
69:24

**serving**
19:14
23:4
66:10
70:14
106:24

**sessions**
29:6

**set**
23:12

**setting**
29:9,12
30:22,23,
25

**settings**
31:5

**settle**
72:9

**settled**
90:10

**settlement**
61:14,17,
20  62:2,
5,12,14,
20  64:5,8
92:20
95:2

**setup**
33:18



**severe**
127:13

**share**
13:11
57:3
109:22

**shifts**
32:5
33:20

**short-lived**
127:13

**shorten**
87:19

**Shorthand**
4:3

**shortly**
117:5

**shoulder**
6:20

**show**
100:11

**shrugs**
6:17,21

**side**
28:20
77:7 86:4
87:16
99:19

**sidewalk**
69:7

**sign**
108:25
109:4

**signature**
15:6

**signed**
61:16

**significant**
33:2
116:7

133:19,24
141:5,6,
23 143:12
144:4,9,
12

**significant
ly**
136:14

**similar**
24:24
30:13
32:21,24
33:11,18
36:12
48:14
66:17
88:10

**similaritie
s**
57:3

**simple**
26:11
54:16

**simply**
7:13
33:20
53:4
66:16
76:12
98:3
115:7
122:16
132:25
135:23
154:13

**single**
86:10

**singular**
97:16
98:3
131:5

**sir**
7:15 9:6,

22 12:12
13:7,13,
21 14:21
15:6,21
16:2,20
17:21
18:15
22:2
25:12
26:3
28:24
31:16
33:6
36:22
37:9 38:7
40:7,15
41:19
43:17,20
44:19
45:9
47:15
50:9,16
53:16
56:23
58:15,23
59:18
62:10
64:2,19
67:16
71:16
73:10
77:11,13,
22 78:20
79:7,16,
23 81:7
83:7,14
84:18
86:12
87:9,16
92:19
93:10
95:7,9
98:16
99:7,18
100:5,14,
17
101:10,

12,25
102:14
103:15,22
104:21
106:4,18
107:3,19
109:23
110:11,22
112:7,18
113:9,22
114:17
116:2,10,
14 117:3,
10,12
118:3
121:14
122:5
123:11
124:11,16
125:11,22
126:10,17
127:15
128:11
129:5
130:2,22
131:17
132:3,24
133:21
135:10,25
136:10,25
137:18
138:5
139:7
140:3,11
141:20
142:18
143:9
144:11
145:13
146:5,17,
19
147:15,20
148:5
151:5,8,
13 153:8,
22 154:3,
21

**sister**
30:6

**sit**
99:13

**situation**
94:12

**six-month**
21:3,5
22:6,11

**skips**
101:3

**slightly**
135:2

**slow**
74:17

**small**
68:16
86:11,12

**societies**
43:20

**sole**
27:17
65:11

**solely**
137:21

**sound**
6:2

**span**
84:13

**speak**
9:13,16

**speaking**
64:20
122:14
134:18
138:16

**specialist**
48:17

**specialized**
47:4



| | | | | |
|---|---|---|---|---|
| specialties | Sperry's | 74:17 | 139:11,19 | stipulations |
| 18:9,13, | 112:10, | starting | 141:22 | 5:14,16, |
| 15 27:12 | 15,19 | 18:2 | 142:11 | 17,19 |
| 41:10 | 113:9,13, | 27:25 | 146:25 | stood |
| 48:13 | 22 114:14 | 90:3 | statement | 124:18 |
| specialty | spine | 120:24 | 138:23 | strange |
| 27:15 | 56:2 | starts | 140:5,7, | 69:4 |
| 37:12 | spoke | 136:22 | 10 141:18 | strictly |
| 40:17 | 9:15,19, | state | 142:25 | 67:7 |
| 134:19 | 21 78:3 | 4:4,19 | states | strike |
| specific | St | 8:18 | 18:3 | 5:23 |
| 9:8 18:23 | 18:2 | 51:18,23 | 29:19 | 22:14 |
| 38:21 | 20:10 | 52:4,18, | 93:25 | 24:8 |
| 60:5,21 | 33:15 | 19,24 | 94:4,10 | 107:18 |
| 63:2 | 35:3,11, | 53:4,12 | 103:3 | 150:12 |
| specifically | 15 36:9, | 73:16,20 | 110:17 | struck |
| 17:5 48:8 | 13 | 74:11 | 117:6 | 125:4,7 |
| 61:2 | staff | 75:7,12, | 122:15 | structure |
| 88:20 | 137:2,6 | 13 80:10 | 130:17 | 54:17 |
| 113:10,25 | stamp | 89:13 | 133:10 | structured |
| 114:15 | 100:14,25 | 90:21 | 135:16 | 23:12 |
| 137:7 | stamped | 91:9 | stating | 37:20 |
| specification | 101:13 | 93:19,23 | 79:16 | structures |
| 25:13 | standard | 103:25 | 129:21 | 152:8 |
| specifics | 147:9,13, | 115:4 | 154:3 | struggle |
| 93:14 | 15,22 | 116:14,19 | status | 141:8 |
| specifies | stapled | 125:6 | 47:11 | 142:2 |
| 134:23 | 101:4 | 128:3 | stayed | 146:7 |
| spend | start | 130:12,19 | 125:7 | struggle/ |
| 25:10 | 14:8 | 135:2 | stenographer | altercation |
| 39:17,20, | 60:8,17 | 137:25 | 7:3 | 141:25 |
| 21 | 66:10 | 148:15,22 | stenographer's | 143:14 |
| spent | 67:6 | state's | 6:18 | 144:5 |
| 18:16 | 87:13 | 69:12 | stent | student |
| 81:23 | started | stated | 21:3 | 37:10 |
| Sperry | 5:10,11 | 85:12 | steps | 38:12 |
| 11:20 | 8:15 | 87:17 | 49:16 | 40:5,25 |
| 12:15 | 29:20 | 92:6 | stipulate | students |
| 104:23 | 30:18 | 96:21 | 4:11,13 | 30:19 |
| 105:19 | 36:11 | 107:4 | | 31:7,9 |
| 114:6,23 | 66:12 | 112:19 | | |
| | 69:21 | 114:7 | | |
| | | 121:14 | | |
| | | 123:14 | | |



39:9,16
41:7,8,9

**studies**
47:23

**study**
46:7

**studying**
37:17

**subarachnoid**
111:15
112:2
115:6

**subject**
8:4 65:16
100:5

**submit**
34:8

**submitted**
14:13
107:8

**subspecialties**
18:18
25:10

**substance**
108:6

**Sudden**
152:20

**sued**
59:21
60:6,9,
11,14
61:5,6,9
62:24
65:24

**suffered**
124:9
143:15
148:22
149:5

**suffering**
130:11
148:15
152:23

**suggestive**
112:21

**suggests**
130:9
139:24
149:4

**suit**
94:8

**summary**
93:16

**Summons**
104:18

**superficial**
137:19
152:6

**supervised**
22:25

**support**
19:14
53:20
55:11
56:25
90:18
139:8
141:22

**surgeon**
19:15

**surgery**
18:17
19:15

**surgical**
24:8

**surprised**
134:4

**surveillance**
103:2

**sustained**
132:2
141:9

**Sweeney's**
125:20

**swift**
119:15

**Swinney**
125:18
126:2,11

**sworn**
4:9,12,17
70:3
84:12
91:23

**symptoms**
126:25

**system**
30:2

---

**T**

**table**
45:18

**taking**
24:8
33:20
44:10
70:18
132:23
145:6

**talking**
27:15
40:5
86:21
95:20

**Tarasov**
95:15

**tasked**
140:14

**taught**
31:3

**teach**
28:17

**teaching**
28:17,20,
24,25
29:8
30:18
38:11

**teachings**
29:16

**technicality**
78:24

**technology**
135:22

**temporal**
111:14,24
112:21,22
114:9
115:5
149:10

**ten**
44:10
91:23

**tenth**
82:13

**term**
138:7,17
139:7,8

**Terminal**
103:5

**terms**
19:7
20:24
33:19,23,
25 37:12,
20 53:3
57:4
64:13,17
112:7

115:17

**test**
26:11
47:10
48:4
58:3,5,18

**tested**
45:12
49:22
51:7,15
53:6
54:17

**testified**
4:20 9:7,
9 49:15
88:5,10
94:13
123:22
124:6
125:3,5
126:2,11
142:17
154:9,14

**testify**
64:24
83:16,25
92:23

**testifying**
7:24 9:9

**testimony**
4:11 7:21
10:20
15:25
70:3
75:24
81:16,20
84:12
85:6,7,19
87:14,22
89:16
90:14
91:3,24,
25 93:3,
18,19,22



800.211.DEPO (3376)
EsquireSolutions.com

95:5
106:11
119:4
123:17
124:11,
16,22
125:10,16
126:5
127:21,23
128:13,22
129:4
147:2

**testing**
23:13
46:4

**tests**
42:23
44:25
45:4,15,
16,21
46:2,6,9,
11 49:2,
16 57:23

**therefor**
92:23

**thing**
18:25
78:9

**things**
123:16
141:17

**thinking**
5:4

**thought**
37:6
86:21

**thrombosis**
94:7

**Tikhoplav's**
104:7,8,
17 106:11

**time**

5:23,24
18:18
19:2 21:4
25:10
26:2
32:23
34:13
44:16
46:2,12
49:12,13
51:24
63:21
65:13
70:10
82:6,9,12
90:9
92:20
119:19
123:7
127:17,18
146:9,15
155:5

**timeline**
127:15

**times**
45:12
52:8
60:6,10
76:3,5,7
78:2
83:15,24
84:4,5,7
86:3
94:18
118:19
120:18
151:10

**tips**
23:14

**TLE**
112:23

**today**
5:8,17
8:4 9:10

10:7
45:11
83:11
84:18
96:23
97:12
99:4,13
112:9,16

**today's**
9:14,17
10:3,14,
21 11:8
97:8
104:12
105:13,
14,24

**told**
126:11

**top**
87:13
95:8
102:2,4,
13
116:13,18

**total**
74:14
91:23

**track**
82:8,11

**trained**
132:20
150:12

**training**
17:22,25
23:3,7,
11,20
27:22
41:21
42:19
43:14
124:8
137:15
146:23
148:14

149:20

**transcript**
6:22 7:5
12:14
13:2
104:8
120:3,21
123:15

**transcripts**
10:20,23
11:18,19
125:21

**transitiona
l**
18:3,8,22
19:8
20:3,11
21:2
52:11

**transitione
d**
21:22
22:7
30:19

**trauma**
55:10,15

**traumatic**
55:20,22

**travel**
133:17

**treat**
55:18

**treated**
123:23
124:7

**trial**
5:23,24
63:14
64:20,25
70:4,6
72:11
75:24

76:2
81:19
87:14,17,
22 89:21
92:13,17,
19,21,22
93:4,18
94:16

**trials**
92:7,9
93:14

**tripped**
69:7

**true**
93:13

**truthfully**
8:12 77:6

**turn**
119:17

**turns**
138:24

**twisted**
141:16

**twists**
138:23

**two-page**
136:20

**type**
23:7,11
73:11
113:5

**typical**
126:25
127:5,6,8

**typically**
47:3

**typo**
118:21



800.211.DEPO (3376)
EsquireSolutions.com

**U**

**ultimately**
63:11
72:17
107:23

**ultrasound**
47:17,25
48:3,13,
20,21
49:11,21

**un-defendable**
71:17,21,
23

**unable**
121:5

**unclear**
149:7

**uncommon**
38:22,24

**undergraduate**
17:2,6

**underneath**
98:13
104:6,16

**understand**
6:9,19,24
7:20 8:3,
11 68:2
71:14
94:5
127:8
138:12
139:6,14

**understanding**
94:11
95:16
105:6

111:10
139:23
144:24

**understood**
6:13
37:18
67:2
72:13
110:11

**unit**
102:25

**United**
93:25
94:3,10
103:2
133:9
135:16

**university**
30:23

**unusual**
113:20

**usual**
5:16,19

**V**

**VA**
94:8,9

**valuation**
76:14

**variation**
130:18

**varied**
19:12

**vary**
19:11

**vast**
67:21,24
68:4,9,13
86:5

**vein**
94:7

**venture**
66:17

**veracity**
134:11,18
135:17

**verbal**
6:23

**verbally**
6:16

**verdict**
63:14
64:20
90:11,12

**version**
41:5

**versus**
26:22
31:4
37:21
89:12
93:25
94:3
118:22

**video**
103:2

**videoconferencing**
4:7

**videos**
103:8

**view**
71:7
72:18
73:25
74:6

**Vincent's**
18:2
20:10

**violent**

128:9
129:9
130:9

**vitae**
16:23

**vital**
152:8

**voluntarily**
64:4,7

**W**

**wait**
7:3,6
20:17
62:7 90:7

**wake**
126:24
127:3

**walk**
16:24
27:20
31:15

**wanted**
36:21

**wanting**
34:24

**watch**
82:10

**ways**
112:5

**websites**
67:15

**week**
50:22

**weekly**
23:24

**weeks**
39:18,21,
22

**Weiler**
29:24
30:4,12,
20 36:3,
6,12
58:11

**Weiler-albert**
29:23
35:22

**wide**
130:17

**witnesses**
116:23

**wondering**
69:6

**word**
67:6,12,
14 88:2
129:17,23
130:2
136:22
138:12,16
139:10,24
140:8

**words**
99:7
143:25

**work**
8:25 9:2
23:15
25:16
29:13
32:13
33:12
34:24
36:8,20
66:8,14,
23 67:7,
10 69:15,
22 73:3,
12 82:3,
12,22
83:4,14



**worked**
85:13
93:9
107:7
22:24
31:19
32:5 48:5
56:6,7
68:12,15
74:11
85:15,16,
22 86:2,
3,9,19,25
109:9,10

**worker**
98:19

**working**
21:12
67:19

**works**
27:14

**wraps**
41:19

**Wright-reid**
123:21
124:5
125:3

**writing**
97:11
128:10
131:15

**written**
44:7,10,
11

**wrongful**
60:20,23
63:8

**wrote**
79:22
97:15
117:22
130:21

131:23

---

**Y**

**year**
18:11,12
25:23
26:2
30:18
37:14,22
38:2,4,8
39:9,16
40:4,25
63:2
74:22
75:2,22
77:21,25
89:4

**yearlong**
20:25

**yearly**
44:14
45:5
49:23
53:5

**years**
21:25
37:19
44:10,12
45:5,23
50:18,22,
25 53:8
54:22
57:14,21
58:14
60:13,16
63:7
64:23
66:13
67:5,14
69:22
70:13,17
73:4
74:12,22

75:22
85:14
86:2
93:10

**York**
4:5,19
8:16 9:5,
10 42:4
51:18,22
52:4,18,
24 53:4,
12 69:11,
14 70:8
72:23
73:16,20,
24 74:11
75:7,9,
12,13,20
76:22
89:13
90:20
91:9
93:19,22,
23 97:17
98:7
101:22
102:7
130:24
143:11

**York-based**
74:2

**young**
32:8

**Yup**
103:24

**Yvonne**
101:21
102:6

---

**Z**

**Zender**
98:21,25

