# EXHIBIT DD

# Part 1

ORIGINAL

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALEXEY V. TARASOV, ESQ.,
Administrator of the Estate of
EVGENIY LAGODA, Deceased, and
GRIGORY TIKHOPLAV,

     Plaintiffs,

        vs.              Case No. 21-cv-6226 (NRB)

PORT AUTHORITY OF NEW YORK AND
NEW JERSEY, and PORT AUTHORITY OF
NEW YORK AND NEW JERSEY POLICE
DEPARTMENT a/k/a PORT AUTHORITY
POLICE DEPARTMENT a/k/a/ PAPD,
PAPD OFFICER MICHAEL BUGIADA,
PAPD OFFICER ROBERT JOSEPH, PAPD
OFFICER JONATHAN PAPIA, PAPD
OFFICER PAUL MEZZACAPPA, and PAPD
OFFICER JONATHAN DURAN,

     Defendants.

_____)

--o0o--

REMOTE DEPOSITION OF KRIS SPERRY

Tuesday, September 10, 2024

--o0o--

Magna Legal Services
866-624-6221
www.magnals.com

Reported by:
Rick Galten, CSR No. 13202



APPEARANCES:

      For the Plaintiffs:

Ashcroft Law Firm
200 State Street
Floor 7
Boston, Massachusetts   02109
(617) 573-9400
camrhein@ashcroftlawfirm.com
BY:   J. Christopher Amrhein, Jr., Esq.


      For the Defendants:

The Port Authority of New York and
New Jersey
Law Department
4 World Trade Center
150 Greenwich Street, 24th Floor
New York, New York   10007
(212) 435-3465
calterman@panynj.gov
gfrangos@panynj.gov
BY:   Cheryl Alterman, Esq.
      Matthew Malysa, Esq.

Also present:
    Alexey Tarasov

--o0o--



INDEX OF EXAMINATION

Page

    5         Examination by Ms. Alterman
  172         Examination by Mr. Amrhein
  205         Further Examination by Ms. Alterman
  210         Further Examination by Mr. Amrhein

INDEX OF EXHIBITS

Exhibit No.            Description                 Page

Exhibit 1    Courtroom and Deposition Testimony  26
             (Eight pages)
Exhibit 2    Rule 26 Report                       37
             (17 pages)

Exhibit 3    State of New York                    87
             Office of the Attorney General
             Report
             Bates PA1555 - 1620
Exhibit 4    Republic of Liberia                 127
             Physical Examination Report
             Bates EL000078 - 79
Exhibit 5    Republic of Liberia                 130
             Physical Examination Report
             Bates EL00008 - 81

                    --o0o--



Page 4

BE IT REMEMBERED THAT, pursuant to Notice of Deposition and on Tuesday, September 10, 2024, commencing at the hour of 8:03 a.m., Pacific Standard Time, remotely via Zoom, before me, RICK GALTEN, a Certified Shorthand Reporter for the State of California, there appeared

KRIS SPERRY,

Called as a witness by the Defendants, and who, having been first duly sworn, was thereupon examined and testified as hereinafter set forth.

--oOo--

MS. ALTERMAN:  Good morning.  Cheryl Alterman on behalf of Defendant, the Port Authority of New York and New Jersey as well as the individual and named police officers.

MR. MALYSA:  Good morning.  Matthew Malysa. Port Authority Law Department on behalf of the defendants.

MR. AMRHEIN:  And good morning.  Attorney J. Christopher Amrhein, Jr. on behalf of the plaintiffs in this matter.  And with me here today is one of our clients, the administrator of the estate of Evgeniy Lagoda, Alexey Tarasov.

MS. ALTERMAN:  Thank you.



EXAMINATION

BY MS. ALTERMAN:  Q.   Good morning, Dr. Sperry.

A.   Good morning.

Q.   I just introduced myself on the record.  But I'll introduce myself again to you, because I know we haven't met before.  My name is Cheryl Alterman, and I'm one of the attorneys representing the defendants in this case, the Port Authority of New York and New Jersey as well as the individually named police officers.

We are here to take your deposition today.  And I'm going to be asking you a series of questions and you will be answering those questions.  So before we begin, I'd like to give you a few instructions.  Okay?

A.   Okay.  Would you mind just one quick thing.  If you could raise your voice just a little bit.  That way I won't have -- I hope to bypass any problems with understanding you.  And that's all that I have.

Q.   Sure, not a problem.  Are you able to hear me okay now?

A.   Yes, thank you.

Q.   Sure.  So you'll see that we have a court reporter on the screen.  The court reporter is going to take down everything that's said during today's proceeding.  So please make sure all of your responses are verbal or spoken, because the court reporter cannot



Page 6

take down any hand gestures or nods of the head.  Okay?

A.  Okay.

Q.  I'd also ask you to answer questions with a yes or a no response, because the court reporter can also not take down words like mm-hmm.

Do you understand that?

A.  Yes.

Q.  Since the court reporter is taking down everything that's said, I ask that you wait until I finish my question before you answer the same.  And that's so that we can have a complete record of both my question and your response to that question.  Okay?

A.  Okay.

Q.  If at any time you don't understand the questions that I'm asking you, please let me know and I'll be happy to rephrase them.  If you answer a question, I'm going to assume that you understood the question that was posed to you.  Okay?

A.  Okay.

Q.  If you need a break at any time, also, we'll be happy to accommodate you.  I'd just ask that if there's a pending question, you answer the question before we take that break.

Is that okay?

A.  That's okay.



Page 7

Q. Do you understand all the instructions that I gave to you?

A. Yes.

Q. Is there anything that's preventing you from testifying truthfully and completely today?

A. Not of which I'm aware.

Q. Are you currently taking any medications, sir, that would affect your ability to recall events?

A. No.

Q. Have you ever given deposition testimony before?

A. Yes.

Q. How many times?

A. Probably more than 1,500, I would estimate.

Q. How many times have you testified in court before?

A. 808, actually.

Q. Do you have a breakdown of percentage of how many of the 808 times that you've testified in court were in civil court or criminal court?

A. It's varied across the years. I would say most recently, say, within the last ten years, I'm just estimating, I would say perhaps maybe 60, 65 percent on behalf of the State or the plaintiff and the remainder being on behalf of the defense.

MR. AMRHEIN: And Cheryl, before we -- just as



there's a break right there, do you want to just discuss stipulations and get them on the record before we get going?

MS. ALTERMAN:  Sure.

MR. AMRHEIN:  I know in the past for our other experts last week as well as other past depositions in this matter that we get to the usual stipulations.

Is that something that would be agreeable again here today?

MS. ALTERMAN:  Yes, it is.

MR. AMRHEIN:  Okay.  And I'm happy to read them on the record now.  And if you have anything to add, of course, jump in.  But the past agreement and agreement for today would go would be all objections except as to form are reserved until time of trial and all motions to strike are reserved until the time of trial.

And regarding read and sign, we waive notary if that's okay.

MS. ALTERMAN:  That's fine.

MR. AMRHEIN:  Okay, great.  Thanks.

MS. ALTERMAN:  Q.  Now, Dr. Sperry, when you testified approximately 65 percent of times on behalf of the State, was that in your practice as a forensic consultant or something else?

A.  No.  I mean, it was -- I would say a combination



of things. Primarily -- well, it's, my employment with the State of Georgia directed me -- I mean, I was just employed with the State. So it would be under that -- that particular subcategory.

Q. Now, in order to prepare for today's deposition, what did you do?

A. I reread the information that I had been sent previously regarding Mr. Lagoda and just really refreshed my memory. More or less, it had been a few months since the last time I have looked at everything.

So I just reread the information. And I did speak with Mr. Amrhein briefly. He called me. Just really wanted to know if I had any questions. And that was basically it.

Q. Okay. Your report dated April 26, 2024, lists certain materials that you reviewed in order to prepare your expert report.

Did you review anything in addition to those items listed on Page 1 of your April 26, 2024, report?

A. Sure. There were two things that I was provided with just a few days ago. One was a -- let me see. It would be called Defendant's Federal Record Civil Procedure -- well, having to do with the report written by Grigory L. Mazarin, M.D. And that, kind of in cutting past the other paperwork, that was a three-page



report.

And then I also was furnished with an excerpt from a deposition which, as I understand from reading the text of the deposition, that it started -- well, this was the second half of the deposition testimony, started on Page 139 and ended on Page 230, or at least that's when the text -- useful text for me ended.

And those were the only other things that I reviewed in addition to what I had listed previously, that you -- that you read from.

Q. Now, Dr. Sperry, you mentioned that you were served with an excerpt of the deposition transcript and the pages of interest to you were Pages 139 to 230.

Who was deposed?

A. That was, let's is see, Alexey V. Tarasov as the administrator of the estate of Evgeniy Lagoda and Grigory Tikhoplav. And if I pronounce that -- I apologize for bad pronunciation. But that was the individual. Mr. Tarasov was the individual actually being deposed in that.

Q. And what was of particular interest to you from that excerpt that you were provided with a few days ago?

MR. AMRHEIN: Objection.

THE WITNESS: I'm not sure that anything was of particular interest specifically. It gave me a little



bit more information as far as Mr. Lagoda's background in his younger years, to an extent, anyway, when he was in Russia and some of the training that he underwent in order to ultimately qualify -- well, to sit for an examination and qualify and pass that examination. And that was -- that was basically it.

And it gave me, I mean, a -- an idea of his activities, anyway. You know, that Mr. Tarasov just narrated or discussed and also some things having to do with any knowledge Mr. Tarasov had regarding depositions. I mean, excuse me, regarding medications and other -- other minor backgrounds and things without going into too much detail.

So that was about it.

Q.   Dr. Sperry, did you review the deposition transcript of Mr. Tarasov or the deposition transcript of Mr. Tikhoplav, Mr. Lagoda's father?

A.   Well, this was -- I mean, I'm reading from the title here. It says Alexey V. Tarasov, Esq., administrator of the estate of Evgeniy Lagoda, deceased, and Grigory Tikhoplav. And on the next page it says Continued Videoconference Deposition of the Plaintiff, Grigory Tikhoplav Taken Pursuant to Notice. And some other things. And so that's the -- yeah, and at least the witness -- this is on the index page -- is Grigory



MAGNA
LEGAL SERVICES

Tikhoplav. I don't know how to characterize it any further than just what I've read to you.

Q. That's fine. So to clarify, the witness from the excerpt of the deposition transcript that you've been referring to was Mr. Lagoda's father, Grigory Tikhoplav; is that correct?

A. Yes, I think -- I think that's -- yeah, Grigory Tikhoplav. And if that indeed is his father, then that's -- you know, I don't have any complaints about that.

Q. Do you know the relation between Mr. Lagoda and the plaintiff, Mr. Tarasov?

A. Not well. Not well enough to really, you know, discuss it in detail. I know he was -- Mr. Tarasov was the one who was designated as the representative. Beyond that, I can't tell you the exact relationship that they had.

Q. So you're talking about two individuals, sir. You're talking about Mr. Tarasov and Mr. Tikhoplav.

Do you know what connection, if any, either of them had to the decedent in this case?

A. No.

MR. AMRHEIN: Objection.

THE WITNESS: Other than just what I've read to you, I don't have any further knowledge of those



qualifications.

MS. ALTERMAN:  Understood.

Q.  Is this the only deposition transcript that you received to review in preparation for your report and today's deposition?

A.  Yes, ma'am.

MR. AMRHEIN:  Objection.

THE WITNESS:  I'm sorry.

MR. AMRHEIN:  And Dr. Sperry, should your response go into anything that would invoke issues of privilege, just, you know, be aware of that.  But other than that, you know, I'm just noting my objection for the record.  And you may proceed with your answer.

THE WITNESS:  Okay.  I don't remember exactly the question.  But I'll certainly --

MS. ALTERMAN:  I can --

THE WITNESS:  -- try to reanswer it.

MS. ALTERMAN:  I can rephrase the question.

Q.  Have you --

A.  Sure.

Q.  -- reviewed any other deposition transcripts in preparation for your testimony today and/or your preparation of your report dated April 26, 2024, other than the excerpt of the transcript you just referenced?

A.  No.



Page 14

Q.  Did you review the defendants' other expert disclosure by Mr. Monaghan in preparation for your testimony today?

MR. AMRHEIN:  Objection.

THE WITNESS:  No.  I actually don't know who -- or the identity of Mr. Monaghan.  I don't know who he is.  But I've not reviewed any other disclosures or statements or anything else having to do with other -- other experts or the inclusion of other experts.

MS. ALTERMAN:  Q.  And just to clarify that statement, have you reviewed the plaintiff's expert disclosure that was served upon Defendants by Scott Defoe?

A.  And what was your question, then?  I'm sorry, ma'am.

Q.  Have you reviewed the plaintiff's expert disclosure by Scott Defoe?

A.  Yeah, no, I have not.

Q.  Now, besides for your work working for the State of Georgia, which we'll get into in more detail in a few minutes, I want to just take a moment to talk about your forensic work as an expert.

When did you start working as an expert witness?

A.  1983.

Q.  And while you were working as an expert witness



in 1983, did you hold any other employment?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes, I did.  At that time I was a resident in pathology and then a fellow in forensic pathology at the University of New Mexico School of Medicine.

MS. ALTERMAN:  Q.  In terms of your work as an expert witness, how much of your work have you been retained by plaintiffs versus defendants in civil cases?

A.  It's varied a great deal over the years.  I mean, it's been a little over 40 years.  And just patterns and distributions of changes that have changed over the course of years.  There's no easy way to answer.

In general, until the last six or eight years, it's primarily been on behalf of -- or cases that I've looked at have been on behalf of the plaintiff -- no, excuse me -- on behalf of the defense with the remainder being on behalf of the plaintiff.

But then that's changed somewhat.  And really, in the last 12 months, say, I would say I've looked at probably -- probably maybe 80 percent plaintiff and 20 percent defense.  And then there's been -- but of those, they're split into criminal cases and civil cases.  So there's, you know, a different -- different



subcategorization.

In general, again, for the last 12 months or so, the majority of criminal cases that I've reviewed have been on behalf of the plaintiff, really, yes, and the remainder on behalf of the defense. So essentially, there's different patterns of change over the course of years.

Q. Okay. What is your highest level of education?

A. Well, an M.D. degree. But then I'm also certified by the American Board of Pathology in anatomic pathology, clinical pathology, and forensic pathology.

Q. When did you receive your medical degree?

A. In 1978.

Q. Are you Board certified?

A. Yes, in all three areas.

Q. When did you receive your board certifications?

A. I was boarded in anatomic pathology and clinical pathology in May of 1985 and in forensic pathology in, I believe, June of 1986.

Q. When did you start working for the State of Georgia?

A. That would have been in January of 1990.

Q. How long did you work for the State of Georgia?

A. Well, I worked for -- you know, I worked within the State of Georgia. And for the first seven and a



half years up through the middle of June of 1997, I worked -- well, I was an employee of the Fulton County Medical Examiner. But the office that I worked in covered both the Fulton County Medical Examiner's Office and the State of Georgia. So we split our time between two different offices. But I was really paid by the Fulton County office.

And then in December -- or excuse me, in June of 1997, I quit the Offices of the Medical Examiner for Fulton County but then immediately switched to the State of Georgia. And began working solely for the State of Georgia up until -- well, the next 18 years and five or six months.

Q. And that was until 2015?

A. Yes, my official retirement date was November 1st of 2015.

Q. When you retired on November 1st of 2015, what role did you hold with the State of Georgia?

A. I was the chief medical examiner for the State of Georgia. I had held that position continuously since I was appointed into that position in June of 1997.

Q. Okay. So from June of 1997 to November 1st of 2015, you held the position of chief medical examiner for the State of Georgia; is that correct?

A. Yes, ma'am.



Page 18

Q.   What were your duties and responsibilities in that role?

A.   I supervised the death investigation system that was handled by the State of Georgia through the Georgia Bureau of Investigation.  And really, since I was the first individual who was ever in that position, one of my primary duties was to construct or to put together a death investigation system for the State itself and build up something that -- where nothing had existed before.

And so, you know, I gradually over the course of the first few years developed and implemented a death investigation system that remains what it is today.  Once I finally was able to -- I would say get -- to develop it into a position of stability.  And after that, really, nothing changed other than dealing with day-to-day issues or problems or consulting, things like that.  I mean, just issues that came up along with the job.  And that was primarily it.

Q.   How many medical examiners did you have working for you in the department?

A.   At the time, the most that I ever had working for me at one time was 11.  And that fluctuated somewhat between maybe nine or ten and sometimes up to 11.  But it didn't stay constant in that -- in that particular



role.  But, because there were -- there were people that were coming and going and rotating through my office or, like, the chief medical examiner's office.  But then ultimately rotating somewhere else or taking a job, something that they had looked at.  And so they would move out of the position.

So as I said, it varied up to a maximum of about 11.  Realistically, it was somewhere between nine and ten.

Q.  Do you currently reside in the State of Georgia?

A.  Yes.

Q.  What is your address?

A.  2194 Bear Creek Road in Moorland, M-o-o-r-l-a-n-d, Georgia.

Q.  Okay.  And have you been living in the State of Georgia since your retirement in November 2015?

A.  Yes.

Q.  Did you ever provide any medical examiner work outside of the State of Georgia?

A.  I guess, in what sense?  I mean, I have provided testimony, both in depositions and in trials, primarily civil and some -- some criminal cases outside of the state.  But it varied, just depending upon what I was asked to look at and asked to review.

But -- and I mean, in general, yes, I have.



Page 20

Q.  Now, you testified that you first started consulting as an expert in 1983.

Did you work for your own consulting business or as part of another company?  How did that come about?

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Well -- oh, I'm sorry.

MR. AMRHEIN:  Go ahead.

THE WITNESS:  I got a phone call one day in my office with the medical examiner, or the Medical Investigator's Office, as the proper name for the State of Georgia.  And it was an attorney.  The person who called me was an attorney who wanted to know if I could review a case.  And actually, it had to do with the alcohol intoxication and blood levels of alcohol and things like that.  And I told him that I could.  So that was kind of how things started.

But I've never -- either then or since then, I've never advertised.  I've never listed my services. I've never had a website.  I mean, nothing.

All the contacts I've -- excuse me -- ever had were initiated by others and almost exclusively were the contacts were made by attorneys.  You know, I very rarely really worked for clients, I would say.  And instead, I much prefer to work for attorneys.  And so I kept those, you know, those things definitely separate.



And indeed, sometimes if people would call me up that is nonattorneys, I would actually instruct them to have the attorney that represented them to call me and leave it at that.

MS. ALTERMAN:  Okay.

Q.  When did you develop the fee schedule that you're currently charging for this case?

A.  Well, that would have been right around that time, around 1983.  Yeah.  And that was when I first put together a fee schedule.

Q.  Has your fee schedule increased at all since 1983?

A.  It has, yes.  Slowly, not really regularly.  But periodically and slowly, I've increased the fees that I schedule, depending on, you know, whatever it is, the nature of the case and what I'm being asked to do.  But again, I -- I would say I haven't changed my fee schedule to any substantive degree perhaps more than once every six or seven years, perhaps in that time frame, that time interval between 1983 and now.

Q.  The name of your company that appears on your fee schedule that has been provided to us is Sperry Forensic Pathology Consults, Inc.

Is that a corporation that you incorporated?

A.  Yes, it is.  I could not come up with a



better-sounding name, quite honestly.  And that was the suggestion that the incorporating attorney that I utilized made for me.  And so having suggested it, I -- it stuck with me.

And so that would have been -- giving too much information that you don't want -- but that would have been in 1997.  Yes.

Q.  Are there any other members of the corporation besides yourself?

A.  Only my wife, who fulfills the role of secretary-treasurer.  And I'm the president and CEO.

Q.  What is your wife's name?

A.  Her name is Blair, B-l-a-i-r, Sperry.

Q.  Thank you.  How much was the retainer fee that you charged in this case to review the circumstances that occurred on April 12th of 2019?

A.  $3500 --

MR. AMRHEIN:  Objection.

THE WITNESS:  I'm sorry.

MR. AMRHEIN:  Go ahead.

THE WITNESS:  Yeah, $3,500.

MS. ALTERMAN:  Q.  How much do you charge for review of materials and consultation?

MR. AMRHEIN:  Objection.

THE WITNESS:  $600 an hour.



MAGNA
LEGAL SERVICES

Page 23

MS. ALTERMAN:  Q.   How much do you charge to provide deposition testimony?

A.   $1,000 an hour with a two-hour minimum.

Q.   A 2,000 minimum?

A.   Well, yes, a thousand dollars per hour, but with a minimum of $2,000, or basically two hours of time.

Q.   And in the event that you're called to testify at trial, what is your fee?

A.   Generally my fee is $10,000 a day.  It rarely happens that I'm actually called to testify in the cases I'm involved in.  But that's what -- that's what the fee is now anyway.  It just -- but it's -- I very, very rarely am called or asked to provide testimony live and in court.

Q.   Does the $10,000 per day trial fee include travel expenses?

MR. AMRHEIN:  Objection.

THE WITNESS:  It -- no, it does not.  Although it includes -- what can I say?  Basically, one working day.  And the way that I look at it, that is, you know, if I have travel outside of Georgia, it's almost inevitable that I'll fly out somewhere and fly to another location -- excuse me -- and then testify the next day and then fly back.

And I consider that just to be one working day.



Particularly if I'm held over for one reason or another, then I may charge an extra working day.  It -- it really depends upon my judgment.

So that's -- you know, that's it.

The -- anything else, any expenses that are outside of providing testimony, I generally charge for those expenses, although sometimes I don't.  It varies somewhat and kind of according to my judgment.

MS. ALTERMAN:  Q.  Out of the 808 times that you've testified in court, when was the last time that you recall testifying in the court?

A.  The last time, actually, was about a week ago.

Q.  Where was that?

A.  I was here in my home in Georgia.  And this was testifying in a postconviction relief hearing in Detroit.

Q.  You testified remotely?

A.  Yes, ma'am.

Q.  Have you ever testified in the state of New York before?

A.  Yes.  It's been a long time.  Quite a long time.  But I know I've been to New York definitely at least once.  And I suspect probably two or three times, but no more than that.

Q.  Do you recall the year that you testified in



New York?

A. No. No, I don't know. It's been such a long time. That is -- fortunately, at least as I've gotten somewhat older, it's made life easier to keep track of when I've testified and in what different state. But even that is not infallible. Just because I've -- I generally keep the -- the testimony list that I maintain for depositions and for trials, I generally keep that up to about a ten-year interval.

Q. So that was going to be my next question.

Does the list of courtroom and deposition testimony that we've been provided in this case -- and I'm happy to show it to you if you'd like to review it -- include any cases where you've testified in the state of New York?

A. Yes. As far as, you know, whatever I provided you, I would have to look at it to tell you, quite honestly. I know that it's been -- the time interval has been of sufficient duration that I'd be surprised if anything that I -- testimony that I gave in New York would be on that.

But at this point I can't confirm or deny either one. So there may be or there may not be. It's just -- it's been such a long time that a coin flip is about as accurate as I could get right now.



Page 26

MS. ALTERMAN: Okay. So why don't we mark for identification purposes as Sperry 1 the disclosure containing the courtroom and deposition testimony that was provided to Defendants.

(Exhibit 1 was marked for identification.)

MS. ALTERMAN: It's an eight-page document. And we'll pull it up on the screen and give you a chance to review it. And you can let us know if any of the cases that are listed in this eight-page report were venued in the state of New York.

THE WITNESS: Okay.

MS. ALTERMAN: Q. Are you able to see that on the screen?

A. Yeah. It went kind of quickly, but I can see it.

Q. Okay. Well, we'll scroll through it and you'll let us know once you review each page.

A. Okay. Yeah, sure. It starts off with January 31st of 2019. And I tend to arrange things in chronological order, starting with January, and just looking at the dates. Okay. All right. Okay. All right. Okay. All right. Okay. Okay. All right. Okay. All right.

Q. So now that you've had an opportunity to review what we've marked as Sperry 1 for identification, which



is an eight-page list of your courtroom and deposition testimony, does that refresh your recollection whether or not any of the cases that you've testified in were venued in the state of New York?

A.  Yes, at least as far as the ones that are indicated on that.  There's -- at least there are none that have taken place in New York.

Q.  Now, you testified that you recall testifying in the state of New York at least once, more than ten years ago.

Do you recall in that occasion whether or not you were qualified as an expert?

A.  I know that I --

MR. AMRHEIN:  Objection.

THE WITNESS:  Oh, I'm sorry.  I didn't mean to interrupt you.

MR. AMRHEIN:  Go ahead, Dr. Sperry.

MS. ALTERMAN:  Q.   No, you can --

A.  Okay.  No, I know that I was.  Just that my recollection does not include any unusual things or problematic issues.  So my conclusion is that I was accepted as an expert.  And that was, you know, that was about the extent of that discussion.

Q.  In the list of cases that you just had an opportunity to review, that we've marked as Sperry 1 for



Page 28

identification, were you barred from giving expert testimony in any of these cases that's listed in this document?

A.   No.

MR. AMRHEIN:   Objection.

THE WITNESS:   Yeah, no.

MS. ALTERMAN:   Q.   Has your testimony ever been limited based on motion practice to exclude you from testifying as to certain areas based on attorneys' motions that they may have made in this case?

MR. AMRHEIN:   Objection.

THE WITNESS:   Not that I'm aware of.

MS. ALTERMAN:   Q.   When you've been proffered as an expert witness in the court of law, in what areas have you been proffered in?

A.   Oh, my.   Well, pathology, anatomic pathology, forensic pathology, clinical pathology.   Then different areas.   Broadly, causes of death, gunshot wounds, gunshot injuries, strangulation deaths, deaths in custody or deaths during -- excuse me -- law enforcement custody or deaths that occurred during law enforcement custody, excuse me.   Pediatric or childhood deaths.

And, you know, I think I mentioned -- yes, asphyxia.   Yeah, strangulation.   Those are the ones that really at least stand out, anyway.



Page 29

Q.  Okay.  You -- you testified that you retired on November 1st of 2015 from the State of Georgia.

When you retired, did you increase the amount of expert work that you were doing?

A.  No.  No, it stayed the same or basically decreased.  Decreased some.  Not a lot, at least initially.  But I was initially over the next few years after I retired.  But I didn't increase the amount of work that I was doing.

Q.  So you testified that the work decreased some.

Is that because of the circumstances of your retirement?

MR. AMRHEIN:  Objection.

THE WITNESS:  Perhaps.  I didn't sit and try to discern what -- you know, what the purpose was or the -- you know, why it was -- was decreasing.  I just -- because I said quite a while ago that I've always taken cases that have been referred to me or transferred to me, one way or the other, someone has called me, basically.

And so that all really stayed the same.  Whatever else may have gone on behind the scenes, I really -- you know, I really have no idea.  I don't know.

But like I said, at least initially, I decreased



MAGNA
LEGAL SERVICES

the amount of work that I was doing and let it known -- let it be known that there were certain things that I just didn't really want to do, you know, that kind of work anymore.

MS. ALTERMAN:  Q.   Were you planning to retire on November 1st, 2015?

A.  Yes, actually.

Q.  Are you aware of an article that came out in the Atlanta Journal Constitution that said -- or the title of that article was Embarrassed Medical Examiner Abruptly Retired?

A.  Yes.  Oh, yes.

Q.  Is it your testimony that your retirement was not abrupt or was planned?

MR. AMRHEIN:  Objection.  Objection.

THE WITNESS:  Well, I don't know how one would define not abrupt.  I mean, I had already up until that time reached the conclusion that I was going to retire for the State and set the wheels in motion.  And my direct supervisor, who was the head of the Georgia Bureau of Investigation -- I mean, I had discussed my upcoming -- my -- what I viewed as my impending retirement with him.

And we had had discussions over who I thought would be a good person to take my place.  A variety of



different things.  And I had scheduled generally --
scheduled generally my retirement to take place sometime
in the next maybe four to six months, something like
that.  But I had not set a firm date, only that I'm --
again, my -- letting my supervisor know that I was
intending to retire and that, you know, we would discuss
it further.

MS. ALTERMAN:  Q.  Dr. Sperry, isn't it true
that you were forced to retire on November 1st, 2015,
because you were being accused of falsifying your time
sheet and working as an expert witness when you were
supposed to be working for the State of Georgia?

A.  No.

MR. AMRHEIN:  Objection.

THE WITNESS:  I'm sorry, no, no.  That's --
that's not true at all.  I had already, as I said a
minute ago, decided or concluded, really, I was going to
retire.  And again, probably in the earlier part of
2016.  But I'd already made that decision.

And so that was -- although my boss really would
have preferred me not to retire, that was my decision.
And I wasn't put in a position of having to force being
retired or threatened, you know, with any kind of action
if I didn't retire or really much of anything.  I --
again, reached that conclusion on my own.



Page 32

And so when the newspaper article sort of sprung forth, all that it really did was to establish a more firm date.  I set a date to retire rather than being a bit nebulous about things, about when I was going to retire.

So it just set out to confirm what I had planned already to do.

MS. ALTERMAN:  Q.  Dr. Sperry, haven't you probably testified that you weren't planning to retire in 2015 and, in fact, were planning to retire in 2016 but for the article and the news stories that came out accusing you of stealing time from the State of Georgia?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't know.  The -- I don't know the specific nature of exactly what I'd said.  It was something that -- at least that decision to retire, I, you know, thought about it a great deal.  And it really allowed me to -- I'd say crystallize the approach that I decided to take with respect to retirement, because I was not ready immediately to retire in general.  But at the same time, it was -- it was time.

And actually, what made a great deal of difference was the input that the director of the Georgia Bureau of Investigation, or the GBI, the direction that he actually gave me and my discussions


MAGNA
LEGAL SERVICES

with him.  I'd asked him how much time, you know, was --
how much lead time was necessary in order to retire,
because it's something, you know, I just had not
developed into an approach yet.

And he told me, kind of to my surprise, that I
could retire right then if I wanted to, which was very
interesting.  But I never really retired or never
reached the decision to retire.

And I clarified that and just said, you mean,
Mr. Keaton, I can retire now if I want to?  And he said,
sure.  So I said, okay, I retire, then.  And I won't
tell you that, you know, cannons went off and the birds
were singing, but certainly it relieved a great deal of
stress just to -- you know, I realized that I had been
holding onto a lot of stress over the course of,
especially the previous five, six, seven years.  And I
was able to let that go.

And so I realized that I had made the -- made
the right decision inadvertently.  So that's -- yeah,
once I was able to put that into the proper perspective,
then it made perfect sense.

MS. ALTERMAN:    Q.    Is part of the stress that
you were experiencing the fact that you had been
investigated by the Attorney General's office for
committing fraud?



A.   No.

MR. AMRHEIN:   Objection.

THE WITNESS:   Oh, I'm sorry.   I -- no, no one ever investigated me.   I mean, ever.   And let me -- and by ever, I mean ever.   I was not investigated by the Attorney General's Office, by the State Police, by the Georgia Bureau of Investigation, by any police agency of any sort.   I mean, nothing.   I was never asked to turn over any logbooks or documents and -- or anything, really, to the State.   I've just kept them.   And that was basically it.

Now I --

MS. MS. ALTERMAN:   Q.   I had --

A.   I'm sorry.

Q.   I'm sorry, were you working at least 67 other jobs when you were supposed to be working for the medical examiner's office?

MR. AMRHEIN:   Objection.

THE WITNESS:   Working at least what now?

MS. ALTERMAN:   Q.   67 other jobs when --

A.   60?

Q.   Yes.   When you were supposed to be working for the State of Georgia.

MR. AMRHEIN:   Objection.

THE WITNESS:   67 other jobs?



MS. ALTERMAN:  Q.    Yes.

A.    No, I've -- I've never had anyone ask me that. No.

Q.    Now, you've been asked questions about this before during depositions, correct, Dr. Sperry?

A.    Oh, yes.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.    And you've also been asked questions about whether or not your opinions had been excluded in the court of law before, correct?

A.    Yes.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.    Now, you testified just a few minutes ago that, to your knowledge, you had -- your opinion had not been excluded; is that correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.  You know, to the best of my knowledge.  I mean, obviously I don't know what I don't know.  But to the extent of what I do know, that's the best I can say.

MS. ALTERMAN:  Q.    Are you familiar with a case called Griffin v. Coffee County, which was venued in the United States District Court of the Southern District of Georgia?

MR. AMRHEIN:  Objection.



THE WITNESS:  No.  No, not yet.

MS. ALTERMAN:  Q.  Would it refresh your recollection that in that case the Court found that you failed to be qualified as an expert witness and your opinions should be excluded as unreliable?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, I'm sorry, it's still -- it's still not pushing a button yet.

MS. ALTERMAN:  Q.  Are there any cases that you specifically recall being excluded as an expert witness because the Court found your testimony to be unreliable?

MR. AMRHEIN:  Objection.

THE WITNESS:  No.

MS. ALTERMAN:  Q.  Now, you mentioned GBI before.

What does that stand for?

A.  That's the acronym for the Georgia Bureau of Investigation.

Q.  Besides for the expert consulting work that you've been doing since 1983, do you have any other forms of employment or sources of employment?

MR. AMRHEIN:  Objection.

THE WITNESS:  The only other source would be occasional private autopsy examinations that I would perform at the request of coroners, primarily.  Rarely



Page 37

families, but the majority would be on behalf of coroners. And by rare, that -- it works out to be about maybe four to six autopsies -- well, an autopsy every four to six weeks, approximately.

MS. ALTERMAN: Q. How much do you earn, approximately, doing that?

A. Now I make $5500 a case, generally.

Q. And how much of your income would you say is derived from reviewing cases and providing expert testimony?

MR. AMRHEIN: Objection.

THE WITNESS: I'm just thinking. Probably maybe 60- to $80,000 a year.

MS. ALTERMAN: Okay.

Q. I'm going to direct your attention to the report that you prepared that's dated April 26, 2024. And we'll mark it for identification as Sperry 2.

(Exhibit 2 was marked for identification.)

MS. ALTERMAN: And I'll pull it up on screen.

Q. Do you have a copy of the report in front of you?

A. Yes, I do.

Q. So I'd just like to confirm that we're working off the same version of the report. So we'll have you look at a copy of the report on the screen and you'll



Page 38

confirm that this report is identical to the report that you have in front of you.  And for the record --

A.  Okay.

Q.  -- it's a 17-page document.

A.  All right.  Since we're at a transition point, would you mind if we took maybe a five-minutes break, then we can switch gears?

Q.  Sure.  Just, if we could just confirm that this is the same report.  And then I'm happy to take a break.

A.  Okay.

Q.  Did you have an opportunity to review the report?

A.  Yes.  It looks like it's all there.

MS. ALTERMAN:  Okay.  Great, we can take a five-minute break.

(Off the record from 8:57 to 9:02.)

MS. ALTERMAN:  Okay, Dr. Sperry.

Q.  The report that we've marked as Sperry 2 for identification, is this the only report that you prepared in this case?

A.  Yes.

Q.  When you prepared this report, on the first page, as you can see on the screen here, you list several documents that you reviewed in preparation for preparing the report.



Now, earlier I asked you if you reviewed anything else besides for these, and you mentioned two other items, which is Defendants' Expert Disclosure from Dr. Mazarin and an excerpt from deposition testimony of the plaintiff, Tikhoplav.

Is that a complete list of all the materials that you reviewed in preparation for your testimony today?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.

MS. ALTERMAN:  Q.   There's also a reference throughout this 17-page report of an NY OAG investigation report.

Did you have a complete copy of the New York Attorney General's investigation report when you prepared this disclosure?

MR. AMRHEIN:  Objection.

THE WITNESS:  As far as I know -- I'm sorry.  As far as I knew, it was complete.  I have not received any additions or, you know, things that were in addition to what I received.  But to the best of my knowledge, what I had is what I still have.

MS. ALTERMAN:  Q.   How many pages was the report that you received?

A.  Oh, my.  I can tell you.  I just write things



Page 40

down, typically. Somewhere at least 42 pages, approximately.

Q. On Page 2 of your report, you begin the second paragraph with a narrative of some background information pertaining to Mr. Lagoda.

Where did you obtain this information from with respect to his age and his employment prior to his death?

MR. AMRHEIN: Objection.

THE WITNESS: Well, that would have been from documents that I had listed on the first page. And specifically which documents, I can't tell you right at the moment. But that would have been the general source for that information that I condensed downwards to just make it a bit more readable, for my use, anyway.

MS. ALTERMAN: Q. Do you take notes when you're preparing your expert disclosures?

A. No.

Q. Do your notes or -- are there any materials that would refresh your recollection as to where this narrative came from?

MR. AMRHEIN: Objection.

THE WITNESS: No, no.

MS. ALTERMAN: Q. In that same paragraph, Dr. Sperry, with the sentence starting, "The testing


MAGNA
LEGAL SERVICES

results which had not" -- well, it says,

"The testing results which were dated within a year prior to his death disclosed only mild increases in his bilirubin and three liver enzymes."

Do you see that sentence?

A.   Yes.

Q.   Which records were you referring to when you were looking at Mr. Lagoda's testing results?

A.   Well, those would have been specifically from information derived from his various medical examinations in preparation for his duty.  And I synopsized that information to -- well, sort of to reflect the continuity that was, what, five, six sentences long.  I just condensed what -- what I read.

Q.   What is the significance of increased levels of bilirubin and three liver enzymes?

A.   In general, depending on what those elevations are and what degree and severity they are, the relevance could be very minimum.  I mean, so it's a very common problem, I mean, actually, in someone who's not an alcoholic.  Fatty metamorphosis of the liver is very, very common and certainly in industrialized countries.

So other than it being -- or those numerical figures being abnormal, they don't really have any



Page 42

particular significance.  Again, unless they become very abnormal or cause other -- cause or result in other problems.

So it was just an observation that was abnormal in and of itself, but at least for the purposes of approving him for seagoing duty, beyond that, it didn't have any relevance that I could determine.

Q.  Was Mr. Lagoda taking any prescription medication to control these abnormal levels that you identified in your report?

MR. AMRHEIN:  Objection.

THE WITNESS:  I'm sorry.  I remember that he was queried as far as medications and drugs that he was taking.  And I don't -- you know, the medications themselves, I don't remember.  They were foreign drugs and thus, were -- you know, did not have the brand names, anyway.  I didn't have access to.

But it's common -- those sorts of medications are commonly taken by people, say, that have a relatively mild level of fatty metamorphosis of the liver in efforts to control or treat it to its best extent.

MS. ALTERMAN:  Q.  So Dr. Sperry, my question to you was whether or not Mr. Lagoda was taking any prescription medication to control the abnormal levels



of the increased bilirubin and three level enzymes that you noted in your report.

MR. AMRHEIN: Objection.

THE WITNESS: Okay. So --

MS. ALTERMAN: Q. Do you know whether or not he was taking any prescription medication?

A. Oh, okay. I understand. No, I don't know --

MR. AMRHEIN: Objection.

THE WITNESS: -- independently whether he's taking any or all the medications that he listed as ones that had been prescribed. So that -- that, I can't tell you. That's -- they weren't drugs that were life-threatening or, you know, dangerous, if not consumed, something like that.

But whether or not he really was taking them or was not taking them, I don't know. I can't tell you that.

MS. ALTERMAN: Q. Do you know if he was even prescribed any medications to control his abnormal levels, as you identified them?

MR. AMRHEIN: Objection.

THE WITNESS: Whether he would prescribe the drugs?

MS. ALTERMAN: No.

Q. If he was prescribed by a doctor.



Page 44

A.   Oh, okay.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.   If he was --

MR. AMRHEIN:  Same objection.

THE WITNESS:  Okay.  Making sure that I understood.  Just because the laws and regulations are different in different parts of the world.  So no, other than him being prescribed or prescribing for himself, one way or the other, different medications, that would have different effects beyond that, I can't tell you whether or not he was taking the drugs, much less taking them as they were meant to be prescribed.

And, you know, in order to address various biochemical abnormalities.  So I don't have any knowledge about that.

MS. ALTERMAN:  If you can go on to Page 3 of your report.

THE WITNESS:  Okay.

MS. ALTERMAN:  Q.   In the last full paragraph on this page, it includes more background information. In the first few sentences you wrote,

"However, none of them spoke nor understood Russian and Mr. Lagoda did not know or understand English, so a complete verbal communication barrier existed."



Do you see that sentence?

A.   Yes.

Q.   What are you basing that on?

A.   I'm basing it on -- upon much of the information that was subsequently provided to the caregivers. That is, the law enforcement officers and to the flight crew or the -- yes, the men and women who were providing care, professional care to their clients.

And in retrospect, looking -- because there -- at the time there really was no way that I could tell that they knew how much English that Mr. Lagoda understood, much less to what degree and extent that he understood it as well.

So at the time of the event, it was very difficult to really discern what English he knew, that is, Mr. Lagoda knew and how much he was able to understand. So it was, you know, a problem that ultimately was clarified, at least through that -- that -- those answers.

So it was information that did not -- was not apparent at first, just because of the circumstances. But gradually, with the passage of time, then more and more pieces of information became apparent until we arrived at the -- the situation that we were at, at around the time he died.


MAGNA
LEGAL SERVICES

Q.   What are you basing this on?

A.   What am I basing this on?

Q.   Yes.

A.   Well, I'm not sure what you're asking.

Q.   Well, I don't follow your response.  Your response was that based on what's written in your report, that Mr. Lagoda did not know or understand English.  So my question to you is, what are you basing that on?

A.   Oh, all right.  Well --

MR. AMRHEIN:  Objection.

THE WITNESS:  -- that would be information that's -- factual information that ultimately was provided to the law enforcement and medical care personnel with the passage of time that clarified the -- well, clarified the answers.  That is, gave answers that at least formed the basis, as far as why Mr. Lagoda could not understand what they were saying or was unable to understand it, and thus assisted in providing a barrier to effective communication.

MS. ALTERMAN:  Q.   So that's my question, Dr. Sperry.

Where are you getting the information that there was this alleged barrier and that Mr. Lagoda couldn't understand what was happening?


MAGNA
LEGAL SERVICES

MR. AMRHEIN: Objection.

THE WITNESS: Well, as far as I recall, this was information that was derived slowly. You know, bit by bit, really. And --

MS. ALTERMAN: Q. From where? I'm asking you specifically the source of your information.

A. Oh, I --

MR. AMRHEIN: Objection.

THE WITNESS: -- would have to look and see specifically. Because initially that was a main question. That is, did Mr. Lagoda truly understand or comprehend spoken English and nuanced English and translation of English into Russian and vice-versa, things like that. And no one really knew.

But as time passed on -- I mean, as time progressed, then his inability, that is, Mr. Lagoda's inability to effectively communicate from Russian into English became, I would say, more and more clear.

I mean, at the end of it, really -- I would say at the end of the sequence of events, I don't know that anyone could truly swear that Mr. Lagoda did or did not understand English. And then to what degree and extent that he understood it or had a lack of understanding.

But the explanations that were given at this point in the context, some of the issues that the police



Page 48

and that the aircraft crew staff encountered in their difficulty in communicating with him.

MS. ALTERMAN: Q. Which police officers said they had an issue communicating with him?

A. I don't know.

Q. Which flight crew member testified that they had difficulty communicating with Mr. Lagoda?

A. Oh, I don't know which flight crew member gave such testimony.

Q. Which passenger of the aircraft gave such testimony?

A. Oh, I -- I do not know, even if anyone gave such testimony.

Q. So what are you basing these conclusions on that Mr. Lagoda did not know or understand English?

MR. AMRHEIN: Objection.

THE WITNESS: Well, his inability to effectively communicate and understand what was being asked of him and then respond in kind to speak in English and show that he could understand them. That's -- you know, I think that's the most reasonable explanation that was given.

And, you know, because Mr. Lagoda never did really -- never was able to communicate to what degree anyone thought was effective that even could be wrong,



as far as that goes.

MS. ALTERMAN:  Q.   And what are you pointing to to support that opinion?

A.   Oh, just -- just -- it is what it is.  He never -- Mr. Lagoda never said anything that was responsive to any questions that were asked of him.  And the -- the metamorphosis between not understanding anything up to perhaps understanding something, it never really was clear until the time that he died.

And then it remained somewhat of an unknown inquiry.  But nothing was ever determined, that I'm aware of, that allowed the interpretation that something was different, that is, that some conclusion on the part of the police or that -- you know, the flight crew, the stewardesses, stewards, that their conclusions were erroneous.

MS. ALTERMAN:  Q.   What questions were asked of Mr. Lagoda?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, he was asked, I mean, a variety of things.  But nothing that was -- as I recall, was very -- it was very forceful or, you know, required -- well, required answers, I guess, is perhaps the best way to put it.  I mean, he -- Mr. Lagoda did not ever seem to give what I would say were appropriate


MAGNA
LEGAL SERVICES

Page 50

responses to even the simplest questions.  And things --
you know, the conditions deteriorated fairly rapidly
into a struggle, eventually into a fight.

So I did not determine that there was any
specific time that was allowed for me -- for Mr. Lagoda
and for others to effectively communicate, really, at
all.

MS. ALTERMAN:  Q.   Well, Dr. Sperry, you just
testified that Mr. Lagoda didn't seem to give
appropriate responses.

So my question to you is, what was asked of him?
What were the specific questions that were asked of
Mr. Lagoda, that you believe he didn't give appropriate
responses to?

MR. AMRHEIN:  Objection.

THE WITNESS:  Oh, I can -- I mean, it was -- my
recollection is that it varied.  I mean, the -- the
questions that were asked of Mr. Lagoda, I mean, really
varied.  And even -- even among different individuals,
the nature and contents of the discussions or the
inquiries were -- well, were brief and, you know,
attempting to communicate with him.

And as far as I could tell, the -- he never
received -- or that is, the persons asking him -- asking
Mr. Lagoda different things never received answers that



helped them to understand, you know, what problems there were. And more often than not, it seemed like he was -- Mr. Lagoda was effectively communicating at all, which I can understand as being confusing.

MS. ALTERMAN: Q. Dr. Sperry, you were given notice of today's deposition, correct?

A. Yes.

Q. And you had time to review the materials that were provided to you in addition to your report that you prepared, correct?

A. Yes.

MR. AMRHEIN: Objection.

THE WITNESS: I'm sorry.

MS. ALTERMAN: Q. And you also had an opportunity to speak with Plaintiff's Counsel in order to prepare for your testimony today, correct?

A. Yes.

MR. AMRHEIN: Objection.

MS. ALTERMAN: Q. So I'm asking you very specific questions here, sir. I'm not asking you for generalized responses.

Dr. Sperry, my question to you is very specific. I asked, what questions were asked of Mr. Lagoda? Do you know?

A. No.



MR. AMRHEIN: Objection.

THE WITNESS: Yeah, no, I do not know. Because the -- even -- I won't say necessarily the log, but the recounting of the discussions that were undertaken between the law enforcement and the flight crew and then Mr. Lagoda were tremendously varied and differed, in fact, between one individual and another.

So it was -- there really wasn't any consistency that I could tell that, you know, with repetition that -- that would have enabled him to perhaps understand some or all of what was said.

It was -- I mean, my impression was that this was very confusing.

MS. ALTERMAN: Q. You didn't review any deposition testimony besides for the excerpt from Mr. Tikhoplav, correct?

A. Correct.

MR. AMRHEIN: Objection.

MS. ALTERMAN: Q. So you didn't review any of the testimony from the police officers who were involved in this incident; is that correct?

A. Correct.

MR. AMRHEIN: Objection.

MS. ALTERMAN: Q. And you also didn't review the testimony of any of the flight crew who were onboard



the JetBlue flight that day, correct?

A.  Correct.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.  And you also didn't review the nonparty testimony from the passengers who were onboard the JetBlue flight, who interacted with Mr. Lagoda, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct.

MS. ALTERMAN:  Q.  So when you state in your report that Mr. Lagoda did not know or understand English, is that based on an assumption?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, for me, it was based upon the conclusion, which attempted to explain why Mr. Lagoda was unable to understand or comprehend what was being asked of him.

MS. ALTERMAN:  Q.  Whose conclusion is that?

A.  Well, I think ultimately the different -- different people had different conclusions, depending upon what their interactions with Mr. Lagoda consisted of.  And I mean, if there's another explanation which provides similar information and similar conclusions, well, I mean, that -- certainly I don't have any problem with including that as a reason why Mr. Lagoda did



Page 54

not -- well, again, did not show that he understood what was going on and what was being asked of him.

MS. ALTERMAN:  Q.  If there was sworn deposition testimony in this case that states that Mr. Lagoda did, in fact, speak English and did have a command of the English language, would that change your opinion?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, that's one of those basically broad sorts of things.  And also, like, I mean, I can tell you that once -- just because someone says that they understand -- excuse me, that they understand English, but yet are unable to discern colloquial English or abbreviated sorts of English -- spoken English -- I mean, it's -- the variables are tremendous.

But it's -- English is not one of those things that -- as is any language -- where someone either speaks it perfectly or not at all.  So that's -- I think that's the best that can be said.  And it appears that there ultimately were even differences in the ability that Mr. Lagoda had to actually understand spoken English and act upon questions or comments or statements, you know, made in colloquial English.

MS. ALTERMAN:  Q.  Your report assumes multiple



times throughout the 17 pages that Mr. Lagoda did not know or could not understand English.

Would you agree with me?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes, I think that's fair.

MS. ALTERMAN:  Q.  So my question to you, Dr. Sperry, is, if there is testimony contrary to that assumption, would you feel that your report is inaccurate?

MR. AMRHEIN:  Objection.

THE WITNESS:  No, not -- not necessarily. Not -- certainly not without other factual information which would be -- I would say surprisingly contradictory, would be very different.  It does not mean that it was inaccurate, but it doesn't mean that it was wrong either.

MS. ALTERMAN:  Q.  There are multiple references throughout this report that you prepared with the assumption that Mr. Lagoda did not know or understand English, correct?

A.  Yes.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.  And you made that assumption without reviewing any deposition testimony in this case, correct?



MR. AMRHEIN:  Objection.

THE WITNESS:  Yes, without reviewing any deposition testimony, yes.

MS. ALTERMAN:  Q.  And you also made that assumption, Dr. Sperry, without speaking with any of Mr. Lagoda's living family members, correct?

A.  That's true.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.  Did you ever ask to contact or consult with Mr. Lagoda's parents?

MR. AMRHEIN:  Objection.

THE WITNESS:  No.

MS. ALTERMAN:  Q.  Did you ever ask or request to consult with Mr. Lagoda's ex-wife?

MR. AMRHEIN:  Objection.

THE WITNESS:  No.

MS. ALTERMAN:  Q.  Did you ever ask to consult with Mr. Lagoda's son?

MR. AMRHEIN:  Objection.

THE WITNESS:  No.

MS. ALTERMAN:  Q.  Did you ever ask to consult with or discuss whether or not Mr. Lagoda understood English with Mr. Tarasov, the administrator of this action?

MR. AMRHEIN:  Objection.



Page 57

THE WITNESS:  No, not that I can recall.

MS. ALTERMAN:  Q.  When did you first learn that the New York State Attorney General's Office investigated the incident involving Mr. Lagoda's death?

A.  That would have been in February of 20 -- I don't think it was this year -- yes, 2024.

Q.  Is that when you were first retained?

A.  Yes.  I -- I mean, I know that I was first contacted with the intent of retaining me somewhere in that area in February of 2019.  But when the decision was made to -- to actually retain me, that would have been sometime afterwards.  Sometime in the order of late March, early April, April, of 2019.

Q.  2019 or 2024?

A.  Oh, I'm sorry.  No, 2024.  No, no, no.  Sorry about that.  The wrong date.

Q.  Now, you testified earlier that your entire consulting business is word of mouth.  And you made it a point of testifying that you don't advertise, you don't have a website, or anything of that nature.

How were you referred to the plaintiffs in this case?

MR. AMRHEIN:  Objection.  And then, Dr. Sperry, anything about our engagement and the basis of our, you know, preparation for, you know, having you as an expert



in this matter would be considered privileged material. So anything that would be privileged, you know, I would instruct you not to divulge privileged, protected material.

And then just continuing to note my objection for the record and proceed with your answer.

THE WITNESS:  All right.  And the answer to that is, I -- I don't know who it was that referred this law firm to me as a consultant.  I rarely ask unless it's a firm that I've had other dealings with at other times or someone, you know, just mentions that they've worked with me or got my name from somebody or something like that.  But otherwise, I very, very rarely make reference to who it was that contacted me.

MS. ALTERMAN:  Q.  Have you worked with this law firm before?

A.  No.

Q.  Have you been on cases with Scott Defoe as an expert witness before?

MR. AMRHEIN:  Objection.

THE WITNESS:  I think I have.  I mean, at least -- at least once and possibly maybe two or maximum of three times, potentially.  But at least once, anyway.

MS. ALTERMAN:  Q.  Did you have conversations with Mr. Defoe outside of Counsel's presence regarding



this incident?

A. No.

MR. AMRHEIN: Objection.

THE WITNESS: Yeah, no, I did not.

MS. ALTERMAN: Q. How long was the Attorney General's Office investigating Mr. Lagoda's death?

A. Oh, how long?

Q. Yes.

A. I don't know. I believe that actually is -- it's noted on one of the reports that I had. Actually, I think it's the special investigations and prosecution unit. And I would have to really look at this to -- you know, to see to what extent. But no, I don't have an independent recollection of how long it was. Only that by the time that I had received the case, the -- their investigation had concluded, as far as I can tell.

Q. How many people were interviewed in the course of the investigation?

A. I don't know.

Q. Do you know who was interviewed?

A. Other than looking through and, you know, seeing -- you know, reading names, I'm horrendously terrible at recounting names. So I -- I don't know. I can't tell you how many.

Q. Did you make any reference in your report as to



how many police officers were interviewed during the course of the Attorney General's investigation?

A. No.

Q. Did you make any reference in your report as to how many members of the flight staff from the JetBlue flight were interviewed in the course of the investigation?

A. No.

Q. Did you make any reference in your report as to how many passengers onboard the flight were interviewed during the course of the investigation?

A. No.

Q. Are you aware that the investigation concluded that there was insufficient evidence to establish that a crime was committed by any of the officers involved?

MR. AMRHEIN: Objection.

THE WITNESS: No. No.

MS. ALTERMAN: Q. Are you aware of any of the conclusions in the Attorney General's report?

MR. AMRHEIN: Objection.

THE WITNESS: I've read them. But as far as specific conclusions and certain things that ultimately were recommendations -- and, in fact, looked at that a while ago -- the executive summaries and some of which appeared to have been made repeated times over the



course of years.  I mean, I know that there were

different summaries, different times.

          But I can't tell you how many there were, how

many recommendations there were, nor the frequency with

which they had been recommended.

          MS. ALTERMAN:  Q.   Are you aware of the

substance of any of the conclusions in the report?

          MR. AMRHEIN:  Objection.

          THE WITNESS:  I would say -- I mean, broadly,

somewhat.  And I'm just looking.

          MS. ALTERMAN:  Q.   And Dr. Sperry, are you

reading from something?

     A.   Oh, no, I'm just looking at the special

investigations and prosecutions unit, the report on the

investigation into the death of Evgeniy Lagoda.  And I

was just -- I was just looking to see if there was

anything that specifically popped out beyond --

     Q.   So Dr. Sperry, I would just ask that if you need

to review something in order to refresh your

recollection, that you ask me first before you start

reading from a document.  Because we're not in the same

room, so I can't see what you're looking at.

          So my questions to you are based upon your

recollection.  If you don't recall something, you can

either tell me that you need something to refresh your



Page 62

recollection or I can ask you if you need something. But you can't just independently choose to read from something that all of us can't see what you're reading from. Okay?

A. Oh, okay. Sure, no problem.

Q. Okay. And I'll give one exception, unless it's your report, because we already marked that for identification and we've established that you have the same report in front of you that we're viewing on our screen. Okay?

A. All right.

Q. So my question to you, Dr. Sperry, was whether or not you've an understanding of the substance of any of the conclusions in the New York Attorney General's report that investigated the death of Mr. Lagoda?

MR. AMRHEIN: Objection.

THE WITNESS: I don't know that I have specific suggestions as far as the recommendations that were made specifically. So, you know, beyond that, I don't have any recollection.

MS. ALTERMAN: Q. Are you aware that the report concluded that under the circumstances, the officers' use of force to restrain Mr. Lagoda could not, as the legal standard requires, be proven to be unjustified beyond a reasonable doubt?


MAGNA
LEGAL SERVICES

Page 63

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes, I am.  I recall reading that, yes.

MS. ALTERMAN:  Q.  Do you recall reading that the Attorney General's report found that the Port Authority Police Department's current use of force policy appropriately instructs officers using force to conduct a careful balancing of all human interests and use only that force that is reasonably necessary to bring an incident under control while protecting the lives of the officer or another?

MR. AMRHEIN:  Objection.

THE WITNESS:  Okay.  I -- I recall that, yes.

MS. ALTERMAN:  Q.  Would you also agree with me, Dr. Sperry, that Mr. Lagoda was violent onboard the aircraft?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes, based upon the description of others, the law enforcement and the flight crew and other -- other nonprofessional witnesses, there was descriptions of him exhibiting violent behavior, yes.

MS. ALTERMAN:  Q.  Would you also agree with me, Dr. Sperry, that Mr. Lagoda struck several members of the flight crew prior to --

MR. AMRHEIN:  Objection.



Page 64

MS. ALTERMAN: Q. -- law enforcement boarding the flight?

MR. AMRHEIN: Objection.

THE WITNESS: Yes.

MS. ALTERMAN: Q. Now, Dr. Sperry, you are not a police practice expert, correct?

A. Correct.

Q. Now I'd like to direct you to Page 6 of your report. And we'll go to the second paragraph on that page. The last two sentences on that page, you wrote,

"At 10 o'clock p.m., an officer radioed that 'it's under control, we're getting it under control,' indicating that Mr. Lagoda's restraint had been achieved."

Do you know what the phrase to be under control means in police jargon?

MR. AMRHEIN: Objection.

THE WITNESS: Oh, specifically? I mean, if it has another -- another meaning other than what's here, you know, what I've listed, that, you know, that I'm unaware of it.

MS. ALTERMAN: All right.

Q. Going back to the page before, on Page 5 of your report, in the first paragraph, Dr. Sperry, you note that an autopsy examination at the NYC OCME was



Page 65

performed and then a second autopsy report was completed by Russian forensic physicians and scientists.

Do you see that?

A.    Yes.

Q.    How many times have you seen multiple autopsies done on the same individual?

A.    Oh, my.  It's an odd question.  There's always something that's odd that comes about.  I mean, at least -- at least a hundred.  Easily.  Probably -- probably more than that.  Sure there is.

Q.    Do you know why the second autopsy was done in this case?

A.    Only from the perspective that the Russian authorities utilizing the expertise of Russian physicians in many different areas of forensic medicine and pathology wanted and a different examination to be done.  That is, I can't tell you that they were not anticipating something that was out of norm or out of practice, although that's really one of the main reasons for doing a second autopsy.

But nonetheless, they wanted to -- I say -- the family, with the assistance of the Russian -- different members of the Russian forensic sciences community, wanted answers to be provided.  And if there was something that was different, well, they wanted those to



Page 66

be provided too.

MS. ALTERMAN:  Q.  Who told you that the Russian authorities wanted a different examination to be performed?

MR. AMRHEIN:  Objection.

THE WITNESS:  No, that's -- that's why examinations like this would be done.  You know, whatever -- yeah, I can tell you whatever politics were undergoing or being -- being undertaken at the time, I certainly have no idea about.  And there's clearly subtexts that are not mentioned here.  And I would be surprised if they were mentioned.

But they could just have easily -- I say they, the Russian authorities could just have easily turned down the request to do another autopsy examination.  So there is many possible outcomes.  And, in fact, probably not really that many when it comes down to it.

But the Russians, especially, rarely do anything without a purpose behind it.  However, I have to say, once I found this report and then started reading through, I was genuinely impressed with the conclusions that were derived.  So there's -- it's not a simple answer, by any means.  But it's not as complex and complicated either.

MS. ALTERMAN:  Q.  Who made the request for the



second autopsy to be performed?

A.    I don't know who exactly made the request.

Q.    Do you know --

A.    I'm sorry.

Q.    -- who did the --

A.    In Russia, such requests are going to be made through political officers and science officers.  And all that really has to be done is to turn it down.  Turn down such a request.  In this case, the request was followed through and a very detailed examination was done.  So there was a reason, there was a purpose.  In fact, now even probably multiple purposes behind it.

But it was not just as simple as finding out the truth.  I mean, that's kind of nebulous, when you think about it.  But there -- there had to have been reasons why such an undertaking was really endeavored.

Q.    So that's the basis of my question, Dr. Sperry.

What were these multiple purposes behind conducting a second autopsy?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, I don't know.  Speculating, it's relatively easy to see -- should be easy to see that, just finding differences, and even substantial differences, between the autopsy done by the OCME in New York and by the medical examiner's office in Russia



is the place one would start.  And then it could get very different from there.

So there -- there definitely are reasons.  And they're not being approached with everyone being just flat honest about it.  But that's -- you know, that's the way some of these things, especially currently, that's the way they're -- they're done.

MS. ALTERMAN:  Q.  Based upon your review of the autopsy report that was performed in New York, was there a reason to perform the second autopsy report?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, I actually have an understandable bias.  But I also understand the need to perform a second autopsy as long as that autopsy, first of all, is done objectively and scientifically and correctly documents the presence or absence of a wide array of different things.

After that, then, you know, any of us -- any forensic scientist loses control if something different is found, because the body is long gone.  And, you know, not -- and it's lost, really.

So I wouldn't necessarily agree that the second autopsy ought to be done, but I've been doing this for a long enough time that I don't -- you know, it's -- I accept that questions like this are going to be asked.



And at least I'm satisfied with my own degree and level of objectivity. But I cannot vouch for that of somebody else, even to the degree that, you know, they may just consider that I'm wrong. That, I don't have any control over other than documenting the things that I document.

MS. ALTERMAN: Q. Now, you had an opportunity to review the autopsy that was performed in New York in addition to the photographs that were taken during the examination, correct?

A. Yes.

MR. AMRHEIN: Objection.

MS. ALTERMAN: Q. Based upon your years of experience being the chief medical examiner for the State of Georgia, did you feel that the New York autopsy report that was prepared was objective and complete and met the standards required for autopsy reports?

MR. AMRHEIN: Objection.

THE WITNESS: Well, yes, I actually know Dr. Milewski. I've known her for 25, 30 years, perhaps. And I know the quality of the work that she does and the veracity of her findings and opinions.

I personally, because of all those features, I do not have any qualms about Dr. Milewski doing the autopsy in Mr. Lagoda's death.


MAGNA
LEGAL SERVICES

But I can't tell you that I necessarily would have had the same level of comfort and of trust if it had been someone that I did not know compared with Ms. Milewski -- Dr. Milewski. So there's a lot of nebulous variables, really.

But ultimately with her, with Dr. Milewski, I was satisfied to my own level of professional degree that -- that she would have done a good job. And I would say she didn't let me down, which was also a good thing to do.

So beyond that, there's not a way that I could champion her cause, if you will, but I could certainly -- if someone asked me what I thought her opinion was, I would be honest and tell them. So realistically, Mr. Lagoda's autopsy was in good hands and was done appropriately.

MS. ALTERMAN: Q. And you felt that Dr. Milewski did a professional and appropriate job in her work doing Mr. Lagoda's autopsy in this case, correct?

MR. AMRHEIN: Objection.

THE WITNESS: Yes. Oh, I'm sorry. Yes.

MS. ALTERMAN: Q. Now, on the same page, Dr. Sperry, in the second paragraph on Page 5, you note again that there was a complete language barrier between



Page 71

Mr. Lagoda and Officer Bugiada.

Do you see that?

A.   Yes.

Q.   Is this based on the same assumption that we see on the previous page?

MR. AMRHEIN:   Objection.

THE WITNESS:   Yes, essentially.  Because up until that time that I had, you know, finally written this -- because that paragraph culminates with officers beginning to flood into the aircraft and, you know, and other things beyond that, there was nothing that I encountered that told me anything different.  That is that Mr. Lagoda knew anything different or had any ability to comprehend anything differently and thus changed or recounted his difficulties.  That is -- yeah, his difficulty in understanding English.

So until that time, I did not find anything that was contradictory to what it appeared to be the situation up until that time.

MS. ALTERMAN:   Q.   How about your review of the excerpt from the Mr. Tikhoplav's deposition transcript?  Does that change your opinion that there was a complete language barrier?

MR. AMRHEIN:   Objection.

THE WITNESS:   Yeah, do you know a specific --



specific place that you're referring to?

MS. ALTERMAN:  Q.  Well, you testified, sir, that you were given an excerpt of that deposition transcript.

So my question to you is, based upon your review of that excerpt, does that change your opinion at all?

A.  Yeah, well, I'm just simply asking --

MR. AMRHEIN:  Objection.

THE WITNESS:  -- if you can give me, you know -- I don't expect it to be 30 pages long, but if you can give me a point at which you're referring to, I certainly would be quite happy to look at it and just make sure that I'm as clear as I could be.

MS. ALTERMAN:  Q.  So my question doesn't involve you rereading parts of the deposition transcript.

My question is simply, based upon your review of the transcript, does your opinion change at all based on Mr. Tikhoplav's testimony, that Mr. Lagoda did understand English and had a command of the English language?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, I mean, unless we're stuck -- I mean, if you can show me what it is that you're referring to, I would be quite happy to read it



Page 73

and then incorporate that into the context of everything I've seen up to -- until this point. But I certainly don't want to get anything -- well, unnecessarily complicated either.

MS. ALTERMAN: Q. So are you able to answer my question, sir, without reading the deposition transcript?

A. No, I can't. I mean, it's 230 -- it's -- 90 pages long. And I -- all I can tell you is, I know that it's a small amount of text that, as I recall, is devoted to that. So I just don't -- I don't want to make any mistakes by well, misinterpreting even something quite small, especially something that can be easily buried within this. Because it will just -- it makes things much easier.

Q. So it's fair to say, Dr. Sperry, that even after reviewing that excerpt from Mr. Tikhoplav's deposition testimony, you did not feel it was necessary to make an addendum or supplement your report in any way?

MR. AMRHEIN: Objection.

THE WITNESS: General -- oh, I'm sorry. Yeah, I would say in general, that is -- that's correct. To the limits of, you know, my understanding and comprehension of the elements here.

MS. ALTERMAN: Q. Did you ever ask Plaintiff's



Page 74

Counsel if you had the ability to change or make a supplemental addendum to your report?

MR. AMRHEIN: Objection. And I -- anything -- any questions about what you would converse with Plaintiff's Counsel about strategy regarding, you know, any document preparation or review or any discussion we would have about anything that would involve this matter in preparation for your deposition, for trial, for anything is privileged information, so I would instruct you not to answer on the protection of privilege.

MS. ALTERMAN: I'll rephrase the question.

Q. Dr. Sperry, did you feel that, after reviewing the additional materials that were provided to you a few days ago, that it was necessary to change your report in any way?

MR. AMRHEIN: Objection.

THE WITNESS: Okay. Not to -- I didn't feel that I had been -- had the necessity to alter my opinions or change something substantively. But at the same time, now that I'm being asked very specific questions about what was and what wasn't said in a text that's 90 pages, I would feel much more comfortable in just knowing what it is that you're referring to so that I can make a, you know, a meaningful answer, really.

MS. ALTERMAN: Q. So if you could just answer



Page 75

the question that I'm asking you.

My question to you is, after reviewing the additional materials that you were provided a few days ago, did you feel that it was necessary to amend or supplement your report in any way.

MR. AMRHEIN:  Objection?

MS. ALTERMAN:  Q.   It's a yes-or-no question.

MR. AMRHEIN:  Again --

THE WITNESS:  Yeah, no question is always yes or no.  But in general, I don't recall encountering anything in what I read that drew me up short.  But at the same time, I can't tell you that there was such a radical difference that, yeah, when questioned in detail, I would really want to explore the -- well, the terminology of everything that was mentioned, you know, on and on and on.

So that -- that really basically is about it.  It's not as simple as it sounds, at least not to me.

MS. ALTERMAN:  Okay.

Q.   When was the autopsy performed in New York?

A.   Oh, the autopsy?  That was April 13th of 2019.

Q.   When was the second autopsy performed in Russia?

A.   All right.  I'm sorry.  Sorry.  My right arm does not work very well.

Q.   Are you reading through your report or something



else?

A.   No.   I'm looking at the -- the document, the translation that was furnished that was English -- the document itself -- I mean, the translation of that. And --

MR. AMRHEIN:  Dr. Sperry, if I may, I know Cheryl put this on the record earlier, but if you can just simply respond to her question.  And any materials that weren't already in front of you or verified as it's on the screen and you're looking at it as well, you know, please leave those off to the side and simply answer her question.

THE WITNESS:  Oh, okay.

MR. AMRHEIN:  Cheryl, please add to that if you'd like.  I just tried to capture what you put on the record earlier.

MS. ALTERMAN:  Oh, thank you.  I was going to give him the same instruction.

MR. AMRHEIN:  Yeah.

THE WITNESS:  Yeah.

MS. ALTERMAN:  Q.   So Dr. Sperry, I think it's fair to say that you don't know offhand the date of the second autopsy that was performed in Russia; is that correct?

A.   Well, correct.   In fact, there was -- I was



looking at it earlier. There was really a date that was, I mean, several months different. So it -- there was definitely things that had to be completed in order to generate a completed report. And those were months apart. So in a sense, you know, in a good sense, the -- it's not, you know, a simple answer. Because there were a lot of different things that were done.

Yeah, in fact, here's the -- it says -- this is what I was looking for. This is page EL000871. It says this examination started on 8/5/2019 at 1500 hours. And the examination ended on 2/9/2019 -- should be the other way around -- at 1400 hours. So I mean, all in all, it comprised -- it took several months for the final document to be completed, actually.

Q. And do you know when Mr. Lagoda's body arrived in Russia?

A. Not without looking to see specifically when -- when that was, no.

Q. What document would indicate when Mr. Lagoda's body arrived in Russia?

A. Well, there may be something in -- and I don't know offhand. But it could definitely be something. I mean, because it said on -- for instance, this is    Page EL000848. Says on -- well, it would be 5/15/2019. A petition was sent on the need to provide the results of



Page 78

the initial study of the corpse.  And so on and so forth.  And then on 7/8/2019, then a resolution was submitted to satisfy the petition.

And then on 7/18/2019, a repeated petition was sent to -- for -- indicating the need to provide the results of the initial study.

So it was a fairly long process, really, in order to satisfy the bureaucratic necessities to even begin to do a second autopsy.

Q.  Okay.  So Dr. Sperry, I will just remind you that we all need to know what you're looking at when you're testifying.

A.  Sure.

Q.  So it's not helpful that you're reading from documents that all the attorneys in this case don't have in front of them.  So we can either do one of two things, you can put everything aside except for your report.  And then if you need refer to something, we can pull it up on the screen.  But that's the only way that this is going to be a fair process here to make sure we're all on the same page.

A.  Oh, okay.  Well, you know, I -- I have -- I must assume that everything that I have in front of me has been supplied to and given to everyone on, you know, your side of the fence.  So I mean -- and if that's an



Page 79

error on my part, well, then I definitely need to know that. But that's -- at least I have to start somewhere. But I'd be happy to -- I mean, I can preface anything you want, just, you know, with a date and all of that sort of stuff. So --

Q. That's fine. However, this is -- as you, I'm sure, are aware, since you've been deposed 808 times, a deposition is a question and answer. It's not an opportunity to search through however many documents that you've been provided during your review of this case and answer the questions that way.

If you need to look at a document to refresh your recollection, then you can state that you need to do that. But we're not going to have you sift through whatever documents that you have in front of you which haven't even been identified to Defense Counsel. So that's something that we're not going to do during the course of this deposition. Okay?

A. Oh, okay. No, well, all I could do is, you know, answer the questions that are, you know, posed to me. And if I need to elaborate further to give you some background as far as dates and times, I definitely will do so. But it's -- you know, I -- I typically don't give just yes-or-no answers to questions.

But having said that, I appreciate your, you



Page 80

know, well, your counseling, really, so that I can make sure that I can give you what you need.  So...

Q.  Okay.  Thank you.  So I know you just went through some dates with respect to when Mr. Lagoda's body arrived back in Russia.

Do you know relative to when the second autopsy was first started on August 5th, 2019, when his body arrived in Russia?

A.  No, not without looking -- you know, looking specifically for -- you know, to an answer to that question, no.

Q.  Okay.  And do you know of a specific document that would indicate when Mr. Lagoda's body arrived in Russia?

A.  There may be.  Again, I say maybe.  But just the -- the habitual nature of the policies and procedures that are concluded and documented by the different members of the Russian Commission on Forensic Sciences, I would expect those -- that information to be there.  It would just take a little bit of looking. Because that's -- they are nothing if not meticulous.

Q.  You're referring to Russians?

A.  Russians, yes.  With respect to my experience in forensic sciences, yes.

Q.  Is there anything that's in your report that



Page 81

references when either the second autopsy was performed or when Mr. Lagoda's body returned to Russia?

MR. AMRHEIN: Objection.

THE WITNESS: Well, I mentioned the dates that I concluded with or that he -- that -- there's so much -- and that, at least, is the -- you know, those dates -- again, Page EL000871 delineates the start of the examination and then the end of the examination, which in and of itself is -- I think, if I do my dates right, it's four months.

So that would be -- I mean, that's -- that's the best answer that I can give as far as when -- when it was received -- when the body was received and when the autopsy -- the second autopsy was commenced and then terminated.

MS. ALTERMAN: Okay.

Q. So my question to you, Dr. Sperry, was, in your report, you indicate when the second autopsy was performed and when Mr. Lagoda's body was returned back to Russia.

MR. AMRHEIN: Objection.

THE WITNESS: Okay, ask me a question. I'm sorry.

MS. ALTERMAN: Yes. Could the reporter read back the question, please.



Page 82

(Reporter read back.)

MS. ALTERMAN:  And I don't know if I misspoke, but let me rephrase the question.

Q.  In your report, do you indicate when a second autopsy was performed and when Mr. Lagoda's body was returned to Russia?

A.  No, not in my report do I indicate those -- those specific dates, whether it was when the body was returned and received or when the second autopsy was commenced.  So that's -- you know, that's the only information read to you that at least I've found just through a cursory examination that gives me those dates.

Q.  In your report, do you indicate how much time passed between the time of death and when the second autopsy was performed?

A.  I'm sorry, how much time passed and --

Q.  Between --

A.  -- what?

Q.  -- Mr. Lagoda's time of death and when the second autopsy was performed.

A.  No.  No, I did not make any specific determination as far as that interval.

Q.  Do you comment at all in your report as to the body's composition or how much the body had decomposed between the time of death and the time of the second



autopsy report?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yeah, no.  I'm just looking here briefly at the last part.  No, I did not make any specific determination or delineation as far as the -- you know, those -- those particular --

MS. ALTERMAN:  Q.  Dr. Sperry, would you agree with me that when an autopsy is performed, the body is dissected?

A.  Oh, yes.

Q.  Would you agree with me that when an autopsy is performed, that the medical examiner who's performing the autopsy has to remove organs and certain body parts in order to perform their examination?

MR. AMRHEIN:  Objection.

THE WITNESS:  In general, that's not -- that's not something that, you know, is uniformly sort of a "yes" or a "no" situation.  I mean, such -- such -- dissections can occur.  Sometimes they may not.  It's tremendously variable and up to the discretion and judgment of the pathologist doing the medical examination.

MS. ALTERMAN:  Q.  Would you agree with me, in the terms of Mr. Lagoda's autopsy that was performed in New York, that dissection did occur?



Page 84

A. Oh, yes.

Q. Can you detail for me the amount of dissection that occurred during that examination that was performed in New York.

A. Well, there was a lot. Much of what was documented was really a repetition of other or previous dissections that had been undertaken on Mr. Lagoda's body that were then just documented or redocumented during the course of that examination. The second autopsy examination. And certain things, such as the -- well, the fractures. The ribs, for instance. Those were --

Q. Dr. Sperry, I'm just going to stop you there, because --

A. Oh, okay.

Q. -- I don't think you're answering the question that I asked you. My question was specifically about the autopsy performed in New York, nothing to do with the second autopsy. So if you could --

A. Oh, okay.

Q. -- just limit your answer to the first autopsy performed by Dr. Milewski. Okay?

A. Oh, okay. Well, you didn't say that.

MR. AMRHEIN: Just for the record, I just want to object in this sense. I think Mr. -- excuse me,



Dr. Sperry's answer was interrupted and then he should have the opportunity to be able to finish that specific answer.

However, with the understanding moving forward, please try and limit your answer to the question that is addressed to you.

But I do feel that his answer was cut off there, so he didn't have the opportunity to express what he wanted to express, while noting Counsel's instructions on the record.

MS. ALTERMAN:   Q.   So Dr. Sperry, my question --

A.   Okay.

Q.   -- to you now is limited to the first autopsy performed by Dr. Milewski.   Okay?

A.   All right.

Q.   Okay.   So with respect to that first autopsy that was performed by Dr. Milewski, would you agree with me that Mr. Lagoda's body was dissected?

A.   Yes.

Q.   Can you describe for me specifically what parts of Mr. Lagoda's body was dissected during that first autopsy performed by Dr. Milewski?

A.   Yes.

Q.   What are those?



Page 86

A.   Okay.   Well, extensive dissection was undertaken of the front and the back of the chest and abdomen, the upper extremities, the lower extremities, and the deep soft tissues down to and including exposure of the bones and the back of the neck, the front part of the neck. So those were -- those were dissected and, you know, in detail.

And which are things that are -- dissection techniques that are, I would say, reserved in -- to be more extensive.  And that, you know, as a consequence, it was incomplete, if you will -- excuse me, my wife is at the door.  It was much more complete than would be usual in the majority of autopsies, except in situations where a death during custody was -- occurred.  An in- -- an in-custody death, in which case more extensive dissection is much more routine.

Q.   So I'm not sure if your answer got interrupted. But I just want to clarify part of your response.

Is it your testimony that the dissection performed by Dr. Milewski here in New York during the first autopsy was appropriate?

A.   Yes.

Q.   And did you feel that the dissection that was performed by Dr. Milewski here in New York was complete?

A.   Yes.



Q.   Would you agree with me, Dr. Sperry, that during an autopsy, when dissection occurs, the chemistry of the body is disturbed?

MR. AMRHEIN:   Objection.

THE WITNESS:   Well, yeah, that's an amazingly broad -- broad question.  The things -- well, things are disturbed in the sense that they're not -- you know, it -- it does not culminate in the way that everything started.  So, you know, there are definite differences.

MS. ALTERMAN:   Q.   And once the autopsy by Dr. Milewski was completed, were all of the parts of the body that were dissected returned to the body or were some parts kept for specimen or for other analysis?

MR. AMRHEIN:   Objection.

THE WITNESS:   I would have to look again at what was kept and what was not.  Offhand, I don't recall the specifics of what -- you know, what was undertaken, what was removed, and what was kept.

MS. ALTERMAN:   We can mark for identification as Sperry 3 the autopsy report that was prepared here in New York by Dr. Milewski.

(Exhibit 3 was marked for identification.)

MS. ALTERMAN:   And if you have that in front of you, you can take a look at that now, Dr. Sperry.  But we'll also put it up on the screen.  Okay.  So, for the



Page 88

record --

THE WITNESS:  Yeah.

MS. ALTERMAN:  -- we're going to show you what's on the screen is a 66-page document.  And it's the report, including the photographs that were generated in connection with the autopsy performed in New York by Dr. Milewski.

THE WITNESS:  Okay.

MS. ALTERMAN:  Q.  And Dr. Sperry, I can't tell if you're looking at the screen or looking at something else, but would you just be able to describe for us so we're all on the same page here if the report that you have in front of you is the same as what's on the screen.

A.  Okay.  I mean, I'm looking at the narrative and along with the translation.  All that's written from one page to the next.  And that's what I'm looking at.

Q.  Okay.  Well, there shouldn't be any translation, 'cause we're just on the New York one right now.

A.  We're just on what?  I'm sorry?

Q.  We're just on the first autopsy performed here in New York.  So there shouldn't be any translation involved.

A.  Oh, okay.  Well --

MR. AMRHEIN:  Dr. Sperry, please just look at



the screen.

THE WITNESS:  Okay.

MR. AMRHEIN:  The document that's on the screen.

THE WITNESS:  Okay.

MS. ALTERMAN:  I don't know whose phone is ringing, but --

THE WITNESS:  It's our house phone.

MS. ALTERMAN:  Oh, okay.  I didn't know if somebody needed to take that call.

THE WITNESS:  It's all right.  I think they -- yeah, they just hung up.

MS. ALTERMAN:  Q.  Okay.  Dr. Sperry, so if you could just take a look at the document we have up on the screen, that way we're all on the same page here. Because I know you were referring to some translation before.  And we're not up to any documents that have been translated from Russian to English.

A.  Okay.

Q.  Okay.  With respect to the autopsy performed by Dr. Milewski, do any of the records indicate whether there were any parts of Mr. Lagoda's body that were not returned after dissection occurred?

A.  I don't recall that they indicate whether they were or not returned.

Q.  Okay.  Well, is there any specific page in the



Page 90

report that would help refresh your recollection?

A.    Well, I don't -- I don't know.  I don't know.
This is -- this particular letter is from Nicholas
Viorst, I can't read that very well.  The deputy chief
of the Special Investigations & Prosecutions unit of --
what was followed up, though, and ultimately provided, I
can't --

Q.    Do you --

A.    -- tell you.  I can't tell you.

Q.    So this is a 60-page document.  I don't know if
you were looking before.  But we scrolled through the
document.  And we can scroll through it again, if
there's a page that you believe would help refresh your
recollection as to answering the questions posed to you.

A.    Well, I don't know whether I can answer that
question, you know, as you have posed it, as this has
been posed, or not.

Q.    Okay.  So why don't we scroll through the
document again now that you're looking at the screen and
you can have an opportunity to review the documents that
were provided to us from the Office of the Chief Medical
Examiner from the City of New York.

A.    Hold on just a second, please.  Go back up a
page.  And stop, please.  All right.  Thank you.  You
can keep going, if you don't mind.  Yeah, I don't see,



MAGNA
LEGAL SERVICES

just quickly going through this, anything specifically that tells me what or was not provided or retained, I should say, by the OCME of New York City versus what's kept.

Q.   Okay.   So is it fair to say, Dr. Sperry, that you would not know the composition of Dr. -- of Mr. Lagoda's body when it arrived in Russia?

MR. AMRHEIN:   Objection.

THE WITNESS:   Other than reading the details line by line of what was described in there, in the -- that would be the only way that I could tell.   And even then it might not necessarily be completely accurate either.

MS. ALTERMAN:   Q.   Now, during the autopsy that was performed, was there a toxicology analysis?

A.   Yes.

Q.   What were the results of the toxicology analysis?

A.   I believe they found caffeine, as I recall. Nothing -- no illicit drugs.   No illicit drugs.   Nothing other than things that have a mild therapeutic effect, that were completely legal.   But nothing illegal.

Q.   Now, based upon your experience working for the State of Georgia as a chief medical examiner, would you agree with me that substances can take anywhere from



hours to weeks to metabolize and leave the body and have different retention times in different parts of the body?

MR. AMRHEIN:  Objection.

THE WITNESS:  This is an awfully broad question. And I mean, it's -- the source of things -- that's how initial discussions, anyway, are initiated.  But that's really about it.

MS. ALTERMAN:  Q.  Do you have any understanding of Mr. Lagoda's alcohol use prior to his death?

A.  No.

Q.  Do you know whether or not Mr. Lagoda ever used illegal substances prior to his death?

A.  No.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.  No, you don't know, or no, he didn't?

A.  Oh, no, I don't have independent knowledge of what, if any, alcohol intake he had prior to his death.

Q.  When was the last time Mr. Lagoda consumed alcohol prior to his death?

A.  I don't know when the last time was.  Once it had been metabolized, then that's -- you know, it's gone.  And he did have what would otherwise be


MAGNA
LEGAL SERVICES

characterized as nonalcoholic fatty liver disease, which can be related to alcohol consumption.  And it's metabolization.

Or if it's really close in time between the consumption and its appearance at the autopsy, then there are discoveries that could be made.  But beyond that, there is nothing that I could see that delineated exactly when, or even if, alcohol was consumed outside of the question of nonalcoholic fatty liver disease, which is something else entirely.

Q.   Okay.  Did Mr. Lagoda consume alcohol in the airport in the hours prior to his death?

A.   I don't remember that he did or not.  If he did, it was enough -- enough time had passed that it was metabolized.  But beyond that, well, if indeed metabolization, complete metabolization had been undertaken, up to and including vitreous fluid metabolization, then there's not a way to know whether this was alcohol related to consumption or whether it was nonalcoholic fatty liver disease.

Q.   Are you able to rule out with any certainty whether the fatty liver disease that you have identified was related to alcohol consumption?

MR. AMRHEIN:  Objection.

THE WITNESS:  No, not with any degree of medical



certainty, no.

MS. ALTERMAN:  Q.  So it's equally probable that Mr. Lagoda's fatty liver disease was caused by alcohol abuse or consumption prior to his death, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  No, I would not say that it's, you know, equally probable.  There's many more people, especially obese adult males, who have nonalcoholic fatty liver disease, who do not drink alcohol-containing beverages, but yet have this condition.

So it's really erroneous to arrive at a conclusion that the nonalcoholic fatty liver disease really or more probably than not is related to alcohol consumption.  It's just that we can't tell it.

MS. ALTERMAN:  Q.  So what we can agree on, Dr. Sperry, is that there's no way for you to conclude with any reasonable degree of medical certainty that the fatty liver disease was caused or was not caused by alcohol consumption.

MR. AMRHEIN:  Objection.

THE WITNESS:  That's true, but -- yes, that's true.  Because there's not a way to -- to prove it or disprove it.

MS. ALTERMAN:  Q.  How many times per week did



Mr. Lagoda consume alcohol prior to his death?

A.    I don't know.

Q.    How many alcoholic beverages did Mr. Lagoda consume in the year prior to his death?

A.    Oh, again, I don't have any knowledge of that.

Q.    Is there anything in the toxicology analysis that would indicate the level of Mr. Lagoda's alcohol consumption prior to his death?

A.    No.

Q.    I'd like you to -- we're going to go back to your report, which we've marked as Sperry 2 for identification.  And I'll direct you to Page 8.  And we're also going to pull it up on the screen.

A.    Okay.  I'm sorry for that.  You want Page 8, you said?

Q.    Yes, please.  And if it's easier, you can look on the screen, Dr. Sperry.  Because we're going to pull it up for everyone to see.

A.    Okay.

Q.    So in the last paragraph on Page 8 of your report, you go through the examination of Mr. Lagoda's brain.

Do you see that?

A.    Yes.

Q.    In the last sentence of that paragraph, you note



that there was a growth of scar cells in the brain.

Do you see that?

A.   Yes.

Q.   Okay.   The mention of those scar cells, would you agree that that has nothing to do with the incident involving the Port Authority Police?

MR. AMRHEIN:   Objection.

THE WITNESS:   Oh, you mean the -- the appearance -- you mean the location and appearance, things -- things like that?   Is that what you're asking?

MS. ALTERMAN:   Q.   Correct.

A.   Yeah, correct.   That is a condition that is separate and beyond anything having to do with the Port Authority Police.

Q.   Okay.   And you would agree with me, Dr. Sperry, that this condition that you've noted in the last paragraph on Page 8 of your report was pre-existing and something that Mr. Lagoda had been living with prior to him arriving in New York on April 12th, 2019, correct?

A.   Yes.

MR. AMRHEIN:   Objection.

MS. ALTERMAN:   Q.   What is the significance of the scar cells in the brain that you've noted in this paragraph?

A.   Well, it provided an anatomic distinction that


MAGNA
LEGAL SERVICES

denotes the -- not only the presence of this condition, but the relevance. That is, that it -- in and of itself, it may be the source of the seizure disorder that was -- that ultimately -- well, ultimately the problem that initiated the cause of death.

Q. And this seizure disorder that you just referred to, Mr. Lagoda had been living with this seizure disorder for how long prior to his death?

A. Years.

MR. AMRHEIN: Objection.

THE WITNESS: I'm sorry. Years.

MS. ALTERMAN: Q. How do you know that?

A. Because that's the way that it evolves and develops. It takes a long time to -- to manifest itself. And sometimes it can go on and really progress but yet not cause any source of medical problems. Other times it will. But that's the nature of this particular disorder, is that it is a -- you know, a birth defect, really, that involves specific parts on the brain itself.

Q. And Dr. Sperry, you had an opportunity to review the medical records that were translated from Russian to English concerning Mr. Lagoda, correct?

A. Yes.

Q. Okay. Did any of those medical records that you



Page 98

reviewed mention the growth of scar cell in his brain or any abnormal locations of brain neurons?

A. No.

MR. AMRHEIN: Objection.

MS. ALTERMAN: Q. Are you aware that Mr. Lagoda had physical examinations in order to clear him for his sea voyages each time he worked on a tanker ship?

A. Yes.

Q. And those physical examinations were in order to determine if he was physically well and capable of performing the duties and for being out to sea for extended periods of time, correct?

A. Yes.

Q. In all of the fitness for duty evaluations that were performed for his employment working on a tanker ship, did any of those physicians in Russia describe that Mr. Lagoda had this abnormal brain condition with -- which ultimately could lead to a seizure disorder?

MR. AMRHEIN: Objection.

THE WITNESS: No.

MS. ALTERMAN: Q. To your knowledge, was Mr. Lagoda taking any medication for the seizure disorder prior to his death?



MR. AMRHEIN:  Objection.

THE WITNESS:  Not that I'm aware of.

MS. ALTERMAN:  Q.  Would you agree with me, Dr. Sperry, that Mr. Lagoda's seizure was the leading cause of death on April 12th, 2019?

MR. AMRHEIN:  Objection.

THE WITNESS:  Okay.  I mean, I understand what you're saying.  But for -- for the seizure disorder, he should not have died of what he died of.

MS. ALTERMAN:  Q.  Correct, that's the question.

A.  Oh, good.

Q.  What is your response?

A.  Oh, I thought I answered it.  But for the seizure disorder, he should not have died of what he died of.

Q.  Thank you.  Now, on Page 9, the very top of Page 9 of your report in the first -- the first full sentence on that page, you write there was no evidence of any skull fractures found in the autopsy, correct?

A.  Yes.

Q.  Why is that significant, Dr. Sperry?

A.  It's an observation.  I mean, it's something that potentially might be seen in an individual who had a seizure disorder based upon the presence of a mesial



temporal sclerosis. And it just so happens that there was not. So it's, again, an anatomic observation.

Q. And that anatomic observation that you made, you would also agree that there were no skull fractures as a result of Mr. Lagoda's interaction with the Port Authority Police, correct?

MR. AMRHEIN: Objection.

THE WITNESS: Yes.

MS. ALTERMAN: And then you go on, on the same page in the next paragraph to state that the overall appearance of the microscopic brain findings is suggestive of MTS.

Q. Do you see that?

A. See that -- oh, Page 9. No, not yet.

Q. Okay. So we're on Page 9, the first full paragraph, the first sentence.

A. Okay. Oh, you're talking also -- known also as the temporal lobe epilepsy, TLE, which is the most common of the focal epilepsies?

Q. Yes.

A. Yes. Okay, I see it.

Q. Okay. And then you go on to say that Mr. Lagoda had no known history of epilepsy or seizures of any type.

Do you see that?



A.   Yes.

Q.   Are you only basing that on the medical records that you reviewed from Russia?

A.   Well, yes, there's -- that's the only thing that I'm aware of that has -- or incorporates the ability to make such a conclusion.  So that's all that one can say.

Q.   Were there any inquiries made of Mr. Lagoda's family members to establish whether or not he had, in fact, had seizures in his lifetime?

MR. AMRHEIN:  Objection.

THE WITNESS:  I recall that there were.  And that it wasn't -- what I saw, anyway, was not extensive, but that there were some inquiries.

MS. ALTERMAN:  Q.   Who were the inquiries made of?

A.   As far as I know, of -- they were made of family members.

Q.   Which family members?

A.   Well, I think the individual who, as I recall, anyway, was designated as the spokesperson for the family.

Q.   Who is that person?

A.   Well, you're going to get tricky.  Is it over here?  It would be Alexey Tarasov.  Yeah, but G. Tikhoplav.  Yeah, one of those two individuals.


MAGNA
LEGAL SERVICES

Page 102

Q.   And what did either of those individuals state about whether or not Mr. Lagoda had experienced seizures before April 20th 2019?

A.   As I recall, that there -- they had no knowledge that this was a problem that Mr. Lagoda had developed or had presented with.

Q.   Did you review any records from Mr. Lagoda's primary care physician?

A.   No, not -- not that I recall, anyway.

Q.   Would you agree with me that Mr. Lagoda had untreated mesial temporal scoliosis?

A.   Yes, please.

MR. AMRHEIN:  Objection.

THE WITNESS:  Sclerosis, yes.  As far as I'm aware, he had untreated mesial temporal sclerosis in the sense that it had not yet been identified or discovered, thus was not -- was not treated.

Q.   What type of treatment is necessary once MTS is discovered?

A.   Sedation, primarily.  And utilizing medications that increase the seizure threshold and make it more difficult for the person to develop seizures in relationship to the MTS.  That's the primary -- or at least that's the way that MTS, at least, is initially treated.


MAGNA
LEGAL SERVICES

Q.   And the first thing that you mentioned, Dr. Sperry, is sedation.

That would be performed in a hospital setting, correct?

A.   Possibly.  I mean, it depends on how the person presented and what problems that they had.  And so, you know, development -- well, first of all, you have to identify the problem and put a name to it.  And then second of all, you have to really treat it or try to make it more difficult physiologically to develop the MTS as being a -- a true medical problem.

So it could be treated in the hospital.  It could be not treated.  There's different ways to go about it depending on the nature and extent of the problem as it presents.

Q.   Would you agree with me, Dr. Sperry, that only a trained medical professional would be able to diagnose MTS?

A.   Well, yeah, I mean, I think that that is fair.  Because it's a difficult medical complication that really needs someone with experience in treating the complication.  So it's not something that I would say, you know, a nurse practitioner would typically be caused -- would typically be called to treat, much less diagnose.



Page 104

Q. And you also certainly would not expect a police officer to be able to diagnose MTS, correct?

MR. AMRHEIN: Objection.

THE WITNESS: That's fair, unless the police officer happened to have some familiarity with the medical condition. But still, their qualifications would not be adequate enough or sufficient enough to rely upon their diagnosis and treatment.

MS. ALTERMAN: Q. Now, in the last sentence of that same paragraph that we've been discussing, you wrote that you agree with the opinion held by the NYC OCME,

"That the presence of anatomically proven MTS is to a reasonable degree of medical certainty the anatomic cause of the seizure he experienced in the airplane at at this JFK IA."

Do you see that?

A. Yes.

Q. Do you stand by that opinion, sir?

A. Yes.

Q. And do you agree with a reasonable degree of medical certainty that that seizure disorder was the leading cause of Mr. Lagoda's death on April 12th, 2019?

MR. AMRHEIN: Objection.



THE WITNESS:  All right.  Well, the presence of the seizure disorder and the presence of the MTS set the stage for the ultimate abnormality that is the seizures and then ultimately his death.

And again, but for the presence of the seizure disorder, I would not expect that Mr. Lagoda would have had the problem of the MTS to start with.

MS. ALTERMAN:  Q.  You also note in that same paragraph, Dr. Sperry, that,

"There's no evidence that he," being

Mr. Lagoda, "experienced any preseizure aura

or other abnormality that would possibly

herald an impending seizure and that he did

not have any drugs, medications, or alcohol

in his blood that might have lowered his

seizure threshold."

Do you see that?

A.  Yes.

Q.  Okay.  What are you basing that information on?

A.  That there are no other complicating factors that alone or in combination would have independently explained why he developed a preseizure aura or other complication that's known to be associated with a seizure disorder, and specifically with MTS.

So that's the only thing -- that is, the MTS is



the only thing that's left over, if you will.  And its presence is an adequate explanation for the severe outcome.  The lethal outcome.

Q.  What is a preseizure aura?

A.  The manifestation on the part of the person who has the seizure disorder that there is something wrong. There's a wide array of different issues, different problems that people develop.  But they're difficulties. They're problems that -- let me see.  The mouse -- mouth is dry.  Thanks.

No, they're problems that are a warning, if you will, that something is about to happen, but it's unclear as far as what it is.  You know, with the passage of time, repetition of such abnormalities then can be reliably determined to be problems that herald the gradual onset of medial temporal sclerosis.  But initially it can be very confusing.  Excuse me.

Q.  How do you know that there were no warning signs that Mr. Lagoda knew this was about to happen?

A.  Well, the only way to really know is -- is that is Mr. Lagoda's complaints that there is something wrong.  I would not expect for Mr. Lagoda to understand or comprehend what was happening to him.  So it's, you know, more often than not, that is, you know, a problem that people just don't appreciate until they are having



Page 107

a seizure itself.

But the ability to hide it is really, really, really difficult. And like I said, even initially they -- people just don't know that they -- they have it, really.

Q. We can agree, Dr. Sperry, that there's no evidence one way or the other indicating that Mr. Lagoda knew or didn't know that he had a seizure disorder, correct?

A. Yes.

MR. AMRHEIN: Objection.

MS. ALTERMAN: Okay.

Q. Now, in terms of treating a seizure disorder, would you agree with me, based on your years of experience as the chief medical examiner for the State of Georgia, that medical professionals are trained in a hospital setting with respect to how to handle patients experiencing a seizure?

A. Well, broadly speaking, but I don't and never have, really, treated patients with seizure disorders, nor -- excuse me. Nor have I, you know, kept up with the ways -- the different manifestations, or the way that seizures are treated and responses and things like that. So that's really beyond my expertise as far as what sort of treatment would be initiated.



Page 108

Q. Okay. And to clarify that testimony, is it your position that the training of medical staff pertaining to seizures and the handling of patients or the patient care for seizures is outside of your expertise?

MR. AMRHEIN: Objection.

THE WITNESS: Broadly speaking, yes. I mean, I have opinions. And, you know, those opinions are based on information that I have accumulated and derived over the course of years.

But if it were, say, me being treated or, you know, a seizure disorder of some sort, I would want someone with more experience and more up-to-date information than just me.

MS. ALTERMAN: Q. So you don't know the latest protocols with respect to treating patients experiencing seizures, correct?

A. Correct.

MR. AMRHEIN: Objection.

MS. ALTERMAN: Q. Do you know how long Mr. Lagoda was allegedly in a postictal state of confusion?

MR. AMRHEIN: Objection.

THE WITNESS: I don't think actively how long that he was. Retrospectively, I recall reading that it was thought that he may -- it may have been a 10- to



20-minute period of time.  But even that is not really clear as far as nailing down time frames, just because it was unclear -- unclear to start with that he was having a seizure.

And then his behaviors and abnormal actions were really reflecting the care -- or reflecting, you know, the care that he should have received or should have obtained versus, you know, care for something else.

You know, I don't think that his -- I don't -- that he was identified as having a seizure disorder was something that was clearly initially problematic.

Q.  Was there confusion, Dr. Sperry, initially as to whether or not Mr. Lagoda did have a seizure onboard the aircraft?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, my recall -- my recollection is that it was, you know, still very unclear.  And there were -- you know, it happened -- things were happening very fast.  But there were differing opinions, differing perspectives as to what exactly was going on with Mr. Lagoda and how he was responding to the treatment or responding -- responding to the medical problems that he was presenting -- he was causing (verbatim).

So I -- I wouldn't say that that was, you know, really common, nor actually, recognized very well.



Page 110

MS. ALTERMAN:  Q.   When you say it wasn't common or recognized very well, who was in a position to recognize that Mr. Lagoda was experiencing a seizure?

A.   Well, I would hope that it would be the people that were directly interacting with him.  But that certainly -- especially in a cramped physical area, that is not always the case, by any means.  And, you know, it's very easy to misunderstand exactly what the problem consisted of and then treat it improperly.

So it stuck.  The whole problem started off as being confusing and pretty much stayed that way until the time when certainly Mr. Lagoda was, well, unresponsive and lost a heartbeat.  Then things changed very, very rapidly.

Q.   Dr. Sperry, in your opinion, would you agree that because the officers were interacting with Mr. Lagoda in such a confined space in the back alley of an aircraft, that there was uncertainty that Mr. Lagoda had experienced a seizure once they responded to the airplane?

MR. AMRHEIN:  Objection.

THE WITNESS:  And generally, I mean, I think that's fair.  But I can't read their minds at all.  But some confusion, some relative confusion as far as what the cause was is quite real.  I mean, even unto -- up



Page 111

and till the inclusion of drugs or alcohol, those questions were, you know, very real and very realistic and were not erroneously posed, by any means.

So the conclusion that he did or did not clearly have postictal issues related to drugs or alcohol consumption just never really was satisfied until he deteriorated badly.

MS. ALTERMAN:  Q.  And would you also agree, Dr. Sperry, that based upon this confusion that you have identified, that Mr. Lagoda's actions -- violent actions would have exacerbated any level of confusion?

MR. AMRHEIN:  Objection.

THE WITNESS:  Oh, you ended -- you ended your question?

MS. ALTERMAN:  Yes.

THE WITNESS:  I -- I -- I don't have a problem with Mr. Lagoda's response to the -- you know, what he perceived as being threats or confusion.  I mean, it was -- it was unclear as to what exactly was going on and what his problems were.

But he was, you know, fighting.  And the officers had to respond.

MS. ALTERMAN:  Q.  So you would agree, based upon your review of the materials in this case, that Mr. Lagoda's actions were violent, correct.



Page 112

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, certainly at times -- at times they were violent, based upon the statements given by different individuals.

MS. ALTERMAN:  Q.   Now, based upon your medical training, have you ever seen such a violent postictal reaction to a seizure before?

A.   I have.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.   How many times?

A.   Oh, I don't know.

Q.   Was this back in medical school or during your residency or some other time?

A.   No.  I was just thinking.  It's during -- really, during my -- my residency and -- yeah, it's primarily my residency and also my time in the public health service that I, you know, saw with my own eyes and treated individuals who were -- I don't want to say victims -- who had problems with a violent response to serious medical problems.

And, you know, I can tell you, though -- just trying to think if I'm pausing a little bit.  I don't recall that I had the knowledge at those times that the medical problems that they were manifesting were actually related to the seizure issues that they had.  I



Page 113

mean, I, along with paramedics and law enforcement, entered into the situation of treating people with the knowledge that they had medical problems that were initiated and perpetuated by seizures.

Q. So even as a medical doctor who had gone through medical school, residency, years of training, there were times that you yourself were unable to recognize that a patient's problems were related to their seizures; is that fair to say?

MR. AMRHEIN: Objection.

THE WITNESS: Not entirely. I think it's more that having the knowledge that an individual was developing problems related to his seizures -- and I say him, you know, most of them were male. A few female -- but related to his seizures would almost inevitably cause me to stay towards the back and let the guys with the big muscles really overtake him, whereas I filled the backup position, coming in to give medications, drugs, things like that to try to calm the person down.

So I knew that there was a problem that was definitely related to drugs and/or alcohol.

MS. ALTERMAN: Q. So my question is not related to substance abuse. My question is related to seizure disorders.

With respect to seizure disorders, would you


MAGNA
LEGAL SERVICES

Page 114

agree, Dr. Sperry, that there are times, even with your medical training and expertise, that it was unclear that a patient's behavior was causally related to their seizure disorder?

MR. AMRHEIN:  Objection.

THE WITNESS:  There were times, but not very many.  Really, I mean, we -- we knew who the patients were and what their problems were.  And so when someone decompensated and started developing mental problems in relationship to seizures, I and other -- other law enforcement officers and paramedics, we knew what we were getting into.  And we responded to someone like this.

MS. ALTERMAN:  Q.  And you knew partly, Dr. Sperry, because as a medical doctor, there is a doctor-patient relationship and you had the benefit or -- of reviewing the patient's medical file, so you had an understanding of any medical history and conditions that they had -- may have been experiencing as you were treating them, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  To varying degrees.  Oh, I'm sorry.  Yeah, to varying degrees.  Sometimes a lot.  Sometimes virtually nothing.  So it -- it varied.  But I would say that it was vanishingly rare that I or the



Page 115

other professionals just had no idea as far as what was going on.

MS. ALTERMAN: Q.  So we can say, Dr. Sperry, that you did have a general understanding of a patient's medical history background when treating them for a seizure disorder, correct?

A.  Sometimes.

MR. AMRHEIN:  Objection.

THE WITNESS:  Yeah, I wouldn't say that, you know, universally that it really changed, you know, a lot, it changed very radically.  But to -- and I'm just trying to think.  I don't recall ever even coming into a situation blindly and not really know what the problem was or the basis of the problems that culminated in why we're being called.

MS. ALTERMAN:  Q.  And you would also agree, Dr. Sperry, that in your words, sometimes it was necessary to take a step back and let the guys with the big muscles handle a situation because there were times when patients who were experiencing a seizure needed to be sedated and controlled in order to manage their violent outburst, correct.

MR. AMRHEIN:  Objection.

THE WITNESS:  That's not unreasonable.  You know, if we can get to that point, then we certainly --



we certainly would. And definitely take advantage of the people we had around us whose job it was to physically stop someone and prevent them from hurting innocent people like me.

MS. ALTERMAN: Q. Dr. Sperry, were there trained medical staff, whether it be in hospitals or in other facilities, who have the training with respect to controlling patients who are exhibiting violent outburst related to their seizure disorders?

MR. AMRHEIN: Objection.

THE WITNESS: As a general rule of thumb, no. No.

MS. ALTERMAN: Q. In your experience, have you worked with individuals, either during your residency or through other training avenues, who have experience in managing patients' violent outbursts in connection with their seizure disorder?

MR. AMRHEIN: Objection.

THE WITNESS: Again, in general, no. Only because it's -- would be very unusual for a stranger -- I mean, for us as emergency personnel to encounter someone that we just had no idea whatsoever. You know, those were -- those were questions and issues that were very, very difficult and very different. For the most part -- for the most part, no. It just -- it was not a



problem.  We just had to be extra prepared, if you would.

MS. ALTERMAN:  Q.  So who was responsible in a hospital setting for restraining a patient once they exhibited violent tendencies due to a seizure disorder?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, whoever the -- either the on-call doctor was.  That is primarily who would take responsibility.  And some doctors were very reluctant, others were not.  It varied tremendously.

But we never -- I say we, that is, there were five of us.  And we have -- someone who was reluctant to undertake treatment and address the problems, then we certainly wouldn't make them at all.  And there were -- there were a couple of guys who never did treat medical problems and seizures and, you know, issues relating to severe mental illness.  And that's just it.  We left it up to their judgment.

MS. ALTERMAN:  Q.  Have you observed on-call doctors sedate patients who have seizure disorders?

A.  Yes.

Q.  And have you observed that many times in your career?

A.  Oh, I don't know.  I'm not sure how one would define -- define many.  It all has to do with response



and the ability to get through to a patient and let them -- let them understand and be -- and be sure that they were understanding what we were trying to get across. And we still -- still, it would be very difficult, just because no one, especially us, no one wants to be fooled at all. It's just -- it depends on the degree and extent and severity of the problem as it's manifest.

Q. Have you ever had to contact hospital security in order to help overtake a patient who was exhibiting violent tendencies due to a seizure disorder?

MR. AMRHEIN: Objection.

THE WITNESS: Rarely. And in those situations, it would inevitably be when someone -- someone who is suffering from delusions or hallucinations would appear at the hospital doors at the emergency room. And then, you know, protocol -- security-related protocol would have to be initiated.

Because the last thing anybody wanted, especially us, was to put other patients at direct risk. And that is, you know -- you just can't do that. So in changes like that, yes. But in situations where that wasn't the problem, you know, then we had to adapt.

MS. ALTERMAN: Q. And you mentioned that there are situations when you don't want to put patients at



direct risk.

And in those circumstances, Dr. Sperry, would patients who are exhibiting the violent tendencies need to be restrained?

MR. AMRHEIN:  Objection.

THE WITNESS:  Sometimes.  I mean, it really varied.  But it's better -- far better to be careful and not regret it than to make a very bad judgment and be really sorry.

MS. ALTERMAN:  Q.  And those patients that you're referring to who exhibited delusions and needed to be restrained, you would describe those patients as exhibiting psychotic behaviors; would you not?

A.  Sometimes --

MR. AMRHEIN:  Objection.

THE WITNESS:  Oh, I'm sorry.  I mean, sometimes. It varied tremendously.  And sometimes people wanted help.  I mean, the -- the -- every -- there was -- how can I explain it?  There was just a tremendous amount of variability.

I one night discovered that I could control a man's delusions that he had numbness in his arms and legs by using a tuning fork.  And I approached it with care but certainty.  And he was astonished, and so was I.  Now, I had security guys in the same room with me,



just kind of standing back.  But, you know, one does what one has to do.

And I wouldn't say I would recommend that to anyone.  But it's, you know, sometimes amazing things happen.  Other times, they want -- they don't happen at all.  So it's a process of constant experimentation.

MS. ALTERMAN:  Q.  As medical professionals, you're trained to protect the lives of the patient and the other members of staff in the hospital setting; is that true.

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.  Yeah, I think that's fair.

MS. ALTERMAN:  Q.  And in terms of the oath, the Hippocratic Oath that you take as medical doctors, would you agree with me that if a patient is causing harm to him- or herself or others, that that patient should be restrained or sedated.

MR. AMRHEIN:  Objection.

THE WITNESS:  That may have to be, you know, the ultimate outcome.  I mean, yes, that is in the armamentarium of things that need to be accomplished if necessary.

MS. ALTERMAN:  Q.  Now, in this case, Dr. Sperry, you noted on Page 10 of your report that Mr. Lagoda's confusion may have been psychotic.



Page 121

Do you see that?

A.  Yes.

Q.  And you agree with me, Dr. Sperry, that a psychotic response to having a seizure is not a typical response, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Oh, as far as being a response -- I mean, I -- you lost me just a little bit.

MS. ALTERMAN:  I'll rephrase the question.

Q.  The fact that you've identified Mr. Lagoda's response as one of being psychotic, would you agree that that is an atypical response to having a seizure?

MR. AMRHEIN:  Objection.

THE WITNESS:  Oh, okay.  Well, again, the sort of broadest terms that are -- are utilized -- I mean, there could be -- you know, it can be.  I guess I have to say it that way and include that as being within the differential as far as the behavior that someone who is actively psychotic can involve himself or herself in. So it's -- again, it's a broad perspective of what can occur.

MS. ALTERMAN:  Well, I'm not speaking broadly, Dr. Sperry.  I'm using your language.

Q.  In your report you indicated that Mr. Lagoda's confusion may have even been psychotic.  Those are the



words chosen by you when you prepared this report.

Do you see that?

A.  Yeah.

Q.  So you would agree with me that Mr. Lagoda's psychotic break was atypical, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yeah, I -- you're -- you're reading much more into it than what I was putting into that.  In fact, you just said that, you know, it may be that, you know, as a reaction to what, you know, what was going on, what his experiences were, things like that.  I mean, I'm including that as a differential, not as something that is far more likely or more probably than not or anything like that.

I mean, it's speaking to the family of delusions and psychoses rather than what's going to be there.  So I mean, you're giving much more relevance to it than I was.

MS. ALTERMAN:  Q.  In your opinion, Dr. Sperry, was Mr. Lagoda experiencing some degree of psychosis?

A.  Okay.  I think ultimately he probably was within -- within the realm of -- well, in conclusion, that this whole -- the whole scenario engendered.  But that, you know, taking into account the English barrier, English-Russian barrier and what appeared to be



Page 123

contusion -- excuse me -- confusion, that may not necessarily have been confusion. I mean, there's a whole lot of differentials that -- that are probable.

And I can't tell you who -- who was more correct than anyone else, other than, as I said, this is something that is never a never. You know, it -- it has to be considered.

Q. How many seizures result in a psychotic break?

A. I don't know that there is a number that can be assigned to something like that. Not -- not to my knowledge.

Q. Would you say that a small percentage of seizures would be described as psychotic?

MR. AMRHEIN: Objection.

THE WITNESS: well, in general -- in general, yes. But at the same time, it's -- one has to be very cautious about arriving at such conclusions. I'm -- I'd be very reluctant to reach a determination of that.

MS. ALTERMAN: Okay.

Q. You also just mentioned again about the language barrier. That's based on the same assumption, correct?

A. Yes.

MR. AMRHEIN: Objection.

MS. ALTERMAN: Q. Now, on this same page, Dr. Sperry, you note that Mr. Lagoda's blood pressure


MAGNA
LEGAL SERVICES

Page 124

levels were elevated.

A.  Yes.

Q.  What is a normal blood pressure for a 39-year-old male of Mr. Lagoda's size?

A.  Anything 135/90, anything above either one of those parameters is considered to be elevated.

Q.  Now, the fact that we saw elevated blood pressure in Mr. Lagoda, that was noted in his Russian medical records, correct?

A.  Yes.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.  And that's something that you noted in your report as being an abnormal figure that was untreated as well, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.

MS. ALTERMAN:  Q.  To your knowledge, was Mr. Lagoda taking any blood pressure medication prior to his death?

A.  I believe that he was.  My recollection is that he is taking some medications for his blood pressure.

Q.  What were those medications?

A.  I would have to look at their trade names that are Russian.  I mean, they're not translated well. So -- or translated, I'd say, adequately.



Page 125

Q.  Was there any indication made in your report that Mr. Lagoda was taking blood pressure medication prior to his death?

A.  I don't recall making such statements, no.

Q.  Would you agree that heart disease is a leading cause of death in men each year?

MR. AMRHEIN:  Objection.

THE WITNESS:  I'm just trying to think how to answer that.  That's a -- I mean, that's an odd question, in a sense.  But in general, hypertensive heart disease along with diabetic heart disease have more or less equal degrees of penetrance.  So it's something -- it's -- you know, it's a disease condition that is, you know, is seen, is not rare.

MS. ALTERMAN:  Okay.

Q.  Would you also agree, Dr. Sperry, that both smoking and excessive alcohol consumption are linked to high blood pressure?

A.  Yes.

Q.  Do you know whether or not Mr. Lagoda's alcohol consumption had any effect on his elevated blood pressure levels?

MR. AMRHEIN:  Objection.

THE WITNESS:  Okay.  Was that a question?

MS. ALTERMAN:  Yes, that was a question.



Page 126

THE WITNESS: Okay, then I'm sorry, but you lost me a bit.

MS. ALTERMAN: Could you read it back, please.

(Reporter read back.)

MR. AMRHEIN: Objection.

THE WITNESS: Okay. Yeah, so, you know, looking at it, you know, from that perspective, yes, I mean, it had -- it certainly had an effect. And a deleterious effect, excuse me, on his ability to control his blood pressure naturally.

MS. ALTERMAN: Q. What was Mr. Lagoda's last blood pressure reading prior to his death?

A. I don't know.

Q. Are there any documents that would refresh your recollection?

A. Oh, there possibly may be. But once, you know, he had had his cardiac arrest, it really kind of threw a wrench into everything else. So -- excuse me -- determining what effect -- you know, what the meaning was or the interpretation was, you know, if his blood pressure is not -- not really reliable.

MS. ALTERMAN: We're just going to mark -- I think we're up to 4. We're going to mark as Sperry 4 for identification a portion of Mr. Lagoda's medical records from Russia.



Page 127

(Exhibit 4 was marked for identification.)

MS. ALTERMAN:  And we'll pull it up on the screen.  This is a physical examination report.  It's a two-page document.  And it's the -- let me -- it's Bates stamped EL000078 to 79.

Q.  Have you reviewed this document before, Dr. Sperry?

A.  I know I've seen it.

Q.  Okay.  Do you see --

A.  It's from Liberia.

Q.  Do you see where it says blood pressure on the document?

A.  Yes.

Q.  Okay.  And what is the level indicated on this document?

A.  135/80.

Q.  Is that an abnormal blood pressure?

A.  No.

Q.  You said no?

A.  Correct, no.

Q.  Did you -- did you find other documents to suggest that Mr. Lagoda had an abnormal blood pressure?

A.  No.

Q.  So when you indicate in your report that he had elevated -- elevated blood pressure readings, what



documents were you looking at?

A. Oh, I don't remember what specifically I was looking at. It was mentioned at some point. But I can't tell you what it was.

Q. And you also mentioned that Mr. Lagoda was obese, correct?

A. Yes.

Q. This document indicates his height and weight. Do you see that?

A. Yes.

Q. Okay. And would you consider that height and weight to be obese?

A. I mean, I would have to look, you know, at the tables for that. But his -- I mean, just even his physical appearance on the morgue table, that is -- that is obese.

Q. Okay. Did Dr. Milewski note whether or not she believed Mr. Lagoda was obese?

A. I don't recall that she did.

Q. Okay. Did Dr. Milewski indicate as part of her autopsy findings that Mr. Lagoda had a blood pressure disorder or high blood pressure?

A. I would have to look and see what -- what she did note.

Q. So why don't we go back to the autopsy, which --



Page 129

MR. AMRHEIN:  Cheryl, just before we -- can you just put that back up on the screen.  I apologize.  I think there was a representation that that was the most recent medical record prior to Mr. Lagoda's death.  And I think the Bates stamp that you had was EL78 and 79.  That's not the most up-to-date record, just for -- just want to note that for the record, that there's a more recent test prior to the date of Mr. Lagoda's death.

MS. ALTERMAN:  Okay, and that's fine.  I don't believe I used the word most recent.  I just believe I said this is a medical record of the plaintiff.  Or --

MR. AMRHEIN:  I think there was.  And I don't want to suggest that -- I don't think that was verbatim what I said right there.  And I don't mean to mis- -- I am not mischaracterizing anything.  I just believe that there was some form of characterization leading up to it, that that was the most recent blood pressure test or medical exam, medical record of Mr. Lagoda prior to his expiration in April of 2019.

This is -- there was a more recent record.  Particularly, it's Bates stamped EL80 and 81.  It looks very, very similar to 78 and 80, Bates stamped, but the date of that is January 10th, 2019.  So it's several months later and postdates this exam.

So I just wanted to note that for the record.



Page 130

MS. ALTERMAN:  And that's fine.  I'm happy to show him that now so that, you know, we can clarify.

Q.  Dr. Sperry, are you still with us?

A.  Yes.  I'm just waiting.

Q.  Okay.  So before we go back to the autopsy report, let just finish this line of questioning.  We'll mark as Sperry 5 for identification another medical record that will be -- that's Bates stamped EL000080 to 81.

(Exhibit 5 was marked for identification.)

THE WITNESS:  Well, I don't see that.  Unless you have --

MS. ALTERMAN:  Q.   Do you see it on the screen?

A.  Okay.

Q.  Okay.  So we've marked this two-page document as Sperry 5 for identification.

Have you seen this physical examination report before?

A.  I -- I don't see it in my stack of things.  I can't tell you I don't have it.  But I thought I had everything in sequence, and I don't.  So I just don't recall right now.

Q.  Okay.  Does this document indicate any elevated levels of Mr. Lagoda's blood pressure?

A.  No.



Page 131

Q. Does this document indicate that Mr. Lagoda is obese?

A. Not directly, no.

Q. What physical examination reports do indicate that Mr. Lagoda had elevated blood pressure levels?

A. Well, the blood pressure itself is the objective measurement. And if there was a question, then that can be contrasted with the mass -- yeah, the body mass index. But the blood pressure itself here is normal.

Q. Dr. Sperry, my question was, what documents indicate that Mr. Lagoda had elevated blood pressure reading?

A. Well, the -- the blood pressure.

Q. Do you recall specifically which documents you reviewed in preparation for preparing your report that indicated Mr. Lagoda had elevated blood pressure readings?

A. No, I don't. I don't recall what specifically I reviewed.

Q. Is there anything in your report that would refresh your recollection or any papers in front of you that may refresh your recollection as to materials indicating that Mr. Lagoda had elevated blood pressure readings?

A. No. I mean, not that I can recall at this point



in time, no.

Q. But you do know, in preparing your report, that there was documentation indicating that Mr. Lagoda had elevated blood pressure readings despite what these two physical examination reports detail, correct?

MR. AMRHEIN: Objection.

THE WITNESS: Well, if that's what I wrote, then there was a reason for writing that. And so that's -- you know, that's the best I can say.

MS. ALTERMAN: Q. So I don't want you to guess, but that is what's contained in your report. So you can review your report and let me know. But I had asked you at the beginning of this deposition whether or not your report was complete and accurate.

So do you still stand by that fact that your report is complete and accurate?

A. Well, to the best of my knowledge. I mean, based upon what I see here. And if this is something that I was not furnished, well, then that's a different issue, in which case there is something else.

Q. Okay. Why don't we take a look at Page 10. We'll go back to your report and the last paragraph on Page 10. You wrote,

"His translated Russian medical records document blood pressures that are at and



Page 133

around the upper limit of what is considered to be normal."

Do you see that?

A.   Yes.

Q.   Where did that information come from?

A.   Well, that would have been -- excuse me -- from the autopsy report.

Q.   Is that from the second autopsy report or the first?

A.   No, the first.

Q.   Okay.  So why don't we go back to the autopsy report prepared by Dr. Milewski, which was marked as -- I believe it's Sperry 3.

A.   Okay.

Q.   Okay.  So we'll scroll down to the report itself prepared by Dr. Milewski.  So please review the report and let me know where in the report it states that Russian medical records document blood pressures that are at or around the upper limit of what is considered to be normal.

A.   No, this would be 3A.  Hypertensive cardiovascular diseases, subcategory A, cardiac hypertrophy, 455 grams, with microscopic features consistent with above.  See cardiac pathology consultation report.  And then arterial and



nephrosclerosis kidneys.

Q.   So you're referring -- we're on Page 4 of the document.  And it's under the heading Final Anatomic Diagnoses.  And you've just referred to Section 3A where it says hypertensive cardiovascular disease, correct?

A.   Yes.

Q.   Okay.  So this final diagnosis, the third final diagnosis, to you, means that Mr. Lagoda was suffering from high blood pressure disease, correct?

A.   Yes.

MR. AMRHEIN:  Objection.

THE WITNESS:  Based upon all of the -- the different findings, yes.  Excuse me.  His blood pressure appeared to have been controlled, which is a good thing.  But he had hypertensive cardiovascular disease, which is, you know, a bad thing, in a relevant sense.

MS. ALTERMAN:  Q.   And the fact that he had that hypertensive cardiovascular, disease which you've characterized as a bad thing, that in part could have been as a result of Mr. Lagoda's alcohol consumption prior to his death, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, it could be.  Again, you're getting into problems with -- with definitions.  But, you know, he had microscopic features consistent with


MAGNA
LEGAL SERVICES

Page 135

hypertensive cardiovascular disease.  I mean, that's the best that really could be said.  And so that's it.  Did he -- so did he have findings that were consistent with controlled hypertensive cardiovascular disease?  Sure.

MS. ALTERMAN:  Q.  And the fact that he had hypertensive cardiovascular disease was one of the causes of Mr. Lagoda's death, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Oh, I mean, along with everything else.  All the pathologic diagnoses and, you know -- then yes.

MS. ALTERMAN:  Q.  Going back to your report, same page, Page 10 -- and we'll just bring it up so that way we're all looking at the same page.  Okay.  You wrote on Page 10 of your report that,

"The underlying fact that his only language was Russian and that he spoke no English put a complete language barrier in place between him and everyone else around him.  Mr. Lagoda understood nothing that he was instructed or ordered to do."

Do you see those sentences in your report?

A.  Yes.

Q.  Do you have any evidence to corroborate the fact that Mr. Lagoda understood nothing that he was



instructed or ordered to do?

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.    Other than this --

A.   Well, okay, nothing outside of what is known up to this point.

Q.   All right.  And on Page 11 of the report, the next page, you have additional narrative as to the interaction between Mr. Lagoda and the officers who responded to the aircraft.

Do you see that?

A.   Yes.

Q.   This summary of the interactions between Mr. Lagoda and the officers is taken from what source?

A.   Well, that's actually towards the top third.  It says,

"For context, the NY OAG report contains specific delineations of blows that were delivered to Mr. Lagoda's head and body by Officer Bugiada and other officers, the placement of handcuffs, the application of a leg compliance maneuver, and the actions of Officer Bugiada laying on Mr. Lagoda's back."

So I mean, that -- that set up the description, really.  And --

Q.   And I --



A.   And I quoted from their report.

Q.   Okay.  Did the New York Attorney General's officers record the interviews with the officers?

A.   No, I don't believe they did.

Q.   Do you know whether or not the New York Attorney General's report only contained summaries of the interviews with the officers?

A.   No.  I don't know for a fact that that was the only limitation or if that was the limitation that was there.  You know, so no, I don't know that.

Q.   And based upon your earlier testimony today, you have not reviewed any of the officers' deposition testimony in this case, correct?

A.   Correct.

Q.   So you don't know what the officers testified to under oath as to their interactions with Mr. Lagoda.

That's fair to say?

A.   That's fair.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:   Q.   And it's also fair that you don't know whether or not the officers testified that none of them placed any pressure on Mr. Lagoda's neck or back, correct?

A.   Correct.

MR. AMRHEIN:  Objection.



THE WITNESS:  Correct.

MS. ALTERMAN:  Q.   Do you know what, if any, force was applied to Mr. Lagoda's neck on the date of this incident?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, no, I don't know specifically, because that -- that objective information was not recorded.  And so -- however -- nonetheless, there were definite injuries that were identified, and so there -- and, you know, therein lies the rub.

MS. ALTERMAN:  Q.   Do you know what, if any, injuries Mr. Lagoda had sustained prior to him getting onboard that JetBlue flight?

MR. AMRHEIN:  Objection.

THE WITNESS:  No, I can't tell you specifically what injuries he sustained prior to that, no.

MS. ALTERMAN:  Q.   Do you know whether or not Mr. Lagoda had sparred or boxed in the days leading up to his trip on April 12th, 2019?

A.   No, I do not know that.

Q.   Do you know what black-and-blues, if any, he had on his body prior to him embarking on this trip?

MR. AMRHEIN:  Objection.

THE WITNESS:  No, I don't know specifically.  I don't recall any descriptions of that, those findings.


MAGNA
LEGAL SERVICES

Page 139

But as far as what examples or what he demonstrated as being blacks and blues, I don't know specifically, no.

MS. ALTERMAN:   Q.   Do you have any understanding of Mr. Lagoda's physical condition as he boarded the flight on April 12th, 2019?

MR. AMRHEIN:   Objection.

THE WITNESS:   Other than being ambulatory and, as far as anyone, you know, really knew or could recall, not complaining about anything.   Beyond that, I don't know specifically what restrictions or what limitations he had.

MS. ALTERMAN:   Q.   Do you know how much Mr. Lagoda boxed prior to his trip?

A.   No.

Q.   Do you know whether or not that he was an avid boxer?

A.   I knew that he was, based upon the deposition transcript of Mr. Tarasov, yes.

Q.   In reviewing Mr. -- and you keep referring to Mr. Tarasov's deposition transcript.   But I believe you mean Mr. Tikhoplav's deposition transcript.

A.   Okay.

Q.   In -- in reviewing Mr. Tikhoplav's deposition transcript, do you recall him stating that he would come back home beaten up after boxing?



Page 140

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.

MS. ALTERMAN:  Q.  Do you also recall Mr. Tikhoplav stating that Mr. Lagoda felt, in quotes, that every real man should be covered with bruises and black and blues, end quote?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes, I did.  That -- that was interesting.  But yes.

MS. ALTERMAN:  Q.  Are you able to state with any degree of medical certainty that the bruising noted on the autopsy report prepared by Dr. Milewski was not, in fact, on his body before his interaction with the Port Authority Police?

MR. AMRHEIN:  Objection.

THE WITNESS:  No, I can't state to a reasonable degree of medical certainty that that was not the case, no.

MS. ALTERMAN:  Q.  Was there any objective evidence that you reviewed to suggest that Mr. Lagoda was kicked with his interaction with the Port Authority Police?

A.  No, there was nothing that specifically was consistent with kicks from shod feet.  Although -- well, you know, no, there wasn't anything specifically.  It's



just, the nature and extent and degree exceeded what would be normal and, I would say, usual in such instances.

Q. And we've already established that you're not a police expert.

And so when you say that it exceeded -- I'm not sure what your -- the rest of your testimony was, but exceeded the nature and something else that you would have expected to see, that's based upon your training as a medical doctor; is that correct

MR. AMRHEIN:  Objection.

THE WITNESS:  As a -- I'm sorry, as a forensic pathologist, yes.

MS. ALTERMAN:  Q.   There's also no evidence, Dr. Sperry, that there was any pressure applied to Mr. Lagoda's neck, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.

MS. ALTERMAN:  Q.   Now, taking a look at the next page of your report, Page 12.  You note in the third paragraph here that no long bones were fractured.

Do you see that?

A.  Yes.

Q.  What are long bones?

A.  The long bones.  I mean, the tibia, fibula,



Page 142

femur, radius, ulna, humerus.  Those would be the bulk of the long bones.

Q.  And those are the bones in your arms and legs, correct, sir?

A.  Yes.

Q.  You also note that there were no rib fractures found, correct?

A.  Yes.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.  And you respect Dr. Milewski's opinion as a pathologist, correct?

A.  Yes.

Q.  And you think highly of her, sir?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.

MS. ALTERMAN:  Q.  And you felt that Dr. Milewski did a thorough job in preparing and conducting her autopsy and the report that she generated, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.  I thought that was reasonable.

MS. ALTERMAN:  Q.  But you do go on to note, Dr. Sperry, that the Russian autopsy report that was prepared months later after Mr. Lagoda's body had been



MAGNA
LEGAL SERVICES

dissected revealed nondisplaced fractures of the right lateral third and fourth ribs.

Do you see that?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.  Yes.

MS. ALTERMAN:  Q.  Would you agree that that finding is inconsistent with Dr. Milewski's autopsy finding and diagnoses?

A.  Yes.

Q.  Would you agree that if Mr. Lagoda had fractures of the right lateral third and fourth ribs, you would have expected Dr. Milewski to note those findings in her report?

MR. AMRHEIN:  Objection.

THE WITNESS:  I would have hoped that she would have.  I don't know -- expecting is one thing.  It would have been good if she had, but it doesn't necessarily mean that they weren't there.

MS. ALTERMAN:  Q.  If -- if you had been performing this autopsy report on Mr. Lagoda, you -- you would have included rib fractures, correct, sir?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.

MS. ALTERMAN:  Q.  And you would agree with me that, based upon your years of experience as the chief



Page 144

medical examiner for the State of Georgia, that it would be easy to observe rib fractures in the third and fourth ribs, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, not necessarily.  I mean, that -- that's -- that's an easy thing to say, but not necessarily.

MS. ALTERMAN:  Q.  Would you agree with me, sir, that based upon your years of training and experience, that observing fractures of the right lateral third and fourth ribs is something that you would have observed in the course of your autopsy?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, I would have hoped that I would have -- excuse me -- would have observed them, yes.

MS. ALTERMAN:  Q.  Now, the fact that Dr. Milewski found no rib fractures, do you believe that there is another reason for the fractures that were found in the second autopsy report prepared in Russia months later?

A.  No.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.  Why is that?

A.  Well, it gets back, really, to the question that



you answered -- or you asked a little while ago of -- they could be very difficult in their location and their appearance and their displacement. The presence of other hemorrhage will very readily obscure them.

And also, the -- the -- their appearance could be missed easily. And if you don't look, then you don't necessarily know. So it's a fair assessment to miss rib fractures. But at the same time, you know, I'm not going to tell you that I'm going to find them above and beyond everyone else. But depending on the location, the appearance of other factors that are inevitably present in situations like this, they could be very difficult, if not really difficult -- real difficult to miss.

Q. Well, we know the location, Dr. Sperry.

We know it was the right lateral third and fourth ribs, correct?

A. Yes.

Q. So knowing the location, the specific alleged rib fractures that Mr. Lagoda had, would you expect Dr. Milewski to have identified those rib fractures during her autopsy?

A. Well --

MR. AMRHEIN: Objection.

THE WITNESS: -- I'm afraid that's not an



Page 146

answerable question, just because the -- just reading what you have up here, that there -- the lateral side of the chest. And it's the third and fourth rib. So really, it's at the level where it's very easy to miss, especially if there's other hemorrhage associated with it. So it's not as easy as it really could sound.

And again, it requires looking. And if you -- well, if you look, then you would find it. But that's what it requires.

MS. ALTERMAN: Q. Well, would you agree that Dr. Milewski's examination did involve looking at Mr. Lagoda's ribs?

A. Well, again, to varying degrees. You know, it's -- I mean, that's a deceptive question. You can look at ribs, and you can look at ribs. And, you know, I can't account for differences in what one sees and what one finds as compared especially to the location of the ribs.

So there's some fractures where I would be very surprised if they were missed. There are others that it's not terribly surprising.

Q. Are you able to say with any degree of medical certainty whether or not those rib fractures occurred during the dissection process as opposed to during the interaction with the Port Authority Police?



MR. AMRHEIN: Objection.

THE WITNESS: It would be very difficult for them to occur just during their interaction with anything -- well, I mean, I think the Port Authority Police interaction very readily explains their location and appearance. And I don't really have a problem with it. But how well one looks, how well a pathologist looks and -- and answers that question really makes a difference as far as the -- how the encounter was caused.

MS. ALTERMAN: So I don't believe I got an answer to my question.

Q. My question, Dr. Sperry, was whether or not you can state with a reasonable degree of medical certainty that the rib fractures occurred from Mr. Lagoda's interaction with the Port Authority Police rather than from the dissection process of the autopsy itself or something else.

MR. AMRHEIN: Objection.

THE WITNESS: Okay. Well, if I think I understand you correctly, I think that the rib fractures occurred from something else. In other words, from some type of physical exertion of force that was located in such a specific area that it fractured -- it resulted in nondisplaced rib fractures that were angulated inwards.



Page 148

MS. ALTERMAN: Q. Do you know whether or not Mr. Lagoda had these nondisplaced rib fractures before he boarded the aircraft?

MR. AMRHEIN: Objection.

THE WITNESS: I'm just thinking. I would -- I would doubt it. The description, both grossly and microscopically, of the -- of the rib fractures and their angulation, that very clearly favors something that -- favors injuries that occurred because of direct trauma to the area and not something that was just happenstance.

MS. ALTERMAN: Q. So it's your testimony, Dr. Sperry, that after Dr. Milewski performed an autopsy and did not find any rib fractures and months passed before a second autopsy was performed in Russia, after the body had been transported over Transatlantic flight, that you would connect the rib fractures that were found in Russia to the injuries that occurred back on April 12th, 2019? That's your testimony?

MR. AMRHEIN: Objection.

THE WITNESS: Well, yes, I -- I've done similar, if not identical, things myself. It depends on how hard one looks and if you know what you're looking for. But I have put individuals -- law enforcement officers in federal prison because of just those findings. So I



don't know what else to say.

MS. ALTERMAN:  Q.   Do you know what type of care was used to transport Mr. Lagoda's body to Russia?

A.   Other than being in a casket, I mean, sealed. Beyond that, I don't know.

Q.   Do you know if anyone tampered with the body before the second autopsy was performed?

A.   I don't know that.  I'd be really, really surprised, though.  Really surprised.

Q.   Why would that surprise you?

A.   It's a lot harder to do than what you think about.  And then tampering with a body but making it look like it wasn't tampered with is really, really, really difficult.  You know, it sounds -- it sounds good on paper, but it's very difficult to do.

Q.   Do you know what restrictions or rules are in place in Russia with respect to performing autopsies?

A.   Well, again, that's an incredibly broad question.  But I can't -- I can't tell you what specific rules or regulations are in place in order to effectively conduct an autopsy.  That, I don't know.

(Off the record from 11:59 to 12:07.)

MS. ALTERMAN:  Q.   Okay, Dr. Sperry.  We were just talking about the broken ribs that were noted in the second autopsy report prepared in Russia.



MAGNA
LEGAL SERVICES

Page 150

Do you recall that?

A.   Yes.

Q.   Would you agree with me that high-quality chest compressions are the most important component of CPR?

MR. AMRHEIN:   Objection.

THE WITNESS:   Okay.   In the -- in the broad sense of that statement, I mean, yes.

MS. ALTERMAN:   Q.   Would you also agree with me, Dr. Sperry, that the most common complication of CPR is rib fractures?

MR. AMRHEIN:   Objection.

THE WITNESS:   Yes.   It's also the most common bony injury, yes.

MS. ALTERMAN:   Q.   Would you further agree, Dr. Sperry, that CPR was performed on Mr. Lagoda?

A.   Oh, yes.

Q.   And CPR was performed for an extensive period of time; is that right?

A.   Yes.

MR. AMRHEIN:   Objection.

MS. ALTERMAN:   Q.   How long was CPR performed in this case?

A.   Oh, my.   It took 35 minutes, something along those lines, 35, 40 minutes.

Q.   And in your experience, would you consider that


MAGNA
LEGAL SERVICES

Page 151

a lengthy amount of time to perform CPR?

A.    Yes.

Q.    Would you also agree, Dr. Sperry, that autopsies are considered to be the gold standard for detecting CPR-related injuries?

MR. AMRHEIN:   Objection.

THE WITNESS:   I don't know that I necessarily would consider them to be the gold standard, no.

MS. ALTERMAN:   Q.    Well, would you consider autopsies to be an objective source to determine whether or not there were CPR-related injuries?

A.    In a -- in a -- in a broad sense.   I mean, it's certainly detecting rib fractures when there were not any rib -- or chest compressions performed, that is troublesome.   But at the same time, it's something -- well, they're -- they're not uncommon, I guess, is the best way to put it.

Q.    And you would agree that you are unable to state with any degree of medical certainty how much force was applied to Mr. Lagoda during his interaction with the Port Authority Police, correct?

MR. AMRHEIN:   Objection.

THE WITNESS:   That's true.   That, I'm sure, has been worked out.   But I'm not aware of specific results of such interactions.



Page 152

MS. ALTERMAN: Okay. We're going to take a look at Page 13 of your report. Okay. In the first paragraph, do you see that it states,

"The OSC CME autopsy found the larynx and hyoid bone in the neck had no fractures."

A. Yes.

Q. Would you agree with me that the fact that there were no fractures in the neck means that there was no significant amount of force placed to Mr. Lagoda's neck?

MR. AMRHEIN: Objection.

THE WITNESS: I don't know that I could reach -- reach out that far and conclude it, especially if he's a male, a large-boned male. So that's about all that one can say. And yeah, other -- really, that's it, that it was not -- not excessive. That's the best I could say.

MS. ALTERMAN: Q. Now, Dr. Sperry, you -- you testified earlier this morning that you had been proffered as an expert in asphyxiation cases, correct?

A. Yes.

Q. And in those cases, Dr. Sperry, did you see evidence of trauma to the neck in cases that resulted in an autopsy report?

MR. AMRHEIN: Objection.

THE WITNESS: No, I'm just thinking. I'm not -- I'm honestly not sure how to answer that particularly.



I -- I really don't know how I -- I could answer that.

MS. ALTERMAN:  Q.   Dr. Sperry, you can answer that -- and it's noted in your report on the same page -- that Dr. Milewski's autopsy report revealed that the areas of hemorrhage were attributed to intubation trauma, correct?

A.   Yes, probably intubation trauma.  Okay.

Q.   And intubation trauma has nothing to do with force exerted by law enforcement officers, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Just reading here.  Well, okay. Does not appear to be related to neck compression, although the limitations that we started out with a long time ago still are in effect in the sense that there's no one that describes the presence -- or absence, for that matter -- of neck compressive injuries.  So that's -- you know, that -- that is a problem.

MS. ALTERMAN:  Q.   And based upon that lack of evidence, you have concluded that the areas of hemorrhage that are documented in the OCME report are probably from intubation trauma, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes, some of those -- yeah, some of those injuries, I think, are related to intubation trauma.  I think that they probably are.



Page 154

MS. ALTERMAN:  Q.   You also note, Dr. Sperry, that there are other undefined actions that you claim caused Mr. Lagoda's tongue biting.

Do you see that in your report?

A.   No.

Q.   Okay.  So you note on Page --

A.   Oh, okay.

Q.   All right.  Well, do you see that in your report?  If not, I'll clarify.

A.   No, if you wouldn't mind, clarify, please.

Q.   Okay.  So on Page 13 of your report, you start off by stating that Mr. Lagoda was bleeding from the mouth when he was having his seizure.

Do you see that in the last paragraph?

A.   Yes.

Q.   And then you go on to say that,

"There were lacerations on the underside of the end of the tongue about one and a half inches, which also arose from the teeth."

Do you see that?

A.   Yes.

Q.   Okay.  And then you go on to state that,

"The bite marks certainly develop in patients who have generalized seizures, but the extent of those present in Mr. Lagoda's



Page 155

tongue with the lateral injuries distinctly separate from those on the end of the tongue strongly suggest" -- going on to Page 14 of your report -- "that these were not all sustained contemporaneously, but came from separate actions."

Do you see that, sir?

A.   Yes.

Q.   So that was the basis of my question.

When you claimed that there were other actions that caused Mr. Lagoda's tongue bites, what are those?

A.   Oh, well, other aspects of compression of the tongue against the clinched jaw and that this occurred during different applications of force, different applications of injury.  So there were multiple different ones, different injuries that really could not be sustained contemporaneously, as I put.

So based on that, it was my opinion that there were different explanations.

Q.   What objective evidence do you have to support your theory that there were different applications of force which led to the compression of Mr. Lagoda's tongue and the resulting bite marks?

A.   The location of the injuries, location, the appearance, the -- the depth, the extent of the



Page 156

hemorrhage -- hemorrhages that -- that really would in a shorthand way describe differing force applications to result in differing injuries.

Q.   Is there any deposition testimony that was provided in this case to support this conclusion that there was a certain amount of compression in Mr. Lagoda's tongue?

MR. AMRHEIN:   Objection.

THE WITNESS:   No, I am not aware of anything specifically that describes that.

MS. ALTERMAN:   Okay.

Q.   Going on to the first full paragraph on Page 14 of your report, you state that,

"When Mr. Lagoda was prone on the airplane cabin deck and was being held in that position, and also being struck, including when Officer Bugiada 'laid on his body,' this potentially -- this would expose the back of the neck and upper back to blows and also potentially allow great pressure to be forced downward on Mr. Lagoda's upper back and the back of his neck."

Do you see that?

A.   Yes, yes.

Q.   What evidence do you have to suggest that



Officer Bugiada laid on Mr. Lagoda's body?

A.   Actually, as I recall, what Officer Bugiada stated that he did.

Q.   What amount of pressure, if any, did Mr. Bugiada -- or Officer Bugiada apply when he allegedly laid on Mr. Lagoda's body?

A.   That was not quantitated, as far as I could tell.

Q.   So if you're unsure of the amount of force, if any, that was applied, how would you be able to state to a reasonable degree of medical certainty that the pressure would readily distort Mr. Lagoda's mouth and inhibit his ability to adequately exchange air?

A.   Based upon what officers said that he did, what he stated that he did to Mr. Lagoda, and that there really is no other reasonable explanation for the complex injuries that he exhibited.

Q.   And you're basing that on Officer Bugiada's interview with the New York State Attorney General's Office?

A.   I don't know what I'm basing that on.  That's -- I took that from a statement that Officer Bugiada made or gave.  And that was the source.

Q.   If Officer Bugiada testified that he never laid on Mr. Lagoda's back, would that change your opinion?



Page 158

A.   Well, it would make me question what exactly happened, just because that's contradictory to what he described occurred.

Q.   Okay.  You go on to say that, "There was in excess of the forces exerted upon his body."

Do you see that?  It's in the beginning of the paragraph.

A.   No.

Q.   It's in the paragraph --

A.   In what?  I'm sorry.

Q.   Let me rephrase the question.

In the first full paragraph on Page 14, you wrote,

"The injuries sustained by Mr. Lagoda are markedly in excess of the forces exerted upon his body by Officer Bugiada and possibly by whichever other officer who struck him."

A.   Okay.

Q.   What does it mean when you wrote "are in excess of the forces exerted upon his body"?

A.   That the degree of intensity of the forces exceeds what the officer states that he inflicted or -- yeah, inflicted upon Mr. Bugiada -- excuse me, yes, excuse me, I'm sorry, inflicted upon Mr. Lagoda.  Yeah, I'm sorry about that.  So the degree and extensive


MAGNA
LEGAL SERVICES

Page 159

nature of the forces exceeded what was described as occurring when Mr. Bugiada -- Officer Bugiada inflicted trauma to Mr. Lagoda.

Q. Are you making a credibility determination in this statement?

MR. AMRHEIN: Objection.

THE WITNESS: No. No.

MS. ALTERMAN: Q. If Mr. -- if Officer Bugiada testified that the amount of force used was reasonable and necessary under the circumstances, would you disagree with that testimony?

A. Well, it brings a tremendous amount of interpretation into question. And I would not be satisfied based upon that degree of interpretation, as far as explaining the injuries.

Q. What specifically do you claim that Officer Bugiada's actions were in excess of the forces exerted upon Mr. Lagoda's body?

A. Well, it comes up later. I mean, potentially allow great pressure to be forced downward on Mr. Lagoda's upper back and the back of his neck, which then could readily distort his mouth, tongue, and upper airway and inhibit his ability -- that is, Mr. Lagoda's ability to adequately exchange air.

Q. How long do you claim that there was this great



Page 160

pressure placed on Mr. Lagoda?

A.   I don't know.  I can't tell you how long that I'm stating or claiming such a pressure to be applied or could be applied.

Q.   How much pressure are you claiming was applied?

A.   Again, I can't tell you the degree and severity of the pressure itself.

Q.   What type of pressure was applied?

A.   Well, this pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway.  And inhibited the -- inhibiting the ability to adequately exchange air.

Q.   Was Mr. Lagoda actively resisting at this point?

MR. AMRHEIN:  Objection.

THE WITNESS:  It seems as if it depends on -- on who you ask and what was happening, as in the appearance -- that is, when this occurred, there was some intensity of reaction.  But how much and how extensive that was is, you know, questionable.

MS. ALTERMAN:  Q.   Are you aware that Mr. Lagoda bit Officer Bugiada when he was attempting to handcuff him?

MR. AMRHEIN:  Objection.



Page 161

THE WITNESS:  Yes, I saw that.  That I believe he attempted to bite the leg, yes.

MS. ALTERMAN:  Q.  Are you also aware that Mr. Lagoda tried to grab at officers' gun belt during the handcuffing process?

MR. AMRHEIN:  Objection.

THE WITNESS:  I think I recall that that statement was made.

MS. ALTERMAN:  Q.  And this conclusion that you've made here on Page 14, Dr. Sperry, this assumes that there was some amount of pressure placed to Mr. Lagoda's upper back and back of his neck, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  And I'm just looking.  Yes, it's reasonable.

MS. ALTERMAN:  Q.  What is the difference between a legal homicide versus a medical homicide?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, you're asking me a lawyer question.  And that -- that's outside of my realm of experience.  I mean, I don't make legal conclusions when it comes to those things.

MS. ALTERMAN:  Q.  Are you aware that there is a different deposition between a legal homicide and a medical homicide?



Page 162

A.   Yes.   I'm aware that a difference exists, yes.

Q.   What is your understanding of the difference?

A.   Well, the -- the best I can say it, a homicide results from the action or actions of others which cause the death of another individual.  And a legal homicide is something different in the sense that it's excessive and the degree of force and the way the force is applied, the injuries that result, those are the things that are different.  But those -- well, that's -- that's the extent of it.

Q.   Okay.  So now, you testified that a medical homicide -- we'll stick with the medical homicide -- results from the actions of others, correct?

A.   Yes.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.   And you were often tasked with finding a cause of death in the many autopsies that you've performed, right?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.

MS. ALTERMAN:  Q.   How many autopsies would you say you have performed in the course of your career?

A.   More than 6,800 myself.

Q.   How many have you overseen?

A.   Oh, my.   88- to 90,000, perhaps.


MAGNA
LEGAL SERVICES