# EXHIBIT GG

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

# New York State Office of the Attorney General

# Special Investigations and Prosecutions Unit

# Report on the Investigation into The Death of Evgeniy Lagoda



**Letitia James**
**NYS Attorney General**

120

PA1802

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

## EXECUTIVE SUMMARY

On July 8, 2015, Governor Andrew Cuomo signed Executive Order No. 147 (the "Executive Order"), appointing the Attorney General as special prosecutor "to investigate, and if warranted, prosecute certain matters involving the death of an unarmed civilian . . . caused by a law enforcement officer." On April 12, 2019, Evgeniy Lagoda ("Mr. Lagoda") became unresponsive and subsequently died following an encounter with multiple officers of the Port Authority of New York and New Jersey Police Department ("PAPD") on an aircraft at John F. Kennedy International Airport ("JFKIA") in Queens, New York.[1] Governor Cuomo subsequently issued Executive Order No. 147.24, expressly conferring jurisdiction on the Office of the Attorney General ("OAG") to investigate any potential unlawful acts or omissions by law enforcement related to Mr. Lagoda's death.[2]

The Office of the Attorney General's investigation and review of this matter included the following, among other materials:

- PAPD paperwork generated in connection with the incident;
- Audio recordings of telephone calls and radio communications to, from, and between JFKIA Police Command, the PAPD Central Police Desk, PAPD officers, and emergency medical technicians;
- Video footage from inside JFKIA;
- Interviews of PAPD officers who were involved with and/or witnessed the incident;
- Interviews of multiple civilians who witnessed relevant aspects of the incident, including flight attendants, passengers, and emergency medical technicians;
- Medical records, including records from the responding emergency medical services and from Jamaica Hospital; and
- Autopsy report from the Office of the Chief Medical Examiner ("OCME") of New York City.

On the night of April 12, 2019, PAPD Officer Michael Bugiada responded to a call for a medical emergency inside an aircraft docked at a terminal at JFKIA. At the rear galley of the aircraft, the officer encountered Evgeniy Lagoda, who the officer was told had just suffered from a seizure and then become "combative." When the officer attempted to calm him down, Mr. Lagoda either advanced on or swung at the officer, at which point the officer deployed pepper spray, and took Mr. Lagoda to the ground. The officer used physical force in an attempt to restrain Mr. Lagoda and, following a struggle during which Mr. Lagoda was struck repeatedly in the head, was able to restrain and handcuff Mr. Lagoda with the assistance of other responding officers. Immediately thereafter, Mr. Lagoda was observed to be unresponsive; despite life-saving efforts on the part of the officers, and then emergency medical technicians, the passenger could not be resuscitated. He was subsequently transported to a hospital, where he was pronounced dead.

---

[1] The Port Authority Police Department is the principal law enforcement agency assigned to enforce state and city laws in the airports (including JFKIA), seaports, bridges, and tunnels owned or operated by the Port Authority of New York and New Jersey.

[2] Executive Order 147.24 is attached as Exhibit 1.

1

PA1803

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Ultimately, a medical examiner identified as the cause of Mr. Lagoda's death: "[s]udden death following grand mal seizure of undetermined etiology complicated by post-ictal excited delirium." The medical examiner did, however, take note of significant blunt force injuries to Mr. Lagoda's face and body, at least some of which were directly attributable to the officers, and concluded that the interaction with the officers likely contributed to Mr. Lagoda's death. For this reason, the medical examiner deemed the manner of death to be "homicide."

Having completed its investigation of this incident, the OAG has nevertheless concluded that there is insufficient evidence to establish that a crime was committed by any of the officers involved. In particular, the OAG has concluded that, under the circumstances, the officers' use of force to restrain Mr. Lagoda could not – as the legal standard requires – be proven to be unjustified beyond a reasonable doubt. For these reasons, the OAG will not pursue a criminal prosecution in connection with this matter.

Nevertheless, this incident has raised some concerns about the PAPD's handling of the incident and the OAG does make recommendations to address these concerns. Most notably, the investigation revealed that emergency medical services were significantly delayed in responding to the scene due to PAPD's failure to have personnel available to escort an ambulance there. Although there is no evidence that, in this particular instance, a more prompt response would have saved Mr. Lagoda's life, PAPD should revise its practices to make sure such a miscue does not occur in the future. Second, because the force used by the PAPD officer likely contributed to Mr. Lagoda's death, the OAG recommends that PAPD provide training to its officers about the unique vulnerability of individuals in the immediate wake of a seizure such that officers may incorporate that information into their decisions as to the appropriate amount of force used against such individuals. Finally, as the OAG has recommended in prior reports concerning other police departments, the PAPD should work toward outfitting their officers with body-worn cameras.

2

PA1804

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

## STATEMENT OF FACTS

### A. Events Leading to Law Enforcement Response

On April 12, 2019, 39-year-old Russian national Evgeniy Lagoda, from Krasnodar, Russia, was travelling by air from Moscow, via JFK International Airport, to Kingston, Jamaica, where he was set to join the crew of a tanker ship as an engineer. Mr. Lagoda arrived on Aeroflot Flight 500 at Terminal 1 in JFKIA at approximately 11:56 am. After passing through passport control, then retrieving a suitcase at baggage claim, he made his way to Terminal 5, from which JetBlue Flight 659 to Kingston was scheduled to depart that evening. It is not altogether clear how Mr. Lagoda spent his approximately nine-hour layover in Terminal 5; during that time, however, he did meet up with at least one other Russian national, who was also en route to join the tanker crew in Kingston. At approximately 9:33 pm, Mr. Lagoda boarded the JetBlue aircraft at Gate 18, and took seat 33C, an aisle seat in the second-to-last row of seats.

The aircraft pulled away from the gate at approximately 9:55 pm. At about 10:00 pm, or shortly thereafter, as the aircraft was taxiing away toward the runway, Mr. Lagoda began to have what appeared to be a seizure. His body was convulsing, he was slumped over toward the seat beside him, and he was bleeding from the mouth. Nearby passengers called out for help; two male flight attendants appeared immediately, while a third flight attendant called for medical assistance over a loudspeaker and alerted the pilots of the emergency. Responding to the request, three female nurses – all passengers on the flight – made their way to the rear of the aircraft. At the direction of at least one of the nurses, the flight attendants lifted Mr. Lagoda from his seat, carried him into the rear galley area and laid him on the floor. Mr. Lagoda was rolled onto his side and pillows and blankets placed under his head. As Mr. Lagoda worked through the seizure, the flight attendants and nurses made sure he did not strike his head or any other part of his body up against any hard surfaces in the galley.

After several minutes, the seizure began to subside, but it was clear that Mr. Lagoda was still disoriented. As the flight attendants and nurses tried to explain to him what had just happened, Mr. Lagoda said nothing but rolled onto his back, then onto his hands and knees. (At this time, none of the civilians was aware that Mr. Lagoda neither spoke nor understood English.) Mr. Lagoda began struggling to remove the leather jacket he was wearing, and with the nurses' help he was able to do so. He was sweating profusely and his eyes were blank. Still saying nothing, Mr. Lagoda got to his feet and stood facing toward the front of the aircraft. One of the nurses, standing directly in front of Mr. Lagoda, continued to speak to him.

Suddenly, and without warning, Mr. Lagoda struck the nurse forcefully in the abdomen with his fist, and she stumbled backward into the aisle. At this point, one of the male flight attendants stepped in front of Mr. Lagoda – who was now standing tense, with his fists clenched at his sides – and urged him to calm down. At about that same time, Mr. Lagoda's Russian colleague appeared at the rear of the aircraft and also tried to calm Mr. Lagoda. Instead, however, Mr. Lagoda began to repeatedly swing at the flight attendant, striking him at least five or six times in the chest. As the flight attendant absorbed the blows, another one of the nurses fled from out of the galley and up the aisle. (In addition to the flight attendants and nurses,

3

PA1805

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

multiple other passengers corroborated the aggressive behavior of Mr. Lagoda prior to the appearance of any police officers.[3])

Meanwhile, the pilots had received permission to return to the terminal, and at 10:24 pm the aircraft was back at Gate 20 and the doors soon opened with access to the terminal. And within a minute or so of Mr. Lagoda's having struck the flight attendant, the first of many PAPD officers rushed onto the aircraft.

### B. Law Enforcement Response

The first call to the JFKIA Police Desk about Mr. Lagoda came from ground control – which had learned about the medical emergency directly from the aircraft's pilots – just before 10:21 pm.[4] Less than a minute later, Officer Michael Bugiada, who was posted in Terminal 5, was dispatched by a supervisor via radio to respond to Gate 20 for a "male having a seizure onboard." As Officer Bugiada made his way to the gate, Emergency Medical Services ("EMS") was also alerted to the emergency and additional PAPD officers were instructed to escort the ambulance to the aircraft as well.[5] Officer Bugiada reached the terminal almost immediately after the plane had returned to the gate at 10:24 pm and the doors to the aircraft had opened.

As he entered the aircraft, Officer Bugiada was directed to the rear, from which the officer could also hear cries for help. By the time he reached the galley area, Mr. Lagoda was no longer striking the flight attendant, but was standing with his fists clenched at his sides. The flight attendant informed Officer Bugiada that the passenger had had a seizure, and was disoriented, but also "combative." The precise sequence of events that followed is not entirely clear. Several of the flight attendants and nurses, and several passengers seated nearby as well, recalled that Officer Bugiada stated to Mr. Lagoda that he had just had a seizure and instructed him to "calm down" – at which point Mr. Lagoda either "lunged" at the officer, or swung at him, or (according to three of the witnesses) actually struck the officer in the arm or chest. In response, these witnesses say, Officer Bugiada stepped back, drew a canister of pepper spray from his belt, and delivered a burst in the direction of Mr. Lagoda. At that point, according to the witnesses, Mr. Lagoda either fell or was taken to the ground by Officer Bugiada, who began to attempt to handcuff Mr. Lagoda.

Officer Bugiada's own account of the initial encounter is somewhat different from that of these witnesses. It is his recollection that, after being informed that Mr. Lagoda had been "combative," he instructed Mr. Lagoda to move to one side of the galley to allow a flight attendant and a nurse, who were effectively trapped in the back, to pass by, but that Mr. Lagoda ignored these commands. At this point, Officer Bugiada attempted to call for backup via radio, although the connection apparently failed to go through.[6] Mr. Lagoda then began to advance directly toward the officer, who pulled the pepper spray from his belt and delivered a burst at Mr.

---

[3] In the course of its investigation, the OAG was able to track down and interview nine passengers (in addition to the previously-mentioned nurses) who had been seated in the last five rows of the aircraft.

[4] A transcript of all PAPD radio communications related to the incident is attached as Exhibit 2.

[5] PAPD practice is to arrange for an ambulance to respond to the police command building on JFKIA grounds to meet up with PAPD officers, who then escort the ambulance to the emergency location in a separate vehicle.

[6] The transcript of radio communications reflects an attempted transmission shortly after 10:29 pm with no response.

4

PA1806

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Lagoda. The pepper spray, however, had no effect on Mr. Lagoda; he simply wiped the substance off of his face then took a swing at Officer Bugiada's head, but missed. In response, Officer Bugiada struck Mr. Lagoda in the face with his fist one time, knocking him onto his buttocks, and moved in to handcuff him. (One passenger's account also had Officer Bugiada exchanging blows with Mr. Lagoda, although in the passenger's account the exchange of blows came *prior to* the use of pepper spray.)

By the time Mr. Lagoda was on the ground and Officer Bugiada had begun his efforts to handcuff him, all the flight attendants and the nurses had fled from the galley area – in part to escape the effects of the pepper spray – and did not witness the rest of his (or any other officers') interaction with Mr. Lagoda. Several passengers seated near the rear of the aircraft, however, did observe at least some part of what occurred between Mr. Lagoda, Officer Bugiada, and the other officers who a short time later began to flood into the aircraft; however, their accounts are partial and in many respects different from one another.

In any event, according to Officer Bugiada, although he was immediately able to take hold of one of Mr. Lagoda's arms, he could not bring it behind Mr. Lagoda's back, and in the struggle ended up on top of Mr. Lagoda, with Mr. Lagoda lying on his back and Officer Bugiada straddling Mr. Lagoda's midsection. (One passenger's account described Officer Bugiada as "straddling" a face-up Mr. Lagoda "across his legs.") According to Officer Bugiada, Mr. Lagoda now began to bite Officer Bugiada's knee,[7] and with his free hand grabbed at the officer in the area of his gun belt. Officer Bugiada struck the right side of Mr. Lagoda's face twice with his fist, causing Mr. Lagoda to release the bite. (One passenger described Officer Bugiada and Mr. Lagoda swinging at one another at this time.) At some point during the altercation, he called again over the radio (this time successfully) that he was "in a fight" and moments later put over: "Still combative, speed it up."[8] Officer Bugiada was able to turn Mr. Lagoda on his stomach, but could not pull Mr. Lagoda's arms out from underneath his body. Officer Bugiada struck Mr. Lagoda three more times in the face in an effort to get him to comply. As the 207-lb. Mr. Lagoda now tried to push himself up off the ground, Officer Bugiada (190 lbs.) laid his own body on top of Mr. Lagoda. (In describing this phase of the altercation, one passenger stated that Mr. Lagoda "was on his face and Officer Bugiada was…trying to get his hands and he was telling him to relax…giving him several orders but he was still…resisting until…the other…officers came on the plane." This same witness stated that prior to the other officers' arrival, he attempted to assist Officer Bugiada by holding Mr. Lagoda's feet down.)

It was at about this time that PAPD officers Robert Joseph, Jonathan Papia, Paul Mezzacappa, and Jonathan Duran appeared at the back of the aircraft, with many more officers close behind them, and began to aid Officer Bugiada in restraining Mr. Lagoda. All four officers had been at the PAPD police command when Officer Bugiada's call for assistance had come over the radio just before 10:30 pm. They had responded in various vehicles to the tarmac in a

---

[7] Officer Bugiada's medical records indicate that he was treated on April 13, 2019, for pain to the hands resulting from the altercation the evening prior; x-rays found no acute fracture, and Officer Bugiada was given acetaminophen. Officer Bugiada visited a Port Authority health care facility on April 16, 2019, to report that during the altercation he had also been bitten on the right thigh through his pants; a round bruise approximately 1.5 inches in diameter was observed on Officer Bugiada's thigh.

[8] This radio call appears in the transcript of radio communications shortly before 10:30 pm.

5

PA1807

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

matter of minutes, then taken stairs up to the jet bridge and into the aircraft. When they reached the back of the aircraft, all the officers stated that they observed Officer Bugiada sitting on top of Mr. Lagoda (who was face down), trying unsuccessfully to get control of Mr. Lagoda's hands – although it is unclear whether this was because Mr. Lagoda's hands were now tucked under his body, because he was flailing them about, or because he was otherwise resisting Officer Bugiada's efforts to pull his hands behind his back. Mr. Lagoda was also kicking his feet. Officer Bugiada stated that, when the other officers arrived, he got off of Mr. Lagoda and attempted from one side to take control of Mr. Lagoda's right arm, while either Officer Joseph or Officer Papia (each recalls doing so) attempted from the other side to take control of Mr. Lagoda's left arm. Meanwhile, Officer Mezzacappa grabbed one of Mr. Lagoda's legs to stop him from kicking, while Officer Duran put Mr. Lagoda's other leg in a so-called "compliance hold," with a baton pressed forcefully against Mr. Lagoda's shin. According to Officer Bugiada, Mr. Lagoda grabbed for his groin area before the officer was able to get control of the right arm. According to Officer Papia, in order to overcome Mr. Lagoda's resistance, he struck Mr. Lagoda with a fist in the face and left arm at least one time each. (According to one passsenger's account, "one person alone couldn't hold him down and that's why additional people had to go back there to try and…hold him down but, as I said, he was like a wild animal;" another passenger stated that "the officers…might have thrown a punch or two.") After a matter of a few seconds, the officers were able to get control of Mr. Lagoda's hands and handcuff him behind his back. At 10:33 pm, an unidentified officer on-scene put over the radio that "It's under control, we're getting it under control" – suggesting that by this time, Mr. Lagoda had been restrained.

## C. Medical Assessment and Treatment

After Mr. Lagoda was restrained, the officers searched Mr. Lagoda then rolled him onto his side and attempted to move him from the cramped galley area. As they did so, within a minute or so of Mr. Lagoda's having been handcuffed, Officer Papia noticed that the side of his neck was turning blue. Officer Joseph checked for a pulse and, finding none, quickly removed the handcuffs and lay Mr. Lagoda on his back. Observing that Mr. Lagoda did not appear to be breathing, and that he was no longer speaking or moving at all, the officers called out for an Automated External Defibrillator ("AED"), and Officer Mezzacappa (subsequently assisted by Officer Papia and others) began cardiopulmonary resuscitation ("CPR"). Up at the front of the aircraft, one of the flight attendants located an AED and oxygen on board, and handed them to a PAPD sergeant, who had another officer bring them to the rear. The AED was connected to Mr. Lagoda, but the device detected no heartbeat, which is necessary to trigger a shock. Another officer attempted to provide oxygen to Mr. Lagoda.

Meanwhile, an ambulance – which had responded to the PAPD police command building on the original report of a passenger having a seizure – was still waiting for a police escort to the aircraft. (Apparently, even before the ambulance had shown up, all the officers assigned to the headquarters had already rushed to the aircraft to assist Officer Bugiada, leaving none behind to serve as escort for the ambulance.[9]) At about 10:36 pm, officers on-scene twice called again over the radio for an ambulance. It was not until about 10:50 pm that EMS, with escort, had made it to the aircraft. By this point, a stair truck had been set up at the back of the plane, allowing the two

---

[9] This apparent miscommunication is reflected in the transcript of radio communications.

6

PA1808

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Emergency Medical Technicians ("EMTs") to enter directly into the rear galley and make contact with Mr. Lagoda at 10:55 pm.

Once inside the aircraft, the EMTs found officers performing CPR on a non-responsive Mr. Lagoda. They took over care of Mr. Lagoda, hooking him up to a defibrillator of their own; but again, the device registered no heartbeat, and no shock was advised. The EMTs then moved Mr. Lagoda on to a stretcher and carried him down to the ambulance, and at about 11:10 pm headed for Jamaica (Queens) Hospital. In the ambulance, accompanied by an officer who continued the CPR, they established an airway to provide Mr. Lagoda with oxygen and an intraosseous ("IO") line to introduce epinephrine, intended to restart his heart. However, they were unable to regain a pulse.

The ambulance arrived at the hospital at about 11:25 pm, and Mr. Lagoda was transferred into the care of doctors there. Upon admission, Mr. Lagoda was found to be unresponsive and in cardiac arrest. Doctors administered further epinephrine and sodium bicarbonate, but were unable to restore any cardiac activity. Mr. Lagoda was pronounced dead at 11:35 pm.

### D. Medical Examiner's Report

Dr. Yvonne Milewski of the Office of the Chief Medical Examiner of the City of New York ("OCME") conducted an autopsy of Mr. Lagoda on the morning of April 13, 2019. Prior to issuing a report on Mr. Lagoda's death, Dr. Milewski was provided with Mr. Lagoda's EMS and hospital records, medical documents and images of medications recovered from among Mr. Lagoda's belongings, and accounts of the circumstances surrounding Mr. Lagoda's encounter with the police, including observations prior to the officers' appearance, from multiple civilian and police witnesses on the aircraft. Dr. Milewski also consulted with, and sought additional testing from, specialists in cardiology, neuropathology, and toxicology at the OCME.

Ultimately, as noted in her autopsy report,[10] Dr. Milewski determined the cause of Mr. Lagoda's death to be "[s]udden death following grand mal seizure[11] of undetermined etiology[12] complicated by post-ictal[13] excited delirium."[14] As the medical examiner explained in a meeting with the OAG, a seizure[15] of the sort Mr. Lagoda experience is an "electrical event" that leaves the brain unstable in its immediate aftermath, putting the heart at risk of failure (due to disruption of electrical signals to the heart), especially if the heart is independently vulnerable and if the

---

[10] A copy of Mr. Lagoda's autopsy report is attached as Exhibit 3, with appropriate redactions to protect Mr. Lagoda's privacy. A complete copy of the report has been provided to Mr. Lagoda's family.

[11] A "grand mal seizure" is a seizure that causes loss of consciousness and violent muscle contractions. A seizure reflects abnormal electrical activity throughout the brain.

[12] "Etiology" refers to the manner of causation of a medical condition.

[13] "Post-ictal" refers to the state of altered consciousness and physical vulnerability following a seizure.

[14] "Excited delirium" describes a condition of agitation, confusion, and heightened body temperature, as well as (at times) violent behavior.

[15] Dr. Milewski was unable to determine the cause of Mr. Lagoda's seizure. An examination of Mr. Lagoda's brain did, however, identify scarring and hardening in certain areas of the brain ("mesial temporal sclerosis") and the abnormal anatomy of certain cells ("glioneronal heterotopia") as well, suggestive of a seizure disorder. However, these phenomena do not definitively establish that Mr. Lagoda suffered from such a disorder. There is no independent evidence of a history of seizures on the part of Mr. Lagoda.

7

PA1809

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

body is then subjected to further stress. In this case, it was just this combination of factors that caused the fatal cardiac arrest Mr. Lagoda suffered during or immediately after his encounter with the police.

Indeed, the report further identified two "other significant conditions" associated with Mr. Lagoda's death. One of these was "hypertensive cardiovascular disease," that is, an enlarged heart caused by high blood pressure.[16] This condition, Dr. Milewski explained, is commonly correlated with sudden cardiac arrest, and rendered Mr. Lagoda susceptible to such a traumatic event even prior to the incident.

The second "other significant condition" noted in the autopsy report was "[p]hysical struggle/altercation with blunt impacts." Although Dr. Milewski explained that it would be impossible to tease out the relative contributions of Mr. Lagoda's own initial aggression toward the nurse and flight attendant, his own resistance to being restrained by the police officers, and the physical force used against him by those same officers, she explained that the stress from the altercation(s) surely played a role in Mr. Lagoda's death, given the timing of the cardiac arrest's onset. Indeed, because, in the medical examiner's expert opinion, the actions of the police officers at least contributed to Mr. Lagoda's death, the manner of death was identified in the autopsy report as "homicide." (The OCME identifies a cause of death as "natural" only if the death is due *exclusively* to natural causes.)

It should be noted that the blunt injuries to Mr. Lagoda's face and head[17] in particular were not insignificant. Among other injuries, Dr. Milewski observed a laceration to the bridge of Mr. Lagoda's nose; severe bruising around both eyes; and further bruising of the cheeks, the left and right sides of the scalp, and the forehead, and behind the left ear. According to Dr. Milewski, these injuries are signs of repeated impacts, many delivered with considerable force. However, these blunt force injuries were ultimately superficial; none of them resulted in any skull or facial fractures, and they caused no injury to the brain. And the force used to produce these injuries would not have been sufficient in and of themselves to cause death, or to contribute to death, in an otherwise healthy person.

---

[16] According to Dr. Milewski, an enlarged heart is often a consequence of high blood pressure (hypertension), which forces the heart to work harder, with a resulting increase in the size of the heart muscle. Although Mr. Lagoda's blood pressure could not be directly measured, evidence of hypertension was reflected in scarring in his kidneys.
[17] Mr. Lagoda also suffered superficial injuries to his neck, shoulders, and back, and other parts of the torso, as well as a notable bruise to his shin.

PA1810

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

## LEGAL ANALYSIS

All of the crimes for which any of the officers might arguably be culpable[18] – reckless manslaughter, criminally negligent homicide, and reckless endangerment – contain elements that would be difficult (at best) to prove beyond a reasonable doubt, with the likely exception of intentional assault. Both reckless manslaughter[19] and criminally negligent homicide[20] demand proof, as a threshold matter, that it was objectively "reasonably foreseeable" that the officer's conduct would contribute to Mr. Lagoda's death. In addition, reckless manslaughter would require that the officer have been affirmatively aware of the risk of death that his conduct was causing, yet chose to engage in that conduct anyway. Criminally negligent homicide would essentially require establishing that the officer *should have known* the risk of death his conduct was causing. Although the crime of reckless endangerment[21] would not demand proof of causation of the death, only proof of risk of "serious physical injury,"[22] it would still require conscious awareness and disregard of that risk. In light of the superficial nature of the injuries caused by the officers, the medical examiner's opinion that such injuries would not have caused the death of an otherwise healthy individual, and the absence of any evidence that the officers appreciated, or even should have appreciated, the uniquely vulnerable condition Mr. Lagoda's seizure had put him in, it is highly unlikely that all the elements for any of these crimes could be proven beyond a reasonable doubt. Only for the crime of intentional assault[23] would all the elements appear to be readily provable.

But even if the elements for these various crimes could be established, all of them – including intentional assault – would be negated if the officers' conduct was justified under the law.

Under PL 35.30(1), "[A] police officer…, in the course of effecting…an arrest…of a person whom he or she reasonably believes to have committed an offense, may use physical force when and to the extent he or she reasonably believes such to be necessary to effect the

---

[18] This list of such crimes does not include murder (PL 125.25(1)), which would require an intent to cause Mr. Lagoda's death, or intentional manslaughter (PL 125.20(1)), which would require an intent to cause "serious physical injury" (as defined by New York law), because there is simply no affirmative evidence of any such intent on the part of any of the officers involved.

[19] A person is guilty of reckless manslaughter (manslaughter in the second degree, PL 125.15(1)) when he or she "recklessly causes the death of another person." Under PL 15.05(3), "A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exist."

[20] A person is guilty of criminally negligent homicide (PL 125.10) when, "with criminal negligence, he [or she] causes the death of another person." Under PL 15.05(4), "A person acts with criminal negligence with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

[21] A person is guilty of reckless endangerment (PL 120.20, reckless endangerment in the second degree) when he or she "recklessly engages in conduct which creates a substantial risk of serious physical injury to another person."

[22] Under PL 10.00(1), "serious physical injury" is defined as "physical injury which creates a substantial risk of death, or which cause death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."

[23] A person is guilty of intentional assault (PL 120.00(1), assault in the third degree) when "with intent to cause physical injury to another person, he [or she] causes such injury to such person or to a third person."

9

PA1811

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

arrest....">[24] When such a defense is raised, it must be disproven beyond a reasonable doubt in order to establish the officer's criminal culpability. Although the Court of Appeals has not directly addressed the meaning of the "reasonably believe" language in PL 35.30, it has interpreted identical language in the context of another subsection of the justification statute, PL 35.15. In People v. Goetz, 68 N.Y.2d 96 (1986), and then later in People v. Wesley, 76 N.Y.2d 555 (1990), the Court held that the phrase "reasonable belief" has both a subjective component and an objective component. The subjective component is satisfied if the defendant in fact actually believed, "honestly and in good faith," that physical force was being used or was about to be used against him (or a third person) at the time he used physical force, and that the use of physical force was necessary in order to repel the danger, regardless of whether that belief was accurate or not. Goetz, 678 NY2d at 114. The objective component is satisfied if a "reasonable person" under the same "circumstances" could have held those beliefs. Id. at 115. To negate a justification defense offered by Officer Bugiada or Officer Papia, then, it would be necessary to prove either that the officer did not subjectively believe the use of force was necessary or that the use of force was not objectively reasonable (or both).

There can be little doubt that the officers were legally permitted to use at least some degree of physical force on Mr. Lagoda. Having been informed that Mr. Lagoda had been combative toward civilians on the aircraft, and then having himself been swung on by Mr. Lagoda, Officer Bugiada was certainly reasonable in his belief that Mr. Lagoda had committed an offense, and was therefore authorized to arrest him – and likewise authorized to "use physical force when and to the extent he…reasonably believe[d] such to be necessary to effect the arrest." The use of physical force would only be criminal if, and to the extent that, it exceeded what the officers reasonably believed was necessary to effect the arrest.

If Mr. Lagoda did indeed continuously pull his arms away, kick his legs, and buck his body as Officer Bugiada, later assisted by Officer Papia and other officers, tried to handcuff him – and there is no evidence to suggest otherwise – and if all the blows to Mr. Lagoda were delivered prior to their finally restraining him, it would be difficult to conclude, and even more difficult to prove, that the use of force was unjustified. As discussed earlier, while the resulting injuries were ugly, they were ultimately superficial, and – though painful – would have caused no meaningful or lasting damage to an otherwise healthy person. Had the officers struck Mr. Lagoda with some kind of dangerous instrument, such as a baton, or kicked or stomped him to induce compliance, the reasonableness of their conduct could have been more readily called into question. Similarly, if the officers had continued to strike Mr. Lagoda even after he had been restrained, their conduct might well have been unjustified, and the analysis would be quite different. There is, however, no evidence to support this scenario either. Indeed, none of the police officers, flight attendants, nurses, or other passengers interviewed indicated that they observed the officers continue to use physical force on Mr. Lagoda after handcuffs had been applied.

---

[24] PL 35.30(1) sets a significantly higher threshold for the use of "deadly physical force," essentially permitting such only when the officer reasonably believes it necessary to defend himself from "the use or imminent use of deadly physical force." PL 10.00(11) defines deadly physical force as "[p]hysical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury." But while PO Bugiada's and Officer Papia's conduct may well have been a cause of Mr. Lagoda's death, it is highly unlikely that the law would regard the officers' use of force to be "readily capable of causing death or serious physical injury."

PA1812

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Because it would be impossible to prove beyond a reasonable doubt that any of the officers' conduct was unjustified, and therefore that their conduct violated New York Penal Law, the OAG has concluded that no criminal charges are warranted.

11

PA1813

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

## RECOMMENDATIONS

Improve PAPD emergency vehicle escort protocols –

Under current PAPD guidelines (and consistent with Federal Aviation Administration and Transportation Security Administration regulations), emergency vehicles, including ambulances and fire trucks, that respond to calls for service on the Air Operations Area (that is, aircraft movement, parking, and safety areas, loading ramps, and any adjacent areas) at JFKIA are instructed to stand by at a designated location to await a PAPD escort to the emergency location. As discussed above, however, on April 12, 2019, when the ambulance dispatched to respond to Mr. Lagoda's seizure arrived at the standby location, no officers were present to escort them to the aircraft – apparently because all available officers rushed to the aid of Officer Bugiada. As a result, emergency medical treatment for Mr. Lagoda was delayed by as much as 20 minutes. Although it is not at all clear that the expedited arrival of emergency medical technicians would have saved Mr. Lagoda's life, a preventable delay of this nature should not be tolerated. We strongly recommend that the PAPD review its emergency vehicle escort protocols to ensure that miscues of this sort do not occur again the future.

Provide additional training to PAPD officers –

The PAPD currently provides training to all recruits on dealing with individuals who experience seizures. Such training does not, however, cover the uniquely vulnerable condition of such individuals in the period immediately after the resolution of a seizure, the so-called "post-ictal" state discussed earlier in this report. We recommend that such information be incorporated into PAPD training to provide heightened awareness to officers who are using, or considering the use of, physical force against individuals in this state. More broadly, PAPD's current use of force policy appropriately instructs officers using force to conduct a "careful balancing of all human interests" and "use only that force that is reasonably necessary to bring an incident under control, while protecting the lives of the officer or another." To ensure that officers understand how to apply these provisions in the context of their day-to-day duties, including fast-moving, complex situations such as the one referenced in this report, training is essential.

Outfit PAPD officers with body-worn cameras –

We have previously issued seven reports recommending that police departments equip officers with body-worn cameras and/or dashboard cameras for police vehicles.[25] Without question, videotaped evidence would have greatly facilitated the investigation of this case. We use the absence of such cameras as an opportunity to recommend that PAPD work toward outfitting their officers with body-worn cameras, police vehicles equipped with dashboard cameras, and (insofar as the PAPD makes use of them) tasers that are equipped with cameras.[26]

---

[25] New York State Office of the Attorney General Special Investigations and Prosecutions Unit, Reports of Investigation into the Deaths of Miguel Espinal (December 2016), Richard Gonzalez (March 2017), Edson Thevenin (December 2017), Wardel Davis III (January 2018), Walter Perez (February 2019), Robert Scott (May 2019), and Jaime Lopez-Cabrera (October 2019).

[26] It should be noted that the New York State Police recently announced plans to move forward with a body-worn camera pilot program.

12

PA1814

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

# EXHIBIT 1

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER



**State of New York**

**Executive Chamber**

No. 147.24

### EXECUTIVE ORDER

In view of the request of Attorney General Letitia James, my order and requirement, embodied in Executive Order Number one hundred and forty-seven, dated July 8, 2015, is hereby amended to include an additional paragraph to the penultimate paragraph as amended by Executive Order Numbers 147.1 - 147.23 to read as follows:

**FURTHER**, the requirement imposed on the Special Prosecutor by this Executive Order shall include the investigation, and if warranted, prosecution:

(x) of any and all unlawful acts or omissions or alleged unlawful acts or omissions by any law enforcement officer, as listed in subdivision 34 of section 1.20 of the Criminal Procedure Law, arising out of, relating to or in any way connected with the death of Evgeniy Lagoda on April 12, 2019, in Queens County.



GIVEN under my hand and the Privy Seal of the State in the City of Albany this fourth day of October in the year two thousand nineteen.

BY THE GOVERNOR

Secretary to the Governor

PA1816

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

# EXHIBIT 2

PA1817

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

**PAPD RADIO AND TELEPHONE TRANSMISSIONS**
**Friday, April 12, 2019 through Saturday, April 13, 2019**

**JFKIA Telephone – Comm. Desk 4 (22:20:43 hours)**

Officer Norman: "Port Authority Police."

Female Caller: "Hey how are you, we have a medical emergency going back to the Gate."

Officer Norman: "Okay, what's the location?"

Female Caller: "Uh, right now he is on Bravo going back to Terminal 5. I don't have the Gate exactly but the supervisor's on the phone with the Gate."

Officer Norman: "Okay, do you have the flight number?"

Female Caller: "Gate 20, Gate 20, Delta Alpha is going in and its Jet Blue 659, an Airbus 321. It's a male passenger, uh having seizures right now."

Officer Norman: "Male, seizures, okay. Returning to Gate 20, Jet Blue 659."

Female Caller: "Yes."

Officer Norman: "Okay, we'll send Officers over."

Female Caller: "Thank you."

Officer Norman: "You got it."

**JFKIA Patrol Radio (22:21:44 hours)**

Officer Williams: "Response 5, from Kennedy."

Officer Bugiada: "Go for 93"

Officer Williams: "Gate 25, uh, check that, Gate 2-0…aircraft returning to Gate, male having a seizure onboard."

Officer Bugiada: "Copy. Gate 20."

**JFKIA Patrol Radio (22:22:10 hours)**

Officer Williams: "8-9-2, from Kennedy."

Officer Duran: "9-2."

Officer Williams: "40 for EMS."

Officer Duran: "Copy, Gate 20, Terminal 5. Right?"

1

PA1818

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Officer Williams: "Affirm."

**JFKIA Telephone – Comm. Desk 1 (22:22:20 hours)**

EMS Dispatcher: "Port Authority"

Officer Williams: "How're you doing. Male, having a seizure."

EMS Dispatcher: "Male having a seizure. 1350 again?"

Officer Williams: "Yes ma'am. It will be me all night long." *Laughs*

EMS Dispatcher: "No problem."

Officer Williams: "Bye."

EMS Dispatcher: "Bye."

**JFKIA Telephone – Comm. Desk 3 (22:23:26 hours)**

Officer Kovalsky: "Port Authority Police, Kovalsky, JFK."

Brandon (Terminal 5 Operations): "Hello, Good Evening, this is Brandon from JFK Ops T5. How you doing?"

Officer Kovalsky: "I've been better. How are you Brandon?"

Brandon: "Eh, could be better."

Officer Kovalsky: "Alright- Thanks for calling, I appreciate it."

Brandon: *laughs* "Uh we have a return to gate, due to a medical."

Officer Kovalsky: "Uh, what gate?"

Brandon: "Gate 20."

Officer Kovalsky: "Gate 20, we already have units en-route."

Brandon: "Okay, copy that."

Officer Kovalsky: "Alright, thank you."

Brandon: "Alright."

Officer Kovalsky: "Bye Brandon."

2

PA1819

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

**JFKIA Telephone – Comm. Desk 3 (22:24:19 hours)**

Officer Kovalsky: "Port Authority Police, Kovalsky, JFK."

Brandon: "How're you doing? This is Brandon again, from T5."

Officer Kovalsky: "Brandon, yeah, what's up buddy?"

Brandon: "Just giving you a little more details about that medical for Gate 20."

Officer Kovalsky: "What do ya got?"

Brandon: "Male, mid-40s."

Officer Kovalsky: "Male, mid-40s, okay."

Brandon: "He's having a seizure and blood from the mouth."

Officer Kovalsky: "Male, 40s, seizure, bleeding from mouth. Alright, thank you."

Brandon: "Copy that."

Officer Kovalsky: "Alright Brandon."

Brandon: "Alright."

**JFKIA Patrol Radio (22:24:42 hours)**

Officer Williams: "Response 5, uh, 8-9-3 from Kennedy."

**JFKIA Patrol Radio (22:24:54 hours)**

Officer Bugiada: "Go for 93."

Officer Williams: "Male 40s, seizure, bleeding from the mouth."

Officer Bugiada: "Copy."

Officer Williams: "4-2-4 from Kennedy."

Officer Sykula: "Go for 4."

**JFKIA Patrol Radio (22:25:23 hours)**

Officer Williams: "Roger 4, uh, are you off with that bag?"

Officer Sykula: "Affirm, it's a wallet with currency."

Officer Williams: "Roger, 9-7-5-2-4. 9-7-5-2-4. You're gonna hold on to it and return with it. Uh-

3

PA1820

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

at this time. Bravo 25, Bravo 25, irate female causing a disturbance at the counter. Bravo 25."

Officer Sykula: "Copy."

Officer Williams: "Romeo 2, can you 14, uh, Response 4?"

Officer Reen: "Kennedy, 2-4 will handle. EMS 1 to Jamaica from the previous Aided. Just go with a case number."

Officer Williams: "Roger 2-4. 9-7-5-2-6. 9-7-5-2-6. One to Jamaica. You're heading to Gate 25 along with Response 4. Copy."

**JFKIA Patrol Radio (22:26:39 hours)**

Officer Williams: "8-9-1, 3-9 the Desk."

Officer Delions: "Copy."

**JFKIA Patrol Radio (22:27:05 hours)**

Officer Bugiada: "Kennedy, 93 is off."

Officer Williams: "Roger, 8-9-3."

**JFKIA Patrol Radio (22:27:43 hours)**

Officer Cassella: "Kennedy, Charlie 2."

Officer Williams: "Charlie 2."

Officer Cassella: "Go with a case for the, uh, K-L-M 3-5."

**JFKIA Patrol Radio (22:29:22 hours)**

Unknown: *inaudible*

Officer Williams: "Last unit, you're not coming over. Last unit go again."

**JFKIA Patrol Radio (22:29:41 hours)**

Officer Bugiada: "Kennedy, 93, speed it up."

Officer Williams: "Roger 8-9-3, uh, male having a seizure?"

Officer Bugiada: "Negative, I'm in a fight. Send me another one."

Unknown: "Where is he?"

Officer Williams: "Roger, what's your location?"

4

PA1821

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Unknown: *inaudible*

Officer Williams: "8-9-3, what is your location?"

Officer Bugiada: "Gate 20, on the plane!"

Officer Williams: "Roger, Gate 20, Terminal 5. All units Gate 20, Terminal 5."

Officer Bugiada: "Still combative, speed it up."

Officer Duran: "Kennedy, 92-"

Officer Williams: "Roger, just--, First unit on scene transmit. Leave the air open."

Officer Jannazzo: "15 en-route ramp side."

Officer Williams: "Roger, just call off when you're on-scene. Leave the air open."

**JFKIA Patrol Radio (22:32:41 hours)**

Sergeant Corbin: 8-1 Hack, Kennedy. Do we have any units off in Terminal 5 yet?

Officer Joseph: "Airtrain's going off right now."

Unknown: "Goin off."

Officer Williams: "Roger, keep the air clear. When you go off, let me know, first unit on scene."

Unknown: "Go, go, go"

Unknown: *sirens*

**JFKIA Patrol Radio (22:33:06 hours)**

Unknown: "We're all off."

Officer Williams: "Roger, copy. When things calm down I need one unit to let me know, uh, what the situation is."

Officer Kostaris: "Kennedy, Response 7 is off."

Officer Williams: "Roger, Response 7."

Officer Guidice: "Kennedy, Romeo 2 is off."

Officer Williams: "Roger, uh, Romeo 2, when you get on-scene, let me know if we still need more units."

Unknown: *inaudible* "...on-scene."

5

PA1822

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Unknown: "It's under control, we're getting it under control. "

Officer Williams: "Roger, situation is under control? Last unit transmitting, come up with your call sign."

Lt. Hernandez: "8-0, Kennedy. That's affirm. Situation under control."

Officer Williams: "Roger, situation under control, 2234 hours, one unit."

Sergeant Vaughn: "8-1 Patrol is off."

Officer Williams: "Roger, 8-1 Patrol. When you can, advise the desk."

Sergeant Vaughn: "Copy."

Unknown: "Kennedy, Hack's off."

Sergeant Mitchell: "8-1 Alpha off."

Officer Williams: "Roger, 8-1 Alpha, 8-1 Patrol, off."

**JFKIA Patrol Radio (22:34:48 hours)**

Unknown: *inaudible*

Sergeant Vaughn: "Kennedy, 8-1 Patrol, no further."

Officer Williams: "Roger, 8-1 Patrol. All units, all units, no further at Gate 20, Terminal 5. No further as per 8-1 Patrol. 2235."

Unknown: "Kennedy, no further. One under."

Officer Williams: "Roger, again. No further at that location, Gate 20, Terminal 5. One unit under. One unit under, 2235 hours. No further at Jet Blue, Gate 20."

Unknown: "…alright, he's cuffed."

**JFKIA Patrol Radio (22:35:40 hours)**

Officer DaSilva: "15 Alpha, Kennedy, he's gonna need (send me?) a Bus for OC."

6

PA1823

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

**JFKIA Patrol Radio (22:36:10 hours)**

Officer Williams: "8-1 Patrol from Kennedy."

**JFKIA Patrol Radio (22:36:18 hours)**

Sergeant Mitchell: "Go for 8-1 Alpha."

Officer Williams: "Roger 8-1 Alpha, one unit's requesting a Bus for OC. Are we having the Bus come to 2-6-9 or out at the scene?"

Sergeant Mitchell: "Alright standby, I'll advise in one."

**JFKIA Patrol Radio (22:37:20 hours)**

Sergeant Mitchell: "8-1 Alpha, Kennedy. That's gonna be EMS to 2-6-9."

**JFKIA Patrol Radio (22:37:34 hours)**

Officer Williams: "4, 2-4, what's the situation at your location?"

Officer Sykula: "Customer Service issue, 9-8."

Officer Williams: "Roger. I need one unit to respond to TSA Lane Seven for a prohibited item in the machine."

**JFKIA Patrol Radio (22:37:59 hours)**

Officer Reen: "2-4 copies."

**JFKIA Patrol Radio (22:39:10 hours)**

Unknown: "Can one unit bring an AED back here?"

Officer Delions: "AED? Uh, 9-1, I'll, uh, respond street side."

Unknown: "Negative, street. It's on the plane."

Officer Delions: "Roger, my vehicle's street. I'll be back in two mikes."

Unknown: "What terminal is that?"

Unknown: "Terminal 5, Gate 20."

Officer Delions: "Roger, 9-1 en-route."

7

PA1824

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

**JFKIA Patrol Radio (22:39:42 hours)**

Unknown: "There's one on the wall."

Unknown: "Kennedy, send EMS forthwith."

Sergeant Mitchell: "8-1 Alpha, Kennedy."

Officer Williams: "8-1 Alpha, Go."

Sergeant Mitchell: "Re-de, Redirect EMS, Terminal 5, Gate 20. Make good time."

Officer Williams: "Roger."

**JFKIA Telephone – Comm. Desk 1 (22:40:05 hours)**

EMS Dispatcher (Tara): *inaudible* "…this is Tara, how can I help you."

Officer Williams: "Yeah, how you doing? We need, uh, one unit, uh, good time, uh, they're calling for an AED. They're not really telling me what the situation is.

EMS Dispatcher (Tara): "So this has to be tersed to 9-1-1 because we…"

Officer Williams: "Yeah..I, I…"

EMS Dispatcher (Tara): "…have none available to post them on jobs…Umm, so what is it? A…"

Unknown: "Cardiac condition."

EMS Dispatcher (Tara): "Cardiac condition?"

Officer Williams: "Yeah."

Unknown: "Yep."

EMS Dispatcher (Tara): "13?"

Officer Williams: "Yeah, 1350."

Unknown: "Make sure it goes in as Priority One."

EMS Dispatcher (Tara): "Cardiac condition…"

Officer Williams: "Let me see, where were the other two Buses? What were they here for?"

EMS Dispatcher (Tara): "One was for a non-responsive chest pain--"

Officer Williams: "Yeah--"

8

PA1825

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

EMS Dispatcher (Tara): "And the other one was a seizure."

Officer Williams: "Yeah, well, th- where is the Bus for the seizure?"

EMS Dispatcher (Tara): "He shoulda been there. He shoulda been on his way. He shoulda been there already."

Officer Williams: "Can you see if he's standing outside? Because I think it's the same seizure that went cardiac."

EMS Dispatcher (Tara): "Okay, let me just see, where they at."

Officer Williams: "I need one unit, uh, 2-6-9, for EMS ASAP."

EMS Dispatcher (Tara): "Now it's disconnected. I love this machine. Oh it's connecting, gimme a second..hmm."

Officer Riccardi: "Response 2, I have a car, I'll go back."

Officer Williams: "Response 2, thank you…What'd he say?"

Unknown: *inaudible in background*

EMS Dispatcher (Tara): "He didn't even answer me. One second I'm trying to get him now."

Officer Williams: "He just told me, Bus is standing by right now."

EMS Dispatcher (Tara): "Okay, so that's the same thing?"

Officer Williams: "I believe so, even if it's not, we're gonna grab him, uh…8-9, uh, Response 2, Bus is standing by 2-6-9."

EMS Dispatcher (Tara): "EMS Two, are you standing outside? Are you at 2-6-9?"

Officer Duran: *inaudible* "…do you need me to uh, respond back to 6-9, for uh, the Bus?"

Officer Williams: "Roger, I believe, uh, Response 2 said he has a car, he was gonna take him. Whoever gets there first we need that Bus ASAP."

EMS Dispatcher (Tara): "Yes, what's your ETA to 2-6-9?"

Officer Williams: *inaudible*

EMS 2: *background* "EMS 2, we've been at 2-6-9. They just have no personnel here."

EMS Dispatcher (Tara): "Okay."

Officer Williams: "Yeah, is it-- two seconds he'll be pulling up."

9

PA1826

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

EMS Dispatcher (Tara): "Alright, two seconds, they'll be pulling up. No problem. Thank you."

Officer Williams: "Alright, thank you."

EMS Dispatcher (Tara): "No problem."

Officer Williams: "Bye."

EMS Dispatcher (Tara): "Bye, bye."

**JFKIA Patrol Radio (22:40:59 hours)**

Officer Williams: "I need one unit, uh, 2-6-9, for EMS ASAP."

**JFKIA Patrol Radio (22:41:08 hours)**

Officer Riccardi: "Response 2, I have a car, I'll go back."

Officer Williams: "Response 2, thank you."

EMS Dispatcher (Tara): "…one second, I'm trying to get him so that's the same thing?"

Officer Williams: "I believe so, even if it's not, we're gonna grab him, uh…8-9, uh, Response 2, Bus is standing by 2-6-9.

Officer Duran: "Kennedy, 92, do you need me to uh, respond back to 6-9, for uh, the Bus?"

Officer Williams: "Roger, I believe, uh, Response 2 said he has a car, he was gonna take him. Whoever gets there first we need that Bus ASAP."

**JFKIA Patrol Radio (22:42:06 hours)**

Unknown Male: "Capaccio, come up with that 02 and the BVM."

**JFKIA Patrol Radio (22:44:12 hours)**

Sergeant Vaughn: "Kennedy, 8-1 Patrol. ETA on the Bus?"

Officer Williams: "Response 2, you have a Bus en-route?"

Sergeant Mitchell: "8-1 Alpha, Kennedy. For the CAD, CPR in progress, no shock advised."

Officer Williams: "Roger."

Unknown: *inaudible*

Unknown: "8-1, I believe Jet Blue is gonna try and open the back door for EMS to get access."

Unknown: "Copy."

PA1827

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

**JFKIA Patrol Radio (22:45:00 hours)**

Officer Williams: "Response 2, do you have EMS en-route?"

Officer Riccardi: "I'm taking 'em up."

Officer Williams: "Roger, can you make good time to Gate 20, Terminal 5?"

**JFKIA Patrol Radio (22:47:46 hours)**

Sergeant Mitchell: "8-1 Alpha, Kennedy. Do you have an ETA on EMS?"

Officer Riccardi: "8-1 Alpha, I'm near Terminal 8 right now, I should be there in a couple mikes."

Sergeant Mitchell: "Alright, 10-4. Uh, it looks like Jet Blue is trying to setup a, uh, stair truck in the back of the Bus, uh, the back of the plane.

Officer Riccardi: "Alright, copy."

Sergeant Mitchell: "8-0 from 8-1 Alpha."

Lieutenant Hernandez: "Go. Go for 8-0."

Sergeant Mitchell: "8-0 are you on-scene or do you have a 3-9 number?"

Lieutenant Hernandez: "I'm on-scene, on the jet bridge."

Sergeant Mitchell: "Alright, 10-4."

**JFKIA Patrol Radio (22:49:34 hours)**

Sergeant Mitchell: "8-1 Alpha, Kennedy."

Officer Williams: "8-1 Alpha, Go."

Sergeant Mitchell: "Have the 8-5s respond."

Officer Williams: "Roger, they're notified and responding."

Sergeant Mitchell: "Alright, 10-4."

**JFKIA Patrol Radio (22:50:27 hours)**

Officer Riccardi: "Response 2, I'm off, EMS."

Officer Williams: "Roger. 2250 hours."

**JFKIA Patrol Radio (22:51:14 hours)**

Officer Reen: "2-4 is off lane 7. I'll advise in effect."

11

PA1828

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Officer Williams: "Roger. Roger, uh, 1…8-1 Alpha, I need to know could you break off 15 Alpha and 15 Charlie?"

**JFKIA Patrol Radio (22:51:45 hours)**

Officer Capaccio: "15 Charlie, Kennedy. What do ya need?"

Officer Williams: "Guard Post Sierra, Info Cop."

Officer Capaccio: * inaudible*

Officer Williams: "Roger. And I need one unit for an ID check, KCM, Terminal 5."

**JFKIA Patrol Radio (22:55:38 hours)**

Detective Brugnoni: "Kennedy, 8-5s off, Terminal 5."

**JFKIA Patrol Radio (22:55:48 hours)**

Officer Williams: "Roger. 8-5s off, 2255."

**JFKIA Patrol Radio (23:00:14 hours)**

Officer Reen: "Kennedy, 2-4."

Officer Williams: "2-4, Go."

Officer Reen: "It was a novelty item voluntarily surrendered to TSA. Can you go with a case number for an NCIR?

Officer Williams: "4-9-5-1. 4-9-5-1. NCIR."

Officer Reen: "Copy."

Unknown: "Bobby Joe, it's gonna be a few mikes, okay?"

Officer Joseph: "I copy."

**JFKIA Patrol Radio (23:01:37 hours)**

Officer Joseph: "DaSilva, on the air? Danny on the air?"

Officer DaSilva: "Yeah, go ahead."

Officer Joseph: "Disregard, I'll pull up to you, uh, standby."

Unknown: "Joseph, Charlie Papa."

PA1829

**CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER**

**JFKIA Patrol Radio (23:02:31 hours)**

Officer Reen: "Kennedy, 2-4."

Officer Williams: "Officer Williams: "2-4, Go."

Officer Reen: "Can you put me out 8-70 Papa for this job?"

**JFKIA Patrol Radio (23:02:49 hours)**

Officer Williams: "Roger."

Officer Reen: "Thank you."

Officer Capaccio: "1-5 Charlie, can you--I'ma head over to Sierra."

Officer Williams: "Roger."

**JFKIA Patrol Radio (23:03:26 hours)**

Officer Williams: "Uh, Can I get a unit to the ID check at KCM, uh, Terminal 5 Departures?"

Officer Justincic: "Response 5, I'm going."

Officer Williams: "Roger, 5."

**JFKIA Patrol Radio (23:04:08 hours)**

Officer DaSilva: "1-5 Alpha, Kennedy. Uh, show me on the back of 1-5 Charlie."

Officer Williams: "Roger, 1-5."

**JFKIA Patrol Radio (23:05:19 hours)**

Sergeant Mitchell: "15 Alpha, 8-1."

Officer DaSilva: "Go ahead."

**JFKIA Patrol Radio (23:05:29 hours)**

Officer Williams: "8-1, 1-5 Alpha and 1-5 Charlie are heading for an Info Cop at Guard Post Sierra."

Sergeant Mitchell: "Roger, when they clear have 15 Alpha, 40 to 2-6-9."

Officer Williams: "Roger, 1-5 Alpha, you copy?"

Officer DaSilva: "Affirm."

PA1830

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

**JFKIA Patrol Radio (23:06:27 hours)**

Officer Justincic: "Kennedy, Response 5."

Officer Williams: "Response 5."

Officer Justincic: "I'm standing by, there doesn't seem to be an ID check here."

Officer Williams: "Roger. Inquire. They called it in but it was a while ago."

Officer Justincic: "Copy."

**JFKIA Patrol Radio (23:07:45 hours)**

Officer Guidice: "Kennedy, Romeo 2."

Officer Williams: "Romeo 2."

Officer Guidice: "Roger, you can show me driving the Jamaica 2, ALS Bus. 2-6 is on board with ALS. 2-7 is gonna follow us to Jamaica Hospital."

Officer Williams: "Roger. Uh, 2308."

Officer Guidice: "Copy."

**JFKIA Patrol Radio (23:08:21 hours)**

Officer Williams: "That was 2-6 onboard, 2-7 on the follow and who's driving?"

Officer Guidice: "Gonna be Romeo as the driver."

Officer Williams: "Roger."

**JFKIA Patrol Radio (23:10:27 hours)**

Officer Capaccio: "Kennedy, show 15 Charlie off."

Officer DaSilva: "1-5 Alpha is off."

Officer Williams: "Roger."

**JFKIA Patrol Radio (23:12:20 hours)**

Sergeant Mitchell: "Airtrain, 8-1 Alpha."

Officer Joseph: "Yeah, Sarge."

Sergeant Mitchell: "When you get off at the hospital, can you go with an update?"

Officer Joseph: "Sarge, can you go again? You broke up, I'm sorry."

14

PA1831

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Sergeant Mitchell: "Roger, when you get off at the hospital, go with an update."

Officer Joseph: "Copy, I'll advise."

Sergeant Mitchell: "And the doctor's name."

Officer Joseph: "Copy, we'll get info."

**JFKIA Patrol Radio (23:14:48 hours)**

Sergeant Mitchell: "1-5 Alpha, 8-1Alpha."

Officer DaSilva: "Go ahead."

Sergeant Mitchell: "Once you clear that Info Cop, can you swing by Terminal 5, Gate 20? Pick up 8-2 Bugiada."

Officer DaSilva: "Affirm."

Sergeant Mitchell: "Roger, let me know when you're en-route."

**JFKIA Patrol Radio (23:15:19 hours)**

Sergeant Mitchell: "8-1 Alpha, Kennedy."

Officer Williams: "8-1 Alpha, Go."

Sergeant Mitchell: "Once 1-5 Alpha is clear that Info Cop, he's gonna pick up 8-2 Bugiada and bring him back to 2-6-9. You can uh, request EMS for him, when they're on the way back."

Officer Williams: "Roger."

**JFKIA Patrol Radio (23:15:51 hours)**

Officer DaSilva: "Kennedy, 1-5 Alpha is gonna be en-route to uh, uh, Terminal 5, Gate 20."

Officer Williams: "Roger."

**JFKIA Patrol Radio (23:16:19 hours)**

Unknown: "Delions, on the air?"

**Central Police Desk ("CPD") Telephone (CPD Sgt. Left) (23:16:36 hours)**

Sergeant Brown: "Port Authority Police, Sergeant Brown."

Lieutenant Hernandez: "Hey Naeemah, how you doin', Lieutenant Hernandez."

Sergeant Brown: "Hey Lou."

15

PA1832

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Lieutenant Hernandez: "Alright. What's uh, IAD's, uh, number? The one you have on file there. The one on call?

Sergeant Brown: "You wanna know who's the Detective on call tonight?"

Lieutenant Hernandez: "No, none of the Detectives, the IG's Office.."

Sergeant Brown: "Oh, umm..Lawanda's covering for Brennan."

Lieutenant Hernandez: "Who's covering?"

Sergeant Brown: "Lawanda Irving is covering for Brennan."

Lieutenant Hernandez: "Lawanda Irving?"

Sergeant Brown: "Umm hmm."

Lieutenant Hernandez: "And what's the…what's her number?"

Sergeant Brown: "Umm, it's 2-0-1, 5-7-7, 4-6..."

Lieutenant Hernandez: "5-7-7-4-6?"

Sergeant Brown: "3-9."

Lieutenant Hernandez: "Okay, 2-0-1-, 5-7-7, 4-6-3-9?"

Sergeant Brown: "Lawanda Irving."

Lieutenant Hernandez: "Irving, okay, Irving. Alright, thanks."

**JFKIA Patrol Radio (23:16:44 hours)**

Officer Capaccio: "15 Charlie, Kennedy. Can you go with a case number, negative condition all around."

Officer Williams: "Roger, standby one."

**JFKIA Patrol Radio (23:17:08 hours)**

Unknown: *inaudible* "...Charlie Papa."

**JFKIA Patrol Radio (23:17:28 hours)**

Officer Williams: "Uh, apparently, no reception in the Desk. I picked up, calling you back and it's Officer Williams."

**JFKIA Patrol Radio (23:18:00 hours)**

16

PA1833

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Officer Justincic: *inaudible* "...Response 5."

Officer Williams: "Response 5, go."

Officer Justincic: "5-2 clear."

Officer Williams: "Roger, standby for your, uh, number."

**JFKIA Patrol Radio (23:18:43 hours)**

Officer Delions: "Kennedy, 9-1."

Officer Williams: "All units, standby one."

**JFKIA Patrol Radio (23:18:58 hours)**

Officer Williams: "Response 5, 9-7-5-4-4. 9-7-5-4-4.

**JFKIA Patrol Radio (23:19:09 hours)**

Officer Williams: "9-1, go."

Officer Delions: "Roger, still off Gate 20. One of the uh, victims is requesting EMS for stomach pain. Forty-five year old female, Gate 20."

**JFKIA Patrol Radio (23:19:30 hours)**

Officer Williams: "Roger, female, 45, Gate 20 , uh, stomach pain?

Officer Delions: "Affirm, she was, uh, hit in the stomach."

**JFKIA Patrol Radio (23:20:08 hours)**

Unknown: "HSI, can you 3-9, 4-3-2-5?"

**JFKIA Patrol Radio (23:20:27 hours)**

Officer DaSilva: "8-2 Bugiada, one mike out."

Officer Bugiada: "Go again."

Officer DaSilva: "Step out, I'll be out in thirty seconds."

Officer Bugiada: "Roger. Ramp side at Gate 20?"

Officer DaSilva: "Affirm."\

**JFKIA Patrol Radio (23:21:02 hours)**

Unknown: "HSI-U on the air?"

17

PA1834

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Unknown: "Go."

Unknown: "3-9, 4-3-2-5."

Unknown: "Copy."

**JFKIA Telephone – Comm. Desk 1 (23:22:19 hours)**

EMS Dispatcher (Tara): *inaudible* "…this is Tara."

Officer Williams: "I'm keeping you busy all night long."

EMS Dispatcher (Tara): "I see that."

Officer Williams: "Okay, first, most important we need a Bus for a male--

Officer DaSilva (background): "1-5 Alpha Kennedy, show uh--"

Officer Williams: "Hold on."

Officer DaSilva (background): "…me transporting 8-2 Bugiada *inaudible*"

Officer Williams: "Roger, 2322, I'm on the line with EMS now. Umm, injured Police Officer…"

Officer DaSilva (background): "Copy."

Officer Williams: "Uh, have the Bus respond to the precinct and step in, it's gonna be a male…"

EMS Dispatcher (Tara): "Okay, Injured precinct…injured PO"

Officer Williams: "Injured yeah, injured PO…"

EMS Dispatcher (Tara): "…PO…"

Officer Williams: "What do you say? He's Thirties? Forties? Thirty-five? What do you say? Thirty-five good?"

Unknown (background): "He's an adult male."

Officer Williams: "Thirty-five? Adult male, uh, hand injury."

EMS Dispatcher (Tara): "Hand injury. This is going to 9-1-1"

Officer Williams: "Okay, and then when you're done with that I have another one for you."

EMS Dispatcher (Tara): "Oh, great. Okay. Alrighty, umm…"

Officer Williams: "Just let me know…I'll stay on the line if you can tell- oh, you have to call me

18

PA1835

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

back with the Bus number, right?"

EMS Dispatcher (Tara): "Yeah."

Officer Williams: "Okay, so that's the first one."

EMS Dispatcher (Tara): "Umm hmm."

Officer Williams: "The second one is a female, 45, stomach pain."

EMS Dispatcher (Tara): "Female…45…stomach pain. Both of these are going…*inaudible*"

Officer Williams: "Correct, you- you'll call me back with both those b- uh, Bus numbers, I'm still 1350."

EMS Dispatcher (Tara): "Thirteen-Fifty, gotcha."

Officer Williams: "Alright, bye."

EMS Dispatcher (Tara): "Bye."

**JFKIA Patrol Radio (23:22:20 hours)**

Officer Joseph: "Airtrain, Kennedy. All units off Jamaica."

Officer Williams: "Roger. 2322."

**JFKIA Patrol Radio (23:22:35 hours)**

Officer DaSilva: "1-5 Alpha Kennedy, show uh, me transporting 8-2 Bugiada *inaudible*"

Officer Williams: "Roger, 2322, I'm on the line with EMS now."

Officer DaSilva: "Copy."

**JFKIA Patrol Radio (23:24:03 hours)**

Det. Sergeant Graf: "Kennedy, 8-5, 8-1 radio check."

Officer Williams: "8-5, 8-1, Eight-One you're 5 by 5."

Det. Sergeant Graf: "Copy, read you loud and clear. Thank you."

Officer Williams: "3-9 my cell."

**JFKIA Patrol Radio (23:24:26 hours)**

Unknown: *inaudible* "…copy."

PA1836

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

**JFKIA Patrol Radio (23:24:53 hours)**

Officer Reen: "Kennedy, 2-4."

Officer Williams: "2-4, Go."

Officer Reen: "9-8."

Officer Williams: "Rog."

**JFKIA Patrol Radio (23:25:14 hours)**

Officer Capaccio: "15 Charlie, Kennedy. You got no other jobs, I'm gonna go delayed 8-3-7."

**JFKIA Patrol Radio (23:25:52 hours)**

Officer DaSilva: "1-5 Alpha, Kennedy. Show me uh, show me off 2-6-9. Front of the building."

Officer Williams: "2325. EMS en-route."

**JFKIA Patrol Radio (23:26:34 hours)**

Sergeant Mitchell: "8-1 Alpha Kennedy."

Officer Williams: "8-1 Alpha."

Sergeant Mitchell: "Can you go with the time that uh, the aided went to the hospital?"

Officer Williams: "Roger, standby…2309, Romeo Two reported driving EMS Bus with ALS on board.

Sergeant Mitchell: "10-4, thank you. 2309."

Officer Williams: "Roger. They just went off Jamaica."

Sergeant Mitchell: "Roger. That was to Jamaica, affirm?"

Officer Williams: "Affirm."

Sergeant Mitchell: "Thank you."

**JFKIA Patrol Radio (23:27:33 hours)**

Officer Williams: "Response 5, did you get your number?"

**JFKIA Patrol Radio (23:27:41 hours)**

Officer Williams: "Response 5 from Kennedy."

Officer Justincic: "Affirmative. I got it, thank you."

20

PA1837

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Officer Williams: "Rog."

**JFKIA Patrol Radio (23:30:17 hours)**

Sergeant Mitchell: "8-1 Alpha, Kennedy."

**JFKIA Patrol Radio (23:30:26 hours)**

Officer Williams: "8-1 Alpha, Go."

Sergeant Mitchell: "You're gonna have an additional aided…*inaudible*… to respond to, it's gonna be one of the flight crew, uh, I'll have the Bus coming out take a look at him as well but you just note it in the CAD.

Officer Williams: "Roger, you're coming in and out. You need a Bus to respond to one of the flight crew members?

Sergeant Mitchell: "I should have a Bus coming out for one of the passengers, affirm?"

Officer Williams: "Affirm, 45-year-old female, stomach pain. You're having a crew member checked out also, is that affirm?"

Sergeant Mitchell: "Affirm. It's gonna be a male, I'll get you the age."

**JFKIA Patrol Radio (23:31:25 hours)**

Sergeant Mitchell: "8-1 Alpha, Kennedy."

Officer Williams: "8-1 Alpha, Go."

Sergeant Mitchell: "52 year old male, pain

to the chest from uh, strikes." Officer

Williams: "Roger, copy."

Sergeant Mitchell: "Roger, no difficulty breathing at this time."

Officer Williams: "Roger."

**JFKIA Patrol Radio (23:31:59 hours)**

Officer Williams: "One unit to standby 2-6-9 for EMS."

**JFKIA Patrol Radio (23:32:46 hours)**

Officer Williams: "Response 5, 3-9 again."

21

PA1838

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

**JFKIA Telephone – Comm. Desk 1 (23:33:00 hours)**

Officer Williams: "Alright listen, you need to uh, go back to the plane. Uh, some of the cops think they lost their memo books on board the aircraft. So, can you check?

Officer Justincic: "Yeah, I got it."

Officer Williams: "Alright, thanks bye."

**JFKIA Patrol Radio (23:33:51 hours)**

Unknown: *inaudible*
Officer Joseph: "Airtrain, 8-1 Alpha."

**JFKIA Telephone – Comm. Desk 1 (23:34:04 hours)**

Officer Williams: "How ya doing?"

EMS Dispatcher (Tara): "Hi, this is Operator 30 from…"

Officer Williams: "Okay so the number for the injured Police Officer is what?"

EMS Dispatcher (Tara): "4702."

Officer Williams: "4702?"

EMS Dispatcher (Tara): "Umm hmm."

Officer Williams: "Alright and the number for the 45…"

EMS Dispatcher (Tara): "…female?

Officer Williams: "Female."

EMS Dispatcher (Tara): "4710."

Officer Williams: "4710."

EMS Dispatcher (Tara): "Yeah, both of them are en-route."

Officer Williams: "Okay, just for your CAD."

EMS Dispatcher (Tara): "Umm hmm."

Officer Williams: "Umm, I'm gonna take the Bus for the…that's going out to the aircraft for the female, 45, stomach pain…"

EMS Dispatcher (Tara): "Umm hmm."

22

PA1839

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Officer Williams: "…they're also gonna check out a, uh, male 52, hit in the chest. There was a fight onboard the aircraft, so, it's not a chest pain, uh you know, just breather type of thing."

EMS Dispatcher (Tara): "Oh okay, so you're gonna take that same…"

Officer Williams: "Yeah, they're gonna check out two different people with, ya know, complaints."

EMS Dispatcher (Tara): "Okay, okay, no problem…" *inaudible*

Officer Williams: "Alright."

EMS Dispatcher (Tara): "No problem."

Officer Williams: "Alright, bye."

EMS Dispatcher (Tara): "Bye."

**JFKIA Patrol Radio (23:34:10 hours)**

Sergeant Mitchell: "2-6, 2-7, 8-1 Alpha."

**JFKIA Patrol Radio (23:35:59 hours)**
Officer Williams: "Response 5, disregard last."

Officer Justincic: "Copy."

**JFKIA Patrol Radio (23:37:43 hours)**

Officer Williams: "Kennedy Desk to available unit to standby 2-6-9 for EMS transport."

**JFKIA Patrol Radio (23:38:02 hours)**

Officer Capaccio: "15 Charlie, I'll break away from 3-7."

Officer Williams: "Roger, 1-5 Charlie. It's gonna be going to Gate 20. Uh, it's gonna be for uh, one crew member and one passenger."

Officer Capaccio: "Copy."

**JFKIA Patrol Radio (23:41:54 hours)**

Unknown: "Unit with EMS, uh, try and figure out which Bus that is."

Unknown: "You got another Bus?"

Unknown: "Yeah, we got two coming. One for the PO and uh, one for the aided."

Unknown: "Copy."

23

PA1840

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

**JFKIA Patrol Radio (23:42:36 hours)**

Unknown: "Kennedy, I'm gonna send EMS in for the PO."

Unknown: "Copy, we're waiting."

**JFKIA Patrol Radio (23:44:42 hours)**

Officer Capaccio: "EMS en-route to Terminal 5, Gate 20."

**JFKIA Patrol Radio (23:45:00 hours)**

Officer Capaccio: "Kennedy, you copy?"

Officer Williams: "Roger, you're en-route with EMS to Gate 20, Terminal 5 is that affirm?"

Officer Capaccio: "That's affirm."

**JFKIA Patrol Radio (23:45:18 hours)**

Officer Napoli: "Kennedy, Charlie 1."

Officer Williams: "Charlie 1."

Officer Napoli: "Case number Emirates."

Officer Williams: "9-7-5-2-5. 9-7-5-2-5."

Officer Napoli: "Roger. Show me on to Cathay."

**JFKIA Telephone – Comm. Desk 3 (23:49:26 hours)**

Officer Kovalsky: "Port Authority Police, Kovalsky, JFK."

Detective Brugnoni: "Hey, it's Brugnoni, how are you?"

Unknown: *inaudible*

Detective Brugnoni: "Hello?"

Unknown: *inaudible*

Officer Kovalsky: "Hello?"

Detective Brugnoni: "Hello? Hey, Brugnoni. Hey, can you do me a favor? Do you if Koloskov is working right now"

Officer Kovalsky: "I don't think so…*inaudible*…hang on let me check…*inaudible*"

24

PA1841

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Detective Brugnoni: "Cause he was working the afternoon I don't know if he got forced or if he held over."

Officer Kovalsky: "Hang on...*inaudible*...standby."

**JFKIA Telephone – Comm. Desk 3 (23:50:49 hours)**

Officer Kovalsky: *inaudible*

Detective Brugnoni: "Yeah."

Officer Kovalsky: "I don't have him on the roll."

Detective Brugnoni: "Alright, no problem. Thank you."

Officer Kovalsky: "Yep."

Detective Brugnoni: "Bye."

**JFKIA Patrol Radio (23:52:36 hours)**

Officer DaSilva: "1-5 Alpha, Kennedy."

Officer Williams: "1-5 Alpha."

Officer DaSilva: "8-2 Bugiada, 8-2 McCafferty on board Bus 5-1 Charlie to Manhasset LIJ."

Officer Williams: "Roger, 2352."

Officer DaSilva: "Roger. You can show me on the follow."

**JFKIA Patrol Radio (23:54:38 hours)**

Sergeant Mitchell: "15, 8-1 Alpha."

Officer Jannazzo: "Go ahead."

Sergeant Mitchell: "What's your location?"

Officer Jannazzo: "Standing by Terminal 5 Departures, waiting for 800."

Sergeant Mitchell: "Rog."

**JFKIA Patrol Radio (23:55:02 hours)**

Sergeant Mitchell: "8-1 Alpha, Kennedy."

Officer Williams: "8-1 Alpha."

25

PA1842

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Sergeant Mitchell: "Have an available unit 50 with me, Terminal 5, Gate 20."

**JFKIA Patrol Radio (23:55:26 hours)**

Officer Williams: "1-5 from Kennedy."

Sergeant Mitchell: "Nah, he's waiting for 800. Send me somebody else."

**JFKIA Patrol Radio (23:55:44 hours)**

Officer Justincic: "Response 5, I can step out."

Officer Williams: "Uh, Roger, I believe he said available sector. You need a sector, uh Sarge, or you need a unit?"

Sergeant Mitchell: "Response 5 is fine. Thank you."

Officer Williams: "Rog."

**JFKIA Patrol Radio (23:56:40 hours)**

Sergeant Croce: "8-9-2, 8-1."

**JFKIA Patrol Radio (23:56:50 hours)**

Sergeant Croce: "8-1 Alpha, 8-1."

**JFKIA Patrol Radio (23:56:58 hours)**

Sergeant Croce: "8-1 Alpha, on the air?"

Sergeant Mitchell: Go 'head."

Sergeant Croce: "Do you have 92?"

**JFKIA Patrol Radio (23:57:11 hours)**

Sergeant Mitchell: "Go again."

Sergeant Croce: "Do you have 92 on a job?"

**JFKIA Patrol Radio (23:57:24 hours)**

Officer Williams: "Roger, is uh, somebody trying to raise the desk?"

Sergeant Mitchell: "That's a negative. 92 is not at my location."

Sergeant Croce: "Kennedy, raise 92 have him 3-9 the Main."

Sergeant Mitchell: "Alright Roger."

26

PA1843

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Officer Williams: "8-9-2, 3-9 the Main House. 8-9-2."

**JFKIA Patrol Radio (23:58:22 hours)**

Officer Williams: "1-5 Charlie, are you off Terminal 5 yet?"

Officer Capaccio: "Off with EMS."

Officer Williams: "Roger, 2358. I'll show you off."

**JFKIA Patrol Radio (23:58:58 hours)**

Officer Justincic: "Kennedy, Response 5."

Officer Williams: "Response 5, go."

Officer Justincic: "8-1 Alpha's exact location?"

Officer Williams: "8-1 Alpha come up with your exact location for Response 5."

**JFKIA Patrol Radio (23:59:21 hours)**

Officer Williams: "8-1 Alpha from Kennedy."

Sergeant Mitchell: "G'head."

Officer Williams: "Roger, Response 5 is trying to 50 with you, uh, come up with your exact location."

Sergeant Mitchell: "On board the aircraft."

Officer Williams: "Roger, Response 5 copy? On board the aircraft."

Officer Justincic: "Copy. Stepping over."

**JFKIA Telephone – Comm. Desk 3 (23:59:50 hours)**

Officer Kovalsky: "Port Authority Police. Kovalsky. JFK."

Detective Brugnoni: "Hey, it's Brugnoni again. Sorry to bother you but, let me ask you a question, is Mazuryan here?

Officer Kovalsky: "Uh, no."

Detective Brugnoni: "He's not working either. Is there anybody working the tour that speaks Russian?

Officer Kovalsky: "Ooh. Uh...not that I know of. No. Those would be the only two that I would go with."

27

PA1844

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Detective Brugnoni: "Do you guys have the uh.."

Officer Kovalsky: "Maybe…nah, not even Mezzacappa, nah, never mind."

Detective Brugnoni: "Nah, Mezzacappa, Mezzacappa barely speaks English."

Officer Kovalsky: "Ah ha! Listen to you. I love it. Here he is, Mezzacappa. No, I'm kidding. Anyway, no.

Detective Brugnoni: "Alright, bye. Uh, you guys don't have the…you guys don't have the language line number around, do you?"

Officer Kovalsky: "Uh…yeah. Hang on, hang on. I just saw that…Nah, he does not."

Detective Brugnoni: *inaudible*

Officer Kovalsky: "You know what, give me a few minutes and I- I'll send you a text, alright Bud?"

Detective Brugnoni: "You have my number, right?"

Officer Kovalsky: "Yup."

Detective Brugnoni: "I appreciate it Bud."

Officer Kovalsky: "Bye."

## SATURDAY, APRIL 13, 2019

### JFKIA Telephone – Comm. Desk 1 (00:03:26 hours)

Officer Williams: "What's up Sarge?"

Sergeant Mitchell: "Hey, could you uh, tell me what time we got this Terminal 5 job as an Aided?"

Officer Williams: "Okay, uh…it came in as a seizure."

Sergeant Mitchell: "Came in as a seizure."

Officer Williams: "Yeah, standby one second…it came in as a seizure. Uh, plane returning to Gate, male seizing on board the aircraft at 2221 hours."

Sergeant Mitchell: "2221 as a male seizing on board the aircraft."

Officer Williams: "Correct, and then we got additional information. Male, forties having a seizure, bleeding from the mouth. That was at 2225."

Sergeant Mitchell: "2225 they called back and they said he was already bleeding from the mouth?"

28

PA1845

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Officer Williams: "Correct. And…2221 is when the request for uh 85 came up."

Sergeant Mitchell: "2221 is when the 85 came out."

Officer Williams: "Correct."

Sergeant Mitchell: "Gotcha. Okay."

Officer Williams: "Uh…"

Sergeant Mitchell: *inaudible* "…is the 85."

Officer Williams: "Uh, yeah. Do we, eh..uh..have a 16?"

Sergeant Mitchell: "Uh…"

Officer Williams: "Get back to me."

Sergeant Mitchell: "Yeah, actually if you could reach out to Joseph and tell him to uh, respond back to 2-6-9 with the three that he has with him."

Officer Williams: "Three what?"

Sergeant Mitchell: "The three…well…it's…the three officers at the hospital. They're no longer needed there. Have them respond to 2-6-9."

Officer Williams: "Okay, I'm a little confused. Wh- what, Joseph."

Sergeant Mitchell: "Rob Joseph. Airtrain 2-6, 2-7…

Officer Williams: "Okay…"

Sergeant Mitchell: "…and Romeo 2 went to the hospital with the, uh, perp."

Officer Williams: "Alright, so, they- you want all three to return…"

Sergeant Mitchell: "To 2-6-9 and standby."

Officer Williams: "And…negative 16? Or you'll get back to me?"

Sergeant Mitchell: "Nah, nah, there's uh…"

Officer Williams: "I know, alright…"

Sergeant Mitchell: "I'll get back to you on that…"

Officer Williams: "Okay, alright, bye."

29

PA1846

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Sergeant Mitchell: "Okay, no problem."

**JFKIA Patrol Radio (00:06:27 hours)**

Officer Duran: "Capaccio, on the air?"

Officer Capaccio: "Go."

Officer Duran: "Do you have the Bus number that RMA'd the passengers?"

Officer Capaccio: "5-1 Lima."

Officer Duran: "5-1 Lima, copy."

**JFKIA Patrol Radio (00:07:32 hours)**

Lieutenant Hernandez: "8-0, Kennedy. You can show, uh, Inspector on-scene at this time…*inaudible*"

Officer Williams: "Roger, 0-0-0-7. CO on-scene."

Lieutenant Hernandez: "Copy that."

**CPD Telephone – CPD Sgt. Main (00:08:25 hours)**

Sergeant Brown: "Port Authority Police, Sergeant Brown."

Inspector O'Connor: "Hi, how ya doing? It's Inspector O'Connor from JFK. How are you tonight?"

Sergeant Brown: "Good Inspector, yourself?"

Inspector O'Connor: "Good, good. I'm uh, I'm present over at uh, JFK, umm Terminal 5. Umm, I just want to put out a CPD message regarding an Aided. Umm, basically, uh, at 2155, umm, JFK patrol command, uh, had a, uh, a seizure, a male with a seizure on board a Jet Blue flight that was uh, scheduled to take off."

Sergeant Brown: "Okay."

Inspector O'Connor: "The uh, the flight returned back to the gate at uh, 22…"

Sergeant Brown: "You know what Inspector?

Inspector O'Connor: "Yes?"

Sergeant Brown: "Hold on one second. What I'm gonna do is actually print the UOC. This took place on the plane it's a UOC notification.

Inspector O'Connor: "Uh, Chief Gonzalez wanted a notification made to CPD and uh…"

30

PA1847

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Sergeant Brown: "Oh okay, he's the one who said to put it out? No problem."

Inspector O'Connor: "Well yeah, but it's gonna be a very, uh, brief, uh, message."

Sergeant Brown: "Okay, so should it go all COs…"

Inspector O'Connor: "Yes."

Sergeant Brown: "…or just in the Registry?"

Inspector O'Connor: "Uh, well I guess it can just go, it can go in the Registry, but it's gonna be very brief."

Sergeant Brown: "Okay."

Inspector O'Connor: "Umm, basically stating, umm, what we're gonna say. Alright, so basically we'll have, uh, patrol responded to an Aided of uh, male having a seizure on board Jet Blue flight at 2224 hours. Umm, the Aided was removed from Terminal 5 and taken to Jamaica Hospital where he subsequently expired at 2335 hours. Okay, now umm…"

Sergeant Brown: "What was the *inaudible*?"

Inspector O'Connor: "2335 hours."

Sergeant Brown: "Okay, at 2224 hours, uh, JFK units responded to an Aided of a male se- having a seizure on board a JF-, JF-, uh, Jet Blue flight."

Inspector O'Connor: "Umm hmm."

Sergeant Brown: "Aided transported to Jamaica Hospital and expired at 2335 hours."

Inspector O'Connor: "Perfect. Now on the side, uh, not in this note. But I need you to uh, make a special notification to IG, Steve Pasichow, he's the Inspector General."

Sergeant Brown: "Okay."

Inspector O'Connor: "And make a notification to the on-duty Public Information Officer. Because there was, you know, there was definitely a lot of people on the flight and uh, we don't know if there's you know, any media or social media that's reporting on this. So, uh, basically we want the PIO to be involved in it, in case there's any issues. I'm currently uh, out at the, I'm out at the scene and uh, if they need anything they can reach me on my cell.

Sergeant Brown: "Okay."

Inspector O'Connor: "Yeah, so tha- that obviously, that's not in there, in the, uh, the blast. But you know…

Sergeant Brown: "No,"

31

PA1848

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Inspector O'Connor: "…to make notifications, yeah…"

Sergeant Brown: "…but the Public Information Officer. I don't normally give them that information. But I can reach out to the IG."

Inspector O'Connor: "Well, make...yeah, make the notification…uh this is as per Chief Gonzalez. He wants IG notification to Steve Pasichow and he wants the on-duty Public Information Officer notified."

Sergeant Brown: "Okay."

Inspector O'Connor: "I'm just saying that if any of these people have a question, they can just reach me on my cell if they want to speak to me direct. I'm at 9-1-7, 8-8-5, 0-4-6-9."

Sergeant Brown: "Okay, so when I speak to the PIO, I'm gonna give him this same notification, correct?"

Inspector O'Connor: "Okay, that's great. Yep."

Sergeant Brown: "Okay, no problem."

Inspector O'Connor: "Alright, I'm sorry, I didn't catch your name, Sarge. What was it?"

Sergeant Brown: "Sergeant Brown."

Inspector O'Connor: "Sergeant Brown. Okay, thank you so much."

Sergeant Brown: "You're welcome no problem"

Inspector O'Connor: "Have a good night. Bye, bye."

Sergeant Brown: "You too. Bye, bye."

**JFKIA Patrol Radio (00:12:04 hours)**

Officer Williams: "8-9-2 from Kennedy."

Officer Duran: "92"

Officer Williams: "Roger, did I copy correctly that EMS has RMA'd both the crew member and passenger?"

Officer Duran: "That's affirm Kennedy."

Officer Williams: "Roger, do you have the Bus number for the CAD, please?"

Officer Duran: "Affirmative, that's gonna be 5-1 Lima. Go with a case. Oh, actually, uh, everything's gonna be together."

32

PA1849

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Officer Williams: "Roger."

**CPD Telephone – CPD Sgt. Main (00:13:33 hours)**

Sergeant Irving: "Sergeant Irving."

Sergeant Brown: "Hi, Good Evening, Sergeant Brown, CPD. How are you?"

Sergeant Irving: "Good, how are you?"

Sergeant Brown: "Good, uh, they had an incident at JFK and as per Inspector O'Connor and Chief Gonzalez they wanted me to make you aware of it. Just in case of anything."

Sergeant Irving: "Yes, it's…"

Sergeant Brown: "Hold on one second, tho- let me just get the other line."

**CPD Telephone – CPD Sgt. Main (00:14:40 hours)**

Sergeant Brown: "Sorry about that."

Sergeant Irving: "That's okay. I've already been notified. This is about the prisoner that was, that died?"

Sergeant Brown: "See now, nobody told me it was a prisoner. They just said it was a Aided."

Sergeant Irving: "Okay, it was at Kennedy within the last hour, correct?"

Sergeant Brown: "This is at Kennedy with, uh, yeah, 2224 hours he expired at uh, the hospital?"

Sergeant Irving: "Yes, okay. Yes, I've been notified, thank you."

Sergeant Brown: "Okay, so this was a prisoner? Cause I'm, I'm, otherwise I'm putting out the wrong information. You know what I'll call them back."

Sergeant Irving: "Okay, I'm headed out there myself, so I've been getting pieces of information. But from what I understand, he was either in custody or they were attempting to put him in custody. I don't know the semantics of it yet."

Sergeant Brown: "He's telling me this is an aided. This is totally not correct."

Sergeant Irving: "Who, who did you speak to?"

Sergeant Brown: "Uh, Inspector O'Connor."

Sergeant Irving: "Okay, I haven't spoken to him yet directly so I would put out whatever he directed you because he's probably at the scene and I'm not there."

33

PA1850

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Sergeant Brown: "Okay I'll follow up."

Sergeant Irving: "Okay?"

Sergeant Brown: "Okay. Thank you."

Sergeant Irving: "Yeah…Alrighty...bye, bye."

Sergeant Brown: "Okay. Bye, bye."

**CPD Telephone – CPD Sgt. Main (00:16:27 hours)**

Lieutenant Hernandez: "Lieutenant Hernandez."

Sergeant Brown: "Hey Lou, it's Naeemah, how are you?"

Lieutenant Hernandez: "Good, what's going on?"

Sergeant Brown: "Lou, I just spoke with the Inspector who asked me to put out a notification um.."

Lieutenant Hernandez: "Uh huh…"

Sergeant Brown: "…and I have to speak with IG as well, but there's some, a little bit of conflicting information. Was this guy a prisoner?"

Lieutenant Hernandez: "He was an Aided. He was an Aided. He was, he was becoming a prisoner. He…assaulted uh…he assaulted one of the Officers. The first Officer who responded."

Sergeant Brown: "He assaulted one of our Officers?"

Lieutenant Hernandez: "Yes…"

Sergeant Brown: "Okay, did that…"

Lieutenant Hernandez: "That is…"

Sergeant Brown: "Did that happen onboard the plane?"

Lieutenant Hernandez: "Onboard the plane, yes. In the rear of the plane."

Sergeant Brown: "Okay, before he started seizing? Or…You know I'm just. *inaudible* …I just want to put out proper notifications here and I got a lotta bad information. So I'm putting it out as a Aided and I'm just sayin…I'm talking about the seizure, but there's actually an assault involved?"

Lieutenant Hernandez: "Uh, well yes. He was, he was combative with one of the first officers that responded. Uh, basically, taking swings at, at the, the, uh responding officer and he had to be cuffed."

34

PA1851

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Sergeant Brown: "Okay. Alright. I'll…I'll just figure this one out. Okay."

Lieutenant Hernandez: "Alright."

Sergeant Brown: "Thank you."

Lieutenant Hernandez: "Al-alright. You got it. Bye."

Sergeant Brown: "Bye, bye."

**JFKIA Patrol Radio (00:18:28 hours)**

Officer DaSilva: "1-5-Alpha, Kennedy."

Officer Williams: "1-5 Alpha."

Officer DaSilva: "Roger, show uh, show us off at the *inaudible* for LIJ."

Officer Williams: "Roger, copy. 0-0-1-8 hours."

**CPD Telephone – CPD Sgt. Main (00:26:32 hours)**

Scott Ladd (Port Authority Media Relations): "Scott Ladd."

Sergeant Brown: "Hi, Sergeant Brown, CPD. How are you? Good Morning."

Scott Ladd: "Hey Sergeant, how are you?"

Sergeant Brown: "I'm good. I was called…I was, uh, told to give you a call regarding an incident at JFK."

Scott Ladd: "Is this the one on the Jet Blue, uh, flight?"

Sergeant Brown: "Yes. You've already been notified?"

Scott Ladd: "Yeah, uh…Bilich just called us actually, a few minutes ago. But I thank you for reaching out. Umm, yeah, just as an FYI, uh he mentioned there was a disturbance on I guess, a plane as it was heading to Jamaica, is that correct?"

Sergeant Brown: "Correct."

Scott Ladd: "Yeah, and umm, the guy I guess turned violent and we were called at that point and I know the guy expired so…oh you know our plan is basically Sergeant, to just kinda keep it uh, that we're looking into it. It's under investigation and really say nothing else…"

Sergeant Brown: "Okay…*inaudible*"

35

PA1852

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Scott Ladd: "Unless you have other information to offer…"

Sergeant Brown: "Inspector O'Connor gave me a notification to put out, well, I mean, at this point I think I'm probably just gonna put it in the Register as opposed to putting it out. But umm…"

Scott Ladd: "You wanna just give it to me again, to make sure we're all on the same page? Is that okay?"

Sergeant Brown: "Sure, umm…My notification says that umm, at 2224 hours, uh, JFK units responded to a Aided uh, of a male seizing aboard a JetBlue flight. Aided was transported to Jamaica Hospital and expired at 2335 hours."

Scott Ladd: "Okay… 2335 you said?"

Sergeant Brown: "Yes, sir."

Scott Ladd: "Alright, yeah, that's pretty much what Bilich had told us as well, that uh, that they were, I guess this guy turned violent. Sounds like a crazy case. I guess we'll find out more as, as time goes on, right?"

Sergeant Brown: "Yes."

Scott Ladd: "It sounds pretty nuts. Great Sergeant, thank you, yeah I think we're in pretty good shape. If I have any other questions I will give you a call back tho okay…"

Sergeant Brown: "That's fine, you can call me…"

Scott Ladd: "I'm gonna reach…I'm gonna reach out to Inspector O'Connor, but I'll call you guys probably first if I need to…"

Sergeant Brown: "Okay, no problem."

Scott Ladd: "Alright, I hope you have a quieter night going forward."

Sergeant Brown: "I'm sorry?"

Scott Ladd: "I hope you have a quieter night from here."

Sergeant Brown: "Yeah, no, no problem. You know I, I actually had to call Steve Coleman first because I don't have an April calendar of who's on, you know, who's on duty."

Scott Ladd: "Yeah, I, I am by the way. And if you need any, if you have anything either tonight, tomorrow or whenever you're on duty again, yeah, just feel free to call me, Scott Ladd. I'm on the home duty…"

Sergeant Brown: "Okay, Scott, if you have an updated calendar of…"

Scott Ladd: "Yeah, let me…what's your email? Let me forward it to you guys."

PA1853

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Sergeant Brown: "Send it to P-A-P-D-C-P-D."

Scott Ladd: "C-P-D…okay, I will send it over, I'll try to dig it up and if I don't get it tonight, I'll get it tomorrow, but I'll *inaudible*…"

Sergeant Brown: "Not a problem."

Scott Ladd: "I'll definitely send you guys the calendar."

Sergeant Brown: "Much appreciated…"

Scott Ladd: "Appreciate it Sergeant, thanks."

Sergeant Brown: "You're welcome. Bye, bye."

Scott Ladd: "Talk to you soon. Bye."

### JFKIA Telephone – Comm. Desk 1 (00:28:52 hours)

Officer Williams: "Uh, are you tied up doing something?"

Officer Duran: "I'm just uh, helping out, with uh, Delions with uh, witness statements and you know, anything that he needs 'cause that's, that's a lotta sh*t. You know."

Officer Williams: "Alright, no problem, you're tied up. Never mind."

Officer Duran: "Alright."

Officer Williams: "Alright Bye."

### CPD Telephone – CPD Sgt. Main (00:29:22 hours)

Inspector O'Connor: "Yeah."

Sergeant Brown: "Inspector?"

Inspector O'Connor: "Inspector O'Connor, can I help you?"

Sergeant Brown: "Hi Inspector, Sergeant Brown, CPD. Just calling you back to let you know that, um, I was able to reach out to Scott Ladd, the PIO on-duty."

Inspector O'Connor: "Who- who is that? What's his name?"

Sergeant Brown: "His name is Scott Ladd."

Inspector O'Connor: "Scott…"

Sergeant Brown: "Ladd. L-A-D-D."

37

PA1854

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Inspector O'Connor: "Okay."

Sergeant Brown: "He did advise that uh, uh, uh, that Mr. Bilich, Chief Bilich had spoken to him, probably a few minutes before I called.

Inspector O'Connor: "Uh, huh."

Sergeant Brown: "Umm, IG was already notified. They're on their way over there."

Inspector O'Connor: "Okay, sounds good."

Sergeant Brown: "Okay? Uh, sir?"

Inspector O'Connor: "Yep?"

Sergeant Brown: "I just wanted to…I think I'm just gonna put this in the Registry instead of sending it out to everybody. Are you okay with that?

Inspector O'Connor: Which one?

Sergeant Brown: "The-the notification that you gave me. About the Aided."

Inspector O'Connor: "No, uh, the Chief wanted it CPD, you it…"

Sergeant Brown: "CPD all CO's or…?"

Inspector O'Connor: "Umm…"

Sergeant Brown: "If I send it all CO's it's going to all the bosses."

Inspector O'Connor: "Even the civilians?"

Sergeant Brown: "I believe that list is supposed to be all CO's."

Inspector O'Connor: "Yeah…"

Sergeant Brown: "I can look at it again. And just call you back to make sure it's all just internal."

Inspector O'Connor: "Well, I-I mean, unless it's, you know I mean the Chief said he just wanted a brief message and I told him what we have was pretty brief enough."

Sergeant Brown: "Yes, that's fine. I just-I just…"

Inspector O'Connor: "Did you put that out yet? Because I didn't look at my phone yet."

Sergeant Brown: "Well I was trying to reach the IG and uh and Steve Coleman."

Inspector O'Connor: "Alright, I-I think I would just put out, you know that I guess for the CO's…"

38

PA1855

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Sergeant Brown: "Roger that."

Inspector O'Connor: "Uh, that just, that just, basic Aided, stuff that, you know, guy had a seizure and uh, he subsequently was taken to the hospital and he expired. I think that's enough. It's very light, yeah."

Sergeant Brown: "Yes, sir."

Inspector O'Connor: "I appreciate it. Thank you."

Sergeant Brown: "You're welcome. Bye."

Inspector O'Connor: "Bye."

**JFKIA Patrol Radio (00:51:56 hours)**

Officer Reen: "2-4 is off Bravo 46."

Officer Norman: "Roger 2-4."

Lieutenant Hernandez: "8-1 Mitchell, from 8-0."

Sergeant Mitchell: "Go ahead."

Lieutenant Hernandez: "Can you confirm the hospital the Officer went to? Is it Manhasset or Long Island Jewish?"

Sergeant Mitchell: "Alright, standby."

Officer Norman: "8-0, that's gonna be Northshore Manhasset, slash, LIJ, same."

**CPD Telephone – CPD Sgt. Main (01:06:17 hours)**

Sergeant Brown: "Port Authority Police, Sergeant Brown."

Officer Delions: "Hi Ma'am, good night, this is Officer Delions, from JFK."

Sergeant Brown: "Hey, how are you?"

Officer Delions: "I'm well thank you. I was advised to make notifications about an incident that we're investigating right now at Terminal 5."

Sergeant Brown: "Okay."

39

PA1856

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Officer Delions: "Uh, alright, so…it came in as a medical. It was a pl-, it was an outbound flight. Flight 6-5-9 from Terminal 5 to Kingston Jamaica. Umm, it departed at Gate Eighteen and while they were still taxiing, uh, one of the passengers had a seizure onboard the aircraft. So they notified the pilot and he immediately had to turn around, back to Terminal 5. Umm, they returned to Gate 20. Umm, they moved the passenger to the rear of the plane, flight crew members and some nurses onboard. The passenger about ten minutes later started to come out of his seizure state and he reacted by becoming combative. Umm, by this time one of the first responding Officers showed up. The gentleman hit the crew members, two crew members, one of the passengers and the Officer. The Officer pepper sprayed the individual and at this time he requested an 8-13 and everyone showed up. Umm, they got the individual cuffed. He went into another seizure state. They requested put a rush on the, on the responding ambulance. He was transported to the hospital where he was pronounced, at Jamaica Hospital at 2335."

Sergeant Brown: "Okay, let me umm…let's go back."

Officer Delions: "Sure."

Sergeant Brown: "I have a outbound flight, Jet Blue flight 6-5-9."

Officer Delions: "Correct."

Sergeant Brown: "Kingston, Jamaica. Departed to gate, Departed Gate 18. Passenger, male passenger begins to seize, uh gate, uh flight returned, aircraft returned to Gate 20."

Officer Delions: "Umm hmm."

Sergeant Brown: "Uh, JFK Units uh, responded to the Aided. Uh, passenger came out of the seizure and became combative. Uh, struck crew members and a Police Officer. Uh, subject was OC sprayed. Uh, became- uh, started to seize again. Uh, subject was transported to Jamaica Hospital and expired."

Officer Delions: "That is correct."

Sergeant Brown: "Okay…alright. Uh, who am I speaking with?"

Officer Delions: "This is Officer Delions. Uh, I'll spell it… Delta, Echo, Lima, India, Oscar, November, Sierra. Uh, that's badge number 3148."

Sergeant Brown: "Question for you…"

Officer Delions: "Yes…"

Sergeant Brown: "…umm who, who asked you to call here to make the complete notification?"

Officer Delions: "Oh well, this is, everyone's on-scene. Yeah, the Sergeant's on-scene, the Lieutenant's on-scene. So they, I-I, already advised TSA and FBI…negative response by both parties so they just wanted to make sure CPD was notified as well."

40

PA1857

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Sergeant Brown: "Okay...alright. Thank you."

Officer Delions: "Do you need this individual's name?"

Sergeant Brown: "You know, no…"

Officer Delions: "Okay."

Sergeant Brown: "No, you can hold that for your report and IG and everybody else has that."

Officer Delions: "Yeah, everyone's responding of course."

Sergeant Brown: "Okay, alrighty."

Officer Delions: "Ma'am, do you mind if I just take your name?"

Sergeant Brown: "Sure, Sergeant Brown."

Officer Delions: "Sergeant Brown. Thank you very much."

Sergeant Brown: "You're welcome. Thank you."

Officer Delions: "Alright ma'am, have a good night."

Sergeant Brown: "You too, be safe."

**JFKIA Patrol Radio (01:30:05 hours)**

Lieutenant Hernandez: "8-0, Kennedy."

Officer Williams: "8-0, Go."

Lieutenant Hernandez: "Alright, for the CAD. All units gonna be 98 from Gate 20, Terminal 5."

Officer Williams: "Roger, copy. All units, 9-8. 0-1-3-0 hours."

Lieutenant Hernandez: "Thank you."

Officer Williams: "Roger uh, 8-0, can you 3-9, uh, I need to know who's…who's doing the paperwork and what paperwork is being done.

Sergeant Mitchell: "8-1 Alpha, Kennedy."

Officer Williams: "8-1 Alpha, go."

Sergeant Mitchell: "8-2 Delions is gonna handle the paperwork. It's gonna be a CCR, uh four Aideds and uh, numerous vouchers."

41

PA1858

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Officer Williams: "Roger and one POI."

**CPD Telephone – CPD Sgt. Main (01:38:47 hours)**

Sergeant Brown: "Central Police Desk, Sergeant Brown."

Lieutenant Hernandez: "Hey uh, Sergeant Brown, Lieutenant Hernandez. Umm, ok, we're all 9-98 from JetBlue, Terminal 5."

Sergeant Brown: *inaudible*

Lieutenant Hernandez: "…Gate 20. Umm, it's in the hands of the IG."

Sergeant Brown: "Okay."

Lieutenant Hernandez: "Alright…and the Officer's still at the hospital. But, uh, we'll update CPD when he gets out."

Sergeant Brown: "There's a Officer who's at the hospital?"

Lieutenant Hernandez: "Yeah, yeah, the uh, officer that uh, first responded, uh, Bugiada."
Sergeant Brown: "Is he there being treated?"

Lieutenant Hernandez: "Yeah, he's being treated."

Sergeant Brown: "That information didn't get up here Lou." Lieutenant Hernandez: "Oh it, oh it didn't…"

Sergeant Brown: "No it didn't."

Lieutenant Hernandez: "When they called CPD they didn't notify the…"

Sergeant Brown: "He gave me all the information that I didn't get previously about this whole thing…"

Lieutenant Hernandez: "Uh huh."

Sergeant Brown: "…Uh but you know I didn't even know what…we didn't, we didn't get properly notified up here with this. Umm, in any event, the last thing I got is really just about the expiration of the Aided, umm and everything to do with that. Umm, what's the Officer's umm, employee number…who was involved?"

Lieutenant Hernandez: "Uh…let me get you that. Okay, his employee number is uh, 4-7-8-1-4. And his name is Bugiada, B-U-…"

Sergeant Brown: "It's okay, because I won't put his name in it…"

Lieutenant Hernandez: "Alright."

42

PA1859

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Sergeant Brown: "I just will put the Officer, he was also transported to the hospital, or-?

Lieutenant Hernandez: "Yeah, he's at North Shore University Hospital. They, they, uh, all the bosses know about it. It just didn't go to CPD I guess cause…"

Sergeant Brown: "So this is where the notifications get logged…

Lieutenant Hernandez: "Yeah…"

Sergeant Brown: "…so I have to put it in there, about the incident…"

Lieutenant Hernandez: "…Right, right."

Sergeant Brown: "Off Shore University Hospital, you said?

Lieutenant Hernandez: "Yeah, yeah, North Shore Universe-…"

Sergeant Brown: "Oh, North Shore…"

Lieutenant Hernandez: "Yeah…North Shore…"

Sergeant Brown: "N-O-R-T-H S-O…North Shore University. So, what do you want me to put in the Registry? During the course of, uh…I don't know…responding to the Aided…"

Lieutenant Hernandez: "Yeah, during the course of uh, struggling with the Aided subject uh, the officer uh, injured both right and left hand."

Sergeant Brown: "And was transported to North Shore…"

Lieutenant Hernandez: "That's uh, I think, North Shore Manhasset, that's what they call it, North Shore Manhasset Hospital."

Sergeant Brown: "North Shore Manhasset Hospital, okay."

Lieutenant Hernandez: "Alright…and…"

Sergeant Brown: "And I'll put his Employee Number, you said 4-7-8-1-4?"

Lieutenant Hernandez: "Uh…Yes."

Sergeant Brown: "Okay. Roger that, I'll add it to the uh…"

Lieutenant Hernandez: "And we're all 98 from uh, the uh…the uh, investigation scene at Gate 20."

Sergeant Brown: "Okay…Gate 20, Terminal 5."

Lieutenant Hernandez: "Yes."

43

PA1860

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Sergeant Brown: "Roger that."

Lieutenant Hernandez: "Thanks, have a good one."

Sergeant Brown: "No problem, you too."

PA1861

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

# EXHIBIT 3

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER



# OFFICE OF CHIEF MEDICAL EXAMINER
## CITY OF NEW YORK

## REPORT OF AUTOPSY



**Name of Decedent:** Evgeniy Lagoda

**M.E. Case #:** Q-19-009214

**Autopsy Performed by:** Yvonne Milewski, M.D.

**Date of Autopsy:** 04/13/2019

## FINAL ANATOMIC DIAGNOSES

I. SUDDEN DEATH FOLLOWING GRAND MAL SEIZURE OF UNDETERMINED ETIOLOGY WITH POST-ICTAL EXCITED DELIRIUM:
    A. TONGUE ABRASIONS/LACERATION/CONTUSIONS
    B. FEATURES SUGGESTIVE OF MESIAL TEMPORAL SCLEROSIS (CA4) AND BILATERAL BASAL SUBARCHNOID GLIONERONAL HETEROTOPIA (SEE NEUROPATHOLOGY REPORT)

II. PHYSICAL STRUGGLE/ALTERCATION WITH MULTIPLE BLUNT IMPACTS TO HEAD, TORSO, AND EXTREMITIES WITH MULTIPLE ABRASIONS, CONTUSIONS AND LACERATIONS

III. HYPERTENSIVE CARDIOVASCULAR DISEASE:
    A. CARDIAC HYPERTROPHY (455 GRAMS) WITH MICROSCOPIC FEATURES CONSISTENT WITH ABOVE (SEE CARDIAC PATHOLOGY CONSULTATION REPORT)
    B. ARTERIOLONEPHROSCLEROSIS; KIDNEYS

IV. HEPATIC STEATOSIS (MODERATE):
    A. ABDOMINAL ULTRASOUND (MARCH 2019): HEPATIC STEATOSIS
    B. BLOOD CHEMISTRIES (CLINICAL LABORATORY – MARCH 2019):
        1. BILIRUBIN, TOTAL 31.5 (REFERENCE RANGE 3.4-20.5)
        2. ASPARTATE TRANSAMINASE 92 (REFERENCE RANGE 5-34)
        3. ALANINE AMINOTRANSFERASE 81 (REFERENCE RANGE 0-55)
        4. GAMMA-GLUTAMYL TRANSFERASE 218 (REFERENCE RANGE 12-64)

V. BLUNT FORCE INJURIES ASSOCIATED WITH RESUSCITATIVE EFFORTS:
    A. ABRASIONS OF STERNUM
    B. PARA-TRACHEAL AND TRACHEAL HEMORRHAGE, FOCAL

CONFIDENTIAL SUBJECT TO CONFIDENTIALITY ORDER

Q-19-009214                    EVGENIY LAGODA                    Page 2

## OPINION

**CAUSE OF DEATH:**          SUDDEN DEATH FOLLOWING GRAND MAL SEIZURE OF UNDETERMINED ETIOLOGY COMPLICATED BY POST-ICTAL EXCITED DELIRIUM

**OTHER SIGNFICANT CONDITION(S):**          PHYSICAL STRUGGLE/ALTERCATION WITH BLUNT IMPACTS; HYPERTENSIVE CARDIOVASCULAR DISEASE

**MANNER OF DEATH:**          HOMICIDE (SEE ABOVE)

New York City Office of Chief Medical Examiner
I certify the attached are true copies of
document(s) in OCME's possession.

Signed                                    Date  10/28/19
Yvelisse Matias

PA1864