UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

ALEXEY V. TARASOV, ESQ., Administrator of the
Estate of EVGENIY LAGODA, Deceased, and
GRIGORY TIKHOPLAV,

                           Plaintiffs,

    -against-

PORT AUTHORITY OF NEW YORK AND
NEW JERSEY, and PORT AUTHORITY OF NEW
YORK AND NEW JERSEY POLICE DEPARTMENT
a/k/a PORT AUTHORITY POLICE DEPARTMENT a/k/a
PAPD, PAPD OFFICER MICHAEL BUGIADA, PAPD
OFFICER ROBERT JOSEPH, PAPD OFFICER
JONATHAN PAPIA, PAPD OFFICER PAUL
MEZZACAPPA, and PAPD OFFICER JONATHAN
DURAN,

                           Defendants.

------------------------------------------------------------------------X

Case No.: 21-cv-6226 (NRB)

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Port Authority Law Department
*Attorneys for Defendants*

On the Brief:
Cheryl Alterman, Esq.
Matthew Malysa, Esq.

## TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 2

ARGUMENT .......................................................................................................................... 2

Standard for Granting Summary Judgment ...................................................................... 2

    Point I ................................................................................................................................3

Plaintiff's State Law Claims are Barred by their Failure to Timely Serve a Notice of Claim .... 3

    A.   The Notice of Claim Requirement is a Mandatory Condition Precedent to Suit ........ 3

    B.   Plaintiffs' Notice of Claim Was Untimely ................................................................. 4

    Point II ...............................................................................................................................5

The Port Authority Cannot Be Held Liable Under a Failure-To-Train Theory
as Alleged ............................................................................................................................ 5

    A.   Legal Standard for Municipal Liability Under Section 1983 ...................................... 5

    B.   The Port Authority's Training Was Adequate and Did Not Cause Any
        Constitutional Violation .............................................................................................. 6

        a.   Port Authority Police Officers Receive Comprehensive Training ........................... 6

        b.   No Pattern of Constitutional Violations or Deliberate Indifference ....................... 8

        c.   No Casual Connection Between Any Alleged Training Deficiency and Lagoda's
            Death .................................................................................................................. 10

        d.   The Port Authority's Police Training Satisfies the Standards of *City of Canton* ...11

    Point III ............................................................................................................................12

Plaintiffs' Purported Section 1983 Excessive Force Claim Fails a Matter of Law .................. 12

    A.   Legal Standard for Excessive Force Claims ............................................................. 13

    B.   The Officers Use of Force Was Objectively Reasonable Under the Circumstances . 14

        a.   The Nature and Severity of the Situation ............................................................. 14

        b.   The Immediate Threat to Officers and Others ..................................................... 15

        c.   Active Resistance to Officers ............................................................................... 15

        d.   Immediate Medical Response ............................................................................... 18

        e.   Medical Evidence ................................................................................................ 18

        f.   The Officers' Actions Were Reasonable Under the Circumstances ...................... 19

    C.   The Individual Defendants are Entitled to Qualified Immunity .............................. 20

      a.    Legal Standard for Qualified Immunity................................................................... 20

      b.    The Officers' Actions Were Objectively Reasonable Under the Circumstances .. 21

Point IV............................................................................................................................23

The Port Authority of New York and New Jersey Police Department a/k/a Port Authority Police Department a/k/a PAPD is Not a Proper Defendant to this Action........................................... 23

Point V.............................................................................................................................24

The Port Authority Cannot be Assessed Punitive Damages ...................................................... 24

CONCLUSION...................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amnesty Am. v. Town of W. Hartford*,
  361 F.3d 113 (2d Cir. 2004)...............................................................................8, 10

*Amore v. Novarro*,
  624 F.3d 522 (2d Cir. 2010)................................................................................21, 23

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).................................................................................................2

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011)...............................................................................................20

*Bd. of County Comm'rs v. Brown*,
  520 U.S. 397 (1997)...........................................................................................8, 10

*Blyden v. N.Y.P.D.*,
  No. 05 CV 4740 SJF LB, 2005 WL 3388609 (E.D.N.Y. Dec. 12, 2005)..................9

*Caceres v. Port Auth. of New York & New Jersey*,
  631 F.3d 620 (2d Cir. 2011).................................................................................3, 5

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).................................................................................................3

*City of Canton v. Harris*,
  489 U.S. 378 (1989)..................................................................................5, 6, 8, 11, 12

*City of Oklahoma City v. Tuttle*,
  471 U.S. 808 (1985).................................................................................................9

*Connick v. Thompson*,
  563 U.S. 51 (2011)............................................................................................10, 12

*Fujitsu Ltd. v. Fed. Exp. Corp.*,
  247 F.3d 423 (2d Cir. 2001).....................................................................................3

*Gabin v. Greenwich House, Inc.*,
  210 A.D.3d 497 (2022)..............................................................................................4

*Graham v. Connor*,
  490 U.S. 386 (1989)........................................................................................13, 14, 23

iii

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982) ................................................................................................20

*Hernandez v. New York City Health & Hosps. Corp.,*
  78 N.Y.2d 687 (1991) ..............................................................................................4

*Jones v. Town of E. Haven,*
  691 F.3d 72 (2d Cir. 2012) .....................................................................................10

*Jourdain v. Port Authority of New York and New Jersey,*
  19-CV-1168 ARR JO 2020 WL 2513447 (E.D.N.Y. May 15, 2020) ......................23

*Kiss v. Torres,*
  No. 21-CV-10391, 2024 WL 1210941 (S.D.N.Y. Mar. 19, 2024) ............................6

*Lennon v. Miller,*
  66 F.3d 416 (2d Cir. 1995) ......................................................................................21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ..................................................................................................3

*Monell v. Dep't of Soc. Servs.,*
  436 U.S. 658 (1978) ..............................................................................................5, 8

*Mullenix v. Luna,*
  577 U.S. 7 (2015) ....................................................................................................20

*Murphy v. Harris,*
  210 A.D.3d 410 (2022) .............................................................................................4

*New York City Transit Auth. v. Am. Transit Ins. Co.,*
  211 A.D.3d 643 (2022) .............................................................................................4

*Payne v. Cnty. of Nassau,*
  No. 03-CV-1929 DRH JO, 2005 WL 2179419 (E.D.N.Y. Sept. 9, 2005) ................9

*Pearson v. Callahan,*
  555 U.S. 223 (2009) ................................................................................................20

*Provost v. City of Newburgh* .......................................................................................21
  262 F.3d 146 (2d Cir. 2001)

*Rose v. Port Auth. of New York & New Jersey,*
  13 F. Supp. 2d 516 (S.D.N.Y. 1998) .......................................................................24

*Shifa Services, Inc. v. Port Authority of New York and New Jersey,*
  No. 96 Civ. 1361(AGS), 1997 WL 563301 (S.D.N.Y. Sept. 8, 1997) ....................24

iv

*Stephenson v. Doe,*
    332 F.3d 68 (2d Cir. 2003)....................................................................................23

*Tracy v. Freshwater,*
    623 F.3d 90 (2d Cir. 2010)..............................................................................13, 20

*Vernon v. Port Auth. of New York & New Jersey,*
    154 F. Supp. 2d 844 (S.D.N.Y. 2001)..................................................................24

*Walker v. City of N.Y.,*
    974 F.2d (2d Cir. 1992)..........................................................................................6

*Wray v. City of N.Y.,*
    490 F.3d 189 (2d Cir. 2007)...................................................................................6

**Statutes**

42 U.S.C. § 1983...............................................................................................................13

N.J. Stat. Ann. § 32:1-163..................................................................................................3

N.Y. Est. Powers & Trusts Law § 5-4.1 ............................................................................4

N.Y. Unconsol. Laws § 7107..............................................................................................3

**Other Authorities**

Fed. R. Civ. P. 56(a) ..........................................................................................................2

v

## PRELIMINARY STATEMENT

Defendants Port Authority of New York and New Jersey ("Port Authority"), Port Authority Officer Michael Bugiada, Port Authority Officer Robert Joseph, Port Authority Officer Jonathan Papia, Port Authority Officer Paul Mezzacappa, and Port Authority Officer Jonathan Duran (collectively "Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment dismissing Plaintiffs' claims.

This case arises from the unfortunate death of Evgeniy Lagoda ("Lagoda") on April 12, 2019, following an incident on JetBlue Flight 659 at JFK Airport. As established by the undisputed material facts, Lagoda experienced a seizure related to his previously undiagnosed medical condition while onboard an aircraft with approximately 200 passengers. At the time Port Authority Officers responded to the aircraft, they were confronted with Lagoda who presented as a violent individual who had assaulted members of the flight crew and passengers. The officers were tasked with the difficult job of restraining Lagoda onboard the aircraft while protecting the safety of all the passengers and flight crew. The officers' actions were reasonable, necessary, and in accordance with their training and Port Authority protocols.

The undisputed material facts, which are supported by overwhelming evidence including eyewitness testimony, contemporaneous documentation, medical records, and expert testimony, establish that Plaintiffs' complaint should be dismissed for the following reasons:

(1) Plaintiffs failed to serve a timely notice of claim as required by statute, which bars their state law claims.

(2) The Port Authority's training of its officers was comprehensive and appropriate and there is no evidence of any pattern of constitutional violations resulting from inadequate training, nor any deliberate indifference to a known risk.

1

(3) Plaintiffs did not include an excessive force claim in their complaints; however, the undisputed evidence shows that the responding officers did not use excessive force or violate Lagoda's constitutional rights in any way.

(4) The Port Authority of New York and New Jersey Police Department ("PAPD") is not a legal entity subject to suit and must be dismissed from this action.

(5) Punitive damages cannot be assessed against the Port Authority.

For these reasons, and as set forth more fully below, Defendants are entitled to summary judgment dismissing all claims in this action.

## STATEMENT OF FACTS

The undisputed facts, as supported by the evidence in the record, are set forth in Defendants' Rule 56.1 Statement of Material Facts ("56.1 St."), which is incorporated by reference herein. Citations to "56.1 St. ¶ __" refer to the corresponding paragraphs in Defendants' Rule 56.1 Statement of Material Facts.

## ARGUMENT

### Standard for Granting Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the

2

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal quotation marks omitted). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *id.* at 586, and "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

## Point I

### Plaintiff's State Law Claims are Barred by their Failure to Timely Serve a Notice of Claim

Plaintiffs' claims for wrongful death and conscious pain and suffering under New York State law must be dismissed against the Port Authority because Plaintiffs failed to comply with the mandatory notice of claim requirements governing actions against the Port Authority.

### A.  The Notice of Claim Requirement is a Mandatory Condition Precedent to Suit

It is well-established that before commencing any action against the Port Authority, a plaintiff must serve a notice of claim at least sixty days prior to filing suit. *See* N.J. Stat. Ann. § 32:1-163; N.Y. Unconsol. Laws § 7107. These statutory provisions are strictly construed. *Caceres v. Port Auth. of New York & New Jersey*, 631 F.3d 620, 624 (2d Cir. 2011). Failure to comply with the notice of claim requirement is considered a jurisdictional defect that cannot be cured and mandates dismissal. *Id.*

### B. Plaintiffs' Notice of Claim Was Untimely

In wrongful death actions, the one-year limitations period begins to run from the date of death. N.Y. Est. Powers & Trusts Law § 5-4.1 (McKinney); see also *Hernandez v. New York City Health & Hosps. Corp.*, 78 N.Y.2d 687, 693 (1991). Lagoda died on April 12, 2019 (56.1 St. ¶ 79), which means Plaintiffs had until April 12, 2020, to file their complaint. Because the notice of claim must be filed at least sixty days before commencing suit, Plaintiffs were required to serve their notice of claim by February 12, 2020, at the latest.

Plaintiffs did not serve their notice of claim until April 7, 2021—421 days after the statutory deadline. (56.1 St. ¶ 115). Even accounting for the tolling periods established by New York Governor Andrew Cuomo's COVID-19 Executive Orders, Plaintiffs' notice of claim was untimely. Under the most generous interpretation of those orders, Plaintiffs had until November 26, 2020, to commence this action and would have needed to serve a notice of claim at least 60 days prior. See *Murphy v. Harris*, 210 A.D.3d 410, 411 (2022); *Gabin v. Greenwich House, Inc.*, 210 A.D.3d 497, 498 (2022); *New York City Transit Auth. v. Am. Transit Ins. Co.*, 211 A.D.3d 643, 643 (2022).

Accordingly, Plaintiffs' state law claims for wrongful death (First Count of Plaintiff's First Amended Complaint) and conscious pain and suffering (Second Count Plaintiff's First Amended Complaint) are time-barred and must be dismissed. (56.1 St. ¶¶ 106-110). Plaintiffs filed their Complaint in New York Supreme Court, New York County, on April 9, 2021, two days after serving their notice of claim. (56.1 St. ¶ 116). Plaintiffs' failure violates the Port Authority's statutory requirement that a notice of claim be served at least 60 days before commencing an action.

Furthermore, Plaintiffs filed their Complaint more than one year after Lagoda's death, which exceeds the statute of limitations for wrongful death actions, even accounting for COVID-

4

19-related tolling periods. The Complaint was filed on April 9, 2021, nearly two years after Lagoda's death on April 12, 2019, well beyond the one-year limitations period.

The Second Circuit has consistently required strict compliance with the Port Authority's notice provisions, recognizing the requirement is jurisdictional. See *Caceres*, 631 F.3d at 624-25 (confirming that "the notice of claim provisions in the [Port Authority] Compact... are jurisdictional, and thus... there can be no waiver of those requirements").

Applying the Second Circuit's strict interpretation of the notice requirement in *Caceres* makes clear that Plaintiffs' claims are jurisdictionally barred. Plaintiffs' April 7, 2021 notice of claim was served 421 days after the February 12, 2020 deadline—a delay that far exceeds what any court in this Circuit has found permissible. The Second Circuit has consistently held that such failures constitute a complete bar to bringing state law claims against the Port Authority, with no exceptions for extenuating circumstances or substantial compliance.

Because Plaintiffs failed to timely serve a notice of claim as required by statute, their state law claims for wrongful death and conscious pain and suffering against the Port Authority must be dismissed as a matter of law.

### Point II

**The Port Authority Cannot Be Held Liable Under a Failure-To-Train Theory as Alleged**

#### A. Legal Standard for Municipal Liability Under Section 1983

To establish municipal liability under Section 1983, a plaintiff must demonstrate that a governmental policy or custom caused the alleged constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). The Supreme Court has established a rigorous standard for municipal liability claims based on alleged failures in training. As made clear in *City of Canton v. Harris*, 489 U.S. 378, 388 (1989), a municipality's failure to train must amount to "deliberate indifference to the rights of persons with whom the police come into contact." This deliberate

5

indifference standard requires more than mere negligence; it requires a showing that policymakers made a "conscious" or "deliberate choice" not to train officers adequately in a particular area. *Id.* at 389.

To establish deliberate indifference, a plaintiff must show that: (1) a policymaker knows 'to a moral certainty' that city employees will confront a particular situation; (2) the situation either presents the employee with 'a difficult choice of the sort that training or supervision will make less difficult' or 'there is a history of employees mishandling the situation;' and (3) 'the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.'" *Wray v. City of N.Y.*, 490 F.3d 189, 195-96 (2d Cir. 2007) (quoting *Walker v. City of N.Y.*, 974 F.2d 293, 297-98 (2d Cir. 1992)); see *Kiss v. Torres*, No. 21-CV-10391, 2024 WL 1210941, at *24 (S.D.N.Y. Mar. 19, 2024) (to the same effect). Additionally, the plaintiff must establish causation by showing that "the identified deficiency in a city's training program [is] closely related to the ultimate injury." *City of Canton*, 489 U.S. at 391.

## B. The Port Authority's Training Was Adequate and Did Not Cause Any Constitutional Violation

The undisputed evidence demonstrates that the Port Authority's training was sufficient and that any alleged deficiencies did not cause Lagoda's death.

### a. Port Authority Police Officers Receive Comprehensive Training

Port Authority Officers receive comprehensive training, which includes 26-week academy training that covers behavioral sciences, police practices, laws of arrest, court procedures, defensive tactics, use of force training, first aid, medical response, mental health crisis response, and de-escalation techniques. (56.1 St. ¶ 81). After academy graduation, Port Authority Officers must complete mandatory in-service training sessions twice annually (Spring and Fall sessions), pass tests with a minimum score of 70%, complete remedial training if standards are not met, and maintain proficiency in skills learned at the academy. (56.1 St. ¶ 82).

6

On the date of the incident, the Port Authority's use of force policies were set forth in General Order 100-05 "Use of Non-Deadly Force" and General Order 100-13 "Use of Force." (56.1 St. ¶ 83). Lt. Bergery testified that Port Authority Officers are trained to use force that is "objectively reasonable at the time to control the suspect" and "whatever level of force is reasonable at the time that the officer believes they are able to utilize, just to control the situation, to control the suspect." (56.1 St. ¶ 84).

Port Authority Officers are trained to evaluate "the totality of the circumstance" and make decisions based on "the entire scope" of a situation. This includes assessing environmental factors and space constraints, potential threats to officers and the public, and the number of people involved or at risk. (56.1 St. ¶ 85). This training complies with guidelines from both New York and New Jersey as the department "fall[s] underneath both" state jurisdictions, ensuring adherence to proper standards. (56.1 St. ¶ 86).

Port Authority Officers receive specific training on handling subjects experiencing medical emergencies, including CPR, managing subjects in altered mental states, and frequent medical refresher courses. (56.1 St. ¶ 87). Lt. Sandoz testified that Port Authority Officers are trained to assess situations individually and respond appropriately based on circumstances presented. (56.1 St. ¶ 88).

Port Authority Officers receive in-service training that includes responding to medical emergencies. (56.1 St. ¶ 89). Lt. Sandoz testified that "make the scene safe" is a principle taught at the Academy and that officers first must secure a scene before medical treatment can be rendered. (56.1 St. ¶ 90).

Lt. Sandoz testified that officers are trained to evaluate and respond to the actual situation they encounter, not just what was reported, stating "Many jobs are not exactly what they start out

7

as." (56.1 St. ¶ 91). Lt. Sandoz testified that when responding to medical emergencies, officers consider whether the person is creating a danger to themselves or others. Lt. Sandoz stated: "For police, when we get to the scene, it's someone's actions that we have to deal with." (56.1 St. ¶ 92).

### b. No Pattern of Constitutional Violations or Deliberate Indifference

Plaintiff has failed to prove that the Port Authority can be held liable under the standards of *Monell* because there is no governmental custom, policy or usage that permits officers to use excessive force in these instances. See *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) ("Demonstrating that the municipality itself caused or is implicated in the constitutional violation is the touchstone of establishing that a municipality can be held liable for unconstitutional actions taken by municipal employees.") (discussing *Monell*, 436 U.S. at 691-92.)

In order to establish deliberate indifference, a plaintiff must show that the policymaker's inaction was the result of a "conscious choice" rather than mere negligence. *City of Canton*, 489 U.S. at 389 (internal quotation marks omitted); see also *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 410 (1997) (stating that "deliberate indifference ... requir[es] proof that a municipal actor disregarded a known or obvious consequence of his action" or inaction (internal quotation marks omitted)). There is no evidence that the Port Authority was deliberately indifferent to a known risk. Further, Plaintiffs have not identified any pattern of constitutional violations resulting from inadequate training, nor have they shown that the Port Authority made a "deliberate choice ... from among various alternatives" not to train officers about post-seizure vulnerabilities, use of force, or improper restraint techniques.

The Port Authority's training program was thorough and addressed the full range of situations officers might encounter, including medical emergencies and use of force scenarios. The first course of action that police officers are trained on is to secure the scene for the safety and welfare of the innocent civilians. Here, Lagoda posed a significant threat to the flight crew and

8

passengers onboard the plane.  The police officers were charged with the job of making the scene safe, which required Lagoda to be restrained. (56.1 St. ¶¶ 74, 90). The fact that this specific incident involved a rare confluence of factors—a seizure followed by alleged post-ictal violence in the confined space of an aircraft—does not demonstrate a failure in the Port Authority's training program.

Moreover, the New York Attorney General's Office acknowledged that the Port Authority's "current use of force policy appropriately instructs officers using force to conduct a 'careful balancing of all human interests' and 'use only that force that is reasonably necessary to bring an incident under control, while protecting the lives of the officer or another.'" (56.1 St. ¶ 102).

Courts in this Circuit routinely dismiss failure to train claims where plaintiff cannot demonstrate a history of similar constitutional violations that would have put policymakers on notice of an alleged training deficiency. See *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (the court held that "a single incident of unconstitutional activity is not sufficient to impose liability" on a municipality unless it was caused by an existing policy.); *Blyden v. N.Y.P.D.*, No. 05 CV 4740 SJF LB, 2005 WL 3388609, at *1 (E.D.N.Y. Dec. 12, 2005) (the court dismissed a *Monell* claim where the plaintiff failed to establish a pattern of misconduct beyond the single incident at issue); *Payne v. Cnty. of Nassau*, No. 03-CV-1929 DRH JO, 2005 WL 2179419, at *3 (E.D.N.Y. Sept. 9, 2005) (the court rejected a failure-to-train claim where the plaintiff could not demonstrate a history of similar constitutional violations that would have put policymakers on notice of a training deficiency). Here, there is no evidence of prior incidents that would have alerted the Port Authority to inadequacies in its training regarding handling post-seizure medical conditions when confronted with a violent individual who is assaulting members of the public.

The Second Circuit has set a high bar for establishing municipal liability based on failure to train. In *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012), the Court stated that a plaintiff must show "that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious", and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction. (quoting *Amnesty Am.*, 361 F.3d at 128). The Supreme Court clarified this principle in *Connick v. Thompson*, 563 U.S. 51, 61 (2011), that "deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410, (1997)).

The Second Circuit in *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 130 (2d Cir. 2004), underscored that a single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy. Plaintiffs here have failed to meet this stringent standard.

### c.  No Casual Connection Between Any Alleged Training Deficiency and Lagoda's Death

Plaintiffs cannot establish causation between any alleged training deficiency and Lagoda's death. The undisputed medical evidence demonstrates that Lagoda died from "sudden death following a grand mal seizure of undetermined etiology complicated by post-ictal excited delirium," not from any force applied by the officers. (56.1 St. ¶ 97).

The autopsy revealed multiple underlying medical conditions that contributed to Lagoda's death, including: (1) mesial temporal sclerosis (CA4) and bilateral basal subarachnoid glioneuronal heterotopia, which are associated with seizure disorders (56.1 St. ¶ 99); (2)

10

hypertensive cardiovascular disease, with cardiac hypertrophy (455 grams) (56.1 St. ¶ 98); and (3) arteriolonephrosclerosis of the kidneys (56.1 St. ¶ 98).

The New York Attorney General's Office noted that any injuries associated with the physical struggle were "ultimately superficial; none of them resulted in any skull or facial fractures, and they caused no injury to the brain." (56.1 St. ¶ 100). The New York Attorney General's Office's report further noted that these injuries "would not have been sufficient in and of themselves to cause death, or to contribute to death, in an otherwise healthy person." (56.1 St. ¶ 101).

Furthermore, the restraint techniques used by the officers did not involve prone positioning with pressure on Lagoda's back. As Officer Joseph testified, Lagoda was never placed "strictly prone with his nose directly on the ground" but was always positioned "with his head to one side or the other." (56.1 St. ¶ 53).

The officers' prompt medical response to Lagoda's distress demonstrates proper training rather than its absence. As soon as Officer Joseph noticed Lagoda turning blue, the officers immediately removed the handcuffs, placed Lagoda on his back, initiated CPR, and used an AED. (56.1 St. ¶ 62). This prompt medical response continued until EMS arrived. (56.1 St. ¶ 67).

### d. The Port Authority's Police Training Satisfies the Standards of *City of Canton*

The Port Authority's training program satisfies the standards set forth in *City of Canton*. *City of Canton*, 489 U.S. at 388-89) ([A] municipality's failure to train must amount to "deliberate indifference to the rights of persons with whom the police come into contact…[t]his deliberate indifference standard requires more than mere negligence"; it requires a showing that policymakers made a "conscious" or "deliberate choice" not to train officers adequately in a particular area.). Unlike cases where courts have found deliberate indifference, here, the Port

Authority provided comprehensive training on use of force, medical emergencies, and defensive tactics. More importantly, applying the causation requirement from *City of Canton*, the undisputed medical evidence severs any causal chain between alleged training deficiencies and Lagoda's death. Dr. Mazarin's testimony that Lagoda "had all superficial injuries" with "no injuries to any of his vital structures" and Dr. Sperry's admission that "but for the grand mal seizure... he would have survived" conclusively establish that no training—however comprehensive—could have prevented the medical outcome in this case.

The requirement that a plaintiff identify a pattern of similar violations is particularly relevant here. The record contains no evidence of any prior incidents where Port Authority Officers failed to identify post-seizure medical situations, nor any other cases where individuals died following restraint by Port Authority Officers. Without such a pattern, the stringent standard described in *Connick* cannot be satisfied. See *Connick*, 563 U.S. at 61.

Because the Port Authority's training was adequate and Plaintiffs failed to prove that the Port Authority was aware of any alleged training deficiencies or that the officers consciously disregarded the decedent's rights, Plaintiffs' failure-to-train claim fails as a matter of law.

## Point III

### Plaintiffs' Purported Section 1983 Excessive Force Claim Fails a Matter of Law

Before addressing the merits of a potential excessive force claim, it is important to note that Plaintiffs did not explicitly plead excessive force under 42 U.S.C. § 1983 in either their complaint (Declaration of Cheryl Alterman ("Alterman Dec."), Ex. D.) or the first amended complaint (Alterman Dec., Ex. E). Yet, in plaintiff's premotion conference letter, they claim, "the PAPD Officers' exertion of force had the effect of distorting Mr. Lagoda's upper airway and inhibiting normal air exchange, resulting in the compression of Mr. Lagoda's neck and ultimately

12

his death." (Docket Number 67, p.3).  Pursuant to 42 U.S.C. § 1983 Defendants address why any such excessive force claim would fail as a matter of law.

### A.  Legal Standard for Excessive Force Claims

Claims of excessive force during an arrest or investigatory stop are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). This standard requires balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). The reasonableness of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and must account for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Courts consider several factors in determining whether the force used was reasonable, including: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Graham*, 490 U.S. at 396).

The objective reasonableness standard established by the Supreme Court in *Graham v. Connor* has been consistently applied by the Second Circuit. As the Second Circuit emphasized in *Tracy*, "Not every push or shove, even if it may later seem unnecessary... violates the Fourth Amendment." *Tracy*, 623 F.3d at 96 (quoting *Graham*, 490 U.S. at 397). Rather, the inquiry requires careful attention to "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

13

officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."
*Id.* (quoting *Graham*, 490 U.S. at 396).

### B. The Officers Use of Force Was Objectively Reasonable Under the Circumstances

The undisputed evidence demonstrates that the force used by the officers was objectively reasonable under the circumstances.

#### a. The Nature and Severity of the Situation

The officers were responding to a serious threat to public safety. The incident began as a medical call from JetBlue reported to the Port Authority Police that a male passenger was having seizures on JetBlue Flight 659 at Gate 20, Terminal 5. (56.1 St. ¶ 5). The aircraft was bound for Kingston, Jamaica with approximately 200 passengers on board. (56.1 St. ¶ 7). Multiple witnesses observed Lagoda exhibiting symptoms of a seizure, including "tremors, foaming at the mouth, and some bleeding." (56.1 St. ¶ 9).

However, after the seizure ended, Lagoda suddenly became violent. (56.1 St. ¶ 12). Lagoda had violently assaulted a nurse, striking her hard in the stomach, and repeatedly and forcefully punched flight attendant Calvin Swinney "five to six times" with significant force. (56.1 St. ¶¶ 14-17). As Lagoda became violent, the nurses – one of whom was pregnant – suddenly found themselves trapped in a confined space with a man who had just assaulted two individuals. (56.1 St. ¶¶ 18).

The situation had quickly evolved from a medical incident to an active security threat aboard an aircraft with approximately 200 passengers. (56.1 St. ¶ 7). Flight attendant Swinney, who had 20 years of NYPD experience, including 11 years as a detective, testified that Lagoda "posed a threat to the safety of the other passengers on board this aircraft." (56.1 St. ¶ 19). Swinney further testified as the confined nature of an aircraft being a safety concern, when he testified, "The space is very limited. There's not much you can do, so you just try to get ahold of the suspect, or

14

customer, as best you can before things get out of control." (56.1 St. ¶ 25). Captain Bengtson testified that a confined aircraft environment magnifies the danger of violent behavior: "... it's a confined environment, so anything that one person does in a confined environment has a greater chance to impact more people around them ..." and "... there is a chance for inadvertent people getting hurt, as well as the higher chance of someone getting hurt just due to the density of the people onboard." *Id.*

### b. The Immediate Threat to Officers and Others

When Officer Bugiada arrived at the plane, he was directed to the rear galley where he immediately observed a chaotic scene with women trapped and screaming for help. (56.1 St. ¶ 27). Officer Bugiada testified that Lagoda was blocking the exit from the galley where three women were trapped and visibly scared. (56.1 St. ¶ 28).

Officer Bugiada first attempted to resolve the situation by giving verbal commands and using hand gestures directing Lagoda to move aside to let the women out. (56.1 St. ¶ 29). Lagoda did not comply with Officer Bugiada's verbal commands. (56.1 St. ¶ 30).

Multiple witnesses testified regarding Lagoda's aggressive behavior toward Officer Bugiada, confirming that Lagoda initiated the physical confrontation with the officer. Officer Bugiada stated that Lagoda charged at him with clenched fists. Flight attendant Kevin Ingleton stated that "The officer, to my recollection, also got attacked," "He did attack the officer," and "I saw him move toward to attack him...I saw that he lunged at him." Nurse Wright-Reid stated that when police arrived, Lagoda continued his behavior and was "throwing punches everywhere" including at the police officer. (56.1 St. ¶ 33).

### c. Active Resistance to Officers

In response to Lagoda charging at him, Officer Bugiada deployed OC (pepper) spray. (56.1 St. ¶ 34). Officer Bugiada testified that at the time he deployed the OC spray, he did so to protect

15

himself and everyone on the aircraft by trying to gain compliance and control over Lagoda. (56.1 St. ¶ 35).

The OC spray had no effect on Lagoda, who wiped it off his face and proceeded to attempt to punch Officer Bugiada in the head. (56.1 St. ¶ 36). After avoiding Lagoda's punch, Officer Bugiada responded by striking Lagoda once in the face with his fist, after which Lagoda went to the ground. (56.1 St. ¶ 37).

At 10:29 p.m., Officer Bugiada radioed a distress call stating, "I'm in a fight. Send me another one," and further reporting, "Negative, I'm in a fight. Send me another one." When asked for his location, Officer Bugiada responded, "Gate 20, on the plane!" followed by, "Still combative, speed it up." (56.1 St. ¶ 38).

Officer Bugiada testified that while on the ground, Lagoda bit him, after which Officer Bugiada struck Lagoda four more times: twice when Lagoda bit him, and twice more when he was "losing control." (56.1 St. ¶ 39).

Multiple officers responded to Officer Bugiada's radio call for assistance as they were ordered to do based upon the gravity of the situation. Officer Papia testified the threat to Officer Bugiada was evident to him given that Officer Bugiada "was screaming on the radio" that "he was in a fight for his life." Officer Joseph stated he could "hear a struggle on the radio." (56.1 St. ¶ 41).

Officer Papia described the situation on the aircraft as "total chaos" with passengers standing in the aisle and screaming for help. Officer Joseph observed "an active fight in the rear of the plane" between Lagoda and Officer Bugiada, as well as "multiple passengers, some screaming, an environment filled with OC or pepper spray." (56.1 St. ¶ 42).

Officer Joseph specifically observed Lagoda "actively fighting with Officer Bugiada," "kicking... actively swinging at or grabbing at Officer Bugiada near and around his upper body

16

and his waist and his gun belt." (56.1 St. ¶ 43). Officer Papia testified that he observed Lagoda was "trying to gain compliance over [Bugiada]. He was actively biting him... trying to grab his testicles, his firearm, trying to bite him overall fighting and resisting compliance." (56.1 St. ¶ 44).

Upon arrival at the rear of the aircraft, the responding officers immediately engaged Lagoda, who continued to actively resist. Officer Joseph testified that during the restraint process, Lagoda was actively resisting by "pulling his hands away and kicking and attempting to push up and pull his arms away." (56.1 St. ¶ 46).

Officer Papia testified that he struck Lagoda with a closed fist twice—once in the face and once in the arm area—as he attempted to gain control over Lagoda's left arm as Officer Bugiada attempted to gain control of Lagoda's right arm. (56.1 St. ¶ 47). Officer Joseph assisted by grabbing Lagoda's left hand and bringing it to the rear of his lower back. (56.1 St. ¶ 48). Officer Duran testified that he applied a compliance hold on Lagoda's shin using his expanded baton and hands in a controlled manner. (56.1 St. ¶ 49). Officer Mezzacappa held Lagoda's leg to the ground with his hands. (56.1 St. ¶ 50).

Officer Duran testified that he did not apply his body weight to Lagoda during the restraint process and did not observe any other officers sitting on Lagoda or applying body weight to him. (56.1 St. ¶ 51). Officer Joseph testified that at no point did he observe any officer on top of Lagoda during the restraining process, nor did he observe any officer attempting to asphyxiate Lagoda or cut off his airway. (56.1 St. ¶ 52).

Officer Joseph testified that Lagoda was not entirely face down at any point. Rather, Lagoda was on his chest with his head turned to one side. (56.1 St. ¶ 53).

17

The undisputed facts here show that Lagoda was actively resisting by biting, kicking, and attempting to grab officers' weapons—actions that courts have consistently found justify proportional force responses.

### d.  Immediate Medical Response

After Lagoda was restrained, Officer Joseph noticed Lagoda turning blue around his "neck into his cheek area." (56.1 St. ¶ 60). Officer Papia testified that when the officers discovered Lagoda's neck was blue, Officer Joseph immediately checked for a pulse. (56.1 St. ¶ 61).

Upon finding no pulse, the responding officers immediately removed handcuffs, placed Lagoda on his back, initiated CPR, and called for and used an AED. (56.1 St. ¶ 62). The officers immediately participated in life-saving efforts. Officer Papia testified that he "instructed the group of officers to start CPR." Officer Mezzacappa testified: "I was doing the oxygen. Someone had handed us an AED. Officer Papia was doing compressions." (56.1 St. ¶ 63).

Officer Bugiada, who had started walking toward the front of the aircraft upon Lagoda being handcuffed, was speaking to a sergeant about what had transpired, when he learned that an AED was needed. He then retrieved an AED from a flight attendant and delivered it to the officer at the rear of the aircraft with Lagoda. (56.1 St. ¶ 64).

The AED was administered to Lagoda by the officers and the device recommended that no shock be administered and that the officers continue CPR compressions. (56.1 St. ¶ 65). The officers continued to administer CPR until Emergency Medical Services personnel was on scene. (56.1 St. ¶ 66).

### e.  Medical Evidence

The Office of Chief Medical Examiner's Investigation Report documents that Lagoda was pronounced dead at Jamaica Hospital Emergency Room on April 12, 2019 at 11:35 p.m. (56.1 St. ¶ 67). The Medical Examiner's report notes that "Upon arrival to the emergency room at [11:25

p.m.] the decedent was in asystole. ACLS was continued and the decedent was pronounced dead despite all efforts [11:35 p.m.]." (56.1 St. ¶ 68).

The Medical Examiner's report states that "As per Dr. Turner, the decedent sustained a small laceration to his nose, a few abrasions to his back and chest." (56.1 St. ¶ 69). Dr. Mazarin testified that Lagoda "had all superficial injuries. There were no injuries to any of his vital structures or any of his vital organs, and there's no evidence from the Medical Examiner report that any of those physical injuries led to his death." (56.1 St. ¶ 70).

Plaintiffs' medical expert, Dr. Sperry testified: "But for the grand mal seizure... If the grand mal seizure had not happened, then far more probably than not, he would have survived." (56.1 St. ¶ 71). The autopsy revealed that Lagoda had a pre-existing medical condition called mesial temporal sclerosis (MTS), described by Plaintiff's own medical expert as "the most common of the focal epilepsies" which Lagoda "had been living with for years prior to his death." (56.1 St. ¶ 57). Dr. Sperry testified that Lagoda's MTS was undiagnosed and untreated, and that he was taking no medication for seizures. (56.1 St. ¶ 58).

### f.  The Officers' Actions Were Reasonable Under the Circumstances

Applying the objective reasonableness standard from *Graham* and *Tracy* to the officers' actions in this case demonstrates why summary judgment is appropriate. The Second Circuit in *Tracy* emphasized examining the "severity of the crime," the "immediate threat," and whether the suspect was "actively resisting." Here, all three factors weigh heavily in favor of the officers: (1) Lagoda had committed multiple violent assaults on civilians in a confined aircraft; (2) he posed an immediate threat to approximately 200 passengers, flight crew, and the responding officers; and (3) he was actively and forcefully resisting throughout the encounter—charging at Officer Bugiada with clenched fists, attempting to punch him, biting him, and continuing to physically resist even after multiple officers arrived.

19

The Second Circuit's instruction in *Tracy* that courts should not "second-guess the officer's decision to use force during the course of a dangerous altercation" is particularly relevant here, where the officers confronted a rapidly evolving emergency in the confined space of an aircraft. The force used—progressing from verbal commands to OC spray to physical strikes only after less intrusive methods failed—follows the kind of measured escalation that Second Circuit precedent has found reasonable.

In sum, the officers' use of force was objectively reasonable under the rapidly evolving, dangerous circumstances they faced. The force used was proportionate to the threat posed by Lagoda, who was violent, combative, and actively resisting. Once Lagoda was secured, all restraint holds were released, and when signs of medical distress were observed, the officers immediately transitioned to providing emergency medical care. Accordingly, Plaintiffs' purported excessive force claim fails as a matter of law.

## C. The Individual Defendants are Entitled to Qualified Immunity
### a. Legal Standard for Qualified Immunity

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An officer is entitled to qualified immunity if either: (1) the officer's actions did not violate a constitutional right, or (2) the right was not clearly established at the time of the incident. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotation marks omitted). Even if

20

an officer's actions violated a clearly established right, qualified immunity still applies if it was "objectively reasonable" for the officer to believe his actions were lawful. *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995).

The Supreme Court has emphasized that qualified immunity provides "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010) (*quoting Provost v. City of Newburgh*, 262 F.3d 146, 160 (2d Cir. 2001)).

This doctrine is particularly important in the context of law enforcement, where officers must make rapid decisions in tense and dangerous situations.

### b. The Officers' Actions Were Objectively Reasonable Under the Circumstances

Even if the Court were to find a triable issue regarding whether the individual officers violated Lagoda's constitutional rights, they would still be entitled to qualified immunity because, at a minimum, it was objectively reasonable for them to believe their actions complied with the law.

Given the rapidly evolving emergency onboard a crowded aircraft, the violent behavior exhibited by Lagoda, and the threats he posed to the officers and the public, the officers reasonably believed that their use of force was necessary and appropriate under the circumstances.

Officer Bugiada attempted to resolve the situation without physical force by giving verbal commands and using hand gestures. (56.1 St. ¶ 29). When that failed and Lagoda charged at him with clenched fists, Officer Bugiada used OC spray—a less-lethal option. (56.1 St. ¶¶ 33-34). Only after Lagoda wiped away the spray and attempted to punch Officer Bugiada while Lagoda was charging at him, did the officer resort to physical strikes. (56.1 St. ¶¶ 36-37).

The responding officers used only the force necessary to handcuff Lagoda, who continued to actively resist by biting, kicking, and attempting to grab an officer's weapon. (56.1 St. ¶¶ 39,

21

43-44, 46). Once Lagoda was handcuffed, Officer Mezzacappa testified that "there was no more compliance hold on his body." (56.1 St. ¶ 54).

No reasonable officer believed that the force used under these circumstances violated clearly established law. Indeed, the New York Attorney General's investigation concluded that "there can be little doubt that the officers were legally permitted to use at least some degree of physical force on Lagoda" given that they were informed "that Lagoda had been combative toward civilians on the aircraft," and Officer Bugiada himself "had been swung on by Mr. Lagoda." (56.1 St. ¶ 94). The Attorney General further determined that "Because it would be impossible to prove beyond a reasonable doubt that any of the officers' conduct was unjustified, and therefore that their conduct violated New York Penal Law, the OAG has concluded that no criminal charges are warranted." (56.1 St. ¶ 95).

Moreover, once the officers observed signs of medical distress, they immediately transitioned to providing emergency medical care, demonstrating their commitment to Lagoda's well-being. (56.1 St. ¶¶ 61-66). This prompt medical response further supports the reasonableness of their actions.

Lt. Irving, who conducted an investigation into the incident, testified that "in this particular situation, the officers did not violate any policies that would warrant discipline; therefore, they were not disciplined in this situation." (56.1 St. ¶ 103). Lt. Irving further testified: "… the officers were presented with an individual who did not present having a seizure. He presented as a violent subject. Therefore, in this situation, the officers responded according to what they were presented at the time, which is someone who was violent." (56.1 St. ¶ 104).

Defendants' police expert, John Monaghan, testified that his review and analysis of this matter determined Officer Bugiada's actions to be proper and reasonable under the circumstances,

22

finding Lagoda presented as a combative man in a confined area and Officer Bugiada tried to take control of the situation without using physical force and that progressed to physical restraint in order to take Lagoda under control and place him into custody. (56.1 St. ¶ 40).

The Second Circuit, in *Stephenson v. Doe*, 332 F.3d 68, 78 (2d Cir. 2003), emphasized that the qualified immunity inquiry must recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." (quoting *Graham*, 490 U.S. at 396-397). The evidence here demonstrates that the officers faced precisely such circumstances, and their measured response entitles them to qualified immunity.

As *Stephenson* recognizes, qualified immunity must account for "split-second judgments" in "tense, uncertain, and rapidly evolving" situations. Here, Officer Bugiada had mere seconds to respond when Lagoda charged at him in the confined aircraft galley. His decision to deploy OC spray rather than immediately resort to physical strikes demonstrates exactly the kind of measured response the Second Circuit protected in *Amore*, where the court emphasized that qualified immunity provides room for reasonable but mistaken judgments.

Because the officers' conduct was objectively reasonable under the circumstances, they are entitled to qualified immunity as a matter of law.

### Point IV

**The Port Authority of New York and New Jersey Police Department a/k/a Port Authority Police Department a/k/a PAPD is Not a Proper Defendant to this Action.**

The Port Authority of New York and New Jersey Police Department a/k/a PAPD does not exist as a legal entity separate from the Port Authority and, accordingly, must be dismissed from this action. See *Jourdain v. Port Authority of New York and New Jersey*, 19-CV-1168 ARR JO 2020 WL 2513447, at *9 (E.D.N.Y. May 15, 2020) ("departments which are merely administrative

arms of a municipality [i.e. the Port Authority Police Department] have no separate legal identity apart from the municipality and therefore cannot sue or be sued.").

### Point V

### The Port Authority Cannot be Assessed Punitive Damages

It is well-established by this Court that the Port Authority cannot be assessed punitive damages. See *Shifa Services, Inc. v. Port Authority of New York and New Jersey*, No. 96 Civ. 1361(AGS), 1997 WL 563301 at *5 (S.D.N.Y. Sept. 8, 1997); *Vernon v. Port Auth. of New York & New Jersey*, 154 F. Supp. 2d 844, 860 (S.D.N.Y. 2001); *see also Rose v. Port Auth. of New York & New Jersey*, 13 F. Supp. 2d 516, 524 (S.D.N.Y. 1998) (holding the Port Authority is immune from punitive damages).

Therefore, Plaintiff's claim seeking punitive damages should be dismissed with prejudice.

### CONCLUSION

Based on the foregoing legal analysis and undisputed material facts, Defendants have established that: (1) Plaintiffs' state law claims are barred by their failure to comply with mandatory notice of claim requirements; (2) the Port Authority's training was comprehensive and appropriate, and there is no evidence of a constitutional violation; (3) the officers' use of force was objectively reasonable under the circumstances and did not violate Lagoda's constitutional rights; and, even if a constitutional violation was deemed to have occurred, the individual officers are entitled to qualified immunity because their actions were objectively reasonable under the rapidly evolving circumstances; (4) Port Authority Police Department is not a proper defendant to this action, as it does not exist as a legal entity subject to suit; and (5) Punitive damages cannot be assessed against the Port Authority.

For all these reasons, Defendants are entitled to summary judgment dismissing all claims in this action with prejudice.

Dated: New York, New York
   March 28, 2025

               Port Authority Law Department
               Attorneys for Defendants, Port Authority of
               New York and New Jersey, Port Authority
               Officer Michael Bugiada, Port Authority Officer
               Robert Joseph, Port Authority Officer Jonathan
               Papia, Port Authority Officer Paul Mezzacappa,
               and Port Authority Officer Jonathan Duran

               By:_____
                 Cheryl Alterman, Esq.
                 Matthew Malysa, Esq.
                 4 World Trade Center, 24th Floor
                 150 Greenwich Street
                 New York, New York 10007
                 Telephone: (212) 435-3431

25