# Exhibit E

Kris Sperry, M.D.
Forensic Pathologist

Certified by the American Board of Pathology in:
Anatomic Pathology
Clinical Pathology
Forensic Pathology

April 26, 2024

Re:  Evgeniy Grigorevich Lagoda

I have been provided with records, photographs, reports, and other materials in the matter of Evgeniy Grigorevich Lagoda, a Russian citizen who was pronounced dead at the Jamaica Hospital Medical Center in Jamaica, New York, on April 12, 2019.  These materials include the following:

Jamaica Hospital Medical Center records, including Prehospital
    Care Report Summary (First Responders at the scene)
Autopsy Report and complete Medical Examiner Office file
Photographs (181) taken during autopsy examination
Photographs (59) of prescription and non-prescription medications that
    accompanied the body (labels in Russian)
Medical Records in Russian, with English translations
Second Autopsy Report (translated to English), conducted in Russia by
    a group of Russian Forensic Pathologists, Physicians and Scientists
    New York State Office of the Attorney General (OAG) Report on the
    Investigation into The Death of Evgeniy Lagoda, including Exhibits
Press Release announcing the OAG report

The majority of the information concerning the medical history and the sequence of events which culminated in the death of Mr. Lagoda is obtained from the NY OAG Investigation Report.  Very little other information was known, before his medical records and associated documents were obtained from Russia, as well as the Second Autopsy Report.  The following historical narrative is not meant to comprehensively document the entire sequence of events, but to state certain factual

Sperry Forensic Pathology Consultants
2194 Bear Creek Road
Moreland, Georgia  30259
Telephone:  (770)  252-2002
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
4/26/2024
Page 2 of 17

information and also provide a context for Mr. Lagoda's death.  It is noteworthy that the Port Authority Police Department (PAPD) officers did not wear body cameras, and there is no videotaped record of the incident.  To the best of this writer's understanding, the reconstruction appears to be based upon interviews with Officer Bugaida, others who were involved, and nearby witnesses.

Evgeniy Lagoda was a 39 year old male, a Russian national, who was employed as a mechanic who worked on board large merchant seagoing vessels.  He lived in Russia, and his job required that he periodically would fly to ports in different parts of the world, then board a ship and perform his work as an engineer, generally spending several months at sea before returning back to his home in Russia to await his next assignment.  According to the medical records from Russia, which included the results of a physical examination, routine laboratory testing and standard toxicologic analysis which appear to have been performed periodically to ensure his fitness for employment and his general health, given that he routinely would spend months on board an ocean-going vessel, he was in good health and had no identified drug or alcohol use problems.  The testing results, which were dated within a year prior to his death, disclosed only mild increases in his bilirubin and three liver enzymes, and ultrasonographic diagnosis of an abnormal fatty liver (which is the most likely explanation for the mild laboratory test abnormalities).  He was considered to be fit and in appropriately good health for his employment on large ocean-going ships.

On April 12, 2019, Mr. Lagoda was travelling by air from Moscow, via JFK International Airport, where he was going to change to a JetBlue flight to Kingston, Jamaica, where he was to join the crew of a tanker ship.  Mr. Lagoda arrived at Terminal 1 of JFKIA at approximately 11:56 am, went through passport control, retrieved a suitcase at baggage claim, then went to Terminal 5 to eventually board JetBlue flight 659, which was set to depart to Kingston later in the evening.  It was reported that Mr. Lagoda met up with at least one other Russian national during the layover, who was also bound to join the same tanker crew.  Mr. Lagoda boarded the

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia  30269
Telephone:  (770) 486-5380
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
4/26/2024
Page 3 of 17

aircraft at approximately 9:33 pm, taking seat 33C, an aisle seat in the second-to-last row.

The aircraft pulled away from the gate at approximately 9:55 pm, and about 5 minutes later, Mr. Lagoda began having what appeared to be a generalized seizure. His body was described as convulsing, he was slumped towards the seat beside him, and blood was emanating from his mouth (due to tongue bite injuries, to be detailed subsequently). Passengers who were near him called for assistance, and two male flight attendants immediately responded, and another flight attendant both called for medical assistance on the plane loudspeaker, and notified the pilots of the emergency. Three female nurses, who coincidentally were passengers on the flight, responded to the appeal for help, and went to the rear of the aircraft. One of the nurses directed the flight attendants to lift Mr. Lagoda and take him to the rear galley, where they laid him on the floor. He was rolled on to his side, and pillows and blankets placed under his head.

From the historical information provided, it appears that Mr. Lagoda had continued to exhibit seizure-like activity during his transfer to the galley area, but this began to wane after several minutes, although those attending him believed that he was disoriented; however, none of them spoke nor understood Russian, and Mr. Lagoda did not know or understand English, so a complete verbal communication barrier existed. The flight attendants and nurses (again, unaware of the communication problem) attempted to talk to Mr. Lagoda, who said nothing, but rolled on to his back, then on to his hands and knees. Then, he is described as struggling to remove the leather jacket he was wearing, and was able to do so with the help of the nurses. He was sweating profusely, continued to say nothing, and stood facing towards the front of the aircraft. One of the nurses was standing directly in front of him, trying to speak with him; then, described in the OAG narrative as, "Suddenly, and without warning, Mr. Lagoda struck the nurse forcefully in the abdomen with his fist, and she stumbled backward into the aisle." One of the male flight attendants stepped in front of Mr. Lagoda and "urged him to calm down." Mr.

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia 30269
Telephone: (770) 486-5380
e-mail Dr. Sperry: stiffdoc@bellsouth.net

Dr. Kris L. Sperry
4/26/2024
Page 4 of 17

Lagoda's Russian colleague had come to the galley area by then, and tried to talk to him. However, it is reported that Mr. Lagoda then struck the male flight attendant at least five or six times in the chest. By this time, the pilots had received permission to return to the terminal, and the plane was back at the gate by 10:24 pm. Thus, assuming these times are accurate, approximately 29 minutes had elapsed since the plane had pulled away from the gate.

As soon as the boarding ramp attached to the plane and the door was opened, PAPD officers entered the aircraft. Officer Michael Bugaida, who was posted in Terminal 5 and had been dispatched by a supervisor via radio for a "male having a seizure onboard." Emergency Medical Services (EMS) had been alerted to the emergency, and PAPD officers both entered the plane and were detailed to assist the EMS personnel to the patient. When Officer Bugaida reached the galley area, Mr. Lagoda was no longer striking anyone, and a flight attendant informed Officer Bugaida that "the passenger had had a seizure, and was disoriented, but also "'combative.'"

At this point in the NY OAG report, the following is stated: "**The precise sequence of events that followed is not entirely clear.** [Emphasis added] Several of the flight attendants and nurses, and several passengers seated nearby as well, recalled that Officer Bugaida stated to Mr. Lagoda that he had just had a seizure and instructed him to "'calm down'"---at which point Mr. Lagoda either "'lunged'" at the officer, or swung at him, or (according to three of the witnesses) actually struck the officer in the arm or chest." At this point, Officer Bugaida drew his canister of pepper spray and delivered a burst at Mr. Lagoda. Then, Mr. Lagoda either fell or was "taken to the ground" by Officer Bugaida, who then attempted to handcuff him.

The NY OAG report also states, **"Officer Bugaida's own account of the initial encounter is somewhat different from that of these witnesses."** [Emphasis added] This writer will not detail the text of the OAG report, except to note that the sequence appears to consist of a synthesis of

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia  30269
Telephone:  (770) 486-5380
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
4/26/2024
Page 5 of 17

Officer Bugaida's recollection, which is most probably contained within an interview transcript or other reference source, and interviews with nine passengers and the nurses, and it is assumed also the flight attendants, who witnessed the events. The accounts as put forth in the OAG report are especially significant when the physical encounter as described by Officer Bugaida are contrasted with the physical injuries that were found on Mr. Lagoda's body, both during the autopsy examination at the NYC OCME and the second autopsy report that was completed by Russian forensic physicians and scientists.

Officer Bugaida recalled that he had instructed Mr. Lagoda to move to one side of the galley, to allow a nurse and a flight attendant to pass by, but these commands were ignored (it is unclear if Officer Bugaida knew, at this point, of the complete language barrier.) Mr. Lagoda began to advance on the Officer, who pulled out and discharged his pepper spray, to no effect, and Mr. Lagoda "simply wiped the substance off of his face then took a swing at Officer Bugaida's head, but missed." The Officer then struck Mr. Lagoda in the face one time, knocking him onto his buttocks, and moved to handcuff him. One passenger's account also had the Officer exchanging blows with Mr. Lagoda, but this account also placed the exchange prior to the pepper spray deployment. Irrespective, by this time, all of the nurses and flight attendants are reported to have fled, and did not witness the remainder of Officer Bugaida's actions, nor those of any other PAPD officer. Several passengers reportedly witnessed at least some of those interactions. Many officers began to "flood" into the aircraft, and the NY OAG report states that, "their accounts are partial and in many respects different from one another."

According to Officer Bugaida, he obtained a hold on one of Mr. Lagoda's arms, but could not bring it behind the back, and a struggle ensued which ended with Mr. Lagoda on his back (supine) and the officer straddling the midsection region (thus, facing Mr. Lagoda). The officer recounted that Mr. Lagoda then began to bite the officer's knee, and grabbed at the officer in the region of his gun belt. The officer struck Mr. Lagoda twice (2 times) on

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia  30269
Telephone:  (770) 486-5380
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
4/26/2024
Page 6 of 17

the right face, and the bite was released.  At some point, the officer called over the radio that he was "in a fight," and moments later radioed, "Still combative, speed it up."  Officer Bugaida was able (by his account) to turn Mr. Lagoda on to his stomach (prone), but could not pull the arms out from beneath is body.  The officer then struck Mr. Lagoda three (3) more times, whereupon Mr. Lagoda tried to push himself up off of the deck with his arms, and Officer Bugaida laid his own body on top of him.  A passenger/witness recounted that the officer was telling him [Mr. Lagoda] to relax, giving orders but encountering continual resistance, until more officers entered the airplane.

At and around this time, four more PAPD officers (Robert Joseph, Jonathan Papia, Paul Mezzacappa and Jonathan Duran) entered the back of the aircraft, with more officers still arriving, and began to try to assist Officer Bugaida in the restraint.  All of the officers described seeing Officer Bugaida sitting upon the prone Mr. Lagoda, but it was unclear as to exactly where Mr. Lagoda's hands were located, and whether he was actively resisting the officer's attempts to gain control of the hands.  When the other officers arrived, Officer Bugaida got off of Mr. Lagoda and attempted to gain control of the right arm from the side and one of the other officers attempted to get control of the left arm from the other side (of interest is that two different officers each recall being the one trying to control the left arm).  Officer Mezzacappa grabbed one of Mr. Lagoda's legs, and Officer Duran put the other leg into a "compliance hold," with a baton pressed against the shin area.  Officer Bugaida related that Mr. Lagoda grabbed for the officer's groin region before control of the right arm could be achieved, and Officer Papia struck Mr. Lagoda with a fist in the face and left arm at least one (1) time each.  After only a few seconds, Mr. Lagoda's hands were under control and handcuffs were placed.  At 10:33 pm, an officer radioed that, "It's under control, we're getting it under control," indicating that Mr. Lagoda's restraint had been achieved.  This would indicate that only about 9 to 10 minutes had elapsed from when Officer Bugaida first entered the airplane cabin.

Dr. Kris L. Sperry
4/26/2024
Page 7 of 17

After Mr. Lagoda was restrained, he was rolled on to his side and tried to move him out of the small airplane galley.  It is not clear as to exactly when Mr. Lagoda completely ceased to struggle, or simply ceased to move.  However, within about a minute of the handcuff placement, Officer Papia noticed that the side of Mr. Lagoda's neck was turning blue.  Officer Joseph checked for a pulse, and finding none, removed the handcuffs and put Mr. Lagoda on his back (supine).  Mr. Lagoda was not breathing, moving, or speaking at all, and a call was made for an Automatic External Defibrillator (AED), and other officers began to perform cardiopulmonary resuscitation (CPR).  A flight attendant obtained the aircraft's AED and oxygen equipment, and these were passed back to the event location.  The AED reported that "no shock" was advised (which indicates a cardiac rhythm that will not respond to external defibrillation, such as asystole or Pulseless Electrical Activity (PEA)).

The ambulance that had responded to the PAPD call that a patient was having a seizure was still waiting outside, needing a police escort to the aircraft.  (It was noted that all available officers had responded to Officer Bugaida's call for assistance, leaving none who could escort the ambulance.)  It was not until 10:50 pm that escorted access was achieved, and the EMS personnel did not reach Mr. Lagoda until 10:55 pm (about 22 minutes after it had been reported that the restraint had been accomplished.  The EMS AED also registered "no shock," and with CPR continuing, Mr. Lagoda was transferred into the ambulance and taken to Jamaica (Queens) Hospital, where they arrived at about 11:25 pm.  Despite extensive CPR and repeated epinephrine (adrenaline) administration, no cardiac rhythm was ever restored, and Mr. Lagoda was pronounced dead at 11:35 pm.  A King airway had been placed by the EMS personnel, and this was replaced with an endotracheal tube (ET tube) at the hospital.

A complete autopsy examination was performed on April 13, 2019, by Dr. Yvonne Milewski of the NYC OCME.  This autopsy was documented with extensive contemporaneously obtained photographs of the inside and outside of Mr. Lagoda's body, which also included photographs of injuries

Dr. Kris L. Sperry
4/26/2024
Page 8 of 17

that were visible and discovered during the course of the dissection.  The examination also included retention of the brain and spinal cord and the heart, for formal, separate neuropathologic and cardiovascular pathologic evaluation, and detailed dissection of the posterior and anterior thorax (trunk) down to the skeletal structures, which is standard procedure when conducting a forensic autopsy of a death that occurs when an individual is in police custody, or in the process of being restrained by law enforcement officers.  Specimens were submitted for toxicologic analyses (by both the NYC OCME and an outside accredited forensic toxicology laboratory), and for DNA testing for epilepsy-focused Sudden Death Molecular Analysis (Panel B).

The toxicology testing did not reveal the presence of any ethyl alcohol, nor the presence of any licit or illicit drugs.  No clinically significant DNA variants were detected.  These findings are significant, as there were thus no drugs which could have caused or contributed to Mr. Lagoda's death, and no evidence of ingested alcohol whatsoever.  The DNA testing did not disclose the presence of any clinically significant DNA variants that could have been the reason for his seizure.

The detailed examination of the brain did not reveal any grossly visible (that is, visible to the naked eye) abnormalities of the brain, the coverings of the brain, or the internal brain structures, and the anatomy appeared normally developed.  However, the microscopic examination of brain tissue from specific anatomic regions was abnormal.  Scattered acutely ischemic neuronal cells were found within the right and left hippocampal regions, which means that scattered brain nerve cells showed evidence of damage that could arise from a lack of oxygen and/or sufficient blood supply.  Similar ischemic neurons were found in other places, including the amygdala and right parieto-occipital watershed region.  Slight gliosis (growth of "scar cells" in the brain) was found in the hippocampal area CA4, along with subarachnoid glioneuronal heterotopic (brain neurons in abnormal locations, a condition that occurs during embryonic brain

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia  30269
Telephone:  (770) 486-5380
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
4/26/2024
Page 9 of 17

development).  There was no evidence of any subarachnoid, subdural, or epidural hemorrhage (and no skull fractures were found at the autopsy).

The overall appearance of the microscopic brain findings is suggestive of Mesial Temporal Sclerosis (MTS), also known as Temporal Lobe Epilepsy (TLE), which is the most common of the focal epilepsies.  Up until the event that occurred on the night of April 12, 2019, where Mr. Lagoda had experienced what was correctly interpreted as a generalized seizure, he had no known history of epilepsy or seizures of any type, and his medical records from Russia contained no documentation that he had ever experienced a seizure, of any type.  However, it is known and recognized that MTS may first be manifested by an externally observable seizure at any age, and the apparent fact that this seizure was the initial presentation of Mr. Lagoda's MTS-induced generalized seizure is not, in and of itself, unusual.  It is possible that he might have experienced an unwitnessed seizure at some unknown point in the past, when he was alone, but this is speculative; again, the sudden presentation of a generalized seizure on the basis of neuropathologically proven MTS in a 39 year old male is not unknown or unusual.  Additionally, there is no evidence that he experienced any pre-seizure "aura" or other abnormality that would possibly herald an impending seizure, and he did not have any drugs, medications or alcohol in his blood that might have lowered his seizure threshold.  I agree with the opinion held by the NYC OCME, that the presence of anatomically proven Mesial Temporal Sclerosis is, to a reasonable degree of medical certainty, the anatomic cause of the seizure he experienced in the airplane at JFKIA.

When a seizure occurs, there are frequently abnormalities that persist after the seizure has terminated, which are termed postictal confusion, and sometimes may be very severe disturbances in the normal behavior and thought processes, and these severe disturbances are referred to as postictal psychosis.  Severe disruptions in the thought processes usually resolve after 10 to 20 minutes, but may even persist for days.  In the specific case of Mr. Lagoda, he most probably developed severe postictal

Dr. Kris L. Sperry
4/26/2024
Page 10 of 17

confusion which may have been even psychotic, that began almost as soon as he regained consciousness from the seizure, and which explains his subsequent behavior that was interpreted as violent and aggressive. It is impossible to meaningfully interpret the degree and severity of his behavioral derangement following the seizure, but with the knowledge that a generalized seizure from MTS will frequently be followed by behavior disturbances that can be severe, it is reasonable that he may have interpreted those people around him as being threatening (since he had absolutely no idea of what he had experienced), and if he was struck, or perceived that he was being threatened, responded with aggressive actions in order to protect himself. The underlying fact that his only language was Russian and that he spoke no English put a complete language barrier in place between him and everyone else around him. Mr. Lagoda understood nothing that he was instructed or ordered to do. From the historical information, it is also clear that every person who interacted with Mr. Lagoda knew from the outset that he had had a seizure.

The autopsy examination also included a detailed examination of the heart. The heart was enlarged (cardiomegaly, or cardiac hypertrophy), weighing 455 grams. Various references exist that have attempted to establish "normal" heart weights for adult men and women, and these have established weight variances that exhibit variability from one study to the next. One of the most recent analyses to address the question of "normal" heart weights (Molina, 2012) established a range of "normal" of 233-383 grams, within a 95% confidence interval. Mr. Lagoda's kidneys also exhibited microscopic arteriolonephrosclerosis, or scarring of the filtering units (glomeruli), a finding that is frequently seen in persons with a history of hypertension, or chronically elevated blood pressure. A history of hypertension also explains the relatively mild cardiac enlargement. His translated Russian medical records document blood pressures that are at and around the upper limits of what is considered to be normal. In the absence of any other cause for the heart enlargement (which is not by any means severe), some degree of chronic hypertension is most probably the underlying cause for these findings.

---

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia 30269
Telephone: (770) 486-5380
e-mail Dr. Sperry: stiffdoc@bellsouth.net

Dr. Kris L. Sperry
4/26/2024
Page 11 of 17

The autopsy conducted by Dr. Milewski revealed multiple externally visible and internally revealed abrasions, contusions and hemorrhages, all of which were caused by blunt force impacts of sufficient force to rupture blood vessels and result in localized cutaneous, soft tissue and musculature hemorrhage (bleeding).  These are described within the OCME autopsy report, exhaustively described in the translated second autopsy conducted by Russian physicians and forensic scientists, and illustrated best in the extensive photographs taken at the OCME autopsy examination.  For context, the NY OAG report contains specific delineations of blows that were delivered to Mr. Lagoda's head and body by Officer Bugaida and other officers, the placement of handcuffs, the application of a leg compliance maneuver, and the action of Officer Bugaida "laying" on Mr. Lagoda's back.  Officer Bugaida describes 2 blows to the right face, then 3 blows when Mr. Lagoda attempted to bite the officer's knee.  Officer Papia struck Mr. Lagoda at least once each in the face and left arm.  A compliance hold was used on a leg, with pressure against the shin by a baton.  At least one passenger believed that Mr. Lagoda and Officer Bugaida were "trading" blows at some time.  Once Mr. Lagoda was prone (face-down) in the plane cabin, he stayed in that position until he had sustained the cardiorespiratory arrest.  The blunt force origin of the multiple injuries would be consistent with blows from closed fists, kicks from shod feet, possible blows from a blunt instrument (such as a baton), and knee strikes.  There were no external injuries that exhibited a pattern that would indicate a specific structure to anything he was struck with.

The photographs reveal a laceration with hemorrhage on the bridge of the nose.  The skin and tissues around both eyes are markedly hemorrhagic, with severe swelling most pronounced around the left eye, and with extensive bruising on the right forehead, and extending from the swollen left lower lid towards the ear.  The autopsy dissection revealed dense hemorrhage of the left temporal scalp, measuring 8" across and thickening the scalp with bleeding by ½".  Deep dissection revealed extensive, very

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia  30269
Telephone:  (770) 486-5380
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
4/26/2024
Page 12 of 17

deep bleeding in the deep right orbit, and 2 other contusions, 2" to 3" in size, were in the right temporal and parietal scalp. Deep dissection of the right and left zygomatic (cheekbone) regions revealed deep hemorrhage, continuous with the externally-visible bruising around the eyes and swelling the eyelids. No facial bone or skull fractures were identified.

Scattered contusions were visible externally and by dissection on the thorax. Overlying the posterior base of the neck, in the midline, was a large contusion which extended deeply to the cervical vertebral bone prominences, and measured 2 ½ X 1" externally. Two, 1" contusions overlay the right scapula (shoulder blade). Following deep dissection down to the skeleton on the posterior thorax, multiple areas of hemorrhage were found that extended from the external injuries, deep into the muscles and soft tissues of the back and the back of the neck. Scattered contusions with deeper accompanying hemorrhage were found on the upper and lower extremities, with deep hemorrhage extending into the left forearm, the right ankle, and lateral left leg. The leg hemorrhage is consistent with the compliance hold that had been administered during the restraint.

No long bones were fractured. Dr. Milewski's autopsy revealed no rib fractures. However, the Russian autopsy report revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, which were opined to ben generally contemporaneous with the hemorrhages revealed on the rest of the body. The location of these fractures, on the lateral (side) of the chest, is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs. This could not be accomplished by a blow from a closed fist, but would require the force of a kick with a shod foot, or a knee strike, to break the ribs. Furthermore, the bruising on the upper back/base of the neck which extended deeply down to the posterior cervical spine represents at least one distinct blow of significant force, delivered to the back of the neck, when Mr. Lagoda was prone. Extensive pressure exerted against the back of the neck, again when he was prone, would also produce this bleeding.

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia  30269
Telephone:  (770) 486-5380
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
4/26/2024
Page 13 of 17

Externally, there were no petechial hemorrhages that were found on the face, or within the eyelids or surfaces of the eyes. Petechiae, which are pinpoint hemorrhages, are nonspecific findings that most often arise from pressure inequities within the arterial and venous systems of the head and neck, such as in strangulations, and may be correlated with other neck injuries to indicate a strangulation action. Although petechiae are not pathognomonic of strangulation, nonetheless their presence in a trauma-related death is highly suggestive of strangulation, or of very great pressure that crushes the chest (such as being trapped beneath an overturned vehicle). The OCME autopsy found that the larynx and hyoid bone in the neck had no fractures. However, there are numerous photographs of the opened larynx and proximal trachea, and numerous photographs of the surrounding soft tissues and muscles of the dissected upper chest and neck regions. These areas of hemorrhage are documented in the OCME report, but are attributed as "probably intubation trauma." The photographs reveal rather extensive hemorrhage of the aryepiglottic folds, adjacent to the hyoid bone cornua, and hemorrhage in the trachea which commences at approximately the level of the 3rd tracheal ring and with adjacent hemorrhage in the muscles around the upper trachea.

The medical records from Jamaica Hospital Medical Center do not describe any difficulty in placing the endotracheal tube, and likewise, the King tube placed by the EMS personnel (which has a balloon that just extends to the upper opening of the larynx) was also placed without difficulty. The tongue also exhibits large hemorrhagic lacerations of the right and left sides, in locations typical of seizure-related bite marks, and the historical information noted that Mr. Lagoda was bleeding from the mouth when he was having his seizure. There are also hemorrhagic lacerations of the underside of the end of the tongue, over about 1 ½", which also arose from the teeth. Bite marks certainly develop in patients who have generalized seizures, but the extent of those present in Mr. Lagoda's tongue, with the lateral injuries distinctly separate from those on the end of the tongue, strongly suggest

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia  30269
Telephone:  (770) 486-5380
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
4/26/2024
Page 14 of 17

that these were not all sustained contemporaneously, but came from separate actions.

The injuries sustained by Mr. Lagoda are markedly in excess of the forces exerted upon his body by Officer Bugaida, and possibly by whichever other officer who struck him.  The deep bleeding in the head and face involve about ¾ of the facial/head circumference, and also extend deeply into the deep soft tissues of the upper sides of the face, and much of the right scalp.  The extensive nature of these regions of swollen hemorrhage indicate multiple, repeated blows to the left side, front, nasal area, right front, and extensively into the right side and right back of the head.  There is no explanation provided in the narratives based upon the officers' accountings that explains the bruising and very deep hemorrhage of the posterior upper back/base of the neck.  However, when Mr. Lagoda was prone on the airplane cabin deck and was being held in that position and also being struck, including when Officer Bugaida "laid" on his body, this would expose the back of the neck and upper back to blows, and also potentially allow great pressure to be forced downward on Mr. Lagoda's upper back and the back of his neck, which could readily distort his mouth, tongue, and upper airway, inhibiting his ability to adequately exchange air.  The extensive internal hemorrhage on either side of the upper glottis and the extent of the hyoid bone would be caused by very forcible neck distortion from intense posteriorly-applied pressure.

The Final Anatomic Diagnosis written in the autopsy report for Evgeniy Lagoda was:  SUDDEN DEATH FOLLOWING GRAND MAL SEIZURE OF UNDETERMINED ETIOLOGY WITH POST-ICTAL EXCITED DELIRIUM.  Other Significant Conditions included:  PHYSICAL STRUGGLE/ALTERCATION WITH BLUNT IMPACTS; HYPERTENSIVE CARDIOVASCULAR DISEASE.  The Manner of Death was determined to be:  HOMICIDE.

The term "excited delirium" has, in recent years, gradually disappeared from forensic pathology diagnoses.  "Excited delirium" is not a diagnosis,

Dr. Kris L. Sperry
4/26/2024
Page 15 of 17

but has always been a syndromic definition, with most of the criteria being subjective and observational.  Put another way, there is no pathologic feature which allows a diagnosis of "excited delirium" to be made, and due to the vague and nonspecific nature of this syndromes different features, it is problematic to utilize the term in explaining a sudden and unexpected death.  A particular problem that has long been associated with sudden deaths during law enforcement restraint is that many of these deaths are very rapid, with the patient progressing to a cardiorespiratory arrest over the span of a few minutes, with no obvious external mechanism for this rapid deterioration.  Mr. Lagoda was not under the influence of any drugs or medications, had no alcohol in his blood nor had a history of alcohol abuse.  However, he had just had a generalized epileptic seizure, was disoriented and confused afterwards (and did not understand the language with which he was being addressed), and became involved in an altercation with a law enforcement officer who was punching him and trying to restrain him, which reasonably caused Mr. Lagoda (again, in his confused state) to struggle and fight back.  Mr. Lagoda was also obese, and the restraint of obese individuals in a prone position will interfere with the normal diaphragm excursion and normal breathing, thus compounding his ability to breathe normally.  An intense struggle such as this also causes increased oxygen demand by the body's tissues, and the development of acidosis.  When all of these derangements occur at the same time, the outcome may be lethal.

My opinions concerning the death of Evgeniy Lagoda are as follows:

- Evgeniy Lagoda had previously undiagnosed and unknown Mesial Temporal Sclerosis (Temporal Lobe Epilepsy), which caused the sudden and unexpected development of a generalized seizure while in an aircraft that was about to depart.

- When he regained consciousness, he was in a post-ictal state that caused him to be confused, disoriented, and possibly even psychotic, such that he misinterpreted the efforts of others who were trying to

---

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia  30269
Telephone:  (770) 486-5380
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
4/26/2024
Page 16 of 17

give him aid. Also, he spoke only Russian and did not understand English, which could only contribute to his confusion and fright.

- He became engaged in an altercation with a law enforcement officer, during which he was struck multiple times, and extensively struck with great force about the face, sides of the face, and right side of the head. The extent of his blunt force injuries significantly exceed both the number and expected force of fist blows which were inflicted as stated by the primary officer who was involved.

- Mr. Lagoda was also most probably kicked with shod feet, and even subjected to knee strikes, with deep sort tissue and muscular hemorrhage resulting from these blows. Fractures of the right 3rd and 4th ribs probably occurred from such blows, and not from a closed fist.

- Mr. Lagoda was obese, and ultimately restrained in a prone position, with the primary officer involved "laying" on Mr. Lagoda's body, exerting the force of his body weight on Mr. Lagoda. This would cause upward displacement of the obese abdomen, interfering with normal diaphragmatic excursion and thus impairing normal breathing.

- Mr. Lagoda has multiple deep contusional hemorrhages in parts of the body that are not explained by the accounting provided by the law enforcement officers involved.

- Deep contusions on the upper back and base of the neck may have arisen from blows, but also could occur if great pressure were exerted on these areas when Mr. Lagoda was restrained, prone, on the airplane cabin floor. This would have the effect of pushing the neck and lower head and face into the floor, distorting the upper airway, and inhibiting normal air exchange. The hemorrhages on either side of the hyoid bone and the adjacent muscles and soft tissues would be produced by such exertion of force.

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia 30269
Telephone: (770) 486-5380
e-mail Dr. Sperry: stiffdoc@bellsouth.net

Dr. Kris L. Sperry
4/26/2024
Page 17 of 17

- The hemorrhages in the region immediately above the glottis were not caused by intubation attempts. The hemorrhages in the mid tracheal mucosa are, however, indicative of having been caused by insertion of an endotracheal tube.

- During the course of the intense struggle, Mr. Lagoda became acidotic, and the physical interference with his ability to adequately breathe would accentuate the severity of these metabolic derangements, culminating in a sudden, ultimately lethal cardiorespiratory arrest.

- It is my opinion that he did not die of the direct effects of the seizure that he had sustained. The autopsy revealed relatively mild heart enlargement, most probably due to long-standing hypertensive cardiovascular disease, but this was not a substantive contributing factor in his death.

- I concur with the opinion of the New York City Office of the Chief Medical Examiner, that the Manner of Death for Evgeniy Lagoda should be properly called HOMICIDE.

All of the above opinions are rendered to a reasonable degree of medical certainty.

Kris Sperry, M. D.

---

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia 30269
Telephone: (770) 486-5380
e-mail Dr. Sperry: stiffdoc@bellsouth.net

# On-Scene Consulting

April 26, 2024

Mr. J. Christopher Amrhein, Jr., Esquire
Ashcroft Law Firm, LLC
200 State Street, 7th Floor.
Boston, Massachusetts 02109

## Federal Rules of Civil Procedure 26 (a) (2) (B) Report

**ALEXEY V. TARASOV, ESQ. Administrator of the EVGENIY LAGODA, Deceased and GRIGORY TIKHOPLAV, Plaintiffs,**

**v.**

**PORT OF AUTHORITY of NEW YORK and NEW JERSEY and PORT AUTHORITY of NEW YORK and NEW JERSEY POLICE DEPARTMENT a/k/a PORT AUTHORITY POLICE DEPARTMENT, a/k/a PAPD, PAPD OFFICER MICHAEL BUGIADA, PAPD OFFICER ROBERT JOSEPH, PAPD OFFICER JONATHAN PAPIA, PAPD OFFICER PAUL MEZZCAPPA and PAPD JONATHAN DURAN, Defendants,**
**Civil Action No. 1:21-cv-06226NRB.**

Dear Mr. Amrhein,

Thank you for retaining me to analyze and render opinions regarding the April 12, 2019, use of force incident and In-Custody Death of Mr. Evgeniy Lagoda that occurred at John F. Kennedy International Airport in Queens, New York. Pursuant to the requirements of Rule 26, I have studied reports and policies, procedures, Transcriptions of Digitally Recorded Depositions and other material (as listed under Materials Reviewed) provided to me thus far regarding this case.

Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions. It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

Page 1 of 29

## On-Scene Consulting
**Materials Reviewed:**

1. Summons, Index No. 153490/2021.

2. U.S. Department of Justice, Office of Justice Programs, National Law Enforcement Technology Center, Positional Asphyxia-Sudden Death, June 1995.

3. 2016 National Safety Council Lessons, (PA 1994-2170).

4. New York State Office of the Attorney General, Special Investigations and Prosecutions Unit Report into the Death of Evgeniy Lagoda, Leticia James, NYS Attorney General, (PA 1802-1864).

5. New York State Office of the Attorney, Case Master Report, SIPU 19-003, 4/15/19, (PA 1539-1554).

6. Photographs of Officer Michael Bugiada's Hands, (PA 1103-1105).

7. Personnel Records of Port Authority Police Department, Police Officer Michael Bugiada, No. 47814, (PA 2346-2440).

8. Personnel Records of Port Authority Police Department, Police Officer Jonathan Duran, No. 47359, (PA 2172-2267).

9. Personnel Records of Port Authority Police Department, Police Officer Robert Joseph, No. 45010, (PA 2539-2593).

10. Personnel Records of Port Authority Police Department, Police Officer Paul Mezzacappa, No. 47742, (PA 2441-2538).

11. Personnel Records of Port Authority Police Department, Police Officer Jonathan Papia, No. 47887, (PA 2268-2345).

12. The Port Authority of New York & New Jersey Handwritten Memorandum, PA 2265/07-10, (PA 1131-1156).

13. The Port Authority of New York & New Jersey General Order, IO 1-10, 600-01, 6/9/15, (PA 1928-1934).

## On-Scene Consulting

14.  The Port Authority of New York & New Jersey General Order, Safeguarding and Transporting of Prisoners, POI 6-2, 600.05, 10/14/15, (PA 1935-1939).

15.  The Port Authority of New York & New Jersey General Order, 600-06, Hospitalized Prisoners, 10/14/15, (PA 1940-1942).

16.  Port Authority Police Academy Lesson Plan(s), (PA 1943-1993).

17.  The Port Authority of New York & New Jersey, Use of Force Report, PA 3979/03-16, (PA 1157-1161).

18.  Case File Documents, Emails, Photographs, & Medical Records, (PA 1059-1919).

19.  The Port Authority of New York & New Jersey, General Order, Use of Non-Deadly Force, Procedure No. 100-5, 7/9/15, (PA 2594-2597).

20.  The Port Authority of New York & New Jersey, General Order, Use of Deadly Force, Procedure No. 100-04,3/6/17, (PA 2598-2601).

21.  The Port of Authority of New York & New Jersey, Operations Order, Order No. 2020-OPS-52, Patrol Guide Update, Use of Non-Deadly Force, 8/6/20, (PA 2602).

22.  The Port Authority of New York & New Jersey, General Order, Use of Non-Deadly Force, 12/23/14, (PA 2603-2606).

23.  The Port Authority of New York & New Jersey, General Order, Use of Force, 6/7/21, (PA 2631-2642).

24.  The Port Authority of New York & New Jersey, General Order, Oleoresin Capsicum, (OC)/Pepper Spray, 6/9/15, (PA 2668-2670).

25.  The Port Authority of New York & New Jersey, General Order, Crime/Violations Aboard an Aircraft, 10/23/15, (PA 2671-2673).

26.  Office of the Attorney General Press Release. "Attorney General James, Special Investigations and Prosecutions Unit, Releases Report on Investigations into the Death of Evgeniy Lagoda."

27.  Deposition Transcript and Exhibits of Shantell Miller taken on August 18, 2023.

## On-Scene Consulting

28. Deposition Transcript and Exhibits of Nathana Wright-Reid taken on August 21, 2023.

29. Deposition Transcript and Exhibits of Frank Leandro taken on August 17, 2023.

30. Deposition Transcript and Exhibits of Kurt Bengtson taken on August 15, 2023.

31. Deposition Transcript and Exhibits of Calvin Swinney taken on August 21, 2023.

32. Deposition Transcript and Exhibits of Paul Mezzacappa taken on August 2, 2023.

33. Deposition Transcript and Exhibits of Robert Joseph taken on August 2, 2023.

34. Deposition Transcript and Exhibits of Jonathan Duran taken on August 3, 2023.

35. Deposition Transcript and Exhibits of Jonathan Papia taken on August 3, 2023.

36. Deposition Transcript and Exhibits of Michael Bugiada taken on August 8, 2023.

37. Deposition Transcript and Exhibits of Kevin Troy Ingleton taken on August 22, 2023.

38. Deposition Transcript and Exhibits of 30 (b) (6) Lieutenant Mark Bergery taken on February 13, 2024.

39. Deposition Transcript and Exhibits of 30 (b) (6) Lieutenant Jaime Sandoz taken on February 13, 2024.

40. Deposition Transcript and Exhibits of 30 (b) (6) Lieutenant Lawanda Irving taken on February 14, 2024.

41. The Port Authority of New York & New Jersey, General Order, Use of Force, 6/7/21, (PA 2618-2620).