# Exhibit H

## On-Scene Consulting

April 26, 2024

Mr. J. Christopher Amrhein, Jr., Esquire
Ashcroft Law Firm, LLC
200 State Street, 7th Floor.
Boston, Massachusetts 02109

### Federal Rules of Civil Procedure 26 (a) (2) (B) Report

**ALEXEY V. TARASOV, ESQ. Administrator of the EVGENIY LAGODA, Deceased and GRIGORY TIKHOPLAV, Plaintiffs,**

**v.**

**PORT OF AUTHORITY of NEW YORK and NEW JERSEY and PORT AUTHORITY of NEW YORK and NEW JERSEY POLICE DEPARTMENT a/k/a PORT AUTHORITY POLICE DEPARTMENT, a/k/a PAPD, PAPD OFFICER MICHAEL BUGIADA, PAPD OFFICER ROBERT JOSEPH, PAPD OFFICER JONATHAN PAPIA, PAPD OFFICER PAUL MEZZCAPPA and PAPD JONATHAN DURAN, Defendants,**
<u>**Civil Action No. 1:21-cv-06226NRB.**</u>

Dear Mr. Amrhein,

Thank you for retaining me to analyze and render opinions regarding the April 12, 2019, use of force incident and In-Custody Death of Mr. Evgeniy Lagoda that occurred at John F. Kennedy International Airport in Queens, New York. Pursuant to the requirements of Rule 26, I have studied reports and policies, procedures, Transcriptions of Digitally Recorded Depositions and other material (<u>as listed under Materials Reviewed</u>) provided to me thus far regarding this case.

Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions. It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

## On-Scene Consulting
**Materials Reviewed:**

1. Summons, Index No. 153490/2021.

2. U.S. Department of Justice, Office of Justice Programs, National Law Enforcement Technology Center, Positional Asphyxia-Sudden Death, June 1995.

3. 2016 National Safety Council Lessons, (PA 1994-2170).

4. New York State Office of the Attorney General, Special Investigations and Prosecutions Unit Report into the Death of Evgeniy Lagoda, Leticia James, NYS Attorney General, (PA 1802-1864).

5. New York State Office of the Attorney, Case Master Report, SIPU 19-003, 4/15/19, (PA 1539-1554).

6. Photographs of Officer Michael Bugiada's Hands, (PA 1103-1105).

7. Personnel Records of Port Authority Police Department, Police Officer Michael Bugiada, No. 47814, (PA 2346-2440).

8. Personnel Records of Port Authority Police Department, Police Officer Jonathan Duran, No. 47359, (PA 2172-2267).

9. Personnel Records of Port Authority Police Department, Police Officer Robert Joseph, No. 45010, (PA 2539-2593).

10. Personnel Records of Port Authority Police Department, Police Officer Paul Mezzacappa, No. 47742, (PA 2441-2538).

11. Personnel Records of Port Authority Police Department, Police Officer Jonathan Papia, No. 47887, (PA 2268-2345).

12. The Port Authority of New York & New Jersey Handwritten Memorandum, PA 2265/07-10, (PA 1131-1156).

13. The Port Authority of New York & New Jersey General Order, IO 1-10, 600-01, 6/9/15, (PA 1928-1934).

## On-Scene Consulting

14. The Port Authority of New York & New Jersey General Order, Safeguarding and Transporting of Prisoners, POI 6-2, 600.05, 10/14/15, (PA 1935-1939).

15. The Port Authority of New York & New Jersey General Order, 600-06, Hospitalized Prisoners, 10/14/15, (PA 1940-1942).

16. Port Authority Police Academy Lesson Plan(s), (PA 1943-1993).

17. The Port Authority of New York & New Jersey, Use of Force Report, PA 3979/03-16, (PA 1157-1161).

18. Case File Documents, Emails, Photographs, & Medical Records, (PA 1059-1919).

19. The Port Authority of New York & New Jersey, General Order, Use of Non-Deadly Force, Procedure No. 100-5, 7/9/15, (PA 2594-2597).

20. The Port Authority of New York & New Jersey, General Order, Use of Deadly Force, Procedure No. 100-04,3/6/17, (PA 2598-2601).

21. The Port of Authority of New York & New Jersey, Operations Order, Order No. 2020-OPS-52, Patrol Guide Update, Use of Non-Deadly Force, 8/6/20, (PA 2602).

22. The Port Authority of New York & New Jersey, General Order, Use of Non-Deadly Force, 12/23/14, (PA 2603-2606).

23. The Port Authority of New York & New Jersey, General Order, Use of Force, 6/7/21, (PA 2631-2642).

24. The Port Authority of New York & New Jersey, General Order, Oleoresin Capsicum, (OC)/Pepper Spray, 6/9/15, (PA 2668-2670).

25. The Port Authority of New York & New Jersey, General Order, Crime/Violations Aboard an Aircraft, 10/23/15, (PA 2671-2673).

26. Office of the Attorney General Press Release. "Attorney General James, Special Investigations and Prosecutions Unit, Releases Report on Investigations into the Death of Evgeniy Lagoda."

27. Deposition Transcript and Exhibits of Shantell Miller taken on August 18, 2023.

## On-Scene Consulting

28. Deposition Transcript and Exhibits of Nathana Wright-Reid taken on August 21, 2023.

29. Deposition Transcript and Exhibits of Frank Leandro taken on August 17, 2023.

30. Deposition Transcript and Exhibits of Kurt Bengtson taken on August 15, 2023.

31. Deposition Transcript and Exhibits of Calvin Swinney taken on August 21, 2023.

32. Deposition Transcript and Exhibits of Paul Mezzacappa taken on August 2, 2023.

33. Deposition Transcript and Exhibits of Robert Joseph taken on August 2, 2023.

34. Deposition Transcript and Exhibits of Jonathan Duran taken on August 3, 2023.

35. Deposition Transcript and Exhibits of Jonathan Papia taken on August 3, 2023.

36. Deposition Transcript and Exhibits of Michael Bugiada taken on August 8, 2023.

37. Deposition Transcript and Exhibits of Kevin Troy Ingleton taken on August 22, 2023.

38. Deposition Transcript and Exhibits of 30 (b) (6) Lieutenant Mark Bergery taken on February 13, 2024.

39. Deposition Transcript and Exhibits of 30 (b) (6) Lieutenant Jaime Sandoz taken on February 13, 2024.

40. Deposition Transcript and Exhibits of 30 (b) (6) Lieutenant Lawanda Irving taken on February 14, 2024.

41. The Port Authority of New York & New Jersey, General Order, Use of Force, 6/7/21, (PA 2618-2620).

## On-Scene Consulting
### Summary

The following statement summaries represent documents/statements that were used in part during my review but are in no way meant to be exhaustive. The documents listed in the Materials Reviewed Section of this report represent the full library of documents reviewed thus far and used as a basis for my opinions.

**The below listed information is verbatim portions of New York State Office of the Attorney General, Special Investigations and Prosecutions Unit Report into the Death of Evgeniy Lagoda, Leticia James, NYS Attorney General, (PA 1802-1864):**

### EXECUTIVE SUMMARY

*"On the night of April 12, 2019, PAPD Officer Michael Bugiada responded to a call for a medical emergency inside an aircraft docked at a terminal at JFKIA. At the rear galley of the aircraft, the officer encountered Evgeniy Lagoda, who the officer was told had just suffered from a seizure and then had become "combative." When the officer attempted to calm him down, Mr. Lagoda either advanced on or swung at the officer, at which the officer deployed pepper spray, and took Mr. Lagoda to the ground. The officer used physical force in an attempt to restrain Mr. Lagoda and, following a struggle during which Mr. Lagoda was struck repeatedly in the head, was able to restrain and handcuff Mr. Lagoda with the assistance of other responding officers. Immediately thereafter, Mr. Lagoda was observed to be unresponsive; despite lifesaving efforts on the part of the officers and then emergency medical technicians, the passenger could not be resuscitated. He was subsequently transported to a hospital, where he was pronounced dead."*

*"Ultimately, a medical examiner identified as the cause of Mr. Lagoda's death: "(s)udden death following grand mal seizure of undetermined etiology complicated by post-ictal excited delirium."* **The medical examiner, did, however, take note of significant blunt for injuries to Mr. Lagoda's face and body, at least some which were attributable to the officers, and concluded that the interaction with the officers likely contributed to Mr. Lagoda's death. For this reason, the medical examiner deemed the manner of death to be "homicide."**

*"This incident has raised some concerns about PAPD's handling of the incident and the OAG does make recommendations to address these concerns. Most notably, the investigation revealed that emergency medical services were significantly delayed in responding to the scene due to PAPD's failure to have personnel available to escort an ambulance there. Although there is no evidence that, in this particular instance, a*

## On-Scene Consulting

*prompter response would have saved Mr. Lagoda's life, PAPD should revise its practices to make sure such a miscue does not occur in the future. Second, because the force used by the PAPD officers likely contributed to Mr. Lagoda's death, the OAG recommends that PAPD provide training to its officers about the unique vulnerability of individuals in the immediate wake of a seizure such that officers may incorporate that information into their decisions as to the appropriate amount of force used against such individuals. Finally, the OAG has recommended in prior reports concerning other police departments, the PAPD should work toward outfitting their officers with body-worn cameras."*

### Opinions:

Note: None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues. I hold the opinions below a reasonable degree of professional certainty. The basis and reasons for my opinions are premised upon my education, training and experience in law enforcement, my knowledge of law enforcement standards, analysis and study; my familiarity with generally accepted police practices and the professional and academic literature in the field; my review of relevant actions, policies and procedures; and my understanding of the facts of this case based on my review of the comprehensive materials listed on Pages 2-4 of this report. My opinions and testimony regarding police procedure are relevant topics concerning issues of which lay jurors are unaware or frequently have misconceptions. My testimony on these topics is relevant and would assist a jury in understanding the evidence presented to them.

### Opinion Number 1

It is my opinion, based on my review of the facts and testimony in this matter, the Defendants to include, Port Authority of New York & New Jersey Police Department Police Officers Michael Bugiada, No. 47814, Jonathan Duran, No. 47359, Robert Joseph, No. 45010, Paul Mezzacappa, No. 47742, and Police Officer Jonathan Papia, No. 47887, failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act reasonably and appropriately. In addition, it is my opinion the Defendants to include, Port Authority of New York & New Jersey Police Department Police Officers Michael Bugiada, No. 47814, Jonathan Duran, No. 47359, Robert Joseph, No. 45010, Paul Mezzacappa, No. 47742, and Police Officer Jonathan Papia, No. 47887, actions fell below the standard of care. Throughout the United States and in New York, law enforcement agencies have recognized and trained their officers in multiple ways to safely interact with subjects such as Mr. Evgeniy Lagoda who are experiencing a medical emergency. The objective is to avoid unnecessary injury and or death. The underlying principle is reverence for human life. Law Enforcement Officers should be trained to

## On-Scene Consulting ⎯⎯⎯⎯⎯

recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, time to assess and calm the situation, request additional equipment, provide reassurance that the officers are there to help, give the person time to calm down, move slowly, and reduce environmental distractions.

A seizure is the result of a surge of energy through the brain. Instead of discharging electrical energy in a controlled manner, the brain cells continue firing, causing massive involuntary contractions of muscles and possible unconsciousness. After the seizure has ended, individuals may experience a period of post-seizure confusion. Police Officers should remain with the individual until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of care. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer.

In addition, the Defendants failed to ascertain that Mr. Evgeniy Lagoda did not speak English and could not understand their commands.

In addition, it is my opinion, based on my review of the facts and testimony in this matter Port Authority of New York & New Jersey Police Department Police Officers Michael Bugiada, No. 47814, Jonathan Duran, No. 47359, Robert Joseph, No. 45010, Paul Mezzacappa, No. 47742, and Police Officer Jonathan Papia, No. 47887, failed to comply with 2016 National Safety Council Lessons, (PA 1994-2170), during their interaction with Mr. Evgeniy Lagoda:

Lesson 13: Behavioral Emergencies:

Common Causes of Altered Behavior:

- Seizure Disorders.

Calming a Behavioral Patient:
- Approach slowly but purposefully.
- Identify yourself.
- Say you are there to help.
- Ask a patient for name and use it.
- Tell patient what you plan to do.
- Treat the patient with respect.

## On-Scene Consulting

In addition, I base my opinion on the following facts and testimony:

- According to PAPD Police Officer Jonathan Duran, he did not know Mr. Lagoda's native language was Russian, (Deposition Transcript of Jonathan Duran, Page 54).
- According to PAPD Police Officer Jonathan Papia, he was not aware that Mr. Lagoda's native language was Russian, (Deposition Transcript of Jonathan Papia, Pages 50-51).
- According to PAPD Police Officer Jonathan Papia, he did not know that someone who just came out of a seizure might be disoriented, might exhibit combative behavior and might be medically vulnerable, (Deposition Transcript of Jonathan Papia, Pages 79-83).
- According to Mr. Kevin Ingleton, the individual seemed to be convulsing and having a seizure, (Deposition Transcript of Mr. Kevin Ingleton, Page 28).
- According to Mr. Kevin Ingleton, they carried the individual gently so he wouldn't bump into anything, (Deposition Transcript of Mr. Kevin Ingleton, Page 30).
- According to Mr. Kevin Ingleton, the individual was "seizing" for a few minutes, (Deposition Transcript of Mr. Kevin Ingleton, Pages 32-33).
- According to Mr. Kevin Ingleton, the individual was foaming at the mouth and bleeding fluids from the mouth, (Deposition Transcript of Mr. Kevin Ingleton, Page 84).
- According to PAPD Lieutenant Mark Bergery, he agrees someone coming out of a seizure would be in an altered mental state and may be disoriented and combative upon coming out of a seizure, (Deposition Transcript of Mark Bergery, Page 107).
- According to PAPD Police Officer Paul Mezzacappa, he was unaware that Mr. Lagoda's native language was Russian, (Deposition Transcript of Paul Mezzacappa, Page 45).
- According to PAPD Police Officer Paul Mezzacappa, he agrees that someone who had just come out of a seizure is medically vulnerable, maybe disoriented and may have combative behavior, (Deposition Transcript of Paul Mezzacappa, Page 77).
- According to PAPD Police Officer Robert Joseph, he heard over the radio that there was a male on a Jet Blue flight that was having a seizure and in a medical emergency, (Deposition Transcript of Robert Joseph, Page 40).
- According to PAPD Police Officer Robert Joseph, he was unaware that Mr. Lagoda's native language was Russian, (Deposition Transcript of Robert Joseph, Page 40).
- According to PAPD Police Officer Jonathan Duran, he was unaware that Mr. Lagoda's native language was Russian, (Deposition Transcript of Jonathan Duran, Page 54).

## On-Scene Consulting

- According to PAPD Police Officer Michael Bugiada, he was unaware that Mr. Lagoda's native language was Russian, (Deposition Transcript of Michael Bugiada, Page 57).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level by recognizing that an individual may be mentally ill and or experiencing a mental crisis.

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 2

It is my opinion, based on my review of the facts and testimony in this matter, the Defendants to include, Port Authority of New York & New Jersey Police Department Police Officers Michael Bugiada, No. 47814, Jonathan Duran, No. 47359, Robert Joseph, No. 45010, Paul Mezzacappa, No. 47742, and Police Officer Jonathan Papia, No. 47887, failed to use de-escalation and defusing techniques during their interaction with Mr. Evgeniy Lagoda. Defusing is a process of reducing the potential for violence and bringing emotional level to a manageable level to restore order. The primary objective is to calm the person so that a conversation can take place and the use of force can be avoided.

In addition, it is my opinion the Defendants failed to use the following de-escalation and defusing techniques during their interaction with Mr. Evgeniy Lagoda:

1. When safe and feasible, officers shall:

a. Attempt to slow down or stabilize the situation so that more time, options, and resources are available:
   - Mitigating the immediacy of threat gives officers more time to call additional officers or specialty units and to use other resources.
   - The number of officers on scene may make more force options available and may help reduce overall force used.

## On-Scene Consulting

b. Consider whether a subject's lack of compliance is a deliberate attempt to resist or an inability to comply based on factors including but not limited to:

- Medical conditions.
- Mental impairment.
- Developmental disability.
- Physical limitation.
- Language barrier.
- Influence of drug or alcohol use.
- Behavioral crisis.

Such consideration, when time and circumstances reasonably permit, shall then be balanced against incident facts when deciding which tactical options are the most appropriate to resolve the situation safely.

2. De-escalation tactics include, but are not limited to:
- Placing barriers between an uncooperative subject and a Police Officer.
- Containing a threat.
- Moving from a position that exposes Police Officers to potential threats to a safer position.
- Reducing exposure to a potential threat using distance, cover, or concealment.
- Communication from a safer position intended to gain the subject's compliance, using verbal persuasion, advisements, or warnings.
- Avoidance of physical confrontation, unless immediately necessary (e.g., to protect someone or stop dangerous behavior).
- Using verbal techniques to calm an agitated subject and promote rational decision making.
- Calling additional resources to assist, including more Police Officers and Police Officers equipped with less-lethal tools.

The Code of Ethics of any profession details the standard of conduct that identifies specific principles of desired behavior required of its practitioners. The profession of policy requires its members to adhere to specific standards in order to maintain the trust and respect of those who are served. Adherence to a Code of Ethics is required to build and maintain morale, a sense of duty, effective standards of performance and community support. Peace Officers are held to higher standards than others in the community. Although policing shares ideals with other professions, only peace officers are given the authority and power to detain and arrest others and to deprive them of their liberty while

## On-Scene Consulting

awaiting adjudication of their offense. It is essential that officers understand the importance of professional behavior.

To embody the spirit of professionalism, ethical conduct must be a way for those in policing. To maintain the community's trust, peace officers must maintain consistently high- standards of ethical conduct. Officers must model and live as examples of the behavior that they are charged to enforce. The policing community is only as strong as its weakest link. Unethical conduct affects the image and morale of the entire profession, and it offends officers and society throughout the country.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 3

It is my opinion, based on my review of the facts and testimony in this matter, the Defendants to include, Port Authority of New York & New Jersey Police Department Police Officers Michael Bugiada, No. 47814, Jonathan Duran, No. 47359, Robert Joseph, No. 45010, Paul Mezzacappa, No. 47742, and Police Officer Jonathan Papia, No. 47887, failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground and in a prone position. This can be accomplished by immediately rolling him on to his side in a recumbent position or place him in a seated or standing position.

In addition, I base my opinion on U.S. Department of Justice, Office of Justice Programs, National Law Enforcement Technology Center, Positional Asphyxia-Sudden Death, June 1995, **Advisory Guidelines for Care of Subdued Subjects:** To help ensure subject safety and minimize the risk of sudden in-custody death, officers should learn to recognize factors, contributing to positional asphyxia.

## On-Scene Consulting

To help minimize the potential for in-custody injury death officers should:

- Follow existing training and policy guidelines for situations involving physical restraint of subjects.
- As soon as the suspect is handcuffed, get the subject off his or her stomach.
- Ask the subject if he or she has used drugs recently or suffers from any cardiac or respiratory diseases or conditions such as asthma, bronchitis, or emphysema.
- Monitor subject carefully and obtain medical treatment if needed.
- Be trained to recognize breathing difficulties or loss of consciousness and immediately transport the individual to the emergency room or call for an Emergency Medical Team (EMT) unit if such signs are observed.

The Defendants knew or should have known that when an individual is restrained in a face-down position, and breathing may become labored:

- Weight is applied to the person's back and the more weight, the more severe the degree of compression.
- The individual experiences increased difficulty breathing.
- The natural reaction to oxygen deficiency occurs and consequently the person struggles more violently.
- The officer applies more compression to subdue the individual.

It is my opinion that the Basic Physiology of a Struggle is applicable in this matter. A person lying on his stomach has trouble breathing when pressure is applied to the back. The remedy seems relatively simple: get the pressure off his back. In addition, it is my opinion that Defendants should have recognized that there are certain factors that may render some individuals more susceptible to positional asphyxia following a struggle, particularly when prone in a face-down position.

The risk of positional asphyxia is compounded when an individual with predisposing factors become involved in a violent struggle with an officer or officers, particularly when physical restraint includes use of behind the back handcuffing combined with placing the subject in a stomach-down position.

Every day, police officers encounter situations that require them to restrain persons. Properly trained officers learn how improper restraining techniques can block the flow of air into the individual's lungs contributing to a life-threatening condition known as "positional, or restraint, asphyxia." Proper training also covers multiple effective options available such as avoiding compression of the chest, rolling the subjects over on his side, and sitting or standing the subject up.

## On-Scene Consulting

In addition, I base my opinion on <u>Americans for Effective Law Enforcement, (AELE),
Monthly Law Journal, Restraint and Asphyxia, Part Two-Compressional Asphyxia,
January 2009:</u>

2. **Conclusions:** Police trainers must be aware of potential deaths from compressional
asphyxia. Dr. Reay's article in the May 1996. FBI Law Enforcement Bulletin
emphasized:

"Instructors must stress vigilance in monitoring the subject's condition. The process of
hypoxia is insidious, and subjects might not exhibit any clear symptoms before they
simply stop breathing. Generally, it takes several minutes for significant hypoxia to
occur, but it can happen more quickly if the subject had been violently active and is
already out of breath. If the subject experiences extreme difficulty breathing or stops
breathing altogether, officers must take steps to resuscitate the subject and obtain medical
care immediately."

In addition, it is my opinion, based on my review of the facts and testimony in this matter
Port Authority of New York & New Jersey Police Department Police Officers Michael
Bugiada, <u>No. 47814</u>, Jonathan Duran, <u>No. 47359</u>, Robert Joseph, <u>No. 45010</u>, Paul
Mezzacappa, <u>No. 47742</u>, and Police Officer Jonathan Papia, <u>No. 47887,</u> <u>failed</u> to comply
with <u>2016 National Safety Council Lessons,</u> (PA 1994-2170), during their interaction
with Mr. Evgeniy Lagoda:

<u>Lesson 13:</u> <u>Behavioral Emergencies:</u>

<u>Restraining Patients</u>
- Avoid unreasonable force.
- Use only as much force as needed to keep patient from injuring him or herself or others.
- Avoid acts of physical force that may injure the patient.
- Do not restrain the patient face down; maintain airway access at all times.
- Assess patient's breathing and circulation frequently.
- Provide oxygen by non-rebreather mask if appropriate.

<u>Emergency Care for Seizures</u>
- Perform standard patient care.
- Provide ventilation if needed.
- ***Prevent injury especially to head.***
- Loosen tight fitting clothing around neck.
- ***Don't restrain patient.***

## On-Scene Consulting ⎯⎯⎯⎯⎯⎯⎯⎯

- Don't put anything in patient's mouth.

In addition, it is my opinion, based on my review of the facts and testimony in this matter, the Defendants to include, Port Authority of New York & New Jersey Police Department Police Officers Michael Bugiada, No. 47814, Jonathan Duran, No. 47359, Robert Joseph, No. 45010, Paul Mezzacappa, No. 47742, and Police Officer Jonathan Papia, No. 47887, used unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. Evgeniy Lagoda.

In addition, it is my opinion based on my review of the facts and testimony in this matter, the Defendants to include, Port Authority of New York & New Jersey Police Department Police Officers Michael Bugiada, No. 47814, Jonathan Duran, No. 47359, Robert Joseph, No. 45010, Paul Mezzacappa, No. 47742, and Police Officer Jonathan Papia, No. 47887, violated The Port Authority of New York & New Jersey, General Order, Use of Deadly Force, Procedure No. 100-04,3/6/17, (PA 2598-2601): It is the policy of this department that police officers shall use only that force that is reasonably necessary to effectively bring an incident under control, while protecting the life of the officer or another.

*Officers should make every reasonable effort to avoid compressing and restricting the suspect's airway or compressing the suspect's neck and chest area when applying physical force.*

**Note:** The Port Authority of New York & New Jersey, General Order, Use of Force, 6/7/21, (PA 2618-2620), adopted the following language after this incident involving Mr. Mr. Evgeniy Lagoda: Members of the Force are prohibited from sitting, kneeling, or standing on the subject's torso, (chest, back, abdomen), in a manner that compresses the diaphragm.

In addition, I base my opinion on the following facts and testimony:
- According to PAPD Officer Michael Bugiada, he just put his body on top of the male because he was attempting to get up, (like doing a pushup), (PA 1551).
- According to PAPD Police Officer Jonathan Duran, when he first saw Mr. Lagoda, he was chest down, (Deposition Transcript of Jonathan Duran, Page 50).
- According to PAPD Police Officer Jonathan Papia, it is safe to say that other Police Officers were still applying pressure to Mr. Lagoda after he was handcuffed, (Deposition Transcript of Jonathan Papia, Page 58).
- According to PAPD Police Officer Jonathan Papia, it was few minutes from the time that Mr. Lagoda was placed in handcuffs until he first observed Mr. Lagoda turning blue, (Deposition Transcript of Jonathan Papia, Page 97).

## On-Scene Consulting ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

- According to PAPD Lieutenant Mark Bergery, he agrees that improper restraining techniques can block the flow of air to the lungs contributing to a life-threatening condition known as restraint or positional asphyxiation, (Deposition Transcript of Mark Bergery, Pages 108-109).
- According to PAPD Police Officer Robert Joseph, Mr. Lagoda was face down on his stomach when he engaged him, (Deposition Transcript of Robert Joseph, Page 42).

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 4

It is my opinion, based on my review of the facts and testimony in this matter, the Defendants to include, Port Authority of New York & New Jersey Police Department Police Officers Michael Bugiada, No. 47814, and Police Officer Jonathan Papia, No. 47887, used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency.  In addition, it is my opinion, Police Officers Michael Bugiada, No. 47814, and Police Officer Jonathan Papia, No. 47887, inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident.

In addition, I base my opinion on, New York State Office of the Attorney General, Special Investigations and Prosecutions Unit Report into the Death of Evgeniy Lagoda, Leticia James, NYS Attorney General, (PA 1802-1864): *"It should be noted that the blunt injuries to Mr. Lagoda's face and head in particular were not insignificant.  Among other injuries, Dr. Milewski observed a laceration to the bridge of Mr. Lagoda's nose; severe bruising around both eyes; and further bruising of the cheeks, the left and right sides of the scalp, and the forehead, and behind the left ear.  According to Dr. Milewski, these injuries are signs of repeated impacts, and many delivered with considerable force."*

In addition, I base my opinion on the following facts and testimony:

- According to PAPD Officer John Papia, the male's hands were under his body, and he was twisting his body so they could not get to his hands.  Officer Papia stated he struck the man with a closed fist in the arm and face, (unknown how many times), (PA 1547).

## On-Scene Consulting ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

- According to PAPD Officer Michael Bugiada, he managed to get the male on his stomach and struck the male three more times in an attempt to get the male's arms from underneath him, (PA 1551).
- According to PAPD Police Officer Jonathan Papia, he punched Mr. Lagoda one time in the face and one time on the left arm area, (Deposition Transcript of Jonathan Papia, Page 54).
- According to PAPD Police Officer Michael Bugiada, he punched Mr. Lagoda one time in the face with his right fist, (Deposition Transcript of Michael Bugiada, Page 60).

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 5

It is my opinion that a reasonable Police Officer would have intervened and advised the Police Officers at scene to immediately roll Mr. Evgeniy Lagoda over on his side in a recumbent position, or place Mr. Evgeniy Lagoda in a seated position or stand Mr. Evgeniy Lagoda up on to his feet to take the weight and pressure off of his back.

In addition, it is my opinion based on my review of the facts and testimony in this matter, the Defendants to include, Port Authority of New York & New Jersey Police Department Police Officers Michael Bugiada, No. 47814, Jonathan Duran, No. 47359, Robert Joseph, No. 45010, Paul Mezzacappa, No. 47742, and Police Officer Jonathan Papia, No. 47887, while Mr. Evgeniy Lagoda was in a prone position on his stomach, should have immediately intervened to take the pressure off of Mr. Evgeniy Lagoda's back and to immediately roll Mr. Evgeniy Lagoda over on his side in a recumbent position, or place Mr. Evgeniy Lagoda in a seated position or stand Mr. Evgeniy Lagoda up on to his feet.

**Intervention:** A Police Officer is guilty of having failed to intervene and prevent other Police Officers from violating anyone's rights while having reason to know:

- Unreasonable force was being used,
- A member of the public was unjustifiably arrested,
- Any constitutional violation has been committed by any law enforcement officer,
- The Police Officer had a reasonable opportunity to prevent harm from occurring.
- Inappropriate language is being used, or,
- Other unlawful, unethical, or inappropriate behavior occurred.

## On-Scene Consulting

Police Officers have a legal and ethical obligation to uphold the law no matter who is breaking it. It does not matter whether the violator is considered an average citizen, prominent community or corporate leader, or another peace officer. Minding your own business is never a valid excuse for remaining silent. If Police Officers disregard unlawful or unethical acts by another officer, they can be as responsible as the offender and as unworthy of wearing the badge. Such officers are equally responsible for embarrassing their agency and the policing profession.

In addition, it is my opinion based on my review of the facts and testimony in this matter, the Defendants to include, Port Authority of New York & New Jersey Police Department Police Officers Michael Bugiada, No. 47814, Jonathan Duran, No. 47359, Robert Joseph, No. 45010, Paul Mezzacappa, No. 47742, and Police Officer Jonathan Papia, No. 47887, should have intervened immediately, either verbally, physically, or both.

Verbal Intervention: Verbally offering to take over or assist the situation or reminding fellow Police Officer of appropriate behavior.

Physical Intervention:

I. Touching: Touching the officer on the shoulder or arm and offering a tactful reminder to calm down or to take over.

II. Stepping In: Stepping In and immediately advise the law enforcement officers to immediately roll Mr. Evgeniy Lagoda over on his side in a recumbent position, or place Mr. Evgeniy Lagoda in a seated position or stand Mr. Evgeniy Lagoda up on to his feet and to take the weight and pressure off of his back.

III. Restraining: Physical restraint of the Police Officer may be necessary if the Police Officer is using unreasonable physical force.

**Note:** The Port Authority of New York & New Jersey, General Order, Use of Force, 6/7/21, (PA 2618-2622), adopted the following language after this incident involving Mr. Mr. Evgeniy Lagoda:

DUTY TO INTERVENE AND REPORT: *"All Members of the Force, regardless of rank, title, seniority, or status, have an affirmative duty to take steps to prevent any use of force that is illegal, excessive, or otherwise inconsistent with governing laws, regulations, or Port Authority Police Department policies. If possible, this action should take place prior to the use of excessive, illegal, or otherwise inappropriate force by another Member of the*

## On-Scene Consulting

*Force. All improper uses of force must be reported to a supervisor as soon as it is safe and reasonable to do so. Use of force compliance is the responsibility of all Members of the Force and such those who report illegal or inappropriate uses of force shall be protected from retaliation or other negative consequences."*

In addition, I base my opinion on the following facts and testimony:

- According to PAPD Polce Officer Jonathan Papia, he did not intervene for Mr. Lagoda's safety, (Deposition Transcript of Jonathan Papia, Pages 56-57).
- According to PAPD Police Officer Paul Mezzacappa, he did not intervene for any concern of Mr. Lagoda's health and safety, (Deposition Transcript of Paul Mezzacappa, Page 52).
- According to PAPD Police Officer Robert Joseph, he did not intervene for any concern of Mr. Lagoda's health and safety, nor did he see any other Police Officer intervene, (Deposition Transcript of Robert Joseph, Page 49).

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 6

It is my opinion based on my review of the facts and testimony in this matter, the Defendants to include, Port Authority of New York & New Jersey Police Department Police Officers Michael Bugiada, No. 47814, Jonathan Duran, No. 47359, Robert Joseph, No. 45010, Paul Mezzacappa, No. 47742, and Police Officer Jonathan Papia, No. 47887, failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having a difficulty breathing and take appropriate action.

It is my opinion based on my training and experience that Agonal Respirations or what is commonly referred to as Agonal Breathing looks or sounds like: snoring, heavy breathing; labored or exaggerated breathing; gurgling; guttural sounds; groaning; snorting; and or gasping. Agonal Respirations are often heard by those people who are near a person prior to death.

An individual who speaks in one-word sentences is in medical trouble and needs medical treatment. Police Officers must demonstrate concern and remain professional at all times.

Peace officers are trained to provide basic care for victim(s). Such care may include providing basic emergency medical care until relieved by other personnel with equal or higher levels of training.

## On-Scene Consulting  ⎯⎯⎯⎯⎯⎯⎯

In addition, it is my opinion that the Defendants in this matter failed to take appropriate action by initiating CPR until they were relieved by Emergency Medical Services, (EMS).

If the victim is unable to speak or is not responsive, then appropriate steps should be taken to assess the victim's:

- Airway
- Breathing
- Circulation

I.  The responding peace officer should determine if the victim is breathing:

If the victim is not breathing with a pulse:

- Begin rescue breathing.

If the victim is not breathing with no pulse:

- Begin CPR.

If the victim is breathing:

- Complete primary assessment.

If the victim has a pulse, is breathing, but unconscious:

- Check for indications of life-threatening conditions, (e.g., major bleeding, shock, etc.).
- Place the victim in a **recovery position** (**on the side with the head supported by the lower forearm**), if appropriate to aid breathing and allow fluids or vomit to drain from the mouth.

In addition, it is my opinion based on the facts and testimony in this matter, the Defendants failed to properly assign a Police Officer(s) to immediately escort Emergency Medical Services, so they could provide life-saving medical services to Mr. Evgeniy Lagoda.

In addition, I base my opinion on, New York State Office of the Attorney General, Special Investigations and Prosecutions Unit Report into the Death of Evgeniy Lagoda, Leticia James, NYS Attorney General, (PA 1802-1864):

## On-Scene Consulting

### RECOMMENDATIONS:

I. <u>Improve PAPD Emergency Vehicle Escort Protocols</u>: *"Under current PAPD guidelines, (and consistent with Federal Aviation Administration and Transportation Security Administration regulations), emergency vehicles, including ambulances and fire trucks, that respond to calls for service on the Air Operations Area, (that is, aircraft movement, parking and safety areas, loading ramps and any adjacent areas), at JFKIA are instructed to stand by at a designated location to await a PAPD escort to the emergency location. As discussed above, however, on April 12, 2019, when the ambulance dispatched to respond to Mr. Lagoda's seizure arrived at the standby location, no officers were present to escort them to the aircraft-apparently because all available officers rushed to the aid of the Officer Bugiada. **As a result, emergency medical treatment for Mr. Lagoda was delayed as much as 20 minutes. Although it is not all clear that the expedited arrival of emergency medical technicians would have saved Mr. Lagoda's life a preventable delay of this nature should not be tolerated. We strongly recommend that the PAPD review its emergency vehicle escort protocols to ensure that miscues of this sort do not occur again in the future."***

Lastly, I base my opinion on my twenty-eight-year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 7

It is my opinion that the Defendants use of force/lethal force in this matter did not comport with standard police practices and violated their training or the training that they should have received that resulted in the death of Mr. Evgeniy Lagoda, including <u>but not limited to for the following reasons</u>:

- Highest level of force a Police Officer can use.
- This was not an immediate Defense of Life situation.
- Must be a last resort before using lethal force.
- Must be the direst of circumstances.
- Deadly force is likely to cause great bodily injury or death.
- Must show a reverence for human life.
- There were other reasonable measures available.
- All other reasonable measures were not exhausted.
- Subjective Fear is insufficient.
- Over reaction is excessive force.

## On-Scene Consulting

In addition, I base my opinion on the following facts and testimony:

- According to PAPD Lieutenant Lawanda Irving, she is aware they the AG's report concluded that the use of force by the PAPD Police Officers in this matter contributed to the death of Mr. Lagoda, (Deposition Transcript of Lieutenant Lawanda Irving, Page 95).
- According to PAPD Police Officer Paul Mezzacappa, he is not sure if Mr. Lagoda would still be alive if he and his fellow officers didn't use force against Mr. Lagoda, (Deposition Transcript of Paul Mezzacappa, Page 45).

Lastly, I base my opinion on my twenty-eight-year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 8

It is my opinion there was a gross lack of situational awareness and fundamental tactical errors in this incident. It is also my opinion that there was a failure by The Port Authority of New York & New Jersey Police Department to provide training to the Defendant Officers on following subject matters: Proper Response and Interaction with a subject in a Medical Crisis, Working as a Team, Verbal Strategies, Active Listening Skills, Crisis Intervention Training, Defusing and De-Escalation Techniques, Excited Delirium, Agonal Breathing and Compressional/Positional/Restraint Asphyxia.

In addition, it my opinion based on my review of the facts and testimony in this matter, The Port Authority of New York & New Jersey Police Department failed to issue Body-Worn Cameras to Police Officers and require that they utilize them in course and scope of their employment as Police Officers prior to April 12, 2019.

In addition, I base my opinion on, New York State Office of the Attorney General, Special Investigations and Prosecutions Unit Report into the Death of Evgeniy Lagoda, Leticia James, NYS Attorney General, (PA 1802-1864):

II. Provide Additional Training to PAPD Officers: *"The PAPD currently provides training to all recruits on dealing with individuals who experience seizures. Such training does not, however, cover the uniquely vulnerable condition of such individuals in the period immediately after the resolution of a seizure, the so-called "post-ictal" state discussed earlier in this report. We recommend that such information be incorporated into PAPD training to provide heightened awareness to officers who are using, or considering the use of, physical force against individuals in this state. More broadly, PAPD's current use of force policy appropriately instructs officers using force that is reasonably necessary to bring an incident under control, while protecting the lives of the*

## On-Scene Consulting

*officer or another." To ensure that officers understand how to apply these provisions in the context of their day-day duties, including fast-moving, complex situations such as the one referenced in this report, training is essential."*

III. <u>Outfit PAPD Officers with Body-Worn Cameras</u>: *"We have previously issued seven reports recommending that police departments equip officers with body-worn cameras and/or dashboard cameras for police vehicles. Without question, videotaped evidence would have greatly facilitated the investigation of this case. We use the absence of such cameras as an opportunity to recommend that PAPD work toward outfitting their officers with body-worn cameras and police vehicles equipped with dashboard cameras."*

In addition, it is my opinion, The Port Authority of New York & New Jersey Police Department should have determined through their investigation and review process that there was a failure to effectively de-escalate the situation and that the Less Lethal Force and the Lethal Force used in this matter was <u>inappropriate, unnecessary, and unreasonable</u>, based on the totality of the circumstances.

In addition, it is my opinion that ratification of the use of deadly force and the Defendants conduct prior to the use of deadly force can be seen as endorsing and perpetuating Defendants' inadequate training and failure to enforce written polices and established standards.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

<u>In addition, I base my opinion on the following facts and testimony</u>:

- According to PAPD Police Officer Jonathan Duran, when he was at the PAPD Police Academy, he was not taught how to restrain someone without putting pressure on their back, (<u>Deposition Transcript of Jonathan Duran, Page 17</u>).
- According to PAPD Police Officer Jonathan Duran, he does not recall any updated training manuals that discussed the use of body weight when trying to restrain a civilian, (<u>Deposition Transcript of Jonathan Duran, Page 29</u>).
- According to PAPD Police Officer Jonathan Papia, he does not recall if he heard the terms positional restraint or compressional asphyxiation or was trained on the term's positional restraint or compressional asphyxiation, (<u>Deposition Transcript of Jonathan Papia, Page 27</u>).

## On-Scene Consulting

- According to PAPD Police Officer Jonathan Papia, he did not know that someone who just came out of a seizure might be disoriented, might exhibit combative behavior and might be medically vulnerable, (Deposition Transcript of Jonathan Papia, Page 79-83).
- According to PAPD Police Officer Jonathan Papia, he did not know if it is just as easy to breathe standing up or sitting up as to when you are lying down with multiple people applying pressure to you while you are face down, (Deposition Transcript of Jonathan Papia, Pages 87-88).
- According to PAPD Police Officer Jonathan Papia, he did not know that the risk of positional asphyxia is compounded when a person with predisposing factors is involved in an altercation with law enforcement officers, (Deposition Transcript of Jonathan Papia, Page 89).
- According to PAPD Lieutenant Mark Bergery, positional asphyxiation curriculum wasn't embedded into the Police Academy until 2020, (Deposition Transcript of Mark Bergery, Page 23).
- According to PAPD Lieutenant Lawanda Irving, the PAPD determined there was no wrong doing or violation of policies by the PAPD Police Officers in this matter involving Mr. Lagoda, (Deposition Transcript of Lieutenant Lawanda Irving, Page 103).
- According to PAPD Police Officer Robert Joseph, he was not taught about compressional asphyxiation by the PAPD, (Deposition Transcript of Robert Joseph, Page 15).
- According to PAPD Police Officer Jonathan Papia, since he left the PAPD Police Academy, an update came into effect that applying bodyweight to an individual's diaphragm can impact their ability to breathe and this update became effective after the incident involving Mr. Lagoda, (Deposition Transcript of Jonathan Papia, Page 25).
- According to PAPD Police Officer Jonathan Papia, he does not know if he heard the terms positional restraint and compressional asphyxiation before this deposition, (Deposition Transcript of Jonathan Papia, Page 27).
- According to PAPD Police Officer Jonathan Papia, he doesn't know if he was provided any training materials from the National Safety Council, (Deposition Transcript of Jonathan Papia, Page 33).

Lastly, I base my opinion on my twenty-eight-year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## On-Scene Consulting
### My Qualifications for Reviewing this Case:

My opinions are based on my education, training, and experience. Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent, GS-1811. Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC), 6-Month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale drug smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader. Upon my graduation from the LAPD Academy, I was assigned to 77th Division. In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail). I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I was assigned to a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking, and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds. I received the Purple Heart in 2010. Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer (FTO) at Wilshire Division. I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident.

I was promoted to the rank of Detective and attended the LAPD Detective School. Upon completion of LAPD Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division. Prior to my assignment, I attended the mandated LAPD Supervisor School. In conjunction with

## On-Scene Consulting

LAPD Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training. The training focused on team building, leadership, and decision making. While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training. I directly supervised Police Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents. I conducted audits, personnel investigations, Standard Based Assessments (Ratings/Evaluations), Use of Force Investigations, Administrative Projects, and prepared commendations for Police Officer's field performance. While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group, (SEG). I directly supervised (14) Police Officers and Detectives assigned to the Unit. SEG worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in Hollenbeck Division. I provided ongoing mandated Department Training as well tactical, firearms, less than lethal force, lethal force and search warrant tactics training to Police Officers and Detectives. SEG prepared and served numerous search warrants. I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the of the search warrant service. I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was assigned to Internal Affairs Division (IAD), Headquarters Section. I investigated personnel complaints that exceeded the scope for a geographical Division. At the conclusion of my assignment to IAD, I was selected to Management Services Division, Special Projects, Office of the Chief of Police. I completed numerous in-depth staff projects for review by the Chief of Police. In addition, I conducted research and edited the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I was selected as a Sergeant II at 77th Division Vice. I directly supervised (10) undercover Vice Officers and four uniformed Police Officers. I provided all facets of training to the Police Officers assigned to Vice to include Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations Training, Surveillance Training, and any other

## On-Scene Consulting

training deemed necessary by the Area Commanding Officer. I conducted audits, personnel investigations, administrative projects, Use of Force Investigations, and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force. I conducted Use of Force audits and Internal Affairs Audits on Specialized Units in Central Bureau and South Bureau.

In 2000, I was selected to Metropolitan Division K9 Platoon as a Sergeant II+1. I directly supervised (16) K9 Handlers. Metropolitan Division K9 conducted K9 searches for the entire Department covering all Patrol Divisions and Specialized Units. I provided all facets of training to the K9 Officers to include K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer. In addition, I taught K9 Operations at LAPD In-Service Training, Watch Commander School, Sergeant School, Field Training Officer (FTO) School and Detective School. While assigned to K9, I investigated and completed K9 contacts (bite investigations), personnel complaints, and Use of Force Investigations. In addition, I directed and was directly involved in Use of Force incidents. I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised (60) SWAT Officers. I conducted and facilitated all facets of SWAT training to include Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, 37mm, X-26 Taser) on a monthly basis. In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast Rope, Aerial Platform Shooting). I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing). I was the Supervisor-in-Charge of the Crisis Negotiation Team, (CNT). I provided on-going Crisis Negotiation Training, mental health training, Tactical de-briefs of SWAT incidents, 40-hour POST Certified CNT School, and suicide prevention training. I worked in conjunction with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and Didi Hirsch Suicide Prevention Training. In addition, I assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

## On-Scene Consulting

During this time, I was selected as the LAPD SWAT representative to respond to Mumbai India with LAPD Counterterrorism and Las Vegas Metropolitan Division Police Department Counterterrorism following the terrorist attack in November 2008. I taught use of force, tactics, and SWAT deployment to 250 Mumbai Special Tactical Police Officers. Upon my return, I assisted with the development of Multi-Assault, Counter-Terrorism Action Capabilities, (MACTAC).

In June 2010, I retired from the Los Angeles Police Department with over 20 years of service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career. During my tenure with the LAPD, I received over 100 Commendations including: The Medal of Valor, Purple Heart, and the Police Star.

From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA. My responsibilities included identifying and conducting Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences. I utilized strategic-level analysis from the intelligence community, law enforcement and the private sector. I identified and monitored potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated. I mitigated expected threats. I utilized preplanned, coordinated actions in response to infrastructure warnings or incidents. I responded to hostilities. I identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include on-site security personnel, local law enforcement, medical and fire rescue, and relevant investigative agencies. I conducted all facets of security training for the company and employees. I formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests. I conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC). I processed and monitored inmate population from initial intake, housing, court, transportation, and release. I conducted searches of inmate population as well as the facility on an ongoing basis. I utilized my experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. I provided information to Gang Detail. I functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. I attended and certified in

## On-Scene Consulting

RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. I attended on-going training to include Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza. I conducted and facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. I ensured all Security Professionals were compliant with BSIS security training and licensing. I conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft. I conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED) and protocols to respond and mitigate threats. I developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. I coordinated all security efforts to ensure safety at Special Events. I conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.

From March 2016 to September 2017, I was the Director of Security at L&R Group of Companies. I conducted Risk and Vulnerability (RAV) Assessments for all L&R Group of Companies developments and projected developments throughout the United States. I conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. I ensured all Security Professionals were compliant with BSIS security training and licensing. I conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft. I conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. I developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. I coordinated all security efforts to ensure safety at Special Events. I conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles

## On-Scene Consulting

Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.

In 2020, I received my Master of Legal Studies from Pepperdine Caruso School of Law.

Attached are my curriculum vitae, listing of testimony and fee schedule.

Scott A. DeFoe