# Exhibit I

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

ALEXEY V. TARASOV, ESQ.,
Administrator of the Estate of
EVGENIY LAGODA, Deceased, and
GRIGORY TIKHOPLAV,

      Plaintiffs,

          vs.          Case No. 21-cv-6226 (NRB)

PORT AUTHORITY OF NEW YORK AND
NEW JERSEY, and PORT AUTHORITY OF
NEW YORK AND NEW JERSEY POLICE
DEPARTMENT a/k/a PORT AUTHORITY
POLICE DEPARTMENT a/k/a/ PAPD,
PAPD OFFICER MICHAEL BUGIADA,
PAPD OFFICER ROBERT JOSEPH, PAPD
OFFICER JONATHAN PAPIA, PAPD
OFFICER PAUL MEZZACAPPA, and PAPD
OFFICER JONATHAN DURAN,

      Defendants.

_____)

--o0o--

REMOTE DEPOSITION OF SCOTT A. DEFOE

Wednesday, September 4, 2024

--o0o--

Reported by:
Rick Galten, CSR No. 13202



APPEARANCES:

For the Plaintiffs:

        Ashcroft Law Firm
        200 State Street
        Floor 7
        Boston, Massachusetts  02109
        (617) 573-9400
        camrhein@ashcroftlawfirm.com
        BY:  J. Christopher Amrhein, Jr., Esq.


For the Defendants:

        The Port Authority of New York and
        New Jersey
        Law Department
        4 World Trade Center
        150 Greenwich Street, 24th Floor
        New York, New York  10007
        (212) 435-3465
        calterman@panynj.gov
        gfrangos@panynj.gov
        BY:  Cheryl Alterman, Esq.
             Matthew Malysa, Esq.

                        --o0o--



Page 3

INDEX OF EXAMINATION

Page

Examination by Ms. Alterman                           4
Examination by Mr. Amrhein                          202


INDEX OF EXHIBITS


Exhibit No.          Description                      Page

Exhibit 1    Curriculum Vitae                          24
             (Seven pages)
Exhibit 2    On-Scene Consulting                       70
             Rule 26 Report
             (29 pages)
Exhibit 3    Attorney General's Report                141
             Bates PA1802 - 1864

Exhibit 4    Record of Trial Testimony and            169
             Depositions
             (55 pages)

Exhibit 5    Bergery Transcript Excerpt               205
             (Six pages)
                        --o0o--



Page 4

BE IT REMEMBERED THAT, pursuant to Notice of Deposition and on Wednesday, September 4, 2024, commencing at the hour of 8:05 a.m., Pacific Standard Time, remotely via Zoom, before me, RICK GALTEN, a Certified Shorthand Reporter for the State of California, there appeared

SCOTT A. DEFOE,

Called as a witness by the Defendants, and who, having been first duly sworn, was thereupon examined and testified as hereinafter set forth.

--o0o--

MS. ALTERMAN:  Good morning.  This is Cheryl Alterman, I'm one of the attorneys representing Defendants the Port Authority of New Jersey as well as the individually named police officers.

MR. MALYSA:  Good morning.  Matthew Malysa of Port Authority Law Department on behalf of Defense.

MR. AMRHEIN:  And my name is Attorney Chris Amrhein, Jr., with Ashcroft Law Firm here in Boston, Massachusetts.  And we represent the plaintiff in this matter.  And this deposition is of Plaintiffs' expert Scott Defoe.

EXAMINATION

BY MS. ALTERMAN:  Thank you.



Page 5

Q.   Good morning, Mr. Defoe.  As I just stated on the record, my name is Cheryl Alterman, and I'm an attorney representing the defendants in this case, collectively the Port Authority of New York and New Jersey, as well as the individually named police officers in this action.

We are here to take your deposition today.  I know you've been deposed before and given testimony in court, but I'd like to give you some preliminary instructions before we begin.  Okay?

A.   Yes, ma'am.

Q.   I will be asking you a series of questions today, and you will be answering those questions. First, you'll see the court reporter is on the screen. The court reporter in this case has the job of taking down everything that's said during today's deposition. Please make sure all of your answers are verbal or spoken, since the court reporter cannot take down any hand gestures or nod of the head.

Do you understand that?

A.   Yes, ma'am.

Q.   I also ask that all of your responses, if they're a yes or no, be stated yes or no.  Please don't shake your head or say "mm-hmm," because the court reporter cannot take down any of those type of



Page 6

responses.

Do you understand that?

A. I do.

Q. I also ask that, even if you anticipate the question that I'm asking, you allow me to finish asking the question before you answer it, so that way we have a complete record of both my question and your response to the same. Okay?

A. Yes, ma'am.

Q. If at any time you don't understand a question that I'm asking you, please let me know and I'll be happy to rephrase the question. If you answer the question as it was posed, I'm going to assume that you understood the question.

Do you understand that?

A. I do. Thank you.

Q. If you need to take a break at any time, we'll be happy to accommodate you. I just ask that if there's a pending question, you answer the question before we take the break. Okay?

A. Yes, ma'am.

Q. Now, do you understand all the instructions as I gave them to you today?

A. I do, ma'am. Thank you.

Q. Is there anything affecting your ability to



Page 7

testify truthfully and completely today?

A.   No, ma'am.

Q.   Are you taking any medications that would prevent you or restrict your ability to recall events?

A.   No, ma'am.

Q.   Please state your full name and address for the record.

A.   It's Scott Allen Defoe, S-c-o-t-t, A-l-l-e-n, D-e-F-o-e.  526 21st Street, Huntington Beach, California 92648.

Q.   Thank you.

MR. AMRHEIN:  And Cheryl, before we get going, just to discuss stipulations for the record.

MS. ALTERMAN:  Sure.

MR. AMRHEIN:  I know in the past that we had done, you know, what we typically call the usual stipulations.  Is that agreeable for this?  And if so, could we just read them onto the record?

MS. ALTERMAN:  Yes, that's fine.

MR. AMRHEIN:  Okay, great.  And I'm happy to say them out loud and confirm that we agree that all objections except as to form are reserved until the time of trial, all motions to strike are reserved until the time of trial.  And then we can come to agreement on, you know, any notary or read and sign if that's



Page 8

agreeable to you.

MS. ALTERMAN:  Yes, that's fine.  And if the witness prefers to sign, we can deal with that at the end of the deposition.

MR. AMRHEIN:  Sounds good.  Thanks, Cheryl.

MS. ALTERMAN:  Sure.

Q.  Mr. Defoe, the address that you provided to us on the record, is that a business address or a home address?

A.  Both.  I work out of my home.

Q.  What is the name of your business?

A.  On-Scene Consulting Group.

Q.  And what is your position in the business for On-Scene Consulting Group?

A.  I'm the owner of the company.

Q.  Is that an LLC?

A.  It is.

Q.  Are there any other members of the LLC?

A.  No, there's not.

Q.  Are there any other co-owners of the On-Scene Consulting Group?

A.  I think for tax purposes, my wife and I are in a partnership.

Q.  Do you have any employees?

A.  I do not.



Page 9

Q.  And when I say any employees, I'm referring to both full-time and part-time employees.

A.  Correct, no employees at all, ma'am.

Q.  Prior to today's date, Mr. Defoe, how many times have you given deposition testimony?

A.  This would be my 265th deposition.

Q.  Of those 265 depositions, how many of those were in civil-related cases?

A.  All of them.

Q.  Have you ever appeared in a criminal case and gave testimony outside of a court setting in connection with your practice with On-Scene Consulting Group?

A.  Not outside of a court session -- setting, no, ma'am.

Q.  Of those 265 depositions that you've participated in, how many of those depositions were you retained by Plaintiff's Counsel?

A.  I've been retained approximately 90 percent of my 500 or 50-so police-related matters, approximately 53 or to 54 times have been for the defense and approximately 500 times have been for the plaintiff.

On premises liability or security matters, which are about 300 matters, about 70 percent have been for the plaintiff and approximately 30 percent have been for the defense.



Page 10

I'd like to just go back regarding the question regarding a criminal testimony regarding a criminal matter. I was the expert in the George Floyd case on the civil matter, but I did provide testimony during the time. I don't know if the testimony had any impact on the criminal matter in the Floyd matter, but I did provide more of a Zoom interview that they used.

I don't know if it was used as in any way -- I wasn't called into court, but I don't know if the statement in itself were used in any fashion at all as a result of the interview that I did.

Q. Understood. Was that interview recorded, to your knowledge?

A. It was on Zoom. It was -- Romanucci & Blandin were the retaining attorneys out of Chicago. And they conducted an interview. I believe it was just for mediation purposes, to settle the case. But I don't know, once again, if any part of that interview was used at all in Hennepin County, Minnesota.

Q. When you were interviewed on Zoom for the George Floyd civil case, were you sworn to give testimony under penalty of perjury?

A. No, not for that matter, I was not.

Q. Now, you've said that you've testified 90 percent of times for the 550 police-related cases



MAGNA
LEGAL SERVICES

Page 11

that you've been involved in.

Of those 550 police-related cases, has your involvement been in a consulting role?

MR. AMRHEIN:  Objection.

THE WITNESS:  No, it's been as a retained police practice expert in the police-related matters, not as a consultant.  On some of the -- my work -- I've been retained in the Tyree Nichols matter out of Memphis.  In that matter, it's been as of now just consulting.  I've not been deposed.

There's been some, obviously, pre-litigation work that I've done.  I think might be in preparation, once again, for a settlement or settlement conference, but not -- I've not done any work or have not been deposed in the matter, but I have done work in the matter.

Q.  So if you're not deposed in the matter, do you consider your role to be as a consultant?

A.  No.  Like, for instance, I was retained on a number of cases where the matter is settled prior to my deposition, but I have -- I am retained based on my retention agreement with the attorney as the expert, but just the cases -- many of the cases don't go to deposition.  They're settled prior to.

Q.  Understood.  So my question to you is, what do


MAGNA
LEGAL SERVICES

Page 12

you consider the difference when you're retained as a consultant versus a police practices expert?

A.   Ultimately that my work in the matter will not result in any testimony, just that it will result in primarily just maybe working in conjunction with the attorneys on case preparation, on discovery requests. But not -- my role will never evolve into that where I will be testifying at a deposition or trial.

And I've not ever been retained in any of those matters.  They've always been with the objective is, I will ultimately testify if, in fact, asked to sit for a deposition or testify at trial.

Q.   Now, of the 53 or 54 police-related cases where you were retained by the defense, were any of those cases venued in the state of New York?

A.   No.   Just plaintiff matters in New York.   They were in California, in West Virginia, Minnesota.   I believe that's the three states where the defense work has occurred.

Q.   Now, your testimony was that you said you only did plaintiff matters in New York.

What type of plaintiff matters were you involved in in the state of New York?

A.   I've had a -- three or four premises liability matters.  I have the Daniel Crude matter, the positional



Page 13

asphyxiation case.  I believe it was up in Buffalo.
That case settled prior to deposition.  But I did write
a preliminary Rule 26 report in that matter.  And I
believe that is -- I believe that is it.

Q.  So the only police-related case that you've
worked on in New York is the Daniel Crude case; is that
correct?

A.  I believe so, yes.

Q.  And that Daniel Crude case did not result in
deposition testimony or court testimony on behalf of
yourself, correct?

A.  That's correct, ma'am.

Q.  Is that case resolved, to your knowledge?

A.  It's settled, ma'am.

Q.  When when did it settle?

A.  Probably about -- I believe -- I think about
18 months ago or so, I was advised that it was settled.

Q.  Who were the defendants in the Daniel Crude
case?

A.  I don't know the exact defendants.  I can look
on my computer if you'd like me to.

Q.  Is this case listed in your list of deposition
and trial testimony?

A.  No, ma'am.  Because I was not deposed.

Q.  Okay.  Did the defense have an expert in the



Page 14

Daniel Crude case, if you know?

A.  I don't know.

Q.  Were you ever asked to review a defense police practices expert report in connection with the Daniel Crude case?

A.  No.  We never -- there was never disclosures that were a disclosure date.  So I don't believe that -- and I'm just speculating -- that the defense expert submitted a report.  I completed a preliminary Rule 26 report in the matter.  But I was not ever provided a defense expert's report.

Q.  Is it fair to say, Mr. Defoe, that you've never given deposition testimony in a police-related matter in the state of New York?

A.  I believe that is correct.

Q.  Is it also correct, Mr. Defoe, that you've never testified in the court of law in any police-related matter in the state of New York?

A.  Correct.  There is another case.  Jones verse Rochester is another matter.  It's a police shooting case I've been retained in outside of the Daniel Crude matter.  But I've not been -- to answer your question, I've never been deposed other than this case.  And I've never testified in any courtroom in New York as a result of my work as a police practices expert.



MAGNA
LEGAL SERVICES

Page 15

Q.  And I'll ask you the same question with respect to the federal courts in New York.

Have you ever given deposition testimony for a police-related matter in federal court in the state of New York, either in the Southern District of New York or a case that went up on appeal to the Second Circuit?

A.  No, ma'am.

Q.  Have you ever given trial testimony in a police-related matter in a federal court case, either in the Southern District of New York, the Eastern District of New York, or has the trial testimony went up on appeal to the Second Circuit Court of Appeals?

A.  No, ma'am.

Q.  Have you ever given testimony in a police-related matter in the state of New Jersey?

A.  I don't believe I have.

Q.  And is the same answer true with respect to both deposition and courtroom testimony in the state of New Jersey for a police-related case?

A.  I believe so.

Q.  Have you ever given testimony in any district court, federal court in the state of New Jersey for a police-related case?

A.  I don't believe so.

Q.  In order to prepare for your deposition



Page 16

testimony today, what, if anything, did you do to review?

A.   I reviewed my original Rule 26 report dated April 26, 2024.  I reread Mr. Monaghan, that's M-o-n-a-g-h-a-n's, report addressed to you, ma'am, that was both a report and appears to be a rebuttal report.

I had a call with Plaintiff's Counsel yesterday in preparation for my deposition.  I had a call this morning briefly with Plaintiff's Counsel as relates to my deposition today.

I briefly reviewed some of the policies for the Port Authority of New York and New Jersey, both the prior policies prior to the incident on April 12, 2019, and the use of force policy in 2021.  I reviewed the use of force report.  The officers involved in this matter. I briefly looked at the special investigations and prosecution unit of the investigation into this matter by the Attorney General's Office.

And I believe that is it.

Q.   Mr. Defoe, are you aware that your deposition had previously been scheduled on two prior occasions?

A.   Yes.

Q.   Prior to the other two dates that you were scheduled to testify, did you also have any consultations with Plaintiffs' Counsel before those



Page 17

original depositions scheduled dates?

MR. AMRHEIN:  Objection.

THE WITNESS:  Conversations -- initial conversation when I was originally contacted on June 2nd, 2023, was Plaintiffs' Counsel.  And I believe one or two conversations intermittently throughout the review of the material and the submission of my report on April 26.  The issue regarding the trial -- the deposition cancellation, that was by way of e-mail correspondence advising that I had federal court trials that -- and one family-related issue that prevented my moving forward with the deposition.

MS. ALTERMAN:  Q.  So just with respect to those two canceled prior deposition dates, my question specifically is whether or not you had any consultation, preparation sessions with Plaintiffs' Counsel prior to the original -- the two original deposition scheduled dates.

MR. AMRHEIN:  Object.

THE WITNESS:  My apologies, ma'am.  No, I did not.

MS. ALTERMAN:  Q.  Now, you testified that you were first contacted by Plaintiffs' Counsel on June 2nd, 2023; is that correct?

A.  Correct.



Page 18

Q.  On that date, did you agree to take the case and issue a report on behalf of Plaintiffs in this action?

MR. AMRHEIN:  Objection.

THE WITNESS:  No.  I originally spoke to Plaintiffs' Counsel the first part of June, had a brief conversation.  He sent a -- I believe a couple documents:  The Attorney General's report; the use of force report; the incident report, which was basically the officers' statements.  And then he recontacted me on or about the week of July 18th.  I did not hear from Plaintiffs' Counsel in the interim.

And then he just stated that he was -- they were going to move forward if I was agreeable to take the case, which I was, based on my preliminary review of the materials that were provided.

MS. ALTERMAN:  Q.  Did you require a retainer or initial payment in order to agree to work on this case for Plaintiffs' Counsel?

MR. AMRHEIN:  Objection.

THE WITNESS:  My -- I requested my standard retainer agreement as well as my initial check required as a part of my retention.  But that wasn't prior to reviewing the initial documents.  I did that, as I always do, for screen down purposes on my own time.  I don't bill for original or initial screen downs.



MAGNA
LEGAL SERVICES

Page 19

Q. How much is your retainer in this case?

A. $4,000.

Q. How much was the initial check required?

MR. AMRHEIN: Objection.

THE WITNESS: $4,000.

MS. ALTERMAN: Q. Is that separate from the retainer or one and the same?

A. No, there's just one check. It's a $4,000 check.

Q. What is your billing rate per hour?

A. For work on the case, $425 per hour. For depositions and trial, $525 per hour.

Q. Do you also charge travel time in the event that you're called to testify at trial?

A. Yes. That's $100 per hour.

Q. Did you review any other documents, recordings, photographs in preparation for your testimony today that were not listed or next to your report that was issued on April 26 -- no -- yes, April 26, 2004?

A. There were a couple medical reports from defense experts I just looked over. And as I mentioned, when I received those after the submission of my report on April 26 as well as Mr. Monaghan's report, as mentioned, I received that after my initial submission of my Rule 26 report and reviewed that afterwards. And that's


MAGNA
LEGAL SERVICES

Page 20

not listed on my -- my report.

Q.  Did you also review the defense expert's, Dr. Mazarin's report?

A.  I believe so, just briefly.  I don't offer medical opinions.  So, just briefly looked at the medical reports.

Q.  How do you keep track of your time when you work on a case?  Do you do that yourself, or does someone do that for you?

MR. AMRHEIN:  Objection.

THE WITNESS:  I do it myself on a calendar.  I just write the case I work on and the number of hours that I expend on a particular case.

MS. ALTERMAN:  Q.   In your police practices cases that you work on that eventually go to trial where you've given deposition testimony, how much would you say on average you charge on those cases from inception to trial?

MR. AMRHEIN:  Objection.

THE WITNESS:  It's going to depend.  On -- on security matters that don't require Rule 26 report, though, I typically provide a report.  I think an average case, if it goes to trial, will be 15- to 25,000, depending on the volume of number of deposition, depending on, you know, if there's body-worn camera,



Page 21

which -- you know, or something where there's a lot of time expenses for police-related matters, probably the same.  Between 15- and $25,000, depending on the size of the case.  Sometimes more, sometimes less.

Q.  How much have you billed on this case to date?

MR. AMRHEIN:  Objection.

THE WITNESS:  I have -- I have billed and received a total of -- my total billable was $20,931.25 less my $4,000 retainer.  My invoice was $16,931.25. And that's been received -- sent and received.  And that invoice was sent to Plaintiffs' Counsel on May 1st, 2024.

MS. ALTERMAN:  Q.  Do you anticipate charging more than $25,000 in this particular case, based upon the fact that you've already billed $16,931.25?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yeah, I don't know what the additional discovery -- I don't know the number of depositions that I've not received or reviewed. Obviously, if the case goes to trial, it will be travel time and then trial prep.  So no, I wouldn't foresee it going beyond that unless there's a volume of material that I haven't received yet.

MS. ALTERMAN:  Q.  Have you spoken with the plaintiffs in preparation for your deposition testimony?



Page 22

A.    No, ma'am, I've never spoken to the plaintiff in this matter.

Q.    Have you ever spoken with Mr. Tarasov, the plaintiffs' administrator in this case?

A.    No, ma'am.

Q.    Have you reached out to any family members of Mr. Lagoda prior to your testimony here today?

A.    No, ma'am.

Q.    What is your highest level of education?

A.    I have a master's of public administration degree from California State University at Long Beach. I have a master's of legal studies from Pepperdine School of Law.

Q.    When did you receive your master's in public administration?

A.    1998.

Q.    When did you receive your master's of legal studies?

A.    2000 and -- 2020 -- actually, yeah, 2020.

Q.    Where did you attend undergraduate college?

A.    Northeastern University in Boston.

Q.    What degree did you receive?

A.    Bachelor of Science in criminal justice.

Q.    What year did you earn that degree?

A.    1988.



Page 23

Q.   Do you have any other certifications or degrees?

A.   A lot of certifications, based on my law enforcement.  Degrees, no.

Q.   So let's go through your employment history.

If you could start with your police-related employment, please describe for us or start by telling us, where was the first place you were employed as a police officer?

A.   Okay.  I -- after graduating from Northeastern, I attended the Federal Law Enforcement Training Center in Georgia.  I was hired by United States Customs Service as a special agent.  I was assigned to Drug Enforcement Administration's organized crime drug task force in San Francisco.  I ended up leaving there and joining the Los Angeles Police Department in 1989.  I stayed at LAPD from 1989 to 2010 full-time, and then I was a level 1 reserve from 2010 to 2016.

I also went back into law enforcement from 2013 to 2014 and worked one year at the Riverside County Sheriff's Department.

Q.   Now, when you were assigned to U.S. Customs as a special agent, is that the highest rank that you attained working for U.S. Customs?

A.   Yes, ma'am.

Q.   And then you were transferred to the



Page 24

San Francisco unit; is that correct?

A.  Yes.  That was my first assignment out of -- out of FLETC, which is the Federal Law Enforcement Training Center.  That was my first and only assignment out of -- as an agent and U.S. Customs.

Q.  How long did you work for the -- at the San Francisco office?

A.  Let me check my CV real quick.

Q.  Okay.  And why don't we go ahead and mark that as Defoe 1 and we can show it to you.  That way we're all looking at the same thing.

(Exhibit 1 was marked for identification.)

MS. ALTERMAN:  Okay.  I have it in front of me, if you don't want to put it on the screen.

MS. ALTERMAN:  Okay.  We can put it up just to confirm that we have the same CV that you're looking at.

THE WITNESS:  Sure, but the time was June 1988 through October 1989.

MS. ALTERMAN:  Okay.  So for the record, this is a seven-page document.  It's the CV that was provided as part of Plaintiffs' Rule 26 disclosure when your report was disclosed as well.

Q.  We'll just scroll through the document.  And just let us know if this is most up-to-date CV and the same CV that you have in front of you today.


MAGNA
LEGAL SERVICES

Page 25

A.  Yes, ma'am.  That is correct.  That's the most up-to-date CV and the one I do have in front of me today.

Q.  Okay.  Great.  So you testified that you were assigned to the San Francisco office from June 1998 -- 1988, excuse me, until October 1989, correct?

A.  Yes, ma'am.

Q.  At that time were you applying to different police departments within Los Angeles or other areas in California?

A.  No.  I ended up working a matter that emanated in San Francisco and ended up -- it was a drug smuggling matter and ended up in Los Angeles.  And I had the opportunity to work with LAPD major narcotics.  And I learned pretty quickly how poorly I was being paid by the government, based on what the annual income was for police officers.  So I decided to join LAPD based on my interaction with the officers and detectives I worked with on an operation.

Q.  When you joined LAPD, did you join LAPD as a police recruit?

A.  Yes.  Because special agents are not P.O.S.T., which is Peace Officer Standards and Training, certified, which is consistent with, like, New York's municipal police training council.  In California you're


MAGNA
LEGAL SERVICES

Page 26

not a peace officer unless you're P.O.S.T. certified, so I had to attend the full six-month police academy in Los Angeles.

Q.  When you attended the full six-month police academy at the Los Angeles Police Department, were you given copies of either their patrol guide or police orders or instructions that you were required to follow as a Los Angeles police officer?

A.  Yes.

MR. AMRHEIN:  Objection.

THE WITNESS:  The policy -- we were taught policies, procedures, and P.O.S.T. learning domains.

MS. ALTERMAN:  Q.  And what was the last thing you said?  Post learning domains?

A.  Yeah, P.O.S.T., which is Peace Officers Standards and Training.  There were 43 learning domains that all police officers in the State of California are taught during their initial 7- to 800 hours of police training and then throughout their career.

Q.  Now, during your academy training with the LAPD, were you taught the California penal law?

A.  Yeah.  Yes, based -- some of it, based on the areas that we would be enforcing during the course and scope of our employment.

Q.  Is it fair to say that during your academy



Page 27

training with the LAPD, you were not trained on the -- New York's penal law?

A.   Correct.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.  Would you also agree with me that you've never been trained on New York's penal law?

MR. AMRHEIN:  Objection.

THE WITNESS:  You know, I don't know.  As a special agent, you can perform in all 50 states and even out of the country.  So I don't know some of the case law, such as Grand v. Connor and others, or -- and I know are applicable to all states within the country on the reasonableness of the use of force and some other areas.  But the baseline training as an agent would apply to anyone if they were working in New York or California or New England, anywhere.

So there was some training, but specific Municipal Codes, Penal Codes that are applicable only to the State of California, I've not received any training in that respect.

MS. ALTERMAN:  Q.  Mr. Defoe, I'd just like to give you an instruction so that we can make sure this deposition proceeds smoothly, that if you just answer the question that I've posed to you.

My question specifically was whether or not you



Page 28

received any training on New York penal law.

MR. AMRHEIN:  Objection.

THE WITNESS:  Once again, I don't know if part of the training at FLEPC was applicable to New York penal law or not.

MS. ALTERMAN:  Q.  My question is not whether or not the training at FLEPC was applicable to New York's penal law.

I'm asking specifically if you've ever been trained in a police academy setting on New York's penal law.  Yes or no?

MR. AMRHEIN:  Objection.

THE WITNESS:  On that -- that was a different question.  That's no.

MS. ALTERMAN:  Q.  Now, after you graduated from the academy, from the LAPD, your rank was police officer, correct?

A.  Police officer I.

Q.  As a police officer I, where were you assigned to?

A.  17th Division.

Q.  How long did you hold the rank of police officer I with the LAPD?

A.  A rank is for one year for all police officers. And then you become a police officer II.



Page 29

Q.  Is the police officer I rank a probationary period?

MR. AMRHEIN:  Objection.

THE WITNESS:  It is.

MS. ALTERMAN:  Q.  So is it true that you held the rank of police officer I from 1989 to 1990?

A.  It would have been 1990 to 1991.

Q.  Was it your understanding that any infractions, whether you were on or off-duty, could affect your ability to maintain your rank of police officer I and becoming a police officer II during your probationary period?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct.

MS. ALTERMAN:  Q.  Were you involved in any off-duty incidents in 1991?

A.  I was.  I was involved in an off-duty altercation in 1991.  And I worked without a work permit in 1991 as well, both off-duty.

Q.  Now, with respect to that work duty altercation, as you describe it, that resulted in an arrest, correct?

A.  Correct.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.  And you were arrested specifically with respect to that off-duty altercation,


MAGNA
LEGAL SERVICES

Page 30

correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Myself and three other individuals, correct.

MS. ALTERMAN:  Q.  And yourself and three other individuals were arrested for allegedly punching and assaulting an individual from the Bronx in New York, correct?  Who happened to be in California at the time?

MR. AMRHEIN:  Objection.

THE WITNESS:  Allegedly, yes.

MS. ALTERMAN:  Q.  Were you arraigned as a result of that incident?

A.  We don't really arraign.  There was a preliminary hearing -- initial preliminary hearing, and then the case was dismissed.

Q.  As a result of that off-duty incident in 1991, did that affect your work status as a police officer I with LAPD?

MR. AMRHEIN:  Objection.

THE WITNESS:  No.  I was already a police officer II with LAPD when the incident occurred.  I just recently finished my probationary period.  And I was transferred from 17th Division to another division in LAPD when the altercation occurred.  I'd already completed my probationary time.



MAGNA
LEGAL SERVICES

Page 31

MS. ALTERMAN:  Q.  If you had been in your probationary period at the time when this off-duty altercation occurred, would your employment with LAPD have been terminated?

MR. AMRHEIN:  Objection.

THE WITNESS:  Potentially.

MS. ALTERMAN:  Q.  As a police officer II at the time when this off-duty altercation occurred, were there any ramifications, discipline, counseling, suspensions as a result of your arrest?

MR. AMRHEIN:  Objection.

THE WITNESS:  I was disciplined as a result of my actions that evening, not as a result of the arrest.

MS. ALTERMAN:  Q.  What type of discipline did you receive as a result of your actions?

A.  I received a 50-day suspension.

Q.  Now, in terms of the severity of that penalty, where did that fall in the spectrum, 50-day suspension?

MR. AMRHEIN:  Objection.

THE WITNESS:  It was probably -- it's a significant suspension.  It didn't impact my career after the suspension, if you say significant.  But it was -- I think -- I mean, you could be -- you could be -- I believe the maximum you could be suspended would be 122 days at that time.  I don't know if it's that



Page 32

much now.  But back 34 years ago, I believe that was -- or 33 years ago, pardon me, I think it was -- 122 days was the maximum suspension you could receive.

MS. ALTERMAN:  Q.  Is that 50-day suspension that you received as a result of your actions, was that unpaid, sir?

A.  Yes, it was without pay.

Q.  During that 50-day suspension, were you ineligible for promotional opportunities within the LAPD at that time?

A.  Yes.  I was not -- I volunteered my -- every day during my 50-day suspension, but I would not have been in a position to be promoted during that time, that's correct.

Q.  Were you also not permitted to work with your on-duty weapon during that 50-day suspension?

A.  Correct.

MR. AMRHEIN:  Objection.

THE WITNESS:  No, I didn't make -- they -- for suspensions, I think, over ten days, they will take your assigned duty weapon and you cannot work any other secondary employment that has any nexus to law enforcement at all.  You could do, like, blue collar work or something of that to be able to support yourself, but nothing as relates to police and, I


MAGNA
LEGAL SERVICES

Page 33

believe, security as well during your suspension.

MS. ALTERMAN:  Q.  During your 50-day suspension, is it correct that they -- the LAPD took away your assigned duty weapon?

A.  That's correct.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.  You said that's correct?

A.  Yes, ma'am.

Q.  Who issued the suspension?  Did that come from the superintendent of the LAPD or someone else?

MR. AMRHEIN:  Objection.

THE WITNESS:  I -- we don't have superintendents.  We have chiefs.  And ultimately the chief of police ultimately signs off on all suspensions. And that would have been Chief Daryl Gates at the time.

MS. ALTERMAN:  Q.  Now, you also mentioned that there was another incident that you were involved in in 1991?

A.  Yes.  That was -- the fist incident, I worked without a work permit during a security detail.  And I received a three-day suspension for working without a work permit.  That was preceding the altercation.

Q.  Were you a police officer I or a police officer II at the time when you worked without a work permit?


MAGNA
LEGAL SERVICES

Page 34

A.   That was in 1990.  And I was a police officer I.

Q.   Did you have any other suspensions or discipline while you were a probationary police officer I for the LAPD?

A.   No other discipline or suspensions ever after the incident involving the fight during my remaining 26 years.

Q.   Now, you described the incident as a fight.

Can you tell me what your actions were in that fight.

MR. AMRHEIN:  Objection.

THE WITNESS:  Sure.  I -- my roommate at the -- would you like me to continue?

MS. ALTERMAN:  Q.   Yes, please, go ahead.

A.   Sure.  My roommate was an LAPD officer who was a former Marine.  He had served with two individuals that were from New York as well.  They were from, I think, Brooklyn or Manhattan.  They had served in Camp Pendleton, California where the Marine Corps training facility is.  He could not get the night off from work, so he asked me to work to chaperone his friend, who he had served with in the Marine Corps.  They were in town. So I decided to do so.

We went to some restaurants and bars in Los Angeles.  I was the designated driver.  I was



Page 35

driving their rental car.  And we ended up at a restaurant after hours restaurant in the Hollywood area of California.

One of the Marines got involved with an individual who was in line -- I guess there was some discussions.  He thought we were cutting in line.  There was a long line, kind of like an after-hours-type restaurant where people go after going to bars and nightclubs.

The one Marine got involved in kind of a verbal dispute with the individual in line.  That kind of ended.  They went in before us.  That being the other individual, his -- I think his sister.  We were about 30 minutes behind them.  But unfortunately, we were seated in the very next table to them.

When the -- there was some kind of looks and, I think, some discussion with the Marine and the individual as they were leaving, that being the other individual and his sister.

As they were leaving, the other individual challenged the Marine at the table to fight outside.  The Marine obliged.  They went outside.  And the individual punched the Marine, I think, in the face.  I went out to break up the fight, to try to de-escalate the situation.  I was struck and became involved in the



Page 36

altercation. The altercation ended.

I thought the best thing to do was to get the Marine, myself, and leave the area. That was a poor choice. And we left the area. The Los Angeles County Sheriff's Department were called. And we were detained and ultimately arrested.

Q. During this fight, Mr. Defoe, you yourself threw punches as well, correct?

MR. AMRHEIN: Objection.

THE WITNESS: I did. I did, as a result of the -- in self-defense, because I was struck in trying to break up the fight.

MS. ALTERMAN: Q. Initially you weren't involved in the fight, but then made yourself a part of the fight, correct?

MR. AMRHEIN: Objection.

THE WITNESS: Well, I tried to break the fight up to try to de-escalate it, and I was struck. And then I became involved in the fight.

MS. ALTERMAN: Q. Mr. Defoe, you've testified about this many times; is that fair to say?

MR. AMRHEIN: Objection.

THE WITNESS: Both at depos and in trial as well, correct.

MS. ALTERMAN: Q. Of the 255 depositions that



Page 37

you've done to date, how many times have you testified about this story?

MR. AMRHEIN:  Objection.

THE WITNESS:  Probably -- I don't know, ma'am. Maybe a quarter of the time, 10 percent of the time, I don't know.  Comes up in deposition on occasion.

MS. ALTERMAN:  Q.  And is it fair to say that every time before you are deposed in a case or give trial testimony, you are prepared by the attorney who has retained you about this specific fight and how to answer questions about this fight?

MR. AMRHEIN:  Objection.

THE WITNESS:  No.  Most attorneys don't really care, 'cause it happened 34 years ago and it wasn't in the course and scope of my employment.  But I -- still, like I told Plaintiffs' Counsel yesterday about the altercation.  I don't believe he knew about it.  And that there may be a question or two that may come up about it.

But majority of the time, I don't get asked. It's virtually -- it's come up in trial.  But typically it's a motion in limine, because it wasn't related and it was 34 years ago.  And it was dismissed.  So -- but I've answered questions about it both in deposition -- but I'm not getting coached by any attorneys as to how



Page 38

to testify, if that was your question.

MS. ALTERMAN:  Q.   Now, when you've testified about this off-duty incident when you were arrested in trial, you have given trial testimony about this as well, not only deposition testimony, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct.  I've probably -- a handful of trials or more it's come up.  And if the attorney didn't file a motion in limine, which if they do, typically it's excluded.  But I have testified about it in trial.

MS. ALTERMAN:  Q.   And there have been times that even when attorneys file motions in limine, those motions in limine have been denied and you've been required to testify about this off-duty incident which led to your arrest, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't know if it was as a result -- many attorneys don't care.  And they're -- when I ask them if they're going to write a motion in limine or prepare one, they don't believe that it's relevant to the case.  Many judges won't even allow it without a motion in limine, 'cause it's not relevant to my opinions.  It wasn't in the course and scope as a police officer, and it was 34 years ago.



But at the time I --

Q.  I understand your position, but I'm --

A.  Well, I was saying --

Q.  But you -- I'm just asking --

A.  I was -- well, I am -- I was completing your question.  Give me a second.  The -- but your question was, was I required to testify as a result of it -- a motion in limine being declined?  I don't think that has ever happened.

I've been -- I've testified when a motion in limine was not filed.  I've testified on occasion, if allowed, on probably a handful of times.

Q.  When was the last time you testified at trial about this incident?

A.  I think it was a positional asphyxiation matter in San Diego, California.  T-h-o-u-n-s-y is the name of the case.  You may have read about it.  It was an $85 million plaintiff verdict on a positional asphyxiation case with similar facts to the one we'll be talking about today.

Q.  Now I'll direct you back to your employment with the LAPD.  When you were elevated to the rank of police officer II, how long did you hold that rank for?

A.  I think about two years.  And then I was promoted to police officer III.  So about -- I think



Page 40

about two years.

Q. How long did you hold the rank of police officer III?

A. I think for a couple years. And then I was promoted to the civil service rank of detective.

Q. Were you required to take an exam in order to be a detective at LAPD?

A. For both the police officer III and detective, they're both exams as well as oral interviews for any position that you apply for.

Q. Is the rank of detective within the LAPD considered a supervisory role?

A. It is if you achieve the rank of detective II and higher, is a supervisor role.

Q. How long did you hold the rank of detective?

A. I think about -- let me look. About a year and a half, I was a detective I. Then I was promoted to sergeant.

Q. When you were promoted to the rank of sergeant. Is that considered a supervisory role?

A. It is, ma'am.

Q. Which unit were you assigned to supervise as -- were you a patrol sergeant?

A. Yes. At LAPD we always go by -- I think most agencies, you go back to a patrol function when you


MAGNA
LEGAL SERVICES

Page 41

promote to sergeant.

Q.   Which precinct were you assigned to as a patrol sergeant?

A.   I was assigned initially to Hollenbeck Patrol Division, which is, like, in East Los Angeles.

Q.   Were you required to undergo additional training to become a patrol sergeant?

A.   Well, the curriculum that you study to prepare for the exam is quite extensive.  And then when you are promoted, if you are promoted to sergeant, then you attend a -- I think at the time a six-week basic sergeant or supervisor school.

And then I also attended -- they had a Westpoint Leadership Academy supervisor training that was approximately six months when I was newly promoted to sergeant.

Q.   Is that six-week basic sergeants course also known as Charm School?  Have you heard that term before?

A.   I've not, ma'am.  I've never heard that term.

Q.   Were any of the force tactics that you were trained on when you were becoming a police officer I, did any of those change from the point when you held the rank of police officer I to police sergeant?

MR. AMRHEIN:  Objection.

THE WITNESS:  When you say force tactics, are



Page 42

you talking about the use of -- the use of force in general? Or at what -- so less than lethal or lethal force? I'm confused.

MS. ALTERMAN:  Q.   The use of force in general.

A.   I don't believe --

MR. AMRHEIN:  Objection.

THE WITNESS:  -- there were any revisions at that time from the time of police officer I through the rank of sergeant.  So from 1989, say, when I was in the academy, until 1996, I don't believe.  There may have been slight revisions, but the overall use of force policies for both lethal and less than lethal force, I believe, stayed relatively the same.

MS. ALTERMAN:  Q.   When you use the terms lethal and less than lethal, are those terms defined in California penal law?

A.   They are.  They're defined, obviously, by policy.  But I believe they're defined in the Penal Code as well.

Q.   And that terminology, less than lethal and lethal, that's specifically drawn from California Penal Code Section 6 -- 16780, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct.

MS. ALTERMAN:  Q.   Is that correct?



Page 43

A.  I believe so, that's correct.

Q.  Do those terms, less than lethal or lethal, appear in the New York penal law, to your knowledge?

A.  In the actual penal law, I don't know.

Q.  What was the next rank that you held with LAPD after sergeant?

A.  I was a sergeant II, was the next rank, which was at 77 Vice.

Q.  How long did you hold that rank of sergeant II?

A.  A little bit over a year.

Q.  What was the next rank that you held?

A.  Sergeant II+1.

Q.  What is sergeant II+1?

A.  That is a position that -- the sergeant II is a pay rate advancement, which means that you need to apply for that particular job within -- and you need to interview for that particular job, which means the Department has to advertise it to all supervisors who would be candidates to apply.  And then there's an interview, a background, and in some cases, like, for my tenure with Special Weapons and Tactics, there's a physical fitness test as well as with Metropolitan Division canine platoon.  There's a physical fitness test.  And then they'll put you on a list based on how you performed in certain categories.



Page 44

The plus 1 is a pay grade advancement and a pension-based bonus based on the danger associated with the respective assignment.

Q.  How long did you hold the rank of sergeant II+1?

A.  From April of 2000 through June of 2010.

Q.  Were you assigned to the same precinct during that ten-year period?

A.  Same division, yes, Metropolitan Division, five years, approximately, at the Metropolitan Division canine platoon and five years, approximately, at Special Weapons and Tactics.

Q.  When you were assigned to the Special Weapons and Tactics unit, were you interfacing with the public in that role?

A.  Yes.  During -- obviously we worked in a patrol function approximately two days per month to augment patrol in busy areas of the City of Los Angeles.  And then obviously, we're getting called out to barricaded subject incidents at approximately 150 per year.  And during that time we're interfacing with the public.  And as well as training, different facets of training and interfacing with the public as well.

Q.  Did you make any arrests during that ten-year period when you held the rank of sergeant II+1?

A.  Yes.  Did I personally make arrests?  Yes.



Page 45

Q. How many arrests did you personally make during that ten-year period?

A. Well, it's unique. I mean, if you're in conjunction with the other members or just solely by myself. Because that -- we're not --

Q. I'll clarify that question.

A. -- wouldn't be doing that --

Q. During the ten-year period when you held the rank of sergeant II+1, how many times were you the arresting officer in an incident?

A. I have no idea. Maybe -- maybe a dozen during that time.

Q. Now, of those 12 times when you were the arresting officer, when you held the rank of sergeant II+1, did any of those 12 times result in lethal use of force?

A. No. My -- I've been involved in lethal use of force situations, but they were not during my time at S.W.A.T. It was during my time at canine and during patrol assignment as a police officer III.

Q. So when you said that your -- there were three times when you had to use lethal force; is that correct?

MR. AMRHEIN: Objection.

THE WITNESS: Correct, there were four, basically, officer-involved shooting incidents.



Page 46

Three -- the way the Department classifies it, three, I was a shooting officer and I was shot in the line of duty or I was not the shooting officer but my partner was, so they classified that as an officer-involved shooting incident, though I was a victim and not a shooting officer.

MS. ALTERMAN:  Q.   And of those three incidents when you were the shooting officer, were you required to complete use of force reports for the use of deadly force?

A.   No.   You --

MR. AMRHEIN:  Objection.

THE WITNESS:  -- just provide an interview.  And you are doing a scene walk-through.  But Robbery Homicide Division completes all the reports, along with -- they run a parallel investigation with Force Investigation Division and Internal Affairs.

MS. ALTERMAN:  Q.   As a result of being a shooting officer three times, were you a subject of an Internal Affairs investigation at any point?

MR. AMRHEIN:  Objection.

THE WITNESS:  No, I -- Internal Affairs looks at the investigation to ascertain if there are any policies or procedures that were violated.  But there was no Internal Affairs investigation as a result of the



Page 47

officer-involved shootings I was involved in.

MS. ALTERMAN:  Q.   Now, during the 12 times that you were the arresting officer during that ten-year period, on any of those 12 occasions, were you required to use force in order to effectuate your arrest?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't believe I used -- I don't believe I used force in any of those 12 matters.

MS. ALTERMAN:  Q.   Were you required to use physical contact to handcuff the suspects in any of those 12 arrests?

MR. AMRHEIN:  Objection.

THE WITNESS:  I believe I handcuffed -- I don't know how many of the 12, but I believe that I used. It's not considered a use of force within LAPD to handcuff unless the person resists.  But I believe I handcuffed most -- the majority of the people that I was the arresting officer on.

MS. ALTERMAN:  Q.   Until this point in your career, besides for the three incidents which you utilized deadly force, had you used nondeadly force in any arrests that you effectuated up and to this point in your career?

A.  Yes.

MR. AMRHEIN:  Objection.


MAGNA
LEGAL SERVICES

Page 48

MS. ALTERMAN:  Q.   On how many occasions?

MR. AMRHEIN:  Objection.

THE WITNESS:  Probably overall, maybe 15 to 20 occasions.

MS. ALTERMAN:  Q.   Of those 15 to 20 occasions when you utilized nondeadly force, can you recall the type of nondeadly force that you utilized in order to effectuate the arrest?

MR. AMRHEIN:  Objection.

THE WITNESS:  A team takedown, we're using force to take someone to the ground.  The use of oleo, o-l-e-o-r-e-s-i-n, first word, second word, capsicum, c-a-p-s-i-c-u-m, which is OC spray, better known as pepper spray, probably half-dozen times or more, probably more.

The use of a baton or an impact weapon, probably several times.  The use of a Taser, electronic control device, both in probe and drive stun, that's d-r-i-v-e, stun mode.  The use of a .40 millimeter long-range impact device on a few occasions, the use of the Remmington 870 beanbag shotgun, probably on several occasions as well.

MS. ALTERMAN:  Q.   When you used these nondeadly uses of force in order to effectuate your arrests, were all of the types that you've just



Page 49

described approved by the LAPD as reasonable and necessary uses of nondeadly force under various circumstances?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes, all -- all of my use of force, including the lethal use of force, were found to be in policy, no action, no training, and no discipline associated with any of the incidents.

MS. ALTERMAN:  Q.  Now, in terms of the team takedown use of nondeadly force, how many times did you use that specific tactic?

A.  Well, as a supervisor, I coordinated those dozens of times.  As a participant as a police officer, probably half a dozen times, I think.

Q.  When you coordinated a team takedown as a supervisor, so as a sergeant I or a sergeant II+1, could you tell me the type of methods that you trained your officers on on how to use a takedown nondeadly use of force tactic.

A.  Once again, depending on the time we had to plan.  So the time and instructions may differ, depending on the totality of the circumstances.  But for team takedown, you're going to designate someone as a contact officer.  That's someone who will be speaking with the subject, if there's an opportunity to do that,



Page 50

from the initial contact throughout the use of force.

You're going to designate four officers to control a limb.  That being one arm, one leg -- one on each arm and one on each leg, better said.  There will be a coordinating effort for someone to take that person down, typically by the waist, to the ground.  And then you're going to control the limb until you can put that person into a handcuffing position.

And then we would immediately put that person into a seated, standing, or recumbent position once they were handcuffed.

Q.  When you were using this method of the team takedown, you would agree with me that the suspect was handcuffed in a prone position, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Ideally, yes.  I mean, typically they're going to be in a prone position if they go to the ground, handcuffed behind a back, that's correct.

MS. ALTERMAN:  Q.  And handcuffing a suspect on the ground in a prone position is a reasonable nondeadly use of force, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  It can be reasonable, or it should be, if you're not applying any pressure to the neck or back or striking the individual during the handcuffing



Page 51

process, that could be reasonable.  But the simple handcuffing behind to the small of the back with mechanical restraints is typically, or should be, considered reasonable use of force based on the totality of the circumstances.

MS. ALTERMAN:  Q.  And you would agree with me that that's the standard, correct?  That the use of force has to be reasonable under the circumstances that the officer is presented with at the time, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct.  Correction, the facts known to the officer, the severity of the crime, whether the suspect poses an immediate threat to the officer or others, and whether the suspect was actively resisting at the time the force was used.

MS. ALTERMAN:  Q.  You would also agree with me, Mr. Defoe, that time is important and that officers need to assess the time that they have in order to eliminate or reduce the threat to themselves or other individuals in the immediate vicinity, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  I just want clarification.  Are you talking about, should they look to be expeditious in the application of force regarding time?  I'm confused by your question.


MAGNA
LEGAL SERVICES

Page 52

MS. ALTERMAN: Q. My question is based upon your prior response that one of the things that officers need to do and to take into account is the time they have to respond to a situation.

So my question to you is, is it reasonable for an officer to account for time when they're assessing the threat of a suspect?

MR. AMRHEIN: Objection.

THE WITNESS: Correct. Based on the subject level of resistance, that's correct.

MS. ALTERMAN: Q. And if a suspect is actively resisting, then you would expect an officer to initiate some nondeadly use of force in order to restrain that individual so they're not a threat to the officers or anyone else in the immediate vicinity, correct?

MR. AMRHEIN: Objection.

THE WITNESS: Yes. If words and de-escalation techniques and defusing techniques are unsuccessful, then you may have to resort to the restraining of that person to prevent that person from injuring others, including the officers.

MS. ALTERMAN: Q. Now, you also testified that you used OC spray more than six times or so in your career as an LAPD officer; is that correct?

A. Well, during S.W.A.T., we used it hundreds of



Page 53

times in residences.  But single deployment to a single individual, I think, six to ten times, an estimation, of during my career.

Q.  And of those six to ten times, did you find that it was a reasonable use of force under the circumstances when you had an actively resisting suspect in order to spray them with the OC spray?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes, I believe it was reasonable, based on the totality of the circumstances.

MS. ALTERMAN:  Q.  You also testified that you used a baton or an impact weapon in your experience as an LAPD officer, correct?

A.  Correct.

Q.  And of the occasions when you used a baton, have you used a baton to strike a suspect or to effectuate a compliance hold or a combination of both?

MR. AMRHEIN:  Objection.

THE WITNESS:  Both.

MS. ALTERMAN:  Q.  When using a baton as a compliance hold, did you find that that was a reasonable nondeadly use of force in order to effectuate an arrest?

A.  Yes.

Q.  And why is that, sir?

A.  Because at the time it was used to control a



Page 54

limb and to assist with the effecting of a handcuffing

technique or to -- we would use a RIPP, R-I-P-P, hobble

h-o-b-b-l-e, restraint device to -- at some times to

tether the knees together so someone couldn't kick, not

to connect obviously to the handcuffing, but just more

to restrain the legs.

And you could utilize an impact weapon in

assistance with controlling a leg until the application

of the RIPP hobble restraint device was completed.

Q.   In your experience, do you also feel that it was

effective both as a supervisor and as a police officer,

to use a team takedown approach when a suspect is

actively resisting arrest?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct.  When they're

noncompliant and they were in an open-air environment

that you needed to take them down to control their

movements and actions.  Or sometimes they may have been

in the middle of the street or in an area where, you

know, you don't want them to get injured.  So you would

do so to control their movement; that's correct.

MS. ALTERMAN:  Q.   Have you ever used a team

takedown approach or coordinated a team takedown

approach inside a vicinity as opposed to an open air

environment?


MAGNA
LEGAL SERVICES

Page 55

A.  Yes.  Like, inside of a residence, an apartment, or some structure that's -- I have, yes.

Q.  And you've also found that team takedown approach to be equally as effective inside a residence, for example, when you have an actively resisting suspect?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes, in the cases I was involved in, I found it to be effective.

MS. ALTERMAN:  Q.   Did you ever use --

A.  Can we --

Q.  Sorry?

A.  Can we -- whenever you have a break, could I use the restroom?  And we've been going about an hour.  If we can just take five minutes, if that works for you.

Q.  Sure.  I just want to go this one question in, then we can take a break.

A.  Sure.

Q.  Did you ever use nondeadly lethal force in the form of punches or strikes with your fist in order to restrain an actively resisting suspect?

MR. AMRHEIN:  Objection.

THE WITNESS:  I think the question was nondeadly, then you said lethal force?  Is that -- or did I mishear that?



Page 56

MS. ALTERMAN:  No.  I'll rephrase the question.

Q.  My question is, have you ever in your experience used nondeadly force in the form of punches or strikes in order to effectuate an arrest with an actively resisting suspect?

MR. AMRHEIN:  Objection.

THE WITNESS:  Not for -- not for active resistance, but for preassaultive and assaultive behavior would be the time in which personal body weapons, including punches, kicks, elbows, could be used to stop an individual's assaultive or preassaultive behavior.

MS. ALTERMAN:  Q.  Did you find that -- those techniques to be effective when you were encountering a suspect in a preassault or assaultive behavior?

MR. AMRHEIN:  Objection.

THE WITNESS:  Not always effective.  But there's been a majority of the time I found to be effective, yes.

MS. ALTERMAN:  Q.  And did you find that your actions when you used those type of tactics in an assaultive behavior suspect to be reasonable under the circumstances?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.


MAGNA
LEGAL SERVICES

Page 57

MS. ALTERMAN:  All right.  We can take a five-minute break.

(Off the record from 9:22 to 9:30.)

MS. ALTERMAN:  Q.  Mr. Defoe, what was the next rank that you held while working for LAPD?

A.  My last full-time rank was a sergeant II+1.  I didn't participate in any other promotional exams or apply of any higher rank, which would have been the rank of lieutenant, prior to leaving LAPD.

Q.  And you also have never held the rank of detective sergeant, correct?

A.  Well, we -- I was a detective and a sergeant. We just don't use those rank classifications like detective sergeant.  I was both.  And I could revert back to detective from sergeant whenever -- at any time I wanted to.  So we -- our rank structure's a little bit different than some East Coast police departments.

Q.  In 2010, that's when you retired from the LAPD?

A.  That's when I left.  I didn't retire until -- according to my pension, until I turned 50.  I was 44. But I maintained a level 1 reserve status with LAPD from 2010 to 2016.

Q.  What is level 1 reserve status?

A.  It's a -- basically, you're a sworn peace officer, a police officer.  And you're assigned to a



Page 58

specific unit or assignment.  You work in a patrol function.  And then whatever your expertise may be, you will work in that expertise as a reserve minimum of two days per month.

You're not compensated.  They give you a stipend every quarter, I think, for gas.  But it's more of a volunteer position.  But you have the same police powers you had when you were a full-time active member of the Department.

Q.   Did you make any arrests as an arresting officer when you held that level 1 reserve status?

A.   Yes.

Q.   How many?

A.   Over a six-year period of time, probably more than a hundred, I would think.

Q.   How many arrests did you make in total during your career with the LAPD?

A.   Well, over a thousand or more.

Q.   Of those thousand arrests that you've made during your career with the LAPD, how many of those arrests were made using nondeadly use of force tactics?

MR. AMRHEIN:  Objection.

THE WITNESS:  Probably 20-plus, in that range, I think, is my best estimate.  I think about 20 times or so I used force, 20 to 25 times.  And that's including



Page 59

the use of lethal force.

MS. ALTERMAN: Q. And the other arrests that you made were all simply by handcuffing the suspect?

MR. AMRHEIN: Objection.

THE WITNESS: I may have handcuffed them, or someone else may have. But yes, without any force used other than the application of handcuffs.

MS. ALTERMAN: Q. Were you ever a subject of a civilian complaint while you held any of the ranks, either of police officer I, police officer II, detective, or sergeant with the LAPD?

MR. AMRHEIN: Objection.

THE WITNESS: No.

MS. ALTERMAN: Q. Were you ever the subject of an Internal Affairs investigation while you were at the LAPD?

A. The off-duty altercation was an Internal Affairs investigation. The working without a work permit was an Internal Affairs investigation. I had an Internal Affairs investigation in 2009. As a result of me reporting misconduct, they completed an Internal Affairs investigation, which was unfounded. Other than that, no. No other times.

Q. Were you ever questioned about whether or not your partner had used their weapon and while you were



MAGNA
LEGAL SERVICES

Page 60

injured on duty and you didn't know the answer to that question?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.  I -- when I -- I was shot inside of a vehicle.  And when I was asked at Cedars Sinai if my partner fired his weapon, I did not believe he had.  So I testified I didn't believe he had fired, but, in fact, I found out later that he actually did.

MS. ALTERMAN:  Q.  Were you disciplined as a result of that?

A.  I was shot in the mouth, ma'am.  Why would I be disciplined?

Q.  Were you ever counseled with respect to the questioning about whether or not your partner shot his gun when you said he didn't when, in fact, he did?

MR. AMRHEIN:  Objection.

THE WITNESS:  No.  I think anyone reasonable would realize that I was shot multiple times.  And I did not know that my partner had fired his gun next to me. So I don't think any reasonable supervisor, nor anyone in LAPD, found that response to be untruthful.  I just didn't know, based on the injuries I received while being shot.

MS. ALTERMAN:  Q.  So my question is not what's reasonable for a supervisor in LAPD.



Page 61

My question was just simply whether or not you were counseled or disciplined as a result of saying either in an interview or under oath, whatever it may have been, that your partner did not shoot his weapon when, in fact, he did.

MR. AMRHEIN:  Objection.

THE WITNESS:  So I'm just confused, 'cause I've been deposed 200-some-odd -- 60-something times.  And I've never been asked, was I disciplined as a result of getting shot.  So that's why I'm sounding concerned. I've never been -- I've been deposed on 800 -- or I've been retained on 800 or so cases.  And you will be the first attorney that's ever asked that.

But the answer is no.

MS. ALTERMAN:  Q.  You spoke about this incident recently on a podcast; is that true?

A.  It wasn't recently.  It was a couple of years ago.

Q.  And during that podcast interview, you spoke about this specific incident when you were questioned at the hospital.  And you had said on that podcast that you testified that your partner did not shoot his weapon when, in fact, he did, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  I didn't testify anywhere.  I



Page 62

mentioned that when asked.

And the reason for the questioning was, when they question officers about lying, my response was, I wasn't lying when I didn't hear my partner fire his gun as a result of being injured.

So the point of the questioning was not, was I being disciplined or questioned or LAPD had any concerns. It's just, I didn't recall based on the injuries. So you brought up about a third of the conversation rather than actually what was being said on the actual podcast.

MS. ALTERMAN: Q. Were you ever accused of lying about that incident?

A. No, ma'am, I wasn't accused of lying about the incident.

Q. Would you agree with me, sir, that there are times during a highly stressful incident when there may be shooting involved or just simply a suspect resisting arrest that officers can think one thing happens when, in fact, something else actually occurs due to the environment and stressors that result from the situation?

MR. AMRHEIN: Objection.

THE WITNESS: Potentially.

MS. ALTERMAN: Q. Why did you decide to leave


MAGNA
LEGAL SERVICES

Page 63

the LAPD at the age of 44 and work as a reserve for the next six years as opposed to continuing as a sergeant II+1 rank?

A.   I was offered a position as the vice-president of security for Rick Carrueso, who recently ran for mayor in LA.  He's a billionaire in Los Angeles who owns a bunch of developments.  I went out of the country with his family four or five months earlier.  And he offered me a position.

Q.   Is that when you started working in corporate security?

A.   I left LAPD in June 1st of 2010, and I started work for Mr. Carrueso June 1st of 2010.

Q.   Okay.  Did Mr. Carrueso help spearhead your corporate security and consulting work business?

MR. AMRHEIN:  Objection.

THE WITNESS:  No, ma'am.  Mr. Carrueso is a billionaire.  And he hired me to oversee his 13 shopping malls, including, like, The Grove in Los Angeles.  And I had the executive protection of his family, his out-of-country interests.

I don't even know if he knows that I've done any consulting work after I left him.  So he has nothing to do with my work as a consultant other than he provided me employment for about three years, working directly



Page 64

for him.

MS. ALTERMAN:  Q.  Did that experience help you start your consulting company and your security company?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, I mean, the experience in premises liabilities, foreseeability, and maintenance and security, yes, I had the responsibility of all the security involved with the family and the premises that he owned.  So it provided me experience that I had prior to, but this kind of amplified my experience.

MS. ALTERMAN:  Q.  When did you start your On-Scene Consulting business?

A.  Myself and another officer opened the business up in 2012, but it was not for the purpose of expert witness, it was for the purpose of conducting risk and vulnerability assessments.

Q.  Were you also conducting surveillance at that time?

A.  Surveillance?  I don't understand your question.

Q.  Were you being hired by different companies to perform surveillance for cases in 2012?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't know if any of the cases involved surveillance.  I did some contract work after 2013, not before.  So no, not during -- not in 2012.  It



Page 65

would have been after I left Mr. Carrueso's employment.

MS. ALTERMAN:  Q.  When did you start working full-time as a consultant?

A.  Full-time, September of 2017.

Q.  Presently are you still working full-time as a consultant and expert witness?

A.  Yes, ma'am.

Q.  Do you have any other revenue or income besides from your on-scene consulting practice?

A.  I own a gym in Huntington Beach, California. Other than that, no.

Q.  Is it fair to say, Mr. Defoe, that you've never worked with the New York Police Department?

MR. AMRHEIN:  Objection.

THE WITNESS:  I worked with them -- correct, I never have.

MS. ALTERMAN:  Q.  And when I say worked with them, I mean you've never been employed by the NYPD, or New York Police Department, correct?

A.  No, I have not, ma'am.

Q.  Have you ever been employed by any local police department in the state of New York?

A.  No, ma'am.

Q.  Have you ever been employed by any local police department within the state of New Jersey?



Page 66

A.    No, ma'am.

Q.    Have you ever been employed by the Port Authority Police Department?

A.    No, ma'am.

Q.    Are you familiar with the Port Authority of New York and New Jersey as a bistate agency?

A.    Yes, ma'am.

Q.    What is your understanding of the responsibilities of the Port Authority police officers who are employed by the Port Authority Police Department?

A.    They work on transfer -- transportation infrastructure projects.  They obviously oversee the airports:  Kennedy; Newark; La Guardia; JFK; Newark; Teterboro, which is New Jersey.  All the bridges and tunnels they oversee, Lincoln and Holland tunnels.  The rail system.  Bus terminals.  They conduct traffic control within the tunnels.

Marine ports.  They have the World Trade Center as part of their responsibility.  Traffic control, traffic enforcement, and the Holland Tunnel and the Lincoln Tunnels.

Q.    Have you ever been employed by a bistate agency's police department?

A.    A bistate?  No, ma'am, I have not.



Page 67

Q.   Have you ever been employed by any police department that required you to police an airport?

A.   With LAPD, our airport is within one of our geographical patrol divisions, so we worked and train -- and I specifically worked and trained with the Los Angeles Port Police.  We obviously trained with the Los Angeles Harbor Police, both during my time with LAPD Special Weapons and Tactics on ship boardings, ship assaults.

And it relates to the airport training on -- we called it tubular assaults and training on responding to incidents on airplanes, both primarily lethal incidents, where there may be an active shooter or something as a response to some type of terrorist-related event.

Q.   Did you ever respond to an incident onboard an aircraft during your time with the LAPD?

A.   Yes.  I think on probably three or four occasions at the LA -- LAX terminal.

Q.   Did you ever effectuate an arrest while you responded to an incident at the LAX terminal?

A.   The terminal, yes.  On an airplane, no.

Q.   How many times did you effectuate an arrest within a terminal at LAX Airport?

A.   I used to work overtime details there, so I'd probably estimate 20-plus times arrests during my time



Page 68

assigned there.  Both in responding to incidents and as well as working overtime, especially during 9/11, I did a lot of overtime details at LAX.

Q.  Were you required to use nondeadly force during any of those 20-plus arrests within LAX terminal airport?

MR. AMRHEIN:  Objection.

THE WITNESS:  Potentially, I think a couple occasions.  There was some less lethal force that was used in effecting an arrest of a subject.

MS. ALTERMAN:  Q.  What type of less lethal force do you specifically recall utilizing on those occasions?

A.  I think just physical force to effect a handcuffing technique more so than what would be normally required, based on the subject's level of resistance.

Q.  And was it your testimony that you've never effectuated an arrest onboard an aircraft?

A.  Correct.

Q.  Now, you've testified that you've been working as a consultant recently on a few cases involving a claim of positional asphyxia; is that right?

A.  Been retained on about 50 cases involving positional asphyxia.



Page 69

Q.  Are all of those cases -- were all of those cases filed after 2020?

MR. AMRHEIN:  Objection.

THE WITNESS:  No.  My first case was, I think, in 2013 or '14.  That was the Kelly Thomas case in Fullerton, California.

MS. ALTERMAN:  Q.  How many of those 50 cases would you say were filed after 2020, specifically July of 2020?

MR. AMRHEIN:  Objection.

THE WITNESS:  Probably -- I'm just estimating -- probably a third or so.  A third to -- 30 to 40 percent.

Q.  Would you agree with me that the laws changed after the Eric Garner incident with respect to how officers were permitted to restrain suspects?

MR. AMRHEIN:  Objection.

THE WITNESS:  They change for some agencies. They -- my former agency, the change didn't really occur as it relates to carotid, c-a-r-o-t-i-d, neck restraints following the George Floyd case, as many departments did.  But some departments changed their policies and procedures and training after many sensational cases, including the Eric Garner case.

MS. ALTERMAN:  Q.  Do you know when the diaphragm law went into effect in New York?


MAGNA
LEGAL SERVICES

Page 70

MR. AMRHEIN:  Objection.

THE WITNESS:  The diaphragm?  What's the name of it?

MS. ALTERMAN:  Q.  The diaphragm law.

A.  No, I don't.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.  Have you ever read the New York City Administrative Code Section 10-181?

MR. AMRHEIN:  Objection.

THE WITNESS:  No, I don't believe so.

MS. ALTERMAN:  I'd like to now turn to the report that you issued in this case that's dated April 26, 2024.  And we can mark that as Defoe 2.

(Exhibit 2 was marked for identification.)

MS. ALTERMAN:  Q.  Do you have a copy of that in front of you, or would you like me to put that up on the screen?

A.  No, I have it.

Q.  Okay.  I'm just going to show it to you for identification purposes to make sure we're working off the same copy.  And for the record, we'll be marking this as Defoe 2.  It's a 29-page report that's dated April 26, 2024.  This report was produced by Plaintiffs' Counsel as part of their Rule 26 disclosures for Mr. Defoe.



MAGNA
LEGAL SERVICES

Page 71

And we'll scroll through it and you will let us know if this is a same copy that you have in front of you.

A. That's correct; that's the copy I have in front of me.

Q. Okay. So you can review the copy that you have in front of you if that easier for you. If I'm directing you to certain portions of the report, I'm happy to put them on the screen if that -- if you'd like that. Just let me know. But if not, I'll just refer to the page of the specific opinion or page in the report if I'm drawing your attention to that. Okay?

A. Yes, ma'am.

MR. AMRHEIN: And Cheryl, if you could just scroll to that specific area of the report. Just 'cause I know this is being recorded, it might just be easier for everybody to see on one recording.

MS. ALTERMAN: Okay.

MR. AMRHEIN: Just -- yeah, 'cause I mean, I have a copy of the report separately. But I just think, for the record's sake, it might just be best to have it on the screen.

MS. ALTERMAN: Okay, not a problem.

Q. And Mr. Defoe, not drawing your attention to anything specific right, now I'd just like to ask some


MAGNA
LEGAL SERVICES

Page 72

general questions before I dive into the report.

When did you first learn that the New York State Attorney General's Office investigated the incident involving Mr. Lagoda's death that occurred on April 12th, 2019?

A.  Well, at the time in which I was provided with the case file.  I don't know the exact date, but sometime after -- sometime after July -- or actually, it might have been between July 2nd and July 18th originally.  I'm not 100 percent sure.  And then I was obviously provided a copy with the actual report at some time prior to submitting my Rule 26 report.

Q.  During your review of the file that was provided by Plaintiffs' Counsel, did you become aware of how long the New York State Attorney General's Office spent reviewing this incident before they issued the report?

A.  No.

Q.  Have you ever become aware of how long the New York Attorney General's Office spent reviewing this incident before issuing their final report?

A.  No.

Q.  Did you ever become aware whether the police officers who were named defendants in this case were interviewed as part of the New York State Attorney General's Office investigation of the April 12, 2019,


MAGNA
LEGAL SERVICES

Page 73

incident?

A.  Yes.  They were interviewed.

Q.  Did you become aware whether or not civilians, such as the JetBlue flight staff, was also interviewed as part of the New York State Attorney General's office's investigation into this incident?

A.  Yes, ma'am.

MS. ALTERMAN:  And just off the record.

(Off the record from 9:55 to 9:56.)

MS. ALTERMAN:  Can you just read back the last answer, please.

(Reporter read back.)

MS. ALTERMAN:  Thank you.

Q.  During your review of the New York State Attorney General's Office, did you investigate -- investigation, did you have an opportunity to review the conclusion of that investigation?

A.  Yes, ma'am -- well, recommendations would be a conclusion, yes.

Q.  Was it your understanding, sir, that the New York Attorney General's Office concluded that there was insufficient evidence to establish that a crime was committed by any of the officers involved?

MR. AMRHEIN:  Objection.

THE WITNESS:  That's my understanding, yes.



Page 74

MS. ALTERMAN:  Q.  Was it also your understanding, sir, that in particular, the New York State Attorney General's Office concluded that under the circumstances, the officers' use of force to restrain Mr. Lagoda could not, as the legal standard requires, be proven to be unjustified beyond a reasonable doubt?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't recall if that was part of my review.

MS. ALTERMAN:  Q.  At some point, Mr. Defoe, did you become aware that that was the New York State Attorney General's Office's conclusion?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes, based on his decision not to file criminal charges, correct.

MS. ALTERMAN:  Q.  Did you also become aware that the New York State Attorney General's Office found that the Port Authority Police Department's current use of force policy appropriately instructs officers using force to conduct a careful balancing of all human interests and use only that force that is reasonably necessary to bring an incident under control while protecting the lives of the officer or another?

MR. AMRHEIN:  Objection.

THE WITNESS:  That -- that's what's documented



MAGNA
LEGAL SERVICES

Page 75

in the actual policy, both preceding this incident, the policy that -- date issued of 3/6/17 as well as the policy that was issued after this -- this incident, though the language is a little bit different.

MS. ALTERMAN:  Q.  And we can agree, sir, that the New York State Attorney General's Office specifically commented in its report that the Port Authority Police Department's use of force policy appropriately instructed the officers with respect to those specific policies that you're referencing?

MR. AMRHEIN:  Objection.

THE WITNESS:  But without the respect to certain areas within the policy that were revised effective 6/20/2021 that were added as a result of the new policy.

MS. ALTERMAN:  Q.  My question just pertains to the policies that were in effect on April 12th, 2019.

So with respect to the policies that were in effect as of the date of this incident, April 12th, 2019, would you agree that the New York State Attorney General's Office found that the Port Authority Police Department's use of force policies appropriately instructed the police officers using force at that time?

MR. AMRHEIN:  Objection.

THE WITNESS:  Not as relates to the use of choke holds or the use of positional or compressional



Page 76

asphyxiation, which was added to the revised policy. So I don't understand how they could have found that the policy contained the necessary language and then add it to a policy post-incident, including a number of descriptors of types of force that officers can use and/or should not use based on the revised policy in 2021.

MS. ALTERMAN: Q. So is it your testimony that you disagree with the Attorney General's Office conclusion?

A. I disagree that the initial policy that -- from 2019 that was in place at the time of this incident did not include language that was necessary, including the use of potential use of bodyweight on a diaphragm did not include certain language and definitions about what each specific use of force was available to the officers at the time.

The prior policy did not include duty to render medical assistance, duty to intervene and report as relate -- did not include de-escalation, as it does in the new policy.

So I disagree -- I disagree that the policy was inclusive and was appropriate in a manner to properly train and advise officers how to respond to incidents such as this, where they needed to properly de-escalate,



MAGNA
LEGAL SERVICES

Page 77

not put additional weight on an individual's back or compress the diaphragm that may result in a homicide, as it did in this case.

Q. Did you view the Port Authority Police Department's General Order 100-05, use of nondeadly force, which was revised on July 9, 2015, and in effect on the date of this incident?

A. Yes. I have it right in front of me.

Q. And that specific general order, sir, required that officers should make every reasonable effort to avoid compressing and restricting the suspect's airway or compressing the suspect's neck and chest area when applying physical force, correct?

MR. AMRHEIN: Objection.

THE WITNESS: Correct, and that policy does on Bates Page 2595.

MS. ALTERMAN: Q. And that policy, you would agree with me, sir, was in effect on April 12th, 2019, correct?

MR. AMRHEIN: Objection.

THE WITNESS: That language was, in fact, contained -- that language you read was contained in the date that the -- that policy was revised on 7/9/2015.

MS. ALTERMAN: Q. Was that policy in effect, sir, on the date of April 12th, 2019, to your knowledge?



Page 78

A.   That policy was in effect.  Once again, the language within the new policy differed than the one that is in the -- that we just discussed, which is 100-05.  There's additional language, though -- there is language about compression of the neck and chest area when applying force, but it does not have anything regarding the chest, back, and abdomen.

In this case specifically, compressing the diaphragm, that information is not in the 100-05 policy, but it is in the 2021 revised policy.  So there's different language.  The original one does not -- it just talks about to avoid compressing or restricting the suspect's airway or compressing the suspect's neck and chest when applying physical force.  Does not discuss back and abdomen.  And in a manner that compresses the diaphragm, as it does in the revised policy.

Q.   Mr. Defoe, I'm going to remind you that I -- that you're here to answer the questions that I pose to you.  And I only asked you whether or not you were familiar with the General Order 100-5 and whether what I read to you was accurate and whether or not that was in effect at the time.

You've already testified that yes, you were familiar with it, and that yes, it was in effect at the time.  I didn't ask you about any policy changes



Page 79

post-incident.  Okay?

A.  Okay.

Q.  Now, all the questions that I'm asking to you are going to be for the time period of April 12th, 2019, and prior to that date.  Unless I state otherwise, I'd ask that you refrain from talking about changes that went into effect as a result of the deaths of Eric Garner and George Floyd that have nothing to do with this incident.

MR. AMRHEIN:  Objection to the -- to how the -- the framing of change in policy after this incident, labeling it as a result of George Floyd or Eric Garner. That is, we believe, an improper capturing of the change and, frankly, ignores the incidents and the death of Mr. Lagoda at the hands of the Port Authority Police Department.

So I just want that objection on the record to that characterization of the change in policy.

MS. ALTERMAN:  And our response, just for the record, is that this -- the change in the diaphragm law that went into effect in July of 2020 was a direct result of the deaths of Eric Garner and George Floyd and the use of force by police officers during those arrests and that was what changed the -- administrative code.

It had nothing to do with the death of



Page 80

Mr. Lagoda. That's not in dispute here. I don't think there's any evidence to dispute otherwise. And to characterize any change post April 12th, 2019, as in the diaphragm law as being connected with Mr. Lagoda's death, is improper, in our opinion.

MR. AMRHEIN: And I know we'll disagree. And I just will again note my objection to their characterization of the change involved, which, you know, all but ignores the fact similarities, you know, between this and the other matters with respect to compressional asphyxiation, positional restraint, and the death at the hands of police officers.

So just again please note my objection to that. I'm happy to move forward.

MS. ALTERMAN: Okay. I'm going to direct you, Mr. Defoe, to the first opinion in your report, which appears on Page 6 out of 29.

And if we could just and go off the record for a moment.

(Off the record from 10:06 to 10:07.)

MS. ALTERMAN: Back on.

Q.  Sir, did you have an opportunity to review the first opinion that you rendered in your report from April 2024?

A.  Yes, I reviewed it.



Page 81

Q.  And in this report, you issued a total of eight opinions, correct?

A.  Correct.

Q.  The -- in this first opinion that we see starts on Page 6 of 29, you discuss calming a behavioral patient, correct?

A.  Correct.

MR. AMRHEIN:  Objection.  Can you just point to that, please, Cheryl.  Sorry, I'm just trying to find my place on the page.

MS. ALTERMAN:  I'm going to have to go back and forth.  I'm sorry.

MR. AMRHEIN:  Got it.  Thanks, Cheryl.

MS. ALTERMAN:  Okay.

Q.  So specifically this part of your first opinion appears on Page 7 of the report.

Do you see that, Mr. Defoe?

A.  It begins on Page 6, correct.

Q.  Correct.  And specifically the discussion regarding behavioral emergencies and calming a behavioral patient appears on Page 7, for the record. Now --

A.  Correct.

Q.  -- the individual, Mr. Lagoda, the subject of this incident, he was not a patient of the Port



MAGNA
LEGAL SERVICES

Page 82

Authority Police, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct, he was not a patient.

MS. ALTERMAN:  Q.   In fact, Mr. Defoe, you would agree with me that in your years of experience working for the LAPD, police officers, regardless of their rank, do not have patients, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct.  They may transport someone to a medical facility, where they are a patient at the time.  But they don't -- they're just a subject in the police officer's custody, but they may be a patient or be treated as a patient during time while they're in law enforcement's custody.

MS. ALTERMAN:  Q.   There is no doctor-patient relationship between a police officer and a suspect or a subject, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct, there's no doctor or patient relationship.

MS. ALTERMAN:  Q.   And in your experience working for LAPD, you -- you never received a medical degree, correct?

A.  Correct.

Q.  And you don't have any professional licenses



Page 83

pertaining to medical care, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Other than CPR and AED certification, no.

MS. ALTERMAN:  Q.  And those are basic CPR and first aid, AED that all officers are trained with, correct?

A.  Or should be trained with, correct.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.  You're not a nurse, correct?

A.  I'm not.

Q.  You don't hold a license for a nurse practitioner, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct.

MS. ALTERMAN:  Q.  Now, in this first opinion, you refer to Mr. Lagoda as a patient.

Do you see that?

A.  What page are we referring to, ma'am?

Q.  Page 7, the page that's on the screen.

A.  I'm -- that's a directive verbatim from the actual directive that I've cited, that I have in front of me.  In the directive, they refer to the individual as a patient, correct.



Page 84

Q.  The directive that you're referring to is a PowerPoint presentation from the National Safety Council, correct?

A.  Correct.

Q.  And the National Safety Council is not a law enforcement directive, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't know if it's used in course and scope of training in law enforcement.  It's not generated from the actual respective department.  So I don't know if it's an ancillary training aid for law enforcement.

MS. ALTERMAN:  Q.  Do you know whether or not the National Safety Council works in conjunction with OSHA?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't know.

MS. ALTERMAN:  Q.  Do you know what OSHA is?

A.  Yes.

Q.  Do you know whether or not the National Safety Council lessons that you reviewed are for workplace health and safety for nonlaw enforcement, civilian work?

MR. AMRHEIN:  Objection.

THE WITNESS:  So I don't know if it's for them and in addition to that, that law enforcement was



Page 85

trained in this information as well with this directive

and the training associated with the directive as well.

MS. ALTERMAN: Q. Would you agree with me,

sir, that based upon your review of this specific

National Safety Council lessons that you cite to on

Page 7 of your report, PA 1994 to 2170, that those

PowerPoint presentations are utilized by health care

professionals when calming a behavioral patient or

dealing with a behavioral emergency?

MR. AMRHEIN: Objection.

THE WITNESS: I don't know if it's specific to

health care professionals or not, if they were

individuals within a workplace to include law

enforcement. So I don't know if the training, though

may be germane to law enforcement personnel, could

obviously be -- though -- I mean, for medical personnel,

could be as well to law enforcement. I don't know if

they were trained in this area.

MS. ALTERMAN: Q. Did you ever receive

training while you worked for the LAPD about the

National Safety Council lessons pertaining to behavioral

emergencies?

A. You know, I don't know if that's a source

document called Learning Domain 34 on Emergency First

Aid for Law Enforcement. I don't know if that was one


MAGNA
LEGAL SERVICES

Page 86

of the reference materials that were used in formulating learning domain 34 for the Los Angeles Police Department specifically for P.O.S.T. throughout the state of California.

Q.  Have you ever specifically been trained on the National Safety Council PowerPoint presentation, specifically lesson 13 Behavioral Emergencies, while you worked for the LAPD?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't recall.

MS. ALTERMAN:  Q.  Have you ever received any training, whether ancillary or as any type of additional training, while you worked for LAPD specifically given by the National Safety Council?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't recall.

MS. ALTERMAN:  Q.  Did you receive any training when you were at the LAPD specifically with respect to individuals coming out of a postictal seizure?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.

MS. ALTERMAN:  Q.  When did you receive that training?

A.  It would have been in the basic P.O.S.T. academy and then intermittently throughout the -- my time with



Page 87

LAPD, the 26 years.  Also, I received training from behavioral sciences section of the Los Angeles Police Department.  I was the supervisor of our crisis negotiation team.

And part of the responsibility, we're responding to individuals who may be mentally ill, experiencing a mental crisis, and suicidal.  But within the training, we also were taught regarding medical emergencies that may parallel somebody who may be under the influence of a controlled substance or may be mentally ill, on or off psychotropic medications.

So part of the training was to ensure or try to recognize that what we perceive to be a mental health or a controlled substance-related issue very well may be a medical emergency and not a mental health or a controlled substance-related event.

Q.  Were you ever trained specifically on the term uniquely vulnerable individual?

A.  Possibly.

Q.  Would you be able to point me to any specific training that you may have received with respect to that term, a uniquely vulnerable individual?

A.  I don't know if learning domain 34 captures that exact language.  That would be the document that I'm referring to on some of the baseline training I



Page 88

received.

Q.  And none of that training or reference for that training was included in your report; is that fair to say?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct, I don't believe I used the term as part of my opinion in this matter.

MS. ALTERMAN:  Q.   And if you need a moment, you can look through your report.  I would like an answer about this, whether or not any of that training was included in your report.

A.  I don't believe I used California P.O.S.T. learning domain as a reference domain in formulating my opinions.  Actually, I know I didn't, actually.

Q.  Thank you.  Now, also in this first opinion you reference that the defendant -- and I'm on Page 7 here, starting with paragraph where it says "in addition" -- you state here that the defendants, and underline the word failed, to ascertain that Mr. Lagoda did not speak English and could not understand their commands.

Do you see that sentence?

A.  Correct.

Q.  What did you base that conclusion on?

A.  Based on the officers' testimony that began on Page -- begins on Page 8 of my report.


MAGNA
LEGAL SERVICES

Page 89

Q.   Now, specifically the testimony that you're basing that on, you said it was just the officers' testimony; is that correct?

A.   I believe so.  That was the basis of my opinion when I stated that they failed to recognize that Mr. Lagoda may not understand commands, based on a language barrier.

Q.   Did you ever read the deposition transcript of Mr. Lagoda's father?

A.   What's his name?

Q.   He's one of the named plaintiffs.

A.   Yes.  I don't believe I received -- looking at my list here, I don't believe I received -- I know I didn't receive and I did not review that -- that transcript.  That was not one of the 13 deposition transcripts I reviewed.

Q.   Would it surprise you to learn, Mr. Defoe, that Mr. Lagoda's father testified that Mr. Lagoda did understand English and took classes in English and did have some command of the English language?

MR. AMRHEIN:  Objection to the characterization there.  If Counsel wants to put up the deposition transcript to allow Mr. Defoe to review, that's fine. But a broad characterization for something that Mr. Defoe has already indicated that he didn't review


MAGNA
LEGAL SERVICES

Page 90

is, we believe, objectionable.

So I just want that on the record.

MS. ALTERMAN:  That's fine.

Q.  You can answer.

A.  I was unaware of what his language capabilities -- my -- my opinion was based on the officers' own sworn deposition testimony that's contained on Page 8 and 9 of my report.

Q.  Why didn't you feel that it was important to read Mr. Lagoda's father's testimony about whether or not he understood the English language?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, I think all depositions are important, ma'am.  I didn't receive it.  I didn't know that deposition existed, so that's why I didn't review it.

MS. ALTERMAN:  Q.  Part of your opinion 1 is based on the fact that Mr. Lagoda allegedly did not speak or could not understand English; is that true?

A.  Can you repeat the question for me.  I'm sorry.

MS. ALTERMAN:  Would you be able to read it back, please.

(Reporter read back.)

MR. AMRHEIN:  And again, I'm going to renew the objections of characterization of Mr. Tikhoplav's



Page 91

testimony.  We were -- that can be introduced as evidence here.  But the characterization of what Mr. Tikhoplav testified to regarding the alleged ability to understand and/or speak English, we believe, is an improper characterization of his testimony, considering conflicting testimony within the same deposition.

And just want to note that for the record.

And you can proceed, Mr. Defoe.

THE WITNESS:  Yes, I don't recall, ma'am.

MS. ALTERMAN:  Q.  You don't recall?  I'm not sure you're understanding my question.

My question to you, sir, is that your opinion, the first opinion, in part, is premised on the assumption that Mr. Lagoda did not speak and could not understand the English language; is that correct?

A.  That's correct.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.  And if there was deposition testimony to the contrary, your opinion would be false, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Once again, that would be depending on his -- his ability to understand what he was being told, if what he was being told anything, would be depending on his level of understanding and


MAGNA
LEGAL SERVICES

Page 92

his -- you know, obviously his proficiency with the English language.

So just based on what I knew, I didn't know anything about his father's deposition until today. I went off of what the officers testified to. So I don't know what his language capability was.

MS. ALTERMAN: Q. What is command presence?

A. Typically a uniform, something where you're -- based on your -- your uniform. Your recognized identifiable police uniform, that in itself would cause a reasonable person to understand that you're a police officer. And that position holds authority.

Q. Would you agree with me, sir, that regardless of your native language, if an officer is in uniform and speaking words towards an individual, that individual should understand -- a reasonable individual should understand that they are to follow or comply with the directive as they are given?

MR. AMRHEIN: Objection.

THE WITNESS: Well, if they understand the directives, then they should comply with them, as long as they're reasonable and lawful. But if they don't understand the directives because of a language barrier, they clearly can't follow those directives.

MS. ALTERMAN: Q. Well, Mr. Defoe, that can't



Page 93

possibly be true.

Wouldn't you agree with me that regardless of any language that you speak, if an officer is appearing in uniform in front of you and speaking words, regardless of whether or not you understand the words that are being spoken, you understand that there is a certain level of compliance that is required of you as an individual, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Ma'am, how would you know what to comply to if you don't know what the person's saying? If you're telling me, don't move or get on the ground, what would the the difference?  I wouldn't know if I didn't understand the language.

If you asked me those questions or told me a directive in Mandarin right now, I have no idea what you're talking about.  So what would I do?  Would I get on the ground or not move?

So it creates a question of level of understanding of what the person's saying.  The fact that someone's in uniform doesn't mean anything.  If I don't know what they're saying, I don't know what they want me do.  Stand still?  Move?  Jump up and down?  Get on the ground?  I have no idea.

MS. ALTERMAN:  Q.  Would you agree with me,


MAGNA
LEGAL SERVICES

Page 94

sir, that there's ways to communicate with individuals, even if you don't understand a language that's being spoken?

MR. AMRHEIN:  Objection.

THE WITNESS:  There are ways -- there are some ways you can do so that a reasonable person may understand what you're asking them to do, hopefully. Once again, if they understand the movement or whatever, the nonverbal cue you're trying to have them do, it depends on what -- if they understand that or not.

MS. ALTERMAN:  Q.  And in your experience working for the LAPD, did you ever employ those tactics where you were in a situation where a suspect may not have spoken the same language as yourself or the officers that were accompanying you and you were able to communicate through command presence and verbal cues and the use of hand gestures without actually speaking the same language as the suspect?

MR. AMRHEIN:  Objection.

THE WITNESS:  Hand gestures, yes; verbal cues, no.  If they don't understand the language, the verbal cues I'm giving them, they wouldn't understand unless it's something like no.  Most people understand universally what no is, or maybe they should.

But hand gestures, waving, put the hand up for



Page 95

someone to stop, people may recognize some of those,

maybe a universal gesture.  But if they don't know what

I'm saying, they don't know what I want them to do.  So

it just depends on the person, level of proficiency, and

what I'm asking him or her to do or want him or her to

do, based on my motioning or gestures or language.

MS. ALTERMAN:  Q.  So we can agree that between

command presence and gesturing and other tactics that

police officers may employ, there are ways to

communicate with individuals regardless of the language

that they speak?

MR. AMRHEIN:  Objection.

THE WITNESS:  Depends on what you want them to

do.  Something may be simple.  But a baseline command or

a baseline movement, like the stop or pointing for them

to go somewhere else.  But asking them specifically what

they want them to do and then giving them a reasonable

opportunity to comply based on that directive just

depends on their level of proficiency.

But the command presence in itself and a hand

gesture may indicate one thing.  Obviously, the language

that they don't understand or may have a difficult time

understanding is something different.

MS. ALTERMAN:  Q.  Would you agree with me that

an individual who is striking and punching civilians



Page 96

onboard an aircraft poses a threat?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.  I believe that if somebody's punching civilian or someone on an airplane, that they pose a threat, correct.

MS. ALTERMAN:  Q.  And would you agree with me that someone who charges at a police officer poses a threat?

MR. AMRHEIN:  Objection.

THE WITNESS:  Depending from what distance, but potentially, yes.

MS. ALTERMAN:  Q.  Would you agree with me that someone who charges at a police officer in a confined space, such as an aircraft, poses a threat to themselves and everybody else an board that aircraft?

MR. AMRHEIN:  Objection.

THE WITNESS:  Depends on where everyone else on board is.  If they're behind the person or -- it just depends on who would be in front of that person, if that person is charging in that area.  So the people behind may not be of -- you know, in a threatening the position, but people in front may, depending on what the person's doing by charging.  Could be evacuating a plane, could be evacuating an area.  Just depends on what they're doing.



Page 97

MS. ALTERMAN:  Q.   Mr. Defoe, isn't it true that if a police officer's carrying a loaded weapon, as they do in the course of their duties, that that police officer is always at risk if someone is attempting to assault or threaten them?

MR. AMRHEIN:  Objection.

THE WITNESS:  I think officers always should be concerned, if they're carrying a loaded weapon, that they must know how to utilize proper weapon retention techniques in the event they have to put hands on an individual or take an individual into custody.  I believe that.

MS. ALTERMAN:  Q.   Would you also agree, Mr. Defoe, that regardless of a person's physical condition, if they are assaulting individuals onboard an aircraft, then they are a threat to those individuals?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, sure, if they're assaulting the individual, yes, they would be a threat to the individual.

MS. ALTERMAN:  Q.   And would you consider punching individuals multiple times -- flight staff onboard an aircraft to be an assault to those individuals?

MR. AMRHEIN:  Objection.



Page 98

THE WITNESS:  You may be asking me a legal question.  If that person is experiencing a medical crisis and is unaware of what they're doing and they're not intending to assault, not intending to harm someone, but are doing so as a result of the medical emergency they're experiencing, then no, I don't think there's any malice there.

It's more that they're responding to the event that they're experiencing without any intent -- specific intent to harm anyone else.  They just don't really know what they're doing because they're in the throes of a medical emergency.

MS. ALTERMAN:  Q.  Would you agree with me, sir, that regardless of any potential medical emergency that an individual may be experiencing, that an individual who is assaulting other individuals onboard an aircraft should be restrained?

MR. AMRHEIN:  Objection.

THE WITNESS:  Should be controlled.  The idea of restraining someone who is experiencing a seizure is something that you should not do.  At least restrained in the manner that occurred in this case.  But to cordon an individual off and to put them in a safe recovery position until the medical emergency is no longer -- exists or until medical personnel can come and assist or



Page 99

safely put them in some type of restraint is a recommended tactic.

MS. ALTERMAN:  Q.   If you have a full aircraft full of individuals who some of those individuals have been assaulted, like in this case, wouldn't you agree with me that it's important to gain control over the situation for the --

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.   -- safety of everyone onboard that aircraft?

MR. AMRHEIN:  I'm sorry.  Objection.

THE WITNESS:  You would want to cordon that individual off from the other passengers.  If they're in the rear of the plane, like in this case, you're going to want individuals in front.  I know, my understanding, he was approximately in row 33C.  I'm going to want people that are initially -- the parties moved to the rear of the plane.  I would want everyone to be away from that individual and cordon off that area, knowing that it was a medical emergency, to ensure that people weren't inadvertently struck or unintentionally injured to do that.

But I would put a barrier between those passengers, in this case 200, have them come to front of the plane, provide an ingress and egress in the aisle


MAGNA
LEGAL SERVICES

Page 100

way.  And then kind of cordon off that individual to allow them to experience the medical emergency without hurting themselves or anyone else.

MS. ALTERMAN:  Q.  And that's what you would do if you were able to do so under the circumstances.

There are also cases where you're operating under variable circumstances and you may not be able to operate in the same scenario which you just described, correct.

MR. AMRHEIN:  Objection.

THE WITNESS:  Potentially that would be the ultimate -- that's where training is important.  If you have someone isolated on a plane who may be experiencing a medical emergency.  But that would be the objective. But I understand there are variables that may prevent you from doing everything that you intend on doing due to a number of other factors.

MS. ALTERMAN:  Q.  And we can agree, Mr. Defoe, that Mr. Lagoda was not isolated on this plane, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  He -- he should have been.  He was in the rear of the plane, is my understanding, when he was moved by Mr. Sweeney.  And yes, my understanding, he was all the way to the rear.  So much so that none of the flight attendants and the captain, Mr. Bengston,



Page 101

B-e-n-g-s-t-o-n, had observed the actual force application by the officers.  So he was isolated.

MS. ALTERMAN:  Q.  Mr. Defoe, did you review the testimony of the civilians who came to assist the alleged medical emergency, who were trapped behind Mr. Lagoda in the galley of the plane?

A.  Yes, I did read the individuals who, in fact, came to assist the -- with the medical emergency, correct.

Q.  And we can agree that certain of those individual females became trapped in the back of the aircraft, so Mr. Lagoda was, in fact, not isolated, as you've just testified?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, they were trapped temporarily, to use your term.  They were back there with him, because they were trying to assist with treating him, based on, they recognized that it was a medical emergency that he was experiencing.  And they were back there with him for a period of time.  That's correct.

MS. ALTERMAN:  Q.  So you would agree with me that those individuals were trapped.  And one of those female individuals who were attempting to assist Mr. Lagoda was so fearful for her life because she was


MAGNA
LEGAL SERVICES

Page 102

afraid that he was going to strike her in the stomach and she would miscarry; is that true?

MR. AMRHEIN:  Objection.

THE WITNESS:  I believe that's what she testified to, correct.

MS. ALTERMAN:  Q.  So we know that Mr. Lagoda was not isolated and that there were civilians and flight staff in the back of the plane.

Based upon testimony that you've reviewed and have just testified about, would you agree with me that in this circumstance, that it was necessary to restrain Mr. Lagoda so that he would not cause any additional threat or harm to anyone onboard that aircraft?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, to properly control his movement to ensure he doesn't injure himself or inadvertently injure someone else would be reasonable, based on the totality of the circumstances.

MS. ALTERMAN:  Q.  You're assuming that Mr. Lagoda was still experiencing a medical emergency at this time, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, ma'am, I'm not offering any medical opinions in this case.  It's outside of my scope.



Page 103

MS. ALTERMAN:  Q.   So we can agree, Mr. Defoe, that you don't know one way or the other whether or not Mr. Lagoda was experiencing a medical emergency at the time when the police officer, Officer Bugiada, and that's B-u-g-i-a-d-a, first came aboard the aircraft?

MR. AMRHEIN:  Objection.

THE WITNESS:  And once again, I'm not providing any medical opinions one way or the other on what his level of -- of, you know, what the -- what his level of medical or -- urgency or health was at the time, other than the witnesses in this case all testified that he was experiencing a medical crisis at the time at which they attempted to assist.

Like, Dontel Miller and Nathaniel Reed and others was based on the fact that they had medical training and recognized immediately that he was experiencing a medical crisis or emergency and that they intervened to assist with the trying to help him at that point --

MS. ALTERMAN:  Q.   And that testimony that you're referring to, that was all before Officer Bugiada came aboard the aircraft, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  That's correct.

MS. ALTERMAN:  Q.   So we can agree, sir, that



Page 104

once Officer Bugiada responded to the call for help and came upon the aircraft, you don't know whether or not Mr. Lagoda was still experiencing a medical emergency?

MR. AMRHEIN: Objection.

THE WITNESS: Based on the information that I reviewed and received, and based on the officers' testimony, it appeared that he was experiencing a medical emergency at the time in which the contact was made by the officers. To what extent, I don't know. Because I'm not providing any medical opinions in this matter, as I mentioned.

MS. ALTERMAN: Q. And -- understood.

And based on the fact that you have no medical training and you're not providing a medical opinion, we can agree, then, that you don't know and it's beyond your expertise whether or not Mr. Lagoda was experiencing a medical emergency at the time Officer Bugiada boarded the plane?

MR. AMRHEIN: Objection.

THE WITNESS: I don't agree. I'm not making medical determinations. But I understand what it looks like when someone has a seizure and have so on hundreds of calls for service and recognize what my role as a police officer should do, that would be reasonable to ensure that that person doesn't injure themselves or



Page 105

others when in the throes of a seizure.

I don't need to have -- be a medical doctor to make that determination, just based on baseline training and what a reasonable response would be to an individual who is in the throes of a medical emergency, such as a seizure.

What I would do as a law enforcement officer to ensure that I don't somehow prolong the incident or injure the subject -- or kill the subject, better said -- when trying to assist that person, I'm not there to medically diagnose, nor am I purporting that the officers there are medically diagnose -- I state -- you know, other than that the person is experiencing a medical emergency and their actions should be reasonable based on behalf of totality of the circumstances

MS. ALTERMAN:  Q.  So going back to my initial question, would you agree with me that you have no evidence to suggest that Mr. Lagoda was experiencing a medical emergency at the time Officer Bugiada boarded the aircraft?

MR. AMRHEIN:  Objection.

THE WITNESS:  It appeared, based on his -- the actions by Mr. Lagoda at the time and when Officer Bugiada had entered the aircraft and responded, that the individual, once again, was -- even according



Page 106

to just -- he was, in fact, told that Mr. -- Mr. Lagoda had suffered from a seizure and then had become combative.  So he had that information at the time, that he had suffered from a seizure and his actions should have been reasonable accordingly.

And whenever you have a next minute, I need to take another five-minute break.

MS. ALTERMAN:  Just a few more questions on this line of questioning.

Q.  When Officer Bugiada boarded the aircraft, you would agree with me that he was in police uniform, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct.

MS. ALTERMAN:  Q.  And when Officer Bugiada boarded the aircraft, you would agree with me that he was confronted with a combative suspect, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes, he -- he was -- he did observe that the individual was told the person was being combative.  He also stated that the radio call indicated that there was a male possibly having a seizure and that he boarded the plane and he was -- he spoke to flight crew when he entered the plane and knew that the person was experiencing a medical emergency



Page 107

based on the information he received as well as confirmed when he got onto the plane.

MS. ALTERMAN:  Q.  In your experience, Mr. Defoe, working for the LAPD, had you ever been called to respond to an incident and then responded to that incident and it was different from how the call came over?

MR. AMRHEIN:  Objection.

THE WITNESS:  Numerous times, Counsel, yes.

MS. ALTERMAN:  Q.  And that's a frequent occurrence for police officers, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  It's frequent that some of the information that may be -- may be different than what the initial comments of the call are or the situation may have evolved or devolved from the time in which the initial call was generated until the time in which I arrived at the call or officers arrived at the call.

So things do -- something may have transpired prior to and then maybe changed since the initial call for service.

MS. ALTERMAN:  Q.  You would also agree with me that because this is a frequent occurrence that happens, it's important to assess the situation once you respond to the call for yourself as the responding police



Page 108

officer, correct?

MR. AMRHEIN: Objection.

THE WITNESS: Correct. Situational awareness is important when you respond, especially when you're the first officer at scene.

MS. ALTERMAN: We can take a break.

(Off the record from 10:42 to 10:51.)

MS. ALTERMAN: Q. Mr. Defoe, before we took a break, we were discussing situational awareness.

Q. What is situational awareness?

A. It's just really understanding your surroundings based on information that you have received as well as your observations at the time.

Q. Would you agree with me that situational awareness is determined by the officers who respond to the scene?

MR. AMRHEIN: Objection.

THE WITNESS: Well, if they're providing the assessment on situational awareness, then yes, that would be their perspective or perception of what is transpiring at the scene.

MS. ALTERMAN: Q. Would you also agree with me, sir, that the officers who are responding to the scene are charged with the responsibility of assessing the situation that they are responding to?



Page 109

MR. AMRHEIN:  Objection.

THE WITNESS:  The answer -- or should be, yes.

MS. ALTERMAN:  Q.   Would you also agree with me, sir, that officers are not medically trained professionals and are given basic CPR, first-aid, AED training as part of their academy training or In-Service training?

MR. AMRHEIN:  Objection.

THE WITNESS:  In most cases, correct.

MS. ALTERMAN:  Q.   Unless an officer chooses to receive extra training or training outside of a department, officers are not experts in providing seizures or any type of specific medical emergency.

Would you agree with that statement?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, it would be depending on the officer's training and experience.  Many officers have EMS training.  Many roles require specific EMS training.  Could be emergency medical attack or a higher level of paramedic, depending on the nature of the assignment.

But most officers are taught baseline training, or should be taught, as to how it to recognize that somebody is going into a seizure or coming out of a seizure as well as when they're provided that goes prior to responding, as well as when they arrive, that they're



Page 110

provided that information.  I think it would put an officer on notice as to what he can reasonably expect, based on the information he knew at the time of the call.

MS. ALTERMAN:  Q.  You would agree with me also that there was no requirement for any Port Authority police officer to have EMS training on April 12th, 2019, or prior to that date, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, for this particular incident, I -- I would say these particular officers. But not for all of the Port Authority.  I'm sure they have specialized details and units that may require more of advanced level of training.  But I'm unsure.

MS. ALTERMAN:  Q.  So the officers involved in this incident, none of the officers were required to have EMS training as of April 12th, 2019, or prior to that date, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Not based on the assignment.  My understanding of their assignments, correct.

MS. ALTERMAN:  We can go ahead and scroll to -- before we scroll to opinion 2, I'd just like to take you to Page 9.  And the last paragraph of opinion 1.  Now, you end every opinion, the eight opinions that you


MAGNA
LEGAL SERVICES

Page 111

rendered in this report with the same paragraph, essentially, that states that you base your opinions on your 28-year law enforcement career where, as a supervisor, you had investigated over 100 use of force incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

Q.   Do you see that?

A.   Yes.

Q.   Now, the 100 use of force incidents is a much larger number than you had testified to just a few moments ago when I asked you about this.  And your testimony was that you used less than lethal use of force only about 20 or so times.

Do you recall that testimony?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct.  That's not what the paragraph states.  It says I have investigated over 100 use of force investigations, not incidents.  Not used force 100 times.  So --

MS. ALTERMAN:  Q.   So your investigation pertains to your work as a consultant; is that right?

MR. AMRHEIN:  Objection.

THE WITNESS:  No.  As a supervisor -- supervisor for 14 years, I've investigated over 100 use of force investigations as a nonparticipant in the use of force,


MAGNA
LEGAL SERVICES

Page 112

as a supervisor investigating the use of force by officers under my command over 100 times, is what that statement is.

MS. ALTERMAN:  Q.  And that statement, Mr. Defoe, that refers to your time when you were working as an investigator for the LAPD, not as a patrol sergeant, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  No, it -- I don't know where you got that information from, but refers to as a sergeant in patrol, as a watch commander, all the specialized units that I supervised, it has to do with the 14 years as a supervisor, is what I'm referring to under the 100 use of force investigations.

MS. ALTERMAN:  Q.  Mr. Defoe, as a supervisor, a sergeant at the LAPD, you're not charged with investigating your own officers under your command, right?

MR. AMRHEIN:  Objection.

THE WITNESS:  Quite to the contrary, if you're -- an officer in your command is involved in a use of force, a baton strike, a taser, canine involved about 50 of those as a canine deployment, as a canine supervisor.

As a supervisor sergeant at my former agency,



Page 113

you will conduct that investigation unless you are a

percipient witness.  That means that you controlled the

use of force.  If you directed or controlled it and

advise in a manner that you were part of the actual

tactical component, then an outside supervisor not

involved in the tactical planning or the direction of

the use of force, he or she will conduct the

investigation.

        MS. ALTERMAN:  Q.   So it's your testimony that

you've investigated as a police supervisor over 100 use

of force incidents.

        Is that your testimony?

    A.   Correct, correct.  Individual --

    Q.   And as --

    A.   Separate use of force individuals -- incidents,

correct.

    Q.   And as a supervisor working for the LAPD, of

those 100 or over 100 use of force incidents, how many

of those did you find that the force used was excessive?

    A.   Well, as a sergeant you conduct the

investigation.  You provide that investigation to your

direct reports.  Could be a lieutenant, could be a

captain.  He or she will make the determination through

the review process and make -- the use of force review

board will determine if the force was, in fact,



Page 114

reasonable or unreasonable, in policy, out of policy.

Other than if the use of force only amounts to a training issue where the use of force in itself rose to the level -- it's called a general -- general form 78 notice to correct deficiencies where the force in itself only amounted to maybe a training issue and not the reasonableness of the force, because that would be decided by the bureau in which you are assigned to.

Q.  So going back to my question.

My question to you, sir, was whether or not you ever found the use to be unreasonable by any of the patrol officers for the over 100 use of force incidents that you investigated.

MR. AMRHEIN:  Objection.

THE WITNESS:  Response is, sergeants don't make the determination.  So I did not find one way or the other.

MS. ALTERMAN:  Q.  Did you ever make a recommendation to your supervisor, to the lieutenant or to a captain, that, based upon your investigation, one of your police officers used an unreasonable amount of force in over 100 use of force incidence?

MR. AMRHEIN:  Objection.

THE WITNESS:  Once again, you're just a collector of information.  The determination was made by



Page 115

the bureau.  You don't provide any insight as to what your thoughts are other than if there were violations of policy, it will include that.  If there were any issues as relates to the preforce -- that would be planning, tactics, communication, cover, things such as that -- that is included in your investigation.

But the ultimate determination is made typically by the rank of captain or above at the Los Angeles Police Department.

MS. ALTERMAN:  Q.  Did you ever find in the over 100 use of force incidents that you investigated a violation of LAPD's use of force policy?

MR. AMRHEIN:  Objection.

THE WITNESS:  Once again, you don't make the determination that there was a violation other than if there was -- the actions were inconsistent with the policy.  And then you'll -- you'll put the attached policy or reference it in the report.

The commanding officer makes a determination if there was actually a violation, based on the information you provided in the course of the investigation.

MS. ALTERMAN:  Q.  Mr. Defoe, is it your testimony that if you observed a use of force that was unreasonable or in violation of the law, that you would not inform your supervisors of the same?


MAGNA
LEGAL SERVICES

Page 116

MR. AMRHEIN:  Objection.

THE WITNESS:  Okay.  I'm -- I'm advising of the same.  Your question is the determination.  I will say I observed, you know, Officer Smith unnecessarily strike a subject, that would be in my -- and by the way, if I observed an unreasonable or unnecessary use of force, that would be considered misconduct.  And I would be required to immediately notify Internal Affairs and initiate a personnel investigation if, in fact, I observed a use of force that was unreasonable.

So there would be two things I would need to do, is document what I did and then immediately report that without delay to my commanding officer, who would more than likely initiate a personnel complaint based on the observation.

MS. ALTERMAN:  That is my question, Mr. Defoe.

Q.  Have you ever observed in the over 100 use of force incidents, that you personally investigated any unreasonable use of force that you reported to any channel while you worked for the LAPD?

MR. AMRHEIN:  Objection.

THE WITNESS:  Not on its face, that it was unreasonable.  But it was -- there have been investigations that I reported on that were determined to be unreasonable by the commanding officer.  But as I



Page 117

mentioned, i don't make those determinations, just observations.

MS. ALTERMAN:  Q.  So based upon your observation as a sergeant II+1 and the 28 years that you've spent in law enforcement, you never personally observed any of the Port -- of the LAPD police officers involved in unreasonable use of force, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  That's not what I testified to.  I made observations.  I don't make recommendations other than what the observations were.  I don't make the determination what's reasonable or unreasonable.  That is a commanding officer's -- they may have found that based on my observations of what I had reported.

But the ultimate trier of fact or the adjudicator is the rank of captain or above, because it results in discipline.  And we have binding arbitration as to what a sergeant can report and what he can do.

Now, if there's an excessive use of force, I have a duty to intervene and intercede as a supervisor. I have not had to intervene or intercede, where I thought there was unreasonable or excessive force at the time of observation of any incident in my -- that I was at, or I would have interceded or intervened.

Q.  So Mr. Defoe, you testified that it would be



Page 118

your obligation as a sworn police officer to report any abuses of authority, unreasonable use of force regardless of whether or not you make the final determination; isn't that correct?

A.  Correct.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.  So based upon that testimony, my question to you is, in your 28-year law enforcement career and in the over 100 use of force incidents that you've personally investigated, did you ever report an unreasonable use of force by any LAPD officer who reported to you?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.

MS. ALTERMAN:  Q.  How many times?

A.  Probably a handful of times.

Q.  What is a handful?

A.  Five.

Q.  What were those five incidents?

A.  I don't recall, it's been so long, ma'am.  It's been -- I don't know the specific incidents.  But I found that, based on my observations, that the force did not comport with policy and training.  I did not make determination that that was, in fact, true.  That was a captain or above.


MAGNA
LEGAL SERVICES

Page 119

But I believe that the complaints, if they were generated, or the use of force, that there was -- a violation of policy was based on my observations and my reporting of the incident.

Q.  Were your observations corroborated, and ultimately were those individuals disciplined for an unreasonable use of force, based upon your observations?

MR. AMRHEIN:  Objection.

THE WITNESS:  I think partly based on my observations in addition to the entire investigation that was completed, yes.

MS. ALTERMAN:  Q.  Could you provide me with any details from any of the five incidents that you're referring to where you observed officers using an unreasonable amount of force?

A.  Specific details, ma'am, no.

Q.  Do you know the names of the officers involved?

A.  I don't.

Q.  Do you know where these incidents occurred?

A.  I do not.

Q.  Do you know the circumstances which you observed to be unreasonable in the use of force that was deployed?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't recall the circumstances.


MAGNA
LEGAL SERVICES

Page 120

MS. ALTERMAN:  Q.  Do you know whether or not, in fact, there were five times where you observed an unreasonable use of force?

MR. AMRHEIN:  Objection.

THE WITNESS:  That's an estimation.  You asked me to provide a number.  And I'm estimating about five times, is when I found that my observations were such that it resulted in the force being deemed as unreasonable, along with the other facets of the investigation that were conducted in addition to my observation or my facts that were collected at the time of the investigation.

MS. ALTERMAN:  Q.  Did the five times include a use of unreasonable lethal force or less than lethal force?

MR. AMRHEIN:  Objection.

THE WITNESS:  No, I've never investigated the use of lethal force.  That would be by Robbery Homicide Division, which I never was assigned to, and Force Investigation Division, which I was never assigned to.

As a supervisor, unless you're assigned to those one or two entities, you're not going to be investigating the use of lethal force other than public safety statement and containment of witnesses, things such as that.  That's going to be a separate entity at



Page 121

LAPD that will handle that responsibility.

MS. ALTERMAN: Q. So in this paragraph that we've been looking at, when you say that you've investigated over 100 use of force incidents, you're only referring to use of nondeadly force incidents, correct?

MR. AMRHEIN: Objection.

THE WITNESS: Correct.

MS. ALTERMAN: Q. And you don't use the phrase nondeadly force. You use the terminology from the California penal law, which is less than lethal, correct?

A. Correct.

MR. AMRHEIN: Objection.

THE WITNESS: Lethal or less than lethal.

MS. ALTERMAN: Q. And you understand that when I'm saying nondeadly, it's your version of less than lethal. We're talking about the same thing?

MR. AMRHEIN: Objection.

THE WITNESS: Right. Typically force that would not result in imminent or great bodily injury and/or death.

MS. ALTERMAN: Q. And if during the questioning, Mr. Defoe, you're looking at something other than your report, I'd just ask that you let me



Page 122

know what you're looking at.  Thank you.

A.  Sure.  I'm looking at the General Order 100-13.
It's the use of force general order.

Q.  Okay.  And unless I direct you to look at a
document or just -- you have to let me know that you
need a document to refresh your recollection.  I ask
that you not just look at documents to help assist you
with your testimony.

A.  Okay.  Do you want me to let you know if I'm
reading my report or just, you point to it?  Or should I
let you know that I'm looking at the report that you
asked me to look at?  Or should you just assume that I'm
looking at it because you asked me to look at it?

Q.  If I asked you to look at the report, we can
assume that you're looking at the report.  Otherwise,
I'd ask that you tell me what you're looking at or
intend to look at before you do so.  Okay.  We can go on
to your second opinion, which starts on Page 9 of the
report.

In the second paragraph under opinion Number 2,
you state that it's your opinion the defendants failed,
and you underline the word failed, to use the following
de-escalation and defusing techniques with Mr. Lagoda.

Do you see that?

A.  Correct.



Page 123

Q. Would you agree with me, sir, that de-escalation should only be used when it's safe and feasible?

MR. AMRHEIN: Objection.

THE WITNESS: No, I disagree. I think it should be used at all times during the course of an entire event.

MS. ALTERMAN: Q. Are you familiar with the use of force matrix that's utilized by the Port Authority Police Department?

A. I believe I saw that in the defense expert's report that was provided. I don't believe I was provided any documents that talk about the matrix within the use of force.

Q. Do you have an understanding one way or the other whether or not the use of force matrix requires de-escalation throughout an incident?

A. I'm not sure. I didn't use it as a basis for my opinion.

Q. Would you agree with me that de-escalation is only appropriate when the time and circumstances reasonably permits it?

MR. AMRHEIN: Objection.

THE WITNESS: I disagree with that.

MS. ALTERMAN: Q. So if you have a threat of a suspect that is potentially threatening your life as



Page 124

well as the lives of the people who are surrounding you, you feel that de-escalation would be appropriate in that circumstance?

MR. AMRHEIN:  Objection.

THE WITNESS:  It could be.  It could be appropriate.  Depends on the circumstance.

MS. ALTERMAN:  Q.  But the circumstances are the circumstances that I just proffered to you.

So if a suspect is threatening your life as well as the lives of the individuals surrounding you, do you feel that in that circumstance, that immediate circumstance that de-escalation is appropriate?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, I would have to determine what type of threat.  Was it an imminent threat of great bodily injury or death?  What was the person armed with?  Were they armed with a firearm, a knife, an object?  What was available?  Was there any cover available?

Because creating time and distance and utilizing distance is a form of de-escalation without using any words.  So a tactical movement or utilizing cover is a part of de-escalation, once again, which is always prudent.

So the fact that someone may not have to say anything, using both words and actions to influence



Page 125

behaviors is what the proper manner in which to de-escalate a police situation is.

MS. ALTERMAN:  Q.  And the person who determines whether or not de-escalation is prudent under the circumstances it would be the officers responding to the incident, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  It would be the incident.  Many incidents, officers don't properly de-escalate, like in this case, where they should have.  So the fact that they didn't doesn't mean that it was properly determined.  It means that they didn't properly de-escalate.

MS. ALTERMAN:  Q.  Well, you would agree with me that when Officer Bugiada first boarded the aircraft, he instructed Lagoda to calm down, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  That's what he stated.

MS. ALTERMAN:  Q.  That was his sworn testimony, right, sir?  That's what you reviewed?

A.  I did.  That's what -- I mentioned that's what he stated.  And that's what he stated in the Attorney General's statement as well.

Q.  And he also testified under oath, Officer Bugiada, that Lagoda did not comply with his



Page 126

commands, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  That's what he -- that's what he testified to, correct.

MS. ALTERMAN:  Q.  Mr. Bugiada -- or Officer Bugiada also testified that after he used OC spray, that Mr. Lagoda threw a punch at his head, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  That's what he testified to, correct.

MS. ALTERMAN:  Q.  If an individual is throwing a punch at an officer's head, who's armed, on an aircraft full of people, do you think he should use de-escalation tactics at that point?

MR. AMRHEIN:  Objection.

THE WITNESS:  He definitely should.  I mean, time and distance, creating distance from someone throwing a punch at you, and tactically retreating and move out of the way is a form of de-escalation at that point.  So yes, you should use de-escalation techniques and tactics throughout the entire incident from the onset and to the conclusion of the incident.

MS. ALTERMAN:  Q.  Mr. Defoe, I know you've never responded to an incident onboard an aircraft, but



Page 127

you've been on airplanes before, right?

A.   No, I -- yeah, no, I've never been an airplane before, ma'am.  Yes, I've been on an airplane.

Q.   Okay.  You can just answer my questions.  We don't need the sarcasm.

So if you've been on an aircraft before, you know that there's a single aisle, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  It depends.  Depends on the type of aircraft.  And it depends on -- but in this particular case, there was a single aisle, correct.  On this particular JetBlue airline, there was a single aisle, correct.

MS. ALTERMAN:  Q.   So you just testified that in order to utilize de-escalation techniques, you need time and space, correct?  That was your testimony?

MR. AMRHEIN:  Objection.

THE WITNESS:  That wasn't my testimony.  I said that officers should use time and distance, if possible, to properly de-escalate.  And if someone's throwing punches at me, if I'm on an airplane or in the street or a confined space in an apartment, I should try to move out of the way.  And then maybe tactically retreating to a position where I'm not in that person's direct vicinity so I don't get punched.


MAGNA
LEGAL SERVICES

Page 128

MS. ALTERMAN:  Q.   And that testimony assumes that you're able to move out of the way, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct.  But if you don't move out of the way, you can still use your -- you use your voice to be able to properly use verbal strategies, provide commands and directives to hopefully calm that person down.

MS. ALTERMAN:  Q.   But verbal strategies, according to you, only work if that person understands the same language as you, right?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct.  If the person doesn't understand -- if the person doesn't understand "calm down" because they speak Russian, then they wouldn't know exactly what you're telling them to do.

MS. ALTERMAN:  Q.   When an officer puts over a radio call that says still combative, speed it up, does that convey any sense of urgency to you as a former LAPD officer for 28 years?

A.   Yes.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.   What does it mean to you?

A.   It means that the situation is not static.  That the person is still more than likely not in custody and


MAGNA
LEGAL SERVICES

Page 129

that the person is requesting an expedited response from the officers that are responding.

Q.  Did you actually listen to the radio call that Officer Bugiada put over?  Or did you only read it in the report?

MR. AMRHEIN:  Objection.

THE WITNESS:  I'm going to refer to my report, if I can --

MS. ALTERMAN:  Sure.

THE WITNESS:  -- and see if there were audio recordings.  No, I believe it was just a written report I reviewed.

MS. ALTERMAN:  Q.  If you had the opportunity to listen to that radio call, would that give you some clarity with respect to the sense of urgency that Officer Bugiada was confronted with at the time?

MR. AMRHEIN:  Objection.

THE WITNESS:  No.  I would take on face value that the nature of the request for the response to expedite means that he wanted the response to be expedited regardless of any voice inflection.  I conceptually understand what he was asking officers to do.

MS. ALTERMAN:  Q.  You understand that he felt that he was in trouble at that time, right?


MAGNA
LEGAL SERVICES

Page 130

MR. AMRHEIN:  Objection.

THE WITNESS:  I felt that it was a concern.  I don't know if there was trouble -- if it was trouble or not.  But he felt that he -- he needed assistance, is what I would take from that request.

MS. ALTERMAN:  Q.   At the time when Officer Bugiada put over the radio, still combative, speed it up, he was the only law enforcement officer on board that aircraft, correct?

A.  Correct.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.   You also understood that at the time that Officer Bugiada put over that radio call still combative, speed it up, that the aircraft was full of civilians onboard the aircraft, all the passengers on that JetBlue flight, as well as the flight crew, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct.

MS. ALTERMAN:  Q.   In opinion 2 on page 9, your first Subsection 1 of that opinion underlines,

"When safe and feasible, officers shall:
Subsection (a), attempt to slow down or
stabilize the situation so that more time,
options, and resources are available."



Page 131

Do you see that?

A.  Yes.

Q.  So this de-escalation or defusing technique that you reference in opinion Number 2 contemplates that this is to be utilized by officers when safe and feasible, correct?

A.  Correct.

Q.  And that terminology, when safe and feasible, is the precursor to determine whether or not an officer shall attempt to slow down or stabilize the situation so that more time, options, and resources are available, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct.

MS. ALTERMAN:  And we can go to the next page, Page 10 of your report.

Q.  You would also agree, Mr. Defoe, that consideration should be given to utilize de-escalation techniques when time and circumstances reasonably permit the officers to do so, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct.

MS. ALTERMAN:  Q.  Now, going on to Page 11, still within opinion Number 2, the paragraph that starts with, "To embody the spirit of professionalism."  I'll



MAGNA
LEGAL SERVICES

Page 132

direct you to that paragraph.

A.   I'm here.

Q.   Okay.  The third sentence of that paragraph, you wrote,

"Officers must model and live as examples of the behavior that they are charged to enforce."

Where does that appear within the Port Authority's code of conduct for the public Safety Department?

A.   I don't know where -- I don't know if it appears there.

Q.   Where did that language come from?

A.   I wrote it in the report --

Q.   Did you --

A.   -- or typed it in the report.

Q.   -- take that language from a general order or a patrol guide from the LAPD or from some other resource?

MR. AMRHEIN:  Objection.

THE WITNESS:  I believe so.  I don't know where I formulated that from, but it's -- it's a sentence I typed in.  Where I got that language, I don't know.  I just agree with it.

MS. ALTERMAN:  Q.   You disagree with it?

A.   I agree with it.



Page 133

Q.   Where did the language "to embody the spirit of professionalism, ethical conduct must be a way for those in policing" come from?

A.   I don't recall where I received that from or if I formulated that sentence on my own.

Q.   Where did the language, "to maintain the community's trust, peace officers must maintain consistently high standards of ethical conduct" come from?

A.   I think I formulated that sentence on my own.  I don't think it came from anything.

Q.   And what about the sentence, "The policing community is only as strong as its weakest link"?

Was that your language, or did you take that from somewhere else?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't recall.

MS. ALTERMAN:  And the last sentence in that paragraph,

"Unethical conduct affects the image and morale of the entire profession, and it offends officers and society throughout the country."

Q.   Is that your language, or did you take that from somewhere?



Page 134

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't recall where I got that from.  It may have been my language.

MS. ALTERMAN:  Q.  Is there anything within the Port Authority's rules or general orders that requires any of these standards, as you've stated them on Page 11 of your report?

MR. AMRHEIN:  Objection.

THE WITNESS:  Verbatim, I don't know.  I've only received a few of the directives.  I don't know if the entire manual -- in the manual, if it has language similar or identical to what I typed in there.

MS. ALTERMAN:  Q.  Would you agree with me that when Officer Bugiada first boarded the aircraft, that he did attempt to defuse the situation and use de-escalation techniques?

MR. AMRHEIN:  Objection.

THE WITNESS:  By saying calm down, yes, I think that would have been a -- potentially been a reasonable directive if the person understood English and if the person wasn't in a medical crisis where even by your words, still won't allow that person to comprehend but what you're trying to ask them.

Because they're going through a seizure or have just gone through a seizure.  And they're still feeling

MAGNA
LEGAL SERVICES

Page 135

the effects of the seizure.  Especially when you know that you are responding to an individual who had had a seizure, both by way of information you received on the radio as well as information that you received when you boarded the plane or as you were boarding the plane.

MS. ALTERMAN:  Q.  But you don't know and your opinion is based on the assumption that Mr. Lagoda was experiencing a medical emergency at the time that Officer Bugiada boarded the aircraft, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Or coming out of a medical emergency where he's still going to be disoriented, confused, afraid.  Those other factors don't immediately stop upon, you know, the seizure coming to a halt.  My understanding from my baseline training on seizures is that people will still feel confused, disoriented, and -- until they realize what transpired.  Many times they don't even know what occurred until you let them know.

And so I don't know what stage, if he was still in the throes of the seizure or had just come out of the seizure, was still confused, afraid, and maybe did not understand what he was being asked to do.  And with the -- the potential issue regarding not understanding what the English word means to calm down, being as he



Page 136

spoke Russian or only understand a limited amount of English.

MS. ALTERMAN: Q. So we could agree, Mr. Defoe, that this opinion is based upon all those assumptions, correct? You're assuming that Mr. Lagoda did not understand English, correct?

MR. AMRHEIN: Objection.

THE WITNESS: Potentially, yes.

MS. ALTERMAN: Okay.

THE WITNESS: Also, the assumption is that what -- it's not really what Mr. Lagoda knew --

MS. ALTERMAN: Not part of my question.

THE WITNESS: Okay.

MS. ALTERMAN: My question's not done. It's multipart. I'm just going to ask you separately each assumption that you relied upon.

Q. So this opinion is based on the assumption, assumption 1, that Mr. Lagoda did not understand that English language, correct?

MR. AMRHEIN: Objection.

THE WITNESS: That's part of the -- part of the assumption, correct.

MS. ALTERMAN: Okay.

Q. The next assumption is that Mr. Lagoda was still experiencing a medical emergency at the time


MAGNA
LEGAL SERVICES

Page 137

Officer Bugiada boarded the aircraft, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Partially correct as well.

MS. ALTERMAN:  Okay.

Q.   The third assumption is that Mr. Lagoda did not understand any of the commands that Officer Bugiada gave to him in an effort to de-escalate the situation when he boarded the aircraft, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Partially correct.

MS. ALTERMAN:  Q.   And you also have assumed that Mr. Lagoda was still in the throes, as you've described them, of a post-seizure or dealing with a post-seizure at the time Officer Bugiada boarded the aircraft, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct.

MS. ALTERMAN:  Q.   So we can agree, Mr. Defoe, that if any of those assumptions were proven to be false, that your opinion should change, right?

MR. AMRHEIN:  Objection.

THE WITNESS:  I disagree with that.

MS. ALTERMAN:  Q.   Well, isn't it true that you based your opinion, in part, at least, on those assumptions that we just went over?



MAGNA
LEGAL SERVICES

Page 138

MR. AMRHEIN:  Objection.

THE WITNESS:  Regardless of what the situation was, was he in the middle of a medical emergency?  Was there a language barrier?  It's what Officer Bugiada knew at the time.  He knew that an individual had suffered from a seizure.  He knew that he had become combative.

He knew, or should have known, through his baseline training that when someone has experienced a seizure or any seizure, that they're going to act in a certain manner and to act properly and use proper tactics and de-escalation techniques until that person completely is out of the seizure is no longer feeling the effects of the seizure.  That's what my -- where my opinion lies.

MS. ALTERMAN:  Q.  And that's what it is, Mr. Defoe, that's your opinion.  You're not testifying what Officer Bugiada knew at the time.  Officer Bugiada testified that when he boarded the aircraft, he did not observe someone who was post-seizure, that, in fact, he observed someone who was a combative individual looking to punch or charge at him.

Is that what his testimony was?

MR. AMRHEIN:  Objection.

THE WITNESS:  He -- he did testify to that.  But



Page 139

he also testified that he knew that Mr. Lagoda had experienced a seizure and was in the throes of the seizure at the time. So that's where my criticism is, is what he knew at the time.

MS. ALTERMAN: Q. You're basing what Officer Bugiada allegedly knew based on the call that came over, not what he actually observed. When Officer Bugiada boarded the aircraft, he testified that he didn't observe any medical emergency; isn't that true?

MR. AMRHEIN: Objection.

THE WITNESS: Well, that's what he stated. But he was -- also testified that he was advised as he was boarding the plane of what had transpired, not just over the air. So he was aware of what transpired prior to his arrival. So he had an understanding that it was a seizure that Mr. Lagoda was experiencing or had experienced and that I believe his actions were not reasonable, based on the information that he knew at the time.

MS. ALTERMAN: Q. How much time had passed between time that Mr. Lagoda was experiencing a seizure and when Officer Bugiada boarded the aircraft?

MR. AMRHEIN: Objection.

THE WITNESS: You know, I don't know if he was



MAGNA
LEGAL SERVICES

Page 140

still experiencing a seizure when Mr. Bugiada -- or Officer Bugiada boarded the aircraft. So I don't know if he was still in medical distress at that time.

MS. ALTERMAN: Q. And you don't have any documentation to support your opinion that Mr. Lagoda was, in fact, experiencing a seizure or post-seizure effects at the time Officer Bugiada boarded the aircraft, correct?

MR. AMRHEIN: Objection.

THE WITNESS: Correct.

MS. ALTERMAN: Going on to opinion Number 3, which starts on Page 11 of your report.

Q. This opinion deals primarily with the use of force; is that right?

A. Primarily, yes.

Q. Would you agree with me that lethal force was not used in this case?

MR. AMRHEIN: Objection.

THE WITNESS: I don't agree. I agree with that -- and once again, I'm not providing a medical opinion here. But according to the Attorney General's report, that it was a contributing factor of both the punches and the -- and actually, they determined that the actual incident was a homicide, based on significant blunt force injuries to his face and body, many



MAGNA
LEGAL SERVICES

Page 141

attributable to the officers.  So the medical examiner deemed manner of death to be homicide.

My understanding is -- once again, I'm not making any medical determinations in this case.  I'm just going off of verbatim what the executive summary of the Attorney General's Office report stated.

MS. ALTERMAN:  Q.  Do you know the difference between a legal homicide and a medical homicide?

MR. AMRHEIN:  Objection.

THE WITNESS:  I -- can you repeat that.  A legal homicide and medical homicide?

MS. ALTERMAN:  Yes.

Q.  The question was, do you know the difference between a legal homicide versus a medical homicide?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't.

MS. ALTERMAN:  Why don't we mark the Attorney General's report as Defoe 3.

(Exhibit 3 was marked for identification.)

MS. ALTERMAN:  And I just want to bring something up for you to take a look at.

Q.  Do you have it in front of you, Mr. Defoe?

A.  Part of it.

Q.  Okay.  I'll put it up on the screen.  I'm going to -- we'll scroll to Page 10 of the report.  Now I will


MAGNA
LEGAL SERVICES

Page 142

direct you to the footnote on Page 10.

Do you see the footnote there?  Are you able --

A.   Yes.

Q.   -- to read that?  I -- we can zoom it in if it's difficult to read.

A.   I can read it.

Q.   Okay.  So the last sentence in that footnote on Page 10 states,

"But while PO Bugiada's and Officer Papia's conduct may well have been a cause of Mr. Lagoda's death, it is highly unlikely that the law would regard the officers' use of force to be readily capable of causing death or serious physical injury."

Do you see that?

A.   Yes.

Q.   So would you agree with me, sir, that the actions taken by Officer Bugiada and Officer Papia did not cause the death or serious physical injury to Mr. Lagoda?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't have a comment.  I'm not offering any legal opinions here, ma'am.

MS. ALTERMAN:  Q.   Based upon your review of this case, you did render an opinion, and in part in



Page 143

opinion Number 3 and it's reiterated in some later

opinions that we'll go over, but you did, in fact,

render opinion that the officers' actions contributed to

Mr. Lagoda's death; isn't that your opinion?

MR. AMRHEIN:  Objection.

THE WITNESS:  According to the executive summary

that I reviewed from the Attorney General's Office.

MS. ALTERMAN:  Q.  But in that same report,

Mr. Defoe, that you're relying upon, it clearly states

that the officers' conduct was incapable of causing

death or serious physical injury.

MR. AMRHEIN:  Objection.

THE WITNESS:  Once again, ma'am, I'm not

offering legal opinions.  The summary states -- and I

quote the summary verbatim in my report -- that there

was -- the officers' actions, based on the strikes to

the head and body, contributed to the death of

Mr. Lagoda, is what I have in my report and what I read

from the Attorney General's report.

MS. ALTERMAN:  Q.  Do you also see that in the

same report that you're relying on, that PO Bugiada's

and Officer Papia's conduct may well have been a cause

of Mr. Lagoda's death, but it's highly unlikely that the

law would regard the officers' use of force to be, in

quotes, "readily capable of causing death or serious



Page 144

physical injury"?  Do you see that?

A.  I do.

Q.  Do you disagree with this conclusion in the Attorney General's report?

A.  I don't disagree that when they state that Bugiada's and Papia's conduct may well have been a cause of Mr. Lagoda's death.  I don't disagree with that.  Once again, it is highly unlikely -- you asked me for a legal opinion, which more justifies a criminal filing more so than causation, I believe.  But I think you're asking me for a legal opinion.  And I'm -- it's an ultimate trier of fact issue you're asking me.

Q.  I'm not asking you for a legal opinion.  What I'm asking you for is the basis for your opinion.  The basis for your opinion Number 3 is that you believe is that officers used an unreasonable amount of force.  And you said that that opinion is based upon the conclusions in the New York Attorney General's report.

So I'm asking you, sir, to look at that report that you're claiming you based your opinions on and confirm that that same report that you're basing your opinions on says that the use of force was readily incapable of causing death or serious physical injury.

Doesn't it say that?

MR. AMRHEIN:  Objection.



Page 145

THE WITNESS:  It says highly unlikely that the law would regard the officers' use of force to be readily capable of causing death or serious physical injury.  You're asking me a legal question.

I'm specifically going off of what the medical examiner came back and concluded, that the interaction with the officers likely contributed to the -- Mr. Lagoda death.  And he classified it as a homicide.

MS. ALTERMAN:  Q.  And we've already established that you don't the know the difference between a legal homicide and a medical homicide, right?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't.

MS. ALTERMAN:  Q.  Would you agree with me that the medical examiner who issued that statement would be rendering an opinion to a medical degree of reasonable certainty and is not issuing a legal opinion?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.  But I also found in my work that many times the medical examiner's opinions and reports may result in a criminal filing, based on the medical examiner's determination, may result in a criminal filing of officers.

MS. ALTERMAN:  Q.  And in this case, Mr. Defoe, you're aware that there was no criminal charges



Page 146

recommended against any of the police officers involved in this case, right?

A.   Yes, ma'am.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.   Now, in opinion Number 3, you discuss positional asphyxia, sudden death, and advisory guidelines for care of subdued subject on Page 11.  We can go back to the Defoe report.

Do you see the section I'm referring to?

A.   I do.

Q.   Were the Port Authority police officers trained on the advisory guidelines for care of subdued subjects, as referenced on Page 11 in your report?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't know if it -- I don't know if they were asked or not at the time of their deposition or if they received that specific training or not.

MS. ALTERMAN:  Q.   Do you have any understanding whether or not that training was given to any Port Authority police officer on or prior to April 12th, 2019.

MR. AMRHEIN:  Objection.

THE WITNESS:  It doesn't seem like it was, based on the testimony on Pages 22 and 23 of my report that I



Page 147

derived from the deposition transcripts regarding the involved officers' knowledge of what positional asphyxiation is or compressional asphyxiation.

MS. ALTERMAN:  Q.  The Port Authority police officers were trained regarding the use of nondeadly force tactics and to refrain from certain restraint positions prior to April 12th, 2019, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct, not to -- it does not refer to the back pressure on the diaphragm, or the neck.

MS. ALTERMAN:  Q.  And that's because, sir, there was no legal requirement in New York State at the time to restrain from putting pressure on the back or neck as of April 12th, 2019; is that true?

A.  On the back there was not.  There was obviously language regarding compression to the neck prior to 2019, in the 2017 directive.  But there was no language as results to the pressure on the back and diaphragm in there.

But once again, you're asking me a legal opinion as to legal requirement.  I'm talking about what a reasonable department should have trained positional or compressional asphyxiation, especially because they take people into custody, especially from a ground position,



Page 148

so it's important to understand the the potential threats or potential medical issues associated with positional and/or compressional asphyxiation.

Q.   You would agree with me, though, sir, that the Attorney General's office determined, as part of their investigation, that the Port Authority police did provide proper training to its police officers as of April 12th, 2019, with respect to use of force tactics?

MR. AMRHEIN:  Objection.

THE WITNESS:  As it relates to compression to chest.  No proper training as relates to compression to back and weight on diaphragm.

MS. ALTERMAN:  Q.   Is there any requirement that you can point to that would have required the Port Authority Police to be trained about compression to the back or diaphragm prior to April 12th, 2019?

MR. AMRHEIN:  Objection.

THE WITNESS:  Requirement, I'm not -- unaware of any requirement other than it would be reasonable to train, based on, there's been countless positional and/or compressional asphyxiation matters throughout the the United States that a reasonable police department would recognize and then provide requisite training to the officers that may be in situations where they're taking someone into custody, that may be in a prone



MAGNA
LEGAL SERVICES

Page 149

and/or supine position.

MS. ALTERMAN:  Q.  So do you disagree with that part of the Attorney General's Office report as well, that states the Port Authority Police properly trained its office as of the date of this incident?

A.  Based on the training that was in place, yes. But I don't believe they were properly trained.  I disagree with that.  I believe they should have been properly trained.

And I disagree with the Attorney General's statement regarding that.  They should have been properly trained, as they were afterwards, regarding to avoid putting weight on the back or when keeping someone in a prone position and avoid putting weight on the diaphragm, is what they derive after the fact.  But they should have trained them in those areas before this incident.

Q.  There's no evidence in this case from any of the police officers involved in the incident that any pressure was applied to the Plaintiff's back -- the -- Mr. Lagoda's back; isn't that true?

MR. AMRHEIN:  Objection.

THE WITNESS:  The actual amount of pressure, other than what they testified to as they enter the plane and Mr. Lagoda was on -- he was face down and



Page 150

there were people on top of him.  But the physical amount of pressure, the weight -- total weight, I don't know.

And at what point, would be another question, as to how much weight, other than he was in a prone position with weight on his back when officers arrived at scene on the plane and testified to such.

MS. ALTERMAN:  Q.  There's actually no testimony that he -- Mr. Lagoda was in a prone position with weight directly on his back.  There's testimony that officers straddled his back to maintain control of Mr. Lagoda, who continued to buck as he was handcuffed and in a prone position on the ground.

But there's no testimony from any police officer, unless you would like to point us to that testimony, that officers directly applied pressure to Mr. Lagoda's back while he was in a prone position.

MR. AMRHEIN:  Objection.

THE WITNESS:  The amount of weight, I don't know.  Once again, though, but he was in a prone position with the officers on top of him.  And the resistance, I believe, is based on the basic physiology of the struggle, not as to try to resist, more so to resist to attempt to breathe, as is what happened in this case.



Page 151

MS. ALTERMAN:  Q.   Sir, you don't have any evidence that there was any pressure applied to Mr. Lagoda's back while he was handcuffed and in a prone position; isn't that correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  I have the officers' testimony, ma'am.  I can -- I can read.  Bugiada stated he just put body -- his body on top of the male because he was attempting to get up.  So I would assume that would pressure.  According to Cathy --

MS. ALTERMAN:  Q.   Is that --

A.   -- he stated.

Q.   -- before you --

A.   Well, you asked me a question --

Q.   Okay.  Yeah.

A.   You asked me a question and you don't want to hear my answer.

Q.   No, I'd like to hear your response, but I'd like to --

MR. AMRHEIN:  He's answering your question, Cheryl.  Please let him answer.

MS. ALTERMAN:  I'm allowing him to answer, but I'm going to --

MR. AMRHEIN:  Go ahead, Scott.

MS. ALTERMAN:  Q.   Mr. Defoe, would you --



Page 152

MR. AMRHEIN:  He's answering -- he's answering your question.

Please go ahead, Scott.

MS. ALTERMAN:  I'm going to -- I'm going to question him on his response.

MR. AMRHEIN:  You asked him -- you asked him -- you asked him to provide evidence.  He -- as a part of your question, which was an objectionable question and a leading question and testifying on behalf of your client.

Secondly, I objected.  Scott's allowed to answer.  And you interrupted him during his answer.  Please allow him to answer.  He's providing the evidence you requested.

Go ahead, Scott.

MS. ALTERMAN:  He can answer the questions that I'm questioning him.  If you'd like to question him once I'm done, you can do so.

MR. AMRHEIN:  He was in the process of answering your question, and you interrupted him.

MS. ALTERMAN:  I'm going to allow him to finish his question.  You're interrupting my question.  So I'm going to ask my question, he's going to answer my question, and he will have an opportunity to answer the question fully.  But he's going to answer the questions



Page 153

as I pose them to him.

MR. AMRHEIN: For the record, you answered -- you asked him a question. It was an objectionable question. I stated my objection on the record. Mr. Defoe proceeded with answering the question. And then you interrupted his answer.

MS. ALTERMAN: I didn't interrupt his answer, I'm asking him a question, based upon his response with respect to Officer Bugiada's testimony. He was then --

MR. AMRHEIN: He had not --

MS. ALTERMAN: -- talking about other officers' testimony.

MR. AMRHEIN: He had not concluded his answer. You can ask the question after he finishes his answer and break down each part of his answer. You're free to do -- absolutely free to do that and explore that as much as you want. However he wasn't finished answering. So please let him finish answering his question.

MS. ALTERMAN: I'm going to ask my question.

MR. AMRHEIN: And please take my objection for the record, because this is improper. He was answering. He was interrupted. And Counsel's more than free to explore every aspect of his answer, but he wasn't allowed to finish his answer.

MS. ALTERMAN: Q. Mr. Defoe, you testified



Page 154

that Officer Bugiada said that part of his body was on Mr. Lagoda.

Did Officer Bugiada specifically state that part of his body was on Mr. Lagoda's back?

MR. AMRHEIN:  Objection.

THE WITNESS:  He didn't put part of his body. He said he just put his body on top of the male because he was attempting to get up.  The information was based on Bugiada and everyone else's testimony.

According to Papia, Duran, and others, when he first observed him, he was chest down.  So that would be his back.  He wasn't underneath Mr. Lagoda.  And Papia also stated they were still applying pressure to Mr. Lagoda after he was handcuffed.  And this was for a few minutes from the time he was placed in handcuffs until he first observed Mr. Lagoda turning blue.

Those are all derived from deposition transcripts, sworn deposition testimony, beginning on Page 14 of my report.

MS. ALTERMAN:  Q.  Have you completed your answer?

A.  Yes.

Q.  None of those excerpts from either Officer Bugiada's testimony, Officer Papia's testimony, or Officer Duran's testimony state that they applied



Page 155

pressure to Mr. Lagoda's back, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Ma'am, I disagree with you.  They were -- it says -- Papia states,

"The other -- it is safe to say the other police officers," plural, "were still applying pressure to Mr. Lagoda after he was handcuffed."

It says pressure.  And I understand if I lay on top of someone, that is going be pressure on -- Bugiada said he put his body on top of the male.  I think it's pretty simple to assume that if you put anything on top of something, that is going to be pressure or weight of whatever that things is, like a human being with all kinds of police equipment, gear, Sam Browne on, vest, boots on top of someone, that is pressure.  That is weight.  However you want to characterize that.

MS. ALTERMAN:  Q.   Is your opinion Number 3 based upon the assumption that there was pressure placed on Mr. Lagoda's back?

A.   Pressure from the officers and as well as what the response would be from an individual like Mr. Lagoda, who has pressure on his back and is in a prone position.  And what a reasonably trained officer would do in looking and observing to see how someone


MAGNA
LEGAL SERVICES

Page 156

would respond to having weight on their back and the basic physiology of the struggle associated with the weight onto back.

And my opinion on 3 is that there's a failure to recognize that. And they continue with weight and pressure on the back until he ultimately turned blue. And then it became a medical emergency and he ultimately died.

Q. Is there any testimony that you have reviewed in this case in all of the time that you've spent reviewing and preparing for today's deposition where any officer involved in this incident specifically testified that they put pressure on Mr. Lagoda's back?

MR. AMRHEIN: Objection.

THE WITNESS: To use the word pressure, Papia states on Page 58,

"It is safe to say other officers were still applying pressure," verbatim, "to Mr. Lagoda after he was handcuffed, which he was on the ground and in a prone position until," once again, Papia, "they first observed -- he first observed Mr. Lagoda turning blue."

Then we know in the statement of facts in this case he was then turned over to a supine position and



Page 157

his handcuffs were taken off.  But that was -- he was in the prone position the entire time leading up to the point that he was in a prone position with weight and pressure on his back until he became nonresponsive.

MS. ALTERMAN:  Q.  Did Officer Papia state there was pressure put on Mr. Lagoda's back, or did he state that there was pressure put on Mr. Lagoda?

MR. AMRHEIN:  Objection.

THE WITNESS:  Still applying pressure.  But we know that he was on back, so it wouldn't be onto the front part of his body, because that would have been onto the floor.

MS. ALTERMAN:  Q.  Mr. Defoe, you would agree with me that when you're utilizing a use of force tactic, such as a compliance hold, you're applying pressure to the limbs but not to the back of an individual, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  I -- I disagree.  If you -- by use of a compliance hold to push your legs to your buttocks or use a baton or an impact weapon to push your legs down, the weight is still pushing on your diaphragm, which is restricting your ability to breathe.

So it's all the same.  If it's on the back, lower back, or you're using a limb, such as the legs,



Page 158

using an impact weapon to hold those legs down, you're putting weight and pressure on the actual -- on the actual diaphragm.

I need to change out my earbuds real quick. They're dying.  Give me a second.

(Off the record from 11:52 to 12:00.)

MS. ALTERMAN:  Q.  Was there any Port Authority policy that restricted the Port Authority police officers responding to Mr. Lagoda's incident from applying pressure to his back in an effort to restrain him?

MR. AMRHEIN:  Objection.

THE WITNESS:  At the time of the incident or in the policy --

MS. ALTERMAN:  Q.  At the time of the incident.

A.  Yes, there was.

Q.  What is that?

A.  Bates 2595, looking at the general order dated 3/6/17.  It states,

"Officers should make every reasonable effort to avoid compressing and restricting the suspect's airway."

Which you will do if you have weight on the back.

Q.  So is it your testimony, sir, in your



Page 159

experience, every time that you use a baton as a compliance hold, that you were placing pressure on a suspect's back?

MR. AMRHEIN:  Objection.

THE WITNESS:  If you're forcing the legs into a position or forcing the legs and the shin into a position where now you're pushing on the buttocks area of someone and ultimately pushing on the diaphragm, yes, that would be inappropriate.

It depends on the duration, and it depends on the manner.  If you're using it as a control mechanism to do that briefly to get someone in a -- quickly handcuffed and then put he or she in a seated, standing, or recumbent position, no.  But it's based on the reasonableness of the force, not solely the force option.

MS. ALTERMAN:  Q.  So you would agree with me, then, that if it was brief, in order to restrain the individual and place them in handcuffs, then it would be reasonable for the officers to do so?

MR. AMRHEIN:  Objection.

THE WITNESS:  If the manner in which the baton was used while there was additional weight and/or pressure on the back, then no, it would be counterproductive.  And -- to the incident.  So yes, it



Page 160

would be problematic.

MS. ALTERMAN:  Q.  Are there situations where the use of a baton as a compliance hold is a reasonable use of force in order to handcuff an individual?

A.  Yeah, there are times.

Q.  I missed your response.

A.  There are times.  But it doesn't apply to the fact of this case.

Q.  What are those circumstances?

A.  If you needed to use the baton to -- as a device to -- a rake across -- lightly across the side of the body as a distraction device to loosen up someone's arm, if they're not providing it, so you can effect a handcuffing technique.

I don't believe it should be used in a manner of pressing the legs into the buttocks, because that is going to put weight and pressure on diaphragm and going to restrict breathe.  So I think if you're using it as a device to -- to somehow effect the handcuffing technique, would be an appropriate way, but not in the manner in which it was used in this case.

Q.  Are you aware that at the time the officers were attempting to handcuff Mr. Lagoda, that he was biting the police officers?

MR. AMRHEIN:  Objection.



Page 161

THE WITNESS:  There was -- there was testimony that he bit Bugiada, not officers, plural.

MS. ALTERMAN:  Q.   And that was at the time --

When Mr. Lagoda bit Officer Bugiada, that was the time that the officers were attempting to gain control and handcuff him, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct, when they were striking him, putting pressure on him, and trying to gain control, correct.

MS. ALTERMAN:  I'm just going to go -- scroll to Page 13 of your report.  Same opinion, the section pertaining to lesson 13, Behavioral Emergencies.

Q.  Do you see that?

A.  Yes.

Q.  The first part under the section underlines, says Restraining Patients.

Do you see that?

A.  Where are we at right now?  I'm sorry.

Q.  Page 13 of your report under where it says --

A.  Okay.

Q.  -- lesson 13, "Behavioral Emergencies:"  And then the next heading is Restraining Patients.

A.  Correct.

Q.  We can agree that Mr. Lagoda was not the



Page 162

officers' patient at this time, right?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, once there's a medical emergency, he may not -- they're not going to be providing, you know -- other than stabilizing him, they're not going to be providing medical care.  So I wouldn't -- other than stabilizing.

I don't believe the term patient should be used if he is taken into custody.  It may be a temporary custodial situation so he can get medical treatment from a medical care provider.  And then he would assume the patient role at that point.  But I don't believe that patient role is with the officers, no.

MS. ALTERMAN:  Q.   And then scrolling to the next page of your report, Page 14.  With the paragraph that says Note, in bold and underlined.

Do you see where I am?

A.  No, where are we at?  I'm sorry.

Q.  Page 14 of your report, the paragraph starts with the word note in bold and underlined, and then colon.

A.  Yes.

Q.  Okay.  In that paragraph you write,

"Members of the force are prohibited from sitting, kneeling, or standing on the



Page 163

subject's torso."

And in parentheses you wrote, "(chest, back, abdomen) in a manner that compresses the diaphragm."

Do you see that?

A.   Yes.

Q.   This general order that you're referring to on Page 14 of your report was not in effect on April 12th, 2019, correct?

A.   That language was not.  But the language regarding, as I read to you a moment ago, regarding officers should make every reasonable effort to avoid compressing and restricting the suspect's airway is.

So it doesn't specifically state out that language, but we know that -- or should know that any weight on the back, sitting, kneeling, or standing on a subject's torso would -- or pressure on the torso would compress the diaphragm and would restrict breathing.

Q.   There are circumstances, though, where weight on the back would be reasonable under the circumstances, aren't there?

MR. AMRHEIN:  Objection.

THE WITNESS:  Depends on the circumstances and depends on the duration of time on back.

MS. ALTERMAN:  Q.   How long was Mr. Lagoda in a



Page 164

prone position while the officers were attempting to handcuff him?

A.   They didn't have body-worn camera, so I don't know the exact time.

Q.   Did you ever review the radio footage to determine a timeline?

A.   At least minutes.  The time after he was handcuffed until he first observed him turning blue, that was from Papia.  So it was a time of minutes.  How many minutes, I don't know.

Q.   And how many minutes do you think it's reasonable to be in a prone position in a compliance hold position?

MR. AMRHEIN:  Objection.

THE WITNESS:  How many minutes would be reasonable is your question?

MR. AMRHEIN:  Q.   Yes.

A.   Zero minutes.

Q.   Did you ever observe any officers at the LAPD utilizing a compliance hold when the suspect was in a prone position?

MR. AMRHEIN:  Objection.

THE WITNESS:  I have not.

MS. ALTERMAN:  Q.   Going on to opinion Number 4 on Page 15 of your report.  Now, we've already reviewed



Page 165

your summary of the chief medical examiner's report

contained within the Attorney General's report, as

referenced in opinion Number 4 on Page 15.

          Do you see that?

     A.   Yes.

     Q.   So you are agreeing with a portion of the

New York State Attorney General report, but you disagree

with several of the conclusions; is that fair to say?

     A.   I don't understand the question as to which

ones.  You have to be more specific.  I don't

understand.

     Q.   Well, you disagree that the policies that the

Port Authority officers were trained in were appropriate

at the time of the incident; is that --

          MR. AMRHEIN:  Objection.

          THE WITNESS:  Correct.  I believe that the

language should have contained the current language in

the -- in the policy that was generated in 2021.  I

think it's -- and there's de-escalation and as well as

duty to intervene and intercede, there's areas of the

new policy that should have been included in the 2019

policy.

          MS. ALTERMAN:  Q.  Well, the officers had a

duty to intervene if they observed anything illegal or

contrary to policy or law at the time of this incident,



Page 166

correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.

MS. ALTERMAN:  Q.  What is your understanding of when officers are required to intervene?

A.  Well, once an individual's handcuffed, the person should be immediately placed in a seated, standing, or recumbent position without delay.  The minute you -- right at the moment he was handcuffed, he should have been off to his stomach.

We know that Officer Papia testified to, as I read into the record moment ago, that he -- they were on top -- he was on his stomach until they observed that he turned blue.  So the time in which he was handcuffed, he should have been immediately put in -- placed in a seated, standing, or recumbent position without delay.

Anytime after that, they had a duty to immediately say, let's put him on his side, let's stand him up, let's seat him up, let's put him in a seat, seatbelt him in, and wait for EMS to arrive.

Q.  Okay.  Did Officer Papia testify that immediately after he was handcuffed that he was moved back and then turned on his side?

MR. AMRHEIN:  Objection.

THE WITNESS:  I think he may have testified to



Page 167

something, but that's conflicting with what Officer Papia testified to, because he stated he was in a prone position. And Papia stated it's safe to say they were applying pressure to Lagoda after he was handcuffed.

So there was no indication he was on his side at that time. And we all know as well, from what Duran stated, that he was in a chest down position, not on his side. And when they noticed he was turning blue is when he was on his stomach.

MS. ALTERMAN: Q. Was Mr. Lagoda still resisting after he was placed in handcuffs?

MR. AMRHEIN: Objection.

THE WITNESS: He was resisting the weight being placed on him, I believe. And he resisted up to the point he turned blue. So, you know, that point up until he -- he definitely wasn't resisting when he turned blue. But he was -- which outlined in the basic physiology of the struggle. The resistance is not resisting the officers, but the resisting is the resisting to try to be able to draw in breath and to be able to breathe.

MS. ALTERMAN: Q. What are you basing that on?

A. Based on my training and experience, based on being an expert in over 50 matters involving positional



Page 168

and/or compressional asphyxiation.  I was a defensive tactics academy instructor for about 18 of my 26 years that dealt with ground fighting, ground techniques, weapon retention, positional or and/or compressional asphyxiation.

Q.  Has your testimony ever been excluded regarding positional asphyxia?

A.  Not that I know of.

Q.  Has your testimony ever been limited by motion practice?

A.  The only limitations were for both experts regarding, cannot recite facts that the jury would have heard prior to my testimony.  And that's for both experts.  And could not use terms such as excessive.  On a couple cases, the judge did not -- that was an ultimate trier of fact opinion and did not want the language of excessive.

And the judge also did not want us to provide ultimately trier of fact opinions as relates to the, you know -- was the force reasonable and/or necessary on a couple of opinions -- on a couple of cases.  But that was universal for both the plaintiff and the defense experts.

Q.  How many times have you testified in court regarding positional asphyxiation?


MAGNA
LEGAL SERVICES

Page 169

A.  I can pull up my testimony and take a look if you'd like me to.

Q.  Sure.

A.  Are you talking trial or deposition?

Q.  Why don't we break it down.  So we can pull that up.  Why don't we mark it as Defoe -- I think we're up to 4.

(Exhibit 4 was marked for identification.)

MS. ALTERMAN:  And we'll mark your list of deposition and trial testimony that was produced to us.

THE WITNESS:  Is it the most recent one that you received?  Is that the one you have?

MS. ALTERMAN:  I will show it to you.  I think we got an updated version this morning.  So that's what we'll show to you.

THE WITNESS:  Great.

MR. AMRHEIN:  Yeah, Cheryl, for clarification, Mr. Defoe provided the updated version of his list of trial testimony -- or testimony under oath.  I sent that over by e-mail to Matthew.  It is -- covers the gap between when we produced the Rule 26 information, including Mr. Defoe's CV report, et cetera, up to and through, I believe, the end of August, so just a few days ago.

MS. ALTERMAN:  Okay.  That's the one we'll show



Page 170

you.

THE WITNESS:  Okay, great.

MS. ALTERMAN:  So for the record, we'll mark this Record of Trial Testimony and Depositions as Defoe Exhibit 4.  It's a 55-page document.  The updated version of this record of trial testimony and depositions was provided to our office by e-mail this morning.

And we'll give you an opportunity to review it just to make sure this is what you're looking at and the most updated version.

THE WITNESS:  If you can just go to the last page, it might easier.  It would be -- I can just tell you what the last number would be.  I just printed out the last couple of pages of it.

MS. ALTERMAN:  The last number we have --

THE WITNESS:  That's correct.

MS. ALTERMAN:  -- is 332.

THE WITNESS:  Yeah, that's correct.  That's updated.  That's correct.

MS. ALTERMAN:  Okay.

Q.  So taking a look at the copy you have in front of you -- and we can turn to it once you reference a specific case.

If you could tell me how many times you provided



Page 171

trial testimony with respect to positional asphyxiation.

A. Can you go to -- I don't have it in front of me, the entire document. Can you go to the first page and we can just go page by page.

Q. And if we're going page by page, maybe it would just be easier if we point out just deposition and crime testimony so we don't have to go back through it again.

A. Okay. Go to the second page. Number 11 Number 14. Keep going. Keep going. Keep going. I believe Number 30. Keep going. Number 41. Keep going. Number 46. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. Number 89. Keep going keep going. Keep going. Keep going. Keep going. Keep going. Actually, go back. I believe 116. I believe 121. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. 167, 172. Keep going. Keep going. Keep going. 185. Keep going. Keep going. Keep going. 204. Keep going. Keep going. Keep going. Keep going. 226. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. That's it.

Q. Okay. So by my count, that's 13 cases that


MAGNA
LEGAL SERVICES

Page 172

you've identified where you have provided deposition

testimony or trial testimony regarding positional

asphyxiation.

A.   Correct.  Positional, compressional, and neck

restraint.

Q.   Okay.  Understood.  So it could vary, depending

on the case.  But some sort of asphyxiation or some --

correct?

A.   Correct.

Q.   Of those 13 cases, were you retained by the

Plaintiffs' attorney in all of those 13 cases?

A.   Plaintiff, yes.

Q.   And of those cases, of the 13 you've identified

that have gone to trial and you testified in court, was

your testimony limited by motion practice with respect

to this issue of asphyxiation?

A.   No.

Q.   Okay.  We're going to go back to your report

now.  And we'll take a look at opinion Number 5.

Your fifth opinion, which starts on Page 16 of

your report, also seems to come to the same conclusion

as the previous opinion, that you believe that pressure

put on Mr. Lagoda's back was unreasonable; is that fair

to say?

A.   That, and then the failure to monitor until the



Page 173

point he was observed to be blue.  And then only at that time was he turned over and the handcuffs taken off.  So time -- pressure on back, pressure on body, pressure on legs up to the point that he became nonresponsive during that time.

Q.  Was it your understanding that the very moment Officer Papia noticed that Mr. Lagoda's -- the side of his face was turning blue, that he was unhandcuffed, turned over, and CPR and first-aid was initiated?

MR. AMRHEIN:  Objection.

THE WITNESS:  My understanding is, after observing that, that's what happened.

MS. ALTERMAN:  Correct.

Q.  Well, would it also be your understanding that there would be no reason to start CPR unless you observed the individual turning blue or that there was some restriction to the airway that the officers were made aware of?

A.  We shouldn't --

MR. AMRHEIN:  Objection.

THE WITNESS:  -- start CPR unless the person's not breathing.  But yes, my criticism is that the opportunity preceding him turning blue is the opportunity once he's handcuffed to immediately take the weight off back, put him in a seated, standing, or



MAGNA
LEGAL SERVICES

Page 174

recumbent position. And it was everyone -- every officer at scene that are outlined in my report had a duty to intervene and intercede to ensure that he was breathing and in a position where he could properly recover.

MS. ALTERMAN: Q. Was it reasonable for the officers to start CPR at the moment they noticed that the side of his face was turning blue?

A. It could be a clue that there's no oxygen. But you, you know, still want to check for a pulse at that point. If there was no pulse, then if there wasn't, then to initiate the CPR, including the initiation or utilization of an AED.

Q. Was that done in this case?

A. It was.

Q. And was there also testimony that the officers checked for a pulse and because they didn't feel a pulse and saw that Mr. Lagoda was turning blue on the side of his face, that they called for an AED machine?

MR. AMRHEIN: Objection.

THE WITNESS: Correct.

MS. ALTERMAN: In opinion Number 5, you also discuss the revised general order for use of force that stated June 7, 2021. And we've already gone over that. That that was not in effect on April 12th, 2019, the



Page 175

date of this incident.

Q.   That's your understanding, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Correct.

MS. ALTERMAN:  Q.   Was it your understanding that the Port Authority did, in fact, have a failure to intervene or an intervene policy if a use of force was observed to be unreasonable or if there was any illegal or inappropriate action done by an officer at the time?

MR. AMRHEIN:  Objection.

THE WITNESS:  I believe that it doesn't spell out, like it does in the revised policy.  But what it does state is that the officer should make every reasonable effort to avoid compressing and restricting the suspect's airway.  And I think part of that, even though not spelled out, would be that if you are and you see that, then you should intervene and intercede and ensure that that is not being done.

MS. ALTERMAN:  Q.   Were the officers questioned at their depositions about whether or not they observed any illegal or inappropriate uses of force during this incident?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't know if it would be illegal or improper.  More that they just stated in



Page 176

their deposition that they did not intervene during this incident, is what they stated, for Mr. Lagoda's safety or concerns for his health and safety.

MS. ALTERMAN: Q. Was the testimony that the officers didn't intervene or they didn't feel there was a need to intervene under the circumstances?

MR. AMRHEIN: Objection.

THE WITNESS: That they didn't intervene. I don't -- it doesn't say need to intervene.

MS. ALTERMAN: Q. Did police officer Mezzacappa, and that's M-e-z-z-a-c-a-p-p-a, observe any concerns for Mr. Lagoda's health and safety requiring him to intervene?

MR. AMRHEIN: Objection.

THE WITNESS: He stated he did not intervene for the concern for Mr. Lagoda's health and safety. I don't know if he -- if it was asked did he feel he needed to other than he just stated that he did not.

MS. ALTERMAN: Q. Did Officer Robert Joseph feel that he was required to intervene for the concern of Mr. Lagoda's health and safety?

A. No.

Q. Okay. Did Officer Papia, and that's P-a-p-i-a, testify that he needed to intervene for Mr. Lagoda's health and safety?


MAGNA
LEGAL SERVICES

Page 177

MR. AMRHEIN:  Objection.

THE WITNESS:  No, other than that he just did not intervene.

MS. ALTERMAN:  Q.  As a trained police officer, part of your training is knowing when to intervene.

Would you agree with that statement?

MR. AMRHEIN:  Objection.

THE WITNESS:  Or should know when to intervene, based on a person's position, a person's, you know, breathing, things such as that.

MS. ALTERMAN:  Q.  Are you aware that that specific training was gone over in the Port Authority Police Academy as well as during In-Service training for all of the officers involved in this incident?

A.  I don't recall.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Going on to opinion Number 6, which starts on Page 18 of your report.  In the second paragraph of the sixth opinion, you state that -- or I should say you comment on Mr. Lagoda's breathing at the time of this incident.

Q.  Do you see that?

A.  Yes.

Q.  Were there any videos or audio tapes that you had the opportunity listen to which would corroborate



Page 178

your statements in opinion Number 6 as to what

Mr. Lagoda's breathing was like at the time of this

incident?

MR. AMRHEIN:  Objection.

THE WITNESS:  No.

MS. ALTERMAN:  Q.  And we've already gone over

that you're not a trained medical professional and you

don't have any specific advanced training with respect

to agonal respirations or agonal breathing, correct?

A.  Well, I --

MR. AMRHEIN:  Objection.

THE WITNESS:  -- I've attended and been

certified in the excited delirium instructors course I

took in Henderson, Nevada, that was put on by the -- the

Prevention for In-Custody -- Institute for the

Protection for In-Custody Deaths.  I took the

certification course for excited delirium.

In addition to that, you know, as a parent, we

listen for breathing, to baby monitors and whatnot when

we have children.  Don't know if any of these officers

had children.  But we're listening for distressed

breathing.  If your child has the flu or has a breathing

issue and you're monitoring that from the other room.

And none of us are trained respiratory therapists.

We're just listening for abnormal breathing.



Page 179

And so you respond to that, is what the training is.  Not to be a respiratory therapist, but just to listen for variations:  Gurgling, snorting, distressed breathing, you know, the -- from an individual, and then act accordingly.

MS. ALTERMAN:  Q.  When did you receive that or when did you take that training on excited delirium?

A.  Well, I took the course -- I believe it was 2022 -- '21 or '22.  It's on my CV.

Q.  So that course that you took on excited delirium was after you retired from the LAPD, correct?

A.  Yes.

Q.  There were no courses that you took on excited delirium as a law enforcement officer; is that fair to say?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.  It wasn't really a topical term at the time I retired.

MS. ALTERMAN:  Q.  Now, are you aware that there are -- the American Medical Association has opposed the term of excited delirium as a medical diagnosis?

A.  Yes.

MR. AMRHEIN:  Objection.

MS. ALTERMAN:  Q.  Are you also aware that



MAGNA
LEGAL SERVICES

Page 180

there are -- it's the position of medical professionals that the term excited delirium should be denounced as sole justification for law enforcement?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes, it's -- and I'm not purporting that there's excited delirium in this case, nor diagnosing, nor are officers meant to diagnose. This is a medical emergency.  There wasn't anything related to a stimulant or anything else in this matter.

So yes, I believe it has been rebuked for -- police departments have attempted to use the term excited delirium to justify force or excessive force with terms such as superhuman strength and other things, that they find a correlation between someone who is experiencing excited delirium and the manner in which they act as a result of.

MS. ALTERMAN:  Q.   Are you claiming that Mr. Lagoda was experiencing excited delirium at the time of this incident?

MR. AMRHEIN:  Objection.

THE WITNESS:  No, ma'am.  I specifically stated he was experiencing a medical emergency.

MS. ALTERMAN:  Q.   So why did you just reference excited delirium if that's irrelevant to this opinion?



Page 181

MR. AMRHEIN:  Objection.

THE WITNESS:  It was -- it was referenced in the -- in the New York -- the special investigations report and referenced in my report as well.  I think on Page 1 of my report, I think I -- I may not have referenced -- yes, I did.  I referenced it on Page 1 of -- actually, Page 5 of my report, pardon me.  The term excited delirium is referenced in the executive summary.

MS. ALTERMAN:  Q.  But based upon your review of this case, you don't believe that Mr. Lagoda was experiencing excited delirium, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  Based on -- based on my review of the facts and based on my training, correct.

MS. ALTERMAN:  Q.  Now, going back to your sixth opinion on Page 18, you state in the second paragraph that it's your opinion, based on your training and experience, that agonal respirations, or what is commonly referred to as agonal breathing, looks or sounds like snoring, heavy breathing, labored or exacerbated breathing, gurgling, guttural sounds, groaning, snorting, and/or gasping.

Do you see that?

A.  Yes.



Page 182

Q. Did you receive this information from the excited delirium course that you took?

MR. AMRHEIN: Objection.

THE WITNESS: Possibly. It may have been some of the language from that course, yes.

MS. ALTERMAN: Q. So if it's possibly from that, what else could it be from, if not that?

MR. AMRHEIN: Objection.

THE WITNESS: Many police departments have policies that relates to positional or compressional asphyxiation, that discuss about policy, procedure, and training to listen for agonal respirations or agonal breathing. Many of the cases I've had, you can hear it on body-worn camera. And even the officers recognize on the body-worn camera the agonal breathing, based on the training. Do not provide any medical diagnosis, just more from the training they received in agonal breathing and in real life, if the person is in some type of medical distress, specifically respiratory distress, and then take appropriate action.

MS. ALTERMAN: Q. Regardless of the source of this information on agonal breathing, do you agree that Officer Papia initiated CPR and called for an AED machine as soon as he saw that Mr. Lagoda was turning blue and they could not feel a pulse?



Page 183

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.  Yes, but agonal breathing, occurred prior to someone going unconscious.  It's the breathing from the incident leading up to the point of someone being unconscious.  It's labored breathing.  It's gurgling, it's things that you'll hear.  It's -- basically, the body's dying at that point and that's what you're hearing from the agonal respirations.

And that's where I'm critical from the time in which he was restrained until the time in which he turned blue, that would be the opportunity to listen, monitor, especially from a seated, standing, recumbent position, to monitor and ensure the breathing is not labored, restricted, or agonal, so to speak.

And then if so, take appropriate action.

MS. ALTERMAN:  Q.  Is it your opinion that the officers should have or are required to recognize this agonal breathing while he was -- while they were attempting to restrain Mr. Lagoda?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yes.  I believe it's a prudent -- I think -- I believe it's prudent training, especially if you're going to be taking people to the ground to arrest them or place them in handcuffs, I think it's important to monitor.  That's where there's typically an


MAGNA
LEGAL SERVICES

Page 184

officer assigned to monitor the subject.  Might be the contact officer initiating dialog, monitoring breathing. Monitoring the type of breathing to make sure it's not labored, agonal, grunting, snorting, which would advise a reasonable officer that you have -- may have some respiratory issues with the subject.

Q.  Where was that required within the Port Authority's rules and regulations?

A.  It does not say required under the regulations. Just prior to this incident, just more so that -- more so to avoid compressing and restricting the suspect's airway.

And if you did compress, like I believe happened in this case, and/or restricted the suspect's airway, you're going to hear -- the agonal breathing is the artifact of doing that.  So that where the nexus between compressional asphyxiation, positional asphyxiation, and agonal breathing is so important in the training.

So not only are you putting that person in a seated, standing, and a recumbent position or you're also monitoring breathing as a result that an incident -- some incidents are prolonged.

And with that, you can hear some of these distorted respirations, which would put the officers on notice, ensure that EMS was responding if they weren't



Page 185

already requested.

Q.   Was there any Port Authority general order or police division instruction that required the officers to observe agonal breathing at the same time when they were trying to handcuff him?

MR. AMRHEIN:  Objection.

THE WITNESS:  Not that I know of, ma'am.

MS. ALTERMAN:  Q.   Are you familiar with the expert report prepared by Dr. Kris, and it's K-r-i-s, Sperry, S-p-e-r-r-y, on behalf of the plaintiffs?

A.   Well, I've not seen the report.  I know who Dr. Sperry is, but I've not seen the report in this case.

Q.   Were you aware that Dr. Sperry was retained by the same attorneys who retained you to testify on behalf of the plaintiffs in this case?

A.   I don't know if Plaintiffs' Counsel mentioned that or not.  He may have.

Q.   Did you recommend Dr. Sperry to Plaintiffs' attorney?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't recall.

MR. AMRHEIN:  And Scott, Scott, I'm going to instruct you to -- any conversations that we have had about trial preparation or case strategy, to just make



Page 186

sure that that -- you know, that that would be

privileged information.

THE WITNESS:  Yes, sir.

You know, I -- I don't recall.

MS. ALTERMAN:  Q.  How many times have you been

working on a case where Dr. Sperry was also retained on

the same side that you're working on?

A.  I think a few cases.  I don't know Dr. Sperry;

I've never spoken to him, don't know who he is.  But I

think he's been on a couple matters that I've been --

positional asphyxiation matters I've been involved in.

Q.  Do you know where Dr. Sperry practiced?

A.  I have no idea.

Q.  Do you know if he ever held a position of a

medical examiner?

A.  I don't know.

Q.  Did you ever have any discussions with

Dr. Sperry about agonal breathing?

A.  I've never spoken to Dr. Sperry or seen him in

my entire life.

Q.  Now, in this same opinion, opinion Number 6, you

state here that -- let me find my spot -- on Page 19

that it's your opinion,

"Based on the facts and testimony, that

the defendants failed" -- and you underline



Page 187

failed -- "to properly assign a police

officer(s) to immediately escort emergency

medical services so they could provide

life-saving medical services to Mr. Lagoda."

Do you see that paragraph?

A.  Yes.

Q.  Are you aware that Officer Duran was assigned to escort the original ambulance that was called to respond to the JetBlue flight?

MR. AMRHEIN:  Objection.

THE WITNESS:  I believe so, yes.

MS. ALTERMAN:  We can move on to opinion Number 7, which starts on Page 20 of your report.  This opinion deals with the standard policies -- standard police practice, and in your opinion, that the Port Authority violated -- or the Port Authority police officers violated their training or training that they should have received.

Q.  Do you see that?

A.  Yes.

Q.  Are you aware that the New York State Attorney General's Office was tasked with providing recommendations after investigating this incident?

A.  Yes.

Q.  As part of those recommendations that were made



Page 188

by the New York State Attorney General's Office, did you see that the Attorney General's office found that the training provided to the police officers as of April 12th, 2019, was appropriate?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't know if I read the word appropriate.  Other than the recommendations as to the type of training, which will be, obviously, provide additional training to the officers.  And the assurance that it would be incorporated into the ongoing training throughout an officer's career.

MS. ALTERMAN:  So why don't we take a look, go back to the Attorney General's report.  Just going to take a moment and find the page for you.  Why don't we go to Page 12 of the report.  Okay.  In the paragraph that starts with, "The PAPD currently provides training to all recruits."

Q.  Do you see that paragraph?

A.  Yes.

Q.  I'd like to read to you this sentence that starts with,

        "More broadly.  PAPD's current use of
        force policy appropriately instructs
        officers using force to conduct a careful
        balancing of all human interests and use



only that force that is reasonably necessary
to bring an incident under control while
protecting the lives of the officer or
another."

Do you see that?

A.  Yes.

Q.  Were you aware that the officers in this case
were part of a union?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't know if they were all part
of a union or not.

MS. ALTERMAN:  Q.  Do you know whether or not
changes to policy and things like body-worn cameras can
be changed without getting the consent from the
collective bargaining unit?

MR. AMRHEIN:  Objection.

THE WITNESS:  Yeah, I don't know if -- what
involvement the collective bargaining unit would have as
relates to policy revisions on the use of force and/or
the implementation of body-worn camera.

MS. ALTERMAN:  Q.  Were you part of a union
when you were an LAPD officer?

A.  Yes.

Q.  And if the LAPD wanted to change certain
policies, was it your understanding that if they did so



Page 190

without the consent of the union, that the union could grieve those policies?

MR. AMRHEIN:  Objection.

THE WITNESS:  Typically no, unless it dealt with pay, deployment, shifts, something where the work environment impact -- the changes would impact the work environment for the officers -- respective officers, but not as it relates to the performance of their duties once they're at work.

I don't believe the police union would have any interference or have any argument or -- as to the policies that are put in place as long as it doesn't impact, you know, time an officer needs to be at work and the collective bargaining around payroll and overtime and things such as that.

Q.  Do you know what authority, if any, the Port Authority Police Benevolent Association has with the Port Authority Police Department and the Port Authority of New York and New Jersey?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't, ma'am.

MS. ALTERMAN:  Q.   You referred to Lieutenant Lawanda Irving's role in this investigation in your seventh opinion in the fist bullet point on Page 21.  So we can go back to the report.



Page 191

Do you see that section of the report?

A.  Yes.

Q.  Was it your understanding that the New York State Attorney General's Office was investigating this incident for the Port Authority Office of Inspector General or both?  What was your understanding?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't know if there was -- my -- my understanding was, it was definitely a New York -- obviously the special investigations and prosecutions unit, which is under the tutelage of the Attorney General's Office, is my understanding who would investigate.  I don't know if there was a separate investigation that ran parallel with this one or not.

MS. ALTERMAN:  Q.  Did you review Lieutenant Irving's deposition testimony?

A.  Yes.

Q.  Did you review the part of her testimony that said that the New York State Attorney General's Office was the only investigative body into this incident once they took over the case?

MR. AMRHEIN:  Objection.

THE WITNESS:  I don't recall.

MS. ALTERMAN:  Q.  Was there any finding by the New York State Attorney General's Office that any of the


MAGNA
LEGAL SERVICES

Page 192

Port Authority police officers failed to comply with their training?

MR. AMRHEIN:  Objection.

THE WITNESS:  The -- the -- I don't know specifically other than the training recommendations that were in place at the time.  And the training recommendations that should be implemented regarding vehicle escorts, additional training to PAPD officers, and the outfitting with body-worn cameras.

MS. ALTERMAN:  My question was not pertaining to recommendations.

Q.  My question was whether or not there was any finding in the New York State Attorney General's report that any of the Port Authority police officers involved in this case failed to comply with their training.

MR. AMRHEIN:  Objection.

THE WITNESS:  I did not see that, if it exists.

MS. ALTERMAN:  Q.  Going on to opinion Number 8, the last opinion in your report, which starts on Page 21.  You start off by stating it's your opinion that there was gross lack of situational awareness and fundamental tactical errors in this incident.

Do you see that?

A.  Yes.

Q.  What was the gross lack of situational awareness



Page 193

that you're referring to?

A. Really, conceptually understanding that you have a medical emergency. There wasn't a crime that was committed intentionally in that he had a medical emergency and then respond accordingly, like we would all want them to do if that was our family member on that plane that was having a seizure. Just respond accordingly and understand that people may -- were not, once again, within their own control may act out, may be in the throes of a seizure, may be coming out of a seizure or may have language issues, maybe afraid.

All these things are considerations. And realize there was no intent for someone, in this case Mr. Lagoda, to be intentionally trying to harm anyone other than the fact that he was in the middle of a seizure, based on all accounts from the initial call for service and to the information provided by the percipient witnesses and staff.

And I believe there was a complete disconnect, especially of the incident initiating with -- with Officer Burgiada -- Bugiada, pardon me, and then what transpired after the fact.

So I believe there was a gross lack of situational awareness as relates to the type of call for service that they were responding to.



MAGNA

LEGAL SERVICES

Page 194

Q.   I'm just going to move to strike the reference to anyone's family members.

MR. AMRHEIN:   And we're going object to that motion to strike.

MS. ALTERMAN:   Q.   What were the fundamental tactical errors that you believe occurred in this incident?

A.   Just, it's all outlined on the -- where I capture this on the testimony beginning on Page 22 to 29.   The tactical errors, basically, is the fact that, you know, knowing that, you know, even without the language barrier, of that being Russian, is that people in the middle of a seizure are obviously not in a position at that point, I believe, to understand or comply to calm down and things that you would normally expect of someone who is not in that type of situation.

So I think, that being said, that it was important for the officers to recognize that you have a medical emergency.   And that's what you have.   And then understand that it may take some restraint.   Understand that the individual's actions may not be consistent with how you would want them to act if the person wasn't experiencing a medical crisis.

And then you should respond accordingly and have the discipline and the understanding that the person may



Page 195

swing at you.  They may act a certain way.  They may be combative.  And understand that you don't restrain people that are in the middle of a medical episode, such as a seizure.  And if you are, you need to do so safely and do so without being punitive by striking them and punching them to get compliance when they really don't know what's going on, based on my review of the facts in this case.

Q.  The review of the facts in this case and your opinions that you rendered are based on assumptions that we've gone over; is that correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  It's not just based on assumptions.  It's based on the basis for my opinion literally articulated in the document, or better said in my report, with -- from deposition testimony.  And as well as from what the Attorney General's Office found as a result of their investigation.  And for what a reasonable officer would do, based on the totality of the circumstances.

Not based on simply, you know, a -- a -- I'm not opining that, you know, in a perfect world opining based on what they testified to in their definitions, which is documented in my 29-page report, of where the failures occurred in this case and where I believe there was



Page 196

excessive and unreasonable force, there was a failure to intervene, there was a duty to intervene, there was a failure to monitor this individual who is in a medical crisis at the time.

MS. ALTERMAN:  Q.  The New York Attorney General's report does not state that the officers used an unreasonable or excessive amount of force, correct?

MR. AMRHEIN:  Objection.

THE WITNESS:  What it states, ma'am, which is documented in my report, it states in the executive summary when they wrote it in there, is that the medical examiner did, however, take note that significant blunt force injuries to Mr. Lagoda's face and body, at least some which were attributable to the officers, and concluded that the interactions with the officers likely contributed to Mr. Lagoda's death.

For this reason, they deem the manner of death to be homicide.  And they wrote that in their report. And they italicized it.  And I think that is important, important information.  Because that's what they surmised in conducting interviews and interviewing the involved officers and witnesses and the result of their investigation and the information and input that they received from the medical examiner that the officers' actions resulted in or contributed to Mr. Lagoda's



death.

MS. ALTERMAN:  Q.  Was there any statement or conclusion in the Attorney General's report finding that the officers used an unreasonable amount of force?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, other than what came from the -- they even wrote the -- in -- in addition, on Page 6 of 29, in the report, that PAPD should revise its practice to make sure such a miscue does not occur in the future.

And because the force used by PAPD officers likely contributed to Mr. Lagoda's death, they recommended providing training to officers about unique vulnerability of individuals in the immediate wake of a seizure.  Such officers may incorporate that information in their decisions, which goes to situational awareness and totality of the circumstances, as to the amount of force used against such individuals.

Q.  So I'm going to go back to my original question.

Was there any conclusion in the New York State Attorney General's report that found that any of the police officers used an unreasonable amount of force in this incident?

MR. AMRHEIN:  Objection.

THE WITNESS:  Well, if the force contributed --


MAGNA
LEGAL SERVICES

Page 198

or likely contributed to Mr. Lagoda's death, they're stating that because of that, they're recommending training. So without saying the force was unreasonable, they're saying that the force used contributed to his death. And they're recommending training to understand how an officer should respond to someone in a medical emergency.

And that this particular response did not comport with proper police response is what I gleaned from reading the report, which is outlined in my report beginning at Page 5 through 6.

MS. ALTERMAN: Q. So there's no statement that says, or conclusion, in the New York State Attorney General's report that says any of the force used by the officers involved in this incident was unreasonable, correct? You don't find that language anywhere in the report?

MR. AMRHEIN: Objection.

THE WITNESS: I didn't see that language if it exists.

MS. ALTERMAN: Q. In your eighth opinion, you also state that the Port Authority Police Department failed to issue body-worn cameras to police officers and require them to utilize them in the course and scope of their employment as police officers prior to April 12th,



Page 199

2019.

Was there any requirement for the Port Authority to issue body-worn cameras to its police officers prior to April 12th, 2019?

MR. AMRHEIN:  Objection.

THE WITNESS:  Not that I know of.

MS. ALTERMAN:  Q.   Have you reviewed reports from Attorney General's Office prior to this case?

A.  In other cases or this case?

Q.  In other cases.

A.  Yes.  I've been retained by the Attorney General's Office on approximately 43 or 44 cases in California.

I've also assisted writing a report that went to the Attorney General's Office as my work as a Ram -- a sergeant assigned to the Rampart Division Corruption Task Force, where I got -- evaluated, reviewed hundreds of use of force investigations, personnel complaints that were generated in Rampart Division after the Rampart fallout that occurred as a result of officers being involved in unreasonable shootings, bank robberies, and murders in the Rampart Division.

MS. ALTERMAN:  Q.   In the cases where Attorney General's Office had prepared reports about police matters, is there always a section in those reports



Page 200

pertaining to their recommendations after investigating a particular incident?

MR. AMRHEIN:  Objection.

THE WITNESS:  That's been my experience, that typically the reports will discuss, you know, actions taken, recommendations proposed, the training potentially which may be incorporated within the recommendations, yes.

MS. ALTERMAN:  Q.  Now, at the beginning of the deposition, I asked you about your employment.  And you testified that you work as an expert consultant for your company, On-Scene Consulting.  And you also own a gym.

Do you recall that testimony?

A.  Yes.

Q.  Do you have any other income from appearing in movies or TV shows?

MR. AMRHEIN:  Objection.

THE WITNESS:  I get residual income.  Nothing nominal, but -- actually, it is nominal.  But residual income here and there that comes in from prior television and film work I've done in the past.

MS. ALTERMAN:  Q.  How many TV shows or films have you appeared in?

MR. AMRHEIN:  Objection.

THE WITNESS:  TV shows, maybe 30.  Commercials,



Page 201

maybe 20.  National commercials are 15 to 20 national commercials.  And a couple movies.  Nothing too -- nothing too significant.

MS. ALTERMAN:  Q.  What was the most recent movie you appeared in?

A.  I think the only movie that you would have seen would maybe be Bruce Almighty.  I had a small five-line cameo role in that movie.

Q.  And in the -- the TV shows or movies that you appeared in, do you play the roles of a police officer?

MR. AMRHEIN:  Objection.

THE WITNESS:  Typically I don't go too far outside my range.  Police officer, bad guy.  I've done a lot of those Punk'd episodes where I play the cop in those particular deals.

Commercials are different.  Home Depot, Titleist, things such as that, car commercials, soap operas, bad guy, cop.  That kind of stuff.  Not too far-out reach and not playing a whole lot outside of what my comfort zone is, I guess.

MS. ALTERMAN:  Okay.  I just want to take a five-minute break.  I'm almost done.  So I just want to review my notes.

(Off the record from 1:13 to 1:19.)

MS. ALTERMAN:  Mr. Defoe, I don't have any



Page 202

further questions at this time.  Thank you for your time today.

THE WITNESS:  Thank you, ma'am.  Appreciate it.

MR. AMRHEIN:  Cheryl, I have just a few questions.  Do you mind if -- I just need to gather just a couple of things.  And I apologize for the back-to-back break, but can I just have about three minutes, just to make sure I have everything gathered?  I don't think it's going to be very long at all.

MS. ALTERMAN:  Okay.

(Off the record from 1:23 to 1:23.)

EXAMINATION

BY MR. AMRHEIN:  Great.

Q.  Thank you again, Mr. Defoe, for appearing here today.  I know it's getting a little bit later in the day, so I want to be as fair to you with your time as possible, as well as our great court reporter here today.  So I just have a few questions for you.

Mr. Defoe, you were asked a number of questions about your time as an officer with the LAPD during which time you held a number of different ranks and roles.

Do you recall that?

A.  Yes.

Q.  Do you recall being asked about the instances where you personally used nondeadly force?



Page 203

A.   Yes.

Q.   Do you recall being asked about the instances where you personally used deadly force?

A.   Yes.

Q.   Do you recall the instances where you were asked about, when you were in a supervisory role, officers under you used nondeadly force?

A.   Correct.

Q.   And similarly, when you were in your supervisory role, do you recall being asked questions about -- again, in your supervisory role, where officers under you were -- had used deadly force?

A.   Yes.

Q.   To be -- do you recall being asked about team takedowns?

A.   Yes.

Q.   And that's both in your personal capacity as an officer with the LAPD as well as in a supervisory role?

A.   Yes.

Q.   And in both of those capacities I'm going to ask the next couple of questions.

        Do you recall being asked about the use of OC spray?

A.   Yes.

Q.   And the use of batons?



Page 204

A.    Yes.

Q.    And you had been asked about punching and using fists?

A.    Yes.

Q.    Do you recall being asked about -- or asked whether those instances were considered to be reasonable use of either lethal force or nonlethal force or use of deadly force or nondeadly force?

A.    Yes.

Q.    Am I correct that your responses to those questions here today were specifically tailored to you, your unit, and California law and policy?

A.    Correct.  Units, to be plural.

Q.    Mr. Defoe, you were asked a number of questions about the National Safety Council.

       Do you recall that?

A.    Yes.

Q.    And as a part of your prepare -- as a part of preparing the Rule 26 report, which I believe is Exhibit 2 in this matter, and was produced to Defendants back in April of this year, do you recall citing some of the material from the National Safety Council in your Rule 26 report?

A.    Yes.

Q.    Do you recall being asked a few questions by



Page 205

Counsel for Defendants regarding your use of National Safety Council materials in your report?

A.  Yes.

Q.  Do you recall a suggestion that it was for OSHA purposes and only for in-office issues, or for a layperson, nonofficers, to use as reference materials?

MS. ALTERMAN:  Objection.

THE WITNESS:  Yes.  Counsel brought up OSHA to me today, yes.

MR. AMRHEIN:  So I'm just going to introduce what I think is Exhibit 5, if my count is correct.

(Exhibit 5 was marked for identification.)

MR. AMRHEIN:  So just give me a sec.  I'll put it on the screen.  Now, can everybody see -- I'm going to scroll up.

Can you see this?

A.  Yes.

Q.  Okay.  It says in the matter of Tarasov, Esq. v. Port Authority of New York and New Jersey.  That's this matter.

Am I correct that it says Lieutenant Mark Bergery February 13th, 2024, 30(b)(6)?

A.  Yes.

Q.  Okay.  I'm just going to scroll through.  It's just an excerpt.  But just for identification purposes,


MAGNA
LEGAL SERVICES

Page 206

I just have the cover page provided to us by Esquire

Deposition Solutions as well as the case caption, Remote

Videoconference Deposition of Lieutenant Mark Bergery

30(b)(6) witness on behalf of Port Authority.  And then

the appearances here.

          Do you recognize this document?  And I know it's

just the cover, but do you recognize this, Mr. Defoe?

     A.   Yes.  I read that deposition.

     Q.   Okay.  I'm going just read from Pages 56 through

58, just a part of this excerpt, starting on line 6.

          "QUESTION:  As a part of your training, when

          you were at the academy, when you were a

          recruit or as an officer taking the ISTs,

          did any of your training involve materials

          from the National Safety Council?

          "ANSWER:  National Safety Council, yes, sir.

          "QUESTION:  Could you tell me what that is.

          "ANSWER:  The National Safety Council is the

          curriculum that was in place for the

          emergency response.  So this training is

          given to physical trainers, any civilians,

          some teachers, paramedics, EMTs,

          firefighters, and police officers."

          Now I'll scroll down.  On Page 57, line 9.

          "QUESTION:  And could you [just] tell me



Page 207

about the description?  Is that something that's given out yearly?  Is it something that's covered or given out at ISTs?  Can you describe those materials -- or how those materials are distributed.

"ANSWER:  Yes, sir.  So there is levels to basically emergency response training.  So blood one pathogens is yearly.  CPR is every two years.  And then there is other things that are incorporated, which would be review of the medical bag and whatnot.  So it could be yearly.  It could be multiple times a year. That information is disseminated through In-Service training, so the documentation is distributed at the police academy, whenever that In-Service training comes up.

"QUESTION:" -- and this is on Page 58, line 3. "Okay.  So do you recall if it was, like, a Microsoft Word document or a set of PowerPoint slides?  Do you recall what those materials were like, sir?

"ANSWER:  From the National Safety Council?

"QUESTION:  Yes, sir.

"ANSWER:  It was a very thick binder.

"QUESTION.  So it was a lot?



Page 208

ANSWER:  Yeah.  I specifically remember that. Every medical response person at the police academy at that time enjoyed printing out the entire very thick binder and give it to us."

Meaning us, meaning the officers.

"QUESTION:  And as a part of your duties and responsibilities, as a part of an officer's duties and responsibilities with the Port Authority Police Department, were they responsible for understanding the materials within the National Safety Council documents that were distributed on a yearly basis?"

Objection from Ms. Alterman.  "You can answer."

"ANSWER:  Yes, sir."

Mr. Defoe, did I read that correctly?

A.  Yes.

Q.  And you reviewed this deposition in preparation of your Rule 26 report; am I correct?

A.  Yes.

Q.  So am I correct that the materials you cited in your expert report regarding the National Safety Council, based upon the deposition testimony of the defendants' designee, that the Port Authority police officers were responsible for understanding and applying


MAGNA
LEGAL SERVICES

Page 209

the materials learned from the National Safety Council?

MS. ALTERMAN:  Objection.

THE WITNESS:  Yes.

MR. AMRHEIN:  Q.   And this information was included in your expert report, correct?

A.  Correct.

Q.  And this was regarding seizures and how to approach and handle a situation where a person is suffering from a seizure?

A.  Correct.

Q.  As well as how to handle a situation where a person is coming out of a seizure or just had a seizure?

A.  Correct.

Q.  Mr. Defoe, you fielded several questions about how a responsible person would respond to one of -- an officer presented him- or herself.

Based upon your education, training, and professional experience, would you agree with me -- would you agree with me that individuals who are experiencing a medical crisis or were in an already mental state would have a more difficult time understanding verbal cues, directives, and universal gestures versus how a reasonable person would perceive them?

MS. ALTERMAN:  Objection.



Page 210

THE WITNESS:  Yes.

MR. AMRHEIN:  Q.   You also testified that Mr. -- or Officer, excuse me, Bugiada had boarded the aircraft responding to a call for having a male -- for a male having a seizure onboard the aircraft.

Do you recall that?

A.  Yes.

Q.  And that's in your report, correct?

A.  It is.

Q.  Can you tell me what the significance of that fact is.  The significance of an officer who knows he or she is responding to a call for a medical emergency.

A.   That there's no crime that has been committed, typically.  That you're there to help.  You may need to obviously summon EMS, or emergency medical services.  That typically, if the medical emergency -- you don't know the gravity of it, but you should know if someone is having a seizure, that they may be unable to follow commands.  They may be combative.  They may be in the seizure where they could possibly harm themselves inadvertently, could harm someone else.  You maybe trying to restrain them.

And just understanding that you're walking into a potential complex situation and understand that the standard of care needs to be greater if the person



Page 211

obviously is having a medical emergency and they haven't committed a crime. And they just basically need your help.

Q. You were also asked a number of questions about changes in the circumstances as an officer and importance of assessing a situation.

When you were responding to a medical emergency, regardless of whether circumstances change, is that heightened state of care still in place throughout the length and the width of the response?

MS. ALTERMAN: Objection.

THE WITNESS: Yes. Until you get there and get boots on the ground and figure out what you have, what you need, and what the situation is, yes, it should be -- it should be heightened. Because you know that you're being called for a reason. With the caveat that you're there, obviously, to help. Because it's maybe beyond the capabilities of the people that are dealing with the issue.

MR. AMRHEIN: Q. And again, based upon Officer Bugiada's testimony as the 30(b)(6) designee for the Port Authority Police Department as well as the National Safety Council's materials that were produced in evidence. And as Officer Bugiada testified, officers were responsible for knowing the materials in there.



Page 212

Those materials included how officers should treat an individual who is in the wake of a seizure or suffering from a seizure, correct?

A.    Correct.

Q.    Additionally, you were asked about your opinion on the failure of Port Authority Police Department officers to have someone available to escort the emergency medical services.

Do you recall those questions?

A.    Yes.

Q.    Do you recall being asked about a certain officer who was supposedly -- or allegedly designated to be responsible for escorting emergency medical services to the scene to help Mr. Lagoda?

A.    Yes.

Q.    And is it your understanding that that officer who was allegedly designated was nowhere present to escort the emergency medical services?

A.    According to the material I reviewed, yeah, she came onto the plane rather than waiting for EMS.

Q.    And I know we went over extensively the -- the New York State Attorney General's Office investigation and their report.

Do you recall that?

A.    Yes.



Page 213

Q.  And so if I refer to it as the OAG's report, is that fair, in your understanding, that that's what we're discussing?

A.  Yes.

Q.  Okay.  I have -- so I can pull it up.  But it's the same, I believe, number of exhibits -- it's the same as Exhibit -- let's see.  Is it 3, Cheryl?

MS. ALTERMAN:  Yeah, 3.

MR. AMRHEIN:  Okay.  Just give me a second. I'll pull it up for you.

Q.  Just let me know if that's on your screen.

A.  Yes, I can see that.  I have it in front of me as well.

Q.  Okay.  And we had gone over and you had referenced a couple things on this page to begin with. And I just have a couple questions here.  So in particular, this is the OAG's report, specifically Bates Number PA1814.  And this is Page 12 of the report.

Mr. Defoe, you recognize this, right?

A.  Yes.

Q.  In particular, I just want to point you to -- and perhaps you can see my cursor.  It's the one, two, three, fourth line -- or fifth line above -- or fifth line from the bottom of the top program.

Do you generally see that?  It starts --



Page 214

A.   Yes.

Q.   -- with, "As a result."   Just tell me if I'm reading this correctly.

"As a result, emergency medical treatment for Mr. Lagoda was delayed by as much as 20 minutes."

Did I read that correctly?

A.   Yes.

Q.   So in your expert report, Rule 26 report, you spoke about the delay of EMS arriving to the scene to provide medical care to Mr. Lagoda, correct?

A.   Yes.

Q.   And that is an opinion shared by the Office of the Attorney General, correct?

A.   Yes.

Q.   And so your opinion in your Rule 26 report, am I correct that it was based upon the evidence in the report that nobody was available or nobody stayed behind to escort EMS to the scene, as required in order for EMS to provide potentially life-saving care to Mr. Lagoda?

MS. ALTERMAN:   Objection.

THE WITNESS:   Yes.

MR. AMRHEIN:   Staying on this document and on this page in particular, do you see the middle paragraph where -- under Recommendations where it talks about



Page 215

"provide additional training to the Port Authority police officers."

Do you see that?

A. Yes.

Q. And in then particular, it talked about,

"The PAPD currently provides training to all recruits on dealing with individuals who experience seizures."

And that would be included in the National -- National Safety Council's materials, correct?

A. Correct.

Q. So back to this document.

"The PAPD consultant provides all -- provides training to all recruits on dealing with individuals who experience seizures. Such training does not, however, cover the uniquely vulnerable condition of such individuals in the period immediately after the resolution of the seizure."

Did I read that correctly?

A. Yes.

Q. And then the next full sentence,

"We recommend that such information be incorporated into the PAPD training to provide heightened awareness to officers who



Page 216

are using or considering the use of physical force against individual in this state."

Did I read that correctly?

A.  Yes.

Q.  So would you agree with me that this is an admission by the Office of the Attorney General's Office that the Port Authority Police Department officers were not adequately trained to handle a situation like the one with Mr. Lagoda, where he was an individual in a uniquely vulnerable condition in the wake of a seizure?

MS. ALTERMAN:  Objection.  Calls for a legal conclusion.

THE WITNESS:  Yes.

MR. AMRHEIN:  I'm going to ask it again, just because we agreed to the usual stipulations on the record where objections to the form of the question.  So you can simply state objection, should you so choose.

I'm going to ask it one more time.

Q.  Would you agree that this is an admission -- or excuse me.

Do you view this as an admission by the Office of the Attorney General's Office that the Port Authority Police Department officers were not adequately trained to handle a situation like the one with Mr. Lagoda, where he was an individual in a uniquely vulnerable



MAGNA
LEGAL SERVICES

Page 217

position in the wake of a seizure?

MS. ALTERMAN:  Objection.

THE WITNESS:  Yes.

MR. AMRHEIN:  Q.   And am I correct that you had previously testified regarding how Officer Bugiada had specifically responded to a call for a male having a seizure on board?

A.  Yes.

Q.  And you had discussed the importance of that fact and evidence on the record, because it heightened the standard by which an officer or officers must proceed when encountering an individual who is in that uniquely vulnerable condition, whether seizing or in the immediate wake of a seizure?

A.  Yes.

Q.  And the bases for your opinion in your report are your education, training, and professional experience as well as your evaluation of the evidence and the record, correct?

A.  Correct.

Q.  I know you ran into a number of questions on this already.  So I'll just try and fly through this.

Mr. Defoe, you know, as you know, you've been retained as Plaintiffs' expert in this matter.  You've been retained as an expert in plaintiffs matters -- on a


MAGNA
LEGAL SERVICES

Page 218

number of plaintiffs matters, correct, before this?

A.   Correct.

Q.   As well as, I'm sure, after you've been retained on this matter, correct?

A.   Correct.

Q.   But your testimony as an expert is not limited to plaintiffs' work, isn't that correct?

A.   Correct.

Q.   You also have a number of instances where you have served as an expert for the defense, correct?

A.   Correct.

Q.   You said around 40 to 50 cases that you've worked as the defense expert, correct?

A.   Correct.

Q.   I just want to go into a little bit more detail about your screening process that you had mentioned with regard to whether or not you would accept being -- you know, going on -- engaging with, you know, a client or a law office or an entity for your expert services.

What is -- you know, how do you go about screening cases?

A.   I have initial call.  I don't, obviously, charge my time.  If there's a complaint and/or body-worn camera or surveillance video, I ask to see that first.  If there's not, then I'll go with the facts that don't



Page 219

have, obviously, any video attached to it.

I'll speak to the attorney, get their version of the events. I'll conduct a -- a review -- an initial review of the material to see if my opinions of the case aligns with the attorney, though I would be part of the legal team. But I just want to let them know if I've got any conflicts, may be the case if I know a particular officer. Or if I've testified in a similar case, then my testimony could be problematic if the facts are similar.

I then receive material. If during the course the course of the material I find that some of the material that was provided to me changes my opinion, I will let the attorney know. And I've refunded retainers on a number of occasions to attorneys in which I've worked with.

If an officer gets hurt, if there's a gun involved, I typically don't take that type of case. I don't take a case where I believe the officer's actions are reasonable. That would be, obviously, for any matter for the -- against the police. That would be for the plaintiff.

And I won't take a defense case if looking at, you know, the video information, I believe the officer's actions were unreasonable based on the totality of the


MAGNA
LEGAL SERVICES

Page 220

circumstances.

Q. And speaking of video evidence that you just referenced, I believe it was specific to your opinion Number 6 in your Rule 26 report, whether you would listen to any audio or viewed any video of Mr. Lagoda's breathing at the time he was restrained and ultimately killed.

The defendant officers, were their bearing body cams?

MS. ALTERMAN: Objection.

THE WITNESS: No.

MR. AMRHEIN: Q. Do you know if the defendant officers in this matter were wearing body cams?

A. They were not.

Q. So did you have the opportunity to view any footage or audio from the restraining of Mr. Lagoda as a result?

A. No.

Q. And is that because they weren't bearing body cams?

A. Correct. And there wasn't any CCTV or any type of video I was provided in this matter.

Q. Nothing -- no video from the plane -- from the officers' perspective, correct?

A. Correct.



Page 221

Q.   So your opinion Number 6 in your Rule 56 (verbatim) report, that was based upon your review of the evidence that is on the record as well as it's based upon your education, training, and professional experience, correct?

A.   Correct.

Q.   And do you recall the OAG's report?  It was just up a little bit ago, Exhibit 3 in this matter.

Do you recall that they also recommended that the PAPD outfit its officers with body-worn cameras?

A.   Yes.

Q.   Mr. Defoe, are you typically engaged as an expert in certain states?  I know you had mentioned three states where you had been a defense expert.  Are you typically limited to a certain number of states?  Or do you practice in a wide variety of states or even outside the country?

A.   Probably 45 or so states, including Canada.

Q.   In terms of, you know, the party or the entity with whom you engage for your expert services, is it typically law firms, big law firms?  Is it government entities?  Can you just provide some information there.

A.   On the defense side, U.S. Attorney's Office, Attorney General's Office, some defense firms that were hired, either by county or city counsel.  Recently for


MAGNA
LEGAL SERVICES

Page 222

an officer that was charged with murder up in Hennepin County.

For plaintiffs matters, some are matters that firms may take pro bono, you know, big law firms. You know, such as ReedSmith or Jones Day, that take on some work. And then plaintiffs law firms that specialize in plaintiffs matters. Insurance companies. I deal with law firms that deal with insurance companies on premises liability matters or security matters. A lot of those are Las Vegas at casinos.

Smaller defense firms that support law enforcement throughout the country. Just a wide variety of different firms.

Q. You wouldn't call yourself a one-trick pony, right?

MS. ALTERMAN: Objection.

THE WITNESS: No. I call -- I take cases I believe in. Take cases that I never feel uncomfortable providing a deposition in. I don't take cases because I, you know -- simply because of the compensation. I have 289 open cases. So I'm not looking for work.

I will take a matter on that I believe in, that I believe that the officer's actions were reasonable. Or in this case, where I believe that the officers' actions could have been different and there's a standard



Page 223

of care.  There was some standard of care concerns in the -- in a particular case.

MR. AMRHEIN:  I just have a few finishing questions for you.

Q.  And am I correct that your expert report and your testimony here today are all based upon your extensive education, training, and professional experience?

A.  Along with my review of the file in this matter.

Q.  Thank you for that clarification.  So I can rephrase that question, just to put a bow on it.

Am I correct that your expert report and your testimony today are based upon your extensive education, training, and professional experience as well as the evidentiary record in this matter?

A.  Yes.

Q.  I'm just going to ask you a series of questions about what a reasonable law enforcement officer would recognize or do.

So based upon -- and this is, you know, based upon your education, training, and professional experience.

So Mr. Defoe, based upon your education, training, and professional experience, would you agree with me that the Port Authority Police Department had



Page 224

not properly trained its officers regarding individuals'
uniquely vulnerable condition in the immediate wake of a
seizure?

A.  Yes.

Q.  And again, this is all based upon, you know,
your education, training, and professional experience
with respect to what a reasonable law enforcement
officer would recognize and/or do.

So based upon your education, training, and
professional experience, would you agree with me that
someone who has just come out of a seizure is in a
medically vulnerable state?

MS. ALTERMAN:  Objection.

THE WITNESS:  Yes.

MR. AMRHEIN:  Q.  Based upon your education,
training, and professional experience, would you agree
with me that someone who has just come out of a seizure
may be disoriented and afraid?

A.  Yes.

Q.  Based upon your education, training, and
professional experience, would you agree with me that
someone who has just come out of a seizure may have
agitated behavior?

A.  Yes.

Q.  Based upon your education and review --



Page 225

education, training, and professional experience as well as review of the evidence in this matter, would you agree with me that the PAPD had not properly trained its officers regarding an individual -- individual's uniquely vulnerable condition at the wake of the seizure?

A.    The officers involved in this case, correct.

Q.    Based upon your education, training, and professional experience, would you agree with me that an individual who has suffered a seizure and is in the medically vulnerable condition, that convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance to officers?

MS. ALTERMAN:    Objection.

THE WITNESS:    Yes.

MR. AMRHEIN:    Q.    And do you recall putting that in your Rule 26 report?

A.    Yes.

Q.    Based upon your education, training, and professional experience, would you agree with me that the use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure?

A.    Yes.



Page 226

Q.  Based upon your education, training, and professional experience, would you agree with me that it is more difficult to breathe lying face down on your stomach in a prone position than it is in a recumbent position, a seated position, or standing position?

A.  Yes.

Q.  Based upon your education, training, and experience, would you agree with me that it is even more difficult to breathe when lying face down in the prone position with persons applying increasing amounts of pressure to the back, neck, and legs of the individual in the prone position?

MS. ALTERMAN:  Objection.

THE WITNESS:  Yes.

MR. AMRHEIN:  Q.  Based upon your education, training, and professional experience, would you agree with me that improper restraining techniques can block the flow of air into a person's lungs, contributing to a life-threatening condition, known as positional or restraint asphyxia?

A.  Yes.

Q.  Based upon your education, training, and professional experience, would you agree with me that the risk of potential asphyxia is compounded when a person in a medically vulnerable state becomes involved



Page 227

in a physical struggle with an officer or officers?

A. Yes.

Q. Now, based upon your review of the evidence in this matter, in conjunction with your education, training, and professional experience, do you believe that Mr. Lagoda's risk of potential asphyxia was compounded when the defendant officers engaged in a physical struggle with Mr. Lagoda, who was in a medically vulnerable state?

MS. ALTERMAN: Objection.

THE WITNESS: Yes.

MR. AMRHEIN: I think I'm good for questions for now. You know, should Cheryl have any additional questions, to which I will follow up, I'm just going to reserve time for that.

MS. ALTERMAN: I don't have any further questions.

MR. AMRHEIN: Mr. Defoe, thank you very much for your time.

And thank you, Mr. Galten, for being here today.

And very much appreciate Cheryl. Thank you, as always.

MS. ALTERMAN: Yeah, thank you for your time.

DEPOSITION OFFICER: Counsel, would you like to order a copy of the transcript?



Page 228

MR. AMRHEIN:  Yes, please.  Can we have an electronic copy and the normal copy as well as the mini.

DEPOSITION OFFICER:  Yes, that is standard.

(Proceedings concluded at 1:54 p.m.)

--o0o--



Page 229

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA        )

                           ) ss.

COUNTY OF SAN FRANCISCO)

I, Rick Galten, hereby certify:

I am a duly qualified Certified Shorthand Reporter in the State of California, holder of Certificate Number CSR 13202 issued by the Court Reporters Board of California and which is in full force and effect.  (Fed. R. Civ. P. 28(a)).

I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b) and prior to being examined, the witness was first duly sworn by me.  (Fed. R. Civ. P. 28(a), 30(f)(1)).

I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in this action.  (Fed. R. Civ. P. 28).

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record

///



Page 230

of the testimony given by the witness.   (Fed. R. Civ. P. 30(f)(1)).

         Before completion of the deposition, review of the transcript [ ] was [X] was not requested.   If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto.   (Fe. R. Civ. P. 30(e)).

Dated:_____9/9_____, 2024

__Rick Galton_____



MAGNA
LEGAL SERVICES

# Magna
## Key Contacts

### Schedule a Deposition:
Scheduling@MagnaLS.com | 866-624-6221

### Order a Transcript:
CustomerService@MagnaLS.com | 866-624-6221

### General Billing Inquiries:
ARTeam@MagnaLS.com | 866-624-6221

### Scheduling Operations Manager:
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

### Customer Care:
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

### Director of Production Services:
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

### National Director of Discovery Support Services:
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

### Billing Manager:
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

### Director of Sales Operations:
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



**A**

**abdomen**
78:7,15 163:3
**ability**
6:25 7:4 29:10 91:3
91:23 157:23
**able**
32:24 87:20 90:21
94:15 100:5,7 128:2
128:6 142:2 167:21
167:22
**abnormal**
178:25
**aboard**
103:5,22
**absolutely**
153:16
**abuses**
118:2
**academy**
26:2,5,20,25 28:10
28:16 41:14 42:10
86:24 109:6 168:2
177:13 206:12
207:15 208:3
**accept**
218:17
**accommodate**
6:18
**accompanying**
94:15
**account**
52:3,6
**accounts**
193:16
**accurate**
78:21
**accused**
62:12,14
**achieve**
40:13
**act**
138:10,11 179:5
180:16 193:9
194:22 195:1

**action**
5:6 18:2 49:7 175:9
182:20 183:15
229:20
**actions**
31:13,15 32:5 34:9
54:18 56:21 105:14
105:23 106:4
115:16 124:25
139:18 142:18
143:3,16 194:21
196:25 200:5
219:19,25 222:23
222:25
**active**
56:7 58:8 67:13
**actively**
51:14 52:11 53:6
54:13 55:5,21 56:4
**actual**
43:4 62:11 72:11
75:1 83:23 84:10
101:1 113:4 140:24
149:23 158:2,3
**add**
76:3
**added**
75:14 76:1
**addition**
84:25 88:17 119:10
120:10 178:18
197:7
**additional**
21:18 41:6 77:1 78:4
86:12 102:12
159:23 188:9 192:8
215:1 227:13
**Additionally**
212:5
**address**
7:6 8:7,8,9
**addressed**
16:5
**adequately**
216:8,23
**adjudicator**

117:16
**administer**
229:12
**administration**
22:10,15
**Administration's**
23:13
**administrative**
70:8 79:24
**administrator**
1:4 22:4
**admission**
216:6,19,21
**advanced**
110:14 178:8
**advancement**
43:15 44:1
**advertise**
43:18
**advise**
76:24 113:4 184:4
**advised**
13:17 139:13
**advising**
17:10 116:2
**advisory**
146:7,12
**AED**
83:3,6 109:5 174:13
174:19 182:23
**Affairs**
46:17,20,22,25 59:15
59:17,19,20,21
116:8
**affect**
29:9 30:17
**affirmations**
229:13
**afraid**
102:1 135:13,22
193:11 224:18
**after-hours-type**
35:7
**age**
63:1
**agencies**

40:25 69:17
**agency**
66:6 69:18 112:25
**agency's**
66:24
**agent**
23:12,22 24:5 27:9
27:14
**agents**
25:22
**agitated**
224:23 225:12
**ago**
13:17 32:1,2 37:14
37:23 38:25 61:18
111:11 163:11
166:12 169:24
221:8
**agonal**
178:9,9 181:19,20
182:12,12,15,17,22
183:2,8,14,18 184:4
184:15,18 185:4
186:18
**agree**
7:21 18:1,17 27:5
50:13 51:6,16 62:16
69:13 75:5,19 77:18
82:5 85:3 92:13
93:2,25 95:7,24
96:6,12 97:13 98:13
99:5 100:18 101:10
101:22 102:10
103:1,25 104:15,20
105:17 106:11,16
107:22 108:14,22
109:3,14 110:5
123:1,19 125:14
131:17 132:23,25
134:13 136:3
137:18 140:16,19
140:19 142:17
145:14 148:4
157:13 159:17
161:25 177:6
182:22 209:18,19



216:5,19 223:24
224:10,16,21 225:3
225:9,21 226:2,8,16
226:23
**agreeable**
7:17 8:1 18:13
**agreed**
216:15
**agreeing**
165:6
**agreement**
7:24 11:22 18:21
**ahead**
24:9 34:14 110:22
151:24 152:3,15
**aid**
83:6 84:11 85:25
**air**
54:24 139:15 226:18
**aircraft**
67:16 68:19 96:1,14
96:15 97:16,23
98:17 99:3,10
101:12 102:13
103:5,22 104:2
105:20,24 106:10
106:16 125:15
126:14,25 127:6,10
130:9,14,15 134:14
135:9 137:1,8,15
138:19 139:8,23
140:2,8 210:4,5
**airline**
127:12
**airplane**
67:21 96:4 127:2,3
127:21
**airplanes**
67:12 127:1
**airport**
67:2,3,10,23 68:6
**airports**
66:14
**airway**
77:11 78:13 158:22
163:13 173:17

175:15 184:12,14
**aisle**
99:25 127:7,11,13
**ALEXEY**
1:3
**aligns**
219:5
**alleged**
91:3 101:5
**allegedly**
30:6,10 90:18 139:6
212:12,17
**Allen**
7:8
**allow**
6:5 38:22 89:23
100:2 134:22
152:13,21
**allowed**
39:12 152:11 153:24
230:6
**allowing**
151:22
**Almighty**
201:7
**altercation**
29:18,20,25 30:24
31:3,8 33:22 36:1,1
37:17 59:17
**Alterman**
2:14 3:6 4:13,14,25
5:2 7:14,19 8:2,6
17:13,22 18:16 19:6
20:14 21:13,24
24:13,15,19 26:13
27:5,21 28:6,15
29:5,15,24 30:5,11
31:1,7,14 32:4 33:2
33:7,16 34:14 36:13
36:20,25 37:7 38:2
38:12 42:4,14,25
46:7,18 47:2,9,19
48:1,5,23 49:9
50:19 51:6,16 52:1
52:11,22 53:11,20
54:22 55:10 56:1,13

56:20 57:1,4 59:2,8
59:14 60:9,24 61:15
62:12,25 64:2,11
65:2,17 68:11 69:7
69:24 70:4,7,11,15
71:18,23 73:8,10,13
74:1,10,16 75:5,15
76:8 77:17,24 79:19
80:15,21 81:11,14
82:4,15,21 83:5,10
83:17 84:13,18 85:3
85:19 86:11,17,22
88:8 90:3,17,21
91:10,18 92:7,25
93:25 94:11 95:7,24
96:6,12 97:1,13,21
98:13 99:3,9 100:4
100:18 101:3,22
102:6,19 103:1,20
103:25 104:12
105:16 106:8,15
107:3,10,22 108:6,8
108:22 109:3,10
110:5,15,22 111:20
112:4,15 113:9
114:18 115:10,22
116:16 117:3 118:7
118:15 119:12
120:1,13 121:2,9,16
121:23 123:7,24
124:7 125:3,14,19
126:5,12,24 127:14
128:1,9,17,23 129:9
129:13,24 130:6,12
130:20 131:15,23
132:24 133:18
134:4,13 135:6
136:3,9,12,14,23
137:4,11,18,23
138:16 139:5,21
140:4,11 141:7,12
141:17,20 142:24
143:8,20 145:9,14
145:24 146:5,19
147:4,12 148:13
149:2 150:8 151:1

151:11,22,25 152:4
152:16,21 153:7,11
153:19,25 154:20
155:18 157:5,13
158:7,15 159:17
160:2 161:3,11
162:14 163:25
164:24 165:23
166:4 167:11,23
169:9,13,25 170:3
170:16,18,21
173:13 174:6,22
175:5,19 176:4,10
176:19 177:4,11,17
178:6 179:6,19,25
180:17,23 181:10
181:16 182:6,21
183:16 185:8 186:5
187:12 188:12
189:12,21 190:22
191:15,24 192:10
192:18 194:5 196:5
197:2 198:12,21
199:7,23 200:9,22
201:4,21,25 202:10
205:7 208:14 209:2
209:25 211:11
213:8 214:21
216:11 217:2
220:10 222:16
224:13 225:15
226:13 227:10,16
227:23
**ambulance**
187:8
**American**
179:20
**amount**
114:21 119:15 136:1
144:16 149:23
150:2,19 196:7
197:4,17,22
**amounted**
114:6
**amounts**
114:2 226:10



**amplified**
64:10
**Amrhein**
2:6 3:7 4:19,20 7:12
7:15,20 8:5 11:4
17:2,19 18:3,19
19:4 20:10,19 21:6
21:16 26:10 27:4,7
28:2,12 29:3,13,23
30:2,9,19 31:5,11
31:19 32:18 33:6,11
34:11 36:9,16,22
37:3,12 38:6,17
41:24 42:6,23 45:23
46:12,21 47:6,12,25
48:2,9 49:4 50:15
50:22 51:10,21 52:8
52:16 53:8,18 54:14
55:7,22 56:6,16,24
58:22 59:4,12 60:3
60:16 61:6,24 62:23
63:16 64:4,22 65:14
68:7 69:3,10,16
70:1,6,9 71:14,19
73:24 74:7,13,24
75:11,23 77:14,20
79:10 80:6 81:8,13
82:2,8,18 83:2,9,15
84:7,16,23 85:10
86:9,15,20 88:5
89:21 90:12,24
91:17,21 92:19 93:9
94:4,19 95:12 96:2
96:9,16 97:6,17,25
98:18 99:8,11
100:10,20 101:14
102:3,14,22 103:6
103:23 104:4,19
105:21 106:13,18
107:8,12 108:2,17
109:1,8,15 110:9,19
111:15,22 112:8,19
114:14,23 115:13
116:1,21 117:8
118:6,13 119:8,24
120:4,16 121:7,14

121:19 123:3,22
124:4,13 125:7,17
126:2,9,16 127:8,17
128:3,12,22 129:6
129:17 130:1,11,18
131:13,21 132:19
133:16 134:1,8,17
135:10 136:7,20
137:2,9,16,21 138:1
138:24 139:11,24
140:9,18 141:9,15
142:21 143:5,12
144:25 145:12,18
146:4,14,23 147:8
148:9,17 149:22
150:18 151:5,20,24
152:1,6,19 153:2,10
153:13,20 154:5
155:2 156:14 157:8
157:18 158:12
159:4,21 160:25
161:7 162:2 163:22
164:14,17,22
165:15 166:2,24
167:13 169:17
173:10,20 174:20
175:3,10,23 176:7
176:14 177:1,7,16
178:4,11 179:16,24
180:4,20 181:1,13
182:3,8 183:1,20
185:6,21,23 187:10
188:5 189:9,16
190:3,20 191:7,22
192:3,16 194:3
195:12 196:8 197:5
197:24 198:18
199:5 200:3,17,24
201:11 202:4,13
205:10,13 209:4
210:2 211:20 213:9
214:23 216:14
217:4 220:12 223:3
224:15 225:17
226:15 227:12,18
228:1

**ancillary**
84:11 86:12
**and/or**
76:6 91:4 121:21
148:3,21 149:1
159:23 168:1,4,20
181:23 184:14
189:19 218:23
224:8
**Angeles**
23:15 25:9,13 26:3,5
26:8 34:25 36:4
41:5 44:17 63:6,19
67:6,7 86:2 87:2
115:8
**annual**
25:16
**answer**
6:6,12,19 14:22
15:17 27:23 37:11
60:1 61:14 73:11
78:18 88:10 90:4
109:2 127:4 151:17
151:21,22 152:12
152:12,13,16,23,24
152:25 153:6,7,13
153:14,15,23,24
154:21 206:16,18
207:6,22,24 208:1
208:14,15
**answered**
37:24 153:2
**answering**
5:13 151:20 152:1,1
152:19 153:5,17,18
153:21
**answers**
5:17
**anticipate**
6:4 21:13
**anyone's**
194:2
**Anytime**
166:17
**apartment**
55:1 127:22

**apologies**
17:20
**apologize**
202:6
**appeal**
15:6,12
**Appeals**
15:12
**appear**
43:3 132:8
**appearances**
2:1 206:5
**appeared**
4:6 9:10 104:7
105:22 200:23
201:5,10
**appearing**
93:3 200:15 202:14
**appears**
16:6 80:17 81:16,21
132:11
**appended**
230:7
**applicable**
27:12,18 28:4,7
**application**
51:24 54:8 59:7
101:2
**applied**
149:20 150:16 151:2
154:25
**apply**
27:15 40:10 43:15,19
57:8 160:7
**applying**
25:8 50:24 77:13
78:6,14 154:13
155:7 156:18 157:9
157:15 158:10
167:4 208:25
226:10
**appreciate**
202:3 227:21
**approach**
54:12,23,24 55:4
209:8



MAGNA
LEGAL SERVICES

**appropriate**
76:23 123:20 124:2,6
124:12 160:20
165:13 182:20
183:15 188:4,7
**appropriately**
74:19 75:9,21 188:23
**approved**
49:1
**approximately**
9:18,19,21,24 41:15
44:9,10,16,19 99:16
199:12
**April**
16:4,13 17:8 19:19
19:19,23 44:5 70:12
70:23 72:4,25 75:16
75:18 77:18,25 79:4
80:3,24 110:7,17
146:21 147:7,15
148:8,16 163:8
174:25 188:3
198:25 199:4
204:21
**arbitration**
117:17
**area**
35:2 36:3,4 54:19
71:15 77:12 78:5
85:18 96:20,24
99:19 159:7
**areas**
25:9 26:23 27:14
44:17 75:13 149:16
165:20
**argument**
190:11
**arm**
50:3,4 160:12
**armed**
124:16,17 126:13
**arraign**
30:13
**arraigned**
30:11
**arrest**

29:21 31:10,13 38:16
47:5 48:8 53:22
54:13 56:4 62:19
67:19,22 68:10,19
183:24
**arrested**
29:24 30:6 36:6 38:3
**arresting**
45:10,14 47:3,18
58:10
**arrests**
44:23,25 45:1 47:11
47:22 48:25 58:10
58:16,19,21 59:2
67:25 68:5 79:23
**arrival**
139:16
**arrive**
109:25 166:20
**arrived**
107:18,18 150:6
**arriving**
214:10
**articulated**
195:15
**artifact**
184:16
**ascertain**
46:23 88:19
**Ashcroft**
2:3 4:20
**asked**
12:11 14:3 34:21
37:20 60:5 61:9,13
62:1 78:19 93:15
111:11 120:5
122:12,13,14
135:23 144:8
146:16 151:14,16
152:6,6,7 153:3
176:17 200:10
202:19,24 203:2,5
203:10,14,22 204:2
204:5,5,14,25 211:4
212:5,11
**asking**

5:12 6:5,5,11 28:9
39:4 79:3 94:7 95:5
95:16 98:1 129:22
144:11,12,13,14,19
145:4 147:21 153:8
**aspect**
153:23
**asphyxia**
68:23,25 146:6 168:7
226:20,24 227:6
**asphyxiation**
13:1 39:15,19 76:1
80:11 147:3,3,24
148:3,21 168:1,5,25
171:1 172:3,7,16
182:11 184:17,17
186:11
**assault**
97:5,23 98:4
**assaulted**
99:5
**assaulting**
30:7 97:15,18 98:16
**assaultive**
56:8,11,15,22
**assaults**
67:9,11
**assess**
51:18 107:24
**assessing**
52:6 108:24 211:6
**assessment**
108:19
**assessments**
64:16
**assign**
187:1
**assigned**
23:12,21 25:5 28:19
32:21 33:4 40:22
41:2,4 44:6,12
57:25 68:1 114:8
120:19,20,21 184:1
187:7 199:16
**assignment**
24:2,4 44:3 45:20

58:1 109:20 110:20
**assignments**
110:21
**assist**
54:1 98:25 101:4,8
101:17,24 103:13
103:18 105:10
122:7
**assistance**
54:8 76:19 130:4
**assisted**
199:14
**associated**
44:2 49:8 85:2 148:2
156:2
**Association**
179:20 190:17
**assume**
6:13 122:12,15 151:9
155:12 162:11
**assumed**
137:11
**assumes**
128:1
**assuming**
102:19 136:5
**assumption**
91:14 135:7 136:10
136:16,17,18,22,24
137:5 155:19
**assumptions**
136:5 137:19,25
195:10,14
**assurance**
188:9
**attached**
115:17 219:1
**attack**
109:19
**attained**
23:23
**attempt**
130:23 131:10
134:15 150:24
**attempted**
103:13 180:11



**attempting**
97:4 101:24 151:9
154:8 160:23 161:5
164:1 183:19
**attend**
22:20 26:2 41:11
**attendants**
100:25
**attended**
23:10 26:4 41:13
178:12
**attention**
71:12,24
**attorney**
3:17 4:19 5:3 11:22
16:18 18:7 37:9
38:9 61:13 72:3,15
72:19,24 73:5,15,21
74:3,12,17 75:6,19
76:9 125:22 140:21
141:6,17 143:7,19
144:4,18 148:5
149:3,10 165:2,7
172:11 185:20
187:21 188:1,2,13
191:4,11,19,25
192:13 195:17
196:5 197:3,21
198:13 199:8,11,15
199:23 212:22
214:14 216:6,22
219:2,5,14 221:24
229:17,19
**attorneys**
4:14 10:15 12:6
37:13,25 38:13,19
185:15 219:15
**Attorney's**
221:23
**attributable**
141:1 196:14
**audio**
129:10 177:24 220:5
220:16
**augment**
44:16

**August**
169:23
**authority**
1:8,8,9 2:9 4:15,18
5:4 16:12 66:3,5,9
66:10 74:18 75:8,20
77:4 79:15 82:1
92:12 110:6,12
118:2 123:9 146:11
146:21 147:4 148:6
148:15 149:4 158:7
158:8 165:13 175:6
177:12 185:2
187:16,16 190:16
190:17,18,18 191:5
192:1,14 198:22
199:2 205:19 206:4
208:10,24 211:22
212:6 215:1 216:7
216:22 223:25
**Authority's**
132:9 134:5 184:8
**authorized**
229:12
**available**
76:16 124:18,18
130:25 131:11
212:7 214:18
**average**
20:17,23
**avoid**
77:11 78:12 149:13
149:14 158:21
163:12 175:14
184:11
**aware**
16:20 72:14,18,22
73:3 74:11,16
139:15 145:25
160:22 173:18
177:11 179:19,25
185:14 187:7,21
189:7
**awareness**
108:3,9,10,15,19
192:21,25 193:24

197:16 215:25
**A-l-l-e-n**
7:8
**a.m**
4:3
**a/k/a**
1:9,10

---
**B**
---

**baby**
178:19
**Bachelor**
22:23
**back**
10:1 23:18 32:1
39:21 40:25 50:18
50:25 51:2 57:15
73:10,12 77:1 78:7
78:15 80:21 81:11
90:22,23 101:11,16
101:20 102:8
105:16 114:9 145:6
146:8 147:10,14,16
147:19 148:12,16
149:13,20,21 150:6
150:10,11,17 151:3
154:4,12 155:1,20
155:23 156:1,3,6,13
157:4,6,10,16,24,25
158:10,24 159:3,24
163:3,16,20,24
166:23 171:7,14
172:18,23 173:3,25
181:16 188:13
190:25 197:19
204:21 215:12
226:11
**background**
43:20
**back-to-back**
202:7
**bad**
201:13,18
**bag**
207:11
**balancing**

74:20 188:25
**bank**
199:21
**bargaining**
189:15,18 190:14
**barricaded**
44:18
**barrier**
89:7 92:23 99:23
138:4 194:12
**bars**
34:24 35:8
**base**
88:23 111:2
**based**
11:21 18:14 21:14
23:2 25:16,17 26:22
26:22 43:24 44:2
51:4 52:1,9 53:10
60:22 62:8 68:16
74:14 76:6 85:4
88:24 89:6 90:6,18
92:3,9 95:6,18
101:18 102:9,18
103:15 104:5,6,13
105:3,15,22 107:1
108:12 110:3,20
114:20 115:20
116:14 117:3,14
118:7,22 119:3,7,9
135:7 136:4,17
137:24 139:6,19
140:24 142:24
143:16 144:17,20
145:21 146:24
148:20 149:6
150:22 153:8 154:8
155:19 159:14
167:24,24 177:9
181:10,14,14,15,18
182:15 186:24
193:16 195:7,10,13
195:14,19,21,22
208:23 209:17
211:20 214:17
219:25 221:2,3



223:6,13,20,20,23
224:5,9,15,20,25
225:8,20 226:1,7,15
226:22 227:3
**baseline**
27:14 87:25 95:14,15
105:3 109:21
135:15 138:9
**bases**
217:16
**basic**
41:11,17 83:5 86:24
109:5 150:22 156:2
167:18
**basically**
18:8 45:25 57:24
183:7 194:10 207:7
211:2
**basing**
89:2 139:5 144:21
167:23
**basis**
89:4 123:17 144:14
144:15 195:14
208:13
**Bates**
3:17 77:16 158:18
213:17
**baton**
48:16 53:12,15,16,20
112:22 157:21
159:1,22 160:3,10
**batons**
203:25
**Beach**
7:9 22:11 65:10
**beanbag**
48:21
**bearing**
220:8,19
**becoming**
29:11 41:21
**began**
88:24
**beginning**
154:18 194:9 198:11

200:9
**begins**
81:18 88:25
**behalf**
4:18 13:10 18:2
105:15 152:9
185:10,15 206:4
**behavior**
56:9,12,15,22 132:6
224:23 225:12
**behavioral**
81:5,20,21 85:8,9,21
86:7 87:2 161:13,22
**behaviors**
125:1
**believe**
10:16 12:18 13:1,4,4
13:8,16 14:7,15
15:16,20,24 16:19
17:5 18:6 20:4
31:24 32:1 33:1
37:17 38:21 42:5,10
42:13,18 43:1 47:7
47:8,13,14,16 53:9
60:6,7 70:10 79:13
88:6,12 89:4,12,13
90:1 91:4 96:3
97:12 102:4 119:1
123:10,11 129:11
132:20 139:18
144:10,15 149:7,8
150:22 160:15
162:8,12 165:16
167:15 169:23
171:10,14,15
172:22 175:11
179:8 180:10
181:11 183:21,22
184:13 187:11
190:10 193:19,23
194:6,14 195:25
204:19 213:6
219:19,24 220:3
222:18,22,23,24
227:5
**Benevolent**

190:17
**Bengston**
100:25
**Bergery**
3:20 205:22 206:3
**best**
36:2 58:24 71:21
**better**
48:13 50:4 105:9
195:15
**beyond**
21:22 74:6 104:15
211:18
**big**
221:21 222:4
**bill**
18:25
**billable**
21:8
**billed**
21:5,7,15
**billing**
19:10
**billionaire**
63:6,18
**binder**
207:24 208:4
**binding**
117:17
**bistate**
66:6,23,25
**bit**
43:10 57:16 75:4
161:2,4 202:15
218:15 221:8
**biting**
160:23
**Blandin**
10:14
**block**
226:17
**blood**
207:8
**blue**
32:23 154:16 156:6
156:23 164:8

166:14 167:9,16,18
173:1,8,16,23 174:8
174:18 182:25
183:11
**blunt**
140:25 196:12
**board**
96:15,18 113:25
130:9 217:7 229:10
**boarded**
104:18 105:19
106:10,16,23
125:15 134:14
135:5,9 137:1,8,14
138:19 139:8,23
140:2,7 210:3
**boarding**
135:5 139:14
**boardings**
67:8
**bodily**
121:21 124:16
**body**
56:9 140:25 143:17
151:8,8 154:1,4,6,7
155:11 157:11
160:12 173:3
191:20 196:13
220:8,13,19
**bodyweight**
76:14
**body's**
183:7
**body-worn**
20:25 164:3 182:14
182:15 189:13,20
192:9 198:23 199:3
218:23 221:10
**bold**
162:16,20
**bono**
222:4
**bonus**
44:2
**boots**
155:16 211:13



**Boston**
2:4 4:20 22:21
**bottom**
213:24
**bow**
223:11
**break**
6:17,20 35:24 36:12
36:17 55:13,17 57:2
106:7 108:6,9
153:15 169:5
201:22 202:7
**breath**
167:21
**breathe**
150:24 157:23
160:18 167:22
226:3,9
**breathing**
163:18 173:22 174:4
177:10,20 178:2,9
178:19,22,22,25
179:4 181:20,21,22
182:13,15,17,22
183:2,4,5,13,18
184:2,3,15,18,21
185:4 186:18 220:6
**bridges**
66:15
**brief**
18:5 159:18
**briefly**
16:9,11,16 20:4,5
159:12
**bring**
74:22 141:20 189:2
**broad**
89:24
**broadly**
188:22
**Bronx**
30:7
**Brooklyn**
34:18
**brought**
62:9 205:8

**Browne**
155:15
**Bruce**
201:7
**buck**
150:12
**Buffalo**
13:1
**Bugiada**
1:10 103:4,21 104:1
104:18 105:19,24
106:10,15 125:15
125:25 126:5,6
129:4,16 130:7,13
134:14 135:9 137:1
137:6,14 138:4,18
138:18 139:6,8,23
140:1,2,7 142:18
151:7 154:1,3,9
155:10 161:2,4
193:21 210:3
211:24 217:5
**Bugiada's**
142:9 143:21 144:6
153:9 154:24
211:21
**bullet**
190:24
**bunch**
63:7
**bureau**
114:8 115:1
**Burgiada**
193:21
**Bus**
66:17
**business**
8:8,11,13 63:15
64:12,13
**busy**
44:17
**buttocks**
157:20 159:7 160:16
**B-e-n-g-s-t-o-n**
101:1
**B-u-g-i-a-d-a**

103:5

———————————
**C**
———————————
**calendar**
20:11
**California**
4:6 7:10 12:17 22:11
25:10,25 26:17,21
27:16,19 30:8 34:19
35:3 39:16 42:16,21
65:10 69:6 86:4
88:12 121:11
199:13 204:12
229:2,8,10,13
**call**
7:16 16:7,8 104:1
106:21 107:6,15,17
107:18,18,20,25
110:4 128:18 129:3
129:14 130:13
139:6 193:16,24
210:4,12 217:6
218:22 222:14,17
**called**
4:8 10:9 19:14 36:5
44:18 67:11 85:24
107:5 114:4 174:19
182:23 187:8
211:16
**calls**
104:23 216:11
**calm**
125:16 128:7,14
134:18 135:25
194:15
**calming**
81:5,20 85:8
**calterman@panyn...**
2:13
**cameo**
201:8
**camera**
20:25 164:3 182:14
182:15 189:20
218:23
**cameras**

189:13 192:9 198:23
199:3 221:10
**Camp**
34:18
**camrhein@ashcro...**
2:5
**cams**
220:9,13,20
**Canada**
221:18
**canceled**
17:14
**cancellation**
17:9
**candidates**
43:19
**canine**
43:23 44:10 45:19
112:22,23,23
**capabilities**
90:6 211:18
**capability**
92:6
**capable**
142:13 143:25 145:3
**capacities**
203:20
**capacity**
203:17
**capsicum**
48:12
**captain**
100:25 113:23
114:20 115:8
117:16 118:25
**caption**
206:2
**capture**
194:9
**captures**
87:23
**capturing**
79:13
**car**
35:1 201:17
**care**



37:14 38:19 83:1
85:7,12 146:7,12
162:6,11 210:25
211:9 214:11,20
223:1,1
**career**
26:19 31:21 47:20,23
52:24 53:3 58:17,20
111:3 118:9 188:11
**careful**
74:20 188:24
**carotid**
69:19
**Carrueso**
63:5,13,14,17
**Carrueso's**
65:1
**carrying**
97:2,8
**case**
1:7 5:3,15 9:10 10:3
10:17,21 12:6 13:1
13:2,5,6,9,13,19,22
14:1,5,19,21,23
15:6,9,19,23 18:1
18:14,18 19:1,11
20:8,12,13,23 21:4
21:5,14,20 22:4
27:10 30:15 37:8
38:22 39:17,19 69:4
69:5,20,23 70:12
72:7,23 77:3 78:8
98:22 99:5,14,24
102:24 103:11
125:10 127:11
140:17 141:4
142:25 145:24
146:2 149:18
150:25 156:10,25
160:8,21 170:24
172:7 174:14 180:6
181:11 184:14
185:13,16,25 186:6
189:7 191:21
192:15 193:13
195:8,9,25 199:8,9

206:2 219:4,7,9,18
219:19,23 222:24
223:2 225:7
**cases**
9:8 10:25 11:2,20,23
11:23 12:13,15
20:15,17 43:20 55:8
61:12 64:21,23
68:22,24 69:1,2,7
69:22 100:6 109:9
168:15,21 171:25
172:10,11,13
182:13 186:8 199:9
199:10,12,23
218:12,21 222:17
222:18,19,21
**casinos**
222:10
**categories**
43:25
**Cathy**
151:10
**causation**
144:10
**cause**
37:14 38:23 61:7
71:15,19 92:10
102:12 142:11,19
143:22 144:6
**causing**
142:14 143:10,25
144:23 145:3
**caveat**
211:16
**CCTV**
220:21
**Cedars**
60:5
**Center**
2:11 23:10 24:4
66:19
**certain**
43:25 71:8 75:12
76:15 93:7 101:10
138:11 147:6
189:24 195:1

212:11 221:13,15
**certainty**
145:17
**Certificate**
229:1,9
**certification**
83:4 178:17
**certifications**
23:1,2
**certified**
4:5 25:24 26:1
178:13 229:7
**certify**
229:6
**cetera**
169:22
**challenged**
35:21
**change**
41:22 69:17,18 79:11
79:13,18,20 80:3,8
137:20 158:4
189:24 211:8
**changed**
69:13,21 79:24
107:20 189:14
**changes**
78:25 79:6 189:13
190:6 211:5 219:13
230:5
**channel**
116:20
**chaperone**
34:21
**characterization**
79:18 80:8 89:21,24
90:25 91:2,5
**characterize**
80:3 155:17
**charge**
19:13 20:17 138:22
218:22
**charged**
108:24 112:16 132:7
222:1
**charges**

74:15 96:7,13 145:25
**charging**
21:13 96:20,23
**Charm**
41:18
**check**
18:21 19:3,8,9 24:8
174:10
**checked**
174:17
**Cheryl**
2:14 4:13 5:2 7:12
8:5 71:14 81:9,13
151:21 169:17
202:4 213:7 227:13
227:21
**chest**
77:12 78:5,7,14
148:11 154:11
163:2 167:8
**Chicago**
10:15
**chief**
33:14,15 165:1
**chiefs**
33:13
**child**
178:22
**children**
178:20,21
**choice**
36:4
**choke**
75:24
**choose**
216:17
**chooses**
109:10
**Chris**
4:19
**Christopher**
2:6
**Circuit**
15:6,12
**circumstance**
102:11 124:3,6,11,12


MAGNA
LEGAL SERVICES

102:11 124:3,6,11
124:12
**circumstances**
49:3,22 51:5,8 53:5
53:10 56:23 74:4
100:5,7 102:18
105:15 119:21,25
123:20 124:7,8
125:5 131:19 160:9
163:19,20,23 176:6
195:20 197:17
211:5,8 220:1
**cite**
85:5
**cited**
83:23 208:21
**citing**
204:21
**city**
44:17 70:8 221:25
**Civ**
229:11,15,20 230:1,7
**civil**
10:4,21 40:5 229:13
**civilian**
59:9 84:22 96:4
**civilians**
73:3 95:25 101:4
102:7 130:15
206:21
**civil-related**
9:8
**claim**
68:23
**claiming**
144:20 180:17
**clarification**
51:22 169:17 223:10
**clarify**
45:6
**clarity**
129:15
**classes**
89:19
**classifications**
57:13

**classified**
46:4 145:8
**classifies**
46:1
**clearly**
92:24 143:9
**client**
152:10 218:18
**clue**
174:9
**coached**
37:25
**Coast**
57:17
**code**
42:18,22 70:8 79:24
132:9 229:13
**Codes**
27:18,18
**collar**
32:23
**collected**
120:11
**collective**
189:15,18 190:14
**collectively**
5:4
**collector**
114:25
**college**
22:20
**colon**
162:21
**combative**
106:3,17,21 128:18
130:7,14 138:7,21
195:2 210:19
**combination**
53:17
**come**
7:24 33:9 37:18,21
38:8 98:25 99:24
132:13 133:3,8
135:21 172:21
224:11,17,22
**comes**

37:6 200:20 207:16
**comfort**
201:20
**coming**
86:19 109:23 135:11
135:14 193:10
209:12
**command**
89:20 92:7 94:16
95:8,14,20 112:2,17
112:21
**commander**
112:11
**commanding**
115:19 116:13,25
117:13
**commands**
88:20 89:6 126:1
128:7 137:6 210:19
**commencing**
4:3
**comment**
142:22 177:20
**commented**
75:7
**comments**
107:15
**commercials**
200:25 201:1,2,16,17
**committed**
73:23 193:4 210:13
211:2
**commonly**
181:20
**communicate**
94:1,16 95:10
**communication**
115:5
**community**
133:13
**community's**
133:7
**companies**
64:20 222:7,8
**company**
8:15 64:3,3 200:12

**compensated**
58:5
**compensation**
222:20
**complaint**
59:9 116:14 218:23
**complaints**
119:1 199:18
**complete**
6:7 46:9 193:19
**completed**
14:9 30:25 54:9
59:21 119:11
154:20
**completely**
7:1 138:13
**completes**
46:15
**completing**
39:5
**completion**
230:3
**complex**
210:24
**compliance**
53:17,21 93:7 157:15
157:20 159:2 160:3
164:12,20 195:6
**comply**
92:17,21 93:11 95:18
125:25 192:1,15
194:15
**component**
113:5
**comport**
118:23 198:9
**compounded**
226:24 227:7
**comprehend**
134:22
**compress**
77:2 163:18 184:13
**compresses**
78:15 163:3
**compressing**
77:11,12 78:8,12,13



175:14 184:11
**compression**
78:5 147:17 148:10
148:11,15
**compressional**
75:25 80:11 147:3,24
148:3,21 168:1,4
172:4 182:10
184:17
**computer**
13:21
**conceptually**
129:22 193:2
**concern**
130:2 176:16,20
**concerned**
61:10 97:8
**concerns**
62:8 176:3,12 223:1
**concluded**
73:21 74:3 145:6
153:13 196:15
228:4
**conclusion**
73:17,19 74:12 76:10
88:23 126:23 144:3
172:21 197:3,20
198:13 216:12
**conclusions**
144:17 165:8
**condition**
97:15 215:17 216:10
217:13 224:2 225:5
225:11 226:19
**conduct**
66:17 74:20 113:1,7
113:20 132:9 133:2
133:8,20 142:10
143:10,22 144:6
188:24 219:3
**conducted**
10:16 120:10
**conducting**
64:15,17 196:21
**conference**
11:13

**confined**
96:13 127:22
**confirm**
7:21 24:16 144:21
**confirmed**
107:2
**conflicting**
91:6 167:1
**conflicts**
219:7
**confronted**
106:17 129:16
**confused**
42:3 51:24 61:7
135:13,16,22
**confusion**
225:12
**conjunction**
12:5 45:4 84:14
227:4
**connect**
54:5
**connected**
80:4
**connection**
9:11 14:4
**Connor**
27:11
**consent**
189:14 190:1
**consider**
11:18 12:1 97:21
**consideration**
131:18
**considerations**
193:12
**considered**
40:12,20 47:15 51:4
116:7 204:6
**considering**
91:5 216:1
**consistent**
25:24 194:21
**consistently**
133:8
**consultant**

11:7,18 12:2 63:24
65:3,6 68:22 111:21
200:11 215:13
**consultation**
17:15
**consultations**
16:25
**consulting**
3:15 8:12,14,21 9:12
11:3,9 63:15,23
64:3,12 65:9 200:12
**contact**
47:10 49:24 50:1
104:8 184:2
**contacted**
17:4,23
**contained**
76:3 77:22,22 90:8
165:2,17
**containment**
120:24
**contemplates**
131:4
**continue**
34:13 156:5
**continued**
150:12
**continuing**
63:2
**contract**
64:24
**contrary**
91:19 112:20 165:25
**contributed**
143:3,17 145:7
196:16,25 197:12
197:25 198:1,4
**contributing**
140:22 226:18
**control**
48:17 50:3,7 53:25
54:17,21 66:18,20
74:22 99:6 102:15
150:11 159:11
161:6,10 189:2
193:9

**controlled**
87:10,14,16 98:19
113:2,3
**controlling**
54:8
**conversation**
17:4 18:6 62:10
**conversations**
17:3,6 185:24
**convey**
128:19
**convulsions**
225:11
**coordinated**
49:12,15 54:23
**coordinating**
50:5
**cop**
201:14,18
**copies**
26:6
**copy**
70:15,21 71:2,4,6,20
72:11 170:22
227:25 228:2,2
**cordon**
98:22 99:12,19 100:1
**corporate**
63:10,15
**Corps**
34:19,22
**correct**
9:3 13:7,11,12 14:15
14:16,19 17:24,25
24:1 25:1,6 27:3
28:17 29:14,21,22
30:1,4,8 32:14,17
33:3,5,7 36:8,15,24
38:5,7,16 42:22,24
42:25 43:1 45:22,24
50:14,18,21 51:7,9
51:11,20 52:9,10,15
52:24 53:13,14
54:15,21 57:11
61:23 65:15,19
68:20 71:4 74:15



77:13,15,19 81:2,3
81:6,7,18,19,23
82:1,3,7,9,17,19,23
82:24 83:1,7,8,11
83:14,16,25 84:3,4
84:6 88:6,22 89:3
91:15,16,20 93:8
96:5 100:9,19 101:9
101:21 102:5,21
103:22,24 106:12
106:14,17 107:11
108:1,3 109:9 110:8
110:18,21 111:16
112:7 113:13,13,16
114:5 117:7 118:4,5
121:6,8,12,13
122:25 125:6,16
126:1,4,8,11 127:7
127:11,13,16 128:2
128:4,13 130:9,10
130:17,19 131:6,7
131:12,14,20,22
135:9 136:5,6,19,22
137:1,3,8,10,15,17
140:8,10 147:7,9
151:4 155:1 157:17
161:6,8,10,24 163:9
165:16 166:1
170:17,19,20 172:4
172:8,9 173:13
174:21 175:2,4
178:9 179:11
181:12,15 195:11
196:7 198:16 203:8
204:10,13 205:11
205:21 208:19,21
209:5,6,10,13 210:8
212:3,4 214:11,14
214:17 215:10,11
217:4,19,20 218:1,2
218:4,5,7,8,10,11
218:13,14 220:21
220:24,25 221:5,6
223:5,12 225:7
**Correction**
 51:11

**correctly**
 208:16 214:3,7
  215:20 216:3
**correlation**
 180:14
**correspondence**
 17:10
**corroborate**
 177:25
**corroborated**
 119:5
**Corruption**
 199:16
**council**
 25:25 84:3,5,14,21
  85:5,21 86:6,14
  204:15,22 205:2
  206:15,16,18
  207:22 208:12,23
  209:1
**Council's**
 211:23 215:10
**counsel**
 9:17 16:7,9,25 17:5
  17:16,23 18:5,11,18
  21:11 37:16 70:24
  72:14 89:22 107:9
  185:17 205:1,8
  221:25 227:24
  229:18,19
**counseled**
 60:13 61:2
**counseling**
 31:9
**Counsel's**
 153:22
**count**
 171:25 205:11
**counterproductive**
 159:25
**countless**
 148:20
**country**
 27:10,12 63:7 133:23
  221:17 222:12
**county**

10:19 23:19 36:4
 221:25 222:2 229:3
**couple**
 18:6 19:20 40:4
  61:17 68:8 168:15
  168:21,21 170:15
  186:10 201:2 202:6
  203:21 213:15,16
**course**
 26:23 37:15 38:24
  41:17 84:9 97:3
  115:21 123:5
  178:13,17 179:8,10
  182:2,5 198:24
  219:11,12
**courses**
 179:13
**court**
 1:1 5:9,14,15,18,24
  9:11,13 10:9 13:10
  14:17 15:4,9,12,22
  15:22 17:10 168:24
  172:14 202:17
  229:9
**courtroom**
 14:24 15:18
**courts**
 15:2
**cover**
 115:5 124:18,21
  206:1,7 215:17
**covered**
 207:3
**covers**
 169:20
**co-owners**
 8:20
**CPR**
 83:3,5 109:5 173:9
  173:15,21 174:7,12
  182:23 207:8
**creates**
 93:19
**creating**
 124:19 126:18
**crew**

106:24 130:16
**crime**
 23:13 51:12 73:22
  171:6 193:3 210:13
  211:2
**criminal**
 9:10 10:2,2,6 22:23
  74:15 144:9 145:21
  145:23,25
**crisis**
 87:3,7 98:3 103:12
  103:17 134:21
  194:23 196:4
  209:20
**critical**
 183:9
**criticism**
 139:3 173:22
**Crude**
 12:25 13:6,9,18 14:1
  14:5,21
**CSR**
 1:25 229:9
**cue**
 94:9
**cues**
 94:16,20,22 209:22
**current**
 74:18 165:17 188:22
**currently**
 188:16 215:6
**curriculum**
 3:13 41:8 206:19
**cursor**
 213:22
**custodial**
 162:10
**custody**
 82:12,14 97:11
  128:25 147:25
  148:25 162:9
**Customs**
 23:11,21,23 24:5
**cutting**
 35:6
**CV**



24:8,16,20,24,25
25:2 169:22 179:9
**c-a-p-s-i-c-u-m**
48:13
**c-a-r-o-t-i-d**
69:19

**D**

**danger**
44:2
**Daniel**
12:25 13:6,9,18 14:1
14:4,21
**Daryl**
33:15
**date**
9:4 14:7 18:1 21:5
37:1 72:7 75:2,18
77:7,23,25 79:5
110:8,18 149:5
175:1
**dated**
16:3 70:12,22 158:18
230:8
**dates**
16:23 17:1,14,18
**day**
32:11 202:16 222:5
**days**
31:25 32:2,20 44:16
58:4 169:24
**deadly**
46:9 47:21 203:3,12
204:8
**deal**
8:3 222:7,8
**dealing**
85:9 137:13 211:18
215:7,15
**deals**
140:13 187:14
201:15
**dealt**
168:3 190:4
**death**
72:4 79:14,25 80:5

80:12 121:22
124:16 141:2
142:11,14,19 143:4
143:11,17,23,25
144:7,23 145:3,8
146:6 196:16,17
197:1,12 198:1,5
**deaths**
79:7,22 178:16
**Deceased**
1:4
**decide**
62:25
**decided**
25:17 34:23 114:8
**decision**
74:14
**decisions**
197:16
**declined**
39:8
**deem**
196:17
**deemed**
120:8 141:2
**defendant**
88:16 220:8,12 227:7
**defendants**
1:13 2:8 4:8,15 5:3
13:18,20 72:23
88:18 122:21
186:25 204:20
205:1 208:24
**defense**
4:18 9:20,25 12:14
12:18 13:25 14:3,8
14:11 19:20 20:2
123:10 168:22
218:10,13 219:23
221:14,23,24
222:11
**defensive**
168:1
**deficiencies**
114:5
**defined**

42:15,17,18
**definitely**
126:17 167:17 191:9
**definitions**
76:15 195:23
**Defoe**
1:19 4:7,23 5:1 7:8
8:7 9:4 14:12,16
16:20 24:10 27:21
36:7,20 51:17 57:4
65:12 70:13,22,25
71:24 74:10 78:17
80:16 81:17 82:4
89:17,23,25 91:8
92:25 97:1,14
100:18 101:3 103:1
107:4 108:8 112:5
112:15 115:22
116:16 117:25
121:24 126:24
131:17 136:4
137:18 138:17
141:18,22 143:9
145:24 146:8
151:25 153:5,25
157:13 169:6,18
170:4 201:25
202:14,19 204:14
206:7 208:16
209:14 213:19
217:23 221:12
223:23 227:18
**Defoe's**
169:22
**defuse**
134:15
**defusing**
52:18 122:23 131:3
225:22
**degree**
22:11,22,24 82:23
145:16
**degrees**
23:1,3
**delay**
116:13 166:8,16

214:10
**delayed**
214:5
**deliberate**
225:14
**delirium**
178:13,17 179:7,10
179:14,21 180:2,6
180:12,15,18,24
181:8,12 182:2
**denied**
38:14
**denounced**
180:2
**department**
1:9,10 2:10 4:18
23:15,20 26:5 36:5
43:18 46:1 58:9
65:13,19,22,25 66:3
66:11,24 67:2 79:16
84:10 86:2 87:3
109:12 115:9 123:9
132:10 147:23
148:22 190:18
198:22 208:10
211:22 212:6 216:7
216:23 223:25
**departments**
25:9 57:17 69:20,21
180:11 182:9
**Department's**
74:18 75:8,21 77:5
**depend**
20:20
**depending**
20:24,25 21:3 49:20
49:22 91:23,25
96:10,22 109:16,20
172:6
**depends**
94:10 95:4,13,19
96:17,19,24 124:6
127:9,9,10 159:10
159:10 163:23,24
**deployed**
119:23


MAGNA
LEGAL SERVICES

**deployment**
53:1 112:23 190:5
**deponent**
230:5
**depos**
36:23
**deposed**
5:8 11:10,15,17
13:24 14:23 37:8
61:8,11
**deposition**
1:19 4:2,22 5:7,16
8:4 9:5,6 11:21,24
12:8,12 13:2,10,22
14:13 15:3,18,25
16:8,10,20 17:9,12
17:14,17 20:16,24
21:25 27:23 37:6,24
38:5 89:8,15,22
90:7,15 91:6,18
92:4 146:17 147:1
154:17,18 156:11
169:4,10 171:6
172:1 176:1 191:16
195:16 200:10
206:2,3,8 208:18,23
222:19 227:24
228:3 229:1,22,24
230:3
**depositions**
3:19 9:7,15,16 17:1
19:12 21:19 36:25
90:13 170:4,7
175:20
**Depot**
201:16
**derive**
149:15
**derived**
147:1 154:17
**describe**
23:6 29:21 207:4
**described**
34:8 49:1 100:8
137:13
**description**

3:12 207:1
**descriptors**
76:5
**designate**
49:23 50:2
**designated**
34:25 212:12,17
**designee**
208:24 211:21
**detail**
33:20 218:15
**details**
67:24 68:3 110:13
119:13,16
**detained**
36:5
**detective**
40:5,7,8,11,13,15,17
57:11,12,14,15
59:11
**detectives**
25:18
**determination**
105:3 113:23 114:16
114:25 115:7,15,19
116:3 117:12 118:4
118:24 145:22
**determinations**
104:21 117:1 141:4
**determine**
113:25 124:14 131:9
164:6
**determined**
108:15 116:24
125:12 140:23
148:5
**determines**
125:4
**developments**
63:7
**device**
48:18,20 54:3,9
160:10,12,19
**devolved**
107:16
**de-escalate**

35:24 36:18 76:25
125:2,9,13 127:20
137:7
**de-escalation**
52:17 76:20 122:23
123:1,16,19 124:2
124:12,20,22 125:4
126:15,20,21
127:15 131:3,18
134:16 138:12
165:19 225:22
**diagnose**
105:11,12 180:7
**diagnosing**
180:7
**diagnosis**
179:22 182:16
**dialog**
184:2
**diaphragm**
69:25 70:2,4 76:14
77:2 78:9,16 79:20
80:4 147:10,19
148:12,16 149:15
157:22 158:3 159:8
160:17 163:4,18
**died**
156:8
**Diego**
39:16
**differ**
49:21
**differed**
78:2
**difference**
12:1 93:13 141:7,13
145:10
**different**
25:8 28:13 44:21
57:17 64:20 75:4
78:11 95:23 107:6
107:14 201:16
202:21 222:13,25
**difficult**
95:22 142:5 209:21
226:3,9

**direct**
39:21 79:21 80:15
113:22 122:4
127:24 132:1 142:1
**directed**
113:3
**directing**
71:8
**direction**
113:6
**directive**
83:22,23,24 84:1,6
85:1,2 92:18 93:16
95:18 134:20
147:18
**directives**
92:21,23,24 128:7
134:10 209:22
**directly**
63:25 150:10,16
**disagree**
76:9,11,22,22 80:6
123:4,23 132:24
137:22 144:3,5,7
149:2,8,10 155:3
157:19 165:7,12
**discipline**
31:9,14 34:2,5 49:7
117:17 194:25
**disciplined**
31:12 60:9,12 61:2,9
62:7 119:6
**disclosed**
24:22
**disclosure**
14:7 24:21
**disclosures**
14:6 70:24
**disconnect**
193:19
**discovery**
12:6 21:18
**discuss**
7:13 78:14 81:5
146:6 174:23
182:11 200:5



discussed
78:3 217:9
discussing
108:9 213:3
discussion
35:17 81:19
discussions
35:6 186:17
dismissed
30:15 37:23
disoriented
135:12,16 224:18
dispute
35:11 80:1,2
disseminated
207:13
distance
96:10 124:19,20
126:18,18 127:19
distorted
184:24
distraction
160:12
distress
140:3 182:19,19
distressed
178:21 179:3
distributed
207:5,15 208:13
district
1:1,2 15:5,10,10,21
dive
72:1
division
28:21 30:23,23 41:5
43:23 44:8,8,9
46:15,17 120:19,20
185:3 199:16,19,22
divisions
67:4
doctor
82:19 105:2
doctor-patient
82:15
document
24:20,23 85:24 87:24

116:12 122:5,6
170:5 171:3 195:15
206:6 207:19
214:23 215:12
documentation
140:5 207:14
documented
74:25 195:24 196:10
documents
18:7,23 19:16 122:7
123:12 208:12
doing
45:7 46:14 96:23,25
98:3,5,11 100:16,16
184:16
domain
85:24 86:2 87:23
88:13,13
domains
26:12,14,16
Dontel
103:14
doubt
74:6
downs
18:25
dozen
45:11 49:14
dozens
49:13
Dr
20:3 185:9,12,14,19
186:6,8,12,18,19
draw
167:21
drawing
71:12,24
drawn
42:21
drive
48:18
driver
34:25
driving
35:1
drug

23:12,13 25:12
due
62:20 100:16
duly
4:9 229:7,15
Duran
1:12 154:10 167:7
187:7
Duran's
154:25
duration
159:10 163:24
duties
97:3 190:8 208:7,9
duty
29:20 32:21 33:4
46:3 60:1 76:18,19
117:20 165:20,24
166:17 174:3 196:2
dying
158:5 183:7
D-e-F-o-e
7:9
d-r-i-v-e
48:18

———————————————
E
———————————————
earbuds
158:4
earlier
63:8
earn
22:24
easier
71:7,16 170:13 171:6
East
41:5 57:17
Eastern
15:10
education
22:9 209:17 217:17
221:4 223:7,13,21
223:23 224:6,9,15
224:20,25 225:1,8
225:20 226:1,7,15
226:22 227:4

effect
68:14 69:25 75:16,18
77:6,18,24 78:1,22
78:24 79:7,21
160:13,19 163:8
174:25 229:11
effecting
54:1 68:10
effective
54:11 55:4,9 56:14
56:17,18 75:13
effects
135:1 138:14 140:7
effectuate
47:5 48:8,24 53:16
53:22 56:4 67:19,22
effectuated
47:22 68:19
effort
50:5 77:10 137:7
158:10,21 163:12
175:14
egress
99:25
eight
81:1 110:25
eighth
198:21
either
15:5,9 26:6 59:10
61:3 154:23 204:7
221:25
elbows
56:10
electronic
48:17 228:2
elevated
39:22
eliminate
51:19
else's
154:9
emanated
25:11
embody
131:25 133:1



emergencies
81:20 85:22 86:7
87:8 161:13,22
emergency
85:9,24 87:15 98:5
98:12,14,24 99:20
100:2,14 101:5,8,19
102:20 103:3,17
104:3,8,17 105:5,14
105:19 106:25
109:13,19 135:8,12
136:25 138:3 139:9
156:7 162:4 180:8
180:22 187:2 193:3
193:5 194:19 198:7
206:20 207:7
210:12,15,16 211:1
211:7 212:8,13,18
214:4
employ
94:12 95:9
employed
23:7 65:18,21,24
66:2,10,23 67:1
employee
229:17,19
employees
8:24 9:1,2,3
employment
23:4,6 26:24 31:3
32:22 37:15 39:21
63:25 65:1 198:25
200:10
EMS
109:18,18 110:7,17
166:20 184:25
210:15 212:20
214:10,19,19
EMTs
206:22
encountering
56:14 217:12
ended
23:14 25:11,12,13
35:1,12 36:1
enforce

132:7
enforcement
23:3,10,13,18 24:3
32:23 66:21 84:6,9
84:12,22,25 85:14
85:15,17,25 105:7
111:3 117:5 118:9
130:8 179:14 180:3
222:12 223:18
224:7
enforcement's
82:14
enforcing
26:23
engage
221:20
engaged
221:12 227:7
engaging
218:18
England
27:16
English
88:20 89:19,19,20
90:11,19 91:4,15
92:2 134:20 135:25
136:2,6,19
enjoyed
208:3
ensure
87:12 99:20 102:16
104:25 105:8 174:3
175:18 183:13
184:25
enter
149:24
entered
105:24 106:24
entire
119:10 123:5 126:22
133:21 134:11
157:2 171:3 186:20
208:4
entities
120:22 221:22
entity

120:25 218:19
221:19
environment
54:16,25 62:21 190:6
190:7
episode
195:3
episodes
201:14 225:12
equally
55:4
equipment
155:15
Eric
69:14,23 79:7,12,22
errors
192:22 194:6,10
escort
187:2,8 212:7,18
214:19
escorting
212:13
escorts
192:8
especially
68:2 108:4 135:1
147:24,25 183:12
183:22 193:20
Esq
1:3 2:6,14,14 205:18
Esquire
206:1
essentially
111:2
establish
73:22
established
145:10
Estate
1:4
estimate
58:24 67:25
estimating
69:11 120:6
estimation
53:2 120:5

et
169:22
ethical
133:2,8
evacuating
96:23,24
evaluated
199:17
evaluation
217:18
evening
31:13
event
19:13 67:14 87:16
97:10 98:8 123:6
events
7:4 219:3
eventually
20:15
everybody
71:17 96:15 205:14
EVGENIY
1:4
evidence
73:22 80:2 91:2
105:18 149:18
151:2 152:7,13
211:24 214:17
217:10,18 220:2
221:3 225:2 227:3
evidentiary
223:15
evolve
12:7
evolved
107:16
exacerbated
181:22
exact
13:20 72:7 87:24
164:4
exactly
128:16
exam
40:6 41:9
Examination


MAGNA
LEGAL SERVICES

3:1,6,7 4:24 202:12
**examined**
4:9 229:14
**examiner**
141:1 145:6,15
186:15 196:12,24
**examiner's**
145:20,22 165:1
**example**
55:5
**examples**
132:6
**exams**
40:9 57:7
**excerpt**
3:20 205:25 206:10
**excerpts**
154:23
**excessive**
113:19 117:19,22
168:14,17 180:12
196:1,7
**excited**
178:13,17 179:7,10
179:13,21 180:2,6
180:12,15,18,24
181:8,12 182:2
**excluded**
38:10 168:6
**excuse**
25:6 210:3 216:20
**executive**
63:20 141:5 143:6
181:8 196:10
**Exhibit**
3:12,13,15,17,18,20
24:12 70:14 141:19
169:8 170:5 204:20
205:11,12 213:7
221:8
**exhibits**
3:10 213:6
**existed**
90:15
**exists**
98:25 192:17 198:20

**expect**
52:12 110:2 194:16
**expedite**
129:20
**expedited**
129:1,21
**expeditious**
51:23
**expend**
20:13
**expenses**
21:2
**experience**
53:12 54:10 56:2
64:2,5,9,10 82:5,21
94:11 100:2 107:3
109:17 159:1
167:24 181:19
200:4 209:18 215:8
215:15 217:18
221:5 223:8,14,22
223:24 224:6,10,16
224:21 225:1,9,21
226:2,8,16,23 227:5
**experienced**
138:9 139:2,18
**experiencing**
87:6 98:2,6,9,15,20
100:13 101:19
102:20 103:3,12,17
104:3,7,17 105:13
105:18 106:25
135:8 136:25
139:17,22 140:1,6
180:15,18,22
181:12 194:23
209:20
**expert**
4:22 10:3 11:6,22
12:2 13:25 14:4,8
14:25 64:14 65:6
167:25 185:9
200:11 208:22
209:5 214:9 217:24
217:25 218:6,10,13
218:19 221:13,14

221:20 223:5,12
**expertise**
58:2,3 104:16
**experts**
19:21 109:12 168:11
168:14,23
**expert's**
14:11 20:2 123:10
**explore**
153:16,23
**extensive**
41:9 223:7,13
**extensively**
212:21
**extent**
104:9
**extra**
109:11
**e-mail**
17:9 169:20 170:7

_____
**F**
_____

**face**
35:23 116:22 129:18
140:25 149:25
173:8 174:8,19
196:13 226:3,9
**facets**
44:21 120:9
**facility**
34:20 82:10
**fact**
12:11 21:15 60:8,15
61:5,23 62:20 77:21
80:9 82:4 90:18
93:20 101:7,12
103:15 104:13
106:1 113:25 116:9
117:15 118:24
120:2 124:24
125:10 138:20
140:6 143:2 144:12
149:15 160:8
168:16,19 175:6
193:15,22 194:10
210:11 217:10

**factor**
140:22
**factors**
100:17 135:13
**facts**
39:19 51:11 120:11
156:24 168:12
181:15 186:24
195:7,9 218:25
219:10
**failed**
88:19 89:5 122:21,22
186:25 187:1 192:1
192:15 198:23
**failure**
156:4 172:25 175:6
196:1,3 212:6
**failures**
195:24
**fair**
14:12 26:25 36:21
37:7 65:12 88:3
165:8 172:23
179:14 202:16
213:2
**fall**
31:18
**fallout**
199:20
**false**
91:19 137:20
**familiar**
66:5 78:20,24 123:7
185:8
**family**
22:6 63:8,20 64:8
193:6 194:2
**family-related**
17:11
**far**
201:12
**far-out**
201:19
**fashion**
10:10
**father**



89:9,18
**father's**
90:10 92:4
**Fe**
230:7
**fearful**
101:25
**feasible**
123:2 130:22 131:5,8
**February**
205:22
**Fed**
229:11,15,20 230:1
**federal**
15:2,4,9,22 17:10
23:10 24:3
**feel**
54:10 90:9 124:2,11
135:16 174:17
176:5,17,20 182:25
222:18
**feeling**
134:25 138:13
**felt**
129:24 130:2,4
**female**
101:24
**females**
101:11
**fielded**
209:14
**fifth**
172:20 213:23,23
**fight**
34:6,8,10 35:21,24
36:7,12,14,15,17,19
37:10,11
**fighting**
168:3
**figure**
211:13
**file**
38:9,13 72:7,13
74:15 223:9
**filed**
39:11 69:2,8

**filing**
144:9 145:21,23
**film**
200:21
**films**
200:22
**final**
72:20 118:3
**financially**
229:20
**find**
53:4,21 56:13,20
81:9 113:19 114:16
115:10 180:14
186:22 188:14
198:16 219:12
**finding**
191:24 192:13 197:3
**fine**
7:19 8:2 89:23 90:3
**finish**
6:5 152:21 153:18,24
**finished**
30:22 153:17
**finishes**
153:14
**finishing**
223:3
**fire**
62:4
**firearm**
124:17
**fired**
60:6,7,19
**firefighters**
206:23
**Firm**
2:3 4:20
**firms**
221:21,21,24 222:4,4
222:6,8,11,13
**first**
4:9 5:14 17:23 18:5
23:7 24:2,4 48:12
61:13 69:4 72:2
80:16,23 81:4,15

83:6,17 85:24 88:15
91:13 103:5 108:5
125:15 130:21
134:14 154:11,16
156:21,22 161:16
164:8 171:3 218:24
229:15
**first-aid**
109:5 173:9
**fist**
33:19 55:20 190:24
**fists**
204:3
**fitness**
43:22,23
**five**
44:8,10 55:15 63:8
118:18,19 119:13
120:2,6,13
**five-line**
201:7
**five-minute**
57:2 106:7 201:22
**FLEPC**
28:4,7
**FLETC**
24:3
**flight**
73:4 97:22 100:25
102:8 106:24
130:16,16 187:9
**floor**
2:4,11 157:12
**flow**
226:18
**Floyd**
10:3,6,21 69:20 79:8
79:12,22
**flu**
178:22
**fly**
217:22
**follow**
26:7 92:17,24 210:18
227:14
**following**

69:20 122:22
**footage**
164:5 220:16
**footnote**
142:1,2,7
**force**
16:14,15 18:8 23:14
27:13 41:20,25 42:1
42:3,4,11,12 45:16
45:18,22 46:9,10,16
47:5,8,15,21,21
48:6,7,10,24 49:2,6
49:6,10,19 50:1,21
51:4,8,15,24 52:13
53:5,22 55:19,24
56:3 58:21,25 59:1
59:6 68:4,9,12,14
74:4,19,20,21 75:8
75:21,22 76:5,16
77:6,13 78:6,14
79:23 101:1 111:4,6
111:9,13,18,19,24
111:25 112:1,14,22
113:3,7,11,15,18,19
113:24,25 114:2,3,5
114:7,12,22,22
115:11,12,23 116:6
116:10,18,19 117:7
117:19,22 118:2,9
118:11,22 119:2,7
119:15,22 120:3,8
120:14,15,18,19,23
121:4,5,10,20 122:3
123:8,13,15 140:14
140:16,25 142:13
143:24 144:16,22
145:2 147:6 148:8
157:14 159:15,15
160:4 162:24
168:20 174:23
175:7,21 180:12,12
188:23,24 189:1,19
196:1,7,13 197:4,11
197:18,22,25 198:3
198:4,14 199:17,18
202:25 203:3,7,12


**MAGNA**
**LEGAL SERVICES**

204:7,7,8,8 216:2
229:10
**forcing**
159:5,6
**foregoing**
229:23,24
**foresee**
21:21
**foreseeability**
64:6
**form**
7:22 55:20 56:3
114:4 124:20
126:20 216:16
**former**
34:16 69:18 112:25
128:19
**formulated**
132:21 133:5,10
**formulating**
86:1 88:13
**forth**
4:10 81:12
**forward**
17:12 18:13 80:14
**found**
49:6 55:3,9 56:18
60:8,21 74:17 75:20
76:2 114:11 117:13
118:22 120:7
145:19 188:2
195:17 197:21
**four**
12:24 45:24 50:2
63:8 67:17
**fourth**
213:23
**framing**
79:11
**Francisco**
23:14 24:1,7 25:5,12
229:3
**frankly**
79:14
**free**
153:15,16,22

**frequent**
107:10,13,23
**friend**
34:21
**front**
24:13,25 25:2 70:16
71:2,4,7 77:8 83:23
93:4 96:19,22 99:15
99:24 141:22
157:11 170:22
171:2 213:12
**full**
7:6 26:2,4 99:3,4
126:14 130:14
215:22 229:10
**Fullerton**
69:6
**fully**
152:25
**full-time**
9:2 23:16 57:6 58:8
65:3,4,5
**function**
40:25 44:16 58:2
**fundamental**
192:22 194:5
**further**
202:1 227:16
**future**
197:10

_____

**G**
_____

**gain**
99:6 161:5,9
**galley**
101:6
**Galten**
1:25 4:4 227:20
229:6
**gap**
169:20
**Garner**
69:14,23 79:8,12,22
**gas**
58:6
**gasping**

181:23
**Gates**
33:15
**gather**
202:5
**gathered**
202:8
**gear**
155:15
**general**
42:2,4 72:1 77:5,9
78:20 114:4,4 122:2
122:3 132:17 134:5
158:18 163:7 165:7
174:23 185:2 191:6
214:14
**generally**
213:25
**General's**
3:17 16:18 18:7 72:3
72:15,19,25 73:5,15
73:21 74:3,12,17
75:6,20 76:9 125:23
140:21 141:6,18
143:7,19 144:4,18
148:5 149:3,10
165:2 187:22 188:1
188:2,13 191:4,12
191:19,25 192:13
195:17 196:6 197:3
197:21 198:14
199:8,12,15,24
212:22 216:6,22
221:24
**generated**
84:10 107:17 119:2
165:18 199:19
**geographical**
67:4
**George**
10:3,20 69:20 79:8
79:12,22
**Georgia**
23:11
**germane**
85:15

**gesture**
95:2,21
**gestures**
5:19 94:17,20,25
95:6 209:23
**gesturing**
95:8
**getting**
37:25 44:18 61:10
189:14 202:15
**gfrangos@panynj....**
2:13
**give**
5:9 10:21 27:22 37:8
39:6 58:5 129:14
158:5 170:9 205:13
208:4 213:9
**given**
5:8 9:5 14:13 15:3,8
15:14,21 20:16 26:6
38:4 86:13 92:18
109:5 131:18
146:20 206:21
207:2,3 230:1
**giving**
94:22 95:17
**gleaned**
198:9
**go**
10:1 11:23 20:15
23:4 24:9 34:14
35:8 40:24,25 50:17
55:16 80:18 81:11
95:16 110:22
122:17 131:15
143:2 146:8 151:24
152:3,15 161:11
170:12 171:2,3,4,7
171:8,14 172:18
188:12,15 190:25
197:19 201:12
218:15,20,25
**goes**
20:23 21:20 109:24
197:16
**going**



6:13 7:12 18:13
20:20 21:22 35:8
38:20 49:23 50:2,7
50:17 55:14 70:19
78:17 79:4 80:15
81:11 90:24 99:14
99:16 102:1 105:16
109:23 114:9
120:22,25 129:7
131:23 134:24
135:12 136:15
138:10 140:11
141:5,24 145:5
151:23 152:4,4,21
152:23,23,25
153:19 155:10,13
160:17,17 161:11
162:4,6 164:24
171:5,9,9,9,10,10
171:11,11,11,12,12
171:12,12,13,13,13
171:13,14,14,15,15
171:16,16,16,16,17
171:17,17,17,18,18
171:18,18,19,19,19
171:19,20,20,20,20
171:21,21,21,21,22
171:22,22,22,23,23
171:23,23,24
172:18 177:17
181:16 183:3,23
184:15 185:23
188:13 192:18
194:1,3 195:7
197:19 202:9
203:20 205:10,14
205:24 206:9
216:14,18 218:18
223:17 227:14
**good**
4:13,17 5:1 8:5
227:12
**government**
25:16 221:21
**grade**
44:1

**graduated**
28:15
**graduating**
23:9
**Grand**
27:11
**gravity**
210:17
**great**
7:20 25:4 121:21
124:15 169:16
170:2 202:13,17
**greater**
210:25
**Greenwich**
2:11
**grieve**
190:2
**GRIGORY**
1:5
**groaning**
181:23
**gross**
192:21,25 193:23
**ground**
48:11 50:6,18,20
93:12,18,24 147:25
150:13 156:20
168:3,3 183:23
211:13
**Group**
8:12,14,21 9:12
**Grove**
63:19
**grunting**
184:4
**Guardia**
66:14
**guess**
35:5 201:20
**guide**
26:6 132:18
**guidelines**
146:7,12
**gun**
60:15,19 62:4 219:17

**gurgling**
179:3 181:22 183:6
**guttural**
181:22
**guy**
201:13,18
**gym**
65:10 200:12

---
**H**
---

**half**
40:17 49:14
**half-dozen**
48:14
**halt**
135:14
**hand**
5:19 94:17,20,25,25
95:20
**handcuff**
47:10,16 160:4,23
161:6 164:2 185:5
**handcuffed**
47:13,17 50:11,14,18
59:5 150:12 151:3
154:14 155:8
156:19 159:13
164:8 166:6,9,14,22
167:5 173:24
**handcuffing**
50:8,19,25 51:2 54:1
54:5 59:3 68:15
160:14,19
**handcuffs**
59:7 154:15 157:1
159:19 167:12
173:2 183:24
**handful**
38:8 39:12 118:16,17
**handle**
121:1 209:8,11 216:8
216:24
**hands**
79:15 80:12 97:10
**happened**
30:8 37:14 39:9

150:24 173:12
184:13
**happens**
62:19 107:23
**happy**
6:12,18 7:20 71:9
80:14
**Harbor**
67:7
**harm**
98:4,10 102:13
193:14 210:20,21
**head**
5:19,24 126:7,13
143:17
**heading**
161:23
**health**
84:22 85:7,12 87:13
87:15 103:10 176:3
176:12,16,21,25
**hear**
18:10 62:4 151:17,18
182:13 183:6
184:15,23
**heard**
41:18,19 168:13
**hearing**
30:14,14 183:8
**heavy**
181:21
**heightened**
211:9,15 215:25
217:10
**held**
29:5 41:22 43:5,11
44:24 45:8,14 57:5
57:10 58:11 59:9
186:14 202:21
**help**
63:14 64:2 103:18
104:1 122:7 210:14
211:3,17 212:14
**Henderson**
178:14
**Hennepin**



10:19 222:1
**hereinafter**
4:10
**hereto**
230:7
**high**
133:8
**higher**
40:14 57:8 109:19
**highest**
22:9 23:22
**highly**
62:17 142:11 143:23
144:8 145:1
**hired**
23:11 63:18 64:20
221:25
**history**
23:4
**hobble**
54:2,9
**hold**
28:22 39:23 40:2,15
43:9 44:4 53:17,21
83:13 157:15,20
158:1 159:2 160:3
164:13,20
**holder**
229:8
**holds**
75:25 92:12
**Holland**
66:16,21
**Hollenbeck**
41:4
**Hollywood**
35:2
**home**
8:8,10 201:16
**homicide**
46:15 77:2 120:18
140:24 141:2,8,8,11
141:11,14,14 145:8
145:11,11 196:18
**hopefully**
94:7 128:7

**hospital**
61:21
**hostility**
225:14
**hour**
4:3 19:10,11,12,15
55:14
**hours**
20:12 26:18 35:2
**human**
74:20 155:14 188:25
**hundred**
58:15
**hundreds**
52:25 104:22 199:17
**Huntington**
7:9 65:10
**hurt**
219:17
**hurting**
100:3
**h-o-b-b-l-e**
54:3

---

**I**

**idea**
45:11 93:16,24 98:19
186:13
**Ideally**
50:16
**identical**
134:12
**identifiable**
92:10
**identification**
24:12 70:14,20
141:19 169:8
205:12,25
**identified**
172:1,13
**ignores**
79:14 80:9
**II**
28:25 29:11 30:21
31:7 33:24 39:23
40:13 43:7,9,14

59:10
**III**
39:25 40:3,8 45:20
**II+1**
43:12,13 44:4,24
45:9,15 49:16 57:6
63:3 117:4
**ill**
87:6,10
**illegal**
165:24 175:8,21,25
**image**
133:20
**immediate**
51:13,20 52:15
124:11 197:14
217:14 224:2
**immediately**
50:9 103:16 116:8,12
135:13 166:7,15,18
166:22 173:24
187:2 215:18
**imminent**
121:21 124:15
**impact**
10:5 31:21 48:16,20
53:12 54:7 157:21
158:1 190:6,6,13
**implementation**
189:20
**implemented**
192:7
**importance**
211:6 217:9
**important**
51:17 90:9,14 99:6
100:12 107:24
108:4 148:1 183:25
184:18 194:18
196:19,20
**improper**
79:13 80:5 91:5
153:21 175:25
226:17
**inadvertently**
99:21 102:17 210:21

**inappropriate**
159:9 175:9,21
**incapable**
143:10 144:23
**inception**
20:17
**incidence**
114:22
**incident**
16:13 18:8 30:12,16
30:21 33:17,19 34:6
34:8 38:3,15 39:14
45:10 46:5 61:16,20
62:13,15,17 67:15
67:20 69:14 72:3,16
72:20 73:1,6 74:22
75:1,3,18 76:12
77:7 79:9,11 81:25
105:8 107:5,6
110:11,16 117:23
119:4 123:16 125:6
125:8 126:22,23,25
140:24 149:5,17,19
156:12 158:9,13,15
159:25 165:14,25
175:1,22 176:2
177:14,21 178:3
180:19 183:4
184:10,22 187:23
189:2 191:5,20
192:22 193:20
194:7 197:23
198:15 200:2
**incidents**
29:16 44:19 45:25
46:7 47:20 49:8
67:12,12 68:1 76:24
79:14 111:5,6,9,18
113:11,15,18
114:12 115:11
116:18 118:10,19
118:21 119:13,19
121:4,5 125:9
184:22
**include**
76:13,15,18,20 85:13



115:3 120:13
**included**
88:3,11 115:6 165:21
209:5 212:1 215:9
**including**
49:6 52:21 56:10
58:25 63:19 69:23
76:4,13 169:22
174:12 221:18
**inclusive**
76:23
**income**
25:16 65:8 200:15,18
200:20
**inconsistent**
115:16
**incorporate**
197:15
**incorporated**
188:10 200:7 207:10
215:24
**increasing**
226:10
**INDEX**
3:1,10
**indicate**
95:21
**indicated**
89:25 106:22
**indication**
167:6
**individual**
30:7 35:5,11,13,18
35:19,20,23 50:25
52:14 53:2 81:24
83:24 87:18,22
92:15,15,16 93:8
95:25 97:11,11,19
97:20 98:15,16,23
99:13,19 100:1
101:11 105:4,25
106:20 113:13
126:12 135:2 138:5
138:21 155:22
157:17 159:19
160:4 173:16 179:4

196:3 212:2 216:2,9
216:25 217:12
225:4,10 226:11
**individually**
4:16 5:5
**individuals**
30:4,6 34:16 51:20
85:13 86:19 87:6
94:1 95:10 97:15,16
97:22,24 98:16 99:4
99:4,15 101:7,23,24
113:15 119:6
124:10 197:14,18
209:19 215:7,15,18
224:1
**individual's**
56:11 77:1 166:6
194:21 225:4
**ineligible**
32:9
**inflection**
129:21
**influence**
87:9 124:25
**inform**
115:25
**information**
78:9 85:1 104:5
106:3 107:1,14
108:12 110:1,3
112:10 114:25
115:20 135:3,4
139:19 154:8
169:21 182:1,22
186:2 193:17
196:20,23 197:15
207:13 209:4
215:23 219:24
221:22
**infractions**
29:8
**infrastructure**
66:13
**ingress**
99:25
**initial**

17:3 18:17,21,23,25
19:3,24 26:18 30:14
50:1 76:11 105:16
107:15,17,20
193:16 218:22
219:3
**initially**
36:13 41:4 99:17
**initiate**
52:12 116:9,14
174:12
**initiated**
173:9 182:23
**initiating**
184:2 193:20
**initiation**
174:12
**injure**
102:16,17 104:25
105:9
**injured**
54:20 60:1 62:5
99:21
**injuries**
60:22 62:9 140:25
196:13
**injuring**
52:20
**injury**
121:21 124:16
142:14,19 143:11
144:1,23 145:4
**input**
196:23
**inside**
54:24 55:1,4 60:5
**insight**
115:1
**Inspector**
191:5
**instance**
11:19
**instances**
202:24 203:2,5 204:6
218:9
**Institute**

178:15
**instruct**
185:24
**instructed**
75:9,22 125:16
**instruction**
27:22 185:3
**instructions**
5:10 6:22 26:7 49:21
**instructor**
168:2
**instructors**
178:13
**instructs**
74:19 188:23
**insufficient**
73:22
**insurance**
222:7,8
**intend**
100:16 122:17
**intending**
98:4,4
**intent**
98:9,10 193:13
**intentionally**
193:4,14
**interaction**
25:18 145:6
**interactions**
196:15
**intercede**
117:20,21 165:20
174:3 175:17
**interceded**
117:24
**interested**
229:20
**interests**
63:21 74:21 188:25
**interfacing**
44:13,20,22
**interference**
190:11
**interim**
18:11


MAGNA
LEGAL SERVICES

**intermittently**
17:6 86:25
**Internal**
46:17,20,22,25 59:15
59:17,19,19,21
116:8
**interrupt**
153:7
**interrupted**
152:12,20 153:6,22
**interrupting**
152:22
**intervene**
76:19 117:20,21
165:20,24 166:5
174:3 175:7,7,17
176:1,5,6,8,9,13,15
176:20,24 177:3,5,8
196:2,2
**intervened**
103:18 117:24
**interview**
10:7,11,12,16,18
43:17,20 46:13 61:3
61:19
**interviewed**
10:20 72:24 73:2,4
**interviewing**
196:21
**interviews**
40:9 196:21
**introduce**
205:10
**introduced**
91:1
**investigate**
73:15 191:13
**investigated**
72:3 111:4,17,24
113:10 114:13
115:11 116:18
118:10 120:17
121:4
**investigating**
112:1,17 120:23
187:23 191:4 200:1

**investigation**
16:17 46:16,17,20,23
46:25 59:15,18,19
59:20,22 72:25 73:6
73:16,17 111:20
113:1,8,21,21
114:20 115:6,21
116:9 119:10
120:10,12,20 148:6
190:23 191:14
195:18 196:23
212:22
**investigations**
16:16 111:18,25
112:14 116:24
181:3 191:10
199:18
**investigative**
191:20
**investigator**
112:6
**invoice**
21:9,11
**involve**
206:14
**involved**
11:1 12:22 16:15
29:15,17 33:17 35:4
35:10,25 36:14,19
45:17 47:1 55:8
62:18 64:8,24 73:23
80:8 110:15 111:5
112:21,22 113:6
117:7 119:17 146:1
147:2 149:19
156:12 177:14
186:11 192:14
196:22 198:15
199:21 219:18
225:7 226:25
**involvement**
11:3 189:18
**involving**
34:6 68:22,24 72:4
167:25
**In-Custody**

178:15,16
**in-office**
205:5
**In-Service**
109:6 177:13 207:14
207:16
**irrelevant**
180:24
**Irving's**
190:23 191:16
**isolated**
100:13,19 101:2,12
102:7
**issue**
17:8,11 18:2 87:14
114:3,6 135:24
144:12 172:16
178:23 198:23
199:3 211:19
**issued**
19:18 33:9 70:12
72:16 75:2,3 81:1
145:15 229:9
**issues**
115:3 148:2 184:6
193:11 205:5
**issuing**
72:20 145:17
**ISTs**
206:13 207:3
**italicized**
196:19

——————————
**J**
——————————
**J**
2:6
**Jersey**
1:8,9 2:10 4:15 5:5
15:15,19,22 16:12
65:25 66:6,15
190:19 205:19
**JetBlue**
73:4 127:12 130:16
187:9
**JFK**
66:14

**job**
5:15 43:16,17
**join**
25:17,20
**joined**
25:20
**joining**
23:15
**JONATHAN**
1:11,12
**Jones**
14:19 222:5
**Joseph**
1:11 176:19
**Jr**
2:6 4:20
**judge**
168:15,18
**judges**
38:22
**July**
18:10 69:8 72:8,9,9
77:6 79:21
**Jump**
93:23
**June**
17:4,23 18:5 24:17
25:5 44:5 63:12,13
174:24
**jury**
168:12
**justice**
22:23
**justification**
180:3
**justifies**
144:9
**justify**
180:12

——————————
**K**
——————————
**keep**
20:7 171:9,9,9,10,10
171:11,11,11,11,12
171:12,12,13,13,13
171:13,14,14,15,15


MAGNA
LEGAL SERVICES

171:15,16,16,16,16
171:17,17,17,18,18
171:18,18,19,19,19
171:19,20,20,20,20
171:21,21,21,21,21
171:22,22,22,22,23
171:23,23,23
**keeping**
149:13
**Kelly**
69:5
**Kennedy**
66:14
**kick**
54:4
**kicks**
56:10
**kill**
105:9
**killed**
220:7
**kind**
35:7,10,11,16 64:10
100:1 201:18
**kinds**
155:15
**kneeling**
162:25 163:16
**knees**
54:4
**knew**
37:17 92:3 106:24
110:3 136:11 138:5
138:5,6,8,18 139:1
139:4,6,19
**knife**
124:17
**know**
5:8 6:11 7:15,16,25
10:5,8,9,18 13:20
14:1,2 20:25 21:1
21:17,18 24:24 27:8
27:8,10,12 28:3
31:25 37:4,6 38:18
43:4 47:14 54:20
60:1,19,22 63:22

64:23 69:24 71:2,10
71:16 72:7 80:6,9,9
84:8,11,13,17,18,20
84:24 85:11,14,17
85:23,23,25 87:23
88:14 89:13 90:14
92:1,3,6 93:10,11
93:13,22,22 95:2,3
96:21 97:9 98:10
99:15 102:6 103:2,9
104:2,9,15 105:13
112:9 116:4 118:21
119:17,19,21 120:1
122:1,5,9,11 126:24
127:7 128:16 130:3
132:11,11,20,22
134:9,10 135:1,6,14
135:18,19,20
139:25,25 140:2
141:7,13 145:10
146:15,15 150:3,20
156:24 157:10
162:5 163:15,15
164:4,10 166:11
167:7,16 168:8,20
174:10 175:24
176:17 177:8,9
178:18,20 179:4
185:7,11,17 186:1,4
186:8,9,12,14,16
188:6 189:10,12,17
190:13,16 191:8,13
192:4 194:11,11
195:7,21,22 199:6
200:5 202:15 206:6
210:17,17 211:15
212:21 213:11
217:21,23,23
218:18,18,20 219:6
219:7,14,24 220:12
221:13,19 222:4,5
222:20 223:20
224:5 227:13
**knowing**
99:19 177:5 194:11
211:25

**knowledge**
10:13 13:13 43:3
77:25 147:2
**known**
41:18 48:13 51:12
138:8 226:19
**knows**
63:22 210:11
**Kris**
185:9
**K-r-i-s**
185:9

---

**L**

**La**
63:6 66:14 67:18
**labeling**
79:12
**labored**
181:21 183:5,14
184:4
**lack**
192:21,25 193:23
**Lagoda**
1:4 22:7 74:5 79:15
80:1 81:24 83:18
88:19 89:6,18 90:18
91:14 100:19 101:6
101:12,25 102:6,12
102:20 103:3 104:3
104:16 105:18,23
106:1 122:23
125:16,25 126:7
135:7 136:5,11,18
136:24 137:5,12
139:1,17,22 140:5
142:20 143:18
145:8 149:25 150:9
150:12 154:2,12,14
154:16 155:7,23
156:19,22 157:7
160:23 161:4,25
163:25 167:4,11
174:18 180:18
181:11 182:24
183:19 187:4

193:14 212:14
214:5,11,20 216:9
216:24 220:16
227:8
**Lagoda's**
72:4 80:4 89:9,18
90:10 142:11 143:4
143:23 144:7
149:21 150:17
151:3 154:4 155:1
155:20 156:13
157:6 158:9 172:23
173:7 176:2,12,16
176:21,24 177:20
178:2 196:13,16,25
197:12 198:1 220:5
227:6
**language**
75:4 76:3,13,15
77:21,22 78:2,4,5
78:11 87:24 89:7,20
90:5,11 91:15 92:2
92:6,14,23 93:3,14
94:2,14,18,21 95:6
95:10,21 128:11
132:13,17,22 133:1
133:6,14,24 134:3
134:11 136:19
138:4 147:17,18
163:10,10,15
165:17,17 168:17
182:5 193:11
194:12 198:16,19
**LAPD**
23:16 25:14,17,20,20
26:20 27:1 28:16,23
30:18,21,24 31:3
32:9 33:3,10 34:4
34:15 39:22 40:7,11
40:24 43:5 47:15
49:1 52:24 53:13
57:5,9,18,21 58:17
58:20 59:11,16
60:21,25 62:7 63:1
63:12 67:3,7,16
82:6,22 85:20 86:8



86:13,18 87:1 94:12
107:4 112:6,16
113:17 116:20
117:6 118:11 121:1
128:19 132:18
164:19 179:11
189:22,24 202:20
203:18
**LAPD's**
115:12
**larger**
111:10
**Las**
222:10
**law**
2:3,10 4:18,20 14:17
22:13 23:2,10,18
24:3 26:21 27:2,6
27:11 28:1,5,8,11
32:22 42:16 43:3,4
69:25 70:4 79:20
80:4 82:14 84:5,9
84:11,25 85:13,15
85:17,25 105:7
111:3 115:24 117:5
118:8 121:11 130:8
142:12 143:24
145:2 165:25
179:14 180:3
204:12 218:19
221:21,21 222:4,6,8
222:11 223:18
224:7
**Lawanda**
190:23
**lawful**
92:22
**laws**
69:13
**LAX**
67:18,20,23 68:3,5
**lay**
155:9
**layperson**
205:6
**Leadership**

41:14
**leading**
152:9 157:2 183:4
**learn**
72:2 89:17
**learned**
25:15 209:1
**learning**
26:12,14,16 85:24
86:2 87:23 88:13
**leave**
36:3 62:25
**leaving**
23:14 35:18,20 57:9
**led**
38:16
**left**
36:4 57:19 63:12,23
65:1
**leg**
50:3,4 54:8
**legal**
22:12,17 74:5 98:1
141:8,10,14 142:23
143:14 144:9,11,13
145:4,11,17 147:13
147:21,22 216:11
219:6
**legs**
54:6 157:20,21,25
158:1 159:5,6
160:16 173:4
226:11
**length**
211:10
**lesson**
86:7 161:13,22
**lessons**
84:21 85:5,21
**lethal**
42:2,2,12,12,15,15
42:20,21 43:2,2
45:16,17,22 49:6
55:19,24 59:1 67:12
68:9,11 111:6,6,12
120:14,14,18,23

121:11,15,15,18
140:16 204:7
**let's**
23:4 166:18,18,19,19
213:7
**level**
22:9 23:17 52:10
57:21,23 58:11
68:16 91:25 93:7,19
95:4,19 103:9,9
109:19 110:14
114:4
**levels**
207:6
**liabilities**
64:6
**liability**
9:22 12:24 222:9
**license**
83:13
**licenses**
82:25
**lies**
138:15
**lieutenant**
57:9 113:22 114:19
190:22 191:15
205:21 206:3
**life**
101:25 123:25 124:9
182:18 186:20
**life-saving**
187:4 214:20
**life-threatening**
226:19
**lightly**
160:11
**limb**
50:3,7 54:1 157:25
**limbs**
157:16
**limine**
37:22 38:9,13,14,21
38:23 39:8,11
**limitations**
168:11

**limited**
136:1 168:9 172:15
218:6 221:15
**Lincoln**
66:16,22
**line**
35:5,6,7,11 46:2
106:9 206:10,24
207:17 213:23,23
213:24
**link**
133:13
**list**
13:22 43:24 89:13
169:9,18
**listed**
13:22 19:18 20:1
**listen**
129:3,14 177:25
178:19 179:3
182:12 183:11
220:5
**listening**
178:21,25
**literally**
195:15
**little**
43:10 57:16 75:4
202:15 218:15
221:8
**live**
132:5
**lives**
74:23 124:1,10 189:3
**LLC**
8:16,18
**loaded**
97:2,8
**local**
65:21,24
**long**
22:11 24:6 28:22
35:7 39:23 40:2,15
43:9 44:4 72:14,18
92:21 118:20
163:25 190:12


MAGNA
LEGAL SERVICES

202:9
**longer**
98:24 138:13
**long-range**
48:19
**look**
13:20 40:16 51:23
88:9 122:4,7,12,13
122:14,17 141:21
144:19 169:1
170:22 172:19
188:12
**looked**
16:16 19:21 20:5
**looking**
24:11,16 89:12 121:3
121:24 122:1,2,11
122:13,15,16
138:21 155:25
158:18 170:10
219:23 222:21
**looks**
35:16 46:22 104:21
181:20
**loosen**
160:12
**Los**
23:15 25:9,13 26:3,5
26:8 34:25 36:4
41:5 44:17 63:6,19
67:6,7 86:2 87:2
115:8
**lot**
21:1 23:2 68:3
201:14,19 207:25
222:9
**loud**
7:21
**lower**
157:25
**lungs**
226:18
**lying**
62:3,4,13,14 226:3,9

————————
**M**
————————

**machine**
174:19 182:24
**maintain**
29:10 133:6,7 150:11
**maintained**
57:21
**maintenance**
64:6
**major**
25:14
**majority**
37:20 47:17 56:18
**making**
104:20 141:4
**male**
106:22 151:8 154:7
155:11 210:4,5
217:6
**malice**
98:7
**malls**
63:19
**Malysa**
2:14 4:17,17
**Mandarin**
93:16
**Manhattan**
34:18
**manner**
76:23 78:15 98:22
113:4 125:1 138:11
141:2 159:11,22
160:15,21 163:3
180:15 196:17
**manual**
134:11,11
**Marine**
34:16,19,22 35:10,17
35:21,22,23 36:3
66:19
**Marines**
35:4
**mark**
24:9 70:13 141:17
169:6,9 170:3
205:21 206:3

**marked**
24:12 70:14 141:19
169:8 205:12
**marking**
70:21
**Massachusetts**
2:4 4:21
**master's**
22:10,12,14,17
**material**
17:7 21:22 204:22
212:19 219:4,11,12
219:13
**materials**
18:15 86:1 205:2,6
206:14 207:4,5,21
208:11,21 209:1
211:23,25 212:1
215:10
**matrix**
123:8,12,15
**matter**
4:22 10:3,4,6,6,23
11:8,9,15,16,17,20
12:3,25 13:3 14:10
14:13,18,20,22 15:4
15:9,15 16:15,17
22:2 25:11,13 39:15
88:7 104:11 180:9
204:20 205:18,20
217:24 218:4
219:21 220:13,22
221:8 222:22 223:9
223:15 225:2 227:4
**matters**
9:19,22,23 11:6
12:10,16,21,22,25
20:21 21:2 47:8
80:10 148:21
167:25 186:10,11
199:25 217:25
218:1 222:3,3,7,9,9
**Matthew**
2:14 4:17 169:20
**maximum**
31:24 32:3

**mayor**
63:6
**Mazarin's**
20:3
**ma'am**
5:11,21 6:9,21,24 7:2
7:5 9:3,14 13:12,14
13:24 15:7,13 16:5
17:20 22:1,5,8
23:24 25:1,7 33:8
37:4 40:21 41:19
60:11 62:14 63:17
65:7,20,23 66:1,4,7
66:25 71:13 73:7,18
83:20 90:14 91:9
93:10 102:23
118:20 119:16
127:3 142:23
143:13 146:3 151:7
155:3 180:21 185:7
190:21 196:9 202:3
**mean**
31:23 45:3 50:16
64:5 65:18 71:19
85:16 93:21 125:11
126:17 128:23
**meaning**
208:6,6
**means**
43:15,17 113:2
125:12 128:24
129:20 135:25
**meant**
180:7
**mechanical**
51:3
**mechanism**
159:11
**mediation**
10:17
**medical**
19:20 20:5,6 76:19
82:10,22 83:1 85:16
87:8,15 98:2,5,12
98:14,24,25 99:20
100:2,14 101:5,8,19


MAGNA
LEGAL SERVICES

102:20,24 103:3,8
103:10,12,15,17
104:3,8,10,13,14,17
104:21 105:2,5,14
105:19 106:25
109:13,19 134:21
135:8,11 136:25
138:3 139:9 140:3
140:20 141:1,4,8,11
141:14 145:5,11,15
145:16,20,22 148:2
156:7 162:3,6,10,11
165:1 178:7 179:20
179:21 180:1,8,22
182:16,19 186:15
187:3,4 193:3,4
194:19,23 195:3
196:3,11,24 198:6
207:11 208:2
209:20 210:12,15
210:16 211:1,7
212:8,13,18 214:4
214:11
**medically**
105:11,12 109:4
224:12 225:11,23
226:25 227:9
**medications**
7:3 87:11
**member**
58:8 193:6
**members**
8:18 22:6 45:4
162:24 194:2
**Memphis**
11:8
**mental**
87:7,13,15 209:21
**mentally**
87:6,10
**mentioned**
19:21,23 33:16 62:1
104:11 117:1
125:21 185:17
218:16 221:13
**method**

50:12
**methods**
49:17
**Metropolitan**
43:22 44:8,9
**Mezzacappa**
1:12 176:11
**MICHAEL**
1:10
**Microsoft**
207:19
**middle**
54:19 138:3 193:15
194:13 195:3
214:24
**Miller**
103:14
**millimeter**
48:19
**million**
39:18
**mind**
202:5
**mini**
228:2
**minimum**
58:3
**Minnesota**
10:19 12:17
**minute**
106:6 166:9
**minutes**
35:14 55:15 154:15
164:7,9,10,11,15,18
202:8 214:6
**miscarry**
102:2
**misconduct**
59:21 116:7
**miscue**
197:9
**mishear**
55:25
**missed**
160:6
**mm-hmm**

5:24
**mode**
48:19
**model**
132:5
**moment**
80:19 88:8 163:11
166:9,12 173:6
174:7 188:14
**moments**
111:11
**Monaghan**
16:4
**Monaghan's**
19:23
**monitor**
172:25 183:12,13,25
184:1 196:3
**monitoring**
178:23 184:2,3,21
**monitors**
178:19
**month**
44:16 58:4
**months**
13:17 41:15 63:8
**morale**
133:21
**morning**
4:13,17 5:1 16:9
169:14 170:8
**motion**
37:22 38:9,20,23
39:8,10 168:9
172:15 194:4
**motioning**
95:6
**motions**
7:23 38:13,14
**mouth**
60:11
**move**
18:13 80:14 93:12,18
93:23 126:20
127:22 128:2,4
187:12 194:1

**moved**
99:17 100:23 166:22
**movement**
54:21 94:8 95:15
102:16 124:21
**movements**
54:18
**movie**
201:5,6,8
**movies**
200:16 201:2,9
**moving**
17:12
**multipart**
136:15
**multiple**
60:18 97:22 207:12
**municipal**
25:25 27:18
**murder**
222:1
**murders**
199:22
**M-e-z-z-a-c-a-p-p-a**
176:11
**M-o-n-a-g-h-a-n's**
16:5

---
**N**
---
**name**
4:19 5:2 7:6 8:11
39:16 70:2 89:10
**named**
4:16 5:5 72:23 89:11
**names**
119:17
**narcotics**
25:14
**Nathaniel**
103:14
**national**
84:2,5,14,20 85:5,21
86:6,14 201:1,1
204:15,22 205:1
206:15,16,18
207:22 208:12,22


MAGNA
LEGAL SERVICES

209:1 211:23 215:9 215:10
**native**
92:14
**nature**
109:20 129:19
**necessary**
49:2 74:22 76:3,13 102:11 168:20 189:1 225:23
**neck**
50:24 69:19 77:12 78:5,13 147:11,15 147:17 172:4 226:11
**need**
6:17 43:15,16 51:18 52:3 88:8 105:2 106:6 116:11 122:6 127:5,15 158:4 176:6,9 195:4 202:5 210:14 211:2,14
**needed**
54:17 76:25 130:4 160:10 176:17,24
**needs**
190:13 210:25
**negotiation**
87:4
**Nevada**
178:14
**never**
12:7 14:6,6,12,16,23 14:24 22:1 27:6 41:19 57:10 61:9,11 65:12,16,18 68:18 82:22 117:5 120:17 120:19,20 126:25 127:2 186:9,19 222:18
**new**
1:2,8,8,9,9 2:9,10,12 2:12 4:15 5:4,5 12:15,16,21,23 13:6 14:14,18,24 15:2,5 15:5,10,11,15,19,22

16:12,12 25:24 27:2 27:6,15,16 28:1,4,8 28:10 30:7 34:17 43:3 65:13,19,22,25 66:6,6,15 69:25 70:8 72:2,15,19,24 73:5,14,21 74:2,11 74:17 75:6,14,19 76:21 78:2 144:18 147:13 165:7,21 181:3 187:21 188:1 190:19,19 191:3,9 191:19,25 192:13 196:5 197:20 198:13 205:19,19 212:22
**Newark**
66:14,14
**newly**
41:15
**nexus**
32:22 184:16
**Nichols**
11:8
**night**
34:20
**nightclubs**
35:9
**nod**
5:19
**nominal**
200:19,19
**noncompliant**
54:16
**nondeadly**
47:21 48:6,7,24 49:2 49:10,18 50:20 52:13 53:22 55:19 55:24 56:3 58:21 68:4 77:5 121:5,10 121:17 147:5 202:25 203:7 204:8
**nonlaw**
84:22
**nonlethal**
204:7

**nonofficers**
205:6
**nonparticipant**
111:25
**nonresponsive**
157:4 173:4
**nonverbal**
94:9
**normal**
228:2
**normally**
68:16 194:15
**Northeastern**
22:21 23:9
**notary**
7:25
**note**
80:7,13 91:7 162:16 162:20 196:12
**notes**
201:23
**notice**
4:1 110:2 114:5 184:25
**noticed**
167:9 173:7 174:7
**notify**
116:8
**NRB**
1:7
**number**
11:20 20:12,24 21:18 76:4 100:17 111:10 120:6 122:20 131:4 131:24 140:11 143:1 144:15 146:5 155:18 164:24 165:3 170:14,16 171:8,9,10,10,11,12 172:19 174:22 177:17 178:1 186:21 187:13 192:19 202:19,21 204:14 211:4 213:6 213:18 217:21 218:1,9 219:15

220:4 221:1,15 229:9
**Numerous**
107:9
**nurse**
83:10,13
**NYPD**
65:18

---

### O

**OAG's**
213:1,17 221:7
**oath**
61:3 125:24 169:19
**oaths**
229:12
**object**
17:19 124:17 194:3
**objected**
152:11
**objection**
11:4 17:2 18:3,19 19:4 20:10,19 21:6 21:16 26:10 27:4,7 28:2,12 29:3,13,23 30:2,9,19 31:5,11 31:19 32:18 33:6,11 34:11 36:9,16,22 37:3,12 38:6,17 41:24 42:6,23 45:23 46:12,21 47:6,12,25 48:2,9 49:4 50:15 50:22 51:10,21 52:8 52:16 53:8,18 54:14 55:7,22 56:6,16,24 58:22 59:4,12 60:3 60:16 61:6,24 62:23 63:16 64:4,22 65:14 68:7 69:3,10,16 70:1,6,9 73:24 74:7 74:13,24 75:11,23 77:14,20 79:10,17 80:7,13 81:8 82:2,8 82:18 83:2,9,15 84:7,16,23 85:10 86:9,15,20 88:5



89:21 90:12 91:17 91:21 92:19 93:9 94:4,19 95:12 96:2 96:9,16 97:6,17,25 98:18 99:8,11 100:10,20 101:14 102:3,14,22 103:6 103:23 104:4,19 105:21 106:13,18 107:8,12 108:2,17 109:1,8,15 110:9,19 111:15,22 112:8,19 114:14,23 115:13 116:1,21 117:8 118:6,13 119:8,24 120:4,16 121:7,14 121:19 123:3,22 124:4,13 125:7,17 126:2,9,16 127:8,17 128:3,12,22 129:6 129:17 130:1,11,18 131:13,21 132:19 133:16 134:1,8,17 135:10 136:7,20 137:2,9,16,21 138:1 138:24 139:11,24 140:9,18 141:9,15 142:21 143:5,12 144:25 145:12,18 146:4,14,23 147:8 148:9,17 149:22 150:18 151:5 153:4 153:20 154:5 155:2 156:14 157:8,18 158:12 159:4,21 160:25 161:7 162:2 163:22 164:14,22 165:15 166:2,24 167:13 173:10,20 174:20 175:3,10,23 176:7,14 177:1,7,16 178:4,11 179:16,24 180:4,20 181:1,13 182:3,8 183:1,20 185:6,21 187:10 188:5 189:9,16

190:3,20 191:7,22 192:3,16 195:12 196:8 197:5,24 198:18 199:5 200:3 200:17,24 201:11 205:7 208:14 209:2 209:25 211:11 214:21 216:11,17 217:2 220:10 222:16 224:13 225:15 226:13 227:10

**objectionable**
90:1 152:8 153:3
**objections**
7:22 90:25 216:16
**objective**
12:10 100:14
**obligation**
118:1
**obliged**
35:22
**observation**
116:15 117:4,23 120:11
**observations**
108:13 117:2,10,11 117:14 118:22 119:3,5,7,10 120:7
**observe**
106:20 138:20 139:9 164:19 176:11 185:4
**observed**
101:1 115:23 116:4,6 116:10,17 117:6 119:14,21 120:2 138:21 139:7 154:11,16 156:22 156:22 164:8 165:24 166:13 173:1,16 175:8,20
**observing**
155:25 173:12
**obviously**
11:11 21:20 42:17

44:15,18 54:5 66:13 67:6 72:11 85:16 92:1 95:21 147:16 188:8 191:10 194:13 210:15 211:1,17 218:22 219:1,20
**OC**
48:13 52:23 53:7 126:6 203:22
**occasion**
37:6 39:11
**occasions**
16:21 47:4 48:1,4,5 48:20,22 53:15 67:18 68:9,13 219:15
**occur**
69:18 197:9
**occurred**
12:19 30:21,24 31:3 31:8 72:4 98:22 119:19 135:18 183:3 194:6 195:25 199:20
**occurrence**
107:11,23
**occurs**
62:20
**October**
24:18 25:6
**offends**
133:22
**offer**
20:4
**offered**
63:4,8
**offering**
102:23 142:23 143:14
**office**
16:18 24:7 25:5 72:3 72:15,19,25 73:15 73:21 74:3,17 75:6 75:20 76:9 141:6 143:7 148:5 149:3,5

170:7 187:22 188:1 188:2 191:4,5,12,19 191:25 195:17 199:8,12,15,24 212:22 214:13 216:6,6,21,22 218:19 221:23,24
**officer**
1:10,11,11,12,12 23:8 25:23 26:1,8 28:17,18,19,23,25 29:1,6,10,11 30:17 30:21 31:7 33:23,24 34:1,3,15 38:25 39:23,25 40:3,8 41:21,23 42:8 45:10 45:14,20 46:2,3,6,8 46:19 47:3,18 49:13 49:24 51:9,12,13 52:6,12,24 53:13 54:11 57:25,25 58:10 59:10,10 64:13 74:23 82:16 92:12,14 93:3 96:7 96:13 97:4 103:4,4 103:21 104:1,18,24 105:7,19,24 106:10 106:15 108:1,5 109:10 110:2,7 112:21 115:19 116:4,13,25 118:1 118:12 125:15,25 126:6 128:17,20 129:4,16 130:7,8,13 131:9 134:14 135:9 137:1,6,14 138:4,18 138:18 139:6,8,23 140:2,7 142:10,18 142:18 143:22 146:21 150:15 153:9 154:1,3,24,24 154:25 155:24 156:11 157:5 161:4 166:11,21 167:2 173:7 174:2 175:9 175:13 176:10,19


MAGNA
LEGAL SERVICES

176:23 177:4
179:14 182:23
184:1,2,5 187:7
189:3,22 190:13
193:21 195:19
198:6 201:10,13
202:20 203:18
206:13 209:16
210:3,11 211:5,21
211:24 212:12,16
217:5,11 219:8,17
222:1 223:18 224:8
227:1,24 228:3
229:22

**officers**
4:16 5:6 16:15 18:9
25:17,18 26:15,17
28:24 49:18 50:2
51:17 52:2,14,21
62:3,19 66:9 69:15
72:23 73:23 74:4,19
75:9,22 76:5,16,24
77:10 79:23 80:12
82:6 83:6 88:24
89:2 90:7 92:5
94:15 95:9 97:7
101:2 104:6,9
105:12 107:11,18
108:15,23 109:4,12
109:17,21 110:11
110:15,16 112:2,17
114:12,21 117:6
119:14,17 125:5,9
127:19 129:2,22
130:22 131:5,20
132:5 133:7,22
141:1 142:13 143:3
143:10,16,24
144:16 145:2,7,23
146:1,11 147:2,5
148:7,24 149:19
150:6,11,16,21
151:6 153:11 155:6
155:21 156:17
158:9,20 159:20
160:22,24 161:2,5

162:1,13 163:12
164:1,19 165:13,23
166:5 167:20
173:17 174:7,16
175:19 176:5
177:14 178:20
180:7 182:14
183:17 184:24
185:3 187:17 188:3
188:9,24 189:7
190:7,7 192:1,8,14
194:18 196:6,14,15
196:22,24 197:4,11
197:13,15,22
198:15,23,25 199:3
199:20 203:6,11
206:23 208:6,25
211:24 212:1,7
215:2,25 216:7,23
217:11 220:8,13,24
221:10 222:24
224:1 225:4,7,13,14
227:1,7

**officer's**
82:12 97:2 109:17
117:13 126:13
188:11 208:8
219:19,24 222:23
229:1

**officer(s)**
187:2

**officer-involved**
45:25 46:4 47:1

**office's**
73:6 74:12

**off-duty**
29:9,16,17,19,25
30:16 31:2,8 38:3
38:15 59:17

**Okay**
5:10 6:8,20 7:20
13:25 23:9 24:9,13
24:15,19 25:4 63:14
70:19 71:6,12,18,23
79:1,2 80:15 81:14
116:2 122:4,9,17

127:4 132:3 136:9
136:13,23 137:4
141:24 142:7
151:15 161:21
162:23 166:21
169:25 170:2,21
171:8,25 172:6,18
176:23 188:15
201:21 202:10
205:18,24 206:9
207:18 213:5,9,14

**oleo**
48:11

**onboard**
67:15 68:19 96:1
97:15,23 98:16
99:10 102:13
126:25 130:15
210:5

**once**
10:18 11:13 28:3
49:20 50:10 78:1
91:22 94:8 103:7
104:1 105:25
107:24 114:24
115:14 124:22
140:20 141:3
143:13 144:8
147:21 150:20
152:17 156:21
162:3 166:6 170:23
173:24 190:9
191:20 193:9

**ones**
165:10

**one-trick**
222:14

**ongoing**
188:10

**onset**
126:23

**on-duty**
32:16

**on-scene**
3:15 8:12,14,20 9:12
64:12 65:9 200:12

**open**
54:24 222:21

**opened**
64:13

**open-air**
54:16

**operas**
201:18

**operate**
100:8

**operating**
100:6

**operation**
25:19

**opining**
195:22,22

**opinion**
71:11 80:5,16,23
81:4,15 83:17 88:7
88:15 89:4 90:6,17
91:12,13,19 104:14
110:23,24,25
122:18,20,21
123:18 130:20,21
131:4,24 135:7
136:4,17 137:20,24
138:15,17 140:5,11
140:13,21 142:25
143:1,3,4 144:9,11
144:13,14,15,17
145:16,17 146:5
147:21 155:18
156:4 161:12
164:24 165:3
168:16 172:19,20
172:22 174:22
177:17,19 178:1
180:25 181:17,18
183:16 186:21,21
186:23 187:12,14
187:15 190:24
192:18,19,20
195:14 198:21
212:5 214:13,16
217:16 219:13
220:3 221:1



**opinions**
20:5 38:24 81:2
88:14 102:24 103:8
104:10 110:25
111:2 142:23 143:2
143:14 144:20,22
145:20 168:19,21
195:10 219:4
**opportunities**
32:9
**opportunity**
25:14 49:25 73:16
80:22 95:18 129:13
152:24 170:9
173:23,24 177:25
183:11 220:15
**opposed**
54:24 63:2 179:21
**option**
159:16
**options**
130:25 131:11
**oral**
40:9
**order**
15:25 18:17 40:6
47:5 48:7,24 51:18
52:13 53:6,22 55:20
56:4 77:5,9 78:20
122:2,3 127:15
132:17 158:18
159:18 160:4 163:7
174:23 185:2
214:19 227:25
**orders**
26:7 134:5
**organized**
23:13
**original**
16:3 17:1,17,17
18:25 78:11 187:8
197:19
**originally**
17:4 18:4 72:10
**OSHA**
84:15,18 205:4,8

**outfit**
221:10
**outfitting**
192:9
**outlined**
167:18 174:2 194:8
198:10
**outside**
9:11,13 14:21 35:21
35:22 102:24
109:11 113:5
201:13,19 221:17
**out-of-country**
63:21
**overall**
42:11 48:3
**oversee**
63:18 66:13,16
**overtime**
67:24 68:2,3 190:15
**owned**
64:9
**owner**
8:15
**owns**
63:6
**oxygen**
174:9
**o-l-e-o-r-e-s-i-n**
48:12
**o0o**
1:16,22 2:23 3:22
4:11 228:5

---

**P**

**P**
229:11,16,20 230:1,7
**PA**
85:6
**Pacific**
4:3
**page**
3:3,12 71:11,11
77:16 80:17 81:5,10
81:16,18,21 83:20
83:21,21 85:6 88:16

88:25,25 90:8
110:24 122:18
130:20 131:15,16
131:23 134:6
140:12 141:25
142:1,8 146:8,13
154:19 156:16
161:12,20 162:15
162:15,19 163:8
164:25 165:3
170:13 171:3,4,4,5
171:5,8 172:20
177:18 181:5,6,7,17
186:22 187:13
188:14,15 190:24
192:20 194:9 197:8
198:11 206:1,24
207:17 213:15,18
214:24
**pages**
3:14,16,19,21 146:25
170:15 206:9
**paid**
25:15
**PAPD**
1:10,10,11,11,11,12
188:16 192:8 197:8
197:11 215:6,13,24
221:10 225:3
**PAPD's**
188:22
**Papia**
1:11 142:18 154:10
154:12 155:4
156:15,21 157:5
164:9 166:11,21
167:2,3 173:7
176:23 182:23
**Papia's**
142:10 143:22 144:6
154:24
**paragraph**
88:17 110:24 111:1
111:17 121:2
122:20 131:24
132:1,3 133:19

162:15,19,23
177:19 181:18
187:5 188:15,18
214:24
**parallel**
46:16 87:9 191:14
**paramedic**
109:20
**paramedics**
206:22
**pardon**
32:2 181:7 193:21
**parent**
178:18
**parentheses**
163:2
**part**
10:18 18:5,22 24:21
28:3 36:14 66:20
70:24 72:24 73:5
74:8 81:15 87:5,12
88:7 90:17 91:13
109:6 113:4 124:22
136:12,21,21
137:24 141:23
142:25 148:5 149:3
152:7 153:15 154:1
154:3,6 157:11
161:16 175:15
177:5 187:25 189:8
189:10,21 191:18
204:18,18 206:10
206:11 208:7,8
219:5
**Partially**
137:3,10
**participant**
49:13
**participate**
57:7
**participated**
9:16
**particular**
20:13 21:14 43:16,17
74:2 110:10,11
127:11,12 198:8



200:2 201:15
213:17,21 214:24
215:5 219:8 223:2
**parties**
99:17 229:18
**partly**
119:9
**partner**
46:3 59:25 60:6,14
60:19 61:4,22 62:4
**partnership**
8:23
**party**
221:19
**part-time**
9:2
**passed**
139:21
**passengers**
99:13,24 130:15
**pathogens**
207:8
**patient**
81:6,21,25 82:3,10
82:13,13,20 83:18
83:25 85:8 162:1,8
162:12,13
**patients**
82:7 161:17,23
**patrol**
26:6 40:23,25 41:2,4
41:7 44:15,17 45:20
58:1 67:4 112:6,11
114:12 132:18
**PAUL**
1:12
**pay**
32:7 43:15 44:1
190:5
**payment**
18:17
**payroll**
190:14
**PA1802**
3:17
**PA1814**

213:18
**peace**
25:23 26:1,15 57:24
133:7
**penal**
26:21 27:2,6,18 28:1
28:5,8,10 42:16,18
42:22 43:3,4 121:11
**penalty**
10:22 31:17
**pending**
6:19
**Pendleton**
34:19
**pension**
57:20
**pension-based**
44:2
**people**
35:8 47:17 94:23
95:1 96:20,22 99:17
99:20 124:1 126:14
135:16 147:25
150:1 183:23 193:8
194:12 195:3
211:18
**pepper**
48:14
**Pepperdine**
22:12
**perceive**
87:13 209:23
**perceived**
225:13
**percent**
9:18,23,24 10:25
37:5 69:12 72:10
**perception**
108:20
**percipient**
113:2 193:18
**perfect**
195:22
**perform**
27:9 64:21
**performance**

190:8
**performed**
43:25
**period**
29:2,12 30:22 31:2
44:7,24 45:2,8 47:4
58:14 79:4 101:20
215:18 230:6
**perjury**
10:22
**permit**
29:18 33:20,22,25
59:18 131:19
**permits**
123:21
**permitted**
32:15 69:15
**person**
47:16 50:5,8,9 52:20
52:20 92:11 94:6
95:4 96:18,19,20
98:2 104:25 105:10
105:13 106:20,25
124:16 125:3 128:8
128:10,13,14,25
129:1 134:20,21,22
138:12 166:7
182:18 184:19
194:22,25 208:2
209:8,12,15,23
210:25 226:25
**personal**
56:9 203:17
**personally**
44:25 45:1 111:5
116:18 117:5
118:10 202:25
203:3
**personnel**
85:15,16 98:25 116:9
116:14 199:18
**persons**
226:10
**person's**
93:11,20 96:23 97:14
127:24 173:21

177:9,9 226:18
**perspective**
108:20 220:24
**pertaining**
83:1 85:21 161:13
192:10 200:1
**pertains**
75:15 111:21
**photographs**
19:17
**phrase**
121:9
**physical**
43:22,23 47:10 68:14
77:13 78:14 97:14
142:14,19 143:11
144:1,23 145:3
150:1 206:21 216:1
227:1,8
**physiology**
150:22 156:2 167:19
**place**
23:7 76:12 81:10
149:6 159:19
183:24 190:12
192:6 206:19 211:9
**placed**
154:15 155:19 166:7
166:15 167:12,15
**placing**
159:2
**plaintiff**
4:21 9:21,24 12:16
12:21,22 22:1 39:18
168:22 172:12
219:22
**plaintiffs**
1:6 2:2 4:22 16:25
17:5,16,23 18:2,5
18:11,18 21:11,25
22:4 24:21 37:16
70:23 72:14 89:11
172:11 185:10,16
185:17,19 217:24
217:25 218:1,7
222:3,6,7



**Plaintiff's**
9:17 16:7,9 149:20
**plan**
49:21
**plane**
96:24 99:14,18,25
100:13,19,22 101:6
102:8 104:18
106:23,24 107:2
135:5,5 139:14
149:25 150:7 193:7
212:20 220:23
**planning**
113:6 115:4
**platoon**
43:23 44:10
**play**
201:10,14
**playing**
201:19
**please**
5:17,23 6:11 7:6 23:6
34:14 73:11 80:13
81:9 90:22 151:21
152:3,13 153:18,20
228:1
**plural**
155:6 161:2 204:13
**plus**
44:1
**PO**
142:9 143:21
**podcast**
61:16,19,21 62:11
**point**
41:22 46:20 47:19,22
62:6 74:10 81:8
87:20 103:19
122:10 126:15,21
148:14 150:4,15
157:3 162:12
167:16,16 171:6
173:1,4 174:11
183:4,7 190:24
194:14 213:21
**pointing**

95:15
**police**
1:9,10 4:16 5:5 11:5
12:2 14:3,20,25
20:14 23:8,15 25:9
25:17,21,25 26:2,4
26:5,6,8,17,18
28:10,16,18,19,22
28:24,25 29:1,6,10
29:11 30:17,20 31:7
32:25 33:14,23,23
34:1,3 38:25 39:22
39:25 40:2,8 41:21
41:23,23 42:8 45:20
49:13 54:11 57:17
57:25 58:7 59:10,10
65:13,19,21,24 66:3
66:9,10,24 67:1,2,6
67:7 72:22 74:18
75:8,20,22 77:4
79:15,23 80:12 82:1
82:6,12,16 86:2
87:2 92:10,11 95:9
96:7,13 97:2,3
103:4 104:24
106:11 107:11,25
110:7 113:10
114:21 115:9 117:6
118:1 123:9 125:2
146:1,11,21 147:4
148:6,7,15,22 149:4
149:19 150:14
155:6,15 158:8
160:24 176:10
177:4,13 180:11
182:9 185:3 187:1
187:15,16 188:3
190:10,17,18 192:1
192:14 197:22
198:9,22,23,25
199:3,24 201:10,13
206:23 207:15
208:2,10,24 211:22
212:6 215:2 216:7
216:23 219:21
223:25 225:13

**police-related**
9:19 10:25 11:2,6
12:13 13:5 14:13,17
15:4,9,15,19,23
21:2 23:5
**policies**
16:11,13 26:12 42:12
46:23 69:21 75:10
75:16,17,21 165:12
182:10 187:14
189:25 190:2,12
**policing**
133:3,12
**policy**
16:14 26:11 42:18
49:7 74:19 75:1,2,3
75:8,13,14 76:1,3,4
76:6,11,18,21,22
77:15,17,23,24 78:1
78:2,9,10,16,25
79:11,18 114:1,1
115:3,12,17,18
118:23 119:3 158:8
158:14 165:18,21
165:22,25 175:7,12
182:11 188:23
189:13,19 204:12
**pony**
222:14
**poor**
36:3
**poorly**
25:15
**Port**
1:8,8,9 2:9 4:15,18
5:4 16:12 66:2,5,9
66:10 67:6 74:18
75:7,20 77:4 79:15
81:25 110:6,12
117:6 123:8 132:8
134:5 146:11,21
147:4 148:6,14
149:4 158:7,8
165:13 175:6
177:12 184:7 185:2
187:15,16 190:16

190:18,18 191:5
192:1,14 198:22
199:2 205:19 206:4
208:9,24 211:22
212:6 215:1 216:7
216:22 223:25
**portion**
165:6
**portions**
71:8
**ports**
66:19
**pose**
78:18 96:5 153:1
**posed**
6:13 27:24
**poses**
51:13 96:1,7,14
**position**
8:13 32:13 39:2
40:10 43:14 50:8,10
50:14,17,20 58:7
63:4,9 92:12 96:22
98:24 127:24
147:25 149:1,14
150:6,9,13,17,21
151:4 155:24
156:20,25 157:2,3
159:6,7,14 164:1,12
164:13,21 166:8,16
167:3,8 174:1,4
177:9 180:1 183:13
184:20 186:14
194:14 217:1 226:4
226:5,5,5,10,12
**positional**
12:25 39:15,18 68:23
68:25 75:25 80:11
146:6 147:2,23
148:3,20 167:25
168:4,7,25 171:1
172:2,4 182:10
184:17 186:11
226:19
**positions**
147:7



**possible**
127:19 202:17
**possibly**
87:19 93:1 106:22
  182:4,6 210:20
**post**
26:14 80:3
**postictal**
86:19
**post-incident**
76:4 79:1
**post-seizure**
137:13,14 138:20
  140:6
**potential**
76:14 98:14 135:24
  148:1,2 210:24
  226:24 227:6
**potentially**
31:6 62:24 68:8
  96:11 100:11
  123:25 134:19
  136:8 200:7 214:20
**PowerPoint**
84:2 85:7 86:6
  207:20
**powers**
58:7
**practice**
9:12 11:6 65:9
  168:10 172:15
  187:15 197:9
  221:16
**practiced**
186:12
**practices**
12:2 14:4,25 20:14
**practitioner**
83:14
**preassault**
56:15
**preassaultive**
56:8,11
**preceding**
33:22 75:1 173:23
**precinct**

41:2 44:6
**precursor**
131:9
**prefers**
8:3
**preforce**
115:4
**preliminary**
5:9 13:3 14:9 18:14
  30:14,14
**premised**
91:13
**premises**
9:22 12:24 64:6,8
  222:8
**prep**
21:21
**preparation**
11:12 12:6 16:8
  17:16 19:17 21:25
  185:25 208:18
**prepare**
15:25 38:21 41:8
  204:18
**prepared**
37:9 185:9 199:24
**preparing**
156:11 204:19
**presence**
92:7 94:16 95:8,20
**present**
212:17
**presentation**
84:2 86:6
**presentations**
85:7
**presented**
51:9 209:16
**Presently**
65:5
**pressing**
160:16
**pressure**
50:24 147:10,14,19
  149:20,23 150:2,16
  151:2,10 154:13

155:1,7,9,10,13,16
155:19,21,23 156:6
156:13,15,18 157:4
157:6,7,9,16 158:2
158:10 159:2,24
160:17 161:9
163:17 167:4
172:22 173:3,3,3
226:11
**pretty**
25:15 155:12
**prevent**
7:4 52:20 100:15
**prevented**
17:11
**Prevention**
178:15
**previous**
172:22
**previously**
16:21 217:5
**pre-litigation**
11:11
**primarily**
12:5 67:12 140:13,15
**printed**
170:14
**printing**
208:3
**prior**
9:4 11:20,24 13:2
  16:13,13,21,23
  17:14,16 18:22 22:7
  52:2 57:9 64:9
  72:12 76:18 79:5
  107:20 109:24
  110:8,17 139:15
  146:21 147:7,17
  148:16 168:13
  183:3 184:10
  198:25 199:3,8
  200:20 229:14
**privileged**
186:2
**pro**
222:4

**probably**
13:16 21:2 31:20
  37:4 38:7 39:12
  48:3,14,15,16,21
  49:14 58:14,23
  67:17,25 69:11,12
  118:16 221:18
**probationary**
29:1,11 30:22,25
  31:2 34:3
**probe**
48:18
**problem**
71:23
**problematic**
160:1 219:9
**procedure**
182:11 229:14
**procedures**
26:12 46:24 69:22
**proceed**
91:8 217:12
**proceeded**
153:5
**Proceedings**
228:4
**proceeds**
27:23
**process**
51:1 113:24 152:19
  218:16
**produced**
70:23 169:10,21
  204:20 211:23
**profession**
133:21
**professional**
82:25 178:7 209:18
  217:17 221:4 223:7
  223:14,21,24 224:6
  224:10,16,21 225:1
  225:9,21 226:2,16
  226:23 227:5
**professionalism**
131:25 133:2
**professionals**



85:8,12 109:5 180:1
**proffered**
124:8
**proficiency**
92:1 95:4,19
**program**
213:24
**prohibited**
162:24
**projects**
66:13
**prolong**
105:8
**prolonged**
184:22
**promote**
41:1
**promoted**
32:13 39:25 40:5,17
40:19 41:10,10,15
**promotional**
32:9 57:7
**prone**
50:14,17,20 148:25
149:14 150:5,9,13
150:17,20 151:3
155:24 156:20
157:2,3 164:1,12,21
167:3 226:4,9,12
**proper**
97:9 125:1 138:11
148:7,11 198:9
**properly**
76:23,25 102:15
125:9,11,12 127:20
128:6 138:11 149:4
149:7,9,12 174:4
187:1 224:1 225:3
**proposed**
200:6
**prosecution**
16:17
**prosecutions**
191:10
**protecting**
74:23 189:3

**protection**
63:20 178:16
**proven**
74:6 137:19
**provide**
10:4,7 20:22 46:13
99:25 113:21 115:1
119:12 120:6 128:7
148:7,23 152:7
168:18 182:16
187:3 188:8 214:11
214:20 215:1,25
221:22
**provided**
8:7 14:10 18:15
24:20 63:24 64:9
72:6,11,13 109:24
110:1 115:21
123:11,12 169:18
170:7,25 172:1
188:3 193:17 206:1
219:13 220:22
230:6
**provider**
162:11
**provides**
188:16 215:6,13,14
**providing**
103:7 104:10,14
108:18 109:12
140:20 152:13
160:13 162:5,6
187:22 197:13
222:19
**prudent**
124:23 125:4 183:21
183:22
**psychotropic**
87:11
**public**
22:10,14 44:13,20,22
120:23 132:9
**pull**
169:1,5 213:5,10
**pulse**
174:10,11,17,17

182:25
**punch**
126:7,13,19 138:22
**punched**
35:23 127:25
**punches**
36:8 55:20 56:3,10
127:21 140:23
**punching**
30:6 95:25 96:4
97:22 195:6 204:2
**punitive**
195:5
**Punk'd**
201:14
**purporting**
105:11 180:6
**purpose**
64:14,15
**purposes**
8:22 10:17 18:24
70:20 205:5,25
**pursuant**
4:1 229:13
**push**
157:20,21
**pushing**
157:22 159:7,8
**put**
24:14,15 43:24 50:7
50:9 70:16 71:9
77:1 89:22 94:25
97:10 98:23 99:1,23
110:1 115:17 129:4
130:7,13 141:24
151:7 154:6,7
155:11,12 156:13
157:6,7 159:13
160:17 166:15,18
166:19 172:23
173:25 178:14
184:24 190:12
205:13 223:11
**puts**
128:17
**putting**

147:14 149:13,14
158:2 161:9 184:19
225:17
**P-a-p-i-a**
176:23
**p.m**
228:4
**P.O.S.T**
25:22 26:1,12,15
86:3,24 88:12

---

**Q**

**qualified**
229:7
**quarter**
37:5 58:6
**question**
6:5,6,7,10,12,13,14
6:19,19 10:1 11:25
14:22 15:1 17:14
27:24,25 28:6,14
37:18 38:1 39:6,6
45:6 51:25 52:1,5
55:16,23 56:1,2
60:2,24 61:1 62:3
64:19 75:15 90:20
91:11,12 93:19 98:2
105:17 114:9,10
116:3,16 118:8
136:12 141:13
145:4 150:4 151:14
151:16,20 152:2,5,8
152:8,9,17,20,22,22
152:23,24,25 153:3
153:4,5,8,14,18,19
164:16 165:9
192:10,12 197:19
206:11,17,25
207:17,23,25 208:7
216:16 223:11
**questioned**
59:24 61:20 62:7
175:19
**questioning**
60:14 62:2,6 106:9
121:24 152:17



**questions**
 5:12,13 37:11,24
  72:1 78:18 79:3
  93:15 106:8 127:4
  152:16,25 202:1,5
  202:18,19 203:10
  203:21 204:11,14
  204:25 209:14
  211:4 212:9 213:16
  217:21 223:4,17
  227:12,14,17
**question's**
 136:14
**quick**
 24:8 158:4
**quickly**
 25:15 159:12
**quite**
 41:9 112:20
**quote**
 143:15
**quotes**
 143:25

---

**R**

**R**
 229:11,15,20 230:1,7
**radio**
 106:21 128:18 129:3
  129:14 130:7,13
  135:4 164:5
**rail**
 66:17
**rake**
 160:11
**Ram**
 199:15
**ramifications**
 31:9
**Rampart**
 199:16,19,20,22
**ran**
 63:5 191:14 217:21
**range**
 58:23 201:13
**rank**

23:22 28:16,22,24
  29:1,6,10 39:22,23
  40:2,5,11,13,15,19
  41:23 42:9 43:5,7,9
  43:11 44:4,24 45:9
  45:14 57:5,6,8,8,10
  57:13,16 63:3 82:7
  115:8 117:16
**ranks**
 59:9 202:21
**rate**
 19:10 43:15
**reach**
 201:19
**reached**
 22:6
**read**
 7:18,25 39:17 70:7
  73:10,12 77:22
  78:21 89:8 90:10,21
  90:23 101:7 129:4
  142:4,5,6 143:18
  151:7 163:11
  166:12 188:6,20
  206:8,9 208:16
  214:7 215:20 216:3
**readily**
 142:13 143:25
  144:22 145:3
**reading**
 122:10 198:10 214:3
**real**
 24:8 158:4 182:18
**realize**
 60:18 135:17 193:13
**really**
 30:13 37:13 69:18
  98:10 108:11
  136:11 179:17
  193:2 195:6
**rear**
 99:14,18 100:22,24
**reason**
 62:2 173:15 196:17
  211:16
**reasonable**

49:1 50:20,23 51:1,4
 51:8 52:5 53:5,9,21
 56:22 60:17,20,25
 74:6 77:10 92:11,16
 92:22 94:6 95:17
 102:17 104:24
 105:4,14 106:5
 114:1 117:12
 134:19 139:19
 145:16 147:23
 148:19,22 158:20
 159:20 160:3
 163:12,20 164:12
 164:16 168:20
 174:6 175:14 184:5
 195:19 204:6
 209:23 219:20
 222:23 223:18
 224:7
**reasonableness**
 27:13 114:7 159:15
**reasonably**
 74:21 110:2 123:21
  131:19 155:24
  189:1
**rebuked**
 180:10
**rebuttal**
 16:6
**recall**
 7:4 48:6 62:8 68:12
  74:8 86:10,16 91:9
  91:10 111:14
  118:20 119:25
  133:4,17 134:2
  177:15 185:22
  186:4 191:23
  200:13 202:22,24
  203:2,5,10,14,22
  204:5,16,21,25
  205:4 207:18,20
  210:6 212:9,11,24
  221:7,9 225:17
**receive**
 22:14,17,22 31:15
  32:3 85:19 86:17,22

89:14 90:14 109:11
 179:6 182:1 219:11
**received**
 19:22,24 21:8,10,10
  21:19,23 27:19 28:1
  31:16 32:5 33:21
  60:22 82:22 86:11
  87:1,21 88:1 89:12
  89:13 104:6 107:1
  108:12 133:4
  134:10 135:3,4
  146:17 169:12
  182:17 187:18
  196:24
**recite**
 168:12
**recognize**
 87:13 89:5 95:1
  104:23 109:22
  148:23 156:5
  182:14 183:17
  194:18 206:6,7
  213:19 223:19
  224:8
**recognized**
 92:9 101:18 103:16
**recollection**
 122:6
**recommend**
 185:19 215:23
**recommendation**
 114:19
**recommendations**
 73:18 117:10 187:23
  187:25 188:7 192:5
  192:7,11 200:1,6,8
  214:25
**recommended**
 99:2 146:1 197:13
  221:9
**recommending**
 198:2,5
**recontacted**
 18:9
**record**
 3:18 5:2 6:7 7:7,13



7:18 8:8 24:19 57:3 70:21 73:8,9 79:17 79:20 80:18,20 81:21 90:2 91:7 108:7 153:2,4,21 158:6 166:12 170:3 170:4,6 201:24 202:11 216:16 217:10,19 221:3 223:15 229:24

**recorded**
10:12 71:16 229:23

**recording**
71:17

**recordings**
19:16 129:11

**record's**
71:21

**recover**
174:5

**recovery**
98:23

**recruit**
25:21 206:13

**recruits**
188:17 215:7,14

**recumbent**
50:10 159:14 166:8 166:16 174:1 183:12 184:20 226:4

**reduce**
51:19

**Reed**
103:14

**ReedSmith**
222:5

**refer**
71:10 83:18,24 129:7 147:10 213:1

**reference**
86:1 88:2,13,16 115:18 131:4 170:23 180:24 194:1 205:6

**referenced**

146:13 165:3 181:2,4 181:6,6,8 213:15 220:3

**referencing**
75:10

**referred**
181:20 190:22

**referring**
9:1 83:20 84:1 87:25 103:21 112:13 119:14 121:5 146:9 163:7 193:1

**refers**
112:5,10

**refrain**
79:6 147:6

**refresh**
122:6

**refunded**
219:14

**regard**
142:12 143:24 145:2 218:17

**regarding**
10:1,2,2 17:8 51:24 78:7 81:20 87:8 91:3 135:24 147:1,5 147:17 149:11,12 163:11,11 168:6,12 168:25 172:2 192:7 205:1 208:22 209:7 217:5 224:1 225:4

**regardless**
82:6 92:13 93:2,5 95:10 97:14 98:14 118:3 129:21 138:2 182:21 211:8

**regulations**
184:8,9

**reiterated**
143:1

**relate**
76:20

**related**
37:22 180:9

**relates**

16:9 32:25 67:10 69:19 75:24 115:4 148:10,11 168:19 182:10 189:19 190:8 193:24

**relationship**
82:16,20

**relative**
229:17,18

**relatively**
42:13

**relevant**
38:22,23

**relied**
136:16

**relying**
143:9,21

**remaining**
34:6

**remember**
208:1

**REMEMBERED**
4:1

**remind**
78:17

**Remmington**
48:21

**Remote**
1:19 206:2

**remotely**
4:4

**render**
76:18 142:25 143:3

**rendered**
80:23 111:1 195:10

**rendering**
145:16

**renew**
90:24

**rental**
35:1

**repeat**
90:20 141:10

**rephrase**
6:12 56:1 223:11

**report**

3:15,17 13:3 14:4,9 14:10,11 16:3,5,6,6 16:15 17:7 18:2,7,8 18:8 19:18,22,23,25 20:1,3,21,22 24:21 70:12,22,23 71:8,11 71:15,20 72:1,11,12 72:16,20 75:7 76:19 80:16,23 81:1,16 85:6 88:3,9,11,25 90:8 111:1 115:18 116:12 117:18 118:1,11 121:25 122:10,11,14,15,19 123:11 129:5,7,11 131:16 132:14,16 134:7 140:12,22 141:6,18,25 143:8 143:15,18,19,21 144:4,18,19,21 146:8,13,25 149:3 154:19 161:12,20 162:15,19 163:8 164:25 165:1,2,7 169:22 172:18,21 174:2 177:18 181:4 181:4,5,7 185:9,11 185:12 187:13 188:13,15 190:25 191:1 192:13,19 195:16,24 196:6,10 196:18 197:3,8,21 198:10,10,14,17 199:14 204:19,23 205:2 208:19,22 209:5 210:8 212:23 213:1,17,18 214:9,9 214:16,18 217:16 220:4 221:2,7 223:5 223:12 225:18

**reported**
1:24 116:19,24 117:14 118:12

**reporter**
4:5 5:14,15,18,25 73:12 90:23 202:17



229:8 230:6
**Reporters**
229:10
**reporting**
59:21 119:4
**reports**
19:20 20:6 46:9,15
113:22 145:21
199:7,24,25 200:5
**represent**
4:21
**representing**
4:14 5:3
**request**
129:19 130:5
**requested**
18:20 152:14 185:1
230:4,5
**requesting**
129:1
**requests**
12:6
**require**
18:16 20:21 109:18
110:13 198:24
**required**
18:21 19:3 26:7
38:15 39:7 40:6
41:6 46:8 47:4,9
67:2 68:4,16 77:9
93:7 110:16 116:8
148:14 166:5
176:20 183:17
184:7,9 185:3
214:19
**requirement**
110:6 147:13,22
148:13,18,19 199:2
**requires**
74:5 123:15 134:5
**requiring**
176:12
**requisite**
148:23
**reread**
16:4

**reserve**
23:17 57:21,23 58:3
58:11 63:1 227:15
**reserved**
7:22,23
**residence**
55:1,4
**residences**
53:1
**residual**
200:18,19
**resist**
150:23,24
**resistance**
52:10 56:8 68:17
150:22 167:19
225:14
**resisted**
167:15
**resisting**
51:14 52:12 53:6
54:13 55:5,21 56:5
62:18 167:12,14,17
167:20,20,21
**resists**
47:16
**resolution**
215:19
**resolved**
13:13
**resort**
52:19
**resource**
132:18
**resources**
130:25 131:11
**respect**
15:1,17 17:13 27:20
29:20,25 60:13
69:14 75:9,12,17
80:10 86:18 87:21
129:15 148:8 153:9
171:1 172:15 178:8
224:7
**respective**
44:3 84:10 190:7

**respirations**
178:9 181:19 182:12
183:8 184:24
**respiratory**
178:24 179:2 182:19
184:6
**respond**
52:4 67:15 76:24
107:5,24 108:4,15
156:1 179:1 187:8
193:5,7 194:24
198:6 209:15
**responded**
67:20 104:1 105:24
107:5 126:25 217:6
**responding**
67:11 68:1 87:5 98:8
107:25 108:23,25
109:25 125:5 129:2
135:2 158:9 184:25
193:25 210:4,12
211:7
**response**
6:7 52:2 60:21 62:3
67:14 79:19 105:4
114:15 129:1,19,20
151:18 152:5 153:8
155:22 160:6 198:8
198:9 206:20 207:7
208:2 211:10
**responses**
5:22 6:1 204:10
**responsibilities**
66:9 208:8,9
**responsibility**
64:7 66:20 87:5
108:24 121:1
**responsible**
208:11,25 209:15
211:25 212:13
**restaurant**
35:2,2,8
**restaurants**
34:24
**restrain**
52:13 54:6 55:21

69:15 74:4 102:11
147:14 158:10
159:18 183:19
195:2 210:22
**restrained**
98:17,21 183:10
220:6
**restraining**
52:19 98:20 161:17
161:23 220:16
226:17
**restraint**
54:3,9 80:11 99:1
147:6 172:5 194:20
226:20
**restraints**
51:3 69:19
**restrict**
7:4 160:18 163:18
**restricted**
158:8 183:14 184:14
**restricting**
77:11 78:12 157:23
158:21 163:13
175:14 184:11
**restriction**
173:17
**restroom**
55:14
**result**
10:11 12:4,4 13:9
14:24 30:12,16
31:10,12,13,15 32:5
36:10 38:19 39:7
45:15 46:18,25
59:20 60:10 61:2,9
62:5,21 75:14 77:2
79:7,12,22 98:5
121:21 145:21,22
180:16 184:21
195:18 196:22
199:20 214:2,4
220:17 225:12
**resulted**
29:21 120:8 196:25
**results**



117:17 147:19
**retained**
 9:17,18 11:5,8,19,21
  12:1,9,14 14:21
  37:10 61:12 68:24
  172:10 185:14,15
  186:6 199:11
  217:24,25 218:3
**retainer**
 18:16,21 19:1,7 21:9
**retainers**
 219:14
**retaining**
 10:15
**retention**
 11:22 18:22 97:9
  168:4
**retire**
 57:19
**retired**
 57:18 179:11,18
**retreating**
 126:19 127:23
**revenue**
 65:8
**revert**
 57:14
**review**
 14:3 16:2 17:7 18:14
  19:16 20:2 71:6
  72:13 73:14,16 74:9
  80:22 85:4 89:14,23
  89:25 90:15 101:3
  113:24,24 142:24
  164:5 170:9 181:10
  181:14 191:15,18
  195:7,9 201:23
  207:10 219:3,4
  221:2 223:9 224:25
  225:2 227:3 230:3
**reviewed**
 16:3,11,14 19:25
  21:19 80:25 84:21
  89:16 102:9 104:6
  125:20 129:12
  143:7 156:9 164:25

 199:7,17 208:18
  212:19
**reviewing**
 18:23 72:16,19
  156:10
**revise**
 197:8
**revised**
 75:13 76:1,6 77:6,23
  78:10,16 174:23
  175:12
**revisions**
 42:7,11 189:19
**Rick**
 1:25 4:4 63:5 229:6
**right**
 57:1 68:23 71:25
  77:8 93:16 111:21
  112:18 121:20
  125:20 127:1
  128:11 129:25
  137:20 140:14
  145:11 146:2
  161:19 162:1 166:9
  213:19 222:15
**RIPP**
 54:2,9
**risk**
 64:15 97:4 226:24
  227:6
**Riverside**
 23:19
**robberies**
 199:22
**Robbery**
 46:14 120:18
**Robert**
 1:11 176:19
**Rochester**
 14:20
**role**
 11:3,18 12:7 40:12
  40:14,20 44:14
  104:23 162:12,13
  190:23 201:8 203:6
  203:10,11,18

**roles**
 109:18 201:10
  202:21
**Romanucci**
 10:14
**room**
 178:23
**roommate**
 34:12,15
**rose**
 114:3
**row**
 99:16
**Rule**
 3:15 13:3 14:9 16:3
  19:25 20:21 24:21
  70:24 72:12 169:21
  204:19,23 208:19
  214:9,16 220:4
  221:1 225:18
**rules**
 134:5 184:8
**run**
 46:16
**Russian**
 128:15 136:1 194:12
**R-I-P-P**
 54:2

———————————————
S
———————————————
**safe**
 98:23 123:2 130:22
  131:5,8 155:5
  156:17 167:3
**safely**
 99:1 195:4
**safety**
 84:2,5,14,20,22 85:5
  85:21 86:6,14 99:9
  120:24 132:9 176:2
  176:3,12,16,21,25
  204:15,22 205:2
  206:15,16,18
  207:22 208:12,22
  209:1 211:23
  215:10

**sake**
 71:21
**Sam**
 155:15
**San**
 23:14 24:1,7 25:5,12
  39:16 229:3
**sarcasm**
 127:5
**saw**
 123:10 174:18
  182:24
**saying**
 39:3 61:2 93:11,20
  93:22 95:3 121:17
  134:18 198:3,4
**says**
 88:17 111:17 128:18
  144:22 145:1 155:4
  155:9 161:17,20
  162:16 198:13,14
  205:18,21
**scenario**
 100:8
**scene**
 46:14 108:5,16,21,24
  150:7 174:2 212:14
  214:10,19
**scheduled**
 16:21,24 17:1,17
**school**
 22:13 41:12,18
**Science**
 22:23
**sciences**
 87:2
**scope**
 26:24 37:15 38:24
  84:9 102:25 198:24
**Scott**
 1:19 4:7,23 7:8
  151:24 152:3,15
  185:23,23
**Scott's**
 152:11
**screen**



**screen**
5:14 18:24,25 24:14
70:17 71:9,22 83:21
141:24 205:14
213:11
**screening**
218:16,21
**scroll**
24:23 71:1,15 110:22
110:23 141:25
161:11 205:15,24
206:24
**scrolling**
162:14
**seat**
166:19,19
**seatbelt**
166:20
**seated**
35:15 50:10 159:13
166:7,16 173:25
183:12 184:20
226:5
**sec**
205:13
**second**
15:6,12 39:6 48:12
122:18,20 158:5
171:8 177:18
181:17 213:9
**secondary**
32:22
**Secondly**
152:11
**section**
42:22 70:8 87:2
146:9 161:12,16
191:1 199:25
229:14
**security**
9:22 20:21 33:1,20
63:5,11,15 64:3,7,8
222:9
**see**
5:14 71:17 81:4,17
83:19 88:21 111:7

122:24 129:10
131:1 142:2,15
143:20 144:1 146:9
155:25 161:14,18
162:17 163:5 165:4
175:17 177:22
181:24 187:5,19
188:2,18 189:5
191:1 192:17,23
198:19 205:14,16
213:7,12,22,25
214:24 215:3
218:24 219:4
**seen**
185:11,12 186:19
201:6
**seizing**
217:13
**seizure**
86:19 98:20 104:22
105:1,6 106:2,4,23
109:23,24 134:24
134:25 135:1,3,14
135:21,22 138:6,10
138:10,13,14 139:2
139:3,17,22 140:1,6
193:7,10,11,16
194:13 195:4
197:15 209:9,12,12
210:5,18,20 212:2,3
215:19 216:10
217:1,7,14 224:3,11
224:17,22 225:6,10
225:24
**seizures**
109:13 135:15 209:7
215:8,16
**self-defense**
36:11
**sensational**
69:22
**sense**
128:19 129:15
**sent**
18:6 21:10,11 169:19
**sentence**

88:21 132:3,21 133:5
133:10,12,18 142:7
188:20 215:22
**separate**
19:6 113:15 120:25
191:13
**separately**
71:20 136:15
**September**
1:21 4:2 65:4
**sergeant**
40:18,19,23 41:1,3,7
41:10,12,16,23 42:9
43:6,7,9,12,13,14
44:4,24 45:9,15
49:16,16 57:6,11,12
57:14,15 59:11 63:3
112:7,10,16,25
113:20 117:4,18
199:16
**sergeants**
41:17 114:15
**series**
5:12 223:17
**serious**
142:14,19 143:11,25
144:23 145:3
**served**
34:16,18,22 218:10
**service**
23:12 40:5 104:23
107:21 193:17,25
**services**
187:3,4 210:15 212:8
212:13,18 218:19
221:20
**session**
9:13
**sessions**
17:16
**set**
4:10 207:19
**setting**
9:11,13 28:10
**settle**
10:17 13:15

**settled**
11:20,24 13:2,14,17
**settlement**
11:13,13
**Seven**
3:14
**seventh**
190:24
**seven-page**
24:20
**severity**
31:17 51:12
**shake**
5:24
**shared**
214:13
**Sheriff's**
23:20 36:5
**shifts**
190:5
**shin**
159:6
**ship**
67:8,8
**shoot**
61:4,22
**shooter**
67:13
**shooting**
14:20 45:25 46:2,3,5
46:6,8,19 62:18
**shootings**
47:1 199:21
**shopping**
63:18
**Shorthand**
4:5 229:7
**shot**
46:2 60:4,11,14,18
60:23 61:10
**shotgun**
48:21
**show**
24:10 70:19 169:13
169:15,25
**shows**



200:16,22,25 201:9
**side**
 160:11 166:18,23
    167:6,9 173:7 174:8
    174:18 186:7
    221:23
**sign**
 7:25 8:3
**significance**
 210:10,11
**significant**
 31:21,22 140:24
    196:12 201:3
**signs**
 33:14
**similar**
 39:19 134:12 219:8
    219:10
**similarities**
 80:9
**similarly**
 203:9
**simple**
 51:1 95:14 155:12
**simply**
 59:3 61:1 62:18
    195:21 216:17
    222:20
**Sinai**
 60:6
**single**
 53:1,1 127:7,11,12
**sir**
 32:6 53:24 62:16
    73:20 74:2 75:5
    77:9,18,25 80:22
    85:4 91:12 92:13
    94:1 98:14 103:25
    108:23 109:4
    114:10 123:1
    125:20 142:17
    144:19 147:12
    148:4 151:1 158:25
    186:3 206:16 207:6
    207:21,23 208:15
**sister**

35:13,19
**sit**
 12:11
**sitting**
 162:25 163:16
**situation**
 35:25 52:4 62:22
    94:13 99:7 107:15
    107:24 108:25
    125:2 128:24
    130:24 131:10
    134:15 137:7 138:2
    162:10 194:16
    209:8,11 210:24
    211:6,14 216:8,24
**situational**
 108:3,9,10,14,19
    192:21,25 193:24
    197:16
**situations**
 45:18 148:24 160:2
**six**
 3:21 41:15 52:23
    53:2,4 63:2
**sixth**
 177:19 181:17
**six-month**
 26:2,4
**six-week**
 41:11,17
**six-year**
 58:14
**size**
 21:3
**slides**
 207:20
**slight**
 42:11
**slow**
 130:23 131:10
**small**
 51:2 201:7
**Smaller**
 222:11
**Smith**
 116:4

**smoothly**
 27:23
**smuggling**
 25:12
**snoring**
 181:21
**snorting**
 179:3 181:23 184:4
**soap**
 201:17
**society**
 133:22
**sole**
 180:3
**solely**
 45:4 159:15
**Solutions**
 206:2
**somebody**
 87:9 109:23
**somebody's**
 96:3
**someone's**
 93:21 127:20 160:12
**soon**
 182:24
**sorry**
 55:12 81:9,12 90:20
    99:11 161:19
    162:18
**sort**
 172:7
**sounding**
 61:10
**sounds**
 8:5 181:21,22
**source**
 85:23 182:21
**Southern**
 1:2 15:5,10
**space**
 96:14 127:16,22
**speak**
 88:19 90:19 91:4,14
    93:3 95:11 128:15
    183:14 219:2

**speaking**
 49:24 92:15 93:4
    94:17 220:2
**spearhead**
 63:14
**special**
 16:16 23:12,22 25:22
    27:9 43:21 44:10,12
    67:8 181:3 191:10
**specialize**
 222:6
**specialized**
 110:13 112:11
**specific**
 27:17 37:10 49:11
    58:1 61:20 71:11,15
    71:25 75:10 76:16
    77:9 85:4,11 87:20
    98:9 109:13,18
    118:21 119:16
    146:17 165:10
    170:24 177:12
    178:8 220:3
**specifically**
 17:15 27:25 28:9
    29:25 42:21 67:5
    68:12 69:8 75:7
    78:8 81:15,19 86:3
    86:5,7,13,18 87:17
    89:1 95:16 145:5
    154:3 156:12
    163:14 180:21
    182:19 192:5
    204:11 208:1
    213:17 217:6
**spectrum**
 31:18
**speculating**
 14:8
**speed**
 128:18 130:8,14
**spell**
 175:11
**spelled**
 175:16
**spent**



72:15,19 117:5 156:10
**Sperry** 185:10,12,14,19 186:6,8,12,18,19
**spirit** 131:25 133:1
**spoke** 18:4 61:15,19 106:24 136:1 214:10
**spoken** 5:18 21:24 22:1,3 93:6 94:3,14 186:9 186:19
**spot** 186:22
**spray** 48:13,14 52:23 53:7 53:7 126:7 203:23
**ss** 229:2
**stabilize** 130:24 131:10
**stabilizing** 162:5,7
**staff** 73:4 97:22 102:8 193:18
**stage** 135:20
**stand** 93:23 166:18
**standard** 4:3 18:20 51:7 74:5 187:14,14 210:25 217:11 222:25 223:1 228:3
**standards** 25:23 26:16 133:8 134:6
**standing** 50:10 159:13 162:25 163:16 166:8,16 173:25 183:12 184:20 226:5
**start**

23:5,6 64:3,11 65:2 173:15,21 174:7 192:20
**started** 63:10,12
**starting** 88:17 206:10
**starts** 81:4 122:18 131:24 140:12 162:19 172:20 177:18 187:13 188:16,21 192:19 213:25
**state** 2:3 4:5 7:6 12:15,23 14:14,18 15:4,15,18 15:22 22:11 26:17 27:19 65:22,25 72:2 72:15,24 73:5,14 74:3,11,17 75:6,19 79:5 86:3 88:18 105:12 122:21 144:5 147:13 154:3 154:25 157:5,7 163:14 165:7 175:13 177:19 181:17 186:22 187:21 188:1 191:4 191:19,25 192:13 196:6 197:20 198:13,22 209:21 211:9 212:22 216:2 216:17 224:12 225:24 226:25 227:9 229:2,8
**stated** 5:1,23 18:12 89:5 106:21 125:18,22 125:22 134:6 139:12 141:6 151:7 151:12 153:4 154:13 167:2,3,8 174:24 175:25 176:2,15,18 180:21
**statement** 10:10 109:14 112:3,4

120:24 125:23 145:15 149:11 156:24 177:6 197:2 198:12
**statements** 18:9 178:1
**states** 1:1 12:18 23:11 27:9 27:12 111:2,17 142:8 143:9,14 148:22 149:4 155:4 156:16 158:19 196:9,10 221:13,14 221:15,16,18
**static** 128:24
**stating** 192:20 198:2
**status** 30:17 57:21,23 58:11
**stayed** 23:16 42:13 214:18
**Staying** 214:23
**stenographically** 229:23
**stimulant** 180:9
**stipend** 58:5
**stipulations** 7:13,17 216:15
**stomach** 102:1 166:10,13 167:10 226:4
**stop** 56:11 95:1,15 135:14
**story** 37:2
**straddled** 150:11
**strategies** 128:6,9
**strategy** 185:25
**street**

2:3,11 7:9 54:19 127:21
**strength** 180:13
**stressful** 62:17
**stressors** 62:21
**strike** 7:23 53:16 102:1 112:22 116:4 194:1 194:4
**strikes** 55:20 56:3 143:16
**striking** 50:25 95:25 161:8 195:5
**strong** 133:13
**struck** 35:25 36:11,18 99:21
**structure** 55:2
**structure's** 57:16
**struggle** 150:23 156:2 167:19 227:1,8
**studies** 22:12,18
**study** 41:8
**stuff** 201:18
**stun** 48:18,19
**subdued** 146:7,12
**subject** 44:19 46:19 49:25 52:9 59:8,14 68:10 81:24 82:11,17 105:9,9 116:5 146:7 184:1,6
**subjects** 146:12



subject's
68:16 163:1,17
submission
17:7 19:22,24
submitted
14:9
submitting
72:12
Subsection
130:21,23
substance
87:10
substance-related
87:14,16
sudden
146:6
suffered
106:2,4 138:6 225:10
suffering
209:9 212:3 225:24
suggest
105:18
suggestion
205:4
suicidal
87:7
summary
141:5 143:6,14,15
165:1 181:9 196:11
summon
210:15
superhuman
180:13
superintendent
33:10
superintendents
33:13
supervise
40:22
supervised
112:12
supervisor
40:14 41:12,14 49:12
49:16 54:11 60:20
60:25 87:3 111:4,23
111:23 112:1,13,15

112:24,25 113:5,10
113:17 114:19
117:20 120:21
supervisors
43:18 115:25
supervisory
40:12,20 203:6,9,11
203:18
supine
149:1 156:25
support
32:24 140:5 222:11
supposedly
212:12
sure
5:17 7:14 8:6 24:17
27:22 34:12,15
55:16,18 70:20
72:10 91:11 97:18
110:12 122:2
123:17 129:9 169:3
170:10 184:3 186:1
197:9 202:8 218:3
surmised
196:21
surprise
89:17
surrounding
124:1,10
surroundings
108:11
surveillance
64:17,19,21,24
218:24
suspect
50:13,19 51:13,14
52:7,11 53:6,16
54:12 55:6,21 56:5
56:15,22 59:3 62:18
82:16 94:13,18
106:17 123:25
124:9 164:20
suspects
47:10 69:15
suspect's
77:11,12 78:13,13

158:22 159:3
163:13 175:15
184:11,14
suspended
31:24
suspension
31:16,18,21,22 32:3
32:4,8,12,16 33:1,3
33:9,21
suspensions
31:10 32:20 33:14
34:2,5
Sweeney
100:23
swing
195:1
sworn
4:9 10:21 57:24 90:7
118:1 125:19
154:18 229:15
system
66:17
S-c-o-t-t
7:8
S-p-e-r-r-y
185:10
S.W.A.T
45:19 52:25

——————————
T
——————————
table
35:15,21
tactic
49:11,19 99:2 157:15
tactical
113:5,6 124:21
192:22 194:6,10
tactically
126:19 127:23
tactics
41:20,25 43:21 44:11
44:13 56:21 58:21
67:8 94:12 95:8
115:5 126:15,22
138:12 147:6 148:8
168:2

tailored
204:11
take
5:7,18,25 6:17,20
18:1,13 32:20 40:6
48:11 50:5 52:3
54:17 55:15,17 57:1
97:11 106:7 108:6
110:23 129:18
130:5 132:17
133:14,24 141:21
147:24 153:20
169:1 172:19
173:24 179:7
182:20 183:15
188:12,14 194:20
196:12 201:21
219:18,19,23 222:4
222:5,17,18,19,22
takedown
48:10 49:10,15,18,23
50:13 54:12,23,23
55:3
takedowns
203:15
taken
142:18 157:1 162:9
173:2 200:6
talk
123:12
talked
215:5
talking
39:20 42:1 51:23
79:6 93:17 121:18
147:22 153:11
169:4
talks
78:12 214:25
tapes
177:24
Tarasov
1:3 22:3 205:18
taser
48:17 112:22
task



23:13 199:17
**tasked**
187:22
**taught**
26:11,18,21 87:8
109:21,22
**tax**
8:22
**teachers**
206:22
**team**
48:10 49:9,15,23
50:12 54:12,22,23
55:3 87:4 203:14
219:6
**technique**
54:2 68:15 131:3
160:14,20
**techniques**
52:18,18 56:14 97:10
122:23 126:21
127:15 131:19
134:16 138:12
168:3 225:22
226:17
**television**
200:21
**tell**
34:9 49:17 122:16
170:13,25 206:17
206:25 210:10
214:2
**telling**
23:6 93:12 128:16
**temporarily**
101:16
**temporary**
162:9
**ten**
32:20 53:2,4
**tenure**
43:21
**ten-year**
44:7,23 45:2,8 47:3
**term**
41:18,19 87:17,22

88:7 101:16 162:8
179:18,21 180:2,11
181:8
**terminal**
67:18,20,21,23 68:5
**terminals**
66:17
**terminated**
31:4
**terminology**
42:20 121:10 131:8
**terms**
31:17 42:14,15 43:2
49:9 168:14 180:13
221:19
**terrorist-related**
67:14
**test**
43:22,24
**testified**
4:10 10:24 14:17,24
17:22 25:4 36:20
37:1 38:2,10 39:10
39:11,13 52:22
53:11 60:7 61:22
68:21 78:23 89:18
91:3 92:5 101:13
102:5,10 103:11
111:10 117:9,25
125:24 126:4,6,10
127:14 138:19
139:1,8,13 149:24
150:7 153:25
156:12 166:11,25
167:2 168:24
172:14 195:23
200:11 210:2
211:24 217:5 219:8
**testify**
7:1 12:11,12 16:24
19:14 38:1,15 39:7
61:25 138:25
166:21 176:24
185:15
**testifying**
12:8 138:17 152:9

**testimony**
3:18 5:8 9:5,11 10:2
10:4,5,21 12:4,20
13:10,10,23 14:13
15:3,8,11,14,18,21
16:1 19:17 20:16
21:25 22:7 37:9
38:4,5 68:18 76:8
88:24 89:1,3 90:7
90:10 91:1,5,6,19
101:4 102:9 103:20
104:7 111:12,14
113:9,12 115:23
118:8 122:8 125:20
127:16,18 128:1
138:23 146:25
150:9,10,14,16
151:6 153:9,12
154:9,18,24,24,25
156:9 158:25 161:1
168:6,9,13 169:1,10
169:19,19 170:4,6
171:1,7 172:2,2,15
174:16 176:4
186:24 191:16,18
194:9 195:16
200:13 208:23
211:21 218:6 219:9
223:6,13 229:23
230:1
**Teterboro**
66:15
**tether**
54:4
**thank**
4:25 6:16,24 7:11
73:13 88:15 122:1
202:1,3,14 223:10
227:18,20,21,23
**Thanks**
8:5 81:13
**therapist**
179:2
**therapists**
178:24
**thick**

207:24 208:4
**thing**
24:11 26:13 36:2
62:19 95:21 121:18
**things**
52:2 107:19 115:5
116:11 120:24
155:14 177:10
180:13 183:6
189:13 190:15
193:12 194:15
201:17 202:6 207:9
213:15
**think**
8:22 11:12 13:16
20:22 31:23 32:2,20
34:17 35:13,17,23
39:8,15,24,25 40:4
40:16,24 41:11
49:14 53:2 55:23
58:6,15,24,24 60:17
60:20 62:19 67:17
68:8,14 69:4 71:20
80:1 90:13 97:7
98:6 110:1 119:9
123:4 126:14
133:10,11 134:18
144:10 155:11
160:18 164:11
165:19 166:25
169:6,13 175:15
181:4,5 183:22,24
186:8,10 194:17
196:19 201:6 202:9
205:11 227:12
**third**
62:9 69:12,12 132:3
137:5
**Thomas**
69:5
**thought**
35:6 36:2 117:22
**thoughts**
115:2
**thousand**
58:18,19



**threat**
51:13,19 52:7,14
96:1,5,8,14 97:16
97:19 102:13
123:24 124:15,15
**threaten**
97:5
**threatening**
96:21 123:25 124:9
**threats**
148:2
**three**
12:18,24 30:3,5
45:21 46:1,1,7,19
47:20 63:25 67:17
202:7 213:23
221:14
**three-day**
33:21
**threw**
36:7 126:7
**throes**
98:11 105:1,5 135:21
137:12 139:2
193:10
**throwing**
126:12,19 127:20
**Tikhoplav**
1:5 91:3
**Tikhoplav's**
90:25
**time**
4:4 6:10,17 7:22,24
10:5 18:24 19:13
20:7 21:2,21 24:17
25:8 30:8,25 31:2,8
31:25 32:10,13
33:15,24 37:5,5,8
37:20 39:1,13 41:11
42:8,8 44:20 45:12
45:18,19 49:20,21
51:9,15,17,18,24
52:3,6 53:25 56:9
56:18 57:15 58:14
64:18 67:7,16,25
72:6,12 75:22 76:12

76:17 78:22,25 79:4
82:11,13 86:25
95:22 101:20
102:21 103:4,10,12
104:8,17 105:19,23
106:3 107:16,17
108:13 110:3 112:5
117:23 120:11
123:20 124:19
126:18 127:16,19
129:16,25 130:6,13
130:24 131:11,19
135:8 136:25
137:14 138:5,18
139:3,4,20,21,22
140:3,7 146:16
147:14 154:15
156:10 157:2
158:13,15 159:1
160:22 161:3,5
162:1 163:24 164:4
164:7,9 165:14,25
166:14 167:7 173:2
173:3,5 175:9
177:21 178:2
179:18 180:18
183:9,10 185:4
190:13 192:6 196:4
202:1,1,16,20,21
208:3 209:21
216:18 218:23
220:6 227:15,19,23
**timeline**
164:6
**times**
9:4,20,21 10:25
36:21 37:1 38:12
39:12 45:9,13,15,22
46:19 47:2 48:14,17
49:10,13,14 52:23
53:1,2,4 54:3 58:24
58:25 59:23 60:18
61:8 62:17 67:22,25
97:22 107:9 111:13
111:19 112:2
118:15,16 120:2,7

120:13 123:5
135:17 145:20
160:5,7 168:24
170:25 186:5
207:12
**Titleist**
201:17
**today**
5:7,13 6:23 7:1 16:1
16:10 19:17 22:7
24:25 25:3 39:20
92:4 202:2,15,18
204:11 205:9 223:6
223:13 227:20
**today's**
5:16 9:4 156:11
**told**
37:16 91:24,24 93:15
106:1,20
**top**
150:1,21 151:8 154:7
155:10,11,12,16
166:13 213:24
**topical**
179:17
**torso**
163:1,17,17
**total**
21:8,8 58:16 81:1
150:2
**totality**
49:22 51:4 53:10
102:18 105:15
195:19 197:17
219:25
**town**
34:22
**track**
20:7
**Trade**
2:11 66:19
**traffic**
66:17,20,21
**train**
67:4 76:24 148:20
**trained**

27:1,6 28:10 41:21
49:17 67:5,6 83:6,8
85:1,18 86:5 87:17
109:4 146:11 147:5
147:23 148:15
149:4,7,9,12,16
155:24 165:13
177:4 178:7,24
216:8,23 224:1
225:3
**trainers**
206:21
**training**
23:10 24:3 25:23,25
26:16,19,20 27:1,14
27:17,19 28:1,4,7
34:19 41:6,14 44:21
44:21 49:7 67:10,11
69:22 84:9,11 85:2
85:14,20 86:12,13
86:17,23 87:1,7,12
87:21,25 88:2,3,10
100:12 103:16
104:14 105:3 109:6
109:6,7,11,11,17,18
109:18,21 110:7,14
110:17 114:3,6
118:23 135:15
138:9 146:17,20
148:7,11,23 149:6
167:24 177:5,12,13
178:8 179:1,7
181:15,18 182:12
182:16,17 183:22
184:18 187:17,17
188:3,8,9,10,16
192:2,5,6,8,15
197:13 198:3,5
200:6 206:11,14,20
207:7,14,16 209:17
215:1,6,14,16,24
217:17 221:4 223:7
223:14,21,24 224:6
224:9,16,20 225:1,8
225:20 226:1,7,16
226:22 227:5



transcript
3:20 89:8,15,23
   227:25 229:24
   230:4
transcripts
89:16 147:1 154:18
transfer
66:12
transferred
23:25 30:23
transpired
107:19 135:17
   139:14,15 193:22
transpiring
108:21
transport
82:9
transportation
66:12
trapped
101:5,11,15,23
travel
19:13 21:20
treat
212:2
treated
82:13
treating
101:18
treatment
162:10 214:5
trial
3:18 7:23,24 12:8,12
   13:23 15:8,11 17:8
   19:12,14 20:15,18
   20:23 21:20,21
   36:23 37:9,21 38:4
   38:4,11 39:13 169:4
   169:10,19 170:4,6
   171:1 172:2,14
   185:25
trials
17:10 38:8
tried
36:17
trier

117:15 144:12
   168:16,19
trouble
129:25 130:3,3
true
15:17 29:5 61:16
   90:19 93:1 97:1
   102:2 118:24
   137:23 139:10
   147:15 149:21
   229:24
trust
133:7
truthfully
7:1
try
35:24 36:18 87:12
   127:22 150:23
   167:21 217:22
trying
36:11 81:9 94:9
   101:17 103:18
   105:10 134:23
   161:9 185:5 193:14
   210:22
tubular
67:11
Tunnel
66:21
tunnels
66:16,16,18,22
turn
70:11 170:23
turned
57:20 156:6,25
   166:14,23 167:16
   167:18 173:2,9
   183:11
turning
154:16 156:23 164:8
   167:9 173:8,16,23
   174:8,18 182:24
tutelage
191:11
TV
200:16,22,25 201:9

two
16:21,23 17:6,14,17
   34:16 37:18 39:24
   40:1 44:16 58:3
   116:11 120:22
   207:9 213:22
type
5:25 12:22 31:14
   48:7 49:17 56:21
   67:14 68:11 86:12
   99:1 109:13 124:15
   127:9 182:18 184:3
   188:8 193:24
   194:16 219:18
   220:21
typed
132:16,22 134:12
types
48:25 76:5
typically
7:16 20:22 37:21
   38:10 50:6,16 51:3
   92:8 115:7 121:20
   183:25 190:4 200:5
   201:12 210:14,16
   219:18 221:12,15
   221:21
Tyree
11:8
T-h-o-u-n-s-y
39:16

_____
U
_____
ultimate
100:12 115:7 117:15
   144:12 168:16
ultimately
12:3,11 33:13,14
   36:6 119:6 156:6,7
   159:8 168:19 220:6
unable
210:18
unaware
90:5 98:3 148:18
uncomfortable
222:18

unconscious
183:3,5
undergo
41:6
undergraduate
22:20
underline
88:18 122:22 186:25
underlined
162:16,20
underlines
130:21 161:16
underneath
154:12
understand
5:20 6:2,10,15,22
   39:2 64:19 76:2
   88:20 89:6,19 90:19
   91:4,15,23 92:11,16
   92:17,20,23 93:5,6
   93:14 94:2,7,8,10
   94:21,22,23 95:22
   100:15 104:21
   121:16 128:14,14
   129:22,24 135:23
   136:1,6,18 137:6
   148:1 155:9 165:9
   165:11 193:8
   194:14,20,20 195:2
   198:5 210:24
understanding
29:8 66:8 73:20,25
   74:2 91:11,25 93:20
   95:23 99:15 100:22
   100:23 108:11
   110:21 123:14
   135:15,24 139:16
   141:3 146:20 166:4
   173:6,11,14 175:2,5
   189:25 191:3,6,9,12
   193:2 194:25
   208:11,25 209:22
   210:23 212:16
   213:2
understands
128:10



**understood**
6:14 10:12 11:25
90:11 104:12
130:12 134:20
172:6
**Unethical**
133:20
**unfortunately**
35:14
**unfounded**
59:22
**unhandcuffed**
173:8
**uniform**
92:8,9,10,14 93:4,21
106:11
**unintentionally**
99:21
**union**
189:8,11,21 190:1,1
190:10
**unique**
45:3 197:13
**uniquely**
87:18,22 215:17
216:10,25 217:13
224:2 225:5
**unit**
16:17 24:1 40:22
44:13 58:1 189:15
189:18 191:11
204:12
**United**
1:1 23:11 148:22
**units**
110:13 112:12
204:13
**universal**
95:2 168:22 209:22
**universally**
94:24
**University**
22:11,21
**unjustified**
74:6
**unnecessarily**

116:4
**unnecessary**
116:6
**unpaid**
32:6
**unreasonable**
114:1,11,21 115:24
116:6,10,19,23,25
117:7,12,22 118:2
118:11 119:7,15,22
120:3,9,14 144:16
172:23 175:8 196:1
196:7 197:4,22
198:3,15 199:21
219:25
**unsuccessful**
52:18
**unsure**
110:14
**untruthful**
60:21
**updated**
169:14,18 170:5,11
170:20
**up-to-date**
24:24 25:2
**urgency**
103:10 128:19
129:15
**use**
16:14,14 18:7 27:13
42:1,1,4,11,14
45:16,17,22 46:9,9
47:5,9,15 48:11,16
48:17,19,20 49:5,6
49:10,11,18,18 50:1
50:21 51:4,7 52:13
53:5,22 54:2,12
55:10,13,19 57:13
58:21 59:1 68:4
74:4,18,21 75:8,21
75:24,25 76:5,6,14
76:14,16 77:5 79:23
94:17 101:16 111:4
111:6,9,12,18,24,25
112:1,14,22 113:3,7

113:10,15,18,24
114:2,3,11,12,22
115:11,12,23 116:6
116:10,17,19 117:7
117:19 118:2,9,11
119:2,7,22 120:3,14
120:18,23 121:4,5,9
121:10 122:3,22
123:8,13,15,17
126:14,21 127:19
128:5,5,6 134:15
138:11 140:13
142:13 143:24
144:22 145:2 147:5
148:8 156:15
157:14,19,21 159:1
160:3,4,10 168:14
174:23 175:7
180:11 188:22,25
189:19 199:18
203:22,25 204:7,7
205:1,6 216:1
225:22
**uses**
48:24 49:2 175:21
**usual**
7:16 216:15
**utilization**
174:13
**utilize**
54:7 97:9 127:15
131:18 198:24
**utilized**
47:21 48:6,7 85:7
123:8 131:5
**utilizing**
68:12 124:19,21
157:14 164:20
**U.S**
23:21,23 24:5 221:23

---
**V**
---

**v**
1:3 27:11 205:19
**value**
129:18

**variable**
100:7
**variables**
100:15
**variations**
179:3
**variety**
221:16 222:12
**various**
49:2
**vary**
172:6
**Vegas**
222:10
**vehicle**
60:5 192:8
**venued**
12:15
**verbal**
5:17 35:10 94:16,20
94:21 128:6,9
209:22
**verbatim**
83:22 134:9 141:5
143:15 156:18
221:2
**verdict**
39:18
**verse**
14:19
**version**
121:17 169:14,18
170:6,11 219:2
**versus**
12:2 141:14 209:23
**vest**
155:15
**Vice**
43:8
**vice-president**
63:4
**vicinity**
51:20 52:15 54:24
127:25
**victim**
46:5


MAGNA
LEGAL SERVICES

**video**
218:24 219:1,24
  220:2,5,22,23
**Videoconference**
206:3
**videos**
177:24
**view**
77:4 216:21 220:15
**viewed**
220:5
**violated**
46:24 187:16,17
**violation**
115:12,15,20,24
  119:3
**violations**
115:2
**Virginia**
12:17
**virtually**
37:21
**Vitae**
3:13
**voice**
128:6 129:21
**volume**
20:24 21:22
**volunteer**
58:7
**volunteered**
32:11
**vs**
1:7
**vulnerability**
64:16 197:14
**vulnerable**
87:18,22 215:17
  216:10,25 217:13
  224:2,12 225:5,11
  225:23 226:25
  227:9

—————— **W** ——————

**waist**
50:6

**wait**
166:20
**waiting**
212:20
**wake**
197:14 212:2 216:10
  217:1,14 224:2
  225:5
**walking**
210:23
**walk-through**
46:14
**want**
24:14 51:22 54:20
  55:16 79:17 90:2
  91:7 93:23 95:3,5
  95:13,17 99:12,15
  99:16,18 122:9
  141:20 151:16
  153:17 155:17
  168:16,18 174:10
  193:6 194:22
  201:21,22 202:16
  213:21 218:15
  219:6
**wanted**
57:16 129:20 189:24
**wants**
89:22
**wasn't**
10:9 18:22 37:14,22
  38:24 61:17 62:4,14
  127:18 134:21
  153:17,23 154:12
  167:17 174:11
  179:17 180:8 193:3
  194:22 220:21
**watch**
112:11
**waving**
94:25
**way**
6:6 10:8 17:9 24:10
  46:1 100:1,24 103:2
  103:8 114:16 116:5
  123:14 126:20

127:23 128:2,5
133:2 135:3 160:20
195:1
**ways**
94:1,5,6 95:9
**weakest**
133:13
**weapon**
32:16,21 33:4 48:16
  53:12 54:7 59:25
  60:6 61:4,22 97:2,8
  97:9 157:21 158:1
  168:4
**weapons**
43:21 44:11,12 56:10
  67:8
**wearing**
220:13
**Wednesday**
1:21 4:2
**week**
18:10
**weight**
77:1 148:12 149:13
  149:14 150:2,2,5,6
  150:10,19 155:13
  155:17 156:1,3,5
  157:3,22 158:2,23
  159:23 160:17
  163:16,19 167:14
  173:25
**went**
15:6,11 23:18 34:24
  35:12,22,24 63:7
  69:25 79:7,21 92:5
  137:25 199:14
  212:21
**weren't**
36:13 99:21 184:25
  220:19
**West**
12:17
**Westpoint**
41:13
**we'll**
6:17 24:23 39:19

70:21 71:1 80:6
141:25 143:2 169:9
169:15,25 170:3,9
172:19
**we're**
24:10 44:18,20 45:5
  48:10 70:20 87:5
  121:18 169:6 171:5
  172:18 178:21,25
  194:3 213:2
**we've**
55:14 121:3 145:9
  164:25 174:24
  178:6 195:11
**whatnot**
178:19 207:11
**wide**
221:16 222:12
**width**
211:10
**wife**
8:22
**witness**
4:8 8:3 11:5 17:3,20
  18:4,20 19:5 20:11
  20:20 21:7,17 24:17
  26:11 27:8 28:3,13
  29:4,14 30:3,10,20
  31:6,12,20 32:19
  33:12 34:12 36:10
  36:17,23 37:4,13
  38:7,18 41:25 42:7
  42:24 45:24 46:13
  46:22 47:7,13 48:3
  48:10 49:5 50:16,23
  51:11,22 52:9,17
  53:9,19 54:15 55:8
  55:23 56:7,17,25
  58:23 59:5,13 60:4
  60:17 61:7,25 62:24
  63:17 64:5,15,23
  65:6,15 68:8 69:4
  69:11,17 70:2,10
  73:25 74:8,14,25
  75:12,24 77:15,21
  82:3,9,19 83:3,16


MAGNA
LEGAL SERVICES

84:8,17,24 85:11
86:10,16,21 88:6
90:13 91:9,22 92:20
93:10 94:5,20 95:13
96:3,10,17 97:7,18
98:1,19 99:12
100:11,21 101:15
102:4,15,23 103:7
103:24 104:5,20
105:22 106:14,19
107:9,13 108:3,18
109:2,9,16 110:10
110:20 111:16,23
112:9,20 113:2
114:15,24 115:14
116:2,22 117:9
118:14 119:9,25
120:5,17 121:8,15
121:20 123:4,23
124:5,14 125:8,18
126:3,10,17 127:9
127:18 128:4,13
129:7,10,18 130:2
130:19 131:14,22
132:20 133:17
134:2,9,18 135:11
136:8,10,13,21
137:3,10,17,22
138:2,25 139:12,25
140:10,19 141:10
141:16 142:22
143:6,13 145:1,13
145:19 146:15,24
147:9 148:10,18
149:23 150:19
151:6 154:6 155:3
156:15 157:9,19
158:13 159:5,22
161:1,8 162:3
163:23 164:15,23
165:16 166:3,25
167:14 169:11,16
170:2,12,17,19
173:11,21 174:21
175:4,11,24 176:8
176:15 177:2,8

178:5,12 179:17
180:5,21 181:2,14
182:4,9 183:2,21
185:7,22 186:3
187:11 188:6
189:10,17 190:4,21
191:8,23 192:4,17
195:13 196:9 197:6
197:25 198:19
199:6 200:4,18,25
201:12 202:3 205:8
206:4 209:3 210:1
211:12 214:22
216:13 217:3
220:11 222:17
224:14 225:16
226:14 227:11
229:15 230:1
**witnesses**
103:11 120:24
193:18 196:22
**word**
48:12,12 88:19
122:22 135:25
156:15 162:20
188:6 207:19
**words**
52:17 92:15 93:4,5
124:21,25 134:22
**work**
8:10 11:7,12,14,15
12:3,18 14:25 18:17
19:11 20:7,12,15
24:6 25:14 29:18,20
30:17 32:15,21,24
33:20,22,24 34:20
34:21 58:1,3 59:18
63:1,13,15,23,24
64:24 66:12 67:24
84:22 111:21
128:10 145:19
190:5,6,9,13 199:15
200:11,21 218:7
222:6,21
**worked**
13:6 23:19 25:18

29:18 33:19,24
44:15 65:13,15,17
67:4,5 85:20 86:8
86:13 116:20
218:13 219:16
**working**
12:5 23:23 25:11
27:15 33:21 57:5
59:18 63:10,25 65:2
65:5 68:2,21 70:20
82:6,22 94:12 107:4
112:6 113:17 186:6
186:7
**workplace**
84:21 85:13
**works**
55:15 84:14
**world**
2:11 66:19 195:22
**wouldn't**
21:21 45:7 93:2,13
94:22 99:5 128:15
157:10 162:7
222:14
**write**
13:2 20:12 38:20
162:23
**writing**
199:14
**written**
129:11
**wrote**
132:4,14 163:2
196:11,18 197:7

––––––––––––––
**X**
––––––––––––––
**X**
230:4

––––––––––––––
**Y**
––––––––––––––
**yeah**
21:17 22:19 26:15,22
71:19 127:2 151:15
160:5 169:17
170:19 189:17
208:1 212:19 213:8

227:23
**year**
22:24 23:19 28:24
40:16 43:10 44:19
204:21 207:12
**yearly**
207:2,8,12 208:13
**years**
32:1,2 34:7 37:14,23
38:25 39:24 40:1,4
44:9,10 61:17 63:2
63:25 82:5 87:1
111:24 112:12
117:4 128:20 168:2
207:9
**yesterday**
16:7 37:16
**York**
1:2,8,9 2:9,12,12 5:4
12:15,16,21,23 13:6
14:14,18,24 15:2,5
15:5,10,11 16:12
27:15 28:1,4 30:7
34:17 43:3 65:13,19
65:22 66:6 69:25
70:8 72:2,15,19,24
73:5,14,21 74:2,11
74:17 75:6,19
144:18 147:13
165:7 181:3 187:21
188:1 190:19 191:3
191:9,19,25 192:13
196:5 197:20
198:13 205:19
212:22
**York's**
25:24 27:2,6 28:8,10

––––––––––––––
**Z**
––––––––––––––
**Zero**
164:18
**zone**
201:20
**zoom**
4:4 10:7,14,20 142:4



**$**

**$100**
19:15
**$16,931.25**
21:9,15
**$20,931.25**
21:8
**$25,000**
21:3,14
**$4,000**
19:2,5,8 21:9
**$425**
19:11
**$525**
19:12
**$85**
39:18

**0**

**02109**
2:4

**1**

**1**
3:13 23:17 24:10,12
44:1 57:21,23 58:11
90:17 110:24
130:21 136:18
181:5,6
**1st**
21:11 63:12,13
**1:13**
201:24
**1:19**
201:24
**1:23**
202:11,11
**1:54**
228:4
**10**
37:5 131:16 141:25
142:1,8
**10-181**
70:8
**10:06**
80:20

**10:07**
80:20
**10:42**
108:7
**10:51**
108:7
**100**
72:10 111:4,9,17,19
111:24 112:2,13
113:10,18,18
114:12,22 115:11
116:17 118:9 121:4
**100-05**
77:5 78:4,9
**100-13**
122:2
**100-5**
78:20
**10007**
2:12
**11**
131:23 134:6 140:12
146:8,13 171:8
**11:52**
158:6
**116**
171:15
**12**
16:13 45:13,15 47:2
47:4,8,11,14 72:25
188:15 213:18
**12th**
72:5 75:16,18 77:18
77:25 79:4 80:3
110:7,17 146:22
147:7,15 148:8,16
163:8 174:25 188:4
198:25 199:4
**12:00**
158:6
**121**
171:15
**122**
31:25 32:2
**13**
63:18 86:7 89:15

161:12,13,20,22
171:25 172:10,11
172:13
**13th**
205:22
**13202**
1:25 229:9
**14**
69:5 111:24 112:12
154:19 162:15,19
163:8 171:9
**141**
3:17
**15**
20:23 21:3 48:3,5
164:25 165:3 201:1
**150**
2:11 44:19
**16**
172:20
**167**
171:17
**16780**
42:22
**169**
3:18
**17th**
28:21 30:23
**172**
171:17
**18**
13:17 168:2 177:18
181:17
**18th**
18:10 72:9
**185**
171:18
**1864**
3:17
**19**
186:22
**1988**
22:25 24:17 25:6
**1989**
23:15,16 24:18 25:6
29:6 42:9

**1990**
29:6,7 34:1
**1991**
29:7,16,18,19 30:16
33:18
**1994**
85:6
**1996**
42:10
**1998**
22:16 25:5

**2**

**2**
3:15 70:13,14,22
110:23 122:20
130:20 131:4,24
204:20
**2nd**
17:5,23 72:9
**20**
48:3,5 58:24,25
111:13 187:13
201:1,1 214:6
**20-plus**
58:23 67:25 68:5
**200**
2:3 99:24
**200-some-odd**
61:8
**2000**
22:19 44:5
**2004**
19:19
**2009**
59:20
**2010**
23:16,17 44:5 57:18
57:22 63:12,13
**2012**
64:14,21,25
**2013**
23:18 64:25 69:5
**2014**
23:19
**2015**



77:6
**2016**
23:17 57:22
**2017**
65:4 147:18
**2019**
16:13 72:5,25 75:16
    75:19 76:12 77:18
    77:25 79:4 80:3
    110:7,17 146:22
    147:7,15,18 148:8
    148:16 163:9
    165:21 174:25
    188:4 199:1,4
**202**
3:7
**2020**
22:19,19 69:2,8,9
    79:21
**2021**
16:14 76:7 78:10
    165:18 174:24
**2022**
179:9
**2023**
17:5,24
**2024**
1:21 4:2 16:4 21:12
    70:13,23 80:24
    205:22 230:8
**204**
171:19
**205**
3:20
**2093(b)**
229:14
**21**
179:9 190:24 192:20
**21st**
7:9
**21-cv-6226**
1:7
**212**
2:12
**2170**
85:6

**22**
146:25 179:9 194:9
**226**
171:20
**23**
146:25
**24**
3:13
**24th**
2:11
**25**
58:25
**25,000**
20:24
**255**
36:25
**2595**
77:16 158:18
**26**
3:15 13:3 14:9 16:3,4
    17:8 19:19,19,23,25
    20:21 24:21 34:6
    70:13,23,24 72:12
    87:1 168:2 169:21
    204:19,23 208:19
    214:9,16 220:4
    225:18
**265**
9:7,15
**265th**
9:6
**28**
117:4 128:20 229:21
**28(a)**
229:16
**28(a))**
229:11
**28-year**
111:3 118:8
**289**
222:21
**29**
3:16 80:17 81:5
    194:10 197:8
**29-page**
70:22 195:24

---
**3**
---

**3**
3:17 140:11 141:18
    141:19 143:1
    144:15 146:5
    155:18 156:4
    207:17 213:7,8
    221:8
**3/6/17**
75:2 158:19
**30**
9:24 35:14 69:12
    171:10 200:25
**30(b)(6)**
205:22 206:4 211:21
**30(e))**
230:7
**30(f)(1))**
229:16 230:2
**300**
9:23
**33**
32:2
**33C**
99:16
**332**
170:18
**34**
32:1 37:14,23 38:25
    85:24 86:2 87:23

---
**4**
---

**4**
1:21 2:11 3:6,18 4:2
    164:24 165:3 169:7
    169:8 170:5
**40**
48:19 69:12 218:12
**41**
171:10
**43**
26:16 199:12
**435-3465**
2:12
**44**

57:20 63:1 199:12
**45**
221:18
**46**
171:11

---
**5**
---

**5**
3:20 172:19 174:22
    181:7 198:11
    205:11,12
**50**
27:9 57:20 68:24
    69:7 112:23 167:25
    218:12
**50-day**
31:16,18 32:4,8,12
    32:16 33:2
**50-so**
9:19
**500**
9:19,21
**526**
7:9
**53**
9:19 12:13
**54**
9:20 12:13
**55**
3:19
**55-page**
170:5
**550**
10:25 11:2
**56**
206:9 221:1
**57**
206:24
**573-9400**
2:5
**58**
156:16 206:10
    207:17

---
**6**
---

**6**



42:22 80:17 81:5,18
177:17 178:1
186:21 197:8
198:11 206:10
220:4 221:1
**6/20/2021**
75:14
**60-something**
61:8
**617**
2:5

---

**7**

**7**
2:4 26:18 81:16,21
83:21 85:6 88:16
174:24 187:13
**7/9/2015**
77:23
**70**
3:15 9:23
**77**
43:8
**78**
114:4

---

**8**

**8**
88:25 90:8 192:19
**8:05**
4:3
**800**
26:18 61:11,12
**870**
48:21
**89**
171:13

---

**9**

**9**
77:6 90:8 110:24
122:18 130:20
206:24
**9/11**
68:2
**9/9**

230:8
**9:22**
57:3
**9:30**
57:3
**9:55**
73:9
**9:56**
73:9
**90**
9:18 10:25
**92648**
7:10

