# Exhibit L

# Biennial Report of the
# Office of Attorney General's
## Special Investigations & Prosecutions Unit

A report from the Office of

### New York State Attorney General

# Letitia James



**2019**

## Biennial Report of the Office of the Attorney General's Special Investigations and Prosecutions Unit

### Executive Summary

On July 8, 2015, Governor Cuomo issued Executive Order No. 147, titled, "A Special Prosecutor to Investigate and Prosecute Matters Relating to the Death of Civilians Caused by Law Enforcement" ("EO 147"). EO 147 sets forth its rationale and purpose. It states that "incidents involving the deaths of unarmed civilians have challenged the public's confidence and trust in our system of criminal justice" and that "it is necessary to ensure that a full, reasoned, and independent investigation and prosecution of any such incident is conducted without conflict or bias, or the perception of conflict or bias."

In furtherance of this purpose, EO 147 conferred exclusive prosecutorial powers on the Attorney General for incidents "involving the death of an unarmed civilian, whether in custody or not, caused by a law enforcement officer as defined in Criminal Procedure Law Section 1.20(34)[1]" or "where, in [the Attorney General's] opinion, there is a significant question as to whether the civilian was armed and dangerous at the time of his or her death." EO 147 directs that when the Attorney General does not submit charges to a grand jury, or when a grand jury declines to return an indictment, the Attorney General must provide the Governor a report providing an "explanation of that outcome and any recommendations for systemic reform arising from the investigation."

On July 9, 2015, the Office of the Attorney General ("OAG") announced the creation of the Special Investigations and Prosecutions Unit ("SIPU"). SIPU is staffed with experienced prosecutors, investigators, a crime victims' assistance coordinator, community liaisons, and a legal

---

[1] This section provides a detailed listing of who falls into the category of "police officer."

analyst.[2] While SIPU's principal objective is to fairly and thoroughly investigate the incidents covered by EO 147, it also seeks to provide transparency to the public and to strengthen the public trust in matters involving deadly police-civilian encounters.

In furtherance of this mission, in August 2017, SIPU released its first Biennial Report summarizing the work of SIPU's first two years in operation. The 2017 Biennial Report is available here. In the two years since the release of the 2017 Biennial Report, SIPU has evaluated 69 incidents in which a police encounter ended in the death of a civilian to determine whether the incident fell within SIPU's jurisdiction. These assessments determined that EO 147 gave SIPU jurisdiction over 16 incidents (plus an additional, earlier incident)[3], and SIPU has conducted – or is currently conducting – full investigations of these incidents. SIPU determined that the 53 other incidents did not fall within the terms of EO 147 and were thus outside of SIPU's jurisdiction.

Section I of this report provides an overview of the 69 fatal police-civilian encounters that SIPU evaluated for jurisdiction, including data on the genders, races, and ages of the civilians who were involved in these incidents. Section II of this report discusses active SIPU investigations and prosecutions, and provides summaries of SIPU's closed investigations and reports. Section III of this report offers recommendations for reform.

I.      **Overview of Incidents Evaluated by SIPU Pursuant to the Executive Order**

SIPU has established a hotline and notification protocol for county District Attorneys to alert SIPU about incidents that may fall within the scope of EO 147. County District Attorneys generally receive notice from local police departments of "officer-involved" deaths of civilians shortly after such an incident occurs and, as a general matter, send personnel to respond to the

---

[2] Appendix A provides the biographies of the SIPU leadership.

[3] Although reported to the SIPU hotline prior to July 8, 2017, SIPU asserted jurisdiction over this case in 2018.

2

scenes of these incidents. Because jurisdiction under EO 147 is not always immediately clear, SIPU has encouraged District Attorneys to notify the hotline even in cases where jurisdiction would appear to lie with the District Attorney. In addition, SIPU identifies incidents potentially within SIPU's jurisdiction through several others means, such as communication with community groups, civilian complainants, and police departments, and through media reports. Once it learns of an incident, SIPU also responds to the scene (if timely notified) and, in any event, endeavors to promptly obtain and review the available evidence in order to determine whether it has jurisdiction under EO 147. SIPU generally completes this initial evaluation and makes its jurisdictional determination within several days (and sometimes several hours) of the incident.

This section of the report discusses the 69 incidents in which a police-civilian encounter ended in the death of a civilian and for which SIPU conducted a jurisdictional evaluation. The section explains in particular how SIPU determined which of the 69 incidents fell within its jurisdiction under EO 147.

## A.  *Total Number of Incidents Evaluated*

From July 9, 2017, to July 8, 2019, SIPU assessed 69 incidents for potential jurisdiction under EO 147. Of these incidents, 92.75% of the civilians involved were male and 7.25% were female. *See Figure 1*. The racial composition of the civilians involved in these incidents is as follows: Black/African-American – 46.38%; White (non-Hispanic) – 33.33%; Hispanic/Latino – 17.39%; Asian – 1.45%; Native American – 1.45%. *See Figure 2*. The average age of the involved civilians was 42.[4]

---

[4] Given the relatively narrow scope of EO 147, the limited timeframe for this report, and the sample size, this data is not offered to arrive at any statistical conclusion beyond the fact that this was the composition of the civilians involved in the matters assessed by SIPU.

Available data on the deaths caused by local law enforcement have been sparse historically. In 2014, Congress passed the Death in Custody Reporting Act, which requires local agencies to report fatal encounters starting with

**B.** *Decision Points under EO 147*

EO 147 requires SIPU to make at least two significant factual determinations before it can assert jurisdiction. Incidents are often complex and facts may be evolving, and at times, determination of each factual scenario requires a thorough review of the facts and applicable law. The principal factual determinations that SIPU must make before asserting jurisdiction (which are not conclusions as to ultimate criminal liability) include: (1) Did the incident involve a civilian who was unarmed, or Was there a significant question as to whether the civilian was "armed and dangerous"?, and (2) Was the death of the civilian caused by a police pfficer? Each of these is discussed in detail below.

1. **Did the Incident Involve a Civilian Who Was Unarmed or Was There a Significant Question as to Whether the Civilian Was "Armed and Dangerous"?**

SIPU has jurisdiction under EO 147 if the incident involved the death of an unarmed civilian. If a civilian was armed, EO 147 assigns jurisdiction to SIPU if "there is a significant question as to whether the civilian was armed and dangerous at the time of his or her death." Neither the EO nor the criminal statutes define the term "armed and dangerous." When the civilian in question appears to have been armed, the OAG must still determine whether the civilian was "armed and dangerous." This is highly fact-specific and requires an examination of several factors, including, but not limited to: (i) the type of instrument that the civilian possessed; (ii) the location of the instrument at the time the police used force; (iii) the distance between the civilian and the officer(s) or any other civilians; (iv) the manner in which an instrument was used, attempted to be

---

fiscal year 2016. See https://www.fbi.gov/file-repository/ucr/national-use-of-force-data-collection-pilot-study-121018.pdf/view for the results of the 2016 Pilot Study.

used, or threatened to be used, and whether it was thus capable of causing death or other serious physical injury, and (v) the physical location and conditions where the incident occurred. The amount of evidence, its quality, and its reliability are also key considerations.

The OAG's determination that a civilian was "armed and dangerous" only means that SIPU does not have jurisdiction over the matter under EO 147. As explained above, EO 147 only confers jurisdiction on the OAG to investigate and, if warranted, prosecute crimes in certain specified circumstances. As a result, SIPU's jurisdictional determination is not a determination that the officer's actions were justified or unjustified. Once SIPU determines that it lacks jurisdiction, the county District Attorney's Office can exercise its authority to investigate and, if warranted, prosecute any crimes.

Of the 69 incidents SIPU evaluated, 30 involved a civilian whom SIPU determined, based on the factors listed above, was "armed and dangerous" at the time of death and, therefore, outside of SIPU's jurisdiction. Among these, 11 civilians were armed with a firearm, 17 were armed with a knife, 1 was armed with a baseball bat, and 1 was armed with a shard of glass.

### 2. <u>Was the Death of the Civilian Caused by a Police Officer?</u>

For the 39 incidents either involving an unarmed civilian or in which there was a significant question as to whether the civilian was "armed and dangerous," SIPU next considered whether the death was "caused" by a police officer. Whether a person "caused" an injury or death is typically a legal conclusion and has various meanings in different areas of the law. For purposes of determining whether sufficient causation exists to confer jurisdiction under EO 147, SIPU assesses whether a police officer used force or took some deliberate action that resulted in the civilian's death, or whether such officer failed to take a legally required action, and whether that failure to act caused or contributed to or may reasonably have caused or contributed to, the civilian's death.

Of the 39 incidents SIPU evaluated for causation, it found that 17 incidents fell within SIPU's jurisdiction under EO 147.[5] SIPU found that in the remaining 23 incidents, the civilian deaths were not caused by a police officer. Of the 17 civilian deaths for which the causation requirement was satisfied for purposes of SIPU jurisdiction, 82.35% were male and 17.65% were female. The racial background of the civilians was as follows: Black/ African-American – 41.18%; White (non-Hispanic) – 29.41%; Hispanic/Latino – 23.53%; Asians - 0%; Native American – 5.88%. The average age of the involved civilians was 44.

*Figure 1: Gender of Civilians in SIPU-Evaluated Incidents*

| Census Category | 2018 Census Estimate (NY) | Total Number of Civilian Deaths Evaluated under the Executive Order | Percentage | Total Number of Unarmed Civilians whose deaths were determined to have been caused by a police officer* | Percentage |
|---|---|---|---|---|---|
| | | 69 | | 17 | |
| Female | 51.40% | 5 | 7.25% | 3 | 17.65% |
| Male | 48.60 | 64 | 92.75% | 14 | 82.35% |

* "Unarmed Civilians" includes cases where there is a significant question as to whether the civilian was armed and dangerous at the time the officer caused the civilian's death.

* "Caused" includes cases where a police officer used force or took some deliberate action that resulted in the civilian's death, or whether such officer failed to take a legally required action, and whether that failure to act caused or contributed to the civilian's death.

---

[5] Please refer to Ft 3.

*Figure 2: Race of Civilians in SIPU-Evaluated Incidents*

| Census Category | 2018 Census Estimate (NY) | Total Number of Civilian Deaths Evaluated under the Executive Order | Percentage | Total Number of Unarmed Civilians whose deaths were determined to have been caused by a police officer* | Percentage |
|---|---|---|---|---|---|
| | | 69 | | 17 | |
| Native American | 1.0% | 1 | 1.45% | 1 | 5.88% |
| Asian | 9.0% | 1 | 1.45% | 0 | 0.00% |
| Black | 17.60% | 32 | 46.38% | 7 | 41.18% |
| Hispanic | 19.20% | 12 | 17.39% | 4 | 23.53% |
| White | 55.40% | 23 | 33.33% | 5 | 29.41% |
| Total | | 69 | | 17 | |

* "Unarmed Civilians" includes cases where there is a significant question as to whether the civilian was armed and dangerous at the time the officer caused the civilian's death.

* "Caused" includes cases where a police officer used force or took some deliberate action that resulted in the civilian's death, or whether such officer failed to take a legally required action, and whether that failure to act caused or contributed to the civilian's death.

## II.    Substantive SIPU Investigations

Once it is determined that EO 147 confers upon SIPU jurisdiction over a case, SIPU (as a matter of best practice) obtains from the Governor's Office a "conforming order" that states that a specific incident falls within SIPU's jurisdiction.[6] Historically, special prosecutors have obtained conforming orders to protect against subsequent challenges to the prosecutor's jurisdiction. As EO 147 only generally refers to certain types of incidents, such as when an unarmed civilian is killed by a police officer, the conforming order makes clear that SIPU has jurisdiction over a specific incident and thus protects against subsequent challenges to jurisdiction. In *Figure 3*, we list the

___

[6] Under New York Executive Law 63(2), the Governor may require the Attorney General to supersede a District Attorney in any category of cases or for a particular case. EO 147 supersedes the District Attorneys in a category of cases involving the death of unarmed civilians by police officers. Each conforming order amends EO 147 to include specific incidents and are designated chronologically as EO 147.1, 147.2, etc.

7

cases within SIPU's jurisdiction pursuant to EO 147.[7] Of the 17 incidents that fell within SIPU's jurisdiction under EO 147, 52.9% involved a death in custody, 23.5% were automobile-involved, and 23.5% were officer-involved shootings.[8] Furthermore, 79.6% of the 17 incidents involved civilians who were displaying signs of a mental crisis.[9]

*Figure 3: Overview of Incidents under SIPU's Jurisdiction*

| Date of Incident | County | Name of Civilian | Type of Incident | Race | Age | Sex | Status |
|---|---|---|---|---|---|---|---|
| 2/21/16 | Erie | India Cummings | Death in Custody | Black | 27 | Female | Open |
| 9/23/17 | Nassau | Walter Perez | Death in Custody | Hispanic | 37 | Male | Report |
| 11/29/17 | Westchester | Jonathan Maldonado | Death in Custody | Hispanic | 21 | Male | Report |
| 1/22/18 | Oneida | John Havener, Jr. | Death in Custody | Black | 41 | Male | Report |
| 1/29/18 | Bronx | Dwayne Pritchett | Death in Custody | Black | 48 | Male | Open |
| 3/30/18 | Erie | Susan LoTempio | Automobile-Involved | White | 64 | Female | Report |
| 4/4/18 | Kings | Saheed Vassell | Shooting | Black | 37 | Male | Report |
| 5/20/18 | Wayne | Robert L. Scott | Death in Custody | Black | 58 | Male | Report |
| 5/27/18 | New York | Edwin William Garcia Lopez | Death in Custody | Hispanic | 42 | Male | Report |
| 9/25/18 | Dutchess | Jaime Lopez-Cabrera | Shooting | Hispanic | 41 | Male | Report |
| 11/9/18 | Schoharie | Gerard Roldan | Automobile-Involved | White | 26 | Male | Report |
| 11/17/18 | Rockland | Michael Rizzetta | Automobile-Involved | White | 69 | Male | Report |
| 12/8/18 | Monroe | Lillian Weyanna | Automobile-Involved | Native American | 52 | Female | Report |
| 4/12/19 | Queens | Evgeniy Lagoda | Death in Custody | White | 29 | Male | Open |
| 5/23/19 | Orange | Luke Patterson | Shooting | White | 41 | Male | Open |
| 6/17/19 | Niagara | Troy Hodge | Death in Custody | Black | 39 | Male | Open |
| 6/18/19 | Onondaga | DeWayne Watkins | Shooting | Black | 74 | Male | Open |

[7] Although the scope of EO 147 is narrow and this report reflects a limited timeframe, the data reveals a disturbing trend. Of the cases that are covered here, out of the 13 civilians killed in police custody or in police-involved shootings, 7 are African-American and 4 are Hispanic. Out of the four civilians killed in automobile-involved incidents, all are white except one.

[8] In raw numbers, this is nine deaths in custody, four automobile-involved deaths, and four officer-involved shootings.

[9] In raw numbers, this is twelve incidents.

**A.** *Active Matters*

The following section summarizes each of SIPU's active matters. To preserve the integrity of active prosecutions and investigations, only limited, non-confidential information is provided.

1. <u>Dwayne Pritchett (Bronx County)</u>

On January 28, 2018, Dwayne Pritchett ("Mr. Pritchett"), 48, died during an arrest by New York Police Department officers. Mr. Pritchett was unarmed. On February 7, 2018, SIPU asserted jurisdiction over the matter. SIPU's investigation is ongoing.

2. <u>India Cummings (Erie County)</u>

On February 21, 2016, India Cummings ("Ms. Cummings"), 27, died at Buffalo General Hospital after having been in custody at the Erie County Holding Center for 17 days. Lackawanna Police Officers arrested Ms. Cummings on February 1, 2017. The New York State Commission of Correction Medical Review Board conducted an investigation into Ms. Cummings' death and concluded that the cause of death was homicide due to medical neglect. On October 16, 2018, the New York State Commission of Correction, pursuant to Executive Law § 63(3), requested that the OAG investigate and prosecute the alleged commission of any indictable offense or offenses associated with the death of India Cummings. SIPU's investigation is ongoing.

3. <u>Evgeniy Lagoda (Queens County)</u>

On April 12, 2019, Evgeniy Lagoda, 29, died after an encounter with Port Authority police officers. On April 14, 2019, SIPU asserted jurisdiction over the matter. SIPU's investigation is ongoing.

4.  Luke Patterson (Orange County)

On May 23, 2019, Luke Patterson ("Mr. Patterson"), 41, died after being shot by a New York State Police trooper. Mr. Patterson was unarmed. On May 23, 2019, SIPU asserted jurisdiction over the matter. SIPU's investigation is ongoing.

5.  Troy Hodge (Niagara County)

On June 16, 2019, Troy Hodge, 39, died after an encounter with officers from the Lockport Police Department and Niagara County Sheriff's Department. On June 19, 2019, SIPU asserted jurisdiction over the matter. SIPU's investigation is ongoing.

6.  DeWayne Watkins (Onondaga County)

On June 18, 2019, DeWayne Watkins ("Mr. Watkins"), 74, died after being shot by a Syracuse Police Department officer. While initial reports stated Mr. Watkins was armed at the time he was killed, SIPU asserted jurisdiction over the matter on June 21, 2019, as there was a significant question as to whether Mr. Watkins was in fact armed and dangerous. SIPU's investigation is ongoing.

7.  People v. Joel Abelove

On April 17, 2016, Edson Thevenin, 37, died after being shot by a police sergeant with the Troy Police Department ("TPD"), in Troy, New York (Rensselaer County). (The circumstances surrounding this shooting, and the handling of the incident by the TPD, are the subject of the OAG's Report on the Investigation into the Death of Edson Thevenin, discussed below.) Apparently recognizing that the incident potentially came under Executive Order 147, then-District Attorney Joel Abelove reported the incident to the OAG that morning. During an in-person conversation that morning and a phone conversation the next day, an Assistant Attorney General informed Mr. Abelove that the OAG would need to review evidence to determine whether the

10

Thevenin shooting fell within Executive Order 147, and thus within the exclusive investigative and prosecutorial authority of the Attorney General. Two days later, the OAG delivered a letter to Mr. Abelove expressly requesting information about Mr. Thevenin's death and reiterating that the information was needed in order for the OAG to assess jurisdiction over the matter.

By letter dated April 21, 2016, Mr. Abelove responded to the OAG's letter. He acknowledged that the OAG was assessing the jurisdictional question, but stated that he had unilaterally decided "to continue to exercise jurisdiction in this matter" because "[his] assessment of the facts . . . support[ed] the conclusion that Executive Order No. 147 [did] not apply." The OAG did not receive Mr. Abelove's letter until the following week because he sent the letter via first-class mail, rather than by e-mail, fax, or hand delivery. In any event, the letter did not mention that Mr. Abelove was planning to present the case to a grand jury.

On April 22, 2016, one day after the date of his letter and less than one week after the Thevenin shooting, with no prior notice to the OAG and having provided none of the requested evidence, DA Abelove presented the matter to a grand (the "Thevenin Grand Jury"). The Thevenin grand jury declined to return an indictment. Mr. Abelove then issued a press statement saying that the Thevenin grand jury had "passed on charging [the sergeant] with any crime relating to" Mr. Thevenin's death and had found that sergeant's "use of deadly physical force was justifiable under the law."

The OAG did not learn about Mr. Abelove's grand jury presentation until it was over. At that point, the OAG commenced a proceeding against Mr. Abelove seeking an order that, among other things, prohibited Mr. Abelove from continuing to investigate or prosecute matters related to Mr. Thevenin's shooting. Pursuant to a stipulation of settlement resolving the proceeding, Mr.

Abelove agreed to take no further action to investigate or prosecute any matter relating to the Thevenin shooting, and to turn his sealed file over to the OAG.

The OAG's subsequent investigation into Sgt. French's shooting of Mr. Thevenin raised significant concerns about Mr. Abelove's conduct during his investigation of the shooting and his presentation to the Thevenin Grand Jury. On February 1, 2017, Governor Cuomo issued Executive Order 163, authorizing the Attorney General "to investigate, and if warranted, prosecute" any "alleged unlawful acts or omissions by any person arising out of, relating to, or in any way connected with the [death of Mr. Thevenin] and its subsequent investigation, including its grand jury presentation."

As part of that investigation, the OAG appeared before a grand jury in Rensselaer County and presented a case relating to Mr. Abelove's handling of the investigation into the shooting death of Edson Thevenin. On November 2017, the grand jury returned an indictment against Mr. Abelove charging him with two counts of Official Misconduct in the Second Degree, a class A misdemeanor and one count of Perjury in the First Degree, a class D felony. The official misconduct charges arose from Mr. Abelove's handling of the Thevenin homicide investigation and alleged that: Mr. Abelove 1) withheld material evidence from the grand jury, and 2) improperly failed to have the police sergeant waive immunity before giving evidence before the grand jury. The perjury charge arose from Mr. Abelove's appearance before the grand jury that was investigating his handling of the Thevenin homicide and alleged that Mr. Abelove gave false testimony before that body.

Mr. Abelove filed an omnibus motion seeking to dismiss the indictment. Among other arguments, Mr. Abelove contended that the OAG lacked authority to prosecute him for perjury arising out of the OAG investigation into his presentation to the Thevenin Grand Jury. On June

12

10, 2018, an acting Rensselaer County Supreme Court Judge granted Mr. Abelove's motion and dismissed the entire indictment, including not only the perjury count but also, on the ground that the improper perjury charge had tainted the other charges, the two counts of Official Misconduct as well. The OAG appealed that decision to the Appellate Division, Third Department and on November 21, 2019, the appellate court unanimously reversed the trial court decision.

Assuming that Mr. Abelove does not seek leave to appeal to the New York State Court of Appeals, this matter will proceed to trial in 2020.

**B.  *Closed Matters***

1.  [Report on the Investigation into the Death of Ariel Galarza (Bronx County)](#)

On November 2, 2016, at about 5:29 p.m., a Bronx New York resident called 911 reporting that another building resident, Ariel Galarza ("Mr. Galarza"), was acting strangely, swinging around a "big knife," and was screaming as if he was arguing with someone. The caller said that Mr. Galarza lived in the basement but the caller was unsure if anyone else was in the apartment with him. The caller said that this behavior was out of the ordinary for Mr. Galarza and that she believed that Mr. Galarza was under the influence of some type of mood-altering substance.

Three New York Police Department ("NYPD") officers, including a sergeant, responded to the house, and went down to the basement, where they saw Mr. Galarza in the apartment. He was seated at the end of a narrow hallway and holding a glass bottle. Mr. Galarza was shirtless and sweating profusely. He was punching the air and shouting about another person wanting to fight him. The officers ordered Mr. Galarza to lie down on the floor. Mr. Galarza ignored these commands and then, with the sergeant standing only a few feet in front of Mr. Galarza, stood up

13

and raised the glass bottle. The sergeant then deployed his Taser in "dart-probe[10]" mode, which struck Mr. Galarza in the left side of his torso and conveyed an electric current for five seconds. Mr. Galarza dropped the bottle and went to the floor. Officers tried to handcuff him, but Mr. Galarza struggled, trying not to be handcuffed. The sergeant used the Taser again for five seconds. The struggle continued until the sergeant again used the Taser in "drive-stun" mode for five seconds. Then, Mr. Galarza stopped struggling and the officers were able to handcuff him. Shortly thereafter, Mr. Galarza lost consciousness and his heart stopped beating.

Within minutes, emergency medical personnel arrived, restored a faint heartbeat, and rushed Mr. Galarza to the hospital. However, emergency room physicians were unable to get Mr. Galarza's heart to maintain a normal heart rhythm, and approximately 40 minutes after his arrival at the hospital, Mr. Galarza was pronounced dead. The Office of Chief Medical Examiner of the City of New York ("OCME") determined that the cause of death was "cardiac arrest following physical exertion, restraint and use of conducted electrical weapon in an individual with atherosclerotic cardiovascular disease, acute drug intoxication (cocaine and N-Ethylpentylone, a psychoactive substance commonly found in bath salts) and obesity."

The OAG concluded that the officers' use of force was justified under the New York State Penal Law due to the fact that Mr. Galarza: (i) had been reportedly brandishing a large knife; (ii) ignored multiple commands from the officers to lie down on the floor; (iii) acted erratically (punching the air and shouting about another person wanting to fight him although no one else was there); (iv) brandished a glass bottle while standing less than eight feet from the officers in a narrow

---

[10] Tasers are used in "drive-stun" mode (where the instrument's two electrodes are pressed directly against the suspect) or "dart-probe" mode (where darts are released from the instrument, pierce the skin, and can cause temporary neuromuscular incapacitation, rendering an individual unable to move). When a Taser is deployed in dart-mode, and both darts remain embedded in the subject's skin, the officer can administer multiple five second electrical charges through the same darts by continuously depressing the trigger. Drive-stun mode delivers an electric shock that is a pain compliance technique, but does not cause the override of an individual's central nervous system.

14

hallway; and (v) vigorously resisted arrest, including flailing his arms, kicking his legs, and trying to stand up. Accordingly, no criminal charges against any NYPD officers were found to be warranted.

2.   [Report on the Investigation into the Death of Edson Thevenin (Rensselaer County)](#)

On April 17, 2016, Edson Thevenin died after being shot by a member of the Troy Police Department ("TPD"), in Troy, New York. Many of the circumstances concerning the shooting were undisputed: (i) a TPD sergeant stopped Mr. Thevenin for suspicion of driving while intoxicated; (ii) Mr. Thevenin fled in his car; (iii) the sergeant in a TPD vehicle, pursued Mr. Thevenin's car until Mr. Thevenin's car struck a concrete barrier; (iv) the sergeant's vehicle blocked Mr. Thevenin's car from the front, and another officer's vehicle blocked in Mr. Thevenin's car from behind; (v) Mr. Thevenin began to back up his car with the apparent aim of fleeing again; and (vi) the sergeant stepped from his vehicle and, within moments, fired a total of eight bullets through Mr. Thevenin's windshield, striking Mr. Thevenin seven times and killing him. The time of the shooting was approximately 3:27 a.m.

Two key, related issues concerning this incident were: (i) whether Mr. Thevenin's car was moving backward, at rest, or moving forward when the sergeant began shooting, and (ii) whether the sergeant fired all eight shots from one location or multiple locations. According to statements made at a press conference the following day by the Troy Police Department Chief, the sergeant started firing his gun because his left leg was pinned between Mr. Thevenin's car and the sergeant's vehicle, and he feared for his life. As discussed below, this account was contradicted by forensic evidence.

For example, TPD took photographs of Mr. Thevenin's windshield showing trajectory rods inserted in each of the eight bullet holes. Those photographs make clear that some of the

15

bullets were fired from different points across the front of Mr. Thevenin's car (i.e., evidence inconsistent with a pinned, immobile shooter.) Also, some civilian witnesses contradicted the Chief's account. Further, the OAG's investigation retained an expert to do an independent forensic analysis of the incident. This reconstruction conclusively established that the sergeant was not pinned when he began firing his gun. However, the reconstruction was unable to determine at what point the sergeant became pinned by Mr. Thevenin's car, and was unable to preclude the possibility that Mr. Thevenin's car was moving forward (as opposed to backward or at rest) when the sergeant fired the initial shots. Eyewitness accounts were similarly unable to provide clarity on this issue. The location of Mr. Thevenin's car at the time of the first shot, and the direction in which it was moving, were critical issues for determining legal culpability. OAG's inability to resolve this question—despite engaging experts to advise on the events that took place—foreclosed the possibility of criminal prosecution because the OAG could not disprove beyond a reasonable doubt the defense of justification.

In addition, the sergeant testified before a grand jury concerning the death of Mr. Thevenin without having waived immunity from prosecution. (The circumstances surrounding the grand jury presentation are the subject of ongoing criminal litigation against former Rensselaer County District Attorney Joel Abelove, discussed above.) Under New York State law, any witness who appears before a grand jury and gives evidence before the grand jury about a particular transaction, automatically receives immunity from prosecution for any crimes the witness may have committed in connection with that transaction. It is therefore standard practice for prosecutors to require any person who is the target of a grand jury investigation to execute a document called a "waiver of immunity" before the witness is allowed to testify before the grand jury. Failure to have the witness waive immunity results in the witness receiving immunity from prosecution for any crime the

16

witness may have committed during the course of the transaction the witness gave testimony about. As a result, under current New York State statutory and case law, criminal prosecution of the sergeant for the shooting was impossible, regardless of the ultimate conclusions reached by the OAG because the sergeant was granted immunity from prosecution owing to the failure of DA Abelove to have the sergeant execute a waiver of immunity before the sergeant testified before the grand jury.

The OAG made three recommendations regarding TPD practices, based upon its investigation:

First, the OAG recommended that the TPD overhaul its investigative approach to officer-involved shootings. Among other things, the TPD should: abstain from prejudging (and publicly announcing) the results of an investigation before it has been completed; make broad efforts to identify and promptly speak with all civilian witnesses (and fully elicit their narratives); properly train TPD members in the evaluation of evidence (particularly bullet trajectory evidence); and readily seek assistance from outside experts when questions arise.

Second, the OAG recommended that the TPD review and update its training and policies with respect to shooting at vehicles. An ever-increasing number of law enforcement agencies are adopting policies that prohibit an officer from shooting at a moving vehicle if the vehicle itself is the only threat to the officer's safety. The goal of these policies is to trigger in officers confronting a vehicle an automatic response of getting out of the way rather than discharging a firearm. This type of policy change, with the necessary and attendant training, has become the standard for a number of law enforcement agencies across the nation.

Third, the OAG recommended that the TPD outfit officers with body-worn and dashboard cameras. Videotaped evidence would have facilitated the investigation of this incident and would

17

have provided a more reliable account of critical details of the events. The absence of any such digital video evidence in this case underscores the need for police agencies and policy makers to work toward outfitting as many officers and vehicles as possible with body-worn and dashboard cameras.

3. [Report on the Investigation into the Death of Wardel Davis III (Erie County)](#)

On February 7, 2017, Wardel Davis III ("Mr. Davis"), who suffered from asthma, complained to a friend and to his family of chest pain, a persistent cough, and shortness of breath. Later that night, Buffalo Police Department ("BPD") officers, while on patrol, spotted Mr. Davis, whom they knew from previous arrests, exiting a house they knew to be associated with drug dealing.

The officers approached Mr. Davis because they believed that he may have been involved in a drug transaction. The officers said that Mr. Davis admitted to having drugs on his person. They further said that they tried to arrest and search Mr. Davis, who briefly fled, then fell, and began to struggle with them in order not to be arrested.  One of the officers admitted to punching Mr. Davis several times during the physical altercation, causing injuries to his face.

One officer repeatedly called for help during the incident. Multiple other officers responded immediately, arriving just as the first officers were handcuffing Mr. Davis. Shortly thereafter, Mr. Davis appeared distressed and seemed to stop breathing. The officers immediately removed the handcuffs and began chest compressions. They also called an ambulance. Emergency Medical Technicians ("EMTs") and ambulance personnel arrived, took over, and continued these measures on the scene, in the ambulance, and at the hospital. Mr. Davis died at the hospital shortly thereafter.

According to both the Medical Examiner and an independent pathologist retained by the OAG, Mr. Davis' death was due to his underlying asthmatic condition, which was exacerbated by

18

acute bronchitis and exertion during the struggle with the two officers. The Medical Examiner's conclusions and those of the independent pathologist are supported by Mr. Davis' medical history and the complaints of illness that he made to friends and family before the incident.

The medical evidence showed that the injuries to Mr. Davis' face and body were consistent with a struggle. The medical evidence also showed that Mr. Davis' death was precipitated by exertion and an underlying asthmatic condition, and not the injuries suffered in the altercation. Based on these facts, there was insufficient evidence to warrant any criminal charges in this matter.

Nevertheless, SIPU made three recommendations in the case: (i) to provide assurance that future Medical Examiner's investigations are conducted in a professional manner, the Medical Examiner's office should adopt policies consistent with National Association of Medical Examiners standards; (ii) the BPD should take steps to obtain accreditation by the New York State Division of Criminal Justice Services ("DCJS") (the process requires police agencies to achieve and maintain various standards that constitute best practices in the field of law enforcement); and (iii) the BPD should outfit officers with body-worn cameras and marked vehicles with dashboard cameras.

In 2019, The BPD became accredited with DCJS. In 2018, the BPD received $150,000 for 300 body-worn cameras from the OAG's CAMS program.[11]

4.  Report on the Investigation into the Death of Jose Hernandez Rossy (Erie County)

On May 7, 2017, two Buffalo Police Department ("BPD") Officers observed Jose Hernandez Rossy ("Mr. Hernandez Rossy") driving a car and apparently smoking marijuana. One of the officer's activated the horn and lights of his police car, but Mr. Hernandez Rossy did not

---

[11] The CAMS (Capture an Account of a Material Situation) program was an OAG grant funding program that supported the creation or expansion of body-worn camera programs for eligible law enforcement agencies throughout New York State. See https://ag.ny.gov/cams-program.

stop. The officer then pulled around and in front of the car, cutting it off. Both officers approached the driver's side of the vehicle and saw Mr. Hernandez Rossy smoking what appeared to be a marijuana cigarette. The officer began questioning Mr. Hernandez Rossy. According to this officer, Mr. Hernandez Rossy did not verbally respond to questions and moved his hand toward the top right pocket of his jacket. The same officer jumped into the vehicle through the driver's side door, reaching for Mr. Hernandez Rossy's jacket pocket. The officer recalled feeling something "hard" in the pocket and he believed that he felt a "small caliber gun." He started yelling, "Gun! Gun!" Mr. Hernandez Rossy accelerated his vehicle forward with the officer partially inside, eventually striking a house before stopping and causing the vehicle's airbag to deploy.

The officer, who was still partially inside Mr. Hernandez Rossy's car, described hearing "the loudest fireworks" go off in his right ear and felt a burning sensation. He exited the vehicle bleeding, with his right ear partially detached from his head. This officer believed Mr. Hernandez Rossy had just shot him in the head and began yelling to his partner that he had been shot. His partner saw this officer's bleeding head and heard him yelling that he had been shot; he then entered Mr. Hernandez Rossy's vehicle through the passenger's side and both officers wrestled Mr. Hernandez Rossy out of the vehicle. Around this time, several civilians called 911 stating that an officer had been shot.

The officer's partner unsuccessfully attempted to restrain Mr. Hernandez Rossy. The officer's partner told Mr. Hernandez Rossy that he would be shot if he did not stop resisting. At this point, the injured officer had moved away from the struggle and was yelling, "Help me . . . I've been shot . . . Shoot him!" Mr. Hernandez Rossy twisted out of his sweatshirt and began running away. The officer's partner again told Mr. Hernandez Rossy that he would be shot if he

20

did not stop. Mr. Hernandez Rossy continued to run away and the officer's partner then fired three shots. One bullet struck Mr. Hernandez Rossy in the arm. Mr. Hernandez Rossy ultimately died as a result of the gunshot wound to his arm, which ruptured his brachial artery.

The evidence reviewed during the investigation showed that Mr. Hernandez Rossy was unarmed. However, the evidence also demonstrated that the officers, as well as numerous civilian witnesses believed Mr. Hernandez Rossy had shot one of the officers. At the moment the officer shot Mr. Hernandez Rossy, he was under the erroneous, yet reasonable, belief that Mr. Hernandez Rossy had just shot his partner: the officer saw his partner emerge from Mr. Hernandez Rossy's vehicle bleeding from the head with his ear partially detached and shouting that Mr. Hernandez Rossy just shot him. In addition to the two officers, numerous civilian witnesses also believed Mr. Hernandez Rossy had just shot the officer. Accordingly, the OAG found, pursuant to Penal Law §35.30(1)[12], that there was no basis for criminal charges as the use of deadly force was justified.

The OAG did, however, make two recommendations as a result of this incident. First, given that the officers were not equipped with Tasers, the OAG recommended that the BPD outfit its

---

[12] New York State Penal Law §35.30(1) A police officer or a peace officer, in the course of effecting or attempting to effect an arrest, or of preventing or attempting to prevent the escape from custody, of a person whom he or she reasonably believes to have committed an offense, may use physical force when and to the extent he or she reasonably believes such to be necessary to effect the arrest, or to prevent the escape from custody, or in self-defense or to defend a third person from what he or she reasonably believes to be the use or imminent use of physical force; except that deadly physical force may be used for such purposes only when he or she reasonably believes that:
(a)  The offense committed by such person was:
(i)  a felony or an attempt to commit a felony involving the use or attempted use or threatened imminent use of physical force against a person;  or
(ii)  kidnapping, arson, escape in the first degree, burglary in the first degree or any attempt to commit such a crime;  or
(b)  The offense committed or attempted by such person was a felony and that, in the course of resisting arrest therefor or attempting to escape from custody, such person is armed with a firearm or deadly weapon;  or
(c)  Regardless of the particular offense which is the subject of the arrest or attempted escape, the use of deadly physical force is necessary to defend the police officer or peace officer or another person from what the officer reasonably believes to be the use or imminent use of deadly physical force.

21

members with Tasers. Second, the OAG recommended that the BPD become a New York State accredited law enforcement agency.

5. Report on the Investigation into the Death of Andrew Kearse (Schenectady County)

On May 11, 2017, at approximately 4:32 p.m., a Sergeant of the Schenectady Police Department ("SPD") observed Andrew Kearse ("Mr. Kearse") run a red light in Schenectady, New York. The Sgt. attempted to pull over Mr. Kearse, but Mr. Kearse led the Sgt. on a chase for over half a mile before pulling into the driveway of his friend's home. Mr. Kearse then jumped from the car and ran around to one side of the house; when the Sgt. caught up with Mr. Kearse in the back yard, Mr. Kearse denied having been the driver of the vehicle. While the Sgt. reviewed his dash-cam footage to verify the driver's identity, Mr. Kearse fled again. Soon thereafter, several other officers arrived. Once apprehended, and with some resistance, Mr. Kearse was handcuffed. At this point, he told the officers that he could not walk and needed to catch his breath. The officers carried Mr. Kearse most of the way to the officer's patrol car.

Over the course of 16 minutes, approximately seven of which Mr. Kearse spent alone in the police vehicle while the officers spoke outside the vehicle, Mr. Kearse called out to the officers at least fifty times. Complaining that he could not breathe, felt nauseous and dizzy, and was going numb, the officers provided no assistance of any sort. Approximately one minute before reaching the station house (and after he had been in the patrol car for a total of approximately 16 minutes), Mr. Kearse fell onto his side in the back seat and did not speak again.

Upon arrival at the station house, officers removed an unresponsive Mr. Kearse from the patrol car and placed him on the sidewalk. Approximately six minutes after arriving, an officer began to perform chest compressions on Mr. Kearse. Shortly before starting the chest compressions, an officer had called for assistance from Emergency Medical Services ("EMS").

22

The officer continued compressions until EMS arrived approximately four minutes later. Emergency Medical Technicians continued resuscitation efforts on the scene and then took Mr. Kearse by ambulance to nearby Ellis Hospital, where after further efforts at resuscitation, he was pronounced dead.

Police officers have a duty to ensure reasonable and adequate medical care without undue delay for persons in their custody. In his statement to the New York State Police ("NYSP"), the officer transporting Mr. Kearse to the station house stated that, after Mr. Kearse was put into his vehicle, the officer turned on a live-feed monitor of the back seat so that he could monitor Mr. Kearse. In his statement, the officer gave several reasons why he did not call for medical services prior to arrival at the station house: (i) the officer had been trained in the police academy and the military (and otherwise learned through his professional experience) that if someone can speak, he or she can breathe; (ii) Mr. Kearse did not expressly complain of any pain and did not expressly ask for medical assistance; and (iii) Mr. Kearse was able to "upright" his body on his own when the car made turns. The officer also said he declined Mr. Kearse's request to roll down any windows in the vehicle for security reasons (i.e., an arrestee could reach outside the car and open the door, or flee through the open window) and, given Mr. Kearse's multiple attempts to flee that day, the officer regarded Mr. Kearse's request for the windows to be lowered as a possible ruse to escape custody.

Following an autopsy, the Medical Examiner for Schenectady County concluded that Mr. Kearse's death was caused by "heart rhythm problems (i.e., a cardiac arrhythmia) due to an enlarged heart and thickening of the heart's walls." The manner of death was "natural." Mr. Kearse's prior medical records note his history of high blood pressure, which is consistent with the Medical Examiner's conclusions. The OAG retained an expert cardiologist to review and

further elaborate on the Medical Examiner's work. The expert cardiologist's conclusions about cause of death were consistent with those of the Medical Examiner. According to the expert cardiologist, Mr. Kearse had pre-existing left ventricular hypertrophy, or thickening of the heart walls, due to high blood pressure. This condition leads to an increased risk of malignant arrhythmias (essentially, extra heartbeats), which in turn can cause a cardiac arrest. Due to his underlying health conditions, combined with the mental and physical stress from fleeing the police, Mr. Kearse developed an arrhythmia after being placed in the back seat of the officer's car, which progressed over time to a heart attack. The expert cardiologist further concluded that the arrhythmia would explain why Mr. Kearse felt like he could not breathe. When the heart fails to pump properly, blood backs up into the blood vessels of the lungs, impeding their functioning; moreover, a malfunctioning heart does not adequately circulate oxygenated blood. Both consequences of an arrhythmia event can create a sensation that one cannot breathe, even though the airway is not blocked and air is entering the lungs normally. The expert cardiologist also noted that because an arrhythmia does not cause the chest pain typically associated with a heart attack, and because the symptoms expressed by Mr. Kearse can also be consistent with other non-life-threatening events like a panic attack, it would be very difficult to identify his symptoms as originating from a cardiac event without additional sophisticated medical testing, such as an electrocardiogram. Finally, the expert cardiologist concluded that Mr. Kearse's physical condition deteriorated rapidly after the onset of the malignant arrhythmia, with a limited window of time in which appropriate medical intervention could have saved his life and quite possibly even prevented any serious physical injury, such as brain damage, a stroke, or permanent shutdown of the kidneys.

After conducting an independent investigation and undertaking comprehensive investigative steps, the OAG decided to present this matter to a grand jury, because the OAG

24

concluded that the evidence was sufficient for a properly instructed grand jury to find probable cause for a criminal charge. This decision was made with full recognition that the probable cause determination would depend on the grand jury's assessment of several difficult factual questions, including the officer's state of mind while Mr. Kearse was in his custody, and whether the officer's failure to secure medical attention for Mr. Kearse prior to their arrival at the station house was a cause (under the relevant legal standards) of Mr. Kearse's death.

After hearing the evidence and receiving instruction on the applicable law, the grand jury determined that no criminal charges should be brought. That determination is final. Because this matter was submitted to a grand jury, the OAG is constrained by law from discussing what actually occurred in the grand jury, either with respect to the evidence presented or the charges considered by the grand jury.

The OAG made the following recommendations in connection with this matter:

First, in order to avoid any more tragic deaths like Mr. Kearse's, The New York State Legislature should pass legislation requiring the New York State Division of Criminal Justice Services ("DCJS") to establish a uniform statewide policy for police departments in New York requiring that: (i) police officers treat indications of breathing difficulties by arrestees (whether reported by the arrestee or observed by the officer) as medical emergencies; and (ii) conduct training concerning the policy that makes clear that a complaint about breathing difficulties should not be dismissed because the arrestee is able to talk;

Second, the SPD should revise its policies concerning medical treatment of arrestees to make clear that arrestees should receive emergency medical services whenever they are in need of such services, even if the need for such services does not arise from the use of force against the arrestee; and

25

Third, the SPD should take steps to become a New York State-accredited law enforcement agency. The DCJS offers an accreditation process that requires police agencies to achieve and maintain various standards that constitute best practices in the field of law enforcement.

6. Report on the Investigation into the Death of Walter Perez (Nassau County)

Walter Perez ("Mr. Perez") died following an interaction with officers from the Nassau County Police Department ("NCPD"). On September 23, 2017, Mr. Perez's landlord called 911 and reported that Mr. Perez was intoxicated, banging on walls, and making a lot of noise. Earlier in the night, Mr. Perez's landlord and two tenants had observed Mr. Perez naked, dancing, and singing in a basement common area of the house. Four NCPD officers responded to Mr. Perez's home, and they observed that Mr. Perez was naked, bleeding from a swollen right eye, sweating profusely, and positioned with his fists up, in a fighting stance. The officers repeatedly told Mr. Perez to calm down, and an ambulance was called to provide medical assistance and transport Mr. Perez to a hospital for a mental health evaluation. After the officers had attempted to talk to Mr. Perez for approximately ten minutes, Mr. Perez told the officers that he had something for them. He then went into his bedroom and resumed his fighting stance. Officers entered Mr. Perez's bedroom and determined that there were no weapons near Mr. Perez. They then tried to handcuff Mr. Perez, and a struggle ensued, during which Mr. Perez attempted to punch one of the officers. The officer Tasered Mr. Perez. Mr. Perez ripped out one of the probes from his chest and pushed the officer into a closet. A second officer deployed her Taser in dart-probe mode and, as a result, Mr. Perez fell to the floor. In total, two officers used their Tasers a total of 13 times for a total of approximately 66 seconds. Mr. Perez continued to struggle and resisted officers' attempts to handcuff him for several minutes. After being handcuffed, Mr. Perez was placed face down on the floor. An EMT responding to the prior call from the officers arrived; the EMT observed that Mr.

26

Perez went into cardiac arrest. Emergency life-saving measures, both at the scene and en route to a nearby hospital, were not effective, and Mr. Perez died at the hospital later that night. The Medical Examiner determined that the cause of Mr. Perez's death was "excited delirium due to acute cocaine intoxication following physical exertion with restraint and use of conducted electrical weapon."

The OAG examined the evidence above and concluded that it did not support criminal charges in connection with Mr. Perez's death. However, the OAG made several recommendations in this case. Considering the period after Mr. Perez entered his bedroom, we encouraged the NCPD to assess whether other techniques specifically taught in Integrating Communications, Assessment, and Tactics ("ICAT") training[13], such as continuing to monitor Mr. Perez while maintaining distance from him, were viable. Further, once the officers engaged physically with Mr. Perez, the officers subjected him to more than three successful Taser activations, which was inconsistent with NCPD's own policy. Accordingly, we recommended that the NCPD: (i) continue to implement programs and review methods to defuse incidents involving individuals who appear to be experiencing excited delirium[14] or a mental health crisis; (ii) develop training programs cautioning NCPD officers concerning the simultaneous deployment of multiple Tasers against the same civilian, as well as multiple uses of a single Taser consecutively for a prolonged period; (iii) NCPD should work toward outfitting their officers with body-worn cameras and equipping Tasers with cameras.

---

[13] See https://www.policeforum.org/about-icat .
https://www.nccpsafety.org/assets/files/library/ICAT_Integrating_Communications,_Assessment,_and_Tactics.pdf

[14] Excited Delirium Syndrome (ExDS) is a medical condition that can manifest itself as a combination of anxiety, disorientation, elevated body temperature, psychomotor agitation, speech disturbances, unexpected physical strength, aggressive behavior, disorientation, hallucination, insensitivity to pain, and violent and bizarre behavior. It may result in sudden death, often through respiratory or cardiac arrest. See DC Mash, *Excited Delirium and Sudden Death: A Syndromal Disorder at the Extreme End of the Neuropsychiatric Continuum*, 7 FRONT. PHYSIOL. 435 (2016) (describing the effects of Excited Delirium).

27

7.  Report on the Investigation into the Death of John Havener (Madison County)

On January 22, 2018, at approximately 4:20 a.m., 41-year-old John Havener ("Mr. Havener"), who was under the influence of narcotics, drove his vehicle in reverse on Route 5 in the City of Oneida, Madison County. Mr. Havener's passenger in the vehicle tried to wrestle control of the steering wheel from Mr. Havener, causing the car to leave the roadway after nearly colliding with another vehicle, passing over a curb, and coming to rest in a snowbank.

Mr. Havener got out of the vehicle and, as reported by civilians and seen on recorded video, began acting erratically and approaching drivers in the middle of the three-lane highway. Police officers responded, blocked traffic in each direction, and engaged with Mr. Havener, who would not leave the road. After initial verbal engagement followed by hands-on only techniques, officers deployed their Tasers in an attempt to restrain Mr. Havener and remove him from the road. In all, three different officers deployed one successful Taser strike, though not simultaneously, but rather, over the course of time. After nearly eleven minutes, a total of five law enforcement officers were able to take Mr. Havener into custody.

After he was restrained, Mr. Havener became unresponsive and despite the immediate summoning of medical assistance, he did not survive. The Medical Examiner deemed Mr. Havener's cause of death as "multiple drug toxicity (methamphetamine, amphetamine, and pseudoephedrine)" and designated the manner of death as "accidental."

The OAG's investigation found that the involved officers used "objectively reasonable" force to take Mr. Havener into custody and removing him from the roadway. Specifically, the OAG found that the involved officers appropriately used techniques in an effort to restrain Mr. Havener, who was at the time, actively engaged in conduct endangering his own life and the lives

of others (by remaining in the middle of a well-traveled roadway.) Accordingly, the OAG found no criminal culpability on the part of the involved officers.

The OAG did not make any recommendations in connection with this incident.

8.  Report on the Investigation into the Death of Susan LoTempio (Erie County)

On March 30, 2018, a pedestrian, Susan LoTempio ("Ms. LoTempio"), died after being hit by a Buffalo Police Department ("BPD") patrol vehicle. The collision occurred at approximately 6:30 a.m., which was approximately thirty minutes before sunrise. The roads were wet and visibility was poor. Wearing dark clothing, Ms. LoTempio was crossing the street at an angle and in an area where there was no crosswalk. A BPD patrol vehicle responding to a call by a civilian for police assistance collided with Ms. LoTempio. The evidence shows that the collision was a tragic accident for which no criminal charges were warranted.

The OAG made the following recommendation in this matter:

The placement of the mobile computer terminal ("MCT") in the officer's car obstructed a portion of his view of the side of the road on which Ms. LoTempio was walking. While changing the placement of the MCT may not have prevented this accident, we recommend that BPD explore changing the placement of the MCT so as not to obstruct the driver's view.

9.  Report on the Investigation into the Death of Saheed Vassell (Kings County)

On April 4, 2018, Saheed Vassell ("Mr. Vassell") died after being shot multiple times by four officers of the New York Police Department ("NYPD"). At 4:39 p.m. a pedestrian who was walking on Utica Avenue in East New York, Brooklyn, called 911 reporting that a man, later determined to be Mr. Vassell, was "walking around pointing…I don't know what he's pointing at people's face…if it's a gun, it's silver…" This caller then stated, "He's pointing things at people's faces…" When the 911 operator attempted to clarify what the caller observed, the caller responded,

"I don't know if it's a gun ma'am. It looks…it seems like a gun. It's silver." The caller added, "No one is injured. He's just pointing in their face walking and walking back and putting it to their back." The caller provided a description of Mr. Vassell's appearance and the direction that he was taking.

At approximately 4:40 p.m., a second civilian called 911. This caller reported that "[t]here's a guy walking around the street. He looks like he's crazy, but he's pointing something at people that looks like a gun and he's like popping it like if he's pulling a trigger. He's not pulling a trigger, but he's making a motion as if he is and there's something sticking out of his jacket." The second civilian also provided the 911 operator with a description of Mr. Vassell, as well as the direction that he was walking. When the 911 operator asked, "You said that it looks like a gun?" the caller responded: "Yes." At a later point in the call, this second caller stated, "I just called the cops because I saw him doing it to like five people in the street…It's not a gun…He has no…he did it to like three people…He pulled it like it's a gun…I'm sitting in the car and I'm watching the guy, he's crossing the street and he's pointing at them people's face like it's a gun. And pulling his hands. He's doing some [*making sound*] …pulling it back like he's making a trigger sound and people are like ducking and like trying to [inaudible] because they thinking it's a gun. There's something hanging out of his jacket. I'm like oh my god. I don't know if it's a gun or not, I don't know, you know, but…"

Despite the fact that both 911 callers were not completely certain as to whether the item that Mr. Vassell was wielding was a gun (although they suspected that it was), the police officers on patrol received information that was less equivocal. The information they received was characterized in the system as a "firearm job;" they were informed that "[the] caller states the male was pointing a gun at people."

30

NYPD Anti-Crime Unit officers responded to this dispatch transmission and indicated over the air that they were responding to the "firearm job." Three Anti-Crime officers were travelling in an unmarked police vehicle and responded without their lights and sirens activated. In addition to these plain-clothed officers, a 71st Precinct Patrol Lieutenant and Sergeant also informed dispatch that they too were responding to the scene. The Patrol Sergeant was travelling immediately behind the unmarked Anti-Crime car. At the same time, uniformed officers assigned to the NYPD's Strategic Response Group overheard the dispatcher's communications regarding the man armed with a gun and proceeded to respond to the area of the incident as well. These officers were assigned to a marked NYPD police vehicle; their car was travelling several seconds behind the Anti-Crime officers' unmarked car.

While travelling north on Utica Avenue, the Anti-Crime officers stated they saw Mr. Vassell, who fit the description provided by the dispatcher. One of the Anti-Crime officers stated he saw Mr. Vassell point what appeared to be a gun at people and at a car that was stopped on the street waiting for a traffic signal to change. The officers immediately stopped their car and stepped out. The Patrol Sergeant and Strategic Response group cars parked to the side and to the rear of the Anti-Crime officers' vehicle. Mr. Vassell turned, assumed a two-handed shooting stance and made a racking motion with the silver object, using his left hand. According to the four police officers, believing that Mr. Vassell was about to fire a gun at them, they fired their weapons at Mr. Vassell, striking him multiple times. Police officers and EMTs provided medical treatment to Mr. Vassell at the scene. Despite their efforts, however, Mr. Vassell was pronounced dead after being rushed to Kings County University Hospital.

Pursuant to New York State law, SIPU determined that the responding officers' use of deadly physical force against Mr. Vassell was legally justified. Under the particular facts and

31

circumstances of this case, the officers' use of deadly physical force was justified in that it was reasonable for them to believe that such force was necessary to defend themselves and others from what they reasonably believed to be Mr. Vassell's imminent use of deadly physical force.

Despite the fact the shooting officers' actions were determined to be legally justified under New York State law, OAG offered two specific recommendations: First, that 911 operators and police dispatchers should receive comprehensive critical incident training.[15] Second, that the NYPD review and reform its public information policies and practices regarding which facts it should release to the public in police-involved use of force cases.

10. Report on the Investigation into the Death of Robert L. Scott (Wayne County)

On May 20, 2018, at approximately 5:00 a.m., a Wayne County Sheriff's Department ("WCSD") deputy and New York State Police ("NYSP") troopers responded to a call for a fight in progress at a multi-family dwelling in the town of Lyons, New York. A WCSD deputy arrived first and found the female occupant of the apartment and Robert Scott ("Mr. Scott") inside. The female advised that she and Mr. Scott were not fighting but that Mr. Scott was drunk and fell over. After some further conversation, the deputy asked Mr. Scott and the female to keep the noise level down and then walked downstairs and outside, where he and the troopers remained talking.

Approximately three minutes later, the officers heard arguing and screaming coming from the apartment and went back up the stairs. The same female answered the door and said that Mr. Scott had overdosed and was "freaking out." She also told the deputy that Mr. Scott and she had smoked potentially "laced" marijuana. The officers observed that Mr. Scott, naked and sweating

---

[15] The Police Executive Research Forum recommends that this type of training should include "dealing with persons with mental illness (including communicating with family members and agency protocols), crisis communications, use-of-force policy, and de-escalation strategies." They also recommend that call-takers and dispatchers should actively participate in the agency's mental health training program. See https://www.policeforum.org/assets/guidingprinciples1.pdf at page 68.

profusely, was exhibiting symptoms consistent with excited delirium.[16] At that point, the deputy requested an ambulance to evaluate Mr. Scott as the troopers verbally attempted to calm him.

However, when the ambulance arrived, Mr. Scott jumped up, pushed the officers out of the way, and ran out of the apartment. Mr. Scott ran down the stairs, out of the house, and fell to the ground, not far from the front door, near the waiting ambulance. With an emergency medical technician watching, the officers worked together to handcuff Mr. Scott as he continued to resist; the officers did not use Tasers, pepper spray, or any other instruments in order to restrain him. After he was restrained, Mr. Scott became unresponsive, stopped breathing, and lost his pulse. Despite the immediate application and continuation of CPR and other life-saving measures, Mr. Scott was pronounced dead at 6:31 a.m. The Monroe County Medical Examiner's Office deemed the cause of death to be "complications of acute cocaine intoxication. Hypertensive cardiovascular disease is a significant contributing condition." The manner of death was "undetermined."

Based on the totality of the evidence, the OAG found no evidence that the force used to restrain Mr. Scott was excessive or otherwise unjustified. The officers' actions comported with acceptable best practices for interacting with individuals experiencing what appeared to be an excited delirium event. Specifically, the officers immediately summoned EMS. Thereafter, they did not engage physically with Mr. Scott; they took no action to restrain or otherwise physically interact with him until after the ambulance arrived, indeed until after Mr. Scott ran from the house. Instead, while awaiting EMS, the officers simply spoke with Mr. Scott and tried to calm him. This manner of dealing with individuals displaying signs consistent with excited delirium has been recognized as a best practice that can potentially save lives. The OAG recommended that the NYSP

---

[16] The Troopers later related this observation to the responding ambulance personnel.

and the lawmakers responsible for its funding work to outfit members of NYSP with body-worn cameras.

11. Report on the Investigation into the Death of Lillian Weyanna (Monroe County)

On December 8, 2018, at approximately 9:00 p.m., a Greece Police Department investigator operating an unmarked police vehicle on Route 104 in the town of Parma struck and killed Lillian Weyanna ("Ms. Weyanna"), who was walking across the street. Ms. Weyanna, 4'7" tall and weighing 90 pounds, was wearing all black outer-clothing as she attempted to navigate the roadway at an unlit location where there were no crosswalk markings, stop signs, or traffic signals. Based upon the totality of the evidence, the OAG concluded that Ms. Weyanna's death was a tragic accident and was not the result of any unlawful acts or omissions by the Greece Police Department investigator. The OAG made no recommendations in connection with this incident.

12. Report on the Investigation into the Death of Jaime Lopez-Cabrera (Dutchess County)

On the morning of September 25, 2018, New York State Police ("NYSP") troopers were dispatched to Coyote Flaco restaurant in Stanfordville for the report of a man threatening a woman with a knife. NYSP Trooper Katherine Gorey ("Trp Gorey") arrived first and found Mr. Lopez-Cabrera behind the restaurant speaking to his wife, who was seated inside of her minivan. Mr. Lopez-Cabrera had placed items behind the minivan in an apparent attempt to prevent his wife from leaving. Mr. Lopez-Cabrera showed his hands to Trp Gorey when she directed him to do so. However, according to Trp Gorey, Mr. Lopez-Cabrera also indicated that he had a weapon in his pocket. Mr. Lopez-Cabrera then placed his left hand into his left pocket and did not remove it again for the duration of the incident.

Trp Kevin Wolensky ("Trp Wolensky") arrived at this time. According to both Trp Gorey and Trp Wolensky, Trp Gorey advised Trp Wolensky that Mr. Lopez-Cabrera had a weapon in his

34

left pocket. Trp Wolensky then repeatedly directed Mr. Lopez-Cabrera to remove his hand from his left pocket where, according to Trp Wolensky, he could see the outline of what he believed to be a large knife.

As Trp Gorey moved behind the minivan to remove items so that Mr. Lopez-Cabrera's wife could leave, Trp Wolensky, with weapon drawn, repeatedly directed Mr. Lopez-Cabrera to remove his hand from his pocket. Instead of removing his hand, Mr. Lopez-Cabrera advanced toward Trp Wolensky. Trp Wolensky walked backward with his gun drawn as Mr. Lopez-Cabrera continued to walk toward him, refusing to remove his hand from his left pocket. After backing up 11 or 12 steps, Trp Wolensky fired two shots at Mr. Lopez-Cabrera.

After restraining Mr. Lopez-Cabrera, Trp Wolensky found a 9-inch electric screwdriver in his left pocket. Despite the immediate summoning of emergency services, Mr. Lopez-Cabrera ultimately died at the hospital.

Applying applicable New York state and federal legal principles to the matter, SIPU determined that it could not disprove the defense of justification beyond a reasonable doubt. Under the circumstances, SIPU determined that it could not prove that Trp Wolensky's belief was not objectively reasonable. Accordingly, the OAG found, pursuant to Penal Law §35.30(1), that there was no basis for criminal charges.

The OAG did, however, make four recommendations as a result of this incident. First, SIPU's evaluation of the matter prompted a recommendation that New York State mandate de-escalation training for all police officers. Second, observing that Trp Wolensky's actions were in-line with his training, the OAG encouraged all law enforcement agencies (including the NYSP) to re-evaluate their training protocols regarding sharp-edged weapon training. Third, the OAG encouraged all law enforcement agencies to partner with local mental health providers and

35

organizations in order to educate families of individuals suffering from conditions that affect their mental health on how to properly communicate with call-takers. And fourth, the OAG reiterated a prior recommendation that the NYSP equip its members with body-worn cameras.

13. Report on the Investigation into the Death of Jonathan Maldonado (Westchester County)

On November 29, 2017, Jonathan Maldonado ("Mr. Maldonado"), 21, died after an encounter with Greenburgh Police Department ("GPD") officers. On November 29, 2017, at approximately 5:40 p.m., Mr. Maldonado entered a Best Buy store in Hartsdale, NY. A few minutes later, Best Buy store employees heard an alarm activate for a secured display product, which was later identified as an iPhone X. Immediately thereafter, at approximately 5:45 p.m., Mr. Maldonado left the store. Several Best Buy employees ran out after Mr. Maldonado.

Once outside the store in the shopping area parking lot, a Best Buy employee called out to Mr. Maldonado, "Sir, can you come over here?" Mr. Maldonado then began to run through the parking lot toward North Central Park Avenue. The Best Buy employees chased Mr. Maldonado and surrounded him to prevent him from leaving. The employees asked Mr. Maldonado to hand over the phone, but he denied having it. (The missing phone was subsequently recovered from Mr. Maldonado's clothing.) One Best Buy employee called 911 to report what was happening and to request police assistance. Mr. Maldonado tried to walk away, but one of the Best Buy employees pushed him to the ground. At this point, Mr. Maldonado said he could not breathe. As GPD vehicles approached with their emergency lights and sirens on, Mr. Maldonado said to the Best Buy employees, "I don't care about the cops. I just don't want to get caught with this stuff." Mr. Maldonado then removed a small pouch from his pants pocket, took out several small white glassine envelopes, and put them in his mouth.

36

Before the GPD officers arrived, the GPD dispatcher had broadcast that a shoplifter from Best Buy was in the employees' custody. The first GPD officer on the scene came over to where Mr. Maldonado was kneeling. A Best Buy employee told the GPD Officer that Mr. Maldonado had put drugs in his mouth. The officer then took Mr. Maldonado to the ground from behind, bringing his face down onto the ground. The officer lay on Mr. Maldonado's back, trying to remove the items from Mr. Maldonado's mouth, and yelling for Mr. Maldonado to "spit it out." Mr. Maldonado did not comply, and when the officer tried to handcuff him, Mr. Maldonado twisted his body and would not release his hands from underneath his body. A second GPD officer arrived at the scene and attempted to help place handcuffs on Mr. Maldonado, but Mr. Maldonado kept his hands underneath his body. A third GPD officer arrived at the scene, by which time officers had control of one of Mr. Maldonado's arms, but Mr. Maldonado still had his other arm tucked under his body. The third GPD officer activated his Taser in the dart-prong mode toward Mr. Maldonado's mid-lower back for a period of approximately five seconds. According to the third officer, the Taser did not appear to have any effect on Mr. Maldonado. He immediately activated his Taser a second time in drive-stun mode for approximately five seconds against the back of Mr. Maldonado's leg. Mr. Maldonado became limp after the second Taser activation.

After Mr. Maldonado went limp, he was handcuffed behind his back and placed in a sitting position on the ground with his legs extended in front of him. GPD officers immediately performed a quick assessment of Mr. Maldonado's medical condition and concluded that he may have overdosed on narcotics. A GPD officer quickly administered several doses of Narcan by injection and by nasal spray. Several GPD emergency medical personnel arrived shortly after Mr. Maldonado was given the doses of Narcan. Mr. Maldonado remained unresponsive when the ambulance arrived. However, a responding Emergency Medical Technician ("EMT") was able to

37

detect a weak pulse during his medical evaluation of Mr. Maldonado. Mr. Maldonado was then placed onto a stretcher and brought inside the ambulance. At this point, one officer observed several small glassine envelopes in the back of Mr. Maldonado's mouth and removed them with a pair of forceps. GPD officers and emergency medical personnel continued to provide emergency care to Mr. Maldonado, which included administering epinephrine and additional Narcan (intravenously), intubating him, providing oxygen, monitoring his vital signs, and performing manual CPR and chest compressions with the use of a Lucas machine. Mr. Maldonado was then taken to White Plains Hospital in cardiac arrest. Unfortunately, all efforts to revive Mr. Maldonado were unsuccessful, and hospital personnel pronounced Mr. Maldonado dead at 6:54 p.m.

An autopsy subsequently determined that the cause of Mr. Maldonado's death was "acute mixed drug intoxication (fentanyl, acetyl fentanyl, methoxy acetyl fentanyl, heroin)" – although the Medical Examiner could not rule out that the presence of the glassine envelopes in the back of Mr. Maldonado's mouth, his struggle with the police, and/or the use of the Taser contributed to his death.

SIPU determined that the GPD officers' actions did not violate New York Penal Law and that no criminal charges against any GPD officers were warranted. The OAG nevertheless made several recommendations as to appropriate policies, procedures, and training with respect to the use of force by GPD officers. Specifically, the OAG recommended that the GPD (i) amend its Taser use policy and training to account for the heightened risk when a targeted individual is reasonably believed to be under the influence of drugs; (ii) amend its use of force policy and procedure to develop a mandatory investigation protocol whenever a death in custody occurs in connection with, or immediately after, an officer's use of force; (iii) take steps to ensure that GPD officers follow the department's existing policy with regard to use of body-worn cameras; and (iv)

clarify its protocols for timely and respectfully notifying family members of the death of someone in police custody.

14. Report on the Investigation into the Death of Edwin William Garcia Lopez (New York County)

On May 27, 2019, Edwin William Garcia Lopez ("Mr. Garcia Lopez"), 39, died after an encounter with New York City Police Department ("NYPD") officers. At 1:50 a.m. that morning, NYPD officers responded to an apartment building located at East 116th Street in New York County after Mr. Garcia Lopez's roommate's wife called 911. During this call, she reported that Mr. Garcia Lopez was acting in an irrational and violent manner and that he was fighting and biting people inside the apartment. When police arrived, Mr. Garcia Lopez was struggling in the living room with his brother and roommate. The two men were attempting to subdue Mr. Garcia Lopez, who was physically resisting their efforts to hold him down. The officers entered the apartment, handcuffed Mr. Garcia Lopez, and walked him out into the staircase landing area immediately outside the apartment.

As officers were leading Mr. Garcia Lopez towards the stairs to the lobby, he began to violently struggle. The officers responded by physically restraining, then forcing Mr. Garcia Lopez to the floor. Despite these efforts to subdue him, Mr. Garcia Lopez persisted in kicking at the police officers. Moments later, officers noticed that Mr. Garcia Lopez appeared to stop breathing. Officers removed Mr. Garcia Lopez's handcuffs and started performing chest compressions in an attempt to resuscitate him.

Emergency Medical Services ("EMS") personnel soon relieved the police officers and continued CPR. CPR was performed from the time Mr. Garcia Lopez was lying on the landing

floor, and continued for the duration of his journey by ambulance to Metropolitan Hospital. Despite these efforts, hospital medical staff pronounced Mr. Garcia Lopez dead at 3:08 a.m.

The Office of Chief Medical Examiner of the City of New York ("Medical Examiner") deemed the Cause of Death "Acute cocaine intoxication." The Manner of Death was: "Accident," characterized as "an accident (substance abuse)." In addition to this conclusion, the Medical Examiner highlighted a number of cardiac issues in her final diagnoses.

SIPU determined that the NYPD officers' actions did not violate New York Penal Law and that no criminal charges against any NYPD officers were warranted. The OAG nevertheless made two recommendations based on the actions of an officer, shown on video surveillance footage, kicking Mr. Garcia Lopez as he lay on the ground. While this disturbing behavior did not in any way contribute to Mr. Garcia Lopez's death, the OAG noted that such conduct does not comport with the NYPD's stated motto of serving the public with courtesy, professionalism, and respect. Accordingly, the OAG recommended that the NYPD consider any and all appropriate disciplinary measures against this officer, and perhaps his direct supervisor, who was present during the entirety of the encounter and appeared to do nothing in response.

15. [Report on the Investigation into the Death of Michael Rizzetta (Rockland County)](#)

On November 17, 2018, at approximately 4:55 a.m., Michael Rizzetta ("Mr. Rizzetta") was struck by a marked police vehicle operated by Police Officer Keith Rosario ("PO Rosario") of the Haverstraw Police Department on Route 202 in Rockland County.  Mr. Rizzetta, wearing dark clothing, was crossing the street by foot in an unlit area where there was no cross walk or stop sign. PO Rosario was driving 41 mph in a 40 mph zone eastbound on his way back to the police station after having completed an assignment. PO Rosario was approximately two blocks

40

away from the police station when he heard a "blast" and noticed broken glass inside his vehicle. He applied his brakes and activated his emergency lights. Upon exiting his car, PO Rosario realized that he had struck a person. PO Rosario immediately radioed for medical assistance and began administering CPR. Despite the life-saving efforts administered at the scene and at Nyack Hospital, Mr. Rizzetta was declared dead at 6:10 a.m. At the time of the collision, PO Rosario was driving with his headlights on and was not under the influence of alcohol or using his cell phone. Based upon the totality of the evidence, the OAG concluded that Mr.Rizzetta's death was a tragic accident and was not the result of any unlawful acts or omissions by PO Rosario. The OAG made no recommendations in connection with this incident.

16. Report on the Investigation into the Death of Gerard Roldan III (Schoharie County)

On November 8, 2018, Gerard Roldan III ("Mr. Roldan") was fatally struck by a marked police vehicle operated by Patrolman Christopher Sniffen ("Ptl. Sniffen") of the Cobleskill Police Department ("CPD") in the Village of Cobleskill. A Jeep, with a Pizza Hut sign mounted on its roof, passed Ptl. Sniffen's vehicle (an SUV), going westbound, and Ptl. Sniffen's radar device indicated that that the Jeep was travelling at over 40 mph (the speed limit was 30 mph). Ptl. Sniffen then, in his mirror, observed the Jeep run through a red light at a traffic-light-controlled crosswalk further down the roadway. Ptl. Sniffen proceeded a short distance and then made a u-turn, with the intention of conducting a stop of the Jeep. In order to catch up to the Jeep, Ptl. Sniffen increased his own speed, up to (ultimately) between 53 and 63 mph. He did not activate his emergency lights or sirens.

Shortly after passing through the same traffic light that the Jeep had run (the light was now green), and about 120 yards beyond the traffic-light-controlled crosswalk, Ptl. Sniffen's vehicle struck Mr. Roldan, who had apparently been crossing the roadway. Mr. Roldan – a 26-year-old

41

resident of the village, known to Ptl. Sniffen – was wearing a black knit hat, gray sweatshirt, black pants, and brown boots, and was not in a crosswalk. Ptl. Sniffen had not seen Mr. Roldan until striking him. Ptl. Sniffen immediately stopped his vehicle, radioed to central dispatch that he had struck a pedestrian and called for an ambulance; he then exited his vehicle to attend to Mr. Roldan, who was lying unresponsive in the roadway. Ptl. Sniffen checked Mr. Roldan for a pulse and, finding none, soon began performing CPR on Mr. Roldan; he (and at least one other emergency responder) continued to do so until paramedics arrived and took over. Mr. Roldan was transported to Cobleskill Regional Hospital, where he was pronounced dead.

Ptl. Sniffen may arguably be faulted for driving substantially above the speed limit without having activated his emergency lights and sirens when he struck and killed Mr. Roldan. (At the time of the incident, CPD policy did not require the activation of lights and sirens under these circumstances – a policy which has since been changed.) However, Ptl. Sniffen was not impaired by drugs or alcohol, distracted by a cell phone, or engaged in otherwise blameworthy conduct. Mr. Roldan was in a part of the roadway not marked for pedestrian crossing, and was wearing clothing that greatly minimized his visibility. Under New York law, Ptl. Sniffen's conduct did not rise to the level of criminal culpability. For this reason, the OAG has determined that criminal charges are not appropriate in this matter.

### III.    Recommendations

Under Executive Order 147, the OAG is instructed to include in each of its reports "any recommendations for systemic reform arising from the investigation." Pursuant to that provision, the OAG in most of its reports has identified ways to improve the policies or practices relevant to police-involved deaths of the law enforcement agencies in question. The recommendations have typically been intended to advance two broad objectives: (i) minimizing the risk that a police-

42

civilian encounter will result in the civilian's death; and (ii) enhancing transparency and accountability for officers and police departments when such deaths do result. While some recommendations are uniquely tailored to a specific police agency, often, the reforms identified would just as readily apply to countless other agencies throughout the state.

In this section, we highlight some of the most widely applicable recommendations (in summary form) that the OAG has made. These recommendations, and others, are discussed in greater detail within the individual investigation reports from which they are drawn. It should be noted that, while these recommendations are directed at police agencies themselves, many do not have the resources to implement them without additional funding. The OAG strongly encourages the appropriate state, county, and city entities to provide the necessary resources to implement our recommendations.

### A. *Minimizing risk of civilian death*

#### 1. 911 Operators and Dispatchers

In 2016, the Police Executive Research Forum ("PERF"), an independent organization focused on identifying best practices relative to critical issues in policing, issued its "Guiding Principles on Use of Force."[17] In the report, PERF provided 30 recommendations broadly dealing with improvements to law enforcement responses in the areas of "use-of-force policies, training, tactics, and equipment." Guiding Principle 29 emphasizes the need for "[w]ell trained call-takers and dispatchers [since they are] essential to the police response to critical incidents. Indeed, the phenomenon of what is referred to as "dispatch priming" shows that "priming officers with incorrect [] information about what a subject [is] holding significantly increase[s]

---

[17] https://www.policeforum.org/assets/30%20guiding%20principles.pdf

the likelihood" of a shooting error … while "priming officers with the correct information …

significantly decrease[s] the likelihood for error."[18]

PERF has recognized the significant role 911 call-takers and dispatchers play "in

improving the police response to critical incidents of all types, including incidents that have the

potential for use of lethal force." PERF's training program, developed to help officers defuse

critical incidents [Integrating Communications, Assessment and Tactics – "ICAT"] similarly

recognizes the important role of dispatchers in reducing fatal uses of force and encourages the

co-training of dispatchers and police officers; ICAT also trains responding officers, where time

permits, to contact dispatchers in order to receive further information about the subject of a

critical incident.

### 2. De-Escalation

In situations where there is no indication that a subject possesses a firearm, de-escalation

techniques encourage officers to slow down, create space between themselves and a subject, and,

where possible, use communication-based strategies to defuse potentially dangerous situations.

When employed, these techniques carry the potential to save lives in situations that might

otherwise evolve into fatal uses of force. Generalized, communications-based de-escalation

training provides officers with more tools they can use across a host of scenarios. The Integrating

Communications, Assessment, and Tactics ("ICAT") training program developed by PERF is the

type of general de-escalation training program we encourage for all police officers. This program

is specifically designed to address situations involving unarmed individuals, or individuals armed

with weapons other than firearms, who appear to be experiencing a mental crisis.[19] ICAT's

---

[18] Id.

[19] See https://www.policeforum.org/icat

mission is to teach officers to "safely and professionally resolve critical incidents involving subjects who may pose a danger to themselves or others but who are not [known to be] armed with firearms." Programs like ICAT use scenario-based training to teach officers a variety of de-escalation strategies (beyond simply drawing their firearms and/or shouting commands) that can be employed in a variety of circumstances. We recommend that all New York law enforcement officers receive training in how to defuse incidents using communication-based de-escalation techniques.

### 3. Taser Use

Numerous studies have shown that the electric current delivered by a Taser is capable of causing death or serious injury, even in otherwise healthy individuals. This risk is significantly heightened when the device is used on certain populations, including young children, the elderly, pregnant women, individuals under the influence drugs and/or alcohol, and individuals with pre-existing heart conditions. Most of these risks are acknowledged by the weapon's principal manufacturer, Axon, which itself now describes the Taser as "less lethal" rather than "non-lethal."

These findings are reflected in Taser-use guidelines across the country. For example, in a 2011 report, PERF and the United States Department of Justice Community Oriented Policing Services ("COPS") established guidelines for use-of-force practices and policies governing Tasers. The report notes that "[p]ersonnel should be aware that there is a higher risk of sudden death in subjects under the influence of drugs."[20]

All police department use-of-force policies should reflect the heightened risk of serious injury or death when certain populations are subjected to a Taser, and train its officers on such

---

[20] See https://www.policeforum.org/assets/docs/Free_Online_Documents/Use_of_Force/electronic%20control%20weapon%20guidelines%202011.pdf

policies. The policy and training should make clear that the officer should first employ lesser means of force before employing a Taser, when the arrestee's vulnerabilities are reasonably known to the officer. If a Taser is deployed without first employing other means, the officer should be able to articulate a legitimate justification for why exposing such person to increased risk was necessary in the first instance.

### 4.   Shooting into Moving Vehicles

Many police departments prohibit an officer from shooting into a moving vehicle unless deadly physical force *other than the moving vehicle* is being used against the officer or another person. This express prohibition requires officers to move out of the way of an oncoming vehicle rather than remaining in place and firing into the vehicle. This policy protects the safety of the officer and other officers in the area, the driver, any passengers in the car, and bystanders. The New York City Police Department adopted this policy in 1972. Police agencies in Denver, Boston, Chicago, Cincinnati, Philadelphia, Washington D.C., and Los Angeles all subscribe to this policy as well. These agencies have not seen a concomitant increase in their rates of officer injuries. Put differently, when an officer fires at a moving vehicle, the officer is "not going to stop the vehicle. It is still going to be moving forward and everything in its path is going to get hit." We recommend that all police agencies in New York adopt such a policy.

### 5.   Automobile-involved incidents

Police take a sworn oath to protect the lives of members of the communities they serve, and this includes taking reasonable actions to prevent injury or death through reductions of police department vehicle collisions.  Automobile-involved incidents should serve as a reminder to police departments throughout New York State of the cautions their officers should consider when operating department vehicles during times where there is no natural sunlight; in areas that are

trafficked by pedestrians – some who may not be seen due to wearing dark clothing; and in areas that do not bear crosswalk pavement markings or where a pedestrian might otherwise attempt to walk outside of a crosswalk.

Additionally, automobile-involved incidents highlight the added risks associated with police officers operating motor vehicles and potential officer behavior-related hazards that may, according to the National Institute for Occupational Safety and Health (NIOSH)[21], put officers at risk of a collision to include: speeding, particularly through intersections; being distracted while using a mobile data terminal; or experiencing tunnel vision from increased stress. We encourage police and sheriff departments throughout the state to consider the factors that were involved in these collisions, to ensure all reasonable measures are being taken to protect the lives of their officers and members of the public.

### 6. **Post-Arrest Medical Care**

All police agencies should adopt policies that require arresting officers to arrange for emergency medical services after an arrest, whenever such services are requested and without delay, notwithstanding whether force was used in effecting the arrest. In addition, all police officers should be trained to respond to indications of breathing difficulties by arrestees as medical emergencies. Mandatory training about the policy should make clear that a person who is able to speak about difficulty breathing may nonetheless require emergency medical attention.

### 7. **Accreditation**

All police agencies in the state should become accredited law enforcement agencies. The New York State Division of Criminal Justice Services ("DCJS") offers an accreditation process

---

[21] See https://www.cdc.gov/niosh/topics/leo/default.html

47

that provides a "progressive and contemporary way of helping police agencies evaluate and improve their overall performance." The accreditation process requires police agencies to achieve and maintain various standards of excellence that constitute best practices in the field of law enforcement. The process of becoming accredited is time and labor intensive, but accredited agencies are recognized as having policies that are "conceptually sound and operationally effective."

Four principles are addressed by accreditation: (i) increased effectiveness and efficiency of law enforcement agencies utilizing existing personnel, equipment and facilities to the extent possible; (ii) promotion of increased cooperation and coordination among law enforcement agencies and other agencies of the criminal justice services; (iii) provision of appropriate training of law enforcement personnel; and (iv) promotion of public confidence in law enforcement agencies. For those agencies that do not already have such accreditation, the training requirements and written protocol standards required by the process can be of great value with respect to many aspects of an agency's policing practices.

### B. *Enhancing transparency and accountability*

#### 1. Body-Worn Cameras

In a 2014 report, the United States Department of Justice Community Oriented Policing Services and the Police Executive Research Forum detailed extensive research and analysis about the implementation of body-worn cameras in law enforcement agencies nationwide.[22] Those agencies that have adopted body-worn camera programs have obtained many benefits, including: transparency; improved performance; accountability; the documentation of evidence; enhanced officer training; and the prevention and/or resolution of citizen complaints. Dashboard cameras

---

[22] See https://www.justice.gov/iso/opa/resources/472014912134715246869.pdf

have proven to be similarly beneficial to officers, law enforcement agencies, and members of the public alike. Moreover, at a time when police-civilian encounters are increasingly recorded by members of the public, body-worn and dashboard cameras provide the additional benefit of ensuring that events are captured from as many perspectives as possible.

We recommend that all police agencies outfit their officers with body-worn cameras with audio capability and police vehicle dashboard cameras. In addition, officers outfitted with body-worn cameras or operating vehicles equipped with dashboard cameras must be trained on the proper use of this equipment to ensure that all critical interactions with civilians are captured on video.

## 2.  **Policies and Training**

The policies and training of police officers, particularly related to the use of force, are critical components of public safety. Ensuring that information about these policies and training is readily, publicly available also promotes transparency and accountability and is helpful in building public trust. While some departments publish their policies online, not every department does so. We recommend and encourage police departments to publish online or otherwise make publicly available information about their policies and procedures, if that information is not already readily available. The departments should also make readily, publicly available any recent department-wide trainings related to minimizing civilian deaths.

49

**Appendix A: Biographies**

**Jose Maldonado** is a member of the OAG's executive leadership staff and serves as the Chief Deputy Attorney General for Criminal Justice. Previously, Mr. Maldonado held leadership positions under four New York City mayors and in a previous administration of the OAG. His service with the City includes appointments as the first chair of the Business Integrity Commission, Commissioner of the Department of Juvenile Justice, Commissioner of the Department of Consumer Affairs, and Assistant Commissioner with the New York City Police Department. Mr. Maldonado also served as an Assistant District Attorney in the New York County District Attorney's Office and was subsequently promoted to the position of Chief Assistant to the City-wide Office of the Special Narcotics Prosecutor. At the state level, he served as the Deputy Attorney General for the Medicaid Fraud Control Unit where he directed the nation's largest unit dedicated to investigating and prosecuting health care crimes and nursing home patient abuse.

**Wanda Perez-Maldonado** is the Chief of the Special Investigations and Prosecutions Unit. From 2016 to 2018, she was the Chief of the Public Integrity Bureau at the Bronx County District Attorney's Office. In that capacity, she oversaw investigations and prosecutions involving homicides, deaths in custody, excessive use of physical force and misconduct by law enforcement and public servants. For thirteen years, from 2003 to 2016, Ms. Perez-Maldonado was an Assistant Attorney General in the OAG, assigned to the Special Investigations and Prosecutions Unit, Public Integrity Bureau, Westchester Regional Office and the Organized Crime Task Force. Before joining the OAG in 2003, Ms. Perez-Maldonado was an Assistant District Attorney in the Bronx County District Attorney's Office Rackets Bureau, where, for seven years, she investigated and prosecuted official misconduct by elected officials and law enforcement, gun-related offenses and violent felonies.

50

**Oliver Pu-Folkes** was named Chief of Investigations in the OAG in August 2019. To this position he brings over three decades of prior law enforcement, executive leadership, and investigative experience having held various appointments at the New York City level of government to include the rank of Deputy Inspector within the New York City Police Department (NYPD) where he was last assigned as the Commanding Officer to the Risk Management Bureau – Special Projects. Prior to this, he served within the following positions: Associate Commissioner for the Administration of Children's Services overseeing the Division of Youth and Family Justice; First Deputy Sheriff Commissioner for the Sheriff's Office, a division of the Department of Finance; and as Assistant Commissioner of Operations and Detention for the former Department of Juvenile Justice. Chief Pu-Folkes is a graduate of the Federal Bureau of Investigations (FBI) National Academy, 231st session. He also served as a Managing Attorney to the Legal Bureau where he established the Inspector General Compliance Unit. In this capacity, he coordinated with the Department of Investigations in their role as an independent investigative entity to review the NYPD's policies, practices, procedures and training. Chief Pu-Folkes also taught as an adjunct professor in the John Jay College of Criminal Justice, and as a guest lecturer on criminal justice topics at various universities, colleges and schools.

**Gail Heatherly** is Counsel to the Special Investigations and Prosecutions Unit, Senior Counsel to the Criminal Justice Division, and the Bureau Chief of the Conviction Review Bureau. From 2007 through the fall of 2012, she was the Bureau Chief of the Criminal Prosecutions Bureau. For fourteen years, from 1991 through 2005, Ms. Heatherly was a senior prosecutor in the New York County District Attorney's Office. There, she was a homicide assistant; conducted long-term cold case homicide investigations; was the Domestic Violence supervisor in her trial bureau; and was

51

a member of the Sex Crimes Prosecution Unit. Before working in the District Attorney's Office, she was a litigation associate at Paul, Weiss, Rifkind, Wharton & Garrison.

**Paul Clyne** is a Deputy Bureau Chief in the Special Investigations and Prosecutions Unit. He served as District Attorney of Albany County from 2001 to 2004 and was an Assistant District Attorney in the Albany County District Attorney's Office for 14 years. Mr. Clyne has presented over 700 cases to grand juries, including scores of homicides, and has tried fifteen homicides to verdict.

**Joshua Gradinger** is a Deputy Bureau Chief in the Special Investigations and Prosecutions Unit, which he joined in October 2015. Before that, for ten years, Mr. Gradinger served as an Assistant District Attorney in the Bronx County District Attorney's Office, principally handling homicides and other violent crimes. Before joining the Bronx District Attorney's office, Mr. Gradinger worked as a Homicide Division Chief at the Miami-Dade County State Attorney's Office for six years. Mr. Gradinger has a Masters in Social Work.

**Diane LaVallee** is a Deputy Bureau Chief in the Special Investigations and Prosecutions Unit and is also assigned to the Criminal Enforcement and Financial Crimes Bureau in Buffalo. Ms. LaVallee started her career in the Erie County District Attorney's Office, where she ultimately became Chief of the Comprehensive Assault, Abuse, and Rape Bureau. She left in 1997 and became the Chief of the Capital Assistance to Prosecutor's Unit of the OAG. In 2004, she moved to Buffalo's Sister City in Lille, France, after which Ms. LaVallee returned to private practice in Buffalo, working primarily in the area of immigration law. She became First Assistant District Attorney in the Orleans County District Attorney's Office and later worked in the Criminal Division of the New York State Department of Taxation and Finance. In 2014, she made her way

back to the OAG. Ms. LaVallee is an adjunct professor at the University of Buffalo School of Law, her alma mater.

**Michael Smith** is currently a Deputy Bureau Chief in the Special Investigations and Prosecutions Unit and is also assigned to the Criminal Enforcement and Financial Crimes Bureau in Buffalo. Before joining the OAG in December 2018, he served as an Assistant District Attorney in the Erie County District Attorney's Office for nine years, where, in addition to prosecuting gun-related offenses and other violent crimes, he was a member of the Domestic Violence Bureau and the Homicide Bureau. Mr. Smith began his legal career as an Appellate Court Attorney with the Fourth Department of the New York State Supreme Court Appellate Division.

**Jennifer Sommers** is a Deputy Bureau Chief in the Special Investigations and Prosecutions Unit. Before joining the OAG, Ms. Sommers spent 11 years as an Assistant District Attorney in the Livingston and Monroe County District Attorney's Offices. During her career, she handled all facets of criminal prosecution including appeals, grand jury presentations, and trials; she prosecuted to verdict numerous violent felony offenses including homicides, assaults, sexual assaults, and robberies. Ms. Sommers also worked as counsel to the Monroe County Sheriff's Office for seven years before joining the OAG in 2014. She holds a master's degree in toxicology and teaches prosecutors nationally regarding legal/forensic issues.

**Nicholas Viorst** is a Deputy Bureau Chief in the Special Investigations and Prosecutions Unit, which he joined in September 2016. Before that, for 12 years, Mr. Viorst was an Assistant District Attorney in the New York County District Attorney's Office, principally handling homicides and other violent crimes.

**Herman Wun** is a Deputy Bureau Chief in the Special Investigations and Prosecutions Unit. Mr. Wun joined the OAG in 2013 and served in the Public Integrity Bureau and the Medicaid Fraud

53

Control Unit. Before that, Mr. Wun was a criminal defense attorney in private practice for approximately eight years. Mr. Wun has also previously worked as a criminal prosecutor in Washington, DC and in Miami, Florida.

**Priscilla Taveras** is the Crime Victims Assistance Coordinator for the OAG. Before this role, Ms. Taveras worked in the Bronx County District Attorney's Office for over 12 years, and for five of those years, she was the Crime Victims Assistance Unit Satellite Office Program Coordinator. She also provided direct services to crime victims, such as crisis intervention, support counseling, advocacy, and referrals to appropriate resources. Ms. Taveras started her career working with NYC TASC (Treatment Alternative to Street Crime) as a case manager. Ms. Taveras' current role requires her to assist crime victims and their families access information and services.

**Madeleine Ballard** is the Legal Support Analyst in the Special Investigations and Prosecutions Unit. Ms. Ballard received her B.A. in French from the University of Utah in 2015 and an MPhil in European Comparative Literatures and Cultures from the University of Cambridge in 2016.

**John Reidy** has been with the OAG for nearly 21 years. He has been the First Deputy Chief Investigator for the past seven years. Before his promotion to First Deputy Chief Investigator, he served as the Assistant Chief Investigator for the Investigations Division's Special Operations Unit and the Organized Crime Task Force. Chief Reidy retired after nearly 24 years of service with the City of Syracuse Police Department where he served as the Commanding Officer of the Intelligence Section, the Executive Officer of the Special Investigations Division, a Detective in the Criminal Investigations Division, and a uniformed Officer and Supervisor in the Patrol Division.

**Ronald Enfield** is an Investigator in the Special Investigation Prosecution Unit. He was previously assigned to the OAG's Medicaid Fraud Control Unit. Before that, Inv. Enfield served with the City of Cohoes Police Department for 20 years, primarily working with victims of sexual assaults.

**Bryan Mason** joined the Special Investigations and Prosecutions unit as an investigator in February 2016. Before that, Inv. Mason served almost 22 years with the New York Police Department, obtaining the rank of Detective First Grade. His assignments included extensive homicide investigations. Inv. Mason earned several awards during his tenure, including Detective of the Year in Staten Island.

**Kim Ramos** was named the Director of Intergovernmental Affairs in the OAG in January 2019. Ms. Ramos coordinates the OAG's legislative priorities and all significant communications between the OAG and New York's public and elected officials, faith-based, grassroots, not-for-profit, community-, and issue-based organizations. Before this appointment, Ms. Ramos served as the Deputy Secretary to the Speaker of New York State Assembly, Carl Heastie.

**Tai Johnson** is the Special Advisor to the OAG, working in the Executive Division. Before joining the office in January 2019, Ms. Johnson was the Intergovernmental Affairs Director in the New York City Public Advocate's office. Before that, Ms. Johnson worked in Government Relations at the Port Authority of New York and New Jersey. Ms. Johnson began her career in government working at the New York State Senate for eight years, where she helped created programs like Operation S.N.U.G. (a statewide anti-gang program).