UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ALEXEY V. TARASOV, ESQ., Administrator of the Estate of EVGENIY LAGODA, Deceased, and GRIGORY TIKHOPLAV,<br><br>                Plaintiffs,<br><br>-against-<br><br>PORT AUTHORITY OF NEW YORK AND NEW JERSEY, and PORT AUTHORITY OF NEW YORK AND NEW JERSEY POLICE DEPARTMENT a/k/a PORT AUTHORITY POLICE DEPARTMENT a/k/a PAPD, PAPD OFFICER MICHAEL BUGIADA, PAPD OFFICER ROBERT JOSEPH, PAPD OFFICER JONATHAN PAPIA, PAPD OFFICER PAUL MEZZACAPPA, and PAPD OFFICER JONATHAN DURAN,<br><br>                Defendants. | 1:21-cv-06226-NRB |

**PLAINTIFFS' RESPONSES TO DEFENDANTS' RULE 56.1 STATEMENT OF
MATERIAL FACTS AND PLAINTIFFS' ADDITIONAL
<u>RULE 56.1 STATEMENT OF MATERIAL FACTS</u>**

Defendants, Port Authority of New York and New Jersey, (the "Port Authority")[1], Port Authority Officer Michael Bugiada, Port Authority Officer Robert Joseph, Port Authority Officer Jonathan Papia, Port Authority Officer Paul Mezzacappa, and Port Authority Officer Jonathan Duran, (hereinafter referred to collectively as "Defendants"), by the undersigned attorneys for the Port Authority Law Department, submit the following statement of material facts pursuant to Local Rule 56.1:

---

[1] The Port Authority of New York and New Jersey Police Department a/k/a Port Authority Police Department a/k/a PAPD was also named as Defendant in this matter; however, the Port Authority Police Department does not exist as a separate entity that is subject to suit.

**Preliminary Statement**

This case arises from the unfortunate death of Evgeniy Lagoda on April 12, 2019, following an incident aboard JetBlue Flight 659 at JFK Airport. As the undisputed material facts establish, Lagoda experienced a seizure related to his previously undiagnosed medical condition while onboard an aircraft with approximately 200 passengers. Once the Port Authority Police was called to respond to the plane, Lagoda became violent and assaulted a flight crew member and a passenger, creating a safety risk in the confined aircraft environment. When Port Authority Officers responded to this escalating emergency, they were confronted with a combative individual who refused to comply with verbal commands, physically attacked an officer, and continued to pose a threat to the safety of others. The officers' actions were reasonable, necessary, and in accordance with their training and Port Authority protocols. Medical evidence confirms that Lagoda's death resulted from his underlying medical conditions rather than from any force used by the officers, who promptly initiated life-saving measures once they observed the first sign of medical distress. An independent investigation by the New York Attorney General's Office concluded that no wrongdoing occurred.

**Plaintiffs' Response to Defendants Preliminary Statement**: Plaintiffs strongly dispute Defendants' characterization of what transpired on April 12, 2019. The only facts that are undisputed are that Mr. Lagoda died on April 12, 2019, and that he experienced a seizure that night April 12, 2019.

**The Parties**

1.      The Port Authority is a body corporate and politic created by Compact between the States of New York and New Jersey with the consent of the Congress of the United States, having

its principal office at 4 World Trade Center, 150 Greenwich Street, New York, New York 10007. (Exhibit ("Ex.") F of Declaration of Cheryl N. Alterman ("Alterman Dec.") at ¶ 4).

**Plaintiffs' Response**: Undisputed.

2.      At all times relevant, Port Authority Officers Michael Bugiada, Robert Joseph, Jonathan Papia, Paul Mezzacappa, and Jonathan Duran were employed by the Port Authority as police officers. (Ex. F of Alterman Dec., Defendants' Answer, at ¶¶ 6-10).

**Plaintiffs' Response**: Undisputed.

3.      Alexey V. Tarasov, Esq., is an attorney duly licensed to practice in the states of Texas, Oklahoma, and New York. On January 8, 2021, Mr. Tarasov was appointed as the Administrator of the Estate of Evgeniy Lagoda, deceased, by the Surrogate's Court of the State of New York, Queens County.  (Ex. E of Alterman Dec., Plaintiffs' First Amended Complaint at ¶ 1).

**Plaintiffs' Response**: Undisputed.

4.      Gregory Tikhoplav is the father of decedent, Evgeniy Lagoda, and is a citizen of Russia, residing in the city of Krasnodar. (Ex. E of Alterman Dec., Plaintiffs' First Amended Complaint at ¶ 3).

**Plaintiffs' Response**: Undisputed.

### Initial Medical Response and Rapid Escalation to Violence

**Plaintiffs' Response**: Plaintiffs strongly dispute Defendants' characterization of "Rapid Escalation to Violence".

5.      The first call reporting the incident was received at 10:20 p.m. on April 12, 2019, when a female caller from JetBlue reported to the Port Authority Police that a male passenger was

having seizures on JetBlue Flight 659 at Gate 20, Terminal 5. (Ex. JJ of Alterman Dec., Analysis of Radio Transmissions, PA1405).

**Plaintiffs' Response**: Undisputed. Plaintiffs add further context that the female caller states "It's a male passenger, uh having seizures right now" to which Officer Noorman responds "Male, seizures, okay. Returning to Gate 20, Jet Blue 659." Defs. Ex. JJ (Analysis of Radio Transmissions) at 1405.

6.     At 10:21 p.m., the initial dispatch information was transmitted via patrol radio, informing Officer Michael Bugiada and other officers that an aircraft was returning to Gate 20 with a male passenger having a seizure onboard. (Ex. JJ of Alterman Dec., Analysis of Radio Transmissions, PA1405).

**Plaintiffs' Response**: Disputed. Officer Williams said over the patrol radio to Officer Bugiada "Gate 25, uh, check that, Gate 2-0…aircraft returning to Gate, male having a seizure onboard" to which Officer Bugiada replied "Copy. Gate 20." Defs. Ex. JJ (Analysis of Radio Transmissions) at 1405. Two minutes later Officer Williams said over the patrol radio to Officer Bugiada "Male 40s, seizure, bleeding from mouth" to which Officer Bugiada replied "Copy." *Id.* at 1408.

7.     JetBlue Flight 659 was bound for Kingston, Jamaica with approximately 200 passengers on board. (Ex. O of Alterman Dec., Swinney Dep. at 51:6-15; Ex. R, Bengtson Dep. at 43:21-44:25).

**Plaintiffs' Response**: Disputed. Mr. Swinney testified that "if" it was a full flight, there would be 200 passengers. Defs. Ex. O (Swinney Dep.) at 51:6-15. Undisputed only as to JetBlue Flight 659 that was bound for Kingston, Jamaica.

4

8.    It was discovered by the flight crew, that the passenger, Evgeniy Lagoda ("Lagoda"), had experienced a seizure while seated in an aisle seat near the back of the aircraft, around Row 32 or 33. (Ex. P of Alterman Dec., Ingleton Dep. at 27:16-28:14, 81:6-13; Ex. Q, Leandro Dep. at 22:9-18; Ex. S, Wright-Reid Dep. at 16:10-17:11).

**Plaintiffs' Response**: Disputed. It was discovered that Mr. Lagoda was having a seizure and he was observed while having the seizure. Defs. Ex. P (Ingleton Dep.) at 28:9-14; Defs. Ex. Q (Leandro Dep.) at 22:9-19; Defs. Ex. S (Wright-Reid Dep.) at 16:10–17:18. Undisputed as to the approximate row and the aisle seat.

9.    Lagoda was observed to be exhibiting symptoms of a seizure, including "tremors, foaming at the mouth, and some bleeding." (Ex. T of Alterman Dec., Miller Dep. at 55:23-56:9; Ex. O, Swinney Dep. at 20:18-23; Ex. Q, Leandro Dep. at 22:9-19).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was having a seizure and was observed while having the seizure. Defs. Ex. P (Ingleton Dep.) at 28:9-14; Defs. Ex. Q (Leandro Dep.) at 22:9-19; Defs. Ex. S (Wright-Reid Dep.) at 16:10–17:18. While Mr. Lagoda was experiencing the seizure, he was observed "foaming from the mouth, and like his eyes were rolled in the back of his head", Defs. Ex. O (Swinney Dep.) at 20:21-23; foaming at the mouth and blood, Defs. Ex. T (Miller Dep.) at 56:4-16; "as soon as I got there, I saw him, you know, twitching", "rolled back" eyes, and "foaming at the mouth mixed with blood", Defs. Ex. Q (Leandro Dep. at 22:16-21).

10.    Flight attendants Calvin Swinney and Kevin Ingleton responded to the medical incident by moving Lagoda to the aft galley in the rear of the aircraft where he was laid down. (Ex.

O of Alterman Dec., Swinney Dep. at 21:9-22-7; Ex. P, Ingleton Dep. at 28:7-14; Ex. Q, Leandro Dep. at 23:12-18).

> **Plaintiffs' Response**: Disputed. Mr. Lagoda was still experiencing a seizure when he was moved to the aft galley. Defs. Ex. O (Swinney Dep.) at 22:24–23:19, 26:4-10; Defs. Ex. P (Ingleton Dep.) at 30:23–33:4.

11.    The flight crew made an announcement requesting medical assistance, and three nurses, who were passengers on the flight, responded and came to assist with Lagoda. (Ex. P of Alterman Dec., Ingleton Dep. at 35:6-20; Ex. O, Swinney Dep. at 25:25-26:10, 29:24-30:6).

> **Plaintiffs' Response**: Undisputed.

12.    After approximately 10 minutes, Lagoda suddenly became violent. (Ex. O of Alterman Dec., Swinney Dep. at 41:13-42:10; Ex. Q, Leandro Dep. at 67:13-68:1, 70:21-14; Ex. T, Miller Dep. at 56:24-57:9).

> **Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Ms. Miller also testified that she was aware that it is common for someone who has experienced a seizure to have an altered mental status. Defs. Ex. T (Miller Dep.) 59:16-21.

13.    After the seizure ended, Lagoda became "aggravated and belligerent" and swinging his arms "trying to fight". (Ex. S of Alterman Dec., Wright-Reid Dep. at 28:23-29:20; Ex. P, Ingleton Dep. at 66:6-23).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Furthermore, Ms. Wright-Reid testified that even after she was struck by flailing arms in the stomach and she realized she could have left the area, she still wanted to stay there to help Mr. Lagoda because he was experiencing a medical emergency, and that is because, as a nurse, she felt that she was treating somebody in the ongoing process of having a medical emergency. Defs. Ex. S (Wright-Reid Dep.) at 64:10–65:6. Ms. Wright-Reid also testified that she was aware based on her experience and training as a registered nurse, that a person who comes out of a seizure may be confused, disoriented, aggressive, and combative. *Id.* at 66:6–67:4.

14.     Registered nurse Nathana Wright-Reid testified that when she tried to explain to Lagoda what had happened, he became aggressive and struck her hard in the stomach. (Ex. S of Alterman Dec., Wright-Reid Dep. at 17:19-25, 26:3-13; Ex. T, Miller Dep. at 37:19-38:12).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Furthermore, Ms. Wright-Reid testified that even after she was struck by flailing arms in the stomach and she realized she could have left the area, she still wanted to stay there to help Mr. Lagoda because he was experiencing a medical emergency, and that is because, as a nurse, she felt that she was treating somebody in the

ongoing process of having a medical emergency. Defs. Ex. S (Wright-Reid Dep.) at 64:10–65:6. Ms. Wright-Reid also testified that she was aware based on her experience and training as a registered nurse, that a person who comes out of a seizure may be confused, disoriented, aggressive, and combative. *Id.* at 66:6–67:4.

15.     Wright-Reid described Lagoda as "aggravated and belligerent," "just trying to fight," and "swinging his arms." (Ex. S of Alterman Dec., Wright-Reid Dep. at 28:23-29:10).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Furthermore, Ms. Wright-Reid testified that even after she was struck by flailing arms in the stomach and she realized she could have left the area, she still wanted to stay there to help Mr. Lagoda because he was experiencing a medical emergency, and that is because, as a nurse, she felt that she was treating somebody in the ongoing process of having a medical emergency. Defs. Ex. S (Wright-Reid Dep.) at 64:10–65:6. Ms. Wright-Reid also testified that she was aware based on her experience and training as a registered nurse, that a person who comes out of a seizure may be confused, disoriented, aggressive, and combative. *Id.* at 66:6–67:4.

16.     After punching Wright-Reid, Lagoda repeatedly and forcefully punched flight attendant Calvin Swinney. Swinney testified that he was struck "five to six times". (Ex. O of Alterman Dec., Swinney Dep. at 37:13-18, 43:16-44:5; Ex. P, Ingleton Dep. at 50:12-18, 119:5-24).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Mr. Swinney also testified in the affirmative that he was providing "treatment [for] a man (Mr. Lagoda) having a serious medical situation", Defs. Ex. O (Swinney Dep.) at 81:20-24; that he tried to calm down Mr. Lagoda but he was "disoriented and confused and definitely out of it", *id.* at 85:7-17; that when he was struck several times in the torso by Mr. Lagoda, this occurred when "Mr. Lagoda was confused, disoriented and definitely out of it and foaming at the mouth", *id.* at 85:23–86:7.

17.     The punches were delivered with significant force, as Swinney described Lagoda as "a strong dude" who "hit [him] pretty hard." Swinney was "in pain" from the assault. (Ex. O of Alterman Dec., Swinney Dep. at 37:19-25, 44:6-16).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Mr. Swinney also testified in the affirmative that he was providing "treatment [for] a man (Mr. Lagoda) having a serious medical situation", Defs. Ex. O (Swinney Dep.) at 81:20-24; that he tried to calm down Mr. Lagoda but he was "disoriented and confused and definitely out of it", *id.* at 85:7-17; that when he was struck several times in the torso by Mr. Lagoda, this occurred when "Mr. Lagoda was confused, disoriented and definitely out of it and foaming at the mouth", *id.* at 85:23–86:7.

18.      Lagoda's violent behavior trapped two women in the galley, one of whom was pregnant, who were "too scared to move." (Ex. O of Alterman Dec., Swinney Dep. at 42:18-43:5; Ex. J, Bugiada Dep. at 112:13-113:4; Ex. S, Wright-Reid Dep. at 31:21-32:20).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Ms. Wright-Reid testified that even after she was struck by flailing arms in the stomach and she realized she could have left the area, she still wanted to stay there to help Mr. Lagoda because he was experiencing a medical emergency, and that is because, as a nurse, she felt that she was treating somebody in the ongoing process of having a medical emergency. Defs. Ex. S (Wright-Reid Dep.) at 64:10–65:6.

**Significant Threat to Aircraft Safety**

**Plaintiffs' Response**: Plaintiffs strongly dispute Defendants' characterization of "Significant Threat to Aircraft Safety".

19.      Flight attendant Calvin Swinney, who had 20 years of NYPD experience including 11 years as a detective, testified that Lagoda "posed a threat to the safety of the other passengers on board this aircraft." (Ex. O of Alterman Dec., Swinney Dep. at 13:14-15:6, 44:20-45:8).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex.

DD (Sperry Dep.) at 174:19–175:15. Mr. Swinney also testified in the affirmative that he was providing "treatment [for] a man (Mr. Lagoda) having a serious medical situation", Defs. Ex. O (Swinney Dep.) at 81:20-24; that he tried to calm down Mr. Lagoda but he was "disoriented and confused and definitely out of it", *id.* at 85:7-17.

20.    Swinney positioned himself between Lagoda and the passenger cabin to prevent Lagoda from threatening other passengers. (Ex. O of Alterman Dec., Swinney Dep. at 45:2-20).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Mr. Swinney also testified in the affirmative that he was providing "treatment [for] a man (Mr. Lagoda) having a serious medical situation", Defs. Ex. O (Swinney Dep.) at 81:20-24; that he tried to calm down Mr. Lagoda but he was "disoriented and confused and definitely out of it", *id.* at 85:7-17; that when he was struck several times in the torso by Mr. Lagoda, this occurred when "Mr. Lagoda was confused, disoriented and definitely out of it and foaming at the mouth", *id.* at 85:23–86:7.

21.    Captain Bengtson testified that assaulting crew members and passengers constitutes "serious customer misconduct" that "effects the safety of the flight." (Ex. R of Alterman Dec., Bengtson Dep. at 32:9-34:5, 75:17-76:8).

**Plaintiffs' Response**: Plaintiffs dispute the materiality of Capt. Bengtson's testimony concerning alleged misconduct and flight safety because JetBlue policies are not at issue in this case. Furthermore, Capt. Bengtson's vantage point of the events that transpired was

11

from the cockpit or via emergency communication device—*i.e.*, he was not in the aft galley with Mr. Lagoda; for example, Capt. Bengtson received an emergency call reporting a male was having a seizure onboard. Defs. Ex. R (Bengtson Dep.) at 93:12–94:10; 97:6-23. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Mr. Swinney, a flight attendant who was in the aft galley with Mr. Lagoda, testified in the affirmative that he was providing "treatment [for] a man (Mr. Lagoda) having a serious medical situation", Defs. Ex. O (Swinney Dep.) at 81:20-24; that he tried to calm down Mr. Lagoda but he was "disoriented and confused and definitely out of it". This is consistent with Capt. Bengtson's testimony confirming that he expected "any response to [the emergency call] would be for the medical emergency that was onboard." Defs. Ex. R (Bengtson Dep.) at 99:17–100:2. Captain Bengtson's testimony is otherwise disputed.

22.    Captain Bengtson further testified that when crew members are injured "they cannot perform that safety function, so the safety of that flight is compromised." (Ex. R of Alterman Dec., Bengtson Dep. at 75:24-76:8).

**Plaintiffs' Response**: Plaintiffs dispute materiality of Capt. Bengtson's testimony concerning alleged misconduct and flight safety because JetBlue policies or general operations are not at issue in this case. Capt. Bengston's testimony is otherwise disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion,

disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15.

23.    According to the flight operations manual, Lagoda's actions constituted a "Level II customer disturbance," defined as "physically abusive behavior" that is "considered a serious violation of safety of flight resulting in the need to involve law enforcement authorities." (Ex. R of Alterman Dec., Bengtson Dep. at 27:5-25, 72:4-73:12, 74:12-75:3, 115:3-18; Ex. OO, JetBlue Flight Operations Manual at Sections 1.47.22-1.47.23 at PA267-PA269).

> **Plaintiffs' Response**: Plaintiffs dispute materiality of Capt. Bengtson's testimony concerning alleged misconduct and flight safety because JetBlue policies or general operations are not at issue in this case. Plaintiffs also dispute the materiality and admissibility of The JetBlue Flight Operations Manual because JetBlue policies or general operations are not at issue in this case. Capt. Bengtson's testimony is otherwise disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15.

24.    Captain Bengtson testified that in his 16.5 years of experience with JetBlue Airways, he has experienced "two or three" instances where flight attendants reported being assaulted by customers. (Ex. R of Alterman Dec., Bengtson Dep. at 111:2-18).

> **Plaintiffs' Response**: Disputed. Plaintiffs, first and foremost, dispute the characterization of "assault", particularly given that it calls for a legal conclusion, and that Capt. Bengtson

did not personally witness the events that transpired with Mr. Lagoda. Defs. Ex. R (Bengtson Dep.) at 93:12–94:10; 97:6-23. Plaintiffs also dispute the materiality of Capt. Bengtson's testimony concerning the number of alleged assaults onboard JetBlue flights in his piloting career because this is not at issue in this case. Capt. Bengtson's testimony is otherwise disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15.

25.     Captain Bengtson noted that a confined aircraft environment magnifies the danger of violent behavior: "… it's a confined environment, so anything that one person does in a confined environment has a greater chance to impact more people around them …" and "… there is a chance for inadvertent people getting hurt, as well as the higher chance of someone getting hurt just due to the density of the people onboard." This was echoed by Swinney, who testified that the confined nature of an aircraft provides additional safety concerns when violence occurs on a plane, "The space is very limited. There's not much you can do, so you just try to get ahold of the suspect, or customer, as best you can before things get out of control." (Ex. R of Alterman Dec., Bengtson Dep. at 28:1-25; Ex. O, Swinney Dep. at 50:12-23).

> **Plaintiffs' Response**: Plaintiffs dispute the materiality of this testimony because it was in the context of and commentary on JetBlue policies and procedures, which are not at issue in this case. Defs. Ex. R (Bengtson Dep.) at 28:1-25. Furthermore, Plaintiffs also dispute the materiality of Mr. Swinney's testimony because it was in a line of questioning that began with a question seeking him to answer based on his prior work experience as a law

enforcement officer with the NYPD—which has no bearing on the issues present in this matter. Defs. Ex. O (Swinney Dep.) at 49:18–50:23. The above testimony is otherwise disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15.

### Officer Bugiada's Response

26.     The situation that Officer Bugiada encountered upon arrival on the aircraft had escalated from what was initially reported medical incident to an active violent disturbance threatening the safety of crew and passengers. (Ex. J of Alterman Dec., Bugiada Dep. at 55:22-56:18, 111:13-112:23; Ex. O, Swinney Dep. at 46:24-47:23).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Furthermore, Mr. Swinney confirmed that he told the first responding officer (Defendant Officer Bugiada) when he got to the back galley of the plane that "there was a medical emergency of a man (Mr. Lagoda) having a seizure, and that man (Mr. Lagoda) was both disoriented and combative," *id.* at 89:18-25. Officer Bugiada "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such his "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had

a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officer Bugiada had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22.

27.    When Officer Bugiada arrived at the plane, he was directed to the rear galley where he immediately observed a chaotic scene with women trapped and screaming for help. (Ex. MM of Alterman Dec., Affidavit of Michael Bugiada ("Bugiada Aff.") at ¶¶ 7-9; Ex. J, Bugiada Dep. at 112:13-112:23; Ex. P, Ingleton Dep. at 55:17-56:11).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Furthermore, Mr. Swinney confirmed that he told the first responding officer (Defendant Officer Bugiada) when he got to the back galley of the plane that "there was a medical emergency of a man (Mr. Lagoda) having a seizure, and that man (Mr. Lagoda) was both disoriented and combative," *id.* at 89:18-25. Officer Bugiada "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such his "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented

16

to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officer Bugiada had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Furthermore, Ms. Wright-Reid testified that even after she was struck by flailing arms in the stomach and she realized she could have left the area, she still wanted to stay there to help Mr. Lagoda because he was experiencing a medical emergency, and that is because, as a nurse, she felt that she was treating somebody in the ongoing process of having a medical emergency. Defs. Ex. S (Wright-Reid Dep.) at 64:10–65:6. Ms. Wright-Reid also testified that "she left and went back to the front of the plane" when Officer Bugiada arrived at the back of the plane had his interaction Mr. Lagoda. *Id.* at 30:8-20.

28.     Officer Bugiada testified that Lagoda was blocking the exit from the galley where three women were trapped. (Ex. MM of Alterman Dec., Bugiada Aff. at ¶¶ 9-10; Ex. J, Bugiada Dep. at 112:13-23).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Furthermore, Mr. Swinney confirmed that he told the first responding officer (Defendant Officer Bugiada) when he got to the back galley of the plane that "there was a medical emergency of a man (Mr. Lagoda) having a seizure, and that man (Mr. Lagoda) was both disoriented and combative," *id.* at 89:18-25. Officer

17

Bugiada "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such his "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6. When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officer Bugiada had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Furthermore, Ms. Wright-Reid testified that even after she was struck by flailing arms in the stomach and she realized she could have left the area, she still wanted to stay there to help Mr. Lagoda because he was experiencing a medical emergency, and that is because, as a nurse, she felt that she was treating somebody in the ongoing process of having a medical emergency. Defs. Ex. S (Wright-Reid Dep.) at 64:10–65:6. Ms. Wright-Reid also testified that "she left and went back to the front of the plane" when Officer Bugiada arrived at the back of the plane had his interaction Mr. Lagoda. *Id.* at 30:8-20.

29.    Officer Bugiada first attempted to resolve the situation by giving verbal commands and using hand gestures directing Lagoda to move aside to let the women out. (Ex. MM of Alterman Dec., Bugiada Aff. at ¶¶ 12-13; Ex. J, Bugiada Dep. at 112:24-113:23; Ex. Z, Monaghan Dep. at 295:12-24).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought

18

processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Furthermore, Mr. Swinney confirmed that he told the first responding officer (Defendant Officer Bugiada) when he got to the back galley of the plane that "there was a medical emergency of a man (Mr. Lagoda) having a seizure, and that man (Mr. Lagoda) was both disoriented and combative," *id.* at 89:18-25. Officer Bugiada "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such his "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officer Bugiada "failed to use de-escalation and defusing techniques during [his] interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Officer Bugiada had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Furthermore, Officer Bugiadia testified that he "didn't go right to commands" when he first got to the scene. Defs. Ex. J (Budiaga Dep.) at 56:6-24.

30.     Lagoda did not comply with Officer Bugiada's verbal commands. (Ex. MM of Alterman Dec., Bugiada Aff. at ¶ 14; Ex. J, Bugiada Dep. at 113:13-114:8).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought

19

processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Furthermore, Mr. Swinney confirmed that he told the first responding officer (Defendant Officer Bugiada) when he got to the back galley of the plane that "there was a medical emergency of a man (Mr. Lagoda) having a seizure, and that man (Mr. Lagoda) was both disoriented and combative," *id.* at 89:18-25. Officer Bugiada "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such his "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officer Bugiada "failed to use de-escalation and defusing techniques during [his] interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Officer Bugiada had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Furthermore, in a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. Moreover, Officer Bugiadia testified that he "didn't go right to commands" when he first got to the scene. Defs. Ex. J (Budiaga Dep.) at 56:6-24.

20

31.    Officer Bugiada gave his verbal commands to Lagoda in English in a combination with his use of hand gestures. (Ex. MM of Alterman Dec., Bugiada Aff. at ¶¶ 12-13; Ex. J., Bugiada Dep. at 104:17-19, 112:24-113:18).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Furthermore, Mr. Swinney confirmed that he told the first responding officer (Defendant Officer Bugiada) when he got to the back galley of the plane that "there was a medical emergency of a man (Mr. Lagoda) having a seizure, and that man (Mr. Lagoda) was both disoriented and combative," *id.* at 89:18-25. Officer Bugiada "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such his "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officer Bugiada "failed to use de-escalation and defusing techniques during [his] interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Officer Bugiada had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Furthermore, in a situation where an individual is having or just

experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. Moreover, there was a significant language barrier that further complicated the medical emergency: Plaintiff Tikhoplav testified regarding (his son) Mr. Lagoda's ability to speak English, and stated that his son was not fluent in English, and his testimony on Mr. Lagoda's command of the English language, if any, was entirely in the context of what was required of Mr. Lagoda in his employment. Defs. Ex. V (Tikhoplav Dep. pt. 2) at 174:7:23.

32.     Lagoda's father conceded that he "had the command of the English – technical English language … " and "He was able to communicate. He was not completely fluent in the English language, but he could understand. He could carry a conversation." (Ex. V of Alterman Dec., Tikhoplav Dep. dated July 25, 2023 at 174:3-23).

**Plaintiffs' Response**: Disputed. Plaintiff Tikhoplav testified regarding (his son) Mr. Lagoda's ability to speak English, and stated that his son was not fluent in English, and his testimony on Mr. Lagoda's command of the English language, if any, was entirely in the context of what was required of Mr. Lagoda in his employment. Defs. Ex. V (Tikhoplav Dep. pt. 2) at 174:7:23. This testimony revealed only that Mr. Lagoda was able to meet the requirements of his employment and could comprehend an engineering manual, and has no bearing on Mr. Lagoda's ability to understand the verbal commands of a law enforcement officer speaking a non-native tongue, particularly when he was in the uniquely vulnerable state after suffering a seizure where he was experiencing "severe disturbances in behavior and thought processes." *Id.*; *see also* Defs. Ex. DD (Sperry Dep.) at 174:19–

175:15. In a situation where an individual is having or just experienced a seizure, "they may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6.

33.     Multiple witnesses testified regarding Lagoda's aggressive behavior toward Officer Bugiada and confirmed that Lagoda initiated the physical confrontation with the officer. Officer Bugiada stated that Lagoda charged at him with clenched fists. Flight attendant Kevin Ingleton stated that "The officer, to my recollection, also got attacked," "He did attack the officer," and "I saw him move toward to attack him...I saw that he lunged at him." Nurse Wright-Reid stated that when police arrived, Lagoda continued his behavior and was "throwing punches everywhere" including at the police officer. (Ex. J of Alterman Dec., Bugiada Dep. at 113:24-114:8; Ex. P, Ingleton Dep. at 56:12-57:9, 59:18-61:12; Ex. S, Wright-Reid Dep. at 29:21-30:16).

> **Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Furthermore, Mr. Swinney confirmed that he told the first responding officer (Defendant Officer Bugiada) when he got to the back galley of the plane that "there was a medical emergency of a man (Mr. Lagoda) having a seizure, and that man (Mr. Lagoda) was both disoriented and combative," *id.* at 89:18-25. Officer Bugiada "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such his "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had

23

a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officer Bugiada "failed to use de-escalation and defusing techniques during [his] interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Officer Bugiada had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Furthermore, in a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. Furthermoer, Mr. Ingleton's qualified his testimony by saying "I do remember, like I said, him (Mr. Lagoda) trying to attack him (Officer Bugiada), *I know based on what I heard*, my I just don't remember the lunge, I just really don't remember the lunge at the time. I could say attack him." Defs. Ex. P (Ingleton Dep.) at 60:23–61:4 (emphasis added). Secondly, Ms. Wright-Reid testified that "when the first cop came onto the plane" Mr. Lagoda "was still going on"—i.e., still in a uniquely vulnerable state while he was in the immediate wake of a seizure, and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. S (Wright-Reid Dep.) at 29:25–30:4; Defs. Ex. DD (Sperry Dep.) at 174:19–175:15.

24

34.      In response to Lagoda charging at him, Officer Bugiada used OC (pepper) spray on Lagoda. (Ex. MM of Alterman Dec., Bugiada Aff. at ¶ 15; Ex. J, Bugiada Dep. at 114:9-12).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Furthermore, Mr. Swinney confirmed that he told the first responding officer (Defendant Officer Bugiada) when he got to the back galley of the plane that "there was a medical emergency of a man (Mr. Lagoda) having a seizure, and that man (Mr. Lagoda) was both disoriented and combative," *id.* at 89:18-25. Officer Bugiada "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such his "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officer Bugiada "failed to use de-escalation and defusing techniques during [his] interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Officer Bugiada had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Furthermore, in a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is

having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. Officer Bugiada's "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Officer Bugiada's "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23. Undisputed only that Officer Bugiada used OC (pepper) spray on Mr. Lagoda.

35.    Officer Bugiada testified that at the time he deployed the OC spray he did so to protect himself and everyone on the aircraft by trying to gain compliance and control over Lagoda. (Ex. J of Alterman Dec., Bugiada Dep. at 114:9-115:6).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Furthermore, Mr. Swinney confirmed that he told the first responding officer (Defendant Officer Bugiada) when he got to the back galley of the plane that "there was a medical emergency of a man (Mr. Lagoda) having a seizure, and that man (Mr. Lagoda) was both disoriented and combative," *id.* at 89:18-25. Officer Bugiada "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such his "actions fell below the standard of care."

Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officer Bugiada "failed to use de-escalation and defusing techniques during [his] interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Officer Bugiada had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Furthermore, in a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. Officer Bugiada's "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Officer Bugiada's "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23. Officer Bugiada's "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 1.

36.    The OC spray had no effect on Lagoda, who wiped it off his face and attempted to punch Officer Bugiada in the head. (Ex. MM of Alterman Dec., Bugiada Aff. at ¶ 18; Ex. J, Bugiada Dep. at 116:8-15).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Furthermore, Mr. Swinney confirmed that he told the first responding officer (Defendant Officer Bugiada) when he got to the back galley of the plane that "there was a medical emergency of a man (Mr. Lagoda) having a seizure, and that man (Mr. Lagoda) was both disoriented and combative," *id.* at 89:18-25. Officer Bugiada "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such his "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officer Bugiada "failed to use de-escalation and defusing techniques during [his] interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Officer Bugiada had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Furthermore, in a situation where an individual is having or just

28

experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. Officer Bugiada's "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Officer Bugiada's "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23. Officer Bugiada's "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 1.

37.    After avoiding Lagoda's punch, Officer Bugiada responded by striking Lagoda once in the face with his fist, after which Lagoda went to the ground. (Ex. MM of Alterman Dec., Bugiada Aff. at ¶¶ 19-20; Ex. J, Bugiada Dep. at 117:13-21).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Furthermore, Mr. Swinney confirmed that he told the first responding officer (Defendant Officer Bugiada) when he got to the back galley of the plane that "there was a medical emergency of a man (Mr. Lagoda) having a seizure, and

29

that man (Mr. Lagoda) was both disoriented and combative," *id.* at 89:18-25. Officer Bugiada "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such his "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officer Bugiada "failed to use de-escalation and defusing techniques during [his] interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Officer Bugiada had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Furthermore, in a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. Officer Bugiada's "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Officer Bugiada's "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23. Officer

Bugiada's "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 1. Officer Bugiada, "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16.

38.     Officer Bugiada radioed a distress call stating, "I'm in a fight. Send me another one," and further reporting, "Negative, I'm in a fight. Send me another one." When asked for his location, Officer Bugiada responded, "Gate 20, on the plane!" followed by, "Still combative, speed it up." (Ex. MM of Alterman Dec., Bugiada Aff. at ¶ 21; Ex. JJ, PA1409; Ex. J, Bugiada Dep. at 117:22-118:17; Ex. NN, Affidavit of Paul Mezzacappa ("Mezzacappa Aff.") at ¶ 8).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Furthermore, Mr. Swinney confirmed that he told the first responding officer (Defendant Officer Bugiada) when he got to the back galley of the plane that "there was a medical emergency of a man (Mr. Lagoda) having a seizure, and that man (Mr. Lagoda) was both disoriented and combative," *id.* at 89:18-25. Officer Bugiada "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such his "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented

31

to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officer Bugiada "failed to use de-escalation and defusing techniques during [his] interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Officer Bugiada had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Furthermore, in a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. Officer Bugiada's "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Officer Bugiada's "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23. Officer Bugiada's "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 1. Officer Bugiada, "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face

32

while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16.

39.     While on the ground with Officer Bugiada, Lagoda bit him, after which Officer Bugiada struck Lagoda four more times: twice when Mr. Lagoda bit him, and twice more when he was "losing control." (Ex. MM of Alterman Dec., Bugiada Aff. at ¶¶ 22-23; Ex. J, Bugiada Dep. at 62:11-64:2).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Furthermore, Mr. Swinney confirmed that he told the first responding officer (Defendant Officer Bugiada) when he got to the back galley of the plane that "there was a medical emergency of a man (Mr. Lagoda) having a seizure, and that man (Mr. Lagoda) was both disoriented and combative," *id.* at 89:18-25. Officer Bugiada "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such his "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officer Bugiada "failed to use de-escalation and defusing techniques during [his] interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe

33

Rule 26 Report) at 9–11. Officer Bugiada had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Furthermore, in a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. Officer Bugiada's "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Officer Bugiada's "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23. Officer Bugiada's "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 1. Officer Bugiada, "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16.

40.    Defendants' police expert, Retired New York City Police Department Captain John Monaghan, testified that his review and analysis of this matter determined Officer Bugiada's actions to be proper and reasonable under the circumstances, finding Lagoda presented as a combative man in a confined area and Officer Bugiada tried to take control of the situation without

34

using physical force and that progressed to physical restraint in order to take Lagoda under control and place him into custody. (Ex. AA of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan; Ex. Z, Monaghan Dep. at 321:4-323:13).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Furthermore, Mr. Swinney confirmed that he told the first responding officer (Defendant Officer Bugiada) when he got to the back galley of the plane that "there was a medical emergency of a man (Mr. Lagoda) having a seizure, and that man (Mr. Lagoda) was both disoriented and combative," *id.* at 89:18-25. Officer Bugiada "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such his "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officer Bugiada "failed to use de-escalation and defusing techniques during [his] interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Officer Bugiada had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Furthermore, in a situation where an individual is having or just

35

experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. Officer Bugiada's "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Officer Bugiada's "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23. Officer Bugiada's "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 1. Officer Bugiada,  "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16.

**<u>Additional Officers' Response to Emergency</u>**

41.    Multiple officers responded to Officer Bugiada's radio call for assistance. Officer Papia testified the threat to Officer Bugiada was evident to him given that Office Bugiada "was screaming on the radio" that "he was in a fight for his life." Officer Joseph stated he could "hear a struggle on the radio." (Ex. K of Alterman Dec., Papia Dep. at 91:5-10; Ex. L, Joseph Dep. at 84:16-85:7).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Furthermore, Mr. Swinney confirmed that he told the first responding officer (Defendant Officer Bugiada) when he got to the back galley of the plane that "there was a medical emergency of a man (Mr. Lagoda) having a seizure, and that man (Mr. Lagoda) was both disoriented and combative," *id.* at 89:18-25. Officer Bugiada "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such his "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6. When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officer Bugiada "failed to use de-escalation and defusing techniques during [his] interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Officer Bugiada had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Furthermore, in a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the

37

throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. Officer Bugiada's "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Officer Bugiada's "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23. Officer Bugiada's "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 1. Officer Bugiada, "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Undisputed only that multiple PAPD officers responded to the scene.

42.     Officer Papia described the situation on the aircraft as "total chaos" with passengers standing in the aisle and screaming for help. Officer Joseph observed "an active fight in the rear of the plane" between Lagoda and Officer Bugiada, as well as "multiple passengers, some screaming, an environment filled with OC or pepper spray." (Ex. K of Alterman Dec., Papia Dep. at 92:19-93:5; Ex. L, Joseph Dep. at 85:8-15).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex.

38

DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a

39

medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23. In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated

40

behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25.

43.     Officer Joseph observed Lagoda "actively fighting with Officer Bugiada," "kicking... actively swinging at or grabbing at Officer Bugiada near and around his upper body and his waist and his gun belt." (Ex. L of Alterman Dec., Joseph Dep. at 85:16-86:4).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency,

41

avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary,

and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23. In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25.

44.     Officer Papia testified that he observed Lagoda was "trying to gain compliance over [Bugiada]. He was actively biting him... trying to grab his testicles, his firearm, trying to bite him overall fighting and resisting compliance." (Ex. K of Alterman Dec., Papia Dep. at 93:16-94:4).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7.

44

Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're

45

in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25.

45.    Officer Papia testified as to the safety threat posed by Lagoda's actions in the following manner: "As police officers, we wear gun belts... if Officer Bugiada was overcome by the suspect, all of those articles and weapons on his gun belt could be used against him and other people." (Ex. K of Alterman Dec., Papia Dep. at 91:11-23).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that

46

Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant

47

Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual

who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25.

46.     Upon arrival at the rear of the aircraft, the responding officers immediately engaged Lagoda, who continued to actively resist. Officer Joseph testified that during the restraint process, Lagoda was actively resisting by "pulling his hands away and kicking and attempting to push up and pull his arms away." (Ex. NN of Alterman Dec., Mezzacappa Aff. at ¶ 10; Ex. L, Joseph Dep. at 85:24-87:3).

> **Plaintiffs' Response**: Disputed. First, "When the Defendant Officers reached the back of the aircraft, "all . . . stated that they observed Officer Bugiada sitting on top of Mr. Lagoda (who was face down)[.]" Defs. Ex. GG (OAG Report) at 6. Furthermore, Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions,

49

confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15.  Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant

50

Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable

51

condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. Undisputed only that the Defendant Officers physically engaged and restrained Mr. Lagoda.

47.    Officer Papia testified that he struck Lagoda with a closed fist twice – once in the face and once in the arm area – as he attempted to gain control over Lagoda's left arm as officer Bugiada attempted to gain control of Lagoda's right arm. (Ex. K of Alterman Dec., Papia Dep. at 53:23-54:11, 56:8-18).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as

52

such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15.  Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe

53

Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just

had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. Undisputed only that Officer Papia punched Mr. Lagoda twice.

48.    Officer Joseph assisted by grabbing Lagoda's left hand and bringing it to the rear of his lower back. (Ex. L of Alterman Dec., Joseph Dep. at 86:9-15).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that

55

Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6. When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15. Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily

56

escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a

57

seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. Undisputed only that Officer Joseph, along with the other Defendant Officers, physically engaged Mr. Lagoda.

49.     Officer Duran testified that he applied a compliance hold on Lagoda's shin using his expanded baton and hands in a controlled manner. (Ex. N of Alterman Dec., Duran Dep. at 54:13-55:23).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate

58

wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15.  Defendant Officers used "unreasonable, unnecessary

59

and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at

60

22–23. In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. Undisputed only that Officer Duran, along with the other Defendant Officers, physically engaged Mr. Lagoda.

50.    Officer Mezzacappa held Lagoda's leg to the ground with his hands. (Ex. NN of Alterman Dec., Mezzacappa Aff. at ¶ 11; Ex. M, Mezzacappa Dep. at 46:12-17).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6. When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy

62

Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15.  Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and []

63

Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23. In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. Undisputed only that Officer Mezzacappa, along with the other Defendant Officers, physically engaged Mr. Lagoda.

64

51.     Officer Duran testified that he did not apply his body weight to Lagoda during the restraint process and did not observe any other officers sitting on Lagoda or applying body weight to him. (Ex. N of Alterman Dec., Duran Dep. at 59:24-15, 69:12-23).

**Plaintiffs' Response**: Disputed. First, "When the Defendant Officers reached the back of the aircraft, "all . . . stated that they observed Officer Bugiada sitting on top of Mr. Lagoda (who was face down)[.]" Defs. Ex. GG (OAG Report) at 6. Furthermore, Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe

65

Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15.  Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not

66

comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate

hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25.

52.    Officer Joseph testified that at no point did he observe any officer on top of Lagoda during the restraining process, nor did he observe any officer apply pressure in a way that would restrict Lagoda's airway. (Ex. L of Alterman Dec., Joseph Dep. at 86:5-87:10).

**Plaintiffs' Response**: Disputed. First, "When the Defendant Officers reached the back of the aircraft, "all . . . stated that they observed Officer Bugiada sitting on top of Mr. Lagoda (who was face down)[.]" Defs. Ex. GG (OAG Report) at 6. Second, the deep contusions on Mr. Lagoda's upper back and base of neck are consistent with "great pressure [] exerted on those areas when Mr. Lagoda was restrained prone" which "would have the effect of pushing the neck and lower head and face into the floor, distorting the upper airway and inhibiting normal air exchange"—*i.e.*, positional asphyxiation. Defs. Ex. DD (Sperry Dep.) at 202. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14. Furthermore, Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions

fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6. When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15. Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report)

69

at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23. In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a

70

seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25.

53.   Officer Joseph testified that Lagoda was not entirely face down at any point. Rather, Lagoda was on his chest with his head turned to one side: "At no point did I see Mr. Lagoda on his stomach face down. It was always with his head to one side or the other, but it was never strictly prone with his nose directly on the ground. That was not the case." (Ex. L of Alterman Dec., Joseph Dep. at 55:1-9).

Plaintiffs' Response: Disputed. First, "When the Defendant Officers reached the back of the aircraft, "all . . . stated that they observed Officer Bugiada sitting on top of Mr. Lagoda (who was face down)[.]" Defs. Ex. GG (OAG Report) at 6. Second, the deep contusions

71

on Mr. Lagoda's upper back and base of neck are consistent with "great pressure [] exerted on those areas when Mr. Lagoda was restrained prone" which "would have the effect of pushing the neck and lower head and face into the floor, distorting the upper airway and inhibiting normal air exchange"—*i.e.*, positional asphyxiation. Defs. Ex. DD (Sperry Dep.) at 202. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14. Furthermore, Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6. When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide

72

assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15. Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to

properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of

74

Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. Officer Joseph testified that when he physically engaged Mr. Lagoda, "He was face down on his stomach more towards his left side a little bit." Defs. Ex. L (Joseph Dep.) at 42:9-12. Officer Mezzacappa testified that Mr. Lagoda prone on the ground face down. Defs. Ex. M (Mezzacappa Dep.) at 45:7-16.

54.     Officer Mezzacappa testified that "Once he was handcuffed, there was no more compliance hold on his body." (Ex. M of Alterman Dec., Mezzacappa Dep. at 53:21-54:10).

**Plaintiffs' Response**: Disputed. First, Officer Papia testified that the Defendant Officers were still applying pressure to Mr. Lagoda after he was handcuffed. Defs. Ex. K (Papia Dep.) at 58:10-13. Furthermore, Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim

75

is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15. Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a

76

medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port

Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. While being restrained, Mr. Lagoda was suffering and trying to alleviate himself from the hurt and from the struggle. Defs. Ex. DD (Sperry Dep.) at 196–97. The deep contusions on Mr. Lagoda's upper back and base of neck are consistent with "great pressure [] exerted on those areas when Mr. Lagoda was restrained prone" which "would have the effect of pushing the neck and lower head and face into the floor, distorting the upper airway and inhibiting normal air exchange"—*i.e.*, positional asphyxiation. Defs. Ex. DD (Sperry Dep.) at 202. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14.

55.     Even after being successfully handcuffed, Lagoda remained combative and continued to pose a threat. Officer Joseph testified he was "Still actively resisting, kicking, jerking his body around in a manner that was very distinctly to injure or harm people at his feet." (Ex. L of Alterman Dec., Joseph Dep. at 88:23-89:10).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their

interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15. Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that

80

[PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-

81

escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. While being restrained, Mr. Lagoda was suffering and trying to alleviate himself from the hurt and from the struggle. Defs. Ex. DD (Sperry Dep.) at 196–97. The deep contusions on Mr. Lagoda's upper back and base of neck are consistent with "great pressure [] exerted on those areas when Mr. Lagoda was restrained prone" which "would have the effect of pushing the neck and lower head and face into the floor, distorting the upper airway and inhibiting normal air exchange"—*i.e.*, positional asphyxiation. Defs. Ex. DD (Sperry Dep.) at 202. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14.

56.    Once Lagoda was handcuffed, he was put on his side and a search of his person was conducted. Officer Papia testified that Lagoda was actively continuing to resist and bucking his body as the search was being conducted. (Ex. NN of Alterman Dec., Mezzacappa Aff. at ¶¶ 13-14; Ex. K, Papia Dep. at 57:14-58:22).

**Plaintiffs' Response**: Disputed. Disputed. First, Officer Papia testified that the Defendant Officers were still applying pressure to Mr. Lagoda after he was handcuffed. Defs. Ex. K (Papia Dep.) at 58:10-13. Furthermore, Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that

82

Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15.  Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily

83

escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a

84

seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. While being restrained, Mr. Lagoda was suffering and trying to alleviate himself from the hurt and from the struggle. Defs. Ex. DD (Sperry Dep.) at 196–97. The deep contusions on Mr. Lagoda's upper back and base of neck are consistent with "great pressure [] exerted on those areas when Mr. Lagoda was restrained prone" which "would have the effect of pushing the neck and lower head and face into the floor, distorting the upper airway and inhibiting normal air exchange"—*i.e.*, positional asphyxiation. Defs. Ex. DD (Sperry Dep.) at 202. That Officer Bugiada's applied "pressure downward on the upper back, that is, with

85

Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14.

**Immediate Medical Response Upon Signs of Distress**

57.     Medical records confirm that Lagoda had a pre-existing medical condition called mesial temporal sclerosis (MTS), described by Plaintiff's own medical expert as "the most common of the focal epilepsies" which Lagoda "had been living with for years prior to his death." (Ex. DD of Alterman Dec., Sperry Dep. at 95:10-97:24, 100:9-21).

**Plaintiffs' Response**: Disputed. Dr. Sperry's report states that the "overall appearance of the microscopic brain findings is *suggestive* of Mesial Temporal Sclerosis (MTS), also known as Temporal Lobe Epilepsy (TLE), which is the most common of the focal epilepsies." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 9. Furthermore, there is no medical record indicating that Mr. Lagoda had ever been diagnosed with MTS, diagnosed with a seizure disorder, or prescribed seizure medication. Ex. A of Amrhein Decl. (Mr. Lagoda Medical Records and Translations). Moreover, Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda

did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. "Any speculation about whether or not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1.

58.    Plaintiffs' medical expert, Dr. Sperry, testified that Lagoda's MTS was undiagnosed and untreated, and that he was taking no medication for seizures. (Ex. DD of Alterman Dec., Sperry Dep. at 98:5-99:16, 102:1-25, 193:17-194:12).

**Plaintiffs' Response**: Disputed. Dr. Sperry's report states that the "overall appearance of the microscopic brain findings is *suggestive* of Mesial Temporal Sclerosis (MTS), also known as Temporal Lobe Epilepsy (TLE), which is the most common of the focal epilepsies." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 9. Furthermore, there is no medical record indicating that Mr. Lagoda had ever been diagnosed with MTS, diagnosed with a seizure disorder, or prescribed seizure medication. Ex. A of Amrhein Decl. (Mr. Lagoda Medical Records and Translations). Moreover, Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda

did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. "Any speculation about whether or not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1. Undisputed that Mr. Lagoda was taking no medications for seizures.

59.    Lagoda was fatigued at the time of the incident, having been traveling for approximately 24 hours. Tikhoplav testified that his son was extremely fatigued upon arrival at JFK, stating: "When they arrived in JFK, he wrote that he was extremely fatigued. He did not sleep at all during that flight." (Ex. V of Alterman Dec., Tikhoplav Dep. dated July 25, 2023 at 183:7-185:13).

> **Plaintiffs' Response**: Disputed. Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. "Any speculation about whether or not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda]

88

on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1. Plaintiffs dispute the materiality of the alleged fatigue, as it is not at issue and had no impact on Mr. Lagoda's death.

60.    Sometime after Lagoda was restrained, Officer Joseph noticed Lagoda turning blue around his "neck into his cheek area." (Ex. L of Alterman Dec., Joseph Dep. at 90:18-91:9).

**Plaintiffs' Response**: Disputed. Officer Papia testified that the Defendant Officers were still applying pressure to Mr. Lagoda after he was handcuffed. *Id.* at 58: 10-13. Second, the record states that "within a minute or so of Mr. Lagoda's having been handcuffed" Defendant Officers noticed that Mr. Lagoda's neck was turning blue. Defs. Ex. GG (OAG Report) at 6. Undisputed only as to Officer Joseph's noticing that Mr. Lagoda's neck was turning blue.

61.    Officer Papia testified that when the officers discovered Lagoda's neck was blue, Officer Joseph immediately checked for a pulse. (Ex. K of Alterman Dec., Papia Dep. at 60:21-61:8).

**Plaintiffs' Response**: Undisputed.

62.    Upon finding no pulse, the responding officers immediately removed handcuffs, placed Lagoda on his back, initiated CPR, and called for and used an AED. (Ex. NN of Alterman Dec., Mezzacappa Aff. at ¶¶ 15-19; Ex. K, Papia Dep. at 61:5-21; Ex. L, Joseph Dep. at 91:15-92:11).

**Plaintiffs' Response**: Disputed. Officer Papia observed other Defendant Officers still applying pressure to Mr. Lagoda even after he was handcuffed. Defs. Ex. K (Papia Dep.) at 58:10-13.  "[W]ithin a minute or so of Mr. Lagoda's having been handcuffed" Defendant

89

Officers noticed that the Mr. Lagoda's neck was turning blue. Defs. Ex. GG (OAG Report) at 6. Officer Papia testified that when the officers discovered Lagoda's neck was blue, Officer Joseph immediately checked for a pulse. Defs. Ex. K (Papia Dep.) at 60:21-61:8. When Officer Joseph checked for a pulse, Mr. Lagoda had no pulse. Defs. Ex. L (Joseph Dep.) at 58:3-5. Defendant Officers initiated CPR because Mr. Lagoda had no pulse. Defs. Ex. M (Mezzacappa Dep.) at 56:10-21. Defendant Officers called for an AED after CPR was initiated, and it was retrieved by Officer Bugiada. Defs. Ex. J (Bugiada Dep.) at 80:22–81:11. An AED device requires a detectable heartbeat in order to trigger a shock, and since Mr. Lagoda had no heartbeat, the AED did not trigger a shock. Defs. Ex. GG (OAG Report) at 6; Defs. Ex. K (Papia Dep.) at 63:11-12 ("If [the AED] does not detect a rhythm, it does not produce a shock."). Undisputed that Defendant Officers found no pulse, initiated CPR, and called for an AED.

63.    Officer Papia testified that he "instructed the group of officers to start CPR." Officer Mezzacappa participated, testifying: "I was doing the oxygen. Someone had handed us an AED. Officer Papia was doing compressions." (Ex. K of Alterman Dec., Papia Dep. at 61:5-16; Ex. M, Mezzacappa Dep. at 56:10-21).

**Plaintiffs' Response**: Undisputed.

64.    Officer Bugiada, who had started walking toward the front of the aircraft upon Lagoda being handcuffed, was speaking to a sergeant about what had just transpired, when he learned that an AED was needed. He then retrieved an AED from a flight attendant and delivered it to the officer at the rear of the aircraft with Lagoda. (Ex. J of Alterman Dec., Bugiada Dep. at 80:22-81:18).

**Plaintiffs' Response**: Undisputed. For additional context, Officer Bugiada provided this testimony as it concerned where he was in the aircraft when he learned that Mr. Lagoda's "neck was blue and he had no pulse". Defs. Ex. J (Bugiada Dep.) at 80:22–81:11.

65.    The AED was administered to Lagoda by the officers and the device recommended that no shock be administered and that the officers continue CPR compressions.  (Ex. NN of Alterman Dec., Mezzacappa Aff. at ¶¶ 19-21; Ex. M, Mezzacappa Dep. at 56:22-58:5).

**Plaintiffs' Response**: Disputed. Officer Papia observed other Defendant Officers still applying pressure to Mr. Lagoda even after he was handcuffed. Defs. Ex. K (Papia Dep.) at 58:10-13.  "[W]ithin a minute or so of Mr. Lagoda's having been handcuffed" Defendant Officers noticed that the Mr. Lagoda's neck was turning blue. Defs. Ex. GG (OAG Report) at 6. Officer Papia testified that when the officers discovered Lagoda's neck was blue, Officer Joseph immediately checked for a pulse. Defs. Ex. K (Papia Dep.) at 60:21-61:8. When Officer Joseph checked for a pulse, Mr. Lagoda had no pulse. Defs. Ex. L (Joseph Dep.) at 58:3-5. Defendant Officers initiated CPR because Mr. Lagoda had no pulse. Defs. Ex. M (Mezzacappa Dep.) at 56:10-21. Defendant Officers called for an AED after CPR was initiated, and it was retrieved by Officer Bugiada. Defs. Ex. J (Bugiada Dep.) at 80:22–81:11. An AED device requires a detectable heartbeat in order to trigger a shock, and since Mr. Lagoda had no heartbeat, the AED did not trigger a shock. Defs. Ex. GG (OAG Report) at 6; Defs. Ex. K (Papia Dep.) at 63:11-12 ("If [the AED] does not detect a rhythm, it does not produce a shock.").

91

66.    The officers continued to administer CPR until Emergency Medical Services personnel was on scene. (Ex. NN of Alterman Dec., Mezzacappa Aff. at ¶¶ 21-22; Ex. M, Mezzacappa Dep. at 58:2-9).

**Plaintiffs' Response**: Disputed. The OAG's report found that Emergency Medical Services ("EMS") were "significantly" delayed "by as much as 20 minutes" in arriving at the scene to provide care to Mr. Lagoda because the EMS ambulance "which had responded to the PAPD police command building on the original report of a passenger having a seizure – was still waiting for a police escort to the aircraft. (Apparently, even before the ambulance had shown up, all the officers assigned to the headquarters had already rushed to the aircraft to assist Officer Bugiada, leaving none behind to serve as escort for the ambulance.) At about 10:36 pm, officers on-scene twice called again over the radio for an ambulance. It was not until about 10:50 pm that EMS, with escort, had made it to the aircraft. By this point, a stair truck had been set up at the back of the plane, allowing the two Emergency Medical Technicians ("EMTs") to enter directly into the rear galley and make contact with Mr. Lagoda at 10:55 pm." Defs. Ex. GG (OAG Report) at 2, 6–7, 12. Undisputed that officers administered CPR until EMTs made contact with Mr. Lagoda.

67.    The Office of Chief Medical Examiner's Investigation Report documents that Lagoda was pronounced dead at Jamaica Hospital Emergency Room on April 12, 2019 at 11:35 p.m. (Ex. HH of Alterman Dec., Notice of Death, p. 1).

**Plaintiffs' Response**: Undisputed.

92

68.     The Medical Examiner's report notes that "Upon arrival to the emergency room at [11:25 p.m.] the decedent was in asystole. ACLS was continued and the decedent was pronounced dead despite all efforts 23:35." (Ex. HH of Alterman Dec., Investigation Report, p. 1).

**Plaintiffs' Response**: Undisputed.

69.     The Medical Examiner's report states that "As per Dr. Turner, the decedent sustained a small laceration to his nose, a few abrasions to his back and chest." (Ex. HH of Alterman Dec., Investigation Report, p. 1).

**Plaintiffs' Response**: Undisputed.

70.     Defendants' Emergency Medical Expert, Dr. Gregory I. Mazarin, testified that Lagoda "had all superficial injuries. There were no injuries to any of his vital structures or any of his vital organs, and there's no evidence from the Medical Examiner report that any of those physical injuries led to his death." (Ex. CC of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. BB, Mazarin Dep. at 151:24-152:15).

**Plaintiffs' Response**: Disputed. Dr. Mazarin, Defendants' purported medical expert, testified that he is not a forensic pathologist, anatomical pathologist, clinical pathologist, neurologist, or cardiologist. Defs. Ex. BB (Dr. Mazarin Dep.) at 58:23–59:17, 145–51. Dr. Mazarin's expert opinion was for the purposes of making a determination on whether there was excessive force (a police term of art) used by PAPD Officers despite not being a police officer and never reviewing any PAPD policies and procedures. Defs. Ex. BB (Dr. Mazarin Dep.) at 110:16-24, 145–51; Defs. Ex. CC (Dr. Mazarin Rule 26 Report). Dr. Mazarin can neither opine nor say to a reasonable degree of medical certainty what Mr. Lagoda's cause of death was because Dr. Mazarin is not a forensic pathologist, anatomical pathologist,

clinical pathologist, neurologist, or cardiologist. Defs. Ex. BB (Dr. Mazarin Dep. at 149–51. Furthermore, The deep contusions on Mr. Lagoda's upper back and base of neck are consistent with "great pressure [] exerted on those areas when Mr. Lagoda was restrained prone" which "would have the effect of pushing the neck and lower head and face into the floor, distorting the upper airway and inhibiting normal air exchange"—*i.e.*, positional asphyxiation. Defs. Ex. DD (Sperry Dep.) at 202. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14.  The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod feet and subjected him to knee strikes, not just the few punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03. Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. "Any speculation about whether or

94

not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1. That but for the Defendant Officers' substantial use of force, Mr. Lagoda would still be alive today. Defs. Ex. DD (Sperry Dep.) at 205:6-14.

71.     Dr. Sperry testified: "But for the grand mal seizure... If the grand mal seizure had not happened, then far more probably than not, he would have survived." (Ex. DD of Alterman Dec., Sperry Dep. at 171:19-25).

**Plaintiffs' Response**: Disputed. Mr. Lagoda, while being confronted by Officer Bugiada, was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15.  While being restrained, Mr. Lagoda was suffering and trying to alleviate himself from the hurt and from the struggle. Defs. Ex. DD (Sperry Dep.) at 196–97. The deep contusions on Mr. Lagoda's upper back and base of neck are consistent with "great pressure [] exerted on those areas when Mr. Lagoda was restrained prone" which "would have the effect of pushing the neck and lower head and face into the floor, distorting the upper airway and inhibiting normal air exchange"—*i.e.*, positional asphyxiation. Defs. Ex. DD (Sperry Dep.) at 202. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14.  The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod

95

feet and subjected him to knee strikes, not just the few punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03. Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. "Any speculation about whether or not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1. "'Excited delirium' is not a diagnosis, but has always been a syndromic definition, with most of the criteria being subjective and observational. Put another way, there is no pathologic feature which allows a diagnosis of 'excited delirium' to be made, and due to the vague and nonspecific nature of this syndromes different features, it is problematic to utilize the term in explaining a sudden and unexpected death." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 14–15. The risk of positional asphyxia is compounded when a person in a medically vulnerable state becomes involved in a physical struggle. Defs. Ex. DD (Sperry Dep.) at 203–04. Mr. Lagoda was put at significant risk of positional asphyxia by the Defendant Officers when they used substantial

force in restraining Mr. Lagoda when he was in the immediate wake of a seizure. Defs. Ex. DD (Sperry Dep.) at 204. That but for the Defendant Officers' substantial use of force, Mr. Lagoda would still be alive today. Defs. Ex. DD (Sperry Dep.) at 205:6-14.

## Ambulance Response

72.     Officer Duran was originally assigned to wait for and escort an ambulance but proceeded to the scene as instructed when Officer Bugiada called for help due to the emergent nature of the situation onboard the plane. (Ex. N of Alterman Dec., Duran Dep. at 75:12-22).

**Plaintiffs' Response**: Disputed. Officer Duran was not "instructed" to proceed to the scene. Officer Duran testified that "[he] was supposed to stay behind and wait for the escort" but "[he] decided to proceed to assist Officer Bugiada." Defs. Ex. N (Duran Dep.) at 75:12-15; 75:21-22. It was his decision to respond despite the fact that he was assigned to stay behind to escort the ambulance. *Id.* "Emergency medical treatment for Mr. Lagoda was delayed by as much as 20 minutes" because the EMS ambulance "which had responded to the PAPD police command building on the original report of a passenger having a seizure – was still waiting for a police escort to the aircraft. (Apparently, even before the ambulance had shown up, all the officers assigned to the headquarters had already rushed to the aircraft to assist Officer Bugiada, leaving none behind to serve as escort for the ambulance.) At about 10:36 pm, officers on-scene twice called again over the radio for an ambulance. It was not until about 10:50 pm that EMS, with escort, had made it to the aircraft. By this point, a stair truck had been set up at the back of the plane, allowing the two Emergency Medical Technicians ("EMTs") to enter directly into the rear galley and make contact with Mr. Lagoda at 10:55 pm." Defs. Ex. GG (OAG Report) at 6–7, 12. Officer Duran testified that "[he] was supposed to stay behind and wait for the escort" but "[he] decided to proceed to

97

assist Officer Bugiada." Defs. Ex. N (Duran Dep.) at 75:12-15; 75:21-22. Paramedic Hodges stated that "we were told to respond to [the police building for escort[,] [w]e went into the vehicle, started responding to [the police building for escort.]" Defs. Ex. KK (Hodges Dep.) at 2. Paramedic Hodges stated that "we waited there for a while" because "there was no unit there" for escort. Defs. Ex. KK (Hodges Dep.) at 2. The ambulance driver, Jerry Zander, stated that they were waiting for escort "anywhere from 10 to 15 minutes." Defs. Ex. LL (Zander Dep.) at 2. EMS unit was alerted of the "male having a seizure" at 10:22 PM, Defs. Ex. GG (OAG Report) at 6–7. An ambulance proceeded posthaste to the police building for escort but there was no unit there and they had to wait there for a while. Defs. Ex. KK (Hodges Dep.) at 2. At approximately 10:36 officers aboard the JetBlue flight radioed again requesting an ambulance. Defs. Ex. GG (OAG Report) at 6–7. At 10:40 PM, EMS stated to the radio dispatcher "we've been at 2-6-9 [location for escort]. They just have no personnel here." Defs. Ex. GG (OAG Report) at Ex. 2 at 9. At 10:41 PM, Officer Duran stated over the JFK Patrol Radio "Kennedy, 92, do you need me to uh, respond back to 6-9 [location for escort], for uh, the Bus [ambulance]?" Defs. Ex. GG (OAG Report) at Ex. 2 at 10 (emphasis added). EMS did not arrive at the aircraft until approximately 10:50 PM. Defs. Ex. GG (OAG Report) at 7. EMTs first made contact with Mr. Lagoda at 10:55 PM. Defs. Ex. GG (OAG Report) at 7. Mr. Lagoda "was pulseless electrical activity" when EMTs arrived. Defs. Ex. KK (Hodges Dep.) at 8. At approximately 11:10 PM the ambulance headed for Jamaica (Queens) Hospital and arrived at 11:25 PM and. Defs. Ex. GG (OAG Report) at 7; *supra* ¶ 68. Mr. Lagoda was pronounced dead at 11:35 PM, 10 minutes after arriving at the hospital. *See supra* ¶ 68.

Undisputed only that Officer Duran was assigned to wait for and escort the ambulance to Mr. Lagoda's scene.

73.    Lt. Sandoz testified that the designated meeting point for EMS was located adjacent to the police command post. (Ex. W of Alterman Dec., Sandoz Dep. at 58:5-25).

**Plaintiffs' Response**: Undisputed.

74.    Lt. Sandoz testified that Port Authority Police procedures require that a scene must be secured before EMS personnel can enter to provide treatment. Lt. Sandoz stated: "Nothing really can be done to help anybody until a scene is safe." (Ex. W of Alterman Dec., Sandoz Dep. at 71:9-74:5).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency,

avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15. Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize

that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23. In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out

of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25.

75.     On April 30, 2019, Sergeant Lawanda Irving of the Port Authority Office of Inspector General, Police Integrity Unit, and Investigator Bryan Mason from the New York State Attorney General's Office interviewed Mr. Chalako Hodges, a paramedic from Jamaica Hospital, regarding the April 12, 2019 incident aboard JetBlue flight 659. (Ex. KK of Alterman Dec., Chalako Hodges Interview Transcript, p. 1).

**Plaintiffs' Response**: Undisputed.

76.     According to Mr. Hodges, the EMS unit responded to a call at JFK Airport and waited within 10 minutes the ambulance was escorted to the aircraft, where they encountered Port Authority police officers performing CPR on a male passenger with an AED attached. (Ex. KK of Alterman Dec., Chalako Hodges Interview Transcript, p. 1-2).

**Plaintiffs' Response**: Disputed. "Emergency medical treatment for Mr. Lagoda was delayed by as much as 20 minutes" because the EMS ambulance "which had responded to the PAPD police command building on the original report of a passenger having a seizure – was still waiting for a police escort to the aircraft. (Apparently, even before the ambulance

102

had shown up, all the officers assigned to the headquarters had already rushed to the aircraft to assist Officer Bugiada, leaving none behind to serve as escort for the ambulance.) At about 10:36 pm, officers on-scene twice called again over the radio for an ambulance. It was not until about 10:50 pm that EMS, with escort, had made it to the aircraft. By this point, a stair truck had been set up at the back of the plane, allowing the two Emergency Medical Technicians ("EMTs") to enter directly into the rear galley and make contact with Mr. Lagoda at 10:55 pm." Defs. Ex. GG (OAG Report) at 6–7, 12. Officer Duran testified that "[he] was supposed to stay behind and wait for the escort" but "[he] decided to proceed to assist Officer Bugiada." Defs. Ex. N (Duran Dep.) at 75:12-15; 75:21-22. Paramedic Hodges stated that "we were told to respond to [the police building for escort[,] [w]e went into the vehicle, started responding to [the police building for escort.]" Defs. Ex. KK (Hodges Dep.) at 2. Paramedic Hodges stated that "we waited there for a while" because "there was no unit there" for escort. Defs. Ex. KK (Hodges Dep.) at 2. The ambulance driver, Jerry Zander, stated that they were waiting for escort "anywhere from 10 to 15 minutes." Defs. Ex. LL (Zander Dep.) at 2. EMS unit was alerted of the "male having a seizure" at 10:22 PM, Defs. Ex. GG (OAG Report) at 6–7. An ambulance proceeded posthaste to the police building for escort but there was no unit there and they had to wait there for a while. Defs. Ex. KK (Hodges Dep.) at 2. At approximately 10:36 officers aboard the JetBlue flight radioed again requesting an ambulance. Defs. Ex. GG (OAG Report) at 6–7. At 10:40 PM, EMS stated to the radio dispatcher "we've been at 2-6-9 [location for escort]. They just have no personnel here." Defs. Ex. GG (OAG Report) at Ex. 2 at 9. At 10:41 PM, Officer Duran stated over the JFK Patrol Radio "Kennedy, 92, do you need me to uh, respond back to 6-9 [location for escort], for uh, the Bus [ambulance]?" Defs. Ex.

103

GG (OAG Report) at Ex. 2 at 10 (emphasis added). EMS did not arrive at the aircraft until approximately 10:50 PM. Defs. Ex. GG (OAG Report) at 7. EMTs first made contact with Mr. Lagoda at 10:55 PM. Defs. Ex. GG (OAG Report) at 7. Mr. Lagoda "was pulseless electrical activity" when EMTs arrived. Defs. Ex. KK (Hodges Dep.) at 8.

77.    The ambulance transport from JFK Airport to Jamaica Hospital took approximately 10-12 minutes. (Ex. KK of Alterman Dec., Chalako Hodges Interview Transcript, p. 7, 10).

**Plaintiffs' Response**: Disputed. "Emergency medical treatment for Mr. Lagoda was delayed by as much as 20 minutes" because the EMS ambulance "which had responded to the PAPD police command building on the original report of a passenger having a seizure – was still waiting for a police escort to the aircraft. (Apparently, even before the ambulance had shown up, all the officers assigned to the headquarters had already rushed to the aircraft to assist Officer Bugiada, leaving none behind to serve as escort for the ambulance.) At about 10:36 pm, officers on-scene twice called again over the radio for an ambulance. It was not until about 10:50 pm that EMS, with escort, had made it to the aircraft. By this point, a stair truck had been set up at the back of the plane, allowing the two Emergency Medical Technicians ("EMTs") to enter directly into the rear galley and make contact with Mr. Lagoda at 10:55 pm." Defs. Ex. GG (OAG Report) at 6–7, 12. Officer Duran testified that "[he] was supposed to stay behind and wait for the escort" but "[he] decided to proceed to assist Officer Bugiada." Defs. Ex. N (Duran Dep.) at 75:12-15; 75:21-22. Paramedic Hodges stated that "we were told to respond to [the police building for escort[,] [w]e went into the vehicle, started responding to [the police building for escort.]" Defs. Ex. KK (Hodges Dep.) at 2. Paramedic Hodges stated that "we waited there for a while" because "there was no unit there" for escort. Defs. Ex. KK (Hodges Dep.) at 2. The ambulance

104

driver, Jerry Zander, stated that they were waiting for escort "anywhere from 10 to 15 minutes." Defs. Ex. LL (Zander Dep.) at 2. EMS unit was alerted of the "male having a seizure" at 10:22 PM, Defs. Ex. GG (OAG Report) at 6–7. An ambulance proceeded posthaste to the police building for escort but there was no unit there and they had to wait there for a while. Defs. Ex. KK (Hodges Dep.) at 2. At approximately 10:36 officers aboard the JetBlue flight radioed again requesting an ambulance. Defs. Ex. GG (OAG Report) at 6–7. At 10:40 PM, EMS stated to the radio dispatcher "we've been at 2-6-9 [location for escort]. They just have no personnel here." Defs. Ex. GG (OAG Report) at Ex. 2 at 9. At 10:41 PM, Officer Duran stated over the JFK Patrol Radio "Kennedy, 92, do you need me to uh, respond back to 6-9 [location for escort], for uh, the Bus [ambulance]?" Defs. Ex. GG (OAG Report) at Ex. 2 at 10 (emphasis added). EMS did not arrive at the aircraft until approximately 10:50 PM. Defs. Ex. GG (OAG Report) at 7. EMTs first made contact with Mr. Lagoda at 10:55 PM. Defs. Ex. GG (OAG Report) at 7. Mr. Lagoda "was pulseless electrical activity" when EMTs arrived. Defs. Ex. KK (Hodges Dep.) at 8. At approximately 11:10 PM the ambulance headed for Jamaica (Queens) Hospital and arrived at 11:25 PM and. Defs. Ex. GG (OAG Report) at 7; *supra* ¶ 68. Mr. Lagoda was pronounced dead at 11:35 PM, 10 minutes after arriving at the hospital. *See supra* ¶ 68.

78.    A similar account was provided by Mr. Jerry Zander, another Jamaica Hospital paramedic who was also testified that the ride to JFK Airport took 10-12 minutes. (Ex. LL of Alterman Dec., Jerry Zander Interview Transcript, p. 3, 7).

**Plaintiffs' Response**: Disputed. To start, provided a "[b]allpark" guess as to how long it "maybe" and "roughly" took to get to the hospital. Defs. Ex. LL (Zander Dep.) at 7. Furthermore, "Emergency medical treatment for Mr. Lagoda was delayed by as much as

20 minutes" because the EMS ambulance "which had responded to the PAPD police command building on the original report of a passenger having a seizure – was still waiting for a police escort to the aircraft. (Apparently, even before the ambulance had shown up, all the officers assigned to the headquarters had already rushed to the aircraft to assist Officer Bugiada, leaving none behind to serve as escort for the ambulance.) At about 10:36 pm, officers on-scene twice called again over the radio for an ambulance. It was not until about 10:50 pm that EMS, with escort, had made it to the aircraft. By this point, a stair truck had been set up at the back of the plane, allowing the two Emergency Medical Technicians ("EMTs") to enter directly into the rear galley and make contact with Mr. Lagoda at 10:55 pm." Defs. Ex. GG (OAG Report) at 6–7, 12. Officer Duran testified that "[he] was supposed to stay behind and wait for the escort" but "[he] decided to proceed to assist Officer Bugiada." Defs. Ex. N (Duran Dep.) at 75:12-15; 75:21-22. Paramedic Hodges stated that "we were told to respond to [the police building for escort[,] [w]e went into the vehicle, started responding to [the police building for escort.]" Defs. Ex. KK (Hodges Dep.) at 2. Paramedic Hodges stated that "we waited there for a while" because "there was no unit there" for escort. Defs. Ex. KK (Hodges Dep.) at 2. The ambulance driver, Jerry Zander, stated that they were waiting for escort "anywhere from 10 to 15 minutes." Defs. Ex. LL (Zander Dep.) at 2. EMS unit was alerted of the "male having a seizure" at 10:22 PM, Defs. Ex. GG (OAG Report) at 6–7. An ambulance proceeded posthaste to the police building for escort but there was no unit there and they had to wait there for a while. Defs. Ex. KK (Hodges Dep.) at 2. At approximately 10:36 officers aboard the JetBlue flight radioed again requesting an ambulance. Defs. Ex. GG (OAG Report) at 6–7. At 10:40 PM, EMS stated to the radio dispatcher "we've been at 2-6-9 [location for

106

escort]. They just have no personnel here." Defs. Ex. GG (OAG Report) at Ex. 2 at 9. At 10:41 PM, Officer Duran stated over the JFK Patrol Radio "Kennedy, 92, do you need me to uh, respond back to 6-9 [location for escort], for uh, the Bus [ambulance]?" Defs. Ex. GG (OAG Report) at Ex. 2 at 10 (emphasis added). EMS did not arrive at the aircraft until approximately 10:50 PM. Defs. Ex. GG (OAG Report) at 7. EMTs first made contact with Mr. Lagoda at 10:55 PM. Defs. Ex. GG (OAG Report) at 7. Mr. Lagoda "was pulseless electrical activity" when EMTs arrived. Defs. Ex. KK (Hodges Dep.) at 8. At approximately 11:10 PM the ambulance headed for Jamaica (Queens) Hospital and arrived at 11:25 PM and. Defs. Ex. GG (OAG Report) at 7; *supra* ¶ 68. Mr. Lagoda was pronounced dead at 11:35 PM, 10 minutes after arriving at the hospital. *See supra* ¶ 68.

79.     Lagoda was pronounced dead at Jamaica Hospital by Dr. Turner at 11:35 p.m. on April 12, 2019. (Ex. II of Alterman Dec., Certificate of Death at PA1556).

**Plaintiffs' Response**: Undisputed.

80.     Lagoda had features suggestive of mesial temporal sclerosis (CA4) and bilateral basal subarachnoid glioneuronal heterotopia, which have been associated with seizures. (Ex. II of Alterman Dec., Neuropathology Report at PA1566-1567).

**Plaintiffs' Response**: Disputed. Mr. Lagoda, while being confronted by Officer Bugiada, was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15.  While being restrained, Mr. Lagoda was suffering and trying to alleviate himself from the hurt and from

107

the struggle. Defs. Ex. DD (Sperry Dep.) at 196–97. The deep contusions on Mr. Lagoda's upper back and base of neck are consistent with "great pressure [] exerted on those areas when Mr. Lagoda was restrained prone" which "would have the effect of pushing the neck and lower head and face into the floor, distorting the upper airway and inhibiting normal air exchange"—*i.e.*, positional asphyxiation. Defs. Ex. DD (Sperry Dep.) at 202. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14.  The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod feet and subjected him to knee strikes, not just the few punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03. Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. "Any speculation about whether or not an alleged seizure disorder had an impact on

what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1. That but for the Defendant Officers' substantial use of force, Mr. Lagoda would still be alive today. Defs. Ex. DD (Sperry Dep.) at 205:6-14. Dr. Mazarin, Defendants' purported medical expert, testified that he is not a forensic pathologist, anatomical pathologist, clinical pathologist, neurologist, or cardiologist. Defs. Ex. BB (Dr. Mazarin Dep.) at 58:23–59:17, 145–51. Dr. Mazarin's expert opinion was for the purposes of making a determination on whether there was excessive force (a police term of art) used by PAPD Officers despite not being a police officer and never reviewing any PAPD policies and procedures. Defs. Ex. BB (Dr. Mazarin Dep.) at 110:16-24, 145–51; Defs. Ex. CC (Dr. Mazarin Rule 26 Report). Dr. Mazarin can neither opine nor say to a reasonable degree of medical certainty what Mr. Lagoda's cause of death was because Dr. Mazarin is not a forensic pathologist, anatomical pathologist, clinical pathologist, neurologist, or cardiologist. Defs. Ex. BB (Dr. Mazarin Dep. at 149–51.

### Comprehensive Port Authority Training and Policies

**Plaintiffs' Response**: Plaintiffs strongly dispute the characterization of "Comprehensive".

81.    Port Authority Officers receive comprehensive training, including a 26-week academy training that covers behavioral sciences, police practices, laws of arrest, court procedures, defensive tactics, use of force training, first aid, medical response, mental health crisis response, and de-escalation techniques. (Ex. X of Alterman Dec., Bergery Dep. at 18:24-19:11, 19:16-22:14).

**Plaintiffs' Response**: Disputed. Lt. Mark Bergery, Defendants' FRCP 30(b)(6) designee responsible for testifying regarding Port Authority Police Department policies, procedures, and training, testified that prior to and at the time of Mr. Lagoda's death, the Port Authority

did not train its officers as to positional restraint, compressional asphyxiation, and duties to intercede. Defs. Ex. X (Bergery Dep.) at 23:12–24:2, 25:18-21. Port Authority Police training as to positional restraint, compressional asphyxiation did not begin until 2020, the year after Mr. Lagoda's death, despite decades of law enforcement knowledge about the substantial risks of improper restraining techniques and positional asphyxia. Defs. Ex. X (Bergery Dep.) at 23:12–24:2; Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–13. Officer Duran testified that he was not taught at the PAPD Police Academy how to restrain someone without putting pressure on the individual's back. Defs. Ex. N (Duran Dep.) at 17:6-7. Port Authority did not train its officers as to the unique vulnerability of an individual in the immediate wake of a seizure. Defs. Ex. GG (OAG Report) at 2, 12. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted the following language after this incident involving Mr. [] Lagoda: 'Members of the Force are prohibited from sitting, kneeling, or standing on the subject's torso, (chest, back, abdomen), in a manner that compresses the diaphragm." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original); Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–20. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted [new] language after this incident involving Mr. [] Lagoda" as to an PAPD officer's duty to intervene." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original), 17–18; Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–22. Undisputed only as to the 26-week academy training.

82.    After academy graduation, Port Authority Officers must complete mandatory in-service training sessions twice annually (Spring and Fall sessions), pass tests with a minimum score of 70%, complete remedial training if standards are not met, and maintain proficiency in

skills learned at the academy. (Ex. X of Alterman Dec., Bergery Dep. at 41:15-43:5, 44:23-45:22, 54:25-56:5).

**Plaintiffs' Response**: Undisputed.

83.    On the date of the incident the Port Authority's use of force policies were set forth in General Order 100-05 "Use of Non-Deadly Force" and General Order 100-04 "Use of Force." (Ex. EE of Alterman Dec., General Order 100-05; Ex. FF, General Order 100-04).

**Plaintiffs' Response**: Undisputed that the above General Orders were in effect on the day of Mr. Lagoda's death. Disputed as to the comprehensive nature of the policies, as well as the PAPD officer training at the time of Mr. Lagoda's death. Lt. Mark Bergery, Defendants' FRCP 30(b)(6) designee responsible for testifying regarding Port Authority Police Department policies, procedures, and training, testified that prior to and at the time of Mr. Lagoda's death, the Port Authority did not train its officers as to positional restraint, compressional asphyxiation, and duties to intercede. Defs. Ex. X (Bergery Dep.) at 23:12–24:2, 25:18-21. Port Authority Police training as to positional restraint, compressional asphyxiation did not begin until 2020, the year after Mr. Lagoda's death, despite decades of law enforcement knowledge about the substantial risks of improper restraining techniques and positional asphyxia. Defs. Ex. X (Bergery Dep.) at 23:12–24:2; Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–13. Officer Duran testified that he was not taught at the PAPD Police Academy how to restrain someone without putting pressure on the individual's back. Defs. Ex. N (Duran Dep.) at 17:6-7. Port Authority did not train its officers as to the unique vulnerability of an individual in the immediate wake of a seizure. Defs. Ex. GG (OAG Report) at 2, 12. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted the following language <u>after</u> this incident involving Mr. [] Lagoda:

'Members of the Force are prohibited from sitting, kneeling, or standing on the subject's torso, (chest, back, abdomen), in a manner that compresses the diaphragm." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original); Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–20. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted [new] language after this incident involving Mr. [] Lagoda" as to an PAPD officer's duty to intervene." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original), 17–18; Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–22.

84.     Lt. Bergery testified that Port Authority Officers are trained to use force that is "objectively reasonable at the time to control the suspect" and "whatever level of force is reasonable at the time that the officer believes they are able to utilize, just to control the situation, to control the suspect." (Ex. X of Alterman Dec., Bergery Dep. at 29:24-31:11).

**Plaintiffs' Response**: Disputed. Lt. Mark Bergery, Defendants' FRCP 30(b)(6) designee responsible for testifying regarding Port Authority Police Department policies, procedures, and training, testified that prior to and at the time of Mr. Lagoda's death, the Port Authority did not train its officers as to positional restraint, compressional asphyxiation, and duties to intercede. Defs. Ex. X (Bergery Dep.) at 23:12–24:2, 25:18-21. Port Authority Police training as to positional restraint, compressional asphyxiation did not begin until 2020, the year after Mr. Lagoda's death, despite decades of law enforcement knowledge about the substantial risks of improper restraining techniques and positional asphyxia. Defs. Ex. X (Bergery Dep.) at 23:12–24:2; Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–13. Officer Duran testified that he was not taught at the PAPD Police Academy how to restrain someone without putting pressure on the individual's back. Defs. Ex. N (Duran Dep.) at

112

17:6-7. Port Authority did not train its officers as to the unique vulnerability of an individual in the immediate wake of a seizure. Defs. Ex. GG (OAG Report) at 2, 12. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted the following language after this incident involving Mr. [] Lagoda: 'Members of the Force are prohibited from sitting, kneeling, or standing on the subject's torso, (chest, back, abdomen), in a manner that compresses the diaphragm." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original); Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–20. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted [new] language after this incident involving Mr. [] Lagoda" as to an PAPD officer's duty to intervene." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original), 17–18; Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–22. Furthermore, Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the

113

medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15. Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize

114

that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out

115

of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14.  The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod feet and subjected him to knee strikes, not just the few punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03. Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda

did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda

did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-

21. "Any speculation about whether or not an alleged seizure disorder had an impact on

what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD

(Sperry Dep.) at 179:23–180:1.

85.     Port Authority Officers are taught to evaluate "the totality of the circumstance" and

make decisions based on "the entire scope" of a situation. This includes assessing environmental

factors and space constraints, potential threats to officers and the public, and the number of people

involved or at risk. (Ex. X of Alterman Dec., Bergery Dep. at 73:23-74:16, 104:25-106:13, 107:10-

108:6, 109:15-110:8).

> **Plaintiffs' Response**: Disputed. Lt. Mark Bergery, Defendants' FRCP 30(b)(6) designee
>
> responsible for testifying regarding Port Authority Police Department policies, procedures,
>
> and training, testified that prior to and at the time of Mr. Lagoda's death, the Port Authority
>
> did not train its officers as to positional restraint, compressional asphyxiation, and duties
>
> to intercede. Defs. Ex. X (Bergery Dep.) at 23:12–24:2, 25:18-21. Port Authority Police
>
> training as to positional restraint, compressional asphyxiation did not begin until 2020, the
>
> year after Mr. Lagoda's death, despite decades of law enforcement knowledge about the
>
> substantial risks of improper restraining techniques and positional asphyxia. Defs. Ex. X
>
> (Bergery Dep.) at 23:12–24:2; Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–13.
>
> Officer Duran testified that he was not taught at the PAPD Police Academy how to restrain
>
> someone without putting pressure on the individual's back. Defs. Ex. N (Duran Dep.) at
>
> 17:6-7. Port Authority did not train its officers as to the unique vulnerability of an
>
> individual in the immediate wake of a seizure. Defs. Ex. GG (OAG Report) at 2, 12. The

117

Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted the following language after this incident involving Mr. [] Lagoda: 'Members of the Force are prohibited from sitting, kneeling, or standing on the subject's torso, (chest, back, abdomen), in a manner that compresses the diaphragm." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original); Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–20. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted [new] language after this incident involving Mr. [] Lagoda" as to an PAPD officer's duty to intervene." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original), 17–18; Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–22. Furthermore, Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess

118

and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15.  Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants

119

"failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of

120

Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14.  The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod feet and subjected him to knee strikes, not just the few punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03. Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-

121

21. "Any speculation about whether or not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1.

86.     Port Authority Officer training complies with guidelines from both New York and New Jersey. The department "fall[s] underneath both" state jurisdictions, ensuring adherence to proper standards. (Ex. X of Alterman Dec., Bergery Dep. at 44:7-22).

**Plaintiffs' Response**: Disputed. Lt. Bergery's testimony was specifically in response to in-service training (ISTs). Defs. Ex. X (Bergery Dep.) at 44:7-22. Moreover, Lt. Bergery's testimony does not say that the "Port Authority Officer training *complies* with the guidelines from both New York and New Jersey." *Id.* Rather, Lt. Bergery's testimony suggests that the Port Authority crafts its own general orders, seemingly taking things from the "guidelines from the State of New Jersey and the State of New York." *Id.* Lt. Bergery also testified that prior to and at the time of Mr. Lagoda's death, the Port Authority did not train its officers as to positional restraint, compressional asphyxiation, and duties to intercede. Defs. Ex. X (Bergery Dep.) at 23:12–24:2, 25:18-21. Port Authority Police training as to positional restraint, compressional asphyxiation did not begin until 2020, the year after Mr. Lagoda's death, despite decades of law enforcement knowledge about the substantial risks of improper restraining techniques and positional asphyxia. Defs. Ex. X (Bergery Dep.) at 23:12–24:2; Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–13. Officer Duran testified that he was not taught at the PAPD Police Academy how to restrain someone without putting pressure on the individual's back. Defs. Ex. N (Duran Dep.) at 17:6-7. Port Authority did not train its officers as to the unique vulnerability of an individual in the immediate wake of a seizure. Defs. Ex. GG (OAG Report) at 2, 12. The

122

Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted the following language <u>after</u> this incident involving Mr. [] Lagoda: 'Members of the Force are prohibited from sitting, kneeling, or standing on the subject's torso, (<u>chest, back, abdomen</u>), in a manner that compresses the diaphragm." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original); Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–20. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted [new] language <u>after</u> this incident involving Mr. [] Lagoda" as to an PAPD officer's duty to intervene." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original), 17–18; Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–22.

87.    Port Authority Officers receive specific training on handling subjects experiencing medical emergencies, including emergency medical response, CPR, managing subjects in altered mental states, and frequent medical refresher courses. (Ex. X of Alterman Dec., Bergery Dep. at 34:18-38:3, 55:24-58:25, 90:10-24).

**Plaintiffs' Response**: Disputed. Lt. Mark Bergery, Defendants' FRCP 30(b)(6) designee responsible for testifying regarding Port Authority Police Department policies, procedures, and training, testified that prior to and at the time of Mr. Lagoda's death, the Port Authority did not train its officers as to positional restraint, compressional asphyxiation, and duties to intercede. Defs. Ex. X (Bergery Dep.) at 23:12–24:2, 25:18-21. Port Authority Police training as to positional restraint, compressional asphyxiation did not begin until 2020, the year after Mr. Lagoda's death, despite decades of law enforcement knowledge about the substantial risks of improper restraining techniques and positional asphyxia. Defs. Ex. X (Bergery Dep.) at 23:12–24:2; Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–13. Officer Duran testified that he was not taught at the PAPD Police Academy how to restrain

someone without putting pressure on the individual's back. Defs. Ex. N (Duran Dep.) at 17:6-7. Port Authority did not train its officers as to the unique vulnerability of an individual in the immediate wake of a seizure. Defs. Ex. GG (OAG Report) at 2, 12. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted the following language <u>after</u> this incident involving Mr. [] Lagoda: 'Members of the Force are prohibited from sitting, kneeling, or standing on the subject's torso, (<u>chest, back, abdomen</u>), in a manner that compresses the diaphragm." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original); Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–20. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted [new] language <u>after</u> this incident involving Mr. [] Lagoda" as to an PAPD officer's duty to intervene." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original), 17–18; Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–22..

88.     Lt. Sandoz testified that Port Authority Officers are trained to assess situations individually and respond appropriately based on circumstances presented. (Ex. W of Alterman Dec., Sandoz Dep. at 67:1-71:8).

**Plaintiffs' Response**: Disputed. Lt. Mark Bergery, Defendants' FRCP 30(b)(6) designee responsible for testifying regarding Port Authority Police Department policies, procedures, and training, testified that prior to and at the time of Mr. Lagoda's death, the Port Authority did not train its officers as to positional restraint, compressional asphyxiation, and duties to intercede. Defs. Ex. X (Bergery Dep.) at 23:12–24:2, 25:18-21. Port Authority Police training as to positional restraint, compressional asphyxiation did not begin until 2020, the year after Mr. Lagoda's death, despite decades of law enforcement knowledge about the substantial risks of improper restraining techniques and positional asphyxia. Defs. Ex. X

124

(Bergery Dep.) at 23:12–24:2; Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–13. Officer Duran testified that he was not taught at the PAPD Police Academy how to restrain someone without putting pressure on the individual's back. Defs. Ex. N (Duran Dep.) at 17:6-7. Port Authority did not train its officers as to the unique vulnerability of an individual in the immediate wake of a seizure. Defs. Ex. GG (OAG Report) at 2, 12. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted the following language after this incident involving Mr. [] Lagoda: 'Members of the Force are prohibited from sitting, kneeling, or standing on the subject's torso, (chest, back, abdomen), in a manner that compresses the diaphragm." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original); Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–20. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted [new] language after this incident involving Mr. [] Lagoda" as to an PAPD officer's duty to intervene." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original), 17–18; Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–22. Furthermore, Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions,

125

confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15.  Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant

126

Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable

127

condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14.  The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod feet and subjected him to knee strikes, not just the few punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03. Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr.

128

Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. "Any speculation about whether or not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1.

89.    Port Authority Officers receive in-service training that includes responding to medical emergencies and handling persons in altered mental states. (Ex. W of Alterman Dec., Sandoz Dep. at 33:13-34:10).

**Plaintiffs' Response**: Disputed. Lt. Mark Bergery, Defendants' FRCP 30(b)(6) designee responsible for testifying regarding Port Authority Police Department policies, procedures, and training, testified that prior to and at the time of Mr. Lagoda's death, the Port Authority did not train its officers as to positional restraint, compressional asphyxiation, and duties to intercede. Defs. Ex. X (Bergery Dep.) at 23:12–24:2, 25:18-21. Port Authority Police training as to positional restraint, compressional asphyxiation did not begin until 2020, the year after Mr. Lagoda's death, despite decades of law enforcement knowledge about the substantial risks of improper restraining techniques and positional asphyxia. Defs. Ex. X (Bergery Dep.) at 23:12–24:2; Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–13. Officer Duran testified that he was not taught at the PAPD Police Academy how to restrain someone without putting pressure on the individual's back. Defs. Ex. N (Duran Dep.) at 17:6-7. Port Authority did not train its officers as to the unique vulnerability of an

129

individual in the immediate wake of a seizure. Defs. Ex. GG (OAG Report) at 2, 12. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted the following language after this incident involving Mr. [] Lagoda: 'Members of the Force are prohibited from sitting, kneeling, or standing on the subject's torso, (chest, back, abdomen), in a manner that compresses the diaphragm." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original); Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–20. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted [new] language after this incident involving Mr. [] Lagoda" as to an PAPD officer's duty to intervene." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original), 17–18; Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–22. Furthermore, Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators

in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15.  Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take

131

appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23. In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-

19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14. The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod feet and subjected him to knee strikes, not just the few punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03. Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda

133

did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. "Any speculation about whether or not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1. Undisputed that the National Safety Council ("NSC") materials are distributed to Port Authority officers.

90.    Lt. Sandoz testified that "make the scene safe" is a principle taught at the Academy and that officers must secure a scene before medical treatment can be rendered. (Ex. W of Alterman Dec., Sandoz Dep. at 71:9-75:4).

**Plaintiffs' Response**: Disputed. Lt. Mark Bergery, Defendants' FRCP 30(b)(6) designee responsible for testifying regarding Port Authority Police Department policies, procedures, and training, testified that prior to and at the time of Mr. Lagoda's death, the Port Authority did not train its officers as to positional restraint, compressional asphyxiation, and duties to intercede. Defs. Ex. X (Bergery Dep.) at 23:12–24:2, 25:18-21. Port Authority Police training as to positional restraint, compressional asphyxiation did not begin until 2020, the year after Mr. Lagoda's death, despite decades of law enforcement knowledge about the substantial risks of improper restraining techniques and positional asphyxia. Defs. Ex. X (Bergery Dep.) at 23:12–24:2; Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–13. Officer Duran testified that he was not taught at the PAPD Police Academy how to restrain someone without putting pressure on the individual's back. Defs. Ex. N (Duran Dep.) at 17:6-7. Port Authority did not train its officers as to the unique vulnerability of an individual in the immediate wake of a seizure. Defs. Ex. GG (OAG Report) at 2, 12. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted the following language after this incident involving Mr. [] Lagoda: 'Members of the Force are prohibited from

134

sitting, kneeling, or standing on the subject's torso, (<u>chest, back, abdomen</u>), in a manner that compresses the diaphragm." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original); Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–20. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted [new] language <u>after</u> this incident involving Mr. [] Lagoda" as to an PAPD officer's duty to intervene." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original), 17–18; Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–22. Furthermore, Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6. When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and

135

de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15.  Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe

Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes

137

of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14.  The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod feet and subjected him to knee strikes, not just the few punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03. Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. "Any speculation about whether or not an alleged seizure disorder had an impact on

138

what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1.

91.    Lt. Sandoz testified that officers are trained to evaluate and respond to the actual situation they encounter, not just what was reported, stating "Many jobs are not exactly what they start out as." (Ex. W of Alterman Dec., Sandoz Dep. at 59:25-63:4).

**Plaintiffs' Response**: Disputed. Lt. Mark Bergery, Defendants' FRCP 30(b)(6) designee responsible for testifying regarding Port Authority Police Department policies, procedures, and training, testified that prior to and at the time of Mr. Lagoda's death, the Port Authority did not train its officers as to positional restraint, compressional asphyxiation, and duties to intercede. Defs. Ex. X (Bergery Dep.) at 23:12–24:2, 25:18-21. Port Authority Police training as to positional restraint, compressional asphyxiation did not begin until 2020, the year after Mr. Lagoda's death, despite decades of law enforcement knowledge about the substantial risks of improper restraining techniques and positional asphyxia. Defs. Ex. X (Bergery Dep.) at 23:12–24:2; Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–13. Officer Duran testified that he was not taught at the PAPD Police Academy how to restrain someone without putting pressure on the individual's back. Defs. Ex. N (Duran Dep.) at 17:6-7. Port Authority did not train its officers as to the unique vulnerability of an individual in the immediate wake of a seizure. Defs. Ex. GG (OAG Report) at 2, 12. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted the following language after this incident involving Mr. [] Lagoda: 'Members of the Force are prohibited from sitting, kneeling, or standing on the subject's torso, (chest, back, abdomen), in a manner that compresses the diaphragm." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original); Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–20.

139

The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted [new] language after this incident involving Mr. [] Lagoda" as to an PAPD officer's duty to intervene." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original), 17–18; Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–22. Furthermore, Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at

140

7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15.  Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H

141

of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable

142

state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14. The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod feet and subjected him to knee strikes, not just the few punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03. Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. "Any speculation about whether or not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1.

92.    Lt. Sandoz testified that when responding to medical emergencies involving altered mental states, officers consider whether the person is creating a danger to themselves or others. Lt.

143

Sandoz stated: "For police, when we get to the scene, it's someone's actions that we have to deal with." (Ex. W of Alterman Dec., Sandoz Dep. at 68:17-70:13, 71:9-73:12).

**Plaintiffs' Response**: Disputed. Lt. Mark Bergery, Defendants' FRCP 30(b)(6) designee responsible for testifying regarding Port Authority Police Department policies, procedures, and training, testified that prior to and at the time of Mr. Lagoda's death, the Port Authority did not train its officers as to positional restraint, compressional asphyxiation, and duties to intercede. Defs. Ex. X (Bergery Dep.) at 23:12–24:2, 25:18-21. Port Authority Police training as to positional restraint, compressional asphyxiation did not begin until 2020, the year after Mr. Lagoda's death, despite decades of law enforcement knowledge about the substantial risks of improper restraining techniques and positional asphyxia. Defs. Ex. X (Bergery Dep.) at 23:12–24:2; Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–13. Officer Duran testified that he was not taught at the PAPD Police Academy how to restrain someone without putting pressure on the individual's back. Defs. Ex. N (Duran Dep.) at 17:6-7. Port Authority did not train its officers as to the unique vulnerability of an individual in the immediate wake of a seizure. Defs. Ex. GG (OAG Report) at 2, 12. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted the following language after this incident involving Mr. [] Lagoda: 'Members of the Force are prohibited from sitting, kneeling, or standing on the subject's torso, (chest, back, abdomen), in a manner that compresses the diaphragm." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original); Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–20. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted [new] language after this incident involving Mr. [] Lagoda" as to an PAPD officer's duty to intervene." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original), 17–18; Ex.

144

M of Amrhein Decl. (Use of Force Policies) at PA2618–22. Furthermore, Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy

145

Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15. Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and []

146

Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23. In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then

147

distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14.  The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod feet and subjected him to knee strikes, not just the few punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03. Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. "Any speculation about whether or not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1.

### Investigation of the Incident

93.    The New York State Office of the Attorney General ("OAG") conducted an investigation into the circumstances surrounding Lagoda's death, reviewing Port Authority paperwork, audio recordings, interviews with officers and witnesses, medical records, and the autopsy report. (Ex. GG of Alterman Dec., OAG Report, PA1803; Ex. Y, Irving Dep. at 61:7-64:8).

148

**Plaintiffs' Response**: Undisputed. More specifically, the OAG's criminal investigation was to "investigate any potential unlawful acts or omissions by law enforcement related to Mr. Lagoda's death." Defs. Ex. GG (OAG Report) at 1.

94.     The OAG concluded: "There can be little doubt that the officers were legally permitted to use at least some degree of physical force on Mr. Lagoda. Having been informed that Mr. Lagoda had been combative toward civilians on the aircraft, and then having himself been swung on by Mr. Lagoda, Officer Bugiada was certainly reasonable in his belief that Mr. Lagoda has committed an offense, and was therefore authorized to arrest him – and likewise authorized to use 'physical force when and to the extent … he reasonably believe[d] such to be necessary to effect the arrest.'" (Ex. GG of Alterman Dec., OAG Report, PA1811-PA1812).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency,

avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15.  Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize

150

that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out

151

of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14.  The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod feet and subjected him to knee strikes, not just the few punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03. Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda

did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. "Any speculation about whether or not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1. Additionally, Lt. Mark Bergery, Defendants' FRCP 30(b)(6) designee responsible for testifying regarding Port Authority Police Department policies, procedures, and training, testified that prior to and at the time of Mr. Lagoda's death, the Port Authority did not train its officers as to positional restraint, compressional asphyxiation, and duties to intercede. Defs. Ex. X (Bergery Dep.) at 23:12–24:2, 25:18-21. Port Authority Police training as to positional restraint, compressional asphyxiation did not begin until 2020, the year after Mr. Lagoda's death, despite decades of law enforcement knowledge about the substantial risks of improper restraining techniques and positional asphyxia. Defs. Ex. X (Bergery Dep.) at 23:12–24:2; Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–13. Officer Duran testified that he was not taught at the PAPD Police Academy how to restrain someone without putting pressure on the individual's back. Defs. Ex. N (Duran Dep.) at 17:6-7. Port Authority did not train its officers as to the unique vulnerability of an individual in the immediate wake of a seizure. Defs. Ex. GG (OAG Report) at 2, 12. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted the following language after this incident involving Mr. [] Lagoda: 'Members of the Force are prohibited from sitting, kneeling, or standing on the subject's torso, (chest, back, abdomen), in a manner that compresses the diaphragm." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original); Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–20. The Port Authority, via "General Order, Use of Force, 6/7/21 []

adopted [new] language <u>after</u> this incident involving Mr. [] Lagoda" as to an PAPD officer's duty to intervene." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original), 17–18; Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–22.

95.     The OAG further determined: "Because it would be impossible to prove beyond a reasonable doubt that any of the officers' conduct was unjustified, and therefore that their conduct violated New York Penal Law, the OAG has concluded that no criminal charges are warranted." (Ex. GG of Alterman Dec., OAG Report, PA1812-PA1813).

**Plaintiffs' Response**: Plaintiffs dispute the materiality of the statement given that it calls for a legal conclusion in the context of criminal law and a criminal investigation. This is otherwise disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6. When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions

154

regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15. Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate

155

action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-

156

19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14. The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod feet and subjected him to knee strikes, not just the few punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03. Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda

157

did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. "Any speculation about whether or not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1. Additionally, Lt. Mark Bergery, Defendants' FRCP 30(b)(6) designee responsible for testifying regarding Port Authority Police Department policies, procedures, and training, testified that prior to and at the time of Mr. Lagoda's death, the Port Authority did not train its officers as to positional restraint, compressional asphyxiation, and duties to intercede. Defs. Ex. X (Bergery Dep.) at 23:12–24:2, 25:18-21. Port Authority Police training as to positional restraint, compressional asphyxiation did not begin until 2020, the year after Mr. Lagoda's death, despite decades of law enforcement knowledge about the substantial risks of improper restraining techniques and positional asphyxia. Defs. Ex. X (Bergery Dep.) at 23:12–24:2; Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–13. Officer Duran testified that he was not taught at the PAPD Police Academy how to restrain someone without putting pressure on the individual's back. Defs. Ex. N (Duran Dep.) at 17:6-7. Port Authority did not train its officers as to the unique vulnerability of an individual in the immediate wake of a seizure. Defs. Ex. GG (OAG Report) at 2, 12. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted the following language <u>after</u> this incident involving Mr. [] Lagoda: 'Members of the Force are prohibited from sitting, kneeling, or standing on the subject's torso, (<u>chest, back, abdomen</u>), in a manner that compresses the diaphragm." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original); Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–20. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted [new] language <u>after</u> this incident involving Mr. [] Lagoda" as to an PAPD officer's

158

duty to intervene." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original), 17–18; Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–22.

96.    The Office of Chief Medical Examiner of the City of New York performed an autopsy on Lagoda on April 13, 2019, conducted by Dr. Yvonne Milewski, M.D. (Ex. GG of Alterman Dec., OAG Report, PA1863).

**Plaintiffs' Response**: Undisputed.

97.    The Medical Examiner determined the cause of death to be "sudden death following grand mal seizure of undetermined etiology complicated by post-ictal excited delirium." (Ex. GG of Alterman Dec., OAG Report, PA1864).

**Plaintiffs' Response**: Disputed. Mr. Lagoda, while being confronted by Officer Bugiada, was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15.  While being restrained, Mr. Lagoda was suffering and trying to alleviate himself from the hurt and from the struggle. Defs. Ex. DD (Sperry Dep.) at 196–97. The deep contusions on Mr. Lagoda's upper back and base of neck are consistent with "great pressure [] exerted on those areas when Mr. Lagoda was restrained prone" which "would have the effect of pushing the neck and lower head and face into the floor, distorting the upper airway and inhibiting normal air exchange"—*i.e.*, positional asphyxiation. Defs. Ex. DD (Sperry Dep.) at 202. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then

159

distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14. The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod feet and subjected him to knee strikes, not just the few punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03. Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. "Any speculation about whether or not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1. That but for the Defendant Officers' substantial use of force, Mr. Lagoda would still be alive today. Defs. Ex. DD (Sperry Dep.) at 205:6-14. Dr. Mazarin, Defendants' purported medical expert, testified that he is not a forensic pathologist, anatomical pathologist, clinical pathologist, neurologist, or cardiologist. Defs. Ex. BB (Dr. Mazarin Dep.) at 58:23–59:17, 145–51. Dr. Mazarin's expert opinion was for the purposes of making a determination on whether there was excessive force (a police

160

term of art) used by PAPD Officers despite not being a police officer and never reviewing any PAPD policies and procedures. Defs. Ex. BB (Dr. Mazarin Dep.) at 110:16-24, 145–51; Defs. Ex. CC (Dr. Mazarin Rule 26 Report). Dr. Mazarin can neither opine nor say to a reasonable degree of medical certainty what Mr. Lagoda's cause of death was because Dr. Mazarin is not a forensic pathologist, anatomical pathologist, clinical pathologist, neurologist, or cardiologist. Defs. Ex. BB (Dr. Mazarin Dep. at 149–51.

98.    The autopsy revealed that Mr. Lagoda had several pre-existing medical conditions including "hypertensive cardiovascular disease: cardiac hypertrophy (455 grams) with microscopic features consistent with above" and "arteriolonephrosclerosis; kidneys." (Ex. GG of Alterman Dec., OAG Report, PA1863).

**Plaintiffs' Response**: Disputed. Mr. Lagoda, while being confronted by Officer Bugiada, was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15.  While being restrained, Mr. Lagoda was suffering and trying to alleviate himself from the hurt and from the struggle. Defs. Ex. DD (Sperry Dep.) at 196–97. The deep contusions on Mr. Lagoda's upper back and base of neck are consistent with "great pressure [] exerted on those areas when Mr. Lagoda was restrained prone" which "would have the effect of pushing the neck and lower head and face into the floor, distorting the upper airway and inhibiting normal air exchange"—*i.e.*, positional asphyxiation. Defs. Ex. DD (Sperry Dep.) at 202. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then

distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14.  The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod feet and subjected him to knee strikes, not just the few punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03. Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. "Any speculation about whether or not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1. That but for the Defendant Officers' substantial use of force, Mr. Lagoda would still be alive today. Defs. Ex. DD (Sperry Dep.) at 205:6-14. Dr. Mazarin, Defendants' purported medical expert, testified that he is not a forensic pathologist, anatomical pathologist, clinical pathologist, neurologist, or cardiologist. Defs. Ex. BB (Dr. Mazarin Dep.) at 58:23–59:17, 145–51. Dr. Mazarin's expert opinion was for the purposes of making a determination on whether there was excessive force (a police

162

term of art) used by PAPD Officers despite not being a police officer and never reviewing any PAPD policies and procedures. Defs. Ex. BB (Dr. Mazarin Dep.) at 110:16-24, 145–51; Defs. Ex. CC (Dr. Mazarin Rule 26 Report). Dr. Mazarin can neither opine nor say to a reasonable degree of medical certainty what Mr. Lagoda's cause of death was because Dr. Mazarin is not a forensic pathologist, anatomical pathologist, clinical pathologist, neurologist, or cardiologist. Defs. Ex. BB (Dr. Mazarin Dep. at 149–51.

99.    The Medical Examiner identified "features suggestive of mesial temporal sclerosis (CA4) and bilateral basal subarachnoid glioneuronal heterotopia" which are associated with seizure disorders. (Ex. GG of Alterman Dec., OAG Report, PA1863).

**Plaintiffs' Response**: Disputed. There is no medical record indicating that Mr. Lagoda had ever been diagnosed with MTS, diagnosed with a seizure disorder, or prescribed seizure medication. Ex. A of Amrhein Decl. (Mr. Lagoda Medical Records and Translations). The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod feet and subjected him to knee strikes, not just the few punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03. Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda

did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. "Any speculation about whether or not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1. That but for the Defendant Officers' substantial use of force, Mr. Lagoda would still be alive today. Defs. Ex. DD (Sperry Dep.) at 205:6-14. Dr. Mazarin, Defendants' purported medical expert, testified that he is not a forensic pathologist, anatomical pathologist, clinical pathologist, neurologist, or cardiologist. Defs. Ex. BB (Dr. Mazarin Dep.) at 58:23–59:17, 145–51. Dr. Mazarin's expert opinion was for the purposes of making a determination on whether there was excessive force (a police term of art) used by PAPD Officers despite not being a police officer and never reviewing any PAPD policies and procedures. Defs. Ex. BB (Dr. Mazarin Dep.) at 110:16-24, 145–51; Defs. Ex. CC (Dr. Mazarin Rule 26 Report). Dr. Mazarin can neither opine nor say to a reasonable degree of medical certainty what Mr. Lagoda's cause of death was because Dr. Mazarin is not a forensic pathologist, anatomical pathologist, clinical pathologist, neurologist, or cardiologist. Defs. Ex. BB (Dr. Mazarin Dep. at 149–51.

100.    The OAG report noted that "a medical examiner identified as the cause of Lagoda's death: '[s]udden death following grand mal seizure of undetermined etiology complicated by post-ictal excited delirium.'" The medical examiner found blunt force injuries to Lagoda's face and body attributable to the officers but concluded these injuries were "ultimately superficial; none of them resulted in any skull or facial fractures, and they caused no injury to the brain." (Ex. GG of Alterman Dec., OAG Report, PA1809-PA1810).

**Plaintiffs' Response**: Disputed. Mr. Lagoda, while being confronted by Officer Bugiada, was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. While being restrained, Mr. Lagoda was suffering and trying to alleviate himself from the hurt and from the struggle. Defs. Ex. DD (Sperry Dep.) at 196–97. The deep contusions on Mr. Lagoda's upper back and base of neck are consistent with "great pressure [] exerted on those areas when Mr. Lagoda was restrained prone" which "would have the effect of pushing the neck and lower head and face into the floor, distorting the upper airway and inhibiting normal air exchange"—*i.e.*, positional asphyxiation. Defs. Ex. DD (Sperry Dep.) at 202. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14. The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod feet and subjected him to knee strikes, not just the few punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03. Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr.

165

Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. "Any speculation about whether or not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1. That but for the Defendant Officers' substantial use of force, Mr. Lagoda would still be alive today. Defs. Ex. DD (Sperry Dep.) at 205:6-14. Dr. Mazarin, Defendants' purported medical expert, testified that he is not a forensic pathologist, anatomical pathologist, clinical pathologist, neurologist, or cardiologist. Defs. Ex. BB (Dr. Mazarin Dep.) at 58:23–59:17, 145–51. Dr. Mazarin's expert opinion was for the purposes of making a determination on whether there was excessive force (a police term of art) used by PAPD Officers despite not being a police officer and never reviewing any PAPD policies and procedures. Defs. Ex. BB (Dr. Mazarin Dep.) at 110:16-24, 145–51; Defs. Ex. CC (Dr. Mazarin Rule 26 Report). Dr. Mazarin can neither opine nor say to a reasonable degree of medical certainty what Mr. Lagoda's cause of death was because Dr. Mazarin is not a forensic pathologist, anatomical pathologist, clinical pathologist, neurologist, or cardiologist. Defs. Ex. BB (Dr. Mazarin Dep. at 149–51.

101.    The OAG report further noted that these blunt force injuries "would not have been sufficient in and of themselves to cause death, or to contribute to death, in an otherwise healthy person." (Exhibit GG of Alterman Dec., OAG Report, PA1810).

166

**Plaintiffs' Response**: Disputed. Mr. Lagoda, while being confronted by Officer Bugiada, was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. While being restrained, Mr. Lagoda was suffering and trying to alleviate himself from the hurt and from the struggle. Defs. Ex. DD (Sperry Dep.) at 196–97. The deep contusions on Mr. Lagoda's upper back and base of neck are consistent with "great pressure [] exerted on those areas when Mr. Lagoda was restrained prone" which "would have the effect of pushing the neck and lower head and face into the floor, distorting the upper airway and inhibiting normal air exchange"—*i.e.*, positional asphyxiation. Defs. Ex. DD (Sperry Dep.) at 202. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14. The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod feet and subjected him to knee strikes, not just the few punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03. Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12. "[Mr.

Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97. Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21. "Any speculation about whether or not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1. That but for the Defendant Officers' substantial use of force, Mr. Lagoda would still be alive today. Defs. Ex. DD (Sperry Dep.) at 205:6-14. Dr. Mazarin, Defendants' purported medical expert, testified that he is not a forensic pathologist, anatomical pathologist, clinical pathologist, neurologist, or cardiologist. Defs. Ex. BB (Dr. Mazarin Dep.) at 58:23–59:17, 145–51. Dr. Mazarin's expert opinion was for the purposes of making a determination on whether there was excessive force (a police term of art) used by PAPD Officers despite not being a police officer and never reviewing any PAPD policies and procedures. Defs. Ex. BB (Dr. Mazarin Dep.) at 110:16-24, 145–51; Defs. Ex. CC (Dr. Mazarin Rule 26 Report). Dr. Mazarin can neither opine nor say to a reasonable degree of medical certainty what Mr. Lagoda's cause of death was because Dr. Mazarin is not a forensic pathologist, anatomical pathologist, clinical pathologist, neurologist, or cardiologist. Defs. Ex. BB (Dr. Mazarin Dep. at 149–51.

102.   The OAG acknowledged that the Port Authority's "current use of force policy appropriately instructs officers using force to conduct a 'careful balancing of all human interests' and 'use only that force that is reasonably necessary to bring an incident under control, while protecting the lives of the officer or another.'" (Ex. GG of Alterman Dec., OAG Report PA1814).

**Plaintiffs' Response**: Disputed. Lt. Mark Bergery, Defendants' FRCP 30(b)(6) designee responsible for testifying regarding Port Authority Police Department policies, procedures, and training, testified that prior to and at the time of Mr. Lagoda's death, the Port Authority did not train its officers as to positional restraint, compressional asphyxiation, and duties to intercede. Defs. Ex. X (Bergery Dep.) at 23:12–24:2, 25:18-21. Port Authority Police training as to positional restraint, compressional asphyxiation did not begin until 2020, the year after Mr. Lagoda's death, despite decades of law enforcement knowledge about the substantial risks of improper restraining techniques and positional asphyxia. Defs. Ex. X (Bergery Dep.) at 23:12–24:2; Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–13. Officer Duran testified that he was not taught at the PAPD Police Academy how to restrain someone without putting pressure on the individual's back. Defs. Ex. N (Duran Dep.) at 17:6-7. Port Authority did not train its officers as to the unique vulnerability of an individual in the immediate wake of a seizure. Defs. Ex. GG (OAG Report) at 2, 12. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted the following language after this incident involving Mr. [] Lagoda: 'Members of the Force are prohibited from sitting, kneeling, or standing on the subject's torso, (chest, back, abdomen), in a manner that compresses the diaphragm." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original); Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–20. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted [new] language after this incident involving Mr. [] Lagoda" as to an PAPD officer's duty to intervene." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original), 17–18; Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–22. Furthermore, Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state

169

while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15.  Defendant Officers used "unreasonable, unnecessary

170

and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at

171

22–23. In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25.

103.    Lt. Irving testified that after investigation: "in this particular situation, the officers did not violate any policies that would warrant discipline; therefore, they were not disciplined in this situation." (Ex. Y of Alterman Dec., Irving Dep. at 102:21-103:9).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6. When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy

173

Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15.  Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and []

174

Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25.

104.    Lt. Irving testified: "In this particular situation, the officers were presented with an individual who did not present having a seizure. He presented as a violent subject. Therefore, in

this situation, the officers responded according to what they were presented at the time, which is someone who was violent." (Ex. Y of Alterman Dec., Irving Dep. at 104:17-105:7).

**Plaintiffs' Response**: Disputed. Mr. Lagoda was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.  When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7. Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7. Defendant Officers "failed to use de-escalation and defusing techniques during their

176

interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11. Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15. Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21. Defendant Officers had a "gross lack

of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.  In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16. The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25. Lt. Mark

178

Bergery, Defendants' FRCP 30(b)(6) designee responsible for testifying regarding Port Authority Police Department policies, procedures, and training, testified that prior to and at the time of Mr. Lagoda's death, the Port Authority did not train its officers as to positional restraint, compressional asphyxiation, and duties to intercede. Defs. Ex. X (Bergery Dep.) at 23:12–24:2, 25:18-21. Port Authority Police training as to positional restraint, compressional asphyxiation did not begin until 2020, the year after Mr. Lagoda's death, despite decades of law enforcement knowledge about the substantial risks of improper restraining techniques and positional asphyxia. Defs. Ex. X (Bergery Dep.) at 23:12–24:2; Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–13. Officer Duran testified that he was not taught at the PAPD Police Academy how to restrain someone without putting pressure on the individual's back. Defs. Ex. N (Duran Dep.) at 17:6-7. Port Authority did not train its officers as to the unique vulnerability of an individual in the immediate wake of a seizure. Defs. Ex. GG (OAG Report) at 2, 12. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted the following language after this incident involving Mr. [] Lagoda: 'Members of the Force are prohibited from sitting, kneeling, or standing on the subject's torso, (chest, back, abdomen), in a manner that compresses the diaphragm." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original); Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–20. The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted [new] language after this incident involving Mr. [] Lagoda" as to an PAPD officer's duty to intervene." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original), 17–18; Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–22.

**Plaintiffs' Late Notice of Claim**

**Plaintiffs' Response**: Disputed. Plaintiffs contend that Plaintiffs' notice of claim was timely and suit was timely filed.

105.    On or about April 7, 2021, Plaintiffs served the Port Authority with a Notice of Claim seeking monetary damages related to the death of decedent, Evgeniy Lagoda, on April 12, 2019.  (Ex. C of Alterman Dec., Notice of Claim at pp. 2-3).

**Plaintiffs' Response**: Disputed. Plaintiffs' notice of claim <u>was</u> served on April 7, 2021. Dkt. 1-1 at Exs. B, C.

106.    On April 9, 2021, Plaintiffs filed a Complaint in the New York Supreme Court, New York County. (Ex. D of Alterman Dec., Plaintiffs' Complaint).

**Plaintiffs' Response**: Undisputed.

107.    Plaintiffs' April 9, 2021 Complaint raises a federal law claim and two state law claims. (Ex. D of Alterman Dec., Plaintiffs Complaint).

**Plaintiffs' Response**: Undisputed.

108.    On June 9, 2021, the Port Authority filed a motion to dismiss the state law claims contained in Plaintiff's Complaint due to Plaintiffs' failure to serve a notice of claim at least 60 days before initiating suit. (Ex. G of Alterman Dec., Port Authority's Motion to Dismiss Plaintiffs' State Law Claims filed on June 9, 2021).

**Plaintiffs' Response**: Disputed. The Port Authority's motion to dismiss the state law claims in Plaintiffs' original complaint merely *argued* that—not "due to"—Plaintiffs failed to serve a timely notice of claim. The alleged material fact above, which is disputed, is a legal

180

conclusion proffered by Defendants that was not adjudicated because Defendants removed to federal court. Dkt. 1 (Notice of Removal).

109.    On June 29, 2021, Plaintiffs filed their First Amended Complaint in the New York Supreme Court, New York County, which added Port Authority Officers Michael Bugiada, Robert Joseph, Jonathan Papia, Paul Mezzacappa, and Jonathan Duran as defendants. (Ex. E of Alterman Dec., Plaintiffs' First Amended Complaint filed on June 29, 2021).

**Plaintiffs' Response**: Undisputed. The record shows that the Amended Complaint added the additional defendants as individuals and identified them for the record as the Port Authority Officers involved in the death of Mr. Lagoda. Defs. Exs. D, E.

110.    On July 12, 2021, Plaintiffs filed a motion seeking an order pursuant to McKinney's Unconsolidated § 7108 giving Plaintiffs leave of court satisfy jurisdictional conditions precedent pursuant to McKinney's Unconsolidated § 7107. (Ex. H of Alterman Dec., Plaintiffs' Motion to for Leave of Court to Satisfy Jurisdictional Conditions Precedent filed on July 12, 2021).

**Plaintiffs' Response**: Plaintiffs dispute the materiality of Defendants' statement because it is a disputed legal conclusion disguised as a fact.  Undisputed only as to the type of motion that was filed.

111.    On July 21, 2021, Defendants filed a notice of removal pursuant to 28 U.S.C. § 1441 removing this matter from the New York Supreme Court, New York County to this Honorable Court. (Docket No. 1, Notice of Removal).

**Plaintiffs' Response**: Undisputed.

112.    On July 22, 2021, the Hon. Barbara Jaffe, J.S.C., of the New York Supreme Court, New York County, denied the pending motions of the parties as academic, citing that the matter had been removed to federal court. (Ex. I of Alterman Dec., Decision + Order on Motions).

**Plaintiffs' Response**: Disputed. Plaintiffs do not dispute the state court purported to enter an order regarding Plaintiffs' motion, but deny it had any legal effect because removal of the action the day before divested the state court of jurisdiction.

113.    New York Unconsolidated Laws § 7107 contains provisions regarding claims against the Port Authority. (Ex. A of Alterman Dec., McKinney's Consolidated Laws of New York, § 7107).

**Plaintiffs' Response**: Plaintiffs dispute the materiality of Defendants' statement because it is a disputed legal conclusion disguised as a fact. It is otherwise undisputed.

114.    Lagoda died on April 12, 2019. The date of February 12, 2020 was sixty days prior to April 12, 2020. (Ex. CC of Alterman Dec., Mazarin Dep. at 152:20-21).

**Plaintiffs' Response**: Undisputed only as to the date of Mr. Lagoda's death. Plaintiffs dispute the materiality of remainder of Defendants' statement because it is a disputed legal conclusion disguised as a fact.

115.    Plaintiffs served the Port Authority with a notice of claim on April 7, 2021. (Ex. C of Alterman Dec., Notice of Claim).

**Plaintiffs' Response**: Undisputed.

116.    Plaintiffs filed their Complaint in New York Supreme Court, New York County on April 9, 2021, two days after serving their notice of claim.  (Ex. D of Alterman Dec., Plaintiffs' Complaint).

**Plaintiffs' Response**: Undisputed.

[Intentionally Left Blank]

## PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS

### Mr. Lagoda's Clean Bill of Heath Prior to His Death

117.    Mr. Lagoda, as a requirement of his employment, underwent numerous medical evaluations to determine if he was fit to work. Ex. A of Amrhein Decl. (Mr. Lagoda's Pre-Death Medical Records and Translations).

118.    Mr. Lagoda's pre-death medical records show that he had no medical history of seizures. Ex. A of Amrhein Decl. (Mr. Lagoda's Pre-Death Medical Records and Translations).

119.    Mr. Lagoda's pre-death medical records show that he had no medical history of pre-existing conditions. Ex. A of Amrhein Decl. (Mr. Lagoda's Pre-Death Medical Records and Translations).

120.    Mr. Lagoda had never been diagnosed with MTS, diagnosed with a seizure disorder, or prescribed seizure medication. Ex. A of Amrhein Decl. (Mr. Lagoda's Pre-Death Medical Records and Translations).

### Mr. Lagoda's Substantially Limited Understanding of English

121.    Plaintiff Tikhoplav testified that his son (Mr. Lagoda) was not fluent in English, and that Mr. Lagoda's command of the English language, if any, was entirely in the context of what was required of Mr. Lagoda in his employment. Defs. Ex. V (Tikhoplav Dep. pt. 2) at 174:7:23.

122.    Mr. Lagoda's English capabilities were limited to being able to meet the requirements of his employment, including comprehending his work engineering manual. Defs. Ex. V (Tikhoplav Dep. pt. 2) at 174:7:23.

**Mr. Lagoda's Medical Emergency**

123.    Mr. Lagoda suffered a seizure while onboard the taxiing JetBlue Flight 659. Defs. Ex. P (Ingleton Dep.) at 28:9-14; Defs. Ex. Q (Leandro Dep.) at 22:9-19; Defs. Ex. S (Wright-Reid Dep.) at 16:10–17:18.

124.    While Mr. Lagoda was experiencing the seizure, he was observed "foaming from the mouth, and like his eyes were rolled in the back of his head", Defs. Ex. O (Swinney Dep.) at 20:21-23.

125.    Mr. Lagoda was removed from his seat while still actively seizing, and was placed in the aft galley while he was observed to still be in the midst of a seizure. *See* Plaintiffs' Response to ¶ 10, *supra*.

126.    Witnesses testified that, once the seizure subsided, Mr. Ladoga was noticeably confused, disoriented, agitated, and combative. Defs. Ex. O (Swinney Dep.) at 81:20-24, 85:7-17 (testifying testified in the affirmative that he was providing "treatment [for] a man (Mr. Lagoda) having a serious medical situation" and that he tried to calm down Mr. Lagoda but he was "disoriented and confused and definitely out of it").

127.    One witness, nurse Nathana Wright-Reid, who responded to the call for assistance from any on-board medical professionals, testified that even though Mr. Lagoda struck her in his state of confusion and disorientation, she remained in the aft galley so she could help Mr. Lagoda because it was an on-going, continuous medical emergency. Defs. Ex. S (Wright-Reid Dep.) at 64:10–65:6..

128.    From "the initial call [alerting the captain of Mr. Lagoda's medical event] to the arrival at the gate was within 5 minutes." Ex. B of Amrhein Decl. (Capt. Bengtson FCIR) at PA1362.

129.    PAPD Officer Williams said over the patrol radio to Officer Bugiada "Gate 25, uh, check that, Gate 2-0…aircraft returning to Gate, male having a seizure onboard" to which Officer Bugiada replied "Copy. Gate 20", Defs. Ex. JJ (Analysis of Radio Transmissions) at 1405, and two minutes later Officer Williams said over the patrol radio to Officer Bugiada "Male 40s, seizure, bleeding from mouth" to which Officer Bugiada replied "Copy." *Id.* at 1408.

130.    Officer Bugiada was at the Gate 20 when the plane arrived, immediately boarded the plane, and was informed by a flight attendant that Mr. Lagoda had just suffered a seizure and was disoriented and combative." Defs. Ex. J (Bugiada Dep.) at 69:2-17; Defs. Ex. JJ (Analysis of Radio Transmissions) at 1405.

131.    When Officer Bugiada interacted with Mr. Lagoda, Mr. Lagoda was in the immediate wake of the seizure. Defs. Ex. DD (Sperry Dep.) at 174:19–175:15; Defs. Ex. J (Bugiada Dep.) at 69:2-17.

132.    Officer Bugiada "failed to initially determine that Mr. [] Lagoda was experiencing a medical emergency and act reasonably and appropriately." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.

133.    Officer Bugiada "failed to use de-escalation and defusing techniques during [his] interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9.

134.    Officer Bugiada punched Mr. Lagoda in the face, after which Lagoda went to the ground. Defs. Ex. J (Bugiada Dep.) at 117:13-21.

135.    Officer Bugiada punched Mr. Lagoda four more times in the face when Mr. Lagoda was on the ground. Defs. Ex. J (Bugiada Dep.) at 63:19–64:2.

136.    Officer Bugiada was then on his knees straddling a prone Mr. Lagoda and applying pressure to his shoulders. Defs. Ex. J (Bugiada Dep.) at 65:13–66:11.

186

137. Officers Joseph, Mezzacappa, Papia, and Duran also responded to the scene and physically engaged Mr. Lagoda along with Officer Bugiada. Defs. Ex. GG (OAG Report) at 5.

138. When the Defendant Officers reached the back of the aircraft, "all . . . stated that they observed Officer Bugiada sitting on top of Mr. Lagoda (who was face down)[.]" Defs. Ex. GG (OAG Report) at 6.

139. Officer Joseph testified that when he physically engaged Mr. Lagoda, "He was face down on his stomach more towards his left side a little bit." Defs. Ex. L (Joseph Dep.) at 42:9-12.

140. Officer Mezzacappa testified that Mr. Lagoda prone on the ground face down. Defs. Ex. M (Mezzacappa Dep.) at 45:7-16.

141. Officer Papia punched Mr. Lagoda twice while Defendant Officers restrained Mr. Lagoda in a prone position. Defs. Ex. K (Papia Dep.) at 53:23-54:11, 56:8-18.

142. Officer Joseph testified that, in using force to restrain an individual like Mr. Lagoda, an officer uses his or her own body weight to try and gain physical leverage. Defs. Ex. L (Joseph Dep.) at 41:18–42:6.

143. The Defendant Officers restrained Mr. Lagoda in a prone position. Defs. Ex. L (Joseph Dep.) at 42:9-12; Defs. Ex. M (Mezzacappa Dep.) at 45:7-16.

144. Officer Papia observed other Defendant Officers still applying pressure to Mr. Lagoda even after he was handcuffed. Defs. Ex. K (Papia Dep.) at 58:10-13.

145. "[W]ithin a minute or so of Mr. Lagoda's having been handcuffed" Defendant Officers noticed that the Mr. Lagoda's neck was turning blue. Defs. Ex. GG (OAG Report) at 6.

146. Officer Papia testified that when the officers discovered Lagoda's neck was blue, Officer Joseph immediately checked for a pulse. Defs. Ex. K (Papia Dep.) at 60:21-61:8.

147.    When Officer Joseph checked for a pulse, Mr. Lagoda had no pulse. Defs. Ex. L (Joseph Dep.) at 58:3-5.

148.    Defendant Officers initiated CPR because Mr. Lagoda had no pulse. Defs. Ex. M (Mezzacappa Dep.) at 56:10-21.

149.    Defendant Officers called for an AED after CPR was initiated, and it was retrieved by Officer Bugiada. Defs. Ex. J (Bugiada Dep.) at 80:22–81:11

150.    An AED device requires a detectable heartbeat in order to trigger a shock, and since Mr. Lagoda had no heartbeat, the AED did not trigger a shock. Defs. Ex. GG (OAG Report) at 6; Defs. Ex. K (Papia Dep.) at 63:11-12 ("If [the AED] does not detect a rhythm, it does not produce a shock.").

### Significant and Preventable Delay in Medical Treatment for Mr. Lagoda

151.    "Emergency medical treatment for Mr. Lagoda was delayed by as much as 20 minutes" because the EMS ambulance "which had responded to the PAPD police command building on the original report of a passenger having a seizure – was still waiting for a police escort to the aircraft. (Apparently, even before the ambulance had shown up, all the officers assigned to the headquarters had already rushed to the aircraft to assist Officer Bugiada, leaving none behind to serve as escort for the ambulance.) At about 10:36 pm, officers on-scene twice called again over the radio for an ambulance. It was not until about 10:50 pm that EMS, with escort, had made it to the aircraft. By this point, a stair truck had been set up at the back of the plane, allowing the two Emergency Medical Technicians ("EMTs") to enter directly into the rear galley and make contact with Mr. Lagoda at 10:55 pm." Defs. Ex. GG (OAG Report) at 6–7, 12.

152.    Officer Duran testified that "[he] was supposed to stay behind and wait for the escort" but "[he] decided to proceed to assist Officer Bugiada." Defs. Ex. N (Duran Dep.) at 75:12-15; 75:21-22.

153.    Paramedic Hodges stated that "we were told to respond to [the police building for escort[,] [w]e went into the vehicle, started responding to [the police building for escort.]" Defs. Ex. KK (Hodges Dep.) at 2.

154.    Paramedic Hodges stated that "we waited there for a while" because "there was no unit there" for escort. Defs. Ex. KK (Hodges Dep.) at 2.

155.    The ambulance driver, Jerry Zander, stated that they were waiting for escort "anywhere from 10 to 15 minutes." Defs. Ex. LL (Zander Dep.) at 2.

156.    EMS unit was alerted of the "male having a seizure" at 10:22 PM, Defs. Ex. GG (OAG Report) at 6–7.

157.    An ambulance proceeded posthaste to the police building for escort but there was no unit there and they had to wait there for a while. Defs. Ex. KK (Hodges Dep.) at 2

158.    At  approximately 10:36 officers aboard the JetBlue flight radioed again requesting an ambulance. Defs. Ex. GG (OAG Report) at 6–7.

159.    At 10:40 PM, EMS stated to the radio dispatcher "we've been at 2-6-9 [location for escort]. They just have no personnel here." Defs. Ex. GG (OAG Report) at Ex. 2 at 9.

160.    At 10:41 PM, Officer Duran stated over the JFK Patrol Radio "Kennedy, 92, do you need me to uh, respend back to 6-9 [location for escort], for uh, the Bus [ambulance]?" Defs. Ex. GG (OAG Report) at Ex. 2 at 10 (emphasis added).

161.    EMS did not arrive at the aircraft until approximately 10:50 PM. Defs. Ex. GG (OAG Report) at 7.

162.   EMTs first made contact with Mr. Lagoda at 10:55 PM. Defs. Ex. GG (OAG Report) at 7.

163.   Mr. Lagoda "was pulseless electrical activity" when EMTs arrived. Defs. Ex. KK (Hodges Dep.) at 8.

164.   At approximately 11:10 PM the ambulance headed for Jamaica (Queens) Hospital and arrived at 11:25 PM and. Defs. Ex. GG (OAG Report) at 7; *supra* ¶ 68.

165.   Mr. Lagoda was pronounced dead at 11:35 PM, 10 minutes after arriving at the hospital. *See supra* ¶ 68.

### Autopsies of Mr. Lagoda

166.   New York medical examiner, after conducting the first autopsy, listed the manner of death as homicide, citing "physical struggle/altercation with blunt impacts" as a "significant condition." Defs. Ex. GG (OAG Report) at PA1864.

167.   The anatomic diagnoses noted "multiple blunt impacts to head, torso, and extremities with multiple abrasions, contusions and lacerations." Defs. Ex. GG (OAG Report) at PA1863.

168.   A second autopsy was conducted in Russia, which discovered Mr. Lagoda had suffered fractured ribs. Ex. C of Amrhein Decl. (Russian Autopsy and Translation).

169.   Mr. Lagoda's fractured ribs were as a result of the significant use of force by the Defendant Officers, not from the CPR administered by the Defendant Officers after Mr. Lagoda was discovered to be without a pulse and not breathing. Defs. Ex. DD (Sperry Dep.) at 187.

170.   Autopsy photos showed substantial bruising to Mr. Lagoda's head and neck area consistent with the substantial amount of force used by the Defendant Officers while improperly restraining Mr. Lagoda while in the prone position, as well as strikes by the Defendant Officers

190

shod feet and knees. Defs. Ex. DD (Sperry Dep.) at 187, 203; Ex. D of Amrhein Decl. (Autopsy Photos).

### Report and Testimony of Dr. Kris Sperry[2]

171. Mr. Lagoda, while being confronted by Officer Bugiada, was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15.

172. While being restrained, Mr. Lagoda was suffering and trying to alleviate himself from the hurt and from the struggle. Defs. Ex. DD (Sperry Dep.) at 196–97.

173. The deep contusions on Mr. Lagoda's upper back and base of neck are consistent with "great pressure [] exerted on those areas when Mr. Lagoda was restrained prone" which "would have the effect of pushing the neck and lower head and face into the floor, distorting the upper airway and inhibiting normal air exchange"—*i.e.*, positional asphyxiation. Defs. Ex. DD (Sperry Dep.) at 202.

174. That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14.

175. The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod feet and subjected him to knee strikes, not just the punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03.

---

[2] Dr. Kris Sperry, M.D. is certified by the American Board of Pathology in anatomic pathology, clinical pathology, and forensic pathology. Defs. Ex. DD (Sperry Dep.) at 16:9-19.

176.    Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97.

177.    Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12.

178.    "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97.

179.    Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21.

180.    Mr. Lagoda did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21.

181.    Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21.

182.    "Any speculation about whether or not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1.

183.    "'Excited delirium' is not a diagnosis, but has always been a syndromic definition, with most of the criteria being subjective and observational. Put another way, there is no pathologic feature which allows a diagnosis of 'excited delirium' to be made, and due to the vague and nonspecific nature of this syndromes different features, it is problematic to utilize the term in explaining a sudden and unexpected death." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 14–15.

192

184.    The risk of positional asphyxia is compounded when a person in a medically vulnerable state becomes involved in a physical struggle. Defs. Ex. DD (Sperry Dep.) at 203–04.

185.    Mr. Lagoda was put at significant risk of positional asphyxia by the Defendant Officers when they used substantial force in restraining Mr. Lagoda when he was in the immediate wake of a seizure. Defs. Ex. DD (Sperry Dep.) at 204.

186.    That but for the Defendant Officers' substantial use of force, Mr. Lagoda would still be alive today. Defs. Ex. DD (Sperry Dep.) at 205:6-14.

### Defendants' Purported Medical Expert

187.    Dr. Mazarin, Defendants' purported medical expert, testified that he is not a forensic pathologist, anatomical pathologist, clinical pathologist, neurologist, or cardiologist. Defs. Ex. BB (Dr. Mazarin Dep.) at 58:23–59:17, 145–51.

188.    Dr. Mazarin's expert opinion was for the purposes of making a determination on whether there was excessive force (a police term of art) used by PAPD Officers despite not being a police officer and never reviewing any PAPD policies and procedures. Defs. Ex. BB (Dr. Mazarin Dep.) at 110:16-24, 145–51; Defs. Ex. CC (Dr. Mazarin Rule 26 Report).

189.    Dr. Mazarin can neither opine nor say to a reasonable degree of medical certainty what Mr. Lagoda's cause of death was because Dr. Mazarin is not a forensic pathologist, anatomical pathologist, clinical pathologist, neurologist, or cardiologist. Defs. Ex. BB (Dr. Mazarin Dep. at 149–51.

### National Safety Council Materials

190.    PAPD Officer training included materials from the National Safety Council ("NSC"). Defs. Ex. X (Bergery Dep.) at 56:6–58:25.

191.    The NSC is the curriculum that was in place for the emergency medical response" and "this training is given to . . . police officers." Defs. Ex. X (Bergery Dep.) at 56:6–58:25.

192.    PAPD Officers, as a part of their duties and responsibilities, were responsible for understanding the materials with the NSC documents distributed to them on yearly basis. Defs. Ex. X (Bergery Dep.) at 56:6–58:25.

193.    The NSC documents were distributed to the PAPD leading up to and at the time of Mr. Lagoda's death. Defs. Ex. X (Bergery Dep.) at 59:9–60:12.

194.    One NSC set of documents was on "Altered Mental Status," which stated that (1) a person a person "may be confused, disoriented, combative, drowsy or partially or wholly unresponsive" and (2) a "Common Cause of Altered Mental Status" is "Seizures." Ex. F of Amrhein Decl. (NSC – Altered Mental Status) at PA2065–66.

195.    One NSC set of documents was on "Seizures," which stated (1) "Caused by many different conditions", "Brain's electrical activity out of balance", "results in altered mental status/uncontrolled muscular contractions, "Rarely life-threatening, but a serious emergency"; and (2) for "Emergency Care", "Prevent injury especially to head" and "Don't restrain." Ex. G of Amrhein Decl. (NSC – Seizures) at PA2083, 2093.

### Report and Testimony of Scott DeFoe[3]

196.    Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.

---

[3] Scott DeFoe has more than 28 years of law enforcement where he has "investigated over 100 use of force incidents as well as being personally involved in the use of lethal and less than lethal force incidents[,]" and "responded to thousands of calls for service and effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9, 11, 24–29.

197.    When an individual is having or had a seizure, police officers "should remain with the induvial until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7.

198.    Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7.

199.    Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7.

200.    Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11.

201.    Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15.

202.    Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14.

203. Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15.

204. Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16.

205. Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18.

206. Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19.

207. Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19.

208. Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21.

209. Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22.

196

210. Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.

211. In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3.

212. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6.

213. The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7.

214. Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14.

215. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19.

216. Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24.

217. With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and

should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16.

218.    The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25.

219.    It is even more difficult to breathe when lying face down in the prone position with persons applying increasing amounts of pressure to the back, neck, and legs of the individual in the prone position. Ex. I of Amrhein Decl. (DeFoe Dep.) at 226:7-14.

220.    Improper restraining techniques can block the flow of air into a person's lungs, contributing to a life-threatening condition known as positional or restraint asphyxia. Ex. I of Amrhein Decl. (DeFoe Dep.) at 226:15-21.

221.    The risk of potential asphyxia is compounded when a person in a medically vulnerable state becomes involved in a physical struggle with an officer or officers. Ex. I of Amrhein Decl. (DeFoe Dep.) at 226:22–227:2.

222.    Mr. Lagoda's risk of potential asphyxia was compounded when the Defendant Officers restrained him in his medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 227:3-11.

### Port Authority Changes Force Policies After Death of Mr. Lagoda

223.    Lt. Mark Bergery, Defendants' FRCP 30(b)(6) designee responsible for testifying regarding Port Authority Police Department policies, procedures, and training, testified that prior to and at the time of Mr. Lagoda's death, the Port Authority did not train its officers as to positional restraint, compressional asphyxiation, and duties to intercede. Defs. Ex. X (Bergery Dep.) at 23:12–24:2, 25:18-21.

224.    Port Authority Police training as to positional restraint, compressional asphyxiation did not begin until 2020, the year after Mr. Lagoda's death, despite decades of law enforcement knowledge about the substantial risks of improper restraining techniques and positional asphyxia. Defs. Ex. X (Bergery Dep.) at 23:12–24:2; Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–13.

225.    Officer Duran testified that he was not taught at the PAPD Police Academy how to restrain someone without putting pressure on the individual's back. Defs. Ex. N (Duran Dep.) at 17:6-7.

226.     Port Authority did not train its officers as to the unique vulnerability of an individual in the immediate wake of a seizure. Defs. Ex. GG (OAG Report) at 2, 12.

227.    The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted the following language <u>after</u> this incident involving Mr. [] Lagoda: 'Members of the Force are prohibited from sitting, kneeling, or standing on the subject's torso, (<u>chest, back, abdomen</u>), in a manner that compresses the diaphragm." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original); Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–20.

228.    The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted [new] language <u>after</u> this incident involving Mr. [] Lagoda" as to an PAPD officer's duty to intervene." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original), 17–18; Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–22.

**OAG Report and Findings**

229.    "On April 14, 2025, [the OAG's Special Investigation & Prosecutions Unit ("SIPU")] asserted jurisdiction over the matter"—two days after Mr. Lagoda's death. Exs. L of Amrhein Decl. (2019 Biennial Report of the OAG's SIPU) at 9.[4]

230.    The OAG released its report on April 9, 2020. Exs. J, K of Amrhein Decl. (Press Release)[5]; *see also* Defs. Ex. GG (OAG Report).

231.    The SIPU conducted the criminal investigation by looking to examine the criminal liability of the Port Authority and Defendant Officers in the death of Mr. Lagoda. Defs. Ex. GG (OAG Report) at 1 ("investigate any potential unlawful acts or omissions by law enforcement related to Mr. Lagoda's death."), 9–11.

232.    The OAG report determined that the use of force by Defendant Officers contributed to the death of Mr. Lagoda. Defs. Ex. GG (OAG Report) at 2, 12.

233.    The OAG's report found that the Port Authority did not train its officers as "the uniquely vulnerable condition of such individuals in the period immediately after the resolution of a seizure[.] Defs. Ex. GG (OAG Report) at 12.

234.    The OAG's report "revealed that emergency medical services were significantly delayed in responding to the scene due to PAPD's failure to have personnel available to escort [the] ambulance[,] and that "emergency medical treatment for Mr. Lagoda was delayed by as much as 20 minutes." Defs. Ex. GG (OAG Report) 2, 12.

---

[4] This court may take judicial notice. *Rynasko v. New York Univ.*, 63 F.4th 186, 191 n.4 (2d Cir. 2023) ("we may take judicial notice of documents from official government websites."); Fed. R. Evid. 201(d) (a "court may take judicial notice at any stage of the proceeding").

[5] Exhibit J of Amrhein Declaration was produced in June 2022 as a part of discovery. Exhibit K is the very same press release, but it was retrieved by undersigned on May 11, 2025, displays the NY Attorney General's updated website, and is available here: https://ag.ny.gov/press-release/2020/attorney-general-james-special-investigations-and-prosecutions-unit-releases-0. This court may take judicial notice. *Rynasko*, 63 F.4th 186 at 191 n.4; Fed. R. Evid. 201(d).

235.    The OAG's report attached as an exhibit the autopsy report, which found that Mr. Lagoda's manner of death was: "HOMICIDE." Defs. Ex. GG (OAG Report) at PA1864.

### Defendant Officers Are Sued as Individuals

236.    The Defendant Officers were sued in their individual capacity. Dkt. 1-1.

237.    Defendant Officers Bugiada, Duran, Papia, and Mezzacappa were served with the Amended Complaint at their personal residences. Ex. N of Amrhein Decl. (Affidavits of Service).

238.    Despite exhaustive efforts, Officer Joseph could not be served at any of the personal addresses identified by Plaintiffs. Counsel for the PA, having already entered an appearance in the matter, agreed to accept service for Officer Joseph. Ex. O of Amrhein Decl. (Officer Joseph Service Attempts and Acceptance of Service).

### Plaintiffs' State Court Filing

239.    In support of its Motion, Defs. Ex. H, Plaintiffs filed an Affidavit of Alexey V. Tarasov, Esq. Ex. P of Amrhein Decl. (Aff. of A. Tarasov).

Respectfully Submitted,

/s/ *J. Christopher Amrhein, Jr.*
J. Christopher Amrhein, Jr., Esq. (*pro hac vice*)
Michael J. Sullivan, Esq. (*pro hac vice*)
*Ashcroft Law Firm*
200 State Street, 7th Floor
Boston, MA 02109
P: 617-573-9400
camrhein@ashcroftlawfirm.com
msullivan@ashcroftlawfirm.com

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I, J. Christopher Amrhein, Jr., certify that this document is being filed through the ECF system on May 12, 2025, which serves counsel for Defendants who are registered participants as identified on the ECF docket.

/s/ *J. Christopher Amrhein, Jr.*
J. Christopher Amrhein, Jr.