UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
ALEXEY V. TARASOV, ESQ., Administrator of the
Estate of EVGENIY LAGODA, Deceased, and
GRIGORY TIKHOPLAV,

                              Plaintiffs,

     -against-

PORT AUTHORITY OF NEW YORK AND
NEW JERSEY, and PORT AUTHORITY OF NEW
YORK AND NEW JERSEY POLICE DEPARTMENT
a/k/a PORT AUTHORITY POLICE DEPARTMENT
a/k/a PAPD, PAPD OFFICER MICHAEL BUGIADA,
PAPD OFFICER ROBERT JOSEPH, PAPD OFFICER
JONATHAN PAPIA, PAPD OFFICER PAUL
MEZZACAPPA, and PAPD OFFICER JONATHAN
DURAN,

                        Defendants.
------------------------------------------------------------------------X

Case No.: 21-cv-6226 (NRB)

**DEFENDANTS' REPLY TO
PLAINTIFFS' REPONSES TO
DEFENDANTS' RULE 56.1
STATEMENT AND PLAINTIFFS'
STATEMENT OF ADDITIONAL
FACTS**

Defendants, Port Authority of New York and New Jersey, (the "Port Authority")[1], Port

Authority Officer Michael Bugiada, Port Authority Officer Robert Joseph, Port Authority Officer

Jonathan Papia, Port Authority Officer Paul Mezzacappa, and Port Authority Officer Jonathan

Duran, (hereinafter referred to collectively as "Defendants"), by the undersigned attorneys for the

Port Authority Law Department, submit the following statement of material facts pursuant to Local

Rule 56.1 of the United States District Court for the Southern District of New York, in Reply to

Plaintiffs' Reponses to Defendants' Rule 56.1 Statement of Material Facts and Plaintiffs'

Additional Rule 56.1 Statement of Material Facts filed on May 12, 2025.

---

[1] The Port Authority of New York and New Jersey Police Department a/k/a Port Authority Police Department a/k/a
PAPD was also named as Defendant in this matter; however, the Port Authority Police Department does not exist as
a separate entity that is subject to suit.

## <u>REPLY TO PLAINTIFFS' RESPONSES TO DEFENDANTS' RULE 56.1 STATEMENT</u>

1.      Plaintiffs' "responses" to Defendants' Rule 56.1 Statement largely constitute argumentative characterizations rather than appropriate disputes of material fact. Throughout their responses, Plaintiffs repeatedly insert the same lengthy block of text containing opinions from their expert witness, conclusions rather than factual statements, and legal arguments. These formulaic responses fail to address the specific factual assertions contained in Defendants' Rule 56.1 Statement.

2.      Plaintiffs' repeated characterization that Lagoda was "experiencing a continuous medical emergency where he was in a uniquely vulnerable state" (*e.g.*, responses to paragraphs 12-20) constitutes an opinion rather than a fact. The contemporaneous observations of multiple eyewitnesses, including medical professionals who were present during the incident, consistently described Lagoda's conduct as violent, aggressive. (Defs. Ex. S (Wright-Reid Dep.) at 28:23-29:20; Ex. P (Ingleton Dep.) at 66:6-23; Ex. O (Swinney Dep.) at 37:13-25).

3.      Contrary to Plaintiffs' assertions, the evidence demonstrates that Officer Bugiada was specifically informed of Lagoda's previous seizure but was also informed of his current combative state when arriving on the scene. Officer Bugiada's actions were in direct response to the aggressive behavior Lagoda was exhibiting at that moment, including charging at Officer Bugiada with clenched fists. (Defs. Ex. J (Bugiada Dep.) at 113:24-114:8).

4.      Plaintiffs' responses repeatedly mischaracterize the sworn testimony of witnesses. For example, in response to paragraph 33, Plaintiffs claim Mr. Ingleton "qualified his testimony," but the full testimony clearly confirms that Lagoda attacked Officer Bugiada. Similarly, Plaintiffs selectively quotes Ms. Wright-Reid's testimony while ignoring her clear statements about Lagoda's aggressive behavior.

5.      Plaintiffs' assertion that Officer Bugiada "applied pressure downward on the upper back" of Lagoda (*e.g.*, responses to paragraphs 51-53) is not supported by the evidence cited and contradicts the testimony of multiple officers who were present during the restraint. The evidence establishes that at no point was Lagoda's airway restricted or compressed. (Defs. Ex. L (Joseph Dep.) at 86:5-87:10).

6.      The uncontested medical evidence establishes that there was no "direct connection between the physical injuries described and his demise, "his" meaning Mr. Lagoda." (Defs. Ex. BB (Mazarin Dep.) at 137:24-138:6). Plaintiffs' attempt to dispute this medical finding by citing their expert's opinion does not create a genuine issue of material fact.

## REPLY TO PLAINTIFFS' ADDITIONAL STATEMENT OF FACTS

### Mr. Lagoda's Clean Bill of Heath Prior to His Death

117.     Mr. Lagoda, as a requirement of his employment, underwent numerous medical evaluations to determine if he was fit to work. Ex. A of Amrhein Decl. (Mr. Lagoda's Pre-Death Medical Records and Translations).

**DEFENDANTS' RESPONSE:**

**Disputed. While Lagoda's pre-death medical records may not show a diagnosed seizure disorder, the post-mortem medical evidence conclusively established that Lagoda had mesial temporal sclerosis (MTS), described by Dr. Sperry as "the most common of the focal epilepsies" which Lagoda "had been living with for years prior to his death." (Defs. Ex. DD (Sperry Dep.) at 95:10-97:24, 100:9-21). Dr. Sperry further testified that Lagoda's MTS was undiagnosed and untreated, and that he was taking no medication for seizures. (Defs. Ex. DD (Sperry Dep.) at 98:5-99:16, 102:1-25, 193:17-194:12).**

118.     Mr. Lagoda's pre-death medical records show that he had no medical history of

3

seizures. Ex. A of Amrhein Decl. (Mr. Lagoda's Pre-Death Medical Records and Translations).

**DEFENDANTS' RESPONSE:**

**Disputed. While Lagoda's pre-death medical records may not show a diagnosed seizure disorder, the post-mortem medical evidence conclusively established that Lagoda had mesial temporal sclerosis (MTS), described by Dr. Sperry as "the most common of the focal epilepsies" which Lagoda "had been living with for years prior to his death." (Defs. Ex. DD (Sperry Dep.) at 95:10-97:24, 100:9-21). Dr. Sperry further testified that Lagoda's MTS was undiagnosed and untreated, and that he was taking no medication for seizures. (Defs. Ex. DD (Sperry Dep.) at 98:5-99:16, 102:1-25, 193:17-194:12).**

119.    Mr. Lagoda's pre-death medical records show that he had no medical history of preexisting conditions. Ex. A of Amrhein Decl. (Mr. Lagoda's Pre-Death Medical Records and Translations).

**DEFENDANTS' RESPONSE:**

**Disputed. While Lagoda's pre-death medical records may not show a diagnosed seizure disorder, the post-mortem medical evidence conclusively established that Lagoda had mesial temporal sclerosis (MTS), described by Dr. Sperry as "the most common of the focal epilepsies" which Lagoda "had been living with for years prior to his death." (Defs. Ex. DD (Sperry Dep.) at 95:10-97:24, 100:9-21). Dr. Sperry further testified that Lagoda's MTS was undiagnosed and untreated, and that he was taking no medication for seizures. (Defs. Ex. DD (Sperry Dep.) at 98:5-99:16, 102:1-25, 193:17-194:12).**

120.    Mr. Lagoda had never been diagnosed with MTS, diagnosed with a seizure disorder, or prescribed seizure medication. Ex. A of Amrhein Decl. (Mr. Lagoda's Pre-Death Medical Records and Translations).

4

**DEFENDANTS' RESPONSE:**

**Disputed. While Lagoda's pre-death medical records may not show a diagnosed seizure disorder, the post-mortem medical evidence conclusively established that Lagoda had mesial temporal sclerosis (MTS), described by Dr. Sperry as "the most common of the focal epilepsies" which Lagoda "had been living with for years prior to his death." (Defs. Ex. DD (Sperry Dep.) at 95:10-97:24, 100:9-21). Dr. Sperry further testified that Lagoda's MTS was undiagnosed and untreated, and that he was taking no medication for seizures. (Defs. Ex. DD (Sperry Dep.) at 98:5-99:16, 102:1-25, 193:17-194:12).**

### Mr. Lagoda's Substantially Limited Understanding of English

121.    Plaintiff Tikhoplav testified that his son (Mr. Lagoda) was not fluent in English, and that Mr. Lagoda's command of the English language, if any, was entirely in the context of what was required of Mr. Lagoda in his employment. Defs. Ex. V (Tikhoplav Dep. pt. 2) at 174:7:23.

**DEFENDANTS' RESPONSE:**

**Disputed. Lagoda's father testified that his son "had the command of the English - technical English language" and "He was able to communicate. He was not completely fluent in the English language, but he could understand. He could carry a conversation." (Defs. Ex. V (Tikhoplav Dep.) at 174:3-23). This testimony demonstrates that Lagoda possessed sufficient English language skills to understand basic universal commands.**

122.    Mr. Lagoda's English capabilities were limited to being able to meet the requirements of his employment, including comprehending his work engineering manual. Defs. Ex. V (Tikhoplav Dep. pt. 2) at 174:7:23.

**DEFENDANTS' RESPONSE:**

**Disputed. Lagoda's father testified that his son "had the command of the English - technical English language" and "He was able to communicate. He was not completely fluent in the English language, but he could understand. He could carry a conversation." (Defs. Ex. V (Tikhoplav Dep.) at 174:3-23). This testimony demonstrates that Lagoda possessed sufficient English language skills to understand basic universal commands.**

### Mr. Lagoda's Medical Emergency

123.    Mr. Lagoda suffered a seizure while onboard the taxiing JetBlue Flight 659. Defs. Ex. P (Ingleton Dep.) at 28:9-14; Defs. Ex. Q (Leandro Dep.) at 22:9-19; Defs. Ex. S (Wright Reid Dep.) at 16:10–17:18.

**DEFENDANTS' RESPONSE:**

**Admitted to the extent this information was reported to the Port Authority.**

124.    While Mr. Lagoda was experiencing the seizure, he was observed "foaming from the mouth, and like his eyes were rolled in the back of his head", Defs. Ex. O (Swinney Dep.) at 20:21-23.

**DEFENDANTS' RESPONSE:**

**Disputed to the extent that the Port Authority was not on scene at the time Lagoda allegedly experienced a seizure and by the time Port Authority officers arrived on scene, they encountered a violent and aggressive individual [Lagoda] who was assaulting crew members and passengers. (Ex. J of Alterman Dec., Bugiada Dep. at 55:22-56:18, 111:13-112:23; Ex. O, Swinney Dep. at 46:24-47:23).**

6

125.    Mr. Lagoda was removed from his seat while still actively seizing, and was placed in the aft galley while he was observed to still be in the midst of a seizure. *See* Plaintiffs' Response to ¶ 10, *supra*.

**DEFENDANTS' RESPONSE:**

**Disputed to the extent that the Port Authority was not on scene at the time Lagoda allegedly experienced a seizure and by the time Port Authority officers arrived on scene, they encountered a violent and aggressive individual [Lagoda] who was assaulting crew members and passengers. (Ex. J of Alterman Dec., Bugiada Dep. at 55:22-56:18, 111:13-112:23; Ex. O, Swinney Dep. at 46:24-47:23).**

126.    Witnesses testified that, once the seizure subsided, Mr. Ladoga was noticeably confused, disoriented, agitated, and combative. Defs. Ex. O (Swinney Dep.) at 81:20-24, 85:7-17 (testifying testified in the affirmative that he was providing "treatment [for] a man (Mr. Lagoda) having a serious medical situation" and that he tried to calm down Mr. Lagoda but he was "disoriented and confused and definitely out of it").

**DEFENDANTS' RESPONSE:**

**Disputed to the extent that the Port Authority was not on scene at the time Lagoda allegedly experienced a seizure and by the time Port Authority officers arrived on scene, they encountered a violent and aggressive individual [Lagoda] who was assaulting crew members and passengers. (Ex. J of Alterman Dec., Bugiada Dep. at 55:22-56:18, 111:13-112:23; Ex. O, Swinney Dep. at 46:24-47:23).**

127.    One witness, nurse Nathana Wright-Reid, who responded to the call for assistance from any on-board medical professionals, testified that even though Mr. Lagoda struck her in his state of confusion and disorientation, she remained in the aft galley so she could help Mr. Lagoda

7

because it was an on-going, continuous medical emergency. Defs. Ex. S (Wright-Reid Dep.) at 64:10–65:6.

**DEFENDANTS' RESPONSE:**

**Disputed. Ms. Wright-Reid testified that Lagoda hit her in the stomach. (Ex. S of Alterman Dec., at 64:10-11).**

128.    From "the initial call [alerting the captain of Mr. Lagoda's medical event] to the arrival at the gate was within 5 minutes." Ex. B of Amrhein Decl. (Capt. Bengtson FCIR) at PA1362.

**DEFENDANTS' RESPONSE:**

**Disputed. Captain Bengston testified that his personal notes contained the specific time the plane pushed back from the gate and the time it returned. (Ex. B of Alterman Dec., at 57:8-58:14).**

129.    PAPD Officer Williams said over the patrol radio to Officer Bugiada "Gate 25, uh, check that, Gate 2-0…aircraft returning to Gate, male having a seizure onboard" to which Officer Bugiada replied "Copy. Gate 20", Defs. Ex. JJ (Analysis of Radio Transmissions) at 1405, and two minutes later Officer Williams said over the patrol radio to Officer Bugiada "Male 40s, seizure, bleeding from mouth" to which Officer Bugiada replied "Copy." *Id.* at 1408.

**DEFENDANTS' RESPONSE:**

**Admitted.**

130.    Officer Bugiada was at the Gate 20 when the plane arrived, immediately boarded the plane, and was informed by a flight attendant that Mr. Lagoda had just suffered a seizure and was disoriented and combative." Defs. Ex. J (Bugiada Dep.) at 69:2-17; Defs. Ex. JJ (Analysis of Radio Transmissions) at 1405.

8

**DEFENDANTS' RESPONSE:**

**Disputed.  The radio calls state: "male, seizures, okay."  (Alterman Dec., Ex. JJ, at 1405).**

131.    When Officer Bugiada interacted with Mr. Lagoda, Mr. Lagoda was in the immediate wake of the seizure. Defs. Ex. DD (Sperry Dep.) at 174:19–175:15; Defs. Ex. J (Bugiada Dep.) at 69:2-17.

**DEFENDANTS' RESPONSE:**

**Disputed to the extent this paragraph mischaracterizes the evidence regarding Lagoda's condition at the time Officer Bugiada arrived. The evidence shows that Lagoda's seizure had ended, and he was exhibiting aggressive and combative behavior that was threatening the safety of others on the aircraft. (Defs. Ex. O (Swinney Dep.) at 41:13-42:10; Ex. Q (Leandro Dep.) at 67:13-68:1, 70:21-14; Ex. T (Miller Dep.) at 56:24-57:9). Further, this statement reflects opinions rather than facts. The reference to Lagoda being "in the immediate wake of the seizure" is not a factual statement but a characterization by Plaintiffs' experts. The evidence shows that multiple witnesses, including medical professionals on scene, perceived Lagoda as acting aggressively and violently towards Officer Bugiada.**

132.    Officer Bugiada "failed to initially determine that Mr. [] Lagoda was experiencing a medical emergency and act reasonably and appropriately." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.

**DEFENDANTS' RESPONSE:**

**Disputed to the extent this paragraph mischaracterizes the evidence regarding Lagoda's condition at the time Officer Bugiada arrived. The evidence shows that Lagoda's seizure had ended, and he was exhibiting aggressive and combative behavior that was**

9

threatening the safety of others on the aircraft. (Defs. Ex. O (Swinney Dep.) at 41:13-42:10; Ex. Q (Leandro Dep.) at 67:13-68:1, 70:21-14; Ex. T (Miller Dep.) at 56:24-57:9).

133. Officer Bugiada "failed to use de-escalation and defusing techniques during [his] interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9.

**DEFENDANTS' RESPONSE:**

**Disputed to the extent this paragraph mischaracterizes the evidence regarding Lagoda's condition at the time Officer Bugiada arrived. The evidence shows that Lagoda's seizure had ended, and he was exhibiting aggressive and combative behavior that was threatening the safety of others on the aircraft. (Defs. Ex. O (Swinney Dep.) at 41:13-42:10; Ex. Q (Leandro Dep.) at 67:13-68:1, 70:21-14; Ex. T (Miller Dep.) at 56:24-57:9).**

134. Officer Bugiada punched Mr. Lagoda in the face, after which Lagoda went to the ground. Defs. Ex. J (Bugiada Dep.) at 117:13-21.

**DEFENDANTS' RESPONSE:**

**Disputed as this paragraph mischaracterizes the evidence regarding Officer Bugiada's actions. Officer Bugiada only used a reasonable amount of force after Lagoda charged at him with clenched fists. (Defs. Ex. J (Bugiada Dep.) at 113:24-114:8). The force used was in direct response to Lagoda's aggressive actions and was limited to what was reasonable and necessary to control the situation. Alterman Dec., Ex. 1 (Monaghan Dep. at 321:4-322:12).**

135. Officer Bugiada punched Mr. Lagoda four more times in the face when Mr. Lagoda was on the ground. Defs. Ex. J (Bugiada Dep.) at 63:19–64:2.

**DEFENDANTS' RESPONSE:**

**Disputed as this paragraph mischaracterizes the evidence regarding Officer Bugiada's actions. Officer Bugiada only used a reasonable amount of force after Lagoda charged at him with clenched fists. (Defs. Ex. J (Bugiada Dep.) at 113:24-114:8). The force used was in direct response to Lagoda's aggressive actions and was limited to what was reasonable and necessary to control the situation. Alterman Dec., Ex. Z (Monaghan Dep. at 321:4-322:12).**

136.    Officer Bugiada was then on his knees straddling a prone Mr. Lagoda and applying pressure to his shoulders. Defs. Ex. J (Bugiada Dep.) at 65:13–66:11.

**DEFENDANTS' RESPONSE:**

**Disputed as this paragraph mischaracterizes the evidence regarding Officer Bugiada's actions. Officer Bugiada only used a reasonable amount of force after Lagoda charged at him with clenched fists. (Defs. Ex. J (Bugiada Dep.) at 113:24-114:8). The force used was in direct response to Lagoda's aggressive actions and was limited to what was reasonable and necessary to control the situation. Alterman Dec., Ex. Z (Monaghan Dep. at 321:4-322:12).**

137.    Officers Joseph, Mezzacappa, Papia, and Duran also responded to the scene and physically engaged Mr. Lagoda along with Officer Bugiada. Defs. Ex. GG (OAG Report) at 5.

**DEFENDANTS' RESPONSE:**

**Disputed as the paragraph presents an incomplete and misleading account of the responding officers' response. The evidence shows that when the responding officers arrived, they encountered an active fight between Officer Bugiada and Lagoda, who was actively resisting. (Defs. Ex. K (Papia Dep.) at 92:19-93:5; Ex. L (Joseph Dep.) at 85:8-15).**

11

138.    When the Defendant Officers reached the back of the aircraft, "all . . . stated that they observed Officer Bugiada sitting on top of Mr. Lagoda (who was face down)[.]" Defs. Ex. GG (OAG Report) at 6.

**DEFENDANTS' RESPONSE:**

**Disputed. The assertion that all officers "stated that they observed Officer Bugiada sitting on top of Mr. Lagoda" mischaracterizes the evidence. Officer Joseph specifically testified that at no point did he observe any officer on top of Lagoda during the restraining process, nor did he observe any officer apply pressure in a way that would restrict Lagoda's airway. (Defs. Ex. L (Joseph Dep.) at 86:5-87:10).**

139.    Officer Joseph testified that when he physically engaged Mr. Lagoda, "He was face down on his stomach more towards his left side a little bit." Defs. Ex. L (Joseph Dep.) at 42:9-12.

**DEFENDANTS' RESPONSE:**

**Disputed. Officer Joseph testified that Lagoda was not entirely face down at any point. Rather, Lagoda was on his chest with his head turned to one side: "At no point did I see Mr. Lagoda on his stomach face down. It was always with his head to one side or the other, but it was never strictly prone with his nose directly on the ground. That was not the case." (Defs. Ex. L (Joseph Dep.) at 55:1-9).**

140.    Officer Mezzacappa testified that Mr. Lagoda prone on the ground face down. Defs. Ex. M (Mezzacappa Dep.) at 45:7-16.

**DEFENDANTS' RESPONSE:**

**Disputed. Officer Mezzacappa testified that Lagoda was only lying on his stomach as the officers were applying handcuffs.   (Defs. Ex. M (Mezzacapa Dep.) at 53: 13-15 and Ex. L (Joseph Dep.) at 55:1-9).**

141.    Officer Papia punched Mr. Lagoda twice while Defendant Officers restrained Mr. Lagoda in a prone position. Defs. Ex. K (Papia Dep.) at 53:23-54:11, 56:8-18.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph mischaracterizes the evidence regarding the restraint of Lagoda. The evidence shows that the officers used only the force necessary to gain control of a combative individual who posed a threat to others. Once Lagoda was successfully restrained, the officers immediately rolled him to his side. (Defs. Ex. K (Papia Dep.) at 92:19-93:5; Ex. L (Joseph Dep.) at 85:8-15).**

142.    Officer Joseph testified that, in using force to restrain an individual like Mr. Lagoda, an officer uses his or her own body weight to try and gain physical leverage. Defs. Ex. L (Joseph Dep.) at 41:18–42:6.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph mischaracterizes the evidence regarding the restraint of Lagoda. The evidence shows that the officers used only the force necessary to gain control of a combative individual who posed a threat to others. Once Lagoda was successfully restrained, the officers immediately rolled him to his side. (Defs. Ex. K (Papia Dep.) at 92:19-93:5; Ex. L (Joseph Dep.) at 85:8-15).**

13

143.    The Defendant Officers restrained Mr. Lagoda in a prone position. Defs. Ex. L (Joseph Dep.) at 42:9-12; Defs. Ex. M (Mezzacappa Dep.) at 45:7-16.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph mischaracterizes the evidence regarding the restraint of Lagoda. The evidence shows that the officers used only the force necessary to gain control of a combative individual who posed a threat to others. Once Lagoda was successfully restrained, the officers immediately rolled him to his side. (Defs. Ex. K (Papia Dep.) at 92:19-93:5; Ex. L (Joseph Dep.) at 85:8-15), Ex. M (Mezzacapa Dep.) at 53: 9-15.**

144.    Officer Papia observed other Defendant Officers still applying pressure to Mr. Lagoda even after he was handcuffed. Defs. Ex. K (Papia Dep.) at 58:10-13.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph mischaracterizes the evidence regarding the restraint of Lagoda. The evidence shows that the officers used only the force necessary to gain control of a combative individual [Lagoda] who posed a threat to his own safety as well as the officers' safety. (Defs. Ex. K (Papia Dep.) at 60:4-9).**

145.    "[W]ithin a minute or so of Mr. Lagoda's having been handcuffed" Defendant Officers noticed that the Mr. Lagoda's neck was turning blue. Defs. Ex. GG (OAG Report) at 6.

**DEFENDANTS' RESPONSE:**

**Admitted to the extent this is a statement from the NY OAG Report.**

146.    Officer Papia testified that when the officers discovered Lagoda's neck was blue, Officer Joseph immediately checked for a pulse. Defs. Ex. K (Papia Dep.) at 60:21-61:8.

**DEFENDANTS' RESPONSE:**

**Admitted.**

147. When Officer Joseph checked for a pulse, Mr. Lagoda had no pulse. Defs. Ex. L (Joseph Dep.) at 58:3-5.

**DEFENDANTS' RESPONSE:**

**Admitted. This statement demonstrates the officers' response to Lagoda's medical episode. The evidence shows that the officers promptly initiated CPR and called for an AED when they observed Lagoda's medical distress. (Defs. Ex. K (Papia Dep.) at 60:21-61:8, 61:5-21; Ex. L (Joseph Dep.) at 91:15-92:11).**

148. Defendant Officers initiated CPR because Mr. Lagoda had no pulse. Defs. Ex. M (Mezzacappa Dep.) at 56:10-21.

**DEFENDANTS' RESPONSE:**

**Admitted. This statement demonstrates the officers' response to Lagoda's medical episode. The evidence shows that the officers promptly initiated CPR and called for an AED when they observed Lagoda's medical distress. (Defs. Ex. K (Papia Dep.) at 60:21-61:8, 61:5-21; Ex. L (Joseph Dep.) at 91:15-92:11).**

149. Defendant Officers called for an AED after CPR was initiated, and it was retrieved by Officer Bugiada. Defs. Ex. J (Bugiada Dep.) at 80:22–81:11.

**DEFENDANTS' RESPONSE:**

**Admitted. This statement demonstrates the officers' response to Lagoda's medical episode. The evidence shows that the officers promptly initiated CPR and called for an AED when they observed Lagoda's medical distress. (Defs. Ex. K (Papia Dep.) at 60:21-61:8, 61:5-21; Ex. L (Joseph Dep.) at 91:15-92:11).**

150. An AED device requires a detectable heartbeat in order to trigger a shock, and since Mr. Lagoda had no heartbeat, the AED did not trigger a shock. Defs. Ex. GG (OAG Report) at 6;

15

Defs. Ex. K (Papia Dep.) at 63:11-12 ("If [the AED] does not detect a rhythm, it does not produce a shock.").

**DEFENDANTS' RESPONSE:**

**Admitted. This statement demonstrates the officers' response to Lagoda's medical episode. The evidence shows that the officers promptly initiated CPR and called for an AED when they observed Lagoda's medical distress. (Defs. Ex. K (Papia Dep.) at 60:21-61:8, 61:5-21; Ex. L (Joseph Dep.) at 91:15-92:11).**

**Significant and Preventable Delay in Medical Treatment for Mr. Lagoda**

**DEFENDANTS' RESPONSE:**

**Paragraphs 151-165 are disputed to the extent these paragraphs suggest that any delay in medical treatment was a proximate cause of Lagoda's death. The evidence reveals that once Lagoda was in cardiac arrest, the officers immediately initiated life-saving measures; therefore, there was no delay in medical treatment. (Defs. Ex. NN (Mezzacappa Aff.) at ¶¶ 15-19; Ex. K (Papia Dep.) at 61:5-21; Ex. L (Joseph Dep.) at 91:15-92:11). Moreover, the Medical Examiner determined the cause of death to be "sudden death following grand mal seizure of undetermined etiology complicated by post-ictal excited delirium," not a delay in medical treatment. (Defs. Ex. GG (OAG Report) at PA1864).**

151.    "Emergency medical treatment for Mr. Lagoda was delayed by as much as 20 minutes" because the EMS ambulance "which had responded to the PAPD police command building on the original report of a passenger having a seizure – was still waiting for a police escort to the aircraft. (Apparently, even before the ambulance had shown up, all the officers assigned to the headquarters had already rushed to the aircraft to assist Officer Bugiada, leaving none behind to serve as escort for the ambulance.) At about 10:36 pm, officers on-scene twice called again over

16

the radio for an ambulance. It was not until about 10:50 pm that EMS, with escort, had made it to the aircraft. By this point, a stair truck had been set up at the back of the plane, allowing the two Emergency Medical Technicians ("EMTs") to enter directly into the rear galley and make contact with Mr. Lagoda at 10:55 pm." Defs. Ex. GG (OAG Report) at 6–7, 12.

**DEFENDANTS' RESPONSE:**

**Admitted only to the extent that these statements are from the NY OAG Report. However, the Defendants dispute any findings suggesting that a delay in EMTs' arrival was attributable to the Port Authority.**

152.   Officer Duran testified that "[he] was supposed to stay behind and wait for the escort" but "[he] decided to proceed to assist Officer Bugiada." Defs. Ex. N (Duran Dep.) at 75:12-15; 75:21-22.

**DEFENDANTS' RESPONSE:**

**Admitted to the extent that Officer Duran's post was to escort the ambulance. However, once Bugiada put over a call for help, Officer Duran was required to assist. (Alterman Dec., Ex. N at 45:3-13; 54:13-55:2).**

153.   Paramedic Hodges stated that "we were told to respond to [the police building for escort[,] [w]e went into the vehicle, started responding to [the police building for escort.]" Defs. Ex. KK (Hodges Dep.) at 2.

**DEFENDANTS' RESPONSE:**

**Disputed. Paramedic Hodges was not deposed in this case. In the interview with the OAG, Hodges stated that they were using the bathroom at 7-Eleven when they received the call. (Alterman Dec., Ex. KK at PA1508).**

154.   Paramedic Hodges stated that "we waited there for a while" because "there was no unit there" for escort. Defs. Ex. KK (Hodges Dep.) at 2.

**DEFENDANTS' RESPONSE:**

**Disputed. Paramedic Hodges was not deposed in this case. In the interview with the OAG, Hodges stated that they were using the bathroom at 7-Eleven when they received the call. Hodges further stated that they only waited "roughly 10 minutes". (Alterman Dec., Ex. KK at PA1508).**

155.   The ambulance driver, Jerry Zander, stated that they were waiting for escort "anywhere from 10 to 15 minutes." Defs. Ex. LL (Zander Dep.) at 2.

**DEFENDANTS' RESPONSE:**

**Disputed. Zander was not deposed in this case. In the interview with the OAG, Zander stated that they waited for an escort for approximately 10 to 15 minutes. (Alterman Dec., Ex. LL at PA1522).**

156.   EMS unit was alerted of the "male having a seizure" at 10:22 PM, Defs. Ex. GG (OAG Report) at 6–7.

**DEFENDANTS' RESPONSE:**

**Admitted.**

157.   An ambulance proceeded posthaste to the police building for escort but there was no unit there and they had to wait there for a while. Defs. Ex. KK (Hodges Dep.) at 2.

**DEENDANTS' RESPONSE:**

**Disputed. Paramedic Hodges was not deposed in this case. In the interview with the OAG, Hodges stated that they were using the bathroom at 7-Eleven when they received the**

18

**call. Hodges further stated that they only waited "roughly 10 minutes". (Alterman Dec., Ex. KK at PA1508).**

158.    At approximately 10:36 officers aboard the JetBlue flight radioed again requesting an ambulance. Defs. Ex. GG (OAG Report) at 6–7.

**DEFENDANTS' RESPONSE:**

**Admitted only to the extent this is a statement in the OAG report.**

159.    At 10:40 PM, EMS stated to the radio dispatcher "we've been at 2-6-9 [location for escort]. They just have no personnel here." Defs. Ex. GG (OAG Report) at Ex. 2 at 9.

**DEFENDANTS' RESPONSE:**

**Admitted only to the extent this is a statement in the OAG report.**

160.    At 10:41 PM, Officer Duran stated over the JFK Patrol Radio "Kennedy, 92, do you need me to uh, respond back to 6-9 [location for escort], for uh, the Bus [ambulance]?" Defs. Ex. GG (OAG Report) at Ex. 2 at 10 (emphasis added).

**DEFENDANTS' RESPONSE:**

**Disputed. The OAG report does not contain this radio transmission at the cited page.**

161.    EMS did not arrive at the aircraft until approximately 10:50 PM. Defs. Ex. GG (OAG Report) at 7.

**DEFENDANTS' RESPONSE:**

**Admitted to the extent this statement is contained in the summary of the OAG's report.**

162.    EMTs first made contact with Mr. Lagoda at 10:55 PM. Defs. Ex. GG (OAG Report) at 7.

**DEFENDANTS' RESPONSE:**

**Admitted to the extent this statement is contained in the summary of the OAG's report.**

163.    Mr. Lagoda "was pulseless electrical activity" when EMTs arrived. Defs. Ex. KK (Hodges Dep.) at 8.

**DEENDANTS' RESPONSE:**

**Disputed. Paramedic Hodges was not deposed in this case. In the interview with the OAG, Hodges stated "he's in asystole, the entire arrest. There was no change in the rhythm, nothing." (Alterman Dec., Ex. KK at 8).**

164.    At approximately 11:10 PM the ambulance headed for Jamaica (Queens) Hospital and arrived at 11:25 PM and. Defs. Ex. GG (OAG Report) at 7; *supra* ¶ 68.

**DEFENDANTS' RESPONSE:**

**Admitted to the extent this statement is contained in the summary of the OAG's report.**

165.    Mr. Lagoda was pronounced dead at 11:35 PM, 10 minutes after arriving at the hospital. *See supra* ¶ 68.

**DEFENDANTS' RESPONSE:**

**Admitted to the extent this statement is contained in the summary of the OAG's report.**

### Autopsies of Mr. Lagoda

166.    New York medical examiner, after conducting the first autopsy, listed the manner of death as homicide, citing "physical struggle/altercation with blunt impacts" as a "significant condition." Defs. Ex. GG (OAG Report) at PA1864.

**DEFENDANTS' RESPONSE:**

**Disputed. The Medical Examiner's report found that sudden death following grand mal seizure of undetermined etiology with post-ictal excited delirium was the leading cause of death. (Alterman Dec., Ex. GG (OAG Report) at PA1863).**

167.    The anatomic diagnoses noted "multiple blunt impacts to head, torso, and extremities with multiple abrasions, contusions and lacerations." Defs. Ex. GG (OAG Report) at PA1863.

**DEFENDANTS' RESPONSE:**

**Disputed as this paragraph mischaracterizes the medical evidence regarding Lagoda's cause of death. The Medical Examiner's report noted that the blunt force injuries to Lagoda's face and body attributable to the officers were "ultimately superficial; none of them resulted in any skull or facial fractures, and they caused no injury to the brain." (Defs. Ex. GG (OAG Report) at PA1809-PA1810).**

168.    A second autopsy was conducted in Russia, which discovered Mr. Lagoda had suffered fractured ribs. Ex. C of Amrhein Decl. (Russian Autopsy and Translation).

**DEFENDANTS' RESPONSE:**

**Admitted to the extent that the second autopsy was conducted in Russa months later and allegedly noted fractured ribs.**

21

169.   Mr. Lagoda's fractured ribs were as a result of the significant use of force by the Defendant Officers, not from the CPR administered by the Defendant Officers after Mr. Lagoda was discovered to be without a pulse and not breathing. Defs. Ex. DD (Sperry Dep.) at 187.

**DEFENDANTS' RESPONSE:**

**Disputed. The assertion that "Mr. Lagoda's fractured ribs were as a result of the significant use of force by the Defendant Officers" is not supported by the evidence cited and contradicts the Medical Examiner's findings. The Medical Examiner found that these injuries "would not have been sufficient in and of themselves to cause death, or to contribute to death, in an otherwise healthy person." (Defs. Ex. GG (OAG Report) at PA1810).**

170.   Autopsy photos showed substantial bruising to Mr. Lagoda's head and neck area consistent with the substantial amount of force used by the Defendant Officers while improperly restraining Mr. Lagoda while in the prone position, as well as strikes by the Defendant Officers shod feet and knees. Defs. Ex. DD (Sperry Dep.) at 187, 203; Ex. D of Amrhein Decl. (Autopsy Photos).

**DEFENDANTS' RESPONSE:**

**Disputed. This assertion mischaracterizes the medical evidence regarding Lagoda's cause of death. The Medical Examiner's report noted that the blunt force injuries to Lagoda's face and body were "ultimately superficial; none of them resulted in any skull or facial fractures, and they caused no injury to the brain." (Defs. Ex. GG (OAG Report) at PA1809-PA1810).**

22

**Report and Testimony of Dr. Kris Sperry**

**DEFENDANTS' RESPONSE:**

**Paragraphs 171-186 are disputed as they present the opinions of Plaintiffs' expert witness as established facts. These opinions are contradicted by the findings of the Medical Examiner and the OAG investigation, which concluded that Lagoda's death resulted from his underlying medical conditions rather than from any force used by the officers. (Defs. Ex. GG (OAG Report) at PA1809-PA1810).**

171.    Mr. Lagoda, while being confronted by Officer Bugiada, was experiencing a continuous medical emergency where he was in a uniquely vulnerable state while he was in the immediate wake of a seizure and was experiencing "severe disturbances in behavior and thought processes", including "confusion, disorientation, fear, agitation, and aggression." Defs. Ex. DD (Sperry Dep.) at 174:19–175:15.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph improperly asserts the opinions of Plaintiffs' expert witness as established facts. Defendants' experts opined that the force used was reasonable and necessary under the circumstances and did not cause Lagoda's death. (Ex. AA of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan; Ex. Z, Monaghan Dep. at 321:4-323:13; Ex. CC of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. BB, Mazarin Dep. at 151:24-152:15).**

172.    While being restrained, Mr. Lagoda was suffering and trying to alleviate himself from the hurt and from the struggle. Defs. Ex. DD (Sperry Dep.) at 196–97.

23

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph improperly asserts the opinions of Plaintiffs' expert witness as established facts. Defendants' experts opined that the force used was reasonable and necessary under the circumstances and did not cause Lagoda's death. (Ex. AA of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan; Ex. Z, Monaghan Dep. at 321:4-323:13; Ex. CC of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. BB, Mazarin Dep. at 151:24-152:15).**

173.   The deep contusions on Mr. Lagoda's upper back and base of neck are consistent with "great pressure [] exerted on those areas when Mr. Lagoda was restrained prone" which "would have the effect of pushing the neck and lower head and face into the floor, distorting the upper airway and inhibiting normal air exchange"—*i.e.*, positional asphyxiation. Defs. Ex. DD (Sperry Dep.) at 202.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph improperly asserts the opinions of Plaintiffs' expert witness as established facts. Defendants' experts opined that the force used was reasonable and necessary under the circumstances and did not cause Lagoda's death. (Ex. AA of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan; Ex. Z, Monaghan Dep. at 321:4-323:13; Ex. CC of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. BB, Mazarin Dep. at 151:24-152:15).**

174.   That Officer Bugiada's applied "pressure downward on the upper back, that is, with Mr. Lagoda face down, and the pressure being forced downward onto the back of his neck, that then distorts the mouth and the tongue and the upper airway. And inhibited the—inhibiting the ability to adequately exchange air." Defs. Ex. DD (Sperry Dep.) at 160:9-14.

24

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph improperly asserts the opinions of Plaintiffs' expert witness as established facts. Defendants' experts opined that the force used was reasonable and necessary under the circumstances and did not cause Lagoda's death. (Ex. AA of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan; Ex. Z, Monaghan Dep. at 321:4-323:13; Ex. CC of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. BB, Mazarin Dep. at 151:24-152:15).**

175.    The autopsy photos revealed that the Defendant Officers most probably kicked Mr. Lagoda with shod feet and subjected him to knee strikes, not just the punches Defendant Officers admitted to. Defs. Ex. DD (Sperry Dep.) at 202–03.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph improperly asserts the opinions of Plaintiffs' expert witness as established facts. Defendants' experts opined that the force used was reasonable and necessary under the circumstances and did not cause Lagoda's death. (Ex. AA of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan; Ex. Z, Monaghan Dep. at 321:4-323:13; Ex. CC of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. BB, Mazarin Dep. at 151:24-152:15).**

176.    Mr. Lagoda "was subject to severe and unremitting violence" and "he was beat to death" Defs. Ex. DD (Sperry Dep.) at 196–97.

**DEFENDANTS' RESPONSE:**

**Disputed. Dr. Sperry's opinion that "Mr. Lagoda 'was subject to severe and unremitting violence' and 'he was beat to death'" directly contradicts the Medical Examiner's finding that the blunt force injuries were "ultimately superficial" and "would**

not have been sufficient in and of themselves to cause death, or to contribute to death, in an otherwise healthy person." (Defs. Ex. GG (OAG Report) at PA1809-PA1810).

177.    Mr. Lagoda's autopsy "revealed nondisplaced fractures of the right lateral 3rd and 4th ribs, and the location of these fractures "is not characteristic of CPR-related rib fractures, but most probably represent a separate, distinct blow to the right side of the chest, which fractured the ribs." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 12.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph fails to note that it is referencing an autopsy report completed in Russia and not by the New York Medical Examiner's Office, which was conducted months later and after the original autopsy was performed.**

178.    "[Mr. Lagoda] succumbed to the point where he eventually died because of his inability to save himself from the actions of others." Defs. Ex. DD (Sperry Dep.) at 196–97.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph improperly asserts the opinions of Plaintiffs' expert witness as established facts. Defendants' experts opined that the force used was reasonable and necessary under the circumstances and did not cause Lagoda's death. (Ex. AA of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan; Ex. Z, Monaghan Dep. at 321:4-323:13; Ex. CC of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. BB, Mazarin Dep. at 151:24-152:15).**

179.    Mr. Lagoda's seizure wasn't the cause of death. (Defs. Ex. DD (Sperry Dep.) at 179:13-21.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph improperly asserts the opinions of Plaintiffs' expert witness as established facts. Defendants' experts opined that the force used was reasonable and necessary under the circumstances and did not cause Lagoda's death. (Ex. AA of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan; Ex. Z, Monaghan Dep. at 321:4-323:13; Ex. CC of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. BB, Mazarin Dep. at 151:24-152:15).**

180.   Mr. Lagoda did not die because of his seizure. (Defs. Ex. DD (Sperry Dep.) at 179:13-21.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph improperly asserts the opinions of Plaintiffs' expert witness as established facts. Defendants' experts opined that the force used was reasonable and necessary under the circumstances and did not cause Lagoda's death. (Ex. AA of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan; Ex. Z, Monaghan Dep. at 321:4-323:13; Ex. CC of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. BB, Mazarin Dep. at 151:24-152:15).**

181.   Mr. Lagoda did not die because of an alleged seizure disorder. (Defs. Ex. DD (Sperry Dep.) at 179:13-21.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph improperly asserts the opinions of Plaintiffs' expert witness as established facts. Defendants' experts opined that the force used was reasonable and necessary under the circumstances and did not cause Lagoda's death. (Ex. AA of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan; Ex. Z, Monaghan**

27

**Dep. at 321:4-323:13; Ex. CC of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. BB, Mazarin Dep. at 151:24-152:15).**

182.    "Any speculation about whether or not an alleged seizure disorder had an impact on what happened [to Mr. Lagoda] on that plane . . . [is] just speculation[.]" Defs. Ex. DD (Sperry Dep.) at 179:23–180:1.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph improperly asserts the opinions of Plaintiffs' expert witness as established facts. Defendants' experts opined that the force used was reasonable and necessary under the circumstances and did not cause Lagoda's death. (Ex. AA of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan; Ex. Z, Monaghan Dep. at 321:4-323:13; Ex. CC of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. BB, Mazarin Dep. at 151:24-152:15).**

183.    "'Excited delirium' is not a diagnosis, but has always been a syndromic definition, with most of the criteria being subjective and observational. Put another way, there is no pathologic feature which allows a diagnosis of 'excited delirium' to be made, and due to the vague and nonspecific nature of this syndromes different features, it is problematic to utilize the term in explaining a sudden and unexpected death." Ex. E of Amrhein Decl. (Dr. Sperry Rule 26 Report) at 14–15.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph improperly asserts the opinions of Plaintiffs' expert witness as established facts. Defendants' experts opined that the force used was reasonable and necessary under the circumstances and did not cause Lagoda's death. (Ex. AA of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan; Ex. Z, Monaghan**

**Dep. at 321:4-323:13; Ex. CC of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. BB, Mazarin Dep. at 151:24-152:15).**

184.    The risk of positional asphyxia is compounded when a person in a medically vulnerable state becomes involved in a physical struggle. Defs. Ex. DD (Sperry Dep.) at 203–04.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph improperly asserts the opinions of Plaintiffs' expert witness as established facts.  Defendants' experts opined that the force used was reasonable and necessary under the circumstances and did not cause Lagoda's death.  (Ex. AA of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan; Ex. Z, Monaghan Dep. at 321:4-323:13; Ex. CC of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. BB, Mazarin Dep. at 151:24-152:15).**

185.    Mr. Lagoda was put at significant risk of positional asphyxia by the Defendant Officers when they used substantial force in restraining Mr. Lagoda when he was in the immediate wake of a seizure. Defs. Ex. DD (Sperry Dep.) at 204.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph improperly asserts the opinions of Plaintiffs' expert witness as established facts.  Defendants' experts opined that the force used was reasonable and necessary under the circumstances and did not cause Lagoda's death.  (Ex. AA of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan; Ex. Z, Monaghan Dep. at 321:4-323:13; Ex. CC of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. BB, Mazarin Dep. at 151:24-152:15).**

186.    That but for the Defendant Officers' substantial use of force, Mr. Lagoda would still be alive today. Defs. Ex. DD (Sperry Dep.) at 205:6-14.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph improperly asserts the opinions of Plaintiffs' expert witness as established facts. Defendants' experts opined that the force used was reasonable and necessary under the circumstances and did not cause Lagoda's death. (Ex. AA of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan; Ex. Z, Monaghan Dep. at 321:4-323:13; Ex. CC of Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. BB, Mazarin Dep. at 151:24-152:15).**

### Defendants' Medical Expert

187. Dr. Mazarin, Defendants' purported medical expert, testified that he is not a forensic pathologist, anatomical pathologist, clinical pathologist, neurologist, or cardiologist. Defs. Ex. BB (Dr. Mazarin Dep.) at 58:23–59:17, 145–51.

**DEFENDANTS' RESPONSE:**

**Disputed as a mischaracterization of Dr. Mazarin's qualifications and testimony. Dr. Mazarin is a board-certified emergency medicine physician with extensive experience treating patients with seizures and other medical emergencies. His expertise is directly relevant to evaluating the medical aspects of this case. (Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. CC).**

188. Dr. Mazarin's expert opinion was for the purposes of making a determination on whether there was excessive force (a police term of art) used by PAPD Officers despite not being a police officer and never reviewing any PAPD policies and procedures. Defs. Ex. BB (Dr. Mazarin Dep.) at 110:16-24, 145–51; Defs. Ex. CC (Dr. Mazarin Rule 26 Report).

**DEFENDANTS' RESPONSE:**

**Disputed. Dr. Mazarin conducted an independent review as an expert in the field of Emergency Medicine. (Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. CC).**

189.    Dr. Mazarin can neither opine nor say to a reasonable degree of medical certainty what Mr. Lagoda's cause of death was because Dr. Mazarin is not a forensic pathologist, anatomical pathologist, clinical pathologist, neurologist, or cardiologist. Defs. Ex. BB (Dr. Mazarin Dep. at 149–51.

**DEFENDANTS' RESPONSE:**

**Disputed. Dr. Mazarin reviewed the Medical Examiner's report and opined to a reasonable degree of medical certainty that Lagoda's injuries were all superficial with no fractures or evidence of any injury to the brain or vital structures and there was no direct connection between the physical injuries described and his [Lagoda's] demise. (Alterman Dec., Defendants' Rule 26(a)(2) Expert Disclosure of Gregory I. Mazarin; Ex. CC at 2).**

### National Safety Council Materials

190.    PAPD Officer training included materials from the National Safety Council ("NSC"). Defs. Ex. X (Bergery Dep.) at 56:6–58:25.

**DEFENDANTS' RESPONSE:**

**Admitted.**

191.    The NSC is the curriculum that was in place for the emergency medical response" and "this training is given to . . . police officers." Defs. Ex. X (Bergery Dep.) at 56:6–58:25.

**DEFENDANTS' RESPONSE:**

**Admitted that the NSC PowerPoint slides were part of the training provided to Port Authority Police Officers.**

192.    PAPD Officers, as a part of their duties and responsibilities, were responsible for understanding the materials with the NSC documents distributed to them on yearly basis. Defs. Ex. X (Bergery Dep.) at 56:6–58:25.

**DEFENDANTS' RESPONSE:**

**Disputed.  The NSC PowerPoint slides were utilized as training modules during the police academy and "it's really driven towards any type of basic first responder." (Alterman Dec., Ex. X (Bergery Dep.) at 56:20-25.**

193.    The NSC documents were distributed to the PAPD leading up to and at the time of Mr. Lagoda's death. Defs. Ex. X (Bergery Dep.) at 59:9–60:12.

**DEFENDANTS' RESPONSE:**

**Admitted that the NSC PowerPoint slides were part of the training given to Port Authority Police Officers.**

194.    One NSC set of documents was on "Altered Mental Status," which stated that (1) a person a person "may be confused, disoriented, combative, drowsy or partially or wholly unresponsive" and (2) a "Common Cause of Altered Mental Status" is "Seizures." Ex. F of Amrhein Decl. (NSC – Altered Mental Status) at PA2065–66.

**DEFENDANTS' RESPONSE:**

**Admitted that the cited NSC PowerPoint slides include this information.**

32

195.    One NSC set of documents was on "Seizures," which stated (1) "Caused by many different conditions", "Brain's electrical activity out of balance", "results in altered mental status/uncontrolled muscular contractions, "Rarely life-threatening, but a serious emergency"; and (2) for "Emergency Care", "Prevent injury especially to head" and "Don't restrain." Ex. G of Amrhein Decl. (NSC – Seizures) at PA2083, 2093.

**DEFENDANTS' RESPONSE:**

**Admitted in part and denied in part. Admitted that the cited NSC PowerPoint slides include this information. Disputed to the extent they suggest that the Port Authority failed to provide adequate training regarding the handling of individuals with seizures or other medical emergencies. The evidence shows that Port Authority Officers receive comprehensive training, including emergency medical response, and managing subjects in altered mental states. (Defs. Ex. X (Bergery Dep.) at 34:18-38:3, 55:24-58:25, 90:10-24).**

**Opinions of Scott DeFoe**

**DEFENDANTS' RESPONSE:**

**Paragraphs 196-222 are disputed as they present the opinions of Plaintiffs' expert witness as established facts. These opinions are contradicted by the testimony of the officers involved and the findings of the OAG investigation, which concluded that the officers' actions were reasonable under the circumstances. (Defs. Ex. GG (OAG Report) at PA1811-PA1812).**

**The opinions expressed by Mr. DeFoe regarding the officers' adherence to standard police practices are contradicted by the testimony of Defendants' police expert, Retired New York City Police Department Captain John Monaghan, who testified that his review and analysis of this matter determined that the officers' actions were proper and reasonable**

33

under the circumstances. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).

196. Defendant Officers "failed to initially determine that Mr. Evgeniy Lagoda was experiencing a medical emergency and act appropriately" and as such their "actions fell below the standard of care." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

197. When an individual is having or had a seizure, police officers "should remain with the individual until the individual is reoriented to the surroundings and the victim is transferred to equal or higher level of cere. Convulsions, confusion, and episodes of agitated behavior during an episode should not be perceived as deliberate hostility or resistance to the officer." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

198. Officers are required to safely interact with the individual experiencing the medical emergency, avoid unnecessary injury or death, recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, buy time to assess and calm the situation, provide assurance that officers are there to help, give the person time to calm down, move slowly,

34

reduce environmental distractions, employ defusing and de-escalation techniques, and apply active listening skills. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 6–7.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

199.    Defendant Officers "failed to comply with [NSC lessons] during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 7.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

200.    Defendant Officers "failed to use de-escalation and defusing techniques during their interaction with Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 9–11.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

201.    Defendant Officers "failed to immediately take the pressure and weight off of Mr. Evgeniy Lagoda's back once he was on the ground in an a prone position." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–15.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

202.   Defendant Officers used "unreasonable, unnecessary and inappropriate lethal force that led to the unnecessary death of Mr. [] Lagoda" and violated General Order 100-04. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

203.   Defendant Officers' "inappropriate, unnecessary and unreasonable force unnecessarily escalated and unnecessarily prolonged the incident[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

204.   Defendant Officers "used inappropriate, unnecessary and unreasonable force when they punched/struck Mr. Evgeniy Lagoda numerous times to include the on the head and face while he was in a prone position and in the throes of a medical emergency." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 15–16.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

205.    Defendant Officer "should have intervened immediately, either verbally, physically, or both" in order to prevent other officers from endangering the life and safety of Mr. Lagoda. Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 17–18.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

206.    Defendant Officers "failed to recognize that Mr. Evgeniy Lagoda was in medical distress and having difficulty breathing and take appropriate action." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 18–19.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

207.    Defendants "failed to properly assign [a PAPD Officer] to immediately escort [EMS] so they could provide life-saving medical services to Mr. [] Lagoda." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 19.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

208.    Defendant Officers' "use of force/lethal force in this matter did not comport with standard police practices and violated [PAPD] training or the training that [PAPD] should have received that resulted in the death of Mr. Evgeniy Lagoda[.]" Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 20–21.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

209.    Defendant Officers had a "gross lack of situational awareness and fundamental tactical errors in this incident." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 21–22.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

210.    Defendant Officers' "Less Letha Force and [] Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 22–23.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13). Further, Plaintiffs' expert improperly attempts to apply a standard to this case that does not comport with New York State or federal law.**

211. In response to a medical emergency, an officer is required to apply a heightened standard of care regardless of any change in circumstances. Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10–211:3.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13). Further, Plaintiffs' expert improperly attempts to apply a standard to this case that does not comport with New York State or federal law.**

212. In a situation where an individual is having or just experienced a seizure, a responding officer should know that "they [the individual who is having or just had a seizure] may be unable to follow commands", "they may be combative", and "they just don't really know what they're doing because they're in the throes of a medical emergency." Ex. I of Amrhein Decl. (DeFoe Dep.) at 210:10-19, 105:2-6.

39

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

213.    The Port Authority did "not properly train[] its officers regarding individuals' uniquely vulnerable condition in the immediate wake of a seizure." Ex. I of Amrhein Decl. (DeFoe Dep.) at 223:23–225:7.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

214.    Someone who has just come out of a seizure is in a medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:5-14.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

215. Someone who has just come out of a seizure may be disoriented and afraid. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:15-19.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

216.    Someone who has just come out of a seizure may have agitated behavior. Ex. I of Amrhein Decl. (DeFoe Dep.) at 224:20-24.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

217.    With regards to an individual who has suffered a seizure and is in the medically vulnerable condition, convulsions, confusion, and episodes of agitated behavior may result and should not be perceived by police officers as deliberate hostility or resistance. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:8-16.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

218.    The use of de-escalation and defusing techniques is necessary when someone is in a medically vulnerable state after suffering a seizure. Ex. I of Amrhein Decl. (DeFoe Dep.) at 225:20-25.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

219. It is even more difficult to breathe when lying face down in the prone position with persons applying increasing amounts of pressure to the back, neck, and legs of the individual in the prone position. Ex. I of Amrhein Decl. (DeFoe Dep.) at 226:7-14.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

220. Improper restraining techniques can block the flow of air into a person's lungs, contributing to a life-threatening condition known as positional or restraint asphyxia. Ex. I of Amrhein Decl. (DeFoe Dep.) at 226:15-21.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

221. The risk of potential asphyxia is compounded when a person in a medically vulnerable state becomes involved in a physical struggle with an officer or officers. Ex. I of Amrhein Decl. (DeFoe Dep.) at 226:22–227:2.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

222.    Mr. Lagoda's risk of potential asphyxia was compounded when the Defendant Officers restrained him in his medically vulnerable state. Ex. I of Amrhein Decl. (DeFoe Dep.) at 227:3-11.

**DEFENDANTS' RESPONSE:**

**Disputed. This paragraph attempts to present the opinions of Plaintiffs' expert witness as established facts. (Defs. Ex. AA (Defendants' Rule 26(a)(2) Expert Disclosure of John Monaghan); Ex. Z (Monaghan Dep.) at 321:4-323:13).**

**Port Authority Policies After Death of Mr. Lagoda**

**DEFENDANTS' RESPONSE:**

**Paragraphs 223-228 are disputed to the extent they suggest that the Port Authority's training was inadequate at the time of the incident. The evidence shows that Port Authority Officers receive comprehensive training, including a 26-week academy training that covers behavioral sciences, police practices, laws of arrest, court procedures, defensive tactics, use of force training, first aid, medical response, mental health crisis response, and de-escalation techniques. (Defs. Ex. X (Bergery Dep.) at 18:24-19:11, 19:16-22:14).**

223.    Lt. Mark Bergery, Defendants' FRCP 30(b)(6) designee responsible for testifying regarding Port Authority Police Department policies, procedures, and training, testified that prior to and at the time of Mr. Lagoda's death, the Port Authority did not train its officers as to positional restraint, compressional asphyxiation, and duties to intercede. Defs. Ex. X (Bergery Dep.) at 23:12–24:2, 25:18-21.

43

**DEFENDANTS' RESPONSE:**

**Disputed. Lt. Bergery testified that Port Authority policies regarding compression were amended in 2020 due to calls for reform after George Floyd's murder. However, the officers received training as to the requirement on when to intervene prior to Lagoda's death. (Defs. Ex. X (Bergery Dep.) at 18:24-19:11, 19:16-22:14-25:21; Alterman Reply Dec., PA 2443 & PA2214).**

224.    Port Authority Police training as to positional restraint, compressional asphyxiation did not begin until 2020, the year after Mr. Lagoda's death, despite decades of law enforcement knowledge about the substantial risks of improper restraining techniques and positional asphyxia. Defs. Ex. X (Bergery Dep.) at 23:12–24:2; Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 11–13.

**DEFENDANTS' RESPONSE:**

**Disputed. Lt. Bergery testified that Port Authority policies regarding compression were amended in 2020 due to calls for reform after George Floyd's murder. (Defs. Ex. X (Bergery Dep.) at 18:24-19:11, 19:16-22:14-25:21).**

225.    Officer Duran testified that he was not taught at the PAPD Police Academy how to restrain someone without putting pressure on the individual's back. Defs. Ex. N (Duran Dep.) at 17:6-7.

**DEFENDANTS' RESPONSE:**

**Disputed. Lt. Bergery testified that Port Authority policies regarding compression were amended in 2020 due to calls for reform after George Floyd's murder. (Defs. Ex. X (Bergery Dep.) at 18:24-19:11, 19:16-22:14-25:21).**

226.    Port Authority did not train its officers as to the unique vulnerability of an individual in the immediate wake of a seizure. Defs. Ex. GG (OAG Report) at 2, 12.

**DEFENDANTS' RESPONSE:**

**Disputed. The term "unique vulnerability" is not a defined term. Nevertheless, Port Authority police officers received yearly training on responding to incidents involving a person experiencing medical distress. (Defs. Ex. X (Bergery Dep.) at 35:2-22).**

227.    The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted the following language after this incident involving Mr. [] Lagoda: 'Members of the Force are prohibited from sitting, kneeling, or standing on the subject's torso, (chest, back, abdomen), in a manner that compresses the diaphragm." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original); Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–20.

**DEFENDANTS' RESPONSE:**

**Disputed to the extent the amendment to the policies is wholly distinct from this lawsuit. Lt. Bergery testified that Port Authority policies regarding compression were amended in 2020 due to calls for reform after George Floyd's murder. (Defs. Ex. X (Bergery Dep.) at 18:24-19:11, 19:16-22:14-25:21).**

228.    The Port Authority, via "General Order, Use of Force, 6/7/21 [] adopted [new] language after this incident involving Mr. [] Lagoda" as to an PAPD officer's duty to intervene." Ex. H of Amrhein Decl. (DeFoe Rule 26 Report) at 14–15 (emphasis in original), 17–18; Ex. M of Amrhein Decl. (Use of Force Policies) at PA2618–22.

**DEFENDANTS' RESPONSE:**

**Disputed to the extent the amendment to the policies is wholly distinct from this lawsuit. Lt. Bergery testified that Port Authority policies regarding compression were**

45

amended in 2020 due to calls for reform after George Floyd's murder. (Defs. Ex. X (Bergery Dep.) at 18:24-19:11, 19:16-22:14-25:21).

### OAG Report and Findings

**DEFENDANTS' RESPONSE:**

**Paragraphs 229-235 are disputed to the extent they mischaracterize the findings of the OAG Report. The OAG concluded: "There can be little doubt that the officers were legally permitted to use at least some degree of physical force on Mr. Lagoda. Having been informed that Mr. Lagoda had been combative toward civilians on the aircraft, and then having himself been swung on by Mr. Lagoda, Officer Bugiada was certainly reasonable in his belief that Mr. Lagoda has committed an offense, and was therefore authorized to arrest him – and likewise authorized to use 'physical force when and to the extent ... he reasonably believe[d] such to be necessary to effect the arrest.'" (Defs. Ex. GG (OAG Report) at PA1811-PA1812).**

**The OAG further determined: "Because it would be impossible to prove beyond a reasonable doubt that any of the officers' conduct was unjustified, and therefore that their conduct violated New York Penal Law, the OAG has concluded that no criminal charges are warranted." (Defs. Ex. GG (OAG Report) at PA1812-PA1813).**

229.    "On April 14, 2025, [the OAG's Special Investigation & Prosecutions Unit ("SIPU")] asserted jurisdiction over the matter"—two days after Mr. Lagoda's death. Exs. L of Amrhein Decl. (2019 Biennial Report of the OAG's SIPU) at 9.4

**DEFENDANTS' RESPONSE:**

**Admitted.**

230. The OAG released its report on April 9, 2020. Exs. J, K of Amrhein Decl. (Press Release)5; *see also* Defs. Ex. GG (OAG Report).

**DEFENDANTS' RESPONSE:**

**Admitted.**

231.     The SIPU conducted the criminal investigation by looking to examine the criminal liability of the Port Authority and Defendant Officers in the death of Mr. Lagoda. Defs. Ex. GG (OAG Report) at 1 ("investigate any potential unlawful acts or omissions by law enforcement related to Mr. Lagoda's death."), 9–11.

**DEFENDANTS' RESPONSE:**

**Disputed to the extent this statement mischaracterizes the scope of the investigation. (Defs. Ex. GG (OAG Report) at PA1812-PA1813).**

232.     The OAG report determined that the use of force by Defendant Officers contributed to the death of Mr. Lagoda. Defs. Ex. GG (OAG Report) at 2, 12.

**DEFENDANTS' RESPONSE:**

**Disputed. The OAG concluded: "There can be little doubt that the officers were legally permitted to use at least some degree of physical force on Mr. Lagoda. Having been informed that Mr. Lagoda had been combative toward civilians on the aircraft, and then having himself been swung on by Mr. Lagoda, Officer Bugiada was certainly reasonable in his belief that Mr. Lagoda has committed an offense, and was therefore authorized to arrest him – and likewise authorized to use 'physical force when and to the extent ... he reasonably believe[d] such to be necessary to effect the arrest.'" (Defs. Ex. GG (OAG Report) at PA1811-PA1812).**

233.    The OAG's report found that the Port Authority did not train its officers as "the uniquely vulnerable condition of such individuals in the period immediately after the resolution of a seizure[.] Defs. Ex. GG (OAG Report) at 12.

**DEFENDANTS' RESPONSE:**

**Disputed in part. Plaintiffs' counsel is citing "recommendations" that were suggested by the OAG as opposed to conclusions.  Rather, OAG concluded: "There can be little doubt that the officers were legally permitted to use at least some degree of physical force on Mr. Lagoda. Having been informed that Mr. Lagoda had been combative toward civilians on the aircraft, and then having himself been swung on by Mr. Lagoda, Officer Bugiada was certainly reasonable in his belief that Mr. Lagoda has committed an offense, and was therefore authorized to arrest him – and likewise authorized to use 'physical force when and to the extent ... he reasonably believe[d] such to be necessary to effect the arrest.'" (Defs. Ex. GG (OAG Report) at PA1811-PA1814).**

234.    The OAG's report "revealed that emergency medical services were significantly delayed in responding to the scene due to PAPD's failure to have personnel available to escort [the] ambulance[,] and that "emergency medical treatment for Mr. Lagoda was delayed by as much as 20 minutes." Defs. Ex. GG (OAG Report) 2, 12.

**DEFENDANTS' RESPONSE:**

**Disputed in part. Plaintiffs' counsel is citing "recommendations" that were suggested by the OAG as opposed to conclusions.  Rather, the OAG concluded: "There can be little doubt that the officers were legally permitted to use at least some degree of physical force on Mr. Lagoda. Having been informed that Mr. Lagoda had been combative toward civilians**

48

on the aircraft, and then having himself been swung on by Mr. Lagoda, Officer Bugiada was certainly reasonable in his belief that Mr. Lagoda has committed an offense, and was therefore authorized to arrest him – and likewise authorized to use 'physical force when and to the extent ... he reasonably believe[d] such to be necessary to effect the arrest.'" (Defs. Ex. GG (OAG Report) at PA1811-PA1814).

235.    The OAG's report attached as an exhibit the autopsy report, which found that Mr. Lagoda's manner of death was: "HOMICIDE." Defs. Ex. GG (OAG Report) at PA1864.

**DEFENDANTS' RESPONSE:**

**Disputed. The Medical Examiner's report found that sudden death following grand mal seizure of undetermined etiology with post-ictal excited delirium was the leading cause of death.  (Alterman Dec., Ex. GG (OAG Report) at PA1863).**

### Defendant Officers Sued as Individuals

236.    The Defendant Officers were sued in their individual capacity. Dkt. 1-1.

**DEFENDANTS' RESPONSE:**

**Admitted.**

237.    Defendant Officers Bugiada, Duran, Papia, and Mezzacappa were served with the Amended Complaint at their personal residences. Ex. N of Amrhein Decl. (Affidavits of Service).

**DEFENDANTS' RESPONSE:**

**Admitted.**

238.    Despite exhaustive efforts, Officer Joseph could not be served at any of the personal addresses identified by Plaintiffs. Counsel for the PA, having already entered an appearance in the matter, agreed to accept service for Officer Joseph. Ex. O of Amrhein Decl. (Officer Joseph Service Attempts and Acceptance of Service).

49

**DEFENDANTS' RESPONSE:**

**Admitted to the extent Port Authority counsel accepted service for Officer Joseph.**

**Plaintiffs' State Court Filing**

**DEFENDANTS' RESPONSE:**

239.    In support of its Motion, Defs. Ex. H, Plaintiffs filed an Affidavit of Alexey V. Tarasov, Esq. Ex. P of Amrhein Decl. (Aff. of A. Tarasov).

**DEFENDANTS' RESPONSE:**

**Admitted.**

Dated:    New York, New York
          May 27, 2025

                                        Yours etc.

                                        PORT AUTHORITY LAW
                                        DEPARTMENT
                                        *Attorneys for Defendants, Port Authority of
                                        New York and New Jersey, PAPD Police
                                        Officers Michael Bugiada, PAPD Officer
                                        Robert Joseph, PAPD Officer Jonathan
                                        Papia, PAPD Officer Paul Mezzacappa, and
                                        PAPD Officer Jonathan Duran*

                                        By: */s/ Cheryl N. Alterman*
                                            Cheryl Alterman, Esq.
                                            4 World Trade Center
                                            150 Greenwich Street, 24th Floor
                                            New York, NY 10007
                                            Telephone: (212) 435-3431

50