UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
ALEXEY V. TARASOV, ESQ.,
Administrator of the Estate of
EVGENIY LAGODA, Deceased, and
GRIGORY TIKHOPLAV,

                Plaintiffs,

       - against –

PORT AUTHORITY OF NEW YORK AND
NEW JERSEY, and PORT AUTHORITY
OF NEW YORK AND NEW JERSEY
POLICE DEPARTMENT a/k/a PORT
AUTHORITY POLICE DEPARTMENT
a/k/a PAPD, PAPD OFFICER
MICHAEL BUGIADA, PAPD OFFICER
ROBERT JOSEPH, PAPD OFFICER
JONATHAN PAPIA, PAPD OFFICER
PAUL MEZZACAPPA, and PAPD
OFFICER JONATHAN DURAN,

             Defendants.

------------------------------X

**MEMORANDUM AND ORDER**

21 Civ. 6226 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    This case arises from the death of Evgeniy Lagoda, a 39-year-old Russian national who was travelling through John F. Kennedy International Airport on JetBlue Flight 659 to Kingston, Jamaica. Alexey V. Tarasov, the administrator of Mr. Lagoda's estate, and Grigory Tikhoplav, Mr. Lagoda's father, (together, "plaintiffs") bring this action pursuant to 42 U.S.C. § 1983 and New York state law asserting claims for wrongful death, conscious pain and

suffering, and municipal liability against defendants Port Authority of New York and New Jersey ("Port Authority"), Port Authority Officer Michael Bugiada, Port Authority Officer Robert Joseph, Port Authority Officer Jonathan Papia, Port Authority Officer Paul Mezzacappa, and Port Authority Officer Jonathan Duran (the "Individual Officers," and together with the Port Authority, "defendants").[1]    Defendants now move for summary judgment. Plaintiffs have not cross-moved for summary judgment.  For the reasons set forth below, the motion is granted.[2]

## I.    Factual Background

Two statutorily mandated reports were issued in the wake of Mr. Lagoda's death: (i) a report released by the New York State Office of the Attorney General's Special Investigations and Prosecutions Unit ("NYOAG Report"), ECF No. 76-8; and (ii) an autopsy report issued by the Office of the Chief Medical Examiner of the City of New York ("Autopsy Report"), ECF Nos. 76-10, 76-11, 76-12.  The NYOAG Report reflects the Office of the Attorney

---

[1]    Plaintiffs also named the Port Authority of New York and New Jersey Police Department ("PAPD") as a defendant in their Amended Complaint.  ECF No. 75-5. The parties now agree that the PAPD "does not exist as a legal entity separate from the Port Authority," and plaintiffs consent to the dismissal of the PAPD from this action.  Opp. at 4 n.1.

[2]    In a sur-reply filed on September 12, 2025, plaintiffs sought oral argument on defendants' motion.  ECF No. 87.  However, the Court has concluded on the basis of the parties' submissions that oral argument is unnecessary. See Mir v. Shah, 2012 WL 6097770, at *4 (S.D.N.Y. Dec. 4, 2012); see also Katz v. Morgenthau, 892 F.2d 20, 22 (2d Cir. 1989).

General's review of materials including Port Authority paperwork,
audio recordings of telephone calls and radio communications to,
from, and between PAPD entities and medical personnel, video
footage from inside John F. Kennedy International Airport,
interviews of Port Authority officers, interviews of civilians
including flight attendants, passengers, and medical personnel,
medical records, and the Autopsy Report.  NYOAG Report at 1.  There
is no suggestion that either the NYOAG Report or the Autopsy Report
was biased, untrustworthy, or methodologically flawed.  As the
Autopsy Report was issued the day after Mr. Lagoda's death and the
NYOAG Report was finalized within a year thereafter, these
documents constitute the most contemporaneous records concerning
his death.  Indeed, the two reports are also admissible pursuant
to Federal Rule of Evidence 803(8).  Fed. R. Evid. 803(8); see
also United States v. Feliz, 467 F.3d 227, 237 (2d Cir. 2006)
(holding that autopsy reports are public records under Federal
Rule of Evidence 803(8)).  Moreover, plaintiffs have offered no
reason that the two reports should not be relied upon.
Accordingly, the Court's statement of the facts is based upon the
NYOAG Report and Autopsy Report.

A.   **Mr. Lagoda's Seizure and Delirium**

On April 12, 2019, 39-year-old Evgeniy Lagoda was connecting through John F. Kennedy International Airport while travelling from Moscow, Russia to Kingston, Jamaica, where he was set to join the crew of a tanker ship as an engineer. NYOAG Report at 3. Mr. Lagoda's flight from Moscow landed at approximately 11:56 a.m., and during the ensuing nine-hour layover in Terminal 5, Mr. Lagoda met up with another Russian national who was also en route to join the tanker crew in Jamaica. Id. At around 9:33 p.m., Mr. Lagoda boarded JetBlue Flight 659 at Gate 18 and took seat 33C, an aisle seat in the second-to-last row of the aircraft. Id.

As the plane pulled away from the gate and began to taxi toward the runway at around 10:00 p.m. "or shortly thereafter," Mr. Lagoda began to have a seizure. Id. Slumped over towards the seat next to him, Mr. Lagoda's "body was convulsing" and "he was bleeding from the mouth." Id. After nearby passengers called for help, two male flight attendants responded immediately while a third flight attendant called for medical assistance over the loudspeaker and alerted the pilots of the emergency. Id. Three nurses, all passengers, rushed towards the rear of the aircraft and provided preliminary assistance to Mr. Lagoda. Id. Upon instruction from one of the nurses, the flight attendants lifted

-4-

Mr. Lagoda from his seat, carried him into the rear galley area, and laid him on the floor. Id. Mr. Lagoda was then rolled on his side, with blankets and pillows supporting his head, while he "worked through the seizure." Id. The flight attendants and nurses worked to ensure that Mr. Lagoda "did not strike his head or any other part of his body up against any hard surfaces in the galley." Id.

The seizure lasted "several minutes." Id. As it subsided, "it was clear that Mr. Lagoda was still disoriented." Id. While flight attendants and nurses tried to explain what happened, Mr. Lagoda said nothing but "rolled onto his back, then onto his hands and knees." Id. Mr. Lagoda struggled to remove the leather jacket he was wearing, which he was able to do with the nurses' assistance. Id. "Sweating profusely" and with blank eyes, Mr. Lagoda rose to his feet and stood facing towards the front of the aircraft. Id. One of the nurses, "standing directly in front of Mr. Lagoda," continued to speak to him and explain what had occurred, but Mr. Lagoda remained silent. Id.

"Suddenly, and without warning," Mr. Lagoda "struck the nurse forcefully in the abdomen with his fist, and she stumbled backward into the aisle." Id. One of the male flight attendants immediately stepped in front of Mr. Lagoda, who was now "standing

tense, with his fists clenched at his sides," and urged him to calm down.  Id.  Mr. Lagoda's Russian colleague, who he had met up with during the nine-hour layover, "appeared at the rear of the aircraft and also tried to calm" him down.  Id.  Mr. Lagoda proceeded to "repeatedly swing at the flight attendant, striking him five or six times in the chest."  Id.  The flight attendant absorbed Mr. Lagoda's blows, while one of the nurses "fled" from out of the galley and up the aisle.  Id.  The flight attendants, nurses, and at least nine passengers interviewed by the New York State Office of the Attorney General "corroborated the aggressive behavior of Mr. Lagoda" prior to the response of the Port Authority officers.  Id. at 3-4.  At around 10:24 p.m., the aircraft returned to the gate, and "within a minute or so," the first Port Authority officer "rushed onto the aircraft."  Id. at 4.

**B.   Port Authority Response**

The first call to the John F. Kennedy International Airport Police Desk had come just minutes earlier, and Officer Michael Bugiada was immediately dispatched via radio to respond to a "male having a seizure onboard."  Id.  Emergency Medical Services ("EMS") personnel were also alerted to the situation.  Officer Bugiada reached the terminal "almost immediately after the plane had returned to the gate," and upon entering, was directed towards the

rear of the aircraft, where he "could also hear cries for help."
Id.  At this point, Mr. Lagoda was no longer punching the flight
attendant but was still "standing with his fist clenched at his
sides."  Id.  One of the flight attendants informed Officer Bugiada
that Mr. Lagoda "had a seizure, and was disoriented, but also
'combative.'"  Id.  Though the exact sequence of events "is not
entirely clear," flight attendants, nurses, and passengers
recalled the following:

> Officer Bugiada stated to Mr. Lagoda that he had just
> had a seizure and instructed him to "calm down" – at
> which point Mr. Lagoda either "lunged" at the officer,
> or swung at him, or (according to three of the witnesses)
> actually struck the officer in the arm or chest.  In
> response, these witnesses say, Officer Bugiada stepped
> back, drew a canister of pepper spray from his belt, and
> delivered a burst in the direction of Mr. Lagoda.  At
> that point, according to the witnesses, Mr. Lagoda
> either fell or was taken to the ground by Officer
> Bugiada, who began to attempt to handcuff Mr. Lagoda.

Id. at 4.  Officer Bugiada offers a similar, albeit slightly
different, recollection:

> It is his recollection that, after being informed that
> Mr. Lagoda had been "combative," he instructed Mr.
> Lagoda to move to one side of the galley to allow a
> flight attendant and a nurse, who were effectively
> trapped in the back, to pass by, but that Mr. Lagoda
> ignored these commands.  At this point, Officer Bugiada
> attempted to call for backup via radio, although the
> connection apparently failed to go through.  Mr. Lagoda
> then began to advance directly towards the officer, who
> pulled the pepper spray from his belt and delivered a

burst at Mr. Lagoda.  The pepper spray, however, had no
effect on Mr. Lagoda; he simply wiped the substance off
of his face then took a swing at Officer Bugiada's head,
but missed.   In response, Officer Bugiada struck Mr.
Lagoda in the face with his fist one time, knocking him
onto his buttocks, and moved in to handcuff him.

Id. at 4-5.  Once Mr. Lagoda and Officer Bugiada were on the

ground, the flight attendants and nurses fled from the galley area,

"in part to escape the effects of the pepper spray," though

passengers seated near the rear of the aircraft "did observe at

least some part of what occurred" thereafter.  Id. at 4-5.

While struggling to bring Mr. Lagoda's arms behind his back,

Officer Bugiada "ended up on top of Mr. Lagoda, with Mr. Lagoda

lying on his back and Officer Bugiada straddling Mr. Lagoda's

midsection."   Id. at 5.   One passenger's recollection confirms

that Officer Bugiada was "'straddling' a face-up Mr. Lagoda 'across

his legs.'"  Id.  Mr. Lagoda then bit Officer Bugiada's right thigh

"through his pants," leaving a round bruise of approximately 1.5

inches in diameter, and "grabbed at" Officer Bugiada's "gun belt."

Id.  Officer Bugiada responded by striking Mr. Lagoda's face twice

with his fist.   Officer Bugiada again called over the radio,

stating that he was "in a fight."  Id.  He radioed once more

moments later: "Still combative, speed it up."  Id.  Though Officer

Bugiada was eventually able to turn Mr. Lagoda on his stomach, he

could not pull Mr. Lagoda's arms out from underneath his body and

-8-

struck him three more times in the face "in an effort to get him
to comply." Id.  At 207 pounds, Mr. Lagoda began to "push himself
up off the ground," and a 190-pound Officer Lagoda "laid his own
body on top of Mr. Lagoda" in response. Id.  One passenger stated
that Mr. Lagoda was "on his face" and Officer Bugiada was "trying
to get his hands" and was "telling him to relax . . . giving him
several orders" but that Mr. Lagoda was "still . . . resisting
until" additional officers arrived at the scene. Id.  This same
passenger "attempted to assist Officer Bugiada by holding Mr.
Lagoda's feet down." Id.

Officers Joseph, Papia, Mezzacappa, and Duran entered the
aircraft and began to assist Officer Bugiada in restraining Mr.
Lagoda. Id.  All of the officers "stated that they observed
Officer Bugaida sitting on top of Mr. Lagoda (who was face down),
trying unsuccessfully to get control of Mr. Lagoda's hands" while
Mr. Lagoda kicked his feet. Id.  Once backup arrived, Officer
Bugiada "got off Mr. Lagoda," and the officers attempted to
restrain Mr. Lagoda together, with each officer restraining a
different limb. Id. at 6. At this point, Mr. Lagoda again "grabbed
for" Officer Bugiada's "groin area." Id.  To "overcome Mr.
Lagoda's resistance," Officer Papia struck Mr. Lagoda with a fist

to the face and left arm at least once.  Id.  According to one
passenger's recollection:

> One person alone couldn't hold him down and that's why
> additional people had to go back there to try and . . .
> hold him down but, as I said, he was like a wild animal.

Id.  By 10:33 p.m., officers were able to control Mr. Lagoda and
handcuff him, as confirmed by one of the officer's radio calls:
"It's under control, we're getting it under control."  Id.

None of the witnesses, including the officers, flight
attendants, nurses, and passengers, observed the officers using
physical force on Mr. Lagoda after the handcuffs were applied.
Id. at 10.  Once restrained, the officers rolled Mr. Lagoda onto
his side and attempted to move him from the galley.  Id. at 6.
"Within a minute or so" of the Mr. Lagoda's handcuffing, "Officer
Papia noticed that the side of his neck was turning blue."  Id.
Officer Joseph "checked for a pulse and, finding none, quickly
removed the handcuffs and lay Mr. Lagoda on his back."  Id.  The
officers also called out for, and subsequently received from a
flight attendant, an Automated External Defibrillator ("AED") and
oxygen while Officer Mezzacappa and others began CPR.  Id.  The
AED was connected to Mr. Lagoda but, because the device detected
no electrical pulse activity, it did not deliver a shock.  Id.
Emergency Medical Technicians ("EMTs"), who had been waiting for

a police escort to the aircraft, arrived on the scene around 10:50 p.m. and observed "officers performing CPR on a non-responsive Mr. Lagoda." Id. at 6-7.  The EMTs "took over care" of Mr. Lagoda, first attempting (unsuccessfully) to shock him with an AED before moving him to a stretcher, carrying him to the ambulance, and transporting him to Jamaica Hospital in Queens, New York.  Id. at 7.  Despite efforts to revive Mr. Lagoda using CPR, oxygen, and epinephrine, Mr. Lagoda was pronounced dead at Jamaica Hospital at 11:35 p.m.  Id.

### C. Office of the Chief Medical Examiner of the City of New York Autopsy Report

The next day, April 13, 2019, Dr. Yvonne Milewski of the Officer of the Chief Medical Examiner of the City of New York ("OCME") conducted an autopsy of Mr. Lagoda.  To inform the Autopsy Report, Dr. Milewski consulted Mr. Lagoda's hospital and EMS records, medical documents, and "accounts of the circumstances surrounding Mr. Lagoda's encounter with the police, including observations prior to the officers' appearance, from multiple civilian and police witnesses on the aircraft."  NYOAG Report at 7.  Additionally, Dr. Milewski "consulted with, and sought additional testing from, specialists in cardiology, neuropathology, and toxicology" at the OCME.  Id.  The Autopsy Report reflects Dr. Milewski's determination that Mr. Lagoda's

cause of death was "sudden death following grand mal seizure of undetermined etiology[3] complicated by post-ictal excited delirium.[4]"  Autopsy Report at PA1559.  A "seizure" is defined as a "single episode of epilepsy," and "epilepsy" is defined, in relevant part, as:

> Any of a group of syndromes characterized by paroxysmal transient disturbances of the brain function that may be manifested as episodic impairment or loss of consciousness, abnormal motor phenomena, psychic or sensory disturbances, or perturbation of the autonomic nervous system.

See Dorland's Illustrated Medical Dictionary 626, 1660 (33rd ed. 2020).  A "grand mal seizure," sometimes referred to as a "tonic-clonic seizure," is defined as a seizure characterized by "a loss of consciousness and generalized tonic convulsions followed by clonic convulsions."[5]  Id. at 1660.  Although Dr. Milewski was

---

[3]    In medical terminology, "etiology" is defined as the "causes or origin of a disease or disorder."  Dorland's Illustrated Medical Dictionary 645 (33rd ed. 2020).

[4]    "Post-ictal" is defined as "occurring after a seizure or sudden attack." Id. at 1479.  "Delirium" is defined as an "acute, transient disturbance of consciousness, accompanied by a change in cognition . . . and includes characteristics such as "a reduced level of consciousness . . . sensory misperceptions, disturbance of the  . . . level of psychomotor activity, disorientation as to time, place, or person, and memory impairment[.]" Id. at 477.  Delirium "may be caused by a number of conditions that result in derangement of cerebral metabolism, including . . . seizures[.]" Id.

[5]    By contrast, other types of seizures, such as myoclonic seizures, generally do not involve a total loss of consciousness and are characterized by a "brief episode" with "immediate recovery."  Dorland's Illustrated Medical Dictionary 1660 (33rd ed. 2020).

unable to determine the cause of Mr. Lagoda's seizure, an examination of his brain as reflected in the Autopsy Report showed "scarring and hardening of certain areas of the brain" and "abnormal anatomy of certain cells" that were "suggestive of a seizure disorder." Autopsy Report at PA1566-67; NYOAG Report at 7 n.15. The Autopsy Report also revealed that Mr. Lagoda had "hypertensive cardiovascular disease," also known as an enlarged heart caused by uncontrolled high blood pressure, and listed it as a "significant condition[]" associated with Mr. Lagoda's death. Autopsy Report at PA1559.

As described by the Medical Examiner, a seizure is an "electrical event" that leaves the brain unstable and puts the "heart at risk of failure" due to the disruption of electrical signals. NYOAG Report at 7-8. This risk is amplified "if the heart is independently vulnerable and if the body is then subjected to further stress." Id. Dr. Milewski explained that hypertensive cardiovascular disease is "commonly correlated with sudden cardiac arrest, and rendered Mr. Lagoda susceptible to such a traumatic event even prior to the incident." NYOAG Report at 8. According to the NYOAG Report, "it was just this combination of factors that caused the fatal cardiac arrest Mr. Lagoda suffered during or immediately after his encounter with the police." Id.

The other "significant condition" identified in the Autopsy Report was "physical struggle/altercation with blunt impacts." Autopsy Report at PA1559.  Because it would be "impossible to tease out the relative contributions" of Mr. Lagoda's own aggression, his resistance to the officers, and the officers' physical force, Dr. Milewski explained that the stress of the altercation "played a role" in Mr. Lagoda's death.  NYOAG Report at 8.  Consequently, Mr. Lagoda's manner of death is identified in the Autopsy Report as "homicide."  Autopsy Report at PA1559; see also NYOAG Report at 8.  The OCME only identifies a cause of death as "natural" if the death is due "exclusively to natural causes."  NYOAG Report at 8. The blunt force injuries to Mr. Lagoda included: lacerations to the nose; bruising around the eyes; bruising of the cheeks, scalp, forehead, and the area behind the ear; bruising of the forearms, wrists, and hands; bruising of the right thigh and shin; and "superficial injuries" to his neck, shoulders, back, and torso. Autopsy Report at PA1561-63.  While "not insignificant," Dr. Milewski concluded that Mr. Lagoda's injuries were "superficial" and insufficient to "cause . . . or contribute to death":

> [T]hese blunt force injuries **were ultimately superficial**; none of them resulted in any skull or facial fractures, and they caused no injury to the brain.  And **the force used to produce these injuries would not have**

**been sufficient in and of themselves to cause death, or to contribute to death**, in an otherwise healthy person.

NYOAG Report at 8 (emphasis added).  The Autopsy Report further determined that there were no fractures to Mr. Lagoda's ribs, sternum, vertebral column, or pelvis.  Autopsy Report at PA1564.

### D.    NYOAG Report

Pursuant to Executive Order 147, the New York State Office of the Attorney General ("NYOAG") is appointed as special prosecutor to investigate, and if warranted, prosecute certain matters involving the death of an unarmed civilian "caused by a law enforcement officer."  NYOAG Report at 1.  Executive Order 147.24, signed by Governor Andrew Cuomo, expressly conferred jurisdiction on the NYOAG to "investigate any potential unlawful acts or omissions by law enforcement related to Mr. Lagoda's death."  Id.

That investigation culminated in the issuance on April 9, 2020 of the NYOAG Report.  The NYOAG Report's primary conclusion was that there was "insufficient evidence to establish that a crime was committed by any of the officers involved" and that "under the circumstances, the officers' use of force to restrain Mr. Lagoda could not – as the legal standard requires – be proven to be unjustified beyond a reasonable doubt."  Id. at 2.  Underpinning this conclusion was the NYOAG's analysis that any of the crimes

-15-

for which any of the Individual Officers might arguably be culpable would be "difficult (at best) to prove beyond a reasonable doubt." Id. at 9.  Specifically, the NYOAG Report determined that:

> In light of the superficial nature of the injuries caused by the officers, the medical examiner's opinion that such injuries would not have caused the death of an otherwise healthy individual, and the absence of any evidence that the officers appreciated, or even should have appreciated, the uniquely vulnerable condition Mr. Lagoda's seizure had put him in, it is highly unlikely that all the elements for any of these crimes could be proven beyond a reasonable doubt.

Id.  The NYOAG accordingly declined to pursue a criminal prosecution against any of the Individual Officers.  Id. at 11.

In addition, the NYOAG Report explained that even if the elements for any of the possible crimes could possibly be established (which, except for assault, they could not), those elements would be negated if the Individual Officers' conduct was "justified under the law."  Id. at 9.  That is, it would be necessary to prove that the Individual Officers "did not subjectively believe the use of force was necessary or that the use or force was objectively reasonable (or both)."  Id. at 10. Applying that standard, the NYOAG Report concluded that there was "little doubt that the officers were legally permitted to use at least some degree of physical force" to restrain Mr. Lagoda, given that he was "combative" towards officers and civilians alike.  Id.

-16-

The NYOAG Report further concluded that Officer Bugiada was
"certainly reasonable in his belief that Mr. Lagoda had committed
an offense" and that "it would be difficult to conclude, and even
more difficult to prove, that the use of force was unjustified."
Id.  The NYOAG Report repeated the Medical Examiner's findings
that "while the resulting injuries were ugly, they were ultimately
superficial and – though painful – would have caused no meaningful
or lasting damage to an otherwise healthy person."  Id.  In sum,
the NYOAG Report concluded that there was "no evidence to support"
a scenario in which the Individual Officers' actions could be
considered unreasonable.  Id.

The NYOAG Report issued three recommendations relating to
Port Authority training.  First, the NYOAG Report recommended that
the PAPD improve emergency vehicle escort protocols.  Id. at 12.
That recommendation was based on the delay in the arrival of
emergency medical services resulting from the absence of available
Port Authority officers to escort the ambulance to aircraft.  Id.
Second, the NYOAG Report recommended that the PAPD provide training
covering the "uniquely vulnerable condition" of individuals
"immediately after the resolution of a seizure."  Id.  This
recommendation was intended to complement the PAPD's existing use

of force policy, which the NYOAG Report determined to be
appropriate:

> More broadly, PAPD's current use of force policy
> appropriately instructs officers using force to conduct
> a "careful balancing of all human interests" and "use
> only that force that is reasonably necessary to bring an
> incident under control, while protecting the lives of
> the officer or another."

Id. Finally, the NYOAG Report recommended that the PAPD equip
officers with body-worn cameras because "videotaped evidence would
have greatly facilitated the investigation of this case." Id.

## II.  Procedural Background

Plaintiffs served the Port Authority with a notice of claim
seeking monetary damages on April 7, 2021. ECF No. 75-3. That
same day, plaintiffs also served the PAPD with a notice of claim.
Id. Two days later, on April 9, 2021, plaintiffs filed a complaint
in Supreme Court, New York County against the Port Authority and
PAPD. ECF No. 75-4. Plaintiffs' original complaint asserted two
claims under New York state law for wrongful death and conscious
pain and suffering, and one claim for municipal liability pursuant
to 42 U.S.C. § 1983. Id. at 8-11. On June 9, 2021, the Port
Authority filed a motion to dismiss the state law claims, arguing
that plaintiff did not comply with New York's Unconsolidated Laws
§§ 7107 and 7108 by (i) failing to serve a notice of claim at least

60 days before initiating suit, and (ii) failing to commence the action within one year of claim accrual. ECF No. 75-7.

Plaintiffs filed an Amended Complaint on June 29, 2021, which asserted the same three claims and added the Individual Officers as defendants. ECF No. 75-5. On July 12, 2021, plaintiffs filed a motion for leave to commence the action against the Port Authority, arguing that their claims fell within the exception in New York's Unconsolidated Laws § 7108 for wrongful death cases. ECF No. 75-8. On July 21, 2021, defendants removed the case. ECF No. 1. The next day, Judge Barbara Jaffe of the Supreme Court, New York County denied defendants' motion to dismiss and plaintiffs' motion for leave to commence the action on grounds that both motions were "academic" after the case was removed to federal court. ECF No. 75-9. Neither motion was refiled after removal. Rather, the parties proceeded to discovery. After a period substantially prolonged by frequent extension requests, discovery closed on October 15, 2024.

The parties exchanged pre-motion letters to address proposed motions for summary judgment between November 14, 2024 and December 6, 2025, ECF Nos. 65-68, and the Court held a teleconference with the parties on January 8, 2025. Thereafter, defendants filed a motion for summary judgment ("Mot.") on March 28, 2025. ECF Nos.

72-77.  Plaintiffs filed an opposition to that motion ("Opp.") on May 12, 2025, ECF Nos. 78-81, and defendants filed a reply ("Reply") on May 27, 2025, ECF Nos. 82-84.  Plaintiffs filed a request for leave to file a sur-reply on June 5, 2025, which defendants did not oppose.  ECF No. 85.  The Court granted plaintiffs' request on September 5, 2025, and plaintiffs filed a sur-reply ("Sur-Reply") on September 12, 2025.  ECF Nos. 86, 87.

## DISCUSSION

### I.  Motion for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' when it 'might affect the outcome of the suit under governing law,'" and an issue of fact is "'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 113-14 (2d Cir. 2017) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "Factual disputes that are irrelevant or unnecessary will not be counted."  Anderson, 477 U.S. at 248.  "In assessing the record to determine whether there is a genuine issue to be tried, we are required to resolve all ambiguities and draw all

permissible factual inferences in favor of the party against whom summary judgment is sought." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010).

Once the moving party has satisfied their burden, to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). A "scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252. In other words, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Although on summary judgment the evidence must be viewed in the light most favorable to Plaintiffs as the non-moving parties, when there is reliable objective evidence . . . the evidence may speak for itself." Marcavage v. City of New York, 689 F.3d 98, 110 (2d Cir. 2012) (citing Scott v. Harris, 550 U.S. 372, 378-81 (2007).

### A.   Plaintiffs' Failure to Comply with the Jurisdictional Requirements of Section 7107 and Section 7108 Bars Their State Law Claims Against the Port Authority

We begin by setting out the jurisdictional requirements of New York's Unconsolidated Laws §§ 7107 and 7108, what is required of potential plaintiffs, and how §§ 7107 and 7108 apply to facts of this case.  As a bi-state entity, the Port Authority enjoyed sovereign immunity until 1951, when New York and New Jersey enacted statutes consenting to suits against the Port Authority, subject to two conditions: (i) actions against the Port Authority must be commenced within one year after accrual of the cause of action; and (ii) a plaintiff must serve a notice of claim on the Port Authority at least 60 days before commencing an action against the Port Authority.  See N.Y. Unconsol. Law § 7107.  A party bringing an action against the Port Authority must strictly comply with these jurisdictional prerequisites as they are conditions to the waiver of sovereign immunity, and failure to do so compels the dismissal of the action for lack of subject matter jurisdiction.  See Lyons v. Port Authority, 643 N.Y.S.2d 571 (1st Dep't 1996); Aegis Ins. Servs., Inc. v. The Port Auth. of N.Y. & N.J., 435 F. App'x 18, 25 (2d Cir. 2011).  Accordingly, "all claims under state law against the Port Authority must be filed within one year" after the cause of action accrues.  Goodman v. Port Auth. of New York &

New Jersey, 2013 WL 5313427, at *8 (S.D.N.Y. Sept. 20, 2013); see also N.Y. Unconsol. Law § 7107.

New York's Unconsolidated Laws § 7108 provides a narrow exception to the strict requirements of § 7107, permitting a court "in its discretion," and only in certain situations, to grant leave to serve the notice of claim and bring suit against the Port Authority "within a reasonable time but in any event within three years after the cause of action accrued." See N.Y. Unconsol. Law § 7108. One such situation provided for in § 7108 is "where a person entitled to make a claim dies and by reason of his death no notice of claim is filed or suit, action or proceeding is commenced" within one year of accrual. Id. A party seeking to take advantage of § 7108's exception "must" seek leave of the court "upon an affidavit showing the particular facts which caused the delay[.]" Id.

Here, plaintiffs failed to comply with the requirements of either § 7107 or § 7108. Plaintiffs filed their original complaint on April 9, 2021, almost three years after Mr. Lagoda's death on April 12, 2019 and the accrual of plaintiffs' state law claims. ECF No. 75-4. In addition, plaintiffs filed their original complaint just two days after serving a notice of claim on the Port Authority, thus failing to also comply with § 7107's 60-day

requirement.  See ECF Nos. 75-4, 75-3.  Plaintiffs' proffered
excuse that they were required to wait for release of the NYOAG
Report before serving the Port Authority with a notice of claim is
wholly unsupported by either § 7107 or relevant caselaw.  In fact,
the relevant statutory provisions require that a notice of claim
only specify the claimant, the time and place where the claim
arose, the nature of the claim, and "so far as then practicable,"
the items of damage or injuries sustained.  N.Y. Unconsol. Law §
7108.  All of the information required for a notice of claim was
readily available to plaintiffs shortly after Mr. Lagoda's death,
and certainly within one year.

     Because the one-year requirement in § 7107 is a condition
precedent and "not a mere statute of limitations, tolling
provisions are inapplicable[.]"  See, e.g., Goodman v. Port Auth.
of New York & New Jersey, 2013 WL 5313427, at *8 (S.D.N.Y. Sept.
20, 2013); see also Yonkers Contracting Co. v. Port Auth. Trans-
Hudson Corp., 248 A.D.2d 463, 463 (2d Dep't 1998), aff'd, 93 N.Y.2d
375 (1999).  However, even accounting for the tolling period
established by Governor Cuomo's COVID-19 Executive Orders,
plaintiffs failed to comply with the requirements of §§ 7107 and
7108.  Those COVID-19 Executive Orders "tolled" any "specific time
limit for the commencement, filing, or service of any legal action"

from March 20, 2020 through November 3, 2020. As relevant here, plaintiffs' state law claims for wrongful death and conscious pain and suffering accrued on the date of Mr. Lagoda's death: April 12, 2019. Under the requirements of § 7107, plaintiffs had until one year later, April 12, 2020, to commence action against the Port Authority. Accounting for the COVID-19 Executive Orders, plaintiffs' claims were tolled on March 20, 2020, when 22 days remained on the one-year clock. The COVID-19 tolling period expired on November 3, 2020. Thus, even accounting for the COVID-19 tolling, plaintiffs had until November 26, 2020 (22 days after November 3, 2020) to commence their action asserting state law claims against the Port Authority, which they failed to do.

Moreover, the exception provided for in New York's Unconsolidated Laws § 7108 cannot be utilized by plaintiffs. While § 7108 allows for a court, in its discretion, to permit an extension of time to serve the notice of claim and commence suit against the Port Authority in wrongful death cases, a plaintiff "must" seek leave of court and "must" do so based on an affidavit detailing the facts of the delay. N.Y. Unconsol. Law § 7108. Remarkably, despite a nearly three-year-long discovery period prolonged by numerous extension requests, and despite the fact that plaintiffs were on notice that the Port Authority sought

dismissal of their state law claims on precisely the jurisdictional grounds now asserted, plaintiffs have never made such an application with this Court.  Indeed, plaintiffs fully appreciated the seriousness of the Port Authority's motion in state court to dismiss on jurisdictional grounds, because plaintiffs shortly thereafter filed an Amended Complaint adding the Individual Officers as defendants.  See ECF Nos. 75-4, 75-5, 75-7.

Plaintiffs' effort to take advantage of § 7108 must be rejected because it is (i) inexplicably belated, (ii) procedurally improper, and (iii) lacking in any substantive reason for the Court to exercise its discretion in plaintiffs' favor.  As of this writing, more than six years have passed since Mr. Lagoda's death, more than five years have passed since the NYOAG Report was released, and more than four years have passed since plaintiffs belatedly served their notice of claim on the Port Authority and defendants removed this action.  Despite the passage of time, plaintiffs request to "re-file their state motion for leave to commence action out of time under Section 7108," Opp. at 13-14, yet make no attempt to offer this Court an explanation or excuse for the delay.  In addition to being inexplicably delayed, such an application is improperly included in their opposition to defendants' motion for summary judgment.  Finally, although

plaintiffs' request to commence an action out of time is committed to the Court's discretion, plaintiffs have articulated no grounds warranting the exercise of that discretion in their favor. Plaintiffs' related and similarly belated attempt to rely on substantial compliance with § 7107, id. at 14, is woefully unavailing.  The situations in which courts have positively exercised their discretion and found substantial compliance bear no resemblance to the facts here, where plaintiffs failed to timely serve a notice of claim, commence suit, or petition this Court to commence action out of time under § 7108.  Accordingly, the Court lacks jurisdiction over plaintiffs' state law claims, and plaintiffs' wrongful death and conscious pain and suffering must be dismissed.[6]

## B. Plaintiffs' Claims for Wrongful Death and Conscious Pain and Suffering Against the Individual Officers

Although plaintiffs do not explicitly assert an excessive force claim, to prevail on their state law claims of wrongful death and conscious pain and suffering, plaintiffs must ultimately prove that the Individual Officers used excessive force thereby causing Mr. Lagoda's death, and relatedly that Mr. Lagoda did not die from

---

[6]    As discussed, plaintiffs' state law claims against the Port Authority are barred, and plaintiffs' untimely attempt to revive those claims is rejected. Moreover, plaintiffs' jurisdictional arguments are academic given the Court's holdings, explained infra, that there is no meritorious basis to impose liability on either the Individual Officers or the Port Authority.

a grand mal seizure and the medical sequela of that grand mal
seizure.  At the summary judgment stage, plaintiffs must establish
that there are genuine issues of material fact with respect to
excessive force and that any such excessive force was the proximate
cause of Mr. Lagoda's death.

Broadly, to prevail on a Fourth Amendment excessive force
claim, a plaintiff must show that the amount of force used by
police was "objectively unreasonable in light of the facts and
circumstances confronting [the officers], without regard to
[their] underlying intent or motivation." Jones v. Parmley, 465
F.3d 46, 61 (2d Cir. 2006) (citing Graham v. Connor, 490 U.S. 386,
397 (1989)) (internal quotations omitted).  Officers' actions are
not to be judged in hindsight, but from the perspective of a
reasonable officer on the scene.  Id.  The reasonableness of the
force employed is determined by balancing the nature of the
intrusion on the individual's Fourth Amendment interests against
the countervailing governmental interests at stake.  Graham, 490
U.S. at 396.  Of course, law enforcement officers may need to use,
and often do use, force during an arrest, particularly when
required to make split-second judgments in chaotic or dangerous
situations.  Maxwell v. City of New York, 380 F.2d 106, 108 (2d
Cir. 2004) (internal quotations and citations omitted); see also

Jones, 465 F.3d at 61.  To determine whether the amount of force applied to a plaintiff was unreasonable, courts consider: (i) the severity of the crime at issue; (ii) whether the suspect posed an immediate threat to the safety of the officers or others; and (iii) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  Graham, 490 U.S. at 396.  Given the NYOAG Report and the factual and legal findings contained therein, which resulted from an intensive and extensive investigation, there can be no question that the second and third Graham factors are satisfied.

Defendants maintain that the Individual Officers responded to a rapidly unfolding situation in which Mr. Lagoda assaulted multiple individuals on the aircraft, attacked Officer Bugiada, and forcefully resisted the Individual Officers' subsequent attempts to restrain him.  Mot. at 12-20.  Accordingly, defendants assert that the use of force used by the Individual Officers was proportionate to the threat posed by Mr. Lagoda.  Id.  Plaintiffs do not explicitly address the excessive force argument in their opposition but nevertheless contend that several facts concerning Mr. Lagoda's interaction with the Individual Officers are "sharply disputed."  Opp. at 21-22.  To the contrary, all of the facts most critical to the incident, as reflected in both the NYOAG Report

and the Autopsy Report, are undisputed.  None of those facts support an inference that the Individual Officers' actions were unreasonable.

Specifically, it is undisputed that, upon arrival to Flight 659, Officer Bugiada was confronted with a muscular, 207-pound man who: (i) experienced a seizure involving a total loss of consciousness (NYOAG Report at 3, Autopsy Report at PA1558); (ii) after working through the seizure, stood up and punched a passenger nurse forcefully in the abdomen (NYOAG Report at 3); (iii) punched a flight attendant at least five or six times (NYOAG Report at 3); (iv) trapped at least one nurse in the aircraft galley (NYOAG Report at 3; (v) stood with clenched fists and was non-responsive to pleas from flight attendants and passengers, including his Russian colleague, to calm down (NYOAG Report at 3-4); (vi) was non-responsive to Officer Bugiada's attempts to calm him down (NYOAG Report at 4); and (vii) punched or lunged at Officer Bugiada himself (NYOAG Report at 4-5).  It is similarly undisputed that, even after Officer Bugiada deployed pepper spray and Mr. Lagoda was taken to the ground, he remained non-compliant and combative, punching and kicking Officer Bugiada, grabbing at his waistbelt, and biting his leg with enough force to leave a one-and-a-half-inch laceration on Officer Bugiada's thigh.  NYOAG Report at 5.

The record additionally confirms that the force employed by the Individual Officers did not, by itself, cause Mr. Lagoda's death.  The Autopsy Report sets forth a medical basis unrelated to physical force as the Mr. Lagoda's cause of death: "[s]udden death following grand mal seizure of undetermined etiology complicated by post-ictal excited delirium."  Autopsy Report at PA1559.  As explained by the Medical Examiner, a seizure is an "electrical event" that leaves the brain "unstable" and "put[s] the heart at risk of failure," particularly if the heart is "independently vulnerable" and if the body is "subjected to further stress." NYOAG Report at 7-8.  It was "just this combination of factors" – Mr. Lagoda's seizure, his preexisting conditions including hypertensive cardiovascular disease, and the stress on his body from the post-ictal delirium and interaction with the Individual Officers – that "caused" Mr. Lagoda's "fatal cardiac arrest."  Id. Any and all blunt force injuries to Mr. Lagoda were decidedly "superficial," "caused no injury to the brain," and "would not have been sufficient in and of themselves to cause death, or to contribute to death, in an otherwise healthy person."  Id.

Plaintiffs attempt to connect the Individual Officers' use of force to Mr. Lagoda's death by relying primarily on (i) the expert report and testimony of Dr. Kris Sperry, plaintiffs' proffered

medical expert, and (ii) a second autopsy conducted in Russia and issued on September 2, 2019.  See ECF No. 80-5 ("Sperry Report"), ECF No. 80-3 ("Russian Autopsy").  However, it is not sufficient to connect the Individual Officers' blows to evidence of injury to establish such blows as the cause of Mr. Lagoda's death.  There is no dispute that the Individual Officers utilized physical force in an effort to effect a lawful arrest and to protect themselves, the crew, and passengers from Mr. Lagoda's strikes.  Rather, plaintiffs must undermine the Medical Examiner's conclusion that the physical injuries were "superficial" and insufficient to "cause" or "contribute to" Mr. Lagoda's death.  NYOAG Report at 8.  Neither the Sperry Report nor the Russian Autopsy do so.

The Sperry Report does not challenge the Medical Examiner's findings, as reflected in the Autopsy Report and the NYOAG Report, on grounds that they are inadequate, defective, or tainted by bias.  Indeed, the Sperry Report explicitly agrees with several of the Medical Examiner's key findings, including that: (i) Mr. Lagoda's brain showed abnormal scarring and hardening suggestive of a seizure disorder (Mesial Temporal Sclerosis); (ii) Mr. Lagoda "developed severe postictal confusion which may have been even psychotic"; (iii) Mr. Lagoda had chronic hypertension and, consequently, an enlarged heart; and (iv) Mr. Lagoda had no facial

-32-

bone, long bone, or skull fractures.  Sperry Report at 9-10, 12.
Rather, in an attempt to establish that the Individual Officers'
actions were unreasonable and that such unreasonable actions were
the cause of Mr. Lagoda's death, the Sperry Report engages in a
selective retelling of the incident while wholly inventing facts
for which there is no factual support.

The Sperry Report, for example, minimizes the undisputed
attacks of Mr. Lagoda on passengers and crew as behavior that was
merely "interpreted as violent and aggressive."  Sperry Report at
10.  Further, the Sperry Report manufactures a scenario in which
Mr. Lagoda was "most probably kicked with shod feet, and even
subjected to knee strikes[.]"  Sperry Report at 16.  But there is
zero support for this scenario in the record despite the multiple
interviews of disinterested passengers and airline crew, none of
whom mentioned knee strikes, kicks, or the use of weapons such as
batons.  The Sperry Report's reliance on such hallucinated facts
only underscores plaintiffs' inability to establish that the
Individual Officers' actions were objectively unreasonable.

Again attempting to connect the Individual Officers' use of
force to Mr. Lagoda's death, plaintiffs rely on the Russian Autopsy
that purportedly identified fractures to Mr. Lagoda's right
lateral third and fourth ribs.  Russian Autopsy at EL00245-46.

The Sperry Report cites to this finding and opines that such fractures "could not be accomplished by a blow from a closed fist, but would require the force of a kick with a shod foot, or a knee strike, to break the ribs." Sperry Report at 12. At the summary judgment stage, however, plaintiffs must point to competent evidence from which a reasonable jury could find that the Individual Officers used excessive force and that any such excessive force was the proximate cause of Mr. Lagoda's death. The Sperry Report acknowledges, yet refuses to refute or meaningfully address, the Medical Examiner's express finding that Mr. Lagoda suffered no fractured ribs.

The Russian Autopsy itself undermines any inference of rib fractures caused by the Individual officers. It states that its examiners were not provided access to "the results of the initial investigation of the corpse" and laboratory testing and that, before the body was transported to Russia, "a majority of the internal organs," including the heart, brain, and spinal cord, had already been removed by the New York Medical Examiner. Russian Autopsy at EL00247. Any rib irregularities therefore could have occurred after death, whether as a consequence of organ removal or during transport, and neither the Russian Autopsy nor the Sperry Report provide any reliable basis for attributing them to the

Individual Officers' use of force.  Nor do the Russian Autopsy or Sperry Report specifically challenge the methodology or conclusions of the Medical Examiner as reflected in the Autopsy Report.  Indeed, the Russian Autopsy disclaimed the ability to determine, inter alia: (i) the cause or time of death; (ii) the severity or clinical significance of any injuries; (iii) the instrument or mechanism by which the injuries were inflicted; (iv) the degree of force involved; and (vi) whether Mr. Lagoda's underlying conditions contributed to his death.  Id. at EL00247-251.  The Russian Autopsy further reported that "signs of repeated trauma [were] not detected" in the third and fourth ribs.  Id. at EL00246.  These disclaimers preclude any non-speculative conclusion that the purported rib fractures were inflicted by the Individual Officers, much less that they resulted from excessive force or that they played any role in Mr. Lagoda's death.

While the Sperry Report speculates that the ribs were fractured by officer-applied force, that speculation is flatly contradicted by the Medical Examiner and unsupported by the Russian Autopsy's own findings and disclaimers.  The Sperry Report's failure to reconcile that inference with the Medical Examiner's unambiguous finding of no fractured ribs confirms the conjectural nature of the opinion.  Because "[a]n expert's opinions that are

without factual basis and are based on speculation or conjecture"
or are otherwise "conclusory" are "inappropriate material for
consideration for summary judgment," reliance on two purported
fractured ribs where the Medical Examiner found none is
insufficient to raise a genuine issue of material fact as to the
cause of Mr. Lagoda's death.  Major League Baseball Props., Inc.
v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008).

     In light of the undisputed record, there is no basis to
reject, and every reason to concur with, the NYOAG Report's
conclusion: there is "no evidence to support" conduct by the
Individual Officers that would call into question the
"reasonableness of their conduct."  NYOAG Report at 10.  Neither
the NYOAG Report nor Autopsy Report determined or indicated that
the Individual Officers used excessive force, and there is no
evidence that Mr. Lagoda's death was the result of any excessive
force by the Individual Officers.  As described above, Mr. Lagoda
assaulted individuals on the aircraft, posed an immediate and
continuing threat to the safety of the crew, passengers, and
officers in a crowded, confined space, and actively resisted
restraint when confronted by law enforcement.  Even taken in the
light most favorable to plaintiffs, the Individual Officers'
actions cannot be considered "objectively unreasonable in light of

the facts and circumstances" that they confronted.  <u>Graham</u>, 490
U.S. at 397.  As the NYOAG Report concluded:

> There can be little doubt that the officers were legally
> permitted to use at least some degree of physical force
> on Mr. Lagoda.  Having been informed that Mr. Lagoda had
> been combative towards civilians on the aircraft, and
> then having himself been swung on by Mr. Lagoda, Officer
> Bugiada was certainly reasonable in his belief that Mr.
> Lagoda had committed an offense, and was therefore
> authorized to arrest him – and likewise authorized to
> "use physical force when and to the extent he . . .
> reasonably believe[d] such to be necessary to effect the
> arrest."

NYOAG Report at 10.  Indeed, not only does the record not support
a finding of excessive force, but it also supports a finding that
the Individual Officers' use of force was reasonable.[7]
Accordingly, plaintiffs' excessive force claim, and, by extension,
plaintiffs' wrongful death and conscious pain and suffering
claims, fail.  See <u>Chamberlain v. City of White Plains</u>, 986 F.
Supp. 2d 363, 399 (S.D.N.Y. 2013) ("Because [the defendant]
committed no underlying wrong against [the decedent], the
conscious pain and suffering and wrongful death claims also fail
as a matter of law.").

---

[7]     The Individual Officers are also protected by the doctrine of qualified
immunity, as it would be objectively reasonable to respond to Mr. Lagoda's
assault, combative behavior, and resistance to arrest with a degree of physical
force.  <u>See, e.g.</u>, <u>Cerrone v. Brown</u>, 246 F. 3d 194, 199 (2d Cir. 2001) (officers
entitled to qualified immunity on grounds that it was objectively reasonable
for them to believe that their actions were lawful at the time of the challenged
act).

### C.    Plaintiffs' <u>Monell</u> Claim Against the Port Authority Based on a Failure to Train Must Be Dismissed Because There Is No Underlying Constitutional Violation

Plaintiffs' claim for municipal liability[8] under 42 U.S.C. § 1983 is brought against the Port Authority pursuant to <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658 (1978) and <u>City of Canton Ohio v. Harris</u>, 489 U.S. 378 (1989). This claim is solely premised on the Port Authority's purported failure to adequately train its officers.  <u>See</u> <u>generally</u> Opp. at 15-20.

Plaintiffs' <u>Monell</u> claim necessarily fails because "[i]t is well-established that a <u>Monell</u> claim cannot succeed without an underlying violation, and here there is no constitutional violation." <u>Mastromonaco v. City of Westchester</u>, 779 F. App'x 49, 51 (2d Cir. 2019); <u>see also</u> <u>DeRaffele v. City of New Rochelle</u>, 2017 WL 2560008, at *6 (S.D.N.Y. 2017) ("It is well-established that a <u>Monell</u> claim cannot lie in the absence of an underlying constitutional violation.")  It is similarly well-established that "<u>Monell</u> does not provide a separate cause of action . . . it <u>extends</u> liability to a municipal organization where that

---

[8]    "Although the Port Authority, a bi-state agency, is not technically a municipality, courts have treated it as such and have analyzed claims against it under the standards governing municipal liability under Section 1983."  <u>Mack v. Port Auth. of N.Y. & N.J.</u>, 225 F. Supp. 2d 376, 382 n.7 (S.D.N.Y. 2002) (collecting cases).

organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006). As discussed above, plaintiffs' have not established a constitutional violation because the record does not support a conclusion that the Individual Officers used excessive force against Mr. Lagoda. Without an "independent constitutional violation," Segal, 459 F.3d at 219, plaintiffs' municipal liability claim against the Port Authority based on a purported failure to train must be dismissed.

Even if an underlying cause of action survived, plaintiffs have not plausibly alleged a Monell claim against the Port Authority, necessitating dismissal on this independent basis. The failure to properly train employees may constitute a "policy, custom, or practice" under Monell where "the failure to train amounts to deliberate indifference of the rights of persons with whom the police come into contact" and actually causes the injury alleged. City of Canton v. Harris, 489 U.S. 378, 388-390 (1989). The Second Circuit has identified three requirements before a failure to train amounts to deliberate indifference: a plaintiff must show that (i) "a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (ii) "the

situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (iii) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992). At the summary judgment stage, "plaintiffs must identify a specific deficiency in the city's training program and establish that the deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." Green v. City of New York, 465 F.3d 65, 81 (2d Cir. 2006) (quoting Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 129 (2d Cir. 2004)).

Plaintiffs argue that because the Port Authority has a policy governing the use of force, it knows "to a moral certainty" that its officers will confront a situation like that of Mr. Lagoda's. Opp. at 17-18.  Not so.  As the NYOAG Report explained, Mr. Lagoda's encounter with the Port Authority officers represented a unique "combination of factors": an individual with preexisting conditions who suffered a grand mal seizure, was in the midst of post-seizure delirium and was unresponsive to commands, and who had assaulted multiple civilians on in a crowded, confined space. NYOAG Report at 3-8.  Plaintiffs have set forth no evidence to

suggest that the Port Authority knew "to a moral certainty" that its officers would confront such a situation.

Further, plaintiffs have not identified a "specific deficiency" in the Port Authority's training that "actually caused the constitutional deprivation." Amnesty Am., 361 F.3d at 129. Port Authority officers receive training, including a 26-week academy program, covering topics such as first aid and CPR, mental health crisis response, de-escalation techniques, and use of force. Indeed, the NYOAG Report concluded that the Port Authority's use of force policy "appropriately instructs officers using force to conduct a 'careful balancing of all human interests' and 'use only that force that is reasonably necessary to bring an incident under control, while protecting the lives of the officer or another.'" NYOAG Report at 12. While Port Authority officers are trained in medical response and first aid measures, including how to deal with individuals experiencing seizures, they are not, nor should we expect them to be, trained as if they were neurologists or psychiatrists. NYOAG Report at 12.

Plaintiffs' argument that the Port Authority did not adequately train its officers as to positional restraint and compressional asphyxiation until 2020, Opp. at 18-19, is inapposite and represents an attempt to link unrelated remedial

measures to Mr. Lagoda's death.  As an initial matter, plaintiffs'
argument runs afoul of Federal Rule of Evidence 407, which provides
that subsequent remedial measures are not admissible to prove
negligence, culpable conduct, a defect in a product or its design,
or the need for a warning or instruction.  Fed. R. Evid. 407.
Moreover, as discussed above, the NYOAG Report and Autopsy Report
concluded that Mr. Lagoda died from "sudden death following grand
mal seizure of undetermined etiology complicated by post-ictal
excited delirium," not from physical force or compressional
asphyxiation.  NYOAG Report at 7-8; Autopsy Report at PA1559.

Finally, plaintiffs have not demonstrated a history of
similar events that would have put the Port Authority on notice of
an alleged training deficiency.  Plaintiffs have set forth no
evidence of prior incidents that would have alerted the Port
Authority to training inadequacies regarding post-seizure medical
conditions in a combative, non-compliant individual. See Ricciuti
v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991) ("[A]
single incident alleged in a complaint, especially if it involved
only actors below the policy-making level, does not suffice to
show a municipal policy.")  Accordingly, plaintiffs' Monell claim
is dismissed in its entirety.

D. **Even if Plaintiffs' Claims Against the Port Authority Survived, Punitive Damaged Would Not Be Available**

It is well-established that punitive damages cannot be assessed against a municipality. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 261 (1981). Plaintiffs nevertheless argue that this Court is "free" to permit punitive damages against the Port Authority because the Second Circuit has not specifically addressed the issue. Opp. at 25. Although the Port Authority is self-financing, any "wrongdoing of the Port Authority's officials should not be borne by the public generally." Holden v. Port Auth. of N.Y. & N.J., 521 F. Supp. 3d 415, 437 (S.D.N.Y. 2021). Accordingly, this Court is persuaded to join the majority of courts that have considered the issue and find that, even if plaintiffs' claims against the Port Authority survived, the Port Authority cannot be assessed punitive damages. See id., Evans v. Port Auth. of N.Y. & N.J., 273 F.3d 346, 357 (3d Cir. 2001); Ryduchowski v. Port Auth. of N.Y. & N.J., 1998 WL 812633, at *15 (E.D.N.Y. Nov. 19, 1998).

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted. The Clerk of Court is respectfully directed

to terminate the motion pending at ECF No. 72 and close this case.

**SO ORDERED.**

Dated:     February 3, 2026
           New York, New York

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE